

APR 2 7 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| AMAZON.COM, INC.; AMAZON DATA SERVICES, INC.,<br><br>       Plaintiffs,<br><br>     v.<br><br>WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; JOHN DOES 1-20,<br><br>       Defendants. | CIVIL NO. 1:20CV484<br><br><br>FILED UNDER SEAL PURSUANT TO LOCAL RULE 5 |

### PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR APPLICATION FOR AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

## TABLE OF CONTENTS

Page

INTRODUCTION AND RELIEF REQUESTED .......................................................................... 1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ................................ 4

    A.   Amazon's Acquisition of the Virginia Properties Targeted by Defendants'
Scheme ............................................................................................................................. 4

    B.   Defendants' Lease Transaction and Direct Purchase Enterprises ............................ 5

    C.   Evidence of Defendants' Enterprise Misconduct and Other Illegal Acts .............. 9

    D.   Imminent Threat of Irreparable Harm Since Defendants' April 2020
Termination ................................................................................................................... 12

LEGAL STANDARDS ............................................................................................................... 13

SUMMARY OF ARGUMENT ................................................................................................... 16

ARGUMENT ............................................................................................................................... 18

   I.    AMAZON IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ........... 18

    A.   Civil RICO and Conspiracy Claims ......................................................................... 18

    B.   Fraud and Tortious Interference with Contractual or Business
Relationships ................................................................................................................. 20

    C.   Breach of Contract ....................................................................................................... 21

    D.   Detinue .......................................................................................................................... 22

    E.   Unjust Enrichment, Conversion, and Constructive Trust ..................................... 23

    F.   *Alter Ego*/Piercing the Corporate Veil .................................................................... 24

  II.   AN *EX PARTE* TRO AND PRELIMINARY INJUNCTION ARE
NECESSARY TO PREVENT IMMINENT AND IRREPARABLE HARM TO
AMAZON ..................................................................................................................... 25

    A.   Preliminary Relief Is Necessary to Protect Evidence and Assets ........................ 26

    B.   Preliminary Relief Is Also Necessary to Avoid Irreparable Business Harm ........ 28

 III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR
AMAZON ..................................................................................................................... 29

 IV.  CONCLUSION ............................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Allen Corp. of Am. v. Zayas,*
  2014 WL 6893868 (D. Md. Dec. 4, 2014)...........................................................................3, 27

*AllscriptsMisys, LLC v. Am. Digital Networks, LLC,*
  l:10-cv-00111, 2010 U.S. Dist. LEXIS 4450 (D. Md. Jan. 20, 2010) .....................................25

*Am. Can Co. v. Mansukhani,*
  742 F.2d 314 (7th Cir. 1984) .....................................................................................................13

*Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.,*
  780 F.2d 589 (7th Cir. 1986) .....................................................................................................26

*AT&T Broadband v. Tech Comm'ns, Inc.*
  381 F.3d 1309 (11th Cir. 2004) .................................................................................................25

*Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.,*
  550 F.2d 189 (4th Cir. 1977) .....................................................................................................28

*Boyle v. United States,*
  556 U.S. 938 (2009).....................................................................................................................18

*Buffalo Wings Factory, Inc. v. Mohd.,*
  No. 1:07cv612 (JCC), 2008 WL 4699803 (E.D. Va. Oct. 23, 2008).........................................27

*C.F. Tr., Inc. v. First Flight Ltd. P'ship,*
  306 F.3d 126 (4th Cir. 2002) .....................................................................................................24

*Capital Inv'rs Co. v. Executors of Ex'rs of Morrison,*
  800 F.2d 424 (4th Cir. 1986) ...............................................................................................16, 23

*Crestar Bank v. Williams,*
  462 S.E.2d 333 (Va. 1995).....................................................................................15, 17, 23

*Crosby v. Petromed, Inc.,*
  2:09-cv-05055, 2009 U.S. Dist. LEXIS 73419 (E.D. Wash. Aug. 6, 2009)......................17, 25

*D'Addario v. Geller,*
  264 F. Supp. 2d 367 (E.D. Va. 2003) ......................................................................................18

*Deckert v. Indep. Shares Corp.,*
  311 U.S. 282 (1940)....................................................................................................................17

*Dexia Credit Local v. Rogan,*
  602 F.3d 879 (7th Cir. 2010) ................................................................................................13

*Di Biase v. SPX Corp.,*
  872 F.3d 224 (4th Cir. 2017) ...............................................................................................29

*Dunlap v. Cottman Transmission Sys., LLC,*
  754 S.E.2d 313 (Va. 2014)...................................................................................................20

*E. Tenn. Nat. Gas Co. v. Sage,*
  361 F.3d 808 (4th Cir. 2004) ...............................................................................................29

*Federal Leasing, Inc., et al., v. Underwriters at Lloyd's et al.,*
  650 F.2d 495 (4th Cir. 1981) ...............................................................................................13

*Fred Hutchinson Cancer Research Ctr. v. Biopet Vet Lab, Inc.,*
  768 F. Supp. 2d 872 (E.D. Va. 2011) ..................................................................................29

*Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States,*
  354 F. Supp. 3d 690 (E.D. Va. 2018) ..................................................................................15

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No.*
  *70 of Alameda Cty.,*
  415 U.S. 423 (1974)........................................................................................................13, 25

*Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.,*
  499 S.E.2d 266 (Va. 1998)...................................................................................................24

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999)..............................................................................................................16

*Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.,*
  17 F.3d 691 (4th Cir. 1994) ..........................................................................13, 17, 26, 27, 28

*Instant Air Freight, Co. v. C.F. Air Freight, Inc.,*
  882 F.2d 797 (3d Cir. 1989).................................................................................................25

*Kelly v. Thompson,*
  MO-10-CV-31-RAJ, 2010 U.S. Dist. LEXIS 31800 (W.D. Tex. Mar. 31,
  2010) .....................................................................................................................................25

*Kemp v. Peterson,*
  940 F.2d 110 (4th Cir. 1991) ...............................................................................................15

*Keystone Builders, Inc. v. Floor Fashions of Va., Inc.,*
  829 F. Supp. 181 (W.D. Va. 1993) ................................................................................14, 30

*Leonard v. Counts*,
    272 S.E.2d 190 (Va. 1980)..................................................................................17, 23

*Little Tor Auto Center v. Exxon Co. U.S.A.*,
    822 F. Supp. 141 (S.D.N.Y. 1993)..............................................................................25

*Marsellis-Warner Corp. v. Rabens*,
    51 F. Supp. 2d 508 (D.N.J. 1999) ................................................................................3

*Merrill Lynch, Pierce, Fenner and Smith v. Bradley*,
    756 F.2d 1048 (4th Cir. 1985) ...................................................................................28

*Microsoft Corp. v. John Does 1-2*,
    No. 1:17-cv-01224-TSE-MSN (Oct. 27, 2017) ...........................................................17

*Mtn. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) ...............................................................................29, 30

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S.
    7 (2008).............................................................................................................26, 28

*Nossen v. Hoy*,
    750 F. Supp. 740 (E.D. Va. 1990) ..............................................................................23

*In re Paysage Bords de Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*,
    991 F. Supp. 2d 740 (E.D. Va. 2014) .........................................................................22

*Punnett v. Carter*,
    621 F.2d 578 (3d. Cir. 1980)......................................................................................18

*U.S. ex rel. Rahman v. Oncology Assocs.*,
    198 F.3d 489 (4th Cir. 1999) ................................................................3, 16, 17, 23

*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) ...................................................................................13

*Rosetta Stone Ltd. v. Google Inc.*,
    732 F. Supp. 2d 628 (E.D. Va. 2010) ....................................................................23, 24

*SAS Inst., Inc. v. World Programming Ltd.*,
    874 F.3d 370 (4th Cir. 2017) ............................................................17, 26, 27, 28

*Schaecher v. Bouffault*,
    772 S.E.2d 589 (Va. 2015)..........................................................................................21

iv

*Spring Constr. Co. v. Harris,*
  614 F.2d 374 (4th Cir. 1980) ............................................................................................16

*U.S. ex rel. Taxpayers Against Fraud v. Singer Co.,*
  889 F.2d 1327 (4th Cir. 1989) ...............................................................................2, 27, 28

*Thompson v. Bacon,*
  425 S.E.2d 512 (Va. 1993)................................................................................................20

