

MAY 1 4 2020

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |
|---|
| AMAZON.COM, INC., et al. |
| Plaintiffs, |
| v. |
| WDC HOLDINGS LLC., et al., |
| Defendants. |

**CIVIL ACTION No. 1:20cv484**

**UNDER SEAL**

### DEFENDANTS BRIAN WATSON AND WDC HOLDINGS LLCS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Defendants Brian Watson ("Watson") and WDC Holdings LLC, dba Northstar Commercial Partners ("Northstar") respectfully urge the Court to refuse to grant a preliminary injunction and to dissolve the temporary restraining order previously entered. This case shows why courts' rightly disfavor emergent *ex parte* injunctive relief. In its rush to obtain a competitive advantage in this action, Plaintiffs have, perhaps unwittingly, mischaracterized the evidence and facts that underlie their claims. Plaintiffs have not properly demonstrated emergent or exigent circumstances to support their requested injunction, but instead rely on hearsay and innuendo in support of a complaint larded with the proverbial kitchen sink of claims. Despite their many allegations, Plaintiffs have not actually satisfied the well-established standards for the issuance of a preliminary injunction.

Although the Verified Complaint exceeds 50 pages in length, the precise factual bases for Plaintiffs' claims remain unclear. Although labeled "verified," the only affidavits submitted in

1

support of Plaintiffs' Complaint were from a Gibson Dunn associate with no first-hand knowledge of any pertinent fact. No Amazon employee and no "confidential informant" submitted evidence in support of the complaint or application. That lack of actual evidence is especially significant because the entire case against Watson and Northstar is based on logical leaps and baseless accusations. As explained below, Plaintiffs' Verified Complaint and supporting documentation contain demonstrably incorrect facts, misleading insinuations, and seeks relief to which Plaintiffs are not entitled as a matter of law. Moreover, Plaintiffs have failed to demonstrate that they have suffered any actual harm, much less irreparable harm. Despite this, Plaintiffs seek to forcibly place Watson's and Northstar's assets into escrow and prevent them from exercising their rights to seek redress for wrongs against them. Because Plaintiffs have failed to show that they will be irreparably harmed or that are likely to succeed on the merits, the Court should dissolve its temporary restraining order and refuse to grant a preliminary injunction.

## I.    BACKGROUND

Watson is the founder and chief executive officer of Northstar, a Colorado Limited Liability Company. *See* Verified Complaint ("Compl.") ¶¶ 16, 17. Northstar is a privately held, full-service real estate investment and asset management company, specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States. *Id.* Northstar currently has 35 employees based in Denver, Colorado. *See* Declaration of Freimann ¶ 5.

Plaintiffs' Complaint contains a range of misleading allegations, ranging from erroneous assumptions of fact to gross exaggerations to simple falsehoods. For example, and because it features prominently in the Verified Complaint, Plaintiffs grossly mischaracterize the so-called "direct purchase enterprise" transaction from September of 2019. *See* Compl. ¶¶ 4, 68-74. The

facts reveal that in September of 2019, Watson became aware, because of open source reporting, that two entities, White Peaks Capital LLC and NOVA WPC LLC, both defendants in the present suit, were party to a "same day" transaction involving the purchase and sale of a parcel in the Dulles, Virginia area during the summer of 2019. *See* Freimann Decl. at Ex. B (October 2, 2019 letter from Lisa Hogan to Kyle Ramstetter and Will Camenson ("Hogan Letter")). This transaction took place on July 30, 2019, with NOVA WPC LLC apparently paying $98.67 million to an entity known as "41992 John Mosby Highway LLC" for a parcel of land, and then selling the same parcel to Vadata, Inc., an affiliate of Amazon Data Services, for $116.4 million, for a one-day profit of almost $18 million.[1] *Id*; *see also* MacDonald Decl. at Ex. 32. Upon learning of this transaction, Watson did simple public records research, which revealed that the principals behind this deal were two of his own (now former) employees, Kyle Ramstetter and Will Camenson. *See* Hogan Letter. By this time, Northstar had been doing real estate deals with Amazon for almost two years, and Ramstetter and Camenson were, therefore, aware of and had some involvement in Northstar's business relationship with Amazon. Because of Northstar's ongoing relationship with Amazon, Watson believed that (i) the opportunity to purchase this parcel and sell it to Amazon was a potential opportunity that belonged to Northstar and (ii) Ramstetter and Camenson had wrongfully usurped a corporate opportunity. *Id*. On September 28, 2019, Watson confronted Ramstetter and Camenson with the facts he had discovered. *See id*. The audio of these meetings was recorded and the recordings were later transcribed. *See* Freimann Decl. at Ex. A. During these meetings, neither Ramstetter nor Camenson denied that they were behind this "side" deal, but they were reluctant to share any of the details of the deal with Watson. *Id*. Following these meetings, Watson suspended both Ramstetter and Cameson from their employment at Northstar while waiting for them to

---

[1] Vadata, Inc. is not a plaintiff in this action.

provide additional details concerning this deal, including the identity of other persons who were involved and the source of their financing. *Id.* When neither came forward with any such information within a short period of time, they were both terminated as Northstar employees. Hogan Letter. Upon Northstar's threat of legal action, the parties agreed to a mediation with a former Colorado Supreme Court Justice, and the matter was settled in or about October of 2019.

Contrary to certain allegations in the Verified Complaint, at no time did Watson believe that Ramstetter and Camenson, or the entities they created to facilitate the deal, had "gauged" or otherwise took advantage of Amazon. Hogan Letter. Defendants are aware of no evidence that the transaction was not negotiated by Amazon at arms-length, and Plaintiffs have offered no such evidence. However, Watson did believe that both former employees had wrongfully usurped a potential opportunity belonging to Northstar and, in so doing, had committed a breach of fiduciary duty and a breach of a duty of loyalty to Northstar, as well as other torts. *Id.* In their zeal to support a preliminary injunction, Plaintiffs unfairly attribute the self-dealing activities of Ramstetter and Camenson to Watson, despite the fact that Watson was clearly shocked by their conduct, terminated them from employment with his company, and threatened a lawsuit against them. *Id.* This matter was resolved pursuant to a confidential agreement.[2] *See* Compl. ¶ 74.

