# EXHIBIT E

```
              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA


AMAZON.COM AND AMAZON DATA          )
SERVICES, INC.,                     )
                                    )  Civil Action
            Plaintiffs,             )  No. 1:20-CV-484
                                    )
       v.                           )  May 21, 2020
                                    )  2:00 p.m.
WDC HOLDINGS, et al.                )
                                    )
            Defendants.             )
                                    )


       TRANSCRIPT OF SEALED MOTION HEARING PROCEEDINGS
                    (Via Teleconference)
          BEFORE THE HONORABLE LIAM O'GRADY,
          UNITED STATES DISTRICT COURT JUDGE



APPEARANCES:

    For the Plaintiffs:        Elizabeth Petrela Papez, Esq.
                               Gibson Dunn & Crutcher LLP (DC)
                               1050 Connecticut Avenue, NW
                               Washington, DC 20036-5306
                               202-955-8500
                               Fax: 202-831-6055
                               Email: Epapez@gibsondunn.com

                               Travis Stuart Andrews, Esq.
                               Gibson Dunn & Crutcher LLP (DC)
                               1050 Connecticut Avenue, NW
                               Washington, DC 20036-5306
                               202-955-8500
                               Fax: 202-831-6055
                               Email: Tandrews@gibsondunn.com

                               Patrick Friel Stokes, Esq.
                               Gibson Dunn & Crutcher LLP (DC)
                               1050 Connecticut Avenue, NW
                               Washington, DC 20036-5306
                               202-955-8500
                               Fax: 202-467-0539
                               Email: Pstokes@gibsondunn.com
```

APPEARANCES:   (Cont.)


For the Defendants:          **George Reld Calhoun, Esq.**
                             Ifrah, PLLC
                             1717 Pennsylvania Avenue, NW
                             Suite 650
                             Washington, DC 20006
                             202-524-4140
                             Fax: 202-524-4141
                             Email: George@ifrahlaw.com

                             **James M. Trusty, Esq.**
                             Ifrah, PLLC
                             1717 Pennsylvania Avenue, NW
                             Suite 650
                             Washington, DC 20006
                             202-524-4140
                             Fax: 202-524-4141
                             Email: Jtrusty@ifrahlaw.com

                             **Jeffrey Robin Hamlin, Esq.**
                             Ifrah PLLC
                             1717 Pennsylvania Avenue NW
                             Suite 650
                             Washington, DC 20006
                             202-600-2076
                             Fax: 509-749-7057
                             Email: Jhamlin@ifrahlaw.com

                             **Stanley L. Garnett, Esq.**
                             Brownstein Hyatt Farber Schreck, LLP
                             410 Seventeenth Street
                             Suite 2200
                             Denver, CO 80202
                             303-223-1100
                             Fax: 303-223-1111
                             Email: Sgarnett@bhfs.com

                             **Gregory A. Brower, Esq.**
                             Brownstein Hyatt Farber Schreck, LLP
                             100 North City Parkway
                             Suite 1600
                             Las Vegas, NV 89106-4614
                             702-382-2101
                             Fax: 702-382-8135
                             Email: Gbrower@bhfs.com

APPEARANCES:   (Cont.)

Court Reporter:              **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA 2231-5798
                            703.549.4626
                            scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

**AFTERNOON SESSION, MAY 21, 2020**

(2:03 p.m.)

THE COURTROOM CLERK:  The Court calls case 1:20-CV-484, *Amazon.com, Inc., et al., versus WDC Holdings, LLC,* et al. for a sealed preliminary injunction hearing.

May I have the appearances, please, first for the plaintiffs?

MS. PAPEZ:  Thank you.  For Plaintiffs Amazon, it's Elizabeth Papez, Gibson Dunn & Crutcher.

MR. STOKES:  This is Patrick Stokes with Gibson Dunn on behalf of Amazon.

MR. ANDREWS:  And this Travis Andrews with Gibson Dunn on behalf of plaintiffs.

MR. CALHOUN:  Good afternoon, Your Honor.  This is George Calhoun of Ifrah, PLLC.  I'm here along today with my colleagues Jeff Hamlin, Jim Trusty of my firm, and also on the line from the defendants are Stanley Garnett and Gregory Brower of Brownstein Hyatt Farber Schreck, LLP.

THE COURT:  All right.  Is that everybody?  All right. Well, good afternoon to all of you.

This is a hearing to determine whether the TRO should be converted to a preliminary injunction, and, perhaps, a discussion about other matters.

I read the pleadings and the declarations and exhibits that followed them, and I've had time to take a look at the law

that has been argued, and I appreciate the written pleadings and the declarations.  They were of great assistance to me.

So, Ms. Papez, do you want to begin?

MS. PAPEZ:  Of course, Your Honor.  Thank you, and may it please the Court, just as a matter of housekeeping and for the record, we moved for the TRO.  The Court granted it on April 28th against eight named defendants.  Four of those defendants, Villanova, Manassas, Sterling NCP, the administrative manager party, have not entered appearances or responded to the show cause order, and so we think converting it to a PI is obviously appropriate as to those parties under the *Mircrosoft* and other precedences in our brief.

And two additional defendants, White Peaks and NOVA WPC of the defendants, as your Honor saw, responded through counsel in the letter attached in Exhibit 1 to supplemental McDonald declaration, that they do not oppose the order; they intend to comply.

We've been working with them on the escrow.  They have some enforcement issues that we can deal with separately.  So, unless the Court has questions, I think we'll rest on our papers as to those six defendants and focus our presentation today on the two opposing defendants.

THE COURT:  I agree with you.  That's fine.  I don't have any questions about the six defendants.

MS. PAPEZ:  Thank you, Your Honor.  With respect to the

two opposing defendants, Mr. Watson and his company, WDC Holdings, we respectfully submit we've more than satisfied the *Winter* standard that the defense in Opposition 8 concedes is the governing standard for the PI here.

I know this has been extensively briefed.  I'm prepared, Your Honor, to touch briefly on some of the points that, I think, sort of conclusively establish that we've met our burden under the *Winter* standard for the PI today; obviously, subject to the Court's questions.

So, I hope Your Honor will interrupt or direct me if we're covering ground that doesn't make sense.

You know, to start, again, the likelihood of success, it's an agreed standard that's on page 8 of the opposition.  It's a standard that talks first about likelihood of success on the merits.  I stress that because this is a pleadings-stage preliminary injunction proceeding.  We have 11 separate claims against the opposing defendants.  We think we've established likelihood of success on the merits on all of them, but I would highlight just a few for the Court's consideration in the hope that maybe we could, you know, simplify the proceedings and cut through some of the burdens.

The first claim I would highlight, because it is uncontested, is our claims in equity for unjust enrichment at paragraphs 196 to 200 of our verified complaint.  The defendants did not oppose or otherwise take issue with our likelihood of

success on that claim, which is incredibly important because, under the Fourth Circuit's decision in *Rahman* that we briefed in our TRO reply in our May 8th reply on pages 14 through 16, we are entitled to an injunction simply on the equitable claim under the Supreme Court's *Grupo* decision and the *Rahman* decision on that claim alone.

We also have some conversion and other equitable claims, frankly, that the defendants' own filings, particularly Exhibits A and B to the *Grupo* declaration, concede involve claims of conversion of business opportunities and conflicts of interest, fraud that would support a constructive trust on what their own exhibits term "the proceeds of such conduct" that we think establish the conversion claims.

So, as to the *Grupo*, *Rahman*, do we state a claim in equity to support a preliminary injunction against money? We think it's not only the case that we've met our burden, but that they have, in fact, conceded.

With respect to some of the claims at law, I noticed a lot of back and forth about the RICO claims. I'm happy to address those. I don't want to lose sight, though, of two very important claims against the opposing defendants here that would support the relief we seek, wholly independent of the RICO charge, and those are the common law fraud and common law breach of contract claims in our verified complaint.

Paragraph 80 of the verified complaint detailed these. I

point these out because we do have, particularly through the
confirmatory declarations that we submitted at the defense
counsels' request, particularly Mr. Doden's paragraph 20, an
uncontested record that Amazon would never have done any business
at all with these two defendants had they not -- had they
disclosed their Villanova Trust referral agreement with a family
member of an Amazon employee who was handpicking and overseeing
their deals and taking a share of the payments; that Amazon paid
Northstar, and Northstar then passed on to Villanova Trust, and I
stress this because fraudulent inducement of the contract in
common law, like common law civil conspiracy, has nothing to do
with some of the RICO predicates that the defendants have
briefed.

         And I want to stress the other point, which is, I think,
extremely important, that the defendants have made much in their
papers that it was perfectly fine for them to have this, what
they call referral agreement with the Villanova Trust.  They
maintain that they didn't know it was paying kickbacks through to
the Amazon individuals who were supervising their contracts.  We
don't think that's credible.  We think the weight of the evidence
is on our side, but the point is, for the fraud, it's clear they
did not disclose the conflict and the trust agreement, and that
alone is enough for inducement.  And the only argument they offer
to the contrary -- and I really want to press this; we were a bit
rushed in filing our papers on Monday, so I want to make sure I

state this clearly enough -- on pages 16 and 17 of the defendants' opposition paper, they tell the Court that their payment of those admitted broker fees -- this is their quote -- "not inconsistent with our contracts," and that they made no representations about undisclosed fees at all.

