**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **AMAZON.COM, INC., et al.** | |
| **Plaintiffs,** | |
| **v.** | **CIVIL ACTION No. 1:20cv484** |
| **WDC HOLDINGS LLC., et al.,** | |
| **Defendants.** | |

**WATSON DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR AN ORDER
TO SHOW CAUSE WHY DEFENDANTS BRIAN WATSON AND WDC HOLDINGS
LLC SHOULD NOT BE HELD IN CONTEMPT OF THE JUNE 5, 2020
PRELIMINARY INJUNCTION**

Defendants Brian Watson ("Watson") and WDC Holdings LLC, dba Northstar
Commercial Partners ("Northstar") (collectively the "Watson Defendants") hereby submit the
following Response to Plaintiffs' Motion for an Order to Show Cause Why Defendants Brian
Watson and WDC Holdings LLC Should Not be Held in Contempt of the June 5, 2020 Preliminary
Injunction.

## I.   INTRODUCTION

As an initial matter, it is important to emphasize that Plaintiffs' repeated references to an
alleged fraud scheme involving the Watson Defendants are obviously intended to poison the record
with mere allegations that, while inflammatory and salacious, have not been adequately pled, let
alone proven.[1]  Moreover, Plaintiffs' references to an "ongoing federal criminal investigation" and

---

[1] On June 26, 2020, the Watson Defendants filed a motion to dismiss Plaintiffs' complaint,
explaining in great detail how said complaint depends upon demonstrably incorrect facts and

an "FBI search," are clearly intended to unfairly portray what is, at best, a civil dispute, as something far more nefarious.  In doing so, Plaintiffs are misleading the Court in an obvious effort to obtain prejudgment relief in a way that is manifestly unfair and, as explained below, practically impossible.

Nevertheless, despite the onerous and largely impossible nature of the preliminary relief that has been ordered, the Watson Defendants have diligently made their very best efforts to substantially comply with the Court's order, as shown by the following detailed summary of said efforts.  As discussed below, the result of these efforts is that the preliminary injunction has been complied with to the extent possible and, therefore, there is no factual or legal basis upon which the Watson Defendants should be held in contempt.

## II.     RELEVANT FACTS AND PROCEDURAL HISTORY

### A.     The Court Issues a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue.

On April 27, 2020, Plaintiffs filed a sealed Application for an *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should not Issue ("TRO Application") seeking to "prevent spoliation of evidence and dissipation of assets that are central to this action … and to halt Defendants' interference with Amazon business relationships in the District."  Dkt. 10 at 1.  On April 28, 2020, this Court granted Plaintiffs' TRO Application and set a hearing for the requested preliminary injunction ("Preliminary Injunction Hearing").  Dkt. 16 at 7.

---

misleading insinuations.  *See* Dkt 65.  The preliminary injunction at issue is largely premised on both these baseless allegations, and a theory of damages that is fatally flawed, even assuming that one or more Plaintiffs' claims can be proven.

**B.     At the Preliminary Injunction Hearing, the Parties are Instructed to Work Together on Possible Alternative Forms of Security.**

At the Preliminary Injunction Hearing, the Court indicated that it was inclined to issue a preliminary injunction requiring the Watson Defendants to, among other things, place $21,250,000 into an escrow account pending the outcome of this case. Dkt. 69-5 at 51.  In response, the Watson Defendants' counsel objected and explained that his clients simply do not have anywhere near that amount of money available to place into escrow:

> **Mr. Garnett:** Your Honor, the issue that's been so challenging for WDC and for Brian Watson on this -- and counsel is right, we have been engaged in discussions about the escrow, and we will continue to do that. I think we have a form that everybody can agree to.  The issue is that the funds that were received by Northstar and by Brian Watson in connection with the -- both paragraph 1 and paragraph 2, were funds that were received in due course; with regard to paragraph 2, last year, as this business continued to do operation.
>
> We, as the case proceeds and there's discovery, we'll hotly contest Amazon's characterization of what those funds are, and we don't need to get into that now, but the point is these are funds that were received in the course of business for a commercial real estate developer – he's based in downtown Denver; he has about 45 employees -- and those funds were used for what developers use them for, paying salaries, paying obligations, paying fees, et cetera, and so there is not a corpus of money that comes anywhere close to these amounts, and certainly it is a significant obligation that's imposed by the injunction that we will have to explore.

