**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| AMAZON.COM, INC. *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-484 |
| | ) | Hon. Liam O'Grady |
| WDC HOLDINGS LLC, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiffs Amazon.com, Inc. and Amazon Data

Services, Inc.'s ("Plaintiffs" or "Amazon") Motion for Preliminary Injunction. Dkt.41.  On April

28, 2020, the Court granted Plaintiffs' motion for an *ex parte* Temporary Restraining Order

("TRO"), and subsequently granted a motion to continue the hearing to convert the TRO to a

Preliminary Injunction ("PI") from Defendants Brian Watson and WDC Holdings, d/b/a

Northstar Commercial Partners' ("WDC" or "Northstar") (collectively, "Watson Defendants").[1]

---

[1] There are only two defendants opposing Amazon's proposed injunctive relief: Brian Watson and WDC.  In sum, Amazon argues there is a basis for an immediate entry of the PI against those defendant entities that have not responded and/or are cooperating.  Specifically, four other defendants—Sterling NCP FF, LLC; Manassas NCP FF, LLC; NSIPI Administrative Manager, and Villanova Trust—have not filed in response to the Court's Order (Dkt. 16) granting the TRO.  White Peaks Capital LLC ("White Peaks") and NOVA WPC LLC ("NOVA WPC") have not filed, but have cooperated through counsel, complying with the "non-monetary aspects of the TRO."  *See* Supp. MacDonald Decl., Letter from White Peaks and NOVA WPC.  The monetary aspects have been satisfied in part, though they claim they do not have (or control) the funds to satisfy Paragraph 3 of the order ($17,730,000.00) because of a transfer already made to an entity under Watson's control, and because of cooperation with the criminal investigation.  As such, compliance with the PI is unopposed by White Peaks and NOVA WPC.  Plaintiffs also bring this action against Doe Defendants 1-20, as the full scale and complexity of Defendants' enterprise activities is not yet known.

Watson Defendants filed in opposition to the existing TRO on May 5, 2020, and more fully on

May 14, 2020. Plaintiffs filed a supplemental brief on May 18, 2020, which moved the Court for

a proposed PI.

## I. PROCEDURAL BACKGROUND

The Court entered Amazon's proposed Temporary Restraining Order ("TRO") *ex parte*

on April 28, 2020.[2] Dkt. 16. After continuing the PI hearing upon Defendants' request to allow

more time to respond, a telephonic hearing was scheduled for May 21, 2020, and the Parties

thoroughly briefed the issues. At the close of the hearing, Defendants expressed concern

regarding its ability to satisfy or to secure a bond for the PI's requirement to place just over $20

million in escrow. Accordingly, the Court entered an Order continuing the TRO for ten days "to

allow further negotiations to reach a mutually agreeable solution" regarding the funds the PI

places in escrow. Dkt. 49 at 2.

The funds for the proposed bond seemed attainable, as the Watson Defendants publicly

boasted "more than $1.3 Billion in assets under ownership and management." Dkt. 12-6. As

such, the continuance was extended another five days. This was to allow Defendants to finalize

matters related to both the bond and treatment of confidential information, as well as to share

sealed pleadings with Defendants' surety provider to facilitate approval of the surety bond. Dkt.

51. Indeed, Defendants attempted to secure a bond in the weeks after the May 21 hearing, but

had no final decision or solution by the June 3 status report to the Court and did not provide any

further information.

For the following reasons, the PI shall enter as proposed.

---

[2] The accompanying Sealed Protective Order (Dkt. 17) was modified on May 1, 2020 to allow sealed documents to be shared with Defendants, the United States Attorney's Office for the Eastern District of Virginia, and IPI, the third party responsible for the anticipated payment per Paragraph 1 of the TRO. Dkt. 24.

## II. FACTUAL BACKGROUND

Amazon alleges a widespread scheme of kickbacks and fraudulent transactions among all defendants—with a focus on Brian Watson and Northstar—amounting to tens of millions of dollars on real property transactions with Amazon in the northern Virginia Dulles corridor since 2018. Relevant transactions include both build-to-suit leases and direct purchase transactions, as detailed in the pleadings and summarized here.

Amazon targets and develops real estate parcels and real property to accommodate its supply chain and other business operations. A large collection of these sites, including data centers and warehouses, is in northern Virginia. Compl. ¶ 7. Amazon engages with third party commercial real estate companies to assist with both build-to-suit leasing and direct purchase transactions. An internal selection process for suitable parcels begins with site diligence by Amazon's Real Estate Transaction Managers ("TM"). Compl. ¶ 31. Plaintiffs issue requests for proposals ("RFPs") associated with these real estate transactions to choose which third parties will help execute and facilitate Amazon's development efforts and investments.

