# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| AMAZON.COM, INC., et al.<br><br>Plaintiffs,<br><br>v.<br><br>WDC HOLDINGS LLC., *et al.*,<br><br>Defendants. | CIVIL ACTION No. 1:20cv484 |

### REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

IFRAH PLLC
Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun (*pro hac vice*)
James Trusty (*pro hac vice*)
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
Stanley L. Garnett (*pro hac vice*)
410 Seventeenth Street
Denver, Colorado 80202-4432

Gregory A. Brower (*pro hac vice*)
100 North City Parkway
Las Vegas, Nevada 89106-4614

*Counsel for Defendants Brian Watson and WDC Holdings Inc.*

Defendants Brian Watson ("Watson") and WDC Holdings LLC, dba Northstar Commercial Partners ("Northstar") respectfully submit this reply in support of their motion seeking a stay of the Court's June 5, 2020 Preliminary Injunction Order pending appeal.

## Introduction

In their opposition, Plaintiffs continue their practice of making unsupported leaps of logic and presenting false innuendo to support their claims. Between Plaintiffs' original motion for an injunction and their current opposition, they have substantially modified their pleading—adding to and changing their theory of the case. But none of those modifications have cured the basic deficiencies in their allegations. Indeed, many of Plaintiffs' arguments amount to assumptions that they will eventually win the case. Because Defendants' motion is supported by fact and law, the Court should enter a stay pending appeal. First, it is undisputed that the injunctive relief is only available in support of equitable claims. But the equitable relief sought by Plaintiffs is contrived and subject to dismissal. As to irreparable injury, Plaintiffs contend that (1) the jobs of Defendants and their employees are mere economic injury, and (2) Defendants have no entitlement to spend funds subject to the PI so therefore cannot be harmed by it (Opp. at 22). The first argument is simply wrong. The second is both circular and wrong. Plaintiffs have made no showing that Watson seeks to spend (or even has) any ill-gotten funds. The undisputed evidence shows that Amazon, who has chosen to forego rescission of the rental property contracts, faces no prospect of harm from a brief stay while the Fourth Circuit considers the merits on an expedited basis. In contrast, Defendants face irreparable injury as they lack liquid assets to deposit into any escrow and liquidation of Watson and Northstar's unrelated real estate properties and investments would do irreparable harm to the Defendants.

## Argument

### I. Defendants are Likely to Succeed on the Merits

Defendants are likely to succeed on the merits. Plaintiffs attempt to explain their offering of late affidavits as a response to arguments from Defendants that Plaintiffs had not submitted adequate evidence to support their motion. See Opp. at 21. The affidavits offered by Plaintiffs were not responding to affidavits from Defendants. Rather, they were substantive declarations in support of Amazon's claims, in several cases raising allegations that were not contained in the complaint or moving papers. This is exactly the sort of evidence barred by Rule 6(c). The Court should have excluded this late evidence that was submitted in violation of the rules and Defendants' due process rights.

Defendants also are likely to succeed on their argument that the injunction exceeds the Court's power under the principles set forth by the Supreme Court in *Grupo Mexicano*. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999). Plaintiffs concede that they may only obtain a prejudgment asset injunction in connection with equitable claims. Plaintiffs contend, however, that because their Complaint includes claims in equity, the injunction is appropriate. In their original complaint, the only equitable claim upon which they purportedly sought injunctive relief was Count IX for conversion.[1] Neither conversion nor unjust enrichment support relief here and both claims should be dismissed.

As explained in detail in Defendants' motion to dismiss, conversion only applies to specific property and typically will not apply to money. Moreover, in this case, the only payments from Plaintiffs were paid as rent to non-party landlords pursuant to lease agreements. Plaintiffs contend that they "do allege equitable claims for fees they paid directly to Defendants and their privies as

---

[1] At the May 21, 2020 hearing, Plaintiffs argued that they also were entitled to equitable relief on their unjust enrichment claim. Plaintiffs then explained why that claim did not support relief.

a direct result of fraudulent representations made by Defendant Watson. Opp. at 19 (citing Dkt. 1 ¶¶ 55–60, 170–72; Dkt. 41 at 8–9). Despite this contention, they do not allege a single payment from Plaintiffs to Northstar or Watson. They also concede that the landlord entities are controlled not by Defendants, but by IPI.[2] Similarly, Plaintiffs argue that Defendants' own documents show that they received $15 million from Plaintiffs. Opp. at 20. That is an outright falsehood. The citations that Plaintiffs cite to support this claim refer to the White Peaks transaction and in one case to a document, the author of which is not revealed by Plaintiffs, retrieved from an Amazon computer, in which an Amazon employee allegedly listed expected fees.[3] None of the citations include any admission by Defendants as to what fees they have been paid.

