# EXHIBIT 9

Confidential
**DRAFT**

**Transcript of**
**Northstar Recording: September 27, 2019**

Duration:  00:36:07

| | |
|---|---|
| Watson: | Hey guys. |
| Ramstetter: | What's going on? |
| Watson: | Well, we've got to talk about some stuff. |
| Lorman: | Do you want the room? |
| Watson: | Yeah. |
| Lorman: | Ok.  Hey Will, let's step outside. |
| Camenson: | What's up? |
| Watson: | Need you to step outside with Tim.  Thanks. |
| Watson: | I have to tell you, Kyle.  Some information I want to start with and ask you questions.  I want to ask if there's anything that you'd like to share with me of any unscrupulous behavior that you've done or had at Northstar.  I want to give you that opportunity before I ask you some questions and explain some information. |
| Ramstetter: | Okay.  It's a loaded question, but go ahead. |
| Watson: | Do you have anything-- |
| Ramstetter: | So no, no.  I will based on your questions. |
| Watson: | Okay.  Well, yesterday afternoon-- |
| Ramstetter: | Yeah. |
| Watson: | --it was brought to my attention that it looks like you were involved in a transaction-- |
| Ramstetter: | Okay. |
| Watson: | --in Virginia, that--first of all, you want to tell me who NOVA LLC is? |
| Ramstetter: | No. |
| Watson: | NOVA W – NOVA WPC LLC? |

Confidential
**DRAFT**

| | |
|---|---|
| Ramstetter: | No. |
| Watson: | Do you know that group? |
| Ramstetter: | No. |
| Watson: | You don't? |
| Ramstetter: | No. |
| Watson: | Okay.  Well, it's registered at your home address-- |
| Ramstetter: | Okay. |
| Watson: | --in Parker, Colorado.  And according to the records that I have here, that your entity that's registered there went under a contract for land with JK Moving and Storage, which is one of our clients, or one of our people-- |
| Ramstetter: | [unintelligible] |
| Watson: | [unintelligible]--we bought land from.  Excuse me.  And it went under contract, and for $98.7 million of a piece of land, and on July 25th, did a simultaneous closing to Amazon, which is one of our clients, our largest client, for $116.4 million, and there's about a $17.8 million profit. |
| Ramstetter: | Okay. |
| Watson: | Were you involved in that at all, or no? |
| Ramstetter: | Yes. |
| Watson: | So you're not involved in that? |
| Ramstetter: | I said – I didn't say, not at this time, no comment. |
| Watson: | Okay, no comment.  Okay. |
| Watson: | Is it true? |
| Ramstetter: | What's that? |
| Watson: | Is it true that you did this? |
| Ramstetter: | That that transaction happened? |
| Watson: | Yeah. |
| Ramstetter: | I mean, that's a loaded que--a bigger question and conversation we should have with other people. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | Okay.  Who are the other people? |
| Ramstetter: | Depends on how far we want to take this, Brian.  The parties involved in the transaction, maybe somebody tonight. |
| Watson: | Yeah, I'm happy to do whatever you want.  I'm just trying to get--I'm shocked, and actually heartbroken, because I never knew about this transaction, and I'm just wondering why you did it behind my back. |
| Ramstetter: | Okay.  I had to.  That's why I said the bigger conversation. |
| Watson: | You had to? |
| Ramstetter: | Yes. |
| Watson: | Okay.  Well, were there any other NCP employees or relationships, current or past, involved? No? |
| Ramstetter: | Yeah. |
| Watson: | Just you, and it looks like according to the CoStar records, which is amazing to me that it's public knowledge, according to CoStar, this NOVA LLC which is based at your residence in Parker, the 11364 Mesa Verde, it has our company phone number on here, 303-893-9500, with Will Camenson as the contact.  The original newspaper article that came out, which turned me on to all this, said NOVA LLC, registered at the home belonging to Kyle Ramstetter, Director of Development for Northstar Commercial Partners, did this transaction.  Then it looks like you transferred the location for NOVA LLC on August 22nd from your home to someplace in Henderson, Nevada, which I don't know why that was done, but I don't understand what was--I knew nothing about this transaction.  You never told me about this transaction, so let me just ask you, I mean, was IPI or any of its employees or owners involved? |
| Ramstetter: | No. |
| Watson: | No.  So it was just you and Will? |
| Ramstetter: | [unintelligible] No comment, man. |
| Watson: | Okay, okay. |
| Ramstetter: | [unintelligible] |
| Watson: | Then just say no comment.  I'm just asking – |
| Ramstetter: | Yeah. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | So can you tell me where you got the $5 million of earnest money deposit that was used for the transaction? |
| Ramstetter: | No. |
| Watson: | You can't tell me that? |
| Ramstetter: | I mean I – yeah. |
| Watson: | Okay.  Can you tell me who got paid the $17.8 million in profit? |
| Ramstetter: | That's the bigger conversation.  How bad--how far do you want to take this? |
| Watson: | I want to take it to the truth. |
| Ramstetter: | Okay. |
| Watson: | Because I knew nothing about it. |
| Ramstetter: | I know. |
| Watson: | So can you tell me that? |
| Ramstetter: | Not now. |
| Watson: | Okay.  Did you make more than $17.8 million on the deal? |
| Ramstetter: | No [unintelligible]. |
| Watson: | Just asking. |
| Ramstetter: | That in itself was significantly misleading, but that's a bigger conversation. |
| Watson: | Well, I'm just going by what the public record said.  You know, I mean, again, I wasn't involved in the transaction, didn't know about it.  But according to CoStar, it went from this NOVA LLC of yours--went--had it under contract of $98.7 million, and sold the same day for $116.4, which is about a $17.8 million difference.  Now maybe there was closing costs or something, but it sounds like that was the number.  But you won't say what it--okay.  Can you tell me where the money is now? |
| Ramstetter: | [inaudible] |
| Watson: | You can't tell me that either.  Okay. |
| Ramstetter: | I mean, yes, I can under a different context Brian, yes. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | What context would that be? |
| Ramstetter: | Like, just, yeah. |
| Watson: | Okay.  I mean, now that you know that I know about this, are you going to do the right thing and pay us the money immediately? |
| Ramstetter: | Who's us? |
| Watson: | Northstar.  You were working for Northstar as a full-time employee. |
| Ramstetter: | Yep. |
| Watson: | We introduced you to JK Moving and Storage originally-- |
| Ramstetter: | [talking simultaneously] No you didn't.  No you didn't.  You didn't do anything.  Amazon introduced us, and it did not come from you, it came from-- |
| Watson: | [talking simultaneously] It's because of our-- |
| Ramstetter: | [talking simultaneously] --a bigger conversation. |
| Watson: | Yeah.  But it's-- |
| Ramstetter: | [talking simultaneously] No, it's not.  No, it's not. |
| Watson: | Okay.  Kyle, maybe you don't understand how employment works. |
| Ramstetter: | [laughs] |
| Watson: | But these are trade secrets; these are relationships. |
| Ramstetter: | I [unintelligible]-- |
| Watson: | You were brought in to the Amazon account to work specifically for Amazon on our behalf.  We brought that to you.  Anything that comes from that should be Northstar involvement and property.  You now have gone out and done a separate transaction with our largest client, and a group that we transacted with buying land from, JK Moving and Storage.  And now you've pocketed $17.8 million and you didn't tell us about it or involve us?  How can you say that that shouldn't be paid to us? |
| Ramstetter: | I'm not saying that. |
| Watson: | Okay then, are you-- |
| Ramstetter: | That didn't come out of my mouth. |

