# EXHIBIT 23

## PART 1



    

# NORTHSTAR COMMERCIAL PARTNERS' RESPONSE TO:

# AMAZON WEB SERVICES, INC. NORTH VIRGINIA RFP

SEPTEMBER 20, 2017



    

# TABLE OF CONTENTS

1. RESPONSE TO RFP
2. DEVELOPMENT MODEL
3. LEASE COMMENTS
4. ABOUT NORTHSTAR COMMERCIAL PARTNERS
5. ABOUT DEVELOPMENT
6. ABOUT CORPORATE PARTNERSHIPS



# RESPONSE TO RFP

**AWS – Northern Virginia RFP**

**Introduction & RFP Format**

Thank you for taking the time to respond to this Request for Proposal. Please prepare your response and submit all required documentation as requested by 5:00 PM PST on September 20, 2017.

Upon receipt of your response and our internal review of this information, we will then schedule interviews with the selected team(s) to address specific questions.

## Table of Contents

Section 1: Project Overview ................................................................................................................................. 2

Section 2: Project Term Sheet ............................................................................................................................. 2

Section 3: Team Structure ................................................................................................................................... 6

Section 4: Pricing Matrix ..................................................................................................................................... 6

**Required Deliverables**

For your RFP submission to be considered complete, the following information should be completed and provided as outlined in the table below by the required delivery date:

| Item | Via Email |
|------|-----------|
| Project Term Sheet | RFP Response |
| Project Team Structure Sheet | RFP Response |
| Project Pricing Matrix | RFP Response |

**Disclaimer**

The submission of this Request for Proposal does not constitute an offer to work with your organization.  A formal agreement shall not be binding and in effect unless and until a Purchase and Sale Agreement, Development Agreement or Lease has been executed by both parties. We will not have any liability for any expenses you incur in anticipation of this project or in replying to this Request for Proposal unless they have been specifically authorized in writing by Amazon Web Services or its subsidiaries.  We reserve the right to reject any proposal we receive.

Section 1: Project Overview

**Project Description**

Amazon Web Services (AWS) is evaluating the possible expansion of its network with build-to-suit facilities for AWS as the tenant in the greater Northern Virginia market.  As part of this effort, we are looking at a programmatic approach to this expansion with a selected team through our purchase of a short-listed site or an open book development process through various financial structures.

**Building Design**

The shell will generally follow AWS design criteria, with modifications to be provided subsequent to this Request for Proposal.  We request that you provide rental constant pricing in response to various pricing scenarios outlined in the tables in

.

**Legal Contracts**

Your specific pricing under the open book development process should be reflective of the using the provided AWS Lease Agreement template. When responding, please also include your comments to the document in a list format for further discussion. Please note, these are subject to additional modification to ensure conformance with AWS's latest requirements.

## Section 2: Project Term Sheet

Please note your confirmation to the following clauses by responding in the right column.

| ISSUE | DESCRIPTION | LANDLORD RESPONSE |
|---|---|---|
| **TENANT/LANDLORD** | | |
| Tenant: | VADATA, Inc., a Delaware corporation | |
| Landlord: | Please provide the entity who would be entering into the lease agreement: <br>• Entity name, legal entity (corporation, partnership) that will execute a lease. <br>• Information in regard to outside financial partner / interest in the project. <br>Please note the connection between the Landlord entity and the parent entity. | We will form a single purpose limited liability company for each building. For this project we will form: Sterling I NCP, LLC and Sterling II NCP, LLC. We generally file the Articles of Organization in Colorado, with the ability to do foreign business in Virginia. If preferred, we can file the Articles of Organization in Delaware. |
| **PREMISES, TERM AND RENT** | | |
| Premises: | ███████████████████ <br>████████████ <br>██████████ | Agree. |
| ███ | ████████ <br>████████████ <br>████████ <br>║ ████████████ <br>║ ████████████ <br>║ ████████████ | Noted. |

| | | |
|---|---|---|
| | ████████████████████████<br><br>████████████████████████<br><br>████████████████████████<br><br>████████████ | |
| | Please provide your proposed development fee that you would be using for the project along with your potential construction financing fee schedule.<br><br>If there are additional fees that the Landlord shall receive please call these out at this time. | ██████████████████████ |
| **Design Process:** | Tenant will submit to each other up to three qualified Architectural firms for the Tenant specific base building design. Landlord & Tenant shall agree on the three most suitable firms for RFP. Landlord will then administrate the RFP process to the selected three firms based off of Tenants Basis of Design in the following three phases:<br><br>   I.     Preliminary Schematic Design 10%<br>   II.    Conceptual Design 50%<br>   III.   Construction Documents 50%-100%<br><br>The proposals will include Lump sum fees to each phase of the design as calculated by the sum of the following specialties:<br><br>   1.   Architectural<br>   2.   Structural engineering<br>   3.   MEP (Base Building)<br>   4.   Civil Engineering<br>   5.   Landscape Architect<br><br>Landlord and Tenant will review each submittal on an open book basis and interview the candidates as necessary. In the event that Landlord and Tenant disagree on the contract award the Tenant election shall take precedence.<br><br>Final design of the project will be based upon Tenant's specifications which will be at Tenant's sole discretion. | Landlord agrees to use architect recommended by Tenant. |
| **GC Bid Process:** | Landlord & Tenant will submit to each other three qualified General Contracting (the"GC") firms for the Tenant specific base building construction. Landlord & Tenant shall agree on the three most suitable for RFP. Landlord will then administer the RFP process to the selected three firms based on either fees and conditions only or off of the Phase II Conceptual Design Documents utilizing a CSI division line item budget as the parties may agree with Tenant having final say. Landlord shall require a minimum of 3 subcontractor bids for all major scopes of work.<br><br>Landlord and Tenant will review each submittal on an open book basis and interview the candidates as necessary. Landlord and Tenant will agree on the General Contractor based on the budget for the cost of the project and the contractor schedule for construction of the facility.<br><br>In the event that Landlord and Tenant disagree on the contract award the Tenant election shall take precedence.<br><br>Based on the GC selection the Landlord will submit to Tenant a delivored building budget as an initial not-to-exceed development budget (the "I-GMP") based on the | Landlord agrees to use contractor and civil engineer recommended by Tenant.<br><br><br><br><br><br>See attached Development Model (Tab 2). |

| | | |
|---|---|---|
| | following categories with open book bid leveling having been completed by the parties:<br><br>• Land Costs<br>• Soft Costs<br>• Hard Costs<br>• Fees | |
| | Before the start of construction, Landlord will enter into a cost plus contract with the selected GC and will submit to Tenant a guaranteed maximum price ("GMP") for the construction of the Premises based off of Phase III (the "Construction Documents") for a development budget amount that will not exceed the I-GMP. | Agree. |
| | In the event that the cost plus contract to construct the facility reflects exceeds the I-GMP, Tenant, at Tenants sole option shall have the ability to terminate the Lease. | Agree, as long as construction has not started. |
| | In the event that the contract reflects a reduction to the I-GMP cost to construct the delivered facility, the Landlord delivered building I-GMP shall be revised to the new cost as the not-to-exceed delivered building GMP. | Agree. |
| **Operating Expenses:** | ██████████████████████████ | See initial comments on Tenant's form of Lease (Tab 3). |
| **Initial Term:** | Please propose rates based upon 10, 12, and 15 years. | |
| **Option to Renew:** | ████████████████████ ████ Fair market rental shall be determined for comparing base industrial buildings within the Dulles/Ashburn market and shall not include any power or building upgrades the tenant has made to the building as part of market determination at its sole cost. | Agree. |
| **Right of First Offer, Right of First Refusal:** | Right of First Refusal: Confirm Tenant shall have an ongoing right throughout the original term and any subsequent renewal terms to purchase the building if Landlord places the building on the market and receives an offer to purchase, or if Landlord receives an unsolicited offer to purchase and agrees to an offer from a 3rd party. Purchase price shall be at the offered terms, whether solicited or unsolicited. | Agree. |
| | Right of First Offer: Confirm Tenant shall have an ongoing right throughout the original term and subsequent renewal terms to purchase the building, even if Tenant passes on the Right of First Refusal, at the offered terms agreed to with a 3rd party. | Agree. |
| **Profit Share:** | ████████████████████ | Landlord proposes Tenant shall retain ██████ |

| Security Deposit/Guaranty: | None. Parent payment guaranty will be provided equal to 100% of the then remaining rent + operating expense payments. | Agree. |
|---|---|---|
| **BUILDING & PROPERTY INFORMATION** | | |
| Due Diligence Materials: | While Tenant currently controls the site, Tenant would look to the Landlord/developer to perform the due diligence for the site (with Tenant signing a cost reimbursement agreement), these items would include, but not be limited to: | Please provide us a copy of the reimbursement agreement to review. |
| | (1) The existing phase I report for the property together with copies of any other environmental reports. An updated Phase I that is no more than 90 days old, with a reliance letter in favor of tenant, will be required prior to finalizing business terms. | Agree. |
| | (2) The most recent survey for the property. A reliance letter in favor of tenant will be provided prior to finalizing business terms. | Agree. |
| | (3) Detailed site plan as it currently exists; | Agree. |
| | (4) Site and building design to the extent needed to obtain permits; and | Agree. |
| | (5) Re-zone/Zoning letter indicating the permitted use is allowed. | Agree. |
| Lender: | Tenant will require a non-disturbance agreement on Tenant's for SNDA before signing the lease. | Agree. |
| Landlord Work and Milestone Dates | Based on Landlords working development knowledge of the market and specific parcel information, please provide an estimated timeline for the development ▇▇▇▇ ▇ ▇▇▇▇▇▇▇ | Based upon discussion with the Loudoun County planning department, site plan approval will take between 2 and 3 months, after the first submittal (please see Exhibit A). |
| | Upon a GC having been placed under contract by the Landlord, the parties shall mutually agree upon a project design, permitting and construction project timeline. ▇▇▇▇▇ ▇▇▇▇▇▇▇ | Agree, with allowed contingency and weather days. |
| | If any of the milestones have not been completed within 2 months after the specified deadline, Tenant may terminate the lease. | |
| Tenant Contingencies: | (1) Receipt of local permits for the building and Tenant's specific use | Agree. |
| | (2) Receipt of confirmation that Tenant will be able to receive its required power through the grid operator Landlord engages with. | Agree. |
| | (3) Receipt of permits for Tenant's initial construction work | Agree. |
| Easements | Landlord shall diligently and in good faith work with Tenant in delivering required easements on the property for utility and fiber delivery as well as working with Tenant in moving any existing easements for water, sewer and electrical under previous master site plans to allow for Tenant's maximized use of the truck court areas for equipment and exterior storage. | Agree. |

| | | |
|---|---|---|
| Lease Agreement: | The parties will use Tenant's existing standard form lease agreement, subject to site specific and country specific revisions. The lease template has been provided as part of this RFP. Please submit any comments you may have to the form lease with your response to this RFP. Your pricing under the open book development process should be reflective of your comments in these documents. | Agree. Please see initial comments on Tenant's form of Lease, subject to further review (Tab 3). |
| Broker Disclosure: | na | |
| Disclaimer: | The submission of this Request for Proposal does not constitute an offer to lease. A Lease shall not be binding and in effect unless and until a Lease document has been executed by both parties. Tenant shall not have any liability for any expenses you incur in anticipation of the lease or in replying to this request unless they have been specifically authorized in writing. Tenant reserves the right to reject any proposal it receives. | Agree. |
| Exclusivity | By submitting a response to this RFP, you agree to negotiate exclusively with tenant to finalize a transaction for a 90-day period. During this 90-day period, you will not solicit or accept any offers to buy or lease the premises. | Agree. |

## Section 3: Team Structure

| | |
|---|---|
| Capital Source | Private and Institutional Equity |
| Lender (if applicable) | TBD |
| Development Partner(s) | TBD |
| General Contractor (potential firms)* | Landlord agrees to use General Contractor recommended by Tenant. |
| Project/Program Management (if applicable) | Northstar Commercial Partners |
| Legal Firm | Jones & Keller |
| Architectural Firm* | Landlord agrees to use Architect recommended by Tenant. |
| Civil Engineering Firm* | Landlord agrees to use Civil Engineer recommended by Tenant. |

*AWS has preferred architectural firms and will make this selection.

