# EXHIBIT 23

## PART 2

Lease to the contrary, Landlord shall not be in default of this Lease unless (i) Tenant has given notice by certified mail to any mortgagee of the Premises whose address has been furnished to Tenant, and (ii) Tenant offers such mortgagee a reasonable time to cure the default (in no event less than thirty (30) days).

(b) Interruption of Tenant's Business. If there is an interference with Tenant's normal business operations resulting from (i) an interruption of utilities or services to the Premises due to the deliberate actions, deliberate omissions or gross negligence of any Landlord Party, (ii) Landlord's breach of this Lease (regardless of whetherafter expiration of any cure period has elapsed), (iii) the activities of any Landlord Parties on the Premises, or (iv, or (iii) an interruption of access to the Premises [ or the Park] due to the deliberate actions, deliberate omissions or gross negligence of any Landlord Party, then in each such event Rent shall abate in proportion to the square footage of the Premises affected by the interference. Any such abatement shall commence as of the occurrence of the matter set forth above and shall continue until the problem is corrected; provided further that if any such event results in a continuing material interference with Tenant's normal business operations at the Premises, Tenant may terminate this Lease upon not less than thirty (30) days' prior notice to Landlord.

(c) Compliance Issues. In addition to Tenant's other rights and remedies under this Lease, if a condition is discovered or develops on the Premises [or in the Park] that would place Tenant out of compliance with, or prevent Tenant from obtaining, any license, permit or Specialized Permit related to the Permitted Uses, or is a material violation of any Environmental Requirements (as defined below), then Tenant may require Landlord to immediately remedy the same and the cost of such remedy shall be an Operating Expense to the extent allowed under Section 6 above. If Landlord fails to commence to cure such a condition within twenty-four (24) hours of notice from Tenant, then Tenant at its option may cure the same and the cost of such cure shall be paid by Landlord to Tenant within thirty (30) days of demand. Further, if such a condition is discovered or develops in the Premises [or in the Park] and has a material impact on Tenant's ability to use the Premises for the Permitted Uses or on Tenant's business operations, and if such condition cannot in Tenant's estimation be cured within twenty (20) days, then Tenant at its sole option may elect to terminate this Lease effective upon notice to Landlord.

**26. Waiver of Jury Trial**. TENANT AND LANDLORD WAIVE ANY RIGHT TO TRIAL BY JURY OR TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN LANDLORD AND TENANT ARISING OUT OF THIS LEASE OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED HERETO.

**27. Subordination**. [Landlord represents and warrants to Tenant that there is no mortgage encumbering the Premises.] [Landlord represents and warrants to Tenant that (a) the mortgage in favor of __________ dated __________ and recorded in _______________ is the only mortgage encumbering the Premises and (b) Landlord is not in default under such mortgage or any loan document related thereto and there is no event or condition that, with the giving of notice or the passage of time, or both, would constitute a default by Landlord thereunder. Concurrently with the execution of this Lease, Landlord shall deliver to Tenant a s SNDA (as defined below) executed by Landlord and the holder of such mortgage in a form as described below and otherwise acceptable to Tenant.] This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any first mortgage, hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, provided that the holder of such mortgage has executed, acknowledged and delivered to Tenant a commercially reasonable Subordination, Attornment and Non-Disturbance Agreement ("SNDA") acceptable to Tenant that provides in substantially the same form that: (a) provided no Event of Default exists, this Lease shall not be terminated, nor shall Tenant's possession of the Premises and other rights hereunder be disturbed in any proceeding to foreclose the mortgage or in any other action instituted in connection with such mortgage, (b) Tenant shall not be named as a defendant in any foreclosure action or proceeding which may be instituted by the holder of such mortgage, (c) in the event of casualty or condemnation, the holder of the mortgage agrees to make available the insurance and condemnation proceeds for the repair and restoration of the Premises by Landlord in accordance with Sections 15 and 16 of this Lease, (d) Tenant shall have the right at any time to prepay any portion or all of any allowances provided herein and (eand (d) if the holder of the mortgage or any other person acquires title to the Premises through foreclosure or otherwise, this Lease shall continue in full force and effect as a direct lease between

Tenant and the new owner, and the new owner shall assume and perform all of the terms, covenants and conditions of this Lease. Tenant agrees to execute, acknowledge and deliver any such SNDA ~~promptly~~within ten (10) days following a request therefor. Notwithstanding the foregoing, any such holder may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such holder shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such holder. The term "mortgage" whenever used in this Lease shall be deemed to include deeds of trust, security assignments and any other encumbrances, and any reference to the "holder" of a mortgage shall be deemed to include the beneficiary under a deed of trust.

**28.** **Mechanic's Liens**. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed by Tenant on the Premises and that it will save and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens with respect to such work against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate notice of the placing of any lien or encumbrance against the Premises as a result of work by Tenant and cause such lien or encumbrance to be discharged within ~~thirty~~fifteen (~~30~~15) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured over in a manner satisfactory to Landlord within such ~~thirty~~fifteen (~~30~~15) day period.

**29.** **Estoppel Certificates**. Tenant and Landlord agree, from time to time, but not more often than one (1) time in any calendar year, within twenty (20) days after request of the other that is delivered pursuant to Section 35(c), to execute and deliver to each other, any prospective purchaser, or any lender for the Premises, an estoppel certificate in the form attached hereto as **Exhibit D**, with any appropriate exceptions to the statements therein. Tenant acknowledges that a purchaser or lender may rely upon the truth of the matters set forth in any such estoppel certificate. The parties acknowledge that an estoppel certificate does not constitute an independent contractual undertaking or constitute representations, warranties or covenants or otherwise have legal effect (except as an estoppel from asserting any contrary fact or claim as that set forth in such certificate), or modify in any way, Tenant's relationship, obligations or rights vis-à-vis Landlord.

**30.** **Environmental Requirements**.

(a) Hazardous Materials Generally. Except for Hazardous Materials used by Tenant for ordinary cleaning, office and warehouse or data center maintenance purposes, materials used on minor maintenance of Tenant's machinery, and fuel for any generators (all of which shall be handled by Tenant in compliance with all Environmental Requirements), Tenant shall not permit any Hazardous Material upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Material in or about the Premises without Landlord's prior consent, which consent may be withheld in Landlord's sole discretion. Tenant, at its sole cost and expense, shall operate its business in the Premises in compliance with all Environmental Requirements and shall remediate in a manner required by Environmental Requirements any Hazardous Materials brought onto the Premises by any Tenant Parties in violation of Environmental Requirements. The term "Environmental Requirements" means all present and future Legal Requirements relating to environmental conditions on, under, or emanating from the Premises or the environment, including the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; all state and local counterparts thereto; and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or contaminant listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

(b) Landlord Representations. Landlord represents and warrants that except for information contained in the ______________ Report dated ___________ and prepared by _______________ ("Phase I"), to Landlord's current, actual knowledge after reasonablewithout independent investigation or inquiry, (1) the [Park, the ]Land and the Premises are free from Hazardous Materials and significant mold and there are no environmental conditions affecting the Land or Premises in violation of Environmental Requirements, (2) there is no asbestos or asbestos-containing materials in the Premises, (3) there are no environmental reports or studies related to the Premises [ or Park] other than the Phase I, (4) there areis no past, present or threatened release, disposal, discharge, dispersal or emission of Hazardous Material at, in, on, or under or emanating to or from the Premises, (5) there are no, and have never been, any underground storage tanks or wells at the Premises, and (6) Landlord has provided Tenant copies of all written notices within its possession or control (i) from governmental entities in connection with the environmental condition of the Premises, and (ii) related to actual or threatened administrative or judicial proceedings in connection with the environmental condition of the Premises. Landlord represents and warrants that it has conducted all "appropriate inquiry", as that term is defined by 42 USC 9601(40), prior to the purchase of the Premises and has otherwise satisfied the conditions set forth in 42 USC 9601(40), as applicable.

(c) Tenant Indemnification Obligation. Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses, claims, demands, actions, suits, fines, penalties, liabilities, damages (including punitive damages and natural resource damages), costs and expenses (including remediation, removal, repair, corrective action, or cleanup expenses, reasonable attorneys' fees, consultant fees or expert witness fees) which are brought or recoverable against, or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Section 30 by any Tenant Party, regardless of whether Tenant had knowledge of such noncompliance.

(d) Landlord Remediation. Landlord shall at Landlord's own cost and expense comply with, and cause the Premises [and the Park] to comply with, all Environmental Requirements during the Lease Term except to the extent Tenant is required to do so under this Section 30 above. Without limiting the foregoing, Landlord shall, at its sole expense, promptly and diligently (i) investigate, remove, monitor, mitigate and/or remediate (or, at Tenant's election, reimburse Tenant for removal or remediation costs for) any and all Hazardous Materials located in, on and under the Premises [and the Park] (other than those for which Tenant is responsible under this Section 30) as may be required pursuant to Environmental Requirements, or as may be required for the health or safety of Tenant's employees, and (ii) obtain, maintain, and comply with any and all environmental permits required with respect to the Premises [and the Park] under applicable Environmental Requirements, (except for such permits specifically required in connection with Tenant's operations). Landlord shall indemnify, defend and hold Tenant harmless from and against any and all losses, claims, demands, actions, suits, fines, penalties, liabilities, damages (including punitive damages and natural resource damages), costs and expenses (including investigation, remediation, removal, repair, corrective action, or cleanup expenses, reasonable attorneys' fees, consultant fees or expert witness fees) which are brought or recoverable against, or incurred by Tenant arising from (i) any environmental condition existing prior to Tenant's occupancy of the Premises in violation of Environmental Requirements, or (ii) the release of Hazardous Materials by or any Landlord Parties affecting the Premises and in violation of Environmental Requirements.

(e) Mitigation of Hazardous Materials. If Hazardous Materials are hereafter discovered on the Premises, or Tenant believes that any Hazardous Materials are located in, under, on or about the Premises in violation of any Environmental Requirements, Tenant shall promptly give Landlord notice thereof. Within thirty (30) days after notification from Tenant, Landlord shall diligently conduct its own investigation to confirm such presence or release of Hazardous Materials in violation of Environmental Requirements, and Landlord shall commence to mitigate such Hazardous Materials to the extent Landlord is required by the Environmental Requirements within sixty (60) days after notification from Tenant and thereafter diligently prosecute such mitigation to completion. If Landlord commences mitigation pursuant to this paragraph, the Base Rent shall be equitably adjusted if and to the extent and during the period the Premises are unsuitable for Tenant's business.

(f) Survival. The obligations of Landlord and Tenant under this Section 30 shall survive termination or expiration of this Lease.

**31. Security Service**. Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises by any third party or any other breach of security with respect to the Premises, except to the extent such entry or breach of security is caused by the gross negligence or willful misconduct of any Landlord Party~~ or a breach of this Lease by Landlord~~.

