# EXHIBIT 23

# PART 3

**EXHIBIT E**

**FORM OF MEMORANDUM OF LEASE**

<TO BE SUPPLIED BY LANDLORD>

**EXHIBIT F**

**RIGHT OF FIRST OFFER/RIGHT OF FIRST REFUSAL**

Subject to the terms and conditions set forth in this Exhibit G, Tenant shall have: (a) the ongoing right of first offer (the "Right of First Offer") to purchase the Premises or any part thereof (the "Property"), and (b) the ongoing right of first refusal (the "Right of First Refusal") to purchase the Property, all on the terms and conditions set forth in this Exhibit G.  If the Property is part of a portfolio or "packaged" sale, Tenant may exercise its Right of First Offer or Right of First Refusal on the Property and not the other properties included in such portfolio or packaged sale.

1.      Right of First Offer.  If during the Lease Term (a) Landlord shall determine to offer all or any portion of the Property to the market ("Take to Market") for sale, or (b) Landlord receives a bona fide, unsolicited offer from an unrelated third (3rd) party (an "Unsolicited Offer"; and the third party making the Unsolicited Offer is referred to herein as the "Unsolicited Offeror") to purchase all or any portion of the Property (such portion of the Property is referred to herein as the "Offered Property"): then (i) in the Take to Market scenario, Landlord shall notify Tenant, before taking the Offered Property to the market, of the terms upon which Landlord intends to offer the Offered Property for sale to the market; and (ii) in the Unsolicited Offer scenario, if Landlord intends to accept an Unsolicited Offer, Landlord shall first provide Tenant, before entering into any agreement with the Unsolicited Offeror, a copy of the written offer from the Unsolicited Offeror (in either such scenario, such notification from Landlord to Tenant is referred to herein as the "ROFO Purchase Notice").  At the time Landlord delivers a ROFO Purchase Notice, Landlord will also deliver to Tenant a Landlord executed purchase agreement on the economic terms set forth in the ROFO Purchase Notice and otherwise in the form attached hereto as Exhibit G-1 (the "ROFO/ROFR Purchase Agreement").

2.      Exercise of Right of First Offer.  Tenant shall have thirty (30) days after receipt of a complete and correct copy of the ROFO Notice and the ROFO/ROFR Purchase Agreement (the "ROFO Exercise Period") to exercise its Right of First Offer to purchase the Offered Property for the economic terms set forth in the ROFO Purchase Notice.  Tenant's exercise of its Right of First Offer shall be deemed effective if Tenant executes and delivers the ROFO/ROFR Purchase Agreement to Landlord during the ROFO Exercise Period.  If Tenant elects not to, or fails to timely, exercise its Right of First Offer, then: (a) in the Take to Market scenario and subject to Tenant's continuing Right of First Refusal set forth below, Landlord shall be free to take the Offered Property to market for sale for any purchase price that is not more than five percent (5.0%) lower than the purchase price set forth in the ROFO Purchase Notice; and (b) in the Unsolicited Offer scenario, Landlord shall be free to sell the Offered Property to the Unsolicited Offeror (or its affiliate) for any purchase price that is not more than five percent (5.0%) lower than the purchase price set forth in the ROFO Purchase Notice, and in either event, any such sale shall otherwise be on terms and conditions materially similar to those set forth in the ROFO/ROFR Purchase Agreement (the purchase agreement by and between Landlord and the Unsolicited Offeror is referred to as a "Unsolicited Contract").

3.      Unsolicited Offeror.  If, in the Unsolicited Offer scenario, the Unsolicited Offeror negotiates a purchase price that is more than five percent (5.0%) lower than that which is set forth in the ROFO Purchase Notice or on terms and conditions materially different that those set forth in the ROFO/ROFR Purchase Agreement, before Landlord may enter into such Unsolicited Contract, Landlord must again deliver a ROFO Purchase Notice and ROFO/ROFR Purchase Agreement to Tenant setting forth the proposed changes, and the terms of this Exhibit G shall apply again.  Additionally, if Landlord has not entered into the Unsolicited Contract as permitted herein, or fails to close on any Unsolicited Contract, in either event, within one hundred eighty (180) days following  the expiration of the ROFO Exercise Period, Landlord shall be required, prior to Landlord being able to enter into a contract for sale of such Offered Property with any party, to provide Tenant with a new ROFO Purchase Notice and ROFO/ROFR Purchase Agreement covering such Offered Property, and Tenant shall have a new right, pursuant to Sections 1 and 2 above, to purchase such Offered Property.

4.      <u>Take to Market; Right of First Refusal</u>.  If, in the Take to Market scenario, Tenant elects not to purchase the Offered Property or fails to exercise its Right of First Offer, and Landlord proceeds to take the Offered Property to market, Tenant shall have a Right of First Refusal to purchase the Offered Property on the terms of a bona fide offer from an unrelated purchaser (the "<u>Solicited Offeror</u>").  If Landlord intends to accept an offer to purchase the Property from a Solicited Offeror, Landlord shall first provide Tenant, before entering into a contract with the Solicited Offeror, a copy of the written offer from the Solicited Offeror, except for any portions of such offer that are the subject of a confidentiality agreement by and between Landlord and the Solicited Offeror; provided, however, that Landlord shall, in any event,  be required to notify Tenant of the identity and ownership structure (if known) of the Solicited Offeror and of the material business terms contained in the Solicited Offer (such notification from Landlord to Tenant is referred to herein as the "<u>ROFR Purchase Notice</u>").  At the time Landlord delivers a ROFR Purchase Notice, Landlord will also deliver to Tenant a Landlord executed ROFO/ROFR Purchase Agreement for Tenant's potential purchase of the Offered Property on the economic terms set forth in the ROFR Purchase Notice.

5.      <u>Exercise of Right of First Refusal</u>.  Tenant shall have thirty (30) days after receipt of the ROFR Purchase Notice and the ROFO/ROFR Purchase Agreement (the "<u>ROFR Exercise Period</u>") to exercise its Right of First Refusal to purchase the Offered Property for the economic terms set forth in the ROFR Purchase Notice.  Tenant's exercise of its Right of First Refusal shall be deemed effective if Tenant executes and delivers the ROFO/ROFR Purchase Agreement to Landlord during the ROFR Exercise Period.  If Tenant elects not to or fails to timely exercise its Right of First Refusal, then Landlord shall be free to sell the Offered Property to the Solicited Offeror (or its affiliate) for any purchase price that is not more than five percent (5.0%) lower than the purchase price set forth in the ROFR Purchase Notice and any such sale shall otherwise be on terms and conditions materially similar to those set forth in the ROFO/ROFR Purchase Agreement (the purchase agreement by and between Landlord and the Solicited Offeror is referred to as a "<u>Solicited Contract</u>").

6.      <u>Solicited Offeror</u>.  If the Solicited Offeror negotiates a purchase price that is more than five percent (5.0%) lower than that which is set forth in Landlord's ROFR Purchase Notice or on terms and conditions materially different than those set forth in the ROFO/ROFR Purchase Agreement, before Landlord may enter into a purchase agreement with Solicited Offeror, Landlord must again deliver a ROFR Purchase Notice and ROFO/ROFR Purchase Agreement to Tenant setting forth the proposed changes, and the terms of this <u>Exhibit G</u> shall apply again.  If Landlord has not entered into the Solicited Contract covering such designated Offered Property, or Landlord fails to close under any Solicited Contract, in either event within one hundred eighty (180) days following the expiration of the ROFR Exercise Period, Landlord shall be required, prior to Landlord being able to enter into a contract for sale of such Offered Property with any party, to provide Tenant with a new ROFR Purchase Notice and ROFO/ROFR Purchase Agreement covering such Offered Property, and Tenant shall have a new right, pursuant to Sections 4 and 5 above, to purchase such Offered Property.

