# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

AMAZON.COM, INC., et al.

Plaintiffs,

v.                                              CIVIL ACTION No. 1:20cv484

WDC HOLDINGS LLC, et al.,

Defendants.

## DEFENDANTS BRIAN WATSON, WDC HOLDINGS LLC, STERLING NCP FF, LLC, MANASSAS NCP FF, LLC, AND NSIPI ADMINISTRATIVE MANAGER'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     ARGUMENT ............................................................................................................... 3

   A.   Legal Standard ....................................................................................................... 3

   B.   Jurisdiction and Venue Are Inappropriate ............................................................ 5

   C.   Plaintiffs Have Not Pleaded With Particularity ..................................................... 7

   D.   Plaintiffs Have Failed to Allege Plausible Claims ................................................ 9

      1.   Plaintiffs Have Not Alleged a Viable RICO Claim ................................... 9

      2.   Plaintiffs' Detinue Claims Should Be Dismissed .................................... 17

      3.   Plaintiffs' Fraud Claims Are Unfounded ................................................. 18

      4.   Plaintiffs Have Not Pleaded a Viable Tortious Interference Claim ........... 24

      5.   The Civil Conspiracy Claim Should Be Dismissed .................................. 26

      6.   The Breach of Contract Claims Fail as a Matter of Law ........................... 27

      7.   Amazon's Unjust Enrichment Claim Should Be Dismissed ...................... 28

      8.   Amazon's Conversion Claim Should be Dismissed .................................. 31

      9.   Amazon's Alter Ego Claim Should be Dismissed .................................... 32

     10.   Respondeat Superior is Inapplicable ....................................................... 33

     11.   The Robinson Patman Claim Should be Dismissed .................................. 34

   E.   Plaintiffs Have Not Shown How They Have Been Harmed ................................ 38

III.    CONCLUSION ....................................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,*
  369 F.3d 732 (3d Cir. 2004) ............................................................... 37

*ACA Financial Guaranty Corp. v. Goldman, Sachs & Co.,*
  32 N.E.3d 921 (N.Y. 2015) ................................................................. 23

*Aggarwal v. Sikka,*
  No. 1:12cv60, 2012 WL 12870349 (E.D. Va. June 12, 2012) .................... 10

*Al-Abood ex rel. Al-Abood v. El-Shamari,*
  217 F.3d 225 (4th Cir. 2000) ............................................................... 11

*Alex v. Mabus,*
  No. 1:11cv1207 (LMB/IDD), 2012 WL 2366151 (E.D. Va. June 20, 2012) ........ 3, 4

*Allen Realty Corp. v. Holbert,*
  318 S.E.2d 592 (Va. 1984) .................................................................. 26

*Am. Sur. Co. v. Hannah,*
  130 S.E. 411 (Va. 1925) ..................................................................... 23

*American Bancard, LLC v. East Payment Solutions,*
  No. 18-cv-80681, 2018 WL 3708462 (S.D. Fla. Aug. 3, 2018) ................... 13

*Anderson v. Found. For Advancement, Educ. & Emp't of Am. Indians,*
  155 F.3d 500 (4th Cir. 1998) ............................................................... 11

*Arias v. Jokers Wild, Inc.,*
  73 Va. Cir. 281, 2007 WL 6013198 (Va. Cir. Ct. 2007) ........................... 32

*Arnold v. Moran,*
  687 F. Supp. 232 (E.D. Va. 1988) .......................................................... 9

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 3, 4

*Bank of Hampton Rds. v. Powell,*
  785 S.E.2d 788 (Va. 2016) .................................................................. 32

*Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.,*
  152 F.3d 313 (4th Cir. 1998) ............................................................... 27

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................ 3, 4

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,*
  448 F.3d 573 (2d Cir. 2006) ................................................................ 29

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
  369 F.3d 212 (2d Cir. 2004) ................................................................ 36

*Boers v. United States,*
  133 F. Supp. 2d 64 (D.D.C. 2001) .......................................................... 7

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ......................................................................... 36

*Brown v. Gilner,*
  No. 1:10-cv-00980 (AJT/IDD), 2012 WL 4473086 (E.D. Va. Sept. 25, 2012) ....... 38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................ 35, 37
*Bunker Ramo Corp. v. Cywan*,
    511 F. Supp. 531 (N.D. Ill. 1981) ......................................................... 37
*CGI Fed. Inc. v. FCi Fed., Inc.*,
    814 S.E.2d 183 (Va. 2018) ...................................................................... 28
*Chaves v. Johnson*,
    335 S.E.2d 97 (Va. 1985) ........................................................................ 24
*Citibank, N.A. v. TPI Grp., Inc.*,
    No. 13CV1007, 2014 WL 2579984 (E.D. Va. June 9, 2014) ................. 4
*Cory v. Aztec Steel Bldg., Inc.*,
    468 F.3d 1226 (10th Cir. 2006) ............................................................. 6
*Crenshaw v. Antokol*,
    287 F. Supp. 2d 37 (D.D.C. 2003) ........................................................ 6
*Crestar Bank v. Williams*,
    462 S.E.2d 333 (Va. 1995) ...................................................................... 32
*Devine v. Buki*,
    767 S.E.2d 459 (Va. 2015) ...................................................................... 38
*Dunlap v. Cottman Transmission Sys., LLC*,
    754 S.E.2d 313 (Va. 2014) ...................................................................... 25
*Dunn Constr. Co. v. Cloney*,
    682 S.E.2d 943 (Va. 2009) ................................................................. 19, 22
*Dunn, McCormack & MacPherson v. Connolly*,
    708 S.E.2d 867 (Va. 2011) ...................................................................... 25
*Economopoulos v. Kolaitis*,
    528 S.E.2d 714 (Va. 2000) ...................................................................... 31
*ESAB Group, Inc. v. Centricut, Inc.*,
    126 F.3d 617 (4th Cir. 1997) .................................................................. 6
*Evaluation Research Corp. v. Alequin*,
    439 S.E.2d 387 (Va. 1994) ...................................................................... 18
*Export Liquor Sales, Inc. v. Ammex Warehouse Co.*,
    426 F.2d 251 (6th Cir.) *cert. denied,* 400 U.S. 1000 (1970) ............... 35
*Fed. Sav. & Loan Ins. Corp. v. Quality Hotels and Resorts, Inc.*,
    928 F.2d 399, 1991 WL 30211 (4th Cir. 1991) ................................... 29
*First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*,
    672 F. App'x 229 (4th Cir. 2016) .......................................................... 37
*Fitzgerald v. Vogel*,
    No. 02-7849, 2003 WL 203562 (E.D. Pa. 2003) ................................. 6
*Flip Mortg. Corp. v. McElhone*,
    841 F.2d 531 (4th Cir. 1988) .......................................................... 9, 10, 11
*Foreign Mission Bd. of S. Baptist Convention v. Wade*,
    409 S.E.2d 144 (Va. 1991) ...................................................................... 19

*FTC v. Henry Broch & Co.,*
  363 U.S. 166 (1960) .................................................................. 34

*FTC v. Sun Oil Co.,*
  371 U.S. 505 (1963) .................................................................. 34

*Giant of Md., Inc. v. Enger,*
  515 S.E.2d 111 (Va. 1999) ........................................................ 33

*Goines v. Valley Cmty. Servs. Bd.,*
  822 F.3d 159 (4th Cir. 2016) .................................................. 4, 5

*Gov't Emps. Ins. Co. v. Google, Inc.,*
  330 F. Supp. 2d 700 (E.D. Va. 2004) ....................................... 26

*H.J. Inc. v. Northwestern Bell Telephone,*
  429 U.S. 229 (1989) .................................................................. 10

*Hairston Motor Co. v. Newsome,*
  480 S.E.2d 741 (Va. 1997) ........................................................ 31

*Herald Schmidt v. Household Fin. Corp.,*
  661 S.E.2d 834 (Va. 2008) ........................................................ 28

*Hix Corp. v. Nat'l Screen Printing Equip. Inc.,*
  108 F.Supp.2d 1204 (D. Kan. 2000) ................................... 36, 37

*ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc.,*
  520 S.E.2d 355 (Va. 1999) ........................................................ 38

*J. Truett Payne Co. v. Chrysler Motors Corp.,*
  451 U.S. 557 (1981) .................................................................. 35

*James G. Davis Constr. Corp. v. FTJ, Inc.,*
  841 S.E.2d 642 (Va. 2020) ........................................................ 28

*Jones v. Bank of Am. Corp.,*
  No. 4:09cv162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) ........... 31, 32

*Jordan v. Hudson,*
  690 F. Supp. 502 (E.D. Va. 1988) ............................................. 26

*Liu v SEC,*
  __ U.S. __ (2020) ..................................................................... 41

*Lloyd v. Smith,*
  142 S.E. 363 (Va. 1928) ............................................................ 38

*Lokhova v. Halper,*
  441 F. Supp. 3d 238 (E.D. Va. 2020) ......................................... 33

*MacPherson v. Green,*
  197 S.E.2d 785 (Va. 1955) ........................................................ 17

*Matthew Enter., Inc. v. Chrysler Grp. LLC,*
  No. 13-cv-04236-BLF, 2015 WL 3664843 (N.D. Cal. Jan. 12, 2015) ........... 35, 36

*Menasco, Inc v. Wasserman,*
  886 F.2d 681 (4th Cir. 1989) ..................................................... 10

*Metrocall of Del., Inc. v. Cont'l Cellular Corp.,*
  437 S.E.2d 189 (Va. 1993*)* ..................................................... 23

*Mich. Mut. Ins. Co. v. Smoot,*
  183 F. Supp. 2d 806 (E.D. Va. 2001) .................................................................. 29

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
  248 F.3d 321 (4th Cir. 2001) ................................................................................ 16

*Mitrano v. Hawes,*
  377 F.3d 402 (4th Cir. 2004) .................................................................................. 5

*Mortarino v. Consultant Eng'g Servs.,*
  467 S.E.2d 778 (Va. 1996) .................................................................................... 18

*Nedrich v. Jones,*
  429 S.E.2d 201 (Va. 1993) .................................................................................... 28

*Novell, Inc. v. Microsoft Corp.,*
  505 F.3d 302 (4th Cir. 2007) ................................................................................ 36

*Parker v. Carilion Clinic,*
  819 S.E.2d 809 (2018) ........................................................................................... 33

*Patterson v. Ford Motor Credit Co.,*
  203 F.3d 821, 2000 WL 123943 (4th Cir. 2000) .................................................. 34

*People, Tech., and Processes, LLC v. Bowhead Logistics Solutions, LLC,*
  No. 1:17-cv-282, 2017 WL 2264476 (E.D. Va. May 23, 2017) ........................... 26

*Piper Aircraft v. Reyno,*
  454 U.S. 235 (1981) ................................................................................................ 7

*Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.,*
  153 F.3d 938 (9th Cir. 1998) ................................................................................ 35

*Republican Party of N.C. v. Martin,*
  980 F.2d 943 (4th Cir. 1992) .................................................................................. 3

*Rice Contracting Corp. v. Callas Contractors, Inc.,*
  No. 1:08cv1163, 2009 WL 21597 (E.D. Va. Jan. 2, 2009) ..................................... 6

*Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.,*
  507 S.E.2d 344 (Va. 1998) .............................................................................. 18, 19

*Rivera v. Wells Fargo Bank, N.A.,*
  No. 1:15-cv-1703, 2016 WL 1271038 (E.D. Va. Mar. 29, 2016) ........................... 4

