**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| AMAZON.COM, INC., and AMAZON DATA SERVICES, INC., | |
|    Plaintiffs, | |
| v. | Case No. 1:20 Civ. 484 |
| WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; JOHN DOES 1-20, | |
|    Defendants. | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT BY DEFENDANTS
CARLETON NELSON AND CHESHIRE VENTURES LLC</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.      Nelson's 2012 Employment Agreement ....................................................... 3

II.     Amazon's Process for Approving Real Estate Transactions ......................... 5

III.    The Lease Transactions ................................................................................. 6

       A.     Build-To-Suit Transactions ................................................................ 6

       B.     Northstar's Outreach to Amazon ....................................................... 7

       C.     The Villanova Trust ........................................................................... 8

       D.     The Northstar Build-To-Suit Transactions ........................................ 8

       E.     Amazon's Alleged Payments ............................................................. 11

IV.     The Direct Purchase Transactions ................................................................ 12

       A.     The White Peaks Transaction ............................................................ 12

       B.     The Blueridge Transaction ................................................................. 14

       C.     Amazon Intends To Construct Data Centers at Both Sites ................. 14

V.      Allcore, Cheshire Ventures, and Finbrit ...................................................... 15

VI.     Amazon Launches an Investigation, but Continues Development ................. 16

VII.    Amazon's Claims .......................................................................................... 16

STANDARD OF REVIEW ........................................................................................ 17

ARGUMENT .............................................................................................................. 18

I.      The RICO Claims Must Be Dismissed ......................................................... 18

       A.     Amazon Has Not Alleged Nelson or Cheshire Ventures Invested in,
             Acquired, or Participated in an "Enterprise" ...................................... 19

B.    Amazon Has Not Pled Any Predicate Act with the Required Specificity ........... 23

    1.    Amazon's Fraud Predicates Fail Because Amazon Has Not Pled a Scheme To Defraud ................................................................................ 24

    2.    The Money Laundering and Travel Act Predicates Fail Too .................. 32

C.    Amazon Has Not Alleged a Pattern of Racketeering Activity ............................ 32

D.    Amazon Has Not Alleged a Conspiracy To Violate RICO ................................. 37

E.    Amazon Has Not Alleged Injury or Damages ..................................................... 38

II.    The Robinson-Patman Act Claim Must Be Dismissed ................................................... 41

A.    The Robinson Patman Act Does Not Apply to the Alleged Transactions ........... 41

B.    Amazon Lacks Antitrust Standing To Sue for Treble Damages.......................... 43

III.    The State-Law Claims Must Be Dismissed ..................................................................... 45

A.    Amazon May Not Pursue Its Claims Against Nelson Under Virginia Law ......... 45

B.    The Court Should Dismiss Amazon's Common-Law Fraud Claim ..................... 46

C.    The Court Should Dismiss Amazon's Breach of Contract Claim ........................ 47

D.    Amazon's Remaining Claims Fail ........................................................................ 49

CONCLUSION.................................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*Abbott Labs. v. Adelphia Supply USA*,
　No. 15 Civ. 5826, 2017 WL 57802 (E.D.N.Y. Jan. 4, 2017)...................................................21

*Aebig v. Com. Bank of Seattle*,
　674 P.2d 696 (Wash. Ct. App. 1984)......................................................................................49

*Al-Abood ex rel. Al-Abood v. El-Shamari*,
　217 F.3d 225 (4th Cir. 2000) ......................................................................................34, 35, 37

*Allen Pen Co. v. Springfield Photo Mount Co.*,
　653 F.2d 17 (1st Cir. 1981).....................................................................................................42

*Allstate Ins. Co. v. Seigel*,
　312 F. Supp. 2d 260 (D. Conn. 2004)................................................................................22, 23

*Almanza v. United Airlines, Inc.*,
　851 F.3d 1060 (11th Cir. 2017) ..............................................................................................21

*Amazon.com, Inc. v. Powers*,
　No. 12 Civ. 1911, 2012 WL 6726538 (W.D. Wash. Dec. 27, 2012)................................48, 49

*Anctil v. Ally Fin., Inc.*,
　998 F. Supp. 2d 127 (S.D.N.Y. 2014).....................................................................................20

*Anderson v. Found. for Advancement*,
　155 F.3d 500 (4th Cir. 1998) ..................................................................................................33

*Anthony v. Verizon Va., Inc.*,
　758 S.E.2d 527 (Va. 2014)......................................................................................................47

*Anza v. Ideal Steel Supply Corp.*,
　547 U.S. 451 (2006)................................................................................................................41

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)........................................................................................17, 23, 27, 40

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
　459 U.S. 519 (1983)................................................................................................................44

*Atl. Richfield Co. v. USA Petroleum Co.*,
　495 U.S. 328 (1990)................................................................................................................44

*Banc of Am. Inv. Servs., Inc. v. Magnone*,
  No. 2:09 Civ. 256, 2010 WL 11561564 (E.D. Va. Feb. 25, 2010)..........................................50

*Bank of Montreal v. Signet Bank*,
  193 F.3d 818 (4th Cir. 1999) ...............................................................................................47

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..............................................................................................................17

*Bi v. McAuliffe*,
  927 F.3d 177 (4th Cir. 2019) ...............................................................................................28

*Biggs v. Eaglewood Mortg., LLC*,
  353 F. App'x 864 (4th Cir. 2009) ...................................................................................25, 30

*Bloch v. Exec. Off. of the President*,
  164 F. Supp. 3d 841 (E.D. Va. 2016) ....................................................................................26

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood*
  *Hotels & Resorts Worldwide, Inc.*,
  369 F.3d 212 (2d Cir. 2004)..................................................................................................43

*Bowen v. Oistead*,
  125 F.3d 800 (9th Cir. 1997) ...............................................................................................40

*Boyle v. United States*,
  556 U.S. 938 (2009)....................................................................................................1, 19, 21

*Busby v. Crown Supply, Inc.*,
  896 F.2d 833 (4th Cir. 1990) (en banc) ................................................................................41

*Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*,
  117 F.3d 655 (2d Cir. 1997)..................................................................................................28

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ...........................................................................................19

*City of Chicago Heights v. Lobue*,
  914 F. Supp. 279 (N.D. Ill. 1996) .........................................................................................38

*Congregacion de la Mision Provincia v. Curi*,
  978 F. Supp. 435 (E.D.N.Y. 1997) .......................................................................................23

*Cooper v. Meridian Yachts, Ltd.*,
  575 F.3d 1151 (11th Cir. 2009) ...........................................................................................46

*Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  259 F. Supp. 3d 1344 (M.D. Fla. 2017).................................................................................20

iv

*Cyberlock Consulting, Inc. v. Info. Experts, Inc.*,
876 F. Supp. 2d 672 (E.D. Va. 2012) ....................................................................46

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*,
941 F.2d 1220 (D.C. Cir. 1991).............................................................................41

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*,
No. 2:15 Civ. 3435, 2016 WL 7475816 (E.D. Pa. Dec. 29, 2016) .........................22

*Donaldson v. Primary Residential Mortg.*,
No. 19 Civ. 1175, 2020 WL 3184089 (D. Md. June 12, 2020) ...................19, 20, 21

*Dunlap v. Cottman Transmission Sys., LLC*,
754 S.E.2d 313 (Va. 2014).....................................................................................50

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
48 F.3d 1260 (D.C. Cir. 1995)................................................................................36

*Elcon Constr., Inc. v. E. Wash. Univ.*,
273 P.3d 965 (Wash. 2012)....................................................................................47

*Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*,
847 F.2d 1052 (3d Cir. 1988), *aff'd*, 493 U.S. 400 (1990) .....................................44

*European Cmty. v. RJR Nabisco, Inc.*,
764 F.3d 149 (2d Cir. 2014) (*per curiam*) .............................................................41

*Exp. Liquor Sales, Inc. v. Ammex Warehouse Co.*,
426 F.2d 251 (6th Cir. 1970) .................................................................................43

*Field v. GMAC LLC*,
660 F. Supp. 2d 679 (E.D. Va. 2008) ...............................................................23, 37

*Flip Mortg. Corp. v. McElhone*,
841 F.2d 531 (4th Cir. 1988) .........................................................18, 33, 34, 35

*Foster v. Wintergreen Real Estate Co.*,
363 F. App'x 269 (4th Cir. 2010) .....................................................................35, 37

*Fox v. Deese*,
362 S.E.2d 699 (Va. 1987)......................................................................................50

*Frederick v. Serv. Experts Heating & Air Conditioning, LLC*,
No. 2:14 Civ. 1647, 2016 WL 3753160 (N.D. Ala. July 14, 2016)........................23

*FTC v. Henry Broch & Co.*,
363 U.S. 166 (1960)................................................................................................42

*GE Inv. Priv. Placement Partners II v. Parker*,
  247 F.3d 543 (4th Cir. 2001) ...............................................................................33, 34, 35, 36

*Goines v. Valley Cmty. Servs. Bd.*,
  822 F.3d 159 (4th Cir. 2016) .................................................................................2, 17, 30

*Goodrow v. Friedman & MacFadyen, P.A.*,
  No. 3:11 Civ. 20, 2012 WL 6725617 (E.D. Va. Dec. 27, 2012) ...........................................25

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) ...........................................................................................37

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989).................................................................................................33, 34

*HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*,
  737 F. Supp. 2d 533 (E.D. Va. 2010) ................................................................................47

*Hemi Grp., LLC v. City of N.Y.*,
  559 U.S. 1 (2010)................................................................................................19, 38

*Hinkleman v. Shell Oil Co.*,
  962 F.2d 372 (4th Cir. 1992) .........................................................................................43

*Hitachi Credit Am. Corp. v. Signet Bank*,
  166 F.3d 614 (4th Cir. 1999) ....................................................................................45, 46

*Houser v. City of Redmond*,
  586 P.2d 482 (Wash. 1978).........................................................................................50

*Hunt v. Branch Banking & Tr. Co.*,
  480 F. App'x 730 (4th Cir. 2012) .................................................................................45

*Hyundai Emigration Corp. v. Empower-Visa, Inc.*,
  No. 1:09 Civ. 124, 2009 WL 10687986 (E.D. Va. June 17, 2009)...............................33, 36

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)..........................................................................................20

*Kaul v. Christie*,
  372 F. Supp. 3d 206 (D.N.J. 2019) .................................................................................27

*Kaye v. D'Amato*,
  357 F. App'x 706 (7th Cir. 2009) .................................................................................27

*Knit With v. Knitting Fever, Inc.*,
  Nos. 08 Civ. 4221, 08 Civ. 4775, 2012 WL 2938992 (E.D. Pa. July 19, 2012)...............40, 41

*Larry R. George Sales Co. v. Cool Attic Corp.*,
    587 F.2d 266 (5th Cir. 1979) ...........................................................................44

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*,
    930 P.2d 288 (Wash. 1997)...............................................................................49

*Leonard v. J.C. Pro Wear, Inc.*,
    64 F.3d 657, 1995 WL 508894 (4th Cir. 1995) ................................................44

*Lissmann v. Hartford Fire Ins. Co.*,
    848 F.2d 50 (4th Cir. 1988) ..............................................................................29

*Lockheed Martin Corp. v. Boeing Co.*,
    357 F. Supp. 2d 1350 (M.D. Fla. 2005)............................................................23

*Lupia v. Stella D'Oro Biscuit Co.*,
    586 F.2d 1163 (7th Cir. 1978) ..........................................................................42

*McCauley v. Home Loan Inv. Bank, F.S.B.*,
    710 F.3d 551 (4th Cir. 2013) ............................................................................18

*Med. Supply Chain, Inc. v. Gen. Elec. Co.*,
    144 F. App'x 708 (10th Cir. 2005) ....................................................................43

*Menasco, Inc. v. Wasserman*,
    886 F.2d 681 (4th Cir. 1989) ............................................................... 33, 35, 36

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*,
    716 F.2d 245 (4th Cir. 1983) ............................................................................44

*Mylan Labs. Inc. v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ..............................................................................24

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
    707 F.3d 451 (4th Cir. 2013) .............................................................18, 25, 27, 30

*Neder v. United States*,
    527 U.S. 1 (1999)...............................................................................................30

*Neiman Marcus Grp. Inc. v. Dispatch Transp. Corp.*,
    No. 09 Civ. 6861, 2011 WL 1142922 (S.D.N.Y. Mar. 17, 2011) ....................23

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ............................................................................17

*NOW v. Scheidler*,
    510 U.S. 249 (1994)...........................................................................................22

*Nw. Laborers-Employers Health & Sec. Tr. Fund v. Philip Morris, Inc.*,
   58 F. Supp. 2d 1211 (W.D. Wash. 1999)...............................................................50

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016)..................................................................29, 30

*Ochoa v. Housing Auth.*,
   47 F. App'x 484 (9th Cir. 2002) ...........................................................21

*Parcoil Corp. v. Nowsco Well Service, Ltd.*,
   887 F.2d 502 (4th Cir. 1989) ...............................................................36

*Patterson v. Ford Motor Credit Co.*,
   203 F.3d 821, 2000 WL 123943 (4th Cir. 2000) ...........................2, 41, 42

*Payne v. Ruegsegger*,
   194 Wash. App. 1034, 2016 WL 3402353 (Wash. Ct. App. June 14, 2016)...........49

*Phillips v. Mabus*,
   894 F. Supp. 2d 71 (D.D.C. 2012) ........................................................26

*Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co.*,
   153 F.3d 938 (9th Cir. 1998) ...............................................................44

*Puerto Rico Am. Ins. Co. v. Burgos*,
   867 F. Supp. 2d 216 (D.P.R. 2011)......................................................20

*Pyott-Boone Elec. Inc. v. IRR Trust*,
   918 F. Supp. 2d 532 (W.D. Va. 2013) ..................................................46

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) .................................................................50

*Reninger v. State Dep't of Corr.*,
   951 P.2d 782 (Wash. 1998)..................................................................50

*Retail Wholesale & Dep't Store Union Local 338
   Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) .............................................................29

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)............................................................................22

*Brown ex rel. Richards v. Brown*,
   239 P.3d 602 (Wash. Ct. App. 2010).....................................................49

*Rodman v. Haines*,
   No. 75 Civ. 471, 1976 WL 1315 (S.D.N.Y. Sept. 14, 1976).......................43

*Rojas v. Delta Airlines, Inc.*,
　　425 F. Supp. 3d 524 (D. Md. 2019) ...................................................................28

*Salinas v. United States*,
　　522 U.S. 52 (1997) .............................................................................................37

*Scott v. WFS Fin., Inc.*,
　　No. 2:06 Civ. 349, 2007 WL 190237 (E.D. Va. Jan. 18, 2007) ..........................24

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
　　484 F.3d 700 (4th Cir. 2007) .............................................................................17

*Sedima, S.P.R.L. v. Imrex Co.*,
　　473 U.S. 479 (1985) ...........................................................................................18

*Silverman v. Town of Blackstone*,
　　843 F. Supp. 2d 628 (E.D. Va. 2012) ............................................................3, 17

