**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **AMAZON.COM, INC. and AMAZON DATA SERVICES, INC.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; JOHN DOES 1-20,** | **Case No. 1:20-CV-484** **Hon. Liam O'Grady** **Hon. Theresa Buchanan** |
| **Defendants.** | |

<u>**ANSWER OF DEFENDANT CARLETON NELSON**</u>

Defendant Carleton Nelson ("Mr. Nelson" or "Defendant") answers the Verified Second

Amended Complaint ("Complaint") by Amazon.com and Amazon Data Services, Inc. as follows

(repeating Plaintiffs' allegations for ease of reference):

**PRELIMINARY STATEMENT**

1.    *This case is about a massive fraud and kickback scheme to obtain illegal profits on over $500 million in Amazon development projects in this District alone. The defendants are sophisticated professionals who used commercial real estate transactions and a web of shell entities to hide their criminal enterprise, which is the subject of ongoing internal and federal investigations.*

**RESPONSE:** Mr. Nelson admits that he is a sophisticated professional operating in commercial real estate. Mr. Nelson denies the remaining allegations in Paragraph 1.

2.    *Amazon's investigation began late last year, when one defendant's former employee reported the scheme to the company. Until then, the defendants were able to conceal their misconduct because, in part, two of their leaders are former managers in Amazon's real estate division.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 2 about Amazon's actions and therefore denies the same. Mr. Nelson denies that he committed any misconduct and denies that he was aware of any other defendant committing any misconduct.[1] Mr. Nelson denies the remaining allegations in Paragraph 2.

3.    *For at least two years, these former transaction manager ("TMs") Carleton Nelson and Casey Kirschner (the "TM Defendants") colluded with a broad network of real estate developers, LLCs, and other co-conspirators (the "RICO Defendants"[[]]), to commit wire fraud, honest services fraud, money laundering, and other unlawful acts.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 3.

4.    *The RICO Defendants engaged in these acts under cover of at least 11 commercial real estate lease and purchase transactions in Northern Virginia, all of which the TM Defendants shepherded through Amazon's internal approval process in exchange for multi-million dollar kickbacks and bribes. The TM Defendants were at the center of the overall scheme (the "RICO Enterprise") covering both lease and purchase transactions. Amazon previously described these transactions as comprising the Lease Transaction Enterprise and the Direct Purchase Enterprise. But Amazon's ongoing investigation and public government filings have uncovered evidence that all of these transactions are part of a broader enterprise scheme centered around the TM Defendants. This RICO Enterprise involved multiple unlawful acts undertaken in furtherance of a common purpose over a period of several years that included recurring kickbacks and bribes on Amazon lease and purchase transactions in Virginia, as well as use of unlawful proceeds to continue and broaden the enterprise to target*

---

[1]    Throughout the Complaint, Plaintiffs often make generalized allegations about actions and alleged misconduct by groups of defendants without attributing any specific action to any specific individual. For purposes of this Answer, unless specifically admitted, Mr. Nelson asserts that he lacks sufficient knowledge and information about actions taken by other defendants contained in any such generalized group allegation, and his denials are based on his personal knowledge, information, and beliefs. For the avoidance of doubt, Mr. Nelson specifically denies that he committed or was aware of any other defendant committing any crime, engaging in any conspiracy, or committing any other misconduct that would give rise to the claims in this Complaint.

*additional transactions with Amazon, its business partners, and other victims and markets. Accordingly, this complaint uses the terms "Lease Transactions" and "Direct Purchases" to describe the previously alleged Virginia lease and purchase transactions, as well as the additional transactions and conduct alleged herein as part of the broader RICO Enterprise.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 4.

5.   *The scope and persistence of this RICO Enterprise spanned several jurisdictions, scores of entities and transactions in interstate commerce, and development projects worth more than half a billion dollars. All of the affected transactions unlawfully and unjustly benefitted from the RICO Defendants at the expense of Amazon, its business partners, and innocent investors. And Plaintiffs and their partners reasonably and detrimentally relied on the RICO Defendants' unlawful statements, omissions, and conduct concerning deal terms, opportunities, relationships, costs, fees, and market data for years. This and other misconduct by the RICO Defendants proximately caused Plaintiff to suffer direct financial harm from project costs inflated by at least kickbacks, fraud, and mismanagement, irreparable injury resulting from site and relationship disruptions, and ongoing harm from the RICO Defendants' anti-competitive manipulation and inflation of relevant market data.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 5.

6.   *In the Lease Transaction portion of the RICO Enterprises, the TM Defendants received kickbacks in exchange for rigging Amazon's award of at least nine major commercial lease transactions to other RICO Defendants, most notably corrupt developer Brian Watson and Northstar Commercial Partners ("Northstar Defendants"[]). The Northstar Defendants alone expected to make "over $60 million" on these transactions, for which they agreed to pay the TM Defendants tens of millions in kickbacks. The kickbacks were laundered through all or some of Defendants Villanova Trust, AllCore Development LLC, Finbrit Holdings LLC, Cheshire Ventures LLC, as well through non-defendant trusts and accounts held or created by the TM Defendants and/or their lawyer, Rodney Atherton of Ergo Law in Arvada, Colorado.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 6.

7.   *In the Direct Purchase portion of the RICO Enterprise, the TM Defendants received seven-figure kickbacks on at least two transactions collectively worth nearly $200 million. In the first transaction, defendants White Peaks Capital and NOVA WPC LLC (the "White Peaks Defendants") realized approximately $18 million in unjust and inflated profits from a so-called*

*$116 million "flip sale" to Amazon in mid-2019, ("White Peaks Purchase"), Ex. 1. On information and belief, the TM Defendants and Northstar Defendants together received at least $6 million of the unjust gains from this "flip sale" in kickback payments. On the second transaction, the TM Defendants and their accomplices inflated by at least $10 million the price of a property ("the Blueridge Property") Amazon purchased in late-2019 for $83 million. To facilitate the inflated sale and launder their kickbacks and other illicit gains on this transaction ("Blueridge Sale"), the TM Defendants interposed an investment company called the Blueridge Group, owned by TM Defendant Nelson's contact Herb Glimcher, to buy the property for $73 million before flipping it to Amazon for $83 million. On information and belief, portions of the $10 million in unjustly inflated "flip" proceeds were subsequently paid to the TM Defendants and their co-conspirator LLCs, including Nelson-controlled entities AllCore and Cheshire Ventures. Both of the Direct Purchase transactions were procured or otherwise tainted by the TM Defendants' self-dealing in furtherance of an ongoing scheme to defraud Amazon or otherwise unlawfully coopt its business opportunities.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 7.

8. *In December 2019, a former Northstar employee blew the whistle on Defendants' RICO Enterprise, which Amazon and federal prosecutors continue to investigate. Ex. 2. Amazon filed this action for emergency relief based on information that Northstar's CEO, Defendant Brian Watson, presented an imminent threat to the preservation of evidence and assets central to this case after the FBI executed a warrant at his home. Ex. 3. This evidence resulted in the Court's April 28 Temporary Restraining Order and June 5 Preliminary Injunction in this action.*

**RESPONSE:**   Mr. Nelson denies the existence of a RICO Enterprise or any criminal activity. Mr. Nelson admits that the Court issued an ex parte Temporary Restraining Order on April 28, 2020 and subsequently issued a Preliminary Injunction on June 5, 2020. Mr. Nelson denies that such orders are evidence of any wrongdoing by Mr. Nelson. Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 8 about any Northstar employees and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 8.

9. *As detailed below, several defendants have defied the Court's injunction even as the information about government proceedings proliferate and*

> *evidence of the RICO Defendants' unlawful activities continues to grow. Amazon's prior complaints and the Court's Preliminary Injunction were based on several incriminating conversations and files, including a recovered file that Casey Kirschner tried to delete from his company laptop, evidencing the kickback scheme underlying the Lease Transaction portion of the RICO Enterprise. Amazon has since obtained further evidence of the Direct Purchase portion of the RICO Enterprise. Exs. 5-7, 9. And Amazon's continuing investigation as well as public government forfeiture filings have recently elucidated the RICO Defendants' use of wire transfers and various co-defendant LLCs, as well as trust and other accounts controlled by attorney Atherton, to further, and conceal, criminal acts as well as violations of civil law including fraud, market manipulation, and breach of fiduciary and contractual duties in violation of federal statutes, state law, and the RICO Defendants' contracts with Amazon.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 9 about Amazon's activities and therefore denies the same.  Mr. Nelson admits only that any public forfeiture filings speak for themselves and that Mr. Nelson has contested them. Mr. Nelson denies the remaining allegations in Paragraph 9.

10.   *Notably, public government forfeiture filings this summer[] show that, between "August 2018 and December 2019, $9,194,580.50 in fraud proceeds were" laundered through Villanova Trust and/or other entities, and "credited to a First Western Trust Bank account ending in 3698 maintained for" the benefit of the TM Defendants. Ex. 12 ¶ 15. Amazon's investigation also revealed information that the TM Defendants used a Virginia civil engineering consultant Johnny Lim and his company, E2M Properties LLC, as a conduit for the seven-figure kickback they received on the White Peaks transaction. And it revealed the TM Defendants' use of Blueridge Group to facilitate Amazon's purchase of the artificially price-inflated Blueridge Property. Further, Amazon's internal investigation uncovered evidence that the TM Defendants have used at least co-defendant LLCs AllCore and Cheshire to perpetuate the RICO Enterprise since TM Defendant Nelson was terminated from Amazon in June 2019.*

**RESPONSE:**    Mr. Nelson admits only that the public forfeiture filings speak for themselves and that Mr. Nelson has contested them. Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 10 about Amazon's investigation and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 10.

11.     *Among other things, Amazon's ongoing investigation has also uncovered evidence that the TM Defendants received or sought prohibited gifts and benefits, including kickbacks, from Northstar, White Peaks, and other third parties in exchange for the TM Defendants' steering Amazon opportunities to them, and utilized the proceeds of their unlawful activities for personal gain.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 11.

12.     *On information and belief, the TM Defendants also had responsibility or influence over other commercial real estate opportunities that Amazon engaged or explored in other states, including Ohio, South Carolina, and Tennessee. These opportunities, and other aspects of the [redacted] as yet unknown to Amazon, remain the subject of Amazon's ongoing investigation. In the meantime, the amended claims herein address all of the foregoing misconduct, which supports maintaining – and potentially expanding – the preliminary injunction the Court entered on June 5, 2020.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 12 about other Amazon's activities and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 12.

## PARTIES

13.     *Plaintiff Amazon.com, Inc. is located at 410 Terry Avenue North, Seattle, WA, 98109, and through its subsidiaries employs more than 10,000 individuals (with plans for many more) and has extensive investments and assets in the Commonwealth.*

**RESPONSE:**   Mr. Nelson admits that Amazon.com, Inc. is located at 410 Terry Avenue North, Seattle, WA, 98109 and that Amazon employs more than 10,000 individuals. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations contained in Paragraph 13 and therefore denies the same.

14.     *Plaintiff Amazon Data Services, Inc., a subsidiary of Amazon.com, Inc., is a Delaware corporation located at 410 Terry Avenue North, Seattle, WA 98109, and among other things operates many large Amazon facilities in Virginia and other U.S. states.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 14.

15.    *Northstar is a "privately held, full-service real estate investment and asset management company headquartered in Denver, Colorado, USA, specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States." Ex. 13. Northstar is located at 1999 N. Broadway, Suite 3500, Denver, CO 80202.*

**RESPONSE:**   Mr. Nelson admits that Northstar is a real estate investment and asset management company. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations in Paragraph 15 and therefore denies the same.

16.    *Defendant Brian Watson is the Founder and Chief Executive Officer of defendant Northstar Commercial Partners. On information and belief, Watson resides at 8 Churchill Drive, Englewood, CO 80113.*

**RESPONSE:**   Mr. Nelson admits that Brian Watson is the Founder and Chief Executive Officer of defendant Northstar Commercial Partners. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations contained in Paragraph 16 and therefore denies the same.

17.    *Defendant Casey Kirschner is a former Real Estate Transaction Manager for Amazon.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 17.

18.    *On information and belief, Casey Kirschner resides at 635 Alvarado Ln. North, Minneapolis, MN 55447.*

**RESPONSE:**    Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 18 and therefore denies the same.

19.    *Defendant Carleton Nelson is a former Real Estate Transaction Manager for Amazon and was Casey Kirschner's supervisor at Amazon.*

**RESPONSE:**   Mr. Nelson admits that he is a former Real Estate Transaction Manager for Amazon. Mr. Nelson admits that for some period of his tenure at Amazon he acted as Mr. Kirschner's supervisor.

20.     *On information and belief, Nelson resides at 4025 S.W. Thistle Street, Seattle, WA 98136-2368.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 20.

21.     *Defendant Nelson goes by the names of "Carleton" and "Carl." See, e.g., Ex. 1 at 2; Dkt. 135-4.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 21 but notes that his Amazon email address and employee identification number utilized his full name, Carleton.

22.     *Defendants Sterling NCP FF, LLC, Manassas NCP FF, LLC and NSIPI Administrative Manager are entities formed and controlled by Defendants Watson and Northstar for purposes of executing the Virginia site transactions at issue in this suit.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 22 and therefore denies the same.

23.     *Defendants Sterling NCP FF, LLC and Manassas NCP FF, LLC are limited liability companies formed and existing in the Commonwealth of Virginia.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 23 and therefore denies the same.

24.     *Defendant Villanova Trust is a trust formed and existing in the State of Tennessee. On information and belief, Villanova Trust was formed by Rodney Atherton, an attorney doing business at ErgoLaw, located at 6879 W. 52nd Ave., Suite 203, Arvada, CO 80002.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 24 and therefore denies the same.

25.     *On information and belief, the Villanova Trust was formed by Mr. Atherton to facilitate the transfer of funds to the TM Defendants from Northstar in return for their role in assisting Northstar to obtain the Lease Transactions, and to conceal from Amazon the TM Defendants' receipt of fees derived from the Lease Transactions.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 25.

26. *On information and belief, Villanova Trust, which was previously located at 16 Compton Trace, Nashville, TN 37215, Ex. 14, is now located at 3924 Wallace Lane, Nashville, TN 37215.*

**RESPONSE:** Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 26 and therefore denies the same.

27. *Villanova Trust received payments from Defendant Northstar related to the RICO Enterprise while the TM Defendants were employed by Amazon.*

**RESPONSE:** Mr. Nelson denies the allegations contained in Paragraph 27.

28. *During the period in suit, the TM Defendants had primary responsibility for directing Amazon real estate identification and selection in Virginia, including on the Lease Transaction and Direct Purchase deals at issue in this suit.*

**RESPONSE:** Mr. Nelson denies the allegation in Paragraph 28 that he had primary responsibility for directing Amazon real estate identification and selection in Virginia. Mr. Nelson also denies the allegations in Paragraph 28 because he did not work at Amazon during the full "period in suit." He was terminated by Amazon on June 11, 2019, before Amazon executed the White Peaks Purchase, the Blueridge Sale and at least one of the nine commercial lease transactions at issue in the suit.

29. *Amazon terminated Nelson's employment in June 2019 based on violations of Amazon's Code of Conduct, unrelated to this litigation.*

**RESPONSE:** Mr. Nelson admits he was terminated on June 11, 2019. Mr. Nelson lacks sufficient information and knowledge as to Amazon's true rationale and therefore denies the same. Mr. Nelson admits that he was terminated after he lodged objections to the decisions of multiple Amazon executives regarding certain representations in a formal bid on a contract with the federal government.

30.     *On information and belief, at the time of his termination from Amazon, Nelson was under financial stress.*

**RESPONSE:**  Mr. Nelson denies the allegation in Paragraph 30.

31.     *The conduct that led to Nelson's termination was not his first offense. In October 2017, Nelson was given a warning for violating Amazon's policies. Despite this warning, Nelson, who was by then certainly aware of the policies, engaged in professional misconduct leading to an investigation that resulted in his termination from Amazon.*

**RESPONSE:**   Mr. Nelson lacks sufficient knowledge or information regarding any investigation at Amazon but admits that in October 2017, Amazon issued to him a warning for violating  the Amazon Standard of Conduct designating it an "infraction" to engage in "[a]busive, vulgar, or harassing language to a . . .  fellow associate." Mr. Nelson denies this warning is in any way related to the allegations against him in this complaint. Mr. Nelson denies the remaining allegations contained in Paragraph 31.

32.     *Amazon terminated Casey Kirschner's employment in April 2020 based on its investigation to that point substantiating the 2019 whistleblower report from a former Northstar affiliate alleging his participation in the kickback scheme that is the subject of this suit.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 32 about Amazon's actions and therefore denies the same. Mr. Nelson denies the remaining allegations contained in Paragraph 32.

33.     *Defendants White Peaks Capital LLC and NOVA WPC LLC are Delaware limited liability companies that on information and belief are located at 11364 Mesa Verde Lane, Parker, CO 80138, potentially with subsequent or additional locations in Henderson, NV.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 33 and therefore denies the same.

34.     *Two former Northstar employees, Kyle Ramstetter and Will Camenson, served, respectively, as Managing Director and Manager of White Peaks Capital LLC and NOVA WPC LLC.*

**RESPONSE:**   Mr. Nelson admits that Kyle Ramstetter is a former Northstar employee. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations contained in Paragraph 34 and therefore denies the same.

35.     *White Peaks Capital LLC and NOVA WPC LLC were used to effectuate the White Peaks Purchase with Amazon as part of the Direct Purchase conduct at issue in this suit.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 35 and therefore denies the same.

36.     *Defendant AllCore Development LLC is a limited liability company organized and registered in Wyoming on March 27, 2018, with a principal mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 36.

37.     *AllCore was organized by, and remains registered to, Mr. Atherton, an attorney doing business as ErgoLaw at the Colorado address above.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 37 and admits that it is standard practice for corporations (including Amazon) to designate registered agents.

38.     *On information and belief, the TM Defendants retains or otherwise engaged Mr. Atherton to organize AllCore Development LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains. On information and belief, after his termination from Amazon, Defendant Nelson directed Mr. Atherton to organize two other LLCs, which are also Defendants in this action, Cheshire Ventures LLC and Finbrit LLC.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 38 as stated.

39.     *Defendant Cheshire Ventures LLC is a limited liability company formed and organized in Wyoming on June 27, 2019, with a principal office address of 1908 Thomas Avenue, Cheyenne, WY 82001, and a mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 39.

40. *Cheshire Ventures was organized by, and remains registered to, Mr. Atherton, an attorney doing business as ErgoLaw at the Colorado address above.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 40 and admits that it is standard practice for corporations (including Amazon) to designate registered agents.

41. *On information and belief, Mr. Atherton was retained or otherwise engaged to organize Cheshire Ventures LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 41.

42. *Defendant Finbrit Holdings LLC is a limited liability company formed and organized in Wyoming on September 3, 2019, with a principal office address of 1740 Dell Range, Suite H414, Cheyenne, WY 82009, and a mailing address of 6870 W 52nd Avenue, Suite 203, Arvada, CO 80002.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 42 and therefore denies the same.

43. *Finbrit Holdings was organized by, and remains registered to, Mr. Atherton, an attorney doing business as ErgoLaw at the Colorado address above.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 43 and therefore denies the same.

44. *On information and belief, Mr. Atherton was retained or otherwise engaged to organize Finbrit Holdings LLC for the benefit of the TM Defendants and to facilitate and conceal their illicit gains.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 44.

45. *Doe Defendants 1-20 are individuals and/or entities responsible for some or all of the practices, acts, conduct, and occurrences alleged herein, either as actual perpetrators or co-conspirators, aiders and abettors, officers, directors, and/or managing agents with the knowledge, control, authority, direction, and/or ratification of the other RICO Defendants. Plaintiffs will propose further amendments to this Complaint alleging the true names and capacities of the DOE Defendants, and the roles they played, once further information about their participation in the RICO Enterprise is ascertained.*

**RESPONSE:**   Mr. Nelson denies the existence of a RICO enterprise. Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 45 and therefore denies the same.

## SUBJECT MATTER JURISDICTION AND VENUE

46.   *This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the case arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., the Robinson-Patman Act, 15 U.S.C. § 13, and Article III, section 2, clause 1, of the U.S. Constitution, which extends federal judicial power to "all Cases, in Law and Equity, arising under this Constitution [or] the Laws of the United States, "including the grant in Section 11 of the Judiciary Act of 1789 of original federal equity jurisdiction over cases involving more than $500 between a citizen of the state where suit was brought and a citizen of a different state.*

**RESPONSE:**   Mr. Nelson denies that there are any acts or omission that support the jurisdiction of this Court.

47.   *The Court has supplemental jurisdiction over all of Plaintiffs' state law claims under 28 U.S.C. § 1367 because they arise from, and constitute part of, the same case or controversy that gives rise to Plaintiffs' federal claims.*

**RESPONSE:**   Mr. Nelson denies that there are any acts or omission that support the jurisdiction of this Court.

48.   *This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's.*

**RESPONSE:**   Mr. Nelson denies that there are any acts or omission that support the jurisdiction of this Court.

49.   *Venue is proper in this district under 28 U.S.C. § 1391(b) because it is a district in which Plaintiff maintains headquarters and/or substantial business operations, is the district in which all or many of the affected properties are located, and is the district in which a substantial or significant number of the acts giving rise to the action occurred.*

**RESPONSE:**   Mr. Nelson denies that there are any acts or omission that support the jurisdiction of this Court.

50.   *Venue is also proper in this judicial district under 28 U.S.C. § 1391(c) because Defendants are subject to personal jurisdiction here.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 50.

## PERSONAL JURISDICTION

51.   *Exercise of jurisdiction over Defendants Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NOVA WPC, LLC is reasonable and proper in this District because these Defendants are citizens of the Commonwealth of Virginia and because they conduct extensive business activities within Virginia. For Amazon's claims for violations of 18 U.S.C. § 1962 and Virginia state law, exercise of jurisdiction over these Defendants is proper pursuant to 18 USC. 28 U.S.C. § 1965(a).*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 51 and therefore denies the same.

52.   *Exercise of jurisdiction over Defendants WDC Holdings LLC, Brian Watson, NSIPI Administrative Manager, White Peaks Capital LLC, Villanova Trust, Carleton Nelson, Casey Kirschner, AllCore Development, LLC, Finbrit Holdings LLC and Cheshire Ventures, LLC is reasonable and proper in this District pursuant to 18 U.S.C. § 1965(b). The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of these Defendants could otherwise be tried together. For Amazon's state claims, exercise of jurisdiction over these Defendants is proper pursuant to Va. Code Ann. § 8.01-328.1. These Defendants have knowingly and purposefully transacted business in the Commonwealth of Virginia, contracted to supply services of things in Virginia, caused tortious injury in Virginia by acts or omissions in and out of Virginia, and have an interest in real property in Virginia. Further, there is a substantial nexus between their purposeful availment of the Virginia forum and Amazon's claims. Ex. 15. Notably, several Defendants visited Virginia to view potential and actual Amazon real property sites as well as review and execute lease contracts, and utilized instrumentalities located in Virginia and the Eastern District of Virginia to carry out the acts of which Amazon complains. Defendants thereafter affirmatively directed actions at Virginia and the Eastern District of Virginia by making payments and maintaining business operations here to obtain illicit investment, management, and other benefits on several Virginia commercial development projects.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 52 as stated.

## FACTUAL ALLEGATIONS

53.  *This Second Amended Complaint details how two Amazon former TMs, together with various real estate developers and LLCs, abused their positions and conspired to cheat Amazon out of millions of dollars by coordinating a far-reaching RICO Enterprise with numerous co-conspirators and victims, all for their own personal financial gain.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 53.

## AMAZON REAL ESTATE INVESTMENTS

54.  *As relevant here, Amazon carefully selects and develops real estate locations that will support its various supply chain operations and other business operations, including [redacted]and warehouses.*

**RESPONSE:**   Mr. Nelson admits that Amazon carefully selects real estate locations that will support its data centers and that when he worked at Amazon the company did, from time to time, develop real estate locations to support its data centers. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations contained in Paragraph 54 and therefore denies the same.

55.  *During the period in suit, Amazon has invested heavily in sites in Virginia as well as Ohio and California.*

**RESPONSE:**  Mr. Nelson admits the allegations in Paragraph 55.

56.  *Amazon has also executed or explored real estate transactions in other states in which Defendants have had access to company information and initiatives.*

**RESPONSE:**  Mr. Nelson admits the allegations in Paragraph 56.

57.  *A large collection of the sites at issue in this suit are located in this District in Northern Virginia, where Amazon has invested heavily in acquiring and developing new facilities on land that Amazon has either purchased or leased with the assistance of third parties involved in various commercial real estate activities.*

**RESPONSE:**   Mr. Nelson admits that real estate parcels at issue in this complaint are located in Northern Virginia. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations contained in Paragraph 57 and therefore denies the same.

58.     *Amazon has obtained real estate in and around Dulles, Virginia through two customary real estate deal structures: (i) build-to-suit lease transactions; and (ii) direct purchase transactions.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 58 because, among other reasons, there is no definition of a "customary" real estate deal structure.

59.     *In build-to-suit lease transactions, Amazon identifies the type of location that would be suitable for an Amazon facility and partners with a commercial real estate developer that is willing to find, acquire, and develop the land for Amazon. Typically, the developer purchases the land and builds the basic shell of the facility (i.e., the external structure), and Amazon then leases the land and shell from the developer for a period of years and designs, builds, and operates the inside of the facility to suit its relevant business needs.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 59 because, among other reasons: (a) when Mr. Nelson worked at Amazon there was no policy or procedure related to build-to-suit lease transactions or the methods by which such transactions were undertaken; and (b) during Mr. Nelson's employment at Amazon, some real estate developers (including DCT, Prologis and COPT) or land speculators purchased land (or contracted to do so) prior to any engagement or commitment from Amazon related to a build-to-suit lease transaction.

60.     *The total lease payments to the landlord-developer are typically calculated to compensate the developer for: (i) the cost of the land; (ii) the construction cost of the shell; (iii) a negotiated percentage yield on the cost of the land and shell; and (iv) the developer's operating expenses to act as landlord.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 60 because, among other reasons, when Mr. Nelson worked at Amazon there was no process or policy at Amazon related to

the calculation of lease payments; some Amazon leases compensated a developer and some Amazon leases did not compensate a developer.

61.     *Amazon and/or its affiliates also purchase land outright and subsequently build Amazon facilities on these sites.*

**RESPONSE:**   Mr. Nelson admits that when he worked at Amazon, the company (or its affiliates like ICSP LLC (Insane Cloud Scaling Project)) purchased land from time to time and subsequently built Amazon facilities on these sites.

