# Exhibit 1

# Confidential
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| **AMAZON.COM, INC and AMAZON DATA SERVICES, INC.,** | ) ) ) | **Case No. 1:20cv484 (LO/TCB)** |
| Plaintiffs, | ) ) | |
| v. | ) ) | **[PROPOSED]** |
| **WDC HOLDINGS LLC d/b/a NORTHSTAR COMMERCIAL PARTNERS, et al,** | ) ) ) ) | **INTERPLEADER COMPLAINT OF INTERVENOR** |
| Defendants, | ) ) | FILED UNDER SEAL |
|  | ) ) | |
| **800 HOYT LLC,** | ) ) | |
| Intervening Interpleader Plaintiff, | ) ) ) | |
| v. | ) ) | |
| **BRIAN WATSON, WDC HOLDING LLC, PLW CAPITAL I, LLC.AMAZON.COM, INC, and AMAZON DATA SERVICES, INC.** | ) ) ) ) ) | |
| Interpleader Defendants. | ) ) ) | |

Intervening Plaintiff, 800 Hoyt LLC ("800 Hoyt"), files this Interpleader Complaint pursuant to 28 U.S.C. §1335 against  Brian Watson, WDC Holding LLC d/b/a NorthStar Commercial Partners, PLW Capital I, LLC, Amazon.com, Inc.,and Amazon Data Services, Inc., and, in so doing, respectfully states:

1

## I.      Introduction

1.       This Interpleader Complaint in intervention arises from competing claims related to an injunction entered in this case.

2.       800 Hoyt currently holds funds that to be paid or distributed to parties entitled to take on behalf of Brian Watson ("Mr. Watson") and his related entities WDC Holding LLC d/b/a NorthStar Commercial Partners ("WDC"), and PLW Capital I, LLC ("PLW") (collectively the "Watson Defendants").

3.       Amazon.com, Inc. and Amazon Data Services, Inc. (collectively, "Amazon") have made claim to these funds and specifically demanded 800 Hoyt not distribute the funds on the basis of the injunction pending in this case.

4.       Conversely, the Watson Defendants demand that 800 Hoyt immediately distribute the funds to them.

5.       800 Hoyt is a wholly disinterested stakeholder caught in the middle of opposing legal threats that are entirely dependent upon the proceedings in this lawsuit and seeks by this interpleader action to deposit those funds with the Court so that the Court can determine the party entitled to the funds.

6.       800 Hoyt files this is interpleader action pursuant to 28 U.S.C § 1335 and Fed. R. Civ. P. 22 to resolve competing claims among potential claimants to the interpleader funds.

## II.      Parties, Jurisdiction & Venue

7.       800 Hoyt is a limited liability company formed in Colorado and with a principal place of business in Broomfield, Colorado.

8.       Upon information and belief, Mr. Watson is a citizen of Colorado as he is a natural person residing in Englewood, Colorado.

9.      Upon information and belief, WDC is a limited liability company formed in Colorado with a principal place of business in Denver, Colorado

10.     Upon information and belief, PLW is a limited liability company formed in Colorado with a principal place of business in Denver, Colorado.

11.     Upon information and belief, Amazon.com, Inc. is located in Seattle, Washington but maintains through its subsidiaries more than 10,000 employees and has extensive investments in the Commonwealth of Virginia.

12.      Upon information and belief, Amazon Data Services, Inc. is a Delaware corporation and, among other things, operates many large Amazon facilities in the Commonwealth of Virginia.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1335 as Mr. Watson and Amazon.com, Inc. are citizens of different states as defined in 28 U.S.C. § 1332 and the Interpleader Funds in controversy exceed $500.00.

14.     Pursuant to Federal Rule of Civil Procedure 24, 800 Hoyt files this intervenor complaint in an existing suit pending between the Defendants that shares claims and defenses with the intervenor complaint.

### III.    Background

A.    *Formation and Operation of 800 Hoyt*

15.     In 2014, 800 Hoyt was formed for the purpose of owning, developing, operating, managing, maintaining, leasing, or selling the property located at 800 Hoyt Street, Broomfield, Colorado 80020 (the "Property").

16.     On or about June 4, 2015, the Members and Managers of 800 Hoyt entered into the Amended and Restated Operating Agreement. A true and correct copy of the Amended and Restated Operating Agreement is attached hereto as *Ex. A*.

17.     On or about June 27, 2017, the members of 800 Hoyt entered into the First Amendment To Amended and Restated Operating Agreement.  A true and correct copy of the First Amendment To Amended and Restated Operating Agreement is attached hereto as *Ex. B*.

18.     On or about September 19, 2017, the members of 800 Hoyt entered into the Second Amendment To Amended and Restated Operating Agreement.  A true and correct copy of the Second Amendment To Amended and Restated Operating Agreement is attached hereto as *Ex. C*.

19.     Combined, the Amended and Restated Operating Agreement, First Amendment To Amended and Restated Operating Agreement, and Second Amendment To Amended and Restated Operating Agreement form the Operating Agreement for 800 Hoyt ("Operating Agreement").

20.     Donald J. Marcotte ("Mr. Marcotte") and R. Brian Watson ("Mr. Watson") were the original Managers and Management Committee of 800 Hoyt.

21.     Mr. Watson subsequently resigned as a Manager of 800 Hoyt.

22.     PLW and JM Capital VII, LLC ("JM Capital") are the Class A Members of 800 Hoyt.

23.     On information and belief, PLW is a corporate entity fully owned and operated by Mr. Watson.

B.      *October 2020 Sale of the Property*

24.      On or about October 22, 2020, Hoyt Development LLC ("Hoyt Development"), as owner of the Property, entered into a Purchase and Sale Agreement for the sale of the Property to Lincoln Property Commercial, LLC ("Lincoln").

25.      The closing date for the sale of the Property was December 8, 2020.

26.      Pursuant to the terms of its operating agreement, Hoyt Development distributed the income from the sale pursuant to its various existing loans, obligations, and as distributions to its members, except for funds held as a reserve (the "Reserve Funds").

27.      800 Hoyt is a member of Hoyt Development.

28.      The member distribution 800 Hoyt received in December 2020 for sale of the Property was $4,375,640.21.

29.      During December 2020-January 2021, 800 Hoyt distributed this amount pursuant to its various existing loans, obligations, and as distributions to its members.

C.      CONFIDENTIAL - Filed Under



D.    *Release of Reserve Funds to 800 Hoyt*

34.    On or about September 11, 2021, the Reserve Funds were released.

35.    On or about September 11, 2021, 800 Hoyt received approximately $750,000.00

of the Reserve Funds, ███████████████████████████████████████████████

███████████████████████████████████████

36.    In addition, some of the remainder of the Reserve Funds may be owed as

distributions.

37.    The remainder of the Reserve Funds and cash on hand after paying any other

obligations  and establishing any reserve may be subject to distribution ("the Available Cash").

*See* § 5.01 of 800 Hoyt's Operating Agreement.

38.     As stated in the Operating Agreement, after discharge of obligations and

reservation of funds for anticipated costs, the Available Cash will be distributed as follows:

> (i) First, all Available Cash will be distributed to the Members, pro rata according to their percentage of Interests, until such time as the Members have received a 10% non-compounded, annual rate of return on their Capital Contributions (the "Preferred Return");
>
> (ii)  Second, all Available Cash will be distributed to the Members, pro rata according to their percentage of Interests, until such time as the Members have received a complete return of their Capital Contributions;
>
> (iii) Third, 70% of all Available Cash will be distributed to the Class B Members, pro rata according to their percentage of Class B Membership interests, until the Class B Members have received a 25% non-compounded, annual return on their Capital Contributions (the "Class B Preferred Return"), and 30% of all available cash will be distributed to Class A members.
>
> (iv) Fourth, 50% of all Available Cash will be distributed to the Class B Members, pro rata according to their percentage of Class B Membership Interest, and 50% will be paid to all Class A members for all remaining distributions.

See Ex. A at § 5.01 (emphasis added).

39.     PLW, as one of two Class A Members, will be due either 15% or 25% of

Available Funds, depending on the amount of funds distributed.

40.     PLW's share of the Available Cash distribution to members is estimated at less

than $50,000.00.

E.     *Claim of Amazon.com*

41.     On April 27, 2020, Amazon filed this lawsuit,  *Amazon.com, Inc. v. WDC*

*Holdings LLC et al.,* United States District Court for the Eastern District of Virginia, Case

Number 20cv484 (the "Amazon Lawsuit"), against WDC, Mr. Watson, and others.

42.     On August 24, 2021, 800 Hoyt received a cease-and-desist letter (the "August 24,

2021 Letter") from Amazon related to future distributions of 800 Hoyt.  A true and correct copy

of the August 24, 2021 Letter is attached as *Ex. E.*

43.     In the August 24, 2021 Letter, counsel for Amazon notified 800 Hoyt that a preliminary injunction had been issued against Mr. Watson and WDC.

44.     In the August 24, 2021 Letter, counsel for Amazon requested that 800 Hoyt "immediately cease and desist from distributing any proceeds from the sale of [the Property] pending further notice or court action."

45.     On September 10, 2021, Magistrate Judge Buchanan granted Amazon's Motion for Sanctions against WDC and Mr. Watson in the Amazon Lawsuit (Dkt. 307) permitting Amazon additional rights to subpoena 800 Hoyt.

46.     Amazon has made a claim to all assets to be distributed to Mr. Watson, WDC, or any entity of which Mr. Watson is a member, including PLW, and demanded that 800 Hoyt not distribute any of those funds.

F.     *Claim of Mr. Watson*

47.     On July 26, 2021, Mr. Watson contacted Mr. Marcotte via email regarding anticipated payment from the Reserve Funds to 800 Hoyt and providing invoices for payment.

48.     On August 2, 2021, Mr. Watson emailed Mr. Marcotte requesting acknowledgment of the receipt of invoices.

49.     On August 12, 2021, Mr. Watson emailed Mr. Marcotte requesting a schedule of funds payable to himself and related entities.

50.     On August 30, 2021, Mr. Watson emailed Mr. Marcotte requesting an update on the status of release of funds.

51.     On September 7, 2021, Mr. Watson emailed Mr. Marcotte requesting payment ███████████████████████████████████████████. A true and correct copy of the

email string containing the July 26, 2021, August 2, 2021, the August 12, 2021, the August 30, 2021, and the September 7, 2021 emails to Mr. Marcotte is attached as *Ex. F.*

52.     In September 2021, 800 Hoyt disclosed to counsel for Mr. Watson that it had received a cease-and-desist demand from Amazon for all future payments to Mr. Watson or related entities.

53.     On September 15, 2021, Mr. Watson's other counsel sent a demand letter (the "September 15, 2021 Letter") to counsel for 800 Hoyt requesting payment ████████████ ████████████████████████ A true and correct copy of the September 15, 2021 letter is attached as *Ex. G.*

54.     The September 15, 2021 Letter stated: "I understand that Amazon wrote your client a threatening letter on August 24, 2021.  I have reviewed the letter as well as the injunction order referenced in the 8/21/21 correspondence.  After review of the materials, there is no reasonable basis for withholding ████████████████████████ ████████████████████."

55.     Mr. Watson made a claim to immediate payment of all assets to be distributed to Mr. Watson, WDC, or any entity of which Mr. Watson is a member, including PLW.

56.     WDC, through Mr. Watson, has made a claim to immediate payment of all assets to be distributed to it.

57.     PLW, through Mr. Watson, has made a claim to immediate payment of all assets to be distributed to it.

## IV.    Claim for Interpleader

58.    800 Hoyt incorporates the allegations above as if fully set forth herein.

59.    800 Hoyt is a non-liable, disinterested stakeholder with respect to the funds that are the subject of the competing claims of Amazon and the Watson Defendants (the "Interpleader Funds").

60.    The Interpleader Funds are payable by 800 Hoyt to the Watson Defendants  potentially as distributions from Available Cash under the Operating Agreement, and specifically consist of the following:

a.    ███████████████████████████████████████████

███████████████████████████

b.    ████████████████████████████████████████████████

██████████

c.    The share in Available Cash due and payable to PLW, estimated at below $50,000.00; and

d.    Any remaining funds due and payable to Mr. Watson, WDC, PLW, BW Holdings, or any entity owned or controlled by Mr. Watson.

61.    The competing claims between Amazon, Mr. Watson, WDC, and PLW (the "Interpleader Complaint Defendants") to the Interpleader Funds expose 800 Hoyt to the possibility of double or multiple liability by the competing nature of their claims.

62.    The competing claims from the Interpleader Complaint Defendants share common questions of law and fact with the claims and defenses in this lawsuit.

63.     800 Hoyt stands ready, willing, and able to pay the Interpleader Funds, but the Interpleader Complaint Defendants' potential competing claims have created doubt and uncertainty as to who has the legal rights to the Interpleader Funds.

64.     800 Hoyt may be prejudiced if it conveys the Interpleader Funds to one or some of the Interpleader Complaint Defendants in the absence of clear guidance from the Court as to which of the Interpleader Complaint Defendants are entitled to the funds and in what amount.

65.     800 Hoyt is willing to deposit the value of the Interpleader Funds into the registry of the Court.

66.     Pursuant 28 U.S.C. § 1335, Federal Rule of Civil Procedure 22, and the equitable powers of this Court, 800 Hoyt requests that it be permitted to deposit the value of the Interpleader Funds into the Court's registry.

67.     Upon such deposit, 800 Hoyt requests to be fully discharged of all of its obligations with respect to the Operating Agreement, Settlement Agreement, and the Interpleader Funds with regard to Mr. Watson, WDC, and PLW, and requests that the Interpleader Complaint Defendants be enjoined from any action against 800 Hoyt and/or its agents relating to the Operating Agreement, Settlement Agreement, and the Interpleader Funds.

68.     800 Hoyt requests reasonable costs and fees for bringing this action pursuant to *Sun Life Assur. Co. of Canada v. Bew*, 530 F. Supp. 2d 773, 775 (E.D. Va. 2007) (discussing that attorneys' fees and costs may be awarded to a stakeholder because the stakeholder "should not have to absorb attorneys' fees in avoiding the possibility of multiple litigation")*; see also Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Sprague*, 251 F. App'x 155, 156 (4th Cir. 2007) (holding "an interpleading plaintiff may be reimbursed for its costs at the district court's discretion").

69.     800 Hoyt has conferred with Counsel for Amazon, who does not oppose this action.

70.     800 Hoyt has conferred with Counsel for Mr. Watson, WDC, and PLW and they have not stated their opposition or support of this action but have stated objection to the venue and forum.

## VI.     Prayer for Relief

800 Hoyt respectfully requests as relief an Order:

a.     Accepting deposit of the Interpleader Funds into its registry;

b.     Discharging 800 Hoyt from liability to each and every Interpleader Complaint Defendant with respect to the Operating Agreement, ███████████ , and the Interpleader Funds;

c.     Dismissing 800 Hoyt from this suit;

d.     Requiring Interpleader Complaint Defendants to bring their claims regarding the Operating Agreement, ████████ , and the Interpleader Funds or be forever barred from asserting those claims;

e.     Entering judgment establishing Interpleader Complaint Defendants' respective legal rights to the Interpleader Funds;

f.     Awarding 800 Hoyt its reasonable attorneys' fees and costs related to this action; and,

g.     Awarding 800 Hoyt any further relief the Court deems just and proper.

Dated: September 24, 2021

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/   Kathryn M. Skilton*

Kathryn M. Skilton
Virginia Bar Number 90176
kathryn.skilton@faegredrinker.com
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309
Phone: (515) 248-9000
Fax: (515) 248-9010

**ATTORNEYS FOR**
**INTERVENOR  HOYT LLC**

# Exhibit A

AMENDED AND RESTATED

OPERATING AGREEMENT

*OF*

800 Hoyt, LLC

A Colorado Limited Liability Company

TABLE OF CONTENTS

ARTICLE ONE. GENERAL

SECTION 1.01   DEFINITIONS. UNLESS THE CONTEXT OTHERWISE REQUIRES, THE TERMS DEFINED IN
THIS ARTICLE I SHALL, FOR THE PURPOSES OF THIS AGREEMENT, HAVE THE MEANINGS HEREIN
SPECIFIED.
SECTION 1.02   FORMATION
SECTION 1.03   FILING OF ARTICLES OF ORGANIZATION.
SECTION 1.04   NAME
SECTION 1.05   INITIAL MANAGEMENT
SECTION 1.06   CHARACTER OF BUSINESS.
SECTION 1.07   LOCATION OF THE PRINCIPAL PLACE OF BUSINESS; REGISTERED OFFICE AND AGENT
SECTION 1.08   RECORDS TO BE KEPT AT REGISTERED OFFICE.
SECTION 1.09   TERM.

