**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| AMAZON.COM, INC., et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:20-cv-00484 |
| WDC HOLDINGS LLC, et al., | |
| Defendants. | |

**DEFENDANTS BRIAN WATSON AND WDC HOLDINGS LLC'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO HOLD DEFENDANTS BRIAN WATSON & WDC HOLDINGS LLC IN CIVIL CONTEMPT**

Defendants Brian Watson ("Mr. Watson") and WDC Holdings LLC, d/b/a Northstar Commercial Partners ("Northstar") (collectively, "Defendants"), hereby file their Response in Opposition to Plaintiffs' Motion to Hold Defendants Brian Watson & WDC Holdings LLC in Civil Contempt ("Motion") and state as follows.

## I.     INTRODUCTION

Defendants have made every effort to fully comply with the Court's Order Granting Plaintiffs' Motion for a Preliminary Injunction ("PI Order" or "Order"). Since the Court entered the PI order on June 5, 2020, *see* Dkt. 57, Defendants have successfully complied with *all* but one provision—Paragraph 2, which required Defendants to place $21,250,000 into an escrow account—and it was not for lack of effort. Defendants' position concerning this provision has never wavered; they cannot afford it, though they remain committed to fully complying with the Order.

1

Plaintiffs, however, argue Defendants have willfully failed to meet their obligations pursuant to the PI Order. According to Plaintiffs, the PI Order is a de facto freeze on any asset purchased or managed by Defendants since they first earned fees related to the Amazon transactions.[1] Plaintiffs reason that any funds Defendants *earned* pursuant to the Amazon transactions, some of which Defendants earned more than three years ago, are subject to the PI Order. Accordingly, while the money earned by Defendants pursuant to these transactions was spent long ago, Plaintiffs appear to argue that any ownership interest purchased by Defendants since early 2018, is subject to the anti-dissipation provision of this Court's Order no matter how little Defendants' interest and irrespective of the interests of innocent third-party investors and creditors.

Indeed, Plaintiffs have seized the opportunity to threaten third parties. Plaintiffs' threats are preventing these third parties from paying monies owed to Defendants, which Defendants were relying on to remain a viable business, pay employees, and meet their expenses, loan obligations, and legal costs, etc. With the threat of litigation and in reliance on this Court's Order, Plaintiffs have forced at least one innocent third party to violate its contracts and fiduciary duties and seek intervention in the present matter. This broad interpretation of the Court's anti-dissipation provision opens up a slippery slope. If the Court truly did order that no assets purchased by, invested in, or managed by Defendants after they received their first payment related to the Amazon transactions may be sold, this Court will turn into a de facto bankruptcy court, and seriously harm the individual investors in each unrelated limited liability company ("LLC"), who are not involved in any way with the nine data center assets that Plaintiffs take

---

[1] As detailed in Defendants' Motion to Clarify Injunction (Dkt. 343) and related pleadings, the parties are at an impasse as to the meaning of the PI Order's anti-dissipation provision (Dkt. 57, ¶ 3). Defendants believe they have fully complied with this provision.

issue with. As Defendants begin to default on their obligations, this Court will be faced with countless disputes by third parties seeking to enforce their rights and the Court will be forced to choose which creditors get paid and in what order. Further, if Defendants are not allowed to conduct their business (buying, selling, developing, and managing real property), they will be forced into bankruptcy themselves as they will have no meaningful source of income.

While the parties disagree on what the anti-dissipation provision of the order means, all parties can agree on what it is not. It is not an asset freeze. It is not a prejudgment writ of attachment. It does not specifically supersede the rights of Defendants and their affiliates' creditors, particularly secured creditors. And it is not a monetary judgment against Defendants following a trial in which a jury of their peers has found them liable to Plaintiffs.

