Page 1

```
 1              ROUGH ASCII -- NOT CERTIFIED

 2                     N O T I C E

 3              This transcript is an UNCERTIFIED ROUGH

 4     DRAFT TRANSCRIPT.  It contains raw output from the

 5     court reporter's stenotype machine translated into

 6     English by the court reporter's computer, without

 7     the benefit of proofreading.

 8              It will contain untranslated steno

 9     outlines, mistranslations (wrong words), and

10     misspellings.  These and any other errors will be

11     corrected in the final transcript.  Since this

12     rough draft transcript has not been proofread, the

13     court reporter cannot assume responsibility for

14     any errors therein.

15              This rough draft transcript is intended to

16     assist attorneys in their case preparation and is

17     not to be construed as the final transcript.  It

18     is not to be read by the witness or quoted in any

19     pleading or for any other purpose and may not be

20     filed with any court.
```

21

22

23

24

25

Page 2

11:11:56  1          THE VIDEOGRAPHER: Here begins the

11:11:57  2    video-recorded deposition of Chris Vonderhaar

11:11:59  3    taken in the matter of
https://urldefense.proofpoint.com/v2/url?u=http-3A__Amazon.com&d=DwIGAg&c=wT9hcAyWec
HwFHlf1ZE3OA&r=IcGIiwhuRpB-tDQgfX5Skg_KofTBdhQVVzsEs6QIsWA&m=7QlBvWI7CROq7CO9Ke2YNx1
s9s7-BplAHWDY7ASyp8FRwVCq_uIG_fiQLc8Bt2u3&s=u6r4au_Rld3MPCpD_HgT6dhrJVob_JsWFjoLYW2X
48c&e=  and Amazon Data

11:12:04  4    Services versus WDC Holdings, Case No. 1:20cv484.

11:12:10  5    Today's date is March 23, 2022.  The time is 11:12

11:12:17  6    Eastern time.  This deposition is being held in

11:12:18  7    different locations via Zoom.  The court reporter

11:12:21  8    is Okeemah Henderson.  The video camera operator

11:12:24  9    is Kim Johnson, both are on behalf of Huseby.

11:12:27 10    Will counsel please introduce yourself and state

11:12:30 11    whom you represent.

11:12:36 12          MR. LITTLE:  I'll defer to the plaintiffs

11:12:37 13    first.

11:12:38 14          MS. PAPEZ:  Good morning.  This is

11:12:40 15   Elizabeth Papez Gibson, Dunn and Crutcher, LLP for

11:12:42 16   plaintiff's
https://urldefense.proofpoint.com/v2/url?u=http-3A__Amazon.com&d=DwIGAg&c=wT9hcAyWec
HwFHlf1ZE3OA&r=IcGIiwhuRpB-tDQgfX5Skg_KofTBdhQVVzsEs6QIsWA&m=7QlBvWI7CROq7CO9Ke2YNx1
s9s7-BplAHWDY7ASyp8FRwVCq_uIG_fiQLc8Bt2u3&s=u6r4au_Rld3MPCpD_HgT6dhrJVob_JsWFjoLYW2X
48c&e=  and Amazon Data Services,

11:12:52 17   Inc.

11:12:52 18        MS. BODNER: Sarah Bodner --

11:12:56 19        MR. LITTLE:  Who are the other Amazon

11:12:57 20   employees?  I think we should look at the Amazon

11:13:00 21   representations if we could.

11:13:04 22        MR. VONDERHAAR: Chris Vonderhaar, Amazon.

11:13:11 23        MR. ELIAS:  This is brad Elias in-house

11:13:13 24   counsel at Amazon.

11:13:16 25        MS. STERLING: Amanda Sterling of the Law

Page 3

11:13:18 1   firm Gibson, Dunn & Crutcher for plaintiff's

11:13:18 2   Amazon.

11:13:21 3        MR. DZIUBAN:  Michael Dziuban also of

11:13:24 4   Gibson, Dunn on behalf of Amazon.

11:13:25 5        MR. LITTLE:  Alex Little and Adam Smart

11:13:29 6   Law Firm of Burr & Forman on behalf of Carleton

11:13:29 7   Nelson and Cheshire Ventures our client is also

11:13:36  8   present.

11:13:36  9        MS. BODNER:  Sara Bodner, Stan Garnett and

11:13:40 10   Amanda Houseal for Brian Watson, WDC Holdings and

11:13:41 11   the Watson defendants, and our client, Brian

11:13:42 12   Watson is here as well.

11:13:44 13        MR. LITTLE:  And I'll also note that Casey

11:13:45 14   Kirschner a pro se defendant is here as well.

11:13:49 15   Mr. Kirschner are you here.

11:13:50 16        MR. KIRSCHNER: Yes, I'm here.  Thank you.

11:13:55 17        THE VIDEOGRAPHER:  Will the court reporter

11:13:56 18   please swear in the.

         19              CHRIS VONDERHAAR,

         20   was called as a witness, and having been first

         21   duly sworn, was examined and testified as follows:

         22     EXAMINATION BY COUNSEL FOR DEFENDANT CARLETON

         23   NELSON

         24   BY MR. LITTLE:

11:14:18 25     Q. Good morning, sir.  My name is Alex Little



                                              Page 4



11:14:20  1   as I said I represent Carleton Nelson and Cheshire

11:14:24  2   Ventures in this matter.  Before we get started I

11:14:26  3   want to go over a few background matters, sort of,

11:14:27  4   ground rules for this deposition and to start I

11:14:29  5   would like to ask whether you ever ever been

11:14:32  6   deposed before.

11:14:33  7       A. No.

11:14:34  8       Q. So since this is your first time I'll take

11:14:36  9   them through step by step.  This is also a little

11:14:39  10  bit unusual because usually this happens with

11:14:41  11  everyone in the same room so we'll talk about what

11:14:44  12  happens when we're on Zoom.  The first ground rule

11:14:46  13  relates to the court reporter.  You should see on

11:14:48  14  your screen Ms. Henderson she's the court reporter

11:14:49  15  and she's going to transcribe as best she can

11:14:53  16  every word that's spoken.  Every question that I

11:14:55  17  ask and every answer you give is going to be

11:14:56  18  transcribed by her.  Because of that we need to be

11:15:00  19  able to sort of be articulate and separate

11:15:03  20  questions and answers so I'll do the best I can to

11:15:05  21  give a clear ending to my question and if you wait

11:15:08  22  briefly before you give your answer that hay she

11:15:10  23  can get your full answer and I'll commit to doing

11:15:13  24  my best to not asking the next question until you

11:15:15  25  have done the same.  Do you understand that?

11:15:17  1      A. Yes, sir.

11:15:18  2      Q. The same vain its important that we give

11:15:22  3  oral that you give oral answers as he I can see

11:15:25  4  you and if you were no nod or shake your head the

11:15:28  5  court reporter won't be able to put that into the

11:15:31  6  record sod if I can a question that calls for a

11:15:33  7  yes or no answer answer orally or otherwise

11:15:36  8  indicate with your wors as opposed to gestures is

11:15:40  9  that clear?

11:15:40 10      A. Yes, it is.

11:15:40 11      Q. Is you need the take a break at any time

11:15:43 12  for reason comfort, something is happening at home

11:15:46 13  tell us as long as you're not in the middle of a

11:15:49 14  question we'll be able to take a break at whenever

11:15:52 15  you need it.  We will likely go past lunch ats

11:15:55 16  least in the east cost but if you need a comfort

11:15:57 17  break for my purpose just let us knowful will you

11:15:59 18  commit to tells us if and when you need a break?

11:16:02 19      A. Yes, I will.

11:16:05 20      Q. I'll ask you some questions I'm sure at

11:16:07 21  least bunch of them will be unclear and its

11:16:10 22  important that you understand may questions so if

11:16:12 23  I do ask an unclear question are you willing to

11:16:15 24    ask me to clarify?

11:16:16 25        A. Yes, I can.


Page 6


11:16:17  1        Q. I'll do my best to rephrase it and make it

11:16:21  2    clear for you.  Finally even though you're not in

11:16:24  3    a courtroom you taken an oath to tell the truth.

11:16:26  4    That oath has the same impact and same penalty

11:16:29  5    first break as if you were in the courtroom.  I

11:16:31  6    assume that you understand that and that oat will

11:16:34  7    continue fur the duration of this deposition.  Do

11:16:37  8    you understand all that?

11:16:38  9        A. I do.

11:16:38 10        Q. Similarly these are some questions I ask

11:16:42 11    everyone but its important just for the record are

11:16:44 12    you currently taking any medication that could

11:16:47 13    impair your ability to hear my questions

11:16:49 14    understand them and answer them truthfully?

11:16:51 15        A. I am not.

11:16:51 16        Q. Have you taken any drugs or alcohol in the

11:16:57 17    last 12 minutes -- last 12 hours that would have

11:17:00 18    the same effect?

11:17:00 19        A. No, I have not.

11:17:01 20      Q. Is there any reason to the best of your

11:17:04 21   knowledge that you cannot give true and accurate

11:17:07 22   testimony today?

11:17:08 23      A. There is no reason.

11:17:09 24      Q. You have already given your -- the zoom

11:17:12 25   part of this just for background as well as we

Page 7

11:17:15 1   said we'll be using a product called agile law

11:17:18 2   which will allow tow see the exhibits to a

11:17:20 3   separate screen we talked through that when we

11:17:23 4   were off the record if you have trouble viewing

11:17:26 5   the exhibits let us know and we'll go off the

11:17:28 6   record and make sure you can do that.  And for

11:17:31 7   your knowledge your attorneys who are not present

11:17:33 8   with you not looking at the same thing you are

11:17:36 9   they have access and they can see it just as you

11:17:38 10   can as well.  I want to confirm you are not

11:17:40 11   present with anyone else taking this deposition

11:17:42 12   are you?

11:17:42 13      A. No, I am not.

11:17:43 14      Q. And although there will be breaks and you

11:17:47 15   can communicate with your counsel, during breaks

11:17:49 16   we ask that you not communicate with counsel via

11:17:52 17   chat, messenger or anything of that sort.  Can you

11:17:55 18   commit to doing that?

11:17:56 19      A. Yes, I can.

11:17:58 20      Q. So although you have been sworn this and

11:18:03 21   given your name could you please as we start just

11:18:06 22   spell both your first name and last name?

11:18:09 23      A. Sure.  Chris Vonderhaar spelled C H R I S

11:18:14 24   last name spelled V as in Victor O N D as in dog E

11:18:19 25   R H A A R.

Page 8

11:18:20 1      Q. Thank you sir.  You're here today pursuant

11:18:25 2   to a deposition notice in the case involving your

11:18:27 3   company, Amazon; is that right?

11:18:29 4      A. Correct.

11:18:30 5      Q. When did you first learn that you were

11:18:32 6   going to have to appear for a deposition in this

11:18:34 7   matter?

11:18:38 8      A. Doesn't know an exact date but it was

11:18:41 9   probably a few weeks ago.

11:18:43 10      Q. When you learned your going to be deposed

11:18:46 11   besides attorneys for Amazon in how do you spell

11:18:48 12   or external who have you spoken to about the fact

11:18:51 13   that usual going to be deposed?

11:18:54 14       A. My conversations have been with counsel

11:18:57 15   represented here on the call as well as Amazon's

11:18:59 16   in house counsel.

11:19:01 17       Q. So you spoke with no other Amazon

11:19:03 18   employees or folks of Amazon about the fact that

11:19:06 19   you were going to be deposed?

11:19:08 20       A. I have not.

11:19:08 21       Q. I'm not asking you to divulge anything

11:19:17 22   about your conversation with your attorney what is

11:19:19 23   have you done to prepare for this deposition if

11:19:21 24   anything?

11:19:21 25       A. I have met with counsel represented on

Page 9

11:19:24 1   this call, 3 times for a couple of hours each

11:19:32 2   time.

11:19:32 3       Q. When were these meetings approximately?

11:19:34 4       A. Those meetings have taken place over the

11:19:36 5   past three or four days.

11:19:37  6      Q. What's the length of those meetings

11:19:39  7   approximately in total?

11:19:43  8      A. In total probably 6 to 8 hoursish right in

11:19:50  9   there with bathroom breaks between things like

11:19:53 10   that.

11:19:53 11      Q. Did you review any materials during that

11:19:55 12   time written materials or documents?

11:19:56 13      A. I did.

11:19:57 14      Q. Do you recall what any of those materials

11:20:00 15   were?

11:20:01 16      A. They were materials related to our CAR

11:20:06 17   process, art factes from that process germane to

11:20:11 18   that case and several of the documents that I

11:20:13 19   signed.

11:20:15 20      Q. Of the documents that you signed which

11:20:18 21   ones do you recall looking at in the preparation

11:20:20 22   of this deposition?

11:20:21 23      A. You know, I don't remember the title of

11:20:24 24   the documents.  They were agreements that I had

11:20:26 25   signed.

Page 10

11:20:27  1      Q. Do you know what those agreements related

11:20:31  2   to?

11:20:31  3        A. They were related to the this case and the

11:20:35  4   complaint and some of the dialogue back and forth

11:20:37  5   in this case and then I believe there were some

11:20:41  6   other lease documents that I looked at.

11:20:44  7        Q. Were these lease documents involving IPI?

11:20:50  8        A. I believe one of them was yes.

11:20:52  9        Q. Did you review any e-mails in preparation

11:20:55 10   for this deposition?

11:20:56 11        A. There were a few e-mails had my name on it

11:21:00 12   with details about some of these transactions in

11:21:07 13   question.

11:21:07 14        Q. Have you reviewed any transcripts in

11:21:10 15   connection with the preparation for this

11:21:11 16   deposition?

11:21:12 17        A. I have not reviewed any transcripts.

11:21:16 18        Q. Okay.  Thank you.  Sir, what is your title

11:21:20 19   and position a Amazon?

11:21:21 20        A. Currently my title is vice president AWS

11:21:27 21   datacenters.

11:21:29 22        Q. How long have you held that title?

11:21:31 23        A. That title roughly about 12 months now.

11:21:41 24        Q. How long in total -- wear going to walk

11:21:43 25   through sort of your background how long in total

11:21:46  1   have you worked at Amazon before A W S?

11:21:48  2         A. I have worked at Amazon and A W S

11:21:51  3   specifically A W S since 2010 so about 11 and a

11:21:55  4   half years a little over.

11:21:56  5         Q. How old are you sir?

11:21:58  6         A. 53.

11:21:59  7         Q. What is your highest level of education

11:22:03  8   you attained?

11:22:04  9         A. I have an engineering degree under garage

11:22:07 10   engineering get agree from the University of Iowa.

11:22:10 11         Q. Approximately when did you graduate?

11:22:15 12         A. 1991.

11:22:16 13         Q. Let me turn your attention to what's

11:22:19 14   previously been marked as exhibit CV 01 can you

11:22:26 15   take a look at that?

11:22:27 16         A. Yes, sir.

11:22:28 17         Q. Safe us a little time so you don't have to

11:22:30 18   ask questions specifically about all this I would

11:22:32 19   ask you to review on pages 2 and 3 the summary of

11:22:36 20   your background and let me know if that is an

11:22:39 21   accurate representation of your work experience

11:22:41 22   between the time you left University of Iowa and

11:22:45 23   today?

11:22:46 24          MS. PAPEZ:  Objection to form.

11:23:00 25          A. It lacking to be a good representation of

Page 12

11:23:03 1   my work experience.  Yes.

11:23:03 2   BY MR. LITTLE:

11:23:05 3          Q. I want to talk about a few of those things

11:23:07 4   in particular when you first joined Amazon in July

11:23:11 5   of 2010 thereabouts how did you get that job?

11:23:14 6          A. A mutual colleague that I had worked with

11:23:24 7   reached out to me and ask me if I would be

11:23:26 8   interested in entertaining opportunities at Amazon

11:23:29 9   and I came in and from there that entered me into

11:23:34 10   an interview process.

11:23:36 11          Q. Why did you choose to work with for Amazon

11:23:39 12   at that time?

11:23:43 13          A. At the time I was working for a company

11:23:45 14   called bridge Telecom and it was interesting work,

11:23:49 15   meaningful work but Amazon was starting to

11:23:53 16   generate some buzz and energy in the marketplace

11:23:58 17   they were doing a lot of innovative things I found

11:24:01 18   that breasting and.

11:24:03 19       Q. To be clear when I say Amazon you mean

11:24:07 20   Amazon web services correct?

11:24:08 21       A. Yes.

11:24:09 22       Q. And for purposes of this deposition when I

11:24:11 23   reference Amazon we'll talk about Amazon web

11:24:14 24   services, are you comfortable with that?

11:24:16 25       A. If you mean using them interchangeably

Page 13

11:24:18 1    yeah.

11:24:19 2        Q. But to be clear you started with Amazon

11:24:22 3    web services and then worked for A W S throughout

11:24:25 4    your time at the company?

11:24:27 5        A. Yeah.

11:24:30 6        Q. There were other components but you never

11:24:33 7    moved to other piece of Amazon services?

11:24:34 8        A. That's correct.

11:24:36 9        Q. So your first job was to director of

11:24:39 10   infrastructure planning and product management

11:24:42 11   correct?

11:24:42 12       A. Yes.

11:24:42 13     Q. Could you tell us what your roles were in

11:24:46 14   that job?

11:24:49 15     A. Sure.  I'll say it was somewhat variable.

11:24:56 16   Company A W S specifically I was pretty young at

11:25:00 17   than point growing fast, very few services but

11:25:03 18   developing new services very quickly.  I started

11:25:06 19   out providing serve fulfillment from A W S to

11:25:13 20
https://urldefense.proofpoint.com/v2/url?u=http-3A__Amazon.com&d=DwIGAg&c=wT9hcAyWec
HwFHlf1ZE3OA&r=IcGIiwhuRpB-tDQgfX5Skg_KofTBdhQVVzsEs6QIsWA&m=7QlBvWI7CROq7CO9Ke2YNx1
s9s7-BplAHWDY7ASyp8FRwVCq_uIG_fiQLc8Bt2u3&s=u6r4au_Rld3MPCpD_HgT6dhrJVob_JsWFjoLYW2X
48c&e=  to support things like black friday and

11:25:18 21   Cyber Monday for retail high velocity sales

11:25:21 22   events.  I started to get involved with different

11:25:23 23   programs to build processes, build tools and

11:25:28 24   systems and in some cases started to work with

11:25:32 25   different people in A W S to support new region

                                                    Page 14

11:25:37  1   and scaling our capacity.

11:25:38  2     Q. You say knew region launches for AWS do

11:25:43  3   you mean placing web AWS facilities in different

11:25:49  4   geographic regions?

11:25:54  5     MS. PAPEZ:  Objection to form.

11:25:55  6     A. In terms of the regions basically it's

11:25:58  7  planning what would be required what services

11:26:01  8  would be launched how do we procure some of those

11:26:04  9  asset.

11:26:04 10      Q. We're going to be talking to people who

11:26:06 11  may not know these things when say procure service

11:26:09 12  what is does that mean?

11:26:10 13      A. I would be working -- at the time I was

11:26:12 14  working more with what we call our cloud services

11:26:16 15  compute and storage services offered as utility or

11:26:20 16  cloud computing and working with those service

11:26:22 17  owners to understand any given geographic region

11:26:28 18  what services would be offered.  How many or what

11:26:33 19  scale of infrom structure would be required to

11:26:36 20  support those services at launch and going forward

11:26:39 21  and making sure that everybody had a very clear

11:26:42 22  plan for how much infrastructure physical

11:26:45 23  infrastructure capacity would be required.

11:26:48 24      Q. So when you talk about physical

11:26:51 25  infrastructure capacity I may know what you mean

11:26:55  1  but is physical infrastructure capacity

11:27:01  2    datacenter?

11:27:01  3         MS. PAPEZ:  Objection to form.

11:27:02  4         A. Physical infrastructure capacity would

11:27:05  5    include servers to computer that post, virtual

11:27:08  6    cloud services would include things like

11:27:10  7    networking that connects, datacenter connect

11:27:18  8    services across our region and datacenter

11:27:22  9    capacity.

11:27:22 10         Q. When you talk about networking there's now

11:27:24 11    a team because I want to use these terms that

11:27:27 12    we've used in prior depositions is that known as

11:27:30 13    fiber in AWS today?

11:27:32 14         MS. PAPEZ:  Objection to form.

11:27:33 15         A. Networking includes fiber and a lot of

11:27:36 16    other physical and vir wall services.

11:27:36 17    BY MR. LITTLE:

11:27:40 18         Q. So to be more clear fiber is to component

11:27:42 19    of networking so when its discussed at it is one

11:27:45 20    piece of the broader networking pie is that a fair

11:27:50 21    description?

11:27:51 22         MS. PAPEZ:  Object to form.

11:27:52 23         A. That's mostly accurate description.

11:27:52 24    BY MR. LITTLE:

11:27:54 25         Q. So you were in that position until 2017 --

Page 16

11:27:58  1   let me ask about this before we go there.  Do you

11:28:02  2   have any sense of how big AWS was in 2010 in terms

11:28:05  3   of its revenue?

11:28:08  4        A. I do not.

11:28:08  5        Q. Do you have any idea how many people

11:28:13  6   generally were working there at the time?

11:28:17  7           MS. PAPEZ:  Objection to the form.

11:28:18  8        A. I really don't know how many people were

11:28:20  9   there it was growing fast.

11:28:20 10   BY MR. LITTLE:

11:28:23 11        Q. Is it's fair to say that many many times

11:28:25 12   larger today then it was when you joined in 2010?

11:28:28 13        A. Yeah, its larger.

11:28:31 14        Q. Much larger is that a fair description

11:28:34 15   much larger?

11:28:36 16           MS. PAPEZ:  Objection to form.

11:28:36 17        A. Yes.

11:28:36 18   BY MR. LITTLE:

11:28:37 19        Q. So you changed roles in 2017 to become the

11:28:40 20   VP of infrastructure and forecasting Amazon system

11:28:45 21   correct?

11:28:45 22        A. Yes.

11:28:46 23      Q. One duty in that role was datacenter

11:28:51 24   capacity planning correct?

11:28:53 25      MS. PAPEZ:  Objection to form.

Page 17

11:28:53  1      A. Correct.

11:28:53  2   BY MR. LITTLE:

11:28:56  3      Q.   To the layman can you describe what

11:28:58  4   datacenter capacity planning is.

11:29:01  5      A. Sure.  Datacenter capacity planning takes

11:29:06  6   usage utility or cloud computing services

11:29:11  7   expressed as storage or compute cycles and

11:29:15  8   converts that unit of forecast into service

11:29:21  9   servers.  Servers that require space and power and

11:29:25 10   then servers that require space and power into

11:29:29 11   datacenter capacity units, square footage,

11:29:33 12   kilowatts or megawatt power that we use to plan

11:29:37 13   datacenter acquisition and construction.

11:29:40 14      Q. In that broader level what is the purpose

11:29:42 15   of this exercise of doing planning of this sort?

11:29:46 16      MS. PAPEZ:  Objection to form.

11:29:47 17      A. Very simply planning is about converting

11:29:52 18   of work as to executable instructions or plans for

11:29:56 19   datacenter procurement construction server

11:30:00 20   procurement, networking procurement and the like.

11:30:03 21        Q. And you say a forecast is that a forecast

11:30:05 22   for the demand of services that you described

11:30:07 23   previously the cloud services you described?

11:30:10 24        A. Yes it would be a forecast and the usage

11:30:13 25   unit that I described like storage.

Page 18

11:30:16  1        Q. It might be helpful to ask you to do this

11:30:21  2   you have described storage an computing cycles

11:30:26  3   being a unit a datacenter capacity with square

11:30:29  4   footage, kilowats and megawatt hours, I know this

11:30:30  5   may sound beunanimous tick but you can imagine

11:30:33  6   these things come up and it will be useful to have

11:30:36  7   a clear description of them when you say storage

11:30:39  8   capacity what units are being used in the data

11:30:42  9   capacity planning or the datacenter planning team

11:30:44 10   to express those?

11:30:47 11        MS. PAPEZ:  Objection to the form.

11:30:49 12        A. Actually the compete cloud computing units

11:30:55 13   like compute cycles for storage are not provided

11:30:59 14   or created by datacenter planning they're an input

11:31:02 15   to our process from the services.

11:31:05 16       Q. So there's a whole accept team that does

11:31:08 17   services forecasting correct?

11:31:10 18       A. Correct.

11:31:10 19       Q. And they provide you those units that

11:31:13 20   are -- what are the units they provide you in

11:31:16 21   engineering terms?

11:31:18 22       MS. PAPEZ:  Objection to the form.

11:31:20 23       A. We get from them takes a few different

11:31:23 24   forms.  Generally its normalized power expressed

11:31:27 25   as rat positions.  Ten kilowatt rap or ten K V A

Page 19

11:31:34 1   equivalents merges based power and servers those

11:31:40 2   are the two units we work.

11:31:42 3       Q. T K V correct?

11:31:46 4       MS. PAPEZ:  Objection to form.

11:31:48 5   BY MR. LITTLE:

11:31:48 6       Q. It is TKE is that an acronym for what you

11:31:53 7   described?

11:31:53 8       A. TKE is the ten killable equivalent yes.

11:31:57  9        Q. So then servers are those just expressed

11:32:02 10    in numbers of actual serves or is there a

11:32:05 11    normalized unit for that as well?

11:32:07 12        MS. PAPEZ:  Objection to form.

11:32:10 13        A. The servers are expressed as physical

11:32:14 14    servers that have a power equivalent so we can

11:32:16 15    understand the power draw of those servers.

11:32:20 16        Q. Would that be expressed in kilowatt hours

11:32:23 17    an megawatt hours?

11:32:25 18        A. Generally kilowatts an megawatts they all

11:32:30 19    can be convert today hours yes.

11:32:32 20        Q. Its K W or K W H?

11:32:36 21        A. Generally K W.

11:32:40 22        Q. These are all trems that will show up at

11:32:42 23    different times on Amazon planning documents, will

11:32:45 24    they not?

11:32:46 25        A. Yes.

Page 20

11:32:47  1        Q. Then the last set of units that you just

11:32:52  2    described previously was datacenter capacity

11:32:55  3    square footage or electrical terms.  What are the

11:32:58  4    units that you use for expressing datacenter

11:33:02 5    capacity?

11:33:04 6        A. We will express datacenter capacity in ten

11:33:08 7    K V A equivalent TKE as you mentioned but we'll

11:33:12 8    also look at datacenter capacity in terms of

11:33:15 9    aggregate power provided to a datacenter as well

11:33:19 10   as the square footage.

11:33:23 11       Q. In your role doing datacenter capacity

11:33:26 12   planning and you got these inputs from the team

11:33:28 13   the forecasting team I guess, how often would

11:33:32 14   demand change on a daily basis an hourly basis a

11:33:36 15   weekly basis, how often would that change?

11:33:46 16       MS. PAPEZ:  Objection to the form.

11:33:47 17       A. It changed quite frequently.

11:33:47 18   BY MR. LITTLE:

11:33:54 19       Q. More than daily?

11:33:55 20       A. It would change as afternoon as we have

11:33:57 21   new inputs to inform a trended forecast and

11:34:00 22   generated forecast.  So any time you run a

11:34:03 23   forecast it may change.

11:34:05 24       Q. So what I'm trying to understand is how

11:34:07 25   often would those forecasts be run would they be

11:34:10  1   run weekly monthly annually or any subset?

11:34:14  2        MS. PAPEZ:  Objection to form.

11:34:15  3      A. We would run them on a regular cadence and

11:34:18  4   then as needed if they were some unique demand

11:34:23  5   event associated with the cadence.

11:34:23  6   BY MR. LITTLE:

11:34:26  7      Q. What was the regular cadence to the extent

11:34:28  8   there was one?

11:34:29  9      A. Some forcasts were run monthly some were

11:34:32 10   run quarterly.

11:34:33 11      Q. I'm going to show you on your screen

11:34:39 12   what's going to be marked as Exhibit 2?

11:34:42 13            (Exhibit 2 was marked.)

11:34:47 14        MR. LITTLE:  Let me know when you're able

11:34:49 15   to see that on your screen.

11:34:51 16      A. I see document 2.  CV 02.

11:34:55 17      Q. This is a thread the e-mail we'll be

11:34:58 18   talking about is the e-mail that's on page one to

11:35:01 19   Andy Jassy.  Feel free to read all of it and let

11:35:06 20   me know when you're done.  It's the one July 1,

11:35:10 21   2018 at 12:47 p.m.?

11:36:06 22      A. Okay I have read the e-mail that I sent to

11:36:08 23   him.

11:36:08 24      Q. And just to be -- I want to make sure you

11:36:12 25   have a cop text so there is a two line or 3 line

Page 22

11:36:15  1   e-mail from dandy below that I want to make sure

11:36:19  2   you have read that before I ask my next question

11:36:22  3   as well it's the one on the day before on June

11:36:25  4   30th at 7:49 p.m.?

11:36:29  5       A. Let me take a quick look at that.  Stand

11:36:31  6   by.  Okay.

11:36:41  7       Q. In terms of your e-mail to Mr. Jassy are

11:36:44  8   you trying to respond to his concerns about

11:36:47  9   constraints placed on supply?

11:36:49 10       MS. PAPEZ:  Objection to form.

11:36:52 11       A. This context I'm trying to explain --

11:36:56 12   strike to provide context for e-mail that he

11:36:59 13   received about various projections of supply and

11:37:05 14   demand that fell below what we would expect to

11:37:11 15   want.

11:37:11 16       Q. When I know say what you would want what

11:37:13 17   would AWS want in terms of projections for supply

11:37:16 18   and demand?

11:37:16 19       A. Ideally we get a forecast that has some

11:37:21 20   probability like there might be a mean forecast

11:37:25 21   and then I high side forecast that account first

11:37:28 22   variability and in those forecasts we seek to

11:37:34 23   procure capacity, server datacenter network,

11:37:38 24   whatever to that higher site forecast to allow for

11:37:43 25   unexpected or emergent demand from customer.

Page 23

11:37:47  1       Q. What would happen if the supply was not

11:37:50  2   sufficient to keep up with the demand?

11:37:53  3          MS. PAPEZ:  Objection to form.

11:37:54  4       A. In those cases where our projections show

11:37:57  5   that there's maybe supply or demand is exceeding

11:38:02  6   supply either at a kind of a baseline or a high

11:38:05  7   site then that triggers various teams to go out an

11:38:10  8   seek to procure additional capacity and or pursue

11:38:14  9   other mitigations to bring supply and demand into

11:38:17 10   alignment.

11:38:17 11       Q. Were supply short falls common?

11:38:20 12          MS. PAPEZ:  Objection to the form.

11:38:21 13       A. Projected supply short falls over various

11:38:27 14   horizons were common.  Yes.

11:38:30 15       Q. What would you attribute that to?

11:38:35 16          MS. PAPEZ:  Objection to form.

11:38:36 17      A. There are a number of things that

11:38:38 18  contribute it one is changes in our demand

11:38:40 19  forecast in a pretty rapidly growing business and

11:38:45 20  from time to time there are also supply I'll call

11:38:49 21  them delays maybe a construction project gets

11:38:53 22  delay bid a week or two or whatever.  Either one

11:38:57 23  of those things can misalign demand and supply and

11:39:01 24  lead to a projected -- lead to some sort of

11:39:05 25  difference or delta that you may or may not be

Page 24

11:39:11  1  happy about.

11:39:11  2  BY MR. LITTLE:

11:39:12  3      Q. Fair to say that the variables and the

11:39:14  4  inputs are changing rapidly?

11:39:19  5          MS. PAPEZ:  Objection to form.

11:39:19  6      A. Yes, on the demand side in particular.

11:39:22  7  The variables can change pretty rapidly.

11:39:22  8  BY MR. LITTLE:

11:39:26  9      Q. Were you also responsible in this role for

11:39:28 10  real estate sourcing as a sub component of

11:39:31 11  capacity?

11:39:32 12          MS. PAPEZ:  Objection to form.

11:39:33 13      A. In this time horizon July 2nd, I don't

11:39:41 14   recall if I was responsible for real estate at

11:39:44 15   that specific date.  I did eventually become

11:39:47 16   responsible for real estate.  I don't remember

11:39:49 17   exactly when that occurred.

11:39:49 18   BY MR. LITTLE:

11:39:51 19      Q. When I say real estate sourcing what did

11:39:55 20   that mean within AWS?

11:39:57 21          MS. PAPEZ:  Objection to form.

11:39:58 22      A. Real estate sourcing means procuring

11:40:02 23   additional either real estate and land or

11:40:06 24   colocation third-party datacenter capacity to meet

11:40:10 25   your forecast.

Page 25

11:40:10 1   BY MR. LITTLE:

11:40:14 2      Q. When you say real estate in terms of land

11:40:16 3   does that mean obviously you don't have a

11:40:18 4   datacenter until you have something bit on that

11:40:20 5   land is it fair to say until you have a built

11:40:24 6   datacenter that it does not become capacity?

11:40:27  7          MS. PAPEZ:  Objection to form.

11:40:27  8          A. Real estate is if you're referring to real

11:40:30  9     estate it means procuring the land to build the

11:40:33 10     datacenter and we don't have usable capacity until

11:40:36 11     we constract a commission the datacenter.

11:40:36 12     BY MR. LITTLE:

11:40:39 13          Q. When do you have a constructed datacenter

11:40:42 14     is that then become part of your supply to be able

11:40:45 15     to supply the services?

11:40:47 16          MS. PAPEZ:  Objection to form.

11:40:48 17          A. Yes.  Datacenter representatives for

11:40:55 18     example becomes usable capacity.

11:40:55 19     BY MR. LITTLE:

11:40:58 20          Q. You moved out of the that role in

11:40:59 21     approximately December of 2018 -- or excuse me may

11:41:03 22     have been before then.  Let me confirm that.  This

11:41:13 23     December of 2018 why did you move on to a

11:41:15 24     different role at that time?

11:41:17 25          MS. PAPEZ:  Objection to form.


                                                        Page 26


11:41:17  1          A. In December of 2018 I left the planning

11:41:24  2     role with other things like corporate systems and

11:41:29  3   I started run our datacenter operations team.

11:41:33  4        Q. What was the impotus for that move?

11:41:36  5        A. We had a resignation for one of my peers

11:41:42  6   leaving datacenter operations and I was asked the

11:41:45  7   backfill that role.

11:41:47  8        Q. Who was that individual?

11:41:48  9        A. Gentleman named Bowen Wallace.

11:41:52 10        Q. What is your current operational role to

11:42:02 11   the at AWS?

11:42:06 12        A. My role encompasses everything from

11:42:09 13   engineering and designing, your own lease and

11:42:14 14   datacenter through what we call plan an build so

11:42:17 15   the planning I described earlier, acquiring and

11:42:20 16   procuring assets as well as constructings am

11:42:26 17   commissioning the datacenter so delivering

11:42:28 18   datacenter capacity and the last part is the

11:42:30 19   operations of that capacity so operating servers

11:42:33 20   insurance the datacenter as well as main taping

11:42:36 21   critical infrastructure like power and.

11:42:40 22        Q. Within those different buckets and do they

11:42:43 23   have team names that you sort of supervise in

11:42:45 24   terms of roles you described?

11:42:47 25        A. Yes.

11:42:47  1        Q. There are sub teams in there?

11:42:50  2        Q. And what is a sub steam called that deals

11:42:53  3    with the acquisition of real estate?

11:42:55  4            MS. PAPEZ:  Objection to form.

11:42:56  5        A. I believe we call it the real estate team.

11:42:56  6    BY MR. LITTLE:

11:43:06  7        Q. So let's talk about the real estate team.

11:43:08  8    Is the real estate team structured with you

11:43:10  9    supervisors and subordinates at Amazon?

11:43:14 10        A.

11:43:18 11        A. Yes.

11:43:18 12        Q. Is that supervisor of the real estate team

11:43:20 13    report to you?

11:43:20 14        A. Today that supervisor does not.  He

11:43:25 15    reports to someone who reports to me.

11:43:27 16        Q. So I want to talk through that structure

11:43:30 17    and maybe this is a good time.  Could you describe

11:43:33 18    the Amazon level system for designating levels of

11:43:38 19    seniority?

11:43:39 20            MS. PAPEZ:  Objection to form.

11:43:42 21        A. Yes.

11:43:47 22        A. I'll start with me I'm what we refer to as

11:43:50 23   an L 10 which is a vice president level.  In this

11:43:54 24   kind of particular area of my organization I have

11:44:01 25   an L 8 level 8 director who is responsible for

Page 28

11:44:05  1   Americas plan -- datacenter plan and build

11:44:09  2   delivery and reporting to that director today we

11:44:12  3   have a level 7 senior manager who owns and is

11:44:18  4   accountable for real estate procurement.

11:44:21  5        Q. And the levels go below 7 within the AWS

11:44:27  6   organization?

11:44:28  7        A. Yes, they do.

11:44:28  8        Q. How far down do they go.  Do they start at

11:44:31  9   one or do that it start at 4 or 5?

11:44:35 10        A. In my organization specific to the real

11:44:39 11   estate function they go to level 4.

11:44:42 12        Q. You're a ten are there individuals who are

11:44:51 13   at levels above ten?

11:44:54 14        A. Yes.

11:44:54 15        Q. How high do those levels go?

11:44:56 16        A. I believe -- I believe but I'm not sure

11:44:59 17   they go to L 12.

11:45:03 18        Q. Would an L 12 be the CEO of AWS?

11:45:09 19    A. I don't actually know.

11:45:12 20    Q. There's not an L 9 is there?

11:45:16 21    A. Not that I'm aware of.  No.

11:45:17 22    Q. Do you know that there's not -- are you

11:45:21 23  aware or have you ever been told that there is not

11:45:23 24  an L 9 because Jeff bay /SOEZ wanted to create

11:45:29 25  separation between 8s and tens an make it more

                                            Page 29

11:45:32 1   difficult to become a ten?

11:45:33 2        MS. PAPEZ:  Objection to form.

11:45:34 3        A. Never heard anything like that before

11:45:36 4   until now.

11:45:36 5   BY MR. LITTLE:

11:45:37 6        Q. Okay.  Were you ever your use why there

11:45:40 7   wasn't a 9 before today?

11:45:43 8        MS. PAPEZ:  Objection to form.

11:45:44 9        A. Not really.  No.

11:45:44 10  BY MR. LITTLE:

11:45:46 11       Q. Now those levels do they correspond to

11:45:50 12  something called stack ranking?

11:45:58 13       A. No.

11:45:58 14      Q. What is stack ranking?

11:46:00 15      A. Stack ranking tends to refer to what we

11:46:02 16   call performance management calibration.  More

11:46:08 17   about comparing peers to one another.

11:46:12 18      Q. When you compare peers relative to each

11:46:15 19   other do you compare peers within each level?

11:46:18 20         MS. PAPEZ:  Objection to form.

11:46:18 21   BY MR. LITTLE:

11:46:19 22      Q. For example 7 to be compared to 7s?

11:46:22 23      A. Yes.

11:46:22 24      Q. So when you say you compare them to one

11:46:25 25   another, what actually is entailed in that process

Page 30

11:46:28  1   that you described the performance management

11:46:32  2   calibration?

11:46:36  3      A. Its more around buckets I would say.  I

11:46:39  4   would describe it as we have buckets of people who

11:46:41  5   we rate ass high potential our top tier we think

11:46:49  6   of them and we have a middle bucket that's called

11:46:52  7   highly valued and there's a bucket of folks who

11:46:56  8   have to improve in some way that are in a least

11:47:00  9   effective bucket.

11:47:01 10      Q. That happens on an annual basis this

11:47:05 11   calibration you described?

11:47:08 12      A. Yes.

11:47:08 13      Q. So the individual you said who reports to

11:47:12 14   you who is a level 8 who is that individual with

11:47:17 15   respect to the real estate function?

11:47:18 16      A. Currently its there is a level 8 in 3

11:47:25 17   regions we have a regional structure and the

11:47:29 18   Americas level 8 our director is Nat Sahlstrom.

11:47:35 19      Q. How long has Nat been in that role?

11:47:44 20      A. 2 months.

11:47:45 21      Q. Prior to gnat's recent role who is is

11:47:49 22   level 8 in the nationals function under beneath

11:47:51 23   you?

11:47:52 24      A. Gnat's predecessor is a gentleman named

11:48:00 25   Khoaem Lockhandwala.  Khozem was responsible for

Page 31

11:48:02  1   global plan an build so gnat's role as a result of

11:48:05  2   a bit and very recent enactive reorganization.

11:48:09  3      Q. Is Khozem still with AWS?

11:48:13  4      A. No he's no longer with AWS.

11:48:18  5     Q. Do you know why he left?

11:48:19  6     A. Yes.

11:48:19  7     Q. Why did he leave?

11:48:22  8     A. To pursue another opportunity at a

11:48:24  9  datacenter provider.

11:48:32 10     Q. Who is that?

11:48:34 11     A. Encroak E B Q U E.

11:48:38 12     Q. Are you aware he's doing the same thing at

11:48:40 13  enrevoke that he was doing at AWS same sort of

11:48:44 14  thing?

11:48:45 15     A. No, that's not the way it was described to

11:48:47 16  me.  His primary responsibility the chief

11:48:50 17  financial officer.

11:48:51 18     Q. Do you have any concerns about him taking

11:48:54 19  a job in the datacenter space?

11:48:56 20     MS. PAPEZ:  Objection to form.

11:49:00 21     A. No, not particular.

11:49:00 22  BY MR. LITTLE:

11:49:02 23     Q. There's certainly nothing improper about

11:49:04 24  him doing so is there?

11:49:07 25     MS. PAPEZ:  Objection to form.

11:49:07 1      A. In this case.  No.

11:49:07 2    BY MR. LITTLE:

11:49:13 3      Q. How long was Khozem in that role

11:49:16 4    approximately?

11:49:20 5      A. Khozem was in the director datacenter

11:49:22 6    planning an delivery role for approximately 2

11:49:24 7    years.

11:49:25 8      Q. Who was his predecessor?

11:49:41 9      A. I don't know who SIS predecessor was we

11:49:43 10   had a different work struck which you shall so

11:49:45 11   there were different people involved at that time.

11:49:48 12     Q. Are you aware of an individual who worked

11:49:49 13   at AWS named Karen Davenport?

11:49:52 14     A. I am.

11:49:52 15     Q. Was she also a level 8 director during her

11:49:55 16   time there?

11:49:55 17     A. Yes, she was.

11:49:56 18     Q. Were you aware of where she was in the

11:50:00 19   Amazon sort of hierarchy?

11:50:03 20        MS. PAPEZ:  Objection to form.

11:50:05 21     A. Yeah I'm aware of where she was in the

11:50:07 22   heirarchy as director and leader of that function.

11:50:07 23   BY MR. LITTLE:

11:50:11 24     Q. What was the function that you understood

11:50:13 25   she had at the time she was at AWS?

11:50:15  1      A. Karen led our I believe it was our global

11:50:19  2   real estate function.

11:50:22  3      Q. Was that at a time when the function was

11:50:24  4   not separated into regions?

11:50:27  5         MS. PAPEZ:  Objection to form.

11:50:27  6      A. Yes.

11:50:27  7   BY MR. LITTLE:

11:50:29  8      Q. Who did Karen report to if you're aware?

11:50:31  9      A. Overtime she -- I mean she reported to a

11:50:39 10   number of people.  Myself included at one point.

11:50:43 11      Q. The change because of reorganizations and

11:50:47 12   no other reason?

11:50:49 13         MS. PAPEZ:  Objection to form.

11:50:49 14      A. No.  Changes due to reorganization,

11:50:54 15   changes due to people coming and going from the

11:50:57 16   company.

11:50:57 17   BY MR. LITTLE:

11:50:59 18      Q. Okay.  Understood.  You described that Nat

11:51:05 19   Sahlstrom, do you have that name correctly?

11:51:07 20      A. Yes.

11:51:07 21      Q. Is currently the level 8 for the Americas;

11:51:11 22   is that right?

11:51:11 23      A. Yes.

11:51:12 24      Q. There are -- are there other -- let me ask

11:51:18 25   you this who is Keith Klein?


Page 34


11:51:21  1      A. Keith is a level 7 manager for the real

11:51:30  2   estate senior manager for the Americas.

11:51:31  3      Q. Does he work under Nat Sahlstrom?

11:51:34  4      A. Yes.

11:51:35  5      Q. Do you have much if any direct contact

11:51:37  6   with Keith?

11:51:37  7      A. I have occasional contact with Keith yes.

11:51:40  8      Q. What is the context of that contact?

11:51:48  9      A. Generally our contact is when I have

11:51:50 10   questions about a particular supply plan or

11:51:52 11   perhaps real estate transaction.

11:51:59 12      Q. Does Keith have transaction managers who

11:52:01 13   report to him, he does.  I guess we should talk

11:52:11 14   about the chain you who is the person directly

11:52:14 15   above you who you talk to?

11:52:15 16      A. I work for /PRA sad.  /TPHEZ /PRA sad I

11:52:21 17   can't really pronounce his last name its very

11:52:23 18   long.

11:52:24 19       Q. What is his title?

11:52:26 20       A. Vice president Amazon infrastructure

11:52:30 21   services.

11:52:32 22       Q. Does he report to someone him as well?

11:52:36 23       A. Yes he reports to Adam Selipski.

11:52:41 24       Q. What is Adam's title?

11:52:43 25       A. I believe Adam's title is CEO Amazon web

Page 35

11:52:47 1    service.

11:52:47 2        Q. That's the current structure correct?

11:52:51 3        A. In AWS yes.

11:52:52 4        Q. Previously was there a time where you ever

11:52:56 5    reported to Peter DeSantis?

11:53:04 6        A. Yes.

11:53:04 7        Q. And was there a time when you record today

11:53:07 8    him he reported to Andy Jassy as the CEO of AWS?

11:53:12 9        A. Yes.

11:53:12 10       Q. Was that as recently as 2019?

11:53:15 11           MS. PAPEZ:  Objection to form.

11:53:17 12      A. Yes in 2019 I reported to Peter DeSantis.

11:53:17 13  BY MR. LITTLE:

11:53:24 14      Q. Where is Peter DeSantis now?

11:53:26 15      A. Peter is still with AWS he reports to Adam

11:53:31 16  Selipski.

11:53:31 17      Q. Do you know what his title is?

11:53:33 18      A. I believe his title is vice president --

11:53:38 19  it may be senior vice president utility computing.

11:53:44 20      Q. So in the role you have now how many years

11:53:47 21  have you been involved in the buying land or

11:53:50 22  leasing datacenter in the Americas?

11:53:53 23      MS. PAPEZ:  Objection to form.

11:53:54 24      A. Directly probably two years approximately.

11:54:06 25  Indirectly kind of going back through roles like

Page 36

11:54:09 1  planning roles where I was providing input signals

11:54:13 2  probably say five yearsish.

11:54:14 3      Q. Is that part of your role today?

11:54:17 4      A. Yes, it is.

11:54:20 5      Q. Shifting gears a little bit but still

11:54:24 6  talking about your employment do you know what

11:54:26 7  your terms of employment are at AWS?

11:54:30  8          MS. PAPEZ:  Objection to form.

11:54:31  9       A. -- sorry Mr. Vonderhaar you paused on

11:54:47 10    there for a minute.

11:54:48 11       A. I lost all of you there for a minute I

11:54:50 12    don't know what happened there.

11:54:52 13       Q. No wore reads if it happen where is you

11:54:55 14    totally loose us to do you have a way to's it's

11:54:58 15    contact Ms. /PE /PEZ by cell phone or otherwise?

11:55:03 16       A. I can dial back in if it drops for

11:55:06 17    whatever reason.

11:55:07 18       Q. Want to make sure we have an alternate

11:55:10 19    source if we got forbid lost the internet in an

11:55:15 20    AWS deposition that would be it's Ron in this

11:55:20 21    case?

11:55:20 22       A. That would be unfortunate.

11:55:21 23       Q. Not enough supply for the demand?

11:55:24 24       Q.

11:55:25 25          DEFENSE COUNSEL:  The question I had was

Page 37

11:55:26  1    do you know what your terms of employment are at

11:55:29  2    AWS.

11:55:29  3        MS. PAPEZ:  Objection to form.

11:55:30  4        A. I don't know them specifically.

11:55:30  5    BY MR. LITTLE:

11:55:40  6        Q. Where are they contained if anywhere?

11:55:42  7        MS. PAPEZ:  Objection to form.

11:55:42  8        A. I'm not sure where the terms of employment

11:55:44  9    are maintained.

11:55:44 10    BY MR. LITTLE:

11:55:46 11        Q. Have you ever signed an employment

11:55:48 12    contract with AWS?

11:55:50 13        MS. PAPEZ:  Objection to the form.

11:55:55 14        A. I don't know that it was an employment

11:55:56 15    contract.  I signed -- I know I signed a

11:56:00 16    nondisclose your agreement many years ago.

11:56:00 17    BY MR. LITTLE:

11:56:03 18        Q. Did you sign that when you first started

11:56:05 19    at AWS?

11:56:06 20        A. Yes.

11:56:06 21        Q. Have you signed amendments to it sense you

11:56:18 22    started?

11:56:18 23        A. Not that I can recall.

11:56:20 24        MS. PAPEZ:  Objection to form.

11:56:20 25    BY MR. LITTLE:

11:56:22  1      Q. Have you ever sign Carl Nelson's

11:56:23  2   employment contract?

11:56:24  3         MS. PAPEZ:  Objection to form.

11:56:25  4      A. No, I have not.

11:56:26  5      Q. So you don't though how your employment

11:56:30  6   contract may compare to his correct?

11:56:33  7         MS. PAPEZ:  Objection to form.

11:56:33  8      A. That is correct.

11:56:33  9   BY MR. LITTLE:

11:56:37 10      Q. In your previous role was it British

11:56:41 11   Telecom B T?

11:56:42 12      A. Yes.

11:56:42 13      Q. Did you have an employment contract there?

11:56:46 14         MS. PAPEZ:  Objection to form.

11:56:48 15      A. I had some sort of employment agreement.

11:56:51 16   I'm not sure if it was a contract it was something

11:56:55 17   I signed.

11:56:55 18   BY MR. LITTLE:

11:56:57 19      Q.   Did you have a similar court of

11:56:58 20   contractor agreement when you were at level 3?

11:57:02 21         MS. PAPEZ:  Objection to form.

11:57:07 22      A. I don't recall.

11:57:07 23   BY MR. LITTLE:

11:57:16 24      Q. Beside what is may be in your employment

11:57:17 25   contract are you aware of any fiduciary duties

Page 39

11:57:20  1   that you have to AWS?

11:57:27  2         MS. PAPEZ:  Objection Form.

11:57:27  3      A. I'm not sure what you mean by fiduciary

11:57:29  4   duties can you clarify.

11:57:29  5   BY MR. LITTLE:

11:57:32  6      Q.   Do you know whether or not you're an

11:57:33  7   offer of AWS?

11:57:37  8         MS. PAPEZ:  Objection. Form.

11:57:37  9      A. I believe I'm an officer in some regard

11:57:40 10   for contracts and things of that nature.

11:57:40 11   BY MR. LITTLE:

11:57:43 12      Q.   Are you able to bind AWS or obligate --

11:57:47 13   -- strike that.  Are you able to obligate AWS to

11:57:51 14   contracts with your signature?

11:57:54 15         MS. PAPEZ:  Objection. Form.

11:57:54 16      A. I believe I am.

11:57:54 17   BY MR. LITTLE:

11:57:55 18      Q. Are you able to make approvals to commit

11:57:59 19   Amazon to spending money?

11:58:02 20        MS. PAPEZ:  Objection.  Form.

11:58:02 21        A. Yes.

11:58:02 22   BY MR. LITTLE:

11:58:07 23        Q. Are you generally aware that officers of

11:58:10 24   companies have fiduciary duties to the company?

11:58:15 25        MS. PAPEZ:  Objection.  Form.


Page 40


11:58:15  1        A. Generally aware yes.

11:58:15  2   BY MR. LITTLE:

11:58:19  3        Q.  But fair to say you don't know the

11:58:20  4   specifics of that duty?

11:58:23  5        MS. PAPEZ:  Objection.  Form.

11:58:25  6        A. That is fair to say I have never viewed

11:58:28  7   any specific detail.

11:58:34  8        Q. Sitting there today if you have a question

11:58:43  9   about your fiduciary to Amazon do you believe

11:58:46 10   there's document that lays that out?

11:58:49 11        MS. PAPEZ:  Objection.  Form.

11:58:49 12        A. Beyond the very general I'm not --

11:58:51 13   basically color conduct stuff I'm not aware of the

11:58:56 14   specific document.

11:58:56 15   BY MR. LITTLE:

11:58:57 16       Q. If you had a question about that who would

11:58:59 17   you ask?

11:59:02 18       A. I would approach my legal business

11:59:04 19   partners.

11:59:05 20       Q. Who in particular in the legal business

11:59:08 21   partners do you work with would you ask?

11:59:11 22          MS. PAPEZ:  Objection.  Form.

11:59:11 23       A. Kind of depends on the nature of question

11:59:19 24   there are different legal partners for different

11:59:22 25   function.


Page 41


11:59:22  1   BY MR. LITTLE:

11:59:23  2       Q. Specification cliff on question with any

11:59:25  3   fiduciary duty you may have with respect to AWS

11:59:28  4   who would you approach to the with the question

11:59:30  5   relate today that?

11:59:32  6          MS. PAPEZ:  Objection.  Form.

11:59:32  7       A. If it was related to my duty on signing

11:59:35  8   contracts, I would approach members of our legal

11:59:38  9   groups supporting our real estate.

11:59:38 10   BY MR. LITTLE:

11:59:41 11        Q. Do you know whether or not Amazon has a

11:59:42 12   conflict of interest policy?

11:59:45 13        MS. PAPEZ:  Objection.  Form.

11:59:48 14        A. We have a code of conduct that covers

11:59:51 15   conflicts of interest.

11:59:51 16   BY MR. LITTLE:

11:59:54 17        Q. So beside the code of conflict -- conduct

12:00:01 18   that you just mentioned there any other policy

12:00:03 19   that you're aware of that relates to conflicts of

12:00:05 20   interest?

12:00:06 21        A. Not that I'm aware of.

12:00:07 22        Q. What is your understanding of the code of

12:00:09 23   conduct provisions that relate to conflicts of

12:00:16 24   interest?

12:00:19 25        MS. PAPEZ:  Objection.  Form.

Page 42

12:00:19 1        A. I believe that the basic tenants of our

12:00:22 2   code of conduct are one act on behalf of the

12:00:32 3   company put the company first in all of our

12:00:34 4   business dealings abnot act on behalf half of

12:00:39 5   ourself as some other third-party and second key

12:00:43  6    tenant of our code of conduct is around

12:00:45  7    committeeing to as an employee to disclose any

12:00:55  8    relationships or business dealings that may affect

12:00:58  9    our judgement or our duty to execute transactions

12:01:03 10    on on behalf of the company.

12:01:03 11    BY MR. LITTLE:

12:01:12 12        Q. Are you aware whether the code of conduct

12:01:14 13    has any information about where employees should

12:01:18 14    go with questions about the code of conduct?

12:01:23 15        MS. PAPEZ:  Objection.  Form.

12:01:23 16        A. I believe the code of conduct points

12:01:27 17    employees to various contexts in our legal

12:01:33 18    department should we have questions or concerns

12:01:39 19    about those two primary duties.

12:01:39 20    BY MR. LITTLE:

12:01:42 21        Q. About how many people approximately are

12:01:43 22    in -- let me ask one more question on the code of

12:01:47 23    conduct.  Do you know where the code of conduct

12:01:49 24    permits Amazon employees to receive giftes from

12:01:51 25    vendors?

Page 43

12:01:53  1          MS. PAPEZ:  Objection.  Form.

12:01:55  2          A. The code of conduct prohibits Amazon

12:02:00  3   employees specifically infrastructure where we

12:02:02  4   have a zero dollar gift policy from receiving

12:02:07  5   giftes from vendors.

12:02:07  6   BY MR. LITTLE:

12:02:09  7          Q. Has that always been the policy of AWS?

12:02:14  8          MS. PAPEZ:  Objection.  Form.

12:02:15  9          A. Its changed a little bit over time but I

12:02:18 10   don't remember specifics but generally it's been a

12:02:20 11   no gift policy.

12:02:20 12   BY MR. LITTLE:

12:02:24 13          Q. Do you recall or are you aware that before

12:02:27 14   2018 it did per nit gifts?

12:02:29 15          MS. PAPEZ:  Objection.  Form.

12:02:32 16          A. I'm not aware of the specifics.

12:02:32 17   BY MR. LITTLE:

12:02:35 18          Q.   Is it possible or do you have any reason

12:02:37 19   to doubt that the policy before 2018 did allow

12:02:40 20   giftes from vendors to Amazon employees.

12:02:42 21          A. It is possible that it allowed gifts of

12:02:47 22   very small amounts, yes.

12:02:50 23          Q. Would you consider a dinner that is paid

12:02:53 24   for by a vendor to be a small amount?

12:02:57 25          MS. PAPEZ:  Objection.  Form.

Page 44

12:02:57  1      A. No, actually.  A small amount is more in

12:03:02  2   the area of 50 dollars.

12:03:02  3   BY MR. LITTLE:

12:03:05  4      Q. So before 2018 were you aware of Amazon

12:03:08  5   employees going AWS going to in infrastructure

12:03:12  6   going to dinner with vendors?

12:03:14  7      A. Yes employees from time to time will have

12:03:18  8   dinner with vendors.

12:03:19  9      Q. And an those occasions were you aware that

12:03:23 10   Amazon employeess were letting the vendors pay for

12:03:26 11   the dinners?

12:03:28 12         MS. PAPEZ:  Objection.  Form.

12:03:28 13      A. I'm not aware of any specific details on

12:03:31 14   that.

12:03:31 15   BY MR. LITTLE:

12:03:32 16      Q. If you became aware of that what steps

12:03:35 17   would you take?

12:03:37 18         MS. PAPEZ:  Objection.  Form.

12:03:43 19      A. I think if an employee has a dinner that

12:03:47 20   the vendor paid for we would want to disclose

12:03:51 21   that.

12:03:51 22      Q. If it wasn't disclosed what would the

12:03:54 23   consequences be?

12:03:55 24         MS. PAPEZ:  Objection.  Form.

12:03:56 25      A. I think that depends on the vendor and

Page 45

12:03:58  1   nature of dinner, etc.

12:03:58  2   BY MR. LITTLE:

12:04:00  3      Q. Are you aware of any AWS employees

12:04:02  4   attending sporting events with vendors?

12:04:08  5         MS. PAPEZ:  Objection.  Form.

12:04:08  6      A. It's not aware of that currently.

12:04:08  7   BY MR. LITTLE:

12:04:13  8      Q. Current or ever -- I want to clarify

12:04:15  9   you're Mott aware of it today happening or you're

12:04:18 10   never aware of it happening?

12:04:21 11         MS. PAPEZ:  Objection.  Form.

12:04:21 12      A. I cannot point to any example since I have

12:04:23 13   been here of any employee I know of going to a

12:04:27 14   sporting event with a vendor.

12:04:30 15   BY GOVERNMENT COUNSEL:

12:04:31 16      Q. So yesterday Keith Klein do you know who

12:04:34 17  he is?

12:04:34 18      A. I do.

12:04:36 19      Q. Keith Klein testified that he gone to a

12:04:39 20  sporting event in Seattle that was paid for by a

12:04:42 21  vendor.  You were not aware of that?

12:04:45 22          MS. PAPEZ:  Objection.  Form.

12:04:45 23      A. I was not aware of that.

12:04:45 24  BY MR. LITTLE:

12:04:47 25      Q. Were you aware of engineering in AWS being

Page 46

12:04:50  1  flown by vendors to private jets to sporting

12:04:54  2  events?

12:04:57  3          MS. PAPEZ:  Objection.  Form.

12:04:57  4      A. No I'm not aware of that.

12:04:57  5  BY MR. LITTLE:

12:04:59  6      Q. Were you aware of any engineerings within

12:05:01  7  AWS going to an F 1 race formula one race paid for

12:05:06  8  by a vendor?

12:05:08  9          MS. PAPEZ:  Objection.  Form.

12:05:08 10      A. I am aware of members of our security team

12:05:12 11  who have an engagement with a company could cloud

12:05:17 12  stripe who has an involvement with formula one but

12:05:20 13   I don't know the details of those relationships or

12:05:23 14   events involved.

12:05:23 15   BY MR. LITTLE:

12:05:24 16       Q. You are aware that cloud strike paid for

12:05:26 17   them to take a strip to C an F 1 race?

12:05:31 18          MS. PAPEZ:  Objection.  Form.

12:05:31 19       A. No I'm not aware of that.

12:05:31 20   BY MR. LITTLE:

12:05:33 21       Q.   Are you aware they went to an F one race

12:05:35 22   engineering working with cloud strike.

12:05:38 23       A. I'm aware of at least one person who has a

12:05:45 24   relationship with cloud strike -- business

12:05:48 25   relationship who may have attended I believe

Page 47

12:05:50 1   attend add formula one race.

12:05:52 2       Q. Who is that individual?

12:05:54 3       A. C J Moses.

12:05:56 4       Q. Did CJ Moses paid for his travel to the F1

12:06:03 5   race?

12:06:03 6          MS. PAPEZ:  Objection.  Form.

12:06:03 7       A. I have no idea.

12:06:03  8   BY MR. LITTLE:

12:06:06  9       Q. Did Amazon pay for him cost of his travel?

12:06:09 10          MS. PAPEZ:  Objection.  Form.

12:06:10 11       A. I don't know.

12:06:10 12   BY MR. LITTLE:

12:06:13 13       Q. Is he a former FBI agent?

12:06:17 14          MS. PAPEZ:  Objection.  Form.

12:06:19 15       A. I'm not sure.  I think so but I'm not

12:06:21 16   sure.

12:06:21 17   BY MR. LITTLE:

12:06:22 18       Q. Was he a former law enforcement agent

12:06:27 19   according to your knowledge?

12:06:27 20       A. I believe he is.  Yes.

12:06:29 21       Q. Is it common for -- strike that.  You

12:06:37 22   testified that you knew an AWS employee travel was

12:06:42 23   it international travel or domestic travel?

12:06:47 24          MS. PAPEZ:  Objection.  Form.

12:06:47 25       A. I don't know any of the specifics the

Page 48

12:06:49  1   formula one CJ event.

12:06:49  2   BY MR. LITTLE:

12:06:52  3       Q. How did you learn any specifics how did

12:06:53  4   you learn any detail of cloud strike trip that

12:06:56  5   Mr. Moses went on?

12:07:00  6       A. I'm not -- I believe through the

12:07:03  7   grapevine.  I'm not sure.  I'm not sure who, when.

12:07:07  8   I can't how even what context I learned of it.

12:07:11  9       Q. Are you aware of Tesla bringing Amazon

12:07:15 10   employees on trips at any time?

12:07:20 11           MS. PAPEZ:  Objection.  Form.

12:07:20 12       A. No, not aware of that.

12:07:22 13       Q.

12:07:27 14           MS. PAPEZ: Objection. Form how many people

12:07:39 15   are under your organization direct reports.

12:07:42 16       A. Amazon employees approximately 13,000ish.

12:07:45 17   Today currently I have about 15 direct reports.

12:07:54 18       Q. Going back to that in one second but I do

12:07:57 19   want to ask about a few more employees.  Do you

12:07:59 20   know who Bowen Wallace is at AWS?

12:08:02 21       A. I do know Bowen when he worked at AWS.

12:08:05 22       Q. Do you know /TKAOE /KWRAPB right /STEPB

12:08:08 23   when he was at AWS?

12:08:10 24       A. Yeah, I know Ian rite sen /(.

12:08:14 25       Q. Is he still at AWS?

12:08:16  1       A. /AOEPB rite sen is no longer here.

12:08:18  2       Q. Did you ever know that either of them had

12:08:20  3    gone to dinners paid for by vendors during their

12:08:24  4    time at AWS?

12:08:29  5          MS. PAPEZ:  Objection.  Form.

12:08:29  6       A. I'm not aware of dinners that went to paid

12:08:32  7    for by vendors.

12:08:32  8    BY MR. LITTLE:

12:08:34  9       Q. Are you aware of any Amazon employee at

12:08:37 10    AWS being disciplined for going to dipper with a

12:08:39 11    vendor and the vendor paid for that dinner?

12:08:43 12          MS. PAPEZ:  Objection.  Form.

12:08:44 13       A. I'm not aware of any disciplinary action

12:08:49 14    taken against any employee for attending a dinner

12:08:52 15    paid for the by a vendor.

12:08:52 16    BY MR. LITTLE:

12:08:55 17       Q. Are you aware of any AWS employee who was

12:08:57 18    disciplined for violating the gift policy that you

12:09:02 19    testified about previously?

12:09:04 20          MS. PAPEZ:  Objection.  Form.

12:09:04 21       A. I do not.

12:09:04 22    BY MR. LITTLE:

12:09:12 23       Q. We've been going for almost an hour let me

12:09:14 24   ask list couple questions are you aware of an

12:09:16 25   employee named a vas doe moral less?

Page 50

12:09:20  1       A. Yes, I know Oz.

12:09:21  2       Q. Do you have a nickname is it Oz?

12:09:26  3       A. Yes.

12:09:26  4       Q. What level is Oz when you were colleagues?

12:09:28  5       A. Oz was a vice president when he left AWS

12:09:34  6   when I started he was the director.

12:09:36  7       Q. And vice president that's your level.

12:09:38  8   Level 10?

12:09:40  9       A. Correct.

12:09:40 10       Q. And what level were you when Oz was a

12:09:43 11   level 10?

12:09:44 12       A. For a while I was a level 8 director and

12:09:49 13   later at a level ten.

12:09:51 14       Q. Do you know the circumstances regarding

12:09:53 15   his departure from AWS?

12:10:02 16          MS. PAPEZ:  Objection.  Form.

12:10:02 17       A. I don't know if circumstances around his

12:10:04 18   departure.

12:10:04 19   BY MR. LITTLE:

12:10:06 20    Q. Do you know where Oz currently works?

12:10:11 21    A. Yes.

12:10:11 22    Q. Where is that?

12:10:12 23    A. I believe he's at Microsoft currently.

12:10:14 24    Q. Does he work as far as you know in the

12:10:17 25    cloud computing space at Microsoft?

Page 51

12:10:19  1    A. I believe he.

12:10:22  2        MS. PAPEZ:  Objection.  Form.

12:10:22  3    A. I do believe he's in the cloud computing

12:10:25  4    an datacenter space.

12:10:25  5    BY MR. LITTLE:

12:10:27  6    Q. Did you ever hear Oz use foul language

12:10:31  7    during his time at AWS?

12:10:34  8        MS. PAPEZ:  Objection.  Form.

12:10:34  9    A. Yes.

12:10:34 10    BY MR. LITTLE:

12:10:35 11    Q. Did he frequently use the word fuck?

12:10:41 12        MS. PAPEZ:  Objection.  Form.

12:10:41 13    A. Yes.

12:10:41 14    BY MR. LITTLE:

12:10:42 15      Q. Did he use that in meetings, correct?

12:10:48 16         MS. PAPEZ:  Objection.  Form.

12:10:48 17      A. Some smaller meetings yes.

12:10:48 18  BY MR. LITTLE:

12:10:51 19      Q. Would he use that when he directly spoke

12:10:53 20  to colleagues?

12:10:55 21         MS. PAPEZ:  Objection.  Form.

12:10:55 22      A. On occasion.

12:10:55 23  BY MR. LITTLE:

12:10:59 24      Q. Besides Oz did he have any other

12:11:01 25  nicknames?

Page 52

12:11:06  1      A. No.  I only called him by Oz.

12:11:09  2      Q. Did you ever know anyone to call him a

12:11:13  3  tornado or hurricane?

12:11:15  4      A. No.

12:11:15  5      Q. Do you know whether Oz was fired for using

12:11:24  6  foul language?

12:11:26  7         MS. PAPEZ:  Objection.  Form.

12:11:26  8      A. I don't know what the reasons or details

12:11:28  9  were around his --

12:11:29 10      Q. Okay.  This is as good a time as in we

12:11:35 11    have kind of gotten through the initial sort of

12:11:37 12    section it's been an hour is it okay to take a 10

12:11:40 13    minute break here Liz?

12:11:42 14        MS. PAPEZ:  Sure of course.

12:11:44 15        MR. LITTLE:  We'll try to not go more than

12:11:46 16    an hour at a time just for everyone's benefit

12:11:51 17    including mine.  Its thousand 12:11 central if we

12:11:56 18    can come back in the 12:25 if we can come back

12:12:02 19    at -- its 12:12 eastern if we can all come back at

12:12:05 20    12:25 that will be perfect.

12:12:09 21        MS. PAPEZ:  Thanks Alex.

12:12:11 22        THE VIDEOGRAPHER: Off the record at 12:12

12:12:17 23    p.m.

12:13:35 24    (A break was taken at [!Static Time - 12 Hour].)

12:13:35 25



Page 53



12:25:57 1         (Proceedings resumed at TIME

12:26:09 2         THE VIDEOGRAPHER: Back on the record at

12:26:11 3    12:26 p.m.

12:26:13 4    BY DEFENSE COUNSEL:

12:26:16 5        Q. Thank you Mr. Vonderhaar do you understand

12:26:18  6   you're still under oath?

12:26:20  7        A. Yes, sir.

12:26:21  8        Q. I'm going to turn to a different topic.

12:26:24  9   Are you aware that Amazon has what's called the

12:26:27 10   CAR process?

12:26:34 11        A. Yes, sir.

12:26:35 12        Q. What does CAR mean, C A R?

12:26:37 13        A. It means capital approval request.

12:26:40 14        Q. Have you ever heard it referred to as

12:26:46 15   capital appropriations request?

12:26:49 16        A. Yes.

12:26:49 17        Q. So when I uae term CAR that you'll

12:26:52 18   understand that it means one of those things?

12:26:54 19        A. Yes.

12:26:54 20        Q. In your almost ten years now at Amazon has

12:27:03 21   the CAR process changed?

12:27:07 22            MS. PAPEZ: Objection. Form.

12:27:09 23        A. Its changed in how we execute it where we

12:27:09 24   have improvements and efficiencies and things like

12:27:18 25   that.  Its generally not changed in terms of its

Page 54

12:27:20  1   objectives and goals.

12:27:20  2   BY MR. LITTLE:

12:27:22  3       Q. What are the objectives and goals of the

12:27:24  4   CAR process?

12:27:25  5       A. The CAR process is a transaction review

12:27:29  6   and approval process where be we look at perhaps

12:27:34  7   in this case the acquisition of ass sets like real

12:27:39  8   estate or other things and review the whether

12:27:44  9   they're fit for purpose, whether they meet the

12:27:47 10   needs of business.  We review the economics in

12:27:50 11   great detail and then based on that review, we

12:27:55 12   execute an approval that's captured as part of

12:27:58 13   process.

12:27:59 14       Q. Now, the CAR approval is it the only

12:28:03 15   approval that's required before for example a real

12:28:06 16   estate transaction is conducted?

12:28:06 17       MS. PAPEZ: Objection. Form.

12:28:12 18       A. The CAR approval is the I'll say the

12:28:15 19   financial approval for a given transaction.  There

12:28:19 20   may be other approvals recorded in real estate

12:28:27 21   transactions or agreements or something like that.

12:28:27 22   BY MR. LITTLE:

12:28:30 23       Q. Let's talk about particularly real estate

12:28:33 24   transactions -- what type of real estate

12:28:37 25   transaction does AWS like to take?

Page 55

12:28:40  1        A. Our real estate transactions include land

12:28:43  2     purchases, may include it may include

12:28:57  3     build-to-suit nay include colocation third-party

12:29:00  4     datacenter capacity.

12:29:01  5        Q. Can you describe what it means to have a

12:29:03  6     build-to-suit transaction?

12:29:06  7        A. Generally it means we are engaging with a

12:29:11  8     developer who is who may bring the land as an

12:29:17  9     asset to the transaction and depending on the

12:29:25 10     structure of the transaction or deal we'll design

12:29:27 11     and build and commission a datacenter for us on

12:29:30 12     our behalf.

12:29:31 13        Q. How does that developer get paid?

12:29:31 14           MS. PAPEZ: Objection. Form.

12:29:40 15        A. The developer gets paid in rent or lease

12:29:46 16     payments that we make through a term.

12:29:46 17     BY MR. LITTLE:

12:29:58 18        Q. Lease limit discussion CARs to those 3

12:30:01 19     type of transactions is that okay with you?

12:30:04 20        A. The land, build-to-suit and colo.

12:30:06 21        Q. Yes, so we can focus discussion and I

12:30:09 22   understand there maybe other answers to different

12:30:11 23   parts depending on process but we'll focus on that

12:30:14 24   process?

12:30:14 25        A. Okay.

Page 56

12:30:17 1        Q. One follow-up question on the

12:30:19 2   build-to-suit is it possible in a build-to-suit

12:30:21 3   arrangement that the rent payments that Amazon

12:30:23 4   pays won't cover the developers cost?

12:30:23 5             MS. PAPEZ: Objection. Form.

12:30:31 6        A. I don't know.  It should cover the

12:30:35 7   developers cost but I don't know specifically in

12:30:38 8   every.

12:30:38 9   BY MR. LITTLE:

12:30:40 10       Q. What's your understanding of how a

12:30:41 11   developer making money a build-to-suit deal with

12:30:44 12   Amazon?

12:30:44 13            MS. PAPEZ:  Objection. Form.

12:30:45 14       A. My understanding is that the developer

12:30:46 15   makes money off of the rent payments made back to

12:30:51 16   the developer with some sort of mark up or margin.

12:30:51 17   BY MR. LITTLE:

12:30:56 18     Q. So is the profits as you understand that

12:30:58 19  mark up or margin?

12:30:58 20          MS. PAPEZ: Objection. Form.

12:31:02 21     A. I assume those profits cover their cost in

12:31:06 22  executing on our behalf.

12:31:06 23  BY MR. LITTLE:

12:31:08 24     Q. Are you generally aware that the folks

12:31:10 25  you're did dealing with in build-to-suit

Page 57

12:31:13  1  transactions want to make profits?

12:31:13  2          MS. PAPEZ: Objection. Form.

12:31:17  3     A. Yeah I assume so.

12:31:17  4  BY MR. LITTLE:

12:31:19  5     Q. Is Amazon concerned at all with how much

12:31:22  6  profit development partner makes on any particular

12:31:26  7  transaction it does with Amazon?

12:31:26  8          MS. PAPEZ: Objection. Form.

12:31:29  9     A. Yeah we care.  We care because that profit

12:31:33 10  results in a higher cost for us.

12:31:33 11  BY MR. LITTLE:

12:31:37 12     Q. In terms of -- how does Amazon estimate

12:31:40 13    what the developers profit might be?

12:31:40 14          MS. PAPEZ: Objection. Form.

12:31:46 15          A. We rely on our real estate transaction

12:31:48 16    managers to negotiate and gather information from

12:31:56 17    the developer and represent all of the costs

12:31:59 18    associated with the transaction in our CAR process

12:32:03 19    so we can review how much we're spending and where

12:32:06 20    that money is going and for what purpose.

12:32:06 21    BY MR. LITTLE:

12:32:10 22          Q. When it cops to developers are there

12:32:12 23    circumstances in which Amazon may own land and

12:32:15 24    contract with the developer to bid the datacenter

12:32:18 25    that it uses on that land?

Page 58

12:32:21 1          MS. PAPEZ: Objection. Form it?

12:32:24 2          A. It so possible to pinpoint any one

12:32:26 3    specific example but it's possible.

12:32:26 4    BY MR. LITTLE:

12:32:28 5          Q. Does Amazon have its own team to also

12:32:31 6    create and build datacenters on its own land?

12:32:31 7          MS. PAPEZ: Objection. Form.

12:32:36 8          A. Yes, we have a construction team that

12:32:38  9    works with construction partners not necessarily

12:32:47 10    Amazon we have a construction team that engages

12:32:49 11    with those third parties with datacenter that

12:32:51 12    might be requireded.

12:32:51 13    BY MR. LITTLE:

12:32:53 14        Q. And those circumstances those developers

12:32:59 15    give you budgets for the costs to build on that

12:33:01 16    land that you have acquired?

12:33:03 17        A. I'm not -- the word budget throws me off

12:33:10 18    but we review the cost -- to make sure there's

12:33:10 19    transparency and an understanding of what the

12:33:12 20    costs are.

12:33:13 21        Q. I'll ask a last question that

12:33:16 22    build-to-suit transaction at this moment.  In a

12:33:20 23    build-to-suit transaction because the developer

12:33:22 24    owns the land are you aware that sometimes

12:33:26 25    developers will sell the land when there's a lease

Page 59

12:33:29  1    still pending?

12:33:29  2            MS. PAPEZ: Objection. Form.

12:33:32  3            A.

12:33:32  4          DEFENSE COUNSEL:  Sell the land to another

12:33:34  5     party.

12:33:35  6          MS. PAPEZ: Objection. Form.

12:33:36  7       A. It's aware that can occur.  Yes.

12:33:36  8     BY MR. LITTLE:

12:33:39  9       Q. In doing so, they can capture a profit

12:33:42 10     from the sale of that land that has an active

12:33:46 11     lease on it?

12:33:46 12          MS. PAPEZ: Objection. Form.

12:33:49 13       A. Yes based on what you're describing that's

12:33:52 14     possible.  I'm not aware again of how that occurs

12:33:55 15     and when if that had occurred.

12:33:55 16     BY MR. LITTLE:

12:34:05 17       Q. Are there times in which Amazon would

12:34:06 18     engage this a transaction with a development

12:34:08 19     partner without trying to seek the best market

12:34:12 20     price in the transaction?

12:34:12 21          MS. PAPEZ: Objection. Form.

12:34:24 22       A. No. We always want to get the best market

12:34:26 23     price for a transaction.

12:34:26 24     BY MR. LITTLE:

12:34:28 25       Q. If Amazon has not gotten the best market

12:34:30  1   price in a transaction would that be against

12:34:32  2   Amazon's best interest?

12:34:32  3        MS. PAPEZ: Objection. Form.

12:34:38  4     A. Generally yes if it's not in our best

12:34:41  5   interest however if there was a reason that we're

12:34:43  6   not going to get the best rate, we'll dig deep

12:34:48  7   into the reasons why and we'll consider it.

12:34:53  8     Q. Want to talk a little bit about the basic

12:34:58  9   for land acquisition for datacenters.  Are you

12:35:02  10  involved is your don't involved in site selection

12:35:04  11  for datacenter?

12:35:07  12       MS. PAPEZ: Objection. Form yes, ma'am my

12:35:12  13  apartment is?

12:35:12  14    Q. When I use the term site selection what

12:35:16  15  does that mean within AWS if anything?

12:35:18  16    A. Site selection generally refers to how we

12:35:22  17  would do due diligence on a site that might be

12:35:25  18  appropriate for adding a datacenter and scaling

12:35:30  19  our.

12:35:30  20    Q. Are there certain pieces of real estate

12:35:32  21  that are not qualified so to speak to host a

12:35:37  22  datacenter?

12:35:42  23    A. Yes some properties are disqualifieds are

12:35:46  24  not.

12:35:46 25      Q. There's something called site

Page 61

12:35:48 1    qualification is that a term used within AWS?

12:35:51 2        A. Yes, referring to the due diligence on the

12:35:54 3    site.

12:35:54 4        Q. What types of due diligence are done on a

12:35:57 5    site.  Are there different categories of due

12:36:00 6    diligence?

12:36:01 7        A. Yes, very generally or high level its kind

12:36:05 8    of a physical attributes of site.  Soil, grade,

12:36:11 9    proximity, to risks to datacenters and then

12:36:15 10   there's other nonphysical things like ownership,

12:36:22 11   chain of custody if you will on real estate, any

12:36:27 12   liabilitys that might occur or risks that maybe

12:36:31 13   associated withed property.

12:36:32 14       Q. What are the availabilities within AWS

12:36:37 15   what does that term mean?

12:36:38 16       A. So within a given AWS region like in this

12:36:41 17   case IAD northern Virginia region it will be

12:36:48 18   comprised of three or four availability zones.

12:36:53 19   Those availability zones are simply groupings of

12:36:56 20   physical datacenters that create a logical

12:37:00 21   availability zone that customers use to distribute

12:37:04 22   their cloud workloads across with the intention of

12:37:08 23   providing a high availability in case we maybe we

12:37:13 24   lose access to one availability zone through

12:37:16 25   networking their services can continue to run in

Page 62

12:37:19  1   other availability zones.

12:37:20  2       Q. What you described that their services can

12:37:22  3   run if you lose availability is that known as

12:37:27  4   redundancy or is there another term for it?

12:37:29  5       A. I think you can refer to it as redundancy.

12:37:32  6   If customers use the availability zones in an

12:37:36  7   appropriate architecture they can create

12:37:39  8   redundancy.

12:37:40  9       Q. Is the technical structure of the

12:37:42 10   availability zones place requirements in terms of

12:37:45 11   where certain datacenters can or cannot be

12:37:49 12   situated?

12:37:49 13       A. Yes.

12:37:50 14       Q. You talked to mention that note working is

12:37:57 15   one component to datacenters and are there certain

12:38:03 16    area that have insufficient networking capacity to

12:38:06 17    make it possible to situation a data within that

12:38:09 18    area?

12:38:09 19          MS. PAPEZ: Objection. Form.

12:38:14 20       A. Generally not about the networking

12:38:15 21    capacity its going to be more specific to physical

12:38:18 22    distance an latency, how long it takes for traffic

12:38:22 23    to pass over the network that defines how far or

12:38:24 24    what sites might be candidates for datacenters.

12:38:24 25    BY MR. LITTLE:

Page 63

12:38:28  1       Q. And all the things you have mentioned

12:38:30  2    limit the available areas to build a datacenter

12:38:34  3    correct?

12:38:34  4          MS. PAPEZ: Objection. Form.

12:38:38  5       A. Yes.  Availability of land, suitability of

12:38:42  6    land parcels and distance that creates latency and

12:38:48  7    its how far you can go out or how far away from

12:38:51  8    other datacenters.

12:38:52  9       Q. In the Americas -- I guess you mentioned

12:38:55 10    the word Amazon regions and I want to make sure I

12:38:58 11   understand that.  What are Amazon regions or

12:39:01 12   regions within AWS?

12:39:03 13       A. I should probably use AWS but I'll using

12:39:09 14   Amazon am interchangeably case but an AWS region

12:39:14 15   refers to a group of availability zones and is

12:39:18 16   known as commercial region that will host multiple

12:39:21 17   customers, many customers.  So we have commercial

12:39:25 18   regions roughly 20 something commercial regions

12:39:29 19   these days like IAD is one we have another one

12:39:32 20   this organ called P D X.

12:39:35 21       Q. If the commercial zones designate bid an

12:39:37 22   airported code of nearest international airport?

12:39:41 23       A. We use airport codes not necessarily

12:39:45 24   international airport codes.

12:39:47 25       Q. Airport codes for nearest airport is that

Page 64

12:39:51 1   fair to say?

12:39:51 2       A. Fair to say yes.

12:39:52 3       Q. What are the most congested -- let me say

12:39:56 4   it this way are some of regions in the Americas do

12:40:02 5   they have more datacenter capacity then other

12:40:06 6   regions?

12:40:06  7          MS. PAPEZ: Objection. Form.

12:40:13  8          A. Sol regions are larger in scale today than

12:40:15  9     overs.

12:40:15 10     BY MR. LITTLE:

12:40:16 11          Q. Are there some regions where it is nor

12:40:19 12     difficult to procure real estate for datacenters

12:40:21 13     than other regions?

12:40:21 14          MS. PAPEZ: Objection. Form.

12:40:24 15          A. There are -- its somewhat time dependent

12:40:27 16     but at different point this is time some regions

12:40:31 17     have are more competitive, are more challenging to

12:40:36 18     scale and acquire additional tasks than others but

12:40:40 19     it kind of ebbs and flows.

12:40:43 20          Q. How would you describe those issues with

12:40:47 21     respect to the IAD region presently?

12:40:47 22          MS. PAPEZ: Objection. Form.

12:40:52 23          A. Today as we sit here, IAD is a very

12:40:56 24     competitive marketplace.  There are many companies

12:41:03 25     pursuing datacenter capacity in that Dulles IAD

Page 65

12:41:07  1     northern Virginia.

12:41:07  2   BY MR. LITTLE:

12:41:13  3       Q. Was that true in 2018?

12:41:13  4          MS. PAPEZ: Objection. Form.

12:41:16  5       A. Yes that was generally true in 2018.

12:41:16  6   BY MR. LITTLE:

12:41:19  7       Q. Is IAD the largest region in the AWS

12:41:23  8   network?

12:41:24  9          MS. PAPEZ: Objection. Form?

12:41:26 10       Q. With the Americas?

12:41:27 11       A. Yes, it's the largest AWS region in the

12:41:34 12   Americas.

12:41:34 13   BY MR. LITTLE:

12:41:36 14       Q. Why is that?

12:41:37 15       A. I would define large by scale.  Scale

12:41:40 16   defined in the number of customers servers,

12:41:43 17   datacenters number of power under management.

12:41:45 18       Q. Why is IAD the largest in terms of scale

12:41:49 19   within AWS network?

12:41:52 20       A. IAD is our oldest region.  Its it was the

12:41:57 21   first to launch,ing the first to host AWS cloud

12:42:02 22   services and many of our oldest earliest customer

12:42:08 23   who is had started using cloud have anchored in

12:42:12 24   IAD and grown in, A D group.

12:42:14 25       Q. Is it's fair to say that IAD is supported

Page 66

12:42:17  1   for AWS revenue is excessive to IAD datacenter?

12:42:17  2          MS. PAPEZ: Objection. Form.

12:42:24  3       A. Yes that's accurate its important to us.

12:42:24  4   BY MR. LITTLE:

12:42:32  5       Q. Does IAD region also handle Government

12:42:34  6   customers for AWS services?

12:42:38  7       A. The IAD region likely hosts unclear

12:42:42  8   Government workloads yes.  Appropriate for

12:42:44  9   commercial datacenter space.

12:42:46 10       Q. And so you mentioned commercial data

12:42:50 11   center space, AWS also provides Government data to

12:42:53 12   their space does it not?

12:42:54 13       A. We do provide private cloud services to

12:42:58 14   some Government agencies yes.

12:42:59 15       Q. And through those transactions those

12:43:04 16   datacenters can compete against commercial

12:43:07 17   datacenters this terms of AWS infrastructure leads

12:43:10 18   isn't that right?

12:43:10 19          MS. PAPEZ: Objection. Form.

12:43:13 20       A. I'm not sure what you mean by compete.

12:43:13 21   BY MR. LITTLE:

12:43:16 22       Q. So if you have -- when you talked about

12:43:18 23   capacity demand an supply Government customers can

12:43:23 24   place demands on AWS capacity correct?

12:43:27 25       A. Correct.


Page 67


12:43:28  1       Q. When you're doing demand for capacity you

12:43:31  2   have to account for commercial customers as well

12:43:34  3   as Government customers do you not?

12:43:36  4       A. We do.

12:43:36  5       Q. So if you build a datacenter to create

12:43:41  6   supply when you build that datacenter have you

12:43:45  7   already designated whether its going to be

12:43:47  8   supplying Government capacity or commercial

12:43:50  9   capacity?

12:43:50 10       MS. PAPEZ: Objection. Form.

12:43:52 11       A. Generally speaking we search for and

12:43:57 12   procure capacity for commercial datacenter

12:44:01 13   capacity or what we call our Amazon dedicated

12:44:06 14   cloud datacenter capacity.

12:44:06 15   BY MR. LITTLE:

12:44:08 16       Q. So I guess to re-ask the question at the

12:44:10 17   time you locate a site that's sufficient for

12:44:14 18   potential datacenter, do you know at the time you

12:44:17 19   secure I whether there's going to be commercial

12:44:20 20   capacity created there or Government capacity

12:44:23 21   created there, the dedicated capacity you just

12:44:28 22   mentioned?

12:44:29 23        MS. PAPEZ:  Objection.  Form.

12:44:31 24        A. Through our due diligence and through the

12:44:34 25   CAR process an our review of the potential site we

Page 68

12:44:37  1   generally know whether that capacity is

12:44:39  2   appropriate for and targeted for commercial

12:44:42  3   workloads or Government workloads.

12:44:42  4   BY MR. LITTLE:

12:44:45  5        Q. Are there times when those forecast an

12:44:47  6   requirements change quickly?

12:44:47  7        MS. PAPEZ: Objection. Form.

12:44:52  8        A. Yes, there are times when our demand

12:44:55  9   forecast customer demand forecast do change

12:44:58 10   quickly.

12:44:58 11   BY MR. LITTLE:

12:44:59 12        Q. Are you aware of the Joint Enterprise

12:45:02 13   Defense Initiative what that is?

12:45:05 14      A. I'm aware of JEDI which I think is what

12:45:07 15  you're referring to.

12:45:08 16      Q. Yes its commonly known as JEDI?

12:45:12 17      A. Yes.

12:45:12 18      Q. And was that a request proposal pout outed

12:45:14 19  by the Department of Defense for datacenter

12:45:17 20  services?

12:45:17 21          MS. PAPEZ: Objection. Form.

12:45:21 22      A. I'm not sure who the actual customer of

12:45:24 23  record was.  I didn't have any involvement in

12:45:27 24  JEDI.

12:45:27 25  BY MR. LITTLE:

Page 69

12:45:27 1      Q. Were you ever given demand signals because

12:45:31 2  of JEDI bids that relate today IAD?

12:45:31 3          MS. PAPEZ: Objection. Form.

12:45:37 4      A. I specifically do not review any of those

12:45:41 5  demand projections or asked from that customer.  I

12:45:45 6  just wasn't involved with JEDI.

12:45:45 7  BY MR. LITTLE:

12:45:48 8      Q. Were you present at any meetings where

12:45:50 9    there was a discussion of demands of JEDI putting

12:45:52 10   constraints on commercial capacity in the IAD

12:45:57 11   region?

12:45:57 12        MS. PAPEZ: Objection. Form.

12:45:58 13   A. No I don't recall being part of any

12:46:00 14   meetings where that was discussed.

12:46:00 15   BY MR. LITTLE:

12:46:09 16   Q. Now one of the things that effects the

12:46:11 17   ability of site selection is the access to power

12:46:15 18   correct?

12:46:18 19   A. Correct.

12:46:19 20   Q. If there are existing data centers as part

12:46:23 21   of an availability zone if Amazon wants to extend

12:46:27 22   or create more capacity in the same availability

12:46:30 23   zone is power sometime as constraint?

12:46:34 24   A. Yes at different points in time power can

12:46:38 25   be a constraint.  Those constraints can be resolve

Page 70

12:46:46 1    overtime with additional capacity.

12:46:48 2    Q. As a result do you all work with power

12:46:50 3    providers thissed regions where you have

12:46:52 4    datacenters to ensure that your capacity is not

12:46:55  5    going to be affected by a lack of power?

12:46:55  6         MS. PAPEZ: Objection. Form.

12:47:00  7         A. Yes, we work with our power partners and

12:47:03  8    providers to plan.

12:47:06  9         Q.

12:47:06 10    BY DEFENSE COUNSEL:

12:47:07 11         Q. Are there times where the availability of

12:47:09 12    power determines what sites are suitable or not

12:47:11 13    suitable for expansion in an availability zone?

12:47:15 14         A. Yes.  Sites -- availability of power and

12:47:20 15    typing and delivery of new power or more power may

12:47:25 16    impact our decision on what sites to acquire and

12:47:29 17    when.

12:47:30 18         Q. Said more colloquially you need power to

12:47:34 19    have a datacenter right?

12:47:34 20         MS. PAPEZ: Objection. Form.

12:47:35 21         A. That is a fair statement.

12:47:35 22    BY MR. LITTLE:

12:47:41 23         Q. If you don't have it you can't have a

12:47:43 24    datacenter without the pouter?

12:47:43 25         MS. PAPEZ: Objection. Form.

12:47:45  1      A. Right.

12:47:45  2    BY MR. LITTLE:

12:47:47  3      Q. Going back to the CAR process which it

12:47:49  4    sort of relates to I think I asked the objective

12:47:52  5    and goals an whether its changed.  So you had said

12:47:56  6    that the process may have changed.  Let me go back

12:47:59  7    to that line of questions.  What about the process

12:48:03  8    do you recall changing during the time that you

12:48:04  9    have been at AWS?

12:48:08 10      MS. PAPEZ: Objection. Form.

12:48:09 11    BY DEFENSE COUNSEL:

12:48:09 12      Q. But the process I mean, the CAR process

12:48:12 13    that you described?

12:48:12 14      MS. PAPEZ: Objection. Form.

12:48:14 15      A. A few things have changed over time.  One

12:48:16 16    is you know the approvals required, what levels

12:48:23 17    kind of require or awhat level of spend as noted

12:48:27 18    in tour spending an transaction policy that has

12:48:30 19    changeded and evolved over time.  Some of tools

12:48:35 20    that we use have changed over time to try and

12:48:38 21    become more efficient and allow -- and drive more

12:48:42 22    consistency into the process based on things that

12:48:46 23    we learn along the way.  The ownership and

12:48:50 24    accountability kind of ebbs and flows with the

12:48:54 25   different work changes that we have some of things

Page 72

12:48:56 1   we covered earlier may change to does what in the

12:49:02 2   process those are generally the changes that I

12:49:04 3   have seen.

12:49:04 4   BY MR. LITTLE:

12:49:04 5       Q. Let me ask you about the spending an

12:49:06 6   transaction policy does that set certain limits

12:49:08 7   for approvals to happen -- let me restate that

12:49:12 8   what does the transaction policy do?

12:49:15 9       A. Generally it says as a for example as an L

12:49:19 10   10 what dollar limit of spend commitment do I have

12:49:23 11   Amazon approval authority on and it varies for an

12:49:28 12   L 10 versus somebody else.

12:49:30 13       Q. Do you know what your level of approval is

12:49:33 14   authorized to what amount?

12:49:35 15       A. I don't actually know that today.

12:49:39 16       Q. Sit over 50 million?

12:49:43 17       A. I want to say it's under $50 million

12:49:45 18   today.

12:49:46 19       Q. Has it gone down over time?

12:49:49 20       A. No. Generally it ahs not gone down,

12:49:55 21   generally it has gone up.

12:49:57 22       Q. If there was an amount of acquisition of

12:49:58 23   property that was over the amount that you're

12:49:59 24   authorized to approve, who would need to approve

12:50:02 25   it?

Page 73

12:50:04 1       A. The -- if it's over my approval amount

12:50:09 2   then I'm going to have to first I would seek input

12:50:13 3   from any boss to make sure he's good with it even

12:50:16 4   though his approval amount maybe the same as mine

12:50:19 5   in this case but then we have to go and get C, O

12:50:23 6   or S T VP approval.

12:50:26 7       Q. That's someone at the 11 or 12 level?

12:50:29 8       A. Yes.

12:50:29 9       Q. And the CEO would you aany deals which

12:50:34 10   isser which are the highest threshold in the spend

12:50:38 11   transaction policy?

12:50:38 12          MS. PAPEZ: Objection. Form.

12:50:40 13       A. There is a limit where we have to get CEO

12:50:43 14   and C P O.

12:50:43 15   BY MR. LITTLE:

12:50:45 16        Q. By CEO you would men the CEO of AWS?

12:50:49 17        A. There were some approve value limits where

12:50:52 18    we have the get the Amazon CEO level.

12:50:56 19        Q. Do you know what those limits are?

12:50:57 20        A. I don't know them specifically.

12:50:59 21        Q. What tools have changed that have been

12:51:03 22    used in the CAR process?

12:51:03 23            MS. PAPEZ: Objection. Form.

12:51:08 24        A. A recent example would be in the past we

12:51:12 25    used what we call a trouble ticketing system or

Page 74

12:51:16 1     remedy which is simply a ticket that you can

12:51:22 2     templetize and capture answers to questions an

12:51:25 3     provide attachments and we eve moved from a

12:51:27 4     trouble ticketing base testimony so what we call

12:51:30 5     annual approvals tool it's a more robust bester

12:51:34 6     source of truth little bit more functional to

12:51:37 7     record approval as store information that's one

12:51:40 8     example.

12:51:40 9         Q. Most of those are on line tools that you

12:51:42 10    access through a web brower or another app on the

12:51:47 11    computer?

12:51:47 12      A. Yes.

12:51:47 13      Q. And do those trouble ticket and current

12:51:51 14  approval tool you're able to upload files and

12:51:54 15  they're saved online somewhere?

12:51:54 16          MS. PAPEZ: Objection. Form.

12:51:56 17      A. Yes those tools and others like them are

12:51:59 18  used in that way.

12:51:59 19  BY MR. LITTLE:

12:52:02 20      Q. Presumably on AWS server?

12:52:02 21          MS. PAPEZ: Objection. Form.

12:52:08 22      A. Presumably on our server and network yes.

12:52:08 23  BY MR. LITTLE:

12:52:11 24      Q.   So in the context of these processes who

12:52:14 25  are the decision-makers -- let's start with the

Page 75

12:52:18 1  CAR that has to be a proved at a level 12 we the

12:52:24 2  CEO of AWS for the amount.  Who would be the

12:52:28 3  decision-makers required to approve that car

12:52:34 4  before the is deemed approve?

12:52:36 5          MS. PAPEZ: Objection. Form.

12:52:36 6      A. The first level approval are going to be

12:52:39  7   to L 8s or the directors the some of the folks we

12:52:43  8   talked about earlier it will be Nat Sahlstrom or

12:52:47  9   in 2018, 2019 Carl, Casey, senior managers,

12:52:53  10  directors who approve bringing together these

12:52:57  11  details and recommend given parcel or that you

12:53:03  12  based on its attributes and financials for putting

12:53:08  13  it forth as a recommended acquisition through a

12:53:11  14  CAR transaction.  After their review and approval

12:53:19  15  at L 8 level then it comes to myself and others at

12:53:22  16  the L ten level and by others I mean, myself in

12:53:26  17  the business and my finance partners ans that have

12:53:28  18  some legal depends on the nature of the

12:53:30  19  transaction and then we approve it and at that

12:53:34  20  point we're basically approving the fitness of

12:53:39  21  acquisition that the financials are in budget in

12:53:44  22  plan and appropriate.  We're approving any

12:53:49  23  extraordinary or unique attributes or terms or

12:53:53  24  conditions here.  At that point I approve it and I

12:54:00  25  if it needs to go higher then I take it higher and

Page 76

12:54:04  1   put forward a recommendation to acquire and athat

12:54:07  2   transaction to somebody else.

12:54:10  3      Q. 2018 would that somebody else have been

12:54:12  4   Peter DeSantis?

12:54:14  5      A. In 2018 Peter would have been the aver me

12:54:19  6   that I recommend we approve yes.

12:54:21  7      Q. Who would be after Peter at that time

12:54:23  8   period?

12:54:23  9      A. If required it would have gone to Andy

12:54:27 10   Jassy as the CEO.

12:54:34 11      Q. Is it your understanding that Carl Nelson

12:54:36 12   and Casey Kirschner were level 8 directors at AWS?

12:54:43 13      A. No.

12:54:43 14      Q. What level were they at AWS?

12:54:48 15      A. Carl was an L 7 senior manager.

12:54:52 16      Q. So I just want to give you an opportunity

12:54:54 17   to correct the record on this.

12:54:56 18         Ms. Henderson, can you please read back

12:54:59 19   Mr. Vonderhaar's  answer and I want to you listen

12:55:01 20   to see if you need to clarify part of his answer

12:55:03 21   can you read back his last answer -- would have

12:55:06 22   been two answers ago that conclude the reference

12:55:09 23   to Carl Nelson an Casey Kirschner?

12:55:09 24   (The requested answer was read back.)

12:55:09 25   BY MR. LITTLE:

12:56:19  1      Q. I just want to make sure when you saw that

12:56:22  2   answer you weren't suggesting that Carl Nelson or

12:56:27  3   Casey Kirschner were directors?

12:56:28  4      A. I wasn't very clear there.  They were not

12:56:30  5   correct Doctor director so they wouldn't have any

12:56:33  6   director level approval it would have been in 2018

12:56:36  7   might have been at that time Karen Davenport,

12:56:41  8   would have been the L 8 director my mistake.

12:56:45  9      Q. That's what I wanted to make clear. I

12:56:45 10   thought you may have put a few concepts together

12:56:48 11   so in the CAR chain L 8, L ten, potentially L 11

12:56:53 12   or L 12 depends on the spend; is that a fair

12:56:57 13   description?

12:56:57 14          MS. PAPEZ: Objection. Form.

12:56:59 15      A. Yes that's a fair description.

12:56:59 16   BY MR. LITTLE:

12:57:02 17      Q. Were there types when you received a CAR

12:57:05 18   that you ultimately -- that you denied as it was

12:57:09 19   presented to you?

12:57:09 20          MS. PAPEZ: Objection. Form.

12:57:13 21      A. Yes.

12:57:13 22   BY MR. LITTLE:

12:57:15 23        Q. What were the reasons that you would deny

12:57:17 24    a CAR?

12:57:17 25            MS. PAPEZ: Objection. Form.


Page 78


12:57:21 1        A. I would -- the reasons varied quite

12:57:25 2    broadly.  I would bucket them into first perhaps

12:57:30 3    the details of the CAR were not clear or complete

12:57:36 4    meaning we couldn't make an informed decision.  Or

12:57:42 5    another common discussion was why is this the

12:57:48 6    right thing to do now versus later.  That might

12:57:51 7    prompt us to reject it and say let's not purchase

12:57:56 8    this now let's defer and the third big area would

12:58:05 9    be if the transaction as presented just didn't

12:58:08 10    meet our business needs or wasn't fit for purpose

12:58:11 11    or had other liabilities or risks that we didn't

12:58:14 12    understand or want to engage in.

12:58:14 13    BY MR. LITTLE:

12:58:22 14        Q. Are there times when you recommended CARs

12:58:25 15    to Peter DeSantis when he was the level above you

12:58:28 16    that he denied as presented to him?

12:58:28 17            MS. PAPEZ: Objection. Form.

12:58:32 18        A. There were CARs that I wented to Peter

12:58:35 19   that he -- mostly if I took them to Peter it

12:58:39 20   wasn't a denial it was a defer, go back and answer

12:58:44 21   these additional five questions you haven't

12:58:46 22   explained this clearly enough.  It generally

12:58:48 23   wasn't an I'm not going to approve this.  It was

12:58:52 24   show me this additional detail or clarity

12:58:56 25   clarification.

Page 79

12:58:56  1   BY MR. LITTLE:

12:58:57  2       Q. When Peter would give you those directives

12:59:00  3   would he do those in meetings?

12:59:00  4           MS. PAPEZ: Objection. Form.

12:59:02  5       A. I would get that directive sometime in the

12:59:05  6   meetings where we reviewed these CARs with him or

12:59:07  7   off line one to one with him.

12:59:07  8   BY MR. LITTLE:

12:59:10  9       Q. Let me back up.  So there are a series of

12:59:13 10   CAR meetings are there not?

12:59:13 11           MS. PAPEZ: Objection. Form.

12:59:18 12       A. Yes, we generally revue a group of cars on

12:59:25 13   a very regular basis like we keep transaction

12:59:29 14   moving through the process.

12:59:29 15   BY MR. LITTLE:

12:59:31 16       Q. Is that also true of more senior levels

12:59:33 17   including the L 11 and L 12s?

12:59:33 18           MS. PAPEZ: Objection. Form.

12:59:38 19       A. In 2018 we did have a regular meeting with

12:59:43 20   Peter that eventually we retired and just

12:59:48 21   conducted via e-mail where I myself or others

12:59:51 22   would recommend or propose X number of CAR

12:59:54 23   transactions for his approval via e-mail.

12:59:57 24       Q.

12:59:58 25   BY DEFENSE COUNSEL:

Page 80

12:59:58 1       Q. In the 2018 meetings you had with Pete e

13:00:02 2   DeSantis would he document his reasons for making

13:00:05 3   decisions in any fashion outside of the meeting?

13:00:05 4           MS. PAPEZ: Objection. Form.

13:00:10 5       A. Generally no.  We would get verbal

13:00:13 6   questions that we would write down and go off and

13:00:17 7   answer.

13:00:23 8       Q. Are you aware of why Peter would make the

13:00:25 9   decisions he would in those meeting about CARS?

13:00:25 10        MS. PAPEZ: Objection. Form.

13:00:29 11        A. Yes, his again his decisions were often

13:00:31 12    formed -- formulated as questions or challenges

13:00:38 13    where we hadn't been clear or complete in our

13:00:41 14    representation of the details.

13:00:41 15    BY MR. LITTLE:

13:00:49 16        Q. Is there such thing as a CAR document?

13:00:49 17        MS. PAPEZ: Objection. Form.

13:00:54 18        A. Yes, for the purposes of reviewing

13:00:58 19    efficiently we take relevant details from the many

13:01:06 20    CAR documents and details in that document that

13:01:09 21    are captured by real estate transaction managers,

13:01:13 22    finance and others and we summarize those into a

13:01:19 23    very straightforward templetized paragraph with a

13:01:24 24    few details associated with it we refer to that as

13:01:27 25    a CAR document.

Page 81

13:01:28  1        Q. Does that CAR document change from the

13:01:30  2    time its presented to transaction manager to the

13:01:33  3    time its presented to the ultimate decision

13:01:35  4    manager?

13:01:35  5        A. Frequently yes.

13:01:36  6        Q. And who is involved this making the

13:01:39  7    changes to that document as that process unfolds?

13:01:43  8        A. The owners of the respective proposals so

13:01:46  9    in the case of a real estate transaction a real

13:01:52 10    estate transaction manager will assemble author

13:01:55 11    and edit a CAR document as well as an underlying

13:01:58 12    details right up to the point that its proposed

13:02:02 13    for approval.

13:02:03 14        Q. Can there be other people for example if a

13:02:06 15    transaction manager drafts a car and an L ten

13:02:09 16    believes something is relevant or not relevant can

13:02:12 17    the L-10 make edits and suggestions to portions of

13:02:16 18    that CAR?

13:02:16 19        A. Yes, if I think something is missing or if

13:02:20 20    I think something has been either misrepresented

13:02:24 21    or more generally not represented clearly I will

13:02:27 22    offer suggestions, edits, sample language to help

13:02:33 23    educate and move things along.

13:02:34 24        Q. So were there times where you would edit

13:02:40 25    the CAR summarys that you would present to Peter

13:02:43  1   DeSantis for example?

13:02:45  2       A. There were a few occasions where I would

13:02:49  3   take the pen and I would reword something to make

13:02:53  4   it a little bit more easier for Peter to

13:02:56  5   understand based on his perspective or his

13:02:59  6   context.

13:03:00  7       Q. Does the CAR approval tool or previously

13:03:03  8   the trouble ticket pool provide you with the

13:03:06  9   capacity to see who has made specific eddies to a

13:03:09 10   document as it proceeds through the process?

13:03:12 11           MS. PAPEZ: Objection. Form.

13:03:13 12       A. I don't know.  I have not gone into the

13:03:20 13   tool to see who's changed what I usually see the

13:03:22 14   finished product.

13:03:22 15   BY MR. LITTLE:

13:03:27 16       Q. So understand that you're one of formal

13:03:29 17   approvals of CARs.  What does it mean to be an

13:03:34 18   approver of a CAR?

13:03:34 19           MS. PAPEZ: Objection. Form.

13:03:36 20       A. It's an important duty it's a high

13:03:40 21   judgement activity one that I take very seriously

13:03:43 22   and aside from just that business approval

13:03:51 23   authority there's also an element of teaching and

13:03:55 24   training and coaching others on the team about how

13:04:00 25   we look at these transactions how we think about

Page 83

13:04:03  1   them and what we base our decisions on so they can

13:04:07  2   better prepare and anticipate and apply their own

13:04:10  3   judgement through the process.

13:04:10  4   BY MR. LITTLE:

13:04:11  5        Q.   When you say high judgment what do you

13:04:14  6   mean.

13:04:14  7        A. What I mean, is being able to look at the

13:04:22  8   prop is as presented, put the relevant details in

13:04:25  9   making a judgement call that says this is the

13:04:29  10  right asset at the right cost or price and the

13:04:34  11  right asset to acquire -- right time if you will,

13:04:38  12  right time to acquire that.

13:04:40  13       Q. You mention the relevant components to a

13:04:42  14  CAR what do you believe are the relevant pieces of

13:04:45  15  information.  What do you believe are the relevant

13:04:49  16  pieces of information contained in a CAR for our

13:04:52  17  decision making?

13:04:52  18       MS. PAPEZ: Objection. Form.

13:04:55  19       A. The key elements in our decision making

13:04:58  20  are the characteristics of asset is it fit for

13:05:03 21    purpose.  Is it an asset that we can develop that

13:05:06 22    we can manager, maintain over time, is it going to

13:05:10 23    serve us well and our customers well over time so

13:05:13 24    there's characteristics about the asset.

13:05:15 25    Obviously there's a lot of financial data gathered

Page 84

13:05:18  1    about the asset including the cost of that asset

13:05:23  2    over time, the net present value, details about

13:05:29  3    how does this cost of the asset compare to other

13:05:32  4    assets that we have acquired and more generally to

13:05:35  5    help us determine is this the right price to pay

13:05:39  6    and are we getting good value for this asset and

13:05:43  7    then there are kind of a third set of things more

13:05:50  8    around what are the terms, conditions, maybe the

13:05:54  9    legal parameters, suffer from the cost and

13:05:59 10    physical attributes but what is the deal truck

13:06:03 11    structure, what are the commercial terms around

13:06:05 12    the acquisition and then probably the fourth

13:06:07 13    bucket would be if we were to acquire this asset

13:06:11 14    how does it solve for our demand forecast over

13:06:16 15    time in other words, are we getting the right

13:06:19 16    quantity at the right time in order to meet our

13:06:21 17   customer demand.

13:06:22 18        Q. Let me ask for a few of those to clarity

13:06:25 19   them for folks when you say the right price to

13:06:28 20   pay, is there a financial component to CARs?

13:06:28 21            MS. PAPEZ: Objection. Form.

13:06:35 22        A. Yes, there is's a fair amount of financial

13:06:38 23   data gathered.

13:06:39 24        Q.

13:06:40 25   BY DEFENSE COUNSEL:

Page 85

13:06:40 1        Q. Who is responsible for financial data

13:06:43 2   gathering in the CAR process?

13:06:44 3        A. The financial data around the given refer

13:06:51 4   to answer to interrogatory asset whether its

13:06:53 5   build-to-suit or real estate or both.  The

13:06:55 6   financial data around that asset is gathered by

13:06:57 7   the real estate or colo transaction manager and

13:07:02 8   assembled into the CAR templates.

13:07:05 9        Q. What is the finance teams role this

13:07:07 10   analyzing those numbers?

13:07:08 11        A. Really two responsibilities there one to

13:07:12 12   review that information in detail, and compare and

13:07:17 13   contrast the -- that specific transaction with

13:07:22 14   other transactions and look for things that are

13:07:24 15   out of ordinary or unusual, or perhaps outside of

13:07:30 16   a reasonable benchmark.  The -- or comparable

13:07:35 17   transaction.  That's kind of the first duty of a

13:07:39 18   finance partner.  A second duty of a finance

13:07:42 19   partner is really to make sure that given those

13:07:47 20   financials associated with the asset how does this

13:07:51 21   fit or compare to our budgets and plans.  Is it

13:07:54 22   within plan or within budget or and will it make

13:08:00 23   the cost of our region go up or down overall

13:08:03 24   relative for a P N L so they're looking at taking

13:08:07 25   that asset and looking at the bigger picture

Page 86

13:08:10 1   around how that asset fits into our budget plan

13:08:13 2   and P N L.

13:08:14 3      Q. Does Amazon have a particular name it uses

13:08:17 4   for its budgets or acronym?

13:08:17 5      MS. PAPEZ: Objection. Form.

13:08:22 6      A. We -- our budges result from a process we

13:08:27 7   call operating plan to two or O P plan 2.

13:08:31  8        Q. Is there something called operational plan

13:08:34  9   one?

13:08:34 10        A. Yes, operational plan one presighs

13:08:36 11   operational plan 2.

13:08:38 12        Q. So O P is and O P 2 are parts of your

13:08:42 13   budget planning process?

13:08:44 14        A. O P 2 is really the budgeting process its

13:08:47 15   where are budgets are set and plans are set and

13:08:50 16   commissioning are made.  O P 1 is kind of a you

13:08:53 17   can imagine that as a bunch of inputs to that

13:08:56 18   financial planning process about what are business

13:08:59 19   projects and investments are going to be more

13:09:01 20   broadly that turn into financial budgets an plans.

13:09:05 21        Q. So it's the finance team's

13:09:07 22   responsibilities to see if any particular project

13:09:09 23   is aligned with the numbers and projections in O P

13:09:14 24   2?

13:09:16 25        MS. PAPEZ: Objection. Form.

Page 87

13:09:20  1        A. Yes finance is the person or team that's

13:09:22  2   going to verify what we had plan and are paying

13:09:25   3   for what we had planned ain't it fits within our

13:09:28   4   budget.

13:09:28   5   BY MR. LITTLE:

13:09:30   6       Q.   And the analysis that you described that

13:09:31   7   finance did to compare this deal with past deals

13:09:34   8   that Amazon may have undertaken it does that

13:09:36   9   inspectly at the real estate team does it not?

13:09:38  10          MS. PAPEZ: Objection. Form.

13:09:39  11       A. No.  I don't think they do that

13:09:44  12   independently.  They do it together because the

13:09:46  13   finance team will look at some of the numbers

13:09:48  14   presented, confirm they make sure they understand

13:09:51  15   the numbers are accurate and they understand them

13:09:53  16   the way they are presented and then they I'll lack

13:09:55  17   at those comparisons an present them back to the

13:09:58  18   real estate team and say do we have this right

13:10:00  19   this the way we should look at it.

13:10:00  20   BY MR. LITTLE:

13:10:04  21       Q. But when they're looking at comparisons

13:10:06  22   financial team is selecting prior Amazon deems to

13:10:08  23   compare it to that selection is done initially at

13:10:11  24   least by the finance team isn't that right?

13:10:11  25          MS. PAPEZ: Objection. Form.

13:10:16  1        A. Not the way I have seen it work.  No.

13:10:18  2   It's generally the finance team verifying or

13:10:21  3   asking the real estate transaction manager what

13:10:25  4   deals are the right comparables to compare.

13:10:25  5   BY MR. LITTLE:

13:10:29  6        Q. Is that are those selections given

13:10:32  7   scrutiny through out the process?

13:10:32  8            MS. PAPEZ: Objection. Form.

13:10:35  9        A. Some of those details yes, will be given

13:10:40 10   scrutiny and may be reviewed in detail by me.  For

13:10:44 11   example if there's a difficult comparison to be

13:10:46 12   made or maybe we're in a new local or something

13:10:50 13   like that.

13:10:50 14        Q. Ewe one of things that you talked about

13:10:52 15   you have to consider unique at tributes to any

13:10:56 16   particular deal what are the sort of attributes

13:10:59 17   that might arise in a context of land acquisition

13:11:03 18   for datacenters?

13:11:05 19        A. You could have -- I would have ever asset

13:11:08 20   or property is unique in terms of its size, scope,

13:11:12 21   scaling fit,, etc.  What we're looking for are

13:11:16 22   things that we haven't seen or done before so just

13:11:20 23   something that's maybe new and unique to this

13:11:25 24   particular asset or commercial transaction.  We're

13:11:28 25   also looking for any unusual cost or extraordinary

Page 89

13:11:33  1   cost or cost that in the process we haven't

13:11:37  2   explained clearly what that cost is for and who

13:11:41  3   its going to.  Other things we might explain are

13:11:47  4   for example if using this asset is going to

13:11:50  5   require additional work to address some of the

13:11:54  6   physical from the tributes might be it's a land is

13:11:58  7   built the land is on top of a boulder feel and

13:12:01  8   require extra cost an work and site represent to

13:12:04  9   resome boulders or certain composition.  So kind

13:12:07 10   of those 3 general flavors.

13:12:10 11      Q. I'm going to show you what's going to be

13:12:14 12   marked as Exhibit 3 in this deposition?

13:12:17 13            (Exhibit 3 was marked.)

13:12:26 14      MR. LITTLE:  If you'll take a look I'm

13:12:28 15   going to directing your attention to the e-mail

13:12:29 16   that you sent to a selection of individuals on May

13:12:32 17   25th.  Its about a page long.  Second page is

13:12:37 18   blank.

13:12:37 19     A. Do you want me to go to page 2.

13:12:39 20     Q. No.  Second page is blank so you can take

13:12:42 21  a look and let me know when you completed reading

13:12:44 22  and I'll ask you a few questions about it.

13:13:38 23     A. I read through it fairly quickly and I'm

13:13:42 24  familiar with it.

13:13:43 25     Q. Does this you poor to be an e-mail you

Page 90

13:13:45 1   sent to a number of individuals within AWS?

13:13:47 2      A. Yes, that e-mail on May 25 is it from me.

13:13:50 3      Q. The individuals who you address the e-mail

13:13:53 4   to do they have any significance as a group?

13:13:57 5         MS. PAPEZ: Objection. Form doctor?

13:14:05 6      A. Looking at the names on the e-mail I would

13:14:08 7   say I was send egg it to a collection of direct

13:14:10 8   reports and team leaders.

13:14:10 9   BY MR. LITTLE:

13:14:16 10     Q. What is the subject of this e-mail?

13:14:17 11     A. Subject do you want me to read it to you.

13:14:20 12     Q. Not to subject line but generally how

13:14:22 13  would you characterize the subject or topic of

13:14:25 14  this e-mail?

13:14:25 15       MS. PAPEZ: Objection. Form.

13:14:27 16      A. The subject and my intent in this e-mail

13:14:33 17  was meant to be encouragement team is working very

13:14:37 18  hard to provide to do due diligence, provide good

13:14:42 19  detail.  They were getting a lot of feedback from

13:14:44 20  me and others and hard questions about why are we

13:14:47 21  sure this is the right thing to do at the right

13:14:50 22  price and the right time and it was intended to be

13:14:53 23  a bit of an encolonelment to recognize them for

13:14:57 24  the effort and the great work they were doing.

13:15:00 25  And let me share my prospective on why it's

Page 91

13:15:06 1  important and why this work is so value why it

13:15:09 2  matters that they put this all that hard work.

13:15:11 3      Q. So I want to ask about a few specific

13:15:15 4  things I. says here this is sent on the one year

13:15:17 5  anniversary of these CAR reviews does that mean

13:15:20 6  approximately in May of 2017 the CAR process

13:15:25 7  changed?

13:15:28 8      MS. PAPEZ:  Objection form, foundation.

13:15:32 9      A. I think it marked a change in maybe the

13:15:35 10   process we were using.  I don't remember the

13:15:37 11   specific changes but I believe that's what I was

13:15:40 12   referencing.

13:15:40 13   BY MR. LITTLE:

13:15:41 14      Q. And in that same paragraph there's a

13:15:43 15   statement that says Andy pulled the an don cord

13:15:46 16   that resulted in the over site we have today.

13:15:49 17   Could you explain what that sentence means?

13:15:56 18      MS. PAPEZ:  Objection sorry Alex where are

13:15:58 19   you in the document.

13:16:00 20      MR. LITTLE:  Same paragraph paragraph 2

13:16:01 21   next to last seventh of paragraph 2.

13:16:04 22      MS. PAPEZ:  Thank you.

13:16:06 23      A. I'm sorry.

13:16:06 24   BY MR. LITTLE:

13:16:08 25      Q. The question was Andy pulled the tan don

Page 92

13:16:12 1   cord that resulted in the over site we have today.

13:16:14 2   What did you mean by that sentence?

13:16:18 3      A. As I recall about a year prior we had

13:16:27 4   found ourselves in a situation where we had

13:16:30 5   approved a set of CARs ahead of perhaps a head of

13:16:35  6    time we had planned to do it so maybe if the

13:16:38  7    budget was this May maybe we approved some CARs

13:16:42  8    for some amount this February so different than

13:16:44  9    what we had in our planned budget and had

13:16:49 10    basically approved money and committed spend

13:16:51 11    before we needed to.  And we reviewed that with

13:17:02 12    Andy and we were running a maid of time on spend

13:17:04 13    relative to demand forecast and revenue and we

13:17:08 14    reviewed that with Andy on a standard financial

13:17:10 15    review and it was called out why are we approving

13:17:14 16    these things so far ahead of schedule.

13:17:16 17         Q. The phrase pulling the an don cord what

13:17:20 18    does that mean?

13:17:21 19         A. Generally an an don cord means stop the

13:17:25 20    process take stock of where you're at what the

13:17:28 21    issues are, correct those things before you

13:17:31 22    restart the process.

13:17:31 23         Q. The next paragraph you said that the CAR

13:17:35 24    reviews are servicing all sorts of missing

13:17:39 25    mechanisms slop and are planning an execution

Page 93

13:17:42  1   processes that are flown under the radar forever.

13:17:45  2   Do you believe that to be an accurate state?

13:17:45  3          MS. PAPEZ: Objection. Form.

13:17:51  4      A. It's a -- its accurate in the sense that

13:17:55  5   there was a very man wall human based process and

13:17:59  6   with the man wall or human based process there are

13:18:05  7   efficiencies will happen.  Misunderstandings occur

13:18:12  8   and over time that very man wall nature no matter

13:18:15  9   how hard and how people are working and trying to

13:18:18 10   assemble complete concise comprehensive

13:18:22 11   transaction data we were finding that sometimes

13:18:25 12   our execution of a process it was very difficult

13:18:31 13   to bridge back to our budgeting and planning

13:18:34 14   process and that's what I was referring to by

13:18:37 15   mechanisms how do you keep execution in line with

13:18:40 16   your plan how do you know you're doing when you

13:18:43 17   said you were going to do when you formed your

13:18:45 18   plan that a what I was referring to.

13:18:48 19      Q. In the last sent you sate consider what we

13:18:51 20   look for in our spend proposals A K A CARs and you

13:18:54 21   list 1, 2, 3, 4, 5, 6, 7, 8, 9, different items.

13:19:03 22   Looking at that list today do you think that's an

13:19:06 23   ago rate list of items that you look for that's

13:19:10 24   relevant in your CAR process?

13:19:10 25          MS. PAPEZ: Objection. Form.

13:19:12  1      A. Those are similar to the buckets I

13:19:15  2   provided those are kind of foundational pieces

13:19:18  3   it's not an exhaustive list but a foundational

13:19:22  4   list.

13:19:22  5   BY MR. LITTLE:

13:19:23  6      Q. What are items that you don't see on there

13:19:25  7   that you think are important to look for in the

13:19:27  8   CAR process?

13:19:36  9      A. One of things we talked about was an asses

13:19:43 10   cost over time relative to comparables or

13:19:45 11   benchmarks.  We talked about that.  Another one

13:19:49 12   would be costs and effort work that we have to do

13:19:55 13   to mitigate or change a physical at try bought of

13:19:59 14   a given asset.  The third one might be an unusual,

13:20:04 15   unique sorts of fees or costs or costs that we

13:20:08 16   don't understand and we continue bottom out.

13:20:10 17      Q. I'm going to turn your attention now to

13:20:13 18   the last paragraph and you state I think it would

13:20:17 19   be hard press today find another company or job

13:20:19 20   where we would spend the kind of money we're

13:20:22 21   spending or decision making on such a large sum is

13:20:26 22   concentrated among such a small group of people

13:20:31 23   inparenthesis us.  What did you mean by that?

13:20:33 24       A. What I meant by that is this is a very

13:20:36 25   important due and role that we all play in this

Page 95

13:20:39  1   process and the decisions that we make and the

13:20:44  2   data we collect is very very important given the

13:20:48  3   sums of money and we can't yourself expect or

13:20:51  4   assume that it's okay to spend millions of dollars

13:20:56  5   without just filing every darn opinion any.

13:21:01  6       Q. You say the decision making is concentrate

13:21:04  7   aid amongst a small group of people, us.  Do you

13:21:07  8   remember that the vims to whom you directed the

13:21:10  9   e-mail and yourself constituted us?

13:21:12 10          MS. PAPEZ: Objection. Form?

13:21:14 11   BY DEFENSE COUNSEL:

13:21:14 12       Q. Who constitutes us in that parenthetical?

13:21:18 13       A. In this particular case it would be

13:21:21 14   certainly the people on the e-mail and others that

13:21:24 15   maybe I didn't include.

13:21:27 16       Q. So you meant by that us to indicate other

13:21:30 17   people who are not listed in the e-mail?

13:21:34 18        MS. PAPEZ: Objection. Form.

13:21:34 19        A. No.  It was intended for this group and

13:21:38 20   the people that work for that group to encourage

13:21:41 21   that group.  I believe the decision making is

13:21:46 22   limited.

13:21:46 23   BY MR. LITTLE:

13:21:48 24        Q.   Those decision-makers are listed as L 8s

13:21:52 25   or above on that e-mail?

Page 96

13:21:54  1        MS. PAPEZ: Objection. Form.

13:21:55  2        A. There are some folks in that e-mail that

13:21:57  3   are not L 8sen to distribution list.

13:22:03  4        Q. Who can you identify who is not an L 8 on

13:22:06  5   that list or was not at the time it was sent?

13:22:08  6        A. Arvin, Charles Taylor, Daytono, Francheske

13:22:17  7   and Brent Holly those are the ones I'm reasonably

13:22:22  8   confident were not L 8s.

13:22:25  9        Q. You believe they were low or L 8 or higher

13:22:28 10   than L 8?

13:22:29 11        A. I believe they were L 7 and in Tom cases

13:22:32 12   maybe an L 6 in one case.

13:22:34 13      Q. Did those individuals represent different

13:22:36 14   parts of the prove value process in the CARs?

13:22:36 15          MS. PAPEZ: Objection. Form.

13:22:43 16      A. Those individuals who were not L 8s those

13:22:47 17   individuals were I'm not going to say they were

13:22:50 18   approve veries, they were you can call them

13:22:54 19   project managers, facilitators and coordinators

13:22:57 20   people who collate a lot of this information make

13:23:00 21   sure its complete comprehensive and intelligible

13:23:04 22   and kind of coordinate the review of those CAR

13:23:06 23   document.

13:23:07 24      Q. Does each CAR document list the approve

13:23:10 25   veries who are required for CAR to be approved?

Page 97

13:23:10 1          MS. PAPEZ: Objection. Form.

13:23:16 2      A. I believe that detail is -- I don't

13:23:19 3   believe its in the -- actually yes.  In the CAR

13:23:22 4   document I remember the names and you can see what

13:23:25 5   the approval chain is.  Yes.

13:23:26 6      Q. Give me one moment we're going to look at

13:23:36 7   another document here.  I'm going to this is

13:23:38  8    previously been marked as an exhibit K K 04.  It

13:23:42  9    should come up on your screen at document 4?

13:23:46  10    A. Okay.  Do you see that document.

13:23:51  11    A. Yes, sir.

13:23:52  12    Q. If you take your time to review it if you

13:23:54  13   turn to page 2 line 22 there's a list of names and

13:23:57  14   I wanted to ask you about that briefly.

13:24:00  15    A. I see the list of names.

13:24:01  16    Q. Where it say approvals what do you

13:24:04  17   understand that list of names to represent?

13:24:04  18       MS. PAPEZ: Objection. Form.

13:24:13  19    A. These are the individuals who you would

13:24:16  20   expect to have reviewed and approved this CAR to

13:24:20  21   move forward through an approval process.

13:24:20  22   BY MR. LITTLE:

13:24:24  23    Q. Are you listed there?

13:24:25  24    A. I am.

13:24:25  25    Q. Is that Chris V does that designate you?

Page 98

13:24:29  1    A. Yes.

13:24:30  2    Q. Could you run through from left to right

13:24:34  3   who the other individuals are?

13:24:36  4        A. Yes.

13:24:36  5        Q. If you know?

13:24:38  6        A. In the if we're lack at page 2 I do know

13:24:43  7    these individuals. Ernest P Ernest Popescu, Joe M

13:24:50  8    is Joe Minarik.  Gretchen is Gretchen Stevenson

13:24:57  9    Liz C, Liz Cottington, Khozem, Khozem Lockhandwala

13:25:04 10    Louis -- I can't remember Louis's last name.

13:25:06 11    Sorry.  Chris Vonderhaar and Peter DeSantis.

13:25:10 12        Q. And very briefly what are the roles of

13:25:12 13    these individuals and the approval process

13:25:15 14    starting with Ernest Popescu?

13:25:15 15        MS. PAPEZ: Objection. Form.

13:25:19 16        A. Ernest Popescu was a real estate

13:25:23 17    transaction manager, Joe Minarik was a real estate

13:25:27 18    level 8 or meter of the real estate team that

13:25:31 19    Ernest was a part of.  Gretchen Stevenson was

13:25:35 20    director of infrastructure finance.  Liz

13:25:41 21    Cottington was another finance partner in AWS who

13:25:46 22    worked for Louis P.  Khozem at this time I'm not

13:25:56 23    sure the date on this one, I think he was I

13:26:00 24    believe he was probably the finance partner for

13:26:03 25    infrastructure, Gretchen probably worked for the

Page 99

13:26:07  1   Khozem.  I don't know the time of this there was a

13:26:09  2   time when Khozem was in --

13:26:09  3      Q. It does appear to be a date at the bottom

13:26:12  4   there if that's helpful?

13:26:21  5      A. At this time so Khozem would have been Joe

13:26:28  6   Minarik's boss on the business side not finance.

13:26:35  7   I believe Louis was an AWS CFO and me, Khozem

13:26:40  8   worked for the me and I worked for Peter who

13:26:44  9   ran --

13:26:45 10      Q. What was Peter's role at this time?

13:26:47 11      A. Peter at that time ran infrastructure

13:26:52 12   Amazon infrastructure services.

13:26:55 13         MS. PAPEZ:  We have been going to about an

13:26:56 14   hour but I would like to walk through sections of

13:26:58 15   this CAR.  Looking at this CAR do you recognize

13:27:00 16   this transaction from a year ago or this proposed

13:27:04 17   transaction for SFO 69.

13:27:06 18      A.

13:27:11 19      A. Yes, I remember SFO 69.

13:27:16 20      Q. On the first page there's appears to be a

13:27:21 21   table with a set of two rows an an number of

13:27:24 22   columns.  What is the purpose of this table --

13:27:29 23   does the entire document appear to be a CAR

13:27:32 24    document that you have testified about previously?

13:27:34 25        A. I am just going to scan through.


                              Page 100


13:27:37  1        Q. Yes, please.

13:27:51  2        A. Yes this looks like a pretty thorough

13:27:55  3    document for one particular CAR.

13:27:57  4        Q. I think CAR documents are made up of

13:27:59  5    different sections?

13:27:59  6            MS. PAPEZ: Objection. Form.

13:28:06  7        A. Yes page 2 highlights some of those

13:28:08  8    sections.

13:28:08  9        Q. DEFENSE COUNSEL:  What is page one called

13:28:11 10    for the car document or what does it denote.

13:28:15 11            MS. PAPEZ: Objection. Form.

13:28:16 12        A. Page one is a table it represents an

13:28:20 13    abstract if you will or a summary of the pertinent

13:28:23 14    information abilities what we plan to acquire,

13:28:26 15    whey we think this is a right thing to acquire at

13:28:29 16    the right time and right cost and an explanation

13:28:32 17    briefly on anything that would make it out of the

13:28:38 18    ordinary.

13:28:44 19        Q. Was this part of CAR document given a name

13:28:47 20   within AWS?

13:28:47 21        MS. PAPEZ: Objection. Form.

13:28:49 22     A. Are you referring to the nonstands piece.

13:28:49 23   BY MR. LITTLE:

13:28:52 24     Q.   No this first box here at the top page

13:28:55 25   one section of car given that sort of standard

Page 101

13:28:58  1   name at AWS.

13:28:59  2     A. I refer to it CAR summary.  I'm not sure

13:29:03  3   if everybody uses that term.

13:29:05  4     Q. So if you use the word CAR summary you're

13:29:08  5   understand that I'm referring to that in the box.

13:29:10  6   The note section of car summary who would have

13:29:13  7   written those notes?

13:29:13  8        MS. PAPEZ: Objection. Form.

13:29:17  9     A. It would have been a combination of the

13:29:22 10   what I will call the owner or the real estate

13:29:27 11   transaction manager for SFO 69 combined with their

13:29:30 12   finance partner with input from I mentioned some

13:29:33 13   of the program managers or project managers that

13:29:36 14   facilitate and colate this stuff between some

13:29:40 15   combination of those 3 people would try to

13:29:42 16   articulate as clearly and concisely as possible

13:29:47 17   the relevant details and why somebody's attention

13:29:51 18   is needed on this.

13:29:51 19   BY MR. LITTLE:

13:29:53 20       Q. On page 2 there appears to be text under a

13:29:57 21   title SFO 69 build-to-suit lease CAR that's 2

13:30:03 22   paragraphs and then a line.  What is this part of

13:30:07 23   CAR denote?

13:30:10 24           MS. PAPEZ: Objection. Form.

13:30:10 25   BY MR. LITTLE:

Page 102

13:30:11 1        Q. Let me restate that what's the purpose of

13:30:14 2    this part of CAR?

13:30:14 3            MS. PAPEZ: Objection. Form.

13:30:17 4        A. This is in its most brief form a kind of

13:30:20 5    an orientation or summary of what the proposed

13:30:24 6    transaction is.

13:30:26 7        Q. And the little bullets after that does it

13:30:28 8    give specific information about the proposed

13:30:32 9    transaction?

13:30:33 10       A. Yes.

13:30:34 11      Q. We've already talked about approvals so

13:30:37 12   I'm going to move down to line 25 the demand

13:30:40 13   statement of project drivers what is that?

13:30:40 14          MS. PAPEZ: Objection. Form.

13:30:47 15      A. This is -- this gets back to what is the

13:30:50 16   demand forecast say about customer demand in this

13:30:54 17   region over time.  What is our current supply

13:30:58 18   projection and then what would our projection be

13:31:00 19   or should be if we acquire this asset so you can

13:31:04 20   see to what degree does its solve for that demand.

13:31:04 21   BY MR. LITTLE:

13:31:11 22      Q. Same thing with line 38 the annual lease

13:31:13 23   rate what's the purpose of that section?

13:31:13 24          MS. PAPEZ: Objection. Form.

13:31:20 25      A. For this -- let me take a minute to read


                                                Page 103


13:31:23 1   it real quick. .  In this particular case it's a

13:31:40 2   build-to-suit lease it's a commercial structure

13:31:43 3   for the CAR that. Paragraph on annual lease rate

13:31:45 4   is basically taking the unit cost or norm lazed

13:31:55 5   cost of this particular transaction an compares it

13:31:58  6    to other transactions in the region to help us

13:32:00  7    gauge whether we're paying more or less than what

13:32:05  8    weld expect to pay.

13:32:05  9    BY MR. LITTLE:

13:32:07  10        Q. What team within the CAR process would

13:32:09  11   have provided that information?

13:32:09  12          MS. PAPEZ: Objection. Form.

13:32:15  13        A. Most of the data would have for this

13:32:18  14   transaction would come from the real estate

13:32:23  15   transaction manager the data from the previous

13:32:24  16   leases would have come from the real estate

13:32:26  17   transaction managers and the assembly of that data

13:32:29  18   and the comparison would be as I mentioned I think

13:32:33  19   earlier would be a joint review between the real

13:32:37  20   estate transaction manager and their finance

13:32:38  21   partner to make sure they agree they have

13:32:41  22   correctly represented the lease rates and they

13:32:43  23   have selected the appropriate properties for

13:32:45  24   comparison.

13:32:45  25   BY MR. LITTLE:

Page 104

13:32:46  1        Q. Can you turn to the next page there's only

13:32:49 2   two lines there but I'll ask about those?

13:32:51 3       A. Yes.

13:32:51 4       Q. What is a rent determinant?

13:32:54 5       A. Honestly I still don't have a good

13:32:59 6   understanding of what a rent determinant is.

13:33:02 7       Q. Have you ever heard of term yield?

13:33:03 8       A. I have heard of term yield yes.

13:33:06 9       Q. What do do you understand yield to mean?

13:33:09 10      A. I'm not going to be able to give you a gad

13:33:11 11  definition of yield.

13:33:13 12      Q. I do want to know what your definition or

13:33:16 13  understanding is what a your understanding of the

13:33:19 14  term yield in the context of build-to-suit

13:33:22 15  transactions?

13:33:22 16      A. I don't feel comfortable sharing I really

13:33:25 17  don't know I have seen yield comparison but I

13:33:29 18  can't tell you how they're determined or

13:33:30 19  calculated.

13:33:32 20      Q. What is a yield comparison mean to you?

13:33:36 21      A. Similar to the previous paragraph we

13:33:39 22  reviewed we would compare yield on one transaction

13:33:42 23  versus the yield on another and again to beige

13:33:44 24  what's different or same how different or what you

13:33:48 25  know are these.

13:33:49  1      Q. Are higher yelled or lower yield better

13:33:52  2   from Amazon from a financial prospective?

13:33:52  3         MS. PAPEZ: Objection. Form.

13:33:57  4      A. I don't know.  I really don't know because

13:34:01  5   I don't engage that that level of evaluation on

13:34:04  6   those yields.  I take the transaction managers.

13:34:04  7   BY MR. LITTLE:

13:34:10  8      Q. What do you understand an annual escalator

13:34:13  9   to be?

13:34:15 10      A. At a very high level my understanding is

13:34:18 11   what we can expect the cost -- our costs to change

13:34:22 12   over time.  How it might change or could change or

13:34:25 13   is allowed to change over time.

13:34:27 14      Q. Is there any time you have had an

13:34:30 15   understanding of what rent determinant means or

13:34:33 16   yield?

13:34:33 17         MS. PAPEZ: Objection. Form.

13:34:36 18      A. There have been -- yes, there have been

13:34:39 19   times when myself Khozem others have poked on rent

13:34:45 20   determinants largely that was a discussion between

13:34:52 21   say our finance partner and real estate

13:34:54 22   transaction I didn't have a lot to add to those

13:34:56 23   conversations.

13:34:56 24   BY MR. LITTLE:

13:34:57 25      Q.   When you are consider ago CAR that

                                              Page 106

13:34:58  1   include as line that discussions the yield, what

13:35:03  2   do you do with that information in making your

13:35:05  3   decision in whether or not to athe CAR?

13:35:08  4        MS. PAPEZ: Objection. Form.

13:35:16  5        A. As the business approver I'm doing one

13:35:18  6   thing an making sure its accounted for that its

13:35:20  7   explained and that we can stand by and say this is

13:35:26  8   an appropriate yield based on our knowledge in the

13:35:29  9   marketplace and previous transactions.

13:35:32 10        Q. Who would be the one to know where

13:35:34 11   something is an appropriate yield within a AWS CAR

13:35:39 12   process?

13:35:39 13        MS. PAPEZ: Objection. Form.

13:35:40 14        A. The real estate transaction and other

13:35:45 15   people in our -- some of our legal.

13:35:45 16   BY MR. LITTLE:

13:35:49 17        Q. Who do you rely upon when it comes to

13:35:52 18    yield determinants as to whether they were

13:35:55 19    favorable or not favorable to Amazon?

13:35:55 20         MS. PAPEZ: Objection. Form.

13:35:59 21         A. I rely on the real estate transaction

13:36:02 22    manager and their managers that do report to me

13:36:05 23    along with our finance partners and if I see the

13:36:07 24    two of them agree in applying their judgment to

13:36:14 25    say this is a good or reasonable yield then I

Page 107

13:36:16  1    approve it.

13:36:16  2    BY MR. LITTLE:

13:36:18  3         Q. Keith Klein testified yesterday that he

13:36:21  4    determined that some of yields in the star leases

13:36:24  5    were somehow above market rate are you aware that

13:36:27  6    he has come to that conclusion?

13:36:32  7         MS. PAPEZ: Objection. Form foundation?

13:36:35  8         A. I was not aware that Keith had come to

13:36:37  9    that conclusion until just now.

13:36:37 10    BY MR. LITTLE:

13:36:40 11         Q. Are you aware that anyone had come to that

13:36:41 12    conclusion?

13:36:42 13      A. In some of the documentation that I have

13:36:44 14  been presented with and reviewed and signed along

13:36:46 15  the way, I sue references to yield, I don't

13:36:48 16  remember the specifics.

13:36:50 17      Q. You don't know whether -- do you have a

13:36:53 18  present belief or whether or not the Northstar

13:36:55 19  leases that are issued in the present lawsuit had

13:36:58 20  a market rate yields?

13:36:58 21          MS. PAPEZ: Objection. Form.

13:37:07 22      A. I can't comment on market rate yields.  I

13:37:11 23  would some of Northstar transaction had a high

13:37:14 24  higher costs or were market rate in terms of total

13:37:19 25  net cost.

Page 108

13:37:19 1  BY MR. LITTLE:

13:37:20 2      Q.   How is your total net cost calculated if

13:37:23 3  not associated with a deal?

13:37:25 4          MS. PAPEZ: Objection. Form.

13:37:25 5      A. What I would be looking at would be based

13:37:27 6  on the rates that we are paying relative to market

13:37:30 7  or other transactions.

13:37:30 8  BY MR. LITTLE:

13:37:32  9    Q. What rates are you referring to?

13:37:34 10    A. Rents.

13:37:34 11    Q. Do you understand that there's a

13:37:36 12  relationship between yields and rents?

13:37:39 13    A. I believe.

13:37:42 14       MS. PAPEZ: Objection. Form.

13:37:43 15    A. Yes there's a relationship there.

13:37:43 16  BY MR. LITTLE:

13:37:45 17    Q.  If you were told that the yield is a

13:37:47 18  percentage that the developer receives in terms of

13:37:51 19  annual rent based on the total approved budget

13:37:54 20  would that refresh your recollection as to

13:37:55 21  conversations you may have had with others about

13:37:57 22  what yield means?

13:37:59 23       MS. PAPEZ: Objection. Form.

13:38:01 24    A. Tit doesn't refresh any conversations I

13:38:06 25  have had no.  The definition is helpful and makes

Page 109

13:38:09  1  sense but I don't recall any conversations I have

13:38:11  2  had specifically about yield.

13:38:11  3  BY MR. LITTLE:

13:38:14 4       Q. Do you doubt that that is how yield is

13:38:16 5   used in these transactions?

13:38:16 6           MS. PAPEZ: Objection. Form.

13:38:25 7       A. I don't know.

13:38:25 8   BY MR. LITTLE:

13:38:27 9       Q.   I want to drill down an make clear what

13:38:30 10  you understand and doesn't understand do you know

13:38:32 11  whether a higher yield or lower yield is better

13:38:35 12  for Amazon in terms of total cost structure?

13:38:41 13          MS. PAPEZ: Objection. Form.

13:38:42 14      A. Based on the differentings in addition you

13:38:43 15  just described a higher yield would imemploy a

13:38:46 16  higher cost.

13:38:46 17  BY MR. LITTLE:

13:38:48 18      Q.   Which would be better for Amazon?

13:38:50 19          MS. PAPEZ: Objection. Form.

13:38:50 20      A. A lower cost in this case probably a lower

13:38:55 21  yield would be better for Amazon.

13:38:55 22  BY MR. LITTLE:

13:38:57 23      Q. And generally whether or not you

13:38:59 24  understand a concept of yield your objective would

13:39:03 25  be to find a lower cost in Amazon in any

13:39:05  1    particular transaction is that fair?

13:39:05  2           MS. PAPEZ: Objection. Form.

13:39:10  3       A. Generally speaking yes lower cost is

13:39:12  4    better on our customers.

13:39:12  5    BY MR. LITTLE:

13:39:15  6       Q. On the current document we're looking at

13:39:17  7    here let's turn to page one again I apologize in

13:39:22  8    the middle of that paragraph there's a reference

13:39:24  9    to a developer's yield of 6.25 percent.  I just

13:39:28  10   want to see if you can find that section there?

13:39:30  11      A. I do see it.

13:39:31  12      Q. Is that accurate it say as developers

13:39:36  13   yield is 6. 25 percent is it not?

13:39:39  14      A. Yes, I see that.  Yes.

13:39:40  15      Q. And if you'll turn to page 3 I the rent

13:39:52  16   determinant is set at 6.25 percent do you see

13:39:55  17   that?

13:39:55  18      A. Yes, I do.

13:39:56  19      Q. There's average last two build-to-suit

13:40:01  20   projects but 6.3 percent is that what it says

13:40:05  21   there?

13:40:05  22      A. Yes.

13:40:06  23      Q. Were you aware when you reviewed in CAR

13:40:11  24   that the transaction manager who presented it had

13:40:17 25   received requests for proposals or responses with

Page 111

13:40:19  1   yields of 6 percent and 5.85 percent?

13:40:19  2          MS. PAPEZ: Objection. Form.

13:40:28  3      A. I don't recall knowing that or reviewing

13:40:30  4   that.

13:40:30  5   BY MR. LITTLE:

13:40:31  6      Q. If yield were to result in a lower net

13:40:34  7   cost to Amazon -- the lower yield were to result

13:40:37  8   in a lower net cost to Amazon is that something

13:40:40  9   you would want to be informed about in the process

13:40:43 10   of making decisions about CARs?

13:40:43 11          MS. PAPEZ: Objection. Form.

13:40:48 12      A. Generally speaking we do want to know what

13:40:51 13   other proposals or terms or yields were considered

13:40:58 14   and review and why our folks real estate

13:41:04 15   transaction manager finance partners believe this

13:41:06 16   is the right.

13:41:06 17   BY MR. LITTLE:

13:41:10 18      Q. I have got a few questions along that line

13:41:13 19   but I think we've been going now for an hour so

13:41:18 20   make a good time for a break I don't know if

13:41:20 21   anybody has other feelings?

13:41:23 22        A. I'm good.

13:41:26 23        MS. PAPEZ:  Do you want to do a short

13:41:27 24   break or letting people do some lunch.

13:41:31 25        MR. LITTLE:  Its still the morning for

Page 112

13:41:33  1   Chris and I'm sort of lunchtime as well if you

13:41:35  2   want to take an hour now I'm fine I would say I'm

13:41:38  3   more than halfway through.  So in terms of

13:41:40  4   estimating.  I think we have been on the record

13:41:42  5   for about 2:10 I would say we're not going to go

13:41:46  6   post4 or just maybe 4 hours so I'm halfway through

13:41:49  7   or close to halfway through.  So lunch is fine

13:41:52  8   with me if that's okay with anybody else I don't

13:41:56  9   know how the rest of the folks feel about it.

13:41:59 10        MS. PAPEZ:  Its for you would you like to

13:42:02 11   take a break a short one or eat something.

13:42:05 12        THE WITNESS:  I'm good to go.  I can keep

13:42:08 13   going to but I'm very happy to let you all grab a

13:42:12 14   bite to eat and it can be a short break whatever

13:42:15 15   you prefer.

13:42:18 16          MR. LITTLE:  We'll certainly need to take

13:42:20 17     a break before the end so do you want to say just

13:42:22 18     over half an hour to come back at 2:15 eastern.

13:42:28 19          MS. PAPEZ:  There's great I was going to

13:42:29 20     say maybe 30 minutes so we can keep it moving

13:42:33 21     that's great.

13:42:35 22          MR. LITTLE:  So it is currently 1:42

13:42:38 23     eastern and we'll come back at 2:15 eastern if

13:42:41 24     that works for everyone.

13:42:43 25          THE WITNESS:  Will do.

Page 113

13:42:44  1          MR. LITTLE:  All right.  Thank you.

13:42:46  2          THE VIDEOGRAPHER: Off the record at

13:42:50  3     1:42 p.m.

13:42:50  4          (A break was taken at 1:42 p.m.)

13:42:50  5          (Proceedings resumed at 2:20 p.m.)

14:20:59  6          THE VIDEOGRAPHER:  We are back on the

14:21:00  7     record at 2:20.

14:21:02  8          MR. LITTLE: Before we begin, I just want

14:21:03  9     to let my colleague put on th record the

14:21:04 10     understanding that he reached with Ms. Barrett

14:21:06 11   about the need to ask additional questions after

14:21:09 12   this deposition related to some discovery we ahd

14:21:09 13   not received.  Adam, it's all yours.

14:21:09 14        MR. SMART:  And I'll let -- Elizabeth

14:21:14 15   obviously we weigh in if I misstate something but

14:21:22 16   we just want make on the record that previously we

14:21:23 17   discussed that there is a CAR document or

14:21:24 18   documents related to amendments to the lease

14:21:30 19   transactions at issue in this case that are

14:21:32 20   currently being reviewed for potential content

14:21:35 21   that are privileged once that review takes place

14:21:38 22   think teal be produced but because that review

14:21:40 23   could not occur prior to this deposition and did

14:21:42 24   not occur before the one yesterday that the

14:21:46 25   understanding is that once we do to 30 (B)(6)

Page 114

14:21:49 1   deposition if there's still a need to ask question

14:21:51 2   of this witness and the witness yesterday on that

14:21:54 3   dollar topic that we will be allowed to do so and

14:21:57 4   my understanding is we will -- well I don't think

14:22:00 5   it will been an issue today and we will not come

14:22:03 6   near the 7 hours an it will be within that.

14:22:10  7        MS. PAPEZ:  I appreciate that.  That's my

14:22:12  8    understanding of the conversation this morning so

14:22:13  9    we're happy to have that on record and I expect

14:22:16 10    also that for purposes of today because full

14:22:21 11    candor I don't know exactly the scope of the

14:22:23 12    ongoing privilege review we're not looking to

14:22:25 13    instruct the witness not to answer questions today

14:22:27 14    and we're assuming that there won't be questions

14:22:31 15    that won't implicate that and if there is we

14:22:32 16    reserve the right to raise a privilege objection

14:22:35 17    and proceed from here.

14:22:39 18        MR. SMART:  That makes sense to me and it

14:22:41 19    could be you that raised them because we're

14:22:43 20    uncertain about something and the question that

14:22:44 21    may not be but that makes sense and we understand

14:22:48 22    the need for you to preserve.

14:22:52 23        MS. PAPEZ:  Exactly thanks so much.

14:22:52 24    BY MR. LITTLE:

14:22:54 25        Q. Mr. Vonderhaar are you ready to begin?

Page 115

14:22:57  1        A. Yes, sir.

14:22:57  2      Q. And you understand that you're still under

14:22:59  3  oath?

14:22:59  4      A. I do.

14:23:00  5      Q. I want to turn back again to the document

14:23:02  6  that we were looking at before, document 4 on your

14:23:08  7  screen I'm asking you a few more questions this is

14:23:10  8  the CAR document for SFO 69 we were looking at

14:23:13  9  previously.  Can you turn to page 6 please?

14:23:23  10     A. I'll there.

14:23:23  11     Q. Do you see section 5 titled how does this

14:23:26  12  deal compare to previous AWS transactions?

14:23:29  13     A. Yes, I do.  I'm going to enlarge it a

14:23:32  14  little bit.

14:23:41  15     Q. Who runs these analysis?

14:23:44  16         MS. PAPEZ: Objection. Form.

14:23:47  17  BY MR. LITTLE:

14:23:48  18     Q. On page 6 that we're looking at here?

14:23:51  19     A. That table and let me look at the contents

14:23:55  20  real quick.  So that table would be assembled

14:24:04  21  primarily by the lease transaction manager that

14:24:07  22  the date that the lease transaction manager would

14:24:12  23  gather and they would asimilarable most of this

14:24:15  24  data and they would work with their finance

14:24:16  25  partners to build this schedule.  Again joint

14:24:21  1   reviewed to make sure everything is accounted for

14:24:25  2   and make sure we're comparing the right

14:24:33  3   properties.

14:24:33  4   BY MR. LITTLE:

14:24:33  5       Q. Do you see there it has different cost

14:24:35  6   percentages, land cost per usuable acre, land cost

14:24:38  7   per acre, those sorts of calculation there is as

14:24:41  8   well?

14:24:41  9           MS. PAPEZ: Objection. Form.

14:24:43  10  BY DEFENSE COUNSEL:

14:24:44  11      Q. Do you see those forms?

14:24:45  12      A. Yes, the highlighted like rows 11, 12, 13

14:24:49  13  yes.

14:24:50  14      Q. And it billing these presumely based upon

14:24:54  15  the cost paid by Amazon?

14:24:54  16          MS. PAPEZ: Objection. Form.

14:24:58  17      A. These would be costs normalized costs for

14:25:01  18  comparison purposes across the set of properties.

14:25:01  19  BY MR. LITTLE:

14:25:06  20      Q. When you say set of properties you mean

14:25:07  21  properties of Amazons?

14:25:07  22          MS. PAPEZ: Objection. Form.

14:25:13 23    A. Generally yes, however it may be that we

14:25:16 24    were considering one or more properties and maybe

14:25:18 25    we haven't closed they will and we're comparing


Page 117


14:25:21  1    them to other things that we're lacking at that we

14:25:24  2    don't actually own or have.

14:25:24  3    BY MR. LITTLE:

14:25:27  4        Q. I'm going to turn back to page 1 so do you

14:25:35  5    see the column entitled site type?

14:25:39  6        A. Yes.

14:25:44  7        Q. What does it state there?

14:25:46  8        A. B T S.

14:25:47  9        Q. And that refers to?

14:25:49 10        A. Build-to-suit.

14:25:51 11        Q. And so this CAR appears to be relate today

14:25:54 12    a build to suit transaction is it not?

14:25:58 13        A. I believe so.  Yes.

14:25:59 14        Q. And the build-to-suit transaction I think

14:26:01 15    you previously testified that you worked with

14:26:05 16    developer.  Do you know whether the developer

14:26:07 17    chosen to work with Amazon in the B T S is listed

14:26:10 18   somewhere in the CAR?

14:26:10 19        MS. PAPEZ: Objection. Form.

14:26:14 20        A. I don't know for certain but it usually

14:26:18 21   comes out somewhere either in the discussion or it

14:26:22 22   probably is somewhere in the detail CAR documents.

14:26:25 23        Q.

14:26:26 24   BY DEFENSE COUNSEL:

14:26:27 25        Q. What factors about the developers that you

Page 118

14:26:29 1    work with are included in the CAR documents on a

14:26:32 2    regular basis?

14:26:32 3         MS. PAPEZ: Objection. Form.

14:26:34 4         A. Predominantly its more about -- its more

14:26:38 5    about the fees and the structures and the details.

14:26:46 6    Occasionally I can remember asking the developers

14:26:49 7    make that are new that we haven't worked with or

14:26:52 8    certainly if there was something about the

14:26:54 9    developer that was out of the ordinary in terms of

14:27:00 10   either our relationship with them or maybe the

14:27:02 11   relationship of our employees with those

14:27:05 12   developers.

14:27:05 13   BY MR. LITTLE:

14:27:06 14        Q. Can you give me an example of ladder

14:27:08 15    category you just testified about?

14:27:10 16        A. If we were working an a developer and

14:27:13 17    let's say we were working with a developer that

14:27:16 18    had some relationship with Amazon prior to

14:27:20 19    relationship, good or bad or perhaps relationship

14:27:24 20    or prior history with employees who are applying

14:27:30 21    judgements and making decisions about this those

14:27:33 22    are the things that we want to explore and

14:27:37 23    understand.

14:27:37 24    BY MR. LITTLE:

14:27:38 25        Q. Has that ever been I colluded in a CAR

Page 119

14:27:41  1    that you can recall?

14:27:41  2            MS. PAPEZ: Objection. Form.

14:27:44  3        A. I don't ever recall in the CARs that I

14:27:48  4    have approved where we've seen any improper

14:27:50  5    relationships called out.

14:27:50  6    BY MR. LITTLE:

14:27:52  7        Q. I'm asking more broadly whether any

14:27:54  8    relationship between an Amazon employee and a

14:27:57 9   developer has ever been discussed in a CAR that

14:27:59 10   you have seen?

14:27:59 11       MS. PAPEZ: Objection. Form.

14:28:04 12     A. No.  I mean, I have seen developer names

14:28:08 13   called out and maybe there's something interesting

14:28:10 14   about a developer that we have a discussion about.

14:28:13 15   I don't really recall anything that was

14:28:16 16   significant if you will about this.

14:28:16 17   BY MR. LITTLE:

14:28:19 18     Q. Is there any section of the CAR that's

14:28:24 19   devoted to the discussion that you have just

14:28:26 20   testified about?

14:28:26 21       MS. PAPEZ: Objection. Form.

14:28:27 22     A. In terms of kind of a profile about the

14:28:31 23   developer or information about the developer, I

14:28:35 24   don't recall seeing a dedicated section however

14:28:37 25   these CAR documents its perhaps you have seen this

Page 120

14:28:40 1   one and others, we flex and we put the information

14:28:45 2   we need generally in the form of a frequently

14:28:48 3   asked question or FAQ so just because there's not

14:28:55 4   a place holder in the template a profile developer

14:28:58  5   if there was something you need or out of ordinary

14:29:01  6   we would explain it in a paragraph perhaps as an

14:29:03  7   FAQ.

14:29:03  8   BY MR. LITTLE:

14:29:05  9       Q. Can you recall any CAR that include as FAQ

14:29:08 10   about a developers capabilities?

14:29:08 11       MS. PAPEZ: Objection. Form.

14:29:16 12       A. I don't recall a specific CAR but I do

14:29:18 13   recall conversations in the past use the cord

14:29:21 14   capability.  We have in some places especially

14:29:28 15   where we're working with the new developer less in

14:29:32 16   the U.S. but places elsewhere we will ask the

14:29:34 17   question why the we think this developer can

14:29:37 18   deliver.

14:29:37 19   BY MR. LITTLE:

14:29:38 20       Q. You mentioned working with new developers

14:29:40 21   a few times.  Why do you work with new developers

14:29:44 22   as opposed to only the same developer?

14:29:44 23       MS. PAPEZ: Objection. Form.

14:29:47 24       A. I don't know that I may have used the word

14:29:52 25   new and if I did use the word new I think its more

14:29:55  1   generally do we -- how much information do we

14:29:57  2   explore or require about a developer whether we've

14:30:02  3   worked for them in the past whether they're new.

14:30:04  4   I really wasn't intentionally zoning in on new.

14:30:04  5   BY MR. LITTLE:

14:30:09  6       Q. For the purpose of these questions when I

14:30:10  7   say a new developer it's a developer new to

14:30:13  8   working with Amazon on a datacenter construction

14:30:17  9   project we can agree on that definition for these

14:30:25 10   series of questions right now?

14:30:25 11       MS. PAPEZ: Objection. Form.

14:30:27 12       A. We can use that definition.

14:30:27 13   BY MR. LITTLE:

14:30:33 14       Q. What are some of develop everys that you

14:30:34 15   recall Amazon working with to increase capacity in

14:30:38 16   the Americas?

14:30:44 17       A. Other than some of developer names that

14:30:48 18   are in this case that I'm familiar with -- other

14:30:50 19   developer names it's not something that we spend a

14:30:53 20   lot of time on.

14:30:53 21   BY MR. LITTLE:

14:30:59 22       Q. Would it be considered prudent to use a

14:31:01 23   variety of developers for competitive reasons?

14:31:01 24       MS. PAPEZ: Objection. Form.

14:31:07 25      A. In some cases yes, its good, not -- it is

Page 122

14:31:10  1  good to have more than one developer or several

14:31:14  2  developers at a that we can access and work with.

14:31:20  3  Yes that's a good thing.

14:31:21  4      Q. Is it your understanding that your lease

14:31:25  5  agreement and agreements relate today B T S -- sit

14:31:28  6  your understanding that when you make an agreement

14:31:29  7  with a developer to build a datacenter those

14:31:32  8  agreements include completion guarantees?

14:31:32  9      MS. PAPEZ: Objection. Form.

14:31:39 10      A. I'm not familiar with the completion

14:31:41 11  guarantee term.

14:31:41 12  BY MR. LITTLE:

14:31:43 13      Q. Do you believe that Amazon would be

14:31:44 14  obligate today pay anything if a developer failed

14:31:46 15  to perform its obligation to build a datacenter?

14:31:46 16      MS. PAPEZ: Objection. Form.

14:31:55 17      A. If the developer failed to perform and

14:31:56 18  failed to deliver as per the terms of the contract

14:32:00 19  and agreement, I am sure that we would pursue that

14:32:05 20  and seek the appropriate remedies reliabilities.

14:32:05 21   BY MR. LITTLE:

14:32:10 22       Q. Amazon would have some protections when it

14:32:12 23   works with new developers would it not?

14:32:12 24           MS. PAPEZ: Objection. Form.

14:32:17 25       A. Yes, I believe we include protections when

Page 123

14:32:19  1   we're working with new and or new developers.

14:32:19  2   BY MR. LITTLE:

14:32:24  3       Q. Are you aware that individual transaction

14:32:27  4   managers in real estate were encouraged to seek

14:32:31  5   out additional developers in an effort to drive

14:32:34  6   down costs?

14:32:34  7           MS. PAPEZ: Objection. Form.

14:32:39  8       A. I'm not aware of that specific directive

14:32:42  9   no.

14:32:42 10   BY MR. LITTLE:

14:32:43 11       Q. Would you have any reason to doubt that

14:32:45 12   was a directive given to real estate transaction

14:32:48 13   manager in 2018?

14:32:48 14           MS. PAPEZ: Objection. Form.

14:32:50 15       A. I don't have any reason to doubt that we

14:32:52 16   would seek to broaden our portfolio of partners to

14:32:56 17   work with.

14:32:56 18   BY MR. LITTLE:

14:33:01 19      Q. In the document that we have been looking

14:33:02 20   at here still exhibit K K O 4 we talked about the

14:33:06 21   break before it had to include a yield of 6.25

14:33:10 22   percent if there was a -- well I guess before we

14:33:15 23   get there.  Do you understand what a request for

14:33:17 24   proposal is also known as and RFP?

14:33:21 25      A. Yes, generally I'm familiar with an RFP.

Page 124

14:33:28 1      Q. What is a RFP?

14:33:32 2      A. At the high level it's a documented set of

14:33:36 3   an ask -- of a group whether it be real estate or

14:33:40 4   somebody else so that we have this problem or this

14:33:43 5   opportunity or this goal here's the nature of this

14:33:46 6   we would -- we invite you as a vendor or partner

14:33:49 7   to reply to this RFP and respond with your

14:34:00 8   qualifications and proposals on how to meet our

14:34:01 9   business needs reflected in our

14:34:02 10   BY MR. LITTLE:

14:34:03 11      Q. Who generally in the real estate side

14:34:05 12   would send RFPs to developers?

14:34:12 13       A. I believe it would be predominantly

14:34:17 14   constructed by the  real estate transaction

14:34:20 15   managers in concert with our legal partner as

14:34:22 16   perhaps other people in the business to make sure

14:34:24 17   they were complete, accurate, etc.

14:34:32 18       Q. Are you aware whether Amazon has a policy

14:34:34 19   related to the RFP process?

14:34:38 20           MS. PAPEZ: Objection. Form.

14:34:40 21       A. I'm not aware of particular policies of

14:34:43 22   the RFP process.

14:34:43 23   BY MR. LITTLE:

14:34:44 24       Q. Many f you're not aware of them who do you

14:34:47 25   think would be?

Page 125

14:34:48  1       A. Most definitely our in house legal counsel

14:34:50  2   an partners and I would expect that certainly the

14:34:53  3   business owners engaging in an RFP process to

14:34:56  4   understand structure of rule policies, etc.

14:35:01  5       Q.

14:35:09  6       Q. Was there a time when development of

14:35:11  7   datacenter was a single source to a single

14:35:14  8   developer?

14:35:14  9       MS. PAPEZ: Objection. Form.

14:35:16 10       A. I don't recall.

14:35:16 11   BY MR. LITTLE:

14:35:18 12       Q. Have you ever heard of developer COPT?

14:35:21 13       A. Not by that acronym.

14:35:29 14       Q. Or COPT?

14:35:31 15       A. No.

14:35:32 16       Q. Are you aware in the course of site

14:35:41 17   selection, site transaction mangers and others

14:35:43 18   individual in the real estate department at Amazon

14:35:43 19   used brokers who were outside agents of Amazon?

14:35:43 20       MS. PAPEZ: Objection. Form.

14:35:48 21       A. I'll aware that from time to time brokers

14:35:52 22   have perhaps identified or broughts that we would

14:35:59 23   look at.

14:35:59 24   BY MR. LITTLE:

14:36:00 25       Q. Are you aware that brokers would help

Page 126

14:36:03  1   assist in the RFP process?

14:36:03  2       MS. PAPEZ: Objection. Form.

14:36:07  3      A. I don't know specifically.  They may.  I

14:36:10  4   can see why they might.

14:36:10  5   BY MR. LITTLE:

14:36:14  6      Q. Are you aware that Amazon and AWS uses a

14:36:18  7   few particular brokers?

14:36:18  8         MS. PAPEZ: Objection. Form.

14:36:23  9      A. Yes, I'm aware that from time to time we

14:36:25 10   have engaged commercial real estate brokers to

14:36:30 11   assist us this finding.

14:36:30 12   BY MR. LITTLE:

14:36:32 13      Q. Have you heard of K B C advisors?

14:36:35 14      A. I haven't heard of that one.

14:36:37 15      Q. You have not heard of K B C?

14:36:40 16      A. No.

14:36:40 17      Q. Would it surprise you that there are K B C

14:36:46 18   brokers who are provided with Amazon badges access

14:36:50 19   to the building?

14:36:50 20         MS. PAPEZ: Objection. Form.

14:36:56 21      A. No.  It wouldn't surprise me that a broker

14:36:59 22   that our team was working with what we would call

14:37:03 23   a yellow badge, a vendor.  Yellow badges are that

14:37:08 24   we work with over tile are given badge access to

14:37:11 25   they can come to our facilities an meet with us.

14:37:15  1   It doesn't surprise me.

14:37:16  2       Q. Are brokers also given Amazon e-mail

14:37:19  3   accounts?

14:37:19  4       MS. PAPEZ: Objection. Form.

14:37:24  5       A. If they are a yellow badge vendor, then

14:37:27  6   yeah they get a badge and e-mail account because

14:37:30  7   they're doing transactions or business with us.

14:37:30  8   BY MR. LITTLE:

14:37:33  9       Q. And to be clear they would mean they have

14:37:34 10   an e-mail account that would look similar to an

14:37:37 11   exterm party as if it were an Amazon employee?

14:37:37 12       MS. PAPEZ: Objection. Form.

14:37:42 13       A. I believe that's true.  Yes.

14:37:42 14   BY MR. LITTLE:

14:37:48 15       Q. The term I used COPT stands for Corporate

14:37:52 16   Office Properties Trust does that ring any bells

14:37:55 17   as the developer you have worked with?

14:37:57 18       A. No.

14:37:57 19       Q. I'm going to show you what's marked here

14:38:04 20   as Exhibit 4.  I'm going to show up as document 5?

14:38:09 21              (Exhibit 4 was marked.)

14:38:13 22       A. I have it up on my screen.

14:38:16 23      Q. In the top it appears ton an e-mail from

14:38:20 24   Jason /KWEUPB tell to Todd Meldahl.  Do you know

14:38:22 25   who Todd Meldahl is?

Page 128

14:38:24  1      A. I do not.

14:38:26  2      Q. Okay.  The individual in the C C are John

14:38:30  3   Parsons, Keith Klein, Robert get /RER /RA and Rob

14:38:35  4   Rakusin, R-A-K-U-S-I-N.  Do you know who any of

14:38:39  5   those individuals are?

14:38:40  6      A. I know John and Keith.

14:38:42  7      Q. Who are they?

14:38:45  8      A. John and Keith are currently members of

14:38:49  9   our real estate team.

14:38:50 10      Q. And the first sentence reads the first

14:38:52 11   e-mail begins reads Todd think again for the

14:38:56 12   opportunity to respond to an RFP for A P S data

14:39:00 13   center in Gilroy, California.  Based on that is it

14:39:04 14   reasonable to believe that this is response to an

14:39:07 15   RFP submitted by Amazon?

14:39:11 16      MS. PAPEZ:  Objection form foundation.

14:39:13 17      A. Based on what I'm reading yes.

14:39:13 18   BY MR. LITTLE:

14:39:17 19     Q. And ask you to turn to page 2?

14:39:24 20     A. Okay.

14:39:24 21     Q. Do you see the first paragraph there?

14:39:26 22     A. Yes, sir.

14:39:27 23     Q. And you so it sees reads request for

14:39:29 24     proposal for tenants lease of premises any

14:39:33 25     information given to you in connection with RFP

Page 129

14:39:35 1      and all responses and your responses are all

14:39:38 2      confidential information under the nondisclose

14:39:41 3      your agreement this provided with that RFP based

14:39:45 4      on reading that would you believe this to be an

14:39:48 5      RFP form that's been provided at some point?

14:39:52 6          MS. PAPEZ: Objection. Form.

14:39:52 7      A. Yes, based on what I'm reading.  Yes.

14:39:52 8      BY MR. LITTLE:

14:39:56 9      Q. And on the first page there's a reference

14:39:58 10     to gill Roy -- subject AWS gill row RFP; is that

14:40:04 11     right?

14:40:04 12     A. Yes.

14:40:06 13     Q. I want to turn your attention to page 3

14:40:09 14   the first row where it says base rent?

14:40:16 15      A. Okay.

14:40:17 16      Q. Do you see a reference in the right hand

14:40:19 17   column to a development yield?

14:40:25 18      A. Yes, I do.

14:40:26 19      Q. What is that development yield?

14:40:31 20      A. It says the -- I see it as a 204,750

14:40:39 21   dollars per month.

14:40:40 22      Q. What is the percentage calculation of that

14:40:44 23   expressed as a percentage?

14:40:46 24      A. I see 5.85 percent.

14:40:51 25      Q. Do you recall the RFP that went up for SFO

Page 130

14:40:58 1   69 the gill Roy site had a developer yield of 6.25

14:41:02 2   percent.  5.85 is 40 basis points below 6.25

14:41:08 3   percent is it not?

14:41:08 4         MS. PAPEZ: Objection. Form.

14:41:12 5      A. Yes.

14:41:12 6   BY MR. LITTLE:

14:41:12 7      Q. You can look at the last document if you

14:41:14 8   wish but is there any reference in the last

14:41:16 9   document to -- actually tile direct you to a

14:41:19 10    specific provision.  Hold on.  We're going to back

14:41:23 11    now to document 4.

14:41:27 12          Are there generally in CARs a section that

14:41:30 13    talks about alternatives to the proposal in a CAR

14:41:30 14          MS. PAPEZ: Objection. Form.

14:41:41 15       A. We would ask our real estate transaction

14:41:44 16    managers if they were more than one property

14:41:46 17    considered how did they arrive at their

14:41:48 18    recommendation for a particular property and what

14:41:51 19    comparisons did they use, what judgment did they

14:41:54 20    apply in selecting a property.

14:41:54 21    BY MR. LITTLE:

14:42:01 22       Q. Is that the section in the information

14:42:02 23    provided on page 7 Section 8 of this CAR at

14:42:07 24    exhibit K K 04?

14:42:09 25       A. Can I take a quick peek at that one.

Page 131

14:42:13 1       Q. Page 7 is line 9 through 19?

14:42:28 2       A. Yes I think that highlights or summarizes

14:42:31 3    what other all attorney ITs or options are fall

14:42:34 4    back plan.

14:42:35  5      Q. Is there any reference in that section to

14:42:38  6   the potential of getting a ideal that was 40

14:42:42  7   percent lower?

14:42:42  8          MS. PAPEZ: Objection. Form.

14:42:45  9      A. I don't see any references in Section 8 to

14:42:48 10   yield.

14:42:48 11   BY MR. LITTLE:

14:42:49 12      Q. Can you think of any reason why a

14:42:51 13   transaction manager would not put a substantially

14:42:55 14   lower yield proposal into a CAR like this?

14:43:00 15          MS. PAPEZ:  Objection form foundation.

14:43:01 16      A. Actually yeah, yield is only one piece of

14:43:08 17   information that we use to make decisions about

14:43:11 18   properties.  Lots of other things are -- I

14:43:15 19   shouldn't say lots. Other factors need to be

14:43:19 20   considered including fit of the property,

14:43:22 21   availability of the property, perhaps attributes

14:43:24 22   of property.  So yield is important but it's not

14:43:27 23   the only decision criteria.

14:43:27 24   BY MR. LITTLE:

14:43:31 25      Q. Thank you.  Give me one moment just

14:43:46  1    jumping sections here.

14:43:48  2           So are you familiar with the lease

14:43:52  3    transactions and purchase transactions that are

14:43:54  4    the subject of the lawsuit in which you're

14:43:56  5    presently being deposed in

14:43:59  6        A. I am reasonably familiar with the

14:44:01  7    transactions.  Yes.

14:44:03  8        Q. I'm going to talk about two in particular.

14:44:09  9    IAD 170 and IAD 156 when I say those two terms do

14:44:15 10    you know what they mean?

14:44:16 11        A. They would be reference to our building

14:44:19 12    codes.

14:44:19 13        Q. Are the bidding codes that are related to

14:44:21 14    this lawsuit?

14:44:21 15           MS. PAPEZ: Objection. Form.

14:44:27 16        A. I'm not entirely sure about the specific

14:44:30 17    numbers.  I don't have all the numbers memorized

14:44:37 18    that are in the lawsuit.

14:44:37 19    BY MR. LITTLE:

14:44:40 20        Q. I'm going to show you what's going to be

14:44:42 21    marked as document 6 will be marked as Exhibit 5?

14:44:46 22              (Exhibit 5 was marked.)

14:44:48 23           MR. LITTLE:  Just take a chance to pull

14:44:49 24    that document up and weapon oar going to start on

14:44:51 25    the first page.

14:44:52   1      A. I am there.

14:44:53   2      Q. This first page apierce to depict a table

14:44:58   3   does it not?

14:44:59   4      A. It does.

14:45:00   5      Q. It titled at that top DCGS and IGE weekly

14:45:05   6   CAR summary.  What do those acronyms mean that

14:45:08   7   that title?

14:45:09   8      A. DCGS Datacenter Global Services and IGE is

14:45:20   9   Infrastructure Global Expansion.

14:45:24  10      Q. Is to when you mentioned in prior

14:45:26  11   testimony that you would have these CARs come

14:45:28  12   together as a group is this what you mean there's

14:45:32  13   group of them presented in this fashion?

14:45:32  14         MS. PAPEZ: Objection. Form.

14:45:35  15      A. Yes.

14:45:35  16   BY MR. LITTLE:

14:45:37  17      Q. Here, this document appears to include

14:45:41  18   information about 8 different CARs; is that right?

14:45:46  19      A. There's a 9th on the second page but yes.

14:45:49  20      Q. Yes.  I apologize 9.  Do you see the right

14:45:52 21   hand column what appear to be a number of

14:45:54 22   comments?

14:45:56 23       A. Yes.

14:45:56 24       Q. Do those comments doe note different

14:46:01 25   individuals making changes to this document?

Page 134

14:46:01  1       MS. PAPEZ: Objection. Form.

14:46:08  2       A. Yes you're talking at the comments in the

14:46:10  3   shaded portion the collars comments.

14:46:10  4   BY MR. LITTLE:

14:46:14  5       Q. That's correct?

14:46:14  6       A. Yes.  Those would be reviewers comments on

14:46:18  7   things that needed to be clarified or concluded,

14:46:22  8   added.

14:46:23  9       Q. So for example at the bottom we'll use the

14:46:27 10   last one comment has M M 15414 chan time provided

14:46:33 11   supply brimming for 920 TKE still need demand to

14:46:38 12   supply additional route cause that comment you

14:46:41 13   believe was made by someone involved in the CAR

14:46:44 14   process?

14:46:44 15       MS. PAPEZ: Objection. Form.

14:46:46 16       A. I assume so based on this document and

14:46:50 17    some of the commentary.  I don't know M M 15 and

14:46:56 18    doesn't remember.

14:46:56 19    BY MR. LITTLE:

14:46:59 20        Q. Understood I'm using it as an example and

14:47:02 21    there's request there for demand to explain

14:47:04 22    additional route cause correct?

14:47:06 23        A. Yes.

14:47:07 24        Q. To inquiries like that were fairly common

14:47:10 25    as a CAR document was sent up and down the chain

Page 135

14:47:13  1    is that fair to say?

14:47:13  2            MS. PAPEZ: Objection. Form.

14:47:16  3        A. Yes.  As details were assembled as I went

14:47:22  4    through various reviews people would ask for

14:47:24  5    additional explanation or clarification.

14:47:26  6        Q. So if you'll turn to page 3?

14:47:32  7        A. Okay I'm there.

14:47:33  8        Q. And page 4.  Could you tell me generally

14:47:37  9    what page 3 and 4 involve?

14:47:37 10            MS. PAPEZ: Objection. Form.

14:47:50 11        A. Page 3 and 4 provide a summary of a

14:47:54 12   proposed land acquisition in this case IAD 156

14:47:59 13   along with I would call it the standard or

14:48:04 14   requires details project total CARer nest money in

14:48:09 15   O P 2 as well as a set of F A Qs explaining things

14:48:13 16   that are out of ordinary that we want an

14:48:17 17   explanation.

14:48:17 18   BY MR. LITTLE:

14:48:21 19       Q. So one of FAQs is why land acquisition and

14:48:26 20   not build-to-suit.  Is that a common FAQ?

14:48:26 21           MS. PAPEZ: Objection. Form.

14:48:34 22       A. At this time -- yeah, we wanted to

14:48:37 23   understand why we decided to go with one deal

14:48:40 24   structure versus another deal structure and

14:48:43 25   understand the economics.

Page 136

14:48:43  1   BY MR. LITTLE:

14:48:46  2       Q. The deal structures at the time were they

14:48:48  3   predominantly build to suitors or predominantly

14:48:53  4   land acquisition in 2018?

14:48:53  5           MS. PAPEZ: Objection. Form.

14:48:56  6       A. I don't recall the mix honestly.

14:48:56  7   BY MR. LITTLE:

14:48:59  8      Q. The question seems to suggest that it

14:49:03  9   would generally have been build-to-suit being

14:49:06 10   predominant and asking why that would not be the

14:49:10 11   case in this scenario or is there a different

14:49:12 12   interpretation that you have of that question?

14:49:12 13          MS. PAPEZ: Objection. Form.

14:49:15 14      A. I don't -- I don't read there's a

14:49:19 15   preference or a directive or expectation based on

14:49:23 16   the form of the question I think that's the way

14:49:24 17   the person who filled this in chose to articulate

14:49:27 18   the question.

14:49:27 19   BY MR. LITTLE:

14:49:28 20      Q. Was Amazon agnostic about which method of

14:49:32 21   using acquisition through land acquisition or

14:49:35 22   build-to-suit so long as the decision made was the

14:49:39 23   best financial decision for Amazon?

14:49:39 24          MS. PAPEZ: Objection. Form.

14:49:47 25      A. I would say yes in general.  Amazon was

Page 137

14:49:52  1   agnostic.  We wanted the best assets that suited

14:49:55  2   our business most appropriately with the best

14:50:00  3    financial profile over the long term.  We were

14:50:05  4    aware and cognizant of the mix between build to

14:50:10  5    suit and land.  There was a kind of an opinion if

14:50:14  6    you will that its good to have a mission of both

14:50:19  7    over the long term there were varying opinions I

14:50:23  8    wasn't conclusive and I'm not going to say -- it

14:50:25  9    certainly was an explicit target or expectation

14:50:29 10    that the company had around the mix.

14:50:29 11    BY MR. LITTLE:

14:50:32 12        Q. Would the reason for the mix to mitigate

14:50:34 13    risk for own ago particular type of asset?

14:50:34 14            MS. PAPEZ: Objection. Form.

14:50:41 15        A. When we considered build-to-suit initially

14:50:44 16    it would be the thought was that having some

14:50:49 17    number of properties and capacity in build-to-suit

14:50:53 18    in your portfolio over the long term was

14:50:56 19    beneficial in the event, the unlikely event that

14:51:01 20    our demand started to taper off and go to the

14:51:05 21    other direction and without knowing what land

14:51:08 22    prices were going to look like that build-to-suit

14:51:11 23    gave us an option with a term where if we wanted

14:51:14 24    to we could chose to exit or renew at different

14:51:17 25    rates so it was that mix was deemed to be kind of

14:51:20  1  or thought to be helpful.

14:51:20  2  BY MR. LITTLE:

14:51:24  3      Q. Are you aware that the descriptions you're

14:51:26  4  providing came from a strategy document that Carl

14:51:30  5  Nelson had provided to global real estate in his

14:51:33  6  early years with the company?

14:51:33  7          MS. PAPEZ: Objection. Form.

14:51:36  8      A. I'm not aware of that exact opinion being

14:51:38  9  a specific document.  I am aware that Carl -- that

14:51:44 10  Carl and others advocated for that position an

14:51:49 11  spent time educating myself and others about why

14:51:52 12  that would be beneficial for Amazon.

14:51:52 13  BY MR. LITTLE:

14:51:55 14      Q. On this document we're lacking at here

14:51:56 15  page 3, it lists approvers, correct?

14:51:59 16      A. Yes.

14:52:01 17      Q. Do you know whether those were ultimately

14:52:05 18  the only approvers who were necessary for this

14:52:07 19  deal?

14:52:07 20          MS. PAPEZ: Objection. Form.

14:52:15 21      A. You know I would say it seems a little odd

14:52:19 22  that either myself or depending on the time frame

14:52:22 23  another L 10 is not on that approval chain.

14:52:22 24  BY MR. LITTLE:

14:52:27 25       Q. Is it possible that other approvals were

                                                          Page 139

14:52:30  1  necessary that aren't reflected there?

14:52:31  2       A. It is possible.

14:52:32  3       Q. I'm going to show you the next exhibit.

14:52:36  4  Its going to be document 7 exhibit CV 6?

14:52:41  5             (Exhibit 6 was marked.)

14:52:43  6       A. Okay I have it up.

14:52:43  7  BY MR. LITTLE:

14:52:45  8       Q. Does this appear to be a printout from

14:52:47  9  your approval tool related to the CAR for IAD 156

14:52:53 10  land acquisition?

14:52:53 11          MS. PAPEZ: Objection. Form.

14:52:56 12       A. Yes that's -- I see that.

14:52:58 13  BY MR. LITTLE:

14:52:58 14       Q. If you turn to page 2 does its list the

14:53:02 15  future approvers?

14:53:04 16       A. Yes, it does.

14:53:05 17       Q. Are you listed as a future approver of I

14:53:14 18  IAD 156 land acquisition?

14:53:16 19     A. Yes, I am.

14:53:17 20     Q. So let's turn back to the other documents.

14:53:19 21  I apologize?

14:53:20 22     A. Document 6 right.

14:53:21 23     Q. Yes. .  So if you turn to page 5 there is

14:53:26 24  information about IAD 170 land acquisition

14:53:34 25  correct?

Page 140

14:53:34  1     A. Yes.

14:53:34  2     Q. What is page 5 and 6 of this document?

14:53:34  3        MS. PAPEZ: Objection. Form.

14:53:42  4     A. Similar to IAD 156 this is a proposal for

14:53:46  5  another land acquisition inclusive of standard

14:53:53  6  empletized information at the top of page 5

14:53:55  7  followed by F A Qs that discuss any of the unique

14:54:00  8  attributes or discussion points about this

14:54:04  9  particular transaction.

14:54:06 10     Q. Are you listed as one of the approvers of

14:54:08 11  this document IAD 170?

14:54:15 12     A. No I'm not listed on this document.

14:54:16 13     Q. Does that surprise you?

14:54:16 14        MS. PAPEZ: Objection. Form.

14:54:22 15      A. Mildly.  What I would point out is that

14:54:24 16   these are water documents typed by human occasion

14:54:29 17   untilly they have typos inclusions exclusions,

14:54:32 18   misspelled words grammatical errors it does not

14:54:36 19   surprise me greatly to see that the word document

14:54:39 20   as we saw in the last one was perhaps out of

14:54:43 21   singing with the approval tool.

14:54:45 22      Q. I'm going to show you the to approval tool

14:54:49 23   for this one as well I will going to be document 8

14:54:51 24   exhibit CV 07?

14:54:53 25                  (Exhibit 7 was marked.)

Page 141

14:54:54 1               MR. LITTLE:  Let me know when that's on

14:54:55 2   your screen

14:54:56 3      A. I have it.

14:54:57 4      Q. Does that appear to be a printout from the

14:54:59 5   approval tool for IAD 170 land acquisition?

14:55:03 6      A. It appears to be.

14:55:12 7      Q. On page 2 are you listed as one of

14:55:15 8   approval?

14:55:17 9      A. Yes.

14:55:18 10      Q. Do you believe you are an approval on both

14:55:22 11   IAD 156 and 170?

14:55:22 12         MS. PAPEZ: Objection. Form.

14:55:26 13      A. Cothink I was an aver on these

14:55:30 14   transactions.

14:55:30 15   BY MR. LITTLE:

14:55:31 16      Q. Okay sitting here today do you have any

14:55:34 17   memory of those processes?

14:55:34 18         MS. PAPEZ: Objection. Form.

14:55:36 19      A. I don't I don't have any recollection

14:55:38 20   about the details of these two particular land

14:55:41 21   acquisitions purchases other than what I just saw

14:55:43 22   and read.

14:55:43 23   BY MR. LITTLE:

14:55:45 24      Q. More generally do you have any particular

14:55:47 25   memories today of the transactions that led to

Page 142

14:55:53 1   any -- sorry the CAR processions that led to any

14:55:55 2   of the transactions at issue in the present

14:55:57 3   lawsuit that you're testifying about today?

14:55:57 4         MS. PAPEZ: Objection. Form.

14:56:01 5      A. I'm familiar with based on some of the

14:56:04 6    documents that I reviewed and sign tad there are

14:56:06 7    set of transactions build-to-suit transactions the

14:56:10 8    number I remember is 9 as well as two and might be

14:56:15 9    these two land properties that were flipped -- I

14:56:20 10   remember reading about that in some of the court

14:56:22 11   documents and so but beyond that I do not

14:56:26 12   recollect that the discussions that occurred back

14:56:31 13   in 2019 about these transactions.

14:56:31 14   BY MR. LITTLE:

14:56:35 15       Q. Okay thank you.  Would you have any notes

14:56:37 16   or other information from 2019 that would refresh

14:56:42 17   your recollection about those discussions?

14:56:42 18          MS. PAPEZ: Objection. Form.

14:56:47 19       A. I do not have think notes all I have are

14:56:50 20   these documents.

14:56:50 21   BY MR. LITTLE:

14:57:04 22       Q. Give me one minute I'm pulling up another

14:57:07 23   document when you say there are documents that you

14:57:15 24   have signed relate today these transactions, what

14:57:18 25   documents are you referring to?

Page 143

14:57:19  1      A. They were leading up to these proceedings

14:57:22  2   they were -- I think there were 2 maybe 3

14:57:28  3   documents that I signed as on on behalf of the

14:57:31  4   company.

14:57:34  5      Q. Were these purchase agreements or some

14:57:36  6   other type of documents?

14:57:44  7      A. They were more around the complaint and

14:57:50  8   the response and the dialogue back and forth

14:57:54  9   specific to the proceedings here in this case.

14:57:57  10      Q. I understand.  Deck declarations and

14:58:01  11   things of that sort?

14:58:01  12         MS. PAPEZ: Objection. Form.

14:58:04  13      A. Yes.

14:58:04  14   BY MR. LITTLE:

14:58:05  15      Q. Now I'm going to show you what is

14:58:21  16   marked -- same going to show you what is going to

14:58:24  17   be marked as a next exhibit it will show up

14:58:27  18   Exhibit 9 and its exhibit CV 08?

14:58:31  19            (Exhibit 8 was marked.)

14:58:32  20      Q. Let me know when its on your screen?

14:58:34  21      A. Yes.

14:58:34  22      Q. I'll e-mail screen relate today June 42018

14:58:38  23   CAR meeting follow-up there were e-mail chains

14:58:42  24   both the one I'll going to directing your

14:58:45  25   attention starts on June 6 bottom of page 1 from

Page 144

14:58:49  1   Paul bullty ma and Peter DeSantis copying a large

14:58:53  2   number of people that makes a request to Peter

14:59:02  3   DeSantis and a bunch of CARs on page 2 once you

14:59:04  4   review that e-mail let me me when you've complete?

14:59:11  5       A. Okay.  I think I'm familiar with what's in

14:59:40  6   here I can refer back to it.

14:59:43  7       Q. I want to make sure you have the full

14:59:45  8   context so further down there are CAR summaries or

14:59:48  9   it says full CARs for both 130 and 131 those are

14:59:52 10   on page 3, 4, 5 and 6.  If you want to review

15:00:01 11   those I'll ask you a few questions about them

15:00:06 12   generally?

15:00:06 13       A. Stand by.  130 and 131 right.  Am I back

15:00:46 14   everybody froze.

15:00:49 15       MR. LITTLE:  We're all here.

15:00:49 16   BY MR. LITTLE:

15:00:50 17       Q. I asked you wanted me to look at 13 and

15:00:54 18   131 right?

15:00:54 19       A. That's correct.  Yes.

15:00:56 20       Q. Okay on page 2 of that document there

15:01:05 21   appears to be a list of 13 CARs that were stated

15:01:08 22   they were approved at the June 4, 2018 meeting

15:01:12 23   correct?

15:01:12 24      A. Yes.

15:01:15 25      Q. Further down at that list of 13 there's

Page 145

15:01:19 1   paragraph that says after you receive your

15:01:20 2   approval on this e-mail Chris will forward the

15:01:23 3   first two CARS IAD 130 and IAD 131 build-to-suit

15:01:28 4   leases to Andy for further approval as per SNTP

15:01:30 5   guidelines.  Do you see that?

15:01:32 6      A. I do.

15:01:33 7      Q. Do you understand in this e-mail that SNTP

15:01:37 8   guidelines refer to the transaction policy that

15:01:40 9   you previously referenced in your testimony?

15:01:42 10      A. Yes.

15:01:43 11      Q. The individual who is lasted an Andy there

15:01:47 12   do you believe based on this e-mail that's

15:01:48 13   referring to Andy Jassy?

15:01:51 14      A. I believe that's Andy Jassy.

15:01:54 15      Q. And to be clear the person refer to you

15:01:57 16   Chris Vonderhaar in that e-mail?

15:01:58 17      A. Correct.

15:01:59 18      Q. And based on that e-mail is it reasonable

15:02:01 19  for you to believe that the IAD 130, 131 were

15:02:05 20  approved by yourself, Andy Jassy and Peter

15:02:12 21  DeSantis?

15:02:12 22          MS. PAPEZ: Objection. Form.

15:02:12 23      A. Based on this e-mail it was certainly

15:02:14 24  approved by myself and then Peter.   Andy's

15:02:17 25  approval -- that might have been earlier on in

Page 146

15:02:21 1  the -- let me go to page one.   And I don't see any

15:02:25 2  indication that Andy approved in this e-mail.

15:02:27 3      Q. Understood I guess I'm saying you believe

15:02:30 4  believe from the e-mail that you have would have

15:02:31 5  been required to approve that transaction?

15:02:31 6          MS. PAPEZ: Objection. Form.

15:02:36 7      A. Yes.

15:02:36 8  BY MR. LITTLE:

15:02:37 9      Q. I'll turn your attention first to some

15:02:40 10  portion of the IAD 130 build-to-suit.   On page 4

15:02:46 11  there appears to be a section this red I want to

15:02:48 12  draw your attention to that?

15:02:50 13      A. Okay.

15:02:51 14      Q. That section talks about the annual lease

15:02:56 15   rate does it not?

15:02:57 16      A. Yes.

15:02:58 17      Q. And it states its 5.3 percent higher than

15:03:02 18   the average rate of last 4 build-to-suit projects

15:03:06 19   in prince William county do you see that?

15:03:09 20      A. Yes.

15:03:09 21      Q. And number 5.3 percent higher or the value

15:03:12 22   included there 5.3 percent higher is in reference

15:03:16 23   to four projects IAD 075, 085, 095 and 096.  Would

15:03:23 24   that be your understanding of that e-mail?

15:03:23 25         MS. PAPEZ: Objection. Form.

Page 147

15:03:27 1      A. Yeah those are the ones that they're going

15:03:30 2   to compare it to.

15:03:30 3   BY MR. LITTLE:

15:03:32 4      Q. Those are all Amazon projects that were

15:03:35 5   previously completed?

15:03:35 6         MS. PAPEZ: Objection. Form.

15:03:37 7      A. I assume so.  Yes based on the site codes.

15:03:41 8    Yeah.

15:03:41 9    BY MR. LITTLE:

15:03:42 10       Q. Microsoft isn't using your site codes

15:03:45 11   correct?

15:03:45 12       MS. PAPEZ: Objection. Form.

15:03:47 13       A. Yes without thoughing the details based on

15:03:50 14   the labels yeah those sound like our datacenters.

15:03:50 15   BY MR. LITTLE:

15:03:55 16       Q.   So then after the information is

15:03:57 17   provided about the above average rent is there an

15:04:00 18   explanation for why the rent is above what the

15:04:02 19   prior costs have been?

15:04:04 20       MS. PAPEZ: Objection. Form.

15:04:07 21       A. Yeah it highlighted two primary drivers.

15:04:07 22   BY MR. LITTLE:

15:04:11 23       Q. What are those two drivers.

15:04:14 24       A. What I'm reading is a higher shell cost

15:04:18 25   per square foot based on using a two story center

Page 148

15:04:21 1    design and the second driver is higher land price

15:04:28 2    based on you know market rates that are referred

15:04:31 3    to as higher cost and same benchmark rates.

15:04:31  4   BY MR. LITTLE:

15:04:37  5       Q. Those explanations seem reasonable to you?

15:04:37  6          MS. PAPEZ: Objection. Form.

15:04:41  7       A. Yeah as written they do yes.

15:04:41  8   BY MR. LITTLE:

15:04:44  9       Q. It is in your experience more expensive to

15:04:48 10   build a two-story datacenter than a one-story

15:04:52 11   datacenter?

15:04:52 12          MS. PAPEZ: Objection. Form.

15:04:55 13       A. It is an absolute cost yes, on a cost per

15:04:59 14   unit capacity, like TKE or perhaps watt Z no.

15:04:59 15   BY MR. LITTLE:

15:05:08 16       Q.   So for the purposes of the developer

15:05:09 17   charging you absolute costs the cost would be

15:05:11 18   higher on an absolute basis as to what the

15:05:14 19   developer charges Amazon is that accurate?

15:05:17 20          MS. PAPEZ: Objection. Form.

15:05:19 21       A. That is probably accurate an true yes.

15:05:19 22   BY MR. LITTLE:

15:05:22 23       Q. Its true is it not that rent is based on

15:05:27 24   developers costs in some formula and not on T K

15:05:33 25   Es?

15:05:33  1        MS. PAPEZ: Objection. Form.

15:05:38  2        A. Rent would be based on primarily the

15:05:43  3    developers cost, cost to the bidding the structure

15:05:46  4    and the structure, yes.

15:05:46  5    BY MR. LITTLE:

15:05:48  6        Q. T K Es don't affect the rent directly

15:05:51  7    correct?

15:05:51  8        MS. PAPEZ: Objection. Form.

15:05:53  9        A. Not directly.  Indirectly I guess you

15:05:58 10    could say more TKEs requires more space, more

15:06:04 11    infrastructure, more construction, more cost.

15:06:04 12    BY MR. LITTLE:

15:06:08 13        Q. And ultimately TKEs when it's relevant for

15:06:11 14    your demand signals and supply, correct?

15:06:12 15        MS. PAPEZ: Objection.  Form?

15:06:13 16        A. Yes we use TKE because it includes that

15:06:15 17    unit of power which ties back to servers which

15:06:16 18    ties back to uses.

15:06:18 19        Q. The second explanation about increase land

15:06:22 20    trends that are 5.6 per year higher across the

15:06:25 21    same benchmark does that seem like a second

15:06:28 22    reasonable explanation?

15:06:35 23        MS. PAPEZ: Objection. Form.

15:06:35 24      A. Yeah its -- I have seen explanations like

15:06:39 25   thatment seems reasonable.


                                                    Page 150


15:06:39  1   BY MR. LITTLE:

15:06:41  2      Q.   If that information were incorrect and

15:06:43  3   there weren't actually increases in land values,

15:06:46  4   would that be something you could objective live

15:06:49  5   determine?

15:06:49  6         MS. PAPEZ: Objection. Form.

15:06:50  7      A. I would not be able to objectively

15:06:57  8   determine.  I would relay on real estate

15:07:00  9   transaction managers to provide evidence and data

15:07:03 10   backing up that assertion.

15:07:03 11   BY MR. LITTLE:

15:07:06 12      Q. Let me ask it the different way if someone

15:07:09 13   leave believes that a transaction manager provided

15:07:11 14   inaccurate information about average land value if

15:07:14 15   an area do you believe there is a method in which

15:07:18 16   you could assess whether they provided accurate

15:07:21 17   information or not?

15:07:21 18         MS. PAPEZ: Objection. Form.

15:07:24 19      A. I believe we can gather data to

15:07:25 20   objectively access the accuracy and the

15:07:30 21   information.

15:07:30 22   BY MR. LITTLE:

15:07:31 23       Q. In your experience land values are

15:07:33 24   generally public record are they not?

15:07:33 25           MS. PAPEZ: Objection. Form.

Page 151

15:07:37  1       A. Yeah, generally based on recent

15:07:40  2   transactions and comparables.

15:07:40  3   BY MR. LITTLE:

15:07:43  4       Q. Are you aware that in Virginia you have to

15:07:45  5   register your transaction with the county, for

15:07:50  6   example, when you make a land purchase?

15:07:56  7           MS. PAPEZ: Objection. Form.

15:07:56  8       A. I was ain't ware of that specific that

15:07:58  9   seems reasonable.

15:07:58 10   BY MR. LITTLE:

15:08:00 11       Q. Is that consistent with our knowledge of

15:08:01 12   how the purchase of real estate happens around the

15:08:04 13   United States?

15:08:04 14       A. Yes consistent with any knowledge of

15:08:07 15   commercial and residential real estate.

15:08:08 16       Q. Would have a system of deeds for property?

15:08:08 17          MS. PAPEZ: Objection. Form.

15:08:13 18       A. Correct.

15:08:13 19       Q. And those deeds tend to be documented in

15:08:18 20   some form of local Government?

15:08:18 21          MS. PAPEZ: Objection. Form.

15:08:21 22       A. Yeah I believe that's my understanding

15:08:22 23   yes.

15:08:22 24   BY MR. LITTLE:

15:08:23 25       Q. And sorry do belabor this but these dieds

                                    Page 152

15:08:28 1    can be reviewed by parties seeks to ascertain

15:08:31 2    what's happening in prior transactions in terms of

15:08:34 3    the land value?

15:08:35 4          MS. PAPEZ: Objection. Form.

15:08:36 5       A. I believe that's true and that's how it

15:08:42 6    works.

15:08:42 7    BY MR. LITTLE:

15:08:43 8       Q. I'm going to turn your attention to the

15:08:46 9    bottom of that page?

15:08:51 10      A. Page 4.

15:08:52 11     Q. Is there a similar section this red about

15:08:54 12     IAD 131 annual lease rate for it?

15:08:59 13     A. I see it.

15:09:00 14     Q. And are similar answers provided for the

15:09:03 15     reason of the higher than average rate of rent?

15:09:11 16     That was rate of rent above

15:09:13 17     A. Yes.

15:09:13 18     Q. Is there any other part of either of those

15:09:16 19     two CARs that are highlighted in red?

15:09:22 20     A. Doesn't appear to be.

15:09:24 21     Q. Is it fair to say based on the fact that

15:09:27 22     whoever placed it in red they wanted to emphasize

15:09:30 23     those sections for whoever would be reading it?

15:09:32 24         MS. PAPEZ: Objection. Forminging?

15:09:38 25     A. Its reasonable.  I don't know that -- I

Page 153

15:09:41 1      don't know why somebody highlighted red but its

15:09:43 2      reasonable that that could be a reason.  Yes.

15:09:43 3      BY MR. LITTLE:

15:09:47 4          Q. It certainly highlights that section as

15:09:49 5      opposed to the other sections does it not?

15:09:51  6        A. It does.

15:09:52  7        Q. Turn your attention to a new exhibit this

15:09:55  8    is going to be document ten?

15:09:58  9              (Exhibit 10 was marked.)

15:10:06 10    BY DEFENSE COUNSEL:

15:10:06 11        Q. Take a moment to look at this document and

15:10:08 12    tell me if you can describe it okay?

15:10:40 13        Q. Top e-mail appear to be an e-mail that you

15:10:43 14    wrote to Casey Kirschner and copy add few others?

15:10:46 15        A. Yes.

15:10:46 16        Q. Does its provide some requests of you to

15:10:50 17    Casey Kirschner?

15:10:54 18        A. Yes.  I thinks there was a request

15:10:58 19    properly in the attachment but yes.

15:11:00 20        Q. And then further down is there an e-mail

15:11:02 21    from Casey Kirschner to you copying a few others?

15:11:05 22        A. Yes.

15:11:06 23        Q. Based on reviewing the e-mail between

15:11:10 24    Casey Kirschner and you on May 31st does that lead

15:11:13 25    you to believe that you and Casey met to discuss

Page 154

15:11:16  1    the IAD 131 project?

15:11:16  2          MS. PAPEZ: Objection. Form.

15:11:21  3          A. I believe we lad a dialogue about this

15:11:24  4     it's not clear to me whether we met or had a phone

15:11:27  5     call.

15:11:27  6     BY MR. LITTLE:

15:11:28  7          Q. Understood you had a conversation of some

15:11:31  8     sort?

15:11:31  9          A. It it appears.  That's right.

15:11:33 10          Q. I'm going to mark document 11 CV 10?

15:11:46 11                 (Exhibit 10 was marked.)

15:11:47 12          A. Okay.  I have it.

15:11:54 13          Q. Do you see it appears to be relate today

15:11:56 14     just IAD 130 and 131?

15:11:56 15          MS. PAPEZ: Objection. Form.

15:12:02 16          A. Yes.

15:12:02 17     BY MR. LITTLE:

15:12:03 18          Q.   Do you have any we to tell from this

15:12:05 19     document who has input the information for this

15:12:08 20     document?

15:12:09 21          MS. PAPEZ: Objection. Form.

15:12:10 22          A. Just scanning through the document, no, I

15:12:14 23     don't see any names or indicators or flags, text,

15:12:20 24     indicated by what.

15:12:20 25     BY MR. LITTLE:

Page 155

15:12:23  1      Q. I'll turn your attention to the bottom of

15:12:25  2   page 2 specifically?

15:12:28  3      A. To okay.

15:12:30  4      Q. Deuce a portion in red with brackets that

15:12:32  5   say I thought we were going to take a shot?

15:12:34  6      A. I see that.

15:12:35  7      Q. Does that you poor to be text with a CAR

15:12:37  8   or commentary on the CAR?

15:12:37  9         MS. PAPEZ: Objection. Form.

15:12:42 10      A. It appears to be commentary on the CAR.

15:12:42 11   BY MR. LITTLE:

15:12:49 12      Q. Do you know who would have made that

15:12:51 13   commentary?

15:12:52 14      A. I don't.  I don't know who made it.  Could

15:12:59 15   have been me based on the e-mail that you showed

15:13:01 16   me just previously.

15:13:02 17      Q. It's fair to say there are changes and

15:13:06 18   requests made like this regularly in the CARs are

15:13:09 19   they not?

15:13:09 20         MS. PAPEZ: Objection. Form.

15:13:11 21      A. Yes.

15:13:11 22   BY MR. LITTLE:

15:13:12 23       Q. It's a collaborative process?

15:13:12 24           MS. PAPEZ: Objection. Form.

15:13:19 25       A. It a collaborative in the sense that

Page 156

15:13:21  1   information is put forward.  Decision-makers like

15:13:25  2   myself review that and provide either feedback on

15:13:31  3   what needs to be provided in order for me to

15:13:35  4   exercise my decision making authority and a time

15:13:38  5   that I provide feedback off line collaboratively

15:13:41  6   to help people kind of any and set up principle as

15:13:45  7   guidelines to make it easier for they will to put

15:13:47  8   up work.

15:13:48  9       Q. Is one of Amazon leadership principles

15:13:51 10   disagree and commit?

15:13:51 11           MS. PAPEZ: Objection. Form.

15:13:53 12       A. Yes, it is.

15:13:53 13   BY MR. LITTLE:

15:13:55 14       Q. What does that mean?

15:13:56 15       A. That means that in situation where the

15:14:03 16   data is not clear and where we have to apply

15:14:06 17   judgement to make a decision, there may be

15:14:08 18   differing points of views about what the right

15:14:10 19   course of action or decision is to take and as

15:14:15 20   leaders and Amazonians in any level we're expected

15:14:19 21   to get in the room, have our say and have a good

15:14:22 22   debate, but at the end we make the decision.  Once

15:14:25 23   we make the decision everybody is expected to get

15:14:28 24   on board whether they agreed with the decision or

15:14:30 25   whether they disagree, and what that commitment

Page 157

15:14:33  1   means is when if I may have disagreed with the

15:14:38  2   outcome of a decision I'm still expected to get in

15:14:41  3   and support that decision fully even though that

15:14:43  4   was not my recommendation.

15:14:56  5       Q. Is that true to litigation?

15:14:59  6          MS. PAPEZ: Objection. Form.

15:15:00  7       A. I'm not sure howed applies context.

15:15:00  8   BY MR. LITTLE:

15:15:03  9       Q. Did you make the decision to file a

15:15:05 10   lawsuit that you're hear to be deposed about

15:15:08 11   today?

15:15:08 12          MS. PAPEZ: Objection. Form.

15:15:09 13    A. I did not make the decision.  I did

15:15:13 14    approve on behalf of Amazon the complaint after

15:15:17 15    reviewing the information presented from your

15:15:20 16    investigation.

15:15:20 17    BY MR. LITTLE:

15:15:21 18    Q. Who within the Amazon business side made

15:15:23 19    the decision to bring this lawsuit?

15:15:23 20        MS. PAPEZ: Objection. Form.

15:15:27 21    A. It would be all of the internal counsel

15:15:32 22    that participated in the investigation on review

15:15:35 23    with myself and others that collectively we made

15:15:39 24    that decision to bring that lawsuit.

15:15:39 25    BY MR. LITTLE:

Page 158

15:15:42 1    Q. When you say others are there others you

15:15:44 2    at higher level at Amazon that made the decision

15:15:47 3    to bring the lawsuit?

15:15:47 4        MS. PAPEZ: Objection. Form.

15:15:48 5    A. I actually cannot say.  My interactions

15:15:51 6    with our internal counsel and legal counsel I want

15:15:57 7    part of any group discussion or decision.

15:15:57 8    BY MR. LITTLE:

15:16:00  9      Q. To be clear when you say you cannot say

15:16:02 10   you do not know is that fair?

15:16:04 11      A. Yes, that is fir, I do not --

15:16:08 12      Q. Sit during the CAR process was there

15:16:11 13   active debate about the decisions to be made in

15:16:15 14   the car process?

15:16:16 15         MS. PAPEZ: Objection. Form ask?

15:16:20 16      A. On occasion we would debate detail about

15:16:26 17   the CARs of details about is this a good price,

15:16:30 18   not a good price.  Is this the right time not to

15:16:33 19   right time.  So the debate was generally around

15:16:36 20   the details of a given transaction.

15:16:36 21   BY MR. LITTLE:

15:16:44 22      Q. Did the environment of debate allow people

15:16:47 23   to raise objections if they had them?

15:16:47 24         MS. PAPEZ:  Objection. Form.

15:16:48 25      A. Yes, it did.

Page 159

15:16:48  1   BY MR. LITTLE:

15:16:50  2      Q. Are you aware of anyone who felt like they

15:16:52  3   could not raise objections to things that were

15:16:54  4   corned about with the CAR process?

15:16:54  5          MS. PAPEZ: Objection. Form.

15:16:59  6      A. No I'm not aware of that.

15:16:59  7   BY MR. LITTLE:

15:17:03  8      Q. Are you aware of anyone who was feeling

15:17:06  9   uncomfortable raising objections to certain

15:17:09 10   transactions if they had concerns about them?

15:17:09 11          MS. PAPEZ: Objection. Form.

15:17:11 12      A. I'm not aware of anybody with holding any

15:17:14 13   questions or objections to transactions.

15:17:14 14   BY MR. LITTLE:

15:17:16 15      Q. To do so would be counter to Amazons

15:17:19 16   corporate culture would it not?

15:17:19 17          MS. PAPEZ: Objection. Form.

15:17:23 18      A. Yes we expect people to speak up when they

15:17:26 19   object.

15:17:26 20   BY MR. LITTLE:

15:17:28 21      Q. Now go back to a talking to you about

15:17:33 22   CARs.  When you ultimately make a decision to

15:17:35 23   approve a CAR what is the guiding principal for

15:17:38 24   you?

15:17:38 25          MS. PAPEZ: Objection. Form.

15:17:48  1       A. I don't know if there's a principle going

15:17:50  2    back to sol of things that we discussed earlier

15:17:52  3    this things that I'm look that can that form my

15:17:55  4    opinion or guide my approval and rejection social

15:17:59  5    security fit physical attributes is this a good

15:18:02  6    asset for a purchase is it good financial for us

15:18:05  7    is it in line with our expectations an 3, is this

15:18:11  8    are there any unique or out of the ordinary terms,

15:18:16  9    conditions, or something else that we believe

15:18:21 10    would present a problem.

15:18:21 11    BY MR. LITTLE:

15:18:23 12       Q. Why are those to 3 categories that you use

15:18:26 13    to access questions in the CAR process?

15:18:26 14          MS. PAPEZ: Objection. Form.

15:18:33 15       A. By the way I would add a fourth is it --

15:18:38 16    is it in our financial plan budget, etc., so.

15:18:38 17    BY MR. LITTLE:

15:18:42 18       Q. We asked that why are those 4 categories

15:18:45 19    to categories to you use to guide your judgment in

15:18:48 20    making decisions in the process?

15:18:55 21          MS. PAPEZ:  Objection form misat a times

15:18:58 22    testimony.

15:19:00 23       A. What I'm summarizing are high levels of

15:19:04 24    criteria those are generally the things we look at

15:19:06 25   to decide whether this is the right asset at the

Page 161

15:19:09  1   right time for the right business purpose at the

15:19:12  2   right cost.

15:19:12  3   BY MR. LITTLE:

15:19:14  4       Q. Do you believe that doing that you are

15:19:17  5   making a decision about what is in Amazon's best

15:19:20  6   interest?

15:19:20  7           MS. PAPEZ: Objection. Form.

15:19:22  8       A. Yes.

15:19:22  9   BY MR. LITTLE:

15:19:26 10       Q. Are there any guidelines within Amazon

15:19:28 11   about the guide the exercise of judgment that you

15:19:32 12   have just described?

15:19:38 13           MS. PAPEZ: Objection. Form.

15:19:38 14       A. The primary guideline around Ear sizing

15:19:42 15   judgement is transparency.  Its -- I'm not as a

15:19:47 16   CAR approver I'm not expected to be an expert this

15:19:50 17   everything I'm not expected to have all the

15:19:52 18   answers I'm not expected to be right every time.

15:19:55 19   Transparency and sharing details across other

15:19:58 20   peers who have differ perspectives different areas

15:20:01 21   of expertise, by being transparent and sharings

15:20:06 22   those detail ace cross a diverse group of skilled

15:20:09 23   people who are loyal to the company we're pretty

15:20:11 24   confident that that trance parent process will

15:20:14 25   yield good decision as defensible positions for

Page 162

15:20:17  1   Amazon.

15:20:17  2   BY MR. LITTLE:

15:20:18  3       Q. When you describe transparency are you

15:20:20  4   referencing any particular policy or document

15:20:22  5   within Amazon?

15:20:22  6       MS. PAPEZ: Objection. Form.

15:20:25  7       A. Transparency not represent ago specific

15:20:29  8   document but I would point to our leadership

15:20:33  9   principles, generally expect and drive

15:20:36 10   transparency and earlier in this conversation we

15:20:39 11   talked about our code of conduct around

15:20:42 12   disclosure.  That drives transparency as well.

15:20:42 13   BY MR. LITTLE:

15:20:46 14       Q. But are you aware of any document that

15:20:48 15   relates to transparency in connection with the CAR

15:20:52 16   process specifically?

15:20:52 17         MS. PAPEZ: Objection. Form.

15:20:55 18     A. No, I don't believe we have a statement on

15:20:57 19   transparency around CARs.

15:21:15 20         MR. LITTLE:  Going to show you document 12

15:21:17 21   Exhibit 11.

15:21:18 22              (Exhibit 11 was marked.)

15:21:18 23     A. I have document 12.

15:21:20 24     Q. Do you see that it appears to be the code

15:21:22 25   of business conduct and ethics revised as of

Page 163

15:21:25  1   November 16, 2011?

15:21:27  2     A. Yes, I see that.

15:21:28  3     Q. Could you please review and let me know

15:21:32  4   which aspects of this policy relate to

15:21:36  5   transparency?

15:21:37  6     A. Okay stand by 3:22.  Okay there are a few

15:22:33  7   things I will call your attention to if that's how

15:22:35  8   up want want to go through it.

15:22:37  9     Q. Please?

15:22:39 10     A. And the first reference I would make is on

15:22:42 11   page 1 last paragraph while the word transparency

15:22:51 12   is not used specifically the statement employees

15:22:54 13   should attempt to avoid conflict of interest

15:22:56 14   employees who believe a conflict of interest may

15:23:00 15   exist should notify the legal department that

15:23:04 16   speaks to be transparent aren't a concern that one

15:23:08 17   may have in our obligation as an employee.

15:23:11 18        Q. What is the next portion of in that you

15:23:14 19   believe relates to the concept of transparency

15:23:16 20   within AWS?

15:23:18 21        A. I'll call you to there's a section I guess

15:23:22 22   it would begin on page 5 and it talks about

15:23:25 23   frequently asked questions and if you look through

15:23:28 24   the questions that the theme and the tone is

15:23:34 25   around different hypotheticals where what should I

Page 164

15:23:38  1   do if I believe there's something unusual or wrong

15:23:44  2   in a given situation and it points people to

15:23:47  3   different contexts and what actions they should

15:23:49  4   take that is a form of transparency in our

15:23:53  5   business.

15:23:53  6        Q. And if someone violates the code of

15:23:56 7   conduct what is the maximum disciplinary penalty?

15:24:03 8       MS. PAPEZ: Objection. Form?

15:24:05 9   BY DEFENSE COUNSEL:

15:24:05 10      Q. As you understand it?

15:24:06 11      A. As I understand it, I believe the maximum

15:24:10 12  in most -- well it's hard for me to say what the

15:24:15 13  maximum in Tom cases its termination, separation

15:24:19 14  from the company, I can imagine that in extreme

15:24:24 15  cases that it would be penalties may be beyond

15:24:28 16  termination.

15:24:30 17      Q. What can Amazon do beyond termination?

15:24:30 18      MS. PAPEZ: Objection. Form.

15:24:34 19      A. We can engage the proceedings like this

15:24:37 20  one.

15:24:37 21      Q. Do you believe you can sue someone over a

15:24:39 22  violation of the code of conduct do you think a.m.

15:24:42 23  has that power?

15:24:42 24      MS. PAPEZ: Objection. Form.

15:24:47 25      A. I believe people are accountable for their

Page 165

15:24:50 1   behavior.

15:24:51  2        Q. So my question was do you believe that

15:24:53  3    Amazon can bring a lawsuit for an employee

15:24:55  4    violating the code of conduct?

15:24:55  5        MS. PAPEZ: Objection. Form.

15:25:01  6        A. Yes, I do.

15:25:01  7        Q. What's the basis for that belief?

15:25:05  8        A. If the -- if an employee violates our code

15:25:10  9    of conduct and that results in harm financial harm

15:25:14 10    as an example for other sorts of harm to our

15:25:18 11    business I believe those employees are can annual

15:25:23 12    should believe held accountable to the harm they

15:25:25 13    have caused to our business.

15:25:25 14    BY MR. LITTLE:

15:25:29 15        Q. Solely because they violated code of

15:25:31 16    conduct?

15:25:34 17        MS. PAPEZ:  Objection form misat a times

15:25:35 18    testimony.

15:25:35 19    BY MR. LITTLE:

15:25:36 20        Q. I'm trying to clarify whether that's

15:25:38 21    extent of your answer?

15:25:38 22        A. No.

15:25:41 23        MS. PAPEZ:  Same objection.

15:25:41 24        A. No, not because they violated the code

15:25:44 25    conduct because their actions caused harm to our

Page 166

15:25:46  1   business.

15:25:47  2        Q. I understand that and are you aware in the

15:25:48  3   context to understand that you reviewed the

15:25:50  4   complaint in this case right?

15:25:52  5        A. I have reviewed the complaint.

15:25:53  6        Q. When you bring a civil lawsuit you have to

15:25:55  7   have what what he is what's could a cause of

15:25:57  8   action do you understand that?

15:26:00  9        MS. PAPEZ:

15:26:00 10        MS. PAPEZ: Objection. Form.

15:26:00 11        A. I'm not familiar with the term cause of

15:26:03 12   action.  Sorry.

15:26:03 13   BY MR. LITTLE:

15:26:05 14        Q. Are you familiar with the term tort?

15:26:07 15        A. Yes, I have heard the term tort.

15:26:10 16        Q. What does it mean to you?

15:26:13 17        A. I don't have a good definition or complete

15:26:15 18   definition of tort.

15:26:17 19        Q. Do you understand what the term claim

15:26:20 20   means in the context of a lawsuit that Amazon has

15:26:22 21   brought here?

15:26:22 22        MS. PAPEZ: Objection. Form.

15:26:24 23     A. That is a term I'm more familiar with its

15:26:27 24  in our case it's a claim that Amazon was harmed in

15:26:30 25  some way.

Page 167

15:26:30  1  BY MR. LITTLE:

15:26:33  2     Q. I want to make sure I understand clearly

15:26:35  3  your belief that the claim where Amazon has been

15:26:39  4  harm and can not arise solely from violating a

15:26:43  5  code of conduct?

15:26:45  6     MS. PAPEZ:  Object to form.  Misstates

15:26:46  7  testimony.

15:26:47  8     A. I take issue with the word sole.  In your

15:26:50  9  statement.  I don't believe its solely.  No.

15:26:50 10  BY MR. LITTLE:

15:26:54 11     Q. Let me you said harm is an element of what

15:26:58 12  allows you to bring a lame.  Do you believe that

15:27:01 13  Amazon can sue anyone who harms it?

15:27:01 14     MS. PAPEZ: Objection. Form.

15:27:11 15     A. I think if the harm is material Amazon can

15:27:16 16  hold people accountable and seek the appropriate

15:27:19 17  remedies or penalties yes.

15:27:19 18   BY MR. LITTLE:

15:27:21 19       Q. If the Congress were to pass a law that

15:27:24 20   materially affected Amazons profit as harmed its

15:27:27 21   finances do you believe that a.m. could sue the

15:27:30 22   U.S. Government for that?

15:27:33 23           MS. PAPEZ:  Objection form calls for

15:27:34 24   speculation.

15:27:34 25           A. It seem as little extreme to me if

Page 168

15:27:37 1   Congress pass ass law companies an individuals are

15:27:39 2   expected fellow the law.  They had their recourse

15:27:42 3   to challenge those laws I'm not an expert in that

15:27:47 4   domain.

15:27:47 5   BY MR. LITTLE:

15:27:48 6       Q. I appreciate that answer I'm trying to

15:27:50 7   really kind of drill down into what you believe is

15:27:53 8   the harm plus that allows Amazon to bring a

15:27:56 9   lawsuit against an employee.  I have heard your

15:27:58 10   testimony that you believe harm is essential and

15:28:00 11   I'm trying to understand what the harm plus you

15:28:04 12   believe is necessary for Amazon to bring a legal

15:28:06 13   claim?

15:28:08 14      MS. PAPEZ:  Is there a question Alex let

15:28:11 15   me just object to Mr. Vonderhaar is not a lawyer.

15:28:14 16   So you know I have an appreciate the questioning

15:28:16 17   an if you have after question ask it but he's not

15:28:19 18   here to testify about legal causes of action this

15:28:23 19   is not to purpose of the deposition today.

15:28:24 20      MR. LITTLE:  Think this is going to get

15:28:25 21   tote point that makes sense in a second I hope.

15:28:25 22   BY MR. LITTLE:

15:28:30 23      Q. Now Mr. Vonderhaar, in connection with

15:28:32 24   reviewing this lawsuit do you understand that when

15:28:35 25   a.m. filed its lawsuit it made claims that Carl

Page 169

15:28:39 1   Nelson had violated its employment contract.

15:28:42 2      MS. PAPEZ: Objection. Form.

15:28:44 3      A. I -- yes, you violate -- I'll more

15:28:48 4   familiar with he violated our code of conduct

15:28:53 5   generally.

15:28:53 6   BY MR. LITTLE:

15:28:54 7      Q. So you believe -- are you aware that

15:28:57 8   Amazon also brought a claim that he violated the

15:29:01  9   confidentially and noncompete agreement?

15:29:04 10       A. Now that you say that I do recall that.

15:29:06 11   Yes.

15:29:06 12       Q. Are you aware that when Amazon brought

15:29:09 13   that lawsuit and filed it under penalty of perjury

15:29:11 14   in federal court that it used the contract from a

15:29:14 15   different Carl Nelson and not to Carl Nelson who

15:29:18 16   worked for AWS real estate?

15:29:22 17       MS. PAPEZ:  Objection.  Form.  Foundation.

15:29:23 18       A. That I was not familiar that is news to

15:29:26 19   me.

15:29:26 20       Q. Would its surprise you that Amazon had to

15:29:29 21   aid mend its complaint to include the correct

15:29:31 22   provisions of contract that it alleged was

15:29:35 23   violated?

15:29:37 24       MS. PAPEZ: Objection form.

15:29:38 25       A. If Amazon made a mistake it would not

Page 170

15:29:41  1   surprise me as to they would correct that mistake.

15:29:44  2       Q. I'm asking would you surprise you if

15:29:47  3   Amazon would make amistake of that nature?

15:29:47  4       MS. PAPEZ: Objection. Form.

15:29:51 5        A. Not particularly.  Look, it's a big

15:29:56 6    company, I didn't know there were multiple Carl

15:29:59 7    Nelsons I can imagine a request going to somebody

15:30:02 8    in the company who did their reasonable and level

15:30:07 9    best to provide the information that was requested

15:30:10 10   and may have made a mistake.

15:30:13 11   BY GOVERNMENT COUNSEL:

15:30:14 12       Q. People the cake honest mistakes can't

15:30:17 13   they?

15:30:17 14          MS. PAPEZ: Objection. Form.

15:30:17 15       A. Yes.

15:30:17 16   BY MR. LITTLE:

15:30:19 17       Q. Even though it involves greatly serious

15:30:21 18   matters correct?

15:30:21 19          MS. PAPEZ: Objection. Form.

15:30:24 20       A. Yes.

15:30:24 21   BY MR. LITTLE:

15:30:31 22       Q.   And -- I'll hold that question.  We've

15:30:38 23   been going thousand for an hour 5 and I'll going

15:30:42 24   to be switching gears here I have got three or

15:30:45 25   four more questions is it okay if we stop after

Page 171

15:30:47   1   those.

15:30:47   2      A. Absolutely I'm here for the duration.

15:30:47   3   BY MR. LITTLE:

15:30:54   4      Q. So back to my question of you talked about

15:30:57   5   transparency and transparency being important but

15:30:59   6   I want to go back to the line of question before

15:31:01   7   then about decision makes a determining whethering

15:31:05   8   is something is in Amazon's best interest.

15:31:07   9   Besides what you have testified already or what

15:31:09  10   are a factors -- I'll strike that what do you

15:31:12  11   believe the factors make a transaction in Amazon's

15:31:17  12   best breast?

15:31:19  13      MS. PAPEZ: Objection. Form.

15:31:19  14      A. I'm going to bo back to the things that I

15:31:21  15   have kind of centered on which is asset and the

15:31:24  16   acquisition a good asset sit going to serve our

15:31:27  17   business needs well is it a good fit for us.  Is

15:31:30  18   it financially appropriate and attractive, is it

15:31:36  19   within our kind of expectations and boundaries.

15:31:39  20   Are there -- is it void or free of any unusual

15:31:45  21   risks or things that we'll have to deal with

15:31:51  22   overtime and does it fit within our financial plan

15:31:55  23   or budget in a given fiscalier or time period.  So

15:31:59  24   those things we evaluate those things and try to

15:32:02 25   get as much detail about those as we can we review

Page 172

15:32:05  1   it deeply as we can and base odd than we forward

15:32:08  2   or recommendation to say we believe this is a good

15:32:11  3   transaction for Amazon.

15:32:15  4       Q. I think with that I'll take a break.  It

15:32:17  5   is 3:32 eastern why don't we come back at 3:45

15:32:22  6   eastern?

15:32:24  7       MS. PAPEZ:  Sounds good.

15:32:27  8       MR. LITTLE:  This will be the section

15:32:28  9   where I will be discussing the attorneys eyes only

15:32:31 10   stuff so when I come back on if Mr. Watson and

15:32:36 11   Mr. Kirk aren't on I can direct them to when I'm

15:32:41 12   starting that section.

15:32:42 13       MS. PAPEZ:  Okay thank you.

15:32:43 14       THE VIDEOGRAPHER: Off the record at 3:32

15:47:28 15   p.m.

15:47:28 16            (Proceedings resumed.)

15:47:29 17       THE VIDEOGRAPHER: Wac to the record at

15:47:40 18   3:47.

15:47:40 19   BY MR. LITTLE:

15:47:41 20       Q. Before the break we were just talking

15:47:42 21   about different aspects of the code of conduct and

15:47:46 22   other issues and I want to ask you just as broadly

15:47:49 23   as possible what is your understanding that the

15:47:52 24   harm has Amazon has incurred in connection with

15:47:56 25   the transactions that are at issue in this

Page 173

15:47:58 1    lawsuit?

15:47:58 2         MS. PAPEZ: Objection. Form.

15:48:05 3         A. I think broadly speaking the harm take as

15:48:08 4    few forms.  One, there's the harm relative to I'll

15:48:22 5    say paying for services or fees or parts of that

15:48:25 6    deal for this datacenter capacity that we couldn't

15:48:28 7    have otherwise paid because that money was

15:48:34 8    funneled back the a different of other entitiesen

15:48:37 9    including Carl and Casey, I think frankly the harm

15:48:41 10   that I'm fairly disappointed about is we had

15:48:50 11   employees knowingly take advantage of of their

15:48:57 12   colleagues they a peer in the good will and myself

15:48:59 13   and others extended in terms of building and

15:49:02 14   managing a process called the CAR process and I

15:49:05 15   feel like myself and others were manipulated

15:49:09 16   through that process for somebody else's own

15:49:13 17   personal gain and so there's that harm in terms of

15:49:16 18   credibility and maybe the what myself and others

15:49:21 19   work so hard to accomplish in terms of trust and

15:49:27 20   transparency and I think there are probably other

15:49:29 21   forms of harm that frankly we haven't yet figured

15:49:33 22   out or discovered yet because I don't know if we

15:49:36 23   even covered everything that transpired or took

15:49:40 24   place here.

15:49:42 25        Q. The first thing you pension mentioned but

Page 174

15:49:46 1   pain money that Amazon went through otherwise have

15:49:49 2   paid.  What money do you believe that Amazon would

15:49:52 3   not have otherwise have paid as a result of these

15:49:57 4   transactions?

15:49:57 5        A. In there is particular transactions we

15:50:01 6   paid money that went through various companies and

15:50:08 7   hands and ended up in the pockets of our employees

15:50:13 8   whom we were already pay ago compensation or

15:50:17 9   salary to.  So that money that Amazon made

15:50:21 10   available to myself and others was not intended to

15:50:25 11   be put back into the pockets of our employees it

15:50:28 12   was intended to acquire asset for the customer.

15:50:31 13       Q. What personal information do you have that

15:50:33 14   that is what transpired?

15:50:39 15       A. What I have learned through this

15:50:40 16   investigation an through the complaint documents

15:50:42 17   that I have read and signed is that Amazon paid

15:50:45 18   money that went through set of I'll call them

15:50:50 19   shell companies or proaxial companies I should

15:50:54 20   stay away from technical terms but went to a set

15:50:56 21   of companies like Northstar or white peaks but

15:51:00 22   made its way back to Carl and Casey who was

15:51:03 23   employees of ours at the time.

15:51:04 24       Q. And I guess I'm trying to say is what you

15:51:06 25   reference there's an investigation that was done?

Page 175

15:51:10 1        A. Yes.

15:51:10 2        Q. Who was that investigation done by?

15:51:12 3        A. Investigation was done by various officers

15:51:16 4    and workers an leaders within Amazon.

15:51:20 5        Q. Who are those people?

15:51:23 6        A. Folks on a.m.'s legal counsel.  I don't

15:51:27  7   know who did what specifically.  I reviewed the

15:51:30  8   out put of that investigation.

15:51:32  9       Q. Do you have any reason to believe that the

15:51:34 10   out put -- what -- you said the money ended up in

15:51:39 11   the pockets of Carl and Casey.  What is your

15:51:41 12   understanding of how that actually transpired?

15:51:48 13       A. My understanding based on the review of

15:51:51 14   the documents in the case money was paid to

15:51:53 15   developers of I may not have autocompany names

15:52:00 16   right but I remember the name star white peaks

15:52:04 17   anvil nova and that money that was intended for

15:52:08 18   purchase and acquisition of properties that we

15:52:10 19   have been talking about I believe 9 build-to-suit

15:52:13 20   properties and two others actually didn't just go

15:52:16 21   for the purchase and acquisition and development

15:52:18 22   of those plots some amount of that money was

15:52:23 23   funneled back through various other properties

15:52:28 24   directly to Carl and Casey for their own personal

15:52:30 25   gain and use one form or monetary I think there

Page 176

15:52:33  1   was reference to a fishing trip in Florida that I

15:52:36  2   read which goes back to that gift conversation we

15:52:39  3   had.

15:52:39  4       Q. Is also personal gain money that somebody

15:52:43  5   had to pay for that?

15:52:45  6       Q. I guess I'm trying to understand is

15:52:47  7   besides the investigation done by Amazon's counsel

15:52:52  8   do you have any personal knowledge of any of these

15:52:57  9   facts that you're describing?

15:52:59 10       A. No, I don't have personal facts I didn't

15:53:01 11   do my own investigation I'm relaying what I have

15:53:05 12   read in the complaint.

15:53:07 13       Q. If the investigators have made mistakes in

15:53:11 14   your investigation could that change your view as

15:53:14 15   to what actually transpired?

15:53:14 16       MS. PAPEZ: Objection. Form.

15:53:16 17       A. If mistakes were made and presented back

15:53:22 18   then yeah presented with new information like any

15:53:25 19   other a reasonable decision-maker, if new

15:53:28 20   information comes to like I would definitely

15:53:38 21   consider that.

15:53:38 22       Q. Do you know whether other people at Amazon

15:53:40 23   had taken that position?

15:53:40 24       MS. PAPEZ: Objection.  Form.

15:53:40 25       A. No, I'm not aware of other people's

15:53:40  1   positions on that.

15:53:40  2       Q. You're aware that Amazon as a company AWS

15:53:49  3   sought to have Carl and Casey charged by the

15:53:51  4   federal government in connection with these

15:53:52  5   transactions, don't you

15:53:56  6       MS. PAPEZ: Objection. Form.

15:53:57  7       A. I'm aware there's an investigation going

15:53:58  8   on.

15:53:59  9       Q. And are you aware that was an

15:54:01 10   investigation initiated by your company?

15:54:04 11       MS. PAPEZ:  Objection.  Form.

15:54:07 12       A. I'm not aware I don't know the detail of

15:54:10 13   who initiated what when.

15:54:12 14       Q. Are you aware that that's been going on

15:54:14 15   thousand for over two years?

15:54:21 16       A. Roughly yes.

15:54:22 17       Q. Are you aware that the government gave

15:54:23 18   back the vast majority of the money it seized from

15:54:27 19   Carl Nelson?

15:54:29 20       MS. PAPEZ:  Objection.  Form.

15:54:29 21       A. No.  I don't know what was seized, and I

15:54:32 22   don't know what was given back.

15:54:40 23    Q. If I told you the government based on the

15:54:42 24    accusations made by your company seized $635,000

15:54:44 25    from Carl, that's new information to you?

Page 178

15:54:51 1       MS. PAPEZ: Objection. Form.

15:54:52 2    A. Yes.

15:54:53 3    Q. If I told you that approximately a month

15:54:54 4    ago the government returned $525,000 of that

15:54:56 5    amount that's also new information to you?

15:54:56 6       MS. PAPEZ: Objection. Form.

15:55:00 7    A. Yes.  New information.

15:55:00 8  BY MR. LITTLE:

15:55:04 9    Q. So you don't know also the Government has

15:55:06 10  reached similar settlements with Casey Kirschner

15:55:09 11  and other individuals for whom it seized money?

15:55:09 12      MS. PAPEZ: Objection. Form.

15:55:13 13    A. No.  Not aware of those settlements.

15:55:13 14  BY MR. LITTLE:

15:55:18 15    Q. You understand a that the FBI has the

15:55:20 16  ability to conduct investigations in a manner that

15:55:22 17  general lawyers and law firms cannot?

15:55:22 18      MS. PAPEZ: Objection. Form.

15:55:31 19      A. Generally, yes.

15:55:31 20      Q. Do you have any reason to believe that

15:55:33 21   Carl or Casey had been charged in the last two

15:55:35 22   years by the federal government with a crime?

15:55:46 23          MS. PAPEZ: Objection. Form.

15:55:46 24      A. I don't know.

15:55:46 25   BY MR. LITTLE:

                                                            Page 179

15:55:48  1      Q.   Do you have any reason to believe they

15:55:49  2   have?

15:55:49  3          MS. PAPEZ: Objection. Form.

15:55:50  4      A. I don't have any reason to believe they

15:55:51  5   have been charged.

15:55:51  6   BY MR. LITTLE:

15:55:59  7      Q. I want to drill down on this understanding

15:56:01  8   that you say was harm there was money that was

15:56:04  9   provided to Amazon money that was meant for a

15:56:06 10   certain purpose, how much was the harm that Amazon

15:56:10 11   faced as a result of the transactions you

15:56:13 12   described?

15:56:13 13          MS. PAPEZ: Objection. Form.

15:56:22 14     A. I don't remember the specific amounts

15:56:24 15   matched but I believe it was on the scale of

15:56:26 16   millions of dollars that we made available to

15:56:30 17   purchase and acquire these as sets that went back

15:56:33 18   to I believe Mr. Watson Casey and Carl.

15:56:37 19     Q. Mr. Watson is the owner of knot star

15:56:41 20   correct?

15:56:41 21     A. Yes.

15:56:42 22     Q. Would it be unusual for the owner of a

15:56:47 23   development company to make deal it does with

15:56:51 24   Amazon?

15:56:51 25         MS. PAPEZ: Objection. Form.


Page 180


15:56:52 1     A. I don't know that its unusual.  I just --

15:56:56 2   I know that was part of the complaint though.

15:56:58 3     Q. Explain to me how that is harm to Amazon

15:57:02 4   that developer who does a deal with Amazon profits

15:57:05 5   off that development?

15:57:08 6         MS. PAPEZ: O form misstates testimony.

15:57:10 7     A. There are a couple of things that went

15:57:13 8   wrong and caused harm.  First we paid more money

15:57:20 9   than I believe we should have paid.

15:57:27 10      Q. You said we paid more money than we should

15:57:30 11   have by we do you mean AWS?

15:57:32 12      A. Yes, sorry AWS.

15:57:35 13      Q. Are you aware of or have you made a

15:57:36 14   calculation of how much more money AWS paid for

15:57:40 15   any of these transactions?

15:57:40 16      MS. PAPEZ: Objection. Form.

15:57:51 17      A. I'm aware that some of those amounts

15:57:53 18   detailed in the complaint toting several million

15:57:57 19   dollars calculated by folks dog the investigation

15:58:00 20   an I have read that as part of the complaint.

15:58:00 21   BY MR. LITTLE:

15:58:03 22      Q.   I think it would be useful to talk in

15:58:06 23   specifics so I'm happy to show you the complaint

15:58:08 24   to let you reference to me what you're talking

15:58:10 25   about.  I'm going to mark as Exhibit 12 it will be

Page 181

15:58:16  1   document 13.

15:58:17  2                  (Exhibit 12 was marked.)

15:58:29  3      MR. LITTLE:  Do you have that, sir.

15:58:30  4      A. Yes.

15:58:30  5      Q. Can you please point me to an area where

15:58:34  6  you believe Amazon has calculated the amount that

15:58:37  7  you describe be paid too much or be paid more

15:58:41  8  than?

15:58:42  9      MS. PAPEZ: Objection. Form?

15:58:44 10  BY DEFENSE COUNSEL:

15:58:44 11      Q. Make sure I got your testimony you

15:58:47 12  testified that you believe Amazon paid too much

15:58:49 13  for these transactions; is that correct?

15:58:52 14      A. We paid mar than we should have.

15:58:54 15      Q. More than you should have is there a

15:58:55 16  difference between more than you should have and

15:58:57 17  too much?

15:59:03 18      MS. PAPEZ:  Objection.  Form.

15:59:03 19      A. No.  Its -- we paid more than we would

15:59:09 20  have paid had there not been additional money

15:59:12 21  earmarked final back kickbacks pay to play

15:59:15 22  whatever you want to call it an routed to Casey

15:59:17 23  and Carl and if you other looking for a reference.

15:59:23 24      MR. LITTLE:  You appreciate that we got to

15:59:24 25  get the rest of that answer out and make sure I

15:59:26  1   understand it.  So are you headaching that

15:59:28  2   reference in reference to more than a standard

15:59:30  3   market transaction is that a reference point for

15:59:33  4   you or not.

15:59:36  5        MS. PAPEZ: Objection. Form.

15:59:36  6        A. No, not -- it's not to only reference

15:59:40  7   point.  Again we make the money available to

15:59:45  8   acquire a specific asset.  We expect the terms and

15:59:48  9   the prices and the cost in great deal to be

15:59:52  10  disclosed in those CAR documents and then based on

15:59:57  11  that if we believe we're theying appropriate and

16:00:01  12  reasonable cost for services rendered then we'll

16:00:08  13  pay it.  The reason inappropriate does not include

16:00:11  14  pating our employees as part of the deal.

16:00:15  15       Q. Is reasonable and appropriate in reference

16:00:18  16  to a market price or not?

16:00:21  17       MS. PAPEZ:  Objection.  Form.

16:00:21  18       A. That is one area of comparison but not

16:00:23  19  all.

16:00:23  20  BY MR. LITTLE:

16:00:24  21       Q. So let me ask you do you own a car?

16:00:26  22       A. I do own a car.

16:00:27  23       Q. What sort of vehicle do you have?

16:00:29  24       A. I have a Toyota Tundra pick up truck.

16:00:34  25       Q. So let's call it the truck.  You got a

Page 183

16:00:36  1   truck.  Did you buy that truck from a car dealer?

16:00:40  2        A. I did.

16:00:40  3        Q. Do you believe you got a fair price for

16:00:43  4   that truck?

16:00:43  5           MS. PAPEZ: Objection. Form.

16:00:48  6        A. Yes I believe I got a fair price.

16:00:50  7        Q. Do you know what the truck dealer did with

16:00:55  8   the money that earned from your sale your purchase

16:00:58  9   of truck?

16:00:58 10           MS. PAPEZ: Objection. Form.

16:01:07 11        A. Paid for truck.

16:01:08 12        Q. Does anything he did here with the money

16:01:10 13   here the purr cans of your truck affect your

16:01:13 14   feelings about the available that you receive in

16:01:15 15   that transaction?

16:01:15 16           MS. PAPEZ: Objection. Form.

16:01:17 17        A. No it doesn't but there's a big difference

16:01:22 18   between me guy ago struck and Amazon buying an

16:01:24 19   asset and that money not going to the owner of an

16:01:27 20   asset and come bag to the employees because where

16:01:31 21   our employees are concerned it does matter.

16:01:34 22       Q. Do you have a partner or children?

16:01:36 23       A. I do.

16:01:38 24       Q. We'll say a partner for purposes of this?

16:01:42 25       A. Fine yeah.


Page 184


16:01:43  1       Q. To your partner and you share assets?

16:01:43  2           MS. PAPEZ: Objection. Form.

16:01:48  3       A. We do.

16:01:48  4   BY MR. LITTLE:

16:01:49  5       Q. So if you learned after your partner

16:01:55  6   recommended that you go buy the Toyota Tundra from

16:01:58  7   a specific dealer and later after you purchase

16:02:01  8   that price for a price you thought was reasonable

16:02:03  9   that dealer add bought your partner a gift.  Would

16:02:07 10   that change your views about whether or not to

16:02:09 11   deal you got from the toy I can't that truck

16:02:12 12   dealer was a fair deal or not?

16:02:18 13           MS. PAPEZ:  Objection.  Form.

16:02:19 14       A. Yeah actually it would.  It would.

16:02:19 15   BY MR. LITTLE:

16:02:23 16       Q. Explain to me why?

16:02:24 17     A. Well, for starters while I don't think I

16:02:31 18  would necessarily be angry with my spouse case but

16:02:34 19  that would make me wonder what other shady stuff

16:02:37 20  is that car dealer doing what other things are

16:02:39 21  based into the cost of that truck that I don't

16:02:43 22  about if they're willing to sent a gift the this

16:02:46 23  way.

16:02:46 24     Q. If the price but in the same in both those

16:02:49 25  scenarios how would you quantify the amount of

Page 185

16:02:51 1  harm in the second scenario where the car dealer

16:02:54 2  bought your wife a gift?

16:02:54 3     MS. PAPEZ: Objection. Form.

16:02:58 4     A. For start materials I will like at the

16:03:00 5  size of the gift and assume that was baked into

16:03:04 6  the cost of my struck that wouldn't be the only

16:03:07 7  thing but that would be a starter point.

16:03:08 8     Q. Where is that does that assumption come

16:03:10 9  from?

16:03:12 10     MS. PAPEZ:  Objection.  Form.

16:03:12 11     A. Simple inference that in order to cover

16:03:16 12   the cost of the gift the car dealer had to mark up

16:03:19 13   the cost of the truck.

16:03:19 14   BY MR. LITTLE:

16:03:24 15       Q. Do you understand how profit margins work

16:03:26 16   generally?

16:03:26 17          MS. PAPEZ: Objection. Form.

16:03:28 18       A. Generally.

16:03:28 19   BY MR. LITTLE:

16:03:29 20       Q. And if that car dealer bought the car he

16:03:31 21   sold you let's presume its knew I hope it's a nice

16:03:34 22   knew toy I can't that tun draw and he bought it

16:03:37 23   we'll assume that for the basis of the question

16:03:39 24   and he bought it for $10,000 and was able to sell

16:03:42 25   it to you are from 11 his profit would be keeping

Page 186

16:03:45 1   operational costs aside thousand dollars correct?

16:03:48 2       A. Yes.

16:03:49 3       Q. If he disclosed to you that the cost of

16:03:53 4   the car to him by toy I can't that where he got it

16:03:57 5   was $10,000 you would though there's spread of a

16:04:01 6   thousand dollars between price he paid for that

16:04:03 7   truck and the price he should sold you correct?

16:04:07  8      A. Yes.

16:04:07  9      Q. And if he used that thousand dollars to

16:04:09 10   give your wife the gift would you still be

16:04:11 11   concerned?

16:04:11 12      MS. PAPEZ: Objection. Form.

16:04:18 13      A. Because he didn't disclose he was going to

16:04:20 14   use the money for my wife.  I'm drawing parallel

16:04:24 15   back to this process.  Disclose we care about the

16:04:27 16   disclosure of what the costs are that make up one

16:04:31 17   of our purchases and we want to know those details

16:04:35 18   especially when it involves our employees.

16:04:35 19   BY MR. LITTLE:

16:04:39 20      Q.   So I presume that in transactions you do

16:04:41 21   with brokers you disclose the accurate fees that

16:04:48 22   Amazon pays to a broker in the course of its real

16:04:50 23   estate transactions; is that correct?

16:04:56 24      MS. PAPEZ: Objection. Form.

16:04:58 25      A. Yes in the CAR process we ask our teams to

Page 187

16:05:01  1   gather all of details about what fees we're paying

16:05:04  2   for to whom and why.

16:05:04 3   BY MR. LITTLE:

16:05:06 4       Q.   What I'm asking is when you use a broker

16:05:08 5   and you engage in a real estate transaction with

16:05:10 6   an external party I assume you provide that

16:05:12 7   external party with accurate information about the

16:05:14 8   fees that you're paying that broker or his work or

16:05:17 9   her work in that transaction?

16:05:20 10       MS. PAPEZ: Objection. Form.

16:05:20 11   BY MR. LITTLE:

16:05:25 12       Q. Is that correct?

16:05:25 13       MS. PAPEZ: Objection form foundation.

16:05:27 14       A. General whether I correct yes there's

16:05:29 15   transparency in the process of all the endties we

16:05:32 16   do.

16:05:33 17       Q. So you're not aware that Amazon has an

16:05:35 18   agreement with K B C to kick back a portion of its

16:05:40 19   fees as a rebate to Amazon that's not disclosed to

16:05:44 20   any of the individuals on the other side of those

16:05:46 21   transactions?

16:05:53 22       MS. PAPEZ:  Objection form foundation.

16:05:55 23       A. In this I'm not familiar with KBC and I'm

16:05:59 24   not familiar with those agreements or fees.

16:05:59 25   BY MR. LITTLE:

16:06:04  1     Q. Any broker you're not aware that any

16:06:06  2     broker who works for Amazon kicks back undisclosed

16:06:09  3     fees to Amazon that the sellers do not know about

16:06:14  4     the?

16:06:14  5          MS. PAPEZ: Objection. Form.

16:06:18  6     A. New York Avenue no I'm not and keyword is

16:06:21  7     undisclosed so its all about transparency and

16:06:25  8     disclosure.

16:06:25  9     BY MR. LITTLE:

16:06:27 10     Q. If there is a closing statement in the

16:06:28 11     real estate transaction that list as brokerage fee

16:06:30 12     that Amazon is paying to a broker in this example

16:06:34 13     use KBC and its listed in a certain percentage

16:06:38 14     sale would it be fair for the seller to believe

16:06:40 15     that Amazon is paying the amount represented on

16:06:44 16     the settlement statement to that broker?

16:06:46 17          MS. PAPEZ:  Objection form foundation.

16:06:50 18     A. I think based on what you're describing I

16:06:51 19     think so.

16:06:52 20     Q. When a.m. purchased its properties from

16:06:55 21     the seller, the seller has to pay brokerage fees

16:07:01 22     in those circumstances?

16:07:01 23          MS. PAPEZ: Objection. Form.

16:07:04 24      A. Yes in most cases I believe that's a case.

16:07:04 25  BY MR. LITTLE:

Page 189

16:07:07 1       Q. There's circumstance in that what broker

16:07:09 2   is not taking that entire fee but return ago

16:07:12 3   portion to Amazon without disclosing that to the

16:07:14 4   seller is that proper?

16:07:17 5       MS. PAPEZ:  Object to form.

16:07:19 6       A. I think it depends on circumstances and

16:07:23 7   per agreement and relationship is with that seller

16:07:25 8   and frankly -- sorry with that broker but without

16:07:31 9   the details it's hard for me to say it is or it

16:07:35 10  isn't appropriate.

16:07:39 11      Q. You could have an agreement with a broker

16:07:40 12  where the broker does that, right?

16:07:45 13      MS. PAPEZ: Objection. Form.

16:07:46 14      A. I suppose that's true.

16:07:48 15      Q. If the seller doesn't though that is that

16:07:50 16  proper or not?

16:07:50 17      MS. PAPEZ: Objection. Form.

16:07:53 18      A. I think depending on who the seller is it

16:07:58 19    may or may not be appropriate this certain

16:08:00 20    circumstances.

16:08:01 21    BY DEFENSE COUNSEL:

16:08:07 22        Q. Amazon does that and seller beliefs it is

16:08:09 23    paid a certain price certain percentage it learned

16:08:12 24    later that the broker got a reduced percentage and

16:08:15 25    Amazon was able to say save 300,000 dollars inned


                                                      Page 190


16:08:19  1    course of multi million dollar transaction do you

16:08:24  2    believe that seller has been harmed?

16:08:24  3        MS. PAPEZ: Objection. Form.

16:08:28  4        A. I don't know if the seller has been harmed

16:08:30  5    and I don't know because I don't know what the

16:08:32  6    relationship is with that broker and how many

16:08:35  7    transactions were thought.  There could be

16:08:38  8    legitimate reasons that we're doing it and I don't

16:08:41  9    know that what if any harm would have been caused

16:08:44 10    to that seller.

16:08:44 11        Q. I understand there could be again benefits

16:08:47 12    to Amazon in this relationship and what I'm asking

16:08:49 13    is whether you thick of any reason that would

16:08:51 14    benefit a seller that it would pay what it

16:08:54 15    believed to be a certain fee to broker then some

16:08:57 16    fees would go back to Amazon as regular basis

16:09:00 17    without a rebate without that transaction being

16:09:03 18    disclosed to seller?

16:09:03 19        MS. PAPEZ:  Objection to form.

16:09:12 20        A. I don't know I'm not going to speculate

16:09:14 21    what harm may or may not been caused to that

16:09:17 22    seller.

16:09:18 23    BY DEFENSE COUNSEL:

16:09:18 24        Q. How can you speculate about the harm

16:09:20 25    that's been allegedly cause in the case?

Page 191

16:09:25 1        MS. PAPEZ:  Object to form misstates

16:09:26 2    testimony.

16:09:26 3        A. To be clear I'm not speculating I'm saying

16:09:30 4    what I have read in the complaint and what we were

16:09:33 5    learned through discovery.

16:09:33 6    BY MR. LITTLE:

16:09:35 7        Q. What is the difference that allows you to

16:09:37 8    say there is harm in this scenario but not to have

16:09:41 9    hypothetical where Amazon is hidings the rebates

16:09:44 10   that it gets from its brokers from sellers on the

16:09:47 11   course of real estate transactions.

16:09:55 12        MS. PAPEZ:  Objection.  Form.

16:09:55 13     A. I'm talking about specifics you use the

16:09:59 14   word hiding -- I don't know that -- I'm not

16:10:01 15   familiar with it enough and I don't know what I

16:10:03 16   would agree with your term hiding because I don't

16:10:05 17   know the circumstances or the details around this

16:10:07 18   K B B or K B B transaction.

16:10:07 19   BY MR. LITTLE:

16:10:13 20     Q. If Amazon had an agreement where a broker

16:10:16 21   agreed to pay a percentage of its fees on a

16:10:20 22   regular basis to Amazon, fees that it learn earned

16:10:25 23   the course of transactions that it did on behalf

16:10:28 24   of Amazon as a real estate broker and did not

16:10:30 25   disclose those to the seller how would you

Page 192

16:10:32 1   describe that arrangement?

16:10:32 2        MS. PAPEZ: Objection. Form.

16:10:38 3     A. Not sure -- I'm not sure how you want me

16:10:41 4   to describe that.  Sorry I'm not trying to be

16:10:44 5   difficult I just don't.  I'm not sure how to

16:10:47  6    answer the question.

16:10:47  7    BY MR. LITTLE:

16:10:48  8        Q. Would you believe that it would be

16:10:50  9    transparent on Amazon's part vis-a-vis the seller?

16:10:50 10        MS. PAPEZ: Objection. Form.

16:10:56 11        A. The way you have described it, no, I don't

16:11:00 12    know that that's particularly transparent but I

16:11:03 13    also don't though whether that's expected and

16:11:04 14    customary, so it's hard for me to comment.

16:11:04 15    BY MR. LITTLE:

16:11:08 16        Q. So there are circumstance this is which

16:11:15 17    transparency may not be in the the course or real

16:11:19 18    estate fair?

16:11:19 19        MS. PAPEZ: Objection. Form.

16:11:20 20        A. There maybe but in this transaction and

16:11:22 21    this rest we're talking about two employees who

16:11:25 22    are bound by our code of conduct we trust to go

16:11:28 23    act in the best interest of Amazon and who did not

16:11:31 24    disclose they were going to receive money as a

16:11:34 25    result of acquiring these properties.

Page 193

16:11:34  1  BY MR. LITTLE:

16:11:38  2      Q. Let's drill down to just what you know

16:11:40  3  because as I understand those facts you were told

16:11:43  4  those facts correct?

16:11:44  5      A. I reviewed the facts that were discovered

16:11:47  6  in an investigation presented.

16:11:48  7      Q. But you don't have any first-hand

16:11:51  8  knowledge of any of the facts that you're talking

16:11:53  9  about at this point correct?

16:11:55 10      MS. PAPEZ: O form misstates testimony.

16:11:55 11  BY MR. LITTLE:

16:11:58 12      Q. Do you have any first-hand knowledge of

16:12:00 13  any of things that we're talk about in terms of

16:12:03 14  any of the money that flowing back to Casey or

16:12:07 15  Carl Nelson?

16:12:07 16      A. I did not participate.

16:12:09 17      Q. So you of relying on individuals who did

16:12:11 18  and coming to the conclusions that you are is that

16:12:14 19  fair?

16:12:14 20      MS. PAPEZ:  Objection. Form.

16:12:17 21      A. Yes that's fair.

16:12:17 22  BY MR. LITTLE:

16:12:19 23      Q. For example, you understand the

16:12:20 24  transactions that you're describing here a complex

16:12:23 25  transactions involving multiple entities?

Page 194

16:12:23  1        MS. PAPEZ: Objection. Form.

16:12:27  2        A. That your understanding.

16:12:29  3        A. Yes, that's my understanding.

16:12:32  4        Q. If for example Northstar had a referral

16:12:34  5   arrangement or referral fee with an external party

16:12:39  6   do you know whether or not that would be proper?

16:12:39  7        MS. PAPEZ: Objection. Form.

16:12:47  8        A. It may be proper but I would expect to see

16:12:49  9   it in the disclosure.

16:12:49 10   BY MR. LITTLE:

16:12:51 11        Q. So if there is a disclosure that listed

16:12:53 12   brokerage fees or items of that sort would you

16:12:57 13   have any concerns about that?

16:12:57 14        MS. PAPEZ: Objection. Form.

16:13:04 15        A. If it was disclosed an we were able to

16:13:06 16   have a discussion about it and understand what the

16:13:08 17   fees were for and what services were being provide

16:13:11 18   add why that was in the best interest of Amazon,

16:13:13 19   it may be okay.

16:13:22 20        Q. Is it your understanding that Northstar

16:13:24 21   paid Carl and Casey directly with the deals

16:13:28 22   involving Northstar?

16:13:28 23       MS. PAPEZ: Objection. Form.

16:13:31 24       A. No that's not my understanding.

16:13:33 25       Q.

Page 195

16:13:33  1       DEFENSE COUNSEL:  What is your understand

16:13:34  2   as to what entities star provided money to.

16:13:39  3       A. There were a number of -- I don't think

16:13:43  4   I'll get them in the right order but I think there

16:13:45  5   were a number of entities and companies ultimately

16:13:50  6   the money passed through.  I remember Cheshire

16:13:56  7   something as companies that Carl and or Casey

16:14:02  8   received disbursements from.  How that money made

16:14:07  9   its way through there kind of after high level

16:14:11 10   knowledge of based on what I read in the

16:14:14 11   investigation.

16:14:14 12   BY MR. LITTLE:

16:14:15 13       Q. Is it your belief that those -- that money

16:14:19 14   flowed outside the normal course of business?

16:14:19 15       MS. PAPEZ: Objection. Form.

16:14:26 16       A. I would characterize it as outside the

16:14:28 17   normal flow of business because none of this

16:14:31 18   disclosed and it sure seems like people work

16:14:34 19   pretty hard to not disclose to trail of money and

16:14:39 20   where it was going an from where.

16:14:39 21   BY MR. LITTLE:

16:14:41 22       Q. What do you believe was done to work hard

16:14:43 23   to not disclose the trail of money?

16:14:47 24       A. Based on the investigation and the details

16:14:53 25   and the results of that investigation that I read

Page 196

16:14:55  1   it seems that various companies were stood up by

16:14:58  2   associates of Casey and Carl for the purpose of

16:15:03  3   receiving money through the Amazon transaction

16:15:07  4   through things like white peaks and Northstar or

16:15:11  5   Villanova, money then made its way to companies

16:15:14  6   that Carl and Casey and their associates -- Carl I

16:15:18  7   think his name was stood up and then made that

16:15:23  8   money accessible to Casey and Carl through various

16:15:27  9   means.

16:15:27 10       Q. If you were mace taken about how and why

16:15:30 11   those entities were created, would you concede

16:15:32 12   that maybe you don't know all the facts?

16:15:32 13          MS. PAPEZ: Objection. Form.

16:15:38 14      A. If somebody came back and said hay we got

16:15:41 15   this wrong this wasn't the way it happened, yeah,

16:15:45 16   I would be open to coming to a different

16:15:47 17   conclusion or sharing the details that I have just

16:15:50 18   shared with you differently.  I'm relying on facts

16:15:54 19   that I believe were gathered diligently in this

16:15:57 20   investigation.

16:15:57 21   BY MR. LITTLE:

16:15:58 22      Q. Have you ever spoken to Carl Nelson about

16:16:01 23   these matters?

16:16:01 24      A. Nothing, I have not.

16:16:02 25      Q. Do you know whether anyone at Amazon has

Page 197

16:16:05 1   officered -- -- strike that.  If I represent today

16:16:07 2   you that Carl has tried since April of 2020 to

16:16:12 3   speak with Amazon about he's matters is that news

16:16:15 4   to you?

16:16:15 5          MS. PAPEZ: Objection. Form.

16:16:18 6      A. It is news to me.

16:16:18 7   BY MR. LITTLE:

16:16:21  8        Q. Does it surprise you to learn now two

16:16:23  9    years into this that Carl has sought through

16:16:26 10    counsel to try to speak to Amazon since April

16:16:29 11    2020?

16:16:29 12        MS. PAPEZ: Objection. Form.

16:16:30 13        A. That's knew information to me.

16:16:30 14    BY MR. LITTLE:

16:16:34 15        Q. Let's turn to white peaks you have

16:16:36 16    references that a few times as one of the entities

16:16:39 17    involved what is your understanding of the white

16:16:42 18    peaks transaction?

16:16:47 19        A. I don't know it would characterize my

16:16:49 20    understanding as a transaction I believe white

16:16:53 21    peaks but one of the entities that money Amazon

16:16:57 22    paid went to that again engaged in some sort of

16:17:01 23    relationship with Carl and Casey and their

16:17:06 24    associates.  I'll trying to do from memory I don't

16:17:10 25    remember which transaction is map today what

Page 198

16:17:13  1    entity.

16:17:13  2        Q. So if I reported to that white peaks as

16:17:18  3    has do with the two land acquisition I IAD 130,

16:17:22  4   131 would you have any reason to dispute that?

16:17:24  5       A. I would not have a reason.

16:17:26  6       Q. You understand this tier series of lease

16:17:28  7   transactions with star this case involves and then

16:17:31  8   two direct purchase transactions?

16:17:33  9       A. Yes.

16:17:33 10       Q. So we'll take one of those direct

16:17:35 11   purchases transactions  that involved an entity

16:17:38 12   called white peaks capital one of defendants in

16:17:41 13   this case.  If you want to direction to page 65 of

16:17:44 14   the Exhibit 12 which is document 13?

16:17:53 15       A. Stand by.  Page 65 you said.

16:17:56 16       Q. Yes?

16:18:04 17       A. I'm on page 65.

16:18:10 18       Q. If you review perhaps 294 to 298 and see

16:18:13 19   if that refresh your recollection to the

16:18:17 20   allegations in this transaction?

16:18:52 21       A. Okay.

16:18:54 22       Q. This alleged transaction happened December

16:18:57 23   of 2019; is that correct?

16:18:59 24   That was summer

16:19:06 25          MS. PAPEZ: Objection. Form

16:19:07  1      A. In 294 I see in the summer of 2019 is that

16:19:11  2   the one you're referring to.

16:19:12  3      Q. Yes?

16:19:12  4      A. Yes.

16:19:14  5      Q. Carl Nelson was not an employee of Amazon

16:19:18  6   in the summerover 2019?

16:19:22  7      A. He may not have been I don't remember the

16:19:24  8   exact date when Carl left the company.  I don't

16:19:28  9   know the circumstances around Carl's separation

16:19:33 10   from the company and I don't know the exact times

16:19:36 11   if you say so okay.

16:19:37 12      Q. If I represented to you it was in early

16:19:41 13   May and early June for this transaction would you

16:19:44 14   have any reason to disdispute that?

16:19:49 15      A. No, sir.

16:19:50 16      Q. Can you explain then how and you can

16:19:53 17   reference this if you wish Amazon has been harmed

16:19:55 18   by the transaction listed here as the white Pete's

16:20:00 19   transaction?

16:20:00 20      MS. PAPEZ: Objection. Form incompleteness?

16:20:12 21      A. Base on the 4 paragraphs I'm reading I

16:20:15 22   don't see reference to Amazon.

16:20:17 23      Q. You can read on and let me clarify you

16:20:20 24   don't have to refer to the complaint at all let me

16:20:22 25   ask you directly thought it might be useful to

Page 200

16:20:25  1   refresh your recollection what is your

16:20:25  2   understanding of how Amazon was harmed by the

16:20:29  3   white peek's transaction?

16:20:34  4        A. As I recall and I'm not sure where in this

16:20:36  5   document that is, but the white peaks transactions

16:20:41  6   were unique in that A there was no disclosure of

16:20:48  7   us working with white peeks that I recall and I

16:20:51  8   thinks the misrepresented that this land flip had

16:20:54  9   occurred a year earlier when in fact it occurred

16:20:58 10   and closed in a much shorter time frame than that

16:21:01 11   and those profits then were used again to funnel,

16:21:07 12   feed, kickbacks to some of the folks we talked

16:21:12 13   about in this investigation.

16:21:14 14        Q. That is the most detail you have about

16:21:17 15   that transaction?

16:21:17 16        MS. PAPEZ: Objection. Form.

16:21:20 17        A. From memory.

16:21:24 18        Q. Jaw from memory?

16:21:25 19        A. Yes.

16:21:25 20 Q. So if discovery -- you say that one of

16:21:29 21 issues but a representation of how long the land

16:21:31 22 had been under control is that a question I know

16:21:36 23 just a moment ago correct?

16:21:38 24 A. During the investigation I recall it was

16:21:42 25 pointed out that land was represented as changes

Page 201

16:21:46 1 hands in one time frame when it changed hand

16:21:49 2 another time frame.

16:21:50 3 Q. What does it mean for a land to change

16:21:52 4 hands?

16:21:53 5 A. Change owner of record.

16:21:55 6 Q. Okay.  So if you are -- so in the course

16:21:59 7 of commercial real estate if an intervail take a

16:22:04 8 land under contract and has the ability to control

16:22:06 9 that land you don't believe the property has

16:22:09 10 changed happeneds at that point?

16:22:09 11 MS. PAPEZ: Objection. Form.

16:22:13 12 A. I guess the way you describe it I would

16:22:15 13 have to agree with that.

16:22:17 14 Q. So if it's common in commercial real

16:22:20 15   estate for folk who work in this area to refer as

16:22:23 16   taking control of the property as the time they

16:22:25 17   have a contract to be able to take control of that

16:22:28 18   property would you have any reason to believe

16:22:30 19   that's unusual?

16:22:30 20        MS. PAPEZ: Objection. Form.

16:22:33 21     A. I don't have any reason to believe that's

16:22:34 22   unusual.

16:22:34 23   BY MR. LITTLE:

16:22:36 24     Q. In fact in commercial real estate there

16:22:37 25   maybe times where contracts extend for a long

Page 202

16:22:39 1   period of time due to due diligence before

16:22:47 2   closing?

16:22:47 3        MS. PAPEZ: Objection. Form.

16:22:48 4     A. Okay.

16:22:48 5     Q.

16:22:49 6   BY DEFENSE COUNSEL:

16:22:50 7     Q. You agree with that that a does happen in

16:22:54 8   the commercial real estate?

16:22:55 9     A. I'm going to agree you with because I'm

16:22:58 10   not a real estate transaction manager.

16:23:01 11      Q. Do you know if the people who conducted

16:23:03 12    the investigation that you relied upon had any

16:23:05 13    knowledge about the difference between a closing

16:23:06 14    date for real estate or the date real estate may

16:23:08 15    have gone under contract to be controlled?

16:23:08 16          MS. PAPEZ: Objection. Form.

16:23:12 17      A. I don't know the specific individuals that

16:23:15 18    provided details to the investigators internally

16:23:19 19    but it would surprise me if members of our real

16:23:23 20    estate team either internal or external weren't

16:23:27 21    consulted.

16:23:29 22      Q. That would surprise you, wouldn't it?

16:23:31 23      A. It would surprise.

16:23:33 24      Q. It would surprise you if investigators

16:23:35 25    made such a basic mistake that not understand that

Page 203

16:23:38  1    land can be controlled well before a closing date?

16:23:42  2          MS. PAPEZ: Object to form in this states

16:23:44  3    testimony.

16:23:44  4      A. I'm saying that I agree with your

16:23:48  5    statement I guess what I'm trying to say the

16:23:53  6   investigations that I'm familiar with this one and

16:23:54  7   other ones are quite thorough and done by -- they

16:24:00  8   true to include the right skills per speck I was

16:24:04  9   the an do mains so it would surprise me if we

16:24:07 10   didn't engage people who didn't have some sort of

16:24:11 11   subject matter expertise.  That's all I'm saying.

16:24:11 12   BY MR. LITTLE:

16:24:15 13       Q. So are you aware that the person who owned

16:24:17 14   the piece of property issued in the white peaks

16:24:21 15   transaction before it was purchased by white peak

16:24:24 16   capital was a man named chuck coon and his company

16:24:28 17   J K moving?

16:24:29 18       A. I think I remember the of reference to

16:24:32 19   that name.  Again --

16:24:36 20       Q. And I think you referred in the beginning

16:24:38 21   to this testimony to this transaction being a

16:24:41 22   single day flip; is that correct you referred that

16:24:46 23   some way?

16:24:46 24       MS. PAPEZ: Objection. Form.

16:24:48 25       A. Sorry I think I did say that and from

Page 204

16:24:50  1   memory yeah I don't know if it was single day -- I

16:24:52  2    may have said that but I can't be sure on that

16:24:58  3    again doing it from memory.

16:24:58  4    BY MR. LITTLE:

16:25:00  5        Q. What do you mean when you say a single day

16:25:03  6    flip?

16:25:03  7        A. I guess what I'm pointing out is my

16:25:07  8    recollection of going through this sometime ago

16:25:12  9    and I don't know how long it's been but is that

16:25:17 10    there was land that was represented I think I even

16:25:22 11    red it in these paragraphs -- that land was held

16:25:26 12    for one date and then represented as being held

16:25:30 13    for a longer period of time on or about a year, I

16:25:34 14    think and represented to Amazon and others that

16:25:39 15    this land has been held for a while and then in

16:25:43 16    the course of investigation again what I recall

16:25:45 17    and I don't even I'm not even sure how it

16:25:49 18    transpired that the land was not held for a year

16:25:52 19    it was held and flipped within a much shorter

16:25:58 20    period.

16:25:58 21    BY MR. LITTLE:

16:25:58 22        Q. I think you were incorrect if the

16:26:00 23    investigation were incorrect as to the amount of

16:26:02 24    time that the land was controlled by a white peeks

16:26:05 25    capital before it was sold to Amazon would that

16:26:07  1   change your views about the transaction?

16:26:07  2        MS. PAPEZ: Objection. Form.

16:26:12  3      A. Yeah, it might.  It would change my views

16:26:17  4   perhaps on that specific aspect of this

16:26:21  5   investigation.  I don't think it wipes the slate

16:26:24  6   clean for all the other things that we have talked

16:26:26  7   about.

16:26:27  8      Q. I understand blue if there's an record in

16:26:29  9   that it might cause you to investigate more

16:26:34 10   thoroughly as a prudent person the other

16:26:35 11   allegation as as well?

16:26:35 12        MS. PAPEZ: Objection. Form.

16:26:38 13      A. Yes it's a fair statement.

16:26:38 14   BY MR. LITTLE:

16:26:40 15      Q. In this case are you aware or new

16:26:43 16   information land at issue was under contract and

16:26:46 17   control by the entity that previously sold it on

16:26:48 18   that day to Amazon for 6 months or more?

16:26:52 19        MS. PAPEZ: Objection. Form.

16:26:59 20      A. Can you restate the question part of that.

16:27:01 21      Q. Were you aware or is it new information

16:27:03 22   that the entity that was involved in this

16:27:05 23   transaction of white peeks capital had the land

16:27:08 24   under control for 6 months or more?

16:27:08 25        MS. PAPEZ: Objection. Form.

Page 206

16:27:11 1        A. Its new information in the sense that I

16:27:19 2   don't recall 6 months being a time frame.

16:27:19 3   BY MR. LITTLE:

16:27:23 4        Q. Certainly 6 months is longer than a day?

16:27:25 5        A. Yes.

16:27:26 6        Q. If there are individuals who are engaged

16:27:29 7   that that land sale including the individual who

16:27:33 8   owned the property who stated the price what

16:27:35 9   Amazon bought it for was below market price would

16:27:38 10   that change your view as to propriety of this

16:27:49 11   transaction?

16:27:52 12        MS. PAPEZ:  I think for the court reporter

16:27:54 13   for all our sakes could you please let Chris

16:27:56 14   finish this is I think I let it go a couple of

16:27:59 15   times but just let him finish let's try to

16:28:02 16   organize this a little bit more because couple of

16:28:04 17   times is forgivable but I think its too much.

16:28:08 18    Thanks.

16:28:08 19    BY MR. LITTLE:

16:28:11 20        Q. If you can restate the question I'll

16:28:13 21    certainly answer best I can?

16:28:15 22    BY MR. LITTLE:

16:28:16 23        Q. I'm going to go a different way were you

16:28:18 24    aware that your legal team at AWS had an of the

16:28:23 25    appropriate information as in the exact amount of

Page 207

16:28:26 1    time that land had been held under control by the

16:28:28 2    previous contract holder at the time this

16:28:30 3    transaction was undertaken?

16:28:35 4        MS. PAPEZ:  Objection form foundation.

16:28:36 5        A. I'm not a ware of detailses of what our

16:28:40 6    legal team had and didn't have.

16:28:40 7    BY MR. LITTLE:

16:28:42 8        Q. In the CAR itself included information

16:28:43 9    about the prior transactions and the prior

16:28:46 10    purchase price would that lead you to believe this

16:28:51 11    information was being hidden as you previously

16:28:53 12    described your beliefs?

16:28:56 13        MS. PAPEZ: Objection. Form?

16:28:57 14   BY DEFENSE COUNSEL:

16:28:58 15        Q. Or would you come to another conclusion?

16:29:00 16        MS. PAPEZ: Objection. Form misstates

16:29:03 17   testimony?

16:29:03 18        Q. I think what I'm trying to articulate is

16:29:06 19   that if all of these transactions that are -- that

16:29:11 20   build up to the cost that Amazon pays are fully

16:29:15 21   disclosed and transparent so we can have a

16:29:17 22   discussion about it and make an informed decision

16:29:20 23   about whether we're okay paying for that or we

16:29:23 24   think that's appropriate if everything is out in

16:29:25 25   the open and we can have a conversation about it

Page 208

16:29:28  1   then I'm less concerned?

16:29:28  2   BY MR. LITTLE:

16:29:30  3        Q. Purchase price that someone pays for a

16:29:32  4   piece of real estate is out in the open generally,

16:29:34  5   is it not?

16:29:35  6        MS. PAPEZ: Objection. Form.

16:29:37  7        A. Based on some of the prior conversation

16:29:43  8   when you record a transaction it's recorded and

16:29:46  9    accessible.

16:29:48 10        Q. Getting to ask the question of what is the

16:29:50 11    quantity of harm in the white makes transaction to

16:29:56 12    Amazon?

16:29:58 13        MS. PAPEZ: Objection. Form.

16:30:01 14        A. I don't know the exact point of the

16:30:03 15    monetary harm.

16:30:03 16    BY MR. LITTLE:

16:30:04 17        Q. How would you calculate it?

16:30:04 18        MS. PAPEZ: Objection. Form.

16:30:08 19        A. Again I'm not sure if we go back to the

16:30:16 20    CAR example I would start what would it cost to

16:30:19 21    buy out right and what are a mark ups and who is

16:30:21 22    taking what off the top.

16:30:21 23    BY MR. LITTLE:

16:30:24 24        Q. At the time of this transaction Mr. Nelson

16:30:28 25    did know work at Amazon if he did not work at

Page 209

16:30:31  1    Amazon at the time what obligations does he have

16:30:33  2    to not work for example the seller or buyer case

16:30:37  3    the seller in this case?

16:30:37  4          MS. PAPEZ: Objection. Form.

16:30:42  5          A. I want to make sure we get the time frame

16:30:46  6    right this says on or about July 2019.

16:30:51  7          MR. LITTLE:  July 30th is the date in

16:30:53  8    paragraph 296.

16:30:54  9          A. Can recall was an employee through May and

16:30:57 10    June of 2019.

16:30:58 11          Q. I think the last day was June 11th we'll

16:31:01 12    still e stipulate that for now?

16:31:05 13          MS. PAPEZ:  Please let him finish and Lee

16:31:08 14    let's try to keep some space.

16:31:11 15          A. Hear's where I'm going with that, these

16:31:14 16    transactions doesn't get done.  If you don't do

16:31:17 17    does diligence in in matter of few weeks or days

16:31:21 18    the due diligence would have started while Carl

16:31:23 19    was still an employee of Amazon which means these

16:31:27 20    transactions these propertys were in our pipeline

16:31:30 21    and we were gathering data on them while he was

16:31:32 22    still employed at Amazon.

16:31:34 23          Q. Do you have any reason to believe that

16:31:35 24    Carl had any knowledge of white peak's desire to

16:31:40 25    purchase this property while he was at Amazon?

16:31:40  1        MS. PAPEZ: Objection. Form.

16:31:46  2        A. I don't know what Carl desired or not.

16:31:46  3    BY MR. LITTLE:

16:31:49  4        Q.   Do you have any reason to believe that

16:31:50  5    Carl had information that white peeks but

16:31:54  6    intending -- let me restate that do you have any

16:31:57  7    information that leads you to believe that Carl

16:32:00  8    intended to be involved in this transaction when

16:32:02  9    he was at Amazon?

16:32:10  10       MS. PAPEZ: Objection. Form.

16:32:11  11       A. I don't have any first-hand knowledge --

16:32:15  12       Q. Are you aware?

16:32:18  13       MS. PAPEZ:  Please let the witness finish

16:32:19  14   his answer.  Thank you.

16:32:25  15       A. I don't have firsthand information and I

16:32:27  16   don't know if Carl was aware or not.

16:32:29  17   BY GOVERNMENT COUNSEL:

16:32:30  18       Q. If there were no such evidence that Carl

16:32:32  19   was aware would that mitigate your concern about

16:32:35  20   the due diligence point you have just raised?

16:32:35  21       MS. PAPEZ: Objection. Form.

16:32:42  22       A. Not necessarily.  Again its about

16:32:48  23   transparency and disclose your and we need to see

16:32:52  24   the facts.

16:32:52 25   BY MR. LITTLE:

Page 211

16:32:54 1      Q.   So walk through that just to kind of

16:32:56 2   walking through this point if an entity called

16:32:59 3   white peeks capital controlled by Kyle Ramstetter

16:33:03 4   buys a piece of property and marks to multiple

16:33:06 5   people one of whom is Amazon understand and at

16:33:10 6   some point in time after Carl leaves Amazon he

16:33:13 7   attempts to work with white peaks capital doesn't

16:33:17 8   actually end up doing so.   In that scenario has

16:33:23 9   Carl done anything wrong?

16:33:25 10      MS. PAPEZ: Objection. Form.

16:33:29 11      A. I don't want to speculate the way you have

16:33:33 12   described it probably not.

16:33:33 13   BY MR. LITTLE:

16:33:35 14      Q. There maybe other factors that you have to

16:33:38 15   identify them that could be problematic is that

16:33:42 16   fair?

16:33:42 17      MS. PAPEZ: Objection. Form.

16:33:44 18      A. Yes that's fair.

16:33:44 19   BY MR. LITTLE:

16:33:50 20     Q. Do you think it's possible if Amazon's

16:33:52 21  investigation were incorrect about how the

16:33:54 22  transaction -- the W P transaction occurred it may

16:33:59 23  have made a general mistake like it made with

16:34:01 24  wrong employment contract?

16:34:06 25     MS. PAPEZ: Objection. Form.


Page 212


16:34:08  1     A. Yes there's potential for mistakes to be

16:34:12  2  made but I think in this case there's been a

16:34:15  3  pretty -- as it's been relaid to me through some

16:34:19  4  of the documents that I have reviewed it looks to

16:34:22  5  be a pretty thorough investigation here different

16:34:25  6  from asking a level employee somewhere deep in the

16:34:30  7  organization of a million and a half people for a

16:34:32  8  contract on one individual named Carl Nelson.  I

16:34:36  9  think it's a little different in its complexity.

16:34:36 10  BY MR. LITTLE:

16:34:40 11     Q. You don't think a complex investigation

16:34:42 12  like this could make mistakes of a greater nature?

16:34:42 13     MS. PAPEZ: Objection. Form.

16:34:49 14     A. I think any human process has the

16:34:51 15  potential for maybe for some mistakes.  So I'm

16:34:55 16    never going to say never on something like that.

16:34:55 17    BY MR. LITTLE:

16:34:59 18        Q. And again I have never talked to Carl

16:35:01 19    about any of these things and heard his point of

16:35:04 20    view have you?

16:35:07 21        MS. PAPEZ:  Object to form asked and

16:35:08 22    answered.

16:35:08 23        A. I have not spoken to Carl about any to

16:35:11 24    have this.

16:35:11 25    BY MR. LITTLE:


                                            Page 213


16:35:12  1        Q.   Have you spoken to Casey about any of

16:35:14  2    this?

16:35:15  3        MS. PAPEZ: Objection. Form.

16:35:16  4        A. No, I have not spoken to Casey about any

16:35:19  5    of this is.

16:35:19  6    BY MR. LITTLE:

16:35:21  7        Q. Are you aware that the main informant that

16:35:23  8    your company has relied on in its kiln case as

16:35:26  9    pled guilty to federal charges?

16:35:26 10        MS. PAPEZ: Objection. Form.

16:35:31 11     A. No I'm not -- I'm not aware of details

16:35:37 12  around that.

16:35:37 13  BY MR. LITTLE:

16:35:42 14     Q. We don't need to restate that Casey and

16:35:44 15  Carl have not been charged so we won't go there.

16:35:47 16  Continue on this scheme of harm because obviously

16:35:50 17  its important you understand that -- this is a

16:35:56 18  part where I'm going to get into the A E O

16:35:59 19  documents so if Mr. Watson and Mr. Kirschner need

16:36:02 20  to drop off now is the time.

16:36:06 21     MR. WATSON: This is Brian Watson.  I can

16:36:13 22  drop off and if my counsel will just text me when

16:36:13 23  I can come back on, I would appreciate it.  Thank

16:36:15 24  you.

16:36:15 25     MS. BODNER: Yes, I will, Brian.

Page 214

16:36:15 1  BY MR. LITTLE:

16:36:18 2     Q. Let me ask before we get to that part,

16:36:21 3  have you met with anyone from the FBI in

16:36:23 4  connection with the investigation that was started

16:36:25 5  at Amazon?

16:36:25 6     MS. PAPEZ: Objection. Form.

16:36:27  7      A. Yes, I have.

16:36:27  8   BY MR. LITTLE:

16:36:29  9      Q. Where was that?

16:36:29 10         MS. PAPEZ: Objection. Form.

16:36:32 11      A. It was via video conference.  I was at

16:36:35 12   home.

16:36:35 13   BY MR. LITTLE:

16:36:36 14      Q. Did you have a lawyer there with you?

16:36:43 15      Q. Was there a lawyer present on the video

16:36:45 16   conference besides the FBI?

16:36:47 17      A. Yes, I -- yes, there was I'm not sure who

16:36:53 18   all the people were but I do believe Amazon and

16:36:56 19   certainly internal counsel were represented on

16:36:58 20   that call.

16:36:59 21      A. Were there external counsel on the call as

16:37:02 22   well.

16:37:02 23      Q. I don't recall?

16:37:03 24      Q. Do you recall who they spoke with?

16:37:07 25      A. No, I don't remember the names.

Page 215

16:37:09  1      Q. I told you the name Josh Huckle would that

16:37:12  2    as to one of the individuals that you spoke with?

16:37:15  3         A. No, it doesn't.

16:37:19  4         Q. The person you speak with represent

16:37:21  5    himself or herself to be with the FBI?

16:37:25  6         A. Yes.

16:37:25  7         Q. Okay.  What were the topics to that have

16:37:33  8    conversation?

16:37:33  9             MS. PAPEZ: Objection. Form.

16:37:38  10        A. Topicing were pretty high level as I

16:37:40  11   recall it was basically about me what is my

16:37:43  12   position in the company what is my role.  What are

16:37:46  13   am I responsible for secondary I can't was really

16:37:56  14   around the CAR process tell me about the CAR

16:37:58  15   process kind of questions.

16:38:06  16        A. There may have been only questions about

16:38:08  17   policies and things like that that govern the CAR

16:38:11  18   processes.

16:38:12  19        Q. Do you recall any questions about Casey

16:38:17  20   Kirschner or Carl Nelson?

16:38:18  21        A. I don't recall any questions about them.

16:38:20  22        Q. Do you recall raising any concerns about

16:38:22  23   the behavior of Carl Nelson or Casey Kirschner in

16:38:26  24   that conversation with the FBI?

16:38:28  25        A. No, I don't.  One correction if I may the

16:38:35  1    last question the only reference I can recall

16:38:42  2    about Casey and Carl I believe there were some CAR

16:38:44  3    documents shown kind of like what you showed me

16:38:47  4    earlier with e-mail distributions.  I'm not 100

16:38:50  5    percent sure but I think there were some names

16:38:52  6    there annual Casey and Carl's name may have been

16:38:54  7    on some of those documents as he was asking about

16:38:57  8    the CAR process.  I don't want to represent it as

16:39:00  9    there was no discussion some of these artifacts

16:39:06 10    had our name on them.

16:39:06 11    BY MR. LITTLE:

16:39:07 12        Q. If you were asked any question that over

16:39:09 13    lapped the questions that you were asked here

16:39:11 14    today do you remember your answers to be

16:39:12 15    consistent with the testimony you have given in

16:39:15 16    this deposition?

16:39:15 17        MS. PAPEZ: Objection. Form.

16:39:20 18        A. Given that our conversations were mostly

16:39:22 19    about the process I'm pretty sure my testimony

16:39:25 20    would have been consistent with that conversation.

16:39:25 21    BY MR. LITTLE:

16:39:34 22        Q.

16:39:34 23          GOVERNMENT COUNSEL:  Chris go ahead and

16:39:36 24   finish.

16:39:36 25          A. I kind of -- I was finished then I jumped


                                                        Page 217


16:39:39 1    back in so to the best of my recollection the I

16:39:43 2    have given you consistent testimony mainly and

16:39:46 3    again the overlap appears to be around the CAR

16:39:49 4    process.

16:39:49 5          Q. That's all I'm asking about were there any

16:39:51 6    documents that you requested that provided that?

16:39:51 7          MS. PAPEZ: Objection. Form.

16:39:59 8          A. No.

16:39:59 9    BY MR. LITTLE:

16:40:03 10         Q. You have not testified in any federal

16:40:05 11   grand jury have you?

16:40:05 12         MS. PAPEZ: Objection. Form.

16:40:10 13         A. No. I have not.

16:40:10 14   BY MR. LITTLE:

16:40:11 15         Q.   Are you aware of any Amazon employee

16:40:13 16   testifying before the grand jury?

16:40:16 17         MS. PAPEZ: Objection. Form.

16:40:17 18        A. No, I am not.

16:40:19 19        Q. I apologize I I think we're going to turn

16:40:39 20    to the A E O document?

16:40:42 21        MS. PAPEZ:  Just for the record this is an

16:40:44 22    AEO document that is within the ambit of the

16:40:47 23    agreement for Mr. Nelson.

16:40:51 24        MR. LITTLE:  That's correct.

16:40:51 25        MS. PAPEZ:  Is he privy to.


                                                    Page 218


16:40:54  1        MR. LITTLE:  We state on the record we

16:40:54  2    don't think there's any basis this BAEO and his

16:40:56  3    AEO becasue Amazon and IPI agreed to during the

16:41:00  4    course of this litigation which I think an

16:41:01  5    improper designation.  Nonetheless we don't have

16:41:03  6    an objection at present to using this fashion

16:41:06  7    because Mr. Nelson is allowed to see it.

16:41:09  8        MS. PAPEZ:  Pursuant to tour agreement and

16:41:11  9    reserving all our objections including the one you

16:41:14 10    just challenged thank you Alex.

16:41:14 11    BY MR. LITTLE:

16:41:19 12        Q. You should see document 14 on your screen.

16:41:25 13    I apologize this one is one page short.  I'm not

16:41:31 14    going to not use that exhibit.  We'll show you --

16:41:48 15    okay?

16:41:51 16        Q. On document 14 that's going to be marked

16:41:54 17    CV 13?

16:42:00 18                    (Exhibit 13 was marked.)

16:42:01 19    BY MR. LITTLE:

16:42:02 20        Q. Do you recognize this document?

16:42:03 21        A. Yes what is it.

16:42:04 22        A. Just double checking -- yes, I recognize

16:42:11 23    the document.  This is I understand this is a

16:42:14 24    document that Amazon negotiated with a company

16:42:21 25    called IPI to accomplish a couple of things one,

Page 219

16:42:28 1     secure the properties that had been developed an

16:42:31 2     occupied by Amazon specifically things that we put

16:42:40 3     server as are thousand running data through and

16:42:42 4     one of objective was to make sure that in spite of

16:42:47 5     all these proceedings that we were going to be

16:42:50 6     able to retain the use of those assets an make

16:42:52 7     sure that we had business continuity no matter

16:42:55 8     what the outcome of these proceedings that was

16:42:58  9   kind of objective one as I understand it with this

16:43:01 10   agreement and objective two was to renegotiate

16:43:09 11   some of rates and money that Amazon was going to

16:43:11 12   pay for use of those facilities going forward as

16:43:15 13   well as recooping some of the money that we felt

16:43:18 14   that we had over paid in the past prior to this

16:43:22 15   renegotiation occurring.

16:43:26 16       Q. You testified that Amazon negotiated this

16:43:28 17   document who negotiated this document

16:43:30 18   specifically?

16:43:34 19       A. I don't know the individuals that

16:43:35 20   negotiated this specific document.

16:43:37 21       Q. Did you negotiate this document yourself?

16:43:39 22       A. IPI.

16:43:45 23       Q. Did Dennis Wallace part in the no

16:43:48 24   objection of this document?

16:43:49 25          MS. PAPEZ:  I'm going to object but you

Page 220

16:43:51  1   can go ahead and answer the question the factual

16:43:53  2   question whether Dennis negotiated the document

16:43:56  3   I'm going to instruct you not to get into any

16:43:58  4   communications with Dennis around the agreement

16:44:01  5    and Adam pursuant to our discussions today about

16:44:06  6    the on going privilege.

16:44:06  7    BY MR. LITTLE:

16:44:08  8        Q. My question was whether Dennis Wallace

16:44:12  9    participate on the negotiation of this document

16:44:14 10    did he?

16:44:14 11        A. I don't know.

16:44:15 12        Q. Do you know anyone who participated in the

16:44:18 13    no objection of this document?

16:44:26 14        A. I don't know the names of folks who

16:44:28 15    negotiated this document.

16:44:28 16        Q. Do you know the titles or positions of the

16:44:31 17    folks who negotiated in document?

16:44:33 18        A. No, I do not.

16:44:33 19        Q. Where did this document come from to the

16:44:36 20    best of your knowledge?

16:44:39 21            MS. PAPEZ:  Object to form.

16:44:41 22        A. It was negotiated by the appropriate

16:44:44 23    people at Amazon who is names I don't know because

16:44:47 24    I don't know who was involved it was probably more

16:44:49 25    than one person and negotiated on behalf of Amazon

16:44:53  1   by a group of Amazon employees.

16:44:56  2       Q. You can't name a single one of those

16:44:59  3   Amazon employees who  negotiated this document on

16:45:02  4   the company's behalf?

16:45:03  5       A. I cannot.

16:45:05  6       MR. LITTLE:  So I put on record that we're

16:45:07  7   certainly entitled to dispose Mr. Wallace about

16:45:11  8   that request and for Amazon should have had

16:45:13  9   provide us back in December when its disclose

16:45:16 10   yours were due individuals whom be able to testify

16:45:20 11   about a document that you're asorting proves

16:45:23 12   damage.

16:45:23 13       MS. PAPEZ:  I'll respond and remind you

16:45:25 14   that Mr. Wallace is under an active protective

16:45:28 15   order from the court that hasn't changed so we

16:45:31 16   reserve all right as objections but you appreciate

16:45:33 17   your express on the record.

16:45:36 18       MR. LITTLE:  We intend to object to

16:45:38 19   misrepresented to the court what was accurate.  So

16:45:42 20   with can deal with that at the appropriate time.

16:45:45 21       MS. PAPEZ:  I respect your objections

16:45:47 22   you're free to pursue them.  We misrepresented

16:45:51 23   nothing we object at reserve all rights.

16:45:51 24   BY MR. LITTLE:

16:45:55 25      Q. What is the extent of your knowledge about

Page 222

16:45:56  1   the contents of this document?

16:46:01  2       A. My knowledge of this document is based on

16:46:04  3   what I have read and reviewed when I was asked to

16:46:06  4   sign this on behalf of Amazon and the work that

16:46:10  5   that they did to negotiate the settlement.

16:46:15  6       Q. Who asked tow sign this document?

16:46:21  7       MS. PAPEZ: Objection. Form.

16:46:24  8       A. Amazon legal counsel.

16:46:25  9       Q. Is that a person this particular?

16:46:27 10       A. It came to me a Docusign I don't know that

16:46:30 11   an individual said go sign this.  I consulted with

16:46:36 12   members of Amazon counsel on things I was expected

16:46:38 13   do and I got a heads up there was coming and I

16:46:41 14   read through it and I signed it.

16:46:42 15       Q. Can you name the Amazon counsel who told

16:46:45 16   you they were going to expect you to sign this

16:46:47 17   document?

16:46:49 18       MS. PAPEZ: Objection asked and answered

16:46:50 19   and Chris if you know and you want to answer you

16:46:53 20   can say this name I instruct you not to get into

16:46:55 21    any communications with counsel around this

16:46:58 22    document.

16:46:58 23        A. One of the persons but Dennis Wallace who

16:47:03 24    has been keeping me informed and advicing as

16:47:07 25    member of counsel.

Page 223

16:47:08  1        Q. Were you provided any summarys or

16:47:10  2    information to give context to this document other

16:47:12  3    than the document itself by anyone at AWS?

16:47:12  4            MS. PAPEZ: Objection. Form.

16:47:20  5        A. Very little context only that it was

16:47:23  6    coming, I needed to read through it it was relate

16:47:28  7    today this case.

16:47:28  8        Q. Have you seen any drafts of this document?

16:47:28  9            MS. PAPEZ: Objection. Form.

16:47:35 10        A. I don't recall ever seeing a draft.

16:47:35 11    BY MR. LITTLE:

16:47:37 12        Q. You understand that your company has

16:47:38 13    refused to allow Dennis Wallace to be deposed

16:47:43 14    about this document and others?

16:47:47 15            MS. PAPEZ:  Object to form foundation.

16:47:48 16        A. Only because you just said so.

16:47:48 17    BY MR. LITTLE:

16:47:53 18        Q. Does that surprise you?

16:47:53 19           MS. PAPEZ: Objection. Form.

16:47:57 20        A. Not particularly.  No because I'm not sure

16:48:01 21    what the rules of the road here are.

16:48:01 22    BY MR. LITTLE:

16:48:04 23        Q. Understood.  Can I turn your attention to

16:48:11 24    page?

16:48:25 25           MS. PAPEZ:  I'm sorry Alex can I ask for


                                            Page 224


16:48:27 1     clarification on your comment that the page

16:48:30 2     numbers of document have changed.

16:48:32 3            MR. LITTLE:  No no to we had one document

16:48:34 4     we upload and used with Mr. Clean that was only --

16:48:38 5     did not include the final signature page it

16:48:41 6     included and this one includes the final signature

16:48:44 7     page with the signature by Mr. Vonderhaar the

16:48:46 8     prior one Mr. Client did not sign and we were

16:48:50 9     asking questions about the content so the final

16:48:54 10    signature page wasn't relevant.

16:48:54 11    BY MR. LITTLE:

16:48:57 12     Q. I believe its page 5 Mr. Vonderhaar can

16:48:59 13   you turn your attention there?

16:49:01 14     A. Yes, sir I'm there.

16:49:02 15     Q. Could you read into the record page 5 --

16:49:07 16   paragraph 5 on page 5?

16:49:10 17     A. Paragraph 5 page 5 advise of independent

16:49:14 18   counsel.

16:49:14 19     Q. That's correct?

16:49:16 20     A. Par fees agree that term of this agreement

16:49:18 21   in the amended agreements were negotiated in arms

16:49:23 22   length and in good faith by the parties and renext

16:49:25 23   a settlement that was reached voluntarily after

16:49:28 24   consultation of experienced legal counsel.

16:49:31 25     Q. Are you aware who any of the individuals

Page 225

16:49:34 1   referenced -- are you aware of any of the

16:49:36 2   individuals who negotiated this contract at

16:49:40 3   arm's-length are who are not lawyers?

16:49:40 4       MS. PAPEZ: Objection. Form.

16:49:45 5     A. No.

16:49:45 6   BY MR. LITTLE:

16:49:48  7      Q.   Who would know besides you if anyone.

16:49:55  8      A. Whoever the parties were at Amazon that

16:49:58  9   negotiated this settlement -- that directly

16:50:02 10   negotiated the settlement.

16:50:03 11      Q. Do you believe that information would be

16:50:05 12   documented somewhere in a document or a pository

16:50:07 13   of documents?

16:50:07 14         MS. PAPEZ: Objection. Form.

16:50:13 15      A. I don't know.  Seems reasonable but I

16:50:18 16   don't know.

16:50:18 17   BY MR. LITTLE:

16:50:22 18      Q. Okay. I appreciate that.  I'm going to

16:50:25 19   turn your your tension thousand sort of walk

16:50:27 20   through a few of these things.  Turn your

16:50:33 21   attention to page 3?

16:50:35 22      A. Okay I'm there.

16:50:36 23      Q. Deuce paragraph B 1 original leases?

16:50:41 24      A. Yes, sir.

16:50:42 25      Q. Could you please read that paragraph to

Page 226

16:50:46  1   yourself I'm going to ask you a question about it.

16:51:22  2      A. Okay I read it.

16:51:23  3      Q. Were you aware that the purchase please

16:51:25  4   for the quail ridge property was set in this

16:51:29  5   settlement agreement?

16:51:33  6          MS. PAPEZ:  Object to form foundation.

16:51:37  7      A. I'm only aware because of what I read.

16:51:37  8   BY MR. LITTLE:

16:51:39  9      Q. Prior to first seeing this document were

16:51:41 10   you aware that Amazon was going to buy the quail

16:51:46 11   ridge property for 145 million dollars as

16:51:49 12   indicated in paragraph B 1?

16:51:49 13          MS. PAPEZ: Objection. Form.

16:51:57 14      A. Prior to reviewing the settlement no I was

16:51:59 15   not.

16:51:59 16   BY MR. LITTLE:

16:52:00 17      Q. Do you know how the number was calculated

16:52:02 18   the purchase price?

16:52:02 19          MS. PAPEZ: Objection. Form.

16:52:04 20      A. No, I don't.

16:52:04 21      Q.

16:52:06 22          DEFENSE COUNSEL 1: Do you know who at

16:52:07 23   Amazon may have been involved in calculating that

16:52:09 24   purchase price.

16:52:10 25      A. No, I don't.  No specifics no.

Page 227

16:52:13  1      Q. Do you know whether this was a transaction

16:52:15  2   that you approved in terms of capital expenditure?

16:52:15  3          MS. PAPEZ: Objection. Form.

16:52:22  4      A. I don't recall if there was a CAR for this

16:52:26  5   one but ifs it was a capital expenditure it would

16:52:30  6   have come through the process -- I think its

16:52:32  7   reasonableable to assume it would have come across

16:52:36  8   my desk.

16:52:36  9   BY MR. LITTLE:

16:52:40 10      Q. Imgoing to turn your your tension to K K

16:52:44 11   08 its document 15.  Given that you only cursory

16:52:48 12   knowledge of that document I'm not going to spend

16:52:50 13   much time walking you through it I apologize for

16:52:53 14   the delay but if you could tell me when document

16:52:55 15   15 exhibit K K 08 is on the screen?

16:52:58 16      A. I have it up.

16:53:01 17      Q. Can you please raid to yourself pages one

16:53:03 18   or two which is the text of other pages of this

16:53:06 19   extranneous use web artifacts?

16:53:08 20      A. Will do.  Stand by okay.

16:54:23 21      Q. Are you generally aware of the

16:54:25 22   transactions detailed in this news article?

16:54:27 23      A. I read ages 1 and 2 that was the

16:54:30 24   instructions.

16:54:31 25      Q. That's all there is.  You get 6 payment of

Page 228

16:54:34  1   blank stuff.  Describe to you what this is but the

16:54:39  2   news article are you aware of the transactions

16:54:42  3   that are reported on this article?

16:54:45  4      A. Objection to form.

16:54:47  5      A. I am aware of the Quail Ridge acquisition

16:54:52  6   settlement agreement I wasn't aware of the sale

16:54:58  7   transaction.

16:54:59  8      Q. So the sale transaction to be clear a

16:55:02  9   transaction where Amazon sold property this prince

16:55:04 10   William property that it owned to IPI; is that

16:55:04 11   correct?

16:55:04 12         MS. PAREZ:  Objection. Form.

16:55:13 13      A. Yes.

16:55:14 14      Q. Are you or any other transactions in your

16:55:18 15   time at AWS where Amazon had sold property for

16:55:19 16   data center construction to a developer?

16:55:25 17         MS. PAREZ: Objection to form.

16:55:25 18      A. I can't point to a specific transaction at

16:55:30 19   different points in time that overdue

16:55:35 20   transactions.  Yes.  If our business changes we

16:55:37 21   may be able to sell that land but this is that

16:55:42 22   first specific thing that I see.

16:55:45 23       Q. Were you involved in the approval of

16:55:48 24   selling that land to IPI?

16:55:54 25       MS. PAPEZ:  Objection.  Form.

                                                    Page 229

16:55:55 1       A. I don't recall approving or reviewing the

16:55:57 2   sale.

16:55:57 3   BY MR. LITTLE:

16:56:00 4       Q. Amazon how did AWS go about telling the

16:56:05 5   appropriate please to tell sell the piece of real

16:56:09 6   estate?

16:56:09 7       MS. PAPEZ: Objection. Form.

16:56:12 8       A. I don't want to speculate you would have

16:56:17 9   to ask some of our real estate transaction manager

16:56:21 10   finance folks for the exact way they occur.

16:56:24 11      Q. To be clear has it ever happened before

16:56:28 12   this transaction where Amazon has sold property to

16:56:30 13   a developer?

16:56:39 14          MS. PAPEZ:  Objection.  Form.

16:56:39 15          A. No I can't recall.

16:56:41 16          Q. Fair to say its likely not a detailed

16:56:42 17     process for setting pricing in such a scenario?

16:56:50 18          MS. PAPEZ: Objection. Form misstates

16:56:53 19     testimony?

16:56:53 20          A. I can't recall that doesn't mean it hasn't

16:56:56 21     happened.

16:56:56 22          Q. If transaction manager involved in the

16:56:59 23     sale were to tell you that he priced the value of

16:57:04 24     property at the low end of comparables does that

16:57:08 25     concern me?

Page 230

16:57:15 1           MS. PAPEZ:  Object to form.

16:57:16 2           A. It not why that was this have best

16:57:19 3      interest of Amazon.

16:57:20 4           Q. Sitting here today can you think of a

16:57:22 5      reason why selling the property to Amazon own at

16:57:25 6      the low end of comparables would be beneficial to

16:57:29 7      Amazon?

16:57:31 8           MS. PAPEZ: Objection. Form?

16:57:36 9           A. Not off the top of my head I don't know

16:57:39 10   the details.

16:58:10 11       Q. You know we've been going a while now.  I

16:58:18 12   think you said you were not aware of the

16:58:19 13   circumstance of Carl's termination, correct?

16:58:23 14       A. Yes, that's correct.

16:58:32 15       Q. Pull up CV 14 on my is the exhibit that's

16:58:39 16   do you to interview from the bottom think it goes

16:58:42 17   up that way probably the's east I'm going to be

16:58:47 18   asking you about an e-mail that stars a May 24

16:58:49 19   from KB oaks -- this is exhibit C V 14 that will

16:59:02 20   show up on the witness's screen as document 16?

16:59:07 21                  (Exhibit 14 was marked.)

16:59:12 22       A. You want me to read from that one up.

16:59:17 23       Q. Just the May e-mail?

16:59:40 24       A. Written in KB yolk every within AWS H R?

16:59:44 25       A. Yes.

Page 231

16:59:45 1       Q. Who is KD oaks if you know?

16:59:52 2       A. I believe KD was one our partners.

16:59:52 3       Q. Does it indicate here onb May 24th that

16:59:57 4   you suggested to others that Chris should be

16:59:57  5    involved ASAP?

16:59:57  6        MS. PAPEZ: Objection. Form.

17:00:02  7        A. Yes, that's what I read.

17:00:05  8        A. Yes.

17:00:05  9        Q. Based on this e-mail do you think it's

17:00:08 10    possible that if they discussed this matter with

17:00:09 11    you -- based on this e-mail what is your

17:00:12 12    assumption as to what happened after this e-mail

17:00:14 13    was sent?

17:00:14 14        MS. PAPEZ: Objection. Form.

17:00:17 15        A. As I recall I did get a heads up verbally

17:00:21 16    that there was some discussion and perhaps

17:00:27 17    investigation going on with Carl and if and when

17:00:29 18    they needed to share the details with me they

17:00:35 19    would and that is essentially the amount of

17:00:38 20    communication I had and then from there process

17:00:46 21    took place and I don't recall ever being presented

17:00:48 22    with. So documents that you referenced.

17:00:50 23        Q. You don't understand he was terminated for

17:00:52 24    matters separate from the present case?

17:00:52 25        MS. PAPEZ: Objection. Form.

17:00:57  1     A. Yeah, I don't know the details of why he

17:01:00  2  was terminated.  I have come to find out through

17:01:04  3  this he was terminate bud it's not relate today

17:01:07  4  this case.

17:01:08  5     Q. And you have no recollection as to any

17:01:10  6  conversation about that at that time back in May

17:01:11  7  of 2019?

17:01:11  8          MS. PAPEZ: Objection. Form.

17:01:17  9     A. Correct.

17:01:17 10  BY MR. LITTLE:

17:01:24 11     Q. Would you have had to approve Mr. Nelson's

17:01:28 12  termination?

17:01:28 13          MS. PAPEZ: Objection. Form.

17:01:36 14     A. In the case I don't believe to because at

17:01:39 15  the time Carl was working for Khozem am I believe

17:01:43 16  Khozem and the team handled this.

17:01:44 17     Q. By handled you mean Khozem would have

17:01:47 18  approved the termination?

17:01:48 19     A. Khozem and our H R VPs -- well it's hard

17:01:53 20  for me to say Khozem would have received the

17:01:56 21  details depend of nature of investigation an

17:01:58 22  whether he had a need to know he may have been

17:02:05 23  present and may have been involved this approving

17:02:07 24  this.  I don't know what the specific details were

17:02:09 25  there could be some circumstances where Khozem and

Page 233

17:02:12  1    I don't have a say.

17:02:20  2         DEFENSE COUNSEL 1: I think at this point I

17:02:22  3    think it's a good time to take a break not with

17:02:26  4    standing the fact that we do want to hold the

17:02:28  5    deposition open to be able to ask questions about

17:02:31  6    documents we have not yet receive and we'll save

17:02:33  7    that question for a laider date and I think I may

17:02:36  8    be able to conclude here ask a final questions its

17:02:41  9    5:15.

17:02:43 10         MS. PAPEZ:  Just to be clear on the

17:02:44 11    agreement holding open with respect to documents

17:02:46 12    that we discussed on the privilege review I think

17:02:48 13    everything else I do not that we would have to

17:02:50 14    discuss we're not agreeing to that right now.  Can

17:02:53 15    you give us a sense of what's happening today I

17:02:56 16    think you're happened you're going to conclude

17:02:58 17    your questions are theres who are planning to

17:03:00 18    question.

17:03:02 19         MS. PAPEZ:  I assume Northstar and the

17:03:06 20    Watson will have questions.

17:03:10 21          MS. BODNER: I think we'll have less than

17:03:12 22   an hour of questions but we do plan to have some.

17:03:17 23          THE VIDEOGRAPHER: Off the record at 5:03

17:03:23 24   p.m.

17:16:24 25             (Proceedings resumed.)


                                                    Page 234


17:16:26  1          THE VIDEOGRAPHER: Back on the record at

17:16:31  2   5:16 p.m.

17:16:33  3   BY DEFENSE COUNSEL:

17:16:33  4       Q. Thank you Mr. Vonderhaar, do you

17:16:36  5   understand you're still under oath?

17:16:37  6       A. Yes, sir.

17:16:38  7       Q. Once last topic I want to go over again

17:16:40  8   that we talked about previously you have testified

17:16:42  9   that you the basis for your understanding that

17:16:45 10   Amazon but harmed came from investigation; is that

17:16:50 11   correct?

17:16:50 12          MS. PAPEZ: Objection. Form.

17:16:52 13       A. Yes, many of the details came out through

17:16:56 14   the investigation.

17:16:56 15   BY MR. LITTLE:

17:16:59 16       Q. How is that investigation conveyed to you?

17:16:59 17        MS. PAPEZ: Objection. Form.

17:17:05 18     A. Predominantly through some of the

17:17:07 19   documents that I had to review.  Kind of through

17:17:11 20   this case you know prior to meeting with all of

17:17:14 21   you the documents you were showing me and things

17:17:17 22   like that.  That's where I learned those.  Some of

17:17:21 23   the details in the case.

17:17:21 24   BY MR. LITTLE:

17:17:25 25     Q.   Was there a final report of some sort

Page 235

17:17:27  1   kind of compiling those things together that was

17:17:31  2   provided to you?

17:17:32  3        MS. PAPEZ: Objection. Form.

17:17:34  4     A. There was a complaint document but I

17:17:39  5   believe I reviewed with counsel.

17:17:42  6     Q. Prior to receiving the complaint document

17:17:45  7   were there any other documents in your mind sort

17:17:47  8   of presented this information to you?

17:17:47  9        MS. PAPEZ: Objection. Form.

17:17:51 10     A. No.

17:17:51 11   BY MR. LITTLE:

17:17:53 12      Q. So was it is it fair to say that the first

17:17:57 13   time these materials are compiled in an outlines

17:18:01 14   these am investigations but this a complaint that

17:18:03 15   you reviewed?

17:18:03 16        MS. PAPEZ: Objection. Form.

17:18:06 17      A. Yes, I think that's a fair statement.

17:18:06 18   BY MR. LITTLE:

17:18:09 19      Q. Did you personally under take any

17:18:12 20   investigation of the facts in those complaints or

17:18:15 21   in that complaint that you were provided?

17:18:15 22        MS. PAPEZ: Objection. Form.

17:18:30 23      A. No, I did not.

17:18:30 24        MR. LITTLE:  I think subject to the

17:18:30 25   representations earlier about the fact that we

Page 236

17:18:30  1   were going to hold this aspect of the deposition

17:18:35  2   open I'm ready to hand it over and I appreciate

17:18:38  3   your time and your patience.  Now its Mr. Watson's

17:18:42  4   counsel.

17:18:42  5        EXAMINATION BY DEFENDANT BRIAN WATSON, ET AL

17:18:42  6   BY MS. BODNER:

17:18:44  7      Q. My name is Sara Bodner and I represent

17:18:47  8   Brian Watson ain't the Watson defendants in the

17:18:50  9   case do you understand that you're still under

17:18:52 10   oath

17:18:52 11       A. Yes, ma'am.

17:18:52 12       Q. For the record my client Brian Watson

17:18:55 13   rejoined in deposition after the break.  I'm going

17:18:58 14   to ask you some questions fellowing up on what

17:19:00 15   Mr. Little asked you about if you can't understand

17:19:03 16   any of my questions please feel free to ask me to

17:19:06 17   rephrase?

17:19:07 18       A. Okay.

17:19:07 19       Q. Does Amazon track all of the datacenter

17:19:10 20   facilities it operates in Virginia?

17:19:10 21       MS. PAPEZ: Objection. Form.

17:19:19 22       A. There are definitely things that we track

17:19:21 23   by datacenter is there something specific about

17:19:23 24   our datacenter that you're inquiring about what we

17:19:27 25   track information about our datacenters.

Page 237

17:19:29  1       Q. Does Amazon track the location of all of

17:19:31  2   its datacenters this Virginia this one specific

17:19:35  3   document?

17:19:35  4        MS. PAPEZ: Objection. Form.

17:19:45  5        A. I don't know that it's a document we track

17:19:46  6   the location of our datacenter in Virginia I think

17:19:49  7   it's in a source of record some sort of tool.

17:19:49  8   BY MS. BODNER:

17:19:52  9        Q.  Is there some sort of master tracking

17:19:56  10  spreadsheet for the datacenter?

17:19:56  11       MS. PAPEZ: Objection. Form.

17:20:00  12       A. I'm not aware of a tracking spreadsheet

17:20:02  13  specifically.

17:20:02  14  BY MS. BODNER:

17:20:04  15       Q.  But you do you believe there's some tool

17:20:06  16  that tracks all of datacenters in Virginia?

17:20:09  17       A. Yes, I know that we though the locations

17:20:12  18  and the address of our datacenters and we can

17:20:15  19  provide that.

17:20:16  20       Q. Do you know what other information that

17:20:19  21  tool categorizes regarding the datacenters?

17:20:19  22       MS. PAPEZ: Objection. Form.

17:20:26  23       A. I think there are probably several tools

17:20:29  24  and the reason I say that is I have seen some

17:20:34  25  tools that have details about a specific site and

17:20:39  1   perhaps the parties involved, the costs the term,

17:20:44  2   etc. Its like a contracts datacenter and there's

17:20:47  3   another source that I have personally seen

17:20:49  4   sometime ago that it kind of has that list of

17:20:52  5   here's every datacenter we have and the address

17:20:55  6   and just kind of very basic information.

17:20:55  7   BY MS. BODNER:

17:21:04  8       Q.  What is the purpose of that second tool

17:21:05  9   that has the information that you just testified

17:21:07 10   about?

17:21:07 11       MS. PAPEZ: Objection. Form.

17:21:09 12       A. The purpose that I'm familiar with is on

17:21:15 13   certain occasions we are required to disclose the

17:21:17 14   address of the datacenters to regulatory

17:21:23 15   authorities people doing audits business things

17:21:27 16   like that so those -- that's really the only time

17:21:30 17   that I have seen that source used is when somebody

17:21:32 18   says we need to know the location of your

17:21:35 19   datacenter to evaluate whether this fits within

17:21:37 20   our overall business continuity and recovery

17:21:41 21   profile for a differenten company or financial

17:21:43 22   services sector.

17:21:43 23   BY MS. BODNER:

17:21:48 24      Q.  Do any of these tools that summarize the

17:21:52 25   Virginia datacenter include information like size?

Page 239

17:21:52  1        MS. PAPEZ: Objection. Form.

17:22:10  2        A. There is a source or location that would

17:22:12  3   say I E D X X X location that would show power is

17:22:18  4   is there so there is a sourceover data that senior

17:22:20  5   reports from that tracks those attributes.

17:22:20  6   BY MS. BODNER:

17:22:26  7      Q.  So if you want to quickly compare the

17:22:27  8   different datacenters that Amazon has in Virginia

17:22:31  9   what do you look?

17:22:31 10        MS. PAPEZ: Objection. Form.

17:22:40 11      A. It depends what you want to compare I'll

17:22:42 12   give you within case you may recall the operating

17:22:45 13   plan one discussion we had earlier about our

17:22:47 14   budgeting and planning cycle O P is and O P 2 and

17:22:52 15   time office executive will ask how many

17:22:56 16   datacenters do we have or how much capacity do we

17:22:58 17   have so we query that source of data to provide a

17:23:02 18   very simple report and table to answer that

17:23:04 19   question.

17:23:04 20   BY MS. BODNER:

17:23:06 21       Q.  Do you know who Brian Watson is?

17:23:08 22       A. Only by way of these proceedings.

17:23:15 23       Q. Before you proceedings you had never heard

17:23:17 24   the name Brian Watson?

17:23:19 25       A. No, ma'am, I have not.


                                              Page 240


17:23:20  1       Q. Before these proceedings were you familiar

17:23:23  2   with Brian Watson's companies WDC Holdings or

17:23:28  3   Northstar?

17:23:28  4       A. No, ma'am.

17:23:30  5       Q. So you have never had any interaxes with

17:23:34  6   Brian Watson or his companies WDC Holdings or

17:23:38  7   Northstar?

17:23:38  8           MS. PAPEZ: Objection. Form.

17:23:42  9       A. I have never had any direct interactions

17:23:44 10   or dealings with Brian Watson or his companies.

17:23:44 11   BY MS. BODNER:

17:23:47 12       Q.  Had you heard anything about Brian Watson

17:23:56 13   before 2020?

17:23:56 14           MS. PAPEZ: Objection. Form.

17:23:58 15        A. No, I had not.

17:23:59 16        Q. You they ever heard before 2020 that

17:24:02 17    anyone at Amazon had concerns about Brian Watson?

17:24:04 18        A.

17:24:06 19            MS. PAPEZ: Objection. Form.

17:24:07 20        A. No, I had not.

17:24:07 21    BY MS. BODNER:

17:24:12 22        Q.  You never had any discussions with Keith

17:24:15 23    Klein about Brian Watson?

17:24:15 24            MS. PAPEZ: Objection. Form.

17:24:19 25        A. No, I don't ever recall talking about

Page 241

17:24:22  1    Brian Watson with Keith Klein.

17:24:27  2        Q. Are you aware of fact that Amazon has an

17:24:30  3    injunction requiring that my client's post21.3

17:24:35  4    million dollars?

17:24:35  5            MS. PAPEZ: Objection. Form.

17:24:46  6        A. I didn't ask.

17:24:46  7        Q. Are you aware this there is an injunction

17:24:48  8    against my client for 21.3 million dollars?

17:24:48  9            MS. PAPEZ: Objection. Form.

17:24:52 10      A. No I am not.

17:24:52 11   BY MS. BODNER:

17:25:00 12      Q.  I want to go back to the CAR process that

17:25:02 13   you talked about earlier with Mr. Little you

17:25:06 14   testified about the due diligence process do you

17:25:08 15   recall that testimony?

17:25:10 16      A. Yes generally.  Yes.

17:25:11 17      Q. Is the due diligence process part of CAR

17:25:18 18   approval process or something separate?

17:25:18 19         MS. PAPEZ: Objection. Form.

17:25:21 20      A. The way I think about and define the due

17:25:23 21   diligence process it is the data gathering

17:25:27 22   exercise around a particular asset to gather all

17:25:30 23   of the relevant details and present them as a

17:25:34 24   package -- as a product that represents the full

17:25:40 25   transaction with kind of those 4 areas 4 general

Page 242

17:25:44 1   buckets that adescribe that are then present for

17:25:47 2   the our review.

17:25:47 3      Q. Do you know if the due diligence process

17:25:53 4   for the IAD region specifically has changed

17:25:59 5   overtime?

17:25:59  6          MS. PAPEZ: Objection. Form.

17:26:01  7          A. I think it's fair to say that over time as

17:26:03  8     we look at things we have added additional

17:26:06  9     questions or inquiries, yes.

17:26:06 10     BY MS. BODNER:

17:26:10 11          Q.  Do you know if that process changed

17:26:12 12     between 2018 and 2021?

17:26:17 13          A. I don't know that I can enumerate the

17:26:20 14     specific ways that its changed but its reasonable

17:26:22 15     to assume that we probably added additional

17:26:26 16     questionss or diligence items to explore.

17:26:28 17          Q. Did you add those additional items

17:26:32 18     specifically for the IAD region or was that for

17:26:36 19     the does diligence process for all availability

17:26:38 20     zones?

17:26:43 21          MS. PAPEZ:  Object to form foundation.

17:26:44 22          A. Its more ladder we would at the due

17:26:47 23     diligence questions that weld cascade and use

17:26:50 24     across all regions.

17:26:50 25     BY MS. BODNER:

17:26:52 1        Q.  Are you aware of any Amazon policy that

17:26:55 2    dictates what financial numbers transaction

17:27:05 3    manager's need to include this CARs?

17:27:08 4        MS. PAPEZ: Objection. Form.

17:27:08 5        A. There isn't a business practice based on a

17:27:08 6    set of templates that we maintain that say in

17:27:12 7    order to make a decision we want to review this

17:27:14 8    set of information and as I mentioned over time as

17:27:17 9    we learn more sometimes we had to or edit or

17:27:21 10   change some of those questions.

17:27:21 11   BY MS. BODNER:

17:27:28 12       Q.  Who prepared those templates?

17:27:30 13       A. Its really kind of a group activity.  Its

17:27:34 14   there's a team of people certainly our finance

17:27:36 15   partners maintain some of those templates but I

17:27:39 16   mentioned earlier some of the program managers

17:27:41 17   that maybe you saw on some of those e-mails Paul

17:27:44 18   as an example led to team of people they

17:27:48 19   contribute to those testimony plays or transaction

17:27:50 20   managers contribute to those templates so again it

17:27:54 21   is a -- I don't know who actually changes a

17:27:57 22   spreadsheet or a ticketing system questionnaire or

17:28:01 23   an approval template I don't know who makes those

17:28:05 24   specific changes but as a group we agree on hay

17:28:08 25   this is something we learned now we ain't to track

Page 244

17:28:11  1   this new thing or this modify.

17:28:14  2        Q. Do you know if those templates have

17:28:16  3   changed since the filing of this lawsuit?

17:28:19  4        A.

17:28:20  5           MS. PAPEZ: Objection. Form.

17:28:21  6        A. I don't know the they changed.  I'm not

17:28:24  7   aware of the exact time frames.  They could have

17:28:28  8   changed but I don't know what the last change was

17:28:30  9   and how often you that change.

17:28:30 10   BY MS. BODNER:

17:28:38 11        Q.  The CAR process is an internal Amazon

17:28:40 12   process right?

17:28:40 13           MS. PAPEZ: Objection. Form.

17:28:48 14        A. Yes what we call the CAR process is unique

17:28:50 15   an specific to Amazon other companies have similar

17:28:53 16   processes.

17:28:53 17   BY MS. BODNER:

17:28:55 18        Q.  Do non Amazon employees participate in

17:28:58 19   the CAR process?

17:28:58 20           MS. PAPEZ: Objection. Form.

17:29:01 21        A. Non Amazon employees do participate in the

17:29:05 22   process in the sense they provide information to

17:29:07 23   Amazon employees who then represent that

17:29:10 24   information as their own in the CAR process.

17:29:10 25   BY MS. BODNER:

Page 245

17:29:13  1      Q.  Do non Amazon employees have the

17:29:15  2   opportunity to attend any CAR review meetings?

17:29:15  3         MS. PAPEZ: Objection. Form.

17:29:20  4      A. No, they do not.

17:29:20  5   BY MS. BODNER:

17:29:25  6      Q.  Do non Amazon employees have an

17:29:29  7   opportunity to review any CAR documents?

17:29:29  8         MS. PAPEZ: Objection. Form.

17:29:32  9      A. No, they do not.  Not to my knowledge I

17:29:36 10   would not expect them to review or internal

17:29:38 11   confidential CAR documents.

17:29:38 12   BY MS. BODNER:

17:29:45 13      Q.  Do you think that Amazon's car policing

17:29:48 14   effectively evaluate whether a particular

17:29:51 15   transaction is this Amazon's best interest?

17:29:55 16      A. I do believe our CAR process does discover

17:30:01 17   and facilitate afternoon informed decision-making

17:30:07 18   process for Amazon.  Yes.

17:30:10 19       Q. I'm going to introduce a document as

17:30:25 20   Exhibit 15.  Let me know when you're able to see

17:30:44 21   it?

17:30:44 22       A. Document 17.

17:30:46 23       Q. This is document 17 Exhibit CV 15?

17:30:50 24             (Exhibit 15 was marked.)

17:30:50 25       A. I got it.  Thank you.

Page 246

17:30:50 1   BY MS. BODNER:

17:30:56 2       Q.  I want to draw your attention to the

17:30:59 3   second page to the March 2nd -- March 12, 201811

17:31:06 4   a.m. e-mail?

17:31:19 5       A. I got it second page.  I got it.

17:31:26 6       Q. Do you recognize this e-mail?

17:31:27 7       A. I recognize that as an e-mail I sent to

17:31:30 8   Andy seeking approval.

17:31:33 9       Q. At the time you sent this e-mail had you

17:31:36 10   approved the CAR for IAD 124, 125, 126 and 127?

17:31:36 11         MS. PAPEZ: Objection. Form.

17:31:46 12       A. Yes, I had approved it and now I was

17:31:49 13    seeking Andy Jassy's approval.

17:31:49 14    BY MS. BODNER:

17:31:54 15        Q.  If you scroll you u you and its split

17:31:57 16    between the first an second pages does Andy Jassy

17:32:01 17    approve your request?

17:32:02 18        A. Yes.

17:32:02 19        Q.

17:32:09 20        Q. Do you see the e-mail that you sent at

17:32:11 21    7:44 p.m.?

17:32:19 22        Q. Can you read that please?

17:32:20 23        A. The 727 /PWAOU I can't.

17:32:22 24        Q. No, the 7/24/19 make us whole?

17:32:23 25        A. Make us whole for a long time.

Page 247

17:32:26 1        Q. What did you mean by that?

17:32:28 2        A. This was a significant transaction for us

17:32:40 3    typically we set CARS up for one or two

17:32:43 4    properties.  At the time Carl and the team were

17:32:45 5    working pretty hard to identify properties that

17:32:48 6    will satisfy a ten plus year demand forecast so we

17:32:53 7    were extending our horizon that was something at

17:32:57  8    the time that was knew and different for us and in

17:33:03  9    reading the e-mail it was significant to go to

17:33:08 10    Andy we're asking for your approval on not one or

17:33:12 11    two but actually I believe four B T Ss in one ask.

17:33:17 12         So that kind of set basically that set a

17:33:23 13    new tone because we were able to explain to Andy

17:33:25 14    and others that we worked for that hay we were

17:33:28 15    thousand looking over a longer her risen.  We were

17:33:31 16    going to attempt to solve for demand not for five

17:33:34 17    or 6 years but for ten plus years an my comment on

17:33:39 18    make us whole for a long time referred back to

17:33:41 19    that we want to make sure we have supply looked up

17:33:44 20    for ten plus years in IAD and it was kind of a

17:33:49 21    milestone

17:33:50 22         Q. Because there was a significant

17:33:54 23    transaction did it receive extra attention in the

17:33:57 24    CAR approval process?

17:33:57 25         MS. PAPEZ: Objection. Form.

Page 248

17:34:02  1         A. The individual transaction as I recall

17:34:05  2    back at the time frame the individual transactions

17:34:09  3    I don't think -- like for example 12 or 125 didn't

17:34:16  4    receive necessarily extra scrutiny we were using

17:34:20  5    template we was a standard way that we look at

17:34:22  6    those things so I wouldn't say that the individual

17:34:25  7    transactions it represented here received extra

17:34:30  8    scrutiny what was unique and different was me

17:34:33  9    sending a note to Andy as a bundle or group that

17:34:36  10   required some additional commentary explaining

17:34:40  11   some of the uniqueness around those transactions.

17:34:40  12   BY MS. BODNER:

17:34:45  13       Q.  Do you recall having any discussions with

17:34:48  14   Andy Jassy over the phone about this -- about

17:34:51  15   these four CARs?

17:34:59  16       A. I do not recall talking about CARs over

17:35:01  17   the phone with Andy.

17:35:02  18       Q. Do you recall talking about these four

17:35:04  19   CARs at all outside of context of this e-mail?

17:35:09  20       A. No, I don't.  Most of my -- my

17:35:11  21   correspondence with Andy is usually around these

17:35:15  22   transactions and e-mail.

17:35:17  23       Q. I think you just testified that you

17:35:19  24   included some additional commentary in this

17:35:22  25   e-mail; is that correct?

Page 249

17:35:22  1        MS. PAPEZ: Objection. Form.

17:35:26  2        A. Yes, it looks like I had some additional

17:35:30  3    commentary.

17:35:30  4    BY MS. BODNER:

17:35:31  5        Q.  Can you point me to which lines in your

17:35:36  6    e-mail to Andy Jassy weren colluded?

17:35:44  7        A. The additional commentary in the e-mail to

17:35:48  8    Andy Jassy on page two an example being the -- you

17:35:51  9    see the fourth paragraph down the italicized

17:35:55 10    commentary why now.

17:35:57 11        Q. I do see that?

17:35:58 12        A. There's a -- so this is me anticipating a

17:36:02 13    question from Andy about why are we doing four in

17:36:06 14    a row to satisfy demand through I guess -- through

17:36:15 15    a longer term at the time.  So in anticipation of

17:36:19 16    that question I tried to get this front of that so

17:36:22 17    to make it as efficient as possible it anticipates

17:36:25 18    the question.

17:36:28 19        Q. Have you experienced Andy Jassy ask

17:36:34 20    questions in response to a CAR approval request

17:36:36 21    that you sent him?

17:36:36 22        MS. PAPEZ: Objection. Form.

17:36:38 23        A. Yes, I have.

17:36:38 24   BY MS. BODNER:

17:36:41 25        Q.  Going to introduce another document.


Page 250


17:37:00 1   This is document 16 exhibit CV 14.  Let me know

17:37:04 2   when you see it.

17:37:06 3              (Exhibit 16 was marked.)

17:37:13 4        MS. BODNER: CV 16 document 18

17:37:19 5        Q. Do you see the e-mail you sent on Friday

17:37:21 6   June 15 at 9:29 a.m.?

17:37:30 7        A. I do.

17:37:31 8        Q. Do you recognize that e-mail?

17:37:33 9        A. Yes, I recognize that I sent it.  I don't

17:37:36 10  remember sending it but I see it.  Yes.

17:37:38 11       Q. What was the purpose of this e-mail?

17:37:38 12       MS. PAPEZ: Objection. Form.

17:37:53 13       A. As indicated in the first paragraph I was

17:37:56 14  seek his approval to build a suit to.

17:37:56 15  BY MS. BODNER:

17:38:02 16       Q.  Did Andy Jassy approve IAD 130 and 131?

17:38:06 17       A. He did in the e-mail above June 153:345.

17:38:11 18       Q. And this was June 15, 2018 correct?

17:38:14 19       A. Yes, it was.

17:38:16 20     Q. Do you know if Amazon still occupies the

17:38:27 21  datacenter at IAD 130 and 131?

17:38:27 22     MS. PAPEZ: Objection. Form.

17:38:33 23     A. I believe we do -- I'm not 100 percent

17:38:37 24  sure.  I'm not sure actually.  We haven't vacated

17:38:47 25  any datacenters but if these were the plots of

Page 251

17:38:50 1  land that we referred to in the previous testimony

17:38:54 2  maybe so, but it's hard for me to say yes IAD 130

17:38:59 3  and 131 is in operation right thousand today

17:39:02 4  without going and checking.

17:39:02 5  BY MS. BODNER:

17:39:08 6     Q.  Would you be able to check if you

17:39:09 7  reviewed internal Amazon records?

17:39:12 8     A. Yes, if I want back to those sources I

17:39:15 9  could see if IAD 130 and 131 were operational and

17:39:20 10  had capacity in them.

17:39:22 11     MS. BODNER: I'm going to introduce another

17:39:24 12  document.  This is document 19 Exhibit CV 17.  Let

17:39:37 13  me know when you see it.

17:39:38 14       (Exhibit 17 was marked.)

17:39:38 15      A. I have it.

17:39:38 16   BY MS. BODNER:

17:39:44 17      Q.  If you could go to page 6 please?

17:39:56 18      A. Okay.

17:39:57 19      Q. Do you see the e-mail you sent to Andy

17:40:00 20   Jassy on February 26, 2018?

17:40:05 21      A. I do.

17:40:05 22      Q. Do you recognize this e-mail?

17:40:10 23      A. Yes.

17:40:10 24      Q. What was the purpose of this e-mail?

17:40:10 25         MS. PAPEZ: Objection. Form.

Page 252

17:40:16  1      A. As indicate in the first paragraph I was

17:40:18  2   seeking approval for a child site build-to-suit.

17:40:22  3   This would have been for IAD 145.

17:40:31  4      Q. Had you already reviewed the CAR for IAD

17:40:35  5   145 when you sent this e-mail?

17:40:37  6      A. Yes, I would have reviewed this and

17:40:38  7   approved it before sending this to him.

17:40:43  8      Q. Had Peter DeSantis reviewed and approved

17:40:49  9   this CAR?

17:40:49 10         MS. PAPEZ: Objection. Form.

17:40:51 11      A. I believe he probably did, yes.

17:40:51 12   BY MS. BODNER:

17:40:56 13      Q.  Do you see in the first paragraph it says

17:40:58 14   Peter reviewed and approved this CAR?

17:41:00 15      A. Yes I do see that.

17:41:08 16      Q. Do you understand that to mean that Peter

17:41:11 17   DeSantis did review and approve this CAR?

17:41:14 18      A. Yes, I missed that the first time.

17:41:16 19      Q. Did Peter DeSantis ever send request for

17:41:20 20   approval to Andy Jassy?

17:41:20 21         MS. PAPEZ: Objection. Form.

17:41:23 22      A. I don't recall Peter sending approval

17:41:26 23   request to Andy, no.

17:41:26 24   BY MS. BODNER:

17:41:31 25      Q.  Do you know why that is?

Page 253

17:41:31  1         MS. PAPEZ: Objection. Form.

17:41:35  2      A. Mostly because that was my job in the

17:41:36  3   approval process I aed it and then after I

17:41:39  4   approved it it required higher approval authority

17:41:43  5   and that went to Andy.  Peter reviewed it to make

17:41:47  6   sure my judgement and my decisions were correct.

17:41:47  7   BY MS. BODNER:

17:41:51  8       Q.  Do you recall having any involvement with

17:41:53  9   the IAD 175?

17:41:53 10          MS. PAPEZ: Objection. Form.

17:42:00 11       A. Sorry the number doesn't ring a bell

17:42:05 12   mainly because there's a -- and I'm not trying to

17:42:08 13   be difficult there's a lot of datacenters.

17:42:12 14          MS. BODNER: Understood.

17:42:12 15   BY MS. BODNER:

17:42:16 16       Q.  You testified earlier that you would

17:42:17 17   expect to see a disclosure of referral of

17:42:22 18   brokerage fees do you recall that testimony?

17:42:22 19          MS. PAPEZ: Objection. Form.

17:42:26 20       A. Yes I recall that testimony.  Essentially

17:42:29 21   we require and we expect disclose your of any and

17:42:34 22   all fees that we oar going to pay and to whom

17:42:37 23   we're paying them to.

17:42:37 24   BY MS. BODNER:

17:42:40 25       Q.  Where would you expect to see that

Page 254

17:42:41  1   disclosure?

17:42:44  2      A. That would come out in the CAR template in

17:42:48  3   the details.  It would -- there would be a build

17:42:52  4   up or a schedule a financial schedule that would

17:42:55  5   show what we're paying to whom and why so it would

17:42:58  6   be in the details of that template.

17:43:02  7      Q. Did you preair a financial schedule?

17:43:02  8         MS. PAPEZ: Objection. Form.

17:43:08  9      A. It's a combination of your rest

17:43:11  10  transaction manager working with their finance

17:43:13  11  partners.

17:43:13  12  BY MS. BODNER:

17:43:16  13     Q.  Do CAR reviewers ever ask to see any

17:43:19  14  documentation to support what's included in that

17:43:24  15  financial?

17:43:24  16        MS. PAPEZ: Objection. Form.

17:43:29  17     A. We will ask someone like me may or will

17:43:33  18  ask for additional explanation and clarification

17:43:36  19  but largely that's determined by the disclosures

17:43:40  20  that a real estate transaction manager and our

17:43:47  21  finance markers make where they feel something

17:43:50  22  ordinary they apply their judgments and kind of

17:43:54  23  per the code of conduct they disclose anything

17:43:58  24  that's new and different about in that we should

17:43:59  25  be you war of along with their representation of

Page 255

17:44:06  1   what's right and appropriate and what Amazon would

17:44:09  2   do.

17:44:17  3      Q. Only Amazon employees can prepare a

17:44:23  4   schedule that you just explained?

17:44:23  5         MS. PAPEZ: Objection. Form.

17:44:24  6      A. Yes, only Amazon employees participate in

17:44:27  7   the assembly of this documentation sorry may I

17:44:36  8   correct as I said earlier Amazon employees are the

17:44:38  9   ones entering that information to say that they're

17:44:41 10   the only ones that participate it's not watt

17:44:45 11   gather information and vendors and partners to

17:44:48 12   take that information that Amazon employees are

17:44:52 13   the ones that actually construct these schedules

17:44:56 14   an templates that we review I didn't mean to

17:44:59 15   misspeak there.

17:44:59 16   BY MS. BODNER:

17:45:09 17      Q.  Do you have in any Amazon business

17:45:11 18   personnel had concern about Northstar leases

17:45:13 19   before the internal investigation that you

17:45:15 20   referenced began?

17:45:23 21      A. I'll not aware of any concern about

17:45:25 22   Northstar entity partner or company prior to the

17:45:28 23   investigation.

17:45:28 24        Q. Do you know why that investigation was

17:45:30 25   initiated?

Page 256

17:45:43  1        A. What I learned is that time after these

17:45:46  2   transactions were executed some concerns were

17:45:50  3   escalated and raised about the transactions that

17:45:53  4   led to the investigation.  Really don't know who

17:45:56  5   initiated what and when I don't have the answers.

17:46:14  6        Q. Do you recall ever having any concerns

17:46:16  7   about CARs prepared biby Casey Kirschner before

17:46:20  8   this investigation began?

17:46:20  9            MS. PAPEZ: Objection. Form.

17:46:26 10        A. Generally no.  Casey prepared his CARs as

17:46:34 11   well as anybody else.  He was an active

17:46:38 12   participant and represented his transactions just

17:46:40 13   like any of our other employees.

17:46:40 14   BY MS. BODNER:

17:46:44 15        Q.  Do you recall ever having concerns about

17:46:48 16   CARs prepared by Carl Nelson before the

17:46:56 17   investigation was?

17:46:56 18        MS. PAPEZ: Objection. Form.

17:46:58 19        A. No Carl and I even Casey and I engaged in

17:47:01 20   how what can we do better we didn't have any

17:47:05 21   concerns.  They were people that I counted on to

17:47:08 22   look after our business interest at IAD and gather

17:47:11 23   the details an represent and present

17:47:14 24   recommendations for how Amazon could scale its

17:47:17 25   business.

Page 257

17:47:22  1        Q. Have you ever reviewed CARs submitted by

17:47:25  2   Keith Klein?

17:47:25  3        MS. PAPEZ: Objection. Form.

17:47:29  4        A. I'm pretty sure I have.  I can't point to

17:47:31  5   a specific CAR.

17:47:31  6   BY MS. BODNER:

17:47:34  7        Q.  Do you recall ever having concerns about

17:47:36  8   the the CARs submitted by Keith Klein?

17:47:36  9        MS. PAPEZ: Objection. Form.

17:47:42 10        A. No, I don't recall specific concerns about

17:47:44 11   Keith's CARs.

17:47:44 12   BY MS. BODNER:

17:47:47 13      Q.  Do you recall ever having any concerns

17:47:49 14   about Keith Klein's work?

17:47:53 15          MS. PAPEZ: Objection. Form.

17:47:54 16      A. No quite the contrary.

17:47:54 17   BY MS. BODNER:

17:48:08 18      Q.  Are you involved in the execution of

17:48:11 19   build-to-suit leases?

17:48:11 20          MS. PAPEZ: Objection. Form.

17:48:17 21      A. I would say no I'm not involved in the

17:48:18 22   execution of the leases.  I'm involved in the

17:48:21 23   approval of the capital and the other funding that

17:48:25 24   goes into the execution of leases.  Sorry as I say

17:48:31 25   that -- there may actually be dock sign -- there

Page 258

17:48:36 1   may be leases that come through to me through dock

17:48:39 2   sign that I have to review and approve.  That may

17:48:42 3   be in fact the case now that I said that.

17:48:42 4   BY MS. BODNER:

17:48:47 5      Q.  Do you have sign build-to-suit leases on

17:48:50 6   behalf of of Amazon?

17:48:51 7      A. I believe that I have.

17:48:52 8      Q. Do you recall how many build-to-suit

17:48:56  9   leases you signed on behalf of Amazon?

17:48:59 10       A. No, ma'am, I don't know how many I have

17:49:02 11   signed.

17:49:02 12       Q. What do you do to review a build-to-suit

17:49:06 13   lease?

17:49:07 14       A. The build-to-suit leases come to me

17:49:12 15   through dock sign in electronic format with an

17:49:16 16   introductory paragraph that says here's what this

17:49:19 17   is and what its for and then I scan through the

17:49:24 18   build-to-suit lease, much of it is very detailed

17:49:28 19   technical into about the attributes of lease.  I

17:49:32 20   review certain things make sure its look like its

17:49:35 21   this order and best of my ability and them I

17:49:38 22   electronically sign.

17:49:39 23       Q. Is Amazon have inside counsel review

17:49:47 24   build-to-suit leases?

17:49:47 25           MS. PAPEZ: Objection. Form.

Page 259

17:49:52  1       A. Yes, those build-to-suit leases I believe

17:49:56  2   are reviewed by inside counsel.  Yes.

17:49:56  3   BY MS. BODNER:

17:50:00  4        Q.  Do you know if Amazon has outside counsel

17:50:02  5    review build-to-suit leases?

17:50:11  6        A. I don't know if that's the case.

17:50:13  7        Q. Have you ever interacted with outside

17:50:15  8    counsel in the context of a build-to-suit lease?

17:50:20  9        A. Not prior to this case.

17:50:21 10        Q. Did you have any involvement in the

17:50:25 11    execution of Northstar leases?

17:50:25 12            MS. PAPEZ: Objection. Form.

17:50:31 13        A. No.  First hand responsibility or activity

17:50:34 14    in the execution of the lease and I don't recall

17:50:37 15    if there was an electronic that was required of

17:50:40 16    this business that I signed.

17:50:40 17    BY MS. BODNER:

17:50:45 18        Q.  Do you recall reviewing any of the

17:50:46 19    Northstar leases?

17:50:47 20        A. No, I don't recall specifically.

17:50:49 21        Q. Did you have any involvement in the

17:51:00 22    removal of Northstar from the leases that it was

17:51:03 23    originally a party to?

17:51:03 24            MS. PAPEZ: Objection. Form.

17:51:09 25        A. I didn't have any first hand or direct

17:51:13  1   execution responsibility in removal of Northstar.

17:51:13  2   BY MS. BODNER:

17:51:29  3       Q.  Did you have any involvement in the

17:51:31  4   removal of star other than the signing of IPI

17:51:36  5   settlement agreement?

17:51:39  6       MS. PAPEZ:  Objection form and foundation.

17:51:40  7       A. To my knowledge I did not other than that

17:51:48  8   signing.

17:51:48  9   BY MS. BODNER:

17:51:50 10       Q.  Do you know if Amazon had any datacenter

17:51:53 11   leases with IPI before April 2020?

17:51:56 12       A. No, I don't recall whether we did or

17:51:58 13   didn't.

17:51:58 14       Q. Excluding the Northstar leases do you know

17:52:07 15   how many datacenter leases Amazon has with IPI

17:52:10 16   since April 2020?

17:52:14 17       A. I don't.  No.

17:52:15 18       Q. Have you had any discussions at any time

17:52:24 19   with any current or former employee of IPI about

17:52:29 20   Brian Watson or his companies?

17:52:29 21       MS. PAPEZ: Objection. Form.

17:52:32 22       A. No I have not had any discussions with

17:52:37 23   IPI.

17:52:37 24   BY MS. BODNER:

17:52:37 25      Q.  Do you know someone named Luke Gilpin?

Page 261

17:52:41  1      A. No, I don't know Luke Gilpin.

17:52:44  2      Q. Do you know someone named Matt Ahern?

17:52:47  3      A. I don't recall that name either.

17:52:49  4      Q. Do you know someone named Shawn Ivory?

17:52:52  5      A. No, don't remember that name either.

17:53:09  6      Q. Were you involved in the renegotiation of

17:53:14  7   the Northstar leases with IPI?

17:53:14  8          MS. PAPEZ: Objection. Form.

17:53:19  9      A. I was not directly involved.  No.

17:53:19 10   BY MS. BODNER:

17:53:26 11      Q.  Do you know if anything was changed in

17:53:29 12   those leases?

17:53:32 13      A. I don't know the specifics of what was

17:53:34 14   changed.  Foundationally what I recall was and I

17:53:42 15   was mostly breasted this manging sure we

17:53:44 16   maintained business continuity in those properties

17:53:47 17   and what I read and what I looked for was

17:53:52 18   headaching sure we had the right relationship in

17:53:55 19   place to make sure we could continue doing

17:53:57 20   business.

17:54:02 21        Q. Do you know where Amazon was in charge of

17:54:05 22   amending those leases?

17:54:07 23        A. I do not know who was in charge of

17:54:12 24   amending the leases.

17:54:13 25        Q. Do you know who at Amazon if anyone was in

Page 262

17:54:15 1   charge of identifying what needed to be amended

17:54:18 2   this those leases?

17:54:18 3        MS. PAPEZ: Objection. Form.

17:54:22 4        A. No, I don't know who desited what needed

17:54:24 5   to change.

17:54:24 6   BY MS. BODNER:

17:54:26 7        Q.  Do you recall having any discussing with

17:54:28 8   Keith Klein about the Northstar leases at any

17:54:31 9   time?

17:54:32 10        A. No, I don't recall talking abouter

17:54:35 11   Northstar leases can Keith Klein.

17:54:42 12        Q. Are you aware of any kickbacks involving

17:54:58 13   anyone at Amazon at any time?

17:54:58 14        MS. PAPEZ: Objection. Form.

17:55:06 15        A. Only the kickbacks that we're discussing

17:55:09 16   in this case.

17:55:09 17   BY MS. BODNER:

17:55:11 18      Q.  Other then the allegations in this case

17:55:12 19   you're not aware of any current or former employee

17:55:16 20   at Amazon accepting kickbacks?

17:55:18 21      A. I'm not aware of any of those -- certainly

17:55:23 22   any details of kickbacks for employees no.

17:55:34 23      Q. We talked about a code of conduct that

17:55:37 24   Amazon employees have to sign correct?

17:55:39 25        MS. PAPEZ: Objection. Form misstates


Page 263


17:55:41 1   testimony?

17:55:42 2      A. I'm aware of the code of conduct that

17:55:46 3   governs our behalf your as employees yes.

17:55:46 4   BY MS. BODNER:

17:55:51 5      Q.  Do non Amazon employees have to sign that

17:55:54 6   code of conduct?

17:55:55 7        MS. PAPEZ: Objection. Form.

17:56:03 8      A. I'm not certain about this but I believe

17:56:05 9   our code of conduct does transfer to our partners

17:56:08 10  but I can't be sure about thousand that manifests

17:56:12 11   itself.

17:56:12 12        Q.

17:56:12 13           MS. BODNER: Do you have any idea how that

17:56:14 14   code of conduct translates to Amazon's partners.

17:56:17 15           MS. PAPEZ: Objection. Form?

17:56:18 16        A. I don't know the specifics of how that

17:56:20 17   occurs, no, but -- no, I don't.

17:56:20 18   BY MS. BODNER:

17:56:29 19        Q.  What leads you to believe that that code

17:56:30 20   of conduct extends to non Amazon employees?

17:56:33 21        A. Generally speaking and not just associated

17:56:36 22   with real estate when we engage with a partner, we

17:56:40 23   have to make sure that partner conducts business

17:56:44 24   to the same standard that we hold ourself to so

17:56:48 25   that they are partner represents the best interest

Page 264

17:56:50  1   of Amazon and certainly doesn't cause harm to your

17:56:55  2   brand and our customers.

17:56:56  3        Q. Are you aware of any documents that part

17:57:10  4   they ares have to sign indicating that they're

17:57:15  5   aware that that is Amazon's expectation of them?

17:57:15  6           MS. PAPEZ: Objection. Form.

17:57:18  7      A. I'm not aware of the specific documents.

17:57:20  8  I can speculate that I'm not -- I can't say that I

17:57:24  9  have seen that or studied that specific language

17:57:26 10  in various contractual documents.

17:57:26 11  BY MS. BODNER:

17:57:31 12      Q.  Do you know who at Amazon would know?

17:57:37 13      A. I would assume members of your legal team

17:57:39 14  who work with us on these kinds of agreements

17:57:42 15  would know.  I would also expect some of our

17:57:48 16  business people you mean people for example on our

17:57:51 17  real estate transaction management team people who

17:57:54 18  are engaging with your partners to know at least

17:57:58 19  on some levels what the expectations are so they

17:58:02 20  can communicate that to the partners that aoar

17:58:04 21  doing business with.

17:58:05 22      Q. Are you aware of any Amazon policiess

17:58:08 23  regarding what real estate personnel need to

17:58:11 24  convey to Amazon partners?

17:58:11 25      MS. PAPEZ: Objection. Form.

Page 265

17:58:15  1      A. I believe we have what I have sign we have

17:58:23 2    things like nondisclosure agreement and other

17:58:26 3    standard documents that our rest transaction

17:58:32 4    manager's are expected share with our partners an

17:58:35 5    vendors.

17:58:35 6        Q. Do you know someone named John any limb?

17:58:40 7        A. The name sounds familiar I'm trying to

17:58:43 8    remember where I saw that name.  It's not somebody

17:58:45 9    I was engaged with.

17:58:54 10       Q. You don't recall anything about why you

17:58:56 11   know the name John any limb?

17:58:58 12       A. I want to say I saw that -- I'm not

17:59:01 13   certain.  I think I saw a reference to that name

17:59:05 14   in this case someplace but I can't be sure and

17:59:09 15   I'll not where I saw it.  But it's a familiar

17:59:18 16   name.

17:59:20 17       Q. You testified that you spoke with the FBI

17:59:23 18   on one occasion, correct?

17:59:23 19       MS. PAPEZ: Objection. Form.

17:59:27 20       A. Yes, I did.

17:59:27 21   BY MS. BODNER:

17:59:29 22       Q.  Did the government ask you any questions

17:59:33 23   about Brian Watson or his companies?

17:59:35 24       A. I don't recall that they asked me about

17:59:43 25   Brian Watson or his companies.

Page 266

17:59:43  1  BY MS. BODNER:

17:59:47  2      Q.  Do you recall if the Government asked you

17:59:49  3  about WDC Holdings or Northstar?

17:59:52  4      A. No, I don't.  I don't remember them asking

17:59:57  5  me questions about those companies.

18:00:03  6      Q. Do you have any personal knowledge that

18:00:11  7  the Northstar leases included improper yields?

18:00:11  8          MS. PAPEZ: Objection. Form.

18:00:23  9      A. I don't recall looking at these CARs when

18:00:25  10  they came to this process and seeing if they were

18:00:29  11  improper, no.

18:00:29  12  BY MS. BODNER:

18:00:54  13      Q.  I'm going to introduce another document.

18:01:03  14  This is document 20 exhibit CV 18?

18:01:07  15              (Exhibit 18 was marked.)

18:01:10  16          MS. BODNER: Let me know when you see it?

18:01:11  17      A. I have it.

18:01:12  18      Q. Do you recognize this document?

18:01:21  19      A. Vaguely.  It looks like some of the

18:01:24  20  documents I have had to review.

18:01:26  21      Q. Do you see that its titled
https://urldefense.proofpoint.com/v2/url?u=http-3A__Amazon.com&d=DwIGAg&c=wT9hcAyWec
HwFHlf1ZE3OA&r=IcGIiwhuRpB-tDQgfX5Skg_KofTBdhQVVzsEs6QIsWA&m=7QlBvWI7CROq7CO9Ke2YNx1

s9s7-BplAHWDY7ASyp8FRwVCq_uIG_fiQLc8Bt2u3&s=u6r4au_Rld3MPCpD_HgT6dhrJVob_JsWFjoLYW2X 48c&e=  ink

18:01:31 22   and Amazon data service inks revised responses to

18:01:36 23   Brian Watson first set of interrogatories to

18:01:38 24   plaintiffs?

18:01:39 25       A. I do see that at the bottom of page one

Page 267

18:01:42 1   yes.

18:01:42 2       Q. I'm going to flip to page 21 but if you

18:01:45 3   want a second to look through the document you can

18:01:47 4   certainly take that time?

18:01:49 5       A. I'm just going to kind of scroll through

18:01:51 6   there to kind of refresh my memory on my way to 21

18:01:56 7   if that's okay.

18:02:00 8       Q. That's fine.

18:02:45 9       A. Okay I look at the outline and content I

18:02:48 10   didn't read every paragraph but I'm on 21 now.

18:02:53 11       Q. Do you see that you declared under penalty

18:02:55 12   of perjury that that responses contained in this

18:02:57 13   document were true and correct?

18:03:00 14       A. I do.

18:03:01 15       Q.

18:03:09 16      Q. What did you do to Congress firm a truth

18:03:11 17  and accuracy of the documents contained in the

18:03:13 18  document?

18:03:17 19          MS. PAPEZ: Objection. Form.

18:03:17 20      A. Two things read the document before I

18:03:20 21  signed it and second thing is in the process of

18:03:22 22  preparing for this and even when this document was

18:03:25 23  presented but given an overview of how the

18:03:28 24  information was gathered high level internal

18:03:31 25  Amazon investigators or people conducted in the

Page 268

18:03:35 1  investigation resulted in in the details it

18:03:43 2  presented in this and those two documents so it

18:03:46 3  was those two things.

18:03:46 4  BY MS. BODNER:

18:03:49 5      Q.  Did you do anything other than those two

18:03:51 6  things to confirm the truth and accuracy of these

18:03:54 7  responses?

18:03:54 8      A. No, I did not.

18:03:55 9      Q. You have no first-hand knowledge of what

18:03:57 10  the investigators told you correct?

18:03:57 11          MS. PAPEZ: Objection. Form.

18:04:00 12     A. That is correct.  I relied on information

18:04:03 13   discovered an presented by the investigators.

18:04:12 14     Q. Did you do anything to confirm accuracy of

18:04:16 15   the information provided to you by the

18:04:18 16   investigators?

18:04:18 17         MS. PAPEZ: Objection. Form asked and

18:04:21 18   answered?

18:04:21 19     A. No, I did not.

18:04:24 20         MS. BODNER:  I'm going to introduce

18:04:27 21   another document as Exhibit CV 19 let me know when

18:04:39 22   you can see it.

18:04:39 23     A. Yes.

18:04:40 24     Q. Do you recognize this as Amazon's -- --

18:04:43 25   strike that. .

Page 269

18:04:44  1               (Exhibit 19 was marked.)

18:04:44  2   BY MS. BODNER:

18:04:45  3     Q. Do you recognize this as Amazon's

18:04:46  4   responses to Brian Watson second set of

18:04:48  5   interrogatories to plaintiffs

18:04:49  6     A. Yes that's what I see at the bottom of

18:04:52  7   page 1.  Yes.

18:04:53  8       Q. I'm going to focus on page 8 but if you

18:04:56  9   would like to take the time to scroll through the

18:04:59 10   document please go ahead?

18:05:00 11       A. Thank you.  Okay I'm on page 8.

18:05:35 12       Q. Do you see that you declared urn penalty

18:05:36 13   of perjury that the responses contained in this

18:05:39 14   document are true an correct?

18:05:43 15       MS. PAPEZ:  Objection form abcompleteness.

18:05:45 16       A. I do.

18:05:45 17   BY MS. BODNER:

18:05:46 18       Q.  What did you do to confirm the truth and

18:05:48 19   accuracy of the responses contained in this

18:05:51 20   document?

18:05:51 21       A. Similar to the previous document brief

18:05:55 22   conversation with internal counsel about what I

18:05:57 23   was being presented with and what my duties were

18:06:00 24   followed by me reading the document and signing it

18:06:03 25   as a representative of Amazon.

Page 270

18:06:16  1       Q. Did you part with any to the meetings with

18:06:19  2   the Government described this Amazon's response?

18:06:19  3        MS. PAPEZ: Objection. Form.

18:06:25  4        A. I think you're refer together meeting on

18:06:28  5    page 3 and 4 no I didn't if those are what you're

18:06:31  6    referring to I did not participate.

18:06:31  7    BY MS. BODNER:

18:06:35  8        Q.  Did anyone at Amazon advise you as to

18:06:38  9    what transpires during the meetings described on

18:06:41 10    pages 3 and 4?

18:06:43 11        A. Only to say that I was adviced that these

18:06:46 12    meetings took place and that as a representative

18:06:49 13    of Amazon I was okay and could approve this --

18:06:58 14    whatever you call this document.

18:06:59 15        Q. Do you have any understanding as to what

18:07:01 16    occurred during the meetings described on pages 3

18:07:05 17    and 4?

18:07:05 18        MS. PAPEZ: Objection. Form.

18:07:08 19        A. No not in detail.

18:07:08 20    BY MS. BODNER:

18:07:12 21        Q. At a high level do you have any

18:07:13 22    understanding?

18:07:13 23        MS. PAPEZ: Objection. Form.

18:07:19 24        A. Level with these mettings took place as

18:07:22 25    part of proceedings in this case.

18:07:34  1         MS. BODNER: I'm going to introduce one

18:07:36  2    more document its marked as exhibit CV 20 please

18:07:39  3    let me know when you can see it.

18:07:46  4              (Exhibit 20 was marked.)

18:07:55  5        Q. Do you recognize this as Amazon responses

18:07:57  6    to Brian Watson third set of answers to

18:07:59  7    interrogatories responses to plaintiffs?

18:08:01  8        A. I do.

18:08:02  9        Q. Do you recognize this document?

18:08:03 10        A. This looks familiar and in terms of

18:08:06 11    several documents that are like it yes.

18:08:07 12        Q. I'm going to go to page 13 but if you want

18:08:13 13    to scroll through please go ahead?

18:08:49 14        A. Okay I'm there on 14.

18:08:50 15        Q. Did you declare under penty of perjury

18:08:53 16    that the responses contained in this document were

18:08:55 17    true and correct?

18:08:57 18         MS. PAPEZ: Objection. Form and Sarah

18:08:59 19    completeness this is the third time you have done

18:09:01 20    this where the question is not complete there's

18:09:05 21    more to this declaration than your question

18:09:08 22    represents?

18:09:09 23     Q.

18:09:10 24         MS. BODNER: Can you please read into the

18:09:12 25     record the last sentence contained in this

Page 272

18:09:14  1     verification?

18:09:15  2         A. On page 13.

18:09:17  3         Q. Yes, please?

18:09:20  4         A. I declare under penalty of perjury and

18:09:23  5     under the laws of the United States and the state

18:09:25  6     of California that the foregoing is true and

18:09:28  7     correct and that I executed this verification on

18:09:31  8     March 14, 2022.

18:09:38  9         Q. You signed this verification, correct?

18:09:40 10         A. I did electronically sign this, yes.

18:09:43 11         Q. What did I do to confirm the truth and

18:09:45 12     accuracy of the responses contained in this

18:09:49 13     document?

18:09:50 14         A. I had a conversation with internal counsel

18:09:53 15     for about -- that this document would be coming

18:09:57 16     for my signature about what the -- roughly what

18:10:00 17     the contents of this document were, why it was

18:10:05 18     important and give me a chance to ask questions

18:10:08 19   then I read the document that was the second thing

18:10:10 20   I did and signed it.

18:10:11 21       Q. Do you recall the questions you asked?

18:10:19 22       MS. PAPEZ: Objection. Form I'm going to

18:10:20 23   object of course you can answer if you have a high

18:10:23 24   level sense of question but I'm going to instruct

18:10:26 25   you not to get into any content of your

Page 273

18:10:29 1   communication with counsel on the document?

18:10:33 2       A. Yes probably not a lot I can share based

18:10:38 3   on guidance of counsel.

18:10:38 4   BY MS. BODNER:

18:10:42 5       Q.  Did you have any conversation with Amazon

18:10:44 6   business folks about these responses?

18:10:48 7       A. I didn't have any conversation with any of

18:10:51 8   my business peers, no.

18:10:53 9       Q. I want to draw your attention to the 6th

18:10:59 10   page of PDF which is the answer to interrogatory

18:11:02 11   No. 18?

18:11:03 12       A. Okay.

18:11:05 13       Q. I'll give you second to look through that

18:11:08 14   answer.

18:11:34 15        A. I read through the page 6.

18:11:41 16        Q. You're a basis for this answer?

18:11:41 17            MS. PAPEZ: Objection. Form.

18:11:53 18        A. The basis for the answer why the amount in

18:11:56 19   the last paragraph, no.

18:11:56 20   BY MS. BODNER:

18:12:00 21        Q.  If you look at No. 4 on page 8 can you

18:12:05 22   read the full sentence starting with all fees

18:12:09 23   received by the Watson?

18:12:11 24        A. Sure.  I'll read No. 4 all fees received

18:12:15 25   by the Watson and W DC defendants from the less

Page 274

18:12:19  1   sores in an amount of at least 15 million

18:12:26  2   263,000163 dollars which includes approximately 5

18:12:29  3   million 120,000 dollars in kickbacks attributable

18:12:35  4   to the leases paid to defendant's Nelson and

18:12:37  5   Kirschner by deaf's Watson and WDC Holdings via

18:12:42  6   the Villanova trust.

18:12:46  7        Q. Do you know how that figurover 15 million

18:12:50  8   263,163 was calculated?

18:12:56  9        A. As it states in that paragraph at least

18:13:00 10   part of that 15 million was calculated off the 5

18:13:04 11   million in kickbacks attributable to Nelson,

18:13:07 12   Kirschner and Watson.

18:13:25 13       A. Basely I'm answering your question based

18:13:28 14   on what I have read in this document.

18:13:29 15       Q. Do you have any understanding that it's

18:13:31 16   not contained in that No. 4 as to how that 15

18:13:34 17   million dollar figure was calculated?

18:13:34 18           MS. PAPEZ: Objection. Form.

18:13:41 19       A. Other than this document and the I believe

18:13:43 20   in the I can't be sure but I believe in the

18:13:45 21   complaint document there were also references to

18:13:48 22   what we believe the kickbacks were on some of

18:13:51 23   these fees.

18:13:51 24   BY MS. BODNER:

18:13:56 25       Q.   Boyd other than what's contained in this

Page 275

18:13:58 1   document and what's contained in the complaint do

18:14:01 2   you have any understanding as to how that 15

18:14:03 3   million dollar figure was arrived at?

18:14:03 4           MS. PAPEZ: Objection. Form.

18:14:07  5      A. No, I don't.

18:14:07  6   BY MS. BODNER:

18:14:08  7      Q.  Do you know why the 5 million dollar

18:14:10  8   figure contained in No. 4 is described as a kick

18:14:14  9   back?

18:14:14  10         MS. PAPEZ: Objection. Form.

18:14:19  11      A. My understanding and my definition I guess

18:14:22  12   I would say is Amazon paid money to our

18:14:26  13   development partners and at some point through

18:14:32  14   some series of transactions 5 million 120 dollars

18:14:38  15   was disbursed to both Casey and Carl and I believe

18:14:44  16   Mr. Watson.

18:14:44  17   BY MS. BODNER:

18:14:53  18      Q.  Is that your understanding based on

18:14:54  19   reading the complaint in the internal

18:14:57  20   investigation?

18:14:57  21         MS. PAPEZ: Objection. Form.

18:14:58  22      A. Yes.

18:14:58  23   BY MS. BODNER:

18:15:00  24      Q.  Do you have any other understanding of

18:15:02  25   that 5 million dollar figure that's not based in

Page 276

18:15:05 1   the complaint or the internal investigation?

18:15:05 2        MS. PAPEZ: Objection. Form.

18:15:07 3        A. No, I didn't investigate any further.

18:15:07 4   BY MS. BODNER:

18:15:19 5        Q.  Did you do any investigation to confirm

18:15:21 6   the accuracy of that 15 million dollar number?

18:15:24 7        MS. PAPEZ: Objection. Form asked and

18:15:26 8   answered?

18:15:26 9        A. No, I did not.

18:15:26 10  BY MS. BODNER:

18:15:30 11       Q.  Do you know if Keith Klein was involved

18:15:33 12  this coming up with that figure?

18:15:36 13       A. I don't know if Keith Klein was involved.

18:15:42 14  No.

18:15:43 15       MS. BODNER: If we could take a 10 minute

18:15:46 16  break thousand I need to review so see if I have

18:15:49 17  any final questions it shouldn't be much.

18:15:55 18       MS. PAPEZ:  Of course.

18:15:56 19       THE VIDEOGRAPHER: Off the record at 6:15

18:16:02 20  p.m.

18:26:49 21       THE VIDEOGRAPHER: Back on the record at

18:26:51 22  6:26 p.m.

18:26:54 23       MS. BODNER: I have a couple more questions

18:26:56 24  it's shouldn't take long.

18:26:58 25       A. Of course.

Page 277

18:26:59  1      Q. Mr. Vonderhaar do you know how much it

18:27:02  2   cost Amazon to build out a shell building that a

18:27:06  3   developer provides to it

18:27:08  4          MS. PAPEZ: Objection. Form?

18:27:10  5      A. I understand roughly that the cost of

18:27:17  6   bidding and construction, yes.

18:27:18  7      Q. Do you have a rough estimate of what it

18:27:21  8   cost Amazon to build out that shell?

18:27:28  9      A. Its on the order of between land

18:27:30 10   acquisition an material and construction its on

18:27:32 11   the order of tens of millions of dollars.

18:27:37 12      Q. What about 5 hundred to 7 hundred million

18:27:41 13   per building seem to be an average cost?

18:27:44 14      A. I think 500, 700 would include the fit out

18:27:50 15   of electrical and mechanical infrastructure is

18:27:53 16   where most of cost is that is only referring to

18:27:55 17   what you called the shell which is the 4 walls on

18:27:59 18   top of the dirt.

18:27:59 19   BY MS. BODNER:

18:28:01 20      Q.  Let's breaks down how much does it cost

18:28:04 21   to complete the shell?

18:28:08 22       A. I don't know the specifics.  Several

18:28:12 23   million dollars order magnitude.

18:28:19 24       Q. How much does it cost Amazon on average to

18:28:21 25   complete a fit out of a datacenter shell?

Page 278

18:28:24  1       A. By fit out if that means all of yule

18:28:26  2   tillty connection connections an infrastructure to

18:28:29  3   make it ready for customers then you're right its

18:28:32  4   on the order of hundred of mill millions of

18:28:37  5   dollars depending on the location of the rsite and

18:28:40  6   the design and capacity.

18:28:41  7       Q. Does 5 hundred to 7 hundred million per

18:28:45  8   fit out seem to be about the average cost?

18:28:50  9       A. That seems a bit high for the average

18:28:53 10   cost.  I can't vouch for that.  That is our

18:28:57 11   average cost.  No.

18:28:58 12       Q. Do you know if Amazon tracks the average

18:29:13 13   cost in any of its databases?

18:29:13 14           MS. PAPEZ: Objection. Form.

18:29:21 15       A. I don't think we track average costs I

18:29:23 16   think from time to time we will query compute

18:29:29 17    average cost by generation of datacenter by one

18:29:34 18    story up or two story to D.C. different design to

18:29:38 19    we will do that as an on needed ad hoc basis I

18:29:43 20    don't know that we're storing average.

18:29:43 21    BY MS. BODNER:

18:29:49 22        Q.  I want to go back to the tracking system

18:29:53 23    that we tacked about earlier with respect to

18:29:56 24    Virginia datacenter leases.  Does Amazon maintain

18:30:00 25    any sort of document or database that compares

Page 279

18:30:04 1    datacenter in Virginia with respect to yield on

18:30:08 2    cost?

18:30:08 3            MS. PAPEZ: Objection. Form.

18:30:15 4        A. We have databases that store that

18:30:18 5    information.  I don't know that we have systems or

18:30:21 6    tools that automatically compute and compare we

18:30:28 7    would have to go looking for that data gather the

18:30:31 8    data points and then compare.

18:30:40 9        Q. Do you have any tools that compare the

18:30:42 10    profitability of datacenter in Virginia?

18:30:48 11        A. I cannot point to a single tool.  The way

18:30:53 12   we would look at the profitability of our business

18:30:57 13   in the Virginia or IAD region would be through

18:31:01 14   some sort of financial analysis by our financing.

18:31:12 15        Q. Do you recall if that's been done between

18:31:15 16   2018 and 2020 with respect to the Virginia region?

18:31:18 17        MS. PAPEZ: Object to form.

18:31:18 18        A. I'm not aware of a specific analysis or

18:31:21 19   discussion of that during that time period.  For

18:31:31 20   clarification that's not in my role as operations,

18:31:35 21   I'm not generally sitting in on the profitability

18:31:38 22   that includes customer revenue usage and then the

18:31:43 23   cost of operations I'm pretty focused on what is

18:31:45 24   my unit cost and scaling the business.

18:31:53 25        Q. If someone at Amazon wants to compare ones

Page 280

18:31:56 1   datacenter to another datacenter how did they go

18:31:58 2   about constructing a comparison?

18:32:00 3        A. If the comparison is on a financial basis

18:32:03 4   kind of like you were describing just now they

18:32:05 5   would work through our finance team and our

18:32:08 6   finance partners, our infrastructure finance team,

18:32:14 7   and formulate the questions they want to answer

18:32:16  8    and then our finance team would pull the relevant

18:32:18  9    data from the right sources and pull the analysis

18:32:22 10    to answer the questions.  If it was for some other

18:32:24 11    analysis like maybe technical parameters or

18:32:27 12    availability of time then they might come to --.

18:32:36 13        Q. What is the role of reviewing comparisons

18:32:39 14    in the CAR process?

18:32:44 15        A. Reviewing comparisons helps us -- it helps

18:32:48 16    in a couple ways it helps us to answer the

18:32:51 17    question is this a good deal are we getting gad

18:32:56 18    value so it find of puts an individual transaction

18:33:00 19    in contest with past transaction maybe anticipated

18:33:04 20    future transaction to say how do we evaluate this

18:33:07 21    deal and do we feel good about I or not that's

18:33:11 22    kind of one purpose.  The second purpose this

18:33:13 23    doing that on a transaction by transaction basis

18:33:16 24    is overtime we start to acquire the data and

18:33:21 25    relook for trends.  Are we noticing an increase in

Page 281

18:33:24  1    cost or yield or something like that and that

18:33:26  2    gives us a basis to go out and ask questions about

18:33:31  3   what is it why is it why is it purpose for the

18:33:36  4   long.

18:33:39  5      Q. Do you have any reason to believe that the

18:33:41  6   comparison process did not occur with respect to

18:33:44  7   the Northstar leases?

18:33:45  8      A. No I don't have any reason to believe that

18:33:50  9   it can't to cur because that kind of analysis is

18:33:53 10   at least on a transaction by transaction basis is

18:33:56 11   part of our standard template and analysis of

18:33:59 12   these transactions.

18:34:04 13      Q. Does Amazon still occupy any of the

18:34:09 14   datacenters filled by Northstar?

18:34:09 15         MS. PAPEZ: Objection. Form.

18:34:13 16      A. I cannot speak specifically but given that

18:34:16 17   there were 9 pretty confident that we're in all of

18:34:19 18   most of those 9 datacenter on the build-to-suits.

18:34:24 19      Q. Do you recall if any of those datacenter

18:34:27 20   build by Northstar are profitable for Amazon?

18:34:32 21      A. I cannot speak to the profitability of any

18:34:35 22   one datacenter.

18:34:37 23      Q. Do you know generally speaking sitting

18:34:41 24   here now if any of the datacenter built by star

18:34:45 25   are currently profitable?

18:34:46 1      A. No and that's not how we look at it

18:34:50 2   frankly we don't look at profitability on a per

18:34:53 3   datacenter basis we look at profitability on a per

18:34:57 4   region basis.

18:34:57 5      Q. Can you explain a little more what you

18:35:01 6   mean by that?

18:35:01 7      A. Yeah, what we're determine profitability

18:35:08 8   we want to compare the revenue in a given region

18:35:11 9   like IAD to the underlying costs in a given

18:35:15 10  region.  Customer usage is not specific to a DC.

18:35:21 11  Its largely determined by where the customer wants

18:35:25 12  to look in our availability zone if we remember

18:35:30 13  that part of conversation earlier and sometimes

18:35:32 14  some of our larger customers that may have use a

18:35:36 15  hypothetical to illustrate the point but a

18:35:39 16  customer who may have one pricing scheme for a

18:35:42 17  service with a higher margin may be this two or

18:35:47 18  more A Zs but that revenue may not be in a

18:35:53 19  specific DC so look at the profitability of DC

18:35:56 20  level may not factor in the mission an rate I have

18:35:59 21  a plied across customers who may not be in that DC

18:36:03 22  does that help.

18:36:03 23     Q. That does help.  Do you track the

18:36:06 24   profitability of individual datacenter in any way?

18:36:11 25        A. I don't believe we do.  I'm not aware of

Page 283

18:36:14  1   datacenter profitability.

18:36:16  2        Q. Are you aware if the IAD region overall is

18:36:20  3   profitable for Amazon?

18:36:21  4        A. Overall I believe IAD overall is

18:36:28  5   profitable for Amazon.

18:36:29  6        Q. Do you know if IAD has also been a

18:36:35  7   profitable region for Amazon?

18:36:35  8            MS. PAPEZ: Objection. Form.

18:36:40  9        A. I don't know for how long it's been

18:36:42 10   profitable.  Generally when we start out

18:36:45 11   especially when we're just starting in a region

18:36:51 12   there's a heavy outlay of capital and it takes a

18:36:55 13   long time to recoupe that upfront capital so my

18:37:00 14   hypothesis is the IAD is profitable for some

18:37:03 15   period of time but it didn't start out that way if

18:37:05 16   you go all the way back to 2010, 2011 even prior

18:37:11 17   2008.

18:37:11 18        Q. Do you think IAD has been profitable since

18:37:14 19    2018?

18:37:14 20         MS. PAPEZ: Objection. Form.

18:37:17 21       A. I think so but I can not be sure.

18:37:17 22    BY MS. BODNER:

18:37:22 23       Q.  Who would know that?

18:37:25 24       A. You would have to ask members of our

18:37:28 25    finance team and related service.

Page 284

18:37:31  1       Q. Do you know any specific names of folks

18:37:34  2    who would know the answer to that?

18:37:38  3       A. I think the easiest thing to do is start

18:37:41  4    with our legal team and work our way to your G W S

18:37:46  5    CFO finance team and ask who can calculate that

18:37:49  6    data for you.  I don't want to name somebody that

18:37:55  7    can't actually do it.

18:38:00  8       Q. Are you aware that Northstar was one of if

18:38:03  9    not the first developer to bring the 7 percentage

18:38:08 10    yield on cost for Amazon?

18:38:08 11         MS. PAPEZ: Objection. Form.

18:38:12 12       A. No, I have not aware until just now that

18:38:14 13    you said that.

18:38:14 14    BY MS. BODNER:

18:38:17 15      Q.  Are you aware of Northstar provided one

18:38:20 16   or two story buildings for Amazon?

18:38:20 17         MS. PAPEZ: Objection. Form.

18:38:27 18      A. If I recall in previous review I think

18:38:31 19   there was at least one two story I want to say it

18:38:34 20   was IAD 145 maybe 144.  I can't be sure but think

18:38:41 21   that's what I reviewed earlier.

18:38:43 22      Q. Is that your understanding based on

18:38:45 23   documents introduced as exhibits today?

18:38:49 24      A. Yes, specifically the CAR documents that

18:38:52 25   we reviewed earlier in the summary it says we want

Page 285

18:38:54 1   to build X datacenter where two story with X

18:38:58 2   amount of capacity unless I'm mistaken I think I

18:39:02 3   read that 144 and 145 is a two story datacenter

18:39:06 4   I'm doing that from memory based on the exhibits

18:39:09 5   that we looked at together.

18:39:10 6      Q. You testified that you reviewed and signed

18:39:12 7   some datacenter leases for Amazon correct?

18:39:15 8      A. I believe that I have via dock sign.  Yes.

18:39:19 9      Q. Have you ever renegotiated a datacenter

18:39:23 10   lease for Amazon?

18:39:23 11        MS. PAPEZ: Objection. Form.

18:39:26 12        A. No, I have not.

18:39:28 13        Q. Other than the leases involved in this

18:39:31 14   lawsuit are you aware of any datacenter leases

18:39:34 15   ever being renegotiated by Amazon?

18:39:39 16        MS. PAPEZ: Objection. Form.

18:39:43 17        A. I cannot recall a specific datacenter

18:39:52 18   lease renegotiated I know from time to time my

18:39:55 19   team and I talked about there are terms coming up

18:39:57 20   over the next several years in the several years

18:40:00 21   or in the future and we will renegotiate

18:40:03 22   build-to-suit leases but other than the lease we

18:40:05 23   have talked about I have not been privy to any

18:40:08 24   specific renegotiates.

18:40:08 25   BY MS. BODNER:

Page 286

18:40:10 1        Q.  What sort of terms that you mentioned

18:40:13 2   would be coming up in the future that you mention

18:40:15 3   with your team?

18:40:17 4        A. Some of these leases I recall have ten or

18:40:21 5   15 year terms some of the older leases that we

18:40:25 6    signed.  And I can't say that they're

18:40:28 7    build-to-suit it may be colo that I'm thinking of

18:40:32 8    if they would have had ten or 15 year terms that

18:40:35 9    would mean things that we engaged in 2010 or 2011

18:40:39 10   the they were ten year would be coming up soon or

18:40:42 11   emanently if they were 15 year they would be

18:40:44 12   coming up in the next 3 to 4 years roughly.

18:40:47 13       Q. Were you explaining renegotiates these

18:40:49 14   renews or renegotiating initial leases that Amazon

18:40:52 15   entered?

18:40:53 16       A. Sorry.  I am talking about renew as and

18:41:00 17   or -- I'm talking about renews not renegotiates

18:41:05 18   with the purpose of changing any lease I apologize

18:41:09 19   if I confused the two.

18:41:11 20       Q. Have you ever renegotiated the economic

18:41:13 21   terms of new build-to-suit lease that Amazon

18:41:15 22   entered?

18:41:15 23       MS. PAPEZ: Objection. Form.

18:41:19 24       A. No I'm not aware and I don't recall and I

18:41:23 25   wasn't involved in any of that.

18:41:23  1   BY MS. BODNER:

18:41:26  2       Q.  Have you ever bought a house?

18:41:29  3       A. Yes.

18:41:31  4       Q. Have you ever heard of a sell or buyer who

18:41:34  5   pay as commission per written agreement for a

18:41:37  6   house coming back after closing and saying the

18:41:39  7   commission they paid was too high?

18:41:43  8       A. No.

18:41:44  9       Q. Do you know what makes datacenter any

18:41:53  10  different?

18:41:53  11       MS. PAPEZ: Objection. Form.

18:41:56  12       A. Yes in this case if people charged with

18:41:59  13  negotiating and sourcing these properties were

18:42:05  14  Amazon employees who were expected fellow or code

18:42:09  15  of conduct and disclose all of the relevant fees

18:42:13  16  and costs associated with that purchase

18:42:16  17  acquisition and in this case those folks failed in

18:42:18  18  that duty and therefore we made decisions with

18:42:22  19  incomplete or imperfect or misleading information

18:42:26  20  and that is not how I engaged in buying my own

18:42:30  21  personal properties in the past.

18:42:30  22  BY MS. BODNER:

18:42:38  23       Q.  You don't have any personal knowledge as

18:42:40  24  to what you just explained correct?

18:42:43  25       MS. PAPEZ: Objection. Form misstates

Page 288

18:42:46  1   testimony?

18:42:47  2        A. The personal I like to have is based on a

18:42:51  3   review of the findings and investigation that we

18:42:54  4   discussed previously.

18:42:54  5   BY MS. BODNER:

18:42:57  6        Q.  Do you believe that Amazon has the proper

18:42:59  7   controls and oversight in place to guard against

18:43:04  8   kickbacks in an organization?

18:43:04  9        MS. PAPEZ: Objection. Form.

18:43:07 10        A. I do.  I do believe we have proper

18:43:09 11   controls.  One thing that we expect is all the

18:43:13 12   people that we employed that are engaged was

18:43:18 13   including or real estate transaction manager honor

18:43:21 14   our code of conduct and agree to conduct their

18:43:24 15   business truthfully honestly transparently and

18:43:28 16   make sure that they disclose anything that could

18:43:31 17   impair or compromise their judgment and so in this

18:43:35 18   case I believe we had the proper controls but

18:43:39 19   because the informations that provided was

18:43:42 20   incomplete and misleading an in the the process

18:43:45 21   itself was manipulated by people who understood

18:43:48 22    exactly how we execute the process means that the

18:43:50 23    process itself was fraudulent and so I could not

18:43:54 24    execute my duty and make an informed decision

18:43:58 25    because I didn't have visibility to the things

Page 289

18:44:00  1    that were going on behind the screen.

18:44:05  2        Q. How do the controls that Amazon has in

18:44:08  3    base place to provide you with a process you need

18:44:11  4    to ensure the process is not manipulated?

18:44:14  5        MS. PAPEZ: Objection. Form inch it starts

18:44:15  6    with a foundation of our employees the people we

18:44:17  7    inemploy and the understanding that we all have a

18:44:20  8    duty to act on on behalf of the company first not

18:44:24  9    ourselves or others and that we're going to

18:44:26 10    disclose any relationships that may affect or

18:44:29 11    impair or compromise the value or brand for

18:44:33 12    Amazon.  It starts with that and if we can't rely

18:44:36 13    on people to provide complete and honest

18:44:39 14    information it doesn't matter how much different

18:44:41 15    controls we put in place at our scale we're going

18:44:44 16    to have to rely on those people to do the right

18:44:47 17  thing?

18:44:50 18      Q.

18:44:51 19          MS. BODNER: Have any rules or procedures

18:44:55 20  been put in place since Amazon's internal

18:44:58 21  investigation with respect to -- strike that.  Has

18:45:04 22  Amazon implemented any new rules or procedures to

18:45:07 23  guard against kickbacks since its internal

18:45:10 24  investigation into the allegations in this case.

18:45:13 25          MS. PAPEZ: Objection. Form?

Page 290

18:45:15 1      A. I'm not aware of any specific changes we

18:45:18 2  have made regarding think of against kickbacks.

18:45:22 3  No.  Its at the end of day we're still going to

18:45:25 4  rely on Amazon to gather information and present

18:45:29 5  it truthfully honestly full disclosure so that

18:45:32 6  people like me and finance and others can apply

18:45:35 7  judged and make a decision on behalf of Amazon.

18:45:38 8  I'm not aware of any plausible mechanism we could

18:45:42 9  put in place to guard against lying an desiteful

18:45:47 10  behavior.

18:45:47 11  BY MS. BODNER:

18:45:50 12      Q.  Outside of what you have read in the

18:45:51 13   complaint did you ever have any reason to believe

18:45:53 14   that Casey Kirschner was not providing you

18:45:57 15   complete and accurate information?

18:45:57 16        MS. PAPEZ: Objection. Form.

18:46:01 17     A. No.  I had no reason to believe Casey was

18:46:05 18   providing misleading information.

18:46:05 19   BY MS. BODNER:

18:46:10 20     Q.  Outside whatever you read in the

18:46:11 21   complaint did you have have any reason to believe

18:46:13 22   that Carl Nelson was not providing you complete an

18:46:17 23   accurate information?

18:46:17 24        MS. PAPEZ: Objection. Form.

18:46:18 25     A. No, I did not I believe what Carl was


Page 291


18:46:23 1   providing when he was employed here at Amazon as a

18:46:28 2   real estate transaction manager was accurate an

18:46:29 3   complete information.

18:46:32 4        MS. BODNER:  No further questions for me

18:46:33 5   thank you so much for your time I'm not sure if

18:46:35 6   Mr. Little has additional clean up or follow-up.

18:46:39 7        THE WITNESS:  Yes, ma'am.

18:46:41  8          MR. LITTLE:  Do you have any questions on

18:46:43  9    behalf of Amazon?

18:46:44 10          MS. PAPEZ:  I may have one issue if you

18:46:47 11    don't mind taking a short break I would like to go

18:46:50 12    back over my notes do you have anything further

18:46:53 13    Alex.

18:46:55 14          MR. LITTLE:  I do but it will be less than

18:46:57 15    ten minutes.

18:46:59 16          MS. PAPEZ:  Do you want to go ahead with

18:47:00 17    that that now.

18:47:00 18    REDIRECT EXAMINATION BY DEFENDANT CARLETON NELSON

18:47:00 19    BY MR. LITTLE:

18:47:03 20       Q. Mr. Vonderhaar, you just talked about the

18:47:06 21    difficulty of process where you have incomplete or

18:47:08 22    inperson or missing information do you recall that

18:47:11 23    testimony.

18:47:13 24       A. Just now yes.

18:47:14 25       Q. I want to turn your attention to exhibit

Page 292

18:47:17  1    CV 20 its document 22.  It's a question you were

18:47:23  2    asked about answer 18 the answer to interrogatory

18:47:27  3    18.  If you turn your attention to the top of page

18:47:31 4    17 sorry top of page 7 it appears to be the

18:47:36 5    information you provided about what you described

18:47:38 6    as the 17.7 million dollars in damages arising out

18:47:42 7    of the sale for the purchase from nova W P C and

18:47:47 8    Amazon's subsequent purchase price.  Do you see

18:47:49 9    that part of your answer in interrogatory?

18:47:53 10        MS. PAPEZ: Objection. Form.

18:47:56 11        MR. LITTLE:  I'm trying to direct your

18:47:58 12   attention to where we are in the document.

18:47:59 13       A. I see that part this have document I don't

18:48:01 14   recall in that very recent answer that I had that

18:48:03 15   I was referring to any specific amounts

18:48:05 16   identification talking about the integrity of our

18:48:07 17   process.

18:48:07 18       Q. I'm using that as a reference.  We're

18:48:09 19   going to talk now about jumping back into that

18:48:12 20   particular topic in that answer it says the

18:48:16 21   parenthetical that there was approximately 5

18:48:18 22   million as this amount that was paid in kickbacks

18:48:21 23   to defendant Watson.  Do you see that ass part of

18:48:23 24   your answer that that interrogatory?

18:48:24 25        MS. PAPEZ: Objection. Form just for the

18:48:28  1    record you keep saying Chris's answer.  I don't

18:48:30  2    know if you mean Chris personally or the company

18:48:32  3    but his verification is on on behalf of company

18:48:35  4    for this document.

18:48:35  5         MR. LITTLE:  I understand and he answered

18:48:36  6    questions about how you clarified that to the

18:48:39  7    extent that you answer that you verified, I'll say

18:48:41  8    it that way.

18:48:44  9         MS. PAPEZ:  Thank you.

18:48:44 10    BY MR. LITTLE:

18:48:46 11         Q. Do you see that part of answer you

18:48:47 12    verified.

18:48:47 13         A. Yes, to the best of my ability and based

18:48:50 14    on the my review of the documents and records and

18:48:52 15    information known to Amazon presented to me by

18:48:58 16    other Amazon people.

18:48:58 17    BY MR. LITTLE:

18:49:00 18         Q.   Are you aware that the 5 million dollars

18:49:01 19    that is mentioned in this paragraph was

18:49:05 20    transferred pursuant to that settlement agreement

18:49:07 21    that was mediated by state Supreme Court justice?

18:49:11 22         MS. PAPEZ: Objection. Form.

18:49:13 23         A. No.

18:49:13 24   BY MR. LITTLE:

18:49:16 25       Q. You're not aware there were lawyers

Page 294

18:49:18 1   representing both Northstar and Brian Watson and

18:49:22 2   will -- Kyle Ramsetter with connection to this 5

18:49:26 3   million dollar transfer?

18:49:26 4       MS. PAPEZ: Objection. Form.

18:49:29 5       A. No I'm not privy to that no.

18:49:29 6   BY MR. LITTLE:

18:49:32 7       Q. Are you surprised that you don't have that

18:49:34 8   information given the stage of the case that we're

18:49:37 9   in presently?

18:49:37 10       MS. PAPEZ: Objection. Form.

18:49:39 11       A. No, not particularly.

18:49:39 12   BY MR. LITTLE:

18:49:41 13       Q. Would you believe that a state Supreme

18:49:45 14   court judge or mediator would preside over a

18:49:49 15   proceeding that led to a kick back?

18:49:51 16       MS. PAPEZ: Objection. Form.

18:49:53 17       A. I guess if you say so I don't know what

18:49:56 18   the details or circumstances were.

18:49:56 19   BY MR. LITTLE:

18:49:58 20    Q. If I represent to you the mediation was

18:50:00 21  mediated by a former judge that led to the payment

18:50:03 22  you have listed here as is a kick back would you

18:50:08 23  have reason to believe that the judge would be

18:50:09 24  involved with a kick Wac of this sort that you

18:50:12 25  have described on page 7 or that your company has

Page 295

18:50:16  1  described on page 7?

18:50:16  2     MS. PAPEZ: Objection. Form.

18:50:19  3     A. No I would not -- I would find it

18:50:22  4  surpriseing if a judge is involved in a sort of

18:50:24  5  kick back so I would have a hard time believing

18:50:27  6  that but without any of the other details about

18:50:30  7  what you're describing it's hard for though to

18:50:32  8  change my point view or opinion.

18:50:35  9     Q. Is it fair to say that you had incomplete

18:50:37 10  information about this transaction at the present

18:50:41 11  time?

18:50:41 12     MS. PAPEZ: Objection. Form.

18:50:41 13     A. No, I don't feel that way I have been

18:50:44 14  presented with information that has been gathered

18:50:46 15   diligently by people who investigated this case

18:50:50 16   and to the best of my ability I'm representing my

18:50:53 17   understanding of that information on on behalf of

18:50:57 18   the company.

18:50:57 19       Q. How the form of the kick back the 5

18:50:59 20   million dollars that you verified in this answer

18:51:01 21   take place according to the information that was

18:51:06 22   presented to you?

18:51:06 23       MS. PAPEZ: Objection. Form.

18:51:08 24       A. I'm not going to be able to quote all of

18:51:11 25   the specific dates an times an how that kick back

Page 296

18:51:14 1   occurred.  What I have rerued in the investigation

18:51:18 2   is that Amazon paid money to developer entities

18:51:23 3   that we have discussed and some part of that money

18:51:26 4   that Amazon paid I don't know through what entitys

18:51:29 5   or financing companies necessarily but some part

18:51:31 6   of what we paid and we that we intended to be paid

18:51:35 7   based on represent and other fees incurred in the

18:51:38 8   transaction found its way through various

18:51:41 9   companies back to Casey Kirk and Carl Nelson.

18:51:41 10   BY MR. LITTLE:

18:51:46 11      Q. And you think that's what happened with

18:51:47 12  respect to the whites peek transaction where Nova

18:51:51 13  WPC purchase property for 98.67 million?

18:51:57 14          MS. PAPEZ: Objection. Form.

18:51:58 15      A. I don't know if it happened with that

18:51:59 16  specific property I'm trying to -- there were

18:52:01 17  build-to-suit transactions and then there were the

18:52:03 18  two acquisitions.

18:52:03 19  BY MR. LITTLE:

18:52:07 20      Q. You understand that the one we're

18:52:08 21  references here is a direct purchase acquisition

18:52:11 22  correct based on the answer that you verified

18:52:14 23  here?

18:52:14 24          MS. PAPEZ: Objection. Form.

18:52:16 25      A. Looking at the top of page 7 and reference

Page 297

18:52:19 1  B, yes, it appears to be a direct purchase.

18:52:22 2      Q. How did a kick back occur in our

18:52:26 3  understanding and you verified under oath in a

18:52:28 4  lawsuit that cost these defendants hundreds of

18:52:30 5  thousands of dollars to defend occur?

18:52:30  6         MS. PAPEZ: Objection. Form.

18:52:35  7         A. The -- I don't know who funded the kick

18:52:38  8    back specifically, I know that we've paid for this

18:52:42  9    purchase and this property and some part of that

18:52:45 10    money irrespective of whose hands it went through

18:52:48 11    or what entities it went through, based on the

18:52:51 12    results of this investigation found its way into

18:52:54 13    two of our former employees which violates our

18:52:58 14    code of conduct because they had a duty to

18:53:00 15    disclose that they were going to profit personally

18:53:03 16    from this transaction.

18:53:03 17    BY MR. LITTLE:

18:53:07 18         Q. How did the kick back occur with respect

18:53:09 19    to Mr. Watson that you have verified he harmed

18:53:14 20    your company by 5 million dollars?

18:53:14 21         MS. PAPEZ: Objection. Form.

18:53:17 22         A. Again I don't know whose hands or what

18:53:19 23    entities in order and on what dates those moneys

18:53:23 24    transited on its way to Mr. Watson but place based

18:53:27 25    on the result of investigation presented to me

Page 298

18:53:29  1    some amount of money was also sent directly to

18:53:34  2   Mr. Watson as a result of this transaction.

18:53:34  3   BY MR. LITTLE:

18:53:39  4       Q. What is your understanding of why it would

18:53:40  5   be a cake back for Mr. Watson to receive money in

18:53:44  6   connection with this transaction?

18:53:44  7           MS. PAPEZ: Objection. Form.

18:53:48  8       A. From where I sit as an adjudicator in your

18:53:53  9   CAR process somebody reviewing the details none of

18:53:55 10   that information about Casey Carl or Mr. Watson

18:53:58 11   was disclosed that they were going to receive

18:54:01 12   personally receive money as a result of our

18:54:04 13   transactions.

18:54:04 14   BY MR. LITTLE:

18:54:06 15       Q. What makes you belief it was determined

18:54:08 16   they were going to southeast money when the CAR

18:54:10 17   process was on going to?

18:54:10 18           MS. PAPEZ: Objection. Form.

18:54:14 19       A. There was not being in the CAR process at

18:54:16 20   the time we reviewed these transactions that

18:54:20 21   indicated any of these were going to receive

18:54:21 22   money.

18:54:21 23       Q. Was there any reason to believe that there

18:54:23 24   was any reason for anyone to believe they were

18:54:26 25   going to receive money at the time you believe the

Page 299

18:54:31  1   information should have disclosed?

18:54:31  2        MS. PAPEZ: Objection. Form.

18:54:32  3        A. I think I understand the question I would

18:54:34  4   say at the time we were reviewing these

18:54:37  5   transactions the CAR there was nothing in the CARs

18:54:43  6   that indicated that these individuals were going

18:54:46  7   to receive personally receive any payments of any

18:54:49  8   kind and had had that --

18:54:51  9        Q. Write question?

18:54:53  10       A. Had that been disclosed the deal would

18:54:55  11  have been off the table.

18:54:56  12       Q. You understand that you can't disclose

18:54:58  13  information that doesn't exist, correct?

18:54:59  14       MS. PAPEZ: Objection. Form.

18:55:01  15       A. If what you're saying you can't make up

18:55:06  16  stuff to disclose then yeah I agree with you.

18:55:08  17       Q. Ewe if information doesn't yet exist you

18:55:11  18  can't predict what the information is the future

18:55:13  19  is going to, be correct; you don't expect your

18:55:16  20  transaction manager to predict the future, do you?

18:55:16  21       MS. PAPEZ: Objection. Form.

18:55:19 22      A. No, I don't expect them to predict the

18:55:22 23  future but I do expect them to disclose their

18:55:27 24  intent.

18:55:27 25  BY MR. LITTLE:

Page 300

18:55:30 1      Q. If at the time the CAR process took place

18:55:32 2  there was never any intent of on behalf of Brian

18:55:34 3  Watson to receive any money from a deal he knew

18:55:37 4  nothing about how do you believe that information

18:55:40 5  should have been placed into the CAR process?

18:55:40 6      MS. PAPEZ: Objection. Form.

18:55:46 7      A. I don't know that I agree or believe your

18:55:48 8  premise that he knew nothing about I.

18:55:51 9      Q. So what information do you have that he

18:55:54 10  knew anything about that transaction

18:55:55 11  Mr. Vonderhaar?

18:55:55 12      MS. PAPEZ: Objection. Form.

18:55:59 13      A. The information I have now based on the on

18:56:02 14  the investigation has indicated that he had -- he

18:56:05 15  Casey Carl intended to property from these

18:56:09 16  transactions.

18:56:09 17      Q. You say these transaction I'm talking

18:56:11 18    about the specific transaction and you have not

18:56:13 19    been able to identify any particular information

18:56:15 20    is to let me direct your attention to that is

18:56:18 21    there any particular information that you have and

18:56:20 22    learned at any capacity that led you to believe

18:56:22 23    that Mr. Watson intended when this transaction

18:56:26 24    occurred to receive $5 million?

18:56:26 25          MS. PAPEZ: Objection. Form.


                                                Page 301


18:56:30  1    A. No.  I don't know what his intent was at

18:56:36  2    the time of this transaction.

18:56:37  3    Q. Would it surprise you to know Mr. Watson

18:56:40  4    had no knowledge this transaction was even taking

18:56:42  5    place when it occurred?

18:56:42  6          MS. PAPEZ: Objection. Form.

18:56:45  7    A. I don't know that I'm surprised by it but

18:56:48  8    okay.

18:56:49  9    Q. Would it surprise you to know after he

18:56:52 10    learn of transaction that he was concerned his

18:56:55 11    employee had been engaged in a transaction without

18:57:02 12    telling his employer?

18:57:02 13          MS. PAPEZ: Objection. Form.

18:57:04 14      A. I don't know many details about that and

18:57:06 15  what conversations took place and who is surprised

18:57:09 16  by what.

18:57:09 17  BY MR. LITTLE:

18:57:11 18      Q. So you're not aware that lawyers aren't

18:57:13 19  acting on Mr. Watson's behalf sent a demand lets

18:57:18 20  to Mr. Kyle Ramsetter and Buck related to this

18:57:22 21  transaction do you?

18:57:22 22      A. I'm not aware of that letter or any letter

18:57:25 23  like that no.

18:57:25 24      Q. Are you aware you're not aware that there

18:57:29 25  was then a mediation between counsel and

Page 302

18:57:32 1  Mr. Watson and Kyle Ramsetter and Mr. Cammonson

18:57:36 2  about that dispute?

18:57:37 3      A. No I'm not -- no, I'm not aware of that

18:57:43 4  and honestly -- hold on in my role in the CAR

18:57:49 5  process right I am look at thes breast of Amazon

18:57:57 6  and our employees who are agents of our company

18:57:59 7  and when these CAR transactions take place I'm

18:58:05 8  not -- I don't engage in what star or what

18:58:09  9    Mr. Watson or notion folks do.  What I care about

18:58:12 10    is do our employees work within the bounds of our

18:58:16 11    process do they provide truthful and honest

18:58:20 12    information do they act on behalf of company and

18:58:23 13    in this case are they enbanals solely the our

18:58:26 14    behalf or not on on behalf of to over partner as

18:58:29 15    family member in check cuting their duties to have

18:58:31 16    company so I'm not aware of and I'm not -- I did

18:58:34 17    not dive into what conversations took place

18:58:37 18    between Mr. Watson and the rest of the folks.

18:58:37 19    BY MR. LITTLE:

18:58:40 20       Q. Mr. Vonderhaar the things that I'm

18:58:43 21    describes to you all happened after the CAR

18:58:44 22    process transpired and so is it fair to say you

18:58:48 23    were not aware that your lawyers at Amazon had a

18:58:51 24    copy of the mediation statement where the two

18:58:53 25    sides mediated in question.  You they ever seen

Page 303

18:58:56  1    that document?

18:58:56  2           MS. PAPEZ: Objection. Form.

18:58:59  3       A. No I have not reviewed any mediation.

18:59:01 4      Q. So you were unaware there was a mediation

18:59:04 5   that led to this 5 million dollar payment that you

18:59:06 6   verified under oath it was a kick back?

18:59:06 7         MS. PAPEZ: Objection. Form.

18:59:10 8      A. I verify under oath as per these documents

18:59:13 9   that I have seened to the best of hi ability and

18:59:16 10   based on information presented to me I have some

18:59:18 11   results of our investigation that as a

18:59:20 12   representative of the Amazon that I believe these

18:59:23 13   things occurred and are to be true.

18:59:23 14   BY MR. LITTLE:

18:59:26 15      Q. After receiving additional information

18:59:29 16   such as the timing of payments, how they were

18:59:32 17   made, who made them, the nature of the individuals

18:59:36 18   involved, if received additional information to

18:59:40 19   bring a more complete picture of this transaction

18:59:43 20   do you think you would change your view as to

18:59:46 21   whether or not that 5 million dollar payment was

18:59:48 22   kick back?

18:59:48 23         MS. PAPEZ: Objection. Form.

18:59:51 24      A. As we discussed little bit or explored a

18:59:53 25   little bit earlier, think I'm a reasonable person

18:59:56  1   and if somebody presented me with corrections or

19:00:00  2   new facts or new information then I would be open

19:00:04  3   and objective to that new facts an information and

19:00:08  4   perhaps just my opinion or point of view or

19:00:10  5   decisions acourting.

19:00:12  6       Q. You would certainly want to make sure any

19:00:13  7   information you verified with the court would be

19:00:16  8   correct is that fair to say?

19:00:16  9       MS. PAPEZ: Objection. Form.

19:00:19 10       A. Yes, I want to provide correct and

19:00:22 11   accurate information to the court and I believe

19:00:24 12   the information I believe be presented by my

19:00:26 13   associates at Amazon is truthful and accurate

19:00:30 14   information and based on my understanding of that

19:00:33 15   information that's reflected many my testimony.

19:00:35 16       Q. Well at this time base on fact that you

19:00:37 17   though I represented to you there was a mediation

19:00:40 18   involving a judge there are lawyers involved

19:00:43 19   mediation statement that your lawyers have they

19:00:45 20   have never shown you do you believe you have all

19:00:48 21   the relevant information related to this

19:00:50 22   transaction to make a determination about whether

19:00:52 23   or not it was a kick back?

19:00:52 24       MS. PAPEZ: Objection. Form.

19:00:56 25     A. I'm comfortable with the information I

Page 305

19:00:59 1    have been presented.  The new information you're

19:01:01 2    introducing without a whole lot of other details

19:01:04 3    or context doesn't sway me much frankly.

19:01:08 4        Q. Why not?

19:01:09 5        A. I have not reviewed or discussed any of

19:01:11 6    the details other than what you have just

19:01:13 7    presented and the fact this there are other

19:01:15 8    lawyers and jumps involve doesn't make any of that

19:01:19 9    right or appropriate or relevant in this case

19:01:22 10   because I don't know how they can think.

19:01:23 11       Q. Are those thing you would want to know

19:01:26 12   more about to make a representation to the court

19:01:28 13   that the transaction was a kick back?

19:01:28 14        MS. PAPEZ: Objection. Form.

19:01:32 15       A. If that information was presented to our

19:01:37 16   investigator as counsel and we talked about it and

19:01:40 17   it was deemed that that was relevant and important

19:01:43 18   to how we proceed then yeah I would expect they

19:01:45 19   will to bring that forward so that I could

19:01:48 20   completely and accurately represent Amazon

19:01:50 21   position in this documents an these proceedings.

19:01:54 22      Q. Do you have any reason to know why you

19:01:57 23   weren't provided such?

19:01:57 24         MS. PAPEZ: Objection. Form.

19:01:59 25      A. No I do not.

                                          Page 306

19:01:59  1      Q. You understand do you not a build-to-suit

19:02:10  2   transaction that Amazon is not responsible for

19:02:12  3   paying any of the development costs of a

19:02:14  4   development other than its payment of rent

19:02:20  5   correct?

19:02:20  6         MS. PAPEZ: Objection. Form.

19:02:22  7      A. We pay rent I believe my understanding

19:02:26  8   this these transaction is that rent has to cover

19:02:29  9   fees an expenses of the developer unless its

19:02:33 10   called out specifically and we have visibility to

19:02:36 11   it we can that as part of deal.

19:02:39 12      Q. The out lay of Amazon is in the form of

19:02:41 13   rent exclusively is that fair to say?

19:02:41 14         MS. PAPEZ: Objection. Form.

19:02:45 15      A. I cannot say exclusively its in the out

19:02:49 16   lay of rent.  I believe we execute add lot of

19:02:53 17   transactions and some of them have been different

19:02:55 18   commercial structures generally speaking we pay

19:02:58 19   rent yes I'm not going to say there weren't deals

19:03:01 20   elsewhere where we paid rent an some other fees we

19:03:05 21   disclosed reviewed an approved.

19:03:09 22       Q. You have testified a number of times today

19:03:12 23   about the idea of expecting your employees to

19:03:17 24   operate with good judgement is that fair to say?

19:03:17 25       MS. PAPEZ: Objection. Form.

Page 307

19:03:22  1       A. Yes.

19:03:22  2   BY MR. LITTLE:

19:03:24  3       Q. In that particular you have pointed to the

19:03:26  4   concerns about tranaparency and employees not

19:03:31  5   providing information about conflicts of interest

19:03:33  6   they may have is that a fair summary of parts of

19:03:36  7   your testimony?

19:03:38  8       A. Yes.

19:03:38  9       Q. Are there other typeful of ways in which

19:03:43 10   an employees judgment can be hampered in the

19:03:47 11    making of decisions around spending of the CAR

19:03:50 12    process at Amazon?

19:03:51 13        MS. PAPEZ: Objection. Form?

19:03:59 14        Q. One of the ways that comes to mind is

19:04:02 15    they've improper gifts going back to your truck

19:04:05 16    for example receiving gifts impair my judgement

19:04:09 17    might favor a transaction that's not the best

19:04:12 18    option or transaction for Amazon?

19:04:15 19        Q. Would be an alcoholic operate the same way

19:04:18 20    impair an employee's judgment to make interest?

19:04:18 21        MS. PAPEZ: Objection. Form.

19:04:24 22        A. As a hypothetical I suppose there is

19:04:26 23    circumstances where somebody with an alcohol

19:04:29 24    addiction or problem judgment may be impaired and

19:04:33 25    might compromise their behavior and decisions on

Page 308

19:04:37  1    behalf of Amazon.

19:04:37  2        Q. Do those same consequences stem from

19:04:41  3    somebody having a drug addiction?

19:04:41  4        MS. PAPEZ: Objection. Form.

19:04:44  5        A. Yes much like what I described in alcohol,

19:04:47  6    yes, I can see that.

19:04:47  7      Q. Do those same type of consequences flow

19:04:51  8   from someond having and undisclosed marital

19:04:53  9   affair?

19:04:53 10         MS. PAPEZ: Objection. Form.

19:04:54 11      A. As a hypothetical I suppose in some

19:04:57 12   circumstances that could impair their judgment

19:05:00 13   compromise their decision making yes.

19:05:03 14      Q. Does Amazon have any policies that you're

19:05:06 15   aware of that require individuals to disclose if

19:05:10 16   they have alcoholism, drug addiction or in the

19:05:13 17   course of marital affair?

19:05:13 18         MS. PAPEZ: Objection. Form.

19:05:17 19      A. We don't require people to disclose those

19:05:21 20   aspects to of their personal life.  However I will

19:05:24 21   point back to our code of conduct that does put

19:05:26 22   the onus on employees to disclose any

19:05:30 23   relationships or other mats that may impair their

19:05:32 24   judgment.

19:05:33 25      Q. Because there's no specific policy related

Page 309

19:05:35  1   to the disclosure of alcoholism, correct?

19:05:38   2          MS. PAPEZ: Objection. Form asked and

19:05:41   3    answered?

19:05:41   4       A. I'm in the awore of a specific policy

19:05:44   5    around alcoholism.

19:05:44   6    BY MR. LITTLE:

19:05:46   7       Q. There's no specific policy that AWS has

19:05:49   8    prior disclosure of drug addiction is there?

19:05:53   9          MS. PAPEZ: Objection. Form asked and

19:05:55  10    answered?

19:05:55  11       A. I'm not awore of a specific policy or

19:05:58  12    expectation around drug addiction no.

19:05:58  13    BY MR. LITTLE:

19:06:01  14       Q. And there's likewise not a specific policy

19:06:04  15    that AWS has that wire requires employee to

19:06:08  16    disclose if they're having an extra marital

19:06:12  17    affair?

19:06:12  18          MS. PAPEZ: Objection. Form Object to form?

19:06:14  19       A. Same answer I'm not aware of any specific

19:06:17  20    policy or expectation to disclose extra marital

19:06:20  21    affairs.

19:06:20  22    BY MR. LITTLE:

19:06:21  23       Q. If all three of those circumstances could

19:06:25  24    lead and employee to exercise poor judgment to the

19:06:28  25    detriment of Amazon why do you see that Amazon not

19:06:31  1  have such policies.

19:06:33  2       MS. PAPEZ: Objection. Form calls for

19:06:36  3  speculation.

19:06:36  4       A. The difference for me is that those are I

19:06:43  5  would say confidential and personal situations

19:06:47  6  that may impair someone judgment.  That's very

19:06:50  7  different from routine business transactions where

19:06:54  8  the expectations are very clear; how we evaluate

19:07:00  9  or make a decision for an transaction, what

19:07:01 10  information needs to be disclosed, why it's

19:07:04 11  important that that information is disclosed to

19:07:06 12  make a good business decision  it's hard for me to

19:07:09 13  compare somebody misleading or misrepresenting

19:07:13 14  something and withholding information versus

19:07:16 15  somebody who fines themselves in a very

19:07:18 16  unfortunate situation.

19:07:20 17       Q. If an individual is having a bra marital

19:07:23 18  affair with a vendor would you expect them to

19:07:26 19  disclose that to Amazon?

19:07:26 20       MS. PAPEZ: Objection. Form.

19:07:29 21       A. If that person was engaged in a

19:07:31 22  relationship request that vendor then yes if they

19:07:36 23   are dealing directly with that vendor and

19:07:38 24   connecting Amazon business with our vendoring I

19:07:42 25   would expect somebody to disclose that because

Page 311

19:07:44  1   that could compromise their judgment and our

19:07:47  2   decision making an at least have an opportunity to

19:07:49  3   know that that's occurring so we can evaluate

19:07:52  4   whether we want to have maybe some execute that

19:07:55  5   transaction it gives us an opportunity to take

19:07:58  6   action to protect Amazon and perhaps the employee.

19:08:02  7       Q. And for purpose of the that question your

19:08:07  8   state they should disclose that.  I'm going to

19:08:09  9   turn back to the code of conduct that we've been

19:08:11 10   talking at previously today?

19:08:12 11       A. Okay.

19:08:13 12       Q. I believe its document 12 Exhibit 11?

19:08:23 13       A. Yes.

19:08:24 14       Q. What provision do you believe requires an

19:08:27 15   employee to disclose a relationship of that sort

19:08:31 16   if they're having extra marital affair with a

19:08:34 17   vendor?

19:08:36 18          MS. PAPEZ:  Objection. Form I don't

19:08:38 19     remember?

19:08:38 20          A. On the first and while it doesn't say

19:08:43 21     extra marital affair what it does say is conflict

19:08:46 22     of interest exists when an employee's personal

19:08:49 23     interest interferes with the best interest of

19:08:52 24     Amazon.  I believe that could come into play if we

19:08:55 25     have an employee who is in a relationship with a

Page 312

19:08:58  1     vendor.  I would also point to later down on page

19:09:03  2     1 the last paragraph that says employees should

19:09:09  3     attempt to avoid conflicts of interest an employee

19:09:13  4     should belief conflict of interest exists should

19:09:16  5     notify the legal department.  In your example the

19:09:19  6     onus is on the employee to disclose they're in

19:09:22  7     some sort of a relationship to the legal

19:09:27  8     department to legal and Amazon has an opportunity

19:09:29  9     to decide if that constitute as conflict of

19:09:32 10     interest and if Amazon is in any sort of jeopardy

19:09:36 11     in terms of the business of the two of those

19:09:38 12     people are conducting.

19:09:40 13          Q. Continue this hypothetical you point today

19:09:44 14    conflict of definition of a conflict of interest

19:09:48 15    existing when a employees personal interest

19:09:50 16    appears the best interest of Amazon to continue if

19:09:53 17    there's an employee in a extra marital affair with

19:09:55 18    a vendor and as a result that vendor is willing to

19:09:57 19    give Amazon substantially discounted pricing

19:10:00 20    because that vendor believes its in his or her

19:10:04 21    best interest do you believe that would constitute

19:10:06 22    a conflict of interest under that provision you

19:10:10 23    previously read?

19:10:10 24         MS. PAPEZ: Objection. Form.

19:10:14 25         A. Yes.  And to carry on your hypothetical

Page 313

19:10:19 1    who is to say that while we may get favorable

19:10:22 2    pricing while they're in the relationship things

19:10:24 3    may turn the other direct when they're no longer

19:10:27 4    in that relationship then Amazon would be harmed.

19:10:31 5    The other thing I did miss the other reference

19:10:33 6    back to your previous question.  It calls pretty

19:10:37 7    out specifically under 2 conflicts  of interest

19:10:40 8    sentence that begins for example.  For example a

19:10:42  9   conflict of interest may occur when an employee or

19:10:45 10   a family member receives a personal benefit as a

19:10:48 11   result of the employees position of

https://urldefense.proofpoint.com/v2/url?u=http-3A__Amazon.com&d=DwIGAg&c=wT9hcAyWec
HwFHlf1ZE3OA&r=IcGIiwhuRpB-tDQgfX5Skg_KofTBdhQVVzsEs6QIsWA&m=7QlBvWI7CROq7CO9Ke2YNx1
s9s7-BplAHWDY7ASyp8FRwVCq_uIG_fiQLc8Bt2u3&s=u6r4au_Rld3MPCpD_HgT6dhrJVob_JsWFjoLYW2X
48c&e=  and

19:10:51 12   in an extra marital affair hypothetical case while

19:10:55 13   It may not be a family member, it's a close

19:10:59 14   personal relationship, is the way I'm taking that,

19:11:00 15   in which case that could create that conflict of

19:11:03 16   interest so it think it calls out why that's

19:11:06 17   inappropriate.

19:11:08 18       Q. Does it could it out specifically or does

19:11:11 19   it call it out pretty specifically?

19:11:11 20       MS. PAPEZ: Objection. Form.

19:11:15 21       A. I'm going to go say specifically because

19:11:17 22   the next sentence say as conflict of interest may

19:11:19 23   also rice from an employee's business or personal

19:11:22 24   relationship with a customer, a supplier, a

19:11:26 25   competitor, a business partner or other employee

Page 314

19:11:29  1   if that relationship impairs the employees

19:11:32  2   objective business judgement.

19:11:33  3        Q. Do you believe that the clause impairs the

19:11:36  4    employees effective business judgment Mott fies

19:11:40  5    the first part of that sentence?

19:11:40  6           MS. PAPEZ: Objection. Form.

19:11:44  7        A. I don't know that it modifies it but back

19:11:45  8    to your hypothetical if somebody is in an extra

19:11:50  9    marital affair depending on the nature of that

19:11:53 10    affair and that relationship in the business I

19:11:55 11    think the potential exists for that conflict of

19:11:58 12    interest and that relationship in pairing

19:12:01 13    somebody's judgment and the best thing to do and

19:12:03 14    what our code of contact requires that simply

19:12:07 15    disclose its so we can have a conversation about

19:12:09 16    it and determine whether Amazon is in any sort of

19:12:13 17    compromised position or jeopardy due to that

19:12:14 18    relationship.

19:12:15 19        Q. Mr. Vonderhaar the code of conduct did

19:12:18 20    require to be disclosed why does it include that

19:12:22 21    clause if the employee objective business?

19:12:22 22           MS. PAPEZ: Objection. Form.

19:12:25 23        A. Because at the end of day the employee in

19:12:28 24    the relationship, the onus is on them to make that

19:12:30 25    judgement call and raise the issue or the question

Page 315

19:12:35  1  and make sure its out in the open so we can deal

19:12:37  2  with it.

19:12:40  3      Q. Are you aware that Geoff Bezos former CEO

19:12:44  4  of Amazon had an extra marital affair?

19:12:44  5          MS. PAPEZ: Objection. Form.

19:12:50  6      A. I guess what I have heard in the news and

19:12:52  7  read on the newspaper is that that may have

19:12:55  8  occurred I don't know the circumstances or facts

19:12:57  9  haven't really been interested in it.

19:12:59  10     Q. And so you're in the I have a war that he

19:13:01  11  hired his paramour company to do business

19:13:06  12  transactions as part of his other company Blew

19:13:10  13  Origin?

19:13:10  14         MS. PAPEZ: Objection. Form.

19:13:10  15     A. No, I don't know anything about those

19:13:14  16  details.

19:13:14  17     Q. Ultimately who would athe code of conduct

19:13:18  18  at the highest levels of Amazon?

19:13:18  19         MS. PAPEZ: Objection. Form.

19:13:23  20     A. Our code of conduct is assembled and

19:13:26  21  reviewed through or H R team and senior executives

19:13:28  22  and it would not spur price me and although I

19:13:31 23    cannot confirm the certainty that our board

19:13:34 24    doesn't sign off on these policy.

19:13:36 25        Q. In 2011 was Jeff /TPWE /SOEZ the CEO of

Page 316

19:13:40  1    Amazon?

19:13:40  2        A. Yes, I believe he was.

19:13:43  3        Q. At that time did Andy Jassy report to him

19:13:47  4    at some point between 2011 and 2018 did Andy Jassy

19:13:53  5    report to Jeff besouse in Andy's role as the C, E

19:13:58  6    O of AWS?

19:14:00  7        A. I believe he was in that role I don't know

19:14:02  8    when got to CEO title but he was reporting to Jeff

19:14:06  9    in that time.

19:14:07 10        MR. LITTLE:  I appreciate your patience.

19:14:09 11    I've got no further questions.  I hope you have a

19:14:13 12    good rest of the day.  I don't know if anybody

19:14:14 13    else have anything for you?

19:14:18 14        MS. PAPEZ:  Sarah, do you have anything

19:14:20 15    further?

19:14:21 16        MS. BODNER: I'm all set thank you.

19:14:24 17        MS. PAPEZ:  Can you give us ten minutes I

19:14:25 18    want to make sure we don't have anything else to

19:14:28 19   close up the record and why don't we reconvene

19:14:37 20   7:25 does that work.

19:14:41 21           MR. LITTLE:  That's fine.

19:14:43 22           THE VIDEOGRAPHER: Off the record at 7:14

19:14:48 23   p.m.

19:33:02 24           (Proceedings resumed at TIME

19:33:02 25           THE VIDEOGRAPHER: We are back of record at

Page 317

19:33:11  1   7:33 p.m.

19:33:18  2               EXAMINATION BY PLAINTIFFS

19:33:18  3   BY MS. PAPEZ:

19:33:21  4       Q. Mr. Vonderhaar, we are back only record

19:33:24  5   you are under oath you still understand that.

19:33:24  6       A. Yes, I do.

19:33:25  7       Q. Mr. Vonderhaar earlier today you were

19:33:28  8   asked a series of questions about your personal

19:33:32  9   role in the CAR approval process for the deals at

19:33:38 10   issue in this lawsuit.  Do you recall that

19:33:40 11   testimony?

19:33:47 12       A. Yes, I do.

19:33:47 13       Q. You said you did have some personal role

19:33:49 14   in the approval process for the deals in this case

19:33:53 15   correct?

19:33:55 16       A. Correct.  I was the approve very on most

19:34:00 17   or all of those transactions.

19:34:05 18       Q. You were asked a number of questions about

19:34:07 19   how certain information might have affected your

19:34:15 20   assessment of those deals.  Do you recall that

19:34:16 21   series of questions?

19:34:17 22       A. Yes.

19:34:18 23       Q. Let me ask you are you aware that Carl,

19:34:34 24   Casey and Northstar had a relationship set up with

19:34:38 25   Casey's brother in 2018 before the first CAR came

Page 318

19:34:44 1    to you for approval on these deals?

19:34:57 2        A. That is what I became aware of those

19:34:59 3    relationships came to the surface throw this

19:35:02 4    investigation.

19:35:03 5        Q. Sitting here today you're aware that your

19:35:09 6    transaction managers had relationship where one of

19:35:11 7    your brothers would be getting paid in connection

19:35:14 8    with am zone deals?

19:35:24 9        A. Today I am aware of that yes.

19:35:28 10          MR. LITTLE:  Objection.

19:35:29 11    BY MS. PAPEZ:

19:35:29 12          Q. Were you way or that have relationship

19:35:31 13    when approved the cars for the deal at issue in

19:35:33 14    this lawsuit?

19:35:35 15          A. No, I was not aware at the time those

19:35:39 16    deals at the cars would put forward disclosed

19:35:45 17    about those relationships in those cars.

19:35:48 18          A. Mr. Vonderhaar had anyone disclosed to you

19:35:53 19    that your transaction managers were bringing you

19:35:56 20    deals with a developer who would be paying your

19:36:06 21    transaction manager's brother referral fees with

19:36:09 22    the Amazon transactions would you have approved

19:36:11 23    any of those CARs.

19:36:14 24          MR. LITTLE:  Objection to form.

19:36:17 25          A. No, I would not have approved any of those

Page 319

19:36:20 1     CARs.  In fact I would have alerted legal some

19:36:26 2     sort of investigation into what those

19:36:29 3     relationships were those relationships have

19:36:36 4     compromised our process going back to our code of

19:36:39  5   conduct those are the kinds of relationship is

19:36:44  6   that can aim pair or affect somebody judgment if I

19:36:46  7   had known those relationships existed it would

19:36:53  8   have called into yes one of integrity of process

19:36:55  9   an two all the information that was being put

19:36:58 10   forth in those cars that form the basis for my and

19:37:00 11   other people's approvals.

19:37:07 12       Q. Would you have approved any of the CARs if

19:37:10 13   you had known or had been disclosed to you that

19:37:14 14   your transaction managers would get any financial

19:37:17 15   benefit of any kind in connection with the

19:37:20 16   transactions?

19:37:28 17           MR. LITTLE:   Objection to form.

19:37:29 18       A. Absolutely not.

19:37:30 19   BY MS. PAPEZ:

19:37:31 20       Q. Why not?

19:37:33 21       A. On top of nondisclosure or failure to

19:37:37 22   disclose to improper relationships its kind of a

19:37:39 23   second offense in my mind the way I think about

19:37:43 24   it.  Not only did I not disclose these things but

19:37:50 25   we prohibit our code of ducting conduct as we act

19:37:56  1   an over of the knowing that our employees were

19:37:59  2   going to get a cut of the transaction that was

19:38:03  3   intended to purchase an asset ask absolutely a

19:38:07  4   conflict of interest an would impair their

19:38:10  5   judgment they would be motivated.

19:38:14  6       Q. Just understand the relationship the mere

19:38:17  7   fact of a personal relationship involving in the

19:38:20  8   transaction good enough to prevent you from

19:38:22  9   proving these transactions?

19:38:24  10      A. Yes.  To be clear the relationship would

19:38:29  11  be enough to stop or reject the deal and inform or

19:38:35  12  relate to legal these relationships exist and we

19:38:38  13  need to look into them.  The fact that our

19:38:40  14  employees were going to profit as a result is I'll

19:38:44  15  say doubly bad.

19:38:48  16      MS. PAPEZ:  Thank you Mr. Vonderhaar

19:38:49  17  that's all I have.

19:38:53  18      MR. LITTLE:  I have one follow-up very

19:38:55  19  briefly.

19:38:55  20    EXAMINATION BY COUNSEL FOR DEFENDANT CARLETON

19:38:55  21  NELSON

19:38:55  22  BY MR. LITTLE:

19:38:57  23      Q. You talked about not knowing certain

19:39:00  24  information about the relationship -- you instead

19:39:03  25  of about not knowing about a referral relationship

19:39:05  1   between Northstar and Christian Kirschner.  When

19:39:11  2   as far as you know did Amazon first learn of that

19:39:14  3   relationship?

19:39:20  4       A. I don't know when Amazon learned of that

19:39:23  5   relationship.  Prior to 2022 but I can't say when.

19:39:29  6       Q. Do you know when the so called

19:39:31  7   whistleblower first contacted Amazon about the

19:39:33  8   issues that later lead to the complaint that you

19:39:35  9   looked at before it was filed?

19:39:38 10       A. No, I don't know when that occurred.

19:39:41 11       Q. If I told you that it was in December of

19:39:45 12   2019 would you have any reason to dispute that

19:39:51 13   date?

19:39:52 14       A. No, I don't have any reason to dispute

19:39:54 15   that date.

19:39:56 16       Q. If individuals at Amazon knew about their

19:40:01 17   further relationship you just described in

19:40:03 18   December of 2019 can you explain why Amazon

19:40:08 19   approved IAD 175 in February of 2020?

19:40:08 20           MS. PAPEZ: Objection. Form.

19:40:14 21     A. I can't say why I guess that would be

19:40:19 22  about a 3 minute period I can't say why

19:40:23 23  transactions continued to flow through I know

19:40:25 24  that's a pretty short period I don't know this

19:40:34 25  there was enough data or found grounds to stop

Page 322

19:40:36 1  that transaction based on what was known at that

19:40:38 2  time.

19:40:38 3     Q. You testified if you knew about a referral

19:40:41 4  relationship between Brian Watson and Northstar

19:40:44 5  and Christian Kirschner that would have been

19:40:46 6  enough for you to not approve the transaction; is

19:40:49 7  that correct?

19:40:49 8     A. That is correct.  I don't recall that I

19:40:53 9  knew about a referral relationship in February of

19:40:56 10  2020?

19:40:57 11     Q. I'm not asking about your knowledge I'm

19:40:59 12  asking more generally about Amazon's knowledge?

19:41:03 13     MS. PAPEZ: Objection. Form form and

19:41:05 14  foundation?

19:41:07 15  BY DEFENSE COUNSEL:

19:41:08 16     Q. So it's fair to say you don't know when

19:41:11 17   Amazon the company or AWS first learned that piece

19:41:14 18   of information?

19:41:16 19       A. Yes that's fair to say I don't personally

19:41:19 20   know.

19:41:19 21   BY MR. LITTLE:

19:41:22 22       Q. Do you know who within Amazon or AWS would

19:41:26 23   know the information?

19:41:27 24       A. Not specifically.  No.

19:41:29 25           MR. LITTLE:  Thank you I have got nothing

Page 323

19:41:35 1   further.

19:41:35 2           MR. LITTLE:  Are we off the record folks.

19:41:35 3               EXAMINATION BY PLAINTIFFS

19:41:35 4   BY MS. PAPEZ:

19:41:39 5       Q. Mr. Vonderhaar I want to clarify so I

19:41:41 6   understand your testimony to Mr. Little just now,

19:41:44 7   just for you personally in your role in the

19:41:48 8   approval process had you been aware of the

19:41:53 9   referral relationship between Casey, Carl and

19:41:57 10  Casey's brother would you have approved these

19:41:59 11  transactions.

19:42:01 12        A. Had I been made aware of those referral

19:42:05 13    relationships in the time frame Mr. Little

19:42:09 14    articulates say February of 2020 had I known that

19:42:12 15    I would have stopped the process until we could

19:42:23 16    stopped the process until we know what was going I

19:42:25 17    would not have proceeded knowing there was a

19:42:27 18    relationship between Carl Casey and this referral

19:42:30 19    company and the brother.

19:42:32 20        MS. PAPEZ:  Thank you.

19:42:35 21        THE VIDEOGRAPHER: Anyone else.

19:42:37 22        THE VIDEOGRAPHER:  Okay.  Then we are off

19:42:38 23    the record at 7:42 p.m.

24

25