**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC.,<br><br>     Plaintiffs,<br><br>    v.<br><br>WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE SOLUTIONS LLC; CTBSRM LLC; RODNEY ATHERTON; DEMETRIUS VON LACEY; RENRETS LLC,<br><br>     Defendants. | CASE NO. 1:20-CV-484-RDA-TCB<br><br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| 800 HOYT LLC,<br><br>     Intervening Interpleader<br>     Plaintiff, Intervening<br>     Interpleader Counter-Defendant,<br><br>v.<br><br>BRIAN WATSON; WDC HOLDINGS, LLC; BW HOLDINGS; LLC,<br><br>     Interpleader Defendants,<br>and<br>AMAZON.COM, INC., and AMAZON DATA SERVICES, INC.,<br><br>     Interpleader Defendants,<br>     Interpleader Counter-Plaintiffs. |  |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

PARTIES ................................................................................................................ 3

SUBJECT MATTER JURISDICTION AND VENUE ............................................ 8

PERSONAL JURISDICTION ................................................................................. 8

FACTUAL ALLEGATIONS ................................................................................... 9

I.     A CONFIDENTIAL INFORMANT REPORTED DEFENDANTS' FRAUDULENT SCHEME TO AMAZON ..................................................................... 10

II.    NELSON AND KIRSCHNER WERE TRUSTED TO PLAY CRUCIAL ROLES WITH RESPECT TO AMAZON'S REAL ESTATE INVESTMENTS ................................... 11

III.   NELSON AND KIRSCHNER EXPLOITED THEIR ROLES TO CREATE A PAY-TO-PLAY SCHEME WITH THEIR FRIEND WATSON .................................................. 13

IV.   THE FRAUDULENT LEASE TRANSACTIONS ........................................................ 15

      A.     Nelson and Kirschner Solicit Rigged Northstar Bids for Virginia Leases .......... 15

      B.     Nelson and Kirschner Secure Approval of the Rigged Northstar Bids .............. 17

      C.     Nelson, Kirschner, and the Northstar Defendants Conspire on Lease Performance ................................................................................................... 19

      D.     The Defendants' Fraudulent Misrepresentations in Connection with the Lease Agreements .................................................................................................. 24

      E.     Northstar's COO Reported the Fraudulent Lease Transaction Conduct and Northstar was Terminated from the Lease Transaction as a Result ..................... 28

      F.     Amazon and IPI Amend the Tainted Lease Transactions to Mitigate Damages From Northstar's Fraud ..................................................................................... 32

      G.     Defendants Obtained Millions of Dollars as a Result of the Fraudulent Lease Transaction Conduct ..................................................................................... 34

V.     THE FRAUDULENT DIRECT PURCHASES ............................................................. 38

      A.     The White Peaks Transaction .......................................................................... 39

      B.     The Blueridge Transaction ............................................................................... 44

      C.     Defendants Obtained Tens of Millions of Illicit Gains as a Result of the Fraudulent Purchase Transaction Conduct .................................................................. 49

      D.     The Northstar Defendants are Liable Under the Doctrine of Respondeat Superior for the Acts of Their Employees, Kyle Ramstetter and Will Camenson, in the Direct Purchase Portion of the Kickback Scheme. .................................. 49

VI.   DEFENDANTS USED A COMPLEX WEB OF TRUSTS AND LLCS TO CONCEAL THEIR ILLICIT GAINS AND AVOID PAYMENT OF TAXES ................................. 51

      A.     Atherton ........................................................................................................ 51

      B.      Von Lacey ................................................................................. 52

      C.      Villanova Trust ......................................................................... 53

      D.      AllCore ..................................................................................... 53

      E.      The Flow of Illicit Funds to Defendants ................................. 54

VII.    NELSON AND KIRSCHNER INTENDED TO CONTINUE THEIR PAY-TO-PLAY SCHEME AFTER DEPARTING FROM AMAZON ................................... 57

VIII.   NELSON'S AND KIRSCHNER'S CONDUCT VIOLATED THEIR DUTIES TO AMAZON ................................................................................................ 59

IX.    THE DEFENDANTS' EFFORTS TO CONCEAL THEIR ILLICIT SCHEME ........... 65

COUNT I ............................................................................................................... 69

COUNT II .............................................................................................................. 86

COUNT III ............................................................................................................. 88

COUNT IV ............................................................................................................. 94

COUNT V ............................................................................................................... 96

COUNT VI .............................................................................................................. 97

COUNT VII .......................................................................................................... 102

COUNT VIII ......................................................................................................... 106

PRAYER FOR RELIEF ....................................................................................... 108

Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. (collectively "Plaintiffs" or "Amazon"), for their Third Amended Complaint, allege, upon personal knowledge as to their own actions and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.    This case is about a massive fraud and kickback scheme orchestrated by two former Amazon employees, Carleton Nelson and Casey Kirschner, to personally and illegally profit from over $500 million in Amazon real estate development projects in this District.  Nelson and Kirschner exploited their positions as real estate transaction managers to shepherd certain real estate transactions through Amazon's internal approval process in exchange for millions of dollars in illegal kickbacks from the corrupt counterparties on the other side of those deals.

2.    In fact, Nelson recently admitted in a sworn statement that he secretly obtained money in connection with Amazon real estate deals, and Amazon has obtained bank records in discovery that definitively trace the money to his accounts.  Amazon also recently became aware that Kirschner submitted a signed statement to law enforcement admitting to the kickback scheme:

> I accepted money from Northstar associated with deals I worked on with Amazon. Carl Nelson and I formed Allcore through Rod Atherton.  Northstar paid kickbacks, which were paid to the Villanova Trust. The Villanova Trust was formed by my brother, Christian Kirschner. Brian Watson of Northstar paid the Villanova Trust associated with the Amazon development deals in Northern Virginia.  The Villanova Trust transferred 66% of the funds from Northstar to the 2010 Irrevocable Trust, which Rod Atherton set up. Rod Atherton then transferred the funds to me and Carl Nelson.

3.    As Kirschner's statement makes clear, Kirschner and Nelson did not act alone. They had help from multiple co-conspirators, including: (1) Defendant Brian Watson ("Watson") and his company Defendant WDC Holdings LLC dba Northstar Commercial Partners (together with Watson, "Northstar"), which funneled money to Nelson and Kirschner in exchange for them obtaining approval of Northstar's projects; (2) Defendant Rodney Atherton ("Atherton"), an attorney retained to create shell entities that would make Nelson, Kirschner, and their scheme "invisible"; (3) the numerous shell entities that Atherton created; and (4) Defendant Demetrius

Von Lacey, a "straw man" whose name was used to create a false paper record of ownership and conceal the flow of illicit funds through the shell entities to benefit Nelson and Kirschner.

4.     All in all, Defendants orchestrated kickbacks in connection with at least eleven commercial real estate transactions—nine leases and two purchases—in Northern Virginia. Nelson and Kirschner orchestrated the leases to inflate their cost, syphon off millions of dollars in kickbacks, and distribute the illicit profits through a web of shell entities to cover their tracks. Similarly, Nelson and Kirschner structured the purchases so that a third party would buy the property, sell or assign it to Amazon for approximately $10 to $18 million more, and distribute a portion of that mark-up to Nelson, Kirschner, and their co-conspirators under the table.  Defendants illegally obtained tens of millions of dollars through these fraudulent efforts, which they spent on lavish homes and trips, such as a hundred-thousand-dollar hunting trip to New Zealand.

5.     Along the way, Nelson admitted in audio recordings that he was participating in "sketchy a[*]s sh[*]t," while bragging about how "clean" the scheme looked from the outside and how Amazon employees were "idiot[s]" for approving the fraudulent transactions that he and Kirschner promoted.  Nelson even acknowledged that there was "no question" the scheme violated Amazon's Code of Business Conduct and Ethics ("Code of Conduct") and the sale and lease contracts' anti-bribery language, but he boasted to a co-conspirator that "the only people that are gonna know about this, are gonna be you, me and Casey [Kirschner]").

6.     Yet Nelson and Kirschner's scheme eventually caught up with them when a former Northstar employee alerted Amazon to the kickbacks in late 2019.  Dkt. 155-2.  The evidence that has come to light since then is damning and leaves no doubt that Defendants violated the federal RICO statute and engaged in multiple acts of wire fraud, honest services fraud, money laundering, and other unlawful acts over a multiyear period.  This evidence includes the admissions described above, audio recordings, bank statements, messages, and numerous other records, such as a recovered file that Kirschner tried to delete from his company laptop that details the kickback scheme and calculates his anticipated share of the illicit payments.

7.      Amazon has brought this action to recover the tens of millions of dollars in unjust enrichment Defendants obtained and the damages Amazon has suffered as a result.  Amazon has amended its complaint to (i) add as Defendants additional co-conspirators on the basis of evidence that has recently come to light in discovery, and (ii) streamline Amazon's claims to reflect recent developments, including discovery and the company's mitigation of some of its damages through confidential settlements.

## PARTIES

8.      Plaintiff Amazon.com, Inc., is a Delaware corporation headquartered at 410 Terry Avenue North, Seattle, WA, 98109.  Amazon.com, Inc., through its subsidiaries, employs more than 10,000 individuals in Virginia.

9.      Plaintiff Amazon Data Services, Inc., a subsidiary of Amazon.com, Inc., is a Delaware corporation located at 410 Terry Avenue North, Seattle, WA 98109.  Among other things, Amazon Data Services, Inc. operates many large Amazon facilities in Virginia and other U.S. states.  (Amazon.com, Inc. and Amazon Data Services, Inc. are collectively referred to herein as "Amazon").

10.     Defendant Northstar claims to be a "privately held, full-service real estate investment and asset management company headquartered in Denver, Colorado, USA, specializing in the development, acquisition, and redevelopment of commercial real estate assets throughout the United States." Dkt. 156-3.  Northstar was previously located at 1999 N. Broadway, Suite 3500, Denver, CO 80202, but currently operates out of Defendant Watson's home.  Defendant Watson is the Founder and Chief Executive Officer of Northstar and his last known address was 8 Churchill Drive, Englewood, CO 80113.

11.     Defendants Sterling NCP FF, LLC ("Sterling"), Manassas NCP FF, LLC ("Manassas") and NSIPI Administrative Manager ("NSIPI") are entities formed and controlled by Watson and Northstar for purposes of executing the Virginia lease transactions at issue in this suit. (Sterling, Manassas, and NSIPI are collectively referred to as the "Northstar/Watson Entities," and

the Northstar/Watson Entities, Watson and Northstar are collectively referred to as the "Northstar Defendants").

12.    Defendants Sterling and Manassas are limited liability companies formed and existing in Virginia.

13.    Defendant NSIPI is a limited liability company formed and existing in Delaware.

14.    Northstar and its affiliates (including the Northstar/Watson Entities) served as Watson's alter ego.

15.    Watson has signatory authority over Northstar and the Northstar/Watson Entities' assets; commingled his personal funds with Northstar and the Northstar/Watson Entities' funds; and created, used, and controlled Northstar and the Northstar/Watson Entities to further the lease transactions at issue in this suit.

16.    Defendant Casey Kirschner ("Kirschner") is a former Real Estate Transaction Manager for Amazon.com, Inc.  He resides at 635 Alvarado Ln. North, Minneapolis, MN 55447.

17.    Amazon terminated Kirschner's employment in April 2020 after substantiating a former Northstar employee's 2019 whistleblower report describing Kirschner's participation in the kickback scheme that is the subject of this suit.

18.    Defendant Carleton Nelson ("Nelson") is a former Real Estate Transaction Manager for Amazon.com, Inc. and was, for a time,  Kirschner's supervisor at Amazon.

19.    Nelson resides at 4907 Stonehaven Drive, Columbus, OH 43220 and uses the first names "Carleton" and "Carl."  *See, e.g.*, Dkt. 155-1 at 2; Dkt. 135-4.

20.    Amazon terminated Nelson's employment in June 2019 based on violations of Amazon's Code of Conduct unrelated to this litigation.

21.    Defendant Rodney Atherton ("Atherton") is a Colorado-licensed attorney doing business through the firm Ergo Law at 6870 W. 52nd Ave., Suite 203, Arvada, CO 80002 ("Atherton's office address").  He resides at 12863 West 87th Ave., Arvada, CO 80005.

22.     Atherton created trusts and LLCs to conceal the kickbacks paid to Nelson and Kirschner during the relevant period.

23.     Atherton was suspended from the practice of law from November 15, 2013 to February 25, 2014, Dkt. 162-3, due to violations of five separate Colorado Rules of Professional Conduct in connection with financial transactions.

24.     Defendant Demetrius Von Lacey ("Von Lacey") is the individual paid to sign documents for Nelson and Kirschner's shell entities.  Von Lacey's driver's license lists Atherton's office building as his address.

25.     Defendant Villanova Trust is a trust formed and existing in the State of Tennessee. It was previously located at 16 Compton Trace, Nashville, TN 37215, Dkt. 156-4, and is now located at 3924 Wallace Lane, Nashville, TN 37215.

26.     Villanova Trust was formed by Atherton for the purpose of funneling money from Northstar to Nelson and Kirschner.  In fact, Casey Kirschner's brother, Christian, was the sole trustee of the Villanova Trust.

27.     Villanova Trust is a defaulted defendant in this suit.

28.     Defendant Cheshire Ventures LLC ("Cheshire") is a limited liability company formed and organized in Wyoming on June 27, 2019, with a principal office address of 1908 Thomes Avenue, Cheyenne, WY 82001.  Cheshire uses Atherton's office address as its mailing address.

29.     Cheshire was organized by, and remains registered to, Atherton.

30.     Defendant Finbrit Holdings LLC ("Finbrit") is a limited liability company formed and organized in Wyoming on September 3, 2019, with a principal office address of 1740 Dell Range, Suite H414, Cheyenne, WY 82009. Finbrit uses Atherton's office address as its mailing address.

31.     Finbrit was organized by, and remains registered to, Atherton.

32.     Finbrit is a defaulted defendant in this suit.

5

33.     Defendant 2010 Irrevocable Trust is a trust formed and organized in Colorado and controlled by Atherton.

34.     2010 Irrevocable Trust was a key mechanism by which Atherton funneled monies through various shell companies for the benefit of Nelson and Kirschner.

35.     Defendant AllCore Development LLC ("AllCore") is a limited liability company organized and registered in Wyoming on March 27, 2018.  Allcore uses Atherton's office address as its principal and mailing address.

36.     AllCore was organized by Atherton, and Atherton serves as its registered agent.

37.     AllCore is a defaulted defendant in this suit.

38.     Nelson, Kirschner, Von Lacey, and Atherton conspired to have Atherton organize Villanova Trust, Cheshire, AllCore, Sigma, CTBSRM, Finbrit, and 2010 Irrevocable Trust, for the purpose of facilitating the kickback scheme and concealing their illicit gains.

39.     Defendant Sigma Regenerative Solutions, LLC ("Sigma") is a limited liability company formed and organized in Colorado on June 19, 2019 (five days after Nelson was terminated from Amazon).  Sigma also uses Atherton's office address as its principal and mailing address.

40.     Sigma was organized by Defendant Von Lacey, and Von Lacey is its registered agent.

41.     Defendant CTBSRM LLC ("CTBSRM") is a limited liability company formed and organized in Wyoming on March 27, 2018.  CTBSRM uses Atherton's office address as its principal and mailing address.

42.     CTBSRM is organized by Atherton, and Atherton is its registered agent.

43.     Annual reports filed with the state of Wyoming list Von Lacey as "President" of CTBSRM.

44.     Nelson, Kirschner, Atherton, and Von Lacey conspired to have Atherton organize Sigma and CTBSRM for the purpose of facilitating the kickback scheme and concealing their illicit gains.

45.     Defendant Renrets LLC ("Renrets") is a limited liability company formed and organized in Ohio on May 8, 2017, with an address of PO Box 8156, Columbus, OH 43201.

46.     Renrets was organized by James M. Sterner and James M. Sterner is its registered agent.

47.     James M. Sterner is Nelson's father-in-law.

48.     Nelson, Kirschner, Atherton, and Von Lacey conspired to use Renrets to facilitate the kickback scheme and conceal their illicit gains.

49.     Defendants White Peaks Capital LLC ("White Peaks") and NOVA WPC LLC ("NOVA") are Delaware limited liability companies located at 11364 Mesa Verde Lane, Parker, CO 80138, potentially with subsequent or additional locations in Henderson, NV.

50.     Two former Northstar employees, Kyle Ramstetter and Will Camenson, served, respectively, as Managing Director and Manager of White Peaks and NOVA.

51.     White Peaks and NOVA were used to effectuate one of the direct purchase transactions at issue in this suit.

52.     White Peaks and NOVA are defaulted defendants in this suit.

53.      White Peaks and NOVA were Ramstetter's and Camenson's alter egos.  White Peaks' registered address was the same as the personal home address of Camenson.   Ramstetter signed the initial purchase agreement between White Peaks and the seller of the site (41992 John Mosby Highway LLC), and Camenson signed the purchase agreement between NOVA and Amazon's affiliate.

54.     White Peaks and NOVA were devices or sham entities used to disguise wrongs, obscure fraud, and/or conceal other unlawful activities in connection with the White Peaks transaction.

7

## SUBJECT MATTER JURISDICTION AND VENUE

55.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the case

arises under the laws of the United States, including the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961 *et seq*., and Article III, section 2, clause 1, of the U.S.

Constitution, which extends federal judicial power to "all Cases, in Law and Equity, arising under

this Constitution [or] the Laws of the United States," including the grant in Section 11 of the

Judiciary Act of 1789 of original federal equity jurisdiction over cases involving more than $500

between a citizen of the state where suit was brought and a citizen of a different state.

56.    The Court has supplemental jurisdiction over all of Plaintiffs' state law claims

under 28 U.S.C. § 1367 because they arise from, and constitute part of, the same case or

controversy that gives rise to Plaintiffs' federal claims.

57.    This Court may declare the legal rights and obligations of the parties in this action

under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's

subject matter jurisdiction.

58.    Venue is proper in this district under 28 U.S.C. § 1391(b) because it is a district in

which Plaintiff maintains headquarters and/or substantial business operations, is the district in

which all or many of the affected properties are located, and is the district in which a substantial

or significant number of the acts giving rise to the action occurred.

59.    Venue is also proper in this judicial district under 28 U.S.C. § 1391(c) because

Defendants are subject to personal jurisdiction here.

## PERSONAL JURISDICTION

60.    Exercise of jurisdiction over Defendants Sterling, Manassas, and NOVA is

reasonable and proper in this District because these Defendants are citizens of the Commonwealth

of Virginia and because they conduct extensive business activities within Virginia.  For Amazon's

claims for violations of 18 U.S.C. § 1962 and Virginia state law, exercise of jurisdiction over these

Defendants is proper pursuant to 18 U.S.C. § 1965(a).

8

61.    Exercise of jurisdiction over Defendants WDC Holdings LLC, Watson, NSIPI Administrative Manager, White Peaks Capital LLC, Villanova Trust, Nelson, Kirschner, Atherton, Von Lacey, AllCore, Finbrit, Cheshire Ventures, 2010 Irrevocable Trust, Sigma, Renrets, and CTBSRM is reasonable and proper in this District pursuant to 18 U.S.C. § 1965(b).  The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of these Defendants could otherwise be tried together.  For Amazon's state claims, exercise of jurisdiction over these Defendants is proper pursuant to Va. Code Ann. § 8.01328.1.  These Defendants have knowingly and purposefully transacted business in the Commonwealth of Virginia, contracted to supply services or things in Virginia, caused tortious injury in Virginia by acts or omissions in and out of Virginia, or have an interest in real property in Virginia.  Further, there is substantial nexus between their purposeful availment of the Virginia forum and Amazon's claims.  Dkt. 156-5.  Notably, several Defendants visited Virginia to view potential and actual Amazon real property sites as well as review and execute lease contracts, and utilized instrumentalities located in Virginia and the Eastern District of Virginia to carry out the acts of which Amazon complains.  Defendants thereafter affirmatively directed actions at Virginia and the Eastern District of Virginia by making payments and maintaining business operations here to obtain illicit investment, management, and other benefits on Virginia commercial development projects.

## FACTUAL ALLEGATIONS

62.    This Third Amended Complaint details new and compelling evidence previously unavailable to Amazon about how Nelson and Kirschner abused their positions at Amazon and conspired with new defendants Atherton, Von Lacey, and others to defraud Amazon and obtain millions of dollars in illicit gains by coordinating a far-reaching kickback scheme.

I.     **A CONFIDENTIAL INFORMANT REPORTED DEFENDANTS' FRAUDULENT SCHEME TO AMAZON**

63.     Amazon first learned of Defendants' fraudulent kickback scheme from an unsolicited whistleblower report. On or about December 2, 2019, an individual who stated he was formerly affiliated with Northstar ("Informant 1") emailed an Amazon executive and asked whether Amazon "[w]ould … care to hear about a couple of [Amazon] employees who have taken kickbacks in excess of $8,000,000 maybe as high as $50,000,000." Dkt. 155-2.

64.     During a series of phone calls with members of Amazon's legal compliance team in late 2019 and early 2020, Informant 1 told Amazon that he had personal knowledge of Northstar's payment of millions of dollars in kickbacks on Northstar's real estate transactions with Amazon, and stated his belief that the scheme had been ongoing since January 2018.

65.     Informant 1 specifically alleged that Watson and Northstar agreed to pay a percentage of all revenue Northstar received on Amazon deals to the Villanova Trust, an entity for which Defendant Kirschner's brother, Christian Kirschner ("Christian"), was the trustee.

66.     The payments from Northstar to Villanova Trust were made pursuant to a kickback agreement, styled a "referral agreement," executed by Watson and Christian. Informant 1 alleged that Northstar, at Watson's direction, had caused payments to be made to Defendants Kirschner and Nelson in return for their directing certain lease transactions to Northstar, under which Northstar would act as Amazon's commercial real estate development partner for those transactions.

67.     Informant 1 asserted that Watson was directly involved in the formation of this scheme, including through revisions to Northstar's referral/kickback agreement with Villanova Trust. Recent discovery has confirmed that these revisions were based on feedback that Casey Kirschner, while an Amazon employee, channeled to Watson through his brother Christian.

68.     Informant 1 provided Amazon with evidence of at least $4.6 million in payments from Northstar to the Villanova Trust as of December 14, 2018, and estimated that the total amount

payable from Northstar to Villanova Trust could amount to $30-40 million through late 2019, and over $50 million over the life of the relevant commercial leases.

69.     Informant 1 further disclosed that, in addition to Watson, other Northstar personnel may have had knowledge of and/or involvement in the kickback scheme.

70.     Informant 1 provided Amazon with several documents, including what appeared to be a partially redacted email string between Watson and other Northstar employees, in which Watson requested a report on the total fees Northstar had paid to Villanova Trust.  Informant 1 also provided what he described as a draft of the referral/kickback agreement between Northstar and the Villanova Trust that documented the kickbacks on the lease transactions.

71.     Informant 1 separately provided Amazon with information about fraud and kickbacks on the White Peaks transaction, including that two former Northstar employees used White Peaks and NOVA to facilitate that transaction and funnel money back to Nelson and Kirschner.  These activities were memorialized in recorded conversations and payment records.

72.     Informant 1's report in December 2019 prompted an internal investigation that remains ongoing and continues to uncover additional evidence of the Defendants' fraudulent kickback scheme.

## II.   NELSON AND KIRSCHNER WERE TRUSTED TO PLAY CRUCIAL ROLES WITH RESPECT TO AMAZON'S REAL ESTATE INVESTMENTS

73.     Nelson and Kirschner were able to perpetuate their fraudulent scheme because they played crucial roles in sourcing, negotiating and approving Amazon's real estate transactions in Virginia.

