# EXHIBIT L

*Amazon.com Inc*

*v.*

*WDC Holdings LLC*

---

Timothy Lorman

March 11, 2022

---



**AB Litigation**
SERVICES

**216 16th Street, Suite 600**
**Denver, CO 80202**
**303-296-0017**

EXHIBIT L

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

Case No. 1:20-cv-484-RDA-TCB

- - - - - - - - - - - - - - - - - - - - - - - - - - -

VIDEO DEPOSITION OF TIMOTHY LORMAN

March 11, 2022

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiffs:

AMAZON.COM, INC. and AMAZON DATA SERVICES, INC.,

v.

Defendants:

WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS,

et al.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

Intervening Interpleader Plaintiff/Intervening

Interpleader Counter-Defendant:

800 HOYT LLC,

v.

Interpleader Defendants:

BRIAN WATSON, WDC HOLDINGS, LLC, and BW HOLDINGS,

LLC.

Interpleader Defendants/Interpleader

Counter-Plaintiffs:

AMAZON.COM, INC. and AMAZON DATA SERVICES, INC.

- - - - - - - - - - - - - - - - - - - - - - - - - - -

**Page 2**

```
 1   APPEARANCES
 2       GIBSON, DUNN & CRUTCHER LLP
             By Todd W. Shaw, Esq.
 3           By Alyse Ullery, Esq.
             By Claudia M. Barrett, Esq. (via Zoom)
 4           1050 Connecticut Avenue, N.W.
             Washington, D.C. 20036-5306
 5               Appearing on behalf of Amazon.com,
                 Inc. and Amazon Data Services, Inc.
 6
         BURR & FORMAN LLP
 7           By Adam Smart, Esq.  (via Zoom)
             222 Second Avenue South
 8           Suite 2000
             Nashville, Tennessee 37201
 9               Appearing on behalf of Carleton
                 Nelson and Cheshire Ventures
10
         BROWNSTEIN HYATT FARBER SCHRECK, LLP
11           By Stanley L. Garnett, Esq.
             By Neil Sandhu, Esq.
12           By Sara R. Bodner, Esq. (via Zoom)
             410 17th Street
13           Suite 2200
             Denver, Colorado 80202
14               Appearing on behalf of WDC Holdings
                 LLC, Brian Watson, Sterling NCP FF,
15               LLC, Manassas NCP FF, LLC, NSIPI
                 Administrative Manager, and BW
16               Holdings, LLC.
17   Also Present:
18       Casey Kirschner (via Zoom)
         Carleton Nelson (via Zoom)
19       Brian Watson
         Maryvonne Tompkins, Videographer
20
21
22
23
24
25
```

**Page 3**

```
 1           Pursuant to Subpoena and the Federal
 2   Rules of Civil Procedure, the video deposition of
 3   TIMOTHY LORMAN, called by WDC Holdings LLC, Brian
 4   Watson, Sterling NCP FF, LLC, Manassas NCP FF, LLC,
 5   NSIPI Administrative Manager, and BW Holdings, LLC,
 6   was taken on Friday, March 11, 2022, commencing at
 7   9:11 a.m., at 410 17th Street, Suite 2200, Denver,
 8   Colorado, before Sandra L. Bray, Registered Diplomate
 9   Reporter, Certified Realtime Reporter, and Notary
10   Public within Colorado.
11
12                   I N D E X
13   EXAMINATION OF TIMOTHY LORMAN
14   EXAMINATION BY:                           PAGE
15       Mr. Garnett                        8, 251
16       Mr. Smart                        152, 263
17       Ms. Ullery                            181
18
19
         EXHIBITS                  INITIAL REFERENCE
20
     Exhibit 1      Independent Contractor        91
21                  Agreement, Northstar
                    Development, LLC with
22                  "Business Development
                    Associate," 1/8/18
23
     Exhibit 2      Northstar Commercial          93
24                  Partners Response To:
                    Amazon Web Services, Inc.
25                  North Virginia RFP, 9/20/17
```

**Page 4**

```
 1   Exhibit 3      Purchase Agreement            98
 2   Exhibit 4      Email to Lorman from          98
                    Ramstetter, 3/4/2020, Subject:
 3                  FW:  Referral and attached
                    emails
 4
 5   Exhibit 5      Email to Lorman from Huckel,  99
                    3/5/20, Subject:  RE:
 6                  Additional Files - 1, and
                    attached emails
 7   Exhibit 6      Email to Huckel from Lorman,  99
                    3/25/2020, Subject:  Update
 8
     Exhibit 7      Declaration of Timothy Lorman 100
 9                  In Support of Plaintiffs'
                    Supplemental Memorandum in
10                  Support of Show Cause Order
                    and Plaintiffs' Application
11                  for Preliminary Injunction
12   Exhibit 8      Citywide Banks Outgoing Wire -101
                    Advice of Debit 6/7/19
13
     Exhibit 9      Spreadsheet, Source:  Splits  102
14                  Worksheet provided by Kyle
15   Exhibit 10     Citywide Banks Outgoing Wire -103
                    Advice of Debit 8/7/19
16
     Exhibit 11     Deed of Lease, IAD175         104
17
     Exhibit 12     Exhibit 9,  Transcript of     104
18                  Northstar Recording:
                    September 27, 2019
19
     Exhibit 13     Northstar Commercial           --
20                  Partners' Response to:
                    Amazon Web Services, Inc.
21                  North Virginia RFP, 9/20/17
22
23
24
25
```

EXHIBIT L

Timothy Lorman  - 03/11/2022                                    1–4

Page 5

1  Exhibit 14   Declaration of Timothy Lorman        128
            In Support of Plaintiffs'
2           Supplemental Memorandum in
            Support of Show Cause Order
3           and Plaintiffs' Application
            for Preliminary Injunction,
4           Signed

5  Exhibit 15   Declaration of Luke Gilpin          --
            In Support of Plaintiffs'
6           Supplemental Memorandum in
            Support of Show Cause Order
7           and Plaintiffs' Application
            for Preliminary Injunction
8
   Exhibit 16   Email to Lorman from               186
9           Ramstetter, 3/5/2020, Subject:
            FW:  Sterling Analysis, and
10          attached emails

11 Exhibit 17   Email to Lorman and Christian      202
            Kirschner from Watson, 11/25/19,
12          Subject:  Re:  Discussion and
            attached emails
13
   Exhibit 18   Email to Watson from Gray,         207
14          12/6/19, Subject:  RE:  Call
            Times?, and attached emails
15
   Exhibit 19   Email to Lorman from Gray,         210
16          3/16/2020, Subject:  FW:  Final
            Manassas Payment, and attached
17          emails

18 Exhibit 20   Email to Watson, et al. from       216
            Gray, 2/3/2020, Subject:  RE:
19          Voice Message Attached from
            7202492240 - Brian Watson
20
   Exhibit 21   Exhibit 14, Citywide Banks         224
21          Outgoing Wire - Advice of
            Debit, 8/7/19
22
   Exhibit 22   Exhibit 7, Source:  Splits         226
23          Worksheet provided by Kyle

24 Exhibit 23   Email to Watson from Lorman,       244
            2/14/2020, and attached emails
25

Page 6

1       WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of Civil
3  Procedure.
4       *       *       *       *       *
5       (At this time Mr. Casey Kirschner was
6  not present.)
7       THE VIDEOGRAPHER:  The time is 9:11.  We
8  are on the record.  Today is March 11th, 2022.  This
9  begins the recorded deposition of Timothy Lorman in
10 the matter of Amazon.com and Amazon Data Services,
11 Inc. versus WDC Holdings, LLC, et al.  This deposition
12 is being held at 410 17th Street, Suite 2200 in
13 Denver, Colorado.
14      The court reporter is Sandra Bray.  The
15 videographer is Maryvonne Tompkins.
16      The attorneys will introduce themselves,
17 starting with the Plaintiff, please.
18      MS. ULLERY:  Hi, Alyse Ullery,
19 representing Amazon.
20      MR. SHAW:  This is Todd Shaw,
21 representing the Plaintiffs, Amazon.
22      MR. GARNETT:  Good morning, Mr. Lorman.
23 My name is Stan Garnett, and with me is Neil Sandhu;
24 and we represent Brian Watson and Northstar and the
25 Watson Defendants.  Nice to meet you.

Page 7

1       THE DEPONENT:  Nice to meet you, too.
2       MR. GARNETT:  Adam?
3       MR. SMART:  Good morning.  My name is
4  Adam Smart.  I'm with Burr & Forman, and I represent
5  Carleton Nelson and Cheshire Ventures.
6       MR. GARNETT:  And I believe Claudia
7  Barrett is with us.
8       MS. BARRETT:  Yes.  Good morning.
9  Claudia Barrett from Gibson Dunn & Crutcher
10 representing (inaudible).
11      MR. GARNETT:  Great.  And --
12      MS. BARRETT:  Can you hear me now?
13      MR. GARNETT:  We can, yes.  Thank you.
14      MS. BARRETT:  Claudia Barrett,
15 representing Amazon plaintiffs.
16      MR. GARNETT:  Let me just make sure.  Is
17 there anybody else listening in either with my firm or
18 elsewhere that we need to indicate that you're on the
19 line?
20      MR. SMART:  Casey Kirschner is on.
21      MR. GARNETT:  Okay.  Thank you,
22 Mr. Kirschner.  Adam, is your client on?
23      Sorry.  Couldn't hear you.
24      MR. SMART:  Yes, he is.  Carl Nelson is
25 listening in as well.

Page 8

1       MR. GARNETT:  Great.  And I believe Sara
2  Bodner from Brownstein is on.  Is that right,
3  Ms. Bodner?  I've seen her show up.
4       Good.  All right.  Is there anybody that
5  we've missed?
6       All right.  Swear the witness.
7       TIMOTHY LORMAN,
8  having been first duly sworn or affirmed, was examined
9  and testified as follows:
10              EXAMINATION
11 BY MR. GARNETT:
12      Q.   Good morning, Mr. Lorman.
13      A.   Good morning.
14      Q.   My name is Stan Garnett, and I represent
15 Brian Watson and the Northstar defendants in this
16 case.  It's nice to meet you.  You and I have talked
17 on the phone, I think, a couple of times; is that
18 right?
19      A.   Yes, we have.
20      Q.   And emailed a little bit about setting
21 up the logistics for either a conversation or for this
22 deposition, right?
23      A.   Correct.
24      Q.   First of all, just so we're clear,
25 you're appearing this morning under a subpoena that

EXHIBIT L

*Timothy Lorman  - 03/11/2022*                                5–8

---

**Page 9**

1  was issued that you received service for; is that
2  right?
3      A.  That is correct.
4      Q.  Okay.  Mr. Lorman, have you ever had
5  your deposition taken before?
6      A.  No.
7      Q.  Okay.  What have you done to prepare for
8  your deposition?
9      A.  The only thing that I did is I met with
10 an attorney, who I don't have under representation,
11 just to ask him what the process was for a
12 deposition --
13     Q.  Okay.
14     A.  -- what I should be aware of and the
15 mechanics of a deposition.
16     Q.  Great.  And how recent was that meeting?
17     A.  Two, three weeks ago.
18     Q.  And who was that lawyer?
19     A.  I don't recall his name.  It was -- I'd
20 have to look it up and see.
21     Q.  Okay.  And I'm not -- obviously, I don't
22 want to know what you guys discussed, but you're
23 saying that as you sit here today you don't remember
24 the name of the lawyer you met with a couple weeks
25 ago; is that right?

---

**Page 10**

1      A.  His name was Brian something.  I don't
2  recall.
3      Q.  Okay.  Do you know what firm he was at?
4      A.  Yeah, it was a Jester over in the 199
5  building, Jester something.
6      Q.  Great.  Is this a lawyer that you've
7  worked with before?
8      A.  I talked to him before I spoke with the
9  FBI in this matter.
10     Q.  And has he -- did he represent you at
11 that stage?
12     A.  No, he did not.
13     Q.  But you just consulted with him from --
14     A.  Just consulted.
15     Q.  Let me talk a little bit about -- and
16 this Brian fellow may have told you this, but let me
17 talk a little bit about the ground rules for the
18 deposition.
19     A.  Okay.
20     Q.  First of all, we have under the rules
21 seven hours.  I don't anticipate it's going to take
22 that long, but you never know.  As you know, there's a
23 lot of lawyers with their fingers in this pie.
24         I'll be questioning you initially.
25     A.  Okay.

---

**Page 11**

1      Q.  After that, either counsel for the
2  Plaintiffs or counsel for other Defendants may have
3  questions, and then I'll probably have some questions
4  at the end as well.
5      A.  Okay.
6      Q.  Does that make sense?
7      A.  It does.
8      Q.  One of the things to watch for is --
9  you're obviously a bright guy and you're obviously
10 able to figure out what I'm going to ask you before I
11 finish asking it, and a lot of times I can figure out
12 what you're going to say before you finish saying it.
13 Unlike in a conversation where you can kind of talk
14 over each other, because our court reporter is writing
15 everything down, you and I need to discipline
16 ourselves to make sure that you don't answer a
17 question until I finish asking it and I don't ask the
18 next question until you're finished.  Does that make
19 sense?
20     A.  Yes.
21     Q.  Okay.  Now, another thing to watch for
22 is that even though you're on video here, the most
23 important thing that we have is the transcript that is
24 being taken of what you and I and the other lawyers
25 say, and it's very important that you answer questions

---

**Page 12**

1  orally.  In other words, if I ask you a question that
2  you use words to answer, don't just go uh-huh or nod
3  your head or that kind of thing because that can be
4  confusing in the future.  Does that make sense?
5      A.  Yes.
6      Q.  And then finally, as you've probably
7  gathered, I've been doing this a while, for better or
8  worse, and I've never taken a deposition in 40 years
9  where I didn't ask a few completely confusing
10 questions because I'm kind of thinking as I go.  And
11 please know that if you answer a question, I'm going
12 to assume that you understood what I was asking, and
13 if you don't understand what I'm asking, don't be shy
14 about saying, "I don't understand the question.  Can
15 you clarify?"  All right?
16     A.  Okay.
17     Q.  Great.  So, now, Mr. Lorman, there's two
18 lawyers from Gibson Dunn here today.  Have you ever
19 met these two folks before?
20     A.  By meet, do you mean face to face or had
21 any interaction with?
22     Q.  Well, we're going to break it down.
23 Have you ever met these two folks?
24     A.  I don't recall meeting them, no.
25     Q.  Have you ever had any interaction with

---

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    9–12

ACE Litigation Services

Page 13

1   them?
2        A.   Not that I know of.
3        Q.   You have had some interaction with
4   Gibson Dunn lawyers, though?
5        A.   I have.
6        Q.   Who did you interact with?
7        A.   Patrick Stokes and one other woman.  I
8   think her name was Lora MacDonald or McDowell or
9   something like that.
10       Q.   And that interaction, was it over the
11  phone?
12       A.   Yes.
13       Q.   Have you ever met with them?
14       A.   Face to face?
15       Q.   Uh-huh.
16       A.   No.
17       Q.   And it's my understanding -- we'll go
18  through some documents in a bit.  It's my
19  understanding that they actually prepared an affidavit
20  or a declaration for you at one point.  Is that right?
21       A.   Yes.
22       Q.   And how was that preparation handled?
23  Did they email it to you?  Did they -- how did that
24  declaration come to be?
25       A.   I believe that we had a phone

Page 14

1   conversation, and then they emailed me a draft.
2        Q.   Okay.  All right.  Another name that's
3   come up in some of the other depositions is a fellow
4   named Huckel, an agent named Huckel, who works with
5   the FBI.  Do you know who that is?
6        A.   I do.
7        Q.   Have you ever had a conversation with
8   him?
9        A.   Yes, I have.
10       Q.   How many conversations have you had with
11  Mr. Huckel?
12       A.   More than three.
13       Q.   Okay.  Have you ever met with him in
14  person?
15       A.   I did.
16       Q.   Where did you meet with him in person?
17       A.   I met with him here in Denver.
18       Q.   Okay.  And have you ever traveled
19  anywhere to meet with him?
20       A.   No.
21       Q.   How many times have you met with him
22  face to face?
23       A.   Once.
24       Q.   Okay.  And we'll get into it in more
25  detail, but I'm trying to put together the timeline

Page 15

1   here.
2        A.   Sure.
3        Q.   Roughly when did you meet with him?
4        A.   I'm going to say it was approximately
5   February of 2020.
6        Q.   Okay.  And again, one other thing I
7   forgot to mention -- and hopefully it's clear -- this
8   is not intended to be an endurance contest.  If you
9   get tired or want to take a break or go to the
10  bathroom or get a glass of water, just let us know,
11  and as long as there's not a question pending, we're
12  happy to make sure you get to do that.  Does that make
13  sense?
14       A.   Yes.
15       Q.   Okay.  So you met with Mr. Huckel.  He
16  came to Denver, you think, maybe in February of 2020?
17       A.   Right.  Yes.
18       Q.   Great.  And had you talked with him on
19  the phone before that?
20       A.   Yes.
21       Q.   Okay.  How many times do you think you'd
22  talked to him before that?
23       A.   Two or three times.
24       Q.   Okay.  And have you ever had a
25  conversation with him since that meeting?

Page 16

1        A.   I believe we spoke by phone subsequent
2   to that meeting.
3        Q.   Okay.  Once, a few times?
4        A.   Two or three times.
5        Q.   When was the last time you spoke with
6   this Huckel guy?
7        A.   I don't recall.  If I were to guess, it
8   was probably April or February -- April or May of that
9   same year.
10       Q.   Of 2020?
11       A.   Yeah.
12       Q.   All righty.  And have you ever talked
13  with anybody else with the FBI?
14       A.   Yes.
15       Q.   Who else?
16       A.   I talked with two agents on another
17  matter not related to this matter.  There was a wire
18  fraud transfer issue that we wrestled with, and I
19  spoke to one or two agents regarding that matter.
20       Q.   And if I understand right, that was a
21  matter that also had a connection with Northstar; is
22  that right?
23       A.   Correct.
24       Q.   Can you explain to me -- I'm not sure I
25  fully understand what that was all about.  What's

EXHIBIT L
Timothy Lorman  - 03/11/2022
13–16

Page 17

```
1    that?
2         A.   We had to make a wire transfer payment
3    to a contractor.  There was an issue of fraud, and
4    that wire transfer got intercepted and misappropriated
5    to some unknown third party.
6         Q.   Okay.  Now, in terms of kind of
7    timeline, my understanding is you worked at Northstar
8    roughly from May of 2019 till April of 2020.  Is that
9    about right?
10        A.   That's not correct.
11        Q.   Okay.  What are those years?
12        A.   So it's actually March -- I'm going to
13   say March 20th of '19 until April 4th or 5.
14        Q.   So I was off by a couple months?
15        A.   Sure.
16        Q.   And when did this wire fraud situation
17   happen?
18        A.   As I recall, it was around November or
19   December of '19.
20        Q.   And how much money was involved in that?
21        A.   I believe it was approximately
22   $3 million.
23        Q.   Okay.  And so you guys -- did
24   somebody -- somebody from Northstar contact the FBI
25   about that?
```

Page 18

```
1         A.   Yes.
2         Q.   Who?
3         A.   I think it was me.
4         Q.   Okay.  And what happened after you
5    contacted them?
6         A.   An investigation started, and I didn't
7    really have any subsequent information.  It was
8    difficult to contact the FBI for follow-up.  They
9    didn't have any information to provide to us, and I
10   really didn't have any other contact with them
11   subsequent to that.
12        Q.   You don't remember the name of those two
13   FBI agents?
14        A.   I do not.
15        Q.   And was your conversation with them in
16   person or was it over the phone?
17             MS. ULLERY:  Objection, compound.
18        A.   Over the phone.
19        Q.   (BY MR. GARNETT)  That's true; it was
20   compound.  Was it in person?
21        A.   It was not in person.
22        Q.   Was it over the phone?
23        A.   Yes.
24        Q.   All right.  Now, is that the only
25   time -- other than what we're going to chat about here
```

Page 19

```
1    involving this case, is that the only time you've ever
2    interacted with the FBI?
3         A.   In my entire life?
4         Q.   Uh-huh.
5         A.   To the best of my knowledge, yes.
6         Q.   And did Mr. Watson know that you'd
7    reached out to the FBI in that wire fraud situation?
8             MS. ULLERY:  Objection, speculative.
9         Q.   (BY MR. GARNETT)  You can answer.
10        A.   I believe so.
11        Q.   Did you tell him that you did?
12        A.   I believe so.
13        Q.   Or did he tell you to do that?
14        A.   I don't recall.
15        Q.   Okay.  Was that money ever recovered?
16   What happened with that?
17        A.   I don't know.
18        Q.   Okay.  So let me back up and ask you
19   some questions about your personal background,
20   Mr. Lorman.  How old are you?
21        A.   I am 57.
22        Q.   And where do you live?
23        A.   I live in Littleton, Colorado.
24        Q.   And what do you do for a living?
25        A.   I am the executive managing director of
```

Page 20

```
1    real estate for a company called Denver Real Estate
2    Group or DRG.
3         Q.   Let me make sure I understand your
4    background.  Where did you go to high school?
5         A.   Bishop Noll Institute in Hammond,
6    Indiana.
7         Q.   All right.  And when did you graduate?
8         A.   1982.
9         Q.   All right.  Do you have post high school
10   education?
11        A.   I do.
12        Q.   Tell me about that.
13        A.   I went to Ball State University for
14   undergrad.  I had graduate studies at University of
15   Wisconsin, and then I got graduate studies at
16   University of New Mexico.
17        Q.   Okay.  Did you get a degree at Ball
18   State?
19        A.   I did.
20        Q.   What was that degree in?
21        A.   Bachelor's of science.
22        Q.   In any particular --
23        A.   Architecture.
24        Q.   And when did you get that degree?
25        A.   1986.
```

EXHIBIT L
Timothy Lorman  - 03/11/2022

17-20

**Page 21**

1  Q.  Okay.  And then you talked about
2  graduate studies at the University of Wisconsin,
3  University of New Mexico.  Did you get a degree from
4  either of those institutions?
5  A.  I did not from University of Wisconsin.
6  I did from University of New Mexico.
7  Q.  Okay.  What did you study at the
8  University of Wisconsin?
9  A.  Recreation administration, education
10  administration.
11  Q.  And what did you study -- actually,
12  strike that.  How many -- you can't strike anything
13  anymore.  Let me just ask a better question,
14  hopefully.
15  A.  Sure.
16  Q.  How long did you study at the University
17  of Wisconsin?
18  A.  One year.
19  Q.  And then did you go right to the
20  University of New Mexico?
21  A.  I did not.
22  Q.  What did you do after the year at the
23  University of Wisconsin?
24  A.  I moved to Normal, Illinois, and I
25  worked at a ski shop, scuba shop, backpacking shop.

**Page 22**

1  Q.  There's a ski shop in Normal, Illinois?
2  A.  Yeah, back in the day.
3  Q.  Okay.  And how long did you work there?
4  A.  Two years.
5  Q.  What were you doing, sales?
6  A.  Yes.
7  Q.  Okay.  And then after that, what did you
8  do?
9  A.  Then I went to graduate school at
10  University of New Mexico.
11  Q.  Okay.  And how long did that last?
12  A.  Two years.
13  Q.  And what degree did you get there?
14  A.  Master's degree and Ph.D.
15  Q.  Okay.  In what areas?
16  A.  Education administration.
17  Q.  Okay.  In both, both the master's and
18  the Ph.D.?
19  A.  Correct.
20  Q.  And if I'm following the timeline
21  correctly, you probably would have gotten those
22  degrees about 1990.  Is that about right?
23  A.  '92 and '93.
24  Q.  Okay.  What did you do for work after
25  you got those degrees?

**Page 23**

1  A.  I worked at Fort Lewis College.
2  Q.  Doing what?
3  A.  I was director of student activities.
4  Q.  And that's in Durango, right?
5  A.  Correct.
6  Q.  How long did you do that?
7  A.  Three years.
8  Q.  All right.  What did you do after that?
9  A.  I worked -- I bought a bicycle store in
10  La Crosse, Wisconsin.
11  Q.  Okay.  And did you go back and actually
12  run the store or did you just buy it?
13  A.  I did.
14  Q.  How long did you work at that bicycle
15  store?
16  A.  Three years.
17  Q.  And were you kind of
18  owner/manager/salesman, that kind of thing?
19  A.  Yes.
20  Q.  What did you do after that?
21  A.  Worked for an architecture firm called
22  Gensler.
23  Q.  Gensler has a Denver office, I believe?
24  A.  They do.
25  Q.  Where did you work for them?

**Page 24**

1  A.  I worked for them in Wisconsin, in
2  Chicago, and in Denver.
3  Q.  And were you actually practicing
4  architecture?
5  A.  No.
6  Q.  What were you doing there?
7  A.  So I was doing consulting, management
8  consulting.  Gensler had a software product for space
9  management, and I was doing sales and implementation
10  for the software.
11  Q.  Do you have any licenses anywhere, like
12  in architecture or anything like that?
13  A.  I do not.
14  Q.  Okay.  What did you do after working at
15  Gensler?
16  A.  I worked for a company called TIAA-CREF.
17  Q.  Okay.  And TIAA-CREF has an office in
18  Denver.
19  A.  They do.
20  Q.  Did you work here?
21  A.  Yes.
22  Q.  And what were you doing there?
23  A.  I was the director of space planning,
24  space strategy.
25  Q.  And by space, we're talking about office

EXHIBIT L
Timothy Lorman - 03/11/2022
21–24

Page 25

1    space, not rocketships?
2        A.    Correct.
3        Q.    How long did you have that job?
4        A.    Three years.
5        Q.    What did you do after that?
6        A.    After that, I worked for a company
7    called Serco, spelled S-e-r-c-o.
8        Q.    All right.  What did you do at Serco?
9        A.    I did management consulting.
10       Q.    All right.  How long were you there?
11       A.    Two years.
12       Q.    Was Serco based in Denver?
13       A.    They were not.  Their U.S. operations
14   are based in Reston, Virginia.
15       Q.    So did you go back to Reston when you
16   worked there?
17       A.    From time to time.
18       Q.    Were you based somewhere else but --
19       A.    I was based in Denver.
20       Q.    Okay.  And what did you do after working
21   at Serco?
22       A.    I worked for a company called Colliers
23   International.
24       Q.    Okay.  In Denver?
25       A.    Correct.

Page 26

1        Q.    Doing what?
2        A.    I was in consulting for real estate,
3    location analytics and workplace strategy.
4        Q.    Okay.  How long did you work for
5    Colliers?
6        A.    Two years.
7        Q.    Okay.  And I want to make sure I'm
8    keeping track of the time frame on this, although
9    it'll all be in the record.  This must get you to the
10   mid, early 2000s; is that about right?
11       A.    No, we're probably at -- after I left
12   Colliers was, I believe, 2015.
13       Q.    Okay.  Great.  What did you do after
14   leaving Colliers?
15       A.    Worked for a company called CBRE.
16       Q.    And what did you do there?
17       A.    I was an account director.
18       Q.    CBRE is also a real estate company,
19   isn't it?
20       A.    Correct.
21       Q.    What kind of -- what sector of real
22   estate are they in?
23       A.    They're in most different verticals.
24   They don't do residential, per se, except for large
25   multifamily, but primarily commercial real estate.

Page 27

1        Q.    Okay.  And in the various jobs that
2    you've described prior to CBRE, had you been involved
3    with commercial real estate anywhere?
4        A.    Yes.  I was involved with commercial
5    real estate through Gensler as far as helping
6    companies through location analytics understand which
7    properties would be best suited for acquisition.  At
8    TIAA-CREF, I was responsible for all their space
9    strategy, which really informed whether they were
10   going to be expanding space in locations, renewing
11   leases or canceling leases.  And then at Colliers and
12   CBRE, I was involved in managing real estate
13   portfolios.
14       Q.    Okay.  When did you leave working at
15   CBRE?
16       A.    Immediately prior to working for
17   Northstar.
18       Q.    Okay.  At any of the jobs that you've
19   gone through in the '80s and '90s, were you terminated
20   from those jobs?
21       A.    No.
22       Q.    Okay.  You left all of them voluntarily?
23       A.    Yes.
24       Q.    It's -- obviously, you stayed at most of
25   them just a couple years.

Page 28

1        A.    Correct.
2        Q.    Is there a particular reason for that?
3        A.    No.  It seemed that better opportunities
4    came along, so I took advantage of those.
5        Q.    When did you first meet Brian Watson?
6        A.    My interview for the position that I had
7    with Northstar.
8        Q.    Okay.  And let's talk about that.  How
9    did you find out about the possibility of working at
10   Northstar?
11       A.    I saw a posting on LinkedIn.
12       Q.    Okay.  And what -- do you remember what
13   was the position that was discussed on that posting?
14       A.    Chief operating officer.
15       Q.    Okay.  And did you respond to that
16   posting?
17       A.    I did.
18       Q.    Do you remember when that -- if you
19   started working there in March of 2019, do you
20   remember when that posting was?
21       A.    That I saw it was in early March of
22   2019.
23       Q.    So this happened pretty quickly?
24       A.    It was very quick.
25       Q.    All right.  So you responded to the

EXHIBIT L
Timothy Lorman  - 03/11/2022                          25–28

Page 29

1  posting?
2      A.  Uh-huh.
3      Q.  And you then had an interview, I take
4  it, with Mr. Watson; is that right?
5      A.  Correct.
6      Q.  Okay.  And then when did you get hired?
7      A.  About a week after my interview.
8      Q.  Okay.  Did you have more than one
9  interview at Northstar or did you just interview with
10 Mr. Watson?
11         MS. ULLERY:  Objection, compound.
12     Q.  (BY MR. GARNETT)  You can answer.
13     A.  Okay.  Sorry.  I wasn't sure.
14     Q.  That's fine.  Just so you know,
15 everybody makes objections.  We have a duty to do
16 that.  Unless somebody tells you not to answer, go
17 ahead and answer, but if you don't understand it, let
18 me know and I'll try to clarify.
19     A.  Could you repeat the question, please?
20     Q.  Sure.  Did you just have the one
21 interview with Northstar?
22     A.  I did not.
23     Q.  Who else did you interview with?
24     A.  So my first interview was by phone with
25 Brian.  My second interview was a group interview.  In

Page 30

1  was basically several interviews that day, and I met
2  with Brian and two other members of the firm; and then
3  I had a second interview with three or four other
4  members of the firm.
5      Q.  Okay.  And, Mr. Lorman, prior to going
6  to work at Northstar, had you ever had any involvement
7  with law enforcement?
8      A.  I have.
9      Q.  And tell me about that.
10     A.  So in 2006, I joined the Douglas County
11 Sheriff's Office as a civilian volunteer.  In 2015, I
12 went to a reserve academy to get a reserve commission
13 in the State of Colorado.  And from 2015 -- November
14 is when we graduated -- up until September of this
15 year, I was a reserve deputy with the Douglas County
16 Sheriff's Office.
17     Q.  Are you a reserve deputy anywhere else
18 or just with the Douglas County Sheriff?
19     A.  I'm not one anywhere at this point in
20 time.
21     Q.  Right.  Have you ever been a reserve
22 deputy anywhere other than the Douglas County
23 Sheriff's?
24     A.  No.
25     Q.  And I know sheriff's offices vary in

Page 31

1  Colorado, and there's 64 of them.  What did being a
2  reserve officer with Douglas County, what did that
3  mean?  What did you do?
4      A.  So sheriffs have different
5  interpretations of the statutes as far as what they
6  will allow reserves to do.  Our sheriff was more
7  progressive, and so we were able to operate as a
8  first -- a Level 1 deputy.  And by that, I mean is we
9  were allowed to go on patrol on our own, do any of the
10 same responsibilities as a Level 1 deputy.
11     Q.  Were you a peace officer?
12     A.  Yes.
13     Q.  And did you carry a weapon?
14     A.  Yes.
15     Q.  Did you make -- were you authorized to
16 make arrests?
17     A.  Yes.
18     Q.  Okay.  Did you make arrests?
19     A.  Yes.
20     Q.  And in your -- so it sounds like you
21 were a reserve officer maybe six or seven years.  Is
22 that about right?
23     A.  So since 2015, whatever that math works
24 out to be, yes.
25     Q.  Until just recently?

Page 32

1      A.  Correct.
2      Q.  During that time, do you have any idea
3  how many days or how many hours you worked as a
4  reserve officer?
5      A.  Off the top of my head, I averaged
6  between 4 and 600 hours a year.
7      Q.  Okay.  And you were doing this work as a
8  reserve officer in the Douglas County Sheriff's during
9  the time then that you worked for Northstar?
10     A.  Correct.
11     Q.  And did you talk to Mr. Watson about
12 doing this work?
13     A.  I believe so.
14     Q.  And I take it he didn't have an
15 objection to it?
16     A.  Not that I recall.
17     Q.  Okay.  And is there a reason why you
18 stopped being a reserve officer recently?
19     A.  Yes, the training requirements were
20 becoming too onerous.  We were approaching a point in
21 time where they were speculating that the training for
22 2022 would approach 110 hours a year, and as a
23 volunteer, it was just too much to maintain a day job,
24 a family, and then have a part-time gig that required
25 that much time.

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    29–32

ABI Litigation Services

Page 33

1    Q.    Sure.  Makes sense.  Did you have
2  different sheriffs in the time you were a reserve
3  officer or was it the same fellow?
4    A.    Same --
5         MS. ULLERY:  Objection, relevance.
6    A.    Same officer.
7    Q.    (BY MR. GARNETT)  And who was it?
8    A.    Spurlock, Tony Spurlock.
9    Q.    All right.  So you interviewed with
10 Mr. Watson in March of 2019 by phone.  And then I take
11 it you then came and met at the offices; is that
12 right?
13   A.    Yes.
14   Q.    Did you interview again with him in
15 person?
16   A.    He was in the office interview, the very
17 first one.
18   Q.    Okay.  And was that a group interview?
19   A.    It was.
20   Q.    Who was in that interview?
21   A.    I seem to recall there were two other
22 people who were in that interview.
23   Q.    Do you remember who they were?
24   A.    No.
25   Q.    A man or a woman?

Page 34

1    A.    I believe it was two men.  One, I
2  believe, was Kyle Henderson, and I don't recall who
3  the other one was.
4    Q.    Okay.  And what other interview did you
5  have?
6    A.    Then there was a second interview with
7  more people.
8    Q.    And do you remember who was in that
9  interview?
10   A.    I don't.
11   Q.    Okay.  Do you remember the kinds of
12 questions that people asked in those interviews?
13   A.    I do.
14   Q.    Tell me about that.
15   A.    General questions about what my
16 experience had been, how I approached interacting with
17 people.
18   Q.    Okay.  And did you do some research on
19 Northstar before you applied there?
20   A.    I did.
21   Q.    What kind of research did you do?
22   A.    Basic Web search.
23   Q.    What did you find out?
24   A.    Just a little bit about the background,
25 the history.

Page 35

1    Q.    Okay.  And I take it you were interested
2  in that and that's why you applied; is that right?
3    A.    Yes.
4    Q.    Okay.  Did you understand that -- well,
5  strike that.  When did you then actually start working
6  at Northstar?  Do you remember the first date?
7    A.    It was the Monday of the last day of
8  March of 2019, so 18th, 20th, somewhere around there.
9    Q.    And what did you -- what was your title
10 when you started?
11   A.    Chief operating officer.
12   Q.    Had you ever been a chief operating
13 officer at anywhere prior to that?
14   A.    No.
15   Q.    What was your salary when you started?
16   A.    I believe it was 260,000.
17   Q.    Okay.  And how did that compare with
18 what you'd been making at some of these other jobs?
19 Was it better?  Was it worse?
20   A.    It was better.
21   Q.    And when you came to work at Northstar,
22 did you come to know Kyle Ramstetter and Will
23 Camenson?
24   A.    I had interactions with them.
25   Q.    Were they working there when you

Page 36

1  started?
2    A.    Yes.
3    Q.    What kind of interactions did you have
4  with them?
5    A.    I didn't interact with them very much.
6  They weren't in the office much.
7    Q.    So you would interact what, by phone?
8         MS. ULLERY:  Objection, form.
9    A.    Either email.  Rarely phone, but I'd
10 talk with them when they were in the office.
11   Q.    (BY MR. GARNETT)  What did you
12 understand their responsibilities were at Northstar?
13   A.    My understanding is they were leading
14 the project development for the Amazon projects in
15 Virginia.
16   Q.    Okay.  And what -- in your role as chief
17 operating officer, what involvement did you have in
18 those projects?
19   A.    I didn't have any at first, but I wanted
20 to get involved with that.  So I reached out to them
21 to try to schedule an opportunity.  They spent a lot
22 of time in Virginia, so I wanted to go to Virginia as
23 well to meet with the client and understand the
24 projects.
25   Q.    Sure.  And why did you want to get

EXHIBIT L
Timothy Lorman  - 03/11/2022
33–36

Page 37

1  involved in those projects?
2        A.   Well, from my recollection -- excuse
3  me --
4        Q.   Sure.
5        A.   -- this was the largest projects that we
6  had in flight, and so I thought that was important, to
7  have an understanding of how they were functioning,
8  who were the players, who were the stakeholders, and
9  what the state of the projects were.
10       Q.   When you came to work at Northstar,
11 Mr. Lorman, did you learn about referral programs that
12 Mr. Watson had had in place at Northstar over the
13 years?
14       A.   I did.
15       Q.   Okay.  What did you learn about those
16 programs?
17       A.   The only thing that I had learned was
18 that there was one referral partner that was Villanova
19 Trust, and that's -- the referral was a fee was paid
20 for Villanova Trust to introduce business in the firm.
21       Q.   Okay.  And how did you learn that?
22       A.   Brian shared it with me.
23       Q.   Okay.  And did you ever see on
24 Northstar's website a video discussing the referral
25 partner program?

Page 38

1        A.   No.
2        Q.   Okay.  Did you ever have any discussion
3  with Mr. Watson about referral partners generally?
4        A.   I don't recall one.
5        Q.   Okay.  When did you have this
6  conversation with Mr. Watson about Villanova Trust?
7        A.   I think the first time that we discussed
8  it was in June.
9        Q.   Okay.  So prior to that time, you'd not
10 heard anything about Villanova Trust?
11       A.   I don't recall hearing anything, no.
12       Q.   All right.  You indicated that after you
13 started working at Northstar that you got interested
14 in the Amazon projects in Virginia; is that right?
15       A.   Correct.
16       Q.   And you wanted to go visit them?
17       A.   Correct.
18       Q.   Okay.  Did you go to Virginia?
19       A.   I didn't go to Virginia until September
20 or October.
21       Q.   Okay.  And when you did go to Virginia,
22 did you -- what did you see?
23       A.   I toured the projects, met with the
24 contractor, attended OAC, which is the meetings --
25 project status meetings.

Page 39

1        Q.   Okay.  Did you go to all three
2  locations?
3        A.   Have I visited each of the --
4        Q.   Yes.  I'm sorry.
5        A.   Yes, I have.
6        Q.   And was that in that trip to Virginia in
7  September?
8        A.   Yes.
9        Q.   Have you been to Virginia to see the
10 projects more than that one time?
11       A.   Yes.
12       Q.   Okay.  When else?
13       A.   Several times during the course of my
14 employment subsequent to September.
15       Q.   Okay.  But the first time was that
16 September trip?
17       A.   I believe so, yes.
18       Q.   Okay.  How did you find working for
19 Mr. Watson and working at Northstar from late March
20 until, say, September of 2019?
21       A.   I don't understand what you mean by how
22 did I find.
23       Q.   Did you like it?
24       A.   I did.
25       Q.   Did you -- was there anything in that

Page 40

1  period of time that bothered you about working there?
2        A.   Which period of time again?
3        Q.   From when you first started through
4  September 1st of 2019?
5        A.   The only concern that I had is I had
6  been approached a couple times about some concerns
7  with cash flow for the business.
8        Q.   Okay.  And who had approached you with
9  those concerns?
10       A.   Brent Gray and Kristi Fisher.
11       Q.   And what did you understand their
12 positions to be?
13       A.   Kristi was an office manager, and Brent
14 Gray was the chief financial officer.
15       Q.   And when they approached you -- strike
16 that.  How many times did they approach you about cash
17 flow concerns?
18       A.   More than once.
19       Q.   Okay.  And what kind of issues would
20 they bring to your attention?
21       A.   Just a concern to make sure that we had
22 funding for payroll.
23       Q.   All right.  And when you had those
24 conversations with them, did you take any action based
25 on those conversations?

EXHIBIT L
Timothy Lorman  - 03/11/2022                              37–40

Page 41

1      A.   There was really no action I could take,
2  no.
3      Q.   So you just listened to the concerns?
4      A.   Yes.
5      Q.   Did you ever talk to Mr. Watson about
6  those issues?
7      A.   I don't recall doing that, no.
8      Q.   Okay.  Is there a reason you didn't talk
9  with him about them?
10      A.   Well, Brian, Kristi, and Brent would
11  have regular meetings to go over the cash flow, and so
12  I assumed that was taken care of in those meetings.
13      Q.   Okay.  Well, so, in other words, you
14  were kind of a sounding board, but you didn't feel a
15  need to do anything about it?
16      A.   I don't recall doing --
17      MS. ULLERY:  Objection, form.
18      A.   I don't recall doing anything, no.
19      Q.   (BY MR. GARNETT)  Did they ever ask you
20  to do anything?
21      A.   I don't recall that, no.
22      Q.   Did you understand that you had a
23  fiduciary duty to Northstar when you worked there?
24      A.   I don't know what you mean.
25      Q.   Okay.  Well, you understood you were an

Page 42

1  officer, right, of WDC Holdings, which was Northstar?
2      MS. ULLERY:  Objection, form.
3      A.   My title was chief operating officer,
4  but I didn't have any signature authority in the firm.
5      Q.   (BY MR. GARNETT)  Okay.  And we'll go
6  through some documents in a minute, but are you saying
7  as you sit here you don't believe you had a fiduciary
8  duty to Northstar?
9      A.   I do believe I did, yes.
10      Q.   And did you ever bring issues of concern
11  to Mr. Watson that you'd heard about that you thought
12  maybe he should be aware of prior to September 1 of
13  2019?
14      A.   Yes.
15      Q.   What kinds of issues?
16      A.   Anything that had come up.  We would
17  have a regular one-on-one meeting each week, and we
18  had an agenda we would go through where we would talk
19  about different issues.
20      Q.   Right.  And if something came up during
21  the week that you were concerned about, you'd make
22  sure they got on the agenda and talk to Mr. Watson
23  about it?
24      MS. ULLERY:  Objection, form.
25      A.   Yes.

Page 43

1      Q.   (BY MR. GARNETT)  Okay.  And those
2  meetings were just you and Mr. Watson?
3      A.   Correct.
4      Q.   And you understood, I take it,
5  Mr. Lorman, that Mr. Watson was pretty hands-on in his
6  management of Northstar.
7      MS. ULLERY:  Objection, form.
8      Q.   (BY MR. GARNETT)  Would you think that's
9  correct?
10      A.   I would say yes.
11      Q.   And, in fact, that he was not shy about
12  making decisions or addressing issues as he saw them
13  and saw that as his responsibility?
14      MS. ULLERY:  Objection, form.
15      A.   Yes.
16      Q.   (BY MR. GARNETT)  Okay.  Now, I think
17  you indicated you'd never met Mr. Watson prior to
18  March of 2019, and then it sounds like you were
19  working with him and interacting almost every day
20  after you started.  Is that about right?
21      A.   Yes.
22      Q.   Did you enjoy working with him in that
23  period of time prior to September 1 of 2019?
24      A.   Yes.
25      Q.   And did you find him -- did you find him

Page 44

1  to be a good boss?
2      A.   No.
3      Q.   And why not?
4      A.   I think that's -- I found that Brian's
5  leadership style didn't align well with what my
6  leadership style was.
7      Q.   Tell me about that.
8      A.   I think Brian was a little bit more
9  autocratic, I guess is the right word, and seemed less
10  collaborative.
11      Q.   Okay.  Did you understand -- had you
12  looked into the history of Northstar, kind of where it
13  started and how it had grown through the years?
14      A.   At what point in time?
15      Q.   At any point.
16      A.   I had received anecdotal information
17  from conversations, but I didn't do anything
18  proactively to deeply research.
19      Q.   You understood that Mr. Watson had grown
20  Northstar from pretty much a one-man operation in 2001
21  to what it was in 2019, when you started there, with
22  him providing the leadership, right?
23      MS. ULLERY:  Objection, form.
24      Q.   (BY MR. GARNETT)  Okay.  And did you

EXHIBIT L
Timothy Lorman  - 03/11/2022                    41--44

Page 45

1  understand the importance of the referral partner
2  program during that period of time or you just didn't
3  know anything about that?
4       A.   So the two questions.  Did I understand
5  anything about it?  I didn't understand much, so I
6  don't know that I could speak to its importance.
7       Q.   Okay.  When you came to work at
8  Northstar in March of 2019, did you know anything
9  about the Amazon projects?
10      A.   No.
11      Q.   Had they been discussed in your
12  interviews?
13      A.   I don't recall them being discussed.
14      Q.   When did you first find out that there
15  were projects involving Amazon?
16      A.   I believe it was shortly after I
17  started.
18      Q.   All right.  Do you know a person named
19  Patricia Watson?
20      A.   I've heard of her.
21      Q.   Have you ever met her?
22      A.   No.
23      Q.   Have you ever talked to her?
24      A.   No.
25      Q.   Okay.  When you were at Northstar,

Page 46

1  Mr. Lorman, did Northstar have outside counsel that
2  you were aware of?
3       A.   Yes.
4       Q.   And who was that?
5       A.   I think there was a variety of different
6  outside counsels for a variety of different matters.
7  The firm that I worked with most was Jones & Keller.
8       Q.   Okay.  Do you remember the names of the
9  lawyers that you worked with there?
10      A.   Yes, Lawrence Lee on employment issues
11  and Kerri Assell on real estate issues.
12      Q.   All right.  And what about auditing?  In
13  the time that you were COO of Northstar, were there
14  outside auditors that were involved in any of
15  Northstar's work?
16      A.   Yes.
17      Q.   Okay.
18      A.   And that was Plan Moran, Plante Moran.
19      Q.   All right.  And what about Ernst &
20  Young?  Did they have any involvement while you were
21  there?
22           MS. ULLERY:  Objection, form.
23      A.   I don't recall Ernst & Young being
24  involved while I was there.
25      Q.   (BY MR. GARNETT)  What kinds -- as COO,

Page 47

1  did you have any involvement with Plante Moran in
2  connection with their audits?
3       A.   No.
4       Q.   Were you aware of what kind of auditing
5  they were doing?
6       A.   No.
7       Q.   And do you know whether they ever
8  audited anything in connection to the Amazon
9  transactions?
10      A.   I don't know.
11      Q.   Okay.  How did you know that they were
12  even involved?
13      A.   Their name had come up when -- there was
14  an issue in preparing K-1s at one point in time, and I
15  think there was an organizational change that had
16  delayed the delivery of those; and that was a topic of
17  conversation.
18      Q.   And again, you were there for about 14
19  months.  So the K-1s would have been prepared when
20  during that period of time?
21      A.   I believe that that was for the 2019 tax
22  year.  And so there was some friction about the
23  delivery of those.  I believe they were due at the end
24  of January of 2020.
25      Q.   Okay.  And was it part of your job to

Page 48

1  make sure they got delivered?
2       A.   No.
3            MR. GARNETT:  Okay.  Great.  Let's take
4  a ten-minute break, and we'll come back and start
5  going through some other things.
6            THE VIDEOGRAPHER:  The time is 9:50.  We
7  are going off the record.
8            (Recess taken.)
9            THE VIDEOGRAPHER:  The time is 10:03.
10 We are back on the record.
11           MR. GARNETT:  Thank you.
12      Q.   (BY MR. GARNETT)  Mr. Lorman, we are
13 back on the record, and I'm sure you understand you
14 remain under oath.
15      A.   Yes, I do.
16      Q.   So I want to talk a little bit about
17 Kyle Ramstetter and Will Camenson.  You indicated when
18 you first started working at Northstar in March of
19 2019 that they were not in the office much.  Is that
20 right?
21      A.   Correct.
22      Q.   Okay.  When did you first actually meet
23 those two fellows?
24      A.   I don't recall the specific time.
25      Q.   Did you eventually meet them?

EXHIBIT L
Timothy Lorman  - 03/11/2022
45–48

Page 49

1      A.   I did.
2      Q.   Okay.  Was the fact that they were not
3 in the office anything that ever concerned you?
4      A.   Yes.
5      Q.   Why did it concern you?
6      A.   Because we didn't feel like we had
7 visibility into what we were working on with this,
8 that was our largest project.
9      Q.   Now, is it your testimony you didn't
10 know anything about the Amazon projects before you
11 went to work at Northstar?
12     A.   Correct.
13     Q.   In fact, those came up in some of the
14 interview meetings with you, didn't they?
15          MS. ULLERY:  Objection, misstates
16 testimony.
17     A.   I don't recall conversations about
18 Amazon in the interviews.
19     Q.   (BY MR. GARNETT)  Okay.  So when did you
20 first find out about the Amazon projects?
21     A.   I believe it was sometime shortly after
22 I started employment.
23     Q.   So maybe late March 2019, maybe early
24 April?
25     A.   Sure.

Page 50

1      Q.   And when you found out about the Amazon
2 projects, what was your reaction to that?
3      A.   I was really excited about it because it
4 sounded like it was going to be exciting work, working
5 with a great client.
6      Q.   So if somebody said you came to work at
7 Northstar because of the Amazon projects, that would
8 not be correct?
9          MS. ULLERY:  Objection, leading.
10     A.   Correct, it was not a motivation.
11          (At this time Mr. Casey Kirschner joined
12 the proceedings.)
13          MR. GARNETT:  Did somebody just join us?
14          MR. SMART:  Yeah, it's Casey.
15          MR. GARNETT:  That's great.  Yeah, I
16 should have checked to see before we got started.
17     Q.   (BY MR. GARNETT)  So you came to work at
18 Northstar because of other reasons other than Amazon?
19     A.   Correct.
20     Q.   And do you ever remember Mr. Watson
21 talking to you about Will Camenson and Kyle Ramstetter
22 and asking for your help in managing them?
23          MS. ULLERY:  Objection, compound.
24     A.   So the first part was do I recall
25 them -- I would say no to both.

Page 51

1      Q.   (BY MR. GARNETT)  Okay.  So if somebody
2 said that Mr. Watson had asked you to help rein them
3 in, that would not be correct?
4          MS. ULLERY:  Objection, leading.
5      A.   I don't recall a conversation about
6 Brian specifically instructing me.
7      Q.   (BY MR. GARNETT)  Okay.  Do you think it
8 didn't happen or you just don't remember?
9          MS. ULLERY:  Objection, compound.
10     A.   I don't recall.
11     Q.   (BY MR. GARNETT)  Okay.  Have you
12 recalled the last name of the lawyer you met with a
13 few days ago?
14     A.   No.  I didn't spend the time.  I would
15 have looked it up on the break.
16     Q.   Sure.  I'm just trying to figure out the
17 memory situation here.  So you don't ever remember
18 Mr. Watson talking to you about his concerns about
19 Kyle Ramstetter?
20          MS. ULLERY:  Objection, asked and
21 answered.
22     A.   I specifically do not recall a specific
23 conversation.
24     Q.   (BY MR. GARNETT)  Okay.  Did you ever
25 take any steps to try to manage Kyle Ramstetter and

Page 52

1 Will Camenson?
2      A.   I did.  I reached out to them and said
3 that I wanted to, as I said, travel out to Virginia to
4 meet with the stakeholders and view the project.
5      Q.   And when did you first do that?
6      A.   I would expect it was sometime in April.
7      Q.   And how did they respond to that?
8      A.   They were negative towards it.
9      Q.   Negative meaning what?
10     A.   They were concerned that they were
11 moving at a pace and had a relationship that they
12 didn't want me to be disruptive to the project.
13     Q.   And what was your reaction to that?
14     A.   I said I appreciate their viewpoint, but
15 my concern was from a continuity perspective, that we
16 had two people that we didn't have a lot of visibility
17 into what they were doing who were the only point of
18 contact with our largest project, and my concern was
19 that if something happened to either one of them from
20 a business continuity perspective, we had no backup.
21 So I wanted to be involved so I could better
22 understand.
23     Q.   Of course.  And, of course, your
24 position was COO, right?
25     A.   Correct.

EXHIBIT L
Timothy Lorman  - 03/11/2022                    49–52

Page 53

1    Q.   And you considered this kind of thing to
2  be the kind of thing you should pay attention to?
3    A.   Yes.
4    Q.   But you never felt it was your role as
5  COO to take any steps in connection with the cash flow
6  issues that people brought to you; is that right?
7         MS. ULLERY:  Objection, leading.
8    A.   I attempted to.  I thought it would be
9  important for me to be in those cash flow meetings,
10 but I was told that that was between Brian, Brent, and
11 Kristi.
12   Q.   (BY MR. GARNETT)  So maybe I
13 misunderstood your earlier testimony.  You said you
14 did attempt to do something after they came and talked
15 to you?
16   A.   I did attempt to attend those meetings.
17   Q.   Based on their coming and talking to
18 you?
19   A.   Correct.  I thought that would be
20 appropriate for me to be a part of those
21 conversations.
22   Q.   Okay.  I just want to make sure I
23 understand what you're saying.  So earlier when you
24 said you didn't do anything in reaction to them coming
25 to you, that wasn't quite accurate.  Is that right?

Page 54

1    A.   Correct.  What I did try to do is attend
2  those meetings, but there was nothing else I could do.
3  I didn't have access to anything.
4    Q.   Even as COO, you didn't have access to
5  anything to deal with cash flow?
6         MS. ULLERY:  Objection, asked and
7  answered.
8    A.   No.
9    Q.   (BY MR. GARNETT)  So what did you do to
10 try to attend those meetings?
11   A.   I asked to get invited to the meetings,
12 and I was told no.
13   Q.   And who did you ask?
14   A.   I asked Brian.
15   Q.   Okay.  And the meetings, as you
16 understood it, were between Kristi Fisher, Brent Gray,
17 and Brian?
18   A.   Correct.
19   Q.   Now, are you aware that Brent Gray was
20 deposed yesterday?
21   A.   No.
22   Q.   Okay.  When did you last talk to Brent
23 Gray?
24   A.   Gosh, I'm going to say it was probably
25 late April of 2020, after we both left.

Page 55

1    Q.   Okay.  Did you find him to be a reliable
2  and honest employee at Northstar?
3    A.   Yes.
4    Q.   Okay.  Now, what further steps did you
5  take to visit the Virginia locations after, say,
6  mid-April of 2019, when you were, it sounds like,
7  rebuffed a bit by Will and Kyle?
8    A.   I didn't take any further steps.
9    Q.   Okay.  How did you happen to get out
10 there in the first part of September?
11   A.   It was actually towards the end -- it
12 was after all of the issues arose with the transaction
13 that occurred between Kyle and Amazon, and so we took
14 it upon ourselves to go out there to figure out
15 exactly, now that they were going to be gone, what do
16 we need to do to step in and pick up -- pick up where
17 they left off.
18   Q.   Okay.  And, again, I just want to make
19 sure the time frame is clear.  We'll go into it in
20 some detail, but there was a meeting in late September
21 of 2019 where Will Camenson and Kyle Ramstetter were
22 both fired.  Is that your understanding?
23        MS. ULLERY:  Objection, leading.
24   A.   There was a meeting between --
25 individually between Brian, Kyle, myself, and Brent,

Page 56

1  and then the same group with Will but not Kyle.
2    Q.   (BY MR. GARNETT)  Right.  And I wasn't
3  actually asking who was at them yet.  I'm just trying
4  to lay a bookend just so we're clear.
5    A.   Sorry.  So your question was a meeting
6  where they were fired, and they weren't fired at that
7  meeting.
8    Q.   Right.  There was a meeting in late
9  September of 2019 where they were confronted with
10 concerns about what was called the White Peaks
11 transaction.  Do you agree with that?
12   A.   I agree with that.  There was two
13 meetings.
14        MS. ULLERY:  Objection, leading.
15   Q.   (BY MR. GARNETT)  And the -- and it was
16 after those meetings that you then went out to
17 Virginia to see the projects?
18   A.   Correct.
19   Q.   Who did you go out to Virginia with?
20   A.   I believe we brought John Schillingburg,
21 who was our project manager.  I believe that was all.
22 It was the two of us.
23   Q.   Okay.  And did you fly commercial to get
24 out there?
25   A.   Yes.

EXHIBIT L
Timothy Lorman  - 03/11/2022                53-56

1  Q.  All right.  Mr. Watson did not go on
2  that trip?
3  A.  No.
4  Q.  Okay.  And when you -- how long were you
5  in Virginia looking at the projects?
6  A.  I'm going to estimate two days.
7  Q.  Okay.  And did you go to all the
8  projects?
9  A.  I believe that we did.  I don't know if
10  we went to the Quail Ridge site.  I don't recall, but
11  I believe that we saw all of them.
12  Q.  And what condition -- what state were
13  they in when you went and looked at them there?
14  MS. ULLERY:  Objection, vague.
15  A.  As I recall, one building, the very
16  first, was completed, and the remainders were in
17  various stages of development.
18  Q.  (BY MR. GARNETT)  Okay.  The one that
19  was completed, do you remember which of the projects
20  it was that was completed at that point?
21  A.  It was the first one that we had
22  started, and as far as completion, our scope of work
23  was completed.  There was still some work that Amazon
24  was doing on the final fit-out of the building.
25  Q.  Did you interact with anybody from

1  Amazon on that trip?
2  A.  Yeah, we interacted with a gentleman --
3  I don't recall his name -- who was responsible for
4  facilities management, and part of what we wanted to
5  understand is what our scope of work would be required
6  as the property managers for Amazon.
7  Q.  And so this fellow whose name you don't
8  remember was a facilities management person with
9  Amazon?  Is that what you're saying?
10  A.  Correct, correct.
11  Q.  And was he involved in overseeing or
12  coordinating the construction at all?
13  A.  No, not to my knowledge.  I believe his
14  role was exclusively once the building was completed
15  how it was maintained.
16  Q.  Okay.  And was he keeping an eye on kind
17  of what stage these projects were in?
18  MS. ULLERY:  Objection, speculation.
19  A.  I don't know.
20  Q.  (BY MR. GARNETT)  And would you have a
21  record anywhere, like a calendar or anything, that
22  would help you figure out this guy's name?
23  A.  No.  I don't have access to them.  It
24  would have been my Northstar.
25  Q.  Okay.  Did you coordinate this trip with

1  him?  Like did you call ahead and say, "Hey, we're
2  coming out.  John and I are coming out.  We want to
3  meet with you while we're there"?
4  A.  Yes.
5  Q.  And how did you contact him?
6  A.  I would assume it was through email.
7  Q.  How did you get his name?
8  A.  I believe that we got it through Reed --
9  don't recall his last name; I think it was Mayer --
10  who was the construction project manager for Amazon.
11  Q.  Okay.  So Reed Mayer
12  was a contact you got through Northstar?
13  A.  Correct.
14  Q.  And you reached out to him, and he
15  referred you to this other fellow whose name you can't
16  remember?
17  A.  As I remember, yes.
18  Q.  And you and John went out there for a
19  couple of days?
20  A.  Right.
21  Q.  And among other things, you met with
22  him?
23  A.  Correct.
24  Q.  When you guys went out there, where did
25  you stay?

1  A.  I believe I stayed at the Hampton Inn,
2  which was just, gosh, a couple blocks away from the
3  site.
4  Q.  Which site?
5  A.  The primary -- the first site that was
6  there in Sterling.
7  Q.  Okay.  And were you guys there for --
8  how many nights?  One night, two nights?
9  MS. ULLERY:  Objection, asked and
10  answered.
11  A.  I don't recall specifically.
12  Q.  (BY MR. GARNETT)  Okay.  Did you rent a
13  car for this trip?
14  A.  I assume so, yes.
15  Q.  And was it -- did you and John report
16  back to Brian Watson or anybody at Northstar during
17  the trip?
18  A.  During the trip, I don't believe so.
19  Q.  Okay.  Did the fellow from Amazon who
20  you met with, this facilities manager, did he express
21  any concerns to you about the status of the projects?
22  A.  No.
23  Q.  He seemed pretty pleased?
24  MS. ULLERY:  Objection, leading.
25  A.  I don't know that he was pleased.  He

EXHIBIT L
Timothy Lorman  - 03/11/2022
57~60

ABI Litigation Services

**Page 61**

1  didn't express any objections or questions about the
2  status.
3      Q.   (BY MR. GARNETT)  Did he express any
4  concerns about Will Camenson or Kyle Ramstetter?
5      A.   No.
6      Q.   Do you know if he had any idea who those
7  folks were?
8           MS. ULLERY:  Objection, speculation.
9      A.   No.
10     Q.   (BY MR. GARNETT)  Did he tour the sites
11 with you or did you guys have a meeting with him?
12     A.   We met with him in front of the
13 building.  Then we walked around the perimeter of the
14 buildings, and then we were allowed into the lobby of
15 the building.
16     Q.   By him?
17     A.   By him.
18     Q.   So you were with him, what, maybe an
19 hour?
20     A.   Hour and a half, yeah.
21     Q.   And then when you went to the other
22 sites, did he come along with you?
23     A.   No.
24     Q.   Did you meet with anybody from Amazon at
25 those other sites?

**Page 62**

1      A.   I believe that we had -- there was a
2  construction meeting, and I believe that Reed was in
3  that meeting as well.
4      Q.   Oh, so you met with Reed in person on
5  this trip?
6      A.   I think so.  We've had several trips out
7  there, Stan.  I'm not sure.
8      Q.   Sure.  And all you can do is tell me
9  what you remember, and all I can do is ask until I am
10 sure I understand what you're saying.
11     A.   Totally understand.
12     Q.   So you met Reed at some point?
13     A.   Yes.
14     Q.   Maybe not in that first trip?
15     A.   Exactly.
16     Q.   And then it sounds like you had several
17 trips out to Virginia after the first trip?
18     A.   Correct.
19     Q.   Okay.  How many more trips do you think?
20     A.   I'm going to say three or four.
21     Q.   Okay.  And who did you go on those trips
22 with?
23     A.   Various people.  It was either with
24 John -- I'm trying to think if there's anybody else
25 who joined us.  Brent may have joined us for one trip.

**Page 63**

1  I can't think of who else.
2      Q.   Did you ever travel out there with Brian
3  Watson?
4      A.   Yeah.  We went one time with Brian,
5  and that trip, the bankers from Santander wanted to
6  tour the site.  So we all went there to show them
7  around and show them the properties.
8      Q.   And when was that, do you think?
9      A.   Gosh, I'm going to say that was probably
10 November-ish.
11     Q.   And Santander had what role with the
12 project?
13     A.   They were a lender on that project.
14     Q.   Okay.  So it was you, Mr. Watson, some
15 folks from Santander.  Anybody else?
16     A.   I believe Luke was out there from IPI.
17     Q.   And did anybody express any concern
18 about the status of the projects in that trip?
19     A.   No.
20     Q.   Do you remember which of the trips you
21 met Reed on?
22     A.   I don't.  It was somewhere in between
23 those two.
24     Q.   It was another trip?
25     A.   Right.

**Page 64**

1      Q.   And who was with you from Northstar on
2  that trip?
3      A.   John was usually traveling with me, so I
4  would like to say it was probably -- he was there.
5      Q.   Okay.  And you guys flew commercial on
6  these trips?
7      A.   Yes.
8      Q.   This Reed fellow, what does he look
9  like?
10          MS. ULLERY:  Objection, relevance.
11     A.   He is probably about my height.  I seem
12 to recall he had a bushy beard.  Age range, probably
13 early 40s.
14     Q.   (BY MR. GARNETT)  And what did you
15 understand his responsibility to be?
16     A.   He was the construction project manager,
17 so he was really the owner's rep for Amazon for the
18 project.
19     Q.   Okay.  And he didn't express any
20 concerns about the status of the project to you?
21          MS. ULLERY:  Objection, asked and
22 answered.
23     A.   Actually, Reed did have concerns on our
24 reporting.
25     Q.   (BY MR. GARNETT)  Okay.  What were those

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    61-64

Page 65

1    concerns?

2         A.   He had specific reporting that he needed
3    to provide to Amazon, and I recall that our work in
4    progress reports weren't -- weren't formatted the way
5    that he needed them formatted.  There was some
6    question about those particular reports and updates.
7    He needed updated reports that we were delayed in
8    getting to him.

9         Q.   Okay.  So did you as COO take action
10   with regard to those concerns?

11        A.   Yeah, we leaned into them and wanted to
12   clearly understand what he was looking for and work
13   with a team to be able to produce those reports on a
14   timely fashion for him.

15        Q.   Okay.  And did that happen?

16        A.   To the best of my knowledge, yes.

17        Q.   And some of the witnesses that have
18   testified have indicated that these projects were on
19   time and under budget.  Do you think that's accurate?

20             MS. ULLERY:  Objection.

21        A.   We -- for all the projects that I'm
22   aware of, they were delivered within the schedule, but
23   there were questions about the budgets.

24        Q.   (BY MR. GARNETT) Okay.  So you're
25   saying they were not under budget?

Page 66

1         A.   I didn't say that.  I said there were
2    questions about the budgets.

3         Q.   Were the budgets -- were they over
4    budget?

5         A.   Well, there was some concern on one of
6    the projects as far as there was a question about an
7    acquisition fee that was taken, whether or not that
8    was appropriate.

9         Q.   Who asked that question?

10        A.   IPI.

11        Q.   Okay.

12        A.   Luke from IPI.  As they were doing their
13   review about the budgets, they were concerned about a
14   1.3ish-million-dollar fee.

15        Q.   And when did you have that conversation
16   with IPI?

17        A.   I recall that being towards the end of
18   November, first part of December.

19        Q.   Okay.  And was that a conversation you
20   had during one of these trips?

21        A.   I don't believe so, no.

22        Q.   Did they call you about it?  How did you
23   have that conversation?  That's what I'm asking.

24        A.   Yeah, we met regularly by phone.  I
25   believe that we had a weekly meeting, and it either

Page 67

1    came up during one of those calls or a separate call.

2         Q.   Okay.  So after they raised that
3    question, what did you as COO do?

4         A.   So I shared that with Brian, and we had
5    to go through the budgets to figure out how it was
6    approved.

7         Q.   Okay.  And did you do that?

8         A.   I worked through that, yes.

9         Q.   And was IPI satisfied with how you
10   worked through that?

11        A.   No.

12        Q.   And was it Luke Gilpin you were dealing
13   with?

14        A.   Correct.

15        Q.   And tell me what IPI's position was.

16             MS. ULLERY:  Objection, speculative.

17        A.   IPI -- IPI told us what their concern
18   was, that this acquisition fee was not included in the
19   approved lease budget.

20        Q.   (BY MR. GARNETT)  Okay.  And how did
21   that get resolved?

22        A.   I don't know.

23        Q.   Okay.  Did you talk with Brian Watson
24   about that?

25        A.   Yes.

Page 68

1         Q.   And what did he say?

2         A.   He said that it should have been
3    included in a lease and that Amazon would have
4    approved it.

5         Q.   Okay.  Did you ever talk with anybody
6    else about this issue?

7         A.   Worked through it with Brent, John,
8    David Gomez, who was one of the project accountants.

9         Q.   And "worked through it," what does that
10   mean?

11        A.   Tried to understand.  There was a myriad
12   of different budgets.  There was a myriad of different
13   spreadsheets, and we were trying to reconcile to find
14   out where the money was included.

15        Q.   And were you able to do that?

16        A.   No.

17        Q.   All right.  Let's go back and talk about
18   September of 2019 because I want to make sure I'm
19   clear what occurred in that month.  At some point,
20   were you made aware of what came to be called the
21   White Peaks transaction?

22        A.   Yes.

23        Q.   Okay.  Tell me how you learned about
24   that.

25        A.   I was in the car driving to the office,

EXHIBIT L
Timothy Lorman  - 03/11/2022                              65-68

ABI Litigation Services

**Page 69**

1    and Brian called me and told me.
2        Q.   Okay.  Do you have any recollection when
3    that was, roughly?
4        A.   Gosh, it was probably a Thursday
5    afternoon.
6        Q.   That's pretty good.  Do you remember --
7    in September?
8        A.   Yes.
9        Q.   All right.  Well, that narrows it down
10   to four days.  Do you remember late, early?
11       A.   Middle.
12       Q.   And how do you remember it being a
13   Thursday?
14       A.   I remember it being a Thursday because I
15   had an appointment that I went to, and so I was out of
16   the office; and I came back.  I think Brian was
17   somewhat frustrated that he couldn't get to me sooner,
18   and just in my head I believe it was a Thursday.
19       Q.   Okay.  And what did he tell you about
20   this transaction?
21       A.   He asked me -- I seem to recall that he
22   asked me if I knew anything about it, and I didn't.
23       Q.   Okay.
24       A.   And then he told me high level what had
25   happened, and I said I'm on my way to the office,

**Page 70**

1    let's figure this out.
2        Q.   Okay.  What did he tell you high level
3    that occurred?
4        A.   He told me high level that Will and --
5        Q.   Kyle.
6        A.   -- Kyle -- sorry, spacing out -- thank
7    you -- that Will and Kyle had acquired a piece of land
8    and turned around and sold it to Amazon at a
9    significant profit the same day.
10       Q.   Okay.  And we've had some testimony
11   about this situation, and I'm assuming that Mr. Watson
12   was somewhat upset about this.  Is that right?
13       A.   Oh, yes.
14       Q.   Did you understand why he was upset?
15       A.   Absolutely.
16       Q.   Why did you understand that his being
17   upset was appropriate?
18       A.   Well, my understanding of why he was
19   upset is two of our employees engaged in a real estate
20   transaction, which was one of our primary businesses,
21   without the knowledge of the firm.
22       Q.   Okay.  And did you understand that he
23   saw this as a theft of corporate opportunity, if you
24   will, from Northstar?
25       A.   Yes.

**Page 71**

1        Q.   Okay.  And did you see it that way too
2    when it was explained to you?
3        A.   Yes.
4        Q.   Okay.  So Thursday afternoon, you have
5    this call.  You tell Mr. Watson you're going to come
6    to the office.  Did you go to the office?
7        A.   I did.
8        Q.   Did you meet with him?
9        A.   I did.
10       Q.   And how long was that meeting?
11       A.   An hour, hour and a half perhaps.  I
12   don't recall.
13       Q.   Okay.  And was anybody else in the
14   meeting?
15       A.   We had several conversations.  I believe
16   it was he and I at first, but then I believe Brent was
17   included in that conversation, and I don't know
18   anybody else.
19       Q.   Okay.  Now, again, I'm just trying to
20   get the timeline here.
21       A.   Sure.
22       Q.   Do you remember that Mr. Watson got
23   married in late September of 2019?
24       A.   Uh-huh.
25       Q.   Did you go to the wedding?

**Page 72**

1        A.   I did.
2        Q.   And that was on a Saturday.  Does that
3    sound right?
4        A.   It does.
5        Q.   Okay.  Was it the Saturday right after
6    the Thursday when you got that phone call?
7        A.   I believe so, yes.
8        Q.   Okay.  My understanding is that on
9    Friday, you folks had a conversation -- the first of
10   the conversations with Will and Kyle; is that right?
11       A.   Correct.
12            MS. ULLERY:  Objection, facts not in
13   evidence.
14       Q.   (BY MR. GARNETT)  And tell me -- so --
15   and again, I just want to walk through this, and then
16   we'll look at some documents, make sure I've got it
17   straight.  So you had the conversation with Mr. Watson
18   on Thursday in the office.  Did you meet with Will and
19   Kyle on Thursday?
20       A.   I did not, no.
21       Q.   But there was a meeting with them on
22   Friday?
23       A.   Correct.
24       Q.   All right.  Tell me what you recall
25   about that meeting.

EXHIBIT L
Timothy Lorman  - 03/11/2022                    69–72

Page 73

1      A.   I recall that we started out with
2  myself, Brent, Brian, and both Will and Kyle in the
3  meeting.  I excused myself and took Will outside.  We
4  sat in the lobby while Brian, Brent, and Kyle met.
5  Lasted a half hour, 45 minutes.  Then they left, and
6  then I brought Will into the meeting.  Then the four
7  of us met.
8      Q.   Okay.  And the -- what happened in the
9  meeting that you were present for?
10     A.   So Brian confronted Will on the
11 situation.  Will denied all the allegations that were
12 put forth, was not cooperative in the conversation,
13 and then the conversation ended.
14     Q.   Okay.  There's a transcript around of a
15 conversation on that date, part of which I think you
16 were present for.  Have you seen that transcript?
17     A.   Yes.
18     Q.   Okay.  Is that transcript generally
19 accurate for the portion you were at?
20     A.   Yes.
21     Q.   Do you know who recorded that
22 conversation?
23     A.   It was recorded on my phone.
24     Q.   Okay.  In the meeting that you were not
25 present at, do you know if that was recorded?

Page 74

1      A.   Yes, it was recorded on my phone.
2      Q.   Okay.  So both the meetings were
3  recorded on your phone?
4      A.   Correct.
5      Q.   Okay.  After the meetings were recorded,
6  do you know, Mr. Lorman, how did a transcript come to
7  be made of those meetings?
8      A.   I don't know.
9      Q.   Okay.  Did you give the recordings to
10 somebody?
11     A.   I put them on the drive for Brian and
12 Kristi.
13     Q.   Okay.  Now, I'm just trying to envision
14 this.  Roughly what time of day were the meetings that
15 you recorded?
16     A.   In the morning.
17     Q.   Okay.  And then the wedding was the next
18 day?
19     A.   Correct.
20     Q.   All right.  And were Will -- Will and
21 Kyle were not actually fired in that meeting; is that
22 what you're saying?
23     A.   Correct.
24     Q.   What happened?
25     A.   As I recall, the question was, "Do you

Page 75

1  want to be fired or do you want to be suspended?"  And
2  they both elected to be suspended.
3      Q.   Okay.  So they were suspended as of that
4  date?
5      A.   Yes.
6      Q.   And were fired some time later?
7           MS. ULLERY:  Objection, leading.
8      A.   Yes.
9      Q.   (BY MR. GARNETT)  And then was there any
10 kind of a meeting with employees of Northstar after
11 the recorded meetings to explain what was going on?
12     A.   Yes.
13     Q.   Tell me about that.
14     A.   There was an all-hands meeting in the
15 cafeteria area, and Brian spoke to the group,
16 explained to them what had happened.
17     Q.   And what do you remember him saying had
18 happened?
19     A.   Just at a high level that a little
20 overview of what Will and Kyle had done and how that
21 wasn't acceptable for our firm and they were no longer
22 going to be a part of the firm.
23     Q.   And did you agree with Mr. Watson's
24 position in that meeting?
25     A.   Which meeting?

Page 76

1      Q.   Either -- any of those meetings.  Well,
2  let me ask you this.  Did you agree with the position
3  he was taking about Mr. Ramstetter and Mr. Camenson?
4           MS. ULLERY:  Objection, vague.
5      A.   Yeah, I guess the position that my
6  understanding was is that they weren't fired, but they
7  were suspended.  I agreed with that.
8      Q.   (BY MR. GARNETT)  And they were fired at
9  some later time; is that your understanding?
10     A.   Yes, the following week.
11     Q.   Was there a meeting in connection with
12 that firing?
13     A.   I don't recall there being a meeting.
14     Q.   So you went to the wedding the next day.
15     A.   Uh-huh.
16     Q.   Are people talking about this at the
17 wedding?
18     A.   A little bit, yeah.
19     Q.   Will and Kyle were not at the wedding, I
20 take it?
21     A.   I did not see them at the wedding.
22     Q.   Mr. Watson was?
23     A.   At the wedding?
24     Q.   Yes.
25     A.   Yes.

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    73--76

Page 77

1    Q.   What kinds of things -- what kind of
2  conversations were there about all this at the
3  wedding?
4          MS. ULLERY:  Objection, speculative.
5    A.   The only conversations that I
6  participated in were just kind of gee, whiz, I can't
7  believe that happened.
8    Q.   (BY MR. GARNETT)  And how did firing
9  Will and Kyle change your responsibilities as COO?
10   A.   Well, I took it upon myself to be more
11 involved in the Amazon projects because we didn't have
12 anybody else.  We didn't know anything.  There was --
13 after they left, went through their emails.  There was
14 very few files.  So we really had to try to piece
15 together what the current state was and what needed to
16 be done.
17   Q.   And you say "we."  Who was "we"?
18   A.   It was John and I and Brent and Dave
19 Gomez.  We all -- we would have weekly meetings to
20 just update who's doing what and how are we going
21 to -- how are we going to tackle this.
22   Q.   Were you the chair of these weekly
23 meetings?
24   A.   I led them, yes.
25   Q.   Okay.  Was this the first time you'd

Page 78

1  started leading weekly meetings at Northstar?
2    A.   No.
3    Q.   Okay.  You'd been doing weekly meetings
4  for a while, right?
5          MS. ULLERY:  Objection, leading.
6    A.   I had a variety of meetings that I would
7  host.
8    Q.   (BY MR. GARNETT)  So as COO, you would
9  from time to time have meetings?
10   A.   Yes.
11   Q.   Here, you're talking about weekly
12 meetings, which I'm assuming means kind of regular
13 meetings to take a look at this --
14   A.   Right.
15   Q.   -- is that what you're saying?
16   A.   Yes.
17   Q.   Prior to this meeting, did you have
18 regular meetings that you chaired?
19   A.   Yes, we had a meeting of the senior
20 leadership team, the department heads, on a weekly
21 basis.
22   Q.   Okay.  And were you chair of those
23 meetings?
24   A.   Yes.
25   Q.   Okay.  Would there be, like, an agenda,

Page 79

1  that kind of thing?
2    A.   Yes.
3    Q.   Okay.  And in those meetings, was there
4  ever discussion of the Amazon projects?
5    A.   Not very many discussions because
6  Will -- or, excuse me, Kyle only attended one or two.
7  He was not usually available, and we usually talked
8  about other issues.
9    Q.   So there's a couple of names that come
10 up in various depositions.  One is a fellow named
11 Christian Kirschner.  I think you've mentioned him.
12 Have you ever met Christian Kirschner?
13   A.   No.
14   Q.   Have you ever talked with him?
15   A.   Yes.
16   Q.   Okay.  Tell me about that.
17   A.   Yeah, in late November, Brian had a
18 phone call meeting, and I spoke with him because I had
19 to go over what outstanding commissions were and what
20 the progress was on the Amazon projects as far as
21 commissions that would be paid as a result of status
22 of receivables.
23   Q.   Okay.  And I want to make sure I
24 understand what you're saying.  So was this discussion
25 a discussion about payments that would need to be made

Page 80

1  to Villanova Trust pursuant to that agreement?
2    A.   Yes.
3    Q.   And so when you refer to commissions,
4  you're talking about Villanova Trust provided for
5  commissions to be paid?
6    A.   Yeah.  I wanted to go over what our
7  receivables were for fees that were due to us and then
8  those fees that would result in a commission to them
9  and when those were going to be due.
10   Q.   Fees that would result in a commission
11 to Villanova Trust?
12   A.   Correct.
13   Q.   Okay.  And how did you calculate those?
14 How did you figure that out?
15   A.   So we looked at what the spreadsheet was
16 of all of the fees that were associated with the
17 development project, when those fees would be paid,
18 and then once they were paid, then what portion would
19 go then to Villanova Trust as part of the referral
20 agreement.
21   Q.   And who would do the calculation of
22 that?
23   A.   Brent.
24   Q.   Okay.
25   A.   Or Kristi.

EXHIBIT L
Timothy Lorman  - 03/11/2022
77–80

**AB Litigation Services**

Page 81

1    Q.    All right.  And again, that would make
2  sense with their responsibilities?
3    A.    Uh-huh.
4    Q.    To calculate these kind of things?
5    A.    Uh-huh.
6         MS. ULLERY:  Objection, leading.
7    Q.    (BY MR. GARNETT)  And did you
8  double-check them to make sure the numbers seemed
9  about right?
10    A.    No.
11    Q.    So did you understand them to be
12  calculating them off the terms of the Villanova Trust
13  agreement?
14    A.    I would assume so, yes.
15    Q.    Okay.  And then, how does the
16  conversation with Christian Kirschner fit into this?
17    A.    So my belief was since I was involved in
18  the Amazon projects as far as what the current state
19  was that I was speaking towards the progress of the
20  projects and if there's any risk in delay of those
21  payments being paid based upon the project state.
22    Q.    Okay.  How long did you talk to
23  Christian Kirschner in that call?
24    A.    10, 15 minutes.
25    Q.    And was it a friendly call?

Page 82

1    A.    I assume so.
2    Q.    Did he seem satisfied with whatever was
3  being explained about these commissions?
4         MS. ULLERY:  Objection, speculative.
5    A.    As I recall, yes.
6    Q.    (BY MR. GARNETT)  Is that the only time
7  you've talked with Christian Kirschner?
8    A.    To the best of my knowledge, yes.
9    Q.    Okay.  And what about Casey Kirschner?
10  Have you ever yourself spoken with him?
11    A.    I have.
12    Q.    Okay.  How many times have you spoken
13  with him?
14    A.    Once.
15    Q.    Okay.  Tell me about that.
16    A.    There was some question when we go back
17  to the $1.3 million acquisition fee.  I recall that
18  Brian wanted me to touch base with Casey to make sure
19  that we had approval for that $1.3 million fee.
20    Q.    And so was that a phone call when you
21  actually called Casey?
22    A.    I did.
23    Q.    All right.  How long did you talk to
24  him?
25    A.    10, 15 minutes.

Page 83

1    Q.    And if I'm following the timeline right,
2  that was probably mid-November?
3    A.    Mid-December.
4    Q.    Mid-December.  Okay.  And that was to
5  talk to him about the acquisition fee?
6    A.    Correct.
7         MS. ULLERY:  Objection, asked and
8  answered.
9    Q.    (BY MR. GARNETT)  And what do you
10  remember about that conversation?
11    A.    Casey, as I recall, was adamant that
12  that fee would not be appropriate, that he couldn't
13  sign off on that fee.
14    Q.    Okay.  What did you tell him about the
15  fee?  Tell me kind of -- did he seem surprised you
16  were calling about that fee?
17    A.    I don't know.
18         MS. ULLERY:  Objection, leading.
19    A.    The conversation was I explained to him
20  that we had a $1.3 million acquisition fee that was
21  our contention that should have been a part of the
22  lease but it's not in the lease, would he sign an
23  addendum or provide some kind of approval for that,
24  and he was adamant he was not.
25    Q.    (BY MR. GARNETT)  Was there any email

Page 84

1  discussion about that conversation?
2    A.    I don't recall any email discussion.
3    Q.    And was anyone else on that call other
4  than you and Casey Kirschner?
5    A.    No.
6    Q.    After that call, did you report back to
7  Mr. Watson?
8    A.    Yes.
9    Q.    And tell me about that conversation.
10    A.    Just stated that Casey said that that
11  wasn't a part of the -- he would not approve that.
12    Q.    Okay.  And what did Mr. Watson say?
13    A.    I don't recall.
14    Q.    Okay.  Did you have any other
15  involvement in that $1.3 million acquisition fee?
16    A.    Only for the fact that we were never --
17  I was never able to resolve whether or not that was
18  actually a part of the lease or not.
19    Q.    All right.  There's a name that has come
20  up a couple times, a fellow named Bart Mancuso.  Do
21  you know who that is?
22    A.    I do.
23    Q.    Who is Bart Mancuso?
24    A.    He was a project manager that we hired,
25  I believe, in December to step into the role that was

EXHIBIT L
Timothy Lorman  - 03/11/2022                    81–84

ABI Litigation Services

**Page 85**

1    vacated by Kyle.
2         Q.   Okay.  And he only worked at Northstar
3    for a couple of months; is that right?
4              MS. ULLERY:  Objection, leading.
5         A.   I believe it was, gosh, almost just a
6    month.
7         Q.   (BY MR. GARNETT)  And do you know where
8    Mr. Mancuso is now?
9         A.   No.
10        Q.   When did you last speak with him?
11        A.   Probably about a year ago.
12        Q.   Okay.  And what did you talk to him
13   about in that conversation?
14        A.   We both talked about jobs that we were
15   pursuing.
16        Q.   Okay.  Do you know what he's doing now?
17        A.   I do not.
18        Q.   And do you know where he lives now?
19        A.   I do not.
20        Q.   Okay.  All right.  Let me show you some
21   exhibits and see if I can do this right.
22             MR. GARNETT:  We can be on the record.
23   To try to keep this from being too bizarre, let's just
24   go through and mark them all, and then I'll go back
25   and ask some questions.  Does that make sense?

**Page 86**

1              MR. SANDHU:  All right.
2         Q.   (BY MR. GARNETT)  So we're going to
3    Agile Law, which hopefully you have in front of you,
4    Mr. Lorman.  If not, we'll figure out how to refresh
5    it.
6              MR. SANDHU:  It should be shown to you
7    now.  One second.  I can reveal the marked exhibits.
8              MR. GARNETT:  Yes, mark it.  Do you
9    want -- I'll tell you what.  We could take a short
10   break if you want to load them all and mark them.
11             MR. SANDHU:  That sounds fine.  Are you
12   fine with me BC 1 through whatever?
13             MR. GARNETT:  No, let's call this Lorman
14   1 through whatever.  Does that make sense to you guys?
15             MR. SHAW:  Sure, yes.
16             MR. GARNETT:  And that way, if they want
17   to add some.
18             MR. SANDHU:  Sounds good.
19             MR. GARNETT:  Okay.  Let's go ahead and
20   take a break, Mr. Lorman.  This will be more
21   efficient.  We'll come back in 10 minutes.
22             THE DEPONENT:  Sounds good.
23             THE VIDEOGRAPHER:  The time is 10:38.
24   We are going off the record.
25             (Recess taken.)

**Page 87**

1              (Deposition Exhibits 1 through 14 were
2    marked.)
3              THE VIDEOGRAPHER:  The time is 10:52.
4    We are back on the record.
5         Q.   (BY MR. GARNETT)  Mr. Lorman, we're back
6    on the record, and, of course, you're still under
7    oath.  And I'm going to turn to some exhibits here in
8    a minute, but before we do that, I want to make sure
9    I'm clear on a couple of things.
10             So the first you had found out about
11   anything about this so-called White Peaks transaction
12   was in -- with that phone call you got from Mr. Watson
13   on the Thursday before his wedding in late September
14   of 2019; is that right?
15        A.   Yes.
16        Q.   And did you eventually find out some
17   more about kind of what was involved in the White
18   Peaks transaction?
19        A.   Yes.
20        Q.   What did you find out?
21        A.   Just from the news -- the letter -- or,
22   excuse me, the article that was in the Washington
23   Business Journal had some details about it, and
24   then -- that's the primary source.
25        Q.   And it was actually that article, I

**Page 88**

1    think, that was brought to Mr. Watson.  That's how he
2    learned about it.  Is that what you understand?
3         A.   Correct, correct.
4         Q.   And did he show you the article when you
5    came in on that Thursday?
6         A.   Yes.
7         Q.   And did you find out that, in fact, the
8    White Peaks transaction had been something that had
9    occurred over several months and it involved kind of a
10   flip for profit of land?  Is that what you understood?
11             MS. ULLERY:  Objection, compound.
12        A.   Yes.
13        Q.   (BY MR. GARNETT)  And the flip occurred
14   in a pretty short period of time and it was quite a
15   bit of profit; is that fair to say?
16             MS. ULLERY:  Objection, leading.
17        A.   Yes.
18        Q.   (BY MR. GARNETT)  Okay.  And you
19   indicated that Mr. Watson was pretty upset about this
20   when you talked to him?
21        A.   Yes.
22        Q.   And did you also understand that this
23   was the first he had heard about it, was this whatever
24   occurred on that Thursday?
25        A.   That's what I heard from him, yes.

EXHIBIT L
Timothy Lorman  - 03/11/2022                    85-88

Page 89

1    Q.   Okay.  Now, you've described Will and
2  Kyle being kind of absent and out of the office a lot
3  in the time when you were there after you started in
4  late March of 2019, and that's one of those awkward
5  questions, but generally how I understand you
6  describing it.  Is that right?
7    A.   That's correct.
8    Q.   And their absence is something that
9  concerned you, right?
10   A.   Yes.
11   Q.   Did you understand that it also
12  concerned Mr. Watson?
13   A.   I believe so, yes.
14   Q.   And, in fact, did the two of you talk
15  about kind of taking steps to get those guys under
16  control?
17   A.   Yes.
18   Q.   Okay.  Did Mr. Watson ever ask you to do
19  anything particular in that regard?
20   A.   I don't recall anything specific, no.
21   Q.   Did you have any ideas about how to kind
22  of get those guys under control?
23   A.   Yeah, I believe that we discussed about
24  trying to get visibility with the stakeholders and
25  having some other people in the firm involved with the

Page 90

1  project other than just Will and Kyle.
2    Q.   Did you ever hear those two fellows,
3  Will and Kyle, called cowboys, they're acting like
4  cowboys?
5    A.   I don't recall specifically.
6    Q.   Okay.  Do you think that would be an
7  accurate description of what they were -- kind of how
8  they were acting in those months?
9         MS. ULLERY:  Objection, vague.
10   A.   Well, depending upon --
11   Q.   (BY MR. GARNETT)  Go ahead.
12   A.   Depending on how we would define cowboy.
13   Q.   True.  How would you define cowboy in a
14  context like this?
15   A.   I would say that operating with few
16  rules, heightened sense of entitlements, heightened
17  sense of ownership.
18   Q.   And who knows whether cowboys would
19  agree with that, but that's --
20   A.   Don't know.
21   Q.   -- how they worked.  Would you agree?
22   A.   I would.
23   Q.   Okay.  And that concerned Mr. Watson
24  too?
25   A.   I believe so.

Page 91

1    Q.   And, in fact, when you found out about
2  the White Peaks transaction, were you able to
3  determine that the White Peaks transaction had been
4  going on in this period of time?
5    A.   I'm not following you on the question.
6    Q.   Yeah.  Do you know what the date of the
7  flip of the White Peaks transaction was?
8    A.   I think subsequent through looking at
9  emails and things like that after they left, I believe
10  it was in July.
11   Q.   Okay.  Of 2019?
12   A.   Yeah.
13   Q.   And there were a fair number of weeks of
14  negotiation and such prior to that?
15   A.   Probably.
16   Q.   Let's go through these exhibits.  Do you
17  have them now?
18   A.   I do.
19   Q.   And I'm going to go through them just so
20  I know I've got everything marked, and then some, I'll
21  have specific questions about, and others, I won't.
22  Okay.  Do you have Exhibit 1 in front of you?
23   A.   I don't know if it's Exhibit 1.  It's
24  independent contractor agreement.
25   Q.   Yeah.  It should be --

Page 92

1    A.   I see it now, Document 1.
2    Q.   -- Lorman Number 1.  And is this a copy
3  of the Villanova Trust agreement?
4    A.   I assume so.
5    Q.   Okay.  Well, take a look.  Did you ever
6  actually see the agreement?
7    A.   I believe so.  It would appear to be.
8    Q.   Okay.  And just so we're clear what
9  we're all looking at, it's several pages of a
10  document.  It's got initials, and then it's got some
11  signatures on the last page.  Is that fair to say?
12   A.   Correct.
13   Q.   Okay.  Did you understand that this
14  document was actually drafted by a lawyer named Rod
15  Atherton?
16   A.   No.
17   Q.   Did you have any understanding with
18  regard to that?
19   A.   No.
20   Q.   You agree it looks like a lawyer drafted
21  this?
22   A.   It looks like it.
23   Q.   And did you have any idea who the lawyer
24  might have been that would have drafted it?
25   A.   No.

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    89--92

ABI Litigation Services

Page 93

1    Q.   Now, Mr. Lorman, did you understand that
2  prior to this agreement, which is dated, I think on
3  the first page, January 8th of 2018 -- do you see
4  that?
5    A.   I do.
6    Q.   Which, again, is about -- that's about
7  14 months before you came to work at the company?
8    A.   Uh-huh.
9    Q.   Yes?
10       (The deponent nodded head up and down.)
11   Q.   Did you understand that there was a
12 previous agreement between Northstar and Christian
13 Kirschner personally?
14   A.   No.
15   Q.   Did you know anything about an agreement
16 like that?
17   A.   No.
18   Q.   Okay.  And you've certainly never seen
19 an agreement like that?
20   A.   Not that I recall.
21   Q.   Okay.  Take a look at Exhibit 2.
22 This -- oops.  Hang on a second here.  You know what?
23 Go to Document 3, which is Lorman Exhibit 2.  Are you
24 there?
25   A.   Yeah.

Page 94

1    Q.   Okay.  This is -- and I may through
2  being too diligent have multiple copies of exhibits,
3  but worse things have happened.  Lorman 2 is a
4  Northstar Commercial Partners' response to an RFP from
5  Amazon Web Services dated September 20th, 2017.  Have
6  you ever seen this before?
7    A.   I believe so.
8    Q.   Okay.  When would you have seen this?
9    A.   I believe I saw it in the fall.  There
10 was an opportunity that we were going to submit a
11 proposal for a project in California, and I believe I
12 looked at this document as an example of what we had
13 submitted before.
14   Q.   Okay.  And so just so I understand this,
15 it would have been in the fall of 2019?
16   A.   I believe so, yeah.
17   Q.   And was it an opportunity with Amazon
18 Web Services?
19   A.   It was, yes.
20   Q.   So you were going back to look at this
21 response to the RFP to see what had kind of worked in
22 the past?
23   A.   Right.
24   Q.   Did you put together a response to an
25 RFP in connection with that opportunity?

Page 95

1    A.   Yeah, it was a form that we completed.
2    Q.   Okay.  And what kind of -- what was the
3  opportunity?
4    A.   I believe that it was for a data center
5  in the central part of California, around Gilroy
6  perhaps.
7    Q.   Okay.  All right.  And were you the
8  primary person putting together that RFP response?
9    A.   I was.
10   Q.   Okay.  And did it get submitted?
11   A.   I believe so.
12   Q.   And whatever happened to it?
13   A.   Never heard anything.
14   Q.   Okay.
15       MR. GARNETT:  Did somebody just join us?
16 Maybe we just lost Ms. Barrett.
17       MR. SMART:  Stan, this is Adam and Casey
18 coming back in.
19       MR. GARNETT:  All right.
20   Q.   (BY MR. GARNETT)  And did anybody else
21 help you in providing the RFP that you put together
22 for the California opportunity?
23   A.   Yes.
24   Q.   Who?
25   A.   I think Kristi helped me.  I think Brent

Page 96

1  did as well, too.  I think David as well.
2    Q.   What was Don Marcott's role at Northstar
3  while you were there?
4    A.   So he was a partner of Brian's on
5  development projects, and he brought his experience in
6  having done other development projects.  It felt like
7  it was a separate organization.
8    Q.   So he was not an employee of Northstar?
9    A.   Not to the best of my knowledge, no.
10   Q.   Was he at the offices from time to time?
11   A.   He was.
12   Q.   And this -- what happened with the
13 California project?
14   A.   I never heard.
15   Q.   Now, you said it was the fall of 2019.
16 Was it before or after the meetings that resulted in
17 the suspension and then eventual firing of Will and
18 Kyle?
19   A.   It would have been after.
20   Q.   After.  Was it long after?  Was it in
21 like October, November?
22   A.   Yeah, it felt like November, December
23 period of time.
24   Q.   So there certainly wasn't -- even
25 December, towards the end of the year?

EXHIBIT L
Timothy Lorman  - 03/11/2022
93-96

ABI Litigation Services

**Page 97**

1    A.    Yes.

2    Q.    So there was nothing at that time that

3  caused you to feel like you shouldn't make a proposal

4  to Amazon?

5    A.    No.

6    Q.    And was Mr. Watson involved in this RFP?

7    A.    He was.

8    Q.    Did he sign off on it?

9    A.    I don't know that we had a signature

10 that he had to file.

11   Q.    Fair enough.  Did he approve it before

12 you submitted it?

13   A.    I believe so, yes.

14   Q.    And again, that would be the way that

15 things were run at Northstar; he would approve

16 anything as significant as that?

17   A.    Uh-huh.

18         MS. ULLERY:  Objection, vague.

19   Q.    (BY MR. GARNETT)  Yes?  And just so

20 we're clear, your answer is yes?

21   A.    Yes.

22   Q.    Go to Document 4.  And this is a

23 several-page document, and hopefully you're able to

24 figure out how to look through it.

25   A.    I am.

**Page 98**

1    Q.    Can you take a look at this document,

2  which for the record is marked -- we have a marking

3  here somewhere.

4    A.    Well, this is 111 pages.

5    Q.    Yes.

6    A.    Okay.

7    Q.    Just so we're clear, it's marked Lorman

8  3, and I'm certainly not going to go through 111

9  pages.  I'm just going to ask you generally whether

10 you recognize this document.

11   A.    I don't recall having seen it before.

12   Q.    Okay.

13   A.    I'm trying to get all the way through it

14 so I can see what it is.  This is a purchase

15 agreement.  Again, as I said, I don't recall seeing

16 this.

17   Q.    Okay.  That's fine.  If you don't recall

18 seeing it, I won't ask you questions about it.

19         Can you go to Document 5?

20   A.    Okay.

21   Q.    And this is a series of emails that are

22 marked, I think, Lorman 4.

23   A.    Yep.

24   Q.    Yeah.  Take a look at these.  These

25 appear to be Kyle Ramstetter to you, dated March 4th,

**Page 99**

1  and some back and forth; is that right?

2    A.    Yeah, so what this would have been is in

3  us going through Kyle's computer, and I sent the email

4  to myself so I had a copy of the email.

5    Q.    Okay.  All right.  We'll come back to

6  it.  Let's go to Document 5, which is -- or Document

7  6, which is Lorman Exhibit 5.

8    A.    Okay.

9    Q.    Do you see this?

10   A.    I do.

11   Q.    And this looks like some emails between

12 yourself, your personal email, and a fellow named Josh

13 Huckel, who I think we established worked for the FBI,

14 right?

15   A.    Correct.

16   Q.    And this is dated March 5th of 2020?

17   A.    Yes.

18   Q.    Okay.  Let's go to Document 7, which is

19 Lorman 6.  And this is another set of emails between

20 yourself and Mr. Huckel, is that right?

21   A.    Correct.

22   Q.    And you've got some things attached to

23 this Document 6.  What are those attachments?

24   A.    Those were provided in my submittal.

25         MS. ULLERY:  Stan, I'm sorry.  Is there

**Page 100**

1  a Bates stamp for this?

2         MR. GARNETT:  I don't think so yet, but

3  we're working on it.

4         MS. ULLERY:  Have these been produced?

5         MR. GARNETT:  Yes.  They're all

6  third-party documents and I believe were produced

7  yesterday morning.

8         MS. BARRETT:  Stan, can you make sure

9  you double-check with Catherine?  Because we haven't

10 received any productions yesterday.

11         MR. GARNETT:  I will.  I will

12 double-check, Claudia, and I'll update you guys on the

13 next break.

14   Q.    (BY MR. GARNETT)  We'll come back to

15 this, Mr. Lorman, but when did you first get in touch

16 with Mr. Huckel of the FBI?

17   A.    He approached me.

18   Q.    And when was that?

19   A.    Probably about February.

20   Q.    Can we go to Exhibit 7?

21   A.    I thought that was 7.

22   Q.    I'm sorry.  Document 8, Exhibit 7.  Do

23 you have it?

24   A.    I do.

25   Q.    And as you look at this, do you

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    97-100

Page 101

1  recognize this as your declaration that we were
2  discussing -- I think we discussed briefly at the
3  beginning?
4      A.   I do.
5      Q.   And was this declaration -- this one is
6  unsigned, but you did eventually sign this and approve
7  this; is that right?
8      A.   I don't know if I signed and approved
9  this one.
10     Q.   Okay.  We'll come back and take a look
11 at it.  Exhibit 9 -- I mean Document 9, which is
12 Exhibit 8, what is this, if you know?
13     A.   It appears to be a wire transfer --
14     Q.   Okay.
15     A.   -- instructions.
16     Q.   All right.  And this reflects transfer
17 to Villanova Trust?
18     A.   It appears to be.
19     Q.   Have you seen this before?
20     A.   I don't know if I've seen this specific
21 one.  I've seen several.
22     Q.   And did you provide this document to the
23 FBI at some point?
24     A.   I don't know if I provided this one.
25 I've provided documents that were similar.

Page 102

1      Q.   Okay.  Let's go to Exhibit 9.
2      A.   I'm on Document 9.  I don't see any
3  other documents.  Oh, wait a minute.  Let me stroll
4  here.
5      Q.   Yes, we're actually on Document 10,
6  Exhibit 9.
7      A.   Yeah.  I just found the scroll.
8      Q.   That's okay.  Are you on Document 10,
9  Exhibit 9?
10     A.   I am.
11     Q.   And what is this?
12     A.   This appears to be a spreadsheet showing
13 some transactions.
14     Q.   Have you ever seen it before?
15     A.   It looks familiar.
16     Q.   Okay.  Do you know who prepared it?
17     A.   I do not.
18     Q.   Do you know whose initials are over
19 there in kind of the right-hand column?
20     A.   I don't recognize those.
21     Q.   Do you recognize the handwriting?
22     A.   The handwriting?  No.
23     Q.   Okay.  And do you know what these
24 numbers represent?
25     A.   Is there a way to make this brighter?

Page 103

1  I'm sorry to --
2      Q.   I'm sure there is.  It may take us half
3  an hour to figure it out.  It's just really dark and
4  hard to see.
5           MR. SANDHU:  I can give it a shot.  Do
6  you want to go off the record?
7           MR. GARNETT:  No.
8      A.   I hate to interrupt.  It's just really
9  dark.  I think if we just do function.
10          MR. SMART:  Right click on the battery
11 down at the bottom, and that usually brings it up.
12          THE DEPONENT:  We got it, we got it.
13          MR. GARNETT:  Wow.  Thanks.
14     Q.   (BY MR. GARNETT)  Now that you can read
15 it, do you notice anything else about it?
16     A.   I do not.  It seems to be just recording
17 certain transactions.
18     Q.   Up on the top on the left-hand side, it
19 says splits worksheet provided by Kyle.  Do you know
20 what that means?
21     A.   I do not.
22     Q.   Did Kyle Ramstetter ever explain to you
23 what this document was?
24     A.   He did not.
25     Q.   Let's go to Document 11, Exhibit 10.

Page 104

1  This shows -- appears to show another transfer to
2  Villanova Trust.  Is that what it appears to show you?
3      A.   It does.
4      Q.   Okay.  Do you know whether this transfer
5  was made pursuant to the referral agreement with
6  Villanova Trust?
7      A.   I do not.
8      Q.   Okay.  Did you have anything to do with
9  calculating this amount?
10     A.   I did not.
11     Q.   Okay.  Let's go to Document 12, which is
12 Exhibit 11.  Can you take a look at this?
13     A.   Yep.
14     Q.   And do you recognize what this is?
15     A.   It appears to be a lease for IAD175.
16     Q.   Okay.  Have you ever seen it before?
17     A.   I don't know if I've seen this specific
18 version, but I've seen leases for this property.
19     Q.   Okay.  And finally, take a look at
20 Document 13, which is Lorman Exhibit 12.
21     A.   Okay.
22     Q.   And is this a transcript of the
23 conversation that we were talking about a bit before
24 that occurred in late September of 2019?
25     A.   It appears to be.

EXHIBIT L
Timothy Lorman  - 03/11/2022
101-104

1    Q.   Okay.  And have you seen this transcript
2  before?
3    A.   I believe so, yes.
4    Q.   And have you reviewed it to see whether
5  it appears to be generally accurate?
6    A.   I believe I skimmed through it, but I
7  didn't judge it for accuracy.
8    Q.   Okay.  So at any point in 2019,
9  Mr. Lorman, did you become concerned that there was
10  something improper occurring in connection with the
11  Amazon transactions?
12    A.   I did.
13    Q.   And tell me about that.
14    A.   My first concern was the fact that one
15  of the Amazon employees and our referral partner were
16  brothers and that based upon the transaction that one
17  brother generated, ultimately the other brother would
18  benefit from, and that seemed concerning.
19    Q.   Okay.  When did you first find that out?
20    A.   I don't recall.  I would say probably
21  late summer.
22    Q.   Okay.
23    A.   Because at first, I was introduced to
24  what Villanova Trust was, and I didn't know who
25  participated in Villanova Trust.

1    Q.   And just so we're clear, the brothers
2  you're talking about are Christian Kirschner and Casey
3  Kirschner?
4    A.   Correct.
5    Q.   So the fact that the two Kirschners are
6  brothers, that caused you concern?
7    A.   It raised an eyebrow, yes.
8    Q.   Okay.  Did you go and talk to Mr. Watson
9  about that?
10    A.   I did.
11    Q.   And tell me about that conversation.
12    A.   He explained it as a referral agreement,
13  that Christian had made the introduction, and so
14  stated with that that he would earn a referral fee,
15  that he was making other introductions besides Amazon
16  as well, too.
17    Q.   Okay.
18    A.   And that was -- that was it.
19    Q.   And in that conversation, did Mr. Watson
20  tell you that he'd had a referral agreement in place
21  with Mr. Christian Kirschner personally well prior to
22  January of 2018?
23    A.   I don't recall if he did or not.
24    Q.   Okay.  Did you understand that
25  Mr. Watson had known Mr. Kirschner for a number of

1  years?
2    A.   I did.
3    Q.   And that, in fact, they'd worked
4  together at Cushman & Wakefield at one point?
5    MS. ULLERY:  Objection, leading.
6    A.   I don't recall if I knew that
7  specifically, but . . .
8    Q.   (BY MR. GARNETT)  But you knew they had
9  known each other for a while?
10    A.   Yes.
11    Q.   So after you had that conversation with
12  Mr. Watson, did you do anything in connection with
13  that?
14    A.   No.
15    Q.   Okay.  Did Mr. Watson say anything to
16  you in that conversation about counsel having reviewed
17  and approved the Villanova Trust contract?
18    A.   I don't recall that, no.
19    Q.   Okay.  In the time that you worked at
20  Northstar, how much contact did you have with the
21  lawyers at Jones & Keller, who represented Northstar?
22    A.   The only contact I had, which was fairly
23  significant, was with Kerri Assell, and she was the
24  one who really represented us in the lease
25  negotiations, so working through leasing issues.

1    Q.   Did you understand that she had
2  represented Northstar as well in the lease
3  negotiations in connection with the -- and the other
4  negotiations in connection with the Amazon projects?
5    A.   I believe I knew that, yeah.
6    Q.   Okay.  And did you know that Amazon, in
7  fact, had had counsel involved in reviewing those
8  transactions?
9    MS. ULLERY:  Objection, leading.
10    A.   I'm not aware of that at all.
11    Q.   (BY MR. GARNETT)  Okay.  It wouldn't
12  surprise you if a company like Amazon would have
13  counsel looking at those things?
14    MS. ULLERY:  Objection to form.
15    A.   It would not surprise me, no.
16    Q.   (BY MR. GARNETT)  Did you know that they
17  had both in-house and outside counsel reviewing those
18  contracts?
19    A.   No.
20    Q.   Okay.  All right.  So after the
21  conversation you had with Mr. Watson -- it sounds like
22  that was in maybe August of 2019 --
23    A.   It could have been, yes.
24    MS. ULLERY:  Objection, leading.
25    Q.   -- about the Kirschners.  Was there

EXHIBIT L
Timothy Lorman  - 03/11/2022
105–108

ABI Litigation Services

1   another time when you came to have concerns about the
2   Amazon transactions?
3        A.   Yeah, after we -- I think it was the
4   Monday after Brian's wedding, Brian had me in his
5   office, and he was concerned to make sure that
6   Casey -- our relationship with Amazon wasn't damaged
7   due to what had happened with Will and Kyle.  So I was
8   on a conversation with him.  And at one point in time,
9   I recall Casey saying, "I really never liked Kyle that
10  much anyway.  He figured out what we were up to in two
11  weeks."  And at that point in time, I got up and left
12  Brian's office.
13       Q.   (BY MR. GARNETT)  So let me sort that
14  out.  And again, we've established, I think, the only
15  one-to-one conversation you've had with Casey
16  Kirschner was the one about the -- was it development
17  fee?
18       A.   Acquisition fee.
19       Q.   Acquisition fee in December?
20       A.   Correct.
21       Q.   Other than that, you've never talked to
22  him one on one?
23       A.   I have not.
24       Q.   And you've never met him?
25       A.   No.

1        Q.   So after the White Peaks blowup, if you
2   will, the next Monday, Mr. Watson is talking to
3   Mr. Kirschner on the phone; is that right?
4        A.   Correct.
5        Q.   And does -- and you're in the room for
6   part of that conversation?
7        A.   Correct.
8        Q.   Did -- were you there when Mr. Watson
9   actually dialed Mr. Kirschner?
10       A.   Yes.
11       Q.   Okay.  And what did you understand the
12  reason for dialing Mr. Kirschner was?
13            MS. ULLERY:  Objection, speculative.
14       A.   It's my understanding that we were
15  touching base with Casey just to assess if there was
16  any damage from what had transpired with the White
17  Peaks transaction.
18       Q.   (BY MR. GARNETT)  And given what had
19  happened with the White Peaks transaction, did that
20  seem like a reasonable thing to be doing at that
21  point?
22       A.   Yes.
23       Q.   Okay.  So you didn't think there was
24  anything wrong with him calling Casey Kirschner?
25       A.   No.

1        Q.   Okay.  So he calls him, and then they
2   start talking?
3        A.   Uh-huh.
4        Q.   Yes?
5        A.   Uh-huh.
6        Q.   And I'm sorry.
7        A.   Yes.  Sorry, sorry.
8        Q.   It's all right.  You're doing great.
9             And they talked for a while.  How long
10  were you in the room?
11       A.   Ten minutes maybe.
12       Q.   All right.  And what are they talking
13  about?
14       A.   They're talking about what transpired
15  with the White Peaks transaction.
16       Q.   And what does Mr. Watson say about that?
17       A.   It was just a general check-in.  I don't
18  recall anything specific about it.  I think at that
19  point in time he told Casey that Will and Kyle were no
20  longer going to be with the company.
21       Q.   Okay.  And how did Casey react to that?
22            MS. ULLERY:  Objection, speculative.
23       A.   What Casey stated on the call was what
24  I've said.  He said -- I remember him saying it's a
25  good thing because I didn't trust him anyway, he

1   figured out what we were up to two weeks in.
2        Q.   (BY MR. GARNETT)  And what did you --
3   what did you think that meant?
4        A.   I stepped out because I felt like the
5   conversation was going in a personal nature that
6   wasn't appropriate for me to be a part of that
7   conversation.  So I stepped away.
8        Q.   Okay.  Well, let me ask you this.  Did
9   Mr. Watson ask you to step out?
10       A.   He did not.
11       Q.   And did he gesture at you or anything?
12       A.   No.
13       Q.   So that was a decision that you made?
14       A.   Yes.
15       Q.   All right.  And you then left?
16       A.   Yes.
17       Q.   And how much longer did the conversation
18  go on?
19       A.   I don't know.
20       Q.   All right.  Did you at some point come
21  back and talk to Mr. Watson about it?
22       A.   I came back, and we talked about what
23  next steps were going to be through the whole thing,
24  but I don't recall referencing that.
25       Q.   You didn't say something to him like,

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    109—112

Page 113

1    "What the heck was that?  What was Casey talking
2    about?"
3              MS. ULLERY:  Object to the form.
4        A.   No.
5        Q.   (BY MR. GARNETT)  Why not?
6        A.   I didn't feel -- I didn't feel
7    comfortable talking about it.
8        Q.   Well, you're the COO of Northstar,
9    correct?
10       A.   Correct.
11       Q.   And you're now saying you thought there
12   was something improper about that?
13       A.   Uh-huh.
14       Q.   Yes?
15       A.   Yes.
16       Q.   But you didn't feel it would have been
17   appropriate to raise that to Brian Watson?
18       A.   I did not, no.
19       Q.   Even to ask him for an explanation?
20       A.   I did not.
21       Q.   So you just assumed it was something
22   nefarious, essentially?
23             MS. ULLERY:  Objection, misstates
24   testimony and form.
25       A.   I assumed that it was uncomfortable.

Page 114

1        Q.   (BY MR. GARNETT)  Okay.  But you didn't
2    do anything about it?
3        A.   I did not.
4        Q.   Okay.  Did something else happen that
5    caused you to be concerned about the Amazon --
6        A.   Yes.
7        Q.   -- transactions?
8        A.   Yes.
9        Q.   Tell me about that.
10       A.   So what my concern was is that as we
11   were going through -- and this was in December --
12   trying to determine where the $1.3 million acquisition
13   fee lived within the leases, I was digging through,
14   and there was many variations of lease budgets and
15   construction budgets.  So it took a lot of time to
16   sort through that, and not everything lined up.  So
17   what we're trying to do is figure out is there any
18   document that Amazon would have signed that would have
19   approved this $1.3 million acquisition fee, and we
20   couldn't find out anything.  So IPI was pushing on us
21   because they thought the money should be returned,
22   that we should not have taken the acquisition fee.
23             So as I'm going through the budgets, I
24   noticed that there was a couple of line items -- one
25   or two line items, one of which was Adrenaline

Page 115

1    Capital.  So I asked IPI.  I said, "What is Adrenaline
2    Capital?"
3              They said, "Oh, that's our referral fee
4    for," I believe it was Childress or something like
5    that, who was paid for making some type of referral
6    associated with the transaction.
7              And I noticed that there was no
8    reference to Villanova as being a referral fee, and
9    looking at the documents associated with the
10   partnership, the NS-IPI partnership, clearly stated
11   that all financial transactions were communicated with
12   all of the partners.  I didn't see any evidence of
13   that, so that was my concern.
14             And then kind of putting several things
15   together, there was no reference to the Villanova.
16   There was some behind the scenes, the relationship
17   with the parties.  It began to make me concerned that
18   there was something inappropriate that was happening.
19       Q.   And did you go and talk to Mr. Watson
20   about your concerns?
21       A.   I believe that I did, yes.
22       Q.   Okay.  Tell me about that conversation.
23       A.   It was the same conversation about
24   Villanova as far as that's our referral agreement,
25   lawyers have taken a look at the documents, and I'm

Page 116

1    not privy to what happens with the money that we pay
2    from the referral fee --
3        Q.   Okay.
4        A.   -- and so it should be appropriate.
5        Q.   And did you believe Mr. Watson when he
6    told you that?
7        A.   Which part?  All of the statements?
8        Q.   Yes.
9        A.   Yes, I believed him.
10       Q.   And so between the conversation with
11   Casey Kirschner that you walked out of and this event
12   in December, nothing else caused you to be concerned
13   about the Amazon relationship; is that right?
14             MS. ULLERY:  Objection, misstates
15   testimony.
16       A.   I had several concerns just in our
17   ability to be able to execute on the contracts.  We
18   had gotten -- we had had some issues with our draws
19   and getting our reporting done.  So it was an overall
20   performance about our ability to complete the --
21   complete the work.
22       Q.   (BY MR. GARNETT)  Okay.  But there was
23   nothing that caused you to be concerned that there was
24   something nefarious about this arrangement?
25             MS. ULLERY:  Objection to form.

EXHIBIT L
Timothy Lorman  - 03/11/2022
113—116

ABI Litigation Services

**Page 117**

1    A.   Beyond what I said, no.
2    Q.   (BY MR. GARNETT)  Okay.  Between the
3  conversation with Casey Kirschner and the IPI-related
4  review that you just described in December?
5    A.   Correct.
6    Q.   As a matter of fact, you went ahead and
7  made the proposal -- put together the RFP response for
8  an Amazon transaction in probably October or November;
9  is that right?
10    MS. ULLERY:  Objection, form.
11    A.   Yes.
12    Q.   (BY MR. GARNETT)  Okay.  Let's take a
13  look at Exhibit 7, which is Document 8.  And before we
14  get into this, I asked you before whether you had
15  contacted Mr. Huckel, and I think the answer was no,
16  he contacted you.  Is that right?
17    A.   Correct.
18    Q.   And that was sometime in February?
19    A.   Right.
20    Q.   All right.  Tell me about that.  How did
21  that come about?
22    A.   I just received a phone call from him
23  one day and said he wanted to set up a meeting and
24  wanted me to give me a call.
25    Q.   And did you know -- okay.  And you did

**Page 118**

1  give him a call?
2    A.   I did.
3    Q.   And did he tell you what he wanted to
4  talk to you about?
5    A.   He did.
6    Q.   What did he tell you?
7    A.   He wanted to talk to me about the White
8  Plains transaction.
9    Q.   White Peaks?
10    A.   White Peaks transaction, correct.
11    Q.   And were you at work when he made this
12  call to you initially?
13    A.   No, I was driving.
14    Q.   And do you know how he had gotten your
15  phone number to call you?
16    A.   I don't.
17    Q.   Okay.  And you then set up a meeting?
18    A.   Correct.
19    Q.   All right.  And where did that meeting
20  take place?
21    A.   The phone call or the face-to-face
22  meeting?
23    Q.   Oh.  Well, was there first a more
24  substantive phone call and then a face-to-face
25  meeting?

**Page 119**

1    A.   I believe there was a couple substantive
2  phone calls that we had, and then he organized a
3  face-to-face meeting.
4    Q.   Okay.  And he was, I'm assuming, in
5  these calls elaborating for you on what he wanted to
6  talk about.  Is that right?
7    A.   Correct.
8    Q.   And was he asking you questions?
9    A.   He was.
10    Q.   What do you remember about those phone
11  calls?
12    A.   Just that he was asking me questions
13  about what I knew that had taken place.  He had very
14  specific questions, and I provided answers.
15    Q.   Okay.  When you met with him, did you
16  provide him with documents?
17    A.   When I met with him face to face?  No.
18    Q.   Okay.  Did you provide him with
19  documents prior to that?
20    A.   I don't believe so, no.
21    Q.   Okay.  Let's take a look now at Exhibit
22  7.  This, I believe I've indicated --
23    A.   Is this the declaration?
24    Q.   Yes.  Which is a document to make it as
25  confusing as possible.  Let's take a look at this,

**Page 120**

1  which I think is about five pages.  Did you -- as I
2  understand it, you eventually reviewed and signed off
3  on a final version of this; is that right?
4    A.   Correct.
5    Q.   Can you take a look at Exhibit 7 and see
6  if this appears to you to be the version that you
7  approved?
8    A.   I'm sorry.  It took me a second to
9  figure out how to scroll.
10    Q.   Yes, of course.  No problem.
11    MS. ULLERY:  Objection, form.
12    A.   It appears to be.
13    Q.   (BY MR. GARNETT)  So this appears to be
14  the final version that you signed?
15    A.   It appears to be.
16    MS. ULLERY:  Objection, form.
17    Q.   (BY MR. GARNETT)  Okay.  Do you
18  remember, were there other drafts of this or was it
19  just presented to you and you reviewed it and you
20  signed it?
21    MS. ULLERY:  Objection, form.
22    A.   There was one prior draft, and I believe
23  that I made some changes to it and then sent back
24  those changes.
25    Q.   (BY MR. GARNETT)  Okay.  Do you remember

EXHIBIT L
Timothy Lorman  - 03/11/2022
117—120

ABI Litigation Services

**Page 121**

1   what changes you made?

2        A.   I do not.

3        Q.   Okay.  Who drafted this?  What did you

4   understand?

5        A.   I believe it was attorneys from Gibson.

6        Q.   And was it Patrick Stokes?

7        A.   I don't know.

8        Q.   Do you know who the lawyers from Gibson

9   were?

10       MS. ULLERY:  Objection, asked and

11  answered.

12       A.   I only spoke with Patrick and I believe

13  it was Lora.

14       Q.   (BY MR. GARNETT)  Lora MacDonald?

15       A.   Yeah.

16       Q.   Okay.  Great.  And did you understand

17  what this was going to be used for?

18       A.   It was a document of my statements, and

19  I assumed it was going to be used in this process.

20       Q.   Okay.  Let's take a look, just go

21  through this and make sure I'm clear what you're

22  saying here.  Those are -- in Paragraph 2, those are

23  the dates of your employment at Northstar, March 5th,

24  2019 to April 7th, 2020.  Does that sound right?

25       A.   Yes.

**Page 122**

1        Q.   And did the lawyers from Gibson Dunn

2   explain to you what they were going to use this

3   declaration for?

4        A.   As a part of their argument or case or

5   whatever you want to call it.

6        Q.   Did you understand they were trying to

7   get an injunction against Brian Watson and Northstar

8   for over $20 million?

9        MS. ULLERY:  Objection, leading.

10       A.   I wasn't -- I just simply gave them the

11  information they were looking for.  I wasn't privy to

12  outcomes.

13       Q.   (BY MR. GARNETT)  They didn't explain to

14  you what they were trying to do in the case?

15       MS. ULLERY:  Objection, form.

16       A.   I don't recall that.

17       THE DEPONENT:  Sorry.

18       Q.   (BY MR. GARNETT)  That's okay.  You

19  indicate here that before you were at Northstar, you'd

20  worked in commercial real estate for about 20 years.

21  That's at the various companies you've described?

22       A.   Correct.

23       Q.   So your wife is a construction manager

24  for -- at Amazon, and she got that job shortly after

25  you stepped in to take over for Kyle and Will; is that

**Page 123**

1   right?

2        MS. ULLERY:  Objection, leading.

3        A.   I believe so.

4        Q.   (BY MR. GARNETT)  October 21st, 2019.

5   Does she still work at Amazon?

6        A.   She does.

7        Q.   Okay.  You indicated that "Northstar

8   interacted primarily with Amazon through an Amazon

9   transaction manager named Casey Kirschner, although my

10  interactions with him were not extensive."

11       What was the basis for saying that?

12       A.   I didn't have regular interaction with

13  him.

14       Q.   Right.  But why did you conclude that

15  Northstar interacted with Amazon primarily with Casey

16  Kirschner?

17       A.   Because that's who both Brian and Kyle

18  stated they primarily interacted with.

19       Q.   Here, you indicate that you later

20  identified that Christian Kirschner was a trustee of

21  the Villanova Trust --

22       MS. ULLERY:  I'm sorry, Stan, can you --

23       MR. GARNETT:  I'm sorry.  Paragraph 7.

24       MS. ULLERY:  Thank you.

25       MR. GARNETT:  Yes, thanks, Counsel.

**Page 124**

1        Q.   (BY MR. GARNETT)  Are you indicating you

2   didn't know about that until late 2019?

3        A.   No.  I think I was familiar with that

4   midsummer.

5        Q.   Okay.

6        A.   I'm not sure why it states that.

7        Q.   Paragraph 8, you indicate that you

8   observed a number of indicia of a close personal

9   relationship between Brian Watson and Casey Kirschner.

10  "On information and belief, Brian Watson communicated

11  with Casey Kirschner and another Amazon transaction

12  manager Carleton Nelson through their Gmail accounts."

13       When you say "on information and

14  belief," is that -- you're saying you believe that's

15  true but you can't really prove it?  What are you

16  saying?

17       MS. ULLERY:  Objection; speculative,

18  leading.

19       A.   I seem to recall that I'd seen some

20  communications from Casey, from his personal email

21  account.

22       Q.   (BY MR. GARNETT)  And you assumed that

23  because it was a personal email account there was

24  something inappropriate about it?

25       MS. ULLERY:  Objection, misstates

EXHIBIT L
Timothy Lorman  - 03/11/2022                                   121–124

Page 125

1  testimony.

2      A.   No.

3      Q.   (BY MR. GARNETT)  Okay.  But that was

4  the basis for your concluding that he and Mr. Watson

5  had a close personal relationship?

6      A.   Yes.

7      Q.   Okay.  Then you indicate, "On

8  information and belief, on or around December 5th,

9  2018, Brian Watson invited Casey Kirschner and

10  Carleton Nelson on a hunting trip to New Zealand."  Do

11  you see that?

12      A.   I do.

13      Q.   And then again you say, "On information

14  and belief, at least Casey Kirschner attended this

15  trip."  Again, when you're saying "on information and

16  belief," I'm assuming you mean you believe it to be

17  the case, but you don't have personal knowledge.  Is

18  that what you're saying?

19          MS. ULLERY:  Objection to form.

20      A.   So that would be based upon after

21  reviewing email traffic from Kyle when we had access

22  to his computer.  There was communications.

23      Q.   (BY MR. GARNETT)  In the time that you

24  worked at Northstar, Mr. Lorman, did you participate

25  in any relationship-building trips or activities at

Page 126

1  Northstar?

2      A.   Yeah, we did -- we'd go to C Lazy U

3  Ranch.  We went up there for our Christmas party.

4      Q.   Okay.  And what kinds of things would

5  happen there?

6      A.   There were activities, horseback riding

7  and hiking.  I believe that we had a cornhole

8  tournament, dinners.

9      Q.   Okay.  How many times did you go to the

10  C Lazy U Ranch?

11      A.   I only recall once.

12      Q.   Okay.  Paragraph 9, here we're

13  referencing what we've been through in terms of

14  finding out about the White Peaks transaction?

15      A.   Uh-huh.

16      Q.   When you indicate in Paragraph 9, "We

17  learned that Nova WPC had purchased land," by "we,"

18  are you including Mr. Watson?

19      A.   Yes.

20      Q.   In other words, that he learned about it

21  when you learned about it, essentially?

22      A.   Correct.

23          MS. ULLERY:  Objection, misstates

24  testimony.

25      Q.   (BY MR. GARNETT)  Paragraph 11, you

Page 127

1  indicate that Brian Watson in this meeting "demanded

2  that Kyle Kirschner 'do the right thing and pay us the

3  money immediately' from the profits made on the NOVA

4  WPC Transaction."  Do you remember Mr. Watson saying

5  that?

6      A.   I do.

7      Q.   Okay.  And did you, in fact, think that

8  would have been the right thing for Mr. Ramstetter to

9  do?

10      A.   I don't recall having an opinion about

11  that.

12      Q.   Well, you certainly -- you didn't object

13  to that suggestion, right?

14      A.   No.

15      Q.   Okay.  And then in Paragraph 12, you're

16  talking about the following Monday, September 30th,

17  and here, you're discussing the conversation where

18  Casey Kirschner was on the call; is that right?

19      A.   Correct.

20      Q.   In Paragraph 13, you learned sometime in

21  October that Mr. Watson had settled the dispute with

22  Mr. Ramstetter and Mr. Camenson?

23      A.   Uh-huh.

24      Q.   Yes?

25      A.   Yes.

Page 128

1      Q.   And was there anything about that that

2  you thought was inappropriate, him settling this theft

3  of corporate opportunity situation?

4      A.   No.

5      Q.   You certainly didn't object to it?

6      A.   No.

7      Q.   Oh, just so we're clear --

8          MR. GARNETT:  Thank you, Mr. Sandhu.

9      Q.   (BY MR. GARNETT)  Mr. Lorman, take a

10  look at Document 14, which also happens to be

11  Exhibit 14, and that appears to be your signed

12  declaration.  If you can just confirm that for me.

13      A.   Yes.

14      Q.   Okay.  So that's the one that you

15  actually signed, right?

16      A.   Yes.

17      Q.   Okay.  Go back to Document 7, Exhibit 6.

18      A.   Got it.

19      Q.   Now, this is one of your emails to

20  Mr. Huckel, right?

21      A.   Correct.

22      Q.   And are you aware, Mr. Lorman, that

23  Mr. Huckel has been removed from this investigation?

24      A.   I am not.

25      Q.   Okay.  Do you have any idea who's

EXHIBIT L
Timothy Lorman  - 03/11/2022
125–128

Page 129

1   replaced him?
2        A.   I have not.
3        Q.   You haven't had any contact with the
4   FBI, it sounds like?
5        A.   No.
6        Q.   Let's take a look at this email.  It
7   says, "Josh, the situation here is deteriorating
8   rapidly.  A few important updates for you.  One, we
9   could meet the current payroll, however this will be
10  the last."
11            Why are you expressing these concerns
12  about payroll and cash flow to the FBI?
13       A.   The concern was whether or not the
14  business would still be in place.  I believe Josh had
15  mentioned that they wanted to come in and potentially
16  grab files out of the office, and so letting him know
17  that we may not be there when he comes to do that.
18       Q.   Okay.  You indicate here, additionally,
19  "Attached is a communication from his ex-wife."  And I
20  assume that's -- you're referring to Patricia Watson.
21  Is that right?
22       A.   Correct.
23       Q.   And it says, "He bounced a $312,000
24  check to her.  Included in that amount was money due
25  to her via a court order."  You understood,

Page 130

1   Mr. Watson -- Mr. Lorman, that Mr. Watson had
2   significant financial obligations to his ex-wife?
3            MS. ULLERY:  Objection to form.
4        Q.   (BY MR. GARNETT)  Did you understand
5   that?
6        A.   I believe that.
7        Q.   Did he tell you that?
8        A.   I don't recall a specific conversation
9   about that.
10       Q.   Okay.  And who sent you this information
11  about this?
12       A.   I don't recall.
13       Q.   Okay.  And why did you send this to the
14  FBI?
15       A.   As further evidence of some of the
16  financial difficulties which were impairing our
17  viability.
18       Q.   Okay.  And at this time, late March of
19  2020, do you remember Mr. Watson talking to you about
20  concerns about whether IPI was going to make a payment
21  of over $3 million that was due?
22            MS. ULLERY:  Objection, form.
23       A.   I don't recall that.
24       Q.   (BY MR. GARNETT)  Okay.  Did you know
25  anything at this time about payments that IPI owed to

Page 131

1   Northstar?
2        A.   I would have to think about that.  I
3   recall that there was concern about the $1.3 million
4   acquisition fee, that IPI felt should have been
5   refunded and that we should not have taken, and I
6   believe that there was some amount of money that was
7   due to us from IPI that was being held up because of
8   that.
9        Q.   So the $1.5 million acquisition fee --
10       A.   1.3.
11       Q.   Sorry, 1.3.  That's what you were
12  talking about with IPI back in December?
13       A.   Correct.
14       Q.   And as far as you know, that never got
15  resolved?
16       A.   I have no idea.
17       Q.   You've never seen documents tying that
18  together, pro formas or otherwise?
19       A.   Tying what together?
20       Q.   The $1.3 million acquisition fee that
21  you were concerned about.
22       A.   To any lease documents or anything like
23  that?
24       Q.   Or any of the documents in the
25  transaction.

Page 132

1        A.   No.
2        Q.   Okay.  You're also telling Mr. Huckel
3   about Mr. Watson owning a private jet, and you give
4   him the tail number of that jet.  Why did you do that?
5        A.   In case there was some concern that
6   Brian might just leave based upon the fact that we
7   were experiencing some significant financial
8   difficulties, and so that if he tried to just fly
9   away, that they would know where to find him.
10       Q.   Okay.  Let's go back to Document 5,
11  which is Exhibit 4.  Do you have that?
12       A.   I have Document 5.  Is this the email?
13       Q.   Yeah, these are -- I think you indicated
14  you downloaded this from Kyle's computer.
15       A.   Yes.  That's correct.
16       Q.   And when you did this, was Mr. Watson
17  involved in helping you do this?
18       A.   No.
19       Q.   How did you have access to Kyle
20  Ramstetter's computer at this point?
21       A.   When he had left, we retained his
22  computers, and it was standard practice that when an
23  employee left, that we had access to their computer.
24       Q.   And who helped you then -- when you say
25  "we," who helped you go through the computer?

EXHIBIT L
Timothy Lorman  - 03/11/2022                    129-132

Page 133

1    A.    Kristi.
2    Q.    And did you do the same with Will
3 Camenson's computer?
4    A.    We did.
5    Q.    And "we" means you and Kristi?
6    A.    Correct.
7    Q.    Great.
8         MR. GARNETT:  I've got a few cleanup
9 questions.  Let me do those, then take a short break.
10 Then I'll turn it over to you, and we're happy to take
11 whatever break for lunch we need to do.
12         MS. ULLERY:  Okay.  Was Nelson's counsel
13 going to be asking questions as well?
14         MR. GARNETT:  Oh, yeah.  Let me finish
15 here.  We'll take a break.  We'll figure out the
16 order.
17    Q.    (BY MR. GARNETT)  So, Mr. Lorman, you
18 got the call from the FBI in February.
19    A.    Uh-huh.
20    Q.    How did you end up getting in touch with
21 Gibson Dunn's lawyers?
22    A.    I believe they contacted me.
23    Q.    Okay.  And when did that happen?
24    A.    I'm going to say April-ish.
25    Q.    After you'd left working at Northstar?

Page 134

1    A.    Yes.
2    Q.    Okay.  And what did they tell you when
3 they contacted you?
4    A.    Just had some questions about my
5 experience at Northstar.
6    Q.    Okay.  And did they have an investigator
7 interview you or did just the lawyers talk to you?
8    A.    I don't know --
9         MS. ULLERY:  Objection, compound.
10   A.    I don't know what their roles were, but
11 I assume if they were lawyers, it was, again, Lora and
12 Patrick.
13   Q.    Okay.  Did you feel that you had any
14 obligation of confidentiality to Northstar at that
15 point?
16   A.    Any obligation of confidentiality?
17   Q.    And let me just ask you.  Here's why I'm
18 asking.
19   A.    Sure.
20   Q.    You're an ex-COO of a company, and
21 within a few weeks of you leaving the company, lawyers
22 from somebody else call you up and start asking you
23 about financial and other information about that
24 company.  Did you have any concern about talking to
25 them?

Page 135

1         MS. ULLERY:  Objection, form.
2    A.    I did not.
3    Q.    (BY MR. GARNETT)  Okay.  Why not?
4    A.    I don't know.
5    Q.    Okay.  At some point, somebody starts
6 using the word "kickback."
7    A.    Okay.
8         MS. ULLERY:  Objection to form.
9    Q.    (BY MR. GARNETT)  Do you know that word?
10   A.    I've heard the term.
11   Q.    Have you heard it in connection with
12 Amazon?
13   A.    Specifically, no.
14   Q.    Okay.  Did Mr. Huckel use the word
15 "kickback"?
16   A.    I don't recall.
17   Q.    Have you ever used the word "kickback"
18 to describe what was somehow happening with the Amazon
19 transactions?
20   A.    I don't know that I used that specific
21 term.
22   Q.    Did you use another term that's maybe
23 similar to "kickback"?
24        MS. ULLERY:  Objection, vague.
25   A.    I think -- no.

Page 136

1    Q.    (BY MR. GARNETT)  Okay.  Did you ever
2 have any reason to believe that the payments to
3 Villanova Trust were other than what was laid out and
4 appropriated in the Villanova Trust agreement that we
5 looked at a while ago?
6    A.    No.  The only time that I questioned
7 that is in reading court documents and learning that
8 both Carl and Casey had access to the account.
9    Q.    Okay.  So -- and by "access to the
10 account," what do you mean?
11   A.    Just what it said in the court documents
12 that I had read.
13   Q.    And there's been a lot of court
14 documents.
15   A.    There's been a lot.
16   Q.    I'm trying to figure out -- you don't
17 have to tell me.  I'm trying to figure out what it is
18 you understood from what you were looking at that
19 somehow Casey and Carl --
20   A.    Had withdrawal privileges from the
21 account.
22   Q.    Okay.  Anything else that led you to
23 believe that the money that was paid from Northstar to
24 Villanova Trust was somehow going to be paid to Casey
25 and Carl?

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    133—136

Page 137

1          MS. ULLERY:  Objection to form.
2       A.   My only knowledge of that just came from
3   reading court documents, you know, various
4   transcripts.  There was transcripts of other phone
5   conversations, I believe, that were in there as well,
6   too, so . . .
7       Q.   (BY MR. GARNETT)  And certainly all of
8   those court documents that you would have read were
9   drafted and put together well after you left --
10      A.   Absolutely.
11      Q.   -- on April 7th?
12      A.   Absolutely.
13      Q.   And, of course, we're getting to the
14  point now where you are very good at figuring out what
15  I'm going to ask.  Let me get the question out.
16      A.   Absolutely.
17      Q.   And did you ever have a conversation
18  with Brian Watson about whether or not any of the
19  money that was paid to Villanova was being paid to
20  Carl and Casey?
21      A.   Yes.
22      Q.   When did you have that conversation?
23      A.   I don't recall.
24      Q.   And tell me about that conversation.
25      A.   The only conversation that we had -- and

Page 138

1   there may have been multiple times, but the results
2   were the same thing -- that Brian stated that once
3   Villanova gets paid, he has no knowledge where the
4   money goes from there.
5       Q.   Okay.  And do you believe that was true?
6       A.   I don't know.
7       Q.   Okay.  And did Mr. Watson tell you that
8   counsel had reviewed the Villanova Trust arrangement
9   and approved it?
10          MS. ULLERY:  Objection, asked and
11  answered.
12      A.   Yes.
13      Q.   (BY MR. GARNETT)  Okay.  What do you
14  know about the internal approval process of Amazon for
15  approving transactions like this?
16          MS. ULLERY:  Objection to foundation.
17      A.   Nothing.
18      Q.   (BY MR. GARNETT)  Did your wife's
19  getting a job at Amazon have anything to do with your
20  employment at Northstar?
21      A.   No.
22          MS. ULLERY:  Objection, vague.
23      Q.   (BY MR. GARNETT)  Did you ever do
24  anything to try to -- strike that.  Did you ever
25  present any of your concerns about or discomfort about

Page 139

1   things, as you've described it, with the Amazon
2   relationship to Mr. Watson?
3       A.   I believe so, yes.
4       Q.   And -- and I may object to my own
5   question.  That's when he says it's been approved by
6   counsel, right?
7          MS. ULLERY:  Object to form.
8       A.   Right.
9       Q.   (BY MR. GARNETT)  And is that after the
10  conversation you overheard with Casey Kirschner in
11  late September of 2019?
12      A.   I don't recall.
13      Q.   If I understand your testimony -- and
14  I'm just trying to clarify -- it sounds like you may
15  have had conversations with him about that topic both
16  before or after?
17          MS. ULLERY:  Objection, form.
18      A.   Yes.
19      Q.   (BY MR. GARNETT)  All right.  Let's talk
20  about April 2nd.  Do you remember April 2nd of 2020?
21      A.   I do.
22      Q.   Okay.  And what do you remember about
23  that day?
24      A.   I'm assuming that's the date when Brian
25  sent out his letter and had his suicidal thoughts.

Page 140

1       Q.   Okay.
2       A.   Is that the correct date?
3       Q.   Well, there is -- yes, there is an email
4   dated April 2nd.  Are you -- do you understand that
5   the FBI visited Mr. Watson at his house on April 2nd?
6       A.   I do.
7       Q.   Okay.  And putting aside the email --
8       A.   Okay.
9       Q.   -- that you're referring -- and he sent
10  an email out about that in the evening.  Did you get a
11  copy of that email?
12      A.   I did.
13      Q.   Prior to that email, did you find out
14  that the FBI had visited him that morning?
15      A.   Yes.
16      Q.   Okay.  How did you find out about that?
17      A.   He told me.
18      Q.   What did he tell you?
19      A.   I believe he was calling me on his
20  wife's phone because I think the FBI took his phone
21  and just stated that the FBI had been to his house.
22  The conversation started out talking about the wire
23  fraud issue, migrated into this particular issue, and
24  they'd taken all of his electronic equipment.
25      Q.   Okay.  Was he upset about this?

EXHIBIT L
Timothy Lorman  - 03/11/2022
137-140

Page 141

1    A.    Yes.
2    Q.    Okay.
3    A.    I don't know if he was, but he sounded
4  upset.
5    Q.    Fair enough.  Did you meet with him in
6  person on that day?
7    A.    I don't recall meeting with him in
8  person.
9    Q.    Okay.  And then in the evening, you got
10  a copy of his email?
11    A.    I did.
12    Q.    Prior to that, did you have a meeting
13  with Mr. Watson and others where you offered to take
14  over and run Northstar?
15         MS. ULLERY:  Objection, form.
16    A.    What was the timing?
17    Q.    (BY MR. GARNETT)  Prior to -- so you've
18  got the search in the morning on April 2nd.
19    A.    Right.
20    Q.    You've got his email in the evening on
21  April 2nd.
22    A.    Right.
23    Q.    I'm wondering whether there was a
24  meeting late on April 2nd where you and others offered
25  to manage Northstar after the FBI had visited.

Page 142

1    A.    That was the next day, on the 3rd.
2    Q.    Okay.  Why did you make that offer?
3    A.    A number -- we were flooded with phone
4  calls from people he sent that email to, from
5  investors, stakeholders, a variety of people, who
6  asked us what's going to happen to Brian, is he
7  stepping away, are you stepping in.  And so we talked
8  amongst ourselves and said, "Clearly somebody who's in
9  the state of mind to send out the email he did is
10  probably not going to be coming back to work for a
11  while," and really focus on taking care of yourself.
12  We talked about if that's the case, what do we do
13  because the plane is in the middle of flight, how do
14  we take care of business.
15    Q.    And what was the plan that you proposed?
16    A.    Our approach was for Brian, if he is
17  stepping away, then I would step into a more
18  aggressive COO-type role, looking at all aspects of
19  the business, and Brent was going to step in as the
20  CFO and be able to authorize transactions.
21    Q.    And what happened to that proposal?
22    A.    So we connected several times.  We
23  talked to members of your firm.  You may have been on
24  those calls as well, too.  So we discussed what our
25  go-forward strategy would be, and Brian was a part of

Page 143

1  those conversations as well, too.
2    Q.    Do you remember why they didn't come
3  together?
4    A.    Brian really didn't want to step away.
5  He still wanted to have active control.  And both
6  Brent and I didn't feel like that was going to be
7  feasible, so we said we would step away.
8    Q.    And my understanding is that Brent Gray
9  resigned as of April 3rd.  Is that your understanding?
10    A.    No.  He was there until, I think, the
11  15th or so.
12    Q.    Okay.
13    A.    I was the one who resigned immediately.
14    Q.    Okay.  And I think the date of your
15  resignation -- I may not have it right -- was
16  April 7th.  Does that sound right?
17    A.    Could have been.  We notified -- both
18  Brent and I notified Brian that we would resign that
19  day, on Friday, if he didn't accept it.  We had
20  several conversations over the weekend, and then
21  Monday and Tuesday.  Couldn't come to terms.  So we
22  decided Wednesday was, like, pencils down, and Brent
23  stayed for another two weeks because he wanted to get
24  through payroll.
25    Q.    So there certainly wasn't anything about

Page 144

1  Northstar's condition at that point that would have
2  kept you from stepping into a management role if
3  Mr. Watson had agreed to that; is that right?
4         MS. ULLERY:  Objection, form.
5    A.    I'm not clear about the question.  There
6  was nothing about the organization that would preclude
7  me from doing that?
8    Q.    (BY MR. GARNETT)  Well, you felt
9  comfortable making that offer?
10    A.    I did.
11         MR. GARNETT:  Let's take a break.  Let
12  me look at my notes.  I'm sure we'll have a few more
13  questions.
14         Let's go off the record and talk about
15  order.
16         THE VIDEOGRAPHER:  The time is 11:51.
17  We are off the record.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  The time is 12:15.
20  We are back on the record.
21    Q.    (BY MR. GARNETT)  Great.  Mr. Lorman,
22  we're back on the record, and I have a few more
23  questions.  So in talking to various folks in taking
24  some depositions, it's apparent that by sometime late
25  2019, early 2020 in Northstar there had been a rumor

EXHIBIT L
Timothy Lorman  -  03/11/2022
141–144

Page 145

1   mill developing about Amazon and what was going on
2   with the Amazon projects.  Was Mr. Mancuso a part of
3   that rumor mill, do you think?
4          MS. ULLERY:  Objection, form.
5      A.  I don't know what the rumor mill was, so
6   I really can't speak to that.  I'm not sure.
7      Q.  (BY MR. GARNETT)  That's a fair
8   question.  Do you think there was a rumor mill?  Was
9   there a lot of chatter about what was going on with
10  the Amazon projects?
11         MS. ULLERY:  Objection to form.
12     A.  Well, here's what I would say.  There
13  was a lot of conversation both informally and formally
14  about Amazon.  It was our biggest -- I don't want to
15  say issue, but biggest project.  So a lot of people
16  were well aware of it.  I think it was a common
17  understanding that we were having challenges in trying
18  to sort things, so, yeah, there was a lot of
19  conversation.  I don't know if it's necessarily a
20  rumor mill.
21     Q.  (BY MR. GARNETT)  Okay.  Did you at any
22  point have any concern about whether sharing documents
23  with the FBI or others would have violated your duty
24  of confidentiality or fiduciary duties to Northstar?
25     A.  It did not.

Page 146

1      Q.  Okay.  Why not?
2      A.  Because it was the FBI.
3      Q.  Okay.  What about other parties?  Did
4   you have concern about sharing things with other
5   folks?
6      A.  I think the only other group that I
7   shared documents with was IPI, and based upon the fact
8   that they were business partners in an entity and this
9   involved that entity, I had concerns and brought it to
10  the directors of the organization, so --
11     Q.  Let's talk about that.  When did you --
12  you talked about the various concerns you had.  When
13  did you bring these concerns to the attention of IPI?
14     A.  The only concern that I brought to the
15  attention of IPI was whether they knew about Villanova
16  Trust, and so I went to Chicago to meet with Luke
17  Gilpin; and the only reason that I met with him was,
18  as I was going through the documents, I didn't see any
19  information about Villanova Trust.  Everybody knew
20  about all the other referral partners, and I just
21  simply asked him, "Is this something that you know
22  about?"  If they had said yes, that's it.
23     Q.  So when did you reach out to IPI to have
24  that conversation with them?
25     A.  In mid-January.

Page 147

1      Q.  Okay.  And what was it in mid-January
2   that occurred that caused you to do that?
3      A.  One, there was several pressure points
4   that were increasing.  Number one, the conversations
5   with Kristi and Brent that each payroll was becoming
6   more and more difficult, so I had questions about the
7   long-term viability of the company.  That was number
8   one.
9          Number two, IPI was becoming more and
10  more insistent about this $1.3 million payback, and
11  now I do recall that there was that leverage, that
12  they were holding up some type of payment released to
13  us for that; and that was really critical that we got
14  that money in.  And so that was becoming a greater
15  pressure for the organization as well, too.
16         And so each of these things was lining
17  up that I felt like I had to raise my hand and just
18  get some understanding was this -- did all the
19  partners know about this arrangement.
20     Q.  Did you talk to Mr. Watson before you
21  met with people at IPI?
22     A.  About what?
23     Q.  Apparently you felt an obligation to
24  disclose something about Villanova Trust to IPI; is
25  that right?

Page 148

1          MS. ULLERY:  Objection, form.
2      A.  That's right.
3      Q.  (BY MR. GARNETT)  And did you talk to
4   Mr. Watson before you did that?
5      A.  I don't recall.
6      Q.  Did you feel you had an obligation to do
7   that?
8      A.  I believe that we spoke about it prior,
9   so --
10     Q.  So you told Mr. Watson you were going to
11  Chicago to meet with IPI?
12     A.  No, I did not.
13     Q.  Why didn't you?
14     A.  I don't know.
15     Q.  Okay.  And when you went to Chicago to
16  meet with IPI, was it Luke Gilpin that you met with?
17     A.  Yes.
18     Q.  How long did you meet with him?
19     A.  20 minutes to a half hour.
20     Q.  Okay.  Where did you meet with him?
21     A.  At the United Club lounge at O'Hare
22  Airport.
23     Q.  So did you fly commercial to get there?
24     A.  I did.
25     Q.  And who paid for your ticket?

EXHIBIT L
Timothy Lorman  - 03/11/2022                    145–148

Page 149

1    A.   I did.

2    Q.   Personally?

3    A.   I did.

4    Q.   Not Northstar?

5    A.   No.

6    Q.   Why did you not have Northstar reimburse

7 you?

8    A.   I just didn't fill out the reimbursement

9 paperwork.

10    Q.   Did you not want Mr. Watson to know

11 about this trip?

12         MS. ULLERY:  Objection to form.

13    A.   No, not necessarily.  I mean, no, I just

14 didn't fill out the expense reimbursement.

15    Q.   (BY MR. GARNETT)  And was it a day trip?

16    A.   It was.  I was there and back.

17    Q.   Okay.  Did you get any kind of

18 compensation from IPI for working with them and

19 providing information to them?

20    A.   No.

21    Q.   Do you know who the whistleblower was

22 that sent an email to Jeff Bezos I think in December

23 of 2019?

24         MS. ULLERY:  Objection; form,

25 foundation.

Page 150

1    A.   I don't, no.

2    Q.   (BY MR. GARNETT)  So you do remember

3 April 2nd was a pretty eventful day.  There was a

4 visit from the FBI.  And then you sent Mr. Watson the

5 termination letters that IPI had sent.  Do you

6 remember doing that?

7    A.   I do.

8    Q.   And where did you receive those letters?

9    A.   In my email.

10    Q.   Okay.  And did you know that those

11 letters were in the works?

12    A.   No.

13    Q.   Okay.  Had you had any discussions with

14 anybody at IPI about those termination notices?

15    A.   They had mentioned -- I believe that

16 they had mentioned that they might do something like

17 that, but I didn't have anything specific --

18    Q.   And what did you understand -- what did

19 you understand the basis was for those termination

20 letters?

21    A.   The $1.3 million acquisition fee.

22    Q.   Okay.  So your testimony is that IPI

23 sent the termination letters based on the fact that

24 you were not able to find an explanation for the

25 $1.3 million acquisition fee that you described

Page 151

1 earlier?

2         MS. ULLERY:  Objection, form.

3    A.   My testimony is I believe that's the

4 case.  I don't know that for a fact.

5    Q.   (BY MR. GARNETT)  Okay.  Did you talk

6 with them about it?

7    A.   I don't recall speaking to them about

8 it, no.

9    Q.   You did talk with them, though, about

10 the $1.3 million acquisition fee?

11    A.   Many times.

12    Q.   And that's what you believe was the

13 basis for those letters?

14    A.   Yes.

15    Q.   Okay.  And do you know whether IPI had

16 any reason to know ahead of time about the visit from

17 the FBI to Mr. Watson's house on April 2nd?

18    A.   No.

19         MS. ULLERY:  Objection; form,

20 foundation.

21         MR. GARNETT:  That's all the questions

22 I've got for you right now, Mr. Lorman.  I'm sure I'll

23 have some more at the end of the day, but I want to

24 give some other folks a chance.

25         THE DEPONENT:  Sounds good.

Page 152

1         MR. GARNETT:  Adam, are you okay?

2         MR. SMART:  I am good.  Did you get that

3 exhibit?  Or I could do it, but I figured you guys

4 have control.

5         MR. GARNETT:  Neil, did you get that?

6         MR. SMART:  I don't need it first, so we

7 can get right in, and I'll give you a moment to get

8 there.  Is everybody ready to go?

9         MS. ULLERY:  Yes.

10         MR. GARNETT:  Yes.

11              EXAMINATION

12 BY MR. SMART:

13    Q.   Let's see.  You are -- is it still

14 morning there for you?  No, we're afternoon for

15 everyone.  Good afternoon, Mr. Lorman.  Again, my name

16 is Adam Smart with the law firm of Burr & Forman, and

17 I represent Carl Nelson and Cheshire Ventures in this

18 matter.

19         Have you ever met Carl Nelson?

20    A.   No.

21    Q.   Have you ever spoken to him?

22    A.   No.

23    Q.   Have you had any interaction with him

24 whatsoever?

25    A.   No.

EXHIBIT L
Timothy Lorman  - 03/11/2022
149–152

Page 153

1    Q.   I believe early on Mr. Garnett was
2  asking you about your declaration where I believe you
3  mentioned my client in that declaration.  Do you
4  recall him being mentioned in the declaration?
5    A.   I don't.
6    Q.   Okay.  Let's pull it out.  Let's look at
7  Exhibit 7.
8    A.   I've got it.
9    Q.   Okay.  And it's going to be at Paragraph
10 8, is where you speak about -- well, this is the
11 unsigned one.
12       MR. SMART:  Is it 14?
13       MR. GARNETT:  It's 14, yeah.
14    Q.   (BY MR. SMART)  Let's look at that so we
15 have a good question.  In Paragraph 8, there's a
16 portion that says, "For example, on information and
17 belief, Brian Watson communicated with Casey Kirschner
18 in another Amazon transaction with Carleton Nelson
19 through their email accounts."
20       Have you seen emails to or from my
21 client to Brian Watson?
22    A.   I believe that I saw something on an
23 email that was on either Kyle or Will's computer that
24 would have had their private emails addresses on it.
25    Q.   Okay.  And was that to Brian or was that

Page 154

1  to Kyle or --
2        MS. ULLERY:  Objection, form.
3    A.   I don't --
4    Q.   (BY MR. SMART)  Who were those emails
5  to?
6    A.   I don't recall.  I just saw that they
7  were included in the directions of those emails.  I
8  don't know who they were specifically addressed to.
9    Q.   On this, you say you believe it was to
10 Brian Watson, right?
11    A.   Sure.
12    Q.   Okay.  So as we sit here today, you
13 can't actually say it was to Brian Watson?
14       MS. ULLERY:  Objection, form.
15    A.   I cannot.
16    Q.   (BY MR. SMART)  Okay.  It says "on
17 information and belief."  Does that indicate that you
18 don't actually know?
19       MS. ULLERY:  Objection, form.
20    A.   What it indicates is that I don't recall
21 specifically today.  At that point in time, likely I
22 did know.
23    Q.   (BY MR. SMART)  When you signed this
24 declaration you knew?
25    A.   Yes.

Page 155

1    Q.   Do you know what the term "on
2  information and belief" means?
3    A.   I do not.
4    Q.   Did you put this information in this
5  document?
6    A.   This document was written, and I
7  approved it.
8    Q.   That's not my question.  Did you --
9  well, did you ask anybody what that information --
10 what that phrase meant before you signed this?
11    A.   No.
12    Q.   So did you understand it to mean that
13 you knew that there had been emails between Brian
14 Watson and my client?
15    A.   I took it to mean that on my belief
16 there was.
17    Q.   Okay.  As you sit here today, you can't
18 actually point to any?
19       MS. ULLERY:  Objection, form.
20    A.   I don't have the resources to point to
21 one right now, no, I do not.
22    Q.   (BY MR. SMART)  And you can't recall any
23 specific email that was between my client and Brian
24 Watson as you sit here today?
25    A.   I do not recall a specific email.

Page 156

1    Q.   Okay.  And you said some other things on
2  information and belief.  It's your understanding that
3  at the time you signed this declaration they were
4  true?
5    A.   Based upon what I believed to be true,
6  yes.
7    Q.   Okay.  And this was all firsthand
8  knowledge that you were using to believe this was
9  true?
10    A.   For which item?  All of them?
11    Q.   Well, for all the three things in this
12 paragraph, in each one --
13       MS. ULLERY:  Objection.
14    Q.   -- you said on information and belief.
15    A.   Which paragraph was it?
16    Q.   (BY MR. SMART)  Number 8.
17    A.   So "I observed a number of indices"?
18    Q.   We're talking about the second sentence.
19 Let's talk about the third sentence.  "On information
20 and belief, on or about December 5th, 2018, Brian
21 Watson invited Casey Kirschner and Carleton Nelson on
22 an all-expenses-paid hunting trip to New Zealand."
23 Did you know this?
24    A.   Yeah, that was in an email that I had
25 seen from Kyle's email account.

EXHIBIT L
Timothy Lorman  - 03/11/2022
153—156

Page 157

1    Q.   Okay.  And when did you see that?
2    A.   I believe that we were investigating his
3  laptops in late September, early October.
4    Q.   Okay.  I saw some emails I believe that
5  Mr. Garnett showed you that you imported to yourself
6  from March, I believe.
7    A.   There was a couple times -- there was a
8  couple times that we went through their computers.
9    Q.   Okay.  That one you forwarded to
10 yourself to give to the FBI, right?
11        MS. ULLERY:  Objection, form.
12   A.   I don't remember why -- just so I had
13 records of that -- of those documents.
14   Q.   (BY MR. SMART)  And that same day you
15 forwarded that, you gave emails to the FBI, did you
16 not?
17        MS. ULLERY:  Objection, form.
18   A.   Yes.
19   Q.   (BY MR. SMART)  Okay.  So was it on that
20 occasion that you saw emails between -- that mentioned
21 my client --
22   A.   I don't recall.
23   Q.   -- in March?  All right.  You can't say.
24 I recall in your earlier testimony you testified that
25 you believe that my client and Casey Kirschner had

Page 158

1  withdrawal privileges from Villanova Trust.  Is that
2  correct?
3    A.   Correct.
4    Q.   And what's your basis for that belief?
5    A.   One of the documents that I read from
6  the court filings.
7    Q.   So an allegation in a complaint?
8    A.   It was one of the -- one of the
9  documents associated with the litigation that I'd read
10 where it said that.
11   Q.   Okay.  So you have no personal knowledge
12 one way or the other?
13   A.   I do not.
14   Q.   So it's totally based on whatever was
15 filed in the case?
16   A.   Correct.
17   Q.   Okay.  So when you worked at Northstar,
18 you had -- you did not have that understanding,
19 correct?
20   A.   Correct.
21        MS. ULLERY:  Objection, asked and
22 answered.
23   Q.   (BY MR. SMART)  You didn't know -- did
24 you have any understanding of any role that my client
25 might have had with Villanova Trust during the time

Page 159

1  you were employed at Northstar?
2        MS. ULLERY:  Objection, form.
3    A.   I did not.
4    Q.   (BY MR. SMART)  Okay.  And did you --
5  did you ever -- I want to clarify something.  So you
6  never used the word "kickbacks" while you were
7  employed at Northstar related to the Amazon
8  transaction?
9        MS. ULLERY:  Objection, asked and
10 answered.
11   A.   I don't recall using that term.
12   Q.   (BY MR. SMART)  Okay.  So if someone
13 else testified you used that term, they would not be
14 correct, would they?
15        MS. ULLERY:  Objection, misstates
16 testimony.
17   A.   No, what I said is I do not recall using
18 it.
19   Q.   (BY MR. SMART)  So you could have used
20 it?
21   A.   Absolutely.
22   Q.   But you just can't remember if you ever
23 used the word "kickback"?
24   A.   Correct.
25   Q.   Okay.  I mean, that's a pretty serious

Page 160

1  allegation, isn't it?
2        MS. ULLERY:  Objection, form.
3    A.   I suppose.
4    Q.   (BY MR. SMART)  But you just can't
5  remember if you threw that around while you were at
6  Northstar?
7        MS. ULLERY:  Objection, argumentative.
8    A.   I believe the question was did I use
9  that specific term, and I answered that I do not
10 recall using that specific term.
11   Q.   (BY MR. SMART)  Okay.  And which --
12 well, did you use a term similar to the term
13 "kickback"?
14        MS. ULLERY:  Objection, form.
15   A.   I do not recall.
16   Q.   (BY MR. SMART)  Did you ever use -- did
17 you ever have any concerns that you -- did you ever
18 have any concerns that the payments to Villanova Trust
19 were improper?
20   A.   My concern was that it was curious that
21 we received -- our referral was coming from one
22 brother and another brother was getting compensated by
23 a referral fee.
24   Q.   Okay.  And did you know that while you
25 were employed at Northstar?

EXHIBIT L
Timothy Lorman  - 03/11/2022                              157—160

Page 161

1     A.   Yes.
2          Q.   Okay.  And when did you raise that --
3     did you raise that concern to anyone at Northstar?
4          A.   I did.
5          Q.   And on what date was that?
6          A.   I don't recall.
7          Q.   What month?
8          A.   Could have been June or July of 2019.
9          Q.   And who did you raise that to?
10         A.   Brian Watson.
11         Q.   Okay.  And what specifically did you say
12    about that other than what you just said?
13         A.   I believe that was it, that I mentioned
14    the fact that -- actually, it was Brian who was
15    explaining to me what Villanova Trust was and that
16    Christian was receiving referral fees and he
17    introduced us to his brother and we were getting
18    transactions, and Brian further stated that the
19    lawyers looked at the agreement, it was fine.
20         Q.   Okay.  And did you ever raise any
21    concerns again after that point?
22         A.   I don't recall doing so, no.
23         Q.   Okay.  Do you have any understanding of
24    whether there were any prohibitions on Casey's
25    involvement from an Amazon standpoint to such an

Page 162

1     arrangement?
2               MS. ULLERY:  Objection, foundation.
3          A.   No.
4          Q.   (BY MR. SMART)  Okay.  So you couldn't
5     say one way or another?
6          A.   No.
7          Q.   Okay.  Do you have any understanding of
8     whether there were any prohibitions on Amazon's side
9     of things on Mr. Nelson for having any participation
10    in Villanova Trust?
11              MS. ULLERY:  Same objection.
12         A.   No.
13         Q.   (BY MR. SMART)  So you could not say one
14    way or another?
15         A.   Correct.
16         Q.   What did the FBI tell you they were
17    looking at when they reached out to you?
18         A.   They were looking at the relationship --
19    the Villanova transaction -- excuse me, I want to say
20    White Plains -- the White Peaks Capital transaction.
21         Q.   Okay.  Let's make sure the record is
22    clear on this.  They were looking at the White Peaks
23    transaction?
24         A.   Correct.  I misspoke when I said
25    Villanova.

Page 163

1          Q.   Okay.  Did they mention Villanova to you
2     at all?
3          A.   I don't recall them mentioning that at
4     all.
5          Q.   Did you send them information about
6     Villanova?
7          A.   I did.
8          Q.   And why did you do that?
9          A.   They asked if I had any additional
10    information about the transactions of the referral
11    agreement.
12         Q.   So they asked about the referral
13    agreement?
14         A.   They did.
15         Q.   Okay.  So when did they ask you about
16    that?
17         A.   In one of the subsequent conversations
18    that we had.
19         Q.   Okay.  And did they tell you what their
20    concerns were about the referral agreement?
21         A.   I don't recall them saying that, no.
22         Q.   And did you have an understanding that
23    Villanova was related to White Peaks?
24         A.   No.
25         Q.   Okay.  Do you believe that it is related

Page 164

1     to White Peaks?
2               MS. ULLERY:  Objection, vague.
3          A.   In what way?
4          Q.   (BY MR. SMART)  Well, do they have any
5     corporate relation?
6          A.   I don't know.
7          Q.   Okay.  Do you have an understanding of
8     whether IPI was funding White Peaks?
9          A.   I do not.
10         Q.   Would that surprise you?
11         A.   If they were?
12         Q.   Yes.
13         A.   I don't have an opinion one way or the
14    other.
15         Q.   So do you believe that the White Peaks
16    deal and the Villanova Trust agreement are related --
17              MS. ULLERY:  Objection, asked and
18    answered.
19         Q.   -- in any way?
20         A.   Are they related in any way?  There's
21    parties who are involved with each, but I don't know
22    that the two issues are related.
23         Q.   (BY MR. SMART)  Okay.  Have you ever --
24    have you ever been employed by IPI?
25         A.   No.

EXHIBIT L
Timothy Lorman  - 03/11/2022
161-164

1    Q.   Have you ever served as an independent
2  contractor for them?
3    A.   No.
4    Q.   Have you ever been compensated by them?
5    A.   No.
6    Q.   Okay.  I'm going to turn to the budgets.
7  You had some discussion about that earlier today, the
8  budgets on the Amazon lease transactions.  And you
9  indicated there were some questions about those that
10 you had raised, one of those being the $1.3 million
11 acquisition fee.
12          Putting that aside right now, were there
13 other questions that were raised as to the budgets
14 when you were involved in going in after Kyle left
15 White Peaks?
16   A.   Yeah, the questions we had regarding
17 budgets is there was several different versions of the
18 budgets, and it was difficult to determine what was
19 the current version of the budget.  There was a lot of
20 documentation as far as how costs were being tracked
21 within the budget and how they were being allocated
22 against the budget, and there was some change
23 orders -- some changes that were made to the project
24 as well, too, and how those were accounted for.
25   Q.   Okay.  Let's go through each of those.

1  The change orders, who made those -- who approved
2  those?
3    A.   It was my understanding it was Kyle who
4  approved the change orders.  These happened while he
5  was still an employee.
6    Q.   Okay.  And was there any request that
7  Amazon sign off on any of these change orders?
8    A.   I do not know.
9    Q.   And when you reviewed the records, you
10 didn't see anything that would indicate that?
11        MS. ULLERY:  Objection, form.
12   A.   See any -- that would indicate which?
13   Q.   (BY MR. SMART)  That Amazon signed off
14 on the change orders.
15   A.   Yeah, I didn't have any documentation
16 that showed what our change order process was, how
17 that was documented or how it was communicated.
18   Q.   Did you understand the change order
19 process there at White Peaks when you were doing this
20 review?
21   A.   So I wasn't at White Peaks.
22   Q.   I'm sorry.  At Northstar.  I apologize.
23   A.   No, I did not understand what it was.
24   Q.   Okay.  So who at Northstar would have
25 been the one that understood that during the review?

1    A.   Kyle and Will.
2    Q.   And after they left, who would have been
3  the one to understand that?
4    A.   It was us; myself, John Schillingburg,
5  and other members of the team.  And we didn't have
6  change orders after we took over.
7    Q.   Correct.  But with the ones that Kyle
8  did, did you have to do anything to reconcile if they
9  were within budget or were they already documented?
10        MS. ULLERY:  Objection, form.
11   A.   They were already documented.
12   Q.   (BY MR. SMART)  Okay.  And did the
13 transactions -- you said they finished on schedule,
14 the projects?
15   A.   Yeah, the -- let me think.  I was
16 involved, I believe, in two that completed or turned
17 over.  Maybe it was just one that turned over while I
18 was there.  And they were completed on time, yes.
19   Q.   Okay.  And did the change orders, did
20 Kyle approve those unilaterally?
21   A.   It's my understanding that he did.
22   Q.   Okay.  Do you have an understanding that
23 approving a change order takes it outside of the
24 original budget?
25   A.   My understanding is yes, and it would be

1  captured in the true-up at the end of the project.
2    Q.   Okay.  Did you take private savings to
3  cover the change orders in these transactions?
4    Q.   Did I do what?
5    Q.   Did you take private savings?  Over the
6  course of the project, if there's savings on the
7  original budget, did you take those to cover change
8  orders in these transactions?
9        MS. ULLERY:  Objection; form,
10 foundation.
11   A.   So I wasn't involved in that.  I mean,
12 that happened with Kyle.  So I'm not sure if they were
13 captured with cost savings and other aspects of the
14 budget or not.
15   Q.   (BY MR. SMART)  Well, when you did the
16 true-up, wouldn't you have an opportunity to address
17 some of those things as well?
18   A.   Yeah, I didn't participate in the
19 true-up.
20   Q.   Who did the true-up?
21   A.   I assume that would have been Brent.
22   Q.   And the two-year agreement, do you know
23 which transactions those were?
24   A.   The two -- I'm sorry.  I missed that.
25 The two?

EXHIBIT L
Timothy Lorman  - 03/11/2022                                                165-168

1    Q.   You said you looked at the two of them,
2    you said, two of the deals of the ones from Amazon.
3    Did I understand you correctly?
4         A.   I was involved in a number of the
5    projects.  The one where we were wrestling with the
6    1.3 million was the first IAD project.
7         Q.   Okay.  And do you know the number of
8    that one?  IAD144, is that correct?
9         A.   It would be the lowest number, so I
10   assume 144.
11        Q.   Okay.  And do you know if that was
12   Sterling or Shaw Road?  Do you know?
13             MS. ULLERY:  Objection, foundation.
14        A.   I believe Sterling and Shaw Road are the
15   same.
16        Q.   (BY MR. SMART)  Okay.  That's your
17   understanding --
18        A.   Yeah, if I recall it.  There was three.
19   Okay.
20        Q.   Let me finish because she's going to
21   interrupt us again.  Sorry.
22             So when you're referring to the first
23   transaction, if you used the word Sterling or Shaw
24   Road, you're referring, in your mind, to the same
25   transaction?

1         A.   Yes.
2         Q.   Do you know what the acronym GMP stands
3    for in connection with the lease?
4         A.   Yes.
5         Q.   And what does that mean?
6         A.   Guaranteed maximum price.
7         Q.   And did you have an understanding that
8    these Amazon lease transactions were GMP transactions?
9         A.   I'm not familiar with that, if they were
10   or not.
11        Q.   Okay.  Let's turn to the acquisition fee
12   of $1.3 million.  I believe what you testified to was
13   that -- well, let me just ask this in a different
14   fashion.  Was the dispute over the acquisition fee
15   between IPI and Northstar?
16        A.   Yes.
17        Q.   And is the acquisition fee -- was it
18   your understanding that that's something that
19   Northstar took out of the transaction?
20        A.   Yes.
21        Q.   And IPI was requesting that that money
22   be put back into the project?
23        A.   Yes.
24        Q.   And did you have occasion to ask Casey
25   Kirschner if Amazon would approve the addition of the

1    $1.3 million to the project budget?
2         A.   Yes.
3         Q.   And he declined -- he declined to do so
4    on behalf of Amazon, correct?
5         A.   Yes.
6         Q.   And you had an opportunity to review the
7    lease transactions, and there was just never a line
8    item that you could find that allowed for that
9    $1.3 million acquisition fee, correct?
10             MS. ULLERY:  Objection, form.
11        A.   Correct.
12        Q.   (BY MR. SMART)  So Casey on rejecting
13   the acquisition fee, he was essentially saying Amazon
14   is not going to pay for these transactions?
15        A.   Correct.
16             MS. ULLERY:  Objection; form,
17   foundation.
18        Q.   (BY MR. SMART)  So did -- and you said
19   there was a lot of discussion that was over all
20   $1.3 million acquisition fee.  I want to be clear.
21   You meant that it was never resolved as a dispute
22   between Northstar and IPI, correct?
23        A.   No, what I'm saying is I don't know if
24   it was resolved between the two of them.
25        Q.   Okay.  But is it fair to say that that

1    issue, once Amazon said they wanted to pay for it, it
2    really doesn't have anything to do with Northstar,
3    correct?
4              MS. ULLERY:  Objection; form,
5    foundation.
6         A.   It didn't have anything more to do with
7    them.  I'm not sure that I know what you mean.
8         Q.   (BY MR. SMART)  Sure.  Well, you said it
9    was an issue that needed to be resolved.  Did
10   Amazon -- at the point they declined, did Amazon have
11   any role in that resolution, or is it a dispute solely
12   between Northstar and IPI at that point?
13             MS. ULLERY:  Objection; form,
14   foundation.
15        A.   It was, as my understanding, exclusively
16   between IPI and Northstar.
17        Q.   (BY MR. SMART)  Okay.  You also had a
18   discussion about Adrenaline Capital.  Do you recall
19   that?
20        A.   Yes.
21        Q.   And your understanding was that that was
22   some sort of entity that IPI paid a referral fee to;
23   is that correct?
24        A.   Correct.
25        Q.   And I believe you said that pursuant to

EXHIBIT L
Timothy Lorman  - 03/11/2022                                        169–172

Page 173

1  the NS-IPI partnership agreement that you had an
2  understanding that IPI had to identify that to
3  Northstar and Northstar would have had to identify --
4  your opinion is Northstar would have had to identify
5  these referral arrangements to IPI, correct?
6         MS. ULLERY: Objection, form.
7      A.  Correct.
8      Q.  (BY MR. SMART) And this is, again,
9  coming from the NS-IPI partnership agreement, right?
10     A.  Correct.
11     Q.  You're not pointing -- rather, you're
12 not saying whether there's any allegation under that
13 agreement that flows to Amazon, are you?
14        MS. ULLERY: Objection, form.
15     A.  I'm not saying that.
16     Q.  (BY MR. SMART) I believe you talked a
17 little bit about the project that was bid on in
18 California.  Do you recall talking about that?
19     A.  I do.
20     Q.  Okay.  And that was in the fall --
21 sometime in the fall of 2019?
22     A.  Correct.
23     Q.  And I think you said you can't recall
24 whether it was approved or not or whether or not
25 Northstar obtained a bid or not.  Is that a correct

Page 174

1  recollection of your testimony?
2      A.  Correct.
3      Q.  And do you think if it had been awarded,
4  you would have remembered that?
5         MS. ULLERY: Objection, form.
6      A.  Yes.
7      Q.  (BY MR. SMART) So it's fair to say if
8  you don't remember it, then a likely conclusion is it
9  was not awarded?
10        MS. ULLERY: Objection, speculative.
11     A.  I don't know what happened subsequent to
12 me leaving the firm, so I'm not sure if it was
13 approved later or not.
14     Q.  (BY MR. SMART) Understood.  You do not
15 recall it being approved at the time you were there,
16 but you can't say if it was approved after you left?
17     A.  Exactly.
18     Q.  But probably seems unlikely given the
19 circumstances of how you left.  Is that right?
20        MS. ULLERY: Objection, form.
21     Q.  (BY MR. SMART) You don't have to answer
22 that.  It's not a question.  I still want to ask.  You
23 had mentioned in your earlier testimony that Casey was
24 the primary contact with Amazon on the transactions,
25 the Amazon transactions.  Is that your testimony?

Page 175

1      A.  As far as I understood.
2      Q.  Okay.  And your understanding of that
3  came from what others told you, correct?
4      A.  About who they spoke with at Amazon,
5  yes.
6      Q.  Right.  It wasn't from your direct
7  interaction with Mr. Kirschner, correct?
8      A.  Correct.
9      Q.  You also talked earlier about the
10 telephone call, I guess, that happened shortly after
11 Mr. Watson's wedding.  Do you remember talking about
12 that earlier?
13     A.  I do.
14     Q.  And you indicated, I guess, in your
15 declaration that you overheard Casey say something to
16 the effect of, "I never liked Kyle.  He figured out
17 what we were doing in two weeks."  Is that a fair
18 recitation of what you believe you heard?
19     A.  Yes.
20     Q.  Okay.  You don't -- do you have any
21 personal knowledge of what was meant by "what we were
22 doing"?
23     A.  No.
24        MS. ULLERY: Objection, form.
25     Q.  (BY MR. SMART) And you didn't hear any

Page 176

1  other part of that conversation once you got up and
2  left, correct?
3      A.  No.
4      Q.  No, you did not hear any more, correct,
5  right?
6      A.  Correct.
7      Q.  You also mentioned in your testimony you
8  have several concerns about being able to execute on
9  the contract.  Were those concerns related to
10 financing the remaining construction that needed to be
11 done?
12     A.  We had struggles working with our lender
13 and providing the reporting that we needed to, and
14 based upon our delay in providing reports, our lender
15 was becoming more and more frustrated with us.  And so
16 that was certainly a concern.
17     Q.  Okay.  And so it was related to sort of
18 a financing stream -- continuing stream of the
19 contracts, is that the concern --
20        MS. ULLERY: Objection, form.
21     A.  That was a concern.
22     Q.  (BY MR. SMART) Okay.  What were the
23 other concerns?
24     A.  The other concerns were our ability to
25 be able to work on site consistently and provide

EXHIBIT L
Timothy Lorman  - 03/11/2022                    173—176

1  project management and leadership based on what our
2  skill sets were.
3        Q.   Is that because Kyle had left?
4        A.   Yes.
5        Q.   And was Northstar having a hard time
6  finding somebody to replace them with the necessary
7  skill set?
8        A.   Yes.
9        Q.   I guess someone came in.  Bart, I think
10  is his name.  I think he was only there for a month.
11       A.   Correct.
12       Q.   And was that because he didn't really
13  have the skill set to do what he was hired for?
14            MS. ULLERY:  Objection, form.
15       A.   No, he said he was concerned about the
16  project, as far as there being issues with the
17  project.
18       Q.   (BY MR. SMART)  Did he say what those
19  issues were?
20       A.   He was concerned about some integrity
21  issues around change orders and finances.
22       Q.   Okay.  Did Amazon have staff on site to
23  help monitor the progress of the construction as well?
24            MS. ULLERY:  Objection, form.
25       A.   They had an employee who attended the

1  construction, the owner/architect/contractor at the
2  OAC meetings.
3        Q.   And that was Reed Mayer?
4        A.   Correct.
5        Q.   Okay.  And do you know if they had
6  step-in rights on the transaction, if they could
7  exercise those to complete the project?
8        A.   I do not know.
9        Q.   Had you had any -- do you recall any of
10  the substance of any of the conversations you had with
11  Patrick Stokes?
12       A.   I do not.
13       Q.   Don Marcott, do you know who that is?
14       A.   Don Marcott was Brian's business partner
15  on the development projects.
16       Q.   Okay.  And was he ever in sort of a
17  management role, like similar to what Kyle performed?
18            MS. ULLERY:  Objection, form.
19       A.   No.  He was primarily in business
20  development.
21       Q.   (BY MR. SMART)  Let me get back to
22  Patrick Stokes.  Do you know about how many times you
23  had conversations with him?
24       A.   Two or three times.
25       Q.   Do you know the last time you spoke with

1  him?
2        A.   Probably about two, three weeks ago.
3        Q.   Okay.  What was that in relation to?
4        A.   He informed me that there was going to
5  be a subpoena that was going to be issued and gave me
6  a heads-up that's what the subpoena is for.
7        Q.   For the deposition?
8        A.   Yes.
9        Q.   Did you talk to him about any of the
10  facts of the case?
11       A.   Yes.
12            MR. SMART:  Let's take a quick break and
13  reorganize my thoughts real quick.  I think I'm
14  getting close to the end of my questions.  I need ten
15  minutes.
16            THE VIDEOGRAPHER:  The time is 12:54.
17  We are going off the record.
18            (Recess taken.)
19            THE VIDEOGRAPHER:  The time is 1:09.  We
20  are back on the record.
21       Q.   (BY MR. SMART)  I may have actually
22  clicked over a document, and I'm not actually going to
23  ask you about it.  It was on the screen.  I didn't
24  realize I had control.  So I apologize about that.
25            Just one last topic, and then I'm done

1  with my questions for now.  When you were doing your
2  review of lease budgets after Casey and Kyle left, did
3  you see any fees or line items that looked improper to
4  you during your review?
5            MS. ULLERY:  Objection, vague.
6        A.   Did I see anything in any of the lease
7  documents that seemed inappropriate?
8        Q.   (BY MR. SMART)  No, the budgets.
9        A.   The budgets.
10       Q.   You said you were looking at the
11  budgets.  The budgets and the fees and line items in
12  the budgets, did you see anything improper in those
13  during your review?
14       A.   It was difficult to determine because
15  there were so many different versions of the budgets,
16  I wasn't sure which one we were operating with, and so
17  just the confusion associated with myriad versions of
18  the same budget was what was concerning.  Specific
19  line items, I don't recall seeing any one particular
20  line item in the budget that was more concerning than
21  any other.
22       Q.   So let's be clear.  You don't have a
23  recollection of any particular concern about a
24  particular line item; more simply that you were
25  uncertain which was the actual budget you should be

EXHIBIT L
Timothy Lorman  - 03/11/2022                              177–180

ABI Litigation Services

Page 181

1  working from?
2          MS. ULLERY:  Objection, form.
3      A.  Correct.
4      Q.  (BY MR. SMART)  And again, I think you
5  said that Mr. Gray would be the person to talk about
6  sort of the final true-ups of those.  Is that correct?
7      A.  Yes.
8          MR. SMART:  Okay.  And I'll pass the
9  witness.  Thank you your time.
10         MS. ULLERY:  Let's go ahead and take a
11 lunch break, if it's okay.  Just 20 minutes or so.
12         MR. GARNETT:  Sure.
13         THE VIDEOGRAPHER:  The time is 1:11.  We
14 are going off the record.
15         (Lunch recess taken.)
16         THE VIDEOGRAPHER:  The time is 1:47.  We
17 are back on the record.
18                 EXAMINATION
19 BY MS. ULLERY:
20     Q.  Hi.
21     A.  Hi.
22     Q.  I know we've already met, but for the
23 record, my name is Alyse Ullery.  This is my colleague
24 Todd Shaw.  We're from the law firm of Gibson Dunn &
25 Crutcher, and we represent Amazon in this case.  I

Page 182

1  know we covered all the preliminaries earlier this
2  morning, so let's just kind of jump right in.
3          When did you become aware that Christian
4  Kirschner was Casey Kirschner's brother?
5      A.  I don't know a specific date, but I
6  would say probably mid to late summer.
7      Q.  Do you recall how you came to learn
8  that?
9      A.  I do not.
10     Q.  Okay.  Did you ever meet Christian
11 Kirschner in person?
12     A.  No.
13     Q.  But did you discuss over the phone with
14 him?
15     A.  I did.
16     Q.  Okay.  Do you know who Rod Atherton is?
17     A.  No.
18     Q.  When you first joined Northstar, what
19 were you told about Northstar's approach to referral
20 agents?
21         MR. SMART:  Objection, foundation.
22     A.  I don't recall that -- I don't recall a
23 specific conversation about referral agents.
24     Q.  (BY MS. ULLERY)  So you didn't become
25 aware of any rules or procedures regarding the

Page 183

1  company's use of referral agents?
2      A.  No.
3      Q.  During your employment with Northstar,
4  what did you learn about Brian Watson's relationship
5  with Christian and Casey Kirschner?
6      A.  The only thing that I knew is that they
7  had a prior relationship.  One of them -- I'm not sure
8  which one -- were friends and had worked together in a
9  prior work situation.
10     Q.  Do you remember how you came to learn
11 that?
12     A.  I learned bits and pieces over a
13 variety -- over an extended period of time.
14     Q.  Was it common knowledge in the office?
15     A.  I believe so, yes.
16     Q.  Do you -- well, actually, back up.
17 Earlier we discussed a hunting trip to New Zealand.
18     A.  Uh-huh.
19     Q.  Do you know who attended that hunting
20 trip?
21     A.  The people that I believe -- that I know
22 of who attended was Kyle Ramstetter, Brian, and Casey.
23     Q.  Do you know whether Carleton Nelson
24 attended that trip?
25     A.  I don't know for sure that I know that

Page 184

1  for a fact.
2      Q.  Okay.  How did you first learn about the
3  trip?
4      A.  My first day, I believe that they were
5  already on the trip, so we didn't work together our
6  first week.  Brian was gone on the trip, and so people
7  had told me that that's what they were doing.
8      Q.  Okay.  Do you know whether the trip was
9  considered a business trip?
10     A.  I don't.
11     Q.  Do you know who paid for the trip?
12     A.  I was told by Kristi Fisher that Brian
13 paid for the trip.
14     Q.  With his personal funds?
15     A.  I don't know.
16     Q.  You mentioned that you discussed this
17 with Kristi Fisher.  Did you also discuss it with
18 Brent Gray?
19     A.  Likely, yes.
20     Q.  Do you recall either of them ever
21 raising concerns about the cost of the trip?
22     A.  Yes, they did.
23     Q.  What did they say?
24     A.  They said it was really expensive.
25     Q.  Do you know how expensive?

EXHIBIT L
Timothy Lorman  - 03/11/2022
181–184

ABI Litigation Services

**Page 185**

1    A.   I do not.

2    Q.   Did they say anything about how
3  expensive it was in comparison to other trips?

4    A.   No.

5    Q.   Are you aware of any other trips, gifts,
6  entertainment that Brian Watson arranged for Amazon
7  employees?

8         MR. SMART:  Objection, foundation.

9         THE DEPONENT:  Did you get that?

10        THE COURT REPORTER:  Yes.  Thank you.

11   A.   I know from time to time that Kyle
12 Ramstetter had bought gifts for -- I believe he'd
13 bought it for Carleton, either Carleton or Casey.

14   Q.   (BY MS. ULLERY)  Do you know what the
15 gift was?

16   A.   I seem to recall it was a really
17 expensive bottle of liquor.

18   Q.   Do you know about when he purchased
19 that?

20   A.   I believe it was May or June because I
21 discussed with Kristi the expense report.

22   Q.   So these were showing up on Northstar's
23 expense reports?

24   A.   Yes.

25   Q.   So Northstar paid for that?

**Page 186**

1    A.   Yes.

2         MS. ULLERY:  Let's go ahead and pull up
3  Tab 3.  We will be marking as Exhibit 16 -- is that
4  correct?

5         MR. SANDHU:  Yes.

6         MS. ULLERY:  -- a March 3rd, 2020 email
7  chain that's Bates-numbered WDC 0711415 through 419.

8         (Deposition Exhibit 16 was marked.)

9    Q.   (BY MS. ULLERY)  And let us know when
10 you see that document appear.

11   A.   I have it.

12   Q.   You do?  Okay.  Please take a look at
13 the document.  Do you recognize this email?

14   A.   I recognize this as one of the emails we
15 found on Kyle's laptop.

16   Q.   So at some point in time, you did see
17 this document?

18   A.   Yes, because I found it, and then I
19 emailed it to myself.

20   Q.   Can you direct your attention to the
21 very first email in the exchange at the bottom of this
22 document?  Do you see where Kyle says, quote, Brian, I
23 reworked our current model with the future deal
24 scenarios we discussed.  Here are my thoughts on the
25 numbers associated with them if we left it as is, end

**Page 187**

1  quote.  Do you see that?

2    A.   Get in there one second.

3         I have it.

4    Q.   You have it?

5    A.   I do.

6    Q.   What were the future deal scenarios?

7         MR. SMART:  Objection, foundation.

8    A.   Sorry.  I'm trying to bounce back and
9  forth here.

10   Q.   (BY MS. ULLERY)  Okay.

11   A.   I don't know.

12   Q.   Do you see in the subsequent text where
13 it lists a breakout of the total development fees and
14 the net proceeds between, quote, Dawn, BW, and
15 t-h-i-e-r-s?

16   A.   Oh, "Theirs."

17   Q.   That was about to be my next question.
18 Do you understand that to be a typo?

19        MR. SMART:  Objection, foundation.

20   A.   No.

21   Q.   (BY MS. ULLERY)  You don't think that's
22 a typo?

23        MR. GARNETT:  Objection, foundation.

24   A.   Oh, I'm sorry.  I was looking -- it's
25 written twice.  I was looking at the lower one.

**Page 188**

1    Q.   (BY MS. ULLERY)  Okay.

2    A.   Where it says "theirs 460689," is the
3  amount?

4    Q.   Yes.

5    A.   Because there's a "theirs" that's lower.
6  That one appears to be a typo.

7    Q.   Do you know who "theirs" is referring to
8  here?

9    A.   I do not.

10   Q.   Could you direct your attention to Brian
11 Watson's response where he says, quote, "I am meeting
12 Christian for dinner tonight"?

13   A.   I see it.

14   Q.   Do you understand the "Christian" here
15 to be a reference to Christian Kirschner?

16        MR. GARNETT:  Objection, foundation.

17        MR. SMART:  Same objection.

18   A.   Yes.

19   Q.   (BY MS. ULLERY)  And when he said, "Are
20 we okay with their requests," whose requests do you
21 understand him to be referring to?

22        MR. GARNETT:  Objection, foundation.

23        MR. SMART:  Objection, foundation.

24   A.   I don't know.

25   Q.   (BY MS. ULLERY)  Can you take a look at

EXHIBIT L
Timothy Lorman  - 03/11/2022
185—188

Page 189

1  Kyle Ramstetter's response where he asks if it would
2  be appropriate for him to meet Christian tonight or if
3  they should, quote, plan another time when he and
4  Casey are in town?
5       A.   Is that further up in the document?
6       Q.   Yes, it is.
7       A.   "Tell me where to meet, and I'm there."
8       Q.   It should be on Page 2 of the document.
9       A.   I'm sorry.  It's tough to scroll with
10  this.  Oh, I see.  "Would it be appropriate time to
11  come meet Christian tonight?"  Okay.
12       Q.   Did you understand "Casey" to be Casey
13  Kirschner?
14            MR. GARNETT:  Objection, foundation.
15       A.   Yes.
16       Q.   (BY MS. ULLERY)  Did you ever learn any
17  information about whether this meeting occurred?
18       A.   No.
19       Q.   Okay.  Let's go to -- let's go to -- I
20  believe it's already marked as Tab 1 or Exhibit 1.  Do
21  you see the document?
22       A.   Document 1?
23       Q.   Yes.
24       A.   The independent contractor agreement?
25       Q.   Correct.

Page 190

1       A.   I have it.
2       Q.   So you recognize the document?
3       A.   Yes.
4       Q.   Do you remember when you first saw this
5  document?
6       A.   I do not, specific time, no.
7       Q.   Do you understand -- sorry.  Do you
8  understand this agreement to provide that Villanova
9  Trust would receive payments in connection with real
10  estate transactions that Northstar entered into with
11  Amazon?
12            MR. GARNETT:  Objection, form and
13  foundation.
14            MR. SMART:  Objection.
15       A.   Yes.
16       Q.   (BY MS. ULLERY)  Is this what you would
17  consider a referral agreement?
18            MR. SMART:  Objection, foundation.
19       A.   Yes.
20       Q.   (BY MS. ULLERY)  Am I correct that
21  earlier you said you were not aware of any other
22  referral agents that Northstar partnered with other
23  than Villanova Trust?
24       A.   I believe there was another referral
25  agent, Carl Medaris, who referred business in as well,

Page 191

1  too.
2       Q.   Okay.  Did you see any referral
3  agreements with him?
4       A.   I don't recall seeing one.
5       Q.   Do you know any of the information about
6  the payments that were made to this other individual?
7       A.   No, I don't.
8       Q.   Okay.  Did you ever ask Brian Watson
9  about the Villanova Trust agreement?
10       A.   I did.
11       Q.   What did you ask him?
12       A.   It was in the context of when we first
13  learned about Villanova Trust, and I just simply asked
14  what that was; and he said it was a referral
15  agreement.
16       Q.   What was his reaction when you asked?
17       A.   Not unusual, not out of the ordinary.
18       Q.   Okay.  Did he give you any other details
19  about the agreement?
20       A.   I don't recall anything beyond that it
21  was a referral agreement.
22       Q.   Did he mention Casey Kirschner at all?
23       A.   Casey --
24       Q.   Uh-huh.
25       A.   -- in relation to Villanova Trust?

Page 192

1       Q.   Yes.
2       A.   No, I don't recall that.
3       Q.   Did he mention Carleton Nelson?
4       A.   I don't recall that either, no.
5       Q.   Did you observe any conversations in the
6  office with other Northstar employees about this
7  agreement?
8       A.   I had conversations with both Brent and
9  Kristi.
10       Q.   Tell me more about that.
11       A.   Just the fact that it existed and that
12  it was important that we made sure that we made our
13  payments associated with the agreement.
14       Q.   Did they tell you why it was important?
15       A.   No.
16       Q.   To your knowledge, did Brian Watson
17  discuss the Villanova Trust with anyone at Amazon
18  other than Carleton Nelson and Casey Kirschner?
19       A.   No.
20       Q.   Do you know whether he discussed it with
21  Kyle Ramstetter?
22       A.   The referral agreement?  I don't know
23  that for a fact, no -- oh, I take that back.  So when
24  we were -- at one point in time in June, there was an
25  opportunity that IPI would potentially buy out Brian's

EXHIBIT L
Timothy Lorman  - 03/11/2022
189–192

AB Litigation Services

Page 193

1  interest and we were going through conversations about
2  what the waterfall would look like associated with how
3  the proceeds would be distributed.  The Villanova
4  agreement was towards the top of the distribution, and
5  there was conversations about what Kyle's distribution
6  would be because he had a slightly different
7  agreement, as I recall, and there was some angst as
8  far as what people's positions were in the waterfall.
9  So at that point in time, I would imagine there were
10  some conversations associated with the Villanova
11  agreement.
12      Q.   Do you know how people's positions in
13  that waterfall agreement were determined?
14      A.   Based upon different agreements.
15  There's a lot of different tranches, right?  Referral
16  partners, I believe, got paid first.  I think there
17  were some other commitments that Brian had to Patricia
18  and others that got paid out, and then with Don, and
19  then if anybody else had some side agreements.  And
20  then Brian would take a portion and give it to the
21  employees as a type of bonus program as well, too, but
22  there was a lot of discussion about where people sat
23  within that.
24      Q.   Was that something that was negotiated
25  at any point?

Page 194

1      A.   I think so, yeah.
2      Q.   Would that be something included in the
3  referral agreement itself?
4           MR. SMART:  Object to form.
5      A.   So I think it was documented in a
6  variety of different ways.  I think, for example,
7  Kyle's position was documented within an employment
8  agreement.  I would assume that Don's position was a
9  partnership agreement.  Anything going to Patricia
10  with some type of divorce settlement, and then the
11  Villanova one per the terms of this.
12      Q.   (BY MS. ULLERY)  Okay.  Can you direct
13  your attention to the final page of the document?
14      A.   Sure.
15      Q.   It's titled Exhibit A, Villanova Trust
16  Referral Fee Participation Schedule.
17      A.   Is that the one with the chart?
18      Q.   Yes.
19      A.   Okay.
20      Q.   Do you understand that the fee
21  percentages in this chart signified money that would
22  be paid to Villanova Trust from Northstar?
23      A.   Yes.
24           MR. SMART:  Objection, foundation.
25      Q.   (BY MS. ULLERY)  Do you see the column

Page 195

1  where it says referral fee based on brokerage
2  commission?
3      A.   Yes.
4      Q.   What does that mean?
5      A.   So I would assume that a transaction
6  that had a brokerage commission associated with it,
7  that's the portion of the fee that would be allocated.
8      Q.   Okay.  And lease commission rate, what
9  does that mean?
10           MR. SMART:  Objection, foundation.
11      A.   Lease commission rate for -- oh, so what
12  would happen is after the building is completed, then
13  you would negotiate a lease for the person to occupy
14  that.  The brokers involved with that would typically
15  get a commission of some sort associated with that
16  lease transaction.  So that would be the lease
17  commission that would be associated with the
18  transaction.
19      Q.   So are you saying that this fee, the
20  lease commission rate, would be compensating a
21  referral agent for helping identify a tenant?
22           MR. GARNETT:  Objection to form.
23           MR. SMART:  Objection to form and
24  foundation.
25      A.   The lease commission would be

Page 196

1  compensating the broker for negotiating the lease
2  transaction.
3      Q.   (BY MS. ULLERY)  Okay.  In your
4  experience, would there be this type of fee or rate in
5  situations where a tenant had already been identified
6  at the outset of the agreement?
7           MR. SMART:  Objection, form and
8  foundation.
9      A.   So if there was already a tenant, would
10  you -- yes.
11      Q.   (BY MS. ULLERY)  There would be this
12  fee?
13      A.   Yes.
14      Q.   In those situations, what would the fee
15  represent?
16      A.   So in my prior experience, take a
17  medical office building, for example, that an
18  institution wants to develop, they would have the
19  hospital occupy X percent of square feet.  They would
20  build the building.  Then the hospital would negotiate
21  their lease for that space with the developer.
22      Q.   Okay.
23      A.   There would be a transaction -- a lease
24  commission that would be associated with that.
25      Q.   Okay.  Back to the document we were just

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    193—196

AB Litigation Services

Page 197

```
1   looking at, the development fee percentage, what does
2   that mean?
3           A.   So there's a variety of fees --
4           MR. SMART:  Form and foundation.
5           A.   There's a variety of fees associated
6   with a development project.  The developer's fee is
7   typically a fee that's taken on by the developer that
8   covers their profit and overhead, and it's typically
9   based upon the value of the overall project.
10          Q.   (BY MS. ULLERY)  Manager's net profits
11  interest percentage, do you know what those are?
12          A.   Yeah, so that goes back to the sale
13  transaction.  When -- the idea being after you develop
14  the property, then you want to get it to a certain
15  point of value and would typically sell it.  And then
16  the selling of that portfolio is going to generate
17  revenue, and then that's the manager's net interest.
18  Then that would get allocated out.
19          Q.   Okay.  So this is situations where
20  you're selling a property, not leasing it?
21          A.   Correct.
22          MR. GARNETT:  Objection, form.
23          MR. SMART:  Objection, form and
24  foundation.
25          Q.   (BY MS. ULLERY)  You mentioned
```

Page 198

```
1   earlier -- and we just discussed -- your experience in
2   commercial real estate prior to Northstar.  Did you
3   ever see referral agreements like this?
4           A.   I don't recall seeing one, no.
5           Q.   Do you know whether anything in
6   Northstar's lease agreements with Amazon disclosed the
7   existence of this referral agreement?
8           A.   I don't recall seeing it, no.
9           Q.   Are you aware of whether Northstar ever
10  disclosed the existence of this referral agreement to
11  Amazon personnel other than Casey Kirschner or
12  Carleton Nelson?
13          MR. SMART:  Objection, foundation.
14          A.   I do not know.
15          Q.   (BY MS. ULLERY)  In your experience --
16  well, strike that.
17          MS. ULLERY:  I'm sorry.  We can't
18  connect to the Internet.  Can we go off the record?
19          MR. SHAW:  Can we take a five-minute
20  break and go off the record?
21          THE VIDEOGRAPHER:  The time is 2:06.  We
22  are off the record.
23          (Recess taken.)
24          THE VIDEOGRAPHER:  The time is 2:08.  We
25  are back on the record.
```

Page 199

```
1           Q.   (BY MS. ULLERY)  You understand that
2   you're still under oath?
3           (The deponent nodded head up and down.)
4           A.   Yes.
5           Q.   Thank you.  Going back to this agreement
6   that we're still looking at, did you ever suspect that
7   Northstar was paying these fees in part so that Casey
8   Kirschner would ensure Amazon continued to conduct
9   business with Northstar?
10          MR. SANDHU:  Objection, form and
11  foundation.
12          MR. SMART:  Objection, form and
13  foundation.
14          A.   Can you repeat that again?
15          Q.   (BY MS. ULLERY)  Did you ever come to
16  suspect that Northstar was paying these fees in part
17  so that Casey Kirschner would ensure Amazon continued
18  to conduct business with Northstar?
19          MR. SMART:  Same objection.
20          A.   Yes.
21          Q.   (BY MS. ULLERY)  During your employment
22  at Northstar, did you come to believe or suspect --
23  strike that.  Did you suspect that this payment
24  arrangement violated any of Northstar's agreements
25  with Amazon?
```

Page 200

```
1           MR. SANDHU:  Objection, form and
2   foundation.
3           MR. SMART:  Same objections.
4           A.   I was not familiar with the agreements
5   with Amazon, so I couldn't speak to that.
6           Q.   (BY MS. ULLERY)  During your employment
7   with Northstar, did you come to suspect that this
8   payment arrangement may have been improper and
9   violated the law?
10          A.   Yes.
11          MR. SMART:  Objection, form and
12  foundation.
13          Q.   (BY MS. ULLERY)  What made you come to
14  believe that?
15          A.   So you asked two aspects of that.  What
16  was that again?  Because I want to be clear.
17          Q.   Sure.  What made you suspect that this
18  payment arrangement was improper?  Start there.
19          A.   Yeah.  It seemed to me that having two
20  brothers who had been in business before together, for
21  one to get business -- to give us business and the
22  other brother to get compensated for that didn't feel
23  appropriate.
24          Q.   You said have been in business before
25  together.  What do you mean?
```

EXHIBIT L
Timothy Lorman - 03/11/2022                    197–200

Page 201

1    A.   It was my understanding that they worked
2  together, that Christian had a company that did
3  vacation rentals and that Casey was in that business
4  with him as well, too.
5    Q.   Do you know anything more about that
6  business?
7    A.   Just that it went out of business in the
8  early 2010s.
9    Q.   Okay.  Did Brian Watson ever make any
10 reference to keeping this arrangement a secret?
11   A.   No.
12   Q.   Did he ever make any reference to
13 concealing it from Amazon specifically?
14   A.   No.
15   Q.   Did he ever indicate to you that he
16 thought this payment arrangement might be illegal?
17   A.   No.
18   Q.   Did you ever have any conversations with
19 Casey Kirschner suggesting that he would personally
20 benefit from these fees paid to Villanova Trust?
21        MR. SANDHU:  Objection, form and
22 foundation.
23   A.   No.
24   Q.   (BY MS. ULLERY)  Did you overhear any of
25 these conversations?

Page 202

1    A.   No.
2         MS. ULLERY:  Go ahead and pull up Tab 5.
3         MR. SMART:  Same objection.  Can you
4  speak up a little on your questioning?
5         MS. ULLERY:  Sure.
6         MR. SMART:  It tails off on the end of
7  them.
8         MS. ULLERY:  Sorry about that.  I'll
9  project.
10        MR. SMART:  Thank you.
11        MS. ULLERY:  We will be marking as
12 Exhibit 17 a November 25th, 2019 email chain, Bates-
13 numbered WDC 0440482 through 485.
14        (Deposition Exhibit 17 was marked.)
15   Q.   (BY MS. ULLERY)  Can you let us know
16 when you see the document?
17   A.   I see it.
18   Q.   Great.  Please take a look at it.  This
19 is an email that Brian Watson sent to you and
20 Christian Kirschner, correct?
21   A.   Correct.
22   Q.   Could you direct your attention to the
23 very first email in the thread?  And by "first," I
24 mean first in time.
25   A.   Right.  I see it.

Page 203

1    Q.   I can't.  Sorry.  Just a minute.
2    A.   No, no problem.
3    Q.   Do you see it where he says, "Tim, I
4  would like to arrange a phone call this week between
5  you, Christian, and I to discuss the delayed fee
6  schedule for the Sterling deals?  Christian has
7  several questions and wants to verify this this week"?
8  What were the Sterling deals?
9    A.   Those were the Amazon data centers.
10   Q.   And what was the fee schedule that Brian
11 Watson referenced for these deals?
12   A.   The referral fees were triggered with
13 certain transactions, so signing of a lease.  There
14 was a couple other steps in the development process
15 that would trigger a referral fee to Christian.
16   Q.   So Brian Watson was paying Christian
17 Kirschner a fee for participating in some way in these
18 deals?
19        MR. SANDHU:  Objection, form.
20   A.   Correct.
21   Q.   (BY MS. ULLERY)  And this is pursuant to
22 the agreement we just looked at, the referral
23 agreement?
24   A.   Correct.
25   Q.   Do you know if Christian Kirschner was

Page 204

1  providing any services in exchange for this payment?
2         MR. GARNETT:  Objection to form.
3         MR. SMART:  Objection, foundation.  And
4  please remember to speak into the microphone.  That
5  would be better.
6         MR. SANDHU:  Counsel, if it helps, this
7  is the microphone he's picking you up on.  If you move
8  that closer to you.
9    A.   I'm sorry.  Could you repeat?
10        MS. ULLERY:  Could you read the last
11 question back?
12        (The last question was read back as
13 follows:  "Do you know if Christian Kirschner was
14 providing any services in exchange for this payment?")
15   A.   The only service that I understood that
16 he provided was making the connection.
17   Q.   The initial introduction?
18   A.   Correct.
19   Q.   And then he continued to receive
20 payments after that initial introduction?
21        MR. SANDHU:  Objection, form and
22 foundation.
23   A.   Correct.
24   Q.   (BY MS. ULLERY)  There's a reference to
25 a delay in making these payments.  Do you know what

EXHIBIT L
Timothy Lorman  - 03/11/2022
201–204

Page 205

1  that delay was?
2      A.   There were delays in the development and
3  construction process, which were pushing back those
4  transaction triggers.
5      Q.   What was causing those delays?
6      A.   We had a variety of different issues.  I
7  would -- delays in the construction process for
8  materials.  There was some concerns about certain site
9  work that had to get done that was -- you know, how
10 were we going to handle this versus that and just
11 general construction issues.
12     Q.   At the time of this email, did you know
13 that Christian Kirschner was related to Casey
14 Kirschner?
15     A.   I believe so, yeah.
16     Q.   Okay.  Directing your attention to the
17 last email in the thread, so that is the very first
18 page, it mentions a meeting between you, Brian Watson,
19 and Christian Kirschner for 11:00 a.m. on
20 November 26th.  Did that meeting occur?
21     A.   Yes.
22     Q.   By phone or in person?
23          MR. SANDHU:  Objection, form.
24     A.   Phone.
25     Q.   (BY MS. ULLERY)  What did you discuss

Page 206

1  during that meeting?
2      A.   So there was a spreadsheet that we had
3  of the payments that would be due, and just went
4  through, and the goal was to give Christian some sense
5  of what the timing would be of when the payments were
6  just based on the construction process.
7      Q.   Was anyone else present for that
8  conversation?
9      A.   I was on the phone in my home, and there
10 were people in the home, but the only people on the
11 call was myself, Brian, and Christian.
12     Q.   Do you recall any references to Casey
13 Kirschner during that call?
14     A.   No.
15     Q.   Any references to Carleton Nelson during
16 that call?
17     A.   No.
18     Q.   Any references to Rodney Atherton during
19 that call?
20     A.   No.
21     Q.   Any references to Johnny Lim during that
22 call?
23     A.   No.
24          MS. ULLERY:  We will be marking as
25 Exhibit 18 a December 6th, 2019 email chain,

Page 207

1  Bates-numbered WDC 0675596 through 598.
2          (Deposition Exhibit 18 was marked.)
3      Q.   (BY MS. ULLERY)  Just let us know when
4  it comes up for you.
5      A.   That's Document 18.  It starts with an
6  email from Brent Gray?
7      Q.   Correct.
8      A.   Got it.
9      Q.   Okay.  Please take a moment to just look
10 through it.
11     A.   Sure.
12     Q.   Do you recognize the email?
13     A.   I'll let you know here in a second.
14          Okay.
15     Q.   So do you recognize it?
16     A.   Yeah.
17     Q.   Okay.  Can you direct your attention to
18 Brent Gray's email to Brian Watson on December 4th,
19 2019, where Brent asks Brian Watson, quote, whether an
20 updated version of the Villanova LLC contractor
21 agreement has been executed with WDC via legal?  Do
22 you see that?
23     A.   I do.
24     Q.   Is this a reference to the independent
25 contractor agreement between WC Holdings, Villanova

Page 208

1  Trust, and Christian Kirschner?
2          MR. SANDHU:  Objection, form and
3  foundation.
4      A.   Do I believe that that's what that
5  document is?  Yes.
6      Q.   (BY MS. ULLERY)  That that's what
7  they're referencing?
8      A.   Yes.
9      Q.   So in December 2019, Christian
10 Kirschner's agreement with Brian Watson remained in
11 place?
12          MR. SANDHU:  Objection, form and
13 foundation.
14     A.   Yes.
15     Q.   (BY MS. ULLERY)  To your knowledge, was
16 an updated version of this agreement ever executed?
17     A.   I don't know.
18     Q.   Do you understand what the reference to
19 legal here is?
20     A.   I would assume an attorney.
21     Q.   Do you know which attorney?
22     A.   No, I don't.
23     Q.   Do you know who, if anyone, wanted the
24 agreement to be updated?
25     A.   I do not.

EXHIBIT L
Timothy Lorman  - 03/11/2022
205-208

1    Q.   Can you direct your attention to the
2  email at the very top of the first page?  The first
3  sentence mentions a call with Christian Kirschner
4  regarding Villanova, LLC.  Do you know whether that
5  call ever occurred?
6    A.   I thought that it occurred right after
7  my call.  I think there was two calls that took place.
8    Q.   Okay.  Tell me more about that.
9    A.   Just my first call with going over the
10 spreadsheet, and then I believe I dropped and then
11 Brent got on the call, and then they had that
12 conversation.
13   Q.   Between Brent and Christian Kirschner?
14   A.   Yep.
15   Q.   Was Brian Watson on that call?
16   A.   Yes, I believe so.
17   Q.   Okay.  Did you ever hear from Brent what
18 was discussed on that call?
19   A.   I don't recall him saying what they
20 discussed.
21   Q.   Okay.
22        MS. ULLERY:  Can you pull up Tab 7?
23        We're going to be marking as Exhibit --
24 what number are we on?
25        MR. SANDHU:  I think you're at 18.

1        MS. ULLERY:  Thank you.  Exhibit 18, a
2  March 16th, 2020 email chain, Bates-numbered WDC
3  0654101 through 109.
4        MR. SANDHU:  To clarify, you were on 18.
5  This will be 19.
6        MS. ULLERY:  This will be 19.  Excuse
7  me.  Exhibit 19.
8        (Deposition Exhibit 19 was marked.)
9    Q.   (BY MS. ULLERY)  Let us know when you
10 see the document.
11   A.   I'm pulling it up now.
12        I have it.
13   Q.   Just take a minute to look through it,
14 and let us know when you've done so.
15   A.   Okay.
16   Q.   Okay.  Do you recognize this email?
17   A.   I do.
18   Q.   In this email, Brent Gray forwarded you
19 an email exchange between himself and Christian
20 Kirschner, correct?
21   A.   Yes.
22   Q.   Can you take a look at Pages 8 and 9 of
23 the document?
24   A.   Sure.
25   Q.   It's the very first email in this thread

1  from Brent Gray to Christian Kirschner on
2  December 31st, 2019.  There are two attachments titled
3  Villanova payments.  Do you see that?
4    A.   Yes.  Starting out, "Hi, Christian, did
5  you mean cell?"
6    Q.   Yes.  And Christian responds the same
7  day and says, "Thank you again for the call today."
8  Do you see that?
9    A.   I do.
10   Q.   Did you participate in this call on
11 December 31st, 2019?
12   A.   No.
13   Q.   Do you know whether it occurred?
14   A.   I do not.
15   Q.   Okay.  Can you take a look at Page 7 of
16 the document, where Christian Kirschner asks, "Do you
17 have any updates to the fee schedule"?
18        MR. GARNETT:  And by 7, are you going on
19 the exhibit page numbers?
20        MS. ULLERY:  Are they different?
21        MR. SANDHU:  They look the same to me.
22        MR. GARNETT:  Okay.  Great.  So the
23 answer is yes.
24        MS. ULLERY:  I wasn't sure.
25   Q.   (BY MS. ULLERY)  Do you see that?

1    A.   I do.
2    Q.   Okay.  And then do you see where Brent
3  responds on Page 6 and mentions a, quote, dev fee
4  being paid to WDC?
5    A.   Let me get there.
6        MR. SMART:  Are you on Page 6?
7        MS. ULLERY:  Yes.  So the email is kind
8  of split between 6 and 7, top of 7, bottom of 6.
9        MR. SMART:  Are you asking for the lease
10 fee?  Where it says, "Can we also expect payment of
11 the lease fee," or are we somewhere else?
12        MS. ULLERY:  "Do you have any updates to
13 the fee schedule," and then Brent responding,
14 mentioning the dev fee.
15        MR. GARNETT:  You're not clearing
16 anything up, Adam, for the record.
17        MR. SMART:  No, I'm lost on the exhibit.
18 That's why I'm asking.
19        MS. ULLERY:  Okay.  "Hi, Christian, hope
20 you are in good spirits and well."
21        MR. SMART:  Yes, I see that.
22        MS. ULLERY:  Okay.  It's that email.
23        MR. SMART:  Okay.  No, I understand
24 that.  That's what we're looking at, right, not any
25 other section of this document.

EXHIBIT L
Timothy Lorman  - 03/11/2022
209—212

1    Q.   (BY MS. ULLERY)  Do you see that?

2         (The deponent nodded head up and down.)

3         MR. SMART:  Got it.  I see dev fee.  I

4    thought you were saying debt fee.  Apologize.

5    Q.   (BY MS. ULLERY)  Do you understand dev

6    fee to mean development fee here?

7    A.   Yes.

8    Q.   Are these also referred to as

9    entitlement fees?

10   A.   They can be, yes.

11        MR. SMART:  Foundation.

12   Q.   (BY MS. ULLERY)  Is there a difference

13   between the two?

14        MS. ULLERY:  Did someone join?

15        MR. SMART:  It's just Carl.  He's

16   appearing via cell phone.

17   A.   I've seen it referred to as both.

18   Q.   (BY MS. ULLERY)  Did these payments of

19   development fees seem high to you?

20        MR. SMART:  Objection, foundation.

21        THE DEPONENT:  He may have an objection?

22        MR. GARNETT:  We're not sure what it is.

23        MR. SMART:  Foundation.

24        THE DEPONENT:  Foundation.  I'm getting

25   good at this.

1    A.   No, it didn't seem unusual.

2    Q.   (BY MS. ULLERY)  Not high or low?

3    A.   No.

4    Q.   Not unusual?

5    A.   No.

6    Q.   On Page 6, Christian asks, "Can we also

7    expect a payment on the lease fee?"  Did you

8    understand that Christian here was referring to a

9    percentage of the leasing fee from one of the Amazon

10   transactions?

11        MR. SANDHU:  Objection, form and

12   foundation.

13   A.   Yes.

14   Q.   (BY MS. ULLERY)  Was the leasing fee

15   covering any one specific service provided by

16   Northstar at this time?

17        MR. SMART:  Objection, foundation.

18   A.   It was associated with getting the lease

19   completed for the transaction.

20   Q.   (BY MS. ULLERY)  Okay.  Turning back to

21   the email thread, if you can look at the first page of

22   the document, where Christian asks about fees owed on

23   Manassas, Dulles NCP 2, and Quail Ridge.  Do you see

24   that?

25   A.   I'm getting there in one second, please.

1         Is this the first page?

2    Q.   Yes.

3    A.   "I am reaching out to confirm we're on

4    track for fees owed on Manassas and for Dulles NCP for

5    Building 3."  Yes.

6    Q.   Okay.  Do you know whether Christian

7    Kirschner had a similar fee schedule agreement for the

8    Manassas property?

9         MR. SANDHU:  Objection to form and

10   foundation.

11   A.   It was my understanding that the fee

12   lease -- the referral agreement covered all of them.

13   Q.   (BY MS. ULLERY)  All of them?

14   A.   Yes.

15   Q.   Including Quail Ridge?

16   A.   Yes.

17   Q.   Including Dulles and NCP 2?

18   A.   Yes.

19   Q.   And to your knowledge, did Brian Watson

20   know about these arrangements?

21   A.   Yes.

22   Q.   Okay.  Why do you believe that he knew

23   about them?

24   A.   I believe it based upon the fact that

25   the referral agreement was in place and there was

1    conversation about making sure that we paid our

2    referral.  He would check in when a trigger point

3    occurred to make sure that we made our payments to

4    Villanova.

5    Q.   And he was the only referral partner for

6    these Amazon deals; is that correct?

7    A.   To the best of my knowledge, yes.

8    Q.   Okay.

9         MR. SMART:  Foundation.

10        MS. ULLERY:  Can you pull Tab 8, please?

11   We will be marking as Exhibit 20 a February 2nd, 2020

12   email, Bates-numbered WDC 0350745 through 747.

13        (Deposition Exhibit 20 was marked.)

14   Q.   (BY MS. ULLERY)  Just let us know when

15   you see it.

16   A.   I have it.

17   Q.   Okay.  Do you recognize this email?

18   A.   It looks familiar, yeah.

19   Q.   Brent Gray wrote these were all

20   discussed and understood based on our 12/31/2019 phone

21   call with our referral partner and nothing significant

22   has changed with the exception of understanding Dulles

23   and NCP II in relation to the JV agreements and

24   original Dulles purchase.

25        This call he's referencing on

EXHIBIT L

Timothy Lorman  - 03/11/2022

213–216

1   December 31st, is this the same call that we just saw
2   in the last exhibit?
3       A.   I don't know.
4       Q.   Okay.  Did Brent Gray ever say anything
5   to you about any calls he had with Christian
6   Kirschner?
7       A.   Just that he had spoken with Christian.
8       Q.   Nothing more?
9       A.   He was -- he alluded to the fact, as he
10  stated in that email, that he was tired of dealing
11  with Christian's calls all the time.
12      Q.   Is that why he forwarded this to you?
13      A.   Yeah.
14      Q.   So do you understand that when Brent
15  Gray wrote the "referral partner" he was referring to
16  Christian Kirschner here?
17      A.   Yes.
18           MS. ULLERY:  Let's go ahead and take --
19  can we take a quick break?
20           MR. SANDHU:  Sure.
21           MS. ULLERY:  Just a five-minute break.
22           THE VIDEOGRAPHER:  The time is 2:26.  We
23  are going off the record.
24           (Recess taken.)
25           THE VIDEOGRAPHER:  The time is 2:35.  We

1   are back on the record.
2       Q.   (BY MS. ULLERY)  Mr. Lorman, do you
3   understand you're still under oath?
4       A.   I do.
5       Q.   Now, earlier, we talked about your
6   meeting with Mr. Gilpin.
7       A.   Yeah.
8       Q.   We're going to go back through some of
9   that, and you may have already answered a couple of
10  these questions, but just to make sure we cover
11  everything.  You met with Mr. Gilpin in person on or
12  about January 28th, 2020.  Does that sound right?
13      A.   Yes.
14      Q.   During this meeting, did you tell
15  Mr. Gilpin about what you understood to be an
16  arrangement between Casey Kirschner and Brian Watson?
17      A.   Christian.
18      Q.   Christian Kirschner?
19      A.   Yes.
20      Q.   Apologies.  Christian Kirschner and
21  Brian Watson?
22      A.   Correct.
23      Q.   And did you tell him that you suspected
24  that Brian Watson, Kyle Ramstetter, Will Camenson, and
25  Christian Kirschner may have engaged in misconduct?

1           MR. SANDHU:  Objection to form.
2       A.   No.
3       Q.   (BY MS. ULLERY)  What did you tell him?
4       A.   I just simply wanted to know if he was
5   aware of the referral agreement.
6       Q.   And going into the meeting, if he said
7   he didn't know if he was aware, would that have
8   signified misconduct to you?
9           MR. SMART:  Objection, foundation.
10      A.   It would have signified misconduct in
11  that it was my understanding of the agreement that
12  formed the entity that they were partners and that it
13  was inappropriate under those terms.
14      Q.   So he didn't know about it --
15      A.   He did not.
16      Q.   -- that you believed that the agreement
17  violated Northstar's agreement with IPI?
18      A.   Yeah.
19      Q.   At the time of the meeting, did you
20  suspect that Brian Watson, Kyle Ramstetter, Will
21  Camenson, and Christian Kirschner had violated a lease
22  agreement signed with Amazon?
23           MR. SMART:  Objection, foundation.
24           MR. GARNETT:  Objection to form.
25      A.   I don't know that I did at that time,

1   no.
2       Q.   (BY MS. ULLERY)  Did you at some other
3   point in time?
4           MR. SMART:  Objection, form.
5       A.   Yeah, subsequent to that, I did.
6       Q.   (BY MS. ULLERY)  What caused that
7   suspicion?
8       A.   The suspicion was the fact that the
9   lease budget didn't reflect where the actual money was
10  being -- how it was being allocated and used.
11      Q.   Do you recall about when you started to
12  suspect this?
13      A.   Late January, early February.
14      Q.   Okay.  So after this first meeting?
15      A.   Yep.
16      Q.   At this point in time, did you suspect
17  these individuals might have violated the law?
18           MR. SANDHU:  Objection; form,
19  foundation.
20           MR. SMART:  Same objections.
21      A.   No, I really didn't see it as a legal
22  matter at that point in time.
23      Q.   (BY MS. ULLERY)  When did it become a
24  legal matter to you?
25      A.   I don't know that it did.  I always

EXHIBIT L
Timothy Lorman  - 03/11/2022

217—220

Page 221

1  considered it to be a civil issue, not necessarily a
2  criminal issue.
3      Q.   Okay.  Did you share any of these
4  possible suspicions with Luke at the time or did you
5  just go in asking if he knew about this --
6          MR. SANDHU:  Objection, form.
7      A.   I just wanted to know if they knew about
8  the referral agreement.
9      Q.   (BY MS. ULLERY)  Other than no, what
10 else did he tell you?
11     A.   He just asked me to explain what I knew
12 about it because he had no idea what this referral
13 agreement was, and he seemed shocked when I told him.
14     Q.   He seemed shocked?
15     A.   Uh-huh.
16     Q.   Did he seem upset?
17     A.   I don't know that he seemed upset.  It
18 was just more shock.
19     Q.   Why did you take this information to
20 Luke Gilpin at IPI instead of someone else at
21 Northstar?
22         MR. GARNETT:  Counsel, I just want to
23 interpose an objection to make sure I'm clear.  It's
24 my understanding that Amazon has asserted a common
25 interest privilege with IPI, and I'm wondering whether

Page 222

1  you're intending to waive that in connection with
2  these questions.
3          MS. ULLERY:  We are not.
4          MR. GARNETT:  Sorry.  Go ahead.
5      Q.   (BY MS. ULLERY)  Go ahead and answer.
6      A.   I'm sorry.  I don't recall what the
7  question was.
8          MS. ULLERY:  Can you repeat the question
9  for us?
10         (The last question was read back as
11 follows:  "Why did you take this information to Luke
12 Gilpin at IPI instead of someone else at Northstar?")
13     A.   Because he was one of the directors in
14 the IPI-NS organization entity that was responsible
15 for these transactions.
16     Q.   (BY MS. ULLERY)  Were you concerned that
17 if you took this information to Brian Watson, it could
18 backfire in some way?
19         MR. SANDHU:  Objection; form,
20 foundation.
21     A.   I don't think so, no.
22     Q.   (BY MS. ULLERY)  Did you ever bring this
23 to Brian Watson's attention?
24     A.   Which -- bring what?
25     Q.   The fact that IPI didn't know about the

Page 223

1  agreement.
2      A.   No.
3      Q.   Why not?
4      A.   I don't know.
5      Q.   Following this meeting with Luke Gilpin,
6  on or around February 14th, 2020, did you share
7  documents with him that you believed evidenced some
8  kind of misconduct by these individuals?
9      A.   Yes.
10         MS. ULLERY:  Let's go ahead -- actually,
11 no, this has already been marked.
12     Q.   (BY MS. ULLERY)  Can you take a look at
13 Exhibit 8?  I guess it's probably Document 9.
14         MR. SANDHU:  Yes.
15     A.   Got it.
16     Q.   (BY MS. ULLERY)  Is this one of the
17 documents that you shared with Mr. Gilpin?
18     A.   I don't know, but it looks similar to
19 documents that I did share.
20     Q.   Okay.  It looks similar.
21     A.   Uh-huh.
22     Q.   What types of documents do you recall
23 sharing?
24     A.   I believe that I shared wire transfers.
25     Q.   Do you recall why you decided to share

Page 224

1  those specific types of documents?
2      A.   Just to show that money had exchanged
3  hands based on the terms of the referral agreement.
4      Q.   Okay.
5          MR. GARNETT:  Shocking.
6          MS. ULLERY:  What?
7          MR. GARNETT:  Nothing.  I was talking to
8  Mr. Watson.
9      Q.   (BY MS. ULLERY)  Let's go back to
10 Exhibit 10, which should be probably Document 11.
11     A.   Got it.
12     Q.   Same question here.  Is this one of the
13 documents you shared with Mr. Gilpin?
14     A.   It looks similar to one of the documents
15 that I shared.
16         MS. ULLERY:  And can we go ahead and
17 upload a document?  This will be marked as Exhibit 21,
18 I believe.  Is that correct?
19         MR. SANDHU:  I'll see when it comes up.
20         This is 21.
21         MS. ULLERY:  So we will be marking as
22 Exhibit 21 a spreadsheet.  And for the record, this
23 document is Exhibit 7 to Amazon's second amended
24 complaint, Docket Number 155-7.
25         (Deposition Exhibit 21 was marked.)

EXHIBIT L
Timothy Lorman  - 03/11/2022                                221~224

Page 225

```
 1        A.   I have it.
 2             MS. ULLERY:  Sorry.  That was the wrong
 3   one.
 4        A.   So 21 is not correct?
 5        Q.   (BY MS. ULLERY) I believe not.  I
 6   believe 21 is a duplicate of Exhibit 10 already.  You
 7   know, while he's uploading this, let's go ahead and
 8   stick with Exhibit 10.
 9        A.   I have it too, by the way.
10        Q.   You have it up.  Who was listed as the
11   originator here?
12        A.   In which one, on 10?
13        Q.   Exhibit 10, yeah.
14        A.   Document 11, Exhibit 10.  Originator is
15   WDC Holdings.
16        Q.   And that's Northstar?
17        A.   Correct.
18        Q.   And who is listed as the beneficiary of
19   the $321,000?
20        A.   Beneficiary is Villanova Trust.
21        Q.   Okay.  And what's the description of the
22   beneficiary information that you see there?
23        A.   Manassas leasing fee.
24        Q.   Okay.  Is this an example of a record of
25   payment that Northstar made to Villanova Trust
```

Page 226

```
 1   pursuant to the January 2018 referral agreement?
 2             MR. SANDHU:  Objection, form and
 3   foundation.
 4        A.   Yes.
 5             MS. ULLERY:  What exhibit marking is
 6   this?
 7             MR. GARNETT:  22.
 8             MR. SANDHU:  22.
 9             MS. ULLERY:  We're marking as Exhibit 22
10   a spreadsheet, and, again, for the record, this is
11   Exhibit 7 to Amazon's second amended complaint, Docket
12   Number 155-7.
13             (Deposition Exhibit 22 was marked.)
14        Q.   (BY MS. ULLERY)  Do you see that one
15   now?
16        A.   I do.
17        Q.   Do you recognize it?
18        A.   It looks familiar.
19        Q.   Is this one of the documents that you
20   provided to Luke Gilpin in February 2020?
21        A.   It could be.
22        Q.   It could be.
23        A.   I don't know specifically what I -- I
24   don't recall specifically what I sent.
25        Q.   Did you choose to provide documents that
```

Page 227

```
 1   showed referral payments being made from WDC Holdings
 2   to Villanova Trust?
 3             MR. SANDHU:  Objection, form.
 4             MR. SMART:  Objection, form and
 5   foundation.
 6        A.   Yes.
 7        Q.   (BY MS. ULLERY)  Okay.  And does this
 8   show that?
 9        A.   Yes.
10             MR. SMART:  Objection, form.
11        Q.   (BY MS. ULLERY) According to the
12   spreadsheet, how much money did WDC Holdings owe
13   Villanova Trust at the time?
14             MR. SMART:  Objection, foundation.
15        Q.   (BY MS. ULLERY)  Is it not flipping for
16   you?
17        A.   It's not flipping.
18             MR. SMART:  For the record, there is a
19   record that's already in on that deposition that's in
20   the right orientation.
21        A.   That's okay.  I've got it.  So referrals
22   Villanova owed is $1,447,614.50.
23        Q.   (BY MS. ULLERY)  Okay.  To your
24   knowledge, was this money paid by Northstar to
25   Villanova Trust?
```

Page 228

```
 1        A.   I do not know.
 2        Q.   Okay.  Let's talk about -- well, let's
 3   go back.  Did you have another meeting with Luke
 4   Gilpin after this first one in January?
 5        A.   I don't recall having one.
 6        Q.   Did you have a conversation with him?
 7        A.   I talked to him about many things.
 8        Q.   Do you recall providing him with an
 9   audio recording of a conversation that we've already
10   discussed between Brian Watson and Kyle Ramstetter and
11   Will Camenson?
12        A.   I do.
13        Q.   If you could take a look at Exhibit 12,
14   which earlier you were asked about this transcript,
15   and you said it was an accurate reflection of that
16   recording.  Do you remember that?
17        A.   I do.  Am I looking at Exhibit 12 again?
18        Q.   Pardon?
19        A.   Look at Exhibit 12?
20        Q.   Yes.
21        A.   Got it.
22        Q.   Why did you make this recording?
23        A.   Brian asked me to.
24        Q.   What else did he tell you that he asked
25   you to do?
```

EXHIBIT L
Timothy Lorman  - 03/11/2022
225-228

AB Litigation Services

Page 229

```
1        A.   I don't think there was any other
2   instructions associated with that.
3        Q.   Did you question the legality of making
4   the recording?
5        A.   No.  It's my understanding that Colorado
6   was a one-party consent, so I didn't see any objection
7   to it.
8        Q.   During which parts of the conversation
9   were you present in the room?
10       A.   I was not present -- I was present just
11  for the very start of the conversation with
12  Ramstetter, and then, as it states here, I stepped
13  out.
14       Q.   Okay.
15       A.   And then I was present for the entire
16  meeting with Will Camenson.
17       Q.   Did you listen to the recorded portions
18  of the conversation for which you were not present?
19       A.   Yes.
20       Q.   So you are familiar with the entire
21  recording?
22       A.   I am.
23       Q.   And to the best of your knowledge -- I
24  believe we discussed this earlier, but this transcript
25  is a complete and accurate transcription of that
```

Page 230

```
1   recording that you made on your phone?
2        A.   It appears to be.
3        Q.   When you first discussed this with Brian
4   Watson, what did he tell you about what he believed
5   Kyle and Will had done?
6        A.   It was -- what he shared with me is that
7   Will and Kyle had made an arrangement to acquire a
8   piece of land that Amazon was interested in based upon
9   their knowledge -- based upon information that Amazon
10  shared with them.  They purchased the property and
11  then flipped it to Amazon.
12       Q.   Okay.  And when he was discussing this
13  with you, did he make any mention to you of Casey
14  Kirschner?
15       A.   I don't recall specifically, no.
16       Q.   Carleton Nelson?
17       A.   I don't recall specifically, no.
18       MS. ULLERY:  Okay.  And just so everyone
19  is on the same page, when I reference a page number
20  for the transcript, I'm referring to the number at the
21  top of the page, which should be the same as the
22  document number.
23       Q.   (BY MS. ULLERY)  So if you could look at
24  Page 19 for me, please.  In the middle of the page
25  where Brian Watson says, quote, Do you know Nova WPC,
```

Page 231

```
1   LLC.
2        A.   Okay.  So Page 19 of 25?
3        Q.   Uh-huh.
4        A.   I see it.
5        Q.   Okay.  Are you familiar with the entity
6   Nova WPC, LLC?
7        A.   Only insofar as we did some research to
8   see who had registered that entity.
9        Q.   Okay.  And who had registered it?
10       A.   It was either Will or Kyle.  I don't
11  recall.  One of the two of them with their home
12  address.
13       Q.   Do you know whether Casey Kirschner knew
14  about Nova WPC, LLC?
15       A.   I do not know.
16       Q.   Can you direct your attention to the
17  large paragraph at the bottom of the page where Brian
18  Watson says that the entity is, quote, transacted for
19  98.7 million and then, quote, on the same day, that
20  same entity flipped it for 116.4 million?  Do you see
21  that?
22       A.   I do.
23       Q.   The property that Mr. Watson is
24  referring to is known as White Peaks property,
25  correct?
```

Page 232

```
1        A.   It's been referred to by several names,
2   but I know which one you're talking about.
3        Q.   About how much money did Nova WPC, LLC
4   make on the White Peaks deal?
5        MR. SMART:  Objection, foundation.
6        A.   I don't know.
7        Q.   (BY MS. ULLERY)  You don't know?
8        A.   No.  Some amount of the delta between
9   the sale price and what they paid for it.
10       Q.   When Brian Watson confronted Kyle
11  Ramstetter about this sale, do you know whether Kyle
12  was aware that you were recording the meeting?
13       A.   I do not know.
14       Q.   During that confrontation, did Brian
15  Watson ask Kyle Ramstetter to pay Northstar a portion
16  of the proceeds from the flip?
17       MR. SANDHU:  Objection; form,
18  foundation.
19       A.   I was not in that meeting, so it would
20  be recollection that if it states this in the
21  transcript, he did.
22       Q.   (BY MS. ULLERY)  Could you turn your
23  attention to Page 7?
24       A.   Yes, please.  Thanks.  It's going slow
25  here.
```

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    229–232

1    Q.   That's okay.  We're going to be looking
2  at the portion where Kyle says, "It's a you and me
3  Casey conversation over a drink."
4    A.   Page 7.  Okay.  I'm on Page 8.
5    Q.   Now, you've listened to this recording?
6    A.   I have.
7    Q.   When you hear "Casey," do you understand
8  it to mean Casey Kirschner?
9    A.   Yes.
10   Q.   So is it accurate to say that in
11  response to Brian's request that Northstar be paid a
12  portion of these proceeds, in this recording, Kyle
13  suggested that they discuss the payment with Casey
14  Kirschner?
15       MR. SANDHU:  Objection, form.
16   A.   Yes.
17   Q.   (BY MS. ULLERY)  Do you have any
18  understanding as to what Kyle meant by that statement?
19   A.   Not other than the three of them should
20  get together and discuss the situation, and apparently
21  there would be some resolution based on that
22  conversation.
23   Q.   Did you ask Brian Watson what he meant
24  by that?
25   A.   No.  We didn't really discuss the

1  meeting that I recall afterwards.  There was a lot of
2  shock.
3    Q.   Did you believe that Brian Watson knew
4  what Kyle meant by that statement?
5    A.   I don't know.
6    Q.   Okay.  Can you go ahead and turn to Page
7  9?  It's at the top of the page where Kyle Ramstetter
8  says, quote, "Like what we did for Amazon, that's
9  FBI."
10   A.   Okay.
11   Q.   Do you see that?
12   A.   I do.
13   Q.   Do you know what Kyle was referring to
14  when he said, quote, what we did for Amazon?
15   A.   I don't know the details of all the
16  transactions that were involved.
17   Q.   Do you understand him to be referring to
18  a different arrangement here from the White Peaks
19  deal?
20       MR. SMART:  Objection; form, foundation.
21       MR. SANDHU:  Objection; form,
22  foundation.
23   A.   It was my understanding that was outside
24  the context of the White Peaks deal.
25   Q.   (BY MS. ULLERY)  So this was a different

1  thing?
2    A.   Yes.  In my opinion, yes.
3    Q.   And you understand the "we" to include
4  Brian Watson?
5    A.   Yes.
6    Q.   In the next sentence where Kyle says,
7  you have -- quote, you have two corporate real estate
8  people for the largest tenant in the world that you
9  can trace the money.  The tenant here, did you
10  understand that to be Amazon?
11   A.   Yes.
12       MR. SANDHU:  Objection; form,
13  foundation.
14   Q.   (BY MS. ULLERY)  And who are the, quote,
15  two corporate real estate people?
16       MR. SMART:  Objection, foundation.
17   A.   My understanding, it was Casey and Carl.
18   Q.   (BY MS. ULLERY)  And what did you
19  understand, quote, the money to be traced to mean?
20       MR. SMART:  Objection, foundation.
21       MR. SANDHU:  Objection, foundation.
22   A.   Any of the fees that were moving around.
23   Q.   (BY MS. ULLERY)  To Villanova Trust?
24   A.   Uh-huh.
25   Q.   At the end of this meeting, Brian Watson

1  did not immediately fire Kyle and Will; is that
2  correct?
3    A.   That's correct.
4    Q.   Okay.  What happened after the
5  conversations with Kyle and Will ended?
6    A.   They left the building.  We had a -- I
7  believe we had a team meeting then, that morning, to
8  kind of talk through what had just happened.
9    Q.   Okay.  Did you speak with either of them
10  after that meeting?
11   A.   With Will or -- yeah.  They -- Brent
12  wanted to call Kyle, and he didn't take our call.
13   Q.   What about Will?
14   A.   No.
15   Q.   Let's back up really quickly, actually.
16  I believe you mentioned earlier that you waited in the
17  lobby or some other room with Will while Kyle was
18  meeting with Brian; is that correct?
19   A.   Correct.
20   Q.   Did Will say anything to you?
21   A.   We just talked idle.
22   Q.   Nothing about this?
23   A.   Nope.
24   Q.   What conversations did you have with
25  Brian Watson after this ended?

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    233–236

ABI Litigation Services

Page 237

1    A.   I think the primary conversation that we
2  had was was it the right thing to go ahead and fire
3  them or to just suspend them while we figured out
4  exactly what was happening, was there damage to the
5  Amazon relationship based upon this, and what we were
6  going to do with the projects in flight going forward.
7    Q.   Did he explain what, quote, FBI stuff
8  meant?
9    A.   No.
10   Q.   Did you ask him?
11   A.   No.
12   Q.   Did he explain the, quote, money to be
13 traced?
14   A.   No.
15   Q.   Did you ask him?
16   A.   No.
17   Q.   Did you have any other conversations
18 with Brent Gray after this ended?
19   A.   We had many conversations.  I think both
20 of us were just -- I can't speak for him, but just --
21 it was a lot of information thrown at us in a short
22 period of time, and there was a lot of shock and awe.
23   Q.   Do you recall him mentioning anything
24 about Casey Kirschner in those conversations?
25   A.   Brent?  No, I don't recall that.

Page 238

1    Q.   Do you recall him mentioning anything
2  about Carl Nelson in those conversations?
3    A.   I do not, no.
4    Q.   After this confrontation occurred with
5  Kyle and Will, I believe earlier you discussed a call
6  with Casey Kirschner; is that correct?
7    A.   Uh-huh.
8    Q.   You were present for the conversation?
9    A.   My conversation with Casey or --
10   Q.   Brian Watson's conversation with Casey.
11   A.   I was there for a portion of it, yeah.
12   Q.   What did he say on that call?
13   A.   As I recall, the primary tone of the
14 conversation was Brian just trying to make sure we're
15 okay.  I believe that Casey denied that he knew
16 anything about what happened.  Oh, no.  One thing he
17 mentioned, he had never spoken with Will before.
18   Q.   Okay.
19   A.   And wasn't even sure clearly who Will
20 was, and then he made the comment about, "And then I
21 didn't care for Kyle either because he figured out
22 what we were doing."
23   Q.   And I believe we discussed earlier that
24 this is when you left the room?
25   A.   Yes.

Page 239

1    Q.   Did Brian Watson ever ask you why you
2  left the room?
3    A.   I don't recall him asking me, no.
4    Q.   Did he ever try to explain what Casey
5  meant by that?
6    A.   No.
7    Q.   Did you ask?
8    A.   No.
9    Q.   After this occurred, to the best of your
10 knowledge, did Brian Watson inform any Amazon employee
11 aside from Casey Kirschner that Nova WPC, LLC had
12 purchased the White Peaks land and sold it to Amazon
13 on the same day?
14   A.   To anybody else at --
15   Q.   At Amazon.
16   A.   No, I'm not aware of that.
17   Q.   Okay.  Let's go back to Lorman Exhibit
18 7.
19   A.   Okay.  Is this a filing?  Oh, it's my
20 declaration?
21   Q.   Right.
22   A.   Okay.
23   Q.   I just want to confirm for the record.
24 You did not sign this declaration, correct?
25   A.   I don't believe that I signed this

Page 240

1  version of it.
2    Q.   Okay.  Can you now look at Exhibit 14?
3    A.   I have it.
4    Q.   Okay.  This is the signed version of
5  your declaration, correct?
6    A.   I believe so.
7    Q.   Okay.  Would you ever sign anything
8  submitted to a court without first reviewing it?
9    A.   No.
10   Q.   And if you stated that you believe
11 something to be true, you would mean that, correct?
12   A.   Correct.
13   Q.   Is it fair to say that you carefully
14 reviewed this declaration before you signed it?
15   A.   I did.
16   Q.   And at the time you signed it, you
17 believed everything in it to be true?
18   A.   I did.
19   Q.   So it's fair to say that this is your
20 own testimony?
21   A.   Yes.
22   Q.   Okay.  And nobody else's?
23   A.   Correct.
24   Q.   Let's talk about -- we were just talking
25 about you didn't raise some of these concerns or have

EXHIBIT L
Timothy Lorman  - 03/11/2022                    237–240

1  some of these conversations with Brian Watson after
2  this confrontation.  Did Northstar employees feel
3  comfortable raising issues with Brian Watson in
4  general?
5      A.   I can't speak to other employees.
6      Q.   Did you?
7      A.   I did.
8      Q.   Were you ever present for Northstar
9  employees bringing issues to his attention?
10      A.   Well, every other week, we had a team
11  meeting, and people would raise their hands and speak
12  in public; and I assume that other people would meet
13  with him one on one if they had questions or issues.
14  I know Kyle did.  Both the Kyles, Kyle Henderson and
15  Kyle Ramstetter.
16      Q.   In these meetings that you were present
17  for when an employee raised an issue with him, how did
18  he react?
19      A.   It would depend upon the issue.  You
20  know, I can't say that there was, like, one way that
21  he would react.  It really was varied upon what the
22  issue was.
23      Q.   Did he ever raise his voice?
24      A.   There was times, yeah.
25      Q.   Did he ever get angry?

1      A.   Yeah.
2      Q.   Did you feel like Brian Watson was
3  forthcoming when Northstar employees raised an issue
4  to him?
5      A.   To an extent.
6      Q.   To an extent.  Can you tell me more
7  about what you mean?
8      A.   I don't know that there was full
9  disclosure of all the issues or resolution of the
10  issues or that it was a full conversation.
11      Q.   Did you feel like when you raised issues
12  with him there was full disclosure?
13      A.   I do think so.
14      Q.   What about with respect to the questions
15  you asked about Villanova Trust?
16      A.   So the main questions that I'd asked
17  regarding Villanova Trust were really what was it, who
18  was involved with it, and that was about it.  I didn't
19  drill down too much into it.  It was -- there was
20  aspects of it that made me feel uncomfortable, but I
21  didn't explore that.
22      Q.   So you didn't share with him that you
23  were uncomfortable?
24      A.   No.
25      Q.   Okay.  Earlier, am I correct that you

1  stated you did not know whether Casey Kirschner or
2  Carleton Nelson received a portion of the funds that
3  Villanova Trust received?
4          MR. SANDHU:  Objection to the extent it
5  misstates testimony.
6      A.   I did not.  I did not, no.
7      Q.   (BY MS. ULLERY)  Did you know that Casey
8  Kirschner and Carleton Nelson did not receive a
9  portion of the funds that Villanova Trust received?
10      A.   I did not, no.
11      Q.   So you didn't know either way?
12      A.   Either way.
13          MS. ULLERY:  Let's take a quick
14  five-minute break, and then I'll finish up my line of
15  questioning.
16          MR. GARNETT:  Great.  That's terrific.
17          THE VIDEOGRAPHER:  The time is 3:01.  We
18  are going off the record.
19          (Recess taken.)
20          THE VIDEOGRAPHER:  This time is 3:08.
21  We are back on the record.
22      Q.   (BY MS. ULLERY)  Mr. Lorman, you
23  understand you're still under oath?
24      A.   I do.
25      Q.   We're going to be marking as Exhibit 22,

1  I believe, a February 13th, 2020 email chain,
2  Bates-numbered WDC 0995285 through 52 -- 5290.
3  Apologies.  Can you tell us when you see the document?
4      A.   I will.
5      Q.   You do?
6      A.   And we're waiting.  Which one are we
7  looking at, Number 22?
8          MR. SMART:  There it is.  Mine just
9  showed up.
10      A.   Yes, 23.  I got it.
11          (Deposition Exhibit 23 was marked.)
12      Q.   (BY MS. ULLERY)  As founder and CEO of
13  Northstar, did Brian Watson have the final say on any
14  actions taken by his company?
15      A.   Yes.
16      Q.   Did Brian Watson dictate which projects
17  his employees at Northstar should prioritize?
18      A.   Yes.
19      Q.   Did these projects ever include Brian
20  Watson's personal projects as opposed to professional
21  projects?
22      A.   Yes.
23      Q.   Can you take a look at the document?
24      A.   Sure.
25      Q.   Do you recognize the email?

EXHIBIT L
Timothy Lorman  - 03/11/2022

241–244

```
 1        A.    Not yet.
 2              MR. GARNETT:  And just so we're clear,
 3   Counsel, we're looking at Exhibit 23?
 4              MS. ULLERY:  Correct.
 5              MR. GARNETT:  Okay.
 6        A.    Okay.
 7        Q.    (BY MS. ULLERY)  So you recognize it?
 8        A.    I do.
 9        Q.    In this email, did Brian Watson forward
10   you an email thread between himself and Jake,
11   apologies if I mispronounce, Meilach?
12              MR. SANDHU:  Objection, form.
13        A.    He did.
14        Q.    (BY MS. ULLERY)  And who is Jake?
15        A.    Jake handled our debt acquisition.
16        Q.    Can you take a look at the very first
17   email in the chain between Jeri Shoop and Brian Watson
18   where Jeri Shoop says, quote, Thank you for contacting
19   me to help you finance your investment at the lake
20   house.  Do you see that?
21        A.    Okay, here it is.  Jeri Shoop.
22              Okay.
23        Q.    Do you know what this lake house
24   investment was?
25        A.    I do not.  I assume that this was the
```

```
 1   condo at Stanley Lake.
 2        Q.    Sorry.  At where?
 3        A.    Stanley Lake, just on the west side of
 4   town.  Sloan's Lake?  Sloan's Lake?  Sloan's Lake.
 5   I'm sorry.
 6        Q.    Did Brian Watson ask Jake to assist with
 7   his personal loan application for this property?
 8        A.    I believe so.
 9        Q.    Can you direct your attention to Jake's
10   response to Brian Watson on February 13th, 2020, where
11   he says, quote, I have a very full plate of pressing
12   NCP-related deals and this is another personal
13   administrative exercise that I can't spend time on?
14   Do you see that?
15        A.    Yeah, I'm just scrolling up here.  Yeah.
16        Q.    And do you see Brian Watson's response
17   where he says that, quote, "NCP put up the EMD and we
18   need to protect it.  Any of my interests are interests
19   the team should work on"?
20        A.    Yep.
21        Q.    What does it mean for NCP to have put up
22   the EMD?
23              MR. GARNETT:  Objection to form and
24   foundation.
25        A.    I'm drawing a blank on what the acronym
```

```
 1   stands for.
 2        Q.    (BY MS. ULLERY)  Is EMD earnest money
 3   deposit?
 4        A.    Oh, yeah.
 5              MR. SANDHU:  Objection; form,
 6   foundation.
 7              MR. GARNETT:  Also relevance.
 8        Q.    (BY MS. ULLERY)  So back to my original
 9   question.  What would it mean for NCP to put up the
10   EMD?
11        A.    That means that, according to this, NCP,
12   the company, had paid the earnest money deposit for
13   the development.
14        Q.    So Mr. Watson used Northstar financials
15   to pay the earnest money deposit for the property?
16              MR. SANDHU:  Objection, form.
17        A.    According to this, yes.
18        Q.    (BY MS. ULLERY)  Okay.  And this was a
19   personal home purchase?
20        A.    Yes.
21        Q.    When he forwarded you this email,
22   Mr. Watson said that, quote, As the person that pays
23   them, they need to work on my items I request, whether
24   personal or professional.  Do you see that?
25        A.    I do.
```

```
 1        Q.    Was this the first time that Mr. Watson
 2   had asked a Northstar employee to assist with a
 3   personal purchase?
 4        A.    I don't believe so.
 5        Q.    To your knowledge, was this the first
 6   time that Mr. Watson had used Northstar funds to help
 7   pay for a personal purchase?
 8        A.    I'm not aware of what else he purchased.
 9        Q.    During your employment at Northstar, did
10   you witness Brian Watson mix personal and company
11   funds on more than one occasion?
12              MR. GARNETT:  Objection, relevance.
13   It's not relevant to this lawsuit.
14        A.    So because I had no exposure to any of
15   the financial information, I had anecdotal
16   conversations with both Kristi, Brent, and Jake that
17   indicated that was the case.
18        Q.    (BY MS. ULLERY)  What did they say?
19        A.    Just that -- it was a little complicated
20   how money flowed in and out of the entities, and money
21   would go into -- and this is, like, the real fringe of
22   my understanding because I didn't have exposure to how
23   the finances worked, but I believe cars and some other
24   things were -- the apartment downtown were all
25   purchased by NCP or WDC.
```

EXHIBIT L
Timothy Lorman  - 03/11/2022
245—248

ABI Litigation Services

**Page 249**

1    Q.   Did Brent Gray ever complain to you
2  about these types of purchases?
3    A.   He was frustrated.
4    Q.   Why was he frustrated?
5    A.   I don't -- he alluded to the fact that
6  he didn't feel it was appropriate.
7    Q.   What about Kristi Fisher?
8    A.   She was frustrated as well, too.
9    Q.   For the same reason?
10   A.   Yes.
11   Q.   Earlier, I believe you mentioned that
12 your wife works for Amazon, right?
13   A.   Correct.
14   Q.   How long has she worked there?
15   A.   She started October-ish in 2019.  It's
16 in one of the documents.
17   Q.   And what is her job title?
18   A.   She is a construction job manager.
19   Q.   Do you know what office she is based in?
20   A.   Our house.  She works for AMZL, so she
21 works on the transportation team for logistics.
22   Q.   Where is that office located?
23   A.   I don't know that they have a specific
24 office.  They're distributed all across the country.
25 A number of people work out of Seattle.

**Page 250**

1    Q.   Do you know whether your wife ever
2  worked with Casey Kirschner?
3    A.   She has not.
4    Q.   Do you know whether she ever worked with
5  Carleton Nelson?
6    A.   She has not.
7    Q.   So their paths never crossed?
8    A.   No.
9    Q.   Has your wife ever worked on the
10 transactions between Northstar and Amazon?
11   A.   No.
12   Q.   Have you discussed this matter at all
13 with your wife?
14   A.   Yes.
15   Q.   What have you discussed?
16   A.   Just what we were going through.
17   Q.   Has your wife ever asked you to take any
18 action related to this matter in order to benefit
19 Amazon?
20   A.   No.
21   Q.   Has your wife ever asked you to say
22 anything that you believed to be untrue as it relates
23 to this matter?
24   A.   No.
25   Q.   So is it fair to say that your wife's

**Page 251**

1  employment with Amazon has not impacted the accuracy
2  of your statements and representations in this matter
3  in any way?
4         MR. SANDHU:  Objection, form.
5    A.   Correct.
6         MR. SMART:  Same objection.
7         MS. ULLERY:  All right.  I'll pass the
8  witness.
9         MR. GARNETT:  Thank you.
10        Mr. Lorman, I do have a few follow-up
11 questions.  Would you prefer I sit in Mr. Sandhu's
12 chair?
13        Okay.  Great.
14        MR. SANDHU:  Stan, if you want me to
15 leave my computer here, you can have access to the
16 exhibits.
17        MR. GARNETT:  I wouldn't know what to do
18 with it.  Thank you.
19            EXAMINATION
20 BY MR. GARNETT:
21   Q.   So, Mr. Lorman, are you still doing all
22 right?
23   A.   I'm doing great.
24   Q.   You are doing great.  Let me follow up.
25 Counsel was asking you some questions that I guess

**Page 252**

1  I'll call conflict of interest questions.
2    A.   Okay.
3    Q.   First of all, about your wife.  And I'm
4  assuming the reason they're asking those questions is
5  because people are concerned it might look a little
6  odd that your wife got this job at Amazon right after
7  you took over responsibility on the -- for the Amazon
8  projects at Northstar, right?
9         MS. ULLERY:  Objection, misstates
10 testimony and form.
11   Q.   (BY MR. GARNETT)  Do you think that's
12 why people might be asking about that?
13   A.   I have no clue why they would be.
14   Q.   And your testimony is that even though
15 your wife works at Amazon, that hasn't influenced
16 anything about what you're saying here today?
17   A.   No.
18   Q.   Now, with regard to the -- you just saw
19 some emails about what Mr. Watson calls the lake
20 house.  Do you know what I'm talking about?
21   A.   I do.
22   Q.   And that's the property out by -- is it
23 Sloan's Lake or Stanley Lake?
24   A.   I'm not quite sure.  It's one of the
25 two.

EXHIBIT L
Timothy Lorman  - 03/11/2022                    249—252

Page 253

1    Q.   And your understanding is that that
2  property was being -- at least the down payment was
3  being paid by Northstar.  Is that what you understood?
4    A.   Correct.
5    Q.   Now, when you came to Northstar,
6  Mr. Lorman, you had done some research of the company,
7  right?
8    A.   Uh-huh.
9    Q.   Yes?
10   A.   Yes.
11   Q.   And you knew that, in fact, Northstar
12 had been founded by Mr. Watson, right?
13   A.   Yes.
14   Q.   And, in fact, that Mr. Watson was
15 basically the guy that ran Northstar, right?
16   A.   Yes.
17   Q.   And, in fact, that he was the sole owner
18 of the LLC WDC Holdings, right?
19   A.   Yes.
20   Q.   And that that was not only totally
21 legal, but you knew all about that before you went to
22 work there, right?
23        MS. ULLERY:  Objection, calls for a
24 legal conclusion and form.
25   A.   Yes.

Page 254

1    Q.   (BY MR. GARNETT)  Okay.  Well, you
2  certainly didn't think there was anything
3  inappropriate about that, did you?
4    A.   No.
5    Q.   Okay.  Now, you're aware that an
6  injunction has been imposed by the court requiring
7  Mr. Watson to post with the court more than
8  $21 million.  Are you aware of that?
9    A.   I am.
10   Q.   You've read about that in the paper?
11   A.   Uh-huh.
12   Q.   And you probably know that Mr. Watson
13 has had some difficulty with that, right?
14        MS. ULLERY:  Objection, form.
15   A.   Apparently, yeah.
16   Q.   (BY MR. GARNETT)  Okay.  Do you have any
17 idea from what you know about these transactions as to
18 why the Court would order Mr. Watson to post 21. --
19 almost $21.5 million with the court?
20   A.   No.
21   Q.   Is there anything about anything you've
22 seen in the record here that would explain that amount
23 that would have to be posted by Mr. Watson and WDC
24 Holdings?
25        MS. ULLERY:  Objection, form.

Page 255

1    A.   No.
2    Q.   (BY MR. GARNETT)  And you were the COO
3  of Northstar, right?
4    A.   Correct.
5    Q.   During the relevant time when all of
6  these things were coming to a head with Amazon, right?
7    A.   Correct.
8    Q.   And you didn't see anything in the
9  records of Amazon -- or of Northstar that would
10 explain why an injunction of $21 million would make
11 any sense, correct?
12        MS. ULLERY:  Objection, form.
13   A.   Yeah, I don't understand the calculus
14 behind it.
15   Q.   (BY MR. GARNETT)  Sure.  Are you aware
16 that a receiver has been put in place to take control
17 over Mr. Watson's personal finances and also WDC
18 Holdings?
19   A.   I am.
20   Q.   And are you aware that that receiver,
21 among other things, is handling the sale of this lake
22 house that counsel was asking you about?
23   A.   I am now.
24   Q.   Okay.  So Mr. Smart was asking you --
25 let's circle back about White Peaks.  So White Peaks

Page 256

1  and Mr. Watson's reaction to White Peaks was both
2  pretty intense and pretty understandable, from what I
3  understand of what you've said.  Is that a fair
4  summary?
5        MS. ULLERY:  Objection, form.
6    A.   Yes.
7    Q.   (BY MR. GARNETT)  And Mr. Smart asked
8  you in passing something about the fact that IPI had
9  helped to fund White Peaks.  Did you know that before
10 today?
11        MS. ULLERY:  Objection, misstates
12 testimony and form.
13   A.   No.
14   Q.   (BY MR. GARNETT)  Okay.  Now that you
15 know that IPI was involved in helping to fund the
16 White Peaks transaction that was a theft of corporate
17 opportunity for Northstar, does that cause you any
18 concern?
19        MS. ULLERY:  Objection, assumes facts
20 not in evidence.
21   A.   I would -- this is all new information,
22 so I'd have to think through it.
23   Q.   (BY MR. GARNETT)  Sure.  If you had
24 known that back in January, do you think you would
25 have gone out to Chicago to meet with an IPI

EXHIBIT L
Timothy Lorman  - 03/11/2022
253~256

Page 257

1 representative and talk about the Villanova Trust
2 situation?
3          MS. ULLERY:  Objection, form.
4     A.   I believe so, yes.
5     Q.   (BY MR. GARNETT)  Okay.  Do you think
6 that IP -- knowing this now, do you think that IPI
7 could be trusted with information about the financial
8 situation at Northstar?
9          MS. ULLERY:  Objection, form.
10    A.   I'm not sure how the knowledge that they
11 participated in one transaction would impact their
12 credibility in giving information.  I'm not drawing
13 the connection between the two.
14    Q.   (BY MR. GARNETT)  Okay.  Well, and I'm
15 not here to argue with you.  At least I'm not supposed
16 to argue with you, so let me ask it this way.
17         It's puzzling to hear you talk.  Here
18 you are the COO of Northstar, and you talk about being
19 hesitant to bring information to Brian Watson's
20 attention; and yet you jumped to conclusions about
21 Villanova, take that to IPI's attention without even
22 telling Mr. Watson.  Can you understand why that might
23 seem a little odd?
24         MS. ULLERY:  Objection; form, misstates
25 testimony.

Page 258

1     A.   So I'm not sure what conclusion I jumped
2 to.  I simply wanted to know if they were aware of the
3 referral agreement because there were some referral
4 agreements that were disclosed and apparently some
5 that weren't, and I was trying to sort out what was
6 exactly going on.
7     Q.   (BY MR. GARNETT)  Well, you were not
8 only working for Northstar; you were getting paid by
9 Northstar more than you'd been paid in any other job.
10 Don't you think you had an obligation to bring that to
11 Mr. Watson's attention --
12         MS. ULLERY:  Objection --
13    Q.   -- before you took it to IPI?
14         MS. ULLERY:  Objection, argumentative.
15    A.   I don't know.
16    Q.   (BY MR. GARNETT)  What about Matt Ahern?
17 Was he involved in any of your conversations?  Or was
18 it just Luke Gilpin that you know of?
19    A.   I spoke to Matt Ahern.  We talked in two
20 meetings -- I think Brian was in one of them, and
21 several of us were in another -- where we tried to
22 talk about what our go-forward strategy was after the
23 White Peaks transaction.  So I've had a couple
24 conversations with Matt.
25    Q.   And when you talk about meetings, I'm

Page 259

1 assuming just from context that these were phone
2 conference meetings?
3     A.   No, we flew to Chicago twice.
4     Q.   And you met with Mr. Ahern in person?
5     A.   Yes.
6     Q.   Okay.  And that was because you were
7 wanting to make sure that the relationship with IPI
8 was not damaged with White Peaks?
9     A.   Yes, absolutely.  We were absolutely
10 concerned.  After what happened with the White Peaks
11 transaction, they had questions about now with Kyle
12 and Will being gone how were we going to perform as a
13 development partner.
14    Q.   And did Mr. Ahern or anybody from IPI
15 tell you they had funded the White Peaks transaction?
16    A.   No.
17         MS. ULLERY:  Objection, assumes facts
18 not in evidence.
19    Q.   (BY MR. GARNETT)  Well, if that was
20 true, don't you think they should have told you that?
21         MS. ULLERY:  Objection, form.
22    Q.   (BY MR. GARNETT)  In hindsight, don't
23 you wish you would have known that when you were
24 flying out to meet with them?
25         MS. ULLERY:  Objection, form.

Page 260

1     A.   It would have been helpful to have all
2 the information available.
3     Q.   (BY MR. GARNETT)  Sure.  In particularly
4 the White Peaks transaction, that was such kind of a
5 flash point in changing everything.  To know that IPI
6 was behind that, would that have been important to you
7 to know?
8         MS. ULLERY:  Objection, assumes facts
9 not in evidence.
10    A.   Yes.
11    Q.   (BY MR. GARNETT)  Okay.  Now, this 1.3
12 million amount that you mentioned that you were
13 concerned about in December, if I'm understanding what
14 you're saying, you had questions about that, and then
15 from your review of documents, you were never able to
16 quite figure out how that fit into the arrangements.
17 Is that right?
18    A.   To be clear, the first group to raise
19 concerns about it was IPI, not me, and so they asked
20 me to look into it.  So that's when we started to
21 track it down.
22    Q.   So that's -- then you called Casey
23 Kirschner, and he indicated that they were not going
24 to fund that?
25    A.   I believe Brian and I had a conversation

EXHIBIT L
Timothy Lorman  - 03/11/2022                                    257—260

ABI Litigation Services

Page 261

1   as well, too, and Brian said that should certainly be
2   in the lease, talk to Casey.
3        Q.   And were you aware that, in fact, IPI
4   had in documents approved that precise amount almost a
5   year prior to that time?
6             MS. ULLERY:  Objection, form.
7        A.   I don't recall what we knew what IPI had
8   done.  I mean, they would have had to have approved
9   it, I would think, in order for that to be taking
10  place, and I think as we were doing deeper review
11  under the finances based upon the issues that we had
12  with the draw that came to their attention again.
13       Q.   (BY MR. GARNETT)  And, obviously, IPI
14  was able to use that issue, from your testimony,
15  eventually to terminate Mr. Watson as the manager of
16  these entities on April 2nd in those letters that you
17  received; is that right?
18            MS. ULLERY:  Objection, misstates
19  testimony and form.
20       A.   I don't know what they used.
21       Q.   (BY MR. GARNETT)  And maybe I
22  misunderstood, but didn't you testify earlier that it
23  was your understanding that the reason they terminated
24  Mr. Watson on April 2nd in those letters that you
25  received and then sent to him was because of their

Page 262

1   concern about this acquisition fee?
2             MS. ULLERY:  Same objections.
3        A.   Yes, about the acquisition fee.  I'm
4   sorry if I misunderstood the question.
5             MR. GARNETT:  Okay.  I think,
6   Mr. Lorman, I'm pretty close to being done, like
7   literally very close, but can you give me just a
8   couple minutes to chat with my client and we'll wrap
9   up?
10            THE DEPONENT:  Sure.
11            MR. GARNETT:  Great.
12            THE VIDEOGRAPHER:  The time is 3:27.
13  We're going off the record.
14            (Recess taken.)
15            THE VIDEOGRAPHER:  The time is 3:31.  We
16  are back on the record.
17            MR. GARNETT:  Mr. Lorman, thank you very
18  much.  I don't have any further questions.
19            THE DEPONENT:  Oh, okay.  Great.
20            MS. ULLERY:  Mr. Smart?
21            MR. GARNETT:  Mr. Smart, do you have
22  anything?
23            MR. SMART:  Unfortunately, I have a few,
24  but they shouldn't take long.
25            THE DEPONENT:  You Florida people, I'm

Page 263

1   telling you what.
2                    EXAMINATION
3   BY MR. SMART:
4        Q.   When is the last time you spoke to Matt
5   Ahern?
6        A.   It was in one of our in-person meetings
7   the fall of 2019.
8        Q.   Okay.  And when was the last time you
9   spoke to Luke Gilpin?
10       A.   Probably February or March of 2020.
11            MR. SMART:  And let's pull up real quick
12  Exhibit 7.  I don't know.  If someone else has
13  control, they can do it.  It doesn't matter to me.  I
14  just want to get to the last page of it.  I'm sorry.
15       A.   Which exhibit am I looking at?
16            MR. GARNETT:  7 is --
17            MR. SMART:  No, I'm looking at -- hold
18  on.  I'll tell you.
19            MR. GARNETT:  Are you looking for the
20  declaration?
21            MR. SMART:  No, I'm not.  It's actually
22  Exhibit 1.
23            MR. GARNETT:  Okay.
24            MR. SMART:  The independent contractor
25  agreement.  I want to get to the last page.

Page 264

1        A.   With the exhibit?
2        Q.   (BY MR. SMART)  Exhibit 1.  And we'll go
3   to Exhibit A to Exhibit 1, sorry, the very last page
4   with the chart.
5        A.   With the chart.  Yeah.
6        Q.   I'm focusing in on the manager's net
7   profits interest percentage column there.
8        A.   Yes.
9        Q.   I just want to clarify something.  That
10  portion of the chart, it is referring to a sale of the
11  property that is subject to the lease, correct?
12       A.   Correct.
13       Q.   Okay.  So it is part of a -- it is not
14  necessarily a part of the lease transaction, but it's
15  part of the overall sort of running of that process,
16  that there can be a sale of that underlying property
17  during the lease transaction or the (inaudible)?
18            MS. ULLERY:  Objection, form.
19            THE COURT REPORTER:  I'm sorry.  "Lease
20  transaction or the" --
21       Q.   (BY MR. SMART)  Let me rephrase the
22  question.  I believe there was a question by counsel
23  that involves a sale transaction, and I know
24  technically it does involve a sales transaction, but I
25  want to make sure the record is clear that when you

EXHIBIT L
Timothy Lorman  - 03/11/2022                    261-264

ABI Litigation Services

Page 265

1 have a built-to-lease transaction that there can be a
2 sale that occurs within the context of the property
3 that is subject to that build-to-suit lease
4 transaction, correct?
5       A.   Correct.
6       Q.   And that column there is referring to if
7 a sale like that occurs, that is what that column is
8 referring to with respect to the fees in that chart,
9 correct?
10      A.   Correct.
11           MR. SMART:  Okay.  That's it on that.
12 We can take that down.
13      Q.   (BY MR. SMART)  Last topic.  During --
14 you worked for Cushman for a little bit of time after
15 Northstar?
16      A.   I did.
17      Q.   And were they soliciting transactions
18 with Amazon during your time there?
19      A.   Not to the best of my knowledge.
20      Q.   Okay.  And you're now with DRGinvest?
21      A.   Correct.
22      Q.   And have they been soliciting
23 transactions with Amazon during your time there?
24      A.   No.
25      Q.   And then, between your time at Cushman

Page 266

1 and DRG, did you found a company or anything like
2 that?
3       A.   No.
4            MS. ULLERY:  Objection, form.
5       Q.   (BY MR. SMART)  Okay.  Have you founded
6 a company at any time since leaving Northstar?
7       A.   I was looking at doing an acquisition,
8 and we formed an entity associated with anticipation
9 of acquiring another business, but it never -- never
10 happened.
11      Q.   Okay.  What kind of business was that?
12      A.   I was looking at a couple of different
13 businesses.  One was a construction business that did
14 part of residential construction.  I was looking at a
15 couple of others.  One was a waste removal business.
16 I'm trying to think of anything.  A cookie shop.
17 That's right, because I love cookies, but, yeah, if
18 there was any entities that were formed, it was
19 associated with that.
20           MR. SMART:  Okay.  Just one second.
21           All right.  I don't have any further
22 questions.  Thank you for your time today.
23           THE DEPONENT:  Great.  Thanks a lot.
24           MS. ULLERY:  Nothing further from us.
25           THE VIDEOGRAPHER:  The time is 3:37.  We

Page 267

1 are going off the record.  This will complete the
2 deposition for this witness.
3            (The deposition concluded at
4 3:37 p.m., March 11, 2022.)

Page 268

1        I, TIMOTHY LORMAN, do hereby certify
2 that I have read the foregoing transcript and that the
3 same and accompanying amendment sheets, if any,
4 constitute a true and complete record of my testimony.
5
6        _____
7             Signature of Deponent
8
9             (    ) No amendments
10            (    ) Amendments attached
11
12
13        Acknowledged before me this _____ day of
14 _____, 2022.
15
16        Notary Public: _____
17        My commission expires _____
18        Seal:
19
20
21
22
23
24
25

EXHIBIT L
Timothy Lorman  - 03/11/2022
265–268

**Page 269**

```
1            REPORTER'S CERTIFICATE
2    STATE OF COLORADO        )
3                             ) ss.
4    CITY AND COUNTY OF DENVER )
5        I, SANDRA L. BRAY, do hereby certify that I
6    am a Registered Diplomate Reporter, Certified Realtime
7    Reporter, and Notary Public within the State of
8    Colorado; that previous to the commencement of the
9    examination, the deponent was duly sworn or affirmed
10   to testify to the truth.
11       I further certify that this deposition was
12   taken in shorthand by me at the time and place herein
13   set forth and was thereafter reduced to typewritten
14   form, and that the foregoing constitutes a true and
15   correct transcript.
16       I further certify that I am no related to,
17   employed by, nor of counsel for any of the parties or
18   attorneys herein, nor otherwise interested in the
19   result of the within action.
20       In witness whereof, I have affixed my
21   signature this 15th of March, 2022.
22       My commission expires January 17, 2024.
23
              _____
24            Sandra L. Bray
              Registered Diplomate Reporter
25            Certificate Realtime Reporter
```

**Page 270**

```
1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202
3    March 22, 2022
4    Stanley L. Garnett, Esq.
     410 17th Street, Suite 2200
5    Denver, Colorado 80202
6    Re:  Deposition of TIMOTHY LORMAN
          Amazon.com Inc v. WDC Holdings LLC
7         Case No. 1:20-cv-484-RDA-TCB
8    The aforementioned deposition is ready for
     reading and signing.  Please attend to this
9    matter by following BOTH of the items indicated
     below:
10
     _____ Call 303-296-0017 and arrange with us
11         to read and sign the deposition in our
           office
12
     _XXX_ Have the deponent read your copy and sign
13         the signature page and amendment sheets, if
           applicable; the signature page is attached
14
     _____ Read the enclosed copy of the deposition
15         and sign the signature page and amendment
           sheets, if applicable; the signature page
16         is attached
17   _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18   _____ By _____ due to a trial date of_____
19   Please be sure the original signature page and
     amendment sheets, if any, are SIGNED BEFORE A
20   NOTARY PUBLIC and returned to AB Litigation Services
     for filing with the original deposition.  A copy
21   of these changes should also be forwarded to
     counsel of record.  Thank you.
22
23   AB LITIGATION SERVICES
24   cc:  All Counsel
25
```

**Page 271**

```
1    AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
2    Denver, Colorado  80202
3
4
5            TIMOTHY LORMAN
           March 11, 2022
6    Amazon.com Inc v. WDC Holdings LLC
       Case No. 1:20-cv-484-RDA-TCB
7
8
9    The original deposition was filed with
10   Stanley L. Garnett, Esq. on approximately
11   the 22nd day of March, 2022.
12   _____ Signature waived
13   _____ Signature not requested
14   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
15          trial
16   _XXX_ Unsigned; original amendment sheets and/or
           signature pages should be forwarded to
17         AB Litigation Services to be filed in the
           envelope attached to the sealed original
18
19
     Thank you.
20
     AB LITIGATION SERVICES
21
     cc:  All Counsel
22
23
24
25
```

**Page 272**

```
         - AMENDMENT SHEET -
      Deposition of TIMOTHY LORMAN
           March 11, 2022
    Amazon.com Inc v. WDC Holdings LLC
      Case No. 1:20-cv-484-RDA-TCB
The deponent wishes to make the following changes
in the testimony as originally given:
Page  Line        Should Read        Reason
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
Signature of Deponent: _____
Acknowledged before me this ____ day of _____,
20___.
(seal)     Notary's signature _____
           My commission expires_____
```

EXHIBIT L
Timothy Lorman  - 03/11/2022
269–272

*AB Litigation Services*

## Exhibits

**EXHIBIT 1** 3:20 91:22,23 189:20 263:22 264:2,3

**EXHIBIT 2** 3:23 93:21,23

**EXHIBIT 3** 4:1

**EXHIBIT 4** 4:2 132:11

**EXHIBIT 5** 4:4 99:7

**EXHIBIT 6** 4:7 128:17

**EXHIBIT 7** 4:8 5:22 100:20,22 117:13 119:21,22 120:5 153:7 224:23 226:11 239:17,18 263:12

**EXHIBIT 8** 4:12 101:12 223:13

**EXHIBIT 9** 4:13,17 101:11 102:1,6,9

**EXHIBIT 10** 4:15 103:25 224:10 225:6, 8,13,14

**EXHIBIT 11** 4:16 104:12

**EXHIBIT 12** 4:17 104:20 228:13,17,19

**EXHIBIT 13** 4:19

**EXHIBIT 14** 5:1,20 128:11 240:2

**EXHIBIT 15** 5:5

**EXHIBIT 16** 5:8 186:3,8

**EXHIBIT 17** 5:11 202:12,14

**EXHIBIT 18** 5:13 206:25 207:2 210:1

**EXHIBIT 19** 5:15 210:7,8

**EXHIBIT 20** 5:18 216:11,13

**EXHIBIT 21** 5:20

224:17,22,25

**EXHIBIT 22** 5:22 226:9,13 243:25

**EXHIBIT 23** 5:24 244:11 245:3

## $

**$1,447,614.50** 227:22

**$1.3** 82:17,19 83:20 84:15 114:12,19 131:3,20 147:10 150:21,25 151:10 165:10 170:12 171:1, 9,20

**$1.5** 131:9

**$20** 122:8

**$21** 254:8 255:10

**$21.5** 254:19

**$3** 17:22 130:21

**$312,000** 129:23

**$321,000** 225:19

## 0

**0350745** 216:12

**0440482** 202:13

**0654101** 210:3

**0675596** 207:1

**0711415** 186:7

**0995285** 244:2

## 1

**1** 3:20 4:5 31:8,10 42:12 43:23 86:12,14 87:1 91:22,23 92:1,2 189:20,22 263:22 264:2,3

**1.3** 131:10,11 169:6 260:11

**1.3ish-million-dollar** 66:14

**1/8/18** 3:22

**10** 4:15 81:24 82:25 86:21 102:5,8 103:25 224:10 225:6,8,12, 13,14

**100** 4:8

**101** 4:12

**102** 4:13

**103** 4:15

**104** 4:16,17

**1050** 2:4

**109** 210:3

**10:03** 48:9

**10:38** 86:23

**10:52** 87:3

**11** 3:6 4:16 103:25 104:12 126:25 224:10 225:14 267:4

**11/25/19** 5:11

**110** 32:22

**111** 98:4,8

**116.4** 231:20

**11:00** 205:19

**11:51** 144:16

**11th** 6:8

**12** 4:17 104:11,20 127:15 228:13,17,19

**12/31/2019** 216:20

**12/6/19** 5:14

**128** 5:1

**12:15** 144:19

**12:54** 179:16

**13** 4:19 104:20 127:20

**13th** 244:1 246:10

**14** 5:1,20 47:18 87:1 93:7 128:10,11 153:12,13 240:2

**144** 169:10

**14th** 223:6

**15** 5:5 81:24 82:25

**152** 3:16

**155-7** 224:24 226:12

**15th** 143:11

**16** 5:8 186:3,8

**16th** 210:2

**17** 5:11 202:12,14

**17th** 2:12 3:7 6:12

**18** 5:13 206:25 207:2, 5 209:25 210:1,4

**181** 3:17

**186** 5:8

**18th** 35:8

**19** 5:15 17:13,19 210:5,6,7,8 230:24 231:2

**1982** 20:8

**1986** 20:25

**199** 10:4

**1990** 22:22

**1:09** 179:19

**1:11** 181:13

**1:47** 181:16

**1st** 40:4

## 2

**2** 3:23 93:21,23 94:3 121:22 189:8 214:23 215:17

**2/3/2020** 5:18

**20** 5:18 122:20 148:19 181:11 216:11,13

**2000** 2:8

**2000s** 26:10

**2001** 44:20

**20036-5306** 2:4

**2006** 30:10

**2010s** 201:8

*AB Litigation Services*

**2015** 26:12 30:11,13 31:23

**2017** 94:5

**2018** 93:3 106:22 125:9 156:20 226:1

**2019** 4:18 17:8 28:19,22 33:10 35:8 39:20 40:4 42:13 43:18,23 44:21 45:8 47:21 48:19 49:23 55:6,21 56:9 68:18 71:23 87:14 89:4 91:11 94:15 96:15 104:24 105:8 108:22 121:24 123:4 124:2 139:11 144:25 149:23 161:8 173:21 202:12 206:25 207:19 208:9 211:2, 11 249:15 263:7

**202** 5:11

**2020** 15:5,16 16:10 17:8 47:24 54:25 99:16 121:24 130:19 139:20 144:25 186:6 210:2 216:11 218:12 223:6 226:20 244:1 246:10 263:10

**2022** 3:6 6:8 32:22 267:4

**207** 5:13

**20th** 17:13 35:8 94:5

**21** 5:20 224:17,20,22, 25 225:4,6 254:18

**210** 5:15

**216** 5:18

**21st** 123:4

**22** 5:22 226:7,8,9,13 243:25 244:7

**2200** 2:13 3:7 6:12

**224** 5:20

**226** 5:22

**23** 5:24 244:10,11 245:3

**244** 5:24

**25** 231:2

**251** 3:15

**25th** 202:12

**260,000** 35:16

**263** 3:16

**26th** 205:20

**27** 4:18

**28th** 218:12

**2:06** 198:21

**2:08** 198:24

**2:26** 217:22

**2:35** 217:25

**2nd** 139:20 140:4,5 141:18,21,24 150:3 151:17 216:11 261:16,24

---

### 3

**3** 4:1 93:23 98:8 186:3 215:5

**3/16/2020** 5:16

**3/4/2020** 4:2

**3/5/20** 4:5

**3/5/2020** 5:9

**30th** 127:16

**31st** 211:2,11 217:1

**37201** 2:8

**3:01** 243:17

**3:08** 243:20

**3:27** 262:12

**3:31** 262:15

**3:37** 266:25 267:4

**3rd** 142:1 143:9 186:6

---

### 4

**4** 4:2 32:6 97:22 98:22 132:11

**40** 12:8

**40s** 64:13

**410** 3:7 6:12

**419** 186:7

**45** 73:5

**460689** 188:2

**485** 202:13

**4th** 17:13 98:25 207:18

---

### 5

**5** 4:4 17:13 98:19 99:6,7 132:10,12 202:2

**52** 244:2

**5290** 244:2

**57** 19:21

**598** 207:1

**5th** 99:16 121:23 125:8 156:20

---

### 6

**6** 4:7 99:7,19,23 128:17 212:3,6,8 214:6

**6/7/19** 4:12

**600** 32:6

**64** 31:1

**6th** 206:25

---

### 7

**7** 4:8 5:22 99:18 100:20,21,22 117:13 119:22 120:5 123:23 128:17 153:7 209:22 211:15,18 212:8 224:23 226:11 232:23 233:4 239:18 263:12,16

**747** 216:12

**7th** 121:24 137:11 143:16

---

### 8

**8** 3:15 4:12 100:22 101:12 117:13 124:7 153:10,15 156:16 210:22 216:10 223:13 233:4

**8/7/19** 4:15 5:21

**80202** 2:13

**80s** 27:19

**8th** 93:3

---

### 9

**9** 4:13,17 101:11 102:1,2,6,9 126:12, 16 210:22 223:13 234:7

**9/20/17** 3:25 4:21

**90s** 27:19

**91** 3:20

**92** 22:23

**93** 3:23 22:23

**98** 4:1,2

**98.7** 231:19

**99** 4:4,7

**9:11** 3:7 6:7

**9:50** 48:6

---

### A

**a.m.** 3:7 205:19

**ability** 116:17,20 176:24

**absence** 89:8

**absent** 89:2

**absolutely** 70:15 137:10,12,16 159:21 259:9

**academy** 30:12

**accept** 143:19

**acceptable** 75:21

access 54:3,4 58:23
125:21 132:19,23
136:8,9 251:15

account 26:17
124:21,23 136:8,10,
21 156:25

accountants 68:8

accounted 165:24

accounts 124:12
153:19

accuracy 105:7
251:1

accurate 53:25
65:19 73:19 90:7
105:5 228:15 229:25
233:10

acquire 230:7

acquired 70:7

acquiring 266:9

acquisition 27:7
66:7 67:18 82:17
83:5,20 84:15
109:18,19 114:12,19,
22 131:4,9,20
150:21,25 151:10
165:11 170:11,14,17
171:9,13,20 245:15
262:1,3 266:7

acronym 170:2
246:25

acting 90:3,8

action 40:24 41:1
65:9 250:18

actions 244:14

active 143:5

activities 23:3
125:25 126:6

actual 180:25 220:9

Adam 2:7 7:2,4,22
95:17 152:1,16
212:16

adamant 83:11,24

add 86:17

addendum 83:23

addition 170:25

additional 4:5 163:9

additionally 129:18

address 168:16
231:12

addressed 154:8

addresses 153:24

addressing 43:12

administration
21:9,10 22:16

administrative 2:15
3:5 246:13

Adrenaline 114:25
115:1 172:18

advantage 28:4

Advice 4:12,15 5:21

affidavit 13:19

affirmed 8:8

afternoon 69:5 71:4
152:14,15

Age 64:12

agenda 42:18,22
78:25

agent 14:4 190:25
195:21

agents 16:16,19
18:13 182:20,23
183:1 190:22

aggressive 142:18

Agile 86:3

agree 56:11,12
75:23 76:2 90:19,21
92:20

agreed 76:7 144:3

agreement 3:21 4:1
80:1,20 81:13 91:24
92:3,6 93:2,12,15,19
98:15 104:5 106:12,
20 115:24 136:4
161:19 163:11,13,20
164:16 168:22 173:1,
9,13 189:24 190:8,17
191:9,15,19,21
192:7,13,22 193:4,7,

11,13 194:3,8,9
196:6 198:7,10 199:5
203:22,23 207:21,25
208:10,16,24 215:7,
12,25 219:5,11,16,
17,22 221:8,13 223:1
224:3 226:1 258:3
263:25

agreements 191:3
193:14,19 198:3,6
199:24 200:4 216:23
258:4

ahead 29:17 59:1
86:19 90:11 117:6
151:16 181:10 186:2
202:2 217:18 222:4,5
223:10 224:16 225:7
234:6 237:2

Ahern 258:16,19
259:4,14 263:5

Airport 148:22

align 44:5

all-expenses-paid
156:22

all-hands 75:14

allegation 158:7
160:1 173:12

allegations 73:11

allocated 165:21
195:7 220:10

allowed 31:9 61:14
171:8

alluded 217:9 249:5

Alyse 2:3 6:18
181:23

Amazon 2:5 3:24
4:20 6:10,19,21 7:15
36:14 38:14 45:9,15
47:8 49:10,18,20
50:1,7,18 55:13
57:23 58:1,6,9 59:10
60:19 61:24 64:17
65:3 68:3 70:8 77:11
79:4,20 81:18 94:5,
17 97:4 105:11,15
106:15 108:4,6,12
109:2,6 114:5,18
116:13 117:8 122:24
123:5,8,15 124:11

135:12,18 138:14,19
139:1 145:1,2,10,14
153:18 159:7 161:25
165:8 166:7,13 169:2
170:8,25 171:4,13
172:1,10 173:13
174:24,25 175:4
177:22 181:25 185:6
190:11 192:17 198:6,
11 199:8,17,25 200:5
201:13 203:9 214:9
216:6 219:22 221:24
230:8,9,11 234:8,14
235:10 237:5 239:10,
12,15 249:12 250:10,
19 251:1 252:6,7,15
255:6,9 265:18,23

Amazon's 162:8
224:23 226:11

Amazon.com 2:5
6:10

amended 224:23
226:11

amount 104:9
129:24 131:6 188:3
232:8 254:22 260:12
261:4

AMZL 249:20

Analysis 5:9

analytics 26:3 27:6

anecdotal 44:16
248:15

angry 241:25

angst 193:7

answers 119:14

anticipate 10:21

anticipation 266:8

anymore 21:13

apartment 248:24

apologies 218:20
244:3 245:11

apologize 166:22
179:24 213:4

apparent 144:24

apparently 147:23
233:20 254:15 258:4

*AB Litigation Services*

**APPEARANCES** 2:1

**appearing** 2:5,9,14 8:25 213:16

**appears** 101:13,18 102:12 104:1,2,15,25 105:5 120:6,12,13,15 128:11 188:6 230:2

**application** 4:10 5:3,7 246:7

**applied** 34:19 35:2

**appointment** 69:15

**approach** 32:22 40:16 142:16 182:19

**approached** 34:16 40:6,8,15 100:17

**approaching** 32:20

**appropriated** 136:4

**approval** 82:19 83:23 138:14

**approve** 84:11 97:11,15 101:6 167:20 170:25

**approved** 67:6,19 68:4 101:8 107:17 114:19 120:7 138:9 139:5 155:7 166:1,4 173:24 174:13,15,16 261:4,8

**approving** 138:15 167:23

**approximately** 15:4 17:21

**April** 16:8 17:8,13 49:24 52:6 54:25 121:24 137:11 139:20 140:4,5 141:18,21,24 143:9, 16 150:3 151:17 261:16,24

**April-ish** 133:24

**architecture** 20:23 23:21 24:4,12

**area** 75:15

**areas** 22:15

**argue** 257:15,16

**argument** 122:4

**argumentative** 160:7 258:14

**arose** 55:12

**arrange** 203:4

**arranged** 185:6

**arrangement** 116:24 138:8 147:19 162:1 199:24 200:8, 18 201:10,16 218:16 230:7 234:18

**arrangements** 173:5 215:20 260:16

**arrests** 31:16,18

**article** 87:22,25 88:4

**asks** 189:1 207:19 211:16 214:6,22

**aspects** 142:18 168:13 200:15 242:20

**Assell** 46:11 107:23

**asserted** 221:24

**assess** 110:15

**assist** 246:6 248:2

**Associate** 3:22

**assume** 12:12 59:6 60:14 81:14 82:1 92:4 129:20 134:11 168:21 169:10 194:8 195:5 208:20 241:12 245:25

**assumed** 41:12 113:21,25 121:19 124:22

**assumes** 256:19 259:17 260:8

**assuming** 70:11 78:12 119:4 125:16 139:24 252:4 259:1

**Atherton** 92:15 182:16 206:18

**attached** 4:3,6 5:10, 12,14,16,19,24 99:22

129:19

**attachments** 99:23 211:2

**attempt** 53:14,16

**attempted** 53:8

**attend** 53:16 54:1,10

**attended** 38:24 79:6 125:14 177:25 183:19,22,24

**attention** 40:20 53:2 146:13,15 186:20 188:10 194:13 202:22 205:16 207:17 209:1 222:23 231:16 232:23 241:9 246:9 257:20,21 258:11 261:12

**attorney** 9:10 208:20,21

**attorneys** 6:16 121:5

**audio** 228:9

**audited** 47:8

**auditing** 46:12 47:4

**auditors** 46:14

**audits** 47:2

**August** 108:22

**authority** 42:4

**authorize** 142:20

**authorized** 31:15

**autocratic** 44:9

**Avenue** 2:4,7

**averaged** 32:5

**awarded** 174:3,9

**aware** 9:14 42:12 46:2 47:4 54:19 65:22 68:20 108:10 128:22 145:16 182:3, 25 185:5 190:21 198:9 219:5,7 232:12 239:16 248:8 254:5,8 255:15,20 258:2 261:3

**awe** 237:22

**awkward** 89:4

---

**B**

**Bachelor's** 20:21

**back** 19:18 22:2 23:11 25:15 48:4,10, 13 60:16 68:17 69:16 82:16 84:6 85:24 86:21 87:4,5 94:20 95:18 99:1,5 100:14 101:10 112:21,22 120:23 128:17 131:12 132:10 142:10 144:20,22 149:16 170:22 178:21 179:20 181:17 183:16 187:8 192:23 196:25 197:12 198:25 199:5 204:11,12 205:3 214:20 218:1,8 222:10 224:9 228:3 236:15 239:17 243:21 247:8 255:25 256:24 262:16

**backfire** 222:18

**background** 19:19 20:4 34:24

**backpacking** 21:25

**backup** 52:20

**Ball** 20:13,17

**bankers** 63:5

**Banks** 4:12,15 5:20

**Barrett** 2:3 7:7,8,9, 12,14 95:16 100:8

**Bart** 84:20,23 177:9

**base** 82:18 110:15

**based** 25:12,14,18, 19 40:24 53:17 81:21 105:16 125:20 132:6 146:7 150:23 156:5 158:14 176:14 177:1 193:14 195:1 197:9 206:6 215:24 216:20 224:3 230:8,9 233:21 237:5 249:19 261:11

**Basic** 34:22

**basically** 30:1 253:15

**basis** 78:21 123:11 125:4 150:19 151:13 158:4

**Bates** 100:1

**Bates-** 202:12

**Bates-numbered** 186:7 207:1 210:2 216:12 244:2

**bathroom** 15:10

**battery** 103:10

**BC** 86:12

**beard** 64:12

**began** 115:17

**beginning** 101:3

**begins** 6:9

**behalf** 2:5,9,14 171:4

**belief** 81:17 124:10, 14 125:8,14,16 153:17 154:17 155:2, 15 156:2,14,20 158:4

**believed** 116:9 156:5 219:16 223:7 230:4 240:17 250:22

**beneficiary** 225:18, 20,22

**benefit** 105:18 201:20 250:18

**Bezos** 149:22

**bicycle** 23:9,14

**bid** 173:17,25

**biggest** 145:14,15

**Bishop** 20:5

**bit** 8:20 10:15,17 13:18 34:24 44:8 48:16 55:7 76:18 88:15 104:23 173:17 265:14

**bits** 183:12

**bizarre** 85:23

**blank** 246:25

**blocks** 60:2

**blowup** 110:1

**board** 41:14

**Bodner** 2:12 8:2,3

**bonus** 193:21

**bookend** 56:4

**boss** 44:1

**bothered** 40:1

**bottle** 185:17

**bottom** 103:11 186:21 212:8 231:17

**bought** 23:9 185:12, 13

**bounce** 187:8

**bounced** 129:23

**Bray** 3:8 6:14

**break** 12:22 15:9 48:4 51:15 86:10,20 100:13 133:9,11,15 144:11 179:12 181:11 198:20 217:19,21 243:14

**breakout** 187:13

**Brent** 40:10,13 41:10 53:10 54:16,19,22 55:25 62:25 68:7 71:16 73:2,4 77:18 80:23 95:25 142:19 143:6,8,18,22 147:5 168:21 184:18 192:8 207:6,18,19 209:11, 13,17 210:18 211:1 212:2,13 216:19 217:4,14 236:11 237:18,25 248:16 249:1

**Brian** 2:14,19 3:3 5:19 6:24 8:15 10:1, 16 28:5 29:25 30:2 37:22 41:10 44:8 51:6 53:10 54:14,17 55:25 60:16 63:2,4 67:4,23 69:1,16 73:2, 4,10 74:11 75:15

79:17 82:18 109:4 113:17 122:7 123:17 124:9,10 125:9 127:1 132:6 137:18 138:2 139:24 142:6,16,25 143:4,18 153:17,21, 25 154:10,13 155:13, 23 156:20 161:10,14, 18 183:4,22 184:6,12 185:6 186:22 188:10 191:8 192:16 193:17, 20 201:9 202:19 203:10,16 205:18 206:11 207:18,19 208:10 209:15 215:19 218:16,21,24 219:20 222:17,23 228:10,23 230:3,25 231:17 232:10,14 233:23 234:3 235:4, 25 236:18,25 238:10, 14 239:1,10 241:1,3 242:2 244:13,16,19 245:9,17 246:6,10,16 248:10 257:19 258:20 260:25 261:1

**Brian's** 44:4 96:4 109:4,12 178:14 192:25 233:11

**briefly** 101:2

**bright** 11:9

**brighter** 102:25

**bring** 40:20 42:10 146:13 222:22,24 257:19 258:10

**bringing** 241:9

**brings** 103:11

**broker** 196:1

**brokerage** 195:1,6

**brokers** 195:14

**brother** 105:17 160:22 161:17 182:4 200:22

**brothers** 105:16 106:1,6 200:20

**brought** 53:6 56:20 73:6 88:1 96:5 146:9, 14

**Brownstein** 2:10 8:2

**budget** 65:19,25 66:4 67:19 165:19, 21,22 167:9,24 168:7,14 171:1 180:18,20,25 220:9

**budgets** 65:23 66:2, 3,13 67:5 68:12 114:14,15,23 165:6, 8,13,17,18 180:2,8,9, 11,12,15

**build** 196:20

**build-to-suit** 265:3

**building** 10:5 57:15, 24 58:14 61:13,15 195:12 196:17,20 215:5 236:6

**buildings** 61:14

**built-to-lease** 265:1

**Burr** 2:6 7:4 152:16

**bushy** 64:12

**business** 3:22 37:20 40:7 52:20 87:23 129:14 142:14,19 146:8 178:14,19 184:9 190:25 199:9, 18 200:20,21,24 201:3,6,7 266:9,11, 13,15

**businesses** 70:20 266:13

**buy** 23:12 192:25

**BW** 2:15 3:5 187:14

## C

**cafeteria** 75:15

**calculate** 80:13 81:4

**calculating** 81:12 104:9

**calculation** 80:21

**calculus** 255:13

**calendar** 58:21

**California** 94:11

*AB Litigation Services*

95:5,22 96:13 173:18

**call** 5:14 59:1 66:22 67:1 71:5 72:6 79:18 81:23,25 82:20 84:3, 6 86:13 87:12 111:23 117:22,24 118:1,12, 15,21,24 122:5 127:18 133:18 134:22 175:10 203:4 206:11,13,16,19,22 209:3,5,7,9,11,15,18 211:7,10 216:21,25 217:1 236:12 238:5, 12 252:1

**called** 3:3 20:1 23:21 24:16 25:7,22 26:15 56:10 68:20 69:1 82:21 90:3 260:22

**calling** 83:16 110:24 140:19

**calls** 67:1 111:1 119:2,5,11 142:4,24 209:7 217:5,11 252:19 253:23

**Camenson** 35:23 48:17 50:21 52:1 55:21 61:4 76:3 127:22 218:24 219:21 228:11 229:16

**Camenson's** 133:3

**canceling** 27:11

**Capital** 115:1,2 162:20 172:18

**captured** 168:1,13

**car** 60:13 68:25

**care** 41:12 142:11,14 238:21

**carefully** 240:13

**Carl** 7:24 136:8,19, 25 137:20 152:17,19 190:25 213:16 235:17 238:2

**Carleton** 2:9,18 7:5 124:12 125:10 153:18 156:21 183:23 185:13 192:3, 18 198:12 206:15 230:16 243:2,8 250:5

**carry** 31:13

**cars** 248:23

**case** 8:16 19:1 122:4,14 125:17 132:5 142:12 151:4 158:15 179:10 181:25 248:17

**Casey** 2:18 6:5 7:20 50:11,14 82:9,18,21 83:11 84:4,10 95:17 106:2 109:6,9,15 110:15,24 111:19,21, 23 113:1 116:11 117:3 123:9,15 124:9,11,20 125:9,14 127:18 136:8,19,24 137:20 139:10 153:17 156:21 157:25 170:24 171:12 174:23 175:15 180:2 182:4 183:5,22 185:13 189:4,12 191:22,23 192:18 198:11 199:7, 17 201:3,19 205:13 206:12 218:16 230:13 231:13 233:3, 7,8,13 235:17 237:24 238:6,9,10,15 239:4, 11 243:1,7 250:2 260:22 261:2

**Casey's** 161:24

**cash** 40:7,16 41:11 53:5,9 54:5 129:12

**Catherine** 100:9

**caused** 97:3 106:6 114:5 116:12,23 147:2 220:6

**causing** 205:5

**CBRE** 26:15,18 27:2, 12,15

**cell** 211:5 213:16

**center** 95:4

**centers** 203:9

**central** 95:5

**CEO** 244:12

**Certified** 3:9

**CFO** 142:20

**chain** 186:7 202:12 206:25 210:2 244:1 245:17

**chair** 77:22 78:22 251:12

**chaired** 78:18

**challenges** 145:17

**chance** 151:24

**change** 47:15 77:9 165:22 166:1,4,7,14, 16,18 167:6,19,23 168:3,7 177:21

**changed** 216:22

**changing** 260:5

**chart** 194:17,21 264:4,5,10 265:8

**chat** 18:25 262:8

**chatter** 145:9

**check** 129:24 216:2

**check-in** 111:17

**checked** 50:16

**Cheshire** 2:9 7:5 152:17

**Chicago** 24:2 146:16 148:11,15 256:25 259:3

**chief** 28:14 35:11,12 36:16 40:14 42:3

**Childress** 115:4

**choose** 226:25

**Christian** 5:11 79:11,12 81:16,23 82:7 93:12 106:2,13, 21 123:20 161:16 182:3,10 183:5 188:12,14,15 189:2, 11 201:2 202:20 203:5,6,15,16,25 204:13 205:13,19 206:4,11 208:1,9 209:3,13 210:19 211:1,4,6,16 212:19 214:6,8,22 215:6 217:5,7,16 218:17, 18,20,25 219:21

**Christian's** 217:11

**Christmas** 126:3

**circle** 255:25

**circumstances** 174:19

**Citywide** 4:12,15 5:20

**civil** 3:2 6:2 221:1

**civilian** 30:11

**clarify** 12:15 29:18 139:14 159:5 210:4 264:9

**Claudia** 2:3 7:6,9,14 100:12

**cleanup** 133:8

**clear** 8:24 15:7 55:19 56:4 68:19 87:9 92:8 97:20 98:7 106:1 121:21 128:7 144:5 162:22 171:20 180:22 200:16 221:23 245:2 260:18 264:25

**clearing** 212:15

**click** 103:10

**clicked** 179:22

**client** 7:22 36:23 50:5 153:3,21 155:14,23 157:21,25 158:24 262:8

**close** 124:8 125:5 179:14 262:6,7

**closer** 204:8

**Club** 148:21

**clue** 252:13

**collaborative** 44:10

**colleague** 181:23

**College** 23:1

**Colliers** 25:22 26:5, 12,14 27:11

**Colorado** 2:13 3:8, 10 6:13 19:23 30:13 31:1 229:5

**column** 102:19
194:25 264:7 265:6,7

**comfortable** 113:7
144:9 241:3

**commencing** 3:6

**comment** 238:20

**commercial** 3:23
4:19 26:25 27:3,4
56:23 64:5 94:4
122:20 148:23 198:2

**commission** 30:12
80:8,10 195:2,6,8,11,
15,17,20,25 196:24

**commissions**
79:19,21 80:3,5 82:3

**commitments**
193:17

**common** 145:16
183:14 221:24

**communicated**
115:11 124:10
153:17 166:17

**communication**
129:19

**communications**
124:20 125:22

**companies** 27:6
122:21

**company** 20:1 24:16
25:6,22 26:15,18
93:7 108:12 111:20
134:20,21,24 147:7
201:2 244:14 247:12
248:10 253:6 266:1,6

**company's** 183:1

**compare** 35:17

**comparison** 185:3

**compensated**
160:22 165:4 200:22

**compensating**
195:20 196:1

**compensation**
149:18

**complain** 249:1

**complaint** 158:7

224:24 226:11

**complete** 116:20,21
178:7 229:25 267:1

**completed** 57:16,
19,20,23 58:14 95:1
167:16,18 195:12
214:19

**completely** 12:9

**completion** 57:22

**complicated** 248:19

**compound** 18:17,20
29:11 50:23 51:9
88:11 134:9

**computer** 99:3
125:22 132:14,20,23,
25 133:3 153:23
251:15

**computers** 132:22
157:8

**concealing** 201:13

**concern** 40:5,21
42:10 49:5 52:15,18
63:17 66:5 67:17
105:14 106:6 114:10
115:13 129:13 131:3
132:5 134:24 145:22
146:4,14 160:20
161:3 176:16,19,21
180:23 256:18 262:1

**concerned** 42:21
49:3 52:10 66:13
89:9,12 90:23 105:9
109:5 114:5 115:17
116:12,23 131:21
177:15,20 222:16
252:5 259:10 260:13

**concerns** 40:6,9,17
41:3 51:18 56:10
60:21 61:4 64:20,23
65:1,10 109:1 115:20
116:16 129:11
130:20 138:25 146:9,
12,13 160:17,18
161:21 163:20 176:8,
9,23,24 184:21 205:8
240:25 260:19

**conclude** 123:14

**concluded** 267:3

**concluding** 125:4

**conclusion** 174:8
253:24 258:1

**conclusions** 257:20

**condition** 57:12
144:1

**condo** 246:1

**conduct** 199:8,18

**conference** 259:2

**confidentiality**
134:14,16 145:24

**confirm** 128:12
215:3 239:23

**conflict** 252:1

**confrontation**
232:14 238:4 241:2

**confronted** 56:9
73:10 232:10

**confusing** 12:4,9
119:25

**confusion** 180:17

**connect** 198:18

**connected** 142:22

**Connecticut** 2:4

**connection** 16:21
47:2,8 53:5 76:11
94:25 105:10 107:12
108:3,4 135:11 170:3
190:9 204:16 222:1
257:13

**consent** 229:6

**considered** 53:1
184:9 221:1

**consistently** 176:25

**construction** 58:12
59:10 62:2 64:16
114:15 122:23
176:10 177:23 178:1
205:3,7,11 206:6
249:18 266:13,14

**consulted** 10:13,14

**consulting** 24:7,8
25:9 26:2

**contact** 17:24 18:8,
10 52:18 59:5,12
107:20,22 129:3
174:24

**contacted** 18:5
117:15,16 133:22
134:3

**contacting** 245:18

**contention** 83:21

**contest** 15:8

**context** 90:14
191:12 234:24 259:1
265:2

**continued** 199:8,17
204:19

**continuing** 176:18

**continuity** 52:15,20

**contract** 107:17
176:9

**contractor** 3:20
17:3 38:24 91:24
165:2 189:24 207:20,
25 263:24

**contracts** 108:18
116:17 176:19

**control** 89:16,22
143:5 152:4 179:24
255:16 263:13

**conversation** 8:21
11:13 14:1,7 15:25
18:15 38:6 47:17
51:5,23 66:15,19,23
71:17 72:9,17 73:12,
13,15,22 81:16
83:10,19 84:1,9
85:13 104:23 106:11,
19 107:11,16 108:21
109:8,15 110:6
112:5,7,17 115:22,23
116:10 117:3 127:17
130:8 137:17,22,24,
25 139:10 140:22
145:13,19 146:24
176:1 182:23 206:8
209:12 216:1 228:6,9
229:8,11,18 233:3,22
237:1 238:8,9,10,14
242:10 260:25

**conversations** 14:10 40:24,25 44:17 49:17 53:21 71:15 72:10 77:2,5 137:5 139:15 143:1,20 147:4 163:17 178:10,23 192:5,8 193:1,5,10 201:18,25 236:5,24 237:17,19,24 238:2 241:1 248:16 258:17,24

**COO** 46:13,25 52:24 53:5 54:4 65:9 67:3 77:9 78:8 113:8 255:2 257:18

**COO-TYPE** 142:18

**cookie** 266:16

**cookies** 266:17

**cooperative** 73:12

**coordinate** 58:25

**coordinating** 58:12

**copies** 94:2

**copy** 92:2 99:4 140:11 141:10

**cornhole** 126:7

**corporate** 70:23 128:3 164:5 235:7,15 256:16

**correct** 8:23 9:3 16:23 17:10 22:19 23:5 25:2,25 26:20 28:1 29:5 32:1,10 38:15,17 43:3,9 48:21 49:12 50:8,10,19 51:3 52:25 53:19 54:1,18 56:18 58:10 59:13,23 62:18 67:14 72:11,23 74:4,19,23 80:12 83:6 88:3 89:7 92:12 99:15,21 106:4 109:20 110:4,7 113:9,10 117:5,17 118:10,18 119:7 120:4 122:22 126:22 127:19 128:21 129:22 131:13 132:15 133:6 140:2 158:2,3,16,19,20 159:14,24 162:15,24 167:7 169:8 171:4,9,

11,15,22 172:3,23,24 173:5,7,10,22,25 174:2 175:3,7,8 176:2,4,6 177:11 178:4 181:3,6 186:4 189:25 190:20 197:21 202:20,21 203:20,24 204:18,23 207:7 210:20 216:6 218:22 224:18 225:4,17 231:25 236:2,3,18,19 238:6 239:24 240:5,11,12,23 242:25 245:4 249:13 251:5 253:4 255:4,7,11 264:11,12 265:4,5,9,10,21

**correctly** 22:21 169:3

**cost** 168:13 184:21

**costs** 165:20

**counsel** 11:1,2 46:1 107:16 108:7,13,17 123:25 133:12 138:8 139:6 204:6 221:22 245:3 251:25 255:22 264:22

**counsels** 46:6

**country** 249:24

**County** 30:10,15,18,22 31:2 32:8

**couple** 8:17 9:24 17:14 27:25 40:6 59:19 60:2 79:9 84:20 85:3 87:9 114:24 119:1 157:7,8 203:14 218:9 258:23 262:8 266:12,15

**court** 6:14 11:14 129:25 136:7,11,13 137:3,8 158:6 185:10 240:8 254:6,7,18,19 264:19

**cover** 168:3,7 218:10

**covered** 182:1 215:12

**covering** 214:15

**covers** 197:8

**cowboy** 90:12,13

**cowboys** 90:3,4,18

**credibility** 257:12

**criminal** 221:2

**critical** 147:13

**Crosse** 23:10

**crossed** 250:7

**Crutcher** 2:2 7:9 181:25

**curious** 160:20

**current** 77:15 81:18 129:9 165:19 186:23

**Cushman** 107:4 265:14,25

---

**D**

**D.C.** 2:4

**damage** 110:16 237:4

**damaged** 109:6 259:8

**dark** 103:3,9

**data** 2:5 6:10 95:4 203:9

**date** 35:6 73:15 75:4 91:6 139:24 140:2 143:14 161:5 182:5

**dated** 93:2 94:5 98:25 99:16 140:4

**dates** 121:23

**Dave** 77:18

**David** 68:8 96:1

**Dawn** 187:14

**day** 22:2 30:1 32:23 35:7 43:19 70:9 74:14,18 76:14 117:23 139:23 141:6 142:1 143:19 149:15 150:3 151:23 157:14 184:4 211:7 231:19 239:13

**days** 32:3 51:13 57:6 59:19 69:10

**deal** 54:5 164:16 186:23 187:6 232:4 234:19,24

**dealing** 67:12 217:10

**deals** 169:2 203:6,8,11,18 216:6 246:12

**Debit** 4:12,15 5:21

**debt** 213:4 245:15

**December** 17:19 66:18 84:25 96:22,25 109:19 114:11 116:12 117:4 125:8 131:12 149:22 156:20 206:25 207:18 208:9 211:2,11 217:1 260:13

**decided** 143:22 223:25

**decision** 112:13

**decisions** 43:12

**declaration** 4:8 5:1,5 13:20,24 101:1,5 119:23 122:3 128:12 153:2,3,4 154:24 156:3 175:15 239:20,24 240:5,14 263:20

**declined** 171:3 172:10

**Deed** 4:16

**deeper** 261:10

**deeply** 44:18

**defendants** 6:25 8:15 11:2

**define** 90:12,13

**degree** 20:17,20,24 21:3 22:13,14

**degrees** 22:22,25

**delay** 81:20 176:14 204:25 205:1

**delayed** 47:16 65:7 203:5

**delays** 205:2,5,7

**delivered** 48:1 65:22

*AB Litigation Services*

delivery 47:16,23

delta 232:8

demanded 127:1

denied 73:11 238:15

Denver 2:13 3:7 6:13 14:17 15:16 20:1 23:23 24:2,18 25:12, 19,24

department 78:20

depend 241:19

depending 90:10,12

deponent 7:1 86:22 93:10 103:12 122:17 151:25 185:9 199:3 213:2,21,24 262:10, 19,25 266:23

deposed 54:20

deposit 247:3,12,15

deposition 3:2 6:9, 11 8:22 9:5,8,12,15 10:18 12:8 87:1 179:7 186:8 202:14 207:2 210:8 216:13 224:25 226:13 227:19 244:11 267:2, 3

depositions 14:3 79:10 144:24

deputy 30:15,17,22 31:8,10

describe 135:18

describing 89:6

description 90:7 225:21

detail 14:25 55:20

details 87:23 191:18 234:15

deteriorating 129:7

determine 91:3 114:12 165:18 180:14

determined 193:13

dev 212:3,14 213:3,5

develop 196:18 197:13

developer 196:21 197:7

developer's 197:6

developing 145:1

development 3:21, 22 36:14 57:17 80:17 96:5,6 109:16 178:15,20 187:13 197:1,6 203:14 205:2 213:6,19 247:13 259:13

dialed 110:9

dialing 110:12

dictate 244:16

difference 213:12

difficult 18:8 147:6 165:18 180:14

difficulties 130:16 132:8

difficulty 254:13

digging 114:13

diligent 94:2

dinner 188:12

dinners 126:8

Diplomate 3:8

direct 175:6 186:20 188:10 194:12 202:22 207:17 209:1 231:16 246:9

Directing 205:16

directions 154:7

director 19:25 23:3 24:23 26:17

directors 146:10 222:13

discipline 11:15

disclose 147:24

disclosed 198:6,10 258:4

disclosure 242:9,12

discomfort 138:25

discuss 182:13 184:17 192:17 203:5 205:25 233:13,20,25

discussed 9:22 28:13 38:7 45:11,13 89:23 101:2 142:24 183:17 184:16 185:21 186:24 192:20 198:1 209:18, 20 216:20 228:10 229:24 230:3 238:5, 23 250:12,15

discussing 37:24 101:2 127:17 230:12

discussion 5:12 38:2 79:4,24,25 84:1, 2 165:7 171:19 172:18 193:22

discussions 79:5 150:13

dispute 127:21 170:14 171:21 172:11

disruptive 52:12

distributed 193:3 249:24

distribution 193:4,5

divorce 194:10

Docket 224:24 226:11

document 92:1,10, 14 93:23 94:12 97:22,23 98:1,10,19 99:6,18,23 100:22 101:11,22 102:2,5,8 103:23,25 104:11,20 114:18 117:13 119:24 121:18 128:10,17 132:10,12 155:5,6 179:22 186:10,13,17,22 189:5,8,21,22 190:2, 5 194:13 196:25 202:16 207:5 208:5 210:10,23 211:16 212:25 214:22 223:13 224:10,17,23 225:14 230:22 244:3, 23

documentation 165:20 166:15

documented 166:17 167:9,11 194:5,7

documents 13:18 42:6 72:16 100:6 101:25 102:3 115:9, 25 119:16,19 131:17, 22,24 136:7,11,14 137:3,8 145:22 146:7,18 157:13 158:5,9 180:7 223:7, 17,19,22 224:1,13,14 226:19,25 249:16 260:15 261:4

Don 96:2 178:13,14 193:18

Don's 194:8

double-check 81:8 100:9,12

Douglas 30:10,15, 18,22 31:2 32:8

downloaded 132:14

downtown 248:24

draft 14:1 120:22

drafted 92:14,20,24 121:3 137:9

drafts 120:18

draw 261:12

drawing 246:25 257:12

draws 116:18

DRG 20:2 266:1

DRGINVEST 265:20

drill 242:19

drink 233:3

drive 74:11

driving 68:25 118:13

dropped 209:10

due 47:23 80:7,9 109:7 129:24 130:21 131:7 206:3

**Dulles** 214:23 215:4, 17 216:22,24

**duly** 8:8

**Dunn** 2:2 7:9 12:18 13:4 122:1 181:24

**Dunn's** 133:21

**duplicate** 225:6

**Durango** 23:4

**duties** 145:24

**duty** 29:15 41:23 42:8 145:23

___

**E**

**earlier** 53:13,23 151:1 157:24 165:7 174:23 175:9,12 182:1 183:17 190:21 198:1 218:5 228:14 229:24 236:16 238:5, 23 242:25 249:11 261:22

**early** 26:10 28:21 49:23 64:13 69:10 144:25 153:1 157:3 201:8 220:13

**earn** 106:14

**earnest** 247:2,12,15

**education** 20:10 21:9 22:16

**effect** 175:16

**efficient** 86:21

**elaborating** 119:5

**elected** 75:2

**electronic** 140:24

**else's** 240:22

**email** 4:2,4,7 5:8,11, 13,15,18,24 13:23 36:9 59:6 83:25 84:2 99:3,4,12 124:20,23 125:21 129:6 132:12 140:3,7,10,11,13 141:10,20 142:4,9 149:22 150:9 153:19, 23 155:23,25 156:24, 25 186:6,13,21

202:12,19,23 205:12, 17 206:25 207:6,12, 18 209:2 210:2,16, 18,19,25 212:7,22 214:21 216:12,17 217:10 244:1,25 245:9,10,17 247:21

**emailed** 8:20 14:1 186:19

**emails** 4:3,6 5:10,12, 14,17,24 77:13 91:9 98:21 99:11,19 128:19 153:20,24 154:4,7 155:13 157:4,15,20 186:14 252:19

**EMD** 246:17,22 247:2,10

**employed** 159:1,7 160:25 164:24

**employee** 55:2 96:8 132:23 166:5 177:25 239:10 241:17 248:2

**employees** 70:19 75:10 105:15 185:7 192:6 193:21 241:2, 5,9 242:3 244:17

**employment** 39:14 46:10 49:22 121:23 138:20 183:3 194:7 199:21 200:6 248:9 251:1

**end** 11:4 47:23 55:11 66:17 96:25 133:20 151:23 168:1 179:14 186:25 202:6 235:25

**ended** 73:13 236:5, 25 237:18

**endurance** 15:8

**enforcement** 30:7

**engaged** 70:19 218:25

**enjoy** 43:22

**ensure** 199:8,17

**entered** 190:10

**entertainment** 185:6

**entire** 19:3 229:15, 20

**entities** 248:20 261:16 266:18

**entitlement** 213:9

**entitlements** 90:16

**entity** 146:8,9 172:22 219:12 222:14 231:5,8,18,20 266:8

**envision** 74:13

**equipment** 140:24

**Ernst** 46:19,23

**Esq** 2:2,3,7,11,12

**essentially** 113:22 126:21 171:13

**established** 99:13 109:14

**estate** 20:1 26:2,18, 22,25 27:3,5,12 46:11 70:19 122:20 190:10 198:2 235:7, 15

**estimate** 57:6

**et al** 5:18 6:11

**evening** 140:10 141:9,20

**event** 116:11

**eventful** 150:3

**eventual** 96:17

**eventually** 48:25 87:16 101:6 120:2 261:15

**evidence** 72:13 115:12 130:15 256:20 259:18 260:9

**evidenced** 223:7

**ex-coo** 134:20

**ex-wife** 129:19 130:2

**EXAMINATION** 3:13,14 8:10 152:11 181:18 251:19 263:2

**examined** 8:8

**exception** 216:22

**exchange** 186:21 204:1,14 210:19

**exchanged** 224:2

**excited** 50:3

**exciting** 50:4

**exclusively** 58:14 172:15

**excuse** 37:2 79:6 87:22 162:19 210:6

**excused** 73:3

**execute** 116:17 176:8

**executed** 207:21 208:16

**executive** 19:25

**exercise** 178:7 246:13

**exhibit** 3:20,23 4:1, 2,4,7,8,12,13,15,16, 17,19 5:1,5,8,11,13, 15,18,20,22,24 91:22,23 93:21,23 99:7 100:20,22 101:11,12 102:1,6,9 103:25 104:12,20 117:13 119:21 120:5 128:11,17 132:11 152:3 153:7 186:3,8 189:20 194:15 202:12,14 206:25 207:2 209:23 210:1, 7,8 211:19 212:17 216:11,13 217:2 223:13 224:10,17,22, 23,25 225:6,8,13,14 226:5,9,11,13 228:13,17,19 239:17 240:2 243:25 244:11 245:3 263:12,15,22 264:1,2,3

**exhibits** 3:19 85:21 86:7 87:1,7 91:16 94:2 251:16

**existed** 192:11

**existence** 198:7,10

**expanding** 27:10

**expect** 52:6 212:10 214:7

**expense** 149:14 185:21,23

**expensive** 184:24, 25 185:3,17

**experience** 34:16 96:5 134:5 196:4,16 198:1,15

**experiencing** 132:7

**explain** 16:24 75:11 103:22 122:2,13 221:11 237:7,12 239:4 254:22 255:10

**explained** 71:2 75:16 82:3 83:19 106:12

**explaining** 161:15

**explanation** 113:19 150:24

**explore** 242:21

**exposure** 248:14,22

**express** 60:20 61:1, 3 63:17 64:19

**expressing** 129:11

**extended** 183:13

**extensive** 123:10

**extent** 242:5,6 243:4

**eye** 58:16

**eyebrow** 106:7

---

**F**

**face** 12:20 13:14 14:22 119:17

**face-to-face** 118:21, 24 119:3

**facilities** 58:4,8 60:20

**fact** 43:11 49:2,13 84:16 88:7 89:14 91:1 105:14 106:5 107:3 108:7 117:6 127:7 132:6 146:7 150:23 151:4 161:14

184:1 192:11,23 215:24 217:9 220:8 222:25 249:5 253:11, 14,17 256:8 261:3

**facts** 72:12 179:10 256:19 259:17 260:8

**fair** 88:15 91:13 92:11 97:11 141:5 145:7 171:25 174:7 175:17 240:13,19 250:25 256:3

**fairly** 107:22

**fall** 94:9,15 96:15 173:20,21 263:7

**familiar** 102:15 124:3 170:9 200:4 216:18 226:18 229:20 231:5

**family** 32:24

**FARBER** 2:10

**fashion** 65:14 170:14

**FBI** 10:9 14:5 16:13 17:24 18:8,13 19:2,7 99:13 100:16 101:23 129:4,12 130:14 133:18 140:5,14,20, 21 141:25 145:23 146:2 150:4 151:17 157:10,15 162:16 234:9 237:7

**feasible** 143:7

**February** 15:5,16 16:8 100:19 117:18 133:18 216:11 220:13 223:6 226:20 244:1 246:10 263:10

**Federal** 3:1 6:2

**fee** 37:19 66:7,14 67:18 82:17,19 83:5, 12,13,15,16,20 84:15 106:14 109:17,18,19 114:13,19,22 115:3,8 116:2 131:4,9,20 150:21,25 151:10 160:23 165:11 170:11,14,17 171:9, 13,20 172:22 194:16, 20 195:1,7,19 196:4,

12,14 197:1,6,7 203:5,10,15,17 211:17 212:3,10,11, 13,14 213:3,4,6 214:7,9,14 215:7,11 225:23 262:1,3

**feel** 41:14 49:6 97:3 113:6,16 134:13 143:6 148:6 200:22 241:2 242:2,11,20 249:6

**fees** 80:7,8,10,16,17 161:16 180:3,11 187:13 197:3,5 199:7,16 201:20 203:12 213:9,19 214:22 215:4 235:22 265:8

**feet** 196:19

**fellow** 10:16 14:3 33:3 58:7 59:15 60:19 64:8 79:10 84:20 99:12

**fellows** 48:23 90:2

**felt** 53:4 96:6,22 112:4 131:4 144:8 147:17,23

**FF** 2:14,15 3:4

**fiduciary** 41:23 42:7 145:24

**figure** 11:10,11 51:16 55:14 58:22 67:5 70:1 80:14 86:4 97:24 103:3 114:17 120:9 133:15 136:16, 17 260:16

**figured** 109:10 112:1 152:3 175:16 237:3 238:21

**figuring** 137:14

**file** 97:10

**filed** 158:15

**files** 4:5 77:14 129:16

**filing** 239:19

**filings** 158:6

**fill** 149:8,14

**final** 5:16 57:24 120:3,14 181:6 194:13 244:13

**finally** 12:6 104:19

**finance** 245:19

**finances** 177:21 248:23 255:17 261:11

**financial** 40:14 115:11 130:2,16 132:7 134:23 248:15 257:7

**financials** 247:14

**financing** 176:10,18

**find** 28:9 34:23 39:18,22 43:25 45:14 49:20 55:1 68:13 87:16,20 88:7 105:19 114:20 132:9 140:13, 16 150:24 171:8

**finding** 126:14 177:6

**fine** 29:14 86:11,12 98:17 161:19

**fingers** 10:23

**finish** 11:11,12,17 133:14 169:20 243:14

**finished** 11:18 167:13

**fire** 236:1 237:2

**fired** 55:22 56:6 74:21 75:1,6 76:6,8

**firing** 76:12 77:8 96:17

**firm** 7:17 10:3 23:21 30:2,4 37:20 42:4 46:7 70:21 75:21,22 89:25 142:23 152:16 174:12 181:24

**firsthand** 156:7

**Fisher** 40:10 54:16 184:12,17 249:7

**fit** 81:16 260:16

**fit-out** 57:24

**five-minute** 198:19

217:21 243:14

**flash** 260:5

**flew** 64:5 259:3

**flight** 37:6 142:13 237:6

**flip** 88:10,13 91:7 232:16

**flipped** 230:11 231:20

**flipping** 227:15,17

**flooded** 142:3

**Florida** 262:25

**flow** 40:7,17 41:11 53:5,9 54:5 129:12

**flowed** 248:20

**flows** 173:13

**fly** 56:23 132:8 148:23

**flying** 259:24

**focus** 142:11

**focusing** 264:6

**folks** 12:19,23 61:7 63:15 72:9 144:23 146:5 151:24

**follow** 251:24

**follow-up** 18:8 251:10

**forgot** 15:7

**form** 36:8 41:17 42:2,24 43:7,14 44:23 46:22 95:1 108:14 113:3,24 116:25 117:10 120:11,16,21 122:15 125:19 130:3,22 135:1,8 137:1 139:7, 17 141:15 144:4 145:4,11 148:1 149:12,24 151:2,19 154:2,14,19 155:19 157:11,17 159:2 160:2,14 166:11 167:10 168:9 171:10, 16 172:4,13 173:6,14 174:5,20 175:24 176:20 177:14,24

178:18 181:2 190:12 194:4 195:22,23 196:7 197:4,22,23 199:10,12 200:1,11 201:21 203:19 204:2, 21 205:23 208:2,12 214:11 215:9 219:1, 24 220:4,18 221:6 222:19 226:2 227:3, 4,10 232:17 233:15 234:20,21 235:12 245:12 246:23 247:5, 16 251:4 252:10 253:24 254:14,25 255:12 256:5,12 257:3,9,24 259:21,25 261:6,19 264:18 266:4

**formally** 145:13

**Forman** 2:6 7:4 152:16

**formas** 131:18

**formatted** 65:4,5

**formed** 219:12 266:8,18

**Fort** 23:1

**forthcoming** 242:3

**forward** 237:6 245:9

**forwarded** 157:9,15 210:18 217:12 247:21

**found** 44:4 50:1 87:10 91:1 102:7 186:15,18 266:1

**foundation** 138:16 149:25 151:20 162:2 168:10 169:13 171:17 172:5,14 182:21 185:8 187:7, 19,23 188:16,22,23 189:14 190:13,18 194:24 195:10,24 196:8 197:4,24 198:13 199:11,13 200:2,12 201:22 204:3,22 208:3,13 213:11,20,23,24 214:12,17 215:10 216:9 219:9,23 220:19 222:20 226:3

**227:5,14** 232:5,18 234:20,22 235:13,16, 20,21 246:24 247:6

**founded** 253:12 266:5

**founder** 244:12

**frame** 26:8 55:19

**fraud** 16:18 17:3,16 19:7 140:23

**friction** 47:22

**Friday** 3:6 72:9,22 143:19

**friendly** 81:25

**friends** 183:8

**fringe** 248:21

**front** 61:12 86:3 91:22

**frustrated** 69:17 176:15 249:3,4,8

**full** 242:8,10,12 246:11

**fully** 16:25

**function** 103:9

**functioning** 37:7

**fund** 256:9,15 260:24

**funded** 259:15

**funding** 40:22 164:8

**funds** 184:14 243:2, 9 248:6,11

**future** 12:4 186:23 187:6

**FW** 4:3 5:9,16

---

**G**

**Garnett** 2:11 3:15 6:22,23 7:2,6,11,13, 16,21 8:1,11,14 18:19 19:9 29:12 33:7 36:11 41:19 42:5 43:1,8,16 44:25 46:25 48:3,11,12 49:19 50:13,15,17

51:1,7,11,24 53:12 54:9 56:2,15 57:18 58:20 60:12 61:3,10 64:14,25 65:24 67:20 72:14 75:9 76:8 77:8 78:8 81:7 82:6 83:9, 25 85:7,22 86:2,8,13, 16,19 87:5 88:13,18 90:11 95:15,19,20 97:19 100:2,5,11,14 103:7,13,14 107:8 108:11,16 109:13 110:18 112:2 113:5 114:1 116:22 117:2, 12 120:13,17,25 121:14 122:13,18 123:4,23,25 124:1,22 125:3,23 126:25 128:8,9 130:4,24 133:8,14,17 135:3,9 136:1 137:7 138:13, 18,23 139:9,19 141:17 144:8,11,21 145:7,21 148:3 149:15 150:2 151:5, 21 152:1,5,10 153:1, 13 157:5 181:12 187:23 188:16,22 189:14 190:12 195:22 197:22 204:2 211:18,22 212:15 213:22 219:24 221:22 222:4 224:5,7 226:7 243:16 245:2,5 246:23 247:7 248:12 251:9,17,20 252:11 254:1,16 255:2,15 256:7,14,23 257:5,14 258:7,16 259:19,22 260:3,11 261:13,21 262:5,11,17,21 263:16,19,23

**gathered** 12:7

**gave** 122:10 157:15 179:5

**gee** 77:6

**general** 34:15 111:17 205:11 241:4

**generally** 38:3 73:18 89:5 98:9 105:5

**generate** 197:16

**generated** 105:17

**Gensler** 23:22,23 24:8,15 27:5

**gentleman** 58:2

**gesture** 112:11

**get all** 98:13

**get allocated** 197:18

**Gibson** 2:2 7:9 12:18 13:4 121:5,8 122:1 133:21 181:24

**gift** 185:15

**gifts** 185:5,12

**gig** 32:24

**Gilpin** 5:5 67:12 146:17 148:16 218:6, 11,15 221:20 222:12 223:5,17 224:13 226:20 228:4 258:18 263:9

**Gilroy** 95:5

**give** 74:9 103:5 117:24 118:1 132:3 151:24 152:7 157:10 191:18 193:20 200:21 206:4 262:7

**giving** 257:12

**glass** 15:10

**Gmail** 124:12

**GMP** 170:2,8

**go-forward** 142:25 258:22

**goal** 206:4

**Gomez** 68:8 77:19

**good** 6:22 7:3,8 8:4, 12,13 44:1 69:6 86:18,22 111:25 137:14 151:25 152:2, 15 153:15 212:20 213:25

**gosh** 54:24 60:2 63:9 69:4 85:5

**grab** 129:16

**graduate** 20:7,14,15 21:2 22:9

**graduated** 30:14

**Gray** 5:13,15,18 40:10,14 54:16,19,23 143:8 181:5 184:18 207:6 210:18 211:1 216:19 217:4,15 237:18 249:1

**Gray's** 207:18

**great** 7:11 8:1 9:16 10:6 12:17 15:18 26:13 48:3 50:5,15 111:8 121:16 133:7 144:21 202:18 211:22 243:16 251:13,23,24 262:11, 19 266:23

**greater** 147:14

**ground** 10:17

**group** 20:2 29:25 33:18 56:1 75:15 146:6 260:18

**grown** 44:13,19

**Guaranteed** 170:6

**guess** 16:7 44:9 76:5 175:10,14 177:9 223:13 251:25

**guy** 11:9 16:6 253:15

**guy's** 58:22

**guys** 9:22 17:23 59:24 60:7 61:11 64:5 86:14 89:15,22 100:12 152:3

---

**H**

**half** 61:20 71:11 73:5 103:2 148:19

**Hammond** 20:5

**Hampton** 60:1

**hand** 147:17

**handle** 205:10

**handled** 13:22 245:15

**handling** 255:21

**hands** 224:3 241:11

**hands-on** 43:5

**handwriting** 102:21,22

**Hang** 93:22

**happen** 17:17 51:8 55:9 65:15 114:4 126:5 133:23 142:6 195:12

**happened** 18:4 19:16 28:23 52:19 69:25 73:8 74:24 75:16,18 77:7 94:3 95:12 96:12 109:7 110:19 142:21 166:4 168:12 174:11 175:10 236:4,8 238:16 259:10 266:10

**happening** 115:18 135:18 237:4

**happy** 15:12 133:10

**hard** 103:4 177:5

**hate** 103:8

**head** 12:3 32:5 69:18 93:10 199:3 213:2 255:6

**heads** 78:20

**heads-up** 179:6

**hear** 7:12,23 90:2 175:25 176:4 209:17 233:7 257:17

**heard** 38:10 42:11 45:20 88:23,25 95:13 96:14 135:10,11 175:18

**hearing** 38:11

**heck** 113:1

**height** 64:11

**heightened** 90:16

**held** 6:12 131:7

**helped** 95:25 132:24,25 256:9

**helpful** 260:1

**helping** 27:5 132:17 195:21 256:15

**helps** 204:6

**Henderson** 34:2 241:14

**hesitant** 257:19

**Hey** 59:1

**high** 20:4,9 69:24 70:2,4 75:19 213:19 214:2

**hiking** 126:7

**hindsight** 259:22

**hired** 29:6 84:24 177:13

**history** 34:25 44:12

**hold** 263:17

**holding** 147:12

**Holdings** 2:14,16 3:3,5 6:11 42:1 207:25 225:15 227:1, 12 253:18 254:24 255:18

**home** 206:9,10 231:11 247:19

**honest** 55:2

**hope** 212:19

**horseback** 126:6

**hospital** 196:19,20

**host** 78:7

**hour** 61:19,20 71:11 73:5 103:3 148:19

**hours** 10:21 32:3,6, 22

**house** 140:5,21 151:17 245:20,23 249:20 252:20 255:22

**Huckel** 4:4,7 14:4,11 15:15 16:6 99:13,20 100:16 117:15 128:20,23 132:2 135:14

**hunting** 125:10 156:22 183:17,19

**HYATT** 2:10

*AB Litigation Services*

**I**

**IAD** 169:6

**IAD144** 169:8

**IAD175** 4:16 104:15

**idea** 32:2 61:6 92:23 128:25 131:16 197:13 221:12 254:17

**ideas** 89:21

**identified** 123:20 196:5

**identify** 173:2,3,4 195:21

**idle** 236:21

**II** 216:23

**illegal** 201:16

**Illinois** 21:24 22:1

**imagine** 193:9

**immediately** 27:16 143:13 236:1

**immediately'** 127:3

**impact** 257:11

**impacted** 251:1

**impairing** 130:16

**implementation** 24:9

**importance** 45:1,6

**important** 11:23,25 37:6 53:9 129:8 192:12,14 260:6

**imported** 157:5

**imposed** 254:6

**improper** 105:10 113:12 160:19 180:3, 12 200:8,18

**in-house** 108:17

**in-person** 263:6

**inappropriate** 115:18 124:24 128:2 180:7 219:13 254:3

**inaudible** 7:10 264:17

**include** 235:3 244:19

**included** 67:18 68:3, 14 71:17 129:24 154:7 194:2

**including** 126:18 215:15,17

**increasing** 147:4

**independent** 3:20 91:24 165:1 189:24 207:24 263:24

**Indiana** 20:6

**indicating** 124:1

**indices** 156:17

**indicia** 124:8

**individual** 191:6

**individually** 55:25

**individuals** 220:17 223:8

**influenced** 252:15

**inform** 239:10

**informally** 145:13

**information** 18:7,9 44:16 122:11 124:10, 13 125:8,13,15 130:10 134:23 146:19 149:19 153:16 154:17 155:2, 4,9 156:2,14,19 163:5,10 189:17 191:5 221:19 222:11, 17 225:22 230:9 237:21 248:15 256:21 257:7,12,19 260:2

**informed** 27:9 179:4

**initial** 3:19 204:17,20

**initially** 10:24 118:12

**initials** 92:10 102:18

**injunction** 4:11 5:3, 7 122:7 254:6 255:10

**Inn** 60:1

**insistent** 147:10

**Institute** 20:5

**institution** 196:18

**institutions** 21:4

**instructing** 51:6

**instructions** 101:15 229:2

**integrity** 177:20

**intended** 15:8

**intending** 222:1

**intense** 256:2

**interact** 13:6 36:5,7 57:25

**interacted** 19:2 58:2 123:8,15,18

**interacting** 34:16 43:19

**interaction** 12:21,25 13:3,10 123:12 152:23 175:7

**interactions** 35:24 36:3 123:10

**intercepted** 17:4

**interest** 193:1 197:11,17 221:25 252:1 264:7

**interested** 35:1 38:13 230:8

**interests** 246:18

**internal** 138:14

**International** 25:23

**Internet** 198:18

**interpose** 221:23

**interpretations** 31:5

**interrupt** 103:8 169:21

**interview** 28:6 29:3, 7,9,21,23,24,25 30:3 33:14,16,18,20,22 34:4,6,9 49:14 134:7

**interviewed** 33:9

**interviews** 30:1 34:12 45:12 49:18

**introduce** 6:16 37:20

**introduced** 105:23 161:17

**introduction** 106:13 204:17,20

**introductions** 106:15

**investigating** 157:2

**investigation** 18:6 128:23

**investigator** 134:6

**investment** 245:19, 24

**investors** 142:5

**invited** 54:11 125:9 156:21

**involve** 264:24

**involved** 17:20 27:2, 4,12 36:20 37:1 46:14,24 47:12 52:21 58:11 77:11 81:17 87:17 88:9 89:25 97:6 108:7 132:17 146:9 164:21 165:14 167:16 168:11 169:4 195:14 234:16 242:18 256:15 258:17

**involvement** 30:6 36:17 46:20 47:1 84:15 161:25

**involves** 264:23

**involving** 19:1 45:15

**IP** 257:6

**IPI** 63:16 66:10,12,16 67:9,17 114:20 115:1 130:20,25 131:4,7,12 146:7,13,15,23 147:9,21,24 148:11, 16 149:18 150:5,14, 22 151:15 164:8,24 170:15,21 171:22 172:12,16,22 173:2,5

*AB Litigation Services*

192:25 219:17 221:20,25 222:12,25 256:8,15,25 257:6 258:13 259:7,14 260:5,19 261:3,7,13

**IPI's** 67:15 257:21

**IPI-NS** 222:14

**IPI-RELATED** 117:3

**issue** 16:18 17:3 47:14 68:6 140:23 145:15 172:1,9 221:1,2 241:17,19,22 242:3 261:14

**issued** 9:1 179:5

**issues** 40:19 41:6 42:10,15,19 43:12 46:10,11 53:6 55:12 79:8 107:25 116:18 164:22 177:16,19,21 205:6,11 241:3,9,13 242:9,10,11 261:11

**item** 156:10 171:8 180:20,24

**items** 114:24,25 180:3,11,19 247:23

---

**J**

**Jake** 245:10,14,15 246:6 248:16

**Jake's** 246:9

**January** 47:24 93:3 106:22 218:12 220:13 226:1 228:4 256:24

**Jeff** 149:22

**Jeri** 245:17,18,21

**Jester** 10:4,5

**jet** 132:3,4

**job** 25:3 32:23 47:25 122:24 138:19 249:17,18 252:6 258:9

**jobs** 27:1,18,20 35:18 85:14

**John** 56:20 59:2,18

60:15 62:24 64:3 68:7 77:18 167:4

**Johnny** 206:21

**join** 50:13 95:15 213:14

**joined** 30:10 50:11 62:25 182:18

**Jones** 46:7 107:21

**Josh** 99:12 129:7,14

**Journal** 87:23

**judge** 105:7

**July** 91:10 161:8

**jump** 182:2

**jumped** 257:20 258:1

**June** 38:8 161:8 185:20 192:24

**JV** 216:23

---

**K**

**K-1S** 47:14,19

**keeping** 26:8 58:16 201:10

**Keller** 46:7 107:21

**Kerri** 46:11 107:23

**kickback** 135:6,15, 17,23 159:23 160:13

**kickbacks** 159:6

**kind** 11:13 12:3,10 17:6 23:17,18 26:21 34:21 36:3 40:19 41:14 44:12 47:4 53:1,2 58:16 75:10 77:1,6 78:12 79:1 81:4 83:15,23 87:17 88:9 89:2,15,21 90:7 94:21 95:2 102:19 115:14 149:17 182:2 212:7 223:8 236:8 260:4 266:11

**kinds** 34:11 42:15 46:25 77:1 126:4

**Kirschner** 2:18 5:11 6:5 7:20,22 50:11

79:11,12 81:16,23 82:7,9 84:4 93:13 106:2,3,21,25 109:16 110:3,9,12,24 116:11 117:3 123:9,16,20 124:9,11 125:9,14 127:2,18 139:10 153:17 156:21 157:25 170:25 175:7 182:4,11 183:5 188:15 189:13 191:22 192:18 198:11 199:8,17 201:19 202:20 203:17,25 204:13 205:13,14,19 206:13 208:1 209:3,13 210:20 211:1,16 215:7 217:6,16 218:16,18,20,25 219:21 230:14 231:13 233:8,14 237:24 238:6 239:11 243:1,8 250:2 260:23

**Kirschner's** 182:4 208:10

**Kirschners** 106:5 108:25

**knew** 69:22 107:6,8 108:5 119:13 146:15, 19 154:24 155:13 183:6 215:22 221:5, 7,11 231:13 234:3 238:15 253:11,21 261:7

**knowing** 257:6

**knowledge** 19:5 58:13 65:16 70:21 82:8 96:9 125:17 137:2 138:3 156:8 158:11 175:21 183:14 192:16 208:15 215:19 216:7 227:24 229:23 230:9 239:10 248:5 257:10 265:19

**Kristi** 40:10,13 41:10 53:11 54:16 74:12 80:25 95:25 133:1,5 147:5 184:12,17 185:21 192:9 248:16 249:7

**Kyle** 4:14 5:23 34:2 35:22 48:17 50:21 51:19,25 55:7,13,21, 25 56:1 61:4 70:5,6,7 72:10,19 73:2,4 74:21 75:20 76:19 77:9 79:6 85:1 89:2 90:1,3 96:18 98:25 103:19,22 109:7,9 111:19 122:25 123:17 125:21 127:2 132:19 153:23 154:1 165:14 166:3 167:1, 7,20 168:12 175:16 177:3 178:17 180:2 183:22 185:11 186:22 189:1 192:21 218:24 219:20 228:10 230:5,7 231:10 232:10,11,15 233:2,12,18 234:4,7, 13 235:6 236:1,5,12, 17 238:5,21 241:14, 15 259:11

**Kyle's** 99:3 132:14 156:25 186:15 193:5 194:7

**Kyles** 241:14

---

**L**

**La** 23:10

**laid** 136:3

**lake** 245:19,23 246:1,3,4 252:19,23 255:21

**land** 70:7 88:10 126:17 230:8 239:12

**laptop** 186:15

**laptops** 157:3

**large** 26:24 231:17

**largest** 37:5 49:8 52:18 235:8

**Lasted** 73:5

**late** 39:19 49:23 54:25 55:20 56:8 69:10 71:23 79:17 87:13 89:4 104:24 105:21 124:2 130:18

---

*AB Litigation Services*

139:11 141:24 144:24 157:3 182:6 220:13

**law** 30:7 86:3 152:16 181:24 200:9 220:17

**Lawrence** 46:10

**lawsuit** 248:13

**lawyer** 9:18,24 10:6 51:12 92:14,20,23

**lawyers** 10:23 11:24 12:18 13:4 46:9 107:21 115:25 121:8 122:1 133:21 134:7, 11,21 161:19

**lay** 56:4

**Lazy** 126:2,10

**leadership** 44:5,6, 22 78:20 177:1

**leading** 36:13 50:9 51:4 53:7 55:23 56:14 60:24 75:7 78:1,5 81:6 83:18 85:4 88:16 107:5 108:9,24 122:9 123:2 124:18

**leaned** 65:11

**learn** 37:11,15,21 182:7 183:4,10 184:2 189:16

**learned** 37:17 68:23 88:2 126:17,20,21 127:20 183:12 191:13

**learning** 136:7

**lease** 4:16 67:19 68:3 83:22 84:18 104:15 107:24 108:2 114:14 131:22 165:8 170:3,8 171:7 180:2, 6 195:8,11,13,16,20, 25 196:1,21,23 198:6 203:13 212:9,11 219:21 220:9 261:2 264:11,14,17,19 265:3

**leases** 27:11 104:18 114:13

**leasing** 107:25 197:20 214:9,14 225:23

**leave** 27:14 132:6 251:15

**leaving** 26:14 134:21 174:12 266:6

**led** 77:24 136:22

**Lee** 46:10

**left** 26:11 27:22 54:25 55:17 73:5 77:13 91:9 109:11 112:15 132:21,23 133:25 137:9 165:14 167:2 174:16,19 176:2 177:3 180:2 186:25 236:6 238:24 239:2

**left-hand** 103:18

**legal** 207:21 208:19 220:21,24 253:21,24

**legality** 229:3

**lender** 63:13 176:12, 14

**letter** 87:21 139:25

**letters** 150:5,8,11, 20,23 151:13 261:16, 24

**letting** 129:16

**level** 31:8,10 69:24 70:2,4 75:19

**leverage** 147:11

**Lewis** 23:1

**licenses** 24:11

**life** 19:3

**Lim** 206:21

**lined** 114:16

**lining** 147:16

**Linkedin** 28:11

**liquor** 185:17

**listed** 225:10,18

**listen** 229:17

**listened** 41:3 233:5

**listening** 7:17,25

**lists** 187:13

**literally** 262:7

**litigation** 158:9

**Littleton** 19:23

**live** 19:22,23

**lived** 114:13

**lives** 85:18

**living** 19:24

**LLC** 2:14,15,16 3:3, 4,5,21 6:11 207:20 209:4 231:1,6,14 232:3 239:11 253:18

**LLP** 2:2,6,10

**load** 86:10

**loan** 246:7

**lobby** 61:14 73:4 236:17

**located** 249:22

**location** 26:3 27:6

**locations** 27:10 39:2 55:5

**logistics** 8:21 249:21

**long** 10:22 15:11 21:16 22:3,11 23:6, 14 25:3,10 26:4 57:4 71:10 81:22 82:23 96:20 111:9 148:18 249:14 262:24

**long-term** 147:7

**longer** 75:21 111:20 112:17

**looked** 44:12 51:15 57:13 80:15 94:12 136:5 161:19 169:1 180:3 203:22

**Lora** 13:8 121:13,14 134:11

**Lorman** 3:3,13 4:2, 4,7,8 5:1,8,11,15,24 6:9,22 8:7,12 9:4

12:17 19:20 30:5 37:11 43:5 46:1 48:12 74:6 86:4,13, 20 87:5 92:2 93:1,23 94:3 98:7,22 99:7,19 100:15 104:20 105:9 125:24 128:9,22 130:1 133:17 144:21 151:22 152:15 218:2 239:17 243:22 251:10,21 253:6 262:6,17

**lost** 95:16 212:17

**lot** 10:23 11:11 36:21 52:16 89:2 114:15 136:13,15 145:9,13, 15,18 165:19 171:19 193:15,22 234:1 237:21,22 266:23

**lounge** 148:21

**love** 266:17

**low** 214:2

**lower** 187:25 188:5

**lowest** 169:9

**Luke** 5:5 63:16 66:12 67:12 146:16 148:16 221:4,20 222:11 223:5 226:20 228:3 258:18 263:9

**lunch** 133:11 181:11,15

---

**M**

**Macdonald** 13:8 121:14

**made** 68:20 74:7 79:25 104:5 106:13 112:13 117:7 118:11 120:23 121:1 127:3 165:23 166:1 191:6 192:12 200:13,17 216:3 225:25 227:1 230:1,7 238:20 242:20

**main** 242:16

**maintain** 32:23

**maintained** 58:15

*AB Litigation Services*

**make** 7:16 11:6,16, 18 12:4 15:12 17:2 20:3 26:7 31:15,16, 18 40:21 42:21 48:1 53:22 55:18 68:18 72:16 79:23 81:1,8 82:18 85:25 86:14 87:8 97:3 100:8 102:25 109:5 115:17 119:24 121:21 130:20 142:2 162:21 201:9,12 216:3 218:10 221:23 228:22 230:13 232:4 238:14 255:10 259:7 264:25

**makes** 29:15 33:1

**making** 35:18 43:12 106:15 115:5 144:9 204:16,25 216:1 229:3

**man** 33:25

**manage** 51:25 141:25

**management** 24:7, 9 25:9 43:6 58:4,8 144:2 177:1 178:17

**manager** 2:15 3:5 40:13 56:21 59:10 60:20 64:16 84:24 122:23 123:9 124:12 249:18 261:15

**manager's** 197:10, 17 264:6

**managers** 58:6

**managing** 19:25 27:12 50:22

**Manassas** 2:15 3:4 5:16 214:23 215:4,8 225:23

**Mancuso** 84:20,23 85:8 145:2

**March** 3:6 6:8 17:12, 13 28:19,21 33:10 35:8 39:19 43:18 45:8 48:18 49:23 89:4 98:25 99:16 121:23 130:18 157:6, 23 186:6 210:2 263:10 267:4

**Marcott** 178:13,14

**Marcott's** 96:2

**mark** 85:24 86:8,10

**marked** 86:7 87:2 91:20 98:2,7,22 186:8 189:20 202:14 207:2 210:8 216:13 223:11 224:17,25 226:13 244:11

**marking** 98:2 186:3 202:11 206:24 209:23 216:11 224:21 226:5,9 243:25

**married** 71:23

**Maryvonne** 2:19 6:15

**master's** 22:14,17

**materials** 205:8

**math** 31:23

**Matt** 258:16,19,24 263:4

**matter** 6:10 10:9 16:17,19,21 117:6 152:18 220:22,24 250:12,18,23 251:2 263:13

**matters** 46:6

**maximum** 170:6

**Mayer** 59:9,11 178:3

**Mcdowell** 13:8

**meaning** 52:9

**means** 78:12 103:20 133:5 155:2 247:11

**meant** 112:3 155:10 171:21 175:21 233:18,23 234:4 237:8 239:5

**mechanics** 9:15

**Medaris** 190:25

**medical** 196:17

**meet** 6:25 7:1 8:16 12:20 14:16,19 15:3 28:5 36:23 48:22,25

52:4 59:3 61:24 71:8 72:18 129:9 141:5 146:16 148:11,16,18, 20 182:10 189:2,7,11 241:12 256:25 259:24

**meeting** 9:16 12:24 15:25 16:2 42:17 55:20,24 56:5,7,8 61:11 62:2,3 66:25 71:10,14 72:21,25 73:3,6,9,24 74:21 75:10,14,24,25 76:11,13 78:17,19 79:18 117:23 118:17, 19,22,25 119:3 127:1 141:7,12,24 188:11 189:17 205:18,20 206:1 218:6,14 219:6,19 220:14 223:5 228:3 229:16 232:12,19 234:1 235:25 236:7,10,18 241:11

**meetings** 38:24,25 41:11,12 43:2 49:14 53:9,16 54:2,10,11, 15 56:13,16 74:2,5,7, 14 75:11 76:1 77:19, 23 78:1,3,6,9,12,13, 18,23 79:3 96:16 178:2 241:16 258:20, 25 259:2 263:6

**Meilach** 245:11

**members** 30:2,4 142:23 167:5

**Memorandum** 4:9 5:2,6

**memory** 51:17

**men** 34:1

**mention** 15:7 163:1 191:22 192:3 230:13

**mentioned** 79:11 129:15 150:15,16 153:3,4 157:20 161:13 174:23 176:7 184:16 197:25 236:16 238:17 249:11 260:12

**mentioning** 163:3 212:14 237:23 238:1

**mentions** 205:18 209:3 212:3

**Message** 5:19

**met** 9:9,24 12:19,23 13:13 14:13,17,21 15:15 30:1 33:11 38:23 43:17 45:21 51:12 59:21 60:20 61:12 62:4,12 63:21 66:24 73:4,7 79:12 109:24 119:15,17 146:17 147:21 148:16 152:19 181:22 218:11 259:4

**Mexico** 20:16 21:3,6, 20 22:10

**microphone** 204:4, 7

**mid** 26:10 182:6

**mid-april** 55:6

**Mid-december** 83:3,4

**mid-january** 146:25 147:1

**mid-november** 83:2

**middle** 69:11 142:13 230:24

**midsummer** 124:4

**migrated** 140:23

**mill** 145:1,3,5,8,20

**million** 17:22 82:17, 19 83:20 84:15 114:12,19 122:8 130:21 131:3,9,20 147:10 150:21,25 151:10 165:10 169:6 170:12 171:1,9,20 231:19,20 254:8,19 255:10 260:12

**mind** 142:9 169:24

**Mine** 244:8

**minute** 42:6 87:8 102:3 203:1 210:13

**minutes** 73:5 81:24 82:25 86:21 111:11 148:19 179:15 181:11 262:8

**misappropriated** 17:4

**misconduct** 218:25 219:8,10 223:8

**mispronounce** 245:11

**missed** 8:5 168:24

**misspoke** 162:24

**misstates** 49:15 113:23 116:14 124:25 126:23 159:15 243:5 252:9 256:11 257:24 261:18

**misunderstood** 53:13 261:22 262:4

**mix** 248:10

**model** 186:23

**moment** 152:7 207:9

**Monday** 35:7 109:4 110:2 127:16 143:21

**money** 17:20 19:15 68:14 114:21 116:1 127:3 129:24 131:6 136:23 137:19 138:4 147:14 170:21 194:21 220:9 224:2 227:12,24 232:3 235:9,19 237:12 247:2,12,15 248:20

**monitor** 177:23

**month** 68:19 85:6 161:7 177:10

**months** 17:14 47:19 85:3 88:9 90:8 93:7

**Moran** 46:18 47:1

**morning** 6:22 7:3,8 8:12,13,25 74:16 100:7 140:14 141:18 152:14 182:2 236:7

**motivation** 50:10

**move** 204:7

**moved** 21:24

**moving** 52:11 235:22

**multifamily** 26:25

**multiple** 94:2 138:1

**myriad** 68:11,12 180:17

---

**N**

**N.W.** 2:4

**named** 14:4 45:18 79:10 84:20 92:14 99:12 123:9

**names** 46:8 79:9 232:1

**narrows** 69:9

**Nashville** 2:8

**nature** 112:5

**NCP** 2:14,15 3:4 214:23 215:4,17 216:23 246:17,21 247:9,11 248:25

**NCP-RELATED** 246:12

**necessarily** 145:19 149:13 221:1 264:14

**needed** 65:2,5,7 77:15 172:9 176:10, 13

**nefarious** 113:22 116:24

**negative** 52:8,9

**negotiate** 195:13 196:20

**negotiated** 193:24

**negotiating** 196:1

**negotiation** 91:14

**negotiations** 107:25 108:3,4

**Neil** 2:11 6:23 152:5

**Nelson** 2:9,18 7:5,24 124:12 125:10 152:17,19 153:18 156:21 162:9 183:23 192:3,18 198:12 206:15 230:16 238:2 243:2,8 250:5

**Nelson's** 133:12

**net** 187:14 197:10,17 264:6

**news** 87:21

**nice** 6:25 7:1 8:16

**night** 60:8

**nights** 60:8

**nod** 12:2

**nodded** 93:10 199:3 213:2

**Noll** 20:5

**Normal** 21:24 22:1

**North** 3:25 4:21

**Northstar** 3:21,23 4:18,19 6:24 8:15 16:21 17:7,24 27:17 28:7,10 29:9,21 30:6 32:9 34:19 35:6,21 36:12 37:10,12 38:13 39:19 41:23 42:1,8 43:6 44:12,20 45:8, 25 46:1,13 48:18 49:11 50:7,18 55:2 58:24 59:12 60:16 64:1 70:24 75:10 78:1 85:2 93:12 94:4 96:2,8 97:15 107:20, 21 108:2 113:8 121:23 122:7,19 123:7,15 125:24 126:1 131:1 133:25 134:5,14 136:23 138:20 141:14,25 144:25 145:24 149:4, 6 158:17 159:1,7 160:6,25 161:3 166:22,24 170:15,19 171:22 172:2,12,16 173:3,4,25 177:5 182:18 183:3 185:25 190:10,22 192:6 194:22 198:2,9 199:7,9,16,18,22 200:7 214:16 221:21 222:12 225:16,25 227:24 232:15 233:11 241:2,8 242:3 244:13,17 247:14 248:2,6,9 250:10 252:8 253:3,5,11,15

**Northstar's** 37:24 46:15 144:1 182:19 185:22 198:6 199:24 219:17

**Notary** 3:9

**notes** 144:12

**notice** 103:15

**noticed** 114:24 115:7

**notices** 150:14

**notified** 143:17,18

**Nova** 126:17 127:3 230:25 231:6,14 232:3 239:11

**November** 17:18 30:13 66:18 79:17 96:21,22 117:8 202:12 205:20

**November-ish** 63:10

**NS-IPI** 115:10 173:1, 9

**NSIPI** 2:15 3:5

**number** 91:13 92:2 106:25 118:15 124:8 132:4 142:3 147:4,7, 9 156:16,17 169:4,7, 9 209:24 224:24 226:12 230:19,20,22 244:7 249:25

**numbered** 202:13

**numbers** 81:8 102:24 186:25 211:19

255:3,9 256:17 257:8,18 258:8,9 265:15 266:6

---

**O**

**O'HARE** 148:21

**OAC** 38:24 178:2

**oath** 48:14 87:7 199:2 218:3 243:23

**object** 113:3 127:12 128:5 139:4,7 194:4

objection 18:17
19:8 29:11 32:15
33:5 36:8 41:17 42:2,
24 43:7,14 44:23
46:22 49:15 50:9,23
51:4,9,20 53:7 54:6
55:23 56:14 57:14
58:18 60:9,24 61:8
64:10,21 65:20 67:16
72:12 75:7 76:4 77:4
78:5 81:6 82:4 83:7,
18 85:4 88:11,16
90:9 97:18 107:5
108:9,14,24 110:13
111:22 113:23
116:14,25 117:10
120:11,16,21 121:10
122:9,15 123:2
124:17,25 125:19
126:23 130:3,22
134:9 135:1,8,24
137:1 138:10,16,22
139:17 141:15 144:4
145:4,11 148:1
149:12,24 151:2,19
154:2,14,19 155:19
156:13 157:11,17
158:21 159:2,9,15
160:2,7,14 162:2,11
164:2,17 166:11
167:10 168:9 169:13
171:10,16 172:4,13
173:6,14 174:5,10,20
175:24 176:20
177:14,24 178:18
180:5 181:2 182:21
185:8 187:7,19,23
188:16,17,22,23
189:14 190:12,14,18
194:24 195:10,22,23
196:7 197:22,23
198:13 199:10,12,19
200:1,11 201:21
202:3 203:19 204:2,
3,21 205:23 208:2,12
213:20,21 214:11,17
215:9 219:1,9,23,24
220:4,18 221:6,23
222:19 226:2 227:3,
4,10,14 229:6 232:5,
17 233:15 234:20,21
235:12,16,20,21
243:4 245:12 246:23
247:5,16 248:12
251:4,6 252:9 253:23
254:14,25 255:12

256:5,11,19 257:3,9,
24 258:12,14 259:17,
21,25 260:8 261:6,18
264:18 266:4

objections 29:15
61:1 200:3 220:20
262:2

obligation 134:14,
16 147:23 148:6
258:10

obligations 130:2

observe 192:5

observed 124:8
156:17

obtained 173:25

occasion 157:20
170:24 248:11

occupy 195:13
196:19

occur 205:20

occurred 55:13
68:19 70:3 88:9,13,
24 104:24 147:2
189:17 209:5,6
211:13 216:3 238:4
239:9

occurring 105:10

occurs 265:2,7

October 38:20 96:21
117:8 123:4 127:21
157:3

October-ish 249:15

odd 252:6 257:23

offer 142:2 144:9

offered 141:13,24

office 23:23 24:17,
25 30:11,16 33:16
36:6,10 40:13 48:19
49:3 68:25 69:16,25
71:6 72:18 89:2
109:5,12 129:16
183:14 192:6 196:17
249:19,22,24

officer 28:14 31:2,
11,21 32:4,8,18 33:3,
6 35:11,13 36:17

40:14 42:1,3

offices 30:25 33:11
96:10

one-man 44:20

one-on-one 42:17

one-party 229:6

one-to-one 109:15

onerous 32:20

oops 93:22

operate 31:7

operating 28:14
35:11,12 36:17 42:3
90:15 180:16

operation 44:20

operations 25:13

opinion 127:10
164:13 173:4 235:2

opportunities 28:3

opportunity 36:21
70:23 94:10,17,25
95:3,22 128:3 168:16
171:6 192:25 256:17

opposed 244:20

orally 12:1

order 4:10 5:2,6
129:25 133:16
144:15 166:16,18
167:23 250:18
254:18 261:9

orders 165:23 166:1,
4,7,14 167:6,19
168:3,8 177:21

ordinary 191:17

organization 96:7
144:6 146:10 147:15
222:14

organizational
47:15

organized 119:2

orientation 227:20

original 167:24
168:7 216:24 247:8

originator 225:11,
14

outcomes 122:12

Outgoing 4:12,15
5:21

outset 196:6

outstanding 79:19

overhead 197:8

overhear 201:24

overheard 139:10
175:15

overseeing 58:11

overview 75:20

owe 227:12

owed 130:25 214:22
215:4 227:22

owner 253:17

owner's 64:17

owner/architect/
contractor 178:1

owner/manager/
salesman 23:18

ownership 90:17

owning 132:3

**P**

p.m. 267:4

pace 52:11

pages 92:9 98:4,9
120:1 210:22

paid 37:19 79:21
80:5,17,18 81:21
115:5 136:23,24
137:19 138:3 148:25
172:22 184:11,13
185:25 193:16,18
194:22 201:20 212:4
216:1 227:24 232:9
233:11 247:12 253:3
258:8,9

paper 254:10

paperwork 149:9

paragraph 121:22 123:23 124:7 126:12, 16,25 127:15,20 153:9,15 156:12,15 231:17

Pardon 228:18

part 47:25 50:24 53:20 55:10 58:4 66:18 73:15 75:22 80:19 83:21 84:11,18 95:5 110:6 112:6 116:7 122:4 142:25 145:2 176:1 199:7,16 264:13,14,15 266:14

part-time 32:24

participate 125:24 168:18 211:10

participated 77:6 105:25 257:11

participating 203:17

participation 162:9 194:16

parties 115:17 146:3 164:21

partner 37:18,25 45:1 96:4 105:15 178:14 216:5,21 217:15 259:13

partnered 190:22

partners 3:24 38:3 115:12 146:8,20 147:19 193:16 219:12

Partners' 4:20 94:4

partnership 115:10 173:1,9 194:9

parts 229:8

party 17:5 126:3

pass 181:8 251:7

passing 256:8

past 94:22

paths 250:7

Patricia 45:19 129:20 193:17 194:9

Patrick 13:7 121:6, 12 134:12 178:11,22

patrol 31:9

pay 53:2 116:1 127:2 171:14 172:1 232:15 247:15 248:7

payback 147:10

paying 199:7,16 203:16

payment 5:16 17:2 130:20 147:12 199:23 200:8,18 201:16 204:1,14 212:10 214:7 225:25 233:13 253:2

payments 79:25 81:21 130:25 136:2 160:18 190:9 191:6 192:13 204:20,25 206:3,5 211:3 213:18 216:3 227:1

payroll 40:22 129:9, 12 143:24 147:5

pays 247:22

peace 31:11

Peaks 56:10 68:21 87:11,18 88:8 91:2,3, 7 110:1,17,19 111:15 118:9,10 126:14 162:20,22 163:23 164:1,8,15 165:15 166:19,21 231:24 232:4 234:18,24 239:12 255:25 256:1, 9,16 258:23 259:8, 10,15 260:4

pencils 143:22

pending 15:11

people 33:22 34:7, 12,17 52:16 53:6 62:23 76:16 89:25 142:4,5 145:15 147:21 183:21 184:6 193:22 206:10 235:8, 15 241:11,12 249:25 252:5,12 262:25

people's 193:8,12

percent 196:19

percentage 197:1, 11 214:9 264:7

percentages 194:21

perform 259:12

performance 116:20

performed 178:17

perimeter 61:13

period 40:1,2 43:23 45:2 47:20 88:14 91:4 96:23 183:13 237:22

person 14:14,16 18:16,20,21 33:15 45:18 58:8 62:4 95:8 141:6,8 181:5 182:11 195:13 205:22 218:11 247:22 259:4

personal 19:19 99:12 112:5 124:8, 20,23 125:5,17 158:11 175:21 184:14 244:20 246:7, 12 247:19,24 248:3, 7,10 255:17

personally 93:13 106:21 149:2 201:19

personnel 198:11

perspective 52:15, 20

Ph.d. 22:14,18

phone 8:17 13:11,25 15:19 16:1 18:16,18, 22 29:24 33:10 36:7, 9 66:24 72:6 73:23 74:1,3 79:18 82:20 87:12 110:3 117:22 118:15,21,24 119:2, 10 137:4 140:20 142:3 182:13 203:4 205:22,24 206:9 213:16 216:20 230:1 259:1

phrase 155:10

pick 55:16

picking 204:7

pie 10:23

piece 70:7 77:14 230:8

pieces 183:12

place 37:12 106:20 118:20 119:13 129:14 208:11 209:7 215:25 255:16 261:10

Plains 118:8 162:20

Plaintiff 6:17

plaintiffs 6:21 7:15 11:2

Plaintiffs' 4:9,10 5:1,3,5,7

plan 46:18 142:15 189:3

plane 142:13

planning 24:23

Plante 46:18 47:1

plate 246:11

players 37:8

pleased 60:23,25

point 13:20 30:19 32:20 44:14,15 47:14 52:17 57:20 62:12 68:19 101:23 105:8 107:4 109:8,11 110:21 111:19 112:20 132:20 134:15 135:5 137:14 144:1 145:22 154:21 155:18,20 161:21 172:10,12 186:16 192:24 193:9,25 197:15 216:2 220:3, 16,22 260:5

pointing 173:11

points 147:3

portfolio 197:16

portfolios 27:13

portion 73:19 80:18 153:16 193:20 195:7 232:15 233:2,12 238:11 243:2,9 264:10

*AB Litigation Services*

portions 229:17

position 28:6,13
52:24 67:15 75:24
76:2,5 194:7,8

positions 40:12
193:8,12

possibility 28:9

post 20:9 254:7,18

posted 254:23

posting 28:11,13,16,
20 29:1

potentially 129:15
192:25

practice 132:22

practicing 24:3

precise 261:4

preclude 144:6

prefer 251:11

preliminaries 182:1

Preliminary 4:11
5:3,7

preparation 13:22

prepare 9:7

prepared 13:19
47:19 102:16

preparing 47:14

present 2:17 6:6
73:9,16,25 138:25
206:7 229:9,10,15,18
238:8 241:8,16

presented 120:19

pressing 246:11

pressure 147:3,15

pretty 28:23 43:5
44:20 60:23 69:6
88:14,19 150:3
159:25 256:2 262:6

previous 93:12

price 170:6 232:9

primarily 26:25
123:8,15,18 178:19

primary 60:5 70:20
87:24 95:8 174:24
237:1 238:13

prior 27:2,16 30:5
35:13 38:9 42:12
43:17,23 78:17 91:14
93:2 106:21 119:19
120:22 140:13
141:12,17 148:8
183:7,9 196:16 198:2
261:5

prioritize 244:17

private 132:3 153:24
168:2,5

privilege 221:25

privileges 136:20
158:1

privy 116:1 122:11

pro 131:18

proactively 44:18

problem 120:10
203:2

Procedure 3:2 6:3

procedures 182:25

proceedings 6:1
50:12

proceeds 187:14
193:3 232:16 233:12

process 9:11 121:19
138:14 166:16,19
203:14 205:3,7 206:6
264:15

produce 65:13

produced 100:4,6

product 24:8

productions 100:10

professional
244:20 247:24

profit 70:9 88:10,15
197:8

profits 127:3 197:10
264:7

program 37:25 45:2
193:21

programs 37:11,16

progress 65:4 79:20
81:19 177:23

progressive 31:7

prohibitions 161:24
162:8

project 36:14 38:25
49:8 52:4,12,18
56:21 59:10 63:12,13
64:16,18,20 68:8
80:17 81:21 84:24
90:1 94:11 96:13
145:15 165:23 168:1,
6 169:6 170:22 171:1
173:17 177:1,16,17
178:7 197:6,9 202:9

projects 36:14,18,24
37:1,5,9 38:14,23
39:10 45:9,15 49:10,
20 50:2,7 56:17 57:5,
8,19 58:17 60:21
63:18 65:18,21 66:6
77:11 79:4,20 81:18,
20 96:5,6 108:4
145:2,10 167:14
169:5 178:15 237:6
244:16,19,20,21
252:8

properties 27:7 63:7

property 58:6
104:18 197:14,20
215:8 230:10 231:23,
24 246:7 247:15
252:22 253:2 264:11,
16 265:2

proposal 94:11 97:3
117:7 142:21

proposed 142:15

protect 246:18

prove 124:15

provide 18:9 65:3
83:23 101:22 119:16,
18 176:25 190:8
226:25

provided 4:14 5:23
80:4 99:24 101:24,25
103:19 119:14
204:16 214:15
226:20

providing 44:22
95:21 149:19 176:13,
14 204:1,14 228:8

public 3:10 241:12

pull 153:6 186:2
202:2 209:22 216:10
263:11

pulling 210:11

purchase 4:1 98:14
216:24 247:19 248:3,
7

purchased 126:17
185:18 230:10
239:12 248:8,25

purchases 249:2

pursuant 3:1 6:2
80:1 104:5 172:25
203:21 226:1

pursuing 85:15

pushing 114:20
205:3

put 14:25 73:12
74:11 94:24 95:21
117:7 137:9 155:4
170:22 246:17,21
247:9 255:16

putting 95:8 115:14
140:7 165:12

puzzling 257:17

———————

**Q**

Quail 57:10 214:23
215:15

question 11:17,18
12:1,11,14 15:11
21:13 29:19 56:5
65:6 66:6,9 67:3
74:25 82:16 91:5
137:15 139:5 144:5
145:8 153:15 155:8
160:8 174:22 187:17
204:11,12 222:7,8,10
224:12 229:3 247:9
262:4 264:22

questioned 136:6

questioning 10:24

202:4 243:15

**questions** 11:3,25 12:10 19:19 34:12,15 45:4 61:1 65:23 66:2 85:25 89:5 91:21 98:18 119:8,12,14 133:9,13 134:4 144:13,23 147:6 151:21 165:9,13,16 179:14 180:1 203:7 218:10 222:2 241:13 242:14,16 251:11,25 252:1,4 259:11 260:14 262:18 266:22

**quick** 28:24 179:12, 13 217:19 243:13 263:11

**quickly** 28:23 236:15

**quote** 186:22 187:1, 14 188:11 189:3 207:19 212:3 230:25 231:18,19 234:8,14 235:7,14,19 237:7,12 245:18 246:11,17 247:22

**R**

**raise** 113:17 147:17 161:2,3,9,20 240:25 241:11,23 260:18

**raised** 67:2 106:7 165:10,13 241:17 242:3,11

**raising** 184:21 241:3

**Ramstetter** 4:2 5:9 35:22 48:17 50:21 51:19,25 55:21 61:4 76:3 98:25 103:22 127:8,22 183:22 185:12 192:21 218:24 219:20 228:10 229:12 232:11,15 234:7 241:15

**Ramstetter's** 132:20 189:1

**ran** 253:15

**Ranch** 126:3,10

**range** 64:12

**rapidly** 129:8

**Rarely** 36:9

**rate** 195:8,11,20 196:4

**reach** 146:23

**reached** 19:7 36:20 52:2 59:14 162:17

**reaching** 215:3

**react** 111:21 241:18, 21

**reaction** 50:2 52:13 53:24 191:16 256:1

**read** 103:14 136:12 137:8 158:5,9 204:10,12 222:10 254:10

**reading** 136:7 137:3

**ready** 152:8

**real** 20:1 26:2,18,21, 25 27:3,5,12 46:11 70:19 122:20 179:13 190:9 198:2 235:7,15 248:21 263:11

**realize** 179:24

**Realtime** 3:9

**reason** 28:2 32:17 41:8 110:12 136:2 146:17 151:16 249:9 252:4 261:23

**reasonable** 110:20

**reasons** 50:18

**rebuffed** 55:7

**recall** 9:19 10:2 12:24 16:7 17:18 19:14 32:16 33:21 34:2 38:4,11 41:7,16, 18,21 45:13 46:23 48:24 49:17 50:24 51:5,10,22 57:10,15 58:3 59:9 60:11 64:12 65:3 66:17 69:21 71:12 72:24 73:1 74:25 76:13 82:5,17 83:11 84:2,

13 89:20 90:5 93:20 98:11,15,17 105:20 106:23 107:6,18 109:9 111:18 112:24 122:16 124:19 126:11 127:10 130:8, 12,23 131:3 135:16 137:23 139:12 141:7 147:11 148:5 151:7 153:4 154:6,20 155:22,25 157:22,24 159:11,17 160:10,15 161:6,22 163:3,21 169:18 172:18 173:18,23 174:15 178:9 180:19 182:7, 22 184:20 185:16 191:4,20 192:2,4 193:7 198:4,8 206:12 209:19 220:11 222:6 223:22,25 226:24 228:5,8 230:15,17 231:11 234:1 237:23, 25 238:1,13 239:3 261:7

**recalled** 51:12

**receivables** 79:22 80:7

**receive** 150:8 190:9 204:19 243:8

**received** 9:1 44:16 100:10 117:22 160:21 243:2,3,9 261:17,25

**receiver** 255:16,20

**receiving** 161:16

**recent** 9:16

**recently** 31:25 32:18

**recess** 48:8 86:25 144:18 179:18 181:15 198:23 217:24 243:19 262:14

**recitation** 175:18

**recognize** 98:10 101:1 102:20,21 104:14 186:13,14 190:2 207:12,15 210:16 216:17 226:17 244:25 245:7

**recollection** 37:2 69:2 174:1 180:23 232:20

**reconcile** 68:13 167:8

**record** 6:8 26:9 48:7, 10,13 58:21 85:22 86:24 87:4,6 98:2 103:6 144:14,17,20, 22 162:21 179:17,20 181:14,17,23 198:18, 20,22,25 212:16 217:23 218:1 224:22 225:24 226:10 227:18,19 239:23 243:18,21 254:22 262:13,16 264:25 267:1

**recorded** 6:9 73:21, 23,25 74:1,3,5,15 75:11 229:17

**recording** 4:18 103:16 228:9,16,22 229:4,21 230:1 232:12 233:5,12

**recordings** 74:9

**records** 157:13 166:9 255:9

**recovered** 19:15

**Recreation** 21:9

**Reed** 59:8,11 62:2,4, 12 63:21 64:8,23 178:3

**refer** 80:3

**reference** 3:19 115:8,15 188:15 201:10,12 204:24 207:24 208:18 230:19

**referenced** 203:11

**references** 206:12, 15,18,21

**referencing** 112:24 126:13 208:7 216:25

**referral** 4:3 37:11, 18,19,24 38:3 45:1 80:19 104:5 105:15 106:12,14,20 115:3,

*AB Litigation Services*

5,8,24 116:2 146:20
160:21,23 161:16
163:10,12,20 172:22
173:5 182:19,23
183:1 190:17,22,24
191:2,14,21 192:22
193:15 194:3,16
195:1,21 198:3,7,10
203:12,15,22 215:12,
25 216:2,5,21 217:15
219:5 221:8,12 224:3
226:1 227:1 258:3

**referrals** 227:21

**referred** 59:15
190:25 213:8,17
232:1

**referring** 129:20
140:9 169:22,24
188:7,21 214:8
217:15 230:20
231:24 234:13,17
264:10 265:6,8

**reflect** 220:9

**reflection** 228:15

**reflects** 101:16

**refresh** 86:4

**refunded** 131:5

**regard** 65:10 89:19
92:18 252:18

**registered** 3:8
231:8,9

**regular** 41:11 42:17
78:12,18 123:12

**regularly** 66:24

**reimburse** 149:6

**reimbursement**
149:8,14

**rein** 51:2

**rejecting** 171:12

**related** 16:17 159:7
163:23,25 164:16,20,
22 176:9,17 205:13
250:18

**relates** 250:22

**relation** 164:5 179:3
191:25 216:23

**relationship** 52:11
109:6 115:16 116:13
124:9 125:5 139:2
162:18 183:4,7 237:5
259:7

**relationship-
building** 125:25

**released** 147:12

**relevance** 33:5
64:10 247:7 248:12

**relevant** 248:13
255:5

**reliable** 55:1

**remain** 48:14

**remainders** 57:16

**remained** 208:10

**remaining** 176:10

**remember** 9:23
18:12 28:12,18,20
33:23 34:8,11 35:6
46:8 50:20 51:8,17
57:19 58:8 59:16,17
62:9 63:20 69:6,10,
12,14 71:22 75:17
83:10 111:24 119:10
120:18,25 127:4
130:19 139:20,22
143:2 150:2,6 157:12
159:22 160:5 174:8
175:11 183:10 190:4
204:4 228:16

**remembered** 174:4

**removal** 266:15

**removed** 128:23

**renewing** 27:10

**rent** 60:12

**rentals** 201:3

**reorganize** 179:13

**rep** 64:17

**repeat** 29:19 199:14
204:9 222:8

**rephrase** 264:21

**replace** 177:6

**replaced** 129:1

**report** 60:15 84:6
185:21

**reporter** 3:9 6:14
11:14 185:10 264:19

**reporting** 64:24 65:2
116:19 176:13

**reports** 65:4,6,7,13
176:14 185:23

**represent** 6:24 7:4
8:14 10:10 102:24
152:17 181:25
196:15

**representation**
9:10

**representations**
251:2

**representative**
257:1

**represented**
107:21,24 108:2

**representing** 6:19,
21 7:10,15

**request** 166:6
233:11 247:23

**requesting** 170:21

**requests** 188:20

**required** 32:24 58:5

**requirements** 32:19

**requiring** 254:6

**research** 34:18,21
44:18 231:7 253:6

**reserve** 30:12,15,17,
21 31:2,21 32:4,8,18
33:2

**reserves** 31:6

**residential** 26:24
266:14

**resign** 143:18

**resignation** 143:15

**resigned** 143:9,13

**resolution** 172:11
233:21 242:9

**resolve** 84:17

**resolved** 67:21
131:15 171:21,24
172:9

**resources** 155:20

**respect** 242:14
265:8

**respond** 28:15 52:7

**responded** 28:25

**responding** 212:13

**responds** 211:6
212:3

**response** 3:24 4:20
94:4,21,24 95:8
117:7 188:11 189:1
233:11 246:10,16

**responsibilities**
31:10 36:12 77:9
81:2

**responsibility**
43:13 64:15 252:7

**responsible** 27:8
58:3 222:14

**Reston** 25:14,15

**result** 79:21 80:8,10

**resulted** 96:16

**results** 138:1

**retained** 132:21

**returned** 114:21

**reveal** 86:7

**revenue** 197:17

**review** 66:13 117:4
166:20,25 171:6
180:2,4,13 260:15
261:10

**reviewed** 105:4
107:16 120:2,19
138:8 166:9 240:14

**reviewing** 108:7,17
125:21 240:8

**reworked** 186:23

**RFP** 3:25 4:21 94:4,
21,25 95:8,21 97:6
117:7

**Ridge** 57:10 214:23 215:15

**riding** 126:6

**right-hand** 102:19

**rights** 178:6

**righty** 16:12

**risk** 81:20

**Road** 169:12,14,24

**rocketships** 25:1

**Rod** 92:14 182:16

**Rodney** 206:18

**role** 36:16 53:4 58:14 63:11 84:25 96:2 142:18 144:2 158:24 172:11 178:17

**roles** 134:10

**room** 110:5 111:10 229:9 236:17 238:24 239:2

**roughly** 15:3 17:8 69:3 74:14

**rules** 3:2 6:2 10:17, 20 90:16 182:25

**rumor** 144:25 145:3, 5,8,20

**run** 23:12 97:15 141:14

**running** 264:15

**S**

**S-E-R-C-O** 25:7

**salary** 35:15

**sale** 197:12 232:9,11 255:21 264:10,16,23 265:2,7

**sales** 22:5 24:9 264:24

**Sandhu** 2:11 6:23 86:1,6,11,18 103:5 128:8 186:5 199:10 200:1 201:21 203:19 204:6,21 205:23 208:2,12 209:25

210:4 211:21 214:11 215:9 217:20 219:1 220:18 221:6 222:19 223:14 224:19 226:2, 8 227:3 232:17 233:15 234:21 235:12,21 243:4 245:12 247:5,16 251:4,14

**Sandhu's** 251:11

**Sandra** 3:8 6:14

**Santander** 63:5,11, 15

**Sara** 2:12 8:1

**sat** 73:4 193:22

**satisfied** 67:9 82:2

**Saturday** 72:2,5

**savings** 168:2,5,6, 13

**scenarios** 186:24 187:6

**scenes** 115:16

**schedule** 36:21 65:22 167:13 194:16 203:6,10 211:17 212:13 215:7

**Schillingburg** 56:20 167:4

**school** 20:4,9 22:9

**SCHRECK** 2:10

**science** 20:21

**scope** 57:22 58:5

**screen** 179:23

**scroll** 102:7 120:9 189:9

**scrolling** 246:15

**scuba** 21:25

**search** 34:22 141:18

**Seattle** 249:25

**secret** 201:10

**section** 212:25

**sector** 26:21

**sell** 197:15

**selling** 197:16,20

**send** 130:13 142:9 163:5

**senior** 78:19

**sense** 11:6,19 12:4 15:13 33:1 81:2 85:25 86:14 90:16,17 206:4 255:11

**sentence** 156:18,19 209:3 235:6

**separate** 67:1 96:7

**September** 4:18 30:14 38:19 39:7,14, 16,20 40:4 42:12 43:23 55:10,20 56:9 68:18 69:7 71:23 87:13 94:5 104:24 127:16 139:11 157:3

**Serco** 25:7,8,12,21

**series** 98:21

**served** 165:1

**service** 9:1 204:15 214:15

**services** 2:5 3:24 4:20 6:10 94:5,18 204:1,14

**set** 99:19 117:23 118:17 177:7,13

**sets** 177:2

**setting** 8:20

**settled** 127:21

**settlement** 194:10

**settling** 128:2

**several-page** 97:23

**share** 221:3 223:6, 19,25 242:22

**shared** 37:22 67:4 146:7 223:17,24 224:13,15 230:6,10

**sharing** 145:22 146:4 223:23

**Shaw** 2:2 6:20 86:15 169:12,14,23 181:24

198:19

**sheriff** 30:18 31:6

**sheriff's** 30:11,16, 23,25 32:8

**sheriffs** 31:4 33:2

**shock** 221:18 234:2 237:22

**shocked** 221:13,14

**Shocking** 224:5

**Shoop** 245:17,18,21

**shop** 21:25 22:1 266:16

**short** 86:9 88:14 133:9 237:21

**shortly** 45:16 49:21 122:24 175:10

**shot** 103:5

**show** 4:10 5:2,6 8:3 63:6,7 85:20 88:4 104:1,2 224:2 227:8

**showed** 157:5 166:16 227:1 244:9

**showing** 102:12 185:22

**shown** 86:6

**shows** 104:1

**shy** 12:13 43:11

**side** 103:18 162:8 193:19 246:3

**sign** 83:13,22 97:8 101:6 166:7 239:24 240:7

**signature** 42:4 97:9

**signatures** 92:11

**signed** 5:4 101:8 114:18 120:2,14,20 128:11,15 154:23 155:10 156:3 166:13 219:22 239:25 240:4, 14,16

**significant** 70:9 97:16 107:23 130:2 132:7 216:21

*AB Litigation Services*

**signified** 194:21
219:8,10

**signing** 203:13

**similar** 101:25
135:23 160:12
178:17 215:7 223:18,
20 224:14

**simply** 122:10
146:21 180:24
191:13 219:4 258:2

**sit** 9:23 42:7 154:12
155:17,24 251:11

**site** 57:10 60:3,4,5
63:6 176:25 177:22
205:8

**sites** 61:10,22,25

**situation** 17:16 19:7
51:17 70:11 73:11
128:3 129:7 183:9
233:20 257:2,8

**situations** 196:5,14
197:19

**ski** 21:25 22:1

**skill** 177:2,7,13

**skimmed** 105:6

**slightly** 193:6

**Sloan's** 246:4
252:23

**slow** 232:24

**Smart** 2:7 3:16 7:3,4,
20,24 50:14 95:17
103:10 152:2,6,12,16
153:12,14 154:4,16,
23 155:22 156:16
157:14,19 158:23
159:4,12,19 160:4,
11,16 162:4,13
164:4,23 166:13
167:12 168:15
169:16 171:12,18
172:8,17 173:8,16
174:7,14,21 175:25
176:22 177:18
178:21 179:12,21
180:8 181:4,8 182:21
185:8 187:7,19
188:17,23 190:14,18
194:4,24 195:10,23

196:7 197:4,23
198:13 199:12,19
200:3,11 202:3,6,10
204:3 212:6,9,17,21,
23 213:3,11,15,20,23
214:17 216:9 219:9,
23 220:4,20 227:4,
10,14,18 232:5
234:20 235:16,20
244:8 251:6 255:24
256:7 262:20,21,23
263:3,11,17,21,24
264:2,21 265:11,13
266:5,20

**so-called** 87:11

**software** 24:8,10

**sold** 70:8 239:12

**sole** 253:17

**solely** 172:11

**soliciting** 265:17,22

**sooner** 69:17

**sort** 109:13 114:16
145:18 172:22
176:17 178:16 181:6
195:15 258:5 264:15

**sound** 72:3 121:24
143:16 218:12

**sounded** 50:4 141:3

**sounding** 41:14

**sounds** 31:20 43:18
55:6 62:16 86:11,18,
22 108:21 129:4
139:14 151:25

**source** 4:13 5:22
87:24

**South** 2:7

**space** 24:8,23,24,25
25:1 27:8,10 196:21

**spacing** 70:6

**speak** 45:6 85:10
145:6 153:10 200:5
202:4 204:4 236:9
237:20 241:5,11

**speaking** 81:19
151:7

**specific** 48:24 51:22

**65:2 89:20 91:21**
101:20 104:17
111:18 119:14 130:8
135:20 150:17
155:23,25 160:9,10
180:18 182:5,23
190:6 214:15 224:1
249:23

**specifically** 51:6,22
60:11 90:5 107:7
135:13 154:8,21
161:11 201:13
226:23,24 230:15,17

**speculating** 32:21

**speculation** 58:18
61:8

**speculative** 19:8
67:16 77:4 82:4
110:13 111:22
124:17 174:10

**spelled** 25:7

**spend** 51:14 246:13

**spent** 36:21

**spirits** 212:20

**split** 212:8

**splits** 4:13 5:22
103:19

**spoke** 10:8 16:1,5,19
75:15 79:18 121:12
148:8 175:4 178:25
258:19 263:4,9

**spoken** 82:10,12
152:21 217:7 238:17

**spreadsheet** 4:13
80:15 102:12 206:2
209:10 224:22
226:10 227:12

**spreadsheets**
68:13

**Spurlock** 33:8

**square** 196:19

**staff** 177:22

**stage** 10:11 58:17

**stages** 57:17

**stakeholders** 37:8
52:4 89:24 142:5

**stamp** 100:1

**Stan** 6:23 8:14 62:7
95:17 99:25 100:8
123:22 251:14

**standard** 132:22

**standpoint** 161:25

**stands** 170:2 247:1

**Stanley** 2:11 246:1,3
252:23

**start** 35:5 48:4 111:2
134:22 200:18
229:11

**started** 18:6 28:19
35:10,15 36:1 38:13
40:3 43:20 44:13,21
45:17 48:18 49:22
50:16 57:22 73:1
78:1 89:3 140:22
220:11 249:15
260:20

**starting** 6:17 211:4

**starts** 135:5 207:5

**state** 20:13,18 30:13
37:9 57:12 77:15
81:18,21 142:9

**stated** 84:10 106:14
111:23 115:10
123:18 138:2 140:21
161:18 217:10
240:10 243:1

**statement** 233:18
234:4

**statements** 116:7
121:18 251:2

**states** 124:6 229:12
230:20

**status** 38:25 60:21
61:2 63:18 64:20
79:21

**statutes** 31:5

**stay** 59:25

**stayed** 27:24 60:1
143:23

**step** 55:16 84:25
112:9 142:17,19
143:4,7

**step-in** 178:6

**stepped** 112:4,7 122:25 229:12

**stepping** 142:7,17 144:2

**steps** 51:25 53:5 55:4,8 89:15 112:23 203:14

**Sterling** 2:14 3:4 5:9 60:6 169:12,14,23 203:6,8

**stick** 225:8

**Stokes** 13:7 121:6 178:11,22

**stopped** 32:18

**store** 23:9,12,15

**straight** 72:17

**strategy** 24:24 26:3 27:9 142:25 258:22

**stream** 176:18

**Street** 2:12 3:7 6:12

**strike** 21:12 35:5 40:15 138:24 198:16 199:23

**stroll** 102:3

**struggles** 176:12

**student** 23:3

**studies** 20:14,15 21:2

**study** 21:7,11,16

**stuff** 237:7

**style** 44:5,6

**subject** 4:2,5,7 5:9, 12,14,16,18 264:11 265:3

**submit** 94:10

**submittal** 99:24

**submitted** 94:13 95:10 97:12 240:8

**subpoena** 3:1 8:25 179:5,6

**subsequent** 16:1

18:7,11 39:14 91:8 163:17 174:11 187:12 220:5

**substance** 178:10

**substantive** 118:24 119:1

**suggested** 233:13

**suggesting** 201:19

**suggestion** 127:13

**suicidal** 139:25

**Suite** 2:8,13 3:7 6:12

**suited** 27:7

**summary** 256:4

**summer** 105:21 182:6

**Supplemental** 4:9 5:2,6

**Support** 4:9,10 5:1, 2,5,6

**suppose** 160:3

**supposed** 257:15

**surprise** 108:12,15 164:10

**surprised** 83:15

**suspect** 199:6,16, 22,23 200:7,17 219:20 220:12,16

**suspected** 218:23

**suspend** 237:3

**suspended** 75:1,2,3 76:7

**suspension** 96:17

**suspicion** 220:7,8

**suspicions** 221:4

**Swear** 8:6

**sworn** 8:8

---

**T**

**t-h-i-e-r-s** 187:15

**Tab** 186:3 189:20 202:2 209:22 216:10

**tackle** 77:21

**tail** 132:4

**tails** 202:6

**takes** 167:23

**taking** 76:3 89:15 142:11 144:23 261:9

**talk** 10:15,17 11:13 28:8 32:11 36:10 41:5,8 42:18,22 48:16 54:22 67:23 68:5,17 81:22 82:23 83:5 85:12 89:14 106:8 112:21 115:19 118:4,7 119:6 134:7 139:19 144:14 146:11 147:20 148:3 151:5,9 156:19 179:9 181:5 228:2 236:8 240:24 257:1,17,18 258:22,25 261:2

**talked** 8:16 10:8 15:18,22 16:12,16 21:1 45:23 53:14 79:7,14 82:7 85:14 88:20 109:21 111:9 112:22 142:7,12,23 146:12 173:16 175:9 218:5 228:7 236:21 258:19

**talking** 24:25 50:21 51:18 53:17 76:16 78:11 80:4 104:23 106:2 110:2 111:2, 12,14 113:1,7 127:16 130:19 131:12 134:24 140:22 144:23 156:18 173:18 175:11 224:7 232:2 240:24 252:20

**tax** 47:21

**team** 65:13 78:20 167:5 236:7 241:10 246:19 249:21

**technically** 264:24

**telephone** 175:10

**telling** 132:2 257:22 263:1

**tells** 29:16

**ten** 111:11 179:14

**ten-minute** 48:4

**tenant** 195:21 196:5, 9 235:8,9

**Tennessee** 2:8

**term** 135:10,21,22 155:1 159:11,13 160:9,10,12

**terminate** 261:15

**terminated** 27:19 261:23

**termination** 150:5, 14,19,23

**terms** 17:6 81:12 126:13 143:21 194:11 219:13 224:3

**terrific** 243:16

**testified** 8:9 65:18 157:24 159:13 170:12

**testify** 261:22

**testimony** 49:9,16 53:13 70:10 113:24 116:15 125:1 126:24 139:13 150:22 151:3 157:24 159:16 174:1, 23,25 176:7 240:20 243:5 252:10,14 256:12 257:25 261:14,19

**text** 187:12

**theft** 70:23 128:2 256:16

**thing** 9:9 11:21,23 12:3 15:6 23:18 37:17 53:1,2 79:1 110:20 111:25 112:23 127:2,8 138:2 183:6 235:1 237:2 238:16

**things** 11:8 48:5 59:21 77:1 81:4 87:9 91:9 94:3 97:15 99:22 108:13 115:14 126:4 139:1 145:18 146:4 147:16 156:1, 11 162:9 168:17 228:7 248:24 255:6,

21

**thinking** 12:10

**third-party** 100:6

**thought** 37:6 42:11 53:8,19 100:21 113:11 114:21 128:2 201:16 209:6 213:4

**thoughts** 139:25 179:13 186:24

**thread** 202:23 205:17 210:25 214:21 245:10

**threw** 160:5

**thrown** 237:21

**Thursday** 69:4,13, 14,18 71:4 72:6,18, 19 87:13 88:5,24

**TIAA-CREF** 24:16, 17 27:8

**ticket** 148:25

**till** 17:8

**Tim** 203:3

**time** 6:5,7 16:5 18:25 19:1 25:17 26:8 30:20 32:2,9,21,25 33:2 36:22 38:7,9 39:10,15 40:1,2 43:23 44:14 45:2 46:13 47:14,20 48:6, 9,24 50:11 51:14 55:19 63:4 65:19 74:14 75:6 76:9 77:25 78:9 82:6 86:23 87:3 88:14 89:3 91:4 96:10,23 97:2 107:19 109:1,8, 11 111:19 114:15 125:23 130:18,25 136:6 144:16,19 151:16 154:21 156:3 158:25 167:18 174:15 177:5 178:25 179:16,19 181:9,13, 16 183:13 185:11 186:16 189:3,10 190:6 192:24 193:9 198:21,24 202:24 205:12 214:16 217:11,22,25 219:19,

25 220:3,16,22 221:4 227:13 237:22 240:16 243:17,20 246:13 248:1,6 255:5 261:5 262:12,15 263:4,8 265:14,18, 23,25 266:6,22,25

**timeline** 14:25 17:7 22:20 71:20 83:1

**timely** 65:14

**times** 5:14 8:17 11:11 14:21 15:21,23 16:3,4 39:13 40:6,16 82:12 84:20 126:9 138:1 142:22 151:11 157:7,8 178:22,24 241:24

**timing** 141:16 206:5

**Timothy** 3:3,13 4:8 5:1 6:9 8:7

**tired** 15:9 217:10

**title** 35:9 42:3 249:17

**titled** 194:15 211:2

**today** 6:8 9:23 12:18 154:12,21 155:17,24 165:7 211:7 252:16 256:10 266:22

**Todd** 2:2 6:20 181:24

**told** 10:16 53:10 54:12 67:17 69:1,24 70:4 111:19 116:6 140:17 148:10 175:3 182:19 184:7,12 221:13 259:20

**Tompkins** 2:19 6:15

**tone** 238:13

**tonight** 188:12 189:2,11

**Tony** 33:8

**top** 32:5 103:18 193:4 209:2 212:8 230:21 234:7

**topic** 47:16 139:15 179:25 265:13

**total** 187:13

**totally** 62:11 158:14 253:20

**touch** 82:18 100:15 133:20

**touching** 110:15

**tough** 189:9

**tour** 61:10 63:6

**toured** 38:23

**tournament** 126:8

**town** 189:4 246:4

**trace** 235:9

**traced** 235:19 237:13

**track** 26:8 215:4 260:21

**tracked** 165:20

**traffic** 125:21

**training** 32:19,21

**tranches** 193:15

**transacted** 231:18

**transaction** 55:12 56:11 68:21 69:20 70:20 87:11,18 88:8 91:2,3,7 105:16 110:17,19 111:15 115:6 117:8 118:8,10 123:9 124:11 126:14 127:4 131:25 153:18 159:8 162:19,20,23 169:23,25 170:19 178:6 195:5,16,18 196:2,23 197:13 205:4 214:19 256:16 257:11 258:23 259:11,15 260:4 264:14,17,20,23,24 265:1,4

**transactions** 47:9 102:13 103:17 105:11 108:8 109:2 114:7 115:11 135:19 138:15 142:20 161:18 163:10 165:8 167:13 168:3,8,23 170:8 171:7,14 174:24,25 190:10 203:13 214:10

222:15 234:16 250:10 254:17 265:17,23

**transcript** 4:17 11:23 73:14,16,18 74:6 104:22 105:1 228:14 229:24 230:20 232:21

**transcription** 229:25

**transcripts** 137:4

**transfer** 16:18 17:2, 4 101:13,16 104:1,4

**transfers** 223:24

**transpired** 110:16 111:14

**transportation** 249:21

**travel** 52:3 63:2

**traveled** 14:18

**traveling** 64:3

**trigger** 203:15 216:2

**triggered** 203:12

**triggers** 205:4

**trip** 39:6,16 57:2 58:1,25 60:13,17,18 62:5,14,17,25 63:5, 18,24 64:2 125:10,15 149:11,15 156:22 183:17,20,24 184:3, 5,6,8,9,11,13,21

**trips** 62:6,17,19,21 63:20 64:6 66:20 125:25 185:3,5

**true** 18:19 90:13 124:15 138:5 156:4, 5,9 240:11,17 259:20

**true-up** 168:1,16,19, 20

**true-ups** 181:6

**trust** 37:19,20 38:6, 10 80:1,4,11,19 81:12 92:3 101:17 104:2,6 105:24,25 107:17 111:25 123:21 136:3,4,24

138:8 146:16,19
147:24 158:1,25
160:18 161:15
162:10 164:16 190:9,
23 191:9,13,25
192:17 194:15,22
201:20 208:1 225:20,
25 227:2,13,25
235:23 242:15,17
243:3,9 257:1

**trusted** 257:7

**trustee** 123:20

**Tuesday** 143:21

**turn** 87:7 133:10
165:6 170:11 232:22
234:6

**turned** 70:8 167:16,
17

**Turning** 214:20

**two-year** 168:22

**tying** 131:17,19

**type** 115:5 147:12
193:21 194:10 196:4

**types** 223:22 224:1
249:2

**typically** 195:14
197:7,8,15

**typo** 187:18,22 188:6

———

**U**

**U.S.** 25:13

**uh-huh** 12:2 13:15
19:4 29:2 71:24
76:15 81:3,5 93:8
97:17 111:3,5 113:13
126:15 127:23
133:19 183:18
191:24 221:15
223:21 231:3 235:24
238:7 253:8 254:11

**Ullery** 2:3 3:17 6:18
18:17 19:8 29:11
33:5 36:8 41:17 42:2,
24 43:7,14 44:23
46:22 49:15 50:9,23
51:4,9,20 53:7 54:6
55:23 56:14 57:14

58:18 60:9,24 61:8
64:10,21 65:20 67:16
72:12 75:7 76:4 77:4
78:5 81:6 82:4 83:7,
18 85:4 88:11,16
90:9 97:18 99:25
100:4 107:5 108:9,
14,24 110:13 111:22
113:3,23 116:14,25
117:10 120:11,16,21
121:10 122:9,15
123:2,22,24 124:17,
25 125:19 126:23
130:3,22 133:12
134:9 135:1,8,24
137:1 138:10,16,22
139:7,17 141:15
144:4 145:4,11 148:1
149:12,24 151:2,19
152:9 154:2,14,19
155:19 156:13
157:11,17 158:21
159:2,9,15 160:2,7,
14 162:2,11 164:2,17
166:11 167:10 168:9
169:13 171:10,16
172:4,13 173:6,14
174:5,10,20 175:24
176:20 177:14,24
178:18 180:5 181:2,
10,19,23 182:24
185:14 186:2,6,9
187:10,21 188:1,19,
25 189:16 190:16,20
194:12,25 196:3,11
197:10,25 198:15,17
199:1,15,21 200:6,13
201:24 202:2,5,8,11,
15 203:21 204:10,24
205:25 206:24 207:3
208:6,15 209:22
210:1,6,9 211:20,24,
25 212:7,12,19,22
213:1,5,12,14,18
214:2,14,20 215:13
216:10,14 217:18,21
218:2 219:3 220:2,6,
23 221:9 222:3,5,8,
16,22 223:10,12,16
224:6,9,16,21 225:2,
5 226:5,9,14 227:7,
11,15,23 230:18,23
232:7,22 233:17
234:25 235:14,18,23
243:7,13,22 244:12
245:4,7,14 247:2,8,

18 248:18 251:7
252:9 253:23 254:14,
25 255:12 256:5,11,
19 257:3,9,24
258:12,14 259:17,21,
25 260:8 261:6,18
262:2,20 264:18
266:4,24

**ultimately** 105:17

**uncertain** 180:25

**uncomfortable**
113:25 242:20,23

**undergrad** 20:14

**underlying** 264:16

**understand** 12:13,
14 16:20,25 20:3
27:6 29:17 35:4
36:12,23 39:21 40:11
41:22 44:11 45:1,4,5
48:13 52:22 53:23
58:5 62:10,11 64:15
65:12 68:11 70:14,
16,22 79:24 81:11
88:2,22 89:5,11
92:13 93:1,11 94:14
106:24 108:1 110:11
120:2 121:4,16 122:6
130:4 139:13 140:4
150:18,19 155:12
166:18,23 167:3
169:3 187:18 188:14,
21 189:12 190:7,8
194:20 199:1 208:18
212:23 213:5 214:8
217:14 218:3 233:7
234:17 235:3,10,19
243:23 255:13 256:3
257:22

**understandable**
256:2

**understanding**
13:17,19 17:7 36:13
37:7 55:22 70:18
72:8 76:6,9 92:17
110:14 143:8,9
145:17 147:18 156:2
158:18,24 161:23
162:7 163:22 164:7
166:3 167:21,22,25
169:17 170:7,18
172:15,21 173:2
175:2 201:1 215:11

216:22 219:11
221:24 229:5 233:18
234:23 235:17
248:22 253:1 260:13
261:23

**understood** 12:12
41:25 43:4 44:19
54:16 88:10 129:25
136:18 166:25
174:14 175:1 204:15
216:20 218:15 253:3

**unilaterally** 167:20

**United** 148:21

**University** 20:13,14,
16 21:2,3,5,6,8,16,
20,23 22:10

**unknown** 17:5

**Unlike** 11:13

**unsigned** 101:6
153:11

**untrue** 250:22

**unusual** 191:17
214:1,4

**update** 4:7 77:20
100:12

**updated** 65:7 207:20
208:16,24

**updates** 65:6 129:8
211:17 212:12

**upload** 224:17

**uploading** 225:7

**upset** 70:12,14,17,
19 88:19 140:25
141:4 221:16,17

———

**V**

**vacated** 85:1

**vacation** 201:3

**vague** 57:14 76:4
90:9 97:18 135:24
138:22 164:2 180:5

**variations** 114:14

**varied** 241:21

**variety** 46:5,6 78:6 142:5 183:13 194:6 197:3,5 205:6

**vary** 30:25

**Ventures** 2:9 7:5 152:17

**verify** 203:7

**version** 104:18 120:3,6,14 165:19 207:20 208:16 240:1,4

**versions** 165:17 180:15,17

**versus** 6:11 205:10

**verticals** 26:23

**viability** 130:17 147:7

**video** 3:2 11:22 37:24

**view** 52:4

**viewpoint** 52:14

**Villanova** 37:18,20 38:6,10 80:1,4,11,19 81:12 92:3 101:17 104:2,6 105:24,25 107:17 115:8,15,24 123:21 136:3,4,24 137:19 138:3,8 146:15,19 147:24 158:1,25 160:18 161:15 162:10,19,25 163:1,6,23 164:16 190:8,23 191:9,13,25 192:17 193:3,10 194:11,15,22 201:20 207:20,25 209:4 211:3 216:4 225:20,25 227:2,13,22,25 235:23 242:15,17 243:3,9 257:1,21

**violated** 145:23 199:24 200:9 219:17,21 220:17

**Virginia** 3:25 4:21 25:14 36:15,22 38:14,18,19,21 39:6,9 52:3 55:5 56:17,19 57:5 62:17

**visibility** 49:7 52:16 89:24

**visit** 38:16 55:5 150:4 151:16

**visited** 39:3 140:5,14 141:25

**voice** 5:19 241:23

**voluntarily** 27:22

**volunteer** 30:11 32:23

---

**W**

**wait** 102:3

**waited** 236:16

**waiting** 244:6

**waive** 222:1

**Wakefield** 107:4

**walk** 72:15

**walked** 61:13 116:11

**wanted** 36:19,22 38:16 52:3,21 58:4 63:5 65:11 80:6 82:18 117:23,24 118:3,7 119:5 129:15 143:5,23 172:1 208:23 219:4 221:7 236:12 258:2

**wanting** 259:7

**Washington** 2:4 87:22

**waste** 266:15

**watch** 11:8,21

**water** 15:10

**waterfall** 193:2,8,13

**Watson** 2:14,19 3:4 5:11,13,18,19,24 6:24,25 8:15 19:6 28:5 29:4,10 32:11 33:10 37:12 38:3,6 39:19 41:5 42:11,22 43:2,5,17 44:19 45:19 50:20 51:2,18 57:1 60:16 63:3,14 67:23 70:11 71:5,22

72:17 76:22 84:7,12 87:12 88:1,19 89:12,18 90:23 97:6 106:8,19,25 107:12,15 108:21 110:2,8 111:16 112:9,21 113:17 115:19 116:5 122:7 124:9,10 125:4,9 126:18 127:1,4,21 129:20 130:1,19 132:3,16 137:18 138:7 139:2 140:5 141:13 144:3 147:20 148:4,10 149:10 150:4 153:17,21 154:10,13 155:14,24 156:21 161:10 185:6 191:8 192:16 201:9 202:19 203:11,16 205:18 207:18,19 208:10 209:15 215:19 218:16,21,24 219:20 222:17 224:8 228:10 230:4,25 231:18,23 232:10,15 233:23 234:3 235:4,25 236:25 239:1,10 241:1,3 242:2 244:13,16 245:9,17 246:6,10 247:14,22 248:1,6,10 252:19 253:12,14 254:7,12,18,23 257:22 261:15,24

**Watson's** 75:23 151:17 175:11 183:4 188:11 222:23 238:10 244:20 246:16 255:17 256:1 257:19 258:11

**ways** 194:6

**WC** 207:25

**WDC** 2:14 3:3 6:11 42:1 186:7 202:13 207:1,21 210:2 212:4 216:12 225:15 227:1,12 244:2 248:25 253:18 254:23 255:17

**weapon** 31:13

**Web** 3:24 4:20 34:22 94:5,18

**website** 37:24

**wedding** 71:25 74:17 76:14,17,19,21,23 77:3 87:13 109:4 175:11

**Wednesday** 143:22

**week** 29:7 42:17,21 76:10 184:6 203:4,7 241:10

**weekend** 143:20

**weekly** 66:25 77:19,22 78:1,3,11,20

**weeks** 9:17,24 91:13 109:11 112:1 134:21 143:23 175:17 179:2

**west** 246:3

**whatsoever** 152:24

**whistleblower** 149:21

**White** 56:10 68:21 87:11,17 88:8 91:2,3,7 110:1,16,19 111:15 118:7,9,10 126:14 162:20,22 163:23 164:1,8,15 165:15 166:19,21 231:24 232:4 234:18,24 239:12 255:25 256:1,9,16 258:23 259:8,10,15 260:4

**whiz** 77:6

**wife** 122:23 249:12 250:1,9,13,17,21 252:3,6,15

**wife's** 138:18 140:20 250:25

**Will's** 153:23

**wire** 4:12,15 5:21 16:17 17:2,4,16 19:7 101:13 140:22 223:24

**Wisconsin** 20:15 21:2,5,8,17,23 23:10 24:1

**withdrawal** 136:20 158:1

*AB Litigation Services*

**witnesses** 65:17

**woman** 13:7 33:25

**wondering** 141:23
221:25

**word** 44:9 135:6,9,
14,17 159:6,23
169:23

**words** 12:1,2 41:13
126:20

**work** 22:3,24 23:14,
25 24:20 26:4 30:6
32:7,12 35:21 37:10
45:7 46:15 49:11
50:4,6,17 57:22,23
58:5 65:3,12 93:7
116:21 118:11 123:5
142:10 176:25 183:9
184:5 205:9 246:19
247:23 249:25
253:22

**worked** 10:7 17:7
21:25 23:1,9,21 24:1,
16 25:6,16,22 26:15
32:3,9 41:23 46:7,9
67:8,10 68:7,9 85:2
90:21 94:21 99:13
107:3,19 122:20
125:24 158:17 183:8
201:1 248:23 249:14
250:2,4,9 265:14

**working** 24:14 25:20
27:14,16 28:9,19
35:5,25 38:13 39:18,
19 40:1 43:19,22
48:18 49:7 50:4
100:3 107:25 133:25
149:18 176:12 181:1
258:8

**workplace** 26:3

**works** 14:4 31:23
150:11 249:12,20,21
252:15

**worksheet** 4:14
5:23 103:19

**world** 235:8

**worse** 12:8 35:19
94:3

**Wow** 103:13

**WPC** 126:17 127:4
230:25 231:6,14
232:3 239:11

**wrap** 262:8

**wrestled** 16:18

**wrestling** 169:5

**writing** 11:14

**written** 155:6 187:25

**wrong** 110:24 225:2

**wrote** 216:19 217:15

---

## Y

**year** 16:9 21:18,22
30:15 32:6,22 47:22
85:11 96:25 261:5

**years** 12:8 17:11
22:4,12 23:7,16 25:4,
11 26:6 27:25 31:21
37:13 44:13 107:1
122:20

**yesterday** 54:20
100:7,10

**Young** 46:20,23

---

## Z

**Zealand** 125:10
156:22 183:17

**Zoom** 2:3,7,12,18