# EXHIBIT 5

**Amazon.com, Inc., et al.**

**v.**

**WDC Holdings LLC**

**Transcript of**

# Danny Christopher Mulcahy

**Volume I**

**March 30, 2022**



(702) 476-4500 | www.oasisreporting.com | info@oasisreporting.com
400 South Seventh Street, Suite 400, Las Vegas, NV 89101

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., ) | |
| Plaintiff, ) | Case No. 1:20-CV-484-RDA-TCB |
| vs. ) | |
| WDC HOLDINGS, LLC dba NORTHSTAR COMMERCIAL PARTNERS, et al., ) | ***CONFIDENTIAL*** VIDEOTAPED DEPOSITION |
| Defendant. ) | OF |
| 800 HOYT LLC, ) | |
| Intervening Interpleader Plaintiff/Intervening Interpleader Counter-Defendant, ) | DANIEL CHRISTOPHER MULCAHY |
| vs. ) | Taken on Wednesday, March 30, 2022 |
| BRIAN WATSON, WDC HOLDINGS, LLC, and BW HOLDINGS, LLC, ) | By a Certified Court Reporter and Legal Videographer |
| Interpleader Defendants, ) | At 9:36 a.m. |
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., ) | At 100 North City Parkway, Suite 1600 |
| Interpleader Defendants/ Interpleader Counter-Plaintiffs. ) | Las Vegas, Nevada 89106 |

Reported by: Sarah Safier, CCR No. 808
Job No. 48397, Firm No. 061F

Case 1:20-cv-00484-RDA-TCB   Document 696-6   Filed 04/25/22   Page 4 of 97 PageID# 18850
CONFIDENTIAL
Danny Christopher Mulcahy                            Amazon.com, Inc., et al. v. WDC Holdings LLC

**2**

```
 1    APPEARANCES:
 2    For the Plaintiffs Amazon.com, Inc. and Amazon Data
      Services:
 3
          JACK H. HEYBURN, ESQ.
 4        Gibson, Dunn & Crutcher, LLP
          200 Park Avenue
 5        New York, New York 10166
 6        ALYSE ULLERY, ESQ.
          Gibson, Dunn & Crutcher, LLP
 7        1050 Connecticut Avenue NW
          Washington, D.C. 20036
 8
      For the Defendants WDC Holdings, LLC, Brian Watson,
 9    Sterling NCP FF, LLC, Manassas NCP FF, LLC, NSIPI
      Administrative Manager, and BW Holdings, LLC:
10
          SARA R. BODNER, ESQ.
11        AMANDA K. HOUSEAL, ESQ. (Present Via
          Videoconference)
12        Brownstein Hyatt Farber Schreck, LLP
          410 17th Street, Suite 2200
13        Denver, Colorado 80202
14    For the Defendants Carleton Nelson and Cheshire
      Ventures:
15
          ADAM R. SMART, ESQ.
16        (Present Via Videoconference)
          Burr & Forman, LLP
17        50 North Laura Street, Suite 1800
          Jacksonville, Florida 32202
18
      For the Deponent:
19
          KEVIN B. BEDELL, ESQ.
20        1309 Capulet Court
          McLean, Virginia 22102
21
      Also Present:
22
          BRIAN WATSON
23
          CARLETON NELSON
24        (Present Via Videoconference)
25        DAWN BECK, Videographer
```

**4**

```
 1              E X H I B I T S
                   (Continued)
 2
      NUMBER          DESCRIPTION              PAGE
 3
      DM-010 - Declaration of D. Matthew Doden   143
 4
      DM-011 - 1/27/20 E-Mail/Mulcahy to Omar,   161
 5             Attached NSIPI Data Center Venture-
               Structure Chart
 6
      DM-012 - 12/11/18 - 12/14/18 E-Mail Chain/ 162
 7             Watson, Fisher, Mulcahy, Re:  Two
               Items
 8
      DM-013 - 7/7/20 - 10/7/20 E-Mail Chain,    165
 9             Re:  Confidential Call
10    DM-014 - 1/16/20 E-Mail/Mulcahy to Omar,   187
               Doden, Re:  Vacancies
11
      DM-015 - Independent Contractor Agreement  216
12
      DM-016 - 12/11/18 - 12/12/18 E-Mail Chain, 222
13             Watson and Mulcahy, Re:  Two Items
14    DM-017 - 12/11/18 - 12/14/18 E-Mail Chain/ 227
               Watson and Mulcahy, Re:  Two Items
15
      DM-018 - 3/12/18 - 3/26/18 E-Mail Chain,   239
16             Re:  Fishin' In Florida
17    DM-019 - 2/14/19 - 2/15/19 E-Mail Chain,   240
               Re:  March 11th - 12th
18
19
20        QUESTION INSTRUCTED NOT TO ANSWER
21            Page          Line
22             40            10
23
24
25
```

**3**

```
 1           I N D E X
 2    WITNESS                              PAGE
 3    DANIEL CHRISTOPHER MULCAHY
 4    Examination by Ms. Bodner         6, 247, 257
      Examination by Mr. Smart            196, 256
 5    Examination by Mr. Heyburn          209
 6
 7           E X H I B I T S
 8    NUMBER          DESCRIPTION          PAGE
 9    DM-001 - 10/7/21 Letter and Subpoena/SEC to  41
               Mulcahy
10    DM-002 - 3/3/17 E-Mail/Watson to Others, Re:  53
               Welcome Danny and Yang
11
      DM-003 - 8/2/17 E-Mail Chain, Re:  New       58
12             Referral Agreement and Travel
               Schedule
13
      DM-004 - 3/5/17 E-Mail Chain,                69
14             Re:  Introduction
15    DM-005 - 12/28/17 - 12/29/17 E-Mail Chain/   76
               Watson to Mulcahy and Ramstetter,
16             Re:  Final Agreement, Attached
               Independent Contractor Agreement
17
      DM-006 - Verified Second Amended Complaint  104
18             (Older Version)
19    DM-006A- Verified Second Amended Complaint  183
               (Newer Version)
20
      DM-007 - 12/2/19 E-Mail/Mulcahy to Bezos    107
21
      DM-008 - 12/12/19 - 1/10/20 E-Mail Chain/   134
22             Mulcahy, Doden, Omar, Re:  Time
               To Speak
23
      DM-009 - 1/24/20 E-Mail Chain/Mulcahy, Doden 139
24             Omar, Re:  Confidential - Update?
               Attached Confidential Release
25             Agreement
```

**5**

```
 1            P R O C E E D I N G S
 2        THE VIDEOGRAPHER:  Good morning.  This
 3    begins the videotaped deposition of Danny Mulcahy.
 4    Today's date is March 30, 2022.  The time is
 5    9:36 a.m.
 6        We are located at 100 North City Parkway,
 7    Suite 1600, in Las Vegas, Nevada.
 8        This case is entitled Amazon.com, Inc., et
 9    al., versus WDC Holdings, LLC, doing business as
10    Northstar Commercial Partners, et al.  The case
11    number is 1:20-CV-484-RDA-TCB, in the United States
12    District Court for the Eastern District of Virginia,
13    Alexandria Division.
14        My name is Dawn Beck.  I am the
15    videographer.  The court reporter is Sarah Safier.
16    We represent Oasis Reporting Services.
17        Will counsel please state your appearances
18    for the record and whom you represent.
19        MS. BODNER:  Sara Bodner.  I represent Brian
20    Watson, WDC Holdings, and the Watson defendants in
21    this lawsuit.
22        My client, Brian Watson, is here as well;
23    and I believe my colleague, Amanda Houseal, is on
24    Zoom or will be joining shortly.
25        MR. SMART:  Adam Smart for the law firm of
```

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

**6**

1  Burr & Forman on behalf of Carl Nelson and Cheshire
2  Ventures.  And my client, Carl Nelson, is on the
3  Zoom.
4      MR. HEYBURN:  Jack Heyburn and Alyse Ullery
5  with Gibson, Dunn & Crutcher.  We represent the
6  plaintiff, Amazon.
7      MR. BEDELL:  Kevin Bedell.  I represent the
8  witness.
9      THE VIDEOGRAPHER:  Will the court reporter
10  please administer the oath.
11          DANIEL CHRISTOPHER MULCAHY
12      having been first duly sworn, was
13      examined and testified as follows:
14              EXAMINATION
15  BY MS. BODNER:
16    Q   Hi, Mr. Mulcahy.  As I -- as you just heard
17  me say, my name is Sara Bodner.  I'm from the law
18  firm of Brownstein Hyatt and I represent Brian
19  Watson, WDC Holdings, and the Watson defendants in
20  this lawsuit.
21      Have you ever had your deposition taken
22  before?
23    A   I have.
24    Q   Even if you have, I'm just going to just
25  refresh you on some ground rules for today's

---

**7**

1  deposition.
2      First and foremost, you are required to tell
3  the truth.
4      Do you understand that?
5    A   I do.
6    Q   The court reporter is here transcribing this
7  deposition.  In order for her to do her job, we can't
8  talk over each other.
9      Do you understand that?
10    A   I do.
11    Q   That's even more important today because we
12  have some colleagues appearing via Zoom.
13      Do you understand that?
14    A   I do.
15    Q   For the same reason, it's important that you
16  respond with verbal answers rather than a head nod or
17  mumbling.
18      Can you do that?
19    A   I can.
20    Q   I will definitely at some point ask a
21  question that doesn't make sense; so I'd appreciate
22  it if you'd just ask me for clarification.
23      Are you able to do that?
24    A   I can.
25    Q   We'll take breaks periodically, probably

---

**8**

1  every hour.  If you need one at a different time,
2  just let me know and if there's a question pending,
3  I'll just ask that you answer that question.
4    A   Okay.
5    Q   Your attorney or the attorneys here
6  representing Amazon may make some objections to my
7  questions; that's pretty typical, but even if they
8  do, I'm still entitled to an answer unless your
9  attorney specifically instructs you not to answer.
10      Do you understand that?
11    A   I do.
12    Q   Is there anything about your physical,
13  mental, or emotional health today that would in any
14  way interfere with your ability to give accurate and
15  honest testimony?
16    A   No.
17    Q   Are you currently on any medications?
18    A   No.
19    Q   Have you consumed any drugs or alcohol
20  within the last 24 hours?
21    A   No.
22    Q   Is there anything at all that might, in your
23  opinion, prevent you from testifying fully and
24  truthfully today?
25    A   No.

---

**9**

1    Q   Can you please state your full legal name
2  and spell it for the record.
3    A   Daniel Christopher Mulcahy.  The entire name
4  spelled?
5    Q   Yes, please.
6    A   D-A-N-I-E-L, C-H-R-I-S-T-O-P-H-E-R,
7  M-U-L-C-A-H-Y.
8    Q   What is your birthdate?
9    A   12/22/70.
10    Q   What is your current address?
11    A   11874 Albissola Avenue, Las Vegas, Nevada
12  8913 -- 89138.
13    Q   How long have you lived there?
14    A   Two and a half years.
15    Q   Is it a house or an apartment?
16    A   House.
17    Q   Do you own that house?
18    A   I do.
19    Q   When did you purchase it?
20    A   2019.
21    Q   Do you own any other residences?
22    A   No.
23    Q   Do you own a residence located at 5212
24  Spanish Heights Drive?
25    A   No.

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

10

1    Q    Are you aware of an entity called Dacia,
2  LLC?
3    A    Dacia, LLC?
4    Q    Dacia, LLC.
5    A    I don't think I have -- I don't own Dacia,
6  LLC.  I have a lot of Dacias, so I don't think I own
7  that one, though.
8    Q    Is Dacia the correct way to pronounce it?
9    A    That's the way I say it.  Other people say
10  Dossia or Daycia.
11    Q    Dacia.  What does Dacia mean, if anything?
12    A    It's some Roman or Latin term for nomad.
13    Q    Okay.  Where did you go to high school?
14    A    I went to -- I graduated from Zweibrücken
15  American High School.
16    Q    Where is that located?
17    A    Zweibrücken, Germany.
18    Q    Did you grow up in Germany?
19    A    I spent a couple years there.
20    Q    Which years did you spend there?
21    A    1986 through 1990.  1978 through 1981.
22    Q    Did you go to college?
23    A    UNLV.
24    Q    Did you graduate?
25    A    I did.

11

1    Q    And for the record, is UNLV University of
2  Nevada, Las Vegas?
3    A    It is.
4    Q    What year did you graduate?
5    A    '97.
6    Q    What type of degree did you graduate with?
7    A    Bachelor's in psychology.
8    Q    Do you currently hold any licenses?
9    A    I have licenses that are inactive,
10  securities licenses that are inactive.
11    Q    What securities licenses?
12    A    7, 66, 24 and -- and 7 [sic].
13    Q    And all three of those licenses
14  are currently --
15    A    Four.
16    Q    Sorry.  All four of those licenses are
17  currently inactive?
18    A    Correct.
19    Q    At what time were those licenses active?
20    A    Up until 2000 and -- I don't remember.
21  Recently.  They can only be inactive for two years
22  and then they go away.  So up until two years ago.
23    Q    So they were active up until end of 2020,
24  roughly?
25    A    They were inactive -- they were active, they

12

1  were inactive, they were active and now they're
2  inactive again.
3    Q    Is there any reason that you let them go
4  active and inactive?
5    A    I just don't need them.
6    Q    You don't use them in your current line of
7  work?
8    A    No.
9    Q    What was your first job after graduating
10  college?
11    A    I was probably still working at the golf
12  course when I graduated college.
13    Q    What golf course was that?
14    A    Angel Park Golf Club.
15    Q    Where is that?
16    A    Here in Las Vegas.
17    Q    How long did you work there?
18    A    Couple years.
19    Q    Do you know until when?
20    A    Probably somewhere around '97, '98.
21    Q    Did you hold any other employment during
22  that time?
23    A    No.
24    Q    What did you do at the golf course?
25    A    Guest services.

13

1    Q    What did you do after working at the golf
2  course?
3    A    I've done a lot of things since then.
4    Q    I understand, but I do have to walk through
5  your history of employment.
6        MR. BEDELL:  Objection.  Vague.
7        Ask a better question.
8  BY MS. BODNER:
9    Q    What did you do for work after working at
10  the golf course?
11        MR. BEDELL:  You mean immediately after?
12        MS. BODNER:  I do mean immediately after.
13        MR. BEDELL:  Why don't you answer that
14  question.
15        THE WITNESS:  Immediately after that, I went
16  for the Venator Group and managed Lady and Kids Foot
17  Locker stores.
18  BY MS. BODNER:
19    Q    Was that here in Las Vegas?
20    A    It started in Las Vegas, New Mexico, and
21  California.
22    Q    Okay.  And how long did you work for the
23  Venator Group?
24    A    Two or three years.
25    Q    Okay.  Do you know what year your employment

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

14

1  with the Venator Group concluded?
2      A   Probably around 2000.
3      Q   What was your title?
4      A   Manager.
5      Q   What did you do immediately after working
6  for the Venator Group?
7      A   I was a substitute teacher in Reno, Nevada.
8      Q   Okay.  One second.  I'm just admitting.
9          How long were you a substitute teacher in
10  Reno, Nevada?
11     A   Three months, I guess.
12         MR. BEDELL:  You said you were just
13  admitting.  Does that mean somebody else has joined
14  us?
15         MS. BODNER:  Apologies.  I just admitted
16  opposing counsel to the exhibit share platform so
17  that she can view the exhibits.
18         MR. BEDELL:  That's fine.  Just keeping
19  track.
20         MS. BODNER:  Appreciate it.
21  BY MS. BODNER:
22     Q   What did you do after working as a
23  substitute teacher for three months for work?
24     A   I went and sold corporate apparel here in
25  Las Vegas.

---

15

1      Q   Was that for a specific company?
2      A   I think it was called Campus Club.
3      Q   Okay.  What years did you work for Campus
4  Club?
5      A   Just maybe a year.  I don't remember
6  exactly.
7      Q   Okay.  Did there come a certain time in your
8  career when you transitioned to working in the
9  commercial real estate industry?
10     A   Around 2001.
11     Q   So was that immediately after your
12  employment with Campus?
13     A   Probably.
14     Q   Okay.  What led you to make that transition?
15     A   The opportunity presented itself.
16     Q   What was that opportunity?
17     A   I was able to be hired on as a -- to help
18  somebody build some commercial real estate, so I took
19  it.
20         Oh, no, I forgot.  I had another job in
21  there.  I did staffing.  I did some staffing at a
22  company called TEKsystems in between Campus Club and
23  going into commercial real estate.
24     Q   Was that job in Las Vegas?
25     A   It was.

---

16

1      Q   So to be clear, you were doing that staffing
2  job immediately before you transitioned to commercial
3  real estate work?
4      A   Correct.
5      Q   Okay.  What was the name of the company?
6      A   TEKsystems.
7      Q   TEKsystems.  And when you transitioned to
8  commercial real estate work, did you work for a
9  company?
10     A   I did.
11     Q   What was the name of that company?
12     A   At the time it was called Insight Realty
13  Associates.
14     Q   Where was that company located?
15     A   Las Vegas.
16     Q   Las Vegas.  What was your title?
17     A   Agent/broker.
18     Q   How long did you work for that company?
19     A   Four years.
20     Q   Four years.  What were your
21  responsibilities?
22     A   Sell -- buying, selling, and leasing
23  commercial real estate.
24     Q   Where was that commercial real estate
25  located?

---

17

1      A   Las Vegas.
2      Q   Did you eventually leave that company?
3      A   I did.
4      Q   What year was that?
5      A   2005, I think.  2004, 2005, in that area.
6      Q   What did you do next for work?
7      A   I just was an independent -- self-employed
8  as a commercial real estate broker.
9          MR. SMART:  Amanda -- just hold on one
10  second.  I just want counsel and everyone to know,
11  Amanda Houseal has joined as you indicated she was
12  going to from your firm.
13         MS. BODNER:  Amanda Houseal has just joined
14  as I indicated she was.
15         MS. HOUSEAL:  Thanks, guys.
16         MS. BODNER:  The joys of Zoom.
17  BY MS. BODNER:
18     Q   Did you operate under your own name when you
19  were an independent broker?
20     A   I created a company called Terraspec and
21  then I just changed the name to DM Hollo.
22     Q   DM Hollo?
23     A   H-O-L-L-O.
24     Q   How long did you work as an independent
25  broker under the name Terraspec and DM Hollo?

---

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

18

1    A   Well, Terraspec was just short-lived, maybe
2  a year.  DM Hollo was a better name and probably --
3  that probably ceased operation functionally in 2009.
4  And then technically it probably, you know, as far as
5  like -- you know, I didn't do anything after 2009 or
6  so.
7    Q   Was DM Hollo involved in commercial real
8  estate opportunities?
9    A   It was.
10   Q   Where were those opportunities located?
11   A   Here in Las Vegas.
12   Q   Did you do any work outside of Las Vegas?
13   A   Arizona.
14   Q   Anywhere else?
15   A   Colorado.
16       And you testified that DM Hollo ceased
17 operating in 2009; is that correct?
18   A   Yeah, plus or minus.  During the financial
19 crisis.
20   Q   What did you do for employment after that
21 time?
22   A   I think it was 2010 or '11 -- probably 2010
23 or '11, in that area, I went and joined Merrill Lynch
24 as a financial advisor.
25   Q   Did you get hired by one specific office?

19

1    A   San Diego.
2    Q   Did you move to San Diego?
3    A   I did.
4    Q   How long did you work for Merrill Lynch?
5    A   A year maybe.
6    Q   So was that until 2012?
7    A   Somewhere around there, maybe.  Yeah.
8    Q   What were your responsib- --
9    A   Just financial advisor.
10   Q   Did you do anything related to commercial
11 real estate?
12   A   No.
13   Q   Why did you leave that job?
14   A   Didn't like being a financial advisor.
15   Q   Did you have any prior training as a
16 financial advisor?
17   A   I got trained at Merrill Lynch.
18   Q   What did you do for employment after leaving
19 your job at Merrill Lynch?
20   A   I joined a brokerage in Chicago called Rain
21 Point Securities -- or Rainmaker Securities doing
22 venture capital, working in venture capital.
23   Q   Did you move to Chicago?
24   A   I did.
25   Q   How long did you hold that job?

20

1    A   I don't know.  Maybe a year.
2    Q   Did you have any prior experience working in
3  venture capital?
4    A   No.
5    Q   What were your responsibilities in that job?
6    A   Assist in sourcing and underwriting small
7  companies and raising equity.
8    Q   Was that the first time in your career that
9  you were involved in raising equity?
10   A   No.
11   Q   In what other jobs had you raised equity?
12   A   When I was in DM Hollo, I raised equity.
13   Q   Do you recall how much equity you raised
14 when you were operating DM Hollo?
15   A   I do not.
16   Q   Do you recall how much equity you raised for
17 the venture -- venture capital firm?
18   A   I don't.
19   Q   Why did you leave that job?
20   A   I joined Zacks Investment Research to help
21 them with various business ideas that the owner of
22 that company had.
23   Q   Where is that company located?
24   A   Chicago.
25   Q   Was there line of work related to commercial

21

1  real estate?
2    A   No.
3    Q   What was your title at Zacks Investment
4  Research?
5    A   I guess manager.
6    Q   How long did you work there?
7    A   Probably, I guess, four years maybe.  Three
8  years.  Somewhere around there.
9    Q   And you were in Chicago at this time; is
10 that correct?
11   A   I was.
12   Q   And did you raise any equity for Zacks
13 Investment Research?
14   A   I raised -- I created some equity-raising
15 platforms wherein we raised money for other people's
16 deals.
17   Q   Do you recall how much money you raised in
18 total?
19   A   I do not.
20   Q   Rough estimate?
21   A   I don't know, a million bucks.
22       MS. BODNER:  Adam, you are still able to
23 hear us, right?  Okay.
24 BY MS. BODNER:
25   Q   What did you do after Zacks Investment

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

22

1  Research?
2      A   I was independent but hung my license at
3  TriPoint Global Equities in New York, but I still
4  lived in Chicago.
5      Q   What does it mean to hang your license?
6      A   You just operate as an independent person
7  but you still have to hang your license under a
8  brokerage.
9      Q   What sort of work were you doing while you
10 were --
11     A   Raising equity.  Sourcing deals and raising
12 equity.
13     Q   What were you raising equity for?
14     A   I only raised equity for one deal at
15 TriPoint Global.  That was a senior housing deal.
16     Q   Did your work relate to commercial real
17 estate at this time?
18     A   Other than just raising the money for that
19 deal, but I didn't have any role in sort of a -- you
20 know, it was somebody else's deal.  I just raised the
21 money for it.
22     Q   Was the TriPoint deal located in Chicago?
23     A   No.  I don't even remember where that place
24 was at, actually.
25     Q   What did you do for employment after working

23

1  independently?
2      A   I joined WDC Holdings.
3      Q   Do you know what year that was?
4      A   March to June of 2017, I believe.
5      Q   I'm going to return to that, but I want to
6  jump ahead for now.
7      A   Go ahead.
8      Q   What do you do for work now?
9      A   I own a company called Dacia Resort Group.
10     Q   What is your position with Dacia Resort
11 Group?
12     A   I own it.
13     Q   Did you found it?
14     A   I did.
15     Q   When did you found it?
16     A   2000- -- well, I incorporated in 2018, but
17 it didn't do anything until 2019.
18         (Off-the-record discussion.)
19         THE VIDEOGRAPHER:  We are going off record
20 at 9:55 a.m.
21         (Pause in proceedings.)
22         THE VIDEOGRAPHER:  We are back on record at
23 9:57 a.m.
24 BY MS. BODNER:
25     Q   Why did you incorporate Dacia Resort Group

24

1  in 2018?
2      A   I knew I needed to start my own company.
3      Q   Why did you know you needed to start your
4  own company?
5      A   Because I wanted to.
6      Q   Why did you want to?
7      A   Because I wanted to work for myself.
8      Q   Had you ever started your own company
9  before?
10     A   Yes, as I mentioned already.
11     Q   Was that the DC --
12     A   DM Hollo --
13     Q   DM Hollo?
14     A   -- and Terraspec, yes.
15     Q   Okay.  When did Dacia Resort Group start
16 operating?
17     A   2000- -- April, May of 2019.
18     Q   Did anyone found Dacia Resort Group with
19 you?
20     A   My wife.
21     Q   What's your wife's name?
22     A   Anita Mulcahy.
23     Q   Did anyone else found Dacia Resort Group
24 with you, other than your wife?
25     A   No.

25

1      Q   Does Dacia Resort Group have a physical
2  office location?
3      A   No.
4      Q   Do you operate it out of your personal
5  residence?
6      A   I do.
7      Q   What is that address again?
8      A   11874 Albissola Avenue, Las Vegas, Nevada
9  89138.
10     Q   What sort of work does Dacia Resort Group
11 do?
12     A   We own and operate RV parks.
13     Q   How many RV parks do you own and operate?
14     A   Eight.
15     Q   Where are they located?
16     A   Across the country.
17     Q   Can you name the states?
18     A   Oregon, Missouri, Oklahoma, Texas, Florida.
19     Q   How many employees work for Dacia Resort
20 Group?
21     A   Three.  Other than myself.
22     Q   What are the names of those three employees?
23     A   Karen Cottom, Scott Cleveland, and Will
24 Camenson.
25     Q   Does your wife also work for Dacia Resort

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

26

1  Group?
2      A    Not in an official capacity.
3      Q    Do any other individuals work for Dacia
4  Resort Group, not in an official capacity?
5      A    No.
6      Q    How do you identify the RV park
7  opportunities?
8      A    How do I identify them?
9      Q    (Counsel nods head.)
10     A    I look online and call places and I shop for
11  them.
12     Q    Do you carry out that work yourself?
13     A    I do.
14     Q    Do you raise capital?
15     A    I do.
16     Q    How do you raise the capital?
17     A    I ask investors if they want to participate
18  in my opportunities.
19     Q    How do you identify those potential
20  investors?
21     A    By living an active life and meeting people
22  who are interested in doing that type of stuff.
23     Q    Did you already have capital committed to
24  Dacia Resort Group when you founded it?
25     A    No.

---

27

1      Q    Did you self-fund it in the beginning?
2      A    I did.
3      Q    What is Will Camenson's title?
4      A    Asset manager.
5      Q    Mr. Camenson used to work at Northstar,
6  correct?
7      A    He did.
8      Q    Have any Northstar employees worked for
9  Dacia Resort Group, other than Mr. Camenson, at any
10  time?
11     A    No.
12     Q    Have you raised money from any former
13  Northstar employees?
14     A    No.
15     Q    Have you raised money from any former
16  Northstar investors?
17     A    Identify what a Northstar investor is.
18     Q    Have you raised money from anyone that
19  formerly invested equity with Northstar?
20     A    Yes.
21     Q    Who?
22     A    I couldn't tell you offhand.
23     Q    You don't -- you don't know the names of any
24  investors?
25     A    I know some of them.

---

28

1          MR. BEDELL:  Objection.
2  BY MS. BODNER:
3      Q    Can you please tell me the names of the
4  investors that you know?
5          MR. BEDELL:  Investors that were at
6  Northstar and are now with Dacia --
7          MS. BODNER:  Correct.
8          MR. BEDELL:  -- is that the question?
9          MS. BODNER:  That is the question.
10         THE WITNESS:  Brian Cleveland, Dan Grail,
11  Bryce Kelly, Michael Warner -- and I'm sure there's a
12  few other ones, but for the most part, that would --
13  I'd say -- I mean, the three that I mentioned are per
14  se -- had invested with Brian Watson prior to my
15  meeting them, so -- but there's some other ones in
16  there.
17  BY MS. BODNER:
18     Q    Do you keep track of the investors in Dacia
19  Resort Group?
20     A    I do.
21     Q    Do you maintain some sort of spreadsheet?
22     A    It's not investors in Dacia Resort Group.
23     Q    What entity have those individuals that you
24  just identified --
25     A    They invest in individual investment

---

29

1  opportunities that each have their own companies unto
2  themselves.  So there's no investors in Dacia Resort
3  Group -- there's no investors other than myself in
4  Dacia Resort Group.
5          Each individual RV park has its own group of
6  investors.
7      Q    So the individual investors formerly
8  associated with Northstar have invested in individual
9  RV parks owned and operated by Dacia Resort Group?
10     A    Well, they're owned by themselves and the
11  investment is managed by Dacia.  The property is
12  managed and the investments managed by Dacia Resort
13  Group.
14     Q    So these individual investors own the RV
15  parks and Dacia Resort Group operates --
16     A    Correct.
17     Q    -- and manages the RV parks?
18     A    Correct.
19     Q    Have you founded any other companies since
20  leaving Northstar?
21     A    Be more specific.  So I don't have any other
22  operating companies other than Dacia Resort Group.
23     Q    Did you at one time found a company called
24  Dacia Capital Management?
25     A    That's underneath Dacia Resort Group.

---

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

30

1    Q   Can you explain to me the operating
2  structure of Dacia Resort Group and what companies
3  are underneath it?
4    A   Dacia Resort Group is the property manager.
5  Dacia Capital is sort of the investment manager and
6  they all -- you know, the umbrella organization is
7  Dacia Resort Group and actually technically it's
8  Dacia Hospitality with a d/b/a as Dacia Resort Group.
9    Q   So Dacia Hospitality is the umbrella
10 organization and then there's Dacia Resort Group
11 which operates the RV park?
12   A   Yeah, Dacia Resort Group is a d/b/a for
13 Dacia Hospitality.
14   Q   And then Dacia Capital Management is the
15 investment manager for Dacia Resort Group?
16   A   Correct.
17   Q   Are there any other entities under the
18 umbrella of Dacia Hospitality?
19   A   No.
20   Q   Do you currently operate --
21       MR. BEDELL:  Let's go back a question.  When
22 you say "any other entities under the umbrella of
23 Dacia Hospitality" -- I think that's what you said --
24 where are you counting the individual RV park
25 entities?

31

1        MS. BODNER:  My understanding, and you
2  can --
3        MR. BEDELL:  I just want to make sure we're
4  on the same page.
5        MS. BODNER:  The RV parks are operated by
6  Dacia Resort Group.
7        THE WITNESS:  Correct.
8        MS. BODNER:  They're assets --
9        THE WITNESS:  They're not owned, they're not
10 assets --
11       MS. BODNER:  They're not assets.
12       THE WITNESS:  -- of Dacia Capital --
13       MS. BODNER:  Okay.
14       THE WITNESS:  -- or Dacia Resort Group, no.
15       MR. BEDELL:  I'm just trying to be clear.
16 When you say owning different entities --
17       MS. BODNER:  Mm-hm.
18       MR. BEDELL:  -- that we're not --
19       MS. BODNER:  I appreciate that.
20       MR. BEDELL:  -- that we're being accurate
21 and not creating some tension that's not really
22 there.
23 BY MS. BODNER:
24   Q   Do you have any ownership interest in
25 individual RV parks?

32

1    A   I have my ownership interest in every RV
2  park, yes.
3    Q   Does that mean that you've invested your own
4  money in each of the RV parks?
5    A   It does.
6    Q   Do you know how much money you've invested
7  in those RV parks in total?
8    A   I do not.
9    Q   Have you ever founded any other entities
10 with the name Dacia in it?
11   A   I have incorporated entities with the Dacia
12 name into it.
13   Q   What entities have you incorporated with the
14 name Dacia?
15   A   Well, each RV park has Dacia in the name in
16 it.  Dacia RV Adventure Fund 1, Dacia RV Funds, you
17 know, 2, 3, 4, 5.  I think those are the only ones
18 that I've done.
19       You know, I have eight Dacia entities that
20 are RV parks and then I have two Dacia entities,
21 which is Dacia Capital Management and Dacia
22 Hospitality, as we've discussed.
23   Q   Do you have an estimate of how much money
24 you've invested personally in the RV parks?
25       MR. BEDELL:  Objection.  Asked and answered.

33

1  Try it again.
2        THE WITNESS:  What's the question?
3  BY MS. BODNER:
4    Q   Do you have an estimate as to how much money
5  you've personally invested in the RV parks?
6    A   No, I don't.  No, I don't have an estimate.
7    Q   Is it more than $1 million?
8    A   No.
9    Q   It's less than $1 million?
10   A   Yes.
11   Q   Do you have an estimate as to how much money
12 you invested in Dacia Resort Group when you founded
13 it?
14   A   50 grand.
15   Q   Can you estimate how much capital you've
16 raised overall for the RV parks?
17   A   10 million.
18   Q   Do you know if it was a conflict of interest
19 to raise money from former Northstar investors?
20       MR. HEYBURN:  Objection.  Calls for a legal
21 conclusion.
22       MR. BEDELL:  Same.
23       THE WITNESS:  No, it was not.
24 BY MS. BODNER:
25   Q   You testified that each of the RV parks has

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

34

1   the name Dacia in it, correct?
2       A   I did.
3       Q   Other than those RV parks, have you
4   incorporated any other entities with the term "Dacia"
5   in them?
6       A   Not that I can recall.
7       Q   Did you ever found -- strike that.
8           Did you ever incorporate an entity named
9   Dacia, LLC?
10      A   I don't believe so.
11      Q   Do you know who incorporated that entity?
12      A   Dacia is a large car company owned by
13  Renault now.  So there's actually a number of Dacias,
14  unfortunately.  But the answer is no.
15      Q   Are you affiliated with those car companies
16  in any way?
17      A   No.
18      Q   Are you affiliated with Dacia, LLC in any
19  way, to the best of your knowledge?
20      A   I do not think so.
21      Q   Did you found a company called
22  IIPDIRECT.com?
23      A   I didn't found it.  It was a partnership.
24  It was actually just -- actually, no, the answer is
25  no.

35

1       Q   Have you ever worked for a company called
2   IIPDIRECT.com?
3       A   I founded -- I don't know how to answer that
4   question.
5       Q   Have you heard of the entity IIPDIRECT.com?
6       A   Yes.  That was -- yes, I have heard.
7       Q   How have you heard of it?
8       A   Me and a former business partner were going
9   to create it together and we never -- actually never
10  ended up doing it.  We created the website and then
11  didn't do anything with it.  We just -- we parted
12  ways before we could do anything with it.
13      Q   Who was the partner you just referenced?
14      A   James Zeiter.
15          MR. BEDELL:  Spell the last name for her,
16  please.
17          THE WITNESS:  Z-E-I-T-E-R.
18  BY MS. BODNER:
19      Q   Are you aware that the website is still
20  active?
21      A   I am.
22      Q   Has IIPDIRECT.com ever conducted any
23  business?
24      A   Not with me associated to it.
25      Q   Are you associated with it in any way?

36

1       A   No.
2       Q   Are you aware that your name is still on the
3   website?
4       A   I am.
5       Q   So you've never done any work for
6   IIPDIRECT.com?
7       A   No.
8       Q   Did any former Northstar employees work for
9   IIPDIRECT.com?
10      A   No.
11      Q   Have you ever been arrested?
12      A   Yes.
13      Q   When?
14      A   2007.
15      Q   Why were you arrested?
16      A   Actually, I would like to confer --
17          MR. BEDELL:  Yeah, well, we will talk about
18  that one for a second.  Let's take a break.
19          MS. BODNER:  Can we go off the record.
20          THE VIDEOGRAPHER:  We are going off the
21  record at 10:11 a.m.
22          (Thereupon, a brief recess was taken.)
23          THE VIDEOGRAPHER:  We are back on record at
24  10:13 a.m.
25          ///

37

1   BY MS. BODNER:
2       Q   Mr. Mulcahy, why were you arrested in 2007?
3           MR. BEDELL:  And I'm going to generally
4   object to these questions because, as a general
5   proposition, arrests are irrelevant in a civil
6   proceeding.
7           We don't need to brief it now and I don't
8   want to make the objection too long.  Obviously you
9   can ask some of these questions, but we're not going
10  to go too far into this.
11          Go ahead.
12          THE WITNESS:  I haven't been convicted of
13  anything.
14  BY MS. BODNER:
15      Q   Understood.  Have you been arrested, though?
16      A   Yes.
17      Q   Why were you arrested in 2007?
18      A   DUI.  .089, by the way.
19          MR. SMART:  Are we back on the record?
20  Because I don't have any volume, if we are.
21          MS. BODNER:  Yes.  Sorry, Adam.  Do you want
22  the court reporter to read that back to you?
23          MR. SMART:  Why don't -- what was it about?
24  Was it more about Dacia?
25          MS. BODNER:  No, it was -- I'll just have

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

38

1  the court reporter read it back.
2      MR. SMART:  Sorry.
3      (Thereupon, from the record above,
4       the reporter read, to wit:
5      "Q  Mr. Mulcahy, why were you
6      arrested in 2007?
7      MR. BEDELL:  And I'm going to
8      generally object to these questions
9      because, as a general proposition,
10     arrests are irrelevant in a civil
11     proceeding.
12      We don't need to brief it now
13     and I don't want to make the
14     objection too long.  Obviously you
15     can ask some of these questions, but
16     we're not going to go too far into
17     this.
18      Go ahead.
19     THE WITNESS:  I haven't been convicted
20     of anything.
21     BY MS. BODNER:
22     Q  Understood.  Have you been arrested,
23     though?
24     A  Yes.
25     Q  Why were you arrested in 2007?

---

39

1      A  DUI.  .089, by the way.")
2  BY MS. BODNER:
3      Q   Have you been arrested on any other
4  occasions?
5      A   No.
6      Q   Have you ever been convicted of a crime?
7      A   No.
8      Q   Have you ever been sued before by an
9  individual or entity?
10     A   No.
11     Q   Have you ever filed a lawsuit against anyone
12  before?
13     A   No.
14     Q   Have you ever been a witness to a lawsuit
15  other than the one we're here about?
16     A   No.
17     Q   Have you ever filed a whistleblower
18  complaint?
19     A   No.
20     Q   Have you ever faced any sort of disciplinary
21  action with respect to your securities licenses?
22     A   No.
23     Q   Do you know if you've ever been in violation
24  of any of your securities licenses?
25     A   No.

---

40

1      MR. BEDELL:  Could we do that -- well, never
2  mind.
3  BY MS. BODNER:
4      Q   And you testified that you have had your
5  deposition taken before, correct?
6      A  I have.
7      Q   How many times have you had your deposition
8  taken?
9      A  Once.
10     Q   When was that?
11     MR. BEDELL:  I'm going to object to this and
12  instruct him not to answer because -- actually, I
13  will tell you a short version.  Well, it was -- he
14  got deposed by a government agency, that we had to
15  sign a whole bunch of confidentiality stuff.
16     That's my objection on this.
17     MS. BODNER:  Is that a relevant --
18     MR. BEDELL:  I'm not going to have him
19  violate it by giving you an answer in this case right
20  now.
21     MS. BODNER:  So you're instructing the
22  witness not to answer in what case he was previously
23  deposed in?
24     MR. BEDELL:  Yes.  It was not a case.
25     MS. BODNER:  Can you identify the government

---

41

1  agency that was involved with respect to the
2  deposition?
3      MR. BEDELL:  Securities and Exchange
4  Commission.
5  BY MS. BODNER:
6      Q   Are you aware that you produced a letter
7  from the SEC about that deposition?
8      A  I've never seen a letter from it, no.
9      Q   I will introduce that now.
10     First, actually, do you recall receiving a
11  subpoena to produce documents?
12     A  I do.
13     Q   Were you involved in the identification of
14  the documents in response to that subpoena?
15     A  I am.
16     Q   Did you send those documents to your
17  attorney?
18     A  I did.
19     MS. BODNER:  I am going to introduce the
20  first exhibit, which I'll call DM-001.
21     Is that fine with you guys?
22     MR. HEYBURN:  Yeah.
23     MS. BODNER:  Okay.
24     (Deposition Exhibit DM-001 was deemed
25      marked for identification.)

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

42

1      MR. BEDELL:  We've got a black screen over
2  here.  I don't know if we're supposed to be seeing
3  something different.
4      MS. BODNER:  Nothing has popped up yet, but
5  would you mind wiggling the mouse?  I think it's
6  gone.
7      THE WITNESS:  We have a picture of a castle.
8      MS. BODNER:  Can we go off the record.
9      THE VIDEOGRAPHER:  We are going off record
10  at 10:18.
11     (Pause in proceedings.)
12     THE VIDEOGRAPHER:  We are back on record at
13  10:20 a.m.
14  BY MS. BODNER:
15     Q   Mr. Mulcahy, are you able to see what has
16  been marked as DM-001?
17     MR. BEDELL:  Are you able to see it?
18     THE WITNESS:  I'm able to see a document.  I
19  don't see any label that is DM-001.  I see D-3919.
20     MR. BEDELL:  Scroll down.
21     THE WITNESS:  Okay.  DM -- I got it.  Yes, I
22  am.
23     MR. BEDELL:  Yellow sticker bottom right?
24     MS. BODNER:  Yes.  Thank you.
25     THE WITNESS:  Yes, I am.

43

1  BY MS. BODNER:
2     Q   Do you recognize this document?
3     A   Yes.
4     Q   Was this the matter in which you were
5  deposed?
6     A   I believe so.
7     Q   What do you recall about that deposition?
8     A   It was long.
9     Q   How long was it?
10     A   Eight hours.
11     Q   What else do you recall about the
12  deposition?
13     A   Nothing.
14     Q   Do you recall any of the questions you were
15  asked?
16     A   No.
17     Q   Do you recall generally the subject matter
18  of your testimony?
19     A   Yes.
20     Q   What was the subject matter of your
21  testimony?
22     A   Questions regarding various investments that
23  WDC Holdings had and -- yeah, and the preparation of
24  such.
25     Q   Do you recall which investments in

44

1  particular you were asked about?
2     A   No.  I mean, no, I do not recall the
3  individual ones.  There was at least a dozen of them.
4     Q   Do you recall any of the questions about the
5  preparation of the investments?
6     A   No.
7     Q   Did you provide any documents to the SEC?
8     A   I don't recall.
9     Q   Do you recall if you brought any documents
10  to your deposition?
11     A   I did not.
12     Q   Did you discuss any documents during the
13  deposition?
14     A   I don't recall.
15     Q   You don't recall if they showed you any
16  documents?
17     A   I don't.
18     Q   Since that deposition, have you had any
19  communications with the SEC?
20     A   I don't believe so.
21     Q   Do you know why the SEC wanted to depose
22  you?
23     A   Yes.
24     Q   Why?
25     A   They're investigating WDC Holdings.

45

1     Q   Do you know what they're investigating WDC
2  Holdings for?
3     A   Securities violations.
4     Q   Do you have any more specific understanding
5  as to why they're investigating WDC Holdings?
6     A   I do not.
7     Q   Did you approach the SEC about potential
8  securities violations by WDC Holdings?
9     A   I did not.
10     Q   So they did -- strike that.
11        You did not make contact with the SEC before
12  they sought to depose you?
13     A   Correct.
14     Q   Other than your SEC deposition, have you
15  been deposed in any case?
16     A   No.
17     Q   You received a subpoena to appear for this
18  deposition, right?
19     A   I did.
20     Q   Do you recall receiving that subpoena?
21     A   I do.
22     Q   What did you do when you received it?
23     A   I read it.
24     Q   Did you do anything else?
25     A   Called my attorney.

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

46

1    Q    Was he already your attorney at that time?
2    A    He was.
3    Q    Was he your attorney with respect to
4  Northstar matters or your attorney in general?
5    A    All securities matters.
6    Q    And you retained your attorney to assist you
7  in this deposition?
8    A    I did.
9    Q    Do you understand why you're being deposed
10 today?
11   A    No.
12   Q    You have no understanding as to why you
13 might be being deposed today?
14       MR. HEYBURN:  Objection.  Asked and
15 answered.
16       MR. BEDELL:  Yeah, I'm going to object to
17 that one as well.  He's being deposed today because
18 you issued a subpoena to him.  If you are asking him
19 to guess what your reason is --
20       MS. BODNER:  I'm asking him his
21 understanding as to why he might be being deposed
22 today.
23       THE WITNESS:  No.  I don't see the value in
24 it.
25       ///

---

47

1  BY MS. BODNER:
2    Q    Did you prepare for this deposition?
3    A    I did not.
4    Q    You didn't meet with your attorney at all in
5  advance of this deposition?
6    A    Briefly.
7    Q    When did you meet with your attorney?
8    A    I spoke to him on the phone.
9    Q    Do you recall when that was?
10   A    Well, within -- between getting the subpoena
11 and today.
12   Q    You have no more approximate sense of
13 timing?
14   A    I don't.
15   Q    How long was that conversation?
16   A    Half an hour.
17   Q    Is that the only thing you did to prepare
18 for this deposition?
19   A    It is.
20   Q    Did you discuss any documents with your
21 counsel during that call?
22   A    I did not.
23   Q    Did you personally review any documents in
24 advance of this deposition?
25   A    I did not.

---

48

1       MR. BEDELL:  Objection and clarification
2  there.  You obviously issued a subpoena to him for
3  documents.  He reviewed the documents in response to
4  the subpoena.  That was in advance of this deposition
5  temporally.
6       MS. BODNER:  Mm-hm.
7       MR. BEDELL:  So I just want to be clear that
8  your question was vague.  I have explained why.
9  BY MS. BODNER:
10   Q    Other than identifying the documents
11 responsive to the subpoena, did you review any
12 additional documents to prepare for today's
13 deposition?
14   A    I did not.
15   Q    When you identified those documents
16 responsive to the subpoena, did you review them?
17   A    I did.
18   Q    Did they refresh your recollection with
19 respect to anything?
20   A    Maybe at the time.
21   Q    Do you recall in what way you were
22 refreshed?
23   A    I don't recall them today.
24   Q    Did you speak to anyone about this
25 deposition?

---

49

1    A    No.
2    Q    Did you tell your wife?
3       MR. BEDELL:  Well, other than me, which he
4  already said.
5  BY MS. BODNER:
6    Q    Did you tell your wife about this
7  deposition?
8    A    Yes.
9    Q    What did you tell your wife?
10   A    That I have a deposition.
11   Q    Did you tell anyone else about this
12 deposition?
13   A    No.
14   Q    Did you talk to Will Camenson about your
15 deposition?
16   A    No.
17   Q    Did you talk to Will Camenson about his
18 deposition?
19   A    No.
20   Q    Did you know Will Camenson was deposed?
21   A    No.
22   Q    Did you talk to Tim Lorman about you being
23 deposed today?
24   A    No.
25   Q    Did you talk to Tim Lorman about his

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

50

1   deposition?
2   A   No.
3   Q   Have you had any communications with anyone
4   from Gibson Dunn about this deposition?
5   A   I don't believe so.
6   Q   Have you had any communications with anyone
7   from Amazon about this deposition?
8   A   No.
9       MS. BODNER:  So this would be a natural
10  breaking point if anyone wants a real break.
11  Otherwise, we can proceed.
12      THE WITNESS:  I'm fine.
13      MR. BEDELL:  Since we've had a couple
14  breaks, why don't we go a little longer, see where
15  we --
16      MS. BODNER:  Okay.
17  BY MS. BODNER:
18  Q   I'm going to turn now to your employment
19  with Northstar.  When did you first apply for a
20  position with Northstar?
21  A   Sometime in probably 2017.
22  Q   Did you submit an actual job application to
23  Northstar?
24  A   I don't recall.
25  Q   How did you learn of an open position with

---

51

1   Northstar?
2   A   LinkedIn.
3   Q   Had you heard of Northstar before then?
4   A   No.
5   Q   Did you submit an application through
6   LinkedIn?
7   A   Don't recall.
8   Q   Do you know how you applied for the job with
9   Northstar?
10  A   I don't recall.
11  Q   What position did you see posted on
12  LinkedIn?
13  A   Director of equity.
14  Q   What about that job posting caught your
15  attention?
16  A   It was in Colorado.  It was in commercial
17  real estate.  And it was in raising equity.
18  Q   Did you live in Colorado at the time?
19  A   No.
20  Q   What about it being in Colorado interested
21  you?
22  A   I like Colorado.
23  Q   What about Colorado do you like?
24  A   The clean air.
25  Q   Did you interview for the position as

---

52

1   director of equity with Northstar?
2   A   I did.
3   Q   Who interviewed you?
4   A   Brian Watson and Peter Auerbach, I think.
5   Q   What was Peter's job position?
6   A   Just a friend, I think, or manager,
7   co-manager.  I don't know what his actual title was.
8       MR. BEDELL:  Spell Auerbach.
9       THE WITNESS:  I don't how to spell Auerbach.
10  A-U-E-R-B-A-C-H is what I'd expect.
11  BY MS. BODNER:
12  Q   You said "just a friend."  What did you mean
13  by that?
14  A   I know he was an associate of Brian's.
15  Q   You understood that he worked at Northstar
16  in some capacity?
17  A   Yes.
18  Q   Did you communicate with anyone at Northstar
19  prior to being interviewed?
20  A   Not at Northstar, no.
21  Q   How many interviews did you complete in
22  total?
23  A   One or two.
24  Q   Did you know Brian Watson prior to the
25  interview process?

---

53

1   A   No.
2   Q   Were those interviews conducted in person?
3   A   They were.
4   Q   Do you know how long in total those
5   interviews were?
6   A   No.
7   Q   Were you eventually offered the position as
8   director of equity?
9   A   I was.
10  Q   You accepted that position, right?
11  A   I did.
12  Q   Do you recall what your salary was?
13  A   I don't.
14  Q   Do you have a rough estimate?
15  A   Below a hundred grand.
16      MS. BODNER:  I'm going to introduce another
17  document.  This will be marked as DM-002.
18      (Deposition Exhibit DM-002 was deemed
19          marked for identification.)
20  BY MS. BODNER:
21  Q   Let me know when you are able to see it.  Is
22  it showing up on the left hand?
23      MR. BEDELL:  Yeah, we got it.  He's taking a
24  moment to review it.
25      MS. BODNER:  Of course, absolutely.  Take a

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

54

1   moment to review.
2       Do you need more time to review?
3       THE WITNESS:  No.
4   BY MS. BODNER:
5       Q    Do you see that this is an e-mail from Brian
6   Watson dated March 3, 2017?
7       A    I do.
8       Q    And you were a recipient of this e-mail,
9   right?
10      A    I believe so.  Let me see.  Am I listed in
11  there?
12      MR. BEDELL:  For the record, there's 14
13  lines of e-mail addresses it looks like on this
14  e-mail.
15  BY MS. BODNER:
16      Q    Correct.  I believe your Gmail is in there.
17  And I'm asking you if you see it.  It's at the
18  bottom.  It's the last line above "Subject."
19      A    Oh, I see it, yes.
20      Q    If you look at the second -- at the first
21  and second paragraph, do you see that Brian Watson
22  announced that you were joining Northstar as director
23  of equity?
24      A    I do.
25      Q    Can you read the second sentence in the

---

55

1   second paragraph, starting with, "I would like for
2   you --"
3       MR. BEDELL:  Aloud or to himself?
4       MS. BODNER:  Aloud.
5       THE WITNESS:  The second sentence where?
6   Repeat that.
7   BY MS. BODNER:
8       Q    It says -- it starts with, "I would like for
9   you to take this time --"
10      A    Oh.  "I would like for you to take this time
11  to get to know him, and he will be starting the
12  process of helping to build out our equity raising
13  efforts to another level."
14      Q    When you joined, did you understand that you
15  would be starting the process of helping to build out
16  Northstar's equity raising efforts?
17      A    I did.
18      Q    Can you explain to me what that means?
19      A    At the time, it was to help widen and
20  automate the investor reach of WDC Holdings.
21      Q    You said "at the time."  Did that change
22  eventually?
23      A    No.
24      Q    Was that something you had previous
25  experience in?

---

56

1       A    Yes.
2       Q    While you were at Northstar, did you try to
3   raise equity?
4       A    I did.
5       Q    What did you do to try to raise equity?
6       A    You know, contacted investors with
7   investment opportunities.
8       Q    How did you go about identifying those
9   potential investors?
10      A    I had my own list of e-mail addresses and I
11  reached out to Brian Watson's list of contacts and
12  that's how we did it.
13      Q    Did you successfully raise equity for
14  Northstar?
15      A    Definition of success?
16      Q    Did you raise any equity for Northstar?
17      A    Yes.
18      Q    Do you know how much?
19      A    No.
20      Q    Do you have a rough estimate?
21      A    Below 100 million.
22      Q    Was it above 50 million?
23      A    Probably.
24      Q    Did you ever treat potential investors to
25  dinners?

---

57

1       A    No.
2       Q    Did you ever take potential investors to
3   events?
4       A    No.
5       Q    What did you do to try to convince investors
6   to invest?
7       A    I just discussed -- I just discussed the
8   merits of each individual investment opportunity.
9       Q    Did you have those discussions in person?
10      A    Rarely.
11      Q    So you mostly had those discussions over the
12  phone?
13      A    Correct.
14      Q    Was director of equity your title for the
15  duration of your employment with Northstar?
16      A    It was.
17      Q    Did you have any other responsibilities
18  other than what we just discussed?
19      A    No.
20      Q    Did you have any compliance-related duties?
21      A    No.
22      Q    You didn't do any compliance-related work?
23      A    There's no compliance-related work, so, no.
24      Q    Were you involved with Northstar's referral
25  program?

---

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

58

1     A    Define "involved."
2     Q    How do you define "involved"?
3         MR. BEDELL:  Objection.  It's your question.
4    BY MS. BODNER:
5     Q    Did you recruit potential investors to
6    participate in Northstar's referral program?
7     A    No.
8     Q    Are you aware that Northstar had a referral
9    program?
10    A    Yes.
11    Q    What did you know about Northstar's referral
12   program?
13    A    That Brian would compensate people who made
14   referrals of investors or deals.  He would pay them,
15   you know, in some manner arbitrarily.
16        MS. BODNER:  I'm going to introduce another
17   exhibit.  This will be marked as DM-003.
18        (Deposition Exhibit DM-003 was deemed
19             marked for identification.)
20   BY MS. BODNER:
21    Q    Let me know when you see it, and you can
22   take the time to review.
23    A    Okay.
24    Q    So if you could scroll -- well, first, do
25   you recognize this document, this e-mail?

59

1     A    I do not recognize it.
2     Q    Do you see that it's an e-mail from Brian
3    Watson to you and some others dated August 2, 2017?
4     A    I do.
5         MR. BEDELL:  Scroll down, please.  Scroll a
6    couple pages.
7         I'm going to object to the characterization.
8    It's a chain of e-mails.  One of them probably fits
9    your description, but there's a couple of e-mails on
10   this chain.
11   BY MS. BODNER:
12    Q    I want to focus on an e-mail dated August 2,
13   2017.  It's on Page 5.
14    A    Okay.
15        MR. BEDELL:  Scroll down.  There's a bunch
16   of e-mails on this chain dated August 2, 2017.
17   That's the reason --
18        MS. BODNER:  I understand.  That's why I
19   specified Page 5.
20        THE WITNESS:  Okay.
21   BY MS. BODNER:
22    Q    Do you see that's an e-mail from Brian
23   Watson to Luke Wyckoff?
24    A    I do.
25    Q    Do you know who Luke Wyckoff is?

60

1     A    I do not.
2     Q    Do you see in the first full paragraph it
3    talks about an updated and streamlined referral
4    agreement?
5     A    Yes.
6     Q    Can you read the next sentence starting
7    with, "This would allow you --"
8     A    "This would allow you to receive a flat
9    fee of $1,000 for introductions, or 10 percent of my
10   net manager's profits interests in deals, which could
11   create long-term, significant additional wealth for
12   you."
13    Q    Is that your understanding as to how
14   individuals were compensated for referrals?
15    A    At this moment.
16    Q    Were you involved with devising this
17   compensation structure?
18    A    I was in the conversation of this.
19   Obviously this isn't my, you know, my decision.
20    Q    What do you recall about the conversation
21   about this compensation structure?
22    A    I don't recall the conversation at all.
23    Q    I believe you just testified that you were
24   in the conversation about it.
25    A    Yeah, but I don't know anything about the

61

1    conversation.  I just remember the conversation in
2    general.
3     Q    Do you remember --
4     A    It wasn't one conversation.  Obviously
5    there's a chain of e-mails here.  There's --
6     Q    In what way --
7     A    -- lots of conversations about this.
8     Q    Sorry, we should try not to talk over each
9    other.  I'll try to do a better job, too.
10        What do you recall about your involvement
11   with respect to this referral agreement structure?
12    A    I don't recall anything about my involvement
13   in this structure.
14    Q    Did you ever suggest any changes to the
15   referral program?
16    A    Not that I recall.
17    Q    You don't recall leading compliance with
18   respect to this referral program?
19    A    No.
20    Q    If you could scroll up to the first page,
21   it's an e-mail you sent on August 2nd, at 1:14 p.m.
22    Q    What page?
23    Q    It's the first page of the PDF.
24    A    I didn't send that on the --
25    Q    Do you see the --

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                         Amazon.com, Inc., et al. v. WDC Holdings LLC

---

**62**

1      A    Oh, the second section.  I replied to the
2  e-mail that Brian sent.
3      Q    And you sent an e-mail at 1:14 p.m.,
4  correct?
5      A    I replied to Brian's e-mail at 1:14, yes.
6      Q    Can you please read out loud the first two
7  sentences starting with, "I think we need --"
8      A    "I think we need to be strategic with who we
9  send this to.  I do not want to come off as needy."
10     Q    Can you read the second sentence as well?
11     A    "I think we should test this with only a
12 portion of the groups below and then evaluate the
13 response before doing an exhaustive effort."
14     Q    Do you recall testing this referral program
15 with a group of people?
16     A    I do not.
17     Q    You don't recall ever reaching out to any
18 individuals about Northstar's referral program?
19     A    Your question is vague.  The -- I do not
20 recall this instant of doing this.
21     Q    Do you recall any instance of reaching out
22 to any individuals about Northstar's referral
23 program?
24     A    I recall distributing an e-mail out to these
25 people and evaluating their response to the e-mail.

---

**63**

1      Q    Do you recall sending one e-mail to a bunch
2  of people at the same time or are you talking about
3  separate e-mails?
4          MR. HEYBURN:  Objection.  Compound.
5          THE WITNESS:  I don't recall how it was
6  distributed.
7  BY MS. BODNER:
8      Q    Do you recall distributing it yourself?
9      A    No.
10     Q    Were you copied on the e-mail?
11     A    I have no idea.  This is 2017.  It's 2022.
12 It's five years ago.
13     Q    Understood.  I'm entitled to your best
14 recollection, though, which is what I'm asking you
15 about.
16     A    Yes, I know.
17     Q    What do you remember about Northstar's
18 referral program?
19     A    I remember that Brian Watson wanted to build
20 his referral network out.  That's what I recall.  And
21 he had a couple of people that he used as referral
22 partners quite often.
23     Q    Do you recall who those people were?
24     A    I think a guy named -- I don't remember his
25 last name.  I think there was a guy named Carl.  And

---

**64**

1  there was some girl.  What was her name?  I think she
2  lived in Evergreen or something.  Not Evergreen.
3  What's that little city?
4      Q    Conifer?
5      A    Not Conifer.  It's down from -- it's on the
6  other side of the highway there.  Cool little
7  mountain community.  I can't remember the name,
8  though.
9          So there was a couple of people.  I know
10 Carl.  I don't remember Carl's last name.  I know he
11 had a number of referrals in there.  We're talking
12 about referring investors.  And then that girl, I
13 can't remember what that's girl's name is, though.
14     Q    When you say Carl, are you talking about
15 Carl Nelson?
16     A    No, not Carl Nelson.  I don't remember his
17 name, but I know it wasn't Carl Nelson.
18     Q    Did you identify potential individuals to be
19 contacted about Northstar's referral program?
20     A    I did not.  I did not identify individuals.
21 I did these e-mail distributions to a per se list of
22 individuals, but I didn't target individuals per se.
23     Q    What does it mean to do e-mail
24 distributions?
25     A    A mass e-mail.  Here's a letter, send it out

---

**65**

1  to a list of -- I don't know -- 30,000 investors or
2  whatever, 30,000 e-mail addresses.
3      Q    Did you have your own e-mail distribution
4  list that you would reach out to?
5      A    I did.
6      Q    And you came to Northstar with that e-mail
7  distribution list?
8      A    I did.
9      Q    Do you recall reaching out to your e-mail
10 distribution list about Northstar's referral program?
11     A    Not my list, no.
12     Q    Do you recall reaching out to any other
13 distribution list about Northstar's referral program?
14         MR. BEDELL:  "Any other," other than?
15 BY MS. BODNER:
16     Q    Any other distribution list other than your
17 own distribution list that we just --
18     A    Only Brian's current list of contacts and
19 investors.
20     Q    What was the purpose of the referral
21 program?
22     A    To generate more investors.
23     Q    Did it generate more investors?
24     A    I don't know.
25     Q    Do you recall participating in any

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy

Amazon.com, Inc., et al. v. WDC Holdings LLC

66

1   discussions with Northstar employees about the
2   referral program?
3       A   I don't -- I recall Brian talking about the
4   referral program at the weekly meetings to the whole
5   staff.
6       Q   Do you recall anything else about what he
7   would say during those weekly meetings about the
8   referral program?
9       A   That was essentially the same thing.
10      Q   Same thing as what?
11      A   Every week, you know, "Hey, we have a
12  referral program, you'll get paid, refer us
13  investors."
14      Q   So the referral program wasn't a secret?
15      A   No.
16      Q   Did you ever make money via the referral
17  program?
18      A   No.
19      Q   At the time you worked at Northstar, did you
20  have any concerns about the referral program?
21      A   I don't recall.
22      Q   Do you recall raising concerns to anyone
23  while you worked at Northstar about the referral
24  program?
25      A   I don't recall.

67

1       Q   Do you recall thinking that there was
2   anything improper about the referral program?
3       A   I don't recall.
4       Q   Did the referral program target just
5   investors or was it also corporations?
6       A   I don't know.
7       Q   Do you know who was targeted by the referral
8   program?
9       A   I think I answered that.
10      Q   I apologize.  I don't remember your
11  testimony.
12      A   Brian's list.  Brian's list of -- contact
13  list.  Current investors and contact list of Brian
14  Watson was who was contacted as it relates to the
15  referral program.
16      Q   Do you recall if his referral list included
17  just individual investors or was it also
18  corporations?
19      A   I don't recall the intricacies of the list.
20      Q   Did you have the opportunity to review the
21  list?
22      A   I had access to the list.
23      Q   Did you have any concerns about reaching out
24  to the individuals or entities on the list about the
25  referral program?

68

1       A   No.  I don't recall.
2       Q   Do you know someone named Christian
3   Kirschner?
4       A   I do.
5       Q   How do you know Christian Kirschner?
6       A   He was a referral partner of Brian's.
7       Q   Do you know how he knows Brian?
8       A   They've known each other for years.
9       Q   When did you first learn of Christian
10  Kirschner?
11      A   Somewhere in 2017.
12      Q   How did you learn of Christian Kirschner?
13      A   Brian introduced me.
14      Q   What do you recall about that introduction?
15      A   That he has known Brian for -- you know, he
16  knew Brian -- that Brian knew him for years and that
17  he, you know, still did referral work for Brian.
18      Q   Why did Brian introduce you to Christian
19  Kirschner?
20      A   Brian introduced me to everybody.
21      Q   Did you ever meet Christian Kirschner in
22  person?
23      A   I did.
24      Q   On how many occasions?
25      A   At least once.

69

1       Q   Did you meet with him in the beginning when
2   you joined Northstar?
3       A   I don't recall.
4           MS. BODNER:  I am going to introduce another
5   document.  This will be marked as DM-004.
6           (Deposition Exhibit DM-004 was marked
7           for identification.)
8           THE WITNESS:  Okay.
9   BY MS. BODNER:
10      Q   Does this document refresh your recollection
11  as to whether you met Christian Kirschner when you
12  joined Northstar?
13      A   It doesn't.
14      Q   You don't remember anything about a meeting
15  with Christian Kirschner in Chicago in March 2017?
16      A   No, I completely do not remember that.
17      Q   Did you know Christian Kirschner before
18  Brian Watson introduced you to him?
19      A   No.
20      Q   You testified that Christian Kirschner was
21  involved in Northstar's referral program, right?
22      A   Yes.
23      Q   Can you explain how he was involved?
24      A   Not other than what I told you, which is
25  Brian Watson told me he is part of the referral



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

70

1  program.
2     Q    Do you know what Christian Kirschner did to
3  participate in the referral program?
4     A    He -- I don't have any tangible thing other
5  than he referred -- you know, it was expressed to me
6  that he referred investors and deals to Brian.
7     Q    Who expressed that to you?
8     A    Brian.
9     Q    Did Christian Kirschner ever tell you
10  himself which investors he referred to Northstar?
11     A    I don't recall.
12     Q    Other than from Brian, are you aware of any
13  investors that Christian Kirschner referred to
14  Northstar?
15     A    Say that again.
16     Q    Other than what Brian Watson told you about
17  Christian Kirschner's work, did anyone else tell you
18  the work that Christian Kirschner did to refer
19  investors to Northstar?
20     A    I don't believe so.
21     Q    Did you and Christian Kirschner work
22  together at Northstar?
23     A    Define that.  He didn't live in Denver.
24     Q    Thank you.  Did you at some point move to
25  Denver from Chicago?

71

1     A    I did.
2     Q    When did that occur?
3     A    June of 2017 -- May.  Actually maybe it was
4  May of 2017.
5     Q    Did you live in Denver throughout the
6  duration of your employment with Northstar?
7     A    I did except for maybe the last month.
8     Q    Where did you move that last month?
9     A    Back here to Las Vegas.
10     Q    Did you interact with Christian Kirschner on
11  a daily basis?
12     A    No.
13     Q    How often would you interact with him?
14     A    Rarely.
15     Q    On those rare occasions, was it in person or
16  via e-mail?
17     A    E-mail or phone and there probably wasn't
18  more than, I don't know -- I'd be surprised if there
19  was even five communications between me and
20  Christian.
21     Q    In total throughout your employment?
22     A    Yeah.
23     Q    What led you to interact with Christian
24  Kirschner on those five occasions?
25     A    Brian's -- you know, at Brian's behest, he

72

1  wanted me to work with Christian.
2     Q    Did you have an understanding as to why
3  Brian Watson wanted you to work with Christian
4  Kirschner?
5     A    Well, in my role as director of equity, to
6  do things to raise equity.
7     Q    Did you work with Christian Kirschner at all
8  to raise equity?
9     A    We never raised any money together, no.
10     Q    Did you attempt to raise money together?
11     A    No.
12     Q    What was your impression of Christian
13  Kirschner from your five -- strike that.
14         Did you have an impression of Christian
15  Kirschner based on your five interactions with him?
16     A    I don't recall.
17     Q    You don't recall him making any impression
18  on you?
19     A    Not really.
20     Q    What do you recall about him?
21     A    I don't recall anything about him.  I mean,
22  honestly, I can't -- I can't tell you what he looks
23  like.  I can't remember to tell you what his voice
24  sounds like.  I don't remember anything.
25     Q    You don't remember his hair color?

73

1     A    No.
2     Q    Were you copied on e-mail correspondence
3  between Brian and Christian while you worked at
4  Northstar?
5     A    I don't recall.
6     Q    While you worked at Northstar, did you know
7  what Christian Kirschner was doing on a daily basis?
8     A    No.
9     Q    Did you have a general understanding as to
10  what Christian Kirschner was doing on behalf of
11  Northstar?
12     A    Other than the referral partner that we just
13  discussed, that's it.
14     Q    Did anyone keep you up to date on Christian
15  Kirschner's role with respect to the referral
16  program?
17     A    Say that again.
18     Q    Did anyone keep you up to date on Christian
19  Kirschner's work on behalf of the referral program?
20     A    I don't recall.
21     Q    Are you aware that Christian Kirschner had
22  an agreement with Northstar regarding his services?
23     A    Yes.
24     Q    Were you involved in putting together that
25  agreement?



CONFIDENTIAL

Danny Christopher Mulcahy                              Amazon.com, Inc., et al. v. WDC Holdings LLC

74

1      A    Not the final agreement.
2      Q    Were you involved in early iterations of
3    that agreement?
4      A    I believe so.
5      Q    Do you recall what your involvement was?
6      A    Just, you know, doing the edit -- you know,
7    just doing -- preparing -- doing the editing of an
8    existing document at Brian's direction.
9      Q    Why would you have been involved in the
10   editing of that existing document?
11     A    Anybody could have done it, but, you know, I
12   was the director of equity, so, you know, he just
13   asked me to do it.
14     Q    Did the referral program fall under the
15   umbrella of the director of equity responsibilities?
16     A    I didn't have any referral people, myself,
17   so I'd say Brian was really -- you know, managed his
18   referral partners.
19     Q    And the purpose of the referral program was
20   to raise equity for Northstar, correct?
21     A    Yes.
22     Q    And you were in charge of raising equity for
23   Northstar?
24     A    My job title was director of equity.
25   Ultimately raising the equity fell on to both Brian

75

1    Watson's shoulders and my shoulders. Brian Watson
2    raised more equity during my time at Northstar than I
3    raised at Northstar.
4      Q    Why is that?
5      A    Because he knows more people and he has more
6    relationships. And bigger relationships.
7      Q    Did Brian Watson ever ask you to revise the
8    referral agreement because you had an SEC compliance
9    background?
10     A    Why he asked me to do it, I've -- not the
11   reasoning behind it, no.
12     Q    Did Brian Watson ever ask you to revise the
13   referral agreement?
14     A    He did.
15     Q    Did you, in fact, revise the referral
16   agreement?
17     A    I did.
18     Q    In what ways did you revise the referral
19   agreement, if any?
20     A    I don't recall.
21     Q    You don't recall revising it?
22     A    I said I revised it.
23          MR. BEDELL:  Objection.  That's not what he
24   said.
25          ///

76

1    BY MS. BODNER:
2      Q    Do you have a general recollection as to
3    what revisions you made to the referral agreement?
4      A    No, I do not.
5          MS. BODNER:  I'm going to introduce another
6    exhibit.  This will be marked as DM-005.
7          (Deposition Exhibit DM-005 was deemed
8          marked for identification.)
9    BY MS. BODNER:
10     Q    Take a second to look through it and let me
11   know when you're ready.
12     A    Okay.
13     Q    Do you recall this chain of e-mails with
14   Brian Watson from December 2017?
15     A    I do not.
16     Q    Do you see -- this is on the bottom of the
17   first page -- that Brian Watson sent you an e-mail on
18   December 28, 2017, at 1:53 p.m.?
19     A    I do.
20     Q    And he says, "Please revise Christian
21   Kirschner's agreement to the following and send to me
22   ASAP for Sterling."
23     A    I do.
24     Q    And then on the second page, does he send
25   you some changes he wants made?

77

1      A    He did.
2      Q    Do you know why he sent those changes to
3    you?
4      A    Obviously that's what he negotiated with
5    Christian.
6      Q    Were you involved in those negotiations with
7    Christian?
8      A    I was not.
9      Q    Was this the extent of your knowledge as to
10   the negotiations with Christian?
11     A    I assume so.
12     Q    Do you have any reason to believe that you
13   at any time knew any more about Christian Kirschner's
14   negotiations with Brian Watson?
15     A    I did not.
16     Q    You did not know any more?
17     A    No.
18     Q    Why did Brian Watson ask you to make these
19   changes to Christian Kirschner's agreement?
20     A    I think I just answered that, but he says
21   right here, "Please revise Christian Kirschner's
22   agreement to the following and send to me ASAP," so
23   that's what I did.
24     Q    I'm asking why he asked you to please
25   revise?



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

78

1     MR. BEDELL:  Objection to the extent --
2  objection.  You're calling for him to speculate as to
3  what someone else was thinking.
4     MR. HEYBURN:  Also object.  Asked and
5  answered.
6     THE WITNESS:  So I have no idea why.
7  BY MS. BODNER:
8     Q    You have no understanding?
9     A    I just mentioned -- I just told you it's
10  obvious right here, "Please revise Christian
11  Kirschner's agreement to the following and send to me
12  ASAP."
13        He is asking me to do it.  Plain and simple,
14  that's why I did it.
15     Q    And I'm asking you if you have an
16  understanding as to why Brian Watson asked you to
17  plain and simple revise this agreement?
18     MR. BEDELL:  Same objection.
19     MR. HEYBURN:  Objection.  Asked and
20  answered.
21     THE WITNESS:  I do not.  I also do not know
22  if this was the final negotiation.
23  BY MS. BODNER:
24     Q    And just to confirm, you testified that you
25  weren't involved in any of the negotiations with

---

79

1  Christian Kirschner?
2     A    Correct.
3     Q    Do you recall thinking that there was
4  anything improper about Christian's agreement when
5  Brian asked you to make these revisions?
6     A    No.
7     Q    Do you know if the agreement with Christian
8  was eventually finalized and signed?
9     A    I have no tangible -- I never saw a final
10  agreement.
11     Q    You never saw a final or you don't recall
12  seeing a final?
13     A    I don't recall seeing a final one.
14     Q    Did you have an understanding as to how
15  Christian Kirschner would be paid for his services to
16  Northstar?
17     A    Yeah, it says it right here.  That's what I
18  assumed.
19     Q    So your understanding of what Christian --
20  strike that.
21        Your understanding of how Christian
22  Kirschner would be paid was based solely on the
23  agreement that you saw in draft form?
24     A    Correct.
25     Q    Do you recall having any concerns about how

---

80

1  Christian Kirschner would be compensated for his
2  services?
3     A    I do not recall.
4     Q    Do you recall if the agreement with
5  Christian Kirschner was to be kept a secret at
6  Northstar?
7     A    I do not recall.
8     Q    Do you recall if the agreement with
9  Christian Kirschner was to be kept a secret from
10  anyone?
11     A    I don't recall.
12     Q    Do you recall ever having any conversations
13  with anyone at Northstar about Mr. Kirschner's
14  agreement?
15     A    I don't recall.
16     Q    Looking at this draft agreement now, do you
17  have concerns about it?
18     A    No.
19     Q    Were you involved in any of Northstar's
20  lease transactions with Amazon?
21     A    Define "involved."
22     Q    Did you do any work on behalf of Northstar
23  to raise money for Northstar's lease transactions
24  with Amazon?
25     A    I raised money for the Sterling Investments,

---

81

1  LLC, yes.
2     Q    When did you raise that money?
3     A    I don't recall the exact date.  Obviously
4  right before, prior to the close of the transaction.
5     Q    Do you know if that was 2017 or 2018?
6     A    It was probably -- it probably straddled
7  both.  I don't remember when it actually all came to
8  fruition.
9     Q    Do you recall how much money you raised from
10  investors for the Sterling transactions?
11     A    I think 5 million.  I could be mistaken.
12     Q    What was that equity fundraising process
13  like?
14     A    Prepare an e-mail, send it out, talk to
15  investors about it.
16     Q    Did you ever speak with anyone at Amazon
17  about the Sterling deal?
18     A    No.
19     Q    Were you ever on any correspondence with
20  anyone at Amazon about the Sterling deal?
21     A    At what -- at what time frame are you
22  talking about?  Prior to raising money for --
23     Q    While you were raising money.
24     A    No, I did not.
25     Q    While you raised equity from investors for

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

82

1  the Sterling deal, did you think that Northstar was
2  engaged in improper conduct?
3      A   No.
4      Q   Did you ever let any investors in the
5  Sterling deals know that you had concerns about
6  Northstar's conduct?
7      A   No.
8      Q   Other than raising equity for the Sterling
9  deals, did you have any -- did you do any work on
10  behalf of Northstar's lease transactions with Amazon?
11      A   No.
12      Q   Did you ever review the budgets associated
13  with these lease transactions?
14      A   Budgets is probably not the right word.
15      Q   What did you review -- strike that.
16          What sort of documents did you review in
17  connection with Northstar's lease transactions with
18  Amazon?
19      A   Pro forma.
20      Q   What is a pro forma?
21      A   It's a financial picture of an investment.
22      Q   Who prepared that pro forma?
23      A   One of the analysts.
24      Q   Analysts at Northstar?
25      A   Correct.

83

1      Q   Do you recall who?
2      A   It was probably a group.  It probably wasn't
3  just one.  It was probably a group, but, no, I do not
4  recall exactly who did.
5      Q   Why did you review the pro formas prepared
6  by the Northstar analysts about the Sterling deal?
7      A   So that I understood what the assumptions
8  were.
9      Q   Do you recall what those assumptions were?
10      A   No.
11      Q   Do you recall having any concerns about
12  those assumptions?
13      A   No.
14      Q   Do you recall if anyone else at Northstar
15  had concerns about what was contained in the pro
16  forma?
17      A   No.
18      Q   Did your employment with Northstar
19  eventually come to an end?
20      A   It did.
21      Q   When was that?
22      A   I think it was -- I think it was April
23  of 2019.
24      Q   Did you resign?
25      A   I did.

84

1      Q   Why did you resign?
2      A   Didn't want to work there anymore.
3      Q   Why did you not want to work there anymore?
4      A   Chose to do my own thing.
5      Q   Was there something about Northstar in
6  particular that made you want to do your own thing?
7      A   Not in particular.
8      Q   Were there a couple of things that made you
9  want to do your own thing?
10      A   I'm a Capricorn, I always want to do my own
11  thing.
12      Q   I don't know much about the signs,
13  unfortunately.
14          When you resigned, did you know what you
15  wanted to do job-wise?
16      A   Not really.  I still don't know what I want
17  to do when I grow up.
18      Q   Me, too.
19          So you didn't have another job lined up at
20  the time?
21      A   No.
22      Q   But you had incorporated Dacia Resort Group?
23      A   Correct.
24      Q   And did you intend to make Dacia Resort
25  Group a functional entity when you resigned?

85

1      A   I did.
2      Q   So you did have a general plan in mind when
3  you resigned?
4      A   A plan, yes.
5      Q   Did anything happen at Northstar that led
6  you to want to resign?
7      A   I think I answered that, but I'll just leave
8  it as no.
9      Q   At the time you resigned, did you have any
10  concerns that Northstar was engaged in improper
11  conduct?
12      A   Yes.
13      Q   What were those concerns?
14      A   Unequal treatment of investors, poor
15  management of investments, side deals that I hadn't
16  been aware of.  That's sort of it in a nutshell.
17      Q   So let's start with unequal treatment of
18  investors.  What were your concerns related to
19  unequal treatment of investors?
20      A   Some investors got paid differently than
21  other investors.
22      Q   Do you know why they got paid differently?
23      A   No.
24      Q   How did you know that certain investors were
25  paid differently than other investors?

EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                     Amazon.com, Inc., et al. v. WDC Holdings LLC

86

1    A   Because I was a part of a conversation that
2   I was aware of one such instance.
3    Q   Who was involved in that conversation?
4    A   Brian Watson and myself and Brian Cleveland.
5    Q   What else do you recall about that
6   conversation?
7    A   That Brian Cleveland thought he had a
8   different return, should have gotten paid differently
9   than he had been, and ultimately it was my
10  understanding that he was paid how he believed he
11  should have been paid, but the other investors of
12  that same deal were not paid that same way.
13   Q   How did you know that the other investors
14  involved in that deal were not paid the same way?
15   A   Actually, I guess I don't have any tangible
16  proof that they weren't paid that way; but it was my
17  understanding that they all hadn't been treated the
18  same way.
19   Q   Why was that your understanding?
20   A   That's the information I had at the time.
21   Q   How did you have that information at the
22  time?
23   A   Inference.
24   Q   So your understanding that investors were
25  treated differently was based on an inference from a

87

1   conversation between Brian Cleveland and Brian
2   Watson?
3    A   Correct.
4    Q   Did you have any other reason to believe
5   that there was unequal treatment of investors?
6    A   I don't recall any specific examples.  I
7   believe there were, but I can't recall a specific
8   example.
9    Q   Why do you believe that there were other
10  instances?
11   A   I don't know.
12   Q   Did you testify about this unequal treatment
13  of investors to the SEC?
14   A   I don't know.
15   Q   You don't recall if you testified about
16  that?
17   A   I don't recall.
18   Q   Do you believe that this unequal treatment
19  of investors was reflected in any Northstar
20  documents?
21   A   No.
22   Q   Did you raise your concern about unequal
23  treatment of investors to anyone at Northstar before
24  resigning?
25   A   I don't recall.

88

1    Q   After you resigned, do you recall talking
2   with anyone, either affiliated with Northstar or not,
3   about the unequal treatment of investors?
4    A   I don't recall.
5    Q   And apologies, I just can't remember, is
6   Brian Cleveland one of the investors who invested in
7   an RV park?
8    A   He is.
9    Q   Have you had any discussions with Brian
10  Cleveland about Brian Watson or Northstar at any
11  point since you resigned from Northstar?
12   A   Yes.
13   Q   What do you recall about those
14  conversations?
15   A   Nothing in particular.
16   Q   Do you recall if you discussed any of the
17  allegations related to this lawsuit with
18  Mr. Cleveland?
19   A   No.
20   Q   Do you recall discussing any concerns you
21  had about Brian Watson or Northstar with
22  Mr. Cleveland?
23   A   I don't recall.
24   Q   You also mentioned poor management of
25  investments.  Why were you concerned about that?

89

1    A   I felt they could all be managed better.
2    Q   Why did you feel that they could all be
3   managed better?
4    A   Experience.
5    Q   As someone without investor experience, can
6   you please be more specific?
7    A   Pending capital calls, extended and poor
8   performance of investments.
9        MR. BEDELL:  To be clear, in your last
10  question, you said "as someone without experience."
11  You were referring to yourself, not him?
12       MS. BODNER:  That is correct.
13  BY MS. BODNER:
14   Q   Can you be more specific as to why your
15  experience led you to believe that there was poor
16  management of investments at Northstar?
17   A   Repeat the question.
18   Q   Can you be more specific as to why your
19  prior experience led you to believe there was poor
20  management of investments at Northstar?
21   A   I don't know how to answer that question.
22   Q   Was your concern about poor management of
23  investments -- strike that.
24       Did you think that Northstar was making bad
25  business decisions with respect to its investments?

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

90

1    A   Yes.
2    Q   Did you think that Northstar was doing
3 anything illegal with respect to its investments?
4    A   Yes.
5    Q   What did you think Northstar was doing that
6 was in violation of the law?
7    A   Unequal treatment of investors and side
8 deals.
9    Q   So poor management of investments is sort of
10 an umbrella with the unequal treatment and the side
11 deals as being --
12   A   There's all types of execution issues.
13   Q   Who did you think was responsible for the
14 execution issues?
15   A   Brian Watson.
16   Q   Did you ever raise concerns with Brian
17 Watson about his execution of investments?
18   A   In a manner.
19   Q   And what manner did you raise those concerns
20 with Mr. Watson?
21   A   Just generally in different meetings.
22   Q   Do you recall what concerns you conveyed to
23 him during those meetings?
24   A   No.  I don't recall the specifics, no.
25   Q   Do you recall generally what you conveyed to

91

1 him?
2    A   That I think things should be done
3 differently.
4    Q   Do you recall how Mr. Watson responded, if
5 at all?
6    A   I don't recall.
7    Q   Do you recall if he made any changes based
8 on your concerns?
9    A   No.
10   Q   No, you don't recall or, no, he didn't make
11 any changes?
12   A   I don't recall.
13   Q   So you testified that you had concerns about
14 side deals that you hadn't been made aware of,
15 correct?
16   A   Correct.
17   Q   What do you recall about the side deals that
18 you hadn't been made aware of?
19   A   Asking brokers to give him a referral for
20 deals that he gave them without disclosing them to --
21 those side deals to investors.  They -- I don't
22 remember the specifics of the other ones.
23   Q   Do you recall which brokers you are
24 referring to?
25   A   At least on one occasion I think his name

92

1 was Chris Ball.  B-A-L-L.
2    Q   Thank you.  What was your concern about
3 Northstar's activity with Chris Ball?
4    A   Brian Watson awarded Chris Ball's firm a
5 leasing contract -- a leasing opportunity -- a
6 listing agreement, but then had Chris Ball agree to
7 pay Brian 20 percent of the leasing commissions back
8 to, you know, back to him.
9    Q   What company was Chris Ball affiliated with?
10   A   Don't know.
11   Q   How did you learn about this?  Strike that.
12       How did you know that Brian awarded Chris
13 Ball a leasing agreement?
14   A   Somebody in the firm told me.  I don't
15 recall who.
16   Q   When you say someone at the firm, are you
17 referring to Northstar?
18   A   Yeah, I am.
19   Q   How do you know about the leasing
20 commission that you just testified about?
21   A   Someone at the firm told me.
22   Q   The same person who told you about that --
23   A   No idea who.
24   Q   Did you ever see any financial documents
25 with respect to this leasing commission?

93

1    A   No.
2    Q   Why were you concerned about Brian Watson
3 being paid the leasing commission?
4    A   Because it wasn't disclosed to the
5 investors.
6    Q   How do you know it wasn't disclosed to the
7 investors?
8    A   Because it's not disclosed in any of the
9 investment documents.
10   Q   How do you know it's not disclosed in any of
11 the --
12   A   Because I reviewed all the investment
13 documents.
14   Q   Did you review those recently or at the
15 time?
16   A   At the time.
17   Q   Did you review those investor documents
18 after you learned from the individual at Northstar
19 about the Chris Ball listing agreement?
20   A   No, I had already reviewed the documents
21 prior to that point.
22   Q   Other than the fact you recall that it
23 wasn't disclosed in the investor documents, did you
24 have any other concerns about the arrangement with
25 Chris Ball?

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

---

94

1    A    Not worth noting.
2    Q    I'm sorry, what did you say?
3    A    Not worth noting.
4    Q    I'm interested in anything you recall.
5    A    I don't recall it.
6    Q    Do you recall if the Chris Ball commission
7  was above market rate from what a broker would
8  charge?
9    A    I don't recall.
10    Q    Other than Chris Ball, do you recall any
11  other side deals?
12    A    I don't recall.
13    Q    Do you recall any other broker referrals
14  that you had concerns about?
15    A    I don't recall the specific instances.  I
16  just recall vaguely and I don't know who, but that
17  that wasn't -- that one deal with Chris Ball wasn't
18  the only instance of that arrangement is what I was
19  led to believe.
20    Q    And who led you to believe that?
21    A    Don't remember.
22    Q    Was it Will Camenson?
23    A    I doubt it, but I don't remember.
24    Q    Why do you doubt it?
25    A    I don't think he would have been involved in

---

95

1  those type of discussions.  He is a financial
2  analyst.
3    Q    Do you recall hearing any concerns about
4  Brian Watson's arrangements with anyone at Amazon?
5    A    Say that again.
6    Q    Do you recall hearing any concerns with
7  anyone at Northstar about Brian Watson's arrangements
8  with Amazon?
9    A    That's a yes and a no.  I remember generally
10  hearing concerns, but I can't -- I can't recall
11  specific examples.
12    Q    Do you recall generally what those concerns
13  were?
14    A    Generally that the arrangements, the
15  awarding of the contracts wasn't above board.
16    Q    And is the awarding of the Amazon contracts
17  part of the side deals that you were concerned about
18  or is this something --
19    A    Yes.
20    Q    -- separate?
21         What was your relationship with Mr. Watson
22  like while you worked at Northstar?
23    A    Amicable.
24    Q    Did you leave on amicable terms?
25    A    I did.

---

96

1    Q    While you worked with Mr. Watson, did you
2  ever have any concerns about his ability to manage
3  Northstar?
4    A    I did.
5    Q    What were those concerns?
6    A    I didn't think he executed on his deals very
7  well.
8    Q    Did you have any other concerns about his
9  leadership of Northstar?
10    A    Generally, I didn't -- I'll just say no.
11    Q    At the time you left Northstar, were you
12  considering doing work with Mr. Watson in the future?
13    A    No.
14    Q    Why no?
15    A    Did not want to work with Watson anymore.
16    Q    Why did you not want to work with Mr. Watson
17  anymore?
18    A    I wanted to do my own thing.
19    Q    Since resigning from Northstar, have you
20  ever done any business with Brian Watson or his
21  companies?
22    A    No.
23         MS. BODNER:  Okay.  I think we can take a
24  break now, a longer break.
25         THE VIDEOGRAPHER:  We are going off record

---

97

1  at 11:22 a.m.
2         (Thereupon, a recess was taken.)
3         THE VIDEOGRAPHER:  We are back on record at
4  11:39 a.m.
5  BY MS. BODNER:
6    Q    Mr. Mulcahy, I just want to ask you some
7  follow-up questions based on your testimony before
8  the break.
9         Did you share your concerns about the poor
10  management of investments with the SEC during your
11  deposition?
12    A    I don't recall.
13    Q    Do you recall giving any testimony about the
14  poor management of investments to the SEC?
15    A    I assume so, but I don't recall.
16    Q    Was it Brian Watson's management of the
17  investments that you were concerned about?
18    A    Yes.
19    Q    Did you have any concerns about the
20  investment management by Don Marcotte?
21    A    Yes.
22    Q    What were your concerns about Don Marcotte?
23    A    Good guy but in over his head.
24    Q    What do you mean by "in over his head"?
25    A    Doesn't know how to handle direct reports,

---

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

98

1  can't hold people accountable, places too much
2  reliance on third-party vendors. There's other
3  nuances, but ultimately, yeah.
4      Q   So were you concerned by multiple people's
5  management of Northstar's investments?
6      A   Other than Brian Watson and Don Marcotte?
7      Q   Strike that.
8          Did you have concerns about anyone else's
9  management of Northstar's investments other than
10  Brian Watson and Don Marcotte?
11     A   Well, Brian Watson and Don Marcotte were the
12  only two managing the investments.
13     Q   Did you have any concerns about anyone that
14  worked for Don Marcotte or Brian Watson with respect
15  to managing the investments?
16     A   Again, managing the investments was only
17  technically Brian Watson and Don Marcotte. They were
18  the only managers of any of the investments.
19     Q   Did you have concerns about the execution by
20  the rest of the Northstar team with respect to
21  Northstar investments?
22     A   Yes.
23     Q   What were those concerns?
24     A   In a lot of occasions they didn't know what
25  they were doing.

---

99

1      Q   Do you recall who did not know what they
2  were doing?
3      A   Jason Marcotte, I don't remember some of --
4  Randy Keogh, K-E-O-G-H. I can't remember that guy we
5  fired finally. He did Citadel. Yeah. And there
6  were other instances, but the development team was
7  certainly the weak link at Northstar.
8      Q   Did you raise your concerns about the
9  development team to Mr. Watson?
10     A   I don't recall.
11     Q   Do you recall if Mr. Watson fired the
12  employee you mentioned because of your concerns?
13     A   Not because of my concerns, no.
14     Q   Do you recall why he fired that employee?
15     A   For the same reasons I thought he shouldn't
16  have been there also.
17        MR. BEDELL: Spell Marcotte, and is it the
18  same for both Don and Jason?
19        THE WITNESS: Yes, it is. M-A-R-C-O-T-T-E.
20        MS. BODNER: Thank you.
21  BY MS. BODNER:
22     Q   Were you the only person at Northstar that
23  knew what they were doing?
24     A   No.
25     Q   There were other individuals who you thought

---

100

1  were capable of performing their jobs at Northstar?
2      A   Performing their jobs, meaning performing
3  per se Don Marcotte's job or people in their
4  individual roles? A lot of the people at Northstar
5  were very competent professionals and there's a
6  number of them that were not in the correct position
7  for themselves.
8      Q   Do you recall testifying to the SEC about
9  the side deals that you hadn't been made aware of?
10     A   I don't recall.
11     Q   Did you help create Northstar's RIA,
12  registered investment advisor?
13     A   I did.
14     Q   What did you do with respect to Northstar's
15  registered investment advisor?
16     A   I chaperoned the creation of the ADV form,
17  Parts 1 and 2.
18     Q   I'm sorry, what is an ADV form?
19     A   Those are the forms you need to prepare to
20  establish yourself as an RIA.
21     Q   Is that an SEC obligation?
22     A   It is.
23     Q   Did you have a title affiliated with the
24  RIA?
25     A   No.

---

101

1      Q   Were you an officer?
2      A   No.
3      Q   Did you work with attorneys to create the
4  RIA for Northstar?
5      A   I did.
6      Q   Was the RIA created for the Sterling deals?
7      A   No, it was not created for any particular
8  deal. It was created because Brian Watson -- you
9  know, two of Brian Watson's attorneys strongly
10  recommended creating an RIA because of the amount of
11  assets under management. He passed a threshold of
12  assets under management that sort of makes them
13  required to register as an RIA.
14     Q   So do you have some background in SEC
15  regulations?
16     A   You know, just what I've researched. You
17  know, obviously I've never created a brokerage before
18  nor an RIA before. I just have my own securities
19  licensing.
20     Q   Do you recall making any change to the
21  Northstar website to be in compliance with SEC
22  regulations?
23     A   Not in particular, to be a part of it. You
24  know, I didn't -- I didn't notice something and said,
25  oh, I've got to change this to be in compliance. No,

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                        Amazon.com, Inc., et al. v. WDC Holdings LLC

---

102

1   I never did anything like that.
2      Q   Do you recall reviewing the website with an
3   eye towards SEC compliance?
4      A   Not as it relates to SEC compliance.  As
5   being a prudent investment manager and making sure
6   that your statements and claims aren't false or
7   misleading, yes.  I did my best to make sure that the
8   contents on the Northstar website was not false or
9   misleading.
10     Q   Did you also ever review investor
11  communications for -- to confirm that they were not
12  misleading?
13     A   My investor communications.  Now, "investor
14  communications" is a defined term by the SEC, by the
15  Securities Act.  So I'll assume for this conversation
16  that you're talking about it in general, not through
17  the definition of what a communications is defined by
18  the SEC.
19        So I reviewed my communications with an eye
20  to, again, not including any false or misleading
21  information.
22     Q   Did you have any concerns while you worked
23  at Northstar that it was violating any SEC
24  regulations?
25     A   Be more specific, please.

---

103

1      Q   You seem to have a solid understanding of
2   SEC rules and regulations?
3      A   Correct.
4      Q   While you were at Northstar, did you have
5   any concerns that any Northstar conduct was violating
6   any SEC rules or regulations?
7      A   I did have concerns of that, yes.
8      Q   What were your concerns?
9      A   The same concerns I expressed before, side
10  deals, lack of transparency, treating investors
11  different from one another.
12     Q   But you don't recall if you testified about
13  those concerns to the SEC during your deposition?
14     A   I spoke to the SEC for eight hours.  I don't
15  recall the specifics of that conversation.
16     Q   You testified earlier that you never made
17  a whistleblower complaint, correct?
18     A   Pardon me?
19     Q   You testified before that you've never made
20  a whistleblower complaint?
21     A   Define whistleblower complaint.
22     Q   How do you define whistleblower?
23     A   I think of a whistleblower complaint
24  specifically as it relates to federal contracts and
25  SEC issues.  I don't think there's such a thing as a

---

104

1   whistleblower in the private sector.  I could be
2   mistaken, I'm not a lawyer.
3        MR. BEDELL:  I'll also object.  I think
4   you've misstated his testimony from earlier, but it
5   is what it is.
6   BY MS. BODNER:
7      Q   Under your definition of a whistleblower
8   complaint, have you ever made a whistleblower
9   complaint?
10     A   Again, I would say I've never called the SEC
11  and said that there was something wrong, no.
12     Q   Have you ever called any federal agency and
13  said there was something wrong?
14     A   No.
15     Q   Have you ever gone to any private
16  corporation and said there was something wrong?
17     A   Yes.
18     Q   When did you do that?
19     A   Couple years ago.
20     Q   What entity did you report a wrongdoing to?
21     A   To Amazon.
22        MS. BODNER:  I am going to introduce another
23  document.  This is Exhibit 6.
24        (Deposition Exhibit DM-006 was deemed
25           marked for identification.)

---

105

1   BY MS. BODNER:
2      Q   This is the complaint in the case if you
3   want to flip through.  It's very long.
4      A   Okay.  I'll take your word for it.
5      Q   Have you seen this complaint before?
6      A   Actually, I don't know if I have.  I may
7   have, but I don't believe I have.
8      Q   If you could go to Page 22, you can just
9   type in the number at the bottom.
10        MR. BEDELL:  This is 6?
11        MS. BODNER:  This is Exhibit 6.
12        Oh, I'm sorry, it's Page 25 of the PDF,
13  Page 22 of the complaint.
14        Oh, I'm sorry, this is the wrong version.
15  Can I remove this?
16        MR. BEDELL:  It's not my deposition, but I
17  don't think you can remove an exhibit that you've
18  already marked.  You can mark another one.
19        MS. BODNER:  Yes.  Let's see.
20        MR. SMART:  Yeah, just mark another one.
21  Just add it as the next one.  You can tell the
22  reporter -- you can tell the court reporter.
23  Everybody has this one so you can ask the court
24  reporter to not actually attach it.  It's up to you.
25        MS. BODNER:  Okay.  I think --

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

106

1      MR. SMART:  Just describe what it was for
2  the record and then do another one.
3      MS. BODNER:  Okay.  I don't think -- Adam,
4  is there a way to upload documents once a deposition
5  has started?
6      MR. SMART:  Yeah, there should be an upload
7  button in the top left corner.  Do you see it?
8      MS. BODNER:  Yeah.  So for the record I've
9  introduced as Exhibit 6 an older version of the
10  complaint, which is the first amended version of the
11  complaint.  And I will not be asking questions about
12  this document because I would like to show a
13  different version of the complaint.
14      MR. BEDELL:  For the record, what we have,
15  it doesn't say "First Amended."  It says "Second
16  Amended Complaint."
17      MS. BODNER:  Really?  Okay.  Hold on.
18      MR. BEDELL:  When I say we have, I mean the
19  document on the screen that the witness and I are
20  viewing that is labeled DM-006 bears the title,
21  "Plaintiffs' Verified Second Amended Complaint."
22      MS. BODNER:  You are correct.  Is that what
23  yours shows as well?  But the footer isn't correct,
24  correct?
25      Can we go off the record.

---

107

1      THE VIDEOGRAPHER:  We are going off record
2  at 11:52 a.m.
3      (Off-the-record discussion.)
4      THE VIDEOGRAPHER:  We are back on record at
5  11:53 a.m.
6      MS. BODNER:  Okay.  I am going to introduce
7  another document.  This will be Exhibit 7.
8      (Deposition Exhibit DM-007 was deemed
9      marked for identification.)
10  BY MS. BODNER:
11  Q   Let me know when you're able to see that.
12  A   I see it.
13  Q   Mr. Mulcahy, is this the complaint that you
14  made to Amazon that you testified about?
15  A   It appears to be.
16  Q   Do you have any reason to believe that it's
17  not?
18  A   No.
19  Q   This is an e-mail from you to Jeff Bezos
20  dated December 2, 2019, correct?
21  A   Yes.
22  Q   Did you send this e-mail?
23  A   I did.
24  Q   Jeff Bezos was previously the president and
25  CEO of Amazon, correct?

---

108

1  A   He was.
2  Q   Why did you send this e-mail to Mr. Bezos?
3  A   I felt like it was the right thing to do.
4  Q   Why did you feel like it was the right thing
5  to do?
6  A   Intrinsically, it felt like the right thing
7  to do.
8  Q   What do you mean by "intrinsically"?
9  A   That's what I felt was -- it's a feeling.
10  It doesn't need any other basis.
11  Q   Did you know Mr. Bezos personally?
12  A   No.
13  Q   Did you know any Amazon employees personally
14  at the time you sent this e-mail?
15  A   I've met a few people from Amazon in the
16  past, yes.  Well, Amazon, AWS, where that dividing
17  line is is a different -- is open to debate.
18  Q   Do you understand that when I use the term
19  "Amazon," I'm referring to either Amazon as a whole
20  or AWS?  Are you fine if I use it interchangeably?
21  A   Yeah.
22  Q   Did you discuss this e-mail with anyone
23  before you sent it?
24  A   No.
25  Q   Was there a reason you sent this e-mail on

---

109

1  December 2, 2019?
2  A   Just finally decided to do it.
3  Q   You didn't have any other basis other than
4  you intrinsically felt it was the right thing?
5  A   Correct.
6  Q   You didn't think you needed any other basis
7  to send this e-mail?
8  A   (Witness shakes head.)
9  Q   Do you try to do the right thing in your
10  daily life?
11  A   I do.
12  Q   What did you hope to happen after you sent
13  this e-mail?
14  A   What did I think -- repeat the question.
15  Q   What did you hope to happen after you sent
16  this e-mail?
17  A   Just that it was acknowledged and rectified.
18  Q   That what was acknowledged?
19  A   That there was likely unscrupulous behavior
20  happening at the Amazon level.
21  Q   And what did you hope to be rectified?
22  A   That the -- that this -- that Amazon
23  employees weren't awarding contracts and making --
24  you know, outside the free market.
25  Q   You were not working for Northstar at the

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

110

1  time you sent this e-mail, correct?
2     A   No, I was not.
3     Q   This was a few months after you resigned
4  from Northstar?
5     A   Several, actually.  Nearly a year.
6     Q   And nothing happened that led you to send
7  this e-mail at this time, nearly a year after you
8  left Northstar?
9     A   Not any particular event, no.
10    Q   Did anything generally happen that led you
11 to send the e-mail?
12       MR. HEYBURN:  Objection.  Asked and
13 answered.
14       THE WITNESS:  No.
15 BY MS. BODNER:
16    Q   Did anyone else -- strike that.
17       Did anyone encourage you to send this
18 e-mail?
19    A   No.
20    Q   I want to walk through the contents of this,
21 of this e-mail.
22       Can you please read the first sentence
23 starting with, "Would you care --" out loud.
24    A   "Would you care to hear about a couple of
25 your employees who have taken kickbacks in excess of

---

111

1  $8 million, maybe as high as 50 million, and in my
2  opinion represent a threat to the security of AWS?"
3     Q   Who were you referring to when you said
4  "employees"?
5     A   Casey Kirschner and I didn't know what
6  Carl's last name was at the time.
7     Q   Had you ever met Casey Kirschner at the
8  time?
9     A   I have.
10    Q   You have?
11    A   Uh-huh.
12    Q   On how many occasions have you met Casey?
13    A   Just once.  I believe it was just once.
14       MR. BEDELL:  Objection.  Asked and answered.
15 We already went through this at length this morning.
16       THE WITNESS:  No, that was Christian.
17       MR. BEDELL:  Sorry, my bad.
18       THE WITNESS:  This is Casey.
19       MR. BEDELL:  Yep.
20 BY MS. BODNER:
21    Q   So you just testified that you met Casey
22 Kirschner on one occasion, correct?
23    A   I believe it was only one occasion.
24    Q   Do you remember anything about that meeting?
25    A   I got to see an Amazon data center.

---

112

1     Q   Which Amazon data center?
2     A   I don't know.  It was just one in Virginia.
3     Q   Was it a data center that Northstar was
4  affiliated with?
5     A   No.
6     Q   Do you recall when that meeting with Casey
7  Kirschner was?
8     A   No.
9     Q   Why were you in Amazon -- strike that.
10       Why were you in Virginia seeing an Amazon
11 data center?
12    A   Brian Watson took us there to look at what a
13 data center looked like.
14    Q   Do you recall anything else about that
15 visit?
16    A   No.
17    Q   Did you have any conversations with Casey
18 Kirschner?
19    A   No, nothing in particular.  Not certainly
20 one-on-one, no.
21    Q   Have you ever met Carl Nelson?
22    A   I don't believe so.
23    Q   Did you meet Carl Nelson on that same trip?
24    A   I don't believe so.
25    Q   You say, "your employees who have taken

---

113

1  kickbacks"?
2     A   Yes.
3     Q   What was the basis for your statement that
4  Carl Nelson and Casey Kirschner took kickbacks?
5     A   The basis?
6     Q   Uh-huh.
7     A   It was my understanding that Christian
8  Kirschner had acted as a conduit to pay, you know,
9  the referral fees that were paid to Casey -- to
10 Christian Kirschner, were then a large portion,
11 majority of the portion, was paid to Carl and Casey.
12    Q   What was that understanding based on?
13    A   Different conversations in the office, an
14 e-mail exchange.  Well, that was just conversations
15 in the office.
16    Q   Conversations in the office with who?
17    A   I don't remember.
18    Q   And when you say "office," are you talking
19 about the Northstar office?
20    A   I am.
21    Q   Do you recall if those conversations were
22 with Tim Lorman?
23    A   I do not recall.
24    Q   Do you recall if those conversations were
25 with Kyle Ramstetter?

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

114

1    A   Likely.
2    Q   Why likely?
3    A   Because there's, you know, several people
4  that were involved in those: Brian Watson, Don
5  Marcotte, and Kyle Ramstetter, Brent Gray, and Kristi
6  Fisher.
7    Q   Was Will Camenson also involved in these
8  discussions?
9    A   No.
10   Q   What do you recall about your conversations
11 with the Northstar employees you just listed about
12 Amazon employees taking kickbacks?
13   A   Say your question again.
14   Q   What do you recall about your conversations
15 with the Northstar employees you just listed about
16 Amazon employees having taken kickbacks?
17   A   That it was not -- it was not cool and I
18 didn't want anything to do with it.
19   Q   Who told you that it was occurring?
20   A   I don't remember the specifics.  I just know
21 it was occurring.  Or I never saw the specifics, so a
22 lot of it is assumption and hearsay.  But that was my
23 understanding.
24   Q   So you sent this e-mail to Mr. Bezos based
25 on assumptions and hearsay?

---

115

1    A   Yes.
2    Q   Why did you use the term "kickbacks" in this
3  e-mail?
4    A   Because that's what I understood it to be.
5    Q   And why did you understand it to be
6  kickbacks?
7    A   Because they awarded a contract and then
8  they got paid a lot of money.  That's a kickback.  If
9  you have a different definition, I'm open to hearing
10 it.
11   Q   And who was awarded a lot of money?
12   A   Nobody was awarded a lot of money.  WDC was
13 awarded a contract and Casey --
14   MS. BODNER:  I think we all just lost -- can
15 we go off the record.
16   MR. BEDELL:  I was going to say we've lost
17 connection.
18   THE VIDEOGRAPHER:  We are going off record
19 at 12:03 p.m.
20   (Pause in proceedings.)
21   THE VIDEOGRAPHER:  We are back on record at
22 12:12 p.m.
23 BY MS. BODNER:
24   Q   We just lost internet and you were in the
25 middle of responding to a question.  Do you remember

---

116

1  what you were going to say or do you want me to pose
2  a new question?
3    A   I do.
4    Q   Would you mind continuing?
5    A   It's my understanding that after WDC was
6  awarded the contract, that with Christian as a
7  conduit, Casey and Carl received a bulk of the
8  referral fees that were originally considered for
9  Christian Kirschner.
10   Q   And what was your understanding based on?
11   A   Conversation in office.
12   Q   Conversations in the office with who?
13   A   With the group of people I mentioned
14 earlier.
15   Q   Do you recall any specific conversations?
16   A   No.
17   Q   Do you recall ever seeing any documents
18 about these payments to Carl Nelson and Casey
19 Kirschner?
20   A   No.
21   Q   Did you tell Mr. Bezos in this e-mail that
22 your claims were based on hearsay and assumptions?
23   A   No.
24   Q   Did you think that was important for him to
25 know?

---

117

1    A   No.
2    Q   Why not?
3    A   You know, he can do his own investigation.
4    Q   You had no concerns about him carrying on an
5  investigation based on hearsay and assumptions?
6    MR. HEYBURN:  Objection.  Asked and
7  answered.
8    THE WITNESS:  Not at all.
9  BY MS. BODNER:
10   Q   Do you see that you said, "and in my opinion
11 represent a threat to the security of AWS"?
12   A   Yes.
13   Q   What did you mean by that?
14   A   The integrity of the AWS or -- yeah, the
15 integrity of AWS is put in jeopardy with behavior
16 like that.
17   Q   And other than your conversations with the
18 Northstar employees, did you have any evidence that
19 the integrity of AWS was being put at risk?
20   A   No.
21   Q   And other than your conversations with the
22 Northstar employees you listed, did you have any
23 evidence that Amazon employees were taking kickbacks?
24   A   No.
25   Q   So looking at the second paragraph, would

---



CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

118

1  you mind reading that aloud starting with, "I never
2  considered --"
3    A    "I never considered myself a rat, and I am
4  actually on good terms with everyone involved, but I
5  guess I am just upset that I have always acted with
6  integrity and it is disheartening when people are
7  rewarded so grossly for unscrupulous behavior."
8    Q    Why were you disheartened?
9    A    It states it right there.
10    Q    What people were being rewarded so grossly
11  for unscrupulous behavior?
12    A    Brian Watson, Casey, and Carl.
13    Q    Was your understanding that Brian Watson,
14  Casey Kirschner, and Carl Nelson were being rewarded
15  for unscrupulous behavior based on these
16  conversations you had with Northstar employees?
17    A    Yes.
18    Q    Is it based on anything else?
19    A    No.
20    Q    You also said, "I am actually on good terms
21  with everyone involved," correct?
22    A    Correct.
23    Q    When you said "everyone involved," who are
24  you referring to?
25    A    Brian Watson and Don Marcotte.

---

119

1    Q    What was Don Marcotte's title at Northstar?
2    A    Director of development.  And manager of
3  various investments.
4    Q    Did you believe that he was engaged in
5  unscrupulous behavior with respect to Amazon?
6    A    Yes.
7    Q    What was his involvement?
8    A    The same involvement that Brian Watson had.
9    Q    And what was the involvement that Brian
10  Watson had?
11    A    Being aware of -- helping facilitate the
12  kickbacks to Carl and Casey.
13    Q    And how did you know that Brian Watson was
14  facilitating kickbacks to --
15    A    I don't have any tangible evidence.  That
16  was the understanding that the office was under,
17  multiple people in the office were under.
18    Q    And I just need to repeat my question
19  because you interrupted me.  So I apologize.
20      MS. BODNER:  Would you mind reading back my
21  original question?
22      (Thereupon, from the record above,
23      the reporter read, to wit:
24      "Q  And how did you know that Brian
25      Watson was facilitating kickbacks

---

120

1      to --")
2  BY MS. BODNER:
3    Q    -- Carl Nelson and Casey Kirschner?
4    A    I don't have any tangible evidence.  It's my
5  understanding that that's the behavior that was
6  happening.
7    Q    When you say you don't have any tangible
8  evidence, what do you mean by "tangible evidence"?
9    A    I don't have any evidence.
10    Q    Did you think at any time that you had any
11  evidence of this conduct by Brian Watson?
12    A    No.
13    Q    At any time did you think you had tangible
14  evidence of Carl Nelson or Casey Kirschner accepting
15  kickbacks?
16    A    No.
17    Q    Can you look at the third paragraph and read
18  that first sentence starting with, "My knowledge --"
19    A    "My knowledge and evidence will lead you to
20  the others that have empirical evidence."
21    Q    Who were the others you were referring to?
22    A    It was misstated, but it was Kyle
23  Ramstetter.  It should have been "other."
24    Q    Why didn't you identify Mr. Ramstetter by
25  name?

---

121

1    A    It wasn't pertinent at this point of the
2  communication.  I didn't mention anybody's names in
3  this.
4    Q    Did you think anyone else other than
5  Mr. Ramstetter had empirical evidence?
6    A    No.  Well, in this context, no.
7    Q    What do you mean "in this context"?
8    A    Well, Brent Gray, Kristi Fisher, Don
9  Marcotte also, I'm sure, have tangible evidence, but
10  in this regard, I was just talking about Kyle.
11    Q    Did you talk to Kyle about this e-mail
12  before you sent it to Mr. Bezos?
13    A    No, I did not.
14    Q    Why did you believe that Mr. Ramstetter had
15  empirical evidence that would be of interest to
16  Mr. Bezos?
17    A    That's because it's my understanding that
18  Kyle had done something similar as Brian did.
19    Q    What do you mean that Mr. Ramstetter had
20  done something similar?
21    A    He had bought a piece of land or somehow
22  sold a piece of land -- I don't know the details to
23  it -- but had sold some land to Amazon for -- in
24  exchange for some sort of, you know, kickback
25  structure.  I never had the details to that.  I just

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                      Amazon.com, Inc., et al. v. WDC Holdings LLC

---

122

1    knew that Kyle would have it.
2      Q    And why did you know that Kyle would have
3    those details?
4      A    Just I suspected that he did.
5      Q    What made you suspect Mr. Ramstetter would
6    have those details?
7      A    Because I was aware of the deal that he had
8    done with -- you know, I wasn't aware of the
9    specifics, but I was aware of the deal that he had
10   the land that he had sold to AWS.
11     Q    When did you become aware of the land that
12   Mr. Ramstetter had sold to AWS?
13     A    When it was in the Virginia Business Journal
14   or something like that.
15     Q    After you sent this e-mail, did you tell
16   Mr. Ramstetter that you had sent it?
17     A    No.
18     Q    When is the last time you've communicated
19   with Mr. Ramstetter?
20     A    No idea, but probably 2000- -- probably like
21   April 2019.  I can't remember exactly, but it was a
22   long time ago.  I don't think I spoke to him after I
23   left Northstar.
24     Q    Did you think that Mr. Ramstetter would want
25   to share empirical evidence with Amazon?

---

123

1          MR. HEYBURN:  Objection.  Calls for
2    speculation.
3          THE WITNESS:  Yeah.
4    BY MS. BODNER:
5      Q    You can answer.
6      A    I have no idea.  I have no opinion either
7    way.  I have no idea how he would feel about it.
8      Q    Was Mr. Ramstetter involved in the
9    unscrupulous behavior that you identified above?
10     A    I suspected that he was.
11     Q    And other than what you learned in the
12   Business Journal, did you have any reason to suspect
13   that Mr. Ramstetter was involved in unscrupulous
14   behavior?
15     A    Say that again.
16     Q    What was the basis for your belief that
17   Mr. Ramstetter was engaged in unscrupulous behavior?
18     A    Because he did -- he did a side deal outside
19   of Northstar with the same parties that were at
20   Amazon.  So I just surmised that he did the same
21   thing.
22     Q    What led you to surmise that he did the same
23   thing?
24     A    Didn't I just answer that?
25          MR. BEDELL:  You did.

---

124

1          THE WITNESS:  Because I surmised that he did
2    it because he is -- outside of Northstar he
3    facilitated some sort of real estate transaction with
4    the same parties at Amazon as Brian Watson had, so I
5    figured it was under the similar terms.
6    BY MS. BODNER:
7      Q    Thank you.
8          How did you know that Mr. Ramstetter had
9    engaged in this transaction?
10     A    It was --
11          MR. BEDELL:  Objection.  Go ahead.
12          THE WITNESS:  It was in the
13   Virginia Business -- I think it's called -- I might
14   have the title wrong, but I believe it's called the
15   Virginia Business Journal.  Could be something else.
16   BY MS. BODNER:
17     Q    So it was an article published in some sort
18   of publication?
19     A    Correct.
20     Q    Was Mr. Ramstetter identified by name in
21   that article?
22     A    He was.
23     Q    Was anyone else at Northstar involved in
24   that transaction?
25     A    I don't know the specifics.  I have no idea

---

125

1    who at Northstar did it or was or wasn't a part of
2    it.
3      Q    Do you know if Mr. Watson was a part of it?
4      A    I doubt that he was a part of it.
5      Q    Why do you doubt that he was a part of it?
6      A    Because Brian Watson fired Kyle after he
7    found out about it.
8      Q    Do you recall how you came across that
9    article about the transaction?
10     A    Kyle Ramstetter called me about it.
11     Q    What did he say when he called you?
12     A    "They just published a deal that Northstar
13   did it -- bought a piece of land and they didn't, I
14   did it."  That is what he told me.
15     Q    Why did he call you?
16     A    Because he wanted to talk to somebody.
17     Q    Was he looking for advice?
18          MR. HEYBURN:  Objection to form.
19          THE WITNESS:  I have no idea.
20   BY MS. BODNER:
21     Q    What did you tell him in response to his
22   call to you?
23     A    I told him, "Well, call the Business Journal
24   and correct it, take Northstar out of it, it wasn't
25   Northstar."

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

126

1    Q    Were you working at Northstar when he called
2  you?
3    A    I don't believe I was.  I could have been.
4  I have no idea when -- I don't know when that was
5  published and I have no idea -- I don't recall
6  whether I was still at -- I doubt it, but I couldn't
7  tell you.
8    Q    Did you and Mr. Ramstetter have a close
9  relationship while you worked at Northstar?
10    A    We had a working relationship.  I wouldn't
11  call it close.
12    Q    Did you stay in touch after you left
13  Northstar?
14    A    No.
15    Q    What else do you recall about the
16  conversation with Mr. Ramstetter?
17    A    That was it.  It was literally a
18  three-minute conversation.
19    Q    And you understood from Mr. Ramstetter that
20  he had engaged in a side deal while working at
21  Northstar?
22    A    The terminology is of your choosing.  What
23  he did do was he sold a piece of land to Amazon.
24  Whether you want to consider it a side deal or not is
25  at your discretion.  All I'm aware of is that

---

127

1  Brian -- or that Kyle sold a piece of land to Amazon.
2  The characterization of "side deal," I don't know if
3  that's the correct characterization.
4    Q    Understood.  Did Mr. Ramstetter sell the
5  land to Amazon while he was at Northstar?
6    A    I assume so because he got fired for it.
7    Q    And you have no idea why Mr. Ramstetter
8  would have called you about this?
9          MR. HEYBURN:  Objection.  Asked and
10  answered.
11          MR. BEDELL:  Objection.  Calls for
12  speculation.
13          THE WITNESS:  I mean, he could have called a
14  dozen people.  Why he called me, I don't know.
15  BY MS. BODNER:
16    Q    Had Mr. Ramstetter confided in you before?
17    A    No.
18    Q    And you don't recall anything about your
19  response to Mr. Ramstetter?
20    A    I told you what my response was:  "Well,
21  call the Business Journal and tell them that it
22  wasn't Northstar, that it was whatever -- it was you
23  and whatever entity."
24    Q    Do you know if he did that?
25    A    I have no idea.

---

128

1    Q    After that call, did Kyle Ramstetter follow
2  up with you in any way about this transaction?
3    A    No, not that I'm aware of.
4    Q    Did you discuss Mr. Ramstetter's call with
5  you with Mr. Camenson?
6    A    No.
7    Q    Did Mr. Camenson call you about the article
8  in the Business Journal?
9    A    No.
10    Q    Did you have any discussions with
11  Mr. Camenson about the article in the Business
12  Journal?
13    A    No.
14          MR. HEYBURN:  Objection to form.
15  BY MS. BODNER:
16    Q    And you testified that no one encouraged you
17  to send this e-mail, correct?
18    A    Correct.
19    Q    You said, "I thought about doing an SEC
20  whistleblower or just calling a newspaper," right?
21    A    Yeah.
22    Q    Why did you not file an SEC whistleblower
23  complaint?
24    A    No particular reason.  It was easier just to
25  write an e-mail to Jeff Bezos and see if anybody

---

129

1  responded.
2    Q    Did you think you would get a response?
3    A    No.
4    Q    Did you call any newspapers?
5    A    Uhm-um.  No, I did not.  Sorry.
6    Q    Why did you choose not to call a newspaper
7  about your concerns?
8    A    I believe I just answered that, that it was
9  easiest to just to send a quick e-mail.
10    Q    And you said, "Honestly, I have so much
11  respect for what you have accomplished."
12          What did you mean by that?
13    A    That Jeff Bezos had accomplished a lot.
14    Q    And you had a lot of respect for what Jeff
15  Bezos had accomplished?
16    A    Correct.
17    Q    Can you read the rest of that sentence
18  starting with, "-- not to mention --"
19    A    "-- not to mention I wouldn't turn away any
20  compensation or some sort of professional engagement
21  but we can see how this all plays out."
22    Q    Were you hoping to get compensation for your
23  e-mail?
24    A    I wouldn't say "hoping" is the right word,
25  but it was certainly prudent to, you know, mention it

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

130

1   just in case.
2       Q    Did you expect to receive compensation for
3   your e-mail?
4       A    No, I did not.
5       Q    Were you hoping to get some sort of
6   professional engagement with Amazon?
7       A    Well, I'm always hoping to get professional
8   engagement from any big company, but, yes.
9       Q    Did you send this e-mail hoping that it
10  would lead to some sort of professional engagement
11  with Amazon?
12      A    No.
13      Q    Did you have any motives for sending this
14  e-mail other than to feel good?
15      A    No.
16      Q    Were you looking for employment at the time
17  you sent this e-mail?
18      A    No.
19      Q    So the second-to-last paragraph, you say,
20  "This letter is being shared in confidence and I do
21  not want my name, company, or contact information
22  disclosed --"
23           Do you see that?
24      A    Yes.
25      Q    Why did you not want your name or company

---

131

1   disclosed to anyone outside of Amazon's legal
2   department?
3       A    It's nobody else's business.
4       Q    Did you expect that Amazon would be able to
5   honor your request for confidence?
6       A    I did.
7       Q    Why did you expect that?
8       A    No reason they couldn't.
9       Q    Did you hope that Amazon would carry out an
10  investigation based on this e-mail?
11      A    I did.
12      Q    Did you think that they'd have to contact
13  any current or former Northstar employees?
14      A    Probably.
15      Q    But you thought they could keep your name in
16  confidence while they did that?
17           MR. HEYBURN:  Object to form.
18           THE WITNESS:  Yes.
19  BY MS. BODNER:
20      Q    Did you discuss this e-mail with anyone
21  after you sent it?
22      A    No.
23      Q    And you had never raised any of the concerns
24  contained in this e-mail with anyone while you worked
25  at Northstar, right?

---

132

1       A    No.
2       Q    Did you discuss this e-mail with the SEC?
3       A    I don't recall.
4       Q    Do you recall discussing any of the contents
5   of this e-mail with SEC?
6       A    I don't recall.
7       Q    Did Mr. Bezos respond?
8       A    Not personally.
9       Q    Did someone else at Amazon respond?
10      A    Yes.  Legal counsel.
11      Q    Do you remember who?
12      A    No.
13      Q    So in sending this e-mail, were you trying
14  to report Mr. Watson to Amazon?
15      A    Not as an individual, but the act itself is
16  what I was trying to report to Amazon.
17      Q    And what do you mean by "the act itself"?
18      A    The kickback scheme that jeopardized the
19  security of AWS.
20      Q    Were you trying to report the kickback
21  scheme -- strike that.
22           Were you trying to report the land sale
23  involving Mr. Ramstetter to Amazon as well?
24      A    Yeah, all, everything that was -- that I
25  understood was happening.  I wasn't aware of the full

---

133

1   scope of any of it, whether -- or whether it was just
2   WDC.  You know, it could have been other companies,
3   you know, that were building data centers.  I didn't
4   know.  And I thought it was important for Amazon to
5   know that.
6       Q    You thought it was important for Amazon to
7   know about -- strike that.
8           Did you have any reason to believe that any
9   other data centers involving Amazon involved improper
10  conduct?
11      A    I had no tangible evidence or reason to
12  suspect other than, you know, when there's smoke,
13  there's fire.
14      Q    What do you mean by that?
15      A    That if it's happening in one instance,
16  there's no reason it's not happening in multiple
17  instances.
18      Q    And your understanding that it was happening
19  in this instance is based on hearsay and assumptions?
20      A    It is.
21           MR. HEYBURN:  Objection.  Leading.
22  BY MS. BODNER:
23      Q    And what smoke did you see involving
24  Northstar?
25           MR. BEDELL:  Objection.  Asked and answered

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy

Amazon.com, Inc., et al. v. WDC Holdings LLC

---

**134**

1 repeatedly.
2 BY MS. BODNER:
3    Q   I have not asked that question, so you can
4 answer.
5    A   The smoke is my understanding that Christian
6 Kirschner was acting as a conduit of the referral
7 fees back to Casey and Carl at Amazon.  That was the
8 smoke.
9        The fact that there was a second event
10 wherein Kyle had sold land to the same company and
11 the same principals -- at least is my
12 understanding -- not principals, I guess, but, you
13 know, control persons per se, that was two instances.
14 So, yes, that was smoke in my mind.
15    Q   Did you negotiate a release with Amazon?
16    A   What type of release?
17    Q   I'll show you.
18        MS. BODNER:  I'm going to introduce another
19 document.  This is being introduced as Exhibit 8.
20        (Deposition Exhibit DM-008 was deemed
21        marked for identification.)
22 BY MS. BODNER:
23    Q   Let me know when you're able to see it.
24    A   Yes.
25    Q   Do you recognize this as an e-mail chain

---

**135**

1 with you and Matt Doden at Amazon?
2    A   Which one?  Which page are you referring to?
3    Q   Right now, I'm looking at the top e-mail.
4    A   Okay.  Yes.
5    Q   And do you know if that's how to pronounce
6 his name?
7    A   No idea.
8    Q   Is he who reached out to you after you sent
9 your e-mail?
10    A   I don't remember which person reached out to
11 me.
12    Q   Did multiple people reach out to you?
13    A   There was a couple of people at Amazon.  I
14 don't know who was first and who was second and who
15 was all at the same time.
16    Q   So if you could go to the third page of this
17 PDF, please.
18    A   Okay.
19    Q   Do you see that you sent an e-mail at
20 6:30 p.m. to someone named Yousri Omar?
21    A   I do.
22    Q   Was that someone else at Amazon who you
23 communicated with?
24    A   Yes, it appears to be.
25    Q   Do you know how to pronounce Mr. Omar's

---

**136**

1 name?
2    A   I do not.
3    Q   Do you see that second paragraph, where you
4 say, "Before I share these --"?
5    A   Yes.
6    Q   Can you read that sentence for the record.
7    A   "Before I share these, I'd like to get an
8 agreement for immunity (not that I need one but can't
9 be too careful), I'd expect you may want me to sign a
10 nondisclosure agreement also and I'd like to know
11 whether I might be due some remuneration."
12    Q   Do you recall asking Amazon for an agreement
13 for immunity?
14    A   I do.
15    Q   Why did you request an agreement for
16 immunity?
17    A   As a CYA.
18    Q   What does "CYA" stand for?
19    A   Cover your ass.
20    Q   Why did you want a CYA agreement?
21    A   Because I was -- whether it's knowingly or
22 not, I was still a party to the transaction.  I
23 didn't want to be drug into it.  I had no
24 decision-making, I had no control, etcetera,
25 etcetera.  But none of that matters.  So I just

---

**137**

1 figured, hey, it doesn't hurt to ask.
2    Q   So you were concerned that you would be
3 implicated in any conduct that Amazon was interested
4 in?
5    A   I shouldn't be implicated, no, but --
6        MR. HEYBURN:  Objection.  Leading.
7        THE WITNESS:  Yeah, I shouldn't be
8 implicated, but, you know, I'm not a lawyer, so I
9 thought it would be a prudent thing to ask.
10 BY MS. BODNER:
11    Q   Did you have any concerns that you've done
12 anything improper with respect to Amazon while you
13 worked at Northstar?
14    A   No, I never did anything improper.
15    Q   And you asked again "whether I might be due
16 some remuneration," right?
17    A   I did.
18    Q   Why did you ask that?
19    A   Don't ask, don't get.
20    Q   Were you hoping to get some remuneration?
21    A   It wasn't the basis of the e-mails, but
22 certainly you wouldn't I hope for it.
23    Q   Did you think you deserved remuneration?
24    A   No.
25    Q   Did you know any instances prior to this

EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

138

1  conversation in which Amazon paid someone for
2  providing information?
3      A   No, I did not.
4      Q   Do you recall anything about the process of
5  negotiating an immunity agreement with Amazon?
6      A   Yeah, I believe I -- I don't know how
7  long -- I don't remember the specifics, no, I don't.
8  It took some time.  All I remember is it took some
9  time and it wasn't as cut and dry as I had hoped.
10     Q   What do you recall about the back and forth
11 that took time?
12     A   It just took time.
13     Q   Do you know why it wasn't as cut and dry as
14 you hoped?
15     A   No, just figured it would all be done with
16 with just a couple e-mails and I'd be done with it,
17 but it didn't work out that way.  It took more time
18 and more e-mails and more conversations.
19     Q   Do you know why it took more time and
20 conversations?
21     A   No.
22     Q   Was that on your end or Amazon's end?
23     A   Amazon.
24     Q   Did you eventually enter an agreement with
25 Amazon?

139

1      A   I think I ended up finally with sort of a
2  soft confidentiality agreement, but that was about
3  it.  And I don't even know if I got the actual
4  executed confidentiality agreement, quite honestly.
5          MS. BODNER:  I'm going to introduce another
6  exhibit.  It's Exhibit 9.
7          (Deposition Exhibit DM-009 was deemed
8           marked for identification.)
9  BY MS. BODNER:
10     Q   Let me know when you are able to see it.
11     A   Yeah, I see it.
12     Q   Do you recognize this e-mail with the
13 attachment?
14     A   There's no reason for me to believe this
15 isn't the e-mail exchange that I did, so it was a
16 long time ago -- so, yes, I'll say I recognize it.
17     Q   Can you turn to the second page, which is
18 the Confidential Release Agreement.
19     A   I can.
20     Q   Do you see your signature at the bottom?
21     A   I do.
22     Q   Do you recall if anyone at Amazon ever
23 signed this?
24     A   As I just mentioned, I don't believe I got
25 the fully executed copy.

140

1      Q   Did you ever ask for a fully executed copy?
2      A   I assume that I did, but I do not recall
3  whether I did.
4      Q   Do you understand that this Confidential
5  Release Agreement was never fully executed?
6          MR. BEDELL:  Objection.  Read that one back
7  for me, please.  I think you lost a word in the
8  middle of it.
9          (Thereupon, from the record above,
10          the reporter read, to wit:
11         "Q  Do you understand that this
12          Confidential Release Agreement was
13          ever fully executed?")
14         THE WITNESS:  I do not believe that this was
15 ever fully executed.
16 BY MS. BODNER:
17     Q   Do you think that you ever entered a binding
18 Confidential Release Agreement with Amazon?
19     A   No.
20     Q   Did that concern you at any time?
21     A   It disappointed me.  Didn't concern me.
22     Q   Do you know why Amazon never sent you a
23 signed version?
24     A   Because they didn't have to.
25     Q   Why did they not have to?

141

1      A   Because they had everything that I told them
2  already.
3      Q   And you didn't follow up with them to
4  request a signed version?
5      A   I assume that I did, but I do not recall.
6      Q   Did you expect, based on this Confidential
7  Release Agreement that only you signed, that Amazon
8  would keep your confidence?
9      A   I hoped that they would.
10     Q   But you understood that they were not
11 obligated to?
12     A   I did.
13     Q   Can you go back up to the first page, to the
14 4:11 p.m. e-mail from Mr. Omar.
15     A   Yeah.
16     Q   Do you see that he says, "We got some
17 updates this week that are requiring us to move
18 quickly"?
19     A   I do.
20     Q   Do you know what updates he was referring
21 to?
22     A   No idea.
23         MR. HEYBURN:  Objection.  Calls for
24 speculation.
25         ///

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

142

1  BY MS. BODNER:
2      Q   Did you have any conversations with Mr. Omar
3  about these updates?
4      A   I don't recall.
5      MS. BODNER:  Now would be a good time for a
6  short break if folks want.
7      THE WITNESS:  Is this the lunch break?
8      MS. BODNER:  I don't know if -- can we go
9  off the record.
10     THE VIDEOGRAPHER:  We are going off record
11  at 12:43 p.m.
12     (Thereupon, a lunch recess was taken.)
13     THE VIDEOGRAPHER:  We are back on record at
14  1:11 p.m.
15  BY MS. BODNER:
16     Q   Mr. Mulcahy, I have some additional
17  questions to ask you.
18     Did you do anything to confirm the
19  statements in your e-mail to Mr. Bezos before you
20  sent it?
21     A   No.
22     Q   Were you concerned that you'd face any
23  liability for accusing Mr. Watson, Mr. Nelson, or
24  Mr. Kirschner of taking kickbacks or paying
25  kickbacks?

---

143

1      A   No.
2      MS. BODNER:  I'm going to introduce another
3  document.  This will be marked as Exhibit 10.
4      (Deposition Exhibit DM-010 was deemed
5        marked for identification.)
6  BY MS. BODNER:
7      Q   Please let me know when you see it.
8      Do you see it?
9      A   Yeah.
10     MR. HEYBURN:  I'd just like to object.  I
11  don't see any docket information on this document, so
12  I'm just noting that for the record.
13     MS. BODNER:  Okay.
14  BY MS. BODNER:
15     Q   Do you see that this is titled, "Declaration
16  of D. Matthew Doden in Support of Plaintiffs'
17  Supplemental Memorandum in Support of Show Cause
18  Order and Plaintiffs' Application for Preliminary
19  Injunction"?
20     A   I see it.
21     Q   And then do you see, if we go over to Page
22  8 --
23     MR. BEDELL:  So I've got a question.  Can
24  you show this to him?
25     MS. BODNER:  We have a protective order in

---

144

1  this case.
2      MR. BEDELL:  I understand that.  I'm not
3  sure he is governed by it.  It's not my issue, but
4  I'm just --
5      MS. BODNER:  I believe the protective order
6  governs deponents in this case.
7      Adam, do you think there are any concerns
8  with showing this to the witness?
9      MR. SMART:  The seal's been lifted, if
10  that's what he's asking about.  But it's been refiled
11  as of -- this was refiled, wasn't it, on a recent
12  motion?  The seal got lifted in this.
13     MS. BODNER:  Okay.
14     MR. SMART:  I assume that's what you're
15  asking about.
16     MR. BEDELL:  It's not my issue.  I just see
17  it -- I'm not the one that declared this
18  confidential.  I don't really care.  I'm just sort of
19  curious because you've got a document under seal that
20  we're showing -- a document that says it's under seal
21  that's being shown to a third party who I'm not
22  entirely -- I'm not going to opine on the protective
23  order, but ask away.
24  BY MS. BODNER:
25     Q   Do you see in the last page that it's signed

---

145

1  by Mr. Doden?
2      A   I do.
3      Q   And do you see that it was executed on
4  May 18, 2020?
5      A   I do.
6      Q   Have you ever seen this document --
7      A   No.
8      Q   -- before?
9      A   No, I have not.
10     Q   You know who Mr. Doden is, correct?
11     A   From earlier today, you showed me an e-mail
12  exchange with him, but I wouldn't know him from Adam.
13     Q   Sorry, you wouldn't know him from Adam?
14     A   I wouldn't know him from anybody else.
15     Q   Okay.  Do you recall if he is one of the
16  individuals at Amazon you communicated with?
17     A   I do not recall, but I assume from that
18  e-mail communication that you shared with me earlier
19  that he's one and the same.
20     Q   Do you know the last time you spoke with
21  Mr. --
22     A   No idea.
23     Q   -- Doden?  And you don't know how to
24  pronounce his last name, correct?
25     A   No.

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

146

1    Q    Okay. Let's see. Can you go to
2    paragraph --
3          THE WITNESS: Sorry, this was supposed to be
4    on Do Not Disturb.
5          MS. BODNER: That's okay.
6          THE WITNESS: It is on Do Not Disturb, but
7    it's still ringing, so I don't know.
8          MR. BEDELL: I didn't hear it.
9          THE WITNESS: Okay. Go ahead.
10   BY MS. BODNER:
11   Q    Do you see Paragraph 3?
12         MR. BEDELL: I'm sorry, page?
13   BY MS. BODNER:
14   Q    Page 2, Paragraph 3.
15   A    Okay.
16   Q    Do you see that it says, "On December 2,
17   2019, a former employee and director of Northstar
18   Commercial Partners (Informant 1) sent an e-mail to
19   Amazon CEO and president Jeff Bezos --"
20         MR. BEDELL: The question is: Does he see
21   that?
22         MS. BODNER: Yes.
23         THE WITNESS: I do see it.
24   BY MS. BODNER:
25   Q    Do you understand the reference to Informant

---

147

1    1 to be referring to you?
2          MR. BEDELL: Objection to the extent --
3    objection. You're asking him to speculate on a
4    document that somebody else wrote that he just
5    testified he's never seen before.
6    BY MS. BODNER:
7    Q    Do you have any reason to believe that
8    Informant 1 does not refer to you?
9          MR. BEDELL: Same objection.
10   BY MS. BODNER:
11   Q    You can answer.
12   A    I guess the answer is no. What was the
13   question?
14   Q    Do you have any reason to believe that the
15   phrase "Informant 1" does not refer to you?
16   A    No.
17   Q    Do you understand this paragraph to be
18   describing the e-mail you sent to Mr. Bezos?
19         MR. BEDELL: Same objection.
20         THE WITNESS: Well, it's actually not a
21   description. It's -- it's a couple of -- you know,
22   not even full sentences from it, so it's not a
23   summary of it at all, no.
24   BY MS. BODNER:
25   Q    Do you understand that --

---

148

1    A    It's cherry-picked.
2    Q    What was cherry-picked?
3    A    These -- this statement, these quotes. It's
4    not a summary of it, so, no.
5    Q    Were these quotes cherry-picked from the
6    e-mail you sent to Mr. Bezos?
7    A    Apparently.
8          MR. BEDELL: Let her ask another question.
9    BY MS. BODNER:
10   Q    Do you see Paragraph 5? Can you read that
11   to yourself?
12   A    I do.
13   Q    Do you recall having a preliminary call with
14   Mr. Omar on December 12, 2019?
15   A    I don't know what day it was.
16   Q    Do you recall having a call with Mr. Omar in
17   December 2019?
18   A    I don't know what month it was.
19   Q    Do you recall having any calls whatsoever
20   with Mr. Omar?
21   A    I do.
22   Q    What do you recall about those calls?
23   A    Just, you know, sort of the initial phone
24   calls discussing my e-mail and my thoughts on it all.
25   Q    Do you remember anything else about those

---

149

1    conversations?
2    A    No, I do not.
3    Q    Do you recall having four telephone
4    conversations with Mr. Doden in 2019 and 2020?
5    A    I do not.
6    Q    Do you recall having any conversations at
7    all with him?
8    A    I don't remember the individuals. My
9    recollection is just I was having calls with Amazon.
10   The individuals, I didn't note.
11   Q    Do you recall anything else about those
12   conversations?
13   A    No.
14   Q    Can you go to the next paragraph, which is
15   Paragraph 6.
16   A    Okay.
17   Q    Can you read that to yourself, please.
18   A    Okay.
19   Q    Generally speaking, is Paragraph 6
20   consistent with your recollection of what you told
21   Mr. Doden?
22   A    No.
23   Q    Why is it not consistent?
24   A    The references to -- it's making affirmative
25   statements that I said exactly -- you know, I said

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

150

1 this is my understanding, I have no proof. You know,
2 this is how I believe things had happened. I didn't
3 say with sort of empirical authority that these --
4 all these things did happen. I explained that this
5 was my understanding of how things happened.
6    Q   In your e-mail to Mr. Bezos, did you
7 represent that these things had happened?
8    A   What exhibit is that?
9    Q   That would be Exhibit -- I think it's 7, but
10 I'm double-checking. Yes, Exhibit 7.
11       MR. BEDELL: What was the question again?
12 BY MS. BODNER:
13    Q   In your e-mail to Mr. Bezos, did you
14 represent this kickback scheme had, in fact,
15 occurred?
16    A   I did.
17    Q   Was it your testimony that in your
18 conversations with Mr. Doden, you clarified that you
19 did not have any personal knowledge?
20    A   Well, I told him I didn't have any empirical
21 evidence.
22    Q   Did you tell him that your understanding of
23 the scheme was based on conversations involving -- or
24 strike that.
25       Did you tell Mr. Doden that your

---

151

1 understanding of the kickback scheme was based on
2 what you'd heard from other Northstar employees?
3    A   I did.
4    Q   Do you recall if you told Mr. Doden the
5 names of those Northstar employees?
6    A   I don't recall.
7    Q   Okay. Looking back at -- this is
8 Exhibit 10. We were looking at Paragraph 6. While
9 you were at Northstar, did you know about a trust
10 called Villanova Trust?
11    A   I had heard about a trust called Vill- --
12    Q   What did you hear?
13    A   That was -- however I heard it, I heard that
14 was how monies were being exchanged. I don't
15 remember how I've heard that.
16    Q   Was it your understanding that money was
17 provided to Casey Kirschner and Carl Nelson after
18 Northstar signed contracts with Amazon?
19    A   Correct.
20    Q   Do you know if there was any agreement or
21 understanding between Northstar and Mr. Kirschner and
22 Mr. Nelson before any Amazon lease documents were
23 signed?
24    A   I don't recall.
25    Q   Can you look at Paragraph 7 and read that to

---

152

1 yourself as well.
2    A   Okay.
3    Q   Do you believe that Paragraph 7 accurately
4 describes the information that you provided to
5 Mr. Doden?
6    A   Yes. Again, and the key terminology in this
7 paragraph is "alleged." I didn't say that I had any
8 empirical proof of such, but that this is how I
9 understood things.
10    Q   And you understood the information you
11 alleged to Mr. Doden reflected in Paragraph 7 based
12 on the conversations you had with Northstar
13 employees?
14    A   Yes.
15    Q   Do you recall if you described the payments
16 to Mr. Doden as "kickbacks" or is that his
17 terminology?
18    A   I don't recall. I think my original e-mail
19 said the word "kickback," though, didn't it?
20    Q   Do you see that the middle of the paragraph,
21 it says, "Informant 1 alleged that Kyle Ramstetter
22 worked with another former Northstar employee, Will
23 Camenson, to purchase the subject property and then
24 resell it to Amazon at a price apparently inflated by
25 at least $17 million"?

---

153

1    A   I see it.
2    Q   Did you tell Mr. Doden that Mr. Camenson was
3 involved in the purchase of property in Virginia
4 along with Mr. Ramstetter?
5    A   I did not. I said that Will Camenson worked
6 closely with Kyle Ramstetter. I was not aware of any
7 involvement of Will Camenson, other than he worked
8 closely with him in the Amazon projects. And that's
9 all I said. I didn't lend anything to Will Camenson
10 participating in, you know, an individual
11 transaction. I just said that they worked together,
12 because they worked together at Northstar.
13    Q   Do you have any reason to believe that
14 Mr. Camenson worked with Mr. Ramstetter to sell a
15 piece of land in Virginia to Amazon?
16    A   I wouldn't have a -- I have no basis to make
17 a claim one way or the other on that.
18    Q   Do you think that that sentence suggests
19 that Mr. Camenson was involved in a purchase of a
20 subject property?
21    A   I believe the way it's summarized in this
22 thing here, it does sort of show -- it does represent
23 that Will was a part of it, even though I would not
24 have said that -- I wouldn't have said it explicitly
25 like that.

---

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

154

1     Q    But do you have any recollection as to how
2    you did, in fact, say it?
3     A    No, I don't.
4     Q    Would it surprise you to learn that
5    Mr. Camenson signed the Purchase and Sale Agreement
6    involved with this transaction?
7     A    It's a complete shock, yes.
8     Q    It's your testimony that you don't know
9    anything about Mr. Camenson's involvement in this
10   transaction?
11    A    It is.
12    Q    Have you heard the phrase "White Peaks"
13   before?
14    A    Just as it relates to the Business Journal.
15   When the article was changed to reflect White
16   Peaks -- I think that's what it was called -- bought
17   that piece of land from Amazon -- or for Amazon or
18   something like that, that's the only time I ever
19   heard of it.
20    Q    If I use the term "White Peaks purchase,"
21   will you understand it to be the sale of the land by
22   Mr. Ramstetter in Virginia to Amazon that was
23   discussed in the Journal?
24    A    I will.
25    Q    Are you affiliated with a company called

---

155

1    White Peaks Capital at all?
2     A    No.
3     Q    Are you affiliated with an entity called
4    Nova WPC, LLC?
5     A    No.
6     Q    Do you know anything about any of those
7    entities?
8     A    I do not.
9     Q    Do you know if Mr. Ramstetter is affiliated
10   with any of those entities?
11    A    I do not.
12    Q    Do you know if -- strike that.
13        Do you know if Mr. Camenson is affiliated
14   with any of those entities?
15    A    I have no empirical knowledge of it, no.
16    Q    Do you have any understanding as to whether
17   those entities were involved in the sale of the land
18   in Virginia, other than the article in the Business
19   Journal?
20    A    That's the only reference I have.
21    Q    So you do have some understanding that White
22   Peaks Capital was involved in this?
23    A    White Peaks Capital is the entity that sold
24   the piece of land to Amazon.  That's what I'm aware
25   of.

---

156

1     Q    Did you receive any fees or compensation
2    from White Peaks' sale of the land to Amazon?
3     A    No, no.
4     Q    Did you provide Mr. Camenson with any advice
5    regarding the sale of the land to Amazon?
6     A    No.
7     Q    Do you provide Mr. Ramstetter with any
8    advice regarding the sale of the land to Amazon?
9     A    No.
10    Q    Do you know why White Peaks Capital is
11   domiciled in Nevada?
12    A    No idea.
13    Q    Do you know why Nova WPC, LLC is domiciled
14   in Nevada?
15    A    No idea.
16    Q    You had no involvement in either of those
17   entities choosing to move their domicile location to
18   Nevada?
19    A    None.
20    Q    Okay.  If you could turn back to
21   Paragraph 7.  Sorry for jumping between documents.
22    A    Paragraph 7?
23    Q    Yes.  Do you see that it says, "Informant 1
24   claimed in his conversations with me that Kyle
25   Ramstetter had recorded conversations related to this

---

157

1    transaction --"?
2     A    I do.
3     Q    Have you ever heard those recorded
4    conversations?
5     A    No.
6     Q    How did you know that Mr. Ramstetter had
7    recorded conversations?
8     A    I don't remember.
9     Q    You have no understanding as to how you
10   developed that knowledge?
11    A    No, I don't.
12    Q    Do you recall if you remembered when you
13   told Amazon about these claims?
14    A    Pardon me?
15    Q    Do you recall knowing at one point how you
16   learned about the recorded conversations?
17    A    No.
18    Q    Do you see the last sentence talks about
19   some form of dispute resolution with Mr. Ramstetter
20   and Mr. Camenson?
21    A    I do.
22    Q    What do you know about that dispute
23   resolution?
24    A    Nothing.  I don't know anything about it.
25    Q    Do you recall telling Mr. Doden that there

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

158

1  was some form of dispute resolution?
2    A   Yeah, I heard that there had been at the
3  time, but I have no idea how I heard that or why I
4  knew it.
5    Q   You don't recall anything at all other than
6  there was some form of dispute resolution?
7    A   Correct.
8    Q   Do you recall if anything about that dispute
9  resolution concerned you?
10   A   No.
11       MR. BEDELL:  Can you hold on a sec?  Can you
12  do something about the flashing light right above
13  your head that's sort of --
14       MS. BODNER:  Can we go off the record.  I
15  don't know how to solve it immediately.
16       THE VIDEOGRAPHER:  We are going off the
17  record at 1:31 p.m.
18       (Pause in proceedings.)
19       THE VIDEOGRAPHER:  We are back on record at
20  1:33 p.m.
21  BY MS. BODNER:
22   Q   Continuing to look at that declaration, can
23  you look at Paragraph 8.
24   A   Okay.
25   Q   Do you recall providing Mr. Doden or anyone

---

159

1  at Amazon with documents?
2    A   Yes.
3    Q   What do you recall about providing documents
4  to them?
5    A   Nothing in particular, other than that I
6  sent them some documents.  I don't remember which
7  documents until I just read that.
8    Q   Do you know if they asked you for certain
9  documents?
10   A   I don't recall.
11   Q   Do you recall how you identified certain
12  documents to provide to them?
13   A   I don't know.  I do not recall how I did
14  that.
15   Q   Do you recall why you provided these five
16  documents identified here?
17   A   That's all I had.
18   Q   What do you mean by that?
19   A   That's all the documents I had in relation
20  to the conversation at hand.
21   Q   How did you have those documents in your
22  possession?
23   A   Apparently I saved them in my personal
24  folder.
25   Q   Did you think possessing them was in

---

160

1  violation of any Northstar agreements?
2    A   No.
3        MR. HEYBURN:  Objection.  Calls for a legal
4  conclusion.
5  BY MS. BODNER:
6    Q   Do you recall if you thought that these
7  documents reflected any improper conduct?
8    A   Say the question again.
9    Q   Do you recall believing that any of these
10  five documents reflected improper conduct?
11   A   Reflected, that's a -- I'll say yes.
12   Q   Why?  Why did you think these documents
13  reflected improper conduct?
14   A   Nothing particular other than I felt like
15  they represented -- yeah, they just represented that,
16  you know -- I don't know what the answer is, they
17  just didn't feel -- these documents did represent to
18  me that, you know, something else was going on bigger
19  than what I was aware of initially.
20   Q   At the time you sent these documents to
21  Amazon, did you have any other Northstar documents in
22  your possession?
23   A   No idea.
24   Q   Do you recall if you discussed these
25  documents with Amazon?

---

161

1    A   I don't recall.  I mean, if I submitted them
2  to them, then I probably discussed them; but I don't
3  recall the conversation, no.
4        MS. BODNER:  I'm going to introduce another
5  document.  This will be marked as Exhibit 11.
6        (Deposition Exhibit DM-011 was deemed
7        marked for identification.)
8  BY MS. BODNER:
9    Q   Do you see it?
10   A   I do.
11   Q   Is this an e-mail you sent to Mr. Omar on
12  January 27, 2020, with a separate client org chart?
13   A   It appears to be.
14   Q   And then is the attachment an organization
15  chart for NSIPI Data Center Venture?
16   A   That's what it's titled.
17   Q   Do you recall why you sent this org chart to
18  Mr. Omar?
19   A   No, I do not recall.
20   Q   Looking at this organization chart, does
21  anything in it concern you?
22   A   No.
23   Q   And this was not one of the documents that
24  was described in the declaration, correct?
25   A   I don't believe so.

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

162

1    Q   Other than the five documents described in
2  the declaration and this organization chart, do you
3  recall sending anything else to Mr. Doden or anyone
4  at Amazon?
5    A   I do not.
6    Q   I'm going to show you another document.
7      MS. BODNER:  I'm introducing what has been
8  marked as Exhibit 12.
9      (Deposition Exhibit DM-012 was deemed
10       marked for identification.)
11 BY MS. BODNER:
12   Q   Do you see this document?
13   A   I do.
14   Q   Did you forward an e-mail from your
15 Northstar account on December 14, 2018, to your
16 Gmail?
17   A   I don't recall, but that's what this appears
18 to represent.
19   Q   Do you recall why you forwarded this e-mail
20 chain?
21   A   No, I do not.
22   Q   Was it your practice to forward business
23 e-mails to your personal Gmail while working at
24 Northstar?
25   A   No.

---

163

1    Q   Did you do that often?
2    A   No.
3    Q   So this would have been a rare occasion?
4    A   Yes.
5    Q   You don't have any recollection as to why?
6    A   No.
7    Q   Do you recall if you shared this e-mail
8  exchange with Amazon?
9    A   I think that's -- yeah, that was actually
10 listed in -- I don't recall it until looking at
11 Exhibit 11, which says this is what I included.
12   Q   Looking at this document now, can you
13 identify what you think is improper in it?
14   A   What I think is improper with it?
15   Q   If anything.
16   A   I'm not saying that anything is improper
17 with it.  I haven't made that representation at all.
18   Q   Why did you share this document with Amazon?
19   A   Because it demonstrated how much had been
20 paid to Villanova Trust.
21   Q   And why did you think that information would
22 be of interest to Amazon?
23   A   Seemed like a lot of money.
24   Q   Did you have any reason to believe that
25 Villanova was being paid that money for improper

---

164

1  reasons?
2    A   As discussed earlier, you know, it's my --
3  my -- it was my understanding that Villanova was
4  actually shared by, you know, three people, two of
5  which were Amazon employees.
6    Q   Was it your understanding that Mr. Watson
7  was affiliated with Villanova Trust at all?
8    A   No.
9    Q   Was it your understanding that Mr. Watson
10 knew about payments to Mr. Nelson and Mr. Casey
11 Kirschner through Villanova Trust?
12   A   It was.
13   Q   Would it surprise you to learn that he
14 didn't know anything about those payments, if there
15 were any?
16   A   It would.
17   Q   Why would that surprise you?
18   A   Because it was represented to me otherwise.
19   Q   And who represented that specific fact to
20 you?
21   A   No idea.
22   Q   Did there come a time that you became aware
23 that Amazon was pursuing legal actions related to the
24 claims in your e-mail to Mr. Bezos?
25   A   Say that again.

---

165

1    Q   Did there come a time when you became aware
2  that Amazon was pursuing legal action related to the
3  claims in your e-mail to Mr. Bezos?
4    A   I became aware sometime after these
5  conversations I had had.  I couldn't point to when.
6      MS. BODNER:  I'm going to introduce another
7  document.  This will be marked as Exhibit 13.
8      (Deposition Exhibit DM-013 was deemed
9       marked for identification.)
10 BY MS. BODNER:
11   Q   Let me know when you're ready to discuss it.
12   A   Okay.
13   Q   Do you recall this e-mail chain with Patrick
14 Stokes at Gibson Dunn as well as some internal Amazon
15 employees?
16   A   I do.
17   Q   Amazon produced this document to us.  Do you
18 know if you still have it in your possession?
19   A   I have no idea.
20   Q   Do you recall seeing it when you were
21 looking for documents responsive to the subpoena?
22   A   No.
23   Q   Is there a reason you would no longer have
24 this document?
25   A   Not really.

---

EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

166

1    Q   So if you look on Page 3 of the PDF, do you
2  see that Mr. Omar says he is asking -- or Mr. Omar
3  asked you if you would be amenable to a quick call
4  with outside legal team?
5    A   Yeah.
6    Q   And then do you later see -- I want to focus
7  on the e-mail exchange on Page 1 where you sent an
8  e-mail to Mr. Stokes at 3:30 p.m.
9    A   Yes.
10   Q   So you say in the first sentence, "I am
11 available but I have an agreement that Amazon will
12 use all reasonable efforts to keep me out of it."
13      Did you understand that you had a fully
14 executed agreement with Amazon to keep you out of
15 this?
16   A   No.  I would have said they would use all
17 reasonable efforts.
18   Q   Can you read the next sentence?
19   A   "You shouldn't need the evidence I provided
20 you anymore, you should have a strong enough case
21 without me."
22   Q   Why did you think that they should have a
23 strong enough case without you?
24   A   Because all I -- I didn't have any true
25 evidence.  I just gave them an idea and they were to

167

1  do their own investigation thereafter.  I shouldn't
2  have had anything to do with it.
3    Q   Would it surprise you if they don't have a
4  strong enough case without you?
5    A   I would be surprised.
6    Q   Can you look at the last sentence and read
7  that, "Use the real evidence --"
8    A   Now, apparently, I -- which sentence?
9    Q   The last sentence of the first paragraph.
10   A   Oh.  "Use the real evidence you have, not
11 the circumstantial evidence I provided."
12      Yes.
13   Q   So you believe you had only provided Amazon
14 circumstantial evidence?
15   A   Correct.
16   Q   You can read that second paragraph to
17 yourself.
18   A   Yeah.
19   Q   Do you think that Amazon was putting your
20 family in harm's way?
21   A   Only if my name was going to start getting
22 public, yes.
23   Q   Why did you think that your family would be
24 put in harm's way for --
25   A   As it explains right here, "Three of the six

168

1  primary players are hunters and gun owners.  Not to
2  mention the other employees that may have lost their
3  jobs."
4    Q   Who were the six primary players you were
5  referring to?
6    A   I'm going to have to suppose at this point,
7  but I'll say Watson, Marcotte, Casey, Carl, Kyle, and
8  I guess Will.
9    Q   Had any of those six players ever threatened
10 you?
11   A   Not directly, no.
12   Q   Had they threatened you indirectly?
13   A   No.
14   Q   Did you have any reason to believe that they
15 posed a danger to you or your family?
16   A   Yes.
17   Q   What was your understanding?
18   A   That there's 400 mass shootings every day
19 and crazy things happening in the world.  Mr. Watson
20 had just had a gun incident before this e-mail.  So,
21 yes.
22   Q   What sort of gun incident are you referring
23 to?
24   A   Again, it's -- I wasn't there.  My
25 understanding is that he had a rifle and was

169

1  contemplating doing harm to himself or others.
2    Q   Why did you have that understanding?
3    A   I think it was in the newspaper.
4    Q   So your understanding as to this gun
5  incident involving Mr. Watson was based on something
6  you read in the newspaper?
7    A   I believe so.
8    Q   You said, "Brian is unstable and a
9  sociopath."
10      Why did you think that Mr. Watson was
11 unstable?
12   A   Because he just tried to kill himself.
13   Q   So it was based on your -- strike that.
14      Your belief that Mr. Watson was unstable was
15 based on the article you read in a newspaper?
16   A   Correct.
17   Q   Is that the same reason that you thought
18 Mr. Watson was a sociopath?
19   A   No.
20   Q   Why did you think Mr. Watson was a
21 sociopath?
22   A   I just do.
23   Q   How do you define sociopath?
24   A   Narcissistic tendencies, lack of empathy,
25 there's some other things, but in general, that's it.



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

170

1    Q    And you don't have any training in --
2    A    I have a degree in psychology.
3    Q    You do have a degree in psychology?
4    A    (Witness nods head.)
5    Q    So is that your best clinical diagnosis?
6    A    I'm not a clinician.  I just have a
7  bachelor's in psychology.
8    Q    Did you think Mr. Watson was a sociopath
9  throughout your entire employment at Northstar?
10    A    A narcissist, not a sociopath.
11    Q    So you think that Mr. Watson was a
12  narcissist and not a sociopath?
13    A    Correct, at that time.
14    Q    Did there come a time in which you thought
15  Mr. Watson was a sociopath?
16    A    Over time, I felt that way, yes.
17    Q    What led you over time to believe that he
18  was a sociopath?
19    A    Just my own thoughts.
20    Q    What about your own thoughts led you to
21  develop that?
22    A    Nothing in particular.
23    Q    Have you discussed your belief that
24  Mr. Watson is a sociopath with anyone?
25    A    No, I don't recall.

---

171

1    Q    You also said, "Not to mention other
2  employees that may have lost their jobs."
3        Do you see that?
4    A    I do.
5    Q    What was that a reference to?
6    A    That when all this was happening, Northstar
7  was ceasing to exist and people were losing their
8  jobs.
9    Q    Did any employees who lost their job reach
10  out to you at any time?
11    A    No.
12    Q    Did any employees who lost their jobs
13  threaten you or your family at any time?
14    A    No.
15    Q    If you could take a look at the next
16  paragraph, can you read just that first sentence, "I
17  did you all --"
18    A    Yeah, I -- myself or out loud?
19    Q    Out loud.
20    A    "I did you all a favor, and now my investors
21  are being screwed by IPI and you refused to help when
22  I called a few months ago."
23    Q    Was the favor you're referring to the e-mail
24  to Mr. Bezos?
25    A    Correct.

---

172

1    Q    Did you do Amazon any other favors?
2    A    No.
3    Q    What did you mean by "-- now my investors
4  are being screwed by IPI"?
5    A    IPI had sort of tried to do some sort of a,
6  you know, forced buyout of the Sterling and CP
7  investors that I thought was inappropriate.
8    Q    Were you still affiliated with the Sterling
9  deal at the time the buyout was happening?
10    A    No.
11    Q    Had investors complained to you about
12  actions IPI was taking?
13    A    Yes.
14    Q    Which investors?
15    A    I can't recall specifics.
16    Q    Do you recall anything about --
17    A    Lots of them.
18    Q    Do you recall anything at all about the
19  investors you reached out to?
20    A    No, just a lot of the investors reached out
21  to me.
22    Q    When they reached out to you, did they know
23  that you were no longer affiliated with Northstar?
24    A    They did.
25    Q    How did you respond to those investors'

---

173

1  concerns?
2    A    I don't recall the specifics.
3    Q    What is IPI?
4    A    It's just an acronym, I think, for -- I
5  don't even know what it is.  Maybe Iron Point Iron, I
6  don't know, Iron Point, Iron Partners, I don't know
7  what IPI stands for.  It was the equity partner,
8  though, in the deal.
9    Q    In the Sterling deal?
10    A    Uh-huh.
11    Q    Did you work with IPI while you were
12  employed by Northstar?
13    A    No.
14    Q    Did you ever communicate with anyone at IPI
15  while you were employed by Northstar?
16    A    No.
17    Q    Do you know someone named Luke Gilpin?
18    A    No.
19    Q    Do you know someone named Matt A'Hearn?
20    A    No.
21    Q    After you left Northstar, did you ever
22  communicate with any current or former employees of
23  IPI?
24    A    Of IPI, no.
25    Q    Did you reach out to IPI after your

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

174

1   investors raised concerns with you?
2       A   No.
3       Q   Do you think the investors would be
4   surprised that you wrote this e-mail to Mr. Bezos
5   about Northstar's actions?
6       A   Likely.
7       Q   Why do you think they'd be surprised?
8       A   Why wouldn't they be surprised?
9       Q   Did you ever make any of the investors aware
10  that you had concerns about Northstar's conduct with
11  respect to the Amazon transactions?
12      A   No, I did not.
13      Q   Did you ever tell any of the investors who
14  were being screwed by IPI that you had sent an e-mail
15  to Mr. Bezos?
16      A   No, I did not.
17      Q   Can you read that next sentence out loud
18  that starts with, "I only --"
19      A   "I only had three demands:  Protect my
20  identity, protect my investors, and take it easy on
21  Will Camenson.  As far as I could tell, you haven't
22  done any of this."
23      Q   Your reference to protecting your identity,
24  does that go back to your concern that harm could be
25  inflicted on you or your family?

---

175

1       A   It is.
2       Q   And the protecting your investors, is that
3   with respect to the buyout involving IPI?
4       A   Correct.
5       Q   Were there any other investors being
6   impacted by the concerns you shared with Amazon?
7       A   No, it would only be Amazon investors or
8   Sterling investors.
9       Q   And then you say, "-- and take it easy on
10  Will Camenson."
11          What did you mean?
12      A   From what I -- you know, I didn't have any
13  specifics, but I assumed that Will was, you know, not
14  in the decision-making capacity when any of this was
15  happening and so that I didn't think he was really,
16  you know, per se at fault.
17      Q   What do you mean that he wasn't really in a
18  decision-making capacity?
19      A   Again, I don't have the details, just from
20  what I knew of Will Camenson at the time, I just
21  didn't think that he would have been in any of the
22  decision-making roles.
23      Q   Who would have been in the decision-making
24  roles?
25      A   Kyle Ramstetter.

---

176

1       Q   Did you work closely with Mr. Camenson while
2   you were both at Northstar?
3       A   Not really.
4       Q   Did you develop a relationship outside of
5   work?
6       A   We had a work relationship, but he was on
7   Amazon and that was his job.  Once I raised money for
8   Amazon or the Sterling deal, I really had very little
9   working interaction with William other than just, you
10  know, talking around the office.
11      Q   So you had -- you didn't have much -- strike
12  that.
13          You didn't have much of relationship with
14  Mr. Camenson when you asked that Amazon take it easy
15  on him?
16      A   Correct.
17      Q   Do you typically do that for people that
18  you're not close to?
19      A   I do.
20      Q   Can you please explain why you do that?
21      A   I take care of a lot of people.
22      Q   How did you think you were taking care of
23  Mr. Camenson in this situation?
24      A   I just relayed that I didn't think he was in
25  the decision tree of all of this.  So I figured that

---

177

1   was it.
2       Q   Did you let Mr. Camenson know that you would
3   be relaying that to Amazon?
4       A   No.
5       Q   Did you know if Mr. Camenson was involved in
6   the land transaction involving Mr. Ramstetter?
7       A   No, I didn't know -- I mean, other than
8   working closely with Kyle, I had no idea about the
9   specifics of any of this stuff.  I just knew that he
10  was an employee who worked closely with Kyle at
11  Northstar and I assumed that when all this would come
12  through he would be in the fray, but certainly not a
13  decision-maker.
14      Q   What's your impression of Mr. Ramstetter?
15      A   Good guy.
16      Q   Good guy.  What was your understanding of
17  Mr. Ramstetter's relationship with Mr. Camenson?
18      A   They had a good relationship.
19      Q   Was it your understanding in the
20  relationship that Mr. Ramstetter was the
21  decision-maker?
22      A   Yes.
23      Q   Why was that your understanding?
24      A   Kyle is a strong personality and a strong
25  developer and with, you know, 10 years or more

---



EXHIBIT 5                                      702-476-4500

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

178

1   experience and, you know, it was his show to run.
2       Q    Did you ever have any concerns about
3   Mr. Ramstetter's conduct while you worked at
4   Northstar?
5       A    No, I did not.
6       Q    Since you left Northstar, have you developed
7   any concerns about Mr. Ramstetter's conduct?
8       A    No.
9       Q    You don't have any concerns about
10  Mr. Ramstetter and Mr. Camenson's relationship?
11      A    It has nothing to do with me.  I wouldn't
12  have any thoughts on their relationship.
13      Q    Did Mr. Ramstetter run the Amazon deals at
14  Northstar?
15      A    He ran the development, yes.
16      Q    He ran the development.  Do you know what
17  Mr. Ramstetter's and Mr. Watson's relationship was?
18      A    Outside of --
19      Q    With respect to the Amazon transactions.
20      A    Well, you've got the CEO and you have the
21  project manager.  That's what their relationship was.
22      Q    And when is the last time you communicated
23  with Mr. Ramstetter?
24      A    No idea, but I don't know if I've ever -- I
25  don't know if I've talked to him even after I left

---

179

1   Northstar.
2       Q    Are you trying to protect Mr. Camenson for
3   any reason?
4       A    Mr. Camenson?
5       Q    Uh-huh.
6           MR. HEYBURN:  Objection.  Asked and
7   answered.
8           THE WITNESS:  Yeah, I don't understand
9   your -- I don't have any cause to protect him per se.
10  I'm not aware that he has done anything wrong.  I
11  just know that he was going to get mixed up into the
12  fray.
13  BY MS. BODNER:
14      Q    Are you aware if Mr. Camenson has a plea
15  agreement with the government?
16      A    I'm not aware of that.
17      Q    Are you aware if Mr. Ramstetter has a plea
18  agreement with the government?
19      A    I'm not aware of that.
20      Q    Do you know if either of them have been the
21  subject of a grand jury investigation?
22      A    I have no idea.
23      Q    And you testified that Mr. Camenson works
24  for you now?
25      A    He does.

---

180

1       Q    Why did you hire him?
2       A    Because he is good at his job.
3       Q    Did you have any concerns based on what you
4   heard about his potential involvement with the White
5   Peaks purchase?
6       A    No, no, I did not.
7       Q    Why did you not have any concerns?
8       A    I don't.
9       Q    Since he joined Dacia Resort Group, have you
10  had any concerns about his conduct?
11      A    Not at all.
12      Q    So it doesn't concern you at all that
13  Mr. Camenson was potentially involved in this deal in
14  Virginia while working at Northstar?
15      A    No.
16      Q    Okay.  If you could go to the next page on
17  that e-mail -- so it's Page 2 of this PDF -- if you
18  could read the paragraph starting with, "I know you
19  think --"
20      A    "I know you think it would be better to use
21  the information I provided but you also know it is
22  not necessary, as none of it was the smoking gun."
23      Q    Do you still believe that none of the
24  information you provided to Amazon was a smoking gun?
25      A    Correct.

---

181

1       Q    Do you recall ever connecting with any
2   lawyers from Gibson Dunn?
3       A    No.
4       Q    Do you recall if you had any phone
5   conversations with anyone from Gibson Dunn?
6       A    No.
7       Q    You don't recall having any or you don't
8   think you had any?
9       A    I don't think I had any.
10      Q    So in this e-mail chain --
11      A    I mean, I've only spoken to Amazon and
12  Amazon's attorneys.  So whoever that happens to be, I
13  don't even know who that is.  So I don't even know
14  who these guys are.
15      Q    They'll introduce themselves, don't worry.
16          Do you understand that Amazon is represented
17  by the law firm Gibson Dunn in this litigation?
18      A    Okay, so take a step back then.  Yes, I was
19  a party of at least one phone call that some outside
20  attorneys, third-party attorneys on Amazon's
21  behalf -- I did speak to them, yes.
22      Q    Do you recall any of the names of the
23  outside attorneys?
24      A    Not a clue.
25      Q    Does Patrick Stokes ring a bell?

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

182

1    A    Sounds familiar, but I couldn't --
2    Q    Do you think you'd be able to remember any
3    names at all?
4         MR. BEDELL: Hold on. You were complaining
5    about him jumping on your questions. You just jumped
6    all over his answer.
7         THE WITNESS: I don't know who Patrick
8    Stokes is. I might have heard the name before. You
9    know, I'm sure it's not the -- there's probably more
10   than one Patrick Stokes, but nonetheless I did speak
11   to some attorneys that represented Amazon.
12   BY MS. BODNER:
13   Q    If I listed off some names, would you be
14   able to remember if you spoke with any of them or do
15   you not have any idea?
16   A    You can try.
17   Q    Lora MacDonald?
18   A    I don't recognize it.
19   Q    Claudia Barrett?
20   A    Don't recognize it.
21   Q    Elizabeth Papez?
22   A    Don't recognize it.
23   Q    That's all I'm going to ask about for now.
24   A    Okay.
25   Q    Do you recall how many phone conversations

183

1    you had with Gibson Dunn present on the phone?
2    A    I think only one. Could have been two, but
3    I think only one.
4    Q    Do you recall anything about that
5    conversation?
6    A    None.
7    Q    Did you review any drafts of the complaint
8    before it was filed?
9    A    No.
10        MS. BODNER: Okay. I'm going to introduce
11   the correct version of the complaint as Exhibit 6A
12   and it will replace what was previously introduced as
13   Exhibit 6.
14        (Deposition Exhibit DM-006A was
15         deemed marked for identification.)
16   BY MS. BODNER:
17   Q    So this will be -- please let me know when
18   you see that document.
19        MR. BEDELL: Scroll down on the left.
20        THE WITNESS: I got it. The problem is it's
21   down here, somewhere later.
22        MR. BEDELL: Yeah, yeah, yeah. No, I'm just
23   looking. All I want to see is the front page.
24        I'm good.
25        THE WITNESS: Okay.

184

1    BY MS. BODNER:
2    Q    Do you recognize this document?
3    A    No.
4    Q    You didn't review any versions of this
5    document before it was filed, to the best of your
6    knowledge?
7    A    No.
8    Q    Have you read this document since it was
9    filed?
10   A    I don't believe so.
11   Q    Have you stayed aware of the events in this
12   litigation?
13   A    I have not.
14   Q    If you could go to Page 25, please, of the
15   PDF.
16        MR. BEDELL: Paragraph?
17   BY MS. BODNER:
18   Q    Paragraph 110.
19   A    Okay.
20   Q    Can you please read that paragraph out loud?
21   A    "During a series of phone calls with members
22   of Amazon's legal compliance team in late 2019 and
23   early 2020, Informant 1 claimed to have personal
24   knowledge of Northstar's payment of millions of
25   dollars in kickbacks on Defendants' real estate

185

1    transactions with Amazon, and stated his belief that
2    the scheme had been ongoing since January 2018."
3    Q    Have you at any time claimed to have
4    personal knowledge of Northstar's payment of millions
5    of dollars in kickbacks?
6    A    Not in this -- what I would say is in its
7    empirical form. No, I was aware -- I was aware
8    that -- I was led to believe where that might have
9    been happening, but I had no personal, you know --
10   and I clarified that I have never seen a check stub
11   or a wire and I clarified that, that I don't have any
12   empirical evidence of such. I was just aware of it.
13   Q    So this statement is incorrect as to what
14   you told Amazon?
15   A    Well, it's all a matter of how you guys want
16   to define that.
17        MR. BEDELL: Objection to the form of that.
18        THE WITNESS: Yeah, that's not for me to say
19   here or there. I've consistently stated that I did
20   not have any empirical evidence of any of this.
21   BY MS. BODNER:
22   Q    As you just defined personal knowledge to
23   me, do you believe that this statement is correct?
24        MR. HEYBURN: Objection to form.
25        MR. BEDELL: Yeah, I'm going to object to



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

186

1  form on that as well.  And to clarify, you're asking
2  him to opine about somebody else's statement when the
3  document was never seen.
4      MS. BODNER:  That is correct.
5      MR. BEDELL:  That's objectionable.
6      MS. BODNER:  You can still answer.
7      MR. BEDELL:  If you can answer, you can
8  answer.
9      THE WITNESS:  I would have rephrased it
10  differently.
11  BY MS. BODNER:
12      Q    Have you ever been employed by Amazon?
13      A    No.
14      Q    Did you ever receive any sort of
15  remuneration or compensation from Amazon?
16      A    No.
17      Q    Did you ever receive any sort of
18  remuneration or compensation from Gibson Dunn?
19      A    No.
20      Q    Have you ever applied for a job with Amazon?
21      A    Yes.
22      Q    When did you apply for a job with Amazon?
23      A    Multiple times over the years.
24      Q    Do you recall what years?
25      A    No.

---

187

1      Q    Do you recall if you applied for a job at
2  Amazon at any time between 2017 and 2022?
3      A    Probably.
4      Q    Do you recall which jobs?
5      A    Probably something in London.
6      Q    Why in London?
7      A    Because I want to live in London.
8      MS. BODNER:  I'm going to introduce another
9  document.  I just need to remember what exhibit
10  number we're up to.  I think it's 14.  I'm
11  introducing Exhibit 14.
12      (Deposition Exhibit DM-014 was deemed
13      marked for identification.)
14  BY MS. BODNER:
15      Q    Let me know when you're ready for me to ask
16  you some questions about it.
17      A    Yes.
18      Q    Do you see -- strike that.
19      Do you recognize this as an e-mail you sent
20  to Mr. Omar and Mr. Doden on January 16, 2020, about
21  Amazon vacancies?
22      A    I do.
23      Q    Were these jobs that you were interested in
24  applying to at Amazon?
25      A    They were.

---

188

1      Q    Did you think that Mr. Doden and Mr. Omar
2  could get you in the door?
3      A    Well, I hoped that they could, yes.
4      Q    Did they ever represent to you that they
5  could help you get a job at Amazon?
6      A    No.
7      Q    Why did you hope that Mr. Doden and Mr. Omar
8  could help you get a job at Amazon?
9      A    Restate the question.
10      Q    Why did you believe -- strike that.
11      Why did you hope that Mr. Omar and Mr. Doden
12  could help you get a job at Amazon?
13      A    Because these would be cool jobs to have.
14      Q    Did you hope that your e-mail to Mr. Bezos
15  would help you get a job at Amazon?
16      MR. BEDELL:  Objection.  When?
17      THE WITNESS:  Yeah, put that in perspective.
18  BY MS. BODNER:
19      Q    In 2020, did you hope that --
20      A    Prior to me sending the e-mail, no.  After I
21  sent the e-mail, I was like, well, you know what, why
22  not try.
23      Q    Do you think that Amazon owes you for
24  sending that e-mail to Mr. Bezos?
25      A    Not at all.

---

189

1      Q    Do you recall how Mr. Omar and Mr. Doden
2  responded to this e-mail?
3      A    They said they couldn't help me.
4      Q    Did you ever interview for any of the jobs
5  listed here?
6      A    No.
7      Q    Are you hopeful that your e-mail to
8  Mr. Bezos will help you get a job with Amazon in the
9  future?
10      A    No.
11      Q    Are you hopeful that you might still receive
12  some sort of remuneration for the e-mail you sent to
13  Mr. Bezos?
14      A    No.
15      Q    Do you do any work with Amazon presently?
16      A    No.
17      Q    Is Amazon a potential client in your current
18  line of work?
19      A    No.
20      Q    Is Amazon a potential vendor in your current
21  line of work?
22      A    No.
23      Q    Do you desire to work with Amazon in the
24  future?
25      A    No.

---


EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

190

1    Q    Have you purchased any land or building in
2    the hopes of doing a deal with Amazon in the future?
3    A    No.
4    Q    Do you know someone named Patricia Watson?
5    A    I do.
6    Q    How do you know her?
7    A    Brian Watson's ex-wife.
8    Q    Did you work with her at Northstar?
9    A    No.
10   Q    Do you have a personal relationship with
11   her?
12   A    No.
13   Q    When is the last time you communicated with
14   her?
15   A    I think probably towards the end of his
16   divorce.
17   Q    Have you done any business with Patricia
18   Watson?
19   A    No.
20   Q    Do you do any business in Ohio?
21   A    No.
22   Q    Have you ever been affiliated with any real
23   estate deals in Ohio?
24   A    No.
25   Q    Have you ever assisted with any real estate

191

1    deals in Ohio?
2    A    No.
3    Q    Do you know if Ms. Watson has worked with
4    Mr. Ramstetter on any commercial real estate
5    opportunities?
6    A    No idea.
7    Q    Do you know if Ms. Watson has worked with
8    Mr. Camenson on any real estate opportunities?
9    A    No idea.
10   Q    Do you know someone named Rod Atherton?
11   A    No.
12   Q    You never heard the name before?
13   A    No.
14       MR. SMART:  Hey, Sara.  I apologize for
15   doing this.  Is it possible at 5:15 or in a few
16   minutes if we take a break?  I have something pop up
17   that I have to take care of for 10 minutes.
18   MS. BODNER:  Yep.
19   MR. SMART:  Is that okay?
20   MS. BODNER:  Yep, that's fine.  Then I'll
21   only have a few questions after the break.
22   MR. SMART:  I felt you were close to the end
23   and I'll be ready with mine when we come back on.  I
24   don't have a lot.
25   MS. BODNER:  Okay.

192

1        MR. SMART:  Thank you.
2        MS. BODNER:  Yep.
3    BY MS. BODNER:
4    Q    Do you do any work currently with IPI?
5    A    No.
6    Q    Have you solicited any investment from IPI
7    since working for Northstar?
8    A    No.
9    Q    Have you had any communications with the FBI
10   about Mr. Watson or Northstar?
11   A    Yes.
12   Q    When did you have those communications?
13   A    In the last couple years.
14   Q    Do you recall the year?
15   A    Not at all.
16   Q    Do you recall the name of who you
17   communicated with?
18   A    No, I do not.
19   Q    Would the last name Huckle ring a bell?
20   A    No.
21   Q    Do you know if it was the FBI that you spoke
22   with?
23   A    I believe it was.
24   Q    On how many occasions did you speak with the
25   FBI?

193

1    A    I think just once.
2    Q    Do you recall how long that meeting was?
3    A    No idea.
4    Q    Do you recall what you talked about?
5    A    No.
6    Q    Did the FBI approach you or did you approach
7    them?
8    A    They approached me.
9    Q    You don't recall anything at all about your
10   conversation with the FBI?
11       MR. HEYBURN:  Objection.  Asked and
12   answered.
13       THE WITNESS:  I will clarify that they did
14   ask me about some wires, some fraudulent wires or
15   some wire transactions that they were suspect of, I
16   have no idea about why, but that's what they were
17   asking me about.
18   BY MS. BODNER:
19   Q    Do you know if those wire transactions
20   involved Amazon?
21   A    I have no idea.
22   Q    You don't recall anything else about the
23   wire transactions?
24   A    No.
25   Q    Do you recall talking about Amazon at all

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

194

1   with the FBI?
2      A   I don't think so.  I don't remember, though.
3      Q   Do you recall if the FBI asked you questions
4   about Mr. Watson?
5      A   They did.  I don't remember what, though.
6      Q   So you don't remember anything about the
7   questions other than they had to do with some wires?
8      A   That was the -- I mean, for whatever reason,
9   those two things stuck out in my head.  But I don't
10  remember any of the rest of the conversation.
11     Q   Other than the FBI and the SEC deposition
12  that we talked about earlier, have you spoken with
13  any federal agencies about Mr. Watson or Northstar?
14     A   No.
15        MS. BODNER:  Okay.  I think we have to take
16  a break for Adam anyway.
17        THE VIDEOGRAPHER:  We are going off record
18  at 2:15 p.m.
19        (Thereupon, a recess was taken.)
20        THE VIDEOGRAPHER:  We are back on record at
21  2:31 p.m.
22  BY MS. BODNER:
23     Q   Hi, Mr. Mulcahy.  I just have a couple final
24  questions for you today.
25        Do you understand that you're still under

195

1   oath?
2      A   I do.
3      Q   Do you know anything about a property
4   located at 5212 Spanish Heights Drive?
5      A   No.
6      Q   Do you know someone named Chuck Kuhn?
7      A   No.
8      Q   Have you ever accepted any investment funds
9   for any of your Dacia-related projects from
10  Mr. Camenson?
11     A   No.
12     Q   Have you ever accepted any funds for any of
13  your Dacia-related projects from Mr. Ramstetter?
14     A   No.
15     Q   What's the largest equity investment that
16  you've received for your Dacia-related projects from
17  any former Northstar investor?
18     A   Maybe 200,000.  I'm not sure, but probably
19  200,000.
20     Q   Do you recall if you've ever received any
21  equity investments larger than that from any
22  Northstar investor?
23     A   I don't recall.  Probably not, though.  My
24  deals are small, so they don't really take lots of
25  equity.

196

1        MS. BODNER:  That's all the questions I have
2   for now.
3        I'm going to turn it over to Mr. Smart.
4        I may ask some additional final questions at
5   the end, but thank you very much for your time.
6        THE WITNESS:  Okay.
7             EXAMINATION
8   BY MR. SMART:
9      Q   Good afternoon, Mr. Mulcahy.  Again, my name
10  is Adam Smart.  I represent Carl Nelson and Cheshire
11  Ventures in this matter; and I just have a few topics
12  to hit.  I'll try and be brief.
13        First of all, do you know an individual
14  named Karen Mulcahy?
15     A   No.
16     Q   Do you know individual named JD Mulcahy?
17     A   No.
18     Q   When you use the phrase "empirical proof,"
19  what do you mean by that?
20     A   Tangible.
21     Q   And how do you distinguish that from
22  intangible?
23     A   Wire confirmation would be tangible.
24     Q   Would -- do you consider someone else
25  telling you something happened, is that within your

197

1   definition of intangible proof?
2      A   I don't know if that would be intangible
3   proof.  I don't know.  It would just be hearsay
4   really.
5      Q   Okay.  And I believe earlier in the day you
6   said you believed there was -- you used the phrase,
7   "likely unscrupulous behavior" happened.  Is that a
8   phrase that you recall using earlier?
9      A   I do.
10     Q   And can you specifically delineate what
11  likely unscrupulous behavior you believe was
12  happening?
13     A   I believe that two Northstar employees were
14  accepting cash payments in exchange for awarding
15  development deals to Northstar Commercial Partners.
16     Q   And let me make sure I'm clear.  You mean
17  Amazon employees were?
18     A   Amazon employees, yes.
19     Q   Okay.  And is it fair to say that you had no
20  personal knowledge of that actually occurring,
21  correct?
22     A   Correct.
23        MR. HEYBURN:  Objection to form.
24  BY MR. SMART:
25     Q   And any information you had on that was

CONFIDENTIAL

Danny Christopher Mulcahy                        Amazon.com, Inc., et al. v. WDC Holdings LLC

198

1  based on what other people were saying around the
2  office at Northstar?
3      A   Yes.
4      Q   And so is it like a rumor mill?  What was
5  it?
6      A   No.  There's five people that were a part
7  of -- in those conversations -- or four people I
8  think we talked about earlier:  Brian Watson, Don
9  Marcotte, Brent Gray, Kristi Fisher, and Kyle
10 Ramstetter.
11     Q   So you heard Brian Watson say that Amazon
12 employees were being paid to steer Amazon deals to
13 Northstar?
14     A   I don't know which employees said it, but
15 those are the five people that I would have heard it
16 from.
17     Q   Well, I'm asking you, do you have any
18 recollection if Brian Watson ever said it?
19     A   Not the specific words, no.  I don't have a
20 recollection of any particular person saying it.
21     Q   Okay.  So do you believe Brian Watson said
22 anything like that?
23     A   Yes.
24     Q   And what did he say?
25     A   You just asked me whether I thought he said

199

1  something like it.  I'm just assuming that he did.
2      Q   You're assuming he did?
3      A   Yeah.  I don't recall an exact instance,
4  but --
5      Q   What words do you recall him saying?
6      A   I don't.
7      Q   Okay.  And do you recall words from any of
8  those other people to that effect?
9      A   No.
10     Q   And you never saw any records or any
11 documents that indicated those payments were
12 happening to either Carl Nelson or Casey Kirschner,
13 correct?
14     A   Correct.
15     Q   Okay.  You also used the phrase, "Amazon
16 employees were not awarding contracts outside the
17 free market."
18         What did you mean by that?
19     A   Well, you've got to put it back in context
20 of what the question was, right, which was -- I don't
21 exactly say, but ultimately, it wasn't a fair bidding
22 process to win those contracts because ultimately
23 they were steering those to preferred partners
24 because they were being compensated, you know, for
25 making those awards.  It doesn't have anything to do

200

1  with the marketability of what was awarded.  It just
2  matters that some portion of those contracts' fees
3  were being funneled back to the employees.
4      Q   I mean, that's pretty specific.  Do you have
5  personal knowledge that that was happening?
6      A   I was a part of -- you know, like I said,
7  there was people talking about it.  I'm just telling
8  you that I can't remember the specific instance, but
9  I've identified the five people who all, you know, do
10 know about it and who I had varying degrees of
11 conversations with.
12     Q   And you believe they all know about it
13 because they told you they know about it?
14     A   Yes.
15     Q   Okay.  And they told you they know that
16 money was going from Northstar to Mr. Nelson and
17 Mr. Kirschner to steer contracts to Northstar?
18     A   That's what I was told.
19     Q   And who specifically of those people told
20 you?
21     A   I can't recall who specifically told me.
22     Q   Okay.  Because we talked to those people --
23     A   Go ahead.  Talk to them.
24     Q   We have.  Would it surprise you to learn
25 that none of them have said that they ever told you

201

1  that?
2         MR. BEDELL:  Objection.  Argumentative.
3         MR. HEYBURN:  Objection to foundation.
4         THE WITNESS:  It's not for me to be
5  surprised or not to be surprised.
6  BY MR. SMART:
7      Q   In your e-mail that you sent to Mr. Bezos,
8  you had some numbers in that e-mail.  How did you
9  calculate those?
10     A   I don't recall.
11     Q   Did you have documents that you looked at?
12     A   I don't recall.
13     Q   Do you have any knowledge as you sit here
14 today on where those numbers came from?
15     A   I don't recall.
16     Q   Okay.  So you couldn't testify that --
17 strike that.
18         Have you ever spoken to Carl Nelson?
19     A   No.
20     Q   Have you ever spoken -- did you speak to
21 Casey Kirschner at the time that he was in the
22 office -- or, I'm sorry, strike that.
23         Did you speak to him at the time you were at
24 the data center site?
25     A   I did.



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                        Amazon.com, Inc., et al. v. WDC Holdings LLC

202

1   Q    And what did you talk about with him?
2   A    Nothing in particular.  Just about the
3   construction of data centers.
4   Q    And do you know what the bidding process at
5   Amazon is for contracts for data centers?
6   A    No.
7   Q    Do you know whether there had to be an open
8   bidding process with multiple potential bidders?
9   A    No.
10  Q    Do you have an understanding that any of the
11  fees and rates used in any of the transactions with
12  Northstar were improper?
13  A    No.
14  Q    Okay.  And you discussed the consulting
15  agreement that Christian Kirschner had a little bit,
16  correct?
17  A    Briefly.
18  Q    And did I understand that you at least at
19  some point were involved in providing edits to that?
20  A    Say that again.
21  Q    Did I understand correctly that at some
22  point you were involved in providing edits to that
23  document?
24  A    Correct.
25  Q    And did you have any concerns with the

203

1   propriety of that document in and of itself?
2   A    No.
3   Q    Did you have a concern with any of the
4   percentages that were used in that document in and of
5   itself?
6   A    No.
7   Q    And have you done any investigation of the
8   information that you passed on to Amazon yourself to
9   determine the veracity or reliability of it?
10  A    No.
11  Q    And I believe you said something to the
12  effect of you believe that or you understood from
13  other people that Christian served as a conduit with
14  Casey and Carl receiving the bulk of the funds from
15  the transactions at issue in this case.
16      Is that -- did I say that correctly?
17  A    Yes.
18  Q    And, again, you don't have any personal
19  knowledge of that being true, correct?
20  A    Correct.
21  Q    And it's fair to say you don't have any idea
22  of what amount of funds were being claimed to go to
23  Casey or Carl?
24  A    Correct.
25  Q    When you spoke with the FBI, did you speak

204

1   to them about my client, Mr. Nelson?
2   A    I don't recall.
3   Q    When you spoke to Amazon, did you speak to
4   them about my client, Mr. Nelson?
5   A    I don't recall.
6   Q    When you sent an e-mail to Mr. Bezos, you
7   intended that to include my client, Mr. Nelson,
8   right?
9   A    Carl, yeah.  I didn't know his last name at
10  the time, but, yes, Carl.
11  Q    And when you spoke to Amazon, would you have
12  clarified that with them?
13  A    Clarified what?
14  Q    That you intended to include Mr. Nelson in
15  that group of individuals you were referring to in
16  the e-mail?
17  A    I don't recall.  Probably.
18  Q    You used the term "side deal" a lot today.
19  What do you mean when you use the word "side deal"?
20  A    Undisclosed -- undisclosed arrangements, not
21  a part of the, you know, arguably the deal at hand.
22  Q    Okay.  And do you use the term "side deal"
23  to refer to the arrangement between Northstar and
24  Christian Kirschner?
25  A    No.

205

1   Q    Okay.  Were you using "side deal" to refer
2   to what you believe the arrangement was between
3   Christian Kirschner and Mr. Nelson and Casey
4   Kirschner?
5   A    Yes.
6   Q    Okay.  And that's just your clarification
7   of -- that's just your term, right?  There's not a
8   legal meaning to that in your head, right?
9   A    Not that I'm aware of.
10  Q    And I believe when you said you reported
11  this to Mr. Bezos -- were you still working at
12  Northstar when you sent that e-mail to Mr. Bezos?
13  A    No.
14  Q    And how long had you been gone?
15  A    Almost a year.
16  Q    In any of the documents you sent him, did
17  you already have those in your possession when you
18  left Northstar?
19  A    I did.
20  Q    I believe you said something to the effect
21  that you were reporting that out of the goodness of
22  your heart; is that correct?
23  A    Correct.
24  Q    So -- but you did ask if there was a
25  potential for future engagements, right?

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

206

1     A   Yes.
2     Q   And you even asked if there might be
3  potential compensation, right?
4     A   I did.
5     Q   On another occasion you again asked if there
6  was potential remuneration, right?
7     A   I did.
8     Q   And, in fact, you sent specific job postings
9  to Amazon indicating your interest in those, right?
10    A   That was after everything had already
11  been -- that was after everything had already
12  transpired, all the conversations, everything else.
13  It was well after the fact.
14    Q   The job postings were well after the fact,
15  but the other stuff wasn't, was it?
16    A   No, it wasn't.
17    Q   Okay.  I mean, you sent the job postings --
18  I'm looking at it, Exhibit 14, you did that on
19  January 16th, right?
20    A   Uh-huh.
21    Q   That was less than a month after you sent
22  that e-mail?
23    A   Right.
24    Q   And you're not aware of what any content of
25  any employment contract that either Mr. Nelson or

207

1  Mr. Kirschner may have had with Amazon, are you?
2     A   No, I'm not.
3     Q   Okay.  And when did you send documents to
4  Amazon?
5     A   No idea.
6     Q   In the e-mails we looked at, it looked like
7  it was -- let me see which exhibit that is -- it's in
8  Exhibit 11.
9     A   It's Document 11.  Okay, yeah.
10    Q   You sent an org chart to them on
11  January 27th, correct?
12    A   Yes.
13    Q   So that's after you sent the job postings,
14  right?
15    A   I have no idea.
16    Q   Okay.  Did you have any concerns about any
17  potential liability to any of the people that you
18  were reporting to Amazon based on what you've called,
19  I think, hearsay and speculation?
20        MR. HEYBURN:  Objection to form.
21        MR. BEDELL:  I'm going to object as well.
22        THE WITNESS:  No.
23  BY MR. SMART:
24    Q   And to be clear, you don't recall the
25  specific names of anyone as you sit here of anyone

208

1  you met with at Amazon?
2     A   I mean, as far as the legal team is
3  concerned?
4     Q   Anyone.  I'm not sure who you met with.
5     A   I've only spoken to, yeah, a couple people
6  on the legal side.
7     Q   Okay.  So is it fair to say you don't
8  believe you spoke to anyone outside of lawyers for
9  Amazon?
10    A   Correct.
11    Q   Do you think that you have any personal
12  responsibility for the impacts of the statements you
13  have made to Amazon if they turn out not to be true?
14    A   No.
15        MR. HEYBURN:  Objection to form.
16        MR. SMART:  That's all I have.  Thank you.
17        MS. BODNER:  Should we go off the record?
18        MR. HEYBURN:  Sure.
19        THE VIDEOGRAPHER:  We are going off record
20  at 2:50 p.m.
21        (Thereupon, a recess was taken.)
22        THE VIDEOGRAPHER:  We are back on record at
23  3:04 p.m.
24  ///
25  ///

209

1              EXAMINATION
2  BY MR. HEYBURN:
3     Q   Good afternoon, Mr. Mulcahy.  My name is
4  Jack Heyburn.  I represent the plaintiff, Amazon, in
5  this action.
6         I just have a few additional questions for
7  you today.  I'm going to do my best to not go over
8  everything that we've been over so far and just get
9  us out of here as quickly as possible.
10        You testified that you had conversations
11  with certain individuals at Northstar who were
12  involved in the kickback scheme; is that right?
13    A   I did.
14    Q   And when you had those conversations with
15  them, is it safe to say that you had personal
16  knowledge of the kickback scheme?
17        MS. BODNER:  Objection.  Form.
18        MR. SMART:  Same objection.
19        THE WITNESS:  Personal knowledge is, again,
20  the -- you guys as lawyers, that's your guys'
21  definition.  It was -- I can say that amongst the
22  five people -- or maybe there's a couple more even --
23  at Northstar it was common knowledge.
24  BY MR. HEYBURN:
25    Q   And when they told you about the scheme, you

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

210

1  had the knowledge of the scheme?
2        MS. BODNER:  Object to form.
3        THE WITNESS:  Correct.
4  BY MR. HEYBURN:
5     Q    You also testified that you provided certain
6  documents to Amazon; is that right?
7     A    I did.
8     Q    And did you believe that those documents
9  were evidence of the kickback scheme?
10    A    They were evidence of -- they weren't
11 definitive evidence.  They were just simply, you
12 know, tools to investigate, you know, documents to
13 investigate to see if they had merit.
14    Q    But you provided them to Amazon because you
15 thought they would be helpful?
16    A    Correct.  Correct.
17    Q    You're not a lawyer; is that right --
18    A    Correct.
19    Q    -- Mr. Mulcahy?
20       Do you have any legal training?
21    A    No.
22       MR. BEDELL:  Wait for him to finish his
23 question.
24       THE WITNESS:  Sorry.
25       ///

211

1  BY MR. HEYBURN:
2     Q    So are you familiar with the legal
3  definition of "hearsay"?
4     A    No.
5     Q    Are you familiar with the legal definition
6  of "evidence"?
7     A    No.
8     Q    Are you familiar with the legal definition
9  of "circumstantial" versus "direct evidence"?
10    A    No.
11    Q    Are you familiar with the legal definition
12 of "tangible" versus "intangible evidence"?
13    A    No.
14    Q    So there's been a lot of testimony and
15 questions about these phrases.  When you use these
16 phrases in your testimony, you're not using them in
17 their legal sense; is that right?
18    A    Correct.
19       MR. SMART:  Objection.  Form.
20 BY MR. HEYBURN:
21    Q    Are you using them in a colloquial sense?
22    A    Yes.
23       MR. SMART:  Objection.  Form.
24 BY MR. HEYBURN:
25    Q    Who did you report to at Northstar?

212

1     A    Brian Watson.
2     Q    And what was your -- strike that.
3        How would you describe Brian Watson's
4  management style?
5     A    Inconsistent.
6     Q    Why was it inconsistent?
7     A    Well, there's laissez-faire on one side and
8  then controlling on the other side.
9     Q    So in some circumstances he was controlling?
10    A    Correct.
11    Q    Do you have any examples that come to mind?
12    A    Well, not a good example, but, you know,
13 maybe comment on punctuation in a paragraph, but not
14 comment on the content of the paragraph.
15    Q    And in what circumstances might he have been
16 more hands-off?
17    A    Hands-off?
18    Q    Laissez-faire.
19    A    Laissez-faire, well, I mean, a lot of his
20 deals, he just sort of -- in his mind, he hired
21 people to do a job and then he would just leave it at
22 that without holding them accountable.  Without --
23 yeah, without holding them accountable.  And then to
24 answer that question, that's what would happen.
25    Q    Gotcha.  Did he control all the major

213

1  decisions at Northstar?
2     A    Ultimately he did, yes.
3     Q    Did others play a meaningful role in
4  decision-making at Northstar?
5     A    Not decision-making.  He made all the
6  decisions.  There's no decisions per se made without
7  Brian, yes.
8     Q    And on that point, you discussed the
9  referral program earlier?
10    A    Correct.
11    Q    Who was in charge of the referral program?
12    A    Brian.
13    Q    And did you have involvement in the referral
14 program?
15    A    Other than trying to keep track of which one
16 of his investors might have brought another investor
17 and, you know, the particular arrangement he might
18 have had, because he had multiple -- he had multiple
19 referral agreements out with multiple investors.
20 They weren't all consistent.  We tried to bring some
21 consistency to it at the end, right --
22    Q    Correct.
23    A    -- but I don't believe that it ever got to a
24 consistent form as represented by, you know, we had a
25 form and then it got changed completely when he did

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

214

1  the deal with Christian.
2      Q   Got it. So ultimately Brian Watson was
3  making the decisions on the referral program?
4      A   Correct.
5      Q   Would you say that you had a meaningful role
6  in the referral program?
7          MS. BODNER: Objection. Form.
8          THE WITNESS: No, I mean, other than
9  offering it to some investors, I had no per se
10  control over the referral program.
11  BY MR. HEYBURN:
12     Q   Was Brian Watson transparent with his
13  employees about Northstar's operations?
14         MS. BODNER: Objection. Form.
15         THE WITNESS: I have no idea what he was
16  transparent and not transparent about. I mean,
17  obviously if he wasn't being transparent, I wouldn't
18  know.
19  BY MR. HEYBURN:
20     Q   But did employees at Northstar generally
21  know why certain decisions were being made?
22     A   I assume so. Again, I don't know what was
23  transparent and what wasn't transparent.
24         MS. BODNER: Can you wait one second?
25         Adam, are you still able to hear us?

215

1          THE WITNESS: Is he there?
2          MS. BODNER: Adam, are you there?
3          MR. SMART: Yeah, I'm here. Thank you.
4          MS. BODNER: There was some sort of pop-up.
5          MR. SMART: That's okay. Go ahead. You
6  don't need to read it back. I know what the question
7  was. That's fine.
8  BY MR. HEYBURN:
9      Q   Earlier you discussed Christian Kirschner.
10  What was your impression of him?
11     A   Nice guy.
12     Q   What was your impression of his relationship
13  with Brian Watson?
14     A   They were close.
15     Q   How did you know that they were close?
16     A   They represented to each other that they
17  were close. You know, when we were there, I know we
18  did at least one investor event up in C Lazy U that
19  Christian was invited from and -- invited to. And it
20  was represented that they've known each other for
21  years and, you know, that Christian had had some
22  difficult times with a previous business venture and
23  Brian helped him out thereafter.
24     Q   In your opinion, was Brian Watson's
25  relationship with Christian Kirschner typical of his

216

1  relationship with other referral partners?
2          MS. BODNER: Objection to form.
3          THE WITNESS: No. He was much closer to
4  Christian.
5          I mean, he is close with a lot of people. I
6  mean, Brian knows a lot of people, but I'd say yeah,
7  he was very close with Christian.
8  BY MR. HEYBURN:
9      Q   Did he treat it as a more important
10  relationship for Northstar's business than other
11  referral partners?
12     A   I can't answer to that.
13     Q   I believe earlier you discussed Christian
14  Kirschner making introductions for Brian. How
15  frequently did he make introductions?
16     A   I don't know. Those would have been between
17  Christian and Brian, not Christian, Brian and me. Or
18  not Christian, me, Brian -- it would have gone
19  directly to Brian.
20         MR. HEYBURN: I'm going to introduce an
21  exhibit. This will be Exhibit 15.
22         (Deposition Exhibit DM-015 was deemed
23           marked for identification.)
24         MR. HEYBURN: It's Exhibit 6 to Amazon's
25  Second Amended Complaint.

217

1  BY MR. HEYBURN:
2      Q   And if you could let me know when you can
3  see it.
4      A   Okay. Yes.
5      Q   Are you familiar with this document?
6      A   No, I'm not.
7      Q   Do you see what the title of the document
8  is?
9      A   I do.
10     Q   And who -- just by looking at the document,
11  who is this agreement between?
12     A   WDC Holdings and Villanova Trust.
13     Q   Were you aware that WDC Holdings and
14  Villanova Trust had an agreement like this?
15     A   I never saw this version of this agreement,
16  so, I mean, I saw a template somewhat similar. I
17  haven't reviewed this agreement, so I don't know what
18  the variances are, but I never did see this final
19  version of this.
20     Q   But you saw versions of the independent
21  contractor agreement?
22     A   I saw -- I'd say that the first iteration of
23  this I saw, but I have no idea how many iterations
24  happened thereafter.
25     Q   Gotcha. When did you first see a version of

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

218

1  this document?
2      A   I don't know.  I mean, in the exhibits that
3  they showed me earlier today, you know, I think Brian
4  told me, make these modifications, so I guess that's
5  probably the last time I saw this agreement.
6      Q   I would like you to go to the last page of
7  this document.
8      A   Yes.
9      Q   Do you see the page that's titled, "Exhibit
10  A, Villanova Trust Referral Fee Participation
11  Schedule"?
12      A   I do.
13      Q   Do you see the column where it says,
14  "Referral fee based on brokerage commission"?
15      A   I do.
16      Q   Do you know what that is, what the purpose
17  of that fee is?
18          MR. SMART: Objection.  Foundation.
19          THE WITNESS:  No, I do not.
20  BY MR. HEYBURN:
21      Q   Do you see where it says "Development fee"?
22      A   I do.
23      Q   Do you know what the purpose of a
24  development fee is?
25      A   I do.

219

1          MR. SMART:  Objection.  Foundation.
2          MS. BODNER:  Same objection.
3  BY MS. BODNER:
4      Q   What is the purpose of a development fee?
5      A   A development fee is a fee charged to
6  develop a property.  It ranges in any given deal.
7      Q   Do you see the percentage of the development
8  fee for this particular agreement?
9      A   I do.
10      Q   And what is it?
11      A   20 percent.
12      Q   In your experience, is it reasonable to pay
13  development fees of that type to a referral partner?
14          MS. BODNER:  Objection.  Form and
15  foundation.
16          MR. SMART:  Objection.  Form.
17          THE WITNESS:  I wouldn't pay 20 percent.  I
18  don't know whether it's considered reasonable in the
19  market.  I can say for me it would not be reasonable.
20  BY MR. HEYBURN:
21      Q   Why wouldn't you think that was reasonable?
22      A   I just wouldn't pay that much out.
23      Q   You think that it's too much?
24      A   Yeah.
25      Q   What's a reasonable development fee in your

220

1  opinion?
2      A   I guess it would also, you know, largely
3  depend on --
4          MR. SMART: Form.
5          THE WITNESS:  -- the size of a deal at the
6  same time, right; you know, the bigger the deal, the
7  less the percentage.  The smaller the deal maybe --
8  you know, because you have sort of a critical tipping
9  point.  You're building a house and you need to build
10  that house, you know, maybe paying a larger fee out,
11  but it only amounts to $3,000, and maybe it's
12  reasonable in that regard.
13  BY MR. HEYBURN:
14      Q   Do you see the column that says, "Lease
15  commission rate"?
16      A   I do.
17      Q   What is the purpose of the lease commission
18  rate?
19          MS. BODNER: Objection.  Form.
20          MR. SMART: Objection.  Form and foundation.
21          THE WITNESS:  Well, this would have been a
22  commission paid based on the lease term, the initial
23  lease term.  It would have been a percentage of its
24  overall value paid.
25          ///

221

1  BY MR. HEYBURN:
2      Q   In your experience, is it reasonable to pay
3  a lease commission rate of this type to a referral
4  partner?
5          MS. BODNER: Objection.  Form and
6  foundation.
7          MR. SMART: Objection.  Foundation.
8          THE WITNESS:  That probably would not have
9  been unreasonable to me, no.
10  BY MR. HEYBURN:
11      Q   Not unreasonable.
12          Do you know if other referral partners
13  received that type of fee?
14      A   I do not know that.
15      Q   Do you see the column that says, "Manager's
16  net profits interest percentage"?
17      A   Yes.
18      Q   What's the purpose of that payment?
19          MS. BODNER: Objection.  Form and
20  foundation.
21          MR. SMART:  Join.
22          THE WITNESS:  I think it would be typically
23  a manager has a profits interest; and in this case
24  the manager is sharing 15 percent of his profits
25  interest.

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

222

1  BY MR. HEYBURN:
2     Q   And in your experience, is it reasonable to
3  pay a fee of that type to a referral partner?
4         MS. BODNER:  Objection.  Form and
5  foundation.
6         MR. SMART:  Join.
7         THE WITNESS:  I guess reasonable in this
8  case would be in the eye of the beholder.
9  BY MR. HEYBURN:
10    Q   Why is that?
11    A   One person -- it might be reasonable to one
12 person and depending on how valuable the relationship
13 is.
14        MR. HEYBURN:  I would like to introduce
15 another document.  Our Tab 6.
16        MR. BEDELL:  While they're doing that, wait
17 a second to give your answer so the objections can --
18        THE WITNESS:  Yeah, sorry about that.
19        MR. BEDELL:  Leave her a little space to
20 type and catch up.
21        MR. SMART:  Thank you.
22        (Off-the record discussion.)
23        MR. HEYBURN:  We're introducing Exhibit 16.
24        (Deposition Exhibit DM-016 was deemed
25         marked for identification.)

---

223

1  BY MR. HEYBURN:
2     Q   Do you see Exhibit 16 on your screen?
3     A   I do.
4     Q   Do you see on the second page of this
5  document an e-mail from Brian Watson to you?  Second
6  page.
7     A   Okay.
8     Q   On December 11, 2018.
9     A   I do, yes.
10    Q   Do you recall this e-mail?
11    A   I don't.
12    Q   Is that your e-mail address in the "to"
13 line?
14    A   It is.
15    Q   Do you have any reason to believe that you
16 did not receive this e-mail?
17    A   No, I do not.
18    Q   In this e-mail, Brian Watson says, "Please
19 send me how much we have paid our top 10 referral
20 partners."
21        Then he goes on to say, "This should also
22 include the total we have paid them and should
23 include Christian as well."
24        Why did Brian Watson need to specifically
25 make sure that you included Christian on that list?

---

224

1         MS. BODNER:  Objection.  Foundation.
2         THE WITNESS:  I do not know.
3  BY MR. HEYBURN:
4     Q   If he had told you to make a list of the top
5  10 referral partners, would you have not included
6  Christian?
7         MR. SMART:  Objection.  Foundation.
8         THE WITNESS:  I couldn't answer that.  I can
9  say that Christian was not a common referral partner
10 for investors, but I don't know that I would not have
11 included him.
12 BY MR. HEYBURN:
13    Q   Why was he not common?
14    A   I just hadn't gotten any investors from him.
15 You know, my -- you know, Brian worked with him more
16 on finding deals and I focused on finding investors
17 and he didn't really find investors per se.
18    Q   So do you think Brian Watson's comment to
19 make sure you included Christian, does that mean that
20 Christian was somehow different from the referral
21 partners, other referral partners?
22    A   Well, it was probably because, you know,
23 Brian and Christian had their communications.  I
24 wasn't -- I rarely -- I think I even mentioned that I
25 probably didn't talk to Christian more than -- I

---

225

1  think I said five times or something earlier, right?
2  I rarely, rarely spoke to Christian.
3     Q   Do you see on the first page of this exhibit
4  an e-mail that you sent and then do you see the row
5  that says, in parentheses, "Christian, Villanova
6  Trust"?
7     A   I do.
8     Q   And then what is the figure?
9     A   50 grand.
10    Q   50 grand.  So are you telling -- you're
11 responding to Brian Watson's question, then, in this
12 e-mail?
13    A   Correct.
14    Q   And you're saying that Christian and
15 Villanova Trust have received $50,000?
16    A   That's all I was aware of, yes.
17        MS. BODNER:  Objection.  Foundation.
18 BY MR. HEYBURN:
19    Q   Do you see, then, at the top of that page,
20 Brian Watson's response?
21    A   I do.
22    Q   And what does he say?
23    A   "I think Christian has received millions."
24    Q   Do you recall getting that e-mail?
25    A   I do.

---

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

226

1    Q    And what was your reaction when you saw his
2    response?
3    A    Wow.
4    Q    That surprised you?
5    A    Yes.
6    Q    Why did it surprise you?
7    A    I just -- it just hadn't occurred to me.
8    You know, that's a lot of money.
9    Q    Did you know that Villanova Trust and
10   Christian Kirschner had received millions of dollars
11   from Northstar?
12   A    Not at that time.  I think the follow-up to
13   this one right here was the other one that had Kristi
14   Fisher in there saying 4 million or something in it
15   that you showed me earlier today.
16   Q    Right.
17   A    And that's when I -- I think that's the same
18   day that I e-mailed that e-mail to my Gmail, like
19   that was a lot of money.
20   Q    I would like to take a look at that e-mail.
21   We've introduced our Tab 7.
22       MS. BODNER:  I meant to object to the prior
23   question, but I didn't want to talk over him, so I
24   apologize.
25       THE WITNESS:  I'll try and slow down.

---

227

1        MR. HEYBURN:  I'm introducing a document as
2    Exhibit 17.
3        (Deposition Exhibit DM-017 was deemed
4            marked for identification.)
5    BY MR. HEYBURN:
6    Q    And if you could let me know when you see it
7    on your screen.
8    A    I see it.
9    Q    Do you see Brian Watson's e-mail at the
10   bottom of the first page?
11   A    Yes.
12   Q    And is that your e-mail address in the cc
13   line?
14   A    It is.
15   Q    Do you recall receiving this e-mail?
16   A    I've seen this, but I don't recall the
17   moment.  But, yes, I do recall seeing this e-mail.
18   Q    And there's no reason to think that you did
19   not receive this e-mail; is that right?
20   A    Correct.  Correct.
21   Q    In this e-mail, Brian Watson asks, "What is
22   the total amount of fees we have paid to Villanova or
23   all fees... leasing, sales, development, etcetera?"
24       And then Kristi Fisher responds to Brian
25   with you still cc'ed.

---

228

1        Can you read her response, please?
2    A    "Villanova: $4,641,955.40.  Chiles Capital:
3    $100,000."
4    Q    And what was your reaction when you received
5    that e-mail from Kristi Fisher?
6    A    That's when I was like, wow, that's a lot of
7    money.
8    Q    Same reaction as before?
9    A    Yes.
10   Q    Do you know where Kristi got this
11   information from?
12   A    Kristi is the one who -- you know, between
13   Kristi and the CFO, they would be the ones to handle
14   this type of information.
15   Q    Did you have access to that information?
16   A    No.
17   Q    Was information like this typically
18   balkanized at Northstar?
19       MS. BODNER:  Objection to form.
20       MR. SMART:  Join.
21       THE WITNESS:  I don't know what was typical
22   there.  I just wasn't aware of distributions or
23   referral fees that had been paid out.
24   BY MR. HEYBURN:
25   Q    Was it your understanding that Brian Watson

---

229

1    wanted to hide the total number of fees that had been
2    sent to Villanova Trust from some people at
3    Northstar?
4        MS. BODNER:  Objection.  Form and
5    foundation.
6        MR. SMART:  Join.
7        THE WITNESS:  I couldn't speak to that one
8    way or the other.
9    BY MR. HEYBURN:
10   Q    But the information --
11   A    I can assume that, you know, you hold that
12   type of information confidential, but I don't know if
13   he made any implicit attempts to hide it.
14   Q    But you weren't privy --
15   A    I would not have been privy to it.
16   Q    -- to that information?
17       Sorry, I just need to finish my question.
18       But you weren't privy to that information?
19   A    No, I was not.
20   Q    Did you ever ask anyone why the fees were so
21   high at Northstar?
22       MS. BODNER:  Objection.  Foundation.
23       THE WITNESS:  No.
24   BY MR. HEYBURN:
25   Q    Did you ever speak to Brian Watson about why

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

230

1  Villanova Trust was receiving so much in fees?
2       MS. BODNER: Objection to form.
3       THE WITNESS: No.
4  BY MR. HEYBURN:
5    Q   When you received -- or strike that.
6       Was this e-mail exchange the first time that
7  you became suspicious that something improper was
8  going on with the Northstar/Villanova Trust
9  relationship?
10      MS. BODNER: Objection. Form and
11 foundation.
12      MR. SMART: Join.
13      THE WITNESS: I don't know if it's the first
14 time. It was a remarkable time, but maybe not the
15 first time.
16 BY MR. HEYBURN:
17   Q   You testified earlier that it is your
18 understanding that Brian Watson was aware that a
19 portion of the payments going from Northstar to the
20 Villanova Trust were subsequently transferred to
21 Carleton Nelson and Casey Kirschner; is that right?
22      MS. BODNER: Objection to form.
23      THE WITNESS: That was my understanding.
24 BY MR. HEYBURN:
25   Q   To your knowledge, was Mr. Watson aware that

231

1  this arrangement would violate Northstar's policies?
2       MS. BODNER: Objection. Form and
3  foundation.
4       MR. SMART: Join.
5       THE WITNESS: Repeat the question.
6  BY MR. HEYBURN:
7    Q   To your knowledge, was Mr. Watson aware that
8  this arrangement might violate Northstar's policies?
9    A   I can't answer that.
10   Q   To your knowledge, was Mr. Watson aware that
11 this arrangement might violate Amazon's policies?
12      MS. BODNER: Objection. Form and
13 foundation.
14      THE WITNESS: I can't speak to what he knew
15 or didn't know.
16      MR. SMART: Join.
17 BY MR. HEYBURN:
18   Q   Did you ever see anything that would lead
19 you to think that Mr. Watson wanted to hide this
20 aspect of the agreement from anyone at Northstar?
21      MS. BODNER: Objection. Form.
22      MR. SMART: And foundation.
23      THE WITNESS: Again, I don't know if it was
24 an explicit hiding. Certainly not something that he
25 went and discussed with everybody at the weekly

232

1  meeting.
2  BY MR. HEYBURN:
3    Q   So he would not discuss --
4    A   Paying somebody $4 million.
5    Q   He would not discuss any payments to Casey
6  Kirschner or Carleton Nelson broadly at Northstar?
7       MS. BODNER: Objection. Form and
8  foundation.
9       MR. SMART: Same objections.
10      THE WITNESS: No.
11 BY MR. HEYBURN:
12   Q   To your knowledge, did Brian Watson discuss
13 the Villanova Trust with anyone at Amazon other than
14 Carleton Nelson and Casey Kirschner?
15      MS. BODNER: Objection. Form and
16 foundation.
17      THE WITNESS: No idea.
18      MR. SMART: Same objection.
19 BY MR. HEYBURN:
20   Q   To your knowledge, did Brian Watson attempt
21 to hide the Villanova Trust from anyone at Amazon
22 other than Carleton Nelson and Casey Kirschner?
23      MS. BODNER: Objection. Form and
24 foundation.
25      MR. SMART: Join.

233

1       THE WITNESS: Not aware.
2  BY MR. HEYBURN:
3    Q   Is there any way that he treated this
4  agreement differently than other agreements?
5       MS. BODNER: Objection. Form and
6  foundation.
7       MR. SMART: Join.
8       THE WITNESS: Only in the manner that I
9  never saw the final agreement.
10 BY MR. HEYBURN:
11   Q   And would you typically see a final
12 agreement for a referral partner?
13   A   I had started to be a part of those with,
14 like, if you saw that list of referral partners,
15 Nicole Gamp and Carl Medearis; that was the call I
16 was speaking about earlier. And that was the lady I
17 was speaking about earlier. In those cases, yes, I
18 saw those agreements. I filed those agreements.
19   Q   So was it unusual that you did not see the
20 final agreement for this partner?
21      MS. BODNER: Objection to form.
22      THE WITNESS: I'm not going to say that it
23 was unusual. We were transitioning to a process
24 wherein I should have been the champion or gatekeeper
25 of those referral agreements, and for whatever

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

234

1  reason, it hadn't fully materialized.
2  BY MR. HEYBURN:
3     Q    To your knowledge, was anyone else at
4  Northstar concerned that this agreement with
5  Villanova Trust might be improper?
6     A    Again, I can't speak to a specific moment,
7  but, yes, I would say outside of Brian Watson and Don
8  Marcotte, I would expect that the other people that
9  knew about the arrangement knew that it might not be
10 appropriate.
11    Q    Do you remember who those individuals were?
12    A    No.  Again, I don't know the specific
13 example, but I would expect of the people I mentioned
14 earlier, Brent Gray, Kristi Fisher, Tim Lorman, for
15 that matter -- if Tim was even involved.  I don't
16 know what Tim knew and didn't know.
17    Q    Did you ever speak to Brent Gray about the
18 Villanova Trust agreement?
19    A    Not about the agreement, no.
20    Q    Did you ever speak to Patricia Watson about
21 the Villanova Trust agreement?
22    A    No.
23    Q    Did you ever speak to Josh Richards about
24 the Villanova Trust agreement?
25    A    No.

235

1     Q    Just bear with me a minute.  I want to make
2  sure that we're not repeating things too much.
3     A    Right.  A point of clarification.  You're
4  saying the Villanova Trust agreement, being this
5  exact document, I didn't have those discussions.
6        About the overall arrangement, you know, I
7  can't say at any specific time I did, but I know I
8  did speak about the overall arrangement with those
9  parties.
10    Q    So let me ask again, then:  Did you ever
11 speak with Josh Richards about the overall Villanova
12 Trust arrangement?
13    A    The structure of the Amazon deal in all of
14 its merits, yes; I had conversations with all of
15 those people about all of the people mentioned prior
16 at different times and at different levels of
17 discussion.
18    Q    Do you recall when you had these
19 conversations?
20    A    I do not.
21    Q    Do you recall what you discussed with them?
22    A    No, just free-flow conversation about it.
23    Q    At a general level, was the conversation
24 about concerns about the arrangement?
25    A    Yes.  That it's not something that we should

236

1  talk -- it's not something that you'd want ever out,
2  you know, in the public.
3     Q    So just making sure I have this right, did
4  you have conversations with Josh Richards, Patricia
5  Watson, and Brent Gray about your collective concerns
6  about the Villanova Trust arrangement?
7        MS. BODNER:  Objection to form and
8  foundation.
9        MR. SMART:  Join.
10       THE WITNESS:  I've never spoken to Patricia
11 Watson about any of this stuff.  My only area of
12 conversation with Patricia Watson was helping Brian
13 deal with his divorce from Patricia Watson.  That's
14 the only time I ever had any engagement with Patricia
15 Watson.
16       I had all types of other conversations with
17 Brent Gray and Josh Richards and Kristi Fisher and
18 Kyle Ramstetter.  We all worked in the same office,
19 you know.  I'd boil it down to almost water-cooler
20 talk in a manner.
21 BY MR. HEYBURN:
22    Q    Staying on this just for a minute, do you
23 remember anything specifically that Brent Gray told
24 you during these conversations?
25    A    No.

237

1     Q    Do you remember anything specific about what
2  Josh Richards told you during these conversations?
3     A    No.
4     Q    Do you recall earlier discussing the White
5  Peaks transaction?
6     A    I do.
7     Q    And if I refer to it as the White Peaks
8  transaction, I think you discussed it earlier, you
9  would know what I'm referring to?
10    A    I will.
11    Q    While you were at Northstar, did you have
12 any knowledge of the White Peaks transaction?
13    A    I did not.
14    Q    Do you know if others at Northstar knew that
15 Kyle Ramstetter and Will Camenson were pursuing that
16 transaction?
17       MS. BODNER:  Objection.  Foundation.
18       THE WITNESS:  No, I have no idea.
19 BY MR. HEYBURN:
20    Q    Did you ever hear anyone discussing that
21 transaction while you were at Northstar?
22    A    No.
23    Q    Did you know that that transaction involved
24 a same-day flip that netted White Peaks Capital an
25 $18 million profit?

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

238

1     MS. BODNER:  Objection to form.
2     MR. SMART:  Objection to form and
3  foundation.
4     THE WITNESS:  I didn't know the details to
5  any of it, no.
6  BY MR. HEYBURN:
7     Q    You read an article about it; is that right?
8     A    Correct.
9     Q    Did you learn in that article that White
10  Peaks purchased the property on the same day that
11  they sold it to Amazon?
12     A    No, I did not.
13     Q    Were you aware that Brian Watson engaged in
14  the mediation with Kyle Ramstetter and Will Camenson
15  regarding their involvement in the White Peaks
16  transaction?
17     MS. BODNER:  Objection.  Foundation.
18     MR. SMART:  Join.
19     THE WITNESS:  I was aware that they had some
20  sort of mediation.
21  BY MR. HEYBURN:
22     Q    Are you aware of the result of the
23  mediation?
24     A    I am not.
25     MR. HEYBURN:  Okay.  I'm going to introduce

239

1  another exhibit.  This will be Exhibit 18.
2     (Deposition Exhibit DM-018 was deemed
3     marked for identification.)
4     THE WITNESS:  I have Exhibit 17.
5     Okay, here it is.  Here we go.
6  BY MR. HEYBURN:
7     Q    Do you have the exhibit up?
8     A    I do.
9     Q    Do you recall this e-mail that Brian Watson
10  sent you?
11     A    I do not recall it.
12     Q    Is that your e-mail address in the "to"
13  line?
14     A    It is.
15     Q    Do you have any reason to believe that you
16  did not receive this e-mail?
17     A    No, I do not.
18     Q    The e-mail contains a forwarded e-mail
19  thread discussing a trip to Naples, Florida.  Do you
20  recall the trip to Florida referenced in this e-mail?
21     A    I do not.
22     Q    Do you recall -- strike that.
23     MR. HEYBURN:  I would like to introduce
24  another exhibit.  This will be Exhibit 19, our Tab
25  12.

240

1     (Deposition Exhibit DM-019 was deemed
2     marked for identification.)
3  BY MR. HEYBURN:
4     Q    And if you could just let me know when you
5  see that exhibit.
6     A    Okay.
7     Q    Do you see the exhibit?
8     A    I do.
9     Q    Can you turn to the second page?  Do you
10  recall this e-mail that Brian Watson sent to you and
11  several others on February 15, 2019?
12     A    Vaguely.
13     Q    If you'll see at the bottom of his e-mail,
14  he says, "I then leave Friday evening the 15th for
15  New Zealand/Australia with the Sterling execs."
16     Do you recall that trip to New Zealand and
17  Australia?
18     A    Yes, I do.
19     Q    Do you recall who attended the trip?
20     A    I think it was -- I want to say it was Casey
21  and Kyle and Brian.
22     Q    Did Brian Watson pay for this trip?
23     A    I have no idea.
24     Q    Do you recall what the purpose of this trip
25  was?

241

1     A    It was a hunting trip.
2     Q    Do you know why he invited -- who did you
3  say that he took?
4     A    Kyle and Casey.
5     Q    Do you know why that he invited Casey and
6  Kyle?
7     A    No.
8     Q    Do you believe that he invited Casey to
9  obtain further business from Amazon?
10     MS. BODNER:  Objection.  Form and
11  foundation.
12     THE WITNESS:  Yes.
13     MR. SMART:  Join.
14  BY MR. HEYBURN:
15     Q    Did Brian Watson ever treat any other
16  individuals that he worked with outside of Northstar
17  to trips like this?
18     MS. BODNER:  Objection.  Form.
19     THE WITNESS:  Not that I'm aware of.
20  BY MR. HEYBURN:
21     Q    To your knowledge, did Brian Watson ever try
22  to hide the fact of this trip from anyone at Amazon
23  other than Casey Kirschner and Carleton Nelson?
24     MS. BODNER:  Objection.  Form and
25  foundation.

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

242

1      MR. SMART:  Join.
2      THE WITNESS:  I'm not aware if he tried to
3  hide it from anybody.
4  BY MR. HEYBURN:
5    Q   Did you have any concerns about this trip?
6    A   Not personally.
7    Q   Are you aware of any other trips that Brian
8  Watson provided for Amazon employees?
9      MS. BODNER:  Objection.  Form and
10 foundation.
11     THE WITNESS:  Not that I'm aware of.
12 BY MR. HEYBURN:
13   Q   Are you aware of any other gifts that Brian
14 Watson provided any other employees?
15     MS. BODNER:  Same objection.
16     MR. SMART:  Join.
17     THE WITNESS:  No, I'm not aware.
18 BY MR. HEYBURN:
19   Q   Other than what we've discussed so far
20 today, during your time at Northstar did you ever
21 observe Brian Watson doing anything that you
22 considered improper?
23     MR. SMART:  Objection.  Form.
24     MS. BODNER:  Same objection.
25     THE WITNESS:  Only what was previously

243

1  discussed this afternoon.
2  BY MR. HEYBURN:
3    Q   And other than what was discussed this
4  afternoon, did you ever observe Brian Watson engaging
5  in any activity that you thought might be illegal?
6      MS. BODNER:  Objection.  Form.
7      THE WITNESS:  No.
8      MR. SMART:  Same objection.
9      MR. HEYBURN:  I think we're about done.
10 We'd like to just take five.  I think we should only
11 have a few questions when we come back if that's all
12 right with everyone.
13     MS. BODNER:  Yep.
14     THE VIDEOGRAPHER:  We are going off record
15 at 3:46 p.m.
16     (Thereupon, a recess was taken.)
17     THE VIDEOGRAPHER:  We are back on record at
18 3:54 p.m.
19 BY MR. HEYBURN:
20   Q   Okay.  Just a couple other questions,
21 Mr. Mulcahy.  We'll be done in less than five
22 minutes.
23     Earlier we discussed the e-mail you received
24 from Kristi Fisher which laid out the fees that
25 Northstar had paid to Villanova Trust.

244

1    Do you recall the discussion about that
2  e-mail?
3    A   I do.
4    Q   It's my understanding that you said that
5  that was not the first time you became concerned
6  about the Northstar/Villanova Trust arrangement, but
7  it was a significant thing that made you concerned.
8  Is that an accurate --
9      MS. BODNER:  Objection.  Form and
10 foundation.
11     MR. SMART:  Join.
12 BY MR. HEYBURN:
13   Q   I can restate the question.
14     Was that the first time that you became
15 concerned about the Northstar/Villanova Trust
16 arrangement?
17   A   I actually think you asked that question in
18 the context of was that the first time I suspected
19 things at Northstar, not regarding Villanova itself
20 or that deal in particular; and I said it might not
21 have been the first time, but it was a sort of a
22 remarkable time.
23   Q   And were there earlier instances that you
24 can recall that made you concerned about the
25 Northstar/Villanova Trust arrangement?

245

1      MR. SMART:  Objection.
2      THE WITNESS:  I can't recall.
3  BY MR. HEYBURN:
4    Q   Earlier you testified about your
5  understanding of Don Marcotte's role in this kickback
6  scheme.  What is your understanding of Don Marcotte's
7  role in the kickback scheme?
8      MS. BODNER:  Objection.  Foundation.
9      MR. SMART:  Join.
10     THE WITNESS:  Don, to be colloquial, was
11 along for the ride.  He wasn't a decision-maker per
12 se in -- you know, but he was intimately involved in
13 the decision-making.  I mean, he wasn't a
14 decision- -- but he was aware of exactly all the
15 dynamics.
16 BY MR. HEYBURN:
17   Q   And he was aware that payments made by
18 Northstar to Villanova Trust would subsequently be
19 transferred to Casey Kirschner and Carleton Nelson;
20 is that right?
21     MS. BODNER:  Objection.  Form and
22 foundation.
23     MR. SMART:  Join.
24     THE WITNESS:  Again, I -- back to that word
25 "tangible," "empirical," etcetera, etcetera.  It was



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

246

1  my understanding that he was aware of all those
2  things; but, you know, I was not on the e-mail chain.
3  I wasn't sitting in the same discussion with Brian
4  and him and whoever.
5  BY MR. HEYBURN:
6      Q   And that's all I'm asking about is your
7  understanding.
8      A   That was my understanding, yes.
9      Q   Is it your understanding that he helped
10  facilitate those payments to Casey Kirschner and
11  Carleton Nelson?
12      MS. BODNER:  Objection.  Foundation.
13      MR. SMART:  Objection.  Same objection.
14      THE WITNESS:  I don't believe he had any
15  role in the facilitating because that would have
16  fallen more into the CFO and Kristi Fisher's role.
17  It would have been at the direction of Brian Watson
18  to Brent and Kristi in some manner to pay Christian.
19  And I don't know how it went from Christian into
20  anywhere else.
21      MR. HEYBURN:  Okay.  That is all we have
22  today.  Thank you very much for your time and your
23  patience.
24      THE WITNESS:  Thank you.
25      MS. BODNER:  I have just a couple minutes of

---

247

1  questions, but I will quick.
2              FURTHER EXAMINATION
3  BY MS. BODNER:
4      Q   Following up on the question that you were
5  just asked, do you have any personal knowledge that
6  Brian Watson directed Brent Gray or Kristi Fisher to
7  make payments to Villanova Trust?
8      A   No.
9      Q   Who was Kristi Fisher?
10      A   She -- I guess her job title was probably
11  office manager at Northstar Commercial Partners.
12      Q   Did you interact with her when you worked at
13  Northstar?
14      A   I did.
15      Q   While you worked at Northstar, did you have
16  any reason to believe that Kristi Fisher was engaged
17  in improper conduct?
18      A   Can you clarify that?
19      Q   While you were working at Northstar, did you
20  have any concerns about any of Kristi Fisher's
21  conduct?
22      A   Kristi Fisher is a great woman and a
23  straight-shooter.
24      Q   Did you, at any point, have any concerns
25  that Kristi Fisher was involved in Northstar's

---

248

1  arrangement with Villanova Trust?
2      A   Kristi Fisher is just -- is an employee who
3  controls a lot of information and check writing and
4  bill payment.  She would have done what she was told
5  by Brian Watson.
6      Q   Have you had any conversations with Kristi
7  Fisher in which she expressed concern about being
8  told by Brian Watson to do things related to
9  Villanova Trust?
10      A   No, I did not.  She didn't express any
11  concern, no.
12      Q   Has Kristi Fisher ever expressed any
13  concerns about her employment at Northstar to you?
14      A   No.
15      Q   Did you try to hire Kristi Fisher while she
16  was employed by Northstar?
17      A   Not per se.
18      Q   What do you mean by that?
19      A   I've never per se headhunted her like I
20  would, you know, some other people in business.  I
21  know she is active in RVing and motorcycling and I've
22  certainly told her that she always had a home with me
23  if she wanted.
24      Q   When you told her that she always had a home
25  with you, were you referring to an employment home?

---

249

1      A   Yeah, more of a, you know, what's called a
2  workamper.  It's not really -- it's a workamper role,
3  yes.  You know, stay at an RV park, put in some
4  hours, get a discount on your space.  That's what
5  millions of people do.
6      Q   When you made that offer to Kristi Fisher,
7  you had no concerns about her judgment?
8      A   No.
9      Q   Do you recall the e-mail in which Kristi
10  Fisher sent figures that you called remarkable?
11      A   Pardon me?
12      Q   Do you recall discussing an e-mail in which
13  Kristi Fisher sent certain figures and you called
14  those remarkable?
15      A   Discussing today, yes, I recall that.
16      Q   Correct.  You haven't remembered much today,
17  so how do you remember that you thought those figures
18  were remarkable?
19      MR. BEDELL:  Objection.  Argumentative.
20      THE WITNESS:  They are remarkable and I
21  remember they were remarkable because I forwarded
22  that e-mail thread.  I don't know when I did it, but
23  I know I forwarded that e-mail thread to my personal
24  account so that I'd have a record of it.
25      ///

---



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

250

1  BY MS. BODNER:
2     Q   And do you recall that I showed you a
3  different version of the document this morning when I
4  asked you questions and asked you why you forwarded
5  that e-mail to yourself?
6     A   Vaguely.  What's your question?
7     Q   Do you recall telling me that you don't know
8  why you forwarded that e-mail to your personal Gmail?
9     A   I don't remember saying that.  If I did, I
10 did.
11    Q   Did you testify that it was your
12 understanding that the Villanova Trust arrangement
13 was kept a secret at Northstar?
14       MR. BEDELL:  Objection to the form of the
15 question, and specifically you're asking him a memory
16 question about what he said today.
17       THE WITNESS:  Say it one more time.
18       MR. HEYBURN:  Same.  Objection to form.
19 BY MS. BODNER:
20    Q   Is it your understanding that the Villanova
21 Trust arrangement was a secret at Northstar?
22    A   I did not testify today that it was a
23 secret.  And, yeah, I don't know if it was hidden or
24 not.  It just wasn't publicized.
25    Q   Would it surprise you to hear that others

---

251

1  have testified that the Villanova Trust arrangement
2  was common knowledge?
3        MR. HEYBURN:  Objection to form.
4        THE WITNESS:  Repeat the question.
5  BY MS. BODNER:
6     Q   Would it surprise you to learn that others
7  have testified that the Villanova Trust agreement was
8  common knowledge?
9     A   It wouldn't surprise me one way or the
10 other, no.
11    Q   Did you ever ask to see a fully signed copy
12 of the Villanova Trust agreement from Mr. Watson?
13    A   Not that I'm aware of.
14    Q   Did you understand that Christian
15 Kirschner's role was to open up corporate real estate
16 opportunities and not raise equity?
17    A   No, that's not how I understood it.
18    Q   How did you understand his role to be?
19    A   He was referral partner for both corporate
20 opportunities and investors.
21    Q   Did you understand that your role was
22 limited to just investors?
23    A   My role or his role?
24    Q   Your role.
25    A   My role is to just work on investors, yes.

---

252

1     Q   So is it fair to say that you and Christian
2  Kirschner had different roles at Northstar?
3     A   Well, of course we had different roles.  I
4  was the director of equity and he was just a referral
5  partner referring both corporate opportunities and
6  investors.
7     Q   I'm sorry, did you just say that you
8  referred both corporate opportunities --
9     A   No, I said he referred corporate
10 opportunities and investors.
11    Q   Thank you.
12       And to clarify, you referred just investors,
13 right?
14    A   Correct.
15    Q   And did you understand that Christian
16 Kirschner's referral agreement involved him
17 introducing Northstar to companies?
18    A   Didn't we just have this conversation?  His
19 role was to introduce investors and corporate
20 relationships.
21    Q   Thank you.
22       Do you believe that the investors in the
23 Sterling deals were harmed by the complaint you made
24 to Amazon?
25       MR. HEYBURN:  Objection to form.

---

253

1        THE WITNESS:  Repeat the question.
2  BY MS. BODNER:
3     Q   Do you believe that the investors in the
4  Sterling deals were harmed by your complaint to
5  Amazon?
6     A   Not by my complaint, no.
7     Q   Do you believe that the investors in the
8  Sterling deals have been harmed in any way by your
9  actions with respect to Northstar?
10       MR. HEYBURN:  Objection to form.
11       THE WITNESS:  Not at all.
12 BY MS. BODNER:
13    Q   Did you understand that the IPI reduced
14 buyout was related to the claims you made to Amazon?
15       MR. HEYBURN:  Objection to form.
16       THE WITNESS:  Repeat the question.
17 BY MS. BODNER:
18    Q   Do you understand that the IPI reduced
19 buyout was related to the claims you made to Amazon?
20    A   They weren't related to my claims.
21    Q   What is your understanding as to the impetus
22 for the IPI reduced buyout?
23    A   The actions of WDC and Amazon.  Breach of
24 the morality clause.
25    Q   So you believe the investors in the Sterling

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

254

1 deals were harmed by the actions of WDC?
2    A   Correct.
3    Q   And were the actions that harmed the
4 investors in the Sterling deals anything other than
5 what we've already discussed today?
6    A   Repeat the question.
7    Q   Were the actions that -- strike that.
8        Were the actions conducted by WDC that you
9 believe harmed the Sterling deals anything other than
10 what we've already discussed today?
11   A   No.
12   Q   What was your annual global income in 2019?
13   A   No idea.
14   Q   Do you have a best guess?
15   A   No.
16   Q   Can you estimate what your annual global
17 income was in 2019?
18       MR. BEDELL:  Objection as to the same thing.
19 You just asked that.
20       MR. HEYBURN:  Objection.  Relevance.
21       MS. BODNER:  I just asked about 2018.
22       MR. BEDELL:  You said 2019 both times.
23       MS. BODNER:  You're right.  Thank you.
24 BY MS. BODNER:
25   Q   Can you estimate --

255

1        MR. BEDELL:  I do have a relevance objection
2 in this deposition.
3 BY MS. BODNER:
4    Q   Can you estimate what your annual global
5 income was in 2020?
6    A   Why would my income in 2020 have anything to
7 do with this deposition?  I don't need to disclose
8 that information.
9    Q   You can answer that question.
10   A   I'd say no.
11   Q   No, you don't have any estimate?
12   A   No.
13   Q   Do you have an estimate as to your annual
14 global income from 2021?
15   A   No.
16   Q   You have no understanding?
17       MR. HEYBURN:  Asked and answered.
18       MR. BEDELL:  Objection.
19 BY MS. BODNER:
20   Q   You can answer.
21   A   Oh, no, I'm not going to guess what my
22 income is.
23   Q   Have you done your 2021 taxes?
24   A   I haven't filed them yet, no.
25       MR. HEYBURN:  Objection to relevance.

256

1        MS. BODNER:  We have no further questions.
2        MR. BEDELL:  Did Adam have any more?
3        MS. BODNER:  I think Adam might have one or
4 two.
5             FURTHER EXAMINATION
6 BY MR. SMART:
7    Q   I have one.  So let's look at -- actually,
8 I'm going to ask it this way.  I believe counsel for
9 Amazon asked you whether you were privy to the
10 referral fees being paid to Villanova Trust.
11       Do you recall that question?
12   Q   What was your question?
13       MR. BEDELL:  Do you recall talking about
14 that with him?
15       THE WITNESS:  Yes, I recall that.
16 BY MR. SMART:
17   Q   And you were included on the two e-mails
18 that were setting forth the amount of fees that were
19 paid to Villanova Trust, right?
20   A   The percentage -- the percentages?
21   Q   The 4 million, the $4 million amount and
22 change, do you remember that?
23   A   Yes, yes.  I saw those e-mails.
24       MR. SMART:  That's all I have.
25       MS. BODNER:  I'm sorry.  Can I ask one

257

1 question.  I overlooked it in my notes.
2             FURTHER EXAMINATION
3 BY MS. BODNER:
4    Q   Mr. Mulcahy, you testified earlier today
5 about five people that you discussed the Villanova
6 Trust arrangement with.
7        Do you recall that testimony?
8    A   I discussed and I clarified that I had
9 conversations about the overall structure of it, not
10 the particular referral agreement with Villanova
11 Trust.
12   Q   Can you -- strike that.
13       And I believe you testified to opposing
14 counsel that you considered that water-cooler talk;
15 is that correct?
16       MR. BEDELL:  Objection.  Form.
17       THE WITNESS:  In a manner, correct.
18 BY MS. BODNER:
19   Q   Can you identify the names of all the
20 individuals you engaged in this water-cooler talk
21 with so that it's clear for the record?
22   A   I think I've stated several times, but I'll
23 do it again:  Brent Gray, Kristi Fisher, Kyle
24 Ramstetter would be the three -- or however many that
25 was, those would be the primary ones.

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

---

258

1    There's other -- other per se conversations
2 that I was a part of. I can't bring them to the
3 exact example of when those conversations were, but
4 what I was aware that, you know, Don Marcotte and
5 Brian Watson, the arrangements that they were making
6 and agreeing to.
7    Q   So you just identified five individuals.
8    Are there other individuals formerly or
9 currently employed by Northstar that you engaged in
10 this water-cooler talk with?
11    A   Maybe Josh Richards also. You know, very
12 initially.
13    Q   Can you remember anyone else?
14    A   That should be it.
15    MR. BEDELL:  Can you spell that last name
16 for her?
17    THE WITNESS:  Josh Richards.
18    MR. BEDELL:  Richards, okay.
19    MS. BODNER:  I have no further questions. I
20 don't know if anyone wants to follow up on that.
21    MR. HEYBURN:  None for us.
22    MS. BODNER:  Thank you very much.
23    MR. BEDELL:  Before we go off the record,
24 pursuant to the protective order, we're designating
25 this as confidential.

---

259

1    Now you can go off the record.
2    THE VIDEOGRAPHER:  This concludes the
3 video-recorded deposition of Danny Mulcahy taken on
4 March 30, 2022.
5    We are going off record, and the time is
6 4:12 p.m.
7    THE REPORTER:  Before I go off the record,
8 Counsel, can I get your copy orders, please?
9    Mr. Bedell?
10    MR. BEDELL:  Don't need one.
11    THE REPORTER:  Mr. Heyburn?
12    MR. HEYBURN:  We'd like a rough transcript
13 as soon as possible and an expedited final.
14    THE REPORTER:  Mr. Smart, would you like a
15 copy?
16    MR. SMART:  What's the normal time for the
17 transcript?
18    THE REPORTER:  Ten working days.
19    MR. SMART:  That will be fine.
20    THE REPORTER:  Sara?
21    MS. BODNER:  And then we would just like a
22 rough and then regular time on the transcript.
23    (Thereupon, the videotaped deposition
24    was concluded at 4:12 p.m.)
25    * * * * *

---

260

1                     CERTIFICATE OF WITNESS
2 PAGE   LINE    CHANGE                      REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19            * * * * *
20    I, DANIEL CHRISTOPHER MULCAHY, witness herein,
   do hereby certify and declare under penalty of
21 perjury the within and foregoing transcription to be
   my deposition in said action; that I have read,
22 corrected and do hereby affix my signature to said
   deposition.
23
24 _____   _____
        DANIEL CHRISTOPHER MULCAHY          DATE
25

---

261

1                   REPORTER'S CERTIFICATE
2
   STATE OF NEVADA      )
3                       ) SS
   COUNTY OF CLARK      )
4
5    I, Sarah Safier, a duly certified court
   reporter licensed in and for the State of Nevada, do
6 hereby certify:
7    That I reported the taking of the deposition
   of the witness, DANIEL CHRISTOPHER MULCAHY, at the
8 time and place aforesaid;
9    That prior to being examined, the witness was
   by me duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth;
11    That I thereafter transcribed my shorthand
   notes into typewriting and that the typewritten
12 transcript of said deposition is a complete, true and
   accurate record of testimony provided by the witness
13 at said time to the best of my ability.
14    I further certify (1) that I am not a
   relative, employee or independent contractor of
15 counsel of any of the parties; nor a relative,
   employee or independent contractor of the parties
16 involved in said action; nor a person financially
   interested in the action; nor do I have any other
17 relationship with any of the parties or with counsel
   of any of the parties involved in the action that may
18 reasonably cause my impartiality to be questioned;
   and (2) that transcript review pursuant to FRCP 30(e)
19 was not requested.
20    IN WITNESS WHEREOF, I have hereunto set my
   hand in the County of Clark, State of Nevada, this
21 4th day of April, 2022.
22
23
24
25 _____
        SARAH SAFIER, CCR 808

---

OASIS
REPORTING SERVICES
EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

## $

**$1**
33:7,9

**$1,000**
60:9

**$100,000**
228:3

**$17**
152:25

**$18**
237:25

**$3,000**
220:11

**$4**
232:4 256:21

**$4,641,955.40**
228:2

**$50,000**
225:15

**$8**
111:1

## 0

**089**
37:18 39:1

## 1

**1**
32:16 100:17 146:18 147:1,
8,15 152:21 156:23 166:7
184:23

**10**
33:17 60:9 143:3 151:8
177:25 191:17 223:19 224:5

**100**
5:6 56:21

**10:11**
36:21

**10:13**
36:24

**10:18**
42:10

**10:20**
42:13

**11**
18:22,23 161:5 163:11
207:8,9 223:8

**110**
184:18

**11874**
9:11 25:8

**11:22**
97:1

**11:39**
97:4

**11:52**
107:2

**11:53**
107:5

**12**
148:14 162:8 239:25

**12/22/70**
9:9

**12:03**
115:19

**12:12**
115:22

**12:43**
142:11

**13**
165:7

**14**
54:12 162:15 187:10,11
206:18

**15**
216:21 221:24 240:11

**15th**
240:14

**16**
187:20 222:23 223:2

**1600**
5:7

**16th**
206:19

**17**
227:2 239:4

**18**
145:4 239:1

**19**
239:24

**1978**

**10:21**

**1981**
10:21

**1986**
10:21

**1990**
10:21

**1:11**
142:14

**1:14**
61:21 62:3,5

**1:20-CV-484-RDA-TCB**
5:11

**1:31**
158:17

**1:33**
158:20

**1:53**
76:18

## 2

**2**
32:17 59:3,12,16 100:17
107:20 109:1 146:14,16
180:17

**20**
92:7 219:11,17

**200,000**
195:18,19

**2000**
11:20 14:2

**2000-**
23:16 24:17 122:20

**2001**
15:10

**2004**
17:5

**2005**
17:5

**2007**
36:14 37:2,17 38:6,25

**2009**
18:3,5,17

**2010**
18:22

**2012**

**19:6**

**2017**
23:4 50:21 54:6 59:3,13,16
63:11 68:11 69:15 71:3,4
76:14,18 81:5 187:2

**2018**
23:16 24:1 81:5 162:15
185:2 223:8 254:21

**2019**
9:20 23:17 24:17 83:23
107:20 109:1 122:21 146:17
148:14,17 149:4 184:22
240:11 254:12,17,22

**2020**
11:23 145:4 149:4 161:12
184:23 187:20 188:19 255:5,
6

**2021**
255:14,23

**2022**
5:4 63:11 187:2 259:4

**22**
105:8,13

**24**
8:20 11:12

**25**
105:12 184:14

**27**
161:12

**27th**
207:11

**28**
76:18

**2:15**
194:18

**2:31**
194:21

**2:50**
208:20

**2nd**
61:21

## 3

**3**
32:17 54:6 146:11,14 166:1

**30**
5:4 259:4



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**30,000**
65:1,2

**3:04**
208:23

**3:30**
166:8

**3:46**
243:15

**3:54**
243:18

---

**4**

**4**
32:17 226:14 256:21

**400**
168:18

**4:11**
141:14

**4:12**
259:6,24

---

**5**

**5**
32:17 59:13,19 81:11 148:10

**50**
33:14 56:22 111:1 225:9,10

**5212**
9:23 195:4

**5:15**
191:15

---

**6**

**6**
104:23 105:10,11 106:9
149:15,19 151:8 183:13
216:24 222:15

**66**
11:12

**6:30**
135:20

**6A**
183:11

---

**7**

**7**
11:12 107:7 150:9,10 151:25
152:3,11 156:21,22 226:21

---

**8**

**8**
134:19 143:22 158:23

**8913**
9:12

**89138**
9:12 25:9

---

**9**

**9**
139:6

**97**
11:5 12:20

**98**
12:20

**9:36**
5:5

**9:55**
23:20

**9:57**
23:23

---

**A**

**A'HEARN**
173:19

**A-U-E-R-B-A-C-H**
52:10

**a.m.**
5:5 23:20,23 36:21,24 42:13
97:1,4 107:2,5

**ability**
8:14 96:2

**absolutely**
53:25

**accepted**
53:10 195:8,12

**accepting**
120:14 197:14

**access**
67:22 228:15

**accomplished**
129:11,13,15

**account**
162:15 249:24

**accountable**
98:1 212:22,23

**accurate**
8:14 31:20 244:8

**accurately**
152:3

**accusing**
142:23

**acknowledged**
109:17,18

**acronym**
173:4

**act**
102:15 132:15,17

**acted**
113:8 118:5

**acting**
134:6

**action**
39:21 165:2 209:5

**actions**
164:23 172:12 174:5 253:9,
23 254:1,3,7,8

**active**
11:19,23,25 12:1,4 26:21
35:20 248:21

**activity**
92:3 243:5

**actual**
50:22 52:7 139:3

**Adam**
5:25 21:22 37:21 106:3
144:7 145:12,13 194:16
196:10 214:25 215:2 256:2,3

**add**
105:21

**additional**
48:12 60:11 142:16 196:4
209:6

**address**
9:10 25:7 223:12 227:12
239:12

**addresses**
54:13 56:10 65:2

**administer**
6:10

**admitted**
14:15

**admitting**
14:8,13

**ADV**
100:16,18

**advance**
47:5,24 48:4

**Adventure**
32:16

**advice**
125:17 156:4,8

**advisor**
18:24 19:9,14,16 100:12,15

**affiliated**
34:15,18 88:2 92:9 100:23
112:4 154:25 155:3,9,13
164:7 172:8,23 190:22

**affirmative**
149:24

**afternoon**
196:9 209:3 243:1,4

**agencies**
194:13

**agency**
40:14 41:1 104:12

**Agent/broker**
16:17

**agree**
92:6

**agreeing**
258:6

**agreement**
60:4 61:11 73:22,25 74:1,3
75:8,13,16,19 76:3,21 77:19,
22 78:11,17 79:4,7,10,23
80:4,8,14,16 92:6,13 93:19
136:8,10,12,15,20 138:5,24
139:2,4,18 140:5,12,18
141:7 151:20 154:5 166:11,
14 179:15,18 202:15 217:11,
14,15,17,21 218:5 219:8
231:20 233:4,9,12,20 234:4,
18,19,21,24 235:4 251:7,12
252:16 257:10



EXHIBIT 5

**agreements**
160:1 213:19 233:4,18,25

**ahead**
23:6,7 37:11 38:18 124:11
146:9 200:23 215:5

**air**
51:24

**Albissola**
9:11 25:8

**alcohol**
8:19

**Alexandria**
5:13

**allegations**
88:17

**alleged**
152:7,11,21

**aloud**
55:3,4 118:1

**Alyse**
6:4

**Amanda**
5:23 17:9,11,13

**Amazon**
6:6 8:6 50:7 80:20,24 81:16,
20 82:10,18 95:4,8,16
104:21 107:14,25 108:13,15,
16,19 109:20,22 111:25
112:1,9,10 114:12,16 117:23
119:5 121:23 122:25 123:20
124:4 126:23 127:1,5 130:6,
11 131:4,9 132:9,14,16,23
133:4,6,9 134:7,15 135:1,13,
22 136:12 137:3,12 138:1,5,
23,25 139:22 140:18,22
141:7 145:16 146:19 149:9
151:18,22 152:24 153:8,15
154:17,22 155:24 156:2,5,8
157:13 159:1 160:21,25
162:4 163:8,18,22 164:5,23
165:2,14,17 166:11,14
167:13,19 172:1 174:11
175:6,7 176:7,8,14 177:3
178:13,19 180:24 181:11,16
182:11 185:1,14 186:12,15,
20,22 187:2,21,24 188:5,8,
12,15,23 189:8,15,17,20,23
190:2 193:20,25 197:17,18
198:11,12 199:15 202:5
203:8 204:3,11 206:9 207:1,
4,18 208:1,9,13 209:4 210:6,
14 232:13,21 235:13 238:11
241:9,22 242:8 252:24
253:5,14,19,23 256:9

**Amazon's**
131:1 138:22 181:12,20
184:22 216:24 231:11

**Amazon.com**
5:8

**amenable**
166:3

**amended**
106:10,15,16,21 216:25

**American**
10:15

**amicable**
95:23,24

**amount**
101:10 203:22 227:22
256:18,21

**amounts**
220:11

**analyst**
95:2

**analysts**
82:23,24 83:6

**Angel**
12:14

**Anita**
24:22

**announced**
54:22

**annual**
254:12,16 255:4,13

**answers**
7:16

**anybody's**
121:2

**anymore**
84:2,3 96:15,17 166:20

**apartment**
9:15

**apologies**
14:15 88:5

**apologize**
67:10 119:19 191:14 226:24

**apparel**
14:24

**apparently**
148:7 152:24 159:23 167:8

**appearances**

5:17

**appearing**
7:12

**appears**
107:15 135:24 161:13
162:17

**application**
50:22 51:5 143:18

**applied**
51:8 186:20 187:1

**apply**
50:19 186:22

**applying**
187:24

**approach**
45:7 193:6

**approached**
193:8

**approximate**
47:12

**April**
24:17 83:22 122:21

**arbitrarily**
58:15

**area**
17:5 18:23 236:11

**arguably**
204:21

**Argumentative**
201:2 249:19

**Arizona**
18:13

**arrangement**
93:24 94:18 204:23 205:2
213:17 231:1,8,11 234:9
235:6,8,12,24 236:6 244:6,
16,25 248:1 250:12,21 251:1
257:6

**arrangements**
95:4,7,14 204:20 258:5

**arrested**
36:11,15 37:2,15,17 38:6,22,
25 39:3

**arrests**
37:5 38:10

**article**
124:17,21 125:9 128:7,11
154:15 155:18 169:15 238:7,

9

**ASAP**
76:22 77:22 78:12

**asks**
227:21

**aspect**
231:20

**ass**
136:19

**Asset**
27:4

**assets**
31:8,10,11 101:11,12

**assist**
20:6 46:6

**assisted**
190:25

**associate**
52:14

**Associates**
16:13

**assume**
77:11 97:15 102:15 127:6
140:2 141:5 144:14 145:17
214:22 229:11

**assumed**
79:18 175:13 177:11

**assuming**
199:1,2

**assumption**
114:22

**assumptions**
83:7,9,12 114:25 116:22
117:5 133:19

**Atherton**
191:10

**attach**
105:24

**attachment**
139:13 161:14

**attempt**
72:10 232:20

**attempts**
229:13

**attended**
240:19

**attention**



CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

51:15

**attorney**
8:5,9 41:17 45:25 46:1,3,4,6
47:4,7

**attorneys**
8:5 101:3,9 181:12,20,23
182:11

**Auerbach**
52:4,8,9

**August**
59:3,12,16 61:21

**Australia**
240:17

**authority**
150:3

**automate**
55:20

**Avenue**
9:11 25:8

**awarded**
92:4,12 115:7,11,12,13
116:6 200:1

**awarding**
95:15,16 109:23 197:14
199:16

**awards**
199:25

**aware**
10:1 35:19 36:2 41:6 58:8
70:12 73:21 85:16 86:2
91:14,18 100:9 119:11
122:7,8,9,11 126:25 128:3
132:25 153:6 155:24 160:19
164:22 165:1,4 174:9
179:10,14,16,17,19 184:11
185:7,12 205:9 206:24
217:13 225:16 228:22
230:18,25 231:7,10 233:1
238:13,19,22 241:19 242:2,
7,11,13,17 245:14,17 246:1
251:13 258:4

**AWS**
108:16,20 111:2 117:11,14,
15,19 122:10,12 132:19

**B**

**B-A-L-L**
92:1

**bachelor's**
11:7 170:7

**back**
23:22 30:21 36:23 37:19,22
38:1 42:12 71:9 92:7,8 97:3
107:4 115:21 119:20 134:7
138:10 140:6 141:13 142:13
151:7 156:20 158:19 174:24
181:18 191:23 194:20
199:19 200:3 208:22 215:6
243:11,17 245:24

**background**
75:9 101:14

**bad**
89:24 111:17

**balkanized**
228:18

**Ball**
92:1,3,6,9,13 93:19,25 94:6,
10,17

**Ball's**
92:4

**Barrett**
182:19

**based**
72:15 79:22 86:25 91:7 97:7
113:12 114:24 116:10,22
117:5 118:15,18 131:10
133:19 141:6 150:23 151:1
152:11 169:5,13,15 180:3
198:1 207:18 218:14 220:22

**basis**
71:11 73:7 108:10 109:3,6
113:3,5 123:16 137:21
153:16

**bear**
235:1

**bears**
106:20

**Beck**
5:14

**Bedell**
6:7 13:6,11,13 14:12,18
28:1,5,8 30:21 31:3,15,18,20
32:25 33:22 35:15 36:17
37:3 38:7 40:1,11,18,24 41:3
42:1,17,20,23 46:16 48:1,7
49:3 50:13 52:8 53:23 54:12
55:3 58:3 59:5,15 65:14
75:23 78:1,18 89:9 99:17
104:3 105:10,16 106:14,18
111:14,17,19 115:16 123:25
124:11 127:11 133:25 140:6
143:23 144:2,16 146:8,12,20
147:2,9,19 148:8 150:11

158:11 182:4 183:19,22
184:16 185:17,25 186:5,7
188:16 201:2 207:21 210:22
222:16,19 249:19 250:14
254:18,22 255:1,18 256:2,13
257:16 258:15,18,23 259:9,
10

**beginning**
27:1 69:1

**begins**
5:3

**behalf**
6:1 73:10,19 80:22 82:10
181:21

**behavior**
109:19 117:15 118:7,11,15
119:5 120:5 123:9,14,17
197:7,11

**behest**
71:25

**beholder**
222:8

**belief**
123:16 169:14 170:23 185:1

**believed**
86:10 197:6

**believing**
160:9

**bell**
181:25 192:19

**Bezos**
107:19,24 108:2,11 114:24
116:21 121:12,16 128:25
129:13,15 132:7 142:19
146:19 147:18 148:6 150:6,
13 164:24 165:3 171:24
174:4,15 188:14,24 189:8,13
201:7 204:6 205:11,12

**bidders**
202:8

**bidding**
199:21 202:4,8

**big**
130:8

**bigger**
75:6 160:18 220:6

**bill**
248:4

**binding**
140:17

**birthdate**
9:8

**bit**
202:15

**black**
42:1

**board**
95:15

**Bodner**
5:19 6:15,17 13:8,12,18
14:15,20,21 17:13,16,17
21:22,24 23:24 28:2,7,9,17
31:1,5,8,11,13,17,19,23
33:3,24 35:18 36:19 37:1,14,
21,25 38:21 39:2 40:3,17,21,
25 41:5,19,23 42:4,8,14,24
43:1 46:20 47:1 48:6,9 49:5
50:9,16,17 52:11 53:16,20,
25 54:4,15 55:4,7 58:4,16,20
59:11,18,21 63:7 65:15 69:4,
9 76:1,5,9 78:7,23 89:12,13
96:23 97:5 99:20,21 104:6,
22 105:1,11,19,25 106:3,8,
17,22 107:6,10 110:15
111:20 115:14,23 117:9
119:20 120:2 123:4 124:6,16
125:20 127:15 128:15
131:19 133:22 134:2,18,22
137:10 139:5,9 140:16
142:1,5,8,15 143:2,6,13,14,
25 144:5,13,24 146:5,10,13,
22,24 147:6,10,24 148:9
150:12 158:14,21 160:5
161:4,8 162:7,11 165:6,10
179:13 182:12 183:10,16
184:1,17 185:21 186:4,6,11
187:8,14 188:18 191:18,20,
25 192:2,3 193:18 194:15,22
196:1 208:17 209:17 210:2
214:7,14,24 215:2,4 216:2
219:2,3,14 220:19 221:5,19
222:4 224:1 225:17 226:22
228:19 229:4,22 230:2,10,22
231:2,12,21 232:7,15,23
233:5,21 236:7 237:17
238:1,17 241:10,18,24
242:9,15,24 243:6,13 244:9
245:8,21 246:12,25 247:3
250:1,19 251:5 253:2,12,17
254:21,23,24 255:3,19
256:1,3,25 257:3,18 258:19,
22 259:21

**boil**
236:19

**bottom**
42:23 54:18 76:16 105:9



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

139:20 227:10 240:13

**bought**
121:21 125:13 154:16

**Breach**
253:23

**break**
36:18 50:10 96:24 97:8
142:6,7 191:16,21 194:16

**breaking**
50:10

**breaks**
7:25 50:14

**Brent**
114:5 121:8 198:9 234:14,17
236:5,17,23 246:18 247:6
257:23

**Brian**
5:19,22 6:18 28:10,14 52:4,
24 54:5,21 56:11 58:13 59:2,
22 62:2 63:19 66:3 67:13
68:7,13,15,16,17,18,20
69:18,25 70:6,8,12,16 72:3
73:3 74:17,25 75:1,7,12
76:14,17 77:14,18 78:16
79:5 86:4,7 87:1 88:6,9,10,
21 90:15,16 92:4,7,12 93:2
95:4,7 96:20 97:16 98:6,10,
11,14,17 101:8,9 112:12
114:4 118:12,13,25 119:8,9,
13,24 120:11 121:18 124:4
125:6 127:1 169:8 190:7
198:8,11,18,21 212:1,3
213:7,12 214:2,12 215:13,
23,24 216:6,14,17,18,19
218:3 223:5,18,24 224:15,
18,23 225:11,20 227:9,21,24
228:25 229:25 230:18
232:12,20 234:7 236:12
238:13 239:9 240:10,21,22
241:15,21 242:7,13,21 243:4
246:3,17 247:6 248:5,8
258:5

**Brian's**
52:14 62:5 65:18 67:12 68:6
71:25 74:8

**Briefly**
47:6 202:17

**bring**
213:20 258:2

**broadly**
232:6

**broker**
17:8,19,25 94:7,13

**brokerage**
19:20 22:8 101:17 218:14

**brokers**
91:19,23

**brought**
44:9 213:16

**Brownstein**
6:18

**Bryce**
28:11

**bucks**
21:21

**budgets**
82:12,14

**build**
15:18 55:12,15 63:19 220:9

**building**
133:3 190:1 220:9

**bulk**
116:7 203:14

**bunch**
40:15 59:15 63:1

**Burr**
6:1

**business**
5:9 20:21 35:8,23 89:25
96:20 122:13 123:12 124:13,
15 125:23 127:21 128:8,11
131:3 154:14 155:18 162:22
190:17,20 215:22 216:10
241:9 248:20

**button**
106:7

**buying**
16:22

**buyout**
172:6,9 175:3 253:14,19,22

---

# C

**C-H-R-I-S-T-O-P-H-E-R**
9:6

**calculate**
201:9

**California**
13:21

**call**
26:10 41:20 47:21 125:15,

22,23 126:11 127:21 128:1,
4,7 129:4,6 148:13,16 166:3
181:19 233:15

**called**
10:1 15:2,22 16:12 17:20
19:20 23:9 29:23 34:21 35:1
45:25 104:10,12 124:13,14
125:10,11 126:1 127:8,13,14
151:10,11 154:16,25 155:3
171:22 207:18 249:1,10,13

**calling**
78:2 128:20

**calls**
33:20 89:7 123:1 127:11
141:23 148:19,22,24 149:9
160:3 184:21

**Camenson**
25:24 27:5,9 49:14,17,20
94:22 114:7 128:5,7,11
152:23 153:2,5,7,9,14,19
154:5 155:13 156:4 157:20
174:21 175:10,20 176:1,14,
23 177:2,5,17 179:2,4,14,23
180:13 191:8 195:10 237:15
238:14

**Camenson's**
27:3 154:9 178:10

**Campus**
15:2,3,12,22

**capable**
100:1

**capacity**
26:2,4 52:16 175:14,18

**capital**
19:22 20:3,17 26:14,16,23
29:24 30:5,14 31:12 32:21
33:15 89:7 155:1,22,23
156:10 228:2 237:24

**Capricorn**
84:10

**car**
34:12,15

**care**
110:23,24 144:18 176:21,22
191:17

**career**
15:8 20:8

**careful**
136:9

**Carl**
6:1,2 63:25 64:10,14,15,16,

17 112:21,23 113:4,11
116:7,18 118:12,14 119:12
120:3,14 134:7 151:17 168:7
196:10 199:12 201:18
203:14,23 204:9,10 233:15

**Carl's**
64:10 111:6

**Carleton**
230:21 232:6,14,22 241:23
245:19 246:11

**carry**
26:12 131:9

**carrying**
117:4

**case**
5:8,10 40:19,22,24 45:15
105:2 130:1 144:1,6 166:20,
23 167:4 203:15 221:23
222:8

**cases**
233:17

**Casey**
111:5,7,12,18,21 112:6,17
113:4,9,11 115:13 116:7,18
118:12,14 119:12 120:3,14
134:7 151:17 164:10 168:7
199:12 201:21 203:14,23
205:3 230:21 232:5,14,22
240:20 241:4,5,8,23 245:19
246:10

**cash**
197:14

**castle**
42:7

**catch**
222:20

**caught**
51:14

**cc'ed**
227:25

**ceased**
18:3,16

**ceasing**
171:7

**center**
111:25 112:1,3,11,13 161:15
201:24

**centers**
133:3,9 202:3,5


EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

**CEO**
107:25 146:19 178:20

**CFO**
228:13 246:16

**chain**
59:8,10,16 61:5 76:13
134:25 162:20 165:13
181:10 246:2

**champion**
233:24

**change**
55:21 101:20,25 256:22

**changed**
17:21 154:15 213:25

**chaperoned**
100:16

**characterization**
59:7 127:2,3

**charge**
74:22 94:8 213:11

**charged**
219:5

**chart**
161:12,15,17,20 162:2
207:10

**check**
185:10 248:3

**cherry-picked**
148:1,2,5

**Cheshire**
6:1 196:10

**Chicago**
19:20,23 20:24 21:9 22:4,22
69:15 70:25

**Chiles**
228:2

**choose**
129:6

**choosing**
126:22 156:17

**Chose**
84:4

**Chris**
92:1,3,4,6,9,12 93:19,25
94:6,10,17

**Christian**
68:2,5,9,12,18,21 69:11,15,
17,20 70:2,9,13,17,18,21

71:10,20,23 72:1,3,7,12,14
73:3,7,10,14,18,21 76:20
77:5,7,10,13,19,21 78:10
79:1,7,15,19,21 80:1,5,9
111:16 113:7,10 116:6,9
134:5 202:15 203:13 204:24
205:3 214:1 215:9,19,21,25
216:4,7,13,17,18 223:23,25
224:6,9,19,20,23,25 225:2,5,
14,23 226:10 246:18,19
251:14 252:1,15

**Christian's**
79:4

**Christopher**
6:11 9:3

**Chuck**
195:6

**circumstances**
212:9,15

**circumstantial**
167:11,14 211:9

**Citadel**
99:5

**city**
5:6 64:3

**civil**
37:5 38:10

**claim**
153:17

**claimed**
156:24 184:23 185:3 203:22

**claims**
102:6 116:22 157:13 164:24
165:3 253:14,19,20

**clarification**
7:22 48:1 205:6 235:3

**clarified**
150:18 185:10,11 204:12,13
257:8

**clarify**
186:1 193:13 247:18 252:12

**Claudia**
182:19

**clause**
253:24

**clean**
51:24

**clear**
16:1 31:15 48:7 89:9 197:16
207:24 257:21

**Cleveland**
25:23 28:10 86:4,7 87:1
88:6,10,18,22

**client**
5:22 6:2 161:12 189:17
204:1,4,7

**clinical**
170:5

**clinician**
170:6

**close**
81:4 126:8,11 176:18 191:22
215:14,15,17 216:5,7

**closely**
153:6,8 176:1 177:8,10

**closer**
216:3

**Club**
12:14 15:2,4,22

**clue**
181:24

**co-manager**
52:7

**colleague**
5:23

**colleagues**
7:12

**collective**
236:5

**college**
10:22 12:10,12

**colloquial**
211:21 245:10

**color**
72:25

**Colorado**
18:15 51:16,18,20,22,23

**column**
218:13 220:14 221:15

**comment**
212:13,14 224:18

**commercial**
5:10 15:9,18,23 16:2,8,23,24
17:8 18:7 19:10 20:25 22:16
51:16 146:18 191:4 197:15
247:11

**commission**
41:4 92:20,25 93:3 94:6

218:14 220:15,17,22 221:3

**commissions**
92:7

**committed**
26:23

**common**
209:23 224:9,13 251:2,8

**communicate**
52:18 173:14,22

**communicated**
122:18 135:23 145:16
178:22 190:13 192:17

**communication**
121:2 145:18

**communications**
44:19 50:3,6 71:19 102:11,
13,14,17,19 192:9,12 224:23

**community**
64:7

**companies**
20:7 29:1,19,22 30:2 34:15
96:21 133:2 252:17

**company**
15:1,22 16:5,9,11,14,18
17:2,20 20:22,23 23:9 24:2,
4,8 29:23 34:12,21 35:1 92:9
130:8,21,25 134:10 154:25

**compensate**
58:13

**compensated**
60:14 80:1 199:24

**compensation**
60:17,21 129:20,22 130:2
156:1 186:15,18 206:3

**competent**
100:5

**complained**
172:11

**complaining**
182:4

**complaint**
39:18 103:17,20,21,23
104:8,9 105:2,5,13 106:10,
11,13,16,21 107:13 128:23
183:7,11 216:25 252:23
253:4,6

**complete**
52:21 154:7



CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**completely**
69:16 213:25

**compliance**
61:17 75:8 101:21,25 102:3,
4 184:22

**compliance-related**
57:20,22,23

**Compound**
63:4

**concern**
87:22 89:22 92:2 140:20,21
161:21 174:24 180:12 203:3
248:7,11

**concerned**
88:25 93:2 95:17 97:17 98:4
137:2 142:22 158:9 208:3
234:4 244:5,7,15,24

**concerns**
66:20,22 67:23 79:25 80:17
82:5 83:11,15 85:10,13,18
88:20 90:16,19,22 91:8,13
93:24 94:14 95:3,6,10,12
96:2,5,8 97:9,19,22 98:8,13,
19,23 99:8,12,13 102:22
103:5,7,8,9,13 117:4 129:7
131:23 137:11 144:7 173:1
174:1,10 175:6 178:2,7,9
180:3,7,10 202:25 207:16
235:24 236:5 242:5 247:20,
24 248:13 249:7

**concluded**
14:1 259:24

**concludes**
259:2

**conclusion**
33:21 160:4

**conduct**
82:2,6 85:11 103:5 120:11
133:10 137:3 160:7,10,13
174:10 178:3,7 180:10
247:17,21

**conducted**
35:22 53:2 254:8

**conduit**
113:8 116:7 134:6 203:13

**confer**
36:16

**confided**
127:16

**confidence**
130:20 131:5,16 141:8

**confidential**
139:18 140:4,12,18 141:6
144:18 229:12 258:25

**confidentiality**
40:15 139:2,4

**confirm**
78:24 102:11 142:18

**confirmation**
196:23

**conflict**
33:18

**Conifer**
64:4,5

**connecting**
181:1

**connection**
82:17 115:17

**considered**
116:8 118:2,3 219:18 242:22
257:14

**consistency**
213:21

**consistent**
149:20,23 213:20,24

**consistently**
185:19

**construction**
202:3

**consulting**
202:14

**consumed**
8:19

**contact**
45:11 67:12,13 130:21
131:12

**contacted**
56:6 64:19 67:14

**contacts**
56:11 65:18

**contained**
83:15 131:24

**contemplating**
169:1

**content**
206:24 212:14

**contents**
102:8 110:20 132:4

**context**
121:6,7 199:19 244:18

**continuing**
116:4 158:22

**contract**
92:5 115:7,13 116:6 206:25

**contractor**
217:21

**contracts**
95:15,16 103:24 109:23
151:18 199:16,22 200:17
202:5

**contracts'**
200:2

**control**
134:13 136:24 212:25
214:10

**controlling**
212:8,9

**controls**
248:3

**conversation**
47:15 60:18,20,22,24 61:1,4
86:1,3,6 87:1 102:15 103:15
116:11 126:16,18 138:1
159:20 161:3 183:5 193:10
194:10 235:22,23 236:12
252:18

**conversations**
61:7 80:12 88:14 112:17
113:13,14,16,21,24 114:10,
14 116:12,15 117:17,21
118:16 138:18,20 142:2
149:1,4,6,12 150:18,23
152:12 156:24,25 157:4,7,16
165:5 181:5 182:25 198:7
200:11 206:12 209:10,14
235:14,19 236:4,16,24 237:2
248:6 257:9 258:1,3

**conveyed**
90:22,25

**convicted**
37:12 38:19 39:6

**convince**
57:5

**cool**
64:6 114:17 188:13

**copied**
63:10 73:2

**copy**
139:25 140:1 251:11 259:8,

15

**corner**
106:7

**corporate**
14:24 251:15,19 252:5,8,9,
19

**corporation**
104:16

**corporations**
67:5,18

**correct**
10:8 11:18 16:4 18:17 21:10
27:6 28:7 29:16,18 30:16
31:7 34:1 40:5 45:13 54:16
57:13 62:4 74:20 79:2,24
82:25 84:23 87:3 89:12
91:15,16 100:6 103:3,17
106:22,23,24 107:20,25
109:5 110:1 111:22 118:21,
22 124:19 125:24 127:3
128:17,18 129:16 145:10,24
151:19 158:7 161:24 167:15
169:16 170:13 171:25 175:4
176:16 180:25 183:11
185:23 186:4 197:21,22
199:13,14 202:16,24 203:19,
20,24 205:22,23 207:11
208:10 210:3,16,18 211:18
212:10 213:10,22 214:4
225:13 227:20 238:8 249:16
252:14 254:2 257:15,17

**correctly**
202:21 203:16

**correspondence**
73:2 81:19

**Cottom**
25:23

**counsel**
5:17 14:16 17:10 26:9 47:21
132:10 256:8 257:14 259:8

**counting**
30:24

**country**
25:16

**couple**
10:19 12:18 50:13 59:6,9
63:21 64:9 84:8 104:19
110:24 135:13 138:16
147:21 192:13 194:23 208:5
209:22 243:20 246:25

**court**
5:12,15 6:9 7:6 37:22 38:1



EXHIBIT 5                    702-476-4500

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

105:22,23

**Cover**
136:19

**CP**
172:6

**crazy**
168:19

**create**
35:9 60:11 100:11 101:3

**created**
17:20 21:14 35:10 101:6,7,8,17

**creating**
31:21 101:10

**creation**
100:16

**crime**
39:6

**crisis**
18:19

**critical**
220:8

**Crutcher**
6:5

**curious**
144:19

**current**
9:10 12:6 65:18 67:13
131:13 173:22 189:17,20

**cut**
138:9,13

**CYA**
136:17,18,20

---

**D**

**D-3919**
42:19

**D-A-N-I-E-L**
9:6

**d/b/a**
30:8,12

**Dacia**
10:1,3,4,5,8,11 23:9,10,25
24:15,18,23 25:1,10,19,25
26:3,24 27:9 28:6,18,22
29:2,4,9,11,12,15,22,24,25
30:2,4,5,7,8,9,10,12,13,14,

15,18,23 31:6,12,14 32:10,
11,14,15,16,19,20,21 33:12
34:1,4,9,12,18 37:24 84:22,
24 180:9

**Dacia-related**
195:9,13,16

**Dacias**
10:6 34:13

**daily**
71:11 73:7 109:10

**Dan**
28:10

**danger**
168:15

**Daniel**
6:11 9:3

**Danny**
5:3 259:3

**data**
111:25 112:1,3,11,13 133:3,
9 161:15 201:24 202:3,5

**date**
5:4 73:14,18 81:3

**dated**
54:6 59:3,12,16 107:20

**Dawn**
5:14

**day**
148:15 168:18 197:5 226:18
238:10

**Daycia**
10:10

**days**
259:18

**DC**
24:11

**deal**
22:14,15,19,20,22 81:17,20
82:1 83:6 86:12,14 94:17
101:8 122:7,9 123:18 125:12
126:20,24 127:2 172:9
173:8,9 176:8 180:13 190:2
204:18,19,21,22 205:1 214:1
219:6 220:5,6,7 235:13
236:13 244:20

**deals**
21:16 22:11 58:14 60:10
70:6 82:5,9 85:15 90:8,11
91:14,17,20,21 94:11 95:17
96:6 100:9 101:6 103:10

178:13 190:23 191:1 195:24
197:15 198:12 212:20
224:16 252:23 253:4,8
254:1,4,9

**debate**
108:17

**December**
76:14,18 107:20 109:1
146:16 148:14,17 162:15
223:8

**decided**
109:2

**decision**
60:19 176:25

**decision-**
245:14

**decision-maker**
177:13,21 245:11

**decision-making**
136:24 175:14,18,22,23
213:4,5 245:13

**decisions**
89:25 213:1,6 214:3,21

**declaration**
143:15 158:22 161:24 162:2

**declared**
144:17

**deemed**
41:24 53:18 58:18 76:7
104:24 107:8 134:20 139:7
143:4 161:6 162:9 165:8
183:15 187:12 216:22
222:24 227:3 239:2 240:1

**defendants**
5:20 6:19

**Defendants'**
184:25

**define**
58:1,2 70:23 80:21 103:21,
22 169:23 185:16

**defined**
102:14,17 185:22

**definition**
56:15 102:17 104:7 115:9
197:1 209:21 211:3,5,8,11

**definitive**
210:11

**degree**
11:6 170:2,3

**degrees**
200:10

**delineate**
197:10

**demands**
174:19

**demonstrated**
163:19

**Denver**
70:23,25 71:5

**department**
131:2

**depend**
220:3

**depending**
222:12

**deponents**
144:6

**depose**
44:21 45:12

**deposed**
40:14,23 43:5 45:15 46:9,13,
17,21 49:20,23

**deposition**
5:3 6:21 7:1,7 40:5,7 41:2,7,
24 43:7,12 44:10,13,18
45:14,18 46:7 47:2,5,18,24
48:4,13,25 49:7,10,12,15,18
50:1,4,7 53:18 58:18 69:6
76:7 97:11 103:13 104:24
105:16 106:4 107:8 134:20
139:7 143:4 161:6 162:9
165:8 183:14 187:12 194:11
216:22 222:24 227:3 239:2
240:1 255:2,7 259:3,23

**describe**
106:1 212:3

**describes**
152:4

**describing**
147:18

**description**
59:9 147:21

**deserved**
137:23

**designating**
258:24

**desire**
189:23



Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**details**
121:22,25 122:3,6 175:19
238:4

**determine**
203:9

**develop**
170:21 176:4 219:6

**developed**
157:10 178:6

**developer**
177:25

**development**
99:6,9 119:2 178:15,16
197:15 218:21,24 219:4,5,7,
13,25 227:23

**devising**
60:16

**diagnosis**
170:5

**Diego**
19:1,2

**differently**
85:20,22,25 86:8,25 91:3
186:10 233:4

**difficult**
215:22

**dinners**
56:25

**direct**
97:25 211:9

**directed**
247:6

**direction**
74:8 246:17

**directly**
168:11 216:19

**director**
51:13 52:1 53:8 54:22 57:14
72:5 74:12,15,24 119:2
146:17 252:4

**disappointed**
140:21

**disciplinary**
39:20

**disclose**
255:7

**disclosed**
93:4,6,8,10,23 130:22 131:1

**disclosing**
91:20

**discount**
249:4

**discretion**
126:25

**discuss**
44:12 47:20 108:22 128:4
131:20 132:2 165:11 232:3,
5,12

**discussed**
32:22 57:7,18 73:13 88:16
154:23 160:24 161:2 164:2
170:23 202:14 213:8 215:9
216:13 231:25 235:21 237:8
242:19 243:1,3,23 254:5,10
257:5,8

**discussing**
88:20 132:4 148:24 237:4,20
239:19 249:12,15

**discussion**
23:18 107:3 222:22 235:17
244:1 246:3

**discussions**
57:9,11 66:1 88:9 95:1 114:8
128:10 235:5

**disheartened**
118:8

**disheartening**
118:6

**dispute**
157:19,22 158:1,6,8

**distinguish**
196:21

**distributed**
63:6

**distributing**
62:24 63:8

**distribution**
65:3,7,10,13,16,17

**distributions**
64:21,24 228:22

**District**
5:12

**Disturb**
146:4,6

**dividing**
108:16

**Division**
5:13

**divorce**
190:16 236:13

**DM**
17:21,22,25 18:2,7,16 20:12,
14 24:12,13 42:21

**DM-001**
41:20,24 42:16,19

**DM-002**
53:17,18

**DM-003**
58:17,18

**DM-004**
69:5,6

**DM-005**
76:6,7

**DM-006**
104:24 106:20

**DM-006A**
183:14

**DM-007**
107:8

**DM-008**
134:20

**DM-009**
139:7

**DM-010**
143:4

**DM-011**
161:6

**DM-012**
162:9

**DM-013**
165:8

**DM-014**
187:12

**DM-015**
216:22

**DM-016**
222:24

**DM-017**
227:3

**DM-018**
239:2

**DM-019**
240:1

**docket**
143:11

**document**
42:18 43:2 53:17 58:25 69:5,
10 74:8,10 104:23 106:12,19
107:7 134:19 143:3,11
144:19,20 145:6 147:4 161:5
162:6,12 163:12,18 165:7,
17,24 183:18 184:2,5,8
186:3 187:9 202:23 203:1,4
207:9 217:5,7,10 218:1,7
222:15 223:5 227:1 235:5
250:3

**documents**
41:11,14,16 44:7,9,12,16
47:20,23 48:3,10,12,15
82:16 87:20 92:24 93:9,13,
17,20,23 106:4 116:17
151:22 156:21 159:1,3,6,7,9,
12,16,19,21 160:7,10,12,17,
20,21,25 161:23 162:1
165:21 199:11 201:11
205:16 207:3 210:6,8,12

**Doden**
135:1 143:16 145:1,10,23
149:4,21 150:18,25 151:4
152:5,11,16 153:2 157:25
158:25 162:3 187:20 188:1,
7,11 189:1

**dollars**
184:25 185:5 226:10

**domicile**
156:17

**domiciled**
156:11,13

**Don**
97:20,22 98:6,10,11,14,17
99:18 100:3 114:4 118:25
119:1 121:8 198:8 234:7
245:5,6,10 258:4

**door**
188:2

**Dossia**
10:10

**double-checking**
150:10

**doubt**
94:23,25 125:4,5 126:6

**dozen**
44:3 127:14

**draft**
79:23 80:16

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**drafts**
183:7

**Drive**
9:24 195:4

**drug**
136:23

**drugs**
8:19

**dry**
138:9,13

**due**
136:11 137:15

**DUI**
37:18 39:1

**duly**
6:12

**Dunn**
6:5 50:4 165:14 181:2,5,17
183:1 186:18

**duration**
57:15 71:6

**duties**
57:20

**dynamics**
245:15

--------

**E**

--------

**e-mail**
54:5,8,13,14 56:10 58:25
59:2,12,22 61:21 62:2,3,5,
24,25 63:1,10 64:21,23,25
65:2,3,6,9 71:16,17 73:2
76:17 81:14 107:19,22
108:2,14,22,25 109:7,13,16
110:1,7,11,18,21 113:14
114:24 115:3 116:21 121:11
122:15 128:17,25 129:9,23
130:3,9,14,17 131:10,20,24
132:2,5,13 134:25 135:3,9,
19 139:12,15 141:14 142:19
145:11,18 146:18 147:18
148:6,24 150:6,13 152:18
161:11 162:14,19 163:7
164:24 165:3,13 166:7,8
168:20 171:23 174:4,14
180:17 181:10 187:19
188:14,20,21,24 189:2,7,12
201:7,8 204:6,16 205:12
206:22 223:5,10,12,16,18
225:4,12,24 226:18,20
227:9,12,15,17,19,21 228:5

230:6 239:9,12,16,18,20
240:10,13 243:23 244:2
246:2 249:9,12,22,23 250:5,
8

**e-mailed**
226:18

**e-mails**
59:8,9,16 61:5 63:3 76:13
137:21 138:16,18 162:23
207:6 256:17,23

**earlier**
103:16 104:4 116:14 145:11,
18 164:2 194:12 197:5,8
198:8 213:9 215:9 216:13
218:3 225:1 226:15 230:17
233:16,17 234:14 237:4,8
243:23 244:23 245:4 257:4

**early**
74:2 184:23

**easier**
128:24

**easiest**
129:9

**Eastern**
5:12

**easy**
174:20 175:9 176:14

**edit**
74:6

**editing**
74:7,10

**edits**
202:19,22

**effect**
199:8 203:12 205:20

**effort**
62:13

**efforts**
55:13,16 166:12,17

**Elizabeth**
182:21

**else's**
22:20 98:8 131:3 186:2

**emotional**
8:13

**empathy**
169:24

**empirical**
120:20 121:5,15 122:25

150:3,20 152:8 155:15
185:7,12,20 196:18 245:25

**employed**
173:12,15 186:12 248:16
258:9

**employee**
99:12,14 146:17 152:22
177:10 248:2

**employees**
25:19,22 27:8,13 36:8 66:1
108:13 109:23 110:25 111:4
112:25 114:11,12,15,16
117:18,22,23 118:16 131:13
151:2,5 152:13 164:5 165:15
168:2 171:2,9,12 173:22
197:13,17,18 198:12,14
199:16 200:3 214:13,20
242:8,14

**employment**
12:21 13:5,25 15:12 18:20
19:18 22:25 50:18 57:15
71:6,21 83:18 130:16 170:9
206:25 248:13,25

**encourage**
110:17

**encouraged**
128:16

**end**
11:23 83:19 138:22 190:15
191:22 196:5 213:21

**ended**
35:10 139:1

**engaged**
82:2 85:10 119:4 123:17
124:9 126:20 238:13 247:16
257:20 258:9

**engagement**
129:20 130:6,8,10 236:14

**engagements**
205:25

**engaging**
243:4

**enter**
138:24

**entered**
140:17

**entire**
9:3 170:9

**entities**
30:17,22,25 31:16 32:9,11,
13,19,20 34:4 67:24 155:7,

10,14,17 156:17

**entitled**
5:8 8:8 63:13

**entity**
10:1 28:23 34:8,11 35:5 39:9
84:25 104:20 127:23 155:3,
23

**Equities**
22:3

**equity**
20:7,9,11,12,13,16 21:12
22:11,12,13,14 27:19 51:13,
17 52:1 53:8 54:23 55:12,16
56:3,5,13,16 57:14 72:5,6,8
74:12,15,20,22,24,25 75:2
81:12,25 82:8 173:7 195:15,
21,25 251:16 252:4

**equity-raising**
21:14

**essentially**
66:9

**establish**
100:20

**estate**
15:9,18,23 16:3,8,23,24 17:8
18:8 19:11 21:1 22:17 51:17
124:3 184:25 190:23,25
191:4,8 251:15

**estimate**
21:20 32:23 33:4,6,11,15
53:14 56:20 254:16,25
255:4,11,13

**et al**
5:10

**etcetera**
136:24,25 227:23 245:25

**evaluate**
62:12

**evaluating**
62:25

**evening**
240:14

**event**
110:9 134:9 215:18

**events**
57:3 184:11

**eventually**
17:2 53:7 55:22 79:8 83:19
138:24



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**Evergreen**
64:2

**evidence**
117:18,23 119:15 120:4,8,9,
11,14,19,20 121:5,9,15
122:25 133:11 150:21
166:19,25 167:7,10,11,14
185:12,20 210:9,10,11
211:6,9,12

**ex-wife**
190:7

**exact**
81:3 199:3 235:5 258:3

**EXAMINATION**
6:14 196:7 209:1 247:2
256:5 257:2

**examined**
6:13

**examples**
87:6 95:11 212:11

**excess**
110:25

**exchange**
41:3 113:14 121:24 139:15
145:12 163:8 166:7 197:14
230:6

**exchanged**
151:14

**execs**
240:15

**executed**
96:6 139:4,25 140:1,5,13,15
145:3 166:14

**execution**
90:12,14,17 98:19

**exhaustive**
62:13

**exhibit**
14:16 41:20,24 53:18 58:17,
18 69:6 76:6,7 104:23,24
105:11,17 106:9 107:7,8
134:19,20 139:6,7 143:3,4
150:8,9,10 151:8 161:5,6
162:8,9 163:11 165:7,8
183:11,13,14 187:9,11,12
206:18 207:7,8 216:21,22,24
218:9 222:23,24 223:2 225:3
227:2,3 239:1,2,4,7,24
240:1,5,7

**exhibits**
14:17 218:2

**exist**
171:7

**existing**
74:8,10

**expect**
52:10 130:2 131:4,7 136:9
141:6 234:8,13

**expedited**
259:13

**experience**
20:2 55:25 89:4,5,10,15,19
178:1 219:12 221:2 222:2

**explain**
30:1 55:18 69:23 176:20

**explained**
48:8 150:4

**explains**
167:25

**explicit**
231:24

**explicitly**
153:24

**express**
248:10

**expressed**
70:5,7 103:9 248:7,12

**extended**
89:7

**extent**
77:9 78:1 147:2

**eye**
102:3,19 222:8

---

**F**

**face**
142:22

**faced**
39:20

**facilitate**
119:11 246:10

**facilitated**
124:3

**facilitating**
119:14,25 246:15

**fact**
75:15 93:22 134:9 150:14
154:2 164:19 206:8,13,14

241:22

**fair**
197:19 199:21 203:21 208:7
252:1

**fall**
74:14

**fallen**
246:16

**false**
102:6,8,20

**familiar**
182:1 211:2,5,8,11 217:5

**family**
167:20,23 168:15 171:13
174:25

**fault**
175:16

**favor**
171:20,23

**favors**
172:1

**FBI**
192:9,21,25 193:6,10 194:1,
3,11 203:25

**February**
240:11

**federal**
103:24 104:12 194:13

**fee**
60:9 218:10,14,17,21,24
219:4,5,8,25 220:10 221:13
222:3

**feel**
89:2 108:4 123:7 130:14
160:17

**feeling**
108:9

**fees**
113:9 116:8 134:7 156:1
200:2 202:11 219:13 227:22,
23 228:23 229:1,20 230:1
243:24 256:10,18

**fell**
74:25

**felt**
89:1 108:3,6,9 109:4 160:14
170:16 191:22

**figure**
225:8

**figured**
124:5 137:1 138:15 176:25

**figures**
249:10,13,17

**file**
128:22

**filed**
39:11,17 183:8 184:5,9
233:18 255:24

**final**
74:1 78:22 79:9,11,12,13
194:23 196:4 217:18 233:9,
11,20 259:13

**finalized**
79:8

**finally**
99:5 109:2 139:1

**financial**
18:18,24 19:9,14,16 82:21
92:24 95:1

**find**
224:17

**finding**
224:16

**fine**
14:18 41:21 50:12 108:20
191:20 215:7 259:19

**finish**
210:22 229:17

**fire**
133:13

**fired**
99:5,11,14 125:6 127:6

**firm**
5:25 6:18 17:12 20:17 92:4,
14,16,21 181:17

**Fisher**
114:6 121:8 198:9 226:14
227:24 228:5 234:14 236:17
243:24 247:6,9,16,22,25
248:2,7,12,15 249:6,10,13
257:23

**Fisher's**
246:16 247:20

**fits**
59:8

**flashing**
158:12



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**flat**
60:8

**flip**
105:3 237:24

**Florida**
25:18 239:19,20

**focus**
59:12 166:6

**focused**
224:16

**folder**
159:24

**folks**
142:6

**follow**
128:1 141:3 258:20

**follow-up**
97:7 226:12

**Foot**
13:16

**footer**
106:23

**forced**
172:6

**foremost**
7:2

**forgot**
15:20

**form**
79:23 100:16,18 125:18
128:14 131:17 157:19 158:1,
6 185:7,17,24 186:1 197:23
207:20 208:15 209:17 210:2
211:19,23 213:24,25 214:7,
14 216:2 219:14,16 220:4,
19,20 221:5,19 222:4 228:19
229:4 230:2,10,22 231:2,12,
21 232:7,15,23 233:5,21
236:7 238:1,2 241:10,18,24
242:9,23 243:6 244:9 245:21
250:14,18 251:3 252:25
253:10,15 257:16

**forma**
82:19,20,22 83:16

**Forman**
6:1

**formas**
83:5

**forms**
100:19

**forward**
162:14,22

**forwarded**
162:19 239:18 249:21,23
250:4,8

**found**
23:13,15 24:18,23 29:23
34:7,21,23 125:7

**foundation**
201:3 218:18 219:1,15
220:20 221:6,7,20 222:5
224:1,7 225:17 229:5,22
230:11 231:3,13,22 232:8,
16,24 233:6 236:8 237:17
238:3,17 241:11,25 242:10
244:10 245:8,22 246:12

**founded**
26:24 29:19 32:9 33:12 35:3

**frame**
81:21

**fraudulent**
193:14

**fray**
177:12 179:12

**free**
109:24 199:17

**free-flow**
235:22

**frequently**
216:15

**Friday**
240:14

**friend**
52:6,12

**front**
183:23

**fruition**
81:8

**full**
9:1 60:2 132:25 147:22

**fully**
8:23 139:25 140:1,5,13,15
166:13 234:1 251:11

**functional**
84:25

**functionally**
18:3

**Fund**
32:16

**fundraising**
81:12

**funds**
32:16 195:8,12 203:14,22

**funneled**
200:3

**future**
96:12 189:9,24 190:2 205:25

---

**G**

**Gamp**
233:15

**gatekeeper**
233:24

**gave**
91:20 166:25

**general**
37:4 38:9 46:4 61:2 73:9
76:2 85:2 102:16 169:25
235:23

**generally**
37:3 38:8 43:17 90:21,25
95:9,12,14 96:10 110:10
149:19 214:20

**generate**
65:22,23

**Germany**
10:17,18

**Gibson**
6:5 50:4 165:14 181:2,5,17
183:1 186:18

**gifts**
242:13

**Gilpin**
173:17

**girl**
64:1,12

**girl's**
64:13

**give**
8:14 91:19 222:17

**giving**
40:19 97:13

**global**
22:3,15 254:12,16 255:4,14

**Gmail**
54:16 162:16,23 226:18

**golf**
12:11,13,14,24 13:1,10

**good**
5:2 97:23 118:4,20 130:14
142:5 177:15,16,18 180:2
183:24 196:9 209:3 212:12

**goodness**
205:21

**Gotcha**
212:25 217:25

**governed**
144:3

**government**
40:14,25 179:15,18

**governs**
144:6

**graduate**
10:24 11:4,6

**graduated**
10:14 12:12

**graduating**
12:9

**Grail**
28:10

**grand**
33:14 53:15 179:21 225:9,10

**Gray**
114:5 121:8 198:9 234:14,17
236:5,17,23 247:6 257:23

**great**
247:22

**grossly**
118:7,10

**ground**
6:25

**group**
13:16,23 14:1,6 23:9,11,25
24:15,18,23 25:1,10,20 26:1,
4,24 27:9 28:19,22 29:3,4,5,
9,13,15,22,25 30:2,4,7,8,10,
12,15 31:6,14 33:12 62:15
83:2,3 84:22,25 116:13
180:9 204:15

**groups**
62:12

**grow**
10:18 84:17

**250:8**



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                              Amazon.com, Inc., et al. v. WDC Holdings LLC

**guess**
14:11 21:5,7 46:19 86:15
118:5 134:12 147:12 168:8
218:4 220:2 222:7 247:10
254:14 255:21

**Guest**
12:25

**gun**
168:1,20,22 169:4 180:22,24

**guy**
63:24,25 97:23 99:4 177:15,
16 215:11

**guys**
17:15 41:21 181:14 185:15
209:20

**guys'**
209:20

---

**H**

**H-O-L-L-O**
17:23

**hair**
72:25

**half**
9:14 47:16

**hand**
53:22 159:20 204:21

**handle**
97:25 228:13

**hands-off**
212:16,17

**hang**
22:5,7

**happen**
85:5 109:12,15 110:10 150:4
212:24

**happened**
110:6 150:2,5,7 196:25
197:7 217:24

**happening**
109:20 120:6 132:25 133:15,
16,18 168:19 171:6 172:9
175:15 185:9 197:12 199:12
200:5

**harm**
169:1 174:24

**harm's**
167:20,24

**harmed**
252:23 253:4,8 254:1,3,9

**head**
7:16 26:9 97:23,24 109:8
158:13 170:4 194:9 205:8

**headhunted**
248:19

**health**
8:13

**hear**
21:23 110:24 146:8 151:12
214:25 237:20 250:25

**heard**
6:16 35:5,6,7 51:3 151:2,11,
13,15 154:12,19 157:3
158:2,3 180:4 182:8 191:12
198:11,15

**hearing**
95:3,6,10 115:9

**hearsay**
114:22,25 116:22 117:5
133:19 197:3 207:19 211:3

**heart**
205:22

**Heights**
9:24 195:4

**helped**
215:23 246:9

**helpful**
210:15

**helping**
55:12,15 119:11 236:12

**hey**
66:11 137:1 191:14

**Heyburn**
6:4 33:20 41:22 46:14 63:4
78:4,19 110:12 117:6 123:1
125:18 127:9 128:14 131:17
133:21 137:6 141:23 143:10
160:3 179:6 185:24 193:11
197:23 201:3 207:20 208:15,
18 209:2,4,24 210:4 211:1,
20,24 214:11,19 215:8
216:8,20,24 217:1 218:20
219:20 220:13 221:1,10
222:1,9,14,23 223:1 224:3,
12 225:18 227:1,5 228:24
229:9,24 230:4,16,24 231:6,
17 232:2,11,19 233:2,10
234:2 236:21 237:19 238:6,
21,25 239:6,23 240:3
241:14,20 242:4,12,18

**hidden**
250:23

**hide**
229:1,13 231:19 232:21
241:22 242:3

**hiding**
231:24

**high**
10:13,15 111:1 229:21

**highway**
64:6

**hire**
180:1 248:15

**hired**
15:17 18:25 212:20

**history**
13:5

**hit**
196:12

**hold**
11:8 12:21 17:9 19:25 98:1
106:17 158:11 182:4 229:11

**holding**
212:22,23

**Holdings**
5:9,20 6:19 23:2 43:23 44:25
45:2,5,8 55:20 217:12,13

**Hollo**
17:21,22,25 18:2,7,16 20:12,
14 24:12,13

**home**
248:22,24,25

**honest**
8:15

**honestly**
72:22 129:10 139:4

**honor**
131:5

**hope**
109:12,15,21 131:9 137:22
188:7,11,14,19

**hoped**
138:9,14 141:9 188:3

**hopeful**

189:7,11

**hopes**
190:2

**hoping**
129:22,24 130:5,7,9 137:20

**Hospitality**
30:8,9,13,18,23 32:22

**hour**
8:1 47:16

**hours**
8:20 43:10 103:14 249:4

**house**
9:15,16,17 220:9,10

**Houseal**
5:23 17:11,13,15

**housing**
22:15

**Huckle**
192:19

**hundred**
53:15

**hung**
22:2

**hunters**
168:1

**hunting**
241:1

**hurt**
137:1

**Hyatt**
6:18

---

**I**

**idea**
63:11 78:6 92:23 122:20
123:6,7 124:25 125:19
126:4,5 127:7,25 135:7
141:22 145:22 156:12,15
158:3 160:23 164:21 165:19
166:25 177:8 178:24 179:22
182:15 191:6,9 193:3,16,21
203:21 207:5,15 214:15
217:23 232:17 237:18
240:23 254:13

**ideas**
20:21

**identification**
41:13,25 53:19 58:19 69:7



Danny Christopher Mulcahy                         Amazon.com, Inc., et al. v. WDC Holdings LLC

76:8 104:25 107:9 134:21
139:8 143:5 161:7 162:10
165:9 183:15 187:13 216:23
222:25 227:4 239:3 240:2

**identified**
28:24 48:15 123:9 124:20
159:11,16 200:9 258:7

**identify**
26:6,8,19 27:17 40:25 64:18,
20 120:24 163:13 257:19

**identifying**
48:10 56:8

**identity**
174:20,23

**IIPDIRECT.COM**
34:22 35:2,5,22 36:6,9

**illegal**
90:3 243:5

**immediately**
13:11,12,15 14:5 15:11 16:2
158:15

**immunity**
136:8,13,16 138:5

**impacted**
175:6

**impacts**
208:12

**impetus**
253:21

**implicated**
137:3,5,8

**implicit**
229:13

**important**
7:11,15 116:24 133:4,6
216:9

**impression**
72:12,14,17 177:14 215:10,
12

**improper**
67:2 79:4 82:2 85:10 133:9
137:12,14 160:7,10,13
163:13,14,16,25 202:12
230:7 234:5 242:22 247:17

**inactive**
11:9,10,17,21,25 12:1,2,4

**inappropriate**
172:7

**incident**
168:20,22 169:5

**include**
204:7,14 223:22,23

**included**
67:16 163:11 223:25 224:5,
11,19 256:17

**including**
102:20

**income**
254:12,17 255:5,6,14,22

**inconsistent**
212:5,6

**incorporate**
23:25 34:8

**incorporated**
23:16 32:11,13 34:4,11
84:22

**incorrect**
185:13

**independent**
17:7,19,24 22:2,6 217:20

**independently**
23:1

**indicating**
206:9

**indirectly**
168:12

**individual**
28:25 29:5,7,8,14 30:24
31:25 39:9 44:3 57:8 67:17
93:18 100:4 132:15 153:10
196:13,16

**individuals**
26:3 28:23 60:14 62:18,22
64:18,20,22 67:24 99:25
145:16 149:8,10 204:15
209:11 234:11 241:16
257:20 258:7,8

**industry**
15:9

**inference**
86:23,25

**inflated**
152:24

**inflicted**
174:25

**informant**
146:18,25 147:8,15 152:21

156:23 184:23

**information**
86:20,21 102:21 130:21
138:2 143:11 152:4,10
163:21 180:21,24 197:25
203:8 228:11,14,15,17
229:10,12,16,18 248:3 255:8

**initial**
148:23 220:22

**initially**
160:19 258:12

**Injunction**
143:19

**Insight**
16:12

**instance**
62:21 86:2 94:18 133:15,19
199:3 200:8

**instances**
87:10 94:15 99:6 133:17
134:13 137:25 244:23

**instant**
62:20

**instruct**
40:12

**instructing**
40:21

**instructs**
8:9

**intangible**
196:22 197:1,2 211:12

**integrity**
117:14,15,19 118:6

**intend**
84:24

**intended**
204:7,14

**interact**
71:10,13,23 247:12

**interaction**
176:9

**interactions**
72:15

**interchangeably**
108:20

**interest**
31:24 32:1 33:18 121:15
163:22 206:9 221:16,23,25

**interested**
26:22 51:20 94:4 137:3
187:23

**interests**
60:10

**interfere**
8:14

**internal**
165:14

**internet**
115:24

**interrupted**
119:19

**interview**
51:25 52:25 189:4

**interviewed**
52:3,19

**interviews**
52:21 53:2,5

**intimately**
245:12

**intricacies**
67:19

**intrinsically**
108:6,8 109:4

**introduce**
41:9,19 53:16 58:16 68:18
69:4 76:5 104:22 107:6
134:18 139:5 143:2 161:4
165:6 181:15 183:10 187:8
216:20 222:14 238:25
239:23 252:19

**introduced**
68:13,20 69:18 106:9 134:19
183:12 226:21

**introducing**
162:7 187:11 222:23 227:1
252:17

**introduction**
68:14

**introductions**
60:9 216:14,15

**invest**
28:25 57:6

**invested**
27:19 28:14 29:8 32:3,6,24
33:5,12 88:6

**investigate**
210:12,13


EXHIBIT 5

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**investigating**
44:25 45:1,5

**investigation**
117:3,5 131:10 167:1 179:21
203:7

**investment**
20:20 21:3,13,25 28:25
29:11 30:5,15 56:7 57:8
82:21 93:9,12 97:20 100:12,
15 102:5 192:6 195:8,15

**investments**
29:12 43:22,25 44:5 80:25
85:15 88:25 89:8,16,20,23,
25 90:3,9,17 97:10,14,17
98:5,9,12,15,16,18,21 119:3
195:21

**investor**
27:17 55:20 89:5 93:17,23
102:10,13 195:17,22 213:16
215:18

**investors**
26:17,20 27:16,24 28:4,5,18,
22 29:2,3,6,7,14 33:19 56:6,
9,24 57:2,5 58:5,14 64:12
65:1,19,22,23 66:13 67:5,13,
17 70:6,10,13,19 81:10,15,
25 82:4 85:14,18,19,20,21,
24,25 86:11,13,24 87:5,13,
19,23 88:3,6 90:7 91:21
93:5,7 103:10 171:20 172:3,
7,11,14,19,20 174:1,3,9,13,
20 175:2,5,7,8 213:16,19
214:9 224:10,14,16,17
251:20,22,25 252:6,10,12,
19,22 253:3,7,25 254:4

**investors'**
172:25

**invited**
215:19 241:2,5,8

**involved**
18:7 20:9 41:1,13 57:24
58:1,2 60:16 69:21,23 73:24
74:2,9 77:6 78:25 80:19,21
86:3,14 94:25 114:4,7 118:4,
21,23 123:8,13 124:23 133:9
153:3,19 154:6 155:17,22
177:5 180:13 193:20 202:19,
22 209:12 234:15 237:23
245:12 247:25 252:16

**involvement**
61:10,12 74:5 119:7,8,9
153:7 154:9 156:16 180:4
213:13 238:15

**involving**

132:23 133:9,23 150:23
169:5 175:3 177:6

**IPI**
171:21 172:4,5,12 173:3,7,
11,14,23,24,25 174:14 175:3
192:4,6 253:13,18,22

**Iron**
173:5,6

**irrelevant**
37:5 38:10

**issue**
144:3,16 203:15

**issued**
46:18 48:2

**issues**
90:12,14 103:25

**iteration**
217:22

**iterations**
74:2 217:23

---

**J**

**Jack**
6:4 209:4

**James**
35:14

**January**
161:12 185:2 187:20 206:19
207:11

**Jason**
99:3,18

**JD**
196:16

**Jeff**
107:19,24 128:25 129:13,14
146:19

**jeopardized**
132:18

**jeopardy**
117:15

**job**
7:7 12:9 15:20,24 16:2
19:13,19,25 20:5,19 50:22
51:8,14 52:5 61:9 74:24
84:19 100:3 171:9 176:7
180:2 186:20,22 187:1
188:5,8,12,15 189:8 206:8,
14,17 207:13 212:21 247:10

**job-wise**
84:15

**jobs**
20:11 100:1,2 168:3 171:2,8,
12 187:4,23 188:13 189:4

**Join**
221:21 222:6 228:20 229:6
230:12 231:4,16 232:25
233:7 236:9 238:18 241:13
242:1,16 244:11 245:9,23

**joined**
14:13 17:11,13 18:23 19:20
20:20 23:2 55:14 69:2,12
180:9

**joining**
5:24 54:22

**Josh**
234:23 235:11 236:4,17
237:2 258:11,17

**Journal**
122:13 123:12 124:15
125:23 127:21 128:8,12
154:14,23 155:19

**joys**
17:16

**judgment**
249:7

**jump**
23:6

**jumped**
182:5

**jumping**
156:21 182:5

**June**
23:4 71:3

**jury**
179:21

---

**K**

**K-E-O-G-H**
99:4

**Karen**
25:23 196:14

**keeping**
14:18

**Kelly**
28:11

**Keogh**
99:4

**Kevin**
6:7

**key**
152:6

**kickback**
115:8 121:24 132:18,20
150:14 151:1 152:19 209:12,
16 210:9 245:5,7

**kickbacks**
110:25 113:1,4 114:12,16
115:2,6 117:23 119:12,14,25
120:15 142:24,25 152:16
184:25 185:5

**Kids**
13:16

**kill**
169:12

**Kirschner**
68:3,5,10,12,19,21 69:11,15,
17,20 70:2,9,13,18,21 71:10,
24 72:4,7,13,15 73:7,10,21
79:1,15,22 80:1,5,9 111:5,7,
22 112:7,18 113:4,8,10
116:9,19 118:14 120:3,14
134:6 142:24 151:17,21
164:11 199:12 200:17
201:21 202:15 204:24 205:3,
4 207:1 215:9,25 216:14
226:10 230:21 232:6,14,22
241:23 245:19 246:10 252:2

**Kirschner's**
70:17 73:15,19 76:21 77:13,
19,21 78:11 80:13 251:15
252:16

**knew**
24:2 68:16 77:13 99:23
122:1 158:4 164:10 175:20
177:9 231:14 234:9,16
237:14

**knowing**
157:15

**knowingly**
136:21

**knowledge**
34:19 77:9 120:18,19 150:19
155:15 157:10 184:6,24
185:4,22 197:20 200:5
201:13 203:19 209:16,19,23
210:1 230:25 231:7,10
232:12,20 234:3 237:12
241:21 247:5 251:2,8



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**Kristi**
114:5 121:8 198:9 226:13
227:24 228:5,10,12,13
234:14 236:17 243:24
246:16,18 247:6,9,16,20,22,
25 248:2,6,12,15 249:6,9,13
257:23

**Kuhn**
195:6

**Kyle**
113:25 114:5 120:22 121:10,
11,18 122:1,2 125:6,10
127:1 128:1 134:10 152:21
153:6 156:24 168:7 175:25
177:8,10,24 198:9 236:18
237:15 238:14 240:21 241:4,
6 257:23

---

**L**

**label**
42:19

**labeled**
106:20

**lack**
103:10 169:24

**lady**
13:16 233:16

**laid**
243:24

**laissez-faire**
212:7,18,19

**land**
121:21,22,23 122:10,11
125:13 126:23 127:1,5
132:22 134:10 153:15
154:17,21 155:17,24 156:2,
5,8 177:6 190:1

**large**
34:12 113:10

**largely**
220:2

**larger**
195:21 220:10

**largest**
195:15

**Las**
5:7 9:11 11:2 12:16 13:19,20
14:25 15:24 16:15,16 17:1
18:11,12 25:8 71:9

**late**
184:22

**Latin**
10:12

**law**
5:25 6:17 90:6 181:17

**lawsuit**
5:21 6:20 39:11,14 88:17

**lawyer**
104:2 137:8 210:17

**lawyers**
181:2 208:8 209:20

**Lazy**
215:18

**lead**
120:19 130:10 231:18

**leadership**
96:9

**leading**
61:17 133:21 137:6

**learn**
50:25 68:9,12 92:11 154:4
164:13 200:24 238:9 251:6

**learned**
93:18 123:11 157:16

**lease**
80:20,23 82:10,13,17 151:22
220:14,17,22,23 221:3

**leasing**
16:22 92:5,7,13,19,25 93:3
227:23

**leave**
17:2 19:13 20:19 85:7 95:24
212:21 222:19 240:14

**leaving**
19:18 29:20

**led**
15:14 71:23 85:5 89:15,19
94:19,20 110:6,10 123:22
170:17,20 185:8

**left**
53:22 96:11 106:7 110:8
122:23 126:12 173:21 178:6,
25 183:19 205:18

**legal**
9:1 33:20 131:1 132:10
160:3 164:23 165:2 166:4
184:22 205:8 208:2,6 210:20
211:2,5,8,11,17

**lend**
153:9

**length**
111:15

**letter**
41:6,8 64:25 130:20

**level**
55:13 109:20 235:23

**levels**
235:16

**liability**
142:23 207:17

**license**
22:2,5,7

**licenses**
11:8,9,10,11,13,16,19 39:21,
24

**licensing**
101:19

**life**
26:21 109:10

**lifted**
144:9,12

**light**
158:12

**limited**
251:22

**lined**
84:19

**lines**
54:13

**link**
99:7

**Linkedin**
51:2,6,12

**list**
56:10,11 64:21 65:1,4,7,10,
11,13,16,17,18 67:12,13,16,
19,21,22,24 223:25 224:4
233:14

**listed**
54:10 114:11,15 117:22
163:10 182:13 189:5

**listing**
92:6 93:19

**literally**
126:17

**litigation**
181:17 184:12

**live**
51:18 70:23 71:5 187:7

**lived**
9:13 22:4 64:2

**living**
26:21

**LLC**
5:9 10:2,3,4,6 34:9,18 81:1
155:4 156:13

**located**
5:6 9:23 10:16 16:14,25
18:10 20:23 22:22 25:15
195:4

**location**
25:2 156:17

**Locker**
13:17

**London**
187:5,6,7

**long**
9:13 12:17 13:22 14:9 16:18
17:24 19:4,25 21:6 37:8
38:14 43:8,9 47:15 53:4
105:3 122:22 138:7 139:16
193:2 205:14

**long-term**
60:11

**longer**
50:14 96:24 165:23 172:23

**looked**
112:13 201:11 207:6

**Lora**
182:17

**Lorman**
49:22,25 113:22 234:14

**losing**
171:7

**lost**
115:14,16,24 140:7 168:2
171:2,9,12

**lot**
10:6 13:3 98:24 100:4
114:22 115:8,11,12 129:13,
14 163:23 172:20 176:21
191:24 204:18 211:14
212:19 216:5,6 226:8,19
228:6 248:3



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**lots**
61:7 172:17 195:24

**loud**
62:6 110:23 171:18,19
174:17 184:20

**Luke**
59:23,25 173:17

**lunch**
142:7,12

**Lynch**
18:23 19:4,17,19

---

**M**

**M-A-R-C-O-T-T-E**
99:19

**M-U-L-C-A-H-Y**
9:7

**Macdonald**
182:17

**made**
58:13 76:3,25 84:6,8 91:7,
14,18 100:9 103:16,19 104:8
107:14 122:5 163:17 208:13
213:5,6 214:21 229:13
244:7,24 245:17 249:6
252:23 253:14,19

**maintain**
28:21

**major**
212:25

**majority**
113:11

**make**
7:21 8:6 15:14 31:3 37:8
38:13 45:11 66:16 77:18
79:5 84:24 91:10 102:7
153:16 174:9 197:16 216:15
218:4 223:25 224:4,19 235:1
247:7

**makes**
101:12

**making**
72:17 89:24 101:20 102:5
109:23 149:24 199:25 214:3
216:14 236:3 258:5

**manage**
96:2

**managed**
13:16 29:11,12 74:17 89:1,3

**management**
29:24 30:14 32:21 85:15
88:24 89:16,20,22 90:9
97:10,14,16,20 98:5,9
101:11,12 212:4

**manager**
14:4 21:5 27:4 30:4,5,15
52:6 102:5 119:2 178:21
221:23,24 247:11

**manager's**
60:10 221:15

**managers**
98:18

**manages**
29:17

**managing**
98:12,15,16

**manner**
58:15 90:18,19 233:8 236:20
246:18 257:17

**March**
5:4 23:4 54:6 69:15 259:4

**Marcotte**
97:20,22 98:6,10,11,14,17
99:3,17 114:5 118:25 121:9
168:7 198:9 234:8 258:4

**Marcotte's**
100:3 119:1 245:5,6

**mark**
105:18,20

**marked**
41:25 42:16 53:17,19 58:17,
19 69:5,6 76:6,8 104:25
105:18 107:9 134:21 139:8
143:3,5 161:5,7 162:8,10
165:7,9 183:15 187:13
216:23 222:25 227:4 239:3
240:2

**market**
94:7 109:24 199:17 219:19

**marketability**
200:1

**mass**
64:25 168:18

**materialized**
234:1

**Matt**
135:1 173:19

**matter**
43:4,17,20 185:15 196:11

234:15

**matters**
46:4,5 136:25 200:2

**Matthew**
143:16

**meaning**
100:2 205:8

**meaningful**
213:3 214:5

**means**
55:18

**meant**
226:22

**Medearis**
233:15

**mediation**
238:14,20,23

**medications**
8:17

**meet**
47:4,7 68:21 69:1 112:23

**meeting**
26:21 28:15 69:14 111:24
112:6 193:2 232:1

**meetings**
66:4,7 90:21,23

**members**
184:21

**Memorandum**
143:17

**memory**
250:15

**mental**
8:13

**mention**
121:2 129:18,19,25 168:2
171:1

**mentioned**
24:10 28:13 78:9 88:24
99:12 116:13 139:24 224:24
234:13 235:15

**merit**
210:13

**merits**
57:8 235:14

**Merrill**
18:23 19:4,17,19

**met**
69:11 108:15 111:7,12,21
112:21 208:1,4

**Mexico**
13:20

**Michael**
28:11

**middle**
115:25 140:8 152:20

**mill**
198:4

**million**
21:21 33:7,9,17 56:21,22
81:11 111:1 152:25 226:14
232:4 237:25 256:21

**millions**
184:24 185:4 225:23 226:10
249:5

**mind**
40:2 42:5 85:2 116:4 118:1
119:20 134:14 212:11,20

**mine**
191:23

**minus**
18:18

**minute**
235:1 236:22

**minutes**
191:16,17 243:22 246:25

**misleading**
102:7,9,12,20

**Missouri**
25:18

**misstated**
104:4 120:22

**mistaken**
81:11 104:2

**mixed**
179:11

**Mm-hm**
31:17 48:6

**modifications**
218:4

**moment**
53:24 54:1 60:15 227:17
234:6

**money**
21:15,17 22:18,21 27:12,15,

18 32:4,6,23 33:4,11,19
66:16 72:9,10 80:23,25 81:2,
9,22,23 115:8,11,12 151:16
163:23,25 176:7 200:16
226:8,19 228:7

**monies**
151:14

**month**
71:7,8 148:18 206:21

**months**
14:11,23 110:3 171:22

**morality**
253:24

**morning**
5:2 111:15 250:3

**motion**
144:12

**motives**
130:13

**motorcycling**
248:21

**mountain**
64:7

**mouse**
42:5

**move**
19:2,23 70:24 71:8 141:17
156:17

**Mulcahy**
5:3 6:11,16 9:3 24:22 37:2
38:5 42:15 97:6 107:13
142:16 194:23 196:9,14,16
209:3 210:19 243:21 257:4
259:3

**multiple**
98:4 119:17 133:16 135:12
186:23 202:8 213:18,19

**mumbling**
7:17

**N**

**named**
34:8 63:24,25 68:2 135:20
173:17,19 190:4 191:10
195:6 196:14,16

**names**
25:22 27:23 28:3 121:2
151:5 181:22 182:3,13
207:25 257:19

**Naples**
239:19

**narcissist**
170:10,12

**Narcissistic**
169:24

**natural**
50:9

**needed**
24:2,3 109:6

**needy**
62:9

**negotiate**
134:15

**negotiated**
77:4

**negotiating**
138:5

**negotiation**
78:22

**negotiations**
77:6,10,14 78:25

**Nelson**
6:1,2 64:15,16,17 112:21,23
113:4 116:18 118:14 120:3,
14 142:23 151:17,22 164:10
196:10 199:12 200:16
201:18 204:1,4,7,14 205:3
206:25 230:21 232:6,14,22
241:23 245:19 246:11

**net**
60:10 221:16

**netted**
237:24

**network**
63:20

**Nevada**
5:7 9:11 11:2 14:7,10 25:8
156:11,14,18

**newspaper**
128:20 129:6 169:3,6,15

**newspapers**
129:4

**Nice**
215:11

**Nicole**
233:15

**nod**

7:16

**nods**
26:9 170:4

**nomad**
10:12

**nondisclosure**
136:10

**nonetheless**
182:10

**normal**
259:16

**North**
5:6

**Northstar**
5:10 27:5,8,13,16,17,19 28:6
29:8,20 33:19 36:8 46:4
50:19,20,23 51:1,3,9 52:1,
15,18,20 54:22 56:2,14,16
57:15 58:8 65:6 66:1,19,23
69:2,12 70:10,14,19,22 71:6
73:4,6,11,22 74:20,23 75:2,3
79:16 80:6,13,22 82:1,24
83:6,14,18 84:5 85:5,10
87:19,23 88:2,10,11,21
89:16,20,24 90:2,5 92:17
93:18 95:7,22 96:3,9,11,19
98:20,21 99:7,22 100:1,4
101:4,21 102:8,23 103:4,5
109:25 110:4,8 112:3 113:19
114:11,15 117:18,22 118:16
119:1 122:23 123:19 124:2,
23 125:1,12,24,25 126:1,9,
13,21 127:5,22 131:13,25
133:24 137:13 146:17 151:2,
5,9,18,21 152:12,22 153:12
160:1,21 162:15,24 170:9
171:6 172:23 173:12,15,21
176:2 177:11 178:4,6,14
179:1 180:14 190:8 192:7,10
194:13 195:17,22 197:13,15
198:2,13 200:16,17 202:12
204:23 205:12,18 209:11,23
211:25 213:1,4 214:20
226:11 228:18 229:3,21
230:19 231:20 232:6 234:4
237:11,14,21 241:16 242:20
243:25 244:19 245:18
247:11,13,15,19 248:13,16
250:13,21 252:2,17 253:9
258:9

**Northstar's**
55:16 57:24 58:6,11 62:18,
22 63:17 64:19 65:10,13
69:21 80:19,23 82:6,10,17
92:3 98:5,9 100:11,14 174:5,

10 184:24 185:4 214:13
216:10 231:1,8 247:25

**Northstar/villanova**
230:8 244:6,15,25

**note**
149:10

**notes**
257:1

**notice**
101:24

**noting**
94:1,3 143:12

**Nova**
155:4 156:13

**NSIPI**
161:15

**nuances**
98:3

**number**
5:11 34:13 64:11 100:6
105:9 187:10 229:1

**numbers**
201:8,14

**nutshell**
85:16

**O**

**Oasis**
5:16

**oath**
6:10 195:1

**object**
37:4 38:8 40:11 46:16 59:7
78:4 104:3 131:17 143:10
185:25 207:21 210:2 226:22

**objection**
13:6 28:1 32:25 33:20 37:8
38:14 40:16 46:14 48:1 58:3
63:4 75:23 78:1,2,18,19
110:12 111:14 117:6 123:1
124:11 125:18 127:9,11
128:14 133:21,25 137:6
140:6 141:23 147:2,3,9,19
160:3 179:6 185:17,24
188:16 193:11 197:23 201:2,
3 207:20 208:15 209:17,18
211:19,23 214:7,14 216:2
218:18 219:1,2,14,16
220:19,20 221:5,7,19 222:4
224:1,7 225:17 228:19



CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

229:4,22 230:2,10,22 231:2,
12,21 232:7,15,18,23 233:5,
21 236:7 237:17 238:1,2,17
241:10,18,24 242:9,15,23,24
243:6,8 244:9 245:1,8,21
246:12,13 249:19 250:14,18
251:3 252:25 253:10,15
254:18,20 255:1,18,25
257:16

**objectionable**
186:5

**objections**
8:6 222:17 232:9

**obligated**
141:11

**obligation**
100:21

**observe**
242:21 243:4

**obtain**
241:9

**obvious**
78:10

**occasion**
91:25 111:22,23 163:3 206:5

**occasions**
39:4 68:24 71:15,24 98:24
111:12 192:24

**occur**
71:2

**occurred**
150:15 226:7

**occurring**
114:19,21 197:20

**off-the**
222:22

**off-the-record**
23:18 107:3

**offer**
249:6

**offered**
53:7

**offering**
214:9

**offhand**
27:22

**office**
18:25 25:2 113:13,15,16,18,
19 116:11,12 119:16,17

176:10 198:2 201:22 236:18
247:11

**officer**
101:1

**official**
26:2,4

**Ohio**
190:20,23 191:1

**Oklahoma**
25:18

**older**
106:9

**Omar**
135:20 141:14 142:2 148:14,
16,20 161:11,18 166:2
187:20 188:1,7,11 189:1

**Omar's**
135:25

**one-on-one**
112:20

**ongoing**
185:2

**online**
26:10

**open**
50:25 108:17 115:9 202:7
251:15

**operate**
17:18 22:6 25:4,12,13 30:20

**operated**
29:9 31:5

**operates**
29:15 30:11

**operating**
18:17 20:14 24:16 29:22
30:1

**operation**
18:3

**operations**
214:13

**opine**
144:22 186:2

**opinion**
8:23 111:2 117:10 123:6
215:24 220:1

**opportunities**
18:8,10 26:7,18 29:1 56:7
191:5,8 251:16,20 252:5,8,

10

**opportunity**
15:15,16 57:8 67:20 92:5

**opposing**
14:16 257:13

**order**
7:7 143:18,25 144:5,23
258:24

**orders**
259:8

**Oregon**
25:18

**org**
161:12,17 207:10

**organization**
30:6,10 161:14,20 162:2

**original**
119:21 152:18

**originally**
116:8

**overlooked**
257:1

**owes**
188:23

**owned**
29:9,10 31:9 34:12

**owner**
20:21

**owners**
168:1

**ownership**
31:24 32:1

**owning**
31:16

───────────────

**P**

───────────────

**p.m.**
61:21 62:3 76:18 115:19,22
135:20 141:14 142:11,14
158:17,20 166:8 194:18,21
208:20,23 243:15,18 259:6,
24

**pages**
59:6

**paid**
66:12 79:15,22 85:20,22,25
86:8,10,11,12,14,16 93:3

113:9,11 115:8 138:1
163:20,25 198:12 220:22,24
223:19,22 227:22 228:23
243:25 256:10,19

**Papez**
182:21

**paragraph**
54:21 55:1 60:2 117:25
120:17 130:19 136:3 146:2,
11,14 147:17 148:10 149:14,
15,19 151:8,25 152:3,7,11,
20 156:21,22 158:23 167:9,
16 171:16 180:18 184:16,18,
20 212:13,14

**Pardon**
103:18 157:14 249:11

**parentheses**
225:5

**park**
12:14 26:6 29:5 30:11,24
32:2,15 88:7 249:3

**parks**
25:12,13 29:9,15,17 31:5,25
32:4,7,20,24 33:5,16,25 34:3

**Parkway**
5:6

**part**
28:12 69:25 86:1 95:17
101:23 125:1,3,4,5 153:23
198:6 200:6 204:21 233:13
258:2

**parted**
35:11

**participate**
26:17 58:6 70:3

**participating**
65:25 153:10

**Participation**
218:10

**parties**
123:19 124:4 235:9

**partner**
35:8,13 68:6 73:12 173:7
219:13 221:4 222:3 224:9
233:12,20 251:19 252:5

**partners**
5:10 63:22 74:18 146:18
173:6 197:15 199:23 216:1,
11 221:12 223:20 224:5,21
233:14 247:11



Danny Christopher Mulcahy                              Amazon.com, Inc., et al. v. WDC Holdings LLC

**partnership**
34:23

**Parts**
100:17

**party**
136:22 144:21 181:19

**passed**
101:11 203:8

**past**
108:16

**patience**
246:23

**Patricia**
190:4,17 234:20 236:4,10,
12,13,14

**Patrick**
165:13 181:25 182:7,10

**pause**
23:21 42:11 115:20 158:18

**pay**
58:14 92:7 113:8 219:12,17,
22 221:2 222:3 240:22
246:18

**paying**
142:24 220:10 232:4

**payment**
184:24 185:4 221:18 248:4

**payments**
116:18 152:15 164:10,14
197:14 199:11 230:19 232:5
245:17 246:10 247:7

**PDF**
61:23 105:12 135:17 166:1
180:17 184:15

**Peaks**
154:12,16,20 155:1,22,23
156:10 180:5 237:5,7,12,24
238:10,15

**Peaks'**
156:2

**pending**
8:2 89:7

**people**
10:9 26:21 58:13 62:15,25
63:2,21,23 64:9 74:16 75:5
98:1 100:3,4 108:15 114:3
116:13 118:6,10 119:17
127:14 135:12,13 164:4
171:7 176:17,21 198:1,6,7,
15 199:8 200:7,9,19,22

**203:13 207:17 208:5 209:22
212:21 216:5,6 229:2 234:8,
13 235:15 248:20 249:5
257:5**

**people's**
21:15 98:4

**percent**
60:9 92:7 219:11,17 221:24

**percentage**
219:7 220:7,23 221:16
256:20

**percentages**
203:4 256:20

**performance**
89:8

**performing**
100:1,2

**periodically**
7:25

**person**
22:6 53:2 57:9 68:22 71:15
92:22 99:22 135:10 198:20
222:11,12

**personal**
25:4 150:19 159:23 162:23
184:23 185:4,9,22 190:10
197:20 200:5 203:18 208:11
209:15,19 247:5 249:23
250:8

**personality**
177:24

**personally**
32:24 33:5 47:23 108:11,13
132:8 242:6

**persons**
134:13

**perspective**
188:17

**pertinent**
121:1

**Peter**
52:4

**Peter's**
52:5

**phone**
47:8 57:12 71:17 148:23
181:4,19 182:25 183:1
184:21

**phrase**
147:15 154:12 196:18 197:6,

8 199:15

**phrases**
211:15,16

**physical**
8:12 25:1

**picture**
42:7 82:21

**piece**
121:21,22 125:13 126:23
127:1 153:15 154:17 155:24

**place**
22:23

**places**
26:10 98:1

**plain**
78:13,17

**plaintiff**
6:6 209:4

**Plaintiffs'**
106:21 143:16,18

**plan**
85:2,4

**platform**
14:16

**platforms**
21:15

**play**
213:3

**players**
168:1,4,9

**plays**
129:21

**plea**
179:14,17

**point**
7:20 19:21 50:10 70:24
88:11 93:21 121:1 157:15
165:5 168:6 173:5,6 202:19,
22 213:8 220:9 235:3 247:24

**policies**
231:1,8,11

**poor**
85:14 88:24 89:7,15,19,22
90:9 97:9,14

**pop**
191:16

**pop-up**
215:4

**popped**
42:4

**portion**
62:12 113:10,11 200:2
230:19

**pose**
116:1

**posed**
168:15

**position**
23:10 50:20,25 51:11,25
52:5 53:7,10 100:6

**possessing**
159:25

**possession**
159:22 160:22 165:18
205:17

**posted**
51:11

**posting**
51:14

**postings**
206:8,14,17 207:13

**potential**
26:19 45:7 56:9,24 57:2 58:5
64:18 180:4 189:17,20 202:8
205:25 206:3,6 207:17

**potentially**
180:13

**practice**
162:22

**preferred**
199:23

**preliminary**
143:18 148:13

**preparation**
43:23 44:5

**prepare**
47:2,17 48:12 81:14 100:19

**prepared**
82:22 83:5

**preparing**
74:7

**present**
183:1

**presented**
15:15



CONFIDENTIAL

Danny Christopher Mulcahy                                      Amazon.com, Inc., et al. v. WDC Holdings LLC

**presently**
189:15

**president**
107:24 146:19

**pretty**
8:7 200:4

**prevent**
8:23

**previous**
55:24 215:22

**previously**
40:22 107:24 183:12 242:25

**price**
152:24

**primary**
168:1,4 257:25

**principals**
134:11,12

**prior**
19:15 20:2 28:14 52:19,24
81:4,22 89:19 93:21 137:25
188:20 226:22 235:15

**private**
104:1,15

**privy**
229:14,15,18 256:9

**pro**
82:19,20,22 83:5,15

**problem**
183:20

**proceed**
50:11

**proceeding**
37:6 38:11

**proceedings**
23:21 42:11 115:20 158:18

**process**
52:25 55:12,15 81:12 138:4
199:22 202:4,8 233:23

**produce**
41:11

**produced**
41:6 165:17

**professional**
129:20 130:6,7,10

**professionals**
100:5

**profit**
237:25

**profits**
60:10 221:16,23,24

**program**
57:25 58:6,9,12 61:15,18
62:14,18,23 63:18 64:19
65:10,13,21 66:2,4,8,12,14,
17,20,24 67:2,4,8,15,25
69:21 70:1,3 73:16,19 74:14,
19 213:9,11,14 214:3,6,10

**project**
178:21

**projects**
153:8 195:9,13,16

**pronounce**
10:8 135:5,25 145:24

**proof**
86:16 150:1 152:8 196:18
197:1,3

**property**
29:11 30:4 152:23 153:3,20
195:3 219:6 238:10

**proposition**
37:5 38:9

**propriety**
203:1

**protect**
174:19,20 179:2,9

**protecting**
174:23 175:2

**protective**
143:25 144:5,22 258:24

**provide**
44:7 156:4,7 159:12

**provided**
151:17 152:4 159:15 166:19
167:11,13 180:21,24 210:5,
14 242:8,14

**providing**
138:2 158:25 159:3 202:19,
22

**prudent**
102:5 129:25 137:9

**psychology**
11:7 170:2,3,7

**public**
167:22 236:2

**publication**
124:18

**publicized**
250:24

**published**
124:17 125:12 126:5

**punctuation**
212:13

**purchase**
9:19 152:23 153:3,19 154:5,
20 180:5

**purchased**
190:1 238:10

**purpose**
65:20 74:19 218:16,23 219:4
220:17 221:18 240:24

**pursuant**
258:24

**pursuing**
164:23 165:2 237:15

**put**
117:15,19 167:24 188:17
199:19 249:3

**putting**
73:24 167:19

---

**Q**

**question**
7:21 8:2,3 13:7,14 28:8,9
30:21 33:2 35:4 48:8 58:3
62:19 89:10,17,21 109:14
114:13 115:25 116:2 119:18,
21 134:3 143:23 146:20
147:13 148:8 150:11 160:8
188:9 199:20 210:23 212:24
215:6 225:11 226:23 229:17
231:5 244:13,17 247:4
250:6,15,16 251:4 253:1,16
254:6 255:9 256:11,12 257:1

**questions**
8:7 37:4,9 38:8,15 43:14,22
44:4 97:7 106:11 142:17
182:5 187:16 191:21 194:3,
7,24 196:1,4 209:6 211:15
243:11,20 247:1 250:4 256:1
258:19

**quick**
129:9 166:3 247:1

**quickly**
141:18 209:9

**quotes**
148:3,5

---

**R**

**Rain**
19:20

**Rainmaker**
19:21

**raise**
21:12 26:14,16 33:19 56:3,5,
13,16 72:6,8,10 74:20 80:23
81:2 87:22 90:16,19 99:8
251:16

**raised**
20:11,12,13,16 21:14,15,17
22:14,20 27:12,15,18 33:16
72:9 75:2,3 80:25 81:9,25
131:23 174:1 176:7

**raising**
20:7,9 22:11,13,18 51:17
55:12,16 66:22 74:22,25
81:22,23 82:8

**Ramstetter**
113:25 114:5 120:23,24
121:5,14,19 122:5,12,16,19,
24 123:8,13,17 124:8,20
125:10 126:8,16,19 127:4,7,
16,19 128:1 132:23 152:21
153:4,6,14 154:22 155:9
156:7,25 157:6,19 175:25
177:6,14,20 178:10,13,23
179:17 191:4 195:13 198:10
236:18 237:15 238:14
257:24

**Ramstetter's**
128:4 177:17 178:3,7,17

**ran**
178:15,16

**Randy**
99:4

**ranges**
219:6

**rare**
71:15 163:3

**rarely**
57:10 71:14 224:24 225:2

**rat**
118:3

**rate**
94:7 220:15,18 221:3



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                              Amazon.com, Inc., et al. v. WDC Holdings LLC

**rates**
202:11

**reach**
55:20 65:4 135:12 171:9
173:25

**reached**
56:11 135:8,10 172:19,20,22

**reaching**
62:17,21 65:9,12 67:23

**reaction**
226:1 228:4,8

**read**
37:22 38:1,4 45:23 54:25
60:6 62:6,10 110:22 119:23
120:17 129:17 136:6 140:6,
10 148:10 149:17 151:25
159:7 166:18 167:6,16
169:6,15 171:16 174:17
180:18 184:8,20 215:6 228:1
238:7

**reading**
118:1 119:20

**ready**
76:11 165:11 187:15 191:23

**real**
15:9,18,23 16:3,8,23,24 17:8
18:7 19:11 21:1 22:16 50:10
51:17 124:3 167:7,10 184:25
190:22,25 191:4,8 251:15

**Realty**
16:12

**reason**
7:15 12:3 46:19 59:17 77:12
87:4 107:16 108:25 123:12
128:24 131:8 133:8,11,16
139:14 147:7,14 153:13
163:24 165:23 168:14
169:17 179:3 194:8 223:15
227:18 234:1 239:15 247:16

**reasonable**
166:12,17 219:12,18,19,21,
25 220:12 221:2 222:2,7,11

**reasoning**
75:11

**reasons**
99:15 164:1

**recall**
20:13,16 21:17 34:6 41:10
43:7,11,14,17,25 44:2,4,8,9,
14,15 45:20 47:9 48:21,23
50:24 51:7,10 53:12 60:20,
22 61:10,12,16,17 62:14,17,

20,21,24 63:1,5,8,20,23
65:9,12,25 66:3,6,21,22,25
67:1,3,16,19 68:1,14 69:3
70:11 72:16,17,20,21 73:5,
20 74:5 75:20,21 76:13 79:3,
11,13,25 80:3,4,7,8,11,12,15
81:3,9 83:1,4,9,11,14 86:5
87:6,7,15,17,25 88:1,4,13,
16,20,23 90:22,24,25 91:4,6,
7,10,12,17,23 92:15 93:22
94:4,5,6,9,10,12,13,15,16
95:3,6,10,12 97:12,13,15
99:1,10,11,14 100:8,10
101:20 102:2 103:12,15
112:6,14 113:21,23,24
114:10,14 116:15,17 125:8
126:5,15 127:18 132:3,4,6
136:12 138:4,10 139:22
140:2 141:5 142:4 145:15,17
148:13,16,19,22 149:3,6,11
151:4,6,24 152:15,18
157:12,15,25 158:5,8,25
159:3,10,11,13,15 160:6,9,
24 161:1,3,17,19 162:3,17,
19 163:7,10 165:13,20
170:25 172:15,16,18 173:2
181:1,4,7,22 182:25 183:4
186:24 187:1,4 189:1
192:14,16 193:2,4,9,22,25
194:3 195:20,23 197:8
199:3,5,7 200:21 201:10,12,
15 204:2,5,17 207:24 223:10
225:24 227:15,16,17 235:18,
21 237:4 239:9,11,20,22
240:10,16,19,24 244:1,24
245:2 249:9,12,15 250:2,7
256:11,13,15 257:7

**receive**
60:8 130:2 156:1 186:14,17
189:11 223:16 227:19
239:16

**received**
45:17,22 116:7 195:16,20
213:13 225:15,23 226:10
228:4 230:5 243:23

**receiving**
41:10 45:20 203:14 227:15
230:1

**recent**
144:11

**recently**
11:21 93:14

**recess**
36:22 97:2 142:12 194:19
208:21 243:16

**recipient**
54:8

**recognize**
43:2 58:25 59:1 134:25
139:12,16 182:18,20,22
184:2 187:19

**recollection**
48:18 63:14 69:10 76:2
149:9,20 154:1 163:5
198:18,20

**recommended**
101:10

**record**
5:18 9:2 11:1 23:19,22
36:19,21,23 37:19 38:3 42:8,
9,12 54:12 96:25 97:3 106:2,
8,14,25 107:1,4 115:15,18,
21 119:22 136:6 140:9
142:9,10,13 143:12 158:14,
17,19 194:17,20 208:17,19,
22 222:22 243:14,17 249:24
257:21 258:23 259:1,5,7

**recorded**
156:25 157:3,7,16

**records**
199:10

**recruit**
58:5

**rectified**
109:17,21

**reduced**
253:13,18,22

**refer**
66:12 70:18 147:8,15 204:23
205:1 237:7

**reference**
146:25 155:20 171:5 174:23

**referenced**
35:13 239:20

**references**
149:24

**referral**
57:24 58:6,8,11 60:3 61:11,
15,18 62:14,18,22 63:18,20,
21 64:19 65:10,13,20 66:2,4,
8,12,14,16,20,23 67:2,4,7,
15,16,25 68:6,17 69:21,25
70:3 73:12,15,19 74:14,16,
18,19 75:8,13,15,18 76:3
91:19 113:9 116:8 134:6
213:9,11,13,19 214:3,6,10
216:1,11 218:10,14 219:13

**recipient**
221:3,12 222:3 223:19
224:5,9,20,21 228:23
233:12,14,25 251:19 252:4,
16 256:10 257:10

**referrals**
58:14 60:14 64:11 94:13

**referred**
70:5,6,10,13 252:8,9,12

**referring**
64:12 89:11 91:24 92:17
108:19 111:3 118:24 120:21
135:2 141:20 147:1 168:5,22
171:23 204:15 237:9 248:25
252:5

**refiled**
144:10,11

**reflect**
154:15

**reflected**
87:19 152:11 160:7,10,11,13

**refresh**
6:25 48:18 69:10

**refreshed**
48:22

**refused**
171:21

**regard**
121:10 220:12

**register**
101:13

**registered**
100:12,15

**regular**
259:22

**regulations**
101:15,22 102:24 103:2,6

**relate**
22:16

**related**
19:10 20:25 85:18 88:17
156:25 164:23 165:2 248:8
253:14,19,20

**relates**
67:14 102:4 103:24 154:14

**relation**
159:19

**relationship**
95:21 126:9,10 176:4,6,13
177:17,18,20 178:10,12,17,



CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

21 190:10 215:12,25 216:1,
10 222:12 230:9

**relationships**
75:6 252:20

**relayed**
176:24

**relaying**
177:3

**release**
134:15,16 139:18 140:5,12,
18 141:7

**relevance**
254:20 255:1,25

**relevant**
40:17

**reliability**
203:9

**reliance**
98:2

**remarkable**
230:14 244:22 249:10,14,18,
20,21

**remember**
11:20 15:5 22:23 61:1,3
63:17,19,24 64:7,10,13,16
67:10 69:14,16 72:23,24,25
81:7 88:5 91:22 94:21,23
95:9 99:3,4 111:24 113:17
114:20 115:25 122:21
132:11 135:10 138:7,8
148:25 149:8 151:15 157:8
159:6 182:2,14 187:9 194:2,
5,6,10 200:8 234:11 236:23
237:1 249:17,21 250:9
256:22 258:13

**remembered**
157:12 249:16

**remove**
105:15,17

**remuneration**
136:11 137:16,20,23 186:15,
18 189:12 206:6

**Renault**
34:13

**Reno**
14:7,10

**repeat**
55:6 89:17 109:14 119:18
231:5 251:4 253:1,16 254:6

**repeatedly**
134:1

**repeating**
235:2

**rephrased**
186:9

**replace**
183:12

**replied**
62:1,5

**report**
104:20 132:14,16,20,22
211:25

**reported**
205:10

**reporter**
5:15 6:9 7:6 37:22 38:1,4
105:22,24 119:23 140:10
259:7,11,14,18,20

**reporting**
5:16 205:21 207:18

**reports**
97:25

**represent**
5:16,18,19 6:5,7,18 111:2
117:11 150:7,14 153:22
160:17 162:18 188:4 196:10
209:4

**representation**
163:17

**represented**
160:15 164:18,19 181:16
182:11 213:24 215:16,20

**representing**
8:6

**request**
131:5 136:15 141:4

**required**
7:2 101:13

**requiring**
141:17

**Research**
20:20 21:4,13 22:1

**researched**
101:16

**resell**
152:24

**residence**

9:23 25:5

**residences**
9:21

**resign**
83:24 84:1 85:6

**resigned**
84:14,25 85:3,9 88:1,11
110:3

**resigning**
87:24 96:19

**resolution**
157:19,23 158:1,6,9

**Resort**
23:9,10,25 24:15,18,23 25:1,
10,19,25 26:4,24 27:9 28:19,
22 29:2,4,9,12,15,22,25
30:2,4,7,8,10,12,15 31:6,14
33:12 84:22,24 180:9

**respect**
39:21 41:1 46:3 48:19 61:11,
18 73:15 89:25 90:3 92:25
98:14,20 100:14 119:5
129:11,14 137:12 174:11
175:3 178:19 253:9

**respond**
7:16 132:7,9 172:25

**responded**
91:4 129:1 189:2

**responding**
115:25 225:11

**responds**
227:24

**response**
41:14 48:3 62:13,25 125:21
127:19,20 129:2 225:20
226:2 228:1

**responsib-**
19:8

**responsibilities**
16:21 20:5 57:17 74:15

**responsibility**
208:12

**responsible**
90:13

**responsive**
48:11,16 165:21

**rest**
98:20 129:17 194:10

**restate**
188:9 244:13

**result**
238:22

**retained**
46:6

**return**
23:5 86:8

**review**
47:23 48:11,16 53:24 54:1,2
58:22 67:20 82:12,15,16
83:5 93:14,17 102:10 183:7
184:4

**reviewed**
48:3 93:12,20 102:19 217:17

**reviewing**
102:2

**revise**
75:7,12,15,18 76:20 77:21,
25 78:10,17

**revised**
75:22

**revising**
75:21

**revisions**
76:3 79:5

**rewarded**
118:7,10,14

**RIA**
100:11,20,24 101:4,6,10,13,
18

**Richards**
234:23 235:11 236:4,17
237:2 258:11,17,18

**ride**
245:11

**rifle**
168:25

**ring**
181:25 192:19

**ringing**
146:7

**risk**
117:19

**Rod**
191:10

**role**
22:19 72:5 73:15 213:3



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                    Amazon.com, Inc., et al. v. WDC Holdings LLC

214:5 245:5,7 246:15,16
249:2 251:15,18,21,23,24,25
252:19

**roles**
100:4 175:22,24 252:2,3

**Roman**
10:12

**rough**
21:20 53:14 56:20 259:12,22

**roughly**
11:24

**row**
225:4

**rules**
6:25 103:2,6

**rumor**
198:4

**run**
178:1,13

**RV**
25:12,13 26:6 29:5,9,14,17
30:11,24 31:5,25 32:1,4,7,
15,16,20,24 33:5,16,25 34:3
88:7 249:3

**RVING**
248:21

---

### S

**safe**
209:15

**Safier**
5:15

**salary**
53:12

**sale**
132:22 154:5,21 155:17
156:2,5,8

**sales**
227:23

**same-day**
237:24

**San**
19:1,2

**Sara**
5:19 6:17 191:14 259:20

**Sarah**
5:15

**saved**
159:23

**Schedule**
218:11

**scheme**
132:18,21 150:14,23 151:1
185:2 209:12,16,25 210:1,9
245:6,7

**school**
10:13,15

**scope**
133:1

**Scott**
25:23

**screen**
42:1 106:19 223:2 227:7

**screwed**
171:21 172:4 174:14

**scroll**
42:20 58:24 59:5,15 61:20
183:19

**seal**
144:12,19,20

**seal's**
144:9

**sec**
41:7 44:7,19,21 45:7,11,14
75:8 87:13 97:10,14 100:8,
21 101:14,21 102:3,4,14,18,
23 103:2,6,13,14,25 104:10
128:19,22 132:2,5 158:11
194:11

**second-to-last**
130:19

**secret**
66:14 80:5,9 250:13,21,23

**section**
62:1

**sector**
104:1

**securities**
11:10,11 19:21 39:21,24
41:3 45:3,8 46:5 101:18
102:15

**security**
111:2 117:11 132:19

**self-employed**
17:7

**self-fund**
27:1

**sell**
16:22 127:4 153:14

**selling**
16:22

**send**
41:16 61:24 62:9 64:25
76:21,24 77:22 78:11 81:14
107:22 108:2 109:7 110:6,
11,17 128:17 129:9 130:9
207:3 223:19

**sending**
63:1 130:13 132:13 162:3
188:20,24

**senior**
22:15

**sense**
7:21 47:12 211:17,21

**sentence**
54:25 55:5 60:6 62:10
110:22 120:18 129:17 136:6
153:18 157:18 166:10,18
167:6,8,9 171:16 174:17

**sentences**
62:7 147:22

**separate**
63:3 95:20 161:12

**series**
184:21

**served**
203:13

**services**
5:16 12:25 73:22 79:15 80:2

**setting**
256:18

**shakes**
109:8

**share**
14:16 97:9 122:25 136:4,7
163:18

**shared**
130:20 145:18 163:7 164:4
175:6

**sharing**
221:24

**shock**
154:7

**shootings**
168:18

**shop**
26:10

**short**
40:13 142:6

**short-lived**
18:1

**shortly**
5:24

**shoulders**
75:1

**show**
106:12 134:17 143:17,24
153:22 162:6 178:1

**showed**
44:15 145:11 218:3 226:15
250:2

**showing**
53:22 144:8,20

**shown**
144:21

**shows**
106:23

**sic**
11:12

**side**
64:6 85:15 90:7,10 91:14,17,
21 94:11 95:17 100:9 103:9
123:18 126:20,24 127:2
204:18,19,22 205:1 208:6
212:7,8

**sign**
40:15 136:9

**signature**
139:20

**signed**
79:8 139:23 140:23 141:4,7
144:25 151:18,23 154:5
251:11

**significant**
60:11 244:7

**signs**
84:12

**similar**
121:18,20 124:5 217:16

**simple**
78:13,17



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                        Amazon.com, Inc., et al. v. WDC Holdings LLC

**simply**
210:11

**sit**
201:13 207:25

**site**
201:24

**sitting**
246:3

**situation**
176:23

**size**
220:5

**slow**
226:25

**small**
20:6 195:24

**smaller**
220:7

**Smart**
5:25 17:9 37:19,23 38:2
105:20 106:1,6 144:9,14
191:14,19,22 192:1 196:3,8,
10 197:24 201:6 207:23
208:16 209:18 211:19,23
215:3,5 218:18 219:1,16
220:4,20 221:7,21 222:6,21
224:7 228:20 229:6 230:12
231:4,16,22 232:9,18,25
233:7 236:9 238:2,18 241:13
242:1,16,23 243:8 244:11
245:1,9,23 246:13 256:6,16,
24 259:14,16,19

**smoke**
133:12,23 134:5,8,14

**smoking**
180:22,24

**sociopath**
169:9,18,21,23 170:8,10,12,
15,18,24

**soft**
139:2

**sold**
14:24 121:22,23 122:10,12
126:23 127:1 134:10 155:23
238:11

**solely**
79:22

**solicited**
192:6

**solid**
103:1

**solve**
158:15

**sort**
22:9,19 25:10 28:21 30:5
39:20 82:16 85:16 90:9
101:12 121:24 124:3,17
129:20 130:5,10 139:1
144:18 148:23 150:3 153:22
158:13 168:22 172:5 186:14,
17 189:12 212:20 215:4
220:8 238:20 244:21

**sought**
45:12

**sounds**
72:24 182:1

**sourcing**
20:6 22:11

**space**
222:19 249:4

**Spanish**
9:24 195:4

**speak**
48:24 81:16 181:21 182:10
192:24 201:20,23 203:25
204:3 229:7,25 231:14
234:6,17,20,23 235:8,11

**speaking**
149:19 233:16,17

**specific**
15:1 18:25 29:21 45:4 87:6,7
89:6,14,18 94:15 95:11
102:25 116:15 164:19
198:19 200:4,8 206:8 207:25
234:6,12 235:7 237:1

**specifically**
8:9 103:24 197:10 200:19,21
223:24 236:23 250:15

**specifics**
90:24 91:22 103:15 114:20,
21 122:9 124:25 138:7
172:15 173:2 175:13 177:9

**speculate**
78:2 147:3

**speculation**
123:2 127:12 141:24 207:19

**spell**
9:2 35:15 52:8,9 99:17
258:15

**spelled**
9:4

**spend**
10:20

**spent**
10:19

**spoke**
47:8 103:14 122:22 145:20
182:14 192:21 203:25 204:3,
11 208:8 225:2

**spoken**
181:11 194:12 201:18,20
208:5 236:10

**spreadsheet**
28:21

**staff**
66:5

**staffing**
15:21 16:1

**stand**
136:18

**stands**
173:7

**start**
24:2,3,15 85:17 167:21

**started**
13:20 24:8 106:5 233:13

**starting**
55:1,11,15 60:6 62:7 110:23
118:1 120:18 129:18 180:18

**starts**
55:8 174:18

**state**
5:17 9:1

**stated**
185:1,19 257:22

**statement**
113:3 148:3 185:13,23 186:2

**statements**
102:6 142:19 149:25 208:12

**states**
5:11 25:17 118:9

**stay**
126:12 249:3

**stayed**
184:11

**Staying**
236:22

**steer**
198:12 200:17

**steering**
199:23

**step**
181:18

**Sterling**
76:22 80:25 81:10,17,20
82:1,5,8 83:6 101:6 172:6,8
173:9 175:8 176:8 240:15
252:23 253:4,8,25 254:4,9

**sticker**
42:23

**Stokes**
165:14 166:8 181:25 182:8,
10

**stores**
13:17

**straddled**
81:6

**straight-shooter**
247:23

**strategic**
62:8

**streamlined**
60:3

**strike**
34:7 45:10 72:13 79:20
82:15 89:23 92:11 98:7
110:16 112:9 132:21 133:7
150:24 155:12 169:13
176:11 187:18 188:10
201:17,22 212:2 230:5
239:22 254:7 257:12

**strong**
166:20,23 167:4 177:24

**strongly**
101:9

**structure**
30:2 60:17,21 61:11,13
121:25 235:13 257:9

**stub**
185:10

**stuck**
194:9

**stuff**
26:22 40:15 177:9 206:15
236:11

**style**
212:4



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

**subject**
43:17,20 54:18 152:23
153:20 179:21

**submit**
50:22 51:5

**submitted**
161:1

**subpoena**
41:11,14 45:17,20 46:18
47:10 48:2,4,11,16 165:21

**subsequently**
230:20 245:18

**substitute**
14:7,9,23

**success**
56:15

**successfully**
56:13

**sued**
39:8

**suggest**
61:14

**suggests**
153:18

**Suite**
5:7

**summarized**
153:21

**summary**
147:23 148:4

**Supplemental**
143:17

**Support**
143:16,17

**suppose**
168:6

**supposed**
42:2 146:3

**surmise**
123:22

**surmised**
123:20 124:1

**surprise**
154:4 164:13,17 167:3
200:4 226:6 250:25 251:6,9

**surprised**
71:18 167:5 174:4,7,8 201:5
226:4

**suspect**
122:5 123:12 133:12 193:15

**suspected**
122:4 123:10 244:18

**suspicious**
230:7

**sworn**
6:12

---

## T

**Tab**
222:15 226:21 239:24

**taking**
53:23 114:12 117:23 142:24
172:12 176:22

**talk**
7:8 36:17 49:14,17,22,25
61:8 81:14 121:11 125:16
200:23 202:1 224:25 226:23
236:1,20 257:14,20 258:10

**talked**
178:25 193:4 194:12 198:8
200:22

**talking**
63:2 64:11,14 66:3 81:22
88:1 102:16 113:18 121:10
176:10 193:25 200:7 256:13

**talks**
60:3 157:18

**tangible**
70:4 79:9 86:15 119:15
120:4,7,8,13 121:9 133:11
196:20,23 211:12 245:25

**target**
64:22 67:4

**targeted**
67:7

**taxes**
255:23

**teacher**
14:7,9,23

**team**
98:20 99:6,9 166:4 184:22
208:2

**technically**
18:4 30:7 98:17

**TEKSYSTEMS**
15:22 16:6,7

**telephone**
149:3

**telling**
157:25 196:25 200:7 225:10
250:7

**template**
217:16

**temporally**
48:5

**Ten**
259:18

**tendencies**
169:24

**tension**
31:21

**term**
10:12 34:4 102:14 108:18
115:2 154:20 204:18,22
205:7 220:22,23

**terminology**
126:22 152:6,17

**terms**
95:24 118:4,20 124:5

**Terraspec**
17:20,25 18:1 24:14

**test**
62:11

**testified**
6:13 18:16 33:25 40:4 60:23
69:20 78:24 87:15 91:13
92:20 103:12,16,19 107:14
111:21 128:16 147:5 179:23
209:10 210:5 230:17 245:4
251:1,7 257:4,13

**testify**
87:12 201:16 250:11,22

**testifying**
8:23 100:8

**testimony**
8:15 43:18,21 67:11 97:7,13
104:4 150:17 154:8 211:14,
16 257:7

**testing**
62:14

**Texas**
25:18

**thing**
47:17 66:9,10 70:4 84:4,6,9,
11 96:18 103:25 108:3,4,6
109:4,9 123:21,23 137:9

153:22 244:7 254:18

**things**
13:3 72:6 84:8 91:2 150:2,4,
5,7 152:9 168:19 169:25
194:9 235:2 244:19 246:2
248:8

**thinking**
67:1 78:3 79:3

**third-party**
98:2 181:20

**thought**
86:7 99:15,25 128:19 131:15
133:4,6 137:9 160:6 169:17
170:14 172:7 198:25 210:15
243:5 249:17

**thoughts**
148:24 170:19,20 178:12

**thread**
239:19 249:22,23

**threat**
111:2 117:11

**threaten**
171:13

**threatened**
168:9,12

**three-minute**
126:18

**threshold**
101:11

**Tim**
49:22,25 113:22 234:14,15,
16

**time**
5:4 8:1 11:19 12:22 15:7
16:12 18:21 20:8 21:9 22:17
27:10 29:23 46:1 48:20
51:18 54:2 55:9,10,19,21
58:22 63:2 66:19 75:2 77:13
81:21 84:20 85:9 86:20,22
93:15,16 96:11 108:14
110:1,7 111:6,8 120:10,13
122:18,22 130:16 135:15
138:8,9,11,12,17,19 139:16
140:20 142:5 145:20 154:18
158:3 160:20 164:22 165:1
170:13,14,16,17 171:10,13
172:9 175:20 178:22 185:3
187:2 190:13 196:5 201:21,
23 204:10 218:5 220:6
226:12 230:6,14,15 235:7
236:14 242:20 244:5,14,18,
21,22 246:22 250:17 259:5,



CONFIDENTIAL

Danny Christopher Mulcahy                          Amazon.com, Inc., et al. v. WDC Holdings LLC

16,22

**times**
40:7 186:23 215:22 225:1
235:16 254:22 257:22

**timing**
47:13

**tipping**
220:8

**title**
14:3 16:16 21:3 27:3 52:7
57:14 74:24 100:23 106:20
119:1 124:14 217:7 247:10

**titled**
143:15 161:16 218:9

**today**
7:11 8:13,24 46:10,13,17,22
47:11 48:23 49:23 145:11
194:24 201:14 204:18 209:7
218:3 226:15 242:20 246:22
249:15,16 250:16,22 254:5,
10 257:4

**today's**
5:4 6:25 48:12

**told**
69:24,25 70:16 78:9 92:14,
21,22 114:19 125:14,23
127:20 141:1 149:20 150:20
151:4 157:13 185:14 200:13,
15,18,19,21,25 209:25 218:4
224:4 236:23 237:2 248:4,8,
22,24

**tools**
210:12

**top**
106:7 135:3 223:19 224:4
225:19

**topics**
196:11

**total**
21:18 32:7 52:22 53:4 71:21
223:22 227:22 229:1

**touch**
126:12

**track**
14:19 28:18 213:15

**trained**
19:17

**training**
19:15 170:1 210:20

**transaction**
81:4 124:3,9,24 125:9 128:2
136:22 153:11 154:6,10
157:1 177:6 237:5,8,12,16,
21,23 238:16

**transactions**
80:20,23 81:10 82:10,13,17
174:11 178:19 185:1 193:15,
19,23 202:11 203:15

**transcribing**
7:6

**transcript**
259:12,17,22

**transferred**
230:20 245:19

**transition**
15:14

**transitioned**
15:8 16:2,7

**transitioning**
233:23

**transparency**
103:10

**transparent**
214:12,16,17,23

**transpired**
206:12

**treat**
56:24 216:9 241:15

**treated**
86:17,25 233:3

**treating**
103:10

**treatment**
85:14,17,19 87:5,12,18,23
88:3 90:7,10

**tree**
176:25

**trip**
112:23 239:19,20 240:16,19,
22,24 241:1,22 242:5

**Tripoint**
22:3,15,22

**trips**
241:17 242:7

**true**
166:24 203:19 208:13

**trust**

151:9,10,11 163:20 164:7,11
217:12,14 218:10 225:6,15
226:9 229:2 230:1,8,20
232:13,21 234:5,18,21,24
235:4,12 236:6 243:25
244:6,15,25 245:18 247:7
248:1,9 250:12,21 251:1,7,
12 256:10,19 257:6,11

**truth**
7:3

**truthfully**
8:24

**turn**
50:18 129:19 139:17 156:20
196:3 208:13 240:9

**type**
11:6 26:22 95:1 105:9
134:16 219:13 221:3,13
222:3,20 228:14 229:12

**types**
90:12 236:16

**typical**
8:7 215:25 228:21

**typically**
176:17 221:22 228:17
233:11

---

## U

**Uh-huh**
111:11 113:6 173:10 179:5
206:20

**Uhm-um**
129:5

**Ullery**
6:4

**ultimately**
74:25 86:9 98:3 199:21,22
213:2 214:2

**umbrella**
30:6,9,18,22 74:15 90:10

**underneath**
29:25 30:3

**understand**
7:4,9,13 8:10 13:4 46:9
55:14 59:18 108:18 115:5
140:4,11 144:2 146:25
147:17,25 154:21 166:13
179:8 181:16 194:25 202:18,
21 251:14,18,21 252:15
253:13,18

**understanding**
31:1 45:4 46:12,21 60:13
72:2 73:9 78:8,16 79:14,19,
21 86:10,17,19,24 103:1
113:7,12 114:23 116:5,10
118:13 119:16 120:5 121:17
133:18 134:5,12 150:1,5,22
151:1,16,21 155:16,21 157:9
164:3,6,9 168:17,25 169:2,4
177:16,19,23 202:10 228:25
230:18,23 244:4 245:5,6
246:1,7,8,9 250:12,20
253:21 255:16

**understood**
37:15 38:22 52:15 63:13
83:7 115:4 126:19 127:4
132:25 141:10 152:9,10
203:12 251:17

**underwriting**
20:6

**undisclosed**
204:20

**unequal**
85:14,17,19 87:5,12,18,22
88:3 90:7,10

**United**
5:11

**University**
11:1

**UNLV**
10:23 11:1

**unreasonable**
221:9,11

**unscrupulous**
109:19 118:7,11,15 119:5
123:9,13,17 197:7,11

**unstable**
169:8,11,14

**unusual**
233:19,23

**updated**
60:3

**updates**
141:17,20 142:3

**upload**
106:4,6

**upset**
118:5



EXHIBIT 5

CONFIDENTIAL

Danny Christopher Mulcahy                                    Amazon.com, Inc., et al. v. WDC Holdings LLC

---

**V**

---

**vacancies**
187:21

**vague**
13:6 48:8 62:19

**vaguely**
94:16 240:12 250:6

**valuable**
222:12

**variances**
217:18

**varying**
200:10

**Vegas**
5:7 9:11 11:2 12:16 13:19,20
14:25 15:24 16:15,16 17:1
18:11,12 25:8 71:9

**Venator**
13:16,23 14:1,6

**vendor**
189:20

**vendors**
98:2

**venture**
19:22 20:3,17 161:15 215:22

**Ventures**
6:2 196:11

**veracity**
203:9

**verbal**
7:16

**Verified**
106:21

**version**
40:13 105:14 106:9,10,13
140:23 141:4 183:11 217:15,
19,25 250:3

**versions**
184:4 217:20

**versus**
5:9 211:9,12

**video-recorded**
259:3

**view**
14:17

**viewing**
106:20

**Vill-**
151:11

**Villanova**
151:10 163:20,25 164:3,7,11
217:12,14 218:10 225:5,15
226:9 227:22 228:2 229:2
230:1,20 232:13,21 234:5,
18,21,24 235:4,11 236:6
243:25 244:19 245:18 247:7
248:1,9 250:12,20 251:1,7,
12 256:10,19 257:5,10

**violate**
40:19 231:1,8,11

**violating**
102:23 103:5

**violation**
39:23 90:6 160:1

**violations**
45:3,8

**Virginia**
5:12 112:2,10 122:13
124:13,15 153:3,15 154:22
155:18 180:14

**visit**
112:15

**voice**
72:23

**volume**
37:20

---

**W**

---

**wait**
210:22 214:24 222:16

**walk**
13:4 110:20

**wanted**
24:5,7 44:21 63:19 72:1,3
84:15 96:18 125:16 229:1
231:19 248:23

**Warner**
28:11

**water-cooler**
236:19 257:14,20 258:10

**Watson**
5:20,22 6:19 28:14 52:4,24
54:6,21 59:3,23 63:19 67:14
69:18,25 70:16 72:3 75:1,7,

12 76:14,17 77:14,18 78:16
86:4 87:2 88:10,21 90:15,17,
20 91:4 92:4 93:2 95:21
96:1,12,15,16,20 98:6,10,11,
14,17 99:9,11 101:8 112:12
114:4 118:12,13,25 119:8,
10,13,25 120:11 124:4
125:3,6 132:14 142:23
164:6,9 168:7,19 169:5,10,
14,18,20 170:8,11,15,24
190:4,18 191:3,7 192:10
194:4,13 198:8,11,18,21
212:1 214:2,12 215:13
223:5,18,24 227:21 228:25
229:25 230:18,25 231:7,10,
19 232:12,20 234:7,20
236:5,11,12,13,15 238:13
239:9 240:10,22 241:15,21
242:8,14,21 243:4 246:17
247:6 248:5,8 251:12 258:5

**Watson's**
56:11 75:1 95:4,7 97:16
101:9 178:17 190:7 212:3
215:24 224:18 225:11,20
227:9

**ways**
35:12 75:18

**WDC**
5:9,20 6:19 23:2 43:23 44:25
45:1,5,8 55:20 115:12 116:5
133:2 217:12,13 253:23
254:1,8

**weak**
99:7

**wealth**
60:11

**website**
35:10,19 36:3 101:21 102:2,
8

**week**
66:11 141:17

**weekly**
66:4,7 231:25

**whatsoever**
148:19

**whistleblower**
39:17 103:17,20,21,22,23
104:1,7,8 128:20,22

**White**
154:12,15,20 155:1,21,23
156:2,10 180:4 237:4,7,12,
24 238:9,15

**widen**
55:19

**wife**
24:20,24 25:25 49:2,6,9

**wife's**
24:21

**wiggling**
42:5

**William**
176:9

**win**
199:22

**wire**
185:11 193:15,19,23 196:23

**wires**
193:14 194:7

**wit**
38:4 119:23 140:10

**woman**
247:22

**word**
82:14 105:4 129:24 140:7
152:19 204:19 245:24

**words**
198:19 199:5,7

**work**
12:7,17 13:9,22 14:23 15:3
16:3,8,18 17:6,24 18:12 19:4
20:25 21:6 22:9,16 23:8 24:7
25:10,19,25 26:3,12 27:5
36:5,8 57:22,23 68:17 70:17,
18,21 72:1,3,7 73:19 80:22
82:9 84:2,3 96:12,15,16
101:3 138:17 173:11 176:1,
5,6 189:15,18,21,23 190:8
192:4 251:25

**workamper**
249:2

**worked**
27:8 35:1 52:15 66:19,23
73:3,6 95:22 96:1 98:14
102:22 126:9 131:24 137:13
152:22 153:5,7,11,12,14
177:10 178:3 191:3,7 224:15
236:18 241:16 247:12,15

**working**
12:11 13:1,9 14:5,22 15:8
19:22 20:2 22:25 109:25
126:1,10,20 162:23 176:9
177:8 180:14 192:7 205:11
247:19 259:18

---



CONFIDENTIAL

Danny Christopher Mulcahy                              Amazon.com, Inc., et al. v. WDC Holdings LLC

**works**
179:23

**world**
168:19

**worry**
181:15

**worth**
94:1,3

**wow**
226:3 228:6

**WPC**
155:4 156:13

**write**
128:25

**writing**
248:3

**wrong**
104:11,13,16 105:14 124:14
179:10

**wrongdoing**
104:20

**wrote**
147:4 174:4

**Wyckoff**
59:23,25

---

Y

---

**year**
11:4 13:25 15:5 17:4 18:2
19:5 20:1 23:3 110:5,7
192:14 205:15

**years**
9:14 10:19,20 11:21,22
12:18 13:24 15:3 16:19,20
21:7,8 63:12 68:8,16 104:19
177:25 186:23,24 192:13
215:21

**Yellow**
42:23

**York**
22:3

**Yousri**
135:20

---

Z

---

**Z-E-I-T-E-R**
35:17

**Zacks**
20:20 21:3,12,25

**Zealand**
240:16

**Zealand/australia**
240:15

**Zeiter**
35:14

**Zoom**
5:24 6:3 7:12 17:16

**Zweibrücken**
10:14,17

