IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., <br><br>     Plaintiffs, <br><br>   v. <br><br> WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; CARLETON NELSON; JOHN DOES 1-20, <br><br>     Defendants. | CASE NO. 1:20-CV-484-RDA-TCB |
| 800 HOYT LLC, <br><br>     Intervening Interpleader Plaintiff, <br>     Intervening Interpleader Counter-Defendant, <br><br>   v. <br><br> BRIAN WATSON, WDC HOLDINGS, LLC, BW HOLDINGS, LLC, <br><br>     Interpleader Defendants, <br><br> AMAZON.COM, INC., and AMAZON DATA SERVICES, INC., <br><br>     Interpleader Defendants, <br>     Interpleader Counter-Plaintiffs. | |

**RECEIVER'S SECOND QUARTERLY REPORT**
**(QUARTER ENDING MARCH 31, 2022)**

Mark A. Roberts (the "Receiver"), as receiver of WDC Holdings LLC dba Northstar Commercial Partners LLC ("WDC"), R. Brian Watson ("Mr. Watson" and together with WDC, "Defendants"), and Defendants' respective assets, by and through undersigned counsel, hereby submits this second quarterly report (the "Second Quarterly Report") covering the period from January 1, 2022 through March 31, 2022 (the "Second Reporting Period").

## I. BACKGROUND

1. On October 27, 2021, the Court entered its Order Granting Plaintiffs' Motion to Hold Defendants Brian Watson & WDC Holdings in Civil Contempt [Dkt. 413] (the "Contempt Order"). The Contempt Order provided that the Court would separately enter an order appointing a receiver pursuant to 28 U.S.C. § 754 and Fed. R. Civ. P. 66, with the full power of an equity receiver and at Defendants' expense, for the purpose of preventing further irreparable harm to Plaintiffs and coercing Defendants' compliance with the Court's Injunction. Dkt. 413 ¶ 2.

2. On November 23, 2021, the Court entered its Order Appointing Receiver and Ordering Turnover of Property to the Receiver [Dkt. 433] (the "Receivership Order"), appointing Mark A. Roberts as Receiver of Defendants and the Assets.[1]

3. The Receivership Order directs the Receiver to provide quarterly reports to Defendants, Plaintiffs, and the Court detailing (i) the Receiver's disbursements for costs incidental to the receivership activities, (ii) any payments to or for the expense of Defendants, and (iii) the Receiver's activities and the financial and operation status of Defendants. *See* Receivership Order ¶ 5(h). The Receivership Order further directs the Receiver to maintain accurate accounting and

---

[1] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Receivership Order.

other records of his activities in connection with the receivership and file reports on a quarterly basis detailing the results from the Receiver's collections, operations, and distributions of the Assets. *Id.* ¶ 16.

4.       On January 18, 2022, the Receiver filed the Receiver's First Quarterly Report (Quarter Ending December 31, 2021) [Dkt. 495] (the "Receiver's First Report").  In the Receiver's First Report, the Receiver provided the Court and all parties with an update regarding his activity from the date of his appointment on November 23, 2021 through December 31, 2021 (the "Initial Reporting Period").

## II.  GENERAL OVERVIEW

5.       While the Receiver's activity during the Initial Reporting Period primarily involved preliminary steps to become familiar with, seize control of, and preserve the value of the Assets in accordance with the Receivership Order, the Receiver's activity during the Second Reporting Period involved greater emphasis on monetizing existing Assets while limiting ongoing expenses, all with the ultimate goal of seeking Defendants' compliance with the Court's Injunction in accordance with the Receivership Order.  Defendants' operations are complex, involving hundreds of different legal entities (many of which are now inactive or no longer affiliated with Defendants), numerous ongoing litigations and disputes, and various active real estate investment assets that typically involve separate capital, management, and ownership structures.  Accordingly, the Receiver's activity during the Second Reporting Period also involved managing, preserving, and maximizing the value of the current Assets.

