# EXHIBIT A

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| W.D.C. HOLDINGS, LLC d/b/a NORTHSTAR | ) | |
| COMMERCIAL PARTNERS; NSIPI | ) | |
| ADMINISTRATIVE MANAGER, LLC; | ) | |
| NORTHSTAR COMMERCIAL PARTNERS | ) | |
| MANAGEMENT, LLC; and NORTHSTAR | ) | |
| HEALTHCARE DEVELOPMENT, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-1026-JTL |
| | ) | |
| IPI PARTNERS, LLC; IPI DATA CENTER | ) | |
| PARTNERS FUND I-A, L.P.; IPI DATA CENTER | ) | |
| PARTNERS FUND I-B, L.P.; IPI NSIPI DATA | ) | |
| CENTER HOLDINGS, LLC; DULLES NCP, LLC; | ) | |
| DULLES NCP II, LLC; MANASSAS NCP, LLC; | ) | |
| QUAIL RIDGE NCP, LLC; MATTHEW | ) | |
| A'HEARN; and LUKE GILPIN | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Date Submitted: May 3, 2022
Date Decided: June 22, 2022

Stephen B. Brauerman, Sarah T. Andrade, BAYARD, P.A., Wilmington, Delaware; Christopher O. Murray, Julian R. Ellis, Jr., BROWNSTEIN HYATT FARBER SCHRECK, LLP, Denver, Colorado; *Counsel for Plaintiffs*.

Matthew F. Davis, Justin T. Hymes, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Charles F. Connolly, AKIN GUMP STRAUSS HAUER & FELD, Washington, DC; Stephen M. Baldini, Stephanie Lindemuth, AKIN GUMP STRAUSS HAUER & FELD, New York, New York; *Counsel for Defendants*.

**LASTER, V.C.**

When Amazon, Inc. was seeking partners to build data centers, Christian Kirschner facilitated an introduction between his brother Casey, who worked at Amazon, and plaintiff W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners ("Northstar"), a privately held commercial real estate company.[1] Amazon selected Northstar to build nine data centers on three parcels of land.

To fund the projects, Northstar joined forces with defendant IPI Partners, LLC, a firm that manages two investment funds dedicated to financing data centers. Through affiliates, Northstar and IPI Partners created NSIPI Data Center Venture, LLC (the "Joint Venture") as the entity through which they would develop the data centers for Amazon. Under the limited liability company agreement that governs the Joint Venture (the "LLC Agreement"), a Northstar affiliate managed the day-to-day business of the Joint Venture. An IPI Partners' affiliate controlled the board of managers of the Joint Venture (the "Board of Managers") and had the ability to remove the Northstar affiliates from their roles under specified circumstances, including the occurrence of a "Cause Event."

After several of the data centers were completed, a Northstar employee raised concerns with IPI Partners about payments that Northstar was making to a trust that Christian had established and questioned whether the payments constituted improper kickbacks for Casey and others. A second Northstar employee raised similar concerns with Amazon. Their allegations led to agents from the Federal Bureau of Investigation (the

---

[1] For clarity, this decision refers to Christian and Casey Kirschner using their first names.

"FBI") executing a search warrant at the home of Brian Watson, Northstar's founder and chief executive officer.

Hours after the search warrant was executed, Watson received letters from IPI Partners and its affiliates that (i) removed Watson and the Northstar affiliates from their roles with the Joint Venture and (ii) terminated certain other agreements between the Joint Venture's affiliates and other Northstar affiliates. In each case, the letters asserted the existence of and relied on a particular Cause Event that depended on Watson having personally acted or failed to act as a result of gross negligence, fraud, or willful misconduct (a "Watson Cause Event").

Through this action, Northstar and its affiliates have challenged their removal. They assert that a Watson Cause Event never occurred, so IPI Partners never had the opportunity to exercise its removal and termination rights. They acknowledge that a kickback scheme may have taken place, but they allege that Watson sought and received assurances that the payments to Christian's trust were legitimate. They assert that Watson neither acted nor failed to act as a result of gross negligence, fraud, or willful misconduct.

The plaintiffs contend instead that IPI Partners wanted to own 100% of the economic rights associated with the Joint Venture and used the alleged kickback scheme as a pretext to cut out Northstar and its affiliates. The plaintiffs maintain that by declaring a Watson Cause Event without an adequate basis for doing so, IPI Partners and its affiliates willfully breached the terms of the LLC Agreement, breached the terms of the related agreements with Northstar's affiliates, and committed the torts of conversion and civil conspiracy.

The defendants moved to dismiss the complaint in its entirety. They argue that there was no breach of the LLC Agreement because IPI Partners properly determined that a Watson Cause Event had occurred. The defendants maintain that it is not reasonably conceivable that Northstar's payments to Christian's trust did not provide a sufficient basis for IPI Partners to invoke a Watson Cause Event.

The defendants also argue that even if it was reasonably conceivable that a Watson Cause Event had not occurred, the plaintiffs failed to state a non-exculpated claim for breach. The LLC Agreement contains an exculpation provision which eliminates monetary liability for "Covered Persons" unless the damage arose because of the Covered Person's gross negligence, fraud, or willful misconduct. The defendants argue that it is not reasonably conceivable that the decision by IPI Partners and its affiliates to declare a Watson Cause Event and exercise their removal and termination rights could have resulted from gross negligence, fraud, or willful misconduct. There is some irony in the defendants making this argument, because the same contractual standard—gross negligence, fraud, or willful misconduct—serves both as the trigger for a Watson Cause Event and as the threshold for a non-exculpated claim. For purposes of exculpation, the defendants seek the benefit of the doubt that they refused to give Watson for purposes of the Watson Cause Event.

The defendants separately argue that the plaintiffs failed to state a claim for conversion or civil conspiracy. They assert that this is a contract dispute, nothing more, and that it should not be reclothed in tort guise. The two individual defendants alternatively moved to dismiss the action as to themselves for lack of personal jurisdiction.

3

This is a pleading-stage decision where Northstar receives the benefit of all reasonable inferences. The well-pled facts support a reasonable inference that a Watson Cause Event had not occurred. It is therefore reasonably conceivable that IPI Partners and its affiliates failed to properly exercise their termination and removal rights. The complaint accordingly states a claim for breach of the LLC Agreement. The well-pled facts support a reasonable inference that IPI Partners and its affiliates knew they did not have a basis to invoke a Watson Cause Event but did so anyway because they wanted to cut Northstar out of the Joint Venture. Those allegations give rise to a non-exculpated claim. The defendants' motion to dismiss the claim for breach of the LLC Agreement is denied.

The plaintiffs also have stated claims for breach of two sets of agreements related to the Joint Venture. One set of agreements treated terminations for cause differently from terminations without cause. The defendants terminated those agreements for cause, but the well-pled facts support a reasonable inference that a cause event had not occurred. The complaint therefore supports a reasonable inference that the defendants breached those agreements by terminating them improperly. The other set of agreements required payment of a termination fee regardless of whether the defendants terminated the agreements for cause. The complaint alleges that the defendants failed to pay the termination fee, thereby stating a claim for breach.

