# Exhibit 1

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
2

3

  AMAZON.COM, INC., and       )
4  AMAZON DATA SERVICES,        )
   INC.,,                       )
5                               )
            Plaintiffs,         )
6                               )
   v.                           ) CASE NO.
7                               ) 1:20-cv-484
   WDC HOLDINGS, LLC, et        )
8  al,                          )
                                )
9            Defendants.        )
                                )
10                              )
                                )
11                              )

   _____
12

13

14

            VIDEOTAPED DEPOSITION OF CARLETON NELSON
15
            (Highly Confidential Attorneys' Eyes Only)
16
            Taken on behalf of the Plaintiffs
17
            April 29, 2022
18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

```
                                              Page 2

 1      APPEARANCES:
 2       For the Plaintiffs:
 3              PATRICK STOKES, ESQ.
                 TRISHA PARIKH, ESQ.
 4              Gibson Dunn & Crutcher, LLP
                 1050 Connecticut Avenue, Northwest
 5              Washington,  D.C. 20036
                 (202) 955-8252
 6              Pstokes@gibsondunn.com
                 Tparikh@gibsondunn.com
 7
 8       For the Defendants WDC Holdings, Northstar, and
          Watson:
 9
                 SARA BODNER, ESQ. (Via Zoom)
10              Brownstein Hyatt Farber Schreck, LLP
                 410 Seventeenth Street
11              Suite 2200
                 Denver, Colorado  80202
12              (303) 223-1297
                 Sbodner@bhfs.com
13
                 Amanda Houseal, Esq.  (Via Zoom)
14              And Leah Regan-Smith, Esq.  (Via Zoom)
15
         For the Defendants Carleton Nelson and Cheshire
16       Ventures:
17              ALEX LITTLE, ESQ.
                 ADAM R. SMART, ESQ.  (Via Zoom)
18              LEAH REGAN-SMITH, ESQ. (Via Zoom)
                 AMANDA HOUSCAL, ESQ. (Via Zoom)
19              EMILY MACK, ESQ.  (Via Zoom)
                 Burr & Forman, LLP
20              222 Second Avenue South
                 Suite 2000
21              Nashville,  Tennessee  37201
                 (615) 724-3200
22              Alittle@burr.com
                 Asmart@burr.com
23
24
25
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 3

```
 1      For Casey Kirschner:
 2              JOHN-DAVID H. THOMAS, ESQ.  (Via Zoom)
                 ALY HAMBY, ESQ.      (Via Zoom)
 3              Waller
                 511 Union Street
 4              Suite 2700
                 Nashville, Tennessee  37219
 5              (615) 850-8682
                 Jd.thomas@wallerlaw.com
 6
 7      Also Present:
 8
                 Brian Watson
 9
                 Casey Kirschner (Via Zoom)
10
                 Christian Kirschner (Via Zoom)
11
12      COURT REPORTER:
13              JENNIFER HAYNIE (License No. 403)
                 Cell:  615.429.6588
14              E-mail:  jennifercourtreporter@gmail.com
15
16      VIDEOGRAPHER:
17              DAVID DRUMEL
18
19
20
21
22
23
24
25
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 4

1                                    INDEX

2      WITNESS:                                              PAGE:

3

               EXAMINATION BY MR. STOKES                         8

4

                              * * * * *

5

6      Exhibit 1                                               12
       30(b)(6) notice

7

       Exhibit 2                                               36
8      Licensing agreement facilitator agreement

9      Exhibit 3                                               56
       Structure of the bonus

10

       Exhibit 4                                               81
11     E-mail RFP

12     Exhibit 5                                               88
       Agreement between CN and a company controlled by
13     Scott Peterson

14     Exhibit 6                                              116
       Cheshire Ventures to g-mail

15

       Exhibit 7                                              122
16     E-Mail from Cheshire Ventures to K. Ramstetter at
       White Peaks Capital

17

       Exhibit 8                                              123
18     Facilitator Agreement

19     Exhibit 9                                              128
       Notice of a wire transfer

20

       Exhibit 10                                             133
21     License agreement

22     Exhibit 11                                             147
       Proposed Business Structure

23

       Exhibit 12                                             157
24     Graph

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 5

1    Exhibit 13    160
Bank record for U.S. Bank for Cheshire Ventures, LLC

2

Exhibit 14    172
3    U.S. Bank statement

4    Exhibit 15    174
E-mail June 19, 2019, █

5

Exhibit 16    178
6    E-Mail from Carleton Nelson to Cheshire Ventures to
Johnny Lim at JCL Consulting, dated July 2019

7

Exhibit 17    179
8    E-Mail from Cheshire Ventures to Cheshire Ventures
so from yourself to yourself in April of 2020

9

Exhibit 18    182
10    Cheshire Ventures to Cheshire in August 2019

11    Exhibit 19    187
E-mail chain

12

Exhibit 20    190
13    E-Mail exchange related an operating agreement

14    Exhibit 21    195
E-Mail chain

15

Exhibit 22    200
16    E-mail communication from John Cadwallader

17    Exhibit 23    202
Chain from December 2019 related Finbrit wire
18    instructions

19                     *****

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 6

1              The videotaped deposition of

2      CARLETON NELSON, taken on behalf of Plaintiffs, on the 29th day

3      of April, 2022, commencing at 9:22  a.m., in the offices of Burr

4       & Forman, Nashville, Tennessee, for all purposes under the

5       Virginia Rules of Civil Procedure.

6                     The formalities as to notice, caption,

7       certificate, et cetera, are waived.  All objections, except as

8       to the form of the questions, are reserved to the hearing.

9          It is agreed that Jennifer Haynie, being a Notary

10      Public and Court Reporter for the State of Tennessee, may swear

11       the witness, and that the reading and signing of the completed

12       deposition by the witness are reserved.

13

14                           *  *  *

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 7

```
1              THE VIDEOGRAPHER: Good morning.  On
2      the record at 9:11 a.m., on April 29, 2022.
3      This is media unit one, in the video recorded
4      deposition of Cheshire Ventures with
5      Carlton Nelson as the corporate representative
6      taken by counsel for the Plaintiff, in the
7      matter of Amazon.com, Inc., and Amazon Data
8      Services versus WDC Holdings, LLC, d/b/a North
9      Star Commercial Partners, et al.  Filed in the
10     United States Direct Court of Virginia,
11     Alexandra Division, Case Number 120-cv-484.
12              This deposition is being held at
13     Burr & Forman, located at 222 Second Avenue
14     South, in Nashville, Tennessee.  My name is
15     David Drumel; I'm the videographer, and Jennifer
16     Haynie is court reporter.
17              Counsel and all present in the room
18     and everyone attending remotely, please state
19     your appearance at this time, which then will be
20     followed by the swearing of the witness by the
21     court reporter.
22              MR. STOKES:  Patrick Stokes for
23     Amazon.
24              MS. PARIKH:  Trisha Parikh for
25     Amazon.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 8

1              MR. LITTLE:  Alex Little from Burr &

2       Forman, on behalf of Cheshire Ventures and

3       Carleton Nelson.

4              MS. BODNER:  Sara Bodner from

5       Brownstein, Hyatt, Farber and Schreck, on behalf

6       of Brian Watson, WDC Holdings, and the Watson

7       defendants.  I'm joined by Amanda Houseal and

8       Lia Reagan Smith on Zoom.  My client,

9       Brian Watson, is there in the room.

10              MR. SMART:  This is Adam Smart from

11       Burr & Forman, on behalf of Cheshire Ventures.

12              MR. THOMAS:  And you have JD Thomas

13       on behalf of Casey Kirschner, appearing via

14       zoom.  I believe my client is also on zoom or

15       will be at some point in this deposition.

16                  CARLETON NELSON,

17         Having been sworn to tell the truth,

              the whole truth and nothing but the

18            truth, testified as follows:

19                DIRECT EXAMINATION

20       BY MR. STOKES:

21       Q.    All right.  Good morning.

22       A.    Good morning.

23       Q.    Mr. Nelson, we're back at it.  So

24       obviously we spoke yesterday in the deposition

25       of you in your personal capacity.  Today is with

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 9

```
1     Cheshire Ventures and you're acting as its
2     corporate representative.
3            So my name is Patrick Stokes.  I'll run
4     through the preliminaries again to make sure
5     that we're clear.  I'm sure you know all of
6     these things already, but I'm an attorney with
7     Gibson, Dunn, and represent Amazon in this
8     matter.
9            Today I'm going to be asking questions of
10    you in your capacity as the corporate
11    representative Cheshire Ventures.
12           And do you understand you're under oath?
13    A.    Yes.
14    Q.    And do you understand that being under
15    oath that your required to provide truthful
16    responses to questions?
17    A.    Yes.
18    Q.    And that material -- an intensional
19    material omission would not be consistent with
20    that oath?
21    A.    Yes.
22    Q.    And as we did yesterday, we'll certainly
23    take reasonable breaks throughout the day.  Your
24    counsel can ask for a break, others can ask for
25    take a break as needed and we'll take a break.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 10

```
1     I would jus ask that we take a break after
2     you've answered whatever the standing question
3     is; and if we're handling a particular topic
4     area that is short, we'll complete that before
5     we take a break, but certainly we can take
6     breaks, just like yesterday, as we need.
7            As you know, this is being recorded,
8     videotaped, audio, court reporter in the room,
9     we'll need you in responding to questions
10    verbally.  Do you understand that?
11    A.     Yes.
12    Q.     And just as you did now, we'd ask you to
13    respond, yes, no, or substantively with answers.
14    Not a nod of the head or yeah or uh-huh or
15    something to that effect.
16           Do you understand?
17    A.     I do.
18    Q.     And in my questions, if you do not ask
19    for clarification of a question, I will assume
20    that you understand the question.  Do you
21    understand that?
22    A.     I do.
23    Q.     Your counsel may object for the record,
24    but unless your counsel instructs you not to
25    answer a question, you can go ahead and respond
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 11

1    to the question.  Do you understand?

2    A.     I do.

3    Q.     And have you taken any drugs, alcohol, or

4    medication that would impair your ability to

5    understand the proceedings today?

6    A.     No.

7    Q.     My questions today?

8    A.     No.

9    Q.     To provide complete and truthful answers

10   today?

11   A.     Yes.

12   Q.     I'm sorry.  Have you taken any drugs --

13   A.     Oh.

14   Q.     -- alcohol, or medicine that would

15   prevent you from being able to answer truthfully

16   and completely today?

17   A.     No.

18   Q.     Did you prepare for today's deposition

19   for you as the corporate representative of

20   Cheshire Ventures?

21   A.     Yes.

22   Q.     And did you speak with anyone, other than

23   your attorneys, about this deposition?

24   A.     No.

25   Q.     What documents did you review in

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 12

1    preparation for this deposition?

2    A.     The Amazon interrogatories.

3    Q.     Did you review the deposition notice, the

4    30(b)(6) deposition notice and topics?

5    A.     Yes.

6    Q.     Did you review any other documents in

7    preparation for the deposition today?

8    A.     No.

9    Q.     Did you review any transcripts in

10   preparation for the deposition today?

11   A.     No.

12   Q.     And when you say you reviewed the Amazon

13   interrogatories, are you referring to your own

14   interrogatories or Amazon's?

15   A.     I was referring to the 30(b)(6) notice

16   that you -- Amazon issued.  Sorry.  I got that

17   wrong.

18               (Exhibit Number 1 was marked.)

19   BY MR. STOKES:

20   Q.     Okay.  Good.  So why don't we go ahead

21   and start with the 30(b)(6) notice itself, which

22   is Exhibit 1, on your screen.

23   A.     I see it.

24   Q.     Do you recognize that notice?

25   A.     Yes.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 13

```
1    Q.     If you would -- and that is the notice

2    for Cheshire Ventures for this 30(b)(6)

3    deposition?

4    A.     Yes, I reviewed this.

5    Q.     Yeah.  Do you see this Exhibit A is it --

6    let me find it.  Page nine on your screen, the

7    portion of Exhibit A --

8    A.     I'm not getting an Exhibit A or a page

9    nine.

10   Q.     In an attachment to exhibit -- part of

11   Exhibit 1, if you scroll down the screen, it's

12   page nine of that exhibit?

13   A.     I only go to page seven for some reason.

14   Q.     Maybe I am -- I have 11 page exhibit?

15             MS. PARIKH:  It will be page five.

16             MR. LITTLE:  Page five of the

17   document.

18             MR. STOKES:  You're looking at page

19   numbers.  I'm looking at the PDF numbers.

20             THE WITNESS:  Yes.  I see page nine

21   topics for the deposition.

22   BY MR. STOKES:

23   Q.     Sorry.  In my effort, I'm steering you in

24   the wrong direction.  Yes, it's page five,

25   topics for deposition.  Have you reviewed those
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 14

```
 1    topics?

 2    A.     Yes.

 3    Q.     And done so in preparation for today's

 4    deposition?

 5    A.     Yes.

 6    Q.     Are you prepared today to testify about

 7    those topics?

 8    A.     I am.

 9    Q.     Okay.  So let's start with Cheshire

10    Ventures, if you can tell us what is Cheshire

11    Ventures?

12    A.     Cheshire Ventures is a consulting and

13    advisory -- a real estate development --

14    consul- -- a real estate development

15    consultation and advisory company.

16    Q.     What does that mean?

17    A.     Cheshire Ventures will engage with

18    landowners, utilities, developers, government

19    agencies, and the like, regarding potential

20    development projects or pursuant of projects or

21    things of that nature.

22    Q.     What is your role in Cheshire Ventures?

23    A.     I'm the principal -- managing principal

24    of Cheshire Ventures.

25    Q.     And as the managing principal of Cheshire
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 15

1    Ventures, can you describe what your role and

2    general responsibilities are?

3    A.      Sure.  My role is to engage and

4    oftentimes contract with the various entities I

5    just mentioned on various services that they may

6    solicit or otherwise be interested in in regards

7    to real estate development.

8    Q.      How long have you held that role at

9    Cheshire Ventures?

10   A.      Since it was formed.

11   Q.      Approximately when was it formed?

12   A.      I believe it was the end of June of 2019.

13   Q.      Is that when the entity was formally

14   formed as a corporate entity?

15   A.      Yes.

16   Q.      Who formed it?

17   A.      Rodney Atherton.

18   Q.      And was -- were you operating through

19   Cheshire Ventures prior to the formal

20   establishment of it as the entity it is today?

21   A.      No.

22   Q.      And the description of the

23   responsibilities that you have with Cheshire

24   Ventures and Cheshire Ventures's role that you

25   just described, has that changed over time since

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 16

```
1    its formation in June of 2019?

2    A.    The responsibilities, no.

3    Q.    Has the nature of the business that

4    Cheshire Ventures has engaged in since it was

5    founded in 2019?

6    A.    Other than business has just been harder

7    to come by, no.

8    Q.    And who else is employed by Cheshire

9    Ventures besides yourself?

10   A.    I have no employees.

11   Q.    Have there ever been any other employees

12   with Cheshire Ventures other than yourself?

13   A.    No.

14   Q.    Are there any affiliates of Cheshire

15   Ventures --

16   A.    No.

17   Q.    -- that you're aware of?

18   A.    Well, with W-9s, I believe if you want to

19   count those affiliates or folks -- you might

20   contract with to do various pieces of the

21   consulting arrangement.  Yes.

22   Q.    Okay.  And by W-9s, what do you mean by

23   that?

24   A.    I mean -- or 1099s.  I'm sorry.  No,

25   W-9s.  1099s is what I meant to say.  Other
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 17

1    specialty consultants that fulfill a role that

2    maybe I'm not capable of fulfilling or Cheshire

3    Ventures is not capable of fulfilling.

4    Q.     So by 1099 are you an independent

5    contractor?

6    A.     Yes.

7    Q.     What independent contractors have you

8    employed through Cheshire Ventures over time?

9    A.     Johnny Lim, Grella -- Grella Partnership

10   Strategies.

11   Q.     I'm sorry.  What was the name of that?

12   A.     Grella Partnership Strategies.  Who else

13   have we employed?  I don't know if we did Fiber

14   Locater.  We might have but that was probably a

15   contract basis; not a 1099.

16          That's all I can think of at the moment.

17   Q.     The second entity you mentioned, I just

18   want to make sure I understand the name.

19          Could you spell that name of that entity?

20   A.     Grella, G-R-E-L-L-A.

21   Q.     G-R-E-L-L-A?

22   A.     Yes, Partnership Strategies.

23   Q.     What is Grella Partnership Strategies?

24   A.     Grella Partnership Strategies, is an

25   economic development and incentive consulting

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 18

```
 1    firm.
 2    Q.      Who operates that firm?
 3    A.      Mike Grella.
 4    Q.      Who is Mike Grella?
 5    A.      My Grella is a former colleague of mine
 6    from Amazon.
 7    Q.      And what does this firm do?
 8    A.      Economic development consulting.
 9    Q.      Can you elaborate or describe what you
10    mean by that as it relates to the business
11    Cheshire Ventures?
12    A.      Sure.  At times Cheshire Ventures is
13    engaged to do consulting on certain projects
14    that could also potentially require economic
15    development analysis, jobs analysis, economic
16    impact analysis, things of that nature -- that
17    are not within the stable, so to speak, of
18    Cheshire Ventures.
19    Q.      What projects has Mike Grella or
20    Grella -- I've already forgotten the name.
21    A.      Partnership Strategies.
22    Q.      Yeah.  What project has that entity
23    worked on with Cheshire Ventures?
24    A.      I believe we did a study for a group in
25    Indiana, a utility in Indiana, and I believe we
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 19

1    did a study for a group in Texarkana, as I

2    recall, where Grella was brought in.

3    Q.    You mentioned another entity.  Again,

4    I'll get the first name.  The second and third

5    of the entities, I have already forgotten --

6    fiber -- some entity that's --

7    A.    Fiber Locater.

8    Q.    Fiber Locator, what is that entity?

9    A.    That's a group that does essentially

10    fiber mapping, dark fiber, led fiber, fiberoptic

11    cable mapping.

12    Q.    What projects has Fiber Locater worked on

13    with Cheshire Ventures?

14    A.    You know, I can't remember if I actually

15    ended up actually contracting with them through

16    Cheshire or we ended up not doing it that way.

17    But I believe we did a fiber mapping exercise

18    in -- where was that -- Chicago.

19    Q.    You mentioned Johnny Lim, what work have

20    you done with Johnny Lim through Cheshire

21    Ventures?

22    A.    Johnny Lim is a civil engineering and

23    advisory company, and we've used his services

24    for civil engineering on or, I, Cheshire

25    Ventures, has used his services for civil

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 20

1    engineering, site mapping, preliminary

2    engineering on a few projects, and I'm trying to

3    think where some of those were.

4         I believe there's one in New York and I

5    believe there's one in Connecticut.

6    Q.    To the extent that Cheshire Ventures is

7    using Johnny Lim's services, is Cheshire

8    Ventures retaining Johnny Lim or JCL Consulting?

9    A.    No. More independent consultant work,

10   where a project were to come up and, say, a

11   civil engineering services were needed, Cheshire

12   might reach out to various civil engineers,

13   including Johnny Lim, and say, I've got a

14   project, would you be willing to look at this

15   for me and give me a price that I could, you

16   know -- an estimate and the engage on a 1099

17   basis.

18   Q.    Would there be a contract with JCL or

19   Johnny Lim?

20   A.    Typically it would be a proposal, just a

21   proposal, and then that proposal would be

22   executed, and that would become the contract,

23   yes.

24   Q.    Would the proposal be a written proposal?

25   A.    Yes.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 21

1    Q.      And when I ask about a written contract,

2    to the degree that is -- what you described at

3    the outset.  Sorry.  Let me start the question

4    over again.

5            You described at the outset that Cheshire

6    Ventures was providing real estate development

7    consulting.  Does Cheshire Ventures do real

8    estate development itself?

9    A.      Cheshire Ventures was designed not to do

10   development itself.  It was designed to do the

11   consulting component of real estate development.

12   Q.      Okay.  Has Cheshire Ventures worked on

13   projects that have been developed?

14   A.      Define developed.  It certainly worked on

15   projects that are real in terms of they were

16   acquired and move forward.  But in and of

17   itself, it is not a development company.  It is

18   not setup to be a development company.  No.

19   Q.      To the extent Johnny Lim or JCL are being

20   loosely defined retained to help with this

21   project -- a project of this nature, would JCL

22   or Johnny Lim contract with the development

23   company or with you, Cheshire Ventures?

24   A.      It would be with Cheshire, through the,

25   like I said, through the proposal mechanism.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 22

```
 1    But if a project were to go beyond into full

 2    development phase, then they would presumably

 3    either contract directly or the developer would

 4    or whatever the entity was would move forward

 5    with their own -- with their own independent

 6    contractors.

 7    Q.     Has that, in fact, happened with Johnny

 8    Lim or JCL in a venture that they've had with

 9    Cheshire Ventures?

10    A.     There's been a lot of projects.  My guess

11    is, yes.  But I can't specify any.  We look at a

12    lot of stuff that may or may not happen.

13    Q.     What is Cheshire Ventures's experience in

14    real estate development consulting, and just to

15    sort of cut to the chase; is that your

16    experience?

17    A.     Right.  Yes.

18    Q.     Okay.  You mentioned that you're the

19    managing partner I believe you described?

20    A.     Managing principal, yes.

21    Q.     Managing principal.  What is your

22    compensation or what has your compensation been

23    over time, and if it's changed, if you can

24    describe how it's changed?

25    A.     Yeah.  It's contract-based.  It is -- it
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 23

1     is not a salary-based position.  It's an eat

2     what you kill, and when I say that, I mean, on a

3     per project basis.  Cheshire Ventures

4     traditionally entered into consulting

5     arrangements that can be short term or could be

6     long-term.  But, in essence, the compensation

7     then becomes lumpy.  When I say lumpy, sometimes

8     it's earning more per month.  Sometimes it's

9     learning less.  Sometimes earning nothing.

10    Q.     Does Cheshire Ventures have office space?

11    A.     Just my own.  Just what I delineate at my

12    home.

13    Q.     So your home office?

14    A.     Yes.

15    Q.     Does it have other assets?  Does it have

16    assets of any nature?

17    A.     No.  It's an LLC.

18    Q.     And is Cheshire Ventures set up as a sole

19    proprietorship?  Do you know?

20    A.     I think we did do it as a sole

21    proprietorship, as I recall.  I think that's

22    what Rod did.  Yes.

23    Q.     Okay.  To the degree that Cheshire

24    Ventures enters into a consulting arrangement

25    with a counterparty or another party, would that

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 24

```
 1     be -- would you, would Cheshire Ventures
 2     document that --
 3     A.     Yes.
 4     Q.     -- consulting arrangement?
 5     A.     Yes.
 6     Q.     And what form or what types of agreements
 7     would Cheshire Ventures enter into?
 8     A.     Well, it depends.  Certainly Cheshire has
 9     and continues to contract directly with an
10     entity based on a consulting arrangement or
11     consulting agreement.  Cheshire also is engaged
12     on a 1099 basis for other companies, whereby
13     Cheshire becomes the 1099 vendor, where they
14     don't have the capacity to do what Cheshire can
15     do.  And certainly, at times, Cheshire will
16     engage just on a single-project basis, where it
17     may or may not engage additional vendors.
18     Q.     Okay.  So does Cheshire Ventures have a
19     bookkeeper or anyone that performs bookkeeping
20     services on its behalf?
21     A.     Yes.
22     Q.     Who is that?
23     A.     Edwin -- my personal accountant, Edwin
24     Dell car Poe.  And I actually look yesterday,
25     Aldaris.  Aldaris is the name of his company in
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 25

1    Seattle.

2    Q.     How do you spell Aldaris?

3    A.     A-L-D-A-R-I-S.

4    Q.     And the person's name is Mr. Dell car?

5    A.     Dell car.

6    Q.     How do you spell that?

7    A.     Well, his first name's Edwin, E-D-W-I-N;

8    last name D-E-L-C-A-R-P-I-O.

9    Q.     And does Mr. Delcarpio provide you any

10   records, accounting or bookkeeping records?

11   A.     He does all the books for Cheshire, yes.

12   Q.     And does he provide you copies of

13   bookkeeping records?

14   A.     He does them.  I have to access to them.

15   Yes.

16   Q.     How do you have access to them?

17   A.     If I call and said, I'd like to see all

18   the books, he'd give me all the books.

19   Q.     And have you asked him and received

20   copies of -- have you asked and received copies

21   of the bookkeeping records that he keeps on

22   behalf of Cheshire Ventures?

23   A.     Only tax returns.  Not the full

24   bookkeeping.

25   Q.     And has Cheshire Ventures prepared and

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 26

```
 1    submitted tax returns for 2019?
 2    A.      I believe so, yes.
 3    Q.      2020?
 4    A.      I believe so, yes.
 5    Q.      2021?
 6    A.      I believe so, yes.
 7    Q.      Do you have copies of those returns?
 8    A.      I'd seen them.  I've seen them.  I don't
 9    know that I have copies, like, on my computer.
10    They're on a secure drive that I can look at
11    that he sent me.  Yes.
12    Q.      And who signs those tax returns on behalf
13    of Cheshire Ventures?
14    A.      I do.
15    Q.      And what types of expenses does Cheshire
16    Ventures have in a given year?
17    A.      That's hard to say.  It depends on the
18    year.  But the types would be your typical
19    travel, lodging, if there's a meal stipend in
20    the contract; those types of expenses.
21    Q.      Has Cheshire Ventures performed work on
22    behalf of Allcore?
23    A.      Cheshire Ventures is contracted and
24    licensed to Allcore to enable the notes that I
25    personally took out from CTBSRM to be repaid.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 27

```
 1    The work that it does is essentially a license

 2    fee.

 3    Q.      Okay.  I want to try to understand that.

 4    A.      Sure.

 5    Q.      So first, you said that -- and if I

 6    misstate this, correct me.  I'm just trying to

 7    make sure I understand some of the terminology

 8    in the relationship you just described.

 9    A.      Sure.

10    Q.      Cheshire Ventures, I believe you said, is

11    licensed to -- has a license of some nature with

12    Allcore?

13    A.      I believe that's the way Rod structured

14    it, yes.

15    Q.      What does that mean?

16    A.      That means that Cheshire pays a licensing

17    fee to Allcore, which is, I think, it's

18    98 percent of revenue goes to Allcore.

19    Q.      So 98 percent of Cheshire Ventures's

20    revenue is paid to Allcore?

21    A.      I believe that was -- that was the

22    agreement, the structure, yes.

23    Q.      Okay.  What is the nature or purpose of

24    that licensing fee?

25    A.      To put money back into Allcore and
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 28

```
 1    CTBSRM.
 2    Q.      Is there a document or a licensing
 3    agreement that exists --
 4    A.      Yes.
 5    Q.      -- for this purpose?
 6            Do you have a copy of that agreement?
 7    A.      I don't know if I have a copy of it, but
 8    Rod Atherton certainly does, yes.
 9    Q.      And what is the nature of the license --
10    the services that are subject to this licensing
11    agreement?
12    A.      I don't know that there are services
13    necessarily.  I know that Rod structured it as a
14    license based on what he thought was the most
15    appropriate way of doing it.
16    Q.      What did Mr. Atherton explain the reason
17    for this the arrangement?
18    A.      That it was the most appropriate way to
19    do it.
20    Q.      Do you know what he meant by, This is the
21    most appropriate way to do it?
22    A.      I suspect -- well, I believe that when he
23    said that he meant, This is the most efficient
24    and most -- most efficient and most business
25    appropriate way of -- and I assume that means
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 29

1      also tax advantageous way of structuring a way

2      that Allcore and CTBSRM could receive money from

3      Cheshire Ventures.

4      Q.      Okay.  Let me approach it this way to

5      make sure I understand.  To the degree that

6      Cheshire Ventures has consulting work with an

7      entity that is not Allcore, so some third-party

8      development company, is that work -- who is that

9      work by Cheshire Ventures being performed on

10     behalf of?

11     A.      Okay.  Let me make sure I understand your

12     question.

13     Q.      Fair enough.  Let me rephrase that.

14             When Cheshire Ventures has a -- let's

15     identify in 2019 a developer that Cheshire

16     Ventures did work with.

17     A.      Yes.

18     Q.      Can you identify just some developer that

19     Cheshire Ventures was doing work for in 2020?

20     A.      PointOne Holdings.

21     Q.      PointOne.  To the degree that Cheshire

22     was performing services for PointOne, was

23     Cheshire's in any way connected to or related to

24     or associated with Allcore?

25     A.      Other than fees paid pursuant to a

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 30

1    consulting between Cheshire, and in this case

2    Point One, would have a licensing agreement that

3    paid Allcore a percentage of whatever came into

4    Cheshire.  Other than that, no.

5    Q.    Okay.  And that percentage would be 98

6    percent?

7    A.    I believe we left 2 percent in Cheshire

8    and the other 98 percent.  I'm not -- I don't

9    want to say specifically.  It was in that

10   neighborhood, roughly.

11   Q.    Do you know if what is, the subject of

12   the license fee, is net or gross receipts of

13   what comes to Cheshire that is passed on to

14   Allcore?

15   A.    My understanding was it was intended to

16   be gross.

17   Q.    And what I mean by that, just to be

18   clear, is, are you being paid monies out of

19   Cheshire prior to those monies that the

20   remainder being passed on to Allcore and CTBSRM

21   or --

22   A.    I did take draws against Cheshire prior

23   to this -- to the license agreement being put

24   together.  So there was money in Cheshire that I

25   could take draws against.  Yes.  So I think your

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 31

```
 1      question was, is it gross or was it net?  I

 2      think it was intended to be gross, but the

 3      structure was set up at the end of 2019, early

 4      2020, and the license fee -- so I've been

 5      working with Cheshire since 2019, and up and

 6      until that PointOne in time, I had just taken

 7      draws against Cheshire.

 8      Q.     So in this period from the beginning of

 9      Cheshire up until this licensing fee is in

10      place, you're taking draws from Cheshire?

11      A.     Yes.

12      Q.     Are you taking draws from Cheshire after

13      the licensing fee is put in place?

14      A.     That was the intention, but I think it

15      was six -- maybe three or four months after that

16      agreement was in place, the FBI came to my house

17      and things changed from a financial perspective

18      for me.

19      Q.     Okay.  And what I'm -- so would Cheshire

20      Ventures -- did you, in fact, receive draws from

21      Cheshire Ventures in 2019?

22      A.     Yes.

23      Q.     Approximately how much money?

24      A.     In 2019?

25      Q.     Yes.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 32

```
1     A.      Probably roughly $400,000.

2     Q.      How frequently would you take these

3     draws?

4     A.      Whenever -- I mean, no dedicated

5     frequency.  Randomly.

6     Q.      In 2020 -- approximately when was the

7     licensing arrangement with -- sorry.  Let me

8     back up.

9             Who is the licensing agreement with

10    between Cheshire Ventures?

11    A.      I believe it's Cheshire and Allcore.

12    Q.      Okay.  You mentioned CTBSRM --

13    A.      Yes.

14    Q.      -- previously.  Does Cheshire have a

15    contractual arrangement of some nature with

16    CTBSRM?

17    A.      No. I don't believe so.

18    Q.      Okay.  So with Allcore.  Approximately

19    when was that licensing agreement put in place?

20    A.      I believe it was Q4 of 2019 or if it was

21    the end -- December or January.  So it was

22    either December 2019 or January of 2020.

23    Q.      And after the licensing agreement is put

24    in place, do you continue to take draws from

25    Cheshire, understanding that the FBI executed a
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 33

```
 1     search warrant in April?  Between, you know, Q4
 2     of 2019 and April of 2020, do you continue to
 3     take draws from Cheshire?
 4     A.     I did.  Yes.
 5     Q.     And was Cheshire this licensing agreement
 6     where upwards of 98 percent of gross receipts
 7     but whatever actual amount is transferred to
 8     Allcore, is that, in fact, happening after that
 9     licensing?  Is some amount of monies being
10     transferred to Allcore pursuant to that
11     licensing agreement after it's put in place?
12     A.     We may have done one, but it dried up
13     pretty quickly.
14     Q.     Okay.  Where is Cheshire Ventures bank
15     account?
16     A.     Geographically or?
17     Q.     What bank is it with?
18     A.     I believe U.S. Bank.
19     Q.     Is there a dedicated Cheshire Ventures
20     bank account?
21     A.     Yes.
22     Q.     Did Cheshire operate out of any other
23     bank accounts other than 2it's own business
24     account?
25     A.     No.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 34

1    Q.    Did Cheshire -- did payments to Cheshire

2    for Cheshire services ever get paid into your

3    direct account, into your personal account?

4    A.    Not that I'm aware of.

5    Q.    To the extent you took draws from

6    Cheshire Ventures, where would those monies be

7    transferred from the Cheshire -- would they be

8    withdrawn from the Cheshire Ventures business

9    account?

10   A.    Yes.

11   Q.    And where would they go to?

12   A.    To my personal account.

13   Q.    Okay.  To the degree that Cheshire

14   Ventures's monies were transferred to Allcore,

15   would that go from the Cheshire Ventures's

16   business account to an Allcore bank account?

17   A.    Yes.

18   Q.    Who would cause that transfer?

19   A.    That would have been either myself or Rod

20   Atherton.

21   Q.    Who had access to Cheshire Ventures bank

22   account?

23   A.    I did.

24   Q.    Who had signature authority over it?

25   A.    I did.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 35

1    Q.    Did Ronnie Atherton have any authority

2    over Cheshire Ventures's bank account?

3    A.    I don't think.  Other than helping me set

4    it up, I don't think he had authority.

5    Q.    To a degree a transfer was executed

6    between bank accounts, who would have caused,

7    who would have effectuated that transfer?

8    A.    Yeah, it would have been myself, or

9    Rodney calling me saying you need to do in this

10   for whatever reason.

11   Q.    So Mr. Atherton might make a request of

12   you, but you would execute on the request to

13   cause the monies?

14   A.    Yes.

15   Q.    Did anybody else in your family have

16   access to the Cheshire Ventures bank account?

17   A.    No.

18   Q.    Did you share information regarding the

19   bank balances or payments or expenditures out of

20   the Cheshire Ventures's bank account with

21   anybody.  By that I mean, statements or wired

22   documents or anything like that, did you share

23   those with anybody?

24   A.    Yes.

25   Q.    Who?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 36

1    A.    My accountant.

2    Q.    Okay.  Anybody besides your accountant?

3    A.    No.

4    Q.    Would you send any documents related to

5    Cheshire Ventures's bank account to Mr.

6    Atherton?

7    A.    I don't know if I did or not.  I don't

8    remember.

9    Q.    The licensing agreement with -- let's

10   take a look at 57, Exhibit 2.

11         (Exhibit Number 2 was marked.)

12   BY MR. STOKES:

13   Q.    Do you have that document in front of

14   you?

15   A.    I do.

16   Q.    Do you recognize that document?

17   A.    I do.  I don't remember specifically, but

18   this is -- yes.  This is what I was talking

19   about.

20   Q.    Okay.  So this, Exhibit 2 is labelled a

21   facilitator agreement?

22   A.    Yes.

23   Q.    And does it appear from this document

24   that the facilitator agreement is between

25   Allcore and Cheshire Ventures?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 37

```
 1    A.      That's what it says.  Yes.

 2    Q.      Okay.  You mentioned a licensing

 3    agreement before.  When you're referring to that

 4    licensing agreement before, is that a reference

 5    to this facilitator agreement?

 6    A.      Yes.  I remember it being called a

 7    license agreement for some reason, but maybe it

 8    was called the Facilitator Agreement.

 9    Q.      If you would take a moment to read the

10    section of the agreement 2.0 contractor

11    services.

12    A.      Okay.

13    Q.      Did you review this document in

14    preparation for the deposition today?

15    A.      I did not.

16    Q.      Does that refresh your memory as to what

17    the agreement provided or the contractual

18    relationships between Allcore and Cheshire

19    Ventures?

20    A.      This -- this agreement does refresh my

21    memory as to the generic structure of how

22    Cheshire was going to pay Allcore.  This one

23    isn't signed.  I don't -- I'm not certain that

24    this didn't become a -- I'm blanking now -- I

25    want to say a lease agreement but I mean --
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 38

1    Q.    A license agreement?

2    A.    A licensing agreement.  Thank you.  A

3    license agreement.  I'm not sure if this was

4    just the initial draft that Rod sent me and then

5    changed it to license or not.  But certainly,

6    this is the generalized structure.

7    Q.    The services described here in the

8    contractor services, are those the types of

9    services that Cheshire Ventures performed for

10   Allcore?

11   A.    They could be.  Yes.

12   Q.    Well, did Cheshire Ventures, in fact,

13   perform services for Allcore?

14   A.    No, it did not.

15   Q.    Did Cheshire Ventures pay Allcore any

16   money pursuant to this agreement?

17   A.    As I recall, it may have once, but I

18   don't specifically recall if it did or not.  It

19   certainly would be in the bank records if we

20   did.  Like I said, this is January of 2020.  So

21   three months later, the FBI shows up and things

22   changed.

23   Q.    Okay.  Was that four months later?

24   A.    Yeah I suppose four months later.

25   April 2nd.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 39

1    Q.      And so prior to -- so this agreement is,

2    according to the first paragraph of the

3    document, is dated -- is effective as of

4    January 1, 2020.  So prior to this agreement's

5    date, January 1st of 2020, was Cheshire Ventures

6    performing any services for Allcore?

7    A.      No.

8    Q.      What was Cheshire Ventures relationship

9    to Allcore prior to January 1, 2020?

10   A.      It didn't have one.

11   Q.      Did Cheshire Ventures pay any monies to

12   Allcore prior to January 2020?

13   A.      No.  As far as I know, no.

14   Q.      This document purports that Cheshire

15   Ventures, going forward, will provide business

16   development for development management services

17   or other services required to bring about a

18   successful conclusion of certain development

19   projects associated with the contractor contacts

20   and referrals.

21          Do you see that, that describes that down

22   in the contractor services 2.1?

23   A.      2.1.

24   Q.      Yeah.  Let me ask the question this way.

25   What services do you recall Cheshire Ventures

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 40

1    contemplated performing on behalf of Allcore?

2    A.      I think the concept was as a real estate

3    development consulting entity, presumably that

4    would give way to potential development

5    opportunities or capital opportunities or

6    anything in the real estate development's sphere

7    that might potentially lead to a development of

8    a project that Allcore could participate in.

9    Q.      You previously mentioned that Cheshire

10   Ventures was going to pay over 98 percent of its

11   gross receipts to Allcore.

12   A.      Yes.

13   Q.      Yeah.  Is that gross receipts, was your

14   understanding, that Cheshire Ventures would pay

15   over 98 percent of its gross receipts just on

16   the projects that related to Allcore, or on all

17   projects?

18   A.      On all projects.

19   Q.      Okay.  Was Cheshire Ventures, going

20   forward from this agreement, going to perform

21   services that would not relate to Allcore?

22   A.      Yes.

23   Q.      What types of services?

24   A.      Real estate development consulting

25   services.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 41

1    Q.    So to the degree that Cheshire Ventures

2    perform real estate performing services that

3    were not related to Allcore, was Cheshire

4    Ventures still intending to pay over 98 percent

5    of its gross receipts to Allcore?

6    A.    Yes.

7    Q.    Why?

8    A.    Because I had outstanding notes in the

9    amount of about $2 million through CTBSRM.

10   Q.    What do you mean by that?  What do you

11   mean?  How is that -- what I'm asking is, how is

12   that an explanation for why Cheshire Ventures

13   was going to pay over its -- 98 percent of its

14   gross receipts to Allcore for work that didn't

15   relate to Allcore?

16        MR. LITTLE:  Objection to the form.

17   Asked and answered.  Are you asking him to

18   explain why his answer is his answer?

19        THE WITNESS:  The -- I personally

20   had $2 million in notes that needed to be

21   repaid.  My consulting company, Cheshire

22   Ventures, contracted with Allcore to repay those

23   notes through any project that Cheshire Ventures

24   might have undertaken.

25   BY MR. STOKES:

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 42

1    Q.    What is the form of that contract that

2    you're referring to that Cheshire Ventures had

3    with Allcore with regard to Cheshire Ventures

4    repaying your notes with Allcore?

5              MR. LITTLE:  Objection to form.

6              THE WITNESS:  This agreement is --

7    the 98 percent of gross receipts is intended to

8    go to Allcore and would pay down those notes.

9    BY MR. STOKES:

10   Q.    Okay.  So is this facilitator -- I just

11   want to make sure I understand --

12   A.    Sure.

13   Q.    -- this so facilitator agreement talks

14   about the real estate services, as you can see

15   here?

16             MR. LITTLE:  Objection to form.

17             THE WITNESS:  It talks about a lot

18   of things.  Yes.

19   BY MR. STOKES:

20   Q.    Does -- would you point out to us where

21   the facilitator agreement provides that the

22   purpose of the payments from the Cheshire

23   Ventures to Allcore is to satisfy personal notes

24   that you have with Allcore?

25   A.    I don't think it says that.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 43

1    Q.    Okay.  I believe -- is there -- was

2    there -- did you have an understanding that

3    Cheshire Ventures's payments to Allcore were in

4    part or in whole to satisfy your notes with

5    Allcore?

6                    MR. LITTLE:  Objection to form;

7    objection to the basis of the 30(b)(6)

8    deposition.  Are you asking this of Carleton

9    Nelson the person, or are you asking as the

10   corporate representative?  You said, You, and it

11   sounds like you did not refer to Cheshire

12   Ventures.

13   BY MR. STOKES:

14   Q.    I'm referring to you in your capacity as

15   the managing principal of Cheshire Ventures or

16   Cheshire Ventures.

17                   MR. LITTLE:  Well, to the extent

18   you're not asking about Cheshire Ventures, I'd

19   object on the basis that it can't buy in

20   Cheshire Ventures.  To the extent you're asking

21   him specifically, I'll just note that.

22                   THE WITNESS:  As a managing

23   principal of Cheshire, my intention was to see

24   that any monies that Cheshire Ventures earned

25   based on this agreement went to Allcore and that

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 44

1    would in part or in whole satisfy the notes.

2    Yes.

3    BY MR. STOKES:

4    Q.    And what notes would this include that

5    you had with -- that you personally had with

6    Allcore that Cheshire Ventures was going to

7    satisfy?

8    A.    Cheshire Ventures didn't have a note.

9    Q.    I understand Cheshire Ventures didn't,

10   but what notes are you referring to?

11   A.    Carleton Nelson had notes out from

12   Renrets to Allcore Development or to CTBSRM.

13   Q.    Okay.  And so Carleton Nelson being you?

14   A.    Yes, being me.

15   Q.    Right.  And so when you say Carleton

16   Nelson had notes with Renrets, what do you mean

17   by that?

18   A.    I mean, that a line of credit had been

19   issued and money had been borrowed against the

20   company that was to Carleton Nelson as a person,

21   and Carleton Nelson as a managing principal of

22   Cheshire Ventures, intended to use proceeds from

23   work that Cheshire Ventures, did to fund

24   Allcore, and in part or in whole, repay those

25   notes.

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 45

```
 1    Q.     So as we discussed yesterday, there were
 2    notes in your personal capacity with Allcore, so
 3    that's what you're referring to here?
 4    A.     Yes.
 5    Q.     There are also notes with Renrets?
 6    A.     Well.
 7    Q.     A note --
 8    A.     It's one of the same.  Yes.  It
 9    originally was one note with me in my personal
10    capacity.  That was folded into a note through
11    Renrets, correct.
12    Q.     Did you view yourself as responsible for
13    the Renrets notes?
14    A.     Yes.
15           MR. LITTLE:  Objection to form.
16           THE WITNESS:  Yes, I did.
17    BY MR. STOKES:
18    Q.     And how much monies did Cheshire Ventures
19    contribute or pay down on those notes?
20    A.     None.
21    Q.     Why?
22    A.     Because in April 2nd the FBI visited my
23    home and ended up taking all my money.
24    Q.     In 2019, you mentioned that you took a
25    draw of $400,000 from Cheshire Ventures.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 46

```
 1    A.     Cheshire Ventures earned approximately
 2    $400,000, yes.
 3    Q.     Okay.  So how much of the $400,000 that
 4    Cheshire Ventures earned in 2019 was paid
 5    towards those notes?
 6    A.     None.  The agreement wasn't in placement
 7    then.
 8    Q.     What was the money used for from Cheshire
 9    Ventures in 2019?
10             MR. LITTLE:  Objection to the form.
11             THE WITNESS:  It's hard to say.  I
12    don't know how much the government took and how
13    much I used.
14    BY MR. STOKES:
15    Q.     Previously, just to make sure we're clear
16    for the record, I believe you took draws over
17    time --
18    A.     Yes.
19    Q.     -- from Cheshire Ventures in 2019 of
20    approximately 400,000.  Do you -- so I just want
21    to make sure this is clear for the record.
22             Do you know how much money you drew down
23    from Cheshire Ventures for your personal
24    purposes in 2019?
25    A.     So I believe your question was, how much
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 47

1    did Cheshire earn in 2019, not how much in draws
2    I took.  So let me clarify.
3         I believe Cheshire earned approximately
4    $400,000 in 2019.  I do not know exactly how
5    much in draws I took personally from Cheshire
6    Ventures in 2019.
7    Q.    Do you know generally how much in draws
8    you took from Cheshire Ventures in 2019?
9    A.    I don't.
10   Q.    Okay.  Did you -- besides you drawing
11   down money for your own -- for your personal
12   purposes, what other purposes would Cheshire
13   Ventures's monies have been used for in 2019?
14             MR. LITTLE:  Objection to the form.
15   One, because if you're asking about how he's
16   spending any money that he's obtained through
17   Cheshire Ventures, it's not a proper topic of
18   the 30(b)(6) deposition.
19             And if you're asking him then
20   personally, then we'll just need to note that
21   time for the seven hours you're asking him about
22   him personally.  If the question is Cheshire
23   Ventures is using its money, then we need to
24   clarify that for purposes of the 30(b)(6).
25             MR. STOKES:  For the record, I'd ask

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 48

```
 1    that you not give speeches.
 2               MR. LITTLE:  Well, Patrick, I'm
 3    not going to allow you --
 4               MR. STOKES:  The question was clear.
 5               MR. LITTLE:  It was not.
 6               MR. STOKES:  I was clearly asking
 7    about Cheshire Ventures and his draws from
 8    Cheshire Ventures and how monies that were not
 9    used, drawn down by him, were used by Cheshire
10    Ventures.
11               So I would ask that you stop giving
12    speeches on the record.
13               MR. LITTLE:  Patrick, you've been on
14    both sides of those question the last four
15    times.
16               MR. STOKES:  And to be the clear for
17    the record, we can, of course, ask questions
18    beyond those in the notice.
19               MR. LITTLE:  I'll make sure we point
20    that out when we get to your 30(b)(6), because
21    you guys have objected with 80 pages of
22    objections.
23               MR. STOKES:  That, of course, is
24    completely irrelevant to this hearing and --
25               MR. LITTLE:  It's not irrelevant.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 49

1     The position you're taking here will be the

2     position we expect you to take in a 30(b)(6) for

3     Amazon, so if you ask questions outside the

4     topics --

5                    MR. STOKES:  Why don't we go off the

6     record?

7                    MR. LITTLE:  I got nothing further

8     to say.

9                    MR. STOKES:  Yeah.  Okay.  Alex, if

10    you're going to keep --

11                   MR. LITTLE:  We're still on the

12    record, right?

13                   THE REPORTER:  Yes.

14                   THE VIDEOGRAPHER:  Do you want me to

15    go off the record?

16                   MR. STOKES:  Yes.  Go off the

17    record.

18                   MR. LITTLE:  No.  We're not agreeing

19    to go off the record.  What is the purpose?

20                   MR. STOKES:  Because I want to talk

21    to you about your interference with the

22    deposition, and if you want to talk about the

23    scope of the --

24                   MR. LITTLE:  I objected three time.

25                   MR. STOKES:  If you want to talk

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

```
 1    about the scope of the 30(b)(6), I'm happy to
 2    talk to you about that off the record;
 3    otherwise, please stop interfering with the
 4    deposition.
 5                    MR. LITTLE:  Let's talk about the
 6    30(b)(6).  We can go off.
 7                    THE VIDEOGRAPHER:  We're going off
 8    the record.  The time is 10:02 a.m.
 9                    (Discussion off the record.)
10                    THE VIDEOGRAPHER:  We're returning
11    to the record.  The time is 10:05 a.m.
12    BY MR. STOKES:
13    Q.    Mr. Nelson, how much money did you draw
14    down from Cheshire Ventures in 2019?
15    A.    I don't know.
16    Q.    Of the monies, was there money that
17    remained in Cheshire Ventures in 2019 that you
18    did not draw down?
19    A.    Yes.
20    Q.    What was that money used for?
21    A.    It funded Cheshire Ventures to do
22    whatever it needed to do.
23    Q.    What does that mean?  What does Cheshire
24    Ventures do whatever it needed to do?
25    A.    Well, it funded the ability for Cheshire
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 51

1    to travel places and stay in hotels and to

2    potentially engage with outside consultants and

3    pay them.  Basic operational stuff.

4    Q.    And the work that Cheshire Ventures did

5    in 2019, was it performing any of that work on

6    behalf of or for the benefit of Allcore?

7    A.    No.

8    Q.    Was it performing any of that work on

9    behalf of or for the benefit of CTBSRM?

10   A.    No.

11   Q.    Was it performing any of that work on

12   behalf of or for the benefit of the 2010 trust?

13   A.    No.

14   Q.    In 2020 -- well, the facilitator

15   agreement that we've been looking at, Exhibit 2,

16   did that agreement have any purpose other than

17   to serve as forming a tax structure?

18   A.    Yes.

19   Q.    What purpose?

20   A.    Was to pay money to Allcore.

21   Q.    For what purpose?

22   A.    To fund Allcore and pay down personal

23   notes.

24   Q.    Was any of Cheshire Ventures's monies

25   used to pay down your personal notes?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 52

1    A.     Not that I'm aware of, no.

2    Q.     To the extent that Cheshire Ventures was

3    going to fund Allcore, what was that money being

4    used to fund Allcore for?

5    A.     Real estate development activities.

6    Q.     Okay.  What personal interest would --

7    what interest would Cheshire Ventures -- what

8    interest did Cheshire Ventures have in Allcore?

9    A.     Cheshire Ventures has no interest in

10   Allcore.

11   Q.     Did it have any ownership interest?

12   A.     No.

13   Q.     What would Cheshire Ventures receive from

14   Allcore in exchange for provided 98 percent of

15   its gross receipts to Allcore?

16   A.     Nothing.

17   Q.     Who would benefit, then, from Cheshire

18   Ventures providing Allcore 98 percent of its

19   gross receipts?

20   A.     Allcore.

21   Q.     Would you personally benefit?

22   A.     Possibly.

23   Q.     You mentioned that it would be paying

24   your personal notes with Allcore.

25   A.     Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

```
 1    Q.      Was -- did Cheshire Ventures have an
 2    ownership stake in Allcore?
 3    A.      No.
 4    Q.      To the degree that Cheshire Ventures is
 5    paying, intended to pay 98 percent of its gross
 6    receipts to Allcore, would you personally
 7    receive any ownership stake in Allcore?
 8    A.      No.
 9    Q.      Who owned Allcore?
10    A.      Christian Kirschner.
11    Q.      Who -- to the degree that Allcore
12    received receipts and engaged in development
13    business, who would profit from that development
14    business?
15    A.      Well, it depends on the deal.  It's hard
16    to say.  I don't know.  You're asking a
17    theoretical.
18    Q.      Well, did Allcore engage in any business
19    on behalf of or for the benefit of Cheshire
20    Ventures?
21    A.      No.
22    Q.      Did Cheshire Ventures pay money to
23    Allcore for some purpose, other than paying down
24    your notes?
25    A.      If any money was paid, and I don't
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 54

1    remember that it was or wasn't, like I said, I

2    thought there was at least one payment -- it

3    would have been -- there would have been

4    multiple reasons for that money to be there.

5    One of which was to pay down the notes.  The

6    other or which was to continue Allcore --

7                (Clarification by Reporter)

8                THE WITNESS:  -- to pursue real

9    estate development activities.

10   BY MR. STOKES:

11   Q.    So help, so explain why monies earned by

12   Cheshire Ventures that are paid to Allcore would

13   be paid to Allcore and provide no benefit to

14   Cheshire Ventures?

15                MR. LITTLE:  Object to form.

16                THE WITNESS:  Well, you yourself

17   said that they would pay down my personal notes.

18   That is a benefit.

19   BY MR. STOKES:

20   Q.    How is that benefit to Cheshire Ventures?

21   A.    Well, I'm the managing principal of

22   Cheshire Ventures.

23   Q.    Okay.  So was Cheshire Ventures's

24   activities being performed as an alterego of

25   yourself?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 55

```
1              MR. LITTLE:  Objection to form.
2      Calls for a legal conclusion.
3              THE WITNESS:  Cheshire Ventures was
4      being performed as an LLC.  Period.
5      BY MR. STOKES:
6      Q.    The monies that are identified in the
7      services and the services that are being
8      identified in the facilitator agreement, was
9      there an intention for Cheshire Ventures or you
10     to personally benefit from monies or operations
11     performed by Allcore in the future -- put aside
12     the notes?  Monies paid to Allcore by Cheshire
13     Ventures that you said could be used or would be
14     used for real estate development work, was that
15     Cheshire Ventures's benefit or for your personal
16     benefit?
17              MR. LITTLE:  Objection to form.
18              THE WITNESS:  Yeah.  I don't
19     understand the question.  Can you rephrase the
20     question.
21     BY MR. STOKES:
22     Q.    Sure.  You said that this facilitator
23     agreement and your understanding of the
24     agreement was that Cheshire Ventures would pay
25     monies, 98 percent of its gross receipts to
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 56

```
 1      Allcore; is that right?

 2      A.      Yes.

 3      Q.      And that those monies would be used by

 4      Allcore for its own development work as well as

 5      to pay down your notes?

 6      A.      Yes.

 7      Q.      To the degree it's being used for

 8      development work, to whose benefit would that

 9      accrue?

10      A.      Again, that depends on the deal.  Each

11      deal is a snowflake.  It's hard to know without

12      a specific deal.

13      Q.      Did Allcore engage in any business on

14      behalf -- in connection with Cheshire Venture --

15      Cheshire Ventures?

16      A.      No.

17              (Exhibit Number 3 was marked.)

18      BY MR. STOKES:

19      Q.      Let's take a look at Tab -- Exhibit 3,

20      Tab 31.

21      A.      I see it.

22      Q.      Okay.  Do you recognize this document?

23      A.      I do.

24      Q.      Is this a document that Cheshire Ventures

25      produced in this litigation?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 57

1           MR. LITTLE:  Objection; form.
2           THE WITNESS:  It has a Cheshire
3    Bates stamp on it, yes.
4    BY MR. STOKES:
5    Q.    What is this document?
6    A.    I believe this is a structure of the
7    bonus that Rod and Von were to get through
8    Allcore based off of a loss that Rod had
9    indicated he had, leaving the company in
10   effective the same financial position in the
11   next following year.
12   Q.    Okay.  So this is an e-mail from Cheshire
13   Ventures to Rod Atherton, right?
14           MR. LITTLE:  Objection to form.
15           THE WITNESS:  That's what the e-mail
16   says.  Yes.
17   BY MR. STOKES:
18   Q.    Who is that e-mail address
19   CheshireVentures@outlook.com.  Who is that
20   associated with that e-mail address?
21   A.    I was.
22   Q.    Did you have other Cheshire Ventures's
23   e-mail addresses?
24   A.    I don't think so.  I might have had one
25   or two that they assigned to me, but not that

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 58

1    I'm aware of.

2    Q.     When you say "they assigned" you, who

3    assigned you?

4    A.     I believe I did that through Godaddy or

5    through Outlook Godaddy gave me additional

6    e-mails.

7    Q.     And the subject line of this e-mail with

8    Mr. Atherton, it says, "revised bonus."

9           What is the bonus related to?

10   A.     Allcore.

11   Q.     Why would Cheshire Ventures be involved

12   in communications with Mr. Atherton about a

13   bonus that Mr. Atherton would receive in

14   connection with Allcore's business?

15   A.     I was using the Cheshire Ventures's

16   e-mail.  That's it.

17   Q.     What services had Mr. Atherton provided

18   to Allcore that would permit him to receive a

19   bonus?

20   A.     Is this about Allcore or about Cheshire?

21   Q.     It's a Cheshire e-mail.  Can you explain

22   to us what --

23   A.     To the extent I was using my Cheshire

24   e-mail to send this, yes.  That's all Cheshire's

25   involvement was in this, was Cheshire used an

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 59

1    e-mail to send a communication.

2    Q.    Okay.  So Cheshire Ventures being you,

3    are interacting with the attorney for Allcore

4    and providing a schedule of bonuses for

5    Mr. Atherton and Mr. Von Lacy; is that right?

6              MR. LITTLE:  Objection to form.

7    Mischaracterizes his testimony.

8              THE WITNESS:  I'm using a Cheshire

9    e-mail account to communicate with Rod Atherton.

10   Yes.

11   BY MR. STOKES:

12   Q.    Okay.  What are you communicating to him

13   here?

14   A.    I'm communicating to him a bonus

15   structure that has nothing to do with Cheshire

16   Ventures.

17   Q.    So you say.  So explain what the bonus

18   structure is?

19              MR. LITTLE:  Objection to form.

20              THE WITNESS:  This case, it says,

21   total bonus, and it has a Rod number, a Von

22   number, a CNCK number, a Rod number, and Von

23   number, it looks like a net, and then a gifted

24   back number.

25   BY MR. STOKES:

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 60

```
1     Q.     Okay.  What does CN stand for?

2     A.     I believe Carl Nelson.

3     Q.     What does CK stand for?

4     A.     I believe Casey Kirschner.

5     Q.     And what is the bonus that you're

6     referring to here?

7     A.     This would have been a bonus for Rod and

8     for Von.

9     Q.     For what purpose?

10    A.     It's an annual bonus.

11    Q.     For what services?

12    A.     For their work with Allcore.

13    Q.     What work had they done for Allcore that

14    supported this bonus?

15               MR. LITTLE:  Objection to the form.

16    Also outside of the 30(b)(6) deposition.

17               THE WITNESS:  I mean, Cheshire has

18    nothing to do with this other than the e-mail.

19    BY MR. STOKES:

20    Q.     There's a document here from Cheshire

21    Ventures to Rod Atherton about bonuses --

22               MR. LITTLE:  That's not correct.

23    BY MR. STOKES:

24    Q.     -- so I think we're entitled to ask you

25    about Cheshire Ventures's business here.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1              MR. LITTLE:  And he answered that
 2   part, and to the extent that you continue to ask
 3   this line of questioning, we will note the time
 4   for purposes of his deposition.
 5              MR. STOKES:  We, of course, disagree
 6   with that.
 7              MR. LITTLE:  That's fine.  What
 8   time --
 9              MR. STOKES:  Since this is a
10   Cheshire Ventures that's being --
11              MR. LITTLE:  That's not what he --
12   that's not what he's testified to at all.
13              MR. STOKES:  I understand that's
14   what he's testified to --
15              MR. LITTLE:  That's great.
16              MR. STOKES:  -- and so we are
17   continuing to explore whether that is true.
18              MR. LITTLE:  And he told you three
19   different ways that that is true.
20   BY MR. STOKES:
21   Q.    So continue.
22   A.    If I had had used my G-mail, would it
23   have been a G-mail venture?
24   Q.    Again --
25   A.    The answer is, no.  It's a Cheshire
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 62

1    Ventures e-mail to communicate.  It has nothing

2    to do with Cheshire.

3    Q.    Okay.

4    A.    That's the answer, Pat.  There's nothing

5    else.

6    Q.    Okay.  So is it clearly within the topics

7    of what we've set forth in this 30(b)(6) topic

8    six, but it is also a Cheshire Ventures e-mail.

9         So the question to you, Mr. Nelson, is:

10   What is the purpose, what is the support for the

11   bonus that you are indicating should be paid to

12   Rod Atherton --

13            MR. LITTLE:  Same objection.

14   Also --

15            MR. STOKES:

16   Q.    -- and Von Lacy?

17            MR. LITTLE:  -- as to the lack of

18   clarity as to the "you."

19            THE WITNESS:  In my capacity, as the

20   managing principal of Cheshire Ventures, I had

21   no authority nor did I have any understanding as

22   to what this would have been.

23   BY MR. STOKES:

24   Q.    You sent an e-mail to Rod Atherton laying

25   out a bonus structure.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 63

1              MR. LITTLE:  Same objection.

2    BY MR. STOKES:

3    Q.    What is the structure of that bonus

4    that you're --

5              MR. LITTLE:  Same objections.

6    Q.    -- that you're saying --

7              THE WITNESS:  It's not related to

8    Cheshire Ventures.

9    BY MR. STOKES:

10   Q.    Are you refusing to answer the question?

11   A.    I'm telling you here that's nothing

12   related to Cheshire Ventures.

13   Q.    Are you refusing to answer the question

14   as to what you know in your capacity sitting

15   here in this deposition today?

16             MR. LITTLE:  Are you asking him in

17   his capacity as Cheshire Ventures or his

18   capacity as --

19             MR. STOKES:  I don't know what

20   capacity he knows --

21             MR. LITTLE:  -- capacity as Cheshire

22   Ventures?

23             MR. STOKES:  For the record,

24   Mr. Little, I would ask that you stop

25   interfering in the deposition.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 64

 1            MR. LITTLE:  I'm making objections

 2      on the record, which is perfectly my purpose

 3      here today.

 4            MR. STOKES:  And for the record, we

 5      also did offer to meet and confer with you on

 6      this deposition, and you did not take us up on

 7      it.

 8            MR. LITTLE:  That's not true.  Where

 9      is the e-mail, Patrick?  That is not true.

10            MR. STOKES:  We're not here to

11      answer your questions.

12            MR. LITTLE:  Put on the record that

13      that is false.

14            MR. STOKES:  You can look through

15      your own e-mails.

16            MR. LITTLE:  Okay.

17      BY MR. STOKES:

18      Q.    So, Mr. Nelson, are you refusing to

19      answer questions about this e-mail that is from

20      Cheshire Ventures?

21      A.    In my capacity as managing principal for

22      Cheshire Ventures, who sent this e-mail, I

23      understand this to be a chart showing total

24      bonus with Rod, with Von, with CNCK, with Rod,

25      Von, gifted back and numbers attached to it.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 65

1    That's all Cheshire Ventures would have known

2    about that.

3    Q.     And you're the managing principal for

4    Cheshire Ventures?

5    A.     Yes.

6    Q.     And so what did you know about that?

7               MR. LITTLE:  Same objection.  We're

8    going to start counting time.  If you don't want

9    to do it that way, then I will direct him not to

10   answer the question.

11              MR. STOKES:  We do not agree to

12   that, and this is entirely inappropriate.

13              MR. LITTLE:  Then I'm directly him

14   not to answer.  That's fine.  You guys are

15   trying to get out your seven-hour limit.  The

16   rest has nothing to do with Cheshire Ventures.

17   That's clear from your (sic) testimony

18   yesterday.

19              You started on this topic.  You

20   didn't ask any of these questions yesterday.

21   You had this e-mail available to you yesterday.

22   He talked about this bonus yesterday, and you

23   didn't ask any questions.  And so you're clearly

24   trying to evade the seven-hour limit by asking

25   questions that are not about Cheshire Ventures

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 66

```
 1    and a Cheshire Ventures 30(b)(6).  It's
 2    inappropriate, and we are going to tell him to
 3    not answer questions about those.
 4              He's answered your questions about
 5    Cheshire Ventures.
 6              MR. STOKES:  Okay.
 7              MR. LITTLE:  We've gone for a hour.
 8    It's probably a good time for a break.
 9              MR. STOKES:  No.  We're not going to
10    take a break now.  We're going to stay on the
11    record.
12              MR. LITTLE:  That's fine.
13              MR. STOKES:  Mr. Little, what you
14    just said is completely inappropriate --
15              MR. LITTLE:  Which part?
16              MR. STOKES:  -- not true.  We're
17    asking Mr. Nelson topics -- about topics that
18    are within the topic 30(b)(6).  This is also an
19    e-mail from Cheshire Ventures.  Mr. Nelson can
20    fence and describe this e-mail coming from
21    whoever he likes, but we are perfectly entitled
22    to ask him about his knowledge as a
23    representative of Cheshire Ventures and --
24              MR. LITTLE:  And he has answer that
25    question --
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 67

1              MR. STOKES:  And he clearly know --

2              MR. LITTLE:  -- literally three

3     times.

4              MR. STOKES:  -- and he clearly knows

5     about the topics of this e-mail that hey chooses

6     now to try to distinguish between his knowledge

7     that he knows as to Cheshire Ventures versus

8     himself versus some other role with these

9     entities is fine.  He can explain that on the

10    record.  And he can provide his knowledge, and

11    we can later dispute whether or not that is

12    within the scope of 30(b)(6) or within the scope

13    of his role as Cheshire Ventures, but clearly he

14    is wearing multiple hats at the same time in his

15    operations of these various entities.  So we are

16    entitled to explore and ask about that,

17    particularly where the e-mail itself is from

18    Cheshire Ventures.

19              MR. LITTLE:  It's not.  It's from an

20    e-mail account that involves Cheshire Ventures.

21              MR. STOKES:  That's fine.

22              MR. LITTLE:  He told you multiple

23    times where the distinction lies --

24              MR. STOKES:  And I --

25              MR. LITTLE:  -- and you ask

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 68

```
 1    questions about this topic yesterday, Patrick --
 2              MR. STOKES:  And I understand that
 3    it --
 4              MR. LITTLE:  -- and then you stopped
 5    asking questions it because you didn't want to
 6    waste extra time, and you wanted to use your
 7    time here.  That's what's happening.  We're not
 8    going to allow it.
 9              MR. STOKES:  And, Alex, you're
10    purporting to know why I did what I did
11    yesterday is, of course, based on your own
12    imagination, but for purposes of this deposition
13    today, I would ask that you stop interfering in
14    the deposition.  I'm entitled to ask --
15              MR. LITTLE:  I'm not interfering.
16    We're lodging our objection.  We're directing
17    THE WITNESS:  Not to testify about this matter
18    in a 30(b)(6).  If you want him to answer
19    questions about it, he can do so.  You still
20    have about 50 minutes left of your seven hours.
21    If you wish to do so, we're happy to have him do
22    that now and to do it on the record now.
23              So if you choose not to take that
24    path, that's your decision.
25              MR. STOKES:  Yes.  And it is your
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 69

1    decision to have your witness to refuse to

2    answer questions that clearly are within the

3    scope of 30(b)(6).  Are instructing your witness

4    not to these answer that are --

5                MR. LITTLE:  They are not within the

6    scope of the 30(b)(6).

7                MR. STOKES:  They are clearly within

8    the scope of the 30(b)(6), and are you --

9                MR. LITTLE:  Patrick, let's read

10   this into the record --

11               MR. STOKES:  -- instructing your

12   client --

13               MR. LITTLE:  The topic you've listed

14   is Number six --

15               MR. STOKES:  Are you --

16               MR. LITTLE:  -- your relationship

17   and interactions with Rodney Atherton, which

18   includes Cheshire Ventures -- the your here is

19   defined as Cheshire Ventures's interaction with

20   Rodney Atherton or any entity formed by Rodney

21   Atherton.  He testified about those interactions

22   here, and he has said this interaction is not

23   one of those.

24               MR. STOKES:  We are excluding all of

25   this time from the 30(b)(6) today where you --

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

                                              Page 70

 1                    MR. LITTLE:  You can try to do that,
 2        sir.
 3                    MR. STOKES:  And --
 4                    MR. LITTLE:  You stated on the
 5        record.  I asked to go off the record.
 6                    MR. STOKES:  Yes.  And we are also
 7        going to be asking Mr. Nelson about these topics
 8        in his capacity as a representative of Cheshire
 9        Ventures --
10                    MR. LITTLE:  And he's done that
11        already.
12                    MR. STOKES:  And we are not limited
13        to the topics included in the notice, of course,
14        as you know from the rules.  This is simply
15        these are topics that he must be prepared for.
16        So we will go off the record now to take a break
17        so you can consult with your client.  When we
18        come back on, we will continue with this line of
19        questioning.
20                    THE VIDEOGRAPHER:  We're going off
21        the record.
22                    MR. LITTLE:  You're going to get the
23        same answers next time.
24                    THE VIDEOGRAPHER:  We're going off
25        the record.  The time is 10:25.

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 71

1          (Discussion off the record.)

2              THE VIDEOGRAPHER:  We are returning

3      to the record.  The time is 10:39 a.m.

4      BY MR. STOKES:

5      Q.    Mr. Nelson, do you still have Exhibit 3

6      in front of you?

7      A.    Tab three, yes.

8      Q.    Tell us what you know in any capacity

9      about this bonus that's being described in your

10     e-mail that you're sending to -- from Cheshire

11     Ventures's e-mail account to Rod Atherton?

12             MR. LITTLE:  Objection to the form.

13     Same objection previously about the scope of the

14     deposition.

15             THE WITNESS:  As managing principal

16     of Cheshire Ventures, I gave myself the ability

17     to send e-mails personally.  This would have

18     been a personal e-mail to Rod Atherton regarding

19     the numbers and the names you see there.  As

20     managing principal of Cheshire Ventures, I would

21     have had no idea what this is.

22     BY MR. STOKES:

23     Q.    When you say that you as managing

24     principal of Cheshire Ventures, you gave

25     yourself permission to send personal e-mails

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 72

1    from Cheshire Ventures's e-mail account.  What

2    does that mean?

3    A.     That means that I used company, Cheshire

4    Ventures's company to send personal e-mails.

5    Q.     You said you gave yourself permission to

6    do this.  Describe what you mean by that.

7    A.     I mean, I used the Cheshire Ventures's

8    e-mail account to send personal e-mails.

9    Q.     Okay.  So you're using a Cheshire e-mail

10   to send this.  Do you know the substance of this

11   bonus structure --

12              MR. LITTLE:  Objection to the form.

13   BY MR. STOKES:

14   Q.     -- in any capacity whether your personal

15   or Cheshire Ventures's capacity?

16   A.     So when you say you, as Cheshire Ventures

17   managing principal, no.  In my personal

18   capacity, yes.

19   Q.     Okay.  And what do you know about it in

20   any capacity?

21              MR. LITTLE:  Same objection and

22   we're going to direct him not to answer to the

23   extent you're asking him about his personal

24   capacity, because it's outside of the 30(b)(6).

25   It's not proper.  If you want to ask him in his

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 73

1      personal deposition, you can.

2      BY MR. STOKES:

3      Q.      Are you refusing to answer the question?

4               MR. LITTLE:  I'm directing him to

5      answer on the basis of the objection I

6      previously stated.

7      BY MR. STOKES:

8      Q.      Are you refusing to answer?

9      A.      I am answer as managing principal of

10     Cheshire Ventures.  I have no idea what this is

11     or what this was about.

12     BY MR. STOKES:

13     Q.      And so, sir, how many entities were you

14     associated with?

15     A.      When you say "you," what do you mean?

16     Q.      You and your personal capacity, you are

17     acting on -- you are associated with Cheshire

18     Ventures; is that right?

19     A.      Yes.

20     Q.      Were you associated with Allcore?

21     A.      No.

22     Q.      Did you have any other entities that you

23     were -- you had no association with Allcore?

24     A.      No.

25     Q.      Did you have loans with Allcore?

Page 74

1    A.      No.

2    Q.      Did you have loans with CTBSRM?

3    A.      No.

4    Q.      Are you referring to your yourself or are

5    you referring to you as managing principal of

6    Cheshire Ventures?

7    A.      I'm referring to myself in my personal

8    capacity.  I did not have loans with CTBSRM.

9    Q.      Who did you have loans with?

10   A.      I didn't have loans with anybody.

11   Q.      Did you take out promissory notes in your

12   personal capacity with CTBSRM?

13   A.      No.

14   Q.      What entities did you operate through to

15   take out loans through CTBSRM --

16   A.      I didn't --

17   Q.      -- to borrow monies from CTBSRM?

18   A.      I did not operate any entities that took

19   out loans against CTBSRM.

20   Q.      Did Renrets take out notes through

21   CTBSRM?

22   A.      Yes.

23   Q.      Prior to Renrets taking out a note with

24   CTBSRM, did you personally have a note with

25   CTBSRM that was subsequently folded in to the

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 75

1    Renrets note?

2    A.      Yes.

3    Q.      So when you just said a moment you had no

4    note with CTBSRM, that was not true?

5    A.      I don't have notes with CTBSRM.

6    Q.      Did you have notes with CTBSRM?

7    A.      I don't know that I ever did because

8    Rodney Atherton folded it in before it even

9    became a note.

10   Q.      Okay.  So again, on Exhibit 3, do you

11   have knowledge whether as the corporate

12   representative of Cheshire Ventures or in any

13   other capacity about what the structure -- what

14   the purpose of this bonus structure was?

15            MR. LITTLE:  Objecting, this is

16   asked and answered.  We have the same objections

17   as before.  He's already answered this to the

18   capacity of the 30(b)(6).  If you're asking him

19   in any other capacity, I'm directing him not to

20   answer.

21            MR. STOKES:  And for the record, I

22   want to be clear that Mr. Little is instructing

23   you not to answer question based on 30(b)(6)

24   scope definition that is not provided by the

25   rules, and so we will leave this now but we --

Page 76

1              MR. LITTLE:  Patrick, that's not

2      true.  My objection, I'll state for the record,

3      to make very clear, is you're asking him about

4      his personal capacity.  Not about anything

5      related to Cheshire Ventures.  You're doing so

6      to evade the time limit on his personal

7      deposition.  You have some time left, about 50

8      minutes.  If you wish to ask that question, we

9      will make him available right now to answer

10     those questions and count against your time.

11     That is my objection.  That's the limits of it.

12              MR. STOKES:  And, of course, you

13     don't set the rules, Mr. Little, and so the

14     question I'm asking is about an e-mail in which

15     your client is operating through an e-mail

16     account that says Cheshire Ventures, and you're

17     instructing your client to refuse to answer in

18     this 30(b)(6) a question about whether he has

19     knowledge of the contents of this --

20              MR. LITTLE:  No, that's true.  He

21     did say he had knowledge.  If you read the

22     record back or you can read the court reporter's

23     transcript.  He said he did have knowledge in

24     his personal capacity.

25              MR. STOKES:  I just asked him a

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 77

```
1    question on whether he had any knowledge and you

2    instructed him not to answer the question.

3               MR. LITTLE:  Patrick, you asked the

4    question twice.  I'm happy to go off the record.

5    The first time you asked him, he clarified his

6    bases of his knowledge and included personal

7    bases.  And this time the question was general

8    you said "in any way."  And I'm objecting to the

9    extent it calls for his personal knowledge, we

10   believe it's your attempt to circumvent the

11   seven-hour rule on his personal deposition.

12               MR. STOKES:  And we --

13               MR. LITTLE:  That's our objection.

14   That's it.

15               MR. STOKES:  And we disagree with

16   you.

17               MR. LITTLE:  That's fine.

18               MR. STOKES:  So we are not seeking

19   to circumvent the seven-hour rule, and we do

20   have time in the personal deposition.  This is

21   not a question related to his personal

22   deposition.

23               This is a question for 30(b)(6),

24   which is entirely appropriate.

25   BY MR. STOKES:
```

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 78

1   Q.    And again, do you have any knowledge in
2   any capacity about the substance of this bonus
3   structure?
4              MR. LITTLE:  Objection, asked and
5   answered.
6              THE WITNESS:  In my personal
7   capacity, yes.
8   BY MR. STOKES:
9   Q.    Okay.  What is that substance of this
10  structure?  What is the purpose of this
11  structure?
12             MR. LITTLE:  Same objection and we
13  are directing him not to answer because it is
14  not appropriate for the 30(b)(6) deposition.
15             MR. STOKES:  We'll note for the
16  record as well, instructing a witness not to
17  answer in a 30(b)(6) deposition where the
18  witness has personal knowledge is not proper.
19             MR. LITTLE:  I understand that is
20  your position.  You've heard our position many
21  times.  The record is very clear.
22  BY MR. STOKES:
23  Q.    What business did Cheshire Ventures do
24  with Amazon?
25  A.    Cheshire Ventures didn't do any business

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 79

1    with Amazon.

2    Q.    Did Cheshire Ventures attempt to do

3    business with Amazon?

4    A.    Yes.

5    Q.    What business did it attempt to do

6    business with Amazon?

7    A.    Cheshire Ventures pitched Amazon on

8    various sites and potential development

9    propositions.

10   Q.    Where?

11   A.    Virginia, Knoxville, Tennessee.  I

12   believe potentially even North Carolina.

13   Q.    And when you say Cheshire Ventures did

14   this, who did this on behalf of Cheshire

15   Ventures?

16   A.    As managing principal, I did.

17   Q.    Who did you reach out to at Amazon to

18   pitch these projects to?

19   A.    Todd Meldahl.

20   Q.    And when did you do this?

21   A.    2019 and 2020.

22   Q.    How did you reach out to Todd?

23   A.    E-mail, phone, text.  I think that's it.

24   Q.    Did you communicate with Tod through

25   whatsApp or any other messaging application such

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 80

1    as whatsApp?

2    A.      I don't remember.

3    Q.      And let's start with the Virginia

4    projects.  What Virginia projects did you pitch

5    to Todd on behalf of Cheshire Ventures?

6    A.      As I recall, various land sites.

7    Q.      What were the nature of those lands

8    sites?

9    A.      Potential land sites for development of

10   future Amazon projects.

11   Q.      What types of projects?

12   A.      Any type of project.

13   Q.      What were you proposing to Todd Meldahl?

14   A.      That Cheshire Ventures could take land

15   under control, and potentially be able to

16   develop projects for Amazon.

17   Q.      Were these for data centers?

18   A.      Not necessarily, no.

19   Q.      Where were the land sites located?

20   A.      All over.

21   Q.      All over where?

22   A.      Virginia, Knoxville, and I believe North

23   Carolina.

24   Q.      Sorry.  Focused on Virginia, where in

25   Virginia?  That was my original question.  It

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 81

1    wasn't clear.

2            In Virginia, where were these sites that

3    you were pitching to Todd?

4    A.      I believe along the 95 corridor down near

5    Richmond, between Richmond and D.C.

6                (Exhibit Number 4 was marked.)

7    BY MR. STOKES:

8    Q.      Take a look at Exhibit 4, which is Tab

9    19.

10   A.      Yes, I see it.

11   Q.      Okay.  This is an e-mail from -- what is

12   this document?

13   A.      This is an e-mail from myself at Cheshire

14   Ventures to Todd Meldahl.

15   Q.      And what is it in regard to?

16   A.      It says, Will you send me the RFP

17   response from SDC.

18   Q.      What is SDC?

19   A.      I believe that's Sentinel Data Centers.

20   Q.      Do you know what RFP relates to?

21   A.      I believe I was aware potentially

22   Sentinel Data Centers was going to propose a

23   development on the site that they owned.

24   Q.      And where was that site?

25   A.      In Loudoun County, Virginia.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 82

```
 1    Q.    Is this for a data center?

 2    A.    I believe they were proposing on a data

 3    center wanting to propose on a data center and

 4    wanted to propose on a data center, yes.

 5    Q.    And you sent this to Todd Meldahl from

 6    the same Cheshire Ventures e-mail account that

 7    we previously discussed?

 8    A.    This one has my name on it, so I'm not

 9    sure it's the same one.  But yes.

10    Q.    Okay.  The e-mail is

11    CheshireVentures@outlook.com?

12    A.    Yes.

13    Q.    Okay.  And was this e-mail sent in your

14    capacity as a Cheshire Ventures representative

15    or in some other capacity?

16    A.    As a Cheshire Ventures representative.

17    Q.    What were you seeking on doing with SDC?

18    A.    Potentially consult with them.

19    Q.    On what?

20    A.    On a data center development.

21    Q.    On whose behalf?

22    A.    On Sentinel's.

23    Q.    Were you seeking to do any work on this

24    project for Allcore?

25    A.    No.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 83

1    Q.     Did you -- were you retained by SDC?

2    A.     I was.

3    Q.     And did you obtain a contract with SDC?

4    A.     I did.

5    Q.     What services did you perform for SDC?

6    A.     Real estate development services.

7    Q.     And was that project related to Amazon in

8    any way?

9    A.     They did win the Amazon project, yes.

10   Q.     So what specific services did you provide

11   SDC in connection with SDC's efforts to win that

12   contract with Amazon?

13   A.     I believe by the time I was retained,

14   that they had already won the contract.  My job

15   was to consult with them on what the project

16   actually might look like and what they needed to

17   be worried about in terms of how to deliver that

18   project for Amazon.

19   Q.     What information did you provide to SDC

20   in connection with providing those services?

21   A.     Various pushback points on the lease.

22   Building -- certain contractors that would be

23   preferred over other contractors.  Architectural

24   engineering services that would be a benefit to

25   the project potentially.  Cost saving, anything

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 84

```
 1     that would be cost saving for them for the
 2     project to be more competitive and to save money
 3     for Amazon, and just general consulting
 4     services.
 5     Q.     When you say push points for the lease,
 6     what do you mean by that?
 7     A.     For example, Amazon took positions
 8     sometimes that were unreasonable and they knew
 9     they were unreasonable, and pointing out that
10     they likely knew they were unreasonable, and
11     they would end up not taking that position in
12     the future.
13     Q.     What specific provisions are you
14     referring to?
15     A.     Well, one I could think of off the top of
16     my head, is an interruption of utility services
17     not caused by the landlord was -- gave the --
18     gave Amazon a termination right to the lease.
19     Q.     And what did you share with SDC about
20     that?
21     A.     I simply gave them my opinion that that
22     was unreasonable.
23     Q.     What did you tell them about whether you
24     thought was a position that Amazon would back
25     off of?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 85

1    A.    I simply said I thought that position was

2    unreasonable.

3    Q.    You previously said that you provided

4    them information about areas that you thought

5    Amazon would back off of.  What areas did you

6    tell SDC Amazon would back off of?

7    A.    When I say Amazon would back off of, I

8    meant in my capacity with Amazon what areas that

9    I would have backed off of.  Not necessarily

10   areas that Amazon in their capacity as Amazon

11   would back off of.  So it was generalized

12   personal opinion and knowledge as to what was

13   reasonable and what was not.

14   Q.    And that information was information you

15   gain from your employment at Amazon?

16   A.    Yes.

17   Q.    And --

18   A.    And -- I hate to interrupt you -- and

19   just the commercial real estate development

20   business in general.

21   Q.    What other information from your time at

22   Amazon did you provide to SDC?  Let me rephrase

23   the question.

24         Did you provide SDC any -- in your

25   consulting services with SDC, did you provide

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 86

1    them any information about how Amazon wanted a

2    developer to proceed with the construction of

3    the data center?

4    A.    I advised them as to where we had had

5    success in the past on developing data centers,

6    yes.

7    Q.    What information did you share with SDC

8    about that?

9    A.    Simply contractors and other vendors that

10   had developed or participated in the development

11   and where the development had been successful.

12   Q.    Did you provide any documents to SDC from

13   Amazon?

14   A.    Not from Amazon that I'm aware of, no.

15   But certainly I'm sure I reviewed documents.

16   Yes.

17   Q.    When you say you're sure you reviewed

18   documents, what do you mean by that?

19   A.    Sure.  I'm certain I reviewed e-mails

20   where they had -- Amazon had taken certain

21   positions and otherwise put together

22   specifications for buildings that I reviewed and

23   budgets.

24   Q.    Are you referring to Amazon e-mails in

25   connection with SDC and the project that SDC was

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 87

```
 1     working on?
 2     A.      Yes.
 3     Q.      Or some other set of --
 4     A.      No. SDC and the project they were working
 5     on.
 6     Q.      So is this after SDC had won the tender
 7     the bid and had contracted with Amazon that
 8     you're referring to, you're reviewing documents?
 9     A.      Yes, and I don't know if they had
10     actually signed the lease yet, but certainly
11     they were well on their way.  They had won the
12     bid, yes.  They also owned the land so it wasn't
13     as if Amazon had a choice.
14     Q.      Was Amazon aware that you were providing
15     these services for SDC?
16     A.      I don't know.  I don't think so.
17     Q.      Did you disclaim to Amazon -- did
18     disclose your role to Amazon?
19     A.      No.
20     Q.      Did you share with SDC any details of
21     your employment contract with Amazon?
22     A.      No.
23     Q.      Did you share with SDC your noncompete
24     provision with Amazon?
25     A.      No.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 88

```
1    Q.     What other Virginia-based projects did
2    you work on through Cheshire Ventures?
3    A.     I did site mapping exercises for ████.
4    I did a number of sites in Virginia that
5    PointOne that either already owned or was
6    looking to own.  I did the Sentinel project.  I
7    did some work with a company called Black
8    Chamber.
9    Q.     Okay.  So Black Chamber, Sentinel, and
10   PointOne, can you remember any other companies,
11   individuals, or other parties with whom you
12   performed services in Virginia through Cheshire
13   Ventures?
14   A.     I think I did some -- an agreement to
15   potentially be a finder on particular projects
16   with Scott Peterson.  I don't know if I did any
17   utility consulting in Virginia at that time.
18   But that's what I can remember for now.
19              (Exhibit Number 5 was marked.)
20   BY MR. STOKES:
21   Q.     Let's turn to Exhibit 5, Tab 32.
22   A.     Okay.  I see it.
23   Q.     What is that document?
24   A.     This is an agreement between myself and a
25   company controlled by Scott Peterson.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 89

1    Q.     And this an agreement signed in

2    February 2020?

3    A.     It appears so, yes.

4    Q.     That's your signature?

5    A.     It is a DocuSign signature but, yes, I

6    believe that is mine.

7    Q.     And what were the services you provided

8    for -- I'm sorry.  Let me ask this first.  What

9    is the entity that you're contracting with?

10   A.     Cheshire Ventures was contracting with

11   Nova NDBS High Point Investor, which is Scott

12   Peterson's entity.

13   Q.     And what is the nature of the services

14   that you contracted to perform?

15   A.     Well, let's see.  Do you want me to read

16   it?

17   Q.     Well, let me rephrase the question, then.

18   What are the nature of the services that you, in

19   fact, provided to this entity?

20   A.     The intent of this contract was to find

21   projects that Scott Peterson could potentially

22   invest capital in, as he was a -- controlled a

23   large amount of capital and I believe still

24   does.

25   Q.     What types of projects?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 90

```
 1    A.      I think primarily data center projects,
 2    but I'm not sure what his charter says for him.
 3    Q.      Did you, in fact, provide any of these
 4    consulting services to him?
 5    A.      I did not, no.
 6    Q.      Did you receive money from him?
 7    A.      I did not, no.
 8    Q.      Did you on -- in connection with this
 9    contract, did you review any projects?
10    A.      You're going to have to be more specific.
11    Q.      Did you perform -- why did you not
12    perform any services on behalf of this contract?
13    A.      I was never able to find any projects to
14    source capital into and, therefore, it didn't
15    make a lot of sense that he should have to pay
16    the fees that are outlined in this contract.
17    Q.      Okay.  So as part of this agreement was
18    it incumbent upon you to find projects for
19    Mr. Peterson's company to invest in?
20    A.      Potentially, yes.
21    Q.      Did you attempt to find projects for him
22    to invest in?
23    A.      I'm always looking for projects to invest
24    in.
25    Q.      Were any of those Amazon-related
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 91

```
 1    projects?
 2    A.      Very possibly, yes.
 3    Q.      Do you recall if you reached out to
 4    anybody to Amazon for Mr. Peterson to invest in?
 5    A.      I don't recall.  No.
 6    Q.      Do you recall a conversation with
 7    Kyle Ramstetter about the services you were
 8    performing on behalf of PointOne?
 9    A.      Not in my capacity as managing principal
10    of Cheshire Ventures.
11    Q.      So in what capacity were you talking
12    about your Cheshire Ventures work when you were
13    speaking to Mr. Ramstetter?
14    A.      I was speaking to Mr. Ramstetter in a
15    different capacity.
16    Q.      So --
17    A.      I happened to mention to Mr. Ramstetter,
18    as I recall, about work that Cheshire Ventures
19    was doing, and I'm happy to discuss that.
20    Q.      Yes.  What did you tell Mr. Ramstetter?
21    A.      I was engaged to do real estate
22    development consulting for PointOne Holdings.
23    Q.      Do you ever recall telling Mr. Ramstetter
24    that you were paid 40 grand a month for the
25    work?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 92

```
 1    A.      I don't recall that, but that is accurate
 2    with what I received.
 3    Q.      Did you, in fact, receive money in
 4    connection with PointOne?
 5    A.      Yes.
 6    Q.      Is that different from this consulting
 7    contract?
 8    A.      Yes.
 9    Q.      Okay.  What is that agreement or contract
10    with?  What is the nature of the services you're
11    providing PointOne?
12    A.      Real estate development consulting
13    services.
14    Q.      What is PointOne?
15    A.      PointOne is a data center development
16    company.
17    Q.      Does that have any relationship to Scott
18    Peterson?
19    A.      No.
20    Q.      Who is associated or the individuals
21    behind PointOne?
22    A.      Keith Frazier and Drew Peterson.  Keith
23    Frazier is a Canadian gentleman who owns a large
24    industrial conglomerate up in Edmonton.
25            And Drew Peterson owns a large carter
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 93

1    caterpillar which is a large utility -- or not

2    utility, equipment manufacturer.

3    Q.    Okay.  So we'll come back to PointOne in

4    a moment.  I just want to close out with Nova

5    and DBS.

6    A.    Yes.

7    Q.    And Scott Peterson, did you perform any

8    other services with Scott Peterson in connection

9    with Cheshire Ventures?

10   A.    No, but I would, if I could.

11   Q.    Do you know if -- did Cheshire Ventures

12   receive any other funds from Nova, NDBS, or any

13   other entity associated with Mr. Peterson?

14   A.    No.

15   Q.    PointOne, let's go back to PointOne.  Did

16   you enter into an agreement with PointOne?

17   A.    I did.

18   Q.    What services did you provide to

19   PointOne?

20   A.    Strategic evaluation and potentially

21   tactical -- tactical land engagement, along with

22   utility engagement and anything associated with

23   real estate development for potential sites.

24   Q.    Where was that geographically focused,

25   that work?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 94

1    A.      PointOne has a number of campuses that

2    they own when I was retained.  One is in

3    Remington which is in Falkirk County, which you

4    probably know, Virginia.  They're down in --

5    they have another data center campus that they

6    have not built on yet in Virginia Beach, and

7    they have a site in Loudoun County that they --

8    they've owned for a long time this was a former

9    Caterpillar dealership.

10   Q.      Was any of that real estate or those

11   projects connected in any way with Amazon?

12   A.      Unfortunately, no, but I would have loved

13   it if we could have done that.  Yes.

14   Q.      Did you discuss with PointOne any

15   limitations imposed by your employment agreement

16   on your-post Amazon agreement?

17   A.      No.  In fact, PointOne employed a number

18   of AWS employees full-time.

19   Q.      Let's talk about Black Chamber.  What is

20   Black Chamber?

21   A.      Black Chamber essentially is a

22   close-ended fund that was created in order to

23   pursue power-based buildings around the country.

24   Q.      Who is the individual or individuals

25   associated with Black Chamber?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 95

```
 1     A.     I believe their principals are

 2     Chuck Feolla, Conley Patten, and Derek

 3     Vonderharr, and I believe they've since

 4     expanded, but I haven't talked with those folks

 5     in a while.

 6     Q.     Have you worked with any of them when you

 7     were at Amazon?

 8     A.     I had.

 9     Q.     Who?

10     A.     Chuck Feolla.

11     Q.     What is your relationship Chuck Feolla?

12     A.     He's a friend and business associate.

13     Q.     When you say "he's a friend," describe

14     what you mean by that?  Is it a business

15     associate who you're friendly with, or do you

16     have some relationship with him outside of your

17     business dealings?

18     A.     He's gentleman that I became friendly

19     with through business dealings.  So I'll put it

20     that way.

21     Q.     And so what services did Cheshire

22     Ventures perform with Black Chamber that relate

23     to Amazon, if any?

24     A.     We didn't.  We had an agreement that we

25     would pursue a contract but never did.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 96

```
 1    Q.      Why did you not?
 2    A.      Because the FBI visited my home on
 3    April 2nd.
 4    Q.      ████████████████████████████████████
 5    ███████████████████████████████████████████
 6    A.      Yes.
 7    Q.      When was that?
 8    A.      I believe October, November, or
 9    thereabouts of 2019.
10    Q.      What services did you perform?
11    A.      General site selection and qualification.
12    Q.      Where?
13    A.      Virginia, California.  I don't know if we
14    did Montreal or not.  But generally, those
15    areas.
16    Q.      ███████████████████████████████████████
17    connection with any Amazon projects or potential
18    projects?
19    A.      Yes.  Well, again, I was contracted to do
20    ████████████████████  ██████████████████████
21    just mentioned in terms of sites selection, yes,
22    I was contracted to do some.
23    Q.      Okay.  What?
24    A.      I believe they wanted to engage me on a
25    project where they had taken land under contract
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 97

1    and were going to develop Amazon Data Centers.

2    Q.      Where was that project?

3    A.      That was in Loudoun County, Virginia.

4    Q.      ████████████████████████████████████████

5    projects that it had with Amazon in California?

6    A.      I did not.

7    Q.      The project in Loudoun County, what was

8    that?  Can you identify the property?  Did it

9    have a site identifier?  Did it have --

10   A.      No.  I don't know that it did at the

11   time, and I never got that far.

12   Q.      Why not?

13   A.      Because the FBI showed up on my home on

14   April 2nd.

15   Q.      █████████████████████████████████

16   A.      I had a -- I was negotiating a contract

17   with them, but I did not have an executed

18   contact.  I had had a contract with them in the

19   past to do site acquisition, evaluation, and

20   qualification.  I did do a contract with them.

21          The contract we're talking about, the

22   development consulting services, I did not do

23   with them.

24   Q.      The prior contract, what is that

25   contract?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 98

1    A.      Essentially identifying and qualifying

2    sites for potential future development.

3    Q.      ████████████████████████████████████

4    connection with that contract?

5    A.      As I recall, I did.

6    Q.      When was that?  When were those services

7    provided?

8    A.      I believe, again, October,

9    October-November of 2019.

10   Q.      ██████████   ████████████████████████████

11   ████████

12   A.      I did.

13   Q.      Approximately how much?

14   A.      I believe it was a $75,000 retainer.

15   Q.      Did you receiving anything else?

16   A.      No.

17   Q.      And what did you do with that money, the

18   $75,000?

19   A.      What did I -- I put it in Cheshire's bank

20   account.

21   Q.      What did you do with it from Cheshire's

22   bank account?

23   A.      I'm sure I used it to pursue other deals.

24   Q.      Did you pay any of those monies over to

25   Allcore?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 99

1    A.      I did not.

2    Q.      How do you know that?

3    A.      Because it was prior to the Allcore

4    agreement that we talked about earlier being in

5    place.

6    Q.      Prior to that agreement with Allcore

7    being in place, did you pay any monies from

8    Cheshire Ventures over to Allcore?

9    A.      Again, not that I recall, with the

10   exception of I somehow remember one time, but I

11   don't remember exactly what that was.

12   Q.      And do you have a copy of that contract

13   ███████████████

14   A.      You know, I think I did, but I think it's

15   on a computer in the U.S. Marshal's office.

16   Q.      Is this the computer that you referenced

17   yesterday that was encrypted?

18   A.      That would be the one.

19   Q.      Do you know that or you're surmising

20   that?

21   A.      I'm surmising.  I don't know if I have a

22   copy of the contract on my current computer or

23   anywhere else for that matter.

24   Q.      How would you exchange contracts with

25   ███████████    ██████████████████████

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 100

```
1     A.      E-mail.

2     Q.      And do you have -- do you have -- it

3     sounds like you were negotiating a contract with

4     them in connection with the project in Loudon?

5     A.      I was negotiating a project with them, in

6     general.  Yes.

7     Q.      In general.  Okay.  Do you have a copy of

8     any drafts of that contract?

9     A.      Not that I recall.  I may somewhere.  But

10    not that I recall.  No.

11    Q.      When you were negotiating, were you

12    negotiating over a piece of paper, a contract,

13    or were you negotiating in general terms before

14    you got to the drafting stage?

15    A.      I believe there was a consulting

16    agreement.  I believe it would have been a

17    consulting agreement, but we're talking about

18    years ago now.

19    Q.      Have you heard of the entity called

20    Social Equity Ventures?

21    A.      Yes.

22    Q.      What is that?

23    A.      That is I believe the d/b/a of a company

24    that is run by a gentleman named Mike Grella.

25    Q.      Okay.  And you mentioned Mike Grella
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 101

1    earlier, and he has a -- you mentioned Grella

2    consulting services or something like that?

3    A.    Grella Partnership Strategies.

4    Q.    Are these entities related?

5    A.    I believe.  I don't know the structures.

6    I've never seen the structures, but I have seen

7    Social Equity Ventures in conjunction with

8    Grella Partnership Strategies.  So I assume

9    there's a connection.

10   Q.    Did you perform any services for Social

11   Equity Ventures?

12   A.    As I mentioned, I believe Cheshire has

13   1099 to them.  Yes.

14   Q.    Cheshire Ventures has 1099 -- meaning,

15   they performed services for Cheshire Ventures?

16   A.    No.  We've done it that way, too, but I

17   Cheshire Ventures has acted as a vendor for

18   Social Equity Ventures.

19   Q.    For what types of project?

20   A.    Typically real estate development

21   consulting of some nature.

22   Q.    Anything connected to Amazon?

23   A.    I think we did a last mile study for a

24   developer that was specific to Amazon

25   potentially, but I don't know the Cheshire was

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 102

1    actually connected with that or if I just

2    happened to see that.  So I'd say, no.

3    Q.    What was the -- who was the developer?

4    A.    I believe it was a New York-based

5    developer who owned land, and I can't remember

6    the name -- Criterian was the name.

7    Q.    Did you share with Criterian your

8    employment contract?

9    A.    No.

10   Q.    Did you ever discuss with Criterian any

11   limitations imposed upon you in your employment

12   contract?

13   A.    No.

14   Q.    Did you perform any services through

15   Cheshire Ventures or in connection with Cheshire

16   Ventures for any -- on any projects after you

17   left Amazon that you had been working on while

18   at Amazon?

19   A.    Define working on.

20   Q.    Let me -- fair point.  Let me make the

21   question even broader then.

22         Did you work on any projects after you

23   left Amazon through Cheshire Ventures where

24   those -- where Amazon had a relationship to

25   those projects?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 103

1    A.     Did I ever work for any projects where

2    Amazon had a relationship with those projects?

3    Q.     Let me confine the time period, so you

4    left Amazon in June 2019?

5    A.     Correct.

6    Q.     So from June 2019 to December 2019, did

7    you work on any projects through Cheshire

8    Ventures that were connected to Amazon in any

9    way?

10   A.     Yes.

11   Q.     What were those projects?

12   A.     The Sentinel Data Centers.

13   Q.     Did you work on any other projects

14   besides that one?

15              MR. LITTLE:  Objection; form.

16              THE WITNESS:  So --

17   BY MR. STOKES:

18   Q.     Did you provide -- let me rephrase.  Did

19   you provide any services to any other entity

20   after your employment ended at Amazon in 2019

21   through the end of 2019 where that other entity

22   or project had some connection to Amazon?

23   A.     It's a hard question to answer because

24   Amazon's such a big player and everybody wants

25   to have Amazon.  So in some way ever project out

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

```
1    there is potentially connected to Amazon.  In
2    other words, working for PointOne they would
3    have loved to have Amazon come.  In fact, we did
4    have Amazon representatives and come and
5    actually look at a site that they own in
6    Remington County, which is in Remington,
7    Virginia.  So virtually every project I worked
8    on would have some connection to Amazon.
9         Do you see what I'm trying to tell you
10   here?
11   Q.    Sure.  What about the Blueridge
12   transaction, did you engage any work with
13   Blueridge through Cheshire Ventures?
14   A.    I did not.
15   Q.    Did you engage in any work with White
16   Peaks in connection with Cheshire Ventures?
17   A.    I did not.
18   Q.    And did you use Cheshire Ventures, your
19   Cheshire Ventures e-mail in connection with
20   those communications related to those projects?
21   A.    I believe I used Cheshire, my Cheshire
22   e-mail just generally speaking almost all the
23   time, versus my personal e-mail my G-mail.
24   Q.    And what -- and so when do you -- what is
25   distinction you're drawing as to when Cheshire
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 105

1    Ventures is involved in a project and when

2    you're just using Cheshire Ventures's identity

3    in connection with the project?

4              MR. LITTLE:  Objection to form;

5    mischaracterizes his testimony.

6              THE WITNESS:  Generally speaking, if

7    the Cheshire Ventures has a contract to perform

8    services, I would suggest that that is the

9    nature of the relationship.

10   BY MR. STOKES:

11   Q.    To the extent that you were engaged in

12   real estate business in 2018 after you left

13   Amazon, how did you hold yourself out to the

14   world?  Did you present yourself as Carl Nelson

15   or did you present yourself as Carl Nelson

16   acting through Cheshire Ventures or some other

17   entity?

18   A.    No.  Certainly Carl Nelson -- Cheshire

19   Ventures was the entity that I used to engage in

20   consulting services.  So on a professional

21   level, it was through Cheshire Ventures.  Carl

22   Nelson the person, didn't do any real estate

23   work.

24   Q.    Okay.  Did you do any real estate work

25   through any other entities besides Cheshire

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 106

1    Ventures?

2    A.      At the time, no.

3    Q.      So to be clear, did you do any real

4    estate work through Allcore at that time?

5    A.      After I left Amazon?

6    Q.      Yeah.

7    A.      Yes.

8    Q.      In 2019?

9    A.      Yes.

10   Q.      Okay.  So I'm trying to understand what

11   the distinction you just drew is.  What work did

12   you do through Cheshire Ventures and what work

13   did you do through Allcore?

14   A.      Well, the Cheshire Ventures work was

15   under the Cheshire umbrella; in order words, it

16   would be contracted as Cheshire Ventures.  The

17   work that was done through Allcore would have

18   been done generally through Allcore.  In other

19   words, the Knoxville, Tennessee site that was

20   pitched to Amazon, I use Cheshire Ventures's

21   e-mail accounts, but I put Allcore work in

22   there.  That would be an Allcore development

23   project.  Cheshire Ventures was a consulting

24   company.  Allcore was a development company.

25   Q.      You previously described that Cheshire

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 107

1   Ventures was intending to perform consulting

2   services on behalf of Allcore; is that right?

3   A.    I wouldn't say on behalf of.  It was

4   going to -- it was going to do real estate

5   development consulting services, and it was

6   going to pay Allcore a fee.  Yes.

7   Q.    Okay.

8   A.    In other words, Cheshire Ventures did not

9   represent itself as being a consultant for

10  Allcore.

11  Q.    So to the extent that Cheshire Ventures

12  was proposing an Allcore -- up to the extent an

13  e-mail from Cheshire Ventures was sent to Amazon

14  with regard to an Allcore project, what role

15  would Cheshire Ventures have had or purported to

16  have had in that venture?

17  A.    None.

18  Q.    Why would Cheshire Ventures be associated

19  with that communication?

20  A.    Because that was the only e-mail that I

21  had other than my g-mail.

22  Q.    Was Cheshire Ventures used as a means of

23  disguising your role with Allcore?

24  A.    No.

25  Q.    And the Knoxville project, what was the

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 108

1    Knoxville project?

2    A.    It was a potential development for a

3    warehouse in Knoxville.

4    Q.    Did you pursue that project?

5    A.    Allcore did, yes.

6    Q.    Did Allcore develop that project?

7    A.    No.

8    Q.    So it pursued the project but not win the

9    project; is that the point you're making?

10   A.    Yes.

11   Q.    What role did Cheshire Ventures have in

12   that project?

13   A.    None.

14   Q.    Did you -- did Cheshire Ventures have any

15   projects in Ohio?

16   A.    No.

17   Q.    Did it pursue any projects in Ohio?

18   A.    No.

19   Q.    Did any of your entities pursue projects

20   in Ohio?

21   A.    I don't think so.

22   Q.    Okay.  What other projects are there

23   where you use Cheshire Ventures's e-mail or you

24   purport that Cheshire Ventures was not, in fact,

25   involved in those projects?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 109

```
 1                  MR. LITTLE:  Objection to form.
 2                  THE WITNESS:  I couldn't tell you.
 3      I sent a lot of e-mails.
 4      BY MR. STOKES:
 5      Q.    Was Cheshire Ventures's e-mail used in
 6      connection with Blueridge?
 7      A.    Yeah, I believe so.
 8      Q.    Did Cheshire Ventures perform any
 9      services in connection with the Blueridge
10      connection?
11      A.    Not officially, no.
12      Q.    It unofficially perform any services in
13      connection with the Blueridge?
14      A.    No.
15      Q.    What services did you provide in
16      connection with the Blueridge transaction after
17      you left Amazon?
18                  MR. LITTLE:  Objection to form.
19                  THE WITNESS:  Well, in my personally
20      capacity?
21      BY MR. STOKES:
22      Q.    You previously said that you were acting
23      in through Cheshire Ventures when you were
24      engaged in real estate consulting, but it seems
25      that I'm trying to understand the distinction
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 110

1    you're making between what you're doing through

2    Cheshire Ventures and what you're doing through

3    some other capacity that you haven't defined?

4              MR. LITTLE:  So I'm going to object

5    on the same basis as before.  To the extent

6    you're asking him about this in his capacity as

7    Cheshire Ventures, we think that's permission.

8    But if you're asking him his personal capacity

9    what he did for Blueridge, that would not be

10    permission, and I'll direct him to answer in

11    that fashion.

12              MR. STOKES:  And to be clear for the

13    record, I am asking him what he did through

14    whether through Cheshire Ventures or purporting

15    to act through Cheshire Ventures or through

16    Cheshire Ventures's e-mail that he is now trying

17    to claim that Cheshire Ventures wasn't involved

18    in.

19              MR. LITTLE:  Those are three

20    separate questions.

21              MR. STOKES:  Those are three -- I am

22    trying to describe to you that we believe that

23    his role through Cheshire Ventures was quite

24    large and that your effort to carve out any

25    conduct that he engaged on in where Cheshire

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 111

1    Ventures's e-mails were used, but he is now

2    claiming, despite the fact that he used Cheshire

3    Ventures's e-mail, he was not acting on behalf

4    of Cheshire Ventures, and we think we are

5    entitled to explore that on the record to

6    determine whether, in fact, he was acting on

7    behalf of Cheshire Ventures.

8                    MR. LITTLE:  Yeah.  And I think to

9    the extent you're asking him what Cheshire

10   Ventures did and didn't do, we don't have any

11   objection to that.  But if you're asking him

12   personally what he did without that caveat and

13   without that preference, we objection.

14                    So to the extent he's asked that

15   question specifically, we have no issue there.

16                    He's, I think, laid it out pretty

17   clearly, he's using this e-mail for personal

18   matters unrelated to Cheshire.  He's answered

19   that ten times.

20                    MR. STOKES:  I understand you're

21   representing that and he's representing that,

22   and what I'm saying is we're entitled to explore

23   that.

24                    MR. LITTLE:  And he's answered that

25   question.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 112

```
 1              MR. STOKES:  Yes.  And --
 2              MR. LITTLE:  And so to the extent
 3     you're asking that question and, you know, if
 4     you -- you had a personal deposition available
 5     yesterday.  You could have asked any of these
 6     questions about what he did in his personal life
 7     and you didn't.  And so today, to the extent
 8     he's asked questions about what the limit -- the
 9     role of Cheshire, and he says I only did these
10     things, I think that's the answer for a 30(b)(6)
11     deposition.  If you want a different answer, you
12     still have an hour on the personal.  You can ask
13     that there.
14              MR. STOKES:  We are entitled under
15     30(b)(6) to ask him what he has in his personal
16     knowledge and we're entitled to ask what he did
17     in Cheshire Ventures, and the description that
18     he is providing today that he was communicating
19     through Cheshire Ventures but not acting on
20     Cheshire Ventures --
21              MR. LITTLE:  No, that's your
22     description that he's communicating through
23     Cheshire Ventures --
24              MR. STOKES:  -- and --
25              MR. LITTLE:  -- he's using an e-mail
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 113

1    account that has --

2                    MR. STOKES:  Whatever --

3                    MR. LITTLE:  His testimony's pretty

4    clear on that point.

5                    MR. STOKES:  -- whatever hyper

6    formalistic structure you want to give to this,

7    that's fine.  We're entitled to explore this --

8                    MR. LITTLE:  It's not formalistic.

9    People use e-mails for different purposes.

10                   MR. STOKES:  -- to understand --

11   we're entitled to explore this to understand

12   whether that is true.

13                   MR. LITTLE:  Yes, and he's answering

14   those questions -- but to the extent they're

15   limited.  We're not going to allow you to ask

16   him in his personal capacity what he did for

17   Blueridge.

18                   MR. STOKES:  What is --

19                   MR. LITTLE:  That would be an

20   improper question.

21   BY MR. STOKES:

22   Q.    To the degree that you communicated --

23   did you communicate in connection with the

24   Blueridge transaction through your Cheshire

25   Ventures's e-mail account?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 114

1    A.     I might very well have, yes.

2    Q.     And so what work post Amazon did you do

3    for Blueridge?

4    A.     Reflective of Cheshire Ventures, none.

5    Q.     In any other capacity?

6    A.     In my personal capacity, yes.

7    Q.     You previously stated that all real

8    estate consulting work you did after you left

9    Amazon in 2019 was through Cheshire Ventures.

10   Are you changing your answer now?

11   A.     No.

12   Q.     Okay.  So did you do real estate

13   consulting work for in connection with Blueridge

14   after you left Amazon?

15   A.     Blueridge was a development project.

16   Q.     I'm sorry, that doesn't answer the

17   question.

18              MR. LITTLE:  It does actually.  He's

19   answered it explicitly.

20              THE WITNESS:  It's not a consulting

21   arrangement.  It's a developing project.

22   BY MR. STOKES:

23   Q.     Okay.  Did you do development work -- to

24   the extent that you did development work once

25   you left Amazon, what entity or capacity did you

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 115

1    do that work in?

2    A.     I would have done that either through

3    Allcore or my personal capacity.

4    Q.     Did you receive any funds through

5    Cheshire Ventures in connection with the

6    Blueridge transaction?

7    A.     No.

8    Q.     Did you receive any funds from the White

9    Peaks transaction in connection with your role

10   through Cheshire Ventures?

11   A.     No.

12   Q.     Okay.  Did you perform any services for

13   White Peaks after -- in connection with the

14   White Peaks transaction -- after you left

15   Amazon?

16   A.     Not with Cheshire Ventures.

17   Q.     With any other entity?

18   A.     In my personal capacity, yes.

19   Q.     Did you perform any of those services

20   through Allcore?

21             MR. LITTLE:  Same objection to the

22   extent --

23             THE WITNESS:  I actually don't

24   believe I did through Allcore, and candidly, I

25   didn't do a whole lot.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 116

1              (Exhibit Number 6 was marked.)

2      BY MR. STOKES:

3      Q.    So let's take a look at Tab as Exhibit 6,

4      Tab 40.

5      A.    Just so after this one, can we take a

6      bathroom break, after we go through this?  Just

7      to give you a heads up...

8      Q.    I think it's there.

9      A.    Okay.

10     Q.    Okay.  Do you recognize this document?

11     A.    Yes.

12     Q.    Okay.  And do you see that this was

13     produced in connection with this litigation

14     through Cheshire Ventures?

15              MR. LITTLE:  Objection; form.

16              THE WITNESS:  I see that it is a

17     Cheshire Ventures e-mail, yes.

18     BY MR. STOKES:

19     Q.    And the e-mail is from whom to whom?

20     A.    It is from Cheshire Ventures to my g-mail

21     account.

22     Q.    And what is the nature of the e-mail?

23     A.    It says, Kyle, as discussed here is a

24     simple diagram with how the flow would work.

25     Also attached are the Allcore -- ACOA, Allcore

Page 117

1    Operating Agreement.  Please forward the White

2    Peaks' Operating Agreement, so we can get the

3    number language to your guys, meaning his

4    lawyers.

5    Q.    And what services was Cheshire Ventures

6    providing here?

7    A.    None, and I don't know why I e-mailed it

8    to me personal e-mail.

9    Q.    Do you know why Cheshire Ventures is

10   being used in connection with communications

11   with Kyle --

12             MR. LITTLE:  Objection to form;

13   mis- --

14   Q.    -- in terms of White Peaks?

15             MR. LITTLE:  -- characterizing the

16   document.

17             THE REPORTER:  I'm sorry.  You're

18   going to have to repeat that.

19   BY MR. STOKES:

20   Q.    Why is Cheshire Ventures's e-mail being

21   used in connection with communications with Kyle

22   and the White Peaks transaction?

23   A.    I don't know.  I don't know why I'm

24   mailing myself here.  I can only assume it's

25   because it was easier to get on my phone or some

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 118

1    other technical issue, but this has nothing to

2    do with Cheshire Ventures, other than the

3    e-mail.

4    Q.    And so were you performing whatever these

5    services purport to be in some other capacity?

6                    MR. LITTLE:  Objection to form.

7                    THE WITNESS:  I don't understand

8    your question.

9    BY MR. STOKES:

10   Q.    Other than Cheshire Ventures?

11   A.    This would have been in my -- in my

12   capacity with Allcore.

13   Q.    Okay.

14   A.    As I mentioned, here's the Allcore

15   Operating Agreement.

16                    MR. STOKES:  Okay.  We can go off

17   the record.

18                    THE VIDEOGRAPHER:  Going off the

19   record.  The time is 11:31 a.m.

20                    (Brief lunch break was observed.)

21                    THE VIDEOGRAPHER:  We are returning

22   to the record.  The time is 1146 a.m.

23   BY MR. STOKES:

24   Q.    Okay.  Mr. Nelson, do you have Exhibit 6

25   still in front of you?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 119

1    A.    I do.

2    Q.    What services did you perform in

3    connection with White Peaks after -- in July of

4    2019 that is represented by this e-mail?

5              MR. LITTLE:  Same objection.

6              THE WITNESS:  When you say "you,"

7    you mean me personally or Cheshire?

8    BY MR. STOKES:

9    Q.    I mean in whatever -- this is a Cheshire

10   e-mail, so in whatever capacity you performed

11   services and you have personal knowledge of that

12   or knowledge through Cheshire Ventures --

13             MR. LITTLE:  Same objections.

14   BY MR. STOKES:

15   Q.    -- I'd ask you to answers the question.

16   A.    Cheshire performs no services on behalf

17   of this chart here.

18   Q.    What services did you provide then in any

19   other capacity besides through Cheshire Ventures

20   that is represented here --

21             MR. LITTLE:  I'm going to object --

22   Q.    -- in this e-mail --

23             MR. LITTLE:  -- and direct him not

24   to answer in the context of the 30(b)(6)

25   deposition.  It's proper for his personal

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 120

1    deposition.  If you want to ask in the remaining

2    time you have, we're more than happy to let him

3    answer that.

4              MR. STOKES:  We did not agree to

5    that.

6    BY MR. STOKES:

7    Q.    So would you please answer the question?

8              MR. LITTLE:  He's not going to

9    answer the question.

10             THE WITNESS:  I'm going to listen to

11   my attorney.

12             MR. STOKES:  And to be clear for the

13   record, do you have -- is there a privileged

14   objection on the table?

15             MR. LITTLE:  No.  It's this an

16   improper use of the 30(b)(6) deposition.  That's

17   the scope of my objection.  I've said it many

18   times.

19             MR. STOKES:  And do you have a

20   protective order?

21             MR. LITTLE:  I do not but if you

22   need us to stop the deposition, and call court,

23   we're happy to do so.

24   BY MR. STOKES:

25   Q.    So for the record, are you refusing to

Page 121

```
 1    answer the question then?
 2    A.     I'm listening to the attorney's advice.
 3    Move on.
 4    Q.     Okay.  With regard to 2010 irrevocable
 5    trust, what, if any, connection did Cheshire
 6    Ventures have with the 2010 irrevocable trust?
 7    A.     None.
 8    Q.     Did Cheshire Ventures have any monies
 9    that it received from the trust?
10    A.     No.
11    Q.     Did Cheshire Ventures pay any money to
12    the trust?
13    A.     No.
14    Q.     Did Cheshire Ventures perform any work on
15    the behalf of the trust?
16    A.     No.
17    Q.     Did Cheshire Ventures have any
18    communications with anybody associated with the
19    trust?
20    A.     Rodney and Cheshire Ventures would have
21    had communications with Rodney Atherton, yes.
22    Q.     And would Cheshire Ventures have had
23    communications with Rodney Atherton in
24    connection with the 2010 trust?
25    A.     No.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 122

```
 1              MR. STOKES:  Okay.  Let's go ahead
 2     and show that as Exhibit 7.
 3                  (Exhibit Number 7 was marked.)
 4              THE WITNESS:  Yes, I see that.
 5     BY MR. STOKES:
 6     Q.     What is this document?
 7     A.     This is an e-mail from Cheshire Ventures
 8     to K. Ramstetter at White Peaks Capital.
 9     Q.     And the subject of the e-mail is what?
10     A.     It's titled, "Facilitator Agreement White
11     Peaks Capital."
12     Q.     Okay.  And do you see that it says that
13     "KRAM, The consulting agreement we talked about.
14     Let's chat when convenient"?
15     A.     I see that, yes.
16     Q.     And the Cheshire Ventures e-mail address
17     here, is that you?
18     A.     I believe the Cheshire Ventures e-mail is
19     me, yes.
20     Q.     Did anybody else have a Cheshire
21     Ventures's e-mail address to your knowledge?
22     A.     Not that I'm aware of.
23     Q.     As the sole employee and person working
24     on behalf of Cheshire Ventures, could anybody
25     else have a Cheshire Ventures's e-mail address
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 123

1    without your permitting them to have that

2    address?

3    A.    I can't answer that question.  I don't

4    know.  It's possible that it's somewhere out

5    there but I highly doubt it.

6    Q.    The facilitator agreement that's attached

7    to this for White Peaks capital, what is that?

8    A.    I don't know.  I don't see the document

9    here so it's just titled "Facilitator

10   Agreement."

11              (Exhibit Number 8 was marked.)

12   BY MR. STOKES:

13   Q.    Okay.  Let's pull up Exhibit 8 which is

14   Tab 39.

15   A.    Okay.

16   Q.    Okay.  What is this document?

17   A.    It is titled, Facilitator Agreement.

18   Q.    And who is it between?

19   A.    It says, Allcore Development and --

20   Q.    And --

21   A.    I'm sorry.  And White Peaks Capital.

22   Q.    Okay.  And what was the purpose of this

23   facilitator agreement with Allcore and White

24   Peaks?

25              MR. LITTLE:  Objection.  Same

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

                                              Page 124

1     objection as before.  This is not a question as

2     to -- unless you're asking him what does

3     Cheshire know about the purpose of this

4     agreement, we have the same objections as

5     before.

6                   THE WITNESS:  Cheshire Ventures, as

7     the managing principal of Cheshire Ventures,

8     Cheshire Ventures had nothing to do with this

9     agreement.

10    BY MR. STOKES:

11    Q.      Do you have knowledge of this agreement

12    in any other capacity then Cheshire Ventures?

13    A.      In my personal capacity, yes.

14    Q.      How about in your capacity with Allcore

15    development?

16    A.      Yes.

17    Q.      What then is the purpose of this

18    agreement?

19                  MR. LITTLE:  Same objection.  I'll

20    direct him not to answer.  If you want to ask

21    him now in his personal capacity and count that

22    toward your deposition you left open yesterday,

23    we're happy to let him do so.  If not, I don't

24    think it's appropriate for a 30(b)(6), and I'll

25    direct him not to answer.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 125

1           MR. STOKES:  We don't agree to that.

2           Do you have a privileged objection?

3           MR. LITTLE:  I've made my objection.

4           MR. STOKES:  And as with the prior

5      objection, you have no protective order for the

6      scope of this --

7           MR. LITTLE:  We didn't recognize

8      that you would be asking questions outside of

9      the topics about his personal knowledge, and so

10     to the extent that we did not have notice of

11     that, no, we've not filed for a protective

12     order.  We expected you to confine this

13     deposition to 30(b)(6).  You have the 30(b)(6)

14     topics of Cheshire.  You know from the money

15     flows that these things happened.  This document

16     you're looking at says, Allcore and White Peaks

17     Capital.  You know Allcore is a separate entity.

18     You sued Allcore.  You got a default on Allcore.

19           The only connection -- the only

20     reason that you have any connection here is that

21     e-mail address was used that says "Cheshire

22     Ventures."  And so, no, we did expect that you

23     would not understand from the money flows and

24     everything you know about this case that this

25     document has nothing to do with this 30(b)(6).

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 126

1    So we did not seek a protective order prior to

2    you asking these questions.

3                MR. STOKES:  Despite all of these

4    communications that we've shown you having

5    Cheshire Ventures's e-mails, you did not prepare

6    the witness to answer these questions in which

7    Cheshire Ventures is clearly involved in that it

8    is --

9                MR. LITTLE:  Patrick, it's not

10   clearly involved.  It's not clearly involved

11   when saying a g-mail is not clearly involved to

12   use a g-mail address.  The fact that an e-mail

13   address is used for multiple purposes, is, I

14   think, so the court would take judicial notice

15   of.  I wouldn't require any sort of factual bass

16   to believe that.  In fact, it is just the way

17   the world works.

18               MR. STOKES:  So to be clear, are you

19   going to answer any questions that you purport

20   are not Cheshire Ventures business related to

21   the extent that you used Cheshire Ventures's

22   e-mail address to communicate about the topics

23   of those e-mails?

24               MR. LITTLE:  That's a question for

25   me, and my objections I will tell you that it

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 127

1      depends on the questions you ask.  You're asking

2      a question now about a document between Allcore

3      and White Peaks, which has nothing with the

4      30(b)(6) topics and nothing to do with Cheshire

5      Ventures.

6                  MR. STOKES:  And the cover e-mail is

7      Cheshire Ventures and White Peaks.

8                  MR. LITTLE:  That's your

9      characterization.  He testified that he used the

10     e-mail for personal matters.  It does not, all

11     of sudden, make it a -- I mean, in this case,

12     you know, for example, that there are

13     individuals who is Amazon.com e-mail addresses

14     who are not Amazon employees.  It doesn't make

15     those people Amazon employees.  In fact, you had

16     a witness testify about that at length.  So

17     you're fully aware of the context of this case

18     that the use of an e-mail, does not render

19     everything company business.

20                 MR. STOKES:  Of course, Amazon

21     witnesses have not refused to answer questions

22     in connection with their role with Amazon

23     whether they're employees or not employees.  I

24     think is the essential distinction here.

25                 MR. LITTLE:  I understand you think

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 128

1    it is.  I think it's the fact that people use

2    e-mail for all sorts of purposes.

3    BY MR. STOKES:

4    Q.     Mr. Nelson, do people use corporate shell

5    names and entities to hind and disguise their

6    roles in corporate transactions so that

7    companies like Amazon are unable to identify

8    their participation in fraud schemes?

9               MR. LITTLE:  Objection, calls for a

10   hypothetical; calls for speculation.

11              THE WITNESS:  I can't answer that

12   question.  I don't know what people do.

13   BY MR. STOKES:

14   Q.     Did you do that?

15   A.     No.

16              (Exhibit Number 9 was marked.)

17   BY MR. STOKES:

18   Q.     Mr. Nelson, let's take a look at

19   Exhibit 9 Tab 46.

20              MS. PARIKH:  It should be up now.

21              THE WITNESS:  Yes, I see it.

22   BY MR. STOKES:

23   Q.     What is that document?

24   A.     It appears to be a wire transfer.

25   Q.     Who is -- I'm sorry.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 129

1    A.      A notice of a wire transfer.

2    Q.      Do you see that that is an e-mail from

3    Rod Atherton to Carleton Nelson at Cheshire

4    Ventures?

5    A.      I see that.

6    Q.      What is the wire transfer related to?

7    A.      It says here paid to Park National Bank

8    Renrets debited to CTBSRM.

9    Q.      And what is the nature of that wire

10   transfer?

11   A.      The nature define?  I -- define --

12   Q.      What's the purpose of it?

13   A.      From Cheshire Ventures's perspective?

14   Q.      From any perspective.

15   A.      From Cheshire Ventures's perspective, it

16   has no opinion on this, because it wouldn't have

17   known about this otherwise.  In my personal

18   capacity, I could tell you what this was about.

19   Q.      What is it?

20           MR. LITTLE:  Same objection.  I'm

21   going to direct him not to answer it.  If you

22   want him to answer in his personal capacity, you

23   still have about an hour of questions to do so.

24   BY MR. STOKES:

25   Q.      Mr. Nelson, is this communication to your

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 130

```
1    Cheshire Ventures's e-mail by Rod Atherton, is

2    it your testimony here today that that is not

3    related to Cheshire Ventures?

4    A.     Yes.

5    Q.     And it has no association with Cheshire

6    Ventures?

7    A.     Yes.

8    Q.     What is the distinction you're drawing

9    between Cheshire Ventures -- what is distinction

10   you're drawing between these entities and e-mail

11   addresses and communications that involve

12   Cheshire Ventures but are not Cheshire Ventures

13   related for purposes of our testimony today?

14   A.     Cheshire Ventures has nothing to do with

15   the content of the wire transfer detailed in

16   here, this notice of wire transfer detailed in

17   here.

18   Q.     Yet, Cheshire Ventures is receiving

19   communications about the wire transfer here.

20                MR. LITTLE:  Objection to the form.

21   Mischaracterizes his testimony.  He's never

22   testified that Cheshire Ventures is receiving

23   such things.

24                THE WITNESS:  It is a Cheshire

25   Ventures e-mail.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 131

1    BY MR. STOKES:

2    Q.     And so in what capacity is the Cheshire

3    Ventures's e-mail being used here?

4    A.     It's being used as an e-mail address.

5    Q.     And is your point that while you know

6    about the contents of this transfer personally,

7    it was not in your capacity as a Cheshire

8    Ventures's representative?

9    A.     Cheshire Ventures has nothing to do with

10   this wire or notice of debt.

11   Q.     Why would Cheshire Ventures receive an

12   mail from Rod Atherton?

13   A.     Because there no other e-mail to reach me

14   out.

15   Q.     You had other e-mail addresses at the

16   time, didn't you?

17   A.     I certainly did.

18   Q.     And so why would you receive e-mails

19   related to business like this at your Cheshire

20   Ventures e-mail address?

21   A.     You should ask Rod why he sent it to that

22   e-mail.  Instead of my g-mail.

23   Q.     So to be clear you're refusing to --

24   A.     To be clear, I'm telling you I don't know

25   why Rod Atherton sent it to Cheshire Ventures

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 132

1     versus some other e-mail I might have had.

2     Q.     What the purpose of this money that's

3     being transferred here?

4              MR. LITTLE:  Same objection.  He can

5     answer in his personal capacity as part of his

6     personal deposition time.  Not as 30(b)(6)

7     deposition.

8     BY MR. STOKES:

9     Q.     Are you refusing to answer as part of

10    your 30(b)(6)?

11    A.     I'm listening to my attorney.

12    Q.     Did Cheshire Ventures receive any loans

13    from any entities?

14    A.     No.

15    Q.     Did Cheshire Ventures receive any funds

16    from Allcore?

17    A.     No.

18    Q.     Did Cheshire Ventures receive any funds

19    from Renrets?

20    A.     No.

21    Q.     Did Cheshire Ventures receive any funds

22    from any entities associated with Casey

23    Kirschner?

24    A.     No.

25    Q.     Did Cheshire Ventures receive any funds

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 133

1    from any entity related to Christian Kirschner?

2    A.      No.

3    Q.      Did Cheshire Ventures receive any funds

4    related to CTBSRM?

5    A.      No.

6    Q.      Did Cheshire Ventures receive any funds

7    from any entities related to Johnny Lim?

8    A.      No.

9    Q.      Did Ventures receive any funds from any

10   entities related to Mr. Watson?

11   A.      No.

12   Q.      Did Cheshire Ventures perform any

13   services on behalf of North Star?

14   A.      No.

15   Q.      Did it seek to perform any services on

16   North Star?

17   A.      No, but I certainly would have.

18                (Exhibit Number 10 was marked.)

19   BY MR. STOKES:

20   Q.      Take a look at Tab -- I'm sorry,

21   Exhibit 10, Tab 56.

22   A.      I see it.

23   Q.      What is this?

24   A.      This is the license fee or license

25   agreement that I talked about earlier.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 134

1    Q.    Okay.  So this is a license agreement

2    between CTBSRM and Cheshire Ventures?

3    A.    Yes.

4    Q.    Did you enter into this agreement?

5    A.    This one isn't signed.  I don't remember

6    if I executed it or not, but that certainly was

7    the intention.

8    Q.    Okay.  Earlier you spoke about a license

9    agreement and you described the license

10   agreement as it related to Allcore.  Is this

11   different?

12   A.    Well, this is between CTBSRM.  Yes.

13   Q.    Okay.  So I just want to make sure we're

14   clear for the record.  What we were discussing

15   before we looked at the facilitator agreement

16   and you discussed certain services and

17   relationship with Allcore but you kept referring

18   to a license agreement, and just now you said,

19   this was the license agreement I was talking

20   about.  So what you were talking about before

21   with Allcore and the relationship between

22   Allcore and Cheshire Ventures, was that

23   accurate?  I'm not suggesting you were

24   intentionally being inaccurate.

25         I'm just saying, was that accurate or in

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 135

1    terms of the relationship between Cheshire

2    Ventures and Allcore, or were you referring to

3    CTBSRM?

4    A.     No. I believe, as I gave my testimony, I

5    believed there was a license agreement and here

6    is it.  It just happens to be between CTBSRM.

7    So obviously Rod had changed his mind about how

8    that was going to interface.

9    Q.     So what is the distinction between this

10   license agreement with CTBSRM and the

11   facilitator agreement with Allcore?

12   A.     A couple things.  One, the title is

13   different.  Two, the parties are different.

14   Three -- and then 5.1, I read that the

15   royalty -- it's a royalty and licensee agrees to

16   pay a royalty to licensor for use of license

17   process equal to 75 percent of all gross

18   revenue.

19          So it went from 98 percent to 75 percent,

20   and I'm sure there are some other differences

21   here, but point being, as I mentioned earlier, I

22   did recall there being a license agreement, and

23   I believe that this is -- this is it.

24   Q.     Was there also a facilitator agreement

25   with Allcore?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 136

1    A.      I believe that -- that this license

2    agreement would have replaced the facilitator

3    agreement.

4    Q.      Does this agreement make clear that this

5    is superseding or replacing the facilitator

6    agreement?

7    A.      I don't know.  I could go through it, if

8    you want.

9    Q.      Well, do you have a recollection of that?

10   You just mentioned that you believe that this is

11   replacing the facilitator agreement with

12   Allcore.  What is that based on?

13   A.      Given that this is February 28, 2020, and

14   the facilitator agreement was January 1st, I

15   believe, 2020; and given my recollection that

16   Rod had done a license agreement.  That's the

17   basis of why I say it would supersede the other

18   agreement.  There would be no reason for me --

19   from a practical perspective, I couldn't give

20   98 percent on one side and 75 on the other.

21   That wouldn't make a lot of sense.

22   Q.      What services were purporting to do for

23   CTBSRM through Cheshire Ventures in connection

24   with this license agreement?

25   A.      Let's see what it says.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 137

1    Q.    Do you recall what the services were in
2    connection with the license agreement that you
3    had with CTBSRM?
4              MR. LITTLE:  Objection; there's
5    still a last question pending, unless you want
6    to withdraw it.
7    BY MR. STOKES:
8    Q.    I'll withdraw the first question.  And
9    I'll ask you, do you recall what the purpose of
10   this license agreement was with CTBSRM?
11   A.    I believe that Rod had indicated that a
12   license agreement was a more appropriate way of
13   contracting between Cheshire and CTBSRM versus
14   Allcore.
15   Q.    Why was it more appropriate way?
16   A.    You'd have to ask Rod that.
17   Q.    What was your understanding of why it was
18   more appropriate for you to contract with CTBSRM
19   through a license agreement as opposed to with
20   Allcore through a facilitator agreement?
21   A.    I don't recall specifically why Rod made
22   that decision other than -- so, for instance,
23   here in the defined term license process --
24   Shall mean the proprietary process of generating
25   business development and consulting for

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 138

1    development management services.  This seems to

2    be a more appropriate way to contract CTBSRM

3    given that Cheshire Ventures was, again, purely

4    consulting-type operation where Allcore and

5    CTBSRM were involved in the development of

6    projects.

7    Q.     So what services did you intend to

8    provide through this agreement to CTBSRM?

9    A.     Well, as they say in license process

10   here, it's proprietary services of generating

11   business development and consulting for the

12   development management services.

13   Q.     So I can see that you can read that on

14   the page.  What did you intend to do for CTBSRM?

15   A.     Generate business development and

16   consulting services for development management.

17   Q.     And did you take any steps to do that?

18   A.     This document would be the first.

19   Q.     Was there a second?

20   A.     Not that I recall, no.

21   Q.     Did you take -- did you engage in any

22   work whatsoever for CTBSRM?

23   A.     No, I did not.

24   Q.     What was CTBSRM?

25   A.     CTBSRM was a trust, corporate trust.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 139

1    Q.     What was the purpose of CTBSRM?

2    A.     It was a tax advantageous place to keep

3    development money for Allcore development.

4    Q.     What is your understanding as to why

5    Cheshire Ventures would pay 75 percent of its

6    gross receipts to a trust that is set up for tax

7    advantageous reasons to assist another company

8    called Allcore?

9    A.     Because I had borrowed against that trust

10   and taken out notes through Renrets.

11   Q.     And so what is the purpose of these

12   royalties that are being described here on page

13   two of this document that you just identified?

14   A.     Both to repay those notes and to fund

15   Allcore development.

16   Q.     Okay.  Does this license agreement -- it

17   describes that you're going to pay royalty to

18   the licensor, and as you described, the license

19   process means in connection with development

20   services.  Does it say anything about this

21   arrangement between Cheshire Ventures and CTBSRM

22   being set up to payoff your personal loans with

23   CTBSRM?

24   A.     I don't know.  Let me take a look.  I

25   can't find anything in here that defines how

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 140

1    those license fees are supposed to be spent.

2    Q.    What was the -- you've mentioned tax

3    purposes.  What was the tax purpose of this

4    relationship between Cheshire Ventures and

5    CTBSRM as you understood it?

6    A.    There was no tax purpose for Cheshire and

7    CTBSRM as a -- as it's contracted here that I'm

8    aware of.

9    Q.    And putting aside as it's contracted

10   here, what did you understand to be the tax

11   purpose from -- for Cheshire Ventures and CTBSRM

12   to have a contract with each other or have a

13   relationship with each other?

14   A.    My understand between Cheshire and CTBSRM

15   was exactly as it lays out here.  There was

16   75 percent royalty fee of gross proceeds were to

17   go to CTBSRM.  I don't think that has anything

18   to do with taxes other than there is a defined

19   term taxes -- all fees and other charges are

20   exclusive of federal, state, or foreign taxes,

21   levies and assessment.

22              (Clarification by Reporter)

23              Licensee shall be liable for the

24   payment of all local, state, federal and

25   non-United States taxes or similar assessments

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 141

1    or charges, including any interest or penalties

2    imposed thereon, other than taxes based on the

3    net income of licensor, arising out of or

4    relating to this agreement without limiting the

5    foregoing licensee shall promptly pay the

6    licensor in an amount equal to any such items

7    actually paid or can be collected or paid by

8    licensor.  In lieu of paying such taxes,

9    licensee will provide licensor the tax exemption

10   certificate acceptable to the tax authorities.

11              To me, that outlines the tax

12   relationship of the two.

13   Q.    What discussions did you have with Rod

14   Atherton about the purpose of setting a

15   relationship between Cheshire and CTBSRM?

16   A.    The purpose was to payoff the notes and

17   fund Allcore Development.

18   Q.    How would setting up a relationship

19   between Cheshire and CTBSRM fund Allcore

20   Development?

21   A.    The notes would eventually be paid off

22   and future revenues generated by Cheshire

23   Ventures on a consulting basis will continue to

24   flow to CTBSRM, and then would be used for

25   development of real estate projects.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 142

1    Q.     By whom?

2    A.     By Allcore.

3    Q.     So was it your understanding that monies

4    that would flow from Cheshire Ventures to CTBSRM

5    would then be paid to Allcore?

6    A.     If a deal presented itself that was

7    appropriate, yes.

8    Q.     And was it your understanding that

9    payments to CTBSRM by Cheshire Ventures was for

10   the benefit of Allcore?

11   A.     I don't know if it was for the benefit of

12   Allcore.  I know it was certainly for the

13   benefit of paying the notes off, but certainly

14   there would have been a component of that money

15   that would have been available to Allcore, yes.

16   Q.     Did -- what was your understanding about

17   taxes that would be due and owing on Cheshire

18   Ventures's monies earned that were paid to

19   CTBSRM to pay down the notes that you had with

20   CTBSRM?

21   A.     Any revenue that Cheshire Ventures earned

22   was taxed at my, then, taxable rate.

23   Q.     What real estate development work did

24   CTBSRM do?

25   A.     In relation to Cheshire Ventures, none.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 143

1   Q.    Well, Cheshire Ventures is entering into
2   an agreement with CTBSRM to provide real estate
3   services; is that right?
4   A.    To provide business development services.
5   Q.    Development management services to be
6   exact?
7   A.    No. Business development.  Allcore and
8   CTBSRM are in the development management piece.
9   Q.    And so you're providing consulting in
10  connection with that through Cheshire Ventures?
11  A.    Business development leads and/or
12  potential consulting, yes.
13  Q.    So were you are entering into an
14  agreement to provide consulting services to
15  CTBSRM through Cheshire Ventures.  What was your
16  understanding of what real estate development
17  work Cheshire Ventures was going to be doing?
18  A.    Wait a second.  Let's go back and read
19  that one more time, Pat.  So licensed process,
20  again, first page.  Capitalize term, shall mean
21  the proprietary process of generating business
22  development and consulting for development
23  management services.  So there's two things.
24  It's not just consulting.  It's also business
25  development services.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 144

```
 1        Distinct and separate but for development

 2   services, which would be performed CTBSRM and

 3   Allcore Development.  My piece with Cheshire

 4   Ventures was simply to either generate or

 5   consult.  It did neither.

 6   Q.    And my question again is, since you

 7   agreed to do consulting in connection with this,

 8   what was your understanding of what CTBSRM was

 9   doing in the development management services

10   field?

11   A.    I don't know because they never did

12   anything.

13   Q.    Okay.  So you entered into a license

14   agreement without knowing what CTBSRM did?

15              MR. LITTLE:  Objection.

16              THE WITNESS:  No.  It says it right

17   here, development management services; that's

18   what they were going to do.

19   BY MR. STOKES:

20   Q.    So entered into an agreement to pay

21   CTBSRM 75 percent of the proceeds of Cheshire

22   Ventures for services that it had never

23   performed?

24   A.    Yes.

25   Q.    And for services that you didn't know
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 145

1    what they would be?

2    A.     Development management services.  It says

3    it right there.

4    Q.     What did you understand that CTBSRM was

5    going to do in the future in connection with the

6    management services that would warrant you to

7    agree to pay 75 percent of the gross proceeds of

8    Cheshire Ventures to it?

9    A.     Develop projects with Allcore.

10   Q.     Okay.  What did you understand those

11   projects were going to be?

12   A.     Anything and everything in the industrial

13   and/or commercial field.

14   Q.     Did it involve White Peaks?

15   A.     No.

16   Q.     Was Allcore going to be involved in the

17   development or work with White Peaks?  We just

18   looked at a document that suggests that there

19   was an agreement between the two?

20   A.     Was Allcore going to be in the

21   development business with White Peaks?  With

22   White Peaks Capital or White Peaks site?  I'm

23   sorry.  I'm confused.

24   Q.     Either.

25   A.     ████████████████████████████████

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 146

1

2    earlier was an agreement to -- on a go forward

3    basis to joint venture, so it had nothing to do

4    with the acquisition.

5    Q.     Okay.  So White Peaks was a company; is

6    that right?

7    A.     Yes.

8    Q.     And White Peaks was engaged in

9    development work?

10   A.     I don't know.

11   Q.     Okay.  Well, Allcore was -- did Allcore

12   consider entering into a business relationship

13   with White Peaks, the development company?

14   A.     Are you asking --

15          MR. LITTLE:  Objection.

16          THE WITNESS:  Are you asking me in

17   my capacity as with Cheshire Ventures knew or

18   what Allcore knew?

19   BY MR. STOKES:

20   Q.     Well, I'm asking in whatever capacity you

21   sitting here in the room today know that in.

22   A.     Cheshire Ventures perspective, I have no

23   idea what Allcore did or didn't do.

24   Q.     Okay.  So you in this capacity of

25   Cheshire Ventures that you've described, entered

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 147

1    into an agreement with CTBSRM to provide it

2    75 percent of the gross receipts of your company

3    in connection with consulting to CTBSRM and

4    Allcore you described for developing management

5    services.  Do I understand that correctly?

6    A.    And business development, yes.

7    Q.    And business development and paying down

8    your notes, et cetera?

9    A.    Yes.

10   Q.    And part of that development work that

11   you say you are contemplating on behalf of

12   Cheshire Ventures, was paying them for work that

13   Allcore and CTBSRM would do in connection with

14   real estate development, which would include --

15   would that include White Peaks?

16   A.    Cheshire Ventures had no connection with

17   White Peaks whatsoever.

18             (Exhibit Number 11 was marked.)

19   BY MR. STOKES:

20   Q.    Take a look at Exhibit 11, Tab 58.

21   A.    Okay.  I see it.

22   Q.    What is that document?

23   A.    This appears to be titled "Proposed

24   Business Structure."

25   Q.    Do you recognize that document?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 148

1    A.     I believe I have seen this somewhere,
2    yes.
3    Q.     Do you know who prepared that document?
4    A.     I believe Rod Atherton did.
5    Q.     What is the purpose of that document?
6    A.     I believe Rod put together a blocked
7    diagram for different various development --
8    real estate development work and some associated
9    trusts.
10   Q.     And this document was produced from
11   Cheshire Ventures.  So do you recall receiving
12   this document?
13   A.     I'm not sure it was produced by Cheshire
14   Ventures.  It was produced by me personally.
15   Q.     Do you see the Bates number at the
16   bottom?
17   A.     I see that, but I'm not certain because I
18   produced it -- I believe because I produced it,
19   it's Nelson Cheshire.  I think it was actually a
20   Nelson production; not a Cheshire production.
21   Q.     We just -- we talked about a facilitator
22   agreement between Cheshire Ventures and Allcore
23   and for consulting services, among other things,
24   in connection with real estate development, and
25   we've talked about a license agreement between

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 149

1    Cheshire Ventures and Allcore -- I'm sorry,
2    CTBSRM in connection with consulting, among
3    other things, in connection with real estate
4    development -- does this document have to do
5    with the type of real estate development that
6    CTBSRM and Allcore would be engaged in that
7    Cheshire Ventures might be facilitating in the
8    future?
9    A.      There is that potential, but other than
10   the Bates stamp saying "Cheshire," Cheshire had
11   nothing to do with this.
12   Q.      But do you see sitting here today have
13   knowledge of what this document is?
14   A.      I did not produce this document.
15   Cheshire Ventures did not produce this
16   document -- or did not create this document.  It
17   had nothing to do in the creation of this
18   document, and other than Bates stamped saying
19   it's from Cheshire, I don't know that it had
20   anything to do with Cheshire Ventures.  In fact,
21   I know it had nothing to do with Cheshire
22   Ventures.
23   Q.      I'll ask my question again.
24   A.      Okay.
25   Q.      Do you understand what the purpose of

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 150

1    this document is?

2    A.    I understand what it says, yes.

3    Q.    What does it say?

4    A.    Behind Chinese wall, 2010 trust,

5    Rod trustee, charities, CTBSRM, Von, Pres, Rod

6    general counsel, Allcore development, Von

7    management.

8    Q.    I understand you can read the document.

9    My question --

10                MR. LITTLE:  Are you going to let

11   him finish the answer?  You asked him to testify

12   to what it said, or you can withdraw your

13   question?

14                MR. STOKES:  No.  I don't think I

15   need to withdraw my question.  Your client's

16   playing games.

17                MR. LITTLE:  You asked him -- what

18   did it say, Pat?  He's literally telling you

19   what it said.

20   BY MR. STOKES:

21   Q.    So my question is --

22                MR. LITTLE:  Let him continue

23   please.  He's in the middle of his answer.

24   BY MR. STOKES:

25   Q.    What do you understand this document --

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 151

```
 1            MR. LITTLE:  He still needs to

 2     answer the question.

 3            THE WITNESS:  This looks to me like

 4     a block diagram, not prepared by me or myself in

 5     my capacity with Cheshire Ventures, about

 6     developing data centers and various trusts and

 7     associated with that.

 8     BY MR. STOKES:

 9     Q.    What was the reason for you receiving

10     this document from Rod Atherton?

11     A.    I don't know that I did receive this

12     document from Rod.  Can you show me that?

13     Q.    Well, was it produced by you or Cheshire

14     Ventures?

15     A.    One or the other.  I believe it was me.

16     Q.    Then so you believe the document was

17     produced by Rod Atherton; is that correct?

18     A.    It says --

19     Q.    I'm sorry, was prepared by Rod Atherton?

20     A.    I do believe that, yes.

21     Q.    Okay.  And do you understand that the

22     document was produced by you or Cheshire

23     Ventures?

24     A.    That's what it says in the Bates stamped,

25     yes.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 152

```
 1    Q.    Okay.  Do you remember this document --

 2    A.    I've seen a lot of block diagrams.

 3    Q.    Okay.  Do --

 4    A.    It could have come off the box account

 5    that your guys Consilia broke into.  I don't

 6    know.

 7    Q.    Did you keep documents on the box account

 8    that you just referred to?

 9    A.    Rod Atherton did.

10    Q.    What was that box account used for?

11    A.    To keep any documents.

12    Q.    By whom?

13    A.    By Rod Atherton.

14    Q.    Was that for purposes of sharing

15    documents with you?

16    A.    Certainly it was for sharing documents.

17    Yes.

18    Q.    This document here, do you know whether

19    this document was shared with you by Rod

20    Atherton through that box account?

21    A.    I don't.

22    Q.    Okay.  Why did you just say then that it

23    was?

24    A.    Because I don't know if it was or it

25    wasn't.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 153

1  Q.    Okay.  So putting aside how it was shared

2  with you by Rod Atherton, do you recall

3  receiving blocked diagrams like this from Rod

4  Atherton periodically?

5  A.    It is possible, yes.

6  Q.    Does this block diagram -- the

7  information contained in this block diagram,

8  does this represent a structure that you set up

9  with Rod Atherton for --

10           MR. LITTLE:  Objection; you --

11  Q.    -- for purposes of engaging in real

12  estate development consulting or other type of

13  work?

14           MR. LITTLE:  Objection; it's clear

15  from your question that the you you're referring

16  to is Carl Nelson personally and not Cheshire

17  Ventures.  So same objection as previously.  To

18  the extent he can answer that as the corporate

19  representative, he's free to do so; otherwise,

20  we'd ask that you count this toward your

21  30(b)(6) -- sorry, the deposition time for him

22  personally.

23           MR. STOKES:  So we are not going to

24  count this as time towards Mr. Nelson's personal

25  deposition, and understanding the inappropriate

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 154

1      lines you're attempting to draw on this

2      30(b)(6), Mr. --

3              MR. LITTLE:  Patrick, they're not

4      inappropriate.  I understand you don't agree

5      with it, but it's not inappropriate.

6      BY MR. STOKES:

7      Q.    Mr. Nelson, will you please let us know,

8      do you know, what this diagram is intended to

9      represent with regard to work being done between

10     you in any capacity, and then we'll talk about

11     what capacity that was, in any capacity, with

12     Rod Atherton and Von Lacy?

13     A.    I don't understand this block diagram.

14     They use a lot of national companies, discuss

15     Hope out of Occa (as said); I don't know what

16     that is.  I can tell you that in my personal

17     capacity, I would look at this and say I'm not

18     even sure what this is.

19             In my capacity as Cheshire Ventures, I

20     would have no idea what this is.

21     Q.    So you contracted through Cheshire

22     Ventures with CTBSRM, correct?

23     A.    There was a license agreement, yes.

24     Q.    And you had a facilitator agreement with

25     Allcore; is that correct?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 155

1    A.      I don't know that both existed at the

2    same time.

3    Q.      But you had a facilitator agreement with

4    Allcore as well; is that correct?

5    A.      At one point in time, yes.

6    Q.      And you would receive information from

7    Rod Atherton that would relate to, as this

8    suggests, real estate development work that you,

9    in some capacity, were doing with Rod Atherton's

10   assistance; is that right?

11   A.      This doesn't make any sense.  I didn't do

12   any real estate development work of this nature

13   here.  So I would say, no.

14   Q.      Okay.  So sitting here today are you only

15   willing to answer questions about this document

16   through the lens of Cheshire Ventures, whatever

17   that lens is that you define --

18               MR. LITTLE:  Objection --

19   Q.      -- as opposed to --

20               MR. LITTLE:  Pat, objection.  He

21   just told you from his personal capacity what he

22   would say and he just testified to it.  It's

23   literally in the transcript.

24   BY MR. STOKES:

25   Q.      Was the license agreement that you had

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 156

1    with CTBSRM through Cheshire Ventures relate to

2    doing consulting -- development consulting work

3    such as these types of deals that are

4    represented here in this blocked diagram?

5    A.     Cheshire Ventures would have done the

6    business development and/or consulting.  It

7    would not have done the actual development of

8    the project.

9    Q.     Would you -- and did you receive

10   information from Allcore, CTBSRM, or Rod

11   Atherton on behalf of those entities since

12   apparently they're the managers, presidents, and

13   general counsels of those entities, that would

14   inform you in your role at Cheshire Ventures, as

15   to the structure of business development

16   consulting and development opportunities at any

17   of the entities that you were considering

18   working on behalf of?

19   A.     I would get some information from time to

20   time.  This, I don't recognize it.  It doesn't

21   make any sense.  No.

22   Q.     Did you receive information from

23   Rod Atherton or Von Lacy with regard to Allcore

24   and CTBSRM development work?

25   A.     No, I did not.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 157

1    Q.    Beyond -- I mean, you received this?

2    A.    I don't know that I received this.  I may

3    have this, but this doesn't make any sense to

4    me.  So I don't understand it.  Who is Hope out

5    of Okla- -- I assume it's Oklahoma.  The purpose

6    to operate the deal.  Monies bank brings the

7    relationship.  What bank?  I don't understand

8    any of this.

9              (Exhibit Number 12 was marked.)

10             MR. STOKES:  Take a look at

11   Exhibit 12 Tab 61, slide 25.

12             It's Bates Number 007 at the end.

13             THE WITNESS:  What page does that

14   correspond to, pat?

15   BY MR. STOKES:

16   Q.    So the slide is on page 25?

17   A.    25.

18   Q.    The Bates number is at the end of 007,

19   and I can't seem to tell you on -- and it's page

20   25 of the PDF.

21   A.    25.  Oh, come on.  Okay.

22   Q.    Do you have it in front of you?

23   A.    I see that.

24   Q.    Okay.  Okay.  Have you seen this graph

25   before?

Page 158

1    A.     I believe so, yes.

2    Q.     Did you participate in a presentation by

3    prosecutors EDBNA and --

4              MR. LITTLE:  Objection to form.  As

5    you can certainly imagine, Cheshire Ventures has

6    not participated in this sort of thing.  But to

7    the extent you want to ask him personally, we're

8    happy to allow this be a part of his time as

9    long as it's counted towards his time.

10   BY MR. STOKES:

11   Q.     Do you see Cheshire Ventures on this

12   page?

13             MR. LITTLE:  That wasn't your

14   question.  Your question was whether he

15   participated and that's him personally.  I don't

16   think you were asking if Cheshire Ventures

17   personally participate.  If you want to ask that

18   questions, I'll be more than happy to let him

19   answer, but the other question, I'm not going to

20   let him answer.

21   BY MR. STOKES:

22   Q.     So did Cheshire Ventures participate?

23   A.     No.

24   Q.     Did Cheshire Ventures come up in the

25   meeting?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 159

1    A.    How would I know if Cheshire Ventures

2    didn't participate?

3    Q.    Were you in the meeting?

4    A.    No.

5    Q.    Okay.  Do you see this -- do you see this

6    graph in front of you with Cheshire Ventures?

7    A.    Yes.

8    Q.    Okay.  I'm going to ask you about just

9    the arrows and the graphs here as it relates to

10   Cheshire Ventures, to the extent you know.

11        This graphic appears to represent that

12   Sigma Regenerative Services -- or Solutions,

13   provided funds to Cheshire Ventures?

14   A.    I see an arrow pointing from Sigma to

15   Cheshire Ventures.  Yes.

16   Q.    In your capacity as the principal -- what

17   were you principal what?

18   A.    Managing principal.

19   Q.    Managing principal of this entity

20   Cheshire Ventures, did you receive or did

21   Cheshire Ventures receive any funds from Sigma

22   Regenerative Solutions?

23   A.    Not that I'm aware of.  No.

24   Q.    This seems to suggest that Cheshire

25   Ventures received funds from Rod Atherton?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 160

1    A.    It seems to suggest that there's an arrow
2    pointing from Sigma Regenerative Solutions to
3    Cheshire Ventures.  That's all I see.
4    Q.    Did Cheshire Ventures receive funds from
5    Rodney Atherton?
6    A.    I don't believe they did.
7              MR. STOKES:  Is it 12:40?  Shall we
8    take a break for lunch at this time.
9              MR. LITTLE:  That's fine.
10              THE VIDEOGRAPHER:  We're going off
11    the record.  The time is 12:40 p.m.
12         (Brief lunch break was observed.)
13              THE VIDEOGRAPHER:  We're returning
14    to the record.  The time is 1:13 p.m.
15    BY MR. STOKES:
16    Q.    Okay.  Mr. Nelson, you're still under
17    oath.  Do you understand?
18    A.    I do.
19              (Exhibit Number 13 was marked.)
20    BY MR. STOKES:
21    Q.    We were, prior to the break, talking
22    about Cheshire Ventures receipt of funds from
23    Sigma Regenerative Solutions and Rod Atherton.
24    Let's take a look at Exhibit 13, Tab 111.
25    A.    Okay.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 161

1 Q. Do you have that document in front of
2 you?

3 A. I do.

4 Q. Do you see that this is a bank record for
5 U.S. Bank for Cheshire Ventures, LLC?

6 A. I do.

7 Q. You mentioned previously that Cheshire
8 Ventures's bank account was with U.S. Bank; is
9 that correct?

10 A. That's correct.

11 Q. And is this the bank account that you
12 previously referred to with regard to monies you
13 received and spent on behalf of Cheshire
14 Ventures?

15 A. Yes.

16 Q. Do you know if Cheshire Ventures had any
17 other bank accounts?

18 A. It did not.

19 Q. And if you would look at the -- what is
20 the third page of the bank record, Bates Number
21 497.

22 A. Yep, I see it.

23 Q. Do you see the section that is "Other
24 Deposits"?

25 A. Yes.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 162

1    Q.    Do you see a deposit a wire credit on

2    December 31st of 2019, from Sigma Regenerative

3    Solutions for $40,000?

4    A.    I do.

5    Q.    And do you see just below that a deposit

6    from Rod Atherton on December 21, 2019, and for

7    $82,500?

8    A.    I do.

9    Q.    What were the purposes of those deposits?

10   A.    I believe those were gifts back from a

11   bonus that Allcore had done.

12   Q.    And let's -- and describe what you mean

13   by that?

14   A.    I mean by that is they were gifts that

15   were supposed to go to a personal account but

16   apparently they went to this account.

17          MR. STOKES:  So let's turn to Tab

18   31.  I don't remember what exhibit number it is.

19          MS. PARIKH:  Exhibit 3.

20          MR. STOKES:  Sorry?

21          MS. PARIKH:  Exhibit 3.

22          THE WITNESS:  Yes.

23   BY MR. STOKES:

24   Q.    Do you have that in front of you?

25   A.    I do.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 163

1    Q.    Do you remember that you previously

2    refused to answer questions about this because

3    you claim that this bonus structure did not

4    relate to Cheshire Ventures?

5                 MR. LITTLE:  Objection.  That's not

6    his testimony.  That wasn't what he did.

7                 THE WITNESS:  And this did not

8    relate to -- this bonus structure did not relate

9    to Cheshire Ventures.

10   BY MR. STOKES:

11   Q.    As we just saw, did we see monies

12   deposited into your Cheshire Ventures's bank

13   account?

14   A.    Into Cheshire Ventures's bank account.

15   Yes.

16   Q.    And do we see this e-mail regarding the

17   bonus comes from Cheshire Ventures?

18   A.    Yes.

19   Q.    And are you willing to answer questions

20   at this time about the revised bone and the

21   structure of the bonus and purpose of the bonus?

22                MR. LITTLE:  Is that a question?

23                MR. STOKES:  Yes.

24                MR. LITTLE:  It depends on what the

25   question are, and we'll devise them as we go.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 164

1    BY MR. STOKES:

2    Q.    Mr. Nelson --

3            MR. LITTLE:  You showed him the bank

4    account.  He's answered your question about the

5    bank account.  If you want to ask more questions

6    about that, I'm sure he'll ask -- he'll answer.

7    BY MR. STOKES:

8    Q.    So, Mr. Nelson, this bonus, what was the

9    purpose of this bonus?

10   A.    It was a gift back from a loss that

11   Mr. Atherton had taken.

12   Q.    What was the loss that Mr. Atherton had

13   taken?

14   A.    I don't know.

15   Q.    What was -- what did Mr. Atherton

16   describe to you was the purpose of this bonus?

17   A.    He described to me the purpose of the

18   bonus for him and Mr. Lacy, because we had told

19   them as part of Allcore that they had bonus.

20   Q.    There's a gift back portion of this.

21   What is -- what did Mr. Atherton explain to you

22   is the purpose of the gift back?

23   A.    The purpose of the gift back was a gift

24   back.

25   Q.    Why was he -- what does a gift back mean?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 165

```
1    A.    It means he was able to use a loss to

2    offset a certain amount of taxable income and

3    then gift back a certain amount, bonusing

4    himself along the way, and Mr. Lacy.

5    Q.    Who was he gifting the money back to?

6    A.    Myself.

7    Q.    Is that the money that's deposited into

8    the Cheshire Ventures's bank account that we

9    just saw?

10   A.    I believe so, yes.

11   Q.    And what was -- why were you receiving --

12   as I understand what you just said is, a portion

13   of his bonus is being gifted back to you?

14   A.    Yes.

15   Q.    Do you understand that correctly?

16   A.    Correct.

17   Q.    Why was Mr. Atherton gifting you a

18   portion of his bonus?

19   A.    That was the structure that he proposed.

20   Q.    Well, was -- what was the purpose of the

21   bonus to Mr. Atherton?

22   A.    It was an employment bonus.

23   Q.    For what?

24   A.    For the work that he had done as part of

25   Allcore.
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 166

1    Q.    What work had he done for Allcore?

2    A.    He was general counsel.

3    Q.    So what I understand he had a title and a

4    position, what work did he do for purposes of

5    receiving a bonus?

6    A.    I'm not sure I understand the question.

7            MR. LITTLE:  I'm going to object at

8    this point to the extent you're asking in his

9    with capacity Cheshire Ventures.  He can answer

10   to the extent you're asking him about the

11   continuation of questions you began asking

12   yesterday in his personal deposition.  We're

13   happy to have him answer those as long as you

14   answer those towards your deposition time.

15           If you're not willing to do so, then

16   I'm going to tell him he should not answer as

17   part of the 30(b)(6) deposition.

18           MR. STOKES:  We don't --

19           MR. LITTLE:  You've explored the

20   aspects of this which relate to Cheshire

21   Ventures.  If you want to continue to explore

22   Cheshire Ventures, we're happy to have him

23   answer those questions in this deposition.

24           MR. STOKES:  And so again,

25   Mr. Little, we'll agree to disagree on the lines

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 167

1    you're drawing and --

2                    MR. LITTLE:  It's pretty

3    straightforward lines, Patrick.

4                    MR. STOKES:  And this is not

5    appropriate for the 30(b)(6).

6    BY MR. STOKES:

7    Q.    So we have here, Mr. Nelson, an e-mail

8    bonus structure involving a bonus and gift back

9    that is from an e-mail, again, from Cheshire

10   Ventures; am I correct?

11   A.    Yes.

12   Q.    And we have the monies deposited into

13   Cheshire Ventures; am I correct?

14   A.    There is money deposited into Cheshire

15   Ventures, yes.

16   Q.    Okay.  And what was the reason for

17   Cheshire Ventures to receive a gift back from

18   Rod Atherton or Von Lacy in connection with work

19   that they had performed for any entity other

20   than Cheshire Ventures?

21   A.    Cheshire Ventures didn't receive a gift

22   back.  Cheshire Ventures's bank account did but

23   it was intended for me personally.

24   Q.    Mr. Nelson, is the distinctions that were

25   created for you by Rod Atherton between Cheshire

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 168

1    Ventures, yourself, Allcore, CTBSRM, 2010 Trust,

2    any of these entities, anything other than a

3    figment in order to hide your identity from the

4    IRS and Amazon and in connection with your

5    receipt of funds from North Star, Blueridge, and

6    White Peaks?

7    A.    No.

8    Q.    So there was no purpose, other than to do

9    those things?

10   A.    Your words; not mine.  Certainly not

11   Cheshire Ventures's.

12   Q.    So, Mr. Nelson, we see here that monies

13   are gifted to Cheshire Ventures.  Why --

14   A.    We see that monies are deposited into

15   Cheshire Ventures's bank account.  Yes.

16   Q.    Yes.  Why did Cheshire Ventures -- what

17   was the purpose of the gift to Cheshire

18   Ventures's bank account?

19   A.    Well, it says gifted back here, $312,000.

20   If you look at the exhibit that you showed me

21   for the amount that was deposited, it looks like

22   a lot less than that.  So I'm not sure that

23   we're talking about a gift on the money that was

24   deposited or not.

25         What I can tell you is that it was

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 169

1    intended for me personally, and I can only

2    assume, because Rod Atherton set up that bank

3    account for Cheshire Ventures, he had

4    information in order to wire it there.

5    Q.    In this structure that Mr. Atherton set

6    up, what role was Cheshire Ventures supposed to

7    play?

8    A.    Cheshire Ventures -- Cheshire Ventures

9    was a real estate development consulting

10   company.

11   Q.    And what was the purpose of Mr. Atherton

12   providing a -- what did Mr. Atherton tell you

13   was the purpose of this gift that at least

14   partially ended up with Cheshire Ventures's bank

15   account?

16   A.    It had nothing to do with Cheshire

17   Ventures, other than it happened to go to a

18   Cheshire Ventures's bank account.

19   Q.    So do you know what the purpose -- did

20   Mr. Atherton tell you what the purpose of the

21   gift was?

22   A.    In my personally capacity, yes.

23   Q.    And monies ended up Cheshire Ventures's

24   bank account, correct?

25   A.    Yes, it's right here.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 170

1    Q.    And are you willing here today as part of

2    this 30(b)(6) to answer the question what

3    Mr. Atherton told you the purpose of that gift

4    back was?

5    A.    The purpose of this -- these monies here,

6    so 40,855 and then your -- the exhibit which you

7    showed me, is 312,000, do not add up.

8          So you're calling this the gift back, and

9    you're saying that that 312,000 is a gift back.

10   I'm not sure -- where does it say gift back on

11   the bank account?

12   Q.    So I'm here to ask questions, and,

13   Mr. Nelson, did you previously testify that the

14   monies deposited in Cheshire's back account that

15   came from Rod Atherton and from Sigma

16   Regenerative Solutions related to the revised

17   bonus structure?

18   A.    I said that there is money deposited in

19   here, and I can only assume, because it's from

20   First Western and Regenerative -- Sigma

21   Regener- -- Regenerative and Rod Atherton that

22   it had to do with that, but it does not add up

23   to the amounts in the e-mail that you showed me.

24   Q.    Sure.  Do you have any reason to think

25   it's from something other than the gift back?

HIGHLY CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 171

1    A.    Because it's in this account and Cheshire

2    had nothing to do with it, I don't know.

3    Q.    Was the purpose of the gift back to

4    provide you funds from the structure whether

5    through the Cheshire's bank account or some

6    other bank account such that you didn't have to

7    pay taxes on that money?

8    A.    No, absolutely not.

9    Q.    Did you pay taxes on that money?

10   A.    I did not have to pay any taxes on money

11   that was not taxable.

12   Q.    Because this was gifted to Cheshire

13   Ventures, was it your view that you did not have

14   to pay taxes on it?

15              MR. LITTLE:  Objection to form.

16   Lack of foundation.  Mischaracterizes his

17   testimony.

18              THE WITNESS:  Again, I followed the

19   advice of my attorney and my CPA as to what

20   should be taxed and what shouldn't be taxed.

21   BY MR. STOKES:

22   Q.    Your CPA being Mr. Delcarpio?

23   A.    Yes.

24   Q.    Did Mr. Delcarpio speak to Mr. Atherton?

25   A.    I don't know.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 172

1    Q.    Did you put Mr. Delcarpio in touch with

2    Mr. Atherton?

3    A.    I don't know.

4              (Exhibit Number 14 was marked.)

5    BY MR. STOKES:

6    Q.    Let's take a look at Exhibit 13 -- I'm

7    sorry, it's 14 now.  Tab 110.

8              MS. PARIKH:  It should be on there.

9              THE WITNESS:  Okay.

10   BY MR. STOKES:

11   A.    Okay.

12   Q.    Do you see this is an U.S. Bank statement

13   for an account held in the name of Carleton

14   Nelson?

15   A.    I see that.

16   Q.    Do you know what purpose this bank

17   account served?

18   A.    It says --

19   Q.    In other words, is it a personal bank

20   account, an account associated with Cheshire

21   Ventures, or some other purpose?

22   A.    It says, standard savings, so I assume

23   it's a standard savings account.

24   Q.    Do you recognize the bank account?

25              MR. LITTLE:  Objection to form.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 173

```
 1              THE  WITNESS:   It  has  my  name  on  it.
 2      Yes.   So  to  the  extent  that  my  name  is  on  a
 3      statement  from  a  U.S.  Bank  standard  savings
 4      account,  yes,  I  recognize  it.
 5      BY  MR.  STOKES:
 6      Q.      Okay.   Did  you  have  a  standard  savings
 7      account  at  U.S.  Bank?
 8      A.      Yes,  I  did.
 9      Q.      Okay.   Did  this  bank  account  --  was  this
10      bank  account  in  any  way  associated  with  Cheshire
11      Ventures?
12      A.      No.   I  don't  believe  it  was.
13      Q.      Do  you  know  if  this  bank  account  received
14      funds  related  to  Cheshire  Ventures?
15      A.      I  don't.   It  says,  7023  is  the  last  four
16      of  the  account  number.   And  I  don't  --  let's
17      see,  the  date  on  October  2019  to  November,  so  I
18      don't  know.   I  don't  remember.   But,  no,  it
19      shouldn't  have  taken  any  money  from  Cheshire,
20      unless  I  moved  money  into  there,  which  is
21      possible.
22      Q.      Do  you  know  why  you  were  checking  your
23      balance  more  than  approximately  ten  times  that
24      day?
25      A.      Oh,  it's  a  good  question.   No,  I  don't.
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 174

```
 1     It has all the same reference number.  Is that
 2     possibly an error and just one inquiry?  It
 3     seems odd that every single one have the same
 4     reference number, doesn't it?
 5     Q.     You're asking me to testify.  I can't
 6     testify.  But I will say, it doesn't appear to
 7     me be odd at all.
 8            In any event, my question is:  Do you
 9     know what it is?
10     A.    I don't know what it is.  You also said
11     why did you check your balance so many times.  I
12     don't know that I did.
13            (Exhibit Number 15 was marked.)
14     BY MR. STOKES:
15     Q.    Okay.  Let's take a look at Tab -- sorry,
16     ███████████  Tab 12.
17     A.    █████████████
18     Q.    ██████  █████████████████████████████
19     ██████████████
20     A.    █████████████
21     Q.    ██████████████████████████████████████at
22     ██████
23     A.    █████████████
24     Q.    ██████████████████████████
25     ██████████████████████
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 176

1   Q.   ██████████████████████████████████

2   ███████████████████████████████

3   A.   ████████████

4   Q.   ████████████████████████████

5   ██████████████████████████████

6   A.   ███████████████

7   Q.   ████████████████████████████

8   ████████████████████████████████ r your

9   █████████████

10          MR. LITTLE:  I'm going to objection

11   on the basis it has nothing to do with Cheshire

12   Ventures.  But if you want to ask him about --

13   in his personal capacity, you can certainly do

14   so in the remaining 50 minutes you have.

15          If you don't want it to count again

16   your 30(b)(6) time, I'll direct him not to

17   answer.

18   BY MR. STOKES:

19   Q.    Mr. Nelson --

20          MR. LITTLE:  Or if you want to

21   establish that it has something to do with

22   Cheshire Ventures, that's fine.

23   BY MR. STOKES:

24   Q.   ████████████████████████████████

25   ████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



Page 177

1

2    A.

3    Q.

4

5

6

7    A.                                            had

8                                           .

9

10

11

12   Q.

13

14              MR. LITTLE:  Same objection.  Are

15   you asking him about a question you could have

16   asked him yesterday or are you asking him about

17   a Cheshire Ventures matter?  You can ask him

18   that question.  Otherwise, we'll ask that it

19   counts towards your normal deposition.  If

20   you're not willing to do that, then I'm going to

21   direct him not to answer.

22   BY MR. STOKES:

23   Q.    Are you going to follow your attorney's

24   instruction not to answer the question?

25   A.    Yes.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 178



1          (Exhibit Number 16 was marked.)

2     BY MR. STOKES:

3     Q.    Let's turn to Tab Exhibit 16, Tab 13.

4     A.    Okay.  I see it.

5     Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮om

6     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8     A.    ▮▮▮▮▮

9     Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11    A.    ▮▮▮▮▮▮▮▮▮

12    Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14    ▮▮▮▮▮▮▮▮▮

15    A.    ▮▮

16    Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18    A.    ▮▮▮▮▮▮

19    Q.    ▮▮▮▮▮▮▮▮▮▮▮

20    ▮▮▮▮▮▮▮▮

21    A.    ▮▮

22    Q.    ▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮

24    A.    ▮▮▮▮▮

25    Q.    ▮▮▮▮▮

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 179

1     A. ▓▓▓▓▓▓▓▓

2     Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓?

3     A. ▓▓▓▓▓▓▓▓

4     Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6     ▓▓▓▓▓▓▓▓

7     A. ▓▓▓

8     Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓to

10    ▓▓▓▓▓▓

11              MR. LITTLE: ▓▓▓▓▓▓▓▓  ▓▓▓▓

12    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓n,

14    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

15    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

16    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

17    ▓▓▓▓

18    BY MR. STOKES:

19    Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

20    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22    ▓▓▓▓▓▓▓▓▓▓▓▓

23    A. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓



HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 180

1    BY MR. STOKES:

2    Q.    Let's take a look at Exhibit 17, Tab 14.

3          MS. PARIKH:  It's up.

4          THE WITNESS:  Okay.

5    BY MR. STOKES:



HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 181

1    Q.    ▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮

3    A.    ▮▮▮▮▮

4              THE REPORTER:  You have to wait

5    until he finishes his question.

6    Q.    ▮▮▮▮▮▮▮▮▮

7    A.    ▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮

10   Q.    ▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮

12             MR. LITTLE:  Same objection.  You

13   asked about these questions yesterday.  You

14   could have continued with this question.  The

15   fact that he had e-mailed it to himself using a

16   Cheshire Ventures's e-mail does not make it

17   proper for the scope of a 30(b)(6) deposition

18   the subject to an additional seven hours of

19   deposition time.

20             He's happy to answer this question

21   in your personal deposition time but I'm going

22   to direct him not to do so as a part of the

23   30(b)(6).

24   BY MR. STOKES:

25   Q.    Are you going to follow your attorney's

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 182

1   instructions?

2   A.      Yes.

3                 MR. STOKES:  Let's turn to -- I'm

4   going to go through a series of documents that

5   are going to be very similar to this.  We can go

6   through them one by one, but I anticipate the

7   objections are going to be the same.  So let's

8   turn to -- so if you want to certainly make a

9   blanket objection --

10                MR. LITTLE:  No.  You can ask all

11  your questions one at a time.

12                MR. STOKES:  Exhibit 18, Tab 80.

13                MS. PARIKH:  It's up.

14                (Exhibit Number 18 was marked.)

15  BY MR. STOKES:

16  Q.      Tab 480?

17  A.      I see it.

18  Q.      And do you that that is see an e-mail

19  between -- from Cheshire Ventures to Cheshire in

20  August of 2019?

21  A.      I see that.

22  Q.      And do you see -- what does that e-mail

23  relate to?

24  A.      I don't know.

25  Q.      Do you recognize KR Proceeds as Kyle

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 183

```
1    Ramstetter proceeds from the White Peaks

2    transaction?

3    A.      That -- it's possible that's that what

4    that means, yes.

5    Q.      Do you see the acres of 89.8 and final

6    price of 116,388 --

7    A.      I see that.

8    Q.      ████████████████████████████████████

9    ████████████████████████████

10   A.      I believe that is consistent.

11   Q.      And WP price; is that the White Peaks'

12   price?

13   A.      I believe so.

14   Q.      And total between the net between those

15   is $17,719,000?

16   A.      Yeah, if that's the math, that's the

17   math.

18   Q.      Yeah.  Well, isn't that what the document

19   says?

20   A.      That's what the document says.

21   Q.      Yeah.  And then, Mr. Nelson, what was the

22   purpose of you e-mailing this to yourself

23   through Cheshire Ventures?

24   A.      I have no idea.

25   Q.      What does this -- what is the purpose of
```

Page 184

1    this and substance of this e-mail?

2    A.     Other than a bunch of numbers on a page

3    with a Delta 2.219 million and Delta percentage,

4    I don't know what it means.

5    Q.     Do you recall interacting with

6    Kyle Ramstetter about setting up a structure in

7    which you would participate in the profits from

8    ███████████████████████████████████████

9    A.     Not with Cheshire Ventures.  No.

10   Q.     Did you do so in some other capacity?

11   A.     In my personal capacity, yes.

12   Q.     And why are you e-mailing yourself about

13   this in your Cheshire Ventures's capacity?

14   A.     I can't tell you why I'm e-mailing it to

15   myself.  I don't know.

16   Q.     What was the purpose of your -- what were

17   you doing in your personal capacity that you

18   claim to be doing that wasn't in your Cheshire

19   Ventures capacity in connection with the White

20   Peaks' transaction?

21          MR. LITTLE:  Objection for the same

22   reasons we talked about before.  You had every

23   opportunity and you did ask him about the White

24   Peaks in his personal capacity.  You're

25   appearing to do so just to evade the seven-hour

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 185

1    limit.  The mere fact that there is an e-mail,

2    which he's testified he was using for personal

3    purposes, that relates to a similar matter, is

4    not a basis for you all to ask more questions

5    about it in a 30(b)(6), and I direct him not to

6    answer on that basis.

7    BY MR. STOKES:

8    Q.    Are you refusing to answer?

9              MR. LITTLE:  He's not refusing.  I

10   told him what his attorney's advice is.

11             THE WITNESS:  On the advice of my

12   attorney, yes.

13             MR. STOKES:  If we could look at

14   Exhibit 19, Tab 81.

15             MR. LITTLE:  I want to note for the

16   record that each of these matters were brought

17   up yesterday, and you had an opportunity to ask

18   all of these questions.  In fact, you still do.

19   You have another hour left.  Are you refusing to

20   ask those questions now?  Mr. Stokes, are you

21   refusing to ask those questions to him based

22   on --

23             MR. STOKES:  I'm not here to be

24   cross-examined by you, Mr. Little --

25             MR. LITTLE:  I'm trying to make the

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 186

1    record clear.

2              MR. STOKES:  -- we're in the middle

3    of a 30(b)(6) deposition.  You client has

4    numerous communications involving Cheshire

5    Ventures and you're refusing to let your --

6              MR. LITTLE:  You said involving

7    Cheshire Ventures.  You've heard the testimony

8    quite clear.  The only involvement is that he

9    used an e-mail account that he had for personal

10   purposes through Cheshire Ventures.

11             MR. STOKES:  And you're refusing to

12   allow your client to answer questions about

13   these communications and what the capacity was

14   so those issues can be sorted out --

15             MR. LITTLE:  I'm refusing to let

16   you --

17             MR. STOKES:  -- at a later time as

18   to whether those --

19             MR. LITTLE:  -- gain the federal

20   rules to get more than seven hours to ask my

21   client about personal questions.

22             MR. STOKES:  And, Mr. Little, it is

23   clear to us that you are gaming the rules

24   through the use of a shell structure in order to

25   shield your client from answering questions --

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 187

1            MR. LITTLE:  That has nothing to do

2     with shell structures.

3            MR. STOKES:  -- in his deposition.

4            MR. LITTLE:  I understand that's

5     your accusation, which you have not been able to

6     prove and won't be able to prove.

7            (Exhibit Number 19 was marked.)

8            MR. STOKES:  Let's turn to

9     Exhibit 19.  Which is -- sorry, Tab 81.  Do you

10    have that in front of you?

11           THE WITNESS:  I do.

12    BY MR. STOKES:

13    Q.    Okay.  Do you see here that at the bottom

14    of the e-mail chain that there's an e-mail from

15    Cheshire Ventures to Carleton Nelson at Cheshire

16    Ventures to Kyle Ramstetter at White Peaks

17    Capital?

18    A.    I do.

19    Q.    And you see the subject is "partnership

20    deal structure"?

21    A.    I do.

22    Q.    And you see the e-mail at the bottom says

23    CN?

24    A.    Yes, I do.

25    Q.    Who is CN?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 188

```
 1    A.     That would be me.
 2    Q.     And what is the purchase of this e-mail
 3    to Kyle Ramstetter?
 4    A.     As far as Cheshire Ventures was
 5    concerned, nothing.
 6    Q.     Why were you using Cheshire Ventures in
 7    connection with this communication?
 8    A.     I use Cheshire Ventures for personal
 9    e-mails.
10    Q.     And is Cheshire Ventures anything other
11    than a shell entity for you to engage in
12    business with --
13              MR. LITTLE:  Objection to the for.
14    Q.     -- in your personal capacity?
15              MR. LITTLE:  Objection to the form.
16              THE WITNESS:  No.
17    BY MR. STOKES:
18    Q.     Is this yet another example of you
19    engaging in business through Cheshire Ventures
20    here with White Peaks and Kyle Ramstetter?
21    A.     Cheshire Ventures did not engage in
22    business with Kyle Ramstetter.
23    Q.     Why did you use, then, Cheshire Ventures
24    as the vehicle for communicating with Mr. Kyle
25    Ramstetter?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 189

```
1              MR. LITTLE:  Objection to the form,
2      lack of foundation; misconstrues the document.
3              THE WITNESS:  Maybe Google was down.
4      I don't know.
5      BY MR. STOKES:
6      Q.     And, Mr. Nelson, what is the structure
7      that -- the partnership deal structure that
8      you're discussing with Mr. Kyle Ramstetter here?
9      A.     I don't know.
10     Q.     Do you not know that in any capacity or
11     just in your Cheshire Ventures's capacity?
12     A.     In my Cheshire Ventures's capacity.
13     Q.     Okay.  And are you refusing to answer in
14     your personal capacity, then, what this means --
15             MR. LITTLE:  I'm directly him --
16     Q.     -- as part of this 30(b)(6)?
17             MR. LITTLE:  -- you had an
18     opportunity to ask him that question as part of
19     your regular deposition of Mr. Nelson; he's free
20     and happy to so. He wouldn't have refused.  He
21     refuses to not have it count against his time.
22     So if you don't want it to count against your
23     time, which I understand you don't, then we're
24     not going to do it as part of the 30(b)(6).  Are
25     you not agreeing to that arrangement?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 190

1          MR. STOKES:  No, we are not.

2     BY MR. STOKES:

3     Q.    Are you refusing to answer this question?

4     A.    I'm listening to the advice of my

5     counsel.

6               (Exhibit Number 20 was marked.)

7          MR. STOKES:  Let's go to Exhibit 20,

8     which is Tab -- sorry, we've already done that.

9     Exhibit 20, Tab 87.

10          MS. PARIKH:  It's up.

11          THE WITNESS:  Okay.

12     BY MR. STOKES:

13     Q.    Okay.  Do you see this e-mail exchange

14     related to an operating agreement for an LLC to

15     own Loudoun County Virginia property involving a

16     whole host of people in August 2019, including

17     Carleton Nelson, on behalf of

18     Cheshireventures@outlook.com --

19          MR. LITTLE:  Objection; misconstrues

20     the document.

21          THE WITNESS:  I see a subject that

22     says regarding operating agreement for LLC to

23     own the Loudoun County Virginia property.

24     BY MR. STOKES:

25     Q.    And do you see your e-mail address

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 191

1    CarletonNelsonCheshireVentures@outlook.com?

2    A.      I do.

3    Q.      Does this relate to the Blueridge

4    transaction?

5    A.      Does this relate to the Blueridge

6    transaction?  Does this e-mail relate to the

7    Blueridge transaction?

8    Q.      Yes.

9    A.      In my capacity as Cheshire Ventures, I

10   wouldn't have known anything about whether that

11   relates to the Blueridge transaction.

12   Q.      And so are you saying that you have no

13   understanding in any capacity as to what this

14   relates to, or are you saying you have no

15   understanding in your Cheshire Ventures's world

16   what this e-mail relates to?

17   A.      As it relates to Cheshire Ventures, I

18   have no understanding what this would relate to.

19   Q.      You previous stated that Cheshire

20   Ventures -- did Cheshire Ventures have any

21   business connection to Blueridge?

22   A.      No.

23   Q.      Did it have any connection whatsoever to

24   the Blueridge transaction?

25   A.      No.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 192

1    Q.    And why would you -- were you using your

2    Cheshire Ventures's e-mail address, then, in

3    connection with the Blueridge transaction?

4    A.    Because this e-mail I had available to

5    me.

6    Q.    What was -- where Mr. Atherton states in

7    the top e-mail that's on the our side, what is

8    the side that Mr. Atherton is referring to?

9    A.    I don't know.

10   Q.    Do you not know in your capacity your

11   Cheshire Ventures capacity or you don't know in

12   any capacity?

13           MR. LITTLE:  Objection; calls for

14   speculation.

15           THE WITNESS:  I actually don't know

16   on -- I don't know what Mr. Atherton meant there

17   as far as our on any capacity.

18   BY MR. STOKES:

19   Q.    What did you understand -- who did you

20   understand Mr. Atherton to be representing in

21   connection with this transaction?

22   A.    As far as Cheshire Ventures's concerned,

23   I wouldn't have any idea who he's representing.

24   Q.    Is that a true statement?  In other

25   words, as the representative for Cheshire

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 193

1    Ventures, you would have been well aware of who

2    Mr. Atherton was representing; isn't that right?

3    A.     In the case of this, no, it's not right.

4    Q.     Did you know in your personal capacity

5    who Mr. Atherton was representing?

6    A.     Yes.

7    Q.     And so how is it that in your personal

8    capacity working for Cheshire Adventure that you

9    wouldn't have known the same information?

10   A.     Cheshire Ventures did -- had no part of

11   this deal.

12   Q.     I understand that's your position that

13   Cheshire Ventures had no part of this deal --

14   A.     It's not my position; it's the truth

15   and --

16            MR. LITTLE:  That's his testimony.

17   BY MR. STOKES:

18   Q.     I understand that's your position, but,

19   but regardless in your capacity at Cheshire

20   Ventures or in any other capacity, you still had

21   knowledge, as you sit here today, did you have

22   knowledge of what role Mr. Atherton was playing

23   in that transaction?

24   A.     Of what role Mr. Atherton was playing?

25   Q.     Yes.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 194

1    A.    In this transaction?

2    Q.    Yes.

3    A.    No.

4    Q.    I'm asking, not what the role was.  I'm

5    asking, did you know what role --

6    A.    You just asked what role he was playing?

7    Q.    Yes.

8    A.    Now you're saying not what role he was

9    playing?

10   Q.    No.

11   A.    Why don't you rephrase the question.

12   Q.    No, that's not what I said.  So,

13   Mr. Nelson, did you know in any capacity what

14   role Mr. Atherton was playing in connection with

15   the Blueridge transaction?

16   A.    In my personal capacity, yes.

17   Q.    Okay.  And -- and Mr. Atherton, when he

18   says on our side, was he referring to himself

19   and you or any other entity associated with you?

20          MR. LITTLE:  Objection; calls for

21   speculation.  Same objection as to the extent

22   that now you're asking him about matters in his

23   personal knowledge about this e-mail, which

24   you're actually trying to get him to say here is

25   whether or not he in his personal capacity

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 195

1    disconnected from Cheshire Ventures will give

2    you an answer as to that question, and for about

3    the 10th time, we are going to object.

4                 I'm going to direct him not to

5    answer to the extent it goes to his personal

6    question unless you're willing to let him do so

7    as part of his remaining 50 minutes of your

8    deposition.

9                 If you aren't willing to do so, he's

10   certainly available and willing and here to

11   answer that question, but if you're not going to

12   allow it to be -- count as part of his

13   deposition time, we don't think it's appropriate

14   for a 30(b)(6).

15                 MR. STOKES:  Are you instructing him

16   not to answer the question, then?

17                 MR. LITTLE:  I made my objection.

18   BY MR. STOKES:

19   Q.    Mr. Nelson, are you refusing --

20   A.    I am following the advice of my counsel.

21                 MR. STOKES:  Let's turn to

22   Exhibit 21, Tab 89.

23                 (Exhibit Number 21 was marked.)

24                 MR. LITTLE:  I will note on all of

25   these exhibits, the only thing that you have got

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 196

1    any testimony or evidence of that there are any

2    connection to Cheshire Ventures are the fact the

3    e-mail address that Mr. Nelson was provided

4    with, was provided by Cheshire Ventures.

5                    MR. STOKES:  The record will speak

6    for itself.

7                    MS. PARIKH:  Exhibit is up.

8                    THE WITNESS:  Yes, I've read it.

9    BY MR. STOKES:

10   Q.    Okay.  Does this e-mail chain -- do you

11   see at the top of the e-mail chain an e-mail

12   from CheshireVentures@outlook.com?

13   A.    Yes.

14   Q.    This is in November of 2019?

15   A.    Yes.

16   Q.    And does this relate to the Blueridge

17   transaction?

18   A.    It says HM Gadelsky purchase and sale

19   agreement.

20   Q.    Yes.  Do you know if that relates to the

21   Blueridge transaction?

22   A.    In my capacity as a Cheshire Ventures I

23   wouldn't have known that.

24   Q.    So at the time in November of 2019 would

25   you have known that in any capacity?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 197

1    A.      In a personal capacity, yes.

2    Q.      How would you, therefore, not have known

3    that in your Cheshire Ventures's capacity in

4    2019, even Cheshire Ventures was not involved in

5    the transaction as you purport, that this

6    transaction related to Blueridge?

7    A.      Cheshire Ventures was not involved in

8    this transaction.

9    Q.      I understand that's your position.  But

10   my question is, in your role as the human being

11   who is Cheshire Ventures, you had information in

12   your head in your personal capacity, how would

13   Cheshire Ventures also not have that information

14   available to it?

15            MR. LITTLE:  Objection; calls for

16   legal conclusion.

17            THE WITNESS:  As managing principal

18   of Cheshire Ventures I was not engaged in this

19   particular transaction and/or responsible for

20   putting Cheshire Ventures into this transaction.

21   BY MR. STOKES:

22   Q.      I understand that's your position.  But

23   did you in your position at managing principal

24   of Cheshire Ventures know that this e-mail

25   related to the Blueridge transaction?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 198

```
 1              MR. LITTLE:  Objection, asked and
 2       answered.
 3              THE WITNESS:  In my position as
 4       managing principal of Cheshire Ventures I would
 5       not have to known that this was necessarily part
 6       of Blueridge transaction or not.  Cheshire
 7       Ventures was not involved.
 8       BY MR. STOKES:
 9       Q.    What role were you performing in
10       connection with the Blueridge transaction in any
11       capacity at that time?
12       A.    Cheshire Ventures was not involved in any
13       capacity at that time.
14       Q.    What role were you performing in any
15       capacity with the Blueridge transaction at that
16       time, despite having communications through
17       Cheshire Ventures with the various participants
18       of the transaction?
19              MR. LITTLE:  Objection; misconstrues
20       the testimony and evidence.
21              THE WITNESS:  In my role as managing
22       principal of Cheshire Ventures, I was not
23       involved at all in this transaction.
24       BY MR. STOKES:
25       Q.    Did you have a role in a personal
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 199

1    capacity in the Blueridge transaction?

2    A.    Yes.

3    Q.    And are you refusing to answer this

4    question about what you did in -- questions

5    about your role with Blueridge here today in

6    your 30(b)(6) capacity?

7              MR. LITTLE:  Objection; that's not a

8    question.  If you want to ask him a question, he

9    can answer it.  Put a question on the table and

10   we can either object or he can answer it or not.

11             MR. STOKES:  That was a question.

12             MR. LITTLE:  Well, then I object to

13   it.  It's argumentative.  If it's a question

14   about -- you're asking him wether he's refusing

15   to.  Ask the question you want to ask him.  I

16   either will or I won't.

17   BY MR. STOKES:

18   Q.    Again, in any capacity of what your role

19   in connection with the Blueridge transaction in

20   2019?

21             MR. LITTLE:  Same objection.

22             THE WITNESS:  I had a personal role

23   in that transaction.

24   BY MR. STOKES:

25   Q.    What was your personal role in that

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 200

1    transaction?

2              MR. LITTLE:  Same objection.  You're

3    asking about his personal role in the

4    transaction that you could have asked about

5    during his deposition, his personal deposition.

6    You still have time to do so.  If you'd like to

7    do so, we'd just ask that you count it towards

8    his deposition time.

9              If refuse to count it towards his

10   total deposition, I'm directing him not to

11   answer as part of his 30(b)(6) deposition, which

12   is not appropriate.

13   BY MR. STOKES:

14   Q.    Are you refusing to answer the question?

15   A.    I'm following the advice of my counsel,

16   yes.

17             (Exhibit Number 22 was marked.)

18             MR. STOKES:  Let's look at

19   Exhibit 22, which is Tab 90.

20             MS. PARIKH:  It's up.

21             THE WITNESS:  Okay.

22   BY MR. STOKES:

23   Q.    Okay.  Do you see here a communication

24   from John Cadwallader to a group of people about

25   the Blueridge payment to Finbrit?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 201

1      A.      I see an e-mail from John Cadwallader and

2      a another number of individuals and the subject:

3      Blueridge Payment to Finbrit.

4      Q.      And can you see that one of the CCs on

5      this document is CheshireVentures@outlook.com?

6      A.      Yes, I see that.

7      Q.      Is that you?

8      A.      That's Cheshire Ventures, yes.

9      Q.      Okay.  And what was Cheshire Ventures's

10     role in the receipt to Finbrit of $10 million or

11     of a portion of the $10 million?

12     A.      Cheshire Ventures had no role in this

13     transaction.

14     Q.      Why is Cheshire Ventures then on this

15     e-mail?

16     A.      Because that was the e-mail that I was

17     using on a personal capacity at the time.

18     Q.      Did you have participation in the

19     distribution of 50 percent of the net proceeds

20     of this transaction to Finbrit in some capacity

21     other than a representative of Cheshire

22     Ventures?

23     A.      In a personal capacity, yes.

24     Q.      What was that role?

25              MR. LITTLE:  Same objection.  If you

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 202

```
 1    want to ask him about his personal capacity, you
 2    can do so.  We ask only, however, that it count
 3    towards his seven hours limit.  And if you
 4    refuse, then I'm going to direct him not to
 5    answer as part of his 30(b)(6).
 6              Do you agree to court it towards
 7    your time?
 8              MR. STOKES:  As we've said
 9    repeatedly, no.  This is a 30(b)(6) deposition.
10    This is appropriate.  These are appropriate
11    questions and testimony for purposes of a
12    30(b)(6).
13    BY MR. STOKES:
14    Q.    Are you refusing to answer?
15    A.    No. I'm following the advice of my
16    counsel.
17              (Exhibit Number 23 was marked.)
18              MR. STOKES:  Let's look at
19    Exhibit 23 Tab none.
20              MS. PARIKH:  It's up.
21              THE WITNESS:  Okay.
22    BY MR. STOKES:
23    Q.    Okay.  Do you see here an e-mail chain
24    from December 2019 related to Finbrit wire
25    instructions?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 203

1   A.     I see an e-mail from December 23rd, 2019,

2   the subject line RE:  Finbrit wire instructions.

3   Q.     Okay.  And do you see that this

4   communication involves Cheshire Ventures?

5   A.     I see CheshireVentures@outlook.com is on

6   the CC line.  Yes.

7   Q.     Okay.  At this point in time, did

8   Cheshire Ventures have a role and connection

9   with the Finbrit, the wiring of money to

10  Finbrit?

11  A.     No. Cheshire Ventures did not.

12  Q.     And did you have some other role?  Did

13  you in any other capacity have a role and

14  connection with Finbrit having received monies?

15  A.     Yes, I had a personal role.

16  Q.     And are you refusing to answer questions

17  about --

18         MR. STOKES:  I'll ask the question,

19  Alex, and I'll safe you the objection.

20  BY MR. STOKES:

21  Q.     What role did you have, in any capacity,

22  in connection with the wiring of monies to

23  Finbrit?

24         MR. LITTLE:  Same objection as

25  before.  He can certainly answer that question

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 204

1    in his personal capacity.  But if he does, we'd

2    ask that that count towards his time for the

3    seven-hour deposition.  I think you have about

4    50 minutes left.

5              If you won't agree to do that, then

6    I'll direct him not to answer that as part of

7    the 30(b)(6) deposition as an attempt to work

8    around the time limits.

9    BY MR. STOKES:

10   Q.    Will you answer the question?

11   A.    I'm following the advice of my counsel.

12             MR. STOKES:  Okay.  Why don't we

13   take a break.

14             THE VIDEOGRAPHER:  Going off the

15   record.  The time is 2:01 p.m.

16             (Discussion off the record.)

17             THE VIDEOGRAPHER:  We are returning

18   to record.  The time is 2:13 p.m.

19   BY MR. STOKES:

20   Q.    Thank you.  Mr. Nelson, did Rod Atherton

21   perform any legal work for Cheshire Ventures?

22   A.    Mr. Atherton reviewed contracts,

23   consulting contracts for Cheshire I believe that

24   was the -- and, of course, set up Cheshire and

25   it's bank accounts.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 205

```
 1    Q.    Did you have an engagement letter with

 2    Cheshire Ventures?

 3    A.    No, I did not.

 4    Q.    I'm sorry, with Cheshire Ventures have an

 5    engagement letter with Rod Atherton?

 6    A.    No, I did not.

 7    Q.    Did you receive any written opinions or

 8    legal work product from Mr. Atherton?

 9    A.    He would review consulting contracts and

10    either do markups or make recommendations.  Yes.

11    Q.    And do you have copies of those records?

12    A.    I don't know if I do or not.  I'm not

13    sure where they might be.  I haven't looked for

14    those in a long time.

15    Q.    As part of the 30(b)(6), did you not look

16    for all your records related to Cheshire?

17    A.    I did not.

18    Q.    And, Mr. Nelson, did Rodney Atherton

19    provide any legal advice to Cheshire Ventures

20    with regard to Allcore?

21    A.    Not that I recall, no.

22    Q.    Did he provide any legal advice to

23    Cheshire with regard to CTBSRM?

24    A.    Not that I recall.

25    Q.    How about with your Amazon employment?
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 206

1    A.      No, not that I recall.  And I take that

2    back.  When you say legal advice, he certainly

3    drafted contracts between Cheshire and --

4    Q.      So, for example, the facilitator

5    agreement?

6    A.      For example.

7    Q.      Were there other agreements that you can

8    recall that he drafted between those entities?

9    A.      Not that I can recall, no.

10   Q.      Did he provide any tax advice to Cheshire

11   Ventures?

12   A.      Probably, but I don't remember

13   specifically what.

14   Q.      Did he prepare tax returns for Cheshire

15   Ventures?

16   A.      No, he did not.

17   Q.      Who would prepare tax returns?

18   A.      Edwin Delcarpio.

19   Q.      I know I previously asked about this, but

20   do you know whether there was any communi- --

21   whether there were any communications between

22   Edwin Delcarpio and Mr. Atherton with regard to

23   Cheshire Ventures?

24   A.      I don't know; I don't think so.

25   Q.      Do you know where Mr. Delcarpio would

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 207

1    have obtained materials for purposes of

2    preparing Cheshire Ventures's tax returns?

3    A.      From myself.

4    Q.      And where have you obtained those records

5    for preparing Cheshire Ventures's taxes?

6    A.      Bank records, any pertinent dos that he

7    requested that I would give to him.

8    Q.      Would you obtain Mr. Atherton or Mr. Von

9    Lacy in order to gather materials for

10   preparation for Cheshire Ventures's tax returns?

11   A.      I don't think so, no.

12   Q.      Did, Mr. Nelson, Von Lacy perform any

13   services on behalf of the Cheshire Ventures?

14   A.      Did Mr. Lacy?

15   Q.      Yeah.

16   A.      No, he did not.

17   Q.      Mr. Lacy, is his name -- is his -- what

18   is his last name, or how what does he go by or

19   use?  What name did he use for his last name?

20   A.      I believe Lacy.

21   Q.      Is Von a middle name?

22   A.      No.  His full name is Demetrius Von Lacy,

23   and he goes by Von, I think is what it is.  Yes.

24   Q.      So Lacy, is the last name and Von is his

25   given name?

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 208

1    A.     I believe so, yes.

2    Q.     Do you know if he goes by any other name?

3    A.     I don't.

4    Q.     Okay.

5              MR. STOKES:  Those are all the

6    questions that we have right now.

7              So I don't know if anybody else --

8    any of the other parties have questions, but we

9    do intend to leave the deposition open,

10   documents we have not received that we've

11   discussed we have deficiencies that we are in

12   the process of preparing deficiency letters that

13   preparing 30(b)(6) and reserved all rights with

14   regard to the scope of the 30(b)(6) and today.

15             MS. BODNER:  The Watson Defendants

16   do not have questions at this time.

17             MR. SMART:  Mr. Kirschner does not

18   have any questions.

19             THE VIDEOGRAPHER:  Okay.  Anyone

20   else?

21             THE WITNESS:  I don't have any

22   questions for myself.  No.

23             THE VIDEOGRAPHER:  That concludes

24   today's testimony.  We're off the record at

25   2:19 p.m.

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 209

1

2         FURTHER THIS DEPONENT SAITH NOT.

3       (Proceedings concluded at 2:20.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 210

1                    C E R T I F I C A T E

2

3

           I do hereby certify that I am a Notary
4     Public in good standing, that the aforesaid
      testimony was taken before me, pursuant to
5     notice, at the time and place indicated; that
      said deponent was by me duly sworn to tell
6     the truth, the whole truth, and nothing but
      the truth; that the testimony of said
7     deponent was correctly recorded in machine
      shorthand by me and thereafter transcribed
8     under my supervision with computer-aided
      transcription; that the deposition is a true
9     and correct record of the testimony given by
      the witness; and that I am neither of counsel
10    nor kin to any party in said action, nor
      interested in the outcome thereof.

11

           WITNESS my hand and official seal this
12     6th day of May 2022.

13

14

15     _____
                    Notary Public

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 211

1    Alex Little, Esquire

2    Alittle@burr.com

3

4    RE: Amazon.Com, Inc.< et al.  v. WDC Holdings LLC Et Al.

5         4/29/2022, Carleton  Nelson (#5208676)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22              Yours,

23              Veritext Legal Solutions

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

```
                                          Page 212

 1    Amazon.Com, Inc., et al v. WDC Holdings LLC Et Al.

 2    Carleton  Nelson (#5208676)

 3                  E R R A T A  S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____     _____

24    Carleton  Nelson                      Date

25
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

Page 213

1    Amazon.Com, Inc., et al v. WDC Holdings LLC Et Al.

2    Carleton  Nelson (#5208676)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Carleton  Nelson, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Carleton  Nelson                        Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18                     _____

19                     NOTARY PUBLIC

20

21

22

23

24

25

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

[& - 31]

| & | | | |
|---|---|---|---|

**&** 2:4,19 6:4 7:13
  8:1,11

| **0** | | | |

**007** 157:12,18

| **1** | | | |

**1** 4:6 12:18,22
  13:11 39:4,9
**10** 4:20 133:18,21
  201:10,11
**1050** 2:4
**1099** 17:4,15 20:16
  24:12,13 101:13
  101:14
**1099s** 16:24,25
**10:02** 50:8
**10:05** 50:11
**10:25** 70:25
**10:39** 71:3
**10th** 195:3
**11** 4:22 13:14
  147:18,20
**110** 172:7
**111** 160:24
**1146** 118:22
**116** 4:14
**116,388** 183:6
**11:31** 118:19
**12** 4:6,23 157:9,11
  174:16
**120** 7:11
**122** 4:15
**123** 4:17
**128** 4:19
**12:40** 160:7,11
**13** 5:1 160:19,24
  172:6 178:3
**133** 4:20
**13815** 210:14

**14** 5:2 172:4,7
  180:2
**147** 4:22
**15** 5:4 174:13,16
**157** 4:23
**16** 5:5 178:1,3
**160** 5:1
**17** 5:7 179:25
  180:2
**17,719,000** 183:15
**170** 183:9
**172** 5:2
**174** 5:4
**178** 5:5
**179** 5:7
**18** 5:9 182:12,14
**182** 5:9
**187** 5:11
**19** 5:4,11 81:9
  174:19 175:9
  177:10 185:14
  187:7,9
**190** 5:12
**195** 5:14
**1:13** 160:14
**1:20** 1:7
**1st** 39:5 136:14

| **2** | | | |

**2** 4:7 30:7 36:10
  36:11,20 41:9,20
  51:15
**2.0** 37:10
**2.1** 39:22
**2.1.** 39:23
**2.219** 184:3
**20** 5:12 190:6,7,9
  213:15
**200** 5:15
**2000** 2:20
**20036** 2:5

**2010** 51:12 121:4,6
  121:24 150:4
  168:1
**2018** 105:12
**2019** 5:4,6,10,17
  15:12 16:1,5 26:1
  29:15 31:3,5,21,24
  32:20,22 33:2
  45:24 46:4,9,19,24
  47:1,4,6,8,13
  50:14,17 51:5
  79:21 96:9 98:9
  103:4,6,6,20,21
  106:8 114:9 119:4
  162:2,6 173:17
  174:19 178:7,17
  182:20 184:8
  190:16 196:14,24
  197:4 199:20
  202:24 203:1
**202** 2:5 5:17
**2020** 5:8 26:3
  29:19 31:4 32:6
  32:22 33:2 38:20
  39:4,5,9,12 51:14
  79:21 89:2 136:13
  136:15 180:8,19
  181:2
**2021** 26:5
**2022** 1:17 6:3 7:2
  210:12
**21** 5:14 162:6
  195:22,23
**22** 5:15 200:17,19
**2200** 2:11
**222** 2:20 7:13
**223-1297** 2:12
**23** 5:17 202:17,19
**23rd** 203:1
**25** 157:11,16,17,20
  157:21

**2700** 3:4
**28** 136:13
**29** 1:17 7:2 175:9
  177:9
**29th** 6:2
**2:01** 204:15
**2:13** 204:18
**2:19** 208:25
**2:20** 209:3
**2it's** 33:23
**2nd** 38:25 45:22
  96:3 97:14

| **3** | | | |

**3** 4:9 56:17,19
  71:5 75:10 162:19
  162:21
**30** 4:6 12:4,15,21
  13:2 43:7 47:18
  47:24 48:20 49:2
  50:1,6 60:16 62:7
  66:1,18 67:12
  68:18 69:3,6,8,25
  72:24 75:18,23
  76:18 77:23 78:14
  78:17 112:10,15
  119:24 120:16
  124:24 125:13,13
  125:25 127:4
  132:6,10 153:21
  154:2 166:17
  167:5 170:2
  176:16 179:14
  181:17,23 185:5
  186:3 189:16,24
  195:14 199:6
  200:11 202:5,9,12
  204:7 205:15
  208:13,14 211:17
**303** 2:12
**31** 56:20 162:18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**[312,000 - act]** Page 2

| **312,000** 168:19 |
| 170:7,9 |
| **31st** 162:2 |
| **32** 88:21 |
| **36** 4:7 |
| **37201** 2:21 |
| **37219** 3:4 |
| **39** 123:14 |
| **3rd** 178:7 |

**4**

**4** 4:10 81:6,8
**4/29/19** 177:9
**4/29/2019** 175:16
**4/29/2022** 211:5
**40** 91:24 116:4
**40,000** 162:3
**40,855** 170:6
**400,000** 32:1 45:25
46:2,3,20 47:4
**403** 3:13
**410** 2:10
**46** 128:19
**480** 182:16
**484** 1:7 7:11
**497** 161:21

**5**

**5** 4:12 88:19,21
**5.1** 135:14
**50** 68:20 76:7
176:14 195:7
201:19 204:4
**511** 3:3
**5208676** 211:5
212:2 213:2
**56** 4:9 133:21
**57** 36:10
**58** 147:20

**6**

**6** 4:6,14 12:4,15,21
13:2 43:7 47:18
47:24 48:20 49:2
50:1,6 60:16 62:7
66:1,18 67:12
68:18 69:3,6,8,25
72:24 75:18,23
76:18 77:23 78:14
78:17 112:10,15
116:1,3 118:24
119:24 120:16
124:24 125:13,13
125:25 127:4
132:6,10 153:21
154:2 166:17
167:5 170:2
176:16 179:14
181:17,23 185:5
186:3 189:16,24
195:14 199:6
200:11 202:5,9,12
204:7 205:15
208:13,14
**61** 157:11
**615** 2:21 3:5
**615.429.6588** 3:13
**6th** 210:12

**7**

**7** 4:15 122:2,3
**7023** 173:15
**724-3200** 2:21
**75** 135:17,19
136:20 139:5
140:16 144:21
145:7 147:2
**75,000** 98:14,18

**8**

**8** 4:3,17 123:11,13
**80** 48:21 182:12
**80202** 2:11
**81** 4:10 185:14
187:9
**82,500** 162:7
**850-8682** 3:5
**87** 190:9
**88** 4:12
**89** 195:22
**89.8** 183:5

**9**

**9** 4:19 128:16,19
**90** 200:19
**95** 81:4
**955-8252** 2:5
**98** 27:18,19 30:5,8
33:6 40:10,15
41:4,13 42:7
52:14,18 53:5
55:25 135:19
136:20
**9:11** 7:2
**9:22** 6:3
**9s** 16:18,22,25

**a**

**a.m.** 6:3 7:2 50:8
50:11 71:3 118:19
118:22
**ability** 11:4 50:25
71:16
**able** 11:15 80:15
90:13 165:1 187:5
187:6
**absolutely** 171:8
**acceptable** 141:10
**access** 25:14,16
34:21 35:16
181:10

**account** 33:15,20
33:24 34:3,3,9,12
34:16,16,22 35:2
35:16,20 36:5
59:9 67:20 71:11
72:1,8 76:16 82:6
98:20,22 113:1,25
116:21 152:4,7,10
152:20 161:8,11
162:15,16 163:13
163:14 164:4,5
165:8 167:22
168:15,18 169:3
169:15,18,24
170:11,14 171:1,5
171:6 172:13,17
172:20,20,23,24
173:4,7,9,10,13,16
179:22 186:9
**accountant** 24:23
36:1,2
**accounting** 25:10
**accounts** 33:23
35:6 106:21
161:17 204:25
**accrue** 56:9
**accuracy** 211:9
**accurate** 92:1
134:23,25
**accusation** 187:5
**acknowledgement**
213:3
**acknowledgment**
211:12
**acoa** 116:25
**acquired** 21:16
**acquisition** 97:19
145:25 146:4
**acres** 183:5
**act** 110:15

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[acted - amazon]                                                          Page 3

**acted**  101:17
**acting**  9:1 73:17
  105:16 109:22
  111:3,6 112:19
**action**  210:10
**activities**  52:5
  54:9,24
**actual**  33:7 156:7
**adam**  2:17 8:10
**add**  170:7,22
**additional**  24:17
  58:5 181:18
**additions**  213:6
**address**  57:18,20
  122:16,21,25
  123:2 125:21
  126:12,13,22
  131:4,20 190:25
  192:2 196:3
**addresses**  57:23
  127:13 130:11
  131:15 175:2
**advantageous**
  29:1 139:2,7
**adventure**  193:8
**advice**  121:2
  171:19 179:23
  185:10,11 190:4
  195:20 200:15
  202:15 204:11
  205:19,22 206:2
  206:10
**advised**  86:4
**advisory**  14:13,15
  19:23
**affiliates**  16:14,19
**aforesaid**  210:4
**agencies**  14:19
**ago**  100:18
**agree**  65:11 120:4
  125:1 145:7 154:4

166:25 202:6
  204:5
**agreed**  6:9 144:7
**agreeing**  49:18
  189:25
**agreement**  4:8,8
  4:12,18,21 5:13
  24:11 27:22 28:3
  28:6,11 30:2,23
  31:16 32:9,19,23
  33:5,11 36:9,21,24
  37:3,4,5,7,8,10,17
  37:20,25 38:1,2,3
  38:16 39:1 40:20
  42:6,13,21 43:25
  46:6 51:15,16
  55:8,23,24 88:14
  88:24 89:1 90:17
  92:9 93:16 94:15
  94:16 95:24 99:4
  99:6 100:16,17
  117:1,2 118:15
  122:10,13 123:6
  123:10,17,23
  124:4,9,11,18
  133:25 134:1,4,9
  134:10,15,18,19
  135:5,10,11,22,24
  136:2,3,4,6,11,14
  136:16,18,24
  137:2,10,12,19,20
  138:8 139:16
  141:4 143:2,14
  144:14,20 145:19
  146:2 147:1
  148:22,25 154:23
  154:24 155:3,25
  190:14,22 196:19
  206:5
**agreement's**  39:4

**agreements**  24:6
  206:7
**agrees**  135:15
**ahead**  10:25 12:20
  122:1
**aided**  210:8
**al**  1:8 7:9 211:4,4
  212:1,1 213:1,1
**alcohol**  11:3,14
**aldaris**  24:25,25
  25:2
**alex**  2:17 8:1 49:9
  68:9 203:19 211:1
**alexandra**  7:11
**alittle**  2:22 211:2
**allcore**  26:22,24
  27:12,17,18,20,25
  29:2,7,24 30:3,14
  30:20 32:11,18
  33:8,10 34:14,16
  36:25 37:18,22
  38:10,13,15 39:6,9
  39:12 40:1,8,11,16
  40:21 41:3,5,14,15
  41:22 42:3,4,8,23
  42:24 43:3,5,25
  44:6,12,24 45:2
  51:6,20,22 52:3,4
  52:8,10,14,15,18
  52:20,24 53:2,6,7
  53:9,11,18,23 54:6
  54:12,13 55:11,12
  56:1,4,13 57:8
  58:10,18,20 59:3
  60:12,13 73:20,23
  73:25 82:24 98:25
  99:3,6,8 106:4,13
  106:17,18,21,22
  106:24 107:2,6,10
  107:12,14,23
  108:5,6 115:3,20

115:24 116:25,25
  118:12,14 123:19
  123:23 124:14
  125:16,17,18,18
  127:2 132:16
  134:10,17,21,22
  135:2,11,25
  136:12 137:14,20
  138:4 139:3,8,15
  141:17,19 142:2,5
  142:10,12,15
  143:7 144:3 145:9
  145:16,20 146:11
  146:11,18,23
  147:4,13 148:22
  149:1,6 150:6
  154:25 155:4
  156:10,23 162:11
  164:19 165:25
  166:1 168:1
  205:20
**allcore's**  58:14
**allotted**  211:20
**allow**  48:3 68:8
  113:15 158:8
  179:14 186:12
  195:12
**alterego**  54:24
**aly**  3:2
**amanda**  2:13,18
  8:7
**amazon**  1:4 7:7,23
  7:25 9:7 12:2,12
  12:16 18:6 49:3
  78:24 79:1,3,6,7
  79:17 80:10,16
  83:7,9,12,18 84:3
  84:7,18,24 85:5,6
  85:7,8,10,10,15,22
  86:1,13,14,20,24
  87:7,13,14,17,18

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

**[amazon - associated]**                                              Page 4

87:21,24 90:25
91:4 94:11,16
95:7,23 96:17
97:1,5 101:22,24
102:17,18,23,24
103:2,4,8,20,22,25
104:1,3,4,8 105:13
106:5,20 107:13
109:17 114:2,9,14
114:25 115:15
127:14,15,20,22
128:7 168:4
174:21 175:7,9,10
175:17,22,24
176:2,8 177:4,6
178:14,17 181:6,7
205:25
**amazon's**  12:14
103:24
**amazon.com**  1:3
7:7 127:13 211:4
212:1 213:1
**amount**  33:7,9
41:9 89:23 141:6
165:2,3 168:21
**amounts**  170:23
**analysis**  18:15,15
18:16
**annual**  60:10
**answer**  10:25
11:15 41:18,18
61:25 62:4 63:10
63:13 64:11,19
65:10,14 66:3,24
68:18 69:2,4
72:22 73:3,5,8,9
75:20,23 76:9,17
77:2 78:13,17
103:23 110:10
112:10,11 114:10
114:16 119:24

120:3,7,9 121:1
123:3 124:20,25
126:6,19 127:21
128:11 129:21,22
132:5,9 150:11,23
151:2 153:18
155:15 158:19,20
163:2,19 164:6
166:9,13,14,16,23
170:2 176:17
177:21,24 179:20
181:20 185:6,8
186:12 189:13
190:3 195:2,5,11
195:16 199:3,9,10
200:11,14 202:5
202:14 203:16,25
204:6,10
**answered**  10:2
41:17 61:1 66:4
75:16,17 78:5
111:18,24 114:19
164:4 198:2
**answering**  113:13
186:25
**answers**  10:13
11:9 70:23 119:15
**anticipate**  182:6
**anybody**  35:15,21
35:23 36:2 74:10
91:4 121:18
122:20,24 208:7
**apparently**  156:12
162:16
**appear**  36:23
174:6
**appearance**  7:19
**appearances**  2:1
**appearing**  8:13
184:25

**appears**  89:3
128:24 147:23
159:11 178:18
**appended**  213:7
**applicable**  211:8
**application**  79:25
**approach**  29:4
**appropriate**  28:15
28:18,21,25 77:24
78:14 124:24
137:12,15,18
138:2 142:7 167:5
195:13 200:12
202:10,10
**approximately**
15:11 31:23 32:6
32:18 46:1,20
47:3 98:13 173:23
**april**  1:17 5:8 6:3
7:2 33:1,2 38:25
45:22 96:3 97:14
175:9 180:8,19
**architectural**
83:23
**area**  10:4
**areas**  85:4,5,8,10
96:15
**argumentative**
199:13
**arising**  141:3
**arrangement**
16:21 23:24 24:4
24:10 28:17 32:7
32:15 114:21
139:21 189:25
**arrangements**
23:5
**arrow**  159:14
160:1
**arrows**  159:9

**aside**  55:11 96:20
140:9 153:1
**asked**  25:19,20
41:17 70:5 75:16
76:25 77:3,5 78:4
111:14 112:5,8
150:11,17 177:16
181:13 194:6
198:1 200:4
206:19
**asking**  9:9 41:11
41:17 43:8,9,18,20
47:15,19,21 48:6
53:16 63:16 65:24
66:17 68:5 70:7
72:23 75:18 76:3
76:14 110:6,8,13
111:9,11 112:3
124:2 125:8 126:2
127:1 146:14,16
146:20 158:16
166:8,10,11 174:5
177:15,16 194:4,5
194:22 199:14
200:3
**asmart**  2:22
**aspects**  166:20
**assessment**  140:21
**assessments**
140:25
**assets**  23:15,16
**assigned**  57:25
58:2,3
**assist**  139:7
**assistance**  155:10
**associate**  95:12,15
**associated**  29:24
39:19 57:20 73:14
73:17,20 92:20
93:13,22 94:25
107:18 121:18

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[associated - behalf]                                                        Page 5

132:22 148:8
151:7 172:20
173:10 194:19
**association**   73:23
130:5
**assume**   10:19
28:25 101:8
117:24 157:5
169:2 170:19
172:22
**atherton**   15:17
28:8,16 34:20
35:1,11 36:6
57:13 58:8,12,13
58:17 59:5,9
60:21 62:12,24
69:17,20,21 71:11
71:18 75:8 121:21
121:23 129:3
130:1 131:12,25
141:14 148:4
151:10,17,19
152:9,13,20 153:2
153:4,9 154:12
155:7 156:11,23
159:25 160:5,23
162:6 164:11,12
164:15,21 165:17
165:21 167:18,25
169:2,5,11,12,20
170:3,15,21
171:24 172:2
192:6,8,16,20
193:2,5,22,24
194:14,17 204:20
204:22 205:5,8,18
206:22 207:8
**atherton's**   155:9
**attached**   64:25
116:25 123:6
211:11

**attaches**   180:10
**attachment**   13:10
**attempt**   77:10
79:2,5 90:21
204:7
**attempting**   154:1
**attending**   7:18
**attorney**   9:6 59:3
120:11 132:11
171:19 185:12
211:13
**attorney's**   121:2
177:23 179:23
181:25 185:10
**attorneys**   1:15
11:23
**audio**   10:8
**august**   5:10
182:20 190:16
**authorities**   141:10
**authority**   34:24
35:1,4 62:21
**available**   65:21
76:9 112:4 142:15
192:4 195:10
197:14 211:6
**avenue**   2:4,20 7:13
**aware**   16:17 34:4
52:1 58:1 81:21
86:14 87:14
122:22 127:17
140:8 159:23
193:1
**aws**   94:18 175:17

**b**

**b**   4:6 7:8 12:4,15
12:21 13:2 43:7
47:18,24 48:20
49:2 50:1,6 60:16
62:7 66:1,18
67:12 68:18 69:3

69:6,8,25 72:24
75:18,23 76:18
77:23 78:14,17
100:23 112:10,15
119:24 120:16
124:24 125:13,13
125:25 127:4
132:6,10 153:21
154:2 166:17
167:5 170:2
176:16 179:14
181:17,23 185:5
186:3 189:16,24
195:14 199:6
200:11 202:5,9,12
204:7 205:15
208:13,14
**back**   8:23 27:25
32:8 59:24 64:25
70:18 76:22 84:24
85:5,6,7,11 93:3
93:15 143:18
162:10 164:10,20
164:22,23,24,25
165:3,5,13 167:8
167:17,22 168:19
170:4,8,9,10,14,25
171:3 181:8 206:2
**backed**   85:9
**balance**   173:23
174:11
**balances**   35:19
**bank**   5:1,1,3 33:14
33:17,18,20,23
34:16,21 35:2,6,16
35:19,20 36:5
38:19 98:19,22
129:7 157:6,7
161:4,5,8,8,11,17
161:20 163:12,14
164:3,5 165:8

167:22 168:15,18
169:2,14,18,24
170:11 171:5,6
172:12,16,19,24
173:3,7,9,10,13
204:25 207:6
**based**   22:25 23:1
24:10 28:14 43:25
57:8 68:11 75:23
88:1 94:23 102:4
136:12 141:2
185:21
**bases**   77:6,7
**basic**   51:3
**basis**   17:15 20:17
23:3 24:12,16
43:7,19 73:5
110:5 136:17
141:23 146:3
176:11 185:4,6
**bass**   126:15
**bates**   57:3 148:15
149:10,18 151:24
157:12,18 161:20
**bathroom**   116:6
**beach**   94:6
**began**   166:11
**beginning**   31:8
**behalf**   1:16 6:2 8:2
8:5,11,13 24:20
25:22 26:12,22
29:10 40:1 51:6,9
51:12 53:19 56:14
79:14 80:5 82:21
90:12 91:8 107:2
107:3 111:3,7
119:16 121:15
122:24 133:13
147:11 156:11,18
161:13 190:17
207:13

[believe - capacity]                                                                 Page 6

**believe**  8:14 15:12
  16:18 18:24,25
  19:17 20:4,5
  22:19 26:2,4,6
  27:10,13,21 28:22
  30:7 32:11,17,20
  33:18 43:1 46:16
  46:25 47:3 57:6
  58:4 60:2,4 77:10
  79:12 80:22 81:4
  81:19,21 82:2
  83:13 89:6,23
  95:1,3 96:8,24
  98:8,14 100:15,16
  100:23 101:5,12
  102:4 104:21
  109:7 110:22
  115:24 122:18
  126:16 135:4,23
  136:1,10,15
  137:11 148:1,4,6
  148:18 151:15,16
  151:20 158:1
  160:6 162:10
  165:10 173:12
  180:20 183:10,13
  204:23 207:20
  208:1
**believed**  135:5
**benefit**  51:6,9,12
  52:17,21 53:19
  54:13,18,20 55:10
  55:15,16 56:8
  83:24 142:10,11
  142:13
**beyond**  22:1 48:18
  157:1
**bhfs.com**  2:12
**bid**  87:7,12
**big**  103:24

**black**  88:7,9 94:19
  94:20,21,25 95:22
**blanket**  182:9
**blanking**  37:24
**block**  151:4 152:2
  153:6,7 154:13
**blocked**  148:6
  153:3 156:4
**blueridge**  104:11
  104:13 109:6,9,13
  109:16 110:9
  113:17,24 114:3
  114:13,15 115:6
  168:5 191:3,5,7,11
  191:21,24 192:3
  194:15 196:16,21
  197:6,25 198:6,10
  198:15 199:1,5,19
  200:25 201:3
**bodner**  2:9 8:4,4
  208:15
**bone**  163:20
**bonus**  4:9 57:7
  58:8,9,13,19 59:14
  59:17,21 60:5,7,10
  60:14 62:11,25
  63:3 64:24 65:22
  71:9 72:11 75:14
  78:2 162:11 163:3
  163:8,17,21,21
  164:8,9,16,18,19
  165:13,18,21,22
  166:5 167:8,8
  170:17
**bonuses**  59:4
  60:21
**bonusing**  165:3
**bookkeeper**  24:19
**bookkeeping**
  24:19 25:10,13,21
  25:24

**books**  25:11,18,18
**borrow**  74:17
**borrowed**  44:19
  139:9
**bottom**  148:16
  187:13,22
**box**  152:4,7,10,20
**break**  9:24,25,25
  10:1,5 66:8,10
  70:16 116:6
  118:20 160:8,12
  160:21 204:13
**breaks**  9:23 10:6
**brian**  3:8 8:6,9
**brief**  118:20
  160:12
**bring**  39:17
**brings**  157:6
**broader**  102:21
**broke**  152:5
**brought**  19:2
  185:16
**brownstein**  2:10
  8:5
**budgets**  86:23
**building**  83:22
**buildings**  86:22
  94:23
**built**  94:6
**bunch**  184:2
**burr**  2:19 6:3 7:13
  8:1,11
**burr.com**  2:22,22
  211:2
**business**  4:22 16:3
  16:6 18:10 28:24
  33:23 34:8,16
  39:15 53:13,14,18
  56:13 58:14 60:25
  78:23,25 79:3,5,6
  85:20 95:12,14,17

  95:19 105:12
  126:20 127:19
  131:19 137:25
  138:11,15 143:4,7
  143:11,21,24
  145:21 146:12
  147:6,7,24 156:6
  156:15 179:4,8
  188:12,19,22
  191:21
**buy**  43:19

---

**c**

**c**  25:8 210:1,1
**cable**  19:11
**cadwallader**  5:16
  200:24 201:1
**california**  96:13
  97:5
**call**  25:17 120:22
**called**  37:6,8 88:7
  100:19 139:8
**calling**  35:9 170:8
**calls**  55:2 77:9
  128:9,10 192:13
  194:20 197:15
**campus**  94:5
**campuses**  94:1
**canadian**  92:23
**candidly**  115:24
**capable**  17:2,3
**capacity**  8:25 9:10
  24:14 43:14 45:2
  45:10 62:19 63:14
  63:17,18,20,21
  64:21 70:8 71:8
  72:14,15,18,20,24
  73:16 74:8,12
  75:13,18,19 76:4
  76:24 78:2,7
  82:14,15 85:8,10
  91:9,11,15 109:20

[capacity - cheshire] Page 7

| | | | |
|---|---|---|---|
| 110:3,6,8 113:16 | 172:13 178:6 | 142:12,13 152:16 | 14:9,10,12,17,22 |
| 114:5,6,25 115:3 | 187:15 190:17 | 158:5 168:10 | 14:24,25 15:9,19 |
| 115:18 118:5,12 | 211:5 212:2,24 | 176:13 182:8 | 15:23,24 16:4,8,12 |
| 119:10,19 124:12 | 213:2,4,12 | 195:10 203:25 | 16:14 17:2,8 |
| 124:13,14,21 | **carletonnelsonc...** | 206:2 | 18:11,12,18,23 |
| 129:18,22 131:2,7 | 191:1 | **certificate** 6:7 | 19:13,16,20,24 |
| 132:5 146:17,20 | **carlton** 7:5 | 141:10 | 20:6,7,11 21:5,7,9 |
| 146:24 151:5 | **carolina** 79:12 | **certify** 210:3 | 21:12,23,24 22:9 |
| 154:10,11,11,17 | 80:23 | **cetera** 6:7 147:8 | 22:13 23:3,10,18 |
| 154:19 155:9,21 | **carter** 92:25 | **chain** 5:11,14,17 | 23:23 24:1,7,8,11 |
| 159:16 166:9 | **carve** 110:24 | 178:10,12 187:14 | 24:13,14,15,18 |
| 169:22 176:13 | **case** 1:6 7:11 30:1 | 196:10,11 202:23 | 25:11,22,25 26:13 |
| 179:9 184:10,11 | 59:20 125:24 | **chamber** 88:8,9 | 26:15,21,23 27:10 |
| 184:13,17,19,24 | 127:11,17 193:3 | 94:19,20,21,25 | 27:16,19 29:3,6,9 |
| 186:13 188:14 | **casey** 3:1,9 8:13 | 95:22 | 29:14,15,19,21 |
| 189:10,11,12,14 | 60:4 132:22 | **change** 212:4,7,10 | 30:1,4,7,13,19,22 |
| 191:9,13 192:10 | **caterpillar** 93:1 | 212:13,16,19 | 30:24 31:5,7,9,10 |
| 192:11,12,17 | 94:9 | **changed** 15:25 | 31:12,19,21 32:10 |
| 193:4,8,19,20 | **cause** 34:18 35:13 | 22:23,24 31:17 | 32:11,14,25 33:3,5 |
| 194:13,16,25 | **caused** 35:6 84:17 | 38:5,22 135:7 | 33:14,19,22 34:1,1 |
| 196:22,25 197:1,3 | **caveat** 111:12 | **changes** 211:10 | 34:2,6,7,8,13,15 |
| 197:12 198:11,13 | **cc** 203:6 | 213:6 | 34:21 35:2,16,20 |
| 198:15 199:1,6,18 | **ccs** 201:4 | **changing** 114:10 | 36:5,25 37:18,22 |
| 201:17,20,23 | **cell** 3:13 | **characterization** | 38:9,12,15 39:5,8 |
| 202:1 203:13,21 | **center** 82:1,3,3,4 | 127:9 | 39:11,14,25 40:9 |
| 204:1 | 82:20 86:3 90:1 | **characterizing** | 40:14,19 41:1,3,12 |
| **capital** 4:16 40:5 | 92:15 94:5 | 117:15 | 41:21,23 42:2,3,22 |
| 89:22,23 90:14 | **centers** 80:17 | **charges** 140:19 | 43:3,11,15,16,18 |
| 122:8,11 123:7,21 | 81:19,22 86:5 | 141:1 | 43:20,23,24 44:6,8 |
| 125:17 145:22 | 97:1 103:12 151:6 | **charities** 150:5 | 44:9,22,23 45:18 |
| 187:17 | **certain** 18:13 | **chart** 64:23 | 45:25 46:1,4,8,19 |
| **capitalize** 143:20 | 37:23 39:18 83:22 | 119:17 | 46:23 47:1,3,5,8 |
| **caption** 6:6 | 86:19,20 134:16 | **charter** 90:2 | 47:12,17,22 48:7,8 |
| **car** 24:24 25:4,5 | 148:17 165:2,3 | **chase** 22:15 | 48:9 50:14,17,21 |
| **carl** 60:2 105:14 | 176:6 | **chat** 122:14 | 50:23,25 51:4,24 |
| 105:15,18,21 | **certainly** 9:22 | **check** 174:11 | 52:2,7,8,9,13,17 |
| 153:16 | 10:5 21:14 24:8 | **checking** 173:22 | 53:1,4,19,22 54:12 |
| **carleton** 1:14 2:15 | 24:15 28:8 38:5 | **cheshire** 2:15 4:14 | 54:14,20,22,23 |
| 5:6 6:2 8:3,16 | 38:19 86:15 87:10 | 4:16 5:1,6,8,8,10 | 55:3,9,12,15,24 |
| 43:8 44:11,13,15 | 105:18 131:17 | 5:10 7:4 8:2,11 | 56:14,15,24 57:2 |
| 44:20,21 129:3 | 133:17 134:6 | 9:1,11 11:20 13:2 | 57:12,22 58:11,15 |

[cheshire - collected]

58:20,21,23,25
59:2,8,15 60:17,20
60:25 61:10,25
62:2,8,20 63:8,12
63:17,21 64:20,22
65:1,4,16,25 66:1
66:5,19,23 67:7,13
67:18,20 69:18,19
70:8 71:10,16,20
71:24 72:1,3,7,9
72:15,16 73:10,17
74:6 75:12 76:5
76:16 78:23,25
79:2,7,13,14 80:5
80:14 81:13 82:6
82:14,16 88:2,12
89:10 91:10,12,18
93:9,11 95:21
96:5 99:8 101:12
101:14,15,17,25
102:15,15,23
103:7 104:13,16
104:18,19,21,21
104:25 105:2,7,16
105:18,21,25
106:12,14,15,16
106:20,23,25
107:8,11,13,15,18
107:22 108:11,14
108:23,24 109:5,8
109:23 110:2,7,14
110:15,16,17,23
110:25 111:2,4,7,9
111:18 112:9,17
112:19,20,23
113:24 114:4,9
115:5,10,16
116:14,17,20
117:5,9,20 118:2
118:10 119:7,9,12
119:16,19 121:5,8

121:11,14,17,20
121:22 122:7,16
122:18,20,24,25
124:3,6,7,8,12
125:14,21 126:5,7
126:20,21 127:4,7
129:3,13,15 130:1
130:3,5,9,12,12,14
130:18,22,24
131:2,7,9,11,19,25
132:12,15,18,21
132:25 133:3,6,12
134:2,22 135:1
136:23 137:13
138:3 139:5,21
140:4,6,11,14
141:15,19,22
142:4,9,17,21,25
143:1,10,15,17
144:3,21 145:8
146:17,22,25
147:12,16 148:11
148:13,19,20,22
149:1,7,10,10,15
149:19,20,21
151:5,13,22
153:16 154:19,21
155:16 156:1,5,14
158:5,11,16,22,24
159:1,6,10,13,15
159:20,21,24
160:3,4,22 161:5,7
161:13,16 163:4,9
163:12,14,17
165:8 166:9,20,22
167:9,13,14,17,20
167:21,22,25
168:11,13,15,16
168:17 169:3,6,8,8
169:14,16,18,23
171:1,12 172:20

173:10,14,19
176:11,22,25
177:1,3,5,7,17
178:6,19 179:5,16
179:22,24 180:7,7
180:18,18 181:16
182:19,19 183:23
184:9,13,18 186:4
186:7,10 187:15
187:15 188:4,6,8
188:10,19,21,23
189:11,12 191:9
191:15,17,19,20
192:2,11,22,25
193:8,10,13,19
195:1 196:2,4,22
197:3,4,7,11,13,18
197:20,24 198:4,6
198:12,17,22
201:8,9,12,14,21
203:4,8,11 204:21
204:23,24 205:2,4
205:16,19,23
206:3,10,14,23
207:2,5,10,13
**cheshire's**  29:23
58:24 98:19,21
170:14 171:5
**cheshireventures**
57:19 82:11
174:25 175:1
190:18 196:12
201:5 203:5
**chicago**  19:18
**chinese**  150:4
**chm**  177:8
**choice**  87:13
**choose**  68:23
**chooses**  67:5
**christian**  3:10
53:10 133:1

**chuck**  95:2,10,11
**circumvent**  77:10
77:19
**civil**  6:5 19:22,24
19:25 20:11,12
**ck**  60:3
**claim**  110:17
163:3 184:18
**claiming**  111:2
**clarification**  10:19
54:7 140:22
**clarified**  77:5
**clarify**  47:2,24
**clarity**  62:18
**clear**  9:5 30:18
46:15,21 48:4,16
65:17 75:22 76:3
78:21 81:1 106:3
110:12 113:4
120:12 126:18
131:23,24 134:14
136:4 153:14
186:1,8,23
**clearly**  48:6 62:6
65:23 67:1,4,13
69:2,7 111:17
126:7,10,10,11
**client**  8:8,14 69:12
70:17 76:15,17
186:3,12,21,25
**client's**  150:15
**close**  93:4 94:22
**cluster**  175:5,8,9
177:8
████  175:5,7
**cn**  4:12 60:1
187:23,25
**cnck**  59:22 64:24
**colleague**  18:5
**collected**  141:7

[colorado - continues]                                                                          Page 9

colorado  2:11
columbus  175:7
come  16:7 20:10
  70:18 93:3 104:3
  104:4 152:4
  157:21 158:24
  180:23
comes  30:13
  163:17
coming  66:20
commencing  6:3
commercial  7:9
  85:19 145:13
communi  206:20
communicate  59:9
  62:1 79:24 113:23
  126:22
communicated
  113:22
communicating
  59:12,14 112:18
  112:22 188:24
communication
  5:16 59:1 107:19
  129:25 188:7
  200:23 203:4
communications
  58:12 104:20
  117:10,21 121:18
  121:21,23 126:4
  130:11,19 186:4
  186:13 198:16
  206:21
companies  24:12
  88:10 128:7
  154:14
company  4:12
  14:15 19:23 21:17
  21:18,23 24:25
  29:8 41:21 44:20
  57:9 72:3,4 88:7

88:25 90:19 92:16
  100:23 106:24,24
  127:19 139:7
  146:5,13 147:2
  169:10
compensation
  22:22,22 23:6
competitive  84:2
complete  10:4
  11:9 213:8
completed  6:11
  211:17
completely  11:16
  48:24 66:14
component  21:11
  142:14
computer  26:9
  99:15,16,22 210:8
concept  40:2
concerned  188:5
  192:22
concluded  209:3
concludes  208:23
conclusion  39:18
  55:2 197:16
conduct  110:25
confer  64:5
confidential  1:15
confine  103:3
  125:12
confused  145:23
conglomerate
  92:24
conjunction  101:7
conley  95:2
connected  29:23
  94:11 101:22
  102:1 103:8 104:1
connecticut  2:4
  20:5

connection  56:14
  58:14 83:11,20
  86:25 90:8 92:4
  93:8 96:17 98:4
  100:4 101:9
  102:15 103:22
  104:8,16,19 105:3
  109:6,9,10,13,16
  113:23 114:13
  115:5,9,13 116:13
  117:10,21 119:3
  121:5,24 125:19
  125:20 127:22
  136:23 137:2
  139:19 143:10
  144:7 145:5 147:3
  147:13,16 148:24
  149:2,3 167:18
  168:4 184:19
  188:7 191:21,23
  192:3,21 194:14
  196:2 198:10
  199:19 203:8,14
  203:22
consider  146:12
considering
  156:17
consilia  152:5
consistent  9:19
  183:10
construction  86:2
consul  14:14
consult  70:17
  82:18 83:15 144:5
consultant  20:9
  107:9
consultants  17:1
  51:2
consultation  14:15
consulting  5:6
  14:12 16:21 17:25

18:8,13 20:8 21:7
  21:11 22:14 23:4
  23:24 24:4,10,11
  29:6 30:1 40:3,24
  41:21 84:3 85:25
  88:17 90:4 91:22
  92:6,12 97:22
  100:15,17 101:2
  101:21 105:20
  106:23 107:1,5
  109:24 114:8,13
  114:20 122:13
  137:25 138:4,11
  138:16 141:23
  143:9,12,14,22,24
  144:7 147:3
  148:23 149:2
  153:12 156:2,2,6
  156:16 169:9
  178:7 204:23
  205:9
contact  97:18
contacts  39:19
contained  153:7
contemplated  40:1
contemplating
  147:11
content  130:15
contents  76:19
  131:6
context  119:24
  127:17
continuation
  166:11
continue  32:24
  33:2 54:6 61:2,21
  70:18 141:23
  150:22 166:21
continued  181:14
continues  24:9

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

**continuing** 61:17
**contract** 15:4
16:20 17:15 20:18
20:22 21:1,22
22:3,25 24:9
26:20 42:1 83:3
83:12,14 87:21
89:20 90:9,12,16
92:7,9 95:25
96:25 97:15,16,18
97:20,21,24,25
98:4 99:12,22
100:3,8,12 102:8
102:12 105:7
137:18 138:2
140:12
**contracted** 26:23
41:22 87:7 89:14
96:19,22 106:16
140:7,9 154:21
**contracting** 19:15
89:9,10 137:13
**contractor** 17:5
37:10 38:8 39:19
39:22
**contractors** 17:7
22:6 83:22,23
86:9
**contracts** 99:24
204:22,23 205:9
206:3
**contractual** 32:15
37:17
**contribute** 45:19
**control** 80:15
**controlled** 4:12
88:25 89:22
**convenient** 122:14
**conversation** 91:6
**copies** 25:12,20,20
26:7,9 205:11

211:14
**copy** 28:6,7 99:12
99:22 100:7
**corporate** 7:5 9:2
9:10 11:19 15:14
43:10 75:11 128:4
128:6 138:25
153:18
**correct** 27:6 45:11
60:22 103:5
151:17 154:22,25
155:4 161:9,10
165:16 167:10,13
169:24 210:9
213:8
**corrections** 213:6
**correctly** 147:5
165:15 210:7
**correspond**
157:14
**corridor** 81:4
**cost** 83:25 84:1
**counsel** 7:6,17
9:24 10:23,24
150:6 166:2 190:5
195:20 200:15
202:16 204:11
210:9 211:14
**counsels** 156:13
**count** 16:19 76:10
124:21 153:20,24
176:15 189:21,22
195:12 200:7,9
202:2 204:2
**counted** 158:9
**counterparty**
23:25
**counting** 65:8
**country** 94:23
**counts** 177:19

**county** 81:25 94:3
94:7 97:3,7 104:6
190:15,23
**couple** 135:12
**course** 48:17,23
61:5 68:11 70:13
76:12 127:20
204:24
**court** 1:1 3:12
6:10 7:10,16,21
10:8 76:22 120:22
126:14 202:6
**cover** 127:6
**cpa** 171:19,22
**create** 149:16
**created** 94:22
167:25
**creation** 149:17
**credit** 44:18 162:1
**criterian** 102:6,7
102:10
**cross** 185:24
**crutcher** 2:4
**cs** 211:15
**ctbsrm** 26:25 28:1
29:2 30:20 32:12
32:16 41:9 44:12
51:9 74:2,8,12,15
74:17,19,21,24,25
75:4,5,6 129:8
133:4 134:2,12
135:3,6,10 136:23
137:3,10,13,18
138:2,5,8,14,22,24
138:25 139:1,21
139:23 140:5,7,11
140:14,17 141:15
141:19,24 142:4,9
142:19,20,24
143:2,8,15 144:2,8
144:14,21 145:4

147:1,3,13 149:2,6
150:5 154:22
156:1,10,24 168:1
205:23
**current** 99:22
**cut** 22:15
**cv** 1:7 7:11

|  **d**  |
|---|

**d** 7:8 25:3,7,8
100:23
**d.c.** 2:5 81:5
**dark** 19:10
**data** 1:4 7:7 80:17
81:19,22 82:1,2,3
82:4,20 86:3,5
90:1 92:15 94:5
97:1 103:12 151:6
**date** 39:5 173:17
212:24 213:12
**dated** 5:6 39:3
174:18 178:7,12
**david** 3:2,17 7:15
**day** 6:2 9:23
173:24 210:12
213:15
**days** 211:17
**dbs** 93:5
**deal** 53:15 56:10
56:11,12 142:6
157:6 180:11
187:20 189:7
193:11,13
**dealership** 94:9
**dealings** 95:17,19
**deals** 98:23 156:3
**debited** 129:8
**debt** 131:10
**december** 5:17
32:21,22 103:6
162:2,6 202:24
203:1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[decision - directing]                                               Page 11

**decision** 68:24
  69:1 137:22
**declare** 213:4
**dedicated** 32:4
  33:19
**deemed** 213:6
**default** 125:18
**defendants** 1:9 2:8
  2:15 8:7 208:15
**deficiencies**
  208:11
**deficiency** 208:12
**define** 21:14
  102:19 129:11,11
  155:17
**defined** 21:20
  69:19 110:3
  137:23 140:18
**defines** 139:25
**definition** 75:24
**degree** 21:2 23:23
  29:5,21 34:13
  35:5 41:1 53:4,11
  56:7 113:22
**delcarpio** 25:9
  171:22,24 172:1
  206:18,22,25
**delineate** 23:11
**deliver** 83:17
**delivered** 181:7
**dell** 24:24 25:4,5
**delta** 184:3,3
**demetrius** 207:22
**denver** 2:11
**depends** 24:8
  26:17 53:15 56:10
  127:1 163:24
**deponent** 209:2
  210:5,7 211:13
  213:3

**deposing** 211:13
**deposit** 162:1,5
**deposited** 163:12
  165:7 167:12,14
  168:14,21,24
  170:14,18
**deposition** 1:14
  6:1,12 7:4,12 8:15
  8:24 11:18,23
  12:1,3,4,7,10 13:3
  13:21,25 14:4
  37:14 43:8 47:18
  49:22 50:4 60:16
  61:4 63:15,25
  64:6 68:12,14
  71:14 73:1 76:7
  77:11,20,22 78:14
  78:17 112:4,11
  119:25 120:1,16
  120:22 124:22
  125:13 132:6,7
  153:21,25 166:12
  166:14,17,23
  177:19 179:13
  181:17,19,21
  186:3 187:3
  189:19 195:8,13
  200:5,5,8,10,11
  202:9 204:3,7
  208:9 210:8
**deposits** 161:24
  162:9
**derek** 95:2
**describe** 15:1 18:9
  22:24 66:20 72:6
  95:13 110:22
  162:12 164:16
**described** 15:25
  21:2,5 22:19 27:8
  38:7 71:9 106:25
  134:9 139:12,18

146:25 147:4
  164:17
**describes** 39:21
  139:17
**description** 15:22
  112:17,22
**designated** 180:15
**designed** 21:9,10
**despite** 111:2
  126:3 198:16
**destination** 175:8
**detailed** 130:15,16
**details** 87:20
**determine** 111:6
**develop** 80:16
  97:1 108:6 145:9
**developed** 21:13
  21:14 86:10
**developer** 22:3
  29:15,18 86:2
  101:24 102:3,5
**developers** 14:18
**developing** 86:5
  114:21 147:4
  151:6
**development**
  14:13,14,20 15:7
  17:25 18:8,15
  21:6,8,10,11,17,18
  21:22 22:2,14
  29:8 39:16,16,18
  40:3,4,7,24 44:12
  52:5 53:12,13
  54:9 55:14 56:4,8
  79:8 80:9 81:23
  82:20 83:6 85:19
  86:10,11 91:22
  92:12,15 93:23
  97:22 98:2 101:20
  106:22,24 107:5
  108:2 114:15,23

114:24 123:19
  124:15 137:25
  138:1,5,11,12,15
  138:16 139:3,3,15
  139:19 141:17,20
  141:25 142:23
  143:4,5,7,8,11,16
  143:22,22,25
  144:1,3,9,17 145:2
  145:17,21 146:9
  146:13 147:6,7,10
  147:14 148:7,8,24
  149:4,5 150:6
  153:12 155:8,12
  156:2,6,7,15,16,24
  169:9
**development's**
  40:6
**devise** 163:25
**diagram** 116:24
  148:7 151:4 153:6
  153:7 154:8,13
  156:4
**diagrams** 152:2
  153:3
**differences** 135:20
**different** 61:19
  91:15 92:6 112:11
  113:9 134:11
  135:13,13 148:7
**direct** 7:10 8:19
  34:3 65:9 72:22
  110:10 119:23
  124:20,25 129:21
  176:16 177:21
  181:22 185:5
  195:4 202:4 204:6
**directing** 68:16
  73:4 75:19 78:13
  200:10

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[direction - eat]                                                          Page 12

| | | | |
|---|---|---|---|
| **direction**  13:24 | 117:16 122:6 | **drawing**  47:10 | 117:20 118:3 |
| **directly**  22:3 24:9 | 123:8,16 125:15 | 104:25 130:8,10 | 119:4,10,22 122:7 |
| 65:13 189:15 | 125:25 127:2 | 167:1 | 122:9,16,18,21,25 |
| **disagree**  61:5 | 128:23 138:18 | **drawn**  48:9 | 125:21 126:5,12 |
| 77:15 166:25 | 139:13 145:18 | **draws**  30:22,25 | 126:22,23 127:6 |
| **disclaim**  87:17 | 147:22,25 148:3,5 | 31:7,10,12,20 32:3 | 127:10,13,18 |
| **disclose**  87:18 | 148:10,12 149:4 | 32:24 33:3 34:5 | 128:2 129:2 130:1 |
| **disconnected** | 149:13,14,16,16 | 46:16 47:1,5,7 | 130:10,25 131:3,4 |
| 195:1 | 149:18 150:1,8,25 | 48:7 | 131:13,15,18,20 |
| **discuss**  91:19 | 151:10,12,16,22 | **drew**  46:22 92:22 | 131:22 132:1 |
| 94:14 102:10 | 152:1,18,19 | 92:25 106:11 | 163:16 167:7,9 |
| 154:14 | 155:15 161:1 | **dried**  33:12 | 170:23 174:24 |
| **discussed**  45:1 | 175:10,11,12,20 | **drive**  26:10 180:25 | 175:2 176:1,25 |
| 82:7 116:23 | 175:21 176:5 | 181:8,11 | 177:4 178:5,10,12 |
| 134:16 208:11 | 177:4,9,13 178:22 | **drugs**  11:3,12 | 178:16,20,25 |
| **discussing**  134:14 | 178:24 181:2,10 | **drumel**  3:17 7:15 | 179:21,22 180:6 |
| 189:8 | 183:18,20 189:2 | **due**  142:17 | 180:17 181:15,16 |
| **discussion**  50:9 | 190:20 201:5 | **duly**  210:5 | 182:18,22 183:22 |
| 71:1 204:16 | **documents**  11:25 | **dunn**  2:4 9:7 | 184:1,12,14 185:1 |
| **discussions**  141:13 | 12:6 35:22 36:4 | | 186:9 187:14,14 |
| **disguise**  128:5 | 86:12,15,18 87:8 | **e** | 187:22 188:2,9 |
| **disguising**  107:23 | 152:7,11,15,16 | **e**  3:14 4:11,16 5:4 | 190:13,25 191:6 |
| **dispute**  67:11 | 176:7,8 179:20 | 5:6,8,11,13,14,16 | 191:16 192:2,4,7 |
| **distinct**  144:1 | 180:24 182:4 | 17:20,21 25:7,8 | 194:23 196:3,10 |
| **distinction**  67:23 | 208:10 | 57:12,15,18,20,23 | 196:11,11 197:24 |
| 104:25 106:11 | **docusign**  89:5 | 58:6,7,16,21,24 | 201:1,15,16 |
| 109:25 127:24 | **doing**  19:16 28:15 | 59:1,9 60:18 62:1 | 202:23 203:1 |
| 130:8,9 135:9 | 29:19 76:5 82:17 | 62:8,24 64:9,15,19 | 210:1,1 212:3,3,3 |
| **distinctions** | 91:19 110:1,2 | 64:22 65:21 66:19 | **earlier**  99:4 101:1 |
| 167:24 | 143:17 144:9 | 66:20 67:5,17,20 | 133:25 134:8 |
| **distinguish**  67:6 | 155:9 156:2 | 71:10,11,17,18,25 | 135:21 146:2 |
| **distribution** | 178:19 184:17,18 | 72:1,4,8,8,9 76:14 | **early**  31:3 |
| 201:19 | **dos**  207:6 | 76:15 79:23 81:11 | **earn**  47:1 |
| **district**  1:1,1 | **doubt**  123:5 | 81:13 82:6,10,13 | **earned**  43:24 46:1 |
| **division**  7:11 | **draft**  38:4 175:14 | 86:19,24 99:25 | 46:4 47:3 54:11 |
| **document**  13:17 | **drafted**  175:13 | 100:1 104:19,22 | 142:18,21 |
| 24:2 28:2 36:13 | 206:3,8 | 104:23 106:21 | **earning**  23:8,9 |
| 36:16,23 37:13 | **drafting**  100:14 | 107:13,20 108:23 | **easier**  117:25 |
| 39:3,14 56:22,24 | **drafts**  100:8 | 109:3,5 110:16 | **eastern**  1:1 |
| 57:5 60:20 81:12 | **draw**  45:25 50:13 | 111:1,3,17 112:25 | **eat**  23:1 |
| 88:23 116:10 | 50:18 154:1 | 113:9,25 116:17 | |
| | | 116:19,22 117:7,8 | |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[economic - executed]                                                    Page 13

economic  17:25
  18:8,14,15
edbna  158:3
edmonton  92:24
edwin  24:23,23
  25:7 206:18,22
effect  10:15
effective  39:3
  57:10
effectuated  35:7
efficient  28:23,24
effort  13:23
  110:24
efforts  83:11
either  22:3 32:22
  34:19 88:5 115:2
  144:4 145:24
  199:10,16 205:10
elaborate  18:9
emh  5:4
emily  2:19
employed  16:8
  17:8,13 94:17
  174:21 175:17
employee  122:23
  175:21
employees  16:10
  16:11 94:18
  127:14,15,23,23
employment  85:15
  87:21 94:15 102:8
  102:11 103:20
  165:22 175:24
  176:2,5,8,9 177:5
  177:13 178:14,17
  178:23 179:9
  181:6 205:25
enable  26:24
encrypted  99:17
ended  19:15,16
  45:23 94:22

103:20 169:14,23
  176:2,5,8,9 177:6
  181:6
engage  14:17 15:3
  20:16 24:16,17
  51:2 53:18 56:13
  96:24 104:12,15
  105:19 138:21
  188:11,21
engaged  16:4
  18:13 24:11 53:12
  91:21 105:11
  109:24 110:25
  146:8 149:6
  197:18
engagement  93:21
  93:22 205:1,5
engaging  153:11
  188:19
engineering  19:22
  19:24 20:1,2,11
  83:24
engineers  20:12
enter  24:7 93:16
  134:4
entered  23:4
  144:13,20 146:25
entering  143:1,13
  146:12
enters  23:24
entirely  65:12
  77:24
entities  15:4 19:5
  67:9,15 73:13,22
  74:14,18 101:4
  105:25 108:19
  128:5 130:10
  132:13,22 133:7
  133:10 156:11,13
  156:17 168:2
  206:8

entitled  60:24
  66:21 67:16 68:14
  111:5,22 112:14
  112:16 113:7,11
entity  15:13,14,20
  17:17,19 18:22
  19:3,6,8 22:4
  24:10 29:7 40:3
  69:20 89:9,12,19
  93:13 100:19
  103:19,21 105:17
  105:19 114:25
  115:17 125:17
  133:1 159:19
  167:19 188:11
  194:19
equal  135:17
  141:6
equipment  93:2
equity  100:20
  101:7,11,18
errata  211:11,13
  211:17
error  174:2
esq  2:3,3,9,13,14
  2:17,17,18,18,19
  3:2,2
esquire  211:1
essence  23:6
essential  127:24
essentially  19:9
  27:1 94:21 98:1
establish  176:21
established  176:24
establishment
  15:20
estate  14:13,14
  15:7 21:6,8,11
  22:14 40:2,6,24
  41:2 42:14 52:5
  54:9 55:14 83:6

85:19 91:21 92:12
  93:23 94:10
  101:20 105:12,22
  105:24 106:4
  107:4 109:24
  114:8,12 141:25
  142:23 143:2,16
  147:14 148:8,24
  149:3,5 153:12
  155:8,12 169:9
estimate  20:16
et  1:7 6:7 7:9
  147:8 211:4,4
  212:1,1 213:1,1
evade  65:24 76:6
  184:25
evaluation  93:20
  97:19
event  174:8
eventually  141:21
everybody  103:24
evidence  196:1
  198:20
exact  143:6
exactly  47:4 99:11
  140:15
examination  4:3
  8:19
examined  185:24
example  84:7
  127:12 188:18
  206:4,6
exception  99:10
exchange  5:13
  52:14 99:24
  190:13
excluding  69:24
exclusive  140:20
execute  35:12
executed  20:22
  32:25 35:5 97:17

[executed - foregoing] Page 14

134:6
**exemption** 141:9
**exercise** 19:17
**exercises** 88:3
**exhibit** 4:6,7,9,10
4:12,14,15,17,19
4:20,22,23 5:1,2,4
5:5,7,9,11,12,14
5:15,17 12:18,22
13:5,7,8,10,11,12
13:14 36:10,11,20
51:15 56:17,19
71:5 75:10 81:6,8
88:19,21 116:1,3
118:24 122:2,3
123:11,13 128:16
128:19 133:18,21
147:18,20 157:9
157:11 160:19,24
162:18,19,21
168:20 170:6
172:4,6 174:13,16
178:1,3 179:25
180:2 182:12,14
185:14 187:7,9
190:6,7,9 195:22
195:23 196:7
200:17,19 202:17
202:19
**exhibits** 195:25
**existed** 155:1
**exists** 28:3
**expand** 179:15
**expanded** 95:4
**expansion** 178:10
**expect** 49:2 125:22
**expected** 125:12
**expenditures**
35:19
**expenses** 26:15,20

**experience** 22:13
22:16
**explain** 28:16
41:18 54:11 58:21
59:17 67:9 164:21
**explanation** 41:12
**explicitly** 114:19
**explore** 61:17
67:16 111:5,22
113:7,11 166:21
**explored** 166:19
**extent** 20:6 21:19
34:5 43:17,20
52:2 58:23 61:2
72:23 77:9 105:11
107:11,12 110:5
111:9,14 112:2,7
113:14 114:24
115:22 125:10
126:21 153:18
158:7 159:10
166:8,10 173:2
194:21 195:5
**extra** 68:6
**eyes** 1:15

**f**

**f** 210:1
**facilitating** 149:7
**facilitator** 4:8,18
36:21,24 37:5,8
42:10,13,21 51:14
55:8,22 122:10
123:6,9,17,23
134:15 135:11,24
136:2,5,11,14
137:20 148:21
154:24 155:3
206:4
**fact** 22:7 31:20
33:8 38:12 89:19
90:3 92:3 94:17

104:3 108:24
111:2,6 126:12,16
127:15 128:1
149:20 181:15
185:1,18 196:2
**factual** 126:15
**fails** 211:19
**fair** 29:13 102:20
**falkirk** 94:3
**false** 64:13
**family** 35:15
**far** 39:13 97:11
188:4 192:17,22
**farber** 2:10 8:5
**fashion** 110:11
**fbi** 31:16 32:25
38:21 45:22 96:2
97:13 180:23
**february** 89:2
136:13
**federal** 140:20,24
186:19
**fedex** 99:25
**fee** 27:2,17,24
30:12 31:4,9,13
107:6 133:24
140:16
**fees** 29:25 90:16
98:10 140:1,19
**fence** 66:20
**feolla** 95:2,10,11
**fiber** 17:13 19:6,7
19:8,10,10,10,12
19:17
**fiberoptic** 19:10
**field** 144:10
145:13
**figment** 168:3
**filed** 7:9 125:11
**final** 175:6 177:9
183:5

**financial** 31:17
57:10
**finbrit** 5:17
200:25 201:3,10
201:20 202:24
203:2,9,10,14,23
**find** 13:6 89:20
90:13,18,21
139:25
**finder** 88:15
**fine** 61:7 65:14
66:12 67:9,21
77:17 113:7 160:9
176:22
**finish** 150:11
**finishes** 181:5
**firm** 18:1,2,7
**first** 19:4 25:7
27:5 39:2 77:5
89:8 137:8 138:18
143:20 170:20
**five** 13:15,16,24
**flow** 116:24
141:24 142:4
**flows** 125:15,23
**focused** 80:24
93:24
**folded** 45:10 74:25
75:8
**folks** 16:19 95:4
**follow** 177:23
179:23 181:25
**followed** 7:20
171:18
**following** 57:11
195:20 200:15
202:15 204:11
**follows** 8:18
**foregoing** 141:5
213:5

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**foreign** 140:20
**forgotten** 18:20
  19:5
**form** 6:8 24:6
  41:16 42:1,5,16
  43:6 45:15 46:10
  47:14 54:15 55:1
  55:17 57:1,14
  59:6,19 60:15
  71:12 72:12
  103:15 105:4
  109:1,18 116:15
  117:12 118:6
  130:20 158:4
  171:15 172:25
  188:15 189:1
**formal** 15:19
**formalistic** 113:6
  113:8
**formalities** 6:6
**formally** 15:13
**forman** 2:19 6:4
  7:13 8:2,11
**formation** 16:1
**formed** 15:10,11
  15:14,16 69:20
**former** 18:5 94:8
**forming** 51:17
**forth** 62:7
**forward** 21:16
  22:4 39:15 40:20
  117:1 146:2
**forwarding** 179:2
**foundation** 171:16
  189:2
**founded** 16:5
**four** 31:15 38:23
  38:24 48:14
  173:15
**fraud** 128:8

**frazier** 92:22,23
**free** 153:19 189:19
**frequency** 32:5
**frequently** 32:2
**friend** 95:12,13
**friendly** 95:15,18
**front** 36:13 71:6
  118:25 157:22
  159:6 161:1
  162:24 187:10
**fulfill** 17:1
**fulfilling** 17:2,3
**full** 22:1 25:23
  94:18 207:22
**fully** 127:17
**fund** 44:23 51:22
  52:3,4 94:22
  139:14 141:17,19
**funded** 50:21,25
**funds** 93:12 115:4
  115:8 132:15,18
  132:21,25 133:3,6
  133:9 159:13,21
  159:25 160:4,22
  168:5 171:4
  173:14
**further** 49:7 209:2
**future** 55:11 80:10
  84:12 98:2 141:22
  145:5 149:8

**g**

**g** 4:14 17:20,21
  61:22,23 104:23
  107:21 116:20
  126:11,12 131:22
**gadelsky** 196:18
**gain** 85:15 186:19
**games** 150:16
**gaming** 186:23
**gather** 207:9

**general** 15:2 77:7
  84:3 85:20 96:11
  100:6,7,13 150:6
  156:13 166:2
**generalized** 38:6
  85:11
**generally** 47:7
  96:14 104:22
  105:6 106:18
**generate** 138:15
  144:4
**generated** 141:22
**generating** 137:24
  138:10 143:21
**generic** 37:21
**gentleman** 92:23
  95:18 100:24
**geographically**
  33:16 93:24
**getting** 13:8
**gibson** 2:4 9:7
**gibsondunn.com**
  2:6,6
**gift** 164:10,20,22
  164:23,23,25
  165:3 167:8,17,21
  168:17,23 169:13
  169:21 170:3,8,9
  170:10,25 171:3
**gifted** 59:23 64:25
  165:13 168:13,19
  171:12
**gifting** 165:5,17
**gifts** 162:10,14
**give** 20:15 25:18
  40:4 48:1 113:6
  116:7 136:19
  195:1 207:7
**given** 26:16
  136:13,15 138:3
  207:25 210:9

213:9
**giving** 48:11
**gmail.com** 3:14
**go** 10:25 12:20
  13:13 22:1 34:11
  34:15 42:8 49:5
  49:15,16,19 50:6
  70:5,16 77:4
  93:15 116:6
  118:16 122:1
  136:7 140:17
  143:18 146:2
  162:15 163:25
  169:17 182:4,5
  190:7 207:18
**godaddy** 58:4,5
**goes** 27:18 195:5
  207:23 208:2
**going** 9:9 37:22
  39:15 40:10,19,20
  41:13 44:6 48:3
  49:10 50:7 52:3
  65:8 66:2,9,10
  68:8 70:7,20,22,24
  72:22 81:22 90:10
  97:1 107:4,4,6
  110:4 113:15
  117:18 118:18
  119:21 120:8,10
  126:19 129:21
  135:8 139:17
  143:17 144:18
  145:5,11,16,20
  150:10 153:23
  158:19 159:8
  160:10 166:7,16
  176:10 177:20,23
  179:14,19,23
  181:21,25 182:4,5
  182:7 189:24
  195:3,4,11 202:4

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

[going - information]                                                      Page 16

204:14
**good**  7:1 8:21,22
  12:20 66:8 173:25
  210:4
**google**  189:3
**government**  14:18
  46:12
**grand**  91:24
**graph**  4:24 157:24
  159:6
**graphic**  159:11
**graphs**  159:9
**great**  61:15
**grella**  17:9,9,12,20
  17:23,24 18:3,4,5
  18:19,20 19:2
  100:24,25 101:1,3
  101:8
**gross**  30:12,16
  31:1,2 33:6 40:11
  40:13,15 41:5,14
  42:7 52:15,19
  53:5 55:25 135:17
  139:6 140:16
  145:7 147:2
**group**  18:24 19:1
  19:9 200:24
**guess**  22:10
**guys**  48:21 65:14
  117:3 152:5
  179:15

**h**

**h**  3:2 212:3
**hamby**  3:2
**hand**  210:11
**handling**  10:3
**happen**  22:12
**happened**  22:7
  91:17 102:2
  125:15 169:17

**happening**  33:8
  68:7
**happens**  135:6
**happy**  50:1 68:21
  77:4 91:19 120:2
  120:23 124:23
  158:8,18 166:13
  166:22 181:20
  189:20
**hard**  26:17 46:11
  53:15 56:11
  103:23 180:24
  181:8,10
**harder**  16:6
**hate**  85:18
**hats**  67:14
**haynie**  3:13 6:9
  7:16
**he'll**  164:6,6
**head**  10:14 84:16
  197:12
**heads**  116:7
**heard**  78:20
  100:19 186:7
**hearing**  6:8 48:24
**held**  7:12 15:8
  172:13
**help**  21:20 54:11
**helping**  35:3
**hereto**  213:7
**hey**  67:5
**hide**  168:3
**high**  89:11
**highly**  1:15 123:5
**hind**  128:5
**hm**  196:18
**hold**  105:13
**holdings**  1:7 2:8
  7:8 8:6 29:20
  91:22 211:4 212:1
  213:1

**home**  23:12,13
  45:23 96:2 97:13
  181:9
**hope**  154:15 157:4
**host**  190:16
**hotels**  51:1
**hour**  65:15,24
  66:7 77:11,19
  112:12 129:23
  184:25 185:19
  204:3
**hours**  47:21 68:20
  179:15 181:18
  186:20 202:3
**houscal**  2:18
**house**  31:16
  180:23
**houseal**  2:13 8:7
**huh**  10:14
**human**  197:10
**hyatt**  2:10 8:5
**hyper**  113:5
**hypothetical**
  128:10

**i**

■ 183:9
■■ 178:10
■■ 146:1
180:10,13,15
184:8
**idea**  71:21 73:10
  146:23 154:20
  183:24 192:23
**identified**  55:6,8
  139:13
**identifier**  97:9
**identify**  29:15,18
  97:8 128:7
**identifying**  98:1
**identity**  105:2
  168:3

**imagination**  68:12
**imagine**  158:5
**impact**  18:16
**impair**  11:4
**imposed**  94:15
  102:11 141:2
**improper**  113:20
  120:16
**inaccurate**  134:24
**inappropriate**
  65:12 66:2,14
  153:25 154:4,5
**incentive**  17:25
**include**  44:4
  147:14,15
**included**  70:13
  77:6
**includes**  69:18
**including**  20:13
  141:1 181:8
  190:16
**income**  141:3
  165:2
**incumbent**  90:18
**independent**  17:4
  17:7 20:9 22:5
**index**  4:1
**indiana**  18:25,25
**indicate**  175:2
**indicated**  57:9
  137:11 210:5
**indicating**  62:11
**individual**  94:24
**individuals**  88:11
  92:20 94:24
  127:13 201:2
**industrial**  92:24
  145:12
**inform**  156:14
**information**  35:18
  83:19 85:4,14,14

85:21 86:1,7
153:7 155:6
156:10,19,22
169:4 193:9
197:11,13
**initial** 38:4
**inquiry** 174:2
**instance** 137:22
**instructed** 77:2
**instructing** 69:3
69:11 75:22 76:17
78:16 195:15
**instruction** 177:24
**instructions** 5:18
182:1 202:25
203:2
**instructs** 10:24
**intend** 138:7,14
208:9
**intended** 30:15
31:2 42:7 44:22
53:5 154:8 167:23
169:1
**intending** 41:4
107:1
**intensional** 9:18
**intent** 89:20
**intention** 31:14
43:23 55:9 134:7
**intentionally**
134:24
**interacting** 59:3
184:5
**interaction** 69:19
69:22
**interactions** 69:17
69:21
**interest** 52:6,7,8,9
52:11 141:1
**interested** 15:6
210:10

**interface** 135:8
**interference** 49:21
**interfering** 50:3
63:25 68:13,15
**interrogatories**
12:2,13,14
**interrupt** 85:18
**interruption** 84:16
**invest** 89:22 90:19
90:22,23 91:4
**investor** 89:11
**involve** 130:11
145:14
**involved** 58:11
105:1 108:25
110:17 126:7,10
126:10,11 138:5
145:16 197:4,7
198:7,12,23
**involvement** 58:25
186:8
**involves** 67:20
203:4
**involving** 167:8
186:4,6 190:15
**irrelevant** 48:24
48:25
**irrevocable** 121:4
121:6
**irs** 168:4
**issue** 111:15 118:1
**issued** 12:16 44:19
**issues** 186:14
**items** 141:6

**j**

**january** 32:21,22
38:20 39:4,5,9,12
136:14
**jcl** 5:6 20:8,18
21:19,21 22:8
178:7

**jd** 8:12
**jd.thomas** 3:5
**jennifer** 3:13 6:9
7:15
**jennifercourtrep...**
3:14
**job** 83:14
**jobs** 18:15
**john** 3:2 5:16
200:24 201:1
**johnny** 5:6 17:9
19:19,20,22 20:7,8
20:13,19 21:19,22
22:7 133:7 178:6
178:16 179:2,5
**joined** 8:7
**joint** 146:3
**judicial** 126:14
**july** 5:6 119:3
178:7,17
**june** 5:4 15:12
16:1 103:4,6
174:19 177:9
**jus** 10:1

**k**

**k** 4:16 122:8
**keep** 49:10 139:2
152:7,11 176:7
**keeping** 177:13
**keeps** 25:21
**keith** 92:22,22
**kept** 134:17
**kill** 23:2
**kin** 210:10
**kirschner** 3:1,9,10
8:13 53:10 60:4
132:23 133:1
208:17
**knew** 84:8,10
146:17,18

**know** 9:5 10:7
17:13 19:14 20:16
23:19 26:9 28:7
28:12,13,20 30:11
33:1 36:7 39:13
46:12,22 47:4,7
50:15 53:16 56:11
63:14,19 65:6
67:1 68:10 70:14
71:8 72:10,19
75:7 81:20 87:9
87:16 88:16 93:11
94:4 96:13 97:10
99:2,14,19,21
101:5,25 112:3
117:7,9,23,23
123:4,8 124:3
125:14,17,24
127:12 128:12
131:5,24 136:7
139:24 142:11,12
144:11,25 146:10
146:21 148:3
149:19,21 151:11
152:6,18,24 154:7
154:8,15 155:1
157:2 159:1,10
161:16 164:14
169:19 171:2,25
172:3,16 173:13
173:18,22 174:9
174:10,12 176:3
177:7 179:1,3
182:24 184:4,15
189:4,9,10 192:9
192:10,11,15,16
193:4 194:5,13
196:20 197:24
205:12 206:19,20
206:24,25 208:2,7

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**knowing** 144:14
**knowledge** 66:22
  67:6,10 75:11
  76:19,21,23 77:1,6
  77:9 78:1,18
  85:12 112:16
  119:11,12 122:21
  124:11 125:9
  149:13 193:21,22
  194:23
**known** 65:1
  129:17 146:1
  191:10 193:9
  196:23,25 197:2
  198:5
**knows** 63:20 67:4
  67:7
**knoxville** 79:11
  80:22 106:19
  107:25 108:1,3
**kr** 182:25
**kram** 122:13
**kyle** 91:7 116:23
  117:11,21 182:25
  184:6 187:16
  188:3,20,22,24
  189:8

**l**

**l** 17:20,20,21,21
  25:3,8
**labelled** 36:20
**lack** 62:17 171:16
  189:2
**lacy** 59:5 62:16
  154:12 156:23
  164:18 165:4
  167:18 207:9,12
  207:14,17,20,22
  207:24
**laid** 111:16

**land** 80:6,9,14,19
  87:12 93:21 96:25
  102:5
**landlord** 84:17
**landowners** 14:18
**lands** 80:7
**language** 117:3
**large** 89:23 92:23
  92:25 93:1 110:24
**lawyers** 117:4
**laying** 62:24
**lays** 140:15
**lead** 40:7
**leads** 143:11
**leah** 2:14,18
**learning** 23:9
**lease** 37:25 83:21
  84:5,18 87:10
**leave** 75:25 208:9
**leaving** 57:9
**led** 19:10
**left** 30:7 68:20
  76:7 102:17,23
  103:4 105:12
  106:5 109:17
  114:8,14,25
  115:14 124:22
  185:19 204:4
**legal** 55:2 197:16
  204:21 205:8,19
  205:22 206:2
  211:23
**length** 127:16
**lens** 155:16,17
**letter** 205:1,5
**letters** 208:12
**level** 105:21
**levies** 140:21
**lia** 8:8
**liable** 140:23

**license** 3:13 4:21
  27:1,11 28:9,14
  30:12,23 31:4
  37:7 38:1,3,5
  133:24,24 134:1,8
  134:9,18,19 135:5
  135:10,16,22
  136:1,16,24 137:2
  137:10,12,19,23
  138:9 139:16,18
  140:1 144:13
  148:25 154:23
  155:25
**licensed** 26:24
  27:11 143:19
**licensee** 135:15
  140:23 141:5,9
**licensing** 4:8 27:16
  27:24 28:2,10
  30:2 31:9,13 32:7
  32:9,19,23 33:5,9
  33:11 36:9 37:2,4
  38:2
**licensor** 135:16
  139:18 141:3,6,8,9
**lies** 67:23
**lieu** 141:8
**life** 112:6
**likes** 66:21
**lim** 5:6 17:9 19:19
  19:20,22 20:8,13
  20:19 21:19,22
  22:8 133:7 178:7
  178:16 179:2,5
**lim's** 20:7
**limit** 65:15,24 76:6
  112:8 185:1 202:3
**limitations** 94:15
  102:11
**limited** 70:12
  113:15

**limiting** 141:4
**limits** 76:11 204:8
**line** 44:18 58:7
  61:3 70:18 203:2
  203:6 212:4,7,10
  212:13,16,19
**lines** 154:1 166:25
  167:3
**listed** 69:13
**listen** 120:10
**listening** 121:2
  132:11 190:4
**literally** 67:2
  150:18 155:23
**litigation** 56:25
  116:13 180:21
**little** 2:17 8:1,1
  13:16 41:16 42:5
  42:16 43:6,17
  45:15 46:10 47:14
  48:2,5,13,19,25
  49:7,11,18,24 50:5
  54:15 55:1,17
  57:1,14 59:6,19
  60:15,22 61:1,7,11
  61:15,18 62:13,17
  63:1,5,16,21,24
  64:1,8,12,16 65:7
  65:13 66:7,12,13
  66:15,24 67:2,19
  67:22,25 68:4,15
  69:5,9,13,16 70:1
  70:4,10,22 71:12
  72:12,21 73:4
  75:15,22 76:1,13
  76:20 77:3,13,17
  78:4,12,19 103:15
  105:4 109:1,18
  110:4,19 111:8,24
  112:2,21,25 113:3
  113:8,13,19

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

[little - managing]                                          Page 19

114:18 115:21
116:15 117:12,15
118:6 119:5,13,21
119:23 120:8,15
120:21 123:25
124:19 125:3,7
126:9,24 127:8,25
128:9 129:20
130:20 132:4
137:4 144:15
146:15 150:10,17
150:22 151:1
153:10,14 154:3
155:18,20 158:4
158:13 160:9
163:5,22,24 164:3
166:7,19,25 167:2
171:15 172:25
176:10,20 177:14
179:11 181:12
182:10 184:21
185:9,15,24,25
186:6,15,19,22
187:1,4 188:13,15
189:1,15,17
190:19 192:13
193:16 194:20
195:17,24 197:15
198:1,19 199:7,12
199:21 200:2
201:25 203:24
211:1
**llc**   1:7 5:1 7:8
23:17 55:4 161:5
190:14,22 211:4
212:1 213:1
**llp**   2:4,10,19
**loans**   73:25 74:2,8
74:9,10,15,19
132:12 139:22

**local**   140:24
**located**   7:13 80:19
**locater**   17:14 19:7
19:12
**locator**   19:8
**lodging**   26:19
68:16
**long**   15:8 23:6
94:8 158:9 166:13
205:14
**look**   20:14 22:11
24:24 26:10 36:10
56:19 64:14 81:8
83:16 104:5 116:3
128:18 133:20
139:24 147:20
154:17 157:10
160:24 161:19
168:20 172:6
174:15 180:2
185:13 200:18
202:18 205:15
**looked**   134:15
145:18 146:1
205:13
**looking**   13:18,19
51:15 88:6 90:23
125:16 180:24
**looks**   59:23 151:3
168:21
**loosely**   21:20
**loss**   57:8 164:10
164:12 165:1
**lot**   22:10,12 42:17
90:15 109:3
115:25 136:21
152:2 154:14
168:22
**loudon**   100:4
**loudoun**   81:25
94:7 97:3,7

190:15,23
**loved**   94:12 104:3
**lumpy**   23:7,7
**lunch**   118:20
160:8,12

| m |
| --- |

**machine**   210:7
**mack**   2:19
**mail**   3:14 4:11,14
4:16 5:4,6,8,11,13
5:14,16 57:12,15
57:18,20,23 58:7
58:16,21,24 59:1,9
60:18 61:22,23
62:1,8,24 64:9,19
64:22 65:21 66:19
66:20 67:5,17,20
71:10,11,18 72:1,8
72:9 76:14,15
79:23 81:11,13
82:6,10,13 99:25
100:1 104:19,22
104:23,23 106:21
107:13,20,21
108:23 109:5
110:16 111:3,17
112:25 113:25
116:17,19,20,22
117:8,20 118:3
119:4,10,22 122:7
122:9,16,18,21,25
125:21 126:11,12
126:12,22 127:6
127:10,13,18
128:2 129:2 130:1
130:10,25 131:3,4
131:12,13,15,20
131:22,22 132:1
163:16 167:7,9
170:23 174:24
175:2 176:25

178:5,10,12,20,25
179:22 180:6
181:16 182:18,22
184:1 185:1 186:9
187:14,14,22
188:2 190:13,25
191:6,16 192:2,4,7
194:23 196:3,10
196:11,11 197:24
201:1,15,16
202:23 203:1
**mailed**   117:7
181:15
**mailing**   117:24
176:1 177:4
178:16 179:21
180:17 183:22
184:12,14
**mails**   58:6 64:15
71:17,25 72:4,8
86:19,24 109:3
111:1 113:9 126:5
126:23 131:18
188:9
**making**   64:1 108:9
110:1
**management**
39:16 138:1,12,16
143:5,8,23 144:9
144:17 145:2,6
147:4 150:7
**managers**   156:12
**managing**   14:23
14:25 22:19,20,21
43:15,22 44:21
54:21 62:20 64:21
65:3 71:15,20,23
72:17 73:9 74:5
79:16 91:9 124:7
159:18,19 197:17
197:23 198:4,21

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**manufacturer** 93:2
**mapping** 19:10,11 19:17 20:1 88:3
**marked** 12:18 36:11 56:17 81:6 88:19 116:1 122:3 123:11 128:16 133:18 147:18 157:9 160:19 172:4 174:13 178:1 179:25 182:14 187:7 190:6 195:23 200:17 202:17
**markups** 205:10
**marshal's** 99:15
**material** 9:18,19
**materials** 207:1,9
**math** 183:16,17
**matter** 7:7 9:8 68:17 99:23 177:17 185:3
**mattered** 177:11
**matters** 111:18 127:10 185:16 194:22
**meal** 26:19
**mean** 14:16 16:22 16:24 18:10 23:2 27:15 30:17 32:4 35:21 37:25 41:10 41:11 44:16,18 50:23 60:17 72:2 72:6,7 73:15 84:6 86:18 95:14 119:7 119:9 127:11 137:24 143:20 157:1 162:12,14 164:25 175:12,13 180:22,23

**meaning** 101:14 117:3
**means** 27:16 28:25 72:3 107:22 139:19 165:1 183:4 184:4 189:14
**meant** 16:25 28:20 28:23 85:8 192:16
**mechanism** 21:25
**media** 7:3
**medication** 11:4
**medicine** 11:14
**meet** 64:5
**meeting** 158:25 159:3
**meldahl** 79:19 80:13 81:14 82:5
**memo** 180:11
**memory** 37:16,21
**mention** 91:17
**mentioned** 15:5 17:17 19:3,19 22:18 32:12 37:2 40:9 45:24 52:23 96:21 100:25 101:1,12 118:14 135:21 136:10 140:2 161:7
**mere** 185:1
**messaging** 79:25
**midatlantic** 211:15
**middle** 150:23 186:2 207:21
**mike** 18:3,4,19 100:24,25
**mile** 101:23
**million** 41:9,20 184:3 201:10,11

**mind** 135:7
**mine** 18:5 89:6 168:10
**minutes** 68:20 76:8 176:14 195:7 204:4
**mis** 117:13
**mischaracterizes** 59:7 105:5 130:21 171:16
**misconstrues** 189:2 190:19 198:19
**misstate** 27:6
**moment** 17:16 37:9 75:3 93:4
**money** 27:25 29:2 30:24 31:23 38:16 44:19 45:23 46:8 46:22 47:11,16,23 50:13,16,20 51:20 52:3 53:22,25 54:4 84:2 90:6 92:3 98:17 121:11 125:14,23 132:2 139:3 142:14 165:5,7 167:14 168:23 170:18 171:7,9,10 173:19 173:20 203:9
**monies** 30:18,19 33:9 34:6,14 35:13 39:11 43:24 45:18 47:13 48:8 50:16 51:24 54:11 55:6,10,12,25 56:3 74:17 98:3,24 99:7 121:8 142:3 142:18 157:6 161:12 163:11 167:12 168:12,14

169:23 170:5,14 203:14,22
**month** 23:8 91:24
**months** 31:15 38:21,23,24
**montreal** 96:14
**morning** 7:1 8:21 8:22
**move** 21:16 22:4 121:3
**moved** 173:20
**multiple** 54:4 67:14,22 126:13

**n**

**n** 25:7
**name** 7:14 9:3 17:11,18,19 18:20 19:4 24:25 25:4,8 82:8 102:6,6 172:13 173:1,2 175:3 207:17,18 207:19,19,21,22 207:24,25 208:2
**name's** 25:7
**named** 100:24
**names** 71:19 128:5
**nashville** 2:21 3:4 6:4 7:14
**national** 129:7 154:14
**nature** 14:21 16:3 18:16 21:21 23:16 27:11,23 28:9 32:15 80:7 89:13 89:18 92:10 101:21 105:9 116:22 129:9,11 155:12
**ndbs** 89:11 93:12
**near** 81:4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[necessarily - obtain]                                                        Page 21

**necessarily**  28:13
   80:18 85:9 198:5
**necessary**  213:6
**need**  10:6,9 35:9
   47:20,23 120:22
   150:15
**needed**  9:25 20:11
   41:20 50:22,24
   83:16
**needs**  151:1
**negotiating**  97:16
   100:3,5,11,12,13
**neighborhood**
   30:10
**neither**  144:5
   210:9
**nelson**  1:14 2:15
   5:6 6:2 7:5 8:3,16
   8:23 43:9 44:11
   44:13,16,20,21
   50:13 60:2 62:9
   64:18 66:17,19
   70:7 71:5 105:14
   105:15,18,22
   118:24 128:4,18
   129:3,25 148:19
   148:20 153:16
   154:7 160:16
   164:2,8 167:7,24
   168:12 170:13
   172:14 176:19,24
   177:12 178:6
   179:13,19 183:21
   187:15 189:6,19
   190:17 194:13
   195:19 196:3
   204:20 205:18
   207:12 211:5
   212:2,24 213:2,4
   213:12

**nelson's**  153:24
**net**  30:12 31:1
   59:23 141:3
   183:14 201:19
**never**  90:13 95:25
   97:11 101:6
   130:21 144:11,22
**new**  20:4 102:4
**nine**  13:6,9,12,20
**nod**  10:14
**non**  140:25
**noncompete**  87:23
**normal**  177:19
**north**  7:8 79:12
   80:22 133:13,16
   168:5
**northstar**  2:8
**northwest**  2:4
**notary**  6:9 210:3
   210:15 213:13,19
**note**  43:21 44:8
   45:7,9,10 47:20
   61:3 74:23,24
   75:1,4,9 78:15
   185:15 195:24
   211:10
**noted**  213:7
**notes**  26:24 41:8
   41:20,23 42:4,8,23
   43:4 44:1,4,10,11
   44:16,25 45:2,5,13
   45:19 46:5 51:23
   51:25 52:24 53:24
   54:5,17 55:12
   56:5 74:11,20
   75:5,6 139:10,14
   141:16,21 142:13
   142:19 147:8
**notice**  4:6,19 6:6
   12:3,4,15,21,24
   13:1 48:18 70:13

125:10 126:14
   129:1 130:16
   131:10 210:5
**nova**  89:11 93:4
   93:12
**november**  96:8
   98:9 173:17
   196:14,24
**number**  7:11
   12:18 36:11 56:17
   59:21,22,22,22,23
   59:24 69:14 81:6
   88:4,19 94:1,17
   116:1 117:3 122:3
   123:11 128:16
   133:18 147:18
   148:15 157:9,12
   157:18 160:19
   161:20 162:18
   172:4 173:16
   174:1,4,13 178:1
   179:25 182:14
   187:7 190:6
   195:23 200:17
   201:2 202:17
**numbers**  13:19,19
   64:25 71:19 184:2
**numerous**  186:4

**o**

**o**  25:8
**oath**  9:12,15,20
   160:17
**object**  10:23 43:19
   54:15 110:4
   119:21 166:7
   195:3 199:10,12
**objected**  48:21
   49:24
**objecting**  75:15
   77:8

**objection**  41:16
   42:5,16 43:6,7
   45:15 46:10 47:14
   55:1,17 57:1,14
   59:6,19 60:15
   62:13 63:1 65:7
   68:16 71:12,13
   72:12,21 73:5
   76:2,11 77:13
   78:4,12 103:15
   105:4 109:1,18
   111:11,13 115:21
   116:15 117:12
   118:6 119:5
   120:14,17 123:25
   124:1,19 125:2,3,5
   128:9 129:20
   130:20 132:4
   137:4 144:15
   146:15 153:10,14
   153:17 155:18,20
   158:4 163:5
   171:15 172:25
   176:10 177:14
   179:11 181:12
   182:9 184:21
   188:13,15 189:1
   190:19 192:13
   194:20,21 195:17
   197:15 198:1,19
   199:7,21 200:2
   201:25 203:19,24
**objections**  6:7
   48:22 63:5 64:1
   75:16 119:13
   124:4 126:25
   182:7
**observed**  118:20
   160:12
**obtain**  83:3 207:8

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

**[obtained - part]**                                                    Page 22

| | | | |
|---|---|---|---|
| **obtained** 47:16<br>207:1,4<br>**obviously** 8:24<br>135:7<br>**occa** 154:15<br>**october** 96:8 98:8<br>98:9 173:17<br>**odd** 174:3,7<br>**offer** 64:5<br>**office** 23:10,13<br>99:15<br>**offices** 6:3<br>**official** 210:11<br>**officially** 109:11<br>**offset** 165:2<br>**oftentimes** 15:4<br>**oh** 11:13 157:21<br>173:25<br>**ohio** 108:15,17,20<br>175:7,7<br>**okay** 12:20 14:9<br>16:22 21:12 22:18<br>23:23 24:18 27:3<br>27:23 29:4,11<br>30:5 31:19 32:12<br>32:18 33:14 34:13<br>36:2,20 37:2,12<br>38:23 40:19 42:10<br>43:1 44:13 46:3<br>47:10 49:9 52:6<br>54:23 56:22 57:12<br>59:2,12 60:1 62:3<br>62:6 64:16 66:6<br>72:9,19 75:10<br>78:9 81:11 82:10<br>82:13 88:9,22<br>90:17 92:9 93:3<br>96:23 98:10 100:7<br>100:25 105:24<br>106:10 107:7<br>108:22 114:12,23 | 115:12 116:9,10<br>116:12 118:13,16<br>118:24 121:4<br>122:1,12 123:13<br>123:15,16,22<br>134:1,8,13 139:16<br>144:13 145:10<br>146:5,11,24<br>147:21 149:24<br>151:21 152:1,3,22<br>153:1 155:14<br>157:21,24,24<br>159:5,8 160:16,25<br>167:16 172:9,11<br>173:6,9 174:15,18<br>178:4 180:4 181:1<br>187:13 189:13<br>190:11,13 194:17<br>196:10 200:21,23<br>201:9 202:21,23<br>203:3,7 204:12<br>208:4,19<br>**okla** 157:5<br>**oklahoma** 157:5<br>**omission** 9:19<br>**once** 38:17 114:24<br>**open** 124:22 208:9<br>**operate** 33:22<br>74:14,18 157:6<br>**operates** 18:2<br>**operating** 5:13<br>15:18 76:15 117:1<br>117:2 118:15<br>190:14,22<br>**operation** 138:4<br>**operational** 51:3<br>**operations** 55:10<br>67:15<br>**opinion** 84:21<br>85:12 129:16 | **opinions** 205:7<br>**oppidan** 88:3 96:4<br>96:5,16,20 97:4,15<br>98:3,10 99:13,25<br>**opportunities** 40:5<br>40:5 156:16<br>**opportunity**<br>184:23 185:17<br>189:18<br>**opposed** 137:19<br>155:19<br>**order** 94:22<br>106:15 120:20<br>125:5,12 126:1<br>168:3 169:4<br>186:24 207:9<br>**original** 80:25<br>**originally** 45:9<br>**outcome** 210:10<br>**outdated** 177:10<br>**outlined** 90:16<br>**outlines** 141:11<br>**outlook** 58:5<br>**outlook.com** 82:11<br>174:25 175:1<br>190:18 191:1<br>196:12 201:5<br>203:5<br>**outlook.com.**<br>57:19<br>**outset** 21:3,5<br>**outside** 49:3 51:2<br>60:16 72:24 95:16<br>125:8<br>**outstanding** 41:8<br>**owing** 142:17<br>**owned** 53:9 81:23<br>87:12 88:5 94:8<br>102:5<br>**ownership** 52:11<br>53:2,7 | **owns** 92:23,25<br><br>**p**<br><br>**p** 25:8<br>**p.m.** 160:11,14<br>204:15,18 208:25<br>**page** 4:2 13:6,8,12<br>13:13,14,15,16,18<br>13:20,24 138:14<br>139:12 143:20<br>157:13,16,19<br>158:12 161:20<br>184:2 212:4,7,10<br>212:13,16,19<br>**pages** 48:21<br>**paid** 27:20 29:25<br>30:3,18 34:2 46:4<br>53:25 54:12,13<br>55:12 62:11 91:24<br>129:7 141:7,7,21<br>142:5,18<br>**paper** 100:12<br>175:5<br>**paragraph** 39:2<br>**parikh** 2:3 7:24,24<br>13:15 128:20<br>162:19,21 172:8<br>180:3 182:13<br>190:10 196:7<br>200:20 202:20<br>**park** 129:7<br>**part** 13:10 43:4<br>44:1,24 61:2<br>66:15 90:17 132:5<br>132:9 147:10<br>158:8 164:19<br>165:24 166:17<br>170:1 181:22<br>189:16,18,24<br>193:10,13 195:7<br>195:12 198:5<br>200:11 202:5 |

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

[part - personally]                                                              Page 23

204:6 205:15
**partially** 169:14
**participants**
198:17
**participate** 40:8
158:2,17,22 159:2
184:7
**participated** 86:10
158:6,15
**participation**
128:8 201:18
**particular** 10:3
88:15 197:19
**particularly** 67:17
**parties** 88:11
135:13 208:8
**partner** 22:19
**partners** 7:9
**partnership** 17:9
17:12,22,23,24
18:21 101:3,8
187:19 189:7
**party** 23:25 29:7
210:10
**passed** 30:13,20
**pat** 62:4 143:19
150:18 155:20
157:14
**path** 68:24
**patrick** 2:3 7:22
9:3 48:2,13 64:9
68:1 69:9 76:1
77:3 126:9 154:3
167:3
**patten** 95:2
**pay** 37:22 38:15
39:11 40:10,14
41:4,13 42:8
45:19 51:3,20,22
51:25 53:5,22
54:5,17 55:24

56:5 90:15 98:24
99:7 107:6 121:11
135:16 139:5,17
141:5 142:19
144:20 145:7
171:7,9,10,14
**paying** 52:23 53:5
53:23 141:8
142:13 147:7,12
**payment** 54:2
140:24 200:25
201:3
**payments** 34:1
35:19 42:22 43:3
142:9
**payoff** 139:22
141:16
**pays** 27:16
**pdf** 13:19 157:20
**peaks** 4:16 104:16
115:9,13,14 117:2
117:14,22 119:3
122:8,11 123:7,21
123:24 125:16
127:3,7 145:14,17
145:21,22,22
146:1,5,8,13
147:15,17 168:6
180:13,15 183:1
183:11 184:20,24
187:16 188:20
**penalties** 141:1
**pending** 137:5
**people** 113:9
127:15 128:1,4,12
190:16 200:24
**percent** 27:18,19
30:6,7,8 33:6
40:10,15 41:4,13
42:7 52:14,18
53:5 55:25 135:17

135:19,19 136:20
139:5 140:16
144:21 145:7
147:2 201:19
**percentage** 30:3,5
184:3
**perfectly** 64:2
66:21
**perform** 38:13
40:20 41:2 83:5
89:14 90:11,12
93:7 95:22 96:4
96:10,16 97:4
101:10 102:14
105:7 107:1 109:8
109:12 115:12,19
119:2 121:14
133:12,15 204:21
207:12
**performed** 26:21
29:9 38:9 54:24
55:4,11 88:12
101:15 119:10
144:2,23 167:19
**performing** 29:22
39:6 40:1 41:2
51:5,8,11 91:8
118:4 198:9,14
**performs** 24:19
119:16
**period** 31:8 55:4
103:3 178:13
**periodically** 153:4
**permission** 71:25
72:5 110:7,10
**permit** 58:18
**permitting** 123:1
**person** 43:9 44:20
105:22 122:23
**person's** 25:4

**personal** 8:25
24:23 34:3,12
42:23 45:2,9
46:23 47:11 51:22
51:25 52:6,24
54:17 55:15 71:18
71:25 72:4,8,14,17
72:23 73:1,16
74:7,12 76:4,6,24
77:6,9,11,20,21
78:6,18 85:12
104:23 110:8
111:17 112:4,6,12
112:15 113:16
114:6 115:3,18
117:8 119:11,25
124:13,21 125:9
127:10 129:17,22
132:5,6 139:22
153:24 154:16
155:21 162:15
166:12 172:19
176:13 181:21
184:11,17,24
185:2 186:9,21
188:8,14 189:14
193:4,7 194:16,23
194:25 195:5
197:1,12 198:25
199:22,25 200:3,5
201:17,23 202:1
203:15 204:1
**personally** 26:25
41:19 44:5 47:5
47:20,22 52:21
53:6 55:10 71:17
74:24 109:19
111:12 119:7
131:6 148:14
153:16,22 158:7
158:15,17 167:23

169:1,22
**perspective** 31:17
  129:13,14,15
  136:19 146:22
**pertinent** 207:6
**peterson** 4:13
  88:16,25 89:21
  91:4 92:18,22,25
  93:7,8,13
**peterson's** 89:12
  90:19
**phase** 22:2
**phone** 79:23
  117:25
**piece** 100:12 143:8
  144:3
**pieces** 16:20
**pitch** 79:18 80:4
**pitched** 79:7
  106:20
**pitching** 81:3
**place** 31:10,13,16
  32:19,24 33:11
  99:5,7 139:2
  210:5
**placement** 46:6
**places** 51:1
**plaintiff** 7:6
**plaintiffs** 1:5,16
  2:2 6:2
**play** 169:7
**player** 103:24
**playing** 150:16
  193:22,24 194:6,9
  194:14
**please** 7:18 50:3
  117:1 120:7
  150:23 154:7
**poe** 24:24
**point** 8:15 30:2
  42:20 48:19 89:11

102:20 108:9
  113:4 131:5
  135:21 155:5
  166:8 174:22
  203:7
**pointing** 84:9
  159:14 160:2
**pointone** 29:20,21
  29:22 31:6 88:5
  88:10 91:8,22
  92:4,11,14,15,21
  93:3,15,15,16,19
  94:1,14,17 104:2
**points** 83:21 84:5
**portion** 13:7
  164:20 165:12,18
  201:11
**position** 23:1 49:1
  49:2 57:10 78:20
  78:20 84:11,24
  85:1 166:4 193:12
  193:14,18 197:9
  197:22,23 198:3
**positions** 84:7
  86:21
**possess** 178:22
**possessed** 180:25
**possession** 176:4
  181:1
**possessions** 181:8
**possible** 123:4
  153:5 173:21
  183:3
**possibly** 52:22
  91:2 174:2
**post** 94:16 114:2
  177:13 178:23
  179:9
**potential** 14:19
  40:4 79:8 80:9
  93:23 96:17 98:2

108:2 143:12
  149:9
**potentially** 18:14
  40:7 51:2 79:12
  80:15 81:21 82:18
  83:25 88:15 89:21
  90:20 93:20
  101:25 104:1
**power** 94:23
**practical** 136:19
**preference** 111:13
**preferred** 83:23
**preliminaries** 9:4
**preliminary** 20:1
**preparation** 12:1
  12:7,10 14:3
  37:14 180:20
  207:10
**prepare** 11:18
  126:5 175:21
  206:14,17
**prepared** 14:6
  25:25 70:15 148:3
  151:4,19
**preparing** 207:2,5
  208:12,13
**pres** 150:5
**present** 3:7 7:17
  105:14,15
**presentation**
  158:2
**presented** 142:6
**presidents** 156:12
**presumably** 22:2
  40:3
**pretty** 33:13
  111:16 113:3
  167:2
**prevent** 11:15
**previous** 191:19

**previously** 32:14
  40:9 46:15 71:13
  73:6 82:7 85:3
  106:25 109:22
  114:7 153:17
  161:7,12 163:1
  170:13 206:19
**price** 20:15 183:6
  183:11,12
**primarily** 90:1
**principal** 14:23,23
  14:25 22:20,21
  43:15,23 44:21
  54:21 62:20 64:21
  65:3 71:15,20,24
  72:17 73:9 74:5
  79:16 91:9 124:7
  159:16,17,18,19
  197:17,23 198:4
  198:22
**principals** 95:1
**prior** 15:19 30:19
  30:22 39:1,4,9,12
  74:23 97:24 99:3
  99:6 125:4 126:1
  160:21 178:12
**privileged** 120:13
  125:2
**probably** 17:14
  32:1 66:8 94:4
  206:12
**procedure** 6:5
**proceed** 86:2
**proceedings** 11:5
  209:3
**proceeds** 44:22
  140:16 144:21
  145:7 182:25
  183:1 201:19
**process** 135:17
  137:23,24 138:9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[process - question]                                                      Page 25

139:19 143:19,21
208:12
**produce** 149:14,15
**produced** 56:25
116:13 148:10,13
148:14,18,18
151:13,17,22
**product** 205:8
**production** 148:20
148:20
**professional**
105:20
**profit** 53:13
**profits** 184:7
**project** 18:22
20:10,14 21:21,21
22:1 23:3 24:16
40:8 41:23 80:12
82:24 83:7,9,15,18
83:25 84:2 86:25
87:4 88:6 96:25
97:2,7 100:4,5
101:19 103:22,25
104:7 105:1,3
106:23 107:14,25
108:1,4,6,8,9,12
114:15,21 156:8
179:6,10
**projects** 14:20,20
18:13,19 19:12
20:2 21:13,15
22:10 39:19 40:16
40:17,18 79:18
80:4,4,10,11,16
88:1,15 89:21,25
90:1,9,13,18,21,23
91:1 94:11 96:17
96:18 97:5 102:16
102:22,25 103:1,2
103:7,11,13
104:20 108:15,17

108:19,22,25
138:6 141:25
145:9,11
**promissory** 74:11
**promptly** 141:5
**proper** 47:17
72:25 78:18
119:25 181:17
**property** 97:8
190:15,23
**proposal** 20:20,21
20:21,24,24 21:25
**propose** 81:22
82:3,4
**proposed** 4:22
147:23 165:19
**proposing** 80:13
82:2 107:12
**propositions** 79:9
**proprietary**
137:24 138:10
143:21
**proprietorship**
23:19,21
**prosecutors** 158:3
**protective** 120:20
125:5,11 126:1
**prove** 187:6,6
**provide** 9:15 11:9
25:9,12 39:15
54:13 67:10 83:10
83:19 85:22,24,25
86:12 90:3 93:18
103:18,19 109:15
119:18 138:8
141:9 143:2,4,14
147:1 171:4
205:19,22 206:10
**provided** 37:17
52:14 58:17 75:24
85:3 89:7,19 98:7

159:13 196:3,4
**provides** 42:21
**providing** 21:6
52:18 59:4 83:20
87:14 92:11
112:18 117:6
143:9 169:12
**provision** 87:24
**provisions** 84:13
**pstokes** 2:6
**public** 6:10 210:4
210:15 213:19
**pull** 123:13 175:20
**purchase** 188:2
196:18
**purely** 138:3
**purport** 108:24
118:5 126:19
197:5
**purported** 107:15
**purporting** 68:10
110:14 136:22
**purports** 39:14
**purpose** 27:23
28:5 42:22 49:19
51:16,19,21 53:23
60:9 62:10 64:2
75:14 78:10
123:22 124:3,17
129:12 132:2
137:9 139:1,11
140:3,6,11 141:14
141:16 148:5
149:25 157:5
163:21 164:9,16
164:17,22,23
165:20 168:8,17
169:11,13,19,20
170:3,5 171:3
172:16,21 177:3
177:12 183:22,25

184:16
**purposes** 6:4
46:24 47:12,12,24
61:4 68:12 113:9
126:13 128:2
130:13 140:3
152:14 153:11
162:9 166:4
175:24 185:3
186:10 202:11
207:1
**pursuant** 14:20
29:25 33:10 38:16
210:4
**pursue** 54:8 94:23
95:25 98:23 108:4
108:17,19
**pursued** 108:8
**push** 84:5
**pushback** 83:21
**put** 27:25 30:23
31:13 32:19,23
33:11 55:11 64:12
86:21 95:19 98:19
106:21 148:6
172:1 175:13,14
199:9
**putting** 140:9
153:1 197:20

| q |
|---|

**q2** 175:5
**q4** 32:20 33:1
**qualification**
96:11 97:20
**qualifying** 98:1
**question** 10:2,19
10:20,25 11:1
21:3 29:12 31:1
39:24 46:25 47:22
48:4,14 55:19,20
62:9 63:10,13

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

65:10 66:25 73:3
75:23 76:8,14,18
77:1,2,4,7,21,23
80:25 85:23 89:17
102:21 103:23
111:15,25 112:3
113:20 114:17
118:8 119:15
120:7,9 121:1
123:3 124:1
126:24 127:2
128:12 137:5,8
144:6 149:23
150:9,13,15,21
151:2 153:15
158:14,14,19
163:22,25 164:4
166:6 170:2
173:25 174:8
177:15,18,24
181:5,14,20
189:18 190:3
194:11 195:2,6,11
195:16 197:10
199:4,8,8,9,11,13
199:15 200:14
203:18,25 204:10
**questioning**  61:3
70:19
**questions**  6:8 9:9
9:16 10:9,18 11:7
48:17 49:3 64:11
64:19 65:20,23,25
66:3,4 68:1,5,19
69:2 76:10 110:20
112:6,8 113:14
125:8 126:2,6,19
127:1,21 129:23
155:15 158:18
163:2,19 164:5
166:11,23 170:12

179:16,20 181:13
182:11 185:4,18
185:20,21 186:12
186:21,25 199:4
202:11 203:16
208:6,8,16,18,22
**quickly**  33:13
**quite**  110:23 186:8

**r**

**r**  2:17 17:20,21
25:3,8 210:1
212:3,3
**ramstetter**  4:16
91:7,13,14,17,20
91:23 122:8 183:1
184:6 187:16
188:3,20,22,25
189:8
**randomly**  32:5
**rate**  142:22
**reach**  20:12 79:17
79:22 131:13
**reached**  91:3
**read**  37:9 69:9
76:21,22 89:15
135:14 138:13
143:18 150:8
196:8 211:9 213:5
**reading**  6:11
**reagan**  8:8
**real**  14:13,14 15:7
21:6,7,11,15 22:14
40:2,6,24 41:2
42:14 52:5 54:8
55:14 83:6 85:19
91:21 92:12 93:23
94:10 101:20
105:12,22,24
106:3 107:4
109:24 114:7,12
141:25 142:23

143:2,16 147:14
148:8,24 149:3,5
153:11 155:8,12
169:9
**reason**  13:13
28:16 35:10 37:7
125:20 136:18
151:9 167:16
170:24 211:11
212:6,9,12,15,18
212:21
**reasonable**  9:23
85:13
**reasons**  54:4 139:7
184:22
**recall**  19:2 23:21
38:17,18 39:25
80:6 91:3,5,6,18
91:23 92:1 98:5
99:9 100:9,10
135:22 137:1,9,21
138:20 148:11
153:2 184:5
205:21,24 206:1,8
206:9
**receipt**  160:22
168:5 201:10
211:18
**receipts**  30:12
33:6 40:11,13,15
41:5,14 42:7
52:15,19 53:6,12
55:25 139:6 147:2
**receive**  29:2 31:20
52:13 53:7 58:13
58:18 90:6 92:3
93:12 98:3,10
115:4,8 131:11,18
132:12,15,18,21
132:25 133:3,6,9
151:11 155:6

156:9,22 159:20
159:21 160:4
167:17,21 205:7
**received**  25:19,20
53:12 92:2 121:9
157:1,2 159:25
161:13 173:13
203:14 208:10
**receiving**  98:15
130:18,22 148:11
151:9 153:3
165:11 166:5
**recognize**  12:24
36:16 56:22
116:10 125:7
147:25 156:20
172:24 173:4
182:25
**recollection**  136:9
136:15 183:8
**recommendations**
205:10
**record**  5:1 7:2
10:23 46:16,21
47:25 48:12,17
49:6,12,15,17,19
50:2,8,9,11 63:23
64:2,4,12 66:11
67:10 68:22 69:10
70:5,5,16,21,25
71:1,3 75:21 76:2
76:22 77:4 78:16
78:21 110:13
111:5 118:17,19
118:22 120:13,25
134:14 160:11,14
161:4,20 185:16
186:1 196:5
204:15,16,18
208:24 210:9

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[recorded - rest]                                                                Page 27

**recorded**   7:3 10:7
   210:7
**records**   25:10,10
   25:13,21 38:19
   205:11,16 207:4,6
**refer**   43:11
**reference**   37:4
   174:1,4
**referenced**   99:16
   211:6
**referrals**   39:20
**referred**   152:8
   161:12
**referring**   12:13,15
   37:3 42:2 43:14
   44:10 45:3 60:6
   74:4,5,7 84:14
   86:24 87:8 134:17
   135:2 153:15
   192:8 194:18
**reflective**   114:4
**refresh**   37:16,20
   183:8
**refuse**   69:1 76:17
   179:20 200:9
   202:4
**refused**   127:21
   163:2 189:20
**refuses**   189:21
**refusing**   63:10,13
   64:18 73:3,8
   120:25 131:23
   132:9 185:8,9,19
   185:21 186:5,11
   186:15 189:13
   190:3 195:19
   199:3,14 200:14
   202:14 203:16
**regan**   2:14,18
**regard**   42:3 81:15
   107:14 121:4

154:9 156:23
   161:12 205:20,23
   206:22 208:14
**regarding**   14:19
   35:18 71:18
   163:16 190:22
**regardless**   193:19
**regards**   15:6
**regener**   170:21
**regenerative**
   159:12,22 160:2
   160:23 162:2
   170:16,20,21
**region**   175:8
**regular**   189:19
**relate**   40:21 41:15
   95:22 155:7 156:1
   163:4,8,8 166:20
   179:16 182:23
   191:3,5,6,18
   196:16
**related**   5:13,17
   29:23 36:4 40:16
   41:3 58:9 63:7,12
   76:5 77:21 83:7
   90:25 101:4
   104:20 126:20
   129:6 130:3,13
   131:19 133:1,4,7
   133:10 134:10
   170:16 173:14
   178:10 179:5,9
   190:14 197:6,25
   202:24 205:16
**relates**   18:10
   81:20 159:9 178:9
   183:9 185:3
   191:11,14,16,17
   196:20
**relating**   141:4

**relation**   142:25
**relationship**   27:8
   39:8 69:16 92:17
   95:11,16 102:24
   103:2 105:9
   134:17,21 135:1
   140:4,13 141:12
   141:15,18 146:12
   157:7
**relationships**
   37:18
**remainder**   30:20
**remained**   50:17
**remaining**   120:1
   176:14 179:13
   195:7
**remember**   19:14
   36:8,17 37:6 54:1
   80:2 88:10,18
   99:10,11 102:5
   134:5 152:1
   162:18 163:1
   173:18 206:12
**remington**   94:3
   104:6,6
**remotely**   7:18
**render**   127:18
**renrets**   44:12,16
   45:5,11,13 74:20
   74:23 75:1 129:8
   132:19 139:10
**repaid**   26:25
   41:21
**repay**   41:22 44:24
   139:14
**repaying**   42:4
**repeat**   117:18
**repeatedly**   202:9
**rephrase**   29:13
   55:19 85:22 89:17
   103:18 194:11

**replaced**   136:2
**replacing**   136:5,11
**reporter**   3:12 6:10
   7:16,21 10:8
   49:13 54:7 117:17
   140:22 181:4
**reporter's**   76:22
**represent**   9:7
   107:9 153:8 154:9
   159:11
**representative**   7:5
   9:2,11 11:19
   43:10 66:23 70:8
   75:12 82:14,16
   131:8 153:19
   192:25 201:21
**representatives**
   104:4
**represented**   119:4
   119:20 156:4
**representing**
   111:21,21 192:20
   192:23 193:2,5
**request**   35:11,12
**requested**   207:7
**require**   18:14
   126:15
**required**   9:15
   39:17 213:13
**reserved**   6:8,12
   208:13
**respond**   10:13,25
**responding**   10:9
**response**   81:17
**responses**   9:16
**responsibilities**
   15:2,23 16:2
**responsible**   45:12
   197:19
**rest**   65:16

**retained**  21:20
  83:1,13 94:2
**retainer**  98:14
**retaining**  20:8
**return**  211:13,17
**returning**  50:10
  71:2 118:21
  160:13 204:17
**returns**  25:23 26:1
  26:7,12 206:14,17
  207:2,10
**revenue**  27:18,20
  135:18 142:21
**revenues**  141:22
**review**  11:25 12:3
  12:6,9 37:13 90:9
  205:9 211:7
**reviewed**  12:12
  13:4,25 86:15,17
  86:19,22 204:22
**reviewing**  87:8
**revised**  58:8
  163:20 170:16
**rfp**  4:11 81:16,20
**richmond**  81:5,5
**right**  8:21 22:17
  44:15 49:12 56:1
  57:13 59:5 73:18
  76:9 84:18 107:2
  143:3 144:16
  145:3 146:6
  155:10 169:25
  193:2,3 208:6
**rights**  208:13
**rod**  23:22 27:13
  28:8,13 34:19
  38:4 57:7,8,13
  59:9,21,22 60:7,21
  62:12,24 64:24,24
  71:11,18 129:3
  130:1 131:12,21

131:25 135:7
  136:16 137:11,16
  137:21 141:13
  148:4,6 150:5,5
  151:10,12,17,19
  152:9,13,19 153:2
  153:3,9 154:12
  155:7,9 156:10,23
  159:25 160:23
  162:6 167:18,25
  169:2 170:15,21
  204:20 205:5
**rodney**  15:17 35:9
  69:17,20,20 75:8
  121:20,21,23
  160:5 205:18
**role**  14:22 15:1,3,8
  15:24 17:1 67:8
  67:13 87:18
  107:14,23 108:11
  110:23 112:9
  115:9 127:22
  156:14 169:6
  193:22,24 194:4,5
  194:6,8,14 197:10
  198:9,14,21,25
  199:5,18,22,25
  200:3 201:10,12
  201:24 203:8,12
  203:13,15,21
**roles**  128:6
**ronnie**  35:1
**room**  7:17 8:9
  10:8 146:21
**roughly**  30:10
  32:1
**royalties**  139:12
**royalty**  135:15,15
  135:16 139:17
  140:16

**rule**  77:11,19
**rules**  6:5 70:14
  75:25 76:13
  186:20,23
**run**  9:3 100:24

**s**

**s**  25:3 212:3
**safe**  203:19
**saith**  209:2
**salary**  23:1
**sale**  196:18
**sara**  2:9 8:4
**satisfy**  42:23 43:4
  44:1,7
**save**  84:2
**saving**  83:25 84:1
**savings**  172:22,23
  173:3,6
**saw**  163:11 165:9
**saying**  35:9 63:6
  111:22 126:11
  134:25 149:10,18
  170:9 191:12,14
  194:8
**says**  37:1 42:25
  57:16 58:8 59:20
  76:16 81:16 90:2
  112:9 116:23
  122:12 123:19
  125:16,21 129:7
  136:25 144:16
  145:2 150:2
  151:18,24 168:19
  172:18,22 173:15
  178:11 180:12
  183:19,20 187:22
  190:22 194:18
  196:18
**sbodner**  2:12
**schedule**  59:4

**schemes**  128:8
**schreck**  2:10 8:5
**scope**  49:23 50:1
  67:12,12 69:3,6,8
  71:13 75:24
  120:17 125:6
  181:17 208:14
**scott**  4:13 88:16,25
  89:11,21 92:17
  93:7,8
**screen**  12:22 13:6
  13:11
**scroll**  13:11
**sdc**  81:17,18 82:17
  83:1,3,5,11,19
  84:19 85:6,22,24
  85:25 86:7,12,25
  86:25 87:4,6,15,20
  87:23
**sdc's**  83:11
**seal**  210:11
**search**  33:1
**seattle**  25:1
**second**  2:20 7:13
  17:17 19:4 138:19
  143:18
**section**  37:10
  161:23
**secure**  26:10
**see**  12:23 13:5,20
  25:17 39:21 42:14
  43:23 56:21 71:19
  81:10 88:22 89:15
  102:2 104:9
  116:12,16 122:4
  122:12,15 123:8
  128:21 129:2,5
  133:22 136:25
  138:13 147:21
  148:15,17 149:12
  157:23 158:11

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

**[see - sorry]** Page 29

159:5,5,14 160:3
161:4,22,23 162:1
162:5 163:11,16
168:12,14 172:12
172:15 173:17
174:17,18,20,24
178:4,5,8,9,11
180:6,9,10,12
182:17,18,21,22
183:5,7 187:13,19
187:22 190:13,21
190:25 196:11
200:23 201:1,4,6
202:23 203:1,3,5
**seek**  126:1 133:15
**seeking**  77:18
82:17,23
**seen**  26:8,8 101:6
101:6 148:1 152:2
157:24
**selection**  96:11,21
**send**  36:4 58:24
59:1 71:17,25
72:4,8,10 81:16
**sending**  71:10
**sense**  90:15 136:21
155:11 156:21
157:3
**sensitive**  177:4
**sent**  26:11 38:4
62:24 64:22 82:5
82:13 107:13
109:3 131:21,25
211:14
**sentinel**  81:19,22
88:6,9 103:12
**sentinel's**  82:22
**separate**  110:20
125:17 144:1
**series**  182:4

**serve**  51:17
**served**  172:17
**services**  1:4 7:8
15:5 19:23,25
20:7,11 24:20
28:10,12 29:22
34:2 37:11 38:7,8
38:9,13 39:6,16,17
39:22,25 40:21,23
40:25 41:2 42:14
55:7,7 58:17
60:11 83:5,6,10,20
83:24 84:4,16
85:25 87:15 88:12
89:7,13,18 90:4,12
91:7 92:10,13
93:8,18 95:21
96:5,10 97:22
98:6 101:2,10,15
102:14 103:19
105:8,20 107:2,5
109:9,12,15
115:12,19 117:5
118:5 119:2,11,16
119:18 133:13,15
134:16 136:22
137:1 138:1,7,10
138:12,16 139:20
143:3,4,5,14,23,25
144:2,9,17,22,25
145:2,6 147:5
148:23 159:12
207:13
**set**  23:18 31:3 35:3
62:7 76:13 87:3
139:6,22 146:1
153:8 169:2,5
204:24
**setting**  141:14,18
184:6

**setup**  21:18
**seven**  13:13 47:21
65:15,24 68:20
77:11,19 179:15
181:18 184:25
186:20 202:3
204:3
**seventeenth**  2:10
**share**  35:18,22
84:19 86:7 87:20
87:23 102:7
**shared**  152:19
153:1
**sharing**  152:14,16
**sheet**  211:11
**shell**  128:4 186:24
187:2 188:11
**shield**  186:25
**short**  10:4 23:5
**shorthand**  210:7
**show**  122:2 151:12
**showed**  97:13
164:3 168:20
170:7,23
**showing**  64:23
**shown**  126:4
**shows**  38:21
**sic**  65:17
**side**  136:20 192:7
192:8 194:18
**sides**  48:14
**sigma**  159:12,14
159:21 160:2,23
162:2 170:15,20
**sign**  211:12
**signature**  34:24
89:4,5 210:14
**signed**  37:23 87:10
89:1 134:5 211:20
**signing**  6:11

**signs**  26:12
**similar**  140:25
182:5 185:3
**simple**  116:24
**simply**  70:14
84:21 85:1 86:9
144:4
**single**  24:16 174:3
**sir**  70:2 73:13
**sit**  193:21
**site**  20:1 81:23,24
88:3 94:7 96:11
97:9,19 104:5
106:19 145:22
178:10
**sites**  79:8 80:6,8,9
80:19 81:2 88:4
93:23 96:21 98:2
**sitting**  63:14
146:21 149:12
155:14
**six**  31:15 62:8
69:14
**slide**  157:11,16
**smart**  2:17 8:10,10
208:17
**smith**  2:14,18 8:8
**snowflake**  56:11
**social**  100:20
101:7,10,18
**sole**  23:18,20
122:23
**solicit**  15:6
**solutions**  159:12
159:22 160:2,23
162:3 170:16
211:23
**sorry**  11:12 12:16
13:23 16:24 17:11
21:3 32:7 80:24
89:8 114:16

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[sorry - structure]                                                                 Page 30

117:17 123:21
128:25 133:20
145:23 149:1
151:19 153:21
162:20 172:7
174:15 187:9
190:8 205:4
**sort** 22:15 126:15
158:6
**sorted** 186:14
**sorts** 128:2
**sounds** 43:11
100:3
**source** 90:14
**south** 2:20 7:14
**space** 23:10
**speak** 11:22 18:17
171:24 196:5
**speaking** 91:13,14
104:22 105:6
**specialty** 17:1
**specific** 56:12
83:10 84:13 90:10
101:24
**specifically** 30:9
36:17 38:18 43:21
111:15 137:21
206:13
**specifications**
86:22
**specify** 22:11
**speculation**
128:10 192:14
194:21
**speeches** 48:1,12
**spell** 17:19 25:2,6
**spending** 47:16
**spent** 140:1
161:13
**sphere** 40:6

**spoke** 8:24 134:8
**stable** 18:17
**stage** 100:14
**stake** 53:2,7
**stamp** 57:3 149:10
**stamped** 149:18
151:24
**stand** 60:1,3
**standard** 172:22
172:23 173:3,6
**standing** 10:2
210:4
**star** 7:9 133:13,16
168:5
**start** 12:21 14:9
21:3 65:8 80:3
**started** 65:19
180:24
**state** 6:10 7:18
76:2 140:20,24
**stated** 70:4 73:6
114:7 191:19
**statement** 5:3
172:12 173:3
192:24
**statements** 35:21
**states** 1:1 7:10
140:25 192:6
**stay** 51:1 66:10
**steering** 13:23
**steps** 138:17
**stipend** 26:19
**stokes** 2:3 4:3 7:22
7:22 8:20 9:3
12:19 13:18,22
36:12 41:25 42:9
42:19 43:13 44:3
45:17 46:14 47:25
48:4,6,16,23 49:5
49:9,16,20,25
50:12 54:10,19

55:5,21 56:18
57:4,17 59:11,25
60:19,23 61:5,9,13
61:16,20 62:15,23
63:2,9,19,23 64:4
64:10,14,17 65:11
66:6,9,13,16 67:1
67:4,21,24 68:2,9
68:25 69:7,11,15
69:24 70:3,6,12
71:4,22 72:13
73:2,7,12 75:21
76:12,25 77:12,15
77:18,25 78:8,15
78:22 81:7 88:20
103:17 105:10
109:4,21 110:12
110:21 111:20
112:1,14,24 113:2
113:5,10,18,21
114:22 116:2,18
117:19 118:9,16
118:23 119:8,14
120:4,6,12,19,24
122:1,5 123:12
124:10 125:1,4
126:3,18 127:6,20
128:3,13,17,22
129:24 131:1
132:8 133:19
137:7 144:19
146:19 147:19
150:14,20,24
151:8 153:23
154:6 155:24
157:10,15 158:10
158:21 160:7,15
160:20 162:17,20
162:23 163:10,23
164:1,7 166:18,24
167:4,6 171:21

172:5,10 173:5
174:14 176:18,23
177:22 178:2
179:18 180:1,5
181:24 182:3,12
182:15 185:7,13
185:20,23 186:2
186:11,17,22
187:3,8,12 188:17
189:5 190:1,2,7,12
190:24 192:18
193:17 195:15,18
195:21 196:5,9
197:21 198:8,24
199:11,17,24
200:13,18,22
202:8,13,18,22
203:18,20 204:9
204:12,19 208:5
**stop** 48:11 50:3
63:24 68:13
120:22
**stopped** 68:4
**straightforward**
167:3
**strategic** 93:20
**strategies** 17:10
17:12,22,23,24
18:21 101:3,8
177:8
**strategy** 175:5
**street** 2:10 3:3
**structure** 4:9,22
27:22 31:3 37:21
38:6 51:17 57:6
59:15,18 62:25
63:3 72:11 75:13
75:14 78:3,10,11
113:6 147:24
153:8 156:15
163:3,8,21 165:19

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[structure - testimony]                                              Page 31

167:8 169:5
170:17 171:4
184:6 186:24
187:20 189:6,7
**structured** 27:13
28:13
**structures** 101:5,6
187:2
**structuring** 29:1
**study** 18:24 19:1
101:23
**stuff** 22:12 51:3
**subject** 28:10
30:11 58:7 122:9
181:18 187:19
190:21 201:2
203:2
**submitted** 26:1
**subscribed** 213:14
**subsequently**
74:25
**substance** 72:10
78:2,9 184:1
**substantively**
10:13
**success** 86:5
**successful** 39:18
86:11
**sudden** 127:11
**sued** 125:18
**suggest** 105:8
159:24 160:1
**suggesting** 134:23
**suggests** 145:18
155:8
**suite** 2:11,20 3:4
**supersede** 136:17
**superseding** 136:5
**supervision** 210:8
**support** 62:10

**supported** 60:14
**suppose** 38:24
**supposed** 140:1
162:15 169:6
**sure** 9:4,5 15:3
17:18 18:12 27:4
27:7,9 29:5,11
38:3 42:11,12
46:15,21 48:19
55:22 82:9 86:15
86:17,19 90:2
98:23 104:11
134:13 135:20
148:13 154:18
164:6 166:6
168:22 170:10,24
205:13
**surmising** 99:19
99:21
**suspect** 28:22
**swear** 6:10
**swearing** 7:20
**sworn** 8:17 210:5
213:14

**t**

**t** 210:1,1 212:3,3
**tab** 56:19,20 71:7
81:8 88:21 116:3
116:4 123:14
128:19 133:20,21
147:20 157:11
160:24 162:17
172:7 174:15,16
178:3,3 180:2
182:12,16 185:14
187:9 190:8,9
195:22 200:19
202:19
**table** 120:14 199:9
**tactical** 93:21,21

**take** 9:23,25,25
10:1,5,5 30:22,25
32:2,24 33:3
36:10 37:9 49:2
56:19 64:6 66:10
68:23 70:16 74:11
74:15,20 80:14
81:8 116:3,5
126:14 128:18
133:20 138:17,21
139:24 147:20
157:10 160:8,24
172:6 174:15
180:2 204:13
206:1
**taken** 1:16 6:2 7:6
11:3,12 31:6
86:20 96:25
139:10 164:11,13
173:19 210:4
**talk** 49:20,22,25
50:2,5 94:19
154:10
**talked** 65:22 95:4
99:4 122:13
133:25 148:21,25
184:22
**talking** 36:18
91:11 97:21
100:17 134:19,20
160:21 168:23
**talks** 42:13,17
**tax** 25:23 26:1,12
29:1 51:17 139:2
139:6 140:2,3,6,10
141:9,10,11
206:10,14,17
207:2,10
**taxable** 142:22
165:2 171:11

**taxed** 142:22
171:20,20
**taxes** 140:18,19,20
140:25 141:2,8
142:17 171:7,9,10
171:14 207:5
**technical** 118:1
**tell** 8:17 14:10
66:2 71:8 84:23
85:6 91:20 104:9
109:2 126:25
129:18 154:16
157:19 166:16
168:25 169:12,20
184:14 210:5
**telling** 63:11 91:23
131:24 150:18
**ten** 111:19 173:23
**tender** 87:6
**tennessee** 2:21 3:4
6:4,10 7:14 79:11
106:19
**term** 23:5,6
137:23 140:19
143:20
**termination** 84:18
**terminology** 27:7
**terms** 21:15 83:17
96:21 100:13
117:14 135:1
179:14
**testified** 8:18
61:12,14 69:21
127:9 130:22
155:22 185:2
**testify** 14:6 68:17
127:16 150:11
170:13 174:5,6
**testimony** 59:7
65:17 105:5 130:2
130:13,21 135:4

[testimony - trust]                                                          Page 32

163:6 171:17
186:7 193:16
196:1 198:20
202:11 208:24
210:4,6,9 211:9,18
213:8
**testimony's** 113:3
**texarkana** 19:1
**text** 79:23
**thank** 38:2 204:20
**theoretical** 53:17
**thereabouts** 96:9
**thereof** 210:10
**thereon** 141:2
**thing** 158:6 195:25
**things** 9:6 14:21
18:16 31:17 38:21
42:18 112:10
125:15 130:23
135:12 143:23
148:23 149:3
168:9
**think** 17:16 20:3
23:20,21 27:17
30:25 31:2,14
35:3,4 40:2 42:25
57:24 60:24 79:23
84:15 87:16 88:14
90:1 99:14,14
101:23 108:21
110:7 111:4,8,16
112:10 116:8
124:24 126:14
127:24,25 128:1
140:17 148:19
150:14 158:16
170:24 195:13
204:3 206:24
207:11,23
**third** 19:4 29:7
161:20

**thomas** 3:2 8:12
8:12
**thought** 28:14
54:2 84:24 85:1,4
**three** 31:15 38:21
49:24 61:18 67:2
71:7 110:19,21
135:14
**time** 7:19 15:25
17:8 22:23 31:6
46:17 47:21 49:24
50:8,11 61:3,8
65:8 66:8 67:14
68:6,7 69:25
70:23,25 71:3
76:6,7,10 77:5,7
77:20 83:13 85:21
88:17 94:8,18
97:11 99:10 103:3
104:23 106:2,4
118:19,22 120:2
131:16 132:6
143:19 153:21,24
155:2,5 156:19,20
158:8,9 160:8,11
160:14 163:20
166:14 175:18
176:16 178:13
179:13 180:25
181:19,21 182:11
186:17 189:21,23
195:3,13 196:24
198:11,13,16
200:6,8 201:17
202:7 203:7 204:2
204:8,15,18
205:14 208:16
210:5 211:19
**timeframe** 211:8
**times** 18:12 24:15
48:15 67:3,23

78:21 111:19
120:18 173:23
174:11
**title** 135:12 166:3
**titled** 122:10 123:9
123:17 147:23
**tod** 79:24
**today** 8:25 9:9
11:5,7,10,16 12:7
12:10 14:6 15:20
37:14 63:15 64:3
68:13 69:25 112:7
112:18 130:2,13
146:21 149:12
155:14 170:1
193:21 199:5
208:14
**today's** 11:18 14:3
208:24
**todd** 79:19,22 80:5
80:13 81:3,14
82:5
**told** 61:18 67:22
155:21 164:18
170:3 185:10
**top** 84:15 192:7
196:11
**topic** 10:3 47:17
62:7 65:19 66:18
68:1 69:13
**topics** 12:4 13:21
13:25 14:1,7 49:4
62:6 66:17,17
67:5 70:7,13,15
125:9,14 126:22
127:4
**total** 59:21 64:23
183:14 200:10
**touch** 172:1
**tparikh** 2:6

**traditionally** 23:4
**transaction**
104:12 109:16
113:24 115:6,9,14
117:22 180:14,16
183:2,9 184:8,20
191:4,6,7,11,24
192:3,21 193:23
194:1,15 196:17
196:21 197:5,6,8
197:19,20,25
198:6,10,15,18,23
199:1,19,23 200:1
200:4 201:13,20
**transactions** 128:6
**transcribed** 210:7
**transcript** 76:23
155:23 211:6,20
213:5,8
**transcription**
210:8
**transcripts** 12:9
**transfer** 4:19
34:18 35:5,7
128:24 129:1,6,10
130:15,16,19
131:6
**transferred** 33:7
33:10 34:7,14
132:3
**travel** 26:19 51:1
**trisha** 2:3 7:24
**true** 61:17,19 64:8
64:9 66:16 75:4
76:2,20 113:12
192:24 210:8
213:8
**trust** 51:12 121:5
121:6,9,12,15,19
121:24 138:25,25
139:6,9 150:4

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

168:1
**trustee**  150:5
**trusts**  148:9 151:6
**truth**  8:17,17,18
193:14 210:6,6,6
**truthful**  9:15 11:9
**truthfully**  11:15
**try**  27:3 67:6 70:1
179:15
**trying**  20:2 27:6
65:15,24 104:9
106:10 109:25
110:16,22 185:25
194:24
**turn**  88:21 162:17
178:3 182:3,8
187:8 195:21
**twice**  77:4
**two**  57:25 135:13
139:13 141:12
143:23 145:19
**type**  80:12 138:4
149:5 153:12
**types**  24:6 26:15
26:18,20 38:8
40:23 80:11 89:25
101:19 156:3
**typical**  26:18
**typically**  20:20
101:20

**u**

**u.s.**  5:1,3 33:18
99:15 161:5,8
172:12 173:3,7
**uh**  10:14
**umbrella**  106:15
**unable**  128:7
**understand**  9:12
9:14 10:10,16,20
10:21 11:1,5
17:18 27:3,7 29:5

29:11 42:11 44:9
55:19 61:13 64:23
68:2 78:19 106:10
109:25 111:20
113:10,11 118:7
125:23 127:25
140:10,14 145:4
145:10 147:5
149:25 150:2,8,25
151:21 154:4,13
157:4,7 160:17
165:12,15 166:3,6
187:4 189:23
192:19,20 193:12
193:18 197:9,22
**understanding**
30:15 32:25 40:14
43:2 55:23 62:21
137:17 139:4
142:3,8,16 143:16
144:8 153:25
191:13,15,18
**understood**  140:5
**undertaken**  41:24
**unfortunately**
94:12
**union**  3:3
**unit**  7:3
**united**  1:1 7:10
140:25
**unofficially**
109:12
**unreasonable**  84:8
84:9,10,22 85:2
**unrelated**  111:18
**upwards**  33:6
**use**  44:22 68:6
104:18 106:20
108:23 113:9
120:16 126:12
127:18 128:1,4

135:16 154:14
165:1 186:24
188:8,23 207:19
207:19
**utilities**  14:18
**utility**  18:25 84:16
88:17 93:1,2,22

**v**

**v**  1:6 211:4 212:1
213:1
**various**  15:4,5
16:20 20:12 67:15
79:8 80:6 83:21
148:7 151:6
198:17
**vehicle**  188:24
**vendor**  24:13
101:17
**vendors**  24:17
86:9
**venture**  22:8
56:14 61:23
107:16 146:3
**ventures**  2:16 4:14
4:16 5:1,6,8,8,10
7:4 8:2,11 9:1,11
11:20 13:2 14:10
14:11,12,17,22,24
15:1,9,19,24 16:4
16:9,12,15 17:3,8
18:11,12,18,23
19:13,21,25 20:6,8
21:6,7,9,12,23
22:9 23:3,10,18,24
24:1,7,18 25:22,25
26:13,16,21,23
27:10 29:3,6,9,14
29:16,19 31:20,21
32:10 33:14,19
34:6,8,21 35:16
36:25 37:19 38:9

38:12,15 39:5,8,11
39:15,25 40:10,14
40:19 41:1,4,12,22
41:23 42:2,3,23
43:12,15,16,18,20
43:24 44:6,8,9,22
44:23 45:18,25
46:1,4,9,19,23
47:6,8,17,23 48:7
48:8,10 50:14,17
50:21,24 51:4
52:2,7,8,9,13,18
53:1,4,20,22 54:12
54:14,20,22 55:3,9
55:13,24 56:15,24
57:13 58:11 59:2
59:16 60:21 61:10
62:1,8,20 63:8,12
63:17,22 64:20,22
65:1,4,16,25 66:1
66:5,19,23 67:7,13
67:18,20 69:18
70:9 71:16,20,24
72:16 73:10,18
74:6 75:12 76:5
76:16 78:23,25
79:2,7,13,15 80:5
80:14 81:14 82:6
82:14,16 88:2,13
89:10 91:10,12,18
93:9,11 95:22
96:5 99:8 100:20
101:7,11,14,15,17
101:18 102:15,16
102:23 103:8
104:13,16,18,19
105:1,7,16,19,21
106:1,12,14,16,23
107:1,8,11,13,15
107:18,22 108:11
108:14,24 109:8

[ventures - way]                                                        Page 34

109:23 110:2,7,14
110:15,17,23
111:4,7,10 112:17
112:19,20,23
114:4,9 115:5,10
115:16 116:14,17
116:20 117:5,9
118:2,10 119:12
119:19 121:6,8,11
121:14,17,20,22
122:7,16,18,24
124:6,7,8,12
125:22 126:7,20
127:5,7 129:4
130:3,6,9,12,14
130:18,22,25
131:9,11,20,25
132:12,15,18,21
132:25 133:3,6,9
133:12 134:2,22
135:2 136:23
138:3 139:5,21
140:4,11 141:23
142:4,9,21,25
143:1,10,15,17
144:4,22 145:8
146:17,22,25
147:12,16 148:11
148:14,22 149:1,7
149:15,20,22
151:5,14,23
153:17 154:19,22
155:16 156:1,5,14
158:5,11,16,22,24
159:1,6,10,13,15
159:20,21,25
160:3,4,22 161:5
161:14,16 163:4,9
163:17 166:9,21
166:22 167:10,13
167:15,17,20,21

168:1,13,16 169:3
169:6,8,8,17
171:13 172:21
173:11,14 176:12
176:22,25 177:1,4
177:5,7,17 178:6
179:5,17,24 180:7
180:7,18,18
182:19 183:23
184:9,19 186:5,7
186:10 187:15,16
188:4,6,8,10,19,21
188:23 191:9,17
191:20,20 192:11
193:1,10,13,20
195:1 196:2,4,22
197:4,7,11,13,18
197:20,24 198:4,7
198:12,17,22
201:8,12,14,22
203:4,8,11 204:21
205:2,4,19 206:11
206:15,23 207:13
**ventures's** 15:24
22:13 27:19 34:14
34:15 35:2,20
36:5 43:3 47:13
51:24 54:23 55:15
57:22 58:15 60:25
69:19 71:11 72:1
72:4,7,15 105:2
106:20 108:23
109:5 110:16
111:1,3 113:25
117:20 122:21,25
126:5,21 129:13
129:15 130:1
131:3,8 142:18
161:8 163:12,14
165:8 167:22
168:11,15,18

169:14,18,23
178:20 179:22
181:16 184:13
189:11,12 191:15
192:2,22 197:3
201:9 207:2,5,10
**verbally** 10:10
**verify** 211:9
**veritext** 211:14,23
**veritext.com**
211:15
**versus** 7:8 67:7,8
104:23 132:1
137:13
**video** 7:3
**videographer** 3:16
7:1,15 49:14 50:7
50:10 70:20,24
71:2 118:18,21
160:10,13 204:14
204:17 208:19,23
**videotaped** 1:14
6:1 10:8
**view** 45:12 171:13
**virginia** 1:1 6:5
7:10 79:11 80:3,4
80:22,24,25 81:2
81:25 88:1,4,12,17
94:4,6 96:13 97:3
104:7 190:15,23
**virtually** 104:7
**visited** 45:22 96:2
**von** 57:7 59:5,21
59:22 60:8 62:16
64:24,25 150:5,6
154:12 156:23
167:18 207:8,12
207:21,22,23,24
**vonderharr** 95:3

|  | **w** |
|---|---|

**w** 16:18,22,25 25:7
**wait** 143:18 181:4
**waived** 6:7
**wall** 150:4
**waller** 3:3
**wallerlaw.com** 3:5
**want** 16:18 17:18
27:3 30:9 37:25
42:11 46:20 49:14
49:20,22,25 65:8
68:5,18 72:25
75:22 89:15 93:4
112:11 113:6
120:1 124:20
129:22 134:13
136:8 137:5 158:7
158:17 164:5
166:21 176:12,15
176:20 179:12
182:8 185:15
189:22 199:8,15
202:1
**wanted** 68:6 82:4
86:1 96:24
**wanting** 82:3
**wants** 103:24
**warehouse** 108:3
**warrant** 33:1
145:6
**washington** 2:5
**waste** 68:6
**watson** 2:8 3:8 8:6
8:6,9 133:10
208:15
**way** 19:16 27:13
28:15,18,21,25
29:1,1,4,23 39:24
40:4 65:9 77:8
83:8 87:11 94:11
95:20 99:25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

[way - zoom]                                                                    Page 35

101:16 103:9,25
126:16 137:12,15
138:2 165:4
173:10
**ways** 61:19
**wdc** 1:7 2:8 7:8
8:6 211:4 212:1
213:1
**we've** 19:23 51:15
62:7 66:7 101:16
125:11 126:4
148:25 176:24
190:8 202:8
208:10
**wearing** 67:14
**went** 43:25 135:19
162:16
**western** 170:20
**wether** 199:14
**whatsapp** 79:25
80:1
**whatsoever**
138:22 147:17
191:23
**white** 4:16 104:15
115:8,13,14 117:1
117:14,22 119:3
122:8,10 123:7,21
123:23 125:16
127:3,7 145:14,17
145:21,22,22,25
146:5,8,13 147:15
147:17 168:6
180:13,15 183:1
183:11 184:19,23
187:16 188:20
**willing** 20:14
155:15 163:19
166:15 170:1
177:20 195:6,9,10

**win** 83:9,11 108:8
**wire** 4:19 5:17
128:24 129:1,6,9
130:15,16,19
131:10 162:1
169:4 202:24
203:2
**wired** 35:21
**wiring** 203:9,22
**wish** 68:21 76:8
**withdraw** 137:6,8
150:12,15
**withdrawn** 34:8
**witness** 4:2 6:11
6:12 7:20 13:20
41:19 42:6,17
43:22 45:16 46:11
54:8,16 55:3,18
57:2,15 59:8,20
60:17 62:19 63:7
68:17 69:1,3
71:15 78:6,16,18
103:16 105:6
109:2,19 114:20
115:23 116:16
118:7 119:6
120:10 122:4
124:6 126:6
127:16 128:11,21
130:24 144:16
146:16 151:3
157:13 162:22
163:7 171:18
172:9 173:1 180:4
185:11 187:11
188:16 189:3
190:11,21 192:15
196:8 197:17
198:3,21 199:22
200:21 202:21
208:21 210:9,11

211:8,10,12,19
**witnesses** 127:21
**won** 83:14 87:6,11
**words** 104:2
106:15,19 107:8
168:10 172:19
192:25
**work** 19:19 20:9
26:21 27:1 29:6,8
29:9,16,19 41:14
44:23 51:4,5,8,11
55:14 56:4,8
60:12,13 82:23
88:2,7 91:12,18,25
93:25 96:16,20
97:4 102:22 103:1
103:7,13 104:12
104:15 105:23,24
106:4,11,12,14,17
106:21 114:2,8,13
114:23,24 115:1
116:24 121:14
138:22 142:23
143:17 145:17
146:9 147:10,12
148:8 153:13
154:9 155:8,12
156:2,24 165:24
166:1,4 167:18
204:7,21 205:8
**worked** 18:23
19:12 21:12,14
95:6 104:7
**working** 31:5 87:1
87:4 102:17,19
104:2 122:23
156:18 193:8
**works** 126:17
**world** 105:14
126:17 191:15

**worried** 83:17
**wp** 183:11
**written** 20:24 21:1
205:7
**wrong** 12:17 13:24

                y

**yeah** 10:14 13:5
18:22 22:25 35:8
38:24 39:24 40:13
49:9 55:18 106:6
109:7 111:8
183:16,18,21
207:15
**year** 26:16,18
57:11
**years** 100:18
**yep** 161:22
**yesterday** 8:24
9:22 10:6 24:24
45:1 65:18,20,21
65:22 68:1,11
99:17 112:5
124:22 166:12
177:16 181:13
185:17
**york** 20:4 102:4

                z

**zoom** 2:9,13,14,17
2:18,18,19 3:2,2,9
3:10 8:8,14,14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.