IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS et al., <br><br> Defendants. | CASE NO. 1:20-CV-484-RDA-IDD |
| 800 HOYT LLC, <br><br> Intervening Interpleader Plaintiff, Interpleader Counter-Defendant, <br><br> v. <br><br> BRIAN WATSON, WDC HOLDINGS, LLC, BW HOLDINGS, LLC, <br><br> Interpleader Defendants, <br><br> AMAZON.COM, INC., and AMAZON DATA SERVICES, INC., <br><br> Interpleader Defendants, Interpleader Counter-Plaintiffs. | |

**RECEIVER'S RESPONSE TO WATSON DEFENDANTS'
MOTION TO CLARIFY RECEIVERSHIP ORDER**

Mark A. Roberts (the "Receiver"), as receiver for WDC Holdings LLC dba Northstar Commercial Partners LLC ("WDC"), R. Brian Watson ("Mr. Watson" and together with WDC, the "Watson Defendants"), and their respective assets, pursuant to this Court's *Order Appointing Receiver and Ordering Turnover of Property to the Receiver* [Dkt. 433] (the "Receivership Order"), by and through undersigned counsel, respectfully submits this response to the *Watson Defendants' Motion to Clarify Order Appointing Receiver and Ordering Turnover of Property to the Receiver* [Dkt. 1083] (the "Motion").

**PRELIMINARY STATEMENT**

Less than three weeks after the Court entered its Order denying the Watson Defendants' motion to remove the Receiver [Dkt. 1075], the Watson Defendants have now filed a motion to "clarify" the Receivership Order, which does not actually seek any clarification but instead seeks to require the Receiver to make various payments and undertake various actions in a manner inconsistent with the discretion provided to the Receiver under the Receivership Order. The Motion—which contains several material factual misstatements as described below—is therefore in substance a renewed request for reconsideration of the Receivership Order based on various personal grievances of Mr. Watson and should be denied.[1]

Despite Mr. Watson's assertions to the contrary in the Motion, there is no great hardship in living on $12,000 in cash each month, particularly given the thousands of additional dollars paid each month by the Receiver above Mr. Watson's budget allocation to cover various other family obligations, insurance benefits, and personal expenses. Dkt. 1082 Ex A n. 3. Mr. Watson can readily address the additional personal expenses identified in the Motion, including vehicle repairs and gifts for his family, merely by reprioritizing his spending of his monthly budget amount. While Mr. Watson's current personal and legal situation requires him to make certain reasonable adjustments to the extraordinary spending behaviors he demonstrated prior to the receivership, Mr. Watson's claims of poverty under the present circumstances are not reasonable or credible. Moreover, the Motion is seemingly premised on the existence of some vast trove of liquid assets

---

[1] Notably, the Motion was filed without any pre-motion conference with the Receiver's counsel. Contrary to the suggestion in the Motion, undersigned counsel to the Receiver has never discussed the contents of the Motion or the Watson Defendants' requested "clarification" of the Receivership Order with counsel to the Watson Defendants. Mr. Watson routinely makes various demands on the Receiver, including certain of the requests set forth in the Motion, but neither the Watson Defendants nor their counsel advised the Receiver or his counsel that the Motion was forthcoming before it was filed.

available to satisfy all of Mr. Watson's various liabilities, which Mr. Watson insinuates the Receiver is unreasonably refusing to pay. But liquid assets to pay these liabilities do not exist, at least at present. As such, even if the Watson Defendants' requests were appropriate, the Receiver cannot fund all of Mr. Watson's numerous competing demands from cash that the Receiver does not have.

The Motion should be denied because (1) the specific relief requested regarding "clarification" of the Receiver's authority regarding liabilities and taxes is not necessary or appropriate, and (2) the Watson Defendants' demands for various payments and specific actions by the Receiver are not warranted under the circumstances. As a result of the Watson Defendants' prior financial mismanagement and obfuscations, the Court found them to be in civil contempt and delegated management of Mr. Watson's personal budget and financial affairs to the sound discretion of the Receiver in accordance with the Receivership Order. The Motion presents no basis for this Court to wade into granular disputes regarding these issues, particularly immediately after the Court just denied the Watson's Defendants' motion to remove the Receiver.

