**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| AMAZON.COM, INC. and AMAZON DATA SERVICES, INC., | |
| Plaintiffs, | |
| v. | |
| WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE SOLUTIONS LLC; CTBSRM, INC.; RODNEY ATHERTON; DEMETRIUS VON LACEY; RENRETS LLC, | CASE NO. 1:20-CV-484-RDA-IDD |
| Defendants. | |
| 800 HOYT LLC, | |
| Intervening Interpleader Plaintiff, Intervening Interpleader Counter-Defendant, | |
| v. | |
| BRIAN WATSON; WDC HOLDINGS, LLC; BW HOLDINGS, LLC, | |
| Interpleader Defendants, | |
| and | |
| AMAZON.COM, INC., and AMAZON DATA SERVICES, INC., | |
| Interpleader Defendants, Interpleader Counter-Plaintiffs. | |

**PLAINTIFFS' RESPONSE TO WATSON DEFENDANTS' MOTION TO CLARIFY**
**ORDER APPOINTING RECEIVER AND ORDERING TURNOVER OF PROPERTY**
**TO RECEIVER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .............................................................................................1

RELEVANT BACKGROUND ..............................................................................................3

LEGAL STANDARD ............................................................................................................7

ARGUMENT .........................................................................................................................7

    I.     THE RECEIVERSHIP ORDER DOES NOT REQUIRE "CLARIFICATION" ...........8

        A.    The Receivership Order's Payment Priorities Are Clear ........................................8

        B.    The Order's Provisions on Investment Defaults and Other Suits Are Also
            Clear .....................................................................................................................10

    II.    THE RELIEF DEFENDANTS SEEK WOULD BE IMPROPER EVEN IF
       THE      RECEIVERSHIP ORDER WAS NOT CLEAR ...........................................11

        A.    Any Ambiguity in the Receivership Order Must Be Resolved Against the
            "Clarifications" Defendants Seek ........................................................................12

        B.    Recent Discovery Has Substantiated Amazon's Claims to an Extent That
            Supports Both the Receivership and the Preclusion Remedies the Contempt
            Order Reserved .....................................................................................................14

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*ACA Fin. Guar. Corp. v. City of Buena Vista,*
    298 F. Supp. 3d 834 (Va. 2018) ..............................................................................7

*Amazon.com, Inc. v. WDC Holdings LLC,*
    2021 WL 3878403 (4th Cir. Aug. 31, 2021) ................................................ 14, 19

*Axiom Res. Mgmt. Inc. v. Alfotech Sols., LLC,*
    2011 WL 2560096 (E.D. Va. June 3, 2011), *adopted by* 2011 WL 2559806
    (E.D. Va. June 27, 2011) .........................................................................................19

*Brooks Sports, Inc. v. Anta (China) Co.,*
    2018 WL 7488924 (E.D. Va. Nov. 30, 2018) ......................................................19

*CFTC v. Forefront Invs. Corp.,*
    2007 WL 2437413 (E.D. Va. Aug. 22, 2007) ........................................................4

*Fed. Nat'l Mortg. Ass'n v. CG Bellkor, LLC,*
    2013 WL 12148279 (E.D. Va. Mar. 18, 2013) ......................................................4

*Gilchrist v. Gen. Elec. Capital Corp.,*
    262 F.3d 295 (4th Cir. 2001) ...................................................................................7

*Regal Knitwear Co. v. Nat'l Labor Rel. Bd.,*
    324 U.S. 9 (1945) ....................................................................................................12

*Salinas v. United States,*
    522 U.S. 52 (1997) ..................................................................................................17

*United States v. Mescall,*
    624 F. App'x 103 (4th Cir. 2015) ...........................................................................4

**STATUTES**

11 U.S.C. § 503...........................................................................................................12

11 U.S.C. § 507...........................................................................................................12

11 U.S.C. § 523(a)(2) .................................................................................................11

**OTHER AUTHORITIES**

Securities & Exchange Commission, "Investor Bulletin: 10 Things to Know About Receivers"
   (Aug. 27, 2015), https://www.sec.gov/oiea/investor-alerts-
   bulletins/ib_receivers#:~:text=A%20federal%20district%20court%20judge,receiver%20in%
   20a%20particular%20case ................................................................................................... 12

**RULES**

Fed. R. Civ. P. 66 ............................................................................................................... 7, 18

Plaintiffs Amazon.com Inc. and Amazon Data Services, Inc. (collectively "Amazon") hereby respectfully respond to the Watson Defendants'[1] latest challenge to the Court's November 23, 2021 Receivership Order.  Dkts. 1083 ("Motion"); 433 ("Receivership Order").

## PRELIMINARY STATEMENT

Defendants' Motion, styled as a request for "clarification," seeks to undo the receivership this Court ordered as a remedy for their "willful civil contempt" of the injunction affirmed last year.  Dkts. 413; 319.  The Court has denied Defendants' requests for such relief several times, including just last month.  Dkts. 412, 1075.  It should also deny the current Motion, which seeks to circumvent those rulings by depleting the assets the Receiver is administering (the "Assets") and unseating the Receiver before trial this spring.

As detailed below, the Motion is based on factual misrepresentations the record conclusively refutes.  Dkt. 1087.  The debts and suits the motion describes are not new.  They arise out of Watson's decision to squander assets on kickbacks and personal luxuries rather than comply with this Court's orders or his tax, business, and investor obligations.  Procedures for addressing these obligations were litigated and prescribed in the Receivership Order last year.  Dkt. 433.  The Motion provides no factual basis for revisiting them.  Dkt. 1087.  And the relief it seeks would violate the legal standard set forth in Defendants' own motion.  As Defendants concede, the "purpose of a motion for clarification is to explain or clarify something ambiguous or vague, not to alter or amend."  Mot. 5.  The payment provisions of the Receivership Order are clear.  They prioritize secured creditor, receivership, and injunction payments over the personal expenses and unsecured debts the Motion describes.  And Defendants' request to reverse these priorities, Mot.

