IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AMAZON.COM, INC and AMAZON DATA SERVICES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> WDC HOLDINGS LLC d/b/a NORTHSTAR COMMERCIAL PARTNERS, et al., <br><br> Defendants, <br><br>―――――――――――――――――― <br><br> 800 HOYT LLC, <br><br> Intervening Interpleader Plaintiff, <br><br> v. <br><br> BRIAN WATSON, et al. <br><br> Interpleader Defendants. | Case No. 1:20cv484 <br><br> Hon. Rossie D. Alston, Jr. <br> Hon. Ivan D. Davis <br><br><br><br><br><br> **BRIEF IN SUPPORT OF DEFENDANT CARLETON NELSON'S MOTION TO COMPEL PLAINTIFF'S SUPPLEMENTATION OF ITS RESPONSE TO REQUEST FOR PRODUCTION 4** |

## I.  Introduction

Amazon brought this action alleging among other things that the Defendants violated various internal polices at Amazon by supposedly failing to disclose certain referral arrangements with the relative of an Amazon employee or in the case of Defendant Nelson, consulting with a third-party developer (who Amazon has never accused of any wrongdoing and who is not a competitor of Amazon) on an Amazon project *after* Nelson was terminated from Amazon for reasons unrelated to this action. Nelson disputes that either of these circumstances were improper, and will demonstrate as much on the merits.

For discovery purposes, most critical to this motion are two points. First, Amazon implemented an entirely new internal procurement policy for developers approximately five months *after* Amazon asserts a "whistleblower" reported to them the conduct at issue in this case—a policy that would appear to be an attempt to explicitly cover the conduct Amazon puts at issue in this action. This goes directly to Amazon's claim that its internal policy documents in existence at the time of the conduct actually covered said conduct, including Amazon's understanding of the meaning of its polices as written at the time. If Amazon's polices did cover the conduct at issue, there would be no need to implement the new procurement requirements using different and very specific language not included in any of its prior internal polices. This use of different language is relevant to and demonstrative of the understanding and meaning of these earlier existing polices, including Amazon's actual understanding (not just what it is claiming in this litigation). Defendants are entitled to a copy of the documents setting forth the new procurement policy or requirements, as well as the discussions implementing this new policy to make this demonstration to the fact finder.

Second, Amazon claims that as to the Blueridge Transaction, which makes up a substantial portion of its remaining claims,[1] it would never have proceeded with the transaction had it known Nelson was consulting with the Blueridge Group after he was terminated from Amazon. This

---

[1] Despite numerous representations to this Court that Amazon has suffered millions of dollars in damages from the lease transactions, Amazon's own recently disclosed expert, Mr. Lee, has acknowledged that ▌▌▌▌▌▌. In fact, despite submitting a report that is almost three-hundred pages in length, covering a wide range of computations and calculations, shockingly Mr. Lee, ostensibly a damages expert, admitted ▌▌▌▌▌▌ *See, e.g.,* Ex. B (Lee Transcript at 64, 66, 135-36) ▌▌▌ In fact, Mr. Lee's report implicitly acknowledges that ▌▌▌ *See* Ex. C at Figure 17 at 44 and ¶ 38. Nevertheless, for reasons only known to it, Amazon has persisted in maintaining several claims for economic damages in this Court.

unsupported assertion by Amazon's 30(b)(6) witness was ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See, e.g.,* Ex. B at 153 (Lee Transcript). In contrast, there is significant evidence that Amazon's corporate representative's statement is a post hoc assertion made for purposes of this litigation. First, Amazon entered into both the Blueridge Transaction and one of the lease transactions at issue in this action, IAD175, weeks *after* it began its immediate and extensive investigation into the matters that are the subject of this action. *See* Doc. 1 at ¶¶ 42, 49; Doc. 765 ¶ 258; Ex. D, RFA 7. Second, Amazon has acknowledged it ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Ex. A, Dep. Tr. Vonderhaar 30(b)(6) at 161, 373.

Finally, and most critical to this motion, after issuance of the certification requests at issue here, at least two developers informed Amazon that Nelson was consulting with them in connection with Amazon deals. Nelson Decl. ¶ 3. Despite this disclosure to Amazon, Amazon did not shut down the deals with these developers, but rather continued to work with them. *Id.* This fact goes directly to the credibility of Amazon's claim that it would not have proceeded with the Blueridge Transaction had it known Nelson was consulting with Blueridge Group, a critical underpinning of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. While Nelson can testify that he was told by the developers they disclosed his identity to Amazon, the certifications themselves, and documents reflecting Amazon's internal reactions thereto, are highly relevant and irrefutable evidence of what they say.[2] Further, these certifications would avoid objections from Amazon based on hearsay or the best evidence rule.

