**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **AMAZON.COM, INC and AMAZON DATA SERVICES, INC.,** | Case No. 1:20cv484 |
| Plaintiffs, | **Hon. Rossie D. Alston, Jr.** |
| v. | **Hon. Ivan D. Davis** |
| **WDC HOLDINGS LLC d/b/a NORTHSTAR COMMERCIAL PARTNERS, et al.,** | |
| Defendants, | **DECLARATION OF CARLETON NELSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| **800 HOYT LLC,** | |
| Intervening Interpleader Plaintiff, | |
| **v.** | |
| **BRIAN WATSON, et al.** | |
| Interpleader Defendants. | |

I, Carleton Nelson, pursuant to 28 U.S.C. § 1746 hereby declare, under penalty of perjury, as follows:

1. I am over the age of 18 years. I have personal knowledge of the facts set forth below, and if called upon to do so, I could and would competently testify thereto.

2. I make this declaration in support of my motion for summary judgment.

3. I began my employment with Amazon following agreement with Amazon to do so in April 2012.

4. Attached hereto as Exhibit A is a true and correct copy of the "Confidentiality, Noncompetition and Invention Assignment Agreement" (the "CNIAA") between me and Amazon.com, Inc., dated April 2, 2012. I never signed any amendment to the CNIAA.

5. Attached hereto as Exhibit B is a true and correct copy of correspondence from Amazon.com to Carleton Nelson dated April 2, 2012 and executed April 3, 2012.

6. Attached hereto as Exhibit C is a true and correct copy of correspondence from Amazon.com to Carleton Nelson dated June 12, 2019.

7. Attached hereto as Exhibit D is a true and correct copy of a "New Employee Mandatory Certification" executed by me on May 14, 2012.

8. I was not required to execute certifications under the Amazon.com Code of Business Conduct and Ethics following May 14, 2012.

9. Amazon's data center lease and purchase transactions were designated by a three letter code, corresponding with an airport identifier, along with an identifying number. All of the transactions at issue in this case, both lease and purchase, used the "IAD" identifier along with a specific transaction number.

10. I was assigned, as part of the multilevel process, in the real estate department to over fifty (50) data center related BTS or purchase transactions unrelated to this action (this does not include transactions on which I assisted other real estate team members). However, I was not involved in the multilevel process of structuring or presenting for approval every BTS or purchase transaction at AWS, including those in Northern Virginia. Based on Amazon Web Services' publicly reported revenue in 2019, and approximately 150 deployed global data centers in 2019 , this equates to revenue of approximately $233M per data center in 2019 and demonstrates that these 50 data centers created approximately $12.1B of AWS revenue in 2019.

11. Specifically, I had no role in the IAD175 Lease Transaction when I was an employee at Amazon. I made no presentations to any Amazon executives or supervisory employees concerning the transaction, and was not otherwise involved in the approval process.

12. I had no role with the selection of Blueridge Group to develop the property at issue in the IAD156 Transaction.

13. I only began communicating with Blueridge Group and the Glimchers concerning the Blueridge Property or serving as a consultant on the Blueridge Property after I was terminated by Amazon, like I did with numerous other individuals and entities to generate development or consulting work since my discontinued employment with Amazon.

14. Attached hereto as Exhibits E and F are true and correct copies of the first email communications I had with Herb Glimcher or his representatives following my termination from Amazon, dated July 19, 2019. They were sent the same day I had my initial meeting with Herb Glimcher about providing consulting services. Prior to that, I had not had any communications with him about performing any role with them whatsoever in connection with data center development or consulting, or receiving any money from them related to data centers or data center related transactions.

15. As part of my arrangement with Blueridge Group, I began performing services for Blueridge Group in anticipation of the closing of a BTS transaction involving the Blueridge Property, including work related to rezoning, entitlement, budgeting and other development work. Attached hereto as Exhibits G, H, I, and J are true and correct copies of emails between me and either Herb Glimcher or his son Michael Glimcher and others concerning some of the work I was performing in that role for Blueridge Group.

