**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

AMAZON.COM, INC. and AMAZON DATA SERVICES, INC.,

Plaintiffs,

v.

WDC HOLDINGS LLC dba NORTHSTAR COMMERCIAL PARTNERS; BRIAN WATSON; STERLING NCP FF, LLC; MANASSAS NCP FF, LLC; NSIPI ADMINISTRATIVE MANAGER; NOVA WPC LLC; WHITE PEAKS CAPITAL LLC; VILLANOVA TRUST; CARLETON NELSON; CASEY KIRSCHNER; ALLCORE DEVELOPMENT LLC; FINBRIT HOLDINGS LLC; CHESHIRE VENTURES LLC; 2010 IRREVOCABLE TRUST; SIGMA REGENERATIVE SOLUTIONS LLC; CTBSRM, INC.; RODNEY ATHERTON; DEMETRIUS VON LACEY,

Defendants.

CASE NO. 1:20-CV-484-RDA-IDD

800 HOYT LLC,

Intervening Interpleader Plaintiff, Intervening Interpleader Counter-Defendant,

v.

BRIAN WATSON; WDC HOLDINGS, LLC; BW HOLDINGS, LLC,

Interpleader Defendants,

and

AMAZON.COM, INC., and AMAZON DATA SERVICES, INC.,

Interpleader Defendants, Interpleader Counter-Plaintiffs.

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS CARLETON NELSON AND CHESHIRE VENTURES, LLC, BRIAN WATSON, WDC HOLDINGS, LLC, STERLING NCP FF, LLC, MANASSAS NCP FF, LLC, AND NSIPI ADMINISTRATIVE MANAGER, RODNEY ATHERTON, AND CASEY KIRSCHNER**

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ... iii

INTRODUCTION ... 1

STATEMENT OF FACTS ... 4

I. Amazon's Statement of Material Facts ... 4

A. Nelson and Kirschner were entrusted with critical gatekeeping responsibilities with respect to Amazon's real estate investments ... 4

B. Nelson and Kirschner exploited their roles to create a kickback scheme with developer Brian Watson ... 6

C. Defendants disguised the kickbacks as purported "referral fees" ... 8

D. Nelson and Kirschner steered nine Amazon lease deals to the Watson Defendants, in exchange for millions of dollars in kickbacks ... 9

E. Defendants carried out fraudulent real estate purchase transactions, from which they personally siphoned tens of millions of illicit gains ... 13

F. Defendants conspired to set up a web of trusts and entities to funnel and launder their millions of dollars in kickbacks to evade detection ... 16

G. Defendants never disclosed these payments or other arrangements to Amazon ... 19

II. Response to Defendants' Statements of Material Facts ... 20

A. Nelson's purportedly undisputed facts ... 21

B. Atherton's purportedly undisputed facts ... 26

C. Kirschner's purportedly undisputed facts ... 29

D. Watson's purportedly undisputed facts ... 29

LEGAL STANDARD ... 36

SUMMARY OF ARGUMENT ... 37

ARGUMENT ... 42

I. The RICO Claim (Count I) Must Go To The Jury ... 42

A. Defendants injured Amazon's business and property ... 42

B. Defendants formed a racketeering enterprise ... 51

C. Atherton participated in the RICO enterprise and committed predicate offenses ... 63

D. The statute of limitations does not bar the RICO claim against Atherton ... 65

II. The Fraud Claim (Count III) Must Go To The Jury ... 66

III. Nelson And Kirschner Are Liable For Breach Of Contract (Count VI) ....................... 69
A. Nelson and Kirschner breached non-compete obligations.................................... 69
B. Nelson and Kirschner breached the confidential information provisions............. 71
C. Defendants' remaining contract arguments fail ................................................... 73
IV. Amazon's Civil Conspiracy Claim (Count V) Must Go To The Jury .......................... 73
V. Amazon May Pursue Both Equitable And Legal Claims ............................................ 75
VI. Amazon's Unjust Enrichment Claim (Count VII) Must Go To The Jury .................... 76
VII. The Detinue And Conversion Claims (Counts II & VIII) Must Go To The Jury......... 78
VIII. Amazon's Tortious Interference Claim (Count IV) Must Go To The Jury .................. 79
IX. Atherton Is Not Immune Simply Because He Is An Attorney..................................... 80
CONCLUSION ................................................................................................................... 80

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abraham v. Singh*,
480 F.3d 351 (5th Cir. 2007) ....................62

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)....................36

*Agency Holding Corp. v. Malley-Draft Assocs. Inc.*,
483 U.S. 143 (1987)....................65

*Aggarwal v. Sikka*,
2012 WL 12870349 (E.D. Va. June 12, 2012) ....................63

*Al-Abood v. El-Shamari*,
217 F.3d 225 (4th Cir. 2000) ....................60, 62, 63

*All. Tech. Grp., LLC v. Achieve 1, LLC*,
2013 WL 143500 (E.D. Va. Jan. 11, 2013) ....................67

*Amazon.com Inc. v. Powers*,
2012 WL 6726538 (W.D. Wash. Dec. 27, 2012) ....................70, 72

*Amazon.com, Inc. v. Moyer*,
417 F. Supp. 3d 1388 (W.D. Wash. 2019)....................70

*Amazon.com, Inc. v. WDC Holdings*,
LLC, 2021 WL 3878403 (4th Cir. Aug. 31, 2021)....................37, 75, 77, 78, 79

*Amazon.com, Inc. v. WDC Holdings LLC*,
2020 WL 4353563 (E.D. Va. July 28, 2020)....................37

*AmTruck Factors v. Int'l Forest Prods.*,
795 P.2d 742 (Wash. 1990)....................43, 45

*Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*,
155 F.3d 500 (4th Cir. 1998) ....................63

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................36

*Avalonbay Cmtys., Inc. v. Willden*,
2008 WL 2780983 (E.D. Va. July 16, 2008)....................66

*Baehr v. Creig Northrop Team P.C.*,
953 F.3d 244 (4th Cir. 2020) ....................................................................................47

*Bank of Montreal v. Signet Bank*,
193 F.3d 818 (4th Cir. 1999) ....................................................................................68

*Beck v. Prupis*,
529 U.S. 494 (2000)..........................................................................................51, 56, 74

*BMO Harris Bank, N.A. v. S&F Logistics, LLC*,
2022 WL 732071 (E.D. Va. Mar. 10, 2022)...............................................................76

*Bowe v. Public Storage*,
106 F. Supp. 3d 1252 (S.D. Fla. 2015) .....................................................................46

*Boyle v. United States*,
556 U.S. 938 (2009)..................................................................................39, 52, 58, 59, 60

*Brach v. Conflict Kinetics Corp.*,
2017 WL 3267961 (E.D. Va. July 31, 2017)..............................................................48

*Capital Lighting & Supply, LLC v. Wirtz*,
2018 WL 3970469 (D. Md. Aug. 20, 2018) ..............................................................62

*Catawba Indian Tribe of S.C. v. South Carolina*,
978 F.2d 1334 (4th Cir. 1992) ..................................................................................36

*City of Norfolk v. Norfolk County*,
91 S.E. 820 (Va. 1917)...............................................................................................78

*CMA CGM, S.A. v. Leader Int'l Express Corp.*,
474 F. Supp. 3d 807 (Va. 2020)..................................................................................71

*CVLR Performance Horses, Inc. v. Wynne*,
524 F. App'x 924 (4th Cir. 2013) ......................................................................40, 60, 62

*D'Addario v. Geller*,
264 F. Supp. 2d 367 (E.D. Va. 2003) ........................................................................60

*Dickerson v. TLC The Laser Eye Center Institute, Inc.*,
493 F. App'x 390 (4th Cir. 2012) ...............................................................................46

*Donaldson v. Primary Residential Mortg., Inc.*,
2020 WL 3184089 (D. Md. June 12, 2020)...................................................................55

*United States ex rel. Drakeford v. Tuomey*,
792 F.3d 364 (4th Cir. 2015) .....................................................................................43

*Dunlap v. Cottman Transmission Sys. LLC*,
754 S.E.2d 313 (Va. 2014)....................39, 67, 74, 79, 80

*Edmonson & Gallagher v. Alban Towers Tenants Ass'n*,
48 F.3d 1260 (D.C. Cir. 1995)....................62

*Efron v. Embassy Suites (Puerto Rico), Inc.*,
223 F.3d 12 (1st Cir. 2000)....................62, 74

*United States ex rel. Emanuele v. Medicor Assocs.*,
2017 WL 4867614 (W.D. Pa. Oct. 26, 2017)....................43

*Eplus Tech., Inc. v. Aboud*,
313 F.3d 166 (4th Cir. 2002)....................61

*Express Servs., Inc. v. Averette*,
2007 WL 1888652 (W.D. Okla. June 29, 2007)....................72

*Faulknier v. Shafer*,
563 S.E.2d 755 (Va. 2002)....................76, 77

*Fed. Ins. Co. v. Smith*,
63 F. App'x 630 (4th Cir. 2003)....................78

*Fed. Ins. Co v. Smith*,
144 F. Supp. 2d 507 (E.D. Va. 2001)....................79

*Fed. Reserve Bank of Richmond v. Peters*,
123 S.E. 379 (Va. 1924)....................79

*Fleischhauer v. Feltner*,
879 F.2d 1290 (6th Cir. 1989)....................39, 51, 56

*Flip Mortgage Corp. v. McElhone*,
841 F.2d 531 (4th Cir. 1988)....................63

*Folmar v. Harris*,
650 F. App'x 818 (4th Cir. 2016)....................68

*GE Inv. Private Placement Partners II v. Parker*,
247 F.3d 543 (4th Cir. 2001)....................60, 61, 74

*Gelber v. Glock*,
800 S.E.2d 800 (Va. 2017)....................74

*Goodweather v. Parekh*,
2021 WL 4149030 (E.D. Va. Sept. 10, 2021)....................56, 64

*Grenoble v. Gregory*,
2018 WL 10464031 (E.D. Va. Jan. 11, 2018) ....................36

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989)....................60, 61

*Hall v. Williams*,
960 F.2d 146 (4th Cir. 1992) ....................37, 41

*Handeen v. Lemaire*,
112 F.3d 1339 (8th Cir. 1997) ....................65

*Heinold v. Perlstein*,
651 F. Supp. 1410 (E.D. Pa. 1987) ....................46

*Hemmerdinger Corp. v. Ruocco*,
2016 WL 1588500 (E.D.N.Y. Apr. 19, 2016) ....................48

*Hino Motors Mfg. U.S.A., Inc. v. Hetman*,
2022 WL 16709717 (E.D. Mich. Aug. 4, 2022) ....................38, 43, 45

*Honeycutt v. United States*,
581 U.S. 443 (2017)....................56

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
790 F.3d 532 (4th Cir. 2015) ....................37

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)....................52

*Int'l Data Bank, Ltd. v. Zepkin*,
812 F.2d 149 (4th Cir. 1987) ....................61

*Ivar v. Elk River Partners, LLC*,
705 F. Supp. 2d 1220 (D. Colo. 2010)....................46

*James G. Davis Constr. Corp. v. FTJ, Inc.*,
841 S.E.2d 642 (Va. 2020)....................76

*Jared and Donna Murayama 1997 Trust v. NISC Holdings, LLC*,
727 S.E.2d 80 (Va. 2012)....................66

*Jones v. Harrison*,
458 S.E.2d 766 (Va. 1995)....................76

*Karpenski v. Am. Gen. Life Cos.*,
999 F. Supp. 2d 1235 (W.D. Wash. 2014)....................69

*Keil v. Seth Corp.*,
2021 WL 5088242 (E.D. Va. Nov. 2, 2021)....................67

*L-3 Commc'ns Corp. v. Serco, Inc.*,
926 F.3d 85 (4th Cir. 2019)....................74

*L-3 Servs., Inc. v. Szekely*,
2010 WL 11579457 (E.D. Va. Sept. 24, 2010)....................60, 62

*Liu v. SEC*,
140 S. Ct. 1936 (2020)....................76

*Ludwick v. Premier Bank North, Inc.*,
935 F. Supp. 801 (W.D. Va. 1996)....................68, 69

*Maio v. Aetna, Inc.*,
221 F.3d 472 (3d Cir. 2000)....................46

*Malvino v. Delluniversita*,
840 F.3d 223 (5th Cir. 2016)....................76

*McCarthy v. Kleindienst*,
741 F.2d 1406 (D.C. Cir. 1984)....................74

*McCulloch v. Tahsin Indus. Corp., USA*,
2022 WL 4484214 (W.D. Va. Sept. 27, 2022)....................48

*Menasco, Inc. v. Wasserman*,
886 F.2d 681 (4th Cir. 1989)....................61

*Mich. Mutual Ins. Co. v. Smoot*,
183 F. Supp. 3d 806 (E.D. Va. 2001)....................77

*Montoya v. PNC Bank, N.A.*,
94 F. Supp. 3d 1293 (S.D. Fla. 2015)....................58

*Morley v. Cohen*,
888 F.2d 1006 (4th Cir. 1989)....................39, 48

*Morrow v. Blessing*,
2004 WL 2223311 (E.D. Pa. Sept. 29, 2004)....................63

*Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*,
359 F. Supp. 3d 546 (E.D. Tenn. 2019)....................63

*Murr v. Cap. One Bank (USA), N.A.*,
28 F. Supp. 3d 575 (E.D. Va. 2014)....................66

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
635 F. Supp. 2d 1170 (S.D. Cal. 2009)....................55

*Parcoil Corp. v. NOWSCO Well Serv., Ltd.*,
887 F.2d 502 (4th Cir. 1989)....................60

*Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*,
262 F.3d 260 (4th Cir. 2001)....................37, 42, 43, 45, 46, 65

*Rogers v. Nacchio*,
241 F. App'x 602 (11th Cir. 2007)....................74

*Salinas v. United States*,
522 U.S. 52 (1997)....................51, 56

*Seabury & Smith, Inc. v. Payne Fin. Grp., Inc.*,
393 F. Supp. 2d 1057 (E.D. Wash. 2005)....................70

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)....................43

*Sensormatic Security Corp. v. Sensormatic Electroncis Corp.*,
249 F. Supp. 2d 703 (D. Md. 2003)....................78

*Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc.*,
305 F. Supp. 3d 337 (D.R.I. 2018)....................55

*Sowell v. Butcher & Singer, Inc.*,
926 F.2d 289 (3d Cir. 1991)....................46

*Stallard v. Bank of America*,
137 F. Supp. 3d 867 (E.D. Va. 2015)....................79

*Town of Marlboro v. Scannapieco*,
545 F. Supp. 2d 452 (D.N.J. 2008)....................46

*Tudor Assocaites v. AJ & AJ Servicing, Inc.*,
36 F.3d 1094 (4th Cir. Table)....................63

*U.S. Sec. & Exch. Comm'n v. Johnson*,
43 F.4th 382 (4th Cir. 2022)....................77

*United States v. Baker*,
598 F. App'x 165 (4th Cir. 2015)....................56

*United States v. Bolden*,
325 F.3d 471 (4th Cir. 2003)....................38

*United States v. Bush*,
626 F.3d 527 (9th Cir. 2010) ....................................................................................58

*United States v. Carolina Transformer Co.*,
978 F.2d 832 (4th Cir. 1992) ....................................................................................36

*United States v. Cornell*,
780 F.3d 616 (4th Cir. 2015) ....................................................................51, 56, 60

*United States v. Farrell*,
921 F.3d 116 (4th Cir. 2019) ....................................................................................64

*United States v. Monu*,
782 F.2d 1209 (4th Cir. 1986) ..................................................................................38

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020).......................................................................................73

*United States v. Narang*,
2019 WL 3949308 (E.D. Va. Aug. 21, 2019)...........................................................64

*United States v. Nunez*,
432 F.3d 573 (4th Cir. 2005) ....................................................................................54

*United States v. Palacios*,
677 F.3d 234 (4th Cir. 2012) ....................................................................................52

*United States v. Philip Morris*,
316 F. Supp. 2d 19 (D.D.C. 2004).............................................................................56

*United States v. Pinson*,
860 F.3d 152 (4th Cir. 2017) ....................................................................................54

*United States v. Skilling*,
561 U.S. 358 (2010)..............................................................................................38, 40

*United States v. Taylor*,
942 F.3d 205 (4th Cir. 2019) ....................................................................................38

*United States v. Tillett*,
763 F.2d 628 (4th Cir. 1985) ....................................................................................55

*United States v. Vinyard*,
266 F.3d 320 (4th Cir. 2001) ...............................................................................38, 68

*Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*,
996 F.2d 1534 (3d Cir. 1993).....................................................................................65

*Van Deusen v. Snead*,
441 S.E.2d 207 (Va. 1994)....66

*Volvo v. Trademark Holding Aktiebolaget v. Clark Machinery Co.*,
510 F.3d 474 (4th Cir. 2007)....75

*Weiss v. Bank of Am. Corp.*,
153 F. Supp. 3d 831 (W.D. Pa. 2015)....55

*West Virginia v. Moore*,
895 F. Supp. 864 (S.D.W. Va. 1995)....47

*Williams v. Ricoh Ams., Corp.*,
203 F. Supp. 3d 692 (E.D. Va. 2016)....36, 42

*Wilson v. 5 Choices, LLC*,
776 F. App'x 320 (6th Cir. 2019)....56

*Zito v. Leasecomm Corp.*,
2004 WL 2211650 (S.D.N.Y. Sept. 30, 2004)....55

**STATUTES**

18 U.S.C. § 1956(a)....38, 64

18 U.S.C. § 1957....64

18 U.S.C. § 1961....52

18 U.S.C. § 1962....51

18 U.S.C. § 1962(c)....65

18 U.S.C. § 1962(d)....50, 55, 56, 59

18 U.S.C. § 1964(c)....37, 42, 48

Racketeer Influenced and Corrupt Organziations Act,
84 Stat. 947 (1970)....52

Va. Code § 18.2-499(A)....74

**RULES**

Fed. R. Civ. P. 12....55

Fed. R. Civ. P. 30(b)....31

Fed. R. Civ. P. 56(a)....4, 36

**TREATISES**

10A Wright & Miller, Fed. Prac. & P. § 2730 (2d ed. 1983) ....................................................37, 41

11 James Wm. Moore et al., Moore's Fed. Prac. § 56.91[2] (3d ed. 2015)..................................37

Restatement (First) of Restitution § 1, *cmt. e.* ..................................................................76

Restatement (First) of Restitution § 144 *cmt. a* ..................................................................76

Restatement (Third) of Restitution and Unjust Enrichment, § 2, *cmt. c* (2011) ............................76

Restatement (Third) of Restitution and Unjust Enrichment, § 48 & *cmts. b, d* (2011) ................77

Amazon.com, Inc. and Amazon Data Services, Inc. ("Amazon") respectfully oppose the motions for partial summary judgment by Carleton Nelson and Cheshire Ventures ("Nelson"), Brian Watson and WDC Holdings ("Northstar," together with Watson and the entities under his control,[1] "Watson Defendants"), Casey Kirschner, and Rodney Atherton (collectively, "Defendants").

**INTRODUCTION**

This case is about a massive kickback scheme orchestrated by two former Amazon employees, Carleton Nelson and Casey Kirschner,[2] to illegally profit from over $500 million in Amazon real estate development projects. Nelson and Kirschner exploited their positions as real estate transaction managers to steer lease projects to corrupt developers, including Brian Watson and his company Northstar, in exchange for millions of dollars in kickbacks that were laundered through a series of shell entities.

The evidence of this scheme is overwhelming and includes Defendants' own admissions of their involvement. In a signed statement to the FBI, Kirschner confessed to participating in a "kickback scheme" in which "Northstar paid kickbacks" to "Carl Nelson and me" on "Amazon development deals in Northern Virginia." SOF ¶ 31.[3] Nelson likewise admitted in a recorded conversation that he and Kirschner took money from Northstar through the Villanova Trust ("Villanova"), a shell entity controlled by Kirschner's brother, Christian. SOF ¶¶ 31-32. Nelson acknowledged that this was "sketchy ass s[*]t," while bragging how Amazon employees were "idiot[s]" for approving the fraudulent transactions. SOF ¶ 32. Nelson also acknowledged that

---

[1] Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager.

[2] Casey Kirschner's brother, Christian Kirschner, is also a participant in the conspiracy. For the sake of clarity, any reference to Christian will identify him as "Christian" or "Christian Kirschner." Statements regarding "Kirschner" alone refer to Casey Kirschner.

[3] Unless otherwise noted, all citations to "SOF ¶ __" refer to Amazon's Statement of Facts, *supra*, and the evidence cited therein.

there was "no question" the scheme could violate Amazon's Code of Business Conduct and Ethics ("Code of Conduct") and the anti-bribery provisions of the transaction contracts. SOF ¶ 31. Other participants in the scheme, including Christian Kirschner and Northstar's Kyle Ramstetter, repeatedly invoked their Fifth Amendment right to remain silent when deposed. SOF ¶ 18.

Rodney Atherton, the corrupt lawyer who set up the shell entities used to launder the kickbacks, advised Nelson and Kirschner that the payments [redacted] SOF ¶ 30, but Atherton nevertheless joined in the scheme in exchange for a cut of the proceeds and engaged a "straw guy," Von Lacey, to falsify ownership records and conceal Nelson and Kirshner's involvement. SOF ¶ 31. According to Nelson, Atherton's "job" was "to make [Nelson and Kirschner] invisible" and to ensure that their "names [we]re completely scrubbed off everything." SOF ¶ 31. Before Atherton laundered the money, Nelson was "scared s[*]tless" of getting caught, but Nelson later "realized how clean it [wa]s" with Atherton involved. SOF ¶ 32.

