IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

AMAZON.COM, INC. and AMAZON, )
DATA SERVICES, INC. )
                               )
    Plaintiffs, )
                                 )
    v. )        Civil Action No. 1:20-cv-484 (RDA/IDD)
                                 )
WDC HOLDINGS LLC d/b/a )
NORTHSTAR COMMERCIAL )
PARTNERS, *et al.*, )
                                 )
    Defendants. )
_____)
800 HOYT LLC, )
                                 )
    Intervening Interpleader Plaintiff, )
                                 )
    v. )
                                 )
BRIAN WATSON, WDC HOLDING LLC, )
BW HOLDINGS LLC, PLW CAPITAL I, )
LLC.AMAZON.COM, INC, and AMAZON )
DATA SERVICES, INC., )
                                 )
    Interpleader Defendants. )
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

    This matter comes before the Court on the Nelson Defendants'[1] Motion for Judgment on

the Pleadings (Dkt. 1145),[2] Defendant Rodney Atherton's Motion for Summary Judgment (Dkt.

1162), Defendant Casey Kirschner's Motion for Summary Judgment (Dkt. 1167), the Watson

---

[1] The Court refers to Defendants Carleton Nelson and Chesire Ventures, LLC, collectively, as the "Nelson Defendants."

[2] The Watson Defendants joined the Nelson Defendants' Motion for Judgment on the Pleadings on January 11, 2023.  Dkt. 1180 (Notice of Joinder).

Defendants'[3] Motion for Summary Judgment (Dkt. 1172), and the Nelson Defendants' Motion for Summary Judgment (Dkt. 1175) ("Summary Judgment Motions").  The Court dispenses with oral argument as it would not aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J).  The motions are now ripe for disposition.

Considering the motions together with Defendants' Memoranda in Support (Dkt. Nos. 1146; 1169; 1173; 1174; 1176); Plaintiffs Amazon.com, Inc. and Amazon Data Services' Oppositions (Dkt. Nos. 1200; 1210); and Defendants' Replies (Dkt. Nos. 1206; 1245; 1249; 1252; 1255), it is hereby ORDERED that Defendant Rodney Atherton's Motion for Summary Judgment (Dkt. 1162) is GRANTED, Defendant Casey Kirschner's Motion for Summary Judgment (Dkt. 1167) is GRANTED in part and DENIED in part, the Watson Defendants' Motion for Summary Judgment (Dkt. 1172) is GRANTED in part and DENIED in part, the Nelson Defendants' Motion for Summary Judgment (Dkt. 1175) is GRANTED in Part and DENIED in part, and the Nelson Defendants' Motion for Judgment on the Pleadings (Dkt. 1145) is DENIED as MOOT for the reasons that follow.

---

[3] The Court refers to Defendants Brian Watson, WDC Holdings LLC, dba Northstar Commercial Partners, Sterling NCP FF, LLC, Manassas NCP FF, LLC, and NSIPI Administrative Manager, collectively, as the "Watson Defendants."

I. BACKGROUND

A. Factual Background[4]

Although the parties dispute certain facts, the following material facts are either undisputed[5] or considered in the light most favorable to Plaintiffs for the purposes of Defendants' Summary Judgment Motions. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (noting that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party); *see also* Dkt. Nos. 1169 at 2-3; 1173 at 3-10; 1174 at 2-17; 1176 at 3-13 (Defendants' statements of undisputed material facts); 1210 at 20-36 (Plaintiffs' response to Defendants' statements of undisputed material facts).[6]

---

[4] As an initial matter, many of the material facts Plaintiffs attempt to place in dispute are not actually disputed because Plaintiffs merely object to the "implication" or "characterization" of a fact. *See* Dkt. 1210 at 21 ¶¶ 1-2, 5-8; *id.* at 22 ¶¶ 16, 19; *id.* at 23 ¶ 26; *id.* at 24 ¶¶ 32-35; *id.* at 25 ¶¶ 36, 38-40, 44-45; *id.* at 26 ¶¶ 47, 8-9; *id.* at 27 ¶¶ 13-16; *id.* at 28 ¶¶ 17, 19-20, 26-27; *id.* at 29 ¶¶ 33, 35, 3, 10; *id.* at 30 ¶¶ 17-18, 20; *id.* at 30-31 ¶ 22; *id.* at 31 ¶¶ 29, 31, 33-35; *id.* at 31-32 ¶ 36; *id.* at 32 ¶¶ 39-40; *id.* at 33 ¶¶ 43-44; *id.* at 34 ¶¶ 52-55; *id.* at 35 ¶¶ 65, 70; *id.* at 36 ¶ 76. This is not a viable method of disputing a material fact on summary judgment. *See Emmons v. City of Chesapeake*, No. 2:18cv635, 2019 WL 8062700, at *2 (E.D. Va. Oct. 15, 2019), *aff'd* 982 F.3d 245 (4th Cir. 2020) ("While the parties appear to disagree about the characterization of some facts put forth by the opposing party or feel the need to supplement or qualify the opposing party's stated facts, Plaintiffs and Defendant do not have any genuine disputes regarding facts necessary and material to resolution of the . . . case."). Therefore, the Court treats these facts as undisputed. *See* Fed. R. Civ. P. 56(e)(2) (permitting the court to consider improperly supported or inadequately addressed facts as undisputed for the purpose of summary judgment).

[5] The Court treats any facts that are listed in Defendants' statements of undisputed material facts and not specifically controverted by Plaintiffs as admitted. *Hayes v. Sotera Def. Sol's, Inc.*, 1:15-cv-1130, 2016 WL 2827515, at *2 (E.D. Va. May 12, 2016).

[6] In addition to specifically responding to Defendants' statements of undisputed material facts, Plaintiffs filed their own Statement of Facts despite not having moved for summary judgment. *See* Dkt. 1210 at 4-20. There is no provision in the Local Rules that invites such a fact statement. *See* Local Rule 56(B) ("A brief in response to [a motion for summary judgment] shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute."). In evaluating Defendants' Summary Judgment Motions, the Court does not consider Plaintiffs' Statement of Facts "for it is from [the movant's]

1. The Parties

Plaintiffs Amazon.com, Inc. and Amazon Data Services, Inc. ("Plaintiffs" or "Amazon") are Delaware corporations headquartered in Seattle, Washington.  Dkt. Nos. 1173 ¶ 1; 1174 ¶ 1. Amazon operates many large facilities in Virginia and other parts of the United States.  Dkt. Nos. 1173 ¶ 1; 1174 ¶ 1.  Defendants Carleton Nelson and Casey Kirschner are former real estate transaction managers for Amazon.  Dkt. Nos. 1173 ¶ 2; 1174 ¶ 4.  Amazon terminated Casey Kirschner's employment in April 2020.  Dkt. Nos. 1173 ¶ 2; 1174 ¶ 5.  Amazon later terminated Carleton Nelson's employment in June 2019 based on matters unrelated to the instant litigation. Dkt. Nos. 1173 ¶ 2; 1174 ¶ 6.  Defendant Brian Watson is the founder and Chief Executive Officer of Northstar, a full-service real estate investment, development, and asset management company that Amazon entered into leases with for commercial properties in Northern Virginia.  Dkt. Nos. 1173 ¶ 3; 1174 ¶ 2.[7]  Non-party Christian Kirschner is the brother of Casey Kirschner.  Dkt. Nos. 1173 ¶ 6; 1174 ¶ 9.  Beginning in 2016, he served as a referral partner for Northstar.  Dkt. 1174 ¶ 54.  Defendant Rodney Atherton is a Colorado-licensed attorney who operated the firm Ergo Law, LLC during all relevant times—from 2016 through 2021.  Dkt. 1173 ¶ 5.  He created trusts and corporate entities on behalf of Casey Kirschner, Christian Kirschner, and Nelson.  Dkt 1174 ¶ 7.

---

statement of undisputed facts and the nonmovant's response that a district court determines whether genuine issues of fact are disputed." *Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773, 777–78 (E.D. Va. 2021) (refusing to consider a plaintiff's separate enumerated statement of facts opposing summary judgment), *vacated and remanded on other grounds sub nom. ImmunoGen, Inc. v. Hirshfeld*, No. 2021-1939, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022).

[7] Plaintiffs dispute this fact because, according to them, Northstar merely "*claims* to be a privately held, full-service real estate investment and asset management company."  Dkt. 1210 at 29 ¶ 2 (citing Dkt. 765 ¶ 10).  However, for purposes of the instant Summary Judgment Motions, whether Northstar actually is or ever was such a company, or only purported to be, is irrelevant.

## 2. The Real Estate Transactions

At the center of this litigation is an alleged kickback scheme orchestrated by Nelson and Casey Kirschner involving eleven commercial real estate transactions—nine leases and two direct purchases—that Amazon executed in anticipation of building data centers in Northern Virginia. Dkt. 1176 ¶ 18.

