# EXHIBIT C

*AB Litigation Services*

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF VIRGINIA
                 ALEXANDRIA DIVISION



AMAZON.COM, INC, and AMAZON DATA
SERVICES, INC.,
     Plaintiffs,

v.                                        Case Number
                                          1:20-CV-484-RDA-TCB

WDC HOLDINGS, LLC dba NORTHSTAR
COMMERCIAL PARTNERS, et al.,
     Defendants.
```
_____

           **VIDEO DEPOSITION OF KYLE RAMSTETTER**
                      **April 8, 2023**
_____

Pursuant to Notice and the Federal Rules of Civil Procedure, the video deposition of KYLE RAMSTETTER, taken by Defendant Brian Watson, was held at 410 17th Street, Suite 2200, Denver, Colorado, 80202, on Saturday, April 8, 2023, at 7:38 a.m., before Jason T. Meadors, Registered Professional Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, in the State of Colorado.

Case 1:20-cv-00484-RDA-IDD   Document 1398-4   Filed 04/24/23   Page 3 of 10 PageID# 40397

*AB Litigation Services*

```
 1    little bit about generally how many such meetings
 2    you've had.  Do you know how many times you've met with
 3    her to prepare for the deposition today?
 4         A    I do not.
 5         Q    And do you know how many hours you've spent
 6    preparing for the deposition with her?
 7         A    I do not.
 8         Q    And during the process of preparing with
 9    Ms. Hubbard, did you review some documents?
10         A    Yes.
11         Q    Do you remember how many documents you
12    reviewed?
13         A    I -- I don't.
14         Q    Okay.  Now, do you know these folks over
15    here, Patrick Stokes and Lora MacDonald?
16         A    Yes.
17         Q    And have you met with them to prepare for the
18    deposition?
19         A    Yes.
20         Q    How many times have you met with them?
21         A    Once.
22         Q    And was that yesterday?
23         A    Correct.
24         Q    Okay.  How long a meeting was that?
25         A    I don't know exactly.  We -- I don't know.
```

1   10 -- like, five, six hours.
2       Q    Okay.  And was Ms. Hubbard present for that
3   meeting?
4       A    She was.
5       Q    Where did that meeting happen?  Was it in
6   Ms. Hubbard's office?
7       A    Correct.
8       Q    Okay.  And during that meeting, did
9   Mr. Stokes and Ms. MacDonald show you some documents?
10      A    We did review documents.
11      Q    Okay.  And did they talk to you about your
12  deposition today?
13      A    Yes.
14      Q    And did they give you suggestions or advice
15  about your deposition?
16           MR. STOKES:  I'm going to object to this
17  question and all questions that are -- going into
18  substance of our discussions based on attorney-client
19  product.
20           MR. GARNETT:  Understood.  Mr. Stokes, and I
21  think the record is clear in the previous deposition.
22  I want to make sure the record's clear.  I will be
23  asking a number of questions like that.  If you want to
24  make a standing objection, that's fine.
25           MR. STOKES:  Yeah, that's fine by me.

 1   Plea Agreement, you have an obligation to cooperate
 2   with the government, right?
 3        A    That's correct.
 4        Q    Okay.  And that the extent of your
 5   cooperation is going to go into the government's
 6   position at the time of -- that you're sentenced,
 7   right?
 8        A    Yes.
 9        Q    Did you also understand that pursuant to the
10   Plea Agreement, that it could help you if you helped --
11   if you cooperated with Amazon in this lawsuit?
12        A    Yes.
13        Q    Okay.  And is that part of the reason that
14   you agreed to this Settlement Agreement, was that
15   helping Amazon was going to help you in the criminal
16   case?
17        A    Yes.
18        Q    Okay.  All right.  Let's go back and do some
19   background work, and then we'll come -- probably take a
20   break here in a bit.
21             So I asked you before the other deposition,
22   but I can't remember.  How old are you?
23        A    39.
24        Q    And where did you go to high school?
25        A    Arvada West.

1    in regards to a, you know, essentially scratch my back,
2    I'll scratch yours.  We don't trust, you know, the
3    current employer to give us funds.  Just basically, be
4    our messenger.  Be -- help us facilitate and then Hey,
5    this is going to give a bonus for when we all leave,
6    et cetera, to go start something new.
7         Q    Okay.  And we'll go -- we will go through
8    some texts and things that have different words used
9    for this.  It appears that many times, they called you
10   the inside guy within Northstar.  Is that how you saw
11   yourself?
12        A    I guess I didn't see it that -- or inside
13   guy.  But, yeah, I was -- yes, the communicator of when
14   and how the timing of the payments that will be going
15   to, at the time, to Villanova.
16        Q    Well, did you understand that Casey Kirschner
17   and Carl Nelson saw you as the inside guy?
18        A    Perception, sure.  Yeah.
19        Q    And you certainly didn't tell Mr. Watson
20   about this $150,000 they were paying you, did you?
21        A    I don't recall.  I don't believe I did.
22        Q    Well, as a matter of fact, you went out of
23   your way to make sure he didn't know about it.  Is that
24   correct?
25        A    Yeah, yes.