*UBS Fin. Servs. Inc. v. Carilion Clinic,*
  880 F. Supp. 2d 724 (E.D. Va. 2012) ..............................................................................30

*Ulloa v. QSP, Inc.,*
  624 S.E.2d 43 (Va. 2006)..................................................................................................21

*United States v. Cohen,*
  152 F.3d 321 (4th Cir. 1998) ...........................................................................................14

*Update, Inc., v. Samilow,*
  311 F. Supp. 3d 784 (E.D. Va. 2018) ...................................................................26, 28, 30

*US Airways, Inc. v. US Airline Pilots Ass'n,*
  813 F. Supp. 2d 710 (W.D.N.C. 2011) .............................................................................30

*VFI Assocs., LLC v. Lobo Mach. Corp.,*
  2012 WL 975705 (W.D. Va. Mar. 22, 2012).....................................................................19

*In the Matter of Vuitton et Fils S.A.,*
  606 F.2d 1 (2d Cir. 1979) .................................................................................................25

*William v. AES Corp.,*
  28 F. Supp. 3d 553 (E.D. Va. 2014) .................................................................................24

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008)..........................................................................................................15, 30

**Statutes**

18 U.S.C. § 1343.................................................................................................................19

18 U.S.C. § 1952(a) ............................................................................................................20

18 U.S.C. § 1956(a)(1)(A)-(B) ...........................................................................................19

18 U.S.C. § 1957.................................................................................................................19

18 U.S.C. § 1961(4).............................................................................................................18

18 U.S.C. § 1961(5).............................................................................................................19

PLAINTIFFS' MEM. ISO *EX PARTE* TRO
AND ORDER TO SHOW CAUSE

18 U.S.C. § 1961(c) ......................................................................................................19

18 U.S.C. § 1962(a) ......................................................................................................20

Va. Code § 8.01-144(A)................................................................................................22

Va. Code § 8.01-534(A)(4) ...........................................................................................14

Va. Code § 8.01-534(B)(1) ...........................................................................................14

Va. Code § 8.01-622 .....................................................................................................14

**Rules**

Fed. R. Civ. P. 64 .........................................................................................................14

Fed. R. Civ. P. 65 .........................................................................................................13

Fed. R. Civ. P. 65(b)(1).........................................................................................15, 25

**Treatises**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §
   2948.1 (3d ed. 2019) ...............................................................................................28

Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. ("Plaintiffs" or "Amazon") hereby respectfully submit this memorandum in support of their Application for an *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application") pursuant to Federal Rules of Civil Procedure 64 and 65(b) and Title 8 of the Virginia Code against the Defendants named in Plaintiffs' Verified Complaint ("Compl.").

## INTRODUCTION AND RELIEF REQUESTED

Amazon respectfully seeks an *ex parte* temporary restraining order ("TRO") and preliminary injunction to prevent spoliation of evidence and dissipation of assets that are central to this action and compromised by Defendants' conduct following a recent FBI raid, and to halt Defendants' interference with Amazon business relationships in this District. Defendants are members of a wide-ranging enterprise fraud and kickback scheme they devised to secure illicit personal financial gains from certain Amazon real property transactions in Virginia. Based on evidence from an ongoing internal Amazon investigation, Defendants paid millions of dollars in kickbacks to obtain tens of millions of dollars in fees and profits on transactions related to at least ten properties Amazon has acquired in the Dulles corridor since 2018. The tailored relief Amazon seeks, *ex parte* and under temporary seal to protect the evidence and assets at risk of destruction and conversion, is both reasonable and necessary under controlling law, particularly in light of Defendants' reactions to their recent removal from the landlord-developer companies at the Amazon properties and the early April FBI raid at the home of enterprise leader Brian Watson.

On April 2, the day of the FBI raid, Watson sent an email to a wide range of personal and professional contacts that misstated facts about Defendants' conduct and tipped off other Defendants—notably Villanova Trust, a principal vehicle for Defendants' kickback scheme—to the focus of the FBI investigation. Quotes from this email then appeared in the Denver press in April 7 and 8 news coverage of the raid. Approximately a week later, Watson joined other

PLAINTIFFS' MEMORANDUM ISO *EX PARTE*
TRO AND ORDER TO SHOW CAUSE

Defendants in an April 15, 2020 letter to IPI, the parent entity of Amazon's developer-landlords at the Virginia sites, challenging Defendants' removal from IPI's associated joint venture and all related Amazon development work. Ex. 4. A day later, on April 16, 2020, Amazon learned that most of Northstar's senior management had departed, which exodus left Defendant Watson with nearly complete control of the Northstar, Sterling, and Manassas Defendants and their assets. Ex. 3. Those assets include an expected multi-million dollar payment in May to Defendant accounts Watson controls. *See* Declaration of Lora E. MacDonald Exs. 39 & 40 ("MacDonald Decl.").

For these and other reasons detailed in Amazon's filings, there is an imminent risk that Defendants and those in concert with them will continue to spoliate evidence, tip off accomplices, disrupt business relationships, and dissipate assets central to Amazon's claims in this suit. To protect such evidence and assets, as well as preserve the *status quo* and Amazon's goodwill with its vendors and business partners, Amazon respectfully requests an *ex parte* TRO against Defendants and their officers, directors, principals, agents, servants, employees, successors, assigns, and all other persons and entities acting in concert with them, that enjoins them from:

  i.   Possessing, disbursing, or converting—and instead requiring them to place in escrow during this suit—the assets identified in Plaintiffs' Application, including the May 2020 payment on the lease transactions to the Sterling and Manassas Defendants;

 ii.   Spoliating, concealing, wasting, transferring, or otherwise disposing of documents, records, communications, files, or other evidence or assets used in, or obtained from, the unlawful activities alleged in this action, including but not limited to the specific assets identified in Exhibits 7, 20, 38, 39, 40 hereto; and

iii.   Disrupting any ongoing business transactions or relationships related to Plaintiffs' real estate developments in this District or elsewhere.

*See generally U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1328-31 (4th Cir. 1989) (affirming preliminary injunction requiring court "approval of [the defendant's] non-ordinary-course-of-business transactions to prevent [it], without court awareness, from further liquidating or distributing its assets," which were in "danger of dissipation").

This is a paradigmatic case for the preliminary relief Amazon seeks. When a plaintiff "asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999). Applying these principles, courts in this circuit have issued *ex parte* TROs "freez[ing] Defendants['] [bank] accounts and [] bar[ring] them from selling, disposing of, or transferring any assets" where "there is a strong likelihood that, absent [such relief], the funds will be dissipated or transferred . . . before [the plaintiff] is able to obtain a final judgment." *E.g., Allen Corp. of Am. v. Zayas*, 2014 WL 6893868, at *4 (D. Md. Dec. 4, 2014).

That is precisely the case here, and Plaintiffs have narrowly focused their Application only on assets and conduct that evidence in their verified pleadings ties directly to Defendants' misconduct. Plaintiffs have been cooperating with prosecutors in this District, and Plaintiffs' own internal investigation has already uncovered extensive evidence of unlawful acts by Defendants and their accomplices, including attempts to destroy computer files. The strength of Plaintiffs' case will inevitably grow with discovery, and Plaintiffs reserve all rights. But even now, the evidence strongly supports Plaintiffs' Application. All of the named Defendants had primary involvement in the alleged kickback racket. Six of them (Villanova, Sterling, Manassas, Administrative Manager, White Peaks, and WPC) were created to facilitate the contested transactions, so the relief will not disrupt any legitimate ongoing business. And the remaining two—Watson and Northstar—are ringleaders with a history of financial malfeasance and ongoing threats against Amazon's interests that strongly support *ex parte* relief. *See, e.g., Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 529-32 (D.N.J. 1999).

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

As detailed in Amazon's Verified Complaint, Defendants used fraud, kickbacks, and a host of other unlawful acts to obtain tens of millions of dollars in illicit financial gains on transactions relating to at least ten Amazon real estate transactions in Virginia. Compl. ¶¶ 28-73. These transactions involved at least nine lease development sites in which Amazon invested from February 27, 2018 through January 13, 2020 (the "Lease Transactions"), *id.* ¶ 41, and at least one 2019 direct purchase transaction (the "White Peaks Purchase"), *id.* ¶¶ 68-71. Defendants' alleged misconduct, which is summarized below, amply supports the requested orders, *see id.* ¶¶ 74-90.