Beyond the anomaly of the above-described "direct purchase enterprise" transaction, which in no way involved Watson or Northstar, Northstar was involved in a series of lease transaction deals with Amazon, described in the Verified Complaint as "the leased transaction enterprise." *See* Compl. ¶¶ 36-41, 55. These transactions began in the fall of 2017, when Northstar was invited to respond to an Amazon request for proposal ("RFP"). *Id.* ¶ 36. In or about September of 2017,

---

[2] Northstar is unable to produce or discuss the terms of that agreement absent a court order for its production. Northstar has no objection to the entry of such an order.

Watson was introduced to Casey Kirschner who was then employed by Amazon as a real estate "transaction manager" ("TM"). *Id.* This introduction was made by Watson's long-time friend Christian Kirschner, who is the brother of Casey. *Id.* The Verified Complaint mischaracterizes Watson's long-standing personal and business relationship with Christian Kirschner and seeks to use a distorted description of their relationship to suggest Watson's involvement in the alleged kickback scheme described in the Complaint. *Id.* In fact, when Christian Kirschner introduced Watson to Casey Kirschner, the two men had known each other for nearly two decades, and had previously formed a business partnership whereby Watson paid Christian a monthly fee for fee to assist Northstar with finding potential real estate investment opportunities. *See* Freimann Decl. at Ex. C. Watson's understanding of the purpose of the introduction was to allow Casey to inquire as to Northstar's interest in competing for certain Amazon real estate development RFPs. *See* Compl. ¶ 32.

In mid-2017, Northstar was invited to respond to such an RFP for a development project known as "Dulles" and was eventually awarded the contract. *Id.* ¶¶ 32-35. The Amazon process was "multi-step" and involved internal diligence by Amazon transaction managers who presented proposals for approval by others within Amazon based on relevant needs, pricing and market norms. *See id.* ¶ 31. Contrary to the way in which Plaintiffs' characterize the beginning of this business relationship, they offer no evidence that Watson "exploited" any personal relationships or that Northstar's initial RFP response was a "sham." *See id.* ¶ 32. This Dulles project would turn out to be the first of a series of such development deals between Northstar and Amazon. *Id.* ¶¶ 32-35. Each had the same basic arrangement: Northstar would purchase a parcel of land, develop it to include a "shell" structure to be used as a data center, and then Amazon would finish the internal build-out, occupy the building, and operate the data center. *Id.* Amazon would then

make lease payments to Northstar though an entity set up for this single purpose and Northstar would provide asset management services as part of the lease arrangement. *Id.* These various Northstar-affiliated entities created for this purpose include Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP, LLC; and Dulles II NCP, LLC. *Id.* There is no evidence presented in the Verified Complaint that Northstar has breached its performance obligations under those agreements, and it should be noted that contrary to the allegations in Plaintiffs' Verified Complaint, the relevant lease agreements do not preclude Northstar or the Northstar entities from engaging "brokers" or "finders," or from paying fees to the same. *See id.* ¶ 55. Northstar contends that it received at or below market rate fees as the developer, all of which were reviewed by Amazon, its legal counsel, Northstar's equity investor IPI, and the major lenders used for each project. That none of these entities objected to Northstar's proposed fees is telling.

Later, in January of 2018, because of the success of the Amazon and other development projects that Christian helped to facilitate for Northstar, Watson and Christian, through their respective business entities, Northstar and Villanova Trust ("Villanova") entered into a new agreement whereby Villanova would be paid business development fees based on the actual deals Christian helped Northstar realize. *See* MacDonald Decl. at Ex. 19. This agreement effectively replaced a previous agreement between Northstar and Christian. *See* Freimann Decl. ¶ 7. Despite Plaintiffs' descriptions, neither of these agreements were "concealed" in any way, and clearly did not provide for or in any way contemplate that any payments made by Northstar to Villanova would be passed on to any third parties, including Amazon employees. *Id.* Contrary to their claims, Plaintiffs do not provide any evidence that Watson knew of or participated in such payments. The fact that Watson and Northstar agreed to pay Christian and Villanova certain fees does not mean that Watson agreed to or even knew that any portion of those payments were then

used to pay "kickbacks" to certain Amazon employees. Indeed, the e-mail relied upon by Plaintiffs (MacDonald Decl. at Ex. 25) was originally a request by Watson that an employee send him "how much we have paid our top 10 referral partners, and list their names and amounts individually. This should include the total we have paid them, and should include Christian as well." *Id.* Moreover, the wires to Villanova Trust contain transparent descriptions such as "Dulles Final Leasing Payment." *E.g.*, MacDonald Decl. ¶ 30, Ex. 20. Plaintiffs offer no evidence whatsoever to support their theory that there was an effort by Watson to conceal any dealings with Christian.

Plaintiffs go further to attempt to suggest misconduct by Watson, but, again, don't have their facts straight. First, Plaintiffs' Verified Complaint accuses Watson of improperly directing an Amazon employee to "add a $1.2 million fee in an amended lease with Amazon" and mischaracterizes this as an improper charge that was rejected by Amazon. *See* Compl. ¶ 83. Contrary to the Complaint, this amount reflected a land acquisition fee that had been agreed to and paid upon acquisition over a year prior, but not listed as a separate line item in the final lease with Amazon (but instead bundled it). Prior versions of the lease showed this fee separately and Watson was trying to correct that issue after IPI brought it to his attention. Thus, this request was not rejected, but instead was paid by Amazon. This issue was simply one of paperwork, not entitlement to a fee.

Despite the success of the Northstar-Amazon lease deals described above, Northstar recently received a series of letters from Dulles NCP, LLC and other leasing entities, each purporting to notify Northstar of the termination of their management agreements. MacDonald Decl. at Ex. 26. While these letters suggested that the agreements were being terminated "for cause," no details constituting cause were provided. *Id.* Although counsel for Northstar has been in communication with counsel for these terminating parties to learn what alleged "cause" would

justify the noticed terminations, no detailed facts which, if true, would constitute cause have been provided. Freimann Decl. ¶ 8.