That's opposition 16, 17 and 19.  They say that to the Court.  No verification, no cite.  What I would point out is that they try to support that by saying there was no representation about having to disclose broker fees in the contract.

If the Court looks at Exhibit 14 to our verified complaint, that is a copy of a signed lease.  Page 33 bears Brian Watson's signature for the Northstar defendant.  Page 33, you see his signature.  Page back to page 26, you will see in black and white in that signed executed lease the disclosure and no brokerage fee provision that we placed in our complaint.  And then if you flip back to page 1 of Exhibit 14, that signed lease, you'll see that the disclosed brokerage contractor agreement is "NA," not applicable.

So, it is flat out false that there was a consistency between the agreement.  They concealed from us that Mr. Doden says in black and white, paragraph 20 in the affidavit, "we never would have done this business with them had they disclosed that Villanova Trust agreement."  They didn't do it, they were obliged to do it, and when you look at the case law in our brief, particularly our reply brief, it is clear that withholding that

sort of information, which they knew was material to our contract, and they don't have any evidence the other way, would alone be sufficient for fraud, common law fraudulent inducement. If they prevail on their claim that they're somehow entitled to a contract not withstanding, it is a clear breach, and it's also a civil conspiracy with the Amazon and Villanova Trust parties to that fraud, and it has nothing to do with the RICO.

So, I would point the Court to those points, in addition to equity.  At that point, honestly, I think we've established likelihood of success on the merits on several claims that alone would sustain the PI.

If the Court would like, I'm happy to go on and address the RICO and other claims or move on to the harm, whatever would suit the Court.

THE COURT:  No, no.  You can move along.  I will give you a chance to reply as appropriate.  I don't need you to go back and address the RICO claim.

MS. PAPEZ:  Thank you, Your Honor.

I do want to touch on the next portion of our burden under the *Winter* standard, which is, of course, the likelihood that we would face, absent an injunction, what the opposition brief concedes is a likelihood of irreparable harm.

I want to pause for a moment on the standard.  Their opposition brief on pages 9 and 10 concede the standard that we put forth to the Court.  They quote the *Sun Micro Systems* case.

I'm very old.  I litigated that case a very long time ago when *Sun Micro Systems* was still a thing, but they concede that the irreparable harm, number one at issue here, is to preserve" -- this is a quote from their brief -- "preserve the Court's ability to render a meaningful final judgment on the merits."

And Opposition 9 goes on to quote the Fourth Circuit's *Hughes* case which says, "such irreparable harm exists where, for example, damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected."

And then they go on to quote the *Bethesda* case that says, so, if you get a PI on that standard, which we think we absolutely do, it should be carefully tailored to preserve the plaintiff's opportunity to recover money, money damages at final judgment.

To us, that's the beginning and end of the case.  We have a whole separate showing on irreparable harm insofar as the defendants' interference with our business and site operations here in the district, and that is detailed, again at the defendants' request, in Mr. Gilpin's declaration about how disruptive it would be and how much it could irreparably damage in a frequently calculable way on some level our goodwill with all of the vendors, and Mr. Gilpin talks in the declaration at length about the default the defendants caused at our properties. They caused creditors to suspend.  Facilities were not being run

on time.  Vendors were not being paid.  It was a real problem.
We spent a lot of time and money rectifying it.

It is, by the way, the case that we have terminated these
contracts at the properties with Northstar.  They, again, make a
representation in their brief that is incorrect that we haven't
terminated the contract; we have.  We've terminated them with
Northstar.  We've carried them on with IPI.  And then the
question is, well, what about the damages involved in this?  And
on the standard in their own brief, their own admissions and
pleadings, and particularly Mr. Watson's April 2nd e-mail, which
is, frankly, one of the reasons we came into court concerned,
says it all.  They are under siege.  They have legal claims.
They have a criminal investigation.  He says pointblank in that
e-mail, which is attached as Exhibit 4 to the McDonald
supplemental declaration to our May 18th filing, he says,
pointblank, I'm not going to get $11 million of new revenue that
I was expecting; I thought I would get $16 million from Amazon
before it was terminated for cause.  He has claims left and
right.  It does not seem at all the case that he could possibly
pay a judgment, if we were to litigate through trial on the
merits.

He says currently, Mr. Watson at this company, they can't
fund the court-ordered escrow today.  So, this is the
paradigmatic case that we could all go ahead and litigate this to
a final judgment on the merits and have all wasted our time

because there would be nothing left to collect.  That is exactly the situation that the U.S. Supreme Court and the Fourth Circuit said was appropriate for a PI to preserve and protect a damages award.

So then comes the question, well, what are we asking for? And they've made much about this in their papers as well.  We have asked for a sum that, according to their own defense case, is narrowly tailored.  We looked hard at this record and we chose a number that we could tie directly to evidence we have, even at this very early stage in the case, of payments that we, Amazon, made to the defendants, Northstar and Mr. Watson, on the premise of these fraudulent contracts, misrepresentations; that they then took and paid over to a dear friend's family trust that you can see in 2018 was the entire agreement and was reformed from a $4,000-a-month referral agreement where Christian Kirschner was supposed to be sourcing investigators, if you look carefully at that agreement for Northstar.  They converted that entire thing into a profit share on the Amazon deal that Christian's brother was handpicking and handing to Northstar.

And then what we did was we said, okay, we want to be narrow and tailored and appropriate on this because we're early, so we took the evidence that's detailed in the affidavits.  Now, they requested all of the information in our verified complaints as well.  Rule 65(b) says an affidavit is sufficient.  We gave them the McDonald affidavit.  We now gave three more.  And it

ties the numbers that we're requesting on the PI to something very specific, and that is a deleted file from Casey Kirschner, an Amazon insider who was approving the Northstar deal.  It's a deleted file.  It's Exhibit 41 to our verified complaint that we walked through with the Court at the TRO stage that says there are numbers that Casey Kirschner was expected to receive as his share of Northstar's fees that Amazon was paying to Northstar. Now, there is no way that Casey Kirschner would ever be entitled to a share of any deal that Northstar does with an outside developer -- I'm sorry, that Amazon does with an outside developer like Northstar, except on a kickback basis.  It's prohibited by the company.  It's prohibited by our policies.  He never disclosed it.  And before we imaged his laptop, the file was deleted and found in a recycle bin.

    Mr. Doden's declaration details that, completely details that, and the numbers that we have in that sheet are for three deals that are tied directly to fees that we paid Northstar and that Northstar paid to Villanova and then Casey was expecting a share.  That's in paragraph 81 of our verified complaint.  It's in McDonald's original affidavit at paragraphs 5 and 48.  It's in Mr. Doden's declaration, chapter and verse.  And Mr. Gilpin and Mr. Lorman who, by the way, is Northstar's recently departed COO, also attests that the three deals in Exhibit 41 were resourcing what could only be described or thought of as a kickback scheme resourced to three properties, Shaw, Quail and Manassas, that

Mr. Gilpin and Mr. Lorman tie up with that spreadsheet.

So, we would submit, Your Honor, we have been very narrow and very tailored in the relief we're seeking.  We actually think discovery will show there's much more that we could recover from these defendants, but, at a bare minimum, we're entitled to these documents -- or these numbers that our own documents recovered from deleted files on Amazon's system from their co-conspirator attributed to share, mainly a kickback of the deal fees that we paid to Mr. Watson and Northstar.  It's really that simple, and we move the $5 million that we thought at the TRO stage was properly allocated to the White Peaks defendants, to Mr. Watson, because we have three now separate sources of confirmation that the $5 million from the White Peaks sale, that flip transaction, $18 million in profit on the same day for a property with no improvements, prima facie, gouging our client.  We have a verified complaint, paragraphs 4, 74, 142, and this McDonald affidavit, paragraph 9, that $5 million was actually paid to Brian Watson since the TRO.  The individuals who are cooperating with the government who did that deal and used to work for Northstar confirmed that they paid it over to Mr. Watson.  His own doctored transcript he submitted with his brief shows that, and we have declarations from Mr. Lorman and Mr. Gilpin.  It's Lorman at paragraph 13 and Gilpin at paragraph 21, saying that 5 million belongs in Mr. Watson's column, as opposed to that criminal flip sale.  And that's the number we're asking, and that

is all we are asking.

So, Your Honor, respectfully, we think we've more than met the burden.  The public interest prong and the balance is clearly in our favor, and I'm happy to answer any questions the Court may have.

THE COURT:  No, I don't have any questions at this time. I did have some -- I wanted you to go over the relief being sought and the need for injunctive relief, and I think you've covered it adequately in your papers and in your presentation here today.  So let's hear from defendants for Mr. Watson and Northstar.