*Id.* at 55-56.

Given the fact that the Watson Defendants simply do not have access to $21,250,000, counsel suggested the possibility of other forms of security, including a possible surety bond:

> **Mr. Garnett:** The possibility of a bond is certainly one possibility, and we would be happy to explore that. It would take us a certain amount of time to do that, and we can work with counsel in that regard. I do know that certainly WDC's employees and Mr. Watson's employees are very concerned about whether the business is going to be able to continue operating, et cetera, so those are all things we have to sort out to comply with the Court's order, and I just wanted to reiterate that we've been aware of that, we're focusing

3

> on it. We want to work in good faith with counsel, and we want to make sure that we deal in good faith with the Court's order, but we don't have -- the client does not have that kind of liquidity to simply make that payment.

*Id.* at 56.

Given the Watson Defendants' lack of liquidity, the Court instructed the parties to work together on possible alternative forms of security:

> **Court:** So, if you would both continue to explore options as in a bond or some substitute asset which may satisfy the concerns of Amazon that they will not ever be able to collect if they win their case, that would be much appreciated….
>
> *****
>
> I don't want [the Watson Defendants] to be immediately in violation of the protective order if you're attempting to come to a resolution.

*Id.* at 58-59.

Immediately following the Preliminary Injunction Hearing, this Court issued an order holding the preliminary injunction in abeyance to allow the Watson Defendants "additional time to produce or secure the funds the proposed PI places in escrow [and] [t]o allow further negotiations to reach a mutually agreeable solution."[2]  Dkt. 49 at 2.

Due to the parties' ongoing negotiations regarding the preliminary injunction security, the Court issued an order on May 29, 2020 continuing the TRO to June 5, 2020.  Dkt. 51.  The May 29, 2020 order further required the parties to provide the Court a status report of the outstanding issues by June 3, 2020.

On June 3, 2020, the parties filed the status report that was ordered by the Court on May 29, 2020 ("Status Report").  Dkt. 54.  In the Status Report, the parties agreed that Paragraph 2 of

---

[2] Thereafter, and as discussed in more detail below, the Watson Defendants began diligent efforts to secure a bond for the amount ordered.

the Preliminary Injunction would allow the Watson Defendants to post a surety bond for $21,250,000 in lieu of placing the funds in escrow. *Id.* at 2-3. At the time the Status Report was filed, the Watson Defendants were still in ongoing negotiations with various sureties and were still hopeful that an appropriate security bond could be obtained. *See* Garnett Decl. at ¶ 8.

### C. The Court Issues its Preliminary Injunction

Three days later, on June 5, 2020, the Court issued its Preliminary Injunction. Dkt. 57. The Preliminary Injunction contains three paragraphs that are relevant to the Plaintiffs' Motion. First, Paragraph 2 requires the Watson Defendants to: (1) "promptly" place $21,250,000 into an escrow account, which represents the amount that the Watson Defendants purportedly received from the disputed real estate transactions; or (2) obtain and deposit into the Court's registry a surety bond for $21,250,000; or (3) some combination of both that results in $21,250,000 in security. *Id.* at pp. 4-5, ¶ 2.

Second, Paragraph 5 requires the Watson Defendants to return "all Amazon confidential or otherwise non-public information in their possession except as necessary for use in this case…." *Id.* at p. 5, ¶ 5. Paragraph 5 also required the Watson Defendants to inform Plaintiffs of what "confidential information" is being retained by the Watson Defendants for use in the case. *Id.*

Finally, Paragraph 7 prohibits the Watson Defendants from "spoliating, concealing, wasting, transferring, or otherwise disposing of documents, records, communications, files, or other evidence or assets used in, or obtained from, any activities … relating to Defendants' real property transactions with Amazon in Virginia since 2018…." *Id.* at p. 6, ¶ 7.