Northstar is a private Colorado LLC based in Denver, Co., with thirty-five employees. It is engaged in full-service real estate investment and asset management, specializing in commercial real estate development, acquisition, and redevelopment. Brian Watson is the founder and principal of Northstar. Watson had personal relationships with two now-former Amazon TMs who were involved with deals at issue. The former Amazon TMs are Casey Kirschner and Carleton Nelson. *See* Dkt. 44, Doden Decl. ¶ 6. Watson is a long-time friend of Casey Kirschner's brother, Christian. Dkt. 39 at 5.

Northstar's primary equity investor for the lease transactions was IPI Partners ("IPI"); IPI and Northstar formed a joint venture called NSIPI Data Center Venture, LLC, which is the sole owner of Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II

3

LLC ("Project Entities"). Dkt. 46, Gilpin Decl. ¶¶ 3-4. The Project Entities have executed nine leases for Amazon facilities in Virginia, and Northstar acted as developer, property manager, and asset manager for IPI and Amazon. *Id.* ¶ 4. Overall, Amazon has approved over $400 million in Capital Appropriation Requests ("spend requests") for Northstar-affiliated lease transactions since February 2018. Compl. ¶ 35 (citing Ex. 9).

In fall 2017, Northstar says it was invited to respond to an Amazon request for proposal ("RFP"). This is when Watson and Casey Kirschner began working together on development deals in northern Virginia.[3] Plaintiffs allege that between February 27, 2018 and January 13, 2020, the nine commercial real property leases with the Project Entities in northern Virginia involved an unlawful enterprise for illicit financial gain involving the Watson Defendants. A former employee and director at Northstar, acting as an informant ("Informant 1") to Amazon's Business Conduct & Ethics ("BCE") team, reports that Northstar made payments to TMs Casey Kirschner and Carleton Nelson in return for awarding lease contracts to Northstar. Amazon notes that an allegedly sham RFP in 2017, as well as the lease agreements Amazon ultimately executed with Northstar, included a provision that the Northstar entities had made no brokerage or other fee payments related to the contracts. *Id.* ¶ 38. The Watson Defendants maintain that all lease agreements allow engagement of brokers or finders, and paying fees to the same. Dkt. 39 at 6.

Pursuant to the leases with the Project Entities, Amazon and Northstar then operated as partners overseeing and managing the transactions. Dkt. 44, Doden Decl. ¶ 6. For each, Northstar would acquire the land and include a shell structure, then Amazon would finish the build-out and make it operational. These deals also led to a new agreement between Northstar

---

[3] Watson and Christian Kirschner had done business together in the past, as Christian had worked for Northstar for a monthly fee to find and relay development opportunities.

and Villanova Trust ("Villanova"), which was effectively between Watson and Christian

Kirschner. In 2018, Northstar and Villanova executed an agreement that established Christian

Kirschner as his own entity in a business development role for Northstar. Informant 1 alleges

that the Watson Defendants used Villanova Trust, based in Tennessee, to move kickback funds,

and that Casey Kirschner, Christian Kirschner, and Carleton Nelson all had privileges to access

the funds. *Id.*

Amazon claims at least one direct purchase of real property was also implicated in these

unlawful dealings, in what Plaintiffs call the Direct Purchase Enterprise. Compl. ¶¶ 8, 68-71. In

summer 2019, Defendants White Peaks and NOVA WPC facilitated Amazon's purchase of a

parcel in Chantilly, Virginia. Two then-Northstar employees acted on behalf of the White Peaks

and NOVA WPC entities. When Amazon decided to purchase the White Peaks property outright

rather than lease it, White Peaks represented that it had already secured a price with the then-

owner. This price was promised to be lower than what Amazon would have to pay, thus

Amazon agreed to purchase from NOVA WPC. *Id.* ¶ 69. On or about July 30, 2019, there was a

same-day purchase and sale of the property: NOVA WPC paid $98.67 million and then sold the

property to Plaintiff Amazon Data Services for $116.4 million for a profit of nearly $18 million.

*Id.* ¶¶ 70-71. Watson later confronted the then-Northstar employees, Kyle Ramstetter and Will

Camenson, who were the principals behind this "side deal," asserting that Northstar was entitled

to the profits from Amazon.