What is undisputed, however, is that Amazon never paid anything but rent under the transaction documents at issue. While Northstar may be paid development fees from the joint ventures in connection with the development of the projects, those funds are not paid by Amazon. The leases and operating agreements expressly quantify the budgets from which rent is to be based (and include caps to the extent a project might go over budget). The leases Amazon executed in connection with the alleged Leased Transaction Enterprise provide that Amazon's annual rent for a data center would be a percentage of either the "Final Budget" or, if lower, the developer's "Actual Costs." Dkt. 58-5 at 175.[4] While Amazon has redacted the percentage that would apply to the "Final Budget," the lease it has produced discloses that, in the event the rent is calculated based on "Actual Costs," the annual rent is 6.7% of "Actual Costs," a highly competitive and favorable

---

[2] Plaintiffs concede IPI had majority control of the landlord entities. Dkt. 100 ¶ 112.
[3] In particular, Plaintiffs have referred to Exhibit 10 to the MacDonald Declaration (Dkt. 106-10). Notably, even if the Court accepted those numbers, the purported amounts include millions of dollars on account of sale and land rebates, but neither event has taken place for any project. This shows that the spreadsheet could at best be considered aspirational.
[4] Amazon has submitted only one lease to the Court, but it represents that the other leases it executed with Northstar are "substantially similar in relevant respects." Dkt. 12 ¶ 24.

rate for Amazon. *Id*. A chart prepared and produced by Amazon shows that Amazon had occupied only four of the nine data centers at issue prior to reformation of the leases in February 2020. Dkt. 12-9. That chart shows that Amazon began occupying two Dulles data centers on November 1, 2018, and March 6, 2019, and began occupying two Manassas data centers on June 17, 2019, and November 6, 2019. *Id*. For those four centers, Amazon paid monthly rents ranging from $218,223.81 to $297,597.14. *Id*.[5] Amazon admits that it and IPI reformed the lease agreements (without Northstar's knowledge or approval) for the relevant data centers on February 19, 2020. Dkt. 100 ¶ 112. During that period, Plaintiffs' exhibits show that Amazon would have paid the following amounts in rent:

| Project | Lease Start | Reformation | Months | Monthly Rent | Total Rent |
|---|---|---|---|---|---|
| Manassas | 6/17/2019 | 2/19/2020 | 8 | $225,059 | $1,800,469 |
| Manassas | 11/6/2019 | 2/19/2020 | 3.5 | $224,810 | $786,834 |
| Dulles | 11/1/2018 | 2/19/2020 | 15.5 | $218,224 | $3,382,469 |
| Dulles | 3/6/2019 | 2/19/2020 | 11.5 | $297,597 | $3,422,367 |
|  |  |  |  |  | $9,392,139 |

Thus, Amazon's own documents show that it has paid at most $9,392,139 in rent that it can claim was inflated by the fraud it alleges. Most of this rent is used by the JV entities to service the construction loan used to fund development costs.[6] Northstar would have received a minimal

---

[5] The rent amounts do not correspond to 6.7%, suggesting that the rent is calculated on the Final Budget and is at a lower yield.

[6] As shown in Docket 107-7 (Exhibit 17 to the MacDonald Declaration In Support of the First Amended Complaint), the development costs were funded primarily through a construction loan. As will otherwise be shown, IPI contributed 90–95% of the equity in each project while Northstar and its investors typically would invest 5–10% of the equity.

portion of the rent payments. Amazon paid rent to NSIPI, which is the landlord ownership entity used to service the debt and other expenses (as is typical in real estate deals) and Northstar owns 14.28% of NSIPI Data Center Venture LLC. Northstar would receive typical market rate fees for sourcing and developing the assets pursuant to development agreements, but gets the majority of its profit after the assets are built, occupied and sold. Amazon's rent payments, however, do not reflect its alleged damages. The rent payments were based on many expenses in the final development budgets that Amazon has not challenged. Amazon's alleged damages can only possibly refer to some amount by which the rent was inflated (which it does not claim in its Amended Complaint, *see* Dkt. 100 ¶ 214).

The primary expenses Amazon has challenged in connection with the Leased Transaction Enterprise are commissions and development fees supposedly paid to the Villanova Trust. The Court's preliminary injunction ordered Northstar to place $16.25 million reflecting "the sum of certain Amazon real estate development fees to these Defendants in the amounts of $4,150,000, $8,500,000, and $3,600,000 for the Shaw Rd., Quail Ridge, and Manassas Lease Transactions, respectively." Dkt. 57 ¶ 2. As explained above, Plaintiffs' own documents show that those fees have not actually been paid (at least not in those amounts). But even if the Court assumed that they were added to the rent payments made (as opposed to fees being included in the Final Budget from which rent was calculated), Amazon would have to show how those fees were above market rates in order for it to have been damaged.