5

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | Okay.  Are you willing to pay us the money then, immediately? |
| Ramstetter: | Potentially, Brian.  We have to have a bigger conversation with the people involved in this. |
| Watson: | Okay.  Well, what is that conversation, and when do we have it? |
| Ramstetter: | Depends on how far you want to go. |
| Watson: | I mean, we're two months after the transaction.  You never told me about it—I didn't know about it – |
| Ramstetter: | I couldn't, Brian. |
| Watson: | What?  You couldn't? |
| Ramstetter: | It's a you-me-Casey conversation over a drink. |
| Watson: | Over a drink? |
| Ramstetter: | Or something tonight.  Anything.  [unintelligible] |
| Watson: | I mean, Kyle, this is a huge violation of trust.  I mean, I--you were in my wedding.  I looked at you as a brother. |
| Ramstetter: | Same. |
| Watson: | Do you remember when you first came to me, and you were so stressed out about your $15,000 credit card, and I paid it off, and I said Kyle, let's focus, and let's go do great things.  I've taken you on fishing trips, hunting trips.  The first time you ever went out of the country was because of me.  And now all of a sudden I learn about this from a newspaper article, and you didn't share? I mean, how would you like it if I did that to you? |
| Ramstetter: | I couldn't share, Brian. [unintelligible] |
| Watson: | How could you not share?  Kyle, if you don't speak to me, I mean, this can get out of our hands.  I mean, this is like-- |
| Ramstetter: | [unintelligible] |
| Watson: | --federal, FBI-type stuff.  This is huge.  Like I'm – |
| Ramstetter: | No. |
| Watson: | I don't know what is going on. |
| Ramstetter: | This isn't FBI huge.  Well-- |