## Section 4: Pricing Matrix

Please respond to the various pricing scenarios outlined below.  As part of your response related to Scenario II, III, and IV please outline the amount of capital you are willing to fund at your base rental constant structure based upon funding base building costs plus market tenant improvements.  And then base building costs/market tenant improvements plus various tranches of additional tenant improvement funds. If you are proposing additional funds please specify that in your response and how you are treating these funds. ▮▮▮▮▮▮▮

**Proposed Rental Constant / Open Book Development Program**

| Market | Lease Term | Base Market Amount Capitalized at Proposed Rental Constant ($) | Rental Constant / Base Market Amount Capitalized | Rental Constant on Base Market Amount Capitalized + $10,000,000 additional TI's | Rental Constant on Base Market Amount Capitalized + $20,000,000 additional TI's | Rental Constant on Base Market Amount Capitalized + $30,000,000 additional TI's | Rental Constant on Base Market Amount Capitalized + $40,000,000 additional TI's |
|---|---|---|---|---|---|---|---|
| **One Story Building Northern VA** | 10 years | ▮▮▮ | ▮▮▮ | | | | |
| | 12 years | ▮▮▮ | ▮▮▮ | | | | |
| | 15 years | ▮▮▮ | ▮▮▮ | | | | |
| **Two Story Building Northern VA** | 10 years | ▮▮▮ | ▮▮▮ | | | | |
| | 12 years | ▮▮▮ | ▮▮▮ | | | | |
| | 15 years | ▮▮▮ | ▮▮▮ | | | | |

Exhibit A

**Fast Track Plans (STMP- Site Plan Modified Process):** Description: A high-priority plan meeting the criteria as designated by the Department of Economic Development.  These plans are high profile and fast moving.

- Kick off meeting: The assigned PM is present and has done environmental, engineering, & transportation research for the project.  Identifies potential parallel applications that are required prior to conditional approval and final approval of the plan.
    - Parallel applications – Rezoning (ZMAP), Special Exception (SPEX), Boundary Line Adjustment (BLAD), Dedication (DEDI), Floodplain Alteration (FPAL), Floodplain Studies (FPST), etc.
    - To give conditional approval, at a minimum there can be no Erosion &Sediment Controls comments, no Water Resources comments, and the VSMP has already been issued.
    - To give final approval, all comments have been adequately addressed, parallel applications approved, easements recorded, performance bond documents posted, and all proffers/conditions prior to final approval have been addressed.
- Project schedule is submitted by the Applicant to Economic Development: The PM reviews and gives feedback to Economic Development.  Once approved, Economic Development will give a copy to the PM.  Timelines **in general terms** are shown below.  However, more or less time could be negotiated depending on the County's holiday schedule or to meet an Applicant's timeline.  Only 2 submissions are shown as the goal is to have a good quality plan submitted to the County so that it is approvable after the 2nd submission.
    - 1st submission (County) – 3 weeks
    - 1st submission response (Applicant) – 2 weeks
    - 2nd submission (County) – 2 weeks
    - 2nd submission response (Applicant) – 2 weeks

    Remember the timelines from the County are when the PM sends out comments.
- Keeping in mind the agreed timelines, the PM schedules and sends out a notification of an internal Peer Review.  Book a large conference room at the County for everyone as Economic Development, the Engineering Consultant, their client, and/or a Board Aide may attend this meeting in addition to the usual referrals.
- Reminders:
    - Everything associated with a Fast Track plan is expedited – applications, meetings, review, distribution of documents, etc.
    - The Engineering Consultant needs to be reminded of the timelines and the PM should notify Economic Development if they do not keep to the agreement.



# DEVELOPMENT MODEL



| AWS - Northern Virginia | | | |
|---|---|---|---|
| PROJECTED TOTAL DEVELOPMENT BUDGET | | | |
| | Building 1 | Building 2 | Total |
| **Land Cost** | | | |
| Land Cost | | | |
| Land Closing Costs | | | |
| Acquisition Fee | | | |
| Land Loan Interest | | | |
| Land Loan Origination Cost | | | |
| Brokerage Fee | | | |
| **CONSTRUCTION - HARD COSTS** | | | |
| Off Sites | | | |
| Site Work | | | |
| Building | | | |
| Tenant Finish | | | |
| Pricing Contingency | | | |
| **SOFT COSTS** | | | |
| Design Fees | | | |
| Permits and Fees | | | |
| Taxes During Construction | | | |
| Insurance During Construction | | | |
| Environmental Report | | | |
| Geotechnical Report | | | |
| Materials Testing | | | |
| Title and Recording | | | |
| Land Planning and Zoning | | | |
| Construction Loan Interest | | | |
| Construction Loan Guarantee | | | |
| Traffic Study | | | |
| ALTA Survey | | | |
| Loan Origination Costs | | | |
| Legal and Accounting | | | |
| Other Consultants | | | |
| Contingency | | | |
| **OTHER COSTS** | | | |
| General and Admin | | | |
| Weather Protection | | | |
| Construction Fee | | | |
| Preconstruction Services | | | |
| Pre-Opening Operations | | | |
| Pre-Opening Marketing Costs | | | |
| Equity Investor Introduction Fee | | | |
| Testing and Inspections | | | |
| Low Voltage and Security | | | |
| Main demarcation for telephone/cable | | | |
| Entitlement Costs | | | |
| Leasing Commissions | | | |
| Contingency | | | |
| | | | |
| | | Loan To Cost | |
| | | CONSTRUCTION LOAN REQUIREMENT | |
| | | CONSTRUCTION EQUITY REQUIREMENT (rounded | |

NORTHSTAR COMMERCIAL PARTNERS

## AWS - Northern Virginia Soft Costs

| | Building 1 | | Building 2 | | Total | |
|---|---|---|---|---|---|---|
| | TOTAL COST | Cost PSF | TOTAL COST | Cost PSF | TOTAL COST | Cost PSF |

**LOAN ORIGINATION COSTS**
Loan Origination
Other Lender Charges
Appraisal
Construction Period Return on Investment
Title Work
Legal/Processing

**FEES & PERMITS**
Planning Application Fees
Building Permit
City Use Tax
County Use Tax
Plan Check Fee
Water Tap Fee
Sewer Tap Fee
Water Review Fee
Sewer Review Fee
Fire Inspection Fee
Gas
Power
Other

**Insurance During Construction**
General Liability
Builder's Risk Insurance
Performance & Payment Bond

**Design Fees**
Architect
Civil
Landscape
Structural
Electrical
Plumbing
Mechanical



# LEASE COMMENTS
# FROM NORTHSTAR LEGAL COUNSEL

**LEASE AGREEMENT**
[Property Name/Site Code]
[City/[County or Province]/State/Country]

**\*\* This form is for discussion purposes only and is contingent in all respects on Landlord obtaining title to the Premises.**

THIS LEASE AGREEMENT (this "Lease") is dated for reference purposes _____, 20__, between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant").

| | |
|---|---|
| **Premises:** | All of that certain building, to be constructed, consisting of approximately _____ square feet (the "Building") and commonly known as _____, as depicted on **Exhibit A** hereto, together with the land where the Building is to be located, said land also being depicted on **Exhibit A** hereto and legally described on **Exhibit A-1** hereto (the "Land"), and all other improvements located on the Land |
| **Park:** | _____, depicted on **Exhibit A-2** |
| **Tenant's Proportionate Share:** | 100%  [Note: confirm proportionate share for the Park, if applicable] |
| **Lease Term:** | Beginning on the Commencement Date (as defined below) and ending on the last day of the _____ full calendar month thereafter, subject to Tenant's rights to extend ~~or terminate~~ the Lease Term as provided herein  [Add as necessary extensions of term to deal with delayed delivery] |
| **Base Rent:** | See Addendum 1 |
| **Initial Annual Estimated Operating Expense Payments:** (estimates only and subject to adjustment to actual costs and expenses according to the provisions of this Lease) | $_____ |
| **Brokers:** | _____ |
| **Landlord Work and Tenant Improvements** | As defined in Addendum 4 |
| **Permitted Exceptions:** | The conditions, restrictions, easements and encumbrances affecting the Land and filed of record on the ~~date~~Commencement Date of this Lease in [_____County, _____,] as identified in **Exhibit B** hereto, and any additional matters permitted by Tenant pursuant to Section 1(a) below. |
| **Addenda:** | 1. Base Rent<br>2. Contingency for Economic Development Credits and Incentives<br>3. Extension Options<br>4. Work Letter |
| **Exhibits:** |     A.     Site Plan for Premises<br>B.  A-1.   Legal Description of Land |

{JK~~00978037.2~~00978035.2 } 1

C.   A-2.   Site Plan for Park
       D.       Permitted Exceptions
       E.       Form of Notice of Lease Term Dates
       F.       Form of Estoppel Certificate
       G.       Form of Memorandum of Lease
       H.       Right of First Offer/Right of First Refusal
I.   F-1.   Form of ROFO/ROFR Purchase Agreement
       J.       Purchase Option
       K.       Form of Limited Parent Guaranty
       L.       ███████████████
       M.       Data Center Equipment
       N.       Maintenance Obligations

**1.**        **Granting Clause; Commencement Date; Notice of Lease Term**.

(a)       Grant.   In consideration of the obligation of Tenant to pay rent as herein provided and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, including an exclusive right to use all parking, yard and other areas associated with the Premises and all easements and rights benefiting the Premises, [together with a non-exclusive right, in common with others, to use the following (the "Common Areas"):  the areas of Park that are designed for use in common by all owners and occupants of the Park and their respective employees, agents, customers, invitees and others, including any easements for access or other purposes benefiting the owners and occupants of the Park], all subject to the Permitted Exceptions and the terms, covenants and conditions of this Lease.  Landlord shall promptly provide Tenant with copies of all notices received by Landlord pursuant to the Permitted Exceptions.  Landlord shall neither permit nor  voluntarily further encumber the Premises or modify any of the Permitted Exceptions, which would materially affect Tenant's use or business operations or increase Tenant's costs without Tenant's prior consent. [Landlord and Tenant acknowledge that the Premises are subject to that certain Industrial Park Declaration (the "Declaration"), which contains terms governing the development, alteration and maintenance of the Premises].

(b)       Commencement Date; Notice of Lease Term.  The "Commencement Date" shall be the later of (i) _____, 20__, or (ii) the actual date of Substantial Completion (as defined in Addendum 4) of the Landlord Work (as defined in Addendum 4) or the date Substantial Completion would have occurred but for a Tenant Delay (as defined in Addendum 4). Following the Commencement Date, Landlord and Tenant shall execute a Notice of Lease Term Dates memorandum in the form attached hereto as **Exhibit C**, setting forth the Commencement Date, the rentable square footage of the Building and expiration date of this Lease.  The Lease Term for purposes of Section 365(h)(1)(A)(ii) of Chapter 11 of the United States Bankruptcy Code or any similar federal or state legislation shall commence upon complete execution of this Lease but measurement of its duration and the time for the performance of the obligations of the parties hereto shall be governed by the other provisions of this Lease.