**32. Force Majeure**. Neither party shall be held responsible for delays in the performance of its obligations hereunder when caused by industry wide strikes, industry-wide lockouts or labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor that could not reasonably have been anticipated, governmental restrictions, regulations, or controls, delay in issuance of permits beyond time periods typical for the area, enemy or hostile governmental action, civil commotion, fire or other casualty, any of which (a) could not reasonably have been anticipated by such party, (b) are beyond the reasonable control of such party and (c) by the exercise of due diligence, such party is unable, wholly or in part, to prevent or overcome ("Force Majeure"), provided that this shall not apply~~ (i)~~ to excuse any failure of either party to comply with any monetary obligations hereunder~~, (ii) to delay the date on which Tenant is entitled to exercise self help rights or receive rent abatement, or (iii) only to the extent provided in Section 15 of this Lease, to delay the date on which Tenant is permitted to terminate this Lease or exercise other rights following a casualty~~. In addition, the parties acknowledge that extension of some of the deadlines in Section 1 and elsewhere in this Lease for Force Majeure is limited as set forth in such sections.

**33. Entire Agreement**. This Lease, including its accompanying addenda and exhibits and any non-disclosure agreement between Landlord and Tenant (or any of their affiliates) (collectively, the "Lease Documents"), constitute the complete agreement of Landlord and Tenant with respect to the subject matter hereof. All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control; provided, however, that in the event of any conflict between **Exhibit K** and the terms of this Lease, the terms of this Lease shall control. Any capitalized terms used but not defined in any exhibit or addenda to this Lease shall have the same meaning ascribed to such term in the body of this Lease. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained in the Lease Documents, and any prior agreements, promises, negotiations, or representations are superseded by the Lease Documents. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

**34. Brokers**. Each party represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth in the "CERTAIN TERMS AND DEFINITIONS" at the beginning of this Lease, whom Landlord agrees to compensate per separate agreement (a copy of which will be provided by Landlord to Tenant), and each party agrees to indemnify and hold the other harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with the other party with regard to this leasing transaction.

**35. Miscellaneous**.

(a) If any clause or provision of this Lease is determined to be illegal, invalid or unenforceable under present or future Legal Requirements, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(b) If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant. If and when

included within the term "Landlord," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Landlord.

(c) All notices, approvals, consents, requests or demands required or permitted to be given or served by either party to this Lease shall be in writing (unless otherwise expressly set forth herein to the contrary) and shall be delivered: (i) personally, (ii) by depositing with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, (iii) by a nationally recognized overnight delivery service providing proof of delivery, or (iv) by email or facsimile delivery provided for delivery pursuant to this clause (iv) a copy is also sent pursuant to either clause (i), (ii) or (iii) above, and in all such events, properly addressed to the addresses set forth on the signature pages to this Lease. A copy of any such notice, approval, consent, request or demand made to Tenant shall also be sent to global-lease-abstraction@amazon.com, legal-us-realestate@amazon.com, and NADC-Rent@amazon.com. Either party may by notice given aforesaid change its address for all subsequent notices. Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or when delivery is refused.

(d) Except as otherwise provided in this Lease, neither Landlord nor Tenant shall ~~not~~ unreasonably withhold, condition, or delay any consent or approval to be given pursuant to this Lease.

(e) Any law, usage, or custom to the contrary notwithstanding, each party shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of either party at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same, or a waiver by either party to enforce its rights pursuant to this Lease or at law or in equity, shall not be a waiver of such party's right to enforce one or more of its rights in connection with any subsequent default. A receipt by either party of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by either party of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by such party.

(f) Concurrently with the execution of this Lease, Landlord, at ~~its~~Tenant's expense, ~~shall~~may execute and promptly record a memorandum of lease in the form of **Exhibit E** hereto.

(g) The submission by Landlord or Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution and delivery of this Lease by both parties.

(h) Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease. The words "includes" or "including" are used in this Lease to provide information that is illustrative or exemplary, and not exclusive or exhaustive.

(i) Landlord and Tenant each acknowledge that it has had the opportunity to review this Lease with legal counsel of its choice, and there will be no presumption that ambiguities will be construed or interpreted against the drafter.

(j) Any amount owing by either party pursuant to this Lease which is not paid within five (5) Business Days after receipt of notice that such amount is past due shall bear interest from such due date until paid in full at the lesser of the highest rate permitted by applicable Legal Requirements or twelve percent (12%) per year; provided that no interest shall be due until the third such event in any three hundred and sixty-five (365) day period. If any applicable Legal Requirement is ever judicially interpreted so as to render usurious any interest called for under this Lease, or contracted for, charged, taken, reserved, or received with respect to this Lease, then it is Landlord's and Tenant's express intent that all excess amounts theretofore collected be credited on the applicable obligation (or, if the obligation has been or would thereby be paid in full, refunded to the applicable party), and the

provisions of this Lease immediately shall be deemed reformed and the amounts thereafter collectible hereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable Legal Requirements, but so as to permit the recovery of the fullest amount otherwise called for hereunder.

(k) Construction and interpretation of this Lease shall be governed by the Legal Requirements of the state in which the Premises are located, excluding any principles of conflicts of laws.

(l) Subject to Section 32 of this Lease, time is of the essence as to the performance of each party's obligations under this Lease.

(m) Neither Landlord nor Tenant shall be liable to the other for consequential damages, such as lost profits or interruption of either party's business~~, except that this sentence shall not apply to Landlord's breach of its confidentiality obligations under this Lease~~. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises and to the rents and proceeds therefrom (including insurance proceeds), and in no event shall any recourse be had to any other property or assets of Landlord or against any Landlord Party.

(n) "Business Day" means any day that is not a Saturday, Sunday, or federal holiday.

(o) Landlord or Tenant may deliver executed signature pages to this Lease by electronic means to the other party, and the electronic copy shall be deemed to be effective as an original. This Lease may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

(p) Each party represents to the other that it has the full right and authority to bind itself without the consent or approval of any other person or entity and that it has full power, capacity, authority and legal right to execute and deliver this Lease and to perform all of its obligations hereunder.

(q) It is the express intention of both Landlord and Tenant that this Lease (including its accompanying addenda and exhibits) be considered a lease between Landlord and Tenant for all purposes, including federal and state tax purposes. Nothing in this Lease (including its accompanying addenda and exhibits) shall be construed as creating a joint venture, partnership, tenancy-in-common, joint tenancy, financing, agency, or any relationship other than a landlord-tenant relationship between Landlord and Tenant, express or implied, including for federal and state tax purposes. Landlord and Tenant shall treat this Lease (including its accompanying addenda and exhibits) as a lease in their separate books and records and in any reports to any third party.

(r) For federal tax purposes, the parties intend that Tenant will not be treated as recognizing gross income as a result of receiving any allowance from Landlord to the maximum extent permitted under applicable Legal Requirement. Consistent therewith, it is the express intention of both Landlord and Tenant that any "qualified lessee construction allowance" (as defined in section 110 of the Internal Revenue Code of 1986, as amended, and the Treasury regulations thereunder (the "section 110 rules")) shall qualify for the benefits accorded such allowances under the section 110 rules. Landlord and Tenant intend that any amount that is received in cash by Tenant from Landlord (or that is treated as a rent reduction) is, unless Landlord and Tenant otherwise agree in writing, for the purpose of constructing or improving "qualified long-term real property" (as defined in the section 110 rules) for use in Tenant's trade or business at the "retail space" (as defined in the section 110 rules), which constitutes the Premises subject to this Lease. With respect to any "qualified lessee construction allowance" (as defined in the section 110 rules), Landlord and Tenant shall comply with the section 110 rules, including the expenditure, consistent treatment, and information reporting rules under Treasury regulations section 1.110-1(b)(4), (5) and -1(c). In addition, the parties agree that Landlord will be treated for all purposes, including tax purposes, as the owner of any improvements that were paid for with, or reimbursed by, an allowance and Tenant will be treated for all purposes, including tax purposes, as the owner of any improvements to the extent that the cost for such improvements exceeds any allowance provided by Landlord or that were otherwise paid for by Tenant. Unless required to adopt a contrary position as a result of an administrative or judicial proceeding, the parties agree to file all federal income tax returns in a manner consistent with, and to take no action inconsistent with, the intentions set

forth in this paragraph. The parties will provide each other with such cooperation as is reasonably necessary to implement the intentions of this paragraph.

(s) If, as a result of any default by Tenant in its performance of any of the provisions of this Lease, Landlord uses the services of an attorney in order to secure compliance with such provisions or recover damages therefor, or to terminate this Lease or evict Tenant, whether or not a lawsuit is commenced by Landlord for purpose(s), Tenant shall reimburse Landlord upon demand for any and all attorneys' fees and expenses so incurred by Landlord.

**36. Confidentiality**. No Landlord Party shall make public announcements regarding Tenant's proposed or actual occupancy of the Premises without Tenant's prior consent, ~~which Tenant may withhold in its sole and absolute discretion,~~ and Landlord shall instruct its brokers, developers, contractors, subcontractors, agents and consultants to not make or issue any public announcement regarding Tenant's proposed or actual occupancy of the Premises. In addition, all information specifically labeled as "confidential" or that would reasonably be presumed to be confidential, including this Lease, all nonpublic information relating to Tenant's technology, operations, customers, business plans, promotional and marketing activities, finances and other business affairs ("Confidential Information"), that is learned by or disclosed to any Landlord Parties with respect to Tenant's business in connection with this leasing transaction shall be kept strictly confidential by such Landlord Parties and shall not be used (except for Landlord's confidential internal purposes or as otherwise required by applicable Legal Requirements) or disclosed to others by Landlord, or any other Landlord's Parties, without the express prior consent of Tenant, which Tenant may withhold in its sole and absolute discretion. The provisions of this Section shall survive the expiration or termination of this Lease and shall continue to bind Landlord after Landlord's conveyance of the Premises or any portion thereof.

**37. Rooftop Equipment; Telecommunications Carriers**.

(a) Rooftop Equipment. Subject to Landlord's approval of the plans and specifications related thereto, and subject to any Legal Requirements, Landlord shall permit Tenant to install and maintain at Tenant's sole expense one or more satellite dishes, cellular antennae, solar panels and related equipment (each "Rooftop Equipment") on the roof of the Building, on the ground near the Building, and on a canopy which Tenant may install over any parking areas, all in locations mutually acceptable to Landlord and Tenant. Tenant shall at all times own the Rooftop Equipment. Landlord makes no warranties or representations to Tenant as to the permissibility of Rooftop Equipment on the Building under applicable Legal Requirements. Tenant shall be permitted to erect and maintain Rooftop Equipment during the Lease Term. If installation of Rooftop Equipment requires any roof penetrations, Tenant shall use a contractor approved by Landlord and shall cause such work to be done in a manner that will preserve any roof warranty held by Landlord. Upon the expiration or earlier termination of this Lease, Tenant, at its sole cost and expense, shall remove any Rooftop Equipment and restore the point of attachment to a clean, sealed condition~~.~~ and repair any other damage to the roof. Tenant shall obtain and maintain insurance on the Rooftop Equipment during the Lease Term in customary amounts. Tenant shall have the exclusive right to use the roof. Landlord shall have no obligations whatsoever with regard to the Rooftop Equipment. Tenant agrees to indemnify, defend and hold harmless Landlord from any claims arising out of or relating to the Rooftop Equipment

(b) Tenant's Carriers. Landlord shall, at no additional cost to or restrictions on Tenant and its telecommunications services providers ("Carriers"), allow Tenant and its Carriers to access the Premises for purposes of installing, testing, monitoring and maintaining telephone and network connectivity to the Premises. Such activities may include, but are not limited to (i) allowing each of Tenant's Carriers to install a fiber distribution panel within the Building for purposes of providing connectivity to the Premises; (ii) granting Tenant's Carriers access to and use of telecommunications ducts, risers, closets, and conduits serving the Building and the Premises; (iii) allowing Tenant and its Carriers to install, monitor, and maintain equipment within the Building for purposes of providing, receiving and monitoring telephone and network connectivity to the Premises; and (iv) allowing Tenant and its Carriers to bring additional fiber optic lines to the Premises (including establishing one or more additional pathways to the Building). Landlord acknowledges that such activities may include installing underground or overhead conduit, cabling, fiber, and other telecommunications lines on the Premises and the removal and replacement of curbing pavement and sidewalks. Landlord shall execute any easement, right of entry agreement, or

similar agreement reasonably requested by any of Tenant's Carriers in connection with the provision of telecommunications services to the Premises by such Carrier.