7.      <u>Tenant Rights to Purchase Binding Upon Successors and Assigns</u>. <u>Tenant's Right of First Offer and its Right of First Refusal shall be extinguished by the sale of the Premises by Landlord.</u>  Tenant's Right of First Offer and its Right of First Refusal shall <u>be</u> not ~~be~~ extinguished by Tenant's election not to, or failure to, exercise any such right in the event of a proposed sale of the Property, but shall instead be continuing rights throughout the Lease Term (including any Extension Terms) binding upon Landlord and its successors and assigns.  Notwithstanding the foregoing, the Right of First Offer and Right of First Refusal shall not apply in the event of the following transfers of all or any portion of the Property:

(a)      transfers to Affiliates of Landlord; or

(b)      collateral security transfers in connection with any debt or equity financing, or transfers pursuant to a foreclosure or a deed in lieu thereof.

**EXHIBIT F-1**

**FORM OF ROFO/ROFR PURCHASE AGREEMENT**

[SUBJECT TO FURTHER REVIEW

PURCHASE AGREEMENT

(_____County,_____)

THIS PURCHASE AGREEMENT (this "Agreement") is dated for reference purposes as of _____, 20___, by and between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant"). This Agreement shall be effective upon its mutual execution and delivery by Landlord and Tenant (the "Effective Date").

**RECITALS:**

A.      Landlord and Tenant are parties to that certain Lease Agreement dated as of _____, 20___ (the "Lease") pursuant to which Landlord leases to Tenant all of that certain building known as _____ ("Building") consisting of approximately _____ rentable square feet located at _____, as depicted on Exhibit A hereto, together with the exclusive right to use all portions of the land other than the Building, said land also being depicted on Exhibit A hereto and legally described on Exhibit B hereto ("Land").  The Building and the Land are collectively referred to herein as the "Project").

B.      Pursuant to the terms of the Lease, Landlord wishes to sell to Tenant and Tenant wishes to acquire the Project upon the terms and conditions set forth in this Agreement.

**AGREEMENT**:

NOW THEREFORE, in consideration of the covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, Landlord agrees to sell to Tenant and Tenant agrees to purchase from Landlord the Project, together with and including all hereditaments, appurtenances, easements and rights of way thereunto belonging or in any way appertaining and also the right, title and interest (if any) of Landlord in and to the bounding and abutting streets, alleys and highways, subject to and upon the following terms and conditions:

1.      **Sale**. On and subject to the terms and conditions of this Agreement, Landlord agrees to sell to Tenant, and Tenant agrees to purchase from Landlord, the Project, together with:  (a) all easements and rights benefiting or appurtenant to the Project including any right, title or interest in the bed of any adjoining street, road, highway or alley; (2) Landlord's interests in any certificates, permits, variances, licenses and approvals that benefit or relate to the Project and its current use ("Permits"); (3) all blueprints, shop drawings, surveys, studies, plans and specifications that are in the possession of or readily available to Landlord or its agents (the "Plans"); (4) any warranties and guaranties given to, assigned to or benefiting Landlord or the Project, regarding the acquisition, construction, design, use, operation, management or maintenance thereof ("Warranties"); and (5) all records regarding ownership, maintenance and repair of the Project and all studies of any kind regarding the condition of any element of the Project ("Records") that are in possession or under control of Landlord, or its manager (as such items collectively the "Materials").

2.        __Purchase Price__.  The "<u>Purchase Price</u>" for the Project is _____ Dollars ($_____), allocated as follows: <mark>[DETERMINE IF ALLOCATION NECESSARY AS DIFFICULT TO ADMINISTER IN ROFO/ROFR CONTEXT]</mark>

- $_____ to the Land; and

- $_____ to the Building.

Tenant and Landlord shall each file, in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder, an Asset Allocation Statement on form 8594 that conforms with the above allocation, with their respective federal income tax returns for the tax year in which the Closing occurs, and shall contemporaneously provide the other party with a copy of the form 8594 being filed. Each party agrees not to assert, in connection any with tax return, audit or other similar proceeding, any allocation of the Purchase Price that differs from the allocation agreed to by the parties herein.

3.        __Closing__.  Closing of the transfer of title and payment contemplated by this Agreement (the "<u>Closing</u>") shall occur on _____ or on such earlier or later date as may be mutually agreed upon by the parties (the "<u>Closing Date</u>").   The Closing shall take place at the office of _____ [INSERT NATIONALLY RECOGNIZED TITLE COMPANY] (the "<u>Title Company</u>") or at such other place as may be agreed to mutually by the parties.  Landlord agrees to deliver possession of the Project and Materials to Tenant on the Closing Date.

        A.        <u>Landlord's Closing Documents</u>.  On the Closing Date, Landlord shall execute and/or deliver to Tenant the following:

                (1)        <u>Deed</u>.  A customary-form special warranty deed (with statement regarding no wells), in form reasonably satisfactory to Tenant, conveying good and marketable title to the Project to Tenant, free and clear of all encumbrances, except the "<u>Permitted Encumbrances</u>" determined pursuant to Section 5 hereof.

                (2)        <u>Bill of Sale</u>.  A Bill of Sale, in general warranty form, conveying all fixtures comprising part of the Project to Tenant, free and clear of all encumbrances, except the Permitted Encumbrances.

                (3)        <u>Business Records</u>.  Originals of full and complete copies of the Permits, Plans, Warranties and Records.

                (4)        <u>General Assignment</u>.   An Assignment of the Permits, Plans, Warranties, and Records, in form reasonably satisfactory to Tenant.

                (5)        <u>Landlord's Affidavit</u>.  An Affidavit of Landlord indicating that on the Closing Date there are no outstanding, unsatisfied judgments, tax liens or bankruptcies against or involving Landlord or the Project; that there has been no labor or material furnished to the Project for which payment has not been made or for which mechanics' liens could be filed; that there are no other unrecorded interests in the Project; and that there are no encroachment or survey issues of which Landlord is aware; together with whatever standard owner's affidavit and/or indemnity which may be reasonably required by the Title Company to issue owner's and lenders' policies of title insurance.

                (6)        <u>Settlement Statement</u>.  A customary settlement statement (the "<u>Settlement Statement</u>") prepared in conjunction with the Title Company accounting for all sources and uses of funds at the Closing.

                (7)        <u>Other Requirements</u>. Any other document or instrument reasonably required by the Title Company or any municipal body or agency to evidence or complete the transfer of title as contemplated in this Agreement.

B.      Tenant's Closing Obligations.  On the Closing Date, Tenant will execute the Settlement Statement and deliver to Landlord the Purchase Price pursuant to Section 2.B., above.