*Robertson v. Sea Pines Real Estate Cos.,*
  679 F.3d 278 (4th Cir. 2012) .................................................................................. 4

*Saxby v. Southern Land Co.,*
  63 S.E. 423 (Va. 1909) .......................................................................................... 24

*Schaecher v. Bouffault,*
  772 S.E.2d 589 (Va. 2015) .................................................................................... 24

*Schumaker v. Mather,*
  30 N.E. 755 (N.Y. 1892) ....................................................................................... 23

*Sec'y of State for Defense v. Trimble Navigation Ltd.,*
  484 F.3d 700 (4th Cir. 2007) .................................................................................. 4

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) ................................................................................................ 9

# TABLE OF AUTHORITIES

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*,
    249 F. Supp. 2d 703 (D. Md. 2003) ....................................................................... 29

*Simmons v. Miller*,
    544 S.E.2d 666 (Va. 2001) ................................................................................... 31

*State Analysis, Inc. v. Am. Fin. Servs. Assoc.*,
    621 F. Supp. 2d 309 (E.D. Va. 2009) ..................................................................... 3

*Stephen Jay Photography Ltd. v. Olan Mills, Inc.*,
    903 F.2d 988 (4th Cir. 1990) ......................................................................... 34, 37

*Sucampo Pharm., Inc v. Astellas Pharma, Inc.*,
    471 F.3d 544 (4th Cir. 2006) ................................................................................. 6

*Tate v. Colony House Builders, Inc.*,
    508 SE 2d 597 (Va. 1999) ................................................................................... 24

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
    57 F.3d 1317 (4th Cir. 1995) ............................................................................... 36

*Tudor Associates, Ltd., II v. AJ and AJ Servicing Incorporated*,
    Nos. 93-2294, 93-2326, 36 F.3d 1094 (4th Cir. Sept. 20 1994) ............................ 10

*TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*,
    462 F.2d 1256 (8th Cir. 1972) ............................................................................. 35

*United Leasing Corp. v. Thrift Ins. Corp.*,
    440 S.E.2d 902 (Va. 1994) ................................................................................... 31

*United States v. Cohen*,
    152 F.3d 321 (4th Cir. 1998) ............................................................................... 17

*United States v. Moffitt, Zwerling & Kemler*,
    875 F. Supp. 1190 (E.D. Va. 1995) ..................................................................... 17

*United States v. Philip Morris USA, Inc.*,
    396 F.3d 1190 (D.C. Cir. 2005) ........................................................................... 41

*United States v. Pinson*,
    860 F.3d 152 (4th Cir. 2017) ................................................................................. 9

*Van Vleck v. Sallyport Global Holdings, Inc.*,
    No. 1:19-cv-60, 2019 WL 2273845 (E.D. Va. May 28, 2019) ............................... 3

*Vanguard Military Equip. Corp. v. David B. Finestone Co.*,
    6 F. Supp. 2d 488 (E.D. Va. 1997) ..................................................................... 19

*Victoria Select Ins. Co. v. R & G Transp.*,
    No. 3:16-cv-624, 2017 WL 5158684 (E.D. Va. Sept. 7, 2017) ............................ 34

*Want v. St. Martins Press LLC*,
    No. 1:12-cv-908, 2012 5398887 (E.D. Va. Nov. 1, 2012) ...................................... 4

*Whitney, Bradley & Brown, Inc. v. Kammermann*,
    436 F. App'x 257 (4th Cir. 2011) ................................................................... 9, 11

*York v. Jones*,
    717 F. Supp. 421 (E.D. Va. 1989) ....................................................................... 17

# TABLE OF AUTHORITIES

**Statutes**

15 U.S.C. § 13 .................................................................................................. 34, 36
15 U.S.C. § 15 ........................................................................................................ 35
18 U.S.C. § 1962 ............................................................................................... 12, 16
28 U.S.C. § 1367 ...................................................................................................... 5
28 U.S.C. § 1391 ...................................................................................................... 6
28 U.S.C. §1332 ....................................................................................................... 5
Va. Code § 8.01-114(A)(1) ..................................................................................... 17
Va. Code Ann. §§ 18.2-499 to -501 ....................................................................... 26

**Other Authorities**

Bill Stoller, *Why the Northern Virginia Data Center Market Is Bigger Than Most Realize* (Feb. 15, 2019) .............................................................................................................. 23
Elizabeth Weise, *Amazon HQ2 Timeline: The Winners are New York City and Arlington, Virginia*, USAToday.com .......................................................................................... 23
Kaya Yurieff, *Everything We Know About Amazon's HQ2 Search*, CNN.com ........................... 23
Lauren Feiner, *Jeff Bezos Says He Will Ultimately Decide Amazon HQ2's Location on 'Intuition'*, CNBC.com ............................................................................................... 24
Monica Nickelsburg, *Amazon Directly Visits HQ2 Cities in Phase 2 of Extraordinary Second Headquarters Competition*, Geekwire.com ........................................................... 23
Restatement (Third) of Restitution and Unjust Enrichment ch. 3, topic 2 (2011) ................. 28, 29
Restatement of Restitution § 110 (1937) ..................................................................... 29

**Rules**

Fed. Rule Civ. P. 12 ............................................................................................... 16
Fed. Rule Civ. P. 9 ............................................................................................... 7, 8

Defendants Brian Watson ("Watson"), WDC Holdings LLC, dba Northstar Commercial Partners ("Northstar"), Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager (collectively, the "Watson Defendants") respectfully request that the Court dismiss Plaintiffs' Second Amended Complaint (the "Complaint") with prejudice.

## I.  INTRODUCTION

The precise factual and legal bases for Amazon's Complaint continue to shift.  Although the Court is yet to rule on any motion to dismiss, Amazon is on its fourth complaint.  Amazon has continuously had to modify its allegations to correct its mistakes, add new parties about which it has always known but inexplicably omitted from its original complaint, and attempt to justify its changes.  Although this motion to dismiss challenges the legal sufficiency of Amazon's Complaint, the Watson Defendants strenuously dispute many of the material factual underpinnings of the Complaint.  For purposes of this motion to dismiss, however, the Watson Defendants accept well-pled allegations in the Complaint, including allegations premised on documents referenced or integrated into the Complaint.  Many of those documents, however, flatly contradict Amazon's allegations.  Based on Amazon's well-pled allegations and the documents incorporated into the Complaint, the Complaint must be dismissed.

Plaintiffs have attempted to shoehorn what is, at best, a state law breach of contract and fraud case, into a federal RICO case.  The latest Complaint essentially alleges two different purported RICO schemes: one dealing with a series of lease transactions that were negotiated by Northstar, and a second that involved a real estate purchase in which Northstar had no direct involvement, but which led to a dispute between Northstar and two of its former employees that was later settled.[1]  Amazon previously alleged these schemes as separate enterprises, but now

---

[1] These claims were listed in separate counts in prior versions of the Complaint, but are now broken out as separate alleged transactions within Count I.

attempts to jam all of its alleged claims into one disjointed "enterprise." Amazon fails to adequately plead a cognizable RICO claim with respect to any purported scheme.

Plaintiffs also fail to allege plausibly that either purported scheme resulted in any legally cognizable harm to Amazon. To this day, Amazon has not sought rescission of the lease agreements but has instead accepted—and continues to accept—the benefit of the lease transactions. It is undisputed that Amazon made no payments to Northstar. Rather, Plaintiffs' claimed damages are the fees paid to Northstar by various landlord entities that Amazon did not sue. Nor will the vaguely alleged reputational harm suffice as legally cognizable damages under Amazon's RICO claims.

Similarly, Amazon has taken possession of the so-called "White Peaks" property and has not sought rescission of that sale. While it is true that the sellers of that property realized a large gain as alleged in the Complaint, when Amazon agreed to the White Peaks transaction in July 2019, it already knew that the property had been purchased in 2018 for approximately $20 million. Amazon also knew that NOVA WPC LLC was purchasing the property for approximately $98 million because that contract was attached to Amazon's purchase contract. The prices for these transactions were obvious from the face of the contracts reviewed and signed by Amazon. It could not have been deceived in any way—especially given the multi-step transaction approval process alleged by Amazon. That Amazon might now feel foolish or chagrined that it did not negotiate a better deal does not give rise to RICO claims. But that is exactly what the "Direct Purchase" scheme presents to the Court.

Similarly, Plaintiffs' state law claims have numerous legal defects that mandate dismissal. For example, Plaintiffs bring breach of contract claims but no Watson Defendant is a party to any contract with Plaintiffs. Plaintiffs also allege that Defendants misled them into signing contracts

but point to contract provisions in unsigned agreements and/or which otherwise pertain to ancillary issues that do not support the allegations made by Plaintiffs.

Beyond those glaring deficiencies, Plaintiffs bring a veritable kitchen sink of other state law claims—none of which is legally cognizable. Plaintiffs' claims against the Watson Defendants all come down to the factual contention that Defendants corrupted Amazon employees to gain an advantage in the award of real estate contracts. Critically, however, not only has Amazon failed to allege plausibly that it was misled by any action of the Watson Defendants, it also has not alleged plausibly that it was harmed by any of the alleged actions. The Court should dismiss the Complaint with prejudice.

## II. ARGUMENT

### A. Legal Standard

A motion to dismiss tests the sufficiency of the complaint. *Van Vleck v. Sallyport Global Holdings, Inc.*, No. 1:19-cv-60, 2019 WL 2273845, at *2 (E.D. Va. May 28, 2019) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). In deciding a Rule 12(b)(6) motion, courts must accept all well-pleaded facts as true and construe those facts in a light most favorable to the claimant. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, the foregoing requirement applies only to facts, not to legal conclusions. *Alex v. Mabus*, No. 1:11cv1207 (LMB/IDD), 2012 WL 2366151, at *2 (E.D. Va. June 20, 2012) (citing *Iqbal*, 556 U.S. at 678). A court need not accept legal conclusions drawn from the facts, or unwarranted references, unreasonable conclusions, or arguments. *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F. Supp. 2d 309, 315 (E.D. Va. 2009).

The pleader must plead facts sufficient to raise a right of relief above the speculative level, on the assumption that all well-pleaded allegations in the complaint are true. *Mabus*, 2012 WL 2366151, at *2 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If the well-pleaded

facts do not allow the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not shown—that the pleader is entitled to relief. *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Although a plaintiff 'need not forecast evidence sufficient to prove the elements of the claim,' the complaint must 'allege sufficient facts to establish those elements.'" *Rivera v. Wells Fargo Bank, N.A.*, No. 1:15-cv-1703, 2016 WL 1271038, at *2 (E.D. Va. Mar. 29, 2016) (quoting *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (internal quotation marks omitted)). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the pleader pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Want v. St. Martins Press LLC*, No. 1:12-cv-908, 2012 5398887, at *1 (E.D. Va. Nov. 1, 2012)). To determine whether allegations are plausible, a court may draw on context, judicial experience, and common sense. *Citibank, N.A. v. TPI Grp., Inc.*, No. 13CV1007, 2014 WL 2579984, at *6 (E.D. Va. June 9, 2014)).