*Skilling v. United States*,
　　561 U.S. 358 (2010) .....................................................................................26, 28

*Smith v. Bank of Am., N.A.*,
　　No. 2:11 Civ. 676, 2014 WL 897032 (M.D. Fla. Mar. 6, 2014) ..........................23

*Spaulding v. Wells Fargo Bank, N.A.*,
　　714 F.3d 769 (4th Cir. 2013) .............................................................................18

*Spool v. World Child Int'l Adoption Agency*,
　　520 F.3d 178 (2d Cir. 2008) .........................................................................35, 36

*Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*,
　　419 F. Supp. 3d 176 (D. Mass. 2019) ...............................................................27

*TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*,
　　462 F.2d 1256 (8th Cir. 1972) ...........................................................................43

*United Mine Workers of Am. v. Gibbs*,
　　383 U.S. 715 (1966) ...........................................................................................45

*United States v. Colton*,
　　231 F.3d 890 (4th Cir. 2000) .........................................................................24, 28

*United States v. Fiel*,
　　35 F.3d 997 (4th Cir. 1994) ...............................................................................19

*United States v. Gillion*,
　　704 F.3d 284 (4th Cir. 2012) .............................................................................24

*United States v. Milovanovic*,
  678 F.3d 713 (9th Cir. 2012) ...................................................................26

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
  875 F. Supp. 1190 (E.D. Va. 1995), .........................................................46

*United States v. Pinson*,
  860 F.3d 152 (4th Cir. 2017) ...........................................................24, 35

*United States v. Safavian*,
  528 F.3d 957 (D.C. Cir. 2008)...........................................................29, 30

*United States v. Vinyard*,
  266 F.3d 320 (4th Cir. 2001) .................................................................25

*Univ. of Wash. v. Gov't Emps. Ins. Co.*,
  404 P.3d 559 (Wash. Ct. App. 2017) ......................................................47

*US Airline Pilots Ass'n v. Awappa, LLC*,
  615 F.3d 312 (4th Cir. 2010) ......................................................... *passim*

*Vuyyuru v. Jadhav*,
  No. 3:10 Civ. 173, 2011 WL 1483725 (E.D. Va. Apr. 19, 2011).........................21

*Walters v. McMahen*,
  684 F.3d 435 (4th Cir. 2012) .................................................................23

*Whitney, Bradley & Brown, Inc. v. Kammermann*,
  436 F. App'x 257 (4th Cir. 2011) ............................................................36

*Willener v. Sweeting*,
  730 P.2d 45 (Wash. 1986) (en banc).................................................47, 48

*Williams v. Equity Holding Corp.*,
  498 F. Supp. 2d 831 (E.D. Va. 2007) ......................................................33

*Willis v. City of Va. Beach*,
  90 F. Supp. 3d 597 (E.D. Va. 2015) ...................................................3, 17

*Winter v. NRDC*,
  555 U.S. 7 (2008).................................................................................50

*World Wrestling Ent., Inc. v. Jakks Pac., Inc.*,
  425 F. Supp. 2d 484 (S.D.N.Y. 2006).......................................................42

*Young v. Young*,
  191 P.3d 1258 (Wash. 2008)..................................................................49

*Young-Allen v. Bank of Am., N.A.*,
    839 S.E.2d 897 (Va. 2020)...................................................................47

*Zaklit v. Global Linguist Sols., LLC*,
    2014 WL 3109804 (E.D. Va. July 8, 2014) ........................................46

*Zaremski v. Keystone Title Assocs., Inc.*,
    884 F.2d 1391 (4th Cir. 1989) ............................................................47

## STATUTES & RULES

Clayton Act § 4, codified as amended at 15 U.S.C. § 15....................................43, 44

    15 U.S.C. § 15(a) ...................................................................................43

Racketeer Influenced and Corrupt Organizations Act,
    codified as amended at 18 U.S.C. §§ 1961-68 ............................... *passim*

    18 U.S.C. § 1961(1).........................................................................24, 26

    18 U.S.C. § 1961(5).................................................................................33

    18 U.S.C. § 1962 .............................................................................18, 38

    18 U.S.C. § 1962(a).............................................................19, 22, 23, 33

    18 U.S.C. § 1962(b).............................................................19, 22, 23, 33

    18 U.S.C. § 1962(c).......................................................18, 19, 23, 33

    18 U.S.C. § 1962(d).................................................................................37

    18 U.S.C. § 1964(c).................................................................................38

Robinson-Patman Act, § 2, codified as amended at 15 U.S.C. § 13..................... *passim*

    15 U.S.C. § 13(a) ...................................................................................42

    15 U.S.C. § 13(c) .......................................................................... *passim*

    15 U.S.C. § 13(e) ...................................................................................43

Travel Act, codified as amended at 18 U.S.C. § 1952 ....................................24, 32, 36

    18 U.S.C. § 1952(a).................................................................................32

    18 U.S.C. § 1952(b)(2)............................................................................32

    18 U.S.C. § 1952(b)(3)............................................................................32

18 U.S.C. § 1001 ................................................................................................................29

18 U.S.C. § 1343 ...........................................................................................................23, 35

18 U.S.C. § 1346 ...........................................................................................................23, 35

18 U.S.C. § 1349 ...........................................................................................................24, 26

18 U.S.C. § 1956 ................................................................................................................23

18 U.S.C. § 1956(a)(1) .......................................................................................................32

18 U.S.C. § 1956(c)(7) .......................................................................................................32

18 U.S.C. § 1957 ................................................................................................................23

18 U.S.C.§ 1957(a) ............................................................................................................32

18 U.S.C. § 1957(f)(3) ........................................................................................................32

28 U.S.C. § 1367(c)(3) .....................................................................................................2, 45

Va. Code Ann. § 8.01-114 ..................................................................................................16

Va. Code Ann. § 8.01-114(A)(1) ........................................................................................46

Wash. Rev. Code Ann. § 49.62.050 ...................................................................................48

Wash Rev. Code Ann. § 49.62.100 ....................................................................................48

Fed. R. Civ. P. 9(b) ......................................................................................................*passim*

Fed. R. Civ. P. 10(c) ............................................................................................................2

Fed. R. Civ. P. 12(b)(6) ......................................................................................................17

## <u>INTRODUCTION</u>

The emperor has no clothes. The Second Amended Complaint ("SAC" or the "complaint") filed by Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. (collectively, "Amazon") purports to be the product of an "extensive" nine-month investigation. But that investigation has yielded nothing more than several hundred paragraphs of mostly conclusory allegations that continue to contain basic factual and legal errors. Those errors require dismissal of all claims against Defendants Carleton Nelson and Cheshire Ventures LLC.

Factually, the complaint contradicts its own exhibits and lacks the specificity that Rule 9(b) demands of fraud claims. The complaint's central claim is that two Amazon "transaction managers," Nelson and Defendant Casey Kirschner, steered eleven real estate transactions to preferred developers. But the complaint's exhibits make clear that the transactions at issue were approved ████████████████████████████████████████████████. The complaint does not allege the falsity of any representation Nelson made to obtain those approvals. Three of the eleven transactions even occurred months after Nelson left Amazon.

Legally, Amazon attempts to shoehorn its insufficient allegations into federal claims that do not fit. Amazon continues to assert a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68. But whereas Amazon's prior complaints asserted two separate RICO "enterprises," *e.g.*, Dkt. 100 ¶¶ 157-262, the complaint now attempts to combine them into a single "association-in-fact enterprise" that encompasses all defendants and eleven transactions, Dkt. 150 ("SAC") ¶¶ 359, 361. That broad group cannot satisfy RICO's enterprise requirement because, under the complaint's own allegations, it is not a "continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009).

Amazon's RICO claim fails for other reasons as well. The RICO predicate acts that Amazon purports to identify are fraud claims that it has not pled with specificity. In fact, the

complaint's exhibits demonstrate that Amazon knew many of the facts it now claims were withheld. And even if the complaint could adequately allege instances of fraud, those instances would not show the pattern of "organized, long-term, habitual criminal activity" required for a RICO claim. *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010).

Amazon's claim under § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), fares even worse. The "circuit courts of appeal appear to be in agreement that section 2(c)" of the Robinson-Patman Act "covers only transactions that involve the transfer of ***tangible goods***." *Patterson v. Ford Motor Credit Co.*, 203 F.3d 821, 2000 WL 123943, at *3 (4th Cir. 2000) (table) (emphasis added). Amazon's claims concern real estate transactions, not tangible goods. Thus, the Robinson-Patman Act simply does not apply.

Because Amazon has failed to allege any federal claim, this Court can, and should, dismiss the remaining state-law claims under 28 U.S.C. § 1367(c)(3). But even on the merits, those claims require dismissal as well. One arises only under Virginia law, and thus defies Amazon's election of Washington law in Nelson's employment agreement. And all of Amazon's state-law claims suffer from legal defects that require dismissal. Accordingly, the claims against Nelson and Cheshire Ventures should be dismissed in their entirety.

## **BACKGROUND**

On a motion to dismiss, courts ordinarily must credit the allegations in a complaint. The complaint, however, attaches sixty-six exhibits to the accompanying Declaration of Lora E. MacDonald ("MacDonald Decl."), Dkt. 155. The Court can thus consider the contents of those exhibits, and "dismissal is appropriate" if they contradict Amazon's allegations. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). The Court can also consider "'matters of public record,'" such as Amazon's public filings with

county regulators concerning the properties described in the complaint. *Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 605 (E.D. Va. 2015) (quoting *Silverman v. Town of Blackstone*, 843 F. Supp. 2d 628, 631 (E.D. Va. 2012)). The recitation of facts below thus describes Amazon's allegations, its exhibits, and its public filings, highlighting discrepancies as appropriate.

## I.   NELSON'S 2012 EMPLOYMENT AGREEMENT

On April 2, 2012, Amazon and Carleton Nelson entered a Confidentiality, Noncompetition and Invention Assignment Agreement (the "Employment Agreement"). Dkt. 162-10 (MacDonald Decl. Ex. 57). The Employment Agreement specifically identified the information Nelson had a duty to disclose to Amazon and explicitly permitted him to engage in outside business activity during his employment.

Section 1 of the Employment Agreement is entitled, "Disclosure and Delivery to the Company." Dkt. 162-10 at 1. That provision required Nelson to disclose "ideas or information" he developed as part of his work that "could reasonably be expected to prove useful or valuable to the Company." *Id.* But the disclosure provision further recognized that Nelson could "Conceive and/or Originate certain Products and/or Services which are unrelated to the activities of the Company." *Id.* at 1-2. Nelson had no obligation to disclose "Unrelated Products and/or Services," even if he used "Company equipment or facilities" to create them during "the Company's normal operating hours." *Id.* at 2.

The Employment Agreement's provision governing "Competitive Activities" reinforces Nelson's ability to engage in outside business activity during and after his employment with Amazon. Dkt. 162-10 at 5. That provision permitted Nelson to engage in outside business activities "[d]uring the period of his . . . employment with the Company," provided that the activities were not "of the same nature as, or substantively similar to, an activity or business of the Company." *Id.* The noncompete agreement also permitted Nelson to do business with

Amazon's partners unless, during the "18 months after the date [he] ceases to be employed," the "Company was involved in substantially the same business arrangement." *Id.* at 5-6; SAC ¶ 149.

The Employment Agreement has other provisions that pertain to the allegations in the complaint. It limits Nelson's use of "Confidential Information," a defined term that specifically excluded "any information which is in or which enters the public domain." Dkt. 162-10 at 2-4. It also contains a "Governing Law and Jurisdiction" clause, which provides that "any disputes which may arise under, out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of Washington." *Id.* at 8. That provision further identifies "King County, Washington" as the "exclusive[ ]" "venue of any suit arising out of or related to this agreement." *Id.* Finally, the Employment Agreement provides that "[n]o amendment or alteration of [its] terms . . . shall be valid unless made in writing and signed by both of the parties hereto." *Id.* at 7. The complaint does not allege that Nelson and Amazon ever signed any written amendment to the Employment Agreement.

Amazon also published a "Code of Business Conduct and Ethics" (the "Code of Conduct") that "set[ ] out basic guiding principles" it wanted employees to follow. Dkt. 156-8 (MacDonald Decl. Ex. 18). The Code of Conduct was not, however, a contract. Nelson's Employment Agreement includes an integration clause stating that it "contains the entire agreement of the parties." Dkt. 162-10 at 8. And while the complaint alleges that Nelson "certified compliance with Amazon's Code of Conduct," it does not allege that Amazon provided him consideration for doing so. SAC ¶ 133.[1] The Code of Conduct also states that "[e]mployees who violate the Code of Conduct will be subject to disciplinary action ***up to and including discharge***." Dkt. 156-8 (emphasis added). The complaint alleges that Amazon, by

---

[1] Paragraph 133 of the SAC cites to "Ex. 53." But Exhibit 53 to the MacDonald Declaration states only, "This Exhibit Has Been Intentionally Left Blank." Dkt. 162-6.

"terminat[ing] Nelson's employment in June 2019," has already taken the most severe action contemplated by the Code of Conduct.  SAC ¶ 29.

## II.   AMAZON'S PROCESS FOR APPROVING REAL ESTATE TRANSACTIONS

Amazon alleges that it employed Nelson and Casey Kirschner as transaction managers (or "TMs") who oversaw various real estate transactions.  According to the complaint, "Amazon carefully selects and develops real estate locations that will support its various supply chain and other business operations, including ▮▮▮▮."  SAC ¶ 54.  "Amazon has a multi-step process for selecting suitable land for" ▮▮▮▮ transactions and conducts "extensive initial site diligence" to determine whether a "site meets relevant business needs and that its price aligns with relevant market norms."  *Id.* ¶¶ 62-63.  The site diligence is "conducted largely through external brokers and agents who report property and market details to Amazon."  *Id.* ¶ 78. Ultimately, each transaction involves "months of diligence and a multitude of data points, contracts, and fee structures linked to dynamic markets and business needs."  *Id.* ¶ 82.  Individual transactions can have "no less than 50 different parties involved in project development, project finance, tenancy, and miscellaneous project support services (such as insurance and site maintenance) over a multi-year period."  *Id.* ¶ 85.

The complaint alleges that transaction managers like Nelson and Kirschner "have primary responsibility for presenting site diligence and financials for transactional 'spend' approval."  SAC ¶ 79. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 154-1 (MacDonald Decl. Ex. 55). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



*Id.*

*Id.* at 7.

*Id.* at 8.

The complaint does not allege that Nelson and Kirschner were department managers.

*Id.*

*Id.* at 2.

*Id.*

Amazon claims that Kirschner and Nelson "exploited their positions to evade company controls on transaction approvals." SAC ¶ 77. But Amazon nowhere alleges how that occurred, or how it would even be possible to evade the ██████████████████████████████████████ ██████████████████████████. Nor does Amazon provide factual development of what it believes Nelson and Kirschner did to evade ██████████. Amazon alleges only that Nelson and Kirschner "were *in a position* to manipulate" a "multitude of data points," and that Nelson and Kirschner compared transactions to "'comparables' that, *on information and belief*, *may* themselves had been inflated or otherwise tainted." *Id.* ¶¶ 82-83 (emphasis added).