62.     *Amazon has a multi-step process for selecting suitable land for both lease and purchase transactions that relies on market and internal diligence by Amazon real estate TMs such as Casey Kirschner and Nelson.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 62 because, among other reasons: (a) Amazon pleads at Paragraph 78 that "property and market details" are reported *to* Amazon TMs by "external brokers and agents" through whom "[s]ite diligence is conducted." Mr. Nelson further denies the allegations in Paragraph 62 because when Mr. Nelson worked at Amazon, there was no company policy or procedure concerning the selection of "suitable land for both lease and purchase transactions" and the analysis of such relied on multiple internal and external parties including but not limited to: public utilities, internal finance employees, internal legal employees, external legal counsel, internal energy employees, internal capacity planning employees, external real estate brokers, land owners, internal engineering employees, external engineering consultants, local and state government officials, and federal regulatory agencies.

63.     *Following extensive initial site diligence, an Amazon TM will present the site and financials for "spend" approval based on evidence and representations that the site meets relevant business needs and that its price aligns with relevant market norms.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 63 because, among other reasons, when Mr. Nelson worked at Amazon, any nonbinding "spend" requests were subject to

multiple different procedural guidelines and drafted by multiple stakeholders. Mr. Nelson further

denies the allegations in Paragraph 63 because, among other reasons: (a) when Mr. Nelson worked

at Amazon, Amazon's capacity planning team determines business needs for the company (to the

extent "business needs" means data center space from which to sell cloud computing products to

customers) with no input from TMs and (b) there is no static "market norm" because the price of

real estate is, as stated in Amazon's complaint at Paragraph 82, "dynamic."

## I.   THE TM DEFENDANTS' PAY-TO-PLAY SCHEME

64.   *The TM Defendants abused their positions of trust at Amazon by steering lucrative contracts and/or business opportunities to co-conspirators in exchange for kickbacks and other benefits they concealed from Amazon in violation of the law and company contracts and policies.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 64.

65.   *The RICO Defendants are commercial real estate companies and professionals that include at least one investment firm (WDC Holdings, d/b/a Northstar, as well as its owner and alter ego, Brain Watson), various limited liability companies (Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, White Peaks Capital LLC, NOVA WPC LLC, AllCore Development LLC, Finbrit Holdings LLC, Cheshire Ventures LLC, E2M Properties LLC), and a bank trust (Villanova Trust), that conspired with the TM Defendants to exploit Amazon real estate transactions to derive illicit financial gains at the expense of Amazon and its partners or investors.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 65.

### A.  TM Defendant Nelson Recruits Casey Kirschner to Amazon

66.   *During the period in suit, the TM Defendants served as Amazon's two primary TMs for real estate site identification and selection in Virginia.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 66 as stated because he

because he did not work at Amazon during the full "period in suit."

67.   *Nelson also had responsibility for real estate site identification in other geographies across the Americas (the United States, Canada, and Central/South America).*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 67 insofar as "real estate site identification" was one of his many responsibilities.

> 68.   *The TM Defendants previously worked together at the Royal Bank of Canada, and Nelson recruited Casey Kirschner to Amazon's real estate group and served as his mentor and supervisor.*

**RESPONSE:** Mr. Nelson admits that he served as Casey Kirschner's supervisor for some period during his tenure at Amazon and that for some period of time Mr. Kirschner and Mr. Nelson were both employed as Level 7 Amazonians. Mr. Nelson denies the remaining allegations in Paragraph 68 because, among other reasons, he never worked at the Royal Bank of Canada.

> 69.   *Casey Kirschner reported exclusively to Nelson from November 8, 2017 until June 15, 2019, when Nelson was terminated for misconduct.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 69 because, among other reasons, Amazon terminated Mr. Nelson on June 11, 2019.

> 70.   *Throughout his tenure at Amazon, Casey Kirschner's responsibilities included selecting commercial real estate development partners for Amazon projects, including and specifically Defendant Northstar for the Virginia lease projects at issue in this suit.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 70 because the "select[ion]" of "real estate development partners" was not done at the command or behest of any single individual.

> 71.   *At the time of Nelson's termination, Casey Kirschner served as a Principal Real Estate Manager with primary responsibility for Amazon's portfolio in Northern Virginia. See Ex. 16.*

**RESPONSE:**   Mr. Nelson admits the allegations contained in Paragraph 71 insofar as "portfolio" relates to real estate projects.

> 72.   *As detailed below, these comments - combined with reports from a confidential information that the TM Defendants' misconduct included an elaborate kickback scheme involving Casey Kirschner's brother Christian -- identified Casey Kirschner as a significant risk to the company and the*

*integrity of ongoing investigations into the Defendants' unlawful activities. Amazon thus kept its internal investigation highly confidential and arranged for Casey Kirschner to transition his responsibilities to other personnel before his employment was terminated April 2, 2020.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the

allegations contained in Paragraph 72 and therefore denies the same but answers that Paragraph

72 does not refer to any specified "comments" and thus the allegation is nonsensical.

### B.  The TM Defendants Create a Pay-to-Play Scheme for Amazon Work

73.   *While at Amazon, the TM Defendants conspired to steer lucrative company contracts, business opportunities, and proprietary or otherwise competitively sensitive business information to third parties who provided or agreed to provide the TM Defendants with personal benefits in exchange thereof.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 73.

74.   *On information and belief, Nelson continued to work with Casey Kirschner to steer Amazon contracts, business opportunities, and proprietary or otherwise competitively sensitive information to third parties after his termination from Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 74.

75.   *The benefits the TM Defendants received as a result of their unlawful conduct took many forms, including kickbacks benchmarked to various transaction fees and funneled through multiple shell entities, disguised lump sum payouts on Amazon transactions, and lavish trips or reciprocal agreements to steer real estate sale or development opportunities to the TM Defendants and their affiliates.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 75.

76.   *The full scope of the TM Defendants' misconduct is not yet known, but centered around abusing their positions with Amazon to establish a pay-to-play platform for directing company business and resources to third parties who would provide them with personal benefits they concealed from Amazon and its partners.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 76.

77. *The TM Defendants were able to conceal their unlawful activities because they exploited their positions to evade company controls on transaction approvals, by knowingly misrepresenting the transactions and concealing kickbacks they had embedded into the deals.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 77.

78. *Site diligence is conducted largely through external brokers and agents who report property and market details to Amazon real estate TMs - here the TM Defendants for the period and transactions in suit.*

**RESPONSE:**   Mr. Nelson denies the remaining allegations in Paragraph 78 because, among other reasons: (a) when he worked at Amazon the company did not have any policy or procedure regarding the collection of site diligence; (b) the collection of such diligence varied for each Amazon real estate transaction; and, (c) Mr. Nelson did not work at Amazon after June 11, 2019.

79. *As noted, Amazon TMs have primary responsibility for presenting site diligence and financials for transactional "spend" approval based on evidence and representations that a site meets relevant business needs and its price aligns with relevant market norms.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 79 because, among other reasons, when Mr. Nelson worked at Amazon, any nonbinding "spend" requests were subject to multiple different procedural guidelines and drafted by multiple stakeholders. Mr. Nelson further denies the allegations in Paragraph 79 because, among other reasons: (a) when Mr. Nelson worked at Amazon, Amazon's capacity planning team determines business needs for the company (to the extent "business needs" means data center space from which to sell cloud computing products to customers) with no input from TMs and (b) there is no static "market norm" because the price of real estate is, pursuant to Amazon's complaint at Paragraph 82, dynamic.

80. *On information and belief, the TM Defendants exploited this process and abused their positions to conspire with third parties on site diligence inputs, and then manipulated the site presentations within Amazon to secure approval for steering contracts, transactions, and business opportunities to*

*co-conspirators who would provide the TM Defendants with payments or other personal benefits.*

**RESPONSE:** Mr. Nelson denies the remaining in Paragraph 80.

81.    *For example, the TM Defendants' presentations on several of the Northstar sites represented that the proposed prices were "below market" based on data points the TM Defendants selected, including what they described as "recent site acquisitions made by [Amazon] competitors and other [relevant] developers."*

**RESPONSE:**   Mr. Nelson denies the remaining allegations in Paragraph 81 because, among other reasons, Mr. Nelson did not draft any presentation on any Northstar site (or any site) alone, multiple stakeholders entered "data points" into each presentation, and Amazon does not allege that the data points referenced in Paragraph 81 were in any way incorrect.

82.    *The TM Defendants are able to do this because the lease and purchase transactions involved in their scheme are complex and involve months of diligence and a multitude of data points, contracts, and fee structures linked to dynamic markets and business needs the TM Defendants were in a position to manipulate based on their inside knowledge of Amazon's confidential information, business records, controls and processes.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 82.

83.    *The Northstar Lease Transactions alone involved the purchase, development, and lease of nine different properties over a two-year period based on pricing data the TM Defendants were in a position to influence directly, through third parties, and through the selection of prior market "comparables" that, on information and belief, may themselves have been inflated or otherwise tainted by Defendants' unlawful schemes. The TM Defendants knew this, and, thus, on information and belief, the use of those certain, selected "comparables" by the TM Defendants caused Amazon to pay inflated prices for the properties at issue.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 83.

84.    *Each of these properties was in turn subject to a host of contracts and development budgets that provided the TM Defendants with opportunities to conceal improper payments in the form of leasing, development, acquisition, management, or other fees or invoices related to Amazon's overall project cost and expenditures.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 84.

85.     *These contracts just on the Northstar Lease Transactions involved no less than 50 different parties involved in project development, project finance, tenancy, and miscellaneous project support services (such as insurance and site maintenance) over a multi-year period.[]*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 85 and therefore denies the same but answers that Amazon did not manage any party related to any development of the buildings for what Amazon identifies as the "Northstar Lease Transactions" in the Complaint.

86.     *Amazon's investigations of these transactions is ongoing, but has already revealed evidence that the TM Defendants and their co-conspirators successfully concealed their use of certain contracts and fees to execute their unlawful schemes.*

**RESPONSE:**  Mr. Nelson denies the allegations in paragraph 86.

87.     *Notably and as detailed below, Defendants used acquisition, broker, development, management, and other project fees to fund kickbacks to Villanova Trust that Defendants were able to conceal as a result of the TM Defendants' position with Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 87.

88.     *For example, Northstar's equity partner IPI questioned some of the fee provisions in the Northstar Leases as unusual, but the Northstar Defendants represented that the structure reflected Amazon's approval and preferences.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 88 and therefore denies the same.

89.     *IPI did not have a reason to contest the Northstar Defendants' position until Northstar's COO approached IPI earlier this year to report the concerns that IPI relayed to contacts within Amazon independent of the TM Defendants.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 89 and therefore denies the same.

90.     *These and other reports of the Defendants' conspiracy revealed that the TM Defendants misrepresented and/or concealed from Amazon their receipt of kickbacks, post-closing payments, fee shares, and other valuable benefits they obtained by abusing their positions within the company and converting corporate funds and opportunities to benefit themselves and their co-Defendants.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 90 about any such "reports" and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 90.

91.     *The TM Defendants' internal recommendations and valuation assessments of the properties at issue in this suit were thus all necessarily infected by material misrepresentation or concealment of their personal benefits or "shares" in the transactions.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 91.

92.     *These fraudulent aspects of the transactions caused harm to Amazon wholly apart from any discrete misrepresentations or omissions the TM Defendants made about the market price, market comparables, or acquisition terms on the parcels and contracts in issue.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 92.

93.     *Amazon would not, under any circumstances, have approved the real estate transactions it entered into with the Defendants had Amazon been aware of their undisclosed conflicts of interest and unlawful referral and other arrangements.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 93.

94.     *The TM Defendants concealed their communications evidencing their misuse of corporate information and opportunities and their receipt of prohibited personal benefits through the use of personal emails and chats, meetings and trips, and assistance from third parties, including Mr. Atherton and a network of shell entities.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 94.

95.     *On information and belief, the TM Defendants used the proceeds of their unlawful enterprise, laundered through various trust and third party accounts, to support some or all of three Wyoming limited liability*

*companies – Defendants AllCore, Finbrit, and Cheshire Ventures – they formed while at least one of them was still employed at Amazon.*

**RESPONSE:**  Mr. Nelson admits that AllCore Development LLC was formed while he was employed at Amazon. Mr. Nelson admits that Cheshire Ventures was formed while Casey Kirschner was employed at Amazon but after Mr. Nelson was terminated. Mr. Nelson denies the remaining allegations in Paragraph 95.

96.     *On information and belief, AllCore received proceeds from the unlawful enterprise and the TM Defendants in turn used funds from AllCore for their personal benefit.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 96 because, among other reasons, there was no "unlawful enterprise."

97.     *On information and belief, AllCore was formed for the purpose of allowing the TM Defendants to receive funds that flowed through the Villanova Trust and from Villanova Trust through various entities into AllCore and related entities - all to facilitate the TM Defendants to access the Northstar kickbacks while employees of Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 97. Mr. Nelson further answers that AllCore was formed to be, and remains, a real estate development company. In that capacity, AllCore pursued multiple real estate deals, including deals with parties other than Plaintiffs.

98.     *On information and belief, the TM Defendants' share of the kickbacks received from Northstar were wired through Villanova Trust to another trust organized by Mr. Atherton and ultimately to Defendant AllCore, through which the TM Defendants used the Northstar funds for their personal benefits and accessed at least some funds under the guise of loans.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 98.

99.     *Mr. Atherton is an attorney barred in Colorado who was previously suspended from practice from November 15, 2013 to February 25, 2014, Ex. to, due to violations of five separate Colorado Rules of Professional Conduct in connection with financial transactions.[] Mr. Atherton reportedly assisted clients to exploit a Colorado conservation easement program to*

*obtain millions of dollars in state and federal tax credits. See Ex. 51. Bank accounts held in Mr. Atherton's name also have been the subject of forfeitures related to the government's investigation into the scheme that is the subject of this suit. See Ex. 52.*

**RESPONSE:** Mr. Nelson admits that Mr. Atherton is an attorney licensed in Colorado. Nelson lacks sufficient information and knowledge regarding the allegations contained in Paragraph 99 and therefore denies the same.

100. *On information and belief, the TM Defendants knowingly participated in this scheme and hired Mr. Atherton specifically to facilitate this scheme.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 100.

101. *The TM Defendants did not disclose the existence of these entities-- AllCore, Finbrit and Cheshire Ventures - to Amazon.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 101.

102. *The TM Defendants concealed their affiliation to AllCore, Finbrit and Cheshire Ventures by engaging Mr. Atherton to organize them and appear as the sole contract on their registration documents.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 102.

103. *Defendant AllCore LLC was formed in March 2018, shortly after the TM Defendants facilitated the award of at least two Virginia lease contracts to Northstar, and Defendant Watson reformed his referral agreement with Casey Kirschner's brother Christian to require "referral" payments on the lease transactions to be paid directly to Defendant Villanova Trust.*

**RESPONSE:** Mr. Nelson denies that he "facilitated the award" of any lease contracts to Northstar. Mr. Nelson admits that AllCore Development LLC was formed in March 2018 "after" Amazon awarded "at least two Virginia lease contracts to" NSIPI (not "Northstar"). Mr. Nelson denies the remaining allegations in Paragraph 103.

104. *The Cheshire Ventures and Finbrit LLCs were likewise formed in Wyoming in June 2019 and September 2019, respectively, immediately following Nelson's termination from Amazon and Casey Kirschner's assumption of Nelson's portfolio and responsibilities in Amazon's real estate division.*

**RESPONSE:**  Mr. Nelson admits that Cheshire Ventures was formed in Wyoming in June 2019. Mr. Nelson lacks knowledge and information sufficient to respond to the remaining allegations in Paragraph 104 and therefore denies the same.

105.   *All three Wyoming LLCs - AllCore, Finbrit, and Cheshire Ventures - were formed and organized by Mr. Atherton.*

**RESPONSE:**  Mr. Nelson admits the allegations in Paragraph 105.

106.   *On information and belief, one or both of the TM Defendants had a preexisting relationship with Mr. Atherton and retained or otherwise engaged him to organize the LLCs for the TMs' benefit.*

**RESPONSE:**  Mr. Nelson denies that he had a preexisting relationship with Mr. Atherton. Mr. Nelson lacks knowledge information sufficient to respond to the remaining allegations about Mr. Atherton's relationships with other individuals and therefore denies the same. Mr. Nelson denies the remaining allegations of Paragraph 106.

107.   *On information and belief, the TM Defendants planned to use AllCore to continue misappropriating Amazon information or opportunities for their own benefit after they were terminated from Amazon, and used the proceeds of their unlawful activities to fund AllCore, Finbrit, and/or Cheshire as vehicles for their personal gain and platforms for soliciting and rewarding co-conspirators who helped them profit from Amazon information or opportunities at the company's expense.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 107.

108.   *Due to the nature of their positions with the company and the transactions they handled, the TM Defendants were able to conceal all of these activities from Amazon until a confidential informant formerly associated with Defendant Northstar exposed part of their scheme in December 2019.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 108 about any "confidential informant" and therefore denies the same. Mr. Nelson denies the remaining allegations of Paragraph 108.

### C.  Confidential Informant 1 Reports Defendants' Kickback Scheme

109.    *On or about December 2, 2019, an individual formerly affiliated with Defendant Northstar ("Informant 1") emailed an Amazon executive and asked whether Amazon "[w]ould . . . care to hear about a couple of [Amazon] employees who have taken kick backs in excess of $8,000,000 maybe as high as $50,000,000[?]" Ex. 2.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the

allegations in Paragraph 109 and therefore denies the same.

110.    *During a series of phone calls with members of Amazon's legal compliance team in late 2019 and early 2020, Informant 1 claimed to have personal knowledge of Northstar's payment of millions of dollars in kickbacks on Defendants' real estate transactions with Amazon, and stated his belief that the scheme had been ongoing since January 2018.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 110 about the so-called "Informant" and Amazon's activities and

therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 110.

111.    *Informant 1 specifically alleged that Defendants Watson and Northstar agreed to pay a percentage of all revenue Northstar received on Amazon deals to Villanova Trust, of which TM Defendant Casey Kirschner's brother, Casey Kirschner, was the trustee.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 111 and therefore denies the same.

112.    *The payments from Northstar to Villanova Trust were made pursuant to a kickback agreement, styled as a "referral agreement," executed by Northstar's CEO Brian Watson and Christian Brian Kirschner. Informant 1 also specifically alleged that Northstar, at the direction of its CEO Brian Watson, had caused payments to be made to the TM Defendants in return for their directing certain lease transactions to Northstar, under which Northstar would act as Amazon's commercial real estate development partner for those transactions.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 112 about alleged actions taken by others and therefore denies the same.

Mr. Nelson denies the remaining allegations in Paragraph 112 because, among other reasons, there were no "kickbacks" and Mr. Nelson did not direct certain lease transactions to Northstar "in return" for anything.

113.   *The Northstar Defendants' own filings in this action corroborate this account and establish that in 2018, in connection with their execution of their first Lease Transactions with Amazon, Watson specifically reformed a prior referral agreement with Christian Kirschner to direct payments on the Amazon projects directly to Villanova Trust. Dkts. 39-40; 99.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 113 and therefore denies the same. Mr. Nelson denies that Northstar entered into any "Lease Transactions" with Amazon.

114.   *Financial records further corroborate that Villanova Trust then funneled the kickbacks to accounts maintained for the benefit of the TM Defendants.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 114 because, among other reasons, there were no kickbacks.

115.   *Informant 1 asserted that Defendant Brian Watson was directly involved in the formation of this scheme, including through revisions to Northstar's referral agreement with Villanova Trust and its sole Trustee Christian Kirschner, whom Watson recently described as "one of [his] best friends.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 115 therefore denies the same.

116.   *Informant 1 provided Amazon with evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018, and estimated that total payments that would be payable from Northstar to Villanova Trust could amount to $30-40 million through late 2019, and over $50 million over the life of the relevant commercial leases.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 116 and therefore denies the same.

117.   *The federal forfeiture action the United States filed in this District on June 1 corroborates the subsequent transfer of several million dollars of these*

> *funds from Villanova Trust to at least one First Western Trust account held*
> *for the benefit of the TM Defendants, which Casey Kirscher then used to*
> *fund the personal real estate project at issue in the forfeiture action.*

**RESPONSE:**  Mr. Nelson denies that any federal forfeiture action "corroborates" any fact because the complaint in that action contains only allegations, which he contests. Mr. Nelson further denies that any First Western Trust account was held in his benefit. Mr. Nelson denies the remaining allegations in Paragraph 117.

118.   *Informant 1 further disclosed that, in addition to Brian Watson, other*
*Northstar personnel may have had knowledge and/or involvement in the*
*kickback scheme.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 118 and therefore denies the same. Mr. Nelson also specifically denies the allegations in Paragraph 118 because, among other reasons, there was no "kickback scheme."

119.   *Informant 1 provided Amazon with several documents, including what*
*appeared to be a partially redacted email string between defendant Watson*
*and other Northstar employees, in which Watson requested a report on the*
*total fees Northstar had paid to Villanova Trust. Informant 1 also provided*
*what he described as a draft of the referral/kickback agreement between*
*Northstar and Villanova that facilitated Defendants' kickback scheme on*
*the Lease Transactions.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 119 and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 119.

120.   *Informant 1 separately provided Amazon with information about fraud and*
*kickbacks on the White Peaks Purchase, including that two former*
*Northstar employees used Defendants White Peaks Capital LLC and NOVA*
*WPC LLC to facilitate that transaction through the same Amazon TMs that*
*facilitated the Lease Transactions.  These activities were memorialized in*
*recorded conversations and payment records.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 120 and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 120.

121.   *Informant 1's report in December 2019 prompted an immediate and extensive internal investigation that remains ongoing and continues to uncover additional evidence of the RICO enterprise involving Virginia development projects and potentially involving transactions in at least four other states.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 121 and therefore denies the same. Mr. Nelson denies the existence of any RICO enterprise.

### D. The TM Defendants' Pay-To-Play Scheme Furthered the Unlawful RICO Enterprise

122.   *Since December 2019, Amazon has uncovered significant evidence of the RICO Defendants' pay-to-play scheme and its connection to multiple unlawful enterprise activities involving real estate lease and purchase transactions at Amazon's expense, including the conduct relating to Lease Transactions and Direct Purchases as alleged in Amazon's initial complaint, First Amended Complaint and elaborated herein.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge to respond to allegations about Amazon's investigation and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 122.

123.   *The internal investigation prompted by Confidential Informant 1's December 2019 report encompassed a review of the TM Defendants' company records, including an examination of Casey Kirschner's Amazon laptop.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 123 and therefore denies the same

124.   *This examination revealed that Casey Kirschner copied approximately 375 documents onto a USB device the night before he surrendered the laptop for the requested IT scan.*

**RESPONSE:**     Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 124 and therefore denies the same.

125.     *Many of these files referenced confidential Amazon business transactions, including on the Northstar Virginia sites. MacDonald Decl. ¶¶ 3–4.*

**RESPONSE:**     Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 125 and therefore denies the same.

126.     *The Amazon IT inspection of Casey Kirschner's electronic files identified a remnant file in the Recycle Bin of his laptop, with a partial file name reading "Downloads\Villanova Trust Executed.pdf." A metadata inspection indicated that the file was saved to the laptop Downloads folder on or about May 8, 2019, but was subsequently deleted from the laptop.*

**RESPONSE:**     Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 126 and therefore denies the same.

127.     *Amazon's IT inspection of Casey Kirschner's company files also uncovered a spreadsheet that appeared to be a rough calculation of the fees Casey Kirschner and his co- conspirators expected and agreed to receive on six different build-to-suit deals, including "Shaw Rd.," "Quail Ridge," "Manassas," "Lerner," "Route 50," and "DTC." Id. at ¶¶ 5, 18; Ex. 10.*

**RESPONSE:**     Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 127 and therefore denies the same.

128.     *The referenced fees on these transactions, several of which concern Northstar-affiliated Lease Transaction sites, total $37.1 million, with the author's total "Share" indicated as $14.5 million. Ex. 10. The spreadsheet was recovered from the laptop's Recycle Bin, indicating an attempt to delete the file. See MacDonald Decl. ¶ 18.*

**RESPONSE:**     Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 128 and therefore denies the same but answers also that nowhere in the document do the calculations reference that the "share" indicated in the document refers to the "author's total 'Share'" as alleged by Plaintiffs.

129.   *Amazon found other suspicious information in Casey Kirschner's files, including an Outlook back-end AppData folder containing a Northstar spreadsheet itemizing purported Northstar costs on the Amazon Manassas Leased Transaction deals. Ex. 17; MacDonald Decl. ¶ 6.  On the lower right-hand side of the document, someone had calculated a "Leasing Fee" of $1,656,148, which approximates the $1.6 million Leasing "Commission" that Casey Kirschner had projected for the Manassas transactions. Ex. 17. And evidence that the parties have placed in the case record since Amazon filed this suit in April—including Colorado audio recordings of former Northstar principals and sworn witness testimony submitted with the parties' May 14 and 18 IPI filings—confirm the TM Defendants' involvement in the RICO Enterprise. See Ex. 8. This evidence is documented throughout the PI record.  See Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99. And it includes documentation that Defendant Watson reformed a prior agreement with Christian Kirschner to direct Amazon-related payments directly to Villanova Trust, and that the Northstar Defendants considered themselves Amazon's agents when they extracted a multi- million dollar payment on the White Peaks sale, which the TM Defendants sought to include in their pay-to-play scheme and for which they received a seven-figure payment from the White Peaks Defendants.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 129 about Amazon's actions and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 129.

130.   *This and other evidence contradicts Defendant Watson's assertions to the FBI and Amazon business partners in April that the (undisclosed and/or prohibited) "fees" that Northstar paid Villanova Trust on the Virginia real estate transactions were "not sent" to the TM Defendants. It also corroborates that Northstar's engagements were not "competitive," but were instead facilitated by the TM Defendants in violation of Amazon's Code of Conduct, [redacted]and CNIAA Agreements governing the TM Defendants' conduct during and after their employment with Amazon.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 130 about statements made by others and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 130.

131.   *As relevant here, Amazon's Code of Conduct requires Amazon personnel to, among other things: (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly notify the Legal Department" of any potential "conflict of interest" such as "when an*

*employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com." Ex. 18.*

**RESPONSE:**   Mr. Nelson admits only that Plaintiffs' Code of Conduct speaks for itself. Mr. Nelson denies that the Code of Conduct is accurately presented in Paragraph 131.

132.   *Both TM Defendants were aware of the policy and agreed abide by it.*

**RESPONSE:**   Mr. Nelson admits that he received the Code of Business Conduct and Ethics when he joined Amazon in May 2012. Mr. Nelson denies that he "agreed" to any contractual terms or that the Code of Business Conduct and Ethics modified his rights and obligations pursuant to his CNIAA.