ARTICLE TWO. CAPITAL CONTRIBUTIONS

SECTION 2.01   INITIAL CAPITAL CONTRIBUTIONS.
SECTION 2.02   LIABILITY UPON RETURN OF CAPITAL CONTRIBUTIONS.
SECTION 2.03   ADDITIONAL CAPITAL CONTRIBUTIONS.
SECTION 2.04   NON-CASH CONTRIBUTIONS.
SECTION 2.05   INTEREST.
SECTION 2.06   LOANS BY OWNERS.
SECTION 2.07   DEFAULT BY OWNERS.

ARTICLE THREE. COSTS AND EXPENSES

ARTICLE FOUR. SHARING OF INCOME AND LOSS

SECTION 4.01   ALLOCATIONS.
SECTION 4.02   CAPITAL ACCOUNTS.
SECTION 4.03   ADJUSTMENTS TO CAPITAL ACCOUNTS.
SECTION 4.04   CODE SECTION 704 (C)(1)(A).
SECTION 4.05   CERTAIN DEFINITIONS.
SECTION 4.06   DETERMINATION OF INTEREST IN EVENT OF TRANSFER.

ARTICLE FIVE. DISTRIBUTIONS

SECTION 5.01   AVAILABLE CASH
SECTION 5.02   EQUITY RAISE.
SECTION 5.03   DISTRIBUTIONS IN KIND.
SECTION 5.04   DISTRIBUTIONS IN LIQUIDATION.

ARTICLE SIX. MEMBER MEETINGS

SECTION 6.01   ANNUAL MEETINGS.
SECTION 6.02   SPECIAL MEETINGS.
SECTION 6.03   PLACE OF MEETINGS.
SECTION 6.04   NOTICE OF MEETING
SECTION 6.05   QUORUM
SECTION 6.06   VOTING.
SECTION 6.07   VOTING BY CERTAIN MEMBERS.
SECTION 6.08   ACTION BY MEMBERS WITHOUT A MEETING.

ARTICLE SEVEN. MANAGEMENT

SECTION 7.01   MANAGEMENT'S DUTIES AND POWERS.
SECTION 7.02   FORM OF EXECUTION OF DOCUMENTS.
SECTION 7.03   RESTRICTIONS ON AUTHORITY OF MANAGER.
SECTION 7.04   ELECTION OF A MANAGER.
SECTION 7.05   RESIGNATION OF A MANAGER.
SECTION 7.06   REMOVAL OF A MANAGER.
SECTION 7.07   MANAGEMENT BY OWNERS.
SECTION 7.08   TAX MATTERS PARTNER.
SECTION 7.09   TAX ELECTIONS.
SECTION 7.10   DELEGATION.
SECTION 7.11   UNANIMOUS DECISIONS AND RESPONSIBILITIES.

ARTICLE EIGHT. MANAGEMENT COMPENSATION

SECTION 8.01   COMPENSATION FOR MANAGEMENT SERVICES.
SECTION 8.02   OTHER REMUNERATION.

ARTICLE NINE. ADMISSION AND WITHDRAWAL OF OWNERS; TRANSFERS OF OWNERS'
INTERESTS

SECTION 9.01   TRANSFERS BY OWNERS
SECTION 9.02   SUBSTITUTED MEMBER.
SECTION 9.03   ECONOMIC INTEREST OWNER.
SECTION 9.04   TRANSFERS TO INTERVIVOS TRUST.
SECTION 9.05   TESTAMENTARY BEQUEST TO OWNER'S FAMILY.
SECTION 9.06   EFFECT OF CHARGING ORDER.
SECTION 9.07   OTHER RESTRICTIONS ON TRANSFER.
SECTION 9.08   PURCHASE OF AN OWNER'S INTEREST.
SECTION 9.09   DEATH OF AN OWNER.
SECTION 9.10   RESIGNATION OF A MEMBER. NO MEMBER HAS THE RIGHT TO RESIGN FROM THE
COMPANY UNDER ANY CIRCUMSTANCES.
SECTION 9.11   EXPULSION OF A MEMBER.
SECTION 9.12   CERTAIN TAX ASPECTS INCIDENT TO TRANSACTIONS CONTEMPLATED BY THIS
AGREEMENT.
SECTION 9.13   FAIR MARKET VALUE.
SECTION 9.14   INSTALLMENT PAYMENTS.
SECTION 9.15   DELIVERY OF CERTIFICATE OF OWNERSHIP.

ARTICLE TEN. DISSOLUTION AND TERMINATION

SECTION 10.01   EVENTS CAUSING DISSOLUTION AND TERMINATION.
SECTION 10.02   WINDING UP OF AFFAIRS ON DISSOLUTION.
SECTION 10.03   SPECIAL TAX MATTERS.

ARTICLE ELEVEN. FISCAL MATTERS

SECTION 11.01   BOOKS AND RECORDS.
SECTION 11.02   TAXABLE YEAR.
SECTION 11.03   REPORTS TO MEMBERS.
SECTION 11.04   BANK ACCOUNTS AND INVESTMENT OF FUNDS.
SECTION 11.05   ACCOUNTING DECISIONS.

ARTICLE TWELVE. ADDITIONAL DOCUMENTS

ARTICLE THIRTEEN. AMENDMENTS

SECTION 13.01  CLARIFYING AMENDMENTS.
SECTION 13.02  IRS AMENDMENTS
SECTION 13.03  ALL OTHER AMENDMENTS.

ARTICLE FOURTEEN. TAG ALONG RIGHTS/DRAG ALONG RIGHTS

SECTION 14.01  TAG ALONG RIGHTS: AS TO SALE OR PURCHASE OF INTERESTS
SECTION 14.02  DRAG ALONG RIGHTS: RIGHT TO JOIN IN INTEREST SALES.

ARTICLE FIFTEEN. POWER OF ATTORNEY

ARTICLE SIXTEEN. NOTICES

SECTION 16.01  METHOD FOR NOTICES.
SECTION 16.02  COMPUTATION OF TIME.

ARTICLE SEVENTEEN. EXONERATION AND INDEMNIFICATION

SECTION 17.01  LIMITATION OF LIABILITY.
SECTION 17.02  INDEMNIFICATION.

ARTICLE EIGHTEEN. MISCELLANEOUS PROVISIONS

SECTION 18.01  INTEGRATION.
SECTION 18.02  APPLICABLE LAW.
SECTION 18.03  COUNTERPARTS.
SECTION 18.04  SEVERABILITY CLAUSE.
SECTION 18.05  BINDING EFFECT.
SECTION 18.06  HEADNOTES.
SECTION 18.07  GENDER/SINGULAR AND PLURAL.

AMENDED AND RESTATED OPERATING AGREEMENT

*OF*

*800 Hoyt, LLC*
A Colorado Limited Liability Company

This Operating Agreement (this "Agreement") is entered into with an effective date of June 4, 2015, by and among the Members and Manager of 800 Hoyt, LLC (the "Company").

Whereas, the Company was formed on December 15, 2014, with a Federal Employer Identification Number of 47-3453209.

In consideration of the mutual covenants and promises set forth in this Agreement, the parties agree as follows:

# Article One.   GENERAL

**Section 1.01**   Definitions. Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

a.   "*Agreement*" means this Operating Agreement, as amended, modified, supplemented or restated from time to time.

b.   "*Articles*" means the Articles of Organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Colorado pursuant to the LLC Act.

c.   "*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement.

d.   "*Economic Interest*" means only an economic interest in an Interest in the Company. Holders of Economic Interests are not entitled to voting or management rights and Economic Interests are not included in the calculation of total Membership Interests for voting purposes.

e.   "*Economic Interest Owner*" means a person who has acquired a beneficial interest in all or a part of an Interest in the Company but who is not admitted as a Member in accordance with the terms of this Agreement.  Economic Interest Owners shall have no right to participate in the management of the business and affairs of the Company, including no right to vote on, consent to or otherwise participate in any decision of the Members, or to become a Member and shall only be entitled to receive the share of profits or other compensation by way of income and return of contributions to which the Owner from whom it acquired the Interest would otherwise be entitled.

e.   "*Interest*" means either a Membership Interest or an Economic Interest.

f.   "*LLC Act*" means the Colorado Limited Liability Company Act, as amended from time to time.

g.      "*Majority in Interest*" of the Members means the Members whose aggregate Membership Interests represent more than fifty percent (50%) of the aggregate Membership Interests of all Members.

h.      "*Member*" means any person named as a member of the Company on the Schedules attached hereto and includes any person admitted as an additional Member or a Substitute Member pursuant to the provisions of this Agreement, in such person's capacity as a Member of the Company, and "Members" means two (2) or more of such persons when acting in their capacities as Members of the Company. There shall be two classes of Members under this Agreement; Class A Members and Class B Members, as more particularly described herein.  Class B Members shall have no voting or management rights.

i.      "*Membership Interest*" means a Member's ownership interest in the Company as described on the Schedules attached hereto of the date hereof, and as may hereafter change in accordance with the terms of this Agreement.  Voting, approval, distribution and other participation rights shall at all times be based upon the Members' relative Membership Interests.

j.      "*Owner*" means a Member or an Economic Interest Owner.

k.      "*Proposed Transferee*" has the meaning set forth in Section 9.01.

l.      "*Seventy Five Percent in Interest*" of the Members means the Class A Members whose aggregate Membership Interests represent more than seventy five percent (75%) of the aggregate Membership Interests of all Class A Members.

m.      "*Substitute Member*" means a person who is admitted to the Company as a Member pursuant to the terms of Section 9.02 hereof.

n.      "*Transfer*" means any transfer, assignment, sale, conveyance, hypothecation, license, lease, partition, pledge or grant of a security interest in an Interest, and includes any "involuntary transfer" such as a sale any part of an Interest therein in connection with any bankruptcy or similar insolvency proceedings, or a divorce or other marital settlement involving any Owner who is an individual, or any other disposition or encumbrance of an Interest. For purposes of this Agreement, any transfer, exchange or series of transfers (or exchanges) of the stock, partnership, member or other ownership interests of any Owner that is a business organization or an entity (or any combination of such transfers or exchanges, whether direct or in connection with a merger, acquisition, sale, or similar reorganization or transaction, including issues of new stock or other ownership interests, or the exercise of options, warrants, debentures or other convertible instruments, or a redemption of other interests in the Owner, and any similar transactions involving the stock or other ownership interests of such Owner), the effect of which is that the persons who control such Owner at the time this Agreement is signed, no longer control such Owner, then a Transfer shall also be deemed to have occurred with regard to the Interest owned by such Owner.

## Section 1.02   Formation.

Upon the terms set forth below, the parties hereby agree to form a Limited Liability Company pursuant to the LLC Act.

## Section 1.03   Filing of Articles of Organization.

The Organizer(s) filed the Articles of Organization with the office of the Secretary of State of Colorado, and shall execute such further documents (including amendments to the Articles), and take such further action as shall be appropriate to comply with the requirements of law for the formation and operation of a limited liability company in all other states where the Company may elect to do business.

**Section 1.04**   Name

The name of the Company shall be 800 Hoyt, LLC.

**Section 1.05**   Initial Management

The Managers of the Company shall be R. Brian Watson and Donald J. Marcotte (hereinafter, collectively the "Manager").  The Manager shall organize and manage the Company until a successor is elected by the Class A Members.  The powers, duties and responsibilities of the Manager are provided for in Article Seven. Upon the death of either Manager, the survivor shall serve as the sole Manager subject to the terms of this Agreement.

**Section 1.06**   Character of Business.

The business of the Company shall be any lawful activity including, but not limited to acquiring, owning, developing, operating, managing, maintaining, leasing or selling the specific real and personal property located at 800 Hoyt Street, Broomfield, CO 80020 and  to conduct such other lawful activities which may be necessary or desirable to further the business of the Company.

Location of the Principal Place of Business; Registered Office and Agent: The principal place of business of the Company shall be at 1999 Broadway, Suite 770, Denver, CO  80202, or such other address as from time to time may be selected by the Manager.  The registered agent of the Company shall be Donald Marcotte  whose address is 1999 Broadway, Suite 770,  Denver, Colorado 80202, which shall be the address of the registered office of the Company and the address for service of process upon the Company. Upon change by the Manager of (i) the address of the principal place of business of this Company, (ii) the address of the registered office, or (iii) the name of the registered agent, the Manager shall notify the Owners.

**Section 1.07**   Records To Be Kept At Registered Office.

The Manager shall maintain or cause to be maintained the Company's records at its registered office. Such records shall include:

(a)      a current list of the full name and last known mailing address of each Owner;

(b)      a copy of the Articles of Organization and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)      copies of the Company's federal, state, and local income tax returns and reports, if any, for the three (3) most recent accounting years;

(d)      copies of this Agreement and any amendments thereto;

(e)      the accounting books and records, and copies of the financial statements of the Company, for the three (3) most recent accounting years;

(f)      all documents and records pertaining to the Company, its assets and other aspects of the Company business; and

(g)      all other records as may be required by law.

Such records shall be subject to inspection and copying at the reasonable request and expense of any Member during ordinary business hours.

**Section 1.08**   Term.

The term of this Company shall commence on the day the Articles of Organization are filed with the Secretary of State of Colorado and shall continue until the occurrence of any of the following:

(a)      the dissolution of the Company brought about by operation of law or by the terms of this Agreement; or

(b)      the written consent of all Members to the dissolution of the Company.

## Article Two.   CAPITAL CONTRIBUTIONS

**Section 2.01**   Initial Capital Contribution of Class A Members.

Upon the formation of the Company, the two Class A Members shall make the following capital contributions in exchange for a Membership Interest in the Company:

(a)      PLW CAPITAL I, LLC has contributed to the Company the assets listed in <u>Schedule A</u> attached hereto in exchange for a proportionate initial Class A Membership Interest, as defined later in this Article, in the Company.  Any subsequent capital contributions by PLW CAPITAL I, LLC may be listed on supplemental schedules hereto a PLW CAPITAL I, LLC and shall contain an alphanumeric designation, such as "A-1."  If any of the assets contributed by  are subject to liabilities, then the Company shall take the assets subject to such liabilities. However, the Company will not assume the liabilities unless otherwise noted at the time of transfer into the Company.

(b)      JM CAPITAL VII, LLC has contributed to the Company the assets listed in <u>Schedule B</u> attached hereto in exchange for a proportionate initial Class A Membership Interest, as defined later in this Article, in the Company.  Any subsequent capital contributions by JM CAPITAL VII, LLC may be listed on supplemental schedules hereto and shall contain an alphanumeric designation, such as "A-1."  If any of the assets contributed by JM CAPITAL VII, LLC are subject to liabilities, then the Company shall

take the assets subject to such liabilities. However, the Company will not assume the liabilities unless otherwise noted at the time of transfer into the Company.

**Section 2.02**    Initial Capital Contributions of Class B Members

(a)    Upon execution of a Subscription Agreement for Class B Membership Interests in the Company and execution of a counterpart signature page to this Operating Agreement, each Class B Member shall be formally admitted as a Class B Member of the Company with shares corresponding to their initial contribution. Schedule C attached hereto shall list all Class B Members, the initial capital contributions, and their attendant Class B Membership Interest Any subsequent capital contributions by any Class B Member may be listed on supplemental schedules hereto and shall contain an alphanumeric designation, such as "C-1."  If any of the assets contributed by any Class B Members are subject to liabilities, then the Company shall take the assets subject to such liabilities. However, the Company will not assume the liabilities unless otherwise noted at the time of transfer into the Company.

**Section 2.03**    Liability Upon Return of Capital Contributions.

If an Owner receives a distribution in return of any part of its capital contribution and accruing profits, it shall be liable to the Company for such period only if required under Colorado law for the amount of the distribution to the extent necessary to discharge the Company's liability to creditors who extend credit to the Company during the period that the contribution or profits were held by the Company.

**Section 2.04**    Additional Capital Contributions.

Except as provided in Subsections (a) and (b) below, no Owner shall be required to make any additional contribution to the Company.  The foregoing shall not prevent any Owner from loaning funds to the Company in accordance with Section 2.06 below.

(a)    <u>Written Notice</u>.    Upon a determination by the Manager that additional capital contributions shall be required to fund ongoing operations of the Company related to a business purpose of the Company, to acquire additional assets for the Company related to a business purpose of the Company, or for any other reason reasonably related to a business purpose of the Company, the Manager shall provide written notice to all Owners of such determination. Within ten (10) days of delivery of the written notice, all Owners shall make such additional capital contribution pro rata in proportion to their Interest.  If an Owner fails to make an additional capital contribution as described herein, such failure shall be deemed a default and subject to the remedies set forth in Section 2.08 below.

(b)    <u>Capital Requirements From Other Entities</u>.    In the event the Company is a partner, shareholder, member or holder of other participation rights in other entities (collectively <u>"Other Entities"</u>), and the governing documents of such Other Entities require or permit additional capital contributions by the Company to the Other Entity, this Subsection (b) shall control.  In the event of a required or authorized capital call or contribution from an Other Entity, the Owners of the Company shall be required to contribute their pro rata share in accordance with their Interest.  In the event such capital call or contribution is discretionary, then the Manager shall determine to make such discretionary capital call. In the event the Manager determine to make a discretionary capital contribution, all Owners of this Company shall be required to contribute their pro rata share of such discretionary capital contribution.  If an Owner fails to make an additional capital contribution as described herein, such failure shall be deemed a default and subject to the remedies set forth in Section 2.07(b)(i) below.