Despite this, Plaintiffs continue to hammer down on their position that Defendants have willfully dissipated assets, conflating management with ownership, misinterpreting projected income with actual income, and accusing Defendants of "commingling" funds (a term Plaintiffs frequently misuse throughout their Motion.) [2] Plaintiffs advise this Court that Defendants have "dissipated" $140 million in assets, wrongly implying Defendants pocketed $140 million in cash. While Defendants primarily managed these assets through non-Defendant LLCs and authorized their sale, they did not own the assets. Plaintiffs also gloss over the fact that even pursuant to Amazon's generous reading of the PI Order, they only identify four of these "dissipated" as "related to" the Amazon transactions. [3] Plaintiffs also ask this Court to rely on Defendants' late 2019 and early 2020 emails in which they estimated potential income pursuant to anticipated

---

[2] The legal definition of commingling is "A mixing together; esp., a fiduciary's mixing of personal funds with those of a beneficiary or client." (Black's Law Dictionary (11th ed. 2019)
[3] Mot. at 11 ("800 Hoyt (for $24 million), 5805 Mark Dabling (for $17 million), 5500 S. Quebec (for $575,000), and Gateway Retail (for $5.9 million)[.]").

23258313.2

future sales. These pre-litigation, pre-Covid-19 projections were never realized. Several of the sales did not occur and the ones that did occurred for a 10% loss on average. All this information was provided to Amazon in discovery. Finally, Plaintiffs intentionally misuse the term "commingled" in an attempt to persuade this Court that Defendants somehow improperly deposited funds that did not belong to them in their own accounts. Defendants, however, earned these funds over the course of two years—Defendants cannot "commingle" money that belongs to them.

Defendants have done everything they can to comply with this Court's PI Order. While they were unable to satisfy Plaintiffs and the Court with their discovery responses, Defendants remain committed to complying with the Order. Defendants again present to Plaintiffs, and now this Court, that they will submit to an accounting of their books and records to prove they have no means to comply with the escrow provision of the PI Order. Defendants further request this Court's final interpretation of the anti-dissipation provision of the PI Order. While Defendants believe they have complied with this provision of the Order, Defendants need to know whether they will be permitted to operate as a going concern. Defendants respectfully request the Court deny Plaintiffs' Motion as they have made a good faith attempt to comply with each provision of the PI Order.

## II.     BACKGROUND

Defendants are in the business of buying, selling, developing, and managing commercial real estate. The Covid-19 pandemic, the present litigation, and the criminal investigation spurred by Plaintiffs' accusations took an incredible toll on Defendants' business and income. Since Spring 2020, Northstar downsized to just two employees, and Defendants have struggled to meet

23258313.2

their obligations to lenders, investors, and other creditors. Defendants essentially live "paycheck to paycheck," for lack of a better term.

A.     **Defendants Have Gone Through Great Efforts to Comply With the Escrow Provision of the PI Order.**

In an effort to meet their obligations to various third parties and in accordance with this Court's PI Order, Defendants were forced to liquidate certain assets in their real estate management portfolio over the past sixteen months, all under the watchful eye of Plaintiffs.[4] Despite the public nature of these sales and the fact that these assets were unrelated to the Amazon transactions, Defendants disclosed these sales in their discovery responses, carefully outlining exactly how much money went to each creditor and investor and how much they received themselves.  This amount is woefully short of $21,250,000 and just enough for Defendants to keep up with ongoing expenses.

Pursuant to the PI Order, Defendants also sought to obtain a surety bond from a licensed bonding company. *See* Dkt. 57, ¶ 2; Dkt. 82-2. Unfortunately, as Defendants have explained in detail to this Court and Plaintiffs, Defendants were unable to obtain a surety bond from at least three different companies who determined Defendants did not have enough liquid assets to secure such a bond. Dkt. 82-2. This is because each property in which Defendants have or had an interest is or was highly leveraged. The bonding companies refused to provide even a partial surety bond to help Defendants satisfy their obligations pursuant to the PI Order. *Id.* The risk was not worth it to them.