74.     During the relevant time period, Nelson and Kirschner were responsible for identifying and selecting Virginia real estate locations suitable for Amazon's business needs.  They were also responsible for structuring and negotiating the financial and other key business terms for these transactions on behalf of Amazon, and presenting those transactions for internal Amazon approval.

75.     At the relevant time, Nelson was a Senior Manager, Real Estate, with primary responsibility for real estate transactions in the Americas.

76.     Nelson recruited Kirschner to Amazon's real estate group and served as his mentor and supervisor.  Kirschner reported exclusively to Nelson from November 8, 2017 until June 2019, when Nelson was terminated for misconduct.

77.     At the time of Nelson's termination, Kirschner served as a Principal Real Estate Manager with primary responsibility for Amazon's real estate transactions in Northern Virginia. *See* Dkt. 156-6.

78.     On April 2, 2020, Kirschner was terminated as a result of the internal investigation conducted by Amazon in response to Informant 1's whistleblower report.

79.     Amazon generally used two customary real estate deal structures: (i) build-to-suit lease transactions; and (ii) direct purchase transactions.

80.     In build-to-suit lease transactions, Amazon identifies the type of location that would be suitable for an Amazon facility and partners with a commercial real estate developer that is willing to own and develop the land for Amazon.  Typically, the developer purchases the land and builds the basic shell of the facility (*i.e.*, the external structure).  Amazon then leases the land and shell from the developer for a period of years, and Amazon designs and builds the inside of the facility to suit its business needs.

81.     The total lease payments to the landlord-developer are typically calculated to compensate the developer for: (i) the costs of purchasing the land; (ii) the costs to construct the shell; and (iii) a negotiated percentage yield on the purchase and construction costs.  The developer is also paid its operating expenses to act as landlord.

82.     In direct purchase transactions, Amazon and/or its affiliates purchase land outright and build Amazon facilities on these sites to suit the company's needs.

83.     Amazon has a multi-step process for selecting suitable land for both lease and purchase transactions that relies on market and internal diligence by Amazon real estate Transaction Managers ("TMs") such as Kirschner and Nelson.

84.     Site diligence is conducted largely by Amazon real estate TMs as well as external brokers and agents who report property and market details to Amazon real estate TMs—here Nelson and Kirschner for the transactions at issue.

85.     Following the site diligence, an Amazon TM will structure the transaction and present the proposed transaction for further approval by Amazon executives.  Among other things, the Amazon TM will submit information about the deal and make representations that the site meets Amazon's business needs and that its price and the other terms of the proposed transaction align with market and Amazon transactional norms.

86.     Amazon relies on its TMs, and specifically relied on Nelson and Kirschner, to fully and accurately provide all facts relevant to the real estate transactions they source, structure, and present for approval, including any fees payable to any party as a result of those transactions, the purchase history of any land associated with those transactions, and any other nonstandard terms that would be pertinent for the subsequent approvers with supporting facts that explain why accepting those deviations is in the best interests of Amazon.  Amazon's ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Dkt. 162-8 (sealed).

## III.   NELSON AND KIRSCHNER EXPLOITED THEIR ROLES TO CREATE A PAY-TO-PLAY SCHEME WITH THEIR FRIEND WATSON

87.     Nelson and Kirschner abused their positions at Amazon by steering lucrative contracts, business opportunities, and competitively sensitive information to their co-conspirators in exchange for kickbacks and other benefits they concealed from Amazon in violation of the law and company contracts and policies.

88.  Specifically, Nelson and Kirschner manipulated transaction presentations and concealed material information—including their own conflicts of interest—from Amazon executives in order to secure approval for sale and lease transactions with their co-conspirators that Amazon would not otherwise have approved.[1]  Nelson and Kirschner then personally profited from those transactions by receiving kickbacks from the Northstar Defendants.

89.  Nelson and Kirschner were able to manipulate the transactions and the approval process because the sale and lease transactions they presented were complex, involved months of diligence, and included numerous data points linked to dynamic markets and business needs.  The Amazon executives responsible for subsequently approving the transactions reasonably relied on Nelson and Kirschner to present full and accurate information and to act in the best interests of Amazon.  But Nelson and Kirschner abused that trust by presenting and promoting transactions for their own financial benefit, while misrepresenting or omitting material information, including their own financial interest in the transactions.

90.  Nelson and Kirschner fraudulently induced Amazon to enter into transactions that were structured and negotiated to personally benefit Nelson and Kirschner, violated Amazon's policies, and harmed Amazon.  Amazon would not have approved the real estate transactions at issue had Amazon been aware of Nelson's and Kirschner's undisclosed conflicts of interest and the kickback scheme.

91.  But for Defendants' fraudulent inducement, Amazon would not have entered into the transactions at issue in this dispute.

---

[1] *See, e.g.*, Declaration of D. Matthew Doden in Support of Plaintiffs' Supplemental Memorandum in Support of Show Cause Order and Plaintiffs' Application for Preliminary Injunction ("Amazon would not, under any circumstances, have approved the real estate transactions it entered into with Northstar organized by Casey Kirschner and Carleton Nelson had Amazon been aware of the undisclosed conflicts of interest and 'referral' agreement arrangement between Northstar and Christian Kirschner/Villanova Trust described in detail as the 'Lease Transaction Enterprise in Plaintiffs' Verified Complaint at ¶ 9 et seq.") Dkt. 59, ¶ 20.

## IV.   THE FRAUDULENT LEASE TRANSACTIONS

92.   From February 2018 through January 2020, Amazon executed leases for commercial properties in northern Virginia (the "Lease Transactions") with at least four Northstar-affiliated limited liability companies that acted as landlord-developers for the properties:  Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC (the "Project Entities").

93.   The Lease Transactions grew out of Northstar's rigged bid for two Virginia development projects that Nelson and Kirschner steered to Northstar and Watson at or around the time that Watson executed the 2018 referral/kickback agreement with Kirschner's brother Christian through the Villanova Trust, which was established by Atherton to channel the kickback payments to Nelson and Kirschner.

94.   Nelson and Kirschner used their positions at Amazon to steer approval of the Lease Transactions, while concealing the fact that the transactions included hidden or inflated fees that were used to fund the Northstar Defendants' kickbacks to the Villanova Trust, which was established by Atherton to channel the payments back to Nelson and Kirschner.

### A.   Nelson and Kirschner Solicit Rigged Northstar Bids for Virginia Leases

95.   Northstar served as a primary developer-landlord for the Lease Transactions at issue in this suit.

96.   Amazon began its relationship with Northstar in or around September 2017 based on Nelson's and Kirschner's recommendations.  Amazon did not know, and Nelson and Kirschner did not disclose, that Northstar's CEO Watson was Kirschner's longstanding, personal friend.

97.   Watson's personal relationship with Kirschner began long before Kirschner joined Amazon, and paralleled Watson's longstanding personal relationship with Kirschner's brother, Christian, whom Watson has described as "one of [his] best friends."  Dkt. 155-1; Dkt. 157-1 ("Lorman Decl.") ¶ 7.

98.    Watson also had a personal friendship with Nelson.

15

99.     Watson, Nelson, and Kirschner often communicated with one another through personal emails and chats, including WhatsApp, and they took a variety of personal trips together, which were funded by Watson and Northstar.

100.     These trips included a lavish, all-expenses-paid fishing excursion to the Florida Everglades and a luxury hunting trip to New Zealand (to which Nelson was invited but could not attend).   The Kirschner brothers also served as groomsmen at Watson's September 28, 2019 wedding, to which Nelson was also invited.  *Id.* at ¶ 8.

101.     Nelson and Kirschner's engagement with Watson and Northstar for the Lease Transactions dates back to at least July 2017, when Watson met with Kirschner and his brother Christian in Virginia.  Dkt. 156-9.  Prior to that point, Watson had urged Christian to arrange "getting in front of Amazon with your brother."

102.     Watson coordinated his Virginia visit with Kirschner and Christian through Kirschner's personal email account and text messages.  The following week, Watson emailed Christian "notes from my tour with Amazon in Virginia last week," detailing information he was provided about competitor lease terms.  Christian replied that "[a]fter this meeting, you should have the green light to officially get started."

103.     In a July 26, 2017 email, Kirschner referred to Watson as "Brother" and wrote that he "look[ed] forward to seeing you out here . . . Carl [Nelson] and I will be ready for you." Kirschner and Nelson then met with Watson in Seattle on August 24, 2017.  Dkt. 156-9; Dkt. 156-10.

104.     At or around the time of this meeting, Kirschner sent Watson a so-called "Request for Proposal" ("RFP"), purportedly soliciting terms on which Northstar could work with Amazon to expand Amazon's build-to-suit facilities in Northern Virginia.  Dkt. 155-5.

105.     But the "RFP" Watson received was simply a pretext that Nelson and Kirschner used to justify steering contracts to Northstar in exchange for kickbacks and other benefits.  *See id*.

16

106.     On or around September 20, 2017, Northstar responded to the "RFP."  Dkts. 157-3 to -9.   Northstar's response contained several false representations that induced Amazon to contract with Northstar on the Lease Transactions.

107.     *First*, the response assured Amazon of Northstar's "commitment, loyalty, integrity, and honesty" to its business partners, *id*. at 112, and detailed an investment structure accountable to Amazon and investors and insulated from other projects.  Notably, the response stated that each Northstar "investment is orchestrated through a single-purpose limited liability company or fund that Northstar creates and directs," *id*. at 107, and that "Watson[] functions as the managing partner" and shares in the "net profits of [each] investment through designated sharing ratios with the capital partners," *id*. at 109.

108.     *Second*, the Northstar RFP included a proposed lease agreement that contained various representations regarding the disclosure and activities of all "Professional Service Providers," such as Northstar.  Dkt. 157-4 at 19.  The draft agreements Northstar submitted with its RFP response contained a warranty clause stating that the Northstar entities had made no undisclosed brokerage or other fee payments.  *See id*. at 17, 21, 88; Dkt. 158-1 at 7; Dkt. 158-10 at 14, 16.  This warranty was untrue given the undisclosed agreement between Northstar and the Villanova Trust and the provision of "brokerage" and other payments to the Villanova Trust, approximately two-thirds of which were subsequently distributed to Nelson and Kirschner.

**B.     Nelson and Kirschner Secure Approval of the Rigged Northstar Bids**

109.     During Amazon's transaction review and approval process for the first Northstar build-to-suit transaction, Nelson and Kirschner represented that they had "held a competitive bidding process through issuing RFPs to 4 developers to partner with us in the construction of the shell buildings.  Northstar Development was awarded the BTS project due to their aggressive business terms and strong execution team."  This statement was false as presented, as Nelson and Kirschner had in fact solicited proposals from no other parties.

110.    Nelson's and Kirschner's dishonest claims about the bidding process and the strength of Northstar's bid—without disclosing their personal relationship with Watson or that he had promised to pay them kickbacks if selected to develop the sites—created a false foundation for Amazon's approval of the first two lease transactions, as well as for the subsequent seven lease transactions for which Amazon selected Northstar as a development partner.

111.    In total, the Lease Transactions involved the purchase, development, and lease of nine different properties over a two-year period based on pricing and other data that Nelson and Kirschner were in a position to manipulate, either directly or through third parties.

112.    Each of these transactions was also subject to numerous contracts and development budgets principally created and negotiated between Nelson, Kirschner, and the Northstar Defendants, which allowed them to conceal improper payments in the form of artificially high or unwarranted fees and inflated profit yields for Northstar.

113.    Nelson and Kirschner prepared and presented the internal real estate justifications and recommendations for Amazon's approval of the lease transactions with Northstar.

114.    Consistent with Amazon's ████████████████████████ ████████████████████████████████ ██████████████████████ Kirschner initiated the approval process for each transaction, and was a first-line approver of each transaction.

115.    Nelson also approved each transaction presented for his approval prior to his termination from Amazon in June 2019.  Dkt. 162-8 (sealed).

116.    As a result of Nelson's and Kirschner's efforts, Amazon approved the Lease Transactions with the Northstar Defendants.

117.    These approvals were fraudulently induced by (1) Nelson and Kirschner, who failed to disclose, among other things, their personal relationships and kickback agreement with the Northstar Defendants and the Villanova Trust, and (2) the Northstar Defendants, who deliberately

18

misrepresented and/or concealed from Amazon their arrangements with Nelson, Kirschner, and the Villanova Trust.

### C.   Nelson, Kirschner, and the Northstar Defendants Conspire on Lease Performance

118.   To execute the kickback scheme on the rigged Lease Transactions, Northstar had to do more than just form the Project Entities necessary to execute the transactions; it had to ensure that those entities could purchase and develop the covered real estate sites on the terms specified in the contracts.  These obligations posed a significant problem for Northstar, which did not have the capital or capability to fund the acquisition or perform the development work its contracts required.

119.   The Northstar Defendants thus conspired with Nelson and Kirschner to obtain an equity partner, lender support, and construction and other development contracts for the Lease Transaction sites on terms that fraudulently concealed the kickback scheme.  To accomplish this, they relied on Nelson's and Kirschner's positions and authority at Amazon to deflect or otherwise suppress inquiries about fees and contract provisions that Defendants' partners questioned or identified as suspicious.

120.   Northstar's primary equity investor in connection with the Amazon Lease Transactions was IPI NSIPI Data Center Holdings, LLC ("IPI NSIPI").

121.   This entity was formed by a partner entity, IPI, that makes real estate investments in technology and connectivity-related real estate assets.  IPI has experience entering into joint ventures (JVs) with other firms in order to combine resources on real estate development projects, and often serves as a capital provider as part of its role in the JVs.  Gilpin Decl. ¶ 3.

122.   Watson and Northstar initially reached out to IPI because Northstar did not have the capital to purchase and develop the properties covered by their fraudulently-obtained contracts.

123.    IPI was introduced to Watson and Northstar in January of 2018 by third party brokers who were helping Watson source capital for a real estate development where Amazon was to be the sole tenant.

124.    Thus, Watson and Northstar leveraged their relationships with Nelson and Kirschner to solicit funding and joint venture support from IPI.  Dkt. 160-2 ("Gilpin Decl.") ¶ 3.

125.    IPI is not named as a defendant in this action, and is not known or suspected to have endorsed or engaged in any of the illicit conduct at issue in this suit.

126.    Together, IPI and Northstar formed the joint venture known as NSIPI Data Center Venture, LLC, that partnered with Northstar on the Lease Transactions.

127.    IPI NSIPI is the sole owner of NSIPI Data Center Venture, LLC, which became the sole owner of the four Project Entities holding the nine executed leases with Amazon for the shell facilities developed and located on the Virginia real property sites involved in the Lease Transactions (the "Projects").  Gilpin Decl. ¶¶ 3–4.

128.    Northstar Commercial Partners Management, LLC and its affiliates, at the direction of Watson, was originally the developer, property manager, and asset manager for IPI and Amazon on each of the Projects.  Gilpin Decl. ¶ 4.  Watson created Defendant Sterling to be a minority equity investor in the Quail Ridge NCP, LLC and Dulles NCP, LLC Project Entities.  *Id.*  And he created Defendant Manassas to be a minority investor in the Manassas NCP, LLC Project Entity.

129.    These arrangements were in place before the Northstar parties signed their first leases with Amazon, as evidenced by the fact that the "Sterling NCP I, LLC" referenced in Northstar's 2018 kickback agreement (the "2018 Kickback Agreement") is the same entity referenced in Northstar's September 20, 2017 "RFP" response to Amazon, *see* Dkts. 157-3 to -9, which designated Sterling I NCP, LLC as one of the two Northstar entities—the other being Sterling II NCP, LLC, *id*. at 6— that would execute the two initial Virginia Lease Transactions with Amazon.

130.    Collectively, Defendants Sterling NCP FF, LLC and Manassas NCP FF, LLC owned approximately 8.4% of the equity interest in the Northstar build-to-suit projects (via an interest in NSIPI Data Center Venture, LLC) until April 2, 2020, when IPI terminated them from the lease contracts and associated Projects based on the misconduct at issue in this suit. *Id.*

131.    Once formed, the joint venture between IPI and the Northstar Defendants created the four Project Entities—Dulles NCP LLC[2]; Quail Ridge NP, LLC[3]; Manassas NCP LLC[4]; and Dulles NCP II, LLC[5]—that Northstar/Sterling managed as the landlords for the leased sites. Watson separately created and controlled (through two intermediary LLCs) a separate entity— Defendant NSIPI Administrative Manager, LLC—to handle this management role.  The following chart depicts the relationships that the Northstar Defendants had with the IPI joint venture and various LLC landlord-developers involved in the Lease Transactions prior to Northstar's termination on April 2, 2020:

---

[2]  On or around January 17, 2018, Northstar and IPI, through NSIPI Data Center Venture, LLC, formed Dulles NCP, LLC in Delaware for the purpose of executing lease agreements with Amazon for the first two Virginia sites at issue here.  Dkt. 159-5.  On or around February 27, 2018, Amazon executed the two lease agreements for these sites with Dulles NCP LLC.

[3]  On or around April 6, 2018, Amazon executed lease agreements for four additional commercial sites with Quail Ridge NCP, LLC.  Dkt. 157-2.  Public records indicate that Quail Ridge NCP, LLC   was   incorporated   on   January   17,   2018.   Dkt.   159-6 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[4]  On or around November 1, 2018, Amazon executed lease agreements for two further sites with Manassas NCP, LLC.  Dkt. 157-2.  Public records indicate that Manassas NCP LLC was incorporated   on   May   16,   2018.   Dkt.   159-7 (https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx).

[5]  On or about January 13, 2020, Amazon executed a further lease agreement for another commercial site with Dulles NCP II.  Dkt. 157-2.  Public records indicate that Dulles NCP II, LLC was incorporated on June 6, 2018.  Dkt. 159-8.



132.     The Deeds of Lease were signed by Watson, who was identified as the "Manager" or "President," on behalf of the landlord entities.

133.     Northstar and Watson utilized the foregoing network of LLCs to execute the nine Lease Transactions with Amazon since 2018:

| Lease # | Landlord Entity | Date Executed |
|---------|-----------------|---------------|
| 1 | Dulles NCP LLC | February 27, 2018 |
| 2 | Dulles NCP LLC | February 27, 2018 |
| 3 | Quail Ridge NCP, LLC | April 6, 2018 |
| 4 | Quail Ridge NCP, LLC | April 6, 2018 |
| 5 | Quail Ridge NCP, LLC | April 6, 2018 |
| 6 | Quail Ridge NCP, LLC | April 6, 2018 |
| 7 | Manassas NCP LLC | November 1, 2018 |
| 8 | Manassas NCP LLC | November 1, 2018 |
| 9 | Dulles NCP II | January 13, 2020 |

134.     All but one of these Lease Transactions were recommended by Nelson and Kirschner in furtherance of the kickback scheme (Lease 9 was recommended only by Kirschner because Nelson was terminated in June 2019).

135.     Watson and Northstar were central to the creation, management, and control of the landlord entities.  Watson signed the Deeds of Lease as well as the related ███████████ ██████████████████████████████ and completion guarantees, on behalf of the landlord entities and was identified as the "Manager."  Dkt. 158-3 ¶ 33.

136.     As detailed below, the Lease Transactions were tainted by kickbacks reflected in at least nine lease-related payments from Northstar to the Villanova Trust from March 7, 2018 to August 7, 2019.  Dkts. 155-7, 156-1, 156-4, 159-9, 160-1.

137.     Specifically, Northstar made payments of at least $5.11 million between March 2018 and August 2019 to the Villanova Trust referencing at least three of the landlord LLCs that Northstar had created to manage the Lease Transactions:  Sterling (Leases #1, 2), Quail Ridge (Leases #3, 4, 5, 6), and Manassas (Leases #7, 8).

23

138.     Villanova Trust subsequently sent a portion of these payments to the 2010 Irrevocable Trust set up by Atherton, which in turn funneled the money through several other entities created by Atherton, and ultimately into Nelson's and Kirschner's bank accounts.

139.     Nelson and Kirschner were able to conceal their illicit conduct by exploiting their positions at Amazon.  For example, Northstar's equity partner IPI questioned some of the fee provisions in the Northstar Leases as unusual, but the Northstar Defendants represented that the structure reflected Amazon's approval and preferences.  IPI did not have a reason to contest the Northstar Defendants' position until Northstar's COO approached IPI in early 2020 to report his concerns about the Villanova Trust arrangement, which IPI then relayed to contacts within Amazon independent of Nelson and Kirschner.  See Dkt. 160-2 ("Gilpin Decl.") ¶ 5.

### D.     The Defendants' Fraudulent Misrepresentations in Connection with the Lease Agreements

140.     To the extent the Lease Agreements were or are legally enforceable against Amazon, the Northstar Defendants' kickback arrangement with Nelson and Kirschner breached them.

141.     The initial lease agreements between Amazon and the Northstar-affiliated landlord LLCs warranted that: (i) there "are no management agreements, service, maintenance or *other contracts* . . . relating to the Project . . . other than those" that were "disclosed in writing" to Amazon; (ii) the Northstar parties "dealt with *no brokers, finders or the like* in connection with this transaction"; and (iii) Amazon (as Tenant) would not have to pay or reimburse the Northstar-affiliated Landlords for any "legal, accounting or professional fees and costs incurred in connection with lease negotiations."  Dkt. 158-1 at 7; Dkt. 158-10 at 14, 16.[6]

---

[6]  All emphasis herein is supplied unless otherwise noted.

24

142.    Further, each Lease warranted that "[n]o . . . agreements, oral or written, have been made by Landlord [Defendants] . . . which are not contained in the . . . Lease Documents." Dkt. 158-3 ¶ 34 (at 2).

143.    The immediately ensuing paragraph, titled "Brokers," provided that Northstar "dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than the brokers, if any, set forth [at the start of the] Lease." *Id.* at ¶ 34.  Northstar set forth no Brokers at the beginning of the Deed of Lease, even though the 2018 Kickback Agreement expressly designates as "Brokerage Fees" on the Lease Transactions the multi-million dollar kickback payments that Northstar made to Villanova Trust.  Dkts. 158-1 to 159-3; Dkt. 155-6 at 2, ¶ 2.5; Dkt. 155-10.

144.    The executed 

Dkt. 163-8; Dkt. 163-9.

145.    [REDACTED] of the [REDACTED]

Dkt. 163-8.

146.    There are no provisions in either the Lease Agreements or the [REDACTED] indicating that it would be permissible for Northstar to have engaged the Villanova Trust as its undisclosed broker.

147.    The Lease Agreements also prohibit corrupt activities, specifically including "bribes." Dkts. 158-1 to 159-3.

148.    The "Anti-Corruption" provision in the Lease Agreements states: "Landlord acknowledges that Tenant's Code of Business Conduct and Ethics (the Code) prohibits the paying of bribes to anyone for any reason, whether in dealings with governments or the private sector. Landlord will not violate or knowingly permit anyone to violate the Code's prohibition on bribery

or any applicable anti-corruption laws . . .   Landlord will maintain true, accurate and complete books and records concerning any payments made to another party by Landlord under this deed of lease . . .   Landlord will promptly provide written notice to Tenant regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with activities performed by Landlord pursuant to this Deed of Lease." Dkt. 158-3 ¶ 40 (at 7).

149.    Similarly, Exhibit F to the Lease Agreements lists a provision entitled "Code of Conduct," which states "Grantor acknowledges Grantee's Code of Business Conduct and Ethics . . . [that] prohibits the paying of bribes to anyone for any reason," and "Grantor will promptly provide written notice to Grantee regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with any activities performed by Grantor pursuant to this agreement . . . Grantee may immediately terminate or suspend performance under this Agreement if Grantor breaches this section." Dkt. 158-10 at 4 (¶ 12 of Exhibit F).

150.    The executed ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████    ██████████████████

████████████████████████████████████████████ Dkt.

163-8.