6.       The Receiver's activity during the Second Reporting Period can be categorized into four primary undertakings.  First, the Receiver managed the current operating Assets (including active real estate projects under Defendants' management) in order to maximize value and limit

3

disruptions.  Second, the Receiver initiated and progressed negotiations with potential counterparties regarding possible transactions to sell or otherwise monetize certain of Defendants' Assets in accordance with the Receivership Order.  Third, the Receiver conducted an analysis of Defendants' historical financial activities after entry of the Injunction to identify the scope and nature of Defendants' compliance with the Injunction and to evaluate whether any transferred assets may be recoverable by the Receiver.  Lastly, the Receiver continued managing a reasonable personal expense budget for Mr. Watson in accordance with the limitations and purpose of the Receivership Order and in light of current available cash resources.

### III. RECEIVER'S ASSESSMENT OF DEFENDANTS' FINANCIAL CONDITION AND OPERATIONS

**A.   Description of Near-Term Financial Situation**

7.   As of today, Defendants have insufficient cash or other liquid assets to begin satisfying the Court's Injunction while also paying the costs of the receivership and the essential personal and business expenses of Defendants.  During the Second Reporting Period, the Receiver consummated certain transactions and pursued collections in an effort to provide immediate liquidity, but cash generated during the Second Reporting Period remains substantially below levels needed to fund Defendants' various ongoing liabilities while also satisfying the Injunction.

8.   Looking forward, the Receiver has identified significant potential sources of future cash recoveries over the next three to six months likely to result from the disposition of certain Assets.  These potential transactions may generate cash that would provide a meaningful contribution toward the Injunction, though the Receiver does not expect such amounts to be sufficient to satisfy the full amount of the Injunction.

9.      Attached as Exhibit A is a chart reflecting potential material transactions and collections that may be forthcoming, as well as an estimated low and high range of potential values. To avoid jeopardizing such values and to preserve confidentiality of various parties involved, the Receiver is seeking authority contemporaneously herewith to file Exhibit A under seal. While there is no certainty these projected amounts can be realized, discussions with relevant counterparties remain ongoing and the Receiver believes certain of these collections are likely to occur in the next three to six months.

10.     Attached hereto as Exhibit B is a chart reflecting the results of cash receipts and disbursements during the Second Reporting Period for Defendants and their wholly owned entities on a consolidated basis.[2] Total receipts for the period were $1,457,840 (including $530,000 in gross proceeds from the sale of a condo unit owned by WDC and $617,070 in insurance proceeds that were paid out to five different law firms), and total disbursements were $1,405,526 (including $418,698 to pay off the sold condo's mortgage and $617,070 for the aforementioned legal fee payments from insurance proceeds), for net cash flow for Defendants of positive $52,314. Receipts include proceeds from asset sales as well as fees earned for providing property management or other services. Disbursements included partial payments for the costs of the Receiver and his advisors, funding of the monthly budget for Mr. Watson's personal expenses, and certain operating expenses of the businesses, such as payroll and accounting. The total ending cash balance as of March 31, 2022 for Defendants' wholly owned bank accounts managed by the Receiver was $125,821.

---

[2] The chart on Exhibit B does not reflect receipts and disbursements with respect to special purpose entities that own real estate assets where the Receiver acts as manager for the entity or property, as those cash activities are specific to the properties and do not reflect Defendants' financial condition.

11. In addition to Defendants' obligations with respect to the Injunction, Defendants have substantial obligations owing to other third parties incurred prior to the entry of the Receivership Order, including federal and state taxes (approximately $880,000), personal and business loans (approximately $11,100,000, with certain amounts secured by collateral, including the C Lazy U Ranch property), unpaid legal fees (approximately $1,750,000), office lease termination damages (asserted liability of approximately $1,500,000), credit card obligations (approximately $50,000), as well as outstanding debt guarantees that Mr. Watson provided personally with respect to loan obligations of certain real estate investment entities. At present, these creditors are prohibited from pursuing collection actions against Defendants by operation of the stay in Paragraph 11 of the Receivership Order.