By contrast, the complaint fails to state claims for conversion and civil conspiracy. The conversion claim is dismissed because the plaintiffs failed to allege facts supporting the existence of an independent tort, which is a prerequisite for stating a claim for conversion. The civil conspiracy claim is dismissed because the plaintiffs failed to allege

facts supporting the existence of an underlying wrong sufficient to sustain a conspiracy claim.

This decision does not reach the question of whether the individual defendants would have been subject to personal jurisdiction. The claims for conversion and civil conspiracy are the only claims that the plaintiffs asserted against the individual defendants. With the dismissal of those claims, it is not necessary to address the jurisdictional issues.

At the hearing on the defendants' motion to dismiss, the court asked the parties to discuss the possibility of staying this case pending the outcome of related litigation that Amazon is pursuing in federal court in Virginia (the "Amazon Litigation"). The parties seemed amenable to a stay. Two weeks later, however, the parties notified the court that they were unable to agree to a stay. Within thirty days, any party who opposes a stay will show cause why this case should not be stayed pending the final disposition of the Amazon Litigation.

## I.   FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. *See* Dkt. 22 (the "Amended Complaint" or "Am. Compl."). For purposes of the motion to dismiss, the well-pled allegations of the Amended Complaint are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

## A.   The Amazon Introduction

Watson founded Northstar in 2000 as a privately held commercial real estate company. Part of Northstar's business model involved working with individuals who could introduce Northstar to potential partners for new real estate projects.

In late 2016, Northstar established a referral relationship with Christian. Northstar paid Christian $4,000 per month to provide introductions. Christian also received commissions for introductions that led to deals.

In July 2017, Christian arranged for Watson to meet with Casey, who worked as a transaction manager in Amazon's real estate department. Casey invited Northstar to give a presentation to a group of Amazon executives about its real estate development capabilities. The presentation took place in September 2017. The attendees included Casey's supervisor, who oversaw Amazon's data centers in the Americas.

As part of its business model, Amazon contracts with developers to build and own data centers, then lease them back to Amazon. After the September 2017 meeting, Amazon invited Northstar to make a formal proposal for a data center development deal.

In late 2017, Amazon awarded Northstar the opportunity to develop two data centers on land known as the Dulles parcel. Amazon selected Northstar over three to five other bidders. Amazon subsequently entered into the pertinent transaction documents with Northstar affiliates, including development agreements and leases.

Amazon's initial award to Northstar led to additional development deals for data centers on land known as the Manassas and Quail Ridge parcels. In total, Amazon awarded Northstar development contracts for nine data centers on the three different parcels.

Christian asked Northstar to make special arrangements for the commissions he would receive for the successful deals with Amazon. Rather than paying the commissions to Christian directly, he asked that they be paid to the Villanova Trust, which was a trust that Christian had established.

Northstar alleges that because Casey worked at Amazon, "Northstar sought assurances from Christian that none of the monies paid to [the] Villanova [Trust] would benefit Casey or his family while he was an employee at Amazon." *Id.* ¶ 62. Northstar alleges that Christian provided satisfactory assurances, leading Northstar to agree to pay the commissions to the Villanova Trust. Northstar alleges that it paid Christian's commissions "from its share of normal and customary fees as the sponsor and manager of the projects." *Id.* ¶ 60.

According to the Amended Complaint, Northstar now believes that Christian's "assurances may have been false." *Id.* ¶ 64. The Amended Complaint alleges that "Kyle Ramstetter, a former Northstar employee who worked on the Amazon account, may have conspired with one or more persons to divert some of the referral fees paid to Christian to third parties, including himself." *Id.* ¶ 65. The Amended Complaint thus does not deny the existence of a kickback scheme. Instead, Northstar primarily contends that Watson was himself deceived by his representatives such that he did not know about the kickback scheme. *See* Dkt. 42 at 45 ("What we do dispute is that if there was anything untoward going on there, that [] Watson had any awareness of it.").

## B.    The Joint Venture

Northstar needed a financial partner to provide the estimated $500 million in funding necessary to develop the data centers. In early 2018, Northstar selected IPI Partners as its equity partner. IPI Partners manages two investment funds— defendants IPI Data Center Partners Fund I-A, L.P., and IPI Data Center Partners Fund I-B, L.P. (jointly, "the Funds")—that specialize in data center projects.

7

Together, Northstar and IPI Partners formed the Joint Venture. On March 2, 2018, an affiliate of IPI Partners and two affiliates of Northstar entered into the LLC Agreement.[2] The IPI affiliate was IPI NSIPI Data Center Holdings, LLC ("IPI Holdings"), which served as the "IPI Partners Member." The first Northstar affiliate was Sterling NCP FF, LLC (the "Northstar Member"), which served as the "Sponsor Member." The second Northstar affiliate was NSIPI Administrative Manager, LLC (the "Northstar Manager"), which served as the "Administrative Manager."

The LLC Agreement identified Watson as the "Principal." Among other things, Watson represented that as Principal, he would be actively involved in the business and affairs of the Joint Venture and that he owned and controlled Northstar Member and Northstar Manager. *See* LLCA §§ 4.4, 9.2.

The LLC Agreement established a Board of Managers to govern the business and affairs of the Joint Venture. Watson was the "initial Sponsor Board Member." *Id.* § 7.2(a). Defendants Matthew A'Hearn and Luke Gilpin of IPI Partners were the "initial IPI Board Members." *Id.*

As the Administrative Manager, Northstar Manager was responsible for implementing the decisions of the Board of Managers and conducting the day-to-day activities of the Joint Venture. *Id.* § 7.9(a). For those services, Northstar Manager was

---

[2] The operative version is the Amended and Restated Limited Liability Company Agreement of NSIPI Data Center Venture, LLC, which this decision has already defined as the LLC Agreement. Dkt. 22 Ex. A ("LLCA").

entitled to receive service fees, including acquisition fees, financing fees, and disposition fees. *See id.* § 8.7 (the "Service Fees"). Under a distribution waterfall, Northstar Manager was entitled to receive a share of the returns available to the members depending on the internal rate of return that the Joint Venture generated. *See id.* § 6.2  (the "GP Promote").

The LLC Agreement made clear that IPI Holdings could remove Northstar Manager from its role as Administrative Manager upon the occurrence of a Cause Event. Section 7.9(f) stated:

> *Removal of the Administrative Manager.* [Northstar Manager] may be removed and replaced as the Administrative Manager by the Board of Managers in its sole and absolute discretion by reason of a Cause Event or a Key Person Event (as set forth in Section 8.4(a)(iii)).