## BACKGROUND

After months of briefing and various hearings in connection with the Watson Defendants' failure to comply with this Court's preliminary injunction (the "Injunction"), on October 27, 2021, this Court entered its contempt order, finding the Watson Defendants to be in civil contempt by virtue of their willful and knowing failure to comply with the Injunction. Dkt. 413 ¶ 1. In furtherance of the contempt order, on November 23, 2021, the Court entered the Receivership Order, which appointed the Receiver—at the Watson Defendants' expense—for the express

purpose of preventing further irreparable harm to the plaintiffs and coercing the Watson Defendants' compliance with the Court's Injunction.[2] Dkt. 433 ¶ C. ¶ 1.

Since his appointment, the Receiver has managed various processes pursuant to the Receivership Order, including (i) conducting a forensic review of the Watson Defendants' cash spending during the pendency of the Injunction, (ii) avoiding dissipation of assets by requiring Mr. Watson to limit ongoing personal expenses in accordance with a monthly budget, (iii) preserving and/or monetizing various assets of the Watson Defendants and entities under their control, and (iv) addressing liabilities and other obligations of the Watson Defendants. These functions have required substantial activity by the Receiver and his professionals, particularly given the routinely vexatious and often abusive communications from Mr. Watson in response to the Receiver's efforts to fulfill the requirements of the Receivership Order.

As has been detailed in the Receiver's various Quarterly Reports, based upon the Receiver's work to date, the Court's rationale for appointment of a receiver to avoid irreparable harm and coerce compliance with the Injunction has been fully justified in light of the conduct of the Watson Defendants. For example:

- In the roughly eighteen (18) month period while the Injunction was pending prior to the Receiver's appointment, Mr. Watson personally spent approximately $3 million in cash, with substantial spending on luxury items including shopping, travel, vehicles, and construction of a multimillion ranch property, among other items. Dkt. 702 ¶¶ 12-16 and Ex C. These extraordinary expenditures are detailed in the Receiver's forensic analysis attached to the Receiver's Second Quarterly Report (the "Forensic Report"). *Id.*

- In October 2021, while the contempt motion was fully briefed and under advisement with the Court, Mr. Watson granted millions of dollars in liens to his preferred creditors, including his legal counsel in this action (Brownstein Hyatt) and his personal lender

---

[2] Plaintiffs filed the proposed form of the Receivership Order on November 3, 2021 [Dkt. 416], and this proposed order remained pending on the docket—without any objection or request for modification or clarification concerning Mr. Watson's budget or otherwise—for nearly three weeks before entry by the Court on November 23, 2021.

4

(FirsTier Bank), all without disclosing such transactions to the Court or other parties. These transactions encumbered cash equity that would otherwise have been available to satisfy the Injunction and other liabilities. *See* Dkt. 495 ¶ 8 (describing lien grants).

- Immediately after the Receiver's appointment, Mr. Watson sought to sell his primary residence for a price in excess of $8 million without approval or involvement of the Receiver or the Court. Only after the Receiver obtained further Court confirmation of his authority did Mr. Watson relent. Dkt. 446.

- During the pendency of the Receivership, Mr. Watson has proved unable to appropriately manage his personal expenses, even with a $12,000/month cash budget that is regularly supplemented by thousands of dollars in additional amounts paid directly by the Receiver to fund litigation-related travel, family expenses, insurance costs, and other personal expenses. *See, e.g.*, Dkt. 702 ¶¶ 17-20.

Over the course of the receivership, it has become apparent to the Receiver that Mr. Watson would likely dissipate any assets in his possession absent the existence of the receivership. Dkt. 1082 ¶ 24. Against this backdrop, and on the heels of the Court's denial of the prior motion to remove the Receiver, the Watson Defendants filed their Motion seeking various "clarifications" and asking the Court to require the Receiver to fund various expenses. Each of these requests should be denied.