---

[1] Unless otherwise noted, references to "Defendants" or "Watson Defendants" include Brian Watson, WDC Holdings LLC d/b/a Northstar Commercial Partners ("Northstar"), Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager.  Dkt. 1083.

6, would "alter or amend"—not "clarify"—the Order.  Mot. 5.  Indeed, requiring the Receiver to "prioritize" resolving other "legal actions" and paying Watson's "stipend" and personal expenses (including admittedly delinquent pre-receivership taxes, Dkt. 1091 at 6) ahead of Defendants' obligations to this Court, Mot. 6, would violate all of this Court's prior orders and the Fourth Circuit's appellate mandate.

This result would be particularly inequitable because the Receiver has properly discharged his duties notwithstanding Defendants' obstruction and the April dissolution motion the Court just denied.  Dkt. 1075.  In that motion, Defendants asked the Court to hold that the Assets have been depleted to such a degree that the injunction and receivership should be dissolved as futile.  Dkt. 1073.  The Court denied this request after the Receiver explained that the Assets could generate meaningful future revenue with continued management, and Amazon advanced the fees necessary for the Receiver to continue his work.  Dkt. 1075.  Through their current motion, Defendants seek to end-run this decision by requesting payments that would consume the remaining Asset value the Court's rulings protect.  This history further confirms that the Motion is an admittedly improper request to "alter or amend" (not "clarify") the Order.  Mot. 5.

Defendants' only response is that the order itself is inequitable because it is based on "false" claims and "unsubstantiated allegations."  Mot. 7; Dkt. 1091 at 2–3.  The Court has repeatedly rejected these claims, which Defendants did not raise with Amazon or the Receiver before filing their Motion.  That is not surprising, because the record is even worse for Defendants now than it was earlier in the case.  As detailed below, recent discovery has further substantiated Amazon's allegations and exposed several of Defendants' positions—including certain sworn statements to this Court—as knowingly false.  Accordingly, the Court should not just deny the Motion and assess costs against defense counsel for filing it without a Rule 7 conference.  It should entertain the preclusion remedies the contempt order reserved for the situation the Motion now

describes:  a situation in which "Defendants' civil contempt for the Court's prior orders is not"—

and according to Defendants cannot be—"fully purged by" the receivership.  Dkt. 413 ¶ 4.

## RELEVANT BACKGROUND

The details of Defendants' kickback scheme are set forth in Amazon's complaint, Dkt. 765,

and other submissions and rulings.  *See* Dkts. 10, 12, 41, 43, 46, 59, 99, 150, 318.  The discovery

misconduct and injunction contempt giving rise to the Receivership Order, Dkt. 433, is also

detailed in multiple submissions and rulings.[2]  As relevant here, the Court found Defendants in

"willful civil contempt" of the injunction because, even after it was affirmed on appeal, they

diverted assets and spent millions of dollars on "personal expenses" and "other creditors" with "no

funds used or earmarked for satisfaction of" the injunction's judgment security provisions.  Dkt.

702-3 at 5; *see also* Dkts. 284 at 9; 286-13 at 2; 310-2, 310-3, 349, 413.[3]  The Court appointed the

Receiver to stop this financial misconduct (which he has done[4]) and manage Defendants' assets in

accordance with this Court's rulings and demands from third parties (which now include the IRS

---

[2] *See, e.g.*, Dkts. 95; 190; 193-9; 231; 284 at 9; 286-13 at 2; 302; 310-2; 310-3; 318; 330; 413; 702, 702-3; 786; 992 at 3; 992-2 at 3.

[3] The record shows that from the time the injunction was entered until the Receiver was appointed, Watson spent "approximately $3 million" on personal expenses, including a Range Rover and Mercedes S-class, high-end shopping, artwork, trips to Hawaii and Aspen, and preferential payments to personal creditors.  Dkts. 702, 702-3, 992 at 3, 992-2 at 3.  The Motion's attempt to recharacterize these expenditures is baseless, *accord* Dkt. 1087 at 7–12, and evidence of injunction contempt beyond what Defendants have already admitted, *see id.* at 8.  As Defendants explained in their depositions, they had funds available for injunction compliance.  They simply chose to spend them shopping at Louis Vuitton and taking vacations.  Ex. 1 (WDC Dep. Tr.) at 327:22–328:5.

[4] *See, e.g.*, Dkts. 702-3; 446; 440 ¶ 2, 495 ¶ 8, 702, 768, 786 at 10.

and SEC[5]).  *See, e.g.*, Dkt. 898 at 6 (documenting Defendants' continued requests for "funding of matters [that] are not consistent with" the Court's orders).[6]

  ***The Receivership Order.***  Under this Court's precedents, Defendants' injunction contempt supported a wide variety of remedies, from fines and receivership through default judgment or other forms of preclusion.  *See* Dkts. 348 at 2224 & n.15; 283–84, 296, 308, 324, 330.  To protect the many judicial and private interests in Defendants' assets, the Court opted to appoint a professional to manage the assets "with the full power of an equity receiver and at Defendants' expense" pursuant to 28 U.S.C. § 754 and Federal Rule of Civil Procedure 66.  Dkt. 433 at 2.  Such receiverships are common where, as here, litigation demonstrates a party's refusal to comply with injunction relief ordered to preserve assets for trial.  *See, e.g.*, *Fed. Nat'l Mortg. Ass'n v. CG Bellkor, LLC*, 2013 WL 12148279, at *5 (E.D. Va. Mar. 18, 2013); *United States v. Mescall*, 624 F. App'x 103, 103 (4th Cir. 2015); *CFTC v. Forefront Invs. Corp.*, 2007 WL 2437413, at *2 (E.D. Va. Aug. 22, 2007).