---

[2] There may be other former employees of Amazon identified in the certifications from other developers, as it is believed former employees of Amazon regularly consult with various developers and construction entities who work with Amazon on data centers.

49521693 v3

Amazon has refused to provide a copy of this new procurement policy or the documents reflecting the new requirements, the internal analysis discussing the implementation of the new policy or requirements, the responsive certifications from any of the developers, and any internal discussions or response by Amazon to the responding developers' certifications. Nelson attempted to resolve this issue with Amazon before bringing a motion by seeing if a compromise could be reached, sending a detailed email to Amazon (*see* Ex. E) and several phone calls, ultimately proposing that Amazon provide a copy of only the policy and the responses from the developers. However, ultimately on a phone call, Amazon refused to provide even that limited information, claiming it was not relevant or responsive, particularly because of Nelson's previous agreement to limit request number 3 to cover only the nine lease transactions. *See, e.g.,* Ex. E.

As explained below, this Court should compel the production of the documents comprising the new policy or requirements, the internal analysis considering implementation of the policy or new requirements, and the responses from at least the two developers disclosing Nelson to Amazon, and Amazon's response to and internal analysis of the developers' response.

## II.     Factual Background

Since Amazon filed this action in April 2020, it has continually asserted to this Court and Defendants that the its internal policies—Amazon's "Code of Conduct" and "Spending and Transaction Policy" (neither of which is a contract but rather internal employment policies which may serve as a basis for discipline, up to termination of course)—purportedly provide a foundation for the majority of Amazon's claims in this action, and even purportedly a basis for criminal liability.[3] *See, e.g.,* Doc. 765 ¶¶ 221, 326-328, 347, 360, 404, 497. This assertion is without merit,

---

[3] As to purported criminal liability, by at least February 2020, Amazon began its efforts to convince the U.S. Attorney's Office to indict Nelson, Kirschner, Watson and other co-defendants in this action by conducting numerous meetings, calls and presentations with the U.S. Attorney's Office for the Eastern District of Virginia.  These regular communications and lobbying efforts have continued through this date, as recent disclosed communications

4

and Amazon is overreaching on both the legal assertion that its internal employment policy provides the basis for the claims in this action, or that the language of any such policies covers the conduct at issue.

Despite asserting to this Court that its prior polices covered the conduct at issue in this case, almost simultaneously with the filing of this lawsuit, in late April 2020, Amazon implemented a new internal procurement policy for contracts with its developers of data centers.[4] Specifically Amazon communicated to those developers:



Ex. I. Amazon never produced this policy or documents reflecting the new internal procurement requirements.

In response, the developers were to provide a certification back to Amazon as follows:

---

demonstrate almost weekly calls between counsel for Amazon and the U.S. Attorney's Office, that look to number over 100 at this point since February 2020 when Amazon first reached out to the Government to request they pursue Defendants in this action. Amazon also actively encouraged the Government to seize and restrain the assets of these defendants before it field this action using civil forfeiture on the basis of its sweeping and overinflated claims. *See* Ex. F. The Government did indeed move quickly to seize assets in civil forfeiture (including the funds that were in Nelson's then counsel's trust account that were to be used to defend him in this action). However, earlier this year the Government began returning the vast majority of those funds once the Defendants in this action sought to take discovery and test the basis of those seizures in the civil forfeiture matters. The government went so far as to admit to Amazon that it was returning the bulk of the assets to Defendants because it "probably seized the funds too early" (again at the behest of Amazon to move quickly before it had all the facts, and apparently based in large part on the incomplete picture Amazon was giving them), and because actually allowing defendants to take discovery to test the factual foundation for those seizures could "have a negative impact" any future criminal case. Ex G.

[4] There is a list of developers that was in a stack of other, unrelated attachments, that based on its title—████████████████████—appears to be the list identifying which developers received a copy of this request for certification. *See* Ex. H.