16. The Glimchers and I agreed I would be compensated for my work as a consultant on the Blueridge Transaction. The compensation arrangement agreed to was that I would receive 50% of the net profits from the BTS transaction that Blueridge was preparing to close with Amazon. Attached hereto as Exhibit K is a true and correct copy of a memorandum dated August 29, 2019 concerning the negotiation of that agreement.

17. Blueridge Group was established to be a developer of commercial Real Estate Property, specifically in this case, a data center for Amazon. Blueridge Group did not offer hyper scale or cloud hosting services, or other services offered by AWS to its customers.

18. At some point in the fall of 2019, Blueridge Group was notified that Amazon no longer wished to proceed with a data center development and BTS lease on the Blueridge Property, and instead wished to acquire the property itself.

19. Although I was not involved in any negotiations with Amazon related to the purchase transaction—which I understand was accomplished by outside counsel for Blueridge Group and the Glimchers—I was ultimately made aware that Blueridge Group had negotiated an assignment fee of $10M for assignment to Amazon of the purchase and sale agreement Blueridge Group had executed with the original seller of the property. Despite no longer being a BTS lease project, Herb Glimcher agreed that Blueridge Group would still honor the 50% net profit arrangement, and thus Blueridge Group agreed to make that payment upon closing of the assignment transaction.

20. After leaving Amazon, I performed other consulting work related to data centers and other development projects, but never for entities who provide hyper scale or cloud services like AWS.

21. I have been told by representatives of both SDC Capital Partners and Oppidan Investment Company that each of them identified me in a certification to Amazon Web Services in response to a request from Amazon Web Services that they do so in or about April 2020. Amazon closed both transactions on which I provided consulting services to SDC and Oppidan. Attached as Exhibits L, M, and N are true and correct copies of contracts and invoices for some of that work.

22. I also pursued development work after my termination form Amazon, including a truck stop in North Carolina as well as pitching a potential development deal of a warehouse *to* Amazon. Attached as Exhibit O hereto is a true and correct copy of a pitch proposal I sent to Todd Meldahl as a broker for Amazon regarding a potential development opportunity with Amazon. Attached as Exhibits P and Q are true and correct copies of emails concerning the purchase and potential development of a truck stop property in North Carolina.

23. I am aware of several other former employees of Amazon who have worked for companies providing cloud based services and hyper scaling to customers, which in my understanding is in direct competition with Amazon. Some of these individuals include Osvaldo Morales, Bowen Wallace, Micheal Czmara, Khozem Lokhandwala, Brock Gardner, and many others who previously held security, engineering, project management, capacity planning and other high-level positions at AWS.

24. I had no knowledge of a "rebate agreement" between Amazon and KBC at the time any payments from KBC went to Northstar. Nor was I involved in any communications directing KBC to pay any money to Northstar in connection with the IAD123/124 and IAD144/145 Lease Transactions.

25. Attached as Exhibit R hereto is a true and correct copy of an email chain between Todd Meldahl and other individuals, including myself, between March 5 and March 19, 2019.

26. While at Amazon, I used a portable hard drive to back up my Amazon files following instruction from Amazon's IT department to back-up my files after a crash of my laptop, and IT's salvage of those files in August 2018. Attached as Exhibit S is a true and correct copy of email correspondence with me regarding this matter.

27. On the date of my termination I left the hard drive on my desk. I was escorted out by my then supervisor Joe Minarik and was not allowed to take any electronic devices or materials from the premises.

28. After my termination, I received a plastic storage Rentacrate delivered from Amazon. That crate contained some of my personal belongings left behind at Amazon when I was terminated. It also contained the hard drive I had left at Amazon's offices on the date of my termination. I never made any request that the hard drive in question be returned to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief

Executed on January 11, 2023

_____
CARLETON NELSON

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2023, a true and correct copy of the foregoing has been served through this Court's ECF system on all parties appearing in the action.

*/s/ Rachel Friedman*
RACHEL FRIEDMAN