All in all, Nelson and Kirchner orchestrated kickbacks on eleven commercial real estate transactions—nine leases and two purchases. They inflated Amazon's rent and other costs on the leases, which Watson used to pay them millions in kickbacks. And they structured the purchases so third parties would buy the properties and immediately sell or assign them to Amazon for $10 to $17 million more. The profits generated by these one-day "flip" sales were used to pay Nelson, Kirschner, and their co-conspirators millions more in kickbacks. In total, Defendants illegally obtained more than $33 million from this scheme.

Defendants nevertheless seek summary judgment on all Amazon's claims in the hope of avoiding the trial they have repeatedly requested. But the hodgepodge of arguments they assert over the span of 133 pages are factually and legally meritless. Their primary argument is that the tens of millions of dollars they *admit* to extracting from Amazon deals did not "damage" Amazon.

But the evidence shows the opposite: Defendants' kickback scheme caused Amazon tens of millions of dollars in injury. On the purchase transactions alone, Amazon paid $27 million more for the properties than it would have but for Defendants' fraudulent "flip" sales—at least $6 million of which went to Nelson and Kirschner as kickbacks, while another $5 million went to Watson to keep quiet about the fraud. Defendants also defrauded Amazon into overpaying by millions of dollars on the Northstar leases. Indeed, Kirschner specifically coached the Watson Defendants on how to manipulate the lease fees and other terms to fund the kickbacks without triggering the internal scrutiny that would arise if Northstar became one of Amazon's "most expensive" developers. SOF ¶ 15. All of those fraudulently induced terms directly increased Amazon's rents, which is a legally cognizable injury. The same is true of [redacted] (and was ultimately used to fund additional kickbacks). Defendants' quibbles with the directness or precise amounts of Amazon's injuries raise, at best, disputes of fact for trial.

Defendants' other arguments fare no better. *First*, Defendants contend that Amazon cannot prove a RICO enterprise. But there are reams of evidence that Defendants formed an association-in-fact enterprise with a common purpose, consistent actors, and continuity, that Atherton participated in that enterprise, and that he did so within the applicable limitations period. *Second*, Defendants contend that they had no duties to Amazon that support a fraud claim, or that they did not participate in certain fraudulent transactions. But Nelson and Kirschner had a legal duty to disclose the illegal kickbacks both during and after their employment at Amazon—as did the Watson Defendants, who concealed the fraudulent purchase transactions, including by demanding and accepting $5 million in hush money. *Third*, Nelson and Kirschner contend that they do not have enforceable contracts with Amazon and, in any event, did not breach any contractual term. Their

contracts with Amazon are enforceable under well-established Washington law, and there is overwhelming evidence that they breached their non-compete and confidentiality obligations. *Fourth*, Defendants contend that Amazon cannot pursue both equitable and legal claims. The Fourth Circuit, however, has already rejected that argument, and its decision remains the law of this case. *Finally*, Defendants raise a variety of challenges to Amazon's equitable claims, but none has merit. There is more than enough evidence for a jury to find in Amazon's favor on each of those claims.

Overall, the record in this case is clear: Defendants orchestrated and participated in a long-running kickback scheme that caused significant harm to Amazon. While Defendants are now trying to avoid the consequences of their actions, they have not identified *any* claim for which there is "no genuine dispute as to any material fact" that would allow "judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants' motions must be denied.

## STATEMENT OF FACTS

### I. Amazon's Statement of Material Facts

#### A. Nelson and Kirschner were entrusted with critical gatekeeping responsibilities with respect to Amazon's real estate investments

1. Carleton Nelson and Casey Kirschner were Real Estate Transaction Managers at Amazon. They were responsible for identifying and selecting Virginia real estate locations suitable for Amazon's business needs, for structuring and negotiating the financial and business terms for these transactions on behalf of Amazon, and for presenting those transactions for internal approval at Amazon. Ex. 1 at 24:19-25, 25:24-26:3, 246:17-23; Ex. 2 at 17:3-16; Ex. 3 at 259:8-261:3. They had first-line responsibility for Amazon's real estate portfolio in Northern Virginia, and acted as gatekeepers for commercial partners, such as landlords and real estate developers, who sought to work with Amazon on those deals. Ex. 3 at 108:10-18, 260:8-261:3; Ex. 4 at 60:23-61:11; Ex. 1 at 300:25-301:11. Amazon relied on them to negotiate the terms of leases or pur-

chases and to fully and accurately provide all facts relevant to the transactions they sourced, structured, and presented for approval, including any fees payable to any party as a result of those transactions, the purchase history of any land associated with those transactions, and any other nonstandard terms, with supporting facts explaining why accepting those terms would be in Amazon's best interests. Ex. 5 at 194:8-23, 306:25-307:17; Ex. 3 at 120:7-121:21, 439:20-440:15.

2. As Amazon employees, Nelson and Kirschner also were subject to rules and obligations. These included duties flowing from:

a. ***Spending and Transaction Policy*:** Amazon's Spending and Transaction Policy, [redacted] including those for which Nelson and Kirschner were responsible, [redacted] Ex. 6.

b. ***CNIAA***: Nelson and Kirschner each signed a "Confidentiality, Noncompetition and Invention Assignment Agreement" ("CNIAA"). Exs. 7-8. These contracts expressly prohibited them from using any confidential information "directly or indirectly, at any time, during the term of [their] employment with the Company or at any time thereafter … in connection with any activity or business except the business of the Company." Exs. 7-8. "Confidential Information" is defined to include, among other things, "information about the Company's future plans" and any other intelligence "that could reasonably be expected to prove deleterious to the Company if disclosed to third parties." Exs. 7-8.

c. ***Code of Conduct*:** During their employment, both Nelson and Kirschner also certified compliance with Amazon's Code of Conduct. Ex. 9-11. The Code of Conduct requires Amazon personnel to, among other things, (i) "always act lawfully, ethically, and in the best interests of Amazon.com"; and (ii) "avoid" and "promptly notify the Legal Department" of any potential "conflicts of interest" such as "when an employee or a family member receives a personal benefit

as a result of the employee's position with Amazon.com." *See* Ex. 11. [redacted]

**B. Nelson and Kirschner exploited their roles to create a kickback scheme with developer Brian Watson**

3. From February 2018 through January 2020, Amazon entered into nine leases for commercial properties in northern Virginia (the "Lease Transactions") with Northstar-affiliated limited liability companies that acted as landlord-developers for the properties: Dulles NCP LLC; Quail Ridge NCP, LLC; Manassas NCP LLC; and Dulles NCP II LLC (collectively, "Landlords"). Exs. 12-20. Watson signed each lease agreement for each Landlord, and each deal came to Amazon through Nelson and Kirschner. *Id.*; *see also* Exs. 21-33.

4. The first lease agreement was executed just months after Northstar was introduced to Nelson and Kirschner in mid-2017 through Kirschner's brother, Christian Kirschner, who was Watson's close friend. Ex. 4 at 109:16-110:20. Christian texted Watson in July 2017 to say that [redacted] Ex. 34. Christian and Watson later connected about the "opportunity," and a few weeks later, Watson told others at Northstar that he was traveling to the East Coast to meet with Amazon's "corporate real estate director" because Amazon "want[s] us to build data storage facilities for them." Ex. 35. Watson confirmed in his deposition that the "director" he referenced was Kirschner. Ex. 4 at 105:8-12. After that visit, Watson circulated notes containing proprietary and commercially sensitive information regarding Amazon's future plans for real estate in Northern Virginia. Exs. 36-37. The

next month, Kirschner texted Watson to advise that he "ha[d] a project for you guys," but that "[w]e will need to move quick." Ex. 38. Watson traveled the following week to meet with Kirschner and Nelson and, as Watson told others at Northstar, "to close a commitment from Amazon in Seattle, for their data centers in Virginia." Ex. 39; Ex. 1 at 90:6-92:3; Ex. 2 at 42:3-13.

5. In September 2017, Northstar submitted what purported to be an RFP response in connection with the first of the Lease Transactions. Ex. 40-41. Internal Northstar emails confirm that Watson [redacted] Ex. 42. Kirschner wrote less than two weeks later to advise that [redacted] Ex. 43. Prior to that, Northstar had no preexisting business relationship with Amazon. Ex. 1 at 89:3-15; Ex. 4 at 58:6-25. Aside from Nelson and Kirschner, nobody at Amazon had met with or considered Northstar as a potential real estate partner prior to September 2017, when Nelson and Kirschner recommended to Amazon that Northstar be selected as landlord-developer for the first of the Lease Transactions. Ex. 4 at 58:6-25.

6. Amazon leadership ultimately approved the capital expenditure required for the first deal with Northstar in late December 2017. Ex. 44. The summary analysis submitted to Amazon leadership in support of the request relied on information that Kirschner and Nelson provided regarding the transaction. Ex. 21 at -471; Ex. 3 at 197:11-22. In those materials, Nelson and Kirschner represented that [redacted] Ex. 21 at -471. But, in fact, [redacted] Ex. 45 at 69:21-71:22, 72:25-73:13. Kirschner also failed to disclose to Amazon leadership that he, Nelson, and his brother Christian would be receiving kickbacks from Northstar on the deal. Ex. 21; *infra* ¶¶ 8-18, 37-39.

7. Even before closing the first deal, Nelson and Kirschner gave Watson assurances that Northstar would be awarded future deals. Kirschner reached out to Watson in December—

months before the first lease was signed, *see* Ex. 18—[redacted] Ex. 146 at 3. Amazon leadership was unaware of this arrangement or Kirschner's assurances; in fact, the formal documentation required to secure Amazon's approval of those deals did not even exist. Exs. 25-33.

**C. Defendants disguised the kickbacks as purported "referral fees"**

8. On January 8, 2018, shortly before executing the first of the lease agreements with Amazon, Northstar entered into a "referral agreement" with Villanova (the "Villanova Referral Agreement"). Exs. 46-47; Ex. 4 at 292-93. The referral agreement, which Christian Kirschner signed on behalf of Villanova, required Northstar to pay Villanova specific percentages of the fees and other proceeds Northstar received on all Amazon leases. Ex. 46. Villanova had been created approximately one week earlier by Defendant Rodney Atherton to receive the kickbacks that Northstar would pay to Nelson and Kirschner on Amazon deals in a manner that would not be visible to the public. Ex. 48 at 38:21-41:1, 42:21-43:5; Ex. 49.

9. The Villanova Referral Agreement was negotiated by Watson, Christian, and Kirschner, with Christian serving as an intermediary. Contemporaneous emails and communications show that Kirschner instructed Christian on which percentages should go into the agreement, with different terms for the initial lease and future leases. Exs. 50-51. Watson, Christian, and Kirschner—again, through Christian—negotiated the fee and yield terms that would be inserted into future Amazon leases and dictate the size of the kickback payments to Villanova. Ex. 52; Ex. 4 at 278:4-279:19; *see also* Exs. 50-51; Ex. 53. Christian wrote Watson that Northstar "can charge [Amazon] a 2% NCP Lease Commission to offset the 1.5 percent" Northstar would pay Villanova in kickbacks. Ex. 52; Ex. 4 at 272:13-274:14. The terms were to escalate after the first deal, which was "too lean" to support certain percentages. Ex. 52; Ex. 4 at 278:4-279:19; *see also* Exs. 50-51.

10. Christian did not work at Amazon, and did not have authority to negotiate the terms of Amazon's leases with Northstar. Nelson and Kirschner, however, had first-line responsibility for the Lease Transactions. *See supra* ¶ 1. They selected Northstar as the landlord-developer for each of the transactions, participated in shaping the financial and business terms of the transactions, including by helping develop project budgets with inflated fees, and shepherded each of the deals through Amazon's internal approval process. Exs. 21-33, 54-55; *see also* Ex. 1 at 24:19-25, 25:24-26:3, 246:17-23; Ex. 2 at 17:3-16, 101:19-102:9. The Watson Defendants appreciated this, and knew that they were not negotiating with Christian alone. Although Watson did not directly negotiate with Kirschner in writing about the terms of the Villanova Referral Agreement, emails that Watson exchanged with then-employee Kyle Ramstetter regarding the negotiations refer repeatedly to Christian's proposed terms for Villanova as "*their* outline" and "*their* requests," specifically purport to calculate fees that would be "[t]heirs" under the latest proposed deal model and expressly reference Casey Kirschner by name. Ex. 56. Around the same time, in text messages between Watson and Christian in December 2017, Watson informed Christian of assurances he received from Kirschner about future Amazon deals that would be awarded to Northstar. Ex. 47. Christian pointedly responded that they should "get the [Villanova] agreement done Monday" because he had told Kirschner that "we would get that taken care of." *Id.*

**D. Nelson and Kirschner steered nine Amazon lease deals to the Watson Defendants, in exchange for millions of dollars in kickbacks**

11. Nelson and/or Kirschner presented, and ultimately obtained approval for, all nine Lease Transactions involving Northstar. Exs. 21-33. By Watson's own estimate, these deals were worth hundreds of millions of dollars. Ex. 57. After Kirschner wrote Watson to confirm that Northstar was to be awarded the first deal, but before the transaction was even submitted for formal approval by Amazon leadership, Watson reached out to potential lenders and investors seeking lines of credit on behalf of Northstar "for deals we have secured with Amazon." *Id.* Watson's

document productions show that as of December 2017, he was writing to investors about his Amazon projects, which he said were "the most lucrative facilities to do with them." Ex. 58 at -308. He represented that he had "secure[d] such large projects, with many more to come, with … a corporate guarantee from a Top Fortune 10 company where they are spending hundreds of millions of dollars of their own money for build out." *Id.*; Ex. 4 at 235:19-238:16.

12. In each and every one of the lease agreements at issue, Watson—as signatory for Northstar's landlord-developer affiliates—promised to "promptly provide written notice to [Amazon] regarding all pertinent facts relating to any improper solicitation, demand or other request for a bribe, improper gift or anything of value, made by any party in connection with any activities performed by [Northstar] pursuant to this Deed of Lease," and to "fully assist and cooperate with any investigation of actual or suspected breach of this Section." Exs. 12 ¶ 40, 13 ¶ 40, 14 ¶ 40, 15 ¶ 40, 16 ¶ 40, 17 ¶ 40, 18 ¶ 40, 19 ¶ 40, 20 ¶ 40. Each of the leases also contained a provision stating that each "party represents and warrants that it has dealt with no broker, agent, or other person in connection with this transaction and that no broker, agent, or other person brought about this transaction, other than the brokers, if any, set forth at the beginning of the Lease, whom [Northstar] agrees to compensate per separate agreement (a copy of which will be provided by [Northstar] to [Amazon])." *See, e.g.*, Ex. 12 ¶ 34. This language also appeared in a draft lease that accompanied the September 2017 RFP, and that Northstar submitted in revised format with its RFP response. Ex. 41 at 38, 42. Northstar reviewed and provided proposed edits to the draft lease, but did not revise or otherwise push back on those paragraphs. *Id.* at 15-44.

13. The terms that Watson, Kirschner, and Christian negotiated in connection with the Villanova Referral Agreement are directly tied to the financial terms of the lease agreements at issue. For example, one final lease agreement includes a budget with [redacted]—the exact percentage Christian directed Watson to include, after confirming with Kirschner that the

term was "acceptable." Ex. 12 at -858; Ex. 50 at 1-2. Under the terms of their arrangement, Villanova would receive a majority share of [redacted], with the cost "built into the lease rate cost for the tenant [Amazon]," in addition to "20% of the development fee" and "20% of Brian Watson's Net Manager's Profits." Ex. 59. [redacted] Ex. 12 at -858. Because the rent contractually payable by Amazon under the Lease Transactions was derived from development costs and yield on cost rates, Ex. 60 at 179:20-24, the increase in project budget costs necessarily triggered a corresponding increase in Amazon's long-term rent obligations. Defendants accordingly structured the lease agreements and underlying project budgets in this manner so that the kickback payments to Villanova would, in Watson's words, "be rolled into the rent" that would be charged to Amazon. Ex. 61 at 2; *see* Ex. 62; Ex. 4 at 345:5-346:14

14. Defendants' discussions can be traced to specific Amazon deal terms. The draft project budget in the RFP response that Northstar submitted to Amazon in September 2017 for the first Lease Transaction did not include [redacted] Ex. 41 at 13. On February 13, 2018, Christian advised Watson that they would need to "modify the budget" for the first two Lease Transactions "asap." Ex. 63. Christian then followed up with specifics: "Sterling 1. Revised budget to Casey. Please add: Bldg 1 - $300k lease fee. Bldg 2 - $500k." *Id.* These precise fees made their way into the project budgets that appeared in the final lease agreements, which Amazon and Watson signed a mere two weeks later. Ex. 18 at -375; Ex. 20 at 68. Again, these fees appeared as "costs" that would be rolled into the budget, inflate Amazon's rent, and fund the kickbacks. Exs. 61-62.

15. Internal emails also show that Kirschner and Northstar negotiated yields that were higher than they had initially agreed to (and that Northstar would have accepted), but were not so high as to trigger scrutiny by Amazon leadership reviewing the deal. Ex. 64 at 5. Reporting back to Watson on the negotiations, Ramstetter explained that Kirschner could not approve the even

higher yield Northstar had proposed because it would make Northstar one of Amazon's "most expensive" partners, and because "for us 'on paper' to remain competitive for his internal review, we needed to be at that 6.7% [yield rate] level." *Id.*; Ex. 4 at 339:12-342:8.

16. Northstar also received additional fees that were owed to Amazon but that Kirschner, Watson, and Christian had included in the Villanova Referral Agreement. *See* Exs. 65, 50. For example, [redacted] Ex. 66 at 106:2–107:6. [redacted] Ex. 66 at 234:14-235:-24, 237:9-24.

17. Villanova ultimately received a total of $5,112,984 in kickbacks from Northstar in connection with the nine leases under the Villanova Referral Agreement. Ex. 68 at 52. Most of those kickbacks were transferred to other entities controlled by Nelson and Kirschner before being passed directly into their hands as sham loans or to a purported real estate business that they intended to operate for their personal benefit. Ex. 68 at 52-54; *see also* Ex. 2 at 21:14-23, 24:10-14; Ex. 1 at 52; SOF ¶¶ 28-34.

18. Two Northstar employees who worked on the Amazon transactions under Watson's direction—Kyle Ramstetter and Will Camenson—have both invoked the Fifth Amendment and refused to answer any substantive questions about the transactions at issue in this case. Exs. 69-70. Christian Kirschner likewise has declined on Fifth Amendment grounds to answer any questions about the Villanova Referral Agreement or his role in the events described here. Ex. 71.

### E. Defendants carried out fraudulent real estate purchase transactions, from which they personally siphoned tens of millions of illicit gains

19. On July 30, 2019, Amazon purchased a property (the "White Peaks Transaction") from White Peaks Capital LLC and Nova WPC LLC (collectively, "White Peaks"). White Peaks was controlled by Ramstetter and Camenson, both of whom were then employed by Northstar. Exs. 72-75. They purchased the land involved in that transaction *the same day*, netting a one-day profit of approximately $15.6 million. Ex. 68 at 57. Both Kirschner and Nelson facilitated the White Peaks Transaction internally within Amazon, including by presenting summaries during Amazon's internal deal approval process (or "CAR" process). *See* Ex. 76; *see also* Ex. 55 at 3, 6; Ex. 54. In the weeks before the deal was finalized and approved by Amazon leadership, Nelson wrote Ramstetter and instructed him to "work with me on getting the contract clean ASAP and I'll push the internal CAR to clean that out …. Then we move to PSA with you [] And it will go fast …. This is all I'm focused on now [] So we will get it done!" Ex. 77 at 15-16.

20. After leaving Amazon, but before the White Peaks deal closed, Nelson exerted pressure on Ramstetter to have White Peaks pay him and Kirschner two-thirds of the profits from the White Peaks Transaction, in exchange for being cut into future deals with them. Ex. 78 at 4-9. After closing, Ramstetter ultimately transferred nearly $1 million of the White Peaks proceeds via a middle-man consulting company to the 2010 Irrevocable Trust ("2010 Trust"), which Atherton had created for Nelson, Kirschner, and Christian. Exs. 79-82; *see* Ex. 83 at 11-12. That middle-man invoiced the total back to White Peaks. *See* Ex. 84. The money transferred to the 2010 Trust was then routed to Nelson and Kirschner through other shell entities that Atherton created. Ex. 68 at 61-73; *see also infra* ¶¶ 28-34. The middleman has refused on Fifth Amendment grounds to answer any questions about the money transfer. Ex. 85.

21. In September 2019, Watson demanded that Ramstetter and Camenson pay him $16 million in connection with the White Peaks Purchase, on the theory that they breached their duty

of loyalty to Northstar by doing the deal for their own benefit while employed by Northstar. Ex. 86 at 47:11–15; *see also* Ex. 4 at 94:4-96:7. In response, [redacted] Exs. 87-89. [redacted] Ex. 88; *see also* Ex. 45 at 105:21-106:6.

22. [redacted] Ex. 90. [redacted] *See id.*; *see also* Ex. 91. Watson never disclosed to Amazon [redacted], despite the lease provisions requiring him to do so, except to tell Kirschner—who was, himself, a participant in the scheme. Ex. 4 at 161:19-163:1; Ex. 88 at 2; SOF ¶ 12.