### a. The Lease Transactions

In July 2017, Northstar's referral partner, Christian Kirschner, connected Northstar with his brother, Casey Kirschner, to discuss possible real estate work between Northstar and Amazon. Dkt. Nos. 1173 ¶¶ 9-10; 1174 ¶ 54.  Later that year, Northstar received a Request for Proposal ("RFP") from Amazon pertaining to the development of build-to-suit ("BTS") (*i.e.*, new, custom-built) constructions for Amazon in Northern Virginia.  Dkt. Nos. 1173 ¶ 11; 1174 ¶ 19.[8]  In September 2017, Northstar responded to the RFP with a proposal for BTS construction of multiple buildings.  Dkt. 1174 ¶ 20.  Amazon subsequently selected Northstar as the developer for a total of nine buildings (the "Lease Transactions").  Dkt. 1174 ¶ 21.  Northstar and its joint venture partner would purchase and develop four land sites over a two-year period and lease them to Amazon upon completion of each building.  *Id.*  Amazon does not claim any damages based on its rent being above-market.  Dkt. 1174, Ex. 17 at 10-14 (Amazon.com, Inc.'s and Amazon Data Services, Inc.'s Responses to WDC Holdings, LLC's First Set of Interrogatories to Plaintiffs).[9]

---

[8] The parties dispute whether Amazon sent the RFP in July or September 2017.  *Compare* Dkt. 1174 ¶ 19 (The Watson Defendants' Memorandum in Support) (noting that Amazon sent the RFP in July 2017) *with* Dkt. 1210 at 30 ¶ 19 (Plaintiffs' Opposition) (asserting that Amazon sent the RFP in September 2017).  However, the precise timing of when Amazon sent the RFP is irrelevant for the purposes of resolving the instant Summary Judgment Motions.

[9] The Court can properly consider the exhibits attached to Defendants' Summary Judgment Motions that Plaintiffs did not object to.  *McCloud v. Rice*, 4:20-cv-4, 2022 WL 18146043, at *3 (E.D. Va. Dec. 21, 2022).

Nor has Amazon asked its damages expert, Richard Lee, to assess if the lease fees and rates reflected a fair market price. *Id.*, Ex. 20 at 75:7-25 (Lee Deposition). On February 19, 2020, after Northstar had been removed from the Lease Transactions, Amazon entered into a Lease Continuity Agreement, thereby affirming the lease contracts with various landlord entities. *Id.* ¶ 43. To date, Amazon occupies all nine of the data centers developed by Northstar pursuant to the Lease Transactions. *Id.* ¶ 50.

b. The White Peaks Transaction

In the summer of 2019, Amazon identified a parcel of land in Chantilly, Virginia (the "White Peaks Parcel") to be used for a new Amazon development. *Id.* ¶ 61. On January 16, 2019, two Northstar employees, Kyle Ramstetter and Will Camenson, formed a business called White Peaks Capital, LLC. *Id.* ¶ 64. Acting on behalf of White Peaks, Ramstetter negotiated the purchase of the White Peaks Property from a Virginia real estate entrepreneur, Charles Kuhn, doing business as 41992 John Mosby Highway LLC. *Id.* ¶ 65, Ex. 29 at 40:19-22 (Kuhn Tr.). On April 22, 2019, White Peaks Capital, LLC, purchased the White Peaks Parcel for $98.67 million. Dkt. 1174 ¶ 67. This contract was then assumed by a Special Purpose Ownership entity wholly owned by White Peaks Capital LLC called NOVA WPC, LLC ("NOVA"). *Id.* On July 29, 2019, NOVA closed on the purchase of the property. *Id.* ¶ 68. That same day, Amazon purchased the White Peaks Parcel for $116.4 million from NOVA. *Id.* This price equated to $1.3 million per acre, which an independent group at Amazon determined was "equal to market rate." *Id.*, Ex. 33 (Andrew Jassy Email Approving IAD 170). In discovery, Amazon has produced no evidence concerning the market price of the White Peaks property at the time of the transaction. *Id.* ¶ 70.

Although Ramstetter and Camenson were employees of Northstar at the time of the acquisition, they did not pursue the White Peaks transaction on behalf of Northstar—in fact, they

6

purposefully cut Northstar and Watson out of the deal.  Dkt. 1174 ¶ 66, Ex. 19 at 393:21-394:5

(Vonderhaar 30(b)(6) Tr.) ("I don't recall evidence that [Ramstetter] engaged on behalf of

Northstar. In fact, I think he – he – he engaged directly and independently to some degree."); *id.*,

Ex. 29 at 40:19-22 (Kuhn Tr.) ("My understanding of White Peaks is Kyle Ramstetter left

Northstar, formed White Peaks and White Peaks was the group that approached us to acquire the

property."); *id.*, Ex. 29 at 47:6-13 ("Q: And what did they tell you, if you can recall specifically

about [Camenson and Ramstetter's], kind of, current business venture? A: "They said that they

were going to go out on their own.  They were going to approach Amazon and other hyperscalers

about doing development on their behalf.").[10]  Indeed, the Watson Defendants maintain that they

played no role in the White Peaks transaction and did not even know of its existence until after

Amazon had purchased the property.  Dkt. 1174 ¶¶ 71-73, Ex. 38 at 3 (Defendants' Second

Supplemental Answers to Plaintiffs' First Set of Interrogatories).

After learning of the transaction, Watson threatened to sue Ramstetter and Camenson for

"usurpation of corporate opportunity" due to their intentional exclusion of their employer,

Northstar, from the White Peaks Transaction.  Dkt. 1174 ¶ 76, Ex. 39 (Demand Letter (Oct. 2,

2019)).  Northstar terminated both Ramstetter's and Camenson employment soon thereafter.  Dkt.

---

[10] Plaintiffs purport to dispute Defendants' assertion that Ramstetter and Camenson did not pursue the White Peaks Transaction on behalf of Northstar.  Dkt. 1210 at 25 ¶ 66.  Specifically, Plaintiffs stress that the two individuals who orchestrated the purchase were Northstar personnel. *Id.*  Plaintiffs also emphasize that the Watson Defendants financially benefited from the White Peaks transaction in that, once the transaction was completed, they demanded a cut of the profits from Ramstetter and Camenson.  *Id.*  Plaintiffs further note that the settlement agreement between Watson and Ramstetter and Camenson required the parties to keep the matter strictly confidential, thus allowing the Watson Defendants to double down on their concealment of the kickback scheme from Amazon.  *Id.*  Despite these purported disputes, however, Plaintiffs do not contest that the Watson Defendants had no knowledge of the White Peaks transaction until after NOVA had already sold the property to Amazon.

1174 ¶ 77, Ex. 40 at 74:14-76:22 (Lorman Tr.); *id.*, Ex. 41 at 1 (White Peaks Confidential Settlement Agreement).   Subsequently, Northstar, Ramstetter, and Camenson engaged in mediation to settle the dispute, which was overseen by former Chief Justice of the Colorado Supreme Court, Nancy Rice.  *Id.* ¶ 78.  The parties settled the matter with Ramstetter and Camenson paying $5 million pursuant to a written settlement agreement.  *Id.*, Ex. 7 at 359:20-360:1 (Watson Tr.); *id.*, Ex. 41 at 1 (White Peaks Confidential Settlement Agreement).  Watson did not pay any portion of that Settlement to Nelson or either Kirschner brother.  *Id.* ¶ 79, Ex. 15 ¶¶ 67, 79-84 (Lee Report).

### c. The Blueridge Transaction

In 2019, Amazon began negotiating a deal for the property that was ultimately involved in the Blueridge Transaction with the Blueridge Group, a property developer. Dkt. 1176 ¶ 22.  After Amazon terminated Nelson's employment, he began reaching out to various developers, including Blueridge, in an effort to find work.  *Id.* ¶ 24 (citing Dkt. 1178 ¶ 13 (Nelson Declaration)).[11]  On July 19, 2019, Nelson first met with Blueridge about potentially serving as a consultant for them in their development projects, including the Blueridge Transaction.  *Id.* (citing Dkt. 1178 ¶ 14). After that meeting, Nelson and the principals and consultants for Blueridge began emailing regarding the various roles and services Nelson could provide.  *Id.* (citing Dkt. 1178, Exs. E, F

---

[11] Plaintiffs point out that, while Nelson signed the finder's fee agreement between himself and Blueridge after his termination from Amazon, the transaction bears an unexplained effective date of May 15, 2019, predating his termination from Amazon.  Dkt. 1210 at 23 ¶ 24, Exs. 124, 125, 126.  However, this assertion merely amounts to speculation about when Nelson's employment relationship with Blueridge may have begun and is thus unavailing.

(communications between Nelson and representatives of Blueridge)).  Prior to that, Nelson had not had any communications with Blueridge about performing any work for them.  *Id.*[12]

Nelson and Blueridge agreed that Nelson would be compensated for his work as a consultant on the Blueridge Transaction. Dkt. 1176 ¶ 26.  The parties entered into an arrangement, whereby Nelson would receive 50% of the net profits from the BTS transaction that Blueridge was preparing to close with Amazon.  *Id.* (citing Dkt. 1178, Ex. K (memorandum concerning the negotiation of that agreement)).  Subsequently, Amazon and Blueridge decided to restructure the Blueridge deal as a direct purchase transaction.  *Id.* ¶ 27 (citing Dkt. Nos. 1178 ¶ 18; 1179 (Smart Decl.), Ex. G).  As such, Amazon agreed to have Blueridge assign the purchase contract to Amazon.  *Id.* ¶ 28.  Nelson was not involved in any negotiations concerning the assignment fee. *Id.* (citing Dkt. 1178 ¶ 19).[13]  On December 23, 2019, Amazon and Blueridge closed the assignment of the purchase and sale agreement for $10,000,000. Dkt. 1176 ¶ 29.  Pursuant to the agreement between Nelson and Blueridge, Blueridge paid approximately $5,000,000 to Finbrit Holdings ("Finbrit") (an entity created by Atherton and controlled by Nelson)—*i.e.*, 50% of the profits on the deal.  *Id.* ¶ 30 (citing Dkt. Nos. 1178 ¶ 19; 1179, Ex. J).  The Watson Defendants deny participating in or having any knowledge of the Blueridge Transaction. Dkt. 1174 ¶ 81.  And as with the leases and the White Peaks Transaction, Amazon does not claim that it paid more than market value for the property involved in this transaction.