```
 1      A    I did not, no.
 2      Q    Okay.  What was the compensation that you
 3  were to receive pursuant to this agreement?
 4      A    Pursuant to this specific agreement, I
 5  believe, the first initial one, and it was highlighted,
 6  was a hundred thousand dollars.
 7      Q    Okay.  And that's set out in Section 3.1 on
 8  the second page.  Does that sound right to you?
 9      A    Yes.
10      Q    Okay.  Had you already received this hundred
11  thousand dollars as of July of 2019?
12      A    Yes.  Yeah.
13      Q    Okay.  And my understanding, from our
14  discussion before the break, was the total amount that
15  you were paid to be the inside guy at Northstar was
16  150,000.  Is that right?
17           MR. STOKES:  Objection.  Form.
18      A    Ask again, sir?
19      Q    (By Mr. Garnett)  The -- sure.  I understood
20  before the break that the total amount you were paid to
21  be the mole at Northstar was 150,000.  Is that right?
22           MR. STOKES:  Objection.  Form.
23      A    When you classify as mole, I mean, yeah, I
24  received the total funds I received from AllCore, yes,
25  was 150,000.
```

1   wasn't anything disloyal?  Is that what you're saying?

2           MR. STOKES:  Objection.  Form.

3       A   I didn't say that, no.

4       Q   (By Mr. Garnett)  Okay.  Did you think it was
5   disloyal?

6       A   I didn't think he would be happy with it at
7   the time if I, you know, had his hand in it as well,
8   but yeah.

9       Q   In fact, you knew that if he found out about
10  this, he would be pretty upset, right?

11      A   Probably, yes.

12      Q   Okay.  When did you decide that the -- the
13  payments going to Carl and Casey were, in fact,
14  illegal?

15          MR. STOKES:  Objection.  Form.

16      A   I don't recall -- yeah, I don't recall, other
17  than probably the -- the phone call with Josh Huckel,
18  that it was truly, at this magnitude, that it was
19  illegal, to be honest.

20      Q   (By Mr. Garnett)  Okay.  What did Josh Huckel
21  say it was when you talked --

22      A   He didn't say anything other than -- he
23  didn't tell me there was a crime.  He didn't associate
24  it, other than to tell me, We're here to talk about
25  dealings with Northstar.  And I asked him, White Peaks?

```
 1        A    I don't recall personally.  I think White
 2   Peaks is named, if I remember correctly, but I believe
 3   so.
 4        Q    White Peaks was named, but you, Kyle
 5   Ramstetter, was not?
 6        A    If I remember correctly, yes, I believe so.
 7        Q    Okay.  And do you know whether or not White
 8   Peaks had a default judgment entered against it in
 9   connection with that case?
10        A    No, I don't recall.
11        Q    Do you see in this agreement that the
12   potential default judgment against your entity is
13   discussed?
14        A    Which page?  Sorry.
15        Q    Well, if you look on page 1, do you see that
16   paragraph, Company releases?
17        A    Yes.
18        Q    Okay.  And does that purport to release, sort
19   of, companies related to yourself?
20        A    My understanding, yes.
21        Q    In fact, up above it, it talks about you
22   being involved with two different entities, one called
23   NOVA WPC, LLC, and White Peaks Capital, LLC?
24        A    Correct.  Yeah.
25        Q    And those are both entities that you
```

```
 1   controlled or were involved with?
 2        A    Involved with, yeah.
 3        Q    Okay.  Who controlled those entities?
 4        A    That's what I say -- I would say I controlled
 5   them, yeah.
 6        Q    And did you create them as well through
 7   counsel?
 8        A    Correct.
 9        Q    Okay.  You have an obligation in this plea --
10   in this Settlement Agreement with Amazon to pay them a
11   sum of money, correct?
12        A    That's correct.
13        Q    Are you going to cut them a check to do that?
14        A    I have not heard or worked out details of how
15   to submit those funds.
16        Q    In fact, if you look at paragraph 2, you
17   understand, don't you, that if you're ordered to pay
18   restitution as part of your criminal plea of $450,000,
19   that you won't have to pay that amount of money to
20   Amazon directly, do you?
21        A    That would be correct.
22        Q    Okay.  So you also entered a criminal plea in
23   connection with the things we've been discussing today,
24   did you not?
25        A    I did.
```