### A.  Amazon's Acquisition of the Virginia Properties Targeted by Defendants' Scheme

Amazon recently obtained real estate for new commercial operations around Dulles, Virginia through two customary deal structures:  (i) build-to-suit lease transactions; and (ii) direct purchase transactions.  In the lease transactions, Amazon identifies the type of location that would suit a new facility and contracts with developers (such as the Northstar, Sterling, Manassas and Administrative Manager Defendants here) to find, acquire, and develop the land for Amazon.  The developer purchases the land and builds the external shell of the facility, which Amazon then leases from the developer and builds out to serve specific business needs.  The lease payments compensate the developer for land costs, shell construction, a negotiated percentage yield on the land and shell, and the developer's operating expenses as landlord.  Accordingly, development contracts on build-to-suit lease transactions can be worth tens of millions of dollars to developer-landlords.  Amazon also purchases land outright and builds Amazon facilities on these sites, and though these purchases do not involve the lease fees above, they do involve significant sales profits and contracts that are valuable to commercial real estate developers.

Amazon's multi-step process for selecting and executing both lease and purchase transactions relies in significant part on input from Amazon real estate Transaction Managers

("TMs"). Following initial site diligence, the transaction manager assigned to a potential deal will present the site features and financials for various internal business approvals before the property is acquired and developed. The Defendants' unlawful enterprise schemes involved lease and direct purchase transactions that were sourced and directed by two former Amazon TMs.

### B.   Defendants' Lease Transaction and Direct Purchase Enterprises

*The Lease Transaction Enterprise*. In July 2017, Defendants Watson and Northstar exploited Watson's personal relationships with these two former Amazon TMs. On August 24, 2017, these individuals met with Watson and thereafter provided Northstar with a sham Request for Proposal ("RFP") for development work on two Virginia lease transactions. Compl. ¶¶ 36-37.

On September 20, 2017, Northstar sent these former Amazon TMs an RFP response that: (i) stressed Northstar's "commitment, loyalty, integrity, and honesty" in doing development work "through a single-purpose limited liability company or fund that Northstar creates and directs" with Defendant Watson "as the managing partner," *id.* ¶ 37; (ii) promised the disclosure of all "Professional Service Providers" in accordance with a template lease warranting that the Northstar parties "dealt with *no brokers, finders or the like* in connection with" the covered transactions, Ex. 14;[1] and (iii) proposed the creation of specific Northstar-affiliated entities (the proposed predecessors of Defendant Sterling NCP FF, LLC) that would form a joint venture with IPI to execute Virginia Lease Transactions with Amazon and control the downstream LLCs that would serve as landlords at the Virginia lease site. Compl. ¶¶ 37-40, 55-60; Exs. 13, 15.

A few months later, on January 8, 2018, Defendant WDC Holdings (Northstar) entered into a kickback agreement (titled an "Independent Contractor Agreement") with Defendant Villanova Trust—a Tennessee entity central to Defendants' kickback scheme—for "Business

---

[1] All emphasis herein is supplied unless otherwise noted.

Development" services. Compl. ¶¶ 50, 55; Ex. 19. Defendant Watson signed the agreement on behalf of Northstar with one of the former Amazon TM's siblings as Villanova's trustee. *See* Ex. 19. The agreement set out a compensation schedule that included "Development Fees," "MP Profits," "Brokerage Fees," and "Leasing Fees" for all activity related to the "Sterling" LLC that Watson proposed to handle Northstar's work on the first two Lease Transactions. Compl. ¶¶ 55, 56; Ex. 19. Defendants used this Villanova Trust agreement to funnel kickbacks to the two former Amazon TMs who orchestrated Defendants' contracts with Amazon and its real estate partners in Virginia. *See id.* ¶¶ 9-12, 19, 36-41, 55-60.

Beginning on February 27, 2018, these former Amazon TMs engineered the selection of Defendants Watson, Northstar, and their affiliates (the Sterling, Manassas, and Administrative Manager Defendants) for contracts that eventually covered at least nine Virginia Lease Transactions for Amazon. These Defendants were all part of the group that managed the four downstream LLCs—Dulles NCP LLC, Quail Ridge NP LLC, Manassas NCP LLC, and Dulles NCP II—that were formed to serve as landlord-developers on the leased properties, and continue to serve in that capacity since Defendants' removal from the development joint venture this month:

| Site No. | Landlord Entity | Date Lease Was Executed |
|----------|-----------------|-------------------------|
| 1 | Dulles NCP LLC | February 27, 2018 |
| 2 | Dulles NCP LLC | February 27, 2018 |
| 3 | Quail Ridge NCP, LLC | April 6, 2018 |
| 4 | Quail Ridge NCP, LLC | April 6, 2018 |
| 5 | Quail Ridge NCP, LLC | April 6, 2018 |
| 6 | Quail Ridge NCP, LLC | April 6, 2018 |
| 7 | Manassas NCP LLC | November 1, 2018 |
| 8 | Manassas NCP LLC | November 1, 2018 |
| 9 | Dulles NCP II | January 13, 2020 |

In every lease Defendants executed in connection with these development projects, they expressly warranted, among other things, that: (i) there "are no management agreements, service, maintenance or other contracts . . . relating to the Project" other than those that were "disclosed in

writing" to Amazon; (ii) the Northstar parties "*dealt with no brokers, finders or the like in connection with this transaction,*" Ex. 14; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations." *E.g., id.*

The foregoing representations were material to the Lease Transactions and they were false. Defendants fraudulently induced Amazon's approval of those Transactions and expressly breached material deal terms by concealing the Villanova kickback scheme they devised in 2017 and executed through the Villanova referral contract beginning in January 2018. These and other misrepresentations and misconduct by the Lease Transaction Defendants also caused the breach of several duties that the former Amazon TMs owed to Amazon under the Company's Code of Conduct, which among other things requires Amazon personnel to: (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) to "avoid" and "promptly notify" management of any potential "conflict of interest" such as "when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com." Ex. 36. The scheme Defendants used to obtain tens of millions of dollars in illicit gains from the nine Lease Transactions is described herein as the "Lease Transaction Enterprise."

*The Direct Purchase Enterprise.* Defendants likewise exploited their relationships with the same former Amazon TMs involved in the Lease Transactions to reap over $17 million of illicit profit from the 2019 sale to Amazon of a Virginia property for more than $100 million. The unlawful course of conduct regarding this property is described herein as the "Direct Purchase Enterprise." On information and belief, this Enterprise began in 2019 when two then-Northstar employees used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate Amazon's acquisition of the relevant site for a new commercial development. Exs. 28, 32, 33, 35.

According to evidence obtained in Amazon's ongoing investigation, certain named and Doe Defendants in this action originally proposed that Amazon lease the site from White Peaks Capital. But when Amazon decided to purchase the land instead, these Defendants sought to preserve their stake in the deal by proposing that Amazon purchase it from White Peaks (rather than directly from the site's then-owner) based on representations that White Peaks had locked in a purchase price far lower than what the owner would demand from Amazon. On information and belief, these representations, which were either false or the result of Defendants' illicit arrangements, caused Amazon to purchase the land from Defendants White Peaks Capital and NOVA WPC LLC for a substantial premium. Specifically, on or about July 30, 2019, NOVA WPC LLC paid $98.67 million to purchase the White Peaks property from 41992 John Mosby Highway LLC, a Virginia company that had purchased the land for $20 million just 13 months earlier. Exs. 28, 32, 33, 35. That same day (July 30, 2019), NOVA WPC LLC sold the property to Plaintiff Amazon Data Services, Inc. for $116.4 million. Exs. 28, 32, 33, 35. Press coverage of the sale highlighted Defendant NOVA WPC's same-day profit of nearly $18 million. Ex. 30.