Not coincidentally, on the exact same day of those termination notices, FBI agents came to Watson's home unannounced and served Watson with a copy of a search warrant. *See, e.g.,* Compl. ¶ 1. Counsel for Watson have since been in touch with the U.S. Attorney's Office for the Eastern District of Virginia, and have confirmed that he is, in fact, a target of an ongoing investigation. The prosecutors have not shared the details of the evidence, if any, against Watson, but have confirmed that the subject matter of the criminal investigation is essentially the same as the subject matter of the allegations contained in the Verified Complaint. It appears that the FBI investigation likely is based on the same misimpressions and/or incorrect reports that are behind Plaintiffs' Complaint.

## II.   ARGUMENT

### A.    Legal Standard

To obtain a preliminary injunction a plaintiff must establish that "(1) [it is] likely to succeed on the merits, (2) [it is] likely to suffer irreparable harm [in the absence of an injunction], (3) the balance of hardships tips in [its] favor, and (4) the injunction is in the public interest." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). Granting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. "[T]he danger of a mistake" in this setting "is substantial." *Am. Hosp. Supply Corp. v. Hospital Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986). That is especially so when acting on a record that consists almost entirely of inadmissible evidence, as is the case here.

**B.      Plaintiffs Are Not Likely to Suffer Irreparable Harm**

      **1.      Plaintiffs Have an Adequate Remedy at Law**

"The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Sun Microsystems, Inc. v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).   The harm necessary to justify issuance of a preliminary injunction must be irreparable. The Supreme Court has stated:

> "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Va. Petroleum Jobbers Ass'n v. Federal Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).   The Fourth Circuit similarly has acknowledged that a preliminary injunction is not normally available where the harm at issue can be remedied by money damages. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693-94 (4th Cir. 1994).   There is no irreparable harm here.   Amazon seeks an award of money damages and thus has an adequate remedy at law.

      The Fourth Circuit noted in *Hughes* that "extraordinary circumstances may give rise to the irreparable harm required for a preliminary injunction." *Id.* at 694. The Court explained that such circumstances may exist where "the moving party's business cannot survive absent a preliminary injunction or where '[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.'" *Id.* (internal quotations marks and alterations omitted).   In the narrow circumstances in which preliminary injunctions are

warranted despite the adequacy of money damages, injunctions are "carefully tailored, generally operating simply to preserve the plaintiff's opportunity to receive an award of money damages at judgment." *Id.* The Fourth Circuit has since clarified, however, that *Hughes* does not support the conclusion that a defendant's potential insolvency warrants a finding of irreparable harm supporting injunctive relief. *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 Fed. App'x 351, 354 (4th Cir. Oct. 26, 2011) (unpublished).

The Fourth Circuit's rulings on injunctive relief also must be considered in the context of the Supreme Court's precedents concerning injunctive relief to obtain a prejudgment attachment. In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, the Supreme Court held that in an action for money damages, the district court does not have the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed. *See* 527 U.S. 308, 333 (1999). In that case, which sought only money damages, investors purchased notes issued by Grupo Mexicano, a Mexican holding company involved in toll road construction. When Grupo Mexicano came into serious financial difficulties and defaulted on its notes, the investors sought a preliminary injunction restraining Grupo Mexicano from assigning its assets so that it would be able to pay its debts. The district court, finding that Grupo Mexicano was at risk of insolvency and that it planned to use its assets to satisfy other creditors, frustrating any judgment the investors might obtain, granted a preliminary injunction restraining Grupo Mexicano from transferring its assets, and the Second Circuit affirmed. Reversing the Second Circuit, the Supreme Court stated that general equitable authority does not authorize prejudgment injunctions in actions at law. Rather, "a general creditor (one without a judgment) ha[s] no cognizable interest, either at law or in equity, in the property of his debtor, and therefore could not interfere with the debtor's use of that property" prior to obtaining a judgment.

10

*Id.* at 319-20.  The Court observed that "[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [debt avoidance or preference]; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not."  *Id.* at 322.

Even if Plaintiffs contend that Defendants cannot pay a money judgment, they have provided no evidence of that.  Nor have they presented any evidence of dissipation of assets or spoliation of evidence.  No such evidence exists.  The injunctive relief that Plaintiffs seek would not preserve Northstar's or Watson's assets or protect Plaintiffs from a potential insolvency, but would effectively preclude Northstar from operating and – as a result – almost certainly result in Northstar's insolvency.[3]  Such a result would not preserve the status quo or any right to recovery from Plaintiffs.

### 2.   Plaintiffs Have Not Shown How They Have Been Harmed

Although Plaintiffs cite newspaper articles and "confidential informants" to make a number of sensational allegations in their Complaint, they do not identify how they have been harmed, what their theory of damages is, or what amount they claim is owed by Northstar or Watson.  For example, Plaintiffs ask for an award damages "in the amounts identified in Plaintiffs' Application."  Compl. ¶ 225.  It never actually quantifies those damages or explains the basis for those claims.  That information is all critical because it is necessary to determine the possible scope of damages and thus the likelihood that Plaintiffs would be harmed or that they would not have an adequate remedy.  Significantly, the leases provide that Amazon may terminate the leases upon a breach.  *See* MacDonald Decl., Ex. 14.  They have not done so.

---

[3] The Court also should be aware that the United States has seized the accounts identified by Plaintiffs (almost certainly as a result of Plaintiffs' actions) and thus Defendants are unable to comply with the requested injunctions in any case.

Plaintiffs' claims predominately center on an alleged kickback scheme. Virginia follows the "actual loss" rule for fraud and requires damages as an element of the fraud. *ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc.*, 520 S.E.2d 355, 361 (Va. 1999) (to support a claim of fraud, the plaintiff must prove resulting damage to the complaining party); *Lloyd v. Smith*, 142 S.E. 363, 367 (Va. 1928) ("the facts showing the fraud and the resulting damage must be alleged"); *Brown v. Gilner*, No. 1:10-cv-00980 (AJT/IDD), 2012 WL 4473086 (E.D. Va. Sept. 25, 2012).[4] Plaintiffs seem to be asking for all amounts paid by Amazon to any Defendant. For example, based on discussions with Plaintiffs' counsel, we understand that the $16.25 million deposit that Plaintiffs request is derived from the first three rows of Exhibit 41. That sum pertains to the total amount to be paid with respect to the three listed projects. The requested deposit, therefore, has no relationship to any viable theory of damages.

First, Plaintiffs have not shown that they were harmed by any representation concerning payment of fees.[5] Any fees paid came out of Northstar's pocket – not Plaintiffs. Northstar's fees were reviewed and/or approved by Amazon, IPI, and institutional lenders and their counsel. Plaintiffs have not disputed these facts.