MR. CALHOUN:  Thank you, Your Honor.  This is George Calhoun for WPC and Mr. Watson.  That was a bit of a -- from our position, we disagree with a lot of what Amazon is saying here, and we're grateful for the opportunity to explain why we don't think a PI should be entered, or even that a TRO should have been entered, and this really shows some of the dangers of ex parte applications where materials are submitted.

We've been shooting at a little bit of a shifting target. Their contractual theories have changed.  The relief they're seeking has changed.  They submitted evidence in a reply brief that we never had an opportunity to review or reply to.

Contrary to Ms. Papez's statement, we did not request that they file more information, we just pointed out the fact that they submitted only one hearsay declaration.  But we can get into

the merits of that as we go through this.

Most of what we're going to be talking about, I would like to talk about, addresses paragraphs 1 and 2 of the proposed injunction, Your Honor.  Most of 5 through 8 aren't really an issue, they're things we do anyway, with a couple of comments. But really, the heart of this is why you should not enter a preliminary injunction against Mr. Watson and WDC.

I first would like to point out that Amazon is very much not seeking to maintain the status quo, which is the purpose of a preliminary injunction.  Regardless of what their counsel requests, what they're seeking is a prejudgment attachment of nonspecific funds through a mandatory injunction.  This is not about a request for a pot of money that's sitting somewhere or a particular asset that they're trying to preserve, they're asking you to enter a prejudgment attachment and to order these defendants to come up with or liquidate assets and to put it into escrow.  That's really remarkable, and it's something that the Court shouldn't do.  And you can tell that this is not status quo because of how they've shifted in their positions by submitting affidavits in the way that they have and the evidence of a shortfall in their reply, not in their case-in-chief, as they should have.

And even -- they allege that we made statements that were false.  We will point out that the contractual provisions that they're relying on are --

THE COURT REPORTER:  I'm sorry, Counsel, I didn't quite hear you.  Counsel, this is the court reporter.  I didn't quite understand.  Can you repeat that last sentence?  Someone is shuffling papers, and I can't quite hear what you're saying.

MR. CALHOUN:  I would appreciate it, if anyone else is not speaking, if they would put it on mute.  Perhaps that would help. I was simply saying that they had pointed -- they argued that we had conceded certain issues with respect to the contractual provisions.  I would only point out that the provisions that they, themselves, were relying on didn't say what they said they said and weren't operative with respect to their contractual claims, and so in their reply papers they changed their claims, and they point to new provisions, and so it's a moving target.

But I agree -- we do agree on the standard, and I don't think there's any dispute about the standard for a preliminary injunction.  It's very well-established.  I want to start, however, rather than with the merits on irreparable harm, to explain to you why Amazon faces absolutely no ongoing prospect of irreparable harm, as they must, in order to obtain an injunction.

As you heard, Amazon contends that Mr. Watson and WDC have been removed from the real estate projects at issue, that there's absolutely no harms they can pose with respect to those projects going forward.

Certainly, Mr. Watson and WDC contend that their subsidiaries were improperly removed from those contracts, and

they have their own legal rights in that respect, but there's no issue with respect to ongoing investments of any sort, and that's clear from their own contentions.  What this is really about, and you can tell from the relief that they're focused on today, is money.  And what Amazon is concerned about and alleged in their complaint and their papers is that Watson and WDC might not be able to pay this judgment.

As you well know, money damages are rarely ever considered irreparable harm, and the Supreme Court has said that it never is, but we recognize that maybe in some situations it might be.

And here the Fourth Circuit talks about this.  They encourage District Courts not to enter this sort of relief based on the concern that a plaintiff can't pay, but to, perhaps, advise for swift discovery and swift summary judgment, which this district is famous for and certainly capable of doing.

The irony with respect to their irreparable harm arguments, Your Honor, is that -- Ms. Papez sort of glossed over damages.  She said we've been damaged, and then she started talking about how they wouldn't be able to get a judgment paid. They never explained to you how they've been damaged financially, and that's because they can't.  There is no -- with respect to some of the lease transactions, with respect to the lease transactions, they formed those leases and have -- or continued the leases with IPI.

So, the question is, if they're keeping the benefits of

the contracts, they count.  What actual loss do they have?  And
remember, Your Honor, these are civil claims that -- a lot of
what they're alleging and arguing -- there are a lot of
prosecutors, former prosecutors on both sides and on the bench
here, and maybe have forgotten that damages are a required
element for civil claims, and they haven't explained to you how
they've been damaged.  They explained to you what they're asking
be put in escrow, and they said we think this is all the fees
that WDC might have gotten from these deals, but they haven't
said that they've been harmed in that amount or explained how
they've been harmed in that amount, and that's an absolute
requirement for all of their claims, and it's certainly an
absolute requirement for them to show irreparable injury because
they can't get that amount paid.  And what's particularly telling
about that is they haven't sued the entities that own the real
estate.  They haven't sued their actual landlords that are
sitting on tens or hundreds of millions of dollars of real estate
that could quite easily satisfy a judgment because they're
sitting on those assets.  They sued management companies.  And
that's really telling.  They're saying, oh, we're concerned that
we entered these leases that we wouldn't have entered, but they
didn't sue the landlords, the landlords that owned the property
and hold the leases that they're saying harmed them.  It just
doesn't -- it's absolutely stunning.  But there's no way that
there can be irreparable injury if they don't explain how they've

been damaged.

They told you what they think the improper conduct is, and we can contest that, but that's not -- they haven't explained to you how they've been damaged.  They just said, we wouldn't have entered these contracts.  They haven't said once that these contracts are not market rate.  They haven't said once that the fees that were charged were not market rate.  They're keeping the benefit of that bargain.

Under Virginia's actual loss rules, they have to show how -- what they received is different from what they should have received.  They haven't done that, and that's a requirement.  And so they absolutely have failed in showing irreparable harm. They're asking for money damages, but they haven't shown how they've been damaged, and, frankly, they haven't shown because eventually the landlords will be necessary parties to this, that any damages that they did sustain can't be compensated.

And when you take that, you also get right into the balance of the harms.  And it's interesting.  They cited *SAS versus World Programming* in their brief, which is a recent case from the Fourth Circuit that dealt with the balance of the harms in a way that's really quite analogous here.

In that case, just as here, the judge focused on the fact that an injunction might impair a company's ability to continue to operate, and that's exactly what they're saying.  If they take what would effectively be all of Northstar's cash and put it in

an escrow, it's not going to be able to service its contracts. It's got other real estate contracts and other partners and investors and other deals.  It's not going to be able to service those deals.  It's not going to be able to operate.  It's not going to be able to pay its employees, because it doesn't have $20 million to deposit into an escrow account.

If you enter this injunction, Northstar is extremely likely -- {Indiscernible}.  It has to have a budget in order to continue to operate.  Now, Amazon's Website, if it doesn't get paid the 9 bucks or 20 million, or whatever it is, that's a comparative blip on its financial statement.  I'm not saying it's not serious, Your Honor, but it doesn't affect Amazon's ability to do business.

When the Fourth Circuit looked at that in the *SAS* case, it said that that balance of hardships militates against the injunction, and it noted that *SAS* was the world's largest privately held software company, but, in contrast, the defendant in that case faces a significant hardship for monetary damages it might owe, and that it had a single product, and that the granting of a request of an injunction would be ruinous for the defendant, and therefore held that -- refused to enter a preliminary injunction, and that was appropriate on that basis alone.

So, even if the Court were persuaded that the defendants were likely to lose, which I'll address in a moment, the Supreme

Court has said that money damages -- excuse me -- that Your Honor has to consider the balance of hardships.

And under the Fourth Circuit's analysis in *SAS*, there's no way you should enter this injunction. You have a situation here where you have an enormous, extremely profitable company that's claiming money damages.

We recognize the seriousness of the charges and the claims, but the flip side of that is we're talking about putting a company out of business before it has an ability to defend itself and putting all of its employees out of business. The balance of the harms is overwhelming here. It's not even a -- in my view, it's not even a question. That's not how our system is supposed to work. Damages are supposed to come after trial, not before trial, and there's incredible questions here about whether there are any damages at all, given their conduct and keeping the benefit of these transactions and then seeking damages against parties that, frankly, aren't -- this is a point that didn't come through very well in the papers. They didn't even pay. Other than the lease transactions, they paid the landlord under these, which is joint ventures, and those joint ventures pay the various fees that they're talking about.

Amazon paid and negotiated the lease amount, which it has not contended was not a market rate, and that's pretty telling. If they thought they were getting gouged in these lease transactions, they would have known it. And Amazon is not the

only party that would have looked at the lease fees.  They would have been reviewed by the vendors who are working on the funding that -- the construction projects, by IPI, by all their lawyers. It's just simply not credible that this is an above -- above-market leases, and they haven't said a word about that.  So where is the harm?  It's just not there, and that's an incredibly important point when you're talking about irreparable harm and the balance of the harms.

     If Your Honor has any questions for me, I'm happy to answer them now or we can turn to the merits.

     THE COURT:  Why don't you go ahead and turn to the merits.

     MR. CALHOUN:  Thank you, Your Honor.  I would like to first talk about the plaintiffs' equitable claims, and then I'll go back to address their claims at law.