### D. The Watson Defendants Make all Reasonable Efforts Comply with the Preliminary Injunction Order.

As discussed in detail below, the Watson Defendants have made all reasonable efforts to comply with the Preliminary Injunction paragraphs mentioned above.

### 1.      Paragraph 2: The Bond

As discussed at the May 21, 2020 hearing, the Watson Defendants do not have anywhere near enough available cash or other liquid assets to be able to place $21,250,000 into escrow.  Dkt. 69-5 at 55-56; *see also* Garnett Decl. at ¶ 8.  Indeed, the Watson Defendants dispute that they have ever received this amount from the Plantiffs. While Plaintiffs allege that said amount was paid, they do not offer any evidence to support this purported fact.  Moreover, whatever funds the Watson Defendants received from the disputed real estate transactions were disbursed in the normal course of the Watson Defendants' commercial real estate business.  Garnett Decl. at ¶ 8. This includes, among other things, paying salaries for Northstar's approximately 40 employees, paying obligations, paying fees, ext.  *Id.*; *see also* Dkt. 69-5 at 55-56.

Notwithstanding the issues discussed above, following entry of the injunction, in an effort to try to comply with the Court's order, Watson immediately contacted Jennifer Clampert, a Surety Account Executive at IMA Financial Group in Denver, to seek a surety bond for $21,250,000. Garnett Decl. at ¶ 8.  Unfortunately, there were some delays in getting Ms. Clampert necessary documents because this case, and the relevant documents filed therein, remained sealed at the time. *Id.*  Once Watson obtained permission from the Court to provide the relevant documents to surety companies, Ms. Clampert contacted three different reputable surety companies—The Hartford, Zurich, and Philadelphia—in an attempt to secure a bond for the Watson Defendants.  Garnett Decl. at ¶ 8; Exhibit A attached thereto.  According to Ms. Clampert, however, sureties consider this type of obligation to be very high-risk and she warned the Watson Defendants that up to 100% collateral would likely be required.  *Id.*

After learning some specifics of the case, the first surety company was unwilling to consider writing the bond.  *Id.*  The other two surety companies reviewed the case documents and financial statements for Mr. Watson and Northstar and both determined that 100% collateral in the

form of cash or an irrevocable letter of credit ("ILOC") would be required.  *Id.*  Of these two sureties, one declined to consider the bond further because Mr. Watson and Northstar do not have enough liquidity between them to secure the required collateral.  *Id.*  Indeed, although Mr. Watson's financial statement shows $82,130,971 in "assets," the surety recognized that these assets are far too leveraged and/or illiquid to collateralize a bond for even a third of that amount.  Garnett Decl. at ¶ 8; Exhibit B attached thereto.  The third surety suggested that perhaps there was enough value in Mr. Watson's real estate holdings to pledge to a bank to secure an ILOC as collateral.  *Id.*  However, due to the fact that there are other investors involved in Mr. Watson's real estate ventures, he was unable to pledge those assets.  *Id.*  Without 100% collateral—which the Watson Defendants do not have—Ms. Clampert was unable to continue to pursue a bond.  *Id.*  In short, despite their best efforts, the Watson Defendants are unable to secure a bond for $21,250,000 given their lack of collateral.

The Watson Defendants also have suggested to Plaintiffs' counsel to coordinate with respect to a valuation of the Watson Defendant's assets, so that Plaintiffs can verify for themselves that a deposit of $21,250,000 is impossible.

### 2.    Paragraph 5: The Confidential Information

At the May 21, 2020 hearing, the Court noted that Amazon is in the best position to determine what information Amazon considers "confidential:"

> **Mr. Calhoun:**  With respect to paragraphs 5 and 6, if you could require Amazon to let us know what they consider the proprietary confidential information is.  We don't have any problem with these provisions, we just don't know what is meant by this.  We raised this in discussions with our counsel.  We don't have any problems with returning it, subject to the needs of this case.  And if we have anything, if you could just give us a deadline or something to let us know what that might be, we're happy to comply with it.