Indeed, Watson says he suspended—and then terminated—Ramstetter and Camenson not

for any tortious action against Amazon, but rather for usurping what should have been a

Northstar sale opportunity. Dkt. 30 at 2-3. Northstar had been working with Amazon for almost

two years at that point, and Ramstetter and Camenson were aware of the relationship. Both

employees were suspended as Watson tried to glean information about the financing and details

of the side deal, and when he failed, he terminated Ramstetter and Camenson.[4] Amazon alleges

that Ramstetter and Camenson's termination involved a $5 million payment to Watson and/or

Northstar. Compl. ¶ 74.

Finally, Watson claims he received termination letters from various of the leasing

entities, like Dulles NCP, LLC, claiming without explanation that it was "for cause." Even now,

Watson claims he has no details to justify these terminations for cause, though his counsel is

trying to acquire more information. On April 2, 2020, the day Watson received the termination

notices, the FBI appeared at his home. He claims the FBI never "raided" his house – the agents

came to talk about a purported fraud scheme of which Northstar was the victim, then later turned

its focus to Watson's conduct and served him with a search warrant, target letter, and grand jury

subpoena. Dkt. 30 at 4. The FBI agents seized two laptops and a cell phone. The criminal

investigation is ongoing.

Amazon is conducting its own internal investigation, and has been cooperating with

prosecutors. Internally, Amazon claims to have evidence from—among other sources—former

Amazon employees as confidential informants. For instance, they cite to files recovered from

former Amazon employees' computers, including efforts to conceal evidence. Plaintiffs have

provided or referenced a body of evidence including spreadsheets, wire transfer instructions,

email exchanges, recorded conversations, and other materials implicating defendants in the

alleged scheme.

Plaintiffs seek to prevent spoliation of evidence and dissipation of assets that are

compromised by Defendants' conduct following the April 2, 2020 FBI "raid" at the home of

---

[4] Watson recorded and later transcribed the recordings from his meetings with each of Ramstetter and Camenson prior to terminating them. *See* Dkt. 40, Freimann Decl., Ex. A (transcripts). Plaintiffs dispute the completeness of the transcripts. Watson later executed confidential agreements with Ramstetter and Camenson to avoid further legal action. Dkt. 39 at 4.

Brian Watson. Starting with an email from Watson on the day of the raid that allegedly misstated Defendants' conduct and tipped off all defendants to the investigation, Amazon alleges efforts to spoliate evidence and manipulate corporate ownership structures to the detriment of Amazon. Plaintiffs fear Defendants will continue to tip off accomplices, disrupt business relationships, and dissipate Amazon's assets. In addition to these concerns, Amazon seeks to preserve its business relationships with vendors and business partners to maintain connections and goodwill.

### III. LEGAL STANDARD

"The standard for granting either a TRO or preliminary injunction is the same." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). A grant of temporary injunctive relief requires the movant to establish four factors: (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied; (2) the likelihood of harm to the defendants if the preliminary injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (collecting cases). *Winter* clearly established that each of the four factors must be satisfied to obtain preliminary injunctive relief. *Henderson for Nat'l Labor Relations Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) (citing *Winter*, 555 U.S. at 20). It is "unnecessary to address all four factors," therefore, "when one or more [has] not been satisfied." *Id.* Courts have given particular attention to a movant's likelihood of success on the merits. *See Dewhurst v. Cent. Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011) ("*Winter* thus requires that a party seeking a preliminary injunction . . . must 'clearly show' that it is likely to succeed on the merits.") (additional alteration and citation omitted).

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

Overall, Amazon argues a high likelihood of success because all named Defendants in the Lease Transaction enterprise made false statements and participated in unlawful acts (some of which overlap with the Direct Purchase enterprise). Both enterprises were formed with the purpose prohibited by the RICO statute – to profit from fraudulent and otherwise unlawful kickbacks. The enterprises' operations used LLCs, contracts, interstate communications, and wire transfers. Amazon's support for the eleven substantive counts includes, *inter alia*, business files, wire records, voice recordings, and recent public and incriminating statements by Defendants. Undisclosed self-dealings, kickback payments, and concealed "finder" or "broker" fees also support both the RICO and common law claims. Despite these claims, Defendants maintain Plaintiffs are unlikely to succeed on the merits because the allegations rely on improper information and unsupported "logical leaps and baseless accusations." Dkt. 39 at 2.

To begin, Defendants do not dispute that this lawsuit is based on essentially the same subject matter that led to the FBI's search warrant. In other words, this suit is based on conduct that supported law enforcement's finding of probable cause.