Given that their own documents show that Plaintiffs have not paid anything like the sums they are claiming, it is unsurprising that Plaintiffs do not actually identify <u>any</u> specific payment to Defendants as to which a conversion or unjust enrichment claim might apply.

Plaintiffs do not dispute that each of the payments they made was disclosed and payable to the landlords pursuant to contracts. Every project had a budget that was reviewed and approved by IPI, Amazon and the lenders, and included all fees, including those to Northstar. The landlord entities made certain payments to Northstar pursuant to separate development contracts. This fact pattern does not support a conversion claim because Northstar has a valid claim to the fees that it was paid by the landlord entities and Plaintiffs do not have an immediate right to those funds. Rather, Plaintiffs only have a right to damages if they prevail on their claims. Despite much sound and fury, Plaintiffs have not identified the funds to which they contend they are entitled.

Similarly, Plaintiffs' opposition contains no support for its unjust enrichment claim. Unjust enrichment is a quasi-contractual remedy that does not apply where there are express contracts. A party may not recover on a quasi-contract theory such as quantum meruit or unjust enrichment when an actual contract governs the parties' relations on that issue. *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir.1994) (*citing Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988 ("Because an 'action for unjust enrichment is quasicontractual in nature[, it] may not be brought in the face of an express contract.'")). *See also, Keck Garrett & Assoc., Inc. v. Nextel Comm., Inc.*, 517 F.3d 476, 487 (7th Cir. 2008). Amazon has asked for what appears to be every form of relief under the sun—but for one: rescission. Amazon acknowledges in its Amended Complaint that it could have sought rescission (Dkt. 100 ¶ 82), but it has elected not to do so. In the face of express contracts, Plaintiffs cannot also sue under a quasi-contractual theory.

Plaintiffs also attempt to buttress their RICO claim, which was at the time of their motion the sole basis for federal jurisdiction. They contend primarily that Fourth Circuit law does allow RICO claims where there is only a single victim and a limited scheme. Opp. at 15–16. Although Plaintiffs concede that this is a single victim case, they contend that such RICO cases are

appropriate despite being clearly disfavored by the Fourth Circuit. Other than a fleeting suggestion of misconduct in other states by other defendants, there is nothing remotely particularized in support of the notion that this amendment sufficiently establishes a "criminal enterprise" whose continuity threatens harm to multiple victims. The belated, and vague, inclusion within paragraph eight of the Amended Complaint, repeated without particulars 116 paragraphs later, simply fails to elevate a fraud case beyond the Fourth Circuit's starting framework of discouraging treble damage RICO suits that could and should be pursued as traditional tort claims. Amazon's suit continues to fall squarely into the discouraged territory of *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531, 538 (4th Cir. 1988).

## II. Defendants Face Irreparable Harm

Plaintiffs then take the remarkable position that Defendants have not shown that they will suffer financial hardship. Opp. at 23–24. The entire basis for the preliminary injunction is that Defendants might be unable to pay a judgment on the merits. The proposition that Defendants cannot afford to escrow the full value of any possible judgment is obvious. If Plaintiffs' current position is given credence, the Court will be in the untenable position of holding both that an injunction is necessary because Defendants cannot afford to pay a possible judgment and that Defendants have assets of a value such that the escrow of over $21 million will not cause it irreparable harm. Those positions are irreconcilable.

Plaintiffs rely heavily on financial statements that Defendants produced to bonding companies in connection with efforts to obtain security. *See* Dkt. 82. Contrary to Plaintiffs' arguments to the Court, those financial statements do not show available assets anywhere near sufficient to fund the escrow. First, approximately $45 million of the assets listed in the financial statement is the value ascribed to the value of the Amazon projects. Given the current litigation,

7

the likelihood of realizing that value is low, but certainly the projects do not represent liquid assets. So too, the other Northstar projects represent assets in development. Neither Watson nor Northstar have any way of liquidating those projects to meet the escrow demand, especially given their fiduciary responsibilities to the equity investors in those separate deals.

Watson also has interests in certain real estate and partnerships and other assets. Plaintiffs highlight some of those assets in their opposition, highlighting Watson's ownership of a private jet and two parcels of real estate. Opp. at 24. Plaintiffs omit that all of those assets are encumbered with debt, and while they likely have meaningful net value, they are far from liquid.[7] The financial statement shows that Watson held as of May 31 cash and marketable securities of only $269,086, which includes approximately $132,188 held in a retirement account. The prospect that parties in this financial position cannot fund a $21+ million escrow account is self-evident. Moreover, the stay will not affect the current, limited discovery that the Court authorized to verify Watson and Northstar's assets.