6

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | Well, I don't know what is.  I'm not an attorney-- |
| Ramstetter: | [talking simultaneously] [unintelligible] |
| Watson: | --but it scares the bejeebers out of me. |
| Ramstetter: | And what, what scares you, sorry.  With all due, sorry I'm curious – |
| Watson: | It scares me for you.  You are an employee of this company.  I'm not an attorney.  You'll have to go seek separate legal counsel. |
| Ramstetter: | Yeah. |
| Watson: | But the reason why Brent is here is he's the Chief Financial Officer of this company. |
| Ramstetter: | Yeah. |
| Watson: | A transaction happened without our knowledge, without our involvement, while you were our employee, supposed to be doing deals for us with our largest client.  $17.8 million, or more, or less, I have no idea--but some money transferred hands-- |
| Ramstetter: | Yeah. |
| Watson: | --with Will as the primary contact, who was under you, and you were overseeing him as his manager. |
| Ramstetter: | Yeah. |
| Watson: | And I didn't know? I don't understand what conversation you thought we were going to have, and when we were going to have it.  It's just--it's heartbreaking to me, it really is. |
| Ramstetter: | Yeah. |
| Watson: | So, I mean, are there any other transactions that you're already completed, or working on in Virginia or anywhere else in the U.S. or the world under similar circumstances or others that you haven't told us about? |
| Ramstetter: | No.  [unintelligible] |
| Watson: | Is there anything else that you want to share with me right now? |
| Ramstetter: | I--you and I, I completely agree, given the situation and who the other parties were, I can't tell you.  But I will.  And depend on how it--look at me--depending on how far we want to go-- |
| Watson: | Yeah. |

Confidential
**DRAFT**

| | |
|---|---|
| Ramstetter: | --I'm willing to go there. |
| Watson: | What is-- |
| Ramstetter: | I was put in a position here where your Chief Financial Officer, and me, right, as a director, and you--like what we did for Amazon, that's FBI. You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand. |
| Watson: | Well-- |
| Ramstetter: | Colorado is a--all I'm saying, Colorado is a one party, given legal advi – given legal opinion, is a one party consent for voice – for recordings. |
| Watson: | So-- |
| Ramstetter: | We all know what we did. |
| Watson: | So, so I don't understand what you're saying right now.  Are you saying-- |
| Ramstetter: | [talking simultaneously] [unintelligible] |
| Watson: | --you're threatening me to say, you're extorting me? Is that what you're saying? |
| Ramstetter: | [talking simultaneously] No, no, I'm saying--I'm saying right now, you and I can--it's not extorting you, I'm not, there's no.  There's no [unintelligible] for me to get anything, extortion is, I need something from you by doing something.  What I'm saying is—to protect all of us, and the company, you and I can work something out, guaranteed, look me in the eyes.  If I say something to the wrong person, and it gets out, the whole Amazon thing is shut down and we will never do another deal in the data center space.  And that's not a threat from me, that was, has been told to me-- |
| Watson: | Okay. |
| Ramstetter: | --by said party. |
| Watson: | Well, let me be clear. |
| Ramstetter: | Yeah. |
| Watson: | I would rather not do another deal with Amazon, or another deal in the data center space, if that means that I am violating the law. |
| Ramstetter: | I agree. |
| Watson: | And I knew nothing about this transaction; I'm shocked no one told me-- |

Confidential
**DRAFT**

| | |
|---|---|
| Ramstetter: | This transaction's separate--sorry, sorry--this transaction and everything was, except for the employment situation, was different than what I just previously described. |
| Watson: | Okay.  I don't know what you're--again, you're asking me to s--I don't understand what you're even talking about.  That is what I'm trying to say-- |
| Ramstetter: | [unintelligible] |
| Watson: | You're not coming--you're not being forthright with me.  And so I'm just trying to figure out where we are and what's going on. |
| Ramstetter: | Yep. |
| Watson: | And it's not fair.  I mean, I, you've, you've done a transaction without my knowledge.  I don't--if you've done that, then what else have you done?  And I don't even know what you're saying, like I thought I could trust you. |
| Ramstetter: | Yeah. |
| Watson: | And I don't think I can trust you right now.  Do you--if you were in my shoes, as the employer, do you think I could--would you trust them? |
| Ramstetter: | Wholeheartedly, no. |
| Watson: | And I mean--you've, you've--I can't have people in my company that I can't trust-- |
| Ramstetter: | Right [unintelligible] |
| Watson: | So you've forced me now to fire you. |
| Ramstetter: | With all due respect, I will give you a list of the people closest to you that you also have the same conversation with that are not to the size, not to the tenant, but are doing side deals right now.  I can put them in alphabetical order right now as we sit here. |
| Watson: | In our company? |
| Ramstetter: | In your company.  Brent, would you disagree with that, or are you going to say I don't know? |
| Gray: | What's the question? |
| Watson: | Are there people doing side deals at Northstar without my knowledge, and not involving Northstar in the compensation? |