**2.**        **Acceptance of Premises**.  Without limiting any of Landlord's obligations, representations or warranties under this Lease, Tenant shall accept the Premises in its condition as of the Commencement Date, provided that Landlord shall cause the Premises to conform to the delivery obligations as set forth in Addendum 4 and to be in good order and good operating condition and in compliance with all applicable Legal Requirements (as defined below) as of the Commencement Date.  Landlord represents and warrants to Tenant that prior to the Commencement Date (a) it has will have the full right and power to execute and perform this Lease and to grant and convey the estate demised herein, (b) owns it will own the Building and the Land in fee simple, subject only to the Permitted Exceptions, (c) the Building is not located on a tax parcel with any other building, (d) there are no zoning, title or other restrictions which in any way prohibit or limit the use of the Premises for the Permitted Uses and that such uses are permitted at the Premises under applicable zoning regulations, (e) the Premises are not located in a 100-year or 500-year flood plain, (f) the Land constitutes a single legal lot in compliance with all applicable subdivision laws, (g) [_____] is the only jurisdiction having permitting authority over the Landlord Work, (h) upon completion of the Landlord Work, there will be no alterations, improvements, or additions to the Building

Confidential January 2016

or the Land required for the issuance of a certificate of occupancy for the Premises, and (i) as of the Commencement Date, Landlord is not aware of and has not received notice of any newly enacted, pending, proposed or threatened Legal Requirements, condemnation proceeding or litigation which would in any way prevent or inhibit the use of the Premises by Tenant as contemplated by this Lease or  that the Premises is not in compliance with Legal Requirements or Permitted Exceptions, (j) Tenant may use up to [_____] gallons per day of water without the need to pay any additional "tap fee," "access fee" or other similar charge other than the utility's ordinary usage charges.  Landlord shall notify Tenant within ten (10) days of Landlord becoming aware that any representation or warranty is no longer true and correct.  Landlord shall execute a title company owner's affidavit in a form reasonably acceptable to Landlord in connection with any leasehold title insurance obtained by Tenant. Landlord represents and warrants to Tenant that it has delivered to Tenant complete copies of any zoning reports relating to the Premises or the Land in Landlord's possession, Landlord's most recent title policy or commitment for the Premises and copies of all Permitted Exceptions.

3.      Use.

(a)      Permitted Uses.  The Premises mayshall be used for the operation of a network operations center and computer data center, including (i) the storage, assembly, installation, operation, maintenance and repair of equipment used in a networking operations and computer data center, including the equipment listed on **Exhibit J** ("Data Center Equipment"), (ii) general office use, and (iii) other ancillary and related uses and for any other use in compliance with Legal Requirements (all of the above being individually a "Permitted Use" and collectively "Permitted Uses").  Subject to Legal Requirements, Tenant shall be permitted to have trucks and trailers used in Tenant's business operations enter, operate in and/or drive through the Building for the purpose of loading and unloading Tenant's Property.  Tenant's use of the Premises shall be in a safe and proper manner and will not commit waste, overload the floor or structure of the Building or subject the Premises to any use that would damage the Premises beyond reasonable wear and tear.  Subject to Legal Requirements, Tenant shall be permitted to park trucks and trailers used in Tenant's business operations at the truck docks and in Tenant's Parking Areas (as defined in Section 14), provided such trucks and trailers are at all times in operable condition.   Subject to Legal Requirements, storage of Tenant's Property is permitted in any location upon the Premises for a period not to exceed forty-five (45) days.  Subject to Legal Requirements, Tenant may install and operate modular data center equipment in or adjacent to the Building within the exterior portions of the Premises depicted on **Exhibit A** ("Equipment Area") or in Tenant's Parking Areas.  Tenant may use the Premises, the Common Areas, the Equipment Area and the Tenant Parking Areas twenty-four (24) hours a day, seven (7) days a week, fifty-two (52) weeks a year. In no event shall Tenant use the Premises in violation of any exclusive use restriction recorded against the Premises.

(b)      Compliance with Legal Requirements.  Subject to Landlord's obligations under this Lease, Tenant's use of the Premises shall be, at its sole expense, in compliance with all applicable federal, state, county and municipal statutes, ordinances, codes, rules, regulations and requirements (the "Legal Requirements") that are applicable only by reason of Tenant's particular use of and operations at the Premises (as opposed to Legal Requirements applicable generally to projects in the area); provided, that (i) compliance with Legal Requirements does not obligate Tenant to perform Landlord's maintenance obligations as set forth in Section 10 or undertake any structural changes or structural improvements to the Premises and (ii) Tenant's obligations with respect to Hazardous Materials (as defined below) shall be governed by Section 30.  Subject to the immediately preceding sentence, Landlord shall promptly comply with all Legal Requirements applicable to the Premises, regardless of whether compliance necessitates structural changes or structural improvements.  Tenant may contest, by appropriate legal proceedings, the validity or applicability of any Legal Requirements and Landlord shall cooperate in such contest.

4.      Base Rent.  Tenant shall pay Base Rent in the amount set forth in the schedule of Base Rent attached hereto as Addendum 1. Notwithstanding anything to the contrary contained herein, with respect to the first payment of Base Rent, Landlord shall send Tenant an invoice on or after the Commencement Date specifying the amount of Base Rent then due, and Tenant shall pay the first payment of Base Rent ten (10) days after Tenant's receipt of Landlord's invoice.  Landlord represents and warrants that the Building has been measured using the

{JK00978037.200978035.2 } 3

BOMA [Industrial Standard, Exterior Wall Method].  Tenant may, within ninety (90) days after the Commencement Date, elect to have Tenant's architect remeasure the Building; and, if Tenant disputes the results of Landlord's measurement of the Building, then Tenant shall notify Landlord of such objection within such ninety (90) day period, or Landlord's architect's measurement shall be deemed correct.  Should Landlord and Tenant not agree with respect to the results of such measurement subsection they jointly appoint an independent firm or person who is experienced in making such measurements whose determination as to the measurement of the Premises shall be final and binding upon the parties.  If Landlord and Tenant are unable to agree on an independent firm or person to determine the measurement of the Premises, then each party will appoint an independent firm or person and those two firms or people will appoint a third firm or person to make the determination as to the measurement of the Premises.  Landlord and Tenant shall share equally in the fees of such firm or person.  Upon resolution of the measurement of the Building, all terms of this Lease dependent upon such measurement (e.g., Base Rent, Tenant's Proportionate Share) shall be amended to reflect the actual measurement of the Premises, retroactive to the Commencement Date, and any underpayment (or overpayment, as the case may be) resulting from any term of this Lease subject to adjustment pursuant to this Section shall be paid by the party owing the amount to the other party within thirty (30) days thereafter.] Tenant promises to pay to Landlord in advance, without demand, deduction or set-off except as otherwise specifically provided under this Lease, monthly installments of Base Rent on or before the first Business Day of each calendar month beginning with the month in which Tenant's obligation to pay Base Rent commences as provided in Addendum 1.  Payments of Base Rent for any fractional calendar month shall be prorated.  All payments required to be made by Tenant to Landlord hereunder (or to such other party as Landlord may from time to time specify in writing) shall be made by Electronic Funds Transfer of immediately available federal funds at such place within the continental United States as Landlord may from time to time designate to Tenant in writing.  Tenant shall have no right at any time to abate, reduce, or set-off any rent due hereunder except as may be expressly provided in this Lease.  "Rent" means Base Rent and any other amounts payable by Tenant under this Lease.

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days after such amount shall be due, Tenant shall pay Landlord a late charge equal to ten percent (10%) of the delinquent installment of Rent or other amount due from Tenant.  The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of late payment by Tenant. In addition, any Rent not paid bears interest from the due date until the date paid at a rate equal to twelve percent (12%) per annum  Acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder.

5.      **Early Termination Option.** [Subject to further discussion].   Tenant shall have the right to terminate this Lease effective as of the end of the _____ (____) full calendar month of the Lease Term.  In order to exercise such termination right, Tenant shall notify Landlord of such exercise at least two hundred and seventy (270) days prior to the effective date of such termination, and shall pay to Landlord, on or before the effective date of such termination, a termination fee equal to the unamortized amounts incurred by Landlord (i) to perform the Landlord Work as documented by Landlord in written back-up acceptable to Tenant and (ii) for brokerage commissions with respect to this Lease.  For purposes of the preceding sentence, the term "unamortized amount" means the amount remaining as of the effective date of such termination upon amortizing the subject costs in equal monthly installments over the entire Lease Term.   Such payment is made in consideration for Landlord's grant of this termination option to compensate Landlord for rental and other concessions given to Tenant and for other good and valuable consideration.  The termination fee does not constitute payment of rent to Landlord.

6.      **Operating Expenses.**

(a)     Payment of Operating Expenses.  During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost, as reasonably estimated by Landlord (which estimate Landlord may revise not more than two times per calendar year and for which Landlord shall provide at least thirty (30) days' notice before such revision becomes effective), of Tenant's Proportionate Share of Operating Expenses (as defined below) payable for the Premises for the applicable calendar year. Payments thereof for any fractional year or calendar month shall be prorated.  The first month's installment of the

{JK00978037.200978035.2 } 4

Initial Annual Estimated Operating Expense Payments shall be due and payable together with the first payment of Base Rent. Landlord shall apply such amount against Tenant's obligation to pay Operating Expenses in accordance with this Lease. The term "Operating Expenses" means, subject to the restrictions or specific allocations of cost set forth in this Section 6 and elsewhere in this Lease, all reasonable costs and expenses incurred by Landlord with respect to the maintenance of the Premises (including but not limited to those items listed on **Exhibit K** as "Landlord Maintenance Obligations – Operating Expenses (Recoverable)", but excluding those items listed on **Exhibit K** as "Landlord Maintenance Obligations – Capital Improvements (Non-Recoverable)"); [IF APPLICABLE, ADD IN COMMON AREAS AND INCLUDED OBLIGATION OF LANDLORD TO MAINTAIN SAME]; the Taxes (as defined below) and fees payable to tax consultants and attorneys for consultation and contesting Taxes; insurance; charges or assessments of any association to which the Premises is subject; property management fees payable to a property manager, including any affiliate of Landlord, ███████████████.

       (b)      Operating Expense Exclusions. Notwithstanding anything to the contrary in this Lease, in no event shall Tenant have any obligation to perform, pay directly, or reimburse Landlord for any of the following items: (1) costs incurred in connection with the original construction or subsequent reconfiguration or upgrade of the Building or the Premises; (2) costs of correcting defects in the design or construction of the Building or the material used in the construction of the Building or Building systems (including latent defects), provided that for the purposes of this clause (2) conditions (not occasioned by design or construction defects) resulting from ordinary wear and tear and use shall not be deemed defects; (3) real estate brokers' commissions, renovations or tenant improvements, or other costs incurred for attracting tenants or with respect to other rentable area; (4) costs resulting from the gross negligence or willful misconduct of any Landlord Party (as defined below) or the default of Landlord under this Lease or any other agreement affecting Landlord or the Premises; (5) legal, accounting or professional fees and costs incurred in connection with lease negotiations, the audit of any Landlord financial materials and requests related to any assignment or sublease; (6) interest and principal payments or other amortization or depreciation charges on the Premises (including the Building systems and equipment) or the indebtedness of Landlord; (7) overhead and profit paid to subsidiaries or affiliates of Landlord for management or other services for supplies or other materials to the extent the amounts incurred are in excess of those which would have been reasonably incurred if such supplies or services were obtained from unrelated third parties; (8) voluntary contributions to any political or charitable persons or entities; (9) costs for the acquisition of sculpture, paintings or other art objects; (10) advertising, marketing and promotion costs; (11) costs associated with the operation of the corporation or other entity which constitutes Landlord, as distinguished from costs of operation of the Premises; (12) costs for which Landlord is entitled to reimbursement under warranties or by insurance companies, other tenants, or other third parties; (13) reserves; (14) costs incurred to investigate, remove, remediate, or respond to any claim related to Hazardous Materials (but Tenant's responsibility for Hazardous Materials brought onto the Premises by any Tenant Party (as defined below) shall be governed by Section 30); (15) costs of capital repairs or replacements (except for (i) the Base F/LS System Capital Costs and the HVAC Capital Costs (each as defined below), except for (i) costs of repairing or replacing Building systems if necessary in order to comply with Legal Requirements adopted after the Commencement Date of this Lease and (ii) costs of repairs or replacements of Building systems that result in savings in other Operating Expenses, but only to the extent that the amortized annual amount of the cost of the repairs or replacements does not exceed the resulting savings in any calendar year; provided, that the costs of any capital repairs or replacements that are permitted to be included in Operating Expenses shall be amortized in equal monthly installments over their useful lives in accordance with generally accepted accounting principles, consistently applied; (16) the costs and expenses incurred in leasing equipment or systems that would ordinarily constitute a capital expenditure if such equipment or systems were purchased, to the extent such rental charges exceed the amortization charge, if any, that would have been permitted had the item been purchased; (17) costs of repairs or other work necessitated by fire, windstorm or other casualty and/or costs of repair or other work necessitated by the exercise of the right of eminent domain not covered by insurance; (18) the cost of insurance coverages not generally carried by landlords of similar buildings in the area; (19) insurance deductibles and co-insurance payments in excess of $50,000; (20) interest or penalties due to the late payment of taxes, utility bills or other costs; (21) any cost for overtime or other expenses to Landlord in curing default; (22) the costs, including fines, penalties, and legal fees incurred, due to violations by any Landlord Party, or any other tenant or occupant of the Building of Legal Requirements, the terms and conditions of any lease pertaining to the Building, or any other contract, or title matters; (23) any amount paid to an owners' association of which the Premises is a part or paid in connection with any covenants, conditions, and restrictions or other title matters affecting the Premises if