**38. Generator**. Tenant, at Tenant's sole cost and expense, may install and maintain one or more backup electrical generators and fuel tanks in or adjacent to the Building in a location acceptable to Landlord (collectively, the "Generator"). The Generator and Generator pads shall be constructed in accordance with plans and specifications approved in advance by Landlord, which plans shall include fencing and such curbing as is necessary to contain any fuel spill. Tenant shall be responsible for maintenance and repair of the Generator. The Generator shall be used only for backup power, and may not be used as a primary power source. Tenant shall have the right, at its sole cost and expense, to test the Generator from time to time. So long as the Generator and fuel tanks are in good working order and free from leaks or other defects upon expiration or earlier termination of this Lease, Tenant shall have the right to leave the Generator and all associated tanks and equipment on the Premises and shall have no obligation to remove the Generator or any Generator pad. Tenant may elect to remove the Generator but shall not be obligated to remove any Generator pad.

**39. Tenant's Property; Waiver of Landlord's Lien**. Tenant's property, racking, shelves, fixtures, Rooftop Equipment, Generator, Warehouse HVAC Equipment, furnishings, equipment, furniture, accounts receivable, inventory or other personal property ("Tenant's Property"), however installed or located on the Premises, shall be and remain the property of Tenant and may be installed, modified, and removed at any time and from time to time during the Lease Term without Landlord's consent. In no event (including a default under this Lease) shall Landlord have any lien or other security interest in any of Tenant's Property located in the Premises or elsewhere, and Landlord hereby expressly waives and releases any lien or other security interest however created or arising. Landlord shall, at Tenant's request and cost, execute a reasonable lien waiver and access agreement requested by a reputable institutional lender providing financing for Tenant's Property so long as such party agrees (a) to provide Landlord with at least five (5) days' prior notice before exercising any remedy to remove Tenant's Property, (b) to allow a representative of Landlord to be present during the exercise of any such remedy, (c) to repair and restore any damage caused by the removal of Tenant's Property, (d) to carry at least the same level of insurance as required of Tenant during any time that such third party is on the Premises, (e) to indemnify, defend and hold harmless Landlord from any claims arising out of or relating to the financing party's exercise of its rights, and (f) there will be no private or public auctions conducted at the Premises.

**40. Code of Conduct.** Landlord acknowledges Tenant's Code of Business Conduct and Ethics posted at http://phx.corporate-ir net/phoenix.zhtml?c=97664&p=irol-govConduct (the "Code") prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector. Landlord represents and warrants that neither it nor any employee, agent or other person acting on its behalf will:

(a) undertake, cause, or permit any act which would violate any applicable anti-corruption law, including the U.S. Foreign Corrupt Practices Act, and the UK Bribery Act, or

(b) make, cause, or permit any offer, promise, or payment of money or any other thing of value to any third party, directly or indirectly, to improperly influence the actions of any person, or to obtain any improper advantage in favor of Tenant in connection with any services provided by Landlord under this Lease.

Landlord will report promptly to Tenant all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with any activities performed by Landlord pursuant to this Lease. Landlord will fully assist and cooperate with any investigation of actual or suspected breach of this Section. Tenant may immediately terminate or suspend performance under this Lease if Landlord breaches this Section.

**41. Option to Extend**. Tenant shall have options to extend this Lease as provided for in Addendum 3.

**42. Right of First Offer/Right of First Refusal**. During the Lease Term, Tenant shall have a right of first offer and a right of first refusal to purchase the Premises in accordance with **Exhibits F** and **F-1**.

**43. Purchase Option**. Tenant shall have a Purchase Option in accordance with **Exhibit G** hereto.

**44. Economic Development Contingency; Credits and Incentives**.

(a) See the contingency in Addendum 2.

(b) Each party acknowledges that Tenant and/or Landlord may negotiate, is negotiating or has negotiated with state and local authorities (collectively the "Taxing Authorities") for the provision of certain economic development incentives, including the creation of an enterprise zone, tax increment financing, tax abatements, industrial revenue bonds, and/or other types of abatements and credits (collectively, the "Economic Development Incentives"), in connection with the construction and use of and operation at the Premises. Landlord shall, at no expense or liability to Landlord, cooperate with Tenant in obtaining, qualifying for, documenting, and upon Tenant's request from time to time, amending or modifying the Economic Development Incentives, including Landlord's cooperation in Tenant's filing such applications and reports and entering into such agreements or other documentation with the Taxing Authorities as Tenant may reasonably request in order to implement, obtain, and maintain the Economic Development Incentives. It is understood and agreed that all costs and expenses payable by either Landlord or Tenant under the Economic Development Incentives or any other agreement related to the Incentives, other than nominal administrative costs associated with Landlord's satisfaction of reporting requirements, shall be the sole obligation of Tenant.

(c) Upon request of Tenant, Landlord shall provide the costs and expenses incurred by Landlord in connection with the construction or operation of the Premises, if known, in such manner and in such detail as may be reasonably requested by Tenant and the Taxing Authorities in order to obtain and maintain the Economic Development Incentives; provided, however, that Landlord shall not be required to incur any additional expense on account thereof. Such documentation shall only be for the purpose of obtaining the Economic Development Incentives and shall not be binding upon any other parties, including any lender of Landlord. Tenant, and not Landlord, shall be responsible for all reporting obligations required in connection with the Economic Development Incentives.

(d) All Economic Development Incentives are for the benefit of Tenant and such Economic Development Incentives shall be passed through by Landlord to Tenant in a manner reasonably acceptable to Tenant, Landlord, and the Taxing Authorities so that, to the maximum extent possible, Tenant is placed in the same financial position as if it were to receive such Economic Development Incentives directly.

(e) Landlord agrees not to alter, modify or terminate the Economic Development Incentives without the prior consent of Tenant and agrees to follow Tenant's reasonable written instructions as to the implementation and use of the Economic Development Incentives; provided, however, that all reasonable costs incurred by Landlord in connection with the following of Tenant's instructions or otherwise in connection with obtaining and implementing the Economic Development Incentives shall be paid for by Tenant.

**45. Guaranty.** Amazon.com, Inc. ("Tenant Guarantor") has provided a limited guaranty for Tenant's payment in the form attached hereto as **Exhibit H**. ~~[DISCUSS WHETHER LANDLORD GUARANTOR IS REQUIRED]~~

[redacted]

**47. Contingencies**. ~~Tenant may, at its option, terminate the lease by giving Landlord written notice by ________________ if the~~The following contingencies ~~have not been~~must be satisfied (the "Contingencies"):

[Identify any contingencies, for example: receipt of generator permits, receipt of commitment for increased power, economic development incentives, approval or estoppel under any CCR]

If Tenant fails to timely exercise its termination right, then Tenant will have no further right to terminate this Lease pursuant to this Section 47. Landlord will cooperate with Tenant in Tenant's efforts to satisfy the Contingencies.

**48. Anti-Sanction.** [For International Transactions] Seller represents and warrants that the Seller and its financial institution(s) are is not subject to sanctions or otherwise designated on any list of prohibited or restricted parties or owned or controlled by such a party, including but not limited to the lists maintained by the United Nations Security Council, the US Government (e.g., the US Department of Treasury's Specially Designated Nationals list and Foreign Sanctions Evaders list and the US Department of Commerce's Entity List), the European Union or its member states, or other applicable government authority.

<SIGNATURES ON NEXT PAGE>

IN WITNESS WHEREOF, Landlord and Tenant have executed this Lease as of the dates set forth below.

**LANDLORD:**

______________________________

By: ______________________________
Name: ______________________________
Title: ______________________________
Date Signed: ______________________________

Address:

1999 Broadway, Suite 770
Denver, Colorado 80202

With a copy to:

Jones & Keller P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Attn: Kerri P. Assell, Esq.

<Verify if and when notice is required under any SNDA>

**TENANT:**

______________________________

By: ______________________________
Name: ______________________________
Title: ______________________________
Date Signed: ______________________________

Address:
c/o Amazon.com, Inc.
Attention: Real Estate Manager (AWS)
410 Terry Ave. N
Seattle, WA 98109-5210

With copy to:
c/o Amazon.com, Inc.
Attention: General Counsel (Real Estate)
410 Terry Ave. N
Seattle, WA 98109-5210

{JK~~00978037.2~~00978035.2 }31

Confidential January 2016

<Confirm with local counsel if lease needs to be notarized>

STATE OF___________________________________

COUNTY OF_________________________________

Before me, the subscribers, a notary public in and for said county, personally appeared ________________, the _______________________ of ___________________________, the Landlord in the foregoing instrument who acknowledged the signing of the foregoing instrument to be his free act and deed on behalf of the Landlord for the uses and purposes set forth therein.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed my official seal on the ______ day of _________________, ______.

________________________________________

NOTARY PUBLIC, STATE OF______________

____________________________________

____________________________________

____________________________________

ADDENDUM 1

BASE NNN RENT

| Time Period | Base Rent Per Rentable Square Foot | Monthly Base Rent |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The first increase in Base Rent [(the "Base Rent Escalation")] shall occur twelve (12) months from the Commencement Date[, provided that if Base Rent is abated as set forth above, then the Base Rent Escalation shall occur twelve (12) months from the date that Tenant is first obligated to pay Base Rent], and subsequent increases shall occur every twelve (12) months thereafter.

[For purposes hereof, (a) the Base Rent abatement set forth herein shall commence on the Commencement Date and end on the day immediately preceding the ___-month anniversary of the Commencement Date, (b) Tenant's obligation to pay Base Rent shall commence on the ___-month anniversary of the Commencement Date, and (c) any partial month following the date upon which Tenant's obligation to pay Base Rent commences shall be prorated.]

[Note: Specify whether abatement applies to both Base Rent and Operating Expenses.]