4.      **Inspection**.  Within the initial five (5) days after the Effective Date, Landlord shall make available to Tenant the following, to the extent the same are in Landlord's possession or control, or readily available to it:  (1) any and all "Environmental Reports" relating to the Project (defined below); (2) all historical title work, title policies, past real estate tax records, tax returns, surveys, engineering reports and physical inspection reports; and (3) the Permits, Plans, Warranties and Records.

5.      **Title Examination**.  Title examination will be conducted as follows:

A.      Landlord's Title Evidence.  Landlord shall, within ten (10) days after the Effective Date, furnish to Tenant: (1) a commitment  for an ALTA owner's policy of title insurance ("Title Commitment"), issued by the Title Company, committing the Title Company to insure good and marketable title to the Project, free and clear of liens, mortgages, charges or encumbrances, subject only to the "Permitted Encumbrances" listed in Exhibit C attached hereto [PERMITTED ENCUMBRANCES MAY ONLY INCLUDE THOSE LISTED ON EXHIBIT B OF THE LEASE AND OTHERS PUT OF RECORD IN ACCORDANCE WITH THE PROVISIONS OF THE LEASE]; (2) UCC searches regarding any fixtures comprising part of the Project ("UCC Searches"); and (3).  In addition, Landlord shall within thirty (30) days after the Effective Date, furnish to Tenant a current, "as built" survey of the Project, meeting all ALTA/ASCM requirements, showing all easements of record and all improvements and encroachments and certified to Tenant, the Title Company and such other parties as Tenant may reasonably request ("Survey").

B.      Tenant's Objections.  Within ten (10) days after receiving the last of the Title Commitment, copies of any documents listed in Schedule B of the Title Commitment, the UCC Searches and the Survey, Tenant will make any written objections it may have ("Objections") provided that Tenant shall have no right to object to any Permitted Encumbrances.  Tenant's failure to make Objections within such time period will constitute a waiver of Objections with respect to matters disclosed in Schedule B of the Title Commitment, the UCC Searches and/or the Survey.  Any specific matter shown in Schedule B of the Title Commitment, the UCC Searches or in the Survey and not objected to by Tenant shall also be deemed "Permitted Encumbrances" hereunder.  Landlord will have sixty (60) days after receipt of the Objections to cure the Objections (the "Cure Period"), during which period the Closing will be postponed as necessary and Landlord shall use all commercially reasonable efforts to correct any Objections or, alternatively, to cause the Title Company affirmatively to insure over the Objections, provided that Landlord shall be obligated to remove any Objections related to any mortgages, other monetary liens or items which are not "Permitted Exceptions" pursuant to the Lease, and failure to remove same shall be a default by Landlord hereunder.  In the event that, on the Closing Date Landlord cannot deliver, and Tenant cannot obtain without extra payment, a final title insurance policy consistent with the foregoing terms and requirements, Tenant may, at its option, subject to Section 16 below:

(1)      Terminate this Agreement, or

(2)      Waive the Objections and proceed to Closing.

6.      **Conditions to Tenant's Obligations**.

A.      Inspection Period.  Tenant shall have until 5:00 PM Pacific Time on the day that is thirty (30) days following the Effective Date (the "Inspection Period") to perform its investigation of the Project.  At any time prior to the expiration of the Inspection Period, Tenant shall have the right to terminate this Agreement by sending written notice thereof to Landlord, and upon delivery of such notice, this Agreement shall terminate and thereafter neither party hereto shall have any further rights, obligations or liabilities hereunder except for those matters that expressly survive termination of this Agreement.  During the Inspection Period, Tenant may conduct, among others, a Phase I environmental site assessment and such other investigations as Tenant deems appropriate.

B.      Material Adverse Change.  If there should occur a Material Adverse Change in the condition of the Project between the Effective Date and the Closing Date, Tenant shall have the right to:  (a)

accept a conveyance of the Project subject to the Material Adverse Change (which matter shall thereafter be deemed to be a Permitted Exception), with the right at Closing to receive a credit for the reasonably estimated amount of the cost to cure or loss resulting from the update in excess of Two Hundred Fifty Thousand Dollars ($250,000), but in an amount not to exceed five percent (5%) of the Purchase Price, provided that if the parties are unable to agree on the amount of the reasonably estimated amount of the cost to cure or loss resulting from such Material Adverse Change, the dispute shall be resolved by arbitration following the procedures set forth in Section 25 of the Lease and in the event the arbitration is not concluded by the Closing, the disputed amount of the purchase price credit shall be held in escrow until the final arbitration order is issued; or (b) to terminate this Agreement by sending written notice thereof to Landlord, and upon delivery of such notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to Tenant, and thereafter neither party hereto shall have any further rights, obligations, or liabilities hereunder except for those matters that expressly survive termination of this Agreement. "**Material Adverse Change**" for purposes of this Agreement shall mean a substantial change, or group of changes when aggregated together, and which are not caused by, through or under Tenant or its affiliates, that has an adverse impact on the Project's use or operation and such impact has a monetary value equal to at least Two Hundred Fifty Thousand Dollars ($250,000).

       7.    **Prorations**.  Landlord and Tenant agree to the following prorations and allocation of Closing and related costs:

       A.    Title Insurance and Closing Fee.  The cost of the Title Commitment and any title policy shall be allocated according to prevailing custom or practice in the county in which the Project is located. Landlord and Tenant will each pay one-half of any reasonable and customary closing fee or charge imposed by the Title Company.

       B.    Survey.  ~~Landlord~~Tenant shall pay the cost of the Survey.

       C.    Deed Tax.  Any state deed or similar recordation tax related to the recording of the deed shall be allocated according to prevailing custom or practice in the county in which the Project is located.

       D.    Real Estate Taxes and Special Assessments.  Real estate taxes and installments of special assessments payable therewith payable in the year prior to the year of Closing and all prior years will be paid by Landlord.  Real estate taxes and installments of special assessments payable in the year of Closing shall be prorated on a daily basis by Landlord and Tenant as of the Closing Date based upon a calendar year. Tenant shall be responsible for all real estate taxes and installments of special assessments payable in years following the year of Closing.

       E.    Recording Costs.  Tenant will pay the cost of recording the warranty deed.  Landlord shall pay the cost of recording any documents necessary to perfect its own title or which release encumbrances other than Permitted Encumbrances.

       F.    Rents/Operating Expenses.  All rents and operating expenses related to the Project shall be allocated between the parties in accordance with their respective periods of ownership.

       G.    Charges.  All other charges relating the Project will be paid or prorated according to prevailing custom or practice in the county in which the Project is located.

       H.    Professional Fees.  Each of the parties will pay its own attorneys', accountants' and consultants' fees.

       8.    **Landlord's Warranties**.  Landlord hereby represents and warrants to Tenant and agrees as follows:

       A.    There are no other agreements, or options or first refusals, which give any third party any right or option to purchase or lease any part of the Project.

B.      Landlord has disclosed and made available to Tenant all reports and investigations ~~commissioned by or otherwise readily available to~~in Landlord~~'~~s possession relating to Hazardous Substances and the Project (collectively, the "Environmental Reports").  The term "Hazardous Substance," in the singular and plural form, means any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time (42 U.S.C. §§ 9601 et. seq.), any substances or materials which are classified or considered to be hazardous, contaminants, toxic or pollutants, or otherwise regulated under the laws of the State of in which the Project is located (collectively the "Environmental Requirements"), and crude oil and gasoline, and any fraction thereof, asbestos in any form or condition, area-formaldehyde insulation, and polychlorinated biphenyls in any form or condition.