In the Fourth Circuit, a district court deciding a motion to dismiss may consider any document that is "integral to the complaint" and as to which "there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *accord Sec'y of State for Defense v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). When a complaint "shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Thus, in a breach-of-contract case, the "contract's description of the defendant's duties will prevail

over the plaintiff's contrary characterization." *Id*. at 166. And in a fraud case, a claim "will be dismissed" if documents show that, contrary to plaintiff's allegation, a "disclosure was in fact made." *Id*. Here, when it filed its complaint, Amazon also filed a declaration from Lora E. MacDonald, one of its attorneys, and attached numerous exhibits purporting to be "true and correct" copies. *See* Dkt 155. Amazon cannot dispute the authenticity of these exhibits, which include a representative lease agreement between Amazon and Northstar.

### B. Jurisdiction and Venue Are Inappropriate

The primary bases for subject matter jurisdiction in this Court are the Plaintiffs' spurious RICO claims and a new antitrust claim.[2] The Complaint contains eleven counts, all of which are state law claims except for the two RICO allegations and the new claim under the Robinson Patman Act. Any subject-matter jurisdiction over the state-law claims in Counts II through XI is supplemental. Section 1367(c) of title 28 of the United States Code provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction." As such, the Court's subject matter jurisdiction is dependent upon the viability of the two federal claims. Those claims, however, are not viable and in any case have not been pleaded adequately. As a result, the Court should dismiss the case for lack of subject matter jurisdiction.

This Court is not an appropriate venue and the case should be dismissed pursuant to Rule 12(b)(3). In the Fourth Circuit, courts consider the "entire sequence of events underlying the claim" to determine where venue is appropriate. *See Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (citation and quotation omitted). For venue purposes, a court does not take all facts in

---

[2] No diversity jurisdiction exists because Amazon's principal place of business is in Seattle, Washington (Compl. ¶ 13) and Defendant Nelson is a Washington citizen (Compl. ¶ 20). 28 U.S.C. §1332(c)(1)

the complaint as true and is free to consider facts outside the pleadings. *Sucampo Pharm., Inc v. Astellas Pharma, Inc*., 471 F.3d 544, 549-50 (4th Cir. 2006). Once venue is challenged, the plaintiff bears the burden of showing that venue is proper. *Rice Contracting Corp. v. Callas Contractors, Inc.*, No. 1:08cv1163, 2009 WL 21597, at *1 (E.D. Va. Jan. 2, 2009). Plaintiff cannot meet its burden here.

The venue statute, 28 U.S.C. § 1391 does not support Virginia as the forum for this case. It is undisputed that no defendant resides in Virginia so 28 U.S.C. § 1391(b)(1) is inapplicable. Although the real property that was leased is located in Virginia, the Complaint does not contain a single allegation of conduct in Virginia. Instead, all of the alleged conduct takes place in Colorado or Washington State. The case does not seek a determination as to the ownership of any property located in Virginia. Nor does it seek a lien over any property located in Virginia. Thus, § 1391(b)(2) also is inapplicable. Amazon must rely on § 1391(b)(3) and the RICO statute's venue provision under § 1965(a) and (b) (which provides for jurisdiction over non-residents if the "ends of justice" require it). But courts routinely find § 1965(a) insufficient to support venue where no defendant resides in the judicial district. *See, e.g., Fitzgerald v. Vogel*, No. 02-7849, 2003 WL 203562, at *3 (E.D. Pa. 2003); *see also ESAB Grp., Inc. v. Centricut, Inc*., 126 F.3d 617, 626 (4th Cir. 1997) (determining that personal jurisdiction existed but preserving venue objections); *Cory v. Aztec Steel Bldg., Inc*., 468 F.3d 1226, 1232 (10th Cir. 2006) ("Plaintiffs' failure to include a showing that an alternative forum does not exist for prosecuting their actions is an important weight against bringing the nonresident Defendants to" this forum.); *Crenshaw v. Antokol*, 287 F. Supp. 2d 37, 42 (D.D.C. 2003) ("[i]n undertaking the 'ends of justice' analysis, courts consider a variety of factors" including "location of the parties," "judicial economy," and existence of alternative forum).

This District is the quintessential inconvenient forum. All the individual defendants and witnesses (including the affiants supporting Amazon) reside in Colorado or Washington, which are in different time zones and have long travel times from Virginia. Similarly, no documents are located in Virginia. Even though a court should typically give deference to a plaintiff's forum choice, it need give substantially less deference when the forum preferred by the plaintiff is not, as is the case here, his home forum. *Piper Aircraft v. Reyno*, 454 U.S. 235, 255–56 (1981); *Boers v. United States*, 133 F. Supp. 2d 64, 65 (D.D.C. 2001). The court should dismiss or transfer this action pursuant to Rule 12(b)(3).

### C.    Plaintiffs Have Not Pleaded With Particularity

Amazon has the burden to plead its fraud and RICO claims with particularity. *See* Fed. Rule Civ. P. 9(b). It has not done so. Amazon's Complaint is devoid of any statement concerning how any action of Northstar or Watson has damaged Amazon or how it reasonably relied on any action of any Defendant. Both damages and reasonable reliance are core elements of Amazon's causes of action. Its silence on those requirement elements mandates dismissal. Quite the opposite of pleading damages or reliance, Amazon instead alleges intervening factors that preclude any finding that it was harmed by Defendants.

Amazon compounds its lack of specificity by pleading key facts within its own control on "information and belief." For example, Amazon originally alleged its own process for approving the lease transactions on information and belief. Plaintiffs also originally alleged, on information and belief, "the RFP Watson received was not sent to other developers." Dkt. 1 ¶ 37. After Watson's original motion to dismiss, Amazon changed its tune and omitted that problematic language. But the issue remains. For example, Amazon now contends, still on information and belief, that the RFP Watson received was simply a pretext the TM Defendants used to justify steering contracts to Northstar . . . ." Dkt. 100 ¶ 179. The change is revealing and shows that the

original contention, which was fully within Amazon's knowledge, was false, just as the Watson Defendants had contended. As to the new contention, there are no facts alleged whatsoever to support this conclusory charge.

Similarly, Plaintiffs originally contended, again on information and belief, that "two former Amazon TMs directed Amazon's acceptance of Northstar's September 2017 RFP response for the Virginia Lease Transactions." Dkt. 1 ¶ 40. Given that Amazon itself contends that it has a multi-layered approval process, and that each transaction manager "presents site and financials for approval," Dkt. 1 ¶ 31, this contention was implausible at best. As alleged, a TM cannot approve a transaction alone. Amazon has since retreated from that claim too and now contends that the TM Defendants "prepared and presented the internal real estate justifications and recommendations for the Northstar properties within Amazon." Compl. ¶ 188. They do not, however, allege any misrepresentation in those presentations other than alleged concealment of the disputed "kickback agreement." *Id*. ¶ 190. In other words, taken as true, Amazon alleges that the TM Defendants made a presentation that included "internal real estate justifications" which presumably addressed at least need, price, market data, and location, and none of that information is now disputed. Nor does Amazon allege that any of the representations on which it allegedly relied were even considered or discussed during those presentations.

Amazon is in sole possession of the facts concerning its internal approval process, but documents attached to the Complaint show that it is a multistep process reaching high levels of the company. *See* Dkt. 162-08 (MacDonald Decl. Ex. 55). The allegations that it did not follow its own process are not plausible and support dismissal. Because Amazon must plead its claims with particularity, *see* Fed. R. Civ. P. 9(b), this failure is particularly significant. Amazon's allegations are not plausible because it defies all logic and common sense that a massive and sophisticated

real estate purchaser did not follow its own alleged practices or otherwise could not determine the market prices for real estate in Virginia or that it approved transactions it believed to be above market. Despite Amazon's voluminous allegations, this problem reappears repeatedly throughout the Complaint.

### D. Plaintiffs Have Failed to Allege Plausible Claims

#### 1. Plaintiffs Have Not Alleged a Viable RICO Claim

Count I of the Complaint purports to allege a RICO scheme involving the Lease Transaction Enterprise and the Direct Purchase Enterprise, which Amazon now attempts to cast as a single enterprise. Compl. ¶ 4. To state a claim for a violation of the RICO statute, a plaintiff must allege a pattern of predicate acts and show either open-ended or closed continuity. *Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 258 (4th Cir. 2011) (unpublished) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)); *see also United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) ("To constitute or threaten continued [racketeering] activity, racketeering acts may either be close-ended, i.e., a closed period of repeated conduct, or open-ended, i.e., naturally projecting into the future with a threat of repetition.")

As in most Circuits, the civil RICO case law in the Fourth Circuit has consistently reflected judicial reluctance to elevating financial disputes into the treble-damage framework of RICO. For example, in *Arnold v. Moran*, the court noted that, "The Fourth Circuit has recently issued a stern warning that 'this circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims.'" 687 F. Supp. 232, 236 (E.D. Va. 1988) (quoting *Flip Mortg. Corp. v. McElhone,* 841 F.2d 531, 538 (4th Cir. 1988) ("*Flip Mortg.*")). In dismissing the RICO complaint before it on grounds of inadequately established closed continuity, the court noted that the case boiled down to a series of events constituting a single scheme by a corporation, its officers and directors, against a single victim. *Id.* Consequently, the court found that the *Flip*

*Mortgage* opinion clearly rejects this kind of complaint as inadequate to show a "pattern of racketeering activity" under RICO. *Id.* Amazon's case is equally limited and deserves the same result: dismissal.

### a.     Amazon Did Not Allege Continuity Plausibly

The RICO claim fails because Amazon has not alleged continuity.  In *H.J. Inc. v Northwestern Bell Telephone*, the Supreme Court rejected invitations to narrow civil RICO claims to only those directly associated with organized crime activity. 429 U.S. 229, 243–44 (1989). While the Court recognized that the case for "closed continuity" had to be established on an individualized basis, it reaffirmed the basic principle that, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* at 242. In the present case, the limited scope of the alleged conduct, the small number of participants, and the short length of the scheme all establish that the Plaintiffs' theory of a closed continuity pattern of racketeering activity is deficient.  Similarly, in *Tudor Associates, Ltd., II v. AJ and AJ Servicing Incorporated*, the fraudulent scheme lasted over ten years and involved millions of dollars, but the Fourth Circuit upheld the trial court's summary judgment as the alleged conduct constituted a single scheme to inflict a single injury on a single victim, ruling it did "not rise to the level of conduct necessary to support a RICO recovery." Nos. 93-2294, 93-2326, 36 F.3d 1094, at *4 (4th Cir. Sept. 20 1994) (unpublished table op.); *see also Aggarwal v. Sikka*, No. 1:12cv60, 2012 WL 12870349, at *4 (E.D. Va. June 12, 2012) ("The Fourth Circuit has repeatedly held that continuity is not established, even where there are multiple acts of mail or wire fraud, if there is only a narrow scheme for a limited time with few victims and an inherent end-point." (citing *Menasco, Inc v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989))). There is no continuity alleged here.

The allegations contained in the Complaint do not set forth an ongoing scheme or one involving multiple alleged victims, and the fact that Amazon is the only "victim" of the alleged scheme is a particularly lethal flaw in the RICO claims. Further, and as noted above, the Fourth Circuit urges special caution when the alleged predicate racketeering acts involve mail and wire fraud, as Plaintiffs have alleged here.[3] That court has observed that "[i]t will be the unusual fraud that does not enlist the mails and wires in its service at least twice. This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (internal citations omitted). Here, Amazon has taken a commercial dispute and an allegation of a kickback scheme to manufacture a federal RICO case.