## III.   THE LEASE TRANSACTIONS

The bulk of Amazon's allegations focus on nine lease transactions that Amazon entered with entities created by WDC Holdings LLC ("Northstar") and its equity partner, IPI Partners.

### A.   Build-To-Suit Transactions

In a build-to-suit transaction, Amazon "partners with a commercial real estate developer that is willing to find, acquire, and develop the land for Amazon." SAC ¶ 59. Amazon does not pay for the property or for construction costs. *Id.* The developer does. *Id.* Amazon instead

6

agrees to pay rent to the developer after Amazon begins occupying the finished building.  *Id.*
Real estate developers often work with outside investors to fund property acquisition and
construction costs.  *Id.* ¶225.  Investors and the real estate developer sometimes create joint
ventures and subsidiary entities to acquire the land, construct a "basic shell" facility, and enter
into a lease with Amazon.  *Id.* ¶¶59, 225-227.  After Amazon begins paying rent, the profit is
distributed from the joint venture to investors and the real estate developer in proportion to their
respective investments.  *See id.* ¶¶230-232.

### B.      Northstar's Outreach to Amazon

In 2016, Northstar began paying Defendant Casey Kirschner's brother, Christian Kirsch-
ner, to act as an "independent contractor to research large companies, who may have commercial
real estate needs."  Dkt. 155-1 (MacDonald Decl. Ex. 1) at 2-3.  Christian Kirschner introduced
Northstar's CEO, Defendant Brian Watson, to Casey Kirschner and Amazon.  SAC ¶329.  In
July 2017, Watson sent Casey Kirschner information about Northstar, requested his "business
contact info," and informed him that he would be in Seattle at the end of August.  Dkt. 156-6
(MacDonald Decl. Ex. 16).  A month later, Watson met with Casey Kirschner in Amazon's
offices at 2001 Eighth Avenue in Seattle.  Dkt. 156-10 (MacDonald Decl. Ex. 20) at 2-3.

In September 2017, Kirschner sent Watson a request for proposals for a build-to-suit deal
at a site in Northern Virginia, together with a lease form, specifications, and a general site plan.
Dkt. 155-5 (MacDonald Decl. Ex. 5).  Northstar submitted a response later that month.  Dkt.
157-3 to 157-9 (MacDonald Decl. Ex. 23).  Northstar's proposal informed Amazon that
Northstar "encourages the participation of commercial real estate brokers in its transactions" and
"understands and appreciates the critical role such individuals contribute to the deal process."
Dkt. 157-5 at 32.  It also explained that Northstar would finance the "Total Development and
lease[] back the building at an agreed upon percentage of the Total Development Cost."  Dkt.

157-7 at 15.  Amazon's request asked Northstar to "provide your proposed development fee that you would be using for the project."  Dkt. 157-3 at 7.  Northstar's response proposed a "███████ ████████████████████████████████████████████."  Declaration of Caleb Hayes-Deats dated October 9, 2020 ("Hayes-Deats Decl.") Ex. A at 6.  Northstar also provided a projected development budget that included ████████████████████████ "Entitlement Costs." *Id.* at 14.  The development budget also included "Leasing Commissions" as a line item, ████████████████████████. *Id.*  Because the development fee and leasing commission were development costs, Northstar and its financing partner would pay them.  Dkt. 157-7 at 15.  Those fees could affect Amazon's rent payments only indirectly and in the future, since Amazon's rent would be "an agreed upon percentage of the Total Development Cost." *Id.*

### C.     The Villanova Trust

The complaint alleges that, in January 2018, Northstar entered into an "Independent Contractor Agreement" with the Villanova Trust, of which Christian Kirschner was the trustee.  Dkt. 155-6 (MacDonald Decl. Ex. 6).  That agreement identified the Villanova Trust as a "Business Development Associate" and provided that it would receive percentages of certain fees related to projects to which it was assigned. *Id.* at 2-3.  Specifically, the Villanova Trust would receive 1.25% of any lease commission, 20% of any development fee, and 15% of the manager's net profits interest percentage. *Id.* at 8.

### D.     The Northstar Build-To-Suit Transactions

Amazon ultimately accepted Northstar's proposal and entered into several build-to-suit projects with related entities.  To finance its projects, Northstar worked with IPI Partners ("IPI"), an "equity partner" that could "supply capital necessary to purchase and develop the Amazon lease sites."  SAC ¶225.  Northstar and IPI set up a joint venture, NSIPSI Data Center Venture,

LLC ("NSIPI").  *Id.* ¶¶226-227, 232.  Entities affiliated with IPI owned 85.72% of NSIPI, and entities affiliated with Northstar owned the other 14.28%.  *Id.* ¶232.

Between February 27, 2018, and January 13, 2020, Amazon entered into nine lease transactions with entities owned by NSIPI.  SAC ¶234.  Amazon attaches only one lease agreement to the complaint—executed in January 2020, six months after Nelson left Amazon— but it represents "[o]n information and belief" that the remaining leases are "substantially similar in relevant respects."  Dkt. 155 (MacDonald Decl.) ¶32.[2]  That lease is a contract between Dulles NCP II, LLC and Amazon Data Services, Inc.  Dkt. 158-1 at 1 (MacDonald Decl. Ex. 24).

The lease specifically calculated the rent Amazon would pay when it began to occupy the properties.  As set forth in Northstar's proposal, Amazon's annual rent—which the lease calls "Base Rent"—would equal a percentage (specifically, ███ ) of the project's total development budget.  Dkt. 158-1 at 5; Dkt. 158-9 at 13; Hayes-Deats Decl. Ex. B at 5.  Although the complaint alleges that certain Northstar transactions "exceeded their budgets," SAC ¶269, the leases protected Amazon from any cost overruns.  If the development costs exceeded the amounts set forth in the budget, those overruns would not increase Amazon's rent, and would instead be absorbed by Northstar and IPI.  Dkt. 158-9 at 13.  But if development costs were less than the final budget, Amazon's rent would be reduced to reflect actual costs.  *Id.*  Thus, Amazon received the benefit of any reduction in costs, but would not be affected by any cost overrun.  *Id.* Amazon would not begin paying rent until the "Commencement Date," *id.*, namely, the date on which construction was substantially complete or when Amazon first accessed the property, Dkt. 158-1 at 2; Dkt. 158-4 at 5, 7-8.

---

[2] It is unclear why Amazon would make such an allegation "on information and belief," since Amazon undoubtedly possesses its own lease agreements.

The lease attaches a preliminary budget that ███████████████████████████████ ███████████████████████████████████. Hayes-Deats Decl. Ex. B at 2-4; Dkt. 158-5 at 13-15. Documents Amazon has filed also show that the budgets for the other lease transactions included both a 2% "Leasing Fee" and a 3.5% "Entitlement Fee." Dkt. 156-7 (MacDonald Decl. Ex. 17) at 1. Thus, the budgets disclosed to Amazon the fees that the complaint alleges Northstar had agreed to pay, in part, to the Villanova Trust. *See* Dkt. 156-7 at 1; Dkt. 155-6 at 8. Those budgeted fees were reviewed during the course of Amazon's "extensive" diligence process, SAC ¶¶ 62-63, and ███████████████████████████████ ████████████████████, Dkt. 154-1.

The allegations in the complaint focus on various other lease provisions that are inapposite and, in any event, bind Dulles NCP II, LLC—not Northstar or, of course, Nelson. Amazon alleges that the leases promise that Amazon would not have to pay "real estate brokers' commissions" or "legal, accounting or professional fees." SAC ¶ 194; Dkt. 158-1 at 6. But the cited provisions concern Amazon's payment of "Operating Expenses," which the lease defines as "costs and expenses actually incurred" by Dulles NCP II, LLC "with respect to the maintenance of the Premises." Dkt. 158-1 at 6. The complaint does not allege that Dulles NCP II, LLC paid any brokers' or professional fees in connection with the "maintenance" of any property.[3]

Similarly, Amazon alleges that each party to the lease represented and warranted "that it has dealt with no broker, agent or other person in connection with this transaction." SAC ¶ 198;

---

[3] The complaint also alleges that the lease's integration clause provided that the "Landlord," *i.e.*, Dulles NCP II, LLC, made "[n]o representations, inducements, promises or agreements . . . which are not contained in the Deed of Lease Documents." Dkt. 158-3 at 2; SAC ¶ 195. But this is a common provision in any contract, applies equally to Amazon as "Tenant," and means only that Amazon and Dulles NCP II, LLC did not make any undisclosed promises to or agreements with one another. Dkt. 158-3 at 2. Amazon knew Northstar had reached other agreements not disclosed in the lease, such as its agreement with IPI, its "equity partner." SAC ¶ 225.

Dkt. 158-3 at 2.  But the complaint does not allege that Dulles NCP II, LLC—the counterparty to the lease—dealt with a broker.  Had Dulles NCP II, LLC done so, the lease would have required it to "indemnify and hold [Amazon] harmless from and against any claims by any . . . broker . . . claiming a commission or other form of compensation."  Dkt. 158-3 at 2.

The complaint alleges that Nelson and Kirschner "manipulated the site presentations within Amazon to secure approval" for Northstar's lease transactions.  SAC ¶ 80.  But it does not explain how that occurred or cite to a single misstatement made during those presentations.  The most specific allegation asserts that Nelson's and Kirschner's "presentations on several of the Northstar sites represented that the proposed prices were 'below market' based on data points" they had selected.  *Id.* ¶ 81.  But the complaint does not allege that those statements were false, or that the prices were at or above market.  *Id.*  Nor does the complaint identify any competing proposal that would have offered Amazon a lower or even equivalent price.

### E.     Amazon's Alleged Payments

An exhibit to the complaint shows that, as of February 5, 2020, Amazon had only begun leasing four of the nine ███████ associated with Northstar.  Dkt. 157-2 (MacDonald Decl. Ex. 22).  Thus, for five of the nine lease transactions, Amazon has not paid rent.  *Id.*  Amazon began leasing one property from Dulles NCP LLC on November 1, 2018, for $218,223.81 per month, and a second property on March 6, 2019 for $297,597.14 per month.  *Id.*  Amazon began leasing the other two properties on June 17, 2019, and November 6, 2019, paying approximately $225,000 per month for each.  *Id.*

After allegedly learning of the purported fraud, Amazon and IPI, without involving Northstar, agreed on February 19, 2020, "to reform the leases and management contracts at the Northstar-affiliated Virginia Lease Transaction sites."  SAC ¶ 273.  The complaint does not allege that Amazon paid IPI less in monthly rent under the reformed leases.  As set forth in the

11

table below, between the start dates described above and the date on which Amazon reformed the leases with IPI, Amazon paid $9.4 million in rent for the four ▮▮▮▮▮ it began occupying:

| Landlord | Rent | Lease start | Reformation | Months | Total rent | 14.28% |
|----------|------|-------------|-------------|--------|------------|--------|
| Manassas | $225,059 | 6/17/2019 | 2/19/2020 | 8 | $1,800,469 | $257,107 |
| Manassas | $224,810 | 11/6/2019 | 2/19/2020 | 3.5 | $786,834 | $112,360 |
| Dulles | $218,224 | 11/1/2018 | 2/19/2020 | 15.5 | $3,382,469 | $483,017 |
| Dulles | $297,597 | 3/6/2019 | 2/19/2020 | 11.5 | $3,422,367 | $488,714 |
| | | | | | $9,392,139 | $1,341,197 |

Dkt. 157-2; SAC ¶¶ 232, 273. Northstar, as owner of a 14.28% interest in the transactions, SAC ¶232, would have received at most $1.3 million of that $9.4 million in rent, and likely far less.

The complaint alleges that Northstar "wired at least $5,112,983.84 to Defendant Villanova Trust pursuant to its 2018 Referral Agreement." SAC ¶291. A significant portion of those payments—$3,458,475.68—occurred before November 1, 2018, Dkt. 156-1 (MacDonald Ex. 11), when Amazon first began making rent payments on any lease transaction, Dkt. 157-2.

## IV. THE DIRECT PURCHASE TRANSACTIONS

The complaint further alleges that Nelson and Kirschner engaged in unspecified misconduct in connection with Amazon's purchase of two parcels of land in July 2019 and December 2019. SAC ¶¶ 7, 296, 322. Nelson's employment with Amazon, however, ended in June 2019 for reasons "unrelated to this litigation," *id.* ¶29, and the complaint does not allege that Nelson was involved in Amazon's approval process for either sale.

### A. The White Peaks Transaction

In the first transaction, which the complaint refers to as the "White Peaks Transaction," Amazon purchased a piece of land located at 41992 John Mosby Highway from two related entities, White Peaks Capital LLC ("White Peaks") and NOVA WPC LLC ("NOVA WPC"). SAC ¶¶ 33-35, 294, 296. The complaint alleges only that White Peaks and NOVA WPC purchased the property for $98.67 million and sold it to Amazon for $116.4 million, thereby

making a $17.73 million profit.  *Id.* ¶¶ 296, 298.  Amazon's Purchase Agreement for the White

Peaks property attached a White Peaks' "Prime Contract" as Exhibit H.  Dkt. 160-7 (MacDonald

Decl. Ex. 37) at 5.  That contract—in Amazon's possession at the time of the purchase—shows

that White Peaks paid $98.67 million for the property.  Dkt. 160-8 at 10.

     Contrary to the complaint's allegation that White Peaks reached its agreement "[o]n or

about July 30, 2019," SAC ¶ 296, the White Peaks contract shows that White Peaks entered the

contract of sale on April 22, 2019, three months earlier, Dkt. 160-8 at 10.  The contract permitted

White Peaks, in exchange for deposits totaling $5 million, to study the property for up to ninety

days to ensure that it was suitable.  *Id.* at 10-13; *see also* Dkt. 162-1 (MacDonald Decl. Ex. 48)

(amending contract to extend closing date).  Thus, while the transaction may have closed on July

30, 2019, it was the product of months of work.[4]

     The complaint does not allege that White Peaks reached any advance agreement with

Nelson or Kirschner.  Instead, it claims without elaboration that Nelson and Kirschner "exerted

pressure against the White Peaks Defendants" after the sale and that White Peaks "yielded to this

pressure."  SAC ¶¶ 300-301.  While the complaint claims that White Peaks paid a "seven-figure"

sum, it identifies the recipient only as "one or both of" Kirschner and Nelson.  *Id.* ¶ 301.