133.   *Defendant Nelson repeatedly certified compliance with Amazon's Code of Conduct during the time he was working on the Amazon transactions at issue in this action and received both on-line and in-person training related to the Code of Conduct. Ex. 53.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 133 as stated. Mr. Nelson further answers that Exhibit 53 is blank. Mr. Nelson further responds by noting that Amazon has repeatedly taken the position in litigation that the employment policies it promulgates, such as the Code of Conduct, "[are] not a contract" and are "not intended as a contract."[2]

134.   *Defendant Casey Kirschner also certified complaint with Amazon's Code of Conduct during the time he was working on the Amazon transactions at issue and received both on-line and in-person training related to the Code of Conduct as recently as this year.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 134 and therefore denies the same.

135.   *The Code of Conduct is complemented [redacted] as well as by specific contracts Amazon employees sign, including the CNIAA Agreements that each of the TM Defendants executed as a condition of their employment with the company.*

---

[2]        These quotes come from Amazon's representations to another federal court in *Missouri v. Amazon.com, Inc.*, Civil Case No. 1:19-cv-13525-RMB-JS (D.N.J.), Docket No. 8 at 10.

**RESPONSE:** Mr. Nelson admits only that Amazon has various policies, but he denies that any of these policies modified his rights and obligations pursuant to his CNIAA.

136.    [REDACTED]

**RESPONSE:** Mr. Nelson admits only that the document speaks for itself.

137.    [REDACTED]

**RESPONSE:** Mr. Nelson admits only that the document speaks for itself. Mr. Nelson answers also that the policy specifically clarifies that he was not capable of completing transactions without the review and approval of multiple stakeholders.

138.    *The TM Defendants took advantage of the fact that [redacted].*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 138.

139.    *These CNIAA Agreements contain several provisions relevant to this suit, and that the TM Defendants breached as detailed below.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 139 about CNIAA Agreements he did not sign and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 139.

140.    *The CNIAA Agreements expressly state that each TM Defendant has read or acknowledged all of the Agreement's terms and enters into them freely.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 140 about CNIAA Agreements he did not sign and therefore denies the same. Mr. Nelson's CNIAA speaks for itself.

141.    *In particular, Casey Kirschner's 2015 CNIAA Agreement states that he has "carefully read all of th[e] Agreement's terms," that Amazon "has been induced to employ [him] by [his] representation that [he] will abide by and be bound by each of the covenants and restraints in th[e] Agreement," and that he "recognizes that the restrictions in this Section 4 may significantly limit Employee's future flexibility in many ways. For example, the restriction in Section 4.1 bar Employee, for 18 months after the Separation Date, from accepting certain competitive opportunities." Ex. 56.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the

allegations in Paragraph 141 and therefore denies the same.

142.   *Nelson's 2012 CNIAA Agreement states that he is "entering into this
Agreement . . . as a condition of [his] employment" with Amazon, that his
employment constitutes "consideration" for the "mutual promises" in the
Agreement, and that he "recognizes that the restrictions set forth in Sections
2 and 3 of t[he] Agreement may seriously limit [his] future flexibility in
many ways," including by "mak[ing] it impossible for ]him] to seek or
accept certain opportunities for a period of 18 months after [his]
Termination Date." Ex. 57.*

**RESPONSE:**   Mr. Nelson's CNIAA speaks for itself.

143.   *Both Nelson's and Casey Kirschner's CNIAA Agreements provide that
"[a]ny breach of this Agreement may cause" Amazon "irreparable harm
for which there is no adequate remedy at law" and that "[a]s a result,"
Amazon will "be entitled to the issuance by a court of competent jurisdiction
of an injunction, restraining order, or other equitable relief in favor of itself,
without the necessity of posting a bond, restraining [TM Defendant] from
committing or continuing to commit any such violation." Ex. 56; Ex. 57.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 143 about CNIAA Agreements he did not sign and therefore denies the

same. Mr. Nelson's CNIAA speaks for itself.

144.   *Both Nelson's and Casey Kirschner's CNIAA Agreements expressly limit
each TM Defendant's use and disclosure of a defined universe of
"Confidential Information."*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 144 about CNIAA Agreements he did not sign and therefore denies the

same. Mr. Nelson's CNIAA speaks for itself.

145.   *Casey Kirschner's 2015 CNIAA Agreement defines Confidential
Information to include "proprietary or confidential information of Amazon
in whatever form, tangible or intangible, whether or not marked or
otherwise designated as confidential, that is not otherwise generally known
to the public, relating or pertaining to Amazon's business, projects,
products, customers, suppliers, inventions, or trade secrets." Ex. 56.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the

allegations in Paragraph 145 and therefore denies the same.

146.   *Nelson's 2012 CNIAA Agreement similarly defines Confidential
Information to include non-public "valuable proprietary information and
knowledge of certain modes of business operation" such as "the identity of
the Company's business partners, customers, investors, or joint ventures,
vendors or suppliers," "pricing or marketing strategies," "future plans,"
and "any other information gained in the course of the Employee's
employment with the Company that could reasonably be expected to prove
deleterious to the Company if disclosed to third parties." Ex. 57. Among
other things, Casey Kirchner's 2015 CNIAA Agreement states that he
agrees to "hold all Confidential Information in strictest confidence and will
not acquire, use, publish, disclose, or communicate any Confidential
Information except as required in connection with Employee's work without
the prior written approval of an authorized officer of Amazon." Ex. 56 §3.1
(Casey Kirschner).*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 146 about CNIAA Agreements he did not sign and therefore denies the

same. Mr. Nelson's CNIAA speaks for itself.

147.   *Nelson's 2012 CNIAA Agreement similarly states that he "agrees [he] shall
not, directly or indirectly, at any time, during the term of [his] employment
with the Company or at any time thereafter . . . use or cause to be used any"
non-public "Confidential Information" acquired from or during his tenure
with the Company "in connection with any activity or business except the
business of the Company, and shall not disclose such Confidential
Information to any individual, partnership, corporation, or other entity
unless such disclosure has been specifically authorized in writing by the
Company, or except as may be required by any applicable law." Ex. 57 §
2(b).*

**RESPONSE:**   Mr. Nelson admits only that the CNIAA speaks for itself.

148.   *Both Agreements also contain robust "non-competition" provisions
addressed to each TM Defendant's activities while employed with Amazon,
as well as for periods of 12 and 18 months following their termination dates.*

**RESPONSE:**   Mr. Nelson admits only that the CNIAA's speak for themselves. Mr. Nelson

denies the remaining allegations in Paragraph 148.

149.  **Allegation 149.** *These "non-competition" provisions include the following, non-exhaustive restrictions:*

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| **18-month Provisions** ||
| "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant), engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) accept or solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information; or (b) encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon." Ex. 56 §§ 4.1 - 4.2. | "While employed by the Company and for a period of 18 months after the date the Employee cases to be employed by the Company . . . the Employee will not, directly or indirectly, and whether or not for compensation, either on [his] own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venture, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the Company), knowingly: (i) accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit investment capital, directly or indirectly, from any individual or entity ... from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or. . . (iv) enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Ex. 57 §§ 3(c)(i)-(iv). |
| **12-month Provisions** ||
| "During employment and for 12 months after | "While employed by the Company and for a |

| | |
|---|---|
| the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) solicit or otherwise encourage any employee, contractor, or consultant of Amazon ('Amazon Personnel') to terminate any employment or contractual relationship with Amazon; (b) disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon." Ex. 56 § 4.3. | period of twelve (12) months after the date the Employee ceases to be employed by the Company, without regard to when or for what reason if any, such employment shall terminate (the "Termination Date"), the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly employ, or retain as a consultant or contractor, or cause to be so employed or retained, or enter into a business relationship with any person who: (i) is an employee of the Company or has been employed by the Company at any time within the twelve (12) months prior to the date of such act; or (ii) is a consultant, sales agent, contract programmer, or other independent agent retained by the Company; or (iii) has been retained by the Company as a consultant, sales agent, contract programmer, or other independent agent at any time within the twelve (12) months prior to the date of such an act. Ex. 57 §§ 3(b)(i)-(iii). |
| **During Employment** | |
| See above. | In addition to the restrictions above, "[d]uring the period of [his] employment with the Company, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly engage in any activity or business which is of the same nature as, or substantively similar to, an activity or business of the Company or an activity or business which the Company is developing and of which the Employee has knowledge. |

| | Ex. 57 § 3(a). |
|---|---|

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 149 about CNIAA Agreements he did not sign and therefore denies the same. Mr. Nelson's CNIAA speaks for itself.

150.      *Neither Casey Kirschner's nor Nelson's CNIAA agreement allowed them to engage in the conduct at issue in this suit or to receive kickbacks derived illegally derived from an abuse of their positions at and the trust previously, and reasonably, placed in them by Amazon.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 150 about CNIAA Agreements he did not sign. Mr. Nelson denies the remaining allegations in Paragraph 150.

151.      *In any case, and regardless of the contents of the CNIAA Agreements, [redacted] and the Code of Conduct that the TM Defendants acknowledged at multiple points after they signed the CNIAA expressly prohibit the very conduct in which they nevertheless engaged, i.e., conflicts of interest, bribery, and self-dealing.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 150 about CNIAA Agreements he did not sign and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 151.

152.      *Further, Nelson's 2012 CNIAA explicitly prohibits him from using "Confidential Information," which includes "future plans" and "any other information gained in the course of the Employee's employment with the Company that could reasonably be expected to prove deleterious to the Company if disclosed to third parties," "directly or indirectly, at any time, during the term of [his] employment with the Company or at any time thereafter" acquired from or during his tenure with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law." Ex. 57 § 2(b).*

**RESPONSE:**  Mr. Nelson admits only that the CNIAA speaks for itself.

153.   *And Casey Kirschner's 2015 CNIAA Agreement prohibits him from using "Confidential Information" in any way without Amazon's "prior written approval." In Casey Kirschner's case, "Confidential Information" is broad and includes "proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets." Ex. 56.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 153 and therefore denies the same.

154.   *Despite this requirement both Nelson and Casey Kirschner used proprietary and confidential information for their benefit and to Amazon's detriment.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 154.

155.   *Nelson took Confidential Information, including Amazon's future plans for land purchases, as well as information he had learned during his tenure at Amazon, and used it for his own personal gain, including disclosing it to third parties to advance his own interests to the detriment of Amazon, for the purpose of engaging in the enterprise at issue here. E.g., Exs. 58, 59.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 154.

156.   *The TM Defendants violated Amazon's Code of Conduct, the foregoing CNIAA Agreements they signed with the company, and various laws throughout their tenures at Amazon by conspiring to perpetuate such violations after Nelson's termination.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 156.

157.   *These violations involved a host of Amazon business opportunities and transactions, including those involved in the RICO Enterprise at issue in this suit, as well as the use of at least the Cheshire and AllCore LLCs to misuse Amazon information, coopt business opportunities, or otherwise engage in activities that "interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon," Ex. 56 § 4.3 (Kirschner Agreement), or are "competitive with or otherwise deleterious to the interests of the Company." Ex. 57 § 3(c)(iv) (Nelson Agreement), including but not limited to the activities detailed below.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 157.

158.   *As noted, Lease Transaction portion of the RICO Enterprise targeted at least the nine Virginia commercial real property leases that one or both of the TM Defendants steered to the Northstar Defendants between February 27, 2018 and January 13, 2020 (the "Virginia Lease Transactions"). The Direct Purchase portion of the RICO Enterprise in turn encompassed the 2019 White Peaks "flip" transaction in which Amazon bought a Virginia property at approximately $18 million markup from former Northstar employees (the "White Peaks Purchase"), the 2019 purchase of the Blueridge Property which resulted in a $10 million fee paid to Blueridge, as well as the unlawful use of Amazon funds to pursue business opportunities for the TM Defendants, their Wyoming LLCs, and other co-conspirators at Amazon's expense in Virginia and other states. And Amazon's ongoing investigation suggests the likely future scope of these schemes.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 158.

159.   *In all of these transactions, the TM Defendants violated their duties to Amazon and conspired with one another and third parties to misuse company funds, business opportunities, or information to obtain personal benefits or advantages in real estate lease or purchase transactions to the detriment of the company and potentially other market competitors.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 159.

160.   *The scale and complexity of Defendants' enterprise activities underscore the ongoing need for the preliminary injunctive relief the Court awarded on June 5, 2020, particularly given the resources and recent actions of the Defendants in response to this suit, Watson and Northstar's refusal to comply with certain provisions of the preliminary injunction and related discovery ordered by this Court, Dkt. 95, and ongoing internal and criminal investigations.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 160.

161.   *As detailed in Parts III-V below, the TM Defendants were integral to facilitating at least the ongoing Lease Transaction and Direct Purchase conduct alleged in Amazon's original complaint. And Amazon's ongoing investigation indicates that the TM Defendants continued their pay-to-play and related enterprise schemes after Defendant Nelson's termination from the company by unlawfully colluding with other named and Doe Defendants to steer Amazon business and competitively sensitive information to their own LLCs and other conspirators.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 161.

## II.   THE LEASE TRANSACTION CONDUCT

162.   *The Lease Transactions conduct grew in substantial part out of Defendant Northstar's rigged bid for two Virginia development projects the TM Defendants steered to Northstar's CEO Watson at or about the time he executed the 2018 kickback "referral" agreement with TM Defendant Kirschner's brother at Defendant Villanova Trust.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 162.

### A.  The TM Defendants Solicit Rigged Northstar Bids for Virginia Leases

163.   *Northstar served as a primary developer-landlord for the Virginia Lease Transactions at issue in this suit. Amazon began its relationship with Northstar in or around September 2017, when Brian Watson, Northstar's CEO, conspired with the TM Defendants to submit a rigged Request for Proposal ("RFP") for certain Virginia real estate development projects. Exs. 19–20, 30.*

**RESPONSE:**   Mr. Nelson admits that he met Brian Watson and multiple other Northstar-affiliated individuals in late August 2017 when the Northstar team visited Amazon's Seattle offices to present materials to Amazon. Mr. Nelson denies the remaining allegations in Paragraph 163.

164.   *Defendant Watson's personal relationship with TM Defendant Casey Kirschner began long before Casey Kirschner joined Amazon, and paralleled Watson's longstanding personal relationship with Casey Kirschner's brother Christian Kirschner. Ex. 21 ("Lorman Decl.") ¶ 7.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 157 and therefore denies the same.

165.   *Brian Watson also had a personal relationship with Nelson.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 165 because, among other reasons,  Mr. Nelson met Mr. Watson for the first time in late August 2017 at the Seattle Amazon office building where Mr. Nelson worked.

166.   *On information and belief, Brian Watson and the TM Defendants often communicated with one another through personal emails and chats,*

*including WhatsApp, and during a variety of personal trips and meetings.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 166 about how other individuals communicated with each other and therefore denies the same. Mr. Nelson admits that he took one business trip with Mr. Watson to the Florida Everglades, for which Mr. Nelson paid for his own transportation to meet Mr. Watson. Mr. Nelson denies the remaining allegations in Paragraph 166.

167.   *These trips included the TM Defendants' participation in a lavish, all-expenses-paid fishing excursion to the Florida Everglades and Casey Kirschner's participation in a luxury hunting trip to New Zealand.*

**RESPONSE:** Mr. Nelson denies that he participated in a "lavish, all-expenses-paid fishing excursion to the Florida Everglades." Mr. Nelson admits that he participated in a business trip to Florida with Mr. Watson, Northstar employee Kyle Ramstetter, and Casey Kirschner. Mr. Nelson denies that his business trip to Florida was "all-expenses-paid." Mr. Nelson further admits that business trips are common at Amazon and in most industries, including commercial real estate, and that there is nothing improper or illegal about them.

168.   *The Kirschner brothers also served as groomsmen at Watson's September 28, 2019 wedding, which TM Defendant Nelson also attended. Id. at ¶ 8.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 168 about the wedding therefore denies the same. Mr. Nelson denies that he attended Mr. Watson's wedding.

169.   *From February 2018 through January 2020, Amazon executed leases for commercial facilities around Dulles, Virginia with at least four Northstar-affiliated limited liability companies who acted as landlord-developers for the properties: Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC.*

**RESPONSE:** Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 169 and therefore denies the same.

170.     *Northstar's primary equity investor in connection with these Amazon Lease Transactions was IPI NSIPI Data Center Holdings, LLC.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the

allegations in Paragraph 170 and therefore denies the same.

171.     *This entity was formed by a partner entity (IPI) that makes real estate investments in technology and connectivity-related real assets. IPI is not named as a defendant in this action, and is not known or suspected to have endorsed or engaged in any of the conduct at issue in this suit.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the

allegations in Paragraph 170 and therefore denies the same.

172.     *As detailed below, Amazon and IPI recently incurred significant costs reforming the leases and related contracts relevant to the sites affected by the RICO Defendants' misconduct and mismanagement, and IPI has since assumed or transferred to other partners all Northstar-related responsibilities on these sites, for which Amazon has approved more than $400 million in Capital Appropriation Requests (i.e., spend requests) since February 2018. Ex. 22.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 172 and therefore denies the same.

173.     *The TM Defendants leveraged their personal relationships with Casey Kirschner's brother Christian and his longtime friend, Northstar CEO Brian Watson, to engage the Northstar and Villanova Defendants in the Lease Transaction conduct.  On information and belief, Watson's personal relationship with Casey Kirschner and his brother Christian was Northstar's only preexisting connection to Amazon.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 173 about other named defendants or the nonbinding spend requests

and therefore denies the same. To the extent Amazon alleges that Northstar's lack of preexisting

connection to Amazon is illicit, Mr. Nelson denies the allegation. Mr. Nelson denies the

remaining allegations in Paragraph 173.

174.   *In furtherance of this scheme, the TM Defendants facilitated the award of lease development contracts to Northstar in exchange for Northstar's payment of kickbacks disguised as referral fees to Villanova Trust, whose trustee was Christian Kirschner and which was formed by Mr. Atherton in 2018 specifically to facilitate the concealed transfer to the TM Defendants of their "referral" payments from Northstar on the Amazon lease projects. Exs. 6, 25.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 174.

175.   *The TM Defendants' engagement with Watson and Northstar on the Virginia lease transactions appears to date back to at least mid-2017, when Watson met with Casey Kirschner and Nelson in Seattle. Ex. 19.*

**RESPONSE:**  Mr. Nelson admits that he met with Mr. Watson and other Northstar-affiliated individuals at Amazon's Seattle office in late August 2017 to discuss commercial real estate development. Mr. Nelson denies that this meeting was in any way improper.

176.   *Watson met in Seattle with both individuals on Thursday, August 24, 2017, potentially over dinner. Id.; Ex. 20.*

**RESPONSE:**  Mr. Nelson admits that he met with Mr. Watson and other Northstar-affiliated individuals at Amazon's Seattle office in late August 2017. Mr. Nelson denies that he met with Mr. Watson over dinner in Seattle at any point in August 2017.

177.   *Emails referencing this Seattle meeting indicate that they interacted on a first-name basis, and that Watson referred to Casey Kirschner as "Brother." Ex. 19.*

**RESPONSE:**  Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 177 and therefore denies the same but answers that it is common in modern day business practice in the United States to refer to people by their first name and that Casey Kirschner referred to almost every man he talked with in Mr. Nelson's presence as "brother."

178. *Email records suggest that at or around the time of the Seattle meeting, Casey Kirschner sent Watson an RFP soliciting terms on which Northstar could partner with Amazon to expand Amazon's build-to-suit facilities in Northern Virginia. Ex. 5.*

**RESPONSE:**   Mr. Nelson admits that someone at Amazon sent Northstar an RFP, and those records speak for themselves. Mr. Nelson denies that this engagement with Northstar was in any way improper.

179. *On information and belief, the RFP Watson received was simply a pretext the TM Defendants used to justify steering contracts to Northstar on which Northstar would provide kickbacks and other benefits to the TM Defendants. See id.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 179.

180. *Northstar had no prior business history with Amazon, and conspired with the TM Defendants to misrepresent its ability to fund and develop the Lease Transaction projects as detailed below.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 180 about Amazon's business history and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 180.

181. *On or around September 20, 2017, Northstar responded to the RFP. Ex. 23. Northstar's response contained several representations that induced Amazon to contract with Northstar on the Virginia Lease Transactions at issue here.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 181 and therefore denies the same.

182. *First, the response assured Amazon of Northstar's "commitment, loyalty, integrity, and honesty" to its business partners, id. at 112, and detailed an investment structure accountable to Amazon and investors and insulated from other projects. Notably, the response stated that each Northstar "investment is orchestrated through a single-purpose limited liability company or fund that Northstar creates and directs," id. at 107, and that "Watson[] functions as the managing partner" and shares in the "net profits of [each] investment through designated sharing ratios with the capital partners," id. at 109.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 182 and therefore denies the same.

183.   *Second, the Northstar RFP included a proposed lease agreement that contained various representations regarding the disclosure and activities of all "Professional Service Providers." Ex. 23 at 53.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 183 and therefore denies the same.

184.   *Like the lease agreements, and the ROFO/ROFR Purchase Agreements Amazon and the Northstar Defendants executed (signed by Watson), the draft agreements Northstar submitted with its RFP response contained a warranty clause stating that the Northstar entities had made no undisclosed brokerage or other fee payments.  See id. at 17, 21, 88; Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 184 and therefore denies the same.

185.   *And as detailed in the PI record in this action, the lease agreements at issue in this suit provide that:  "All exhibits and addenda attached hereto are hereby incorporated into this Deed of Lease and made a part hereof." Ex. 24 at 26; see generally Dkts. 41-46, 48, 68-69, 99.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 185 and therefore denies the same.

186.   *Third, the Northstar RFP response proposed the creation of specific Northstar- affiliated entities (the proposed predecessors of Defendant Sterling NCP FF, LLC) that would form a joint venture with IPI to execute Virginia Lease Transactions with Amazon and control the downstream LLCs that would serve as Amazon's landlords for each site. Ex. 23.*

**RESPONSE:**   Mr. Nelson lacks sufficient information and knowledge regarding the allegations in Paragraph 185 and therefore denies the same.

187.   *This joint venture (NSIPI Data Center Venture, LLC), a wholly-owned indirect subsidiary of IPI, is the entity that terminated all Northstar-related involvement in the properties on April 2, 2020 based on evidence of the misconduct at issue in this suit. Ex. 34; Gilpin Decl. ¶ 22–26.*

**RESPONSE:** Mr. Nelson denies the existence of any misconduct. Mr. Nelson lacks sufficient information and knowledge regarding the remaining allegations in Paragraph 185 and therefore denies the same.

### B. The TM Defendants Secure Approval of the Rigged Northstar Bids

188. *Acting under Nelson's supervision, TM Defendant Casey Kirschner prepared and presented the internal real estate justifications and recommendations for the Northstar properties within Amazon.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 188 as stated because, among other reasons, when Mr. Nelson worked at Amazon, the preparation of any "internal real estate justifications and recommendations" were drafted by multiple stakeholders.

189. *As a result of these efforts, Amazon approved the lease contract awards to the Northstar Defendants.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 189 because, among other reasons: (a) Amazon did not approve any leases with the Northstar Defendants; and (b) with respect to the leases between Amazon and NSIPI, Amazon did not "approve[] the lease contract awards" as a result of Mr. Kirschner's "internal real estate justifications and recommendations" but instead, as Amazon pleads at Paragraph 82, based on "months of diligence and a multitude of data points, contracts, and fee structures linked to dynamic markets and business needs" and as Amazon pleads at Paragraphs 62, 63, and 78, because "Amazon has a multi-step process for selecting suitable land for" data center transactions and conducts "extensive site diligence" "largely through external brokers and agents who report property and market details to Amazon" to determine whether a "site meets relevant needs and that its price aligns with relevant market norms."

190. *These approvals were integral to the RICO Enterprise and fraudulently induced by both the TM Defendants, who did not disclose their personal*

*relationships and kickback agreement with Northstar and Villanova Trust, and also by the Northstar Defendants, who deliberately misrepresented and/or concealed from the company their arrangements with the TM Defendants and Villanova.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 190.

191.   *These arrangements were in place before the Northstar parties signed their first leases with Amazon, as evidenced by the fact that the "Sterling NCP I, LLC" referenced in Northstar's 2018 kickback ("Independent Contractor") agreement is the same entity referenced in Northstar's September 20, 2017 RFP response to Amazon, see Ex. 23, which designated Sterling I NCP, LLC as one of the two Northstar entities—the other being Sterling II NCP, LLC, id. at 6— that would execute the two initial Virginia Lease Transactions with Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 191 because, among other reasons, there were no "arrangements" to receive kickbacks.

192.   *These and other misrepresentations and omissions by the Northstar Defendants fraudulently induced Amazon to enter the Lease Transactions, and thus rendered the related contracts with the Northstar Defendants voidable at Amazon's election.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 192 of alleged "other misrepresentations and omissions by the Northstar Defendants" and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 192.

193.   *Further, and to the extent these agreements were or are legally enforceable against Amazon, the Northstar Defendants' kickback arrangement with the TM Defendants breached them.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 193 because, among other reasons, there was no "kickback arrangement."

194.   *Like the RFP response, the initial Lease agreements between Amazon and the Northstar-affiliated landlord LLCs warranted that: (i) there "are no management agreements, service, maintenance or other contracts . . . relating to the Project . . . other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with no brokers,*

*finders or the like in connection with this transaction,"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations." Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.[]*

**RESPONSE:**   Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 194 and therefore denies the same.

195.   *Further, in signing each Lease, Defendants warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents." Ex. 24 at ¶ 33.*

**RESPONSE:**   Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 195 and therefore denies the same.

196.   *In the immediately ensuing paragraph, titled "Brokers," Northstar "represent[ed] and warrant[ed] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." Id. at ¶ 34.*

**RESPONSE:**   Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 196 and therefore denies the same.

197.   *In all of the Leases at issue in this action, the "Brokers" line on page 1 states "N/A," id. at 1, even though the 2018 Villanova Agreement expressly designates as "Brokerage Fees" on the Amazon Virginia Lease Transactions, Ex. 6 at 2, ¶ 2.5, the multi-million dollar kickback payments that Northstar made to Villanova Trust, MacDonald Decl. ¶ 25; Ex. 10.*

**RESPONSE:**   Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 197 and therefore denies the same.

198.   *The executed Lease Agreements' "Broker" provision required that Northstar "represent[] and warrant[] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth at the beginning of this Deed of Lease, whom Landlord agrees to compensate per separate agreement (a copy of which will be provided by Landlord to Tenant)[.]" Ex. 24 at ¶ 34.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 198 and therefore denies the same.

199.   *Northstar "set forth" no Brokers at the beginning of the Deed of Lease. Ex. 24.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 199 and therefore denies the same.

200.   *Instead, the lease states "N/A" next to "Brokers." Ex. 24 at 1. And in any case, the Northstar Defendants never provided Amazon with a copy of a separate agreement.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 200 and therefore denies the same.

201.   [REDACTED]

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 201 and therefore denies the same.

202.   [REDACTED]

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 202 and therefore denies the same.

203.   [REDACTED]

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 203 and therefore denies the same.

204.   *There are no provisions in either the Lease Agreements or the [redacted] indicating that it would be premissible for Northstar to have engaged the Villanova Trust as its undisclosed broker.*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 204 and therefore denies the same.