**Section 2.05**   Non-Cash Contributions.

The Owners agree that if contributions of property other than cash are made to the Company, the fair market value of the property contributed shall be noted or set forth on the conveyance document or schedule hereto at the time of the contribution to the Company.

**Section 2.06**   Interest.

An Owner's Interest in the Company and in its capital account shall be personal property, not real property, despite the nature of the assets allocated to the accounts.  No Owner shall have the right to demand and receive the return of all or any part of its capital contribution during the term of the Company.  No Owner shall have the right to demand and receive distributions of property other than cash.  No Owner shall have the right to seek partition of any Company property, to apply to any court or authority having jurisdiction of the matter for partition of Company property, or to commence or prosecute any action or proceeding for partition of Company property.  The Company may, but shall not be required to, issue Certificates of Ownership representing an Interest in the Company.

**Section 2.07**   Loans by Owners.

Except as otherwise provided herein, loans may be made to the Company by an Owner if any such loan is requested, and is on terms agreed to by the Manager. Loans by Owners to the Company shall not be considered contributions to capital.  Any amounts advanced shall be a debt of the Company to such Owner and shall be payable or collectible only out of Company assets.

**Section 2.08**   Default by Owners.

(a)   Events of Default.  The following constitute events of default:

i.   failure of an Owner to make, when due, any contribution required under this Agreement or as otherwise approved by the Manager; or

ii.   violation of any covenant or other provision of this Agreement.

(b)   Remedies.  Upon the occurrence of a default, the following shall be applicable:

i.   Monetary Default.  In the event of a default to make additional capital contribution to the Company as may be required by this Agreement, the non-defaulting Members shall have the following exclusive remedy.  Specifically, the non-defaulting Members (in proportion to their relative Membership Interest or as otherwise agreed) may make a capital contribution to the Company equal to the defaulting Owner's required contribution.  In such event, the defaulting Owner's Interest shall be reduced to the ratio of the total capital contributions of the defaulting Owner compared to the total capital contributions of all Owners, including additional capital contributions.

ii.   Non-Monetary Default.  In the event of a non-monetary default under this Agreement, any non-defaulting Member may provide the defaulting Owner with a written notice identifying such non-monetary default.  Within thirty (30) days from the receipt of such written notice, the defaulting Owner shall be entitled to cure the default.

iii.   Voting.  While any Member is in default under the terms of this Section 2.07 (other than a monetary default described in Section 2.07(b)(i)), the Member shall have no voting rights until such default is cured.

iv.        Remedies Non-Exclusive.  Except as set forth above, the remedies set forth above are not intended to be exclusive.  Except as set forth above, in the event of any default, a Member or the Company may assert the remedies set forth above or in addition thereto, any remedy under the LLC Act as now or hereafter existing or at law or in equity.  The remedies stated herein are cumulative and not exclusive.

# Article Three.   COSTS, FEES AND EXPENSES

a)   Acquisition Fee. The Members acknowledge and agree that a real estate brokerage fee equal to three percent (3%) of the gross purchase price is due to Midtown Group, LLC in connection with the acquisition of the real property by the Company, which shall be paid at Closing.

b)   Disposition Fee. The Members acknowledge and agree that a real estate brokerage fee equal to two percent (2%) of the gross sales price in connection with the disposition of the real property by the Company is due to WDC Holdings, LLC (or another designated affiliate of the Manager which is a commercial real estate brokerage entity), which shall be paid at Closing.

c)   Debt Guarantee Fee. In the event that the lender on the debt obtained for the Property requires personal guarantees for that debt by the Initial Manager and/or any other person, and such Manager and/or person agrees to personally guarantee the debt, that Manager and/or other person shall receive a debt guarantee fee equal to one percent (1%) of the guaranteed debt, annually, paid monthly.

d)   Construction Management Fee. The Members acknowledge and agree that a construction management fee equal to i) three and one half percent (3.5%) if there is a third party general contractor used, or ii) seven percent (7%) if there is no general contractor and the Company manages the construction itself, which shall be paid to Northstar Commercial Partners Management, LLC or an affiliate company on a monthly basis.

e)   Entitlement and Development Fee. The Members acknowledge and agree that a fee equal to three percent (3%) of the total development costs shall be due to Northstar Commercial Partners Management, LLC or an affiliate company, payable monthly through the entitlement period until receipt of approved construction drawings.

f)   Property Management Fee. The Members acknowledge and agree that a property management fee equal to four percent (4%) of the rental income is due to Northstar Commercial Partners Management, LLC or an affiliate company on a monthly basis.

All costs and expenses of the Company, which relate to its organization and general operations shall be paid from its funds.

# Article Four.   SHARING OF INCOME AND LOSS

**Section 4.01**   Allocations.

All items of income, gain, loss, deduction and credit, including gain or loss realized upon the sale or other disposition of any property shall be allocated among the Owners in the same ratio that each Owner's Capital Account (as defined in Section 4.02 below) bears to the total of all Owners' Capital Accounts.

**Section 4.02**   Capital Accounts.

A separate capital account (a "Capital Account") shall be established and maintained for each Owner in accordance with Treas. Regs. §1.704-1(b)(2)(iv) or any successor legislation or Treasury Regulations thereto, issued pursuant to the Internal Revenue Code of 1986, as amended (hereinafter "IRC"). The Capital Account shall be credited for an amount equal to each Owner's capital contributions, including each Owner's respective share of undistributed profits. Additionally, each Owner's Capital Account shall be charged for their share of losses, and distributions made to him or her. No interest shall be paid on amounts held in an Owner's Capital Account or on any capital contributions. The provisions of this Agreement relating to Capital Accounts are intended to comply with such provisions and related provisions issued with respect to section 704 of the Code and shall be interpreted consistently therewith. The Company shall have the authority to make such adjustments to the Owners' Capital Accounts as may be required to cause the allocations made by the Company to comply with such provisions.

**Section 4.03**   Adjustments to Capital Accounts.

If property other than cash is contributed to the Company by an Owner, and a dispute arises between an Owner and the Internal Revenue Service (hereinafter "IRS") concerning the proper valuation of the Owner's capital contributions, then the Company and Owners shall be bound by the final determination reached as a result of a resolution of the dispute with the IRS, and the Owner's Capital Accounts shall promptly be corrected to reflect such valuation.

At least once each taxable year of the Company for United States tax purposes (as determined under Code section 706, a "Fiscal Year"), after adjusting each Owner's Capital Account for all contributions and distributions with respect to such Fiscal Year, the Company shall allocate all profits and losses and items thereof in the following order of priority:

(A) First, profits and losses and items thereof shall be allocated in the manner and to the extent provided by (1) Treas. Regs. §1.704-1(b)(4), (2) Treas. Regs. §1.704-1(b)(2) (to comply with the substantial economic effect safe harbors), including, without limitation, Treas. Regs. §1.704-1(b)(2)(ii)(d) (flush language) (the "qualified income offset") and Treas. Regs. §1.704-1(b)(2)(iv) (capital accounting requirements), (3) Treas. Regs. §1.704-2, including, without limitation, Treas. Regs. §§1.704-2(e) (provided that allocations pursuant to Treas. Regs. §1.704-2(e) shall be made to the Owners pro rata in accordance the Owners' percentage Interest in the Company); and

(B) all remaining profits and losses and items thereof shall be allocated to the Owners' Capital Accounts in a manner such that, after such allocations have been made, the balance of each Owner's Capital Account (which may be a positive, negative, or zero balance) shall equal (1) the amount that would be distributed to such Owner, determined as if the Company were to sell all of its assets for the section 704(b) Book Value (as defined below) thereof and distribute the proceeds thereof (net of any sales commissions and other similar transaction fees and payments required to be made to creditors) pursuant to the relevant legal documents setting forth such distributions, minus (2) the sum of (a) such Owner's share of the "partnership minimum gain" (as determined under Treas. Regs. §§1.704-2(d) and (g)(3)) and "partner minimum gain" (as determined under Treas. Regs. §1.704-2(i)), and (b) the amount, if any, that such Owner is obligated (or is deemed for United States tax purposes to be obligated) to contribute, in its capacity as an Owner, to the capital of the Company as of the last day of such Fiscal Year.

**Section 4.04**   Code Section 704 (c)(1)(A).

Except as provided in the following provisions of this Section 4.04, each item of taxable income, gain, loss, deduction, or credit shall be allocated in the same manner as its correlative item of "book" items

allocated pursuant to Section 4.03.   In accordance with Code Section 704(c)(1)(A) (and the principles thereof) and Treas. Regs. §1.704-3, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, or after Company property has been revalued under Treas. Regs. §1.704-1(b)(2)(iv)(f), shall, solely for United States federal, state and local tax purposes, be allocated among the Owners so as to take into account any variation between the adjusted basis of such Company property to the Company for United States federal income tax purposes and its value as so determined at the time of the contribution or revaluation of Company property.   This Section shall be construed to authorize the Company to utilize any method permitted under Treas. Regs. §1.704-3 so long as such method eliminates any "ceiling rule" limitations.   Any elections or other decisions relating to such allocations shall be made by the Company. Allocations pursuant to this Section are solely for United States tax purposes and shall not affect, or in any way be taken into account in computing, any Owner's Capital Account or share of profit, loss, or other items, pursuant to any provision of this Agreement or otherwise affect the Owner's rights (including, without limitation, rights to distributions) and obligations with respect to the Company.

**Section 4.05**   Certain Definitions.

For purposes of this Agreement:

(A) the term "section 704(b) Book Value" means, with respect to any Company property, the Company's adjusted basis for United States tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treas. Regs. §§1.704-1(b)(2)(iv)(d) through (g), provided that on the date of the contribution of an asset to the Company, the section 704(b) Book Value of any asset contributed to the Company shall be equal to the fair market value (as reasonably determined by the Owners) of such asset on the date of such contribution,

(B) the term "Treas. Regs." means Treasury Regulations issued under the Code, and

(C) the term "profits and losses" shall mean the items of profit and loss of the Company (including separately stated items) as computed under Treas. Regs. §1.704-1(b)(2)(iv).

**Section 4.06**   Determination of Interest in Event of Transfer.

The term "Recognized Owner" is defined as the owner of an Interest on any given date as reflected on the books and records of the Company.   All items of income, gain, loss, deduction and credit (other than those attributable to the sale, exchange, other disposition or refinancing of the property or the assets of the Company) for a taxable year allocable to any Interest which may have been transferred during the year shall be allocated between the transferring Owner and person to whom the Interest is transferred based upon the period of full months that each was the Recognized Owner of the Interest, without regard to the actual results of Company operations during any particular period, and without regard to whether cash distributions were made to the transferring Owner or person to whom the Interest was transferred during any particular period. All items of income, gain, loss, deduction and credit attributable to the sale, exchange, other disposition or refinancing of the Company's property during a taxable year in which any Interest may have been transferred shall be allocated to the Recognized Owner of the Interest as of the date of the closing of the sale, exchange, other disposition or refinancing.

# Article Five.   DISTRIBUTIONS

**Section 5.01**   Available Cash.

"Available Cash" shall mean all cash of the Company except cash required, in the opinion of, and at the

sole and absolute discretion of, the Manager, for the discharge of all mature and unmatured obligations of the Company and anticipated costs of the Company's acquisition, ownership, operation, leasing, improving, refurbishing or management of the property or the assets of the Company, or for any business of the Company or any other reasonable needs of the Company, including reserves for such expenses and contingencies whether present or future, as determined by the absolute discretion of the Manager.

Subject to any fiduciary duty the Manager may have, the Manager may, but are not required to, distribute some or all Available Cash when deemed appropriate by the Manager.   Available Cash shall be distributed among the Owners as follows:

> (i) First, all Available Cash will be distributed to the Members, pro rata according to their percentage of Interests, until such time as the Members have received a 10% non-compounded, annual rate of return on their Capital Contributions (the "Preferred Return");

> (ii)  Second, all Available Cash will be distributed to the Members, pro rata according to their percentage of Interests, until such time as the Members have received a complete return of their Capital Contributions;

> (iii) Third, 70% of all Available Cash will be distributed to the Class B Members, pro rata according to their percentage of Class B Membership interests, until the Class B Members have received a 25% non-compounded, annual return on their Capital Contributions (the "Class B Preferred Return"), and 30% of all available cash will be distributed to Class A members.

> (iv) Fourth, 50% of all Available Cash will be distributed to the Class B Members, pro rata according to their percentage of Class B Membership Interest, and 50% will be paid to all Class A members for all remaining distributions.

Notwithstanding the above, special allocations of Available Cash may be made, at the discretion of the Manager, when such allocations serve a valid business purpose and are not inconsistent with this Agreement.  The Distributions shall be made to the Recognized Owner (as defined in Section 4.06) of an Interest as of the date of the distribution, and shall be allocated between Class A and Class B Members according to Article 5 of this Operating Agreement.


**Section 5.02**   Equity Raise.

(A) "Initial Equity Raise" shall mean the initial equity raise for the acquisition of the property. Managers will determine the best strategy ("Strategy") to pursue of the following options:

> (i) Keep the current building and invest dollars to improve the building and lease the property; or

> (ii) Demolish the current building and entitle and develop approximately 360,000 SF of flex/industrial space; and

> (iii) Either Strategy will require an additional equity raise.

(B) "Additional Equity Raise" shall mean the additional equity raise required by either Strategy. The existing Class B Members shall be given the frst opportunity to invest in the Additional Equity Raise, and will have the following two options to select from:

(i) Invest in the Strategy selected by the Managers with a 25% annualized step up in their current investment as it is transferred to the new Strategy; or

(ii) Receive a return of their current investment with a 25% annualized return.

**Section 5.03**   Distributions in Kind.

No Owner shall have any right to demand or receive any distributions from the Company in any form other than cash, but the Manager may, upon the unanimous consent of the Members, make distributions in kind.

**Section 5.04**   Distributions in Liquidation.

Pursuant to Article Four, all distributions of liquidation proceeds to Owners shall be made after the allocation among the Owners of Company profits or losses for the Company accounting year in which the liquidation occurs (including any gain or loss deemed to have been realized as the result of a distribution in kind, pursuant to Section 5.02), and shall be made in accordance with the balances remaining in each Owner's capital account until all capital accounts have a zero balance, then the remainder shall be distributed pr rata to all Owners based on the percentage of Interest in the Company owned.

# Article Six.   MEMBER MEETINGS

**Section 6.01**   Annual Meetings.

An annual meeting of the Members may be held at such time on such day as shall be fixed by the Manager, for the purpose of electing a Manager or Manager and for the transaction of such other business as may come before the meeting.  If the election of a Manager is not held on the day designated herein for any annual meeting of the Members, or at any adjournment thereof, the Manager shall cause the election to be held at a special meeting of the Members as soon thereafter as may be convenient.  All Members shall receive notice of the meeting and shall have the right to attend.

**Section 6.02**   Special Meetings.

Special meetings of the Members for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Manager, or by Class A Members holding a Majority in Interest of Class A shares.

**Section 6.03**   Place of Meetings.

The Manager may designate any place within or outside the State of Colorado, as the place of meeting for any annual meeting or for any special meeting called by the Manager.  If no designation is made, or if a special meeting is otherwise called, the place of meeting shall be the principal place of business of the Company.

**Section 6.04**   Notice of Meetings.

Written notice to each Member of record entitled to vote at such meeting, stating the place, day, and hour of the meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or other persons calling the

meeting. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at its address as it appears in the books of the Company, with adequate postage thereon prepaid. If three (3) successive letters mailed to the last-known address of any Member of record are returned as undeliverable, no further notice to such Member shall be necessary until another address for such Member is delivered in writing to the Company.

**Section 6.05**   Quorum.

Class A Members, individually or collectively, holding a Majority in Interest, of Class A Membership Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, those Class A Members present holding a Majority in Interest of Class A Membership Interests may adjourn the meeting from time to time for a period not to exceed thirty (30) days without further notice. However, if the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each Class A Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Class A Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of those Class A Members whose absence would cause there to be less than a quorum.

**Section 6.06**   Voting.

Each Class A Member, at every meeting of the Members, shall have one (1) vote for each one percent (1%) Membership Interest in the Company held by the Class A Member as of the date of the meeting, whether such vote is cast in person or by proxy. In no event shall any Economic Interest Owner or Proposed Transferee be entitled to vote at any meeting of Members. Fractional Membership Interests shall have fractional votes. At all meetings of the Members at which a quorum is present, except as otherwise may be required by statute, the Articles of Organization, this Agreement, or any voting agreement among Class A Members, the affirmative vote of the holders of a Majority in Interest of Class A Membership Interests shall be the act of the Members.