In a further attempt to comply with this provision of the PI Order, Defendants offered to Plaintiffs several financial arrangements, including opening Defendants' books and records up to

---

[4] Defendants managed the majority of these properties through various LLCs, and invested in several through various LLCs, but they did not outright own the majority of these properties.

23258313.2

a third party forensic accounting. These arrangements would have proven Defendants do not have the funds to fully comply with the PI Order, but would have allowed Defendants to partially comply with the escrow provision. For reasons unknown to Defendants, Plaintiffs refused this offer, choosing to file this Motion instead. Defendants have tried every avenue to comply with the escrow provision of the PI Order, but due to reasons beyond their control, have been unable to do so.

**B.**     **Defendants Have Fully Complied With the Anti-Dissipation Provision of the PI Order.**

For the past sixteen months, Defendants have authorized the sale of certain assets under their management and control which were unrelated to the Amazon transactions. These assets were purchased through wholly separate third-party investment vehicles organized by Defendants and funded primarily by third party investors. While Defendants may have invested in some of these properties, Defendants did not own these properties. Instead, the Defendants managed these properties through separate LLCs set up for that specific purpose. Each property Defendants or their affiliates sold over the past sixteen months was encumbered by one or more loans and the parties' relationships were governed by contract. When Defendants' business took a hit following the onslaught of the Covid-19 pandemic and the present litigation, Defendants and their affiliates were forced to sell certain properties to meet their obligations to creditors. These properties were not related to the Amazon transactions and Defendants steadfastly believe they did not violate the PI Order by authorizing their sale.

Plaintiffs argue Defendants liquidated $140 million in assets in violation of the PI Order over the past sixteen months, despite attempting to link only four of these sales totaling less than $50,000,000 to the Amazon transactions. Defendants are at loss to understand, and Plaintiffs have not explained, how or why they believe these properties are related to the Amazon

6

transactions, especially since three of the four properties (Mark Dabling, 800 Hoyt, and S. Quebec) were acquired in 2013 and 2015, respectively. Plaintiffs nonetheless contend the properties sold over the past sixteen months were sold in violation of the anti-dissipation provision of the Order. Plaintiffs appear to argue that any asset purchased, managed, or developed by Defendants following early 2018, when Defendants earned their first fees related to the Amazon transactions, is "related to" the Amazon transactions. Plaintiffs also assert, without any support, that any sale constitutes dissipation, without regard to the financial and business factors surrounding those projects and the Defendants' operations.

Plaintiffs never brought their concerns to the Court's attention even though they closely monitored these public sales. *See* Exhibit 1, Dec. 18, 2020 letter from E. Papez. Indeed, while Defendants believe they operated their business in accordance with the Court's Order, and were therefore not compelled to seek clarification from the Court until Plaintiffs' interference with third parties, Plaintiffs now represent to this Court that the Defendants were violating the anti-dissipation provision of the PI Order for sixteen months. Plaintiffs did not seek this Court's assistance in interpreting or enforcing the Order for nearly one and a half years. They were instead focused on catching Defendants in a game of "gotcha!" and did not raise this issue with the Court in a timely manner. This behavior should not be rewarded.

The Defendants have not dissipated any assets related to the Amazon transactions. Indeed, any assets within Defendants' possession, custody, or control that were "related to" the Amazon transactions have been seized by the government, as noted by Plaintiffs. Mot. at 12. Plaintiffs also took proactive steps to ensure Defendants did not have access to any property related to the Amazon transactions after April 2, 2020, by improperly interfering with Defendants' third-party contracts with their development partner, which is currently the subject

of an active lawsuit.[5] Defendants have fully complied with the anti-dissipation provision of the PI Order.