151.    The Northstar Defendants violated this provision of the Lease Agreement by paying

kickbacks, which are bribes.

152.    At least a month before the initial lease agreements were signed in February 2018—

by Watson, personally—Northstar negotiated and executed the 2018 Kickback Agreement with

Villanova's Trustee for "Business Development" services effective January 8, 2018.  Dkts. 155-6,

159-4.   Notably, the appendix to this agreement details a compensation schedule including

"Development Fees," "MP Profits," "Brokerage Fees," and "Leasing Fees" for "Project Name

Sterling NCP I, LLC," Dkt. 155-6, the entity Northstar created to handle the first two Virginia

Lease Transactions.

153.    The 2018 Kickback Agreement itself is signed by Watson, *see id*., and identifies

Villanova Trust, through its Trustee, Christian, as the "Contractor" entitled to the payments in the

fee schedule, *id*., which Villanova subsequently funneled to First Western Trust and/or other

accounts held for the benefit of Nelson and Kirschner.

154.    The Northstar Defendants' failure to disclose the fact that they were paying

kickbacks fraudulently induced Amazon to enter the Lease Transactions, and thus rendered the

related contracts with the Northstar Defendants voidable at Amazon's election.

155.    The Northstar Defendants also engaged in conduct, both independently and in

concert with the Atherton-established Villanova Trust, that breached the terms of the Lease

Transaction contracts that they fraudulently induced Amazon to sign.   In April 2020, IPI

terminated and rescinded those contracts with respect to the Northstar Defendants and amended

them with Amazon.   Amazon and IPI further amended the Lease Transaction contracts in

connection with a Confidential Settlement Agreement, which mitigated, but did not fully eliminate,

some of the known damages caused to Amazon and IPI by Defendants' kickback scheme.

156.     The Northstar Defendants, Atherton, and the Villanova Trust also aided and abetted Nelson's and Kirschner's acts in breach of their employment agreements and other legal duties to Amazon.

**E.     Northstar's COO Reported the Fraudulent Lease Transaction Conduct and Northstar was Terminated from the Lease Transaction as a Result**

157.     In January 2020, Timothy Lorman,[7] who served as Northstar's COO until April 2020, approached Luke Gilpin, the Vice President of IPI Partners in Chicago, and disclosed information and documents substantially corroborating the facts supplied by Informant 1.  *See generally* Gilpin Decl. ¶¶ 2, 10–21.

158.     Mr. Lorman is a long-time reserve Sheriff's Deputy for the Douglas County Sheriff's Office in Douglas County, Colorado.  Lorman Decl. ¶ 4.

159.     Mr. Lorman was the Chief Operating Officer of Northstar from March 25, 2019 to April 7, 2020.  *Id.* at ¶ 2.

160.     Mr. Lorman personally knows and has interacted with Mr. Gilpin on numerous occasions in Mr. Gilpin's official capacity as Vice President of IPI.  Gilpin Decl. ¶ 10.  Mr. Gilpin first met Mr. Lorman in October 2019, and finds him "competent and trustworthy."  *Id.*

161.     On January 24, 2020, Mr. Lorman told Mr. Gilpin that he wanted to travel from Denver, Colorado to speak with Mr. Gilpin in Chicago, where Mr. Gilpin works for IPI.  Gilpin Decl. at ¶¶ 2.  Mr. Lorman told Mr. Gilpin that the conversation should take place in person.  *Id.* at ¶ 11.

162.     Mr. Lorman and Mr. Gilpin met in Chicago on January 28, 2020.  During the meeting, Mr. Lorman asked Mr. Gilpin if he knew of a "special agreement" between Kirschner and Watson.  Gilpin Decl. at ¶ 12.  Mr. Lorman told Mr. Gilpin that he suspected that Watson,

---

[7] Mr. Lorman is the individual referenced as Informant 2 in the original complaint and other documents filed in this matter.

former Northstar employees Kyle Ramstetter and Will Camenson, Kirschner, and Kirschner's brother Christian had engaged in misconduct that "violated Northstar's agreements with IPI." *Id.* Mr. Lorman also suspected that these individuals could have "violated the leases the entities signed with Amazon, and might have violated the law." *Id.*

163. During the January 28, 2020 meeting, Mr. Lorman shared with Mr. Gilpin multiple documents evidencing the Defendants' misconduct at Amazon's expense. Notably, Mr. Lorman shared an executed version of the 2018 Kickback Agreement that Watson signed on behalf of Northstar on January 8, 2018. Gilpin Decl. ¶ 13; Dkt. 155-6. Mr. Gilpin reviewed the documents and informed IPI's outside counsel of the meeting with Mr. Lorman. Gilpin Decl. at ¶ 14. IPI then informed Amazon of the meeting. *Id.*

164. On or around February 14, 2020, Mr. Lorman provided Mr. Gilpin with at least four documents via Dropbox that further evidenced misconduct by the Defendants at Amazon's expense. *See* Gilpin Decl. ¶ 15.

165. The first document is a copy of the executed version of the Northstar-Villanova kickback agreement that Lorman shared at the Chicago meeting with Mr. Gilpin. Gilpin Decl. ¶ 15; Dkt. 155-6.

166. The second and third documents are wire receipts (dated June 7, 2019, and August 7, 2019) evidencing payments from Northstar-affiliated entities to Villanova Trust in connection with certain Lease Transactions at issue in this action. Gilpin Decl. ¶ 15; Dkts. 156-4, 159-9.

167. Each wire receipt lists the "Originator Name" as "W D C HOLDINGS LLC" (aka Northstar), the "Beneficiary Bank" as "First Tennessee Bank," and the "Beneficiary" as "Villanova Trust" at "16 Compton Trace Nashville, TN." *See* Dkts. 156-4, 159-9.

168. The June 7 wire for $150,000 references "Dulles Final Leasing Payment." *See* Dkt. 159-9.

169. The August 7 wire for $321,028.44 references "Manassas Leasing Fee." *See* Dkt. 156-4.

29

170.     The fourth document that Mr. Lorman provided to Mr. Gilpin is a spreadsheet with a column titled "Referal [sic] - Villanova Owed" with four separate entries totaling $1,497,614.50. Gilpin Decl. ¶ 15; Dkt. 155-7.

171.     The first entry lists $250,000 owed for a "Leasing Fee" associated with the "Dulles" "Project." *Id.*

172.     The second entry lists $225,642.60 owed for a "Development Fee (20%)" also associated with the "Dulles" "Project." *Id.*

173.     The third entry reflects $760,210.50 owed for a "Leasing Fee (25%)" associated with the "Quail" "Project." Dkt. 155-7.

174.     And the fourth entry reflects $211,761.40 for a "Development Fee (20%)" also associated with the "Quail" "Project."  *Id.*

175.     On February 16, 2020, Mr. Lorman provided Mr. Gilpin with additional evidence of the Defendants' misconduct concerning Amazon properties in this District.  This evidence consisted of audio recordings that Watson directed Mr. Lorman to record of discussions between Watson and former Northstar employees (and White Peaks principals) Ramstetter and Camenson on or about September 27, 2019.  Gilpin Decl. ¶ 16; Dkt. 155-9; Lorman Decl. ¶¶ 9–11.

176.     In these recordings, Watson demands that these individuals pay Northstar millions of dollars in proceeds that the White Peaks Defendants realized in July 2019 on their $116 million "flip" sale of a Virginia property to Amazon.

177.     Mr. Lorman and Mr. Gilpin had further conversations in the spring of 2020 concerning Mr. Lorman's "ongoing suspicions regarding potential misconduct by Brian Watson and Northstar relevant to [IPI and Northstar's] business relationship and work for Amazon in Virginia."  Gilpin Decl. ¶ 18.  Notably, Mr. Lorman and Mr. Gilpin discussed "on multiple occasions" Mr. Gilpin's discovery that Ramstetter "had signed" while at Northstar and "without authorization, multiple contracts and change orders related to the [Amazon] Projects [in Northern Virginia]."  *Id.* at ¶ 19.  Mr. Gilpin stated that this unauthorized conduct put the (Northstar-

managed) landlords to whom Amazon rendered payments "in default under their respective credit agreements." *Id.*

178.    Mr. Lorman also reported that "multiple Northstar employees were involved in matters relating to Brian Watson's personal finances," and that Watson had "received into a personal bank account a deposit of approximately $5 million" that Mr. Lorman understood to comprise "part of a settlement" between Watson, Kyle Ramstetter, and Will Camenson on the White Peaks transaction proceeds that Watson demanded Ramstetter and Camenson pay Northstar in September 2019.  Gilpin Decl. ¶ 21.

179.    After Mr. Gilpin received the information and corroborating documents and files from Mr. Lorman in February 2020, he promptly shared them with IPI's outside counsel, who in turn shared them with Amazon.  *See* Gilpin Decl. ¶ 17; Dkt. 44 ¶ 12.  IPI also shared "numerous examples" of Northstar's and Brian Watson's failures to "appropriately manage and comply with" requirements found in contracts governing the affected Virginia real property sites that Amazon would not have executed but for the Defendants' and their coconspirators' unlawful conduct, as well as Watson's failures to "appropriately manage and comply with project requirements." Gilpin Decl. ¶ 6.

180.    All of these failures caused damage to Amazon in amounts to be determined in the course of these and related legal proceedings.

181.    For example, Northstar admitted to IPI in April 2018 that certain fees in the Northern Virginia Projects "were excessive."  Gilpin Decl. ¶ 5.

182.    But Northstar represented to IPI "that an Amazon employee had nonetheless instructed Northstar to include them"—a representation on which IPI reasonably relied based in part on the Northstar Defendants' relationship with Nelson and Kirschner.  *Id.*

183.    In reality, Kirschner, directly and through his brother Christian, Trustee of the Villanova Trust, had requested that Northstar add and/or increase fees to the budgets for the Lease

Transactions to increase the amount of fees that he and Nelson would receive through the Villanova Trust, which thereby increased the cost of the transaction to Amazon.

184.   The first Lease Transaction, for example, contained a leasing fee of 0.5%, which was equivalent to an anticipated $300,000 for that transaction.  The next Northstar budget, however, increased that fee to 2%, which was equivalent to an anticipated $1,013,614 for that transaction.

185.   Indeed, correspondence obtained through discovery shows that in late 2017, Kirschner and Christian exchanged their "thoughts" about negotiating the fees that the Villanova Trust would receive from Northstar and Brian Watson, with proposed terms for, respectively, a "1st Deal" and "Future Deals" with Amazon.

186.   These acts and other contract breaches, along with the underlying fraud and other unlawful acts that precipitated them, damaged Amazon, IPI, and their respective business partners, and compelled the Northstar Defendants' for-cause termination from involvement with the lease transaction projects and contracts on April 2, 2020.  *Id.* ¶ 22–25.

### F.   Amazon and IPI Amend the Tainted Lease Transactions to Mitigate Damages From Northstar's Fraud

187.   After Amazon discovered the Defendants' fraudulent scheme, Amazon and IPI devoted significant resources to transitioning and ultimately removing Defendants and associates entities from their roles in the Virginia Lease Transaction sites in the spring of 2020.  *See generally* Gilpin Decl. ¶ 22–26; Dkt. 160-4.  While Northstar's removal from control of the lease sites has reduced the Defendants' ability to harm those projects, there remains an imminent risk that, absent the injunctive relief ordered by the Court, the Defendants will spoliate evidence, disclose confidential Amazon information, and dissipate assets in which Amazon holds an equitable interest.

188.   On February 19, 2020, Amazon and IPI agreed to amend the leases and management contracts at the Northstar-affiliated Lease Transaction sites to facilitate this transition

and the Northstar Defendants' termination.  IPI relied on its ability to exercise its "majority interest" authority over the joint venture that controls the Landlord LLCs for the relevant properties ("Dulles NCP, LLC, Quail Ridge NCP, LLC, Dulles NCP II, LLC and Manassas NCP, LLC") to remove the Watson/Northstar-affiliated entities from both the joint venture and their involvement with the Landlord LLCs and the properties.

189.    As part of these amendments, Amazon and IPI agreed that it was critical to avoid any interruption in the development or construction of the unfinished Northstar-affiliated Lease Transaction sites and the operation of the completed Northstar-affiliated Lease Transaction sites.

190.    These understandings are reflected in the 2020 Lease Continuity Agreement between Amazon and IPI, which contains a clause guaranteeing completion of the Lease Transaction sites and Amazon's right to "uninterrupted quiet enjoyment."

191.    In early April 2020, IPI executed its obligations under the Lease Continuity Agreement with Amazon by, among other things, terminating the Watson/Northstar-affiliated rights and interests in the Lease Transaction sites, transitioning vendor obligations, and demanding the Northstar Defendants' return of books, records, and business information central to the integrity of Plaintiffs' legal and business interests.  Dkt. 160-4; Gilpin Decl. ¶¶ 22–26.

192.    Specifically, on April 2, 2020, IPI sent a formal Termination Letter to Northstar and Watson notifying them of the Cause Event for their termination and IPI's Election of Remedies as controlling stakeholder in the joint venture parent of the four landlord-developer entities for the relevant Virginia lease sites.  This letter effected the immediate removal of Watson and several Northstar affiliates (NSIPI Administrative Manager, LLC, Sterling NCP FF, LLC, and Manassas NCP FF, LLC) from the joint venture and associated landlord-developer companies.  Dkt. 160-5.

193.    IPI coupled its April 2, 2020 Termination Letter to Defendants Watson and Northstar with required notices to other affiliates and partners.  Dkt. 160-4.

194.    The Termination Letters removed Northstar-related persons and entities from the NSIPI Virginia development joint venture and its affiliated landlord LLCs.

195.    The terminations were necessary to protect Amazon business relationships and mitigate damages that Amazon and/or its partners suffered as a result of the fraud and other unlawful schemes.  This conduct caused costs on Amazon projects to exceed budgets, caused budgeted costs to be diverted to kickbacks and other unauthorized and unlawful payments, and fraudulently induced and caused Amazon to engage in business with partners that did not deliver the value they represented and contracted to provide, and whose work for the company Amazon would not have approved but for the Defendants' unlawful acts.

196.    Amazon and IPI incurred significant costs negotiating amendments to the leases and related contracts relevant to the sites affected by the Defendants' misconduct and mismanagement.  IPI has since assumed or transferred to other partners all Northstar-related responsibilities on the Lease Transactions, for which Amazon has approved more than $400 million in Capital Appropriation Requests (*i.e.*, spend requests) since February 2018.  Dkt. 157-2. In December 2021, Amazon and IPI entered into the Confidential Settlement Agreement, which mitigated, but did not fully eliminate, the damages caused to both Amazon and IPI as the result of Defendants' misconduct and mismanagement.

**G.    Defendants Obtained Millions of Dollars as a Result of the Fraudulent Lease Transaction Conduct**

197.    The benefits Nelson and Kirschner received as a result of their unlawful conduct took many forms, including kickbacks benchmarked to various transaction fees and funneled through multiple shell entities, disguised lump sum payouts on Amazon transactions, and lavish trips or reciprocal agreements to steer real estate deals to the Northstar Defendants and their associates.

198.    As set out in detail below, the monetary benefits provided to Nelson and Kirschner were facilitated and concealed by various trusts: Renrets; the Villanova Trust and the 2010 Irrevocable Trust (the "Atherton Trusts"); and limited liability companies, including AllCore,

34

Finbrit, Cheshire Ventures, Sigma Regenerative Solutions and CTBSRM (the "Atherton LLCs"), all but one of which were established specifically for this purpose by Atherton.

199.    Atherton was a central part of the scheme, such that it would not have been possible without his involvement.

200.    Atherton is an attorney barred in Colorado who was previously suspended from the practice of law from November 15, 2013 to February 25, 2014, Dkt. 162-3, due to violations of five separate Colorado Rules of Professional Conduct in connection with financial transactions.[8] Atherton reportedly assisted clients in exploiting a Colorado conservation easement program to improperly obtain millions of dollars in state and federal tax credits. *See* Dkt. 162-4.  Bank accounts held in Atherton's name have also been the subject of forfeitures related to the government's investigation into the scheme that is the subject of this suit. *See* Dkt. 162-5.

201.    Atherton's "job" in the conspiracy, as described by Nelson, was to "make us invisible" by creating the appearance of a "clean" structure – and that's "exactly what he [was] doing." Dkt. 212-12.  Nelson explained that "the reason we love Rod [Atherton] is because Rod's like this is what I do . . . He, Romanowski, all these guys.  This is his f[*]cking job—is to keep these guys safe."[9]

---

[8] Atherton violated Colo.  RPC 1.7(a)-(b) (Version 2002) (limiting a lawyer's permission to represent a client where the representation is directly adverse to another client, or where the representation may be materially limited by the lawyer's responsibilities or interests); 1.8(a) and (f) (Version 2002) (restricting the circumstances in which a lawyer may enter into a business transaction with a client or knowingly acquire a pecuniary interest adverse to the client, and the circumstances in which a lawyer may accept fees for representing a client from one other than the client); 1.3 (Version 2002) (a lawyer shall exercise reasonable diligence and promptness); 1.4(a)-(b) (Version 2002) (a lawyer shall keep a client reasonably informed about the status of a matter, promptly comply with reasonable requests for information, and explain a matter so that a client can make informed decisions); and 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).

[9] Dkt. 212-12.  This is likely a reference to the tax fraud scandal involving Bill Romanowski, the former National Football League linebacker found to have improperly taken tax deductions by a United States Tax Court judge in 2013.  According to news publications addressing the case, Romanowski asserted that he was "brought into the investment scam by Rodney

*(Cont'd on next page)*

202.    Atherton did so by, among other things, "set[ing] up" "the 2010 Irrevocable Trust," which received 66% of the funds from Northstar via the Villanova Trust.

203.    Kirschner and Nelson "formed Allcore [sic] through Rod Atherton."

204.    Atherton likewise formed Defendants Cheshire Ventures and Finbrit in Wyoming in June 2019 and September 2019, respectively, and Sigma in Colorado in June 2019, immediately following Nelson's termination from Amazon and Kirschner's assumption of Nelson's portfolio and responsibilities in Amazon's real estate division.

205.    Earlier in March 2018, Atherton also formed Defendant 2010 Irrevocable Trust and CTBSRM in Colorado and Wyoming, respectively.

206.    At a minimum, Defendants expected to obtain tens of millions of dollars as a result of the fraudulent lease transaction conduct, including approximately $5,120,000 in kickbacks attributable to the Leases paid by Defendants Watson and WDC Holdings via the Villanova Trust. The 2018 Kickback Agreement (and the Kirschner Recycle Bin spreadsheet to which Kirschner keyed the anticipated profits to himself and his co-conspirators from that agreement) also anticipated the payment by Northstar to the Villanova Trust (and accordingly to Nelson and Kirschner) of monies associated with the back end of the deal, e.g. at the end of the lease term with Amazon—"any MP [Managers Profits] Interest Fees within fifteen (15) days . . . upon receipt of such funds from a sale or other capital event wherein MP profits are received by [Northstar]."

---

Atherton, a Denver tax attorney who was also at the center of the near-collapse of Colorado's conservation-easement program in 2007."  The article continued that "Atherton and the law firms where he has worked have battled lawsuits accusing them of misconduct and being the cause for millions of dollars in back-tax liabilities." (https://www.denverpost.com/2013/02/27/bill-romanowski-ex-denver-broncos-lb-owes-5-million-tax-court-says/); *see also*  https://www.leagle.com/decision/intco20130220f21  This decision states, among other things, that "[a]lthough he testified multiple times to the contrary, the evidence is clear that Atherton received improper payments from [the investment opportunity in which Atherton had convinced Romanowski to invest] as a result of [Romanowski] choosing to enter the program."

207.    Defendant Nelson in fact boasted about the money he had made through this scheme, asserting to Ramstetter in their July 2019 meeting at the Denver International Airport, for example, that: "I don't candidly, I don't actually need the money.  I've put enough of the f[*]cking money I made on the Brian deals in the, you know, couple different investments and savings accounts." Dkt. 212-12.

208.    The United States filed a forfeiture action in this District indicating that, from August 2018 to August 2019, "the Villanova Trust wired approximately $3,375,625 to a bank account maintained for the benefit of" Nelson and Kirschner. Dkt. 156-2 ¶ 10.  The forfeiture complaint, which was filed against a lake house in Minnesota owned by Kirschner, further states that Kirschner "has admitted accepting funds from [Northstar] associated with [his] job with [Amazon]," that Northstar "paid the kickbacks to the Villanova Trust associated with the [Amazon] development deals in Northern Virginia," *id*. ¶ 13, and that Nelson and Kirschner also "received or benefitted from approximately $5,818,955 from other developers in 2019 for [Amazon] projects in Northern Virginia." *Id.* ¶ 14.

209.    This is consistent with evidence Amazon has obtained in its ongoing internal investigation of the Defendants' unlawful enterprise.

210.    Specifically, the "First Western Trust Bank account ending 3698 maintained for" Nelson and Kirschner that received "$9,194,580.50 in fraud proceeds" (Dkt. 156-2) reflects at least in part wire payments from Villanova Trust to another trust or account (¶¶ 5–15).  Further, the "seven transfers totaling $6,244,442.19 [that] were made between First Western Trust Bank account ending 3698 and First Western Trust Bank account ending 0525" (Dkt. 156-2) reflect at least in part wire payments from a separate trust or account (¶16) to AllCore.

211.    On or about December 14, 2018, Watson asked a Northstar subordinate to send him "the template referral agreement" and itemized referral fees for Northstar's "top 10 referral partners," including Villanova Trust.  Dkt. 160-6.

212.    The Northstar employee informed Watson that "V illanova [sic] Trust" had received "$50,000."  *Id.*

213.    Watson then requested "the total amount of fees we have paid to Villanova, or ALL fees . . . .  Leasing, sales, development, etc." *Id.*

214.    The Northstar employee responded that Northstar had paid $4,641,955.40 to Villanova Trust at that time.  *Id.*

215.    Funds received by Villanova Trust were subsequently passed through to AllCore for the personal benefit of Nelson and Kirschner.

216.    Whether other entities or individuals covered by Northstar's "template referral agreement" or "top ten referral partners" had a role in the Lease Transaction portion of the RICO or other unlawful scheme is not clear.  But records obtained from Northstar's former COO Mr. Lorman indicate that at a minimum, the Lease Transaction conduct involving the Defendants continued beyond the December 2018 date on which Northstar records show $4.6 million in payments to Villanova Trust.  In 2019, Northstar sent at least two wires to Villanova Trust with "transaction memo" references to two separate Northstar landlord LLCs (Dulles and Manassas) connected to the Lease Transaction conduct:

| DATE | AMOUNT | TRANSACTION MEMO |
|---|---|---|
| June 7, 2019 | $150,000.00 | Dulles Final Leasing Payment |
| August 7, 2019 | $321,028.44 | Manassas Leasing Fee |

217.    Further, financial statements obtained since Amazon initiated this suit indicate that the Northstar Defendants had received at least $10,026,899 in acquisition, leasing, development, and asset management fees on just the Dulles and Quail Ridge lease projects as of late 2018, and had wired at least $5,112,983.84 to Defendant Villanova Trust pursuant to its 2018 Referral Agreement with Northstar on the Amazon Lease Transactions.  Dkt 156-1; Dkt. 57 ¶ 4.

## V.    THE FRAUDULENT DIRECT PURCHASES

218.    The Direct Purchase portion of Defendants' fraudulent enterprise was a parallel and significant complement to the Lease Transaction portion.

219.     The Direct Purchase portion of Defendants' RICO enterprise included at least the 2019 White Peaks land sale to Amazon, and a separate land acquisition in Northern Virginia at the end of 2019 that netted Nelson and Kirschner approximately $2.5 million each.