  **B.**   **Analysis of Defendants' Financial Activity During Injunction Period.**

12. To evaluate Defendants' compliance with the Injunction and the potential recovery of any improperly transferred assets, the Receiver undertook an historical review of Defendants' transactions and financial activities during the period between the Court's entry of a temporary restraining order on April 28, 2020, and the Court's appointment of the Receiver on November 23, 2021 (the "Injunction Period"). The Receiver's review focused on primary source documents, including bank statements, check copies, deposit slips and credit card statements, relating to accounts controlled by Defendants. In addition to reviewing bank statements and other relevant documents, the Receiver and his advisors interviewed certain additional parties with knowledge of key transactions, including an employee of WDC and certain investment partners.

13. A copy of the Receiver's report (the "Injunction Period Report") regarding Defendants' financial transactions during the Injunction Period is attached hereto as Exhibit C.

14. Based on the Receiver's review, activity for WDC during the Injunction Period appeared fairly conventional. The WDC cash flows reflect a declining business over the course of the Injunction Period, with significantly reduced income as certain assets were sold off. WDC disbursements related primarily to payroll, operating expenses, and accounting and legal fees, though the Receiver noted several payments by WDC (referenced in the report) for Mr. Watson's personal benefit, including luxury car payments, and payments of Mr. Watson's personal credit card bills.

15. Mr. Watson's personal financial transactions during the Injunction Period reflect a high level of spending on luxury and lifestyle items, notwithstanding the pending Injunction. During the Injunction Period, Mr. Watson personally collected approximately $3.0 million from various sources, and spent $3.0 million, leaving a final balance in his personal accounts of $856 on the date of the Receivership Order. Of the approximately $3.0 million spent over the 19-month Injunction Period, approximately $214,000 was spent on luxury travel and shopping, $342,000 on principal and interest mortgage payments for his personal residence (acquired in February 2020, just prior to the Injunction Period, for $6.6 million), $199,000 on furnishings and artwork for his personal residence and the C Lazy U Ranch home (which was recently constructed by Mr. Watson for more than $5.6 million), $197,000 on other house expenses (such as interior design and landscaping), $76,000 on luxury car lease payments, $62,000 in cash withdrawals, $34,000 in Venmo payments for unspecified purposes and $9,000 in country club costs. Mr. Watson also granted liens during the Injunction Period against his personal residence totaling $2.4 million and borrowed approximately $150,000 against a bank line of credit.

16. Further information regarding the scope and findings of the Receiver's analysis are set forth in the Injunction Period Report.

### C.     Management of Mr. Watson's Personal Expense Budget

17. Under the Receivership Order, the Receiver may "authorize and approve, in his sole discretion, a monthly budget of $10,000 for [Mr.] Watson's personal expenses, subject to the Receiver's authority to approve, in his sole discretion, advance written requests for specific personal expenditures in excess of this amount up to a monthly total of $50,000." Receivership Order ¶ 5(c). Any monthly expenditure for Mr. Watson's personal expenses in excess of $50,000 requires Court approval. *Id.*

18. Based on the Receiver's review of Defendants' financial activity and available assets, the Receiver developed a $12,000/month personal expense allocation for Mr. Watson (the "Budget"). In addition to the Budget amounts, which have been funded on a monthly basis, the Receiver has separately funded various other personal expenses upon request, including payments for Mr. Watson's family members, medical bills for Mr. Watson's family, travel for Mr. Watson in connection with depositions and other litigation activities, and other specific expenses that the Receiver determined would preserve Defendants' assets or otherwise further the purposes of the Receivership Order. The Receiver, however, has rejected numerous requests from Mr. Watson for additional funding of matters the Receiver believes are not consistent with the Receivership Order, including luxury car payments, credit card charges incurred in violation of the Receivership Order, and other similar items. Of the $36,000 Budget allocated to Mr. Watson for the three-month Second Reporting Period, Mr. Watson elected to spend nearly half of this amount on luxury car lease payments (approximately $3,600 per month) and spousal maintenance ($3,000 per month), leading to limited liquidity for his other personal expenses.