*Id.* § 7.9(f). The cross-referenced section (Section 8.4(a)(iii)) appears in a provision that granted IPI Holdings broad authority to remove Northstar's affiliates from the Joint Venture upon the occurrence of a Cause Event. It stated:

> *Elective Remedies.* Upon a (y) Key Person Event, or (z) Cause Event, the IPI Member will have the right (but not the obligation), upon delivery of written notice to the Administrative Manager, as applicable, to:
>
> (i) terminate the right of [Northstar Member] to (a) appoint any Managers to the Board of Managers . . . and (B) approve Material Actions . . . ;
>
> (ii) immediately remove any or all Sponsor Board Members from the Board of Managers and appoint successor members to the Board of Managers . . . ;
>
> (iii) subject to <u>Section 8.4(b)</u> (*Removal of Administrative Manager*), immediately remove and replace [Northstar Manager] as the Administrative Manager;
>
> (iv) . . . immediately remove [Northstar Member] and [Northstar Manager] as members of the Company; and
>
> (v) dissolve the Company . . . .

9

*Id.* § 8.4(a).

The removal of Northstar Member and Northstar Manager under Section 8.4 had significant economic implications. Generally speaking, if IPI Holdings removed Northstar Manager as Administrative Manager by reason of a Cause Event, then

> (A) the Administrative Manager will retain zero percent (0%) of the Carried Interest Distributions and corresponding allocations of Net Profits,

> (B) any successor Administrative Manager will be eligible to receive up to one hundred percent (100%) of the Carried Interest Distributions and corresponding allocations of Net Profits, which amounts will thereafter be forever forfeited by the Administrative Manager, and

> (C) the IPI Member will retain any remaining portion of the Carried Interest Distributions and corresponding allocations of Net Profits, which amounts (if any) will thereafter be forever forfeited by the Administrative Manager[.]

*Id.* § 8.4(b)(iii).

This case does not involve a "Key Person Event." This case only involves an alleged "Cause Event."

The LLC Agreement defined a Cause Event as follows:

> "**Cause Event**" means, with respect to any Sponsor Member, a Sponsor Board Member, the Administrative Manager, or the Principal (as the case may be), [that] any one of the following has occurred:

> (a) such Person's conviction of or plea of guilty or no contest to (i) a felony, or (ii) any crime involving fraud, material misrepresentation, material misappropriation of funds, or embezzlement;

> (b) a material breach of this Agreement which, if capable of being cured, is not cured prior to the 30th day following a written demand therefore delivered by the IPI Member;

> (c) an act or omission arising from the gross negligence, willful misconduct or fraud by the Principal, which results in material damage to the Company or a Subsidiary owning an Investment; or

10

(d) a material breach of any agreement (excluding this Agreement) between any Sponsor Member, the Administrative Manager or any of their respective Affiliates (on the one hand) and the Company or any Subsidiary (on the other hand) which, if capable of being cured, is not cured within the applicable cure period.

*Id.* § 1.1, at 4.

The relevant Cause Event for this dispute is Cause Event (c), which is the Watson Cause Event. Notably, a Watson Cause Event only arises if there is an act or omission "arising from the gross negligence, willful misconduct or fraud by the Principal," *viz.* by Watson himself. The other cause events could involve actions or omissions by persons other than Watson, such as lower-level Northstar employees. The definition of Cause Event continues by providing expressly that if a Cause Event under one of those sections arises because of (i) an act or omission "by an employee, officer, manager or member . . . who is not the Principal and (ii) in all events, without the actual prior knowledge of the Principal," then a Cause Event will not have occurred as long as the Principal promptly cures the Cause Event. *Id.*

## C.      The Development Of The Data Centers

The Joint Venture created four special purpose vehicles to own the parcels where the data centers would be built. Each special purpose vehicle is a Delaware limited liability company. Those entities are Dulles NCP, LLC, Dulles NCP II, LLC, Manassas NCP, LLC, and Quail Ridge, NCP, LLC (collectively, the "Property Owners").

Northstar bore the ultimate responsibility for "developing, managing, and leasing the data centers back to Amazon." Dkt. 33 at 6. Northstar created plaintiff Northstar Healthcare Development, LLC ("Northstar Development") to handle the development

11

function. Northstar Development entered into a development agreement with each of the Property Owners (collectively, the "Development Agreements"). Under each Development Agreement, the Property Owner agreed to pay Northstar Development a termination fee equal to "the difference between the Minimum Development Fee and the actual amount of the Development Fee which had previously been paid," subject to certain conditions precedent (the "Termination Fee"). *Id.* Ex. C § 13.1(b); *see id.* §§ 8.1(a)–(b).

Northstar created plaintiff Northstar Commercial Partners Management, LLC ("Northstar Property") to handle the property management function. Northstar Property entered into a property management agreement with each of the Property Owners (collectively, the "Property Agreements"). Either party could terminate a Property Agreement "upon thirty (30) days prior written notice to the other party, without cause," and "upon fifteen (15) days prior written notice to the other party, for cause." Dkt. 22 Ex. D §§ 10.2.5–.6. The Property Agreements do not define "cause."

In November 2018, the Joint Venture completed the first data center, known as Dulles I. In March 2019, the Joint Venture completed Dulles II. In June 2019, the Joint Venture completed Manassas I, and in November 2019, the Joint Venture completed Manassas II. The Joint Venture completed a fifth data center in May 2020. After the completion of each data center, Amazon took possession and began paying rent.

In summer 2019, after the completion of only three data centers, IPI Partners offered $20 million to acquire Northstar's interest in the Joint Venture. As part of its offer, IPI Partners proposed to hire certain key Northstar employees to operate the Joint Venture after

acquiring Northstar's interest. Two of those key Northstar employees were Ramstetter and Will Camenson.

Northstar rejected the offer because it believed that the Joint Venture would become more valuable as additional data centers came online. Northstar also regarded the proposal to hire key Northstar employees as unacceptable.

Northstar now believes Ramstetter and Camenson colluded with IPI Partners to eliminate Northstar from the Joint Venture. In September 2019, Watson fired Ramstetter and Camenson.

### D.   Northstar Employees Raise Concerns About The Villanova Trust.

In January 2020, Northstar's then-Chief Operating Officer, Timothy Lorman, flew to IPI Partners' headquarters in Chicago to discuss his concerns about Northstar's payments to the Villanova Trust. Lorman presented the payments as evidence of bad faith conduct by Northstar and suggested that Northstar won the initial Amazon opportunity illegitimately based on kickbacks that would benefit Casey and others.

The Amended Complaint alleges that Lorman knew at all times that Northstar paid referral fees to Christian, including for the Amazon introduction, and that the Amazon-related payments went through the Villanova Trust. The Amended Complaint takes offense that Lorman did not tell Watson or Northstar about his concerns before discussing them with IPI Partners.

After meeting with Lorman, IPI Partners discussed the issue with Amazon. Gilpin, a Vice President at IPI Partners, initiated the discussions. It turned out that two months

13

before Lorman contacted IPI Partners, a different Northstar employee had emailed Jeff Bezos, then Chief Executive Officer of Amazon, and raised similar concerns.