## ARGUMENT

### A. The Receiver Lacks Resources to Defend and/or Satisfy Third-Party Litigation Demands and Collection Actions.

As the Watson Defendants note in Section II.A of the Motion, various creditors and contract counterparties have asserted claims against the Watson Defendants. This is not a new development, and the Receiver has regularly disclosed these liabilities in the Receiver's Quarterly Reports, noting that such creditors are stayed by operation of the Receivership Order from pursuing collection of receivership assets. *See, e.g.*, Dkt. 495 ¶ 11; Dkt. 702 ¶ 11; Dkt. 898 ¶ 9; Dkt. 1082 ¶ 10. While the Watson Defendants suggest that the Receiver should now be required to take immediate action to defend these various claims in courts around the country where such claims

are asserted, the Receiver has at all times addressed these claims appropriately, including to limit Mr. Watson's guaranty liabilities wherever possible and to rely on the stay in the Receivership Order where pursuit of litigation would not justify the use of limited receivership assets.[3]

As the Receiver's Quarterly Reports have detailed, Mr. Watson currently lacks liquid assets to pay ongoing expenses. Dkt. 1082 ¶ 8. Undertaking the additional costs and burdens associated with actively defending various stayed guaranty and collection actions across the country is not practicable or beneficial. Likewise, contrary to the Watson Defendants' suggestion in the Motion, paying millions of dollars to satisfy Mr. Watson's underlying liability on account of such asserted claims—whether by settlement or upon judgment—is even further outside the realm of possibility. Under the current circumstances, the Receiver is appropriately managing all of these litigation matters to limit expense and liability in accordance with the Receivership Order.

The Motion seeks entry of a proposed order that, with respect to these pending claims against Mr. Watson, "authorizes the Receiver to respond substantively to lawsuits and other demands" and suggests that paying off such amounts is required to meet the obligation of "preserving the Watson Defendants' assets." *See* Dkt. 1083 Ex. A (proposed order). No "clarification" is required regarding the Receiver's authority. The Receiver is already expressly authorized to address these claims as he deems appropriate. Dkt. 433 ¶ 5(j)(f) (authorizing Receiver to defend, settle, and/or adjust disputes and claims relating to the receivership assets).

---

[3] Where feasible, the Receiver has sought to remove Mr. Watson's liability as guarantor in connection with asset dispositions. To that end, the Receiver is presently working with the intervening lender for 77 Sugar Creek, LLC to release Mr. Watson's personal loan guaranty in connection with loan foreclosure. Dkt. 1068 p. 6. Likewise, the Receiver has negotiated for the release of Mr. Watson's personal guaranty in connection with the proposed sale of the NCP 1221 Broadway, LLC interest [Dkt. 1034 ¶ 11], where the loan is currently in default, though Mr. Watson has objected to the Receiver's sale motion [Dkt. 1066], thereby putting greater pressure on his own guaranty. The action against Mr. Watson relating to the Vista Gardens guaranty, as referenced in the Motion, remains stayed, which only benefits Mr. Watson by potentially allowing other assets or value to reduce the lender's demand before collection is sought. There is no value in accelerating litigation involving these and the other liabilities referenced in the Motion.

And contrary to the Watson Defendants' assertion, using the limited funds of the receivership to satisfy the underlying liability in various stayed litigation matters around the country, whether by settlement or upon judgment, is not a reasonable or beneficial use of the Receiver's constrained resources, nor is it consistent with preserving the Watson Defendants' assets in accordance with the purpose of the Receivership Order.