  The Receiver's authority and obligations with respect to the assets in this case are detailed in the Receivership Order.  Dkt. 433.  As relevant here, the order:

 i. Defines the "Assets" under management to "include all of the Defendants' assets, including proceeds," as well as all other "rights" and "claims or causes of action,"[7] Dkt. 433 ¶ 2;

---

[5]  In August 2022, the SEC filed a federal complaint alleging that Defendants committed securities fraud by "rais[ing] approximately $49.5 million from at least 350 investors" by "falsely promising that [he and Northstar] would invest their own money alongside that of other investors."  *U.S. Sec. & Exch. Comm'n v. Watson*, No. 1:22-cv-2147, ECF No. 1 at 1, 2 (D. Colo. Aug. 22, 2022).

[6]  For example, after spending half of one quarterly $36,000 budget on luxury car payments and other personal expenses, *id.* at 8, Watson "issued direct threats of litigation against the Receiver to persuade the Receiver to pay additional personal items, including credit cards, pre-Receivership debts, and other expenses inconsistent with the Receivership Order."  *Id.*

[7]  This language covers the $70 million claims Defendants are pursuing against their former equity partner in Delaware litigation that has been stayed pending the outcome of this suit.  Compl., *W.D.C. Holdings, et al. v. IPI Partners, LLC, et al.*, C.A. No. 2020-1026-JTL (Del Ch. Dec. 2, 2020).

ii.   Authorizes the Receiver to "take any actions he deems necessary to the proper and lawful discharge of his responsibilities," *id.* ¶ 5, including in "any actions or proceedings in [other] tribunals . . . as the Receiver may in his sole discretion deem advisable," *id.* ¶ 12;

iii.  "[E]njoin[s]" Defendants from "disposing of, or otherwise impairing any Asset" or "agreement related to the Assets without the express written consent of the Receiver," or from "obstructing, or preventing in any way, the Receiver's actions," *id.* ¶ 6(a)-(c);

iv.   "[E]njoin[s]" third parties from interfering with the Receiver's discharge of his duties, including his authority "to defend, compromise and adjust any actions," *id.* ¶¶ 11–12; and

v.    Mandates that the "Receiver and his [staff] shall be compensated, without further order of this Court, for services at their standard hourly rates, plus reimbursement of all reasonable and necessary out-of-pocket expenses" from "the Assets," *id.* ¶ 17.

   ***Defendants' Ongoing Contempt.***   Defendants' contempt of this Court's orders has continued throughout the receivership.  As detailed in the Receiver's filings, Defendants have tried to dispose of multi-million dollar assets behind the Receiver's back.  Dkts. 446, 1087 at 4–5. And they have demanded his approval of many improper "personal expenses" beyond the parameters in the Order.  Dkt. 433 ¶ 5(c); Dkt. 702 ¶ 19.  The Receiver's filings provide countless examples of these abuses, *see* Dkts. 702 ¶ 19; 786; 898 ¶ 10; 992 at 8; 1000; 1082; 1087, which have "resulted in a substantial drain of time and resources of the Receiver and his professionals," and increased the receivership costs that must be paid from the injunction Assets.  Dkt. 702 ¶ 20. The current record thus confirms that Defendants cannot be trusted to manage the Assets in accordance with the Court's orders.  *See* Dkts. 433 ¶ 9; 768 ¶ 6;  992-2, at 1–2; 898 ¶ 10.[8]

   ***Defendants' Prior Motions.***   Defendants' legal attacks on the injunction and receivership have escalated in parallel with their efforts to plunder the Assets.  In April of this year, they argued that the Assets' diminished value (which resulted primarily from their contempt) required

---

[8] In April the Receiver reported that Watson had "sent more than 1,200 emails to the Receiver and his professionals during the First and Second Reporting Periods (averaging more than one dozen emails each business day), a substantial portion of which include demands for payment and/or express or implied threats" that Watson "will pursue damages from the Receiver."  Dkt. 702 ¶ 19.

5

dissolution of the injunction and receivership as futile. *See* Dkt. 696. Amazon and the Receiver rebutted these arguments, Dkts. 702; 786; 898; 1000, and took steps to protect the Assets while Defendants' April motion was pending. These efforts were necessary because the relatively illiquid nature of the Assets prevented them from generating cash flow sufficient to cover all of the receivership costs due on October 31, Dkt. 898 ¶¶ 16–17, and this deficiency could have forced the Receiver to resign under Paragraph 18 of the Order, Dkt. 433 ¶ 18. To avoid this outcome and the resulting harm to judicial and creditor interests, Amazon advanced certain fees under Paragraph 17 of the Order so the Receiver could continue working to secure "value from potentially forthcoming transactions," Dkt. 1082 ¶ 24, and otherwise manage the estate in accordance with the Court's rulings, Dkt. 433 ¶¶ 5, 17-18. On October 14, the Court reaffirmed those rulings when it denied Defendants' motion and held that the law and "injunction record as it stands continues to support" the Court's prior orders. Dkt. 1075 at 8.

     ***The Current Record***. The record now is far worse for Defendants than it was when they filed the April motion, Dkt. 695, the Court denied last month, Dkt. 1075. Their co-conspirators have admitted in signed written statements and audio recordings that they took kickback payments from Defendants. Forensic evidence and financial records link those payments to Defendants and show that they were unjustly enriched by at least the amount of the injunction. And as detailed below, Defendants' own depositions and documents have eviscerated their claim that they did not know their "referral" payments were buying influence from their co-defendants who managed the Amazon transactions at issue in this suit. *See* Part II *infra*. This discovery does not merely foreclose their claim that the receivership is based on "unsubstantiated allegations." Mot. 7. It reveals that many of the positions Defendants have taken in this case—including several sworn statements to the Court—were knowingly false. *See* Part II.B *infra*.

***The Current Motion.***   Undeterred by the Court's October 14 ruling, Defendants' Motion charts a backdoor course to the same relief the Court just denied.  It seeks an order allowing them to divert limited Asset value to Defendants' personal expenses before the overwhelming record against them results in an executable judgment.   Granting such relief would reward their contempt—and irreparably harm all of the interests the injunction and appellate mandate protect— just months before trial.  Defendants did not even attempt to obtain a position from Amazon on this procedurally improper and baseless request before they filed their Motion.