49521693 v3

> The below represent and warrant to Amazon Data Services, Inc. the following:
>
> 1. The below Company, its affiliates, and their officers have not entered into, made a payment pursuant to, or received benefits from a consulting, broker, agent, fee sharing, referral, or similar agreement, arrangement or relationship with or for the benefit of any current or former employee of Amazon.com, Inc. (or its subsidiaries) (collectively "Amazon") (or any individual who is the spouse/partner of or related to a current or former employee of Amazon) in connection with any executed or proposed real property transaction with Amazon since January 1, 2015 (including, but not limited to a direct lease, acquisition or sale with Amazon or any underlying land transactions occurring after January 1, 2015 related to a completed or proposed lease or sale to Amazon), except for the following:
>
> [Insert list of any applicable agreements/arrangements/relationships]
>
> 2. The below Company, its affiliates, and their officers have not entered into, made a payment pursuant to, or received benefits from a consulting, broker, agent, fee sharing, referral, or similar agreement, arrangement or relationship with any other company or person in connection with any executed or proposed real property transaction with Amazon since January 1, 2015 (including, but not limited to, a direct lease, acquisition or sale with Amazon or any underlying land transactions occurring after January 1, 2015 related to a completed or proposed lease or sale to Amazon), except as listed above in 1. and the following (note: please include the names of all brokers/consultants even if previously disclosed to Amazon):
>
> [Insert list of any applicable agreements/arrangements/relationships]

Ex. J. In at least two of those responses—from SDC Capital Partners ("SDC") and Oppidan Investment Company ("Oppidan")—Nelson was identified in the certification received by Amazon. Nelson Declaration ¶ 3. In fact, shortly before Amazon sent out this request for certifications, Amazon had recently consulted with the government about SDC, through its counsel in this case:

> Amazon has a transaction closing in the very near future in which SDC is attached to the deal as the developer. It is very important for Amazon to acquire the land, and Amazon can remove SDC from the deal at a later time if that becomes necessary. (And no payments will be made to SDC in the near term.) Please let us know as soon as possible if you have any concern with Amazon moving forward or would like to discuss further.

Ex. K. There is no indication in the documents produced by Amazon whether the government weighed in on whether Amazon should proceed with this transaction (or any other transaction, such as the IAD175 lease transaction at issue in this case which Amazon moved forward with in

6

January 2020, nearly two months after it began its "immediate and extensive internal investigation" on December 2, 2019, *see* Doc. 1 at ¶¶ 42, 49, which transaction Amazon is now in this Court claiming it never would have done had it known about the alleged conduct).

Nelson believes that other developers similarly paid or had relationships with other former Amazon employees in connection with deals they have done with Amazon. Thus, Amazon likely received certifications identifying other such individuals besides Nelson as well.  As noted in the original letter, Amazon would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Amazon has failed to produce any of these responsive certifications, ▮▮▮▮▮▮▮▮▮▮▮ or any internal discussion following receipt of certifications identifying any individuals.

**III.    Argument**

In discovery, Mr. Nelson asked for "All DOCUMENTS evidencing any procurement policies, processes, or procedures applicable to LEASE TRANSACTIONS or land purchases made by YOU." *See* Ex. L, RFP 4. These documents relating to the new procurement policy implemented in April 2020, fit squarely within this requests for production and should be produced by Amazon as the emails demonstrate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[5]

Instead, during its meet and confer call on Nelson's first set of requests for production, Amazon, knowing the new procurement policy had been implemented, that said policy appears to specifically mirror conduct alleged to have occurred in this action, and that Amazon had been getting certifications from developers for built to suit data centers, including ones that identified Nelson, told the Nelson defendants that there was nothing relevant outside anything directly

---

[5] The definition of "Lease Transactions" which includes all built-to-suit lease transactions with data centers that Amazon engaged in, was taken from Amazon's own definitions in its prior requests for production (which surprisingly it objected to when used in requests back to it). Ex. M at Definitions; Smart Declaration ¶ 17.

relating to the nine lease transactions at issue in this case in order to convince them to agree to limit this request to the nine lease transactions or purchase transactions at issue. Smart Decl. ¶ 18. It appears the representation may have been made to prevent the Defendants from obtaining a copy of the new procurement policy that could be used to contradict Amazon's claims about what its prior polices covered or prohibited, and to prevent discovery of the certifications that included Nelson and other former Amazon employees, but with whom Amazon continued to work with, in direct contradiction of its claims in this case that it would not do so.

Now Amazon asserts that because it was able to convince Nelson to agree to a limitation to only the nine lease transactions at issue—when Amazon withheld critical information in obtaining this concession—Nelson should not get what is clearly relevant and discoverable material in this case. Whether the withholding of this information was intentional or through lack of knowledge of the individuals requesting Nelson agree to this limitation does not matter at this point. Even if the representations made at the time to induce the agreement were unintentional, Amazon's attempt to use that agreement now as a means to block discovery of the documents that would have been responsive and discoverable under the request as written, renders that distinction meaningless. Amazon is now ratifying the conduct in a direct effort to obstruct Defendants' ability to obtain what should have already been produced. This is the type of "gotcha" litigation technique in discovery that should not be condoned. *See Reetz v. Lowe's Companies, Inc.*, No. 518CV00075KDBDCK, 2021 WL 674016, at *2 (W.D.N.C. Feb. 22, 2021) (rejecting a party's "unreasonable and uncompromising insistence on the strictest application of the rules with the clear effect of thwarting the search for a true decision on the merits" where the discovery sought was narrow and there was sufficient time to address any potential prejudice that may occur).