23. Amazon purchased another property in December 2019 from the Blueridge Group (the "Blueridge Transaction"). The deal originated in early 2019, when Nelson and Kirschner pursued a transaction with the owner of a parcel of land in Chantilly, Virginia, for a data center project. Ex. 45 at 122:15-123:24; Ex. 92 at 9-11. Both Kirschner and Nelson facilitated the deal within Amazon, including as part of the CAR approval process. *See* Ex. 54 at 5; *see also* Ex. 1 at

296:7-9. Nelson initially identified what would become the Blueridge property in an internal strategy presentation in April 2019. Ex. 93. Amazon did not proceed with the transaction at that time. Ex. 94 at 97:17-98:1. The next month, Nelson and Kirschner introduced the Blueridge Group ("Blueridge") into the transaction, Ex. 95; Ex. 45 at 134:2-21, 136:17-137:8, and Blueridge agreed to purchase the land from the seller for approximately $73 million. Ex. 96.

24. In late 2019, after Nelson's termination, *see* Nelson SOF ¶ 10, Kirschner resurrected the Blueridge deal at Amazon. Ex. 97. That November, Kirschner proposed, and Amazon agreed, to purchase the Blueridge parcel of land for $73 million and pay the Blueridge Group a $10 million assignment fee. Ex. 45 at 171:7-13; Ex. 92 at 10-11. On December 23, 2019, Amazon was assigned the purchase agreement and acquired the property for $83 million. *See* Ex. 98.

25. Around the same time, Blueridge Group entered into a consulting agreement with Finbrit Holdings LLC ("Finbrit"), an entity that Atherton established and Nelson controlled. *See* Ex. 99. The agreement provided that Finbrit would be paid a "Finder's Fee" set at 50% of the net proceeds paid to the Blueridge Group at closing of the Blueridge Transaction. Ex. 100.

26. After the Blueridge transaction closed on December 23, 2019, Blueridge Group paid a kickback of $4,818,955.50 to the 2010 Trust, which Atherton had created and was the sole member of Finbrit. Ex. 101; Ex. 83 at 10-12. From there, the kickback funds flowed to other shell entities controlled by Nelson and Kirschner. Ex. 68 at 61-73. A portion of the kickback funds were provided directly to Nelson and Kirschner through sham loans, and another portion remained in another entity they controlled (purportedly to set up a real estate development company for their benefit). *Infra* ¶¶ 28-34; Ex. 1 at 345:11-346:12. The kickback money thus allowed Nelson to profit from a deal he engineered while at Amazon, and for Kirschner to profit while still an Amazon employee. Ex. 68 at 61-73, 90-92.

27. Nelson was able to secure this profit, and do so without Amazon's knowledge of

his participation in the Blueridge transaction, because following his departure, Kirschner took over Nelson's responsibility for real estate transactions in the Virginia area and oversaw another Amazon employee, Jason Fogle, who back-filled Kirschner's old role. Ex. 2 at 21:9-20. Nelson explained their future plans in a July 2019 conversation with Ramstetter at the Denver International Airport, which Ramstetter recorded: "All these other deals we've got going on are gonna pay in. And a lot of them, I teed up before I left the business. Now Casey's gonna have to get them—Casey will get them through. He knows how to get them through." Ex. 78 at 22; Ex. 1 at 303:7-307:9. He elaborated: "Jason [Fogle]'s value is, he's staying behind at Amazon. … But he's gonna have to show that he's capable of getting deals approved. … If he can't [*sic*] deals approved, then – well then, I'm gonna say why would we pay you a bunch of money to come over here, when you can't f[*]ing feed us deals …. ***That's the whole point***." *Id.* at 20 (emphasis added).

### F. Defendants conspired to set up a web of trusts and entities to funnel and launder their millions of dollars in kickbacks to evade detection

28. After Villanova was established and the Villanova Referral Agreement was executed, Nelson, Kirschner, and Christian worked with Atherton to establish a series of other entities that would receive and launder the kickback payments, Ex. 102 at 11-12; Ex. 103 at 4, 11; Ex. 68 at 62-88, including the 2010 Trust, Finbrit, CTBSRM, Inc. ("CTBSRM"), AllCore Development LLC ("AllCore"), and Cheshire Ventures LLC ("Cheshire"). The formation documents for these entities directed the parties to manage the assets "without … the knowledge of any other person," and imposed a "duty" "to keep the details of the trust assets, income and operations secret." Ex. 104 at 1; Ex. 105 at 1; Exs. 106-107. These entities and others, including Sigma Regenerative Solutions LLC ("Sigma") and Renrets LLC ("Renrets"), helped disguise the flow of kickbacks from Villanova so that the scheme would not be detected. Ex. 103 at 4-5; Ex. 1 at 45:22-46:16.

29. Ultimately, of the kickbacks Northstar paid Villanova, roughly one-third remained or was transferred elsewhere for Christian Kirschner. Ex. 68 at 52-54. The remaining two-thirds

was transferred to the other entities Atherton established, and eventually to Nelson and Kirschner as direct payments, uncollateralized sham "loans," or purported investments in a development company they intended to establish for their personal benefit. *Id.*; Ex. 2 at 54:4-55:10.

30. In creating these entities, Atherton was [redacted] *See, e.g.*, Ex. 83 at 2-4; Ex. 48 at 50:2-51:14, 101:14-105:9; Ex. 2 at 134:4-136:1. Atherton wrote Nelson and Kirschner to advise them [redacted] Ex. 102 at 4; Ex. 83 at 2-4. [redacted] *Id.* at 6.

31. Kirschner confirmed the role that Atherton and these entities played in the "kick-back scheme" in a signed confession to the FBI, in which Kirschner admitted that he and Nelson received "kickbacks" paid through Villanova and "the 2010 Irrevocable Trust, which Rod Atherton set up," from "Northstar" and "Watson." Ex. 108. Nelson described Atherton's role in the kickback scheme during his recorded July 2019 conversation: "Rod's job is to make us invisible. That is exactly what he's doing …. Our names are completely scrubbed off everything." Ex. 78 at 1-2. Nelson also agreed there was "no question" that the scheme violated Amazon's Code of Conduct and the lease agreements, but assured Ramstetter that thanks to Atherton, "the only people that are gonna know about this, are gonna be you, me, and Casey." *Id.* Nelson also described how from the millions of dollars in kickbacks the entities were receiving, "we pay Rod [Atherton] a hundred and fifty thousand a year, [and] we pay [Defendant Demetrius] Von Lacey to be a straw guy." *Id.* at 31. And Watson acknowledged the scheme in a 2019 recording in which Ramstetter advised that "Casey and Carl" were "waiting" for a payment, and Watson replied that he was "shocked" by any implication that Nelson and Kirschner "don't think I'm gonna pay them." Ex. 109 at 35-36; Ex. 60 at 246:6-249:12.

32. Nelson also described the first deal that he received kickbacks on, explaining how "when we did our first deal, I was scared s[*]tless. I was like this is a f[*]ing – this is wrong. I don't feel like this is good. Once we did it, I realized how clean it is." Ex. 78 at 4. He also admitted that the first kickbacks, which were paid "through Casey's brother," were "some sketchy ass s[*]t." *Id.* at 8-9. Nelson further explained that by July 2019 (when the conversation was recorded), he "d[id]n't actually need the money" from kickbacks on additional deals because "I've put enough of the f[*]ing money I made on the Brian deals in the, you know, couple different investments and savings accounts." *Id.* at 17. Nelson has since admitted that "Brian deals" was a reference to Amazon's deals with Northstar, that is, the Lease Transactions. Ex. 1 at 319:15-321:4. He has also admitted that money from those deals, in the form of so-called "loans," flowed through various entities, including an LLC controlled by his father-in-law, and that he considered the loan proceeds "my money" for "my personal use." *Id.* at 320:25-321:17; *see id.* at 194:7-24.

33. Both Nelson and Kirschner have confirmed that they expected to benefit personally from the kickback funds. Nelson knew that the entities Atherton created were set up for his benefit, Ex. 1 at 295:5-23, and he estimated that the amounts funneled through them totaled "between … seven and nine million maybe," *id.* at 294:22-295:3. Kirschner, too, testified that he expected to receive financial opportunities and benefits from the entities, which derived from Villanova and the deals he had approved while at Amazon. Ex. 2 at 114:17-115:7; Atherton SOF ¶ 26.

34. Atherton advised Nelson and Kirschner that [redacted] Ex. 102 at 4; *see* Ex. 48 at 160:2-7, 162:14-163:6; Ex. 2 at 226:9-10. The "loans" were not collateralized, and loan terms and agreements were never finalized or signed. Ex. 48 at 196:7-197:10, 205:11-206:10. Neither Nelson nor Kirschner repaid any of the purported loan principal, Ex. 1 at 204:24-205:1; Ex. 2 at 184:1, and both failed to make interest payments, save for one exception in

which Nelson purportedly made one payment at Atherton's request by wiring funds to an entity that Nelson and Kirschner in fact controlled. See Ex. 68 at 67; *see also* Ex. 1 at 202:10-205:7. Renrets, an entity controlled by Nelson's father-in-law, received certain of the loans and allowed Nelson to use their proceeds, yet had no business purpose for the loans, was not diligenced for the loans in advance, and did not even know why it received the loans. Ex. 110 at 78:9-88:15.

### G. Defendants never disclosed these payments or other arrangements to Amazon

35. Nelson, Kirschner, and Christian (either directly or through associated entities) received at least $7,025,486 in kickbacks from the scheme before it was discovered. Ex. 68 at 65. Nelson received $2,455,152, consisting of $2,332,652 received directly ($384,640 from the 2010 Trust and $1,948,012 from Renrets), and $122,500 through Cheshire ($82,500 from Rodney Atherton and $40,000 from Sigma). *Id*. Kirschner received $2,524,652, consisting of $794,652 received directly and $1,730,000 for the purchase and development of his home in Minnesota. *Id.* at 69. Christian Kirschner received $2,045,682, consisting of $1,069,502 received directly and $976,180 utilized from a trust set up for his benefit. *Id.* at 74.

36. Additional kickbacks flowed to Atherton and associated individuals and entities. *See* Ex. 68 at 88. AllCore and CTBSRM retained a net total of $3,310,886 for the benefit of Nelson and Kirschner. *See id.*; *see also* Ex. 2 at 54:8-23, 68:14-69:14, 161:4-163:3; Ex. 1 at 49:20-50:24, 147:17-149:23. In addition, during the relevant time period, Watson gifted Nelson and Kirschner with lavish vacations that they did not disclose to Amazon, including a fishing trip in Florida, Exs.111-112, a hunting trip to New Zealand, Ex. 113, and other luxury travel, Ex. 114.

37. Nelson and Kirschner never disclosed to Amazon the kickbacks Northstar paid Villanova, Blueridge paid the 2010 Trust, or White Peaks paid the 2010 Trust through the middleman company. Ex. 1 at 169:6-11; *see also id.* at 157:10-12, 271:13-21, 316:4-13; Ex. 2 at 28:8-12, 244:12-16. Nelson testified that he deliberately chose not to disclose the kickback scheme—which

he obliquely referred to as his "outside business"—because Amazon could terminate his employment for violating company policy or his terms of employment. Ex. 1 at 107:23-110:8. Kirschner and Watson likewise admitted during their depositions that they never disclosed the scheme to Amazon. Ex. 2 at 28:8-12, 97:20-25, 144:25-146:16; Ex. 4 at 346:15-347:2.

38. Chris Vonderhaar—who indirectly supervised Nelson and Kirschner at Amazon, and whose approval was required for the transactions—confirmed that Amazon "would not have moved forward with these deals knowing that these kickbacks were in there for our employees." Ex. 3 at 515:19–21; Ex. 5 at 342:3-343:8; *see also, e.g.*, Ex. 115 ¶ 20. He also testified that even if Nelson and Kirschner were not personally receiving kickbacks, Amazon would not have approved the leases had it been aware that Northstar was paying "referral fees" to the brother (Christian Kirschner) of the employee (Casey Kirschner) who was bringing the Northstar deals to Amazon. Ex. 5 at 341:7-342:2. And he testified that Amazon has been harmed by Defendants' kickback scheme. Ex. 3 at 110:4-112:15, 221:20-225:1.

39. To quantify the economic harm that it sustained, Amazon has offered expert opinion evidence by Richard Lee, CPA, CFF, ABV, ASA, a valuation, forensic accounting and damages expert with more than 25 years of industry experience. Based on an extensive analysis and review of the record, Lee issued a report showing (1) the amount of actual quantifiable economic harm Amazon sustained as a result of Defendants' scheme, (2) Amazon's total potential economic harm but for Amazon's discovery of the scheme, (3) that a forensic accounting investigation supports certain of Amazon's claims, (4) unjust enrichment received by Defendants, (5) the total economic benefits Defendants likely would have received but for Amazon's discovery of their scheme, and (6) Defendants' uses of the funds for their personal benefit. Ex. 68 at 10-11.

## II. Response to Defendants' Statements of Material Facts

Below, Amazon responds to specific paragraphs contained in Defendants' respective statements of material facts. The paragraph numbers listed correspond to the paragraph numbers in Defendants' statements. For purposes of opposing their summary judgment motions, Amazon does not dispute Defendants' fact assertions that it does not refute below, but Amazon reserves the right to contest those assertions and introduce all relevant evidence at trial.[4]

**A. Nelson's purportedly undisputed facts**

1. Disputed to the extent this assertion implies that the CNIAA reflects the "only" conditions of Nelson's employment. *See, e.g.*, Nelson Decl. Ex. C.

2. Disputed to the extent this assertion implies that Nelson had no duty to comply with the Code of Conduct or other requirements that he certified he would follow. SOF ¶ 2. Also disputed as to "any other such policy," as Nelson cites no "other" Amazon policies.

5. Dispute that these assertions fully and accurately characterize the terms and purpose of the CNIAA, which speaks for itself. *See* Nelson Decl. Ex. A.

6. Dispute that this assertion fully and accurately characterizes the cited provision of the CNIAA, which speaks for itself. Nelson Decl. Ex. A ¶ 3(c)(i).

7. Dispute that these assertions fully and accurately characterize the terms and purpose of the cited provisions of the CNIAA, which speak for themselves. *See* Nelson Decl. Ex. A.

8. Dispute the implication that Nelson was at liberty to interfere with the performance of Amazon personnel after his termination under the CNIAA or otherwise. *See, e.g.*, *id.* ¶ 3(b)(i).

[4] The below sections refer to, respectively, the statements of purportedly undisputed facts set forth in Defendants Carleton Nelson and Cheshire Ventures, LLC's Brief in Support of Their Motion for Summary Judgment (Dkt. 1176) ("Nelson SOF"); Memorandum in Support of Defendant Rodney Atherton's Motion for Summary Judgment (Dkt. 1173) ("Atherton SOF"); and Defendant Casey Kirschner's Memorandum in Support of Motion for Summary Judgment (Dkt. 1169) ("Kirschner SOF"); and Brian Watson, WDC Holdings LLC, Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager's Memorandum in Support of Motion for Partial Summary Judgment (Dkt. 1160) ("Watson SOF").

9. These are not proper factual assertions, but rather legal conclusions.

16. Dispute the implication that Nelson was not required to comply with the Code of Conduct or provide related certifications. Nelson was required to sign the Code of Conduct as a condition of his employment, SOF ¶ 2; Nelson Decl. Ex. C, and to certify his completion of regular training activities pertaining to the Code of Conduct. *See* Ex. 116.

17. Disputed as to "numerous … claims," which the cited source does not support.

19. Dispute the implication that Nelson was not involved in the transactions at issue in this case. Nelson had a role in each of those deals while at Amazon. SOF ¶¶ 10-11, 19-27.

21. Disputed. Nelson did have a role in the IAD175 transaction. When the deal was proposed, Nelson was responsible for site identification and selection for Amazon data centers. Ex. 1 at 24:7-26:3. His emails show that he was involved in discussions about the deal, and the deal was initially submitted for leadership approval before his effective termination date. *E.g.*, Exs. 117-120; Ex. 33. Nelson also personally influenced Amazon's consideration of the deal in that he "authored" various "IAD real estate strategy docs" that "advised" Amazon on "the demand signal" and "the best way to go solve it," which informed Amazon's decisions about whether and on what terms to enter particular transactions. Ex. 3 at 438:3-439:11; *see also* Exs. 121-122.

22. Disputed. The cited document does not address the Blueridge Transaction timeline or support that Amazon pursued it as a BTS deal. There is conflicting evidence as to whether Amazon ever proposed structuring it as a BTS transaction. Ex. 94 at 101:13-21. In all events, Nelson personally approved it as a direct purchase transaction before leaving Amazon, Ex. 123 at -734, and reaped a multi-million-dollar kickback payment on the deal thereafter, SOF ¶¶ 23-27.

23. Disputed. The cited document and transcript excerpt do not support that Blueridge would have developed the property had the transaction proceeded as a BTS deal. And Nelson

conceded during his deposition that he interacted with Blueridge and approved the deal, and documents confirm that fact. Ex. 1 at 291:11-15, 296:7-297:3; *see also* Exs. 123, 54.

24. Dispute the timing and sequence of Nelson's discussions with Blueridge relative to his Amazon employment, and also that Nelson performed legitimate work on Blueridge's behalf. The cited emails do not refer to any "roles or services" that Nelson provided, nor do they otherwise support the assertion that he performed consulting work. Nelson Decl. Exs. E-F. [redacted] Ex. 124; Ex. 125 at 201:9-203:15; Ex. 126. Weeks after giving his approval, Nelson left Amazon and began working with Blueridge on the deal, allowing him to collect a multi-million-dollar profit on the deal without Amazon's knowledge. SOF ¶¶ 23-27.

25. Dispute that Amazon was contemplating that the Blueridge deal would be a BTS transaction as of or after Nelson's termination date. Exs. 54, 127. Blueridge principal Herb Glimcher testified that Blueridge never discussed developing the property and that he was unaware of Nelson having done such development work. Ex. 128 at 35:4-36:11, 50:15-18, 51:12-17.

26. Dispute that Nelson performed or contracted to perform any legitimate consulting work. The cited document is not a consulting agreement, but rather is a memorandum that refers to an operating agreement and that does not itself describe any consulting work. Nelson Decl. Ex. K; *see* Ex. 128 at 51:12-17. Also dispute the implication that Blueridge does not compete with Amazon in other respects, for example, as a purchaser of land viable for data centers.

27. Dispute that Amazon decided to restructure the Blueridge deal from a BTS to direct purchase transaction *after* Nelson left Amazon. Exs. 54, 127.

28. Dispute that the purported assignment fee was legitimate or based on the asserted timeline and sequence of events. SOF ¶¶ 23-27; Resp. to Nelson SOF ¶ 27. Also dispute that

Nelson had no indirect involvement in assignment fee negotiations through Kirschner, who remained at Amazon and helped steer the Blueridge deal through to completion. SOF ¶¶ 23-27.

30. Disputed. When Nelson was terminated, Amazon contemplated that the Blueridge deal would be a direct purchase, and it was not thereafter "converted" from a BTS deal. Ex. 54.

[redacted]

Resp. to Nelson SOF ¶ 24. The payment [redacted] SOF ¶ 26.

32. Disputed to the extent this assertion implies that Amazon reasonably could or should have delayed the closing of either transaction. Amazon's investigation was in very early stages when the transactions closed, and business disruptions would have been problematic. Ex. 129 at 418:5-11; Ex. 3 at 496:7-497:1.

33. Disputed that these assertions fully and accurately characterize the cited email, which speaks for itself. *See* Smart Decl. Ex. N.

34. Disputed. To the extent these assertions imply that Nelson believed his post-Amazon work to be permissible under the CNIAA, they are contradicted by statements Nelson made in July 2019, the month after he left Amazon, in which he referenced his 18-month non-compete and said that "for the next seventeen and a half months," his name is "Von Lacey," referring to the straw man Atherton had hired. Ex. 78 at 26. Also disputed that Amazon closed on any transaction with Oppidan or SDC on which Nelson was consulting. Nelson's work for Oppidan was not tied to any "executed or proposed transaction" with Amazon. Ex. 130. The cited materials do not address which transactions Nelson worked on for SDC, when they closed, or whether they were Amazon projects. Amazon learned of Nelson's work for SDC when SDC advised that it had terminated a contract it had with Cheshire Ventures out of an abundance of caution. Ex. 131.

35. Disputed to the extent that it implies that Amazon allows its officers and employees

to go work for competitors in positions that would violate their noncompete obligations. Amazon evaluates whether employees' new positions are consistent with such obligations on a case-by-case basis based on the scope of their job responsibilities and exposure to confidential information at Amazon and the scope of their responsibilities at their new employer. Ex. 129 at 372:13-376:18.

36. Dispute the implication that Amazon did not sustain injury. *See* SOF ¶¶ 38-39.

38. Disputed to the extent these assertions imply that Amazon did not sustain injury. Lee's deposition testimony confirms that such external information is unnecessary for purposes of determining whether Amazon suffered actual economic harm. Ex. 133 at 77:24-78:12.

39. Disputed. Lee did not testify that he was instructed to "ignore" the settlement. *See* Smart Decl. Ex. P. His report in fact repeatedly references the settlement. *E.g.*, Ex. 68 at 9, 12, 27, 33-34, 37-40. Also dispute the implication that Amazon did not sustain injury.

40. Dispute the implication that Amazon did not sustain injury. SOF ¶¶ 38-39.

42. Dispute that Amazon was necessarily a "buyer" in the transactions at issue, which is not supported by the cited deposition transcript excerpt.