---

[12] Plaintiffs purportedly dispute the timing and sequence of Nelson's discussions with Blueridge relative to his Amazon employment, and also that Nelson performed legitimate work on Blueridge's behalf.  Dkt. 1210 at 23 ¶ 24.  However, Plaintiffs do not point to anything in the record to support such a dispute.

[13] Plaintiffs dispute that Nelson had no indirect involvement in assignment fee negotiations through Kirschner, who remained at Amazon and helped steer the Blueridge deal through to completion.  *Id.* at 23-24 ¶ 28.  However, they fail to point to anything in the record to support this speculative assertion.

### 3. Atherton's Legal Advice and Services

Atherton had represented Christian Kirschner in a number of matters over the years, beginning in 2010 or 2011. Dkt. 1173 ¶ 7. On December 31, 2017, Atherton organized the Villanova Trust for Christian Kirschner, which was designed as a vehicle through which Christian Kirschner would receive fees and commissions from any Amazon business that Northstar gained by way of Christian Kirschner's referrals. *Id.* ¶ 14. Upon receipt of referral fee payments from Northstar, the Villanova Trust made deposits to the 2010 Irrevocable Trust, another entity that Atherton had created and that Christian Kirschner served as "Trust Protector" of. *Id.* ¶ 20. Atherton also provided his advice and legal services to Nelson in connection with the Blueridge Transaction. *Id.* ¶ 35. Specifically, once the contemplated transaction transformed from a BTS transaction to an assignment of the purchase and sale agreement to Amazon, Atherton conferred with Blueridge's attorney to prepare the documentation for the fee sharing deal between Blueridge and Finbrit. *Id.* The Watson Defendants claim that they did not participate in the formation of any entities, including the Villanova Trust, the 2010 Irrevocable Trust, or Finbrit, created by Atherton for the benefit of Christian Kirschner or Nelson. Dkt. 1174 ¶¶ 10, 12-13.

### 4. Nelson and Casey Kirschner's Employment Agreements with Amazon

As a condition of their employment, Nelson and Casey Kirschner each entered into a "Confidentiality, Noncompetition and Invention Assignment Agreement" (the "CNIAA") with Amazon. Dkt. 1176 ¶ 1. The CNIAA was an Amazon form agreement that the company had all employees joining the company around the same time period sign. *Id.* ¶ 5 (citing *Amazon.com, Inc. v. Powers*, No. C12-1911RAJ, 2012 WL 6726538, at *8 (W.D. Wash. Dec. 27, 2012)).[14]

---

[14] Except where otherwise noted, the provisions of Nelson's and Casey Kirschner's CNIAAs are substantively similar. *See* Dkt. 1169 at 5 n.1.

Sections 1 and 2 of the CNIAA concern the protection of confidential information. Specifically, paragraph 1(a) of the CNIAA provides that Amazon employees must disclose and deliver certain identified information to Amazon "[d]uring the course of employment and at the termination thereof." *Id.* ¶ 3 (citing Dkt. 1178, Ex. A ¶ 1(a) (The CNIAA)).  And paragraph 2(b)(i) of the CNIAA prohibits Amazon employees from using or disclosing information defined as "Confidential Information" except as set forth in that Paragraph. *Id.* ¶ 4 (citing Dkt. 1178, Ex. A ¶ 2(b)(1)).

In the instant case, while he was working at Amazon, Nelson, with permission from Amazon to do so, used a portable hard drive to back up his work files. *Id.* ¶ 45 (citing 1178 ¶ 26). Nelson left the hard drive behind at Amazon when he was terminated. *Id.* ¶ 46 (citing 1178 ¶ 26). After his termination, Nelson received a crate of personal belongings delivered to his home from Amazon, which included the aforementioned hard drive. *Id.* ¶ 47 (citing 1178 ¶ 26).

Casey Kirschner has likewise retained certain work-related files after his termination from Amazon.  Dkt. 1169 ¶¶ 1-3.  To obtain physical possession of Casey Kirschner's laptop without alerting him to its investigation into the alleged kickback scheme at issue here, Amazon sent a malware alert to Casey Kirschner's work laptop, directing him to take the laptop to the IT department of his local Amazon office. *Id.* ¶ 1, Ex. 1 (Plaintiffs' Supplemental Response to Topic No. 122 from the Amended Notice of Deposition).  In accordance with instructions he received from an Amazon technical support representative, Casey Kirschner copied approximately 375 documents onto a USB device before bringing his laptop to the IT department so that he could transfer those files to a new Amazon-issued laptop that he would be given. *Id.* ¶¶ 2-3, Ex. 2 (Kirschner Aff.).

Next, Section 3 of the CNIAA contains the competitive restrictions found in the agreement, which Amazon has described as being "designed to prevent a competitor from using Amazon's competitively sensitive confidential information against it."  Dkt. 1176 ¶ 5 (citing Dkt. 1178, Ex. A ¶ 3; Case No. 2:12-cv01911 (W.D. Wash.), Dkt. 11 at p. 4, ln. 16-17).  Paragraph 3(c)(i) concerns seeking employment, consulting work, or investment capital, from an investor or prospective investor in Amazon.  *Id.* ¶ 6 (citing Dkt. 1178, Ex. A ¶ 3(c)(i)).  Amazon has described Paragraphs 3(c)(ii)-(iv) of the CNIAA as follows:

> First, Section 3(c)(ii) of the Noncompetition Agreement prohibits [employee] from directly or indirectly accepting or soliciting business from Amazon's current and prospective customers, if the business is competitive products or services.
>
> Second, Section 3(c)(iii) of the Noncompetition Agreement prohibits [employee] from directly or indirectly accepting or soliciting business from Amazon's existing or planned target markets regarding competitive products or services.
>
> Third, Section 3(c)(iv) of the Noncompetition Agreement prohibits [employee] from directly or indirectly entering into, or proposing to enter into, competitive business arrangements with entities with which Amazon was involved in substantially the same business arrangement, or had discussed entering into such an arrangement, prior to the termination of his employment.[15]

*Id.* ¶ 7 (citing Case No. 2:12-cv-01911 (W.D. Wash.), Dkt. 11 at pp. 4-5).

Here, after leaving Amazon and during the 18-month period governed by the CNIAA, Nelson performed consulting work for other companies, but never for entities who provide hyper scale or cloud services like Amazon Web Service ("AWS").  *Id.* ¶ 34 (citing Dkt. 1178 ¶ 20).  For instance, Nelson worked as a consultant for Blueridge, which did not and does not offer products or services that compete with AWS—rather, it is a real estate developer.  *Id.* ¶ 26 (citing Dkt. 1178 ¶ 17).  Nelson also held a similar consulting position with two other real estate developers, SDC

---

[15] Casey Kirschner's CNIAA does not contain Paragraph 3(c)(iv).  *See* Dkt. Nos. 1252 at 10; 1215-4 (Casey Kirschner's CNIAA).

and Oppidan, after he left Amazon.  *Id.* (citing Dkt. 1178 ¶ 21, Exs. L-M).  Additionally, Nelson

pitched a potential development of a warehouse to Amazon after his termination.  *Id.* (citing Dkt.

1178 ¶ 22, Exs. O-Q).

Finally, the CNIAA contains a choice of law provision: "This Agreement, and any disputes

which may arise under, out of or in connection with this Agreement, shall be governed by and

construed in accordance with the laws of the State of Washington."  *Id.* ¶ 11 (citing 1178, Ex. A ¶

9).

During their employment, both Nelson and Casey Kirschner also certified compliance with

Amazon's Code of Conduct, which "sets out basic guiding principles" for employees.  *Id.* ¶ 13

(citing Dkt. 156-8 at 2-4 (Amazon's Code of Conduct)).  The Code of Conduct provides, in

pertinent part:

> In performing their job duties, employees are expected to use their judgment to act, at all
> times and in all ways, in the best interests of Amazon.com.
>
> Employees should attempt to avoid conflicts of interest and employees who believe a
> conflict of interest may exist should promptly notify the Legal Department.
>
> Employees who violate the Code of Conduct will be subject to disciplinary action up to
> and including discharge.

*Id.* ¶ 14 (citing Dkt. 156-8 at 2-4).

### B. Procedural Background

On April 27, 2020, Plaintiffs filed suit in this Court.  Dkt. 1.  That same day, Plaintiffs

moved for a temporary restraining order, Dkt. 9, which the Court granted on April 28, 2020, Dkt.

16.  Plaintiffs then filed a Motion for Preliminary Injunction on May 18, 2020, Dkt. 41, which the

Court likewise granted on June 5, 2020, Dkt. 57.  The Watson Defendants moved to dismiss the

Complaint on June 26, 2020.  Dkt. 65.  In response, Plaintiffs filed an Amended Complaint on July

31, 2020.  Dkt. 100.  The Court denied the Watson Defendants' Motion to Dismiss as moot on

March 2, 2021.  Dkt. 276.  Plaintiffs filed a Second Amended Complaint on September 18, 2020.

Dkt. 150.  Defendant Casey Kirschner, the Watson Defendants, and the Nelson Defendants filed

Motions to Dismiss the Second Amended Complaint on October 9, 2020, Dkt. Nos. 174; 176; 179,

all of which the Court denied on February 1, 2021, Dkt. 256.

Plaintiffs subsequently filed a Third Amended Complaint on May 6, 2022, adding Rodney

Atherton as a Defendant.  Dkt. 765.  On January 6, 2023, the Nelson Defendants filed a Motion

for Judgment on the Pleadings, along with a Memorandum in Support thereof.  Dkt. 1145.