Some six weeks later, on September 27, 2019, in a recorded meeting Defendant Watson confronted his then-employees about the White Peaks Purchase. Ex. 31. He began by describing the price-gouging on the transaction as "federal FBI-type stuff," and then pressed them to "pay [Northstar] the money [$17.73 million] immediately" because "[a]nything that comes from [Amazon deals] should be Northstar." *Id.* The senior employee replied that he was "[p]otentially" willing to pay Northstar some of the money, *id.*, but suggested that he and Watson discuss the matter with one of the two former Amazon TMs who selected Northstar for lease transactions in Virginia, *id.* The employee then alluded to misconduct on other Amazon-related transactions, stating that "what we did for Amazon—that's FBI . . . . You have two corporate real estate people

for the largest tenant in the world that if you trace the money, it will get out of hand" and "we all know what we did." *Id.* He then reiterated that he, Watson, and their Amazon contact should try to "work something out" before someone "say[s] something to the wrong person and it gets out . . . [and] the whole Amazon thing shuts down." *Id.* Following these conversations, Northstar did *not* immediately fire the two employees, as Watson falsely asserted earlier this month. Exs. 2, 34. Rather, those employees separated from Northstar, on information and belief, only after executing confidentiality agreements with Watson/Northstar and paying one or both of these Defendants a total of approximately $5 million from the profits on the White Peaks sale to Amazon. Ex. 34; MacDonald Decl. ¶ 9. Thus, far from terminating his employees after learning (purportedly for the first time) of their misconduct, Watson instead tried to buy their silence and shared in the ill-gotten gains from their scheme.

### C.  Evidence of Defendants' Enterprise Misconduct and Other Illegal Acts

Defendants' illegal schemes were executed through concealed contracts and LLCs and escaped detection until a confidential informant (Informant 1) reported them to an Amazon executive in December 2019. Compl. ¶¶ 42-49. Informant 1 described a real estate fraud scheme involving kickbacks in excess of $8,000,000, and likely in the tens of millions of dollars. Ex. 5. Informant 1's report has since been corroborated by Amazon's internal investigation and information that a second confidential informant (Informant 2) provided in February 2020. Notably, these reports and investigations revealed the overwhelming evidence of Defendants' unlawful enterprise schemes (described below), including computer files, voice recordings, and wire transfer records documenting kickback payments to Defendant Villanova Trust, as well as attempts by Defendants or those in concert with them to conceal and/or spoliate such evidence to obstruct this action and other legal proceedings.

*Concealed and/or Spoliated Evidence of Defendants' Unlawful Conduct.* In investigating information provided by the confidential informants, Amazon examined the company laptop of one of the former Amazon TMs responsible for Defendants' involvement in the Virginia real estate transactions. Among other things, this examination revealed that the former TM had copied over 300 files from the laptop to an external device before submitting the laptop to Amazon IT, MacDonald Decl. ¶ 4, and had attempted to delete a file entitled "Villanova Trust Executed.pdf" that references the kickback agreement with Defendant Villanova Trust, *id.* ¶ 5-6.

Pursuant to that arrangement, the Northstar Defendants made at least nine lease-related payments to Villanova from March 7, 2018 to August 7, 2019, all of which are tied to four Amazon build-to-suit lease sites: (i) Sterling; (ii) Quail Ridge; (iii) Dulles; and (iv) Manassas. Ex. 25.

| Date | Description | Amount |
|------|-------------|--------|
| March 7, 2018 | Referral Fees | $50,000.00 |
| May 1, 2018 | Quail Ridge Lease Commissions | $382,500.00 |
| May 7, 2018 | Dulles Lease Commission | $281,350.00 |
| July 30, 2018 | Quail and Dulles Paid in Full | $1,447,614.50 |
| October 2, 2018 | Quail Development & Leasing Fee | $1,297,011.18 |
| November 7, 2018 | Manassas Development Fee | $122,319.64 |
| December 7, 2018 | Dulles Leasing Fee/Manassas Leasing-Dev Fee | $1,061,160.08 |

The confidential informants provided evidence corroborating these payments, including evidence of a December 14, 2018 report that Defendant Watson requested from a Northstar employee documenting that Northstar paid Villanova $4,641,955.40 in "fees" through December 2018. Compl. ¶ 58; Ex. 25. Evidence from Amazon's ongoing investigation, Ex. 24, revealed that Northstar continued making payments to Villanova, including the following payments in 2019:

| DATE | AMOUNT | TRANSACTION MEMO |
|------|--------|------------------|
| June 7, 2019 | $150,000.00 | Final Dulles Leasing Fee |
| August 7, 2019 | $321,028.44 | Manassas Leasing Fee |

Amazon's inspection of one former Amazon TM's company files also uncovered a spreadsheet purporting to calculate the fees its author expected to receive on six different build-

to-suit deals, including "Shaw Rd.," "Quail Ridge," and "Manassas." MacDonald Decl. ¶¶ 5, 48.
The referenced fees on all of the listed transactions, several of which concern Lease Transactions
with Defendants, total $37.1 million, with the spreadsheet author's total "Share" indicated as $14.5
million. Ex. 41. This spreadsheet was recovered from the company laptop's Recycle Bin,
indicating an attempt to delete the file. MacDonald Decl. ¶ 48. A Northstar spreadsheet itemizing
purported costs on the Manassas Lease Transaction deals also noted in the lower-right corner a
"Leasing Fee" of $1,656,148, which approximates the $1.6 million Leasing "Commission" the
former TM had elsewhere projected for the Manassas transactions. *Id.* ¶¶ 6, 47; Ex. 41.

 The foregoing and other evidence of Defendants' kickback scheme directly contradicts
Defendant Watson's public assertions this month that the "fees" he and Northstar paid Villanova
on the real estate transactions at issue in this suit were "not sent" to Villanova beneficiaries. They
plainly were, Exs. 21-23, and those beneficiaries on information and belief included the two former
Amazon TMs who approved Northstar's involvement in the Lease Transactions and owed duties
of loyalty to Amazon. Information from Amazon's investigation similarly corroborates reports
from confidential informants that Northstar's engagements were not "competitive," but were
instead facilitated by insiders in violation of multiple laws and Amazon policies. Notably,
Colorado audio recordings of Watson and former Northstar employees confirm the Direct
Purchase Enterprise, which used interstate wire transfers to settle the inflated White Peaks sale.
The Direct Purchase Defendants directed the "Exchange Escrow Funds" to "be disbursed directly
to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account,"
Ex. 35, and then wired the funds through First VA Community Bank, 11325 Random Hills Rd.,
Fairfax, VA 22030, to a beneficiary at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155.

*Id.* On information and belief, the Count II Defendants also directed or caused the payment of approximately $5 million from the White Peaks Purchase to Watson in or around September 2019.

Information from Defendants' investigation also indicates unauthorized payments related to administration and management of the Virginia properties prior to Defendants' removal from the projects this month. Notably, a development partner referenced a dispute that arose after Watson instructed a Northstar employee to include a $1.2 million fee in an amended lease with Amazon that the Northstar employee questioned and Amazon rejected. MacDonald Decl. ¶ 8.

### D. Imminent Threat of Irreparable Harm Since Defendants' April 2020 Termination

As summarized above and detailed in Amazon's Verified Complaint, Amazon's ongoing investigation uncovered partially deleted files indicating attempts to destroy or conceal evidence of Defendants' misconduct. *See id*. ¶¶ 5-6. And recent events confirm an ongoing and imminent threat that such conduct will continue and irreparably harm Amazon's interests in this case. Compl. ¶¶ 75-92. Notably, Watson went to great lengths after the April 2 FBI raid at his home to alert other Defendants (particularly Villanova) to the focus of the FBI's investigation, and to misrepresent Northstar's conduct in relation to the unlawful enterprise activities at issue in this suit. In addition, Defendants' April 15, 2020 challenge to being removed from the joint venture and landlord-developer companies at the Virginia properties—and Defendants' ongoing threats against those entities—amplify the likelihood that Defendants will irreparably harm Amazon by continuing to interfere with its business relationships and goodwill in this District. The April 16 reports of Northstar's management defections, along with a mounting array of legal claims against Watson and Northstar, underscore the risk that Watson will misappropriate the multi-million dollar payment on the Virginia transactions expected to be made in early May to the Sterling and Manassas accounts Watson controls. Exs. 39-40. For these and other reasons detailed herein, the preliminary relief Amazon seeks is necessary to prevent irreparable harm to Amazon's interests.