Plaintiffs also do not contend that they did not receive the property or services for which they contracted. To the contrary, Plaintiffs have received the leases and construction services for which they contacted. Plaintiffs cannot seriously contend that they are entitled to keep the property and improvements, for which they bargained, but that they should also be paid the full amount that they paid for such property

---

[4] Alternatively, Plaintiffs could seek rescission, but such an election is unavailable if they continue to hold the benefit of the contracts. *See Devine v. Buki*, 767 S.E.2d 459, 466 (Va. 2015) (discussing rescission as remedy for fraudulent inducement and overturning award of consequential damages).
[5] As discussed below, Plaintiffs' contractual and misrepresentation arguments also rely upon a mischaracterization of the relevant contracts that bars their claims.

Plaintiffs also do not contend that any of the leases or sites involved in their Complaint were above-market rates. If Plaintiffs intended to lease property and received that property at a market price, they have not been harmed. Moreover, Plaintiffs allege that they reformed the contracts at issue to cut out Northstar. *See* Compl. ¶ 34. Plaintiffs do not contend, however, that they changed the pricing of those contracts. Under these circumstances, whether Plaintiffs have been damaged by the lease transactions is far from clear.

Finally, Plaintiffs asks for disgorgement of alleged ill-gotten gains. Disgorgement applies only to profits even if it is available as a remedy at all. Moreover, disgorgement is not available as a remedy in private civil RICO actions. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1192 (D.C. Cir. 2005). For all of these reasons, Plaintiffs' failure to specify how they have been damaged – in what amount – precludes a finding that Plaintiffs have been irreparably harmed.

### 3. Plaintiffs Have Shown No Threat of Dissipation of Assets

Plaintiffs have provided no evidence that there is a threat of dissipation of assets. That issue largely has been mooted by the seizure of the accounts at issue by the United States. The claims that Defendants might dissipate assets, however, have no basis. The primary contention was that Watson challenged his removal from the management of the projects at issue and said that the FBI/Amazon had it wrong. *See* Compl. ¶ 2. Those are the actions of a wrongly accused person; not someone bent on concealing assets. Indeed, the communication in question was copied *to* the FBI.

13

### 4. Plaintiffs Have Shown No Threat of Spoilation

Plaintiffs also contend that Watson might destroy evidence. Again, they provide no evidence to support this other than the fact he disputes the claims against him. If that were sufficient to show a risk of spoliation, preliminary injunctive relief would be appropriate in every case.

### C. Plaintiffs Are Not Likely To Succeed on the Merits

Plaintiffs also are not entitled to a preliminary injunction because they are not likely to succeed on the merits. Plaintiffs' claims rely upon assumptions and leaps of logic that are unjustified. Although the Court has entered a TRO, Plaintiff has not shown evidence sufficient to justify issuance of an injunction. Particularly troubling is Plaintiffs' use of hearsay from anonymous "informants." The only evidence provided to the Court is inadmissible hearsay evidence and a declaration from a Gibson Dunn associate with no first-hand knowledge of any relevant fact. No Amazon employee and no "confidential informant" submitted evidence in support of the Complaint. Although the Court may consider such evidence at this stage, such evidence should not be accorded substantial weight. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 726 (4th Cir. 2016) ("the nature of evidence as hearsay goes to 'weight, not preclusion'" at the preliminary injunction stage), *vacated on other grounds*, 137 S.Ct. 1239 (2017).

Plaintiffs compound this by pleading on "information and belief" matters within their own knowledge and purview. For example, Ms. MacDonald states "on information and belief, Informant 2 contacted an Amazon employee about this fee, and that the Amazon employee rejected it." *See* \ MacDonald Decl. ¶ 8. The fee at issue was never in question. Not only did Amazon not reject the fee, it already paid it.

Plaintiffs also plead on information and belief concerning Amazon's own process for approving the lease transactions. Plaintiffs contend, on information and belief, "the RFP Watson received was not sent to other developers." Compl. ¶ 37. Surely Amazon can determine whether it sent an RFP to multiple parties. Defendants are not in possession of such information.

Plaintiffs then contend, again on information and belief, that "two former Amazon TMs directed Amazon's acceptance of Northstar's September 2017 RFP response for the Virginia Lease Transactions." Compl. ¶ 40. Given that Amazon itself contends that it has a multi-layered approval process, and that transaction managers "presents site and financials for approval," Compl. ¶ 31, this contention is implausible at best. As alleged, a transaction manager cannot approve a transaction alone.

Amazon nonetheless contends that its own admittedly junior employees directed acceptance of an RFP response without reference to Amazon's multi-step approval process. Compl. ¶ 40. They again plead this allegation on information and belief. This series of allegations begs the question: Amazon does not know how it approved the transactions? They specifically allege that the transactions required multiple approvals. Moreover, they are in sole possession of the facts concerning their own internal approval process. The allegations that they did not follow their own process are not plausible and thus would be insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). And because Plaintiffs must plead their fraud claims with particularity, *see* Fed. R. Civ. P. 9(b), this failure is particularly significant.

Plaintiffs have the burden to plead their fraud and RICO claims with particularity. *See* Fed. Rule Civ. P. 9(b). They have not done so. Their Complaint is devoid of any statement concerning

how any action of Northstar or Watson has damaged Plaintiffs or how they reasonably relied on any action of any Defendant. Indeed, Amazon itself pleads intervening factors that preclude any finding that it was harmed by Defendants.

### 1.   The Breach of Contract and Fraud Claims Are Unfounded

Plaintiffs' fraud, RICO, and breach of contract claims all rely upon alleged misrepresentation that Defendants purportedly made in various contractual documents. *See* Compl. ¶ 55. Plaintiffs' contentions in this regard are misleading and they have conspicuously chosen not to discuss where the alleged representations occur or what they really mean. The actual language shows that payment by Northstar of a finder or broker fee was not inconsistent with the lease transactions. Page seven of Exhibit 14 cited by Plaintiffs (*see* page 6 of the document) provides that Amazon shall not have any obligation to pay "(3) real estate brokers' commissions . . . [or] (5) legal, accounting or professional fees . . . ." That provision says nothing concerning whether Defendants used a broker, finder, or other referral source. It simply provides that Amazon won't have to pay for any such expenses.