     In particular, I want to talk about the legal claim, which is the only reason we're in this court.  With respect to their equitable claims, it's true that we didn't focus on unjust enrichment in our reply.  We didn't do that because, although it may technically be an equitable claim, they didn't claim any equitable remedies.  They only sought damages.  The only claim on which they -- for constructive trust is conversion, which was Count 9.  They didn't ask for that.  With respect to their unjust enrichment claim, they simply asked for a return of money.  But in any case, to the extent Your Honor wants to focus -- let me back up, Your Honor.  I'm sorry.  I'm getting ahead of myself.

The reason that the equitable claim is important is because they essentially concede under *Grupo Mexicano* that the sort of relief they're asking for is completely improper for claims at law, and we certainly agree that that's the case, that if -- absent a claim for a lien on a property or some equitable interest in some specific property, *Grupo Mexicano* precludes the sort of prejudgment attachment that they're asking for, the same as an injunction, and so I want to spend at least a little bit of time knocking out their equitable claims.

I'll start with the unjust enrichment claim, because it's frivolous. An unjust enrichment claim is a quasi-contractual claim. Here they're relying on contract claims, and the Fourth Circuit has already addressed that specific issue in *Acorn Structures versus Swatz*, which is 846 F. 2d 923, and then *Lion Associates, LLC v. Swiftships Shipbuilders, LLC*. That's 475 Federal Appendix 496 and a little bit of a tongue twister. And those cases, the Fourth Circuit looking at the Virginia law, concluded that the law would not impose an implied contractual relationship, which is what you need for an unjust enrichment claim where there's an expressed contract, and that's what we have here. We have express contracts. They are making fraudulent inducement claims, true, for sure, but they're not rejecting the contract, they're not seeking rescission; they want to keep the benefits of the contracts, which means they have an express contractual relationship. Well, you don't get both.

Because of that, the unjust enrichment claim is going to fail, as a matter of law, and that's, you know, of their own making.  If they wanted to come forward and say, Your Honor, we never would have entered these contracts and we're seeking rescission; we don't want the agreement; we don't want this property as painted, maybe that would be a different story, but that's absolutely not what they're doing.  They want to keep these contracts.  And they're not even contending that Northstar DC didn't do the work that they contracted to do, so there's no theory that there was an explicit contract pursuant to which Amazon did work or did something for which they didn't get paid but they should have because there's an explicit contract.  That's what unjust enrichment is all about.  This is not an unjust enrichment case, this is a case where they said they were fraudulently induced and that these other fraud claims are contract claims, and they sort of turn a stick at it, probably in an effort to preserve some ability to get injunctive relief.  It's just not there.  There simply was no explicit agreement that would support that.

Their conversion and debt-new claim, their other equity claims, are equally weak, Your Honor.  There are a lot of problems with a detinue claim, but as they said in their papers, and I won't belabor it, the Virginia statute is really clear on what you need to establish a detinue claim, and what you need to have is property in Virginia, among other things, and there's absolutely no allegation here that any accounts that they're

seeking, or any funds that they're seeking to put into an escrow account or to recover are located in Virginia.  And, in fact, when you look at their exhibits that they've attached, they're all for accounts in Colorado.  There's just no basis here for a detinue claim, and the same is true for conversion.  You know, we put forth the standard for that in our papers.  Virginia law is that typically you can only have conversion where there's a identifiable personal property.  It's normally not true for simply money.  And like investment enrichment, conversion doesn't apply to the contractual claim, but it's a claim that applies when you have a right to the immediate possession, typically pertains to personal property.  And again, that's just not what they're asking for here.  They're asking for money damages, and they're asking that these defendants go find from wherever a bunch of money, and that's simply money damages; that's not identifiable property.  They're trying to say they can get {indiscernible} fees that were paid.  That's fungible money.  Those fees were paid as part of rent, rent that went to a landlord, the landlord for JV.  The JV paid fees to Northstar, which they used those fees to pay its employees and operating expenses and everything else.  They're simply not -- they're not even asking for the profit, they're asking for all of that.  That's not a realistic pot of money.

        And to the extent that a conversion claim would be viable with respect to money, the Virginia courts have said it's got to

be extensibly traced, and they haven't begun to do that and can't do that.  So, there's no basis for that to arrive at a prejudgment remedy here.

Turning to the legal claims, I'm going to start with the -- I'm going to spend a lot of time -- we briefly provided some authority in our papers, but I did want to highlight the fact that this is the sole reason we're in front of this Court. They have ginned up this RICO claim in an effort to get in Federal Court jurisdiction.  This is really a -- these allegations are serious, and we respect that, but this is a garden variety fraud claim of the sort that should result in being in State Court.  And really, we ask that Your Honor not get tied up in the fact that this is Amazon.  These are serious claims.  This is a case where there's no evidence of a pattern. It's a single victim case.  There's no continuity.  None of the things that you would see in a typical RICO case are present here.  And it's interesting, Amazon relies on all of the exceptions.  They're trying to -- the Fourth Circuit didn't say you can't have a single victim case, but for sure the Fourth Circuit advised that District Courts should look very closely at those types of cases because they're most frequently not the types of cases that should be brought as RICO cases, and this is again {indiscernible}.

And similarly, they can't prevail on a RICO case here because they haven't even alleged damages, and they have to do

that.

The issue -- I did want to go back on the damages piece here, because they allege two different RICO schemes.  The lease one, I think, is pretty simple, and they haven't done anything with respect to that on damages.  We talked a little bit more about the White Peaks transaction, which even under their own theories, Watson and WDC knew nothing about, and they make the -- a big deal out of the fact that they later challenged the former employees about that transaction, and they say that we conceded that that was grounds for a constructive trust, and that's an important distinction that I did want to address before moving on from this.

Tyler Whale worked for Northstar.  When they went out and took a corporate opportunity, that was an independent breach of their duties to Northstar, and they had the sort of implicit contractual arrangement that would actually give rise to an unjust enrichment claim, because that was something, pursuant to their agreements and their employment with Northstar, one could presume that's a corporate opportunity that belongs to Northstar. When he took it, that gives rise to a claim for constructive trust.  That sort of implicit contractual relationship doesn't exist here.  The fact that we may have made that sort of allegation against our own employees is in no way analogous to a concession with respect to constructive trust here.  I mean, Amazon has really taken that and bent it past the breaking point

and actually proves the point that they don't have a claim here. It's completely distinguishable.

The fact that Northstar believed that these former employees usurped the corporate opportunity does not mean that anything happened with respect to Amazon that would give rise to a RICO or fraud claim with respect to this {indiscernible} action.  There is no question that the real estate in Virginia exploded in price at this point in time.  White Peaks Capital bought this property and made a $8 million profit in just a little over a year.  So, yes, the numbers are crazy, and I wish I had bought property in Northern Virginia, but I didn't.

What Amazon doesn't say is that there was a kickback situation and that there was an issue, there was some other sort of actual fraud that's an ongoing scheme, among the other things, that would make that a RICO transaction.  What they said is, they gouged us, we shouldn't have paid that much.  And, Your Honor, we can get into that in discovery, but that's not a statement that's going to provide them with a likelihood of success on the merits of a RICO claim or any other sort of claim because Amazon is one of the largest, most sophisticated companies in the world, and there's no way that it could reasonably rely on any statements about the market value of a piece of property when it owns other property in the area and is certainly capable of looking at that and determining if something is a fair market price.

And with respect to my clients in particular, when they

found out that this corporate opportunity had been usurped, they weren't concerned that Amazon had paid too much.  Amazon pays whatever it decides to pay.  They were concerned that the opportunity had been taken from them, and they eventually mediated that with a Colorado state judge and settled that matter.  The idea that they somehow were a party to wrongdoing in that is just not true.

So, neither of those support a basis for a RICO claim where there is a pattern of misconduct, an ongoing fee and the like.  Again, it's just not there.  The same with the breach of contracts.  They completely changed their theories, Your Honor, about which provisions of the contracts were allegedly breached.

Now they're saying that it's paragraph 33 and 34 of Exhibit 14 that we breached, none of which were in their complaint or in their motion papers.  This is in a reply.  That's really all you really should need to know about their contractual theories.  But, if there was a breach, it's a breach about a representation of whether there were brokers.  And what are those provisions designed to do?  It's designed to prevent Amazon from having to pay for those.  There's no question that they didn't have to pay for any other fees, for a finder, a broker, or anyone else.

So, again, there's no there there.  Even if there was a -- if you consider payments to Villanova as a broker or not a finder or independent contractor, the remedy for that would be Amazon

doesn't have to pay those fees.  They never had to.  They were never asked to pay a penny of that.  If Northstar made its profit from a deal with someone else, that doesn't harm Amazon.

Again, it's not downplaying the seriousness of the allegations, but what we've got here is whether keeping a transaction or keeping a lease -- and they are not financially harmed by it, and they're saying there was a breach.  There's no damages, so there's nothing there.