> **The Court**: All right. I think that's fair. I'm not sure how -- I would guess that Amazon would know better than defendants what they consider to be confidential or nonpublic proprietary information.

Dkt. 69-5 at 52.

To that end, the Watson Defendants' counsel worked with Plaintiffs' counsel to define what Amazon considered confidential. Garnett Decl. at ¶ 9. The Watson Defendants also obtained an agreement from Amazon's counsel that the information in the Watson Defendants' possession would be needed in the course of the litigation and that the best way to address these issues was through an agreed upon protective order. Garnett Decl. at ¶ 9; Exhibit C attached thereto. Additionally, the Watson Defendants' counsel asked Plaintiffs' counsel to provide a list of confidential information, which Plaintiffs' counsel has not provided. Until Plaintiffs' counsel produces a list of what Amazon considers to be its "confidential information," the Watson Defendants cannot take any further action with regards to Paragraph 5.

### 3. Paragraph 7: The Denver Condominium

As the Plaintiffs' point out, WDC Holdings LLC recently sold a condominium in Denver. That condominium was purchased in **October of 2017** and therefore has no relevance to the Preliminary Injunction. Garnett Decl. at ¶ 11; October 3, 2020 Settlement Statement attached as Exhibit D thereto; *see also* Dkt. 57 at p. 6, ¶ 7 (prohibiting the Watson Defendants from "spoliating, concealing, wasting, transferring, or otherwise disposing of … assets used in, or obtained form, any activities … relating to Defendants' real property transactions with Amazon in Virginia **since 2018**….") (emphasis added).

## III. ARGUMENT

A contempt order is inappropriate if the non-moving party has "made in good faith all reasonable efforts to comply with the enforcement order." *United v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017) (internal quotations omitted); *see also Anton Realty, LLC v. Guradian Brokers Ltd.,*

8

*Inc.*, 2015 WL 3649379, at *1 (S.D. Ind. June 11, 2015) ("the Court's power to hold a party in contempt is reserved for egregious misbehavior or disobedience."). Similarly, a contempt order is inappropriate if compliance is impossible. *See U.S. v. Rylander*, 460 U.S. 752, 757 (1983) ("In a civil contempt proceeding such as this, of course, a defendant may assert a *present* inability to comply with the order in question") (emphasis in original); *see also Robertson v. Jackson*, 972 F.2d 529, 535 (4th Cir. 1992) ("the defense of impossibility of compliance would be available if [the non-moving party] had done everything within his power to comply with the district court's order."). As the United States Supreme Court explained in *Rylander*, "[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." 460 U.S. at 757.

Here, Plaintiffs contend that the Watson Defendants should be held in contempt for violating Paragraphs 2, 5, and 7 of the Preliminary Injunction. As discussed in detail below, however, the Watson Defendants should not be held in contempt because they have made all reasonable efforts to comply.

### A.   The Watson Defendants Have Made All Reasonable Efforts to Comply With Paragraph 2 and/or Compliance is Impossible.

Paragraph 2 requires the Watson Defendants to: (1) "promptly" place $21,250,000 into an escrow account, which represents the amount that the Watson Defendants purportedly received from the disputed real estate transactions; or (2) obtain and deposit into the Court's registry a surety bond for $21,250,000; or (3) some combination of both that results in $21,250,000 in security. Dkt. 57 at pp. 4-5, ¶ 2.  Here, the Watson Defendants should not be held in contempt for violating Paragraph 2 because they have made all reasonable efforts to comply and/or compliance is impossible.

First, it is impossible for the Watson Defendants to place the alleged $21,250,000 in payments from the disputed real estate transactions into escrow because any such funds were disbursed in the normal course of the Watson Defendants' commercial real estate business.[3] Garnett Decl. at ¶ 8. This includes, among other things, paying salaries for Northstar's approximately 40 employees, paying obligations, paying fees, ext. Dkt. 69-5 at 55-56. And even outside the specific funds received from the disputed real estate transactions, the Watson Defendants simply do not have anywhere near $21,250,000 that can be placed into escrow.[4] Garnett Decl. at ¶ 8.