Defendants claim deficiencies in Amazon's pleadings based on hearsay, innuendo, and facts "on information and belief" regarding its own internal procedures. The RICO and fraud allegations thus fail to meet the requisite particularity standard, Defendants say. The Court notes Defendants' objections, but "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The "less formal" and "less complete" nature of the Court's review of the evidence at this preliminary stage calls for consideration of everything

8

the Parties have provided and that Plaintiffs have alleged in good faith. *See Elrod v. Burns*, 427
U.S. 347, 350 n.1 (1976) ("For purposes of our review, all of the well-pleaded allegations of
respondents' complaint and uncontroverted affidavits filed in support of the motion for a
preliminary injunction are taken as true.").

With these threshold considerations in mind, the Court addresses the claims at bar as
argued by the Parties.[5]

### 1. *RICO Claims*

Counts I and II allege RICO violations; both include Patterns of: Wire Fraud; Money
Laundering; Engaging in Monetary Transactions; and Violation of the Travel Act. Specific to
these claims, Plaintiffs assert that Watson's claimed ignorance does not preclude his
participation in the enterprises, and the evidence suggests Watson's direct involvement in the
conspiracy. The recorded conversations involving Watson, Ramstetter, and Camenson offer
further evidence of the conspiracy, Plaintiffs proffer, because of certain admissions, and
reference to "Casey" – another conspirator. Defendants include transcripts with their
Opposition, and in at least one instance, a reference to Casey is conspicuously omitted: "You,
me, [unintelligible] conversation over a drink," where Ramstetter said "You, me, Casey
conversation over a drink." Freimann Decl., Ex. B at 5.[6] The transcript shows Ramstetter saying
to Watson: "we all know what we did," so Ramstetter, Watson, and Casey needed to "work

---

[5] The Parties' briefs do not specifically address all claims at bar: (I) Leased Transaction
Enterprise in Violation of RICO; (II) Direct Purchase Enterprise in Violation of RICO; (III)
Detinue – Va. Code § 8.01-114; (IV) Fraud; (V) Tortious Interference with Contractual and/or
Business Relations; (VI) Civil Conspiracy; (VII) Breach of Contract; (VIII) Unjust Enrichment;
(IX) Conversion and Constructive Trust; (X) *Alter Ego*/Piercing the Corporate Veil; (XI) *Ex
Parte* Temporary Restraining Order and Preliminary Injunction – Fed. R. Civ. P. 64, 65 and Va.
Code § 8.01-622.
[6] Plaintiffs submitted the claimed audio file of this conversation, which confirms the omission of
"Casey." The Court granted leave to submit said file electronically. Dkt. 47.

something out" before someone "say[s] something . . . [and] the whole Amazon thing shuts
down." *Id.*; *see* Dkt. 41 at 11.

Defendants also downplay the 2018 Villanova Agreement, which Plaintiffs say further
evidences knowledge of or willful blindness to the kickback scheme because of the agreement's
timing and particular associated payments. There was a 2016 agreement that essentially
established the same relationship, Defendants say, so the 2018 agreement is basically irrelevant.
Plaintiffs respond, "that is like saying the Constitution is irrelevant because it simply replaced
the Articles of Confederation." *Id.* at 12.

Additionally, Plaintiffs address the argument that likelihood of success on RICO is low
because there is only one victim (though Plaintiffs claim to name multiple): "[t]here is no per se
rule against a RICO claim involving only one victim." *Al-Abood ex rel. Al-Abood v. El-Shamari*,
217 F.3d 225, 238 (4th Cir. 2000). Further, Defendants challenge the alleged predicate acts as
invalid because they are part of one single scheme. Plaintiffs first point out that there are other
predicate acts alleged, and that Defendants' authorities are inapposite, [7] then assert, "[p]redicate
acts which arise under a single scheme, [] may be a pattern for RICO purposes if they are
continuous and related." *Mensaco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

The evidentiary standards are such that "[o]ne can be a [RICO] conspirator by agreeing to
facilitate only some of the acts leading to the substantive offense." Dkt. 41 at 9 (quoting *Salinas
v. U.S.*, 522 U.S. 52, 65 (1997)) (collecting cases). The standard is well-satisfied here, as
Plaintiffs cite evidence including the recorded conversations, email correspondence, and files
recovered from co-conspirators' computers. Dkt. 41 at 11-12. Additionally, whereas single

---

[7] Defendants note that *Al-Abood* cautioned against improper use of RICO, as it is "the unusual
fraud that does not enlist the mails and wires in its service at least twice." 217 F.3d at 238.
Plaintiffs emphasize that there are allegations beyond mail and wire fraud, and this is not an
instance of such a questionable claim.

schemes or fraud within one ongoing contractual relationship may be "routine" and insufficient

to support a RICO claim, the underlying facts here suggest a "'scheme[] whose scope and

persistence set them above the routine.'" *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538

(4th Cir. 1988) (quoting *HMK Corporation v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987)).  To

wit, Plaintiffs allege at least nine different commercial lease deals and subsequent management,

a direct "flip" purchase, and at least four Project Entities owned by Defendants and its main

equity investor, IPI.