### III. A Stay Would Not Injure Plaintiffs

Plaintiffs contend both that Watson and Northstar have sufficient assets to fund an escrow and that they lack sufficient assets to make Plaintiffs whole if Plaintiffs were to prevail. In so arguing, they undercut their argument that they face irreparable financial harm. Perhaps conceding that a stay poses no real risk of harm to Plaintiffs, they shift their focus to the alleged risk of dissemination of confidential information. This argument lacks merit.

---

[7] The financial statement shows a value for the corporate aircraft of $2 million and an encumbrance of $1,549,011. The C Lazy U Ranch lists an appraised value of $5,800,000 and encumbrance of $2.3 million. The property at 8 Churchill Drive is listed at an appraised value of $6.6 million with encumbrances of $5.6 million.

First, a stay poses no risk of financial harm to Amazon. The Fourth Circuit has set an expedited briefing schedule and the parties are likely to have a swift disposition of the substantive issues with briefing to be completed by September 17, 2010. Plaintiffs contend that security is "'preferable' to relying on an 'operating' or 'defunct' Northstar to satisfy a judgment requiring Defendants to return the very assets they fraudulently and inequitably procured from Plaintiffs, and have since misrepresented, concealed, and dissipated in violation of this Court's orders." Opp. at 27. Plaintiffs have far from proven that Northstar has fraudulently procured, concealed or dissipated anything, but this argument misses the point. Plaintiffs' preference does not establish a likelihood of harm. Indeed, as they now assert, Plaintiffs are not asking that specific assets be placed into escrow, they are asking for $21+ million regardless of source. The reason for this is, in part, that Amazon has not even paid $21 million under the leases at issue.

Second, Plaintiffs inexplicably have not sued their contract counter-parties, the various joint ventures, which own the properties at issue. If those parties breached contracts with Plaintiffs, the significant real estate that they own would be more than adequate to redress any harm. That Plaintiffs have elected not to pursue relief from the parties that own the real estate at issue reveals that neither breach of the contracts, nor economic harm, are motivating Plaintiffs' actions. A brief stay poses no risk of harm to Plaintiffs, especially as they are requesting an extraordinary injunction tantamount to a prohibited prejudgment attachment.

As to confidential information, the Parties have agreed to a protective order that has been entered by the Court. Despite repeated requests, Plaintiffs have never disclosed to Defendants what information Plaintiffs believe to be confidential or nonpublic. Thus, Defendants are in the position of having to guess what Amazon has not disclosed to others. Although Defendants do not believe that any of the information in their possession is particularly confidential, they have agreed

9

to abide by the protective order. They have not released publicly any information that Amazon purports is confidential. Plaintiffs are simply pounding the table about imaginary issues. If Defendants were to disclose information that is marked as confidential, the Court already has the power to address that conduct through the protective order. A stay of the injunction therefore is irrelevant as to the protection of confidential information.

The balance of the harms weighs particularly in favor of Defendants in this case. If the Court looks past Plaintiffs' bombast, the undisputed facts are that Defendants have received little, if anything, from Plaintiffs in connection with the transactions at issue. Defendants also lack substantial liquid assets, although they do have substantial assets. It would do enormous harm, however, to attempt to liquidate those assets. Indeed, if Defendants were to liquidate their real estate holdings, they would never be able to replace those assets, which is quintessential irreparable harm, and it would inevitably put WDC and its employees out of work. The flip side is a brief delay while the Fourth Circuit determines the merits of the parties' contentions.

## Conclusion

The Court should grant Defendants' motion and stay its preliminary injunction order. Although Defendants do not expect that the Court will reverse itself, Defendants have minimally raised serious merits issues that are likely to result in a reversal on appeal. While the appeal is pending, discovery on Defendants' financial condition can proceed and Plaintiffs face no prospect of financial harm or of disclosure of confidential information. In contrast, Defendants face the imminent destruction of their businesses and the liquidation of irreplaceable real estate assets. Equity demands that the Court stay its improvidently granted injunction.

Dated: August 17, 2020

Respectfully submitted

    */s/ Jeffrey R. Hamlin*
Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun (*pro hac vice*)
James Trusty (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

Stanley L. Garnett (*pro hac vice*)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Denver, Colorado 80202-4432
(303) 223-1100 – Tel.
(303) 223-1111 – Fax
Sgarnett@bhfs.com

Gregory A. Brower (*pro hac vice*)
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway
Las Vegas, Nevada 89106-4614
(702) 382-2101 – Tel.
(702) 382-8135 – Fax
gbrower@bhfs.com

*Counsel for Defendants Brian Watson and WDC Holdings Inc.*