Confidential
**DRAFT**

| | |
|---|---|
| Ramstetter: | Fair question. |
| Watson: | Is that what-- |
| Gray: | I don't know with any certainty.  I've certainly overheard things.  Like Don and-- |
| Ramstetter: | Not, not, not [talking simultaneously] |
| Watson: | To be clarified-- |
| Ramstetter: | [talking simultaneously] I'm not trying to [unintelligible]-- |
| Watson: | I get it.  But understand, Don is not an employee of this company.  Don can do whatever he wants to do. |
| Ramstetter: | I'm not worried about Don.  I agree, I agree. |
| Watson: | But if you're an employee of this company, and you're being paid for full-time work, and you're doing deals that would be deals that Northstar is doing, that is an inherent conflict of interest.  No question.  And after all I give and do I'm-- |
| Ramstetter: | [talking simultaneously] No, no, it had nothing to do with you.  Brian-- |
| Watson: | It does have to do with me. |
| Ramstetter: | [talking simultaneously] [unintelligible] |
| Watson: | This is stealing out of my pocket, Kyle. |
| Ramstetter: | You wouldn't have been a part of the transaction.  It would never have come to you.  I'm telling you right now it would never have come to you. |
| Watson: | Absolutely-- |
| Ramstetter: | I'm telling you right now [unintelligible] |
| Watson: | Absolutely it would have, because I have you on the ground representing my interests, and I've asked you to go turn over stones and deals, and that was part of your role. |
| Ramstetter: | I do not [unintelligible] |
| Watson: | And you haven't brought me any deals. |
| Ramstetter: | I did not turn this over, so again [unintelligible] You don't need to [unintelligible] -- |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | I mean, no offense but your name is all over it, it's your entity, it's, it's your -- |
| Ramstetter: | Money made there was not directly related -- directly into my pocket.  I was a façade because Amazon couldn't do a direct deal with Kevin Gold [*spelled phonetically*] because they hate each other. |
| Watson: | Okay. |
| Ramstetter: | And I was the pawn. |
| Watson: | Okay, so -- |
| Ramstetter: | Now everything's coming down on me but I am willing to counteract that and say I'm sick of being in the middle and go the FBI route, or next call that I'll make I'll go to the damn SEC if other parties don't play along with this and say, Brian we really work something out, it's trust act, no body's the wiser. |
| Watson: | Okay. |
| Ramstetter: | I'm literally a pawn in this and I -- |
| Watson: | So, let's say you're -- |
| Ramstetter: | -- everything's coming down on me. |
| Watson: | Well, you should have told me this, number one. |
| Ramstetter: | I couldn't. |
| Watson: | You can actually tell me -- |
| Ramstetter: | Brian, I couldn't have.  This would have had to have been you at the ranch with – make sure there's nothing in sight to hear us; but yes -- |
| Watson: | I don't know what it is, but whatever it is you absolutely have to tell me as your employer, I need to know. |
| Ramstetter: | Yeah. |
| Watson: | No matter what it is.  It doesn't matter.  I would rather lose an account than go down this path. |
| Ramstetter: | Which path, sorry. |
| Watson: | The path of people doing deals behind my back and taking $17.8 million. |
| Ramstetter: | [unintelligible] |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | So you said you're a pawn?  So but there was a difference in price.  So where did that money go? |
| Ramstetter: | [unintelligible] |
| Watson: | You can't tell me that either? |
| Ramstetter: | You'll find out, and – look at me in the eyes. |
| Watson: | If you what? |
| Ramstetter: | Looking at it, say it can be solved, but yes |
| Watson: | What, what are you -- Can you just tell me what it means it can be solved? Like what does that mean? |
| Ramstetter: | You and I can work something out without making this go further than Monday.  Or, we both know the information we have and we can take it as far as we'd like to – and resolve it. |
| Watson: | Okay, so when can we have this con -- why can't we have this conversation right now? |
| Ramstetter: | I'd rather just talk with you.  For other reasons. |
| Watson: | Individually? |
| Ramstetter: | Correct. |
| Watson: | So, Brent not in the room. |
| Ramstetter: | Yeah, but not now. |
| Watson: | So, if Brent leaves the room you can't have the conversation -- |
| Ramstetter: | I'd rather just have the dust settle and like okay now let's just talk about this.  This isn't a can down the road, it's -- |
| Watson: | Okay, so when are you willing to have this conversation?  I mean, like, let's just assume some -- is it sometime today, this weekend, next week? Like when is it -- |
| Ramstetter: | Next week for sure, no question next week. I'm trying -- I would say tomorrow, I would say Sunday but I -- given what's going on I try to be respectful of that, which I know is tongue in cheek while we're having this conversation. But seriously, let you enjoy your weekend.  We can talk Monday. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | No, I want to know now, I mean, Kyle, I can't have you be in my wedding right now.  I mean -- |
| Ramstetter: | You just said -- you just threatened to fire me.  I'm not going to be in your wedding, let's be -- |
| Watson: | Well, I, I, from what I just found out -- to have you as my groomsman, I mean -- I picked you above my brother-in-law as my groomsman and now all of a sudden you're sitting here saying that -- you know -- |
| Ramstetter: | The irony of two other people standing up there and I'm the pawn and now I'm saying – okay. |
| Watson: | I don't know who the other people are. |
| Ramstetter: | I'm willing to take this as far as it will need to go is what I'm saying.  Unless you and I have a conversation and we can work something out. |
| Watson: | Okay. |
| Ramstetter: | Outside of employee, employment loss, the money – I mean, we'll figure that out. |
| Watson: | Okay.  What I'm asking you is a very -- I've asked you some simple questions, but I need to know, quote-unquote, you said you were willing to figure it out or share this information with me without Brent here.  When are you willing to sit down -- |
| Ramstetter: | I just told you, I've -- we've already answered the question.  I said next week, I respected your wedding -- |
| Watson: | Okay, so -- so -- |
| Ramstetter: | We've already answered that. |
| Watson: | -- sometime, like Monday? |
| Ramstetter: | Sure. |
| Watson: | You'll share this with me? |
| Ramstetter: | Sure. |
| Watson: | Whatever this information is? |
| Ramstetter: | Sure. |
| Watson: | Okay.  And you feel that we can talk about it and figure it out. |