Confidential January 2016

such costs would be excluded from Operating Expenses pursuant to other provisions of this Section 6; (24) rent under any ground lease or master lease; (25) costs incurred in connection with the financing or transfer of the Building or the Premises (including the cost of any lender's policy of title insurance) or any interest therein; (26) the cost of any action that is specifically Landlord's expense under this Lease or any costs for which Landlord is required to pay or reimburse Tenant (including the cost of any repairs or replacements covered by Landlord's express warranties set forth in this Lease); (27) expenses which are separately metered or calculated for the Premises, which are billed separately to Tenant or one or more other tenant(s), as applicable; (28) wages, salaries and other compensation paid to personnel above the grade of property manager; (29) rates paid on service or other contracts to the extent the cost thereof exceeds average market costs for such services of comparable quality in comparable buildings and any termination fees related to any such contracts; (30) Landlord's general overhead and any other expense not directly related to the Premises; (31) costs incurred in contesting Taxes or Legal Requirements except to the extent the costs do not exceed the resulting savings; (32) property management fees in excess of one percent (1%) of Base Rent; (33) to the extent not already covered above, any maintenance obligations of Landlord listed as "Landlord Maintenance Obligations – Capital Improvements (Non-Recoverable)" on **Exhibit K**; and (34) any items that Landlord is obligated to repair pursuant to Section 10 and are expressly stated to be done at the sole expense of Landlord.  Landlord will not collect or be entitled to collect more than one hundred percent (100%) of the Operating Expenses actually paid by Landlord in connection with the operation of the Premises in any calendar year.  Furthermore, Tenant shall not be obligated to pay for (i) Operating Expenses in the calendar year in which the Commencement Date occurs to the extent that Tenant's Proportionate Share of Operating Expenses for such year exceeds (on an annualized basis) one hundred three percent (103%) of the estimated amounts set forth in Initial Annual Estimated Operating Expense Payments on the first page of this Lease <mark>[IF FIRST CALENDAR YEAR WILL BE LESS THAN 90 DAYS EXTEND THIS FOR SUBSEQUENT CALENDAR YEAR AS WELL]</mark> or (ii) Controllable Operating Expenses in any subsequent year to the extent Tenant's Proportionate Share of Controllable Operating Expenses for such year exceeds one hundred three percent (103%) of the Controllable Operating Expenses payable by Tenant for the immediately preceding year.  For purposes of this Section, Controllable Operating Expenses shall mean all Operating Expenses as set forth in this Section 6 of this Lease, except for Taxes, utility costs, costs for snow and ice removal except to the extent set forth as Tenant's obligation in **Exhibit K**.  Controllable Operating Expenses shall be determined on an aggregate, non-cumulative and non-compounded basis and not on an individual basis.

(c)     _Reconciliation of Operating Expenses_.  On or before ninety (90) days following the end of each calendar year, Landlord shall deliver to Tenant a detailed reconciliation statement (the "Reconciliation") showing the calculation of the actual Operating Expenses for the prior calendar year along with reasonable supporting documentation, including a detailed general ledger.  If Tenant's total payments of Operating Expenses for any year are less than Tenant's Proportionate Share of actual Operating Expenses for such year, then Tenant shall pay the difference to Landlord within thirty (30) days after demand, and if more, then Landlord shall retain such excess and credit it against Tenant's next payments or, if Tenant so requests, refund it to Tenant within thirty (30) days after demand, which obligation shall survive the expiration or termination of the Lease Term.  For purposes of calculating Tenant's Proportionate Share of Operating Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date (except that Tenant's obligation to pay Operating Expenses shall not commence until payments of Base Rent commence pursuant to <u>Addendum 1</u>), and the last year, which shall end on the expiration of this Lease.

(d)     _Right to Audit_.  Tenant<u>, at its expense,</u> will be entitled from time to time to audit and verify the Reconciliation to assure that the Operating Expenses from time to time reported by Landlord are in keeping with the provisions of this Section 6. Upon Tenant's request to audit the Reconciliation (which request must be made within one hundred eighty (180) days following Tenant's receipt of the Reconciliation or any correction thereof), Landlord shall make available to Tenant electronically, or at Tenant's election, at the Premises or Landlord's designated office, for photocopying by Tenant (or Tenant's employee or designated representative), invoices of expenditures, as well as other standard Landlord reports, for the expenses as provided in the Reconciliation (as well as for prior years, for purposes of evaluating compliance with the limitations on increases in Controllable Operating Expenses).  Landlord's books and records shall be kept in accordance with generally accepted accounting principles, consistently applied.  Landlord may correct any Reconciliation within one hundred and eighty days (180) after it is initially issued, but may not further correct it thereafter, except in the event that the correction would result in a credit to Tenant or that the Reconciliation of Taxes may occur at any time within three hundred and sixty-five (365)

days following the final determination of the Taxes owed. Tenant's right to receive the Reconciliations and perform the audit shall survive the termination or expiration of this Lease. In the event of any errors the appropriate party will make a correcting payment in full to the other party within thirty (30) days after the determination and communication to all parties of the amount of such error. In the event of any errors on the part of Landlord costing Tenant in excess of three percent (3%) of Tenant's actual Operating Expense liability for any calendar year, Landlord will also, within the above thirty (30) day period, reimburse Tenant for the costs of an audit reasonably incurred by Tenant.

(e)    Annual Estimates.  On or before December 1 of each year during the Lease Term, Landlord shall deliver to Tenant a detailed statement showing the calculation of the estimated Operating Expenses for the subsequent calendar year, along with a detailed explanation in the event of an increase in any line item relative to the previous year's estimate. At a minimum, such statement shall contain a separate line item estimate of each general ledger account estimated to contain Operating Expenses for the subsequent year.

**7.     Utilities**. Tenant shall pay for all water, gas, electricity, telephone, sewer, sprinkler services, refuse and trash collection used on the Premises by Tenant during the Lease Term, together with any taxes, penalties, surcharges or the like on such utility charges. Landlord shall cause the normal and customary utility services (electricity, gas, telephone, fiber optics, water and sewer) to be stubbed into the Building at a location determined by Tenant and otherwise in accordance with the plans and specifications delivered to Landlord prior to the execution of this Lease and shall cause such utility services to continue throughout the Lease Term. Landlord shall cause the Premises to be separately metered for all utilities prior to the Commencement Date at Landlord's cost and expense. Subject to Legal Requirements, Tenant shall further be entitled to alter, increase, upgrade, remove or reconfigure any utilities as reasonably necessary for Tenant's use of the Premises. Any incentives or rebates related to any utilities corresponding to Tenant's occupancy of the Premises shall be fully payable to Tenant or immediately remitted to Tenant if received directly by Landlord. In the event of an interruption of utilities to the Premises which is not the result of the actions, omissions or negligence of any Landlord Party, Rent shall abate in proportion to the square footage of the Premises affected by the interruption as of the date that is three (3) days after the interruption begins and shall continue until the problem is corrected. ~~If the interruption continues for more than sixty (60) days, then Tenant shall have a right to terminate this Lease.~~ The deadlines set forth in this paragraph shall ~~not~~ be extended for Force Majeure.

**8.     Taxes**. ==[CONFORM TO LOCAL AND OTHER REQUIREMENTS CONTAINED IN ANY ECONOMIC INCENTIVES].== Landlord shall pay all real estate taxes, assessments and governmental charges (except to the extent of any Economic Development Incentives as defined in Section 45(b)) (collectively referred to as "Taxes") that are payable with respect to the Premises during the Lease Term, which shall be included as part of the Operating Expenses charged to Tenant. Landlord shall forward to Tenant a copy of all notices, invoices and statements relating to the Premises' Taxes. Upon notice to Landlord, which must be provided no later than five (5) days prior to the applicable deadline, Tenant (acting on behalf of Landlord) shall have the right to contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof. If Tenant exercises its rights under the preceding sentence, (i) Tenant shall have the exclusive right (at Tenant's sole cost and expense) to select any counsel or consultants to effect such contest and to control the institution and prosecution of such contest (including any settlement or withdrawal of the contest), (ii) Landlord shall have no right to settle or withdraw such contest or otherwise control Tenant's prosecution of such contest,  and (iii) Landlord shall reasonably cooperate with Tenant's institution and prosecution of any such Tax contest and will execute any documents reasonably required therefor. If Tenant does not exercise its rights under the first sentence of this Section to contest any Taxes, Landlord may contest such Taxes.  If Landlord exercises its rights under the preceding sentence, it shall notify Tenant as soon as reasonably practicable that it has undertaken to contest such Taxes. All reductions, refunds, or rebates of Taxes paid or payable by Tenant as an Operating Expense shall be refunded by Landlord to Tenant (less costs or expenses incurred by Landlord) whether as a consequence of a Tenant proceeding or otherwise. For the avoidance of doubt, nothing in this Section is intended to cause Tenant to be treated as an agent of Landlord for any purpose. In no event shall Tenant be liable for any estate taxes, inheritance taxes, transfer, gift or franchise taxes, gross receipts taxes of Landlord, "roll-back" or similar taxes attributable to periods before the Lease Term, federal, state or local income taxes, tax in lieu of net income tax, penalties or interest other than those attributable to Tenant's failure to comply timely with its obligations pursuant to this Lease, tax that is or may be imposed against the rents payable under this Lease or upon Landlord's income or profits, nor special assessments incurred as a result of the initial construction or subsequent enlargement of the Premises. If any tax for

which Tenant is liable hereunder is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner as the taxing authority shall require.  Tenant shall be liable for all taxes levied or assessed against any personal property of Tenant placed in the Premises, whether levied or assessed against Landlord or Tenant.  Landlord shall pay (and such amounts shall not be included in Operating Expenses) any transfer taxes or recording fees imposed by any governmental agency or municipality with respect to (a) this Lease, any memorandum of this Lease, any amendment, modification or extension of this Lease, any transfer occurring with regard to this Lease, any financing of Landlord's interest in the Premises, or the exercise of any options granted under this Lease; or (b) any transfer of any interest in the Premises or direct or indirect interests in Landlord.  If any Taxes may be paid in installments, Landlord shall pay the Taxes in the maximum number of installments permitted by law, and Tenant's obligation to pay such Taxes as part of Operating Expenses shall be limited to each installment or prorated share thereof due and payable during the Lease Term.