ADDENDUM 2

CONTINGENCY FOR ECONOMIC DEVELOPMENT CREDITS AND INCENTIVES

This Lease is contingent upon Tenant receiving County and State economic development credits and incentives for location of Tenant's business in the Premises, all on terms and conditions satisfactory to Tenant, in its sole and absolute discretion (the "Contingency"); provided notwithstanding anything to the contrary in this sentence, this Lease shall be effective upon the date of full execution of this Lease. In the event the Contingency is not met within ninety (90) days after the full execution of this Lease, Tenant may elect, in its sole and absolute discretion, to terminate this Lease by delivery of notice to Landlord not later than ninety (90) days after the full execution of this Lease (the "Contingency Date"), together with a termination fee in an amount equal to all costs and expenses incurred by Landlord after Landlord's execution of this Lease in connection with the Lease, including without limitation the Landlord Work, attorneys' fees, consultant fees, and any other third party fees as of the date of Landlord's receipt of such notice, such amount not to exceed $_____________ (the "Termination Fee"), in which case this Lease shall expire fifteen (15) days after the date of delivery of Tenant's notice and the Termination Fee as by natural expiration of the Lease Term. Such early expiration will not release Tenant from liabilities or obligations expressly stated to survive the termination of this Lease. If Tenant fails to timely deliver such notice and the Termination Fee on or before the Contingency Date, time being of the essence, Tenant shall have no further right to terminate this Lease pursuant to this Addendum 2. Furthermore, Landlord covenant, to the extent required by the governmental entity conducting the tax incentives program (the "Agency"), to cooperate with both Tenant and the Agency as is reasonably necessary for Tenant to receive the financial incentives described herein, including entering into a direct contractual agreement with the Agency, as approved by Landlord, and timely executing and delivering reports and other performance reasonably required by the Agency.

Notwithstanding the foregoing, in the event that Tenant receives written confirmation from the Agency that the Contingency has been met, then Tenant shall promptly notify Landlord that it waives its right to terminate this Lease as provided herein whereby Tenant shall have no further right to terminate this Lease pursuant to this Addendum 2.

No broker's commissions shall be earned or payable until after the Contingency has been met or waived by Tenant.

ADDENDUM 3

EXTENSION OPTIONS

(a) Tenant (or any permitted Transferee) shall have the right to extend the Lease Term for _____ additional term(s) of ___ years each (each an "Extension Term") commencing on the day following the expiration of the Lease Term or the applicable Extension Term, as the case may be (each a "Commencement Date of the Extension Term"). Tenant shall give Landlord notice (the "Extension Notice") of its election to extend the Lease Term (as it may have been extended pursuant to the terms herein) at least two hundred and seventy (270) days prior to the scheduled expiration date of the Lease Term or applicable Extension Term.

(b) The Base Rent payable by Tenant to Landlord during the applicable Extension Term shall be ____________ percent (__%) of the then prevailing market rate for new leases for comparable space in comparable buildings in the vicinity of the Premises and shall include any tenant improvement allowance determined to be consistent with the prevailing market rate ("Fair Market Rent"). Fair Market Rent shall be adjusted to take into account the size of the Premises, the length of the extension term, and the credit of Tenant (except that, so long as Tenant is a wholly owned subsidiary of Amazon.com, Inc. or its successor or of a subsidiary or sister company of Amazon.com, Inc. or its successor, the credit of Amazon.com, Inc. or its successor shall be taken into account rather than the credit of Tenant), but shall be calculated without taking into account any increased electric service or capacity to the Premises obtained by or for Tenant, any mezzanine installed in the Premises, or any improvements to the Premises installed after the Commencement Date by Tenant or by Landlord for Tenant. Fair Market Rent shall reflect all monetary and non-monetary concessions being granted to tenants for comparable transactions, including brokerage commissions, improvements performed by landlords and tenant improvements allowances, moving allowances, and rent concessions.

(c) Landlord shall notify Tenant of its determination of the Fair Market Rent (consistent with the methodology reflected in the definition above) and of the deadline for Tenant's Extension Notice for the applicable Extension Term no earlier than four hundred and twenty-five (425) days and no later than three hundred and sixty-five (365) days prior to the scheduled expiration date of the Lease Term or the then-current Extension Term. If Tenant disagrees with Landlord's determination of the Fair Market Rent, Landlord and Tenant shall confer for a period of thirty (30) days in an attempt to agree on the Fair Market Rent. In the event Landlord and Tenant fail to reach an agreement on such rental rate within such thirty (30) day period, then the Fair Market Rent that will be used in computing Base Rent for the applicable Extension Term shall be determined as follows: Within five (5) days after the expiration of the thirty (30) day period described above, Landlord and Tenant shall each select an appraiser with at least ten (10) years' experience in the market in which the Premises are located. If the two appraisers are unable to agree on the Fair Market Rent within ten (10) days after their selection, they shall select a similarly qualified third appraiser (the "Neutral Appraiser"). Within twenty (20) days after selection of the Neutral Appraiser, the three appraisers shall simultaneously exchange determinations of the Fair Market Rent. If the lowest appraisal is not less than ninety percent (90%) of the highest appraisal, then the three appraisals shall be averaged and the result shall be the Fair Market Rent. If the lowest appraisal is less than ninety percent (90%) of the highest appraisal, then the Fair Market Rent shall be deemed the rate set forth in the appraisal submitted by an appraiser appointed by a party that is closest in dollar amount to the appraisal submitted by the Neutral Appraiser. If the Fair Market Rent has not been determined on or before the date that is thirty (30) days prior to the deadline for Tenant to deliver its extension notice for the applicable Extension Term, the Extension Notice deadline shall be extended so that Tenant has thirty (30) days after the determination of Fair Market Rent in which to deliver such notice. Each party shall pay the cost of its own appraiser and the parties shall share the cost of the Neutral Appraiser equally.

(d) Tenant shall continue to pay Landlord as set forth in the Lease for Operating Expenses during the applicable Extension Term, subject to the cap on increases in Controllable Operating Expenses set forth in the Lease.

(e) Except for the Base Rent as determined above, Tenant's occupancy of the Premises during the applicable Extension Term shall be on the same terms and conditions as are in effect for the immediately preceding

Lease Term; provided, however, Tenant shall have no further right to any options to extend the Lease except as set forth in this Addendum 3.

(f)     If the Lease is extended for an Extension Term, then Landlord shall prepare an amendment to the Lease confirming the extension of the Lease Term and the other provisions applicable thereto and Landlord and Tenant shall execute the amendment within thirty (30) Business Days after agreement on the final form of such amendment, provided that any such extension shall be effective irrespective of the execution of any such amendment.

(g)     If Tenant exercises its right to extend the Lease Term for an Extension Term pursuant to this Addendum, the term "Lease Term" as used in the Lease, shall be construed to include the applicable Extension Term.

(h)     Subject to Section 35(r) of the Lease, if a tenant improvement allowance is determined to be part of the Fair Market Rent for any Extension Term, then, at Tenant's option, either (a) Landlord shall provide such allowance to Tenant which must be used to perform improvements to the Premises, whether the tenant improvements are performed by Tenant or by Landlord on behalf of Tenant or (b) the allowance shall be applied as credit against the first payments of Rent due during the applicable Extension Term.

ADDENDUM 4

WORK LETTER

[SUBJECT TO FURTHER REVIEW AND DISCUSSIONS WITH ARCHITECT AND CONTRACTOR]

1. Delivery of Premises.

a. Delivery of Premises. Landlord shall (i) deliver the Premises in broom-clean condition, free and clear of the claims and furniture, fixtures, cabling and equipment of all prior occupants, and in good order and repair (including all Building systems) and otherwise in accordance with the Base Building Specifications as set forth on Schedule __, (ii) cause the Premises to comply with all applicable Legal Requirements as of the later of (a) Final Completion of the Landlord Work or (b) the Commencement Date, and (iii) cause to be provided all water, gas, electricity, telephone, sewer, sprinkler services, and other utilities used on, stubbed to, or delivered to the Premises. As used herein, "Landlord Work" or "Landlord's Work" shall mean all work required under this paragraph in accordance with this Work Letter. Schedule __ is a preliminary budget of the hard and soft costs of the Landlord Work (the "Preliminary Budget"). Schedule __ is a schedule for finalization of the Final Working Drawings (as defined herein) and milestones for the completion of the Landlord Work (the "Project Schedule").

b. Design of the Landlord Work. **[Name of Architect]** is hereby approved by the parties as the project architect for the Landlord Work (the "Architect"). In accordance with the Project Schedule, Landlord shall engage the Architect to prepare a set of working drawings, including without limitation, detailed architectural, structural, mechanical, electrical and plumbing plans and specifications (the "Initial Working Drawings"). Landlord shall submit the Initial Working Drawings to Tenant for review and approval and Tenant shall have ten (10) Business Days after receipt of the Initial Working Drawings in which to review and give Landlord written notice of Tenant's approval of the Initial Working Drawings or its requested changes thereto. Landlord shall within three (3) Business Days modify the Working Drawings as reasonably requested by Tenant, and this approval process shall be repeated until the Working Drawings are approved by Tenant. Once approved by Tenant, the Initial Working Drawings shall constitute "Final Working Drawings". Approval by Landlord or Tenant of the Final Working Drawings shall not be a representation or warranty of either such party that such drawings comply with any applicable Legal Requirements, but shall merely be the consent of those parties to the performance of the Landlord Work consistent with the obligations of Landlord and Tenant set forth in this Lease.

c. Professional Service Providers.

i. Tenant approves of the professional service providers (such as the architect and the engineers) listed on Schedule ___ for engagement by Landlord in connection with the Landlord Work. If Landlord proposes to hire professional service providers other than those listed on Schedule ___ in connection with Landlord's Work, then Landlord will first request Tenant's prior approval, which approval Tenant will not unreasonably withhold, condition or delay. Tenant will have 5 Business Days after receipt of request to review and either approve or reject the proposed professional service provider. Landlord shall conspicuously state in the request "**FAILURE TO RESPOND WITHIN 5 BUSINESS DAYS WILL BE A TENANT DELAY**," and Tenant's failure to respond within the 5 Business Days shall constitute a Tenant Delay. The professional service providers listed on Schedule __ and any subsequently approved by Tenant are collectively referred to as the "**Professional Service Providers**" and individually, a "**Professional Service Provider**".

ii. Landlord will be solely responsible for all theft, damage and/or misconduct related to or caused by the Professional Service Providers and will take all commercially reasonable steps necessary to remedy damage and loss caused by the Professional Service Providers and their personnel. Notwithstanding the existence or terms of any subcontract, Landlord is responsible for the full performance of the Landlord's Work and for the Professional Service Providers' compliance with the terms of this Work Letter and any Change Orders.

iii. Landlord agrees to engage and cause the General Contractor to engage only experienced and professionally qualified and reputable individuals, firms and other entities to perform the Landlord Work, who are duly licensed to

practice their professions in the jurisdiction where the Premises is located, as necessary. Landlord will supervise and direct the Landlord Work, using Landlord's best skill and attention. Landlord will be solely responsible for and have control over construction means, methods, techniques, sequences, and procedures and will be solely responsible for coordinating all portions of the Landlord Work. If this Work Letter or any Change Order gives specific instructions concerning construction means, methods, techniques, sequences, or procedures, Landlord will evaluate the safety thereof at the Premises and shall be fully and solely responsible for the safety of such means, methods, techniques, sequences, or procedures. If Landlord determines that such means, methods, techniques, sequences, or procedures may not be safe, Landlord shall give timely written notice to Tenant and shall not proceed with that portion of the Landlord Work without further written instructions from Tenant.