C.      Except as disclosed in the Environmental Reports, Landlord is not aware of any environmental condition, situation or incident on, at, or concerning the Project, that could give rise to an action or liability under any law, rule, ordinance, or common law theory.

D.      Landlord has paid for, or will pay for on or before the Closing Date (or will provide Tenant with a credit at Closing therefore), all work, supplies and materials, performed upon and supplied to the Project.

E.      ~~There exists no~~Landlord has not received written notice of any litigation affecting or calling into question the Project or any part or component thereof, or Landlord's interest therein.

F.      ~~There is no~~Landlord has not received written notice of any condemnation proceeding pending or threatened with respect to any part of the Project~~, and Landlord has no knowledge of any threat or the imminence thereof~~.

G.      Except as to those liens of record with respect to the Project which shall be released on or before the Closing Date, Landlord is the owner of, and there exists no lien, encumbrance or adverse claim with respect to any fixtures comprising part of the Project.

H.      There are no management agreements, service, maintenance or other contracts or equipment or capital leases relating to the Project other than those which can and, at Tenant's option and Landlord's expense, will be cancelled on or before the Closing Date; and Landlord has disclosed in writing to Tenant all such contracts and equipment and capital leases, if any.

I.      Except for the Lease, there are no leases or other occupancy or use agreements related to the Project, and, except as set forth in the Permitted Encumbrances, no party, other than Tenant, shall have any right to use or occupy the Project from and after the Closing Date.  [TO BE MODIFIED IF TENANT IS NOT THE SOLE TENANT OF THE PROPERTY]

All such representations and warranties shall be true on the Closing Date as if made on and as of such date. ~~In the event that any aforesaid warranty is determined not to be true on and as of the Closing Date Tenant may, in Tenant's sole and absolute discretion, at its option and by notice to Landlord, either:  (i) terminate this Agreement, or (ii) waive the breach of warranty or representation and close the sale and purchase hereof~~ and shall survive for a period of six (6) months after Closing.

9.      **Broker's Commission**.  Landlord and Tenant represent and warrant to each other that they have dealt with no brokers, finders or the like in connection with this transaction. [MODIFY IF A BROKER EXISTS, BUT IN SUCH EVENT LANDLORD SHALL BE LIABLE FOR ANY BROKERAGE COMMISSIONS]  Landlord and Tenant otherwise agree that each is solely responsible for all fees and charges which may become due and payable to their respective brokers, and further agree to indemnify each other and to hold each other harmless against all claims, damages, costs or expenses of or for any other such fees or commissions resulting from their actions or agreements regarding the execution or performance of this Agreement, and will pay all costs of defending any action or lawsuit brought to recover any such fees or commissions incurred by the other party, including reasonable attorneys' fees.

10.     **Assignment**.  Tenant shall have an unconditional right to assign this Agreement; provided that no such assignment will relieve the assigning party of its obligations under this Agreement.  Landlord shall not have a right to assign this Agreement or its interest in the Project.

11.     **Survival**.  The respective covenants, agreements, indemnifications, warranties and other terms of this Agreement will survive and be in full force and effect for a period of twenty-four (24) full calendar months after the Closing, and shall not be deemed to have merged into any of the closing documents.

12.     **Notices.**  All notices, approvals, consents, requests or demands required or permitted to be given or served by either party to this Agreement shall be in writing (unless otherwise expressly set forth herein to the contrary) and shall be delivered: (a) personally, (b) by depositing with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, or (c) by a nationally recognized overnight delivery service providing proof of delivery, in all event such events, properly addressed to the addresses set forth below.  Either party may by notice given aforesaid change its address for all subsequent notices.  Except where otherwise expressly provided to the contrary, notice shall be deemed given upon delivery or when delivery is refused.

Landlord's Address:  c/o Northstar Commercial Partners

1999 Broadway, Suite 770
Denver, Colorado 80202

With copy to:

Jones & Keller, P.C.
1999 Broadway, Suite 770
Denver, Colorado 80202
Attn: Kerri P. Assell

Tenant's Address:     c/o Amazon.com, Inc.
Attention:  Real Estate Manager
410 Terry Ave. N
Seattle, WA 98109-5210

With copy to:
c/o Amazon.com, Inc.
Attention:  General Counsel (Real Estate)
410 Terry Ave. N
Seattle, WA 98109-5210

13.     **Captions**.  The section headings or captions appearing in this Agreement are for convenience only, are not a part of this Agreement and are not to be considered in interpreting this Agreement.

14.     **Entire Agreement; Modification**.  This written Agreement constitutes the complete agreement between the parties and supersedes any prior oral or written agreements between the parties regarding the Project.  There are no oral agreements that change this Agreement and no waiver of any of its terms will be effective unless in a writing executed by the parties.

15.     **Binding Effect**.  This Agreement binds and benefits the parties and their successors and assigns, and heirs and personal representatives.

16.     **Controlling Law.**  This Agreement shall be governed by the laws of the State where the Project is located without regard to any conflicts of law provisions.

17.     **Remedies**.  If Tenant defaults under this Agreement, Landlord may terminate this Agreement by giving notice to Tenant.  If Tenant fails to cure such default within thirty (30) days of the date of such notice, this Agreement will terminate  and Tenant will be liable to Landlord for all costs and expenses incurred by Landlord in connection with the sale in an amount not to exceed $ Termination of this Agreement will be the sole remedy available to Landlord for such default by Tenant, and Tenant will not be liable for damages or subject to equitable relief.  If Landlord defaults under this Agreement, Tenant may terminate this Agreement upon ten (10) days' notice to Landlord (Landlord having cure rights during the 10-day period).  Nothing in this Section 16 precludes Tenant from seeking and recovering specific performance of this Agreement or damages upon Landlord's default, so long as any such action is commenced within one hundred and eighty (180) days of the alleged default by Landlord.

18.     **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and which together shall constitute a single, integrated contract.

IN WITNESS WHEREOF, the properly authorized representatives of the parties set forth below, have executed this Agreement the day and year set forth below.

Landlord:

_____, a
_____

By:   _____
Name: _____
Title: _____
Date: _____

Tenant:

_____, a
_____

By:   _____
Name: _____
Title: _____
Date: _____

**EXHIBIT A to ROFO/ROFR PURCHASE AGREEMENT**

<u>Legal Description of Project</u>

**EXHIBIT B to ROFO/ROFR PURCHASE AGREEMENT**

<u>Depiction of the Project</u>

**EXHIBIT C to ROFO/ROFR PURCHASE AGREEMENT**

<u>Permitted Encumbrances</u>

1.      Real estate taxes due and payable in the year of Closing (subject to proration) and subsequent years.

2.      Building and zoning laws and ordinances, and state and federal regulations.

3.      Matters shown on the Title Commitment and Survey and not objected to by Tenant.

**EXHIBIT G**

**PURCHASE OPTION**

Subject to the terms and conditions set forth in this **Exhibit H**, Tenant shall have the option to purchase (the "Purchase Option") the Premises, on the following terms and conditions:

Provided that at the time of exercise of the Purchase Option and closing thereon there exists no uncured Event of Default by Tenant under the Lease, Tenant shall have the one-time option to purchase the Premises during _____ in accordance with this paragraph or an on-going option to purchase the Premises after a casualty as described herein.  If Tenant desires to exercise the Purchase Option, it must give written notice ("Option Notice") to Landlord (a) only during the first calendar month of _____ or (b) following a casualty in accordance with Section 15 of the Lease.  The purchase price shall equal the amount derived by dividing (i) the annual Base Rent in effect as of the date the Option Notice is given by (ii) _____ percent (____%), subject to any applicable reduction pursuant to Section 15 of the Lease.  It is the intention of Landlord and Tenant that the purchase price described in the preceding sentence shall constitute the expected fair market value of the Premises as of the date the Option Notice is given.  Upon receipt of the Option Notice, Landlord shall negotiate in good faith with Tenant the terms and conditions of a purchase and sale agreement, which shall be substantially in the form attached as **Exhibit F-1** to the Lease.  Such purchase and sale agreement shall be entered into by Landlord and Tenant within thirty (30) days following Landlord's receipt of the Option Notice, and closing of the sale pursuant to the purchase and sale agreement shall occur within fifteen (15) Business Days following the date of full execution of the purchase and sale agreement.  It is expressly understood and agreed that the Purchase Option is personal to Tenant (but may be assigned to Tenant Affiliate (as defined in Section 17 of the Lease).

**EXHIBIT H**

**FORM OF LIMITED PARENT GUARANTY**

<u>LIMITED PARENT GUARANTY</u>

This Limited Parent Guaranty ("Guaranty"), effective _____, is made by Amazon.com, Inc. ("Amazon.com") to and for the benefit of _____ ("Beneficiary").  Capitalized terms not otherwise defined herein have the meanings specified in the Contract (as defined below).

# Recitals

A.      _____, a directly or indirectly wholly owned subsidiary of Amazon.com ("Subsidiary"), and Beneficiary are parties to that certain _____ Agreement (the "Contract") effective _____, _____.

B.      In order to be assured of payment under the Contract, Beneficiary desires that Amazon.com guaranty the performance of certain payment obligations as set forth herein.

# Guaranty

In consideration of the foregoing and to induce Beneficiary to enter into the Contract, Amazon.com agrees as follows.

1.      Amazon.com, as a material inducement to and in consideration of Landlord entering into the Leas with Tenant, unconditionally and absolutely guarantees to Beneficiary Subsidiary's performance when due and owing of all present and future payment obligations related to and promises to and for the benefit of Beneficiary, the full, prompt and complete performance, payment, observance and fulfillment by Subsidiary of its rights and responsibilities under the Lease of each and every obligation, provision, term, covenant and condition of the Lease that Tenant is to perform and the payment as and when due of all installments of Base Rent and, Tenant's Proportionate Share of Operating Expense which are not paid in accordance with the terms of the Contract by Subsidiary.  Notwithstanding anything to the contrary set forth in this Guaranty, Amazon.com's maximum cumulative liability under this Guaranty shall be _____% of remaining Base Rent owing under the Contract (the "Guaranty Cap"). Expenses and other monetary obligations payable by Tenant under the Lease for the Lease Term, as the same may be extended, and regardless of whether Tenant has assigned or sublet any interest under the Lease to a third party.  Amazon.com acknowledges and agrees that this Guaranty is an absolute continuing guarantee of payment and performance.

2.      Under this Guaranty, Amazon.com shall perform (or cause Subsidiary to perform) all payment obligations in accordance with the terms and conditions of the Contract Lease.

3.      Amazon.com promises to pay all amounts guaranteed promptly upon receipt of a written notice from Beneficiary which evidences (i) Subsidiary's non-performance of its payment obligations under the Contract, and (ii) Beneficiary's first having demanded payment from Subsidiary in writing, which Subsidiary has not honored.  Beneficiary's demand upon Subsidiary does not need to include the initiation of legal proceedings and is deemed satisfied if demand upon Subsidiary would violate any stay of collection in effect in an insolvency proceeding.  Except to the extent of the demand requirement set forth in this Section 3, Amazon.com waives protest and notice of dishonor or default.  This is a guaranty of payment only, and not of collection.

4.      Guarantor's liability under this Guaranty is primary, direct and immediate.  Guarantor waives the right to require Beneficiary to:

        (a)      Proceed against Tenant or any other person or entity;

{JK00978037.200978035.2 }

(b)     Proceed against or exhaust any security or collateral that Beneficiary holds from Tenant; or

(c)     Pursue any other remedy in Beneficiary's power.

5.     Except as otherwise expressly provided herein, Guarantor hereby waives: (a) notices of acceptances of this Guaranty and of Tenant's default in the Lease obligations; (b) notices of amendments or modifications of the Lease; (c) presentment and demand for payment or performance; (d) notice of any and all acts of Beneficiary to be done to establish the liability of the Guarantor hereunder; (e) demand, protest, notice of any indulgence or extensions granted to Tenant; (f) any requirement of diligence or promptness on the part of Beneficiary in the enforcement of the Lease and any notice thereof; and (g) any other notice whereby to charge the Tenant thereunder.  In addition, Guarantor waives any defense, counterclaim, or offset arising by reason of any legal disability of Tenant (or any of Tenant's assignees or subtenants), or by reason of the cessation from any cause whatsoever of the liability of Tenant or of any of Tenant's assignees or subtenants.  Guarantor further waives any of the following defenses, counterclaims or offsets:  any defense, counterclaim or offset arising from surety, community or separate property, or lower or courtesy rights; and any right or claim of right to cause a marshalling of Tenant assets.  Guarantor shall be liable and remain liable for the payment of the obligations guaranteed hereunder to the extent provided herein notwithstanding:

(a)     Any previous discharge (partial or total) of the Tenant (or any of its assignees or subtenants) from any further liability;

(b)     Any bar (temporary, partial or total) to the pursuit by Guarantor of any right or claim for indemnification from Tenant or any other party;

(c)     Any right or claim by Guarantor to be subrogated to the rights or claims of Landlord against Tenant or any other party or in and to the Premises;

(d)     Any action or inaction or delay in acting by Beneficiary; or

(e)     Landlord's failure to enforce, or delay in enforcing, any of its rights under the Lease, or otherwise.

6.     Except as otherwise expressly provided herein, Guarantor waives notice of acceptance of this Guaranty and all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Guaranty, and waives all notices of the creation, existence, or incurring of new or additional obligations.

7.     Guarantor agrees to pay all costs and expenses, including reasonable attorneys' fees, incurred by Beneficiary in connection with the protection, defense or enforcement of this Guaranty.

8.     This Guaranty shall inure to the benefit of the Beneficiary and its successors and   assigns and any assignee of the Landlord's interest in the Lease, and shall be binding upon Guarantor and its successors and assigns, personal representatives, devisees and heirs.  If Beneficiary Landlord disposes of its interest in the Lease, the term "Beneficiary" as used in this Guaranty shall mean Beneficiary's successors and assigns.

9.     4.  This Guaranty is governed as to its validity, construction and performance by the laws of the State of _____*[enter state used in Contract; Washington is the default]*, without regard to its conflict of law provisions.

10.     5.  Amazon.com agrees that this Guaranty is a continuing guaranty and shall remain in full force and effect until all payment obligations under the ~~Contract~~Lease have been performed as set forth in the ~~Contract, subject to Section 1 above~~Lease.