Amazon concedes that it is the only RICO "victim,"[4] and erroneously complains of a (single) scheme to defraud that victim, by cheating the competitive bidding process through kickback payments. Even if this Court were to excuse Amazon's failure to plead fraud and RICO with particularity, the allegations that are presented here simply do not rise to the level required to pursue a civil RICO action, as a matter of well-established law in this Circuit. *See Flip Mortg*. 841 F.2d at 538; *see also Al-Abood*, 217 F.3d at 238–39 (concluding that RICO treatment was not appropriate where the main predicate acts, those being mail and wire fraud, involved one victim, even though there was more than one scheme over a period of several years); *Anderson v. Found. For Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998) (continuity

---

[3] Plaintiffs similarly attempt to render contractual payments into money laundering and violations of the Travel Act, but do not allege sufficient facts to show either plausibly. In any case, the Travel Act and money laundering claims are dependent on Amazon's successfully proving substantive wire fraud violations, which its Complaint shows it cannot do.

[4] The two Amazon Plaintiffs together constitute a "single victim" for RICO purposes: "[A] corporate entity is generally treated as a single victim for purposes of civil RICO liability." *Whitney, Bradley & Brown, Inc.*, 436 F. App'x at 262.

element of RICO's pattern requirement not satisfied where telephone and mail services used to defraud one party).

Amazon has alleged a single, short-lived scheme (though one that is not entirely connected). There is no continuing threat of injury, assuming for the moment there has been any past injury. As to the alleged direct purchase transaction, Amazon alleges that Watson fired Camenson and Ramstetter after learning that they had usurped a Northstar corporate opportunity. Compl. ¶ 309. Amazon also has fired its own allegedly involved employees. There is no risk that there will be any future direct purchase transaction involving these parties (even assuming Amazon desires to purchase more data center property). The same is true for the lease transactions. The alleged predicate acts took place briefly at contract formation and even the life of the overall transactions occupied a short time. All of the transactions were dependent on Amazon's own requirements for data center property and thus not capable of ready repetition. The limited real estate transactions involved here do not support continuity for RICO purposes.

### b.    Amazon Has Not Adequately Alleged Predicate Acts

Although it may seem incongruous to seek dismissal due to lack of particularity when faced with a complaint in excess of 100 pages, the fact is that Amazon has pleaded critical elements of its claim through mere generalities and legal conclusions. 18 U.S.C. § 1962(c) specifically requires direct participation by the defendant in a pattern of racketeering activity. The voluminous and repetitive nature of the complaint masks the simple, and fatal, fact that it conspicuously fails to allege specific conduct on behalf any Watson Defendant that could constitute a pattern of racketeering acts.

Many of the allegations simply repeat the statutory language. For example, there are no substantive allegations of any mail or wire fraud, and the predicate racketeering acts necessary to establish a viable RICO claim are devoid of factual particulars. Rather, Amazon simply states that

funds were wired in connection with various commercial contracts, *id.* ¶¶ 371–75, which is the kind of incidental wire usage deemed insufficient in cases like *American Bancard, LLC v. East Payment Solutions*. *See* No. 18-cv-80681, 2018 WL 3708462 (S.D. Fla. Aug. 3, 2018) ("The use of the wire here was simply an electronic transfer of funds. That electronic transfer does not constitute a transmission of a writing, sign, signal, picture, or sound for the purpose of executing the scheme to defraud or to obtain the money by false representations. While a wire may have been used, the wire was not used in furtherance of the scheme . . . ."). Similarly, Amazon's money laundering and Travel Act allegations simply assume that the transaction was fraudulent and allege no culpable involvement of any Watson Defendant. There are no substantive allegations at all against Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager.

With respect to the lease transactions, the only alleged misrepresentations are various contractual provisions that do not suffice as RICO predicates. Remarkably, Amazon's Complaint sums up the lease transaction allegations as follows:

> 188. Acting under Nelson's supervision, TM Defendant Casey Kirschner prepared and presented the internal real estate justifications and recommendations for the Northstar properties within Amazon.
>
> 189. As a result of these efforts, Amazon approved the lease contract awards to the Northstar Defendants.
>
> 190. These approvals were integral to the RICO Enterprise and fraudulently induced by both the TM Defendants, who did not disclose their personal relationships and kickback agreement with Northstar and Villanova Trust, and also by the Northstar Defendants, who deliberately misrepresented and/or concealed from the company their arrangements with the TM Defendants and Villanova.

Compl. ¶¶ 188–90. These allegations show that Amazon was not misled about the market or pricing for the leases. Even if assumed to be true, the claim rests on allegations concerning what

Northstar did with fees that it earned within the pricing approved by Amazon and as between Northstar and its development partners.

There are no allegations whatsoever that Watson or Northstar made any fraudulent misrepresentation or committed any other predicate act in connection with the alleged Direct Purchase Transaction. Amazon alleges only that Northstar and Watson received $5 million from Ramstetter and Camenson and that Watson should have known the transaction was tainted. *Id.* ¶ 313.

Amazon also now alleges generally, that the RICO Defendants used the wires to misrepresent "the nature of the RICO Enterprise, misleading federal agents, and alerting his co-conspirators to the FBI's investigation; and communications by Northstar, Brian Watson, and his agents to IPI and others designed to interfere with Amazon's use and enjoyment of several Virginia lease sites." *Id.* ¶ 376. Amazon provides no detail to support this general allegation.

The "direct purchase" allegations are particularly inadequate as to the Watson Defendants. In seeking to establish Watson's and Northstar's involvement in a pattern of racketeering activity, Plaintiffs simply repeat, in paragraphs 261, 303, and 309, that Watson received a $5 million "payment" as part of a settlement with his former employees who engaged in self-dealing at Watson's expense. *Id.* ¶ 310, Ex. 61. The Complaint alleges that Watson accused Ramstetter and Camenson of usurping a corporate opportunity after learning of the already completed transaction.[5] The notion that a single act can simply be repeatedly alleged to establish a "pattern" is without

---

[5] Amazon bizarrely alleges that "Watson demanded and accepted $5 million in proceeds from the White Peaks transaction on the premise that the money was payable to Northstar as Amazon's agent . . . ." Compl. ¶ 313. That allegation is flatly contradicted by the documents attached to the Complaint and Amazon's own allegation that Watson confronted Ramstetter and Camenson for usurping Northstar's corporate opportunity. Northstar has never contended that it was Amazon's agent.

precedent and is absurd, particularly when the alleged predicate is actually powerful evidence of non-participation in the self-dealers' scheme.[6] Such an allegation will not support a RICO claim against the Watson Defendants.

The direct purchase allegations also are particularly ill-suited for a RICO claim because Amazon was aware of the facts it claims were concealed. Amazon contends that Defendants somehow engaged in a RICO scheme because Amazon entered a contract that Amazon contends was artificially inflated even though the "flip" nature of the transaction was disclosed fully. Regardless of what Amazon might say about this claim, the contract incorporated into its Complaint shows that the sellers expressly referred to and incorporated their underlying contract to purchase the property from John Mosby Highway LLC for a purchase price of $98,670,000. *See* Compl., Ex. 37, Dkt. 160-1 at 5, 7[7], Dkt. 160-8. Indeed, Amazon expressly agreed to assume portions of that sale contract, which is referred to as the "Prime Contract." *Id.* at 5. The Prime Contract was executed in April 2019 and—as shown by Amazon's exhibits—fully disclosed to Amazon. Moreover, the contract expressly states that "This Agreement and the NDA (as applicable) contain the entire agreement between the parties respecting the matters set forth in this Agreement and together supersede all prior agreements between the parties hereto respecting such matters." Dkt. 160-1 at 20. If Amazon is relying on prior representations not incorporated into the sale contract, this integration provision would supersede any such representation. In short, the

---

[6] "A 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).
[7] Because Amazon's exhibits were filed in multiple parts, references to page numbers in this motion are to the PDF pages shown in the time-stamp headers on those filings.

contract itself completely undercuts Amazon's claims based on the White Peaks transaction.[8] Indeed, because the transaction documents themselves reveal that the underlying "flip" of the property was fully disclosed to Amazon, it cannot now claim to have been misled in any way in direct contravention to the contract that it signed through Amazon corporate officer Joe Minarik.

### c.  Amazon Has Not Alleged a Plausible RICO Conspiracy

Although not alleged as a separate count, Amazon lists § 1962(d) as one of the statutory predicates for Count I.  Amazon also has failed to plead a viable RICO conspiracy.  Although covered in window dressing, the RICO conspiracy claim is alleged in a single sentence (Compl. ¶ 427), which does not rise to the level of an actionable claim. *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001) ("Rule 12(b)(6) requires more than the mere recitation of boilerplate statutory language.").  Amazon has failed to allege any RICO conspiracy with the necessary particularity.

The vagueness of the conspiracy claim underscores the ephemeral nature of Amazon's "enterprise" contentions.  Amazon contends that all "RICO Defendants constitute an association-in-fact enterprise , . . ."  Compl. ¶ 361.  But with the current amendment, Amazon adds multiple new parties to this alleged enterprise and does not even contend that the Watson Defendants knew of these new defendants' existence, much less that they had a common purpose.  No plausible reading of the Complaint suggests a single enterprise for RICO or RICO conspiracy purposes.

No matter how powerful the Plaintiffs may be in the marketplace, they cannot wish a RICO case into existence where a less conspicuous plaintiff would be left to traditional remedies. This Circuit's unwillingness to elevate routine fraud cases, even if high-dollar ones, into viable RICO

---

[8] The agreement also contains an arbitration provision.  To the extent that Amazon intends to maintain its causes of action arising out of the White Peaks transaction, the Court should refer this matter to arbitration, and Defendants reserve the right to move to compel arbitration.

claims is well-established. In short, this Court should similarly find the currently formulated RICO claims are insufficient to state a cause of action and subject to dismissal under Rule 12(b)(6).

## 2. Plaintiffs' Detinue Claims Should Be Dismissed

The Court should dismiss Plaintiffs' detinue claim (Count II), which is a Virginia statutory remedy for the pretrial seizure of property. To state a claim for detinue under Virginia law, a plaintiff must allege facts to support, among other elements, that plaintiff has a property interest in specific personal property capable of identification. Va. Code § 8.01-114(A)(1); *see also York v. Jones*, 717 F. Supp. 421, 427 (E.D. Va. 1989); *MacPherson v. Green*, 197 S.E.2d 785, 789 (Va. 1955) (Detinue is "a possessory action having for its object the recovery of specific personal property").[9] Although money may be deemed specific personal property for purposes of detinue, the money in such cases must be easily susceptible to ready and positive identification, *see*, *e.g.*, *United States v. Moffitt, Zwerling & Kemler*, 875 F. Supp. 1190, 1198 (E.D. Va. 1995), as where the personal property sought is a specific bundle of two-dollar bills or currency bearing specific serial numbers. Amazon has not alleged identifiable personal property in support of its detinue claim. Amazon alleges that the "specific personal property totals at least $16,250,00.00." Compl. ¶ 447. In its inability to even state the exact amount of the allegedly "specific" property, Amazon completely undercuts its own allegations. Amazon has not identified specific property, but an amount that it intends to seek as damages.

Moreover, Amazon contends that it "committed to overpaying at least $16,250,000 for the contracts at issue, to its detriment." Compl. ¶ 450. Amazon thus completely ignores the more plausible explanation that any payment made by Northstar came out of its own earnings, which

---

[9] Amazon's citation of *U.S. v. Cohen* is misplaced. Compl. ¶ 437 (citing *United States v. Cohen*, 152 F.3d 321, 326 (4th Cir. 1998)). That case did not discuss application of the interpleader statute substantively, but instead remanded a preliminary injunction for factual development.

were indisputably fully disclosed to and approved by Amazon. In any case, Amazon does not allege that these payments were actually made and thus they cannot suffice to show "specific property" subject to detinue.