     Nor does the complaint allege that White Peaks coordinated with Northstar.  To the

contrary, it alleges that Watson learned of the White Peaks transaction over "six weeks" after it

occurred.  SAC ¶ 304.  Watson did not react to that information by conspiring with White Peaks

---

[4] Nor is it uncommon for data center land to rapidly increase in value.  On August 12, 2020,
Microsoft purchased a data center property at 24282 Quail Ridge Lane for $93,716,210.  Hayes-
Deats Decl. Exs. C & D.  That same property sold three years earlier, in August 2017, for $11.5
million.  *Id.*  Microsoft thus paid an 815% markup after just three years.  Because Microsoft
bought only 66 acres, it paid a higher price per acre ($1.4 million), *id.* Ex. D, than Amazon did
for the 89.8 acres it acquired from White Peaks ($1.3 million), *id.* Ex. E.

in pursuit of a common purpose.  To the contrary, he "confronted" White Peaks' principals, *id.*, and ███████████████████████.  Dkt. 154-2 (MacDonald Decl. Ex. 61) at 1.

**B.  The Blueridge Transaction**

The complaint's allegations regarding the so-called Blueridge transaction are similarly sparse.  Amazon claims that, "due to the machinations of" Kirschner, "a $10 million assignment fee was added to the contemplated transaction by which Amazon would acquire the Blueridge Property."  SAC ¶ 321.  But Amazon paid that fee because the Blueridge Group, LLC "assigned" its purchase agreement for the relevant property to Amazon.  *Id.* ¶ 322.  Amazon claims that the Blueridge Group "provided no services and made no improvements to the Blueridge Property." *Id.* ¶ 325.  But the complaint does not clarify why $10 million would have been an unreasonable price for assignment of a valuable purchase agreement.  Nor does it explain why Amazon's "extensive" diligence and approval process, *id.* ¶¶ 62-63, failed to give that $10 million fee due consideration before approving it.  Amazon has not sued any of its counterparties in the transaction with the Blueridge Group.  Nor has it alleged that the White Peaks or Northstar Defendants had knowledge of, or participated in, the Blueridge transaction.

**C.  Amazon Intends To Construct Data Centers at Both Sites**

The complaint does not allege that Amazon has sought to rescind the White Peaks or the Blueridge transactions.  And publicly filed records show, in fact, that Amazon is moving forward with the construction of data centers at each site.  In March 2020, Amazon applied for permission to fast-track construction of three data centers at the White Peaks site.  Hayes-Deats Decl. Exs. F & G.  And in July, Amazon sought permission to rezone the Blueridge property so that it could build data centers there.  *Id.* Exs. H & I.

## V.   ALLCORE, CHESHIRE VENTURES, AND FINBRIT

The complaint contains allegations regarding three entities that are purportedly affiliated with Nelson and Kirschner:   AllCore Development LLC ("AllCore"), Finbrit Holdings LLC ("Finbrit"), and Cheshire Ventures, each of which is named as a defendant.  *E.g.*, SAC ¶6.  All three entities were allegedly created under Wyoming law by a Colorado attorney named Rodney Atherton.  SAC ¶¶36-37, 39-40, 42-43.

The complaint alleges on "information and belief" that Nelson and Casey Kirschner "could and did access a portion of the funds Northstar wired to Villanova Trust," that the "Villanova Trust could and did wire funds deposited into the Trust to other accounts or trusts that would, in turn, wire the funds to AllCore," and that Nelson and Casey Kirschner "could and did obtain for their personal use funds wired from these other accounts or trusts to AllCore."  SAC ¶¶216-218.  It further alleges, again on "information and belief," that Nelson and Kirschner "used the proceeds of their unlawful activities to fund AllCore, Finbrit, and/or Cheshire as vehicles for their personal gain."  *Id.* ¶107.

But the complaint does not allege that AllCore, Cheshire, or Finbrit played any role in the lease or purchase transactions.  At most, the complaint alleges that, on March 10, 2020, Nelson used a "Cheshire Ventures email address and signature block" to send "real estate site proposals stamped with an AllCore logo" to an Amazon employee named Todd Meldahl.  SAC ¶345; Dkt. 161-6 (MacDonald Decl. Ex. 43); Dkt. 161-7 (MacDonald Decl. Ex. 44).[5]  It further claims that Kirschner forwarded an email from "Cheshireventures@outlook.com" to an Amazon employee who responded, "Bummer.  Kind of far out for us."  SAC ¶346; Dkt. 162-2 (MacDonald Decl.

---

[5] This email from Nelson contradicts the complaint's allegations that Nelson and Kirschner "did not disclose the existence of" AllCore and Cheshire to Amazon, SAC ¶101, and that Nelson "concealed [his] affiliation" with AllCore and Cheshire, *id.* ¶102.

Ex. 49).   The complaint generically alleges that such emails "breach multiple provisions" of Nelson's Employment Agreement, SAC ¶ 347, but does not specify how.  With regard to Finbrit, the complaint has no specific allegations—not even an email.

## VI.   AMAZON LAUNCHES AN INVESTIGATION, BUT CONTINUES DEVELOPMENT

On December 2, 2019, an undisclosed person emailed Jeff Bezos to ask if he would "care to hear about a couple of your employees who have taken kick backs in excess of $8,000,000, maybe as high as $50,000,000."  Dkt. 155-2 (MacDonald Decl. Ex. 2) at 3.  That person further noted that he "wouldn't turn away compensation or some sort of professional engagement."  *Id.* According to the complaint, the December 2019 email "prompted an immediate and extensive internal investigation that remains ongoing."  SAC ¶ 121.[6]  But despite notice of the purported fraud, Amazon continued to approve and execute the transactions it now claims were tainted.  On December 23, 2019, three weeks after it learned of the kickback allegations, Amazon completed the Blueridge transaction.  SAC ¶ 322.  On January 13, 2020, six weeks after it learned of the kickback allegations, Amazon executed another lease agreement involving Northstar.  *Id.* ¶ 234.

The complaint further alleges that IPI independently shared "information and corroborating documents" with Amazon in February 2020.  SAC ¶ 262.  Later that month, Amazon and IPI agreed to "reform the leases and management contracts at the Northstar-affiliated Virginia Lease Transaction sites" and to terminate Northstar's involvement from the projects as of April 2020.  *Id.* ¶¶ 273-277.

## VII.   AMAZON'S CLAIMS

The Second Amended Complaint alleges ten claims against Nelson and Cheshire Ventures:  (1) violation of RICO;  (2) detinue under Va. Code Ann. § 8.01-114;  (3) fraud;

---

[6] That investigation did not identify the correct employment agreement for Mr. Nelson, confusing him for months with another employee.  Dkt. 129 at 3-5; Dkt. 136 at 2.

(4) tortious interference with contractual and/or business relations; (5) civil conspiracy; (6) breach of contract; (7) unjust enrichment; (8) conversion and constructive trust; (9) violation of the Robinson-Patman Act, 15 U.S.C. § 13(c); and (10) preliminary injunction.

## STANDARD OF REVIEW

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court "accepts all well-pled facts as true" at the motion-to-dismiss stage, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). Nor must a court consider "'unwarranted inferences, unreasonable conclusions, or arguments'" in the complaint. *Id.*

In the Fourth Circuit, a district court deciding a motion to dismiss can consider "'matters of public record,'" *Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 605 (E.D. Va. 2015) (quoting *Silverman v. Town of Blackstone*, 843 F. Supp. 2d 628, 631 (E.D. Va. 2012)), as well as any document that is "integral to the complaint" and as to which "there is no dispute about the document's authenticity," *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). When a complaint "shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Thus, in a fraud case, a claim "will be dismissed" if documents show that, contrary to plaintiff's allegation, a "disclosure was in fact made." *Id.* at 166-67.

Additionally, under Federal Rule of Civil Procedure 9(b), where the plaintiff alleges a claim sounding in fraud—including when it alleges fraud as a predicate act under RICO—the

plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (state-law claim that "sounds in fraud" must satisfy Rule 9(b)). The purpose of the rule is "to provide defendants with fair notice of claims against them and the factual ground upon which they are based." *McCauley v. Home Loan Inv. Bank, F.S.B.*, 710 F.3d 551, 559 (4th Cir. 2013). The complaint therefore "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby,'" for *each* allegedly fraudulent act. *Nathan*, 707 F.3d at 455-56.

## ARGUMENT

As a threshold matter, Nelson and Cheshire Ventures adopt and incorporate by reference the arguments advanced in support of the motions to dismiss filed by Watson; Northstar; Sterling NCP FF, LLC; Manassas NCP FF, LLC; NSIPI Administrative Manager; and Casey Kirschner.

## I.   THE RICO CLAIMS MUST BE DISMISSED

The complaint alleges that Nelson and Cheshire Ventures violated RICO, in particular 18 U.S.C. § 1962. RICO "'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010). Courts thus "exercise caution" to ensure that the statute's "drastic" penalties "are not brought against isolated offenders for their harassment and settlement value." *Id.* (quotation marks omitted); *see also Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."). To state a RICO violation under § 1962(c), a complaint must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex*

*Co.*, 473 U.S. 479, 496 (1985).  The RICO violations, moreover, must have proximately caused the plaintiff's asserted injury to its business or property.  *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 8-9 (2010).  The complaint independently fails several of those requirements.

### A.  Amazon Has Not Alleged Nelson or Cheshire Ventures Invested in, Acquired, or Participated in an "Enterprise"

A RICO violation requires Amazon to plead the existence of an "enterprise."  18 U.S.C. § 1962(a)-(c).  Amazon attempts to plead only the existence of an "association-in-fact" enterprise.  SAC ¶ 361.  An "association-in-fact enterprise" is a "continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 938, 945 (2009); *see also United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) ("The hallmark concepts that identify RICO enterprises are 'continuity, unity, shared purpose and identifiable structure.'").  "An abstract common purpose, such as a generally shared interest in making money, will not suffice."  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).  The enterprise must be "an entity 'separate and apart from the pattern of activity in which it engages.'"  *Donaldson v. Primary Residential Mortg.*, No. 19 Civ. 1175, 2020 WL 3184089, at *23 (D. Md. June 12, 2020).

1.      Amazon asserts that the enterprise consisted of *all* defendants in this case.  *See* SAC ¶ 361; *see also id.* ¶ 3 & n.1 (defining "RICO Defendants").  But it has not alleged facts showing how that enterprise "functions" as a "unit" in service of a "common purpose."  *Boyle*, 556 U.S. at 948.  The allegations concerning the White Peaks and Blueridge transactions make that clear.  According to the complaint, the White Peaks Defendants engaged in the White Peaks transaction on their own, without any involvement by Watson and the Northstar Defendants.  *See* SAC ¶¶ 304-305.  Watson knew nothing of the White Peaks transaction until he read about the sale in the *Washington Business Journal*, and his response to learning of the transaction—

—demonstrates that

he viewed the White Peaks Defendants as **competitors**, not compatriots in an ongoing enterprise. Dkt. 155-9 at 5, 18; Dkt. 154-2; Dkt. 161-1.[7]  Similarly, the allegations concerning the Blueridge transaction mention neither the Northstar nor the White Peaks Defendants.  SAC ¶¶ 314-326.

It is hard to see how the Northstar Defendants, the White Peaks Defendants, and the TM Defendants **all** could have associated as a "continuing unit" in pursuit of a "common purpose" where the Northstar Defendants and the White Peaks Defendants were competitors, and the complaint does not plead that either was involved in or aware of the Blueridge transaction, or benefited from it.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010) (noting "competitors who independently engaged in similar" conduct cannot be "considered associates in a common enterprise"); *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 141 (S.D.N.Y. 2014) (noting "parallel activity among competitors" does not qualify as a RICO enterprise), *aff'd in relevant part, rev'd in part sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x 66 (2d Cir. 2015); *Puerto Rico Am. Ins. Co. v. Burgos*, 867 F. Supp. 2d 216, 228 n.12 (D.P.R. 2011) (finding no "association-in-fact" enterprise where defendant insurers "compete against each other").

At most, Amazon has attempted to allege a RICO enterprise with a "'hub and spoke' structure, but [has] not adequately allege[d] the 'rim.'"  *Donaldson*, 2020 WL 3184089, at *25. Such an arrangement among the entities "fail[s] the basic requirement" of a RICO enterprise "that the components function as a unit, that they be 'put together to form a whole.'"  *In re Ins.*

---

[7] The suggestion that the "TM Defendants exerted pressure against the White Peaks Defendants" and that the "White Peaks Defendants yielded to this pressure," SAC ¶¶ 300-301—a suggestion that, to be clear, Nelson fully intends to disprove in discovery—also demonstrates that the alleged enterprise lacks a common purpose.  If the TM Defendants and the White Peaks Defendants were, in fact, a "continuing unit" functioning with a "common purpose," application of "pressure" would be unnecessary.  *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 259 F. Supp. 3d 1344, 1354 (M.D. Fla. 2017) (holding allegation that one party "'coerces and intimidates'" another "show[s] that the [parties] do not share a common purpose"), *aff'd*, 945 F.3d 1150 (11th Cir. 2019).

*Brokerage Antitrust Litig.*, 618 F.3d at 374 (quoting *Boyle*, 556 U.S. at 945) (affirming dismissal of certain claims for failure to plead enterprise). Indeed, courts have "consistently . . . held that allegations of a 'hub-and-spokes' structure . . . do not satisfy the enterprise element of a RICO claim." *Abbott Labs. v. Adelphia Supply USA*, No. 15 Civ. 5826, 2017 WL 57802, at *5 (E.D.N.Y. Jan. 4, 2017) (quotation marks omitted). Amazon therefore has not alleged "relationships among those associated with the enterprise"—the White Peaks Defendants, the Northstar Defendants, **and** the TM Defendants. *Boyle*, 556 U.S. at 946. It has not alleged that those entities were all "'operating *on behalf of each other* and the collective enterprise.'" *Donaldson*, 2020 WL 3184089, at *25 (emphasis added).

In fact, the Supreme Court has explicitly recognized that even where "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates"—to be clear, Nelson has committed no crime—"[p]roof of th[o]se patterns would not be enough to show that the individuals were members of an enterprise." *Boyle*, 556 U.S. at 947 n.4; *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067-71 (11th Cir. 2017) (allegations of merely parallel conduct, even unlawful parallel conduct, insufficient to plead a RICO enterprise). Amazon has not alleged even that much. To survive dismissal, Amazon needed to allege facts showing that the Northstar Defendants and the White Peaks Defendants not only coordinated with the TM Defendants, but also ***coordinated with each other*** at the time of the predicate act violation. *See Abbott Labs.*, 2017 WL 57802, at *3 (requiring that the constituents of an enterprise "***work together*** to achieve" the common purpose (emphasis added)). Amazon has not done so. *See Ochoa v. Housing Auth.*, 47 F. App'x 484, 486-87 (9th Cir. 2002) (noting that pleading no more than a "conspir[acy] to commit predicate acts of racketeering activity" requires dismissal because a "'conspiracy is not an enterprise for purposes of RICO'"); *Vuyyuru v.*

*Jadhav*, No. 3:10 Civ. 173, 2011 WL 1483725, at *18 (E.D. Va. Apr. 19, 2011) (finding no enterprise where complaint "fail[ed] to allege relationships between the members of [the] enterprise").  That failure to plead an enterprise requires dismissal of the RICO claim.