205.   *The Lease Agreements also prohibits corrupt activities, specifically noting*

*"bribes." Ex. 24.*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 205 and therefore denies the same.

206. *The "Anti-Corruption" provision in the Lease Agreements states: "Landlord acknowledges that Tenant's Code of Business Conducts and Ethics ("the Code") prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector. Landlord will not violate or knowingly permit anyone to violate the Code's prohibition on bribery or any applicable anti-corruption laws . . . Landlord will maintain true, accurate and complete books and records concerning any payments made to another party by Landlord under this deed of lease . . . Landlord will provide written notice to Tenant regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with activities performed by Landlord pursuant to this Deed of Lease." Ex. 24 at ¶ 40.*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 206 and therefore denies the same.

207. *Similarly, Exhibit F to the Lease Agreements lists a provision entitled "Code of Conduct," which states "Grantor acknowledges Grantee's Code of Business Conduct and Ethics . . . [that] prohibits the paying of bribes to anyone for any reason," and "Grantor will promptly provide written notice to Grantee regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with any activities performed by Grantor pursuant to this agreement . . . Grantee may immediately terminate or suspend performance under this Agreement if Grantor breaches this section." Ex. 24 (¶ 12 of Exhibit F).*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 207 and therefore denies the same.

208. [REDACTED]

**RESPONSE:** Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 207 and therefore denies the same.

209. *The Northstar Defendants violated this provision of the Lease Agreement by paying kickbacks, which are bribes.*

**RESPONSE:**  Mr. Nelson denies he received or solicited any kickbacks or bribes. Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 209 about the provisions of the Lease Agreement and therefore denies the same. Mr. Nelson also denies the remaining allegations of Paragraph 209.

210.     *Northstar Defendants further violated this provision by not disclosing their actions to Amazon in writing (or otherwise).*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 210 and therefore denies the same.

211.     *Northstar's representations about undisclosed brokerage or similar arrangements on the Lease Transactions were false when made, because at least a month before the initial lease agreements were signed in February 2018—by Watson, personally--Northstar negotiated and executed the kickback ("Independent Contractor") agreement with Villanova's Trustee for "Business Development" services effective January 8, 2018. Exs. 6, 25. Notably, the appendix to this agreement details a compensation schedule including "Development Fees," "MP Profits," "Brokerage Fees," and "Leasing Fees" for "Project Name Sterling NCP I, LLC," Ex. 6, the entity Northstar created to handle the first two Virginia Leased Transactions.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 211 about the Lease Transactions. Mr. Nelson denies that there was any kickback agreement or that he received any kickbacks.

212.     *The Independent Contractor agreement itself is signed by Watson, see id., and identifies Villanova Trust, through its Trustee, Christian Kirschner, as the "Contractor" entitled to the payments in the fee schedule, id., which Villanova subsequently funneled to First Western Trust and/or other accounts held for the benefit of the TM Defendants.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the allegations in Paragraph 212 about agreements to which he was not a party and therefore denies the same. Mr. Nelson denies the remaining allegations of Paragraph 212.

213. *On information and belief, Villanova Trust did not perform any legitimate services that would justify its receipt of fees associated with the Lease Transactions.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 213 because, among other reasons, as Amazon pleads in Paragraph 173, Christian Kirschner was instrumental in introducing Brian Watson to Amazon and such business development work is traditionally compensated and valuable in commercial real estate development (a business which Amazon does not sell).

214. *On information and belief, Mr. Atherton helped the TM Defendants to establish Villanova Trust as a vehicle for them to receive kickback payments from fees Northstar had obtained through its lease transactions with Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 214.

215. *On information and belief, Brian Watson and the TM Defendants all were aware that the purpose of the Villanova Trust was to hide from Amazon the fact that Nelson and Casey Kirschner would each receive a share of the money payable from Amazon to Northstar under the lease transactions and in fact designed this structure to accomplish that aim.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 215.

216. *On information and belief, Nelson and Casey Kirschner could and did access a portion of the funds Northstar wired to Villanova Trust, which transfers evaded detection because by means of a sophisticated and interlocking web of interstate bank accounts.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 216.

217. *On information and belief, the Villanova Trust could and did wire funds deposited into the Trust to other accounts or trusts that would, in turn, wire the funds to AllCore.*

**RESPONSE:**   Mr. Nelson admits that Villanova Trust wired money to AllCore Development LLC via a separate trust, which Christian Kirschner controlled as trust protector. Mr. Nelson denies the remaining allegations of Paragraph 217.

218.   *On information and belief, Nelson and Casey Kirschner could and did obtain for their personal use funds wired from these other accounts or trusts to AllCore in the form of sham "loans."*

**RESPONSE:**  Mr. Nelson denies the allegations of Paragraph 218.

219.   *On information and belief, Mr. Atherton structured AllCore as a legitimate business when in reality AllCore was primarily, if not entirely, a mechanism through which the TM Defendants could collect illicit funds without detection.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 219.

220.   *For the foregoing reasons, and by the foregoing means, the TM Defendants conspired with the Northstar Defendants fraudulently to induce Amazon to do business with the Northstar Defendants on terms that were false, misleading, and violated the RICO Defendants' legal duties to the company.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 220.

221.   *The Northstar Defendants also engaged in conduct, both independently and in concert with Villanova Trust, that breached the terms of the Lease Transaction contracts that they fraudulently induced, and in April of this year IPI terminated and rescinded those contracts with respect to the Northstar Defendants and reformed them with Amazon.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge and information to respond to the

allegations in Paragraph 221 and therefore denies the same.

222.   *The conduct of the Northstar Defendants and Villanova Trust also aided and abetted the TM Defendants' acts in breach of the TM Defendants' employment agreements and other legal duties to Amazon..*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 222.

**C.    The Northstar and TM Defendants Conspire on Lease Execution**

223.   *To execute the agreed kickback scheme on the rigged Lease Transactions, Northstar had to do more than just form the primary LLCs it used to execute its initial Lease Transactions with Amazon. It had to ensure that those LLCs could purchase and develop the covered real estate sites on the terms specified in the contracts. These obligations posed a significant problem for Northstar, which did not have the capital or capability to fund the acquisition or perform the development work its contracts required.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 223.

224. *The Northstar Defendants thus conspired with the TM Defendants to obtain an equity partner, lender support, and construction and other development contracts for the Lease Transaction sites on terms that fraudulently concealed the unlawful aspects of their scheme from these partners, and relied on the TM Defendants' positions and authority at Amazon to deflect or otherwise suppress inquiries about fees and contract provisions that the RICO Defendants' site partners questioned or identified as suspicious.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 224.

225. *IPI is the entity Northstar approached, and ultimately secured, as an equity partner to supply capital necessary to purchase and develop the Amazon lease sites. IPI has experience entering into joint ventures (JVs) with other firms in order to combine resources on development projects, and often serves as a capital provider as part of its role in JVs and partners with firms that serve primarily as developers for real estate developments. Gilpin Decl. ¶ 3.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 225 and therefore denies the same.

226. *IPI was introduced to Brian Watson and Northstar in January of 2018 by third-party brokers who were helping Watson source capital for a real estate development where Amazon was to be the sole tenant ("Shaw Road"). Together, IPI and Northstar formed the joint venture known as NSIPI Data Center Venture, LLC, that partnered with Northstar on the Amazon Lease Transactions.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 226 and therefore denies the same.

227. *An IPI affiliate, IPI NSIPI Data Center Holdings, LLC ("IPI NSIPI"), is the sole owner of NSIPI Data Center Venture, LLC, which is now the sole owner of the four downstream LLCs—Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC, and Manassas NCP, LLC (the "Project Entities")—that hold the nine executed leases with Amazon for the shell facilities developed and located on the Virginia real property sites involved in the Lease Transactions (the "Projects"). Gilpin Decl. ¶¶ 3–4.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 227 and therefore denies the same.

228.   *Watson and Northstar initially reached out to IPI because Northstar did not have the capital to purchase and develop the properties covered by their unjustly-obtained contracts.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 228 and therefore denies the same.

229.   *Thus, Watson and Northstar leveraged their relationships with the TM Defendants to solicit funding and joint venture support from IPI. Ex. 32 [Gilpin Decl. ¶ 3].*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 229 and therefore denies the same.

230.   *Northstar Commercial Partners Management, LLC and its affiliates, at the direction of Brian Watson, was originally the developer, property manager, and asset manager for IPI and Amazon on each of the four Projects above. Gilpin Decl. ¶ 4. Watson created Defendant Sterling NCP FF, LLC to be a minority equity investor in the Quail Ridge NCP, LLC and Dulles NCP, LLC Project Entities. Id. And he created Defendant Manassas NCP FF, LLC to be a minority investor in the Manassas NCP, LLC Project Entity.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 230 and therefore denies the same.

231.   *Collectively, Defendants Sterling NCP FF, LLC and Manassas NCP FF, LLC owned approximately 8.4% of the equity interest in all four of the Projects (via an interest in NSIPI Data Center Venture, LLC) until April 2, 2020, when IPI terminated them from the lease contracts and associated Projects based on the misconduct at issue in this suit.  Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the remaining allegations in Paragraph 231 and therefore denies the same.

232.   *Once formed, the joint venture between IPI and the Northstar Defendants created the four downstream LLCs—Dulles NCP LLC[]; Quail Ridge NP, LLC[]; Manassas NCP LLC[]; and Dulles NCP II, LLC[]—that Northstar/Sterling managed as the landlords for the leased sites. Watson separately created and controlled (through two intermediary LLCs) a separate entity— Defendant NSIPI Administrative Manager, LLC—to handle this management role. The following chart depicts the relationships that the Northstar Defendants had with the IPI joint venture and various*

*LLC landlord-developers involved in the Lease Transactions prior to Northstar's termination on April 2 of this year:*



**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 232 and therefore denies the same.

233.  *The Deeds of Lease were signed by Brian Watson, who was identified as the "Manager" or "President," on behalf of the landlord entities.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 233 and therefore denies the same.

234.  *As part of the Lease Transaction conduct, the Northstar Defendants utilized the foregoing network of LLCs to induce and execute the nine Lease Transactions with Amazon since 2018:*

| Lease# | Landlord Entity | Date Executed |
|--------|-----------------|---------------|
| 1 | Dulles NCP LLC | February 27, 2018 |
| 2 | Dulles NCP LLC | February 27, 2018 |
| 3 | Quail Ridge NCP, LLC | April 6, 2018 |
| 4 | Quail Ridge NCP, LLC | April 6, 2018 |
| 5 | Quail Ridge NCP, LLC | April 6, 2018 |
| 6 | Quail Ridge NCP, LLC | April 6, 2018 |
| 7 | Manassas NCP LLC | November 1, 2018 |
| 8 | Manassas NCP LLC | November 1, 2018 |
| 9 | Dulles NCP II | January 13, 2020 |

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 234 and therefore denies the same.

235.  *All but one of these Lease Transactions were recommended by the TM Defendants in furtherance of the RICO Enterprise (Lease 9 was recommended by Casey Kirschner because Nelson was terminated in June 2019).*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 235 because, among other

reasons, there was no RICO enterprise.

236.  *The Northstar Defendants were central to the creation, management, and control the landlord entities. Watson signed the Deeds of Lease as well as the ROFO/ROFR Agreement on behalf of the landlord entities and was identified as the "Manager." Ex. 24.  The signed ROFO/ROFR agreement also identifies Watson by name as a Key Individual: "As used herein, the term "Seller's actual knowledge," and like phrases, means to the actual*

*direct present knowledge of Seller's Manager and Brian Watson (collectively, the ' Key Individuals' )."*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 236 and therefore denies the same.

237. *As detailed below, all of the transactions were tainted by kickbacks reflected in at least nine lease-related payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019. Exs. 7, 11, 14, 30--31.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 237 because, among other reasons, there were no "kickbacks."

238. *Specifically, Northstar (through its alter ego WDC Holdings) made payments of at least $5.11 million between March 2018 and August 2019 to Villanova Trust referencing at least four of the landlord LLCs Northstar created to manage nine separate Amazon Lease Transactions: Sterling (Leases #1, 2), Quail Ridge (Leases #3, 4, 5, 6), Dulles (Lease #9), and Manassas (Leases #7, 8).*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 238 about the other named defendants and therefore denies the same.

239. *Notably, "Amazon would not, under any circumstances, have approved the real estate transactions it entered into with Northstar organized by the TM Defendants had Amazon been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova Trust described in detail" in Amazon's complaint. Dkt. 59 at ¶ 20.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 239 because, among other reasons, Amazon approved a "real estate transaction[]" with Northstar after it learned of the matters that it describes as the "undisclosed conflicts of interest and 'referral' agreement arrangement."

### D.   2020 Corroboration of the RICO Enterprise from Northstar COO Timothy Lorman and IPI Vice President Luke Gilpin

240. *In January 2020, Timothy Lorman[], who served as Northstar's COO until April of this year, approached Luke Gilpin, the Vice President of IPI*

> *Partners in Chicago, and disclosed information and documents substantially corroborating the facts supplied by Informant 1. See generally Gilpin Decl. ¶¶ 2, 10–21.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 240 and therefore denies the same.

241.   *Mr. Lorman is a long-time reserve Sheriff's Deputy for the Douglas County Sheriff's Office in Douglas County, Colorado. Lorman Decl. ¶ 4.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 241 and therefore denies the same.

242.   *Mr. Lorman was the Chief Operating Officer of Northstar from March 25, 2019 to April 7, 2020. Id. at ¶ 2.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 242 and therefore denies the same.

243.   *Mr. Lorman personally knows and has interacted with Mr. Gilpin on numerous occasions in Mr. Gilpin's official capacity as Vice President of IPI. Gilpin Decl. ¶ 10. Mr. Gilpin first met Mr. Lorman in October 2019, and finds him "competent and trustworthy." Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 243 and therefore denies the same.

244.   *On January 24, 2020, Mr. Lorman told Mr. Gilpin that he wanted to travel from Denver, Colorado to speak with Mr. Gilpin in Chicago, where Mr. Gilpin works for IPI. Gilpin Decl. at ¶¶ 2, 11. Mr. Lorman told Mr. Gilpin that the conversation should take place in person. Id. at ¶ 11.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 244 and therefore denies the same.

245.   *Mr. Lorman and Mr. Gilpin met in Chicago on January 28, 2020. During the meeting, Mr. Lorman asked Mr. Gilpin if he knew of a "special agreement" between Casey Kirschner and Brian Watson. Gilpin Decl. at ¶ 12. Mr. Lorman told Mr. Gilpin that he suspected that Brian Watson, former Northstar employees Kyle Ramstetter and Will Camenson, Casey Kirschner, and Casey's brother Christian Kirschner had engaged in*

> misconduct that "violated Northstar's agreements with IPI." Id. Mr.
> Lorman also suspected that these individuals could have "violated the
> leases the entities signed with Amazon, and might have violated the law."
> Id.

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 245 and therefore denies the same.

> 246.   During the January 28, 2020 meeting, Mr. Lorman shared with Mr. Gilpin
> multiple documents evidencing the RICO Defendants' misconduct at
> Amazon's expense. Notably, Mr. Lorman shared an executed version of the
> Villanova referral/kickback agreement that Brian Watson signed on behalf
> of Northstar on January 8, 2018. Gilpin Decl. ¶ 13; Ex. 6. Mr. Gilpin
> reviewed the documents and informed IPI's outside counsel of the meeting
> with Mr. Lorman. Gilpin Decl. at ¶ 14. IPI then informed Amazon of the
> meeting.  Id.

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 246 and therefore denies the same. Mr. Nelson denies the existence of

any RICO enterprise, kickback, or any misconduct at Amazon's expense.

> 247.   On or around February 14, 2020, Mr. Lorman provided Mr. Gilpin with at
> least four documents via Dropbox that further evidenced misconduct by the
> RICO Defendants at Amazon's expense.

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 247 about Mr. Lorman and therefore denies the same.

> 248.   The first document is a copy of the executed version of the Northstar-
> Villanova kickback agreement that Lorman shared at the Chicago meeting
> with Mr. Gilpin. Gilpin Decl. ¶ 15; Ex. 6.

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 248 and therefore denies the same.

> 249.   The second and third documents are wire receipts (dated June 7, 2019, and
> August 7, 2019) evidencing payments from Northstar-affiliated entities to
> Villanova Trust in connection with certain Virginia Leases at issue in this
> action. Gilpin Decl. ¶ 15; Exs. 30, 14.

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 249 and therefore denies the same.

250. *Each wire receipt lists the "Originator Name" as "W D C HOLDINGS LLC" (aka Northstar), the "Beneficiary Bank" as "First Tennessee Bank," and the "Beneficiary" as "Villanova Trust" at "16 Compton Trace Nashville, TN." See Exs. 14, 30.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 250 and therefore denies the same.

251. *The June 7 wire for $150,000 references "Dulles Final Leasing Payment." See Ex. 30.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 251 and therefore denies the same.

252. *And the August 7 wire for $321,028.44 references "Manassas Leasing Fee." See Ex. 14.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 252 and therefore denies the same.

253. *The fourth document that Mr. Lorman provided to Mr. Gilpin is a spreadsheet with a column titled "Referal [sic] - Villanova Owed" with four separate entries totaling $1,497,614.50. Gilpin Decl. ¶ 15; Ex. 7.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 253 and therefore denies the same.

254. *The first entry lists $250,000 owed for a "Leasing Fee" associated with the "Dulles" "Project." Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 254 and therefore denies the same.

255. *The second entry lists $225,642.60 owed for a "Development Fee (20%)" also associated with the "Dulles" "Project." Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 255 and therefore denies the same.

256.   *The third entry reflects $760,210.50 owed for a "Leasing Fee (25%)" associated with the "Quail" "Project." Ex. 7.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 256 and therefore denies the same.

257.   *And the fourth entry reflects $211,761.40 for a "Development Fee (20%)" also associated with the "Quail" "Project." Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 257 and therefore denies the same.

258.   *On February 16, 2020, Mr. Lorman provided Mr. Gilpin with additional evidence of the RICO Defendants' misconduct concerning Amazon properties in this District. This evidence consisted of audio recordings that Defendant Brian Watson directed Mr. Lorman to record of discussions between Watson and former Northstar employees (and White Peaks principals) Kyle Ramstetter and Will Camenson on or about September 27, 2019. Gilpin Decl. ¶ 16; Ex. 9; Lorman Decl. ¶¶ 9–11.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 258 and therefore denies the same.

259.   *In these recordings, Watson demands that these individuals pay Northstar millions of dollars in proceeds the White Peaks Defendants realized on their $116 million "flip" sale of a Virginia property to Amazon in July 2019.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 259 about the recordings. Mr. Nelson denies the allegation that the

White Peaks Defendants "flip[ped]" the White Peaks Property because, among other reasons,

Amazon's own exhibits show that White Peaks initiated multiple projects to improve the

property, including environmental assessments, surface investigations, and land surveys, as well

as bearing the risk that such investments would not come to fruition.

260.   *Mr. Lorman and Mr. Gilpin had further conversations this spring concerning Mr. Lorman's "ongoing suspicions regarding potential misconduct by Brian Watson and Northstar relevant to [IPI and Northstar's] business relationship and work for Amazon in Virginia."*

*Gilpin Decl. ¶ 18. Notably, Mr. Lorman and Mr. Gilpin discussed "on multiple occasions" Mr. Gilpin's discovery that Kyle Ramstetter "had signed" while at Northstar and "without authorization, multiple contracts and change orders related to the [Amazon] Projects [in Northern Virginia]." Id. at ¶ 19. Mr. Gilpin stated that this unauthorized conduct put the (Northstar-managed) landlords to whom Amazon rendered payments "in default under their respective credit agreements." Id.*

**RESPONSE:**    Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 260 and therefore denies the same.

261.    *Mr. Lorman also reported that "multiple Northstar employees were involved in matters relating to Brian Watson's personal finances," and that Watson had "received into a personal bank account a deposit of approximately $5 million" that Mr. Lorman understood to comprise "part of a settlement" between Watson, Kyle Ramstetter, and Will Camenson on the White Peaks transaction proceeds that Watson demanded Ramstetter and Camenson pay Northstar in September 2019. Gilpin Decl. ¶ 21.*

**RESPONSE:**    Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 261 and therefore denies the same.

262.    *After Mr. Gilpin received the information and corroborating documents and files from Mr. Lorman in February 2020, see infra ¶¶ 97–102, he promptly shared them with IPI's outside counsel, who in turn shared them with Amazon. See Gilpin Decl. ¶ 17; Dkt. 44 ¶ 12. IPI also shared "numerous examples" of Northstar's and Brian Watson's failures to "appropriately manage and comply with" requirements found in contracts governing the affected Virginia real property sites that Amazon would not have executed but for the RICO Defendants' and their co- conspirators unlawful conduct, as well as Brian Watson's failures to "appropriately manage and comply with project requirements." Gilpin Decl. ¶ 6.*

**RESPONSE:**    Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 262 therefore denies the same.

263.    *For example, in April 2018 Northstar told IPI that Amazon had instructed Northstar "to include certain fees in the [Northern Virginia] Projects" that "were excessive." Gilpin Decl. ¶ 5.*

**RESPONSE:**    Mr. Nelson lacks knowledge and information sufficient to answer the

remaining allegations in Paragraph 263 and therefore denies the same.

264.   *But Northstar represented to IPI "that an Amazon employee had nonetheless instructed Northstar to include them"—a representation on which IPI reasonably relied based in part on the Northstar Defendants' relationship with the TM Defendants. Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 264 and therefore denies the same.

265.   *On information and belief, Casey Kirschner requested that Northstar add and/or increase fees to the budgets for the Lease Transactions to increase the amount of fees that he would receive through the Villanova Trust, which thereby increased the cost of the transaction to Amazon.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 265 and therefore denies the same.

266.   *For example, the first Virginia Lease Transaction contained a leasing fee of 0.5%, which was equivalent to an anticipated $300,000 for that transaction. The next Northstar budget, however, increased that fee to 2%, which was equivalent to an anticipated $1,013,614 for that transaction.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 266 and therefore denies the same.

267.   *Amazon also learned of numerous instances in which Northstar failed to "appropriately manage and comply with project requirements, " Gilpin Decl. ¶ 6, including the delivery of draw packages, operating reports, budgets, compliance packages, and operating expense details. Gilpin Decl. ¶ 7. These failures resulted in:*
   i.      *"Five credit agreement defaults or draw stops" that resulted in the halt of necessary property development funding from relevant lenders;*
   ii.     *Late payments (in some cases by months) to multiple vendors;*
   iii.    *Multiple breakdowns in financial reporting to Amazon; and*
   iv.     *Unauthorized execution of construction contracts and change orders totaling more than $50 million.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 267 and therefore denies the same.

268.   *All of these failures caused damage to Plaintiffs in amounts to be determined in the course of these and related legal proceedings.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 268 and therefore denies the same.

269.   *As a result of this and other mismanagement by Northstar, the Shaw Road and Manassas projects were not scheduled to be completed on time and exceeded their budgets. Id. ¶ 8.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 269 and therefore denies the same.

270.   *These and additional actions taken by the RICO Defendants resulted in both actual and anticipated harm to Amazon, including but not limited to the payment by Amazon of rent inflated by kickback fees; the establishment of lease agreements that contemplate rent amounts inflated by kickback fees; and adverse impact to Amazon's relationships with its business partners, including IPI, banks, and investors. And to the extent that IPI or others absorbed these costs, they are additional victims of the RICO Enterprise. Amazon has thus suffered irreparable harm to its goodwill and business relations due to the RICO Defendants' misconduct.*

**RESPONSE:**   Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 270 about Amazon's asserted harm and therefore denies the same. Mr. Nelson denies the existence of a RICO enterprise, kickback fees, or misconduct, and he denies the remaining allegations in Paragraph 270.

271.   *These acts and other contract breaches, along with the underlying fraud and other unlawful acts that precipitated them, damaged Amazon, IPI, and their business partners, and compelled the Northstar Defendants' for-cause termination from involvement with the Lease Termination Projects and contracts on April 2, 2020. Id. ¶ 22–25.*

**RESPONSE:**   Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 271 about the alleged breaches and damage and therefore denies the same. Mr. Nelson denies any fraud or unlawful acts and denies any remaining allegations in Paragraph 271.

E.   **Northstar's April 2, 2020 Termination from the Lease Transactions**

272.   *The foregoing and other evidence of the RICO Enterprise as it relates to Lease Transactions established that Northstar's continued involvement with the nine Virginia lease sites detailed above presented an imminent risk to the integrity and goodwill of Amazon's business relationships, as well as an opportunity for the RICO Defendants and those acting in concert with them to spoliate evidence and convert assets central to ongoing legal investigations. Accordingly, Amazon and IPI devoted significant resources to transitioning and ultimately removing Defendants Watson, Northstar, Sterling, Manassas, and Administrative Manager from their roles in the Virginia Lease Transaction sites this spring. See generally Gilpin Decl. ¶ 22–26; Ex. 34.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 272 about Amazon and IPI, including the existence of any "ongoing legal investigations" prior to the February 19, 2019 lease reformations pled at Paragraph 273. Mr. Nelson denies the existence of a RICO enterprise. Mr. Nelson denies the remaining allegations in Paragraph 272.

273.   *On February 19, 2020, Amazon and IPI agreed to reform the leases and management contracts at the Northstar-affiliated Virginia Lease Transaction sites to facilitate this transaction and the Northstar Defendants' termination. IPI relied on its ability to exercise its "majority interest" authority over the joint venture that controls the Landlord LLCs for the relevant properties ("Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC and Manassas NCP, LLC") to remove the Watson/Northstar-affiliated Sterling entities from both the joint venture and their involvement with the Landlord LLCs and the properties.*

**RESPONSE:**   Mr. Nelson lacks knowledge or information sufficient to answer the allegations in Paragraph 273 about Amazon and IPI and therefore denies the same.  Mr. Nelson denies the remaining allegations in Paragraph 273.

274.   *As part of this reformation, Amazon and IPI agreed it was critical to avoid any interruption in the development or construction of the unfinished Northstar-affiliated Virginia Lease Transaction sites and the operation of all Northstar-affiliated Virginia Lease Transaction sites. It was also understood that any delays or interruptions would cause Amazon substantial damage.*

**RESPONSE:**   Mr. Nelson denies lacks knowledge and information sufficient to answer the allegations in Paragraph 274 and therefore denies the same.

275.   *These understandings are reflected in the 2020 Lease Continuity Agreement between Amazon and IPI, which contains a clause guaranteeing completion of the Virginia Lease Transaction sites and Amazon's right to "uninterrupted quiet enjoyment." To accomplish these objectives, the Agreement contemplates "removal steps" under which IPI would "(i) terminate or cause to be terminated all agreements" that each Landlord and Administrative Manager had with the Northstar Defendants to ensure that the Northstar Defendants were removed or rescinded from all agreements with Amazon and IPI on the Lease Transaction Projects; (ii) cause another entity "to assume responsibility for completing the construction of the Unfinished [Northstar-affiliated Virginia property sites]"; and "(iii) terminate, or otherwise remove Administrative Manager from, any other [relevant] agreement."*

**RESPONSE:**   Mr. Nelson denies lacks knowledge and information sufficient to answer the allegations in Paragraph 275 and therefore denies the same.