**Section 6.07**   Voting by Certain Members.

(a)   Class A Membership Interests owned in the name of a corporation or limited liability company may be voted by such officer, agent, or proxy as the bylaws of such corporation or limited liability company may prescribe, or, in the absence of such provision, as the Board of Directors of such corporation may determine.

(b)   Subject to the terms of Section 9.09 hereof, Class A Membership Interests owned in the name of a deceased person, a minor, or an incompetent person may be voted by an administrator, executor, parent, or a court-appointed guardian or conservator, either in person or by proxy without a transfer of such Membership Interests into the name of such administrator, executor, parent, or court-appointed guardian or conservator.

(c)   Class A Membership Interests owned in the name of a trustee may be voted by such trustee, either in person or by proxy, but no trustee shall be entitled to vote Membership Interests held by such trustee without a transfer of such Membership Interests into the trustee's name.

(d)   Class A Membership Interests owned in the name of a receiver may be voted by such receiver and Membership Interests held by or under the control of a receiver may be voted by such

receiver either in person or by proxy, but no receiver shall be entitled to vote without being admitted as a Substitute Member pursuant to the terms of Article Nine below.

(e)     A Class A Member whose Membership Interests are pledged shall be entitled to vote such Membership Interests until the Interest has been transferred into the name of the pledgee pursuant to the terms of Article Nine below.

(f)     If a Class A Membership Interest is owned in the name of two (2) or more persons, whether fiduciaries, members of a partnership, joint tenants, tenants in common, tenants by the entirety, or otherwise; or if two (2) or more persons have the same fiduciary relationship respecting the same Membership Interests, voting with respect to the Membership Interests shall have the following effect:

i.      if only one (1) person votes, its act binds all;

ii.     if two (2) or more persons vote, the act of the majority so voting binds all; and

iii.    if two (2) or more persons vote, but the vote is evenly split on any particular matter, each faction may vote the Membership Interest in question proportionately; or any person voting the Membership Interest of a beneficiary, if any, may apply to any court of competent jurisdiction in the State of Colorado to appoint an additional person to act with the persons so voting the Membership Interest. The Membership Interest shall then be voted as determined by a majority of such persons and the person appointed by the court. If a tenancy is held in unequal interests, a majority or even split for the purpose of this Subsection (iii) shall be a majority or even split in interest.

**Section 6.08**   Action by Members Without a Meeting.

Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one (1) or more written consents describing the action taken, signed by each Class A Member entitled to vote, and delivered to the Manager for filing with the Company records. Action taken under this Section is effective when all Membership Interests entitled to vote have signed the consent, unless the consent specifies a different effective date. All Members shall be promptly advised in writing by the Manager, of any such actions taken.

# Article Seven.   MANAGEMENT

**Section 7.01**   Management's Duties and Powers.

The Manager shall manage and control the business of the Company. The Manager shall be obligated to devote only as much time to Company business as reasonably shall be required in light of the Company's business and objectives. The Manager shall at all times be free to engage generally in all aspects of any business or activity for its own account or on behalf of others, whether in competition with the Company or not. Neither the Company nor any Owner shall, solely as a result of this Agreement, have any interest in, or rights with respect to such separate business of the Manager, or in any business opportunity discovered in the conduct of any such separate business. Manager of the Company do not need to be Owners of the Company.

Subject to the limitations of Section 7.03, the Manager shall be obligated and empowered to do all acts necessary to conduct the business of the Company, including, but not limited to, the following:

(a)     obtain and pay for, out of Company funds, costs of preparation of required Company tax returns - copies of which shall be furnished to each Owner;

(b)     set-up and maintain accounts in banking institutions and/or savings and loan associations whose deposits are insured by the United States Government;

(c)     invest Company funds in certificates of deposit, money-market fund securities, securities, or debt instruments, or otherwise as the Manager may determine;

(d)     pay the obligations of the Company and collect obligations owed to the Company;

(e)     maintain insurance on Company property in a reasonable amount to protect the Company against loss or liability;

(f)     perform normal administrative and ministerial acts;

(g)     furnish financial statements to the Owners at such time and in such form as deemed appropriate by the Manager;

(h)     maintain reserves and pay costs or expenses consistent with the Approved Budget;

(i)     employ consultants, accountants, legal counsel, managing agents, brokers, or other experts to perform services for the Company and compensate them from Company funds;

(j)     borrow money and incur secured and unsecured indebtedness on behalf of the Company, and execute on behalf of the Company (without obligation on any third party's part for inquiry as to actual authority or as to disposition of funds) all Company contracts, leases, notes, mortgages or deeds of trust, deeds, evidences of indebtedness or security agreements;

(k)     enter into any and all other agreements on behalf of the Company, with any other person or entity for any purpose, in such forms as the Manager may approve. The Manager is expressly permitted to enter into agreements with affiliates of the Manager for provision of any such goods or services, provided that the amounts paid to such affiliated are not more than would be paid to non-affiliated entities for the provision of similar goods or services to the Company. Specifically:

(i)     It is contemplated and approved that the Manager or Manager's agent shall provide all property management and accounting services  required for the Company and its real estate holdings, including but not limited to the collection of rents, payment of bills, payment of taxes, all financial reporting to investors, preparation of tax returns, management of service agreements and administration of leases and shall be paid a standard market fee for such services.

**Section 7.02**   Form of Execution of Documents.

Subject to the limitations of Section 7.03, any document or instrument, of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale or certificate, which is intended to bind the Company or convey or encumber title to its real or personal property, shall be valid and binding for all purposes if executed by the Manager.

**Section 7.03**   Restrictions on Authority of Manager and Creation of a Management Committee.

For purposes of major decisions , as listed below, a Management Committee ("Management Committee") may be formed that includes two (2) members; Donald J. Marcotte and R. Brian Watson, or their designees. In the event of the death of any member of the Management Committee, their surviving spouse or the executor of their estate shall become a member of the Management Committee in their place. In addition to other acts expressly prohibited or restricted by this Agreement or by law, the Manager, without the specific unanimous written consent of the Management Committee, shall have no authority to act on behalf of the Company and the management is expressly prohibited from engaging in the following actions:

       (a)       the dissolution and winding up or discontinuation of the Company;

       (b)       the mortgage or pledge of a substantial part of the assets of the Company;

       (c)       purchase, trade, lease, liquidate and sell any property of the Company;

       (d)       execution of contracts, other than transactions in publicly traded securities, obligating the Company in excess of $100,000;

       (e)       the admission or removal of a Member;

       (f)       amendment to this Agreement except as set forth in Article Thirteen;

       (g)       confession of a judgment against the Company in excess of $100,000 in connection with any threatened or pending legal action;

       (h)       the acquisition of any material asset or the sale of a material asset of the Company;

       (i)       doing any act in contravention of this Agreement

**Section 7.04**   Election of a Manager.

Any Manager subsequent to the Initial Manager shall be elected by the Class A Members. Furthermore, a Manager shall hold office until a successor is duly elected and qualified, unless sooner displaced.  Any Manager position to be filled by reason of an increase in the number of Manager may be filled by election by the Members for a term of office continuing only until the next election by the Members.

**Section 7.05**   Resignation of a Manager.

Any Manager of the Company may resign at any time by giving written notice to the Company.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  If a Manager resigns, effective at a future date, the Management Committee shall have power to fill such vacancy or vacancies, the vote thereon to take effect when such resignation or resignations shall become effective.

**Section 7.06**   Removal of a Manager.

Any Manager of the Company may be removed at any time, with or without cause, by unanimous vote of the Class A Members.

**Section 7.07**   Management by Owners.

Except as herein expressly provided, no Owner who is not a Manager shall take part in Company business, transact any business for the Company, or have the power to bind the Company.  Except as provided in Section 2.02, the Owners shall not be liable for the debts of the Company or for any of the losses thereof beyond the amount of required capital contributions and its share of the undistributed profits of the Company.

**Section 7.08**   Tax Matters Partner.

Donald J. Marcotte is designated as the Tax Matters Partner for the Company.  In the event of his withdrawal as Manager, the Manager shall designate a replacement Tax Matters Partner.

**Section 7.09**   Tax Elections.

The Manager shall be empowered to cause the Company to make or revoke the basis adjustment election under Section 754 of the Internal Revenue Code, and to make or revoke any other tax election available to the Company subject to applicable provision of the IRC and regulation thereto.

**Section 7.10**   Delegation.

The Manager may appoint officers and delegate management decisions and powers to such officers and such delegation shall be binding on all Owners.

**Section 7.11**   Unanimous Decisions and Responsibilities.

If there are two (2) or more Manager of the Company, the powers of the Manager herein shall be exercised upon the consent of a majority in interest of the Manager.  If the Manager cannot agree or reach a consensus, the Company shall not proceed with the intended act, decision, or power.  Whenever an act or action is required of the Manager, each is individually responsible and obligated to perform the act or take the necessary action.

## Article Eight.   MANAGEMENT COMPENSATION

**Section 8.01**   Compensation for Management Services.

Unless otherwise approved by the unanimous vote of the Management Committee, the Manager shall not be entitled to compensation for their services rendered and management and operation of the Company business.. In the event that compensation is unanimously approved, it shall be no more than would be paid to a third party service provider, in an arms length transaction, for similar services.

**Section 8.02**   Other Remuneration.

The Manager shall have the right to receive reasonable compensation for contracts or other business entered into as set forth in Section 7.01, in an amount determined by the Manager.

## Article Nine.   ADMISSION AND WITHDRAWAL OF OWNERS; TRANSFERS OF OWNERS' INTERESTS

**Section 9.01**   Transfers by Owners

An Owner may not voluntarily, involuntarily, or by operation of law Transfer all or any part of its Interest in the Company without the prior approval of all other Members.  No Transfer by an Owner of its Interest in the Company or any portion of it shall relieve the Owner of its obligations under this

Agreement. No transferee, assignee, or donee of an Interest (hereinafter referred to as "Proposed Transferee") shall become a Member without complying with the provisions of Section 9.02 below. If a Proposed Transferee is succeeding to an Interest owned by an Owner who is also a Manager of the Company, the Proposed Transferee is not entitled to become a Manager unless elected a Manager as provided in Article Seven herein.

**Section 9.02**   Substituted Member.

A Proposed Transferee shall not become a Member unless the following conditions are met:

(a)    the Proposed Transferee has executed and delivered an acceptance of the limitations, terms and conditions of this Agreement and any amendments to this Agreement in a form approved by the Manager, and has executed and delivered any other documents reasonably required by the Manager;

(b)    the Proposed Transferee has paid all reasonable expenses connected with his, her or its admission as a Member, including legal fees and other costs of preparing and filing amendments to this Agreement; and

(c)    written consent to the admission of a Proposed Transferee as a Member has been given by all Class A Members other than the transferring Owner.

Upon compliance with all the terms of this Agreement, the Proposed Transferee of an Interest shall be admitted as a Member (hereinafter "Substituted Member").  Subject to all other applicable provisions of this Agreement, a Substituted Member shall be considered a "Member" for the purposes of this Agreement and shall be entitled to all the rights and powers and shall be subject to all the obligations of a Member as set forth in this Agreement.

**Section 9.03**   Economic Interest Owner.

If a Proposed Transferee fails to comply with any of the provisions of Section 9.02, the Proposed Transferee shall not become a Substituted Member and shall become only an Economic Interest Owner.  If this is the case, in addition to other rights described in this Agreement, the Proposed Transferee forfeits any voting rights.  An Economic Interest Owner's rights do not include any rights, powers, or rights to vote on, consent to or otherwise participate in any decision that a Member may have under this Agreement. An Economic Interest Owner's Interest in the Company is not included in the calculation of the total Membership Interest of the Company.

**Section 9.04**   Transfers To Intervivos Trust.

Notwithstanding any provisions contained in this Article to the contrary, any Member whose owns an Interest in an individual capacity may transfer its Membership Interest to a Revocable Intervivos Trust established by the Member without the consent of the other Members.  The trust shall be treated as a Substituted Member when the trustee has complied with the terms of Section 9.02 (a) and (b).

**Section 9.05**   Testamentary Bequest To Owner's Family.

An Owner who owns an Interest in an individual capacity shall have the right, by testamentary disposition, to bequeath all or any portion of his or her Interest to an entity owned at least fifty percent (50%) by such Owner or to a member of his or her family or trust benefiting such family member(s), as defined herein, provided, however, that in the case of any such bequest, the legatee or legatees shall hold the Interest received as a result of such bequest as an Economic Interest Owner subject to the terms of this Agreement, and shall become a Substituted Member only upon compliance with the terms of Section 9.02 (a) and (b).

For purposes of this Section, the term "family" shall include any Qualified Terminable Interest Property ("QTIP") trust as defined in IRC Section 2056 created for an Owner's spouse, and the Owner's ancestors and lineal descendants, including legally adopted children.

**Section 9.06**   Effect of Charging Order.

In the event any Interest becomes subject to a charging order, the following provisions shall apply which shall govern the rights and obligations of the Owner whose Interest is so charged and the creditor in whose favor the charging order was entered:

1.      The creditor must obtain an order of a court of competent jurisdiction charging the Interest of the applicable Owner with payment of the unsatisfied amount of the judgment with interest thereon.

2.      The creditor must notify the Company in writing of the entry of the charging order and provide to the Company a certified copy of the charging order.

3.      Upon receipt of the charging order and subject to the terms and conditions of this Agreement, the creditor shall be automatically vested in the ownership of the Interest and shall be considered an Economic Interest Owner.

4      If, pursuant to Colorado state statute, the creditor has a receiver appointed to manage the Owner's Interest, the receiver shall be considered an Economic Interest Owner of the Interest.

5.      The creditor has the right to sell the Interest subject to the terms and conditions of this Agreement.

6.      An Economic Interest Owner may only become a Substituted Member by complying with all requirements set forth in Section 9.02.

7.      Among other provisions, any Economic Interest Owner is subject to the obligation to make capital contributions provided for in Section 2.03 of this Agreement.

8.      In the event that a court orders the foreclosure or sale of an Interest, any such sale must first comply with Section 9.08 of this Agreement.  Following compliance with Section 9.08, the Company and the other Members shall have the same rights of redemption the Owner of the Interest has pursuant to Colorado state statute.

**Section 9.07**   Other Restrictions on Transfer.

Notwithstanding any other provisions of this Agreement, no Owner may Transfer all or any part of its Interest in the Company, nor shall any Owner be admitted or withdrawn from the Company except in compliance with all applicable federal and state securities laws.  This section shall not be applicable to Transfers by an Owner by gift regardless of whether said gift is a taxable gift under the IRC.

**Section 9.08**   Purchase of an Owner's Interest.

Except as otherwise provided in this Agreement, no Owner (the "Offering Owner") shall Transfer any part or all of its Interests in the Company, without first offering (the "Offer") that portion of its Interest in the Company subject to the contemplated Transfer (the "Offered Interest") first, to the Company, and second, to the other Members, at a purchase price (hereinafter referred to as the "Transfer Purchase Price") and in a manner as follows:

(a)      <u>Transfer Purchase Price</u>.  The Transfer Purchase Price shall be the price at which the Owner proposes transferring its Interest to the Proposed Transferee.

(b)      Offer.

i.        The Offer shall be made by the Offering Owner first to the Company by written notice (hereinafter "Offering Notice").  Within forty-five (45) days (the "Company Offer Period") after receipt by the Company of the Offering Notice, the Company shall notify the Offering Owner in writing (the "Company Notice), whether or not the Company shall accept the Offer and shall purchase all but not less than all of the Offered Interest.  If the Company accepts the Offer to purchase the Offered Interest, the Company Notice shall fix a closing date not more than twenty (20) days (the "Company Closing Date") after the expiration of the Company Offer Period.

ii.       In the event that the Company decides not to accept the Offer, the Offering Owner or the Company, at its election, shall, by written notice (the "Remaining Member Notice") given within that period (the "Member Offer Period") terminating ten (10) days after the expiration of the Company Offer Period, make the Offer of the Offered Interest to the other Members, each of whom shall then have a period of twenty (20) days (the "Member Acceptance Period") after the expiration of the Member Offer Period within which to notify in writing the Offering Owner whether or not that Member intends to purchase all but not less than all of the Offered Interest.  If two (2) or more Members of the Company desire to accept the Offer to purchase the Offered Interest, then, in the absence of an agreement between them, such Members shall have the right to purchase the Offered Interest in the proportion which their respective percentage of Membership Interest in the Company bears to the percentage of Membership Interests of all of the Members who desire to accept the Offer.  If the other Members intend to accept the Offer and to purchase the Offered Interest, the written notice required to be given by them shall fix a closing date not more than fifteen (15) days after the expiration of the Member Acceptance Period (hereinafter the "Member Closing Date").