## III.   LEGAL STANDARDS

"[T]he purpose of civil contempt is not to punish, but to correct." *Landman v. Royster*, 354 F. Supp. 1292, 1300 (E.D. Va. 1973). The Court has broad discretion to determine the appropriate remedy for civil contempt. *ePlus Inc. v. Lawson Software, Inc*., 946 F. Supp. 2d 472, 492 (E.D. Va. 2013) (citing *In re General Motors Corp*., 61 F.3d 256, 259 (4th Cir.1995)). Civil contempt implicates "the power of a court to grant the relief that is necessary to effect compliance with its decree:" and the "measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." *Id*. (citing *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949)). "Nevertheless, 'the remedies and sanctions must be remedial and compensatory and, unlike criminal contempt, nonpunitive.'" *Id*. (quoting *In re General Motors*, 61 F.3d at 259). "Generally, a compensatory sanction may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding." *Id*. (internal citations omitted). "On the whole, however, the Court 'has broad discretion to fashion a remedy based on the nature of the harm and the probable effect of alternative sanctions.'" *Id*. (quoting *Colonial Williamsburg Found. v. Kittinger Co*., 792 F.Supp. 1397, 1407)).

"A finding of civil contempt must be established by clear and convincing evidence." *JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 645 (E.D. Va. 2007). To establish civil contempt, the

---

[5] Defendants' rights to protect their legal interests were not foreclosed by the PI Order and are essential to Defendants if they wish to continue to operate as a going concern. Defendants should not be precluded from actively protecting their interests, particularly where third parties have either sued or threatened to sue Defendants or are attempting to take advantage of Defendants while they are distracted by the present litigation.

23258313.2

movant must prove the following by clear and convincing evidence: (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) a showing that the decree was in the movant's favor; (3) a showing that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge of such violations; and (4) a showing that movant suffered harm as a result. *Id.* (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir.2000)). Further, an award of attorneys' fees is only appropriate where a court finds a contemnor acted willfully. *Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F. Supp. 169, 172 (E.D. Va. 1989).

## IV.    ARGUMENT

Defendants are in compliance with Paragraph 7 of the PI Order and have made best efforts to gather the funds necessary to comply with Paragraph 2 of the Order. Defendants have not sold any assets related to the Amazon transactions. Defendants further attempted to secure a surety bond and Mr. Watson has even listed both his personal residence and a ranch property owned by Northstar for sale, however, despite Defendants' best efforts they have fallen short. Defendants do not have the funds to comply with Paragraph 2 of the PI Order and they do not dispute that they have so far been unable to post funds into escrow. This places Defendants in an impossible catch-22: how do they satisfy a Court Order they cannot afford? Defendants have spent over a year trying to show Plaintiffs they do not have the means to comply, going so far as to provide approximately 1,000,000 pages of documentation, including financial records, LLC agreements, and a host of other items, to Plaintiffs and offering an accounting of their books and records. Defendants' efforts have still not satisfied Plaintiffs. Defendants, however, now turn to this Court for assistance as they remain committed to fully complying with the Court's Order as their means allow, and are now forced into the position of considering filing for personal and

corporate bankruptcy because there is no way that they can comply with funding over $21 million at this time.[6]

A.    **Defendants Have Complied with Paragraph 7 of the PI Order.**

To establish contempt, Plaintiffs must show that Northstar knowingly violated the Court's PI Order. Northstar is "first and foremost a commercial real estate investor."[7] It is a "privately held, full-service real estate investment and asset management company . . . specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States." *Id.* Mr. Watson is Northstar's founder and Chief Executive Officer. Their entire business, and therefore income, is based on the purchasing, selling, developing, and managing of real property. Every move Defendants' make is governed by a contract, be it an operating agreement with investors, a property management agreement, or a loan agreement, among many others. Defendants have fiduciary duties to their investors, particularly when acting as managers for investment properties. As fiduciaries, they have the power to authorize real property sales. The proceeds of any such sales, however, are to be distributed pursuant to the various loan, partnership and other relevant contracts. Since the onslaught of the Covid-19 pandemic and the negative impact of this lawsuit, Defendants' business has taken a financial hit. Commercial real estate values plummeted and many lenders, investors, and would-be investors sought to protect their interests from Plaintiffs' accusations. Defendants had no choice; if they wanted to meet their contractual obligations to lenders and third-party investors, among others, they needed to sell certain properties to avoid catastrophic

---

[6] Defendants do not dispute that (1) they had knowledge of a valid decree and (2) that such decree was in Plaintiffs' favor.