**A.     The White Peaks Transaction**

220.     In the summer of 2019, two of Northstar's then-employees (Ramstetter and Camenson) used Defendants White Peaks Capital LLC and NOVA WPC LLC to facilitate the sale to Amazon of land in Chantilly, Virginia for a new Amazon development.  *See* Dkts. 160-7 to -10. At the time of the transaction, these two Northstar employees styled themselves, respectively, as "Managing Director" of both LLCs, and "Manager" of White Peaks Capital.

221.     Nelson and Kirschner played an essential role in the White Peaks Transaction, worked with the White Peaks Defendants to ensure its success, and did so to obtain kickbacks from the White Peaks Defendants—actions that both Nelson and Kirschner knew to be fraudulent and in violation of their obligations under Amazon's Code of Conduct and other policies, including the ███████████████████████.

222.     On or about July 30, 2019, Defendant NOVA WPC LLC purchased the White Peaks property from 41992 John Mosby Highway LLC, a Virginia limited liability company, for $98.67 million.

223.     41992 John Mosby Highway LLC had purchased the White Peaks property for approximately $20 million just 13 months earlier.  Dkts. 161-1, 161-10 to -12, 162-1.

224.     That same day (July 30, 2019), NOVA WPC LLC sold the White Peaks property to Plaintiff Amazon Data Services for approximately $116.4 million.  Dkts. 160-7 to -10, 161-1, 161-2.  Press coverage of the sale highlighted Defendant NOVA WPC LLC's same-day profit of nearly $18 million.  Dkt. 161-1.

225.     The nearly $18 million in proceeds the White Peaks Defendants realized on the sale were funded directly by Amazon's purchase of the property.  As described below, a portion of those funds were used to pay kickbacks to Nelson, Kirschner, and Watson.

39

226.    Nelson asserted on multiple occasions that he and Kirschner were able to, did, or

had, engineered internal Amazon approvals for the White Peaks transaction.  For example:

    **i.**    In a June 13, 2019 chat—occurring days before Amazon terminated Nelson's

employment for misconduct—Nelson wrote to Ramstetter that the latter should

"work with me on getting the contract clean ASAP and I'll push the internal CAR

[Capital Appropriation Request, i.e., the internal Amazon transaction approval

process] to clean that out . . . Then we move to PSA with you [] And it will go fast

. . . This is all I'm focused on now [] So we will get it done!"  Dkt. 212-16, pgs. 15-

16.

    **ii.**    In the recorded conversation between White Peaks/NOVA WPC principal

Ramstetter and Nelson occurring in July 2019 at the Denver International Airport,

Nelson asserted that Ramstetter had "people like Casey [Kirschner] or myself

saying, 'we've got this,'" (Dkt. 212-12), and that regarding pending deals in which

he and Kirschner have an interest, "Casey [Kirschner] will get them through.  He

knows how to get them through" Dkt. 212-12.[10]

    **iii.**    And when Ramstetter expressed concern about Nelson's direct participation in the

approval process for the transaction with respect to which he is pressuring

Ramstetter to pay him a kickback—"here's what scares me, when you said, hey, I

personally walked this through and ran the level eight, ten, whatever the meetings

---

[10]  Defendant Nelson also suggests to Ramstetter in July 2019—after Amazon terminated his
employment with the company following an investigation substantiating allegations of
misconduct—that he is able to obtain a job for Ramstetter working at Amazon: "We can get
you that job.  I can get you that job today.  We can bring it on a loop and get that cooking.  I
don't think you want that job.  You're maxed out at 160 base a year."  Dkt. 212-12.

*(Cont'd on next page)*

they were"—Nelson asks, "Why?" and suggests that the date on the agreement will somehow obfuscate his prior involvement.[11]

227.    Nelson and Kirschner also exerted pressure on the White Peaks Defendants to obtain a share of the approximately $18 million profit obtained by the White Peaks Defendants through the sale of the property to Amazon.  The White Peaks Defendants yielded to this pressure.

228.    For example, in the July 2019 discussion at the Denver International Airport, Nelson pressured Ramstetter to share monies from the transaction with himself and Kirschner, threatening that "Casey [Kirschner] wants to blow you up."  Dkt. 212-12.  After Ramstetter expressed concern about the "anti-bribery language" in contracts with Amazon, Nelson acknowledged that Ramstetter's concern is valid: **"[t]he anti-bribery stuff, there's no question that that could be -- you get to Code of Business conduct and those things . . . ," but assures Ramstetter that "the only people that are gonna know about this, are gonna be you, me and Casey.**"  Dkt. 212-12.

229.    The White Peaks Defendants yielded to this pressure because they recognized, as reflected in their own documents, that Nelson and Kirschner "control the process and could potentially shut it down."  The White Peaks Defendants therefore agreed to wire the $1 million kickback pursuant to instructions issued by Atherton.  In order to further obfuscate the payment, Nelson, Kirschner, and Atherton then arranged for Amazon civil engineering contractor Johnny Lim and his company, E2M Properties, to facilitate the transfer of the kickback by making the payment through E2M.

230.    Kirschner used upwards of $1.5 million of the funds from the White Peaks and other kickbacks to finance the construction of a lake house in Minnesota.  Dkt. 156-2.

---

[11]  Dkt. 212-12.

231.    The White Peaks Defendants also disbursed $5 million of the proceeds from the 2019 property sale to Watson.

232.    On September 27, 2019, approximately six weeks after the Washington Business Journal reported on the transaction, Watson confronted the White Peaks principals and then-Northstar employees Ramstetter and Camenson about the land sale.  Dkt. 155-9.

233.    Watson accused Ramstetter of engaging in a side deal with Northstar's "largest client" (Amazon), and characterized Ramstetter's conduct of the transaction as "federal FBI-type stuff." *Id*.

234.    Watson never raised these concerns with Amazon, and instead pressed Ramstetter to "pay us [Northstar] the money [nearly $18 million] immediately" because "[a]nything that comes from [Amazon deals] should be Northstar."  *Id.* at 5.

235.    Ramstetter replied that he was "[p]otentially" willing to pay Northstar the money, but suggested he and Watson discuss the matter with their Amazon contact—Kirschner—"over a drink."  *Id*. at 6.  Ramstetter then alluded to misconduct on other Amazon-related transactions, stating that "what we did for Amazon—that's FBI . . . .  You have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand" because there is evidence showing that "we all know what we did."  *Id.* at 8.  He then reiterated that he, Watson, and Kirschner should try to "work something out" before someone "say[s] something to the wrong person and it gets out, [and] the whole Amazon thing shut[s] down."  *Id.*

236.    During a separate conversation Watson secretly recorded, former Northstar employee and White Peaks principal Will Camenson stated that Northstar was left out of the deal because of Watson's "actions and [Watson's] treatment of Kyle [Ramstetter] and his contract." Dkt. 155-9 at 19.

237.    Following these conversations, Northstar fired the two employees involved in the White Peaks transaction, but only ███████████████████████████████████ ████████████████████████████████ and paying both of these Defendants a total of $5 million

from the proceeds that White Peaks realized on the 2019 land sale to Amazon.  Dkt. 163-4; Lorman

Decl. ¶ 13.

238.  The ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████:



i.   ███████████████████████████████████████

239.  In the ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████   Dkt. 163-4.

240.  Watson accepted the $5 million payment for the White Peaks transaction instead of

notifying Amazon of the inflated price of the property or of the fraud and kickback scheme engaged

in by their employees.  In or about February 2020, Watson used approximately $1.36 million of the $5 million payment he received for the White Peaks transaction to fund the construction of a ranch home in Grand County, Colorado.

241.    On the following Monday, September 30, 2019, Watson continued to discuss the White Peaks Purchase with Northstar's then-COO, Timothy Lorman, who later blew the whistle on the fraud scheme.  To "demonstrate to [Mr. Lorman] that his relationship with Casey Kirschner was still strong despite the fallout from the NOVA WPC Transaction, Watson called Kirschner and put the call on speakerphone," without telling Kirschner that Mr. Lorman was in the room.  Lorman Decl. ¶ 12.  After discussing the White Peaks Purchase, Kirschner "commented that he had never liked Ramstetter, and that Ramstetter had 'been involved in this for two weeks and he figured out what you and I were doing,' or words to similar effect."  *Id.*

242.    At the time Watson demanded and accepted $5 million in proceeds from the White Peaks transaction on the premise that the money was payable to Northstar as Amazon's agent, Watson knew or should have known that prior Northstar payments he had arranged had been used to bribe Nelson and Kirschner in connection with the Lease Transactions.  Watson also knew or should have known that the White Peaks land sale was tainted by payments or other benefits to Kirschner (and potentially Nelson) that violated Amazon policies and Northstar's obligations to Amazon.  *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.

243.    Following the PI hearing in this action in May 2020, counsel for the White Peaks principals advised Amazon that "Kyle Ramstetter (controlling manager of White Peaks Capital and NOVA WPC LLC) is cooperating with the government in its ongoing investigation of the events referenced in your complaint."  Dkt. 155-8.

**B.    The Blueridge Transaction**

244.    Nelson and Kirschner facilitated other purchase transactions in Northern Virginia for their own personal benefit.

44

245.    In late 2019, Amazon purchased 100 acres in Northern Virginia (the "Blueridge Property") for $83 million (as part the Blueridge Transaction).

246.    Nelson used proprietary information obtained while working at Amazon to interpose an intermediary, the "Blueridge Group," in the transaction.  The Blueridge Group partnered with Nelson, who was working under a consultancy agreement between the Blueridge Group and Finbrit, in order to benefit himself, Cheshire Ventures, Finbrit, and Kirschner.

247.    Unbeknownst to Amazon, the Blueridge Group had entered into a "Finder's Fee Agreement" with Finbrit Holdings, LLC (as the "Finder") on May 15, 2019—approximately one month *before* Nelson's employment was terminated by Amazon for misconduct.  The Finder's Fee Agreement" asserted that the Blueridge Group was "close to executing a purchase and sale agreement . . . with H&D Gudelsky Asset Management, LLC . . . as Seller . . . of approximately 100 acres of land . . . Due to the assistance of the Finder's helping to locate the Land and assisting in negotiating certain of the terms of the PSA, [the Blueridge Group] desires to pay the Finder a finder's fee."  The "Finder's Fee" was set at "fifty percent (50%) of the net proceeds . . . paid to [the Blueridge Group] at the closing."

248.    The Finder's Fee Agreement was signed for Finbrit by "Von Lacey, Manager." The Finder's Fee Agreement was negotiated for Nelson and Kirschner by Atherton.

249.    In or around May 2019, the Blueridge Group entered into a purchase and sale agreement to purchase the land from the seller for approximately $73 million.

250.    The terms and form of the purchase and sale agreement were substantially similar to a draft agreement exchanged between the seller and Kirschner earlier in May 2019.  The draft purchase and sale agreement provided that the cost of the sale of the land to Amazon would be $73 million.

251.    Nelson was copied on an email chain dated between August 20 and September 20, 2019—months after he was terminated from Amazon—regarding the purchase of this property by Blueridge.  Dkts. 163-1, 163-2.

252.   In that email chain, Nelson's email address is listed as "Cheshireventures@outlook.com."

253.   In addition to negotiating this corrupt transaction while employed at Amazon, Nelson knowingly engaged in this transaction after his employment ended in violation of his CNIAA agreement with Amazon, which precluded him from using confidential information acquired during his tenure with Amazon and also included an 18-month non-compete provision following the termination of his employment with Amazon.

254.   Nelson, in fact, explained the need to use Von Lacey to conceal his role. In his July 2019 conversation with Ramstetter, Nelson referenced his eighteen-month non-compete and told Ramstetter that "for the next seventeen and a half months," his name is "Von Lacey."  Dkt. 212-12.

255.   Atherton aided Nelson (and thereby Kirschner, who benefitted through his receipt of half of the proceeds provided to Finbrit through the corrupt arrangement) to avoid detection by Amazon of his illicit role in connection with the Blueridge Transaction.  In August 2019, Atherton emailed John Cadwallader, the attorney for Blueridge, to explain that the parties should set up Blueridge so that Nelson and Atherton would own 50% of the entity.  Atherton then noted the need for secrecy: "On our side, we will most likely sell our interest in the deal prior to a closing where the underlying ground is sold.  This helps keep this side's interest as far from any potential media scrutiny discoveries as possible—giving us about as complete anonymity as I can muster."

256.   In or around November 2019, and due to Kirschner's actiom, who had previously negotiated a $73 million purchase price for the land *for Amazon*, Amazon agreed to purchase the Blueridge Property for $73 million, and also pay Blueridge Group an additional $10 million assignment fee, which included the undisclosed kickback for the benefit of Nelson and Kirschner that Atherton and Von Lacey helped to arrange.

257.    Lim—who had been engaged by Amazon to assist with civil engineering for the transaction—was also enlisted by Nelson and Kirschner to assist Blueridge, Nelson, Kirschner, Atherton, and Finbrit in connection with the same transaction.

258.    On or around December 23, 2019, Amazon was assigned the purchase agreement and acquired the property for $83 million.

259.    The $83 million purchase price included the previously described $10 million assignment fee payable to Blueridge Group.

260.    That same day, Cadwallader, the attorney for Blueridge, sent an email to various parties including Defendants Nelson (at his Cheshire Ventures account) and Atherton, breaking down the payment of the proceeds.  In the breakdown, Cadwallader noted that "50% of the Net Proceeds is the wire to FinBrit."

261.    Also that same day, Cadwallader emailed Nelson and others involved in the Blueridge transaction that the Finbrit portion of the transaction proceeds would be approximately $4,673,000.

262.    On December 23, 2019, Defendant Allcore issued a $20,000 "Thank You Bonus" to Lim in return for his concealed assistance to Nelson, Kirschner, Atherton, and Von Lacey on the Blueridge Transaction.

263.    On December 24, 2019, the Blueridge Group made a wire transfer of $4,818,955.50 to the 2010 Irrevocable Trust.  Undated wire instructions for the 2010 Irrevocable Trust identify Atherton as Trustee of 2010 Irrevocable Trust at First Western Trust.

264.    Nelson and Kirschner brought Blueridge Group into the transaction to serve as a conduit for approximately $4.8 million in kickbacks.

265.    The value of any services or improvements that the Blueridge Group might have provided with respect to the Blueridge Property between the time it signed the purchase agreement and the time it assigned it to Amazon did not total anywhere near $10 million.  Regardless, the

assignment fee payable to the Blueridge Group included a hidden 50% kickback payment for the benefit of Nelson and Kirschner.

266.    After the transaction closed, Blueridge Group paid approximately half of the assignment fee remaining after costs—or $4,818,955.50—to the 2010 Irrevocable Trust, which had been set up by Atherton to funnel kickbacks to Nelson, Kirschner, and Atherton.

267.    Atherton then caused the 2010 Irrevocable Trust to transfer the kickback proceeds to bank accounts controlled by Nelson, Kirschner, and Atherton via various accounts controlled by Atherton and Von Lacey.  Nelson, Kirschner, and Atherton took approximately even shares from the proceeds, each netting approximately $1.1 million in profit from the Blueridge Transaction.  In particular, on or about December 31, 2019, Atherton caused funds in the amount of $1.4 million to be transferred from the 2010 Irrevocable Trust to an account controlled by Atherton and Von Lacey and held in the name of AllCore, and on or about December 27, 2019, Atherton caused funds in the amount of approximately $3.6 million to be transferred from the 2010 Irrevocable Trust to an account controlled by Atherton and Von Lacey and held in the name of CTBSRM.  Between on or about December 30, 2019, and on or about March 20, 2020, Nelson received approximately $1.1 million in proceeds from the Blueridge transaction via accounts controlled by Atherton, Sigma, Cheshire Ventures, and Renrets.  Between on or about December 31, 2019 and March 18, 2020, Kirschner received approximately $500,000 in proceeds from the Blueridge transaction via accounts controlled by Atherton, Sigma, and Kirschner, and Kirschner spent $600,000 of the proceeds on the construction of a lake house in Plymouth, Minnesota. Between on or about December 31, 2019 and May 5, 2020, Atherton received approximately $1.1 million in proceeds from the Blueridge transaction via accounts controlled by him and/or various entities he owned or controlled.

**C.      Defendants Obtained Tens of Millions of Illicit Gains as a Result of the Fraudulent Purchase Transaction Conduct**

268.     As a result of the conduct relating to the Direct Purchase Transactions, the Defendants obtained at least $22.7 million in illicit gains, including the following:

269.     Approximately $4,800,000 in kickbacks from the Blueridge transaction, which were funded by the $10,000,000 assignment fee paid by Amazon to the Blueridge Group.

270.     Approximately $17,700,000 from the White Peaks transaction, which is the difference between the NOVA WPC LLC purchase price and Amazon's subsequent purchase price, and which funded $5,000,000 in kickbacks to Defendant Watson and approximately $1,000,000 in kickbacks to Nelson and Kirschner.

**D.      The Northstar Defendants are Liable Under the Doctrine of Respondeat Superior for the Acts of Their Employees, Kyle Ramstetter and Will Camenson, in the Direct Purchase Portion of the Kickback Scheme.**

271.     Northstar employed Ramstetter and Camenson, and the work they did was at Northstar's direction.

272.     During the relevant time period, Kyle Ramstetter was employed as an account manager at Northstar.

273.     During the relevant time period, Will Camenson was also employed as an account manager at Northstar.

274.     The Northstar and White Peak Defendants were engaged in commerce through their business dealings.

275.     The White Peaks sale was done within the ordinary course of Northstar's business and within the scope of Ramstetter and Camenson's authority as employees of Northstar.

276.     Indeed, in connection with the White Peaks transaction, ████████████████████ ████████████████████████████████████████████ *See* Dkt. 163-7.

277.     Brian Watson owns and controls Northstar and as chief executive of Northstar, was in a position of control and oversight over Ramstetter and Camenson.

278.     In a recorded discussion between Watson and the White Peaks Defendants, Watson repeatedly emphasized that both Ramstetter and Camenson were employees of Northstar during the Direct Purchase portion of the kickback scheme, stating "[y]ou were working for Northstar as a full-time employee," Dkt. 155-9 at 6, "[y]ou are an employee of this company," *id*. at 8, and "Will [Camenson]...who was under you, and you were overseeing him as his manager," *id*.

279.     Watson also threatened to fire Ramstetter and Camenson if they did not "do the right thing and pay [Northstar the White Peaks sale proceeds] immediately." Dkt. 155-9 at 6, 10, 23.  In so doing, Watson threatened to terminate their employment if they did not perform an act within the scope thereof.

280.     Indeed, Watson contrasted the positions Ramstetter and Camenson held at Northstar with the position that another individual ("Don"), who "is not an employee of this company [and] can do whatever he wants to do." *Id.* at 11.

281.     Ramstetter and Camenson were acting within the scope of their apparent authority as WDC/Northstar employees when they negotiated the White Peaks sale with Amazon.

282.     In the recording, Watson tells Ramstetter that: "You were brought in to the Amazon account to work specifically for Amazon on our behalf." *Id.* at 6.

283.     In the recording, Watson also asserts that: "[I]f you're an employee of this company, and you're being paid for full-time work, . . . you're doing deals that would be deals that Northstar is doing . . . ." *Id.* at 11.

284.     Ramstetter and Camenson were aware that proceeds from Amazon's purchase of the White Peaks property were used to fund a payment to Casey Kirschner, and this knowledge was known or attributable to the Northstar Defendants at the time they demanded and received $5 million in proceeds from the White Peaks sale to Amazon.

285.     Watson and Northstar thus knowingly or recklessly received benefits, including a $5 million payment in the fall of 2019, from the Direct Purchase portion of the kickback scheme.

286.    Watson and Northstar, under the doctrine of respondeat superior, are responsible for all damages that resulted from any wrongful acts committed by the White Peaks Defendants and/or their principals, former Northstar employees Ramstetter and Camenson, in the claims at issue in this suit.

## VI.    DEFENDANTS USED A COMPLEX WEB OF TRUSTS AND LLCS TO CONCEAL THEIR ILLICIT GAINS AND AVOID PAYMENT OF TAXES

287.    Nelson and Kirschner used the proceeds of their unlawful enterprise, laundered through various trust and third party accounts, to support some or all of five Wyoming limited liability companies—Defendants AllCore, Finbrit, Cheshire Ventures, Sigma Regenerative Solutions, and CTBSRM— they formed while at least one of them was still employed at Amazon.

288.    Casey Kirschner, in a signed statement made to law enforcement, admitted and summarized the flow of illicit funds:

> I accepted money from Northstar associated with deals I worked on with Amazon. Carl Nelson and I formed Allcore through Rod Atherton. Northstar paid kickbacks, which were paid to the Villanova Trust. The Villanova Trust was formed by my brother, Christian Kirschner. Brian Watson of Northstar paid the Villanova Trust associated with the Amazon development deals in Northern Virginia.  The Villanova Trust transferred 66% of the funds from Northstar to the 2010 Irrevocable Trust, which Rod Atherton set up. Rod Atherton then transferred the funds to me and Carl Nelson.

### A.    Atherton

289.    In addition to setting up sham entities to conceal the identities of the co-conspirators, as described above, Atherton facilitated transfers of the illicit funds.

290.    For example, WhatsApp exchanges between Kirschner and his brother Christian include a request by Kirschner for Christian to "work with Rod [Atherton] to have our shares wired to his Trust.  I just talked to him he will disperse to us from there."

291.    Atherton also knowingly enabled Nelson and Kirschner to use the Northstar funds for their personal benefit, including accessing at least some funds under the guise of loans. Atherton "advised" Nelson and Kirschner that the "key is avoiding [payments] being looked at as a distribution," by styling them as sham "loans."

292.    Atherton was a willing and knowing participant in the conspiracy who sought to shield and recharacterize his role behind the veil of legitimate legal services.   As Kirschner admitted in his signed statement, Atherton knew that the money paid to the 2010 Irrevocable Trust was from Northstar, and he knew that Nelson and Kirschner worked for Amazon.

293.    Recent discovery also revealed that Atherton was enthusiastic about becoming involved in this scheme to Kirschner's brother, Christian, writing in September 2018 that he "want[ed] to help with the stuff you and Casey are working on and my mind is on overdrive on it."

294.    Nelson and Kirschner paid Atherton at least "a hundred and fifty thousand a year" for his role in the conspiracy out of funds derived from the proceeds of their unlawful enterprise and laundered through the Atherton LLCs.  Dkt. 212-12 ("AllCore has received like $3 million in revenue.  But then, you've got to remember, like, we pay Rod a hundred and fifty thousand a year, we pay Von Lacey to be a straw guy . . .")

**B.    Von Lacey**

295.    Defendant Von Lacey was paid by Nelson and Kirschner "to be a straw guy"— meaning that Von Lacey's name appeared on organizational documents and other corporate documents of several of the entities created by Atherton in furtherance of the scheme.

296.    While Von Lacey's name appeared on the entities, it was in fact Nelson and Kirschner who controlled the entities.  In Nelson's words, Nelson's "name" was "Von Lacey" "for the next seventeen months."  Dkt. 212-12.  Atherton also described Von Lacey to Christian as a "quality guy" who "has been opening doors" for Atherton.

297.    As an example of the services provided by Von Lacey, the May 15, 2019 "Finder's Fee Agreement" between Blueridge Group and Finbrit is signed by "Von Lacey" as "Manager" of the entity.

### C.   Villanova Trust

298.   Defendant Kirschner has admitted in a signed statement that Atherton helped the Nelson and Kirschner to establish the Villanova Trust as a vehicle for them to receive kickback payments from fees Northstar had obtained through the Lease Transactions with Amazon.

299.   The Villanova Trust did not perform any legitimate services that would justify its receipt of fees associated with the Lease Transactions.

300.   Watson, Nelson, Kirschner, and Atherton all were aware that the purpose of the Villanova Trust was to hide from Amazon the fact that Nelson and Kirschner would each receive a share of the money payable from Amazon to Northstar under the lease transactions and in fact designed this structure to accomplish that aim.