19. During the Second Reporting Period, the Receiver has spent a substantial amount of time and resources addressing numerous disagreements with Mr. Watson regarding the funding of his personal expenses. Mr. Watson asserts that the $12,000/month allocation covers less than 30% of his personal monthly expenses (reflecting annual cash needs of approximately $500,000), and has routinely asserted that the Receiver's refusal to fund additional amounts constitutes a malicious and deliberate effort by the Receiver to destroy Mr. Watson's reputation and personal financial affairs. Mr. Watson has also made various threats of forthcoming litigation claims against the Receiver in connection with the marketing of C Lazy Ranch U property, after the Receiver made an adjustment to the property's asking price (now $8.75 million) to better reflect market value (as determined in consultation with the broker previously retained by Mr. Watson). By the Receiver's count, Mr. Watson sent more than 1,200 emails to the Receiver and his professionals during the First and Second Reporting Periods (averaging more than one dozen emails each business day), a substantial portion of which include demands for payment and/or express or implied threats by Mr. Watson that he will pursue damages from the Receiver.

20. While the Receiver has sought to limit these adversarial interactions with Mr. Watson,[3] addressing his frequent demands and threats has resulted in a substantial drain of time and resources of the Receiver and his professionals during the Second Reporting Period. The Receiver will continue working with Mr. Watson and endeavoring to resolve his concerns.

---

[3] For several weeks during the Second Reporting Period, by agreement of counsel to the Receiver and Mr. Watson, Mr. Watson agreed not to send emails directly to the Receiver, and instead sent emails to his counsel, which were forwarded to the Receiver's counsel. Accordingly, the email totals reflected above do not include emails forwarded via counsel during this multi-week period. Mr. Watson has since resumed sending emails directly to the Receiver.

**D.     Status of Escrowed Proceeds from Sale of Residence**

21.     In the Receiver's First Report, the Receiver described Mr. Watson's attempt to consummate a sale of his primary residence (owned by his personal revocable trust) in December 2021 for $8.5 million without the approval of the Receiver.  As noted in the Receiver's First Report, in October 2021—while the Injunction was pending and just days before the Court's entry of the Contempt Order—Mr. Watson voluntarily executed deeds of trust to record liens on this residence in favor of certain beneficiaries, including a $500,000 lien in favor of Mr. Watson's legal counsel in this action, Brownstein Hyatt Farber Schreck, LLP ("Brownstein"), and a $1,350,949.62 lien in favor of FirsTier Bank ("FirsTier"), a lender to Mr. Watson and his entities, without disclosing such grants to the Court or the parties.

22.     After the Receiver obtained an emergency order from this Court confirming the Receiver's authority to control the disposition of the residence, the Receiver negotiated and executed escrow agreements with the second, third, and fourth lienholders to provide the Receiver sixty (60) days after closing of the sale to evaluate the validity and enforceability of the asserted liens.  During the Second Reporting Period, the Receiver concluded that he had sufficient grounds to challenge the validity and/or enforceability of the liens asserted by Brownstein and FirsTier.  The amounts attributable to Brownstein's and FirsTier's liens therefore remain pending in escrows.  Discussions between the Receiver and Brownstein and FirsTier, respectively, regarding any potential resolution of the lien challenges remain ongoing.  The Receiver has requested certain information from FirsTier in accordance with Receivership Order to evaluate potential causes of action, but FirsTier has to date failed to comply with such requests.  Absent resolution, the Receiver may pursue claims to avoid the improvidently granted liens and seek other relief in accordance with the authority provided in the Receivership Order.  *See* Receivership Order ¶ 5(j)(f)

10

(authorizing Receiver to "institute, defend, settle and/or adjust disputes and claims respecting the Assets, including any claims to avoid transfers made with the purpose or effect of diminishing Defendants' capacity to comply with the Injunction and any claims to recover amounts that were both related to the Amazon transactions and disbursed in violation of the Injunction after it was entered on June 5, 2020").