Northstar contends that through these discussions, IPI Partners and Amazon conspired against Northstar. The Amended Complaint alleges that IPI Partners renegotiated the Joint Venture's lease agreements for the data centers so that Amazon would support IPI Partners in taking control of the Joint Venture. The Amended Complaint further alleges that IPI Partners and Amazon decided to work together to secure a criminal investigation into Northstar and Watson so that IPI Partners could use the criminal investigation as a pretext to take control of the Joint Venture.

The Amended Complaint alleges that IPI Partners had a financial motive to seize control of the Joint Venture. According to Northstar, IPI Partners had demonstrated that it wanted to acquire Northstar's interest by offering to buy it for $20 million. By terminating Northstar for cause, IPI Partners stood to gain approximately $70 million by cutting off Northstar's rights to the Service Fees and the GP Promote. The Amended Complaint alleges that A'Hearn and Gilpin stood to benefit personally from that windfall.

## E.    IPI Partners Declares A Watson Cause Event.

On April 2, 2020, FBI agents executed a search warrant at Watson's Colorado home and asked him about Northstar's payments to the Villanova Trust. The FBI agents indicated that Watson could expect a criminal indictment in the near future. As of the date of the motion to dismiss hearing, more than two years later, Watson had not been indicted.

Immediately after the execution of the search warrant, Watson received notices from IPI Partners that removed Watson, Northstar Manager, and Northstar Member from their

positions with the Joint Venture. Watson also received notices terminating the Property Agreements and Development Agreements.

The letters from IPI Partners stated that the removals and terminations were for cause. The letters asserted that IPI Holdings had "identified conduct of [Northstar Manager] and the Principal [Watson] constituting gross negligence, willful misconduct, and/or fraud, which have resulted in, and continue to result in, material damages to the [Joint Venture] and its Subsidiaries, including the Principal's causing of the gross negligence, willful misconduct, and/or fraud of [Northstar Manager]." Dkt. 25 Ex. 2. The letter identified the "material damages" as including, but not being limited to, damages to the Joint Venture's relationship with Amazon. *Id.* IPI Partners thus declared and acted based on a Watson Cause Event.

The letters that terminated the Development and Property Agreements also asserted that the terminations were "for cause." The letter terminating Northstar Property claimed that the terminations were because Northstar Property had "engaged in activities that constitute cause to terminate" the agreements. Dkt. 22 Ex. E. The letters terminating Northstar Development claimed that the terminations were because Northstar Development had "engaged in activities that constitute fraud, gross negligence and intentional misconduct." *Id.* Ex. G. Both groups of letters cited "credible information that raised substantive concerns about self-dealing and fraud" by Northstar and its affiliates. *Id.* Exs. E, G.

Amazon subsequently filed the Amazon Litigation against thirteen parties, including Watson and Northstar, in the United States District Court for the Eastern District

of Virginia. *See Amazon.com, Inc. v. WDC Hldgs. LLC*, No. 1:20-cv-00484 (E.D. Va.). By order dated June 5, 2020, the district court granted Amazon's motion for a preliminary injunction. *See Amazon.com, Inc. v. WDC Hldgs. LLC*, 2020 WL 4720086 (E.D. Va. June 5, 2020), *aff'd*, 2021 WL 3878403 (4th Cir. Aug. 31, 2021) (per curiam). In its decision granting the preliminary injunction, the district court found that there was "good cause to believe that" Watson, Northstar, and Northstar affiliates had "participated in a fraudulent kickback scheme relating to certain real property lease transactions." *Id.* at *1. The district court required Watson and Northstar to post funds totaling $21,250,000.00, representing sums that they allegedly received improperly. *Id.* at *2. On appeal, the United States Court of Appeals for the Fourth Circuit affirmed the district court's ruling. *See WDC Hldgs.*, 2021 WL 3878403.

## F.     This Litigation

On December 2, 2020, the plaintiffs filed this litigation, in which they challenged their removals and terminations. Emphasizing that the letters from IPI Partners arrived just after the FBI executed the search warrant at Watson's home, the plaintiffs infer that IPI Partners had advance notice of the execution of the search warrant and timed its letters to coincide with that event. They assert that IPI Partners used the investigation "as a pretext to terminate Northstar from the Joint Venture." Am. Compl. ¶ 77.

After the defendants moved to dismiss the original complaint, the plaintiffs filed the currently operative Amended Complaint. It asserts claims for (i) breach of the LLC Agreement; (ii) conversion; (iii) breach of the Property Agreements; (iv) breach of the

16

Development Agreements; and (v) civil conspiracy. The defendants again moved to dismiss.

At the hearing on the defendants' motion to dismiss, both sides provided updates on the Amazon Litigation, which is currently in discovery. IPI Partners is not a party to the Amazon Litigation, but it is participating in the discovery process. Both sides cited developments in the Amazon Litigation which they claimed supported their respective positions on the motion to dismiss.

There is also related litigation in this court brought by Northstar Member against the Joint Venture, IPI Holdings, A'Hearn and Gilpin. In that litigation, Northstar Member represents that its investors other than Watson have assumed control of the entity and do not challenge Northstar Member's removal from the Joint Venture. Instead, they assert that the defendants acted improperly and in bad faith when valuing Northstar Member's membership interest as part of a buyout that followed the removal of Northstar Member. *Sterling NCP FF, LLC v. NSIPI Data Ctr. Venture, LLC*, C.A. No. 2021-0059-JTL, Dkt. 19 ¶¶ 80–96 (Nov. 24, 2021). In January 2022, the defendants moved to dismiss Northstar Member's complaint for failure to state a claim on which relief can be granted, or in the alternative to stay proceedings.

## II.   LEGAL ANALYSIS

The defendants contend that the Amended Complaint fails to state a claim on which relief can be granted, warranting dismissal under Court of Chancery Rule 12(b)(6). When considering such a motion,

> a trial court should accept all well-pleaded factual allegations in the [c]omplaint as true, accept even vague allegations in the [c]omplaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

"The reasonable conceivability standard asks whether there is a possibility of recovery." *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *7 (Del. Ch. Dec. 20, 2019). The Delaware Supreme Court has compared Delaware's "conceivability" standard to the federal "plausibility" standard and explained that conceivability is "more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere possibility but short of probability." *Cent. Mortg.*, 27 A.3d at 537 n.13. The "'plausibility' pleading standard is higher than [Delaware's] governing 'conceivability' standard." *Id.* at 537. The federal "plausibility" standard also "invites judges to determine whether a complaint states a plausible claim for relief and draw on judicial experience and common sense." *Id.* (cleaned up). Until the Delaware Supreme Court "decides otherwise or a change is duly effected through the Civil Rules process, the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Id.*

Although this standard favors the plaintiff, "a trial court is required to accept only those reasonable inferences that logically flow from the face of the complaint and is not required to accept every strained interpretation of the allegations proposed by the plaintiff."