### B. The Watson Defendants' Description of Injunction-Period Spending Is Incorrect.

The Motion claims that the Receiver "made misleading statements" in a recent filing regarding Mr. Watson's use of $3 million during the pendency of the Injunction. According to the Watson Defendants, the Receiver's statement was misleading because:

> [A]pproximately $2,843,308 of that $3 million was paid to Mr. Stephen Tebo, a secured creditor, as a required loan repayment for a $5 million loan provided to the Watson Defendants prior to the Amazon's present suit. In fact, this money was never even in the Watson Defendants' possession as it was paid directly to Mr. Tebo by each of the title companies upon the sale of several assets. ***Thus, the Watson Defendants only received approximately $156,691 of the $3 million. Indeed, the net $156,691 that the Watson Defendants Received during that 18-month period amounted to less per month than the current $12,000 monthly stipend the Receiver approved for Mr. Watson's living expenses when he was appointed in November 2021***.

Dkt. 1083 pp. 3-4 (emphasis added).

This statement is remarkable for several reasons. First of all, the Receiver's filing that referenced $3 million in spending specifically referred to the Receiver's Forensic Report as support for the Receiver's statement. Dkt. 1074 p. 5 (citing Dkt. 702 ¶ 15). The Forensic Report provides a detailed description of Mr. Watson's spending over the Injunction period based on a review of Mr. Watson's payment activity from cash accounts under his control. Dkt. 702 Ex. C. ***To be very clear, Mr. Watson did not, as he flatly asserts in the Motion, live on less than $160,000 over the entirety of the 18-month Injunction period.*** Instead, as detailed in the Forensic Report, ***Mr. Watson personally spent more than $160,000 <u>on luxury shopping alone</u> (Louis Vuitton, Gucci,***

7

*and Prada) during this period*. *Id.* at Ex. C, p. 13. Indeed, during the Injunction period, Mr. Watson personally spent $200,000 on furniture and artwork, spent over $76,000 on luxury car payments, and spent over $50,000 on vacations to Miami, Honolulu, Los Angeles, and Las Vegas. WDC and Mr. Watson's other entities spent millions more during this period. *Id.* ¶ 15 and Ex. C. Mr. Watson's remarkable assertion of frugality during the pendency of the Injunction is simply not true.[4]

If anything, Mr. Watson's disclosure that he paid *an additional* $2.8 million to Mr. Tebo during the pendency of the Injunction—all apparently via transfers directly from title agents in connection with asset sales by his different entities as described in the Motion—only further highlights Mr. Watson's use of financial machinations during this period to avoid meeting his obligations under the Injunction. This Court had ordered Mr. Watson to satisfy his obligations under the Injunction, yet Mr. Watson admits that he engineered the liquidation of assets and repayment of *other* obligations instead of paying the Injunction, all through transfers that showed no cash activity in his bank statements that were provided to the Receiver. Accordingly, the $2.8 million payment described by the Watson Defendants only serves as further evidence of the Watson Defendants' asset dissipation, seemingly in violation of the Injunction, which ultimately was the basis for the Court's finding of civil contempt and the appointment of the Receiver in the first instance. Such dissipation is not evidence of the Watson Defendants' financial stewardship that could warrant deference to Mr. Watson's financial decision-making over the professional judgment of the Receiver.

---

[4] It is not reasonable to believe Mr. Watson simply forgot about his millions of dollars in spending on luxury goods and travel during the Injunction period, particularly when the Forensic Report was specifically cited by the Receiver in the filing that the Watson Defendants reference. Mr. Watson's assertion in the Motion that he lived on less than $12,000/month during this 18-month Injunction period is frankly inexplicable.

### C. The Receiver Previously Addressed Mr. Watson's Vehicle Situation.

Mr. Watson also claims the Receiver has not communicated to Mr. Watson regarding his request to purchase a replacement vehicle that he could operate as a ride-share driver. This again is incorrect, as the Receiver addressed this issue specifically with Mr. Watson. Mr. Watson simply did not like the answer he received from the Receiver. As the Receiver advised, Mr. Watson is free to work as a ride-share driver (or in another occupation) if he so chooses, but the Receiver will not allocate additional amounts to fund the purchase of a vehicle for this purpose.