## LEGAL STANDARD

As noted, Defendants concede that the purpose of a motion for clarification is to "explain or clarify something ambiguous or vague" in an existing order, "not to alter or amend" it.  Mot. 5. Their Motion must therefore be judged against the text and purpose of the Receivership Order it seeks to "clarify."   That order was entered pursuant to the Court's "equity power" to "appoint receivers and to administer receiverships," *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 302 (4th Cir. 2001), to enforce an injunction with which Defendants "demonstrated that [they] cannot or will not comply."  2 Fed. R. Civ. P., Rules and Commentary Rule 66; *see ACA Fin. Guar. Corp. v. City of Buena Vista*, 298 F. Supp. 3d 834, 847 (W.D. Va. 2018); Fed. R. Civ. P. 66. That underlying injunction was "affirmed on appeal." Dkt. 1075 at 7.  And the Court held last month that "the injunction record as it stands continues to support" its requirements for asset security. Dkt. 1075 at 8.  Defendants admit their Motion cannot alter these rulings.  Defendants can only seek "clarifications" that accord with them.  The Motion violates all of these standards.

## ARGUMENT

The Motion fails, first and foremost, because the relevant provisions of the Receivership Order are clear, and simply do not permit the Asset allocations Defendants request.  The Motion also fails because, even if the Receivership Order were ambiguous, the relief Defendants seek

would violate—not clarify—the order. And Defendants' only response—that the Court should disregard these dispositive points because the order is based on "false" and "unsubstantiated allegations," Mot. 5, 7; Dkt. 1091 at 2–3—is so meritless they did not even request a position on it before they filed. As the Court reaffirmed last month, Amazon's claims have been substantiated since the start of this case, and their likelihood of success is now backed by a unanimous appellate mandate. Dkt. 1075 (citing Dkt. 319). Further, recent discovery has exposed several of Defendants' positions (and sworn statements) as knowingly false. This record supports more than just denial of the Motion and the assessment of costs for violating Local Rule 7. It supports the preclusion remedies the contempt order expressly reserved "in the event that Defendants' civil contempt for the Court's prior orders is not fully purged by" the receivership. Dkt. 413 ¶ 4; *see generally* Dkt. 348 at 22–24 & n.15 (citing authorities); Dkts. 283-84, 296, 308, 324, 330 (same).

## I.   THE RECEIVERSHIP ORDER DOES NOT REQUIRE "CLARIFICATION"

Defendants' primary request is to "clarify that payment of Mr. Watson's" personal expenses and liabilities in other suits "take[] priority over the Receiver's fees" and the injunction security the Court ordered. Mot. 6. But the Receivership Order is perfectly clear. It *prohibits* the Motion's proposed payment priorities. Dkt. 433 ¶¶ 5–6, 11-12, 17-18. Accordingly, the Motion seeks to "alter or amend" the order in exactly the way Defendants admit is improper. Mot. 5.

### A.   The Receivership Order's Payment Priorities Are Clear

The Receivership Order expressly authorizes the Receiver to "take any actions he deems necessary to the proper and lawful discharge of his responsibilities under" this Court's rulings, including actions to "protect" the Assets from claims by Defendants or third parties. Dkt. 433 ¶¶ 5–6, 11–12. These provisions were entered to prevent Defendants from prioritizing their personal expenses and unsecured liabilities over compliance with this Court's rulings. *See id.*; Dkts. 319, 413. And because the receivership is a contempt remedy, the Court ordered it "*at Defendants'*

8

expense," Dkt. 413 ¶ 3, and mandated that "[a]ll" of the Receiver's "fees and expenses shall be payable" from the Assets "without further order." Dkt. 433 ¶ 17.[9]

Defendants' request to subordinate these priority payments to the payments addressed in the Motion would not "clarify" any of these rulings. If granted, it would "alter or amend" the Receivership Order's text in violation of its entire purpose. That is evident from the Motion's description of the requested payments. It seeks to use the receivership Assets already depleted by Defendants' contempt to pay for luxury vehicles[10] and unsecured tax and other liabilities Defendants incurred prior to the receivership, Mot. 2–6; Dkt. 1091 at 2–7, but did not pay because they spent all their money on kickbacks, funding confidential settlements with witnesses to the kickbacks, and bankrolling Watson's lavish homes, plane, high-end shopping sprees, and extravagant vacations. Dkts. 433 ¶ 3; 702 ¶ 19; 702 ¶ 19; 786; 898 ¶ 10; 992 at 8; 1000; 1082; 1087. In short, Defendants ask the Court to order exactly the type of disbursements the Receiver was appointed to prevent. And they ask the Court to do so at the expense of payments its rulings expressly require.

For these reasons alone, Defendants' request for "clarification" is baseless. It is also misleading because it fails to mention that the Receiver has already authorized many personal expenses in excess of what the Order requires. *See, e.g.*, Dkts. 702, 1087 (documenting these expenses, including stipend payments that to date have provided Watson with a six-figure income). These expenditures, combined with Defendants' wasteful and litigious conduct,[11] continue to place

---

[9] All emphasis in this brief is supplied unless otherwise noted.

[10] As the Motion, Dkt. 1083, and Receiver's response, Dkt. 1087, explain, Defendants want the Court to order the Receiver to approve the purchase of a Tesla Model S to replace or augment Watson's Land Rover so Watson can generate ride-sharing revenue he admits he will withhold from the estate he has wasted in violation of this Court's orders.

[11] Watson consistently travels from Colorado to hearings in Virginia in which he has no personal role, along with multiple lawyers from Colorado and Virginia. Then, when his insurers refuse to

a significant strain on Assets already depleted by their contempt of this Court's orders.  Dkt. 1075; 1083; 1087.  In such circumstances, there is no question the Receivership Order prioritizes the allocation of remaining Asset value to receivership costs and other Court-ordered relief.