This is not the first time Amazon has attempted to block such information by this very same argument. Previously Amazon also argued that a similar limitation was appropriate with respect request for production number 3, which sought "All DOCUMENTS RELATING TO LEASE TRANSACTIONS, including but not limited to (a) "guaranteed maximum price" budgets; (b) yields; (c) leasing, development, and other "soft" costs; (d) executed lease agreements and any amendments, extensions, or renewals; (e) agreements with any commercial real estate brokers (including but not limited to KBC ADVISORS) evidencing any rebate, credit, refund, or kickback to YOU from broker commissions." Ex. L at RFP 3. In that instance, just weeks before the same meet and confer call, Amazon had renegotiated all of the lease transactions at issue purportedly to mitigate its damages,[6] without disclosing that fact to Defendants until much later. Smart Decl. ¶ 18. Once it was finally disclosed, one of Amazon's designated fact witnesses, Keith Klein, admitted at his deposition that Amazon had ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌—making the requested yield and budget information for Amazon's other lease transactions highly relevant to Amazon's claims. Ex. N (Klein Transcript at 270-75).

In that instance, like here, Amazon represented that there was nothing relevant from the yield and fee information Nelson was requesting outside the nine lease transactions at issue. Taking Amazon at its word, without any knowledge of the purported settlement with IPI or any knowledge of the use of the yield and fee information from Amazon's other lease transactions in that settlement negotiation, Nelson similarly agreed to limit that request to the nine lease transactions at issue. Smart Decl. ¶ 18. Once the true nature of things was revealed in discovery, the Nelson

---

[6] Again, based on Amazon's own expert, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌.

49521693 v3

defendants pressed for this information. Ultimately Amazon only provided partial information after numerous requests from Nelson and continued delays on its part, and it was necessary for Nelson to subpoena a third party auditor to obtain Amazon's own internal documents because of Amazon's refusal to provide a complete set of responsive information. Smart Decl. ¶ 19.

As it turns out, the information regarding yield and fee information in Amazon's other lease transactions does undercut Amazon's claims that the yields and fees in the nine lease transactions at issue were inflated. That information shows that the yields and fees were either in the exact range of yields and fees Amazon regularly agreed to in its other transactions, or were in many instances even lower. Had Amazon been allowed to prevent access to this information based on that earlier limitation of the scope of the request for production, Defendants would have been deprived of this very powerful evidence that directly contradicts Amazon's claims that the fees and yields in this case were inflated.

Similarly here, as to the new procurement policy information, Amazon is attempting to use a limitation that it obtained by withholding important information that would bear directly on the willingness of Nelson to agree to such a limitation—the existence of this very policy. As was the case with the yield and fee information that ultimately demonstrates the inaccuracy of Amazon's claims that the yields and fees in the nine lease transactions were inflated, Nelson should be able to obtain the responsive information about Amazon's new internal procurement policies and requirements, as well as the certifications identifying Nelson he was led to believe did not exist at the time he agreed to limit the request for production.

**IV.   Conclusion**

For the forgoing reasons, Nelson respectfully request that the Court compel Amazon to supplement its response to Request for Production No. 3 and provide the documents comprising the new procurement policy or new requirements, the internal analysis considering implementation of the new policy or new requirements, the responses from the two developers disclosing Nelson, and Amazon's response to or internal analysis of such a response from those developers.  Nelson also requests the costs in bringing this motion and any other relief the Court deems proper.

December 23, 2022          **BURR & FORMAN LLP**

*/s/ Rachel Friedman*
Rachel Friedman (VA Bar #93898)
420 North 20th Street, Suite 3400
Birmingham, AL  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
rfriedman@burr.com

J. Alex Little, IV (TN Bar No. 29858) (*pro hac vice*)
Emily H. Mack (TN Bar No. 31217) (*pro hac vice*)
222 2nd Ave. S., Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
alex.little@burr.com
emack@burr.com

*/s/ Adam R. Smart*
Adam R. Smart (FL Bar No 1032572) (*pro hac vice)*
50 North Laura Street, Suite 3000
Jacksonville, Florida 32202
Telephone: (904) 232-7200
asmart@burr.com

*Attorneys for Carleton Nelson*

11

49521693 v3

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2022, a true and correct copy of the foregoing has been served upon all parties of record via the ECF system and via email

Dated: December 23, 2022                /s/ *Rachel Friedman*
                                                                     Rachel Friedman

12

49521693 v3