44. Disputed to the extent these assertions imply that Amazon knowingly [redacted] *See* Smart Decl. Ex. R. [redacted] *See id.*; SOF ¶ 16.

45. No dispute that Nelson may have been directed by Amazon's IT support team to "copy [his] data to a secure location," but dispute that this amounted to indefinite permission to "use[] a portable hard drive to back up his Amazon files." Ex. 134; Ex. 129 at 29:18-30:11.

46. No dispute that Nelson claims to have left the hard drive at Amazon.

47. No dispute that Nelson claims to have received a crate of personal belongings, but dispute any implication that such receipt could reasonably have been construed as permission to use any Amazon confidential information on the hard drive following his termination.

48. Disputed. Nelson's own testimony establishes that he disclosed information regarding Amazon's future business plans and data center needs. Ex. 135 at 138:4-14. His documents corroborate that fact and demonstrate how at least some such information was shared. *E.g.*, Exs. 136-137. Nelson's knowledge of Amazon's proprietary information, including based on materials that he improperly failed to return to Amazon, enabled him to continue participating in the kickback scheme after leaving Amazon, which harmed Amazon in the manner Amazon has identified in its pleadings and discovery. Ex. 3 at 437:17-441:9; SOF ¶¶ 38-39.

**B. Atherton's purportedly undisputed facts**

2. No dispute, except as to Nelson's termination date. *See* Resp. to Nelson SOF ¶ 10.

3. Disputed as to Northstar. The complaint states that Northstar "*claims* to be a privately held, full-service real estate investment and asset management company." Dkt. 765 ¶ 10. Even if Northstar ever was such a company, it no longer is so today. Dkt. 697 ¶¶ 7, 14.

8. Disputed to the extent this assertion implies that Atherton created Villanova *only* for "Christian Kirschner" and *only* "to receive fees paid to Christian Kirschner pursuant to an agreement Christian had with Brian Watson/Northstar." *See* SOF ¶¶ 8-10, 13-17.

9. Dispute the implication that the Villanova Referral Agreement was legitimate and consistent with or similar to any prior referral agreements between Watson/Northstar and Christian. The cited 2016 agreement provides that Christian would make referrals *to potential investors* for $4,000/month. Ex. 4 at 264:17-265:4; Ex. 138. The Villanova Referral Agreement, which was negotiated the next year, required Northstar to pay Christian fees that would presumably total millions of dollars on deals Northstar did with Amazon, which would be presented to Amazon for

approval and funding by Christian's brother Casey Kirschner. SOF ¶¶ 8-10, 13-17.

10. Disputed. Kirschner and Watson testified that they knew each other prior to July 2017. Ex. 2 at 32:18-25; Ex. 4 at 107:10-108:24. No dispute, however, that Christian re-introduced them in July 2017. SOF ¶ 4.

11. Dispute that the RFP dates to July rather than September 2017. *See* Ex. 139.

13. Dispute the implication that "Amazon" made an informed decision to select Northstar as a developer for all nine Lease Transactions, that "Amazon" did so based on the September 2017 RFP response, or that Kirschner and Nelson were not involved in the selection process. SOF ¶¶ 3-18. Kirschner and Nelson selected Northstar as a developer for the projects, and over the next two years, they succeeded in themselves approving and then obtaining further approvals from Amazon leadership on the capital expenditures required for those transactions based on deal summaries that omitted the fact that Northstar was making seven-figure payments on the deals to Kirschner and Nelson and/or Kirschner's brother. *Id.* ¶¶ 3-6, 9-10.

14. Dispute the implication that Atherton created Villanova for legitimate purposes, or that Northstar secured Amazon deals "as a result of Christian's referral" rather than as a result of a kickback agreement to enrich Defendants. SOF ¶¶ 3-18.

15. Dispute any implication that the payments to Villanova were part of a legitimate referral agreement rather than a kickback scheme. SOF ¶¶ 3-18.

16. Dispute the implication that the structure Atherton set up was for legitimate purposes. SOF ¶¶ 3-18, 28-39. Christian Kirschner invoked his Fifth Amendment right and refused to give substantive testimony about his discussions with Atherton. Ex. 71 at 56:20-57:2. Nelson, for his part, described Atherton's advice in July 2019 by explaining: "Rod's job is to make us invisible. That is exactly what he's doing." Ex. 78 at 1. Kirschner confirmed Atherton's role in the "kickback scheme" in a signed confession to law enforcement. Ex. 108; SOF ¶¶ 31.

17. Dispute the implication that Kirschner and Nelson had no ownership interest in AllCore or CTBSRM. SOF ¶¶ 28-29.

18. Disputed. The cited material does not purport to state the purpose for which AllCore and CTBSRM were created. Atherton Decl. Ex. E. And Nelson explained in deposition that they were simply "designed to accept funding." Ex. 1 at 189:11-14; SOF ¶¶ 28-34.

19. Dispute the implication that there was a legitimate agreement for legal services between Atherton, Kirschner, Nelson, the 2010 Trust, AllCore, and CTBSRM. SOF ¶¶ 28-34.

20. Dispute the implication that Villanova received legitimate "referral fee payments" from Northstar and "made deposits" to 2010 Trust. SOF ¶¶ 3-18.

23. Dispute that the money transfers were legitimate "loans." SOF ¶¶ 28-34.

26. Dispute the implication that the funds were valid "loans" or that Kirschner and Nelson requested advice in good faith. SOF ¶¶ 28-34.

27. Dispute this characterization of Atherton's work. Atherton admitted during his deposition that he did not "recall specifically what" research was done or when, and that he did not do the research himself. Ex. 48 at 114:19-20, 154:10-12, 188:15, 194:24-25. Also dispute any implication that there was a legitimate attorney-client relationship in which Nelson and Kirschner sought, and Atherton rendered, advice in good faith. SOF ¶¶ 28, 30-32.

28. Disputed. The payments were not legitimate "loans." SOF ¶¶ 28-34.

30. Disputed. The funds transferred were not legitimate "loans." SOF ¶¶ 28-34.

31. Disputed. The payments to Kirschner, Bauer Trust, or Renrets were not legitimate "loans." SOF ¶ 34.

32. Dispute that Defendants ever made good-faith efforts to secure collateral for the payments from CTBSRM, which were never collateralized, or that those payments constituted legitimate "loans." SOF ¶ 34; *see also* Ex. 48 at 163:3-21, 197:7-198:10.

33. Dispute any implication that the services Atherton performed were legitimate legal work, as opposed to participation in an unlawful kickback scheme. *See* SOF ¶¶ 8, 28-39.

34. No dispute that Atherton drafted organizational documents for Cheshire Ventures, LLC ("Cheshire"), but dispute that Cheshire's "purpose" was to be an entity through which Nelson would provide legitimate services after he left Amazon. SOF ¶¶ 28, 36.

35. Disputed. The cited material does not describe "legal services" or advice; at best, it describes assistance in a business matter. Ex. 83 at 10-11. To the extent these assertions suggest that the Blueridge deal was converted to a direct purchase transaction after Nelson began providing "services" to Blueridge, that fact is disputed. Resps. to Nelson SOF ¶¶ 21-28. Also dispute any implication that Finbrit was created for legitimate purposes. *See* SOF ¶¶ 28-34.

37. Amazon adopts and incorporates herein by reference its responses to the assertions in the cited subsection of the Watson Defendants' Statement. *See infra* at pp. 29-36.

38. Amazon adopts and incorporates herein by reference its responses to the assertions in the cited subsection of the Nelson Defendants' Statement. *See supra* at pp. 21-26.

**C. Kirschner's purportedly undisputed facts**

3. Dispute the implication Kirschner was actually instructed by technical support personnel to transfer files from a machine that purportedly was infected with malware. Ex. 140.

**D. Watson's purportedly undisputed facts**

2. Disputed as to Northstar. The complaint states that Northstar "*claims* to be a privately held, full-service real estate investment and asset management company." Dkt. 765 ¶ 10. Even if Northstar ever was such a company, it no longer is so today. Dkt. 697 ¶¶ 7, 14.

10. Dispute the implication that Villanova was a legitimate entity. Villanova and the other entities Atherton created were not only for Christian's benefit, but also Nelson and Casey

Kirschner's. *See* SOF ¶¶ 3-18, 36. The cited source does not address whether the Watson Defendants have any interest in Villanova or its assets, Hamlin Decl. Ex. 2 at 263:2-5, and Watson negotiated the Villanova Referral Agreement with the expectation that the payments Northstar made pursuant to that agreement would allow it to secure future Amazon deals. SOF ¶¶ 3-10.

11-15. Dispute the implication that the referenced entities were legitimate businesses created for lawful purposes. SOF ¶¶ 20, 26, 28-36.

17. Dispute the implication that Sigma was a legitimate business created for lawful purposes. SOF ¶¶ 28-34.

18. Disputed to the extent these assertions imply that Renrets has been used solely for legitimate purposes and was not used to funnel kickbacks. SOF ¶¶ 34, 36.

19. Disputed. The purported RFP was sent in September 2017. *See* Ex. 139.

20. Dispute any implication that Northstar's RFP response was legitimate and not a product of collusion. SOF ¶¶ 5-6.

21. Disputed. *See* Resp. to Atherton SOF.¶ 13.

22. Disputed. The approval process referenced in the cited materials refers to the procedure by which Amazon leadership approves the capital expenditures required for real estate transactions, not a process by which Amazon leadership reviews bids in order to choose a developer. *See* Hamlin Decl. Ex. 1 at 60:13-21, 68:13-4; Ex. 5 at 62:4-11. Transaction managers select a developer in the first instance, and then submit for approval a proposed deal that recommends their choice of developer. *See* Ex. 3 at 260:8-261:3; *see also* Ex. 1 at 251:19. In this case, the Lease Transactions were approved based on deal summaries that omitted the fact that Northstar was making seven-figure payments on the transactions to Amazon employees and/or family members, and that falsely claimed that Northstar was selected based on its performance in "a competitive bidding process," SOF ¶ 6; Ex. 3 at 520:5-521:21. Also dispute the implication that Northstar

was selected based on a legitimate bid. SOF ¶¶ 3-10.

23. Disputed. The joint venture was created after the initial Lease Transactions closed.

24. Disputed with respect to Dulles NCP LLC, which was created prior to Northstar's joint venture with IPI. *See, e.g.*, Hamlin Decl. Ex. 10.

25. Disputed. The name of the entity was Dulles NCP, LLC. *Id.*

26. Disputed. The name of the entity was Quail Ridge NCP LLC. Ex. 12.

27. Disputed. The name of the entity was Manassas NCP LLC. Ex. 16.

29. Disputed. The name of the entity was Dulles NCP II, LLC. Ex. 19. Also dispute the assertion regarding the timing of the lease to the extent it implies that Amazon could reasonably have delayed signing the lease. Ex. 129 at 418:5-11.

31. Dispute the implication that *all* fees that Northstar received were paid out by the Special Purpose Ownership Entities. *See* Ex. 68 at 14 fig. 3.

33. Dispute any implication that Northstar was not unjustly enriched by the Lease Transactions. SOF ¶ 38; Ex. 68 at 44, 88 fig. 58.

34. Disputed. Neither of the deponents was a Rule 30(b)(6) witness, and their testimony cannot be attributed to Amazon. Ms. Davenport's testimony did not concern whether the leases exceeded "market rates," whatever that term is construed to mean. Also dispute these assertions to the extent they imply that Amazon did not sustain injury. SOF ¶¶ 38-39.

35. Disputed. Mr. Klein's testimony, which the Watson Defendants cite in footnote 4, is itself evidence of a dispute as to whether the yield rates were low as the Watson Defendants assert. Hamlin Decl. Ex. 16 at 279:19-281:6; *see* Watson Br. 9 n.4. Also disputed to the extent these assertions imply that Amazon did not sustain injury. SOF ¶¶ 38-39.

36. Disputed. Amazon's corporate designee testified that Amazon [redacted]

and that "we could have done better" in terms of the yield rates. Ex. 3 at 133:10-134:13, 135:7-136:4; *see also* Ex. 5 at 193:17-194:23. Also dispute the implication that Amazon must prove the deals were not at market rates. *See* Ex. 133 at 77:24-78:12.

37. Disputed. The process referenced in the cited materials refers to the procedure by which Amazon approves the capital expenditures required for real estate deals, not by which Amazon reviews the lease agreements themselves. *See* Ex. 5 at 62:4-11, 276:18-277:4.

38. Disputed. Mr. Klein's deposition excerpt does not address completeness or timeliness. Hamlin Decl. Ex. 16 at 257:2-258:15. Mr. Gilpin's excerpt states only that construction was complete on two buildings, Hamlin Decl. Ex. 14 at 92:14-16, and Mr. A'Hearn simply reads into the record an email to the same effect, Hamlin Decl. Ex. 22 at 238:13-239:8.

39. Disputed. The cited interrogatory response directly contradicts the implication that Amazon received the benefit of its bargain with Northstar. Hamlin Decl. Ex. 17 at 28. Also dispute the implication that Amazon did not sustain injury, or that Amazon could have received the benefit of its bargain under lease agreements that were tainted by kickbacks. SOF ¶¶ 38-39.

40. Disputed. The first deposition transcript excerpt does not state that the projects were delivered under budget; Mr. A'Hearn states only that two buildings were completed with less debt than had been forecast, and that he did not know one way or another whether the reduced debt was attributable to the project(s) being under budget. Hamlin Decl. Ex. 22 at 189:10-19. In the second excerpt, Mr. A'Hearn simply reads the cited email by Mr. Gilpin, which refers only to the buildings involved in the projects. *Id.* at 238:13-239:8. Also dispute the implication that Amazon did not sustain injury, or that Amazon could have received the benefit of its bargain under lease agreements that were tainted by kickbacks. SOF ¶¶ 11-18, 38-39; Hamlin Decl. Ex. 17.

41. Disputed. The cited transcript excerpt states that any fees that flowed to Christian, Nelson, and Kirschner are "in excess of what should be a clean and fair deal." Ex. 3 at 107:7-22.

It says nothing about the types of payments Amazon made on the Lease Transactions, nor about the entities that received the payments. Amazon has made non-rent payments on the Lease Transactions. Ex. 141 at 3-4. Amazon's rent was calculated based on a budget that was inflated by fees that Northstar paid Villanova. Ex. 133 at 105:5-14; SOF ¶¶ 13-15.

42. Disputed. The cited testimony does not state that Amazon had determined to remove Northstar in 2019. Mr. Klein's testimony makes clear that "Amazon" had made no such determination to remove Northstar as of 2019. Ex. 142 at 332:17-334:6.

43. Dispute this characterization of the agreement, which was intended to amend the leases and management contracts at the lease sites in issue in this case after Amazon discovered Defendants' scheme, to minimize disruption. Hamlin Decl. Ex. 24 at 1; Ex. 3 at 73:1-13.

44. Disputed to the extent these assertions imply that Amazon would have entered into the lease agreements even had they been fully aware of Defendants' kickback scheme. *See* SOF ¶ 38. Also disputed that Amazon had all "knowledge of the pertinent facts" during the time period in question. Ex. 129 at 418:5-11.

45. Disputed. [redacted] Hamlin Decl. Ex. 11. The cited discovery materials simply describe the method by which Amazon calculated the amount it had overpaid in connection with the Lease Transactions by virtue of Defendants' kickback scheme for purposes of negotiating the settlement agreement. *See* Hamlin Decl. Exs. 25 & 28.

46. These are not proper factual assertions, but rather legal conclusions.

48. [redacted]

[redacted] Ex. 129 at 272:14-21.

51. Disputed. Amazon claims and has produced evidence of injury. SOF ¶¶ 38-39.

52. Disputed. Record evidence supports that Amazon could indeed have obtained lower yield rates and/or costs but for Defendants' scheme. SOF ¶¶ 13-14. Also disputed to the extent this assertion implies that Amazon did not sustain injury. *See* SOF ¶¶ 38-39.

53. Dispute the implication that Amazon did not sustain injury. *See* SOF ¶¶ 38-39.

54. Disputed to the extent these assertions imply that the Villanova Referral Agreement was consistent with or similar to any agreements between Christian and Watson or Northstar, or that the arrangement was legitimate. Resp. to Atherton SOF ¶ 9; SOF ¶¶ 3-18.

55. Disputed to the extent these assertions imply that the Villanova Referral Agreement was a legitimate arrangement rather than the product of collusion. SOF ¶¶ 3-18

56. Disputed. Neither of the cited materials supports that the use of Villanova was "[a]t Christian's request," and the communications surrounding the establishment of the trust and the creation of the Villanova Referral Agreement demonstrate that Christian was acting in concert with Casey Kirschner, Watson, and other Defendants. SOF ¶¶ 3-18.

57. Disputed. The cited deposition transcript excerpt does not speak to whether the Watson Defendants had any authority or control over the trust or input into its creation or administration. Hamlin Decl. Ex. 2 at 262:10-263:5. Watson negotiated the Villanova Referral Agreement with the expectation that the payments Northstar made in connection with that agreement would allow it to secure future deals with Amazon. SOF ¶¶ 3-18.

58. Disputed. The fees Northstar paid to Villanova are traceable to payments from Amazon and caused quantifiable harm to Amazon. *See* Ex. 68 at 40-44.

59. Disputed. The record contains substantial direct and circumstantial evidence demonstrating the existence of a pay-to-play scheme. SOF ¶¶ 3-18, 19-27, 28-34.

60. Disputed. The money Nelson and Kirschner received is directly traceable to payments made by Northstar. *See* Ex. 68 at 52-54, 61-73. Moreover, although funds were funneled through other vehicles, Watson did in fact pay Nelson and Kirschner, as all three of them have admitted in written or recorded statements. SOF ¶¶ 31-32.

62. Disputed. The cited document [redacted] and does not otherwise support the asserted determination or reasoning. Hamlin Decl. Ex. 33. Also disputed to the extent these assertions seek to support an inference that that Amazon leadership made its determination regarding White Peaks based on full and complete information. SOF ¶¶ 19-22; Ex. 1 at 249:12-13; Ex. 2 at 256:25-257:1.

63. Dispute the implication that Amazon's approval of the White Peaks Transaction was based on full and complete information. *See* SOF ¶¶ 19-22.

65. Dispute the implication that Ramstetter negotiated to purchase the White Peaks property solely "on behalf of White Peaks." SOF ¶¶ 19-22.

66. Disputed that Northstar was completely uninvolved in the White Peaks Transaction. The individuals who orchestrated the purchase were Northstar personnel. [redacted] SOF ¶¶ 21-22.

68. Disputed that "an independent group at Amazon determined" that the White Peaks purchase price "was a competitive price for the area," which is not supported by any of the cited materials. The cited internal Amazon materials merely stated that the purchase price "is considered equal to market rate." *See* Hamlin Decl. Ex. 35.

69. Disputed. As Amazon's corporate witness testified during his deposition, the $1.3 million/acre price was higher than it should have been. Ex. 3 at 142:5-146:4.

70. Dispute the implication that Amazon did not sustain injury. SOF ¶¶ 38-39.

71. Disputed. *See* Resp. to Watson SOF ¶ 66.

72. Disputed. *See* Resp. to Watson SOF ¶ 66; *see also* SOF ¶¶ 21-22

73. Dispute that Watson "played no part in" White Peaks. Resp. to Watson SOF ¶ 66.

75. Disputed. The excerpt from Mr. Vonderhaar's deposition does not discuss White Peaks. Hamlin Decl. Ex. 19 at 320:10-15. [redacted] Hamlin Decl. Ex. 14, but none of the materials suggest that any such understanding was shared within Amazon.

76. Disputed to the extent these assertions imply that Watson and Northstar had no role in the White Peaks Transactions. *See* Resp. to Watson SOF ¶ 66.

78. Disputed to the extent these assertions imply that Defendants' scheme was legally permissible based on the mediation and settlement proceedings. SOF ¶ 22.

## LEGAL STANDARD

The court may grant summary judgment when there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A 'genuine issue'" "arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor." *Williams v. Ricoh Ams., Corp.*, 203 F. Supp. 3d 692, 697 (E.D. Va. 2016) (cleaned up). The movant "has the burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

"[T]he court must 'draw all justifiable inferences in favor'" of the nonmovant. *Grenoble v. Gregory*, 2018 WL 10464031, at *1 (E.D. Va. Jan. 11, 2018) (quoting *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" that the

court cannot undertake at summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).[5] "A court must exercise great care in granting summary judgment when a party's motives or intentions are at issue. 'A determination of someone's state of mind usually entails the drawing of inferences as to which reasonable men might differ—a function traditionally left to the jury.'" *Hall v. Williams*, 960 F.2d 146 (4th Cir. 1992) (Table) (quoting 10A Wright & Miller, Fed. Prac. & P. § 2730, at 238 (2d ed. 1983)).

**SUMMARY OF ARGUMENT**

Two years ago, this Court and a unanimous Fourth Circuit panel concluded that the evidence shows Amazon is "likely to prevail" on the merits. *Amazon.com, Inc. v. WDC Holdings, LLC*, 2021 WL 3878403, *8 (4th Cir. Aug. 31, 2021); *Amazon.com, Inc. v. WDC Holdings LLC*, 2020 WL 4353563 (E.D. Va. July 28, 2020). The factual record is even stronger now.