Plaintiffs opposed the motion on January 20, 2023, Dkt. 1200, and the Nelson Defendants replied

in support of their motion on January 26, 2023, Dkt. 1206.  Defendant Rodney Atherton, Defendant

Casey Kirschner, the Watson Defendants, and the Nelson Defendants (collectively, "Defendants")

filed their respective Summary Judgment Motions on January 11, 2023.  Dkt. Nos. 1162; 1167;

1172; 1175.  On February 1, 2023, Plaintiffs filed an Opposition to Defendants' Summary

Judgment Motions, Dkt. 1210, and on February 8, 2023, Defendants filed Replies in support of

their respective Summary Judgment Motions, Dkt. Nos. 1245; 1249; 1252; 1255.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the

record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law.'"  *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va.

2014) (quoting Fed. R. Civ. P. 56(a)).  "A disputed fact presents a genuine issue 'if the evidence

is such that a reasonable jury could return a verdict for the non-moving party.'"  *Id.* at 615-16

(quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)).  The moving party

bears the "initial burden to show the absence of a material fact."  *Sutherland v. SOS Intern., Ltd.*,

541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986)).  "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party.  *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists.  *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*, 477 U.S. at 247-48.  A "material fact" is one that might affect the outcome of a party's case.  *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001).  A "genuine" issue concerning a "material fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor.  *Anderson*, 477 U.S. at 248.

Rule 56(e) requires the non-moving party to go beyond the pleadings and by its own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). And this Court requires that the non-moving party list "all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." E.D. Va. Loc. Civ. R. 56(B).

### III. ANALYSIS

Plaintiffs bring eight claims against Defendants. *See generally* Dkt. 765. In particular, they bring a RICO claim (Count I) against all Defendants; a detinue claim (Count II) against all Defendants; a fraud claim (Count III) against the Nelson Defendants, the Watson Defendants, and Defendant Casey Kirschner; a claim for tortious interference with contractual and/or business relations (Count IV) against the Watson Defendants; a civil conspiracy claim (Count V) against all Defendants; a breach of contract claim (Count VI) against the Nelson Defendants and Defendant Casey Kirschner; an unjust enrichment and constructive trust claim (Count VII) against all Defendants; and a conversion and constructive trust claim (Count VIII) against all Defendants. *See generally id.* Defendants move the Court for summary judgment in their favor on all the claims against them. The Court addresses each claim in turn.

### A. RICO (Count I)

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, established four criminal offenses that proscribe certain activities involving a "pattern of racketeering activity." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 329-30 (2016); *see* 18 U.S.C. §§ 1962(a)-(d). RICO also created a civil cause of action, empowering private parties to

sue those who engaged in racketeering activity thereby causing them harm.  *See RJR Nabisco*, 579 U.S. at 329; § 1964(c).  "The showing required to succeed on a RICO charge in the Fourth Circuit is both demanding and well-established."  *Baker v. Sturdy Built Mfg., Inc.*, 2007 WL 3124881, *3 (E.D. Va. Oct. 23, 2007).  To prevail on a RICO claim, Plaintiffs must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *D'Addario v. Geller*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).  Plaintiffs must also show that (5) they were injured in their business or property (6) by reason of the RICO violation.  *Id.*  The injury and causation elements of RICO claims are considered to be standing requirements.  *See, e.g.*, *Sedima*, 473 U.S. at 496; *Gallant v. Deutsche Bank Nat. Trust Co.*, 766 F. Supp. 2d 714, 722 (W.D. Va. 2011).

### 1. Injury

Defendants contend that, as a threshold matter, Amazon has not established that it suffered a concrete financial loss from the alleged kickback scheme such that it has standing under the civil RICO statute.  Dkt. Nos. 1173 at 17-19; 1174 at 21-25; 1176 at 25.  In support of their argument, Defendants point to the fact that Amazon's expert has not put forth any market analysis showing that Amazon overpaid for any of the properties it obtained or the leases it entered into.  Dkt. Nos. 1173 at 18; 1174 at 22; 1176 at 25.  In response, Amazon counters that the amount of kickbacks Northstar allegedly paid to Nelson and Casey Kirschner is a proper measure of Amazon's damages. Dkt. 1210 at 43.[16]

---

[16] In its expert report, Amazon also appears to claim that it suffered harm resulting from certain payments, totaling $781,680, that KBC, a broker on Northstar's purchase transactions, sent to Northstar.  Dkt. 1174, Ex. 15 at 40 (Lee Report).  However, Amazon is precluded from claiming these amounts as damages because the company neither alleged any fraud or other wrongful conduct relating to these payments in its Third Amended Complaint, nor included this information in any of its Rule 26(a)(1) disclosures as an amount it was seeking or in response to any of Defendants' interrogatories.  *See* Dkt. 1179 (Smart Declaration), Exs. A (Amazon's Supplemental

This Court finds Amazon's theory of damages unavailing in this regard. Significantly, another district court within the Fourth Circuit has rejected a similar argument. *State of West Virginia v. Moore* involved an alleged bribery scheme, whereby a former governor of West Virginia received unlawful campaign contributions and kickbacks from a coal company. 895 F. Supp. 864, 868 (S.D.W. Va. 1995). The state asserted that the kickback payment and the illegal campaign contributions constituted damages that it was entitled to recover pursuant to RICO. *Id.* at 869. The court disagreed, holding that evidence of such payments was insufficient to establish an injury for civil RICO purposes. *Id.* at 871.[17] In so holding, the district court explained that the RICO statute "make[s] clear that the plaintiff must show an injury to business or property caused by the racketeering activity of the defendant." *Id.* "Thus, the statute looks at the financial position

---

Initial Disclosures), B (Amazon's Supplemental Initial Disclosures), C (Amazon's Responses to the Nelson Defendants' First Set of requests for Admission); *Nelson-Salabes, Inc. v. Morningside Dev.*, LLC, 284 F.3d 505, 513 n.10 (4th Cir. 2002) (affirming the exclusion of testimony concerning damages where such damages had not been properly disclosed); *Companion Prop. & Cas. Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 3:15-CV-01300-JMC, 2016 WL 3452734, at *2 (D.S.C. June 24, 2016) (an expert report cannot simply stand in the place of appropriate Rule 26(a)(1)(A)(iii) disclosures); *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275-D, 2012 WL 1596722, at *6 (E.D.N.C. May 7, 2012) ("Rule 37(c)(1) gives a court discretion to preclude a party from introducing evidence to establish damages when the party fails to make a Rule 26(a)(1)(A)(iii) disclosure or fails to properly supplement its Rule 26(a)(1)(A)(iii) disclosure pursuant to Rule 26(e).").

[17] Several district courts from other circuits are in accord. *See, e.g.*, *Township of Marlboro v. Scannapieco*, 545 F.Supp.2d 452, 459 (D. N.J. 2008) (finding plaintiff lacked standing in RICO cased predicated on alleged bribery because "amorphous injuries to a right to its employees' honest services are not 'concrete financial loss[es]' recoverable under RICO"); *Curiale v. Capolino*, 883 F.Supp. 941, 949 (S.D.N.Y.1995) ("[The] amount allocable to the kickback was not a loss sustained by the plaintiff and therefore is not subject to trebling under RICO."). *But see Hino Motors Mfg. U.S.A., Inc. v. Hetman*, No. 22-2062, 2022 WL 16709717, at *3 (E.D. Mich. Aug. 4, 2022) (A RICO plaintiff "may recover . . . kickback payments . . . as monetary damages"); *City of New York v. CitiSource*, 679 F.Supp. 393 (S.D.N.Y.1988) (holding that defendant employee's receipt of bribes establishes the requisite injury to property or business under civil RICO).

of the plaintiff" in contrast to "[c]ommon law equitable doctrines," that "often focus on the defendant, forcing him to give up ill-gotten gains." *Id.*

A Fourth Circuit opinion in a comparable context confirms that the focus of the injury inquiry is the plaintiff's financial position. In *Baehr v. Creig Northrop Team, P.C.*, the Fourth Circuit found that alleged kickbacks could not satisfy an injury requirement, reasoning: "[T]he deprivation of impartial and fair competition between settlement services providers—untethered from any evidence that the deprivation thereof increased settlement costs—is not a concrete injury under [the Real Estate Settlement Procedures Act]." 953 F.3d 244, 254 (4th Cir. 2020).

The same is true here. Amazon has not established that the kickback payments from Northstar to Nelson and Casey Kirschner led to increased costs to Amazon on the lease transactions or the direct purchase transactions. While Amazon contends that there may be evidence that it "overpaid for the properties and leases," Dkt. 1210 at 44, it cannot *prove* that it overpaid because there is no evidence in the summary judgment record establishing the market value of the properties at the time of the lease and direct purchase transactions.[18] Accordingly, because Amazon has not met its burden of showing that it suffered an injury to its business or property, granting summary judgment as to the RICO count is appropriate.

### 2. Enterprise

Even assuming that Plaintiffs have standing, their RICO claim fails as a matter of law for a second, independent reason—namely, that the undisputed material facts do not establish an

---

[18] The Court notes that Amazon's decision not to conduct a market analysis, at least as to the leases, may have been a conscious one, given that there is evidence in the summary judgment record indicating that the values of the leased properties exceeded the prices Amazon paid. Dkt. 1174, Ex. 16 (Klein Tr.) at 345:11-16, Ex. 1 (Davenport Tr.) at 124:7-17. Indeed, even after discovering the alleged kickback scheme, Amazon itself chose to affirm the leases. *Id.*, Ex. 24 (Lease Continuity Agreement).

enterprise.  A violation of civil RICO requires proof that the defendant conducted an enterprise through a pattern of racketeering activity.  *Sedima*, 473 U.S. at 496.  To establish the existence of such an enterprise, a plaintiff must put forth evidence that the members shared a purpose—*i.e.*, a common venture, undertaking, or project.  *Boyle v. United States*, 556 U.S. 938, 946 (2009).