## LEGAL STANDARDS

*FRCP 65.* Federal Rule of Civil Procedure 65 permits a district court to issue injunctive relief to "preserve the *status quo* during the course of a litigation [and] to prevent irreparable injury to the moving party," which together "preserve the ability of the court to render complete relief." *E.g., Federal Leasing, Inc., et al., v. Underwriters at Lloyd's et al.*, 650 F.2d 495, 499 (4th Cir. 1981) (internal citation omitted); Fed. R. Civ. P. 65. Like preliminary injunctions, temporary restraining orders serve the "underlying purpose of preserving the *status quo* and preventing irreparable harm just so long as is necessary to hold a hearing." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974). The Supreme Court has identified "preserving the *status quo*" and "preventing irreparable harm" as the precise purposes for which *ex parte* proceedings are proper. *Id.* at 438-39. And lower federal courts have long recognized that injunctions may issue "to ensure that a defendant's assets are not so dissipated that a monetary judgment will be frustrated," *e.g., Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 696 (4th Cir. 1994),[2] and that "*ex parte* orders are proper [where] notice to the defendant would [otherwise] render fruitless the further prosecution of the action." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 332 (7th Cir. 1984)).

*FRCP 64 and Title 8 of the Virginia Code.* Federal Rule of Civil Procedure 64 complements Rule 65 by authorizing federal courts to use "*all* remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action . . . under the circumstances and in the manner provided by the law of the state in

---

[2] *See also, e.g., Dexia Credit Local v. Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (affirming *ex parte* proceeding to freeze assets at risk of dissipation).

which the district court is held." Fed. R. Civ. P. 64. Because Rule 64 encompasses state remedies, district courts may use it to fashion injunctive relief and non-statutory remedies—including prejudgment attachment and constructive trusts—in accordance with state law.

Here, Amazon's request for preliminary relief is authorized by Virginia law including Title 8 of the Virginia Code, which expressly permits pretrial attachment of assets if the defendant "[i]s converting, is about to convert or has converted his property of whatever kind, or some part thereof, into money, securities or evidences of debt with intent to hinder, delay, or defraud his creditors." Va. Code § 8.01-534(A)(4). Notably, Virginia law permits "an action for pretrial levy or seizure or an attachment if the specific personal property sought to be levied or seized" is at risk of being "sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same." *Id.* § 8.01-534(B)(1). Virginia law also broadly authorizes the award of an injunction "to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property." Va. Code § 8.01-622. The relief is warranted because, where exigent circumstances threaten assets necessary to satisfy a judgment, "the party seeking the attachment has a great interest in preserving the funds which would satisfy the favorable judgment," and "Virginia has a significant ancillary interest in not allowing an unscrupulous defendant to defraud a prevailing plaintiff by threatening the availability of funds to satisfy the judgment." *Keystone Builders, Inc. v. Floor Fashions of Va., Inc.*, 829 F. Supp. 181, 184 (W.D. Va. 1993); *see also United States v. Cohen*, 152 F.3d 321, 325-26 (4th Cir. 1998) (recognizing "authority for freezing assets of a defendant ... under Virginia equity law and attachment procedure").

*TRO/Winter Factors.* A temporary restraining order may be granted without notice if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[,] and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). Further, at the TRO and preliminary injunction stage of a civil case, "the freezing of funds and the escrowing of monies received from the [allegedly fraudulent] sale of land may be proper without respect to whether those monies are traceable to proceeds or profits and income from the proceeds." *Kemp v. Peterson*, 940 F.2d 110, 113–14 (4th Cir. 1991).[3] Although "'freezing' is an extraordinary remedy, there is no question as to the general authority of the court to fashion the remedy . . . [upon] a showing of fraud, mismanagement, or other reason to believe that, absent the freeze order, the *assets would be depleted or otherwise become unavailable.*" *Id.* at 114.

The standard for granting a TRO is the same as the standard for entering a preliminary injunction. *E.g.*, *Ga. Vocational Rehab. Agency Bus. Enter. Program v. United States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018). A plaintiff seeking either form of pre-judgment relief must demonstrate: (1) that he is likely to succeed on the merits of his claims; (2) that he is likely to suffer irreparable injury in the absence of preliminary relief; (3) that the balance of the equities tips in his favor; and (4) that the relief requested is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Further, where the plaintiff claims an "interest in the defendant's assets (by way of lien or an equitable interest)" in addition to "a money judgment," a district court may enter a pre-judgment order "to freeze or otherwise interfere with the defendant's assets" if

---

[3] In contrast, a judgment awarding a *permanent* constructive trust under Virginia law requires that the claimant's money "be 'distinctly traced'" to the "action, fund, or other property which is to be made the subject of the trust." *Crestar Bank v. Williams*, 462 S.E.2d 333, 335 (Va. 1995).

plaintiff's claims "seek cognizable relief in equity involving assets of the defendant." *Rahman*, 198 F.3d at 497 (citing *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)). In such circumstances, preliminary relief is proper if it "is a reasonable measure to preserve the *status quo* in aid of the ultimate equitable relief claimed." *Id.*

All of these authorities strongly support the relief in Amazon's Application.

## SUMMARY OF ARGUMENT

***Likelihood of Success on Legal and Equitable Claims.*** Amazon has alleged eleven counts of legal and equitable misconduct against Defendants, and has a high likelihood of succeeding on all of them. All Defendants in the Lease Transaction Enterprise made false statements and engaged in other unlawful acts to Amazon's detriment in order to conceal their personal financial gains from enterprise activities that relied on kickbacks, money laundering, and illicit use of interstate instrumentalities, mails, and wires. *See* Compl. ¶¶ 93-181.

Further, and critically for this Application, Amazon's claims against the Defendants sound in both law and equity for purposes of pre-judgment relief under Rules 64, 65 and the Virginia Code. *Id.* ¶¶ 170-73; 196-204. Notably, Amazon's "unjust enrichment count is recognized as equitable." *Rahman*, 198 F.3d at 497 (citing *Spring Constr. Co. v. Harris*, 614 F.2d 374, 378 (4th Cir. 1980)). Amazon's request for a constructive trust is also "a tool of equity to prevent unjust enrichment," *id.* at 498 (quoting *Capital Inv'rs Co. v. Executors of Ex'rs of Morrison*, 800 F.2d 424, 427 (4th Cir. 1986) (quotation marks omitted)), even when it is directed at "a fund of money," *id.* (quotation marks and citation omitted). And Amazon's request either to void or place in escrow certain payments to Defendants is a form of rescission that constitutes an equitable remedy because it "provide[s] just compensation for the wrong, not to impose a penalty." *Id.*

For the foregoing reasons, Amazon sufficiently alleges a "nexus between the cognizable claims in suit and the assets of the defendant" that, "if proved, [would] entitle [Amazon] to some

equitable relief." *Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 289 (1940). "That money damages are claimed along with equitable relief does not defeat the district court's equitable powers." *Rahman*, 198 F.3d at 498. Virginia law recognizes the creation of constructive trusts alongside damages claims "to prevent fraud or injustice," *Leonard v. Counts*, 272 S.E.2d 190, 195 (Va. 1980), and authorizes their use where, as here, "property has been acquired by fraud or improper means" and/or "has been properly acquired but it [would be] contrary to equitable principles" for the acquirer to retain. *Crestar Bank*, 462 S.E.2d at 335.

**_Irreparable Harm and Balance of Interests._** *Ex parte* TROs are proper where, as here, there is a substantial risk that a "Defendant may dissipate [relevant] funds" prior to judgment, and "notice to Defendants of th[e] TRO request could [otherwise] result in further injury or damage to Plaintiffs," *Crosby v. Petromed, Inc.*, 2:09-cv-05055, 2009 U.S. Dist. LEXIS 73419, at *5 (E.D. Wash. Aug. 6, 2009). It is equally well-settled that a preliminary injunction may issue "to ensure that a defendant's assets are not so dissipated that a monetary judgment will be frustrated." *Hughes Network*, 17 F.3d at 696; *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 386–87 (4th Cir. 2017) (citing *Hughes Network*, 17 F.3d at 694) ("preliminary injunctions" can be used to ensure that "assets currently held by the defendant, but likely to become unavailable before damages can be collected, will remain available following trial" by enjoining defendants from "disburs[ing] their assets before a final judgment can be rendered"). The tailored preliminary relief Amazon seeks in this Application is justified under these and other settled authorities. *See, e.g.*, Order, *Microsoft Corp. v. John Does 1-2*, No. 1:17-cv-01224-TSE-MSN (Oct. 27, 2017). As noted, all but two of the named Defendants were created to facilitate the enterprise misconduct at issue here, and Defendants Northstar and Watson pose an imminent threat for the reasons above and because they are now beset by lawsuits, business failures, and FBI inquiries. Exs. 2, 4.