The other two principal provisions relied upon by Plaintiffs are not even in the referenced lease, but are found in a form of ROFO/ROFR Purchase Agreement attached to the lease as Exhibit C to Exhibit F. *See* MacDonald Decl. at Ex. 14. That purchase agreement has never been executed or implemented. *Id.* at 203-11. As such it is irrelevant to Plaintiffs' claims. But even if it were not, the provisions are designed to protect Amazon from having to pay the landlord's commission expenses if the ROFO/ROFR provision were executed:

> Broker's Commission. Landlord and Tenant represent and warrant to each other that they have dealt with no brokers, finders or the like in connection with this transaction. Landlord and Tenant otherwise agree that each is solely responsible for all fees and charges which may become due and payable to their respective brokers, and further agree to indemnify each other and to hold each other harmless against all claims, damages, costs or expenses of or for any other such fees or commissions

> resulting from their actions or agreements regarding the execution or performance of this Agreement, and will pay all costs of defending any action or lawsuit brought to recover any such fees or commissions incurred by the other party, including reasonable attorneys' fees.

*Id.* at 209.  Although it is internally inconsistent, this provision obviously is designed to protect Amazon from the landlord's brokers/finders fees.  So long as the landlord pays any such fees out of their own pocket, it is not a violation of the provision.

> The other provision relied upon by Plaintiffs similarly provides:

> There are no management agreements, service, maintenance or other contracts or equipment or capital leases relating to the Project entered into by or on behalf of Landlord or its affiliates or contractors other than those which can and, at Tenant's option and Landlord's expense, will be cancelled on or before the Closing Date; and Landlord has disclosed in writing to Tenant all such contracts and equipment and capital leases, if any.

*Id.* at 207.  This does not apply at all to a broker's or finder's contract.  Again, however, these provisions are not contained in the leases.  They are contained in an optional purchase agreement attached to the leases for possible later execution.  Plaintiffs' reliance upon these provisions to support breach of contract and misrepresentation claims has no basis.  These provisions in unexecuted documents in connection with a potential future sale cannot provide the basis for a contractual or tort claim.

As with their contract claims, Plaintiffs rely upon the same alleged contractual misrepresentations to support their fraud claims.  In Virginia, "[a] plaintiff asserting a cause of action for actual fraud bears the burden of proving by clear and convincing evidence the following elements: '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting in damage to the party misled.'"  *Richmond Metro. Auth. V. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998) (quoting *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)).  In Virginia, a

cause of action for common law fraud requires the plaintiff to prove: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 581 (Va. 2003). Similarly, negligent misrepresentation, which Virginia courts also call constructive fraud, requires clear and convincing evidence "that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of . . . reliance upon the misrepresentation." *Mortarino v. Consultant Eng'g Servs.*, 467 S.E.2d 778, 782 (Va. 1996) (citing *Alequin*, 439 S.E.2d at 390).

Breach of any contractual provision cannot sound in tort. Virginia further requires that the "duty 18ortuously or negligently breached" by a party committing actual or constructive fraud "be a common law duty, not one existing between the parties solely by virtue of [a] contract." *Foreign Mission Bd. Of S. Baptist Convention v. Wade*, 409 S.E.2d 144, 148 (Va. 1991); *see also Richmond Metro. Auth.*, 507 S.E.2d at 346 (entering summary judgment for a construction contractor who provided fraudulent progress reports to the plaintiff, because the contractor breached only duties assumed by contract). Accordingly, a plaintiff seeking relief for the breach of a contractual duty cannot also receive relief in tort without a corresponding common law duty. *Dunn Constr. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009); *see also Vanguard Military Equip. Corp. v. David B. Finestone Co.*, 6 F. Supp. 2d 488, 492 (E.D. Va. 1997) (explaining that to properly plead a cause of action in tort "[t]he duty owed by [the defendant] to [the plaintiff] must be derived from some source of law other than ex contractu").

Here, Plaintiffs allege that Defendants defrauded them based on contractual provisions (which as established above, were not even in signed contracts). *See* Compl. ¶¶ 176, 178. Plaintiffs specifically contend that "Plaintiffs relied on Defendants' misrepresentations and

Case 1:20-cv-00484-LO-TCB   Document 39   Filed 05/14/20   Page 19 of 31 PageID# 1030

omissions to their detriment. Amazon entered into the Lease Transactions in reliance on Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best interests and in compliance with Amazon's Code of Conduct and that the price Amazon paid for the Leases and White peaks Purchase price were competitive market prices." *Id.* ¶ 180. As shown above, no representations concerning undisclosed fees were made at all. Without those representations, which are central to their claims, the fraud claims fail. Even if such statements were made, they were contractual representations that cannot support a fraud claim. *See Dunn Constr. Co.*, 682 S.E.2d at 947 (holding that a false statement made by a contractor in order to obtain payment for services performed pursuant to a contract did not violate a common law duty independent of the contract, and, thus, that the property owner could not maintain an action for fraud against the contractor).

With respect to the other allegations, Plaintiffs have not even alleged statements made by Watson or Northstar that any transaction was in Amazon's best interest or a competitive market price. *See* Compl. ¶ 176. Even if such statements had been made, Amazon cannot reasonably rely upon a contract counter-party's statement concerning pricing or Amazon's best interest. Although Plaintiffs do not specify how or where any such representations were made, even if the Court were to assume they had been made, Plaintiffs could not have reasonably relied upon them. Amazon is one of the largest and most successful companies on the planet. Parties do not come more sophisticated than Plaintiffs. The subjects of the alleged representations are that commercial real estate prices are reasonable and that a transaction is in the best interest of Amazon. The former issue is one of public knowledge and a sophisticated company like Amazon cannot reasonably rely on a contract counterparty to determine market pricing. Similarly, no one is in a better position than Amazon to determine its own best interest. It recently conducted an extensive search for a

second corporate headquarters location where it was widely reported that it conducted extensive

due diligence.[6]   Any statement by Defendant concerning Amazon's "best interest" is a mere

statement of opinion and not actionable. *See Tate v. Colony House Builders, Inc.*, 508 SE 2d 597,

599 (Va. 1999) ("The mere expression of an opinion, however strong and positive the language

may be, is no fraud. Such statements are not fraudulent in law, because . . . they do not ordinarily

deceive or mislead. Statements which are vague and indefinite in their nature and terms, or are

merely loose, conjectural or exaggerated, go for nothing, though they may not be true, for a

[person] is not justified in placing reliance upon them." (quoting *Saxby v. Southern Land Co.*, 63

S.E. 423, 424 (Va. 1909))).