Your Honor, again, finally, I want to turn to the public interest.  Too often that gets treated as a throwaway factor but shouldn't be.  We know that the type of injunction that is being requested here is critical to our American system of juris prudence.  That's what the Supreme Court said in *Grupo Mexicano*. That's what the Fourth Circuit has said and why this sort of injunction is extraordinarily rare.

Amazon claims that the public interest is in ensuring expectations of parties to a contract, but they haven't alleged or acknowledged a breach of a contract claim.  They haven't even sued the actual landlord.  So, that just doesn't hold water. There's no public interest in that.  This is just a fraud dispute in that sense.

They also say that the public interest is to address illegal conduct, but, again, that's not what this proceeding is for; that's what the criminal justice system is for, and the public interest is not going to be served by putting people out

of work or preventing these defendants from defending themselves.
It's going to undermine the system.  To the extent the public
interest is a factor here, it is -- it weighs in our favor, not
in Amazon's favor.

So, Your Honor, I can talk more about any of the
individual claims, if you would like.  We talked about some more
of the -- Amazon's claims in the brief, but I think the point
that's clear is that Amazon has the burden to show that it's
going to win on every aspect of its claims, particularly with
respect to damages.  It has to do that, and, for the reasons that
I've explained, you should allow the TRO to expire and refuse to
issue a PI.

I'm happy to address any other questions you have or to
deal with anything else that you would like me to address.

THE COURT:  No, I don't.  I mean, you hit the areas that
you had focused on in your opposition, but you also did explain
further your lack of damages theory and irreparable harm, and so
I appreciate the argument that is added to your briefs, and let's
hear from Ms. Papez at this stage.

MS. PAPEZ:  Thank you, Your Honor.  I don't take this
lightly, but I would like to start with some corrections to the
record.  Either counsel is not prepared for this hearing and
hasn't read the pleadings or they're making misrepresentations to
the Court, but those are the only two choices.

Let me go through a couple of the points.  First, counsel

repeatedly said the only reason why we're in this court is a RICO claim on 1331 jurisdiction.  I refer the Court to paragraph 23 of our verified complaint, which expressly invokes 28 U.S.C. 1332, diversity of jurisdiction, in addition.  So, that's just a blatant misstatement of the jurisdictional basis.

I'll get to the federal question and the RICO claim in due course, because there's lots to discuss.

The second thing I wanted to address just briefly is the *Grupo* case and their arguments about unjust enrichment.  If they thought the claim was frivolous, they should have taken the opportunity that the Court gave them after a two-week extension to say something about that.  They waived that.  They said nothing.  And what I would like to point the Court to, because this is critical, is the Fourth Circuit's decision in the *Rahman* case at pages 497 to 99.

In that case, which we cite in our briefs and which they do not engage, other than to cite it and acknowledge it's binding circuit law, it says -- our case, just like the PI and the case that the Fourth Circuit held in *Rahman,* is a case that satisfies *Grupo* and is appropriate for a preliminary injunction, and I'm reading here from the case starting at page 498, because, quote, "the equitable doctrine of unjust enrichment" -- and the unjust enrichment count that we've pled here and they have not even dared to brief -- "is recognized as equitable."  It goes on to say that, "constructive trust remains an equitable remedy,"

quote, "even though it might ultimately reach a fund of money," end quote, and it goes on to uphold the preliminary injunction that froze the defendants' assets prohibiting the defendants from transferring them outside of the ordinary course and prohibiting mergers, reorganizations, or other things.  And the Court went on to conclude right before the page break at 499, "It is clear," quote, "that this case does not present the pure money damage claim addressed in *Grupo Mexicano*.  On the contrary, its equitable claims fall squarely within the traditional equity powers recognized by *Grupo, De Beers* and *Deckert*."  We pled our case with that in mind.  We pled the counts with that in mind. They're in the complaint.  They didn't only fail to brief them, they bring nothing; no evidence, nothing to this record, into this court to say that we don't have a likelihood of prevailing on those claims.  We are at the pleadings stage.  This is not even Rule 12.  They bring nothing to the table on this.  So *Rahman*, our complaint, disposes of that.

        Let me go to a couple of other points.  I don't know. I'll go to SAS, I guess.  You know, they wanted to invoke Judge Wikinson's opinion at SAS as somehow on point here.  I mean, I've got the opinion.  I'm well-familiar with it.  That was, by the way, a summary judgment stage case.  I think this is a fundamental problem that we heard throughout counsel's argument, and we see it on pages 11 to 12 of their opposition.  They literally state in their brief that we have to, quote, "prove,"

and, quote, "quantify" damages at this stage of the case.  We absolutely do not.  This is a pleadings stage civil case.  We alleged damages.

Fourth Circuit law says that even at the end of a merits trial or at summary judgment we don't have to quantify damages, and I'll get to the evidence we have on that in a moment, but this is a permissive issue where they constantly misstate the legal standard.  Their argument is nothing short of an assault of a hundred years of jurisprudence.  Granny Goose, the Supreme Court, goes back to say ex parte TROs are necessary in some circumstances.  Rule 65(b) expressly authorizes them in black and white.  We have decades of precedence.  And then what they come to the table with is nothing.  They come with erroneous legal standards and misstatements of facts.  We don't have to prove or quantify damages, and I want to point this out for the Court.  Look at page 25 of their opposition, footnote 10.  They make the same tracing argument that they made before the Court here today.  If you look at our TRO brief, page 15, note 3, we make the same point that I'm about to get to for you in the *SAS* case, which is this is not a summary judgment/permanent injunction stage case, we're at a PI.  What we say, and we're very clear about this in our brief and transparent and up front, is that at a PI we don't have to trace.  That's what we say on page 15, note 3.  They come back with tracing because that's a permanent injunction standard.  Judge Wilkinson's opinion in *SAS* is a summary judgment stage

case.  And if you look at page 387 of that opinion, he goes on to
distinguish the situations where, quote, "preliminary injunctions
are sometimes used to ensure that assets currently held by the
defendant but likely to become unavailable before the damages can
be collected will remain available following trial," citing our
*Hughes* case.

And then he goes on to say that the reason that the
summary judgment stage PI was not granted there was because the
plaintiff, quote, "offered nothing but vague concerns and
speculation."  We have five affidavits, over 50 exhibits, and a
55-page verified complaint.  The party in this case that comes to
the table with nothing but speculation and vague concerns is the
defense.  So, *SAS* doesn't help them either.

Let's now go to, because I really want to address this,
the contract claims.  They actually said to the Court today that
we didn't plead briefs of the provision that we say they
breached.  I refer the Court to paragraph 79 and 80 of our
verified complaint and paragraph 194, which is the actual count,
and if the Court now were in chambers with the exhibit book, you
can go to Exhibit 14 of our verified complaint, which is the
lease that they signed.  And if you turn with me on the pages,
you will see that on page 26, the language that they flatly
misrepresent to you in their brief at page 16 and 17, is not in a
signed contract, is, in fact, part of their lease, and their
client's signature appears on page 33 a couple of turns later.

And again, page 1 of that Exhibit 14 to our verified complaint, which is the very same contract we say they breached in paragraph 79 and 80 and 194 of our complaint, does, indeed, list brokerage fees as NA.

Now, in the briefing before the Court on this PI, they've admitted Exhibit 19, which is their 2018 agreement with the Villanova Trust, and if you look on page 2 of that exhibit, Exhibit 19 to our verified complaint, you will see that they are, in fact, paying the Villanova Trust what are expressly called brokerage fees on the face of the contract.

And then, if you look at Exhibits 21, 23, and 24 of our verified complaint, you see documentation that we pulled from our internal investigation showing wire transfers across state lines that actually document these brokerage payments in violation of the contracts, in violation of our company policy; that they admittedly did not disclose; that was a fraud and a conspiracy and the underlying predicate for multiple RICO violations.  Maybe I'll go there next.

On the RICO claim, it is astounding to me that they ignore, again, large swaths.  I sometimes wonder if they read the complaint, like on the jurisdictional point, because their arguments do not engage with what's on the page.

In RICO, starting in the body of complaint, paragraph 36 plus, we plead the lease transaction enterprise.  Paragraph 99 is wire fraud.  But we go on to plead in one of three money

launderings, which takes the form of taking proceeds from an unlawful act, here the fraud, by which they procured fees from our clients on deals they never would have gotten had they disclosed their kickback or otherwise untoward conflicted Villanova Trust agreement with our employee's brother.  And Villanova Trust was the washing machine.

So, we have money laundering in 103; we have 106, unlawful acts; anything in the RICO statute, 1591, that includes their bribery, theft, embezzlement, financial institutions fraud.  We have paragraph 110, transacting criminal proceeds; the Travel Act in 118, because this all happened over state lines.  Villanova Trust was in Tennessee.  Watson and Northstar were in Colorado. Our properties and these landlords that co-counsel was discussing, they're in Virginia, and they were formed by the defendant.  And where I want to go on all of this is we have ample evidence of a RICO enterprise for all the reasons in our brief.  And what's stunning to me is the idea that they want to come and say, well, we haven't shown any harm?  Let's start with the leasing transaction enterprise.  The idea -- and this goes to the number in our TRO, those are numbers that our internal investigation, based on their own whistleblower, who came to us in December 2019, told us, your -- Northstar -- informant one was a Northstar employee; informant two, Mr. Lorman, is now an open declarant saying Mr. Watson and Northstar were engaged in a known kickback scheme.  We've got five affidavits, 50-plus exhibits;

they have nothing.  Their counsel affidavit doesn't even purport
to verify Mr. Watson's alleged lack of knowledge of the kickback
scheme.  He certainly didn't exhibit anything.  No affidavit,
nothing under oath, nothing from the company.  He had weeks to
prepare for this.