Second, the Watson Defendants made all reasonable efforts to obtain a surety bond for $21,250,000, but simply could not. Specifically, Watson immediately contacted Ms. Clampert, a Surety Account executive at IMA in Denver. Garnett Decl. at ¶ 8. Ms. Clampert then contacted three different surety companies in an effort to secure a bond for the Watson Defendants. Garnett Decl. at ¶ 8; Exhibit A attached thereto. After learning some specifics of the case, the first surety was unwilling to consider writing the bond. *Id*. The other two sureties reviewed the case documents and financial statements for Mr. Watson and Northstar and both determined that 100% collateral in the form of cash or an irrevocable letter of credit ("ILOC") would be required. *Id*. Of these two sureties, one declined to consider the bond further because the Watson Defendants do not have enough liquidity between them to secure the required collateral. *Id*. The third surety suggested that perhaps there was enough value in Mr. Watson's real estate holdings to pledge to a

---

[3] It should be noted that the Watson Defendants hotly dispute that they received the full $21,250,000 from these real estate transactions or that the money received was not properly earned by the Watson Defendants. It is also undisputed that none of the money received by the Watson Defendants was paid directly by Amazon.

[4] The Watson Defendants' lack of sufficient funds is further bolstered by the fact that the Watson Defendants could not locate a single surety that felt comfortable writing a bond for this amount.

bank to secure an ILOC as collateral.  *Id.*  However, due to the fact that there are other investors involved in Mr. Watson's real estate ventures, he was unable to pledge those assets.  *Id.*  Without 100% collateral—which the Watson Defendants do not have—Ms. Clampert was unable to continue pursuing this bond.  *Id.*  In short, despite their best efforts, the Watson Defendants were unable to secure a bond for $21,250,000.

Given the Watson Defendants' inability to secure the funds ordered, the Watson Defendants remain ready, willing, and able to continue talks with Plaintiffs' counsel regarding alternative forms of security as contemplated by the Court at the May 21, 2020 hearing.  Dkt. 69-5 at 58-59 ("So, if you would both continue to explore options as in a bond or some substitute asset which may satisfy the concerns of Amazon that they will not ever be able to collect if they win their case, that would be much appreciated.").  However, because the Watson Defendants made all reasonable efforts to comply with Paragraph 2 and/or compliance is impossible, the Watson Defendants should not be held in contempt.

### B.   The Watson Defendants Cannot Fully Comply With Paragraph 5 Until Plaintiffs' Counsel Provides a List of What Amazon Considers its "Confidential Information."

Paragraph 5 requires the Watson Defendants to return "all Amazon confidential or otherwise non-public information in their possession except as necessary for use in this case...." Dkt. 57 at p. 5, ¶ 5.  The Watson Defendants must also inform Plaintiffs of what "confidential information" is being retained by the Watson Defendants for use in the case.  *Id.*

As the Court noted at the May 21, 2020 hearing, Amazon is in the best position to determine what information it considers to be its "confidential information."  *See* Dkt. 69-5 at 52 ("**Court:** I would guess that Amazon would know better than defendants what they consider to be confidential or nonpublic proprietary information.").  As such, the Watson Defendants' counsel worked with Plaintiffs' counsel to define what Amazon considered confidential.  Garnett Decl. at ¶ 9.  The

Watson Defendants also obtained an agreement from Amazon's counsel that the information in the Watson Defendants' possession would be needed in the course of the litigation and that the best way to address these issues was through an agreed upon protective order.  Garnett Decl. at ¶ 9; Exhibit C attached thereto.   Additionally, the Watson Defendants asked Plaintiffs' counsel to provide a list of confidential information, <u>which Plaintiffs' counsel has not provided</u>.  Garnett Decl. at ¶ 9.  Thus, until Plaintiffs' counsel provides the Watson Defendants with a list of what Amazon considers to be "confidential information," the Watson Defendants cannot take any further action with regards to Paragraph 5.  Because the Watson Defendants cannot take any further action until Amazon provides this list, the Watson Defendants should not be held in contempt for violating Paragraph 5.