Thus the record supports a likelihood of success on the RICO claims.  Each alleged

conspirator will have had a unique role in the enterprise, and claimed ignorance or exclusion

from part of the conspiracy will not defeat the cause of action.  As the Supreme Court said, "it

suffices that [a conspirator] adopt the goal of furthering or facilitating the criminal endeavor. He

may do so in any number of ways short of agreeing to undertake all of the acts necessary for the

crime's completion." *Salinas*, 522 U.S. at 65.

### 2. *Common Law Tort and Contract Claims*

The common law fraud and contract claims are also likely to succeed, Plaintiffs continue,

and they independently support preliminary injunctive relief.  Defendants argue the breach of

contract claim is based on alleged misrepresentations within the contract terms, which cannot

support a tort claim in Virginia.  Plaintiffs assert the contrary: that a single act or occurrence can

act as the basis for both a breach of contract action and a breach of a duty arising in tort.  *Dunn*

*Const. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009).

The breach of contract claim is further flawed, Defendants argue, because Plaintiffs have

failed to show breach.  At bottom, Plaintiffs are alleging that the real estate prices were too high,

but Defendants say Amazon was not misled, is a very sophisticated party, and should be held to

its business decisions.  Plus, while there is a provision stating that Amazon would not have to

11

*pay* commissions or fees for brokers or referrals, "[t]hat provision says nothing concerning whether Defendants used a broker, finder, or other referral source." Dkt. 39 at 16. Defendants also challenge the basis of the breach of contract claims that arise from "unexecuted documents in connection with a potential future sale." *Id.* at 17. These latter provisions are not in the lease, but are attached to the lease as a right of first offer/refusal ("ROFO/R") purchase agreement, and were never implemented.

Furthermore, without any misrepresentation, Defendants say there can be no fraud claim. Amazon claims Defendants misrepresented "that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best interests and in compliance with Amazon's Code of Conduct and that the price Amazon paid for the Leases and White Peaks Purchase price were competitive market prices." Dkt. 39 at 19 (citing Compl. ¶ 180). Defendants deny that any affirmative misrepresentations were made (or alleged), but even if they were, Amazon cannot claim reasonable reliance. Amazon is the best entity to gauge Amazon's best interests, they claim, and it is too sophisticated to claim injury from reliance on a statement from a counter-party about a reasonable or market price.

Plaintiffs reject each of Defendants' arguments against the contract and common law tort claims. Notably, Defendants failed to identify the "Entire Agreement" provision in the operative leases; the lease between DULLES NCP II, LLC ("Landlord") and Amazon Data Services, Inc. ("Tenant"), for instance, states:

> *No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained in the Deed of Lease Documents*, and any prior agreements, promises, negotiations, or representations are superseded by the Deed of Lease Documents.

Dkt. 12-20 (MacDonald Decl. Ex. 14-Part 1 ¶ 33) (emphasis added). Whereas Defendants imply they could contract for referrals or brokerage with whomever they wanted so long as Amazon

did not have to pay for it, the contract language indicates otherwise. In other words, Defendants'

ROFO/R argument collapses, because language in the body of the executed contract purports to

prohibit these third-party arrangements altogether. Even if the agreement did not have this

clause prohibiting other promises or agreements, Plaintiffs note that the ROFO/R provisions

should apply, because they are expressly "incorporated into [the] Deed of Lease and made a part

[there]of. *Id.*

Moreover, Amazon argues, there is no basis in law or fact for the notion that Amazon

could not reasonably rely on misrepresentations. Acknowledging that the defrauded party bears

the burden to show the right to reasonably rely on the defendant's misrepresentation, Plaintiffs

maintain that Defendants offered no evidence to the contrary.

If concealed facts are truly concealed, it seems to set a high bar for a sophisticated party

to divine them. While the sophistication of a party may have some effect on contract

expectations, there is nothing before the Court to suggest that reliance would be unreasonable in

this instance. Based on the plain language of the relevant provisions for the breach of contract

claims, and due to an overall lack of support to rebut the fraud claims, there is a likelihood of

success on these two claims.