13

Confidential
**DRAFT**

| Ramstetter: | I do.  I don't know your, I don't know your stance.  From my perspective, to answer your question, yes. |
|---|---|
| Watson: | Okay.  Well, I think until then, Monday, 'cause I was ready to summarily fire you today -- |
| Ramstetter: | Yeah. |
| Watson: | -- based on this information because this is news to me and I didn't know anything about this.  I was ready to fire you today. |
| Ramstetter: | That's fine. |
| Watson: | But I think -- |
| Ramstetter: | That's fine. |
| Watson: | -- let me just finish. |
| Ramstetter: | Sorry, go ahead. |
| Watson: | So if your -- says that you think I need to consider other information and review it that you think is reasonable, defensible, whatever it is, I have no idea, then I will officially suspend you as of today -- |
| Ramstetter: | I will accept your resignation and knowing that all you can do is trust me and this will be an afterthought, because, yeah, I would like to talk to you on Monday, in a good way. |
| Watson: | So, well, I would love to be in a good way.  So, and I'd love to do the conversation before then.  So, just to be clear.  My wedding's tomorrow.  This right now -- I didn't even sleep last night.  I found about this this afternoon. |
| Ramstetter: | Same. |
| Watson: | Well, how is it the same for you, you've done this for two months now. |
| Ramstetter: | You have no idea the hell of the last 60 days.  Again, if I was free-lancing, was able to pull off deals like that on my own, would I have stayed here for the last 90 days or 60 days? |
| Watson: | I have no idea why you stayed. |
| Ramstetter: | If I had $15 or $17 or $20 million dollars in my bank would I still be an employee of yours and, and have this risk? |
| Watson: | I have no idea why. |