       **9.**    **Insurance.**

       (a)    <u>Landlord's Insurance</u>.  Landlord shall maintain all risk (also known as "special causes of loss form") property insurance covering the full replacement cost of the Building and the Premises (including any Tenant-Made Alterations (as defined below)) and including ordinance or law coverage and commercial general liability insurance including Tenant as an additional insured, and meeting the requirements for commercial general liability insurance set forth in Section 9(c) below.  All such insurance shall be included as part of the Operating Expenses charged to Tenant, to the extent permitted by Section 6.  Landlord may satisfy its obligations under this Section 9(a) through one or more blanket policies, in which case the cost of such insurance allocable to the Premises will be reasonably determined by Landlord based upon the insurer's cost calculations.  Tenant will not use or permit the Premises to be used for any purpose or in any manner that would void Landlord's insurance and Landlord shall provide Tenant with notice if Landlord becomes aware that any such use will void Landlord's insurance; provided that this sentence shall not be deemed to prohibit the Permitted Uses.  Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems necessary as a result of Tenant's use of the Premises for other than the Permitted Uses.

       (b)    <u>Tenant's Insurance</u>.  Tenant, at its expense, shall maintain from and after the Commencement Date or any earlier date upon which Tenant enters or occupies the Premises or any portion thereof: all risk (or "special causes of loss form") property insurance covering the full replacement cost of all Tenant's Property (as defined below) installed or placed in the Premises by Tenant at Tenant's expense; worker's compensation insurance with no less than the minimum limits required by law; employer's liability insurance with limits of no less than $1,000,000 each accident for bodily injury by accident, $1,000,000 each employee for bodily injury by disease, and $1,000,000 policy limit for bodily injury by disease; and commercial general liability insurance covering liability arising out of Tenant's operations with respect to the Premises, which commercial liability insurance shall include Landlord as an additional insured.  Landlord may from time to time require reasonable increases in any such limits consistent with the insurance being required by institutional owners of similar projects in the area.

       (c)    <u>Insurance Generally</u>.  The commercial general liability policies required of each party shall provide coverage on an occurrence basis with a per occurrence limit of not less than $5,000,000, which limit may be satisfied by any combination of primary and excess or umbrella policies, and shall insure on an occurrence and not a claims-made basis and provide contractual liability coverage.  All insurance policies shall be issued by insurance companies which are authorized to do business in the state in which the Premises are located and have a Best's rating not less than A-.  Each party shall deliver certificates evidencing such policies to the other, upon the other party's request, at the commencement of the Lease Term and at each renewal of said insurance.

       (d)    <u>Waiver of Subrogation</u>.  Notwithstanding any other provision of this Lease, Landlord and Tenant each hereby waives its right against the other party (the "<u>Benefited Party</u>") for any loss of, or damage to, any of the waiving party's property located within the Building or upon, or constituting all or a part of, the Building, in each case to the extent the loss or damage is or would be covered by the ISO special causes of loss form (CP 10 30) with the property in question insured for the full replacement cost, whether or not the waiving party actually carries such insurance, recovers under such insurance, or self-insures the loss or damage, and whether or not the loss is due to the negligent acts or omissions of the Benefited Party, or its members, partners, managers, affiliates, contractors or

Confidential January 2016

subcontractors or its or their officers, directors, employees, agents or invitees, except the waiver in this sentence will not apply to the extent the loss or damage arises from the gross negligence or willful misconduct of the Benefited Party or its members, partners, managers, affiliates, contractors or subcontractors or its or their officers, directors, employees, agents or invitees. Each party's waiver in this Section 9(d) includes a waiver of the right to recover any deductibles and self-insured retentions incurred by such waiving party in connection with a loss to which the waiver in this Section 9(d) applies. The mutual waivers in this Section 9(d) shall be in addition to, and not in limitation or derogation of, any other waiver or release contained in this Lease with respect to any loss of, or damage to, property of the parties hereto. Each party shall ensure that its property insurance policy required under this Lease permits the waiver in this Section, so that such party's waiver will not invalidate or impair any of its coverage, and shall upon request provide the other party with evidence of such arrangements.

(e)     Right to Self-Insure.  Notwithstanding anything in this Section 9 or otherwise in this Lease to the contrary, so long as the originally named Tenant or a permitted Transferee (as defined below) is the tenant-in-possession, Tenant may elect to self-insure some or all of the risks covered by the insurance that it is otherwise obligated to maintain under the terms of this Lease, and upon such election Tenant will be excused from its obligation to obtain third-party insurance for the self-insured risks.  All amounts which are paid or are required to be paid and all loss or damages resulting from risks for which Tenant has elected to self-insure shall be subject to the waiver of subrogation provisions of this Section 9 as to property insurance and shall not limit Tenant's indemnification obligations set forth in Section 18.  Notwithstanding anything in this Section 9 to the contrary, Tenant shall have the right at any time, on reasonable prior notice to Landlord, to terminate its self-insurance program and provide third-party insurance as otherwise required by this Section 9 so long as evidence of such third-party policies are delivered to Landlord prior to termination of Tenant's self-insurance program.  At any time when Tenant elects to self-insure any required coverage, Tenant shall provide Landlord and Landlord's lender, if any, with certificates of self-insurance specifying the extent of self-insurance coverage hereunder.

**10.     Landlord's Maintenance and Repairs**.

(a)     Landlord Obligations Generally.  Subject to Section 15, Landlord shall, at its sole cost and expense, maintain, repair and/or replace, as necessary[ and/or as may be required by the Declaration], the structure of the Building, the loading docks, the structural elements of the roof, the roof membrane (provided, however, that routine preventative maintenance and repair of the roof membrane may be included as part of Operating Expenses to the extent permitted under Section 6), slab, foundation, and exterior walls of the Building, and those items listed on **Exhibit K** as "Landlord Maintenance Obligations – Capital Improvements (Non-Recoverable)".  In addition, as part of Operating Expenses to the extent permitted under Section 6, Landlord shall maintain, repair and/or replace, as necessary, in good repair, reasonable wear and tear excluded, all portions of the Premises not required to be maintained by Tenant pursuant to Section 11, including those items listed on **Exhibit K** as "Landlord Maintenance Obligations – Operating Expenses (Recoverable)"; Building systems, except to the extent listed on **Exhibit K** as "Landlord Maintenance Obligations – Capital Improvements (Non-Recoverable)" or "Tenant Maintenance Obligations"; systems for drainage of water from the roof, the underground or behind wall or otherwise concealed; termite eradication; any pipes, ducts, wires, mains and conduits that do not serve the Premises exclusively; and the parking areas, common areas and other exterior portions of the Premises, including driveways, alleys, landscape and grounds surrounding the Building, except to the extent listed on **Exhibit K** as "Landlord Maintenance Obligations – Capital Improvements (Non-Recoverable)" or "Tenant Maintenance Obligations".  In addition, Landlord shall perform any capital repair or replacement of the existing fire/life safety systems (or the fire/life safety systems that were installed as part of the Base Building Specifications as described in **Addendum 3**) (in either event, the "Base F/LS System"), the cost of which is reasonably expected to be $10,000 or more, and such costs may be passed through to Tenant as part of Operating Expenses provided that such costs shall be amortized in equal monthly installments over their useful lives in accordance with generally accepted accounting principles, consistently applied (the "Base F/LS System Capital Costs").  Landlord's maintenance, repair and replacement activities shall be at a level substantially similar to the level of maintenance, repair and replacement standards that are typical in other similar class buildings that are located in the market in which the Premises are located.  Further, Landlord warrants the operation of the entire Premises, including all Building systems, including the existing HVAC owned by Landlord, the Base F/LS System, electrical, plumbing and lighting (but excluding Tenant's Property) until the end of the twenty-fourth (24th) full calendar month of the Lease Term, and any repairs and replacements (other than routine maintenance, which shall be performed by Tenant if such maintenance is within the scope of Tenant's

{JK00978037.200978035.2 } 9

responsibilities pursuant to Section 11) during such period shall be performed by Landlord at Landlord's sole expense; provided, however, that such warranty shall not be effective for any maintenance, repairs or replacements necessitated due to the misuse of, or damages caused by, Tenant or any Tenant Party. With respect to any Landlord repair and maintenance work performed by Landlord as provided in this Section, Landlord shall use commercially reasonable efforts not to interfere with Tenant's use of the Premises, perform such work in a good and workmanlike manner, in compliance with all safety and other Legal Requirements, and diligently prosecute such work to completion (including the restoration of any portion of the Premises, or any Tenant-Made Alterations, Tenant's Property and fixtures that were disturbed by Landlord to complete such work). Additionally, Landlord shall not locate any new ducts, pipes, mains, wires or conduits in any part of the Premises without Tenant's consent. In addition to the foregoing obligations, Landlord shall be responsible, at its expense, for correcting latent and structural defects throughout the Lease Term.

(b)     Safety Issues. Landlord shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs as may be prudent under the circumstances to ensure the safe completion of any work performed by Landlord hereunder and compliance with all applicable health and safety regulations. Landlord is solely responsible for and has control over the means, methods, techniques, sequences, and procedures used ("Techniques") by Landlord's personnel, contractors, and subcontractors to perform such work. Specific instructions concerning Techniques as may be provided by Tenant, if any, do not discharge Landlord's responsibility. Landlord will evaluate the safety of any such instructions and ensure that reasonable precautions are undertaken for the safety of persons or property at the Premises in all areas where such work is performed. If Landlord determines that any Techniques may not be safe or may not be in compliance with applicable health and safety regulations, Landlord shall give timely written notice to Tenant and shall not proceed with the applicable portion of such work making use of such Techniques. Services and Techniques shall be performed in strict accordance with all Legal Requirements, including Occupational Health and Safety Administration regulations, bearing on the health and safety of persons or their protection from injury.

(c)     Interruption of Tenant's Operations. If Landlord desires to do any work (for maintenance or repairs or otherwise) that would require an interruption of power or any other utility to the Premises or cause any interference with Tenant's operations or access to the Premises, the following requirements shall apply (except in the event of any emergency that precludes compliance with one or more of the following requirements, in which case Landlord shall comply with the requirements to the extent reasonably possible):  (i) no such work may occur during the period commencing November 15 and ending on the immediately following January 15 (the "Holiday Season") without Tenant's consent, (ii) Landlord shall give Tenant not less than ~~thirty~~ten (~~30~~10) days' advance notice of such planned work, (iii) such work may only occur during times reasonably approved by Tenant (and the parties agree it shall be reasonable for Tenant to require that such work occur outside of normal business hours), (iv) any such interruption may not be for more than ~~twenty-~~four (~~4~~24) hours in length, and (v) in the case of a power interruption, if requested by Tenant, Landlord shall, at its sole expense, provide a source of back-up power for the Premises to allow Tenant to continue its normal business operations during such interruption (and the fuel costs and other related charges shall not be included in Operating Expenses).

(d)     Tenant's Right to Maintain. Notwithstanding anything to the contrary contained herein, Tenant may elect, upon at least thirty (30) days' prior notice to Landlord, to take over any maintenance obligation of Landlord, including, without limitation, any of Landlord's obligations that are structural in nature and otherwise at Landlord's sole cost and expense, in which case (i) for those obligations in which the costs were recoverable by Landlord as part of Operating Expenses, such costs shall be at Tenant's sole cost and expense, (ii) Landlord shall not have any obligation to maintain such matters after the date set forth in Tenant's notice, and (iii) any costs incurred by Landlord in connection with any matters taken over by Tenant after the date set forth in Tenant's notice shall be excluded from Operating Expenses. Landlord shall not enter into any maintenance or service contracts that are not terminable within ninety (90) days at no cost. Additionally, upon ~~ninety (90) days' notice to Landlord~~an uncured event of default by the property manager under the property management agreement, Tenant shall have the right to self-manage the Premises, in which case no property management fee would be included in the calculation of Operating Expenses. Tenant shall be responsible for any breakage costs, if any, associated with Landlord's current management contract (provided such contract has a term no longer than one (1) year). In the event Tenant elects to take over any maintenance obligations relating to the structure of the Building, the loading docks, the structural elements of the roof, the roof membrane, or any of those items listed on **Exhibit K** as "Landlord

{JK~~00978037.2~~00978035.2 }10

Confidential January 2016

Maintenance Obligations – Capital Improvements (Non-Recoverable) (collectively, the "Non-Recoverable Elements"), Tenant shall obtain Landlord's prior consent to any contractors Tenant proposes to use for maintenance, repair or replacement activities of the Non-Recoverable Elements.  Landlord shall reimburse Tenant for costs incurred in such activities within thirty (30) days of Landlord's receipt of invoices and reasonably sufficient supporting documentation.  Tenant shall assign to Landlord any warranties for such work upon expiration or earlier termination of the Lease.