iv. Before signing any contract with a Professional Service Provider, Landlord will first submit the contract to Tenant for Tenant's review and approval. Tenant will have 5 Business Days after receipt of each such contract to review and either approve the proposed contract or provide Landlord with reasonably detailed comments. Landlord shall conspicuously state in the request "**FAILURE TO RESPOND WITHIN 5 BUSINESS DAYS WILL BE A TENANT DELAY**," and Tenant's failure to respond within the 5 Business Days shall constitute a Tenant Delay. Unless otherwise approved by Tenant, each of the contracts between Landlord and each Professional Service Provider must include provisions that: (1) permit Tenant, in its sole discretion, to assume and perform Landlord's rights and obligations under each contract if Landlord defaults under that contract or the Lease and (2) require the Professional Service Provider to carry the insurance specified in Schedule __.

d. General Contractor.

i. Tenant approves of the proposed general contractors listed on Schedule ___ for the construction of Landlord's Work, each of which is licensed, bondable and experienced in the development and construction of improvements substantially similar to those contemplated by the Base Building Specifications; however, the selected general contractor will not be required to provide a bond. Landlord will not send out any "bid package" to any of the proposed general contractors, without first obtaining Tenant's approval, which approval Tenant will not be unreasonably withhold, condition or delay. Tenant shall provide Landlord with written approval (or rejection) of the bid package within 5 Business Days of receipt of Landlord's request.

ii. In accordance with the Project Schedule, Landlord will solicit "guaranteed maximum price" bids for completion of Landlord's Work from each of the proposed general contractors. Landlord will consult with Tenant on the bidding process and provide Tenant with reasonable notice of the time, date and place of the opening of the bids, and Tenant may be present at the opening and inspection of each bid submitted on an "open book" basis. Landlord will not provide any bids or information about any bids to any of the other bidders or to any other third parties except in accordance with the Lease. Landlord and Tenant will reasonably cooperate in good faith to agree on the winning bid. In picking the winning bid, Landlord and Tenant will consider all relevant factors, including bid price, qualification, schedule/timing and reputation. Notwithstanding the foregoing, Tenant acknowledges and agree that at Landlord's election, Landlord may bid the general contractor work on a "general conditions plus fee" basis provided, so long as all subcontractor work is bid pursuant to a "guaranteed maximum price" or "lump sum" form and "open book" basis as described above, with Tenant and Landlord reasonably cooperating in good faith on subcontractor selection. In picking subcontractors, Landlord and Tenant will consider all relevant factors, including bid price, qualification and reputation.

iii. The construction contract between the selected general contractor (the "General Contractor") and Landlord (the "Construction Contract") will be on a "cost plus, with a guaranteed maximum price" basis and in substantially the form attached hereto as Schedule __. The Construction Contract will provide: (1) for retention in a percentage determined by Landlord and reasonably approved by Tenant; (2) that Landlord must approve any changes to the Final Working Drawings; (3) that any Change Orders must be signed by Landlord; (4) that, if Landlord defaults on its obligations under the Lease or the Construction Contract, Tenant will have the option (but not the obligation) of assuming the Construction Contract; (5) that the General Contractor will work with Landlord to assess the various options available to minimize the costs included in the Final Budget throughout the development and construction of Landlord's Work; (6) for payment of a fee to the General Contractor not to an agreed upon percentage of the "hard costs" set forth in the Final Budget (which, for the avoidance of doubt, shall exclude any taxes); (7) that the General Contractor will indemnify, defend and hold each of the Tenant Parties harmless from and against any claims, damages, liabilities or costs arising in connection with the performance of Landlord's Work, except to the

extent of any claims, damages, liabilities or costs arising from the negligence or willful misconduct of the Tenant Party and (8) that General Contractor and each of its subcontractors (unless, based on General Contractor's commercially reasonable advice, Landlord and Tenant agree, after good faith discussions to reduce or waive the subcontractor insurance requirements) will carry the insurance specified in Schedule ___. In no event shall the Construction Contract include a provision in which Landlord and General Contractor agree to share the benefit of any savings in the Final Budget.

iv. General Contractor Warranty. Landlord will obtain a warranty from the General Contractor, which shall be enforceable by either Landlord or Tenant, or both, setting forth that for one (1) year after Final Completion, General Contractor will promptly correct any portions of the Landlord Work that are defective or that do not otherwise comply with the Final Working Drawings at Contractor's sole expense without causing unreasonable interruption to Tenant's business operations in the Premises. This one-year warranty period shall not constitute or create any statute of limitations with respect to any claims by Tenant or Landlord, and with respect to any defective work or latent or hidden defects or defective work, Tenant and Landlord shall have such rights as are allowed under the laws of the state where the Premises are located. General Contractor's warranty excludes defects or damage caused by (a) abuse, modification, or improper maintenance or operation by persons other than General Contractor, subcontractors, or others for whom General Contractor is responsible; and (b) normal wear and tear under normal usage. To the extent the Landlord Work consist of equipment or other movable or functional components manufactured by other companies, General Contractor will obtain warranties for such equipment or components for a period of no less than the manufacturer's standard warranty period and Landlord will manage administration of the warranties issued by those companies. General Contractor will not be liable for defects in these components or damages resulting from these defects, unless due to General Contractor's negligent procurement or installation.

e. Replacement of Professional Service Providers and General Contractor. If Landlord replaces the General Contractor or any of the Professional Service Providers, Tenant will have the right to approve the replacement. Tenant will not unreasonably withhold, condition, or delay a proposed replacement. Tenant shall provide Landlord with written approval (or rejection) of the proposed replacement within 5 Business Days of receipt of Landlord's request. If Tenant exercises its takeover right pursuant to Section __ of this Work Letter, Tenant, in the exercise of its commercially reasonable discretion, may replace the General Contractor or any of the Professional Service Providers.

2. Final Budget. After the selection of the General Contractor, but before the award of the Construction Contract, Landlord and Tenant will agree on the final budget for Landlord's Work, which shall include, but not be limited to, hard costs, soft costs (including contingency) and other land costs associated with Landlord's Work (the "Final Budget"), which may not exceed the Preliminary Budget. To the extent the total Actual Costs exceed the total Final Budget, Landlord will bear and be solely responsible for the excess without reimbursement or additional contribution from Tenant, unless the excess is a direct result of any Tenant Change Orders or Tenant Delays or Force Majeure events (pursuant to Section ____ of this Work Letter). If the excess is the direct result of a Tenant Change Order or Tenant Delays, then Tenant will pay the excess pursuant to Section ____ of this Work Letter.

3. Cost Reductions. In the course of preparing the Final Working Drawings, selecting the General Contractor and negotiating the Construction Contract, Landlord and Tenant will use commercially reasonable and good faith efforts to minimize the costs of Landlord's Work. In addition, in the course of the construction of Landlord's Work, Landlord will cause the General Contractor to use commercially reasonable efforts to minimize the costs of Landlord's Work.

4. Schedule.

a. Progress Reports. Landlord will complete Landlord's Work in accordance with the Project Schedule. Upon the completion of the Final Working Drawings, and at such other times as expressly provided in this Work Letter prior to commencement of Landlord's Work, Landlord shall update and deliver to Tenant the Project Schedule to reflect Landlord's good faith estimate of the milestones for completion of Landlord's Work. However, any update to the Project Schedule will not limit Tenant's remedies under the Lease or Sections ____ of this Work Letter for Landlord's failure to timely complete the Early Access Work or the Landlord Work (subject to the Lease's provisions regarding Tenant Delays and Force Majeure).

b. Early Access. Landlord will give Tenant access to the Premises by ________ (the "Early Access Date") for construction of the alterations listed on Schedule ___ (the "Pre-Approved Alterations") and for planning, measurement, construction of improvements and installation of furniture, fixtures, inventory and equipment, shipping and receiving, and any activities included within the Permitted Use ("Tenant's Early Occupancy"). Landlord and Tenant will reasonably cooperate in coordinating completion of Landlord's Work and any work done by Tenant during Tenant's Early Occupancy. Beginning on the Early Access Date, Landlord will provide reasonable, temporary restroom facilities for Tenant's agents, contractors, and employees. Until Substantial Completion, Tenant shall abide by all safety precautions and programs as may be reasonably promulgated by Landlord to ensure the safe completion of Landlord's Work and any Pre-Approved Alterations, and compliance with applicable health and safety regulations. In the event that Landlord does not give Tenant access to the Premises on or before the Early Access Date (which period may be extended as a result of Construction Force Majeure Event for up to thirty (30) days or for Tenant Delay), Tenant shall be entitled to a credit in the amount of one (1) day of Base Rent for each day after the Early Access Date until Landlord gives Tenant access to the Premises, to be applied against the Base Rent otherwise due and payable after the Commencement Date until said credits are fully realized by Tenant. ~~In addition, if Landlord has not given Tenant access to the Premises on or before the date that is [______________] days after the Early Access Date (which period may be extended as a result of a Construction Force Majeure Event for up to thirty (30) days or for Tenant Delay), Tenant may terminate this Lease by written notice to Landlord.~~

c. Target Date. Landlord will cause the construction of the Landlord Work to commence on the date set forth in the Project Schedule and shall Substantially Complete the Landlord Work on or before **[__________]** (the "Target Date"). If the Landlord Work are not Substantially Complete by the Target Date (which deadline may be extended as a result of a Construction Force Majeure Event for up to sixty (60) days and for Tenant Delay), (a) Tenant shall be entitled to a credit in the amount of two (2) days of Base Rent for every such day after the Target Date that Substantial Completion has not occurred ("Rent Credits"), to be applied against the Base Rent otherwise due and payable after the Commencement Date until said Rent Credits are fully realized by Tenant. In addition, if Landlord does not deliver the Premises to Tenant with the Landlord Work Substantially Complete by **[__________]** (which period may not be extended as a result of a Construction Force Majeure Event for up to sixty (60) days and for Tenant Delay), Tenant may terminate this Lease by written notice to Landlord ("Outside Date Termination"). In the event of an Outside Date Termination, Landlord shall pay to Tenant all Rent Credits accrued as of the date of the Outside Date Termination. To the extent any liquidated damages are received by Landlord under the Construction Contract, such liquidated damages shall be passed through to Tenant and deducted from the amount of accrued Rent Credits. Such obligations of Landlord hereunder shall survive the termination of this Lease.