~~6.     This Guaranty is binding upon and inures to the benefit of Amazon.com and Beneficiary and their respective successors and assigns.~~

11.     7.  Amazon.com has all rights and defenses that each Subsidiary may have to any payment

obligation, except that the liability of Amazon.com is not affected by (a) any defense based upon an election of remedies by Beneficiary that destroys or otherwise impairs the subrogation rights of Amazon.com or the right of Amazon.com to proceed against any Subsidiary for reimbursement; (b) any duty on the part of Beneficiary to disclose to Amazon.com any facts Beneficiary may know about any Subsidiary, it being agreed that Amazon.com is fully responsible for being and keeping informed of the financial condition of each Subsidiary and of all circumstances bearing on the risk of non-payment of the payment obligations; or (c) any defense arising from the bankruptcy or insolvency of any Subsidiary.

12.      8. All notices hereunder will be given in writing, will refer to this Guaranty and will be personally delivered or sent by overnight courier, or registered or certified mail (return receipt requested). Notices to Amazon.com will be delivered at the following addresses:

| Mail | Courier |
|---|---|
| Amazon.com, Inc.<br>P.O. Box 81226<br>Seattle, WA 98108-1226<br>Attn. Real Estate Manager | Amazon.com, Inc.<br>410 Terry Avenue North<br>Seattle, WA 98109-5210<br>Attn. Real Estate Manager |
| With a copy to: | With a copy to: |
| Amazon.com, Inc.<br>P.O. Box 81226<br>Seattle, WA 98108-1226<br>Attn. General Counsel ([Real Estate: Site Code]) | Amazon.com, Inc.<br>410 Terry Avenue North<br>Seattle, WA 98109-5210<br>Attn. General Counsel ([Real Estate: Site Code]) |

Amazon.com may from time to time change such address by giving Beneficiary notice of such change in accordance with this Section 8.

13.      All notices hereunder will be given in writing, will refer to this Guaranty and will be personally delivered or sent by overnight courier, or registered or certified mail (return receipt requested). Notices to Beneficiary will be delivered at the following addresses:

_____
1999 Broadway, Suite 770
Denver, Colorado 80202
Attn: Donald J. Marcotte

With a copy to:_____

_____    Jones & Keller, P.C.
1999 Broadway, Suite 3150
Denver, Colorado 80202
Attn: Kerri P. Assell

**AMAZON.COM, INC.**

By:_____
Printed Name:_____
Its:_____
Date Signed: _____

**EXHIBIT I**



**EXHIBIT J**



**EXHIBIT K**

MAINTENANCE OBLIGATIONS

| LANDLORD MAINTENANCE OBLIGATIONS – OPERATING EXPENSES (RECOVERABLE) | | |
|---|---|---|
| Item | Description of Service | Controllable |
| **Exterior paint** | Paint building exterior to mutually agreeable color and design, no more frequently than once every 7 years | Yes |
| **Elevator permit (if equipped)** | Inspections, compliance and maintenance | Yes |
| **Water pumps outside of building** | General maintenance and repair | Yes |
| **Roof repair (membrane)** | Repair leaks, including preventative maintenance | Yes |
| **Snow removal on roof** | Snow and ice removal from roof, including drain clearing | No |
| **Gutters, scuppers, downspouts and storm water systems** | Keep system functional and conduct repair | Yes |
| **Swales and retention/detention ponds** | Keep system functional and conduct repair, stay compliant with Legal Requirements related to cleaning and operation, and maintain permit or file results if required | Yes |
| **Catch basins (parking lot and drive aisles)** | Ensure functionality, stay compliant with Legal Requirements related to cleaning and operation, and maintain permit or file results if required | Yes |
| **Parking lot seal coat and striping after seal coat** | Re-coat all asphalt areas and re-stripe parking lot after seal coat | Yes |
| **Fire water pumps and remote pump houses and associated equipment** | Inspections, compliance and maintenance | Yes |

| LANDLORD MAINTENANCE OBLIGATIONS – CAPITAL IMPROVEMENTS (NON-RECOVERABLE) | | |
|---|---|---|
| Item | Description of Service | Controllable |
| **Landscaping (non-recurring service)** | Items outside of maintenance, such as tree removal, replacement, re-grading, overhauling, etc. | N/A |
| **Parking lot asphalt and concrete replacement** | Replace sections as needed based on useful life | N/A |
| **Roof replacement and repair (structural)** | Repair and replacement of roof deck and structural components | N/A |
| **Slab and foundation** | Ensure integrity, conduct repair, including voids and cavities in soils and fill under slab and around foundation | N/A |
| **Exterior walls and load-bearing walls** | Ensure integrity, conduct repair and replace wall sections as needed | N/A |
| **Electrical system** | Maintenance, repair and replacement of transformer, electrical switchgear and other components of the electrical system located outside the Premises or subgrade | N/A |
| **Subgrade utility lines** | Maintenance, repair and replacement of all subgrade utility lines, including sewer, plumbing and pumps and lift stations, if any | N/A |
| **Subgrade portions of fire sprinkler and fire protection systems** | Maintenance, repair and replacement | N/A |

| TENANT MAINTENANCE OBLIGATIONS (after warranty period if applicable) | | |
|---|---|---|
| Item | Description of Service | Controllable |
| **Window washing** | Washing of exterior and interior glazing | N/A |
| **Exterior glazing** | Repair broken and/or damaged glass and seals | N/A |
| **Exterior building lighting (wall packs and soffit)** | Maintenance and repair of exterior lighting (wall packs and soffit) | N/A |
| **Fire sprinkler system** | Subject to Section 10(a) of the Lease, inspections, compliance and maintenance of (1) those portions of the base fire sprinkler system that are inside of the Premises and downstream from the pump, and (2) any Tenant-installed supplemental fire/life safety systems | N/A |
| **Fire testing/inspections** | Fire testing/inspections | N/A |
| **Fire system monitoring** | Monitoring of above-ground portions of fire systems | N/A |
| **Generator** | If installed or requested by Tenant | N/A |
| **Lighting and ballast replacement** | Maintenance, repair and replacement of bulbs and ballasts | N/A |
| **Interior walls and floor coverings** | Maintenance and replacement of walls and flooring | N/A |
| **Carpentry – Doors, cabinets,** | Maintenance and repair of doors and millwork | N/A |

| | | |
|---|---|---|
| counters, etc. | | |
| Suspended ceilings and hard lids | General maintenance and repair | N/A |
| Electrical service (after main feed, above slab) | General maintenance and repair | N/A |
| Janitorial | Janitorial services, if desired | N/A |
| Kitchen appliances | General maintenance and repair | N/A |
| Below-deck ceiling insulation (if equipped) | The maintenance and replacement of insulation materials that are suspended just below the roof deck | N/A |
| HVAC | Subject to Section 11 of the Lease, maintenance, repair and replacement of HVAC units | N/A |
| Fixtures and Tenant's Property | General maintenance and repair | N/A |
| Plumbing – Above slab | General maintenance and repair | N/A |
| Landscaping and irrigation (recurring services) | Recurring services for landscape maintenance including mowing, fertilizing, leaf removal, pruning, and annual color of Landlord-installed landscape; repair irrigation system as needed | N/A |
| Backflow devices, if any | Necessary testing, inspecting, maintenance, and permit management | N/A |
| Environmental testing, if any | Necessary testing, inspecting, maintenance, and permit management | N/A |
| Parking lot sweeping | Parking lot sweeping | N/A |
| Snow removal – Grounds, parking lots | Remove snow and/or treat ice | N/A |
| Paved surfaces maintenance | Repair potholes in parking lot, truck courts and drive aisles, including treating of cracks and alligatoring | N/A |
| Miscellaneous parking lot striping | Re-stripe parking lot (provided that Landlord shall re-stripe after seal coating) | N/A |
| Curb repair | Maintenance and repair of concrete curbs | N/A |
| Parking lot lights | Maintenance and repair of parking lot lights (fixtures and poles) | N/A |
| Exterior and interior pest control | As needed | N/A |
| Trash and recycling | As needed | N/A |
| Exterior fencing | Maintain gates and fences around premises | N/A |
| Site signage and building signage | Maintain and update signage as needed | N/A |
| Energy and Communications Equipment | General maintenance and repair | N/A |
| Dock doors and support equipment | General maintenance and repair | N/A |
| Interior sump pump or lift stations | General maintenance and repair | N/A |