With respect to the White Peaks transaction, Amazon contends that White Peaks Capital and Nova PWC LLC "inflated the price of the transaction—unknowingly to Plaintiffs . . . ." Compl. ¶ 455. But that allegation is implausible because, as discussed in detail above, the sale contracts fully disclosed the increase in price and was thus executed by Amazon with full knowledge of the increased price.

### 3. Plaintiffs' Fraud Claims Are Unfounded

The Court should dismiss Amazon's fraud claim, Count III. Amazon's fraud, RICO, and breach of contract claims all rely upon alleged misrepresentations or breaches that Defendants purportedly made in various contractual documents. *See* Compl. ¶ 467. Amazon relies upon the same contract provisions to support both its contract and fraud claims. In Virginia, "[a] plaintiff asserting a cause of action for actual fraud bears the burden of proving by clear and convincing evidence the following elements: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting in damage to the party misled.'" *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 346 (Va. 1998) (quoting *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)). Similarly, negligent misrepresentation, which Virginia courts also call constructive fraud, requires clear and convincing evidence "that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of . . . reliance upon the misrepresentation." *Mortarino v. Consultant Eng'g Servs.*, 467 S.E.2d 778, 782 (Va. 1996) (citing *Alequin*, 439 S. E.2d at 390).

Breach of any contractual provision cannot sound in tort. Virginia further requires that the "duty tortiously or negligently breached" by a party committing actual or constructive fraud "be a common law duty, not one existing between the parties solely by virtue of [a] contract." *Foreign Mission Bd. of S. Baptist Convention v. Wade*, 409 S.E.2d 144, 148 (Va. 1991); *see also Richmond Metro. Auth.*, 507 S.E.2d at 346 (entering summary judgment for a construction contractor who provided fraudulent progress reports to the plaintiff, because the contractor breached only duties assumed by contract). Accordingly, a plaintiff seeking relief for the breach of a contractual duty cannot also receive relief in tort without a corresponding common law duty. *Dunn Constr. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009); *see also Vanguard Military Equip. Corp. v. David B. Finestone Co.*, 6 F. Supp. 2d 488, 492 (E.D. Va. 1997) (explaining that to properly plead a cause of action in tort "[t]he duty owed by [the defendant] to [the plaintiff] must be derived from some source of law other than ex contractu"). While Amazon's contract claims fail as a matter of law, to the extent the Court deems them to be viable, the fraud claims cannot be.

Amazon's fraud claims are ill-founded in any case. Although obligated to plead with particularity, Amazon does not identify any specific misrepresentations in Count III. The sole provision from the actual lease that Amazon cites in another count, and upon which it allegedly relied, is a provision of the lease dealing with exclusions from the definition of "Operating Expense." Compl. ¶ 496, Ex. 24 at 7.[10] That provision provides, among other things, that operating expenses do not include any "legal, accounting or professional fees and costs incurred in connection with lease negotiations." *Id.* Critically, however, Operating Expenses are distinct from

---

[10] Amazon also references an integration clause, Compl. ¶ 497, which purports to supersede any prior agreements, but is not itself a representation about any agreement the landlord (much less Northstar, which was not a party to the contract) may have had with others. Indeed, read as Amazon appears to suggest, the IPI joint venture and construction loan also would have violated the lease.

the "Base Rent" Amazon must pay, as set forth in ¶ 4 of the lease.[11]  Compl., Ex. 24 at 5–6.  The

actual language allegedly relied upon by Amazon shows that payment by Northstar of a finder or

broker fee was not inconsistent with the lease transactions.  The language provides that Amazon

shall not have any obligation to pay "(3) real estate brokers' commissions . . . [or] (5) legal,

accounting or professional fees . . . ." as operating expenses.  That provision says nothing

concerning whether Defendants used a broker, finder, or other referral source.  It simply provides

that Amazon would not have to pay directly for any such expenses.  It is undisputed that it did not.

According to the Complaint, the other two provisions allegedly relied upon by Plaintiffs

are not even in the referenced lease, but are found in a form of ROFO/ROFR Purchase Agreement

attached to the lease as Exhibit C to Exhibit F.  *See* Compl., Ex. 24.  No Defendant ever executed

any such ROFR purchase agreement.  If it is ever executed, it would be executed by the landlord,

not Watson or Northstar.  As such it is irrelevant to Plaintiffs' claims.  But even if it were not, the

provisions are designed to protect Amazon from having to pay the landlord's commission expenses

if the ROFO/ROFR provision were executed:

> Broker's Commission. Landlord and Tenant represent and warrant
> to each other that they have dealt with no brokers, finders or the like
> in connection with this transaction. Landlord and Tenant otherwise
> agree that each is solely responsible for all fees and charges which

---

[11] Addendum 1 to the lease states that Amazon will "pay Base Rent in the amount as set forth in Section 11(b) of the Work Letter," which is Addendum 4 to the lease.  Compl. Ex. 24, Dkt. 158-3 at 11.  Section 11(b) of the Work Letter, in turn, states that Base Rent will be calculated based on the "final actual Allowable Construction Costs" or the "Final Budget," whichever is lower.  Dkt. 158-4 at 8–9.  The Preliminary Budget attached to the Work Letter filed with the Court is completely redacted.  Dkt. 158-5.  In fact, however, it disclosed both the Lease Commission and Development Fee for the project.  In addition, both were included in Northstar's RFP response, although the numbers are redacted.  Compl. Ex. 23, Dkt. 157-3 at 14.  The budget Amazon submitted for the Manassas project also included a 2% Leasing Fee and a 5% Developer Contingency.  Compl. Ex. 17, Dkt. 156-6.  Thus, while the lease excluded "professional fees and costs" from the definition of Operating Expense, it explicitly included both the Lease Commission and Development Fee among the costs that could be used to calculate Base Rent.  Plaintiffs explicitly approved these fees.

may become due and payable to their respective brokers, and further agree to indemnify each other and to hold each other harmless against all claims, damages, costs or expenses of or for any other such fees or commissions resulting from their actions or agreements regarding the execution or performance of this Agreement, and will pay all costs of defending any action or lawsuit brought to recover any such fees or commissions incurred by the other party, including reasonable attorneys' fees.

*Id.* at 209. Although it is internally inconsistent, this provision obviously is designed to protect Amazon from the landlord's brokers/finders fees. So long as the landlord pays any such fees out of its own pocket, the provision is not breached.

The other provision relied upon by Amazon similarly provides:

There are no management agreements, service, maintenance or other contracts or equipment or capital leases relating to the Project entered into by or on behalf of Landlord or its affiliates or contractors other than those which can and, at Tenant's option and Landlord's expense, will be cancelled on or before the Closing Date; and Landlord has disclosed in writing to Tenant all such contracts and equipment and capital leases, if any.

*Id.* at 207. This does not apply at all to a broker's or finder's contract. Again, however, these provisions are not contained in the leases. They are contained in an optional purchase agreement attached to the leases for possible later execution by the landlord, which is not a party to this action. Plaintiffs' reliance upon these provisions to support breach of contract and misrepresentation claims against Northstar and Watson has no basis. These provisions in unexecuted documents in connection with a potential future sale cannot provide the basis for a contractual or tort claim.

Despite these indisputable facts, Amazon contends that "[it] had a right to and did rely on the RICO Defendants' misrepresentations and omissions to [its] detriment. Amazon entered into the Lease Transactions in justifiable reliance on the RICO Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best

interests and in compliance with Amazon's Code of Conduct, and that the price Amazon paid for the Leases, the White Peaks Purchase and the Blueridge Transaction were competitive market prices." Compl. ¶ 471. As shown above, no representations concerning undisclosed fees were made at all.[12] To the contrary, the budgets set forth the amount of fees that were to be paid. Amazon has not alleged that it was charged for any unbudgeted expenses. Even if such statements were made, they were contractual representations that cannot support a fraud claim. *See Dunn Constr. Co.*, 682 S.E.2d at 947 (holding that a false statement made by a contractor in order to obtain payment for services performed pursuant to a contract did not violate a common law duty independent of the contract, and, thus, that the property owner could not maintain an action for fraud against the contractor). To the extent any representations were made, they were made by entities—the landlords—that Plaintiffs have chosen not to sue and with whom they are still doing business.[13] Without those representations, which are central to their claims, Plaintiffs' fraud claims fail.

With respect to the other allegations (presumably in reference to the White Peaks transaction), Plaintiffs have not even alleged that Watson or Northstar attempted to defraud Amazon by stating falsely that any transaction was in Amazon's best interest or a competitive market price. *See* Compl. ¶ 468. Even if such statements had been made, Amazon cannot reasonably rely upon a contract counter-party's statement concerning pricing or Amazon's best interest. To establish fraud, "it is essential that the defrauded party demonstrates the right to reasonably rely upon the misrepresentation." *Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 437

[12] Amazon's contention that it relied on representations concerning the White Peaks and Blueridge transactions in connection with the Lease Transactions is nonsensical.

[13] The landlord entities also own the underlying real estate, which would presumably be sufficient to satisfy any of Plaintiffs' claims. That Plaintiffs have chosen not to sue them is an implicit admission that Plaintiffs prefer to keep the benefits of their contracts.

S.E.2d 189, 194 (Va. 1993*); accord Am. Sur. Co. v. Hannah*, 130 S.E. 411, 414 (Va. 1925).  Courts have considered this requirement in the context of contract negotiations.  For example, in a 2015 New York Court of Appeals' decision, *ACA Financial Guaranty Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921 (N.Y. 2015), the court examined justifiable reliance and explained:

> [I]f the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations.

*Id.* at 1044 (quoting *Schumaker v. Mather*, 30 N.E. 755 (N.Y. 1892)).  In other words, if a plaintiff knew—or could have known—that a misrepresentation was false, a claim for commercial fraud will fail.  Although Amazon does not specify how or where any such representations were made, even if the Court were to assume they had been made, Plaintiffs could not have reasonably relied upon them.  Amazon is one of the largest and most successful companies on the planet.  It is as sophisticated as it gets.  The subjects of the alleged representations are that commercial real estate prices are reasonable and that a transaction is in the best interest of Amazon.  The former issue is one of public knowledge and Amazon cannot reasonably rely on a contract counterparty to determine market pricing.  Similarly, no one is in a better position than Amazon to determine its own best interest.  Amazon is the second largest data center owner/operator in Northern Virginia, behind only the US government.  *See* Bill Stoller, *Why the Northern Virginia Data Center Market Is Bigger Than Most Realize* (Feb. 15, 2019), https://www.datacenterknowledge.com/amazon/why-northern-virginia-data-center-market-bigger-most-realize (last visited Oct. 7, 2020).  It recently conducted an extensive search for a second corporate headquarters location where, as widely reported, it

conducted extensive due diligence.[14]  Any statement by Defendant concerning Amazon's "best interest" is a mere statement of opinion and not actionable.  *See Tate v. Colony House Builders, Inc.*, 508 SE 2d 597, 599 (Va. 1999) ("The mere expression of an opinion, however strong and positive the language may be, is no fraud. Such statements are not fraudulent in law, because . . . they do not ordinarily deceive or mislead. Statements which are vague and indefinite in their nature and terms, or are merely loose, conjectural or exaggerated, go for nothing, though they may not be true, for a [person] is not justified in placing reliance upon them." (quoting *Saxby v. S. Land Co.*, 63 S.E. 423, 424 (Va. 1909))).