2.      Even assuming Amazon's complaint adequately pleads the existence of an enterprise, Amazon's RICO claim still fails under § 1962(a) & (b).  Amazon has not pled that Nelson or Cheshire Ventures "use[d] or invest[ed]" racketeering income to acquire, establish, or operate an enterprise.  *See* 18 U.S.C. § 1962(a).  Nor has Amazon pled that Nelson "acquire[d] or maintain[ed] . . . any interest in or control of any enterprise."  *See id.* § 1962(b).  These pro-visions "aim[ ]" to "prevent[ ] racketeers from using the proceeds from their racketeering scheme to invest in . . . legitimate enterprises."  *Allstate Ins. Co. v. Seigel*, 312 F. Supp. 2d 260, 272 (D. Conn. 2004).  "The 'enterprise' referred to in subsections (a) and (b)" thus is "something acquired through the use of illegal activities or by money obtained from illegal activities."  *NOW v. Scheidler*, 510 U.S. 249, 259 (1994).  It is the "***victim*** of unlawful activity."  *Id.* (emphasis added); *see also Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (noting § 1962(a) & (b) "clearly" address "[i]nfiltration of legitimate organizations by 'outsiders' ").

Amazon alleges only that "the TM Defendants . . . used the proceeds of their unlawful activities to fund AllCore, Finbrit, and/or Cheshire."  SAC ¶ 107; *see also* SAC ¶ 95.  But Amazon has not alleged that any of those entities by itself constitutes an enterprise.  SAC ¶ 361.  Nor could it:  AllCore, Finbrit, and Cheshire ***are defendants***, not victims.  And courts relying on the Supreme Court's decision in *NOW v. Scheidler* have repeatedly concluded that use of racketeering proceeds to invest in, or acquire an interest in, an entity accused of wrongdoing does not meet the enterprise requirement of § 1962(a) or § 1962(b).  *See Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, No. 2:15 Civ. 3435, 2016 WL 7475816, at *15-16 (E.D. Pa. Dec. 29,

2016) (entity does not qualify as enterprise under § 1962(b) where entity was the vehicle through which defendants carried out racketeering activity); *Frederick v. Serv. Experts Heating & Air Conditioning, LLC*, No. 2:14 Civ. 1647, 2016 WL 3753160, at *6 (N.D. Ala. July 14, 2016); *Smith v. Bank of Am., N.A.*, No. 2:11 Civ. 676, 2014 WL 897032, at *8 (M.D. Fla. Mar. 6, 2014); *Allstate*, 312 F. Supp. 2d at 272; *Neiman Marcus Grp. Inc. v. Dispatch Transp. Corp.*, No. 09 Civ. 6861, 2011 WL 1142922, at *8 (S.D.N.Y. Mar. 17, 2011); *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1368 (M.D. Fla. 2005) (defendant did not qualify as "enterprise" under § 1962(a)).

Even if a fellow defendant could qualify as the enterprise required by § 1962(a) and § 1962(b), Amazon's generalized allegations that Nelson used proceeds "to fund AllCore, Finbrit, and/or Cheshire" do not satisfy *Iqbal*'s pleading requirements.  SAC ¶ 107; *see also id.* ¶ 95.  Those allegations "contain[] no remotely specific allegations regarding . . . the **manner** in which such income was used to acquire any interest in" the three entities.  *Field v. GMAC LLC*, 660 F. Supp. 2d 679, 687 (E.D. Va. 2008) (emphasis added).[8]  Nor do the allegations "'allege a specific nexus between the control of'" the entities "and the alleged racketeering activity."  *Id.* Amazon therefore has not stated a claim under § 1962(a) or § 1962(b).

**B.    Amazon Has Not Pled Any Predicate Act with the Required Specificity**

A RICO claim must plausibly plead "predicate acts" of racketeering.  *Walters v. McMahen*, 684 F.3d 435, 439-40 (4th Cir. 2012).  Attempting to meet that requirement, Amazon alleges wire fraud in violation of 18 U.S.C. § 1343, honest services fraud in violation of 18 U.S.C. § 1346, money laundering in violation of 18 U.S.C. §§ 1956 & 1957, and violation of the

---

[8] Similarly, an allegation that Cheshire Ventures received proceeds from an enterprise, SAC ¶ 107, is not sufficient to show that it conducted or managed an enterprise under § 1962(c), *Congregacion de la Mision Provincia v. Curi*, 978 F. Supp. 435, 450 (E.D.N.Y. 1997).

Travel Act, 18 U.S.C. § 1952.  The complaint does not, however, allege a conspiracy to engage in wire fraud or honest services fraud under 18 U.S.C. § 1349, because such a conspiracy is not a predicate act of racketeering under RICO.  18 U.S.C. § 1961(1).

1.     *Amazon's Fraud Predicates Fail Because Amazon Has Not Pled a Scheme To Defraud*

Whether pled as traditional wire fraud or as honest-services fraud, Amazon's fraud predicates require it to allege "a scheme to defraud," among other things.  *United States v. Pinson*, 860 F.3d 152, 168-69 (4th Cir. 2017).  "Of course, the fraud statutes do not cover all behavior which strays from the ideal, and not all conduct that strikes a court as sharp dealing or unethical conduct is a scheme or artifice to defraud."  *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) (citations and quotation marks omitted).  To allege a scheme to defraud, Amazon must plead facts showing that Nelson or Cheshire Ventures "made material misrepresentations," *United States v. Gillion*, 704 F.3d 284, 296 (4th Cir. 2012), had a legal duty to disclose information that they failed to disclose, *Colton*, 231 F.3d at 899, or affirmatively concealed—through " 'active or elaborate steps' "—material information, *id*. at 899, 901.

Furthermore, Rule 9(b) requires Amazon to plead the "circumstances constituting fraud . . . with particularity."  *Mylan Labs. Inc. v. Matkari*, 7 F.3d 1130, 1137 (4th Cir. 1993).  It must plead "the time, place, and content of the false representations, the person making them, and what that person gained from them." *Scott v. WFS Fin., Inc.*, No. 2:06 Civ. 349, 2007 WL 190237, at *5 (E.D. Va. Jan. 18, 2007).  Amazon's complaint fails to do so.

<u>*Direct Purchase Transactions.*</u>  The allegations concerning the White Peaks and Blueridge transactions do not identify any fraud at all, much less plead such a fraud with particularity.  For both transactions, Amazon identifies no affirmative misrepresentation and no concealment of any material fact.  At most, the complaint suggests that Amazon paid millions

24

more for the properties than the seller did.  SAC ¶¶294-301, 314-321.  But Amazon **knew** it paid an increased price.  *See* pp. 12-14, *supra*; Dkt. 160-7 at 5; Dkt. 160-8 at 10; SAC ¶321 (noting that "a $10 million assignment fee was added to the contemplated transaction").  Amazon cannot plead fraud when it was "on notice" of the very facts that it claims were concealed.  *Biggs v. Eaglewood Mortg., LLC*, 353 F. App'x 864, 867-68 (4th Cir. 2009).

More fundamentally, the complaint says almost nothing about Nelson's or Cheshire Ventures' involvement in those transactions.  For the White Peaks transaction, Amazon generically refers only to the "TM Defendants."  SAC ¶¶295, 300, 301.  It makes no allegations concerning Nelson or Cheshire Ventures specifically.  Those vagaries hardly satisfy Rule 9(b).  *See Nathan*, 707 F.3d at 455-56.  And with respect to the Blueridge transaction, Amazon pleads only that "Nelson was copied on an email chain" with a Cheshire Ventures email address.  SAC ¶¶318-319.  Nothing in Amazon's complaint suggests such conduct was fraudulent.  Rule 9(b) thus requires dismissal of both the wire-fraud and honest-services fraud claims based on the Direct Purchase Transactions.  *See Goodrow v. Friedman & MacFadyen, P.A.*, No. 3:11 Civ. 20, 2012 WL 6725617, at *12 (E.D. Va. Dec. 27, 2012) (dismissing RICO claims based on wire fraud where complaint failed "to articulate the specific content of the various letters [alleged to be fraudulent], how many letters each received, or the precise date or dates").[9]

The Direct Purchase Transactions cannot serve as the basis for Amazon's honest-services fraud claim for an additional reason:  Each transaction occurred after Amazon terminated Nelson's employment.  SAC ¶¶29, 296, 322.  A claim of private honest-services fraud requires proof that an "'employee intended to breach a fiduciary duty.'"  *United States v. Vinyard*, 266

---

[9] In any event, Nelson's alleged involvement with the Blueridge transaction was not improper. Nelson's Employment Agreement permitted him to enter into—and receive payment from—"any business arrangement" so long as Amazon was not "involved in substantially the same business arrangement." Dkt. 162-10 at 5.

F.3d 320, 327 (4th Cir. 2001); *see also United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012).   "[I]t is axiomatic that 'an employee's fiduciary duty ends upon the termination of the employment relationship.'" *Bloch v. Exec. Off. of the President*, 164 F. Supp. 3d 841, 862 (E.D. Va. 2016); *Phillips v. Mabus*, 894 F. Supp. 2d 71, 93 (D.D.C. 2012).   Simply put, because Nelson was not providing ***any*** services to Amazon after June 2019, he could not deprive Amazon of honest services in connection with transactions that closed in July 2019 (White Peaks), SAC ¶296, and December 2019 (Blueridge), SAC ¶322.   (That is also true for the Dulles NCP II lease, which Amazon signed in January 2020.   SAC ¶234.)[10]   Cheshire Ventures, meanwhile, is not alleged to owe any fiduciary duties at all.   Amazon's honest-services allegations against Cheshire Ventures thus fail for that reason as well.

<u>The Lease Transactions.</u>   Amazon's fraud allegations concerning the lease transactions are similarly deficient.   The complaint does not identify any false statement, nor does it plead with particularity concealment of any fact or nondisclosure in defiance of a legal duty to disclose.   Amazon does not even plead that Cheshire Ventures had any connection to the lease transactions at all.

With respect to honest-services fraud, Amazon does not allege that that Nelson "solicited or accepted side payments from a third party ***in exchange for*** making . . . misrepresentations." *Skilling v. United States*, 561 U.S. 358, 413 (2010) (emphasis added).   Amazon generically claims that the "TM Defendants," referring to both Nelson and Kirschner, "manipulated" site presentations, but it does not specify when or how they did so.   SAC ¶80.   Nor does the

---

[10] Nor can Amazon pursue a claim of honest-services fraud against Nelson based on Kirschner's fiduciary duties.   Any such claim would have to take root in conspiracy law, but honest-services fraud conspiracy under 18 U.S.C. § 1349 is not a RICO predicate.   18 U.S.C. § 1961(1).

complaint identify what facts, figures, or data points Nelson and Kirschner manipulated.[11]  Such "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient, *Iqbal*, 556 U.S. at 678, and plainly fail to meet the heightened pleading standard of Rule 9, *see Nathan*, 707 F.3d at 455-56.

The only modestly specific allegation states that "the TM Defendants' presentations on *several of the Northstar sites* represented that the proposed prices were 'below market.'"  SAC ¶81 (emphasis added).  That allegation does not specify when the presentations occurred, what transactions they concerned, or whether they were given by Nelson (as opposed to Kirschner). And, critically, the complaint *never alleges that the representation was false*, much less plead facts demonstrating such falsity.  To the contrary, the complaint alleges that "the TM Defendants *were in a position* to manipulate" data points, and compared unspecified transactions to "market 'comparables' that, on information and belief, *may* themselves have been inflated." *Id.* ¶¶82-83 (emphasis added).  That is not an allegation of fraud, let alone a specific one.  Being "in a position" to manipulate data is not the same as actually manipulating it.  And data points that "may" have been inflated equally may not have been.  Amazon's failure to allege the "who, what, when, where, and how, for each of [its] honest services fraud allegations," is fatal to its RICO claims.  *Kaye v. D'Amato*, 357 F. App'x 706, 714 (7th Cir. 2009); *Sterling Suffolk Racecourse, LLC v. Wynn Resorts, Ltd.*, 419 F. Supp. 3d 176, 192 (D. Mass. 2019); *Kaul v. Christie*, 372 F. Supp. 3d 206, 248 (D.N.J. 2019).

The complaint's utter lack of specificity is particularly problematic because Amazon's vague allegations concern its own, internal approval process for acquisitions.  SAC ¶¶79-85.

---

[11] Amazon's other allegations suggest that such manipulation would have been impossible.  "Site diligence is conducted largely through external brokers and agents."  SAC ¶78.  Indeed, projects discussed in the complaint "involved no less than 50 different parties." *Id.* ¶85.

Rule 9(b)'s heightened pleading standard "applies with special force to allegations" that "rest on information within a plaintiff's possession." *Bi v. McAuliffe*, 927 F.3d 177, 185 (4th Cir. 2019). Yet, following a nine-month investigation, Amazon repeatedly makes allegations about its own approval process on "information and belief." SAC ¶¶ 80, 83. Under Rule 9(b), "[a]llegations of fraud cannot … be based 'upon information and belief,' except as to matters peculiarly within the ***opposing*** party's knowledge." *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (emphasis added and quotation marks omitted). Amazon's vague allegations concerning information within its possession require dismissal of its RICO claims based on wire and honest-services fraud.

Amazon's allegations concerning Nelson's "undisclosed conflicts of interest," *e.g.*, SAC ¶ 93, do not save its fraud claims. As an initial matter, *Skilling* makes clear that an undisclosed conflict of interest does not qualify as honest-services fraud. 561 U.S. at 409-10. Nor do the allegations concerning conflicts of interest here support a traditional wire-fraud theory. "[S]ilence as to a material fact (nondisclosure), without an independent disclosure duty, usually does not give rise to an action for fraud." *Colton*, 231 F.3d at 899; *see also Rojas v. Delta Airlines, Inc.*, 425 F. Supp. 3d 524, 541-42 (D. Md. 2019) ("Nondisclosure and concealment cannot constitute mail or wire fraud unless the defendant has a duty to disclose and is silent or suppresses a material truth with the intent to deceive.").

Amazon has not identified any disclosure duty. It relies on Nelson's Employment Agreement and its own code of conduct, but neither document provides the duty Amazon needs to allege. Nelson's Employment Agreement had a specific provision governing what information Nelson had to disclose to Amazon. Dkt. 162-10 at 1. That provision required disclosure of trade secrets that "could reasonably be expected to prove useful or valuable to"

Amazon; it did not require disclosure of potential conflicts of interest.  *Id.*  More fundamentally, a breach of any disclosure obligation in the Employment Agreement would not constitute fraud unless the complaint alleged "fraudulent intent *at the time of contract execution*."  *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) (emphasis added); *Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir. 1988).  Nothing in the complaint suggests Nelson harbored such fraudulent intent in April 2012, when he executed the Employment Agreement.  Dkt. 162-10 at 1.