276.   *In early April 2020, IPI executed its obligations under the Lease Continuity Agreement with Amazon by, among other things, terminating the Watson/Northstar-affiliated rights and interests in the Lease Transaction sites, transitioning vendor obligations, and demanding the Northstar Defendants' return of books, records, and business information central to the integrity of Plaintiffs' legal and business interests. Ex. 34; Gilpin Decl. ¶¶ 22–26.*

**RESPONSE:**   Mr. Nelson denies lacks knowledge and information sufficient to answer the allegations in Paragraph 276 and therefore denies the same.

277.   *Specifically, on April 2, 2020, IPI sent a formal Termination Letter to Northstar and Watson notifying them of the Cause Event for their termination and IPI's Election of Remedies as controlling stakeholder in the joint venture parent of the four landlord-developer entities for the relevant Virginia lease sites. This letter effected the immediate removal of Watson and several Northstar affiliates (NSIPI Administrative Manager, LLC, Sterling NCP FF, LLC, and Manassas NCP FF, LLC) from the joint venture and associated landlord-developer companies. Ex. 35.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 277 and therefore denies the same.

278.   *IPI coupled its April 2, 2020 Termination Letter to Defendants Watson and Northstar with required notices to other affiliates and partners. Ex. 34.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 278 and therefore denies the same.

279.   *The Termination Letters removed Northstar-related persons and entities from the NSIPI Virginia development joint venture and its affiliated landlord LLCs.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 279 and therefore denies the same.

280.   *All of these termination actions were necessary to protect Amazon goodwill and business relationships at the relevant properties, and to mitigate site development costs and other damages that Amazon and/or its partners suffered as a result of the fraud and other unlawful conduct by the Lease Transaction Defendants. This conduct caused costs on Amazon projects to exceed budgets, caused budgeted costs to be diverted to kickbacks and other unauthorized and unlawful payments, and fraudulently induced and caused Amazon to engage in business with partners that did not deliver the value they represented and contracted to provide, and whose work for the company Amazon would not have approved but for the RICO Defendants' unlawful acts.*

**RESPONSE:**   Mr. Nelson denies the existence of any RICO enterprise, fraud, kickbacks, or unlawful conduct.  Mr. Nelson denies the remaining allegations in Paragraph 280.

**F.   June 2020 Federal Forfeiture Action and May 2020 Forfeiture Notices**

281.   *The full scope of the fraud, kickback, and other unlawful activities encompassed by the Lease Transaction conduct is not yet known. But recent proceedings in this action, as well as a parallel forfeiture action the United States filed in June and related seizures in public notices, directly connect it to the TM Defendants.*

**RESPONSE:**   Mr. Nelson admits only that the forfeiture action and public notices speak for themselves, and that the actions are contested. Mr. Nelson denies the remaining allegations in Paragraph 281.

282.   *The United States filed a forfeiture action in this District indicating that, from August 2018 to August 2019, "the Villanova Trust wired approximately $3,375,625 to a bank account maintained for the benefit of" the TM Defendants. Ex. 12 at ¶ 10. The forfeiture complaint, which was filed against property owned by TM Defendant Casey Kirschner, further states that Casey Kirschner "has admitted accepting funds from [Northstar] associated with [his] job with [Amazon]," that Northstar "paid the kickbacks to the Villanova Trust associated with the [Amazon] development deals in Northern Virginia," ¶ 13, and that the TM Defendants also "received or benefitted from approximately $5,818,955 from other developers in 2019 for [Amazon] projects in Northern Virginia." Id. ¶ 14.*

**RESPONSE:**   Mr. Nelson admits only that the forfeiture action and public notices speak for themselves, and that the actions are contested. Mr. Nelson lacks knowledge and information sufficient to respond to the remaining allegations in Paragraph 282 and therefore denies the same.

283.   *The government's account of the Northstar kickbacks on the Amazon Lease Transactions at issue in this suit accords with evidence Amazon has obtained in its ongoing internal investigation of the RICO Defendants' unlawful enterprise conduct.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the allegations about Amazon's internal investigation and denies the remaining allegations in Paragraph 283.

284.   *Specifically, on information and belief, the "First Western Trust Bank account ending 3698 maintained for" Nelson and Casey Kirschner that received "$9,194,580.50 in fraud proceeds" (Ex. 12) reflects at least in part wire payments from Villanova Trust to another trust or account (¶¶5–15). Further, the "seven transfers totaling $6,244,442.19 [that] were made between First Western Trust Bank account ending 3698 and First Western Trust Bank account ending 0525" (Ex. 12) reflect, on information and belief, at least in part wire payments from a separate trust or account (¶16) to AllCore.*

**RESPONSE:**  Mr. Nelson admits only that the forfeiture filings speak for themselves, and that the actions are contested. Mr. Nelson denies the remaining allegations in Paragraph 284.

285.  *On or about December 14, 2018, Brian Watson asked a Northstar subordinate to send him "the template referral agreement" and itemized referral fees for Northstar's "top 10 referral partners," including Villanova Trust. Ex. 36.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 285 and therefore denies the same.

286.  *The Northstar employee informed Watson that "Villanova [sic] Trust" had received "$50,000." Id.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 286 and therefore denies the same.

287.  *Watson then requested "the total amount of fees we have paid to Villanova, or ALL fees . . . . Leasing, sales, development, etc." Id.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 287 and therefore denies the same.

288.  *The Northstar employee responded that Northstar had paid $4,641,955.40 to Villanova.  Id.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 288 and therefore denies the same.

289.  *On information and belief, funds received by Villanova were subsequently passed through to AllCore for the personal benefit of the TM Defendants.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 289.

290.  *Whether other entities or individuals covered by Northstar's "template referral agreement" or "top ten referral partners' had a role in the Lease Transaction portion of the RICO  or other unlawful scheme is not clear. But records obtained from Northstar 's former COO Mr. Lorman indicate that at a minimum, the Lease Transaction conduct involving the*

*RICO Defendants continued beyond the December 2018 date on which Northstar records show $4.6 million in payments to Villanova Trust. In 2019, Northstar sent at least two wires to Villanova Trust with "transaction memo" references to two separate Northstar landlord LLCs (Dulles and Manassas) connected to the Lease Transaction conduct:*

| DATE | AMOUNT | TRANSACTION MEMO |
|------|--------|------------------|
| June 7, 2019 | $150,000.00 | Dulles Final Leasing Payment |
| August 7, 2019 | $321,028. 44 | Manassas Leasing Fee |

**RESPONSE:** Mr. Nelson admits only that the financial records speak for themselves. Mr. Nelson denies the existence of a RICO enterprise or any unlawful scheme. Mr. Nelson lacks knowledge and information sufficient to answer the remaining allegations in Paragraph 290 and therefore denies the same.

291. *Further, financial statements obtained since Amazon initiated this suit indicate that the Northstar Defendants had received at least $10,026,899 in acquisition, leasing, development, and asset management fees on just the Dulles and Quail Ridge lease projects as of late 2018, and had wired at least $5,112,983.84 to Defendant Villanova Trust pursuant to its 2018 Referral Agreement with Northstar on the Amazon Lease Transactions. Ex. 11, Dkt. 57.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 291 and therefore denies the same.

292. *As evidenced by public forfeiture notices, the United States has also seized various bank accounts owned by the TM Defendants and Defendant Cheshire Ventures, including a U.S. Bank account co-owned by Casey Kirschner and 10 bank accounts owned or co-owned by Nelson. See Ex. 60 [forfeiture notices].*

**RESPONSE:** Mr. Nelson admits only that the public forfeiture notices speak for themselves, and that he is contesting them.

## III.   THE DIRECT PURCHASE CONDUCT

293. *The Direct Purchase portion of the RICO Enterprise was a parallel and significant complement to the Lease Transaction portion of the RICO Enterprise facilitated by the TM Defendants' broader pay-to-play scheme*

*for Amazon contracts and business opportunities. The Direct Purchase conduct included at least the 2019 White Peaks land sale to Amazon alleged in Amazon's initial complaint and elaborated below and a separate land acquisition in Northern Virginia at the end of 2019 that, on information and belief, netted the TM Defendants $2.5 million each, as well as other efforts by the TM Defendants and their co-conspirators to use Amazon funds, contracts, or information to profit from commercial real estate sales in Virginia and potentially other states where the RICO Defendants had knowledge of Amazon efforts to explore or execute real estate transactions. These states included Ohio, South Carolina and Tennessee.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 293.

### A.   The White Peaks Transaction

294.   *In the summer of 2019, two of Northstar then-employees (Kyle Ramstetter and Will Camenson) used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate Amazon's acquisition of land in Chantilly, Virginia for a new Amazon development. See Ex. 37. At the time of the transaction, these two Northstar employees styled themselves as, respectively, as "Managing Director" of both LLCs, and as "Manager" of White Peaks Capital.*

**RESPONSE:**   Mr. Nelson admits that Kyle Ramstetter is a former employee of Northstar and that Kyle Ramstetter was associated with White Peaks Capital LLC and NOVA WPC LLC, which sold land to Amazon. Mr. Nelson lacks knowledge and information sufficient to respond to the remaining allegations in Paragraph 294 and therefore denies the same.

295.   *The TM Defendants played an essential role in the White Peaks Transaction, worked with the White Peaks Defendants to ensure its success, and did so to obtain kickbacks from the White Peaks Defendants—actions that both TM Defendants knew to be fraudulent and in violation of their obligations under Amazon's Code of Conduct.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 295.

296.   *On or about July 30, 2019, defendant NOVA WPC LLC purchased the White Peaks property from 41992 John Mosby Highway LLC, a Virginia limited liability company, for $98.67 million.*

**RESPONSE:**   Mr. Nelson admits only that documents and records related to the sale speak for themselves. Mr. Nelson lacks knowledge or information sufficient to respond to the

remaining allegations in Paragraph 296 and therefore denies the same.

297.   *41992 John Mosby Highway LLC had purchased the White Peaks property for $20 million just 13 months earlier. Ex. 47-48, 38.*

**RESPONSE:**  Mr. Nelson admits only that the documents and records related to the sale speak for themselves. Mr. Nelson lacks knowledge or information sufficient to confirm or deny the remaining allegations in Paragraph 297 and therefore denies the same.

298.   *That same day (July 30, 2019), NOVA WPC LLC sold the White Peaks property to Plaintiff Amazon Data Services for $116.4 million. Exs. 37–39. Press coverage of the sale highlighted Defendant NOVA WPC LLC's same-day profit of nearly $18 million. Ex. 38.*

**RESPONSE:**   Mr. Nelson admits only that the documents and records related to the sale speak for themselves. Mr. Nelson lacks knowledge or information sufficient to confirm or deny the remaining allegations in Paragraph 29,k8 and therefore denies the same.

299.   *It is undisputed that the nearly $18 million in proceeds the White Peaks Defendants realized on the sale were funded directly by Amazon's purchase of the property.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to confirm or deny the allegations in Paragraph 299 and therefore denies the same.

300.   *On information and belief, the TM Defendants exerted pressure against the White Peaks Defendants to obtain a share of the approximately $18 million profit obtained by the White Peaks Defendants through the sale of the property to Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 300.

301.   *On information and belief, the White Peaks Defendants yielded to this pressure and agreed to wire monies to one or both of the TM Defendants. On information and belief, the TM Defendants arranged for a Virginia civil engineering consultant, Johnny Lim, and his company, E2M Properties LLC, to facilitate the transfer of the seven-figure kickback they demanded from on the White Peaks transaction.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 301. Mr. Nelson further answers that, to the extent Amazon claims that a real estate developer routing the payment of an invoice through a third party is illicit, Amazon frequently routes vendor payments through third parties like and including Johnny Lim.

302. *On information and belief, TM Defendant Casey Kirschner utilized at least some portion of the funds to finance the property named in the government's pending civil forfeiture action in this District. Ex. 12.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 302 and therefore denies the same.

303. *The White Peaks Defendants also disbursed $5 million of the proceeds from the 2019 property sale to Defendants Brian Watson and/or Northstar.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 303 and therefore denies the same.

304. *On September 27, 2019, approximately six weeks after the Washington Business Journal reported on the transaction, Brian Watson confronted the White Peaks principals and then-Northstar employees Kyle Ramstetter and Will Camenson about the land sale. Ex. 9.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 304 and therefore denies the same.

305. *Watson accused Ramstetter of engaging in a side deal with Northstar's "largest client" (Amazon), and characterized Ramstetter's conduct of the transaction as "federal FBI-type stuff." Id.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 305 and therefore denies the same.

306. *Watson never raised these concerns with Amazon, and instead pressed Ramstetter to "pay us [Northstar'] the money [$17.73 million] immediately" because "[a]nything that comes from [Amazon deals] should be Northstar." Id. at 5.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 306 and therefore denies the same.

> 307.   *Ramstetter replied that he was "[p]otentially" willing to pay Northstar the money, but suggested he and Watson discuss the matter with their mutual Amazon contact- TM Defendant Casey Kirschner- "over a drink." Id. at 6. Ramstetter then alluded to misconduct on other Amazon-related transactions, stating that "what we did for Amazon—that's FBI You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand" because there is evidence showing that "we all know what we did." Id. at 8. He then reiterated that he, Watson, and TM Defendant Casey Kirschner should try to "work something out" before someone "say[s] something to the wrong person and it gets out, [and] the whole Amazon thing shut[s] down." Id.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 307 and therefore denies the same.

> 308.   *During a separate conversation Watson secretly recorded and placed in the record in this case on May 14, 2020, former Northstar employee and White Peaks principal Will Camenson stated that Northstar was left out of the deal because of Watson 's "actions and [Watson's] treatment of Kyle [Ramstetter] and his contract." Ex. 9 at 19.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 308 and therefore denies the same.

> 309.   *Following these conversations, Northstar did not immediately "fire[]" the two employees involved in the White Peaks transaction, as Watson asserted in April 2020 and in this litigation. Exs. 1, 4. Rather, these individuals separated from Northstar only after [redacted]. MacDonald Decl. ¶ 8, id. Ex. 61; Lorman Decl. ¶ 13.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 308 and therefore denies the same.

> 310.   [REDACTED]

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to answer the

allegations in Paragraph 310 and therefore denies the same.

311.  *Watson and Northstar accepted the $5 million payment for the White Peaks transaction instead of notifying Amazon of the inflated price of the property or of the fraud and kickback scheme engaged in by their employees.*

**RESPONSE:**  Mr. Nelson denies the existence of any fraud or kickback scheme. Mr. Nelson further denies that Amazon paid an "inflated price" for the White Peaks Property. Mr. Nelson lacks knowledge and information sufficient to confirm or deny the remaining allegations in Paragraph 311 and therefore denies the same.

312.  *On the following Monday, September 30, 2019, Watson continued to discuss the White Peaks Purchase with Northstar's former COO Timothy Lorman. To "demonstrate to [Mr. Lorman] that his relationship with Casey Kirschner was still strong despite the fallout from the NOVA WPC Transaction, Brian Watson called Casey Kirschner and put the call on speaker phone," without telling Casey Kirschner that Mr. Lorman was in the room. Lorman Decl. 12. After discussing the White Peaks Purchase, Casey Kirschner "commented that he had never liked Kyle Ramstetter, and that Kyle Ramstetter had 'been involved in this for two weeks and he figured out what you and I were doing,' or words to similar effect." Id.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to answer the allegations in Paragraph 312 and therefore denies the same.

313.  *The foregoing evidence, which is elaborated in the PI record, alone indicates that, at the time Defendant Watson demanded and accepted $5 million in proceeds from the White Peaks transaction on the premise that the money was payable to Northstar as Amazon's agent, Defendant Watson knew or should have known that the land sale was tainted by payments or other benefits to TM Defendant Casey Kirschner that violated Amazon policies and Northstar's obligations as Amazon's purported agent. See Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.*

**RESPONSE:**  Mr. Nelson denies that the land sale was "tainted." Mr. Nelson lacks knowledge and information sufficient to confirm or deny the remaining allegations in Paragraph 313 about the other named defendants and therefore denies the same.

**B.   Other Land Acquisitions in Northern Virginia**

314.  *On information and belief, the TM Defendants facilitated other purchase transactions in Northern Virginia for their own personal benefit.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 314.

315.  *In late 2019, Amazon purchased 100 acres in Northern Virginia (the "Blueridge Property") for $83 million (the "Blueridge Transaction").*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 315 insofar as the public records reflect a purchase of the land for $73 million.

316.  *On information and belief, Nelson used proprietary information he had obtained while working at Amazon to arrange the involvement in the transaction of an intermediary, the "Blueridge Group," in order to benefit himself, Cheshire Ventures, and Casey Kirschner.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 316.

317.  *The Blueridge Group purchased the land from the seller for approximately $73 million in or around May 2019.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 317 because, as Amazon pleads at Paragraph 322, "Amazon was assigned the purchase agreement" and thus the Blueridge Group did not complete the purchase of the Blueridge Property.

318.  *Although Defendant Nelson's with Amazon had been terminated in June 2019, Nelson was copied on an email chain dated between August 20 and September 20, 2019—months after he was terminated from Amazon—regarding the purchase of this property by Blueridge.  Exs. 58, 59.*

**RESPONSE:**  Mr. Nelson admits that he was terminated by Amazon on June 11, 2019. Mr. Nelson further admits that the emails referenced in Paragraph 318 speak for themselves.

319.  *In that email chain, Nelson's email address is listed as cheshireventures@outlook.com.*

**RESPONSE:**  Mr. Nelson admits the emails referenced in Paragraphs 318 and 319 speak for themselves.

320.  *Nelson knowingly engaged in this transaction in violation of his CNIAA agreement with Amazon.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 320.

321.    *In or around November 2019, and due to the machinations of TM Defendant Casey Kirschner, a $10 million assignment fee was added to the contemplated transaction by which Amazon would acquire the Blueridge Property.*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge or information to respond to the allegations in Paragraph 321 and therefore denies the same.

322.    *On or around December 23, 2019, Amazon was assigned the purchase agreement and acquired the property for $83 million.*

**RESPONSE:** Mr. Nelson admits the allegations in Paragraph 322 insofar as the total acquisition cost was $83 million. Mr. Nelson further answers that the $83 million included $73 million for the price of the land and $10 million to purchase the assignment of the land purchase agreement.

323.    *The $83 million purchase price included a $10 million assignment fee payable to Blueridge Group, LLC.*

**RESPONSE:**   Mr. Nelson admit the allegations in Paragraph 323.

324.    *On information and belief, Blueridge Group was brought into the transaction by the TM Defendants to serve as a conduit for a $10 million kickback.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 324.

325.    *On information and belief, Blueridge Group provided no services and made no improvements to the Blueridge Property between the time it signed the purchase agreement and the time it assigned it to Amazon, netting $10 million in profit.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 325 because, among other reasons: (a) public records filed by Amazon in Loudon County, Virginia, and internal Amazon documents show that between May 2019 and December 2019, the Blueridge Group conducted extensive work to initiate and further the work to rezone the Blueridge Property for data center use by right; (b) internal Amazon communications on December 13, 2019 show that Amazon decided to purchase the Blueridge Property in December 2019 before the Blueridge Group's rezoning work was completed (but after it was well underway) because Amazon's "finance

team" wanted to make a capital expenditure prior the end of 2019 due to a budget surplus and

that Amazon decided to make the purchase even after the risks were outlined; and (c) land prices

for land potentially suitable for data center use were rapidly increasing in Northern Virginia

during the period in suit even without the improvements to the land undertaken by the Blueridge

Group.

326.   *On information and belief, after the transaction closed, Blueridge Group funneled half of the assignment fee—or $5 million—back to the TM Defendants, who split it evenly, netting approximately $2.5 million profit each from the Blueridge Transaction.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 326.

## IV.   THE RICO DEFENDANTS' ONGOING MISCONDUCT, DAMAGE, AND THREATS OF IRREPARABLE HARM

327.   *The RICO Defendants' enterprise is ongoing, has damaged Amazon, IPI, and their business partners, and poses an imminent threat of irreparable harm to time-sensitive development projects at the affected sites and to associated Amazon business relationships and goodwill.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 327.

### A.   The Northstar Defendants

328.   *Hours after the FBI raided his home on April 2, 2020, Brian Watson sent a lengthy and wide-ranging email to a broad range of personal and business contacts including Casey Kirschner and other RICO Defendants who perpetrated the fraud against Amazon. Ex. 1. In that email, Watson alerted the group to the FBI's questions and documents (including and particularly the grand jury's interest in Villanova Trust), cast blame on various former Northstar personnel, referenced discussions with his legal counsel, and identified Northstar assets and payments that could be affected by the fraud and misappropriation allegations against him. The email also made factual statements about Defendants' RICO Enterprise activities that conflict with internal evidence including computer files, bank records, and voice recordings that Watson himself made.*

**RESPONSE:**   Mr. Nelson admits only that the email referenced in Paragraph 328

speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 328.

329.   *Notably, Watson's April email stated that Northstar's "$4,000 per month" agreement with Villanova Trust was executed with one of Watson's "best friends," for "research" and "introduc[tions]" to companies "who may have commercial real estate needs." Id. It further stated that although Villanova's Trustee, Christian Kirschner, "introduced" Northstar to his brother at Amazon, Northstar won a "competitive" bid for the Amazon Virginia projects. Watson then stated that Northstar "paid [Villanova] a share of fees that were generated from [Northstar's] work with Amazon," but declared that "[t]he funds we sent were never sent to Casey Kirschner or Carl Nelson," the former Amazon TMs who oversaw the deals.  Watson's April 2 email also referenced recent statements he made to "investors" that Amazon was "so pleased" with Northstar's work that Amazon "referred to [Northstar] as their best developer in the country."*

**RESPONSE:**   The email referenced in Paragraph 329 speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 329.

330.   *The conflict between the investigation record and Watson's statements confirms the RICO Defendants' misconduct and the ongoing and imminent threat they pose to Amazon and public interests in this and related legal proceedings.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to confirm or

deny the allegations in Paragraph 330 and therefore denies the same.

331.   *As a threshold matter, the email statements Watson made on the evening of April 2 (and earlier that week to investors) about Amazon's view of Northstar's work flatly contradicts the record and termination notice for "fraud and willful misconduct" IPI issued to Northstar that same day.*

**RESPONSE:**   Mr. Nelson admits only that the email referenced in Paragraph 331 speaks

for itself. Mr. Nelson lacks sufficient knowledge or information to confirm or deny the

allegations in Paragraph 331 and therefore denies the same.

332.   *As detailed above and in the PI record in this action, recently uncovered voice recordings, computer files, and financial records indicate that the Northstar Defendants fraudulently induced and/or breached actionable representations and covenants in their 2017 RFP and ensuing contracts that Watson executed on their behalf with Amazon and its partners on the Virginia Lease Transaction sites.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge or information to confirm or deny allegations in Paragraph 332 and therefore denies the same.

333.   *And the case record further demonstrates the knowing or recklessly false nature of the Northstar Defendants' account of the Lease Transaction portion of the RICO Enterprise. See Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge or information to confirm or deny allegations in Paragraph 333 and therefore denies the same.

334.   *These statements this spring, which on information and belief were designed to signal accomplices to obstruct discovery of the RICO Defendants' ongoing unlawful activities, were followed by a host of other developments, including the resignation of much of Northstar's management team, that led to the entry of the Temporary Restraining Order on April 28, 2020 (Dkt. 16) and the Preliminary Injunction on June 5, 2020 (Dkt. 157). See generally Ex. 14, 30, 40-42; MacDonald Decl. 18, 22, 38, 48-50.*

**RESPONSE:**  Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraph 334 and therefore denies the same. Mr. Nelson denies that he engaged in any unlawful activities.

335.   *The Northstar Defendants have since defied both the TRO and PI, as well as the Court's discovery order regarding their compliance with the same, and dissipated assets.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge or information to confirm or deny the allegations in Paragraph 335 and therefore denies the same.

336.   *Defendants Watson and Northstar admit that on June 19, 2020, they closed – without any notice to Plaintiffs or this Court – the $1.85 million sale of a luxury Denver condominium that Defendant Northstar owned and Defendant Watson personally used. Dkt. 68 at 16; Dkt. 82 at 8.*

**RESPONSE:**  Mr. Nelson lacks sufficient knowledge or information to confirm or deny the allegations in Paragraph 336 and therefore denies the same.

337. *Defendants Watson and Northstar admitted they netted nearly $700,000 from the sale of this condo. Dkt. 82-3 at 1 (listing net value of condo as of May 31, 2020 of $688,108 based on appraisal of $1.85 million – the same amount for which the condominium was sold less than three weeks later).*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge or information to confirm or deny the allegations in Paragraph 337 and therefore denies the same.

338. [REDACTED]

**RESPONSE:** Mr. Nelson lacks sufficient knowledge or information to confirm or deny the allegations in Paragraph 338 and therefore denies the same.

339. *And as recently as July 2020, Northstar and Watson demanded $11 million in unjustified payments on their terminated lease contracts for the nine Virginia properties Amazon has the right to lease from IPI, as well as threatened to place liens on those properties in violation of Virginia law and this Court's PI. Dkt. 57.*

**RESPONSE:** Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraph 339 and therefore denies the same.

340. *As of the date of the filing of this Complaint, Defendants Watson and Northstar remain in violation of the preliminary injunction and have not put up for escrow or bond even one penny of their claimed $61 million in personal 'net worth.'' Dkt. 82-3 at 1. Further, they have yet to explain in any way what has happened to the proceeds from the sale of the condominium [redacted].*

**RESPONSE:** Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraph 340 and therefore denies the same.

**B. The TM Defendants and Defendants AllCore Development LLC, Cheshire Ventures LLC, and Finbrit Holdings, LLC**

341. *Amazon's investigation of the TM Defendants is ongoing, but continues to reveal significant evidence of their involvement in the unlawful pay-to-play scheme and related RICO Enterprise at issue in this suit. The first direct evidence of their involvement in these unlawful activities appeared in the information and documents Amazon received from Confidential Informant I in December 2019. And the company's ensuing investigation has continued to reveal corroborating evidence of the TM Defendants' extensive misconduct.*

**RESPONSE:** Mr. Nelson lacks sufficient knowledge or information to respond to allegations in Paragraph 341 about Amazon's investigation and therefore denies the same. Mr. Nelson denies the remaining allegations, including any allegation that he was involved in a racketeering or kickback scheme or "committed extensive misconduct."