(c)      <u>Payment</u>.  The aggregate dollar amount of the Transfer Purchase Price shall be payable in cash on the Company Closing Date or on the Member Closing Date, as the case may be, unless the Company or the purchasing Members shall elect prior to or on the Company Closing Date or the Member Closing Date, as the case may be, to purchase such Offered Interest in installments pursuant to the provisions of Section 9.14 hereof.

(d)      <u>Free Transfer Period</u>.  If the Company or the other Members fail to accept the Offer or, if the Offer is accepted by the Company or the other Members and the Company or the other Members fail to purchase all of the Offered Interest at the Transfer Purchase Price within the time and in the manner specified in this Section 9.08, then the Offering Owner shall be free, for a period (hereinafter the "Free Transfer Period") of sixty (60) days from the occurrence of such failure, to transfer the Offered Interest to a Proposed Transferee; provided, however, that if the conditions set forth in Section 9.02 are not met, the Proposed Transferee and will only be an Economic Interest Owner.   If the conditions set forth in Section 9.02 are met, the Proposed Transferee shall become a Substitute Member.  If the Offering Owner shall not transfer the Offered Interest within the Free Transfer Period, his right to transfer the Offered Interest free of the foregoing restrictions shall thereupon cease and terminate.

**Section 9.09**   Death of an Owner.

(a)      <u>Purchase of Decedent's Interest</u>.    Each Owner who owns an Interest in an individual capacity shall have the right by testamentary disposition to bequeath all or any portion of that Owner's

Interests in the Company to a member of his or her family (as defined in Section 9.05) to an entity owned at least fifty percent (50%) by such Owner; provided, however, that in the case of any such bequest, the legatee or legatees shall hold the Interest received as a Permitted Transferee.  If the conditions set forth in Section 9.02 (a) and (b) are not met, the Proposed Transferee will only be an Economic Interest Owner. If the conditions set forth in Section 9.02 (a) and (b) are met, the Proposed Transferee shall become a Substitute Member.  In the event that all or any portion of the Interest owned by an Owner at the time of death (the "Decedent") shall not be bequeathed by testamentary disposition or shall be bequeathed to one or more person(s) other than those persons to whom such a bequest is permitted under the foregoing provisions of this Section 9.09, then the Company shall have the right (but not the obligation) to purchase the Decedent's Interest.  In the event that the Company elects to exercise the right granted to it hereunder, it shall provide a notice to the Decedent's personal representative that it is so exercising its rights.  In such notice the Company shall fix a closing date for such purchase; the closing date shall not be longer than forty-five (45) days after the appointment of such personal representative.  If the Company exercises the option granted to it, the Company shall purchase the Decedent's Interest on the closing date at a price (hereinafter the "Decedent Purchase Price") which shall be the Appraised Value (as defined in Section 9.13).  If the Company elects not to exercise its option, the remaining Members shall have the right to purchase the Decedent's Interest, consistent with the provisions of the paragraph (ii)of Subsection 9.08(b).

(a)     Payment.  The aggregate dollar amount of the Appraised Value shall be payable in cash on the closing date, unless the Company, or the remaining Members, as the case may be, shall elect prior to or on the closing date to purchase the Decedent's Interest in installments as provided in Section 9.14 hereof.  The installment method of payment shall only be permitted to the extent there are insufficient insurance proceeds, payable as a result of the Decedent's death, available to the purchaser of Decedent's Interest (whether it be the Company or a remaining Member).

**Section 9.10**   Resignation of a Member. No Member has the right to resign from the Company under any circumstances.

**Section 9.11**   Expulsion of a Member.

(a)     Basis for Expulsion and Purchase.  A Member may be expelled (the "Expelled Member") at the option of the Company, authorized by the consent of the Class A Members, for the following reasons:

i.     If the Member shall subject his Membership Interest or any part thereof or interest therein to a charging order entered by any court of competent jurisdiction.

ii.    If the Member shall be in a state of Bankruptcy (as defined below).

iii.        For cause which shall be identified as:  a) any illegal, immoral or dishonest act or omission by the Member, which act or omission results in damages to the Company; or b) failure of the Member to discharge any duties that may be required of the Member under this Agreement other than non-payment pursuant to Section 2.07(b)(i).

Following the occurrence of any of the said events (the "Occurrence Date"), the Company shall have the right (but not the obligation) exercisable by written notice to the Expelled Member, within thirty (30) days of the Occurrence Date, to purchase from the Expelled Member, who shall sell to the Company, all of the Membership Interest (the "Expelled Member's Interest") owned by the Expelled Member in the Company of the Occurrence Date.  The Company shall, by written notice delivered to the Expelled

Member or his successors, fix a closing date for such purchase which shall be not less than seventy five (75) days after the Occurrence Date, but in no event longer than one hundred twenty (120) days after the Occurrence Date.  The Expelled Member's Interest shall be purchased by the Company on such closing date at the Appraised Value (as defined in Section 9.13).  If the Company elects not to exercise its option, the remaining Members shall have the right to purchase the Expelled Member's Interest, consistent with the provisions of subparagraph ii. of Subsection 9.08(b).  In the event of the Bankruptcy of an Expelled Member, all dealings under this Section 9.11 shall be undertaken with the appropriate representative or successor of the Expelled Member. If the Company elects not to exercise its option, the remaining Members shall have the right to purchase the Expelled Member's Interest, consistent with the provisions of subparagraph ii. of Subsection 9.08(b).

(b)      Payment.  The aggregate dollar amount of the Expelled Member's Purchase Price shall be payable in cash on the closing date, unless the Company, or the remaining Members, as the case may be, shall elect prior to or on the closing date to purchase the Expelled Member's Interest in installments as provided in Section 9.14 of this Agreement.

(c)      Expelled Member.   If a Member has been expelled from the Company, but the Membership Interest has not been acquired pursuant to this Section 9.11, then, in such event, the Expelled Member shall automatically become an Economic Interest Owner.

(d)      Bankruptcy Defined.  A bankruptcy (hereinafter "Bankruptcy") shall be defined as the filing by a Member of a petition commencing a voluntary case under the Bankruptcy Code; a general assignment by a Member for the benefit of creditors; an admission in writing by a Member of the Member's inability to pay its other debts as they become due; the filing by a Member of any petition or answer in any proceeding seeking for himself or herself, or consenting to, or acquiescing in, any insolvency, receivership, composition, readjustment, liquidation, dissolution, or similar relief under any present or future statute, law, or regulation, or the filing by a Member of an answer or other pleading admitting or failing to deny, or to contest, the material allegations of the petition filed against the Member in any such proceeding; the seeking or consenting to, or acquiescence by a Member in, the appointment of any trustee, receiver, or liquidator of the Member, or any part of the Member's property; and the commencement against a Member of an involuntary case under the Bankruptcy Code, or a proceeding under any receivership, composition, readjustment, liquidation, insolvency, dissolution, or like law or statute, which case or proceeding is not dismissed or vacated within sixty (60) days.

**Section 9.12**   Certain Tax Aspects Incident to Transactions Contemplated by This Agreement.

It is the intention of the parties that the price to be paid by a purchaser shall constitute and be considered as made in exchange for the interest in partnership property, including goodwill, within the meaning of Section 736(b) of the Internal Revenue Code of 1986, as amended.

**Section 9.13**   Fair Market Value.

(a)      Appraised Value.  The term "Appraised Value," except as used in relation to Section 9.11 and Subsection 9.13(d) of this Agreement, shall be equal to one hundred percent (100%) of the Fair Market Value of the total Interest (less transaction costs, including the cost of the appraisal) in the Company, determined in accordance with the provisions of Subsection 9.13(b) of this Agreement times the percentage of Interest owned.  For purposes of Section 9.11 only, the term "Appraised Value" shall be equal to seventy percent (70%) of the Fair Market Value of the total Interest (less transaction costs, including the cost of the appraisal) in the Company, determined in accordance with the provisions of the Subsection 9.13(b) of this Agreement times the percentage of Interest owned.

(b)     <u>Fair Market Value</u>.  The Fair Market Value of an Interest shall be the amount agreed upon by all Members in writing no less than annually.  If the Members cannot agree, or if no written agreement exists that was entered into and signed by all members within the past twelve (12) months, then the Fair Market Value shall be determined in the following manner:

iv.     Within thirty (30) days of the date of the Offering Notice, date of death of Decedent, or the Occurrence Date, as the case may be, the Manager shall select an appraiser (the "Company Appraiser") to determine the Fair Market Value of the Interest, and the Company Appraiser shall submit his determination thereof within sixty (60) days after the date of his selection (the "Appraisal Due Date").  All costs of the appraisal shall be the sole responsibility of the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as applicable.

v.      If the appraisal made by the Company Appraiser is unsatisfactory to the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as the case may be, then within fifteen (15) days after the date of the Appraisal Due Date, the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as the case may be, shall (at their own expense) select an appraiser (the "Owner's Appraiser") to determine the Fair Market Value of the Interest, and such appraiser shall submit his determination thereof within sixty (60) days after the date of his selection.

vi.     If the appraisal made by the Owner's Appraiser is unsatisfactory to the Manager, then the Company Appraiser and the Owner's Appraiser shall select a third appraiser (the "Appraiser") to determine the Fair Market Value of the Interest and such Appraiser shall submit his determination thereof within sixty (60) days after the date of his selection.  The Appraiser's determination thereof shall be binding upon the Company, the remaining Members, the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as the case may be.  All costs of all appraisals shall be solely borne by the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as the case may be.

(c)     <u>Qualification of Appraiser</u>.  Any and all appraisers selected in accordance with the provisions of this Section shall be appraisers who conduct their business in the same area as the Company property (or, if applicable, its principal place of business) is located, and who shall conduct appraisals provided for in this Section in accordance with generally accepted appraising standards.  Any and all costs incurred in connection with any of the appraisals provided for in this Section shall be borne by the Offering Owner, the personal representatives of the Decedent or Heir, or the Expelled Member, as the case may be.

(d)     <u>Alternate Determination of Appraised Value.</u>  Notwithstanding any other provision of this Section, the parties to any transfer of an Interest pursuant to Sections 9.09, 9.10, or 9.11 may determine, by mutual consent, the value of the Interest.

**Section 9.14**   Installment Payments.

(a)     <u>Election to Pay by Installment</u>.  In the event that there shall be an election pursuant to the provisions of Sections 9.08, 9.09, and 9.11 hereof to purchase the Interest pursuant to the Sections referenced in this Subsection 9.14(a) (hereinafter, where appropriate, referred to as the "Transferred

Interest"), on an installment basis, then the terms and conditions of such installment purchase shall be as set forth below.

i.        If the installment purchase is due to the application of Sections 9.08 or 9.09 above, then twenty percent (20%) of the aggregate purchase price due for such Transferred Interest (hereinafter, where appropriate, referred to as the "Aggregate Purchase Price") shall be paid on the closing date, and the remainder of the Aggregate Purchase Price shall be paid in five (5) equal consecutive annual installments on each anniversary of the closing date over a period, beginning with the year following the calendar year in which the sale occurred (hereinafter referred to as the "Installment Payment Period").   Payment shall consist of principal and interest, applying the Applicable Federal Rate ("AFR") for long term securities at the time of purchase.

ii.        If the installment purchase is due to the application of Section 9.11 above, then five percent (5%) of the aggregate purchase price due for such Transferred Interest shall be paid on the closing date, and the remainder of the Aggregate Purchase Price shall be paid in fifteen (15) equal consecutive annual installments on each anniversary of the closing date over a period, beginning with the year following the calendar year in which the sale occurred (hereinafter referred to as the "Installment Payment Period").   Payment shall consist of principal and interest, applying the AFR for long term securities at the time of purchase.

(b)        <u>Acceleration</u>.   Anything contained in this Section 9.14 to the contrary notwithstanding, the entire unpaid balance of the purchase price shall become immediately due and payable upon the sale, exchange, transfer, or other disposition of all or substantially all of the property or assets of the Company.

(c)        <u>Rights of Members under Installment Payments</u>.   So long as any part of the purchase price for a Transferred Interest remains unpaid, the Company shall permit the Offering Owner, the personal representatives of the Decedent or the Heirs, the Expelled Member or the legal representative, in the event of the Bankruptcy of the Expelled Member, as the case may, and the attorneys and the accountants of each of the foregoing persons, to examine the books and records of the Company and its business following the event that shall have given rise to the election referred to in Section 9.14(a) during regular business hours from time to time upon reasonable prior notice and to receive copies of the annual accounting reports and tax returns of the Company.

**Section 9.15**   Delivery of Certificate of Ownership.

This Section is only applicable if Certificates of Ownership have been issued by the Company.   In such case, on the closing date, upon payment of the purchase price for the purchase for the Interest hereunder or, if payment is to be made in installments pursuant to the provisions of Section 9.14, upon the first payment, the Offering Owner, the personal representatives of the Decedent, the personal representative of the Expelled Member (in the event of the Bankruptcy of the Expelled Member), or the Expelled Member, as the case may be, shall execute, acknowledge seal, and deliver to the person purchasing the Interest such instrument or instruments of transfer to evidence the purchase of the Interest (the "Certificate of Ownership") that shall be reasonably requested by counsel to the person purchasing such Interest in form and substance reasonably satisfactory to such counsel.   If a tender of the purchase price or, if payment is to be made in installments pursuant to the provisions of Section 9.14(a) hereof, the tender of the first payment thereof, shall be refused, or if the Certificate of Ownership shall not be delivered contemporaneously with the tender of the purchase price or of the first payment thereof, as aforesaid, then the Purchasing Person shall be appointed, and the same is hereby irrevocably constituted and appointed, the attorney-in-fact with full power and authority to execute, acknowledge, seal, and deliver the Certificates of Ownership.

## Article Ten.   DISSOLUTION AND TERMINATION

**Section 10.01**  Events Causing Dissolution and Termination.

The Company shall be dissolved upon the occurrence of an event as set forth in Section 1.09 of this Agreement or upon the occurrence of any other event which, by law or under the terms of this Agreement, causes dissolution.

**Section 10.02**  Winding Up of Affairs on Dissolution.

Upon the dissolution of the Company requiring liquidation and termination, the Manager, or if none, such other person permitted by law to carry out the winding up of the affairs of the Company, shall promptly (i) notify all Owners of such dissolution; (ii) sell or liquidate the Company's assets and wind up the affairs of the Company; (iii) after paying or providing for the payment of all liabilities and obligations of the Company, distribute the proceeds from the liquidation of the Company's assets pursuant to Section 5.03 or as otherwise may be required by the LLC Act, as it may be amended; and (iv) prepare and file all instruments or documents required by law to be filed to reflect the termination of the Company.  Company assets in excess of the amounts necessary to discharge indebtedness, may be distributed in kind upon terms and conditions approved by the Members.  If any property is distributed in kind, the capital accounts of the Owners shall be adjusted to reflect unrecognized tax gain or loss attributable to such property.

**Section 10.03**  Special Tax Matters.

Upon liquidation of the Company, all distributions of liquidation proceeds shall be made in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2) issued pursuant to the Internal Revenue Code, as amended.  If an Owner has a deficit in its capital account following the distribution of liquidation proceeds, he or she shall restore the amount of such deficit balance in accordance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(3) issued pursuant to the Internal Revenue Code.

## Article Eleven.   FISCAL MATTERS

**Section 11.01**  Books and Records.

The Manager shall maintain full and accurate books of the Company.

**Section 11.02**  Taxable Year.

The taxable year of the Company shall be the calendar year.

**Section 11.03**  Reports to Members.

(a)  The Manager shall prepare and deliver to the Owners, on or before March 15th of each year, unless extended, a copy of the federal income tax information return of the Company for the preceding taxable year showing the distributive share of each item of income, gain, loss, deduction or credit which the Owner is required to take into account separately on its individual federal income tax return.

(b)  In addition to the foregoing, the Manager may, at the Manager' discretion, cause informational reports to be mailed to the Owners at reasonable intervals during each year.

**Section 11.04**  Bank Accounts and Investment of Funds.

All funds of the Company shall be deposited in the Company's name in such checking and savings accounts or investments as shall be designated by the Manager.  Withdrawals shall be made upon such signature or signatures as the Manager may designate.

**Section 11.05**  Accounting Decisions.

The books of the Company shall be kept on the basis determined by the Manager.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Manager in accordance with good accounting practices, consistently applied.

## Article Twelve.   ADDITIONAL DOCUMENTS

Each Owner agrees to execute with acknowledgment or jurat, if required, any and all documents and writings which may be necessary or expedient in the creation of this Limited Liability Company and the achievement of its purposes, specifically including the Articles of Organization and amendments to, or cancellation of, the Articles of Organization.

## Article Thirteen.   AMENDMENTS

**Section 13.01**  Clarifying Amendments.

This Agreement may be amended by the Manager without the approval of any Owner if such amendment is solely for the purpose of clarification and does not change the substance thereof.