[7] *About Us*, Northstar Commercial Partners (Oct. 14, 2021), https://www.northstarcommercialpartners.com/about/.

23258313.2

liability. These properties were not related to the Amazon transactions and many were acquired long before Defendants' dealings with Plaintiffs.

The PI Order enjoined Defendants from "spoliating, concealing, transferring, or otherwise disposing of. . . assets. . . relating to Defendants' real property transactions with Amazon in Virginia since 2018." Dkt. 57, at 6. Defendants are a real estate investment company. While Defendants have continued business operations since the Court entered its Order, primarily by authorizing the sale of real estate, these properties were not related to the Amazon transactions.

Defendants, however, understand the parties have reached an impasse as to the meaning of Paragraph 7 of the PI Order. Defendants hope the Court can provide clarification on this provision following the hearing on the Motion to Clarify Injunction (Dkt. 343). Defendants were forced to file this Motion when Plaintiffs began threatening unrelated third parties with lawsuits based on this Court's PI Order.[8] The Court's interpretation of this provision is imperative to Defendants' ability to continue operating their business and their continued compliance with the PI Order. Again, Defendants believe they have fully complied with this provision and the spirit of the Court's Order.

Plaintiffs argue Defendants "dissipated" $140 million in real estate assets in violation of this provision. Plaintiffs, however, intentionally gloss over the fact that they only attempted to "tie" four of these properties back to Amazon transactions. Plaintiffs appear to "tie" these properties to the Amazon transactions by alleging Defendants "commingled" the fees they earned pursuant to the Amazon transactions with Defendants' general funds. This is a stretch.

---

[8] This matter will be fully briefed before the Court on 800 Hoyt, LLC's Motion to Intervene (Dkt. 334).

Defendants earn fees pursuant to their real estate transactions. This is how they continue to operate as a going concern. Once Defendants earned fees pursuant to their contracts with their development partner and Amazon, Defendants owned the funds. Defendants put their property in their bank accounts and used their accounts in the normal course of business. As described in detail above, Defendants operate a real estate investment portfolio. This is all they do. Any funds they earn pursuant to any contracts with any parties are used for operational expenses or added to the real estate investment portfolio. Defendants cannot "commingle" their own property. This is how real estate investment portfolios function. It is a standard practice in the industry.

Plaintiffs' broad interpretation of Paragraph 7 of the PI Order puts Defendants and this Court in an impossible position. Defendants never read the PI Order so broadly, and Amazon has always known they do not read it so broadly. If Defendants essentially are banned from buying or selling any properties acquired since early 2018, they will certainly default on their obligations to investors, lenders, and various other third parties. This will, in turn, expose Defendants to significant liability and likely will force Defendants into bankruptcy. Defendants and their affiliates' creditors will be forced to bring their claims before this Court to protect their interests in the various investments. This Court will then have to determine if its order supersedes the rights of these unrelated third parties, determine which creditors get paid, and determine when they might be paid. Plaintiffs' interpretation of this provision presents a very slippery slope.

Plaintiffs also conflate Defendants' management of these investment vehicles with ownership. Defendants create investment vehicles to purchase, develop, and sell real property. Sometimes Defendants invest in these entities through affiliates, sometimes they do not. Defendants then create limited liability companies to manage the properties. As managers,

12

Defendants' affiliates have certain contractual and fiduciary duties. When Defendants authorize the sale of properties, they do so through their affiliates who are acting as managers. The managers are obligated to execute the sale in accordance with the parties' contracts with third parties and investors. Given the state of the commercial real estate market, the Defendants walked away from the sale of these properties with very little money both as investors and managers. While it is true that Defendants authorized the sale of $140 million in assets, they were not entitled to and did not receive anywhere near that amount in funds from the sales.