301.   Watson knew that some of the funds going to Villanova Trust would be, and were being, distributed to Kirschner and Nelson.

302.   The Villanova Trust wired funds deposited into the Trust to other accounts or trusts, such as the 2010 Irrevocable Trust settled by Atherton, that would, in turn, wire the funds to AllCore and to Kirschner and Nelson.

303.   Following the PI hearing in this action against Villanova Trust, Christian Kirschner's counsel advised Amazon that Christian Kirschner, Villanova's founder and sole trustee, "is cooperating with the government in its ongoing investigation into the events referenced in [Amazon's] complaint."  Dkt. 161-8.

### D.   AllCore

304.   Atherton formed Defendant AllCore in March 2018.  He did so shortly after the award of at least two Lease Transactions to Northstar.

305.   Atherton structured AllCore as a legitimate business when in reality AllCore was a mechanism through which Nelson and Kirschner could collect illicit funds without detection. Atherton did so with full knowledge that he was facilitating the transfer of kickbacks through various trust accounts and limited liability companies.

53

306.    AllCore was formed by Atherton for the purpose of allowing Nelson and Kirschner to receive funds that flowed through the Villanova Trust, and from the Villanova Trust through the 2010 Irrevocable Trust to then be transferred to Nelson and Kirschner—all to facilitate their access the Northstar kickbacks while employees of Amazon or soon thereafter.

307.    AllCore received proceeds from the unlawful enterprise and Nelson and Kirschner in turn used funds from AllCore for their personal benefit.

308.    Bank records show that Nelson and Kirschner could and did obtain for their personal use funds wired from these other accounts or trusts to AllCore in the form of sham "loans."  Nelson and Kirschner had no intention of repaying these loans, and Atherton caused them to be extended with full knowledge of this.  In a July 2019 conversation, Nelson told Ramstetter that the loans "aren't recorded, they're totally, I mean it's literally, Rod [Atherton] will say like 'yeah so you're not paying the notes.  So who's going to complain?  The trust? . . . Well I am the trust.  What's going to happen?"  Dkt. 212-12.

### E.    The Flow of Illicit Funds to Defendants

309.    Bank records and other summary materials identified to Amazon in discovery make clear that the Atherton Trusts and the Atherton LLCs were part of an elaborate scheme to obfuscate and conceal the payment of kickback monies to Nelson and Kirschner.  Monies deposited into the 2010 Irrevocable Trust were sent to:

  **i.**    Ramstetter, in return for his assistance to Nelson and Kirschner in facilitating the transfers to the Villanova Trust;[12]

---

[12]    *See, e.g.*, Dkt. 212-16: Nelson messages Ramstetter that Ramstetter can expect a "[l]ittle Xmas bonus"; Nelson suggests that Ramstetter, in connection with this payment, "sign the W9" and writes that they "had to approach it as an employee with payment due to our structure [] On advice of counsel – puts the tax burden on you which I wanted to avoid."  Ramstetter replies, "[n]ow flip me a couple buildings in the interim and let me really line your pockets like we were discussing!"  *Id*. at 9.

*(Cont'd on next page)*

ii.    Nelson, directly;

iii.   Nelson, by way of Allcore Development LLC and Atherton;

iv.    Nelson, by way of CTBSRM Inc. and Renrets LLC, an entity established in May 2017 by James M. Sterner ("Renrets" is "Sterner" spelled backwards), who is his father-in-law.[13]  Sterner is the sole member of the LLC.

v.     Kirschner, directly;

vi.    Kirschner, by way of CTBSRM Inc., Ergo Law LLC, Allcore Development LLC, Sigma Regenerative Solutions LLC, and Atherton;

vii.   Cheshire Ventures, by way of Allcore Development LLC, Sigma Regenerative Solutions LLC, and Atherton; and

viii.  Atherton, by way of Allcore Development LLC, Ergo Law LLC, and Sigma Regenerative Solutions LLC.

310.   In addition to obscuring the identities of Nelson and Kirschner as recipients of kickback payments flowing from transactions with Amazon, this complex web of payments and interlocking shell entities was intended to, and did, provide a means by which Nelson and Kirschner sought to avoid the payment of taxes legally due on their illicit profits.

311.   Nelson and Kirschner sought to avoid the payment of taxes legally due on their receipt of these illicit profits by characterizing distributions from the relevant Atherton LLCs as "loans" which Nelson and Kirschner and Atherton knew would never be repaid.  For example:

---

[13] *See* Nelson forfeiture complaint, Dkt. 1, ¶ 36 (alleging the transfer by a "Person #7," identifiable as Atherton, of "approximately $2,017,152.37 from the CTBSRM, Inc. account to a bank account in the name Renrets LLC, which is controlled by Person #8 [identifiable as Sterner].  Typically, within days of receiving the wires from the CTBSRM, Inc. bank account, Person #8 transferred the funds, which in sum totaled approximately $1,948,011, to Carleton Nelson's personal account #-------5838 at American Express Bank.  Carleton Nelson subsequently transferred the funds he received from Person #8 to various other bank accounts, which Carleton Nelson controlled."

*(Cont'd on next page)*

**i.**     Amazon has identified an extract of a █████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████;

**ii.**    In an interrogatory response dated March 25, 2022, Nelson admitted that he "received monies from Renrets LLC, who received money from CTBSRM via an executed promissory note;"[14] and

**iii.**   In discovery, Nelson produced an August 19, 2019 email to Atherton reflecting a confirmation that $330,512.37 had been paid by CTBSRM for the benefit of Renrets, LLC".

312.    Nelson and Kirschner planned to use AllCore to continue misappropriating Amazon information or opportunities for their own benefit after they were terminated from Amazon, and used the proceeds of their unlawful activities to fund the Atherton LLCs as vehicles for their personal gain and platforms for soliciting and rewarding co-conspirators who helped them profit from Amazon information or opportunities at the company's expense.

313.    A recently-produced document showing a text message between Atherton and Christian makes clear that Atherton was interested not only in facilitating Northstar's fraudulent scheme, but also in expanding the scheme to include other developers: "Also, I definitely want to expand beyond Brian [Watson]. There are lots of Brians."

314.    Nelson and Kirschner did not disclose to Amazon the existence of the Atherton LLCs.

---

[14]   Nelson asserted in the same interrogatory response that "timely interest was due and paid" pursuant to this promissory note.  Despite this assertion, however, to this date Nelson has not produced any evidence showing that he has paid any interest on the loan or has paid back the loan.  In fact, Nelson never had any intention to fulfil his obligations under the note, which was merely a mechanism set up to mask the distributions that 2010 Irrevocable Trust made to Nelson and Casey Kirschner.  *See* Dkt. 212-12.

315.     Nor did Nelson and Kirschner disclose to Amazon that kickbacks solicited and paid in respect of Amazon real estate transactions engineered by Nelson and Kirschner would be routed through a complex web of bank accounts, trusts, and shell entities to avoid alerting Amazon to Nelson's and Kirschner's receipt of these clearly illicit payments.

316.     Indeed, and to the contrary, Nelson and Kirschner and Atherton concealed their affiliation with the Atherton LLCs by having Atherton organize them and appear as the contact on their registration documents, and by appointing Defendant Von Lacey to sign relevant documents relating to these entities.[15]

## VII.   NELSON AND KIRSCHNER INTENDED TO CONTINUE THEIR PAY-TO-PLAY SCHEME AFTER DEPARTING FROM AMAZON

317.     Nelson and Kirschner intended to continue their kickback scheme and other unlawful conduct at Amazon's expense after the termination of their employment with the company, and Nelson in fact did so.  Nelson and Kirschner created one or more of the AllCore, Finbrit and Cheshire LLCs while they were at Amazon, supported these LLCs with proceeds from their unlawful conduct, and continued to use them to obtain information and business opportunities at Amazon's expense.

318.     Defendants Atherton and Von Lacey utilized the Atherton Trusts and the Atherton LLCs to not only facilitate the establishment of channels for the secret involvement of Nelson and Kirschner in Amazon transactions during and after their employment with Amazon, and the payment of kickbacks to Nelson and Kirschner, but also to benefit personally from these transactions.

319.     Although the only individuals listed as a contact for these LLCs in public registration documents is their organizer, Atherton, and registered agent, Defendant Von Lacey,

---

[15]  For example, Defendant Lacey is, variously, designated as the "Manager" and "President" of "AllCore Development, LLC."

email correspondence on Amazon systems and identified in discovery shows Nelson interacting for or with these entities during and after his time at Amazon.

320.    For example, on March 10, 2020, Nelson—who was terminated from Amazon in June 2019—sent Knoxville real estate site proposals stamped with an AllCore logo to an Amazon broker using a Cheshire Ventures email address and signature block:



Dkts. 161-6, 161-7.

321.    Similarly, on January 16, 2020, Kirschner received a proposal for a Fairfax, Virginia real estate site from a Cheshire Ventures email handle that Kirschner forwarded internally for consideration within Amazon.  Dkt. 162-2.

322.    All of the acts alleged herein violate the law and Amazon policies, as well as breach multiple provisions of the CNIAA Agreements Nelson and Kirschner signed with Amazon as a condition of their employment.

323.    Those agreements expressly state that "any breach" may cause Amazon "irreparable harm for which there is no adequate remedy at law," and that Nelson and Kirschner have already agreed that Amazon will "be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining [Nelson and Kirschner] from committing or continuing to commit any such violation."  Dkt. 162-9 § 7.4 (Casey Kirschner CNIAA); Dkt. 162-10 § 6 (Nelson CNIAA).

## VIII.   NELSON'S AND KIRSCHNER'S CONDUCT VIOLATED THEIR DUTIES TO AMAZON

324.   As relevant here, Amazon's Code of Conduct requires Amazon personnel to, among other things: (i) act "lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly notify the Legal Department" of any potential "conflict of interest" such as "when an employee or a family member receives a personal benefit as a result of the employee's position with Amazon.com."  Dkt. 156-8.

325.   Both Nelson and Kirschner were aware of the policy and agreed to abide by it.

326.   Nelson and Kirscher both certified compliance with the Code of Conduct while they were employed at Amazon, and both received online and in-person training related to the Code of Conduct.



327.   The Code of Conduct is complemented by Amazon's ██████████████, as well as by specific contracts Amazon employees sign, including the CNIAA Agreements that each of Nelson and Kirschner executed as a condition of their employment with the company.

328.   The purpose of Amazon's ████████████████ ██████████████████████████████████ ████████████  Dkt. 162-8.

329.   The Spending and Transaction Policy also states that ████████████ ██████████████████████████████████ ████████████████████  Dkt. 162-8.

330.   Nelson and Kirschner took advantage of the fact that they were the █████ on the subject transactions to act in their own interests, instead of ██████████████████████ and thus knowingly and deliberately violated the ████████████████.

331.   These CNIAA Agreements contain several provisions relevant to this suit that Nelson and Kirschner breached, as detailed below.

332.     The CNIAA Agreements expressly state that Nelson and Kirschner each has read or acknowledged all of the Agreement's terms and enters into them freely.

333.     In particular, Kirschner's 2015 CNIAA Agreement states that he has "carefully read all of th[e] Agreement's terms," that Amazon "has been induced to employ [him] by [his] representation that [he] will abide by and be bound by each of the covenants and restraints in th[e] Agreement," and that he "recognizes that the restrictions in this Section 4 may significantly limit Employee's future flexibility in many ways.  For example, the restriction in Section 4.1 will bar Employee, for 18 months after the Separation Date, from accepting certain competitive opportunities."  Dkt. 162-9.

334.     Nelson's 2012 CNIAA Agreement states that he is "entering into this Agreement . . . as a condition of [his] employment" with Amazon, that his employment constitutes "consideration" for the "mutual promises" in the Agreement, and that he "recognizes that the restrictions set forth in Sections 2 and 3 of t[he] Agreement may seriously limit [his] future flexibility in many ways," including by "mak[ing] it impossible for [him] to seek or accept certain opportunities for a period of 18 months after [his] Termination Date." Dkt. 162-10.

335.     Both Nelson's and Kirschner's CNIAA Agreements provide that "[a]ny breach of this Agreement may cause" Amazon "irreparable harm for which there is no adequate remedy at law" and that "[a]s a result," Amazon will "be entitled to the issuance by a court of competent jurisdiction of an injunction, restraining order, or other equitable relief in favor of itself, without the necessity of posting a bond, restraining [Nelson or Kirschner] from committing or continuing to commit any such violation."  Dkt. 162-9; Dkt. 162-10.

336.     Both Nelson's and Kirschner's CNIAA Agreements expressly limit their use and disclosure of a defined universe of "Confidential Information."

337.     Both Agreements also contain robust "non-competition" provisions addressed to Nelson's and Kirschner's activities while employed with Amazon, as well as for periods of 12 and 18 months following their termination dates.

60

338.   These "non-competition" provisions include the following, non-exhaustive restrictions:

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| **18-month Provisions** ||
| "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant), engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; "During employment and for 18 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant): (a) accept or solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information; or (b) encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon." Dkt. 162-9 §§ 4.1 - 4.2. | "While employed by the Company and for a period of 18 months after the date the Employee cases to be employed by the Company . . . the Employee will not, directly or indirectly, and whether or not for compensation, either on [his] own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venture, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the Company), knowingly: (i) accept or solicit employment with, or accept or solicit a consulting assignment with, or accept or solicit investment capital, directly or indirectly, from any individual or entity . . . from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or . . . (iv) enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Dkt. 162-10 §§ 3(c)(i)-(iv). |
| **12-month Provisions** ||
| "During employment and for 12 months after the Separation Date," Employee "will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, or | "While employed by the Company and for a period of twelve (12) months after the date the Employee ceases to be employed by the Company, without regard to when or for what reason if any, such employment shall terminate |

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| consultant): (a) solicit or otherwise encourage any employee, contractor, or consultant of Amazon ('Amazon Personnel') to terminate any employment or contractual relationship with Amazon; (b) disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity; or (c) otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon." Dkt. 162-9 § 4.3. | (the "Termination Date"), the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly employ, or retain as a consultant or contractor, or cause to be so employed or retained, or enter into a business relationship with any person who: (i) is an employee of the Company or has been employed by the Company at any time within the twelve (12) months prior to the date of such act; or (ii) is a consultant, sales agent, contract programmer, or other independent agent retained by the Company; or (iii) has been retained by the Company as a consultant, sales agent, contract programmer, or other independent agent at any time within the twelve (12) months prior to the date of such an act. Dkt. 162-10 §§ 3(b)(i)-(iii). |
| **During Employment** ||
| See above. | In addition to the restrictions above, "[d]uring the period of [his] employment with the Company, the Employee will not, directly or indirectly, and whether or not for compensation, either on his or her own behalf or as an employee, officer, agent, consultant, director, owner, partner, joint venturer, shareholder, investor, or in any other capacity (except in the capacity of an employee of the Company acting for the benefit of the Company), knowingly engage in any activity or business which is of the same nature as, or substantively similar to, an activity or business of the Company or an activity or business which the Company is developing and of which the Employee has knowledge. Dkt. 162-10 § 3(a). |

339.     Neither Kirschner's nor Nelson's CNIAA agreement allowed them to engage in the conduct at issue in this suit or to receive kickbacks derived illegally from an abuse of their positions at and the trust previously, and reasonably, placed in them by Amazon.

340.     In any case, and regardless of the contents of the CNIAA Agreements, the ████ ███████████████ required them to act in the best interests of Amazon, and the Code of Conduct that Nelson and Kirschner acknowledged at multiple points after they signed the CNIAA expressly prohibit the very conduct in which they nevertheless engaged, *i.e.*, conflicts of interest, bribery, and self-dealing.

341.     Further, Nelson's 2012 CNIAA explicitly prohibits him from using "Confidential Information," which includes "future plans" and "any other information gained in the course of the Employee's employment with the Company that could reasonably be expected to prove deleterious to the Company if disclosed to third parties," "directly or indirectly, at any time, during the term of [his] employment with the Company or at any time thereafter" acquired from or during his tenure with the Company "in connection with any activity or business except the business of the Company, and shall not disclose such Confidential Information to any individual, partnership, corporation, or other entity unless such disclosure has been specifically authorized in writing by the Company, or except as may be required by any applicable law."  Dkt. 162-10 § 2(a)-(b).

342.     And Casey Kirschner's 2015 CNIAA Agreement prohibits him from using "Confidential Information" in any way without Amazon's "prior written approval."  In Casey Kirschner's case, "Confidential Information" is broadly defined and includes "proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets." Dkt. 162-9.

343.     Despite this requirement, both Nelson and Kirschner used proprietary and confidential information for their benefit and to Amazon's detriment.

344.     Nelson took and maintained Confidential Information, including Amazon's future plans for land purchases, as well as information he had learned during his tenure at Amazon, and used it for his own personal gain, including disclosing it to third parties to advance his own interests

to the detriment of Amazon, for the purpose of engaging in the enterprise at issue here.  *E.g.*, Dkts. 163-1, 163-2.

345.    In particular, Amazon learned through Defendant Nelson's initial disclosures that after Nelson was terminated, he retained on a personal hard drive approximately 1.4 million pages of Amazon documents generated while he worked at Amazon, in contravention of his CNIAA and other policies that required the hard drive be sanitized.

346.    Instead of abiding by these obligations, Nelson retained and used these 1.4 million pages to his own benefit.

347.    Nelson and Kirschner violated Amazon's Code of Conduct, the foregoing CNIAA Agreements they signed with the company, and various laws throughout their tenures at Amazon by conspiring to perpetuate such violations after Nelson's termination.

348.    These violations involved a host of Amazon business opportunities and transactions, including those involved in the kickback scheme at issue in this suit, as well as the use of at least the Atherton Trusts and the Atherton LLCs to misuse Amazon information, coopt business opportunities, or otherwise engage in activities that "interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon," Dkt. 162-9 § 4.3 (Kirschner Agreement), or are "competitive with or otherwise deleterious to the interests of the Company."  Dkt. 162-10 § 3(c)(iv) (Nelson Agreement), including but not limited to the activities detailed below.

349.    As noted, the Lease Transaction portion of the kickback scheme targeted at least the nine Virginia commercial real property leases that one or both of Nelson and Kirschner steered to the Northstar Defendants between February 27, 2018 and January 13, 2020 (the "Virginia Lease Transactions").  The Direct Purchase portion of the kickback scheme in turn encompassed the 2019 White Peaks "flip" transaction in which Amazon bought a Virginia property at an approximately $18 million markup from former Northstar employees (the "White Peaks Purchase"), the 2019 purchase of the Blueridge Property which resulted in a $10 million fee paid

to Blueridge, Nelson, Kirschner, and Atherton (through Defendant Finbrit)—with a "Thank You Bonus" paid to Lim—as well as the unlawful use of Amazon funds to pursue business opportunities for Nelson, Kirschner, the Atherton LLCs, and other co-conspirators at Amazon's expense in Virginia.

350.    In all of these transactions, Nelson and Kirschner violated their duties to Amazon and conspired with one another and third parties to misuse company funds, business opportunities, or information to obtain personal benefits or advantages to the detriment of the company.

## IX.    THE DEFENDANTS' EFFORTS TO CONCEAL THEIR ILLICIT SCHEME

351.    Nelson and Kirschner concealed their communications evidencing their misuse of corporate information and opportunities and their receipt of prohibited personal benefits through the use of personal emails and chats, meetings and trips, and assistance from third parties, including Atherton and his network of shell entities.

352.    Since December 2019, Amazon has uncovered significant evidence of the Defendants' pay-to-play scheme and its connection to multiple unlawful enterprise activities involving real estate lease and purchase transactions at Amazon's expense, including the conduct relating to Lease Transactions and Direct Purchases as alleged in Amazon's initial complaint, First Amended Complaint, and Second Amended Complaint, and elaborated herein.

353.    The internal investigation prompted by Confidential Informant 1's December 2019 report encompassed a review of Nelson's and Kirschner's company records, including an examination of Kirschner's Amazon laptop.

354.    This examination revealed that Kirschner copied approximately 375 documents onto a USB device the night before he surrendered the laptop for a requested IT scan.

355.    Many of these files referenced confidential Amazon business transactions, including on the Northstar Virginia sites.

356.    The Amazon IT inspection of Kirschner's electronic files identified a remnant file in the Recycle Bin of his laptop, with a partial file name reading "Downloads\Villanova Trust

Executed.pdf." A metadata inspection indicated that the file was saved to the laptop Downloads folder on or about May 8, 2019, but was subsequently deleted from the laptop.

357.     Amazon's IT inspection of Kirschner's company files also uncovered a spreadsheet that appeared to be a rough calculation of the fees Casey Kirschner and his coconspirators expected and agreed to receive on six different build-to-suit deals, including "Shaw Rd.," "Quail Ridge," "Manassas," "Lerner," "Route 50," and "DTC."  Dkt. 155-10.

358.     The referenced fees on these transactions, several of which concern Northstar-affiliated Lease Transaction sites, total $37.1 million, with the author's total "Share" indicated as $14.5 million.  Dkt. 155-10.  The spreadsheet was recovered from the laptop's Recycle Bin, indicating an attempt to delete the file.

359.     Amazon found other suspicious information in Kirschner's files, including an Outlook back-end AppData folder containing a Northstar spreadsheet itemizing purported Northstar costs on the Amazon Manassas Lease Transaction deals.  Dkt. 156-7.  On the lower right-hand side of the document, someone had calculated a "Leasing Fee" of $1,656,148, which approximates the $1.6 million Leasing "Commission" that Casey Kirschner had projected for the Manassas transactions.  Dkt. 156-7.

360.     This and other evidence contradicts Watson's assertions to the FBI and Amazon business partners that the (undisclosed and/or prohibited) "fees" that Northstar paid Villanova Trust on the Virginia real estate transactions were "not sent" to Nelson and Kirschner.  It also corroborates that Northstar's engagements were not "competitive," but were instead facilitated by Nelson and Kirschner in violation of Amazon's Code of Conduct, Amazon's ███████████ ████████████, and CNIAA Agreements governing Nelson's and Kirschner's conduct during and after their employment with Amazon.

361.     Hours after the FBI raided his home on April 2, 2020, Watson sent a lengthy and wide-ranging email to a broad range of personal and business contacts including Kirschner and other Defendants who perpetrated the fraud against Amazon.  Dkt. 155-1.  In that email, Watson

alerted the group to the FBI's questions and documents (including and particularly the grand jury's interest in the Villanova Trust), cast blame on various former Northstar personnel, referenced discussions with his legal counsel, and identified Northstar assets and payments that could be affected by the fraud and misappropriation allegations against him.  Watson's email also contained factual misstatements in an apparent attempt to whitewash his involvement in the fraudulent scheme.

362.    The conflict between the investigation record and Watson's statements confirms the Defendants' misconduct and the ongoing threat they pose to Amazon and public interests in this and related legal proceedings.

363.    As a threshold matter, the email statements Watson made on the evening of April 2, 2020 (and earlier that week to investors) about Amazon's view of Northstar's work flatly contradicts the record and termination notice for "fraud and willful misconduct" IPI issued to Northstar that same day.

364.    As detailed above and in the PI record in this action, voice recordings, computer files, and financial records indicate that the Northstar Defendants fraudulently induced and/or breached actionable representations and covenants in their 2017 RFP and ensuing contracts that Watson executed on their behalf with Amazon and its partners on the Virginia Lease Transaction sites.

365.    And the case record further demonstrates the knowing or recklessly false nature of the Northstar Defendants' account of the Lease Transaction portion of the kickback scheme.  *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.