### E. Description of Receiver's Activities

23. The Receiver's activities during the Reporting Period include:

- Managing Defendants' bank accounts (presently 12), including accounts owned by legal entities under the direct and indirect control of Defendants;

- Acting as asset manager and/or property manager for certain real estate assets managed by Defendants;

- Funding amounts to Mr. Watson's current personal bank account in accordance with the Budget, and communicating with Mr. Watson regarding requests for additional funding;

- Managing real estate assets directly controlled by the Defendants, including completing the sale of the condo owned by WDC (resulting in $74,181 in net proceeds) and marketing for sale the C Lazy U Ranch property owned by Mr. Watson;

- Preparing cash flow forecasts to evaluate projected cash needs and availability;

- Evaluating proposals for the purchase of Defendants' interest in certain assets and engaging in preliminary negotiations regarding such proposals;

- Reviewing and managing various current and past due expenses and liabilities incurred by Defendants prior to the Receiver's appointment;

- Coordinating with tax professionals to complete tax documents required for certain assets managed by the Defendants;

- Responding to investor inquiries, providing an investor update and reviewing information submitted by investors;

- Working with current partners in current investments to ensure Assets and partner relationships are preserved;

- Providing notice of the Receivership Order to third parties asserting an interest in or claim against Defendants or the Assets;

- Addressing ongoing litigation involving Defendants, including seeking to stay collection actions against Defendants while preserving and pursuing potential recoveries from third parties;

- Evaluating potential claims and causes of action by Defendants against third parties that may yield recovery for the receivership;

- Continuing a review of asset dispositions by Defendants during the period between the Court's imposition of the Injunction and the appointment of the Receiver; and

- Undertaking other duties to preserve the Assets and administer the receivership, including ensuring continuing of liability insurance, debt service obligations, and evaluating professional fee obligations.

### IV.  RECEIVER'S RECOMMENDATIONS

24. The Receiver is concerned by the administrative costs necessary to execute his duties as set forth in the Receivership Order given the value of the Assets that have been identified to date. Through the Second Reporting Period, the fees and expenses incurred by the Receiver and his professionals have been substantial given the volume of activity necessary to maintain and pursue monetization the Assets, address disputes with Mr. Watson regarding personal expenses and other matters, and complete the Receiver's historical review of financial activity during the Injunction Period. The Receiver previously sought payment of receivership costs from the D&O insurer that is funding Defendants' defense of the litigation, but, as of the date hereof, the insurer has not agreed to pay the receivership costs under the D&O policy.

25. The Receiver and his professionals are endeavoring to complete the substantial activity required by the Receivership Order as efficiently as possible, and professional fees have reduced each month since December 2021. During the Second Reporting Period, the Receiver disbursed: (i) approximately $125,181 for the fees and expenses of the Receiver and his team at

Alvarez & Marsal North America, LLC, (ii) approximately $70,445 in legal fees and expenses for legal counsel at McGuireWoods LLP, and (iii) $1,080 for the Receiver's local Colorado counsel, Fairfield and Woods, P.C. While the Receiver's ongoing processes associated with the Assets have largely stabilized and the Receiver anticipates that monthly receivership fees and costs should be substantially reduced going forward, accrued but unpaid fees of the Receiver and his professionals are substantial. Fees and expenses accrued but unpaid through the end of the end of the Second Reporting Period (including unpaid amounts incurred in the First Reporting Period) total approximately $891,299 for the Receiver and his team at Alvarez & Marsal North America, LLC, and approximately $639,008 in legal fees and expenses for legal counsel at McGuireWoods LLP.

26. The Receiver presently recommends that the receivership continue in place to allow the Receiver further opportunity to pursue value from potentially forthcoming transactions (as reflected <u>Exhibit A</u>) for purposes of the Receivership Order, while also managing Defendants' expenses to avoid dissipation of such assets that are subject to the Injunction.

Dated: April 27, 2022                                              Respectfully submitted,

                                                                                       /s/   *Aaron G. McCollough*
Aaron G. McCollough (VSB 72146)
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
Tel.: (312) 849-8256
Fax: (312) 698-4522
amccollough@mcguirewoods.com

*Attorney for the Receiver*

## Certificate of Service

I HEREBY CERTIFY that, on April 27, 2022, I caused the RECEIVER'S SECOND QUARTERLY REPORT to be electronically filed and served using the CM/ECF System, which will transmit a Notice of Electronic Filing to counsel of record. Additionally, the document and notification of filing will be sent by U.S. Mail to the following last-known address of the following parties:

    Casey Kirschner
    635 N. Alvarado Lane
    Plymouth, MN 55447
    By email: casey.kirschner@gmail.com

                                                                  /s/ *Aaron G. McCollough*
                                                                  Aaron G. McCollough