*Feldman v. AS Roma SPV GP, LLC*, 2021 WL 3087042, at *5 (Del. Ch. July 22, 2021) (cleaned up). This court need not "accept conclusory allegations unsupported by specific facts." *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

## A.    Count I : Breach Of The LLC Agreement

In Count I, Northstar Manager asserts that IPI Holdings breached the LLC Agreement by wrongfully terminating Northstar Manager from its role as Administrative Manager, thereby depriving Northstar Manager of its right to receive the GP Promote and Service Fees. In seeking dismissal of this claim, IPI Holdings argues that (i) the Amended Complaint fails to allege a breach of the LLC Agreement; (ii) the Amended Complaint fails to allege satisfaction of applicable conditions precedent; and (iii) even if there was a breach, the LLC Agreement's exculpation provision precludes liability for damages. For reasons explained below, Count I states a non-exculpated claim for breach of contract.

Delaware law governs the LLC Agreement. LLCA § 15.11. To allege a breach of contract, it is enough at the motion to dismiss stage to "simply allege first, the existence of the contract; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Garfield v. Allen*, — A.3d —, 2022 WL 1641802, at *23 (Del. Ch. May 24, 2022) (cleaned up). A complaint need not allege quantifiable (or quantified) damages because the breach of contract is itself an injury that gives rise to a right of action. *Id.* It is thus more accurate to describe the elements of a claim for breach of contract as "(i) a contractual obligation, (ii) a breach of that obligation by the defendant,

19

and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021).

### 1.   It Is Reasonably Conceivable That A Watson Cause Event Had Not Occurred.

The LLC Agreement empowered a majority of the Board of Managers to "remove[] and replace[] [Northstar Manager] as the Administrative Manager . . . in its sole and absolute discretion by reason of a Cause Event . . . as set forth in Section 8.4(a)(iii)." LLCA § 7.9(f). Section 8.4(a)(iii) provided that "[u]pon a . . . Cause Event, [IPI Holdings] will have the right (but not the obligation), upon delivery of written notice to [Northstar Manager] . . . to . . . immediately remove and replace [Northstar Manager] as Administrative Manager." *Id.* § 8.4(a)(iii). In this case, IPI Holdings only invoked the Watson Cause Event: "an act or omission arising from the gross negligence, willful misconduct or fraud by [Watson], which results in material damages to the Company or a Subsidiary owning an Investment." *Id.* § 1.1, at 4.

Northstar Manager contends that a Watson Cause Event did not occur. Northstar Manager does not dispute that there could have been an illicit kickback scheme. Northstar Manager instead contends that for the kickback scheme to qualify as a Watson Cause Event, it had to arise from gross negligence, willful misconduct, or fraud by Watson personally. If Watson was not personally involved, then the kickback scheme would not qualify as a Watson Cause Event. The scheme still might qualify as a Cause Event under

20

one of the other subparts of the definition, but IPI Holdings did not invoke any of the other Cause Events and in those cases, Northstar had the right to cure.

Northstar Manager alleges that Watson did not engage in or know of the kickback scheme. The Amended Complaint asserts that Watson sought assurances from Christian that there was not any type of kickback scheme, received those assurances, and relied on them.

At the pleading stage, Northstar is entitled to the inference that Watson was not personally involved in the kickback scheme. Crediting the allegations of the Amended Complaint, it is reasonably conceivable that a Watson Cause Event did not occur.

IPI Partners disagrees and contends that the *only* reasonable inference is that Watson was involved in the kickback scheme and that a Watson Cause Event did occur. IPI Partners is correct that the pled facts support a reasonable inference that a kickback scheme existed. The pled facts even support a reasonable inference that Watson could have been involved. The pled facts do not compel the conclusion that Watson was involved. The pled facts support an inference that Watson could have been duped.

At the pleading stage, the plaintiff gets the benefit of a favorable inference. Accordingly, it is reasonably conceivable that a Watson Cause Event did not occur.

### 2. The Role Of The Exculpation Provision

Seemingly anticipating that the allegations of the Amended Complaint support a reasonable inference that Watson was not personally involved in the kickback scheme, the defendants seek the protection of the exculpatory provision in the LLC Agreement. That provision states:

> No Covered Person, nor any member, manager, partner, officer, director, trustee, shareholder, or beneficiary of such Covered Person, in such capacity, will be liable to the Company or any other Covered Person for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person, except that each applicable Member will be liable to the Company and its other non-affiliated Members for its gross negligence, fraud or willful misconduct by its related or affiliated Covered Person.

*Id.* § 11.1(a) (the "Exculpation Provision"). The phrasing of the Exculpation Provision is clumsy, but the thrust is that a Covered Person only will be liable in damages if the challenged act arose from the Covered Person's gross negligence, fraud or willful misconduct.

Relying on the Exculpation Provision, the defendants argue that Northstar Manager cannot state a claim for breach of the LLC Agreement simply by alleging that IPI Holdings terminated Northstar Manager based on a Watson Cause Event that never existed. The defendants assert that the Amended Complaint must support a reasonable inference that IPI Holdings acted on the basis of gross negligence, fraud, or willful misconduct.

This court has previously defined willful misconduct as "intentional wrongdoing, not mere negligence, gross negligence or recklessness." *Dieckman v. Regency GP LP*, 2021 WL 537325, at *36 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE); *see Bandera Master Fund LP v. Boardwalk Pipeline P'rs, LP*, 2021 WL 5267734, at *79 (Del. Ch. Nov. 12, 2021) ("The concept of misconduct involves unlawful, dishonest, or improper behavior . . . ." (cleaned up)). Determining whether an actor engaged in willful misconduct requires discerning the actor's subjective intent. *Dieckman*, 2021 WL 537325, at *36 (stating that to determine whether an individual engaged in willful misconduct turns

on the "state of mind" of the actor). "At the pleading stage, the trial court must draw reasonably conceivable inferences in favor of the plaintiff based on what the allegations of the complaint suggest, recognizing that it may be virtually impossible for a plaintiff to sufficiently and adequately describe the defendant's state of mind at the pleading stage." *Voigt v. Metcalf*, 2020 WL 614999, at *26 (Del. Ch. Feb. 10, 2020) (cleaned up).

It is reasonably conceivable that IPI Holdings engaged in willful misconduct by terminating Northstar Manager without a sufficient basis to believe that a Watson Cause Event had occurred. Northstar points to the following facts to support an inference that IPI Holdings had a motive to manufacture a basis to terminate Northstar Manager and used the FBI's search of Watson's home as a pretext for removal:

- IPI Partners engaged in discussions with Amazon about future data-center development opportunities without telling Northstar, suggesting that IPI Partners wanted to exclude Northstar. Dkt. 33 at 17 (citing Am. Compl. ¶ 74).

- IPI Partners offered Northstar $20 million to buy out its interest in the Joint Venture. *Id.* (citing Am. Compl. ¶ 123).