Mr. Watson has requested that the Receiver arrange the purchase of a used Tesla Model S, a luxury vehicle that generally retails (new) for over $100,000. Just a few months ago, however, at Mr. Watson's request, the Receiver spent many hours working to procure a reasonable non-luxury vehicle for Mr. Watson. After Mr. Watson expressed dissatisfaction with the options presented by the Receiver, the Receiver ultimately allotted roughly $15,000 for Mr. Watson to acquire on his own a non-luxury vehicle for his personal use (with any additional amounts for financing payable from Mr. Watson's personal budget). Instead of using these funds to purchase a reliable vehicle, however, Mr. Watson unilaterally chose to purchase a Land Rover with extremely high mileage for $7,800. After purchasing this vehicle, Mr. Watson then promptly requested an additional $15,000 to $20,000 from the Receiver to enable Mr. Watson to acquire a second vehicle, an antique Chevy pickup truck from the 1940s that Mr. Watson could use "as a back-up vehicle in case the Land Rover breaks down." The Receiver refused this arrangement but permitted Mr. Watson to use the remaining amounts from the funds initially allotted for a vehicle (over $7,000) for repairs to the Land Rover.

Only a few months after this lengthy and contentious process of acquiring the Land Rover, Mr. Watson now contends that the Land Lover he unilaterally selected and purchased is

inadequate. Given the substantial resources already spent in the process of obtaining a prior vehicle, the Receiver has advised Mr. Watson that the Receiver is unwilling to revisit the process of purchasing a new vehicle for Mr. Watson. And certainly, as Mr. Watson has been told many times before, the Receiver is unwilling to procure a luxury vehicle—such as a Tesla Model S—for Mr. Watson under the current circumstances.

As to funding for the requested vehicle repairs for the Land Rover, as noted above, Mr. Watson was previously allotted over $7,000 for vehicle repairs to his Land Rover. After repairing the vehicle's windshield for a few hundred dollars, however, Mr. Watson used the remaining funds for other personal expenses, leaving him now without the funding previously set aside for vehicle repairs. Given these circumstances, Mr. Watson is free to use some portion of his monthly budget to fund appropriate vehicle repairs, but additional funds are not available. Routine vehicle expenses are precisely the type of personal expense that fall within Mr. Watson's monthly budget amount. For the reasons stated above, Mr. Watson's current vehicle situation is very much a result of his own decision-making, and the Receiver does not believe it is appropriate to set aside additional funding or utilize additional resources to revisit these issues.

**D. The Receiver Has Sole Discretion and Authority to Manage Mr. Watson's Budget.**

In the Motion, the Watson Defendants assert that "Mr. Watson is owed assurance that his stipend from the Receiver will continue" and requests clarification that "[a]ny amounts earned by Mr. Watson's ride share efforts should not be deposited into the Receivership estate or have any impact on his monthly stipend." Dkt 1083 p. 8.

Mr. Watson does not have an unqualified right to $12,000 in cash every month to pay his personal expenses on top of whatever additional cash may come into his or the Receiver's possession. Under the Receivership Order, all assets of Mr. Watson are subject to the control of

10

the Receiver, and Mr. Watson's budget is subject at all times to the availability of resources and the terms of the Receivership Order.  If Mr. Watson earns additional amounts through employment, the Receiver has advised Mr. Watson that he would expand Mr. Watson's budget to reflect such additional net cash flow, but the Receiver does not agree that all earnings of Mr. Watson somehow fall outside of the Receivership Order and may be spent by Mr. Watson without the Receiver's knowledge or oversight. To allow such request would undermine the purpose and function of the Receivership Order.

### E.  The Receiver Has Appropriately Addressed the Watson Defendants' Tax Matters.

Mr. Watson complains that he did not receive a draft of his 2021 personal tax returns until October 14, 2022, the day before they were due (after extension).  That is factually correct, but the Watson Defendants neglect to mention that the Receiver also received these draft returns for the first time on that very same day.  As soon as the Receiver received copies of the draft returns, the Receiver shared them with Mr. Watson and requested any comments.