**B.     The Order's Provisions on Investment Defaults and Other Suits Are Also Clear**

The Receivership Order's provisions for managing the investment and loan "default[s]" and related "lawsuits" the Motion describes, Mot. 2, 6, are also clear.  Defendants ask "this Court to clarify that it is the Receiver's responsibility to properly address legal actions brought against [the] Watson Defendants, rather than simply requesting a stay in each proceeding."  Mot. 5–6.  But the Receivership Order already addresses this issue.  Dkt. 433 ¶¶ 5, 11–12.  It expressly vests "sole discretion" in the Receiver to manage such actions, *id.* ¶ 12, and expressly makes "requesting a stay," Mot. 6, a presumptively *proper* solution.  Dkt. 433 ¶¶ 11–12.

The Order begins by stating that "[a]ll persons" are "enjoined from in any way disturbing the Assets and from prosecuting any actions or proceedings designed to collect their debts or which involve the Receiver or which affect the property of Defendants, to the extent that the same would interfere with or disturb these receivership proceedings."  *Id.* ¶ 11.  It then permits any person who wishes to proceed with a claim it cannot work out with the Receiver (which most claimants have done) to "seek[] relief" in this Court.  *Id.*  Beyond that, the Order gives the Receiver exclusive authority to "defend, compromise and adjust any actions or proceedings" arising out of such claims "as the Receiver may in his sole discretion deem advisable or proper for the protection of the Assets and in furtherance of" this Court's decisions.  *Id.* ¶ 12.  These provisions are clear. "[R]equesting a stay" is one of the many ways the Receiver can exercise his "sole discretion" to "properly address legal actions brought against [the] Watson Defendants."  Mot. 5–6.  And it is

---

cover the cost of these excesses, he threatens the Receiver by asserting that failure to pay the costs from the estate will subject the Receiver to damages for interfering with the defense of this case.

equally clear that Defendants' request to prohibit stays would violate the Order's text and purpose by interfering with the Receiver's exercise of this discretion.  Dkt. 433 ¶ 12.

This conflict is again apparent from the nature of the claims the Motion seeks to amend the Order to compel the Receiver to pay:  namely, claims arising out of Defendants' "defaults" on pre-receivership "investment[s]," "loans," and tax or unsecured personal debts.  Mot. 2, 6.  Those are precisely the claims this Court's orders prohibit Defendants from satisfying ahead of receivership costs and judgment security if the Assets cannot cover all of their obligations.  And Defendants' objections to these priorities were litigated in the injunction proceedings in this Court and the Fourth Circuit, Dkts. 696 at 17-19; Dkts. 99, 318, and in the contempt and receivership proceedings last year.  *See, e.g.,* Dkt. 374 at 2-3 (opposing the receivership on the grounds that it would create a "de facto bankruptcy" that would require the Court to resolve "disputes" over limited assets).  As the Court recognized in overruling these objections, managing defaults and third-party claims are a natural part of receiverships, and the Receivership Order clearly provides for them.  Dkt. 433 ¶¶ 11-12.  The relief Defendants seek now would alter the Order to allow them to pay their other debts ahead of the receivership costs and judgment security this Court's orders require, and thus deplete (if not entirely exhaust) the Assets before they face a judgment for fraud liability they could not discharge in bankruptcy.  *See* 11 U.S.C. § 523(a)(2).

## II.   THE RELIEF DEFENDANTS SEEK WOULD BE IMPROPER EVEN IF THE RECEIVERSHIP ORDER WAS NOT CLEAR

The Receivership Order does not require "clarification" for the reasons above.  But even if it did, any ambiguities would have to be resolved in accordance with the Court's prior rulings and the current record.  The relief Defendants seek is irreconcilable with this requirement.  And Defendants' only response—that the Order rests on "unsubstantiated allegations," Mot. 7—is even more frivolous now than when this Court and the Fourth Circuit previously rejected it.

### A.   Any Ambiguity in the Receivership Order Must Be Resolved Against the "Clarifications" Defendants Seek

Defendants' Motion itself establishes that the relief they seek would not do what a "clarification" request must:  shed "light o[n] a concrete situation that left parties . . . in the dark as to their duty toward the court."  Mot. 5 (quoting *Regal Knitwear Co. v. Nat'l Labor Rel. Bd.*, 324 U.S. 9, 15 (1945)).  The relief Defendants request would do the opposite.  It would enable Defendants to *violate* these duties precisely because the Assets have limited value.

As the Court has explained, the purpose of the receivership is to "prevent[] further irreparable harm to Plaintiffs" and "coerc[e] Defendants' compliance" with the injunction.  Dkt. 413 at 2.  The payments Defendants ask the Court to order, Mot. 6–7, would frustrate the injunction and threaten the receivership itself by depleting the Assets before they can be used to pay the receivership costs and judgment security the Court's orders require.  Dkt. 433 ¶ 18 (stating that the Receiver may terminate his work and seek unpaid costs from Amazon "in the event the Assets are insufficient to pay [his] fees and expenses" in "the ordinary course").  That is exactly the scenario the Receiver and Amazon avoided last month when, consistent with the Court's October 14 ruling, Amazon advanced certain "accrued but unpaid fees" due October 31, Dkt. 898 ¶¶ 16–18, so the Receiver could continue managing the Assets as "potential sources of future cash recoveries" and court-ordered expenses.  Dkt. 702 ¶¶ 8, 19–20, 26.[12]  The relief Defendants seek would destroy the value of this work and exhaust the Assets before trial this spring.  It would thus require denial

---

[12] Although this solution temporarily increased Amazon's burden as a victim of Defendants' misconduct, it was the most efficient way to preserve Asset value while avoiding the cost and "irreparable harm" that would result from the Receiver's resignation and the appointment of "successor Receiver" in this action or another litigation such as the SEC's new enforcement case. *See supra* n.5; Securities & Exchange Commission, "Investor Bulletin: 10 Things to Know About Receivers" (Aug. 27, 2015), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_receivers#:~:text=A%20 federal%20district%20court%20judge,receiver%20in%20a%20particular%20case; *see also* 11 U.S.C. §§ 503, 507.  Whether ordered in receivership or the bankruptcy Defendants have threatened, management of their assets would be at their estate's expense.

even if the Receivership Order were ambiguous, because any ambiguities in the order must be resolved consistent with the parties' "duty toward the court," Mot. 5.