Defendants' arguments fall into three principal categories. *First*, they assert that Amazon has not suffered the kind of injury required for racketeering, fraud, or conspiracy liability. *Second*, they assert that their activities do not constitute a racketeering "enterprise." *Third*, they fire scattershot attacks on Amazon's state law claims. Each argument is legally mistaken or raises factual issues that preclude summary judgment.

***Injury***. The Defendants argue that Amazon has failed to show "damages" resulting from their fraud and therefore lacks "standing" to press its RICO claim. But a RICO plaintiff need only show an "injur[y]" to its "business or property by reason of" a predicate offense. 18 U.S.C. § 1964(c). This requirement goes to "the fact of injury and not the amount." *Potomac Elec. Power*

[5] The Court "may consider materials that would … be admissible at trial, and … otherwise inadmissible materials where … 'the party submitting the evidence show[s] that it will be possible to put the information … into an admissible form.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (quoting 11 James Wm. Moore et al., Moore's Fed. Prac. § 56.91[2] (3d ed. 2015)).

*Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("*PEPCO*"). And here, the "injury" required is the injury caused by Defendants' predicate violations—money laundering, honest services fraud, wire fraud, and related crimes—that caused Amazon to pay rent and land purchase prices that funded "kickback payments" that a RICO plaintiff "may recover" "as monetary damages." *Hino Motors Mfg. U.S.A., Inc. v. Hetman*, 2022 WL 16709717, at *3 (E.D. Mich. Aug. 4, 2022); *United States v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001).

Defendants ignore this law and wrongly contend that Amazon can only show injury by proving that it paid more than the "market" price for the properties. The law does not permit bribery whenever the perpetrators say it was a good deal. The dispositive question is whether Amazon received less or paid more than it would have absent Defendants' fraud. It plainly did. The kickbacks themselves—drawn from funds developers received from Amazon or as a result of Amazon contracts—are topline evidence of Amazon's injury and were funded by rent and purchase prices Amazon paid directly. Amazon paid more than it should have, received less than it bargained for, and was injured as a direct result of Defendants' predicate acts.

These acts include Defendants' repeated use of interstate wires as part of a "scheme to defraud." *United States v. Taylor*, 942 F.3d 205, 213 (4th Cir. 2019). They also include a pernicious pattern of "honest services" fraud, which prohibits "schemes to defraud involving bribes and kickbacks" to employees of the defrauded entity. *United States v. Skilling*, 561 U.S. 358, 368 (2010). They include money laundering via "financial transaction[s]" that moved "proceeds" of an "unlawful activity" to "conceal the nature of the proceeds," "promote the carrying on of" the scheme, and avoid tax liability. *United States v. Bolden*, 325 F.3d 471, 486-87 (4th Cir. 2003) (quoting 18 U.S.C. § 1956(a)). And they include Travel Act violations, because Defendants crossed interstate lines to conduct commercial bribery in violation of state law and distribute its proceeds. *United States v. Monu*, 782 F.2d 1209, 1211 (4th Cir. 1986).

The evidence that Amazon was injured "by reason of" these acts is overwhelming, and more than sufficient to establish the "standing" and injury necessary for Amazon's RICO claim. The real focus of Defendants' briefs—the precise *amount* of Amazon's direct damages—turns on factual disputes that preclude summary judgment for either side. Defendants argue that some of the millions in payments to Kirschner, Nelson, and their coconspirators were legitimate, or not direct enough to constitute recoverable damage to Amazon, or must be offset by value Amazon received in the deals or from subsequent efforts to mitigate its damages by reforming the corrupt leases. These arguments turn on genuine disputes of material fact and also do not support judgment for Defendants as a matter of law.

Any mitigation would not absolve Defendants of liability, but rather partially offset treble damages *after* liability has been determined. *Morley v. Cohen*, 888 F.2d 1006, 1013 (4th Cir. 1989). Similarly, Defendants' efforts to argue that one particular Defendant did not cause one particular injury fail because Defendants bear "joint and several liability" for the injuries caused by the enterprise. *Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (collecting authorities); *see also Dunlap v. Cottman Transmission Sys. LLC*, 754 S.E.2d 313, 318 (Va. 2014) ("Civil conspiracy is merely a method of establishing joint liability for the underlying tort" (cleaned up)). Defendants are not entitled to summary judgment on injury.

***Enterprise.*** Defendants' assertion that their conduct does not amount to a racketeering "enterprise" are likewise riddled with factual disputes and erroneous legal arguments. There is overwhelming evidence that Defendants' conspiracy had the features of an enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Defendants shared the common purpose of defrauding Amazon to enter into transactions that Defendants used to enrich themselves at Amazon's expense, through the payment of millions

of dollars in kickbacks to the Amazon insiders entrusted with overseeing those transactions. This common purpose is documented in recordings, written communications, and Kirschner's signed confession, and supported by bank and other business records. Its illicit nature is evident from Defendants' extensive efforts to conceal the payments as deal fees or loans through a web of shell entities created by Atherton with the express goal of hiding Nelson and Kirschner. "This was no mere failure to disclose a conflict of interest." *Skilling*, 561 U.S. at 410. It is powerful proof of a "classic kickback" scheme—where Nelson and Kirschner "conspired with [multiple] third part[ies] so that [all] would profit from wealth generated by [Amazon's] contracts." *Id*.

The record also shows the necessary relationships among Defendants. Nelson and Kirschner accepted millions in kickbacks on deals with developers, beginning with Watson's Northstar. Watson paid Nelson and Kirschner in exchange for their support selecting, recommending, and securing approval for his bids. Defendants concealed the fraud using Christian Kirschner as a go-between—passing confidential information to Northstar to help Watson secure the leases. The White Peaks and Blueridge sellers similarly procured Amazon deals by paying kickbacks to Nelson and Kirschner in exchange for their internal promotion of the deal, and they shared a portion of the illicit proceeds with Watson to buy his continued silence.

Nelson and Kirschner relied on Atherton to set up and manage the web of entities that hid the proceeds and allowed Defendants to make withdrawals through sham loans. As Nelson's put it, "Rod's job is to make us invisible." SOF ¶ 31. Atherton's engagement letter with Nelson and Kirschner [redacted] SOF ¶ 30. He created shell entities, including trusts with secret beneficiaries, to hide Nelson and Kirschner, and took a cut of the kickbacks as they passed through. Atherton brought in Von Lacey to sign for these entities. Nelson described Von Lacey as a "straw guy" to conceal Nelson's involvement: "my name's not Carl Nelson, it's Von Lacey for the next 17 ½ months." Resp. to Nelson SOF ¶ 34.

This scheme also had continuity, which is assessed "at the time the racketeering activity occurred." *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013). Defendants perpetrated dozens of frauds connected to eleven transactions worth more than $500 million from 2017 to 2020, when the fraud was discovered just as Defendants planned to expand it. This evidence is more than sufficient to create a genuine dispute of fact regarding the scheme's close-ended and open-ended continuity.

***State Law Claims.*** Defendants also cannot establish any factual or legal basis for summary judgment on Amazon's breach of contract and other state law claims. There is overwhelming evidence that Defendants violated contractual or common law duties to Amazon and fraudulently induced it to enter into real estate transactions. There is also extensive evidence that Nelson and Kirschner violated contractual and other duties to Amazon—documented in their own case law—that prohibited them from taking undisclosed profits from Amazon vendors and from disclosing confidential Amazon information. The factual record and the Fourth Circuit's mandate foreclose Defendants' "tracing" arguments on disgorgement and unjust enrichment. Defendants' insistence that Amazon must elect between damages and equitable remedies *prior* to trying the case is wrong, and the Fourth Circuit squarely rejected it in affirming the preliminary injunction. Defendants' scattershot attacks on Amazon's remaining claims are equally flawed. None rests on undisputed facts that would entitle Defendants to judgment as a matter of law on any of the claims in this case.

* * *

Summary judgment is improper where the claims turn on disputed issues of material fact. This case involves such facts, and specifically disputes about motive and intent that are particularly ill-suited for pre-trial relief. As the Fourth Circuit has explained, summary judgment is rarely appropriate "when a party's motives or intentions are at issue" because such issues "'usually entail[] the drawing of inferences as to which reasonable men might differ—a function traditionally

left to the jury.'" *Hall v. Williams*, 960 F.2d 146 (4th Cir. 1992) (Table) (quoting 10A Wright & Miller, Fed. Prac. & P. § 2730, at 238 (2d ed. 1983)). Here, dozens of documents, recorded conversations, a signed confession, and many depositions are more than "sufficient to allow a reasonable jury to return a verdict" for Amazon. *Williams v. Ricoh Ams., Corp.*, 203 F. Supp. 3d 692, 697 (E.D. Va. 2016) (quotation marks omitted). Defendants' motions must be denied.

## ARGUMENT

The record in this case is replete with overwhelming evidence that Defendants perpetrated a kickback scheme that inflicted extensive injury on Amazon. Faced with this evidence, Defendants misstate the controlling law and distort the evidentiary record in a flawed effort to obtain summary judgment and evade trial for this misconduct. Their motions should be denied.

### I. The RICO Claim (Count I) Must Go To The Jury

Defendants offer three attacks on Amazon's RICO claim. First, Defendants suggest that Amazon lacks RICO "standing" because it has not shown injury. Watson Br. 18-26; Atherton Br. 17; Nelson Br. 16-19, 23-25. Second, they contend that they did not form a racketeering enterprise. Watson Br. 29-33; Atherton Br. 13-20. Third, Defendants contend that the scheme lacked continuity. Watson Br. 33-36; Atherton Br. 20-21. None is a valid basis for summary judgment.

#### A. Defendants injured Amazon's business and property

##### 1) Amazon suffered injuries from the RICO scheme

A RICO plaintiff must establish "injur[y]" to its "business or property." 18 U.S.C. § 1964(c). The plaintiff need not "quantify the amount of the injury. The best reading of § 1964(c)'s injury to business or property requirement is that it refers to the fact of injury and not the amount." *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("*PEPCO*"). "[Q]uantifiable damages are [not] a necessary precondition to RICO liability"— the plaintiff must "prov[e] *some* damages, not a specific amount." *Id.*

The denial of a bargained-for (and paid-for) expectation constitutes injury. "If a party specifically bargains for a service, is told that the service has been performed, is charged for the service, and does not in fact receive the service, it is not appropriate for courts to inquire into whether the service 'really' had value as a precondition to finding that injury to business or property has occurred." *PEPCO*, 262 F.3d at 265.

Contrary to Defendants' assertion that Amazon "must allege a RICO injury," Watson Br. 18, there is "no distinct 'racketeering injury' requirement." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985). "[T]he compensable injury … is the harm caused by predicate acts sufficiently related to constitute a pattern." *Id.* at 497. All Amazon must do is establish a triable issue of fact as to the *existence* of an injury to its business or property from Defendants' predicate acts of mail and wire fraud, money laundering, and related violations. Amazon has done so.

***Amazon's Injury.*** *First*, the amount of kickbacks paid to Nelson, Kirschner, and their co-conspirators is a proper measure of Amazon's injury. A RICO plaintiff "may recover … kickback payments … as monetary damages." *Hino Motors Mfg. U.S.A., Inc. v. Hetman*, 2022 WL 16709717, at *3 (E.D. Mich. Aug. 4, 2022). Indeed, "[t]he proper measure of damages" "where a kickback scheme is proven is the amount of kickbacks paid." *AmTruck Factors v. Int'l Forest Prods.*, 795 P.2d 742, 746 (Wash. 1990). Here, the record shows that Nelson, Atherton, Kirschner, and Christian Kirschner pocketed at least $11 million skimmed off of the eleven real estate deals with their various co-conspirators.[6] SOF ¶¶ 35-36. That alone suffices to create a triable issue of fact as to whether Amazon was injured in its business or property.

[6] Nor is the amount of kickbacks a hard cap on recoverable damages. In the related context of the False Claims Act, when a contract is "based on illegal referrals or kickbacks, courts have typically awarded … the full amount of each claim that was tainted by the illicit arrangement, despite [the fact] that the [claimants] may have actually received [some benefit]." *United States ex rel. Emanuele v. Medicor Assocs.*, 2017 WL 4867614, at *9 (W.D. Pa. Oct. 26, 2017) (collecting authorities); *see also United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 386 (4th Cir. 2015) (same).

*Second*, there is abundant evidence that Amazon overpaid for the properties and leases. Most obviously, [redacted][7] SOF ¶ 16. Kirschner, with Nelson's guidance, also convinced Amazon to approve the $10 million assignment fee to Blueridge Group to facilitate the Blueridge transaction, knowing that 50% of that fee would be kicked back to Nelson and Kirschner. SOF ¶¶ 23-27. This evidence creates a triable issue of fact of whether the price was inflated by $5 to $10 million for this property. Similarly, Nelson and Kirschner facilitated the White Peaks purchase for a price they knew would include a kickback to them (ultimately $1 million), and which also included a $5 million "settlement" to keep Watson satisfied and the impropriety secret. This, too, creates an issue of fact of whether the price was inflated by at least $6 million for the White Peaks parcel. Defendants also baked fees into the lease deals for the specific purpose of funding kickbacks to Nelson and Kirschner. Kirschner coached his brother Christian on how far Northstar could raise its fees, thereby increasing Villanova's cut before the increase would trigger rejection or further investigation by Amazon. SOF ¶¶ 13-14. This coaching aimed to maximize the yields and fees to Northstar (and resulting kickbacks) without triggering the concerns that would arise if Northstar became one of Amazon's "most expensive" partners. SOF ¶ 15. The fees were included in the final budget of

[7] Nelson vigorously disputes the damages resulting from [redacted] Amazon disclosed the fees that went to Northstar as damages in its supplemental and expert disclosures and in the Lee report. *Contra* Nelson Br. at 23; *see* SOF ¶ 39; *see also* Ex. 68 at 39-46. [redacted] Nelson claims that [redacted] Nelson Br. at 24–25. This is false. [redacted] Nelson SOF Resp. ¶ 44. Finally, Nelson argues he cannot be liable for [redacted] because he was unaware of them. That is wrong—regardless of his specific knowledge, he is liable as a coconspirator and joint tortfeasor under state and federal law. *Supra* § I.B.2.

the leases, which was used to calculate Amazon's rent. SOF ¶¶ 13-15. Villanova's payments were expressly linked to the fees Northstar received from the Landlords (in turn linked to the lease budgets) and those funds were later routed to Nelson and Kirschner. SOF ¶¶ 38-39.

Amazon has introduced expert evidence of its injury. Amazon suffered $16 million of actual economic harm from the Blueridge and White Peaks transactions. SOF ¶¶ 38-39. Amazon's expert also calculated that Amazon already suffered more than $1 million of direct harm from the portion of the kickbacks from Northstar that can be attributed to Amazon's rent payments to the Landlords. *Id.* This calculation is only a partial estimate of the entire injury caused by the scheme (it excludes the harm to Watson's business partner IPI, investors and lenders and all anticipated harm).[8] *Id.* Had the fraud not been discovered, and the leases subsequently renegotiated, Amazon would have suffered at least $21 million of harm over the life of the leases. *Id.*

***Defendants' Market-Rate Canard.*** Faced with this irrefutable evidence, Defendants argue that Amazon must prove it paid "above-market rates for the Lease Transactions." Watson Br. 21; *see also* Atherton Br. 18. This is wrong. There is no requirement that the measure of harm must lie in the payment of "above-market" lease rates. *See PEPCO*, 262 F.3d at 265. A plaintiff may recover "kickback payments" as damages when it shows that "the total purchase price was inflated by the amount of the commission payments" *whether or not* the plaintiff introduces "evidence about the fair market value of the goods." *Hino Motors*, 2022 WL 16709717, at *3. Evidence abounds that Defendants *did* inflate prices [redacted] to fund their kick-backs. SOF ¶¶ 11-17. A sufficient injury exists whenever a defendant "represented that it was

[8] The Defendants make a number of spurious attacks on Lee's expert report, including arguing that by calculating "economic harm" rather than "damages," Lee has conceded that Amazon suffered no damages. But it is entirely unremarkable that an expert would calculate economic harm—the factual predicate for some forms of damages—and would not opine on a legal conclusion like the measure of recoverable damages.

complying with specifications and intentionally did not do so while charging a contract price that reflected the specifications." *PEPCO*, 262 F.3d at 265. The plaintiff "*need not show* that the [product's] performance was diminished" or that the product it received was "less valuable" because of the defendant's misrepresentation. *Id.* at 264, 265 (emphasis added). Here, Amazon expressly bargained for leases free of corruption or undisclosed referral payments, and Amazon required Defendants to certify (in leases and employment documents) their compliance with Amazon's Code of Conduct. SOF ¶¶ 2, 12. Amazon would not have entered these transactions without those assurances, but those assurances were not followed. *Id.* ¶ 38. *PEPCO* demands no more.

Defendants' cases provide no basis for summary judgment. *See* Watson Br. 21–22; Atherton Br. 18. Most do not involve purchases procured through illicit kickback payments. *See, e.g.*, *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir. 1991) (securities fraud claims fail without showing price was inflated); *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1225 (D. Colo. 2010) (property sales fraud perpetrated by misreporting similar real estate sales); *Heinold v. Perlstein*, 651 F. Supp. 1410, 1412 (E.D. Pa. 1987) (similar with diamond ring sale); *Maio v. Aetna, Inc.*, 221 F.3d 472, 494 (3d Cir. 2000) ("vague allegation that quality of care may suffer" based on defendant's practices does not demonstrate injury); *Dickerson v. TLC The Laser Eye Center Institute, Inc.*, 493 F. App'x 390, 395 (4th Cir. 2012) (plaintiff had no property interest in his medical record, thus disclosure of the file was not "injur[y] in his business or property").

The handful of cases involving bribes are no more useful to Defendants. In *Bowe v. Public Storage*, the court acknowledged that a viable claim exists where a plaintiff "allege[s it] paid inflated prices … and that these inflated prices included undisclosed kickbacks." 106 F. Supp. 3d 1252, 1265 (S.D. Fla. 2015). That plaintiff, unlike Amazon, introduced *no evidence* of price inflation and *no evidence* that its funds were diverted. *Id.* Similarly, in *Township of Marlboro v. Scannapieco*, a town alleged that its employees were bribed to issue land use approvals, but those

bribes had no financial impact because the town expended no money. 545 F. Supp. 2d 452, 455 (D.N.J. 2008).[9] That is far different from this kickback scheme, where Amazon spent *hundreds of millions of dollars* on real estate transactions because of the bribes and paid inflated fees, SOF ¶ 39, and where the conspirators diverted Amazon's rebates into their own pockets, SOF ¶¶ 35-36.

The lone circuit authority Watson identifies, *Baehr v. Creig Northrop Team P.C.*, 953 F.3d 244 (4th Cir. 2020), is not a "comparable context." Watson Br. 21. In *Baehr*, home buyers sued under the Real Estate Settlement Procedures Act after discovering that their settlement services provider had taken a referral fee. Their claims were dismissed for lack of Article III standing (not RICO statutory standing) because the *only* harm alleged in their complaint was the "deprivation of impartial and fair competition." 953 F.3d at 253. Even on that point, the court noted that "the record [was] devoid of evidence that the [plaintiffs] were actually deprived of impartial and fair" services. *Id.* at 255. Here, by contrast, Amazon was deprived of Nelson and Kirschner's honest services *and* Nelson and Kirschner diverted Amazon's funds into their own pockets.

Defendants also offer no authority indicating that Amazon's injury could or must be measured by reference to a single "market price." Accepting Defendants' "market price" theory would be an invitation for fraud, as any estimate of "market price" in the highly idiosyncratic commercial real estate market would necessarily be a range, allowing fraudsters to avoid liability by confining any price inflation within that range. That is precisely what Nelson and Kirschner tried to do, coaching Northstar to increase its fees (and their kickbacks) while remaining competitive "on paper" and ensuring Northstar avoided the scrutiny that would arise if it became one of Amazon's "most expensive" developers. SOF ¶ 15. *Id.* Nor do Defendants offer any authority suggesting

[9] *West Virginia v. Moore* failed for the same reason. 895 F. Supp. 864, 869 (S.D.W. Va. 1995). The State had no injury because its only payment was a refund that would have been paid under state regulations regardless of the conspiracy and, in any event, there was no evidence that the public official had any involvement in the decision to issue the refund. *Id.*

that Amazon would pay the same "market price" as other market participants. Watson conceded that Amazon is not an ordinary market participant because Amazon's deals would "earn [Northstar] a large relationship in a growing industry segment," and its business would be in "Northstar's best interest." SOF ¶ 11; Ex. 4 at 117:1-5. That the Watson Defendants were willing to execute the leases at the rates negotiated by Nelson and Kirschner *and* pay kickbacks indicates that the leases were inflated by at least the amount of the kickbacks—eliminating the kickbacks (thus reducing Amazon's costs) would not have reduced the Watson Defendants' revenue at all. The same is true of the White Peaks and Blueridge sellers. This is powerful evidence that Amazon could have contracted for this land at the cost it paid *less* the amount of the kickbacks. Thus, Defendants' assertion that there is no genuine dispute as to injury cannot be taken seriously.