In the instant case, Amazon alleges that "[e]ach Defendant participated in the operation or management of the kickback scheme, which includes but is not limited to the Lease Transaction conduct and Direct Purchase conduct alleged herein."  Dkt. 765 ¶ 379.  This Court finds that the undisputed material facts show otherwise.  As the Watson Defendants point out, they had no involvement in the direct purchase transactions and did not even learn of them until after the fact.  *See* Dkt. 1174 ¶¶ 71-73, ¶ 81.  Likewise, there is no evidence that the Watson Defendants conspired with Atherton, Christian Kirchner, and/or Nelson to create the entities through which Christian Kirschner and Nelson received purportedly illicit funds.  *See* Dkt.  1174 ¶¶ 10, 12-13.

Essentially, it appears that Amazon has attempted to lump together Defendants connected to three distinct transactions (the lease transactions, the White Peaks Transaction, and the Blueridge Transaction) into a single enterprise because two Amazon employees were at the center of each transaction.  Indeed, the undisputed material facts merely support a "hub and spoke" or "rimless wheel" structure to the alleged kickback scheme—a type of structure that is insufficient to establish an enterprise.  *See, e.g.*, *Donaldson v. Primary Residential Mortg., Inc.*, No. CV ELH-19-1175, 2020 WL 3184089, at *26 (D. Md. June 12, 2020).  The Fourth Circuit in *Dickson v. Microsoft Corp.* described conspiracies of this variety aptly: "A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's

involvement in each transaction." 309 F.3d 193, 203 (4th Cir. 2002). And as we know, a rimless wheel, except under the most unusual construction, holds no air.

In the instant case, the summary judgment record provides no basis for establishing that the spokes (the Watson Defendants, Ramstetter and Camenson, and Nelson, with respect to his role in the Blueridge Transaction) were sufficiently connected to each other so as to constitute an enterprise. This absence of a connection between the alleged kickback scheme's spokes is another fundamental—and dispositive—flaw in Amazon's RICO claim. *See Donaldson*, 2020 WL 3184089, at *26 (dismissing complaint because it "[wa]s devoid of facts connecting the spokes[,]" or, in other words, was "bereft of allegations suggesting that the participating mortgage lenders were working together in furtherance of the scheme or, indeed, that they were even aware of each other's existence"). Ultimately, this Court concludes that there are no genuine issues of material fact as to whether Amazon was damaged by the RICO predicate acts or whether an enterprise existed. Therefore, all Defendants are entitled to summary judgment as a matter of law on Count I of the Third Amended Complaint.

## B. Fraud (Count III)

The Nelson Defendants, the Watson Defendants, and Defendant Casey Kirschner next move for summary judgment on Plaintiffs' fraud claim, on the ground that Amazon has not come forward with evidence of actual damages. Dkt. Nos. 1174 at 37; 1176 17-19. To survive summary judgment on its claim for fraud, Amazon must demonstrate a genuine issue of material fact as to the following elements of fraud under Virginia law: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Rsch. Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). "[W]here the alleged fraud occurs in a commercial transaction

21

involving the transfer of real property, [the Virginia Supreme Court has] defined the measure of damages as 'the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the [fraudulent] representation been true.'" *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 558-59 (Va. 2003) (quoting *Prospect Development Co. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999)); *Nahigian v. Juno-Loudon*, LLC, No. 1:09CV725 JCC, 2010 WL 3418179, at *12 (E.D. Va. Aug. 23, 2010) (same); *see also Sharma v. USA Int'l, Inc.*, 851 F.3d 308 (4th Cir. 2017) (citing *Prospect Development Company, Inc.* as supplying the rule for damages in Virginia). Virginia courts have consistently applied this rule in common law fraud cases involving purchases or leases of property. *See, e.g.*, *Carstensen v. Chrisland Corp.*, 442 S.E.2d 660, 666-67 (Va. 1994); *Patel v. Anand, L.L.C.*, 564 S.E.2d 140, 143 (Va. 2002); *Long & Foster Real Estate, Inc. v. Clay*, 343 S.E.2d 297, 300-01 (Va. 1986).

Here, Amazon has not put forth any evidence that the market value of the properties involved in the White Peaks Transaction and the Blueridge Transaction was anything other than what it paid for those properties. *See* Dkt. 1174, Ex. 15 at 12 n.5 (Lee Report) (Amazon's expert acknowledging that he is not offering an opinion on what the company's recoverable damages are for its fraud claim). This is a particularly glaring omission given that Amazon's Third Amended Complaint alleges that it was injured by "purchas[ing] real property in Virginia unlawfully inflated above its fair market value" and further alleging it paid "approximately $17,700,000 in excess of the fair market value of the [White Peaks Property]." Dkt 765 ¶¶ 447, 541.

Nor has Amazon put forth any evidence of market value with respect to any of the nine lease transactions. In its Third Amended Complaint, Amazon makes only conclusory statements that the rents were "inflated," or that they were not "fair market deals," *see* Dkt 765 ¶ 482, without

actually demonstrating as much through a market analysis.  Moreover, Amazon's Opposition does not respond to Defendants' arguments regarding the lack of evidence to satisfy the damages element.  *See* Dkt 1210 at 66-69.  Thus, Amazon has conceded this point.  *See, e.g.*, *Butler v. United States*, No. 5:20-CV-00480-BO, 2022 WL 5239520, at *1 (E.D.N.C. Aug. 3, 2022) (noting that a failure to address the arguments presented by moving party, amounts to a concession that summary judgment is appropriate on that issue); *Intercarrier Commc'ns, LLC v. Kik Interactive, Inc.*, No. 3:12-cv-771, 2013 WL 4061259, at *1 (E.D. Va. Aug. 9, 2013) (concluding that where a party fails to respond to an argument it is "effectively conceding" the argument).  As with the RICO claim, the Court finds that Amazon's failure to put forth any evidence concerning the value of the properties at the time each transaction closed is fatal to its fraud claim.  Accordingly, summary judgment on Count III of the Third Amended Complaint in favor of the Nelson Defendants, the Watson Defendants, and Defendant Casey Kirschner is appropriate.

   C. Tortious Interference with Contractual and/or Business Relations (Count IV)

     The Court next addresses Amazon's tortious interference claim against the Watson Defendants.  In Virginia, a tortious interference claim requires proof demonstrating "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted."  *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015) (citing *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)).

     In the instant case, Amazon claims that the Watson Defendants interfered with Amazon's employment relationships with Nelson and Casey Kirschner by "enter[ing] into a pay-to-play

arrangement that was deleterious to Amazon's interests." Dkt. 765.[19]   The Watson Defendants

argue that Amazon's tortious interference claim fails because Nelson and Kirschner's employment

agreements were terminable at will.  Dkt. 1174 at 40.[20]  But, as Amazon correctly points out in its

Opposition, even at-will contracts can be the basis for a tortious interference claim if the defendant

"employed improper methods" in causing a breach.  *Dunlap v. Cottman Transmission Sys., LLC*,

754 S.E.2d 313, 318 (Va. 2014) (quotation marks omitted).  In *Dunlap*, the Virginia Supreme

Court explicitly identified "bribery . . . fraud, misrepresentation or deceit . . ., or breach of a

fiduciary relationship" as examples of such improper methods.  *Id.* at 318 n.5.  Here, the parties

dispute whether the Watson Defendants paid Nelson and Casey Kirschner kickbacks in exchange

for Nelson and Casey Kirschner steering lease projects to them.  Thus, having reviewed the record,

and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that a reasonable juror

could conclude that the Watson Defendants interfered with Nelson's and Casey Kirschner's

employment relationships by bribing them and thereby depriving Amazon of its employees' honest

services.  Accordingly, summary judgment on this claim is denied.

---

[19] The court recognizes that the Watson Defendant could only have interfered with Amazon's employment contracts with Nelson and Casey Kirschner on the Lease Transactions, because the undisputed material facts demonstrate that they had no involvement in the Direct Purchase Transactions.  *See* Dkt. 1174 ¶¶ 71-73, Ex. 38 at 3 (Defendants' Second Supplemental Answers to Plaintiffs' First Set of Interrogatories) (the Watson Defendants maintaining that they played no role in the White Peaks transaction and did not even know of its existence until after Amazon had purchased the property); *id.* ¶ 81 (the Watson Defendants denying participating in or having any knowledge of the Blueridge Transaction).

[20] The Watson Defendants further assert that Amazon cannot prove the damages element of its interference claim.  Dkt. 1174 at 40.  However, they do not cite any case law indicating that the same standard that governs damages in the context of a civil RICO or fraud claim also applies to a claim for tortious interference.

D. Breach of Contract (Count VI)

Turning to the breach of contract claim, Amazon alleges that Nelson and Casey Kirschner violated the confidentiality and non-compete provisions found in their respective CNIAAs.[21]  The Court addresses the confidentiality and competitive restrictions of the CNIAA separately.