## ARGUMENT

### I.   AMAZON IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

To establish likelihood of success, the moving party need only make a *prima facie* case and "must generally show . . . a reasonable probability of ultimate success on the merits of the litigation." *E.g., Punnett v. Carter*, 621 F.2d 578, 582-583 (3d. Cir. 1980) (citation omitted).

### A.   Civil RICO and Conspiracy Claims

The extensive evidence of Defendants' unlawful enterprise activities that Amazon has already obtained from confidential informants and its own ongoing investigation establish a high likelihood of success on its civil RICO claims.  To establish a *prima facie* case of civil RICO violations, a plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, [and] (5) [a resulting] injur[y] in his business or property (6) by reason of the RICO violation." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003).  Amazon's Verified Complaint amply alleges all of these elements.  Compl. ¶¶ 92-168.

Notably, Defendants' Lease Transaction and Direct Purchase schemes involved "enterprise" activity, as defined in 18 U.S.C. § 1961(4), that targeted real estate transactions valued at hundreds of millions of dollars, and that resulted in tens of millions of dollars in kickbacks and related illicit payments. *See* Compl. ¶¶ 95, 136.  Both Enterprises were formed for the common purpose of profiting from fraudulent and otherwise unlawful kickback arrangements executed through Defendants' agreed and well-documented use of a web of LLCs, contracts, and interstate communications and wire transfers.  Compl. ¶¶ 95, 122, 136, 160.  Further, both enterprises had precisely the kind of "purpose," "relationships among those associated with the enterprise," and "longevity" emblematic of unlawful racketeering prohibited by the RICO statute. *E.g., Boyle v. United States*, 556 U.S. 938, 940-41, 946 (2009); *see* 18 U.S.C. § 1961(4).

PLAINTIFFS' MEMORANDUM ISO *EX
PARTE* TRO AND ORDER TO SHOW CAUSE

As detailed in the Verified Complaint (¶¶ 93-181), both enterprises involved a "pattern" of multiple predicate statutory violations from 2017 through the present. *See* 18 U.S.C. § 1961(5) (a "pattern of racketeering activity" is "at least two acts of racketeering activity . . . the last of which occurred within ten years after the commission of a prior act"). Between March 2018 and August 2019 alone, Northstar made at least nine documented wire payments to Villanova Trust totaling over \$5 million, Compl. ¶¶ 99, 141, each of which expressly referenced a specific Amazon Virginia real estate engagement that Defendants obtained through a host of fraudulent and otherwise unlawful enterprise activity executed through interstate commerce. *Id.*; *see generally* 18 U.S.C. § 1961(c); *VFI Assocs., LLC v. Lobo Mach. Corp.*, 2012 WL 975705 (W.D. Va. Mar. 22, 2012) (imposing RICO liability for defendants' kickback scheme involving wire fraud). Likewise the Direct Purchase Defendants committed at least two acts of wire fraud as described in 18 U.S.C. § 1343 to secure the sale and settlement of Amazon's direct purchase of the White Peaks commercial real estate parcel in 2019. These and other documented enterprise activities constitute:

i.  multiple acts of wire fraud because they evidence a "scheme or artifice to defraud . . . [by] obtaining money . . . by means of false or fraudulent pretenses, representations, or promises" and by causing "to be transmitted by means of wire" and/or "writings, signs, signals, pictures or sounds" such money "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343; *see also id.* § 1961(c); *VFI*, 2012 WL 975705, at *4-5;

ii. violations of the federal money laundering statute, 18 U.S.C. § 1956(a)(1)(A)-(B), which prohibits a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" from conducting a "financial transaction" involving that property (i) "with the intent to promote the carrying on of specific unlawful activity" or (ii) "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity";

iii. "knowingly engag[ing] . . . in a monetary transaction in criminally derived property" in an amount "greater than \$10,000 [and] derived from specified unlawful activity" in violation of 18 U.S.C. § 1957; and

iv. violations of "Travel Act" prohibitions on the use of "any facility in interstate . . . commerce" to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise

promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity," 18 U.S.C. § 1952(a).

Amazon has been injured in its business and property in violation of 18 U.S.C. § 1962(a) as a direct and proximate result of Defendants' enterprise misconduct, all of which directly and personally benefited Defendants in the form of kickbacks and other illicit payments.

For all the foregoing reasons, Amazon is likely to succeed on the merits of its civil RICO claims as well as its civil conspiracy claims, which lie where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014). In support of these claims, Amazon has pled that: (i) Defendants defrauded Amazon by using material misstatements and omissions in their business solicitations, RFP response, and contract negotiations; (ii) fraudulently induced and/or breached their lease and related agreements by concealing their kickback ("Independent Contractor") arrangement with Villanova Trust and its beneficiaries, including the former Amazon TMs who approved Defendants' involvement with the Virginia properties; and (iii) defrauded and otherwise illicitly obtained profits and fees from Amazon in violation of federal and state laws, Amazon-related contracts, and Amazon policies. These acts rendered Defendants' agreements on the Amazon properties voidable at Amazon's election or, in the alternative, subject to remedies for breach.

## B. Fraud and Tortious Interference with Contractual or Business Relationships

Amazon is similarly likely to succeed on its fraud claims, which require "clear and convincing evidence [of] (1) a false representation [or omission], (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *E.g., Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993). Amazon pleads each element with specificity, alleging (as summarized above) that Defendants fraudulently induced Amazon to approve contracts and payments based on: (i) the Lease Transaction

Defendants' false representations regarding their kickback arrangements with Villanova Trust and its beneficiaries; and (ii) the Direct Purchase Defendants' material misrepresentations and omissions regarding their relationships and conflicts of interest with former Amazon TMs involved in the White Peaks Purchase. These representations and omissions were material and are documented in business files, wire records, voice recordings, and recent public and incriminating statements by Defendants. Amazon relied on these materially false representations and omissions to its detriment, and Defendants' fraud and other ongoing illicit acts have caused Amazon continuing harm including tens of millions of dollars in damages, and irreparable harm in the form of obstruction of this action and injury to its goodwill and business relationships in this District.

Amazon has an equally strong likelihood of success on its tortious interference claims, which under Virginia law require: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015). The Verified Complaint pleads that Defendants intentionally caused a breach or termination of the lease contracts by charging and paying prohibited kickbacks and fees. Compl. ¶¶ 173-86. Defendants also tortiously interfered with business relations on the White Peaks Purchase by engaging in undisclosed self-dealing and coming between Amazon and the site's then-owner.

### C.     Breach of Contract

Amazon is also likely to succeed on its alternative claim that Defendants breached their contracts with Amazon. "[T]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v. QSP, Inc.*,

624 S.E.2d 43, 48 (Va. 2006).  Here, to the extent Amazon's contracts with Defendants are legally enforceable (and not voided at Amazon's option based on Defendants' fraud), there is overwhelming evidence that Defendants breached the express terms of these contracts by, among other things, paying kickbacks and concealing "finder" or "broker" fees.  Compl. ¶¶ 191-94.

### D.   Detinue

Amazon is likely to succeed on its claim of detinue, which is a mechanism "to recover personal property unlawfully withheld from the plaintiff." Va. Code § 8.01-144(A).  For a detinue action to lie under Virginia law, a plaintiff must establish:  (1) a property interest in the thing sought to be recovered; (2) the right to immediate possession of the property; (3) that the property is capable of identification; (4) that the property is of some value; and (5) that the defendant had possession at some time before the institution of the action.  *See, e.g.*, *In re Paysage Bords de Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 744 (E.D. Va. 2014) (internal quotation marks and citations omitted).

The first element is satisfied because Amazon has a property interest in the funds and site operations that Defendants unlawfully obtained or converted as a result of their illicit activities. The second element is satisfied because Amazon has an immediate right to possess those assets, which were not legally transferred to Defendants in the first place. Compl. ¶¶ 169-72.  The third element is also satisfied because the funds Amazon seeks to recover are clearly capable of identification.  Indeed, Amazon can trace millions of dollars it paid to the Lease Transaction Defendants simply on the basis of the amounts listed—down to the penny—in Exhibit A to the Villanova Trust kickback agreement. Exs. 19-25, and the same is true for the sales contract and wire transfer records on the White Peaks Purchase, Exs. 28-33.  The fourth and final elements of a dentinue claim are also satisfied here because the funds and other property Amazon seeks to recover are evidently "valuable" and within the possession or control of Defendants.  Notably,

PLAINTIFFS' MEMORANDUM ISO *EX PARTE* TRO AND ORDER TO SHOW CAUSE

Defendants remain in control of: (i) the Sterling and Manassas LLC accounts designated to receive the upcoming (May 2020) equity payout tied to Defendants' involvement in the Lease Transactions; (ii) the Northstar, Villanova Trust, and other accounts and assets involved in the Lease Transaction Enterprise and (iii) the White Peaks, WPC, Watson, and/or Northstar accounts and proceeds connected to the Direct Purchase Enterprise.