    To establish fraud, "it is essential that the defrauded party demonstrates the right to

reasonably rely upon the misrepresentation." *Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 437

S.E.2d 189, 194 (Va. 1993*); Am. Sur. Co. v. Hannah*, 130 S.E. 411, 414 (Va. 1925). Courts have

considered this requirement in the context of contract negotiations.  For example, in a 2015 New

York Court of Appeals' decision, *ACA Financial Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d

921 (N.Y. 2015), the court held examined justifiable reliance and explained:

---

[6] *See* Kaya Yurieff, *Everything We Know About Amazon's HQ2 Search*, CNN.com (Nov. 5, 2018, 9:55 p.m.), https://www.cnn.com/2018/11/05/tech/amazon-hq2-update/index.html (discussing Amazon's Virginia expansion plan and real estate development deals with JBG Smith Properties); Elizabeth Weise, *Amazon HQ2 Timeline: The Winners are New York City and Arlington, Virginia*, USAToday.com (Feb. 14, 2019, 1:22 p.m.), https://www.usatoday.com/story/tech/science/2018/09/12/timeline-amazons-search-hq-2-its-second-headquarters/1273275002/; Monica Nickelsburg, *Amazon Directly Visits HQ2 Cities in Phase 2 of Extraordinary Second Headquarters Competition*, Geekwire.com (Mar. 5, 2018, 2:00 p.m.), https://www.geekwire.com/2018/amazon-discreetly-visits-hq2-cities-phase-2-extraordinary-second-headquarters-competition/.  Amazon CEO Jeff Bezos said of the process, "Ultimately the decision will be made using intuition after gathering and studying a lot of data . . . ." *Lauren Feiner, Jeff Bezos Says He Will Ultimately Decide Amazon HQ2's Location on 'Intuition'*, CNBC.com (Nov. 2, 2018, 1:22 p.m.), https://www.cnbc.com/2018/11/02/jeff-bezos-says-he-will-decide-amazon-hq2s-location-on-intuition.html.

"if the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations."

*Id.* at 1044 (quoting *Schumaker v. Mather*, 30 N.E. 755 (N.Y. 1892)). In other words, if a plaintiff knew – or could have known – that a misrepresentation was false, a claim for commercial fraud will fail. Here, Amazon is an extremely capable international corporation and more than able to ascertain the market price of real estate itself. It could not have reasonably relied on any of the alleged representations to its detriment.

### 2.    Plaintiffs Have Not Plead a Viable RICO Claim

To state a claim for a violation of the RICO statute, a plaintiff must allege a pattern of predicate acts and show either open-ended or closed continuity. *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 Fed. App'x 257, 258 (4th Cir. 2011) (unpublished) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Plaintiffs have conspicuously failed to do so.

The Fourth Circuit urges special caution when the alleged predicate racketeering acts involve mail and wire fraud, as Plaintiffs have alleged here. That court has observed that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice. . . . This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citation omitted).

Count I of Plaintiffs' Complaint purports to allege a scheme involving the "Lease Transaction Enterprise." Compl. ¶¶ 93-133. Substantively, many of the allegations simply repeat the statutory language. There are no substantive allegations of any mail or wire fraud. Rather, Plaintiffs simply state that funds were wired in connection with various commercial contracts. *Id.*

¶ 142.  While Plaintiffs allege that there was impropriety in the making of the lease contracts, it does not connect Watson to those allegations and does not make more than generic allegations of predicate acts.  Count II of the Complaint, referred to as the "Direct Purchase Enterprise," suffers from additional factual and legal deficiencies, and the associated allegations in support of this RICO claim are woefully inadequate.  In seeking to establish Watson's involvement in a pattern of racketeering activity, Plaintiffs simply repeat, in paragraphs 142, 149, and 154, that Watson received a $5 million "payoff" as part of a mediated settlement with his former employees who engaged in self-dealing at Watson's expense.  The notion that a single act can simply be repeatedly alleged to establish a "pattern" is without precedent and is absurd, particularly when the alleged predicate is actually powerful evidence of non-participation in the self-dealers' scheme.[7]

More fundamentally, the RICO counts both involve a single "victim,"[8] which is expressly conceded in paragraph 123 of the Complaint, and erroneous complains of a (single) scheme to defraud that victim, by cheating the competitive bidding process through kickback payments. Even if this Court were to excuse Plaintiffs' failure to plead fraud and RICO with particularity, the allegations that are presented here simply do not rise to the level required to pursue a civil RICO action, as a matter of well-established law in this Circuit.

In *Flip MortgAge Corp. v. McElhone*, 841 F.2d 531 (4th Cir. 1988), the court noted that:

> It is true that [plaintiff's] allegations point to fraudulent acts spanning seven years depriving [plaintiff] of money properly due to it on many distinct occasions. Nevertheless, [plaintiff's] own pleadings present this series of events as part of a single scheme perpetrated by [defendants' business] and its directors against a

---

[7] "A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).

[8] The two Amazon Plaintiffs together constitute a "single victim" for RICO purposes: "[A] corporate entity is generally treated as a single victim for purposes of civil RICO liability."  *Whitney, Bradley & Brown*, 436 Fed. App'x at 262.

> single victim. [Plaintiff] alleges that the directors of [defendants' business], from the inception of the corporation, never intended to abide by the contract's terms. This plan, [plaintiff] alleges, they stuck to persistently and effectively. Given the unity and narrow focus of the scheme, the fact that the planned injury was inflicted and suffered over a period of years cannot convert this single scheme into a pattern within the meaning of RICO. In fact, a great many ordinary business disputes arising out of dishonest business practices or doubtful accounting methods, such as have until the present been redressed by state remedies, could be described as multiple individual instances of fraud, if one chose to do so. But to adopt such a characterization would transform 'every such dispute ... [into] a cause of action under RICO.' *HMK Corporation v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987). Our precedents have not adopted an interpretation of the statute producing such a result.