     And if you look at Exhibit 4 to our verified complaint,
you will see that the same counsel that are representing the
defendants here today are representing Watson and Northstar on
the breach and termination of the IPI agreements, so they had
weeks and weeks to prepare for this.  What they can't do with all
of that time is explain the simple facts laid out in our
complaint in the Gilpin declaration, which is we wanted these
properties, and we do want these properties on fair terms.  What
we rescinded and terminated and kicked out was a fraudulent
criminal enterprise group of people who were pocketing portions
of the money we paid for these operations.  And if they're going
to stand in court and say that that wasn't harm to us, I don't
know what is.  And what's astounding about it is their own
declaration on their opposition, when they describe self-dealing
and conflict and side deals that happened inside their own
business, they call those people thieves.  They ran them out on a
rail.  They said it was F.B.I. stuff, and they said they were
entitled to the proceeds of the constructive trust and, in fact,
they went and took $5 million of proceeds that the U.S.
government has now seized from that White Peaks flip.  I don't

know, but I would certainly be surprised, if the United States government took that money criminally because they thought that it was a conversion of a Colorado Northstar business opportunity. All indications from the cooperating defendants here are that everyone recognizes that flip transaction was a crime, and what Mr. Watson and Northstar did in response was engage in a coverup deal to pocket $5 million of the money, and then they come in and say, why do you want us to escrow anything on that?  We did nothing wrong.  It's astounding.  And the kickback money that we have from the deleted Amazon laptop files from their co-conspirator who stood in Mr. Watson's wedding last year who had deals with his brother for 20 years, which he admits and concedes paid undisclosed, forbidden referal fees that are termed brokerage fees that are prohibited by the terms of a lease that he signed in Exhibit 14.  The idea that that's not a harm to us? Every penny of our money that we spent on these properties that went to line the pockets of Mr. Watson, Northstar, and his kickback co-conspirators at our company who we fired, is money that harmed us because that money should have gone to proper development of the project.  We've alleged that.  It's a prima facie case on our complaint and our affidavit.  That is all that the Fourth Circuit law requires at this stage.  We have more than met it.

         And what I would say to the Court, respectfully, is they have come into court with absolutely nothing on the other side.

Under the weight standard in their own brief, our scale has something on it; theirs has nothing.  It's an easy call, and I'm happy to answer any further questions the Court may have about any of our allegations.

MR. CALHOUN:  Yeah, this is Mr. Calhoun.  May I reply briefly to that?

THE COURT:  Yes, sir, very briefly.

MR. CALHOUN:  Your Honor, I've just been accused of making a number of misrepresentations, and so I appreciate the opportunity to comment on that.  First on the jurisdictional point, they said they -- that they're astounded that we haven't read the complaint and they attempted to invoke the Court's diversity jurisdiction.  I would just point out that in paragraph 15 they note that Amazon Data Services is a Delaware corporation --

THE COURT REPORTER:  I'm sorry, counsel, I can't quite hear you.  Can you --

MR. CALHOUN:  I'm sorry, Your Honor, I'll try to talk more slowly.  In paragraph 15 they point out that Amazon Data Services is a Delaware Corporation.  And then in paragraph 20 they allege that White Peaks Capital, a defendant, is a Delaware corporation. I don't know how that doesn't destroy complete diversity.  I think it does.

So, whatever they may have attempted to invoke as far as later in the complaint, it doesn't work.  They don't have

diversity.  Ms. Papez made a big to-do that they have five affidavits, Your Honor, which is really sort of an incredible statement when they filed four of those affidavits after our opposition when we had no opportunity to respond to them. Frankly, Your Honor, you should strike those affidavits as inappropriate.  Their time to put the evidence in was with their motion, not on the reply.  It's one of the worst cases of sandbagging I've ever seen.  But what you've heard, in effect, is just a lot of hyperbole and conclusory statements.  Again, they accuse us of misstating and misreading their complainant in a breach of contract claim, and you're directed to paragraph 79 of the complaint.  I would be happy for you to read that, Your Honor.

And, as you can see in our opposition, we quoted the very provisions that they referenced here, and the two that they relied on most heavily are in an attachment to the lease.  We don't dispute that they exist in the attachment to the lease. They do.  They're in a right of first refusal agreement if the property was ever sold.  The property hasn't been sold.  So, it's -- those provisions aren't in effect yet.  They're effectively a nullity.  Those documents, when they're signed, those provisions will be in there.

And finally, I just want to address this last question on -- the two last questions.  And, Your Honor, I've explained the reasons why their unjust enrichment claims just don't lie and

the fact that they didn't seek relief from it.  I invite you to read *SAS* and the other cases that deal with the harm issues because I just think they're just completely misstating them.

But the last issue that I think really the Court should focus on is the issue of harm.  Amazon's counsel was aghast, couldn't believe that we don't see the harm because some of the lease rent that they paid was used to pay fees to Northstar for the alleged wrongdoing.

This is completely right.  If you assume they're completely right, Your Honor, which we don't at all concede, but even if you assume that you're convinced of that, they do have to have a cognizable theory of damages.  And the idea that we don't like bad people to get our money is not a theory of damages that Virginia recognizes.  Virginia law --

THE COURT:  Well, tell me -- hold on.  Tell me why Ms. Papez is wrong when she says that the profits that were used to pay the brokerage fees or the kickbacks, whatever you want to call it, which are prohibited by the lease enterprise language, is not the damages that -- and the harm?  Why is that -- why does that not work?

MR. CALHOUN:  Thank you for asking that, Your Honor.  So, Amazon pays rent.  They're not paying these fees directly.  So they're paying rents to JD and JD then pays through the Amazon network because there's a budget, and the budget is approved by Amazon and by IPI and by the lenders.

So, to the extent -- by the way, they're not asking that
the profit be escrowed, they're asking that a hundred percent of
fees be escrowed and money that's unquestionably been spent.  But
if they're saying that we got -- they're not saying that we got
profit that we would not have gotten in this transaction; they're
saying we don't like the fact they got this because this contract
was fraudulently induced.

Virginia follows an actual loss rule for fraud.  Under an
actual loss rule, what you look at is, what was -- what was the
transaction price versus what was the value of that contract or
the services?  The contract that Amazon entered into here is for
leases, their commercial leases for real estate that provided for
the purchase and the development of this land that Amazon leased.
So, to determine actual loss under Virginia law, which everyone
seems to agree is the law that applies here, what you need to
look at is, what rent did Amazon pay, and was that the market
rate rent for this property?  They haven't even said it's not,
because it is.

And I understand, they don't want -- if they think there's
a kickback here, I understand if they wouldn't want anyone to
profit from that.  And they said in their reply that this is
honest services fraud.  And I don't know, Your Honor, if you
followed the developments of honest services fraud over the
years.  I suspect you have.  The Supreme Court originally said
there's no -- wire fraud doesn't apply to this because there's no

monetary harm, and then the statute was amended criminally to include it.  But in the civil context, fraud requires damages, and honest services damages frequently results in things where there are no damages.

And I understand -- and so the fact that Northstar did anything with profit {indiscernible} doesn't mean that Amazon was harmed in a concomitant amount.  They are unrelated.  Amazon's only harm is that it paid rent that exceeded the value of the property that was given.  That's what the law is in Virginia, because it follows an actual loss rule.  Whatever else somebody did with money that they paid under that rent, it doesn't harm Amazon, as long as Amazon is paying a market-based rent.

Now, there may be other issues involved here.  Your Honor has been told about the FBI issues and about, you know, the claims, but the bottom line here is that they're keeping the leases.  They don't want to get rid of the leases.  You heard from their counsel that they want to keep these leases.  So the only issue -- the only way they could be harmed is to say that -- I'm sorry, Your Honor, I lost the phone for a second.  The only way they could be harmed is if they prove to you or at least allege, which they have not done, that these properties are not worth what they're paying for, and you haven't heard that, and I suspect very strongly that you're not going to hear that.

And I get the indignation.  It is what it is, but that's not the basis for a legal claim.  What we're dealing with are

claims that require elements, and here they have to show an actual loss, and they haven't even alleged it.

     MS. PAPEZ:  Your Honor, may I respond?

     THE COURT:  Yes, you can respond to the last point about whether you have received these properties at a good faith monetary sum and that you're not contending that you would have paid any different amount of money had this scheme not been uncovered.