Although the Watson Defendants do not know what Amazon considers confidential, all of the information provided to them by Amazon is necessary for the defense of this case.  The only information that the Watson Defendants believe Amazon might contend is confidential is data that Plaintiffs redacted in their initial filings, which largely concerned budget issues, property locations, or other lease issues.  *See*, e.g., MacDonald Decl. at Ex. 14.  Those contracts, however, are central to this case and the Watson Defendants necessarily must have access to them and will rely upon them in their defense.  Simply put, based on the agreement to the protective order and the current needs of the case, the Watson Defendants are in compliance with Paragraph 5 of the Preliminary Injunction.

> **C.    The Watson Defendants have Complied with Paragraph 7 Because the Denver Condominium was Acquired *Before* the Disputed Real Estate Transactions with Amazon.**

Paragraph 7 enjoins the Watson Defendants from "spoliating, concealing, wasting, transferring, or otherwise disposing of documents, records, communications, files, or other evidence or assets used in, or obtained from, any activities … relating to Defendants' real property

12

transactions with Amazon in Virginia **since 2018**....” *Id.* at p. 6, ¶ 7 (emphasis added).  In other words, Paragraph 7 does not apply to assets that are unrelated to the Defendants' real property transactions with Amazon in Virginia **since 2018**.

Here, Plaintiffs argue that the Watson Defendants violated Paragraph 7 by selling a Denver condominium in June.  This is simply untrue.  The condominium in question was purchased by WDC Holdings LLC in October of **2017**, long before the Watson Defendants received any funds from the disputed real estate transactions in 2018 and 2019.  Garnett Decl. at ¶ 11; October 3, 2017 Settlement Statement attached as Exhibit D thereto.  Because the Denver condominium was purchased before 2018, it is expressly outside the scope of Paragraph 7.  As a result, the Watson Defendants did not violate Paragraph 7, and should not be held in contempt for doing so.

> **D.    Alternatively, the Parties Should be Allowed to Conduct Expedited Discovery on the Watson Defendants' Ability to Comply with the Preliminary Injunction.**

During the May 21, 2020 hearing, this Court noted that limited discovery on the Watson Defendants' ability to post security may be warranted:

> **Court:** There was a mention in the briefs that discovery, an expedited basis may be appropriate. Certainly, if you're unable to resolve the monetary escrow in any fashion, then I would -- I believe that pursuing that in an expedited discovery fashion would be a possible area that you can move to.

Dkt. 69-5 at 58-59.  To the extent the Court has questions on whether the Watson Defendants have the ability to pledge $21,250,000 in security under the Preliminary Injunction, the Watson Defendants have offered to fully cooperate with a third party effort to value the Watson Defendants' holdings, which are almost entirely illiquid.

## IV.     CONCLUSION

"[T]he Court's power to hold a party in contempt is reserved for egregious misbehavior or disobedience."  *Anton Realty, LLC*, 2015 WL 3649379, at *1.  As discussed above, the Watson Defendants should not be held in contempt for violating Paragraphs 2, 3, or 7 of the Preliminary Injunction because the Watson Defendants made all reasonable efforts to comply and/or compliance is impossible.

DATED this 10th day of July, 2020.

Respectfully submitted

*/s/ Jeffrey R. Hamlin*
Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun (*pro hac vice*)
James Trusty (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue NWSuite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

Stanley L. Garnett (pro hac vice)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Denver, Colorado 80202-4432
(303) 223-1100 – Tel.
(303) 223-1111 – Fax
Sgarnett@bhfs.com

Gregory A. Brower (pro hac vice)
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway
Las Vegas, Nevada 89106-4614
(702) 382-2101 – Tel.
(702) 382-8135 – Fax
gbrower@bhfs.com

14

*Counsel for Defendants Brian Watson and
WDC Holdings, Inc.*