### 3. *Additional Claims: Conversion, Detinue, Tortious Interference, Civil Conspiracy, Alter Ego, and Veil Piercing*

Defendants' relief-based objections to the conversion and detinue claims are discussed

below vis-à-vis the claim for relief in equity rather than law. Specific to the detinue claim,

Defendants contend there is no allegation of targeted property in Virginia, which the Virginia

statute requires. As noted below, Amazon indicates several places in the record to refute this.

For these reasons and to the extent that the argument against these counts is based on the

permissibility of the claims themselves, the likelihood of success on this record favors Plaintiffs.

As Plaintiffs argue, Defendants do not counter the tortious interference claim in much detail. Defendants again claim a lack of specificity in the pleadings, saying this count is "so vague and general as to lack any meaning." Dkt. 39 at 26. It is also addressed in Defendants' constitutional argument, discussed below.

Defendants' Opposition does not address or rebut the civil conspiracy, alter ego, or veil piercing counts. For that reason, the Court has no reason to believe they will fail.

### B. Likelihood of Imminent and Irreparable Harm

*1. Summary*

In general, Plaintiffs assert that the relief sought is narrowly tailored to address the specific harms identified, and those identified are at further risk per the conspiratorial post-raid conduct described above. Specifically, Defendants Northstar and Watson pose an imminent threat as they are now beset by lawsuits, business failures, and FBI inquiries. An injunction is warranted where Defendants' assets might dissipate to frustrate a final judgment – and, Plaintiff notes, funds that are unavailable before trial are likely to remain unavailable after trial. The added burdens Defendants claim since the FBI seizures only add to the urgency for the injunction in Amazon's view. Amazon also argues potential irreparable loss of good will and business relationships, which is a persisting and ongoing threat; this cannot be remedied at time of judgment.

Moreover, Amazon argues that the threat of immediate irreparable harm is established both because of an imminent threat Watson and Northstar present to the parcels they previously managed, and because of undisputed facts demonstrating threats to evidence. For instance, Christian Kirschner's brother Casey, an alleged co-conspirator, already deleted a file thought to document his share of kickbacks. The file was recovered from his computer's recycle bin.

14

Defendants assert irreparable harm is not satisfied because Plaintiffs have an adequate remedy at law, they have not shown how they have been harmed, and there is no shown threat of dissipation of assets or spoliation. While the latter two arguments are unpersuasive in the face of the record, the first argument—an adequate remedy at law and equitable treatment of monetary assets—merits further discussion. It is relevant to the irreparable harm discussion here, but also an important consideration for the balance of equities and the public interest.

### 2. Discussion

Amazon seeks an award of money damages, Defendants say, and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (additional citation omitted). While courts have recognized "extraordinary circumstances [that] may give rise to the irreparable harm required for a preliminary injunction," Defendants argue those extraordinary circumstances are not present here. *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Rather, Watson draws on the Supreme Court's holding in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, concluding, "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." 527 U.S. 308, 333 (1999).

Even where extraordinary circumstances warrant injunctive relief for money awards, "the preliminary injunctions issued in such cases are carefully tailored, generally operating simply to preserve the plaintiff's opportunity to receive an award of money damages at judgment." *Hughes*, 17 F.3d at 694 (citing *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986) (noting that a "preliminary injunction can be granted when it is necessary to protect the damages remedy"); *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683,

686 (5th Cir. 1980) (stating that even where a remedy is "limited to damages, an injunction may issue to protect that remedy")).

The Fourth Circuit has allowed a preliminary injunction "where the principal defendant was 'insolvent' and its assets were 'in danger of dissolution and depletion.'" *Hughes*, 17 F.3d at 694 (additional quotation omitted) (quoting *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1330 (4th Cir. 1989); *see also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289 (1940) (stating, where the defendant was insolvent, "[t]hat a suit to rescind a contract induced by fraud and to recover the consideration paid may be maintained in equity, at least where there are circumstances making the legal remedy inadequate, is well established.").