Confidential
**DRAFT**

| | |
|---|---|
| Ramstetter: | Yeah, no. |
| Watson: | That's why I asked you where the money is. |
| Ramstetter: | Correct, so, yeah. |
| Watson: | I mean that's a lot of money. |
| Ramstetter: | I wholeheartedly agree. |
| Watson: | And this is the very thing I told you and I, I wonder if you and Will were just like laughing at me because I said I think we can go do this on land. |
| Ramstetter: | Not, not at all. |
| Watson: | And laughing off [unintelligible] |
| Ramstetter: | I haven't slept -- I'll have Melissa in the room, the last 60 days have been hell. |
| Watson: | Yeah. |
| Ramstetter: | You think about -- I haven't taken a vacation.  If I had $15 million dollars in the bank don't you think I'd say, hey, Brian, I'm going to go to Mexico for a week and  [unintelligible] – not a chance. |
| Watson: | Last night the only thing I thought -- the reason you're sticking around is because you're in my wedding and you said, you know what I have to finish that off with him and then I'm going to just leave him.  I have no idea.  I mean, when I was so heart-broken and shocked at this last night I was sick. |
| Ramstetter: | Yeah, I respect that and you shouldn't. |
| Watson: | So, I think that -- let me be clear again -- I am willing to meet with you anytime the rest of today, individually, doesn't matter that my wedding is tomorrow or not, I mean, this is a top priority and a major issue.  So I'm willing to meet with you individually, any time today, any place you want to meet and have a conversation.  With anyone you think we need to have a conversation with or just you and me.  And if we need to go to the top of a mountaintop or wherever we need to go you tell me where we need to be.  Okay?  If it's not today, tomorrow is my wedding, so I could meet with you -- |
| Ramstetter: | No, no -- |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | Let me just finish.  I could meet with you on any time – I'll figure out a time, Monday through Friday, of next week.  So you let me know when that is. |
| Ramstetter: | Okay. |
| Watson: | In the meantime, I think that you have forced me, because of the lack of trust right now, and it's a huge violation of trust, and I don't think personally that I have violated your trust, I, I think I've always delivered for you and what I said I would do, and if I have, you know, you, you haven't told me and so I apologize if I have violated your trust but I think I have always delivered for you.  And I trusted you, I mean, I gave you the keys to the castle with this account and I feel like it's a huge violation of trust. |
| Ramstetter: | I -- |
| Watson: | And based on that – |
| Ramstetter: | And I've single-handedly, absolutely crushed it and made this company a lot of money. |
| Watson: | You have performed on the deals that you were employed to do.  No question, and I compliment you on that.  But when I hear about a deal that was done completely without our knowledge and involvement and I see these numbers, that is a huge violation of trust. |
| Ramstetter: | I agree. |
| Watson: | You, you could imagine. |
| Ramstetter: | Yeah. |
| Watson: | That you never brought it to my attention.  And so, based on that -- |
| Ramstetter: | I will accept your resignation and I will text you -- |
| Watson: | Okay, so let me be clear.  Are you -- are you resigning and quitting or are we suspending you until we get further information?  Because what I just offered you, I told you I was going to fire you here just now. |
| Ramstetter: | Yep. |
| Watson: | I then said, based on this other information you want to share, I am willing to suspend you, um, until we have this conversation and we get to the bottom of this.  So, which one would you like to have? |
| Ramstetter: | In hopes of what?  Sorry, the suspension -- |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | I have no idea.  Right now I told you I was summarily firing you because of this information.  You then said there's other information I need to consider that will make it all right and everything will make sense and it will be just fine.  If that's the case, I'm willing to suspend you until we have this conversation to see what the information is, to see what it's about, etc.  So I, I don't know what this information is that you said is going to be illuminating. |
| Ramstetter: | Yeah. |
| Watson: | So you tell me, if you think that it's not and you want to just go ahead and, and accept the firing you can accept the firing, if you want to officially resign you can resign, or you can say I will be willing to suspend you until we have a conversation sometime this coming week.  Which of those options would you like? |
| Ramstetter: | Talk next week. |
| Watson: | So suspended. |
| Ramstetter: | Yep. |
| Watson: | So we'll suspend until next week. |
| Ramstetter: | Yep. |
| Watson: | Until then I have to ask that you immediately leave the premises and, um, you know, we're going to have to keep your laptop, and those items, and I hope and pray that we can figure this out.  Um, and I just appreciate your time and we're going to have the same conversation with Will right now. |
| Ramstetter: | Okay. |
| Watson: | Okay, thank you. |
| Ramstetter: | Yep. |

[*Background noise and unintelligible side conversation*]

| | |
|---|---|
| Camenson: | What's going on? |
| Watson: | Well, I was hoping you'd tell me first. |
| Camenson: | I don't know – what you've got a question about. |
| Watson: | Well, I'm going to ask you the same questions that I asked Kyle. |
| Camenson: | Okay. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | Okay.  First, is there any unscrupulous business conduct at Northstar that you've been involved with that you'd like to share with me?  That you'd like to be proactive in? |
| Camenson: | [*No response*]. |
| Watson: | If you don't want to answer the question, you don't have to, I'm just asking the question. |
| Camenson: | I'm curious what the driver is for this. |
| Watson: | Okay, well, let me tell you what I've learned and then, uh, you can respond to that. |
| Camenson: | Okay, do it. |
| Watson: | So, yesterday, afternoon, it was brought to my attention for the first time, that -- there's a newspaper article, "How do you turn $20 million into $100 million in one year?"  And in that article it said that this NOVA WCP LLC -- do you know NOVA WCP LLC, have you ever heard of that entity, ever been involved with it? |
| Camenson: | Nope. |
| Watson: | Okay, so you don't know anything about that entity?  Okay.  Well, this entity which is part of White Plains Capital -- do you know White Plains Capital? |
| Camenson: | No. |
| Watson: | You don't know White Plains Capital, either.  Okay.  It's registered to a home in Colorado belonging to Kyle Ramstetter, Director of Development.  Then did research on that entity, and lo and behold it's Kyle's home address at 11364 Mesa Verde Lane in Parker, Colorado. And did a little more research and in CoStar, public record, says on July 25th of this year, this entity which you are identified, Will Camenson, with Northstar's phone number on CoStar's report, 303-893-9500, Kyle's home address, transacted for $98.7 million with JK Moving and Storage, which as you know is the seller of the land, the first deal that we did with Amazon for Dulles, and on the same day, that entity flipped it for $116.4 million, which is about a $17.8 million profit and your name is all over this.  So, that's what I know so far.  I'm trying to get to the bottom of everything and that's why I was asking you -- that's what I've learned, so my question to you, is this true?  Do you know anything about this? |
| Camenson: | [*Heavy sigh*] I mean, I'm not really sure. |
| Watson: | You're not sure.  Okay.  I mean, why did you do this behind my back? |