**11.    Tenant's Repairs**. Subject to Landlord's obligation in Section 10 and subject to Sections 9 and 15, Tenant shall, at its sole cost and expense, maintain, repair and/or replace as necessary all interior non-structural portions of the Premises, the HVAC system and any Tenant HVAC (as defined in Section 41) (in accordance with manufacturer's recommended standards but subject to the warranty period described in Section 10(a) and provided that during the last two (2) years of the Lease Term, Tenant may elect not to perform a capital repair or replacement of such HVAC system(s) if such work is reasonably expected to cost in excess of $10,000; provided that Landlord may elect to perform such work and such costs may be passed through to Tenant as part of Operating Expenses provided that such costs shall be amortized in equal monthly installments over their useful lives in accordance with generally accepted accounting principles, consistently applied (the "HVAC Capital Costs")), and those items listed on **Exhibit K** as "Tenant Maintenance Obligations."  Tenant shall also, at its sole cost and expense, maintain the Base F/LS System, and perform any capital repairs or replacements to the Base F/LS System, the cost of which is reasonably expected to be less than $10,000 (but subject to the warranty period described in Section 10(a)).  Tenant shall also, at its sole cost and expense, maintain, repair and/or replace as necessary any modifications or additions to the Base F/LS System that were made by or paid for by Tenant.  Landlord acknowledges that items within, and components of, the Premises that Tenant must maintain will be subject to reasonable wear and tear and, subject to Section 9, non-casualty damage caused by Landlord, its agents and contractors, and Tenant is not required to maintain the Premises in a "like new" condition.  If Tenant fails to perform any repair or replacement for which it is responsible, and does not cure such failure within any applicable cure period, Landlord may, upon ten (10) days' advance notice to Tenant, perform such work and shall be reimbursed by Tenant for the reasonable cost of such work within thirty (30) days after demand therefor (which demand shall be accompanied by reasonable supporting documentation for such costs).  Subject to Sections 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Premises that results from non-casualty damage caused by Tenant~~, its agents, contractors, or invitees~~ or any of the Tenant Parties.  Landlord shall assign to Tenant or otherwise make available to Tenant the benefit of any warranties from contractors, equipment manufacturers or others that benefit any portion of the Premises that Tenant is required to maintain.  Tenant may take actions and employ systems, apparatus and chemicals on the Premises to prevent any infestation by rodents, vermin or other such pests.

**12.    Tenant-Made Alterations.**

(a)    _Tenant Made Alterations Generally_.  Except for the Pre-Approved Alterations (defined in Addendum 4), any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior consent.  Notwithstanding the foregoing, Landlord's consent shall not be required for Tenant-Made Alterations that do not cost in excess of $500,000 in the aggregate on an annual basis and do not involve building penetrations that adversely affect the Building's structure (collectively, "Minor Alterations").  Any permitted alterations made by Tenant shall be made in a good and workmanlike manner in compliance with all Legal Requirements. Additionally, Tenant may, without Landlord's consent, install fencing around the Building and/or Land, cover or block windows in the Premises and drill between floors to add ducting or conduit in connection with the HVAC systems, telecommunications lines, and electricity requirements, so long as such improvements do not adversely affect the Building's Structure.  Tenant shall also have the right, without Landlord's consent, to erect or install shelves, wall display systems, bins, machinery, trade fixtures and security devices, including security gates and rolling shutters (interior or exterior).  Landlord shall respond to all requests by Tenant for consent to Tenant-Made Alterations within seven (7) days of receipt of a request describing in reasonable detail the proposed Tenant-Made Alteration.  If Landlord fails to respond within such seven (7) day period, Tenant may deliver a second request with a conspicuous notice that failure to respond will result in a deemed approval, and if Landlord does not respond to the second request within five (5) days, Landlord shall be deemed to have approved Tenant's request.  In the event that Tenant performs a Tenant-Made Alteration without Landlord's prior consent and it is determined that Landlord's consent was required under the terms of this Section, Landlord shall evaluate the completed Tenant-Made Alteration and give or withhold its

Confidential January 2016

consent as described above in this Section.  If Landlord withholds its consent, Landlord, as its sole remedy, may require that Tenant commence removal of Tenant-Made Alteration within ninety (90) days after receipt of Landlord's disapproval and pursue such removal until it is complete but in no event more than one hundred twenty (120) days after receipt of Landlord's disapproval.  All Tenant-Made Alterations shall be constructed in a good and workmanlike manner.  At Tenant's request, Landlord shall obtain any approvals of Tenant-Made Alterations required under any title matters affecting the Premises.  Landlord may, at Landlord's expense, monitor construction of those Tenant-Made Alterations which require Landlord's approval.  At the completion of any Tenant-Made Alterations, Tenant shall deliver to Landlord final lien waivers from all contractors and subcontractors who did work on or supplied materials that cost in excess of $50,000 for such Tenant-Made Alterations.  At the time Landlord consents to a Tenant-Made Alteration (or within ten (10) Business Days after a request by Tenant if a Tenant-Made Alteration is not one for which consent is required), Landlord shall notify Tenant whether Tenant shall be required to remove such Tenant-Made Alteration at the expiration or termination of the Lease Term, and to restore the Premises to the condition required under Section 21.  Failure of Landlord to notify Tenant that a Tenant-Made Alteration must be removed shall mean that Tenant may leave or remove Tenant-Made Alteration, at its election, provided that if Tenant removes a Tenant-Made Alteration, it shall repair any damage caused by such removal.  During the course of all alteration, additions and/or improvements to the Premises, Tenant shall post and keep posted until completion, in a conspicuous place upon the Premises, a notice of non-liability in accordance with applicable Legal Requirements.

13.     **Signs**.  Tenant may place its standard graphics and signage at the entrance to the Premises, on any monument sign(s) at entrances to the Premises, and in a prominent location on the exterior of the Building, at Tenant's sole cost and expense, subject to applicable Legal Requirements and the Permitted Exceptions.  Upon surrender or vacation of the Premises, Tenant shall remove all signs and spot repair, paint, and/or replace the Building fascia surface to which its signs are attached, at Tenant's sole cost and expense, and shall repair any damage caused by such removal.  Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments.  Landlord shall not install signs identifying Tenant anywhere on the Premises [or in the Park] without Tenant's prior consent, which Tenant may withhold in its sole and absolute discretion.

14.     **Parking**.  Tenant shall be entitled to the exclusive use of the parking areas, truck courts, and driveways depicted on **Exhibit A** (the "Parking Areas"), all of which are a part of the Premises.  Landlord shall use reasonable efforts to enforce Tenant's parking rights against third parties.

15.     **Casualty.**

(a)     Termination.  If at any time during the Lease Term any portion of the Premises the Premises or any part thereof is damaged by a fire or other casualty, Tenant shall give prompt notice thereof to Landlord.  If less than fifty percent (50%) of the Premises is damaged, Landlord shall notify Tenant within thirty (30) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises and Rent and all other amounts due from Tenant to Landlord hereunder shall abate during the period of restoration but this Lease shall not be subject to termination by either Landlord or Tenant.  If fifty percent (50%) or more of the Premises is damaged, Landlord shall notify Tenant within thirty (30) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises (the "Initial Reconstruction Notice").  If the restoration time in the Initial Reconstruction Notice is estimated to exceed one hundred and eighty (180) days following the casualty, then Tenant may elect to terminate this Lease, and if the restoration time is estimated to exceed four hundred and twenty five (425) days following the casualty either Tenant or Landlord may elect to terminate this Lease, in each case upon notice to the other party given no later than thirty (30) days after Landlord's notice.  Notwithstanding the foregoing, Tenant may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than thirty sixty (30 60) days to repair such damage.  If Landlord elects to terminate this Lease following a casualty, Tenant may, by giving written notice within thirty (30) days after Tenant's receipt of Landlord's termination notice, elect to purchase the Premises pursuant to the terms of the Purchase Option, except that the purchase price shall be reduced by the amount necessary to complete restoration of the Premises.

Confidential January 2016

(b)   Restoration.  If this Lease is not terminated pursuant to Section 15(a) above, then Landlord shall promptly restore the Premises, including all Landlord, ~~Improvements~~ Work.  If Tenant desires not to have Landlord restore any components of the Landlord Work, Tenant shall notify Landlord within thirty (30) days after Tenant's receipt of Landlord's Initial Reconstruction Notice, and the estimated time for restoration shall be reasonably adjusted by Landlord.  If Tenant notifies Landlord not to restore any components of the Landlord Work, then the insurance proceeds related to such components ~~shall be either (i) utilized for alternate improvements to the Premises as directed by Tenant (in which event, the estimated restoration date shall be adjusted to permit Landlord a reasonable time period to complete such alternate improvements), or (ii) paid to Tenant (including any amounts not utilized pursuant to the foregoing clause (i)) within thirty (30) days of demand therefor.~~ be paid to Landlord.  All construction and/or repairs made by Landlord shall be made in a manner consistent with and in accordance with all Legal Requirements and industry standards and all such damage shall be repaired in architecture and quality and with facilities and amenities of no less quality than existing prior to the damage.  Rent shall be proportionally abated from the date of such casualty to completion of restoration (and for any additional period reasonably required for Tenant's restoration of any improvements or equipment installed by Tenant) based upon the portion of the Premises affected by the casualty and any related restoration work.

(c)   Failure to Restore.  If the actual restoration is not completed within ~~thirty~~sixty (~~30~~60) days after the end of the estimated restoration period, ~~as may be adjusted as set forth in Section 15(b), but subject to extension for up to sixty (60) days due to Force Majeure (as defined below), Tenant shall have the right to terminate this Lease upon notice to Landlord. Alternatively,~~ Tenant may elect to complete the restoration of the Premises by delivering notice to Landlord, in which event, Landlord shall assign any unused insurance proceeds to Tenant and Tenant may offset any costs funded by Tenant in excess of such insurance proceeds against monthly payments of Rent (but, unless required to recover such costs prior to the end of the Lease Term, not in an amount that exceeds more than fifty percent (50%) of Base Rent in any given month) until Tenant has recovered the full amount funded by Tenant together with (i) interest equal to the greater of (x) three hundred fifty (350) basis points over the 10-year U.S. Treasury Rate at the time Tenant incurred the expenses, or (y) ~~seven~~four percent (~~7~~4%) per annum, and (ii) a commercially reasonable project management fee.

(d)   Tenant Proceeds.  Notwithstanding anything to the contrary contained in this Section 15, if this Lease is terminated in accordance with this Section 15, Landlord shall pay over to Tenant the amount of insurance proceeds attributable to all portions of the Landlord Work, Pre-Approved Alterations and any Tenant-Made Alterations, but only to the extent that Tenant paid for such Landlord Work, Pre-Approved Alterations and Tenant-Made Alterations, either through an allowance or otherwise.

(e)   Cause of Damage.  Notwithstanding anything to the contrary contained in this Section 15, if the damages are caused by the gross negligence or willful misconduct of Tenant or any of the Tenant Parties, Rent does not abate and Tenant shall pay to Landlord on demand as additional Rent any damages in excess of the amount paid by insurance proceeds received by Landlord.