5. Delays.

a. Tenant Delay. For the purpose of this Lease, "Tenant Delay" shall be any actual critical path delay as a result of (a) Tenant's failure to timely provide required information to Landlord or approve any matter relating to the Landlord Work that requires Tenant approval (provided Landlord has provided Tenant with email notice to the email addresses at the end of this paragraph specifying that Tenant has missed the deadline and Tenant does not respond within two (2) Business Days of such notice); (b) Tenant's request for change orders to Final Working Drawings and specifications or rebids or redesign that affect the critical path to the Project Schedule but only if not caused in whole ~~or in part~~ by the ~~wrongful or~~grossly negligent acts ~~or omissions~~ of Landlord, General Contractor~~,~~, or Professional Service Providers~~ or anyone for whom they are responsible~~ (provided that Landlord has provided Tenant with email notice to the email addresses at the end of this Section 3 specifying the anticipated length of the delay that would be caused by the change so that Tenant can evaluate whether to make the change); (c) Tenant's occupancy of the Premises which interferes with Landlord's performance and construction of the Landlord Work (provided Landlord has provided Tenant with email notice to the email addresses at the end of this paragraph at the time of the alleged interference describing the interference and indicating that a Tenant Delay is occurring as a result of the interference); and/or (d) delays in the issuance of a conditional, or temporary, certificate of occupancy resulting from Tenant's installation of trade fixtures or material handling equipment, or any other Pre-Approved Alterations. Email addresses for notice pursuant to this Section 3: **[_______________]**, with copies to: legal-us-realestate@amazon.com.

b. Landlord Delay. "Landlord Delay" means the length of any critical path delay in the permitting, construction or completion of any Pre-Approved Alterations which is a delay caused by (a) Landlord Change

Orders; (b) the presence of Hazardous Materials in the Premises other than those brought onto the Premises by Tenant or its agents or contractors; and/or (c) any other interference with Tenant's installation of Pre-Approved Alterations or equipment caused by acts or omissions of Landlord or its agents or contractors; provided, however, that notwithstanding the foregoing, no Landlord Delay shall be deemed to have occurred unless and until Tenant has provided notice to Landlord (with email notice to the email addresses at the end of this paragraph at the time of the alleged interference) (the "Landlord Delay Notice"), specifying the action or inaction by Landlord that Tenant contends constitutes the Landlord Delay. If Landlord does not cure such action or inaction within two (2) Business Days of receipt of such Landlord Delay Notice, then a Landlord Delay, as set forth in such Landlord Delay Notice, shall be deemed to have occurred commencing as of the date of the Landlord Delay Notice.

c. Construction Force Majeure Event. "Construction Force Majeure Event" shall mean any of the following events if they cause delays in the performance of the Landlord Work: (i) industry wide strikes; (ii) fire; (iii) unavoidable casualties; (iv) acts of God; (v) acts of the public enemy; (vi) floods, tornadoes, hurricanes and other forms of severe weather events; (vii) freight embargoes; and (viii) rebellions, riots, insurrections or sabotage, in all cases only to the extent that the events are beyond the reasonable control of and could not be anticipated by Landlord. If a Construction Force Majeure Event occurs, Landlord shall give written notice of the Construction Force Majeure Event to Tenant within three (3) ~~days~~Business Days after first learning of the occurrence of the Construction Force Majeure Event. If Landlord fails to give such timely notice, Landlord shall have the extension in deadlines to which it would otherwise be entitled to such Construction Force Majeure Event (but for the late notice) reduced on a day for day basis for each day that the notice is late.

6. Change Orders.

a. Tenant Change Orders. Except for changes called for or required due to the ~~wrongful or~~grossly negligent acts or deliberate omissions of Landlord, General Contractor~~,~~ or Professional Service Providers ~~or anyone for whom they are responsible~~, if Tenant shall desire any changes to the Final Working Drawings that are either (i) after such drawings are approved by Tenant, or (ii) prior to the approval of Final Working Drawings, but reflect changes from the Final Plan, Tenant shall so advise Landlord in writing and Landlord shall determine whether such changes can be made in a reasonable and feasible manner and Landlord shall notify Tenant within five (5) Business Days of receipt of such notification, whether the change order process itself will result in a Tenant Delay. Landlord shall prepare and submit (as soon as reasonably practical but not exceeding five (5) Business Days) to Tenant a change order form (each, a "Change Order Form") setting forth the impact on cost and any delay in the Project Schedule resulting from the proposed change. Tenant shall, within five (5) Business Days following Tenant's receipt of such Change Order Form, either (A) execute and return the Change Order Form to Landlord (such executed Change Order form referred to herein as a "Tenant Change Order"), or (B) retract or modify its request for the change. In the event Tenant does not respond within such five (5) Business Day period, Tenant shall be deemed to have retracted its request for the change. Tenant may pay any costs associated with such Tenant Change Order by: (a) direct payment to Landlord, or (b) if the Allowable Construction Costs (defined in Schedule __) are less than the amount set forth in the Final Budget, application by Tenant of the savings to such costs. Within thirty (30) days following final determination of the Actual Costs, Tenant shall elect how to pay such costs. Landlord may not approve change orders without Tenant's consent with respect to the Landlord Work. Notwithstanding anything herein to the contrary, in no event shall Tenant be required to pay for, nor shall a Tenant Delay result from, any change order required due to the (i) failure of the Premises (including the Landlord Work) to comply with Legal Requirements, unless such failure is due to Legal Requirements triggered by any Tenant-Made Alterations or Tenant's Property not reasonably discernible from the Final Working Drawings, (ii) the correction of errors or omissions in the Final Working Drawings, or (iii) any defects or deficiencies in the work by General Contractor~~,~~ or Professional Service Providers ~~or anyone for whom they are responsible.~~

b. Landlord Change Orders. Any changes to the Final Plan or the Final Working Drawings initiated by Landlord or related to the removal of any existing environmental condition at the Premises (each, a "Landlord Change Order"), will be subject to Tenant's approval, which Tenant may grant or withhold in its sole and absolute discretion. Any increase in Actual Costs and any delay in the Project Schedule to the extent resulting from a Landlord Change Order will be Landlord's responsibility without adjustment of the Project Schedule or the Final Budget. The Landlord Change Orders and Tenant Change Orders are sometimes together referred to as the "Change Orders".

7. Construction.

a. Construction Representatives. "Tenant's Representative" for the construction process is [__________]. Landlord's representative for the construction process is [__________].

b. Permits and Approvals. Landlord shall be required to obtain all permits and other authorizations necessary to perform the Landlord Work, excluding, however, all "Tenant Permits" (defined below), which shall be obtained by Tenant at Tenant's sole cost and expense (except as otherwise set forth herein). As used herein, "Tenant Permits" shall mean all permits and approvals, if any, associated with Tenant's Property, any Tenant-Made Alterations or Tenant's use of the Premises. Notwithstanding anything herein to the contrary, (i) Landlord shall complete all Landlord Work and fulfill all requirements with respect to the Landlord Work that are required for Tenant to obtain a temporary certificate of occupancy, provided that the foregoing shall not impose any obligation on Landlord and shall not be applicable with respect to any Tenant-Made Alterations, Tenant's Property, any particular use of the Premises by Tenant (as opposed to Legal Requirements applicable generally to projects in the area) not reasonably discernible from the Final Working Drawings, or any other required approvals or authorizations that do not specifically pertain to the Landlord Work, and (ii) subject to all of the terms and conditions of the Lease (including Landlord Delays and the terms, conditions and other requirements (including notice requirements) associated with the applicability of Landlord Delay contained therein and Force Majeure), a delay in the issuance of a certificate of occupancy as a result of the failure of Landlord to comply with its obligations under this Work Letter, shall (if the other requirements of Landlord Delay are met) constitute a Landlord Delay.

c. Enforcement of Contracts. Landlord shall use its diligent and good faith efforts in supervising construction of the Landlord Work and in enforcing its rights under the Construction Contract and other contracts and subcontracts that may reduce Allowable Construction Costs, and shall diligently pursue all claims it may have under the Construction Contract and other contracts and subcontracts that are reasonably likely to reduce Allowable Construction Costs.

d. Construction Warranty. Landlord shall cause the Landlord Work to be designed and constructed in a good and workmanlike manner, with new and suitable materials, free of defects and in conformance with all applicable Legal Requirements (including that the Landlord Work shall be designed in accordance with the standard of care required of other skilled and experienced Professional Service Providers performing similar work) and the Final Working Drawings. Landlord will use commercially reasonable efforts to enforce any General Contractor, Professional Service Provider or other contractor indemnity and warranty obligations for the benefit of Tenant. For one (1) year after Final Completion, Landlord will (or will cause General Contractor or other Professional Service Provider to) promptly correct any of the Landlord Work that are defective or that do not otherwise comply with the Final Working Drawings, at Landlord's sole expense without causing unreasonable interruption to Tenant's business operations in the Premises. This one-year warranty period shall not constitute or create any statute of limitations with respect to any claims by Tenant or Landlord, and with respect to any defective work or latent or hidden defects or defective work, Tenant and Landlord shall have such rights as are allowed under the laws of the state where the Premises are located. Landlord's warranty excludes defects or damage caused by normal wear and tear under normal usage. To the extent the Landlord Work consist of equipment or other movable or functional components manufactured by other companies, Landlord will obtain warranties for such equipment or components for a period of no less than the manufacturer's standard warranty period and Landlord will manage administration of the warranties issued by those companies. Landlord will not be liable for defects in these components or damages resulting from these defects, unless due to grossly negligent procurement or installation.

8. Substantial Completion. "Substantial Completion" (or any grammatical variation thereof) shall mean (i) completion of the Landlord Work in accordance (in all material respects) with the Final Working Drawings and permits, subject only to the Punchlist (defined below); (ii) a written certification by the Architect that the Landlord Work have been completed in accordance (in all material respects) with the Final Working Drawings; (iii) unrestricted automobile and truck access to the Premises is available to Tenant from each of the access points depicted on the Site Plan; (iv) a conditional or temporary certificate of occupancy or other similar authorization issued by the applicable governmental authority with respect to the Landlord Work and fulfillment of all requirements with respect to the Landlord Work that are required to allow Tenant to operate in the Premises for the Permitted Use; and (v) all utilities are hooked up and available for use by Tenant in the Premises, provided, in

addition, that as a condition precedent to Substantial Completion, Contractor shall provide Tenant with a schedule of all permits required for the Landlord Work and occupancy of the Premises and, attach to such schedule, a copy of each such permit. As soon as reasonably possible after Substantial Completion, Landlord shall also deliver to Tenant a "Close Out Book" which shall include, but not be limited to: detailed O & M manual with list of contractors, product data sheets, electrical and mechanical startup and testing, forms test and balance reports, as-built drawings - stamped and electronic (autocad), Certificates of Occupancy, final inspection certifications and signed off permits and other similar information reasonably requested by Tenant.

9. Punchlist. Upon Substantial Completion of the Landlord Work, a representative of Landlord and Tenant's Representative together shall inspect the Premises and generate a punchlist of defective or uncompleted items relating to the completion of construction of the Landlord Work that do not interfere with Tenant's operations in the Premises (the "Punchlist"). Landlord will use reasonable efforts to cause the General Contractor to complete all Punchlist items within forty-five (45) days after agreement thereon. If Landlord does not complete the Punchlist work by the deadline set forth above, subject to Tenant Delay, Tenant may complete the work and deduct the cost from payments of Base Rent.

10. Final Completion. "Final Completion" means (a) Landlord has caused completion of all the Landlord Work (including any Punchlist items) in accordance with the Final Working Drawings and any Change Orders; (b) Landlord has delivered to Tenant copies of all permits, licenses and approvals necessary to perform and complete the Landlord Work; (c) the Landlord Work have passed inspections by all applicable state, county and municipal authorities; and (d) Landlord has delivered the Close Out Book to Tenant. After Final completion, Tenant agrees to accept the Premises in its existing "As Is" condition.