# ABOUT NORTHSTAR COMMERCIAL PARTNERS

*As featured in:*

### Amazon's Whole Foods Deal Will Remake Strip Malls

What happens to small businesses if grocery stores shut down?





**BRIAN WATSON**
GUEST WRITER

Chairman and CEO at Northstar Commercial Partners

# Entrepreneur.

The implications of Amazon's $13.7-billion Whole Foods Market purchase will go significantly beyond the world of grocery stores, potentially reshaping retail districts in downtowns and suburban shopping areas across America.

---

# Pensions&Investments

REAL ESTATE

## Investors, tenants demanding that managers go green

### Good sense

"It makes good social sense and corporate sense," said Brian Watson, chairman and CEO of the real estate firm that has $1 billion in assets under management.

"With all of our assets, we consider ways to make them more environmentally friendly for the employees that will eventually locate in our buildings and for the companies (tenants) as well," Mr. Watson said.

There is a demand from tenants for buildings that use technology to be more efficient and create a healthier environment for tenants, he said.

Mr. Watson estimates that Northstar's funds have reaped double-digit cash-on-cash savings from sustainability efforts. Making a building more energy efficient by adding solar panels, for example, can bring down utility charges about 30%. These efforts also help to retain existing tenants and attract new tenants, he said.

---

# *Market*Watch

By BRIAN WATSON



## Opinion: We're near the point where this overhyped, overpriced real-estate market flames out

*It's the dangerous ninth inning for this part of New York City's property market, and the cracks are showing.*



CREATING OPPORTUNITY, EMPOWERING PEOPLE,
STRENGTHENING COMMUNITIES.



## CREATING OPPORTUNITY, EMPOWERING PEOPLE, STRENGTHENING COMMUNITIES.

### NORTHSTAR COMMERCIAL PARTNERS

Northstar Commercial Partners ("Northstar") is a commercial real estate investment company based in Denver, Colorado. Since its formation in 2000, Northstar acquires and operates real estate opportunities throughout the United States.

The Founder and CEO of Northstar Commercial Partners, Brian Watson, invests his personal capital in every acquisition of the company. Such personal commitment in the investment process helps align the interests of the company with the long-term profit objectives of its outside capital partners.

Northstar's investments offer compelling opportunities to new and experienced commercial real estate investors, just as the North Star has provided guidance to those seeking fortune throughout the centuries.

### MISSION STATEMENT

*Northstar Commercial Partners is a commercial real estate investment company that seeks to enhance the life and spirit of its employees and the community in which it operates and invests, while striving to provide generous financial returns to its capital partners.*

# The Strategy

Traditionally, investors have experienced difficulty accessing commercial real estate investment opportunities on an individual property basis, due to economic scale, complexity, limited knowledge of the industry, and geographic location. These barriers to entry exist because most markets are dominated by a relatively small group of owners, developers, and brokerage professionals.

Northstar Commercial Partners acquires and manages commercial investment properties throughout the United States from acquisition through disposition. Each investment is orchestrated through a single-purpose limited liability company or fund that Northstar creates and directs. Except with respect to Northstar's funds, capital partners may review and invest in each investment opportunity on a stand-alone basis.  Consequently, investors can evaluate the merit of a specific investment to ascertain if it meets their investment criteria.



**Principles of Success**

Commitment

Loyalty

Integrity

Honesty

   

# Acquisitions

Northstar has significant experience working with individuals, lenders/financial institutions and international corporations in the acquisition of their excess non-strategic real estate. Such transactions have included sale leasebacks, build-to-suits, sale of vacant assets to transfer liability and create cashflow, and depreciation of operating company acquisitions through monetizing facilities. In addition, Northstar frequently sells its improved assets to companies for their occupancy.

*"Northstar Commercial Partners proved to be remarkably creative in terms of deal structure and extremely nimble and proactive in regard to timing. I was impressed with Brian Watson's ability to see our desired end-game from this particular transaction as it related to separating the real estate asset from the business."*

*Mr. Tom Silvers, Director, Corporate Real Estate*
*Ball Corporation*

## CURRENT AND PAST INVESTMENTS INCLUDE

- *Acquisitions with the intent to hold for an extended period of time due to long-term cashflow benefits*
- *Complex national portfolio acquisitions from Fortune 500 companies as well as private owners*
- *Renovations and repositioning of vacant opportunity-driven assets*
- *Purchase and remediation of environmentally impacted properties*
- *Acquisition of notes and properties from lenders/financial institutions*
- *Ground-up development projects*

## PRIMARY BENEFITS OFFERED TO CAPITAL PARTNERS

- *Tax benefits derived from real estate investment through participation in a single-purpose limited liability company or fund*
- *The ability to invest in a specific acquisition or fund according to an investor's financial objectives*
- *Confidential investment and financial reporting provided on a quarterly basis*
- *Integrated asset management including property management, capital construction management, environmental remediation, as well as professional project marketing*
- *Ability to communicate directly with the investment manager*




# INVESTMENT STRUCTURE

The Founder and CEO of Northstar Commercial Partners, Brian Watson, functions as the managing partner in a limited liability company or fund that is formed for the purpose of acquiring and operating each specific investment. Except for the funds, this arrangement provides capital investors with a flexible, stand-alone investment entity for every Northstar project. A limited liability company Operating Agreement and/or Private Placement Memorandum incorporates clear operating procedures, and, through its structure, provides standard protection from exposure to full personal liability for investors.

Though each investment varies in terms of the structure of the limited liability company or fund, depending upon the purpose of that specific transaction, to date all capital partners have the opportunity to earn a preferential return on their investment capital, and a return of their capital from the positive cash flows generated by the real estate asset. After capital partners have received these returns, Northstar's principals then share in a portion of the remaining net profits of the investment through designated sharing ratios with the capital partners. Projected net profits are always stated in the investment analysis and may be realized upon refinancing, cashflows received, and/or the disposition of the asset.

**To date, Northstar has not received any incentive compensation until its investors have received a preferred return on their total capital contribution and the return of their original investment.** This differentiates the company from some other fee-driven or money management-oriented firms. **In addition, the founder of Northstar personally invests his own capital in each of Northstar's investments.** Such personal commitment through the investment process helps to align the interests of the company with the long-term wealth creating objectives of its capital partners.