### 4. Plaintiffs Have Not Pleaded a Viable Tortious Interference Claim

In Virginia, a tortious interference claim requires factual allegations demonstrating (i) the existence of a valid contractual relationship or business expectancy; (ii) the interferor's knowledge of the relationship or expectancy; (iii) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (iv) resulting damage.  *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015) (*citing Chaves v. Johnson*, 335 S.E.2d 97, 101 (Va. 1985)).  If the contract is terminable at will or involves only a contract or business expectancy, the injured party must allege and prove not only an intentional interference, but that the tortfeasor employed

---

[14] *See* Kaya Yurieff, *Everything We Know About Amazon's HQ2 Search*, CNN.com (Nov. 5, 2018, 9:55 p.m.), https://www.cnn.com/2018/11/05/tech/amazon-hq2-update/index.html (discussing Amazon's Virginia expansion plan and real estate development deals with JBG Smith Properties); Elizabeth Weise, *Amazon HQ2 Timeline: The Winners are New York City and Arlington, Virginia*, USAToday.com (Feb. 14, 2019, 1:22 p.m.), https://www.usatoday.com/story/tech/science/2018/09/12/timeline-amazons-search-hq-2-its-second-headquarters/1273275002/; Monica Nickelsburg, *Amazon Directly Visits HQ2 Cities in Phase 2 of Extraordinary Second Headquarters Competition*, Geekwire.com (Mar. 5, 2018, 2:00 p.m.), https://www.geekwire.com/2018/amazon-discreetly-visits-hq2-cities-phase-2-extraordinary-second-headquarters-competition/.  Amazon CEO Jeff Bezos said of the process, "Ultimately the decision will be made using intuition after gathering and studying a lot of data . . . ." Lauren Feiner, *Jeff Bezos Says He Will Ultimately Decide Amazon HQ2's Location on 'Intuition'*, CNBC.com (Nov. 2, 2018, 1:22 p.m.), https://www.cnbc.com/2018/11/02/jeff-bezos-says-he-will-decide-amazon-hq2s-location-on-intuition.html.

improper methods, such as defamation, fraud, misrepresentation, or deceit. *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 & n.5 (Va. 2014) (quoting *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870 (Va. 2011)). Plaintiffs cannot meet this standard.

In Count IV, Amazon contends that Defendants have tortiously interfered with its contracts, Compl. ¶¶ 476–83, but does not specify which contracts or how Defendants interfered. Without identification of third-party contracts that have been breached or terminated, there simply is no tortious interference claim. Amazon broadly alleges that Defendants "charg[ed] fees that were not authorized" and "otherwise engag[ed] in unlawful conduct." *Id.* ¶ 482. As to the first claim, Amazon has not alleged that it paid anything more than was required under its contracts or that it was required to pay any undisclosed fee. The fees about which it complains were never charged to or paid by Amazon, and Amazon does not allege to the contrary. Absent such an allegation, Amazon's claims are not plausible. Notably, as discussed above, the budget attached to the lease referenced in the Complaint shows the fees that Amazon agreed to pay insofar as base rent was calculated from that budget. The proposed development fee also was disclosed in the RFP response. Amazon does not allege that it has paid more than that. As a careful reading of the Complaint confirms, Amazon did not pay <u>any</u> fees to Watson or Northstar. Amazon paid rent to a landlord. What Northstar did with its own fees paid by third parties, all of which were fully disclosed, cannot be a breach of or interference with Amazon's contract. Further, Amazon specifically alleges that it reformed the lease contracts to remove Northstar, not that Amazon was precluded from performing on its contracts in any way. *See* Compl. ¶ 221.

The second allegation is so vague and general as to lack any meaning. In general, however, Amazon's allegations concern the same matters it contends amounted to fraudulent inducement preceding contract formation, not post-contract actions by Northstar to interfere with the contracts.

Ultimately, Amazon's tortious interference claim is not plausible. Logically, Northstar would have vastly preferred that the contracts had been completed as entered. In any event, Amazon continues to enjoy the benefit of its contracts, all of which appear to be performing.

### 5. The Civil Conspiracy Claim Should Be Dismissed

Count V—which purports to state a business conspiracy claim under section 18.2-499 of the Virginia Code—must be dismissed because Amazon has not alleged a conspiracy with particularity or otherwise satisfied the applicable Virginia statute. In addition, as set forth above, the substantive wrongs alleged by Amazon are meritless.

Virginia's Business Conspiracy Act (the "Act") makes it a crime to conspire to injure another person in his or her reputation, trade, business or profession. *See* Va. Code Ann. §§ 18.2-499 to -501. Persons injured in violation of the Act may bring a civil cause of action to recover treble damages and attorney's fees. *Id.* § 18.2-500. To recover damages under Section 18.2-500, a claimant must prove (i) a combination of two or more persons for the purpose of willfully and maliciously injuring the claimant in his or her business; and (ii) resulting damages. *Jordan v. Hudson*, 690 F. Supp. 502, 507–08 (E.D. Va. 1988) (quoting *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 596 (Va. 1984)). It is well-settled that business conspiracy must be pleaded with particularity and with more than conclusory language. *See People, Tech., and Processes, LLC v. Bowhead Logistics Solutions, LLC*, No. 1:17-cv-282, 2017 WL 2264476, at *3 (E.D. Va. May 23, 2017) (citing *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004)). Despite this, Amazon simply makes conclusory allegations and relies on its ill-founded fraud, tortious interference and RICO claims as the basis for this Count. Because Virginia requires that this claim be plead with particularity, this "throw-in" pleading does not suffice.

In addition, as discussed below, Amazon has totally failed to plead how any conduct of Defendants has resulted in economic harm to Plaintiffs. *See infra.* Because resulting damages is

a mandatory element of the cause of action, this failure mandates dismissal.

### 6.    The Breach of Contract Claims Fail as a Matter of Law

In Count VI, Plaintiffs allege that Defendants breached various contractual provisions concerning the use of any third- party broker, finder, or similar referral contracts or arrangements. Compl. ¶ 496.[15]  Aside from other substantive flaws with this claim, Amazon has made a glaring omission—at least with respect to the lease transactions.[16]  Amazon has not sued its contract counterparties, the various landlords.  Because no Watson Defendant is a party to any of the leases at issue, they cannot be held liable based on a breach of contract theory.  Virginia law requires privity as a requirement for contract claims.  *See, Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.,* 152 F.3d 313, 316 (4th Cir. 1998) (discussing requirement of privity).

Amazon's veil piercing theory cannot save its claims here.  The contracts were signed by the landlord joint venture entities.  Amazon has acknowledged that the landlord entities were not under Northstar's control and demonstrated that fact by having Northstar removed from the contracts. Compl. ¶ 221.   As such, Count VI must be dismissed as to the Watson Defendants.

Further, as discussed above, the contractual provisions cited by Amazon either are not contained in a signed contract or do not say what Amazon claims they say.  *See supra* at 19–21. To prevail on a breach of contract claim, Amazon would have to prove that a specific contractual provision was violated.  For the reasons discussed above, it cannot do so.

Nor can Amazon show damages.  Although Amazon contends that it has been damaged in an amount in excess of $50 million (Compl. ¶ 499), it is not clear to what Amazon is referring.

---

[15] The Complaint lumps together multiple contracts and defendants, making it difficult to determine which allegations pertain to which defendants.

[16] Neither Watson nor Northstar were party to any contract or representation with respect to the White Peaks transaction and to the extent that Count VI could be read to include such a claim with respect to Watson and Northstar, it should be dismissed.

With respect to the Watson Defendants, however, the Complaint does not contain a plausible allegation of injury as is necessary to sustain a breach of contract claim. Because this failing is common to several counts, it is discussed separately below.

### 7. Amazon's Unjust Enrichment Claim Should Be Dismissed

Count VII, Amazon's unjust enrichment claim is patently frivolous. A claim for unjust enrichment is quasi-contractual in nature and requires a plaintiff to show: (1) it conferred a benefit on the defendant; (2) the defendant knew of the conferring benefit; and (3) the defendant accepted or retained the benefit under circumstances which render it inequitable for the defendant to do so without paying for its value. *Herald Schmidt v. Household Fin. Corp*., 661 S.E.2d 834, 838 (Va. 2008); *see also Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) ("One may not recover under a theory of implied contract simply by showing a benefit to the defendant, without adducing other facts to raise an implication that the defendant promised to pay the plaintiff for such benefit."). Here, Plaintiffs' lease payments were made pursuant to an express contract as rent. The budget from which that rent was calculated specifically disclosed the fees paid to Northstar.

Moreover, an unjust enrichment claim can exist only where the parties do not have express contracts. a party may not recover on a quasi-contract theory such as quantum meruit or unjust enrichment when an actual contract governs the parties' relations on that issue. *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647–48 (Va. 2020). Amazon has asked for what appears to be every form of relief under the sun – but for one: rescission. Amazon has decided to keep the benefits of its contracts. It cannot, therefore, also sue under a quasi-contractual theory.

It is well-settled that "'[t]he existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment.'" *FTJ, Inc.*, 841 S.E.2d at 647–68 (quoting *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183 (Va. 2018)). The fact that the Watson Defendants are third parties to the contracts does not render the contracts irrelevant. In

the third-party context, "[l]egitimate concerns about privity of contract" must be "accommodated by imposing a test of unjust enrichment that is highly protective of the defendant," Restatement (Third) of Restitution and Unjust Enrichment ch. 3, topic 2 (2011), and by establishing "a rigorous test of unjust enrichment as a threshold requirement of the claim," *id*. § 25 cmt. b. As a matter of law there can be "no unjust enrichment" if the defendant has "paid the contract price" to a third party—that is, "the price originally fixed by contract for the work to which [the plaintiff] has made an uncompensated contribution." *Id.*; *accord Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp. 2d 703, 708–09 (D. Md. 2003) (unjust enrichment not applicable where plaintiff seeks fees paid to defendant by others); *Mich. Mut. Ins. Co. v. Smoot*, 183 F. Supp. 2d 806 (E.D. Va. 2001) (no unjust enrichment where defendant paid by third party).

Here, Amazon's claims are governed by the applicable contracts and thus inappropriate for an unjust enrichment claim. *See, e.g., Fed. Sav. & Loan Ins. Corp. v. Quality Hotels and Resorts, Inc.*, 928 F.2d 399, 1991 WL 30211, at *4 (4th Cir. 1991) (unpublished table decision) (party cannot recover on unjust enrichment where services were rendered pursuant to express contract even if it conferred benefit on a third party); *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recover in quasi-contract for events arising out of the same subject matter."); Restatement of Restitution § 110 (1937) ("A person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person.").[17]

---

[17] Here, of course, Amazon does not even allege a failure of the contract. It is occupying the properties it leased.

At its core, Amazon's unjust enrichment claim asserts *not* that Defendants did not do what they said they would do, but that Defendants failed to disclose payments to yet another third party. Amazon contends that any funds paid to Northstar constitute unjust enrichment because Amazon would not have approved the lease contracts if it had known of those alleged payments. Amazon is conflating remedies. Its argument says nothing about benefits conferred on the Watson Defendants without compensation, as is necessary for an unjust enrichment claim. Amazon's argument instead speaks to some sort of restitution under a rescission theory. Amazon could have alleged that its contracts were fraudulently induced and sought rescission but, despite having amended its complaint three times, it has not done so. Amazon has instead elected to keep the contracts and the benefits conferred thereunder.[18] As such, it cannot also claim that funds it paid pursuant to the contracts unjustly enriched a third party.