Nor can Amazon claim that its internal code of conduct transforms silence into a federal crime.  Amazon's code of conduct is not a contract.  *See* pp. 4-5, *supra*.  Codes of conduct generally "express[] opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).  Amazon's code is no different.  It "sets out basic guiding principles."  Dkt. 156-8 at 2.  For example, it provides that employees "*should* attempt to avoid conflicts of interest" and "are expected to use their *judgment*."  *Id.* at 2-3 (emphasis added).  When an employee errs, the consequences are "disciplinary," not legal, and progress "*up to and including discharge*."  *Id.* at 4 (emphasis added).  Such language does not impose a legal duty to disclose facts, much less one punishable criminally.  *See United States v. Safavian*, 528 F.3d 957, 964-65 (D.C. Cir. 2008) (overturning conviction under 18 U.S.C. § 1001 where "government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees").  Indeed, such an interpretation of the wire-fraud statute would render it unconstitutionally vague.  *See id.* at 964.  And it would allow corporations to displace Congress as the drafter of the federal

criminal code. *Cf. id.* (distinguishing "disciplinary action" from "criminal liability"); *O'Donnell*, 822 F.3d at 661 (refusing to "convert" "breach of contract" into "criminal fraud").[12]

The remainder of Amazon's allegations concerning the Lease Transactions do not involve statements by Nelson or Cheshire Ventures at all. Instead, they involve representations by Northstar and its subsidiaries, such as Dulles NCP II, LLC. SAC ¶¶ 194-200. But even those allegations are deficient. The complaint does not articulate any action Nelson or Cheshire Ventures took in connection with those statements. Neither was a party or signatory to the lease. Dkt. 158-1 at 1; Dkt. 158-3 at 9-10. The complaint recognizes as much by repeatedly attributing statements in the lease agreements to "Northstar," the "Northstar parties," or the "Northstar Defendants." SAC ¶¶ 194, 196, 198-200. Thus, to the extent that the complaint specifies the "time, place, and contents of the false representations" for the lease transactions, *Nathan*, 707 F.3d at 455-56, they are representations Nelson and Cheshire Ventures did not make.

In any event, Amazon's own exhibits show that Northstar disclosed the very fees that Amazon claims were partially paid to the Villanova Trust. *See* Hayes-Deats Decl. Ex. B at 4; Dkt. 156-7 at 1-2 (disclosing "Leasing Fee" and "Entitlement Fee"). Those fees were reviewed and approved ███████████████████████████. *See* pp. 5-6, *supra*. The disclosure of the very information Amazon claims was withheld is fatal to its claims of fraud. *Biggs*, 353 F. App'x at 867-68; *Goines*, 822 F.3d at 167 (fraud claim "will be dismissed" if documents show that, contrary to plaintiff's allegation, a "disclosure was in fact made").

---

[12] Even if Amazon could rely on certifications of compliance with its code of conduct, its claims would still fail. Amazon has not alleged any such certification with specificity. The complaint purports to attach such a certification as "Ex. 53." SAC ¶ 133. But Ex. 53 says only, "This Exhibit Has Been Intentionally Left Blank." Dkt. 162-6. The complaint also fails to allege facts that demonstrate the materiality of any certification to its consideration of the transactions at issue. *Neder v. United States*, 527 U.S. 1, 25 (1999). Finally, Amazon's interpretation of the code of conduct is precluded by its Employment Agreement with Mr. Nelson, which specifically did not require him to disclose outside business activities. *See* pp. 3-5, *supra*.

Amazon ignores the disclosure of the supposedly inflated fees and instead stakes its claim on misinterpretations of other, irrelevant provisions of the lease agreements.  Amazon contends that Dulles NCP II, LLC disclaimed real estate brokers' commissions or "legal, accounting or professional fees," SAC ¶194, but ignores that those statements concerned "Operating Expenses" that relate to the "maintenance of the Premises," not their construction, Dkt. 158-1 at 6.  The complaint does not allege that Dulles NCP II, LLC paid brokers' or professional fees in connection with "maintenance."  Instead, it alleges that Northstar paid the Villanova Trust a portion of fees Northstar received under the development budget.  SAC ¶211.  Those fees were specifically included in the development budget Northstar submitted and Amazon approved, and the fees impacted the calculation of "Base Rent," not "Operating Expenses."  *See* pp. 9-10, *supra*.  Amazon does not allege that the definition of "Base Rent" excludes broker or professional fees—because it does not.  Dkt. 158-1 at 5.

Amazon further alleges that Dulles NCP II, LLC represented that it "dealt with no broker."  SAC ¶198.  But the complaint does not allege that Dulles NCP II, LLC dealt with a broker.  It alleges that Northstar, a separate entity, entered into an independent contractor agreement with the Villanova Trust.  SAC ¶211.  Amazon also ignores that the provision it cites specified that, in the event a broker existed, Dulles NCP II, LLC would "indemnify and hold [Amazon] harmless" from any claim for "a commission or other form of compensation."  Dkt. 158-3 at 2.  Such vague, inapposite promises by Dulles NCP II, LLC cannot overcome the specific disclosure of the fees Amazon claims Northstar partially paid to the Villanova Trust, as its "undisclosed broker."  SAC ¶204.[13]

---

[13] Amazon also relies on stock language from the lease agreements' integration clauses and provisions regarding "Anti-Corruption."  SAC ¶¶195, 206.  But these provisions are plainly inapplicable to these facts.  The integration clause means only that Amazon and Dulles NCP II,

2.     *The Money Laundering and Travel Act Predicates Fail Too*

Amazon's allegations concerning the money-laundering and Travel Act predicates must fall with its wire and honest-services fraud claims.  The money-laundering statutes apply only to the "proceeds of . . . unlawful activity."  18 U.S.C. § 1956(a)(1), (c)(7); *id.* § 1957(a), (f)(3). Amazon pleads only racketeering activity arising from the allegations of wire fraud as the basis of its money-laundering claims.  SAC ¶¶ 396, 405.  Thus, because Amazon has not adequately pled the predicate act of wire fraud, on which its money-laundering claims depend, it has not alleged money laundering.

Amazon's Travel Act allegations suffer the same deficiency.  The Travel Act applies only to "unlawful activity," defined in relevant part as "extortion, bribery, or arson in violation of the laws . . . of the United States" and violations of the money-laundering statutes.  18 U.S.C. § 1952(a), (b)(2)-(3).  Because Amazon has not adequately pleaded honest-services fraud or money laundering, Amazon's Travel Act allegations must fail as well.

**C.     Amazon Has Not Alleged a Pattern of Racketeering Activity**

RICO " 'does not cover all instances of wrongdoing.' "  *US Airline Pilots Ass'n*, 615 F. 3d at 317.  "[I]t is a unique cause of action" with "drastic" penalties "that is concerned with eradicating organized, long-term, habitual criminal activity."  *Id.* (quotation marks omitted).

---

LLC did not make any undisclosed promises to or agreements with one another.  Dkt. 158-3 at 2. Amazon, in fact, knew that Northstar had made other agreements not referenced in the lease agreements.  *See* n.3, *supra*.  The anti-corruption provision, in turn, sought to prevent payment of bribes to "obtain any improper advantage in favor of" Amazon, and thereby avoid running afoul of the U.S. Foreign Corrupt Practices Act.  Dkt. 158-3 at 7.

Amazon also alleges that Northstar made misrepresentations in connection with a "Right of First Offer/Right of First Refusal Agreement."  SAC ¶ 194; Dkt. 158-9 at 29.  But this was a "form" of agreement that Amazon and Dulles NCP II, LLC agreed to use if the latter should "determine to offer all or any portion of the Property to the market."  Dkt. 158-9 at 29.  The complaint does not allege that Dulles NCP II, LLC (or any other entity) has offered to sell any of the facilities, much less used a broker to do so.

Thus, "RICO treatment is reserved for conduct 'whose scope and persistence pose a special threat to social well-being.'" *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543, 551 (4th Cir. 2001). "[A]n ordinary fraud claim [is] better prosecuted under state law." *Anderson v. Found. for Advancement*, 155 F.3d 500, 506 (4th Cir. 1998). The Fourth Circuit has thus "caution[ed]" courts "'to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted.'" *US Airline Pilots Ass'n*, 615 F.3d at 317 (quoting *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683 (4th Cir. 1989)). RICO's "pattern" requirement serves those ends. *See* 18 U.S.C. § 1962(a)-(c).

A "'pattern of racketeering activity' requires at least two acts of racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5). It is a "stringent requirement," *Williams v. Equity Holding Corp.*, 498 F. Supp. 2d 831, 843 (E.D. Va. 2007), and presents a "'high threshold,'" *Hyundai Emigration Corp. v. Empower-Visa, Inc.*, No. 1:09 Civ. 124, 2009 WL 10687986, at *5 (E.D. Va. June 17, 2009). That is particularly true when the plaintiff pleads mail or wire fraud as the predicate act, *Hyundai* 2009 WL 10687986, at *5, because "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *GE Inv.*, 247 F.3d at 549; *see also Flip Mortg.*, 841 F.2d at 538 ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."). "'[W]hile two acts [of racketeering activity] are necessary'" to plead a pattern, "'they may not be sufficient.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989).

To qualify as a pattern, the acts of racketeering activity must be "related, ***and*** . . . amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. In other words, a

pattern requires both relatedness and continuity. "Continuity refers 'either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *GE Inv.*, 247 F.3d at 549 (quoting *H.J. Inc.*, 492 U.S. at 241). Ultimately, continuity is "a temporal concept" that "arises from Congress's concern with long-term criminal conduct." *US Airline Pilots Ass'n*, 615 F.3d at 318 (quotation marks omitted). The inquiry thus focuses on the "threat of long-term, continued criminal activity." *GE Inv.*, 247 F.3d at 549.

1.      Amazon's allegations here present precisely the sort of short-lived, discrete scheme that this Court, the Fourth Circuit, and others have repeatedly found insufficient to qualify as a "closed period of repeated conduct." In *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000), for example, the plaintiff alleged predicate acts of mail and wire fraud spanning "several years" and "involv[ing] three discrete schemes." *Id.* at 238. The Fourth Circuit nonetheless concluded that the case was "not sufficiently outside the heartland of fraud cases to warrant RICO treatment," noting that the case "involv[ed] only one victim" and alleged "commonplace predicate acts." *Id.* In *Flip Mortgage*, the Fourth Circuit found the pattern requirement unsatisfied despite evidence revealing "fraudulent acts spanning seven years" and "depriving [the plaintiff] of money . . . on many distinct occasions." 841 F.2d at 538. Those defendants' conduct involved "regular submission of false revenue reports," leading the defendants to underpay plaintiffs amounts owed under a contract. *Id.* at 533, 537-38. That conduct, the Fourth Circuit explained, did not constitute a pattern because it was "part of a single scheme perpetrated . . . against a single victim." *Id.* at 358.

Amazon's allegations here cannot be distinguished from the single-victim schemes in *Al-Abood* and *Flip Mortgage*. As in those cases, Amazon is the sole alleged victim, a critical fact that distinguishes the allegations in Amazon's complaint from the vast majority of cases in which

courts have found the pattern requirement satisfied.  *See Menasco*, 886 F.2d at 685 (distinguishing between cases involving ten victims and 22,000 victims); *Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 274-75 (4th Cir. 2010) (no pattern where predicate acts of fraud and breach of fiduciary duty were "quintessential state law claims" and plaintiffs failed to plead the existence of any other victims).  Indeed, not only was Amazon the only victim, it was the only ***possible*** victim:  Nelson's and Kirschner's Amazon employment is central to the alleged scheme.  Nelson and Kirschner thus had no opportunity to expand the alleged scheme beyond Amazon to target other victims.

Moreover, the alleged misconduct was discrete and short-lived.  In determining the duration of the misconduct, the "relevant period . . . is the time during which RICO predicate activity occurred, ***not*** the time during which the underlying scheme operated or the underlying dispute took place."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (emphasis added).  Here, the predicate activity—alleged wire fraud in violation of § 1343 and § 1346 and other derivative claims—started no earlier than March 2018, when the first alleged wire transfer took place.  SAC ¶¶ 375, 383.  It spanned at most 22 months, until January 2020 when the final alleged transaction occurred.  SAC ¶¶ 234, 375, 383.  That is far shorter than the years-long schemes in *Al-Abood* and *Flip Mortgage*.[14]  Attempting to stretch the duration of the misconduct beyond those 22 months, Amazon suggests the misconduct in fact began as early as September 2017 when, according to Amazon, Watson "conspired with the TM Defendants to submit a rigged Request for Proposal."  SAC ¶¶ 163, 369.  Even assuming such conclusory allegations—completely barren of supporting facts—support the inference drawn by Amazon,

---

[14] *See also Pinson*, 860 F.3d at 163 (time period "much greater" than "two and a half years" required); *Spool*, 520 F.3d at 184 (suggesting predicate acts must span at least two years to meet pattern requirement); *GE Inv.*, 247 F.3d at 550-51 (two years not "persistent, long-term" fraud); *Menasco*, 886 F.2d at 685 (one year insufficient).

that time period constitutes, at most, the "time during which the underlying scheme operated." *Spool*, 520 F.3d at 184. It is not the period in which the predicate activity occurred. In short, the "number of victims, as well as the duration and magnitude of the scheme to defraud, plainly distinguish" Amazon's allegations from cases where the Fourth Circuit and this Court have found the pattern requirement satisfied. *Menasco*, 886 F.2d at 685.

2. Nor do Amazon's allegations describe "'past conduct that by its nature projects into the future with a threat of repetition.'" *GE Inv.*, 247 F.3d at 549. Such open-ended continuity requires "'far more than a hypothetical possibility of further predicate acts.'" *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1264 (D.C. Cir. 1995). Nelson's alleged conduct presents no ongoing threat because he was terminated for reasons unrelated to this litigation. SAC ¶29. In *Parcoil Corp. v. Nowsco Well Service, Ltd.*, 887 F.2d 502 (4th Cir. 1989), the court found no ongoing threat of continued criminal activity where the relationship between the parties (and the alleged predicate acts) terminated "independently of discovery" by plaintiff. *Id.* at 504-05; *see also Whitney, Bradley & Brown, Inc. v. Kammermann*, 436 F. App'x 257, 259, 264 (4th Cir. 2011) (no "open-ended pattern" where fraudulent activities had "ceased" and defendant's employment terminated); *Hyundai*, 2009 WL 10687986, at *6. Thus, Amazon's decision to fire Nelson (and Kirschner) precludes any finding that Nelson or Cheshire Ventures presents an ongoing threat of future predicate acts.

3. The inclusion of predicate acts concerning money laundering and Travel Act violations, *see* SAC ¶¶392-415, does not alter the conclusion that Amazon has failed to plead a "pattern of racketeering activity." Both of those predicates derive from, and require proof of, the wire-fraud violations Amazon attempts to allege. *See* p. 32, *supra*. Such "other, incidental predicate acts"—like the Travel Act violation and money-laundering allegation here—do not

36

satisfy the pattern requirement where the allegations of underlying fraud otherwise do not.  *Al-Abood*, 217 F.3d at 238 n.11 (noting that predicate acts of interstate transportation of stolen money did not alter the court's conclusion that plaintiff had failed to plead a pattern).