342. *As noted, this evidence is particularly significant to the extent it connects the TM Defendants to the Lease Transaction of the Enterprise in which Casey Kirschner's brother served as a conduit for kickback payments to the benefit the TM Defendants, who Defendant Watson conspicuously declared on April 2 did not receive any of the "funds" Northstar "sent" to Villanova on the Virginia Lease Transactions. Ex. 1. Amazon's retrieval of files from TM Defendant Casey Kirschner's laptop, the recorded conversations Watson placed into the docket in this case in May 2020, and financial records tracing Villanova funds to First Western Trust and/or other accounts held for the benefit of the TM Defendants all evidence the TM Defendants' involvement in the RICO Enterprise, as well as the knowing or reckless falsity of Watson's April 2020 statements to the contrary.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 342, including any allegations that Mr. Nelson was engaged in a racketeering or kickback scheme.

343. *The TM Defendants continued their pay-to-play scheme, the RICO Enterprise, and other unlawful conduct at Amazon's expense after they were terminated from the company. The TM Defendants created one or more of the AllCore, Finbrit and Cheshire LLCs while they were at Amazon, and, on information and belief, supported these LLCs with proceeds from their unlawful conduct and continue to use them to obtain information and business opportunities at Amazon's expense.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 343.

344. *Although the only individual listed as a contact for these LLCs in public registration documents is their organizer, Mr. Atherton, email correspondence on the Amazon system shows the TM Defendants interacting for or with these entities during their time at Amazon.*

**RESPONSE:** Mr. Nelson admits that the public registration documents and emails referenced in Paragraph 344 speak for themselves.

345. *For example, on March 10, 2020, TM Defendant Nelson – who was terminated from Amazon in June 2019 – sent Knoxville real estate site proposals stamped with an AllCore logo to an Amazon broker using a Cheshire Ventures email signature and block:*




Exs. 43–44.

**RESPONSE:**   Mr. Nelson admits only that the email referenced in Paragraph 345 speaks for itself. Mr. Nelson denies that the email referenced in Paragraph 345 was in any way improper.

346. *Similarly, on January 16, 2020, TM Defendant Casey Kirschner received a proposal for a Fairfax, Virginia real estate site from a Cheshire Ventures email handle that Kirschner forwarded internally for consideration within Amazon. Ex. 49.*

**RESPONSE:**   Mr. Nelson admits the allegations in Paragraph 346 because, among other reasons, Cheshire Ventures was an active real estate development consulting firm that sent various opportunities for land and real estate facilities to Amazon employees and agents for the company's consideration to purchase or lease.

347. *All of the acts alleged herein violate the law and Amazon policies, as well as breach multiple provisions of the CNIAA Agreements each TM Defendant signed with the company as a condition of their employment.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to confirm or deny the allegations about any CNIAA Agreement he did not sign and therefore denies the same. Mr. Nelson denies the remaining allegations because, among other reasons, sending potential

land or real estate opportunities to Amazon for its consideration does not violate any law or Mr.

Nelson's CNIAA.

348. *Those agreements expressly state that "any breach" may cause Amazon "irreparable harm for which there is no adequate remedy at law," and that the TM Defendants have already agreed that Amazon will "be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining [the TM Defendants] from committing or continuing to commit any such violation." Ex. 56 § 7.4 (Casey Kirschner CNIAA); Ex. 57 § 6 (Nelson CNIAA).*

**RESPONSE:** Mr. Nelson admits only that Mr. Nelson's CNIAA speaks for itself. Mr.

Nelson lacks knowledge and information sufficient to confirm or deny the remaining allegations

in Paragraph 348 about any other CNIAA.

### C. Villanova Trust

349. *Villanova Trust's central and recently publicized role in the RICO Enterprise as it relates to Lease Transactions underscores the risk that the RICO Defendants or those acting in concert with them will spoliate or convert evidence or assets related to the Trust's role in the RICO enterprise.*

**RESPONSE:** Mr. Nelson denies the remaining allegations in Paragraph 349.

350. *Following the PI hearing in this action against Defendant Villanova Trust, Christian Kirschner's counsel advised Amazon that Christian Kirschner, Villanova's founder and sole trustee, "is cooperating with the government in its ongoing investigation into the events referenced in [Amazon's] complaint," that "Villanova Trust is not in possession of any Amazon confidential or non-public proprietary information," and that "Villanova Trust has no monetary assets in its possession or control." Ex. 45.*

**RESPONSE:** Mr. Nelson admits only that Christian Kirschner's counsel's

representations speak for themselves. Mr. Nelson lacks knowledge and information sufficient to

respond to the allegations in Paragraph 350 and therefore denies the same.

351. *Based on these representations, Amazon has not included Villanova Trust in its recent actions to enforce the PI, but reserves the right to do so in the event evidence of non-compliance emerges.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 351 and therefore denies the same.

### D.   The White Peaks Defendants

352.   *The White Peaks Defendants' role in the Direct Purchase Transactions, as well as their principals' involvement in the Lease Transactions while employed with Northstar, underscores the risk that these RICO Defendants or those acting in concert with them will spoliate or convert evidence or assets related to the White Peaks Defendants' role in the enterprise misconduct at issue in this suit.*

**RESPONSE:**   Mr. Nelson denies the existence of a RICO enterprise. Mr. Nelson lacks knowledge and information sufficient to respond to the remaining allegations in Paragraph 352 and therefore denies the same.

353.   *Following the PI hearing in this action in May 2020, counsel for the White Peaks principals advised Amazon that:*

  a.   *Kyle Ramstetter (controlling manager of White Peaks Capital and NOVA WPC LLC) is cooperating with the government in its ongoing investigation of the events referenced in your complaint";*

  b.   *"Regarding the non-monetary aspects of the TRO," the White Peaks Defendants "are not in possession of any Amazon confidential or non-public proprietary information. White Peaks and NOVA (and their principals) understand their obligations under paragraphs 6-8 of the TRO and will comply with these provisions";*

  c.   *"With respect to the monetary conditions of the TRO, as previously referenced, Mr. Ramstetter is cooperating with the government in its criminal investigation. As part of this cooperation, all proceeds from [] what [Amazon refers] to as the 'Direct Purchase Enterprise' that were within the custody and control of White Peaks LLC and NOVA WPC LLC have been forfeited to the federal government. Mr. Ramstetter voluntarily relinquished these funds and waived his right to assert any defense to forfeiture proceedings. At present, no monetary assets remain in the possession or control of White Peaks LLC or NOVA WPC LLC"; and*

  d.   *"Moreover, as you already know from Mr. Watson's 'Last Words' email sent on April 2, 2020 (referenced in Exhibit 34 to your Complaint and TRO request), a portion of the proceeds from the White Peaks transaction was paid to an entity under Mr. Watson's control."*

Ex. 8.

**RESPONSE:**   Mr. Nelson admits only that counsel's representations speak for themselves. Mr. Nelson lacks knowledge and information sufficient to respond to the remaining allegations in Paragraph 353 and therefore denies the same.

354.   *Based on these representations, Amazon has not included the White Peaks Defendants in its recent actions to enforce the PI, but reserves the right to do so in the event evidence of non-compliance emerges.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 354 and therefore denies the same.

355.   *The foregoing factual allegations alone establish that the RICO Defendants' extensive and unlawful enterprise activities have already resulted in direct, proximate, and foreseeable injuries to Amazon's business and property, including by inflating the prices that Amazon paid and depriving Amazon of the benefits of business decisions free from illegal outside pressure and control of the disposition of its assets and risk of loss. By reason of their misconduct, the RICO Defendants have successfully extracted from Amazon millions of dollars in kickback and other payments, the full extent of which is not yet known. Beyond these illegal payments, the RICO Defendants' misconduct has caused site disruptions and development delays that have caused Amazon and its partners to incur damages in the form of fees, costs, and reputational harm.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 355.

356.   *Without the Court's intervention, Amazon will continue to suffer significant harm at the hands of the RICO Defendants and their co-conspirators.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 356.

357.   *Based on the foregoing allegations, Plaintiffs hereby plead the following causes of action and requests for relief.*

**RESPONSE:**   The allegations in Paragraph 357 are not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the allegations in Paragraph 357.

**COUNT I**
**RICO Enterprise**
**In Violation of RICO 18 U.S.C. § 1962(a), (b), (c), (d)**

358.    Plaintiffs incorporate all preceding paragraphs by reference.

**RESPONSE:**  All responses made to Paragraphs 1 through 357 of the Complaint are re-alleged and incorporated, herein, by reference.

359.    This count is against all Defendants (RICO Defendants).

**RESPONSE:**   The allegations in Paragraph 359 are not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies all allegations contained in Paragraph 359.

360.    Each RICO Defendant is a "person" as required by 18 U.S.C. § 1961(3).

**RESPONSE:**   Mr. Nelson denies the existence of a RICO enterprise. The remaining allegations contain a legal conclusion to which no response is required.

361.    *The RICO Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each RICO Defendant participated in the operation or management of the RICO Enterprise, which includes but is not limited to the Lease Transaction conduct and Direct Purchase conduct alleged herein.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 361.

362.    *At all relevant times, the RICO Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 362.

363.    The RICO Enterprise is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from the acquisitions, investments, and business activities of at least Amazon and its business partners and investors through perpetration of kickbacks and other unlawful acts by and through which the RICO Defendants fraudulently induced Amazon and its affiliates to send business and payments to or through RICO Enterprise members and their accomplices to obtain and distribute illicit gains from the RICO Enterprise, including from the Lease Transactions and Direct Purchases alleged herein.

**RESPONSE:**  To the extent Paragraph 363 states a legal conclusion, no response is

necessary. Mr. Nelson denies the remaining allegations in Paragraph 363.

364.   *The RICO Defendants organized their operation into a cohesive group with specific and assigned responsibilities to further the enterprise. Over the course of the scheme, the RICO Defendants have adapted the structure of their scheme to changing circumstances—recruiting and attempting to recruit new members, creating new legal entities through which to funnel their illicit proceeds, and preparing to expand and perpetuate their fraudulent scheme.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 364.

365.   *Amazon and its affiliates reasonably relied on the RICO Defendants' representations and assurances that they were conducting business ethically, legally, and according to the applicable provisions laid out in various agreements and relationships between and among Amazon and the RICO Defendants. This reliance resulted and proximately caused harm to Amazon by, among other things, causing Amazon and its affiliates to enter into agreements they would not have otherwise entered, to pay more than they would have otherwise paid, and to lose the honest services of its own employees.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 365.

366.   *The RICO Defendants acted with the intention of securing and sharing between themselves the proceeds of transactions that, absent the combination and illicit payments, would not have taken place or would not have resulted in the prices that were approved or received. The agreement between the RICO Defendants resulted in higher purchase, lease, property management, and other costs to Amazon than otherwise would have occurred. As a direct and proximate result of the RICO Defendants' conduct, Amazon and its affiliates suffered economic and reputational harm.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 366.

367.   *The RICO Defendants participated in the RICO Enterprise with the purpose of extracting payments and terms from Amazon and its affiliates that the RICO Enterprise Defendants would not have been able to obtain absent their undisclosed and illegal relationships between and among the RICO Defendants. The RICO Defendants colluded to obtain and direct kickbacks and other illegal benefits to the TM Defendants in exchange for the TM Defendants' fraudulent and otherwise unlawful and inequitable acts causing Amazon and its affiliates to approve contracts, payments, and other benefits to the RICO Defendants.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 367.

368.   *After the RICO Defendants secured commitments and/or approvals from Amazon and its affiliates for real estate transactions worth hundreds of millions of dollars, the RICO Defendants illegally funneled a portion of the proceeds to the TM Defendants and their accomplices, including family members. This kickback scheme allowed the RICO Defendants to secure business and increased the costs and other terms that Amazon and its affiliates agreed to and approved for at least 11 commercial real estate projects in Northern Virginia.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 368.

369.   *The pattern of racketeering has been continuous. The Supreme Court has recognized "continuity" is "both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 241 (1989). The predicate acts in the RICO Enterprise stretched over a substantial period of time, with the scheme beginning in or before September 2017 with the fixing of the RFP process on the Lease Transactions and continuing through August 2019 with the various wire payments made as kickbacks for the lease agreements as well as transaction fraud and kickbacks on the Direct Purchases. The RICO Enterprise expanded over time to encompass new transactions, and was intended to and did present a significant risk of being repeated and expanded to new real estate transactions in Virginia and other markets.*

**RESPONSE:**  To the extent Paragraph 369 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 369.

370.   *Had Amazon and its affiliates not discovered the actions of the RICO Defendants, the RICO Enterprise would have continued and expanded undetected into new transactions and markets. The RICO Defendants worked to set up and expand the infrastructure and patterns that allowed them to execute and repeat their behavior. The development of the RICO Enterprise, and the very nature of it, projects into the future with a threat of repetition due to the constant presentation of new real estate opportunities and contracts. The relationships among the RICO Defendants—including their practices of social interactions—and the way they set up the scheme to function under the cover of their regular courses of business, further establish the common purpose, longevity, and continuing harm of the RICO Enterprise to Amazon, its affiliates and partners, and other victims. The RICO Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise through a*

*pattern of racketeering activity and for the unlawful purpose of intentionally defrauding or otherwise harming the Amazon Plaintiffs and their affiliates. As relevant here, "racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1957 (transacting in criminally-derived property), 18 U.S.C. § 1952 (violations of the Travel Act).*

**RESPONSE:**  To the extent Paragraph 370 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 370.

## Pattern of Racketeering Activity
## Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343

371.    *The RICO Defendants conducted and participated, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).*

**RESPONSE:**  To the extent Paragraph 371 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 371.

372.    *Pursuant to and in furtherance of their unlawful scheme, the RICO Defendants committed, or agreed to facilitate, multiple related acts of wire fraud in violation of 18 U.S.C. § 1343. Under 18 U.S.C. § 1343, anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of the "wire[s]" "for the purpose of executing such scheme or artifice."*

**RESPONSE:**  To the extent Paragraph 372 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 372.

373.    *"For purposes of this chapter, the term 'scheme or artifice to defraud' includes[, but is not limited to,] a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.*

**RESPONSE:**  Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 373.

374.    *Pursuant to and in furtherance of their unlawful scheme, the RICO Defendants committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud," and by "obtaining money*

*[and] property. . . by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be Transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."*

**RESPONSE:**   To the extent Paragraph 374 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 374.

375.   *These acts of wire fraud included at least nine wire payments between March 2018 and August 2019 that constituted kickback payments made pursuant to the referral/kickback agreement that Northstar, by and through its CEO and alter ego defendant Brian Watson, signed with Villanova Trust involving the Virginia Lease Transactions. These payments and related activities constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). The RICO Defendants' acts of wire fraud also included several bank wire payments among the RICO Defendants to secure the sale and settlement of Amazon's direct purchase of the Blueridge Property and also the White Peaks commercial real estate parcel in 2019. For example, the RICO Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account." Ex. 46. The RICO Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. Id. The RICO Defendants also directed or caused the payment of approximately $5 million in proceedings from the White Peaks transaction to a personal bank account registered to RICO Defendant Brian Watson in or around the fall of 2019.*

**RESPONSE:**   To the extent Paragraph 375 states a legal conclusion, no response is necessary. Mr. Nelson denies the remaining allegations in Paragraph 375.

376.   *On information and belief, the RICO Defendants and their agents have also transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds that furthered their fraudulent enterprise. These communications included emails, chats, and other communications between and among the RICO Defendants concerning their scheme; the transmission of Amazon's confidential business information using personal email addresses; communications by the TM Defendants, Brian Watson, and his agents to co-conspirators and others misrepresenting the nature of the RICO Enterprise, misleading federal agents, and alerting his co-conspirators to the FBI's investigation; and communications by Northstar, Brian Watson, and his agents to IPI and others designed to interfere with Amazon's use and enjoyment of several Virginia lease sites.*

**RESPONSE:**   To the extent Paragraph 376 states a legal conclusion, no response is necessary. Mr. Nelson lacks knowledge and information sufficient to respond to allegations in Paragraph 376 against any other defendant in this action and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 376.

377.   *In all instances, the RICO Defendants acted with knowledge and fraudulent intent to cause Amazon to make payments that would benefit the RICO Defendants and their co- conspirators.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 377.

378.   *In committing these acts, the RICO Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 378.

### Pattern of Racketeering Activity
### Honest Services Fraud in Violation of 18 U.S.C. § 1346

379.   *Pursuant to and in furtherance of their unlawful scheme, the RICO Defendants committed, or agreed to facilitate, multiple related acts of honest services fraud as described in 18 U.S.C. § 1346.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 379.

380.   *18 U.S.C. § 1346 provides that the term "scheme or artifice to defraud" in the wire fraud statute, id. at § 1343, "includes a scheme or artifice to deprive another of the intangible right of honest services."*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 380.

381.   *The honest services fraud statute "criminalizes . . . schemes to defraud that involve bribes or kickbacks." Black v. United States, 561 U.S. 465, 471 (2010) (citing Skilling v. United States, 561 U.S. 358, 408 (2010)).*

**RESPONSE:**   Mr. Nelson admits only that the statute and caselaw speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 381.

382. *The RICO Enterprise described herein is a fraudulent kickback scheme under 18 U.S.C. § 1346. Critically, the RICO Defendants used the Villanova Trust and other entities to funnel kickbacks to the TM Defendants on Lease Transactions and Direct Purchases. This kickback scheme was central to the RICO Defendants' broader unlawful enterprise, which was designed and executed through multiple unlawful acts with the common purpose of causing Amazon and its affiliates and partners to approve or provide payments, contracts, or other benefits to the RICO Defendants that caused Amazon and its partners direct and proximate harm.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 382.

383. *The RICO Enterprise is reflected in at least nine lease-related payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019, Exs. 3, 7, 11, 14, 31, and also in kickback and other illicit payments on the Direct Purchases.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 383.

384. *In furtherance of the RICO Enterprise, the RICO Defendants made material false statements and omissions, including but not limited to falsely warranting that the Northstar parties "dealt with no brokers, agent or other person in connection with" the covered transaction, Ex. 24, in connection with real estate transactions worth hundreds of millions of dollars. The RICO Defendants also made knowingly false and material representations about the price, terms, comparables, and availability of Virginia real estate parcels as detailed above.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 384.

385. *In furtherance of the RICO Enterprise, TM Defendant Casey Kirschner made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other RICO Defendants.*

**RESPONSE:**  Mr. Nelson denies that he was engaged in a "RICO Enterprise," or that any such enterprise existed. Mr. Nelson denies the remaining allegations in Paragraph 385.

386. *In furtherance of this fraudulent kickback scheme, Defendant Carleton Nelson made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other RICO Defendants.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 386.

387. *The RICO Defendants also owed fiduciary duties to Amazon, either through their employment relationship or occupation of other positions of trust, which they violated by depriving Amazon of its intangible right to their honest services.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 387.

388. *Absent the kickback payments and related deception and unlawful conduct by the RICO Defendants, Amazon would not have entered into any of the Lease Transactions or Direct Purchases on the terms infected by the RICO Defendants' unlawful acts.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 388.

389. *In all instances, the RICO Defendants acted with knowledge and fraudulent intent.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 389.

390. *In all instances, the RICO Defendants knew, or reasonably should have known, that the RICO Enterprise would directly and proximately harm Amazon and its affiliates and partners.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 390.

391. *In committing these acts, the RICO Defendants committed, or agreed to facilitate, honest services fraud in violation of 18 U.S.C. § 1346, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 391.

### Pattern of Racketeering Activity
### Money Laundering in Violation of 18 U.S.C. § 1956

392. *Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 392.

393. *Under 18 U.S.C. § 1956(a)(1)(A)–(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property "with the intent to promote the carrying on of specific unlawful activity" or "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the*

*location, the source, the ownership, or the control of the proceeds of specified unlawful activity."*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 393.

394.   *A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)–(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 394.

395.   *The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," of the RICO statute.*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 395.

396.   *The RICO Defendants repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts at financial institutions to further their racketeering activities.*

**RESPONSE:**   To the extent Paragraph 396 contains a legal conclusion, no response is

required. Mr. Nelson denies the remaining allegations in Paragraph 396.

397.   *First, they regularly transacted business among themselves and others affiliated with the RICO Enterprise using the various LLCs and trusts. For example, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in wired kickback payments from Northstar to Villanova Trust as of December 14, 2018. Former Northstar COO Timothy Lorman then corroborated these payments and discovered two additional wire receipts (dated June 7, 2019 and August 7, 2019) documenting kickback payments from WDC Holdings (Northstar) to Villanova Trust in furtherance of the RICO Enterprise. These wire transfers occurred across state lines, as Northstar is located in Colorado and Villanova Trust and its accounts are located in Tennessee. Moreover, the RICO Defendants knew that the funds*

*being transferred were derived from the unlawful activities of their RICO Enterprise and associated unlawful acts, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  As such, the RICO Defendants violated 18 U.S.C. § 1956 every time they transacted using funds illicitly derived from the Lease Transactions and every time payments were made to Villanova Trust.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 397.

398.   *The RICO Defendants also engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(A) by engaging in transactions using bank accounts to further their racketeering activities on the Direct Purchases. Specifically, on the White Peaks transaction the RICO Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account." Ex. 46. The RICO Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. Id. The RICO Defendants subsequently directed or caused to be paid a portion of the funds they received from Amazon for the White Peaks sale to at least one account held for the benefit of the TM Defendants. TM Defendant Casey Kirschner used at least a portion of these funds for personal gain, including to finance the real property and improvements known as 35 Queensland Lane North in in Plymouth, Minnesota at issue in the federal civil forfeiture action the United States filed in rem against that property and improvements in this Court on June 1, 2020. Ex. 12.*

**RESPONSE:**   Mr. Nelson denies that he was engaged in a "RICO Enterprise," or that any such enterprise existed. Mr. Nelson further denies that he engaged in money laundering. Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 398 about financial transactions he was not involved with and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 398.

399.   *The RICO Defendants also directed or caused the payment of approximately $5 million in proceeds from the White Peaks Purchase to a personal bank account registered to RICO Defendant Brian Watson in or around the fall of 2019.  The RICO Defendants knew that the funds being moved to these accounts were derived from the unlawful activities of their enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein. As such, the RICO Defendants violated 18 U.S.C. § 1956.*

**RESPONSE:** Mr. Nelson denies that he was engaged in a "RICO Enterprise," or that any such enterprise existed. Mr. Nelson further denies that he engaged in money laundering. Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 399 about financial transactions he was not involved with and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 399.

400. *In addition, in violation of 18 U.S.C. § 1956(a) the RICO Defendants attempted to hide the origins and paths of the proceeds of their Lease Transactions, Direct Purchases, and related unlawful activities by passing funds derived from such activities through various LLCs and trusts, including Villanova Trust, an entity created by Christian Kirschner, the brother of TM Defendant Casey Kirschner, who had legal, fiduciary, and ethical duties to Amazon.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 400.

**Pattern of Racketeering Activity: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957**

401. *Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.*

**RESPONSE:** Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 401.

402. *One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."*

**RESPONSE:** Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 402.

403. *The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense," id. at § 1957(f)(2); it further defines "specified unlawful activity" as the same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1), id. at § 1957(f)(3).*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 403.

404.   *The money that the RICO Defendants derived through the kickback scheme and fraudulent dealings were taken at the expense, and to the detriment of, Amazon and its affiliates.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 404.

405.   *Relatedly, through the RICO Enterprise and related unlawful activities, the RICO Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein (including wire fraud), which also constitute "specified unlawful activity" under 18 U.S.C. § 1957(f)(3). Through this conduct, the RICO Defendants derived proceeds that unjustly enriched themselves and also directly and proximately harmed Amazon and its affiliates and partners.*

**RESPONSE:**   To the extent Paragraph 405 contains a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 405.

406.   *As the perpetrators and beneficiaries of the "specified unlawful activity" from which the funds were derived, the RICO Defendants knew the money and other benefits they obtained from the RICO Enterprise were the product of such activity.*

**RESPONSE:**   To the extent Paragraph 406 contains a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 406.

407.   *By depositing these funds in at least one bank account held by an interstate financial institution, the RICO Defendants engaged in monetary transactions as defined by 18 U.S.C. § 1957(f)(1). When the RICO Defendants engaged in any subsequent withdrawal, transfer, or exchange of these funds, they engaged in further monetary transactions as defined by 18 U.S.C. § 1957(1).*

**RESPONSE:**   To the extent Paragraph 407 contains a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 407.

408.   *As detailed above, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018. And Mr. Lorman discovered two wires, one for $150,000 and another for $321,028.44, both far in excess of the $10,000 threshold required for liability*

*under 18 U.S.C. § 1957. On numerous occasions, the RICO Defendants withdrew or transferred portions of these proceeds in excess of $10,000.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to confirm or deny the allegations in Paragraph 408 about Informant 1 and Mr. Lorman and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 408.

409.   *In addition, the RICO Defendants directed or caused the payment of over $6 million in proceeds from the White Peaks sale to bank accounts held for the benefit of the TM Defendants and Brian Watson in or around the period from July to September 2019. The RICO Defendants also directed or caused the payment of $10 million in illicit profits on the Blueridge Property to be paid or funneled to the TM Defendants. The funds were fruit of the RICO Defendants' unlawful activities related to their RICO Enterprise.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 409.

410.   *For the foregoing reasons, the RICO Defendants repeatedly violated 18 U.S.C. § 1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).*

**RESPONSE:**   To the extent Paragraph 410 contains a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 410.

**Pattern of Racketeering Activity:
Violation of the Travel Act, 18 U.S.C. § 1952**

411.   *Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of interstate facilities to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson denies the remaining allegations in Paragraph 411.

412.   *The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 412.

413.   *For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers. The RICO Defendants made use of interstate facilities in furtherance of their crimes of money laundering.*

**RESPONSE:**   Mr. Nelson admits only that the statute speaks for itself. Mr. Nelson

denies the remaining allegations in Paragraph 413.

414.   *The RICO Defendants used wire transfers to make payments and communicated to each other via phone, e-mail, and/or other electronic means in order to further their money laundering activities. The RICO Defendants reside in various states and used interstate facilities in furtherance of their crimes of money laundering. For example, multiple wire transfers from Northstar in Colorado went to Villanova Trust in Tennessee. Northstar and other Defendants domiciled in Colorado, Tennessee, and Nevada conducted business with Amazon, which has headquarters and/or principal places of business in Washington State and Virginia. And the RICO Defendants, including the TM Defendants, personally engaged in interstate travel to participate in meetings or other activities in furtherance of the RICO Enterprise. Any transactions that the RICO Defendants made with vendors or other business partners located in Virginia were also interstate activities that furthered their bribery (kickback) and money laundering activities with respect to the Lease Transactions and Direct Purchases.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 414.

415.   *Both to commit acts of bribery of others (to ensure their silence) and money laundering and to facilitate these acts, the RICO Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity." Among other things, they intentionally engaged in acts of bribery of others (kickbacks to secure improper and unjust benefits and to secure concealment of the RICO Enterprise) and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956. Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 415.

**Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity under 18 U.S.C. § 1961(5)**

416.  *The RICO Defendants committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering. The acts alleged were related to each other by virtue of common participants (the RICO Defendants), common victims (Amazon, IPI, and their affiliates, partners and investors), a common method of commission (perpetration of a kickback and money laundering scheme that fraudulently induced business and contracting decisions to the benefit of the RICO Defendants), and a common purpose (defrauding and otherwise extracting money and property from Amazon and its affiliates and partners for the personal financial gain of the RICO Defendants while concealing their unlawful conduct). The RICO Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).*

**RESPONSE:**   To the extent the allegations in Paragraph 416 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 416.

417.  *The RICO Defendants violated 18 U.S.C. § 1962(a).*

**RESPONSE:**   To the extent the allegations in Paragraph 417 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 417.

418.  *As a direct and proximate result of the RICO Enterprise and the RICO Defendants' racketeering and other activities, Plaintiffs have been injured in their business and property in violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principle . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."*

**RESPONSE:**   To the extent the allegations in Paragraph 418 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 418.

419.  *The RICO Defendants violated 18 U.S.C. § 1962(b).*

**RESPONSE:**   To the extent the allegations in Paragraph 419 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 419.

420.   *As a direct and proximate result of the RICO Defendants' racketeering activities, the Amazon Plaintiffs and their affiliates, partners, and investors, have been injured in their business and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."*

**RESPONSE:**   To the extent the allegations in Paragraph 420 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 420.

421.   *The RICO Defendants derived, both directly and indirectly, financial and other benefits as a result of their unlawful RICO Enterprise, including but not limited to the kickbacks and other payments they received as a result of their fraud and other enterprise conduct.*

**RESPONSE:**   To the extent the allegations in Paragraph 421 state a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 421.

422.   *The unlawful proceeds from the RICO Enterprise were used in part to operate defendant Northstar, which defendant Brian Watson converted as a vehicle and alter ego for the unlawful activities of the RICO Defendants' racketeering activities.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 422 because, among other reasons, there was no "RICO Enterprise," there were not "unlawful proceeds," and he engaged in neither "unlawful activities" nor "racketeering activities."

423.   *On information and belief, Watson commingled his personal finances with Northstar funds and assets.*

**RESPONSE:**   Mr. Nelson denies knowledge or information sufficient to confirm or deny the allegations in Paragraph 423 and therefore denies the same.

424.   *Moreover, Watson is listed as the owner of the various Northstar-associated entities—notably Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, and NSIPI Administrative Manager, LLC—that until April 2, 2020, had ownership interests and/or management responsibilities for Lease Transaction properties through NSIPI Data Center Venture, LLC, the joint venture that (through IPI) recently terminated all Northstar-related interests in the venture.*

**RESPONSE:** Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraph 424 and therefore denies the same.

425. *The RICO Defendants maintain control of the RICO Enterprise, including through the activities of the RICO Defendants and trusts, LLCs, and other channels engaged in interstate commerce and whose activities affect interstate commerce.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 425.

426. *The RICO Defendants violated 18 U.S.C. § 1962(c) by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."*

**RESPONSE:** To the extent Paragraph 426 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 426.

427. *The RICO Defendants also violated 18 U.S.C. § 1962(d), which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c). The RICO Defendants knowingly agreed to commit, and subsequently engaged in, a pattern of racketeering activity, and further knew that the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. Each of the RICO Defendants knew about and agreed to facilitate the RICO Enterprise's unlawful scheme to obtain property and other illicit benefits from Amazon and its affiliates and partners. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the RICO Enterprise, including the acts of racketeering set forth above.*

**RESPONSE:** To the extent Paragraph 427 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 427.

428. *Amazon was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d).*

**RESPONSE:** To the extent Paragraph 428 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 428.

429. *The RICO Enterprise directly and proximately caused injuries to Amazon and its affiliates and partners include, but are not limited to: the purchase*

*of real property in Virginia unlawfully inflated above its fair market value by millions of dollars; millions of dollars in kickback payments that resulted in Amazon and its affiliates paying artificially inflated prices for at least the 11 real estate transactions alleged herein; the fees and costs Amazon and its partners incurred by working to remove the RICO Defendants, their agents, and those acting in concert with them from their roles on the affected Lease Transaction sites, including attorneys' fees and costs associated with preparing, executing, and enforcing the February 19, 2020 Lease Continuity Agreement; the fees, costs, and reputational damage Amazon and its affiliates incurred due to Lease Transaction site disruption and development delays; the fees and costs associated with investigating, exposing, and defending against the RICO Defendants' pervasive fraud and other misconduct; the fees and costs associated with complying with federal law enforcement agencies' investigations of the RICO Defendants' misconduct; damage to Amazon's business reputation and goodwill, including damage to Amazon's business relationships with entities and individuals associated with the affected Virginia real property sites; the impairment of Amazon's legal entitlement to business relationships and to make business decisions free from outside pressure wrongfully imposed; and the denial of Amazon's right to control both the disposition of its assets and its risk of loss.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 429.

430.   *These injuries to Amazon were a direct, proximate, and reasonably foreseeable result of the RICO Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d). Amazon has been and will continue to be injured in its business and property in an amount to be determined at trial.*

**RESPONSE:**   To the extent Paragraph 430 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 430.

431.   *Pursuant to RICO, 18 U.S.C. § 1964(c), Amazon is entitled to recover treble damages, plus costs and attorneys' fees, from the RICO Defendants.*

**RESPONSE:**   To the extent Paragraph 431 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 431.

432.   *Pursuant to the RICO statute, 18 U.S.C. § 1964(a), Amazon is entitled to injunctive and other equitable relief, including an order requiring the RICO Defendants to disgorge the full measure of their unjust gains from the Lease Transactions.*

**RESPONSE:**   To the extent Paragraph 432 states a legal conclusion, no response is required. Mr. Nelson denies the remaining allegations in Paragraph 432.

433.   *Amazon is further entitled to, and should be awarded, a permanent injunction that enjoins the RICO Defendants, their assignees, and anyone else acting in concert with them from profiting from or otherwise monetizing their relationship with Amazon, Amazon confidential information, or any of the projects or properties described herein, including by marketing or otherwise leveraging the existence of a relationship with Amazon and/or knowledge of Amazon business practices to promote future business activities.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 434.

## COUNT II
## Detinue Pursuant to Va. Code § 8.01-114

434.   *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**   All responses made to Paragraphs 1 through 433 of the Complaint are re-alleged and incorporated, herein, by reference.

435.   *This count is against the RICO Defendants.*

**RESPONSE:**   Paragraph 435 is not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 435.

436.   *"An action for detinue lies when a party unlawfully withholds the personal property of another." Secureinfo Corp. v. Telos Corp., 387 F. Supp. 2d 593, 620 (E.D. Va. 2005) (citing Va. Code § 8.01-114). In a detinue action, "[t]he plaintiff must merely allege that it owns the chattel and that the defendant unlawfully withholds it." Id.*

**RESPONSE:**   Paragraph 436 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 436.

437.   *Further, under Virginia law, "[i]t shall be sufficient ground for an action for pretrial levy or seizure of an attachment if the specific personal property sought to be levied or seized [w]ill be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff,*

*so as not to be forthcoming to answer the final judgment of the court respecting the same." Va. Code § 8.01-534(B)(1). "[A]n attachment in equity under Virginia Code 8.01-534" is satisfied if the district court makes factual findings supporting, among other things, "any incident of self-dealing" or "any incident of secret manipulation of a financial transaction for an unlawful purpose." United States v. Cohen, 152 F.3d 321, 326 (4th Cir. 1998).*

**RESPONSE:**   Paragraph 437 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 437.

438.    *The RICO Defendants fraudulently induced the Plaintiffs to sign multiple lease agreements.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 438.

439.    *Each Lease warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents." Ex. 24 ¶ 33.*

**RESPONSE:**   Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 439 and therefore denies the same.

440.    *And in the immediately ensuing paragraph, titled "Brokers," Northstar "represent[ed] and warrant[ed] that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." Id. at ¶ 34.*

**RESPONSE:**   Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 440 and therefore denies the same.

441.    *In all of the Leases, the "Brokers" line on page 1 states "N/A," id. at 1, and each Lease represented that there were "no management agreements, services, maintenance, or other contracts . . . relating to the Project . . . other than those" that had been "disclosed in writing" to Amazon, id. at 207. The Leases also state that the Northstar parties "dealt with no brokers, finders or the like in connection with th[e] transaction," and that Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations." Id. at 6, 209.*

**RESPONSE:**  Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 441 and therefore denies the same.

442. *In a scheme orchestrated by Defendant Watson and facilitated at his direction through Defendant WDC Holdings, the RICO Defendants charged Amazon fees and costs that were outside the permitted scope of the Lease Agreements and which resulted in inflated pricing.*

**RESPONSE:**  Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 442 and therefore denies the same.

443. *Watson and WDC Holdings then transferred those fees and costs to Defendant Villanova Trust, which thereafter disbursed those funds to former Amazon employees Casey Kirschner and Carlton Nelson, and Villanova Trust Trustee Christian Kirschner.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 443.

444. *The so-called management services, broker and finder fees, and other "professional fees and costs incurred in connection with lease negotiations" were never disclosed to Plaintiffs.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 444.

445. *These "incident[s] of self-dealing" and "secret manipulation[s] of . . . financial transaction[s] for an unlawful purpose" "are shown in the multitude of exhibits and affidavits" that the Plaintiffs have submitted to the Court, and satisfy the issuance of a prejudgment attachment under Virginia law. Cohen, 152 F.3d at 326.*

**RESPONSE:**  Paragraph 445 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 445.

446. *Through the Lease Transaction portion of the RICO Enterprise, the RICO Defendants obtained "specific personal property" that the Plaintiffs now seek "to be levied or seized" given the risk that they will be "disposed of by the [Count I Defendants]." See Va. Code § 8.01-534(B)(1).*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 446.

447. *The specific personal property totals at least $16,250,00.00.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 447.

448. *And the remainder represents the sum of specific amounts that Defendant Casey Kirschner expressly designated as kickbacks from the Northstar Lease Transaction fees in a file recovered from his company laptop: $4,150,000 (Shaw Rd.), $8,500,000 (Quail Ridge), $3,600,000 (Manassas Lease Transactions). Ex. 10; Dkt. 57 ¶ 2.*

**RESPONSE:** Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 448 about the referenced computer file and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 448, including that there were any kickbacks.

449. *By including in the Lease Transactions at least an additional $16,250,000 in kickback fees, the RICO Defendants inflated the transaction price by at least $16,250,000.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 449.

450. *Accordingly, Amazon committed to overpaying at least $16,250,000 for the contracts at issue, to its detriment.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 450.

451. *For this reason alone, the corpus of funds the PI designates for judgment security represents only a highly conservative and clearly documented portion of the Amazon property the Northstar Defendants and their co-conspirators unlawfully procured from the company, which included more than just the kickback "shares" specifically designated to flow to Casey Kirschner.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 451.

452. *Although the Northstar Defendants dispute that they actually received all of these funds, they do not deny making nine wire payments totaling $5,112,983.84 to Villanova Trust pursuant to their 2018 Referral Agreement on the Amazon Lease Transactions. Ex 11, Dkt. 57 ¶ 4.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 452 and therefore denies the same.

453. *These payments relate directly to real estate transactions that occurred in Virginia, and are therefore subject to a claim for detinue under Virginia law.*

**RESPONSE:**  Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 453 about the payments and therefore denies the same. To the extent Paragraph 453 contains a legal conclusion, no response is required. Mr. Nelson denies any remaining allegations in Paragraph 453.

> 454.  *The $17,730,000 that Plaintiffs overpaid White Peaks Capital and NOVA PWC LLC, the $5,000,000 from that corpus these two defendants wired to Watson and WDC Holdings after an October 2019 "settlement," and, on information and belief, the approximately $1,000,000 from that corpus one or both of these defendants wired to an account associated with Johnny Lim and/or E2M Properties, LLC for Casey Kirschner's benefit, also qualify for pretrial attachment under Virginia law.*

**RESPONSE:**  Paragraph 454 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 454.

> 455.  *White Peaks Capital and NOVA PWC LLC inflated the price of the transaction unknowingly to Plaintiffs, who believed that they were paying a price that was negotiated in the absence of fraud or self-dealing.*

**RESPONSE:**  Mr. Nelson lacks knowledge or information sufficient to respond to the allegations in Paragraph 455 about Plaintiffs' knowledge and belief and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 455, including that there was any fraud.

> 456.  *The White Peaks transaction concerned real property located in Loudon County, Virginia, and the initial seller of the property (41992 John Mosby Highway LLC) is a Virginia limited liability company. See Ex. 47.*

**RESPONSE:**  Mr. Nelson admits only that the public records concerning the sale speak for themselves.

> 457.  *The $10,000,000 that Plaintiffs overpaid Blueridge Group with Casey Kirschner's assistance, for the Blueridge Property, and the $5,000,000 from that corpus the TM Defendants received also qualify for pretrial attachment under Virginia. law.*

**RESPONSE:**   Paragraph 457 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 457.

> 458.   *Casey Kirschner and Blueridge Group inflated the price of the transaction- unknowingly to Plaintiffs, who believed that they were paying a price that was negotiated in the absence of fraud or self-dealing.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information to respond to the allegations in Paragraph 458 about Plaintiffs' knowledge and belief and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 458, including that there was any fraud.

> 459.   [REDACTED]

**RESPONSE:**  Mr. Nelson admits that the property is located where the documents reflect it is located.

> 460.   *This type of manipulation is precisely the types of action that the Fourth Circuit has recognized as supporting a detinue claim under Virginia law. See Cohen, 152 F.3d at 326.*

**RESPONSE:**   Paragraph 460 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 460.

> 461.   *The fraudulent Direct Purchase conduct resulted in the RICO Defendants obtaining a specific amount of money from the Plaintiffs.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 461.

> 462.   *The property for which Plaintiffs now seek attachment is Virginia property recoverable in detinue under Virginia law.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 462.

## COUNT III
## Fraud

> 463.   *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 462 of the Complaint are re-

alleged and incorporated, herein, by reference.

464.     *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 464 is not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 464.

465.     *In Virginia, a party "alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him."  Thompson v. Bacon, 425 S.E.2d 512, 514 (Va. 1993).*

**RESPONSE:**  Paragraph 465 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 465.

466.     *In the alternative for the TM Defendants, under Washington law "[t]he elements of fraud include: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." Adams v. King Cty., 192 P.3d 891, 902 (Wash. 2008) (en banc) (citation omitted).*

**RESPONSE:**  Paragraph 466 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 466.

467.     *The RICO Defendants made false representations of an existing fact because they represented and warranted to Amazon that:  (i) they did not pay or receive any undisclosed referral or other fees to third parties in relation to the Virginia Lease Transaction sites, the White Peaks Purchase or, on information and belief, the Blueridge Transaction; and (ii) the Lease Transactions, the White Peaks Purchase and, on information and belief, the Blueridge Transaction were competitive fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 467.

468. *The facts that the RICO Defendants misrepresented or omitted were material. As noted, a central component of the Lease Transactions was the parties' agreement that Amazon's contract partners had "no" undisclosed special arrangements or compensation commitments to third parties, and that employees responsible for ensuring the execution of those transactions would comply with all relevant laws and codes of conduct. Amazon's execution of the White Peaks transaction was expressly premised on the Company's reasonable understanding that it was paying a competitive market price in an arms-length transaction, instead of one unlawfully inflated by millions of dollars due to the RICO Defendants' fraud and kickback scheme. And on information and belief, Casey Kirschner presented and the Company reasonably relied on the fact that the Blueridge Transaction was a competitive market price in an arm-length transaction, instead of one that contained a hidden $10 million fee to an interloper.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 468.

469. *The RICO Defendants knowingly and intentionally made the above and other misrepresentations or omissions to Plaintiffs to induce them to enter into the Lease Transactions, the White Peaks Purchase and, on information and belief, the Blueridge Transaction that Defendants knew involved prohibited and/or undisclosed payments. The RICO Defendants knew at the time they represented they had no undisclosed third party arrangements concerning the Lease Transactions with Amazon that they would channel payments through Northstar's kickback ("Independent Contractor") agreement with Villanova Trust, which in turn resulted in payments to former Amazon TMs, including Casey Kirschner and Nelson, and others in violation of applicable laws and Amazon's Code of Conduct, and, on information and belief, inflated many contracts governing the affected Virginia real property sites above their competitive market price, injuring Amazon by inflating the prices it committed to pay for these transactions. The RICO Defendants likewise intentionally sold the White Peaks property and the Blueridge Property to Amazon at prices they knew were not the competitive market prices represented to Amazon in accordance with its procurement standards. Amazon was not and could not reasonably have been made aware of these misrepresentations and omissions.*

**RESPONSE:** Mr. Nelson denies the remaining allegations in Paragraph 469.

470. *The RICO Defendants made these misrepresentations and omissions with the intent to mislead Amazon and fraudulently induce it to award them lease and purchase contracts (on all of the Virginia Leased Transaction properties, the White Peaks Purchase and, the Blueridge Property) so they*

*could reap millions of dollars in unlawful fees and other payments, at Amazon's expense.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 470.

471.   *Plaintiffs had a right to and did rely on the RICO Defendants' misrepresentations and omissions to their detriment. Amazon entered into the Lease Transactions in justifiable reliance on the RICO Defendants' misrepresentations that no undisclosed fees would be paid on the transactions, that the transactions were in Amazon's best interests and in compliance with Amazon's Code of Conduct, and that the price Amazon paid for the Leases, the White Peaks Purchase and the Blueridge Transaction were competitive market prices.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 471.

472.   *Indeed, "Amazon would not, under any circumstances, have approved [these] real estate transactions . . . had [it] been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova Trust." Dkt. 44 ¶ 20.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 472.

473.   *And the RICO Defendants knew that Amazon would not have proceeded with the transactions had Amazon known of the payments channeled to Amazon employees and their relatives.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 473.

474.   *As a direct result of Amazon's justifiable and reasonable reliance on the RICO Defendants' material misrepresentations and omissions, Amazon sustained at least tens of millions of dollars in damages, including but not limited to the inflated purchase price on the White Peaks property and the Blueridge Property and the costs and fees it paid to members of the Lease Transaction Enterprise on contracts they procured through fraud and kickbacks which artificially inflated the price of the transactions.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 474.

475.   *Plaintiffs' justifiable and reasonable reliance on the RICO Defendants' misrepresentations and/or omissions resulted in damages to Plaintiffs.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 475.

## COUNT IV
## Tortious Interference with Contractual and/or Business Relations

476.     *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 475 of the Complaint are re-alleged and incorporated, herein, by reference.

477.     *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 477 is not directed at Mr. Nelson and therefore requires no response. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 477.

478.     *In Virginia, the elements of tortious interference are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." Schaecher v. Bouffault, 772 S.E.2d 589, 602 (Va. 2015).*

**RESPONSE:**   Paragraph 478 contains a legal conclusion to which no response is required.

479.     *In the alternative for the TM Defendants, under Washington law "[a] claim of tortious interference requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage. Cornish Coll. of the Arts v. 1000 Virginia Ltd. P'ship, 242 P.3d 1, 13 (Wash. Ct. App. 2010).*

**RESPONSE:**   Paragraph 479 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 479.

480.     *Plaintiffs entered into contractual relationships and/or business expectancies with the Northstar Defendants, their affiliates, and other partners as alleged herein.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to Paragraph 480 and therefore denies the same. Mr. Nelson also incorporates his responses to the allegations made "herein" the rest of the Complaint.

481.   *The RICO Defendants had knowledge of these contracts, relationships, or business expectancies.*

**RESPONSE:**   Mr. Nelson denies that there was a RICO enterprise and that he was engaged in a racketeering or kickback scheme. Mr. Nelson denies the remaining allegations in Paragraph 481 as stated.

482.   *With improper motives and by improper means, the RICO Defendants acted intentionally to induce or cause a breach or termination of Plaintiffs' contractual relationships or business expectancies by, among other things, fraudulently and unethically charging fees that were not authorized by Plaintiffs and/or were affirmatively prohibited by Plaintiffs' contracts and/or business policies and practices, and otherwise intentionally engaging in unlawful conduct that impeded or injured Plaintiffs' contractual or business relationships with non-defendant parties.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 482.

483.   *Plaintiffs have been harmed by, and are suffering from ongoing and imminent threats of additional harm from, the RICO Defendants' tortious interference with Plaintiffs' contractual and/or business relations as detailed above and in the Application for a Temporary Restraining Order that accompanied Amazon's first Verified Complaint. Injury and damages include, but are not limited to: irreparable harm to the business relationships at the affected Virginia real property sites; immediate economic damages resulting from inflated and fraudulent transaction costs and non-competitive bidding; damages associated with replacing Northstar and other Defendant-affiliated entities at the affected sites, which transition involved substantial business time, attorneys' fees, and site responsibilities; and damages caused by site disruption, development delays, and the associated loss of goodwill, and reputational harm. Although many of these harms are compensable in money damages, the injury to Amazon's ongoing business and business relationships is not, and regardless injunctive relief is necessary to prevent the RICO Defendants from spoliating evidence and assets essential to recovery of monetary relief.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 483.

**COUNT V**
**Civil Conspiracy**

484.  *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 483 of the Complaint are re-alleged and incorporated, herein, by reference.

485.  *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 485 is not directed at Mr. Nelson and therefore requires no response. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 485.

486.  *Under Virginia law, a common law claim of civil conspiracy lies where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." Dunlap v. Cottman Transmission Sys., LLC, 754 S.E.2d 313, 317 (Va. 2014). Virginia law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." Va. Code § 18.2-499(A).*

**RESPONSE:**  Paragraph 486 contains a legal conclusion to which no response is required. Mr. Nelson denies any remaining allegations in Paragraph 486.

487.  *As alleged in Paragraphs 358 to 483 herein, the RICO Defendants have conspired to engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs and others.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 487.

488.  *Under the Virginia statutory claim for civil conspiracy, Plaintiffs are entitled to "recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel." Va. Code § 18.2-500(A). Amazon is also entitled to "loss of profits." Id.*

**RESPONSE:**  To the extent Paragraph 488 contains a legal conclusion, no response is

required. Mr. Nelson denies the remaining allegations in Paragraph 488.

> 489.     *The statute further provides for equitable relief, stating that the "court shall have jurisdiction to . . . issue injunctions pendente lite and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel." Va. Code § 18.2-500(B).*

**RESPONSE:**   Paragraph 489 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 489.

> 490.     *In the alternative for the TM Defendants, under Washington law "[t]o establish a common law claim for civil conspiracy," a plaintiff is "required to prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." Bonneville v. Pierce Cty., 202 P.3d 309, 318 (Wash. Ct. App. 2008) (quotation marks omitted).*

**RESPONSE:**   Paragraph 490 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 490.

### COUNT VI
### Breach of Contract

491.     *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:** All responses made to Paragraphs 1 through 490 of the Complaint are re-alleged and incorporated, herein, by reference.

492.     *This count is against the RICO Defendants.*

**RESPONSE:**   Paragraph 492 is not directed at Mr. Nelson and therefore requires no response. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 492.

493.  *Under Virginia law, "the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa v. QSP, Inc., 624 S.E.2d 43, 48 (Va. 2006).*

**RESPONSE:**   Paragraph 493 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 493.

494.  *In the alternative for the TM Defendants, under Washington law "[t]he elements of a contract claim are: (1) the existence of a valid contract, (2) breach of that contract, and (3) damages resulting from the breach." Karpenski v. American General Life Companies, LLC, 999 F. Supp. 2d 1235, 1250 (W.D. Wash. 2014).*

**RESPONSE:**   Paragraph 494 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies any remaining allegations in Paragraph 494.

495.  *Plaintiffs and their affiliates executed contracts with the RICO Defendants stating, among other things, that the TM Defendants did not have any third party broker, finder, or similar referral contracts or arrangements in relation to the Virginia Lease Transaction sites, the White Peaks Purchase or, on information and belief, the Blueridge Transaction, and that the Lease Transactions, the White Peaks Purchase and, on information and belief, the Blueridge Transaction were competitive, fair market deals executed in Amazon's best interests and in compliance with all relevant laws and Amazon's Code of Conduct.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 495 about all of the contracts referenced therein and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 495.

496.  *The Lease agreements between Amazon and the Northstar-affiliated landlord LLCs for the Virginia Lease Transaction sites warranted that: (i) there "are no management agreements, service, maintenance or other contracts . . . relating to the Project . . . other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with no brokers, finders or the like in connection with this transaction,"; and (iii)*

> *Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting, or professional fees and costs incurred in connection with lease negotiations." Ex. 24 at 7, 207, 209; MacDonald Decl. ¶ 32.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 496 and therefore denies the same.

497.  *Further, in signing each Lease Defendants warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents." Ex. 24 ¶ 33. In the immediately preceding paragraph titled "Brokers," Northstar "represent[ed] and warrant[ed]" that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." Id. ¶ 34.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 497 and therefore denies the same.

498.  *In all of Defendants' Leases, the "Brokers" line on page 1 states "N/A," id. at 1.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 498 and therefore denies the same.

499.  *The RICO Defendants knew at the time they induced Plaintiffs to sign contracts concerning the Lease Transaction sites that they had previously executed a "referral" agreement as part of the kickback scheme and would in fact charge undisclosed and prohibited amounts to Amazon, including to inflated commissions, unauthorized site fees, and kickback payments they funneled through Villanova Trust. Amazon has been damaged in amounts totaling at least $50 million as a result of the RICO Defendants' knowing breach of their contract provisions and warranties.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 499.

500.  *Plaintiffs also executed a CNIAA Agreement with Casey Kirschner that provides, among other things, that: (i) Amazon "has been induced to employ [the TM Defendant] by [the TM Defendant's] representation that [he] will abide by and be bound by each of the convenants and restraints in th[e] Agreement", Ex. 56 § 9 (Kirschner CNIAA); see also Ex. 56 Recitals A–D (Kirschner CNIAA); (ii) any breach of the Agreement may cause*

*Amazon irreparable harm for which there is no adequate remedy at law, Ex. 57§ 7.4 (Kirschner CNIAA); and that (iii) Defendant Casey Kirschner will "hold all Confidential Information in strictest confidence and will not acquire, use, publish, disclose, or communicate any Confidential Information except as required in connection with [their] work without the prior written approval of an authorized officer of Amazon," Ex. 56 § 3.1 (Kirschner CNIAA).*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 500 and therefore denies the same.