**Section 13.02**  IRS Amendments

This Agreement may further be amended by the Manager and without the approval of any Owner if such amendment is, in the opinion of counsel for the Company, necessary or appropriate to satisfy requirements of the Internal Revenue Code or regulations promulgated thereto with respect to the Company or any federal or state securities laws or regulations.  Any amendment made pursuant to this Section may be made effective as of the date of this Agreement.

**Section 13.03**  All Other Amendments.

All other amendments to this Agreement shall require the written approval of the Management Comittee, unless a greater approval level of  Class A Membership Interests is required by law or by another Section of this Agreement. Absolutely no other amendments to this Agreement may be made which would have the effect of diminishing, delaying or otherwise impairing the financial rights of any Class A or Class B Members without the written, notarized consent of such Class B Member.

## Article Fourteen.   TAG ALONG RIGHTS/DRAG ALONG RIGHTS

**Section 14.01**  Tag Along Rights: As to Sale or Purchase of Interests

In addition to the restrictions and limitations on Transfer imposed hereunder, if (a) one (1) or more Owners receive a bona fide written offer from a proposed purchaser (a "Third Party Purchaser") to purchase all of the Interest held by such Owner, together with all of the Interests held by all other Owners (a "Come-Along Offer"), and (b) Members who hold Seventy Five Percent in Interest, wish to accept such Come-Along Offer ("Accepting Members"), then any other Owners who do not accept such offer with ten (10) days after receipt of notice from the Accepting Members ("Refusing Members"), shall nevertheless be obligated to either match the offer and purchase all the shares or else to sell their Interests to the Third

Party Purchaser, on the same percentage basis as the Accepting Members sell to said Third Party Purchaser, at a price set forth in the Come-Along Offer and upon the same terms and conditions in the Come-Along Offer. The transaction contemplated in the Come-Along Offer must be closed not more than one hundred and eighty (180) days after the date the Accepting Members send notice of the Come-Along Offer to the other Owners and in the event such sale is not closed within such time, the Come-Along Offer shall be null and void and no sale of Interests shall be effected, and the Interests proposed to be Transferred shall again be subject to this Agreement, including without limitation, this Article Fourteen.

**Section 14.02**  Drag Along Rights: Right to Join in Interest Sales.

The Owners agree that all Members shall have "drag along rights" with respect to any sale of Interests in the Company.  This means that each Member has the option to sell the same percentage of Interests as the selling Owner may sell at any time by incorporating their Interests into those being sold by the selling Owner.

The mechanics of this right are as follows:

(a)       If selling Owner intends to Transfer any portion of his Interest to any person pursuant to a bona fide offer to purchase and sell, other than for bona fide personal estate planning purposes, he or she shall give thirty (30) days written notice to the other Members of his intent to transfer.  The notice, in addition to stating the intent to transfer an Interest, shall state (i) the Interest to be transferred (the "Offered Interest"), (ii) the name, business and residence address of the Proposed Transferee, and (iii) whether the Transfer is for valuable consideration, and if so, the amount of the consideration and the other terms of the sale.

(b)       The remaining Members shall have the right and option to include their Interest pro rata in the Offered Interest to be sold.  The Members shall exercise their Option to include their Interest pro rata in the Offered Interests under this provision by giving notice in writing of its intent to exercise this option to the selling Owner.  This right shall be exercisable by the Members within thirty (30) days of the receipt of the notice by the selling Owner.

(c)        If the Members forfeit or decline their option to include their Interest with those to be sold, the Offered Interest may be transferred, subject to the terms of this Agreement, according to the terms of sale of the bona fide proposed transfer, but within not more than six (6) months after the notice by the Accepting Member and upon the terms therein stated.

In the event that the Offered Interest is not transferred within six (6) months of the date of the notice given by the selling Owner, the selling Owner shall notify the Members of that fact, as provided herein, and in that event the Offered Interest shall again be subject to the provisions of this Article.

## Article Fifteen.   POWER OF ATTORNEY

An Owner, by execution of this Agreement or acceptance of an Interest, irrevocably constitutes and appoints the Manager, with full power of substitution, as that Owner's true and lawful attorney(s), in that Owner's name, place, and stead to execute, acknowledge, swear to, and file:  (i)  the original Articles of Organization for the Company and all amendments of the Articles of Organization required by law or by the provisions of this Agreement; (ii) all other instruments necessary to qualify or continue the Company as a Limited Liability Company in any state where the Company may be doing business; (iii) all instruments which effect a change or modification of the Company in accordance with this Agreement; and (iv) all

conveyances and other instruments necessary to effect the dissolution and termination of the Company.  The powers of attorney granted herein are coupled with an interest, shall be irrevocable, and shall not be affected by the death, disability, or incompetence of an Owner.  In the event of any conflict between this Agreement and any instruments executed by such attorney pursuant to the power of attorney granted in this Section, this Agreement shall control.  Notwithstanding the language of this power of attorney, it may not be used by the Manager to amend the Articles of Organization or this Agreement in any manner which would change the nature of the Company's business, or limit or reduce the rights of the Owners in contravention of this Agreement, or increase the liability of the Owners beyond that stated in this Agreement.

## Article Sixteen.   NOTICES

**Section 16.01**  Method for Notices.

Unless contrary to the LLC Act or other provisions of this Agreement, all notices required to be given herein shall be made in writing by:

(a)     personal delivery to the party requiring notice;

(b)     government mail service - postage prepaid;

(c)     email to the last known email address of the recipient;

(d)     air courier service; or

(e)     facsimile (telecopier, fax, or similar device).

Methods (b), (c), (d), and (e), above, shall be effective methods to provide notice only when actually received by the addressee. Until further notice to all Manager of a change of address, the addresses of the initial Class A Members are:

PLW Capital I, LLC
1999 Broadway, Suite 770
Denver Colorado, 80202
ATTN: R. Brian Watson

JM Capital VII, LLC
1999 Broadway, Suite 770
Denver Colorado, 80202
ATTN: Donald J. Marcotte

The names, addresses and email addresses of each Class B Member are set forth on Schedule C, attached hereto.

**Section 16.02**  Computation of Time.

In computing any period of time under this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included unless it is a Saturday, Sunday, or legal holiday, in which event the period shall be extended until the end of the next day which is not a Saturday, Sunday, or legal holiday.

## Article Seventeen.   EXONERATION AND INDEMNIFICATION

**Section 17.01**  Limitation of Liability.

The Manager shall not be liable, responsible, or accountable in damages or otherwise to the Company or to any Owner for any action taken or failure to act on behalf of the Company within the scope of the authority conferred on the Manager by this Agreement or by law.  The above provision does not apply if such action or omission was performed or omitted fraudulently, or in bad faith,.  The Manager shall not be liable for the return of an Owner's capital contributions to the Company.

**Section 17.02**  Indemnification.

The Company shall indemnify, defend and hold harmless the Manager, and the Manager' heirs, successors, and representatives, from and against any loss, expense, damage, or injury suffered or sustained by reasons of any acts, omissions, or alleged acts or omissions arising out of the activities of the Manager on behalf of the Company or in furtherance of the interests of the Company.  The indemnification shall include, but is not limited to, any judgment, award, settlement, reasonable attorneys' fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim.  The Company can, upon consent of the Manager, advance the cost of any defense.  Such indemnification shall apply if the acts, omissions, or alleged acts or omissions upon which such actual or threatened action, proceeding, or claims are based were performed or omitted in good faith and were not performed or omitted fraudulently or in bad faith by the indemnified party.  Such indemnification shall be made only to the extent of available assets of the Company.

## Article Eighteen.   MISCELLANEOUS PROVISIONS

**Section 18.01**  Integration.

This Agreement embodies the entire agreement and understanding among the parties and supersedes all prior agreements and understandings, if any, among them.

**Section 18.02**  Applicable Law.

This Agreement and the rights of the parties shall be construed and enforced in accordance with the laws of the State of Colorado, and the parties hereto consent to the exclusive jurisdiction of the courts of the State of Colorado.

**Section 18.03**  Counterparts.

This Agreement may be executed in counterparts, and all counterparts so executed shall constitute one Agreement binding on all the parties to this Agreement, notwithstanding that all the parties are not signatory to the original or to the same counterpart, except that no counterpart shall be authentic unless signed by the Manager.

**Section 18.04**  Severability Clause.

In case any one or more of the provisions contained in this Agreement or any application of such provisions shall be held to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions and any other application of such provisions shall not in any way be affected or impaired.

**Section 18.05**  Binding Effect.

Except as otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors, and assigns.

**Section 18.06**  Headnotes.

The article captions used in this Agreement are in no way intended to interpret or define the terms and conditions of this Agreement, rather, they are intended for ready reference purposes only.

**Section 18.07**  Gender/Singular and Plural.

Whenever the context of this instrument so requires, words used in the masculine gender include the feminine or entities, and the singular includes the plural and the plural the singular.

Section 18.08  *Prevailing Party*.

If any legal action or other proceeding is brought for the enforcement of this Agreement, the prevailing party shall be entitled to recover reasonable legal fees and other costs incurred in that action or proceeding, in addition to any other relief to which it may be entitled.

*[signature page follows]*

   **IN WITNESS WHEREOF**, the undersigned, being all of the initial Members and Manager of the Company, have executed and acknowledged this Agreement effective as of the day and year written above.

MANAGER:

_____
R. Brian Watson

_____
Donald J. Marcotte

CLASS A MEMBERS:

**PLW Capital I, LLC**
a Colorado limited liability company

By: _____
R. Brian Watson, its Manager

**JM Capital VII, LLC**
a Colorado limited liability company

By: _____
Donald J. Marcotte, its Manager

SCHEDULE A

Capital Contributions of PLW Capital I, LLC

| Description of Capital Contribution | Amount | Initial Percentage of Company Class A Membership Interests: |
|---|---|---|
| Cash | $50.00 | 50% |

SCHEDULE  B


Capital Contributions of JM Capital VII, LLC


| Description of Capital Contribution | Amount | Initial Percentage of Class A Membership Interests |
|---|---|---|
| Cash | $50.00 | 50% |

SCHEDULE C

Names, Addresses, Email Addresses, and Capital Contributions of Class B Members

Class B Member Name:_____

Class B Member Address:_____

Class B Member Email Address:_____

Amount of Capital Contribution:_____


Class B Member Name:_____

Class B Member Address:_____

Class B Member Email Address:_____

Amount of Capital Contribution:_____


Class B Member Name:_____

Class B Member Address:_____

Class B Member Email Address:_____

Amount of Capital Contribution:_____


Class B Member Name:_____

Class B Member Address:_____

Class B Member Email Address:_____

Amount of Capital Contribution:_____


Class B Member Name:_____

Class B Member Address:_____

Class B Member Email Address:_____

Amount of Capital Contribution:_____

Schedule C:
CLASS B MEMBERS

800 Hoyt LLC
Investors

| Name | Entity | Address 1 | address 2 | City | state | Zip | Amount | Email | % Ownership |
|---|---|---|---|---|---|---|---|---|---|
| Tim Brown | | 2366 S. Milwaukee Street | | Denver | CO | 80210 | $25,000.00 | tim@northstarcp.com | 2.56% |
| James F. Kosmiski | | 13854 Ashgrove Circle | | Parker | CO | 80134 | $150,000.00 | slkosmiski@centurylink.net | 15.38% |
| Reese Travis | Hoyt IP, LLC | 14201 Caliber Drive | Suite 200 | Oklahoma City | OK | 73134 | $800,000.00 | rtravis@orangeleafyogurt.com | 82.05% |
| | | | | | | | | | 100.00% |
| Total | | | | | | | $975,000.00 | | |

Exhibit B

**FIRST AMENDMENT TO AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**800 HOYT, LLC**

THIS FIRST AMENDMENT TO AMENDED AND RESTATED OPERATING AGREEMENT OF 800 HOYT, LLC (this "Amendment") is made this 27 day of June, 2017, by 800 HOYT, LLC, a Colorado limited liability company (the "Company"), and the undersigned Class A Members of the Company (the "Class A Members") and the undersigned Class B Members of the Company (the "Class B Members").

**RECITALS:**

A.      The Company is a limited liability company formed under the Colorado Limited Liability Company Act.  The Company is governed by that certain Amended and Restated Operating Agreement, dated as of June 4, 2015 (the "Operating Agreement").

B.      The undersigned Class A Members are all of the Class A members of the Company and the undersigned Class B Members are all of the Class B members of the Company.

C.      Each of the Company, the Class A Members and the Class B Members desire to amend the Operating Agreement as set forth herein.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Company, the Class A Members and the Class B Members do hereby agree as follows (all capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Operating Agreement):

1.      Section 1.08(b) of the Operating Agreement is hereby deleted in its entirety and replaced with the following:

(b)      the written consent of all the Class A Members to the dissolution of the Company.

2.      Section 5.04 of the Operating Agreement is hereby deleted in its entirety and replaced with the following:

All distributions upon the sale of the Property or of liquidation proceeds to Owners shall be made after the allocation among the Owners of Company profits or losses for the Company accounting year in which the liquidation occurs (including any gain or loss deemed to have been realized as the result of a distribution in kind, pursuant to Section 5.03), and shall be made to the Owners in the same manner as set forth in Section 5.01 of this Agreement.

3.      Section 9.01 of the Operating Agreement is hereby deleted in its entirety and replaced with the following:

1



An Owner may not voluntarily, involuntarily, or by operation of law Transfer all or any part of its Interest in the Company without the prior approval of all other Class A Members. No Transfer by an Owner of its Interest in the Company or any portion of it shall relieve the Owner of its obligations under this Agreement. No transferee, assignee, or donee of an Interest (hereinafter referred to as "Proposed Transferee") shall become a Member without complying with the provisions of Section 9.02 below. If a Proposed Transferee is succeeding to an Interest owned by an Owner who is also a Manager of the Company, the Proposed Transferee is not entitled to become a Manager unless elected a Manager as provided in Article Seven herein.

4.    Section 14.01 of the Operating Agreement is hereby deleted in its entirety and replaced with the following:

**Section 14.01** *Tag Along Rights/Drag Along Rights*

In the event that Seventy Five Percent in Interest (the "Selling Members") propose to participate in a Transfer of Control, as hereinafter defined, each other Member (the "Non-Selling Members") shall have the option to participate with the Selling Members in such Transfer of Control (the "Tag Along Sale"), and, in addition thereto, the Selling Members shall have the option to require each other Member to participate in such Transfer of Control (the "Drag Along Sale"), upon the following terms and conditions:

(a)    Not less than twenty (20) days prior to the consummation of the transaction constituting a Transfer of Control, the Selling Members shall give notice to the Company and to each Non Selling Member, which notice (the "Sale Notice") shall state:

(i)    That the Selling Members intend to participate in such Transfer of Control;

(ii)    The name and address of the prospective Transferee; and

(iii)    The terms and conditions of such proposed sale or exchange with respect to each class of Membership Interests.

(b)    The Sale Notice shall also indicate if the Selling Members elect to require each of the Non-Selling Members to sell their Membership Interests to the third party purchaser on the same terms and conditions being offered to the same Class of Member in the Sale Notice (the "Drag Along Sale"). The closing of the Drag Along Sale shall take place on a date and at a time and place unanimously agreed by the Selling Members and the third party purchaser, but not later than thirty (30) days following delivery of the Drag Along Notice, at which time each Member shall be required to consummate the Drag-Along Sale for the amount of consideration and under the terms and conditions set forth in the Sale Notice. At the consummation of the purchase of the Interests by the third party purchaser, the Members shall deliver to the Company duly executed instruments of transfer for

2



their Membership Interests. If one or more of the Members fails to deliver such instrument of transfer, the Company may execute any documents as shall be required by the Company for the purpose of transferring any Interests on the books and records of the Company and the Company is hereby deemed appointed the attorney-in-fact of each such Member for the purpose of effectuating the requirements of this Section. Promptly, but in no event later than seven (7) days after the consummation of the sale of the Interests of the Members pursuant to this Section 14.01(b), the Selling Members shall allocate and distribute (or cause to be distributed) to the Non-Selling Members their pro rata share of the aggregate sales price (in the same form as received by the Selling Members) for the Interests sold pursuant hereto (net of all costs and expenses incurred in connection with the sale) in the same manner as the distribution of liquidation proceeds described in Section 5.04 hereof.

(c)     Each Non-Selling Member shall have the option to participate with the Selling Members in such Transfer of Control upon the same terms and conditions as the Selling Members are participating in such Transfer of Control with respect to the same class of Membership Interests. Each Non-Selling Member shall exercise such Member's option, if at all, by giving written notice to the Company and the Selling Members within ten (10) days after the receipt of the Sale Notice provided for in Section 14.01(a). In the event that any other Non-Selling Member exercises such option, the Selling Members shall cause the prospective third party purchaser to purchase or exchange such Member's Interest, whether a Class A Membership Interest or Class B Membership Interest, upon the same terms and conditions as are stated in the Sale Notice with respect to the same class of Membership Interests. In the event that the prospective third party purchaser refuses to permit each Non-Selling Member to participate in such Transfer of Control, then the Selling Members shall be prohibited from participating in such Transfer of Control.