Defendants have fully complied with the "anti-dissipation" provision of the PI Order. While Defendants have continued to operate their business as a going concern in order to meet their obligations to various third parties, they have not dissipated any assets related to the Amazon transactions. Indeed, Plaintiffs went to great lengths to ensure Defendants had no access to properties actually related to the Amazon transactions. Plaintiffs were well aware that (1) Defendants did not believe any of the properties at issue were related to the Amazon transactions, and (2) Defendants were in the process of liquidating some of their assets as necessary to satisfy contractual commitments and ongoing expenses. *See*. Ex. 1. Plaintiffs do not allege that any of the transactions at issue were anything but arms-length and for fair market value.

**B.      Defendants Have Made a Good Faith Effort to Fully Comply With Paragraph 2 of the PI Order.**

Defendants are a real estate investment company. Investment companies rely on investors to help fund the investment portfolio. The Covid-19 pandemic, this lawsuit, and the related criminal investigation (which has not led to an indictment after one and a half years), destroyed Defendants' business, and therefore their income. This has been devastating to Defendants, who

23258313.2

have made every effort to comply with the escrow provision of the Court's order, but simply do not have the means to satisfy it.

Defendants have been forced to liquidate the assets they managed or had an interest in to meet contractual commitments and ongoing expenses. This is due to the fact that the lawsuit has scared away potential investors and the impact of Covid-19 on the commercial real estate market, which stalled Northstar's growth. Last summer, immediately following this Court's injunction, Defendants were forced to sell an investment condominium to assist with bills and expenses. Since then, Defendants also listed a mountain property and Mr. Watson's personal residence for sale. Defendants are doing everything they can to ensure they meet their obligations to their lenders, other creditors, and this Court, even if it means Mr. Watson selling his home. Defendants were also evicted from their office space and owe back rent to the landlord, which is the subject of another lawsuit Defendants have to address.

Plaintiffs accuse Defendants of liquidating $140 million in assets and imply to this Court that they should have used the funds they received pursuant to these sales to satisfy the escrow provision of the PI Order. Due to Defendants' obligations to third parties, such as lenders, investors, and other creditors, Defendants' affiliates authorized the sale of the majority of these properties. In fact, the majority of these properties were sold at a loss. As described above, however, there is a difference between managing and owning a property. While Defendants authorized the sales of these properties, they did not receive all net proceeds following each sale. There is also a substantial difference between the amount a property is sold for and the total net proceeds received by Defendants. The secured lender is paid what is owed; parties with liens on accounts receivable are paid what they are owed; the real estate agents and brokers are paid their commissions; the government is paid taxes owed, and so on. Mr. Watson also owed and will

23258313.2

continue to owe proceeds from certain sales to his ex-wife pursuant to their Separation Agreement and the Colorado State Court order that effectuates it. Defendants used funds they actualized following these sales to pay necessary operational, payroll, and living expenses. Had they not paid those expenses, Defendants would have defaulted on their obligations and been forced to declare bankruptcy long ago.

Plaintiffs would have this Court believe that Defendants' net worth is in the tens of millions, but this is far from accurate. In support of their position, Defendants cite multiple exhibits showing *projected* income. *See* Mot. at 10 (citing Exs. 5, 7, and 53). These projections, however, were from 2019 and early 2020, before the Covid-19 pandemic negatively impacted Defendants' business and before Plaintiffs' accusations delivered the final blow to Defendants' business, all but halting it. These two factors gravely affected Defendants' business operations. Any projections, forecasts, or estimates created prior to April 2020 turned out to be grossly inaccurate. Indeed, Northstar's most recent balance sheet dated October 7, 2021, which was prepared by a third-party accountant, shows total assets of $341,093.03 and total liabilities of $7,802,829.59, for a total deficit of $7,461,736.56. Defendants have no money to put into escrow.