366.    These statements—designed to signal accomplices to obstruct discovery of the Defendants' ongoing unlawful activities—were followed by a host of other developments, including the resignation of much of Northstar's management team, that led to entry of the Temporary Restraining Order on April 28, 2020 (Dkt. 16) and the Preliminary Injunction on June 5, 2020 (Dkt. 57).  *See generally* Dkts. 156-4, 159-9, 161-3, 161-4, 161-5.

367.    And evidence that the parties have placed in the case record since Amazon filed this suit in April 2020—including Colorado audio recordings of former Northstar principals and sworn witness testimony submitted with the parties' May 14 and 18, 2020 PI filings—confirm Nelson's and Kirschner's involvement in the kickback scheme. *See* Dkt. 155-8.  This evidence is documented throughout the PI record. *See* Dkts. 9-10, 15-16, 39-48, 57-59, 67-69, 82, 84-85, 91, 99.  It includes documentation that Defendant Watson reformed a prior agreement with Christian to direct Amazon-related payments directly to the Villanova Trust, and that the Northstar Defendants considered themselves Amazon's agents when they extracted a multimillion dollar payment on the White Peaks sale, which Nelson and Kirschner sought to include in their pay-to-play scheme and for which they received a seven-figure payment from the White Peaks Defendants.

368.    The Northstar Defendants subsequently defied both the TRO and PI, as well as the Court's discovery order regarding their compliance with the same, and dissipated assets.

369.    For example, Defendants Watson and Northstar admitted that on June 19, 2020, they closed—without any notice to Plaintiffs or this Court—the $1.85 million sale of a luxury Denver condominium that Defendant Northstar owned and Defendant Watson personally used. Dkt. 68 at 16; Dkt. 82 at 8.

370.    Watson and Northstar admitted that they netted nearly $700,000 from the sale of this condo.  Dkt. 82-3 at 1 (listing net value of condo as of May 31, 2020 of $688,108 based on appraisal of $1.85 million—the same amount for which the condominium was sold less than three weeks later).

371.    ███████████████████████████████████████████████████████████████ ██████████  Dkt. 163-5.

372.    And as recently as July 2020, Northstar and Watson demanded $11 million in unjustified payments on their terminated lease contracts for the nine Virginia properties Amazon

had the right to lease from IPI, as well as threatened to place liens on those properties in violation of Virginia law and this Court's PI.  Dkt. 57.

373.    As of the date of the filing of this Complaint, Watson and Northstar have been sanctioned for failure to comply with the Injunction.  Evidence produced in Court-ordered discovery demonstrates that Northstar and Watson dissipated assets covered by the Injunction and failed to comply with this Court's order.  Dkts. 348, 413.  Northstar and Watson's personal assets have been placed under the control of a court-appointed Receiver in order to compel compliance with the Injunction.  Dkts. 413, 433.  In the absence of the Injunction and receivership, Watson and Northstar are likely to return to the acts that pose a risk of imminent harm to Amazon including through the dissipation of assets in which Amazon holds an equitable interest, the compromise of confidential information, and the spoliation of evidence of the fraudulent scheme.

*  *  *  *  *

374.    The foregoing factual allegations alone establish that the Defendants' extensive and unlawful enterprise activities have already resulted in direct, proximate, and foreseeable injuries to Amazon's business and property, including by inflating the prices that Amazon paid and depriving Amazon of the benefits of business decisions free from illegal outside pressure and control of the disposition of its assets and risk of loss.  By reason of their misconduct, the Defendants have successfully extracted through Amazon millions of dollars in kickback and other payments, the full extent of which is not yet known.

375.    Based on the foregoing allegations, Plaintiffs hereby plead the following causes of action and requests for relief.

## COUNT I
### RICO Enterprise
### In Violation of RICO 18 U.S.C. §§ 1962(a), (b), (c), (d)

376.    Plaintiffs incorporate all preceding paragraphs by reference.

377.    This count is against all Defendants ("Defendants").

378.    Each Defendant is a "person" as required by 18 U.S.C. § 1961(3).

379.    The Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962.  Each Defendant participated in the operation or management of the kickback scheme (the "RICO Enterprise"), which includes but is not limited to the Lease Transaction conduct and Direct Purchase conduct alleged herein.

380.    At all relevant times, the RICO Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962.

381.    The RICO Enterprise is an "enterprise" as defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting from the acquisitions, investments, and business activities of at least Amazon and its business partners and investors through perpetration of kickbacks and other unlawful acts by and through which the Defendants fraudulently induced Amazon and its affiliates to send business and payments to or through RICO Enterprise members and their accomplices to obtain and distribute illicit gains from the RICO Enterprise, including from the Lease Transactions and Direct Purchases alleged herein.

382.    The Defendants organized their operation into a cohesive group with specific and assigned responsibilities to further the enterprise.  Over the course of the scheme, the Defendants adapted the structure of their scheme to changing circumstances—recruiting and attempting to recruit new members, creating new legal entities through which to funnel their illicit proceeds, and preparing to expand and perpetuate their fraudulent scheme.

383.    Amazon and its affiliates reasonably relied on the Defendants' representations and assurances that they were conducting business ethically, legally, and according to the applicable provisions laid out in various agreements and relationships between and among Amazon and the Defendants.  This reliance resulted and proximately caused harm to Amazon by, among other things, causing Amazon and its affiliates to enter into agreements they would not have otherwise entered, to pay more than they would have otherwise paid, and to lose the honest services of its own employees.

384.    The Defendants acted with the intention of securing and sharing between themselves the proceeds of transactions that, absent the combination and illicit payments, would not have taken place or would not have resulted in the prices that were approved or received.  The agreement between the Defendants resulted in higher purchase, lease fee, and other costs to Amazon than otherwise would have occurred.  As a direct and proximate result of the Defendants' conduct, Amazon and its affiliates suffered economic harm.

385.    The Defendants participated in the RICO Enterprise with the purpose of extracting payments and terms from Amazon and its affiliates that the Defendants would not have been able to obtain absent their undisclosed and illegal relationships between and among the Defendants.  The Defendants colluded to obtain and direct kickbacks and other illegal benefits to Nelson and Kirschner in exchange for their fraudulent and otherwise unlawful and inequitable acts causing Amazon and its affiliates to approve contracts, payments, and other benefits to the Defendants.

386.    After the Defendants secured commitments and/or approvals from Amazon and its affiliates for real estate transactions worth hundreds of millions of dollars, the Defendants illegally funneled a portion of the proceeds to Nelson and Kirschner and their accomplices, including family members.  This kickback scheme allowed the Defendants to secure business and increased the costs and other terms that Amazon and its affiliates agreed to and approved for at least 11 commercial real estate projects in Northern Virginia.

387.    The pattern of racketeering has been continuous.  The Supreme Court has recognized that "'[c]ontinuity'" is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989).  The predicate acts in the RICO Enterprise stretched over a substantial period of time, with the scheme beginning in or before September 2017 with the fixing of the RFP process on the Lease Transactions and continuing through at least August 2019 with the various wire payments made as kickbacks for the lease agreements, as well as transaction fraud and kickbacks on the Direct Purchases.  The

71

RICO Enterprise expanded over time to encompass new transactions, and was intended to and did present a significant risk of being repeated and expanded to new real estate transactions in Virginia and other markets.

388.    Had Amazon and its affiliates not discovered the actions of the Defendants, the RICO Enterprise would have continued and expanded undetected into new transactions and markets.  The Defendants worked to set up and expand the infrastructure and patterns that allowed them to execute and repeat their behavior.  The development of the RICO Enterprise, and the very nature of it, projects into the future with a threat of repetition due to the constant presentation of new real estate opportunities and contracts.  The relationships among the Defendants—including their practices of social interactions—and the way they set up the scheme to function under the cover of their regular courses of business, further establish the common purpose, longevity, and continuing harm of the RICO Enterprise to Amazon, its affiliates and partners, and other victims. The Defendants agreed to and did conduct and participate in the conduct of the RICO Enterprise through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding or otherwise harming the Amazon Plaintiffs and their affiliates.  As relevant here, "racketeering activity" is defined in 18 U.S.C. § 1961(1) to include, among other crimes, violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1957 (transacting in criminally-derived property), 18 U.S.C. § 1952 (violations of the Travel Act).

**Pattern of Racketeering Activity**

389.    The Defendants conducted and participated in repeated acts of racketeering activity amounting to a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5).

**Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343**

390.    Pursuant to and in furtherance of their unlawful scheme, the Defendants committed, or agreed to facilitate, multiple related acts of wire fraud in violation of 18 U.S.C. § 1343.  Under 18 U.S.C. § 1343, anyone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" is prohibited from making use of the "wire[s]" "for the purpose of executing such scheme or artifice."

391.    The Defendants committed multiple related acts of wire fraud as described in 18 U.S.C. § 1343 by "devis[ing] [a] scheme or artifice to defraud," and by "obtaining money [and] property by means of false or fraudulent pretenses, representations, or promises" and by transmitting or causing "to be transmitted by means of wire" "writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice."  As detailed above, Defendants orchestrated an elaborate ruse involving misrepresentations, omissions, sham legal services, a strawman, and a web of shell entities to obtain illegal profits at Plaintiffs' expense.

392.    The Defendants' acts of wire fraud included at least nine wire payments between March 2018 and August 2019 that constituted kickback payments made pursuant to the referral/kickback agreement that Northstar, by and through its CEO and *alter ego* defendant Brian Watson, signed with Villanova Trust involving the Virginia Lease Transactions.  These payments and related activities constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).  The Defendants' acts of wire fraud also included several bank wire payments among the Defendants to secure the sale and settlement of Amazon's direct purchase of the Blueridge Property and the White Peaks commercial real estate parcel in 2019.  For example, the Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation *by wire for placement in the qualified exchange escrow account*."  Dkt. 161-9 (emphasis added). The Defendants also wired the funds through First VA Community Bank, 11325 Random Hills

Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155. *Id.* The Defendants also directed or caused the payment of approximately $5 million in proceeds from the White Peaks transaction to a personal bank account registered to Watson in or around the fall of 2019.

393. The Defendants and their agents have also transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures and sounds that furthered their fraudulent enterprise. These communications included emails, chats, and other communications between and among the Defendants concerning their scheme; the transmission of Amazon's confidential business information using personal email addresses; communications from Nelson and Kirschner, Brian Watson, and his agents to co-conspirators and others misrepresenting the nature of the RICO Enterprise, misleading federal agents, and alerting his co-conspirators to the FBI's investigation; and communications by Northstar, Brian Watson, and his agents to IPI and others designed to interfere with Amazon's use and enjoyment of several Virginia lease sites.

394. In all instances, the Defendants acted with knowledge and fraudulent intent to cause Amazon to make payments that would benefit the Defendants and their co-conspirators. For example, the Northstar and White Peaks Defendants agreed to pay kickbacks in order to obtain lucrative company contracts and sell property to Amazon at an inflated price, as did the Defendants involved in the Blueridge Transaction; Nelson and Kirschner made misrepresentations and manipulated Amazon's internal review process so that they could receive those kickbacks; and the Defendants went through great pains to conceal that payments were being funneled to themselves and their co-conspirators so that this would go undetected by Amazon.

395. In committing these acts, the Defendants committed wire fraud in violation of 18 U.S.C. § 1343, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

**Honest Services Fraud in Violation of 18 U.S.C. §§ 1343, 1346**

396.     Pursuant to and in furtherance of their unlawful scheme, the Defendants committed, or agreed to facilitate, multiple related acts of honest services fraud as described in 18 U.S.C. §§ 1343 and 1346.

397.     18 U.S.C. § 1346 provides that the term "scheme or artifice to defraud" in the wire fraud statute, *id.* at § 1343, "includes a scheme or artifice to deprive another of the intangible right of honest services."

398.     The honest services fraud statute "criminalizes . . . schemes to defraud that involve bribes or kickbacks" in violation of a fiduciary duty.  *Black v. United States*, 561 U.S. 465, 471 (2010); *see also Skilling v. United States*, 561 U.S. 358, 408 (2010).

399.     The RICO Enterprise described herein is a fraudulent kickback scheme under 18 U.S.C. § 1346.  Critically, the Defendants used the Villanova Trust and other entities to funnel kickbacks to Nelson and Kirschner on the Lease Transactions and Direct Purchases.  This kickback scheme was central to the Defendants' broader unlawful enterprise, which was designed and executed through multiple unlawful acts with the common purpose of causing Amazon and its affiliates and partners to approve or provide payments, contracts, or other benefits to the Defendants that caused Amazon and its partners direct and proximate harm.

400.     As detailed above, the RICO Enterprise is reflected in at least nine lease-related wire payments from Northstar to "Villanova Trust" from March 7, 2018 to August 7, 2019, Dkts. 155-3, 155-7, 156-1, 156-4, 160-1, and also in kickback and other illicit wire payments on the Direct Purchases.

401.     In furtherance of the RICO Enterprise, the Defendants made material false statements and omissions, including but not limited to falsely warranting that the Northstar parties "dealt with *no brokers, agent or other person* in connection with" the covered transaction, Dkts. 158-1 to 159-3, in connection with real estate transactions worth hundreds of millions of dollars.

The Defendants also made knowingly false and material representations about the price and terms of Virginia real estate parcels as detailed above.

402.    In furtherance of the RICO Enterprise, Defendant Casey Kirschner made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other Defendants.

403.    In furtherance of the RICO Enterprise, Defendant Carleton Nelson made material false statements or omissions, including but not limited to the failure to disclose his personal interest in the transactions he promoted with other Defendants.

404.    The Defendants also owed fiduciary duties to Amazon, either through their employment relationship (as contemplated by their CNIAAs, the Code of Conduct, and the ███████████████████████), or occupation of other positions of trust, which they violated by depriving Amazon of its intangible right to their honest services.

405.    Absent the kickback payments and related deception and unlawful conduct by the Defendants, Amazon would not have entered into any of the Lease Transactions or Direct Purchases on the terms infected by the Defendants' unlawful acts.

406.    In all instances, the Defendants acted with knowledge that they were engaged in a massive kickback scheme and had an intent to defraud Amazon.  For example,  Kirschner told federal prosecutors that most of the money Northstar sent to the Villanova Trust was transferred to him and Nelson as kickback payments; he told his brother that Atherton had agreed to disperse Nelson's and Kirschner's "shares" of the proceeds once they were wired to his trust; and Nelson is on tape saying that Atherton's job was to make them "invisible."  Moreover, the complicated web of sham trusts and LLCs used to facilitate payments to the various Defendants demonstrates an intent to conceal the kickbacks from Amazon and others so that the scheme to defraud could continue.

407.    In all instances, the Defendants knew, or reasonably should have known, that the RICO Enterprise would directly and proximately harm Amazon and its affiliates and partners.

408.    In committing these acts, the Defendants committed, or agreed to facilitate, honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346, and their acts amount to racketeering activity under 18 U.S.C. § 1961(1).

**Money Laundering in Violation of 18 U.S.C. § 1956**

409.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the federal money laundering statute, 18 U.S.C. § 1956.

410.    Under 18 U.S.C. § 1956(a)(1)(A)–(B), a person who knows "that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" is prohibited from conducting a "financial transaction" that involves that property "with the intent to promote the carrying on of specific unlawful activity" or "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

411.    A "financial transaction" is broadly defined in 18 U.S.C. § 1956(c)(3)–(4) to include transactions that affect interstate or foreign commerce, such as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition," or various transactions affecting interstate or foreign commerce through a financial institution, including "a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument."

412.    The phrase "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) to include, among other things, "any act or activity constituting an offense listed in section 1961(1)," of the RICO statute.

413.    The Defendants repeatedly engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1) by engaging in transactions using bank accounts at financial institutions to further their racketeering activities and conceal or disguise the nature of the proceeds.

414.    First, they regularly transacted business among themselves and others affiliated with the RICO Enterprise using the various LLCs and trusts.  For example, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in wired kickback payments from Northstar to the Villanova Trust as of December 14, 2018.  Former Northstar COO Timothy Lorman then corroborated these payments and discovered two additional wire receipts (dated June 7, 2019 and August 7, 2019) documenting kickback payments from WDC Holdings (Northstar) to the Villanova Trust in furtherance of the RICO Enterprise.  These wire transfers occurred across state lines, as Northstar is located in Colorado and the Villanova Trust and its accounts are located in Tennessee.  Moreover, the Defendants knew that the funds being transferred were derived from the unlawful activities of their RICO Enterprise and associated unlawful acts, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  As such, the Defendants violated 18 U.S.C. § 1956 every time they transacted using funds illicitly derived from the Lease Transactions and every time payments were made to the Villanova Trust.

415.    The Defendants also engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1) by engaging in transactions using bank accounts to further their racketeering activities on the Direct Purchases.  Specifically, on the White Peaks transaction the Defendants directed the "Exchange Escrow Funds" to "be disbursed directly to Realty Exchange Corporation by wire for placement in the qualified exchange escrow account."  Dkt. 161-9.  The Defendants also wired the funds through First VA Community Bank, 11325 Random Hills Rd., Fairfax, VA 22030, to a beneficiary address at 7400 Heritage Village Plaza, #102, Gainesville, VA 20155.  *Id*.  The Defendants subsequently directed or caused to be paid a portion of the funds they received from Amazon for the White Peaks sale to at least one account held for the benefit of Nelson and Kirschner.  Kirschner used at least a portion of these funds for personal gain, including to finance the real property and improvements known as 35 Queensland Lane North in Plymouth, Minnesota at issue in the federal civil forfeiture action the United States filed in rem against that property and improvements in this Court on June 1, 2020.  Dkt. 156-2.

78

416.    The Defendants also directed or caused the payment of $5 million in proceeds from the White Peaks Purchase to a personal bank account held by Watson in or around the fall of 2019. The Defendants knew that the funds being moved to these accounts were derived from the unlawful activities of their enterprise, including numerous offenses listed in 18 U.S.C. § 1961(1), as detailed herein.  As such, the Defendants violated 18 U.S.C. § 1956.

417.    In addition, in violation of 18 U.S.C. § 1956(a) the Defendants engaged in these financial transactions with the intent to promote the carrying on of specified unlawful activities. For example, Nelson and Kirschner used the laundered proceeds to support some or all of Renrets (in the case of Nelson), Allcore, Finbrit, Cheshire Ventures, Sigma Regenerative Solutions, and CTBSRM as vehicles for their personal gain and platforms for soliciting and rewarding co-conspirators who helped them profit from Amazon information and opportunities.  They also paid Atherton and Von Lacey for their services relating to the RICO Enterprise.  Moreover, the Defendants specifically intended to hide the origins and paths of the proceeds of their Lease Transactions, Direct Purchases, and related unlawful activities by passing funds derived from such activities through various LLCs and trusts, including the Villanova Trust, an entity created by Christian, the brother of Defendant Kirschner, who had legal, fiduciary, and ethical duties to Amazon.

### Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity in Violation of 18 U.S.C. § 1957

418.    Under 18 U.S.C. § 1961(1), violations of 18 U.S.C. § 1957 constitute a predicate act of racketeering activity.

419.    One who "knowingly engages . . . in a monetary transaction in criminally derived property" violates 18 U.S.C. § 1957 if that property is "of a value greater than $10,000 [and] derived from specified unlawful activity."

420.    The statute defines "criminally derived property" as property that constitutes "proceeds obtained from a criminal offense," 18 U.S.C. § 1957(f)(2); it further defines "specified

unlawful activity" as the same unlawful activity defined in 18 U.S.C. § 1956, including acts constituting racketeering activity under 18 U.S.C. § 1961(1), *id.* at § 1957(f)(3).

421.    The money that the Defendants derived through the kickback scheme and fraudulent dealings were taken at the expense, and to the detriment of, Amazon and its affiliates.

422.    Relatedly, through the RICO Enterprise and related unlawful activities, the Defendants committed numerous criminal offenses constituting racketeering activity as detailed herein (including wire fraud), which also constitute "specified unlawful activity" under 18 U.S.C. § 1957(f)(3).  Through this conduct, the Defendants derived proceeds that unjustly enriched themselves and also directly and proximately harmed Amazon and its affiliates and partners.

423.    As the perpetrators and beneficiaries of the "specified unlawful activity" from which the funds were derived, the Defendants knew the money and other benefits they obtained from the RICO Enterprise were the product of such activity.

424.    By depositing these funds in at least one bank account held by an interstate financial institution, the Defendants engaged in monetary transactions as defined by 18 U.S.C. § 1957(f)(1). When the Defendants engaged in any subsequent withdrawal, transfer, or exchange of these funds, they engaged in further monetary transactions as defined by 18 U.S.C. § 1957(1).

425.    As detailed above, Informant 1 provided Amazon with apparent evidence of at least $4.6 million in payments from Northstar to Villanova Trust as of December 14, 2018.  And Mr. Lorman discovered two wires, one for $150,000 and another for $321,028.44, both far in excess of the $10,000 threshold required for liability under 18 U.S.C. § 1957.  On numerous occasions, the Defendants withdrew or transferred portions of these proceeds in excess of $10,000.

426.    In addition, the Defendants directed or caused the payment of over $6 million in proceeds from the White Peaks sale to bank accounts held for the benefit of Nelson, Kirschner, and Watson in or around the period from July to September 2019.  The Defendants also directed or caused the payment of approximately $5 million in illicit profits on the Blueridge Property to

be paid or funneled to Nelson and Kirschner.  The funds were fruit of the Defendants' unlawful activities related to their RICO Enterprise.

427.    For the foregoing reasons, the Defendants repeatedly violated 18 U.S.C. § 1957, engaging in further racketeering activity under 18 U.S.C. § 1961(1).

**Violation of the Travel Act, 18 U.S.C. § 1952**

428.    Racketeering activity is further defined in 18 U.S.C. § 1961(1) to include violations of the "Travel Act," 18 U.S.C. § 1952, which criminalizes the use of interstate facilities to "(1) distribute the proceeds of any unlawful activity; or . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

429.    The Travel Act defines "unlawful activity" to include "extortion, bribery, or arson in violation of laws of the State in which committed or of the United States" as well as acts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957.  18 U.S.C. § 1952(b).

430.    For purposes of 18 U.S.C. § 1952, "interstate facilities" are defined to include email, mail, telephone calls, text messages, and wire transfers.  The Defendants made use of interstate facilities in furtherance of their crimes of money laundering.

431.    The Defendants used wire transfers to make payments and communicated to each other via phone, e-mail, and/or other electronic means in order to further their money laundering activities.  The Defendants reside in various states and used interstate facilities in furtherance of their crimes of money laundering.  For example, multiple wire transfers from Northstar in Colorado went to Villanova Trust in Tennessee.  Northstar and other Defendants domiciled in Colorado, Tennessee, and Nevada conducted business with Amazon, which has headquarters and/or principal places of business in Washington State and Virginia.  And the Defendants, including Nelson and Kirschner, personally engaged in interstate travel to participate in meetings or other activities in furtherance of the RICO Enterprise.  Any transactions that the Defendants

made with vendors or other business partners located in Virginia were also interstate activities that furthered their bribery (kickback) and money laundering activities with respect to the Lease Transactions and Direct Purchases.

432.     With specific intent to commit acts of bribery of others (to ensure their silence) and money laundering and to facilitate these acts, the Defendants made use of "interstate facilities" to "distribute the proceeds of any unlawful activity; or . . . otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of [their] unlawful activity."  18 U.S.C. § 1952(a).  Among other things, they intentionally engaged in acts of bribery of others (kickbacks to secure improper and unjust benefits and to secure concealment of the RICO Enterprise) and money laundering through interstate channels, in violation of 18 U.S.C. §§ 1952 and 1956.  Their conduct thus constitutes racketeering activity in multiple forms according to 18 U.S.C. § 1961(1).