- IPI Partners "leveraged its relationship with . . . Lorman[] to gain access to information about Northstar's business relationship with Christian Kirschner and [the] Villanova [Trust]." *Id.* (citing Am. Compl. ¶¶ 9, 10).

- IPI Partners did not contact Northstar after Lorman raised concerns about the Villanova Trust. *Id.* (citing Am. Compl. ¶ 11). Northstar maintains that if IPI Partners had asked, then "Watson would have told IPI [Partners] about the arrangement. It was no secret." *Id.* at 18.

- After hearing Lorman's concerns, IPI Partners renegotiated the leases for the data centers with Amazon. By doing so, IPI Partners secured Amazon's support for its takeover of the Joint Venture. IPI Partners also manufactured a basis for claiming that the Joint Venture was harmed. *Id.* (citing Am. Compl. ¶ 12).

23

- Still without contacting Northstar to get Watson's side of the story, IPI Partners and Amazon worked together to convince the Department of Justice to investigate Watson. *Id.*

- The same day as the FBI executed the search warrant on Watson's home, Watson received the termination letters from IPI Partners. *Id.* at 19 (citing Am. Compl. ¶¶ 13, 82).

- IPI Partners stood to gain approximately $70 million by terminating Northstar Manager for cause. *Id.* (citing Am. Compl. ¶ 78).

These facts support a reasonable inference that IPI Partners created a pretext to terminate Northstar Manager because it had a financial incentive to do so, not because there was a Watson Cause Event.

In response, IPI Partners argues that the only reasonable inference is that IPI Partners had a good faith basis to believe that Watson was involved in the kickback scheme. IPI Partners stresses that Northstar recognized that there could have been a kickback scheme and that two individuals came forward with similar allegations about a kickback scheme. Those allegations support the existence of a kickback scheme. They do not mean that Watson necessarily was involved.

To take the next step, IPI Partners argues that the fact that the FBI secured a search warrant from a judge to search Watson's home means that it necessarily was reasonable to believe that Watson was involved in the kickback scheme. IPI Partners emphasizes that it waited to terminate Northstar for cause until after the FBI executed the search warrant. *See* Dkt. 42 at 62. The issuance of a federal search warrant reflects a determination by a federal judge that probable cause exists "that contraband or evidence of a crime will be found in a particular place." *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (cleaned up).

The United States Supreme Court has described "probable cause [a]s a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

The issuance of a search warrant does not imply that the owner of the location where the search warrant is executed committed a crime. The fact that a search warrant issued does not mean that Watson was involved in the kickback scheme.

When evaluating the significance of the issuance of a search warrant for purposes of a Watson Cause Event, it is important to recognize that the list of Cause Events specifically includes "such Person's conviction of or plea of guilty or no contest to (i) a felony, or (ii) any crime involving fraud, material misrepresentation, material misappropriation of funds, or embezzlement." LLCA § 1.1, at 4. As this language demonstrates, the drafters of the LLC Agreement knew how to use criminal proceedings as triggers for a Cause Event. They did not identify the issuance of a search warrant as a Cause Event. In particular, they did not do so for purposes of a Watson Cause Event.

The allegations of the complaint support competing inferences. One reasonable inference is that IPI Holdings determined in good faith that the execution of the search warrant provided sufficient proof that Watson had engaged in fraud, gross negligence, or willful misconduct, plus sufficient proof that the Joint Venture was harmed by that conduct, such that IPI Holdings properly determined that a Watson Cause Event had occurred. Another reasonable inference is that IPI Partners was looking for a way to force Northstar out of the Joint Venture and seized upon the execution of the search warrant, even though

that event did not provide a good faith basis to conclude that Watson had engaged in fraud, gross negligence, or willful misconduct, nor that the Joint Venture had suffered material damages.

"At the pleading stage, it is not possible to select between competing inferences." *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *18 (Del. Ch. Mar. 15, 2019). A court cannot choose the inference that seems more likely. Instead, the court must "draw all reasonable inferences in favor of the non-moving party. As a result, there are sometimes reasonable (even, potentially, more likely) inferences that must be passed over at this stage of the proceedings." *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 n.36 (Del. Ch. July 24, 2009). "The plaintiffs receive the benefit of the doubt." *Pilgrim's Pride*, 2019 WL 1224556, at *18.

It is reasonably conceivable that IPI Holdings knew that it did not have sufficient evidence to determine whether Watson was personally involved in a kickback scheme such that a Watson Cause Event had occurred, yet decided to act regardless so as to seize the economic benefits of the Joint Venture. It is reasonably conceivable that IPI Holdings acted willfully, thereby committing a non-exculpated breach of the LLC Agreement.

### 3. It Is Reasonably Conceivable That Northstar Manager Can Recover The GP Promote And Service Fees.

IPI Holdings further argues that Northstar Manager cannot state a claim to recover the GP Promote and Service Fees because Northstar Manager failed to satisfy the conditions precedent required to earn those fees. Implicit in IPI Holdings' argument is that IPI Holdings properly terminated Northstar Manager.

26

IPI Holdings is correct that Northstar Manager cannot receive Service Fees or the GP Promote if Northstar Manager was properly terminated. But if IPI Holdings did not properly terminate Northstar Manager, then IPI Holdings would not have been justified in failing to pay the Service Fees and the GP Promote. As explained above, it is reasonably conceivable that IPI Holdings wrongfully terminated Northstar Manager.

The defendants argue that even if Northstar Manager was terminated improperly, there is still no breach because Northstar Manager's entitlement to the GP Promote and Service Fees depends on "certain monetary thresholds [being] satisfied" and other "conditions precedent." Dkt. 25 at 29. But if IPI Holdings wrongfully terminated Northstar Manager, then IPI Holdings wrongfully prevented Northstar Manager from satisfying the conditions precedent and thus the possibility of earning those amounts. In that setting, principles of contract law like the prevention doctrine and the concept of anticipatory repudiation could come into play to enable Northstar Manager to recover. *See* Restatement (Second) of Contracts § 245 (Am. L. Inst. 1981), Westlaw (database updated May 2022) (discussing the prevention doctrine); *id.* § 250 (discussing the anticipatory repudiation doctrine).

Additionally, the Amended Complaint pleads that as of March 31, 2020—two days before Northstar's termination—IPI Partners owed Northstar $3.8 million in Service Fees. Am. Compl. ¶ 78. The Amended Complaint asserts that Northstar "had been requesting IPI [Partners] to pay [those fees] for months." *Id.* After being terminated due to a Cause Event, Northstar Manager lost the ability to earn *further* Service Fees. Northstar Manger did not lose its right to receive Service Fees it had already earned. Because the Amended

Complaint pleads that the $3.8 million was earned *before* Northstar's termination on April 2, 2020, it is reasonably conceivable that IPI Holdings breached the LLC Agreement by not paying the amounts already due.