Because the Receiver was appointed only at the end of the year in 2021 (November 23, 2021), the Receiver specifically invited Mr. Watson to participate in the preparation of his personal 2021 tax returns, instructing him to work directly with the accountants.  *See* Email dated February 4, 2022, from Receiver's counsel to Mr. Watson's counsel (attached hereto as Exhibit A).  Mr. Watson declined to participate, however, leaving the Receiver and Mr. Watson's accountants to prepare the 2021 returns without Mr. Watson's substantive involvement, even though most activity pre-dated the Receiver's appointment.  Nevertheless, all returns were prepared and submitted to taxing authorities by the Receiver on or before the applicable deadlines.  Mr. Watson continues to

have the opportunity to review the returns, and if any additional material information is identified that affects the tax obligations, the Receiver will file amendments to the filed returns as warranted.[5]

Under the terms of the Receivership Order, the Receiver is entitled to satisfy the administrative expenses of the receivership process, including payment of professional fees (or reimbursement if paid from another source), as well as the other obligations required under the Receivership Order, including payment of the Injunction amount into the Court in the event assets become available. No tax liens have been filed. Notably, while Mr. Watson complains about the accrual and/or payment of professional fees of the Receiver, Mr. Watson does not suggest that the Receiver should fund tax liabilities before paying Mr. Watson's own monthly budget amount, paying the Watson Defendants' own separate professionals in this and other litigation matters, or even paying off the creditors asserting competing claims for pre-receivership liabilities that the Motion asks the Receiver to satisfy. In other words, Mr. Watson wants to selectively prioritize payment of his own preferred expenses and liabilities ahead of the payment of the costs of the receivership process and the Injunction, but doing so is not consistent with the Court's contempt order and Receivership Order. Moreover, as the Receiver has noted previously in his Quarterly Reports, a substantial portion of the fees incurred by the Receiver and his professionals relates directly to addressing Mr. Watson's various demands and threats. Indeed, the Receiver's obligation to prepare a response to this Motion—filed by the Watson Defendants without even

---

[5] Mr. Watson claims that the Receiver has "elected not to pay" the $900,000 in tax liabilities owed under Mr. Watson's 2020 federal and state tax returns, all of which arose and became due prior to the Receiver's appointment. Mr. Watson, while spending millions of dollars in 2020 and 2021, never said aside or paid to the IRS even a single dollar as an estimated tax payment for such obligations. While the Receiver does generally agree that unencumbered cash may be used to fund tax liabilities, subject to payment of administrative expenses and obligations under the Receivership Order, there are insufficient assets available to pay such obligations at this time.

conferring with the Receiver's counsel before filing—is yet another example of expense caused by the Watson Defendants' own actions. The Motion should be denied.

WHEREFORE, the Receiver respectfully requests that the Court deny the Motion and grant the Receiver such other and further relief as the Court deems just and proper.

Dated: November 11, 2022                    Respectfully submitted,

                                                    /s/ *Aaron G. McCollough*
Aaron G. McCollough (VSB 72146)
McGuireWoods LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
Tel.: (312) 849-8256
Fax: (312) 698-4522
amccollough@mcguirewoods.com
    -and-
Joseph S. Sheerin (VSB 47400)
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219-3916
Tel.: (804) 775-1135
Fax: (804) 698-2076
jsheerin@mcguirewoods.com

*Attorneys for the Receiver*

**Certificate of Service**

I HEREBY CERTIFY that, on November 11, 2022, I caused the RECEIVER'S RESPONSE TO WATSON DEFENDANTS' MOTION TO CLARIFY ORDER APPOINTING RECEIVER AND ORDERING TURNOVER OF PROPERTY to be electronically filed and served using the CM/ECF System, which will transmit a Notice of Electronic Filing to counsel of record.

      /s/ *Aaron G. McCollough*
      Aaron G. McCollough