Defendants' attempt to cast their tax and other liabilities as new "concrete situation[s]" the Order fails to address, Mot. 5, does not change this conclusion, and is completely unfounded. The Receiver has highlighted many of Defendants blatant the misstatements. Dkt. 1087. In addition, the Motion mischaracterizes the liabilities it describes as a "direct result" of the receivership. Mot. 7. These liabilities were, however, addressed in the contempt proceedings last year, *see, e.g.*, Dkt. 696 at 17-19, precisely because they arise out of Defendants' conduct during the years before the Receiver was appointed, including the investor fraud the SEC alleges from "April 2017 to August 2019." Compl., *U.S. Sec. & Exch. Comm'n v. Watson*, No. 1:22-cv-2147, ECF No. 1 at 1, 2 (D. Colo. Aug. 22, 2022). The same is true of Northstar's financial woes. Mot. 3. As Defendants' depositions confirmed this summer, the company's precarious financial situation and the claims it now faces, *see id.*, are the direct result of Watson's years of mismanagement and self-dealing. Dkts. 702, 768. Watson's employees, business partners, and investors accused him of "bribery," "fraud," "gross neglect," and other "mismanagement" long before this case was filed.[13] Ex. 1 (WDC Dep. Tr.) at 305–06; Ex. 3.[14] And in early 2020 his CFO wrote that due to the "overall lack

---

[13] *See, e.g.*, Ex. 6 (Watson Dep. Tr.) at 163–68 (admitting that "nine or ten" employees raised concerns that the Villanova payments constituted bribes on the Amazon transactions); Ex. 1 (WDC Dep Tr.) at 286-97) & Ex. 2 (documenting investor claims of "fraud" and asserting that "there is something very wrong with your company"); Ex. 1 (WDC Dep. Tr.) at 242 & Ex. 3 (relaying investor complaints about Defendants' refusal to "take any responsibility for your deals going south" and "pretending [one deal was] fine even though you got fired as a manager and [then got] sued"); Ex. 1 (WDC Dep. Tr.) at 252 & Ex. 4 (describing legal claims against Defendants for "gross neglect and mismanagement of an investment including claims of bad faith, accounting issues and possible loan fraud").

[14] The Receiver's reports corroborate this evidence, and state that Northstar's recent activity "reflect[ed] a declining business" that Watson used as a front for soliciting investor or other support for countless unprofitable or otherwise failed projects. Dkts. 702 ¶ 14; 702-3.

of recommended reserves *per the prior two years of applicable communications*," Northstar "will not make month end payroll" as of "3/17/20," and has "eight days to cure this lack of foresight *that was preventable*."  Ex. 1 (WDC Dep. Tr.) at 339; Ex. 22.  The CFO then proposed various solutions Watson rejected, Ex. 1 (WDC Dep. Tr.) at 339–40, along with his executive team's offer to run Northstar following his alleged suicide attempt, *id*. at 345–347; Ex. 5.

For all of these reasons, even if the Receivership Order were ambiguous, the liabilities the Motion describes are not new "concrete situations" its proposed "clarifications" would resolve consistent with the parties' "duty to the Court."  Mot. 5.

**B.    Recent Discovery Has Substantiated Amazon's Claims to an Extent That Supports Both the Receivership and the Preclusion Remedies the Contempt Order Reserved**

The real claim Defendants wrap in their disingenuous requests for "clarification" is that the Court should amend the Receivership Order because it is causing them real financial harm based on "false" and "unsubstantiated allegations."  Mot. 7; Dkt. 1091 at 2–3.  This Court has already repeatedly rejected this argument.  The Court entered the injunction based on what it described as "extremely powerful" evidence in the 2020 case record.  Dkt. 69-5, at 49; Dkt. 99.  The Fourth Circuit unanimously affirmed that order based on, "*inter alia*, business files, wire records, voice recordings, and recent public and incriminating statements by Defendants" that established Amazon's likelihood of success and a sufficient "link" between the "amount secured by the injunction and the equitable relief" Amazon seeks in this case.  *Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *7–8 (4th Cir. Aug. 31, 2021).  And the record then swelled to include the new evidence of misconduct Amazon detailed in opposing Defendants' April motion.

On October 14, the Court denied that motion based on the record that existed this spring. Dkt. 1075.  And discovery since then has further substantiated every material aspect of Amazon's case.  Among other things, it has confirmed Defendants' role in the kickback scheme and exposed

14

as knowingly false several of Defendants' sworn statements to this Court. Much of this discovery came from documents Defendants improperly withheld from electronic devices the FBI returned to them in 2021, and the Court allowed Amazon to image as a sanction. Dkt. 302. And the rest came primarily from Defendants' own testimony and admissions from their co-conspirators. Taken together, these record developments do not merely foreclose Defendants' claim that Amazon's allegations are "unsubstantiated." Mot. 7. They provide multiple new grounds for imposing the preclusion remedies the contempt order expressly reserved. Dkt. 413.

*First*, former Amazon Transaction Managers Casey Kirschner and Carl Nelson have admitted to taking kickback payments on Defendants' lease transactions. Casey Kirschner signed a written statement to law enforcement declaring that:

> *I accepted money from Northstar associated with deals I worked on with Amazon …. Northstar paid kickbacks, which were paid to the Villanova Trust …. Brian Watson of Northstar paid the Villanova Trust associated with the Amazon development deals in Northern Virginia … Northstar was the only developer who paid Carl Nelson and me.*

Dkts. 978-1; 977 at 2. Nelson similarly admitted in a recording that the "*first couple distributions [he and Casey] took*" on the Northstar deals came "*through Casey's brother*" at the *Villanova Trust*, which was "some sketchy a** sh**," Dkt. 212-13 at 8–9, and that he (Nelson) had "taken 960 total" and Kirschner "eight something" *from "all Brian [Watson's] fees*." Dkt. 787 at 12.[15]