***Mitigation.*** Next, Defendants argue that, by mitigating the harm caused by the fraud, Amazon has eliminated its recoverable damages and mooted its RICO claim. *See* Watson Br. at 23-24; *id.* at 25. Defendants cite no authority for the notion that Section 1964(c) requires proof that the harm suffered is unmitigated. Nor could they, because there is no such requirement. "Mitigation is a limiting principle on damages due to injury. It cannot be used to escape liability in the first instance." *McCulloch v. Tahsin Indus. Corp., USA*, 2022 WL 4484214, at *10 (W.D. Va. Sept. 27, 2022); *Brach v. Conflict Kinetics Corp.*, 2017 WL 3267961, at *26 (E.D. Va. July 31, 2017) ("[M]itigation is an affirmative defense that does *not* bar the underlying claim."); *Hemmerdinger Corp. v. Ruocco*, 2016 WL 1588500, at *9 (E.D.N.Y. Apr. 19, 2016) (allowing RICO defendants to "escape liability so long as third parties mitigate a victim's injury" would be "an absurd result," and that "[i]n such a world, the insurance industry would effectively repeal civil RICO"). Fourth Circuit law is clear that, in RICO actions, the offsetting effect of mitigation applies *after* trebling of damages. *Morley v. Cohen*, 888 F.2d 1006, 1013 (4th Cir. 1989). Moreover, the retroactive rent adjustment effected by the settlement agreement reaches only a fraction of

Amazon's harm.[10] It does not, for example, mitigate the inflated prices that Amazon paid in the White Peaks and Blue Ridge transactions; nor does it mitigate the harm Amazon suffered when Nelson and Kirschner improperly diverted its brokerage rebates.

**2) Defendants proximately caused Amazon's harm**

The Watson Defendants argue that there is no "causal nexus" between the Northstar leases and Amazon's injury. Watson Br. 25. That is flatly wrong. All of Amazon's payments are directly attributable to Defendants' fraud. Amazon "would not have moved forward with these deals knowing that these kickbacks were in there for our employees." SOF ¶ 38. In exchange for Watson's bribes, Nelson and Kirschner [redacted] SOF ¶¶ 3-7. [redacted] *Id.* [redacted] The Villanova Referral Agreement expressly linked the funds that went to Kirschner and Nelson to Northstar's income from "development transactions that [Christian Kirschner] introduce[d]" to Northstar—and the undisputed record shows that the Amazon leases were the only such deals. SOF ¶ 8. Northstar would owe Villanova these fees "only upon receipt of a successful closing of an investment." Ex. 46 at -011. Watson does not dispute that "Villanova would share in some of [Amazon's] fees" and his "share of the GP level promote." Ex. 4 at 53:12-14, 281:1-3 Nor does he dispute that Amazon's rent, in part, funded payments to Villanova.[11] SOF ¶ 13.

---

[10] Amazon received a retroactive rent adjustment of $1,788,330 from IPI and trebling the harm Amazon already suffered from the lease transactions yields damages of at least $3,991,080. SOF ¶ 38; Ex. 68.

[11] The Villanova Referral Agreement and those payments is irreconcilable with the leases Watson executed. Beginning with the request for proposal process in 2017, draft leases warranted that the Watson Defendants would not make undisclosed payments to "brokers" or others who "brought about the deal," SOF ¶ 12, and expressly incorporated Amazon's Code of Conduct, *see id*. That

The kickbacks and the increased fees necessary to fund the kickbacks caused Amazon's injury. SOF ¶¶ 38-39. Watson's communications with Christian Kirschner show that Watson specifically increased lease fees to cover the cost of the kickbacks promised to Villanova—that is, to Casey Kirschner, Christian Kirschner, and Nelson. SOF ¶¶ 11-17. Northstar closed nine leases with Amazon with a total deal value in excess of $400 million, in contracts adopting the specific fee amounts Northstar negotiated with the Kirschners to fund the undisclosed kickbacks funneled through Villanova. SOF ¶ 12. Thus, the kickbacks are directly linked to Amazon's injury.

Similarly, the millions paid in kickbacks on the White Peaks and Blueridge deals diverted money from Amazon into Defendants' hands and caused increased prices for Amazon. SOF ¶¶ 19-27. Ramstetter and Camenson charged Amazon a $17 million premium ($15.6 million of which was their profits) after obtaining Nelson and Kirschner's support for the deal. They then kicked $1 million of their profit back to Nelson and Kirschner, and sent another $5 million to Watson to protect the fraud. That Ramstetter and Camenson (who have repeatedly asserted their Fifth Amendment rights) were willing to take the deal for $9.6 million in profit shows that they charged Amazon far more than it otherwise would have had to pay but for the fraud.

Watson denies causing this particular injury, but it was orchestrated by his employees, who learned that Kirschner and Nelson would take kickbacks for deals because of Watson's leases; [redacted] SOF ¶¶ 21-22. Moreover, his attempt to disaggregate the acts of the RICO enterprise is legally erroneous. Section 1962(d) allows a plaintiff to "sue co-conspirators

---

Code barred payments to the family members of Amazon employees in connection with their relationship with an Amazon insider. Ex. 11. And the leases and drafts directed the Watson Defendants to report "actual or suspected" violations of the Code. SOF ¶ 12; Ex. 12 ¶ 40.

Yet Watson admits that he did not disclose his payments to Villanova, payments he knew were going to the brother of his contact at Amazon, to anyone at Amazon other than Nelson and Kirschner himself. SOF ¶¶ 22, 37.

who might not themselves have violated one of the substantive provisions of § 1962." *Beck v. Prupis*, 529 U.S. 494, 506-07 (2000). It is sufficient that Defendants all "agree[d] to pursue the same criminal objective." *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)). Thus, each Defendant is liable for the acts of the enterprise. *Fleischhauer*, 879 F.2d at 1301 (collecting authorities). *Infra* § I.B.2.

Nelson's attempt to distance himself from the [redacted] and the Blueridge transaction is no more effective. Nelson Br. 22-23. Both profited Nelson and Kirschner in violation of duties they owed Amazon. SOF ¶¶ 35-36; *Infra* § II. Nelson formed the intent to defraud Amazon on both deals *before* he left the company. In any event, he is liable as a conspirator with Kirschner, who *was* an Amazon insider for both deals. Nelson need not "agree to commit or facilitate each and every part of the substantive offense." *Salinas*, 522 U.S. at 63. "[S]o long as they share a common purpose, conspirators are liable for the acts of their co-conspirators." *Id.* at 64. [redacted] SOF ¶¶ 35-36, 38-39. This creates a triable issue of fact as to Nelson's liability.

Atherton's proximate cause argument fares no better. Atherton Br. 17. The record, including Kirschner's signed confession, shows that Atherton played an instrumental, knowing, and profitable role laundering the kickbacks. He created the entire structure of entities and recruited the straw man that made it possible for Nelson and Kirschner to move money into their own pockets. SOF ¶¶ 28-34. This too, at the very least, creates triable issues of fact over causation.

### B. Defendants formed a racketeering enterprise

Defendants argue that no racketeering enterprise exists. Watson Br. 29-33. This rehashes the legal arguments the Court rejected in Defendants' motions to dismiss, *see* Dkt. 182 at 19-2, Dkt. 176 at 11-12, and is contradicted by the record. RICO's use of "enterprise" "is obviously

broad, encompassing '*any* … group of individuals associated in fact.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). "Enterprise" "has a wide reach," *id.*, and the Supreme Court has "cautioned … against reading the term … too narrowly," *United States v. Palacios*, 677 F.3d 234, 249 (4th Cir. 2012) (citing *Boyle*, 556 U.S. at 948). "[T]he RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle*, 556 U.S. at 944 (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961).

An association-in-fact enterprise exists when the evidence demonstrates "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. This is a "relatively undemanding standard," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010), and the factfinder may infer the existence of the enterprise "from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity," *Boyle*, 556 U.S. at 947. The record demonstrates that all three features existed here.

**1) Defendants had a common purpose**

***The Common Purpose.*** Defendants shared "a purpose," *Boyle* 556 U.S. at 946: extracting profits from Amazon real estate deals secured through improper kickbacks. Atherton admitted that he and Christian Kirschner "expected" that they "would use the funds from profits of these [shell] entities to continue growing the companies and developing real estate for many years to come." Ex. 48 at 220:19-23. Kirschner admitted that he "received funds into [his] personal bank account from the Rod Atherton establishment entities." Ex 45 at 113:12-20. Nelson testified that it was "always [his] expectation" that the "real estate deals" he undertook "would be profitable" to him. Ex. 135 at 120:3-8. "Otherwise," Nelson testified, he "wouldn't try to enter into it." *Id.*

Defendants admit (and bank records confirm) that they received millions of dollars from Amazon deals and that they funnelled those funds into these entities. SOF ¶¶ 28-30, 39. Kirschner

confessed in a signed FBI statement to participating in a "kickback scheme" that passed money "through Rod Atherton," who "transferred the [kickback] funds to me and Carl Nelson" and who "knew that the money paid to the 2010 Irrevocable Trust [through Villanova] was from Northstar, and ... that Carl Nelson and I worked for Amazon." SOF ¶ 31. Atherton admitted that he [redacted] SOF ¶ 30; Ex. 83 at 2, and that Defendants "expected" to "use the funds from profits of these entities to continue growing the companies and developing real estate for many years to come," Ex. 48 at 220:19-23. Watson paid kickbacks as part of this scheme to "earn [Northstar] a large relationship in a growing industry segment." Ex. 4 at 117:2–5; SOF ¶ 11.

Defendants also shared the common purpose of concealing these transactions from Amazon. The Villanova Referral Agreement secretly funneled millions that the Watson Defendants received as a result of the Amazon deals to Nelson and Kirschner. SOF ¶¶ 28-29. Despite his disclosure obligations, *supra* n.11, Watson never informed Amazon about the Villanova Referral Agreement, the millions that went to Nelson, Kirschner, and Christian Kirschner under that agreement, or the $5 million that Watson pocketed to keep silent on the White Peaks deal. Instead, Watson instructed Northstar to continue making payments to Nelson and Kirschner to protect his inside track for future Amazon business. SOF ¶ 22. Similarly, Atherton created a web of entities to hide the kickbacks. The Villanova Formation Agreement describes the trust's "primary purpose" as requiring Christian to manage trust assets "without … the knowledge of any other person," and "to keep the details of the trust assets, income and operations secret." SOF ¶ 28. It also states that Atherton's "intention in establishing th[e] trust is to protect its assets from public knowledge." Ex. 49; SOF ¶¶ 28-30. The 2010 Trust Formation Agreement [redacted] Ex. 105. [redacted] Ex. 106. It, in turn, owned AllCore and

CTBSRM, obscuring Nelson and Kirschner's interest in those entities. *See* Ex. 103 at 12-16.

Recordings confirm Defendants' efforts to avoid disclosure. Nelson admitted in a conversation with Ramstetter weeks before the White Peaks deal that "Rod's job is to make us invisible," which is "exactly what he's doing." SOF ¶ 31. As Nelson correctly noted to Ramstetter, Nelson's and Casey's "names [had been] completely scrubbed off everything." *Id.*; Ex. 78 at 2. Nelson also told Ramstetter that Nelson's sham promissory notes had not been "recorded," *id.*, and agreed with Ramstetter's inquiry that the "notes [were] hidden enough where if you wanted to go get a second house, … they're not flagged." Ex. 78 at 31. Watson's recorded conversations with Ramstetter show a similar effort to avoid disclosure. Ramstetter frankly acknowledged: "If I say something to the wrong person, and it gets out, the whole Amazon thing is shut down." Ex. 143 at 8.

The Watson Defendants argue that the conspirators engaged in separate acts. Watson Br. 31. But Defendants' own authority—*United States v. Pinson*, 860 F.3d 152, 158 (4th Cir. 2017)—undermines that argument. In *Pinson*, a jury convicted a businessman of racketeering conspiracy for his involvement in four different business ventures in entirely different markets. Because the defendant was "the only member common to all four ventures" (and there was minimal overlap in any of the schemes), the government failed to "prove a single conspiracy in which each conspirator shared 'the same criminal objective.'" *Id.* at 162. But that is far different from this case. Here, each deal was fundamentally the same with substantially the same participants: All involved an agreement between Nelson and Kirschner to secure an Amazon real estate deal for a developer in exchange for that developer kicking back a portion of the profits to them, funneled through a variety of entities created by Atherton. As *Pinson* concedes "conspirators need not know the full scope nor membership of a conspiracy, nor need they participate in all of its activities" if they "have a 'single-mindedness to achieve a particular goal.'" 860 F.3d at 162 (quoting *United States v. Nunez*, 432 F.3d 573, 578 (4th Cir. 2005)). That single-mindedness exists here.

***Defendants' Arguments Do Not Defeat the Common Purpose.*** Defendants argue that the record shows a "hub-and-spoke structure" insufficient for racketeering. Watson Br. 32. That repeats legal arguments rejected at the Rule 12 stage, *see* Dkt. 182 at 20, because there is no requirement that "all of the members of an association-in-fact enterprise must be cooperating with all other members of that enterprise to have a 'common purpose.'" *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1175 (S.D. Cal. 2009). An enterprise remains even if its members do not "ha[ve] contact with all other members" or "collaborate[] directly with each other." *Weiss v. Bank of Am. Corp.*, 153 F. Supp. 3d 831, 847 (W.D. Pa. 2015). "It is commonplace … for members of the enterprise to engage in separate schemes or conspiracies, not all of which involve all members in the enterprise." *Zito v. Leasecomm Corp.*, 2004 WL 2211650, at *9 (S.D.N.Y. Sept. 30, 2004) (cleaned up). An association in fact exists even "[a]lthough the faces in the group may have changed," provided there is "substantial evidence of a structure within the group." *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985).

Defendants' point to inapposite cases involving "rimless" enterprises, "meaning the[y] lacked some connection among the enterprises' respective spokes." *Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc.*, 305 F. Supp. 3d 337, 347 (D.R.I. 2018) (rejecting similar hub-and-spoke argument); *see, e.g.*, *Donaldson v. Primary Residential Mortg., Inc.*, 2020 WL 3184089, at *26 (D. Md. June 12, 2020) ("[c]omplaint … devoid of facts connecting the spokes"). But here, there is clear evidence of links between members of the conspiracy, substantial overlap in personnel between *all* of the deals (Nelson, Kirschner, and Atherton participated in every deal), and a regular pattern to each fraud. SOF ¶¶ 11-18, 20-27. That is enough to show that the conspirators acted as a single enterprise. *See Sheet Metal Workers*, 305 F. Supp. 3d at 347.

***Defendants Ignore Their Conspiracy Liability.*** Defendants' attempt to evade their liability for various subparts of their scheme ignore the fact that Section 1962(d) imposes liability on

those who "conspire" in a racketeering offense. "One can be a [RICO] conspirator by agreeing to facilitate only some of the acts leading to the substantive offense." *Salinas*, 522 U.S. at 65 (collecting cases). When the defendants "agree to pursue the same criminal objective," *Cornell*, 780 F.3d at 624, a plaintiff may "sue co-conspirators who might not themselves have violated one of the substantive [RICO] provisions," *Beck*, 529 U.S. at 506-07. Section 1962(d), unlike traditional conspiracy, "contains 'no requirement of some overt act or specific act.'" *Id.* (quoting *Salinas*, 522 U.S. at 63). A defendant need not "officially join[]" an enterprise to satisfy the agreement requirement. *Cornell*, 780 F.3d at 631. Those "who help the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable under § 1962(d)." *Id*.

Moreover, a "RICO conspiracy may be shown either by direct or circumstantial evidence." *Goodweather v. Parekh*, 2021 WL 4149030, at *7 (E.D. Va. Sept. 10, 2021). "[A] single conspiracy may be shown by direct or circumstantial evidence that a defendant knew its 'essential object' by demonstrating a 'tacit or mutual understanding' between Defendants and other conspirators even where the connection is slight." *United States v. Baker*, 598 F. App'x 165, 170 (4th Cir. 2015). And, once a defendant joins the RICO conspiracy, he has joint and several liability for the actions of the enterprise.[12] *Fleischhauer*, 879 F.2d at 1301; *see also United States v. Philip Morris*, 316 F. Supp. 2d 19, 27 & n.8 (D.D.C. 2004) (collecting authorities).

No Defendant has shown, by undisputed facts, that they were uninvolved in the conspiracy. The Watson Defendants argue they are not part of the racketeering enterprise because they did not participate in the purchase transactions and did not interact with Atherton or Von Lacey. Watson Br. 30. *Baker*, *Salinas*, and *Cornell* foreclose this argument. Moreover, the Watson Defendants

[12] The Supreme Court has declined to impose joint liability in some criminal forfeitures, but did so based on a criminal forfeiture statute with no bearing in civil RICO. *Honeycutt v. United States*, 581 U.S. 443, 448 (2017). Courts continue to impose joint and several liability in civil RICO suits. *See, e.g.*, *Wilson v. 5 Choices, LLC*, 776 F. App'x 320, 325 (6th Cir. 2019).

ignore key evidence. Camenson and Ramstetter were Northstar employees tasked with negotiating and executing real estate deals with Amazon. SOF ¶¶ 15, 18, 21. The Watson Defendants now insist that Camenson and Ramstetter were acting on their own account. Watson Br. 26-28. [redacted] SOF ¶ 21. [redacted] SOF ¶ 22.

Watson was also aware of the impropriety in the transaction. Watson's own attorney advised [redacted] SOF ¶ 22; Ex. 144. And, in a conversation Watson secretly recorded, Watson told Ramstetter that the White Peaks flip was "federal FBI-type stuff," to which Ramstetter responded that what Northstar "did for Amazon—that's FBI" because "[y]ou have two corporate real estate people for the largest tenant in the world that you can trace the money, it will get out of hand." Ex. 143 at 8. Faced with these threats, the Watson Defendants used the White Peaks settlement to avoid disclosure of both the White Peaks and lease frauds. [redacted] Ex. 145.

The record also contradicts Watson's assertion that there is "no evidence the Watson Defendants interacted with" Atherton. Br. 30. Christian Kirschner, via text message, directed Watson to "email the Sterling investment package to Rod." Ex. 61. That Christian presumed Watson knew Atherton well enough to be able to identify a simple reference to "Rod," creates at least a disputed issue of fact as to Watson's connection to Atherton.[13]

---

[13] Atherton further argues that the enterprise lacks a common purpose because Amazon has not shown the association in fact had "a separate existence distinct from the 'pattern' of racketeering acts it is alleged to have carried out." Atherton Br. 20. Atherton does not develop this argument,

**2) The record shows the relationships between the members of the conspiracy**

The record also shows that Defendants had the requisite "relationships among those associated with the enterprise." *Boyle*, 556 U.S. at 946. Each conspirator played a role. Nelson and Kirschner were the insiders, promoting the deals within Amazon. Their Amazon work required them to "identify[] expansion options in Northern Virginia" by "identifying land sites, identifying existing buildings," "negotiat[ing] the deal terms" and generally "making sure everything was running smoothly" at a high level. Ex. 2 at 17:5-7, 9:14-16; SOF ¶ 10. Nelson and Kirschner "provided the budget and deal terms to finance" and other Amazon teams "for them to do their analysis"; they "wrote the draft CAR summary to be entered into the system for the approval process to move forward"; and they "sent the business terms to legal to begin drafting the lease agreements." Ex. 2 at 245:13-20. Both Kirschner and Nelson approved the proposed transactions. SOF ¶ 33.

Atherton was the adviser to Nelson and Kirschner and did the legal manipulation necessary to try to hide the fraud and launder the bribes. Atherton's own brief *concedes* that [redacted] Atherton SOF 20; *see also id.* ¶ 26 [redacted] Atherton Br. 18 (Northstar payments "trickled down to loans made to Nelson and … Kirschner"). In exchange, he received a generous cut of the unlawful proceeds. SOF ¶ 30. He was "'up to his eyeballs' in the fraudulent scheme." *United States v. Bush*, 626 F.3d 527, 539 (9th Cir. 2010).

---

and the record refutes it. Here, as in Atherton's own authority, the various coconspirators "joined forces on an ongoing basis for the common purpose" of obtaining contracts they "use[d] to extract unearned profits" from the victim. *Montoya v. PNC Bank, N.A.*, 94 F. Supp. 3d 1293, 1312 (S.D. Fla. 2015). They collaborated "[a]s a continuing unit" that "devised various mechanisms for passing the money among the participants to give the scheme an air of legitimacy." *Id.* That collaboration demonstrates the enterprise as an association in fact.

The Watson Defendants were the necessary counterparties for the fraud. They offered the money and development services that made the bribes possible. They secured nine leases with Amazon and funneled millions to the other conspirators through the Villanova Referral Agreement. SOF ¶¶ 3-18. The conspirators used Christian Kirschner as a go-between for passing confidential information from Nelson and Kirschner to Watson (used to manipulate lease budgets) and for passing kickbacks from Watson to Nelson and Kirschner (through Villanova). Thus, each of the moving Defendants was an active participant in the enterprise with a defined role that continued for years. Defendants cemented these relationships through agreements, formal (including the trust formation documents and Villanova Referral Agreement) and informal, to advance the fraud. These agreements formed the backbone of Defendants' fraudulent kickback scheme, and Defendants' participation in negotiating and executing the agreement is clear evidence of their collective agreement to pursue a RICO conspiracy under 18 U.S.C. § 1962(d).

Defendants claim that Amazon has not shown an association in fact because it failed to identify "any organizing principles, roles, or responsibilities within the alleged enterprise." Watson Br. 30. That argument is legally irrelevant and factually wrong. The Supreme Court expressly rejected the argument that a RICO enterprise must have "some additional structural attributes, such as a structural 'hierarchy,' 'role differentiation,' a 'unique *modus operandi*,' a 'chain of command,' [or] 'professionalism and sophistication of organization ….'" *Boyle*, 556 U.S. at 948. There is "no basis in the language of RICO for the structural requirements" that the Watson Defendants purport to require. *Id.* "[A]n association-in-fact enterprise is simply a continuing unit … with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis." *Id.* "Members of the group need not have fixed roles; different members may perform different roles at different times." *Id.* The record shows each

Defendant has, at the very least, "help[ed] the enterprise accomplish its illicit goals, thereby evidencing their agreement to advance the cause." *Cornell*, 780 F.3d at 631; *supra* § I.B.1.