1. The Confidentiality Provisions

Section 1(a) of Amazon's CNIAA requires employees to "promptly disclose and deliver over to the Company"—both "[d]uring the course of employment and at the termination thereof"—certain enumerated categories of "Disclosure Information."  Dkt. 765 ¶ 528.  Further, Section 2(b) broadly prohibits Amazon employees from "us[ing] or caus[ing] to be used any . . . Confidential Information in connection with any activity or business except the business of the Company," either "directly or indirectly, at any time, during the term of his . . . employment with the Company or at any time thereafter, and without regard to when or for what reason, if any, such employment

---

[21] Amazon also makes reference to Amazon's Code of Conduct in the breach of contract count of the Third Amended Complaint. Dkt. 765 ¶ 527.  However, the Code of Conduct does not contain enforceable or mandatory language.  Codes of conduct generally "express[ ] opinions as to what actions are preferable, as opposed to implying that all staff, directors, and officers always adhere to its aspirations."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017).  Amazon's code is no different.  It "sets out basic guiding principles."  Dkt. 156-8 at 2.  For example, it provides that employees "*should* attempt to avoid conflicts of interest" and "are expected to *use their judgment*."  *Id.* (emphasis added).  Such "business's ethics codes have been held to be nonactionable when they are inherently aspirational or do not imply compliance."  *See Flynn v. Exelon Corp.*, No. 19 C 8209, 2021 WL 1561712, at *9 (N.D. Ill. Apr. 21, 2021), *motion to certify appeal denied*, No. 19 C 8209, 2022 WL 267915 (N.D. Ill. Jan. 28, 2022).  Further in Amazon's Code of Conduct, when an employee errs, the consequences are "disciplinary," not legal, and are merely "up to and including discharge."  Dkt. 156-8 at 2.  Additionally, to the extent Amazon asserts that the Code of Conduct is a legally enforceable agreement, that position is directly contrary to the position it has taken in its employment litigation when sued by terminated employees.  *See, e.g.*, *Missouri v. Amazon.com, Inc.*, No. CV 19-13525(RMB/JS), 2020 WL 401842, at *3 (D.N.J. Jan. 24, 2020).  Thus, it is precluded from adopting a contrary position here.  *See* "Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation."  *John S. Clark Co. v. Faggert & Frieden*, P.C., 65 F. 3d 26, 28 (4th Cir. 1995).

shall terminate." *Id.* Amazon alleges that Nelson violated these provisions of his CNIAA by retaining the hard drive that contains approximately 1.4 million pages of Amazon documents after his termination from Amazon and "steer[ing] proprietary and competitively sensitive business information to co-conspirators." *Id.* ¶¶ 527-28. Amazon likewise claims that Casey Kirschner breached these provisions by copying about 375 documents onto a USB drive, many of which allegedly referenced confidential Amazon business transactions, and "steer[ing] proprietary and competitively sensitive business information to co-conspirators." *Id.* ¶ 527.

As an initial matter, the parties agree that Amazon's CNIAA is governed by Washington state law. Dkt. Nos. 1169 at 5-6; 1176 at 27; 1210 at 69.[22] To prevail on a breach of contract claim under Washington law, a plaintiff must prove "(1) the existence of a valid agreement; (2) a breach of that agreement; (3) and resulting damage." *Fin. Pac. Leasing, Inc. v. Moess Trucking LLC*, No. 3:20CV00066, 2021 WL 279608, at *2 (W.D. Va. Jan. 27, 2021) (citing *Univ. of Wash. v. Gov. Empls. Ins. Co.*, 404 P.3d 559, 566 (Wash. Ct. App. 2017)).

The Nelson Defendants and Defendant Casey Kirschner first argue that Amazon has failed to identify any specific confidential information (as defined in Paragraph 2(a) of the CNIAA) that they improperly shared in violation of Section 2(b) of the CNIAA or explain how disclosure of that information proximately caused Amazon harm. Dkt. Nos 1169 at 6; 1176 at 33. Amazon

---

[22] Case law supports the parties' position. The CNIAA features a choice-of-law provision that provides that the "Agreement will be governed by and construed in accordance with the laws of the State of Washington." Dkt. 1178, Ex. A ¶ 9. Since the breach of contract claim is before the Court through supplemental jurisdiction, Virginia's choice-of-law rules apply. *See Ez-XBRL Sols., Inc. v. Chapke*, No. 117CV700LMBTCB, 2018 WL 5808724, at *4 (E.D. Va. Sept. 25, 2018), *report and recommendation adopted*, No. 117CV00700LMBTCB, 2018 WL 5809406 (E.D. Va. Oct. 22, 2018). Outside of unusual circumstances, Virginia law gives full effect to choice of law provisions. *See Zaklit v. Glob. Linguist Sols., LLC*, No. 1:14CV314 JCC/JFA, 2014 WL 3109804, at *5 (E.D. Va. July 8, 2014). Accordingly, Washington state law applies to Amazon's breach of contract claim.

responds that the specific confidential information at issue is bid information that Nelson and Casey Kirschner improperly shared with Watson to ensure that Northstar's bid would be successful.  Dkt. 1210 at 72.

The district court's opinion in *Amazon.com, Inc. v. Powers* makes clear that, to establish a breach, Amazon must show that Nelson and Casey Kirschner improperly used the specific information they copied onto their devices.  2012 WL 6726538, at *7 ("That [a defendant] knows something is not proof that he will use that knowledge" to compete against his prior employer.).  Here, Amazon does not point to any evidence in the summary judgment record from which a reasonable juror could conclude that the information Nelson and Casey Kirschner shared with other Defendants came from the documents downloaded onto their devices.[23]   Accordingly, Amazon's breach of contract claim based on Section 2(b) of the CNIAA fails at the summary judgment stage.

Nelson and Casey Kirschner next contest that their retention of Amazon documents after the termination of their employment amounted to a breach of Section 1(a) of the CNIAA.  Dkt Nos. 1176 at 33-34.  The Nelson Defendants argue that Amazon has no basis to claim a violation of Section 1(a) for conduct that occurred *after* Nelson was terminated.[24]  This Court agrees.  As the Nelson Defendants correctly point out, Section 1(a) merely requires disclosure and delivery of confidential information to Amazon "[d]uring the course of employment and at the termination

---

[23]  For this same reason, Amazon cannot show that Nelson's and Casey Kirschner's retention of confidential information proximately caused the company recoverable damages.

[24] In its Opposition, Amazon does not address this argument, thus conceding it.  *See, e.g.*, *Butler v. United States*, No. 5:20-CV-00480-BO, 2022 WL 5239520, at *1 (E.D.N.C. Aug. 3, 2022) (noting that a failure to address the arguments presented by moving party, amounts to a concession that summary judgment is appropriate on that issue); *Intercarrier Commc'ns, LLC v. Kik Interactive, Inc.*, No. 3:12-cv-771, 2013 WL 4061259, at *1 (E.D. Va. Aug. 9, 2013) (concluding that where a party fails to respond to an argument it is "effectively conceding" the argument).

thereof." Dkt. 1178, Ex. A ¶ 1(a).  The plain language of this provision indicates that Nelson's obligation to turn over confidential information to Amazon did not extend beyond his employment with Amazon.  Here, it is undisputed that Nelson left the hard drive behind at Amazon when he was terminated, and that Amazon delivered the hard drive to his home without erasing its contents only *after* Nelson was terminated.  Dkt. 1176 ¶¶ 45-47.  Thus, Section 1(a) cannot serve as a basis for Amazon's breach of contract claim against the Nelson Defendants.

Casey Kirschner contends that he could not have violated Section 1(a) of the CNIAA because an Amazon IT employee explicitly instructed him to copy documents onto a USB device.  Dkt. 1169 at 7-8.  In response, Amazon counters that such *verbal* permission to copy confidential information is insufficient to avoid liability.  Dkt. 1210 at 71.

Section 3.1 of Casey Kirschner's CNIAA provides that an employee "will not acquire, use, publish, disclose, or communicate any Confidential Information *except as required in connection with Employee's work* without the prior written approval of an authorized officer of Amazon."  Dkt. 1169, Ex. 162-9 § 3.1 (emphasis added).  This provision thus appears to modify the prohibitions on retaining and using confidential information found in Sections 1(a) and 2(b).

Here, there is no genuine dispute as to the fact that, in order to obtain Casey Kirschner's laptop and copy certain information, Amazon sent a malware alert to that device, which, in turn, instructed him to contact Amazon IT.  Dkt. 1169 ¶ 1, Ex. 1 (Plaintiffs' Supplemental Response to Topic No. 122 from the Amended Notice of Deposition).  In accordance with verbal instructions that he received from an Amazon technical support representative, Casey Kirschner copied documents from his work laptop onto a USB device so that he could transfer those files to a new Amazon-issued laptop that he would be given.  *Id.* ¶¶ 2-3, Ex. 2 (Kirschner Aff.).  Essentially, Amazon admits that it sent the malware alert to surreptitiously obtain physical control of Casey

Kirschner's laptop but claims that the actions he was required to take as a result constitute a breach of the CNIAA.  This Court finds that such a result would be untenable and is unsupported by the language of Section 3.1 of Casey Kirschner's CNIAA.  In order to perform his duties as a real estate transaction manager for Amazon, Casey Kirschner would clearly have needed the documents stored on his work laptop.[25]  Thus, even though Casey Kirschner did not have written permission to copy the documents, the exception in Section 3.1 is nonetheless applicable, and he is entitled to summary judgment on this aspect of Amazon's breach of contract claim.