### E.    Unjust Enrichment, Conversion, and Constructive Trust

Amazon also has a strong likelihood of succeeding on the equitable claims it alleges as a complement to detinue. A successful claim for unjust enrichment exists where, as here: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit; and (3) the defendant accepted the benefit on terms that render it inequitable for the defendant to retain. *E.g.*, *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 631 (E.D. Va. 2010). Similarly, a successful claim for conversion exists where, as here, the defendant "use[d] another's personal property as his own and exercise[d] dominion over it without the consent of the owner." *Nossen v. Hoy*, 750 F. Supp. 740, 743 (E.D. Va. 1990). And a constructive trust is supported by Virginia law—which utilizes such trusts "to prevent fraud or injustice," *Leonard*, 272 S.E.2d at 195—not only "when property has been acquired by fraud or improper means, but also when it has been properly acquired but it is contrary to equitable principles that the property should be retained, at least for the acquirer's own benefit." *Crestar Bank*, 462 S.E.2d at 335. In such circumstances the trust, as "a tool of equity to prevent unjust enrichment," *Rahman*, 198 F.3d at 498 (quoting *Cap. Inv'rs*, 800 F.2d at 427 (quotation marks omitted)), is proper "even though it might ultimately reach a fund of money" and no other assets. *Id.* (quotation marks and citation omitted).

Defendants all benefitted unjustly and at Amazon's expense when they fraudulently induced Amazon to confer contract and other benefits on Defendants that they knowingly induced, accepted, and retained as a result of unlawful conduct. That misconduct compels damages and

disgorgement in both law and equity. *See* Compl. ¶¶ 195-199; *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 631 (E.D. Va. 2010). Amazon is similarly likely to succeed on the claim that Defendants unlawfully converted for their personal gain assets directly related to their Lease Transaction and Direct Purchase Enterprises. *See* Compl. ¶¶ 54-59, 67-74.

### F.    *Alter Ego*/Piercing the Corporate Veil

Finally, Amazon is likely to succeed on its claims that: (i) the Manassas, Sterling, and Administrative Manager Defendants were *alter egos* of Defendant Northstar; (ii) Northstar was the *alter ego* of its founder and CEO Defendant Watson; (iii) White Peaks Capital LLC and NOVA WPC LLC were *alter egos* of one another and the two former Northstar employees who created and controlled them; and (iv) that Defendant Villanova Trust was the *alter ego* of its beneficiaries (including the former Amazon TMs who approved Defendants' real estate development work for Amazon) and Villanova's sole Trustee (the sibling of one of the former Amazon TM's). A court may find *alter ego* and pierce the corporate veil where "(1) the corporation was the *alter ego*, alias, stooge, or dummy of [an]other entity; and (2) the corporation was a device or sham used to disguise wrongs, obscure fraud or conceal crime." *William v. AES Corp.*, 28 F. Supp. 3d 553, 562 (E.D. Va. 2014). A plaintiff satisfies the first requirement where, as here, it alleges well-pled facts that "individual[s] used the corporation to 'evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.'" *C.F. Tr., Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 135 (4th Cir. 2002) (quoting *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 499 S.E.2d 266, 272 (Va. 1998)); *see generally* Compl. ¶¶ 204-08. And a plaintiff satisfies the second requirement where, as here, there are factual allegations showing that the corporate entities were used as part of "a device or sham used to disguise wrongs, obscure fraud or conceal crime." *AES*, 28 F. Supp. 3d at 562; Compl. ¶¶ 206-08. For all of these reasons, Amazon is likely to succeed on the merits of all of its claims against Defendants.

## II.    AN *EX PARTE* TRO AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IMMINENT AND IRREPARABLE HARM TO AMAZON

*Ex parte* TROs are proper where, as here, the movant pleads an imminent risk of irreparable injury that would be exacerbated by providing defendants with advance notice of the relief requested. *See* Fed. R. Civ. P. 65(b)(l); *Granny Goose Foods*, 415 U.S. at 438-39 ("*Ex parte* temporary restraining orders are no doubt necessary in certain circumstances"). Indeed, *ex parte* TROs are routinely granted where, as here, there is already evidence that advance notice is likely to render the requested relief ineffective. *See, e.g., AllscriptsMisys, LLC v. Am. Digital Networks, LLC*, l:10-cv-00111, 2010 U.S. Dist. LEXIS 4450, at *2 (D. Md. Jan. 20, 2010) (granting *ex parte* TRO where "Defendant may dissipate the funds and/or take action to render it difficult to recover funds"); *Crosby v. Petromed, Inc.*, 2:09-cv-05055, 2009 U.S. Dist. LEXIS 73419, at *5 (E.D. Wash. Aug. 6, 2009) (same where "notice to Defendants of this TRO request could result in further injury or damage to Plaintiffs"); *In the Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979) (*per curiam*) (same where notice would "serve only to render fruitless further prosecution of the action" based on evidence that notice to one enterprise member would result in transfer of evidence and unlawful activities to other entities, thus perpetuating harm and undermining judicial efforts).[4]

In this case, there is extensive evidence that, absent preliminary injunctive relief— including an *ex parte* TRO—Amazon will suffer "harm which cannot be redressed by a legal or an equitable remedy following a trial." *E.g., Instant Air Freight, Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). *First*, absent preliminary relief, Amazon faces an imminent threat

---

[4] *See also, e.g., AT&T Broadband v. Tech Comm'ns, Inc.* 381 F.3d 1309, 1319-20 (11th Cir. 2004) (affirming *ex parte* order for contraband equipment that defendants had previously secreted); *Little Tor Auto Center v. Exxon Co. U.S.A.*, 822 F. Supp. 141, 143 (S.D.N.Y. 1993) (same based on evidence that contraband "may be destroyed as soon as notice is given"); *Kelly v. Thompson*, MO-10-CV-31-RAJ, 2010 U.S. Dist. LEXIS 31800, at *3 (W.D. Tex. Mar. 31, 2010) (similar).

of irreparable harm in the form of dissipation of assets necessary to satisfy any judgment in this action. *See SAS Inst., Inc.*, 874 F.3d at 386-87 (emphasizing that injunctive relief "ensure[s] that assets currently held by the defendant, but likely to become unavailable before damages can be collected, will remain available following trial"). That threat is real and imminent because, among other things, including Defendants control Northstar, Sterling, Manassas and Villanova and their assets, which Defendants now know are the subject of this action as well as the FBI inquiries Watson disclosed earlier this month. *See supra* 1. 3; Compl. ¶¶ 6, 13, 71-73, 85, 208.

*Second*, absent preliminary relief, Defendants will continue to interfere with Amazon's goodwill and business relationships at the Virginia properties, which will injure Amazon's interests in ways that are "difficult," if not impossible, "to ascertain" and quantify. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008) (quotation marks omitted). These harms include loss of goodwill as a result of Defendants' dissemination of false information to Amazon business partners, and challenges that Defendants made against Amazon's landlord-developers and affiliates regarding the validity of their contract terminations. Compl. ¶¶ 1, 3, 5-6, 79-85. These are exactly the types of intangible losses "the Fourth Circuit has repeatedly recognized" as "irreparable harm." *Update, Inc., v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018).

## A.   Preliminary Relief Is Necessary to Protect Evidence and Assets

For the reasons above, it is blackletter law that an injunction may issue "to ensure that a defendant's assets are not so dissipated that a monetary judgment will be frustrated." *Hughes Network*, 17 F.3d at 696 (citing *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 596 (7th Cir. 1986) (noting that "a defendant's insolvency is a standard ground for concluding that a plaintiff's harm if the preliminary injunction is denied will not be cured by an award of damages at the end of the trial")). Accordingly, in the Fourth Circuit preliminary injunctions are "used to

PLAINTIFFS' MEMORANDUM ISO *EX PARTE* TRO AND ORDER TO SHOW CAUSE

ensure that assets currently held by the defendant, but likely to become unavailable before damages can be collected, will remain available following trial" by enjoining Defendants from "disburs[ing] their assets before a final judgment can be rendered." *SAS Inst., Inc.*, 874 F.3d at 386-87 (citing *Hughes Network*, 17 F.3d at 694). That is the relief Amazon requests here.