*Id.* at 538. *See also Abood*, 217 F.3d at 238-39 (concluding that RICO treatment was not appropriate where the main predicate acts, those being mail and wire fraud, involved one victim, even though there was more than one scheme over a period of several years); *Anderson v. Found. For Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (continuity element of RICO's pattern requirement not satisfied where telephone and mail services used to defraud one party). Plaintiffs have alleged one scheme involving one Defendant. This is insufficient to support a RICO claim. This Circuit's unwillingness to elevate routine fraud cases, even if high-dollar ones, into viable RICO claims is well established. In *Tudor Assocs., Ltd. v. AJ & AJ Servicing, Inc.*, 36 F.3d 1094 (4th Cir. 1994) (unpublished), for example, the court's analysis is clear:

> To determine if a fraudulent scheme rises to the level of a RICO violation, the court must determine its scale, duration and number of victims. RICO is reserved for those schemes whose scope and persistence set them above the routine. *'American Bankers* involved injury to a credit insurer resulting from a fraudulent corporate bond program. The defendants were various financial institutions and law firms that had structured and administered the program. The court found that the ongoing program constituted a 'single scheme designed to inflict a single injury on a single victim and as such, . . . lack[ed] the scope and dimension necessary to form a RICO pattern.' While [plaintiff] may have alleged multiple predicate racketeering acts, [defendant's] reprehensible fraudulent conduct amounted to a single scheme to defraud [plaintiff] of money due under the mortgages. **Despite the fact that the scheme lasted over ten years and involved millions of dollars, it nonetheless**

> involved a single scheme to inflict a single injury on a single victim. As such, it does not rise to the level of conduct necessary to support a RICO recovery. The district court properly granted summary judgment.

*Id.* (emphasis added) (citations omitted).[9]  In short, the currently formulated RICO claims are extremely unlikely to survive a motion to dismiss, and the claims are not saved by a fleeting inclusion of RICO conspiracy, 18 U.S.C. 1962(d), within the confines of conclusory claims of substantive RICO violations under 18 U.S.C. 1962I.  As a matter of law, the RICO claims do not support any notion of Plaintiffs likely succeeding on the merits.

### 3.   Plaintiffs' Conversion and Detinue Claims Cannot Succeed

Plaintiffs also unlikely to prevail on their conversion and detinue claims.  There are multiple reasons that these claims cannot succeed.  Plaintiffs rely upon Virginia's detinue statute, Va. Code § 8.01-114, to seek an order with respect to what they claim is the excess purchase price for the White Peaks transaction.  Aside from the substantive failings with that claim, the Virginia detinue statute only applies to property in Virginia.  *See* Va. Code § 8.01-534.  Plaintiffs have not alleged any such property so the detinue statute is inapplicable.

Similarly, Plaintiffs cannot prevail on a conversion theory.  Virginia law defines the tort of conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights. *Hairston Motor Co. v. Newsome*, 480 S.E.2d 741, 741 (Va. 1997).  The elements of a conversion claim are (i) the ownership or right to possession of the property at the time of the conversion and (ii) the wrongful exercise of dominion or control by the defendant over the plaintiff's property, thus depriving him

---

[9] *See also Aggarwal v. Sikka*, No. 1:12CV60, 2012 WL 12870349, at *4 (E.D. Va. Jun. 12, 2012) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)) ("The Fourth Circuit has repeatedly held that continuity is not established, even where there are multiple acts of mail or wire fraud, if there is only a narrow scheme for a limited time with few victims and an inherent end-point.").

of possession. *Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001). Indeed, absent an allegation that the plaintiff is entitled to immediate possession of the property at issue, no conversion claim lies. *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000); *see also Jones v. Bank of Am. Corp.*, No. 4:09cv162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) (because plaintiff "failed to plead a plausible claim that she has the right to immediate possession" of the property at issue, plaintiff could not state a claim for conversion). To maintain a claim for conversion, the plaintiff must have a property interest in the item allegedly converted and be "entitled to the immediate possession of the item." *Economopoulos*, 528 S.E.2d at 719.

Because of this, Virginia courts have repeatedly recognized that a "cause of action for conversion does not encompass claims for interference with undocumented intangible property rights." *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994). The general rule in Virginia is that "money cannot be the subject of conversion, only tangible personal property may be converted." *Jones*, 2010 WL 6605789, at *5 (quoting *Arias v. Jokers Wild, Inc.*, 73 Va. Cir. 281, 301, 2007 WL 6013198 (Va. Cir. Ct. 2007). Plaintiffs' conversion claim is for money from a variety of co-mingled bank accounts and a future payment yet to be made.[10] Plaintiffs have not shown an immediate entitlement to any of those funds.

### 4.   Plaintiffs Have Not Plead a Viable Tortious Interference Claim

Plaintiffs contend that Defendants has tortiously interfered with Amazon's contracts, Compl. ¶¶ 182-87, but do not specify with which contracts Defendants have interfered or how they have done so. Specifically, Plaintiffs allege that Defendants "charg[ed] fees that were not

---

[10] "[T]o be entitled to the benefit of a constructive trust, a claimant's [interest] must be 'distinctly traced' into the chose in action, fund, or other property which is to be made the subject of the trust." *Bank of Hampton Rds. v. Powell*, 785 S.E.2d 788, 791 (Va. 2016) (quoting *Crestar Bank v. Williams*, 462 S.E.2d 333, 335 (Va. 1995)). Plaintiffs have made no effort to conduct any such tracing.

authorized" and "otherwise engag[ed] in unlawful conduct." *Id.* ¶ 186. As to the first claim, Plaintiffs have not alleged that they paid a single cent in excess of their contractual agreements or that it was required to pay any undisclosed fee. Further, they allege that they reformed their contracts to remove Northstar, not that they have been prohibited from performing their contracts in any way. *See* Compl. ¶ 34 The second allegation is so vague and general as to lack any meaning.

### 5.   Plaintiffs' Requested Injunction Would Violate Defendants' First Amendment Rights

Although not explained in their moving papers with any specificity, what Plaintiffs seek in paragraph 8 of their TRO (and requested injunction) is a presuit injunction preventing Defendants from seeking to enforce their rights against IPI, the 95% equity investor in the three Amazon projects. The alleged threats to Amazon's business partners and relationships in Plaintiffs' Complaint, Compl. ¶¶ 3-4, refer to Watson's response to IPI's letters improperly terminating Northstar's management roles. Those letters and any similar actions are efforts to enforce Defendants' own contractual rights in a legal forum. Enjoining Defendants' rights to enforce their contractual rights – in court if need be – is a blatant violation of their First Amendment and due process rights.