     MS. PAPEZ:  Of course, Your Honor.  The question is, paid for what?  For the services at issue, there's no question that we've never paid money for kickbacks that got us no value at all. So then the question is, what were we paying for?  We did allege that the kickbacks were an injury to us.  That's the only money we're claiming in escrow.  When you look at Mr. Gilpin's affidavit, I would suggest it not only elaborates and confirms everything in our complaint, but it absolutely rebuts everything that counsel just said.  He walks through at paragraph 4 all the way through 9 the fact that the services we got from Northstar were subpar, and we were damaged, apparently, because the money that they were paying their kickback co-conspirators should have been going to things like keeping our projects on time, not allowing credit agreements to default or result in draw stops; vendors cannot get paid on time, lack of financial reporting, unbalanced budgets, contracts improperly signed.

     Mr. Gilpin goes on to allege in paragraph 7 that the

Northstar entities, while they were purporting to manage these properties for us, had failed, and I quote, "and was failing to meet many requirements on time, in some cases at all, including draw packages, operating reports, budget compliance packages." And so there's no question that we were harmed because we paid these defendants money to run a property for us.  And you know what they did instead?  They stole money that they should have been spending on our developments, which were placed in jeopardy as a direct result of their conduct with direct and consequential damages to us and our partner, and they pocketed it.  That is as clear and open and shut a damages case on Virginia or any other law that I'm aware of.

And I would just go back to the point that at the PI stage, we are not, as the defendants improperly state at pages 11 and 12 of their brief, required to prove or quantify any of this; we're required to allege it.  We've done it.  We've put in an affidavit that cites it chapter and verse, and, again, on their side they have nothing but their lawyers' words.

THE COURT:  All right.  Thank you.  First, let me -- you also, Ms. Papez, addressed the possible conflict of counsel in representing Mr. Watson and WDC, and I'm not going to address that issue today.  It's something that I'm sure counsel will look at and determine, whether separate counsel is necessary.  And when that occurs, if it turns out that you believe that there is a conflict, then you can bring that to my attention by separate

motion.

You know, I looked carefully at the declarations that came in and the reply, and I don't find any bad faith in the timing. Amazon looked at the focus of the opposition brief in addressing what might have been perceived as some unfounded accusations or some hearsay accusations, although, of course, hearsay is permitted at this stage of the proceedings.  It's the reliability of the statements that they wanted to address, and they did, and the affidavits are direct, focused, and extremely powerful and present evidence beyond that which is necessary at this stage of our proceedings.  I think that they have, that Amazon has properly alleged the RICO claim, and that when you look at the persons involved here and the Villanova Trust and the lease agreement, which I disagree with counsel and I believe it is binding, I believe that WDC was required to operate in good faith under best practices, which is what the documents allege, and that brokerage fees were not permitted, and that, as a result, this, as alleged, the Villanova Trust was modified from 2016 to the 2018, and a significant amount of money was run through the new account.

I think that the payment of that money into the trust and then disbursed is damages to Amazon, regardless of the lease operation; also that, as Amazon has alleged, that their properties suffered, as the Gilpin affidavit addresses.

I think that the equitable claims are also properly pled

and disagree with the narrow reading that counsel addressed in the unjust enrichment elements, as well as the conversion count.

So, you know, the *Rahman* and the *SAS* cases address monetary damages, in addition to loss of goodwill and business, which is also alleged, but when monetary damages are appropriate for injunctive relief, and it's a very narrow window.  As counsel stated, it is appropriate in cases where assets may likely not be available, if they're not restrained, prior to the resolution of the case at trial, and I think that the facts of this case, as pled, are foursquare with the *Rahman* logic.  We have a corporation and a CEO of a corporation who is under great stress, clearly looking at a criminal proceeding, as well as his termination of leaseholds and business partners having withdrawn from the company, and that there's great risk that Northstar's value is going to be insolvent.  And I think the facts of this case fit, the relief that's been requested, because of it, the facts alleged in the complaint and the TRO and the preliminary injunction papers and with the declarations now in place as well.

So, I'm going to grant the motion for the preliminary injunction.  I think that -- I looked closely at the relief being sought and whether it, in fact, was narrowly tailored to the circumstances of this case and agree that the $21,250,000, which represents the fees that the defendants received on the Shaw Road, Quail Ridge, and Manassas lease transactions, as well as the $5 million payment from the White Peaks Capital/Villanova

deal should constitute that amount of money that they are seeking to be placed in escrow, and I find that the further relief in the form of numbers 5 through 8 where they seek the return of confidential information, a nondisclosure and spoliation, and that the other -- access to premises are all reasonable in light of the facts of this case.  So, I'm going to enter the preliminary injunction and --

MR. CALHOUN:  Your Honor, may I ask a question?  This is Mr. Calhoun again.  With respect to paragraphs 5 and 6, if you could require Amazon to let us know what they consider the proprietary confidential information is.  We don't have any problem with these provisions, we just don't know what is meant by this.  We raised this in discussions with our counsel.  We don't have any problems with returning it, subject to the needs of this case.  And if we have anything, if you could just give us a deadline or something to let us know what that might be, we're happy to comply with it.

THE COURT:  All right.  I think that's fair.  I'm not sure how -- I would guess that Amazon would know better than defendants what they consider to be confidential or nonpublic proprietary information.

Ms. Papez, what -- how do you respond to that?

MS. PAPEZ:  Sure.  I mean, the first statement, we're happy to meet and confer always.  We've been doing that over the last two weeks.

On the confidential, I will just note for counsel, maybe they could start -- we thought their client knew in the April 2nd e-mail that Mr. Watson sent -- we attached a copy as Exhibit 4 to the McDonald supplemental declaration -- he states in the e-mail that he's subject to a strict confidentiality agreement with our company, and so we thought it was clear that anything covered by that agreement or anything on the property deals, but we can work this out.

And I think, Your Honor, the other thing is we'll probably have to work out at some point the more general protective order for the case, because, you know, once we proceed with execution on the TRO, I will state for the record I don't know how this is going to go.  We have been conferring with defense counsel. We've actually made progress, for the record, on the escrow agreement that we attached since we filed our briefs on Monday, Your Honor.

Counsel for Mr. Watson and Northstar have come back with a few acceptable changes to the escrow agreement, so I think we can agree upon that.

And, with the Court's permission, we can submit that as an agreed form of escrow.  They have, however, represented to us, without any substantiation or documentation, that they are unable to fund the amount that Your Honor just ordered.  And so, you know, maybe at the same time that we meet and confer about any questions on confidentiality, we can try not to burden the Court

with, you know, enforcement proceedings by, you know, trying to make some headway on the assets that they say they have or don't have, because up to this point we've just gotten kind of top-line statements that they have liquidity problems, which obviously we're happy to discuss, but we're not obliged; nor should the Court just take their word for that.

THE COURT:  No, I agree with that, and I'm glad to see that you are communicating and moving forward attempting to resolve some of these issues.  So, if you want to continue to work on the escrow agreement and see if you can reach resolution, that was going to be my next question.  That would be terrific.

MR. CALHOUN:  Your Honor, we'll most certainly continue to work with them.  There are issues that, I think, we're able to review, the fact that the FBI seized the payment that's subject to paragraph 1 of the order, but we can certainly submit the evidence on that.  They relied on a letter from counsel for some of the other defendants of the transaction.  It is what it is.

And on the other funds, it just -- it's just not there. One thing that would actually make this easier is if you did exactly what the court's approved and award -- if you're going to enter an injunction, if you simply enjoin the defendants from transferring or disposing of assets beyond the ordinary course, I think that would be a more narrowly tailored injunction and would actually allow them to continue to operate.  So, we would ask you to consider that, but, otherwise, we'll work with counsel subject

to what they've alleged and everything else.

THE COURT:  Is there any likelihood that WDC could put up a bond or some other collateral which would serve as the asset instead of currency?

MR. CALHOUN:  Your Honor, that's an answer that Stan could probably give.

THE COURT:  Yes.

MR. GARNETT:  Your Honor, if I may, this is Stan Garnett, and I'm one of the Colorado counsel that represents WDC.  If I could answer that briefly, I think I could be helpful.

THE COURT:  Go ahead.

MR. GARNETT:  Your Honor, the issue that's been so challenging for WDC and for Brian Watson on this -- and counsel is right, we have been engaged in discussions about the escrow, and we will continue to do that.  I think we have a form that everybody can agree to.  The issue is that the funds that were received by Northstar and by Brian Watson in connection with the -- both paragraph 1 and paragraph 2, were funds that were received in due course; with regard to paragraph 2, last year, as this business continued to do operation.

We, as the case proceeds and there's discovery, we'll hotly contest Amazon's characterization of what those funds are, and we don't need to get into that now, but the point is these are funds that were received in the course of business for a commercial real estate developer -- he's based in downtown

Denver; he has about 45 employees -- and those funds were used
for what developers use them for, paying salaries, paying
obligations, paying fees, et cetera, and so there is not a corpus
of money that comes anywhere close to these amounts, and
certainly it is a significant obligation that's imposed by the
injunction that we will have to explore.