Indeed, the Watson Defendants claim significant financial hardship, but they proffer it weighs against an injunction in this instance. They concede a likelihood of insolvency, saying "[t]he injunctive relief that Plaintiffs seek would not preserve Northstar's or Watson's assets or protect Plaintiffs from a potential insolvency, but would effectively preclude Northstar from operating and – as a result – almost certainly result in Northstar's insolvency." Dkt. 39 at 11 (footnote omitted). Defendants further note that the Fourth Circuit has said potential insolvency does not warrant a finding of irreparable harm supporting injunctive relief. *Id.* at 10 (citing *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 Fed. App'x 351, 354 (4th Cir. Oct. 26, 2011) (unpublished)). They point to *Grupo Mexicano* as additional support, where the Supreme Court held that a general creditor has no cognizable interest in the property of his debtor and could not interfere with a debtor's unencumbered property. *Grupo Mexicano*, 527 U.S. at 319-20.

The potential for insolvency, however, does not weigh in Defendants' favor, despite the Fourth Circuit's unpublished statement in *Bethesda Softworks* that potential insolvency is not sufficient to show irreparable harm. Rather, "'[t]he traditional office of a preliminary injunction

16

is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits.'" *Bethesda Softworks*, 452 Fed. App'x at 354 (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds* by *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)). Thus, as Plaintiffs say, Defendants miss the mark and fail to provide reassurance that the status quo is protected here.

Regardless of whether there are extraordinary circumstances at bar to merit injunctive relief, Plaintiffs argue that the relief sought is equitable, and the case law does not apply as Defendants suggest. Amazon claims the alleged harms have a sufficient nexus with equitable relief to justify the TRO because Amazon seeks to recover on unjust enrichment, a constructive trust, and certain discrete payments that should be rescinded or placed in escrow. Amazon says *Grupo Mexicano* does not help Defendants' argument because it is conceded that the relief sought was only money damages, whereas the instant case seeks equitable action. Opp'n at 10. The prohibition is limited to actions at law, but this case is not. The Fourth Circuit recognized the holding in *Grupo Mexicano* was "carefully circumscribed" to limit its application to "'*action[s] for money damages*'" where "'*no lien or equitable interest is claimed.*'" *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 496 (4th Cir. 1999) (emphasis original) (alteration added) (quoting *Grupo Mexicano*, 527 U.S. at 310). The inquiry, therefore, begins with "whether [plaintiffs] seek cognizable relief in equity involving assets of the defendant." *Rahman*, 198 F.3d at 497.

"The unjust enrichment count is recognized as equitable." *Rahman*, 198 F.3d at 397-98 (citing *Spring Const. Co. v. Harris*, 614 F.2d 374, 378 (4th Cir. 1980)). Indeed, Plaintiffs state that the instant unjust enrichment claim alone supports the equitable requirement, and further note that Defendants only challenge the conversion and detinue claims. Even so, conversion can

seek equitable relief where, as here, usurpation of a corporate opportunity warrants a constructive trust on the proceeds. Dkt. 41 at 8 (citing Freimann Ex. B). What is more, Amazon cites Defendants' authority back to them for the notion that "money can be the basis of a conversion claim, but it has to be in the form of an identifiable fund, such as a bag of money or identifiable settlement proceeds." *Jones v. Bank of Am. Corp.*, No. 4:09 CV 162, 2010 WL 6605789, at *5 (E.D. Va. Aug. 24, 2010) (collecting cases). Detinue must involve the withholding of personal property of another, which Amazon says is also satisfied here. "[T]he Watson Defendants used fraud and kickbacks unlawfully to secure control of, and harm, Amazon funds and other personal property (including shell facilities and equipment) in Virginia." Dkt. 41 at 9 (citing Compl. ¶¶ 55-60; TRO Br. 22-23; Gilpin Decl. ¶¶ 3-26).

In addition to these assets, Plaintiffs cite an urgent need to preserve evidence. What is more, a loss of good will and reputation among Amazon's business partners and participants cannot be redressed by a legal or equitable remedy following trial. Plaintiffs also indicate cognizable harms to specific assets and business relationships. In sum, Plaintiffs claim to show ample harm and the need for equitable relief to avoid irreparable harm. Amazon notes that the Fourth Circuit said, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (additional citation omitted). The Court notes that "the possibility of permanent loss" referenced in *Multi-Channel TV* is not sufficient in light of the Supreme Court's holding in *Winter*, as the "'possibility' standard is too lenient," and plaintiffs must show "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Notwithstanding the higher standard, Amazon discusses at length how the need to secure certain assets is "urgent," and that "Plaintiffs face an imminent threat of irreparable harm," and that

undisputed circumstances surrounding Defendants' business interests and ongoing criminal investigation "confirm this risk is as imminent today as it was in April." Dkt. 41 at 17-18.