Confidential
**DRAFT**

| | |
|---|---|
| Camenson: | [*Long pause; unintelligible*] |
| Watson: | I mean, this is our largest client, Amazon is our largest client.  JK Moving, you guys are, are supposed to go out there and build some buildings, and be turning over land for us and different opportunities that we can continue to grow.  I've been asking you guys for deals all the time.  I never knew about this deal, never heard about this deal, your name's all over it. |
| Camenson: | I don't talk to anyone at Amazon, no deals come to me. |
| Watson: | So, you don't talk to anyone at Amazon? |
| Camenson: | I never talked to Casey in my life. |
| Watson: | You've never talked to Casey? |
| Camenson: | No, never, never ever. |
| Watson: | Okay. |
| Camenson: | That's your relation; I've never talked to him.  I've only met him one time when he came in here. |
| Watson: | But you weren't involved in this NOVA LLC thing?  You said you didn't know the entity, you never heard of it. |
| Camenson: | What do you want me to say? |
| Watson: | Well I just want you just be honest with me, Will.  I mean, for god's sake you have no idea what a spike this is into my heart.  Like, I gave you guys an opportunity.  I moved you from a financial analyst into a project developer.  I'm helping to grow your career.  And, and this?  I mean, to do this behind my back, I mean, what the hell does this [unintelligible]?  Kyle Ramstetter, I mean, I've taken care of that guy like nobody's business.  And I've given you guys everything, full rein to go build relationships and this is how you treat me?  How you treat everybody in this firm? |
| Camenson: | This is a culmination of -- I would say, actions and your treatment of Kyle and his contract. |
| Watson: | My treatment of him and his contract? |
| Camenson: | Yes. |
| Watson: | Well, I just asked him and I'll, we'll get to the bottom of that.  I have done everything that I said I would do in that contract and more. |

Confidential
**DRAFT**

| Camenson: | To date, however, if the file would have gone through it would have been a lot different. |
|---|---|
| Watson: | Okay, well [talking simultaneously] then -- he is -- as my employee, as a gentleman, should come to me and talk to me about that.  That was never discussed with me, so that doesn't give someone license, because they don't like what they think a potential, you know, profit share could look like, to go do a deal behind my back and put $17.8 million in your pocket.  How is that moral justification to steal from your employer?  This is stealing.  So let me just ask you a couple of other questions.  I mean, were there any other NCP employees or relationships, current or past, involved in this deal that you and Kyle did together. |
| Camenson: | I'm not answering any of these questions. |
| Watson: | Ok, well, let me just ask the questions and you can decide if you want to answer them or not. |
| Camenson: | I just said -- |
| Watson: | I would hope out of respect or some modicum of respect that you'd answer them, but if you don't want to, totally up to you.  Was IPI or any of its employees, current or past, or any of its owners, involved in the transaction, to your knowledge? |
| Camenson: | What do you want me to say, I just said -- |
| Watson: | Just the truth would be nice. |
| Camenson: | I'm not going to answer any of these questions. |
| Watson: | Okay, so you're not going to answer that one either. |
| Camenson: | No. |
| Watson: | Where did you get the $5 million earnest money deposit for the contract that you and Kyle put together?  Will you answer that one? |
| Camenson: | No. |
| Watson: | No.  Who got paid the $17.8 million in profit? |
| Camenson: | No comment. |
| Watson: | Okay.  Did you make more than $17.8 million on the deal? |
| Camenson: | No comment. |
| Watson: | Where's the money now? |