16.   Condemnation.  If all of the Premises should be taken for any public or quasi-public use under any Legal Requirement, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), or if ~~any part of the Premises~~ [or the Park] ~~should be Taken and the~~a partial Taking would ~~materially~~ reduce the square footage of the Premises ~~or prevent or materially interfere with Tenant's access to or use of the Premises, then in either such case~~by more than fifty percent (50%), then upon notice by Tenant this Lease shall terminate on the effective date of such Taking and Rent shall be apportioned as of said date.  If ~~part~~less than fifty percent (50%) of the Premises shall be Taken, ~~and~~ this Lease ~~is not terminated as provided above~~shall not termination and, Landlord shall promptly, at its sole cost and expense, restore and reconstruct the Premises, and the Base Rent payable hereunder during the unexpired Lease Term shall be reduced in proportion to ~~such extent as may be fair and reasonable under the circumstances~~the square footage take.  If any Taking occurs, then Landlord and Tenant shall share in the award or other compensation for the Premises in proportion to their respective investments in the Premises and improvements so taken; provided Tenant shall receive the entire award or other compensation for Tenant's Property~~; provided, however, if Tenant is considered to own any of the improvements in accordance with Section 35(r), Tenant shall be entitled to~~ and Landlord shall receive ~~a ratable portion of the condemnation award with respect to the improvements based on the ratio of the cost of improvements owned by Tenant over the cost all improvements.~~ the entire award or other compensation for the Premises.  In no

Confidential January 2016

event shall Tenant have a claim against Landlord as a result of such Taking. In addition, Tenant may elect to separately pursue a claim against the condemnor.  Without limiting the foregoing, if the condemning authority specifically designates that a portion of the award is attributable to (a) the value of Tenant's Property or Tenant-Made Alterations, (b) Tenant's moving costs, and/or (c) Tenant's loss of business, then Landlord shall promptly pay Tenant such portion of its award that is attributable to the foregoing.  Landlord shall promptly notify Tenant of any threatened Taking known to Landlord, and shall allow Tenant to participate in negotiations with public authorities.  [**NOTE: DISCUSS APPROPRIATE CARVEOUTS FOR VALUE ADDED FOR PARTICULAR PROJECT FOR IMPROVEMENTS ADDED BY TENANT, I.E. ADDITIONAL POWER**]

17. **Assignment and Subletting**.

(a) <u>Permitted Transfers</u>.  Without Landlord's prior consent, Tenant shall not assign this Lease, sublease the Premises or any part thereof (except as expressly set forth below) or grant any license within the Premises (each of the foregoing, a "<u>Transfer</u>") to any person or entity (a "<u>Transferee</u>").  Landlord shall provide approval or disapproval of any Transfer request from Tenant within ten (10) days following receipt of the request and shall provide reasons for any disapproval.  If Landlord fails to respond within such ten (10) day period, Tenant may deliver a second request with a conspicuous notice that failure to respond will result in a deemed approval, and if Landlord does not respond to the second request within three (3) Business Days, Landlord shall be deemed to have approvedrejected Tenant's request.  Notwithstanding the above or anything contained herein to the contrary, Tenant may assign, sublease or otherwise Transfer this Lease, or grant other licenses or rights to use all or any portion of the Premises, without the consent of Landlord, to (i) any entity controlling, controlled by or under common control with Tenant, (ii) any entity resulting from the merger or consolidation of or with Tenant, or any entity controlling, controlled by or under common control with Tenant, (iii) any person or entity which acquires all (or substantially all) of the assets of Tenant, or any entity controlling, controlled by or under common control with Tenant, or (iv) any successor of Tenant, or any entity controlling, controlled by or under common control with Tenant, by reason of public offering, reorganization, dissolution, or sale of stock, membership or partnership interests or assets (each of the scenarios described in clauses (i) – (iv) above being a "<u>Tenant Affiliate</u>"), or (v) any third party doing business with Tenant or any Tenant Affiliate, including vendors, consultants, contractors, service providers or joint venture partners.  Tenant shall provide noticea copy of any assignment documenting any Transfer to Landlord., which shall expressly provide for an assumption of this Lease by Transferee. Tenant shall pay all fees and costs incurred by Landlord in the review and processing of any such request, including all reasonable attorneys' fees and costs. Upon a Transfer (other than a sublease), Tenant shall be automatically released from all obligations under this Lease.  Notwithstanding anything to the contrary contained herein, any Transferee (including a Tenant Affiliate) shall have a net worth equal to or greater than Tenant. Tenant agrees to provide all information reasonably requested regarding the Transferee to Landlord upon request.

(b) <u>Right to Pursue Transferee</u>.  If Tenant Transfers this Lease, or if the Premises are occupied in whole or in part by anyone other than Tenant, then upon and during the continuance of a default by Tenant hereunder beyond any applicable notice and cure period Landlord may collect any rent due under the terms of the relevant Transfer from any such Transferee or other occupant and apply the amount collected to the Rent payable hereunder.  No such transaction or collection of rent or application thereof by Landlord, however, shall be deemed a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

(c) <u>Landlord Transfers</u>.  The term "<u>Landlord</u>" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises to a bona fide third party purchaser and the assumption by such transferee of all of the obligations of Landlord under this Lease, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership.

(d) <u>Data Hosting Services</u>.  Tenant's provision of Co-Location Services or Data Hosting Services shall not constitute a Transfer for purposes of this Lease, and contracts entered into by Tenant with respect to the business terms of Tenant's provision of those services shall not require notice to, or consent by, Landlord. "<u>Co-Location Services</u>" means Tenant's housing a third party's telecommunications or information technology

Confidential January 2016

equipment, including switches, routers and servers, for the provision of interconnectivity to telecommunications networks or for the purpose of hosting data.  "Data Hosting Services" means Co-Location Services, except that Tenant will provide the telecommunications and information equipment.

18.   **Indemnification; Waiver**.

(a)   Tenant Indemnification Obligation.  To the extent permitted by applicable Legal Requirements, but subject to Sections 9(d) and 35(m) and except to the extent resulting from the gross negligence ~~of~~or willful misconduct of a Landlord Party ~~or a breach of this Lease by Landlord~~, Tenant agrees to indemnify, defend and hold harmless Landlord and its affiliates and its and their agents, servants, directors, officers and employees (collectively, "Landlord Indemnitees"), from and against any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) resulting from claims by third parties occasioned by (i) injuries to any person or damage to, or theft or loss of, property occurring in or about the Premises to the extent caused or alleged to be caused by the violation of law, fraud, gross negligence or willful misconduct of Tenant or of any member, partner, manager, affiliate, contractor or subcontractor of Tenant or its or their officers, directors, employees or agents, or of any invitee or licensee of Tenant (collectively with Tenant, "Tenant Parties") or (ii) any actual or alleged breach of this Lease by Tenant.  In case any action or proceeding is brought against any Landlord Indemnitee and such claim is a claim from which Tenant is obligated to indemnify Landlord Indemnitees pursuant to this Section, Tenant, upon notice from Landlord, shall resist and defend such action or proceeding with respect to that claim (by counsel reasonably satisfactory to Landlord, except such consent is not required if such defense is provided by Tenant's insurer) at Tenant's expense.

(b)   Landlord Indemnification Obligation To the extent permitted by applicable Legal Requirements, but subject to Sections 9(d) and 35(m) and except to the extent resulting from the gross negligence ~~of~~or willful misconduct of a Tenant Party or a breach of this Lease by Tenant, Landlord agrees to indemnify, defend and hold harmless Tenant and its affiliates and its and their agents, servants, directors, officers and employees (collectively, "Tenant Indemnitees"), from and against any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) resulting from claims by third parties occasioned by (i) injuries to any person or damage to, or theft or loss of, property occurring ~~in or about~~on the Premises to the extent caused ~~or alleged to be caused~~ by the violation of law, fraud, gross negligence or willful misconduct of Landlord or of any member, partner, manager, affiliate, contractor or subcontractor ~~of Landlord or its or their officers, directors, employees or agents, or of any invitee or licensee~~ of Landlord (collectively with Landlord, "Landlord Parties"), or (ii) any actual ~~or alleged~~ breach of this Lease by Landlord.  In case any action or proceeding is brought against any Tenant Indemnitee and such claim is a claim from which Landlord is obligated to indemnify Tenant Indemnitees pursuant to this Section, Landlord, upon notice from Tenant, shall resist and defend such action or proceeding with respect to that claim (by counsel reasonably satisfactory to Tenant, except such consent is not required if such defense is provided by Landlord's insurer) at Landlord's expense.

(c)   Waiver by Tenant. To the extent permitted by applicable Legal Requirements, Tenant, on its behalf and on behalf of all Tenant Parties, waives all claims (in law, equity or otherwise) against all Landlord Parties arising out of, knowingly and voluntarily assumes the risk of, and agrees that Landlord Parties are not liable to any Tenant Parties for any of the following:

(i)   any injury or damage to person or property due to the condition or design of, or any defect in, the Premises that exists now or occurs in the future, except for Landlord Party's gross negligence or willful misconduct;

(ii)   any injury or damage to person or property due to the Premises or a related improvement being out of repair, or defects in the or failure of pipes or wiring, or backing up of drains, or the bursting or leaking or pipes, faucets, and plumbing mixtures, or gas, water, steam, electricity, or oil leaking, escaping or flowing into the Premises, unless caused by any Landlord Party's gross negligence or willful misconduct;

Confidential January 2016

(iii)     any loss or damage caused by the acts or omission of any other persons, excepting only the gross negligence or willful misconduct of any Landlord Party; or

(iv)     any loss or damage to property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, insurrection, war, court order, or any other cause beyond the control of Landlord Parties

19.     **Inspection and Access**.  Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time on not less than ~~fifteen~~five (~~15~~5) Business Days' written notice to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease; provided, however, that no notice shall be required (i) in the event of an emergency, and/or (ii) with respect to any of Landlord's maintenance and repair obligations outside of the Building (e.g., landscaping, etc.) so long as such work does not result in an interruption of vehicular access.  Landlord and Landlord's representatives may enter the Premises during normal business hours on not less than ~~fifteen~~five (~~15~~5) Business Days' written notice for the purpose of showing the Premises to prospective purchasers or lenders and, during the last nine (9) months of the Lease Term (but not before any extension rights under this Lease have expired), to prospective tenants.  Notwithstanding anything to the contrary in this Lease, Tenant may, from time to time, designate secured areas of the Premises (the "Designated Secured Areas"), and Landlord expressly acknowledges and agrees that, except in the event of an emergency, Tenant may deny Landlord and any third parties access to the Designated Secure Areas.  Further, notwithstanding anything to the contrary in this Lease, Tenant may deny Landlord and any third parties access to the Premises during the Holiday Season or on days when Tenant performs "operational continuity" checks.  In connection with any entry by Landlord, Landlord's representatives, or any other party, (a) Landlord agrees that such entry shall be subject to Tenant's confidentiality requirements (including the execution of non-disclosure agreements by those entering the Premises), (b) Tenant shall have the right to deny access to the Premises to third parties if Tenant determines in its sole discretion that allowing such third party potential exposure to Tenant's proprietary and confidential information within the Premises would be detrimental to Tenant's business interests, (c) except in an emergency where necessary to prevent imminent damage to persons or property, Landlord and any other party shall enter the Premises only when accompanied by a representative of Tenant and only in compliance with Tenant's security programs and confidentiality requirements, and (d) no more than three (3) natural persons (excluding representatives of Tenant) shall be allowed per entry.  Except in connection with an emergency or Landlord's maintenance and repair obligations, any and all entry by Landlord and its representatives, or any other party, to the Premises shall be limited to one (1) time per calendar year.  Landlord shall not erect any signs on the Premises stating the Premises are available for sale or to let.  Tenant shall have the right to erect customary signs noting its relocation during the last thirty (30) days of the Lease Term, provided that Landlord has approved the location and nature of such sign in advance and provided such signage is in compliance with applicable Legal Requirements and the Permitted Exceptions.  In addition, Landlord shall require, with respect to any person that Landlord or Landlord's property manager authorizes to enter the Premises, when such person is not accompanied by an authorized employee or agent of Tenant, Landlord's property manager to perform a background check on the person with a vendor selected by Tenant, at Tenant's cost.