11. Final True-Up.

a. On or before the date that is sixty (60) days after Final Completion, Landlord shall determine the final actual Allowable Construction Costs ("Actual Cost" or "Actual Costs") along with Landlord's proposed calculation of the monthly Base Rent based on Section 11(b) below, based on (without duplication) the actual amounts expended or incurred for the Allowable Construction Costs, or as otherwise agreed to by Landlord and Tenant pursuant to the change order process set forth in this Work Letter. Landlord shall provide written notice to Tenant of its determination of Actual Costs and monthly Base Rent ("Actual Cost Notice"). In the event that Tenant, following a review of Landlord's calculations of the Actual Cost and the open book records as set forth in this Work Letter, disagrees with Landlord's determination of the Actual Cost, then within thirty (30) Business Days of receipt of Landlord's Actual Cost Notice, Tenant shall provide written notice to Landlord of its questions, objections or alternative determination of the Actual Cost. Following Tenant's delivery of its determination of the Actual Cost, as applicable, and delivery of written notice thereof to Landlord, Landlord shall agree or disagree in writing within ten (10) Business Days of receipt of Tenant's notice, or the parties shall mutually agree in writing on the amount of the Actual Cost. Landlord and Tenant agree to cooperate with each other in good faith to resolve any disputes with regard to the Actual Cost. If the parties are unable to mutually agree on the Actual Cost within forty-five (45) days of the Actual Cost Notice, then the matter shall be submitted to arbitration in accordance with the process set forth in this Work Letter. In no event shall the Cost Statement or the Actual Cost include any costs that do not constitute Allowable Construction Costs.

b. If the total Actual Costs are greater than the Final Budget, then Base Rent will be calculated based on the Final Budget, as shown in Schedule ___. If the total Actual Costs are less than the Final Budget, then Monthly Based Rent will be calculated based on Actual Costs and any savings, as shown in Schedule ___. If Landlord and Tenant have not agreed on the total Actual Costs by the Commencement Date, then the Tenant will begin to pay monthly Base Rent based the Final Budget. Once Landlord and Tenant have agreed on the Actual Costs (or the arbitrator has determined Actual Costs pursuant to Section 11(a) above), then Landlord and Tenant will promptly execute a lease amendment to reflect the calculation of monthly Base Rent based on the Actual Costs, which will be retroactive to the Commencement Date, with Tenant receiving a

credit against the future payment of monthly Base Rent for any amounts paid by Tenant in excess of the final determination of Base Rent.

12. Tenant's Right to Seek Adequate Assurance and Takeover. If the completion of the Landlord Work falls substantially behind the Project Schedule~~, or if Tenant reasonably believes that Landlord will not be able to complete the Landlord Work in accordance with the Project Schedule~~, then Tenant may give Landlord written notice, specifying in reasonably detail the basis of Tenant's concerns and asking for adequate assurance of Landlord's ability to timely complete Landlord Work. Landlord will respond to Tenant's concerns within five (5) Business Days, specifying in reasonable detail Landlord's plan for timely completion of the Landlord Work (the "Recovery Plan"). If Landlord does not timely respond to Tenant's concerns, or if Tenant concludes that the Recovery Plan will not result in the timely completion of the Landlord Work, then Tenant may send an additional notice to Landlord specifying Tenant's concern. Landlord and Tenant will, within five (5) Business Days after Landlord's receipt of Tenant's notice, cause their respective construction teams to meet in person in an attempt to address Tenant's concerns and agree upon a Recovery Plan. If Tenant still has not received adequate assurance that Landlord will complete the Landlord Work according to the Project Schedule, Tenant may take over construction of the Landlord Work using, at Tenant's sole option, either the General Contractor or a general contractor selected by Tenant. If Tenant elects to complete the Landlord Work with the General Contractor, Landlord will assign and Tenant will assume the Construction Contract. If Tenant elects to complete the Landlord Work with a general contractor selected by Tenant, Tenant shall make all payments required to be made under the Construction Contract as of such date. Whether Tenant proceeds with the General Contractor or a general contractor selected by Tenant under this Section 12, Tenant shall have the right to offset any amounts incurred to complete the Landlord Work against Base Rent.

13. Insurance Requirements.

a. Tenant's Insurance Requirements. Tenant shall purchase and maintain insurance as required by applicable state and federal laws as well as the following minimum limits and types of insurance:

i. Tenant shall not be required to purchase "builder's risk" property insurance but shall maintain "all-risk" coverage upon the Premises for the full cost of replacement of the Pre-Approved Alterations. This insurance shall include the interests of Landlord and General Contractor, subcontractors and sub-subcontractors as loss payees as their interests may appear and shall cover all materials stored offsite. Liability of Tenant (and Tenant's insurance) shall not extend to cover any tools, apparatus, machinery, scaffolding, hoists, forms, staging, shoring and other similar items commonly referred to as "construction equipment" that may be on the site and the capital value of which is not included in the Pre-Approved Alterations. General Contractor and subcontractors of any tier shall make their own arrangements for any insurance they may require on such construction equipment. Tenant shall be responsible for all costs not covered because of deductibles, except to the extent such costs are the result of the gross negligence or willful misconduct of the General Contractor, Professional Service Providers or any subcontractor~~ or anyone for whom they are responsible~~; and Commercial General Liability Insurance, written on an occurrence basis covering Tenant's interest.

ii. Commercial General Liability Insurance, written on an occurrence basis covering Landlord's interest.

b. General Contractor Insurance Coverages. Landlord shall require the General Contractor to purchase and maintain insurance as required by (1) applicable state and federal laws; (2) as specified in this Section 10 with minimum limits and types of insurance required therein, or (3) as required in any applicable Change Order, whichever is greater:

i. Commercial General Liability Insurance, written on an occurrence basis. Coverage shall include products / completed operations, broad form property damage, contractor's protective liability, property damage, including property in the contractors care, custody and control of contractor, bodily injury, broad form blanket contractual, personal/advertising injury liability, premises – operations, elevators and hoists, independent contractors, contractual liability assumed under this Work Letter, and coverage for explosion, collapse, underground (XCU). Minimum Limits: $5,000,000 each occurrence and

$5,000,000 general aggregate combined single limit for bodily injury and property damage. $5,000,000 products/completed operations aggregate;

ii. Commercial Automobile Liability Insurance including owned, hired, and non-owned vehicles with at least $2,000,000 combined single limit for bodily injury or property damage. Coverage must include the following: (1) owned vehicles; (2) leased vehicles; (3) hired vehicles; and (4) non-owned vehicles;

iii. Workers' Compensation Insurance as required by law covering all costs, benefits and liabilities under workers' compensation and similar laws that may accrue in favor of any person employed by General Contractor in all states where General Contractor performs the work, together with "ALL STATES" and "VOLUNTARY COMPENSATION" coverage endorsement. General Contractor shall cause its Workers' Compensation insurer to waive its' right of subrogation against Tenant, Architect, Architect's and Tenant's consultants, agents, employees and successors and assigns (where permitted by law);

iv. Umbrella Liability Policy, which provides excess limits over primary insurance, with minimum limits of $5,000,000;

v. Employer's Liability Insurance with a limit of not less than $1,000,000, with a waiver of subrogation in each case in favor of Tenant (where permitted by law);

vi. Fidelity Bond or similar policy covering employee dishonesty with limits of not less than $500,000 per loss; and

vii. If General Contractor provides professional or consulting services as part of the work contemplated by this will also maintain Professional Liability or Errors and Omissions insurance with limits of not less than $5,000,000 per claim and aggregate for mechanical (including fire protection) electrical and curtain wall enclosure, and $2,000,000 per claim and aggregate for all other design-build sub-trades.

c. General Contractor Insurance Requirements. All of the General Contractor's insurance policies must have a retroactive date no later than the date that the work contemplated under this Work Letter commenced and coverage to continue for a period of not less than 2 years after all such work is completed, except for completed operations coverage and Professional Liability or Errors and Omissions insurance which shall extend for a period of 6 years after Final Completion. All of the General Contractor's insurance policies shall be primary and non-contributory with any insurance carried by Tenant, for all claims arising in connection with this Work Letter. Contractor's Commercial General Liability, Umbrella and Auto Liability insurance policies shall provide a waiver of subrogation in favor of Tenant. General Contractor will cause each insurance policy to provide that it will not be canceled or allowed to expire without at least 30 days prior written notice from the insurance carrier to Tenant (if applicable). Tenant (and its affiliates), and its respective officers, directors, employees, successors, assigns and agents as shall be named as an additional insured on General Contractor's Commercial General Liability, Umbrella and Commercial Automobile Liability policies. Prior to commencing work, General Contractor will provide certificates of all insurance coverage to Tenant: Attn: Risk Management, P.O. Box 81226, Seattle, WA 98108-1226 and at coi@amazon.com. Tenant's approval of any of General Contractor's insurance policies does not relieve or limit any of General Contractor's obligations under this Work Letter or the Construction Contract, for claims exceeding required insurance limits. If General Contractor fails to perform any of its obligations in this Work Letter, Tenant may withhold payment for any sums owed General Contractor until such time as General Contractor meets such obligations.

d. Subcontractor Insurance Requirements. General Contractor shall require that all material subcontractors, of any tier, have insurance coverage and endorsements in the amounts as set forth on Schedule __, or as otherwise approved in writing by Tenant, in sole and absolute discretion. General Contractor shall provide copies of Insurance Certificates, obtained from any subcontractor of any tier to Tenant upon request.

e. Waiver of Subrogation. Tenant and General Contractor waive all rights against each other and any of their contractors, subcontractors, sub-subcontractors, design professionals and consultants for damages caused by fire or other causes of loss to the extent (i) covered by property insurance obtained pursuant to this Work Letter or any Change Orders or other property insurance applicable to the Landlord Work, except their rights to insurance

proceeds; (ii) covered by any property insurance carried by General Contractor (or its personnel, including any subcontractor or sub-subcontractor); or (iii) with respect to construction equipment, such losses would be covered if General Contractor (or the applicable personnel, subcontractor or sub-subcontractor) carried property insurance for the full replacement value of such construction equipment.  General Contractor shall require of the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate written agreements, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

14.   Arbitration.   For disputes arising out of Section 11 of this Work Letter, arbitration shall follow the following procedures:

a.   Selection of Parties' Arbitrators.  Within ten (10) Business Days following written notice from either Landlord or Tenant electing to have their dispute with respect to the Actual Cost submitted to arbitration, Tenant and Landlord shall each select an arbitrator ("Tenant's Arbitrator" and "Landlord's Arbitrator", respectively) who shall be a qualified and impartial person licensed in the state in which the Premises is situated as a certified public accountant with at least ten (10) years of experience in auditing construction costs.

b.   Selection of Third Arbitrator.  Landlord's Arbitrator and Tenant's Arbitrator shall name a third arbitrator, similarly qualified, within ten (10) days after the appointment of Landlord's Arbitrator and Tenant's Arbitrator. Tenant's Arbitrator and Landlord's Arbitrator shall each submit their respective determinations to such third arbitrator

c.   Arbitrator Determination.  The third arbitrator shall, after due consideration of the factors to be taken into account under the definition of Actual Cost set forth in Section 11 and hearing whatever evidence the arbitrator deems appropriate from Landlord, Tenant and others, and obtaining any other information the arbitrator deems necessary, in good faith, shall select either the determination of Landlord's Arbitrator or that of Tenant's Arbitrator as the final conclusive determination of Actual Cost, such determination to be made within thirty (30) days after the appointment of the third arbitrator.  The arbitrator's determination shall be in writing and counterparts thereof shall be delivered to Landlord and Tenant within said thirty (30) day period.  The arbitrator shall have no decision making authority other than to select either the determination of Landlord's Arbitrator or Tenant's Arbitrator as final and conclusive. The arbitrator's determination shall be binding upon the parties hereto.

d.   Costs.  The costs and fees of the third arbitrator shall be shared equally by Tenant and Landlord.