Each investment pro forma analysis provides the projected returns for a potential investor to review. As with any investment opportunity, no specific returns can be guaranteed. It is recommended by Northstar Commercial Partners that any party to a transaction consult with competent legal and tax advisors.




# Relationships

Strong long-term relationships are the foundation upon which Northstar Commercial Partners has built its success. Northstar has developed such relationships with sellers, industry professionals, and its capital partners. Northstar strives to apply the highest standards of skill, diligence, and integrity at each stage of every transaction.






# Partners' Seller Relationships

As a part of Northstar Commercial Partners' definition of success, the company knows that cultivating positive relationships with individual and corporate sellers is vitally important. On several occasions, an initial asset purchase has been followed by subsequent transactions with the same seller. A seller's desire to transact with Northstar Commercial Partners for multiple assets creates further opportunity for both parties.

Northstar may provide the following benefits to sellers, depending on the transaction:

– Acquisitions with no financing contingencies
– An experienced and creative buyer that can structure an acquisition to meet the seller's needs
– The ability to purchase single properties or a national portfolio of vacant or leased assets
– Transfer liabilities of property ownership off the Balance Sheet into cash assets for the seller
– Confidential acquisitions of environmentally impacted assets
– Flexibility to accommodate 1031 exchanges or facility decommissioning
– Acquisitions throughout the United States as well as internationally
– Aggressive due diligence timelines to mitigate the seller's exposure

*"The exceptional management team, overall responsiveness and the quality of work, are just three of the many reasons we are pleased with Northstar Commercial Partners and their sub-contractors."*

*Mr. Dave Sheriff, Owner*
*Healthstyles Exercise Equipment*

# BROKER RELATIONSHIPS

Northstar encourages the participation of commercial real estate brokers in its transactions. As a former commercial broker with Cushman & Wakefield, Inc., the company's Founder and CEO, Brian Watson, understands and appreciates the critical role such individuals contribute to the deal process. Whether in the initial acquisition, or subsequent representation of Northstar in the lease-up or sale process, Northstar works with the brokerage community.



*Northstar Capabilities*

*Acquisition / Disposition*

*Property Management*

*Asset Management*

*Construction*

  

# INDUSTRY RELATIONSHIPS

Another method of identifying and cultivating investment opportunities occurs when an industry leader offers a core competency that makes a partnership between Northstar Commercial Partners and the company logical and financially rewarding for each party. Under this operating plan, Northstar identifies an investment opportunity that presents one or more challenges that can be resolved by a specific industry leader's expertise. Northstar Commercial Partners secures that property, authors the investment strategy, and assembles the appropriate team for the acquisition. Northstar's established relationships and familiarity with the strengths of many national firms has helped the company to form strategic partnerships with industry leaders across the country.

 

*"We very much appreciate Northstar's quick responsiveness, attention to detail, and professionalism throughout this sometimes very trying process. We also appreciate their upstanding working relationship with our company and others within the Denver commercial real estate brokerage community. Northstar Commercial Partners is truly a first class organization in every sense of the word."*

*Mr. Bill Thompson, First Vice President*
*CB Richard Ellis, Inc.*

# Capital Partner Relationships

The creation of successful long-term capital partnerships is a primary focus of Northstar Commercial Partners. Through employing the principles of commitment, loyalty, integrity, and honesty with a focused and creative investment strategy, Northstar strives to strengthen these relationships. As a result of the company's track record with respect to its financial returns to investors, many capital partners continually invest in the successive acquisitions of the company.

Northstar Commercial Partners differentiates itself from other commercial real estate investors through its creative identification of attractive investment opportunities, with a focus on the acquisition of distressed industrial, office, and retail properties.

Northstar proactively acquires, manages, and improves the assets it purchases from concept through completion. The company provides professional property management, improvement oversight, construction management services, and disposition services for the properties it acquires. Since Northstar prefers to keep these services in-house, it remains focused and in control of all aspects of managing the assets it owns.

*"In my work with the Principals of Northstar Commercial Partners, I have been impressed by their tenacious pursuit of deals from introduction through completion."*

*Mr. Chetter Latcham, President*
*Shea Homes*




The company's investors select the acquisitions in which to place their capital based on their personal investment objectives, the investment strategy, and projected returns. For the funds, risks traditionally associated with fluctuations in the market are mitigated through the combination of portfolio diversification and conservative due diligence, which includes comprehensive modeling and financial analysis.

Northstar prides itself on best of class service and its ability to provide unique investment structures for its capital partners. The firm's proactive, highly customized approach to commercial real estate investment provides access to an alternative wealth creating investment opportunity for many capital partners.

# LEADERSHIP



Brian Watson is the Founder and CEO of Northstar Commercial Partners ("Northstar"). In this capacity he manages the firm's overall business, new initiatives, investment strategies and all major investment decisions, as well as sits on the investment committee of all underlying funds. Since founding the firm in 2000, Brian has positioned Northstar as a leading multi-faceted, vertically integrated real estate company. Northstar's line of business, which is value-add real estate focused on job creation, is currently one of the premier acquirers of vacant and/or value-add properties in markets throughout the United States. Northstar focuses on buying these assets from lenders, corporations and other owners, then improving and placing them back into productivity in order to create jobs and opportunities in their local communities and, in the process, delivering significant returns to its investors. To date, Brian has personally overseen the acquisition of over $475 million of property value and has purchased over 11 million square feet in 118 separate properties with his capital investors.

Brian began his career at Cushman & Wakefield of Colorado, Inc. (C&W), an international commercial real estate firm. During his seven year tenure at this firm, he had the distinction of being the youngest broker in company history to qualify for a Directorship title, which was a direct result of his consistent high production and comprehensive understanding of commercial real estate.

Though Brian performed tenant representation, he primarily focused on landlord representation for the majority of his career at C&W. He represented clients such as Lend Lease Real Estate, CarrAmerica Realty LP, P&O Investments/Denver Technological Center, Mission Viejo Companies, Shea Properties, Terrabrook, ERE/Yarmouth and acted as agent for two major Colorado office parks, Highlands Ranch and Stonegate. He also received C&W's prestigious Service Excellence Award for his superior ability to handle complex, high value transactions. Mr. Watson's extensive education and experience in the real estate industry has been instrumental to the success of Northstar Commercial Partners.





Brian is a graduate of the University of Colorado at Boulder, where he received a BS with an emphasis in Real Estate. He has been married to his wife Patricia Watson, a practicing lawyer, since 1997. Patricia and Brian live in Denver, Colorado and have three children. Brian has lived in the State since 1981, and grew up in Olathe on the Western Slope of Colorado.

The business model of Northstar focuses on having a positive impact on its investors, tenants, vendors, local community, and world at large by creating jobs and opportunity through profitable commercial real estate investments. Brian has a deep sense of faith that compels him to find the good in people and leave the world a better place than it was when he was born into. For this reason, he contributes a portion of his fees and interests from his business endeavors and donates them to charitable projects in his community and abroad. Brian's initiatives stretch throughout the globe with a focus on bridging the gap between people of different faiths and cultures. You can learn more about this and other initiatives at: www.brianwatson.us





1999 Broadway
Suite 770
Denver, CO 80202 USA
Phone: 303.893.9500
Fax: 303.893.9505
www.northstarcommercialpartners.com



# ABOUT DEVELOPMENT