The contracts at issue in this matter are leases whereby Amazon leased certain real estate in Virginia. What it seeks as "unjust enrichment" are fees paid by the landlords to a third party (Northstar) in connection with the development of the properties. After the properties were developed, Amazon made rent payments to various landlords and received the property for which it bargained.[19] Amazon has not contended that the rents are at above-market rates. The non-party landlord entities may have paid fees to Northstar in connection with the property development, but Amazon did not. Because Amazon has elected to keep the leases and properties, it cannot say that Northstar was enriched at Amazon's expense. Any analysis of unjust enrichment must consider

---

[18] This fact—along with Amazon's conspicuous choice not to allege that the leases were at above market rates—discredits Amazon's claims of damage. The clear inference from Amazon's alleged actions are that it wanted to lease data center space in Virginia, that it did so, and that it is continuing to enjoy the benefit of those transactions. Indeed, multiple news sources have reported on Amazon's continued expansion of data center property in Virginia and elsewhere.

[19] The leases specifically provide that Amazon does not begin paying until the properties are substantially complete.

the value of the property retained by Amazon, which is governed by express contract with a third party that Amazon admits is not under Northstar's control. Amazon cannot show unjust enrichment based on rent that it is paying pursuant to a contract that it has affirmed. Having received the benefit of its bargain, there can be no unjust enrichment based on whatever some third party paid to Defendants in connection with the development of the properties.

### 8.   Amazon's Conversion Claim Should be Dismissed

Amazon cannot prevail on Count VIII, in which it seeks a remedy for conversion and imposition of a constructive trust. Virginia law defines the tort of conversion as any distinct act of dominion or control wrongfully exerted over the property of another, either inconsistent with, or in denial of, the owner's rights. *Hairston Motor Co. v. Newsome*, 480 S.E.2d 741, 741 (Va. 1997). The elements of a conversion claim are (i) the ownership or right to possession of the property at the time of the conversion and (ii) the wrongful exercise of dominion or control by the defendant over the plaintiff's property, thus depriving him of possession. *Simmons v. Miller*, 544 S.E.2d 666, 679 (Va. 2001). Indeed, absent an allegation that the plaintiff is entitled to immediate possession of the property at issue, no conversion claim lies. *Economopoulos v. Kolaitis*, 528 S.E.2d 714, 719 (Va. 2000); *see also Jones v. Bank of Am. Corp.*, No. 4:09cv162, 2010 WL 6605789 (E.D. Va. Aug. 24, 2010) (because plaintiff "failed to plead a plausible claim that she has the right to immediate possession" of the property at issue, plaintiff could not state a claim for conversion). To maintain a claim for conversion, the plaintiff must have a property interest in the item allegedly converted and be "entitled to the immediate possession of the item." *Economopoulos*, 528 S.E.2d at 719.

Because of this, Virginia courts have repeatedly recognized that a "cause of action for conversion does not encompass claims for interference with undocumented intangible property rights." *United Leasing Corp. v. Thrift Ins. Corp.*, 440 S.E.2d 902, 906 (Va. 1994). The general

rule in Virginia is that "money cannot be the subject of conversion, only tangible personal property may be converted." *Jones*, 2010 WL 6605789, at *5 (quoting *Arias v. Jokers Wild, Inc.*, 73 Va. Cir. 281, 301, 2007 WL 6013198 (Va. Cir. Ct. 2007). Amazon's conversion claim is for money from a variety of co-mingled bank accounts and a future payment yet to be made.[20] Amazon has not shown an immediate entitlement to any of those funds.

Moreover, as shown in the contractual documents, Amazon's payments were all in the form of rent payments to a landlord. Each of the payments was, however, disclosed in the lease budgets from which rent was calculated. *See supra* at 19–20 n.11, 25, 28. Amazon can have no immediate right to funds paid out by its contract counter-party pursuant to contracts. While Amazon may allege various tort claims in its Complaint, none of those claims establishes a right to immediate possession. To the contrary, because Amazon has made its intention clear to keep its lease interests in the various properties, it has shown no entitlement at all to a return of any portion of its lease fees. And if it were to do so, it would have to sue its counter-parties, the landlord entities, to recover the fees.

### 9. Amazon's Alter Ego Claim Should Be Dismissed

In Count IX, Amazon contends that Northstar and its affiliates were the alter ego of Watson for purposes of the lease transactions. Compl. ¶ 544. Amazon's claim lacks merit. It is undisputed that neither Watson nor Northstar control the landlord entities. Whether Northstar is an alter ego of Watson is irrelevant as both are sued as Defendants for the same alleged conduct.

---

[20] "[T]o be entitled to the benefit of a constructive trust, a claimant's [interest] must be 'distinctly traced' into the chose in action, fund, or other property which is to be made the subject of the trust." *Bank of Hampton Rds. v. Powell*, 785 S.E.2d 788, 791 (Va. 2016) (quoting *Crestar Bank v. Williams*, 462 S.E.2d 333, 335 (Va. 1995)). Plaintiffs have made no effort to conduct any such tracing.

### 10.	Respondeat Superior is Inapplicable

In Count X, Amazon alleges that Northstar should be liable for the conduct of its former employees, Camenson and Ramstetter, under a respondeat superior theory.  This claim ignores the other allegations of the Complaint, which specifically acknowledge that Camenson and Ramstetter were acting on their own behalf.  Northstar and Watson, upon learning of the White Peaks transaction, threatened to sue Camenson and Ramstetter and ultimately terminated their employment with Northstar.

Respondeat superior applies where a defendant is acting in his capacity as an employee.  As discussed in *Giant of Md., Inc. v. Enger*, 515 S.E.2d 111, 112 (Va. 1999), the doctrine applies where an employee commits a tortious act "if that employee was performing the employer's business and acting within the scope of the employment when the tortious acts were committed."  *Id.*; *see also Parker v. Carilion Clinic*, 819 S.E.2d 809 (2018) ("[A]n employer is liable for the tortious act of his employee if the employee was performing his employer's business and acting within the scope of his employment.").  That was not the case here.  The contracts for the White Peaks transactions do not list Northstar or any Northstar-related entity.  Moreover, the alleged wrongful acts involved misrepresentations (allegedly as to market price and Amazon's best interest) at or before contract formation. Compl. ¶ 468.  There is no plausible allegation that the former employees were acting for Northstar at that time.  As Amazon alleges, Northstar had no idea of the White Peaks transaction at that time and confronted them six weeks after the deal was publicized in the Washington Business Journal.  Compl. ¶ 304.  Amazon further alleges that, far from acting on Northstar's behalf, Northstar "accused Ramstetter of engaging in a side deal with Northstar's 'largest client'."  Compl. ¶ 305. Amazon's respondeat superior claim is a legal conclusion divorced from any factual allegations and, thus, is "insufficient to state a claim for relief that is plausible on its face." *Lokhova v. Halper*, 441 F. Supp. 3d 238 (E.D. Va. 2020)

(dismissing respondeat superior claim) (citing *Victoria Select Ins. Co. v. R & G Transp.*, No. 3:16-cv-624, 2017 WL 5158684, at \*4 (E.D. Va. Sept. 7, 2017)).

Finally, the respondeat superior claim relies on alleged misrepresentations concerning an inflated price when the price and the increase in price were fully on display to Amazon prior to its "multi-level" approval process. Stated simply, there is no plausible claim that Amazon was misled at all, much less that it was misled by individuals acting on Northstar's behalf.

### 11. The Robinson Patman Claim Should be Dismissed

In its current Complaint, Amazon added a new Count XI, alleging injury under the antitrust laws, specifically the Robinson-Patman Act, 15 USC § 13(c). The Robinson-Patman Act was enacted to address price fixing. It applies to the sellers of goods and protects against anti-competitive injuries. *See Stephen Jay Photography Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 992 (4th Cir. 1990) ("The Robinson-Patman Act was enacted in 1936 to prohibit tactics used by large buyers or sellers to circumvent the discriminatory price prohibitions of the Clayton Act."); *Patterson v. Ford Motor Credit Co.*, 203 F.3d 821, 2000 WL 123943, at \*3-4 (4th Cir. 2000) (recognizing consensus that Robinson-Patman was limited to "transactions that involve the transfer of tangible goods."). The Act was intended to address dummy brokerages and other methods used to achieve price discrimination. *Id.* (citing *FTC v. Henry Broch & Co.,* 363 U.S. 166, 168-69 (1960)). Indeed, the Act's purpose is "to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers . . . and to ensure that businessmen at the same functional level . . . start out on equal competitive footing so far as price is concerned." *FTC v. Sun Oil Co.*, 371 U.S. 505, 520 (1963). The Robinson-Patman Act simply does not apply here.

There appear to be no cases applying the Robinson Patman Act to real estate transactions. The Ninth Circuit considered and dismissed such a claim in 2014 based on the inapplicability of

the act to such cases. *See Mathew Enter., Inc. v. Chrysler Grp. LLC,* No. 13-cv-04236-BLF, 2015 WL 3664843, at *3 (N.D. Cal. Jan. 12, 2015) (dismissing Robinson-Patman claim based on contract that was predominately a real estate lease). Other courts have held the same. *See*, *e.g.*, *Export Liquor Sales, Inc. v. Ammex Warehouse Co.*, 426 F.2d 251, 252 (6th Cir.) *cert. denied,* 400 U.S. 1000 (1970); *TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.,* 462 F.2d 1256, 1259 (8th Cir. 1972) ("[A] real estate transaction . . . is not a commodity within Robinson-Patman."); *see also Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of Cal.,* 153 F.3d 938, 942 (9th Cir. 1998) ("[Reading the Robinson-Patman Act] to include leaseholds, however, would put us in conflict with the other circuits who have considered the question.").[21]

Even if the Court were to conclude that the Robinson-Patman Act could be applied to the conduct alleged, Amazon lacks standing to bring a claim thereunder because it has not alleged an anti-competitive injury as to which the antitrust laws apply. To recover treble damages under § 4(a) of the Clayton Act, a private plaintiff must do more than simply show "an injury causally linked to" a violation of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff must prove "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id*. Thus, the Court pronounced *in J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 568 (1981), "[E]ven if there has been a violation of the Robinson-Patman Act, [a plaintiff] is not excused from its burden of proving antitrust injury and damages." Indeed, as Plaintiffs obliquely acknowledge (Compl. ¶ 338), the Robinson-Patman Act does not provide a private cause of action for damages; instead, a claim must be pursued via section 4 of the Clayton

---

[21] The Federal Trade Commission, which is charged with enforcing the Robinson-Patman Act, notes that it does not apply to the sale of services or leases. *See* https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/price-discrimination-robinson-patman

Act, which authorizes private suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," 15 U.S.C. § 15(a). *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 218 (2d Cir. 2004). "[A] private litigant seeking treble damages for such a violation under § 4 of the Clayton Act must nevertheless *allege* an antitrust injury." *Id.* at 220 (emphasis added).