### D.   Amazon Has Not Alleged a Conspiracy To Violate RICO

Amazon's allegations concerning conspiracy to violate RICO are fatally deficient. Conspiracy under § 1962(d) requires an agreement to "further an endeavor which, if completed would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997).  Meeting that standard requires Amazon to allege both (1) that ***each defendant*** "agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering," and (2) that ***each defendant*** "further agreed that someone would commit at least two predicate acts to accomplish those goals." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998).  Amazon has not done so.

As an initial matter, Amazon has not pleaded the existence of an enterprise or a pattern of racketeering activity.  That alone dooms Amazon's conspiracy claim.  *See Foster*, 363 F. App'x at 275 n.6; *Field*, 660 F. Supp. 2d at 688.  In any event, because the "'core of a RICO civil conspiracy is an agreement to commit predicate acts, a . . . complaint, at the very least, must allege specifically such an agreement.'"  *Field*, 660 F. Supp. 2d at 688.  The Second Amended Complaint does not.  Instead, it repeatedly pleads the conclusory assertion that defendants "conspired."  *See, e.g.*, SAC ¶¶ 53, 65, 73, 159, 180.  "It is well established that a complaint may be dismissed if it contains only conclusory, vague and general allegations of a conspiracy." *Goren*, 156 F.3d at 733.[15]

---

[15] The complaint, moreover, identifies ***all*** defendants as co-conspirators.  SAC ¶ 3 & n.1.  But, as explained above, the Northstar Defendants knew nothing of the White Peaks transaction.  And neither group was allegedly involved in the Blueridge transaction.  *See* pp. 19-20, *supra*.  Those allegations thus show the absence of an agreement, not the existence of one.

### E.      Amazon Has Not Alleged Injury or Damages

The Second Amended Complaint further fails to plead that Amazon was "injured in [its] business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  The civil RICO statute requires injury that was caused by the RICO violation.  *Hemi Grp.*, 559 U.S. at 8. The RICO violation must be "not only . . . a 'but for' cause of [the] injury, but . . . the proximate cause as well."  *Id.* at 9 (quotation marks omitted).  Proximate cause requires "'some direct relation between the injury asserted and the injurious conduct alleged.'"  *Id.*   Amazon's complaint fails to meet that standard.

Amazon has not alleged that it suffered injury "by reason of" the purported RICO violations.  Amazon makes a conclusory assertion, based on "information and belief," that it paid "inflated" prices for the leases and direct purchase properties.  *E.g.*, SAC ¶¶ 7, 83, 270, 429, 469. However, **nowhere** does Amazon allege facts demonstrating that those "inflated" prices exceeded the fair market value of the property.  And while Amazon purports to have reformed the leases with IPI, nowhere does Amazon assert that it pays lower rent under the reformed leases—which, presumably, it would have insisted upon if the original rents were "inflated." Absent such allegations, Amazon has not pleaded harm by reason of the RICO enterprise.  *See City of Chicago Heights v. Lobue*, 914 F. Supp. 279, 283-84 (N.D. Ill. 1996) (plaintiff entitled to actual economic loss as damages, not disgorgement of kickback).

The complaint also makes clear that Amazon was not the source of the fees that it claims Northstar paid, in part, to Villanova Trust.  Northstar and IPI paid development costs, not Amazon.  Dkt. 157-7 at 15; SAC ¶¶ 59, 225.  A majority of payments to Villanova Trust occurred before Amazon began paying rent on any of the lease transactions, and thus could not have come from Amazon.  *See* pp. 11-12, *supra*.  The complaint does not allege otherwise.  It claims only that Northstar "**had received** at least $10,026,899 in acquisition, leasing,

development and asset management fees . . . as of late 2018," without specifying that money's source.  SAC ¶291 (emphasis added).[16]  IPI, moreover, has not joined Amazon as a plaintiff in this action because it has not suffered any loss.  To the contrary, it has earned a substantial profit.  The complaint alleges that IPI owned 85.72% of its joint venture with Northstar, and Northstar owned the other 14.28%.  SAC ¶232.  By terminating Northstar's involvement, IPI became the sole owner and stood to receive *all* rent for *all* nine lease transactions.  *See* Dkt. 157-2 (MacDonald Decl. Ex. 22).  Over the course of the leases, Northstar's 14.28% ownership of the joint venture would be worth millions, without counting the value of the underlying property.  *Id.*  A "valuation expert" engaged by IPI determined that IPI *owed* Northstar's affiliates an additional "equity payout" of $3.8 million for redeeming their ownership interests, Dkt. 160-2 (MacDonald Decl. Ex. 32) ¶26.  Thus, far from claiming damages, the entity that funded development costs determined that it *owed additional money to Northstar*.

Amazon further maintains that merely entering into the transactions itself was injurious.  "Amazon would not, *under any circumstances*, have approved the real estate transactions . . . had Amazon been aware of [Nelson's and Kirschner's] undisclosed conflicts of interests and unlawful referral and other arrangements," the complaint says.  SAC ¶93 (emphasis added).  But Amazon's own allegations give the lie to that statement.  Amazon alleges that a "confidential informant" formerly affiliated with Northstar alerted it to the misconduct on ***December 2, 2019***, and, in a series of calls in "late 2019 and early 2020, . . . claimed to have personal knowledge" of payments made to Casey Kirschner's brother.  SAC ¶¶108-111.  Even ***after*** receiving this warning, however, Amazon continued with the transactions initiated by Casey Kirschner.  It

---

[16] Amazon previously asserted that "Amazon paid Northstar."  *See, e.g.*, Dkt. 69-5 at 8; *id.* at 14 (describing "fees that we paid Northstar"); *id.* at 15 ("deal fees that we paid to Mr. Watson and Northstar").  But the Second Amended Complaint appears to abandon that mistaken assertion.

executed the Dulles NCP II lease on January 13, 2020, SAC ¶ 234, six weeks after it first learned of the "confidential informant's" allegations.  Similarly, Amazon persisted in consummating the Blueridge transaction on December 23, 2019, *id.* ¶ 322, three weeks after the "confidential informant's" email, despite knowledge of Casey Kirschner's involvement in the transaction, *id.* ¶ 321.  And, to date, Amazon has yet to attempt to rescind the leases or land purchases, instead proceeding with—and in some cases fast-tracking—development of those properties.  *See* SAC ¶¶ 272-280 (alleging that Amazon and IPI reformed the leases); pp. 14, 16, *supra*.  Rather than permitting the "plausible inference" that Amazon suffered injury in the form of overpaying for the land, these facts confirm the "'obvious alternative explanation'" that Amazon received the benefit of its bargain, viewed the properties as advantageous investments for which it expected to make a profit, and suffered no injury.  *Iqbal*, 556 U.S. at 682.

Amazon alleges that it suffered reputational harm and injuries to its "business partners, including IPI, banks, and investors."  SAC ¶¶ 270, 429.  But courts have explicitly rejected RICO claims based on "injury to reputation" and "'standing in the community.'"  *Bowen v. Oistead*, 125 F.3d 800, 806 (9th Cir. 1997); *see Knit With v. Knitting Fever, Inc.*, Nos. 08 Civ. 4221, 08 Civ. 4775, 2012 WL 2938992, at *10 (E.D. Pa. July 19, 2012) (reputational injuries are "speculative" and "simply not the types of injuries compensable under RICO").  Even if such injury could support Amazon's RICO claim, Amazon's reputational injury allegations fall short of *Iqbal*'s requirements for a well-pled complaint.  Amazon asserts in conclusory fashion that its relationships with IPI, banks, and investors were harmed.  But such "'naked assertion[s]' devoid of 'further factual enhancement'" are insufficient.  *Iqbal*, 556 U.S. at 678.  Amazon nowhere

says what actions IPI and the unspecified banks and investors took that caused harm.  Indeed, IPI has maintained its business relationship with Amazon.[17]

Because Amazon has not adequately pled that it was injured by reason of the RICO enterprise, the claims should be dismissed.[18]

## II. THE ROBINSON-PATMAN ACT CLAIM MUST BE DISMISSED

Amazon's second federal claim, under § 2(c) of the Robinson-Patman Act, must be dismissed because that Act applies only to sales or purchases of goods, and because Amazon lacks antitrust standing.

### A. The Robinson-Patman Act Does Not Apply to the Alleged Transactions

Section 2(c) of the Robinson-Patman Act makes it "unlawful" to "pay or grant" to a counterparty or its "agent, representative, or other intermediary" any "commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise."   15 U.S.C. § 13(c). "[T]he circuit courts of appeal appear to be in agreement that section 2(c) covers only transactions that involve the transfer of tangible goods."  *Patterson v. Ford Motor Credit Co.*,

---

[17] Other injuries, moreover, were not proximately caused by the alleged misconduct.  Amazon cannot recover for the costs of its internal investigation because "damages incurred by a direct target [of the RICO enterprise] in investigating and mitigating damages[] are generally not deemed direct injury flowing from a defendant's illegal conduct."  *Knit*, 2012 WL 2938992, at *7, *9.  Nor can it seek relief for "site disruption and development delays," SAC ¶ 429, which "could have resulted from factors other than [the] alleged acts of fraud," *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459 (2006) (finding no proximate cause).

[18] Amazon's allegations also fail to plead any injury flowing from the investment of the racketeering proceeds or their use to acquire the enterprise.  While the Fourth Circuit does not treat that failure as grounds for dismissal, *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836-40 (4th Cir. 1990) (en banc), other circuits would, *see, e.g.*, *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 149, 151 (2d Cir. 2014) (*per curiam*); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229-30 (D.C. Cir. 1991).  Nelson and Cheshire Ventures thus advance the argument to preserve the issue for appeal, or in the event that the Court grants the pending motion to transfer.

203 F.3d 821, 2000 WL 123943, at *3-4 (4th Cir. 2000) (table) (collecting cases).  "[V]irtually every court to have considered the issue in the last seven decades has" agreed.  *World Wrestling Ent., Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 501 (S.D.N.Y. 2006).

The limitation of § 2(c) to transactions involving tangible goods is dictated by the Act's text, structure, and its legislative history.  Section 2(a) of the Robinson-Patman Act directly outlaws "discriminat[ion] in price between different purchasers of ***commodities of like grade and quality***."  15 U.S.C. § 13(a) (emphasis added).  Section 2(c), in turn, was designed "to prevent discriminatory rebates granted . . . under the guise of 'brokerage fees' ***never actually earned***"—*i.e.*, those not for services rendered.  *Lupia v. Stella D'Oro Biscuit Co.*, 586 F.2d 1163, 1169 (7th Cir. 1978) (emphasis added); *see Allen Pen Co. v. Springfield Photo Mount Co.*, 653 F.2d 17, 25 (1st Cir. 1981) (similar); *see also* 15 U.S.C. § 13(c) (contemplating commissions only "in connection with the sale or purchase of goods, wares, or merchandise," and barring those for which no services were rendered).  By outlawing such "dummy brokerages," *Patterson*, 2000 WL 123943, at *2, Congress hoped  "to force sellers to confine their discriminatory practices to those dealings whose effect could be more readily measured," *Lupia*, 586 F.2d at 1170.  Thus, as the Supreme Court has explained, § 2(c) "prevent[s] sellers and sellers' brokers from yielding to the economic pressures of a large buying organization by granting unfair preferences in connection with the sale of goods," while denying those benefits to other, less-favored buyers of the same goods.  *FTC v. Henry Broch & Co.*, 363 U.S. 166, 174 (1960).

Amazon has not alleged any "sale or purchase of goods, wares, or merchandise" here.  15 U.S.C. § 13(c).  The leases it signed concern real property—not goods.  "Whatever else might be encompassed by § 2(c), bribes paid to employees of a potential lessee of real property are not covered by that section, since they do not involve abuses of the brokerage function in a

transaction involving the sale of goods." *Rodman v. Haines*, No. 75 Civ. 471, 1976 WL 1315, at

*6 (S.D.N.Y. Sept. 14, 1976); *see also Med. Supply Chain, Inc. v. Gen. Elec. Co.*, 144 F. App'x

708, 715 (10th Cir. 2005) ("[T]he Act only bars price discrimination in the sale of commodities,

not discrimination in the supply of a real estate lease or financing."); *Exp. Liquor Sales, Inc. v.*

*Ammex Warehouse Co.*, 426 F.2d 251, 252 (6th Cir. 1970) (holding that Robinson-Patman Act

"is not concerned" with "a lease of realty" because it "prohibits only price discrimination in the

sale of goods"); *cf. Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 379-80 (4th Cir. 1992), (holding

that "real estate leases" do not qualify as "facilities" that promote the resale of goods "within the

scope of . . . § 2(e)"). Nor does the Robinson-Patman Act cover Amazon's purchases of land.

*See, e.g.*, *TV Signal Co. of Aberdeen v. Am. Tel. & Tel. Co.*, 462 F.2d 1256, 1259 (8th Cir. 1972)

("[A] real estate transaction . . . is not a commodity within Robinson-Patman."). The Robinson-

Patman Act thus has no application here.

### B.     Amazon Lacks Antitrust Standing To Sue for Treble Damages

For related reasons, Amazon has failed to plead that it has standing to seek treble

damages for any purported violation of the Robinson-Patman Act. That Act "does not itself

provide a private right of action for treble damages"—that right is "granted only by § 4 of the

Clayton Act, 15 U.S.C. § 15(a), which authorizes private suits by 'any person who shall be

injured in his business or property by reason of anything forbidden in the antitrust laws.'" *Blue*

*Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212,

218 (2d Cir. 2004). Thus, Amazon must "allege an antitrust injury" caused by a Robinson-

Patman violation, *id.* at 219-20, "'which is to say[,] injury of the type the antitrust laws were

intended to prevent,'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  Such

standing must be alleged "regardless of the type of antitrust claim involved."  *Id.* at 340.[19]

Given that the Robinson-Patman Act was passed to address anticompetitive price

discrimination, the proper plaintiffs in lawsuits under 15 U.S.C. § 13(c) are ***competitors*** suing

those who received the anticompetitive benefit of a discriminatorily rebated price.[20]  Amazon

does not even try to allege that there was any price discrimination here, let alone that it suffered

from it.  It identifies no competitors who received a better deal—because none exist.  Indeed, the

transactions at issue here involve real estate and intangible leases.  The anticompetitive price

discrimination contemplated by the Robinson-Patman Act is thus impossible: each parcel can

only be sold or leased once.  *See* pp. 42-43, *supra*; *Portland 76 Auto/Truck Plaza, Inc. v. Union

Oil Co.*, 153 F.3d 938, 944 (9th Cir. 1998) ("The word 'discriminate' connotes treating like

objects differently, so it is hard to apply the word to the leasing of real estate, ordinarily

considered unique.").[21]  The antitrust laws thus provide Amazon no relief.