501.   *Plaintiffs also executed a CNIAA Agreement with Nelson that provides, among other things, that: (i) that Nelson is "entering into this Agreement . . . as a condition of [his] employment" with Amazon, "recogniz[ing] that the restrictions set forth in Sections 2 and 3 of t[he] Agreement may seriously limit [his] future flexibility in many ways," Ex. 57 Recital and § 4(a) (Nelson); (ii) "[a]ny breach of this Agreement may cause the Company irreparable harm for which there is no adequate remedy at law," Ex. 57 § 6 (Nelson); and that (iii) TM Defendant Nelson "shall not, directly or indirectly, at any time . . . use or cause to be used any" non-public "Confidential Information" acquired from or during employment with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law." Ex. 57 § 2(b) (Nelson).*

**RESPONSE:** Mr. Nelson admits only that his CNIAA speaks for itself.

502.   *These CNIAA Agreements further warrant that, during employment with Amazon and "for 18 months" thereafter, the TM Defendants "will not, directly or indirectly," either "on [their] own behalf or" otherwise, Ex. 56 § 4 (Kirschner CNIAA); Ex. 57 § 3(c) (Nelson CNIAA):*

| CASEY KIRSHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| (i) engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about | (i) "knowingly (i) accept or solicit employment . . . a consulting assignment . . . investment capital, directly or indirectly, from any individual or entity . . . from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective |

which Employee obtained or received Confidential Information";

(ii) "solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information";

(iii) "encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon";

(iv) "solicit or otherwise encourage any employee, contractor, or consultant of Amazon ("Amazon Personnel") to terminate any employment or contractual relationship with Amazon" or "disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity"; or

(v) "otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon." Ex. 56 § 4.

Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or

(ii) accept or solicit employment with, or . . . a consulting assignment with, or . . . business from any individual or entity that was a customer or client of the Company prior to the Termination Date, or with which the Company had engaged in serious discussions prior to the Termination Date related to the possibility that such individual or entity might become a customer or client of the company (a "Current or Prospective Customer"), if the product or service provided by the Employee to such Current or Prospective Customer is substantially the same as a product or service offered by the Company to such Current or Prospective Customer, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business relationship or anticipated business relationship with such Current or Prospective Customer; or

(iii) accept or solicit business from any retail market sector, segment, or group that the Company has solicited, targeted, or accepted business from prior to the Termination Date, or has actively planned, prior to the Termination Date, to solicit, target, or accept business from (the "Target Market"), if the product or service provided or offered by the Employee to such Target Market is substantially the same as a product or service provided or offered by the Company to the Target Market, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business activities, or anticipated business activities, related to the Target Market; or

(iv) enter into or propose to enter into any business arrangement with any entity with

<table>
<tr><td></td><td>which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Ex. 57 §§ 3(c)(i)-(iv).</td></tr>
</table>

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to allegations in Paragraph 502 about other any CNIAA that he did not sign and therefore denies the same. Mr. Nelson admits only that his CNIAA speaks for itself.

503. *The TM Defendants breached all and continue to violate aspects of all of these provisions in the course of conducting their unlawful pay-to-play scheme for Amazon real estate business, including by participating in the RICO Enterprise.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 503, including that he breached his CNIAA and there is a "RICO Enterprise."

504. *These breaches have not been cured and have caused Amazon to suffer irreparable harm in the form of damage to its good will, business relationships, and reputation.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 504.

505. *Defendants' breaches have also caused Amazon to suffer pecuniary harm and damages in amounts to be determined at trial.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 505.

## COUNT VII
## Unjust Enrichment and Constructive Trust

506. *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 505 of the Complaint are re-alleged and incorporated, herein, by reference.

507.   *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 507 is not directed at Mr. Nelson and therefore requires no response. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies any remaining allegations in Paragraph 507.

508.   *Under Virginia law, there is "a three-part test to govern unjust enrichment claims: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." James G. Davis Constr. Corp. v. FTJ, Inc., 841 S.E.2d 642, 650 (Va. 2020). The existence of a contract does not bar a claim for unjust enrichment "where the benefit received was outside the scope of the contract." Id. at 648 (quotation marks omitted); see also, e.g., id. (the "existence of contract d[oes] not bar [a] claim for unjust enrichment based on allegation that fees charged were illegal"). A claim of unjust enrichment "is recognized as equitable," and "a constructive trust . . . is a tool of equity to prevent unjust enrichment." U.S. ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 497–98 (4th Cir. 1999) (quotation marks omitted); see also Cooper v. Cooper, 457 S.E.2d 88, 92 (Va. 1995) ("A constructive trust is appropriately imposed to avoid unjust enrichment of a party.").*

**RESPONSE:**   Paragraph 508 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 508.

509.   *In the alternative for the TM Defendants, under Washington law a "claim of unjust enrichment requires proof of three elements—(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." Norcon Builders, LLC v. GMP Homes VG, LLC, 254 P.3d 835, 844 (Wash. Ct. App. 2011) (quotation marks omitted). Further, "[a] constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." Baker v. Leonard, 843 P.2d 1050, 1055 (Wash. 1993) (en banc).*

**RESPONSE:**   Paragraph 509 contains a legal conclusion to which no response is

required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 509.

> 510. *Plaintiffs conferred a benefit on the RICO Defendants by paying them millions of dollars in fees and costs on the nine lease transactions detailed herein. These benefits were undisclosed and outside of the scope of the contracts governing the lease transactions, and they were at Amazon's expense.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 510.

> 511. *The RICO Defendants had actual knowledge of these benefits.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 511.

> 512. *Defendant Watson's signature appears on each of the contracts that served as vehicles for the delivery of the benefits. See, e.g., Ex. 24.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to allegations in Paragraph 512 and therefore denies the same.

> 513. *Defendant Watson and Northstar intentionally wired millions of dollars of these benefits to Defendant Villanova Trust, Ex. 11, who on information and belief subsequently disbursed some or all of these benefits to Christian Kirschner and the TM Defendants*
> *.*

**RESPONSE:** Mr. Nelson admits only that the wire transfer records speak for themselves. Mr. Nelson denies the remaining allegations in Paragraph 513.

> 514. *Further, Amazon uncovered multiple files in the recycle bin of Casey Kirschner's Amazon-issued computer establishing his and his co-conspirators' knowledge of the benefits conferred, including a spreadsheet documenting certain Amazon real estate development fees that were expressly designated for prohibited payments to the RICO Defendants as a result of the Lease Transaction portion of the RICO Enterprise. Ex. 10; Dkt. 57 ¶ 2; Dkt. 44 ¶ 15–16. The RICO Defendants should have expected to repay Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and intentionally concealed—the benefits through their knowingly illegal and fraudulent Lease Transaction portion of the RICO Enterprise.*

**RESPONSE:**  Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 514 about Amazon's actions and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraph 514.

515. *The RICO Defendants both accepted and retained these benefits without paying for their value. To date, the RICO Defendants have refused to return a penny of the benefits Plaintiffs conferred on them. This renders receipt of the benefits unjust*
.

**RESPONSE:**  Mr. Nelson denies the remaining allegation in Paragraph 515.

516. *The RICO Defendants' misconduct caused Amazon to enter into leases with project budgets that were inflated to cover at least the kickback payments to the RICO Defendants.*

**RESPONSE:**  Mr. Nelson denies the remaining allegation in Paragraph 516.

517. *But for the misconduct of the RICO Defendants, Amazon would not have entered into any of the contracts at issue or would have entered into leases with accurate budgets.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 517.

518. *Plaintiffs also conferred a benefit on the RICO Defendants by paying to White Peaks Capital and NOVA PWC a figure approximately $17,730,000 in excess of the fair market value of the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise— $5,000,000 of which Watson and WDC Holdings subsequently obtained from the White Peaks Capital and NOVA WPC operators in an undisclosed October 2019 settlement, Lorman Decl. ¶ 13, and on information and belief approximately $1,000,000 that the TM Defendants subsequently obtained from these operators using a bank account associated with Johnny Lim and/or E2M Properties, LLC as a fraudulent pass-through.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 518.

519. *The RICO Defendants had actual knowledge of these benefits Plaintiffs conferred on them. White Peaks Capital and NOVA PWC had actual knowledge of the $17,730,000 benefit because they were parties to the original transaction with 41992 John Mosby Highway LLC, Ex. 47 (stating a $98,670,000.00 Purchase Price) and the same-day, inflated transaction with Plaintiffs, Ex. 37 (stating a $116,389,000 Purchase Price). Watson and WDC Holdings had actual knowledge of this $17,730,000 benefit, Lorman Decl. ¶ 9, and also had actual knowledge of the $5,000,000 benefit because*

*they knowingly obtained it after an undisclosed settlement with the White Peaks Capital and NOVA PWC operators, id. at ¶ 13. On information and belief, the TM Defendants had actual knowledge of this $17,730,000 benefit and also had actual knowledge of the approximately $1,000,000 benefit because they successfully persuaded one or both of the White Peaks Defendants to wire the $1,000,000 to a bank account associated with Johnny Lim and/or E2M Properties, LLC from which the TM Defendants could and did obtain the monies. The RICO Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct. The RICO Defendants thus received these benefits at Amazon's expense.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 519.

520.   *The RICO Defendants both accepted and retained these benefits without paying for their value. To date, the RICO Defendants have not returned any of the benefits Plaintiffs conferred on them. This renders the RICO Defendants' receipt of these benefits unjust.*

**RESPONSE:**   Mr. Nelson lacks knowledge and information sufficient to respond to the

allegations in Paragraph 520 about what Plaintiffs have received and therefore denies the same.

Mr. Nelson denies the remaining allegations in Paragraph 520.

521.   *Plaintiffs also conferred a benefit on the RICO Defendants by paying to Blueridge Group a figure approximately $10,000,000 in excess of the fair market value of the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise, $5,000,000 of which Blueridge then funneled to the TM Defendants for their personal use.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 521.

522.   On *information and belief, the RICO Defendants had actual knowledge of these benefits Plaintiffs conferred on them.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 522.

523.   *On information and belief, the TM Defendants had actual knowledge of the $10,000,000 benefit because Nelson identified the land at issue in the Blueridge Transaction for the express purpose of benefitting from the transaction and Casey Kirschner facilitated the transaction, including the insertion of Blueridge Group into the deal to serve as a conduit for the illegally gained profits.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 523.

524.   *On information and belief, the TM Defendants had actual knowledge of this $10,000,000 benefit, and also had actual knowledge of the $5,000,000 they knowingly obtained personally.*
   .

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 524.

525.   *The Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits and because they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct.  The RICO Defendants thus received these benefits at Amazon's expense.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 525.

526.   *The RICO Defendants both accepted and retained these benefits without paying for their value. To date, the RICO Defendants have not returned any of the benefits Plaintiffs conferred on them. This renders the RICO Defendants' receipt of these benefits unjust.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 526.

527.   *The RICO Defendants' misconduct caused Amazon to purchase land whose price was artificially inflated to cover at least the kickback payments to the RICO Defendants.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 527.

528.   *But for the misconduct of the RICO Defendants, Amazon would have entered into purchase agreements at lower prices.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 528.

529.   *Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in the sworn affidavits and exhibits accompanying this complaint, see Exs. 14, 30, 40– 42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50; additional accounts and assets of the RICO Defendants identified during discovery or the ongoing internal and parallel criminal investigations that contain a portion of the benefits; and other assets identified during discovery or the ongoing investigations that the RICO Defendants' obtained by using the benefits Amazon conferred on them. To the extent the RICO Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to equitable*

*liens on those assets or intermingled accounts. Plaintiffs also request disgorgement of any profits that the RICO Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 529.

### COUNT VIII
### Conversion and Constructive Trust

530.   *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 529 of the Complaint are re-alleged and incorporated, herein, by reference.

531.   *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 531 is not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies any remaining allegations in Paragraph 531.

532.   *"Under Virginia law, conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith." Fed. Ins. Co. v. Smith, 44 F. Supp. 2d 507, 517–18 (E.D. Va. 2001) (quotation marks and footnote omitted), aff'd, 63 Fed. App'x 630 (4th Cir. 2003). "It is well-settled that money . . . may be converted." Id. at 518 n. 25; see also, e.g., PGI, Inc. v. Rathe Prods., Inc., 576 S.E.2d 438, 443 (Va. 2003). Further, "[a] conversion may be committed by intentionally . . . dispossessing another of a chattel," Restatement (Second) of Torts § 223(a) (1965), which can occur by intentionally "obtaining possession of a chattel from another by fraud or duress," id. § 221.  See also id. § 221 cmt. b ("One who by fraudulent representations induces another to surrender the possession of a chattel to him has dispossessed the other of the chattel [and] taking possession of the chattel given under such circumstances is ineffectual to constitute a consent to the taking."). In addition, "[o]ne receiving chattel from a third person with intent to acquire a proprietary interest in it is liable without a demand for its return by the person entitled to possession The mere receipt of the possession of the goods under such circumstances is conversion." Smith, 144 F. Supp. 2d at 519 n.27 (quotation marks omitted).*

**RESPONSE:**   Paragraph 532 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 532.

533.   *In the alternative for the TM Defendants, under Washington law "[c]onversion . . .occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession." Davenport v. Wash. Educ. Ass'n, 197 P.3d 686 (Wash. 2008) (en banc). Further, "[m]oney may be the subject of conversion if the defendant wrongfully received it." Id.*

**RESPONSE:**   Paragraph 533 contains a legal conclusion for which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 533.

534.   *The RICO Defendants wrongfully exercised authority over millions of dollars Plaintiffs had and have a right to immediate possession of by inducing Plaintiffs to pay them and/or their affiliates these monies in the form of undisclosed costs and fees on the nine lease transactions detailed herein that they procured by reason of their fraudulent Lease Transaction conduct.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 534.

535.   *The RICO Defendants wrongfully exercised authority over millions of dollars Plaintiffs had and have a right to immediate possession of.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 535.

536.   *White Peaks Capital and NOVA WPC induced Plaintiffs to purchase the Virginia property site subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by $17,730,000. From that corpus, Defendants Watson and WDC Holdings converted $5,000,000 by executing with the White Peaks Capital and NOVA WPC operators the undisclosed October 2019 settlement, and, on information and belief, the TM Defendants converted $1,000,000 of the inflated price.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 536.

537.  *Similarly, Casey Kirschner induced Plaintiffs to purchase the Blueridge Property subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by $10,000,000. On information and belief, from that corpus, the TM Defendants converted $5,000,000, which they split equally.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 537.

538.  *Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in the affidavits and exhibits accompanying this complaint, see Exs. 14, 30, 40–42; MacDonald Decl. ¶¶ 18, 22, 38, 48–50; additional accounts and assets of the RICO Defendants identified during discovery or the ongoing internal and parallel criminal investigations that contain a portion of the converted property; and other assets identified during discovery or the investigations that the RICO Defendants' obtained by using the converted property. To the extent the RICO Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to equitable liens on those assets or intermingled accounts. Plaintiffs also request disgorgement of any profits that the RICO Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 538.

## COUNT IX
### Alter Ego/Piercing the Corporate Veil

**RESPONSE:**  Paragraphs 539-544 are not directed at Mr. Nelson and therefore do not require a response. To the extent they do require a response, Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraphs 539-544 and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraphs 539-544.

## COUNT X
### Agency/Respondeat Superior

**RESPONSE:**  Paragraphs 545-568 are not directed at Mr. Nelson and therefore do not require a response. To the extent they do require a response, Mr. Nelson lacks knowledge or information sufficient to confirm or deny the allegations in Paragraphs 545-568 and therefore denies the same. Mr. Nelson denies the remaining allegations in Paragraphs 545-568.

## COUNT XI
### Robinson-Patman Act – Antitrust Violation

569.   *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 568 of the Complaint are re-alleged and incorporated, herein, by reference.

570.   *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 570 is not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies any allegations in Paragraph 570.

571.   *Federal law prohibits any person from "pay[ing] . . . receiv[ing] or accept[ing] anything of value as a commission, brokerage, or other compensation" to an agent of another party to the transaction. 15 U.S.C. § 13(c). This prohibition outlaws commercial bribery and kickbacks or other conduct that results in the "bribing of a seller's broker by the buyer." FTC v. Henry Broch & Co., 363 U.S. 166, 168-69 (1960) (quotation marks omitted); see also Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 992 (4th Cir. 1990).*

**RESPONSE:**   Paragraph 571 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 571.

572.   *Federal law provides a private cause of action to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Antitrust plaintiffs are entitled to the "cost of suit, including a reasonable attorney's fee" and to "threefold the damages," including prejudgment interest, as the court finds appropriate. Id.*

**RESPONSE:**   Paragraph 572 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 572.

573. *The RICO Defendants acted in concert to extract payments and terms from Amazon that would not have been available to them absent the undisclosed and illegal conduct by the TM Defendants as agents of Amazon. The RICO Defendants conspired and agreed to provide the TM Defendants with payments and other personal benefits in exchange for the TM Defendants steering Amazon contracts and/or other valuable business opportunities and information to them. In so doing, the RICO Defendants paid, and the TM Defendants "receiv[ed] or accept[ed]" funds or other valuable consideration "as a commission, brokerage, or other compensation" in their capacity as agents for Amazon on the transactions for which the commissions or other consideration was paid. 15 U.S.C. § 13(c).*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 573.

574. *The RICO Defendants at no time disclosed to Amazon the payments or other benefits that Amazon's counterparties on the company's real estate transactions paid to the TM Defendants in their capacity as Amazon's agents.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 574.

575. *As a direct result of this unlawful and undisclosed conspiracy and collusion, the RICO Defendants' payment of prohibited benefits to the TM Defendants caused Amazon to suffer injury in its business or property in amounts to be determined at trial.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 575.

576. *This harm to Amazon is of the type the antitrust laws are designed to prevent. The RICO Defendants' unlawful and collusive conduct with Amazon's agents (the TM Defendants) on the Amazon transactions in issue not only deprived Amazon of the faithful work and honest services of the TM Defendants, but also resulted in inflated or otherwise anti-competitive real estate sale and lease transactions that caused economic harm to Amazon both directly and through its distortion of the relevant market for commercial data center sites in Northern Virginia.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 576.

577. *The RICO Defendants engaged in this scheme with knowledge or reckless indifference that their collusive conduct would cause these injuries to Amazon and restrain competition in the relevant market through the payment of commissions or benefits in violation of 15 U.S.C. § 13(c).*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 577.

578.   *Amazon is well positioned to enforce Section 15(c)'s prohibition on commercial bribery because,' as the TM Defendants' former employer and the victim of their conspiracy internally and with other Defendants in this action, Amazon is uniquely well-positioned to investigate the scope and impact of their unlawful acts on both Amazon's own transactions and the relevant market.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 578.

579.   *As a result of the RICO Defendants' violations, Amazon is entitled to remedies including but not limited to threefold damages, costs, attorney's fees and other compensatory, injunctive, and punitive relief as the Court finds appropriate.*

**RESPONSE:**   Mr. Nelson denies the allegations in Paragraph 579.

## COUNT XII
## Preliminary Injunction – Fed. R. Civ. P. 64, 65 & Va. Code § 8.01-622

580.   *Plaintiffs incorporate all preceding paragraphs by reference.*

**RESPONSE:**  All responses made to Paragraphs 1 through 579 of the Complaint are re-alleged and incorporated, herein, by reference.

581.   *This count is against the RICO Defendants.*

**RESPONSE:**  Paragraph 581 is not directed at Mr. Nelson and therefore no response is required. To the extent a response is required, Mr. Nelson denies the existence of a RICO enterprise and denies all allegations in Paragraph 581.

582.   *The RICO Defendants were engaged in commerce through their business dealings.*

**RESPONSE:**  Mr. Nelson denies any allegation that he was involved in a racketeering or kickback scheme. Mr. Nelson admits only that, as part of his work, he was engaged in commerce. Mr. Nelson denies the remaining allegations in Paragraph 582.

583.   *The RICO Defendants committed civil RICO violations, violations of the Robinson-Patman Act, fraud, tortious interference, civil conspiracy, breach of contract, reformation, unjust enrichment, and conversion, when, in the course of commerce, Defendants paid, received, or accepted money as part of the kickback scheme and/or other unlawful activities committed by or*

*through the Defendants, including as part of the RICO Enterprise, and/or the TM Defendants' pay-to-play scheme for Amazon real estate business and related opportunities.*

**RESPONSE:** Mr. Nelson denies the allegations in Paragraph 583.

584. *Plaintiffs were not aware of the RICO Defendants' unlawful activities including the RICO Enterprise.*

**RESPONSE:** Mr. Nelson lacks knowledge and information sufficient to respond to the allegations in Paragraph 584 about the scope of Plaintiffs' knowledge and therefore denies the same. To the extent Paragraph 584 alleges or implies that Mr. Nelson was engaged in unlawful activities or a "RICO Enterprise," Mr. Nelson denies those allegations. Mr. Nelson denies any remaining allegations in Paragraph 584.

585. *Federal Rule of Civil Procedure 65 addresses the authority of a district court to issue "injunctions and restraining orders," and Rule 65(b) states that a district court "may issue a temporary restraining order without written or oral notice to the adverse party or its attorney" where: "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b).*

**RESPONSE:**   Paragraph 585 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 585.

586. *Federal Rule of Civil Procedure 64 complements Rule 65 in stating that, at "the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64. The rule goes on to state that the "remedies available under this rule include," among other things, "attachment, garnishment, replevin, sequestration and other corresponding or equivalent remedies," and that such remedies are available "however designated and regardless of whether state procedure requires an independent action." Id.*

**RESPONSE:**   Paragraph 586 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 586.

587.   *Virginia law permits a court to award an injunction "whether the party against whose proceedings the injunction be asked resides in or out of" the jurisdiction where the injunction is sought, Va. Code § 8.01-620, and also "to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property." Va. Code § 8.01-622.*

**RESPONSE:**   Paragraph 587 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 587.

588.   *Virginia law further and expressly permits pretrial attachment if the plaintiff sufficiently shows that the defendant "[i]s converting, is about to convert or has converted his property of whatever kind, or some part thereof, into money, securities or evidences of debt with intent to hinder, delay, or defraud his creditors." Va. Code § 8.01-534(A)(4).*

**RESPONSE:**   Paragraph 588 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 588.

589.   *Virginia law also states that "[i]t shall be sufficient ground for an action for pretrial levy or seizure or an attachment if the specific personal property sought to be levied or seized" "[w]ill be sold, removed, secreted or otherwise disposed of by the defendant, in violation of an obligation to the plaintiff, so as not to be forthcoming to answer the final judgment of the court respecting the same." Va. Code § 8.01-534(B)(1).*

**RESPONSE:**   Paragraph 589 contains a legal conclusion to which no response is required. To the extent a response is required, Mr. Nelson denies all allegations in Paragraph 589.

590. *Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief enjoining Defendants and their affiliates, agents, and assigns from: (1) disrupting any direct or indirect business or other relationships or vendor performance at or associated with Plaintiffs' Lease Transaction or other properties in this District; (2) spoliating, dissipating, converting, misappropriating or depleting any evidence or assets related to the conduct at issue in this suit; or (3) using Amazon confidential information, business opportunities, contracts, funds or other assets in violation of Amazon contracts or company policies.*

**RESPONSE:**  Mr. Nelson denies the allegations in Paragraph 590.

## PRAYER FOR RELIEF

Mr. Nelson denies that Plaintiffs are entitled to damages for any of the claims outlined in the Complaint, including the claimed damages outlined in Paragraphs 591-601.

## MR. NELSON'S AFFIRMATIVE DEFENSES

1.      Plaintiffs' claims are barred in whole or in part by the doctrine of release, estoppel, delay, laches and/or waiver.

2.      Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands for its actions in connection with some of real estate transactions at issue in this suit by engaging in the very conduct they allege are illicit or improper.

3.      Plaintiffs' claims are barred in whole or in part by assumption.

4.      Plaintiffs' claims are barred in whole or in part by failure of consideration.

5.      Plaintiffs' claims are barred in whole or in part because Plaintiffs knew of the price differentials concerning the "Direct Purchase Transactions" transactions and thus cannot claim they were misled regarding the same.

6.      Plaintiffs' claims are barred in whole or in part by failure to join indispensable or necessary parties.

7.      Plaintiffs' claims are barred by the doctrine of novation.

8.      Plaintiffs' claims are barred by the doctrine of ratification.

9.      Plaintiffs' claims are barred by the doctrine of unjust enrichment.

10.     Plaintiffs' claims are barred in whole or in part due to failure of conditions.

11.     Plaintiffs' claims fail in whole or in part by Plaintiffs' failure to state a claim upon which relief may be granted.

12.     Plaintiffs' alleged damages were not caused by an alleged act or omission of Mr. Nelson.

13.     If Plaintiffs' sustained any injury or incurred any loss or damages as alleged in the Complaint, the same were caused in whole or in part by acts or omission of another or others over whom Mr. Nelson is not responsible, and whose conduct Mr. Nelson had no duty or reason to anticipate or control.

14.     Plaintiffs' claims are barred in whole or in part by the economic loss rule.

15.     Mr. Nelson reserves the right, with leave of court, to amend his Answer and assert any additional defenses, counterclaims, or cross-claims that may become available through the course of discovery or otherwise during the course of litigation.

## **JURY DEMAND**

Mr. Nelson demands a jury trial on all issues so triable.

Dated: February 24, 2021.

Respectfully submitted,


/s/ Rachel Friedman
Rachel Friedman (VA Bar #93898)
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, AL  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
rfriedma@burr.com

and

J. Alex Little, IV (TN BPR #29858)
     (*pro hac vice*)
BURR & FORMAN, LLP
222 2nd Ave. S., Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
Facsimile: (615) 724-3290
alex.little@burr.com

*Attorneys for Carleton Nelson and Cheshire
Ventures, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2021, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system. I will send the document and a notification of such

filing to the following parties via U.S. mail to their last-known address.

Travis S. Andrews
Luke M. Sullivan
Gibson Dunn & Crutcher, LLP
1050 Connecticut Ave. NW
Washington, DC 20036-5306
tandrews@gibsondunn.com
lsullivan@gibsondunn.com

*Counsel for Amazon.Com, Inc. and Amazon
Data Services, Inc.*

Jamie Hubbard
Stimson Stancil LaBranche Hubbard
1652 Downing Street
Denver, CO 80218

*Counsel for Defendants, White Peaks Capital
LLC and NOVA WPC LLC*

Villanova Trust
c/o Christian Kirschner, Trustee
3924 Wallace Lane
Nashville, TN 37215

Finbrit Holdings, LLC
Paracorp Inc.
1920 Thomes Ave., Ste. 610
Cheyenne, WY 82001

Jeffrey R. Hamlin
Ifrah PLLC
1717 Pennsylvania Ave. NW, Suite 650
Washington, DC 20006
jhamlin@ifrahlaw.com

*Counsel for WDC Holdings, LLC; Brian
Watson, Sterling NCP FF, LLC; Manassas
NCP FF, LLC; and NSIPI Administrative
Manager*

Casey Kirschner
635 N. Alvarado Lane
Plymouth, MN 55447
casey.kirschner@gmail.com

*Pro se*

AllCore Development, LLC
c/o CT Corporation System
1908 Thomes Ave.
Cheyenne, WY 82001

/s/ Rachel Friedman
Rachel Friedman