(d)     The term "Transfer of Control" shall mean or refer to any transaction or series of transactions involving a sale or exchange of Interests in which any Person would acquire, directly or indirectly, ownership of or control over Seventy Five Percent in Interest. Any Transfer of Interests to a Person who already owns more than Seventy Five Percent in Interest shall not constitute a Transfer of Control. When two (2) or more Persons act as a partnership or syndicate or otherwise act in concert with respect to the acquisition of Interests, they shall be deemed to be one (1) Person for the purposes of determining whether any Person is acquiring ownership of or control of Seventy Five Percent in Interest.

5.     Section 14.02 of the Operating Agreement is hereby deleted in its entirety:

6.     Except as expressly amended hereby, all of the terms, conditions and provisions of the Operating Agreement shall remain unamended and in full force and effect in accordance with its terms, and the Operating Agreement, as amended hereby, is hereby ratified and confirmed.

3



7.     References in the Operating Agreement to "Agreement", "hereof", "herein" and words of similar import shall be deemed to be a reference to the Operating Agreement as amended by this Amendment.

8.     This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

[Signature page follows]

4

CORE/3008224.0010/133679204.1



IN WITNESS WHEREOF, each of the Member and the Company has executed this Amendment and affixed their signature hereto as of the date first above written.

**CLASS A MEMBERS:**

PLW CAPITAL I, LLC, a Colorado limited liability company

By: _____
R. Brian Watson, Manager

JM CAPITAL VII, LLC, a Colorado limited liability company

By: _____
Donald J. Marcotte, Manager

**COMPANY:**

800 HOYT, LLC, a Colorado limited liability company

By: _____
Name: Donald J. Marcotte, Manager

5

STATE OF COLORADO        )
                         ) ss.
COUNTY OF ___Denver___   )

    Subscribed and sworn before me this 27ᵗʰ day of ___June___, 2017, by R. Brian Watson, the Manager of PLW Capital I, LLC, a Colorado limited liability company.

Witness my hand and official seal.
My commission expires: ___11-16-17___

| JEFFREY J. TOMPKINS, JR. |
| NOTARY PUBLIC |
| STATE OF COLORADO |
| NOTARY ID # 19974012395 |
| MY COMMISSION EXPIRES NOVEMBER 16, 2017 |

_____
Notary Public

STATE OF COLORADO        )
                         ) ss.
COUNTY OF ___Denver___   )

    Subscribed and sworn before me this 27ᵗʰ day of ___June___, 2017, by Donald J. Marcotte, the Manager of JM Capital VII, LLC, a Colorado limited liability company and the Manager of 800 Hoyt, LLC, a Colorado limited liability company.

Witness my hand and official seal.
My commission expires: ___11-16-17___

| JEFFREY J. TOMPKINS, JR. |
| NOTARY PUBLIC |
| STATE OF COLORADO |
| NOTARY ID # 19974012395 |
| MY COMMISSION EXPIRES NOVEMBER 16, 2017 |

_____

6

CORE/3008224.0010/133679204.1



**CLASS B MEMBER:**

_____
Tim Brown


STATE OF _Colorado_        )
                          ) ss.
COUNTY OF _Denver_        )

    Subscribed and sworn before me this **21** day of _July_, 2017, by Tim Brown, individually.

Witness my hand and official seal.
My commission expires: **01/24/2019**

_____
Notary Public

```
KRISTI L. FISHER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20034002770
MY COMMISSION EXPIRES JANUARY 24, 2019
```

7

**CLASS B MEMBER:**

_James F. Kosmiski_

James F. Kosmiski

STATE OF _Colorado_ )
                        ) ss.
COUNTY OF _Douglas_ )

       Subscribed and sworn before me this 30th day of June , 2017, by James F. Kosmiski, individually.

Witness my hand and official seal,
My commission expires: _10/23/2019_

MOLLY KIM
Notary Public
State of Colorado
Notary ID 20154041937
My Commission Expires Oct 23, 2019

Notary Public

COR1/3008224.0010/133679204.1

**CLASS B MEMBER:**

Tribune Maximus Hoyt, LLC

By: _____
Name: _Reese Travis_____
Title: _Manager_____


STATE OF _Oklahoma_____ )
                             ) ss.
COUNTY OF _Oklahoma_____ )

        Subscribed and sworn before me this _14_ day of _July_, 2017, by _Reese Travis____,
the _manager_____ of Tribune Maximus Hoyt, LLC.

Witness my hand and official seal.
My commission expires: _6/2/21_____

_____
Notary Public

KIMBERLY ARTHO
NOTARY
# 17005144
EXP. 06/02/21
PUBLIC
STATE OF OKLAHOMA

9

**CLASS B MEMBER:**

Tribune Maximus Fund I, LP

By: _R. Grant_
Name: _Reese Travis_
Title: _Manager_


STATE OF _Oklahoma_ )
                                          ) ss.
COUNTY OF _Oklahoma_ )

Subscribed and sworn before me this 4 day of _July_, 2017, by _Reese Travis_,
the _Manager_ of Tribune Maximus Fund I, LP.

Witness my hand and official seal.
My commission expires: _6|2|21_

_____
Notary Public

KIMBERLY ARTHO
NOTARY
# 17005144
EXP. 06/02/21
STATE OF OKLAHOMA
PUBLIC

9

# Exhibit C

**SECOND AMENDMENT TO**
**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**800 HOYT, LLC**

THIS SECOND AMENDMENT TO AMENDED AND RESTATED OPERATING AGREEMENT OF 800 HOYT, LLC (this "Amendment") is made this 19ᵗʰ day of September, 2017, by 800 HOYT, LLC, a Colorado limited liability company (the "Company"), and the undersigned Class A Members of the Company (the "Class A Members").

**RECITALS:**

A.      The Company is a limited liability company formed under the Colorado Limited Liability Company Act.  The Company is governed by that certain Amended and Restated Operating Agreement, dated as of June 4, 2015, as amended by that certain First Amendment to Amended and Restated Operating Agreement dated as of June 27, 2017 (as amended, the "Operating Agreement").

B.      The undersigned Class A Members are all of the Class A members of the Company.

C.      Each of the Company and the Class A Members desire to amend the Operating Agreement for the purpose of creating a new class of Membership Interests in the Company as described herein.

**AGREEMENT:**

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, the Company and the Class A Members do hereby agree as follows (all capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Operating Agreement):

1.      The last two sentences of Section 1.01(h) of the Operating Agreement are hereby deleted in their entirety and replaced with the following:

> There shall be three classes of Members under this Agreement; Class A Members, Class B Members and Class B+ Members, as more particularly described herein. Class B Members and Class B+ Members shall have no voting or management rights.

2.      The title of Section 2.02 of the Operating Agreement is hereby changed to "Initial Capital Contributions of Class B Members and Class B+ Members" and a new Section 2.02(b) is added to the Operating Agreement as follows:

> (b)      Class B+ Membership Interests in the Company shall only be available for issuance to those investors making initial capital contributions equal to or in excess of $2,000,000 U.S. Dollars.  Upon execution of a Subscription Agreement for Class B+ Membership Interests in the Company, each Class B+ Member shall

1

be formally admitted as a Class B+ Member of the Company with membership interests corresponding to their initial contribution and the rights and obligations described in Section 2.09 of this Agreement.  Schedule D attached hereto shall list all Class B+ Members, their initial capital contributions and their attendant Class B+ Membership Interest.

3.      A new Section 2.09 is hereby added to the Operating Agreement as follows:

2.09    Rights and Obligations of Class B+ Members.

Class B+ Members of the Company shall have identical rights and obligations under the terms of this Agreement as the Class B Members of the Company; provided, however, with respect to the distribution provisions of Section 5.01 of this Agreement, Class B+ Members shall be entitled to receive a compounded, annual return on their capital contributions if such capital contributions have not been repaid in full on or before the third anniversary of the admission of such Class B+ Members.

4.      A new Schedule D is hereby added to the Operating Agreement in the form and content attached hereto as **Exhibit A**.

5.      Except as expressly amended hereby, all of the terms, conditions and provisions of the Operating Agreement shall remain unamended and in full force and effect in accordance with its terms, and the Operating Agreement, as amended hereby, is hereby ratified and confirmed.

6.      References in the Operating Agreement to "Agreement", "hereof", "herein" and words of similar import shall be deemed to be a reference to the Operating Agreement as amended by this Amendment.

7.      This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one agreement that is binding upon all of the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

[Signature page follows]

2

IN WITNESS WHEREOF, each of the Class A Members and the Company has executed this Amendment and affixed their signature hereto as of the date first above written.

**CLASS A MEMBERS:**

PLW CAPITAL I, LLC,
a Colorado limited liability company

By: _____
     R. Brian Watson, Manager

JM CAPITAL VII, LLC, a Colorado
limited liability company

By: _____
     Donald J. Marcotte, Manager

**COMPANY:**

800 HOYT, LLC,
a Colorado limited liability company

By: _____
     R. Brian Watson, Manager

By: _____
     Donald J. Marcotte, Manager

STATE OF COLORADO       )
                        ) ss.
COUNTY OF Denver      )

Subscribed and sworn before me this 19th day of September, 2017, by R. Brian Watson, the Manager of PLW Capital I, LLC, a Colorado limited liability company and the Manager of 800 Hoyt, LLC, a Colorado limited liability company.

Witness my hand and official seal.
My commission expires: 01/24/2019

KRISTI L. FISHER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20034002770
MY COMMISSION EXPIRES JANUARY 24, 2019

_____
Notary Public

STATE OF COLORADO       )
                        ) ss.
COUNTY OF Denver      )

Subscribed and sworn before me this 19th day of September, 2017, by Donald J. Marcotte, the Manager of JM Capital VII, LLC, a Colorado limited liability company and the Manager of 800 Hoyt, LLC, a Colorado limited liability company.

Witness my hand and official seal.
My commission expires: 01/24/2019

_____
Notary Public

KRISTI L. FISHER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20034002770
MY COMMISSION EXPIRES JANUARY 24, 2019

3

## **EXHIBIT A**

**Schedule D to Operating Agreement**

(See attached)

4

**SCHEDULE D**

Names, Addresses, Email Addresses, and Capital Contributions of Class B+ Members

*Per executed Subscription Agreements*

Class B+ Member Name:_____
Class B+ Member Address:_____
Class B+ Member Email Address:_____
Amount of Capital Contribution:_____


Class B+ Member Name:_____
Class B+ Member Address:_____
Class B+ Member Email Address:_____
Amount of Capital Contribution:_____


Class B+ Member Name:_____
Class B+ Member Address:_____
Class B+ Member Email Address:_____
Amount of Capital Contribution:_____


Class B+ Member Name:_____
Class B+ Member Address:_____
Class B+ Member Email Address:_____
Amount of Capital Contribution:_____


Class B+ Member Name:_____
Class B+ Member Address:_____
Class B+ Member Email Address:_____
Amount of Capital Contribution:_____

CORE/3008224.0010/134848366.1

# Exhibit D

# Confidential Filed Under Seal

# Exhibit E

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

Elizabeth P. Papez
Direct: +1 202.955.8608
Fax: +1 202.530.9698
EPapez@gibsondunn.com

August 24, 2021

VIA UPS NEXT DAY AIR

Donald Marcotte
Manager of 800 Hoyt, LLC
c/o JM Capital LLC
100 S. University, #9
Denver, CO 80209

  - and -

40 W. Littleton Blvd.
Suite 210-133
Littleton, CO 80120

  - and -

18435 W. Colfax Ave.
Golden, CO 80401

      **Re:**    **No. 20-cv-484,** *Amazon.com, Inc. v. WDC Holdings LLC et al.,* **EDVA**

Dear Mr. Marcotte:

      We represent the Amazon plaintiffs in the above-referenced matter against several defendants including Brian Watson and WDC Holdings LLC (the "Northstar Defendants"). On June 5, 2020, the United States District Court presiding over the action entered a preliminary injunction that, among other things, requires the Northstar Defendants to post $21.25 million in judgment security to the Court. A copy of the injunction, with which the Northstar Defendants have not complied, is attached to this letter.

      We write because one of the assets the Northstar Defendants disclosed in connection with the injunction is a property known as 800 Hoyt. The Northstar Defendants disclosed that the property at 800 Hoyt was sold on December 8, 2020 for $24,075,000, that $9,827,201 of the sales proceeds were paid to lenders, and that approximately $13,952,251 remains pending distribution. We requested that the Northstar Defendants cease and desist from any distribution of these funds pending further notice or court order. They responded that Brian Watson is no longer the manager of 800 Hoyt, and that the Northstar Defendants do not control the undistributed funds.

      Upon further inquiry, the Northstar Defendants represented to us that the distribution of these funds is vested in the manager of 800 Hoyt, LLC pursuant to the LLC's operating agreement. They also represented that you are the current manager of 800 Hoyt, that you succeeded Brian Watson in this role, and that you intend to exercise your authority and discretion under the operating agreement to distribute the remaining sale proceeds in the near future, possibly in September 2021. Based on these representations, we hereby request that you immediately cease and desist distributing any proceeds from the sale of 800 Hoyt pending further notice or court

## GIBSON DUNN

action. Because 800 Hoyt was a Northstar asset subject to the preliminary injunction entered in the above-referenced action, distribution of the remaining proceeds from its liquidation would violate the terms of the injunction. The Amazon plaintiffs reserve all rights and remedies with respect to these funds. Please confirm in writing your receipt of this letter and compliance with the terms herein. If you have questions or wish to discuss this matter, please contact me, or if you are represented by counsel please direct your counsel to contact me, at epapez@gibsondunn.com.

Sincerely,

Elizabeth Papez

cc:     Stanley Garnett (sgarnett@bhfs.com)
        George Calhoun (george@ifrahlaw.com)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., | |
| Plaintiffs, | |
| v. | CASE NO. 1:20-CV-484 |
| WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; JOHN DOES 1-20, | **FILED UNDER SEAL PURSUANT TO LOCAL RULE 5** |
| Defendants. | |

## ' ORDER GRANTING PLAINTIFFS' MOTION FOR A
## PRELIMINARY INJUNCTION

On April 27, 2020, Amazon.com, Inc. and Amazon Data Services, Inc. ("Plaintiffs" or "Amazon") filed a Verified Complaint for injunctive and other relief pursuant to: (1) the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 *et seq.*, alleging predicate acts of wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1346; money laundering in violation of 18 U.S.C. § 1956; transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957; and violations of the Travel Act, 18 U.S.C. § 1952; (2) detinue pursuant to Va. Code § 8.01-114; (3) common law fraud; (4) tortious interference with contractual and/or business relations; (5) civil conspiracy; (6) breach of contract; (7) unjust enrichment; (8) conversion and/or constructive trust; and (9) *alter ego*/piercing the corporate veil.  On April 28, 2020, the Court granted Plaintiffs' Application for an *Ex Parte* Temporary Restraining Order ("TRO") and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Application"). *See* Dkt. 16.

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

Pursuant to Federal Rules of Civil Procedure 64 and 65 and Title 8.01 of the Virginia Code, before the Court is Defendants' Brian Watson and WDC Holdings LLC dba Northstar Commercial Partners Brief in Opposition to Plaintiffs' Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue and supporting declarations and exhibits; Plaintiffs' Reply In Support Of Their Motion For A Preliminary Injunction and the supporting Declarations of Lora E. MacDonald, D. Matt Doden, Luke Gilpin, and Timothy Lorman; and the Letters of Jamie Hubbard, Counsel for Defendants White Peaks Capital LLC and NOVA WPC LLC, and Christopher Flood, Counsel for the Trustee of Defendant Villanova Trust.

Upon consideration of the pleadings, all supporting documents filed, and the arguments of counsel, the Court makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW:

This Court has jurisdiction over the subject matter of this case, and there is good cause to believe it will have jurisdiction over all parties hereto.

Based upon the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, there is good cause to believe that Defendants Watson, Northstar, Sterling NCP FF, LLC, Manassas NCP FF, LLC, and Villanova Trust participated in a fraudulent kickback scheme relating to certain real property lease transactions that Plaintiffs executed in Northern Virginia.

Based upon the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, there is good cause to believe that Defendants Watson, Northstar, White Peaks Capital, and NOVA WPC LLC participated in a direct purchase of certain real estate property located in Chantilly, Virginia on behalf of Plaintiffs on July 30, 2019. Based upon the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and

2

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

arguments of counsel, there is good cause to further believe that this direct-purchase transaction resulted in an inflated sale price to the detriment of Plaintiffs.

Based upon the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, there is good cause to believe that Defendants have engaged in, and are likely to continue to engage in, acts or practices that violate the RICO Act, 18 U.S.C. § 1961 *et seq*., and that constitute common law fraud, tortious interference with contractual and/or business relationships, breach of contract, unjust enrichment, detinue and/or conversion, and that Plaintiffs are therefore likely to prevail on the merits of this action.