As the record before this Court shows, in July 2020, immediately following the Court's entry of the PI Order, Defendants sought a surety bond from a licensed bonding company in compliance with the escrow provision of the Order. *See* Dkt. 82-2. The Surety Account Executive with IMA Financial Group, Inc. approached three different surety companies in an effort to obtain Defendants' a surety bond. *Id*. Each broker "decided not to pursue the opportunity" because "there [were] other investors involved in [Defendants'] real estate assets" and Defendants were unable to provide "100% collateral." *Id*. These companies did not even

23258313.2

offer a partial surety bond. *Id*. Further, Defendants' financial position has only deteriorated since

that time and Defendants were therefore forced to abandon this approach. Defendants were

unable to secure a surety bond to satisfy all or part of the escrow provision in the PI Order.

Plaintiffs argue Defendants should have raised and substantiated their right to "prioritize

certain payments over Injunction compliance" in discovery. Mot. at 10-11. In other words,

Plaintiffs believe Defendants should have prioritized the escrow provision of the Court's Order

above other Court orders, secured creditors, and investors, all of whom had rights to Defendants'

or their affiliates' income. The Order, however, did not prioritize the escrow provision over the

rights of others, nor did any subsequent orders of this Court. Plaintiffs' discovery requests further

failed to seek this information. Again, Plaintiffs' broad reading of the Order's escrow provision

puts Defendants and this Court in a perilous position. If the Court's Order does require

Defendants to prioritize the escrow provision above all other creditors, including secured

creditors, Defendants would instantly default on their obligations to countless third parties and

those parties would seek relief in this Court. The Court would be forced to wade through claims

as it determines who should get paid and when – another slippery slope.

Finally, Defendants offered several options to Plaintiffs as a means to resolve their

inability to satisfy the escrow provision of the PI Order. Defendants offered several financial

arrangements whereby Defendants would place a percentage of their income in escrow moving

forward. Plaintiffs refused this proposition, indicating that it was not enough and that they

intended to proceed with this Motion instead. Defendants also offered a third-party forensic

accounting of their books and records. Again, Plaintiffs refused.

Defendants have tried everything they can to comply with the escrow provision of the PI

Order, but they simply do not have the means. Is it really a knowing violation of an order to be

unable to afford it? If that is the case, Defendants are at a loss as to how they might fully comply with this provision.

## C.   Plaintiffs Were Not Injured.

Plaintiffs were not injured by Defendants' actions. Defendants have fully complied with all requirements of the PI Order save the escrow provision, which Defendants have established they cannot afford. Defendants authorized the sale of certain properties in accordance with the Order and their contractual obligations to unrelated third parties. Defendants then distributed proceeds to various third parties, including lenders and investors, as required by contract. The PI Order did not freeze Defendants' assets, it did not prevent Defendants from continuing to operate their business as a going concern, and it certainly did not prioritize Defendants' obligations to this Court above Defendants' debts to third parties, particularly secured third parties.

Notably, Plaintiffs also failed to bring their concerns regarding Defendants' compliance with the escrow provision of the Order to this Court for sixteen months. While Defendants believe they have complied with this provision in good faith for the past year and a half, Plaintiffs assert otherwise. Each sale authorized by Defendants was public and consummated under the watchful eye of Plaintiffs. *See* Ex. 1. Plaintiffs expressed their concerns to Defendants, who informed them they disagreed with their interpretation of the Protective Order, but took no proactive actions to protect their interests and prevent the "dissipation" of assets they claimed were in violation of the Order. While Defendants do not believe Plaintiffs were injured, Plaintiffs could have easily prevented the "injury" they now claim to suffer as early as last summer. If Plaintiffs were unclear as to what the Court meant with the Order, they should have sought the Court's assistance. Instead, Plaintiffs waited over a year before they started to threaten third parties into complying with their interpretation of the Order. Defendants, who believed and

17

continue to believe they acted in accordance with the Court's Order, were forced to seek clarification from the Court to protect their own interests and the interests of unrelated third parties.