**Predicate Acts of Racketeering Activity Amount to a Pattern of Racketeering Activity under 18 U.S.C. § 1961(5)**

433.     The Defendants committed and/or aided and abetted the commission of at least two or more of the foregoing acts of racketeering.  The acts alleged were related to each other by virtue of common participants (the Defendants), common victims (Amazon, IPI, and their affiliates, partners and investors), a common method of commission and common results (perpetration of a kickback and money laundering scheme that fraudulently induced business and contracting decisions to the benefit of the Defendants), and a common purpose (defrauding and otherwise extracting money and property from Amazon and its affiliates and partners for the personal financial gain of the Defendants while concealing their unlawful conduct).  The Defendants' conduct thus constitutes a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5).

434.     The Defendants violated 18 U.S.C. § 1962(a).

435.     As a direct and proximate result of the RICO Enterprise and the Defendants' racketeering and other activities, Plaintiffs have been injured in their business and property in

violation of 18 U.S.C. § 1962(a), which prohibits "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

436.    The Defendants derived, both directly and indirectly, financial and other benefits as a result of their unlawful RICO Enterprise, including but not limited to the kickbacks and other payments they received as a result of their fraud and other enterprise conduct.

437.    The unlawful proceeds from the RICO Enterprise were used in part to operate defendant Northstar, which Watson converted as a vehicle and alter ego for the unlawful activities of the Defendants' racketeering activities.

438.    Watson commingled his personal finances with Northstar funds and assets.

439.    Moreover, Watson is listed as the owner of the various Northstar-associated entities—notably Defendants Sterling NCP FF LLC, Manassas NCP FF LLC, and NSIPI Administrative Manager, LLC—that until April 2, 2020, had ownership interests and/or management responsibilities for Lease Transaction properties through NSIPI Data Center Venture, LLC, the joint venture that (through IPI) recently terminated all Northstar-related interests in the venture.

440.    In addition, and as detailed above, Nelson and Kirschner used the proceeds of their unlawful enterprise to fund Allcore, Finbrit, Cheshire Ventures, Sigma, Regenerative Solutions, and CTBSRM and to pay Atherton and Von Lacey for the services they provide in connection with these entities.

441.    The Defendants violated 18 U.S.C. § 1962(b).

442.    As a direct and proximate result of the Defendants' racketeering activities, the Amazon Plaintiffs and their affiliates, partners, and investors, have been injured in their business

and property in violation of 18 U.S.C. § 1962(b), which prohibits "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

443.    The Defendants maintained control of the RICO Enterprise through the racketeering activities of the Defendants, trusts, LLCs, and other channels engaged in interstate commerce and whose activities affect interstate commerce.  The Defendants conspired together over a period of years to extract unlawful profits from a series of Amazon real estate transactions. Nelson and Kirschner conspired with developers and middlemen, including Watson and Northstar, to arrange deals from which the co-conspirators could leach value.  This scheme relied on Atherton and the network of shell entities he created to make possible the transfers that put funds into the pockets of the co-conspirators while shielding the scheme from Amazon and other third parties. The conspiracy continued after Nelson's departure from Amazon and ended only because it was discovered.   The Defendants facilitated, perpetuated, maintained, and expanded their scheme through committing wire fraud, honest services fraud, bribery, extortion, and money laundering. The illegal enterprise extensively utilized facilities of interstate commerce including, but not limited to, persons and entities, including trusts and shell companies, located in, variously, Colorado, Tennessee, Virginia, Washington State, and Wyoming.

444.    As detailed above, the Defendants violated 18 U.S.C. § 1962(c) by "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

445.    The Defendants also violated 18 U.S.C. § 1962(d), which prohibits "any person to conspire to violate any of the provisions of" 18 U.S.C. §§ 1962(a)-(c).  The Defendants knowingly agreed to commit, and subsequently engaged in, a pattern of racketeering activity, and further knew that the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  Each of the Defendants knew about and agreed to facilitate

the RICO Enterprise's unlawful scheme to obtain property and other illicit benefits from Amazon and its affiliates and partners.  It was part of the conspiracy that the Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the RICO Enterprise, including the acts of racketeering set forth above.

446.    Amazon was injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d).

447.    The RICO Enterprise directly and proximately caused injuries to Amazon and its affiliates and partners including, but not limited to: the purchase of real property in Virginia unlawfully inflated above its fair market value by millions of dollars; millions of dollars in kickback payments that resulted in Amazon and its affiliates paying artificially inflated prices for at least the 11 real estate transactions alleged herein; the fees and costs Amazon and its partners incurred by working to remove the Defendants, their agents, and those acting in concert with them from their roles on the affected Lease Transaction sites, including attorneys' fees and costs associated with preparing, executing, and enforcing the February 19, 2020 Lease Continuity Agreement and the December 27, 2021 Confidential Settlement Agreement; the impairment of Amazon's legal entitlement to business relationships and to make business decisions free from outside pressure wrongfully imposed; and the denial of Amazon's right to control both the disposition of its assets and its risk of loss.

448.    These injuries to Amazon were a direct, proximate, and reasonably foreseeable result of the Defendants' violations of 18 U.S.C. § 1962(a), (b), (c), and (d).  Amazon has been and will continue to be injured in its business and property in an amount to be determined at trial.

449.    Pursuant to RICO, 18 U.S.C. § 1964(c), Amazon is entitled to recover treble damages, plus costs and attorneys' fees, from the Defendants.

450.    Pursuant to the RICO statute, 18 U.S.C. § 1964(a), Amazon is entitled to injunctive and other equitable relief, including an order requiring the Defendants to disgorge the full measure of their unjust gains from the fraudulent scheme.

451.    Amazon is further entitled to, and should be awarded, a permanent injunction that enjoins the Defendants, their assignees, and anyone else acting in concert with them from profiting from or otherwise monetizing their relationship with Amazon, Amazon confidential information, or any of the projects or properties described herein, including by marketing or otherwise leveraging the existence of a relationship with Amazon and/or knowledge of Amazon business practices to promote future business activities.

## COUNT II
## Detinue Pursuant to Va. Code § 8.01-114

452.    Plaintiffs incorporate all preceding paragraphs by reference.

453.    This count is against all Defendants.

454.    "An action for detinue lies when a party unlawfully withholds the personal property of another." *Secureinfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 620 (E.D. Va. 2005) (citing Va. Code § 8.01-114). "The remedy for a detinue claim is recovery of the item being withheld and any damages for its detention." *Id.*

455.    In Virginia, to maintain an action for detinue, "a plaintiff must establish (1) a property interest in the thing sought to be recovered, (2) the right to immediate possession of the property, (3) that the property is capable of identification, (4) that the property is of some value, and (5) that the defendant had possession at some time before the institution of the action." *In re Paysage Bords De Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 744 (E.D. Va. 2014) (citing *Vicars v. Atl. Disc. Co.*, 140 S.E.2d 667, 670 (Va. 1965)).

456.    Through the Lease Transaction portion of the RICO Enterprise, the Defendants received $15,263,163 from their illicit agreement on the Lease Transactions.

457.    Approximately $5,112,983.84 of this corpus was possessed by the Northstar Defendants and then wired to the Villanova Trust pursuant to their 2018 Kickback Agreement on the Lease Transactions for the benefit of Nelson, Casey Kirschner, Christian Kirschner, and

Atherton.  Ex 11; Dkt. 57 ¶ 4.  Discovery and trial may reveal that Defendants possessed or
continue to possess more.

458.    Through the White Peaks Transaction portion of the RICO Enterprise, the
Defendants unlawfully obtained approximately $17,700,000 from Plaintiffs by overcharging
Amazon on a flip-sale of the White Peaks property.

459.    White Peaks Capital and/or NOVA possessed that entire profit, minus costs.  From
that corpus, one or both of those entities wired (i) $5,000,000 to Watson after an October 2019
"settlement" and (ii) $1,000,000 to an account associated with E2M Properties, LLC, a Lim
company, for Kirschner's and/or Nelson's and/or Atherton's benefit.  Discovery and trial may
reveal that Defendants possessed or continue to possess more.

460.    In the Blueridge Transaction, Plaintiffs overpaid the Blueridge Group by
$10,000,000 on account of Kirschner's interposition of the Blueridge Group into a deal whereby
Kirschner had already agreed with the seller that Amazon could purchase the property for $73
million, rather than the $83 million paid following the Blueridge Group's involvement in the deal.

461.    Through the Blueridge Transaction portion of the RICO Enterprise, Defendant
Atherton arranged for approximately $4,800,000 from this corpus to be transferred in due course
to Nelson's Finbrit entity for his own benefit and the benefit of Nelson and Kirschner.  Discovery
and trial may reveal that Defendants possessed or continue to possess more.

462.    In the Lease Transactions, the White Peaks Transaction, and the Blueridge
Transaction, the Defendants inflated the prices for each transaction unknown to Plaintiffs, who
understood that these prices had been negotiated in the absence of fraud or self-dealing.

463.    Plaintiffs have a property interest in the funds that the Defendants unlawfully
obtained or converted as a result of their illicit activities.   Plaintiffs also have an immediate right
to possess these funds, which were not legally transferred to the Defendants in the first place.

464.    The funds Plaintiffs seek to recover are capable of identification.  Amazon can trace
monies it paid to the Defendants relating to (i) amounts corresponding to rent paid in connection

with the Lease Transactions based on the amounts listed in Exhibit A to the Villanova Trust kickback agreement; (ii) the White Peaks purchase, based on the sales contract and wire transfer records; and (iii) the Blueridge purchase, based on an email an attorney from the Blueridge Group sent to various Defendants regarding the breakdown of the proceeds.

465.    All of these payments relate directly to real estate transactions that occurred in Virginia, and are therefore subject to a claim for detinue under Virginia Law.  *See* Dkts. 161-10 to -12, 163-6.

## COUNT III
## Fraud

466.    Plaintiffs incorporate all preceding paragraphs by reference.

467.    This count is against Defendant Nelson, Defendant Kirschner, Defendant Watson, Defendant Northstar, and the White Peaks Defendants.

468.    In Virginia, a party "alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him." *Thompson v. Bacon*, 425 S.E.2d 512, 514 (Va. 1993).  Virginia recognizes fraud by omission, sometimes called "concealment."  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) ("'Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud.'" ) (quoting *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984)).   Concealment is a "deliberate" or "willful" "nondisclosure."  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999).

469.    In the alternative for Nelson and Kirschner, under Washington law "[t]he elements of fraud include: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff." *Adams v. King Cty.*,

192 P.3d 891, 902 (Wash. 2008) (en banc) (citation omitted).   As in Virginia, Washington recognizes that "the first element of fraud may be satisfied by omission of a material fact." *Amtruck Factors, a Div. of Truck Sales, Inc. v. Int'l Forest Prods.*, 59 Wash. App. 8, 18 (1990), *abrogated on other grounds, Ross v. Kirner*, 162 Wash. 2d 493, 500 (2007).

470.    The Defendants committed fraud by concealing from Plaintiffs material information relating to their kickback scheme.

471.    Watson and Northstar knowingly and intentionally concealed the fact that they were paying kickbacks to Amazon employees in connection with the Lease Transactions.

472.    While negotiating with Amazon, and before the lease agreements were executed, Watson and Northstar colluded with Nelson and Kirschner to secure the Lease Transactions and finalized the 2018 Referral Agreement with the Villanova Trust, which would be used to funnel payments to Nelson, Kirschner, and others.

473.    Watson and Northstar failed to disclose their arrangements with Nelson, Kirschner, and the Villanova Trust to Amazon.   The obligation to disclose that information arose out of the common law and existed independent of any contractual obligation that Watson and Northstar had with Amazon.   At the very least, however, Watson and Northstar should have been prompted to comply with their common law obligation once they were presented with contract language inquiring whether they had paid any undisclosed brokerage, referral, or similar fees to third parties in relation to the Lease Transactions and whether there were any agreements made by the landlords that were not contained in the lease documents.   They should have been further prompted by contract language discussing Amazon's Code of Conduct, which prohibited the paying of bribes.

474.    In part, Watson's and Northstar's fraud induced Amazon to enter into the lease contracts.   *See Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 452 (E.D. Va. 2009); *Ware v. Scott*, 257 S.E.2d 855, 857 (Va. 1979).   Watson and Northstar knew that Amazon would not have proceeded with the transactions if it had been aware that its counterparties intended to funnel kickbacks to Amazon employees and the brother of an Amazon employee.   Thus, the

concealment detailed above was undertaken and continued with the purpose of procuring the lease agreements and inducing Amazon to enter and perform them.

475.    The White Peaks Defendants also knowingly and intentionally concealed the fact that they were paying kickbacks to Amazon employees in connection with the White Peaks Transaction.

476.    The White Peaks Defendants knew at the time they negotiated and executed the contract with Amazon that Nelson and Kirschner were actively working behind the scenes to secure approval for the transaction at a rate inflated by their anticipated kickbacks and tainted by their fraud and self-dealing.  The White Peaks Defendants, Nelson, and Kirschner cannot credibly claim that either side expected that Nelson's and Kirschner's assistance steering the deal through internal approvals would come with no kickback strings attached, given the prior pressure exerted by Nelson and Kirschner against White Peaks principal Ramstetter to ensure that the kickbacks on the Lease Transactions were promptly disbursed to the Villanova Trust for their benefit.

477.    The White Peaks Defendants failed to disclose this information to Amazon.  The obligation to disclose that information arose out of the common law and existed independent of any contractual obligation that the White Peaks Defendants had with Amazon.  At the very least, however, the White Peaks Defendants should have been prompted to comply with their common law obligation once they were presented with contract language inquiring whether they had engaged any other brokers or finders and whether there were any other agreements or understandings related to the property.  They should have been further prompted by contract language discussing Amazon's Code of Conduct, which prohibited the paying of bribes.

478.    In part, the White Peaks Defendants' fraud induced Amazon to enter into the purchase agreement.  *See Enomoto, Ltd.*, 624 F. Supp. 2d at 452.  The White Peaks Defendants knew that Amazon would not have proceeded with the transaction if it had known that its counterparty intended to funnel kickbacks to its own employees.  Thus, the concealment detailed

above was undertaken with the purpose of procuring the purchase agreement and inducing Amazon to enter it.

479.    Nelson and Kirschner knowingly and intentionally concealed from Amazon that they would be receiving, and ultimately did receive, kickbacks on the Lease Transactions and Direct Purchase Transactions.

480.    The obligation to disclose this information arose out of the common law and existed independent of any contractual obligation Nelson and Kirschner had with Amazon or any policies that they were required to comply with during their employment.  At the very least, however, Nelson and Kirschner should have been prompted to comply with their common law obligation in light of their CNIAA agreements, Amazon's Code of Conduct, and Amazon's ██████████, which collectively prohibited the conduct at issue and required Amazon personnel to log conflicts of interest.

481.    The Defendants committed fraud by making various misrepresentations and omissions in connection with Amazon's RFP and other approval processes.

482.    Nelson and Kirschner knowingly and intentionally misrepresented and concealed important information from Amazon throughout the RFP process so the Company would conclude that the Lease Transactions were competitive, fair market deals executed in Amazon's best interest and in compliance with all relevant laws and Amazon's Code of Conduct.

483.    Relatedly, Watson and Northstar knowingly and intentionally failed to disclose to Amazon that part of the proceeds they received from the Lease Transactions would be used to fund kickbacks to Amazon insiders, and that they had submitted these inflated bids with the help, and at the direction of, those insiders.

484.    The White Peaks Defendants knowingly and intentionally made various misrepresentations and omissions in their discussions with Amazon leading up to the White Peaks sale, including their failure to disclose to Amazon that they were working with Nelson and Kirschner.

485. In part, Watson's, Northstar's, and the White Peaks' Defendants' fraud induced Amazon to enter into the lease contracts and the White Peaks contract. *See Enomoto*, 624 F. Supp. 2d at 452; *Ware*, 257 S.E.2d at 857. Defendants knew that Amazon would not have proceeded with the transactions if it had been aware that the prices were inflated to include kickback payments to Amazon employees. In addition, Watson and Northstar submitted an RFP response that contained false representations, including assurances that Northstar would be honest with its business partners and a proposed lease agreement representing that Northstar had made no undisclosed brokerage or other fee payments. Thus, these misrepresentations were made, and the concealment detailed above was undertaken and continued, with the purpose of procuring the agreements and inducing Amazon to enter and perform them.

486. The Defendants committed fraud through concealing their personal financial relationships and conflicts of interest from Amazon.

487. Nelson and Kirschner knowingly and intentionally failed to disclose to Amazon that they had personal financial relationships with the landlords and sellers involved in the Lease Transactions and Direct Purchase Transactions from which they expected to receive millions in kickbacks, and these parties similarly failed to disclose these financial relationships to Amazon.

488. Each of these financial relationships created a conflict of interest that was harmful to Amazon, and that under Amazon's policies, was required to be reported to the Company.

489. In part, Watson's, Northstar's, and the White Peaks Defendants' fraud induced Amazon to enter into the lease and purchase agreements. *See Enomoto*, 624 F. Supp. 2d at 452; *Ware*, 257 S.E.2d at 857. These defendants knew that Amazon would not have proceeded with the transactions if it was aware that its employees and the counterparties to prospective or existing transactions had personal financial relationships with each other and were tainted by a conflict of interest. Their concealment was therefore undertaken and continued with the purpose of procuring the lease and purchase contracts and inducing Amazon to enter and perform them.

490.     The Defendants' false statements and omissions were material and designed to mislead Amazon.

491.     Each of the transactions at issue was premised on the Company's reasonable understanding that its employees and counterparties were not laboring under conflicts of interest and that it was paying a fair price instead of one unlawfully inflated by kickbacks.

492.     The Lease Transactions were further premised on Amazon's belief that the information filtered through its internal review and approval processes, and provided by its own employees and those responding to RFPs, was reliable and produced through arm's length negotiations.

493.     The Defendants used false statements and omissions to mislead Amazon into thinking that these conditions were met and fraudulently induce the Company into entering the Lease and Direct Purchase Transactions so that they could reap millions of dollars for their own personal benefit at Amazon's expense.

494.     Had Amazon known that the transactions were inflated by millions of dollars in kickbacks or that its employees and contract counterparties had financial relationships with each other and were colluding to benefit at Amazon's expense, it would not have approved the transactions.

495.     Plaintiffs reasonably relied on the Defendants' misrepresentations and omissions to their detriment and approved the transactions.

496.     Amazon was not and could not reasonably have been made aware of these misrepresentations and omissions.

497.     Amazon had a right to rely on the representations made by its own employees and to assume that the concealed facts did not exist.  Pursuant to their employment agreements and Amazon's policies, including Amazon's Code of Conduct and ███████████████, Nelson and Kirschner had an obligation to act, and were expected to be acting, in Amazon's best interests and to refrain from the unlawful conduct they committed.  Similarly, Amazon had the

right to rely on the assumption that its contract counterparties were not violating their common law duty to refrain from making misrepresentations and concealing material information while engaging in business transactions.

498.    Alternatively, and at the very least, Defendants committed constructive fraud because they negligently or innocently misrepresented or omitted material facts.  *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999); *see also Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007) (en banc).

499.    Each of the landlord entities that signed the lease agreements served as Watson's alter ego.

500.    The White Peaks Defendants were alter egos of Ramstetter and Camenson in executing the White Peaks Transaction.

501.    As a direct result of Amazon's justifiable and reasonable reliance on the Defendants' material misrepresentations and omissions, Defendants were unjustly enriched in the amount of tens of millions of dollars, and Amazon sustained damages, including but not limited to the inflated purchase price on the White Peaks property and the Blueridge Property and the costs and fees it paid to members of the Lease Transaction Enterprise on contracts they procured through fraud and kickbacks which artificially inflated the price of the transactions.  Plaintiffs are also entitled to punitive damages.  *See Tidewater Beverage Services, Inc. v. Coca Cola., Inc.*, 907 F. Supp. 943, 948 (E.D. Va. 1995).

## COUNT IV
### Tortious Interference with Contractual and/or Business Relations

502.    Plaintiffs incorporate all preceding paragraphs by reference.

503.    This count is against Defendant Watson, Defendant Northstar, and the White Peaks Defendants.

504.    In Virginia, the elements of tortious interference are: "(1) the existence of a valid contractual relationship . . .; (2) knowledge of the relationship . . . on the part of the interferor; (3)

intentional interference inducing or causing a breach or termination of the relationship . . .; and (4) resultant damage to the party whose relationship . . . has been disrupted." *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).

505.   Plaintiffs entered into valid employment contracts with Nelson and Kirschner. Those contracts prohibited Nelson and Kirschner from using and/or disclosing confidential information for their own benefit and to Amazon's detriment, as well as from competing with Plaintiffs during and after their terms of employment.

506.   Watson, Northstar, and the White Peaks Defendants had knowledge of Nelson's and Kirschner's employment relationship with Amazon.  Watson, Northstar, and the White Peaks Defendants intentionally interfered with Plaintiffs' contracts by causing Nelson and Kirschner to make improper use of confidential Amazon information and enter into a pay-to-play arrangement that was deleterious to Amazon's interests.

507.   In all instances, and as detailed above, Watson, Northstar, and the White Peaks Defendants acted with improper motives and by improper means (including, but not limited to, racketeering and bribery).

508.   Each of the landlord entities that signed the lease agreements served as Watson's alter ego.

509.   Plaintiffs have been harmed by, and are suffering from ongoing and imminent threats of additional harm from, Watson's, Northstar's, and the White Peaks Defendants' tortious interference with Plaintiffs' contractual and/or business relations relations as detailed above and in the Application for a Temporary Restraining Order that accompanied Amazon's first Verified Complaint.  Injury and damages include, but are not limited to immediate economic damages resulting from inflated and fraudulent transaction costs.

510.   Although many of these harms are compensable in money damages, the injury to Amazon's ongoing business and business relationships is not, and regardless injunctive relief is

necessary to prevent the Defendants from spoliating evidence and assets essential to recovery of monetary relief.

## COUNT V
### Civil Conspiracy

511.     Plaintiffs incorporate all preceding paragraphs by reference.

512.     This count is against all Defendants.

513.     Under Virginia law, a common law claim of civil conspiracy lies where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014).  Virginia law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act."  Va. Code § 18.2-499(A).

514.     In the alternative for Nelson and Kirschner, under Washington law "[t]o establish a common law claim for civil conspiracy," a plaintiff is "required to prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy." *Bonneville v. Pierce Cty.*, 202 P.3d 309, 318 (Wash. Ct.  App. 2008) (quotation marks omitted).

515.     As alleged herein, the Defendants have conspired to induce breach of contract and engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs and others.

516.     The Defendants entered into an agreement to accomplish these conspiracies.  For example, Nelson, Kirschner, and Atherton conspired to have Atherton create a number of trusts and LLCs to facilitate and conceal their illicit gains; Nelson and Kirschner conspired to steer

lucrative company contracts and business opportunities to third parties that agreed to provide them with personal benefits in return; Watson and Christian conspired about how to use the Villanova Trust to funnel kickbacks from the Amazon lease transactions; Atherton volunteered to help Christian with the "stuff" that Christian and Kirschner were working on, which he wanted to expand to more developers; Kirschner had a spreadsheet with rough calculation of the fees and he and his co-conspirators expected and agreed to receive on various Lease Transactions; and the Defendants organized into a cohesive group with specific and assigned responsibilities to further the enterprise.  In forming these agreements, the Defendants acted for the purpose of willfully and maliciously inducing Amazon to pay inflated prices for each of the transactions at issue so that they could obtain kickback payments and other benefits.

517.    The Defendants' actions resulted in damage to Amazon, as detailed elsewhere in relation to the racketeering, fraud, tortious interference, and breach of contract claims.

518.    Under the Virginia statutory claim for civil conspiracy, Plaintiffs are entitled to "recover three-fold the damages by him sustained, and the costs of suit."  Va. Code § 18.2-500(A). Amazon is also entitled to "loss of profits."  *Id.*

519.    The statute further provides for equitable relief, stating that the "court shall have jurisdiction to . . . issue injunctions pendente lite and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel." Va. Code § 18.2-500(B).