### B.    Count II: Conversion

In Count II of the Amended Complaint, Northstar and Northstar Manager asserted a claim for conversion against IPI Partners, the Funds, IPI Holdings, A'Hearn, and Gilpin (collectively, the "Tort Defendants"). In their opposition brief, the plaintiffs clarified that this claim was asserted by Northstar Manager, Northstar Property, and Northstar Development (collectively, the "Tort Plaintiffs"). The defendants object to this clarification, but the issue does not affect the outcome.

"Conversion is an act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996) (cleaned up). "Generally, the necessary elements for a conversion under Delaware law are that a plaintiff had a property interest in the converted goods; that the plaintiff had a right to possession of the goods; and that the plaintiff sustained damages." *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988).

A claim for conversion is a tort claim. "[I]n order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract." *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009). That is because "[w]here . . . the plaintiff's

28

claim arises solely from a breach of contract, the plaintiff generally must sue in contract, and not in tort." *Id.* (cleaned up).

The Tort Plaintiffs contend that they sufficiently "alleged [that] the Tort Defendants violated an independent tort duty to refrain from taking the Tort Plaintiffs' property—the contractual right to earn fees and GP [P]romotes." Dkt. 33 at 38. But that alleged property right derives from the Tort Plaintiffs' contract rights. What the Tort Plaintiffs really are claiming is a breach of contract, not the tort of conversion.

The plaintiffs have properly cited the standard for pleading a conversion claim along with a contract claim, but they have failed to show how they met that standard. Count II is dismissed.

## C.    Counts III and IV: Breach Of The Property And Development Agreements

In Counts III and IV, Northstar Property and Northstar Development assert claims for breach of the Property and Development Agreements. Virginia law governs those claims. Dkt. 25 Ex. 1 §§ 1.1.2, 13.3; Dkt. 33 Ex. C § 15.4. Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). Delaware's procedural law, however, governs the standard of review for the motion to dismiss. *See Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 987 (Del. 2013) ("As a general rule, the law of the forum governs procedural matters . . . ." (cleaned up)); *Novarus Cap. Hldgs., LLC v. AFG Me W. Hldgs., LLC*, 2021 WL 2582985, at *7 (Del. Ch. June 23, 2021) (applying Delaware's motion to dismiss

standard of review even though Georgia's substantive law applied to the underlying claims). It is reasonably conceivable that the Amended Complaint states a claim for breach of the Property and Development Agreements under Virginia law.

### 1.    Breach Of The Property Agreements

In Count III, Northstar Property alleges that Dulles NCP and Manassas NCP breached their respective Property Agreements by wrongfully terminating the agreements for cause and by using the alleged termination for cause to justify only providing 15-days' notice of termination rather than 30-days' notice. Northstar Property argues that it has suffered damages including the loss of 15-days of service fee revenue.[3]

The Property Agreements provide that "[e]ither party [can] . . . terminate the [Property Agreement] upon thirty (30) days prior written notice to the other party, without cause" or "upon fifteen (15) days prior written notice to the other party, for cause." Dkt. 22 Ex. D. §§ 10.2.5–.6 (Property Agreement with Dulles NCP); Dkt. 25 Ex. 1 §§ 10.2.5–.6 (Property Agreement with Manassas NCP). In their termination letters, Dulles NCP and Manassas NCP asserted that they were terminating the respective Property Agreements "for cause immediately upon expiration of the 15-day notice period." Dkt. 22 Ex. E (termination letters from Dulles NCP and Manassas NCP).

---

[3] Northstar Property does not seek to recover from the other Property Owners, because the development of their data centers had not yet reached the stage where the centers required property management services.

For the same reasons that Northstar Manager pled facts supporting the reasonable inference that cause did not exist for its termination from the LLC Agreement, Northstar Property has pled facts supporting the reasonable inference that cause did not exist to terminate the Property Agreements. Accordingly, it is reasonably conceivable that Northstar Property was entitled to the thirty-day written notice and that the fifteen-day notice was insufficient. The Amended Complaint therefore states a claim for breach of the Property Agreements. The motion to dismiss Count III is denied.

### 2. Breach Of The Development Agreements

In Count IV, Northstar Development alleges that Dulles NCP II and Quail Ridge NCP breached their respective Development Agreements by wrongfully terminating the agreements for cause and using the alleged termination for cause to justify not paying fees owed under the agreements.[4]

Northstar Development has been unable to locate the Development Agreement with Dulles NCP II, but expresses confidence that it exists and that discovery will uncover it. The defendants do not deny the existence of the Development Agreement with Dulles NCP II. They instead argue that because the Amended Complaint failed to attach a copy of the agreement or allege when it was executed, by whom, or any consideration exchanged, the claim against Dulles NCP II must be dismissed. "Delaware is a notice pleading

---

[4] Northstar Development does not seek any amounts due from Dulles NCP and Manassas NCP. Dkt. 33 at 32–33. That is because the development of those projects was complete, and their Development Agreements had terminated.

jurisdiction." *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005). Under this standard, Northstar Development has pled facts that make it reasonably conceivable that a Development Agreement exists with Dulles NCP II. The fact that Dulles NCP II sent Northstar Development a letter dated April 2, 2020, that purported to terminate that Development Agreement strongly supports the existence of the agreement. *See* Dkt. 22 Ex. G.[5]

The defendants also argue that the Amended Complaint (i) fails sufficiently to allege that no "cause" existed under the Development Agreements to justify termination and (ii) does not plead that all conditions precedent to Northstar Development's right to payment were met.

First, it is not necessary for Northstar Development to plead cause, because the Development Agreement requires the Property Owner to pay the Termination Fee regardless of whether the termination was for cause:

> If [the Development Agreement] is terminated pursuant to the terms of Section 8.1(a) [termination without cause] or 8.1(b) [termination for default, including a "breach caused by [a] party's fraud or intentional misconduct"] . . . Developer shall be paid an amount equal to the difference between the

---

[5] The case that the defendants rely on is distinguishable. In *Chilton v. Homestead, L.C.*, the Circuit Court of Virginia, Bath County, dismissed a claim for breach of contract in part because "[p]laintiffs ha[d] failed to allege facts sufficient for the court to find that a written contract existed between the [p]laintiffs and [d]efendant." 2008 WL 8225263, at *15 (Va. Cir. Ct. Sept. 8, 2008). In that case, the plaintiffs conceded that they were "at [the relevant] time, unaware of any written document constituting the terms of the contract between [themselves] and [d]efendant." *Id.* at *14 (cleaned up). The court concluded that "[o]verall, there is no indication that [it] has been given any valid factual basis upon which to find that a written contract . . . existed." *Id.* at *15. Far from being "unaware of any written document," Northstar Development is "confident" that the Development Agreement with Dulles NCP II exists and has provided a "valid factual basis" to support that confidence. *See id.* at *14–15.