*Second*, Watson's own documents expose as knowingly false his sworn statements that Christian Kirschner was "*not involved* in the negotiations between Amazon and [Northstar] of the real estate transactions." Dkt. 697 ¶ 13; *see also* Ex. 9 (Watson Rog Resp. 8) (Christian "was not

---

[15] Nelson and Kirschner have defended these payments (disbursed in the form of undercollateralized loans that have not been repaid) based on the advice of their counsel Defendant Rod Atherton. *See* Dkt. 876-1 (Nelson Dep. Tr.) at 52–54, 165–69, 205–06, 209–10; Dkt. 978-1. But Atherton's sworn interrogatory responses and deposition testimony confirm that this advice was qualified and based on incomplete facts that negate any advice-of-counsel defense as a matter of law.

involved in any negotiations with Amazon").  The texts and emails Defendants were sanctioned

for withholding show that Christian was more than "involved."  Christian and his brother Casey

*expressly directed* Watson and other Northstar personnel (including two co-conspirators who have

invoked the Fifth Amendment) to include specific terms in the lease negotiations with Amazon.

*See* Exs. 10–14; Exs. 6 (Watson Dep. Tr.) at 113:16–117:25, 122:9–129:11; Exs. 7–8; Dkts. 978-

5, 978-6.[16]  Casey and his supervisor (Carl Nelson) then approved these terms in the final leases

that determined the Amazon rent and other fees Defendants used to fund the kickbacks.  *See* Exs.

10–14.  And Defendants' testimony this summer confirmed that they knew they would profit from

these terms at Amazon's expense.  Specifically, Watson admitted the payments to Villanova were

funded by Amazon's rent.  Ex. 6 (Watson Dep. Tr.) at 343:11–347:2.  His own documents show

that the rent was determined by the terms he crafted with the Kirschner brothers.  Exs. 10, 12–15.

And the documents show that Defendants would have inflated Amazon's rent and lease budgets

to an even greater extent but for Casey's instruction that the terms had to appear "on paper"

competitive, Ex. 13, so he and Nelson could get them through Amazon internal reviews, Ex. 6

(Watson Dep. Tr.) at 272:9– 279:18, 280:9–284:3, 307:7–317:6, 331:23–342:9, 342:16–347:2;

Exs. 10–14; Ex. 1 (WDC Dep. Tr.) at 160:25–167:3; Ex. 15.

*Third*, discovery this summer confirmed that Defendants were well aware of the improper

influence their "referral" payments were buying.  Their own documents detail the authority Casey

and Nelson had over Amazon contract awards, including veto power over which developers would

receive proposals or enter Amazon's approval process.  *See* Ex. 6 (Watson Dep. Tr.) at 60:23–

---

[16] Watson deferred the explanation of these texts to Christian Kirschner, whose Fifth Amendment
invocations support adverse inferences on the relevant facts.  *See* Ex. 6 (Watson Dep. Tr.) at 271:1–
284:3.  And Casey has separately admitted to providing the Watson Defendants with proprietary
information on the Amazon leases.  Ex. 16 (May 10, 2022 C. Kirschner Dep. Tr.) at 98:13–110:10;
Ex. 17 (August 31, 2022 C. Kirschner Dep. Tr.) at 78:14–83:15; 84:19–85:15.

61:11, 62:16–63:10, 136:21–137:6, 138:6–19.  The documents also detail Casey and Nelson's representations of this influence and Defendants' reliance on it.  For example, Casey told Defendants that certain Amazon deals "are yours" before Defendants submitted proposals or Amazon issued any approvals.  Ex. 2.  And after initial meetings with only Christian, Casey, and Nelson, Watson told investors he had "secured" a "commitment" from Amazon on a $100 million deal with hundreds of millions "more to come."  Exs. 18–19.

These interactions, and Defendants' payments to Christian alone, violated Amazon policies on remuneration to company personnel or their "*family members*," Exs. 20–21, that were expressly incorporated in the leases Watson reviewed and signed, *id*.  And although Defendants had a duty to "report" and "cooperate" in investigating even "suspected" violations of these policies, Ex. 6 (Watson Dep. Tr.) at 159–160, 162; Ex. 20 (Lease ¶ 40), they did not do so even after their own employees asserted that the Villanova payments were being sent to Casey and Nelson, and Defendants' outside counsel advised them to rescind their "referral" agreement with Christian.[17]

*Fourth*, one of the Northstar employees (Kyle Ramstetter) who reported the bribes (and has invoked the Fifth Amendment) recorded Watson acknowledging a commitment to "pay" Casey and Nelson.  Dkt. 212-15 at 35-36.  In that recording, Ramstetter told Watson that "Carl and Casey" were "waiting" for a payment, and Watson responded "you think they'll be fine with the kind of payment we're talking about . . . . 3 million total to them?"  *Id.*  Watson then said "*I'm shocked*

---

[17] Watson's testimony that he did not believe the payments reached Casey or Nelson "while they were at Amazon," Ex. 1 (WDC Dep. Tr.) at 216–17, is belied by his recorded statements, his employees' statements in 2019 legal proceedings, and by forensic analysis detailed in Amazon's expert reports.  *See* Dkt. 155-9; Ex. 1 (WDC Dep. Tr.) at 50:2–51:17.  It is also legally irrelevant to Defendants' liability on the claims in this case.  *See, e.g., Salinas v. United States*, 522 U.S. 52, 65 (1997) (emphasizing that "[o]ne can be a [RICO] conspirator by agreeing to facilitate only some of the acts leading to the substantive offense").  And in any event, it did not absolve him of his obligation to report "suspected" policy breaches to Amazon, which his former colleagues at Northstar and former investors at IPI properly did report.