**3) The enterprise had both close-ended continuity and open-ended continuity**

The racketeering enterprise and conspiracy had "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Longevity exists when "the predicate acts are related and … 'amount to or pose a threat of continued criminal activity.'" *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)). Predicate acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 239 (quoting marks omitted). A plaintiff can establish continuity "either by showing a defined series of related and repeated predicate criminal acts over a substantial period ('closed-end[ed] continuity') or by showing past conduct that by its nature is open-ended." *D'Addario v. Geller*, 264 F. Supp. 2d 367, 399 (E.D. Va. 2003). Continuity is a fact-intensive question that "depends on the specific facts of each case." *H.J. Inc.*, 492 U.S. at 242. Crucially, "the threat of continuity must be viewed at the time the racketeering activity occurred." *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924, 929 (4th Cir. 2013) (quotation marks omitted).

Close-ended continuity turns on a number of factors including "the number of putative victims, … the number and variety of predicate acts, the length of time in which the scheme operated, the presence of multiple schemes, and the potential for distinct injuries." *L-3 Servs., Inc. v. Szekely*, 2010 WL 11579457 at *13 (E.D. Va. Sept. 24, 2010); *see also Parcoil Corp. v. NOWSCO Well Serv., Ltd.*, 887 F.2d 502, 504 (4th Cir. 1989). "'[T]here is no *per se* rule against a RICO claim involving only one victim.'" *L-3 Servs.*, 2010 WL 11579457 at *13 (quoting *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000)). Nor is there a rule against a RICO claim "aris[ing]

under a single scheme." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

Open-ended continuity "may be established where … the 'related predicates themselves involve a distinct threat of long-term racketeering activity,' or where the predicate acts 'are part of an ongoing entity's regular way of doing business or of conducting or participating in an ongoing and legitimate RICO enterprise.'" *GE Inv.*, 247 F.3d at 549 (quoting *H.J. Inc.*, 492 U.S. at 242-43). "[A]ssess[ing] whether the pattern requirement has been satisfied … is a commonsensical, fact-specific inquiry," *Eplus Tech., Inc. v. Aboud*, 313 F.3d 166, 182 (4th Cir. 2002), "a matter of criminal dimension and degree," *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987).

The record shows a racketeering enterprise under either a close-ended or open-ended theory. Before the conspiracy was discovered, it had continued for approximately two years: Defendants began negotiating the kickback agreement in December 2017, SOF ¶ 11, and it continued until two former Northstar employees blew the whistle in late 2019 and early 2020, *id.* ¶ 21. The scheme involved dozens of predicate acts (including money laundering, wire fraud, travel act violations). The scheme was variegated, encompassing nine different leases and two purchases totalling more than $500 million. *Id.* ¶¶ 11-27. And, because the fraudsters pulled in funding from investors and lenders, the fraud had the potential to inflict injuries on numerous counterparties.

Defendants have offered no evidence to suggest that, but for these whistle-blower reports, the conspiracy would not have continued. Before the conspiracy was discovered, Defendants had positioned themselves to continue the fraud. Following Nelson's termination, Kirschner assumed responsibility for real estate transactions in the Virginia area, SOF ¶ 27, and oversaw another Amazon employee, Jason Fogle, who back-filled Kirschner's old role, *id.* Nelson and Kirschner expected Fogle to continue the scheme—in Nelson's recorded words "Jason's value is, he's staying behind at Amazon," *id.*—in exchange for kickbacks (whether paid contemporaneously or as "a bunch of money" down the road). That is why Nelson was able to assure Ramstetter that "of

course we're gonna do … future development deals." Ex. 78 at 5; *see also* SOF ¶ 27.

Finally, Defendants argue that the scheme lacked the necessary continuity because, after its discovery, Amazon terminated Kirschner and there was no potential for future fraud. Watson Br. 35. Defendants' argument is legally wrong—continuity exists when "there is no reason to suppose that [the scheme] would not have continued indefinitely had the Plaintiffs [and federal law enforcement] not filed this lawsuit." *Abraham v. Singh*, 480 F.3d 351, 355-56 (5th Cir. 2007). That is why "the threat of continuity must be viewed at the time the racketeering activity occurred," i.e., when Kirschner was still employed at Amazon. *CVLR Performance Horses*, 524 F. App'x at 929. In any event, the entire goal of recruiting Fogle was to extend the scheme. AllCore, Cheshire Ventures, and Finbrit existed to give Nelson and Kirschner a long-term platform to continue their scheme. SOF ¶¶ 28-34. Thus, Nelson continued to make real estate offers to Amazon following their termination, *see* Nelson SOF ¶ 34, and Atherton testified to their shared expectation that projects would continue for "many years to come." Ex. 48 at 220:19-23.

There is ample evidence that Defendants conspiracy "was open-ended"—indeed, it was "exactly the type of ongoing, escalating criminal endeavour that RICO was intended to target." *Capital Lighting & Supply, LLC v. Wirtz*, 2018 WL 3970469, at *7, 8 (D. Md. Aug. 20, 2018). Had Defendants "not been caught" by Amazon and the FBI, "their criminal conduct likely would have continued 'into the future with a threat of repetition.'" *Id.* at *7.

Atherton argues that the continuity requirement cannot be satisfied where there is only one victim of a racketeering scheme. Atherton Br. 21. "'[T]here is no per se rule against a RICO claim involving only one victim.'" *L-3 Servs.*, 2010 WL 11579457 at *13 (quoting *Al-Abood*, 217 F.3d at 238). Atherton's authorities involve conspiracies aimed at a single wrongful act. *See, e.g.*, *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000) (effort to take control of a partnership); *Edmonson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265

(D.C. Cir. 1995) (single injury scheme). This scheme was not a single incident. Each real estate transaction (and there were eleven here) involved multiple forms of wire and mail fraud, along with other RICO predicate violations. SOF ¶¶ 17, 20, 26, 28-32. And it was not a single-victim conspiracy. Defendants' unlawful acts victimized their lenders, their equity investors, and their business partners, including IPI. "[I]t does not matter for purposes of victim identification that these other entities are not party to this suit." *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 565 (E.D. Tenn. 2019) (collecting authorities).

Defendants' other authorities are similarly inapposite. *See* Watson Br. 35. *Aggarwal v. Sikka* involved a single corporate take-over where the defendants "allegedly fraudulently sold a *single* business saddled with an allegedly unreasonable, *limited-time* contract." 2012 WL 12870349, at *4 (E.D. Va. June 12, 2012). In *Tudor Associates v. AJ & AJ Servicing, Inc.*, the Court rejected a RICO claim premised on a single real estate transaction involving four properties. 36 F.3d 1094 (4th Cir. 1994) (Table). These one-deal-only frauds are nothing like this case.[14]

### C. Atherton participated in the RICO enterprise and committed predicate offenses

Atherton argues that he is not liable because he committed no predicate acts and was simply acting as an attorney. Br. 13-16. He notes that, for an attorney to be a racketeering participant, his actions must go "well beyond their capacities as legal representatives." *Morrow v. Blessing*, 2004 WL 2223311 at *5 (E.D. Pa. Sept. 29, 2004). Atherton went well beyond what a legitimate

[14] Defendants' other authorities simply demonstrate the breadth of the scheme devised here. Watson Br. 34; Atherton Br. 13. *Flip Mortg. Corp. v. McElhone* involved fraudulent underpayment on a *single* contract. 841 F.2d 531, 533 (4th Cir. 1988). *Al-Abood* itself acknowledged that "[t]here is no *per se* rule against a RICO claim involving only one victim." 217 F.3d at 238-39. And *Anderson v. Foundation for Advancement Education & Employment of American Indians* involved two alleged underpayments on a contract and an unrelated act taking place in another state. 155 F.3d 500, 506 (4th Cir. 1998). There was thus no "'threat' of continuity." *Id.* That cannot be said here, where Defendants entered into a number of contracts and participated in many wire transfers and communications linked to the development of eleven properties worth more than $500 million.

attorney would do. Atherton was a co-conspirator who "actively participated in [the] scheme alongside the other conspirators." *United States v. Narang*, 2019 WL 3949308, at *14 (E.D. Va. Aug. 21, 2019). He himself committed predicate acts including violations of 18 U.S.C. §§ 1956 (money laundering) and 1957 (transacting in criminally derived property).

Atherton was "aware of" the "true nature" of the payments. As Kirschner confessed to the FBI, he and Nelson "formed Allcore through Rod Atherton" to receive the "kickbacks" from Northstar. SOF ¶¶ 30-31. The funds moved to "the 2010 Irrevocable Trust, which Rod Atherton set up," and "Atherton then transferred the funds to me and Carl Nelson." Ex. 108. "Atherton knew the money paid to the 2010 Irrevocable Trust was from Northstar, and he knew that Carl Nelson and I worked for Amazon." *Id.* Atherton explained that these payments [redacted] SOF ¶ 30. He knew that Nelson and Kirschner wanted to disguise the money to give it a veneer of legitimacy. *Id.* ¶¶ 30-34. An attorney with this level of awareness of ongoing criminal activity "can readily turn himself into a coconspirator—or an aider and abettor—in the form of a consigliere or fixer." *United States v. Farrell*, 921 F.3d 116, 139 (4th Cir. 2019) (affirming attorney's RICO conviction). In this situation, a lawyer has one valid course of action: advise his client "to immediately cease all unlawful … activities" and "never speak of his unlawful activities after they cease." *Id.* at 139 & n.25. Any other course of action "will readily place [the attorney] in criminal peril." *Id.* at n.25. Atherton did not advise Nelson and Kirschner to "immediately cease." He hid their money in shell companies, trusts, and sham loans. SOF ¶ 30. [redacted] *Id.*

This record sets Atherton apart from the cases he cites. Atherton Br. 15-16 (collecting cases). Those courts rejected RICO liability based solely on the provision of professional services to the enterprise with no showing that the professional service provider was a member of the enterprise. *See, e.g.*, *Goodweather*, 2021 WL 4149030, at *10 (no liability for bond broker who had

no other involvement in scheme); *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1538 (3d Cir. 1993) (auditing firm was not participant in the affairs of client). As Atherton's authorities acknowledge, although "an attorney … does not conduct an enterprise's affairs through run-of-the-mill provision of professional services," that "should not, however, be mistaken for an absolute edict that an attorney who associates with an enterprise can never be liable under RICO." *Handeen v. Lemaire*, 112 F.3d 1339, 1348-49 (8th Cir. 1997). "Behavior prohibited by § 1962(c) will violate RICO regardless of the person to whom it may be attributed" and the court must "not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise. The polestar is the activity in question, not the defendant's status." *Id.* at 1349. Atherton plainly crossed that line.

**D. The statute of limitations does not bar the RICO claim against Atherton**

Atherton argues that Amazon's RICO claim against him is time-barred. Atherton Br. 28-29. RICO claims are subject to a four-year limitations period. *Agency Holding Corp. v. Malley-Draft Assocs. Inc.*, 483 U.S. 143, 156 (1987). But Atherton mistakenly suggests that the limitations period runs from the moment of the fraudulent act. Atherton Br. 28. That is wrong. The limitations period "runs from the date when the plaintiff discovered, or should have discovered, the injury." *PEPCO*, 262 F.3d at 266. Atherton does not even suggest a date when Amazon knew or should have known about its injury. For this reason alone, his limitations period fails. In any event, as this Court found in permitting Amazon to add Atherton as a defendant, although Amazon was "aware of other people's involvement and the general scheme" when it first filed the complaint, it was only during the course of discovery that Amazon learned of the nature and full extent of Atherton's involvement. Hr'g Tr. May 6, 2022 at 6:17-19. Because Amazon did not discover Atherton's role until this litigation was underway, its claims against Atherton are not time-barred.

## II. The Fraud Claim (Count III) Must Go To The Jury

Defendants attack Amazon's fraud claims by arguing they owed no duties to Amazon, Nelson Br. 19-22, or did not injure Amazon, Watson Br. 36-37. Neither contention is correct.

Virginia recognizes fraud by omission and concealment. *See Van Deusen v. Snead*, 441 S.E.2d 207, 209 (Va. 1994). "Concealment of a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if existence of the fact were expressly denied." *Jared and Donna Murayama 1997 Trust v. NISC Holdings, LLC*, 727 S.E.2d 80, 86 (Va. 2012) (quotation marks omitted). An omission is fraud (1) if there is a duty to disclose or (2) if the defendant knows the other party is acting upon the assumption that the fact does not exist. *Murr v. Cap. One Bank (USA), N.A.*, 28 F. Supp. 3d 575, 584 (E.D. Va. 2014). An employee's "fail[ure] to disclose that he received kickbacks" is an "omission" that constitutes fraud. *Avalonbay Cmtys., Inc. v. Willden*, 2008 WL 2780983, at *3 (E.D. Va. July 16, 2008). Defendants make no allegation that they disclosed the kickbacks to Amazon, and Amazon would not have closed the deals had it known of them. SOF ¶¶ 37-38.

Defendants wrongly argue that they are not liable for fraud (or for the fraud-based RICO predicate acts) in connection with discrete parts of the scheme. The Watson Defendants contend they "were not part of any direct purchase." Br. 26. As a factual matter, this is false—they actively conspired to conceal the fraud in the White Peaks purchase and extracted $5 million in profits after the sale closed. *Supra* § I.B.2. Similarly, Nelson argues that he had no "duty to disclose" "following his termination" from Amazon and, as a result, cannot be liable for fraud in connection with the IAD175 lease or the Blueridge transaction. But Nelson admitted that he *was* "involved with the CAR appropriation process" for Blueridge while employed at Amazon. SOF ¶ 23. And the Blueridge purchase agreement was signed in May 2019, before Nelson's June termination. *Id.* ¶ 25. He never disclosed to Amazon that both he and Kirschner [redacted]

[redacted] *Id.* Thus, there exists triable issues of fact as to misrepresentations and omissions made during the Blueridge transaction.

After Nelson was fired, his protégé, Kirschner, pushed the Blueridge deal forward and shepherded it to closing. SOF ¶ 27. Nelson, in a recorded conversation, assured Ramstetter that "all these other deals we've got going on are gonna pay in" because "Casey will get them through. He knows how to get them through." *Id.* This, along with [redacted] *id.* ¶ 25, and the fact that Nelson put the proceeds in an Atherton-controlled trust that ultimately sent funds to both Nelson and Kirschner, is powerful evidence that Nelson intended to defraud Amazon on the deal prior to his termination.

So, too, the evidence shows that Nelson was involved with the IAD175 lease. That lease was executed after Nelson's termination, but Nelson was involved in the preliminary negotiations of that property as well, and it, like all the others in this litigation, was an Amazon-Northstar lease born of kickbacks. Resp. to Nelson SOF ¶ 21.

Even putting aside this evidence, Nelson is liable for participating in a RICO conspiracy, *supra* § I.B.2, and for civil conspiracy because he worked with Kirschner—who undisputedly owed duties to Amazon, *see Dunlap v. Cottman Transmission Sys. LLC*, 754 S.E.2d 313, 317 (Va. 2014) (civil conspiracy exists where "a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business" causes "damage to plaintiff") (quotation marks omitted). Nelson is also "liable as a joint tortfeasor" for the breach of *Kirschner*'s duty to Amazon because he "kn[ew] of a breach of trust and participate[d] in it for his own benefit." *All. Tech. Grp., LLC v. Achieve 1, LLC*, 2013 WL 143500, at *4 n.5 (E.D. Va. Jan. 11, 2013); *Keil v. Seth Corp.*, 2021 WL 5088242, at *14 (E.D. Va. Nov. 2, 2021) (collecting authorities).

Nelson also argues that Amazon cannot establish fraud because Amazon received the whistleblower reports before the closing date on the Blueridge and IAD175 deals. Nelson Br. 22; *see also* Watson Br. 35. But the primary case they cite for that position states the unremarkable (Virginia) rule that a plaintiff "cannot claim reliance" when it "makes a partial inquiry, *with full opportunity of complete investigation*, and elects to act upon the knowledge obtained from the partial inquiry." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999) (quotation marks omitted, emphasis added). That was not the case here—Amazon did not prematurely abandon a partial investigation. When the Blueridge and IAD175 deals closed, Amazon had not had a "full opportunity of complete investigation," *id.*, and had not yet uncovered the fraud.

Nor is Nelson correct to assert that his duties to Amazon ended on the moment of his termination. He cites no authority for his argument that a duty of honest services ceases to exist at the moment of an employee's termination. Nelson's CNIAA with Amazon imposed duties that extended *after* his period of employment with Amazon. SOF ¶ 2; Ex. 7; *see United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001) (affirming fraud conviction based on violation of "contractual duty to disclose potential conflicts of interest"). Nelson breached those duties through his post-termination dealings. *Infra* § III. Such contractual duties can give rise to honest services fraud under RICO, and a relationship of trust—whether memorialized by contract or not—can be the basis for a Virginia fraud claim, as Nelson's own authority recognizes, *see Bank of Montreal*, 193 F.3d at 829 (party with "superior knowledge" of material fact has duty to disclose when he "knows the other [party] is acting upon the assumption that the fact does not exist").

Nelson's other authorities are simply irrelevant. *Folmar v. Harris* involved an alleged failure to disclose problems with the physical condition of a home, but the purchasers conceded that they had seen physical defects in a pre-purchase walk-through with an inspector. 650 F. App'x 818, 819 (4th Cir. 2016). Similarly, *Ludwick v. Premier Bank North, Inc.*, involved a purchaser

whose partial investigation of a target business failed to uncover alleged defects in the acquired entity. 935 F. Supp. 801, 808 (W.D. Va. 1996). But Amazon does not allege a physical defect in the properties themselves that a more thorough investigation would have uncovered—it alleges a defect in the *financial transactions* that Defendants intentionally concealed from Amazon. And while Nelson observes that Amazon received a whistleblower report prior to closing the Blueridge and IAD175 deals, Nelson does not and cannot suggest that Amazon was aware that he or Kirschner were financially involved in either deal prior to closing. At the very least, whether Amazon reasonably relied on fraudulent omissions and misrepresentations in connection with the Blueridge and IAD175 deals is a fact issue that must be resolved by the jury.

## III. Nelson And Kirschner Are Liable For Breach Of Contract (Count VI)

Nelson argues that he is entitled to summary judgment on Amazon's breach of contract claims. Nelson Br. 28-41. He concedes that he executed the CNIAA and that the CNIAA forms a binding contract with Amazon. Nevertheless, he and Kirschner argue that parts of the CNIAA are unenforceable, Nelson Br. 28, and that there is no evidence they breached the agreement, Nelson Br. 29-34, Kirschner Br. 6-7, that Amazon is not entitled to injunctive relief, Nelson Br. 34-36, that Amazon has not alleged damages, Nelson Br. 37, Kirschner Br. 9-10, and that the Code of Conduct is not a binding contract with Amazon. These arguments misstate the law and reflect a fundamental misunderstanding of Amazon's contract claims against Nelson.

The CNIAA is governed by Washington law. Under Washington law, "[t]he elements of a breach of contract claim are: (1) the existence of a valid contract, (2) breach of that contract, and (3) damages resulting from the breach." *Karpenski v. Am. Gen. Life Cos.*, 999 F. Supp. 2d 1235, 1250 (W.D. Wash. 2014). The record supports Amazon on each element.

### A. Nelson and Kirschner breached non-compete obligations

Under Washington law, "restrictive covenants in employment contracts are enforceable so

long as the restrictions are not greater than are reasonably necessary to protect the business or good will of the employer …." *Seabury & Smith, Inc. v. Payne Fin. Grp., Inc.*, 393 F. Supp. 2d 1057, 1062 (E.D. Wash. 2005) (quotation marks omitted). The prohibitions in Nelson and Kirschner's CNIAA are valid, as demonstrated by Nelson's own authority. *Amazon.com Inc. v. Powers*, 2012 WL 6726538, at *8 (W.D. Wash. Dec. 27, 2012). In *Powers*, the district court considered a similar non-compete agreement with a different Amazon employee. While the court found that, in some applications, the provision barring work with Amazon's competitors would be unenforceable, the court stressed that "Washington law permits noncompetition agreements that prevent an employee from trading unfairly on *customer relationships he or she built before leaving employment.*" *Id.* at *6 (emphasis added). The court did not hold, as Defendants suggests, that the clause was unenforceable as a whole—the court found that the agreement "passes muster … to the extent it seeks to prevent Mr. Powers from working with his former Amazon customers." *Id.* at *10. Defendants' other authority, *Amazon.com, Inc. v. Moyer*, 417 F. Supp. 3d 1388, 1398-99 (W.D. Wash. 2019), rests on *Powers*. The court there again found that the CNIAA is enforceable to the extent it restricts an employee from "any contact with any [Amazon] customers" because the employee's "established relationships with existing … customers would obviously allow for unfair competition" and his "knowledge of Amazon's confidential … information would naturally influence his contacts with those customers." *Id.* Thus, under Defendants' own authorities, the CNIAA has enforceable prohibitions that prevent Nelson and Kirschner from working with their Amazon counterparties—including Northstar, White Peaks, and Blueridge. SOF ¶ 2; Ex. 7.