### 2. The Non-Compete Provisions

The Third Amended Complaint cites several competitive restrictions in Nelson's and Casey Kirschner's CNIAAs that it alleges they violated—3(c)(i), 3(c)(ii), 3(c)(iii), and 3(c)(iv).  Dkt. 765 ¶ 526.  Paragraph 3(c)(i) concerns seeking employment, consulting work, or investment capital, from an investor or prospective investor in Amazon.  Dkt. 1176 ¶ 6 (citing Dkt. 1178, Ex. A ¶ 3(c)(i)).  Further, Paragraphs 3(c)(ii)-(iv) prohibit employees from "accepting or soliciting business from Amazon's current and prospective customers, if the business is competitive products or services, [3(c)(ii)]," "accepting or soliciting business from Amazon's existing or planned target markets regarding competitive products or services, [3(c)(iii)]," or "enter[ing] into any . . . business arrangement with any entity with which, prior to [their] Termination Date, the Company was involved in substantially the same business arrangement, or with which the Company had held discussions regarding the possibility of entering into such an arrangement, if such arrangement

---

[25] A breach of contract claim based on Section 1(a) also fails because Amazon has not shown that it suffered any damages resulting from Casey Kirschner merely retaining the USB device.  For instance, Amazon has not pointed to anything in the summary judgment record suggesting that he did anything with those documents other than copy them from one laptop to another.

would be competitive with or otherwise deleterious to the interests of the Company," [3(c)(iv)]."
*Id.* ¶ 7 (citing Case No. 2:12-cv-01911 (W.D. Wash.), Dkt. 11 at pp. 4-5).[26]

Amazon claims that Nelson breached these provisions in three ways: (1) "steer[ing]
proprietary and competitively sensitive business information to co-conspirators"; (2) "[becoming]
involved with the Blueridge Transaction, serving as a consultant for a counterparty on a transaction
for Amazon . . . ; and (3) "us[ing] the Atherton Trusts and Atherton Entities to coopt business
opportunities, interfere with the performance of Amazon personnel, or otherwise engage in
conduct competitive with or deleterious to the interests of the company."  Dkt. 765 ¶ 527.
Similarly, Amazon alleges that Casey Kirschner violated the non-compete provisions by (1)
"steer[ing] proprietary and competitively sensitive business information to coconspirators in
exchange for kickbacks and other benefits they concealed from Amazon in violation of company
contracts and policies"; and (2) "us[ing] the Atherton Trusts and Atherton Entities to co-opt
business opportunities, interfere with the performance of Amazon personnel, or otherwise engage
in conduct competitive with or deleterious to the interests of the company." *Id.*

Nelson and Casey Kirschner assert that Amazon has not demonstrated that they engaged
in any form of prohibited competition.  Dkt Nos. 1169 at 9-11; 1176 at 30-32.  Nelson and Casey
Kirschner aver that, rather than working with Google or any other competitor of Amazon's cloud
computing division, they, at most, cooperated with companies that worked *with* Amazon.  Dkt.
Nos. 1169 at 10; 1176 at 30-31.  For instance, Nelson notes that he provided real estate
development consulting services after leaving Amazon to developers who worked alongside
Amazon, Dkt. 1176 at 30, and Casey Kirschner points out that he merely worked with Amazon's

---

[26] As previously noted, Casey Kirschner's CNIAA does not contain Paragraph 3(c)(iv).
*See* Dkt. Nos. 1252 at 10; 1215-4.

business partners during the course of his employment, Dkt. 1252 at 12.  In response, Amazon emphasizes that Paragraph 3(c)(iv) of the CNIAA forbids employees from entering into business arrangements with other entities that are "deleterious to [Amazon's] interests . . . ."  Dkt. 1210 at 71 (citing 1215-3 (Nelson's CNIAA)).  According to Amazon, Nelson and Casey Kirschner did precisely that by entering into agreements to receive kickback payments linked to Amazon deals with Northstar, White Peaks, and Blueridge.  *Id.*

A reasonable reading of the CNIAA undermines Amazon's argument, however.  Under Paragraph 3(c)(iv), the first inquiry for the Court to undertake is whether Nelson or Casey Kirschner entered into an arrangement with an entity that is substantially similar to the arrangement Amazon had with that entity before they proceeded to do so.  If the answer is no, which Amazon appears to concede here, the next question is whether Nelson or Casey Kirschner entered into an arrangement with an entity that is substantially similar to the arrangement Amazon had been discussing with that other entity.  Here, Amazon makes no argument that it had been discussing an arrangement with any of the entities it identifies similar to the arrangement it claims Nelson and Casey Kirschner had with those entities.  Only if the answer is yes to either of these two preliminary inquiries, would the Court then reach the last provision in that Paragraph, which reads: "if such arrangement would be competitive with or otherwise deleterious to the interests of the Company."  Amazon's interpretation of Paragraph 3(c)(iv) would allow it to skip an essential step in the analysis and assert a breach of contract claim for any arrangement it deems to be "deleterious" to its interests.  Such an interpretation is not only overly expansive, but also runs contrary to the explicit terms of the CNIAA.[27]  Accordingly, because Amazon has not put forth

---

[27] Notably, Casey Kirschner's CNIAA does not even contain Paragraph 3(c)(iv) or any comparable language about arrangements that would be harmful to Amazon's interests.  *See* Dkt. Nos. 1252 at 10; 1215-4.

evidence that either Nelson or Casey Kirschner entered into any competitive business arrangements, summary judgment is appropriate on this final aspect of Amazon's breach of contract claim as well.

### E. Civil Conspiracy (Count V)

Amazon also brings a claim against all Defendants for Virginia common law conspiracy and statutory conspiracy under Va. Code § 18.2-499(A). Specifically, Amazon alleges that "Defendants have conspired to induce breach of contract and engage in fraud, tortious interference with contractual and business relationships, and unlawful racketeering and enterprise activity against Plaintiffs . . . ." Dkt. 765 ¶ 515.

Under Virginia law, a common law claim of civil conspiracy lies where "a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014). Virginia law also recognizes a statutory claim of civil conspiracy where "two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act." Va. Code § 18.2-499(A). Notably, this Court has held that "[c]ivil conspiracy is not an independent cause of action, but requires an underlying wrong which would be actionable absent the conspiracy." *Xia Bi v. McAuliffe*, 2018 WL 4224850, at *2 (E.D. Va. Sept. 5, 2018), *aff'd*, 927 F.3d 177 (4th Cir. 2019), *as amended* (July 9, 2019). In the instant case, while Defendants are entitled to judgment on the underlying RICO, fraud, and breach of contract claims, the remaining tortious interference claim can serve as a basis for the civil conspiracy count.

Defendant Atherton contends that summary judgment in his favor on this claim is proper because, under Virginia law, an agent cannot be held liable for conspiring with its principal as a matter of law.  Dkt. 1173 (citing *Fox v. Deese*, 362 S.E.2d 699, 707 (Va. 1987)); *see also Perk v. Vector Res. Grp., Ltd.*, 485 S.E.2d 140, 144 (Va. 1997) (conspiracy among defendants was legally impossible where plaintiff alleged principal-agent relationship between defendants).[28]  Here, it is undisputed that Defendant Atherton was acting in a representative capacity when he created corporate entities and trusts for the benefit of Nelson and Casey Kirschner, and thus, could not have conspired with those Defendants.  Dkt 1174 ¶ 7.  Further, there is no evidence in the summary judgment record that Defendant Atherton formed an agreement with the Watson Defendants to interfere with Amazon's employment relationships with Nelson and Casey Kirschner.  *See* Dkt. 1174 ¶¶ 10, 12-13 (The Watson Defendants claiming that they did not participate in the formation of any entities, including the Villanova Trust, the 2010 Irrevocable Trust, or Finbrit, created by Atherton for the benefit of Christian Kirschner or Nelson).  For these reasons, the civil conspiracy claim may proceed to trial as to the Watson Defendants, the Nelson Defendants, and Defendant Casey Kirschner, but fails at the summary judgment stage as to Defendant Atherton.

### F. Detinue (Count II)

The Court next turns to Amazon's detinue claim against all Defendants.  An action for detinue under Virginia law is a particularized remedy specific to the "unlawful detainer of the specific property sued for . . . and not a money obligation due from the defendant to the plaintiff."  *Virginia Land Immigr. Bureau v. Perrow*, 89 S.E. 891, 892 (Va. 1916).  To establish a claim for

---

[28] Plaintiffs do not contest this point, thus conceding it.  *See, e.g.*, *Butler*, 2022 WL 5239520, at *1 (noting that a failure to address the arguments presented by moving party, amounts to a concession that summary judgment is appropriate on that issue); *Intercarrier Commc'ns, LLC*, 2013 WL 4061259, at *1 (concluding that where a party fails to respond to an argument it is "effectively conceding" the argument).

detinue under Virginia law, a plaintiff must show that it has a property interest in specific personal property capable of identification.  Va. Code § 8.01-114(A)(1); *York v. Jones*, 717 F. Supp. 421, 427 (E.D. Va. 1989).  As Virginia courts have recognized: "[M]ore certainty is required in a detinue action than in other cases because the specific property sued for is sought to be recovered, and it is therefore necessary for that the property be specifically identified or clearly distinguishable from other property."  *Eung Hee Lee v. Moon Sik Park*, 73 Va. Cir. 219, 2007 WL 6013571 (Fairfax Co. Cir. Ct. 2007) (citing 66 Am.Jur.2d REPLEVIN, § 138, 580).  Although money may be deemed specific personal property for purposes of detinue, the money in such cases must be easily susceptible to ready and positive identification.  *United States v. Moffitt, Zwerling & Kemler*, 875 F. Supp. 1190, 1198 (E.D. Va. 1995), *aff'd in part, rev'd in part on other grounds*, 83 F.3d 660 (4th Cir. 1996).

In the instant case, Amazon seeks to recover monies it paid Defendants relating to (1) amounts corresponding to rent paid in connection with the Lease Transactions; (2) the White Peaks purchase; and (3) the Blueridge purchase.  Dkt. 765 ¶ 464.  In their Summary Judgment Motions, Defendants assert that Amazon seeks an amount specified in damages rather than specific funds. Dkt. Nos. 1173 at 23; 1174 at 38.  Rather than directly responding to this argument, Amazon brings the Court's attention to the Fourth Circuit's opinion on the preliminary injunction in the instant case, where the court found that "disgorgement does not require tracing of specific funds in a defendant's possession."  Dkt. 1210 at 79 (quoting *Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *6 (4th Cir. Aug. 31, 2021)).  In so doing, Amazon makes clear that the remedy it is actually seeking under its detinue claim is disgorgement, meaning "the payment of profits arising from improper conduct."  *Amazon.com, Inc.*, 2021 WL 3878403, at *6. However, in Virginia, detinue is a statutory cause of action, and disgorgement is not an available

remedy.  *See* Va. Code. Ann. § 8.01-121.[29]  For this reason, Plaintiffs' detinue claim cannot proceed beyond the summary judgment stage.