Absent immediate, *ex parte* injunctive relief, Defendants will continue to engage in the spoliation of evidence and dissipation of assets documented above. *See* Compl. ¶¶ 1, 6, 13, 60, 83, 85-86. Such conduct will irreparably harm Amazon's rights in this case, as well as Defendants' continued interference with Amazon's goodwill and business relationships at the Virginia real estate sites in this District. *See id.* ¶¶ 60, 66, 74. In *Allen Corp. of Am. v. Zayas*, 2014 WL 6893868, at *4 (D. Md. Dec. 4, 2014), the court granted preliminary relief on similar grounds. Specifically, the court enjoined the defendant (who had embezzled money from his former employer) from dissipating the stolen money before judgment because, absent such relief, the defendant could "move or dissipate the allegedly stolen funds, and [due in part to potential] criminal prosecution for [his] conduct, will be unable through legitimate means to generate income sufficient to pay a judgment that could potentially reach $2.5 million." *Id.* at *4.

In reaching this conclusion, the *Zayas* court expressly relied on Fourth Circuit precedent recognizing "irreparable harm" where the defendant's "assets [a]re 'in danger of dissolution and depletion.'" *Id.* (quoting *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1330-32 (4th Cir. 1989)). It also cited authorities from this court finding "irreparable harm where, without a TRO, the plaintiff would have had 'little to no opportunity to collect the money it [was] owed'" from defendants that were "empty shell corporations." *Id.* (quoting *Buffalo Wings Factory, Inc. v. Mohd.*, No. 1:07cv612 (JCC), 2008 WL 4699803, at *4 (E.D. Va. Oct. 23, 2008)).

PLAINTIFFS' MEMORANDUM ISO *EX
PARTE* TRO AND ORDER TO SHOW CAUSE

In this case like *Zayas*, absent an *ex parte* TRO and preliminary injunction, Defendants will irreparably harm Amazon's claims by spoliating or dissipating evidence and assets central to this suit. That is exactly the type of irreparable harm that the Fourth Circuit has identified as sufficient for the tailored preliminary relief Amazon seeks in this Application. *See Hughes Network*, 17 F.3d at 694; *SAS Inst., Inc.*, 874 F.3d at 386-87; *Singer Co.*, 889 F.2d at 1330-32.

### B.    Preliminary Relief Is Also Necessary to Avoid Irreparable Business Harm

"[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co.*, 22 F.3d at 551-52 (4th Cir. 1994) (quotation marks omitted); *Blackwelder Furniture Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir. 1977). Accordingly, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)); *see also* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2019) ("Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable."). Indeed, "the Fourth Circuit has repeatedly recognized that . . . 'the potential loss of goodwill'" to a business "'support[s] a finding of irreparable harm.'" *Samilow*, 311 F. Supp. 3d at 795 (quoting *Multi-Channel TV Cable Co.*, 22 F.3d at 552).

Amazon's Verified Complaint alleges ongoing conduct by Defendants—including its recent misstatements and threats to Amazon's vendors and business relationships—that portend the "potential loss of goodwill" in addition to the significant financial costs Amazon and its vendors and business partners have already born in severing all ties with Defendants. Compl. ¶¶ 1, 3, 5-6, 79-85. This court and the Fourth Circuit have credited similar claims of irreparable harm in issuing *ex parte* TROs and other preliminary injunctive relief. In *Samilow*, this Court granted an injunction where the movant alleged that, absent relief, Defendants' conduct could cause a "loss

of future business" that would be difficult to quantify and redress with monetary damages. 311 F. Supp. 3d at 795. And in *Biomet*, the court credited allegations that the movant would suffer "a loss of goodwill and reputation in the absence of preliminary relief." *Fred Hutchinson Cancer Research Ctr. v. Biopet Vet Lab, Inc.*, 768 F. Supp. 2d 872, 881 (E.D. Va. 2011); *see also, e.g.*, *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828-29 (4th Cir. 2004) (absent relief, the defendant's conduct would cause "significant financial harm both to [movant] and some of its putative customers" by . . . "hinder[ing] economic development efforts in several Virginia counties").[5]

For all of these reasons, the harm Amazon faces as a result of Defendants' misconduct goes well beyond the significant "injuries . . . in terms of money, time and energy" Amazon must expend just to recover for Defendants' past illegal acts. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quotation marks omitted). Amazon has pled ample "evidence" of "potential irreparable harms" that are both "imminent" and *not* fairly compensable in damages. *Id.* at 235. As a result, Amazon has far surpassed "the presumption that a preliminary injunction will not issue when the harm suffered can be remedied by money damages at the time of judgment." *Id.* at 230.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR AMAZON

To determine where the equities lie on a request for injunctive relief, courts consider whether the "harms faced by [the movant] in the absence of an injunction outweigh[] the potential harm of an injunction to [the nonmovant]." *Mountain Valley Pipeline*, 918 F.3d at 366. Here, this balance tips in Amazon's favor based on: (i) the tailored nature of its requests, which principally seek escrow or constructive trust protection of funds directly tied to misconduct by the named

---

[5] *See also Mtn. Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (stressing that "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation" in holding that the movant "would suffer significant unrecoverable financial damages [and] face [business] delays . . . absent[] an injunction").

enterprise Defendants;[6] and (ii) Amazon's ability to post an adequate security bond. *See, e.g., Keystone Builders*, 829 F. Supp. at 184 (applying Virginia's pre-judgment attachment statute and stressing that "the risk to the defendant's property is minimal because of the bond requirement").

Amazon has lost at least tens of millions of dollars as a result of Defendants' ongoing and unlawful enterprise activities, *see* Compl. ¶¶ 2, 11, 41, 51-52, 59, 76, 87, and Amazon has already uncovered attempts to spoliate evidence and conceal assets that will irreparably harm Amazon's ability to recover on claims in this case and conduct uncovered in related investigations, *see id.* ¶¶ 1, 3, 5-6, 60, 79-85. The "harms faced by [Amazon] in the absence of . . . injuncti[ve] [relief thus] outweigh[] the potential harm of an injunction to [Defendants]," *Mountain Valley*, 918 F.3d at 366, and "the balance of equities . . . tip[s] strongly in favor of" Amazon. *Winter*, 555 U.S. at 26.

In sum, "the proper determination of where the public interest lies" on Amazon's requests for relief is not "a close question." *Winter*, 555 U.S. at 26. The "public has an interest in protecting the legitimate expectations of parties to a contract," and in ensuring full vindication of victims of illegal conduct. *Samilow*, 311 F. Supp. 3d at 796; *UBS Fin. Servs. Inc. v. Carilion Clinic*, 880 F. Supp. 2d 724, 734 (E.D. Va. 2012) ("[P]ublic policy favors giving effect to the parties' intent" and enforcing the law); *US Airways, Inc. v. US Airline Pilots Ass'n*, 813 F. Supp. 2d 710, 736 (W.D.N.C. 2011) (similar). Accordingly, the public interest favors Amazon's Application.

## IV.   CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court enter the preliminary relief requested in Amazon's Application.

---

[6] Amazon reserves all rights to pursue the attachment and recovery of additional funds and assets to the extent discovery in this case or ongoing investigations ties them to the misconduct alleged herein. On information and belief, such assets may include a private jet (Tail #N137BW) and new $6.6 million dollar residence that belong to Defendants Watson and/or Northstar, as well as other assets of the named or Doe Defendants or individuals acting in privity or concert with them.

Dated:  April 27, 2020

Respectfully submitted,

*TJAndrews*

Elizabeth P. Papez (*pro hac vice* application pending)
Patrick F. Stokes (*pro hac vice* application pending)
Travis S. Andrews (Va. State Bar No. 90520)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
tandrews@gibsondunn.com
epapez@gibsondunn.com
pstokes@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*

PLAINTIFFS' MEMORANDUM ISO *EX PARTE* TRO AND ORDER TO SHOW CAUSE