The Supreme Court has made clear that such prior restraints on speech are prohibited.[11] The prohibition on prior restraint limits restraints until a final judicial determination that the restricted speech is not protected by the First Amendment. The limitation precludes exactly the sort of temporary restraining order and preliminary injunction sought here. It does not bar

---

[11] *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973); *see also Vance v. Universal Amusement Co.*, 445 U.S. 308, 315-16 (1980) ("the burden of supporting an injunction against a future exhibition [of allegedly obscene motion pictures] is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication").

permanent injunctions after a final judgment is made that the restricted speech is not protected by the First Amendment.[12]

Given these Constitutional principles and precedent, the Fourth Circuit also has set an extremely high bar for presuit injunctions. For instance, in *Cromer v. Kraft Foods North America, Inc.*, the Fourth Circuit said:

> Such a drastic remedy must be used sparingly, however, consistent with constitutional guarantees of due process of law and access to the courts. U.S. Const. amend. XIV, § 1. These rights are longstanding and of fundamental importance in our legal system. "The due process clause requires that every man shall have the protection of his day in court." *Truax v. Corrigan*, 257 U.S. 312, 332 (1921). And, the Supreme Court has explained that the particular constitutional protection afforded by access to the courts is "the right conservative of all other rights, and lies at the foundation of orderly government." *Chambers v. Baltimore & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907).
>
> Thus, a judge should not in any way limit a litigant's access to the courts absent "exigent circumstances, such as a litigant's continuous abuse of the judicial process by filing meritless and repetitive actions." *Brow v. Farrelly*, 994 F.2d 1027, 1038 (3d Cir. 1993). Indeed, "use of such measures against a pro se plaintiff should be approached with particular caution" and should "remain very much the exception to the general rule of free access to the courts." *Pavilonis v. King*, 626 F.2d 1075, 1079 (1st Cir. 1980).

390 F.3d 812, 817-18 (4th Cir. 2004). The court set out the factors that courts must consider before issuing a presuit injunction and specified that such injunctions may only issue in exigent circumstances and be narrowly tailored. Plaintiffs seek to restrict Watson's access to funds and simultaneously to silence him. They have not come close to meeting the standards for doing so.

Watson has no interest in threatening Amazon's business relationships. He has not attempted to change any of Amazon's relationships – he has contended only that the allegations against him are wrong and sent a letter challenging a breach of contractual agreements. It is

---

[12]*See* Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 169-71 (1998).

Amazon who is seeking to change the status quo. Watson and Northstar would readily agree not to tortuously interfere in Amazon's contractual relationships. They will not, however, surrender their rights to enforce their own rights and defend themselves from baseless claims.

### D    The Balance of Harms

The balance of harms weighs heavily in favor of Watson and Northstar. Plaintiffs are seeking extraordinary injunctions that violate the Supreme Court's rules on presuit asset restraints and presuit injunctions against speech. The harm to Defendants' speech rights is irreparable. The seizures by the FBI have largely mooted the requested financial injunctions but have exacerbated the financial burden that this case places on Defendants. If the injunction is maintained, Defendants will face server financial hardship and there is a likelihood that Northstar will be unable to continue operations.

In contrast, Plaintiffs seek predominately money damages. Whether they receive those damages will have no meaningful impact on Amazon's bottom line. Amazon's net income for the fourth quarter of 2019 were alone in excess of $3 billion. Amazon having to wait to receive any potential damages (if it were to prevail after trial and appeal) poses no great risk to Amazon. While this case is litigated, Amazon will continue to enjoy the property that it has purchased or leased. In short, Amazon faces no real risk that is not tied to the risk that its claims are ill-founded.

### E.    The Public Interest

The public interest would not be served by an injunction in this case. There is no public interest in prior restraints on speech or petitioning activity. To the contrary, the First Amendment guarantees those rights will not be abridged. With respect to the financial requests of Plaintiffs, the Supreme Court has mandated that courts' injunctive powers are not intended to protect litigants

from potential insolvency.  Moreover, the federal government seizures are already protecting any public interest that might be served by freezing Defendants' assets.

## III.    CONCLUSION

The injunction sought by Plaintiffs appears intended to prevent Defendants from raising a vigorous defense to the claims against them.  Regardless of the tactics chosen by Amazon, the TRO should never have been sought on an ex parte basis and should be dissolved.  As explained above, Plaintiffs have gotten a significant number of their facts wrong and are unlikely to succeed on their claims.  Nor have Plaintiffs suffered irreparable harm.  Because the standards for a preliminary injunction have not been met, the Court should refuse to enter one.

Respectfully submitted

_____

Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun (pro hac vice)
James Trusty (pro hac vice)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

Stanley L. Garnett (pro hac vice)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Denver, Colorado 80202-4432
(303) 223-1100 – Tel.
(303) 223-1111 – Fax
Sgarnett@bhfs.com

Gregory A. Brower
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway
Las Vegas, Nevada 89106-4614
(702) 382-2101 – Tel.
(702) 382-8135 – Fax
gbrower@bhfs.com

Counsel for Defendants Brian Watson and
WDC Holdings, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2020, I caused hard copies of Defendants Brian Watson and WDC Holdings LLCS' Brief in Opposition to Plaintiffs' Motion for Ex Parte Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue to and Declaration of Michael A. Friemann in Support to be served via pre-paid First Class Mail on:

> Elizabeth P. Papez
>
> Patrick F. Stokes
>
> Gibson Dunn & Crutcher LLP
>
> 1050 Connecticut Ave., NW
>
> Washington, DC  20036-5306
>
> epapez@gibsondunn.com
>
> pstokes@gibsondunn.com

Respectfully submitted,
*/s/ James M. Trusty*
James M. Trusty (Bar No. 198359)
IFRAH PLLC
1717 Pennsylvania Ave. NW, Suite 650
Washington, DC 20006
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
*Attorney for Defendants Brian Watson and WDC Holdings LLC*