The possibility of a bond is certainly one possibility,
and we would be happy to explore that.  It would take us a
certain amount of time to do that, and we can work with counsel
in that regard.  I do know that certainly WDC's employees and
Mr. Watson's employees are very concerned about whether the
business is going to be able to continue operating, et cetera, so
those are all things we have to sort out to comply with the
Court's order, and I just wanted to reiterate that we've been
aware of that, we're focusing on it.  We want to work in good
faith with counsel, and we want to make sure that we deal in good
faith with the Court's order, but we don't have -- the client
does not have that kind of liquidity to simply make that payment.

MS. PAPEZ:  Your Honor, may I respond?

THE COURT:  Yes.

MS. PAPEZ:  We're happy to work with counsel.  We've been
trying to do that, and we are going to do that, Your Honor,
before we come to the Court for relief.  The next step, if we
can't resolve it by agreement, which I certainly hope we can, and
we'll be open to different forms for securing this money, the

next step would be briefing, and we would welcome any chance to brief it, but, honestly, what counsel just described is the definition of money laundering.

A defendant cannot take proceeds from an unlawful act like a fraud, pay it out to innocent people or buy cars or spend it, and then when called into court to account say, I'm sorry, Your Honor, I spent that money.  All the cases are clear on that, and it would give the actual wrong incentive, right?  It would give a counts-charged incentive to any defendant to take the proceeds of their fraud and spend it quickly or launder it through some sort of legitimate business, and that's, frankly, all -- and I will tell you, we will raise it with counsel because we want to be appropriately delicate about this, this is what surprised us a bit about the opposition brief on the conflict.

I mean, if they're asserting that Northstar is a legitimate ongoing concern, even after the departure of individuals like Mr. Lorman, it seems very odd to us that they are representing both defendants, because it would seem to me -- and this is just, you know, experiential and it's going to be generally from the Supreme Court's *Upjohn* doctrine, if you represent a corporate defendant that has legitimate ongoing interests and those interests may be in jeopardy as a result of a malfeasance by an officer, there could be a conflict there.

And on the converse side, if it's not and they've conceded alteregos, because that's a claim they didn't oppose, then

there's really no cover for them on the Northstar business.  And even if there were, insolvency is not a defense to posting their escrow.  So, you know, we'll try to work this out, but -- honestly -- I hope we can, but if we can't, I think we will be back with briefing.

MR. GARNETT:  Your Honor, do you want to hear my response to that or would you prefer not to?

THE COURT:  Well, I'm not going to get into --

MR. GARNETT:  Yeah, I mean --

THE COURT:  I mean, if you have substitute assets that need to be identified, which the -- where the money was spent versus whether it was spent on employees' salaries and running the business, that's a little too far afield for today's conversation.  I am concerned about the viability of Northstar of moving forward as an accused but not having been proven liable.  We're not in the collection stage yet, but we are attempting to preserve assets per the injunction while we move forward with the case.

So, if you would both continue to explore options as in a bond or some substitute asset which may satisfy the concerns of Amazon that they will not ever be able to collect if they win their case, that would be much appreciated.

There was a mention in the briefs that discovery, an expedited basis may be appropriate.  Certainly, if you're unable to resolve the monetary escrow in any fashion, then I would -- I

believe that pursuing that in an expedited discovery fashion

would be a possible area that you can move to.  But if you all

would continue to try and work on that and just update the Court.

How much -- if I sign the proposed order, it puts these issues --

orders the defendants to comply immediately.

    If there is, you know -- if you want to continue to

explore ways to comply, other than with money going into the

escrow account, how much time are you looking for to do that?  I

don't want you to be immediately in violation of the protective

order if you're attempting to come to a resolution.

    MR. GARNETT:  Your Honor, this is Stan Garnett.  I think

we appreciate that and, obviously, are very interested in making

sure that we comply with the Court's order and deal in good faith

with all of that.

    And let me just state for the record, since I think it is

important, that absolutely the defendants deny anything close to

money laundering, et cetera.  However, we would like ten days, if

we could have ten days from today's date, which I think is

reasonable, Your Honor, given the long weekend intervening and

the need to explore options.  I don't know if the Court would

want to set it for some kind of status for us to report as to how

we're coming, but I think if we did that, that would give us time

to explore options for posting a bond, et cetera.

    MS. PAPEZ:  Your Honor, may I respond?

    THE COURT:  Yes.

MS. PAPEZ:  We -- I don't have my client, obviously, with me.  I think we would have to object.  May I please propose an alternative?  If you don't enter the order, unless the Court is proposing that the TRO continue, we think it's extremely dangerous for there to be a gap, particularly as long as ten days where the defendants are not subject to any directive of the Court on preserving any of these assets.  We think that actually would undermine and potentially unravel all of the work we have done.

So, the alternative I would propose, if the Court is not planning to keep the TRO in place, is enter the PI today.  We're happy to stipulate that we will not move to enforce it for a ten-day period while we try to work something out with counsel.  And if we are able to do so, we will make a joint motion to the Court simply to modify the order to reflect the new position.  So it will be no jeopardy to them in the sense that we won't move to enforce for contempt, so they'll be protected, but we will also be protected.  We won't have a period where they could do who knows what with the assets because there's no order in place.

MR. CALHOUN:  Your Honor, this is George Calhoun.  There are a couple of issues with that.  One, obviously we will work with all counsel, and we're not going to be a party to fraudulent transfers and things of that sort.  You can enter an order that says we're not going to transfer the assets or dispose of them, but the bigger concern on that, as far as timing, is this will be

an appealable order, and we have to consider whether to appeal, and we would rather not do that while we're trying to work out something, if something can be worked out.

THE COURT:  Well, I think that the TRO would cover all of your concerns, Ms. Papez; isn't that correct?

MS. PAPEZ:  If the Court is intending to leave the TRO in place, yes, it would, Your Honor.  We just wanted to make sure we wouldn't be in a situation where there's no order for a ten-day period, neither a TRO nor the PI.

THE COURT:  Yeah, I understand your concern.  I'll issue an order continuing the TRO for a period of ten days so that the parties can continue to negotiate the terms of the preliminary injunction.  And if you are -- well, you need to notify me where you are on that within the ten days, and then we can have a subsequent hearing, if necessary, after you have attempted to resolve it.

MS. PAPEZ:  Your Honor, the only issue I would raise, and I'm not quite sure how we solve it, is the PI the Court indicated it would grant this afternoon has an additional $5 million ascribed to the two defendants that appeared here today that under the TRO was slated for the White Peaks defendants to cover in escrow, and they've made clear on the record that they don't have that money, and that's properly allocated to the defendants here today.  So, I'm just saying I think the TRO would cover it, except for that $5 million.

MR. GARNETT:  Your Honor, if I could be heard briefly on that issue?

THE COURT:  Yes.

MR. GARNETT:  Your Honor, that's a really interesting point for counsel to make, because the reality is those two defendants have not entered an appearance.  They sent a letter to counsel and apparently had a conversation.  We know nothing about whether those funds have been seized by the FBI, what the status is, other than some mention of it in the letter, so the Court doesn't really have in front of it the specific information about that.

And we also have a settlement agreement which I believe we are going to be authorized to reveal to the Court that explains the good faith with which Mr. Watson received all of that money.

So, it would seem to me that the appropriate remedy would be for the Court to issue an order of injunctive -- a preliminary injunction; that there could be no dissipation of assets; that we have ten days to sort out the particulars of what can be posted or what can be placed in escrow, and then we come back to the Court at the end of that period of time, if we're not able to resolve it with counsel.

THE COURT:  Your co-counsel indicated that it would slow down any appeal process and that, if they were going to take an appeal, they would like to wait until they have final resolution and the PI is entered formally, which makes sense to me.  You're

now kind of modifying that and suggesting that a modified PI would be appropriate.  I think that if no action is taken on the $5 million with White Oaks [sic], then I don't see that the TRO will create a problem for them, if it's not going to be asserted against them during this ten-day period.  So, I think the safer way to go is to go with the TRO continuing.  And if you want, I can reference the fact that the $5 million requirement of escrow by White Oaks [sic] is held in abeyance until further order of the Court.

     MS. PAPEZ:  Thank you, Your Honor.

     THE COURT:  Okay.  All right.  Anything else this afternoon?

     MS. PAPEZ:  No, Your Honor, not from plaintiffs.  Thank you very much for the Court's time.

     THE COURT:  Okay.  I'm happy to hear from you both.  Keep working on it, and I'll put into the order that you're to update me as soon as you have a resolution, or, if no resolution is possible, whether you seek further oral argument or briefing to the Court, and then you two -- you all work together to try and figure out how to best move that forward, all right?

     MR. GARNETT:  Thank you for your time, Your Honor.

     THE COURT:  All right.  You all have a good afternoon.

     MR. CALHOUN:  Thank you, Your Honor.

     MS. PAPEZ:  Thank you.

     (Proceedings adjourned at 3:44 p.m.)

# C E R T I F I C A T E

        I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Scott L. Wallace                    6/15/20
---------------------------        ----------------
  **Scott L. Wallace, RDR, CRR**            **Date**
    **Official Court Reporter**