The totality of the circumstances supports a likelihood of harm to Plaintiffs absent injunctive relief, not just a possibility. Based on the governing law and the arguments at bar, Plaintiffs have shown a need for equitable relief sufficient to support the PI, which is narrowly tailored to achieve the desired relief.

### C. Balance of Harms [8]

As Plaintiffs have shown a likelihood of irreparable harm, the Court balances this against the likelihood of harm to Defendants. *See Winter*, 555 U.S. at 24 ("In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" (quoting *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

The balance of harms shows a disproportionately large threat to Watson and Northstar, Defendants say, because of the violation of constitutional rights, financial hardship imposed, and evidentiary issues that are largely moot after the FBI seizures. Money damages do not outweigh those things, they say, and should not be the subject of injunctive relief – especially not where the monetary loss will have no meaningful impact on Amazon's bottom line and Plaintiffs continue to occupy the properties at issue during litigation.

Specifically, Defendants argue the injunctions sought will violate the Supreme Court's rules on presuit asset restraints and presuit injunctions against speech. Paragraph eight (¶ 8) of the TRO and the proposed PI enjoins Defendants from disrupting any ongoing business transactions or relationships related to Plaintiffs' real estate developments. Believing this to be

---

[8] As noted, *supra* Part III.B, the Court's examination of the balance of harms gives weight to the likelihood of irreparable harm as discussed, but does not repeat that discussion here.

19

aimed at Watson's response to IPI—the 95% equity investor in three Amazon projects—and its termination of Northstar in management roles, Defendants contend this is "a blatant violation of First Amendment and due process rights." Dkt. 39 at 26.

But Plaintiffs call the First Amendment and Due Process arguments a red herring. The constitutional claims equate the injunctive relief to a denial of the ability to contest—in court, if need be—the termination of their Lease contracts. Dkt. 41 at 19 (citing Dkt. 39 at 26). Indeed, the language in the injunction includes a prohibition from "disrupting any ongoing business transactions or relationships related to Plaintiffs' real estate developments in this District and elsewhere." Dkt. 16 ¶ 8. This does not prevent Defendants' ability to challenge it, however, and there is no First Amendment issue to require Defendants to file related claims in the same suit. In fact, Amazon maintains, the first-to-file rule addresses that very issue. *See Ortiz v. Panera Bread Co.*, No. 1:10CV1424, 2011 WL 3353432, at *2 (E.D. Va. Aug. 2, 2011) (citing *Allied–General Nuclear Servs. v. Commonwealth Edison Co.*, 675 F.2d 610, 611 n.1 (4th Cir. 1982) ("Ordinarily[] . . . upon the same factual issues, the first or prior action is permitted to proceed to the exclusion of another subsequently filed.")).

Further, while Defendants claim the government seizures have mooted the need for the PI, Plaintiffs note that the opposite is true, and the window for discovery of relevant evidence and assets is closing. Civil plaintiffs are not guaranteed to receive assets forfeited from criminal defendants, 21 U.S.C. § 853, and the government may decline to produce assets where the civil "defendant has the means to satisfy his restitution obligation." *United States v. Cohan*, 988 F. Supp. 2d 323, 329 (E.D.N.Y. 2013), *aff'd*, 798 F.3d 84 (2d Cir. 2015); Dkt. 41 at 20.

The law aligns with Plaintiffs' arguments with respect to the injunctive relief and evidentiary issues here. The first-to-file rule is well-established, potentially applicable should Defendants wish to bring legal challenges of their own, and does not violate Defendants'

constitutional rights. Moreover, Defendants have not shown that Plaintiffs' interests in the civil investigation and underlying evidence are mooted simply because of overlaps with the criminal investigation. The balance of harms favors Plaintiffs.

### D.  Public Interest

Plaintiff emphasizes there remains a valid interest in protecting legitimate expectations in contracts and vindicating victims of illegal conduct. Defendants maintain the public interest will not be served by restraining speech and petitioning activity, and likely rendering the company insolvent.

As noted above, issues of free speech and potential insolvency do not favor Defendants' position. The public interest factor is not a focus of the briefing, and is addressed secondarily in the discussions about constitutional rights and characterization of equitable remedies in litigation. Amazon has brought significant development to the greater D.C. area, and hopes to continue to invest in northern Virginia in the coming years. Trusted business partners will be necessary to secure ongoing development in the public interest.

### V. CONCLUSION

For these reasons, Plaintiffs' Motion for a Preliminary Injunction will be granted.


July 28 2020
Alexandria, Virginia

_____
Liam O'Grady
United States District Judge