Confidential
**DRAFT**

| | |
|---|---|
| Camenson: | No comment. |
| Watson: | So you don't have it personally? |
| Camenson: | No comment. |
| Watson: | Okay.  Now that you know that I know about this -- |
| Camenson: | Yep. |
| Watson: | -- will you do the right thing and pay me that money immediately? |
| Camenson: | No comment. |
| Watson: | Okay.  Are there any other transactions that you already completed or are working on whether in Virginia or anywhere else in the United States or globally, outside of Northstar or that you haven't told us about that is in conflict with our business in any way? |
| Camenson: | No. |
| Watson: | No, no, so just this one transaction? |
| Camenson: | Yes. |
| Watson: | Okay.  Is there anything else you want to share with me before we end this conversation? |
| Camenson: | [*Heavy sigh*] I hope you know what, well maybe this isn't a conversation for Brent to, to be involved in. |
| Watson: | Well, Kyle said the same thing.  I have no idea what he's talking about.  He said, Brian if we can have a conversation I can explain everything.  I'm like Kyle, you're supposed to be in my wedding on Saturday, tomorrow.  Are you fricking kidding me?  Like what is this magical conversation that we're going to have that's going to make all this right, when you guys blatantly lied to me, haven't told me about this?  The transaction happened two months ago and had I not found this article, would I ever know?  I mean, what in the world can you guys tell me that's a magic wand to make all this just perfect?  It's such a violation of blatant trust as my employees.  And it's to me personally.  I, I have no idea what this magical thing is.  I would love to hear it and if you want to share it with me, great.  And if not, hopefully Kyle will. |
| Camenson: | I will, but I don't know that you want Tim and Brent here.  I mean, you can bring Kyle back in here and we'll tell you. |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | You know what I want?  I want the truth, and I don't care who hears the truth. |
| Camenson: | So do I.  Okay, great. |
| Watson: | So, I mean, if you're willing to share it. |
| Camenson: | Let's bring Kyle back in then. |
| Watson: | Kyle's been already, uh, removed from the premises. |
| Camenson: | Okay. |
| Watson: | He is -- I gave him three options.  First I was going to immediately fire him.  Based on this magical information that he says is out there, I gave him the option, 'cause then he said he wanted to resign.  I gave him the option, three options: A, immediately fired and removed from the premises; B, if he wants to resign, immediately removed from the premises; or C, I offered him to be suspended and immediately removed from the premises until such time as we have this magical conversation that he says is out there.  He says he's willing to have that conversation with me supposedly sometime today, maybe beginning of next week.  So, he picked option C, and he is officially suspended from this company, locked out of all access, we're taking his laptop just like we're going to take your laptop, and we're going to show you the door.  So my question to you is, would you too like to be temporarily suspended until such time as we have this conversation, conversation together, or should I just go ahead and fire you right now and be done? |
| Camenson: | It's definitely a conversation that we need to have, so I will -- |
| Watson: | I would love to have this conversation. |
| Camenson: | -- opt for C. |
| Watson: | Okay.  Suspended? |
| Camenson: | Yes. |
| Watson: | So you're suspended as well until such time as we have this conversation. Um, I will make myself available as I told Kyle, anytime today, I have a wedding tomorrow, but anytime today, whether you guys want to get together individually, collectively, do you want to meet on a mountaintop, wherever you guys want to meet, I'm happy to have this conversation. And I, I look forward to having it. |
| Camenson: | Do you want to have it here?  Do we have to leave the building? |

Confidential
**DRAFT**

| | |
|---|---|
| Watson: | I'm happy to have it whenever.  He's already been removed and the security guards are here, too. |
| Camenson: | Well, can he come back? |
| Watson: | I'm -- not right now, no. |
| Camenson: | Let's not -- |
| Watson: | He's been removed from the premises.  So, um, I'm happy to have the conversation, happy to go meet in the lobby, wherever you guys want to.  I do have a 9:30 at Cherry Creek, uh, otherwise I'm available.  It's 9:00 right now, and then tomorrow I have my wedding, Sunday I have family and anytime Monday through Friday I'd love to have this conversation. |
| Camenson: | Okay. |
| Watson: | Because I am sick.  Last night I heard about this, yesterday.  Couldn't sleep last night, I was like what a violation of trust from my employees, who I have tried to give so much to.  And it's just shocking to me and I, I have no idea what could make this right but I'd really can't wait to hear it.  So if there's anything you need, let us know.  Otherwise, officially suspended.  Tim is there anything else you need to add to this as our Chief Operating Officer? |
| Lorman: | No, we're good. |
| Watson: | So, we ask that you leave the premises now.  Uh, we'll give you your personal items, we'll keep your laptop, you've been officially locked out of the system and, uh, until such time as we figure out and gets the bottom of this.  And I really -- again, you go seek your own counsel and do what you need to do but I hope that we get the truth, because that is really what matters the most to me at this point. |
| Unknown speaker: | I think we really need resolution today. |
| Watson: | I just told them I'd be happy to — .  Kyle for some reason is being very ambiguous about when he can meet and what this big story is about.  So I told him you let me know, I'm available anytime, I'll make it work. |
| Unknown speaker: | Okay. |
| Watson: | I have a rehearsal at 5:00 PM and speaking of which, Will, Kyle was supposed to be one of my groomsmen at my wedding.  That's such a violation of trust right now.  He's not going to be a groomsman at my wedding nor is he welcome.  And unfortunately neither are you and, and your significant other and that's just heartbreaking to me. |

23

Confidential
**DRAFT**

| | |
|---|---|
| Camenson: | Understood. |
| Watson: | Because this is such a violation. |
| Unknown speaker: | Do you think you guys can get a conversation together today? |
| Camenson: | Depending on where Kyle is, he might have gone home. |
| Watson: | Okay, I'll wait to hear, I'm open after 10:30 this morning and, uh, we'll go from there. |
| Camenson: | All right. |
| Watson: | Tim, would you mind showing Will out? |
| Lorman: | No. |
| Watson: | Thank you. |

[*Background noise*]

| | |
|---|---|
| Gray: | What do you think it is? |
| Watson: | What do I think it is? |
| Gray: | Something to do with [unintelligible] Amazon deal? |
| Watson: | [unintelligible] Grab his phone. |
| Gray: | What's that? |

[*Background noise*]

| | |
|---|---|
| Watson: | Monique, would you please grab Tim as soon as he's done and have him come in here, please? |

[*Background noise*]

| | |
|---|---|
| Watson: | Want to shut that off? |

*Recording ends*