20.     **Quiet Enjoyment**.  So long as Tenant is not in default under this Lease beyond any applicable cure period, Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises.

21.     **Surrender**.  Upon expiration of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in good condition, broom clean except for reasonable wear and tear, casualty loss and condemnation covered by Sections 15 and 16, damage caused by any Landlord Parties, and repairs or maintenance for which Tenant is not responsible under this Lease.  Landlord specifically acknowledges that ordinary wear and tear may leave the Premises in need of painting, re-carpeting, and patching of picture hanging holes and the like, and that such work is not required of Tenant at the time of surrender of the Premises.  Any Tenant's Property not removed by Tenant within thirty (30) days after notice from Landlord shall be deemed abandoned and Tenant waives all claims against Landlord for any damages resulting from Landlord's retention and disposition of such property.  Tenant shall not be obligated to remove the Landlord Work, the Pre-Approved Alterations, any replacement thereof, or any substantially similar improvements.  Tenant's obligation

{JK~~00978037.2~~00978035.2 }16

to remove Tenant-Made Alterations shall be governed by Section 12.  All obligations of Landlord and Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including indemnity obligations, payment obligations with respect to Operating Expenses and obligations concerning the condition and repair of the Premises.

22.     **Holding Over**.  If Tenant has provided notice to Landlord at least ninety (90) days prior to the expiration of this Lease, such notice to include a time period (up to one hundred and eighty (180) days) (the "Permitted Hold-Over Period") in which Tenant intends to remain in the Premises, Tenant shall have the right to holdover possession for the Permitted Hold-Over Period under the same terms and conditions as the previous term, but Tenant may terminate the Permitted Hold-Over Period at any time upon thirty (30) days' notice to Landlord. In the event such holdover possession exceeds the Permitted Hold-Over Period or in the event of any other holdover (including following an early termination by Tenant), such possession shall be month to month at a rate of one hundred ~~fifteen~~fifty percent (~~115~~150%) of Base Rent in effect immediately prior to the holdover possession and subject to termination by Landlord or Tenant upon thirty (30) days' notice to the other party at any time.  During any holdover possession as provided herein, all of the other terms and provisions of this Lease (excluding any expansion or extension option or other similar right or option) shall be applicable during such holdover period.  All other payments shall continue under the terms of this Lease during any period of holdover possession.  In addition and subject to Section 35(m) below, if (a) Tenant has not vacated the Premises following the expiration of the Lease Term or the Permitted Hold-Over Period, as applicable, and (b) Landlord provides Tenant not less than ninety (90) days prior notice of the amount of any of the following damages that Landlord will incur as a result of Tenant's failure to vacate the Premises at the end of such ninety (90) day period, then if Tenant fails to vacate within the later to occur of (i) the expiration of the Lease Term, (ii) any Permitted Hold-Over Period, and (iii) ninety (90) days after receipt of such notice, Tenant shall be liable to Landlord for the rental revenue lost by Landlord solely as a result of the holdover (other than as a result of a termination of any executed lease for any portion of the Premises), and any amounts Landlord is required to pay to any new tenant (whether in the form of rent abatement, monetary damages, or otherwise) solely as a result of the holdover, but Tenant will not be liable for any indirect or consequential damages.  No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided herein.

23.     **Events of Default**.  Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a)     Failure to Pay First Installment of Rent.  Tenant shall fail to pay ~~any~~the first installment of Rent when due, and such failure shall continue for a period of ten (10) days after notice from Landlord to Tenant that such payment was not made when due.

(b)      Failure to Pay Subsequent Installments of Rent.  Tenant shall fail to pay any installment of Rent after the first installment of Rent when due, and such failure shall continue for a period of five (5) days after notice from Landlord to Tenant that such payment was not made when due.

(c)     Bankruptcy.  Tenant or any guarantor or surety of Tenant's obligations hereunder shall (i) make a general assignment or arrange for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "proceeding for relief"); (iii) become the subject of any proceeding for relief which is not dismissed within sixty (60) days of its filing or entry;~~ or~~ (iv) be dissolved; (v) becomes insolvent; (vi) makes a transfer in fraud of creditors; (vii) admits in writing its inability to pay its debts when due.  In the event that a guarantor or surety files a proceeding for relief, Tenant shall have the right to replace such guarantor or surety within ninety (90) days of such filing with a guarantor or surety reasonably satisfactory to Landlord.

(~~c~~d)      Insurance.  Tenant shall fail to maintain any insurance that this Lease requires Tenant to maintain.

(e)      Prohibited Assignment.  Tenant assigns this Lease or sublets any portion of the Premises in

violation of the terms of this Lease.

(f)      Other Defaults.  Tenant shall fail to comply with any provision of this Lease other than those specifically referred to above in this Section 23, and, except as otherwise expressly provided herein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant notice of such default; provided, that where any such failure cannot reasonably be cured within a thirty (30) day period, Tenant shall not be in default if Tenant commences to cure the failure within the thirty (30) day period, and thereafter diligently pursues all reasonable efforts to complete the work necessary to cure the failure but in no event shall Tenant have more than sixty (60) days to cure a default. Notwithstanding the foregoing, in the event that such thirty (30) day period occurs during the Holiday Season, Tenant shall be deemed to have commenced a cure for purposes of this Section 23(c) if, during such thirty (30) day period, Tenant schedules commencement of the cure as soon as reasonably practical following the end of such Holiday Season, but only to the extent that any such delay in commencing the cure does not pose an imminent risk of bodily injury or death or of material damage to the Premises.; provided, however, that in no event shall Tenant have more than ninety (90) days to cure a default.

24.      Landlord's Remedies.  Upon the occurrence of any Event of Default by Tenant, Landlord shall be entitled to exercise any one or more of the following remedies, without any notice to Tenant, in addition to any other remedies available to Landlord at law or in equity:

(a)      Remedy Options.  During the existence of an Event of Default, Landlord may terminate this Lease or Tenant's right of possession, (but Tenant shall remain liable as hereinafter provided) and/or pursue any other remedies at law or in equity; provided, however, Landlord may not terminate this Lease or Tenant's right of possession unless, after the occurrence of the Event of Default, Landlord delivers to Tenant notice of Landlord's intent to so terminate (which notice shall be in addition to any notice required under Section 23) and Tenant fails to cure such Event of Default within five (5) Business Days after receipt of the notice (or, in the case of an Event of Default described in Section 23(c), if Tenant fails to commence to cure within five (5) Business Days after receipt of the notice).  If Landlord re-enters the Premises, Landlord shall have the right to remove and store all of the furniture, fixtures and equipment at the Premises.

(b)      Termination of Lease.  If Landlord terminates this Lease, Landlord may recover from Tenant the sum of:  all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including brokerage fees and/or leasing commissions incurred by Landlord (provided that Tenant shall not be liable for any portion applicable to the period after the scheduled termination of this Lease); costs of removing and storing Tenant's or any other occupant's property; costs of repairing, altering, remodeling, or otherwise putting the Premises into the condition that Tenant was required to leave it in at termination of this Lease; all reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and the excess of the then present value of the Rent Tenant would have been required to pay to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease (excluding any extension periods), over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing.  Such present values shall be calculated at a discount rate of twelvesix percent (126%) per annum.

(c)      Termination of Possession.  Without terminating this Lease, Landlord may re-enter and take possession of the Premises and lock out, expel or remove Tenant and any other person occupying the Premises without liability for prosecution of any claim for losses or damages therefor and without being deemed guilty of trespass. If Landlord terminates Tenant's right to possession without terminating this Lease, Landlord shall use commercially reasonable efforts to relet the Premises; provided, however, (i) Landlord shall have the right to lease any other space controlled by Landlord first, and (ii) any proposed tenant shall meet all of Landlord's then applicable leasing criteria.  For the purpose of such reletting, Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable.  If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the Rent payable under this Lease for such period or periods, plus the cost of recovering possession of the Premises (including reasonable attorneys' fees and court cost).  If the Premises are relet and a sufficient sum shall not be realized from such

{JK00978037.200978035.2 }18

Confidential January 2016

reletting to satisfy the Rent payable under this Lease, then Tenant shall pay any such deficiency within  thirty (30) days of demand from Landlord.  Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

(d)      Possession by Landlord.  If Landlord terminates this Lease or re-enters and takes possession of the Premises without terminating this Lease, Landlord may also take possession of and remove any and all trade fixtures and personal property situated in the Premises, without liability for trespass or conversion.

(e)      Performance of Obligations. Perform on behalf of Tenant any obligations of Tenant under this Lease which Tenant has failed to perform.

(f)      Reletting of the Premises.  Any reletting of the Premises shall be on such terms and conditions as Landlord in its reasonable discretion may determine (including a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, and leasing of less than the entire Premises to any tenant). Subject to Landlord's obligation to mitigate its damages, Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of, Landlord's failure to relet the Premises or collect rent due in respect of such reletting, provided that Tenant will not be liable for any indirect or consequential damages.  Landlord shall use commercially reasonable efforts to mitigate its damages in connection with any breach by Tenant of this Lease or an Event of Default.

(g)      The remedies of Landlord hereunder shall be deemed cumulative and not exclusive of each other.

## 25.      Landlord Defaults; Tenant's Remedies.

(a)      Landlord Defaults and Tenant Remedies Generally.  Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within thirty (30) days after notice from Tenant specifying such failure; provided that where any such failure cannot reasonably be cured within a thirty (30) day period, Landlord shall not be in default if Landlord commences to cure the failure within the thirty (30) day period, and thereafter diligently pursues all reasonable efforts to complete the work necessary to cure the failure. Notwithstanding the above, Landlord acknowledges that continuous operation is critical to Tenant's business and agrees that if Landlord's failure causes material interference to Tenant's operations, Landlord shall commence its cure within such shorter period as is commercially reasonable given the nature of the failure and the interference with Tenant's operations and shall diligently prosecute the cure to completion.  If Tenant notifies Landlord that Landlord's failure or activity is causing material interference to Tenant's operations, Landlord shall respond within twenty-four forty-eight (2448) hours with a statement of Landlord's plan to address the failure or activity and the estimated time for cure, shall commence the cure as soon as possible (but in any event within forty-eight (48)three Business Days hours after Tenant's notice), and shall diligently pursue and keep Tenant informed of the progress of the cure and Landlord's failure to comply with this sentence shall constitute a default hereunder.  Notices under the preceding sentence only may be given by email (promptly followed by notice) to all of the following addresses (or other email addresses provided by either party in a notice to the other):  for Landlord: _____; for Tenant: _____ (_____@amazon.com), _____ (_____@amazon.com), (_____@amazon.com), and legal-us-realestate@amazon.com.  If Landlord is in default under this Lease, Tenant, in addition to pursuing any or all other remedies at law or in equity, shall have the right to take commercially reasonable actions to cure Landlord's default (or to cure or repair an emergency situation described above which Tenant may do without prior notice if such prior notice is not reasonably possible due to an emergency situation that threatens or interrupts Tenant's use of the Premises) and, if Landlord fails to reimburse Tenant for the reasonable costs, fees and expenses incurred by Tenant in taking such curative actions, or if Landlord fails to pay any other amount owed to Tenant under this Lease (including any tenant improvement or construction allowance or any other reimbursement), within thirty (30) days after demand therefor, accompanied by supporting evidence of the expenses incurred by Tenant where applicable, Tenant (i) shall have the right to offset such amount from Rent, or (ii) may bring an action for damages against Landlord to recover such costs, fees and expenses, together with interest thereon at the rate provided for in Section 35(j) of this Law, and reasonable attorney's fees incurred by Tenant in bringing such action for damages.  Notwithstanding anything in this Lease to the contrary, in no event shall Tenant have the right to terminate this Lease due to a Landlord default.  Notwithstanding anything in this

Confidential January 2016