15.  Audit Rights.

a.   Open-Book Accounting.  Landlord acknowledges that this Work Letter is to be administered on an "open book" arrangement relative to the cost of the Landlord Work.  Landlord shall keep full and detailed accounts and exercise such controls as may be reasonably necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles.  Landlord shall provide all computerized information (data) to Tenant in an Excel or .PDF format.

b.   Examination of Records.  Tenant shall be permitted to review and audit (at its sole expense) Landlord's records relating to the construction of the Landlord Work for a period of twelve (12) months following Substantial Completion.  If an audit conducted by Tenant reflects any difference in the Actual Cost from that previously submitted, then the Actual Cost shall be corrected to reflect the proper amounts disclosed by the audit and Tenant shall receive a credit against Base Rent or the Base Rent shall be adjusted, as appropriate.

16.  General Provisions.

a.   Cooperation.   Landlord and Tenant acknowledge and agree that they will use reasonable efforts to cooperate with each other in connection with Landlord's construction and installation of the Landlord Work.

b. Defined Terms. Capitalized terms used herein, but which are not defined herein, shall have the meanings given to such terms in the Lease.

c. Rules. Landlord shall, and shall cause the Professional Service Providers to, abide by any and all of Tenant's rules, policies and procedures regarding such matters as safety, security, health, environmental and hazardous material management, misconduct, physical aggression harassment and theft.

d. Restriction on Transfer. Landlord shall not assign, mortgage, transfer or sell its right and interest in the Premises or the Lease (except as collateral security for a construction mortgage loan held by an institutional lender) or be relieved of its obligation under the Lease prior to the agreement of the parties as to the Actual Cost as set forth in Section 11 of this Work Letter.

Schedule __ to Addendum 4

Base Building Specifications

Schedule __ to Addendum 4

Preliminary Budget

Schedule __ to Addendum 4

Project Schedule

Schedule __ to Addendum 4

Approved Professional Service Providers

Schedule __ to Addendum 4

Approved General Contractors

Schedule __ to Addendum 4

Construction Contract

Schedule __ to Addendum 4

Subcontractor Minimum Insurance Limits

| Trade/Scope of Work | CGL | Auto | Employer's Liability | Workers' Comp |
|---|---|---|---|---|
| Shoring, Earthwork, Demolition and Utilities | $5MM Occurrence<br>$5MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| Building/Load Bearing: Framing and Masonry | $5MM Occurrence<br>$5MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| Crane (Excluding Loader Cranes) | $5MM Occurrence<br>$5MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| HVAC, Electrical, Plumbing, Mechanical and Life Safety | $2MM Occurrence<br>$4MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| Elevator and Escalator | $2MM Occurrence<br>$2MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| Roofing, Siding, Flashing and Curtain Wall | $2MM Occurrence<br>$2MM Aggregate | $1MM | $1MM | As Required by Applicable Law |
| Non-Specified | $1MM Occurrence<br>$2MM Aggregate | $1MM | $1MM | As Required by Applicable Law |

Additional Requirements:

- General Requirements: The general insurance requirements for subcontractors are contained in the underlying agreement to which these Subcontractor Minimum Insurance Limits are attached.

- Limited Work: No specified minimum insurance limits shall apply to a subcontractor if the work to be performed by such subcontractor is (i) less than $25,000 and (ii) not a trade specifically listed in the chart above.

- Professional Liability/E&O: Design and design/build subcontractors, including subcontractors providing professional design or engineering services, are also required to procure and maintain professional liability insurance coverage (including contractual liability insurance) with a minimum limit of $1,000,000, provided, however all architects are required to carry a minimum limit of $2,000,000.

- Pollution Liability: If (i) the work required by the subcontractor or its subcontractors of any tier involves, in whole or in part remediation, abatement, transportation or disposal of hazardous materials/substances or contaminants (as defined by applicable law, statutes, codes, regulations or ordinances), demolition or renovation that may involve materials containing hazardous materials/substances or contaminants, or (ii) the subcontractor's primary business is providing demolition services, or (iii) the subcontractor is performing any grading, earthwork, subsurface or related work, then the subcontractor shall maintain Contractor's Pollution Liability insurance of not less than $1,000,000 per occurrence and name all parties required to be named herein as additional insures. Such policy must include coverage for disposal at non-owned disposal sites.

- Umbrella/Excess Limits: Subcontractors may satisfy these Subcontractor Minimum Insurance Limits by any combination of primary liability and excess liability coverage that results in the same protection to Amazon and its affiliates.

Schedule __ to Addendum 4

Pre-Approved Alterations

Schedule __ to Addendum 4

Definition of Allowable Construction Costs

"Allowable Construction Costs" shall mean actual costs incurred by Landlord in the construction of the Landlord Work. Allowable Construction Costs shall not include the following: (i) any entertainment costs, and costs of transportation, meals and lodging not directly related to the construction of the Landlord Work; (ii) the costs, including fines, penalties, and legal fees or costs, of curing violations of applicable building codes or other Legal Requirements (it being agreed, however, that compliance with directives from field or plan inspectors shall not be treated as costs to cure violations); (iii) any amounts paid to subsidiaries or affiliates of Landlord for any services or supplies or other materials to the extent amounts incurred are in excess of those which would have been incurred if such supplies or services were obtained from unrelated third parties; (iv) any advertising, marketing and promotion costs; (v) any Allowable Construction Costs to the extent Landlord is entitled to reimbursement from insurance companies or other third parties; (vi) amounts represented by any claims, defenses, credits or offsets which Landlord actually receives under the Construction Contract or other contracts for goods and/or services that would otherwise qualify as Allowable Construction Costs; (viii) costs incurred as a result of the gross negligence or willful misconduct of Landlord, Landlord's affiliates (which shall not, for purposes of this exclusion, include contractors or consultants); (ix) costs incurred as a result of the wrongful, negligent, grossly negligent or willful misconduct of the General Contractor, Professional Service Providers, or subcontractors or anyone for whom they are responsible.

Schedule __ to Addendum 4

Calculation of Monthly Base Rent

**1. If Total Actual Costs Equal or Exceed Final Budget**

As of the Commencement Date, monthly Base Rent will be calculated using this formula, rounded to the nearest dollar:

$$Monthly\ Base\ Rent\ = \frac{(Final\ Budget) \times __.0\%}{12}$$

On the first anniversary of the Commencement Date and each anniversary thereafter, Base Rent will increase by ______% over the Base Rent for the previous year.

**Addendum 1** to the Lease contains a table showing the amounts of monthly Base Rent and annual Base Rent for the Term, based on the Preliminary Budget.

**2. If Total Actual Costs Are Less than the Final Budget**

As of the Commencement Date, monthly Base Rent will be calculated using this formula, rounded to the nearest dollar:

$$Monthly\ Base\ Rent\ = \frac{(Actual\ Costs) \times __.0\%}{12}$$

On the first anniversary of the Commencement Date and each anniversary thereafter, Base Rent will increase by _____% over the Base Rent for the previous year.

**EXHIBIT A**

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT A-1**

**EXHIBIT A-2**

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

**EXHIBIT C**

**FORM OF NOTICE OF LEASE TERM DATES**

Date: ______________________

To: ______________________

Attention: Real Estate Manager (AWS)
410 Terry Ave. N
Seattle, WA 98109-5210

With copy to:
Attention: General Counsel (Real Estate)
410 Terry Ave. N
Seattle, WA 98109-5210

RE: Lease dated ______________, 20__ between ___________________________ ("Landlord"), and ____________________________ ("Tenant"), concerning the Premises located at _____________________, _______________ County, _______________ ("Lease").

In accordance with the Lease, Landlord represents the following:

1. That the Tenant has possession of the Premises and acknowledges that under the provisions of the Lease the Term of said Lease shall commence as of ________________ for a term of ___ months ending on __________________.

2. That in accordance with the Lease, Rent commences to accrue on _______________.

3. That the Building (as defined in the Lease) consists of ___________ rentable square feet using the <Standard Method of Measurement (ANSI/BOMA 2010) for Industrial Buildings>.

LANDLORD:

________________________________,
a ______________________________

By:__________________________
Name:________________________
Title:_________________________
Date:_________________________

Acknowledged:

TENANT:

____________________________________,
a ___________________________________

By:__________________________ _____
Name:________________________ ______
Title:_________________________ _____
Date:______________________________ _

**EXHIBIT D**

**FORM OF ESTOPPEL CERTIFICATE**

To: ______________________ ("Recipient")

Re: Lease: __________________ dated ____________, (as amended, if at all, as set forth on Exhibit A, the "Lease"), by and between _________________, a ___________________ ("Landlord"), and ____________, a ___________________ ("Tenant").

Premises: The premises described in the Lease (the "Premises"), located at _________________________.

The undersigned, as [Tenant] [Landlord] under the Lease, hereby certifies to Recipient the following, as of the present date:

1. [Tenant] [Landlord] is a party to the Lease. The Lease has not been amended or modified (excluding approvals, consents, or waivers given by Landlord in connection with the Lease) by any written instrument between Tenant and Landlord except as set forth on Exhibit A.
2. Landlord has completed Landlord's Work except for _________________.
3. Tenant is not owed any allowance except for __________________.
4. Tenant has paid Base Rent and Tenant's Proportionate Share of Operating Expenses through ________________.
5. To [Tenant's] [Landlord's] actual knowledge, [Landlord] [Tenant] there is no [Landlord] [Tenant] default existing under the Lease (after expiration of applicable notice and cure period), and [Tenant] [Landlord] has not sent any notice of default to [Landlord] [Tenant] under the Lease which has not been cured.
6. [Any other reasonable, customary statements required by Landlord's lender]

[Tenant's] [Landlord's] "actual knowledge" means the current, actual knowledge of the person executing this document on behalf of [Tenant] [Landlord], without any duty of investigation or inquiry.

[Tenant's certifications are made solely to estop Tenant from asserting to or against Recipient facts or claims contrary to those stated. This estoppel certificate does not constitute an independent contractual undertaking or constitute representations, warranties or covenants or otherwise have legal effect other than estopping Tenant from asserting to or against Recipient any contrary facts or claims. This estoppel certificate does not modify in any way Landlord's relationship, obligations or rights vis-a-vis Tenant.]

Furthermore, this certificate will not be construed or operate to waive any Tenant right to receive any reimbursement in connection with any Reconciliation or to audit the records of Landlord to confirm Landlord's compliance with its obligations under the Lease.

_______________:
______________________________,
a ____________________
By: _________________________________
Name: _______________________________
Title: ________________________________
Date signed: __________________________

EXHIBIT A TO ESTOPPEL CERTIFICATE
List of Lease Documents