To determine whether a plaintiff has alleged antitrust injury, courts consider "'(1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; [and] (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws.'" *Novell, Inc. v. Microsoft Corp.,* 505 F.3d 302, 311, 315 (4th Cir. 2007)). The antitrust laws "are intended to protect competition, and not simply competitors," and thus "only injury caused by damage to the competitive process may form the basis of an antitrust claim." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1325 (4th Cir. 1995) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). The critical inquiry here is whether the alleged injury is one that the antitrust laws were designed to prevent. It is not.

The Robinson-Patman Act applies to commodities in interstate or international commerce. It generally has no application to real estate transactions of any sort. Indeed, by its terms, Section 2(c) is concerned with the "the sale or purchase of goods, wares, or merchandise." *Mathew Enter., Inc.,* 2015 WL 3664843, at *3. Here, there is no transaction that is subject to the Robinson-Patman Act because there are no sales of goods at all. *See*, *e.g.*, *Hix Corp. v. Nat'l Screen Printing Equip. Inc.*, 108 F.Supp.2d 1204 (D. Kan. 2000) (finding no 2(c) violation where neither party was a buyer or seller of goods or services within the meaning of the statute). Moreover, to constitute a violation of the Robinson-Patman Act, the purpose of the illegal payments must be to effect price

discrimination. *Id.* (citing *Henry Broch & Co.*, 363 U.S. at 168 ) (covers all means used to effect price discrimination); *Stephen Jay Photography*, 903 F.2d at 992 (same)); see also 15 U.S.C. § 13(c) (payments for services rendered in connection with sale of goods are not prohibited). Thus, even where a plaintiff alleges that its employee was bribed, that alone is insufficient to establish an antitrust injury for standing purposes. *See First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 672 F. App'x 229, 238 (4th Cir. 2016) ("SecurityMetrics does not allege predatory pricing, which is the only pricing practice that "has the requisite anticompetitive effect."); *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,* 369 F.3d 732 (3d Cir. 2004) ("However, we do not think that paying inflated purchasing prices to vendors, without more, is "an injury of the type the antitrust laws were intended to prevent . . . that flows from that which makes the defendants' acts unlawful.") (*citing Brunswick,* 429 U.S. at 489); *Bunker Ramo Corp. v. Cywan,* 511 F. Supp. 531 (N.D. Ill. 1981) ("[W]hile a company may be injured when a supplier bribes an employee of that company in order to make a sale, the purchaser's injury is not cognizable under the antitrust laws since it is not a 'competitive injury' within the meaning of the statutory framework.")

Amazon includes only a conclusory allegation of antitrust injury. *See* Compl. ¶ 576 ("The harm to Amazon is of the type the antitrust laws are designed to prevent. Defendants' unlawful and collusive conduct with Amazon's agents (the TM Defendants) on the Amazon transactions in issue not only deprived Amazon of the faithful work and honest services of the TM defendants, but also resulted in inflated or otherwise anticompetitive real estate sale and lease transactions that caused economic harm to Amazon both directly and through its distortion of the relevant market for commercial data center sites in Northern Virginia."). This does not suffice to establish an

antitrust injury both because it is wholly conclusory and because the antitrust laws were not designed to govern real estate sales or leases.[22]

### E. Plaintiffs Have Not Shown How They Have Been Harmed

Damages is a necessary element of every claim Amazon purports to allege in the Complaint. Although Amazon cites newspaper articles and "confidential informants" to make numerous sensational allegations in the Complaint, Amazon does not identify how it has been harmed or what its theory of damages is. Significantly, however, the leases provide that Amazon may terminate the leases upon a breach. *See* Compl., Ex. 24. But Amazon declines to avail itself of that remedy. Nor has Amazon claimed fraudulent inducement and sought rescission. Amazon proposes to keep the benefit of its bargains under the leases and has chosen not to sue the landlords with whom it is in contractual privity. Amazon cannot have its cake and eat it too. *Devine v. Buki*, 767 S.E.2d 459, 466–67 (Va. 2015) (discussing rescission as remedy for fraudulent inducement and overturning award of consequential damages as inconsistent). If Amazon keeps the benefits of its contracts, under Virginia law, it is entitled only to any actual damages it has suffered.

Virginia law and federal civil law follow the "actual loss" rule for fraud and requires damages as an element of the fraud. *ITT Hartford Grp., Inc. v. Va. Fin. Assocs., Inc.*, 520 S.E.2d 355, 361 (Va. 1999) (to support a claim of fraud, the plaintiff must prove resulting damage to the complaining party); *Lloyd v. Smith*, 142 S.E. 363, 367 (Va. 1928) ("the facts showing the fraud and the resulting damage must be alleged"); *Brown v. Gilner*, No. 1:10-cv-00980 (AJT/IDD), 2012 WL 4473086 (E.D. Va. Sept. 25, 2012). Rather than allege how any particular property was leased or purchased at above-market prices, Amazon seeks to keep its contracts and further demands as

---

[22] Indeed, Amazon otherwise makes no allegation that the leases were at above-market rates. Moreover, as alleged, the Watson Defendants were not involved in the initial White Peaks sale and could not have caused any antitrust injury through their later settlement with Ramstetter and Camenson.

damages all amounts paid to any Defendant by any party. Amazon's Complaint thus makes no allegations about its own losses. Rather, Amazon seeks to calculate its damages by reference to what was paid to third parties. Thus, for example, Amazon claims to have specifically identified $16.25 million as damages. Compl. ¶¶ 447–48. That sum, as shown in Ex. 10 (Dkt. 155-10) to the Complaint, is the *total* sum of fees that has been or was to be paid to Northstar by various third parties. It does not represent sums that have been paid or of "kickbacks" to any third party. Moreover, that document obviously references events that have not occurred such as "sale" and "land/rebate."

Amazon also has not alleged how it was harmed by any representation concerning payment of fees.[23] It is undisputed that Amazon never paid anything but rent under the transaction documents at issue. The leases and operating agreements expressly quantify the budgets from which rent is to be based (and include caps to the extent a project might go over budget). Compl. Ex. 24, Dk. 158-159. The leases Amazon executed in connection with the alleged Leased Transaction Enterprise provide that Amazon's annual rent for a data center would be a percentage of either the "Final Budget" or, if lower, the developer's "Actual Costs." Compl. Ex. 24, Dkt. 158-1 at 6, 158-4 at 8-9. Amazon wrongly contends that it bore the risk of increased costs despite the express contractual provision to the contrary.[24] *Id*. A chart prepared and produced by Amazon (Compl. Ex. 22, Dkt. 157-2) shows that Amazon had occupied only four of the nine data centers

---

[23] As discussed below, Plaintiffs' contractual and misrepresentation arguments also rely upon a mischaracterization of the relevant contracts that bars their claims.

[24] Amazon did not bear the risk of budget overruns. *See* Compl. Ex. 24, Dkt. 158-4, at 4 ("After the selection of the General Contractor, but before the award of the Construction Contract, Landlord and Tenant will agree on the final budget for Landlord's Work, which shall include, but not be limited to, hard costs, soft costs (including contingency) and other land costs associated with Landlord's Work (the 'Final Budget') . . . . To the extent the total Actual Costs exceed the total Final Budget, Landlord will bear and be solely responsible for the excess without reimbursement or additional contribution from Tenant . . . .").

at issue prior to reformation of the leases in February 2020 to remove Northstar as a joint venture partner in the landlord entities. For those four centers, Amazon paid monthly rents ranging from $218,223.81 to $297,597.14. *Id.* Plaintiffs' exhibits show that Amazon would have paid the following amounts in rent through reformation:

| Project | Lease Start | Reformation | Months | Monthly Rent | Total Rent |
|---------|-------------|-------------|--------|--------------|------------|
| Manassas | 6/17/2019 | 2/19/2020 | 8 | $225,059 | $1,800,469 |
| Manassas | 11/6/2019 | 2/19/2020 | 3.5 | $224,810 | $786,834 |
| Dulles | 11/1/2018 | 2/19/2020 | 15.5 | $218,224 | $3,382,469 |
| Dulles | 3/6/2019 | 2/19/2020 | 11.5 | $297,597 | $3,422,367 |
| | | | | | **$9,392,139** |

Thus, Amazon's own documents show that it has paid approximately $9,392,139 in rent. It did not pay any fees to Defendants, and Amazon makes no allegation that any of the Watson Defendants received any of the rent payments made to the landlords. Northstar would receive typical market rate fees from the landlords for sourcing and developing the assets pursuant to development agreements but gets most of its profit after the assets are sold. *See, e.g*., Compl. Ex. 10, Dkt. 155-10 (showing fees associated with post-development actions such as "land/rebate" and "sale"). Amazon's rent payments cannot reflect damages because Amazon paid rent to the landlords (not Defendants) and received the property for which it paid.

As discussed above, the documents upon which Amazon relies to show Northstar's fees were reviewed and/or approved by Amazon (to say nothing of IPI, institutional lenders and their counsel). Indeed, the schedules attached to Northstar's RFP and the leases disclosed all fees. The budget Amazon submitted for the Manassas project, for example, included a 2% Leasing Fee and a 5% Developer Contingency. Compl. Ex. 17, Dkt. 156-6. Thus, while the lease excluded

"professional fees and costs" from the definition of Operating Expense, it included both the Lease Commission and Development Fee among the costs that could be used to calculate Base Rent and from which Amazon's rent was calculated. *See also* <u>Compl.</u> ¶ 60 ("The total lease payments to the landlord-developer are calculated to compensate the developer for: (i) the cost of the land; (ii) the construction cost of the shell; (iii) a negotiated percentage yield on the cost of the land and shell; and (iv) the developer's operating expenses to act as landlord.").

Amazon does not contend that it did not receive the property or services for which it contracted. To the contrary, Amazon has received the property for which it contracted, and the Complaint specifically references both this fact and that the leases have been reformed to transfer Northstar's responsibilities to IPI (Northstar's primary equity investor and JV partner in the landlord entities, Compl. ¶ 221). Amazon cannot seriously contend that it is entitled to keep the property and improvements for which it bargained, but that it should also be paid the full amount that Northstar was paid by third parties in connection with these transactions.

Amazon also does not contend that any of the leases or sites involved in its Complaint were at above-market rates. If Amazon intended to lease property and received that property at a market price, it has not been harmed.

Finally, Plaintiffs ask for disgorgement of alleged ill-gotten gains. Disgorgement applies only to profits, if it is available as a remedy at all. *See Liu v SEC*, 140 S. Ct. 1936 (2020). Disgorgement is not available, however, as a remedy in private civil RICO actions. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1192 (D.C. Cir. 2005). For all of these reasons, Amazon's failure to specify how it has been damaged mandates dismissal of the Complaint.

## III. CONCLUSION

For the reasons discussed above, Amazon has failed to state a claim upon which relief may be granted and venue is inappropriate. The Court should dismiss the Complaint.

Respectfully submitted

_____/s/ Jeffrey R. Hamlin_____
Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun (*pro hac vice*)
James Trusty (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

Stanley L. Garnett (*pro hac vice*)
Brownstein Hyatt Farber Schreck, LLP
410 Seventeenth Street
Denver, Colorado 80202-4432
(303) 223-1100 – Tel.
(303) 223-1111 – Fax
sgarnett@bhfs.com

Gregory A. Brower (*pro hac vice*)
Brownstein Hyatt Farber Schreck, LLP
100 North City Parkway
Las Vegas, Nevada 89106-4614
(702) 382-2101 – Tel.
(702) 382-8135 – Fax
gbrower@bhfs.com

*Counsel for the Watson Defendants*