---

[19] *Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 716 F.2d 245, 246 (4th Cir. 1983),
is not to the contrary.  The court there observed that § 2(c) "does not address competitive effect,"
*id.*, but it did not discuss the prerequisites for private-plaintiff suits seeking treble damages under
§ 4 of the Clayton Act, *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters*, 459 U.S. 519, 529-38 (1983) (establishing that § 4 "requires" an evaluation of "the
plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them,"
often looking to "the nature of the plaintiff's alleged injury").

[20] *See, e.g.*, *Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir. 1988)
(explaining that "it is generally agreed that a ***direct competitor*** of a company that obtains a
contract through commercial bribery has standing to press a 2(c) claim against the briber"
(emphasis added)), *aff'd*, 493 U.S. 400 (1990); *Larry R. George Sales Co. v. Cool Attic Corp.*,
587 F.2d 266, 272 (5th Cir. 1979) (holding that, even where "commercial bribery" alleged,
plaintiff had to establish that it "was in the same business and ***in competition with***" the alleged
violators (emphasis added)); *cf. Leonard v. J.C. Pro Wear, Inc.*, 64 F.3d 657, 1995 WL 508894,
at *6 (4th Cir. 1995) (table) (affirming finding of "no antitrust injury" where there was "no
evidence that plaintiffs paid more than their competitors as the result of these discounts and
commissions").

[21] The closest Amazon comes to alleging anticompetitive injury is a bald proclamation of
"distortion of the relevant market for commercial data center sites in Northern Virginia."  SAC

III.   **THE STATE-LAW CLAIMS MUST BE DISMISSED**

Amazon's federal claims against Nelson and Cheshire Ventures are meritless and must be dismissed for the reasons set forth above.  This Court thus "may decline to exercise supplemental jurisdiction" over the remainder of Amazon's claims.  *See* 28 U.S.C. § 1367(c)(3).  Indeed, in the interest of avoiding "[n]eedless decisions of state law," when "federal claims are dismissed before trial . . . state claims should be dismissed as well."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see Hunt v. Branch Banking & Tr. Co.*, 480 F. App'x 730, 732 (4th Cir. 2012).  This Court should therefore exercise its discretion and dismiss the state-law claims.  Were the Court to retain jurisdiction, however, the claims should still be dismissed.

A.   **Amazon May Not Pursue Its Claims Against Nelson Under Virginia Law**

Nelson's Employment Agreement with Amazon provides that "any disputes which may arise under, out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of Washington."  Dkt. 162-10 at 8.  That provision precludes Amazon from proceeding under Virginia law on Counts III to VIII.  Because Amazon's claims for detinue (Count II) and statutory conspiracy (Count V) arise only under Virginia law, those claims must be dismissed in full.

Nelson's broad choice-of-law provision covers every single state-law claim in the Second Amended Complaint.  The breach of contract claim, SAC ¶¶ 491-505, by definition arises from the Employment Agreement.  The remaining state-law claims are at the very least "in connection with" it, Dkt. 162-10 at 8, because each relies on Nelson's employment and responsibilities at Amazon, SAC ¶¶ 443, 445, 469, 472-473, 482, 516-517, 53.  All claims are thus necessarily governed by Washington law.  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th

¶576.  That conclusory assertion, however, is wholly unsupported—and is in fact refuted by documents in the public record of which this Court may take judicial notice.  *See* n.4, *supra*.

Cir. 1999); *see also Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009) (holding that "broad[]" choice-of-law provision encompassing "disputes arising . . . in connection with" an agreement covers any claim "having a connection to the agreement"); Dkt. 165.

Even if Virginia law were applied, it would favor adherence to the choice-of-law provision in Nelson's Employment Agreement. "Where a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims," Virginia courts "honor[] the intent of the parties to choose the applicable law" and apply the provision to related non-contract claims. *Hitachi*, 166 F.3d at 628; *see also Zaklit v. Global Linguist Sols., LLC*, 2014 WL 3109804, at *9 (E.D. Va. July 8, 2014); *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 678 (E.D. Va. 2012). Applying those principles, Virginia courts dismiss even statutory claims falling within the scope of the choice-of-law provision, as Amazon's detinue and civil-conspiracy claims do here. *See, e.g.*, *Pyott-Boone Elec. Inc. v. IRR Trust*, 918 F. Supp. 2d 532, 547 (W.D. Va. 2013) (holding that "the Virginia Securities Act" did not "apply to an agreement that identifies Delaware law as the governing law"); *Zaklit*, 2014 WL 3109804, at *12. The Court should thus enforce the choice-of-law provision in Nelson's Employment Agreement and dismiss all claims arising under Virginia law, including the claim for detinue and statutory conspiracy.[22]

## B. The Court Should Dismiss Amazon's Common-Law Fraud Claim

For all the same reasons that Amazon has failed to plead wire fraud and honest-services fraud with particularity, *see* pp. 24-31, *supra*, it has failed to plead any state-law fraud claim as

---

[22] Even under Virginia law, Amazon's claim for detinue fails because Amazon has not alleged the "kind, quantity and estimated fair market value of the specific personal property as to which [it] seeks possession." Va. Code Ann. § 8.01-114(A)(1); *United States v. Moffitt, Zwerling & Kemler, P.C.*, 875 F. Supp. 1190, 1198 (E.D. Va. 1995), *rev'd in part on other grounds*, 83 F.3d 660 (4th Cir. 1996).

to Nelson and Cheshire Ventures.  *See Zaremski v. Keystone Title Assocs., Inc.*, 884 F.2d 1391 (4th Cir. 1989) (applying Rule 9(b) to state-law fraud claims).  Amazon does not plead with particularity any material "representation of existing fact" that Nelson or Cheshire Ventures knew was false and intended Amazon to act upon—let alone any such representation that Amazon rightfully relied on to its detriment.  *Elcon Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012); *cf. Anthony v. Verizon Va., Inc.*, 758 S.E.2d 527, 534 (Va. 2014) (elements under Virginia law).  The complaint and its exhibits refute Amazon's claims of materiality, reliance on, and ignorance of any representations' purported falsity because Amazon continued to develop the land with notice of the purported fraud.  *See, e.g.*, *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) (no fraud when plaintiff "makes a partial inquiry, with full opportunity of complete investigation"); pp. 14, 16, 38-40, *supra*.  And Amazon never ties Nelson or Cheshire Ventures to particularized allegations of any purportedly false statement's timing, content, or audience—despite the fact that all of that information is entirely within Amazon's and its employees' possession.  *See* pp. 27-28, *supra*.

### C.     The Court Should Dismiss Amazon's Breach of Contract Claim

Amazon's breach of contract claim fares no better.  Any such claim must allege that "a valid agreement existed between the parties, the agreement was breached, and the plaintiff was damaged."  *Univ. of Wash. v. Gov't Emps. Ins. Co.*, 404 P.3d 559, 566 (Wash. Ct. App. 2017); *see also Young-Allen v. Bank of Am., N.A.*, 839 S.E.2d 897, 901 (Va. 2020).  Moreover, Amazon must allege its own performance under the contract.  *Willener v. Sweeting*, 730 P.2d 45, 49 (Wash. 1986) (en banc) ("[T]he party claiming nonperformance of the other must establish as a matter of fact the party's own performance"); *see also HCP Laguna Creek CA, LP v. Sunrise Senior Living Mgmt., Inc.*, 737 F. Supp. 2d 533, 541 (E.D. Va. 2010).  Amazon alleges none of that here.

As an initial matter, the breach of contract claims must be dismissed as to Cheshire Ventures because Amazon has not alleged that it had any contract with Cheshire.  The only contract alleged between Nelson and Amazon is the Employment Agreement.  *See* pp. 3-5, *supra*.  In that contract, Amazon agreed that "[j]urisdiction over and venue of any suit arising out of or related to" the Employment Agreement "shall be exclusively in the state and federal courts of King County, Washington."  Dkt. 162-10 at 8.  Amazon breached that provision by bringing this suit against Nelson for allegedly ongoing contractual breaches ***in Virginia***.  The State of Washington has codified the materiality of that breach by declaring "void and unenforceable" any "provision in a noncompetition covenant" that would "require[] the employee . . . to adjudicate a noncompetition covenant outside of" Washington or otherwise deprive the employee "of the protections or benefits of" relevant Washington law.  Wash. Rev. Code Ann. § 49.62.050; *see id.* § 49.62.100 (retroactive application).  Amazon cannot seek to enforce the Employment Agreement while simultaneously breaching it.  *Willener*, 730 P.2d at 49.

Amazon also fails to allege breach of any enforceable contract provision.  As to the alleged breaches of the confidentiality covenants, Amazon has failed to identify any confidential information, as defined in the contract, that Nelson disclosed, let alone explain how disclosure of that information proximately caused it harm.  Dkt. 162-10 at 2-5; *see* p. 4, *supra.*  Nor has Amazon alleged any enforceable noncompetition obligation that Nelson breached.  *See* pp. 3-4, *supra*.  The noncompetition provisions in the Employment Agreement are unenforceable because they would restrain Nelson from engaging in trade unrelated to Amazon over an excessive period with no geographic limitations.  *Amazon.com, Inc. v. Powers*, No. 12 Civ. 1911, 2012 WL 6726538, at *1-2, *10 (W.D. Wash. Dec. 27, 2012).   Reasonably construed, Nelson's noncompete bars him ***at most*** from "working with . . . former Amazon customers" and thus from

competing *with Amazon* for business—something the complaint does not allege Nelson has done. *Id.* Amazon's "general noncompetition clause" in the Employment Agreement "is not reasonable" or enforceable, and Amazon cannot assert a claim for any breach. *Id.*

### D.   Amazon's Remaining Claims Fail

Amazon's remaining state-law claims are equally unfounded. Its claims for unjust enrichment, conversion, and constructive trust must fail because such claims require that "specific property" be identified and traced back to the plaintiff—something Amazon has utterly failed to do with respect to Nelson and Cheshire Ventures. *Aebig v. Com. Bank of Seattle*, 674 P.2d 696, 697 (Wash. Ct. App. 1984); *see also* pp. 11-12, *supra*. Amazon's "general claim[s] for money damages will not give rise to a constructive trust." *Payne v. Ruegsegger*, 194 Wash. App. 1034, 2016 WL 3402353, at *6 (Wash. Ct. App. June 14, 2016) (citations omitted). Nor can Amazon seek to recover money *IPI* transferred to Northstar through the lease transactions. *See Brown ex rel. Richards v. Brown*, 239 P.3d 602, 610 (Wash. Ct. App. 2010) (money must be "'capable of being identified'" to be converted, such as "'when the deposit is special and the identical money is to be kept for the party making the deposit'"). The unjust enrichment claim against Nelson cannot survive for yet another reason: Nelson's relationship with Amazon is governed by an express contract, as revealed by Amazon's indistinguishable—but not alternatively pleaded—breach of contract claim. *See Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008) (unjust enrichment can be awarded only "absent any contractual relationship").

Amazon's tortious interference claim is equally unfounded. Amazon's tortious interference allegations do not specifically mention Nelson or Cheshire Ventures, SAC ¶¶476-483, much less explain how their conduct satisfies the elements of the claim, *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997). And actions Nelson took as an Amazon employee cannot support a claim for tortious interference because "[a] party cannot

tortiously interfere with its own contract." *See Reninger v. State Dep't of Corr.*, 951 P.2d 782, 788 (Wash. 1998); *Houser v. City of Redmond*, 586 P.2d 482, 485 (Wash. 1978) (explaining that, where "employees were acting within the scope of their employment, their actions were [their employer's], and no interference claim will lie"); *see also Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (similar).

Finally, in the absence of any viable theory of liability, Amazon cannot pursue claims for conspiracy or preliminary injunction. *See, e.g.*, *Nw. Laborers-Employers Health & Sec. Tr. Fund v. Philip Morris, Inc.*, 58 F. Supp. 2d 1211, 1216 (W.D. Wash. 1999) ("In Washington, as elsewhere, a civil conspiracy claim . . . fails if the underlying act or claim is not actionable."); *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014); *see also Winter v. NRDC*, 555 U.S. 7, 20, 22 (2008) (holding that a preliminary injunction requires a "clear showing" of that plaintiff is "likely to succeed on the merits"). Nor has Amazon pled the agreement necessary for a civil conspiracy. *See* p. 37, *supra*. Any claim for a preliminary injunction is also untimely, as Amazon has not sought an injunction against Nelson despite knowing of his alleged involvement in the conduct described in the complaint for more than ten months. *See* SAC ¶ 109; *see also Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (affirming rejection of preliminary injunction after nine-month delay); *Banc of Am. Inv. Servs., Inc. v. Magnone*, No. 2:09 Civ. 256, 2010 WL 11561564, at *2 (E.D. Va. Feb. 25, 2010) (nine-month delay warranted dismissal of preliminary-injunction suit).

## CONCLUSION

For the reasons set forth above, all claims in Amazon's Second Amended Complaint against Nelson and Cheshire Ventures should be dismissed.

Dated:  October 9, 2020

Respectfully submitted,

_____/s/_____
Eric R. Nitz (Va. Bar No. 82471)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2021 (telephone)
(202) 536-2021 (facsimile)
enitz@mololamken.com

Justin V. Shur (admitted *pro hac vice*)
Caleb Hayes-Deats (admitted *pro hac vice*)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
jshur@mololamken.com
chayes-deats@mololamken.com

Jennifer E. Fischell (admitted *pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue
New York, New York  10022
(212) 607-8174 (telephone)
(212) 607-8161 (fax)
jfischell@mololamken.com

*Counsel for Defendants Carleton Nelson*
*and Cheshire Ventures*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system.  On October 9, 2020, I will further send the document

and a notification of such filing (NEF) to the following parties by e-mail:

Travis Stuart Andrews (Va. Bar No. 90520)
Luke Michael Sullivan (Va. Bar No. 92553)
Elizabeth P. Papez
Patrick F. Stokes
Claudia M. Barrett
GIBSON DUNN & CRUTCHER LLP
tandrews@gibsondunn.com
lsullivan@gibsondunn.com
epapez@gibsondunn.com
pstokes@gibsondunn.com
cbarrett@gibsondunn.com

*Counsel for Plaintiffs*

Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun
James Trusty
IFRAH PLLC
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

*Counsel for Defendants Brian Watson and
WDC Holdings LLC*

Scott Jeffrey Pivnick (Va. Bar No. 48022)
Edward T. Kang
Kelley C. Barnaby
ALSTON & BIRD LLP
scott.pivnick@alston.com
edward.kang@alston.com
kelley.barnaby@alston.com

*Counsel for Defendant Casey Kirschner*

Dated:  October 9, 2020

_____
                    /s/
Eric R. Nitz (Va. Bar No. 82471)
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2021 (telephone)
(202) 536-2021 (facsimile)
enitz@mololamken.com

*Counsel for Defendants Carleton Nelson
and Cheshire Ventures*