Based on the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, there is good cause to believe that, unless Defendants are restrained and enjoined by Order of this Court, immediate and irreparable harm will result from ongoing violations of law and inequitable conduct by Defendants and others acting in concert with them, including but not limited to the spoliation of evidence and/or dissipation of assets relevant to this action, and tortious and other interference with Amazon's goodwill and business relationships in this District.

Based on the allegations and evidence in and accompanying Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, there is good cause to believe that, unless Defendants are restrained and enjoined by Order of this Court, immediate and irreparable damage to this Court's ability to grant effective final relief will result from the destruction, sale, transfer, or other disposition or concealment by Defendants or those acting in concert with them of otherwise discoverable evidence and assets.

Based on the allegations and evidence in and accompanying Plaintiffs' Verified Complaint,

[PROPOSED] ORDER GRANTING<br>PRELIMINARY INJUNCTION

3

Application, supporting documents filed, and arguments of counsel, there is good cause to believe that Defendants have specifically directed their activities to real property and ongoing business activities located in the Eastern District of Virginia, and have engaged in illegal activity using the instrumentalities and accounts detailed in Plaintiffs' Verified Complaint, Application, supporting documents filed, and arguments of counsel, to perpetrate the illegal conduct alleged in this action.

Accordingly, this Court finds that the requirements of applicable rules and law are satisfied, and that the requested preliminary injunction is reasonable and necessary to protect Plaintiffs' interests and those of the public.

THEREFORE IT IS HEREBY ORDERED THAT:

1.     Defendants[1] Sterling NCP FF LLC, Manassas NCP FF LLC, NSIPI Administrative Manager LLC, WDC Holdings LLC dba Northstar Commercial Partners, and Brian Watson promptly place in an escrow account maintained according to the terms attached to this order, $3,845,009.00 USD, which represents the entirety of IPI's May 7, 2020 payment to the Sterling and Manassas Accounts referenced herein,[2] and shall not withdraw or cause the withdrawal of the $3,845,009.00 from escrow unless and until this Court issues a subsequent Order permitting such withdrawal;

2.     Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, NSIPI Administrative Manager LLC, WDC Holdings LLC dba Northstar Commercial Partners, and Brian Watson shall secure funds totaling $21,250,000.00 USD, representing the sum of certain Amazon real estate development fees to these Defendants in the amounts of $4,150,000, $8,500,000, and $3,600,000 for the Shaw Rd., Quail Ridge, and Manassas Lease Transactions, respectively, that were expressly designated for prohibited payments to a former Amazon employee and his affiliates, and the $5,000,000 these Defendants received from Defendants White Peaks Capital LLC and/or NOVA WPC LLC in October 2019 from proceeds on the White Peaks Defendants' July 30, 2019 sale of a Virginia real estate parcel to Amazon for approximately $116.4 million USD, by (a) promptly placing in an escrow account maintained according to the terms attached to this order funds totaling $21,250,000.00 USD, or (b) obtaining and depositing in the Court's Registry a surety bond from a licensed bonding company for $21,250,000.00 USD, or (c) a

_____

[1] All references to "Defendants" herein encompass the named Defendants as well as their officers, directors, principals, agents, servants, employees, successors, assigns, and all other persons and entities acting in concert with them.

[2] The May 7 payment comprised $3,648,375.00 USD to Sterling NCP FF, LLC (Citywide Account ending *8557), and $196,634.00 to Manassas NCP FF, LLC (Citywide Account ending *9662 ).

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

combination of both (a) and (b), such that the total amount of $21,250,000 USD is secured through the combination of a surety bond and escrow through the entry and execution of final judgment in this action. If an escrow account is used, Defendants shall not withdraw or cause the withdrawal of funds from the escrow account unless and until this Court issues a subsequent Order permitting such withdrawal;

3.     Defendants White Peaks Capital LLC and NOVA WPC LLC shall place in an escrow account maintained according to the terms attached to this order, assets totaling $12,730,000.00 USD, representing the $17,730,000 in proceeds they received on Amazon's purchase of the White Peaks land parcel in Dulles, Virginia for $116,400,000 on July 30, 2019, less the $5,000,000 the White Peaks and NOVA Defendants paid to Defendant(s) Brian Watson and/or WDC Holdings LLC dba Northstar Commercial Partners in October 2019, and shall not withdraw or cause the withdrawal of the $12,730,000.00 USD from the escrow account unless and until this Court issues a subsequent Order permitting such withdrawal;

4.     Defendant Villanova Trust shall place in an escrow account maintained according to the terms attached to this order, $5,112,983.84 USD, which represents nine separate payments the Trust received from Defendants Brian Watson and WDC/Northstar Commercial Partners pursuant to their 2018 Referral Agreement with the Trust, and paid for "brokerage" or other services enumerated in the Referral Agreement from March 7, 2018 through August 7, 2019, in amounts of $50,000, $382,500, $281,350, $1,447,614.50, $1,297,011.18, $122,319.24, $1,061,060.80, $150,000, and $321,028.44, each ascribed to one or more of the Sterling, Quail Ridge, Dulles and Manassas Amazon real estate development sites in this District, and shall not withdraw or cause the withdrawal of the $5,112,983.84 from the escrow account unless and until this Court issues a subsequent Order permitting such withdrawal.

IT IS FURTHER ORDERED THAT:

5.     Defendants immediately return any and all Amazon confidential or otherwise non-public proprietary information in their possession except as necessary for use in this case in accordance with the confidential treatment and other obligations prescribed herein. Within seven (7) business days of the date on which this preliminary injunction order is entered, Defendants shall provide Plaintiffs with copies and/or a description of the information in Defendants' possession, custody, or control that Defendants consider to be Amazon confidential or otherwise non-public proprietary information necessary for Defendants to retain for purposes of litigating and resolving this case. Defendants shall protect all such information, as well as any information that Defendants or Plaintiffs subsequently identify as Amazon confidential or otherwise non-public proprietary information, by designating all such information as confidential, filing it with the Court only in redacted form or under seal absent express advance consent from Plaintiffs, using it solely for purposes of litigating and resolving this case, and disclosing it only to persons or entities that are affiliated with this case and have expressly agreed in writing to

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

protect the information from disclosure on the terms set forth in this order. Defendants shall return all information covered by this paragraph to Amazon upon the entry of final judgment in this case following the exhaustion of any appeals;

6.    Defendants are enjoined from disclosing, selling, transferring, publishing, or otherwise using any Amazon confidential or otherwise non-public proprietary information, except where Defendants deem the disclosure, publication, or use of such information necessary to litigate and Defendants protect the information from disclosure to any person or entity other than Amazon by filing the information with the Court in redacted or sealed form absent express advance consent from Plaintiffs, using it solely for purposes of litigating and resolving this case, and sharing it only with persons or entities that are affiliated with this case and have expressly agreed in writing to maintain its confidentiality on the terms set forth in this order;

7.    Defendants are enjoined from spoliating, concealing, wasting, transferring, or otherwise disposing of documents, records, communications, files, or other evidence or assets used in, or obtained from, any activities (including but not limited to the activities described above) relating to Defendants' real property transactions with Amazon in Virginia since 2018, including but not limited to the August 7, 2019 wire transfer from Defendant WDC Holdings, LLC's Citywide Bank account ending in *1914 to Defendant Villanova Trust's First Tennessee Bank account ending in *8 for $321,028.44; the June 7, 2019 wire transfer from Defendant WDC Holdings, LCC's Citywide Bank account ending in *1914 to Defendant Villanova Trust's First Tennessee Bank account ending in *8 for $150,000.00; wire transfers from Defendant WDC Holdings, LLC's Citywide Bank account ending in *1914 to Defendant Villanova Trust credit account ending in *2908 and/or Wells Fargo account ending in number *0076, including an October 31, 2016 wire transfer for $4,000.00; and all payments within the scope of this paragraph from any Defendant to or from Defendant Manassas NCP FF, LLC's Citywide Bank account in Denver ending in *9662 and/or Defendant Sterling NCP FF, LLC's Citywide Bank account in Denver ending in *8557;

8.    Defendants are enjoined from disrupting, through unauthorized access to premises, accounts, or other property, personnel, or deliveries associated with Plaintiffs' real estate developments in this District, ongoing business activities at such developments; provided, however, that for the avoidance of doubt, this provision shall not be construed to prohibit Defendants from pursuing legal claims, including through court actions, relating to Plaintiffs' real estate developments in this District, or to prohibit Defendants from engaging in authorized and ordinary course business transactions with personnel or facilities that may otherwise be associated with Plaintiffs' real estate developments in this District.

IT IS FURTHER ORDERED that Plaintiffs may identify and update the Defendant accounts identified in the Application and the Plaintiffs' Declarations as may be reasonably

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

necessary to address or reach additional instrumentalities associated with any conduct enjoined, or any assets escrowed or otherwise protected by, this Court either prior to, or within a reasonable time after, the execution of this Order.

IT IS SO ORDERED.

DATED: June 5, 2020

_____
Judge Liam O'Grady
United States District Judge

[PROPOSED] ORDER GRANTING
PRELIMINARY INJUNCTION

# Exhibit F

## Confidential
## Filed Under Seal

**Skilton, Kathryn M.**



**From:** Brian Watson <brian@northstarcp.com>
**Sent:** Tuesday, September 7, 2021 2:42 PM
**To:** Donald Marcotte <dmarcotte@strategicstoragepartners.com>; Dennis Johanningmeier <Dennis@djjcpa.com>
**Cc:** Dylan (DJJ CPA) <Dylan@djjcpa.com>; Kristi Fisher <kfisher@northstarcp.com>
**Subject:** FW: 800 Hoyt ███████ & Upcoming Payments Owed
**Importance:** High

Don and Dennis,

As I did not receive any replies to the email I sent to you over one week ago below, or the email I sent below that over three weeks ago, I am sending you this one as well. Tomorrow is the expiration date for the 800 Hoyt holdback, and if the buyer does not make a claim, the funds should be released by Red Starr to you shortly thereafter (please see the emails I have sent to you from Red Starr, as I confirmed the timing/process with them when you would not reply to me).

In the email from three weeks ago, I had requested a distribution schedule of all proceeds (including my share of my LP investment interests) from you by September 1, 2021. I never received that from you and this date passed over 1 week ago, I am again requesting that you provide this promptly. I have also asked for you to confirm if any remaining development fee is owed, █████████ CONFIDENTIAL - Filed
Under Seal
████████████████████████████████████████
████████████████████████████████████

Thank you,



**Brian Watson**
Founder & CEO

**Office:** 303-893-9500
**Web:** www.NorthstarCP.com



**NORTHSTAR
COMMERCIAL
PARTNERS**

*Creating Opportunity, Empowering People, Strengthening Communities.*

*This e-mail neither constitutes an agreement to conduct transactions by electronic means nor creates any legally binding contract or enforceable obligation in the absence of a fully signed written contract. We are not providing investment advice through this email and this email should not be regarded as an offer to sell, or a solicitation of an offer to buy, any securities. This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender immediately and then delete this email. No warranty or representation, express or implied, is made as to the accuracy of the information contained in this email and is subject to errors, omissions, change of price, rental or other conditions, withdrawal without notice, and to any special listing conditions, imposed by our principals. This message may contain information that is confidential, subject to copyright or constitutes a trade secret. Any views or opinions presented are solely those of the author and do not necessarily represent those of the company.*

---

**From:** Brian Watson <brian@northstarcp.com>
**Sent:** Monday, August 30, 2021 5:12 PM
**To:** Donald Marcotte <dmarcotte@strategicstoragepartners.com>; Dennis Johanningmeier <Dennis@djjcpa.com>
**Cc:** Dylan (DJJ CPA) <Dylan@djjcpa.com>; Kristi Fisher <kfisher@northstarcp.com>
**Subject:** Fwd: 800 Hoyt ██████ & Upcoming Payments Owed

Don and Dennis,

As I did not receive a reply from you regarding the message below that I sent over 2 weeks ago, I am sending another... As you should be receiving the release of the Hoyt escrow this coming week, I hope that you are making progress on this.

In addition to my below inquiries, I would like to know if any remaining development fee is owed, and if so, will it be paid from the proceeds you plan to receive. Given the recent situation with one of our other investments, I want to confirm if a development fee is still owed for the Hoyt project.

Thank you,

---

**From:** Brian Watson <brian@northstarcp.com>
**Sent:** Thursday, August 12, 2021 2:55 PM
**To:** Donald Marcotte; Dennis Johanningmeier
**Cc:** Dylan (DJJ CPA); Kristi Fisher
**Subject:** FW: 800 Hoyt ██████ & Upcoming Payments Owed

Don,

Though I never received a reply from the multiple emails I sent to you regarding the below and attached, which is unfortunate, I did learn from my legal counsel that they communicated with your legal counsel regarding the matter after you would not reply, CONFIDENTIAL - Filed Under Seal ████████████████

As we are now less than three weeks away from when the $1 million escrow should be released and received, I encourage you and Dennis to begin working on an investor distribution analysis, that shows how these funds will be paid out. As the asset sold near the end of last year, you should be in a position to calculate final payments and close out, and after the final investor distributions and other payments clear the bank account, you should be able to close out the entity, its operating account, etc. As I usually handle this for the other investments we are involved in together and that it took you and DJJ several months to calculate and complete the sale distribution for 800 Hoyt, which is much longer than any transaction I have been a part of, I hope that you will start working on this now, so that when the escrow funds are released, you can promptly and efficiently send out the payments and distributions within 1-2 days from receipt of the funds. To this end, I would like to receive a schedule of the payments and distributions you plan to make by September 1, 2021. If you are unwilling to share all of the distribution schedule, I would at least like to receive a schedule of what NCP and/or myself would receive for the following:

CONFIDENTIAL - Filed Under Seal ████████████████

3. Amount of my LP equity investor distribution share
4. Anything else owed to us

If you have any further questions or needs, please let me know.

Thank you,

---

**From:** Brian Watson
**Sent:** Monday, August 2, 2021 10:04 AM
**To:** Donald Marcotte <dmarcotte@strategicstoragepartners.com>

Cc: Kristi Fisher <kfisher@northstarcp.com>; Dennis Johanningmeier <Dennis@djjcpa.com>; Dylan Hinckley <dylan@djjcpa.com>
**Subject:** FW: 800 Hoyt ▮▮▮▮▮▮ & Upcoming Payments Owed

Don,

As you have not replied to the email below, which I sent you over a week ago, I will forward this to our legal counsel to share with your legal counsel. Instead of incurring legal fees for each of us, please acknowledge receipt in the future.

Thank you,

---

**From:** Brian Watson
**Sent:** Monday, July 26, 2021 3:16 PM
**To:** Donald Marcotte <dmarcotte@strategicstoragepartners.com>
**Cc:** Kristi Fisher <kfisher@northstarcp.com>; Dennis Johanningmeier <dennis@djjcpa.com>; Dylan Hinckley <dylan@djjcpa.com>
**Subject:** 800 Hoyt ▮▮▮▮▮▮ & Upcoming Payments Owed

Don,

In anticipation of the release of the 800 Hoyt escrowed funds that should occur during the first week of September 2021, please see the attached two (2) invoices ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both of these payments should be made from first proceeds, and should be paid in a timely manner from your receipt of them. In addition, I should also receive a payment on my equity investment interests, as should the other investors as well.

I have copied Dennis and Dylan from DJJ CPA hereto, as they will probably be assisting you with these payments. I hope that we do not have to involve legal counsel for these, but if you disagree, please let me know and I will have my legal counsel forward this to your attorney.

Should you have any further questions or needs, please let me know.

Thank you,

*****************************
This message and any attachments are for the sole use of the intended recipient(s) and may contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments. Thank you.
*****************************

STATEMENT OF CONFIDENTIALITY & DISCLAIMER: The information contained in this email message is attorney privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this email is strictly prohibited. If you have received this email in error, please notify us immediately by calling (303) 223-1300 and delete the message. Thank you.

# Exhibit G

# Confidential
# Filed Under Seal



## MANN & MAXIMON
### ATTORNEYS AT LAW

September 15, 2021

Via email

Michael MacPhail, Esq.
Faegre Drinker Biddle & Reath LLP
1144 15th Street, Ste. 3400
Denver, Colorado 80202

  Re: 800 Hoyt, LLC

Mr. MacPhail:



  I understand that Amazon wrote your client a threatening letter on August 24, 2021. I have reviewed the letter as well as the injunction order referenced in the 8/24/21 correspondence. After review of the materials, there is no reasonable basis for withholding the ▇▇▇▇▇▇▇▇ to WDC Holding, LLC and the ▇▇▇▇▇▇▇ to Brian Watson.

  If these payments are not made by 5 pm on September 17, 2021, I have been authorized to initiate an action against your client for breach of contract.

     Very truly yours,

     Joshua Maximon

JM/dm