Plaintiffs have failed to establish they were injured.

**D.      Defendants Do Not Object to Further Inquiry Into Their Finances.**

Defendants want to comply with the Court's PI Order to the extent they are able. Defendants are willing to open themselves up to further inquiry into their finances to show that they will have extreme difficulty complying with the escrow provision of the Order while also meeting their obligations to third party creditors. If the Court finds it prudent, Defendants will submit to a third-party forensic accounting of their books and records. Defendants defer to the Court's guidance on this matter.

**E.      Plaintiffs Are Not Entitled to Attorneys' Fees and Costs**

Finally, Defendants seek an award of attorneys' fees and costs "associated with receivership, intervention, and third-party discovery or proceedings required to satisfy the Injunction and the Court's most recent Rule 37 Order." Mot. at 29-30. Where a party's noncompliance with an order was not willful, however, an award of attorneys' fees is not proper. *See Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F. Supp. 169, 172-173 (E.D. Va. 1989). Defendants further argue that such an award "would not deplete the corpus the Injunction secures [because] . . . Defendants have litigation insurance policies that provide up to $15 million of coverage that could be used to cover litigation costs, including the cost of a receiver." Mot. at 30 (citing Dkt. 85-5). This is patently false. Defendants have up to $10 million of insurance coverage, which is provided by an insurance provider with a reservation of rights. This $10 million is also part of an eroding policy. Coverage under the policy is depleting quickly as costs

18

mount for litigation defense and government investigations, including criminal and SEC

investigations. There also is no guarantee that the insurance provider would pay for the

appointment of a receiver or an award of attorneys' fees and costs, particularly if the Court holds

that Defendants willfully acted in civil contempt. Such payments by the insurance company are

completely discretionary and would quickly deplete funds available for Defendants' defense.

## V.    CONCLUSION

For these reasons, Defendants respectfully ask that the Court deny Plaintiffs' Motion for

Contempt.

Dated: October 14, 2021

By: */s/ Jeffrey R. Hamlin*
Jeffrey R. Hamlin (VA Bar No. 46932)
George R. Calhoun (*pro hac vice*)
IFRAH PLLC
1717 Pennsylvania Ave. NW, Suite 650
Washington, DC  20006
202.524.4140 – Tel.
202 524.4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com

Stanley L. Garnett (*pro hac vice*)
Amanda K. Houseal (*pro hac vice*)
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
410 Seventeenth Street, Suite 2200
Denver, CO 80202
(303) 223-1247 – Tel.
sgarnett@bhfs.com
ahouseal@bhfs.com

*Counsel for Defendants WDC Holding,
LLC and Brian Watson*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2021, I will cause the foregoing document to be electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send a notification of electronic filing (NEF) to all counsel of record. I will cause a copy of the date-stamped filing and NEF to be sent to the parties below via U.S. Mail.

Jamie Hubbard
Stimson Stancil LaBranche Hubbard
1652 Downing Street
Denver, CO 80218

*Counsel for Defendants White Peaks Capital LLC and NOVA WPC LLC*

Villanova Trust
c/o Christian Kirschner, Trustee 3924 Wallace Lane
Nashville, TN 37215

Allcore Development LLC
6870 W 52nd Avenue, Suite 203 Arvada, CO 80002

Finbrit Holdings LLC
6870 W 52nd Avenue, Suite 203 Arvada, Colorado 80002

Casey Kirschner
635 N. Alvarado Lane
Plymouth, MN 55447

By: */s/ Jeffrey R. Hamlin*_____
Jeffrey R. Hamlin (VSB 46932)

23258313.2