### COUNT VI
### Breach of Contract

520.    Plaintiffs incorporate all preceding paragraphs by reference.

521.    This count is against Nelson and Kirschner.

522.    Under Virginia law, "the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that

obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ulloa v.
QSP, Inc.*, 624 S.E.2d 43, 48 (Va. 2006) (quotation marks and alteration omitted).

523.    In the alternative for Nelson and Kirschner , under Washington law "[t]he elements
of a breach of contract claim are: (1) the existence of a valid contract, (2) breach of that contract,
and (3) damages resulting from the breach." *Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d
1235, 1250 (W.D. Wash. 2014).

524.    Plaintiffs executed a CNIAA Agreement with Kirschner that provides, among other
things, that:  (i) Amazon "has been induced to employ [Kirschner] by [Kirschner's] representation
that [he] will abide by and be bound by each of the covenants and restraints in th[e] Agreement",
Dkt. 162-9 § 9 (Kirschner CNIAA); *see also* Dkt. 162-9 Recitals A–D (Kirschner CNIAA); (ii)
any breach of the Agreement may cause Amazon irreparable harm for which there is no adequate
remedy at law, Dkt. 162-10 § 6 (Kirschner CNIAA); and that (iii) Defendant Casey Kirschner will
"hold all Confidential Information in strictest confidence and will not acquire, use, publish,
disclose, or communicate any Confidential Information except as required in connection with
[their] work without the prior written approval of an authorized officer of Amazon," Dkt. 162-9 §
3.1 (Kirschner CNIAA).

525.    Plaintiffs also executed a CNIAA Agreement with Nelson that provides, among
other things, that: (i) that Nelson is "entering into this Agreement . . . as a condition of [his]
employment" with Amazon, "recogniz[ing] that the restrictions set forth in Sections 2 and 3 of
t[he] Agreement may seriously limit [his] future flexibility in many ways," Dkt. 162-10 Recital
and § 4(a) (Nelson); (ii) "[a]ny breach of this Agreement may cause the Company irreparable harm
for which there is no adequate remedy at law," *Id.* § 6 (Nelson); and that (iii) Nelson "shall not,
directly or indirectly, at any time . . . use or cause to be used any" non-public "Confidential
Information" acquired from or during employment with the Company "in connection with any
activity or business except the business of the Company, and shall not disclose such Confidential
Information to any individual, partnership, corporation, or other entity unless such disclosure has

been specifically authorized in writing by the Company, or except as may be required by any applicable law." *Id.* § 2(b) (Nelson).

526.    These CNIAA Agreements further warrant that, during employment with Amazon and "for 18 months" thereafter, Nelson and Kirschner "will not, directly or indirectly," either "on [their] own behalf or" otherwise, Dkt. 162-9 § 4 (Kirschner CNIAA); Dkt. 162-10 § 3(c) (Nelson CNIAA):

| CASEY KIRSCHNER AGREEMENT | CARLETON NELSON AGREEMENT |
|---|---|
| (i) engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; | (i) "knowingly (i) accept or solicit employment . . . a consulting assignment . . . investment capital, directly or indirectly, from any individual or entity . . . from which the Company has accepted investment capital, or with which, prior to the Termination Date, the Company has held serious discussions regarding the possibility of securing investment capital ("Investors or Prospective Investors"), provided, however, that this Section 3(c)(i) shall not apply to Investors or Prospective Investors that are introduced to the Company through the efforts of the Employee; or |
| (ii) "solicit business from any Customer of any product or service that Employee worked on or supported, or about which Employee obtained or received Confidential Information"; | |
| (iii) "encourage any Customer or Business Partner to cease doing business with Amazon or to terminate or limit an existing relationship or arrangement with Amazon"; | (ii) accept or solicit employment with, or . . . a consulting assignment with, or . . . business from any individual or entity that was a customer or client of the Company prior to the Termination Date, or with which the Company had engaged in serious discussions prior to the Termination Date related to the possibility that such individual or entity might become a customer or client of the company (a "Current or Prospective Customer"), if the product or service provided by the Employee to such Current or Prospective Customer is substantially the same as a product or service offered by the Company to such Current or Prospective Customer, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business relationship or anticipated business relationship with such Current or Prospective Customer; or |
| (iv) "solicit or otherwise encourage any employee, contractor, or consultant of Amazon ("Amazon Personnel") to terminate any employment or contractual relationship with Amazon" or "disclose information to any other individual or entity about Amazon Personnel that could be used to solicit or otherwise encourage Amazon Personnel to form new business relationships with that or another individual or entity"; or | |
| (v) "otherwise interfere with the performance by current or former Amazon Personnel of their obligations or responsibilities to Amazon." Dkt. 162-9 § 4. | |

| | (iii) accept or solicit business from any retail market sector, segment, or group that the Company has solicited, targeted, or accepted business from prior to the Termination Date, or has actively planned, prior to the Termination Date, to solicit, target, or accept business from (the "Target Market"), if the product or service provided or offered by the Employee to such Target Market is substantially the same as a product or service provided or offered by the Company to the Target Market, and such acceptance or solicitation would be competitive with or otherwise deleterious to the Company's own business activities, or anticipated business activities, related to the Target Market; or |
|---|---|
| | (iv) enter into or propose to enter into any business arrangement with any entity with which, prior to the Termination Date, the Company was involved in substantially the same business arrangement, or with which, prior to the Termination Date, the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement would be competitive with or otherwise deleterious to the interests of the Company. Dkt. 162-10 §§ 3(c)(i)-(iv). |

527.     Nelson and Kirschner breached all and continue to violate aspects of all of these provisions in the course of conducting their unlawful pay-to-play scheme for Amazon real estate business, including by participating in the RICO Enterprise.  For example, Nelson and Kirschner steered proprietary and competitively sensitive business information to co-conspirators in exchange for kickbacks and other benefits they concealed from Amazon in violation of company contracts and policies; Nelson became involved with the Blueridge Transaction, serving as a consultant for a counterparty on a transaction for Amazon despite his non-compete provision; Kirschner copied about 375 documents onto a USB device, many of which referenced confidential Amazon business transactions, including on the Northstar sites; and both Nelson and Kirschner used Atherton Trusts and LLCs to co-opt business opportunities, interfere with the performance of

Amazon personnel, or otherwise engage in conduct competitive with or deleterious to the interests of the company.

528.     Nelson also breached and continues to violate aspects of his CNIAA by retaining after his termination from Amazon the hard drive that contains approximately 1.4 million pages of Amazon documents.  Section 1(a) of Nelson's CNIAA required him to "promptly disclose and deliver over to the Company"—both "[d]uring the course of employment and at the termination thereof"— enumerated categories of "Disclosure Information," including but not limited to "ideas or information conceived, originated, adapted, discovered, developed, acquired, evaluated, tested, or applied by [Nelson] while employed by the Company if the idea or information could reasonably be expected to prove useful or valuable to the Company."  Further, Section 2(b) broadly prohibited Nelson from "us[ing] or caus[ing] to be used any . . . Confidential Information in connection with any activity or business except the business of the Company," either "directly or indirectly, at any time, during the term of his . . . employment with the Company or at any time thereafter, and without regard to when or for what reason, if any, such employment shall terminate."  Section 2(a) defines "Confidential Information" to include, among other things, data "compiled by the Company."

529.     These breaches have not been cured and have caused Amazon to suffer pecuniary harm and damages in amounts to be determined at trial. In addition, Nelson's continued possession of the hard drive containing approximately 1.4 million pages of Amazon documents poses immediate and irreparable harm to Amazon and necessitates injunctive relief in the form of an order (a) preventing their further disclosure or use in any way except for the sole purpose of defending this lawsuit in this Court, and (b) requiring that upon the end of this litigation, Nelson will immediately return all the materials to Amazon, and all other defendants will immediately destroy all copies of the materials in their possession and certify that they have done so.

**COUNT VII**
**Unjust Enrichment and Constructive Trust**

530.     Plaintiffs incorporate all preceding paragraphs by reference.

531.     This count is against all Defendants.

532.     Under Virginia law, there is "a three-part test to govern unjust enrichment claims: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value." *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 650 (Va. 2020). The existence of a contract does not bar a claim for unjust enrichment "where the benefit received was outside the scope of the contract." *Id.* at 648 (quotation marks omitted); *see also, e.g., id.* (the "existence of contract d[oes] not bar [a] claim for unjust enrichment based on allegation that fees charged were illegal"). A claim of unjust enrichment "is recognized as equitable," and "a constructive trust . . . is a tool of equity to prevent unjust enrichment." *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 497–98 (4th Cir. 1999) (quotation marks omitted); *see also Cooper v. Cooper*, 457 S.E.2d 88, 92 (Va. 1995) ("A constructive trust is appropriately imposed to avoid unjust enrichment of a party.").

533.     In the alternative for Nelson and Kirschner, under Washington law a "claim of unjust enrichment requires proof of three elements—(1) the defendant receives a benefit, (2) the received benefit is at the plaintiff's expense, and (3) the circumstances make it unjust for the defendant to retain the benefit without payment." *Norcon Builders, LLC v. GMP Homes VG, LLC*, 254 P.3d 835, 844 (Wash. Ct. App. 2011) (quotation marks omitted). Further, "[a] constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Baker v. Leonard*, 843 P.2d 1050, 1055 (Wash. 1993) (en banc).

534.     Plaintiffs conferred a benefit on the Defendants with respect to the Lease Transactions. First, Defendants received millions in unjustified payments (Watson and the

102

Northstar Defendants) or kickbacks (Nelson and Kirschner) because Plaintiffs were induced to enter into the lease agreements.  Second, by agreeing to the leases, Amazon made it possible for Northstar to seek funding from other sources, such as lenders and investors.  Because Northstar would not have secured this funding without Amazon as tenant, Amazon's actions were a necessary and proximate cause of Northstar's gains.

535.    The Defendants had actual knowledge of these benefits.

536.    Defendant Watson's signature appears on each of the contracts that served as vehicles or catalysts for the receipt of the benefits.  *See, e.g.*, Dkts. 158-1 to 159-3.

537.    Defendants Watson and Northstar intentionally wired millions of dollars of these benefits to Defendant Villanova Trust, Dkt. 156-1, which subsequently disbursed some or all of these benefits to Nelson, Casey Kirschner, Christian Kirschner, and Atherton.

538.    Further, Amazon uncovered files in the recycle bin of Kirschner's Amazon-issued computer establishing his and his co-conspirators' knowledge of the benefits conferred, including a spreadsheet documenting anticipated prohibited payments to the Defendants.  The spreadsheet and the 2018 Kickback Agreement tie these prohibited payments to certain improper or overstated fees which increased the rent payable by Amazon under the Lease Transaction portion of the RICO Enterprise.  Dkt. 155-10; Dkt. 57 ¶ 2; Dkt. 44 ¶ 15–16.  The Defendants should have expected to repay Plaintiffs for the benefits received in unjustified payments or kickbacks because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits, as shown by the fact that they intentionally obtained—and intentionally concealed—the benefits through their knowingly illegal and fraudulent Lease Transaction portion of the RICO Enterprise.

539.    The Defendants both accepted and retained these benefits without paying for their value.  To date, the Defendants have refused to return a penny of the benefits Plaintiffs conferred on them.  This renders receipt of the benefits unjust.

540.    Had Plaintiffs been aware that Nelson and Kirschner would receive kickbacks, Amazon would never have entered into any of the Lease Transactions.

541.     Plaintiffs also conferred a benefit on the Defendants by paying to White Peaks Capital and NOVA PWC a figure approximately $17,700,000 in excess of the fair market value of the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise—$5,000,000 of which Watson subsequently obtained from the White Peaks Capital and NOVA WPC operators in an undisclosed October 2019 settlement, Lorman Decl. ¶ 13, and $1,000,000 of which Nelson and/or Kirschner and/or Atherton subsequently obtained from these operators using a bank account associated with E2M Properties, LLC as a fraudulent pass-through.

542.     The Defendants had actual knowledge of these benefits Plaintiffs conferred on them.   White Peaks Capital and NOVA PWC had actual knowledge of the approximately $17,700,000 benefit because they were parties to the original transaction with 41992 John Mosby Highway LLC, Dkts. 161-10 to -12 (stating a $98,670,000.00 Purchase Price) and the same-day, inflated transaction with Plaintiffs, Dkts. 160-7 to -10 (stating a $116,389,000 Purchase Price). Watson and WDC Holdings had actual knowledge of this approximately $17,700,000 benefit, Lorman Decl. ¶ 9, and also had actual knowledge of the $5,000,000 benefit because they knowingly obtained it after an undisclosed settlement with the White Peaks Capital and NOVA PWC operators, *id.* ¶ 13.   Nelson and Kirschner had actual knowledge of this approximately $17,700,000 benefit and also had actual knowledge of the $1,000,000 benefit because they successfully persuaded one or both of the White Peaks Defendants to wire the $1,000,000 to a bank account associated with E2M Properties, LLC from which Nelson, Kirschner, and/or Atherton could and did obtain the monies.   The Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits, as shown by the fact that they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct. The Defendants thus received these benefits at Amazon's expense.

543.     The Defendants both accepted and retained these benefits without paying for their value.  To date, the Defendants have not returned any of the benefits Plaintiffs conferred on them. This renders the Defendants' receipt of these benefits unjust.

544.     Plaintiffs also conferred a benefit on the Defendants by paying to Blueridge Group $10,000,000 more than the previously-agreed purchase price for the real property in Loudoun County, Virginia, subject to the Direct Purchase portion of the RICO Enterprise, approximately $4,800,000 of which Atherton arranged to be transferred in due course to Nelson's Finbrit entity for his own benefit and the benefit ofNelson and Kirschner.

545.     The Defendants had actual knowledge of these benefits Plaintiffs conferred on them.

546.     Nelson and Kirschner had actual knowledge of the $10,000,000 benefit because Nelson identified the land at issue in the Blueridge Transaction for the express purpose of benefitting from the transaction and Kirschner facilitated the transaction, including the insertion of Blueridge Group into the deal to serve as a conduit for the illegally gained profits.

547.     Nelson, Kirschner, and Atherton also had actual knowledge of the approximately $4,800,000 they knowingly obtained personally through a "Finder's Fee Agreement" that Atherton negotiated between the Blueridge Group and Finbrit.

548.     The Defendants should have expected to repay the Plaintiffs for these benefits because they had actual knowledge that Plaintiffs did not intend for them to receive the benefits, as shown by the fact that they intentionally obtained—and concealed—the benefits through their knowingly illegal and fraudulent Direct Purchase conduct.  The Defendants thus received these benefits at Amazon's expense.

549.     The Defendants both accepted and retained these benefits without paying for their value.  To date, the Defendants have not returned any of the benefits Plaintiffs conferred on them. This renders the Defendants' receipt of these benefits unjust.

550.     But for the misconduct of the Defendants, Amazon would have entered into purchase agreements at lower prices.

551.     Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in Dkts. 156-4, 159-9, 161-3, 161-4, 161-5; additional accounts and assets of the Defendants identified during discovery or the ongoing internal and parallel criminal investigations that contain a portion of the benefits; and other assets identified during discovery or the ongoing investigations that the Defendants' obtained by using the benefits Amazon conferred on them.  To the extent the Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to equitable liens on those assets or intermingled accounts.  Plaintiffs also request disgorgement of any profits that the Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.

## COUNT VIII
## Conversion and Constructive Trust

552.     Plaintiffs incorporate all preceding paragraphs by reference.

553.     This count is against all Defendants.

554.     "Under Virginia law, conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith."  *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 517–18 (E.D. Va. 2001) (quotation marks and footnote omitted), *aff'd*, 63 F. App'x 630 (4th Cir. 2003). "It is well-settled that money . . . may be converted."  *Id.* at 518 n. 25; *see also, e.g.*, *PGI, Inc. v. Rathe Prods., Inc.*, 576 S.E.2d 438, 443 (Va. 2003).  Further, "[a] conversion may be committed by intentionally . . . dispossessing another of a chattel," Restatement (Second) of Torts § 223(a) (1965), which can occur by intentionally "obtaining possession of a chattel from another by fraud or duress," *id.* § 221.  *See also id.* § 221 cmt. b ("One who by fraudulent representations induces another to surrender the possession of a chattel to him has dispossessed the other of the chattel [and] taking possession of the chattel given under such

106

circumstances is ineffectual to constitute a consent to the taking."). In addition, "[o]ne receiving chattel from a third person with intent to acquire a proprietary interest in it is liable without a demand for its return by the person entitled to possession . . . . The mere receipt of the possession of the goods under such circumstances is conversion." *Smith*, 144 F. Supp. 2d at 519 n.27 (quotation marks omitted).

555.   In the alternative for Nelson and Kirschner, under Washington law "[c]onversion . . . occurs when a person intentionally interferes with chattel belonging to another, either by taking or unlawfully retaining it, thereby depriving the rightful owner of possession." *Alhadeff v. Meridian on Bainbridge Island, LLC*, 220 P.3d 1214, 1223 (Wash. 2009) (en banc). Further, "[m]oney may be the subject of conversion if the defendant wrongfully received it." *Id.*

556.   The Defendants wrongfully exercised authority over the millions of dollars they obtained from Plaintiffs by inducing Plaintiffs to pay them and/or their affiliates these monies in the form of undisclosed costs and fees on the nine Lease Transactions detailed herein that they procured by reason of their fraudulent conduct.

557.   Plaintiffs had and continue to have a right to immediate possession of this money, which the Defendants have deprived them of exercising.

558.   White Peaks Capital and NOVA WPC induced Plaintiffs to purchase the Virginia property site subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by $17,730,000. From that corpus, Defendants Watson and WDC Holdings converted $5,000,000 by executing with the White Peaks Capital and NOVA WPC operators the undisclosed October 2019 settlement, and Nelson and Kirschner converted $1,000,000 of the inflated price.

559.   Plaintiffs had and continue to have a right to immediate possession of this money, which the Defendants have deprived them from exercising.

560.   Similarly, Kirschner induced Plaintiffs to purchase the Blueridge Property subject to the Direct Purchase portion of the RICO Enterprise at a price fraudulently inflated by

$10,000,000.   From that corpus, Nelson and Kirschner converted approximately $4,800,000, which they and Atherton split equally.

561.     Plaintiffs had and continue to have a right to immediate possession of this money, which the Defendants have deprived them from exercising.

562.     Plaintiffs request remedies, including, but not limited to, the imposition of a constructive trust over: the accounts and assets identified in Dkts. 156-4, 159-9, 161-3, 161-4, 161-5; additional accounts and assets of the Defendants identified during discovery or the ongoing internal and parallel criminal investigations that contain a portion of the converted property; and other assets identified during discovery or the investigations that the Defendants' obtained by using the converted property.   To the extent the Defendants have intermingled these assets or otherwise made a trust impracticable, Plaintiffs are entitled to equitable liens on those assets or intermingled accounts.   Plaintiffs also request disgorgement of any profits that the Defendants have received through their use of funds in which the Plaintiffs hold an equitable interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

Enter preliminary and permanent injunctive relief against the   Defendants and their officers, directors, principals, agents, servants, employees, successors, and assigns, and as well as all persons and entities in active concert or participation with them:

i.     enjoining any interference with Plaintiffs' ongoing transactions or relationships at the Lease Transaction or White Peaks sites or other sites in this District or elsewhere;

ii.     enjoining the unauthorized use or retention of confidential information, including means proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets, including but not limited to: business and financial information; Amazon techniques, technology, practices, operations, and methods of conducting business; information technology systems and operations;

algorithms, software, and other computer code; published and unpublished know-how, whether patented or unpatented; information concerning the identities of Amazon's business partners and clients or potential business partners and clients, including names, addresses, and contact information; customer information, including prices paid, buying history and habits, needs, and the methods of fulfilling those needs; supplier names, addresses, and pricing; and Amazon pricing policies, marketing strategies, research projects or developments, products, legal affairs, and future plans relating to any aspect of Amazon's present or anticipated businesses;

iii.　　enjoining any and all of the activity alleged herein, any acts causing any of the injury complained of, and any acts assisting, aiding or abetting any other person or business entity in engaging in or performing any of the activity complained of herein or from causing any of the injury complained of herein;

iv.　　enjoining Defendants from using or controlling or in any way disposing, transferring, concealing, wasting or spoliating any evidence, assets, or instrumentalities of the RICO Enterprise as well as any other unlawful activity alleged or addressed herein, including the specific assets listed in Dkts. 156-4, 159-9, 161-3, 161-4, 161-5;

v.　　ordering Defendants to divest themselves of any interest, direct or indirect, of any interest connected to the RICO Enterprise;

vi.　　prohibiting the Defendants from engaging in future conduct similar to that the RICO Enterprise engaged in;

vii.　　ordering the dissolution or reorganization of all trusts, LLCs, and other enterprises established in furtherance of the RICO Enterprise; and

viii.　　otherwise ordering the protection of any assets in which Amazon has an equitable interest.

563.　　Impose a constructive trust on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein.

564.　　Impose an equitable lien on the assets and instrumentalities of the unlawful enterprise and other misconduct alleged or asserted herein.

565.　　Enter judgment on all counts herein in favor of Amazon and against the Defendants.

566.　　Declare that Defendants' conduct has been willful and that Defendants have acted with fraud, malice and oppression.

567.　　Enter a permanent injunction enjoining Defendants, their assignees, and anyone else acting in concert with them from profiting from or otherwise monetizing their relationship with Amazon or any of the projects or properties described herein, including by marketing or

otherwise leveraging the existence of a relationship with Amazon to promote future business activities.

568.    Enter injunctive relief as necessary to ensure the protection of Amazon's confidential and propriety information.

569.    Enter judgment awarding Amazon actual damages from Defendants of at least the amounts identified in the Preliminary Injunction entered by this Court on June 5, 2020 (Dkt. 57) and further damages adequate to compensate Amazon for injuries sustained as a cause of the Defendants' criminal enterprise as alleged herein, including but not limited to interest and costs, in an amount to be proven at trial.

570.    Enter judgment disgorging the Defendants' profits and other ill-gotten gains.

571.    Enter judgment awarding statutory treble damages as well as other enhanced, exemplary, and/or special damages, in amounts to be proven at trial.

572.    Enter judgment awarding punitive damages.

573.    Enter judgment awarding all reasonable attorneys' fees and costs.

574.    Grant Amazon any and all other relief that the Court deems just and proper.

Dated:  April [___], 2022                   Respectfully submitted,

                                            /s/ *Michael R. Dziuban*

Veronica S. Moyé (*pro hac vice*)           Elizabeth P. Papez (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP                 Patrick F. Stokes (*pro hac vice*)
2001 Ross Avenue, Suite 2100                Claudia M. Barrett (*pro hac vice*)
Dallas, TX 75201                            David W. Casazza (*pro hac vice*)
Telephone:  (214) 698-3100                  Michael R. Dziuban (Va. State Bar No. 89136)
Facsimile:  (214) 571-2900                  GIBSON, DUNN & CRUTCHER LLP
vmoye@gibsondunn.com                        1050 Connecticut Avenue, N.W.
                                            Washington, D.C. 20036-5306
                                            Telephone:  (202) 955-8500
                                            Facsimile:  (202) 467-0539
                                            epapez@gibsondunn.com
                                            pstokes@gibsondunn.com
                                            cbarrett@gibsondunn.com
                                            mdziuban@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2022, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system.  I will then send the document and a notification of such filing

(NEF) to the following parties via U.S. mail to their last-known address and by email, where noted:


Casey Kirschner
635 N. Alvarado Lane
Plymouth, MN 55447
By email: casey.kirschner@gmail.com


*s/ Michael R. Dziuban*
Michael R. Dziuban
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
mdziuban@gibsondunn.com