> Minimum Development Fee and the actual amount of the Development Fee which had previously been paid [the Termination Fee]. The Minimum Development Fee is equal to forty percent (40%) of the Development Fee; provided, it is understood that the Minimum Development Fee shall only be paid to the extent Owner is reimbursed for such fee by the Project tenant [Amazon].

Dkt. 33 Ex. C § 13.1(b) (Quail Ridge Development Agreement); *see id.* §§ 8.1(a), (b).

The letters terminating the Development Agreements cited Section 8.1(b)(3) as the reason for termination. Dkt. 22 Ex. G. The Development Agreements specifically provide for a Termination Fee if the Development Agreement is terminated "pursuant to the terms of . . . [Section] 8.1(b)." Dkt. 33 Ex. C § 13.1(b). By its terms, Section 8.1(b)(3) falls within Section 8.1(b) and only protects the Property Owner from having to "pay any additional portion of the Development Fee or Construction Management Fee" to Northstar Development. *Id.* § 8.1(b)(3). It has no impact on the obligation of the Property Owner to pay the Termination Fee. Northstar Development therefore did not have to plead that no cause for termination existed.

Second, Northstar Development has pled facts making it reasonably conceivable that the conditions precedent to receiving the Termination Fee were satisfied. The Termination Fee is calculated based on the Development Fee. And as the definition of the Development Fee makes clear, (i) the calculated amount of the Development Fee must be "in accordance with the approved Budget" and (ii) Amazon must have "reimbursed" the Property Owner for the Development Fee. *Id.* § 13.1(a). It is reasonably conceivable that the Development Fee was established "in accordance with the approved Budget" and that Quail Ridge NCP and Dulles NCP II have been "reimbursed" by Amazon for the

Development Fee. Discovery may reveal that one or both of the conditions precedent were not satisfied. At this stage, however, it is reasonably conceivable that they were. *See In re Cadira Gp. Hldgs., LLC Litig.*, 2021 WL 2912479, at \*14 (Del. Ch. July 12, 2021) ("It is enough that the pleading allege[s] complete performance generally." (cleaned up)). It is thus reasonably conceivable that Dulles NCP II and Quail Ridge NCP breached their respective Development Agreements by not paying the Termination Fee. The defendants' motion to dismiss Count IV is denied.

## D.     Count V: Civil Conspiracy

In the final count of the Amended Complaint, Northstar and Northstar Manager bring a claim for civil conspiracy against the Tort Defendants. In their opposition brief, the plaintiffs change the parties bringing the civil conspiracy claim to the Tort Plaintiffs. As with the conversion claim, the change does not affect the outcome.

In Delaware, "to state a claim for civil conspiracy, a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff." *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1036 (Del. Ch. 2006). "Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong." *Kuroda*, 971 A.2d at 892. Accordingly, if a "plaintiff fails to adequately allege the elements of the underlying claim, the conspiracy claim must be dismissed." *Id.* Further, "unless the breach also constitutes an independent tort, a breach of contract cannot constitute an underlying wrong on which a claim for civil conspiracy could be based." *Id.*

34

The Tort Plaintiffs failed to plead an underlying wrong. As discussed above, the Amended Complaint fails to state a claim for conversion. Even though the Amended Complaint states a claim for breach of contract, that breach cannot constitute the underlying wrong to support a claim for civil conspiracy. *See NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009) ("A breach of contract is not an underlying wrong that can give rise to a civil conspiracy claim.").

The Tort Plaintiffs cite *CMS Investment Holdings, LLC v. Castle*, 2015 WL 3894021 (Del. Ch. June 23, 2015), to support their view that a "breach of contract [can] serv[e] as a wholly independent underlying wrong where the breach constitutes the intentional misuse of a position in a company to harm another member of the company." Dkt. 33 at 51. Their case does not support that assertion. The defendants in *CMS Investment* advanced as their "principal argument" that there was no "unlawful act" to support the plaintiff's civil conspiracy claim. 2015 WL 3894021, at *21. That argument failed because the court found that the plaintiff had sufficiently stated claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and aiding and abetting breaches of fiduciary duty. *Id.* The *CMS Investment* court did not identify *which* of the surviving claims supported the plaintiff's civil conspiracy claim, only that at least one of them did. *See id.* Quite plainly, it was the claim for breach of fiduciary duty that did the trick. Just two months later, the author of *CMS Investment*, former Vice Chancellor Parsons, wrote in *OptimisCorp v. Waite* that "breach of contract claims cannot serve as a predicate for [an] alleged civil conspiracy." 2015 WL 5147038, at *56 (Del. Ch. Aug. 26, 2015).

35

Because the Tort Plaintiffs failed to identify any underlying wrong to support their civil conspiracy claim, Count V is dismissed.

### E.   The Order To Show Cause

The final question is whether to stay this litigation pending the outcome of the Amazon Litigation. "This Court possesses the inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense." *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009). The court can issue a stay *sua sponte*. *See In re Bay Hills Emerging P'rs I, L.P.*, 2018 WL 3217650, at *1 (Del. Ch. July 2, 2018); *Cummings v. Estate of Lewis*, 2013 WL 979417, at *10 (Del. Ch. Mar. 14, 2013); *Kingsland Hldgs. Inc. v. Fulvio Bracco*, 1996 WL 422340, at *2 (Del. Ch. July 22, 1996). In deciding whether to issue a stay, the court "must make a practical judgment as to whether a stay is warranted under the circumstances of each case." *K&K Screw Prods., L.L.C. v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *11 (Del. Ch. Aug. 9, 2011).

The Amazon Litigation will address facts that go to the heart of this case. Two central issues in the Amazon Litigation are whether there was a kickback scheme, and, if so, whether Watson knew of or was involved in it. The Amazon Litigation likely will provide answers to both questions, and those answers will bind Watson and Northstar. The answers will have implications for this case.

The Amazon Litigation is further along than this case. The parties to the Amazon Litigation are engaged in discovery, and IPI Partners is participating as a non-party. At the

motion to dismiss hearing, both parties referenced information learned in discovery that they thought supported their positions in this litigation.

It is inefficient for the Amazon Litigation and this litigation to run concurrently. The Amazon Litigation is likely to provide clarity on pivotal issues. In any event, the discovery and trial record from the Amazon Litigation can be used to streamline this proceeding.

Although the parties were amenable to a stay when last before the court, they failed to reach agreement on implementing a stay. The parties did not explain why no agreement was reached.

The court believes that a stay is warranted. Within thirty days, any party who opposes a stay of this litigation pending the outcome of the Amazon Litigation will show cause why a stay should not issue.

### III.   CONCLUSION

The motion to dismiss is denied as to Counts I, III, and IV. The motion to dismiss is granted as to Counts II and V. Because Gilpin and A'Hearn are not named defendants to the surviving claims, this decision does not address their alternative theory that they must be dismissed from this litigation for lack of personal jurisdiction. Within thirty days, any party who opposes a stay of this litigation pending the outcome of the Amazon Litigation will show cause why a stay should not issue.