*that they don't think I'm gonna pay them*," to which Ramstetter responded "You pay them now; I think then *we're gonna go do what we just did again*." *Id.* at 36.[18]

When this recording was played at Watson's deposition, he tried to cast the statement about "pay[ing]" Casey and Carl as a reference to "honoring" his agreement with "Villanova," which "wanted to invest in a development company" that in the future would "love to hire Casey and/or Carl if they ever left the employ of Amazon." Ex. 1 (WDC Dep. Tr.) 252:7–11. But the amount of the payment Watson describes—$3 million—belies this claim. The "$3 million" Watson proposed paying "Casey and Carl" in the May 2019 recording, Dkt. 212-15 at 34–36, is exactly the amount he admitted (Ex. 1 at 250–51) his 2018 agreement with Villanova would have required him to pay Christian on IPI's proposed 2019 buyout of Defendants' interests in leases they executed with Casey and Carl while they were at Amazon. Ex. 2 (IPI Counterclaim) ¶¶ 116-17; Dkt. 12-28; *see also* Dkt. 212-15 at 34-36; *id.* at 21 (transcript of Watson agreeing on May 31 that "first priorities should be Casey and Carl" in distributing any buyout proceeds).

The foregoing (non-exhaustive) evidence of Defendants' misconduct does not simply foreclose Defendants' claim that Amazon's allegations are "unsubstantiated." Mot. 7. It establishes that Defendants have spent the last year challenging the injunction and contempt rulings against them based on arguments—and several sworn statements—that their own documents have revealed to be knowingly false. This record confirms that Defendants "will not comply with the law." 2 Fed. R. Civ. P., Rules and Commentary Rule 66; Dkt. 433. And it shows

---

[18] Watson was not aware that Ramstetter recorded their conversation in May 2019. In September 2019, Watson directed one of his executives (Timothy Lorman) to record a separate conversation in which Watson confronted Ramstetter about doing a deal (the White Peaks transaction) behind Watson's back. In May 2020, Watson's counsel filed what they represented to be a "true and correct" transcript of that recording with this Court. Dkt. 40. But Amazon obtained a copy of the original recording from Lorman. Dkt. 45. After listening to that recording, the Court agreed that the transcript Watson filed "conspicuously omitted" an inculpatory reference to "Casey," who Ramstetter referenced in telling Watson "we all know what we did." Dkt. 99 at 9 n.6.

that their contumacy has escalated beyond the point at which this Court typically imposes the "additional coercive relief"—including default judgments—the contempt order expressly reserves. Dkt. 413 ¶ 4 (ordering the receivership but reserving the right to "grant additional coercive relief, including increased fines and other measures, in the event that Defendants' civil contempt for the Court's prior orders is not fully purged by Defendants' compliance with the terms of this Order").[19]

The depleted state of the Assets does not mitigate these grounds for additional contempt remedies. It strengthens them because, as the Fourth Circuit explained, the Assets' diminished value exacerbates the likelihood that they will "become unavailable before judgment." *See Amazon.com, Inc.*, 2021 WL 3878403, at *8. And the points in the Motion and related filings, Mot. 2-6; Dkts. 1087, 1091, confirm that this risk will continue to grow. Accordingly, and especially if the Court agrees that the Assets are unlikely to produce revenue sufficient to cover all of Defendants' legal obligations, the Court should: (i) deny Defendants' Motion; (ii) reconfirm that the Assets must be used to pay receivership costs before Defendants' personal expenses and unsecured liabilities; and (iii) revisit the preclusion remedies it expressly reserved as complements to the receivership. *See* Dkt. 413 ¶ 4; *Axiom Res. Mgmt. Inc. v. Alfotech Sols., LLC*, 2011 WL 2560096, at *7 (E.D. Va. June 3, 2011), *adopted by* 2011 WL 2559806 (E.D. Va. June 27, 2011) (entering partial default judgment after defendants "failed to comply with" a preliminary injunction and related "discovery requests"); *Brooks Sports, Inc. v. Anta (China) Co.*, 2018 WL 7488924, at *16 (E.D. Va. Nov. 30, 2018) (same, holding that defendants' "[r]efusal to comply with this Court's orders can only be interpreted as an unabashed flouting of the Court's authority"); Dkt. 348 at 22-24 (citing additional authorities).

---

[19] *See also* Dkts. 348 at 22–24 & n.15 (citing preclusion authorities); 283–84, 296, 308, 324, 330 (citing Rule 37 and civil contempt authorities for barring Defendants from presenting evidence or arguments that they "never received anywhere near [the injunction amount] in connection with the transactions" in suit and had "no knowledge" of the kickbacks alleged in this case).

## CONCLUSION

Defendants' Motion is their latest attempt to divert Assets in violation of this Court's orders.  Dkts. 696, 957, 957-1, 992, 1009.  For the reasons above, the Court should deny the Motion, assess costs for filing it in violation of Local Rule 7, and entertain the preclusion remedies the contempt order expressly reserves for the situation the Motion now describes:  a situation in which "Defendants' civil contempt for the Court's prior orders is not fully purged by" the receivership.

Dated:  November 18, 2022

Veronica S. Moyé (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900
vmoye@gibsondunn.com

Respectfully submitted,

*/s/ Michael R. Dziuban*

Elizabeth P. Papez (*pro hac vice*)
Patrick F. Stokes (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Claudia M. Barrett (*pro hac vice*)
David W. Casazza (*pro hac vice*)
Amanda Sterling (*pro hac vice*)
Michael R. Dziuban (Va. State Bar No. 89136)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
epapez@gibsondunn.com
pstokes@gibsondunn.com
jmendro@gibsondunn.com
cbarrett@gibsondunn.com
dcasazza@gibsondunn.com
asterling@gibsondunn.com
mdziuban@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.  I will then send the document and a notification of such filing (NEF) to the following parties via U.S. mail to their last-known address and by email, where noted:

CTBSRM, Inc.
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

Demetrius Von Lacey
2845 Des Moines Dr.,
Fort Collins, CO 80525

Casey Kirschner
635 N. Alvarado Lane
Plymouth, MN 55447
By email: casey.kirschner@gmail.com

2010 Irrevocable Trust
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

Sigma Regenerative Solutions, LLC
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

*s/ Michael R. Dziuban*
Michael R. Dziuban
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
mdziuban@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and
Amazon Data Services, Inc.*