They next argue that Amazon has failed to show a breach of their CNIAA. Nelson Br. 29-34, Kirschner Br. 10. This is wrong. Nelson contends that he has not violated the "Competitive Activities" provision because he has not "entered into a business arrangement competitive to Amazon with an entity that Amazon had substantially the same business arrangement." Nelson Br.

30. But Nelson truncates the relevant CNIAA provision. Paragraph 3(c)(iv) prohibits him from "enter[ing] into any … business arrangement with any entity with which, prior to [his] Termination Date, the Company was involved in substantially the same business arrangement, or with which the Company *had held discussions regarding the possibility of entering* into such an arrangement, if such arrangement would be competitive with *or otherwise deleterious to the interests* of the Company." Ex. 7 ¶ 3(c)(iv) (emphasis added); *see also id.* ¶ 3(a) (containing substantially similar prohibition); SOF ¶ 2. Kirschner's noncompete contains similar language. *Id.*; Ex. 8. Despite these provisions, Defendants entered into agreements to receive kickback payments linked to *Amazon deals* with Northstar (through Villanova), White Peaks, and Blueridge. It cannot seriously be suggested that an Amazon employee securing kickbacks on contracts that that employee pushes Amazon to sign is not "deleterious to the interests" of Amazon. At a minimum, the debate about the meaning of paragraph 3(c)(iv) precludes summary judgment on this issue.[15] *See CMA CGM, S.A. v. Leader Int'l Express Corp.*, 474 F. Supp. 3d 807, 814 (Va. 2020).

### B. Nelson and Kirschner breached the confidential information provisions

Nelson and Kirschner next seek summary judgment on the confidential information provisions of the CNIAA. Nelson's provision prohibits him from, "at any time" during his employment "or at any time thereafter," retaining "information gained in the course of [his] employment that could reasonably be expected to prove deleterious to the Company if disclosed to third parties." Ex. 7 ¶ 2(a). Information cannot be disclosed unless "such disclosure has been specifically authorized in writing by the Company." *Id.* ¶ 2(b)(i). Nelson's attack on this provision again misreads *Powers*. That court declined to enforce a confidential information provision because there

[15] Nor does the timing of the closings provide Nelson with a defense. Nelson Br. 31. The majority of these deals closed while Nelson was still employed at Amazon, SOF ¶ 11, and even Blueridge was in discussion with Amazon regarding the deal (and Nelson *worked on the project*) prior to Nelson's termination, SOF ¶ 23; Resp. to Nelson SOF ¶ 22.

was "no evidence that Mr. Powers took any documents from Amazon," and any information he took, "he took it is in his memory alone." 2012 WL 6726538, at *5. That is not what happened here. Nelson continues to possess a hard drive *with hundreds of documents from his Amazon work*, including confidential and trade secret information. Resp. to Nelson SOF ¶ 48.

Nelson does not dispute that he possesses those documents but argues that *Powers* requires Amazon to identify specific some dissemination of information. His proposed rule would render confidentiality provisions unenforceable until sensitive information has already been disclosed. *Powers* provides no support for that rule—that court declined to enforce the agreement because the company could not identify what information was at risk of disclosure. 2012 WL 6726538, at *5. Here, Amazon has identified the exact documents (including sensitive information) at risk of disclosure: everything Nelson possesses on his Amazon hard drive. That Amazon, inadvertently, sent this hard drive to Nelson does not alter his duty—and he has never suggested he was "authorized in writing" to share it. *See Express Servs., Inc. v. Averette*, 2007 WL 1888652, at *6 (W.D. Okla. June 29, 2007) (rejecting Defendants' argument on summary judgment that he did not "improperly use[] or disclose[] certain confidential information in violation of the terms of [a] franchise agreement" because the plaintiff "inadvertently sent [those] materials to [him]"). Nelson's conduct shows that he disclosed confidential business information to Northstar, White Peaks, and Blueridge and that further disclosures are likely if he retains the hard drive.

Kirschner's attack on the confidentiality claim is equally baseless. Kirschner admits that he downloaded hundreds of Amazon documents from his work laptop before returning it to the company. Kirschner Br. 7. That Amazon induced him to return the laptop, *id.*, has no bearing on his breach. Amazon resorted to this ruse precisely because of Kirschner's conduct. Kirschner *did* share confidential information with third parties during his time at Amazon, including by [redacted] SOF

¶¶ 5-6. That alone creates a triable issue of fact on Amazon's contract claim.

### C. Defendants' remaining contract arguments fail

Nelson makes three final arguments against the contract claims. Each fails. *First*, Amazon has shown damages that a reasonable jury could attribute to his breach of the CNIAA because, by accepting kickbacks and sharing confidential information, he caused Amazon to pay inflated prices. SOF ¶¶ 38-39. Nelson's authorities are irrelevant. They deal with claims for lost profits. Amazon is not asserting a lost profits theory. Its harm is measured by the loss of its employee's services and the inflation of the deal costs. Even if, as Nelson suggests, Amazon's damages from the breach of the CNIAA are indeterminable, that would simply justify disgorgement all Nelson's unjust enrichment obtained through his breach of contract. *Infra* § V. *Next*, Nelson argues that injunctive relief is unavailable, Br. 35, because the 18-month period has run. But the confidentiality provision applies during employment "*or at any time thereafter*." Ex. 7 ¶ 2(b). Amazon is entitled to injunctive relief protecting its confidential information. *Finally*, Nelson argues the Code of Conduct is not a binding contract. Whether it forms a contract or not, the Code indicates (along with the fact of his employment) that Nelson owed duties of loyalty and honest services. *See United States v. Napout*, 963 F.3d 163, 171 (2d Cir. 2020) (employees owed duty of honest services based, in part, the employer's code of ethics).

## IV. Amazon's Civil Conspiracy Claim (Count V) Must Go To The Jury

Defendants argue that Amazon's civil conspiracy claim fails for the same reasons that its racketeering claim fails. Atherton Br. 24-25. That is mistaken. RICO imposes distinct requirements—multiple predicate racketeering acts, the existence of a racketeering enterprise, and a pattern of racketeering activity—none of which apply to civil conspiracy claims. Even if the RICO claim failed on these hurdles (it does not) that has no bearing on the civil conspiracy claim.

Civil conspiracy lies where "a plaintiff sustains damages" from "an act that is itself wrongful or tortious," *Dunlap*, 754 S.E.2d at 317, or where "two or more persons … combine … [to] willfully and maliciously injur[e] another in his reputation, trade, business or profession by any means whatever," Va. Code § 18.2-499(A).[16] Defendants' conspiracy renders all Defendants liable, whether assessed as a single collective conspiracy or as separate conspiracies for each real estate transaction.[17] Defendants' authorities are not to the contrary. Atherton's cases raise claims for *racketeering conspiracy* not state law claims for civil conspiracy. *See, e.g.*, *GE Inv.*, 247 F.3d at 551 n.2; *Elfon*, 223 F.3d at 21; *Rogers v. Nacchio*, 241 F. App'x 602, 609 (11th Cir. 2007).

Atherton also argues that Amazon's conspiracy claim fails because he is not a named in the other state-law claims. Atherton Br. 24–25. "There is no requirement that the party sued for civil conspiracy be the actual tortfeasor," *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 92 (4th Cir. 2019). "Rather, so long as at least one co-conspirator may be held liable for the underlying tortious act, the plaintiff can hold the other members of the conspiracy liable for any resulting injury." *Id.*; *see also Gelber v. Glock*, 800 S.E.2d 800, 821 (Va. 2017) (civil conspiracy spreads liability "to persons other than the primary tortfeasor"); *Beck*, 529 U.S. at 503 ("conspiracy claim" is "mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act"). Although, for example, Amazon does not allege that Atherton breached a contract with Amazon, it does allege (and has shown through discovery) that Atherton "conspired" with the other Defendants "to *induce* breach of contract," as well as to "*induce*" the other underlying claims. Dkt. 765 ¶ 515 (emphases added). That is sufficient to sustain a civil conspiracy claim.

---

[16] Amazon has shown damages from the civil conspiracy, *supra* § I.A; *contra* Watson Br. 40.

[17] The Watson Defendants fault Amazon's civil conspiracy claim as "a repeat of its other substantive claims" but that is precisely what civil conspiracy is under Virginia law—"conspiracy allegations … do not set forth an independent cause of action; instead, such allegations are sustainable only after an underlying tort claim has been established." *Dunlap*, 754 S.E.2d at 317 (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n.7 (D.C. Cir. 1984)).

## V. Amazon May Pursue Both Equitable And Legal Claims

Defendants argue that Amazon cannot pursue its claims for equitable relief—including unjust enrichment and conversion—in parallel with its legal claims. *See* Nelson Br. 42-44; Watson Br. 41-45. The Fourth Circuit rejected these arguments. *See Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *5 (4th Cir. Aug. 31, 2021). That binds this Court under the mandate rule, which "compels compliance on remand … and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Volvo v. Trademark Holding Aktiebolaget v. Clark Machinery Co.*, 510 F.3d 474, 481 (4th Cir. 2007) (quotation marks omitted).

As the Fourth Circuit held, Amazon is not barred from pursuing equitable relief by the existence of the lease contracts. *Amazon.com, Inc.*, 2021 WL 3878403, at *5. And, in any event, Amazon's unjust enrichment claims "are not confined to the contracts governing the lease agreements" and "take aim at [Defendants'] broader scheme to acquire Amazon's business and thereby generate illicit profits." *Id.* The Watson Defendants, the only party to even acknowledge that this issue was previously decided, Watson Br. 41 n.10, simply argue that the Fourth Circuit improperly interpreted Virginia law, but that is not a valid basis for disregarding the mandate rule.

Even setting aside the mandate, the Watson Defendants are wrong. They argue that Amazon cannot recover equitable remedies because Amazon affirmed the contracts. Watson Br. 41 n.10. That is factually mistaken. After extensive negotiations and a material adjustment of the financial terms—reducing Amazon's financial obligation by millions of dollars—Amazon agreed to *new* leases with the Landlords (now controlled by IPI) that displaced and terminated the Amazon-Northstar leases. Ex. 3 at 73:1-13. Moreover, the Watson Defendants are wrong to assert, Br. 44, that Amazon received "exactly" what it contracted for merely because it occupies the land governed by the leases. Amazon expressly contracted for deals free from corruption and price inflation, SOF ¶ 38, and did *not* receive such deals.

Nelson similarly argues that equitable relief is unavailable when there is a legal remedy. Br. 42-44. But an action for legal damages is *not* an adequate remedy barring equitable relief when the defendant may be unable to pay a claim, *Jones v. Harrison*, 458 S.E.2d 766, 770 n.3 (Va. 1995), or when the defendant would be the "gratuitous recipient of" funds owed to the plaintiff, *Faulknier v. Shafer*, 563 S.E.2d 755, 760 (Va. 2002). Those concerns are present here.

Equitable relief in the form of disgorgement, constructive trust, and equitable liens is also appropriate when the indeterminacy or even absence of quantifiable damages renders legal relief inadequate. *See Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020) (disgorgement measured by wrongdoers "unlawful profits" not harm to plaintiff). These remedies are appropriate even when "the plaintiff has not suffered a corresponding loss, or in some cases, any loss" at all, Restatement (First) of Restitution § 1, *cmt. e*, or when as Nelson's own authority states, damages may be "difficult if not impossible" to ascertain. *BMO Harris Bank, N.A. v. S&F Logistics, LLC*, 2022 WL 732071, at *10 (E.D. Va. Mar. 10, 2022) (quotation marks omitted). Given Defendants' strenuous contention that Amazon suffered no quantifiable damages, Watson Br. 25, Nelson Br. 17-18, Defendants can scarcely argue that a legal action provides an adequate substitute for equitable relief.

It is true that Amazon cannot simultaneously recover damages *and* unjust enrichment for the same wrong from the same wrongdoer, Nelson Br. 42; *see also* Watson Br. 47, but that prohibition applies *post judgment* and bars duplicative *recoveries*. *See Malvino v. Delluniversita*, 840 F.3d 223, 233 (5th Cir. 2016) (collecting authorities). The doctrine of election does not require the plaintiff to choose *before* judgment and prior to the determination of liability. *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 648 (Va. 2020); Restatement (Third) of Restitution and Unjust Enrichment, § 2, *cmt. c*; Restatement (First) of Restitution § 144 *cmt. a*.

## VI. Amazon's Unjust Enrichment Claim (Count VII) Must Go To The Jury

Defendants argue that Amazon cannot seek to recover funds through its unjust enrichment

claim that it did not pay them directly, Watson Br. 41, Atherton Br. 36, and that Amazon cannot prove that they knew the proceeds were tainted by fraud, Watson Br. 44. Neither has merit.

As the Fourth Circuit held in this case, Defendants cannot retain their unjust enrichment even if those funds came through third parties.[18] *Amazon.com, Inc.*, 2021 WL 3878403, at *6; Restatement (Third) of Restitution and Unjust Enrichment, § 48 & *cmts. b, d* (2011). The Watson Defendants, Br. 45, rely on *Michigan Mutual Insurance Co. v. Smoot*, for this argument—but *Smoot* has no such holding and rests, on the interaction between unjust enrichment and Virginia's comprehensive statutory workers compensation scheme. 183 F. Supp. 3d 806, 813 (E.D. Va. 2001). *Smoot* concluded that there was no *per se* bar on the unjust enrichment claim, despite the existence of a third-party payment, and permitted the claim to survive summary judgment. *Id.*

The Watson Defendants repeat the argument they raised on appeal (that Amazon should have sued the Landlords), Appellants' Br. at 12 n.4, *Amazon.com Inc. v. WDC Holdings*, No. 20-1743 (4th Cir. Aug. 27, 2020), and the Fourth Circuit rejected. The Watson Defendants' contend that if the fees Northstar used to pay kickbacks were drawn from capital contributions or loans, they are somehow disconnected from the inflated fees upon which the kickbacks were expressly calculated. But without the Amazon leases, none of the capital contributions or loans would have been made. *All* of the Watson Defendants' gains are attributable to the fraud. And, in any event, the existence of potential contract remedies against the *Landlords*—who are no longer under Watson's control and are not parties—has no bearing on Amazon's equitable right to disgorgement from Watson. *See Faulknier*, 563 S.E.2d at 760.

[18] Defendants also have joint and several liability to disgorge the full amount of the conspiracy's gains. It is no defense simply to argue that a different coconspirator was enriched. *U.S. Sec. & Exch. Comm'n v. Johnson*, 43 F.4th 382, 392 (4th Cir. 2022) (affirming district court's order finding defendant "jointly and severally liable for disgorgement with" his business partner because "*Liu* permits joint-and-several disgorgement for 'partners engaged in concerted wrongdoing'" (quoting *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1949 (2020))).

Nor is there legal support for the Watson Defendants' assertion that, having perpetrated a fraud on Amazon, they have a "bona fide hostile claim of right" to retain the proceeds. Watson Br. 44 (citing *City of Norfolk v. Norfolk County*, 91 S.E. 820, 825 (Va. 1917)); Atherton Br. 26. Such a "bona fide hostile claim" exists only when the benefit was bestowed on the defendant free of "any mistake or fraud." *City of Norfolk*, 91 S.E. at 825. That is not the case here. *Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, is inapposite for the same reasons. Watson Br. 45. That plaintiff attempted to recover in unjust enrichment from a third party based on the benefit the third party received following a breach of a contractual duty owed by a different wrongdoer. 249 F. Supp. 2d 703, 708 (D. Md. 2003). There is overwhelming evidence that Watson and Atherton knew about the kickbacks and fraud. *E.g.*, SOF ¶¶ 10, 21-22, 31.

## VII. The Detinue And Conversion Claims (Counts II & VIII) Must Go To The Jury

Watson argues that Amazon is not entitled to conversion because it "did not pay or transfer a single dollar to any of the Watson Defendants." Br. 46. As the Fourth Circuit has held, and its mandate demands, "a defendant need not be a direct recipient of converted funds for a plaintiff to establish a conversion claim under Virginia law." *Amazon.com*, 2021 WL 3878403, at *6 (citing *Fed. Ins. Co. v. Smith*, 63 F. App'x 630, 632-33 (4th Cir. 2003)). "[A] wronged party can recover money converted if the possessor did not receive it in good faith or for valuable consideration." *Fed. Ins. Co.*, 63 F. App'x at 632-33 (collecting cases). "[E]ven assuming Northstar's relationship to the [Landlords] and White Peaks Capital rendered it a third party, Amazon alleged a right to the funds that were allegedly converted due to Northstar's fraudulent behavior and were eventually deposited into Northstar's accounts."[19] *Amazon.com*, 2021 WL 3878403, at *6.

[19] Similarly, constructive trust principles do not require the plaintiff to show the Defendants retained the specific funds wrongfully received from their fraud. Instead, a plaintiff may recover when the record shows that the unjust gains "passed" through the hands of the defendant, and an

The Watson Defendants and Atherton also argue that Amazon seeks "an amount specified in damages" rather than specific "funds," Watson Br. 38; Atherton Br. 23, 27-28. The Fourth Circuit has already foreclosed this argument in this case by holding that "disgorgement *does not require tracing of specific funds* in a defendant's possession." *Amazon.com*, 2021 WL 3878403, at *6 (emphasis added). Virginia law is "well-settled that money … may be converted." *Id.* It does not matter that Amazon has alleged a parallel claim for damages. Amazon has identified funds obtained by fraud, to which Amazon has a superior equitable right, that were deposited into Defendants' accounts. Atherton's main authority, *Stallard v. Bank of America*, is of no use because the plaintiff there could not "demonstrate how much he overpaid" or what amount *should* have been paid. 137 F. Supp. 3d 867 (E.D. Va. 2015). Defendants are "liable for restitution to a defrauded party for money had and received to the extent [they are] enriched." *Fed. Ins. Co. v. Smith*, 144 F. Supp. 2d 507, 523 (E.D. Va. 2001).

## VIII. Amazon's Tortious Interference Claim (Count IV) Must Go To The Jury

The Watson Defendants argue that Amazon's tortious interference claim fails because Nelson and Kirschner's employment agreements were terminable at will. Br. 40. Nelson and Kirschner's CNIAAs are not at-will agreements. But even an at-will contract, including Kirschner and Nelson's employment agreements, can be the basis for a tortious interference claim if the defendant "employed improper methods" in causing a breach. *Dunlap*, 754 S.E.2d at 318 (quotation marks omitted). *Dunlap* explicitly identifies "bribery … fraud, misrepresentation or deceit … misuse of inside or confidential information, or breach of a fiduciary relationship" as such improper methods. *Id.* at 318 n.5. The Watson Defendants *did* interfere with Nelson and Kirschner's employment relationship by working with them to defraud Amazon, commit bribery, breach the

---

"amount equal to" those gains was "in [the defendant's] hands" at the time of judgment. *Fed. Reserve Bank of Richmond v. Peters*, 123 S.E. 379, 386 (Va. 1924).

employee's duty of honest services, and misuse confidential information. SOF ¶ 2. That is sufficient evidence to support a tortious interference claim. *Dunlap*, 754 S.E.2d at 318.

### IX. Atherton Is Not Immune Simply Because He Is An Attorney

Atherton argues that he "is not an insurer of his clients' actions." Atherton Br. 11. That argument is not directed at any particular claim and it does not lay out any discernible request for relief. Amazon does not assert any claims for "professional malpractice." *Id.* Amazon asserts—and the evidence shows—that Atherton was a coconspirator in fraud, money laundering, and other unlawful actions. Atherton identifies *no authority* refuting the principle that "[a]ny lawyer providing advice concerning an ongoing unlawful activity is circumscribed in the legal advice that can permissibly be provided, lest he become a participant in the unlawful activity. That is, a lawyer representing or advising such an entity can readily turn himself into a coconspirator—or aider or abettor—in the form of a consigliere of fixer." *Farrell*, 921 F.3d at 138-39 (affirming money laundering and conspiracy conviction of lawyer). Atherton was a coconspirator and was paid handsomely for it, *supra* § I.B, thus he is liable as a joint tortfeasor.

## CONCLUSION

Defendants' motions for summary judgment should be denied.

Dated: February 1, 2023

Respectfully submitted,

_/s/ Michael R. Dziuban_
Elizabeth P. Papez (*pro hac vice*)
Patrick F. Stokes (*pro hac vice*)
Jason J. Mendro (*pro hac vice*)
Claudia M. Barrett (*pro hac vice*)
David W. Casazza (*pro hac vice*)
Amanda Sterling (*pro hac vice*)
Michael R. Dziuban (Va. State Bar No. 89136)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
epapez@gibsondunn.com
pstokes@gibsondunn.com
jmendro@gibsondunn.com
cbarrett@gibsondunn.com
dcasazza@gibsondunn.com
asterling@gibsondunn.com
mdziuban@gibsondunn.com

Veronica S. Moyé (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900
vmoye@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I will then send the document and a notification of such filing (NEF) to the following parties via U.S. mail to their last-known address and by email, where noted:

CTBSRM, Inc.
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

2010 Irrevocable Trust
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

Demetrius Von Lacey
2845 Des Moines Dr.
Fort Collins, CO 80525

Sigma Regenerative Solutions, LLC
6870 W 52nd Ave., Ste. 203
Arvada, CO 80002

/s/ Michael R. Dziuban
Michael R. Dziuban
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
mdziuban@gibsondunn.com

*Counsel for Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc.*