And with regard to Defendant Atherton specifically, Amazon seeks to bring a detinue action against him, seemingly not for any specific personal property in his possession, but rather for his role in forming trusts and corporate structures that may have received certain fungible funds. *See* Dkt. 765 ¶¶ 298-303, 461.[30]  However, such a claim that fails to identify particular funds is not cognizable as a detinue action under Virginia law.  Consequently, summary judgment for Defendant Atherton on the detinue claim is appropriate for this reason as well.

## G. Unjust Enrichment (Count VII) and Conversion (Count VIII)

Finally, the Court turns to Plaintiffs' unjust enrichment and conversion claims.  Amazon seeks equitable relief by way of a constructive trust in connection with these two claims.  Dkt. 765 ¶¶ 551, 562.  Defendants assert that Amazon cannot pursue its claims for equitable relief when it has contract remedies available to it.  Dkt. Nos. 1174 at 41-45; 1176 at 42-44.  In response, Amazon maintains that the Fourth Circuit's opinion upholding the preliminary injunction with respect to

---

[29]  Notably, the Fourth Circuit's discussion about disgorgement was specifically in reference to Amazon's unjust enrichment claim.  *See Amazon.com, Inc. v. WDC Holdings LLC*, No. 20-1743, 2021 WL 3878403, at *6 (4th Cir. Aug. 31, 2021) (going on to explain that "'Virginia law allows for disgorgement of *all* profits for *unjust enrichment*,' not only the funds obtained directly from the plaintiff" (second emphasis added) (quoting *Quick Serve Concepts, LLC v. Cedar Fair, L.P.*, 83 Va. Cir. 59, 2011 WL 8947571, at *5 (2011))).

[30]  In their Opposition, Plaintiffs do not address Defendant Atherton's argument as to this point, *see* Dkt. 1173 at 24, and thus concede this issue.  *See, e.g.*, *Butler*, 2022 WL 5239520, at *1 (noting that a failure to address the arguments presented by moving party, amounts to a concession that summary judgment is appropriate on that issue); *Intercarrier Commc'ns, LLC*, 2013 WL 4061259, at *1 (concluding that where a party fails to respond to an argument it is "effectively conceding" the argument).

the equitable claims in this matter forecloses such an argument.  Dkt. 1210 at 75 (*Amazon.com, Inc.*, 2021 WL 3878403, at *5).

"Under Virginia law, equitable remedies are not available if a plaintiff has an adequate remedy at law."  *Williams v. Branch Banking & Tr. Co.*, No. 3:16-CV-00843-JAG, 2017 WL 2999973, at *1 (E.D. Va. Mar. 8, 2017).[31]  Where a party may bring a damages claim for the same conduct for which it seeks equitable relief, it has an adequate remedy at law.  *Id.* at *1 (citing *Wegner v. Mfrs. & Traders Trust Co.*, No. 3:14-CV-851-JAG, 2015 WL 9200478, at *4 (E.D. Va. Dec. 16, 2015) (noting that where Virginia law "recognizes a claim for damages" equitable relief is unavailable)).  And it is well-established that damages are typically an available remedy for conversion claims in Virginia.  *See, e.g.*, *Straley v. Fisher*, 10 S.E.2d 551, 552 (Va. 1940); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09CV58, 2011 WL 4625760, at *2 (E.D. Va. Oct. 3, 2011).  To be sure, where certain unique property is at issue, damages may not be an adequate remedy in a conversion action.  *See, e.g.*, *Montanile v. Botticelli*, No. 1:08CV716 (JCC), 2009 WL 196423, at *3 (E.D. Va. Jan. 26, 2009) (concerning delivery of six rare baseball cards).  In the instant case, however, money is the property at issue.  *See* Dkt. 765 (alleging that "Defendants wrongfully exercised authority over the millions of dollars they obtained from Plaintiffs by inducing Plaintiffs to pay them and/or their affiliates these monies in the form of undisclosed costs and fees on the nine Lease Transactions detailed herein that they procured by reason of their fraudulent conduct").  That Amazon deliberately chose not to seek damages under its conversion count is irrelevant and does not trigger the availability of equitable relief.  *See Robins v. The Southland Corp.*, 20 Va. Cir. 80 (1990) ("The Court is not convinced plaintiffs are

---

[31] Amazon has not alleged that it lacks an adequate remedy at law for any claims in its Third Amended Complaint except for the breach of contract claim concerning the CNIAA, which is irrelevant to the conversion and unjust enrichment counts.  *See* Dkt. 765 ¶¶ 323, 335, 524, 525.

without an adequate remedy at law because there are means and methods of proving damages to a reasonable degree of certainty should a breach be shown by the evidence.").

Similarly, unjust enrichment is an equitable remedy "that is generally available only where there is not adequate remedy at law." *Garcia v. Volkswagen Grp. of Am., Inc*., No. 1:19-CV-331, 2022 WL 2542291, at *11 (E.D. Va. July 7, 2022); *Elegant Homes of Virginia, Inc. v. Boberski*, 70 Va. Cir. 377 (2006) (citing *Barrow v. County of Prince Edward*, 92 S.E. 910, 910 (1917)); *see also Elegant Homes*, 70 Va. Cir. at 378 ("The 'unjust' in 'unjust enrichment' refers to the lack of the plaintiff having an adequate remedy at law for any wrong perpetrated on him by the defendant." (emphasis omitted) (quoting *Wright v. Cangiano*, 20 Cir. C15084 (Loudoun County, 1993))). Thus, where there is a valid contract, or where a party affirms a disputed contract, the contract precludes a recovery for unjust enrichment. *See CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018) (awarding summary judgment to defendant because "[plaintiff] may not recover on a quasi-contractual claim that is otherwise precluded by a contract which [it] has affirmed"); *McPike v. Zero-Gravity Holdings, Inc.*, 280 F.Supp.3d 800, 809-10 (E.D.Va. 2017) ("Because unjust enrichment claims are only appropriate in the absence of an enforceable contract, and neither party here challenges the validity or enforceability of the Agreement . . . , plaintiff's unjust enrichment claim must be dismissed."). Thus, the fact that Amazon affirmed the leases at issue precludes Amazon's unjust enrichment claim.

The Fourth Circuit's opinion upholding the preliminary injunction in this case does not dictate a different outcome. Indeed, the Fourth Circuit held only that it was appropriate for Amazon to plead breach of contract and unjust enrichment with respect to the Lease Transactions in the alternative at an early stage in the litigation. *Amazon.com, Inc.*, 2021 WL 3878403, at *6 ("Because Northstar contests its liability under Amazon's breach of contract claims, Amazon

cannot be barred from arguing unjust enrichment in the alternative."); *see also LMP Holdings, LLC v. PLY Enterprises, LLC*, No. 3:12CV440, 2012 WL 4344302, at *5 (E.D. Va. Sept. 21, 2012) (explaining that, while it is true that a plaintiff may plead claims in the alternative, that rule will not save a claim seeking equitable relief if the plaintiff cannot produce evidence to satisfy the element necessary for all equitable relief—the lack of an adequate remedy at law).  Moreover, since the Fourth Circuit heard the injunction appeal in August 2021, the facts have changed significantly—Amazon entered into the Lease Continuity Agreement, thereby affirming the lease contracts, in February 2022.  Dkt. 1174 ¶ 43.  Accordingly, questions of law resolve the equitable claims in Defendants' favor, and summary judgment is therefore appropriate on Counts VII and VIII of the Third Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant Atherton's Motion for Summary Judgment (Dkt. 1162) is GRANTED; and it is

FURTHER ORDERED that Defendant Casey Kirschner's Motion for Summary Judgment (Dkt. 1167) is GRANTED in part and DENIED in part; and it is

FURTHER ORDERED that the Watson Defendants' Motion for Summary Judgment (Dkt. 1172) is GRANTED in part and DENIED in part; and it is

FURTHER ORDERED that the Nelson Defendants' Motion for Summary Judgment (Dkt. 1175) is GRANTED in part and DENIED in part; and it is

FURTHER ORDERED that the Nelson Defendants' Motion for Judgment on the Pleadings on the RICO claim (Count I) (Dkt. 1145) is DENIED as MOOT.[32]

---

[32] In addition to moving for summary judgment, the Nelson Defendants seek judgment on the pleadings that Amazon lacks statutory standing to bring claims for equitable relief under

The Clerk is directed to enter judgment pursuant to Federal Rule of Civil Procedure 58 for Defendant Atherton as to counts I, II, V, VII, and VIII of the Third Amended Complaint; for Defendant Casey Kirschner as to counts I, II, III, VI, VII, and VIII of the Third Amended Complaint; for the Watson Defendants as to counts I, II, III, VII, and VIII of the Third Amended Complaint; and for the Nelson Defendants as to counts I, II, III, VI, VII, and VIII of the Third Amended Complaint.

The Clerk is further directed to terminate Rodney Atherton as a Defendant in the instant action.

It is SO ORDERED.

Alexandria, Virginia
April 6, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge

---

RICO's civil damages statute.  Dkt. 1145.  Now that the Court has granted summary judgment on the RICO claim in favor of Defendants, this request for judgment on the pleadings is moot.